# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

```
UNITED STATES OF AMERICA,    *        Docket No.
                                      1:23-cr-00037-JLS-MJR-1
                             *
                             *        Buffalo, New York
             v.              *        March 24, 2023
                             *        1:03 p.m.
                             *
PETER GERACE, JR.,           *        ARRAIGNMENT
                             *
          Defendant (1).     *
                             *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          TRINI E. ROSS,
                             UNITED STATES ATTORNEY,
                             By DAVID RUDROFF, ESQ.,
                                JOSEPH M. TRIPI, ESQ.,
                                NICHOLAS COOPER, ESQ.,
                             Assistant United States Attorneys,
                             Federal Centre,
                             138 Delaware Avenue,
                             Buffalo, New York  14202,
                             Appearing for the United States
                             And
                             JORDAN ALAN DICKSON, ESQ.,
                             U.S. Department of Justice,
                             Criminal Division,
                             Public Integrity Section,
                             1331 F Street NW,
                             Washington, DC  20004.


For the Defendant:          LIPPES MATHIAS WEXLER FRIEDMAN, LLP,
                             By ERIC M. SOEHNLEIN,  ESQ.,
                             50 Fountain Plaza,
                             Suite 1700,
                             Buffalo, New York  14202.

1    The Courtroom Deputy:        KIRSTIE L. HENRY

2

3    Court Reporter:              BONNIE S. WEBER,
                                  Notary Public,
4                                 Robert H. Jackson Courthouse,
                                  2 Niagara Square,
5                                 Buffalo, New York  14202,
                                  Bonnie_Weber@nywd.uscourts.gov.
6

7            Proceedings recorded by mechanical stenography,
                     transcript produced by computer.

8

9               (Proceedings commenced at 1:03 p.m.)

10

11           **THE CLERK:**  All rise.

12           The United States District Court for the Western

13   District of New York is now in session.  The Honorable John

14   Sinatra presiding.

15           **THE COURT:**  Please be seated.

16           **THE CLERK:**  United States versus Peter Gerace, Jr.,

17   case number 23-CR-37.  This is the date set for arraignment.

18           Counsel, please state your appearances for the record.

19           **MR. TRIPI:**  Good afternoon, Your Honor.  Joseph Tripi,

20   David Rudroff, Nicholas Cooper, and Jordan Dickson for the

21   United States.

22           **MR. SOEHNLEIN:**  Good afternoon, Your Honor.  Eric

23   Soehnlein with Mr. Gerace.

24           **THE COURT:**  Good afternoon, counsel.

25           Good afternoon, Mr. Gerace.

1          **THE DEFENDANT:**  Good afternoon.

2          **THE COURT:**  Mr. Tripi, are there any victim

3    notifications required at this time?

4          **MR. TRIPI:**  Yes, there are, Your Honor.  We're making

5    efforts to make notifications to the witnesses.

6          **THE COURT:**  And the indictment has been unsealed?

7          **MR. TRIPI:**  I'll make that application now and move to

8    unseal the indictments.

9          I have previously provided it to probation and defense

10   counsel this morning, but I have not asked you to unseal yet, so

11   I'm making that application now.

12          **THE COURT:**  Any objections, Mr. Soehnlein?

13          **MR. SOEHNLEIN:**  No objections, Your Honor.

14          **THE COURT:**  Okay.  That application is granted.

15          Anything else to do?

16          **MR. TRIPI:**  Yes, Your Honor.  There's a four-count

17   indictment charging the defendant with three counts of witness

18   tampering.

19          Each of those three counts each relate to allegations,

20   November 19, 2019.  Each of those three counts carry with it a

21   maximum penalty of 20 years and a $250,000 fine.

22          A fourth count is Count Four, distribution of cocaine,

23   dated November 19, 2019.  All of the alleged crimes are in this

24   district.  That also carries a maximum penalty of $20 million

25   and a $1 million fine.

```
 1            I assume that the defense will waive a reading of the

 2   indictment and enter a plea of not guilty, but --

 3            THE COURT:  Do you concur, Mr. Soehnlein, in that

 4   regard?

 5            Do you represent Mr. Gerace on this indictment?

 6            MR. SOEHNLEIN:  I do, Your Honor.  I'm retained.  We

 7   will waive any further reading.  We will enter a plea of not

 8   guilty.

 9            THE COURT:  Okay.  All right.  In order to take those

10   not guilty pleas, we're going to administer the oath to

11   Mr. Gerace.

12            So why don't you stand and take the oath, Mr. Gerace.

13            Ms. Henry --

14            MR. SOEHNLEIN:  Can I just have one minute with him,

15   Your Honor?

16            THE COURT:  Of course.

17            (Discussion off the record.)

18            MR. SOEHNLEIN:  Thank you, Judge.

19            THE COURT:  Okay, Ms. Henry.

20

21       PETER GERACE, having first been duly sworn, testified as

22                              follows:

