IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

            v.                            19-CR-227-LJV

JOSEPH BONGIOVANNI,

             Defendant.
_____


## GOVERNMENT'S REQUESTS TO CHARGE


      **THE UNITED STATES OF AMERICA**, by and through its attorney, Trini E. Ross,

United States Attorney for the Western District of New York, Joseph M. Tripi, Nicholas T.

Cooper, and Casey L. Chalbek, Assistant United States Attorneys, Corey R. Amundson,

Chief, United States Department of Justice, Public Integrity Section, and Jordan Dickson,

Trial Attorney, United States Department of Justice, Public Integrity Section, of counsel,

hereby files its requests to charge.


      DATED:  Buffalo, New York, January 19, 2024.

TRINI E. ROSS                       COREY R. AMUNDSON
United States Attorney              Chief

BY:  s/JOSEPH M. TRIPI          BY:  s/JORDAN DICKSON
      s/NICHOLAS T. COOPER            Trial Attorney
      s/CASEY L. CHALBEK              U.S. Department of Justice
      Assistant United States Attorneys    Criminal Division
      United States Attorney's Office      Public Integrity Section
      Western District of New York       1301 New York Ave. NW
      138 Delaware Avenue             Washington, D.C. 20530
      Buffalo, New York 14202         202/597-0508
                                       Jordan.Dickson@usdoj.gov

# **INDEX**

**REQUEST**                                                                                                    **PAGE NO.**

1    General Requests.........................................................................................1

2    The Indictment and the Statute: Counts 1 and 2 ...................................... 2

3    Conspiracy Defined (Purpose of the Statute)..........................................19

4    Elements of the Conspiracy....................................................................21

5    Element 1: Existence of Agreement ........................................................22

6    Element 2: Membership in the Conspiracy .............................................24

7    Element 3: Commission of an Overt Act .................................................27

8    Element 4: Commission of an Overt Act in Furtherance of the Conspiracy.............29

9    The Indictment and the Statute: Counts 3 and 6; Conspiracy .................30

10   Statute Defining Offense .......................................................................32

11   Purpose of the Statute ...........................................................................34

12   Elements of the Conspiracy....................................................................35

13   Element 1: Existence of Agreement ........................................................36

14   Element 2: Membership in the Conspiracy .............................................38

15   Objectives of the Conspiracy .................................................................41

16   The Statute: 21 USC 856(a)(1)...............................................................46

17   Elements of the Offense .........................................................................47

18   Element 1: Using or Maintaining a Place................................................48

19   Element 2: Purpose................................................................................49

20   Element 3: Knowledge............................................................................50

# INDEX

**REQUEST**                                                                                    **PAGE NO.**

21    Defendant's Role in the Conspiracy ..................................................................51

22    Special Verdict Form ......................................................................................52

23    The Indictment and the Statute: Counts 4 and 5 ....................................................56

24    Bribery Defined (Purpose of the Statute)..............................................................58

25    Elements of the Offense ..................................................................................59

26    Element 1: Recipient was a Public Official............................................................61

27    Element 2: Demand or Receipt of Something of Value............................................62

28    Element 3: Corrupt Intent to Influence an Official Act or Violate an Official Duty..63

29    Stream of Benefits..........................................................................................65

30    Mixed Motive not a Defense .............................................................................66

31    The Indictment and the Statute: Counts 7 through 13 ............................................67

32    Elements of the Offense ..................................................................................71

33    Element 1: Altering or Destroying Evidence .........................................................72

34    Element 2: Knowing Conduct ...........................................................................73

35    Element 3: Intent to Impede Investigation ...........................................................74

36    The Indictment and the Statute: Counts 14 and 15................................................75

37    Purpose of the Statute ...................................................................................77

38    Elements of the Offense ..................................................................................78

39    Element 1: Statement or Representation ..............................................................79

40    Element 2: Materiality ....................................................................................80

41    Element 3: False, Fictitious, or Fraudulent Statement ...........................................81

## **INDEX**

**REQUEST**                                                    **PAGE NO.**

42   Element 4: Knowing and Willful Conduct ................................................82

43   Element 5: Matter Within the Jurisdiction of the United States Government ..........83

44   Unanimity Explained ..............................................................84

45   Acts and Declarations of Co-Conspirators ........................................85

46   Impossibility of Success ........................................................86

47   Success of Conspiracy Immaterial ................................................87

48   Failure to Name a Defendant .....................................................88

49   Specific Investigation Techniques not Required ..................................89

50   Accomplices Called by the Government ............................................90

51   Witness Using or Addicted to Drugs ..............................................92

52   Admission of Defendant ..........................................................93

53   Consciousness of Guilt from False Exculpatory Statement .........................94

54   Charts and Summaries ............................................................95

55   Similar Acts – Intent, Knowledge, Absence of Mistake ............................96

56   Consciousness of Guilt from Falsification of Evidence ...........................97

**REQUEST NO. 1**             **GENERAL REQUESTS**

The government respectfully requests that the Court give the following General Instructions[1] to the jury:

a.  Function of Court and Jury

b.  Statements of Court and Counsel Not Evidence

c.  Burden of Proof and Presumption of Innocence

d.  Reasonable Doubt

e.  Indictment Is Not Evidence

f.  Consider Each Defendant Separately

g.  Multiple Counts – Multiple Defendants

h.  Variance – Dates

i.  Government Treated Like Any Other Party

j.  Improper Considerations: Race, Religion, National Origin, Sex, or Age

k.  Witness Credibility – General Instruction

l.  Judicial Notice and Stipulations (If Applicable)

m.  Jury to Draw No Adverse Inference from Defendant's Failure to Testify (If Applicable and Requested by Defense)

n.  Jury Notes

o.  Right to See Exhibits and Hear Testimony; Communications with Court

p.  Submitting the Indictment

q.  Sympathy

r.  Punishment is Not To Be Considered by the Jury

s.  Verdict of Guilt or Innocence Must Be Unanimous

---

[1] *See* Modern Federal Jury Instructions-Criminal ¶¶ 1.02, 2.01, 3.01, 4.01, 5.02, 5.05, 5.10, 9.01, 9.03, 9.04, 9.07.

**REQUEST NO. 2**          **THE INDICTMENT AND THE STATUTE: COUNTS 1 AND 2**

The defendant, Joseph Bongiovanni, is charged in Counts 1 and 2 with violating Title 18, United States Code, Section 371, which provides that if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency of the United States, in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each is guilty of an offense against the United States.

Both Count 1 and Count 2 include the following introductory allegations:

At all times relevant to this Indictment:

1.  The defendant, JOSEPH BONGIOVANNI ("BONGIOVANNI"), began his career in law enforcement as an Erie County Sheriff Deputy in or about 1995.  In or about 1998, the defendant BONGIOVANNI joined the Drug Enforcement Administration ("DEA") as a Special Agent ("SA") and his career with the DEA took him out of the Buffalo area for a period of time. In or about 2001, until his retirement on or about February 1, 2019, the defendant BONGIOVANNI was assigned to Buffalo, New York, DEA Resident Office.

2.  As a DEA SA, the defendant BONGIOVANNI was a "public official" as defined in Title 18, United States Code, Section 201(a)(1).

3.  The defendant BONGIOVANNI had friends and associates who he knew were involved in possession, use, distribution, and importation of controlled substances.  The defendant BONGIOVANNI's friends and associates who were involved in possession, use, and distribution, and importation of controlled substances, included, among others, individuals he believed to be members of, connected to, or associated with Italian Organized Crime (IOC) in the Western District of New York and elsewhere.

4.  Peter Gerace Jr. ("Gerace"), is a friend and associate of defendant BONGIOVANNI.  Gerace, for a period of time, was on supervision by the United States Probation Office for the Western District of New York.  Gerace is also the owner and principal operator of Pharaoh's

2

Gentlemen's Club ("Pharaoh's"), located at 999 Aero Drive, Cheektowaga, New York. Gerace employs topless dancers, bartenders, bouncers, managers, and kitchen staff at Pharaoh's where food, beverages, and dances with topless dancers are sold to patrons. Several of Gerace's male employees at Pharaoh's are members of a motorcycle club called the Outlaws Motorcycle Club ("Outlaws MC").

5.    Michael Massecchia ("Masecchia"), is a friend and associate of defendant BONGIOVANNI and is a member or associate of IOC in the Western District of New York, and elsewhere. Massecchia has been involved in the possession with intent to distribute, and distribution of, controlled substances for over twenty (20) years in the Western District of New York and elsewhere. Massecchia had been a target or subject of several DEA cases during defendant BONGIOVANNI's tenure as a DEA special agent, but Massecchia was never arrested or charged in any DEA cases or investigations during defendant BONGIOVANNI's tenure as a DEA special agent.

6.    The DEA was an agency within the executive branch of the Government of the United States, and the DEA is charged with, among other things, investigating narcotics trafficking activity and enforcing the controlled substance laws of the United States. The DEA required its SAs to uphold the rule of law, and to act with integrity in their personal and professional actions.

7.    As a DEA SA, the defendant BONGIOVANNI was specially trained in the investigation of drug trafficking activity and was familiar with DEA policy, record keeping, procedures, and databases.

8.    The lawful functions and official duties of DEA SAs included, but were not limited to, initiating and conducting investigations; interviewing witnesses and DEA confidential sources; protecting the identity of witnesses and DEA confidential sources; protecting the integrity, confidentiality, and operational security of federal and state investigations; collecting and preserving evidence; preparing truthful and accurate DEA memoranda and reports; preparing search warrant and criminal complaint affidavits, documenting information that was helpful to current and future DEA investigations; arresting individuals who had violated federal and state drug laws; preparing and proposing DEA cases for prosecution; and acting with honesty and integrity in their representations and communications with prosecutors and other members of law enforcement.

9.    The defendant BONGIOVANNI, through training and experience, was familiar with how the DEA and other law enforcement agencies conducted drug trafficking investigations, and how DEA agents and

other law enforcement officers utilized de-confliction databases as a means to coordinate investigations with other agents and law enforcement agencies.

10. De-confliction databases enabled law enforcement officers conducting an investigation of a specific individual or specific individuals to be alerted if another law enforcement officer or agency had an investigative interest in the same individual or individuals.

Count 1 incorporates those introductory allegations and further charges only

the defendant, Joseph Bongiovanni, with:

2. Beginning in or about 2008 and continuing until in or about August 2019, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendant, JOSEPH BONGIOVANNI, did knowingly, willfully, and unlawfully combine, conspire, and agree with Michael Masecchia and others, known and unknown:

a. to defraud the United States and the Drug Enforcement Administration (DEA), an agency of the United States, by interfering with and obstructing by means of deceit, craft, and trickery, the lawful and legitimate governmental functions and rights of the DEA, that is:

i. the right to have its business and its affairs, and the transaction of the official business of the DEA conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction; and

ii. the right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of his duties by the defendant, JOSEPH BONGIOVANNI, in his official capacity as a DEA SA free from corruption, partiality, improper influence, bias, dishonesty and fraud in dealing with the DEA and other law enforcement agencies;

b. directly and indirectly, corruptly to give, offer, and promise a thing of value to a public official, with intent to induce a public official to do an act and omit to do an act in violation of his lawful duty as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(1)(C); and

c.   directly and indirectly, corruptly to demand, seek, receive, accept, and agree to receive and accept, a thing of value personally, in return for being induced to do an act and omit to do an act in violation of official duty as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(2)(C).

## **Manner and Means**

3.   The conspiracy was carried out by the Manner and Means set forth below.

4.   It was part of the conspiracy that, in order to build trust and maintain continuity with his coconspirators, the defendant BONGIOVANNI did not investigate his friends and associates and used his position as a DEA SA in Buffalo, New York, to shield his friends and associates, and others including Masecchia, who he believed were connected to or associated with IOC, from criminal investigations.

5.   It was part of the conspiracy that, in exchange for payments he received and in order to ingratiate himself to individuals whom he believed were members and associates of IOC, the defendant BONGIOVANNI utilized his position as a DEA SA to attempt to dissuade other members of law enforcement: from conducting investigations of his coconspirators, friends, associates and individuals the defendant believed to be connected to or associated with IOC, including Masecchia and others; and from conducting investigations into any individuals who may have been able to expose his criminal activities and those of his friends, associates, and individuals the defendant believed to be connected to or associated with IOC.

6.   It was part of the conspiracy that, in exchange for payments he received, and to ingratiate himself to individuals he believed to be connected to or associated with IOC, the defendant BONGIOVANNI used his position as a DEA SA to gain and provide information about federal investigations, and about individuals cooperating or suspected to be cooperating with law enforcement, to enable his coconspirators, friends, and associates to continue their drug trafficking activities without disruption by law enforcement.

7.   It was part of the conspiracy that, between in or about 2008 and in or about 2017, in exchange for bribes totaling approximately at least $250,000 in United States currency paid by Masecchia, working with others, the defendant BONGIOVANNI used his position as a DEA SA to protect the coconspirator drug traffickers who were paying him bribes and their associates.

