03:07PM

```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                      Case No. 1:19-cr-227
 4              Plaintiff,                     (LJV)
   v.
 5                                    February 29, 2024
   JOSEPH BONGIOVANNI,
 6
   _____Defendant._____
 7

 8       TRANSCRIPT EXCERPT - EXAMINATION OF DJ GRANVILLE
           BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                 UNITED STATES DISTRICT JUDGE

10
   APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
11                       BY: JOSEPH M. TRIPI, ESQ.
                             NICHOLAS T. COOPER, ESQ.
12                           CASEY L. CHALBECK, ESQ.
                         Assistant United States Attorneys
13                       Federal Centre
                         138 Delaware Avenue
14                       Buffalo, New York 14202
                             And
15                       UNITED STATES DEPARTMENT OF JUSTICE
                         BY: JORDAN ALAN DICKSON, ESQ.
16                       1301 New York Ave NW
                         Suite 1000
17                       Washington, DC 20530-0016
                         For the Plaintiff
18
                         SINGER LEGAL PLLC
19                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
20                       Williamsville, New York 14221
                             And
21                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
22                       3110 Delaware Avenue
                         Kenmore, New York  14217
23                       For the Defendant

24 PRESENT:              BRIAN A. BURNS, FBI Special Agent
                         MARILYN K. HALLIDAY, HIS Special Agent
25                       KAREN A. CHAMPOUX, USA Paralegal
```

| | | |
|---|---|---|
| 1 | **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |
| 2 | **COURT DEPUTY CLERK:** | **JANE D. KELLOGG** |
| 3 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 4 | | Robert H. Jackson Federal Courthouse |
| | | 2 Niagara Square |
| | | Buffalo, New York  14202 |
| 5 | | Ann_Sawyer@nywd.uscourts.gov |

6

7                    *    *    *    *    *    *    *

8

9          (Excerpt commenced at 3:07 p.m.)

10          (Jury is present.)

03:07PM    11          **THE COURT:**  The government can call its next witness.

03:07PM    12          **MR. COOPER:**  Thank you, Judge.  The government calls

03:07PM    13    DJ Granville.

03:08PM    14

03:08PM    15    **D J   G R A N V I L L E,** having been duly called and sworn,

03:08PM    16    testified as follows:

03:08PM    17          **MR. COOPER:**  Judge, may I inquire?

03:08PM    18          **THE COURT:**  You may.

03:08PM    19

03:08PM    20                    **DIRECT EXAMINATION BY MR. COOPER:**

03:08PM    21    Q.  Good afternoon, Mr. Granville, how are you?

03:08PM    22    A.  Good, how are you?

03:08PM    23    Q.  Well, thank you.  Can you tell the jury a little bit

03:08PM    24    about your background, where you grew up?

03:08PM    25    A.  I grew up in the City of Buffalo.  I started the police

03:08PM 1   academy in August of 1998.  I spent approximately seven years

03:08PM 2   with the Buffalo Housing Police.  The majority of my time

03:08PM 3   there was spent -- at the time, it's now the FBI Safe Streets

03:08PM 4   Task Force, it was called the Career Criminal Task Force.

03:09PM 5   And then I -- they closed up shop there, and I went to the

03:09PM 6   NFTA police for three years.  And then caught on with the

03:09PM 7   Sheriff's Office in about 2008.

03:09PM 8   Q.  Is it fair to say that since you began working in law

03:09PM 9   enforcement in the Housing Authority, that you've continued a

03:09PM 10  career in law enforcement that whole time?

03:09PM 11  A.  Yes.

03:09PM 12  Q.  Okay.  And you said you started in the Sheriff's Office

03:09PM 13  in Erie County in 2008?

03:09PM 14  A.  That's correct.

03:09PM 15  Q.  Can you describe for the jury your progression through

03:09PM 16  the Sheriff's Office from 2008 through 2024?

03:09PM 17  A.  I started as a deputy, and ultimately was promoted to

03:09PM 18  detective around -- around 2010.

03:09PM 19      From there, I was promoted to senior detective.

03:09PM 20      And ultimately to the position which I hold now, which is

03:09PM 21  the chief of narcotics and intelligence with the Erie County

03:09PM 22  Sheriff's Office.

03:09PM 23  Q.  Generally, as a detective in the narcotics unit, and I

03:09PM 24  guess let's cover your time as a detective first.  Did you

03:10PM 25  work on a variety of different types of narcotics

03:10PM    1    investigations?

03:10PM    2    A.    Yes.

03:10PM    3    Q.    Did you work on marijuana cases?

03:10PM    4    A.    Yes.

03:10PM    5    Q.    Did you work on cocaine cases?

03:10PM    6    A.    Yes.

03:10PM    7    Q.    Okay.  Heroin?

03:10PM    8    A.    Yes.

03:10PM    9    Q.    Did you obtain search warrants?

03:10PM   10    A.    Yes.

03:10PM   11    Q.    Okay.  And did you also participate in execution of

03:10PM   12    search warrants?

03:10PM   13    A.    Yes.

03:10PM   14    Q.    Did you handle confidential informants or confidential

03:10PM   15    sources?

03:10PM   16    A.    Yes.

03:10PM   17    Q.    What is the term that, in the Erie County Sheriff's

03:10PM   18    Office, is used to refer to a confidential source or

03:10PM   19    informant?

03:10PM   20    A.    It's -- it's either confidential source, confidential

03:10PM   21    informant, or the nontechnical term, a snitch.

03:10PM   22    Q.    Okay.  And have you participated in the handling of

03:10PM   23    confidential sources?

03:10PM   24    A.    Yes.

03:10PM   25    Q.    Are confidential sources an important part of building a

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

5

03:10PM   1   drug investigation?

03:10PM   2   A.   Yes.

03:10PM   3   Q.   During the course of your career, have you had a

03:10PM   4   confidential source where they don't presently have any

03:11PM   5   information, but you leave them open?  Has that ever happened

03:11PM   6   before?

03:11PM   7   A.   Yes.

03:11PM   8   Q.   Why do you leave them open if they don't presently have

03:11PM   9   any information?

03:11PM   10   A.   Well, it would depend what the confidential source was

03:11PM   11   cooperating for.  Whether it was a working off charges, for

03:11PM   12   money, potentially working off charges for somebody else, or

03:11PM   13   just a concerned citizen.  So it would depend on -- it would

03:11PM   14   vary in each particular case.

03:11PM   15   Q.   Is it fair to say that over time, an informant could gain

03:11PM   16   new information or new knowledge?

03:11PM   17   A.   Yes.

03:11PM   18   Q.   Okay.  And would that be helpful in your work as a

03:11PM   19   narcotics detective?

03:11PM   20   A.   Yes.

03:11PM   21   Q.   You told -- you told the jury that after working as a

03:11PM   22   detective, you became a senior detective; is that correct?

03:11PM   23   A.   That's correct.

03:11PM   24   Q.   How did your responsibilities change when you became

03:11PM   25   senior detective?

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

6

03:11PM   1   A.   I then supervised a group of detectives and deputies that

03:11PM   2   were assigned to the narcotics and intelligence unit.

03:11PM   3   Q.   Okay.  And what was the period of years that you were a

03:11PM   4   senior detective, approximately?

03:11PM   5   A.   Maybe four or five years.

03:12PM   6   Q.   Okay.  And after being a senior detective, were you

03:12PM   7   promoted again to your current role?

03:12PM   8   A.   That's correct.

03:12PM   9   Q.   Okay.  And how do your responsibilities differ now as the

03:12PM   10  chief of the narcotics and intelligence unit?

03:12PM   11  A.   I still participate generally on a day-to-day level with

03:12PM   12  our narcotics unit, but I've also taken on more

03:12PM   13  administrative responsibilities which tie up a lot of my

03:12PM   14  time.

03:12PM   15  Q.   Is that less fun?

03:12PM   16  A.   Less fun.

03:12PM   17  Q.   Have you -- during the course of your whole career

03:12PM   18  working in law enforcement, can you estimate for the jury how

03:12PM   19  many search warrants you've been a part of?

03:12PM   20  A.   More than a thousand.

03:12PM   21  Q.   Have you participated in drafting search warrants?

03:12PM   22  A.   Yes.

