IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

            v.                                 19-CR-227-LJV

JOSEPH BONGIOVANNI,

                Defendant.
_____

## GOVERNMENT'S OPPOSITION TO DEFENDANT BONGIOVANNI'S MOTION FOR A JUDGMENT OF ACQUITTAL AND A NEW TRIAL

The defendant, JOSEPH BONGIOVANNI, through his attorneys, filed a motion for a judgment of acquittal and for a new trial. ECF No. 908. The UNITED STATES OF AMERICA, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, Corey R. Amundson, Chief of the Public Integrity Section, Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys, and Jordan Dickson, Trial Attorney, Public Integrity Section, of counsel, hereby files the government's opposition.

## STANDARD FOR JUDGMENT OF ACQUITTAL

This Court must reject a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "if any rational jury could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ajelero*, No. 22-1825, 2024 WL 1756060, at *1 (2d Cir. Apr. 24, 2024) (unpublished) (citing *United States v. Dumitru*, 991 F.3d 427, 432 (2d Cir. 2021)). "[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quoting *United States v.*

*Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)).  "A judgment of acquittal can be entered 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).  When the Court conducts its assessment of the claims in a Rule 29 motion, "the evidence must be viewed in conjunction, not in isolation."  *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011).  This is because "one fact may gain color from others[.]"  *United States v. Tramunti*, 500 F.2d 1334, 1338 (2d Cir. 1974).

Importantly, the Court must view the evidence in the light most favorable to the government, "crediting every inference that could have been drawn in the government's favor."  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).  Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter."  *Landesman*, 17 F.4th at 319.  For that reason, "the government's case need not exclude every possible hypothesis of innocence."  *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).  Ultimately, "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court."  *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020).  This deference to the jury is at its zenith when a court reviews the sufficiency of the evidence undergirding a conspiracy count because "the government must typically rely on circumstantial evidence to prove its case."  *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020).

## STANDARD FOR A NEW TRIAL

Federal Rule of Criminal Procedure 33 permits the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F.3d at 134).

## ARGUMENT

### I.     Count 5: a Rational Jury Could Find that the Defendant Sought, Accepted, or Agreed to Accept Bribes from Peter Gerace, Jr.

The Court should deny the defendant's Rule 29 motion on Count 5.[1]  A rational jury could find that the government proved each essential element of bribery as charged in Count 5:  (1) that, between in or about 2009 and on or about June 6, 2019, the defendant demanded, sought, received, accepted, or agreed to receive or accept something of value; (2) that at the time, the defendant was a public official; and (3) that the defendant did so with the corrupt intent to be influenced in the performance of an official act or for being induced to do an act or omit to do an act in violation of his official duty.  *See* 18 U.S.C. § 201(b)(2); *United States v.*

---

[1] Throughout its opposition, the government will refer to the Counts by the number in the Redacted Indictment provided to the jury during deliberations.

*Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999) ("[F]or bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act) (emphasis in original); *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a quid pro quo requirement").

The defendant's Rule 29 motion on Count 5 is premised on three flawed arguments. First, he incorrectly contends that because Katrina Nigro did not visually observe cash inside the envelopes that she gave the defendant on behalf of Gerace, her testimony cannot establish that the defendant received "something of value." *See* Mot. for Acq., at 3–7, ECF No. 908, (dated May 3, 2024) ("Mot. for Acq."). Second, the defendant misconstrues the contours of what constitutes an "exchange" in a bribery case. Specifically, the defendant makes specious arguments about the "as opportunities arise" theory of bribery, contending that because there was no direct evidence of the defendant articulating the specific means he would use to uphold his end of the corrupt exchange at the time he received the envelopes, Count 5 cannot survive Rule 29 review. *See id*. Lastly, the defendant erroneously argues that there is no evidence that he demanded or sought anything of value. *See id*. None of these arguments succeed.

A.    There Was Sufficient Evidence for a Rational Jury to Conclude that the Defendant Received "Anything Of Value" From Peter Gerace, Jr.

The defendant's first argument in support of his Rule 29 motion on Count 5 fails with even a cursory acknowledgment of the value of circumstantial evidence in a criminal case. "[T]he law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof." *United States v. MacPherson*, 424 F.3d 183, 190 (2d

Cir. 2005).  In fact, "[c]ircumstantial evidence can be as compelling as direct evidence[.]" *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).  "As the name 'circumstantial evidence' suggests, the strength of a particular piece of evidence turns on the specific circumstances that accompany the evidence.  Wigmore observed that, '[a]side from autoptic preference, all evidence must involve an inference from some fact to the proposition to be proved.'"  *Id.* (quoting JOHN HENRY WIGMORE, WIGMORE ON EVIDENCE § 25 (Tillers rev. 1983)).

As appellate courts have acknowledged, the very kind of evidence Nigro provided about cash in envelopes is more than adequate to survive Rule 29 review.  For example, in *United States v. O'Grady*, 280 F. App'x 124 (3d Cir. 2008) (unpublished), a panel of the Third Circuit rejected the defendant-appellant's argument that his bribery conviction could not stand absent "direct evidence that the envelopes given to him by [the briber] contained cash" and corroborating "documentary evidence."  *Id.* at 130.  The panel rejected the defendant's argument because the government may "prove each element beyond a reasonable doubt . . . solely by circumstantial evidence[.]"  *Id.* (quoting *United States v. Dent*, 149 F.3d 180, 183 (3d Cir. 1998)).  The court went on to say, "the uncorroborated accomplice testimony" supporting O'Grady's conviction enabled the jury to "infer . . . that O'Grady participated in th[e] [bribery] scheme and that the envelopes [he received] contained cash."  *Id*

Similarly, in *United States v. Turchin*, 21 F.4th 1192 (9th Cir. 2022), the Ninth Circuit affirmed a public official's bribery conviction based almost entirely on circumstantial evidence.  There, the "evidence showed that a truck-school owner . . . took money from his students to help them obtain [CDL] licenses without having to pass the required exams"

before sending "messages to [the defendant] with California driver's license numbers." *Id.* at 1203–04. Afterward, the defendant "fraudulently updated the corresponding applications" and sent the truck-school owner a message with the comment "postage due." *Id.* Additionally, "law enforcement found more than $10,000 in cash in envelopes in [the defendant's] car." Accordingly, even in the absence of witness testimony describing a cash exchange, the court concluded that "a jury could reasonably conclude, beyond a reasonable doubt, that [the defendant] had agreed to accept a thing of value—namely, cash—for entering fraudulent passing scores for applicants seeking California CDLs." *Id.* at 1203–04.

Here, Nigro, who at times worked within Pharoah's front office, testified that Gerace commonly paid vendors and dancers with cash-filled envelopes. *See* Tr. Tran. Test. Katrina Nigro at 46:04–17 (dated Mar. 19, 2024). Nigro likewise testified that she, herself, would pay dancers and vendors in cash, ostensibly at Gerace's direction. *Id.* at 46:12–17. And Nigro testified that, as with other individuals on his payroll, Gerace instructed Nigro to provide the defendant "envelope[s] of cash." *Id.* at 46:22–25. Nigro testified that, at Gerace's behest, she handed the defendant envelopes thick with cash on two occasions. *See id.* at 47:04–06, 47:18. When asked how she knew the envelopes contained cash, Nigro, who testified about her life experience in paying other people with cash envelopes, answered: "[y]ou could just feel it." *Id.* at 47:11. In addition to this circumstantial evidence, Nigro provided direct evidence that the defendant received United States currency from Gerace. Specifically, Nigro testified that Gerace told her he was giving the defendant $5,000 in a birthday card and saw Gerace hand the defendant that card. *See id.* at 48:13–49:23.