23

24            THE DEFENDANT:  I do.

25            THE COURT:  Please be seated, Mr. Gerace.  What's your
```

1  full name?

2          THE DEFENDANT:  Peter Gerace.

3          THE COURT:  Okay.

4          THE DEFENDANT:  G is a middle initial.

5          THE COURT:  All right.  And how old are you?

6          THE DEFENDANT:  55.

7          THE COURT:  How far along in school did you go,

8  Mr. Gerace?

9          THE DEFENDANT:  First year of college.

10          THE COURT:  What's your most recent or current

11  employment?

12          THE DEFENDANT:  Pharaoh's.

13          THE COURT:  Are you currently or have you recently

14  been under the care of a physician or psychiatrist or been

15  hospitalized or treated for narcotics addiction?

16          THE DEFENDANT:  I go to a psychiatrist, but not for

17  that.

18          THE COURT:  Is there anything about that, what you go

19  to a psychiatrist for that affects your judgment?

20          THE DEFENDANT:  No.

21          THE COURT:  Does it affect your ability to understand

22  what you are doing here today?

23          THE DEFENDANT:  No.

24          THE COURT:  Have you taken any drugs, medication,

25  pills, or any alcohol in the last 24 hours?

 1              **THE DEFENDANT:**  No.

 2              **THE COURT:**  Is Mr. Soehnlein your lawyer?

 3              **THE DEFENDANT:**  Yes.

 4              **THE COURT:**  Okay.  Have you received a copy of the

 5      indictment that Mr. Tripi summarized?

 6              **THE DEFENDANT:**  Yes.  It's here.

 7              **THE COURT:**  Have you had a chance to discuss it with

 8      your lawyer?

 9              **THE DEFENDANT:**  Yes.

10              **THE COURT:**  And are you waiving reading of that

11      indictment?

12              **THE DEFENDANT:**  Yes, Your Honor.

13              **THE COURT:**  How do you plead to the four counts in

14      that indictment?

15              **THE DEFENDANT:**  Not guilty.

16              **THE COURT:**  And that's as to all four counts?

17              **THE DEFENDANT:**  Yes, sir.

18              **THE COURT:**  Okay.  As you know, Mr. Gerace, you have

19      the right to an attorney in this case, this new indictment.

20      We'll address the detention request, if any, and the pretrial

21      release issue, if any, next.

22              You have a right to consult your counsel.  You have a

23      right not to make any statement.  If you choose make a

24      statement, that statement may be used against you.

25              Are you aware of all that?

1          **THE DEFENDANT:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  I need to cover the Due Process

3     Protections Act.

4          That statute and Rule 5(f)(1) require me to direct the

5     prosecution to comply with its Brady obligation and that case's

6     progeny, to disclose to the defense all information, admissible

7     or not, that is favorable to the defendant, material either to

8     guilt or punishment and known to the prosecution.

9          Possible consequences for noncompliance may include

10    dismissal of individual charges or the entire case, exclusion of

11    evidence, and professional discipline or court sanctions on the

12    responsible attorneys.

13         I'm going to enter that order now and direct the

14    prosecution to review and comply with it.

15         **MR. TRIPI:**  Understood, Your Honor.

16         **THE COURT:**  Okay.  Here it is.

17         Okay.  As to the arraignment, Mr. Tripi, have I missed

18    anything?

19         **MR. TRIPI:**  No, Your Honor.

20         **THE COURT:**  Mr. Soehnlein --

21         **MR. SOEHNLEIN:**  No, Your Honor.

22         **THE COURT:**  Okay.  Before we get to any detention or

23    release issue, Mr. Tripi, is there anything I need to know about

24    the Government's plans for this indictment vis-a-vis the other

25    pending case that I've got with Mr. Gerace and Mr. Bongiovanni?

 1          **MR. TRIPI:**  Yes, Judge.  We do plan within relatively

 2   short order to file a motion to join this case with the pending

 3   indictment that's set for trial.

 4          **THE COURT:**  Okay.  I'm going to be, at some point

 5   today, sending you, both sides, to Magistrate Judge Roemer to

 6   work out a schedule -- a pretrial schedule.

 7          So there will be a referral and pretrial schedule in

 8   front of Judge Roemer.  You probably want to let him know your

 9   plans as well.

10          **MR. TRIPI:**  Yes, Your Honor.

11          **THE COURT:**  Next, is the Government moving for

12   detention?

13          **MR. TRIPI:**  Yes, Judge.  We are moving for detention.

14          **THE COURT:**  Okay.  And, Mr. Soehnlein, are you

15   prepared to proceed and have a detention hearing now?

16          **MR. SOEHNLEIN:**  Yes, Your Honor.

17          **THE COURT:**  Okay.

18          **MR. TRIPI:**  May I proceed, Your Honor?

19          **THE COURT:**  You may.

20          **MR. TRIPI:**  Your Honor, this four-count indictment, as

21   you know, charges three counts of witness tampering and one

22   count of distribution of cocaine, which occurred November 19,

23   2019.

24          At the outset, I will just note that Count Four of

25   this indictment does carry a presumption of detention pursuant

1    to Title 18, US Code Sections 3142(e)(3)(C) and (f)(1)(C), due

2    to the drug count that's included.  The presumption is that the

3    defendant is a flight risk and a danger to the community.

4          Additionally, Your Honor, we will be proceeding by

5    proffer, as is well-documented is permitted by the Second

6    Circuit in United States versus LaFontaine.  That's a Second

7    Circuit case in year 2000.

8          And interestingly, in that case, Your Honor, before I

9    get to the core of my proffer here, that case involved witness

10   tampering, and it didn't allege any allegation of violence or

11   threats, which is a little bit different here; this involves

12   intimidation and threats.

13         In LaFontaine, the Court said:  We have a record of

14   violence or dangerousness in the sense of threats or is not

15   necessary to support pretrial detention.  Citing to the

16   Ferranti case and the Rodriguez case.

17         Second, Second Circuit said:  Obstruction of justice

18   has been a traditional ground to grant detention by the courts

19   even prior to detention for dangerousness.

20         Which was instituted prior to the Bail Reform Act --

21   excuse me -- instituted by the Bail Reform Act.

22         The Court went on to talk about in the Gotti case,

23   that there was a single incident of witness tampering that

24   constituted a threat to the integrity of the trial process,

25   rather than more generally a danger to the community, so

1    LaFontaine cited to the Gotti case.

2         Further in the LaFontaine case, the Second Circuit

3    stated:  We have held, quote, the sort of electronic

4    surveillance suggested by the defendants can be circumvented.

5         Home detention and electronic monitoring, at best,

6    elaborately replicate a detention facility, without the

7    confidence of security such a facility instills.

8         Citing to Millan with citations and quotations

9    omitted.  That cite to LaFontaine is 210(f)(3)(E), 125, and cite

10   135 Second Circuit 2000.

11        As this Court is aware, the factors to consider are

12   the nature and circumstances of the offense charged when you are

13   weighing whether to detain the defendant; the weight of the

14   evidence against the person.

15        Significantly in the Government's view, the history

16   and characteristics of the person -- which I'll spend some time

17   on; and the nature and seriousness of the danger to any person

18   or the community that would be posed by the person's release.

19        Another case they talked about, the nature and the

20   circumstances of the witness tampering in a criminal proceeding

21   being serious, is relatively a recent case, United States versus

22   Murray.  It's an SDNY case from February of 2023; 2023 Westlaw

23   2055886.

24        And in the Murray case, they quote to the Supreme

25   Court, stating that the Government is not obligated to show that

1    the defendant had any particular law enforcement officer or

2    officers in mind when the defendant acted, observing that

3    witness tampering occurs frequently and most effectively before

4    the victim has engaged in any communication with officers.

5           Another case in this district, United States versus

6    Fernandez, 50 F Supp. 3(b)406409, Western District of New York,

7    December 8, 2014.  In that case the Court stated:  Superseding

8    indictment reflects a finding of probable cause by a Grand Jury,

9    that the defendant engaged in witness tampering, which only

10   further supports a finding that the defendant presents a danger

11   to others in the community.

12          So in this case, Your Honor, I'm going to start with

13   this defendant's conduct towards the witness, who is the victim

14   of the threatening communications that are alleged in the

15   indictment, so a little history is warranted here.

16          On or about April 9, 2019, that victim/witness was

17   arrested by the Amherst Police Department and charged by that

18   department with stealing Mr. Gerace's Rolex.

19          That day, after being arrested, Federal agents were

20   contacted by a supervisor at the Amherst Police Department, and

21   Federal agents responded there and spoke with this witness.

22          In that set of conversations, the witness made

23   statements about this defendant, about fairness, and generally

24   about some of the -- some of the information that culminated in