5

8.      It was part of the conspiracy that the defendant BONGIOVANNI was paid bribes by Masecchia, who was working with others, on a recurring basis in exchange for regular debriefings whereby the defendant BONGIOVANNI provided information designed to protect and conceal the drug trafficking activities of his friends, associates, and coconspirators.

9.      It was part of the conspiracy that, utilizing state and DEA de-confliction databases, the defendant BONGIOVANNI would be alerted when other agents were looking at the drug trafficking activity of individuals associated with the defendant BONGIOVANNI or under his protection.

10.     It was part of the conspiracy that, in exchange for bribes he received and in order to create the appearance of a legitimate DEA investigation and to maximize his ability to utilize de-confliction databases to monitor the activities of other law enforcement agents and agencies, and to ensure no other law enforcement agents or agencies successfully investigated the drug traffickers under the defendant BONGIOVANNI's paid protection, the defendant BONGIOVANNI initiated a DEA case file in the names of coconspirator drug traffickers who were paying the defendant BONGIOVANNI protection bribes.

11.     It was part of the conspiracy that the defendant BONGIOVANNI utilized his access to DEA databases and information, meetings with other law enforcement officers and Assistant United States Attorneys, and knowledge of law enforcement techniques, methods, and procedures, to advise and assist drug traffickers in avoiding law enforcement scrutiny and detection.

12.     It was part of the conspiracy that, in exchange for bribes he received, defendant BONGIOVANNI provided information to his coconspirators about the existence of investigations, the status of investigations, the identity of cooperators, and specific information, including specific techniques utilized or under consideration in investigations that he learned through his position as a DEA SA and his interactions with other members of law enforcement.

13.     It was part of the conspiracy that, in exchange for bribes he received and to protect the continuing drug trafficking operations of his coconspirators, after opening a DEA file, the defendant BONGIOVANNI feigned legitimate investigation so that information about his coconspirators, and anyone seeking to cooperate against them, would be funneled towards him, and so inducing other members of law enforcement to defer investigation of his coconspirators to him.

14.     It was part of the conspiracy that, after feigning legitimate investigation for a period of time so that information about his coconspirators, and anyone seeking to cooperate against them, would be funneled towards him, the defendant BONGIOVANNI closed the DEA file related to drug traffickers under defendant BONGIOVANNI's paid protection knowing that, even with the file closed, he would continue to receive de-confliction notices related to individuals under his protection.

15.     It was part of the conspiracy that, even after the defendant BONGIOVANNI closed the DEA file related to drug traffickers under the defendant BONGIOVANNI's paid protection, he continued to represent to others in law enforcement that he had an active investigation in an effort to dissuade other members of law enforcement from commencing and developing an investigation of his friends, associates, and coconspirators.

16.     It was part of the conspiracy that the defendant BONGIOVANNI made false entries and representations in DEA documents, and false statements and representations to other members of law enforcement, in order to protect his friends, associates, and coconspirators from investigation, arrest, prosecution, and potential incarceration.

17.     It was part of the conspiracy that the defendant BONGIOVANNI would falsely deny to other agents of the DEA the existence and extent of connections between himself and individuals he knew to be involved in the possession, use, distribution, and importation of controlled substances, and individuals he believed were connected to or associated with IOC.

18.     It was part of the conspiracy that the defendant BONGIOVANNI provided cover stories to his coconspirators and would instruct such individuals that, if the communications or meetings between the defendant and the coconspirators were ever questioned by law enforcement, the conspirators should conceal the true nature of their relationship with the defendant BONGIOVANNI by pretending the defendant BONGIOVANNI was recruiting such individuals to be DEA informants.

19.     It was part of the conspiracy that, upon request, the defendant BONGIOVANNI made efforts to use his position as a DEA SA to help coconspirators get out of trouble with other law enforcement agencies.

20.     It was part of the conspiracy that the defendant BONGIOVANNI would conceal his possession, use, and distribution of controlled substances, the bribes he received, and the assistance he provided to his

friends, associates, coconspirators, and individuals who he believed were members of, connected to, or associated with IOC.

### Overt Acts

21.     In furtherance of the conspiracy and to effect the objects thereof, the following overt acts were committed in the Western District of New York, and elsewhere, by the defendant and others.

22.     Between in or about 2008 and in or about 2017, Masecchia, working with others, paid the defendant BONGIOVANNI, who accepted, bribes on a recurring basis totaling approximately at least $250,000 in United States currency in exchange for protection from arrest and prosecution.

23.     Between in or about 2008 and in or about 2017, the defendant BONGIOVANNI provided information about investigations, including the status of specific investigative techniques, potential witnesses, and confidential sources during routine recurring meetings with drug traffickers who were paying him bribes.

24.     On or about November 25, 2012, the defendant BONGIOVANNI learned that friends and associates of individuals paying him bribes were arrested by the New York State Police in relation to the seizure of marijuana, U.S. currency, and other items, and the defendant BONGIOVANNI began acquiring information about the arrests and made arrangements to open a DEA case to take control of the case from the New York State Police.

25.     On or about November 28, 2012, the defendant BONGIOVANNI authored a DEA 6 summary report and caused the initiation of DEA Case Number C2-13-0026.

26.     On or about December 24, 2012, the defendant BONGIOVANNI caused the preparation of DEA 202 forms adding target names to the file in DEA Case Number C2-13-0026, including the names of drug traffickers and associates who were paying him bribes.

27.     On or about December 24, 2012, the defendant BONGIOVANNI caused the DEA preparation and entry of three (3) separate DEA 202 forms in DEA Case Number C2-13-0026 with signatures that do not belong to the DEA Special Agent listed as the co-case agent on the DEA 202 form.

28.     In or about January 2013, the defendant BONGIOVANNI submitted names, including the names of drug traffickers and associates who were

paying him bribes, and the defendant's contact information, to "Safety-Net," a state de-confliction system.

29. In or about April 2013, the defendant BONGIOVANNI became aware of an individual, known to the Grand Jury, who could cooperate against the drug traffickers paying the defendant BONGIOVANNI bribes, and the defendant BONGIOVANNI signed up the individual as a DEA confidential source ("CS") with himself as the handling agent.

30. On or about April 29, 2013, the defendant BONGIOVANNI signed up the individual DEA CS with himself as the handling agent for a period from April 29, 2013, until April 29, 2014.

31. On or about May 2, 2013, in DEA Case Number C2-13-0026, the defendant BONGIOVANNI indexed names related to individuals who were paying the defendant BONGIOVANNI bribes to give the appearance of legitimate investigation and so that DEA de-confliction database procedures would alert him if other members of law enforcement were investigating the individuals and associates of individuals who were paying the defendant BONGIOVANNI bribes.

32. Between on or about April 29, 2013, and on or about September 9, 2013, the defendant BONGIOVANNI ensured that the CS provided no cooperation against the drug traffickers who were paying him bribes, and on September 9, 2013, the defendant BONGIOVANNI caused the completion of form DEA-512(d) deactivating the DEA CS.

33. On or about May 23, 2013, defendant BONGIOVANNI sent an email regarding DEA Case Number C2-13-0026 to members of the United States Attorney's Office, Western District of New York, and a Special Agent with the Internal Revenue Service (IRS) stating that "we are making strides in the street and will report back soon."

34. On or about June 18, 2013, a fellow DEA agent conducted surveillance on a warehouse in Buffalo, New York that was controlled by a coconspirator who was a source of bribe payments to the defendant BONGIOVANNI, and after the fellow DEA agent made relevant observations, the fellow DEA agent was advised by the defendant BONGIOVANNI to discontinue the surveillance.

35. On or about July 11, 2013, the defendant BONGIOVANNI received an email from a fellow member of law enforcement advising him, in part, that "Masecchia is an associate and possibly made member of the Buffalo LCN family," an IOC group operating in Buffalo, New York, and elsewhere.

36.     On or about July 16, 2013, the defendant BONGIOVANNI sent an email to members of the United States Attorney's Office, Western District of New York, and a Special Agent with the IRS, and copied his supervisor in the DEA Buffalo Resident Office, that read in part "we are working on GPS warrant for trackers to locate these grow operation [sic] a CI [confidential informant] reported they are turning the grow over in 8 to 9 weeks. Joe."

37.     On or about July 30, 2013, defendant BONGIOVANNI notified the DEA CS he/she would be deactivated as a DEA CS pursuant to BONGIOVANNI's entry in Confidential Source Deactivation form DEA-512d.

38.     On September 9, 2013, the defendant BONGIOVANNI de-activated the CS who had an ability to cooperate in DEA Case Number C2-13-0026, and falsely stated in the "Confidential Source Deactivation" form DEA-512d, "The CS can no longer provide services or information for any open investigation."

39.     On or about September 9, 2013, the defendant BONGIOVANNI caused the preparation and entry of "Confidential Source Deactivation" form DEA-512d with a false and fraudulent signature line for the co-case agent.

40.     On or about September 11, 2013, the defendant BONGIOVANNI prepared a DEA 6 report in DEA Case Number C2-13-0026 wherein he made false, fraudulent, fictitious, and misleading statements as follows: "Agents are presently waiting for approval from the United States Attorney's Office (WDNY) to utilized [sic] GPS trackers to aid in the investigation."

41.     On or about September 26, 2013, the defendant BONGIOVANNI met with other members of law enforcement and an Assistant United States Attorney at the United States Attorney's Office for the Western District of New York regarding in DEA Case Number C2-13-0026 during which meeting, specific investigative techniques were discussed.

42.     On or about December 31, 2013, the defendant BONGIOVANNI made false and misleading statements in a DEA 6 report in DEA Case Number C2-13-0026.

43.     On or about April 7, 2014, the defendant BONGIOVANNI made false and misleading statements in a DEA 6 report in DEA Case Number C2-13-0026.

44.     On or about July 7, 2014, the defendant BONGIOVANNI made false and misleading statements in a DEA 6 report in DEA Case Number C2-13-0026.

45.     Between on or about April 30, 2013, and on or about November 4, 2014, the defendant BONGIOVANNI made false representations regarding DEA Case Number C2-13-0026 to others in law enforcement that he did not have a source who could provide information about the locations of marijuana grow operations being controlled and operated by those who were paying the defendant BONGIOVANNI bribes.

46.     Between in or about 2008 and in or about 2017, during routine and recurring meetings with individuals paying the defendant BONGIOVANNI bribes, the defendant BONGIOVANNI passed along information regarding specific techniques utilized or being considered by other members of law enforcement in DEA Case Number C2-13-0026.

47.     During conversation with other members of law enforcement involved in the investigation of DEA Case Number C2-13-0026, the defendant BONGIOVANNI falsely stated that he did not have a confidential informant and, as a result, marijuana grow locations could not be located to further the investigation in DEA Case Number C2-13-0026.

48.     On or about November 4, 2014, in preparation for closing DEA Case Number C2-13-0026, the defendant BONGIOVANNI prepared a DEA 6 report wherein he made false, fraudulent, fictitious, and misleading statements as follows: "The confidential informant associated with this case/file is no longer viable and can not provide credible information in furtherance of this investigation.  This agent will not [sic] prepare this case for closure."

49.     On or about January 28, 2015, the defendant BONGIOVANNI prepared a DEA 6 report in DEA Case Number C2-13-0026 officially closing the DEA file related to investigation of individuals and associates of individuals who were paying him bribes.

50.     On or about January 28, 2015, the defendant BONGIOVANNI prepared a DEA 210 form "Defendant Disposition Report" wherein he made false, fraudulent, fictitious, and misleading statements as follows: "On January 6, 2015- [name redacted] plead in New York State court and sentenced (sic) to 36 months probation."

51.     On or about February 21, 2016, the defendant BONGIOVANNI attended a party in Toronto, Canada with friends and associates involved in possession, use, and distribution of cocaine.

52.     In or about August 2016, the defendant BONGIOVANNI used his position as a DEA SA in an attempt to dissuade a member of a different federal law enforcement agency from investigating some of the defendant BONGIOVANNI's friends and associates.

53.     At various times while the defendant BONGIOVANNI was a DEA SA assigned to the Buffalo Resident Office, he possessed, used and distributed, and observed others possess, use, and distribute, cocaine.

54.     On or about February 1, 2019, the defendant BONGIOVANNI's last day as a DEA SA in the Buffalo Resident Office due to his retirement from the DEA, the defendant caused his DEA issued cellular telephone to be wiped clean such that all data was deleted from the telephone.

55.     On a date unknown to the Grand Jury, but before on or about February 1, 2019, without authorization or permission, the defendant BONGIOVANNI removed the DEA working file in DEA Case Number C2-13-0026, which contained DEA database information (including de-confliction database information), administrative subpoenas and responses, cellular telephone toll analysis, and other DEA records and property, including an Organized Crime Drug Enforcement Task Forces investigation initiation form for Operation Past Due, from the DEA Buffalo Resident Office and stored and concealed this DEA property in the basement of his residence.