03:12PM   23  Q.   Are you aware -- are you aware of the different sorts of

03:12PM   24  investigative techniques that can be used to obtain a search

03:12PM   25  warrant?

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

| | | |
|---|---|---|
| 03:12PM | 1 | A.  Yes. |
| 03:12PM | 2 | Q.  Would surveillance on a target be one sort of |
| 03:12PM | 3 | investigative technique? |
| 03:12PM | 4 | A.  Yes. |
| 03:12PM | 5 | Q.  And just to frame this, I'm talking specifically about |
| 03:13PM | 6 | narcotics investigations.  In addition to surveillance, is |
| 03:13PM | 7 | the use of a confidential source a helpful tool in getting a |
| 03:13PM | 8 | search warrant? |
| 03:13PM | 9 | A.  Yes. |
| 03:13PM | 10 | Q.  Is it fair to say that narcotics investigations vary in |
| 03:13PM | 11 | length, how long they go for? |
| 03:13PM | 12 | A.  Yes. |
| 03:13PM | 13 | Q.  Okay.  Can you describe just for the jury in your own |
| 03:13PM | 14 | words what the difference is in how some investigations vary |
| 03:13PM | 15 | in length? |
| 03:13PM | 16 | A.  It depends on each investigation.  There are some |
| 03:13PM | 17 | investigations where you need to conduct, you know, |
| 03:13PM | 18 | controlled purchases or maybe some meet and greets with the |
| 03:13PM | 19 | target to obtain certain information.  There's a lot of |
| 03:13PM | 20 | physical surveillance that is involved in it. |
| 03:13PM | 21 |     If the source is reliable, we're able to take that |
| 03:13PM | 22 | source, if he has very credible and very recent information |
| 03:13PM | 23 | pertaining to the target or residence or storage facility or |
| 03:13PM | 24 | a vehicle, and obtain search warrants that way. |
| 03:14PM | 25 |     On a state level, we utilize the term what's called |

Case 1:19-cr-00227-LJV-MJR   Document 932   Filed 05/12/24   Page 8 of 45
USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

8

03:14PM   1   "in camera."  We'll make an appointment with the judge --

03:14PM   2   whether on site in his chambers or her chambers, or off site

03:14PM   3   in a vehicle in a restaurant, whatever it may be -- and that

03:14PM   4   informant will testify to the judge under oath to his or her

03:14PM   5   knowledge relating to the drug activities of a certain

03:14PM   6   individual.

03:14PM   7        And then a judge decides if there's probable cause for a

03:14PM   8   search warrant.  And if so, he'll sign that warrant, and then

03:14PM   9   we'll plan around when we're executing those warrants.

03:14PM  10   Q.  During the course of your lengthy career as a narcotics

03:14PM  11   investigator, have you been a part of narcotics cases that

03:14PM  12   develop and resolve very quickly?

03:14PM  13   A.  Yes.

03:14PM  14   Q.  What's "very quickly" to you?

03:14PM  15   A.  One day.

03:14PM  16   Q.  Okay.  Have you been a part of longer-term narcotics

03:14PM  17   investigations?

03:14PM  18   A.  Yes.

03:14PM  19   Q.  In your experience, is there sometimes a nexus working as

03:14PM  20   a narcotics investigator with violent crimes?

03:15PM  21   A.  Yes.

03:15PM  22   Q.  Okay.  And are there times when information that comes in

03:15PM  23   about a violent crime is also information that's pertinent in

03:15PM  24   a narcotics investigation?

03:15PM  25   A.  Yes.

03:15PM    1    Q.  Okay.  Are drug dealers known to have lots of cash?

03:15PM    2    A.  Yes, some.

03:15PM    3    Q.  Okay.  And are some drug dealers known to have a lot of

03:15PM    4    product that has expensive value --

03:15PM    5    A.  Yes.

03:15PM    6    Q.  -- or a high value?

03:15PM    7        In your experience working as a narcotics investigator,

03:15PM    8    are narcotics traffickers or large-scale narcotics

03:15PM    9    traffickers, specifically, targets of armed robbery?

03:15PM   10    A.  They are.

03:15PM   11    Q.  Okay.  Has that come up during the course of your career?

03:15PM   12    A.  Yes.

03:15PM   13    Q.  Once, or more than once?

03:15PM   14    A.  More than once.

03:15PM   15    Q.  Do you cooperate with other law enforcement agencies in

03:15PM   16    your work as a narcotics investigator?

03:15PM   17    A.  Yes.

03:15PM   18    Q.  Okay.  And is that something that happens frequently or

03:15PM   19    infrequently?

03:15PM   20    A.  Almost on a daily basis.

03:15PM   21    Q.  Okay.  What other law enforcement agencies do you work

03:15PM   22    with frequently?

03:15PM   23    A.  We work with the Buffalo Police Department almost on a

03:16PM   24    daily basis.  We work with the FBI Safe Streets Task Force

03:16PM   25    frequently.  We work with the DEA.  We also work with his and

03:16PM  1   any local town, or village, suburban police department.

03:16PM  2   Q.  Do you share information with those other law enforcement

03:16PM  3   agencies during the course of your regular duties?

03:16PM  4   A.  Yes.

03:16PM  5   Q.  Okay.  And do they share information with you, as well?

03:16PM  6   A.  Yeah, they do.

03:16PM  7   Q.  Okay.  Do you trust information that's provided to you by

03:16PM  8   law enforcement officers from other agencies?

03:16PM  9   A.  Yes.

03:16PM 10   Q.  Is that trust necessary in order to effectively do your

03:16PM 11   job?

03:16PM 12   A.  It is.

03:16PM 13   Q.  We talked a little bit a moment ago about confidential

03:16PM 14   informants, and I just want to speak with you about your

03:16PM 15   experience handling informants.

03:16PM 16       Is it important in your experience to keep a confidential

03:16PM 17   informant's identity secured?

03:16PM 18   A.  Yes.

03:16PM 19   Q.  How important?

03:16PM 20   A.  It's extremely important.

03:17PM 21   Q.  Why?

03:17PM 22   A.  We're talking -- we're putting -- you know, whether you

03:17PM 23   agree or disagree with some of the life choices that some of

03:17PM 24   these informants have made, you know, it's a life-or-death

03:17PM 25   situation for -- for most of them.  Because if their

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

11

03:17PM   1    identities are revealed to other drug suspects, or drug

03:17PM   2    dealers, or other members of -- that are involved in violent

03:17PM   3    crime, it could cost them their life.

03:17PM   4    Q.  Are you married?

03:17PM   5    A.  I am.

03:17PM   6    Q.  If you're out to lunch with your wife and you saw an

03:17PM   7    informant walk by, would you tell her, hey, that guy's an

03:17PM   8    informant?

03:17PM   9    A.  No.

03:17PM  10    Q.  Is that the sort of information that keep within your

03:17PM  11    team and law enforcement sensitive?

03:17PM  12    A.  Yes.

03:17PM  13    Q.  Where did you go to high school, DJ?

03:17PM  14    A.  Bishop Timon.

03:17PM  15    Q.  What's that?

03:17PM  16    A.  Bishop Timon.

03:17PM  17    Q.  Okay.  And if you, in your role as a narcotics detective

03:17PM  18    before you became a boss, if you had a person come in that

03:17PM  19    wanted to become a confidential source, and it was someone

03:18PM  20    that you were friends with in high school, would you sign

03:18PM  21    that person up?

03:18PM  22    A.  Me, personally?

03:18PM  23    Q.  Correct.

03:18PM  24    A.  No.

03:18PM  25    Q.  Would you be their handling agent?