On Rule 29 review, this testimony defeats the defendant's argument that there was insufficient evidence to prove Gerace gave the defendant United States currency. The circumstantial evidence including Nigro's observations about the envelopes and Gerace's directives to give the defendant envelopes is more than enough for a rational jury to conclude that the defendant received United States currency from Gerace. Suggesting a farcical alternative for what could have been in the envelopes is nowhere near sufficient for the defendant to meet his heavy burden at the Rule 29 stage. Taking all inferences in favor of the government, Nigro's testimony establishes the defendant received cash from Gerace.

B.   There Was Sufficient Evidence for a Rational Jury to Conclude that the Defendant Understood the Particular Kinds Of Influence He Was Expected to Undertake In Exchange For Cash Payments, As Opportunities Arose.

The defendant's next argument in support of his Rule 29 motion on Count 5—that the government did not prove a corrupt exchange—is equally feeble. As noted, the Supreme Court has held that "for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value in exchange for an official act." *Sun-Diamond Growers*, 526 U.S. at 404–05 (emphasis omitted). Nothing more is required to meet the statute's requirement of "corrupt intent." *See United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995). Nor must the corrupt agreement be expressly stated. *See Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J. concurring); *United States v. Benjamin*, 95 F.4th 60, 68 (2d Cir. 2024). Instead, "the jury may *infer* such an agreement based on evidence of the official's 'implicit promise to use his official position to serve the interests of the bribegiver.'" *Benjamin*, 95 F.4th at 71 (emphasis in original) (quoting *Evans*, 504 U.S. at 257); *see also McDonnell v. United States*, 579 U.S. 550,

567 (2016) ("The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.").

Commonly, the bribe payor will provide one or more payments in exchange for multiple official acts or violations of duty, without a one-for-one relationship between each payment and a specific act. This form of bribery is typically referred to as the "as opportunities arise" theory. "Put differently, this theory means that the government does not have to prove an explicit promise to perform a particular act made at the time of payment so long as the general nature of the act to be taken was understood at the time of the payment." *United States v. Skelos*, 988 F.3d 645, 655 (2d Cir. 2021) (internal quotation marks omitted); *see United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) (Sotomayor, J.) ("While it frequently will be true that particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts, that will not always be the case—for example, because the opportunity to undertake the requested act has not arisen, or because the payment is one of a series to ensure an ongoing commitment to perform acts to further the payor's interests"); *see also Woodward v. United States*, 905 F.3d 40, 46 (1st Cir. 2018) ("Thus, we remain confident that a 'stream of benefits' theory of bribery remains valid [after *McDonnell*]"); *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) ("[T]he federal bribery and honest services fraud statutes . . . . criminalize scheme[s] involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise, even if the opportunity to undertake the requested act has not arisen, and even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise particular kinds of influence."); *United States v. Ciavarella*, 716 F.3d 705, 730 (3rd Cir. 2013) (stating that "the bribery theory does not

8

require that each quid, or item of value, be linked to a specific quo, or official act. Rather, a bribe may come in the form of a 'stream of benefits'" in honest services mail fraud case); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 945 (9th Cir. 2009) ("[t]he district court's instruction that 'the Government is not required to link any particular payment to a specific act on the part of the public official,' . . . did not remove the necessary link between the receipt of the item of value and the intent to be influenced."); *United States v. Chartock*, 283 F. App'x 948, 956 (3rd Cir. 2008) (unpublished) (approving court's jury instruction for honest services wire fraud that "if you find beyond a reasonable doubt that a person gave an official a stream of benefits in implicit exchange for one or more official acts, you may conclude that a bribery has occurred"); *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (holding that "each payment need not be correlated with a specific official act" in affirming federal programs bribery conviction).

Though the government need not prove a one-for-one exchange in an "as opportunities arise" bribery case, it must prove that the public official understood that there was a particular question or matter he was expected to act upon or a particular kind of influence he was expected to exercise at the time he entered into the agreement or accepted payment. *See United States v. Silver*, 948 F.3d 538, 551–53 (2d Cir. 2020) ("*Silver II*") ("*McDonnell's* interpretation of the 'official act' requirement fits comfortably with—and provides a narrowing gloss on—*Ganim*'s 'as the opportunities arise' theory. . . . But we agree that . . . a particular question or matter must be identified at the time the official makes a promise or accepts a payment."); *Rosen*, 716 F.3d at 700.

The Second Circuit has clarified that the government does not have to allege or prove that the public official knew or agreed to *how* he would influence or act upon the particular question or matter or the means by which he would exercise a particular kind of influence, only on what the question, matter, or particular kind of influence was.  *See Silver II*, 948 F.3d at 570 n.22 ("[T]he question or matter need not specify how the public official would support/oppose those programs—e.g., sponsoring a bill, lobbying colleagues to gather votes for that bill, or funding a study on the program's efficacy.").  It is not necessary for the government to prove a "meeting of the minds" between the bribe payor and bribe receiver.  *See United States v. Silver*, No. 15-CR-93 (VEC), 2018 WL 4440496, at *6 (S.D.N.Y. Sept. 17, 2018) ("In short, the focus of bribery-based honest services fraud is the defendant's state of mind and his understanding that there is a quid pro quo exchange—no actual agreement with the counterparty, implicit or explicit, is required.").

In other words, what matters in a bribery case is whether the defendant possessed corrupt intent when he solicited, accepted, or agreed to accept a thing of value.  *See Skelos*, 988 F.3dd at 655 ("The 'as opportunities arise' theory of bribery requires the government to prove, [ ] that a public official received a payment to which he was not entitled and, in return for that payment, underst[ood] that he or she [was] expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise." (cleaned up)); *Alfisi*, 308 F.3d at 149; *Ganim*, 510 F.3d at 145 ("We explained in [*United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993)], in language mirroring the jury charge here, that 'it is sufficient if the public official understands that he or she is expected as a result of

the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise.'").

Proof of what particular kinds of influence the public official contemplates exercising when he solicits or accepts a bribe—and the corrupt intent underlying that understanding—is often derived from "circumstantial evidence and reasonable inferences drawn therefrom."  *See Ratzlaf v. United States*, 510 U.S.135, 149 n.19 (1994) (noting that "jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct");  *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998) (recognizing that "as a general rule most evidence of intent is circumstantial"); *United States v. Sheiner*, 410 F.2d 337, 340 (2d Cir. 1969) (noting that "finding of knowledge that is largely inferential is not impermissible"); *see also United States v. Wright*, 665 F.3d 560, 568–69 (3d Cir. 2012) ("The inducement from the official is criminal if it is implied from his words and actions.").