25   the charges in the indictment.  But to be clear, this was one of

1    many witnesses.  But, generally, it involved information about

2    drug trafficking.

3         Now, I'll note -- and I'll get to this later in my

4    presentation -- that this defendant has many contacts in law

5    enforcement, many friends in high places, to include State

6    judges, members of law enforcement, multiple prior police

7    commissioners of the Buffalo Police Department, police

8    commissioners, friends in police departments -- in local police

9    departments.

10        He has bragged to witnesses that he has contacts in

11   every local police department, political figures, and many

12   others.  And we get that through our investigation through

13   multiple sources of information.

14        But what's clear here, is that on this April 9, 2019,

15   arrest -- I won't name the detective who made the arrest -- but

16   the detective who made the arrest, based upon the defendant's

17   complaint, is the same detective who made multiple arrests of

18   Mr. Gerace's ex-wife, who you've heard.

19        The defense named in many, many court appearances, and

20   even most recently in a court filing before this court:  Well,

21   that detective was the same detective who arrested his ex-wife

22   on multiple occasions for various contempt charges, for conduct

23   that included things as innocuous as liking a Facebook post.

24        While that detective is the same detective that

25   arrested this witness, and subsequent to the arrests of Gerace's

 1   ex-wife, and prior to the arrest of the witness here, from text

 2   messages in Mr. Gerace's phone, which have been turned over to

 3   him -- this whole phone extraction has been turned over, I'll

 4   just give you one example.

 5        On December 20, 2018, at 19:06 p.m., Gerace texted:

 6   "Now I've had it.  Now keep in touch; we've got to get a drink."

 7   And there was some communications about needing the phone

 8   number.

 9        This detective texted back that same day within the

10   next -- 24 seconds later:  "Absolutely.  Let's get a drink

11   soon."  And then another 56 seconds later texted:  "What time

12   you hanging out up there tonight?"

13        So this defendant has had the ability to have friends

14   of his arrest witnesses in this case.

15        **THE COURT:**  Let me pause you there.  I just need to --

16   because otherwise, I'm going to forget to come back to it.

17        **MR. TRIPI:**  Yeah.

18        **THE COURT:**  Is this detective that you are talking

19   now, the same person who alerted Federal law enforcement?

20        **MR. TRIPI:**  To what?

21        **THE COURT:**  To come down and --

22        **MR. TRIPI:**  No.

23        **THE COURT:**  Okay.

24        **MR. TRIPI:**  So the detective arrests -- brings to the

25   station house, and then the supervisor gets involved.  The

1    supervisor contacts Federal law enforcement.

2             **THE COURT:**  Got it.  Okay.  Go ahead.

3             **MR. TRIPI:**  So this witness spoke with some Federal

4    authorities that day, was released, but Federal authorities have

5    no role in what happened regarding the allegation regarding the

6    Rolex watch.

7             In July of 2019, a long-time associate of Mr. Gerace

8    and employee at Pharaoh's attacked that witness and made

9    comments about speaking to the Feds.

10            Now, the Feds, quote, unquote, did not publicize this

11   witness's conversations with them.  Nevertheless, she was

12   assaulted.

13            In October of 2019, the witness testified to the Grand

14   Jury regarding this investigation.  On October 31, 2019, the

15   initial indictment in this case was filed under seal, charging

16   defendant Bongiovanni by name, but clearly referencing Peter

17   Gerace as co-conspirator one, and referencing a gentleman's

18   club.

19            Although at that time, the defendant was not named,

20   Mr. Gerace's actual cell phone number was referenced in one of

21   the overt acts charging Bongiovanni.  That indictment was

22   unsealed November 5, 2019, to a great deal of media attention.

23            It would have been absolutely and abundantly clear to

24   Mr. Gerace that he was a target of a Federal investigation no

25   later than November 5, 2019.

1          But based on these circumstances -- and I submit the

2     corroborating circumstances of a witness against him being

3     assaulted at a bar, it seems he knew well before then.

4          Additionally during that timeline in April, his phone

5     was seized at a border search, so he knew he was a target.

6          November 19, 2019, the defendant was with two female

7     associates of his, and as of that date, he'd had conversations

8     clearly describing this witness/victim in this indictment as a

9     snitch.  That is, a snitch that was resulting in the problems he

10    was looking at Federally, being a target.

11         After referring to that witness as a snitch on prior

12    occasions, that brought -- brings us to the night of

13    November 19, 2019, where Mr. Gerace was with two females in his

14    basement.

15         And after having drinks with them and providing each

16    of them cocaine, that all three of them used, Mr. Gerace making

17    comments and statements about the witness in this case being a

18    snitch and a snitch bitch.

19         His colleague -- his confidante, a proxy of his, you

20    might say, made some messages, borrowing the other female's

21    phone, because this witness had taken the steps to block certain

22    people from her Facebook account.

23         But the third person in the room was not blocked, so

24    that provided an avenue for communications.

25         So the one female associate of Mr. Gerace borrows the

1   other female associate of Mr. Gerace's phone, while all three of

2   them are using cocaine and makes statements that are stated out

3   loud as to what those threats are.

4         And it was after Mr. Gerace was making comments about

5   the witness.  I'll read them to you, leaving out names.  The

6   Facebook communication reads:  "Hey, you ray ass bitch" -- I

7   believe that to be a typo, potentially.  Y is next to T on a

8   keyboard.

9         "It" and then name, "I'm good to G" -- should be "good

10  to go."  "See you, and when I do, well, use your imagination,

11  bitch, you snitch junkie cunt.  You are a fucking funny cunt.

12        You do whatever for drugs.  In feeling" -- should be

13  "I'm feeling" -- insert name of second female Gerace associate,

14  "in on how much of a scum bag you are.  But if you want to claim

15  Peter's home like you deserve it, bitch.

16        You deserve nothing, you nasty cunt.  Learn how to be

17  a mother, because your husband was just at my place filling me

18  in on how my" -- it says, "H of a pull."  I believe it should

19  be, "pill head junkie you are.

20        Too bad you couldn't take" -- insert name of second

21  Gerace female associate -- "down.  Oops.  She is too smart

22  because you're the biggest piece of shit I've ever met.

23        That why" -- insert name another female -- "was

24  fucking your husband and being mother to your daughter, you

25  junkie ass pond scum.

1          Plan on nothing.  Peter knows better, you fucking nut.

2    Girl, H" -- should be U.  U and H are next to each other on a

3    keyboard -- "Girl, you don't want to fuck with me.  You know how

4    I get down.  I hope you fucking his, cunt."

5          And then there are some typos.  It talks about

6    shampoo, and then the last line is:  "Ha ha, you are a joke.  Go

7    kill yourself, you dirty cum guzzling whore."

8          When those messages were sent, while those three were

9    together, well after this woman had talked to Federal

10   authorities, testified in the Grand Jury, they are designed to

11   scare the witness.

12         They did scare the witness.  The witness was very

13   familiar with Pharaoh's; very familiar with Gerace; very

14   familiar with his associates; very familiar with the people that

15   run his club, and the biker gang that he employs at his club.

16   It had the designated effect.

17         Now, December 19, 2019, the defendant doesn't stop

18   there.  This witness is one of two females that the defendant

19   sues in State court in sum and substance for slander.

20         And in that civil law suit, which this court later

21   enjoined, he alleged that this witness provided false

22   information to the FBI, in connection with the date of her

23   arrest for the watch.

24         Notably, she didn't talk to the FBI on that day.  So

25   the information in the lawsuit was inaccurate from the

1    beginning.

2          But notably, that may support another charge for

3    witness intimidation under Title 18, United States Code, Section

4    1513(e), and there is support for this in the case law that

5    we're looking into.

6          That statute provides:  Whoever knowingly, with intent

7    to retaliate, takes any action harmful to any person, including

8    with the lawful employment or the livelihood of another -- any

9    person, for providing to the law enforcement officer any

10    truthful information, relating to the commission or possible

11    commission of any Federal offense, shall be guilty of a crime.

12          There is a 10th Circuit case where an individual sued

13    his ex-girlfriend, who became a witness.  The US Attorney

14    charged the case.  The 10th Circuit affirmed the conviction.

15          So although the injunction that you ordered was taken

16    up on appeal, there might be criminal liability with respect to

17    even the filing of that civil lawsuit.

18          Obviously, Gerace is named as a charged defendant in a