56.     During the course of the conspiracy, defendant BONGIOVANNI advised a coconspirator, who was working with Masecchia and known to the Grand Jury, of a cover story for their interactions, that is, if anyone [in law enforcement] ever questioned [the coconspirator] he should say that defendant BONGIOVANNI was talking to [the conspirator] about becoming defendant BONGIOVANNI's informant.

57.     At times, including an occasion following the execution of a federal search warrant at defendant BONGIOVANNI's residence on June 6, 2019, defendant BONGIOVANNI met with a coconspirator, who was working with Masecchia and is known to the Grand Jury, and advised the coconspirator that if he was ever approached [by law enforcement] "I'll coach you on it, I'll get you prepared."

58.     On or about August 23, 2019, Masecchia possessed quantities of marijuana, cocaine, and other controlled substances, $27,950 in bundled U.S. currency, eight firearms, various rounds of ammunition, and drug paraphernalia at 5907 Main Street, Williamsville, New York.

Count 2 incorporates the introductory allegations I read to you earlier and further charges the defendant with:

2.      Beginning in or about 2005 and continuing until in or about February 2019, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendant, JOSEPH BONGIOVANNI, and Peter Gerace Jr., did knowingly, willfully, and unlawfully combine, conspire, and agree together and with others, known and unknown:

a.      to defraud the United States and the Drug Enforcement Administration (DEA), an agency of the United States, by interfering with and obstructing by means of deceit, craft, and trickery, the lawful and legitimate governmental functions and rights of the DEA, that is:

i.      the right to have its business and its affairs, and the transaction of the official business of the DEA conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction; and

ii.      the right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of his duties by the defendant, JOSEPH BONGIOVANNI, in his official capacity as a DEA SA free from corruption, partiality, improper influence, bias, dishonesty and fraud in dealing with the DEA and other law enforcement agencies;

b.      directly and indirectly, corruptly to give, offer, and promise a thing of value to a public official, with intent to induce a public official to do an act and omit to do an act in violation of his lawful duty as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(1)(C); and

c.      directly and indirectly, corruptly to demand, seek, receive, accept, and agree to receive and accept, a thing of value personally, in return for being induced to do an act and omit to do an act in violation of official duty as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(2)(C).

**Manner and Means**

3.      The conspiracy was carried out by the Manner and Means set forth below.

4.      It was part of the conspiracy that, in order to build trust and maintain continuity with his coconspirators, the defendant BONGIOVANNI did not investigate his friends and associates and used his position as a DEA SA in Buffalo, New York, to shield his friends and associates, and others, including Gerace, from criminal investigations.

5.      It was part of the conspiracy that, in exchange for payments he received and in order to ingratiate himself to individuals whom he believed were members and associates of IOC, the defendant BONGIOVANNI utilized his position as a DEA SA to attempt to dissuade other members of law enforcement: from conducting investigations of his coconspirators, friends, associates and individuals the defendant believed to be connected to or associated with IOC, including Gerace and others; and from conducting investigations into any individuals who may have been able to expose his criminal activities and those of his friends, associates, and individuals the defendant believed to be connected to or associated with IOC.

6.      It was part of the conspiracy that, in exchange for payments he received, the defendant BONGIOVANNI used his position as a DEA SA to gain and provide information to enable his coconspirators, friends, and associates to continue their drug trafficking activities without disruption by law enforcement.

7.      It was part of the conspiracy that, at various times between in or about 2005 and in or about 2017, defendant BONGIOVANNI provided information he learned during the course of his duties as a DEA SA, including information learned through participating in investigations, to Gerace.

8.      It was part of the conspiracy that defendant BONGIOVANNI used his position as a DEA SA to influence other federal agents, including from the Federal Bureau of Investigation (FBI) and the DEA, to dissuade them from investigating Gerace and Pharaoh's.

9.      It was part of the conspiracy that Gerace paid defendant BONGIOVANNI cash bribes on a recurring basis to protect Gerace and Gerace's business, Pharaoh's Gentlemen's Club from federal narcotics investigations.

10.     It was part of the conspiracy that defendant BONGIOVANNI falsely represented that Gerace was defendant BONGIOVANNI's source of information to protect Gerace and Pharaoh's from federal investigations.

11.     It was part of the conspiracy that the defendant BONGIOVANNI falsely represented to the DEA that Gerace was defendant BONGIOVANNI's source of information about ongoing drug trafficking activity in an effort to protect Gerace and Pharaoh's from federal investigations.

12.     It was part of the conspiracy that the defendant BONGIOVANNI would falsely deny to other agents of the DEA the existence and extent of connections between himself and individuals he knew to be involved in the possession, use, distribution, and importation of controlled substances, and individuals he believed were connected to or associated with IOC.

13.     It was part of the conspiracy that the defendant BONGIOVANNI provided cover stories to his coconspirators and would instruct such individuals that, if the communications or meetings between the defendant and the coconspirators were ever questioned by law enforcement, the conspirators should conceal the true nature of their relationship with the defendant BONGIOVANNI by pretending the defendant BONGIOVANNI was recruiting such individuals to be DEA informants.

14.     It was part of the conspiracy that, upon request, the defendant BONGIOVANNI made efforts to use his position as a DEA SA to help coconspirators get out of trouble with other law enforcement agencies.

15.     It was part of the conspiracy that the defendant BONGIOVANNI would conceal his possession, use, and distribution of controlled substances, the bribes he received, and the assistance he provided to his friends, associates, coconspirators, and individuals who he believed were members of, connected to, or associated with IOC.

## Overt Acts

16.     In furtherance of the conspiracy and to effect the objects thereof, the following overt acts were committed in the Western District of New York, and elsewhere, by the defendant and others.

17.     In or about 2005, GERACE learned information from the execution of a DEA search warrant in which defendant BONGIOVANNI participated.

18.     Between in or about 2013 and in or about 2016, the defendant BONGIOVANNI, accepted cash bribes on a recurring basis from Gerace in exchange for protection from arrest and prosecution.

19.     Between on or about November 1, 2009, and on or about November 3, 2009, in response to information he received from Gerace, the defendant BONGIOVANNI contacted the United States Probation Office in an effort to intercede on Gerace's behalf and to help Gerace mitigate any sanctions that might be imposed by the Probation Office for Gerace violating the terms and conditions of his term of federal supervised release.

20.     On or about November 6, 2009, the defendant BONGIOVANNI authored an official DEA 6 report in which the defendant BONGIOVANNI made false, fraudulent, fictitious, and misleading statements, namely, that Gerace had acted as a confidential source and had provided information to the DEA in narcotics investigations.

21.     On or about November 6, 2009, in the DEA 6 report referenced above, the defendant BONGIOVANNI omitted documenting any telephone number for Gerace.

22.     In or about November 2009, the defendant BONGIOVANNI engaged in conduct and made statements portraying Gerace as a DEA confidential source, when in fact Gerace was not a DEA confidential source, in order to dissuade an FBI Special Agent from investigating and potentially charging Gerace with federal criminal offenses.

23.     Between on or about November 6, 2009, and on or about October 31, 2018, the defendant BONGIOVANNI did not document in any DEA reports or memoranda any information about Gerace and did not document the substance of any in-person or telephonic contacts he had with Gerace, who, for a period of time, was on supervision by the United States Probation Office for the Western District of New York and who was an individual whom the defendant BONGIOVANNI knew and had reason to know was involved in possession, use, and distribution of controlled substances, and had reason to believe to be a member of, connected to, or associated with IOC.

24.     On or about February 21, 2016, the defendant BONGIOVANNI attended a party in Toronto, Canada with friends and associates involved in possession, use, and distribution of cocaine.

25.     In or about June 2016, in response to another DEA SA in the Buffalo Resident Office subpoena of phone records showing contacts between Gerace and the defendant BONGIOVANNI, the defendant BONGIOVANNI attempted to dissuade and discourage another DEA SA from further investigating Gerace by asking his colleague if he "hated Italians," and by making other comments to his fellow DEA SA

16

to dissuade and discourage the DEA SA from continuing to investigate Gerace and others.

26.    On a date unknown to the Grand Jury, in response to a telephone call from Gerace after a stripper overdosed on drugs at Pharaoh's in Cheektowaga, New York, the defendant BONGIOVANNI advised Gerace to "get her out" of the gentlemen's club.

27.    On or about May 4, 2017, Gerace left a voicemail message on the defendant BONGIOVANNI's DEA issued cell phone, as follows:

> "Hey Joe, it's Peter. Listen, if a guy is dealing drugs he's got a regular phone…it's a phone that's, one of those Tracfones. Is there a way to ping it like police do? Where they can tell where you're at? I just want to know if you could do that or not. Give me a call back 725-1931."

to which the defendant BONGIOVANNI responded via text message, "Yes but you would need a warrant to get a ping order."

28.    At various times while the defendant BONGIOVANNI was a DEA SA assigned to the Buffalo Resident Office, he possessed, used and distributed, and observed others possess, use, and distribute, cocaine.

29.    On or about November 1, 2018, the defendant BONGIOVANNI authored and submitted an internal DEA memorandum in which he made false and misleading statements as follows: "It should be known that any contact I have had with [Gerace] in the past was minimal in-person contact and primarily consisted of random telephonic communication based on the fact we were childhood friends.  I would sometimes randomly encounter [Gerace] at a restaurant or golf outing and have not made plans to meet him socially in several years."

30.    On or about December 10, 2018, the defendant BONGIOVANNI authored and submitted an internal DEA memorandum wherein he made false and misleading statements as follows: "I have and will report all contact with [Gerace] to a DEA supervisor like I have in the past[.]"

31.    On or about January 28, 2019, the defendant BONGIOVANNI authored and submitted an internal DEA memorandum wherein he made false and misleading statements regarding the nature of Gerace's relationship with another DEA SA in the Buffalo Resident Office.

32.    On or about February 1, 2019, the defendant BONGIOVANNI's last day as a DEA SA in the Buffalo Resident Office due to his retirement

from the DEA, the defendant caused his DEA issued cellular telephone to be wiped clean such that all data was deleted from the telephone.

33.     On a date unknown to the Grand Jury, but before on or about February 1, 2019, without authorization or permission, the defendant BONGIOVANNI removed the DEA working file in DEA Case Number C2-13-0026, which contained DEA database information (including de-confliction database information), administrative subpoenas and responses, cellular telephone toll analysis, and other DEA records and property, including an Organized Crime Drug Enforcement Task Forces investigation initiation form for Operation Past Due, from the DEA Buffalo Resident Office and stored and concealed this DEA property in the basement of his residence.

34.     At various times between in or about 2006, and on or about February 1, 2019, Gerace possessed with intent to distribute, and distributed cocaine, a Schedule II controlled substance.

35.     At various times between in or about 2009 and in or about 2018, female dancers employed at Pharaoh's have overdosed inside Pharaoh's after ingesting controlled substances.

36.     Beginning in or before 2009, and continuing until at least in or about February 2019, and later, Gerace, knowingly maintained the premises known as Pharaoh's Gentlemen's Club, located at 999 Aero Drive, Cheektowaga, New York, to facilitate prostitution; to provide drugs and money to Pharaoh's employees in exchange for sex with Gerace and others; and for use and distribution of controlled substances, including cocaine, cocaine base, and amphetamine also known as Adderall, Schedule II controlled substances, and marijuana and heroin, Schedule I controlled substances.

**REQUEST NO. 3          CONSPIRACY DEFINED (PURPOSE OF THE STATUTE)**

In Count 1, the defendant, Joseph Bongiovanni, is accused of having been a member of a conspiracy to violate certain federal laws and to defraud the United States. In Count 2, both defendants are accused of having been members of a conspiracy to violate certain federal laws and to defraud the United States. A conspiracy is a kind of criminal partnership—a combination or agreement of two or more persons to join together to accomplish some unlawful purpose.

The crime of conspiracy to violate a federal law is an independent offense. It is separate and distinct from the actual violation of any specific federal laws, which the law refers to as "substantive crimes."  Indeed, you may find the defendant guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime that was the object of the conspiracy was not actually committed.

The charge of conspiracy to defraud the government does not mean that one of the illegal objects must be to cause the government to suffer a loss of money or property as a consequence of the conspiracy. It would also be a conspiracy to defraud if one of the objects was to obstruct, interfere, impair, impede or defeat the legitimate functioning of the government through fraudulent or dishonest means, as I will define these terms.

Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime even if the conspiracy is not successful. This is because collective criminal activity poses

a greater threat to the public's safety and welfare than individual conduct and increases the

likelihood of success of a particular criminal venture.[2]

---

[2] Adapted from Modern Federal Jury Instructions-Criminal ¶¶ 19.01, 19.02, Instruction 19-2, 19-12.

**REQUEST NO. 4**          **ELEMENTS OF CONSPIRACY**

In order to satisfy its burden of proof, the government must establish each of the following four essential elements beyond a reasonable doubt separately for both Counts 1 and 2:

First, that two or more persons entered the unlawful agreement charged in the indictment;

Second, that the defendants knowingly and willfully became a member of the conspiracy;

Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment; and

Fourth, that the overt act that you find to have been committed was committed to further some objective of the conspiracy.[3]

---

[3] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-3.