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

12

| | | |
|---|---|---|
| 03:18PM | 1 | A.  No. |
| 03:18PM | 2 | Q.  Why not? |
| 03:18PM | 3 | **MR. MacKAY:**  Judge, I'm going to object to this line |
| 03:18PM | 4 | about the C.I.s.  I think we're talking only about Sheriff's |
| 03:18PM | 5 | Office procedure, and there's a question of whether it's |
| 03:18PM | 6 | relevant to the DEA procedure, if that's where we're going. |
| 03:18PM | 7 | **MR. COOPER:**  Judge, I think we're talking about the |
| 03:18PM | 8 | proper handling of C.I.s in law-enforcement community |
| 03:18PM | 9 | generally, not DEA specific. |
| 03:18PM | 10 | **THE COURT:**  I'll allow it.  Overruled. |
| 03:18PM | 11 | **BY MR. COOPER:** |
| 03:18PM | 12 | Q.  Go ahead. |
| 03:18PM | 13 | A.  If we were to have a -- if I were to have a person or |
| 03:18PM | 14 | someone that I work with were to have a person that had -- |
| 03:18PM | 15 | they had a personal relationship with come in and want to be |
| 03:18PM | 16 | a C.I. for one reason or another, it -- it would -- it would |
| 03:18PM | 17 | be our regular practice to toss that C.I. to somebody that |
| 03:18PM | 18 | doesn't have a history with that person. |
| 03:18PM | 19 | Q.  And I want to again focus this question during your time |
| 03:18PM | 20 | as a narcotics detective, not as a supervisor. |
| 03:18PM | 21 | If you were a narcotics detective investigating a |
| 03:19PM | 22 | drug-trafficking group, and during that investigation a close |
| 03:19PM | 23 | personal friend of yours came up as a target in that |
| 03:19PM | 24 | investigation, what would you do? |
| 03:19PM | 25 | A.  It would just check myself out of the investigation. |

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

13

| | |
|---|---|
| 03:19PM | 1 |
| 03:19PM | 2 |
| 03:19PM | 3 |
| 03:19PM | 4 |

03:19PM   1   Q.  Why?

03:19PM   2   A.  It's -- that's, first off, it's -- it would hurt, hurt

03:19PM   3   for me as a friend of that person for them to come up,

03:19PM   4   number 1.

03:19PM   5       And number 2, I wouldn't want to have any involvement.

03:19PM   6   Q.  We talked before a little bit about the nexus between

03:19PM   7   narcotics offenses and violent crimes.  Did there come a time

03:19PM   8   in April of 2017 when you were contacted by the FBI Safe

03:19PM   9   Streets Task Force to work jointly on an investigation?

03:19PM   10  A.  Yes.

03:19PM   11  Q.  Can you tell the jury who contacted you?

03:19PM   12  A.  It was Special Agent Jason Galle.

03:19PM   13  Q.  Okay.  And what was the nature of that joint

03:19PM   14  investigation that was brought to you by Special Agent Galle?

03:19PM   15  A.  Special Agent Galle advised us, or advised me that there

03:19PM   16  was a group of individuals that were looking to rob Ron

03:20PM   17  Serio.

03:20PM   18  Q.  Did you learn, during the course of your conversation

03:20PM   19  with Special Agent Galle, why Ron Serio was the target of a

03:20PM   20  robbery from a group of individuals?

03:20PM   21  A.  Yes.

03:20PM   22  Q.  Why?

03:20PM   23  A.  It was said from these individuals that Mr. Serio was in

03:20PM   24  possession of a large amount of marijuana and drugs, and a

03:20PM   25  large amount of U.S. currency.

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

03:20PM  1  Q.  Was that the first time in your career that that sort of

03:20PM  2  scenario had played out, where you learned about a home

03:20PM  3  invasion before it happened?

03:20PM  4  A.  No.

03:20PM  5  Q.  Okay.  And was law enforcement's plan at that point to

03:20PM  6  sit and wait and catch them in the act of the home invasion?

03:20PM  7  A.  Absolutely not.

03:20PM  8  Q.  Can you tell the jury why that wasn't the plan?

03:20PM  9  A.  It's -- it's very dangerous on many levels.  It's

03:20PM  10  dangerous for us.  It's dangerous for the suspects.  It's

03:20PM  11  certainly dangerous for the target of the home invasion.

03:20PM  12      There's been many times in my career where we've come

03:21PM  13  across information where the target -- there was a target of

03:21PM  14  a home invasion, and there was nothing there really we could

03:21PM  15  do criminally, and we would make notification to that

03:21PM  16  individual.  Like, hey, listen, we get you're a drug dealer,

03:21PM  17  but there's another drug dealer and dangerous people out here

03:21PM  18  looking to rob you and do bad things to you.

03:21PM  19  Q.  With respect to Ron Serio, how did you and the FBI Safe

03:21PM  20  Streets Task Force decide to pursue that situation?

03:21PM  21  A.  We decided to target Ron Serio.

03:21PM  22  Q.  And would this have been sometime in early April of 2017?

03:21PM  23  A.  Yes.

03:21PM  24  Q.  Okay.  At the time, you say you decided to target Ron

03:21PM  25  Serio.  Did you have buys into Ron Serio?

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

15

03:21PM   1    A.  No.

03:21PM   2    Q.  Did the FBI have buys into Ron Serio?

03:21PM   3    A.  Not to my knowledge.

03:21PM   4    Q.  Had you been investigating him for months before that?

03:21PM   5    A.  No.

03:21PM   6    Q.  Had you been investigating him for years before that?

03:21PM   7    A.  No.

03:21PM   8    Q.  Did you have an open file on your desk with Ron Serio's

03:21PM   9    name written on it?

03:21PM  10    A.  No.

03:21PM  11    Q.  Okay.  So was it fair to say this was kind of the first

03:22PM  12    you'd heard of Ron Serio?

03:22PM  13    A.  Yes.

03:22PM  14    Q.  Okay.  From the first time you heard of Ron Serio, did

03:22PM  15    there come a time after that when you executed search

03:22PM  16    warrants at his house?

03:22PM  17    A.  Yes.

03:22PM  18    Q.  How much time passed from the first time you heard Ron

03:22PM  19    Serio's name to you executing warrants at his house?

03:22PM  20    A.  It was less than two weeks.

03:22PM  21    Q.  Can you tell the jury about how that investigation

03:22PM  22    progressed from beginning to end?

03:22PM  23    A.  We had identified someone that Ron Serio was supplying

03:22PM  24    over on Huntington Avenue in North Buffalo.

03:22PM  25        We were able to develop some probable cause for a search

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

16

03:22PM    1    warrant of this Huntington Avenue address.  We set up some

03:22PM    2    surveillance, some stationary surveillance on this Huntington

03:22PM    3    address, and also on Mr. Serio's address on Lebrun.  And

03:22PM    4    things kind of progressed from there.

03:22PM    5    Q.  Was this being worked at this time only by the Erie

03:23PM    6    County Sheriff's Office?

03:23PM    7    A.  No.

03:23PM    8    Q.  Was the Safe Streets Task Force involved, as well?

03:23PM    9    A.  Yes.

03:23PM   10    Q.  Now you mentioned that there was surveillance set up at

03:23PM   11    two different locations; is that correct?

03:23PM   12    A.  That's correct.

03:23PM   13    Q.  Do you remember what day this was?

03:23PM   14    A.  That I don't recall the exact day.

03:23PM   15    Q.  Okay.  Was it a couple weeks after you first learned of

03:23PM   16    the Serio name?

03:23PM   17    A.  Roughly two weeks or less.

03:23PM   18    Q.  Okay.  Now, was that surveillance at the house on Lebrun

03:23PM   19    and the house on Huntington happening simultaneously?

03:23PM   20    A.  It was.

03:23PM   21    Q.  Were you at one of those locations?

03:23PM   22    A.  I was.

03:23PM   23    Q.  Which location?

03:23PM   24    A.  I was on Lebrun.

03:23PM   25    Q.  Okay.  And at any point, did you observe Serio leave the

03:23PM   1    residence on Lebrun?

03:23PM   2    A.   No.   We had -- we had arrived on Lebrun, and another crew

03:23PM   3    of guys arrived on Huntington.   A short time later we were

03:24PM   4    advised that Mr. Serio had showed up at the address on

03:24PM   5    Huntington.

03:24PM   6    Q.   What did you do at that point?

03:24PM   7    A.   At that point, we were -- maintained our surveillance.

03:24PM   8    Mr. Serio had left the address on Huntington, shot back to

03:24PM   9    his place on Lebrun, and then ultimately went back to this

03:24PM   10   place on Huntington.

03:24PM   11   Q.   Okay.   So let's break that down.   You didn't see him

03:24PM   12   leave Lebrun, but did you see him arrive back at Lebrun?

03:24PM   13   A.   We did.