The defendant articulates his argument as a critique of Nigro for not being able to provide "context" of the contours of the exchange when she gave the defendant envelopes of cash at Gerace's behest.  *See* ECF No. 908 at 7.  But the government's evidence was more than sufficient to establish that the defendant corruptly intended to exercise a particular kind of influence in exchange for cash payments—namely to protect Gerace and Pharaoh's from law enforcement scrutiny concerning drug-related investigations and to personally omit to enforce the drug laws of the United States against Gerace and Pharaoh's.  Lou Selva testified that the defendant admitted that he "stepped in" to help Gerace when Gerace was under

scrutiny by U.S. Probation.  *See* Tr. Tran., at 72:17–25 (dated Feb. 21, 2024) (Test. of Louis Selva).  The Court heard specific testimony about this incident, and the resulting attempts by the defendant to dissuade the FBI from pursuing Gerace, from U.S. Probation Officer Peter Lepiane, retired FBI Special Agent Thomas Herbst, and officer Robert Cottrell.

While the government acknowledges that this incident occurred before Nigro provided the envelopes of cash to the defendant in 2015, this incident is significant because it evinces the defendant's state of mind when dealing with Gerace.  By this incident alone, there was sufficient evidence for a jury to find that the defendant was willing to intercede with law enforcement on Gerace's behalf.  Thus, when the defendant later accepted cash from Gerace, the defendant accepted those payments with an understanding that he was expected to continue protecting Gerace from law enforcement scrutiny concerning drug-related investigations and to not, personally, investigate Gerace or Pharaoh's, in violation of his duties as a DEA Special Agent.  Likewise, A.P.'s testimony established that Gerace had a similar understanding of the corrupt exchange.  Specifically, A.P., who admitted to being a cocaine dealer inside Pharaoh's, testified that Gerace introduced her to the defendant, gave A.P. the defendant's business card, and instructed A.P. that if she ever "got in trouble" she should call the defendant.  *See* Tr. Tran., at 28:01–04 (dated Feb. 20, 2024) (Test. of A.P). This testimony, again, evinces an understanding of the arrangement between the defendant and Gerace, and that Gerace believed the defendant was willing to assist Gerace and his associates as opportunities arose to avoid drug-related investigations.  The jury was free to infer that the defendant shared the same understanding as Gerace.  Thus, when the defendant accepted the envelopes of cash from Nigro and accepted the birthday card full of cash from

Gerace, there was circumstantial evidence of his corrupt mindset to continue to intercede on Gerace's behalf and protect him from law enforcement scrutiny concerning drug-related investigations.

This circumstantial proof is bolstered further by how the defendant acted and what the defendant did after he received the envelopes of cash. The defendant, a sworn DEA Special Agent, did not return or refuse the envelopes of cash he received inside of Pharaoh's from Nigro. Rather, the defendant accepted the cash on multiple occasions, *see* Tr. Tran. Test. Katrina Nigro at 47:01–06 (dated Mar. 19, 2024), and continued to fulfill his end of the corrupt bargain. Specifically, between 2015 and 2016, the defendant interceded on Gerace's behalf to protect him from investigations by Anthony Casullo, attempted to pressure Casullo into investigating black and Hispanic people instead of Gerace, instructed Gerace to remove a woman at Pharaoh's who had overdosed inside the club, and omitted to assist in any investigative efforts targeting Gerace when the defendant knew that Gerace and Pharaoh's were under DEA scrutiny. *See* Tr. Tran., at 69:23–75:07 (dated Mar. 20, 2024) (Test. Anthony Casullo). Then, in 2017, Gerace inquired of the defendant whether police could track or "ping" a burner phone. Govt. Ex. 311. Instead of ignoring Gerace, investigating Gerace, or reporting Gerace's inquiry to his superiors, the defendant did what he had been paid by Gerace to do—he provided law enforcement information about what was required to "ping" a phone to Gerace, enabling Gerace to learn information that could aid him in avoiding detection. *See* Govt. Ex. 310D. These actions by the defendant tend to permit a reasonable inference that the defendant operated with a corrupt state of mind when he accepted envelopes of cash from Gerace. In other words, it would be reasonable for a jury to infer that when a

DEA Special Agent accepts envelopes of cash from a strip club owner whom he had assisted in the past and continues to make attempts to protect that strip club owner from law enforcement scrutiny concerning drug-related investigations rather than investigating the strip club owner as his DEA duties required, that a corrupt bribery arrangement exists.

In addition, the government presented substantial evidence of the defendant lying to federal investigators about his relationship with Gerace and submitting false memoranda to the DEA about his relationship with Gerace. *Compare, e.g.*, Govt. Exs. 97, 98, 99, *with* Govt. Ex. 310D; *see* Tr. Tran., at 98:01–126:25 (dated Mar. 14, 2024) (Test. of Curtis Ryan). The Second Circuit has been clear that obstructing justice and lying can be used as evidence of consciousness of guilt and to infer culpable *mens rea*. *See, e.g.*, *United States v. George*, 779 F.3d 113, 121–22 (2d Cir. 2015); *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004). Taken in conjunction with the defendant's conduct to protect Gerace, the defendant's decision to lie and obstruct justice tends to support the conclusion that a reasonable jury could infer the defendant had a corrupt understanding that he was supposed to protect Gerace from law enforcement scrutiny, as opportunities arose, in exchange for cash payments.

C.    There Was Sufficient Evidence that the Defendant Demanded, Sought, Received, Accepted, and Agreed to Accept "Something Of Value" From Peter Gerace, Jr.

Finally, the defendant makes a passing statement about the lack of direct evidence that the defendant demanded or sought something of value from Gerace. *See* Mot. for Acq., at 5. As a threshold matter, section 201 can be violated by a public official corruptly demanding,

seeking, receiving, accepting, or agreeing to accept anything of value in exchange for being influenced in the performance of official acts or violating an official duty.  18 U.S.C. § 201.

In other words, demanding or seeking something of value are only two of the five means by which the "quid" piece of the "quid pro quo" can be fulfilled.  Thus, even if it were true that there was no proof that the defendant demanded or sought anything of value, a rational jury could still find sufficient evidence of the "quid" if the defendant received, accepted, or agreed to accept anything of value.  As explained above, *see supra* section I-A, Nigro testified that the defendant received, accepted, and agreed to accept cash from Gerace.  But Nigro's testimony also established sufficient evidence for a jury to find that the defendant demanded and sought cash from Gerace.  Specifically, Nigro testified that the defendant "stopped by" Pharaoh's for the purpose of picking up envelopes of cash.  *See* Tr. Tran., at 47:22–25 (dated Mar. 19, 2024) (Test. of Katrina Nigro).  Certainly, a jury could infer that by the defendant making the choice to enter Pharaoh's, approach Nigro, and take the cash, that the defendant was demanding and seeking payment from Gerace.  Regardless, whether the defendant actually demanded or sought anything of value from Gerace is inapposite because the record plainly establishes that the defendant received, accepted, and agreed to accept cash from Gerace.

II.     **Count 6: A Rational Jury Could Find that the Defendant Knowingly and Willfully Conspired with Peter Gerace, Jr. to Maintain Pharaoh's as a Drug-Involved Premises.**

The Court should also deny the defendant's Rule 29 motion as to Count 6 of the Redacted Second Superseding Indictment.  A rational jury could find that the government

proved each essential element of narcotics conspiracy as charged: that the defendant knowingly, willfully, and unlawfully conspired with Gerace to knowingly, intentionally, and unlawfully use Pharoah's for the purpose of manufacturing, distributing, and using cocaine, cocaine base, methamphetamine, amphetamine, marijuana, and heroin. *See* Red. Sec. Super. Indict., at 31, ECF No. 89, (dated Feb. 25, 2021); 21 U.S.C. § 846; *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (instructing that to be convicted of a drug conspiracy, "[t]he record must . . . permit a rational jury to find: (1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy").