19    very serious second superseding indictment.  I'm not going to

20    spend a lot of time on that, because that's in front of Your

21    Honor and it's set for trial.

22          But I do think since it's never been proffered to this

23    Court, and you have to the consider its history and

24    characteristics, there are a couple of things I think the Court

25    should know.

1        And one of them relates to some of the relationships

2   with some of the people that go to Pharaoh's, to include a

3   former State Supreme Court judge.

4        The law provides that "Johns", that is men who receive

5   sex from prostitutes, are liable for Federal sex trafficking

6   crimes.

7        They can be what are referred to as unindicted

8   co-conspirators.  Now, this particular judge I'm talking about

9   is unfortunately deceased former Judge Michalski.

10        But it goes to show you that people in the position of

11   power this defendant has access to, absolutely ruin people's

12   lives.

13        One of the text messages in the defendant's phone,

14   that will be introduced at trial, further corroborating some of

15   the other witnesses that will testify, is that Supreme Court

16   judge texting the defendant:  "You're funny.  Let's get some

17   pussy there."

18        The defendant responding:  "Where and when?"  This is

19   back in 2015.  And the defendant is following up with:  "I want

20   drinks."

21        A former Pharaoh's dancer who will testify at trial

22   and who testified in the Grand Jury, will explain she began at

23   Pharaoh's as an 18-year-old and continued there for

24   approximately five years.

25        When she began working at Pharaoh's, she'd never used

1    drugs.  Within two months, she was addicted to cocaine and

2    heroin and began having sex in exchange for drugs and money,

3    with Gerace and his friends.

4           She explained that other dancers performed sexual

5    favors in exchange for drugs and money, and that managers at

6    Pharaoh's knew what was going on.

7           Gerace gave this young lady cocaine and money in

8    exchange for intercourse and oral sex.  And she did the same by

9    going to a private upstairs area controlled by Gerace -- and I'm

10   paraphrasing; these are not quotes -- with Gerace's friends, his

11   brother, the DJ at his club.

12          This corroborated other information provided by the

13   ex-wife, that they have repeatedly argued to you is so

14   perjurious.

15          This young lady testified in the Grand Jury, and I

16   anticipate will testify at trial in sum and substance, that she

17   felt Gerace and others used her addiction against her to engage

18   in prostitution.  And she had that opinion of other dancers as

19   well.

20          When asked how many times she overdosed at Pharaoh's,

21   this young lady said:  "One time that I can remember."  But

22   seemed to acknowledge there might have been other occasions.

23          Another young lady, who I anticipate will testify, was

24   employed there for about six years.  She made statements against

25   her own penal interest, described girls going upstairs and Peter

1    and his friends, that she knew something was going on.

2        Quote:  For as long as they were up there, girls would

3    come back down and say I need a shower or a baby wipe.

4    Consistent with having had sex -- that's me speaking now, Judge.

5        When asked how many dancers were using drugs inside of

6    Pharaoh's, this witness said:  Probably about 50.  He's the

7    owner.  He was in control.  He provided some of the drugs.

8        Another young lady who I anticipate will testify, she

9    acknowledged becoming involved in prostitution though men she

10   met at Pharaoh's, and knew other dancers were engaged in

11   prostitution there as well.

12       I anticipate evidence about high-end prostitution for

13   important people in this community, to include some potential

14   defense lawyers.

15       One defense lawyer who was mentioned by other

16   witnesses, testified in the Grand Jury and acknowledged that

17   Gerace provided him with cocaine on several occasions, to

18   include at Pharaoh's.

19       That defense lawyer testified in the Grand Jury, and

20   they will be getting his Jencks this week.

21       Regarding some of the high-end prostitution, there was

22   evidence that Judge Michalski was one of those high-end

23   customers, and that he liked the female name Shelby.

24       So when we looked at Mr. Gerace's text communications

25   with that judge, Mr. Gerace texted the judge on January 4th,

 1   2017:  "LOL.  I was with Shelby."

 2          And then he asked -- I don't know what he asked means

 3   -- and the judge responded:  "Ha ha ha ha ha."

 4          In 2015, the New York State Police received

 5   information that prostitution and narcotic activity was taking

 6   place at Pharaoh's, and they began undercover operations there,

 7   where they purchased cocaine inside of Pharaoh's in January of

 8   2015.

 9          The Erie County DA's office at the time, surely

10   unaware of the relationship between Judge Michalski and Peter

11   Gerace, actually went to Judge Michalski to get a protective

12   order to not disclose the names of identifying witnesses in the

13   case until trial of one of the dancers who sold drugs.

14          Michalski -- who I'll get into in a moment -- had, in

15   the defendant's prior criminal case, written a letter on his

16   behalf, acknowledging they were personal friends, didn't recuse,

17   signed the order.  And then ultimately, that case went nowhere.

18   I don't think that was a coincidence.

19          Additional text messages between Michalski and Gerace

20   include -- in the years that that local detective was arresting

21   Gerace's ex-wife, he was sending screenshots of her mug shots to

22   the judge, who mocked her.

23          Who said things like:  Wow.  Unbelievable.  Ha ha ha.

24   And, "She looks like crap.  Give her enough rope."  Those

25   messages were in 2019 -- excuse me -- those messages were in

1    2017.

2            Despite that and despite knowing full well the

3    relationship that he had with Gerace and the witness in this

4    case, when his ex-wife was arrested for driving drunk and

5    hurting someone, the judge heard the case, took the plea.

6            And then only when publicity in this case started, he

7    recused himself prior to sentencing.

8            And that's just one example that I'm willing to talk

9    about today, of people in high places, that we submit the

10   defendant has been able to groom over time.

11           Just like females that he groomed at his club,

12   leveraged relationships with, and ruined lives.

13           That's the type of danger that maybe this Court hasn't

14   seen yet, but that's the type of danger this defendant poses.

15           So despite those text messages in 2017, mocking his

16   ex-wife, the judge handled her case in 2019 in October.  Those

17   messages will be introduced before the Court, corroborating the

18   witnesses in this case.

19           But there is more to his history here.  In 2005, the

20   defendant was convicted of wire fraud for a telemarketing scam

21   where he bilked elderly people out of money with the promise of

22   lavish prizes.

23           It started as a Federal plea agreement.  The defendant

24   admitted he was on organizer.  The plea was to Title 18, US

25   Code, Section 371, conspiracy to commit wire fraud,

1    telemarketing fraud.

2           Among the letters on his behalf at sentencing, again,

3    was the deceased Judge Michalski's letter in support of

4    sentencing.

5           And then deputy police commissioner of the Buffalo

6    Police Department, who later was the Commissioner, including

7    part of the time period of this indictment, that same judge --

8    and I'll get to it -- also handled the defendant's custody and

9    name change of his son.

10          He had a son with a young lady, and I'll get to how he

11   assaulted her in a moment, but while she was afraid of him and

12   on the run in fear for her life, hiding out, the judge -- excuse

13   me -- this defendant did a pro se motion for a name change to

14   have his son's name changed to this name.

15          And that judge granted it the same day.  The mother

16   was nowhere to be found, but, of course, it was applied for and

17   granted the same day.

18          In 2010, there was information that the defendant was

19   traveling with a young lady from New York City.  There was a tip

20   that she had drugs in a false compartment, coming through the

21   airport.

22          At that time, law enforcement had a canine do a sniff.

23   The dog didn't alert, and they decided not to step and question.

24          But the information about the defendant having a

25   supplier throughout that timeframe, there was other information

1   to suggest that, that I've reviewed in this investigation.

2        So looking back at that tip that didn't turn out to be

3   anything, I will consider asking you to consider that part of

4   his history.

5        Then while on supervised release in front of Judge

6   Skretny, he would have received six months in prison, five years

7   on supervised release, for his wire fraud conviction.

8        He told probation he wasn't working at Pharaoh's.  He

9   said he was working at Pietro's.  FBI had to provide probation

10  with information about criminality that the defendant was

11  involved in.  That led to a probation search.

12       See, no offense to probation, they are spread thin,

13  they don't find out about crimes.

14       It takes more law enforcement resources and