**REQUEST NO. 5**          **ELEMENT 1: EXISTENCE OF AGREEMENT**

The first element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in the indictment.

In order for the government to satisfy this element, you need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement. Similarly, you need not find that the alleged conspirators stated, in words or writing, what the scheme was, its object or purpose, or every precise detail of the scheme or the means by which its object or purpose was to be accomplished. What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.

You may, of course, find that the existence of an agreement to disobey or disregard the law has been established by direct proof. However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of this case and the conduct of the parties involved.

In a very real sense, then, in the context of conspiracy cases, actions often speak louder than words. In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all of those you find to be participants as proof that a

common design existed on the part of the persons charged to act together to accomplish an

unlawful purpose.[4]

---

[4] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-4.

**REQUEST NO. 6**           **ELEMENT 2: MEMBERSHIP IN THE CONSPIRACY**

The second element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that the defendant knowingly, willfully and voluntarily became a member of the conspiracy.

If you are satisfied that the conspiracy charged in the indictment existed, you must next ask yourselves who the members of that conspiracy were. In deciding whether the defendant whom you are considering was, in fact, a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy. Did he participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its business or objective as an associate or worker?

In that regard, it has been said that in order for a defendant to be deemed a participant in a conspiracy, he must have had a stake in the venture or its outcome. You are instructed that, while proof of a financial interest in the outcome of a scheme is not essential, if you find that the defendant had such an interest, that is a factor that you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment.

As I mentioned a moment ago, before the defendant can be found to have been a conspirator, you must first find that he knowingly joined in the unlawful agreement or plan. The key question, therefore, is whether the defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

24

It is important for you to note that the defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences that may be drawn from them.

The defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need he have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part. Furthermore, the defendant need not have joined in all of the conspiracy's unlawful objectives.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not, by itself, make him a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know, or be friendly with, a criminal, without being a

25

criminal himself. Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish membership in the conspiracy.

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking. He thereby becomes a knowing and willing participant in the unlawful agreement—that is to say, a conspirator.[5]

---

[5] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-6.

**REQUEST NO. 7          ELEMENT 3: COMMISSION OF AN OVERT ACT**

The third element that the government must prove beyond a reasonable doubt, to establish the offense of conspiracy, is that at least one of the overt acts charged in the indictment was knowingly committed by at least one of the conspirators, at or about the time and place alleged.

[I have already read the overt acts the government alleges were committed in furtherance of the conspiracy charged in Count 1 and the overt acts the government alleges were committed in furtherance of the conspiracy charged in Count 2.  You will have a copy of the indictment with you in the deliberation room and may reference it to refresh your memory of the alleged overt acts.]

In order for the government to satisfy this element, it is not required that all of the overt acts alleged in the indictment be proven.

Similarly, you need not find that the defendant committed the overt act. It is sufficient for the government to show that one of the conspirators knowingly committed an overt act in furtherance of the conspiracy, since such an act becomes, in the eyes of the law, the act of all of the members of the conspiracy.

You are further instructed that the overt act need not have been committed at precisely the time alleged in the indictment. It is sufficient if you are convinced beyond a reasonable doubt, that it occurred at or about the time and place stated.

There is a limit on how much time the government has to obtain an indictment. For you to find the defendant guilty of conspiracy, the government must prove beyond a reasonable doubt that at least one overt act in furtherance of the conspiracy charged in Count 1 was committed after October 31, 2014.  Separately, the government must prove beyond a reasonable doubt that at least one overt act in furtherance of the conspiracy charged in Count 2 was committed after February 25, 2016.

Finally, you must find that either the agreement was formed or that an overt act was committed in the Western District of New York.[6]

---

[6] Adapted from Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-7.

**REQUEST NO. 8**          **ELEMENT 4: COMMISSION OF AN OVERT ACT IN FURTHERANCE OF THE CONSPIRACY**

The fourth, and final, element that the government must prove beyond a reasonable doubt is that the overt act was committed for the purpose of carrying out the unlawful agreement.

In order for the government to satisfy this element, it must prove, beyond a reasonable doubt, that at least one overt act was knowingly and willfully done, by at least one conspirator, in furtherance of some object or purpose of the conspiracy, as charged in the indictment. In this regard, you should bear in mind that the overt act, standing alone, may be an innocent, lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding or assisting the conspiratorial scheme. You are therefore instructed that the overt act does not have to be an act that, in and of itself is criminal or constitutes an objective of the conspiracy.[7]

---

[7] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-8.

29

**REQUEST NO. 9**                    **THE INDICTMENT AND THE STATUTE:**
                                     **COUNTS 3 AND 6; CONSPIRACY (21 U.S.C. § 846)**

The defendant, Joseph Bongiovanni, is charged in Count 3 and Count 6 with conspiring to commit several violations of the federal drug laws.

Count 3 of the Indictment charges defendant Bongiovanni with conspiring to possess with intent to distribute controlled substances and to distribute controlled substances.

Count 6 of the Indictment charges defendant Bongiovanni with conspiring to possess with intent to distribute controlled substances, to distribute controlled substances, and to use or maintain a drug-involved premises.

Count 3 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges the following:

Beginning in or about 2008, and continuing to in or about August 2019, the exact dates being unknown to the Grand Jury, in the Western District of New York, and elsewhere, the defendant, JOSEPH BONGIOVANNI, did knowingly, willfully, and unlawfully combine, conspire, and agree with Michael Masecchia and others, known and unknown, to commit the following offenses, that is, to possess with intent to distribute, and to distribute, 1000 kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance, and cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 841(b)(1)(C).

All in violation of Title 21, United States Code, Section 846.

Count 6 of the Indictment incorporates the introductory allegations and the allegations in Count 2 that I have already read to you and further alleges the following:

30

Beginning in or about 2009 and continuing to in or about February 2019, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendant, JOSEPH BONGIOVANNI and Peter Gerace Jr., did knowingly, willfully, and unlawfully combine, conspire, and agree together and with others, known and unknown to the Grand Jury, to commit the following offenses, that is:

    a.  to possess with intent to distribute, and to distribute, cocaine, cocaine base, methamphetamine, and amphetamine also known as Adderall, Schedule II controlled substances, and marijuana and heroin, Schedule I controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), and 841(b)(1)(C); and

    b.  to knowingly, intentionally, and unlawfully use and maintain a place, that is, the premises known as Pharaoh's Gentlemen's Club, located at 999 Aero Drive, Cheektowaga, New York, for the purpose of manufacturing, distributing, and using cocaine, cocaine base, methamphetamine, and amphetamine also known as Adderall, Schedule II controlled substances, and marijuana and heroin, Schedule I controlled substances.

All in violation of Title 21, United States Code, Section 846.

**REQUEST NO. 10**          **STATUTE DEFINING OFFENSE (21 U.S.C. § 846)**

Count 3 of the Indictment charges the defendant Bongiovanni with conspiring to: (a) possess with intent to distribute, or to distribute, 1000 kilograms or more of marijuana; and (b) possess with intent to distribute, or to distribute, cocaine, all in violation of Title 21, United States Code, Section 846.

Section 846, as pertinent to this charge, states as follows:

Any person who conspires . . .

. . . to possess with intent to distribute, or to distribute, a controlled substance . . . in violation of Title 21, United States Code, Sections 841(a)(1); is guilty of an offense against the United States.

Count 6 of the Indictment charges defendant Bongiovanni with conspiring to (a) possess with intent to distribute, or to distribute, cocaine, cocaine base, methamphetamine, amphetamine (known as Adderall), marijuana, or heroin; and (b) to knowingly, intentionally, and unlawfully use and maintain a place for the purpose of manufacturing, distributing, or using cocaine, cocaine base, methamphetamine, amphetamine (known as Adderall), marijuana, or heroin.

Section 846, as pertinent to this charge, states as follows:

Any person who conspires . . .

. . . to possess with intent to distribute, or to distribute, a controlled substance . . . in violation of Title 21, United States Code, Sections 841(a)(1); and

. . . to use and maintain any place . . . for the purpose of manufacturing or distributing any controlled substance . . . in violation of Title 21, United States Code, Section 856(a);

is guilty of an offense against the United States.

Title 21, United States Code, Section 846.

**REQUEST NO. 11**          **PURPOSE OF THE STATUTE - 21 U.S.C. § 846**

Under this statute, the defendant is accused of having been a member of a conspiracy to violate certain federal laws. A conspiracy is a kind of criminal partnership — a combination or agreement of two or more persons to join together to accomplish some unlawful purpose.

The crime of conspiracy to violate a federal law is an independent offense. It is separate and distinct from the actual violation of any specific federal laws, which the law refers to as "substantive crimes".

Indeed, you may find the defendant guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime which was the object of the conspiracy was not actually committed.

Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime even if the conspiracy is not successful. This is because collective criminal activity poses a greater threat to the public's safety and welfare than individual conduct, and increases the likelihood of success of a particular criminal venture.[8]

---

[8] Adapted from Title 21, United States Code, Section 846; Modern Federal Jury Instructions ¶ 19.01, Instruction No. 19-2.

**REQUEST NO. 12**          **ELEMENTS OF CONSPIRACY**

In order to satisfy its burden of proof with respect to Counts 3 and 6, the government must establish each of the following two essential elements beyond a reasonable doubt for each Count:

   (1) that two or more persons entered the unlawful agreement charged in the Indictment; and,

   (2) that the defendant knowingly and willfully became a member of the conspiracy.

In proving that Mr. Bongiovanni is guilty of Count 3 and Count 6, the government is not required to prove the commission of any overt act in furtherance of the conspiracy.[10]

---

[10] Adapted from Modern Federal Jury Instructions ¶ 19.01, Instruction 19-3; *see United States v. Shabani*, 513 U.S. 10 (1994) (government need not prove commission of any overt acts in furtherance of conspiracy in violation of 21 U.S.C. § 846); *United States v. Story*, 891 F.2d 988, 992 (2d Cir. 1989) ("The only elements of a section 846 narcotics conspiracy offense are the existence of a conspiracy and defendant's willfully joining it"); *United States v. Knuckles*, 581 F.2d 305, 311 (2d Cir. 1978); *United States v. Bermudez*, 526 F.2d 89, 94 (2d Cir. 1975).

**REQUEST NO. 13**          **ELEMENT 1: EXISTENCE OF AGREEMENT**

The first element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in Counts 3 and 6.

In order for the government to satisfy this element, you need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement. Similarly, you need not find that the alleged conspirators stated, in words or writing, what the scheme was, its object or purpose, or every precise detail of the scheme or the means by which its object or purpose was to be accomplished. What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.

You may, of course, find that the existence of an agreement to disobey or disregard the law has been established by direct proof. However, since conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of this case and the conduct of the parties involved.

In a very real sense, then, in the context of conspiracy cases, actions often speak louder than words. In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all of those you find to be participants as proof that a

common design existed on the part of the persons charged to act together to accomplish an

unlawful purpose.[11]

---

[11] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-4.

**REQUEST NO. 14**          **ELEMENT 2: MEMBERSHIP IN THE CONSPIRACY**

The second element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy as charged in Counts 3 and 6 is that the defendant knowingly, willfully and voluntarily became a member of the conspiracy.

If you are satisfied that the conspiracy charged in the indictment existed, you must next ask yourselves who the members of that conspiracy were. In deciding whether the defendant whom you are considering was, in fact, a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy. Did he participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its business or objective as an associate or worker?

In that regard, it has been said that in order for a defendant to be deemed a participant in a conspiracy, he must have had a stake in the venture or its outcome. You are instructed that, while proof of a financial interest in the outcome of a scheme is not essential, if you find that the defendant had such an interest, that is a factor that you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment.

As I mentioned a moment ago, before the defendant can be found to have been a conspirator, you must first find that he knowingly joined in the unlawful agreement or plan. The key question, therefore, is whether the defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

It is important for you to note that the defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences that may be drawn from them.

The defendant's knowledge is a matter of inference from the facts proved. In that connection, I instruct you that to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need he have been apprised of all of their activities. Moreover, the defendant need not have been fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part. Furthermore, the defendant need not have joined in all of the conspiracy's unlawful objectives.

The extent of a defendant's participation has no bearing on the issue of a defendant's guilt. A conspirator's liability is not measured by the extent or duration of his participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not, by itself, make him a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know, or be friendly with, a criminal, without being a

criminal himself. Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish membership in the conspiracy.

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking. He thereby becomes a knowing and willing participant in the unlawful agreement—that is to say, a conspirator.[12]

---

[12] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-6.

**REQUEST NO. 15**          **OBJECTIVES OF THE CONSPIRACY**

Count 3 of the Indictment charges several objectives of the conspiracy.  An objective of the conspiracy charged in Count 3 was the distribution of marijuana or cocaine, or possession of marijuana or cocaine with intent to distribute it.  A finding that the defendant conspired to distribute, or possess with intent to distribute, either marijuana, or cocaine, or both controlled substances would be sufficient to satisfy this objective as long as you are unanimous as to the controlled substance or controlled substances involved.   You are instructed, as a matter of law, that marijuana and cocaine are controlled substances.