03:24PM   14   Q.   Okay.   And did you see what vehicle he was in?

03:24PM   15   A.   I recall it was a Range Rover.

03:24PM   16   Q.   Okay.   Is that expensive?

03:24PM   17   A.   Yeah.

03:24PM   18   Q.   Okay.   And how long, approximately, you know, estimate

03:24PM   19   for us, how long was Serio at the Lebrun residence before he

03:24PM   20   left again?

03:24PM   21   A.   It was a very brief period.

03:24PM   22   Q.   Okay.   And when he left, what happened?   What did you do?

03:24PM   23   A.   We surveilled him to the vicinity of 370 Huntington, not

03:24PM   24   myself, other guys that were working that day.   And he

03:25PM   25   ultimately arrived at the Huntington address, met with

03:25PM  1   another individual in the rear driveway.  This was all

03:25PM  2   reported back to us.

03:25PM  3       And there appeared to be some duffle bags in and around a

03:25PM  4   garage that were being exchanged.  And at that point, the

03:25PM  5   decision was made to execute the warrant on Huntington.

03:25PM  6   Q.  Okay.  Now at this time in 2017, were you in your role as

03:25PM  7   senior detective?

03:25PM  8   A.  I was.

03:25PM  9   Q.  Were you kind of orchestrating this operation?

03:25PM 10   A.  Trying to, yes.

03:25PM 11   Q.  Okay.  And were you in communication with the other

03:25PM 12   detectives and agents that were working with you?

03:25PM 13   A.  Yes.

03:25PM 14   Q.  And so did you learn at some point that Serio arrived at

03:25PM 15   Huntington a second time?

03:25PM 16   A.  I did.

03:25PM 17   Q.  Okay.  And did other agents that you were working with

03:25PM 18   inform you what they observed happen?

03:25PM 19   A.  Yes.

03:25PM 20   Q.  Okay.  As a result of that, was the search warrant at

03:25PM 21   370 Huntington executed?

03:25PM 22   A.  Yes.

03:25PM 23   Q.  Was Serio arrested?

03:25PM 24   A.  He was.

03:25PM 25   Q.  Okay.  Was the other individual at that house also

| | | |
|---|---|---|
| 03:25PM | 1 | arrested? |
| 03:25PM | 2 | A.   Yes. |
| 03:25PM | 3 | Q.   Were drugs recovered? |
| 03:25PM | 4 | A.   Yes. |
| 03:25PM | 5 | Q.   What kind of drugs? |
| 03:25PM | 6 | A.   Marijuana.   I know there was a large quantity of |
| 03:26PM | 7 | marijuana, some cocaine, some U.S. currency. |
| 03:26PM | 8 | Q.   Now at that moment when Ron Serio was arrested at |
| 03:26PM | 9 | Huntington, did you already have a search warrant for the |
| 03:26PM | 10 | house on Lebrun? |
| 03:26PM | 11 | A.   No. |
| 03:26PM | 12 | Q.   Did you get one? |
| 03:26PM | 13 | A.   We did. |
| 03:26PM | 14 | Q.   Did you get one for a separate property in addition to |
| 03:26PM | 15 | Lebrun? |
| 03:26PM | 16 | A.   Yes. |
| 03:26PM | 17 | Q.   Was that 91 West Grimsby? |
| 03:26PM | 18 | A.   Yes. |
| 03:26PM | 19 | Q.   Is that an address that was also believed, based upon |
| 03:26PM | 20 | your investigation, to be associated with Ron Serio? |
| 03:26PM | 21 | A.   Yes. |
| 03:26PM | 22 | Q.   Were those warrants at 697 Lebrun and 91 West Grimsby |
| 03:26PM | 23 | executed that very same day? |
| 03:26PM | 24 | A.   They were. |
| 03:26PM | 25 | Q.   Were you present for one of those? |

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

20

03:26PM    1    A.  I was.

03:26PM    2    Q.  Were they happening simultaneously?

03:26PM    3    A.  Yes.

03:26PM    4    Q.  Okay.  And which one were you present for?

03:26PM    5    A.  I was at Lebrun.

03:26PM    6    Q.  I'm holding what's marked for identification as

03:27PM    7    Government Exhibit 42A-33, 34, and 35.

03:27PM    8         **MR. COOPER:**  May I approach the witness?

03:27PM    9         **THE COURT:**  You may.

03:27PM   10         **BY MR. COOPER:**

03:27PM   11    Q.  Take a moment and look at those, and look back up at me

03:27PM   12    when you're finished.

03:27PM   13         You've been to 697 Lebrun before, right?

03:27PM   14    A.  Yes.

03:27PM   15    Q.  You've seen the outside?

03:27PM   16    A.  I have.

03:27PM   17    Q.  Have you seen the inside?

03:27PM   18    A.  Yes.

03:27PM   19    Q.  Have you seen the property surrounding it?

03:27PM   20    A.  Yes, sir.

03:27PM   21    Q.  Does Government Exhibit 42A-33, 34, and 35, fairly and

03:27PM   22    accurately depict the appearance of 697 Lebrun as it appeared

03:27PM   23    when you were there in 2017?

03:27PM   24    A.  Yes.

03:27PM   25         **MR. COOPER:**  Judge, with that foundation, I'd offer

| | | |
|---|---|---|
| 03:27PM | 1 | 42A-33, 34, and 35 into evidence. |
| 03:28PM | 2 | **MR. MacKAY:**  Can I just see them quickly? |
| 03:28PM | 3 | **MR. COOPER:**  Thank you. |
| 03:28PM | 4 | **MR. MacKAY:**  No objection. |
| 03:28PM | 5 | **THE COURT:**  So 42A-33, 34, and 35 are admitted |
| 03:28PM | 6 | without objection. |
| 03:28PM | 7 | **(GOV Exhibits 42A-33, 34 & 35 were received in evidence.)** |
| 03:28PM | 8 | **MR. COOPER:**  Ms. Champoux, can you pull up 42A-33. |
| 03:28PM | 9 | And can you zoom in on the picture?  Yeah. |
| 03:28PM | 10 | **THE COURT:**  I think I said 42.  These are actually |
| 03:28PM | 11 | 42A? |
| 03:28PM | 12 | **MR. COOPER:**  These are 42A-33, 34, and 35. |
| 03:28PM | 13 | **THE COURT:**  And those are what have been admitted.  I |
| 03:28PM | 14 | did not say A.  I apologize. |
| 03:28PM | 15 | **MR. COOPER:**  Thank you, Judge. |
| 03:28PM | 16 | **BY MR. COOPER:** |
| 03:28PM | 17 | Q.  Do you see what's on the screen there? |
| 03:28PM | 18 | A.  I do. |
| 03:28PM | 19 | Q.  And the jury can -- okay.  You said that you've executed, |
| 03:28PM | 20 | I think, over a thousand search warrants, right? |
| 03:29PM | 21 | A.  Yes. |
| 03:29PM | 22 | Q.  Was this the first mansion you've ever executed a search |
| 03:29PM | 23 | warrant at? |
| 03:29PM | 24 | A.  This is by far about the nicest property we've ever |
| 03:29PM | 25 | executed a search warrant on. |

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

22

03:29PM    1    Q.  Is this common in your experience for a house to search

03:29PM    2    in a narcotics investigation?

03:29PM    3    A.  No.

03:29PM    4    Q.  What's different about it?

03:29PM    5    A.  Its -- its location, its size.  It was a gorgeous home.

03:29PM    6    Very gaudy.  We were kind of unsure when we were making entry

03:29PM    7    into the residence on how to breach the door.

03:29PM    8    Q.  Why were you unsure of how to breach the door?

03:29PM    9    A.  Because we don't normally see doors like that.  They were

03:29PM   10    gorgeous.

03:29PM   11         **MR. COOPER:**  Okay.  And can you zoom out of that,

03:29PM   12    Ms. Champoux.  And can you go to -- I'm sorry 42A-34.  Can we

03:29PM   13    zoom in on the photo again?  Thank you, ma'am.

03:29PM   14         **BY MR. COOPER:**

03:29PM   15    Q.  Is this that same house?

03:29PM   16    A.  Yes.

03:29PM   17    Q.  Just a different angle?

03:29PM   18    A.  Yes.