The defendant premises his challenge on the dubious assertion that "insufficient evidence exists to show that [he] could have been aware of any of the conduct occurring at [Pharoah's]," and thus "cannot be said to have willfully joined any conspiracy that might have existed." Mot. for Acq., at 9, 10. This argument fails because a rational jury could find through the "totality" of both the direct and circumstantial evidence that the defendant knew Gerace used Pharoah's to use and distribute drugs and joined the conspiracy by using his status as a DEA Special Agent to protect Gerace and Pharoah's from legal scrutiny. *United States v. Anderson*, 747 F.3d 51, 59 (2d Cir. 2014).

A.   <u>Elements of Narcotics Conspiracy</u>

To be convicted of a drug conspiracy, "[t]he record must . . . permit a rational jury to find: (1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (citations omitted). Or, stated, otherwise, "[t]o sustain

a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004)).  This standard, however, does not demand that the government "show that the defendant knew *all* the details of the conspiracy."  *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008).  Rather, a reasonable jury can return a guilty verdict so long as the evidence shows the defendant "knew [the conspiracy's] general nature and extent."  *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir.1994).

      B.    <u>A Rational Jury Could Find That Gerace Knowingly, Intentionally, and Unlawfully Maintained Pharoah's for the Purpose of Manufacturing, Distributing, and Using Cocaine and Other Substances.</u>

A rational jury could find that Gerace permitted, encouraged, and capitalized on rampant drug use and distribution at Pharoah's, and thus maintained the club as a drug-involved premises.  For John McDonald, a former cocaine dealer, "[t]hat's all Pharoah's was, [ ] a place to do and sell drugs."  Tr. Tran. at 37:04–05, 37:24–38:11, (dated Mar. 7, 2024) (Test. of John McDonald); *id.* (explaining that "everybody kn[ew]" that Pharoah's employee Jessica Leyland sold cocaine).  McDonald patronized Pharoah's an "uncountable" number of times, openly using and selling cocaine each time he went.  *Id.* at 36.  Echoing McDonald, Nigro testified that "drug use" was "[e]verywhere" at Pharoah's.  Tr. Tran., at 19:07, (Test. of Katrina Nigro).  Likewise, A.P. explained that cocaine "was around a lot" when she worked at Pharoah's and that virtually everyone there used drugs: "[T]here was [sic] girls

using, there was [sic] customers using, employees using."  Tr. Tran., at 4:01–05 (Test. of A.P.).

Such drug use was not only permitted but encouraged—and arranged—by none other than Gerace, himself.  According to A.A., Gerace's friends would ask her if they could "get [cocaine]" while at Pharoah's.  Tr. Tran., at 15:22–16:01, (dated Feb. 29, 2024) (Test. of A.A.).  At Gerace's direction, A.A. obtained cocaine from dealer Marcus Black, who effectively tipped A.A. with cocaine for facilitating the transaction.  *See id.* at 16:02–17:15. As demand for cocaine increased, Gerace "told [A.A.] that [she] didn't need to [ask] anymore" for permission to arrange a sale, authorizing her to broker drug deals without his direct input. *Id.* at 17:16–18:05.  Several witnesses corroborated A.A.'s account of the black-market menu of drugs available to paying Pharoah's customers.  *See, e.g.*, Tr. Tran., at 18:03–20:12, (dated Feb. 28, 2024) (Test. of Kevin Myszka) (testifying that he once asked Gerace if he could purchase drugs and was soon thereafter approached by a Pharoah's employee, cocaine in hand); *id.* at 31:20–32:04 (recounting obtaining opiate pills from a Pharoah's employee).

Unsurprisingly, witnesses testified to observing "people under the influence of cocaine" at Pharoah's.  Nigro, for instance, could tell that people in the club were high on cocaine due to their dilated eyes, fast rate of speech, and excess sweating.  *See, e.g.*, Tr. Tran. at 19:10–25, (Test. of Katrina Nigro).  Further painting the picture of conspicuous drug consumption, Nigro recounted that "most of the time" Pharoah's dancers could be observed with "white [ ] cocaine" in their noses, "glowing" under the blacklight.  *Id.* at 20:01–03.  In short, based on the overwhelming evidence, a rational jury could conclude that Gerace

maintained Pharoah's as a drug-involved premises, as charged in Count 6. *Cf. United States v. Hinojosa*, No. 22-10584, 2024 WL 841088, at *3 (5th Cir. Feb. 28, 2024) ("At a minimum, because Hinojosa, Casas, and Rodriguez were known as hands-on managers, the jury could infer from how prevalent and conspicuous the sales were that each of the defendants knew about the sales." (footnote omitted)).

C.      A Rational Jury Could Permissibly Conclude that the Defendant Knew Gerace Maintained Pharoah's as a Drug-Involved Premises and Willfully Entered a Conspiracy to Protect Gerace and Pharoah's.

Moreover, based on the totality of the evidence, a rational jury could conclude that the defendant both knew of Pharoah's status as a site of illicit substance abuse and willfully joined a conspiracy to protect it from legal scrutiny.  For starters, despite the apparent omnipresence of drugs at Pharoah's, the defendant was a repeat customer so familiar with the strip club that he would enter through the employee entrance and had access to the employee garage.  *See* Tr. Tran. at 46:22–47:06 (Test. of Katrina Nigro) (testifying that the defendant visited Pharoah's to pick up envelopes of cash); Tr. Tran. at 16:16–17:03 (Test. of Protected Witness #4) (testifying that she met the defendant through Gerace at Pharoah's), Tr. Tran. at 73:05–19, (dated Feb. 21, 2024) (Test. of Louis Selva) (testifying that he went to Pharoah's with the defendant "right when [Gerace] had just taken it back over"); Tr. Tran. at 53:21–24, (dated Mar. 5, 2024) (Test. of K.L.) (testifying she observed the defendant in the Pharoah's garage where customers are not permitted); Govt. Ex. 310D at 10 (text message from Gerace directing the defendant to enter Pharoah's through the "[e]mployee ent").  Based on the defendant's training and experience as a DEA Special Agent, as well as his own cocaine use with Gerace, Selva, and P.H., a rational jury could infer the defendant knew that the

individuals around him were under the influence of cocaine and other drugs when he frequented Pharoah's.

Moreover, though not dispositive, the defendant's interactions with Pharoah's employees in the employees-only garage lends further support to the rational inference that the defendant was aware that Pharoah's was a drug-involved premises and willfully conspired with Gerace to maintain it as such.  According K.L., another Pharoah's employee, P.J., approached her while she was organizing material in the garage; P.J., a member of the Outlaws Motorcycle Club and drug dealer who sold drugs at the club, instructed K.L. "that [she] had to get out."  Tr. Tran. at 54:18–21, (Test. of K.L.); *see* Tr. Tran. at 42:08–10, (Test. of Katrina Nigro) (testifying that "PJ" was a member of the Outlaws Motorcycle Club). Immediately thereafter, Gerace and four other men, including the defendant, entered, meeting privately.  *See* Tr. Tran. at 56:01–08, (Test. of K.L.).  Viewing all of the trial evidence in its totality, a jury could reasonably *infer* that the defendant's secretive meeting with Gerace and other individuals in the presence of a cocaine dealer involved drugs even as no witness could specifically place the defendant at the scene of a Pharoah's-based drug deal or observed him consuming drugs there.  *See* Mot. for Acq., at 9.