15  investigation to find out, except when they get lucky and they

16  do a walkthrough in plain view and someone leaves a gun out.

17  Probation doesn't investigate crimes, Judge.

18       But a canine was walked through Pharaoh's, and a

19  canine hit several locations -- in several locations in the club

20  where marijuana, Lortabs were found.

21       The canine also alerted to two safes that were in the

22  club.  One empty safe, and one safe that had money.

23       But that day, October 31st, 2009, formed part of the

24  violations that occurred in front of Judge Skretny.

25       In 2012, the defendant had a domestic incident with a

1  an ex-girlfriend of his.  He choked her.  She stated that she

2  saw stars, but did not lose consciousness.

3         He punched her in the side of the face, and she

4  stabbed him.  She described a violent interaction between the

5  two that happened in this involvement.

6         A year later -- approximately a year later in 2013 --

7  the defendant was arrested May 2nd, 2013.  He was later

8  convicted of assault in the 3rd degree, an A misdemeanor.

9         It's odd, because the arrest occurs in 2013, but --

10  and he pleads guilty in 2013, but he wasn't sentenced, according

11  to his rap sheet, until October of 2016, to three years of

12  probation.

13         I've not yet looked to see what judge that case was in

14  front of.  I don't have that information.

15         But regarding some of the facts of the underlying

16  strangulation and assault, Buffalo 911 received a call from the

17  woman who then said:  "Never mind.  Never mind."  The caller

18  hung up, but not before dispatcher heard:  "Look what you did to

19  my face."

20         The call was traced to 95 Joseph Drive.  Town of

21  Tonawanda police officers responded and arrived at the scene,

22  spoke to Peter Gerace.  Who stated there weren't any problems.

23         They then spoke to the victim, who had a black eye and

24  a scratch on her neck.  But the victim was denying that anything

25  occurred and said her injuries were the result of playing catch

1   with her son.

2          The police officers on the scene assessed that this

3   defendant and the female were not forthcoming with information.

4   Both insisted the injuries were sustained while playing catch.

5          Ultimately, the young lady was interviewed at the

6   police station, because the police noted in the reports that

7   obviously she was afraid to speak freely in front of Peter

8   Gerace and his extended family.

9          Reading from the excerpt from the police report:

10  "While at our station, she spoke at length in private with a

11  crisis service counselor in our family room with the door

12  closed.

13         I could hear a lot of crying and distraught discussion

14  coming from that room."

15         A little bit further:  "A witness told the police that

16  this victim had been repeatedly a victim of ongoing domestic

17  abuse at the hands of Mr. Gerace for many years, and that the

18  daughter was very afraid of him and his family."

19         Witnesses further -- a witness further reported that

20  the defendant's seven-year-old child at the time, sometimes gets

21  so nervous about his home life that he vomits when he has to

22  return home.

23         A witness reported that this female had been to the

24  hospital on prior occasions for unexplained injuries.

25         They explained that one time this female victim took

1    off to Florida out of fear of being killed by the defendant.

2    And during that time, Gerace went to court and obtained sole

3    custody of the child.

4         I've previously indicated about the name change order

5    that we found during a search warrant of Mr. Gerace's house,

6    signed the same day by Judge Michalski.

7         The family thought she was dead, because she was in

8    such deep hiding.  So much so, that they recorded a Niagara

9    County cadaver dog search various locations for this young lady.

10   They were convinced that she was dead.

11        Yet she was still refusing to sign a police report out

12   of fear.  Ultimately, that case did go forward, and there was a

13   conviction for assault in the 3rd degree.

14        But there is more.  And this is sort of hot off the

15   press, Judge.  Just today our office received a subpoena

16   response from the Small Business Administration regarding the

17   defendant's EIDL loan application during COVID.

18        It's clear from that application that the defendant

19   made several material false statements that resulted ultimately

20   in him acquiring $2 million from the Small Business

21   Administration, based upon material misrepresentations that are

22   in this application.

23        For example, he said he did not provide sexual

24   services at his business.  Had he checked the box yes, it would

25   have been over with.

1          The actual question is:  Applicant does not present

2     live performances of a prurient sexual nature, or derived

3     directly or indirectly, more than through the disclosed revenue,

4     through the sale of products or services or presentation of any

5     depictions or displays of a prurient sexual nature.

6          So he said no, on April 5th of 2020.  The loan was

7     funded to the tune of $150,000 in June of 2020.

8          Around that same time, he had applied for a separate

9     PPP loan and was told and acknowledged in an affidavit filed in

10    Federal Court, that he knew that he was advised that his

11    business was of a prurient sex nature.

12          That litigation was conducted by AUSA Michael Cerroni

13    before District Court Judge Lawrence Vilardo.

14          So as he's fighting that with the PPP people, he then

15    applied for a loan modification in July of 2021, asking for an

16    increase in his EIDL loan, E-I-D-L.  And around July of 2021,

17    it's increased to $500,000.

18          Now, this is after he's told that his business is of a

19    sexual and prurient nature; after he acknowledged that in a

20    sworn affidavit in Federal Court.

21          And as part of the EIDL loan questionnaire that asked

22    of him, one of the questions asks, also, Your Honor:  For any

23    criminal offense, other than a minor vehicle violation, have you

24    ever been convicted, pled guilty, plead nolo contendere or

25    placed on pretrial diversion or been placed on any form of

1   parole or probation, including probation before judgment?  He

2   checked no.

3         He was clearly a Federal felon before Judge Skretny.

4   He had also had a conviction for assault, which he got sentenced

5   to probation on.  So there is another lie.  And he ultimately

6   gets the loan funded to the tune of $2 million.

7         And as of July 2021, he was under Federal indictment.

8   So there is another question that reads:  Are you presently

9   subject to an indictment?  And he says:  No.

10        And when he went to extend the loan, there is

11   questions:  Has anything changed since the last time?  So he

12   should have said yes.  I am now under Federal indictment.

13        He indicates:  No.  And he gets the loan funded to the

14   tune of $2 million.

15        Now, a USA Rudroff is our office's coordinator for

16   COVID prosecutions.  And he estimates that this is the third or

17   fourth largest fraud of COVID since it happened in this

18   district.

19        $2 million, that's the maximum you can get.  I would

20   anticipate charges forthcoming in short order.  We just got this

21   information today.

22        So connections with powerful people; lying; fraud;

23   prior fraud; prior felony convictions; endangering people;

24   scaring them through proxies, because he's not dumb enough to do

25   it directly.  Presumption in the Government's favor.

1          Now, the defense is going to argue:  They knew about

2     this for three years.

3          What I say to that, Judge, truth does not equal proof.

4     It was true three years ago that through proxies, he intimidated

5     and tampered with this young lady.

6          There is a reason there is a five-year statute of

7     limitations; we are well within that.  We now have the proof

8     from everyone else who was involved and the victim of the crime.

9          I ask that you detain him on this indictment for all

10    the reasons stated.  Thank you, Judge.

11         **THE COURT:**  While you're still there, Mr. Tripi, let

12    me ask you -- just about that last point about "truth does not

13    equal proof."

14         Some of the proffers about the first three counts in

15    the indictment are facts that I would have heard in the other

16    case and would have accounted for.

17         **MR. TRIPI:**  I don't think I went into that depth and

18    detail at all.  Because we're a lot closer to trial, they have

19    stuff now.  So there's a balance, Judge.

20         And at that point, we only had it from the one source

21    -- I think -- maybe two.  Certainly not all three.

22         We had recent testimony.  And I'm not going to go much

23    further than that, but there's a difference.

24         What's the old adage?  Trust, but verify.  It was true

25    then; it's verified now.  Now, there's an indictment.  Now, the

1    presumption is triggered.

2            And I didn't go into that level of detail.  I know

3    95 percent of what I told you today, you've not heard before.

4    And there is always a balance with protecting witnesses.  Now,

5    they know this stuff, I'm free to tell you more.

6            **THE COURT:**  Mr. Soehnlein --

7            **MR. SOEHNLEIN:**  Your Honor, it's an interesting and

8    salacious story, and it's the reason that we have trials.

9            I can't possibly respond to all that stuff, and I