Count 6 of the Indictment also charges several objectives of the conspiracy.   An objective of the conspiracy charged in Count 6 was the distribution of cocaine, or cocaine base, or methamphetamine, or amphetamine, or marijuana, or heroin.  A finding that the defendant conspired to distribute, or possess with intent to distribute, cocaine, or cocaine base, or methamphetamine, or amphetamine, or marijuana, or heroin would be sufficient to satisfy this objective as long as you are unanimous as to the controlled substance or controlled substances involved.   You are instructed, as a matter of law, that cocaine,  cocaine base, methamphetamine, amphetamine, marijuana, and heroin are controlled substances.

Let me talk to you for a few minutes about the meanings of the terms "distribute" and "possession with intent to distribute."  The word "distribute" means to deliver a controlled substance. "Deliver" is defined as the actual, constructive or attempted transfer of a controlled substance.  Simply stated, the words distribute and deliver mean to pass on, or to hand over

41

to another, or to cause to be passed on or handed over to another, or to try to pass on or hand over to another, a controlled substance.

For example, if A tells or orders B to hand over the drugs to C, then A has caused the drugs to be handed over, and therefore has distributed them.

Distribution does not require a sale. Activities in furtherance of the ultimate sale, such as vouching for the quality of the drugs, negotiating for or receiving the price, and supplying or delivering the drugs may constitute distribution. In short, distribution requires a concrete involvement in the transfer of the drugs.

The legal concept of "possession" may differ from the everyday usage of the term, so I will explain it in some detail.

Actual possession is what most of us think of as possession; that is, having physical custody or control of an object. For example, if someone had drugs on his person, you may find that he had possession of the drugs. The law recognizes that possession may be sole or joint. If one person alone possesses a controlled substance, that is sole possession. It is possible, however, that more than one person can have control over the same drugs. If this is so, then these people have what is called "joint possession."

A person need not have actual physical custody of an object in order to be in legal possession of it. If an individual has the ability and the intention to exercise substantial

control over an object that he does not have in his physical custody, then he is in possession of that item.  An example of this from everyday experience would be a person's possession of items he keeps in a safe deposit box of his bank.  Although the person does not have physical custody of those items, he has the ability and the intention to exercise substantial control over them and so has what is known as constructive possession of them.

Here is another example.   Suppose A is negotiating the price of heroin with B.  Standing next to A is C, who has several envelopes of heroin in his pocket.  After a period of negotiation, A directs C to hand over to B a few of the envelopes.  B then hands A some money.  In this situation, you could find that C had possession of the heroin because he had them in his pocket.  However, you could also find that A had possession of the narcotics because of his proximity to the drugs, his association with the person -- C -- in actual possession of them, and his negotiations over price.  This example is not conclusive, but is simply meant to illustrate the notion of constructive possession.

Your decision about a defendant's intention to distribute a controlled substance involves a decision about the defendant's state of mind.  It is obviously impossible to directly prove the operation of the defendant's mind.  But a wise and intelligent consideration of all the facts and circumstances shown by the evidence and the exhibits in the case may enable you to infer what the defendant's state of mind was.  Since you cannot read a defendant's mind, you must make inferences from his behavior.

In our everyday affairs, we are continuously called upon to decide from the actions of others what their state of mind is. Experience has taught us that, frequently, actions speak louder and more clearly than spoken or written words. Therefore, you may well rely in part on circumstantial evidence in determining the defendant's state of mind.

It is sufficient in determining intent to distribute if you find that a defendant intended to cause or assist the distribution of the drugs. Basically, what you are determining is whether the drugs possessed were for personal use or for the purpose of distribution. Often it is possible to make this determination from the quantity of drugs found in a person's possession.

The possession of a large quantity of narcotics does not necessarily mean that a person intended to distribute them. On the other hand, a person may have intended to distribute narcotics even if he did not possess large amounts of them. Other physical evidence, such as paraphernalia for the packaging or processing of drugs, can show such an intent. There might also be evidence of a plan to distribute. You should make your decision whether a person intends to distribute any narcotics in his possession from all of the evidence presented.

The conspiracy in Count 3 charges that the controlled substances involved were marijuana and cocaine.

The conspiracy in Count 6 charges that the controlled substances involved were cocaine, cocaine base, methamphetamine, amphetamine, marijuana, and heroin. In this regard, let me instruct you that the purity of the drugs involved is not an element of this crime,

44

so you need not be concerned with that.  You need only find that the co-conspirators agreed to distribute or possess with intent to distribute any quantity of the controlled substance.

Another objective of the conspiracy in Count 6 was to maintain or use a place for the purpose of manufacturing or distributing cocaine, cocaine base, methamphetamine, amphetamine, marijuana, or heroin.  I will now provide you with instructions regarding the crime of maintaining a place for the purpose of manufacturing, distributing, or using controlled substances.[9]

---

[9] *United States v. Salameh*, 152 F.3d 88, 147 (2d Cir. 1998) ("The defendant must be shown to have agreed to commit a *particular offense* and not merely a vague agreement to do something wrong. A court's jury charge comports with this rule when it sets forth the essential nature of the plan by accurately describing the essence of the [conspiracy's] underlying illegal objective[s], and then instructs the jury that the government must demonstrate an agreement as to the objective[s] of the conspiracy. The government is not required to demonstrate that the defendant agreed to all of the conspiracy's objectives, as long as the defendant shared some knowledge of the [conspiracy's] unlawful aims and objectives."). (citations and punctuation omitted; emphasis in original); *see also United States v. Rodriguez*, 68 F. App'x 237, 242 (2d Cir. 2003) (Summary Order) ("the jury was correctly instructed that the government was not obliged to prove all the objectives beyond a reasonable doubt, it was specifically told that if it did not so find, 'you ... must be unanimous as to the object you do find. That is, you must all be in agreement with respect to at least one of the alleged objects of the conspiracy.' Further, the jury was instructed that if it found a drug conspiracy proved, it would be asked to indicate whether the scheme involved crack, powder cocaine, or both. Far from constituting error, these careful instructions ensured that the jury did not conflate the various conspiratorial objectives nor the two drugs at issue in determining if the government met its burden of proof.") (citations omitted); Title 21, United States Code, Section 841 (adapted).

**REQUEST NO. 16**          **THE STATUTE: MAINTAINING A PLACE FOR THE PURPOSE OF MANUFACTURING, DISTRIBUTING, AND USING CONTROLLED SUBSTANCES**

The defendant is charged in Count 6 of the Indictment with conspiracy to distribute controlled substances, and one of the objectives of the conspiracy alleged in Count 6 is maintaining a drug involved premises, in violation of Title 21, United States Code, Section 856(a)(1). Title 21, United States Code, Section 856(a)(1) provides that "[I]t shall be unlawful to knowingly [use or maintain] any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance."[13]

---

[13] Title 21, United States Code, Section 856(a)(1); Title 18, United States Code, Section 2; Modern Federal Jury Instructions ¶ 56.06, Instruction 56-39.

**REQUEST NO. 17**          **ELEMENTS OF THE OFFENSE**

In order to find the defendant guilty of maintaining a drug involved premises as charged in the indictment, the government must prove each of the following elements beyond a reasonable doubt:

First, that the defendant permanently or temporarily used or maintained the place described in the Indictment;

Second, that the defendant maintained that place for the purpose of manufacturing, distributing or using any controlled substance; and

Third, that the defendant acted knowingly.[14]

---

[14] Modern Federal Jury Instructions ¶ 56.06, Instruction 56-40.

**REQUEST NO. 18**             **ELEMENT 1: USING OR MAINTAINING A PLACE**

The first element that the government must prove beyond a reasonable doubt is that the defendant permanently or temporarily used or maintained the premises described in the Indictment, specifically the premises known as Pharaoh's Gentlemen's Club, located at 999 Aero Drive, Cheektowaga, New York.

To "maintain" a place means to exercise significant supervisory control over the activities that occur and the people who are in that place over a period of time.  For example, a person who owns and resides in a house or apartment exercises such control while a casual visitor does not.

In determining whether the defendant permanently or temporarily used or maintained the premises, you should consider all of the relevant evidence, taking into account such factors as how much control the defendant exercised over the property, the duration of that control, and whether the defendant was responsible for furnishing, repairing, protecting, and providing food and other supplies to those at the place.[15]

The terms "use" is given its ordinary meaning.

---

[15] Modern Federal Jury Instructions ¶ 56.06, Instruction 56-41.

48

**REQUEST NO. 19**          **ELEMENT 2: PURPOSE**

The second element that the government must prove beyond a reasonable doubt is that the defendant permanently or temporarily used or maintained the premises for the purpose of manufacturing, distributing, or using any controlled substance.

To establish this element, the government must prove that the drug activity was a significant or important reason why the defendant maintained the place. The government is not required to prove that the drug activity was the defendant's only purpose in maintaining the place, although that would obviously satisfy this element.[16]

---

[16] Modern Federal Jury Instructions ¶ 56.06, Instruction 56-42.

**REQUEST NO. 20**          **ELEMENT 3: KNOWLEDGE**

The third element that the government must prove beyond a reasonable doubt is that the defendant acted knowingly.

An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake, or some other innocent reason.

The question of whether a person acted with knowledge is a question of fact for you to determine, like any other fact question. Direct proof of knowledge is not always available, and such proof is not required. The ultimate fact of whether someone knew something at a particular time, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, his words, his conduct, his acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.[17]

---

[17] Modern Federal Jury Instructions ¶ 56.06, Instruction 56-43.

**REQUEST NO. 21**              **DEFENDANT'S ROLE IN CONSPIRACY**

As I have instructed you, if a person, with an understanding of the unlawful character of a conspiracy, intentionally engages, advises, or assists, for the purpose of furthering the illegal undertaking, he thereby becomes a knowing and willful participant, a conspirator.

Before you conclude a defendant was a member of the conspiracy, you must be satisfied that he knowingly associated himself with the conspiracy with the intent to aid in the accomplishment of one or more of its unlawful purposes.

I further instruct you, however, that is not necessary that a defendant receive any monetary benefit from his participation in the conspiracy or have a financial stake in the outcome as long as he in fact participated in it in the way I have just explained.[18]

---

[18] *United States v. Zambrano*, 776 F.2d 1091, 1095-96 (2d Cir. 1985); *United States v. Torres*, 901 F.2d 205, 222-24, 244-45 (2d Cir. 1990).

**REQUEST NO. 22**              **SPECIAL VERDICT FORM**

I want to address for a moment the verdict form which is being provided to you.  As I have said, one of the objectives of Count 3 is that the defendant Bongiovanni conspired to possess with intent to distribute, or to distribute, 1000 kilograms or more of marijuana.

The amount of the controlled substance involved is unrelated to the issue of whether the defendant is, in fact, guilty.  You will note, however, that the verdict form requires that, in the event you determine the defendant to be guilty of the conspiracy charged in Count 3 involving a mixture or substance containing marijuana.

With regard to marijuana, you must also determine whether the weight of that mixture or substance for which the defendant is responsible was at least 1000 kilograms of marijuana, or if he was responsible for less than 1000 kilograms of marijuana, then it was at least 100 kilograms or more of marijuana, or it was less than 100 kilograms of marijuana.  The verdict form has a place for you to indicate your findings in this regard.

Let me now discuss with you how, if your determination on Count 3 makes it necessary, you are to determine the quantity of marijuana for which defendant Bongiovanni is responsible.  In a conspiracy case such as this one, a member of the conspiracy is responsible for the amount of drugs that he himself agreed to distribute or possess with intent to distribute. In addition, that conspirator is also responsible for all reasonably foreseeable amounts of drugs that other conspirators agreed to distribute or possess with intent to distribute, in furtherance of the criminal activity that the defendant jointly undertook with them. In other

52

words, a defendant is responsible for drug amounts that are within the scope of the conspiracy

that he joined and that are reasonably foreseeable to him.  Your verdict with regard to all of

the questions that you answer on the verdict sheet must be unanimous.

We, the Jury, return the following verdicts in United States v. Joseph Bongiovanni et al.,

Docket Nos. 19-CR-227-LJV and 23-CR-37-LJV.

## COUNT 3

### (Narcotics Conspiracy)

### The Grand Jury Charges That:

Count 3 of the Indictment incorporates the introductory allegations and the

allegations in Count 1 that I have already read to you and further alleges the following:

Beginning in or about 2008, and continuing to in or about August 2019, the exact dates being unknown to the Grand Jury, in the Western District of New York, and elsewhere, the defendant, JOSEPH BONGIOVANNI, did knowingly, willfully, and unlawfully combine, conspire, and agree with Michael Masecchia and others, known and unknown, to commit the following offenses, that is, to possess with intent to distribute, and to distribute, 1000 kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance, and cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 841(b)(1)(C).

All in violation of Title 21, United States Code, Section 846.

See Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Thomas, 274 F.3d 655 (2d Cir. 2001) (en banc); United States v. Jackson, 335 F.3d 170, 175, 180-83 (2d Cir. 2003); United States v. Martinez, 987 F.2d 920, 924-26 (2d Cir. 1993).

As I have instructed you before, if you find that the conspiracy as alleged had any one of the charged objectives, the illegal purpose element is satisfied, so long as you are all in agreement with respect to at least one of the alleged objectives of the conspiracy.

How do you find on Count 1 as to the defendant, _____?

[   ] Guilty          [   ] Not Guilty

If you answered "Guilty" to Count 3 proceed to part "a".

If you answered "Not Guilty" to Count 1 proceed to Count 4 (do not answer part "a").

a.    Did you unanimously find that one of the objectives of the conspiracy was to possess with intent to distribute or to distribute marijuana?

[   ] Yes          [   ] No

If you answered "Yes", proceed to part "1".  If you answered "No", proceed to Count 4.

1.    We, the Jury, find that the amount of the mixture or substance containing cocaine base was:

_____ 1000 kilograms or more

_____ Less than 1000 kilograms but at least 100 kilograms

_____ less than 100 kilograms

I certify the above verdict to be true and accurate.


DATED:      _____ _____, 2024.



_____
JURY FOREPERSON


(PLEASE REMEMBER THAT YOUR VERDICT MUST BE UNANIMOUS)

**REQUEST NO. 23**          **THE INDICTMENT AND THE STATUTE: COUNTS 4 AND 5**

The defendant, Joseph Bongiovanni, is charged in Counts 4 and 5 with a violation of section 201(b) of Title 18 of the United States Code. That section, which I shall refer to as the bribery section, provides that:

"Whoever being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for—

(1) being influenced in the performance of any official act; or

. . .

(2) being induced to do or omit to do any act in violation of the official duty of such official or person;"[19]

[shall be guilty of a crime].

Count 4 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges as follows:

Beginning in or about 2008, and continuing to in or about 2017, the exact dates being unknown to the Grand Jury, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally, in return for being induced to do an act and omit to do an act in violation of his official duty as opportunities arose; that is the defendant, JOSEPH BONGIOVANNI, was paid at least $250,000 in United States currency to, among other acts, open and close a DEA case file; to

---

[19] Title 18, United States Code, Section 201; Modern Federal Jury Instructions ¶ 16.02, Instruction 16-8.

open and close a DEA CS; to cause the issuance of DEA administrative subpoenas; to cause the entry of names, locations, and phone numbers in de-confliction databases; to make false and misleading entries in DEA reports and forms; to make false and misleading statements to other members of law enforcement; to provide information about federal investigations, law enforcement methods and techniques, and the identity of individuals cooperating and potentially cooperating with law enforcement in order to conceal the drug trafficking activities, and to help such drug trafficking activities continue, of individuals associated with the defendant, including individuals the defendant believed to be connected to and associated with IOC.

All in violation of Title 18, United States Code, Section 201(b)(2)(C).

Count 5 of the Indictment incorporates the introductory allegations and the allegations in Count 2 that I have already read to you and further alleges as follows:

Beginning in or about 2009, and continuing to on or about June 6, 2019, the exact dates being unknown to the Grand Jury, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally, in return being influenced in the performance of an official act and for being induced to do an act and omit to do an act in violation of official duty, as opportunities arose; that is the defendant, JOSEPH BONGIOVANNI, was paid United States currency to, among other acts and omissions, omit to enforce the drug laws of the United States against Peter Gerace Jr., and against Pharaoh's Gentlemen's Club located at 999 Aero Drive, Cheektowaga, New York; to falsely advise an Federal Bureau of Investigation (FBI) Special Agent (SA) that Peter Gerace Jr. was a DEA confidential source, thereby inducing the FBI SA to abandon a narcotics investigation into Peter Gerace Jr. and Pharaoh's Gentlemen's Club; to provide advice and information to Peter Gerace Jr.; to help Peter Gerace Jr. and Pharaoh's Gentlemen's Club avoid federal narcotics investigations; to make statements to his co-worker, a fellow DEA SA, to dissuade and discourage the fellow DEA SA from investigating Peter Gerace Jr., and Pharaoh's; to make false and misleading statements to other members of law enforcement; to provide information about law enforcement methods and techniques; and, to help such drug trafficking activities continue.

All in violation of Title 18, United States Code, Sections 201(b)(2)(A) and 201(b)(2)(C).

**REQUEST NO. 24**          **BRIBERY DEFINED (PURPOSE OF THE STATUTE)**

The purpose of the bribery section is to protect the public from the consequences of corruption in public service. It is a major concern of organized society that the community have the benefit of objective evaluation and unbiased judgment on the part of those who participate in the making of official decisions.

In short, the purpose of this statute is to assure high standards of ethical behavior by government employees, and to enforce uniform treatment of all citizens who have matters before governmental agencies.[20]

---

[20] Modern Federal Jury Instructions ¶ 16.02, Instruction 16-9.

**REQUEST NO. 25**         **ELEMENTS OF THE OFFENSE**

In order to find the defendant guilty of the crime of bribery as charged in Count 4, the government must prove each of the following elements beyond a reasonable doubt:

First, that between in or about 2008 and in or about 2017, the defendant demanded, sought, received, or agreed to receive or accept something of value;

Second, that at that time the defendant was then a public official by virtue of his being a Drug Enforcement Administration Special Agent; and

Third, that the defendant did so with the corrupt intent of being induced to do an act or omit to do an act in violation of his official duty.

In order to find the defendant guilty of the crime of bribery as charged in Count 5, the government must prove each of the following elements beyond a reasonable doubt:

First, that between in or about 2009 and on or about June 6, 2019, the defendant demanded, sought, received, or agreed to receive or accept something of value;

Second, that at that time the defendant was then a public official by virtue of his being a Drug Enforcement Administration Special Agent; and

Third, that the defendant did so with the corrupt intent to be influenced in the performance of an official act or for being induced to do an act or omit to do an act in violation of his official duty. [21]

---

[21] Adapted from Modern Federal Jury Instructions ¶ 16.02, Instruction 16-10; *see also* Title 18, United States Code, Section 201(b)(2)(C).

**REQUEST NO. 26**          **ELEMENT 1: RECIPIENT WAS A PUBLIC OFFICIAL**

The first element that the government must prove beyond a reasonable doubt is that at the time in question the defendant was then a public official by virtue of his being a Drug Enforcement Administration Special Agent.

"Public official" is defined in the bribery statute as a "Member of Congress … or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government or a juror."[22]

---

[22] Modern Federal Jury Instructions ¶ 16.02, Instruction 16-11.

61

**REQUEST NO. 27**         **ELEMENT 2: DEMAND OR RECEIPT OF SOMETHING OF VALUE**

The second element that the government must prove beyond a reasonable doubt is that between in or about 2008 and 2017 for Count 4 and between in or about 2009 and June 6, 2019 for Count 5, the defendant demanded, sought, received, or agreed to receive or accept something of value.

The bribery section makes no distinction between demanding, seeking or receiving a bribe; the mere seeking of a bribe is just as much a violation of the statute as the actual receiving of one.[23]

---

[23] Modern Federal Jury Instructions ¶ 16.02, Instruction 16-12.

**REQUEST NO. 28**          **ELEMENT 3: CORRUPT INTENT TO INFLUENCE AN OFFICIAL ACT OR VIOLATE AN OFFICIAL DUTY**

The third element that the government must prove beyond a reasonable doubt is that the defendant demanded, sought, or received the thing of value with the corrupt intent of being induced to do an act or omit to do an act in violation of his official duty, for Count 4, and with the corrupt intent of being influenced in the performance of an official act or for being induced to do an act or omit to do an act in violation of his official duty, for Count 5.

Corrupt intent for bribery means a quid pro quo requirement; that is, there must be a specific intent to demand, seek, or receive something of value in exchange for being influenced in the performance of official acts or violating official duties.

A public official's "official duty" encompasses a public official's job responsibilities as dictated, either orally or in writing, by governing statutes, rules, and regulations.

An "official act" means any decision or action on any question, matter, cause, suit, proceeding, or controversy that may at any time be pending or that may by law be brought before any public official in his official capacity or in his place of trust.

The question, matter, cause, suit, proceeding, or controversy must involve a formal exercise of governmental power similar in nature to a lawsuit before a court, a determination before an agency or a hearing before a committee. It also must be something focused and specific that is pending or may be brought before a public official.

To qualify as an "official act," the public official must make a decision or take an action on that question, matter, cause, suit, proceeding, or controversy, or agree to do so. The public official in fact does not have to intend to perform the "official act," so long as he agrees to do so. An agreement to do so need not be explicit, and the public official need not specify the means that he or she will use to perform his or her end of the bargain.

A public official can perform an "official act" by making a decision or taking an action on a question, matter, cause, suit, proceeding, or controversy on a matter pending or brought before the official. A public official, however, also takes an "official act" if the official uses his or her official position to exert pressure, or advise another public official, knowing or intending that pressure, or advice will form the basis for an "official act" by the second official. Simply setting up a meeting, talking to another official, or organizing an event, or agreeing to do so, however, without more does not constitute an "official act."[24]

---

[24] Adapted from Modern Federal Jury Instructions ¶ 16.02, Instruction 16-13; *United States v. Alfisi*, 308 F.3d 144, 151 n.3 (2d Cir. 2002).  For the instruction on "official act," *see McDonnell v. United States*, 579 U.S. 550, 567–580 (2016).  For the instruction on "official duty," *see United States v. Fernandez*, Nos. 19-15044; 19-15165, 2022 WL 3581793, at *2–*5 (11th Cir. Aug. 22, 2022); *see also United States v. Bailey*, No. 19-156-1 (CKK), 2023 WL 2139365, at *3–*6 (D.D.C. Feb. 21, 2023) (interpreting "lawful duty" as used in section 201(b)(1)(C)); *United States v. Trinh*, Case No. 2:15-cr-00179(A)-CA, 2017 WL 3835138, at *4 (E.D. Cal. Aug. 31, 2017) (same as *Bailey*); *United States v. Young*, 87 F. Supp. 3d 805, 806 (W.D. Va. 2015) (same as *Bailey*); *cf. United States v. Cruz*, 946 F.2d 122, 123 (11th Cir. 1991) (affirming law enforcement officer who provided an investigative target with information relating to the IRS and FBI's investigations in exchange for money violated his lawful duty).

**REQUEST NO. 29**          **STREAM OF BENEFITS**

For Counts 4 and 5, it is sufficient if the government proves that Mr. Bongiovanni solicited or received something of value as part of a stream of benefits that was, for Count 4, corruptly intended to influence violations of Mr. Bongiovanni's official duties, as opportunities arose, and, for Count 5, corruptly intended to influence particular official acts or violations of Mr. Bongiovanni's official duties, as opportunities arose.

In other words, for Counts 4 and 5, the government does not need to establish that a specific bribe payment was made in exchange for a specific official act or violation of duty.  It is sufficient if the government proves that the bribe was solicited or received, or given, offered, or paid, with the intent that Mr. Bongiovanni's services were retained on an "as needed" basis, so that whenever the opportunity presented itself, Mr. Bongiovanni would perform official acts on an identified focused, concrete, and specific question or matter or that Mr. Bongiovanni would violate an identified official or lawful duty, as charged in the specific count you are considering.[25]

---

[25] *See United States v. Silver*, 948 F.3d 538, 556–67 (2d Cir. 2020); *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007).

**REQUEST NO. 30**          **MIXED MOTIVE NOT A DEFENSE**

Because people rarely act for a single purpose, the government does not need to prove that Mr. Bongiovanni was solely motivated by a corrupt purpose when he engaged in the charged bribery conduct.  If you find beyond a reasonable doubt that the bribery conduct charged in Counts 4 and 5 was at least in part done with corrupt intent, then it makes no difference that Mr. Bongiovanni may also have had another lawful motive, like friendship, for soliciting or receiving, or giving or offering, the thing of value.[26]

---

[26] *See United States v. Reichberg*, 5 F.4th 233, 240 (2d Cir. 2021); *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (noting that where a defendant argues friendship provided an innocent motivation for his actions, it is proper to instruct the jury that "a valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability" (internal quotation marks omitted)).

**REQUEST NO. 31**          **THE INDICTMENT AND THE STATUTE: COUNTS 7 THROUGH 13**

The defendant, Joseph Bongiovanni, is charged in Counts 7 through 13 of the Indictment with tampering with evidence in a federal investigation, in violation of Title 18, United States Code, Section 1519.  That section provides that "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, or any case filed under title 11, or in relation to or contemplation of any such matter or case, [shall be guilty of a crime.]"[27]

Count 7 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges the following:

On or about November 4, 2014, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, did knowingly falsify and make false entries in records and documents with intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Drug Enforcement Administration, an agency of the United States, that is, the defendant, JOSEPH BONGIOVANNI, made false and misleading statements in DEA 6 reports he prepared relating to the status of a drug trafficking investigation in DEA Case Number C2-13-0026 and the viability and credibility of the confidential source who was providing information to the DEA regarding a drug trafficking organization in order to close the DEA file and investigation into the organization and shield members and associates of the organization from arrest and prosecution.