03:30PM   19         **MR. COOPER:**  And, Ms. Champoux, can we go to 42A-35.

03:30PM   20    Okay.  And you don't have to zoom in on it.

03:30PM   21         **BY MR. COOPER:**

03:30PM   22    Q.  Chief Granville, can you see the property at 697 Lebrun

03:30PM   23    in this photograph?

03:30PM   24    A.  I can.

03:30PM   25    Q.  Is it the one with the red dot on it?

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

23

03:30PM    1    A.   Yes.

03:30PM    2    Q.   Okay.  What's that above the property in the photograph?

03:30PM    3    A.   Above is a tennis court, and to the rear is a pool.

03:30PM    4    Q.   Was there a tennis court at Ron Serio's house when you

03:30PM    5    searched it in 2013?

03:30PM    6    A.   Yes.

03:30PM    7    Q.   Okay.  And what about that pool to the right of the

03:30PM    8    property, or to the right of the house?  Was that there, as

03:30PM    9    well?

03:30PM   10    A.   It was.

03:30PM   11    Q.   Were there drugs seized at 697 Lebrun?

03:30PM   12    A.   There were.

03:30PM   13    Q.   You mentioned before that Serio had driven a Range Rover

03:30PM   14    to bring marijuana to 370 Huntington; do you remember

03:31PM   15    testifying about that?

03:31PM   16    A.   Yes.

03:31PM   17    Q.   Did there come a time where law enforcement searched the

03:31PM   18    Range Rover?

03:31PM   19    A.   Yes.

03:31PM   20    Q.   And as the senior detective involved in that

03:31PM   21    investigation, did you personally search the Range Rover?

03:31PM   22    A.   I did not.

03:31PM   23    Q.   Okay.  Are you aware that a large amount of U.S. currency

03:31PM   24    was recovered from the Range Rover?

03:31PM   25    A.   Yes.

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24
24

| | | |
|---|---|---|
| 03:31PM | 1 | **MR. COOPER:** Ms. Champoux, you can take down 42A-35, |
| 03:31PM | 2 | thank you. |
| 03:31PM | 3 | **BY MR. COOPER:** |
| 03:31PM | 4 | Q. During the course of your career in law enforcement, have |
| 03:31PM | 5 | you worked on narcotics investigations into targets that are |
| 03:31PM | 6 | difficult to find evidence on? |
| 03:31PM | 7 | A. Yes. |
| 03:31PM | 8 | Q. Okay. Have you had a situation where you're -- you |
| 03:31PM | 9 | suspect someone of narcotics trafficking, but it never |
| 03:31PM | 10 | develops into anything? |
| 03:31PM | 11 | A. Yes. |
| 03:31PM | 12 | Q. Did you have difficulty obtaining search warrants to |
| 03:32PM | 13 | search Ron Serio's properties? |
| 03:32PM | 14 | A. No, the -- the -- the knowledge that we were provided |
| 03:32PM | 15 | with, with the people that we're going to rob him, among |
| 03:32PM | 16 | other things, to include our surveillance did not make it |
| 03:32PM | 17 | difficult at all. |
| 03:32PM | 18 | Q. Okay. And how many days of surveillance do you think it |
| 03:32PM | 19 | took before you got search warrants? |
| 03:32PM | 20 | A. It was a few days. We didn't spend much time out there. |
| 03:32PM | 21 | Q. Okay. Did that investigation take up a lot of the |
| 03:32PM | 22 | financial resources of the Erie County Sheriff's Office? |
| 03:32PM | 23 | A. No. |
| 03:32PM | 24 | Q. Did it take up a lot of your time in your job? |
| 03:32PM | 25 | A. No, it did not. |

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

25

03:32PM    1    Q.  Okay.  Do you know an individual by the name of Anthony

03:32PM    2    Gerace?

03:32PM    3    A.  I do.

03:32PM    4    Q.  Have you heard that name before?

03:32PM    5    A.  Yes.

03:32PM    6    Q.  Have you ever met that person before?

03:32PM    7    A.  Yes.

03:32PM    8    Q.  When did you meet that person?

03:32PM    9    A.  The day we executed the search warrants on Lebrun and

03:32PM   10    Grimsby and Huntington.

03:32PM   11    Q.  Can you tell the jury, how did Anthony Gerace factor into

03:32PM   12    this day in April of 2017?

03:33PM   13    A.  Anthony Gerace was present at the address on Lebrun.  He

03:33PM   14    ultimately departed the address, and we had him traffic

03:33PM   15    stopped by some marked units a very long distance away from

03:33PM   16    the Lebrun residence into the Town of Amherst.  And

03:33PM   17    Mr. Gerace was found in possession of a very small quantity

03:33PM   18    of drugs.

03:33PM   19    Q.  Okay.  I want to just try to tighten up the timeline

03:33PM   20    there.  Did Anthony Gerace arrive at the Lebrun address

03:33PM   21    before or after the warrant was executed?

03:33PM   22    A.  Prior to the warrant being executed.

03:33PM   23    Q.  Okay.  And so it's while you're in surveillance waiting

03:33PM   24    to kind of let the day's activities unfold?

03:33PM   25    A.  That's correct.

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24

26

03:33PM    1    Q.  Okay.  And did you personally traffic stop Anthony

03:33PM    2    Gerace?

03:33PM    3    A.  No.

03:33PM    4    Q.  Did you personally arrest him?

03:33PM    5    A.  No.

03:33PM    6    Q.  How did you become involved with Anthony Gerace in April

03:33PM    7    of 2017?

03:33PM    8    A.  While being interviewed back at our office, Mr. Gerace

03:34PM    9    advised a couple deputies that him and his family were

03:34PM   10    friendly with Dan Derenda who, at the time, was the

03:34PM   11    commissioner of the Buffalo Police Department.

03:34PM   12    Q.  Was that information conveyed to you as the senior

03:34PM   13    detective?

03:34PM   14    A.  It was.

03:34PM   15    Q.  Did you know Dan Derenda personally?

03:34PM   16    A.  I did.

03:34PM   17    Q.  Had you interacted with him before?

03:34PM   18    A.  Yes.

03:34PM   19    Q.  And what was his position?

03:34PM   20    A.  He was the commissioner of the police for the Buffalo

03:34PM   21    Police Department.

03:34PM   22    Q.  During the course of your lengthy law enforcement career,

03:34PM   23    have you had someone's who's under arrest who tries to drop a

03:34PM   24    name?

03:34PM   25    A.  Yes.

USA v Bongiovanni - Granville - Cooper/Direct - 2/29/24
27

03:34PM 1   Q.  Have you had someone drop the name of a police

03:34PM 2   commissioner before?

03:34PM 3   A.  No.

03:34PM 4   Q.  Okay.  Now, ultimately, what was the decision that was

03:34PM 5   made with respect to Mr. Gerace by the Erie County Sheriff's

03:34PM 6   Office?

03:34PM 7   A.  Mr. Gerace was released from our custody, and -- with

03:34PM 8   pending drug charges.

03:34PM 9   Q.  Okay.  And why was he released from your custody with

03:34PM 10  pending drug charges as opposed to held?

03:34PM 11  A.  We -- we were extremely short on manpower that day, as

03:35PM 12  far as the Erie County Sheriff's Office were concerned.

03:35PM 13      This individual was found with a very small amount of

03:35PM 14  drugs.  We didn't believe he had any real information to

03:35PM 15  provide us, and he was kicked loose.

03:35PM 16  Q.  Did you follow up in any way with respect to that

03:35PM 17  information that you learned that he said his family was

03:35PM 18  friends with Dan Derenda?

03:35PM 19  A.  Yes.

03:35PM 20  Q.  What did you do?

03:35PM 21  A.  I contacted my supervisor, who ultimately gained contact

03:35PM 22  with Mr. Derenda.

03:35PM 23  Q.  I'm sorry, who gained contact with --

03:35PM 24  A.  Mr. Derenda.

03:35PM 25  Q.  Okay.  And was information conveyed back to you as a

03:35PM  1  result of that communication?

03:35PM  2  A.  There was.

03:35PM  3  Q.  Okay.  And what was the information that was conveyed

03:35PM  4  back to you?

03:35PM  5          MR. MacKAY:  Objection to hearsay.