Regardless, evidence that a defendant used drugs or witnessed a drug transaction at a particular location is unnecessary to sustain a conspiracy conviction for maintaining the location as a drug-involved premises.  For example, in *United States v. Jenkins*, No. 19-2778-CR, 2022 WL 3138879 (2d Cir. Aug. 5, 2022) (unpublished), *cert. denied*, 143 S. Ct. 533 (2022), a panel of the Second Circuit rejected defendant-appellant Timothy Enix's argument that his

conviction for conspiring to maintain a drug-involved premises was supported by "insufficient evidence of his *mens rea*." *Id.* at *3. Based on "the evidence of ubiquitous drug use at [Kingsmen Motorcycle Club] clubhouses (including the South Buffalo clubhouse), Enix's attendance at the South Buffalo clubhouse, and his leadership position" within the club, "[a] rational jury could infer . . . that Enix knew about the drug use and distribution in the clubhouses." *Id.*

A similar conclusion applies here. Based on the (1) ubiquity of drug-related activity at Pharoah's; (2) the defendant's repeated patronage of Pharoah's; (3) the defendant's access to employee-only areas within the club; and (4) the defendant's secretive interactions with Gerace and other individuals in the midst of a Pharoah's employee who sold drugs, a rational jury could conclude that the defendant knew of the drug activity unfolding within the club.

This reasonable interpretation of the evidence is buttressed by evidence of the defendant's obstructive conduct vis-à-vis the Pharoah's-centric narcotics investigations into Gerace. Specifically, on October 31, 2009, the FBI and the U.S. Probation Office conducted a drug-related search of Pharoah's after learning of "potential distribution of cocaine occurring" there. *See* Tr. Tran., at 15–20, (dated Feb. 15, 2024) (Test. of Peter Lepiane); Tr. Tran., at 15:03–04, 25–27, 46:19–23 (dated Feb. 20, 2024) (Test. of Thomas Herbst). The very next day, according to a November 6, 2009, Report of Investigation ("ROI") authored by the defendant, Gerace called. *See* Govt.'s Ex. 30A. During the call, Gerace "advised . . . that United States Probation officer Peter Lepiane and Agents of the **FBI initiated a search of Pharoah's Gentleman's club** located at 23 Aero Drive in Cheektowaga, NY." *See id.*

(emphasis added).   The defendant further wrote: "**It should be known that Gerace is associated with Pharoah's Gentleman's club**." *Id.* (emphasis added).  Finally, the defendant stated that Gerace "was prepared to offer information regarding individuals who are trafficking in narcotics in the Buffalo area . . . . in lieu of consideration on th[e] pending supervised release violation due to the failed urine test." *Id.*

On November 3, 2009, the defendant called U.S. Probation Officer Peter Lepiane, one of the officers who searched Pharoah's. *See* Tr. Tran., at 20:23–24, (Test. of Peter Lepiane). During the call, the defendant "said that Mr. Gerace had reached out to him about potentially cooperating to lessen his violation sentence." *Id.* at 21:01–03.  A few weeks later, purportedly to discuss Gerace's cooperation, the defendant convened a meeting attended by Gerace, FBI Special Agent Thomas Herbst (the agent spearheading the investigation into Gerace), and himself. *See* Tr. Tran., at 23:07–09, 26–27, (Test. of Thomas Herbst).  According to Special Agent Herbst, the defendant expressly "did not want anybody else at the meeting." *Id.* at 26:17. Notwithstanding the pomp and circumstance engineered by the defendant, the meeting was not "substantive," and neither the defendant nor Gerace discussed Gerace's knowledge of "kilo-level cocaine traffickers"—i.e., the very information that Gerace purportedly wanted to offer to barter his way out of a probation violation. *See id.* at 29:02–14.

Importantly, after Gerace left, and on the heels of the Pharoah's search, Special Agent Herbst informed the defendant that "the FBI[] ha[d] a drug case on Mr. Gerace." *Id.* at 30:08–09.  The defendant responded "dismissive[ly] . . . , indicating that it wasn't a very good drug case." *Id.* at 30:10–11.  However, when Special Agent Herbst replied that a senior federal

prosecutor known for his interest in organized crime cases "had already committed to [the] prosecution of Peter Gerace," the defendant "changed completely" and had an "oh, poop" moment. *Id.* at 30:14–24.   Nevertheless, the FBI's narcotics investigation into Gerace went nowhere because the defendant's conduct left Special Agent Herbst with the distinct impression that Gerace "was his source" and professional norms dictated that the FBI defer to the DEA over how to respond to a confidential source's criminal activity. *See id.* at 32:06, 32:07–11, 32:14–25.   Consequently, the FBI dropped its narcotics investigation into Gerace. *See id.* But the problem was that Gerace was never a DEA confidential source. *See* Tr. Tran. at 62:19–63:09, (dated Feb. 26, 2024) (Test. of Francis DiCarlo).   And, as noted earlier, the defendant admitted to his former best friend and fellow co-conspirator, Selva, that he "stepped in" to help Gerace when Gerace was under scrutiny. *See* Tr. Tran., at 72:17–25, (Test. Louis Selva).

From this, a rational jury could permissibly infer that the defendant intervened in SA Herbst's investigation—and successfully derailed it—because he knew Gerace was vulnerable to a successful drug investigation which, at that time, centered on narcotics distribution at Pharoah's.   And were that not enough, Gerace even advertised the defendant's protection to his Pharoah's-based drug associates.   For example, shortly after introducing the defendant to A.P. at Pharoah's, Gerace handed her the defendant's business card, instructing her to "use it to help [her] get out of trouble" if she "ever got in trouble."   Tr. Tran. at 28:01–04 (Test. of A.P.).   Of course, Gerace knew of A.P.'s legal vulnerability: he had previously tasked her with retrieving cocaine and used cocaine with her, and she sold cocaine at his club. *See id.* at 7:25–08:25, 9:23–10.   Combined with other evidence, this, too, supports the rational inference

that the defendant agreed to assist Gerace and his confederates in evading legal scrutiny—a conclusion that necessarily suggests the defendant had knowledge of Gerace and his Pharoah's-associates' legal liability.

Finally, the defendant's own statements evince his knowledge that Gerace maintained Pharoah's as a drug-involved premises—and that he willfully conspired with Gerace to protect it. Specifically, the defendant told former DEA Special Agent Anthony Casullo of an overdose that occurred at Pharoah's. *See* Tr. Tran., at 68:24–69:25, (Test. of Anthony Casullo). According to Agent Casullo, the defendant recounted a time when Gerace "called [him] when a stripper overdosed at his club." *Id.* at 69:01–02. The defendant's response? "Get her out of there." *Id.* at 69:02. The exchange left SA Casullo with the indelible belief that the defendant "was possibly trying to cover up something." *Id.* at 69:12–13. Doug Augstinyak, a former Pharoah's manager, testified that around the same time as this exchange, Gerace directed him to dump an overdosing dancer's (still live) body at a hotel near the Buffalo-Niagara International Airport. Combined with the defendant's other efforts to squash Special Agent Casullo's narcotics investigation into Gerace, *see supra*, a rational jury could further infer that the defendant knowingly and willfully conspired with Gerace to maintain Pharoah's as a drug-use and distribution site.