10   don't have to respond to a lot of it, because most of it doesn't

11   go to detention.  That's what we're here to talk about.  We're

12   here to talk about detention.

13           The last date I heard the Government reference was

14   2019.  And I might have missed it, but I think it was 2019; is

15   that right?

16           **MR. TRIPI:**  For the stuff in the indictment, 2019 --

17           **MR. SOEHNLEIN:**  '19.

18           **MR. TRIPI:**  The loan stuff was 2021.

19           **MR. SOEHNLEIN:**  All right.  So the stuff that they're

20   seeking detention on is 2019.  Mr. Gerace was charged -- he was

21   indicted in 2021.

22           Mr. Macaluso, he hasn't violated in any way, has he?

23           **PROBATION OFFICER:**  To date -- today, no.

24           **MR. SOEHNLEIN:**  You are still recommending release; is

25   that correct?

1          **PROBATION OFFICER:**  Because the violation -- the new

2   conduct was prior to his supervision, we cannot violate him on

3   anything, no.

4          **MR. SOEHNLEIN:**  So, Your Honor, I think that's the

5   important place to start.

6          Now, to the extent that there is a presumption, okay?

7   The presumption is on that last count.

8          That last count, if you take Mr. Tripi's word for it,

9   is what I would consider to be a recreational use of cocaine.

10  Even on its best day, it is three people together in a basement

11  using cocaine together.

12         We're not talking about bricks of cocaine; we're not

13  talking about firearms; we're not talking about helicopters

14  coming from Miami.  We're talking about three people in a

15  basement, okay.

16         That's the count that triggers the presumption.  And

17  the presumption is rebuttable.  And it's rebutted by the last

18  two and however many months that Mr. Gerace has been on

19  supervised release without re-offense, Your Honor.

20         The proof's in the pudding.  There are terms and

21  conditions that guarantee his return to court, the safety of the

22  community, and he hasn't shown that he won't abide by any of the

23  numerous protective orders.

24         Now, the Government wants timelines.  I like timelines

25  too, Judge.  I like timelines a lot.  This conduct's allegedly

 1    in November of '19, December of '19.

 2           Mr. Gerace gets charged in 2021.  The Government

 3    references it in proffers for a while -- and I wasn't part of

 4    the case then, but I've read them.

 5           And what happened in this case three days ago, we made

 6    a motion to allow Mr. Gerace an opportunity to see some of the

 7    3500 material to assist in defense at trial.

 8           Those motions are under seal -- I'm not going to go

 9    into them.  I'm certainly not going to name names, certainly not

10    people who aren't here, people who may be deceased.

11           But, Your Honor, it's a little suspicious that having

12    that information for that long, this indictment comes three days

13    after we try to give Gerace a fair opportunity to prepare his

14    defense for the trial that's imminent and serious.  It's going

15    to be a fight for his life, Your Honor.

16           So, Your Honor, there are terms and conditions that

17    exist.  There is a presumption that has been rebutted;

18    probation's consenting or recommending his release.

19           And I think those terms and conditions should be

20    continued, Your Honor.

21           **MR. TRIPI:**  Can I have a moment, Judge?

22           **MR. SOEHNLEIN:**  That's all I have.  I can't go on as

23    long as he has.

24           **THE COURT:**  Thank you, Mr. Soehnlein.

25           **MR. SOEHNLEIN:**  Thank you, Judge.

1          **THE COURT:**  Give me one second, Mr. Tripi.

2          All right, Mr. Tripi.

3          And then I'll give you the last word, Mr. Soehnlein.

4          **MR. SOEHNLEIN:**  Thank you, Judge.

5          **MR. TRIPI:**  I'll be very brief, Judge.

6          As to the last point, and I made reference to it, but

7     I just want to put a fine point on it.

8          Probation only knows if the defendant tested positive

9     for cocaine, and he hasn't.

10          And they only know if he's where he's supposed to go

11    to include on this earned leave, that nobody in my office knew

12    existed for 20 years and apparently is a thing.

13          He can go to the casino, and he has.  He can go to

14    Sabres games, and he has.  He can go to dinner, and he does.

15          And as long as he's got access to his cell phone; as

16    long as he can see people in public places; as long as he can

17    speak to people; as long as he can use a computer, he's a danger

18    through proxies.

19          And that's what some of the case law I talked about,

20    we talked about -- that's why witness tampering is so important.

21    It goes to the integrity of the proceedings that we do here.

22          There are other acts of witness tampering that are

23    under active investigation.

24          As to timelines, well, the last witness testified in

25    the Grand Jury on March 16th, before that motion was granted.

1            After that, there is an internal approval process to

2     get an indictment approved.  And the last day of the Grand Jury

3     was yesterday.  So we didn't know that motion was coming.

4            So that's a coincidence -- an interesting coincidence,

5     but that's all it was.

6            One other thing:  You know, there is one young lady

7     who is a witness in the case, who was charged, and all of a

8     sudden had people who never represented her as a lawyer -- and

9     she's represented by a lawyer, texting her about if she needs

10    legal counsel because a member of the defense team is concerned

11    about the Government threatening and intimidating her.

12            I can assure you the Government doesn't threaten and

13    intimidate witnesses.  We investigate that conduct.

14            And unsolicited texts from attorneys to people who are

15    already represented, raises issues ethically, maybe even

16    obstruction.

17            And I'm certainly not saying that Mr. Soehnlein was

18    involved in any of that --

19            **THE COURT:**  Tell me more about that vignette.  When

20    did that happen, Mr. Tripi?

21            **MR. TRIPI:**  That happened after the young lady who

22    sent these messages was charged in a public complaint and before

23    she came in for her first proffer with the Government.

24            And her attorney has represented to us -- I believe

25    this is accurate -- someone interrupt me if I'm wrong -- that he

1    has represented her on every case.

2             So this attorney reaching out, claiming he represented

3    her before, seeing if she is okay -- he mentioned he talked to a

4    specific member of Gerace's defense team who said to check in on

5    her -- and I'm paraphrasing -- because they were concerned about

6    the Government intimidating her.

7             Now, there is a member of the Gerace defense team,

8    that there is other interviews happening of witnesses, of people

9    who are employed by Gerace.

10            Those interviews are happening at Pharaoh's.  Think

11   about that coercive nature.  "Come talk to my attorney at

12   Pharaoh's", the site of the crime, which I'm now allowed to go

13   to, "and fill out a questionnaire."

14            Do you think we're getting accurate information from

15   people in that setting?  I don't.

16            Those are the types of things that are being reported

17   to us, Your Honor.

18            Those are the types of things that should be happening

19   in law offices, not at Pharaoh's.

20            **THE COURT:**  Is it your position, Mr. Tripi, that the

21   factual recitation that I heard from you here today, is much

22   more fulsome than the factual recitation that I heard from you

23   in 19-CR-227?

24            And I guess I'm getting back to your earlier comment,

25   before you sat down before, which is that -- is it the

1    Government's position that the timeline of the other case, being

2    where we were back then --

3            **MR. TRIPI:**  Yes.

4            **THE COURT:**  -- that it was the Government's election

5    not to disclose those details to the defendant at that time, and

6    potentially weigh that against detention versus a release?

7            **MR. TRIPI:**  Yes.  Well, first, I didn't have all the

8    details.

9            **THE COURT:**  Right.  Some of them you certainly did.

10            **MR. TRIPI:**  Some of them I did.  I don't have the

11    transcript in front of me, Your Honor, but I can tell you that

12    initial information was similar in nature.

13            About a year and a half to two years later in 2021, we

14    get a second witness, and this month or early last month, we got

15    a third witness.  So along that timeline, the Government learned

16    additional information.

17            And so I don't know exactly which transcript you're

18    looking at, so I don't want to misstate it.

19            **THE COURT:**  Yep.

20            **MR. TRIPI:**  But certainly, as I sit here today, there

21    is more information the Government knows, and believe it has

22    proffered more information.

23            For example, we didn't have information about him

24    repeatedly talking to this woman about her being a snitch.  We

25    had the message.

1              I probably told you the substance of the message, but

2      all this other stuff about him blaming this young lady, as well

3      as another young lady.

4              And at one point, he blamed his now co-defendant

5      Bongiovanni.  He blamed those three people for being snitches,