All in violation of Title 18, United States Code, Section 1519.

---

[27] Title 18, United States Code, Section 1519.

Count 8 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges the following:

On or about January 28, 2015, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, did knowingly falsify and make false entries in records and documents with intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Drug Enforcement Administration, an agency of the United States, that is, the defendant, JOSEPH BONGIOVANNI made false and misleading statements in DEA 6 reports he prepared relating to the status of a drug trafficking investigation in DEA Case Number C2-13-0026 and the viability and credibility of the confidential source who was providing information to the DEA regarding a drug trafficking organization in order to close the DEA file and investigation into the organization and shield members and associates of the organization from arrest and prosecution.

All in violation of Title 18, United States Code, Section 1519.


Count 9 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges the following:

On or about November 1, 2018, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, did knowingly falsify and make false entries in a record and document with intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Drug Enforcement Administration, Homeland Security Investigations, the Department of Justice, Office of Inspector General, and the Federal Bureau of Investigation, agencies of the United States, that is, the defendant, JOSEPH BONGIOVANNI, in an investigation regarding the nature of the relationship between the defendant and individuals involved in drug trafficking activities, including Peter Gerace Jr., and the drug trafficking activities of such individuals, made false and misleading statements in a memorandum relating to the nature of his relationship and extent of his communications with Peter Gerace Jr. in order to cover up, mislead, create a false justification for, and misrepresent the true relationship between the defendant JOSEPH BONGIOVANNI and Peter Gerace Jr.

All in violation of Title 18, United States Code, Section 1519.


Count 10 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges the following:

On or about December 10, 2018, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, did knowingly falsify and make false entries in a record and document with intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Drug Enforcement Administration, Homeland Security Investigations, the Department of Justice, Office of Inspector General, and the Federal Bureau of Investigation, agencies of the United States, that is, the defendant, JOSEPH BONGIOVANNI, in an investigation regarding the nature of the relationship between the defendant JOSEPH BONGIOVANNI and individuals involved in drug trafficking activities, including Peter Gerace Jr., and the drug trafficking activities of such individuals, made false and misleading statements in a memorandum relating to the nature of his relationship and extent of his communications with Peter Gerace Jr. in order to cover up, mislead, create a false justification for, and misrepresent the true relationship between the defendant JOSEPH BONGIOVANNI and Peter Gerace Jr.

All in violation of Title 18, United States Code, Section 1519.

Count 11 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges the following:

On or about January 28, 2019, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, did knowingly falsify and make false entries in a record and document with intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Drug Enforcement Administration, Homeland Security Investigations, the Department of Justice, Office of Inspector General, and the Federal Bureau of Investigation, agencies of the United States, that is, the defendant, JOSEPH BONGIOVANNI, in an investigation regarding the nature of the relationship between the defendant and individuals involved in drug trafficking activities, including Peter Gerace Jr., and the drug trafficking activities of such individuals, made false and misleading statements in a memorandum relating to the nature of his relationship and extent of his communications with Peter Gerace Jr., in order to cover up, mislead, create a false justification for, and misrepresent the true relationship between the defendant JOSEPH BONGIOVANNI and Peter Gerace Jr. and to misrepresent the true nature of the relationship between Peter Gerace Jr. and a DEA Special Agent known to the Grand Jury.

All in violation of Title 18, United States Code, Section 1519.

Count 12 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges the following:

Beginning on a date unknown but no later than on or about February 1, 2019, to on

or about February 8, 2019, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, did knowingly alter, destroy, mutilate and conceal a record and tangible object with intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Drug Enforcement Administration, Homeland Security Investigations, the Department of Justice, Office of Inspector General, and the Federal Bureau of Investigation, agencies of the United States, that is, the defendant, JOSEPH BONGIOVANNI, in an investigation regarding the nature of the relationship between the defendant and individuals involved in drug trafficking activities, and the drug trafficking activities of such individuals, did cause the contents of, and data on, his DEA-issued cellular telephone to be deleted.

All in violation of Title 18, United States Code, Section 1519.


Count 13 of the Indictment incorporates the introductory allegations and the allegations in Count 1 that I have already read to you and further alleges the following:

Beginning on a date unknown, but no later than on or about February 1, 2019, and continuing to on or about June 6, 2019, in the Western District of New York, the defendant JOSEPH BONGIOVANNI, did knowingly conceal and cover up records, documents, and tangible objects, with intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Drug Enforcement Administration, Homeland Security Investigations, the Department of Justice, Office of Inspector General, and the Federal Bureau of Investigation, agencies of the United States, that is, the defendant, JOSEPH BONGIOVANNI, in an investigation regarding the nature of the relationship between the defendant and individuals involved in drug trafficking activities, and the drug trafficking activities of such individuals, did unlawfully take, remove, conceal, and store the working file in DEA Case Number C2-13-0026 in his residence.

All in violation of Title 18, United States Code, Section 1519.

**REQUEST NO. 32**          **ELEMENTS OF THE OFFENSE**

In order to prove the defendant guilty of tampering with evidence in a federal investigation, the government must prove each of the following elements beyond a reasonable doubt:

First, that the defendant altered or falsified or destroyed or mutilated or concealed or covered up or made a false entry in any record, document, or object that can be used to record or preserve information as alleged in the Indictment;

Second, that the defendant acted knowingly; and

Third, that the defendant acted with the intent to impede, obstruct, or influence an investigation or a matter within the jurisdiction of a department or agency of the United States Government.[28]

---

[28] Modern Federal Jury Instructions ¶ 46.13, Instruction 46-79.

**REQUEST NO. 33**          **ELEMENT 1: ALTERING OR DESTROYING EVIDENCE**

The first element the government must prove beyond a reasonable doubt is:

For Counts 7, 8, 9, 10, and 11: that the defendant falsified or made false entries in any record, document or tangible object as alleged in the Indictment.

For Count 12: that the defendant altered, destroyed, mutilated, or concealed any record, document or tangible object as alleged in the Indictment.

For Count 13: that the defendant concealed or covered up any record, document or tangible object as alleged in the Indictment.[29]

---

[29] Modern Federal Jury Instructions ¶ 46.13, Instruction 46-80.

**REQUEST NO. 34**        **ELEMENT 2: KNOWING CONDUCT**

The second element the government must prove beyond a reasonable doubt is that the defendant acted knowingly.

A person acts knowingly if he acts intentionally and voluntarily, and not because of ignorance, mistake, accident, or carelessness. Whether the defendant acted knowingly may be proven by the defendant's conduct and by all of the facts and circumstances surrounding the case.[30]

---

[30] Modern Federal Jury Instructions ¶ 46.13, Instruction 46-81.

**REQUEST NO. 35**          **ELEMENT 3: INTENT TO IMPEDE INVESTIGATION**

The third element the government must prove beyond a reasonable doubt is that the defendant acted with the intent to impede, obstruct or influence an investigation or a matter within the jurisdiction of a department or agency of the United States Government.

The government is not required to prove that the defendant knew his conduct would obstruct a federal investigation, or that a federal investigation would take place, or that he knew of the limits of federal jurisdiction. However, the government is required to prove that the investigation that the defendant intended to impede, obstruct, or influence did, in fact, concern a matter within the jurisdiction of an agency or department of the United States.[31]

---

[31] Modern Federal Jury Instructions ¶ 46.13, Instruction 46-82.

**REQUEST NO. 36**          **THE INDICTMENT AND THE STATUTE: COUNTS 14 AND 15**

The defendant, Joseph Bongiovanni, is charged in Counts 14 and 15 of the Indictment with knowingly and willfully making false statements to a department or agency of the United States.

Count 14 alleges the following:

On or about March 29, 2019, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, in a matter within the jurisdiction of the executive branch of the United States, did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations to special agents of the Department of Justice, Office of the Inspector General, in that the defendant denied ever witnessing Peter Gerace Jr., consume narcotics; the defendant denied that Peter Gerace Jr. ever called him while a staff member or customer was actively overdosing at the gentlemen's club operated by Peter Gerace Jr.; and the defendant denied ever initiating contact with Peter Gerace Jr., whereas in truth and in fact, and as the defendant then and there well knew, the defendant had witnessed Peter Gerace Jr. consume narcotics; Peter Gerace Jr. did call the defendant while a staff member was overdosing; and the defendant did previously initiate contact with Peter Gerace Jr.

All in violation of Title 18, United States Code, Section 1001(a)(2).

Count 15 alleges the following:

On or about June 6, 2019, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, in a matter within the jurisdiction of the executive branch of the United States, did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations to special agents of the Department of Justice, Office of the Inspector General, and Homeland Security Investigations in that the defendant stated as follows:

(i) he denied he was in a close relationship with Peter Gerace Jr.;

(ii) that he had not spoken with defendant Peter Gerace Jr. in over a year;

(iii) that he had never attended a party with Coconspirator 2, a person known to the Grand Jury;

(iv) that he never socialized with Coconspirator 3, a person known to the Grand Jury, and they never went on any trips together;

(v) that Coconspirator 3's number was in the defendant's telephone because Coconspirator 3 had done the defendant's landscaping;

(vi) that Peter Gerace Jr. once tried to cooperate with the DEA and that the defendant recused himself at the time because he knew Peter Gerace Jr. personally;

75

(vii) that defendant Peter Gerace Jr. and the defendant were together, with others, a few years ago at Lake Erie around the 4th of July by chance encounter;

(viii) that he kept the file regarding DEA Case Number C2-13-0026 in his house because it was an old case and he thought it would come up again and the defendant wanted to verify everything was on the up and up; and

(ix) that Peter Millitello was the source in DEA Case Number C2-13-0026;

whereas in truth and in fact, and as the defendant then and there well knew,

(i) he did have a close relationship with Peter Gerace Jr.;

(ii) he had spoken with Peter Gerace Jr. within the preceding year;

(iii) he did attend a party with Coconspirator 2;

(iv) he did socialize with Coconspirator 3 and they were on a trip to Toronto, Canada together;

(v) Coconspirator 3's number was in his telephone for reasons other than landscaping;

(vi) Peter Gerace Jr. did not try to cooperate with DEA and the defendant did not recuse himself;

(vii) Peter Gerace Jr. and the defendant were not together at Lake Erie around the 4th of July a few years ago by chance encounter;

(viii) he did not keep the file regarding DEA Case Number C2-13-0026 in his house to verify everything was on the up and up; and

(ix) Peter Millitello was not the source in DEA Case Number C2-13-0026.

All in violation of Title 18, United States Code, Section 1001(a)(2).


The relevant statute on this subject is section 1001(a) of Title 18 of the United States

Code. It provides:


[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial

branch of the Government of the United States, knowingly and willfully—

. . .

(2) makes any materially false, fictitious or fraudulent statement or representation;

. . .

shall be [guilty of a crime].[32]


---

[32] Modern Federal Jury Instructions ¶ 36.01, Instruction 36-1.

**REQUEST NO. 37**              **PURPOSE OF THE STATUTE**

The purpose of § 1001 is to protect the authorized functions of the various governmental departments from any type of misleading or deceptive practice and from the adverse consequences that might result from such deceptive practices.

To establish a violation of § 1001, it is necessary for the government to prove certain essential elements—which I will soon describe for you—beyond a reasonable doubt. However, I want to point out now that it is not necessary for the government to prove that the government agency was, in fact, misled as a result of the defendant's action. It does not matter that the agency was not misled, or even that it knew of the misleading or deceptive act, should you find that the act occurred. These circumstances would not excuse or justify a false, fictitious or fraudulent statement made willfully and knowingly about a matter within the jurisdiction of the government of the United States. [33]

---

[33] Modern Federal Jury Instructions ¶ 36.01, Instruction 36-2.

**REQUEST NO. 38**                **ELEMENTS OF THE OFFENSE**

In order to prove the defendant guilty of the crime charged, the government must establish beyond a reasonable doubt that:

First, on or about the date specified, the defendant made a statement or representation;

Second, that this statement or representation was material;

Third, the statement or representation was false, fictitious or fraudulent;

Fourth, the false, fictitious or fraudulent statement was made knowingly and willfully; and

Fifth, the statement or representation was made in a matter within the jurisdiction of the government of the United States.[34]

---

[34] Modern Federal Jury Instructions ¶ 36.01, Instruction 36-9; *United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015).

**REQUEST NO. 39**     **ELEMENT 1: STATEMENT OR REPRESENTATION**

The first element that the government must prove beyond a reasonable doubt is that the defendant made a statement or representation. In this regard, the government need not prove that the defendant physically made or otherwise personally prepared the statement in question. It is sufficient if defendant caused the statement charged in the indictment to have been made. Under this statute, there is no distinction between written and oral statements.[35]

---

[35] Modern Federal Jury Instructions ¶ 36.01, Instruction 36-10.