03:35PM  6          MR. COOPER:  Judge, I'm not offering it for its truth

03:35PM  7  at all, I just want to show the effect or lack of effect that

03:35PM  8  it had on the listener.

03:35PM  9          MR. MacKAY:  I'll leave it to the Court's discretion.

03:35PM  10         THE COURT:  Yeah, overruled.

03:35PM  11         MR. COOPER:  Yeah, okay.

03:35PM  12         BY MR. COOPER:

03:35PM  13 Q.  What was the information that was conveyed back to you?

03:35PM  14 A.  To not do the kid any favors on behalf of Mr. Derenda.

03:36PM  15 Q.  Okay.  And regardless of what that information was that

03:36PM  16 came back to you, would you have done anything differently

03:36PM  17 with respect to Mr. Gerace?

03:36PM  18 A.  No.

03:36PM  19 Q.  You told us that this Serio investigation involved the

03:36PM  20 FBI Safe Streets Task Force; is that correct?

03:36PM  21 A.  That is.

03:36PM  22 Q.  Did you notify the DEA that you were looking into Serio?

03:36PM  23 A.  No.

03:36PM  24 Q.  Did you know if the DEA had previously had an

03:36PM  25 investigation into him?

03:36PM   1   A.  I did not.

03:36PM   2   Q.  If you had known that, would you have done anything

03:36PM   3   differently?

03:36PM   4   A.  I would have probably contacted the DEA or discussed it

03:36PM   5   with the FBI that day that, hey, maybe we should contact the

03:36PM   6   DEA.

03:36PM   7   Q.  Okay.  Did you ultimately discuss it with anybody at DEA?

03:36PM   8   A.  No.

03:36PM   9   Q.  Okay.

03:36PM  10        MR. COOPER:  Judge, just one second, please.

03:36PM  11        THE COURT:  Sure.

03:36PM  12        MR. COOPER:  No further direct.  Thank you, Judge.

03:36PM  13        THE COURT:  Cross-examination.

03:37PM  14

03:37PM  15             CROSS-EXAMINATION BY MR. MacKAY:

03:37PM  16   Q.  Good afternoon, Chief Granville.  How are you?

03:37PM  17   A.  Good.  How are you?

03:37PM  18   Q.  Okay.  So this investigation began, as far as you know,

03:37PM  19   because a source came into FBI, correct?

03:37PM  20   A.  That's correct.

03:37PM  21   Q.  The source did not come to the Sheriff's Office, correct?

03:37PM  22   A.  No, sir.

03:37PM  23   Q.  Okay.  But you eventually get contacted by the FBI

03:37PM  24   because of whatever the source brought into the FBI, correct?

03:37PM  25   A.  That's correct.

03:37PM  1   Q.  Okay.  And from there, both you and the FBI Safe Streets

03:37PM  2   Task Force team up to do this investigation, you've spent

03:37PM  3   this time talking about, correct?

03:37PM  4   A.  That's correct.

03:37PM  5   Q.  Okay.  And in sum and substance, the information you

03:37PM  6   learned from -- that was communicated to you was fairly

03:37PM  7   specific; is that fair to say?

03:37PM  8   A.  It was.

03:37PM  9   Q.  Okay.  So in your experience, you've had confidential

03:38PM  10  informants who might say something as simple as I know

03:38PM  11  so-and-so deals drugs, correct?

03:38PM  12  A.  That's correct.

03:38PM  13  Q.  They might say I've heard such-and-such a location, there

03:38PM  14  might be drugs there, correct?

03:38PM  15  A.  That's correct.

03:38PM  16  Q.  Okay.  Fair to say this is nothing like that, correct?

03:38PM  17  A.  This was not.

03:38PM  18  Q.  This was something far more specific that provided

03:38PM  19  specific addresses, correct?

03:38PM  20  A.  That's correct.

03:38PM  21  Q.  Provided specific targets, specifically Ron Serio,

03:38PM  22  correct?

03:38PM  23  A.  That's correct.

03:38PM  24  Q.  It provided one of the people he supplied to, correct?

03:38PM  25  A.  Yes.

03:38PM    1    Q.  We don't have to get into the names, but that person

03:38PM    2    lived on Huntington, correct?

03:38PM    3    A.  That's correct.

03:38PM    4    Q.  It provided information about what the dealings between

03:38PM    5    that person who was being supplied by Ron Serio and Ron Serio

03:38PM    6    were, correct?

03:38PM    7    A.  Can you --

03:38PM    8    Q.  It talked about the relationship between those two

03:38PM    9    people, Mr. Serio and this person who lived on Huntington,

03:39PM   10    correct?

03:39PM   11    A.  That's correct.

03:39PM   12    Q.  And it also talked about another person who, along with

03:39PM   13    this person on Huntington, was planning on rob Mr. Serio,

03:39PM   14    correct?

03:39PM   15    A.  That's correct.

03:39PM   16    Q.  So from the information you received, you knew the

03:39PM   17    addresses, correct?

03:39PM   18    A.  That's correct.

03:39PM   19    Q.  You had a pretty accurate sense of when drugs were going

03:39PM   20    to be at those addresses, correct?

03:39PM   21    A.  That's correct.

03:39PM   22    Q.  Because you knew that there was going to be a robbery

03:39PM   23    taking place that required the drugs to be taken from one of

03:39PM   24    the addresses, correct?

03:39PM   25        Well, strike that.  Let me withdraw that question.

03:39PM 1    The robbery involved -- the planned robbery, as you came

03:39PM 2 to learn, was that Mr. Serio was going to be distracted with

03:39PM 3 one location while drugs were taken from another location; is

03:39PM 4 that fair to say?

03:39PM 5 A.  No.  The information given to us was very specific to the

03:39PM 6 Lebrun address and the West Grimsby address.  It was believed

03:39PM 7 that they were going to conduct a home burglary while

03:40PM 8 Mr. Serio was present, and keep him detained while they

03:40PM 9 robbed both addresses.

03:40PM 10 Q.  Okay.  So -- so it was that they were going to rob both

03:40PM 11 addresses is what you're saying?

03:40PM 12 A.  That's correct.

03:40PM 13 Q.  Okay.  It's not that he was going to be at the Lebrun

03:40PM 14 address, and while he wasn't at the Grimsby address, they

03:40PM 15 were gonna take things from the Grimsby address?

03:40PM 16 A.  No.  They were going to, for lack of a better term, take

03:40PM 17 Mr. Serio into custody and rob both addresses.

03:40PM 18 Q.  Okay.  And you knew then to a fairly specific time frame

03:40PM 19 when Mr. Serio was going to be potentially traveling between

03:40PM 20 addresses, correct?

03:40PM 21 A.  No, we did not.  We just -- we had the information that

03:40PM 22 was given to us, based upon that they were gonna rob him and

03:40PM 23 the addresses involved.  And we conducted surveillance on

03:40PM 24 those addresses.  And, you know, as had previously stated,

03:41PM 25 things kind of shook out very quickly in one day.

03:41PM    1        We were able to arrest not only Mr. Serio, but another

03:41PM    2    individual.

03:41PM    3    Q.   And to your understanding, the robbery that was to occur

03:41PM    4    was not gonna be just for money, it was gonna be for drugs as

03:41PM    5    well, too, correct?

03:41PM    6    A.   That's correct.

03:41PM    7    Q.   So the source had come into FBI, and you learned as a

03:41PM    8    result of that that there were going to be drugs in one of

03:41PM    9    these locations in a fairly short period of time, correct?

03:41PM   10    A.   There were gonna be drugs at both locations.

03:41PM   11    Q.   Okay.  At least one of them if not both.

03:41PM   12    A.   Correct.

03:41PM   13    Q.   Now in the time leading up to the actual search warrant

03:41PM   14    execution, you said you were contacted by -- was it FBI Agent

03:41PM   15    Jason Galle, correct?

03:41PM   16    A.   That's correct.

03:41PM   17    Q.   Okay.  Did you take any step to reach out to any other

03:41PM   18    law enforcement agencies?

03:41PM   19    A.   I did not.

03:41PM   20    Q.   Okay.  Did you personally do any sort of entries into any

03:41PM   21    deconfliction databases to see whether Mr. Serio was a target

03:41PM   22    for any other law enforcement agencies?