### III. Count 13: Sufficient Evidence Supports the Defendant's Obstruction of Justice Conviction.

The Court should also reject the defendant's challenge to his obstruction of justice conviction under Count 13. The defendant argues that "the evidence did not establish that the removal of the Serio file was done 'knowingly' to 'conceal' and 'cover up' anything with

an intent to 'impede, obstruct, or influence' any investigation" in violation of 18 U.S.C. § 1519.  Mot. for Acq., at 11.  In his view, "for the jury to reach this conclusion, it would have first had to find that [the defendant's] provision of various reasons why he took the file home were inaccurate, and then it would have had to speculate in the absence of any admission that such action was taken for an improper purpose."  *Id.*  Once more, this argument fails because a rational jury, considering the evidence in its totality, could conclude beyond a reasonable doubt that the defendant committed the essential elements of the offense: that he knowingly concealed a "record, document, or tangible object" with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States.  18 U.S.C. § 1519.

Specifically, a rational jury could conclude that the defendant was attempting to conceal the Serio file to cover up his corrupt conduct vis-à-vis the Serio drug trafficking organization ("the Serio DTO").  With respect to that conduct, a rational jury could conclude that the defendant accepted bribes from Ron Serio in exchange for law enforcement sensitive information provided to two intermediaries, Selva and Michael Massechia.  *See, e.g.*, Tr. Tran. at 94:13–18, (Test. of Louis Selva) (testifying that he approached the defendant with a bribe offer in hopes of obtaining his protection for the Serio DTO); Tr. Tran. at 83:04–23, (dated Mar. 11, 2024) (Test. of Ron Serio) (testifying that he initially paid the defendant approximately $2,000 a month in exchange for "information about possible people to stay away from, and informants").

A rational jury could also conclude that the defendant disrupted, dismantled, and derailed any investigation into the Serio DTO by falsifying official DEA documents, shutting down informants, forging signatures, exploiting deconfliction systems that would notify the defendant if other law enforcement agencies were investigating members of the Serio DTO, and shutting down surveillance efforts—evidence of which existed in the Serio file.  *See, e.g.*, Tr. Tran. at 111:05, (Test. of Ron Serio) (testifying that he learned the names of two individuals—B.K. and T.S.—who the defendant identified as DEA informants); Tr. Tran. at 141–42, (Test. of Louis Selva) (testifying that the defendant informed him that T.S. was an informant); *id.* at 137–38, (testifying that the defendant informed him that B.K. was an informant); Tr. Tran. at 66–77, (Test. of Francis DiCarlo) (discussing various falsified DEA-6 and other official reports contained in the Serio file); Tr. Tran. at 21:23–22:03, (dated Feb. 29, 2024) (Test. of Mark Gentile) (testifying that he did not sign an official DEA report purporting to bear his signature contained in the Serio file and that "[s]omebody else must have signed it"); Tr. Tran. at 33:04–06, (dated Feb. 28, 2024) (Test. of Shane Nastoff) (testifying that he did not sign an official DEA report purporting to bear his signature contained in the Serio file); Tr. Tran. at 27:18–28:17, (dated Feb. 29, 2024) (Test. of David Leary) (testifying that the defendant pulled him off of a promising surveillance operation targeting members of the Serio DTO); *see generally* Tr. Tran. (Test. of Brian Burns) (testifying about the falsified and misleading DEA-6 and other officials reports contained in the Serio file).

Moreover, a rational jury could conclude that the defendant concealed the file to impede investigation into his relationship with Selva, who was arrested in 2019 and whose

name and telephone information appeared in the file.  A rational jury could find that concealing the defendant's relationship with Selva was especially important to the defendant considering Selva's facilitation of the bribes the defendant received from Serio.  In like manner, a rational jury could find that the defendant was motivated to conceal records of his investigation into Selva in light of the coaching he provided Selva following Serio's unexpected arrest on June 20, 2017.  Specifically, a rational jury could find that the defendant met privately with Selva to coach him on what to say if he were approached by law enforcement.  *See* Tr. Tran. at 40–41, (Test. of Louis Selva).  To that end, the defendant directed Selva "[t]o call him immediately, and . . . [h]he would go over interviewing techniques with [him], questions they would . . . , that type [of] thing."  *Id.* at 41:02–04.  And the defendant advised Selva to "portray[] [himself] as [the defendant's] informant," just as Gerace did years earlier during the FBI's narcotics investigation.  *Id.* at 41:13–14.  At least at first, Selva relied on this coaching after his own arrest.  Thus, concealing a record of the defendant's investigation into the Serio DTO—and, by extension, Selva—could impede investigators from corroborating any account Selva could provide of the defendant's larger obstruction.  Accordingly, a rational jury could conclude that the Serio file contained inculpating evidence regarding the defendant's corrupt acts vis-à-vis the Serio DTO and the defendant, in turn, removed the Serio file from the DEA to ensure that no other law enforcement officer would discover the paper trail of his corruption.[2]

---

[2] A rational jury could further conclude that the defendant felt acutely motivated to conceal the Serio file considering his knowledge that he was under investigation for allegations of misconduct related to his relationship with Gerace, as the discovery of additional impropriety could deepen the defendant's criminal exposure.

The defendant dismisses these evidence-support conclusions and inferences as mere "speculat[ion]," and suggests, without citing any legal authority, that a § 1519 conviction requires an "admission" evincing an "improper purpose."  Mot. for Acq., at 11.  Not only does the defendant's argument ignore the law's "long recogni[tion] that criminal intent may be proved" exclusively by the very kind of "circumstantial evidence" discussed above, *United States v. Heras*, 609 F.3d 101,106 (2d Cir. 2010), but it is belied by the judgment of circuit courts from across the country affirming § 1519 convictions where the evidence showed that the defendant had a motive to falsify or conceal evidence.  *See, e.g.*, *United States v. Rowland*, 826 F.3d 100, 111 (2d Cir. 2016) (affirming § 1519 conviction where the defendant, the former governor of Connecticut and a convicted felon, and his co-conspirators, individuals campaigning for political office, "intentionally created a document that misrepresented their relationships with the *aim* of concealing the truth from the FEC—and, not incidentally, the public" (emphasis added)); *United States v. Moyer*, 674 F.3d 192, 207 (3d Cir. 2012) (affirming §1519 conviction where the defendant, a police chief, falsified police reports and "had a motive to falsify" the reports);  *United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008) (affirming § 1519 conviction where defendant "was aware he may have engaged in wrongful behavior and that this awareness—being close in time to the false statement—influenced the statement in the report").  As such, the Court should deny the defendant's Rule 29 challenge as to Count 13.

### IV.   Count 15: Sufficient Evidence Supports the Defendant's False Statements Conviction.

The last of the defendant's Rule 29 arguments concern his conviction under Count 15 for providing a false statement.  Specifically, Count 15 alleged, in pertinent part:

> On or about June 6, 2019, in the Western District of New York, the defendant, JOSEPH BONGIOVANNI, in a matter within the jurisdiction of the executive branch of the United States, did willfully and knowingly make materially false, fictitious, and fraudulent **statements and representations** to special agents of the Department of Justice, Office of the Inspector General, and Homeland Security Investigations in that the defendant **stated** as follows:
>
> . . . .
>
> (viii) **he kept the file regarding DEA Case Number C2-13-0026 in his house because it was an old case and he thought it would come up again and the defendant wanted to verify everything was on the up and up** . . . .