6      for him being a target.

7              THE COURT:  And who is he telling that?

8              MR. TRIPI:  To one of the witnesses in this case.

9              THE COURT:  Okay.

10             MR. TRIPI:  And so that's certainly all new

11     information that we acquired in the last month or so.

12             THE COURT:  That loan application is brand new?

13             MR. TRIPI:  We got that today.

14             THE COURT:  And what about Michalski thing yet, if you

15     will.  Is that material that was at the time --

16             MR. TRIPI:  That, I don't know.  I don't know what

17     date of the transcript you're looking at, Judge, but certainly

18     it took a while to locate those text messages.

19             I didn't have that at the time.  And the Michalski

20     search warrant, I believe, was earlier.  I don't remember the

21     date of the Michalski search warrant, although it was one of the

22     last ones we did.

23             So a lot of this -- there is a lot of information

24     we've been grinding through.  We've been grinding through it.

25     That was an active investigation too.

1          I would have been constrained to be able to say a lot

2     of that, because we were under an active investigation of a

3     judge -- a sitting judge.

4          But certainly, more has been learned since any last

5     proffer.

6          I know for a fact that I didn't have all of this

7     information on the one hand.

8          And on the other hand, to the stuff that I did have, I

9     would have been concerned about witness safety and identifying

10    people through my proffers.

11         **THE COURT:**  So a little bit of both.

12         **MR. TRIPI:**  A little bit of both.  I got the dates

13    here.  The Michalski search warrant, that we obtained in Federal

14    Court, was signed on March 23, 2022.

15         So I don't know how that compares to whatever

16    transcript you're looking at, Judge, but --

17         **THE COURT:**  Mr. Soehnlein, last word on the proffers,

18    if you will.

19         And in that process, tell me why -- I'm just calling

20    it a vignette for lack of a better term -- but the Michalski

21    details or vignette, and the loan application vignette, why

22    don't those issues matter to me?

23         **MR. SOEHNLEIN:**  They don't go to detention, Your

24    Honor.

25         **THE COURT:**  Why not?

1          **MR. SOEHNLEIN:**   Because detention is about return to

2    court and safety of the community, Your Honor.

3          To the extent we're talking about safety of the

4    community, the Government has almost made your point for you.

5          They talked about him going to a Sabres game; they

6    talk about him going to the casino.  They're watching him here.

7    It's not just probation that's watching him.

8          If he would have violated, don't you think they would

9    have charged him additionally in something less after 2019?

10         Where is that proof?  They are watching him all the

11   time, Your Honor.  Why aren't you hearing about that?

12         Why aren't you hearing about him improperly, you know

13   -- in terms of the content of the messages in the indictment,

14   Your Honor -- now, I don't have a copy of the messages, but I

15   heard them just like you did.

16         I heard the person sending the message making a

17   threat.  I heard that.  But I didn't hear anything that tied it

18   back to Gerace.

19         I heard references to Gerace.  But the threat, as I

20   understood it, came from the person sending the message.

21         Nowhere did I hear:  "Oh, you know, Peter is going to

22   take you out."  "Peter is going to do physical harm to you."

23   That's not in the message, Your Honor.  It's not there.  They

24   don't have that.

25         And the law, Your Honor, should favor release in these

1    situations.  He's been out since 2021.

2          Terms and conditions exist that allow him to prepare

3    for his case, which is imminent, that safeguard the community

4    and ensure his return to court, which is exactly where we are,

5    Your Honor.

6          What we're talking about are not things that are

7    recent, not things that occurred when he was under supervised

8    release.

9          And, Your Honor, the fact that the Grand Jury

10   concluded yesterday, our motion to get -- to obtain access to

11   discovery in his prior case was earlier this week, I think is

12   more than just a coincidence, Your Honor.

13         I -- look, I take issue; the Government is going to

14   take issue with me making issue with this.  I take issue with

15   them having an issue with defense attorney interviewing

16   witnesses.

17         That's a critical part of a defense attorney's job.  I

18   don't think there is anything coercive of that.

19         I haven't been involved in any of that, but I don't

20   know there is anything wrong about it, and I will never

21   acknowledge that -- that there is, Your Honor.  I take issue

22   with them even bringing that up as part of a proffer.

23         A lot of the other proof, Your Honor, is proof that we

24   are going to vet in this incredibly lengthy trial that we are

25   going to have, okay?

1          Where there's explanations, and where Mr. Gerace will

2    have an opportunity to fully and fairly defend himself.

3          The Government's proffer, Your Honor, is new to you.

4    It's just as new to me.  It's just as new to him, their spin on

5    these facts.

6          Because this material that we're talking about, we

7    don't have all of it.  We don't have the most important stuff

8    yet.  The Government is not rushing to turn it over.

9          And to the extent that we are getting important things

10   and we want to try to share them with our client, now we have

11   this indictment in an attempt to detain Mr. Gerace, presumably

12   through that June trial.

13         So, Your Honor, the proof is in the pudding here.

14   There is no allegation, as near as I can tell, that he -- that

15   Peter Gerace has done anything wrong while he's been on release

16   for the other Federal case since 2021.

17         And so I'm asking you to continue those terms and

18   conditions, Your Honor.  He knows he's being watched.  He triple

19   knows that he's being watched now.

20         **THE COURT:**  Right.  And so it's safety to the

21   community, if you will.

22         And I'm going to dovetail with that is whether I've

23   got the confidence level that he can abide by the conditions

24   that go to that.

25         And so on the one hand, really, what we have is a

1    record of compliance.

2        **MR. SOEHNLEIN:**  Yes, Your Honor.

3        **THE COURT:**  And on the other hand, what we also have

4    is an easy detention argument in almost every other case.  So

5    that's where I am right now.

6        **MR. SOEHNLEIN:**  But, Your Honor, the detention

7    argument -- I don't think it's that easy.

8          Because the facts that would normally support

9    detention, the case law says that you detain a person in this

10   situation:  One, either because it's a large scale narcotics

11   trafficking crime.

12         That's not what he's charged with in the new

13   indictment, okay?  So let's put that one aside.  Recreational

14   use is what we're talking about.

15         The second thing is:  Threat to the trial process.

16   Threat to the trial process.  That's the LaFontaine.  Threat to

17   the trial process.

18         He's been released for two and a half years awaiting

19   trial.  There has been no threat.  The alleged threat came

20   before the indictment, came a year before the indictment, Your

21   Honor.  That's what we're talking about.  Threat to the trial

22   process.  There is none.

23         And so that's why I'm asking you to continue the terms

24   and conditions, Your Honor.

25       **MR. TRIPI:**  I would just take issue with the record of

1    compliance.

2          As I stated, probation would have no way of knowing

3    that he appears to have committed fraud to the tune of $2

4    million to the Small Business Administration while under this

5    Federal indictment.

6          That crime alone would have at least a 46 to 57 month

7    guideline range, if he's a criminal history category one.  He

8    might be a two.  That's irrespective of the life he's facing on

9    the indictment 227 and the indictment here.

10         **MR. SOEHNLEIN:**  May I be heard on that, Your Honor?

11   This is the first that we're hearing of this.

12         I spoke with Mr. Gerace on a sidebar, okay?  We

13   believe that there is a lot more to that story, that there is a

14   lot more nuance around the loan application.

15         We believe there is a lot more communication with the

16   Federal authorities around the loan.  He's not charged with it.

17         I don't have the loan application in front of me here.

18   I'm learning this as I go, Your Honor.

19         But to the extent you are going to rely on that, I

20   would ask to have the loan application, and I want to have a

21   hearing on it, Judge.

22         **MR. TRIPI:**  Second Circuit allows Government proffer,

23   and that's what we're doing.

24         **THE COURT:**  And so what I'm looking at here and what

25   is new, Mr. Soehnlein, I have facts going to the nature and --

1    and, kind of, the history and characteristics of the defendant.

2          So that's what I'm weighing on the one hand versus

3    compliance on the other.

4          Do you want to speak to that?

5          **MR. SOEHNLEIN:**  I do, Your Honor.  Because this is not

6    something that's new today.

7          Your Honor, the Government has referenced these text