**REQUEST NO. 40**          **ELEMENT 2: MATERIALITY**

The second element the government must prove beyond a reasonable doubt is that the defendant's statement or representation was material.

A fact is material if it was capable of influencing the government's decisions or activities. However, proof of actual reliance on the statement by the government is not required.[36]

---

[36] Modern Federal Jury Instructions ¶ 36.01, Instruction 36-11.

**REQUEST NO. 41**          **ELEMENT 3: FALSE, FICTICIOUS, OR FRAUDULENT STATEMENT**

The third element that the government must prove beyond a reasonable doubt is that the statement or representation was false, fictitious or fraudulent. A statement or representation is "false" or "fictitious" if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made. A statement or representation is "fraudulent" if it was untrue when made and was made or caused to be made with the intent to deceive the government agency to which it was submitted.

If the government's question was ambiguous, so that it reasonably could be interpreted in several ways, then the government must prove that defendant's answer was false under any reasonable interpretation of the question.[37]

---

[37] Modern Federal Jury Instructions ¶ 36.01, Instruction 36-12.

**REQUEST NO. 42**          **ELEMENT 4: KNOWING AND WILLFUL CONDUCT**

The fourth element that the government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully.

An act is done knowingly if it is done purposely and voluntarily, as opposed to mistakenly or accidently.

An act is done willfully if it is done with an intention to do something the law forbids, that is, with a bad purpose to disobey the law.[38]

---

[38] Modern Federal Jury Instructions ¶ 36.01, Instruction 36-13.

**REQUEST NO. 43**          **ELEMENT 5: MATTER WITHIN THE JURISDICTION OF THE UNITED STATES GOVERNMENT**

As I have told you, the fifth element with respect to each false statement count is that the statement or representation be made with regard to a matter within the jurisdiction of the government of the United States. I charge you that the Department of Justice and the Department of Homeland Security are departments of the United States government.

There is no requirement that the statement be actually directed to or given to the Department of Justice or the Department of Homeland Security. All that is necessary is that you find that it was contemplated that the statement was to be used in a matter that was within the jurisdiction of the government of the United States government. To be within the jurisdiction of a department or agency of the United States government means that the statement must concern an authorized function of that department or agency.

In this regard, it is not necessary for the government to prove that the defendant had actual knowledge that (e.g., the false statement) was to be used in a matter that was within the jurisdiction of the government of the United States. It is sufficient to satisfy this element if you find that the false statement was made with regard to a matter within the jurisdiction of the government of the United States.[39]

---

[39] Modern Federal Jury Instructions ¶ 36.01, Instruction 36-14.

**REQUEST NO. 44**          **UNANIMITY EXPLAINED**

Counts 14 and 15 of the indictment allege a number of false or fraudulent statements.

The government is not required to prove that all of the statements that are alleged in Counts 14 or 15 of the indictment are, in fact, false.

Each juror must agree with each of the other jurors, however, that the same statement or representation alleged in Counts 14 or 15 to be false, fictitious or fraudulent is, in fact, false, fictitious, or fraudulent. The jury need not unanimously agree on each such statement alleged, but, in order to convict, must unanimously agree upon at least one such statement as false, fictitious or fraudulent when knowingly made or used by the defendant. [40]

---

[40] Adapted from 2A O'Malley, Grenig and Lee, *Federal Jury Practice and Instructions*, § 40:15 (6th ed. updated through February 2019); *see also United States v. Crisci*, 273 F.3d 235, 239 (2d Cir. 2001) (affirming conviction and sentence and finding that the district court did not improperly charge the jury that it could convict [defendant] under Section 1001 if any one of the seven charged statements was false wherein the district court also instructed the jury that in order to convict [defendant] under Section 1001, it had to unanimously agree on "any statement that the defendant made in violation of the false statement statute.").

**REQUEST NO. 45**        **ACTS AND DECLARATIONS OF CO-CONSPIRATORS**

You will recall that I have admitted into evidence against the defendant the declarations and statements of others because these declarations and statements were committed by persons who, the government charges, were also confederates or co-conspirators of the defendant on trial. The reasonably foreseeable declarations and statements of any member of a conspiracy made in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be those of all of the members. It is the jury's function to determine whether the evidence, including the co-conspirators' declarations and statements, is credible and convincing. The burden of proving beyond a reasonable doubt that a conspiracy existed and that the defendant was a member of that conspiracy remains with the government.[41]

---

[41] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-9.

**REQUEST NO. 46**               **IMPOSSIBILITY OF SUCCESS**

It is not a defense to a conspiracy charge that the object of the conspiracy could not be achieved because of circumstances that the conspirators did not know about. Thus, you may find the defendants guilty of conspiracy even though it was impossible for them to carry out their plan successfully.[42]

---

[42] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-10.1; *United States v. Wallace*, 85 F.3d 1063, 1068 (2d Cir. 1996).

**REQUEST NO. 47**          **SUCCESS OF CONSPIRACY IMMATERIAL**

The government is not required to prove that any of the members of the conspiracy were successful in achieving any or all of the objectives of the conspiracy. You may find the defendant guilty of conspiracy if you find that the government proved beyond a reasonable doubt the elements I have explained, even if you find that the government did not prove that any of the conspirators actually committed the substantive offense. Conspiracy is a criminal offense separate from the offense that was the objective of the conspiracy; conspiracy is complete without the commission of the object crime offense.[43]

---

[43] S1 Modern Federal Jury Instructions-Criminal 6.18.371G; *see also United States v. Watkins*, 339 F.3d 167, 178 (3d Cir. 2003); *United States v. Uzzolino*, 651 F.2d 207, 213-14 (3d Cir. 1981); *United States v. Shoup*, 608 F. 2d 950, 956-59 (3d Cir. 1979).

**REQUEST NO. 48**          **FAILURE TO NAME A DEFENDANT**

You may not draw any inference, favorable or unfavorable, towards the government or the defendant on trial, from the fact that certain persons were not named as defendants in the indictment or that certain persons were named as co-conspirators but not indicted.  The fact that these persons were not indicted must play no part in your deliberations.

Whether a person should be named as a co-conspirator or indicted as a defendant is a matter within the sole discretion of the United States Attorney and the grand jury.  Therefore, you may not consider it in any way in reaching your verdict as to the defendants on trial.[44]

---

[44] Modern Federal Jury Instructions-Criminal ¶ 3.01, Instruction 3-4.

**REQUEST NO. 49**      **SPECIFIC   INVESTIGATION   TECHNIQUES   NOT REQUIRED**

During the trial, you have heard testimony of witnesses and argument by counsel that the government did not utilize specific investigative techniques.

You may consider these facts in deciding whether the government has met its burden of proof, because as I told you, you should look to all of the evidence or lack of evidence in deciding whether the defendant is guilty.  However, you also are instructed that there is no legal requirement that the government use particular investigative techniques to prove its case. There is no requirement to test every piece of evidence.  Law enforcement techniques are not your concern.

Your concern, as I have said, is to determine whether or not, on the evidence or lack of evidence, the defendant's guilt has been proved beyond a reasonable doubt.[45]

---

[45] Modern Federal Jury Instructions-Criminal ¶ 4.01, Instruction 4-4.

**REQUEST NO. 50**          **ACCOMPLICES CALLED BY THE GOVERNMENT**

You have heard witnesses who testified that they were actually involved in planning and carrying out the crimes charged in the Indictment.  There has been a great deal said about these so-called accomplice witnesses in the summations of counsel and whether or not you should believe them.

The government argues, as it is permitted to do, that it must take the witnesses as it finds them.  It argues that only people who themselves take part in criminal activity have the knowledge required to show criminal behavior by others.

For those very reasons, the law allows the use of accomplice testimony.  Indeed, it is the law in federal courts that the testimony of accomplices may be enough in itself, for conviction, if the jury finds that the testimony establishes guilt beyond a reasonable doubt.

However, it is also the case that accomplice testimony is of such nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe.

I have given you some general considerations on credibility and I will not repeat them all here nor will I repeat all of the arguments made on both sides.  However, let me say a few things that you may want to consider during your deliberations on the subject of accomplices.

You should ask yourselves whether these so-called accomplices would benefit more by lying or by telling the truth.  Was their testimony made up in any way because they believed or hoped that they would somehow receive favorable treatment by testifying falsely?  Or did they believe that their interests would be best served by testifying truthfully?  If you believe that the witness was motivated by hopes of personal gain, was the motivation one that would cause him to lie or was it one that would cause him to tell the truth?  Did this motivation color his testimony?

In sum, you should look at all of the evidence in deciding what credence and what weight, if any, you will want to give to the accomplice witnesses.[46]

---

[46] Modern Federal Jury Instructions-Criminal ¶ 7.01, Instruction 7-5.

**REQUEST NO. 51**          **WITNESS USING OR ADDICTED TO DRUGS**

There has been evidence introduced at the trial that the government (or defendant) called as a witness a person who was using (or addicted to) drugs when the events he observed took place or who is now using drugs. I instruct you that there is nothing improper about calling such a witness to testify about events within his personal knowledge.

On the other hand, his testimony must be examined with greater scrutiny than the testimony of any other witness. The testimony of a witness who was using drugs at the time of the events he (or she) is testifying about, or who is using drugs (or an addict) at the time of his testimony may be less believable because of the effect the drugs may have on his ability to perceive or relate the events in question.

If you decide to accept his testimony, after considering it in light of all the evidence in this case, then you may give it whatever weight, if any, you find it deserves.[47]

---

[47] Modern Federal Jury Instructions-Criminal ¶ 7.01, Instruction 7-9-1.

**REQUEST NO. 52**         **ADMISSION OF DEFENDANT**

There has been evidence that the defendant made certain statements in which the government claims he admitted certain facts charged in the indictment.

In deciding what weight to give the defendant's statements, you should first examine with great care whether each statement was made and whether, in fact, it was voluntarily and understandingly made. I instruct you that you are to give the statements such weight as you feel they deserve in light of all the evidence.[48]

---

[48] Modern Federal Jury Instructions-Criminal ¶ 5.07, Instruction 5-19.

**REQUEST NO. 53**          **CONSCIOUSNESS OF GUILT FROM FALSE EXCULPATORY STATEMENT**

You have heard testimony that the defendant made certain statements outside the courtroom to law enforcement authorities in which the defendant claimed that his conduct was consistent with innocence and not with guilt. The government claims that these statements in which he exonerated or exculpated himself are false.

If you find that the defendant gave a false statement in order to divert suspicion from himself, you may, but are not required to infer that the defendant believed that he was guilty. You may not, however, infer on the basis of this alone, that the defendant is, in fact, guilty of the crime for which he is charged.

Whether the evidence as to a defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to any such evidence, are matters for you, the jury, to decide.[49]

---

[49] Modern Federal Jury Instructions-Criminal ¶ 6.05, Instruction 6-11.

**REQUEST NO. 54**         **CHARTS AND SUMMARIES**

The government has presented exhibits in the form of charts and summaries. I decided to admit these charts and summaries in place of the underlying documents that they represent in order to save time and avoid unnecessary inconvenience. You should consider these charts and summaries as you would any other evidence.[50]

---

[50] Modern Federal Jury Instructions-Criminal ¶ 5.05, Instruction 5-12.

**REQUEST NO. 55**          **SIMILAR ACTS – INTENT, KNOWLEDGE, ABSENCE OF MISTAKE**

The government has offered evidence tending to show that on a different occasion the defendant engaged in conduct similar to the charges in the indictment.

In that connection, let me remind you that the defendant is not on trial for committing this act not alleged in the indictment. Accordingly, you may not consider this evidence of the similar act as a substitute for proof that the defendant committed the crime charged. Nor may you consider this evidence as proof that the defendant has a criminal personality or bad character. The evidence of the other, similar act was admitted for a much more limited purpose and you may consider it only for that limited purpose.

If you determine that the defendant committed the acts charged in the indictment and the similar acts as well, then you may, but you need not draw an inference that in doing the acts charged in the indictment, the defendant acted knowingly and intentionally and not because of some mistake, accident or other innocent reasons.

Evidence of similar acts may not be considered by you for any other purpose. Specifically, you may not use this evidence to conclude that because the defendant committed the other act he must also have committed the acts charged in the indictment.[51]

---

[51] Modern Federal Jury Instructions-Criminal ¶ 5.10, Instruction 5-25.

**REQUEST NO. 56**          **CONSCIOUSNESS OF GUILT FROM FALSIFICATION OF EVIDENCE**

You have heard testimony that the defendant, Mr. Bongiovanni, knowingly attempted to falsify evidence in this case. If you find that the defendant attempted to falsify evidence in order to mislead investigating authorities, you may, but need not, infer that the defendant believed that he was guilty. You may not, however, infer on the basis of this alone, that the defendant is, in fact, guilty of the crime for which he is charged.

Whether evidence that the defendant falsified evidence shows that the defendant believed that he was guilty and the significance, if any, to be given to such evidence, are matters for you, the jury, to decide.[52]

---

[52] Modern Federal Jury Instructions-Criminal ¶ 6.05, Instruction 6-14.