03:42PM   23    A.   I personally did not.

03:42PM   24    Q.   Okay.  But there are deconfliction databases that the

03:42PM   25    Sheriff's Office uses, correct?

03:42PM  1    A.   That's correct.

03:42PM  2    Q.   Okay.  And again, to your knowledge, do you know why FBI

03:42PM  3    contacted the Sheriff's Office in this specific case when

03:42PM  4    they already had the source come into their office?

03:42PM  5    A.   The federal agencies, through their own admission,

03:42PM  6    sometimes take an extended period of time to resolve criminal

03:42PM  7    matters.  We're able to act very quickly by taking people in

03:42PM  8    front of a judge to apply for search warrants.

03:42PM  9        We have a very outstanding crew that does great

03:42PM  10   surveillance.  We're able to execute warrants at a very fast

03:42PM  11   pace.

03:42PM  12   Q.   Okay.  So sometimes, obviously, you do collaborate with

03:42PM  13   other law enforcement agencies as you said, correct?

03:42PM  14   A.   We do.

03:42PM  15   Q.   But fair to say there's also competition among the

03:43PM  16   agencies as to who gets the collar on any one arrest,

03:43PM  17   correct?

03:43PM  18   A.   With some agencies, not ours.

03:43PM  19   Q.   Okay.  But there is, for example, sometimes there's

03:43PM  20   funding or resources that are tied to the number of arrests

03:43PM  21   an agency makes, correct?

03:43PM  22   A.   That's correct.

03:43PM  23   Q.   Or to the amount of drugs or contraband seized, correct?

03:43PM  24   A.   That's correct.

03:43PM  25   Q.   So it is in your interest to make arrests, to put them

03:43PM    1    under the Sheriff's Office's mantle if you can, correct?

03:43PM    2    A.  It would be fair to say that it's important for the

03:43PM    3    Sheriff's Office to work with all agencies simply because,

03:43PM    4    you know, we're -- we're not, we're a small group of guys.

03:43PM    5    And when we get together with the DEA or the FBI or his, you

03:43PM    6    know, they have more funding than we do, and more tools to

03:43PM    7    the trade than we do.

03:43PM    8    Q.  Oh, speaking of tools of the trade, one of the tools your

03:43PM    9    office specifically has is an aerial helicopter to do

03:44PM   10    surveillance, correct?

03:44PM   11    A.  That's correct.

03:44PM   12    Q.  And is it my understanding that that's the only one in

03:44PM   13    the area that can do that?

03:44PM   14    A.  I believe there are other helicopters in the area, but we

03:44PM   15    stick with our own, we utilize our own aircraft.

03:44PM   16    Q.  Okay.  And as part of the Sheriff's duties in using that

03:44PM   17    helicopter, that is often is used to assist other law

03:44PM   18    enforcement agencies, correct?

03:44PM   19    A.  That's correct.

03:44PM   20    Q.  Oftentimes there's formal requests to use that helicopter

03:44PM   21    as part of an operation, correct?

03:44PM   22    A.  Correct.

03:44PM   23    Q.  And sometimes there's informal requests about can you be

03:44PM   24    on the lookout for something while you're up in the air,

03:44PM   25    correct?

USA v Bongiovanni - Granville - MacKay/Cross - 2/29/24

36

03:44PM   1   A.  That's correct.

03:44PM   2   Q.  So oftentimes, your office, you know, wouldn't be roped

03:44PM   3   into a formal investigation, but there might be informal

03:44PM   4   things like keep an eye on this address, for example, when

03:44PM   5   you're up in the air, correct?

03:44PM   6   A.  That's correct.

03:44PM   7   Q.  Okay.  So lastly, let's talk about Anthony Gerace.

03:44PM   8       He is arrested leaving the Lebrun Road place, correct?

03:44PM   9   A.  That's correct.

03:44PM  10   Q.  And you didn't participate in the arrest, but ultimately

03:45PM  11   you come to be involved in an interview in some fashion with

03:45PM  12   him, correct?

03:45PM  13   A.  That's correct.

03:45PM  14   Q.  And to your knowledge, he has a small amount of drugs on

03:45PM  15   him, correct?

03:45PM  16   A.  That's correct.

03:45PM  17   Q.  Do you recall those to be fentanyl pills?

03:45PM  18   A.  I later learned that, yes.

03:45PM  19   Q.  Okay.  Consistent with a user quantity rather than a

03:45PM  20   dealer quantity?

03:45PM  21   A.  Yes.

03:45PM  22   Q.  Okay.  And you used the term "pending charges," correct?

03:45PM  23   A.  Yes.

03:45PM  24   Q.  Fair to say, though, you didn't actually formally file

03:45PM  25   charges at that time, correct?

03:45PM    1    A.  That's correct.

03:45PM    2    Q.  Okay.  What you actually did is said you're free go with

03:45PM    3    the understanding that if this comes back as a controlled

03:45PM    4    substance, we may charge you, correct?

03:45PM    5    A.  That's correct.

03:45PM    6    Q.  And that's not an uncommon scenario in your office,

03:45PM    7    correct?

03:45PM    8    A.  Not at all.

03:45PM    9    Q.  Because you can do some tests on drugs right there in the

03:45PM   10    field, correct?

03:45PM   11    A.  Correct.

03:45PM   12    Q.  But to sustain a prosecution, generally, you know that

03:45PM   13    you have to go send those drugs off to a lab to take the

03:45PM   14    prosecution further, correct?

03:45PM   15    A.  That's correct.

03:45PM   16    Q.  Okay.  And in this case, did you come to learn that the

03:46PM   17    drugs were not -- were never even sent out to the lab?

03:46PM   18    A.  I don't recall.

03:46PM   19    Q.  Okay.  But ultimately, to your knowledge, Anthony Gerace

03:46PM   20    was never charged, correct?

03:46PM   21    A.  Never charged by us, no.

03:46PM   22    Q.  That's what I mean.  He was never charged by your office

03:46PM   23    in connection with those drugs that your office recovered,

03:46PM   24    correct?

03:46PM   25    A.  That's correct.

03:46PM    1    Q.   And you said that he dropped Dan Derenda's name in this

03:46PM    2    interview, correct?

03:46PM    3    A.   That's correct.

03:46PM    4    Q.   And you said it that's a fairly common thing?  It's not

03:46PM    5    uncommon that people will do that during an arrest?

03:46PM    6    A.   It's common.

03:46PM    7    Q.   It's actually common?  Okay.

03:46PM    8         But he didn't drop any other names other than Dan

03:46PM    9    Derenda's though, correct?

03:46PM   10    A.   Not that I'm aware of.

03:46PM   11    Q.   Okay.  And you never had anybody reach out to you

03:46PM   12    directly about Mr. Gerace's situation, correct?

03:46PM   13         Let me withdraw the question.

03:46PM   14         Mr. Bongiovanni never reached out to you about Anthony

03:46PM   15    Gerace's arrest by the sheriffs, correct?

03:46PM   16    A.   Correct.

03:46PM   17             **MR. MacKAY:**  I have nothing further, Your Honor.

03:47PM   18

03:47PM   19                 **REDIRECT EXAMINATION BY MR. COOPER:**

03:47PM   20    Q.   Chief Granville, you were just asked some questions about

03:47PM   21    whether Anthony Gerace was ever charged; do you remember

03:47PM   22    those questions?

03:47PM   23    A.   I do.

03:47PM   24    Q.   Are you aware of whether those fentanyl pills later

03:47PM   25    formed part of a federal prosecution of Anthony Gerace?

03:47PM  1    A.  Yes.

03:47PM  2    Q.  You are aware of that?

03:47PM  3    A.  Yes.

03:47PM  4    Q.  Okay.  So was Anthony Gerace ever charged?

03:47PM  5    A.  He was.

03:47PM  6    Q.  Okay.  Let's talk about the difference between cases

03:47PM  7    charged in state court and federal court.  Are you aware of

03:47PM  8    the differences?

03:47PM  9    A.  I am.

03:47PM  10   Q.  Have you ever heard of the term "federal adoption"

03:47PM  11   before?

03:47PM  12   A.  Yes.

03:47PM  13   Q.  Can you describe what that term means to the jury?