Red. Sec. Super. Ind. at 37 (emphases added).

The defendant argues that this conviction must be dismissed because the Second Superseding Indictment charged that the defendant "stated" that he "wanted to verify everything was on the up and up" and the agent to whom he provided the statement could not recall whether the words "up and up" referred to a quote from the defendant or reflected a summary of the defendant's account.   Mot. for Acq., at 11.   "In the face of such discrepancy," the defendant submits that "the government's evidence did not sufficiently establish that [he] made such [a] statement." *Id.* at 12.  In other words, the defendant contends that because the Second Superseding Indictment uses the legal convention "stated" the false statement for which he was convicted should be regarded as a verbatim quote—and any evidence short of an exact quote is insufficient to sustain his charge.[3]  This argument fails for two reasons.

---

[3] Despite bearing a heavy burden, the defendant fails to cite any legal authority for his argument.  Because "a party may be deemed to have waived an argument through inadequate briefing," *United States v. Fayton*, --- F. Supp. 3d ----, 2023 WL 8275924, at *3 (S.D.N.Y. 2023), the defendant's challenge to his false statement conviction should be rejected on this basis alone.

First, consistent with "[f]ederal pleading require[ments]," the Second Superseding Indictment charged in the "conjunctive to inform the [defendant] fully of the charges," *United States v. McDonough*, 56 F.3d 381, 389 (2d Cir. 1995) (quoting *United States v. McGinnis*, 783 F.2d 755, 757 (8th Cir. 1986)) (second alteration added), when it alleged that he made "materially false, fictitious, and fraudulent **statements and representations**," Red. Sec. Super. Indict. at 37 (emphasis added).  Because the law dictates that "[a] conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in *any* of the ways charged," the government was permitted to prove its case in the disjunctive. *United States v. Mejia*, 545 F.3d 179, 207 (2d Cir. 2008) (quoting *McDonough*, 56 F.3d at 390). That is, the government was permitted to prove that the defendant made false representations.

Second, other courts have rejected the "excessively literalist tack urged by [the defendant] of treating the summary language of the indictment"—here, the word "stated"— as requiring "a direct quote, and superimposing the indictment's language over [the defendant's] actual statement to insure a perfect match." *United States v. Bartle*, 835 F.2d 646, 649 (6th Cir. 1987); *see United States v. Youn*, No. 1:14-CR-0117-AT, 2015 WL 6693714, at *10 (N.D. Ga. Nov. 2, 2015) (similar).  Instead, the jury may convict so long as the indictment "adequately summarize[d] the [defendant's] statements." *Bartle*, 835 F.2d at 648–49; *see also United States v. Atl. States Cast Iron Pipe Co.*, No. CRIM. 03-852(MLC), 2007 WL 2282514, at *76 (D.N.J. Aug. 2, 2007), *aff'd sub nom. United States v. Maury*, 695 F.3d 227 (3d Cir. 2012); *accord United States v. Fern*, 696 F.2d 1269, 1275–76 (11th Cir. 1983) (affirming Section 1001 conviction where there was no verbatim account of the false statement); *United States v. Khan*, No. 3:18-CR-00195 (JAM), 2020 WL 7767890, at *3 (D. Conn. Dec. 30, 2020) (concluding

that a rational jury could have the defendant guilty of making a false statement where the agent's notes, though failing "to render a verbatim recitation of particular statements . . . were on the whole consistent with [the defendant's] having told the agents" something false).

Consistent with these rules, the government proved beyond a reasonable doubt that the defendant stated or represented that he "he kept the file regarding DEA Case Number C2-13-0026 in his house because it was an old case and he thought it would come up again and the defendant wanted to verify everything was on the up and up."  Red. Sec. Super. Indict. at 37.  As HSI Special Agent Curtis Ryan explained, when asked why he had reports related to the Serio DTO in his home after he retired, the defendant represented "[t]hat he wanted to show that everything was on the up and up with the Serio investigation.  That he had burned his other files, but he kept this one."  Tr. Tran. at 119:14–20 (dated Mar. 14, 2024) (Test. of Curtis Ryan); *see id*. at 120:16–18.  Moreover, the defendant represented "[t]hat he knew there was an organized crime investigation and he thought Serio might come up again—with that investigation.  And he made a comment about how Serio's last name qualifies.  So that was one of the reasons why he kept the box."  *Id.* at 120:08–12.  In sum and substance, the defendant stated that he kept the file to show "that his investigation was legitimate."  Tr. Tran. at 209:19–21, (dated Mar. 18, 2024) (Test. of Curtis Ryan); *see id.* at 210:18–19 (testifying that the words "up and up" were his words to "characterize what [the defendant's] message" was, that is, "that he wanted to show that the investigation was legitimate").  Assessing the evidence in its totality, a rational jury could conclude that the defendant's explanation to Special Agent Ryan that he *removed* a file *from the DEA office* to verify (presumably to the DEA) the legitimacy of his sham investigation was facially implausible,

31

as removing the file from the DEA impedes—not assists—the DEA (or other law enforcement agencies) from verifying the legitimacy of the investigation documented in the file.

## V.      A New Trial is Not Warranted Under Rule 33.

In addition to challenging his convictions under Rule 29, the defendant seeks a post-verdict inquiry of alleged jury misconduct to determine whether he is entitled to a new trial pursuant to Rule 33.  The defendant offers two bases for his request: (1) purported hostility during the jury's deliberations and (2) a purported indication that one or more jurors failed to apply the Court's instructions.  *See* Mot. for Acq., at 13.  Both bases are unavailing.

"The standard for conducting a post-verdict jury inquiry . . . is . . . demanding," *United States v. Yeagley*, 706 F. Supp. 2d 431, 433 (S.D.N.Y. 2010), as the importance of resisting investigations into jury deliberations is well established:

> courts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial. This undertaking is particularly sensitive where, as here, the court endeavors to investigate allegations of juror misconduct during deliberations.  As a general rule, no one-including the judge presiding at a trial-has a 'right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror.

*United States v. Thomas*, 116 F.3d 606, 618 (2d Cir. 1997).

Courts should therefore be reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983); *see United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (warning of the "evil consequences" attending to post-verdict inquiries).

Only where there is "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred" is post-verdict inquiry appropriate.  *Ianniello*, 866 F.2d at 543 (internal quotation marks and ellipse omitted).

Critically, in elucidating the contours of this standard, the Second Circuit has cautioned that "possible internal abnormalities in a jury will not be inquired into except in the *gravest* and most important cases," such as where there are allegations that one juror threatened to physically harm another.  *Anderson v. Miller*, 346 F.3d 315, 327 (2d Cir. 2003) (emphasis added).  But that standard contains an equally critical implication: "that an allegation of intrajury pressure that does *not* rise to the level of physical coercion is *insufficient* to require a post-verdict jury inquiry."  *Yeagley*, 706 F. Supp. 3d at 434; *see also Anderson*, 346 F.3d at 324 ("[E]ven though [the complaining jurors] might have experienced severe emotional distress within the jury room . . . [the defendant] was tried in conformance with the Constitution."); *id.* at 329 ("Jurors Nos. 2 and 11 felt themselves to be under pressure, perhaps even under duress, to vote in favor of conviction.  But we do not find that a reasonable juror, standing in the shoes of Juror Nos. 2 and 11, would have thought herself to be facing a physical assault if she refused to vote for conviction.").