8    messages in the past, is my understanding.  I was not involved

9    in the case at the time, but I have read the transcripts, and I

10   certainly have read the local media, that have made reference to

11   what I assume to be these text messages.

12         These are 2019.  The Government's had them for at

13   least three years.  The indictment is new.  The text messages

14   are not new.

15         The content of the text messages are not new.  What's

16   new is what Mr. Gerace has done while he's been released.

17         Mr. Macaluso, do you feel that you do a good job

18   supervising Mr. Gerace?

19         **PROBATION OFFICER:**  Your Honor, just to speak in terms

20   of probation --

21         **THE COURT:**  Yep, yep.  I'm going to give you a chance

22   now.  So why don't you go ahead, Mr. Macaluso, and tell me what

23   your position is generally.

24         **PROBATION OFFICER:**  Yeah.  Mr. Gerace has had a very

25   high level of supervision.  He is on GPS.  He is monitored 24/7.

 1          We've done unannounced home contacts; unannounced work

 2   contacts; unannounced drug and alcohol tests.  All have been

 3   negative.  We view his maps daily, weekly, monthly, in terms of

 4   his GPS mapping.

 5          He was on home detention, and then he was switched

 6   over to curfew.  Since he's been on curfew and even home

 7   detention, there's been no occasion of violations, where he's

 8   stepped out of the house or had any curfew violations.

 9          All tests have been negative, and he's followed all

10   release conditions in terms -- as they've been set forth by this

11   Court.

12          So there has been no non-compliance on our end in

13   terms of his supervision and following the rules set forth by

14   Your Honor.

15          **MR. TRIPI:**  Judge, stated another way, they know he

16   hasn't tested positive for drugs, and he goes to dinner where he

17   says he's going.  And he's got this earned leave that allows him

18   to do that.

19          **PROBATION OFFICER:**  Well, he's on curfew now, Your

20   Honor, so he can come and go as he pleases.

21          **MR. TRIPI:**  Oh, he's even less.  Earned leave was when

22   it was supposed to be detention.  Now, it's just come and go

23   whenever you want.

24          **PROBATION OFFICER:**  He's on a 6 a.m. to 8 p.m. curfew

25   as you set, Your Honor.

1        **THE COURT:**  So the last thing you said, Mr. Soehnlein,

2   was about not having seen the loan application related

3   documents.

4        And I want to be sure:  Are you asking to continue

5   this detention hearing or not?

6        **MR. SOEHNLEIN:**  In the event that Your Honor is going

7   to rely on the loan applications and the allegations around the

8   loan --

9        **THE COURT:**  I'm going to rely on everything that I've

10  heard here.

11       **MR. SOEHNLEIN:**  You are going to rely on everything

12  you've heard?  Then, Your Honor --

13       **THE COURT:**  So you have think about that,

14  Mr. Soehnlein, as well.  So talk to your client, if you like.

15       **MR. SOEHNLEIN:**  Thank you, Judge.

16       (Discussion off the record.)

17       **MR. SOEHNLEIN:**  Thank you, Your Honor.  I've spoken

18  with Mr. Gerace, and we would like to continue the hearing.

19       I'd like an opportunity to see the loan and further

20  opportunity to review the Government's lengthy proffer in

21  support of detention.

22       **THE COURT:**  Okay.  So the loan application you will

23  get from your own client, I assume.  And then you will ask the

24  court reporter for the transcript?  Is that what you are telling

25  me?

1          **MR. SOEHNLEIN:**  I'm going to ask the Court for a

2    transcript, yeah.

3          **THE COURT:**  Okay.  All right.

4          So do you have anything to say on that application for

5    a continuance, Mr. Tripi?

6          **MR. TRIPI:**  No, Your Honor.  I have no objection to

7    the defense request, and we'll have no problem giving them the

8    loan application, if that's easier.

9          **THE COURT:**  Okay.  During the continuance, the

10   defendant shall be detained under the statute.

11         You are aware of that, Mr. Soehnlein?

12         **MR. SOEHNLEIN:**  I spoke with Mr. Gerace, and we

13   understand that.

14         I also spoke with Mr. Macaluso from probation.  And

15   probation indicated that in the event that Your Honor were

16   willing to do so, they would be able to coordinate home

17   confinement for Mr. Gerace during the period of time, until you

18   could get him back.

19         I don't have my Federal statute book immediately in

20   front of me to know whether or not there is an exception or not,

21   Your Honor.

22         And I would love an opportunity to research and be

23   heard on that, but I can only report to you basically the facts

24   as I know them.

25         **THE COURT:**  Right.  And the way I read subsection (f)

 1   of 3142, you don't have a lot of wiggle room there in this

 2   posture.

 3          Mr. Tripi, do you see it the same way?

 4          **MR. TRIPI:**  Yes, Judge.  I think he shall be detained

 5   pending the determination of the Government's motion for

 6   detention.

 7          **THE COURT:**  Well, where I'm at is the flush language

 8   after (2)(b):  During a continuance, such person shall be

 9   detained.

10          **MR. TRIPI:**  Yes.  Up to three days, if there is a

11   Government request for adjournment, and five days if the defense

12   requests it.

13          **THE COURT:**  Right.  So we can come back here pretty

14   early next week, if you like.

15          **MR. SOEHNLEIN:**  I would like, Your Honor.

16          **THE COURT:**  All right.  We can get you in probably

17   Monday.

18          **MR. SOEHNLEIN:**  That sounds good.

19          **THE COURT:**  Everybody okay, Monday afternoon?

20          **MR. TRIPI:**  I think so, Judge.

21          **MR. SOEHNLEIN:**  Yes, Judge.

22          **MR. TRIPI:**  Let me see if there is a time conflict.

23          **THE COURT:**  All right.  How about 1:30?

24          **MR. TRIPI:**  That will be fine.  Thank you.

25          **MR. SOEHNLEIN:**  That's fine.

1          THE COURT:  Okay.  And I think either way -- I'm

2    granting the motion for a continuance.  We'll see you on this

3    issue to be continued Monday at 1:30.

4          I should tell you now, though, that Judge Roemer is

5    ready for you on Tuesday for a schedule.  So either way on

6    Monday, you will be seeing Judge Roemer at 2:00 o'clock on

7    Tuesday for scheduling and whatever else you need to talk to him

8    about.

9          MR. TRIPI:  Okay.

10         THE COURT:  So that's Judge Roemer piece of it.

11   Speedy trial does not need to be addressed because of the

12   continuance and --

13         MR. TRIPI:  The pending motion for detention, Your

14   Honor.

15         THE COURT:  We've got the pending motion for the

16   detention, yeah.

17         Should we adjourn the Curcio, step one, or should we

18   do it now, the status conference on the Curcio, the thing that

19   was scheduled for 3:00 o'clock today?

20         We can do it now, or we can do it after our

21   continuation on Monday afternoon.

22         MR. TRIPI:  I'll defer to Mr. Soehnlein.

23         MR. SOEHNLEIN:  I don't feel strongly about it, Your

24   Honor.  Whatever you want to do.

25         THE COURT:  Why don't we do it then.

1           **MR. TRIPI:**  Okay.

2           **THE COURT:**  Why don't we do it then.  All I would do

3    now is a little bit and then call somebody like maybe Kevin

4    Spitler, since he was the Curcio counsel last time, I would

5    reach out to him.

6           In the meantime, Mr. Tripi, bring with you your

7    conflict list maybe?

8           **MR. TRIPI:**  Yes.  I'll work on that.  I'll get that

9    squared away.

10          Judge, the only thing I want to flag was --

11          **THE COURT:**  I know.  I'm flipping kind of over into

12   the other case, which we haven't even called yet so --

13          **MR. TRIPI:**  There may be a need for -- just depending

14   on Your Honor's thoughts, also someone to be contacted for the

15   witness, potentially, that created the issue.

16          **THE COURT:**  Okay.  Just be mindful of that on the

17   Curcio side of things.

18          And my plan would be to call Kevin Spitler, if that --

19   if for some reason he's conflicted out now, I need to know that.

20          **MR. TRIPI:**  I don't believe he is, but I'll double

21   check.

22          **THE COURT:**  All right.  Anything else on this 23-CR-37

23   case?

24          **MR. TRIPI:**  No, Your Honor.  Thank you.

25          **MR. SOEHNLEIN:**  Nothing else, Your Honor.  Thank you.

1          **THE COURT:**  Okay, folks.  So in the meantime,

2     Mr. Gerace is going to be in Marshal's custody, I believe, at

3     this point.

4          No?

5          **MR. TRIPI:**  He is -- I think that that -- thank you,

6     Your Honor.

7          **THE COURT:**  Yes?  Okay.  All right.  Very good.  Thank

8     you.

9          **MR. TRIPI:**  Thank you, Your Honor.

10

11               (Proceedings concluded at 2:18 p.m.)

12                         *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2      In accordance with 28, U.S.C., 753(b), I certify that these

3    original notes are a true and correct record of proceedings in

4     the United States District Court for the Western District of

5        New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10    _s/ Bonnie S. Weber_           _March 25, 2023_
        Signature                      Date

11

12   BONNIE S. WEBER, RPR

13   Official Court Reporter
     United States District Court
14   Western District of New York

15

16

17

18

19

20

21

22

23

24

25