03:47PM  14   A.  Oftentimes, there's adoption of cases, whether it's -- we

03:47PM  15   execute a search warrant hypothetically at 123 Main Street,

03:47PM  16   we recover a large amount of narcotics, and solely the

03:48PM  17   Sheriff's Office is involved.

03:48PM  18       We bring that individual back to our office, and we

03:48PM  19   contact one of our federal partners.  And they may, in fact,

03:48PM  20   take our information, whether it's a search warrant, police

03:48PM  21   report, any interviews that were conducted, and charge that

03:48PM  22   person individually.  That's one scenario.

03:48PM  23       There's other scenarios where we charge that person that

03:48PM  24   night.  They're housed at the holding center, and then the

03:48PM  25   following day the arraignment.

03:48PM   1        Or, a little further down the line, those charges are

03:48PM   2   dismissed and that person is ultimately charged federally

03:48PM   3   with the results of what had occurred in the original

03:48PM   4   incident.

03:48PM   5   Q.   Are there benefits to you as a narcotics investigator of

03:48PM   6   having a case taken federally in terms of progressing an

03:48PM   7   investigation?

03:48PM   8   A.   Yes.

03:48PM   9   Q.   Why?

03:48PM  10   A.   The -- the penalties certainly outweigh -- the penalties

03:48PM  11   in the federal system certainly outweigh those in the state

03:48PM  12   system.  The mere mention of that sometimes causes a person

03:48PM  13   to cooperate.

03:49PM  14   Q.   You were asked some questions on cross-examination about

03:49PM  15   helicopter surveillance; do you remember that?

03:49PM  16   A.   I do.

03:49PM  17   Q.   Did that have anything to do with your Serio operation?

03:49PM  18   A.   No.

03:49PM  19   Q.   Do you have anything to do with flying helicopters?

03:49PM  20   A.   I do not.

03:49PM  21   Q.   Do you have any idea whether this defendant ever asked

03:49PM  22   for helicopters to be flown ever in life?

03:49PM  23   A.   I do.

03:49PM  24   Q.   Okay.  What do you know?

03:49PM  25   A.   I know previously Mr. Bongiovanni had asked our office

03:49PM  1    to -- or, asked to utilize our helicopter for surveillance.

03:49PM  2    Q.  Okay.  And what case was that a part of?

03:49PM  3    A.  I don't recall.  I just -- that was brought to my

03:49PM  4    attention over the course of this -- this -- the briefing

03:49PM  5    that we've had prior to all this testimony.

03:49PM  6    Q.  Okay.  And so when you say it was brought to your

03:49PM  7    attention, do you have personal knowledge of it?

03:49PM  8    A.  I don't.

03:49PM  9    Q.  Have you heard other people talk about helicopter

03:50PM  10   surveillance?

03:50PM  11   A.  Yes.

03:50PM  12   Q.  Do you have any idea whether the defendant ever asked for

03:50PM  13   helicopter surveillance, your personal knowledge?

03:50PM  14   A.  No.

03:50PM  15   Q.  Okay.  You don't work in the helicopter, right?

03:50PM  16   A.  No.

03:50PM  17   Q.  Do you keep the helicopter logbook?

03:50PM  18   A.  No.

03:50PM  19   Q.  Okay.  You were asked about deconfliction databases on

03:50PM  20   cross-examination; do you remember that?

03:50PM  21   A.  Yes.

03:50PM  22   Q.  Do you use those?

03:50PM  23   A.  We -- we have access to them.

03:50PM  24   Q.  Do you use those?

03:50PM  25   A.  It's something that I -- I have used in the past.  I do

USA v Bongiovanni - Granville - Cooper/Redirect - 2/29/24

03:50PM    1    not like using.

03:50PM    2    Q.  Why don't you like using them?

03:50PM    3    A.  Oftentimes we've found, specifically federal agencies,

03:50PM    4    every federal agency would pump a name into the deconfliction

03:50PM    5    database simply to, you know, maybe that person's name was

03:50PM    6    mentioned in a proffer, and they put it in the database, and

03:50PM    7    then three months from then, we'll knock them in a search

03:50PM    8    warrant or some local agency will have a good case on them,

03:50PM    9    and it, you know, they would kind of ride our coattails on

03:51PM    10   that caper and not really have much invested.

03:51PM    11   Q.  Let me ask you this.  Are deconfliction databases

03:51PM    12   sometimes used by law enforcement to essentially mark a

03:51PM    13   target as their territory?

03:51PM    14   A.  That's what it is.

03:51PM    15   Q.  Okay.  And can that sometimes prevent you from furthering

03:51PM    16   your own investigations?

03:51PM    17   A.  Yes.

03:51PM    18   Q.  Is that why you don't use them?  Or you generally prefer

03:51PM    19   not to use them?

03:51PM    20   A.  I prefer not to use them.  And we have guys assigned to

03:51PM    21   various federal agencies as task force officers, and we

03:51PM    22   generally try to keep everybody in the loop.

03:51PM    23   Q.  Got it.  And finally, you were asked some questions on

03:51PM    24   cross-examination about the specificity of the information

03:51PM    25   that led to the search at Serio's properties, do you remember

03:51PM  1    being asked those questions?

03:51PM  2    A.  I do.

03:51PM  3    Q.  Okay.  If you had never conducted any surveillance, would

03:51PM  4    you have been able to arrest Ron Serio?

03:51PM  5    A.  No.

03:51PM  6    Q.  Okay.  Did Ron Serio drop off a duffle bag of marijuana

03:51PM  7    by himself?

03:51PM  8    A.  Yes.

03:51PM  9    Q.  Was that hard to detect when you conducted surveillance?

03:52PM  10   A.  No.

03:52PM  11          **MR. COOPER:**  I have no further questions, Judge.

03:52PM  12          **MR. MacKAY:**  Very briefly, Judge.

03:52PM  13

03:52PM  14                **RECROSS-EXAMINATION BY MR. MacKAY:**

03:52PM  15   Q.  But the location that there was surveillance where the

03:52PM  16   marijuana was dropped off, you only knew about that because

03:52PM  17   the C.S. came to the FBI, and gave that very specific location

03:52PM  18   to the FBI which came to you, correct?

03:52PM  19   A.  That's correct.

03:52PM  20          **MR. MacKAY:**  No further questions, Your Honor.

03:52PM  21          **MR. COOPER:**  Just one.

03:52PM  22

03:52PM  23                **RE-REDIRECT EXAMINATION BY MR. COOPER:**

03:52PM  24   Q.  You followed Serio's car from his house to that location,

03:52PM  25   right?

03:52PM    1    A.   That's correct.

03:52PM    2    Q.   Was that hard to do?

03:52PM    3    A.   No.

03:52PM    4         **MR. COOPER:**  Okay.

03:52PM    5         **MR. MacKAY:**  Nothing further, Your Honor.

03:52PM    6         **THE COURT:**  Okay.  You can step down, sir.  Thanks.

03:52PM    7         (Witness excused at 3:52 p.m.)

           8         (Excerpt concluded at 3:52 p.m.)

           9              *     *     *     *     *     *     *

          10

          11

          12

          13

          14              **CERTIFICATE OF REPORTER**

          15

          16         In accordance with 28, U.S.C., 753(b), I

          17    certify that these original notes are a true and correct

          18    record of proceedings in the United States District Court for

          19    the Western District of New York on February 29, 2024.

          20

          21                   s/ Ann M. Sawyer
                               Ann M. Sawyer, FCRR, RPR, CRR
          22                   Official Court Reporter
                               U.S.D.C., W.D.N.Y.
          23

          24

          25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF DJ GRANVILLE**

**FEBRUARY 29, 2024**

**W I T N E S S**                                     **P A G E**

**D J   G R A N V I L L E**                           2

  DIRECT EXAMINATION BY MR. COOPER:                2

  CROSS-EXAMINATION BY MR. MacKAY:                 29

  REDIRECT EXAMINATION BY MR. COOPER:              38

  RECROSS-EXAMINATION BY MR. MacKAY:               43

  RE-REDIRECT EXAMINATION BY MR. COOPER:           43


**E X H I B I T S**                                   **P A G E**

  GOV Exhibits 42A-33, 34 & 35                     21