With that cautionary *dicta* in mind, the *Yeagley* Court declined to conduct a post-verdict inquiry where the juror alleged "extreme pressure," "badgering," "comments that had very little to do with the case," a "heated exchange," and a "climate in the jury room . . . of extreme frustration and anger at having had to sit through the hearing for so long as well as having to deliberate through the Christmas season."  *Yeagley*, 706 F. Supp. 2d at 434–35.  In that Court's

view, such allegations were both too "vague and conclusory" to merit post-verdict inquiry. And, as the *Yeagley* Court rightfully noted, "[c]ourts have refused to upset a jury's verdict, or even conduct a hearing, despite far more serious allegations of intrajury tension." *Id.* at 434; *see Jacobson v. Henderson*, 765 F.2d 12, 14 (2d Cir. 1985) (affirming denial of habeas relief even where "during the court of jury deliberations, there was screaming, historical crying, fist banging, name calling, [ ] the use of obscene language"); *United States v. Aiyer*, 433 F. Supp. 2d 468, 473–74 (S.D.N.Y. 2020) (holding that a juror's allegation that another juror was pressured to vote guilty was insufficient to require a post-verdict inquiry); *United States v. Sattar*, 395 F. Supp. 2d 66, 71, 76–77 (S.D.N.Y. 2005) (refusing to hold hearing despite juror's letter declaring that the juror voted to convict "only as a result of the fear and intimidation" caused by "a relentless verbal assault [sic]" during deliberations).

*Yeagley*'s well-supported conclusion—that uncomfortable and even hostile jury deliberations do not merit post-verdict inquiry—should apply here as, on their face, Juror #12's allegations do not reflect the gravity necessary to conduct a post-verdict inquiry. *See Anderson*, 346 F.3d at 327. For starters, Juror #12 complained of verbal, not physical, hostility. *Id.* at 324, 327. In addition, the Court's judicious response following receipt of Juror #12's allegations insulated the defendant's convictions from even the specter of coercive taint. Specifically, this Court appropriately halted deliberations after Juror #12 indicated that she perceived hostility during deliberations, identified herself as a holdout juror, and signaled her unwillingness to continue deliberating. Thus, at the time Juror #12 sent her note, there was no evidence that an intrajury social dynamic caused her to yield her position of the defendant's guilt. Instead, Juror #12 indicated that she was committed to her positions and

that future deliberations would be fruitless.  By ceasing deliberations at that juncture, the Court ensured that no juror would yield his or her conscientious evaluation of the evidence—a duty this Court repeatedly reminded the jurors they owed to the parties—in the face of further discussion, irrespective of whether those discussions were hostile or amicable. Furthermore, this Court commendably cured any concern that the defendant's two convictions *resulted* from any undue, intrajury pressure when it confirmed with each juror on the record that his or her vote was made freely without any coercion.   Accordingly, notwithstanding the defendant's speculative assertion to the contrary, there was no "damage" for a post-verdict inquiry to investigate or for the extraordinary remedy of a new trial to correct.  Mot. for Acq., at 14.

Juror #12's allegations that a juror stated that he or she "knew he was guilty from day 1" and "[y]ou have to prove to us that [the defendant] is innocent" do not alter these conclusions.   Starting with the first alleged statement, Judge Weinstein's insights are instructive:

> Our criminal justice system does not contemplate that jurors will avoid forming tentative conclusions about the guilt or innocence of a defendant before all the evidence has been presented and the judge releases them to the jury room for deliberations.   All that is required of a juror is that he or she keep an "open mind" and remain receptive to the parties arguments and evidence.  It is thoroughly unsurprising that at some point near the end of a trial one or more jurors will believe a defendant's guilt or innocence to have been established. Even so, those jurors vowed they would be receptive to opposing arguments.  This is, after all, the goal of requiring juror deliberation in an effort to reach unanimity.

*Brown v. Greiner*, No. 02-CV-2043 (JBW), 2003 WL 22964395, at *13 (E.D.N.Y. Oct. 2, 2003).

Here, even assuming the veracity of Juror #12's allegation, there is <u>no</u> evidence that the unknown juror refused to deliberate with an open mind, consistent with the Court's instructions.  And just as fundamentally, "there is no reason to doubt that the *jury* based its *ultimate* decision only on [the] evidence formally presented" at the defendant's lengthy, approximately two-month-long trial.  *United States v. Sabhnani*, 529 F. Supp. 2d 384m 391 (E.D.N.Y. 2008) (emphasis added) (quoting *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993)).

Similarly, no concrete, blatant, or inherently improper inference—and certainly not the unspecified bias that the defendant complains of—can be discerned from Juror #12's allegation that another juror told her that she had "to prove to us that [the defendant] is innocent."  Because the alleged statement was not made until after the case was submitted to the jury, there is no evidence tending to suggest that any juror denied the defendant the presumption of innocence.  Additionally, the Court repeatedly instructed the jury that its decision as to the defendant's guilt or innocence had to be unanimous.  As such, it is entirely plausible that one of Juror #12's peers was, consistent with the Court's instruction, soliciting Juror #12's perspective as to why she believed the defendant to be innocent in a broader effort to secure a unanimous verdict.

That plausible interpretation does not deter the defendant, citing The Buffalo News's comments section, from speculating that the alleged comment must have meant something more nefarious—and warning that failure to reverse his convictions will "risk undermining confidence in the judicial process locally."  Mot. for Acq., at 17.  The comments section, however, rarely bears fruit.  And lest this Court create a standard empowering strangers on

36

the internet to overturn verdicts based on their speculative misgivings, this case presents no exception.  *Cf. Aiyer*, 433 F. Supp. 3d at 474 ("The post hoc misgivings of a single juror are an insufficient basis to conduct a post-verdict inquiry.").   Regardless, as the actual caselaw demonstrates, Juror #12's second allegation is far from the "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety [ ] occurred" in the deliberation room; indeed to find otherwise requires the very kind of speculation that the Second Circuit cautions against.   *Ianniello*, 866 F.2d at 543.   Combined with the Court's instructions that the defendant was innocent until proven guilty and that the government was required to present proof beyond a reasonable doubt, as well as the split verdict "evince[ing] [the jury's] understanding of these instructions," Juror #12's allegations neither merit any inquiry that could disturb the jury's verdict nor a new trial.  *United States v. Variano*, 550 F.2d 1330, 1334 (2d Cir. 1977).  Accordingly, the Court should deny the defendant's motion.

## CONCLUSION

The government respectfully requests the Court deny the defendant's motion for judgment of acquittal and motion for a new trial.

Dated May 17, 2024.

COREY R. AMUNDSON                        TRINI E. ROSS
Chief                                    United States Attorney

BY:   s/JORDAN DICKSON          BY:   s/JOSEPH M. TRIPI
Trial Attorney                        s/NICHOLAS T. COOPER
Public Integrity Section              s/CASEY L. CHALBECK
U.S. Department of Justice            Assistant United States Attorneys
Criminal Division                     United States Attorney's Office
1301 New York Ave. NW, Ste. 1000      Western District of New York
Washington, D.C. 20530                138 Delaware Avenue
202-597-0508                          Buffalo, New York 14202
jordan.dickson@usdoj.gov