IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

          v.                            19-CR-227-LJV
                                               23-CR-37-LJV
                                         **(REDACTED)**

PETER GERACE, JR.,

              Defendant.
_____

### GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTION TO RESOLVE POTENTIAL AND ACTUAL CONFLICTS OF INTEREST[1]

#### INTRODUCTION

Peter Gerace argues that there are no actual or potential conflicts here, and the government is acting in bad faith to suggest otherwise.  That is quite a take given that this very Court twice asked "whether [Attorney] Soehnlein has a potential or lesser actual conflict that requires a full-blown *Curcio* hearing and, if necessary, will order further briefing on that question."  *United States v. Gerace*, No. 19-CR-227, 2024 WL 1793022, at *8, n.7 (W.D.N.Y. Apr. 25, 2024); *see* Status Conf. Tran., at 3, (dated May 1, 2024) ("I think I need to give the government a chance to comment on whether there's still a lesser actual or potential conflict in light of my Safe Harbor analysis.").

Though Attorney Soehnlein has since been immunized from prosecution for conduct related to the orchestrated recusal—thereby eliminating any *per se* conflict—this reply brief

---

[1]      Though the government does not think that sealing is appropriate, it will file a redacted version on the public docket and then file an unredacted version under seal.

focuses on four core questions before the Court.[2]  First, is there evidence that Gerace used his attorneys to fraudulently induce Judge Sinatra into recusing?  If so, then there is evidence that Gerace weaponized counsel to obstruct justice in violation of either 18 U.S.C. § 1503, § 401, or, as the Grand Jury has already found, *Klein*, and the attorney-client privilege cannot shield him from Attorney Soehnlein serving as a witness.[3]  Second, if Attorney Soehnlein might be used as a witness against his client, should the Court accept Gerace's waiver during a *Curcio* hearing?  Third, does the integrity of the judicial process militate in favor of declining a waiver?  Fourt, might there be ethical—if not criminal—implications to Attorney Soehnlein's participation in the effort to orchestrate Judge Sinatra's recusal under false pretenses?

If the answer to any of these questions is "yes," the government thinks the Court should decline to accept Gerace's waiver.  But, more fundamentally, even if the Court were to accept Gerace's waiver, these issues require elucidation and discussion so that Gerace can make an informed waiver.  Once more, and irrespective of whatever personal offense Gerace and his counsel take, the government would be doing Gerace, this Court, and the legal process a disservice not to raise these concerns.

---

[2]     On May 16, 2024, the USAO-WDNY conferred letter immunity upon Attorney Soehnlein in connection with the investigation into Judge Sinatra's orchestrated recusal.

[3]     The government briefed whether Attorney Soehnlein could be considered a witness against Mr. Gerace in its Revised and Superseding Motion to Disqualify.  *See* ECF No. 691 at 62–63 ("As set forth above, there is a legitimate basis for the government to investigate the [obstructive] conduct described above, and whether Mr. Soehnlein is ultimately a target, subject, **or witness to that conduct**, the end result is the same—he must be disqualified." (emphasis added)); *see id.* at 32–33 ("As these cases illustrate, the *per se* framework encompasses conflicts emerging from the reasonable possibility that an attorney engaged in criminal conduct related to the client's charges; *that the attorney might be called as a witness against his client in some future proceeding*; . . . .  They further underscore—both explicitly and implicitly—the government's duty to bring such information to the Court's attention." (emphasis added)).  The government interpreted the Court's decision not to resolve this issue in its prior Decision and Order evidence that the Court deemed Attorney Soehnlein's status as a witness as a potential or actual conflict, as opposed to the species of *per se* conflict that the government previously advanced.

## I.      Discussion

Based on this Court's prior findings, there remains probable cause that Attorney Soehnlein was an unwitting participant in Gerace's obstructive scheme to fraudulently induce Judge Sinatra's recusal and may be called to testify against his client under the crime-fraud exception to the attorney-client privilege.  Moreover, as other courts have acknowledged, manipulating the recusal statutes smacks of impropriety and injustice—a problem Gerace confronts by discrediting the recording ███████████████████ ████████.  Gerace's complete failure to grapple with any of these issues all but underscores that the integrity of the judicial process demands the disqualification of the attorney whom he wielded to select the judge of his choice.  Finally, if Attorney Soehnlein was a knowing and willing participant in Gerace's obstructive scheme, he might still face ethical consequences even if he is immunized from criminal prosecution.[4]

### A.      Attorney-Client Privilege Cannot Shield Attorney Soehnlein from Being a Witness to his Client's Obstruction.

Gerace contends that "[t]his Court's decision [denying the government's motion to disqualify] established that the filing of the defense witness list was not a criminal act, and the decision arguably forecloses any further argument" that the crime-fraud exception could make Attorney Soehnlein a witness against his client.  Resp. in Opp. at 9–10.  That argument fails—and the crime fraud exception applies—for four reasons.[5]  First, the Court's order never addressed whether it was possible or probable that Gerace fed his attorneys false information

---

[4]        In the government's view, the Court need not decide what, if any, ethical implications attach to Attorney Soehnlein's representation of Gerace because he was, at minimum, an unwitting participant in, and witness to, his client's obstruction and thus may be called as a witness against Gerace.

[5]        In the disqualification context, it is generally sufficient for the purposes of disqualification that the attorney witnessed his client's crime.  That is why the government argued in its prior briefing that Attorney Soehnlein should be disqualified under the *Fulton* framework irrespective of his status as a target, subject, or witness to the orchestrated recusal.

to convey to Judge Sinatra and induce his recusal, and therefore committed a crime.  Second, "there is a factual basis [to show] probable cause to believe that a fraud or a crime has been committed—or has been attempted" by Gerace and his other non-attorney co-conspirators. *United States v. Costanzo*, 22-CR-281 (JPO), 2024 WL 2046053, at *2, (S.D.N.Y. May 8, 2024). Third, based on the numerous factually-contested representations made to Judge Sinatra, "a prudent person" would find a factual basis to believe that "the communications in question were in furtherance of [a] fraud or crime." *Id.*  Fourth, and finally, Gerace wholly overlooks that the crime-fraud exception is not limited to crimes but, rather, as its name suggests, encompasses the kind of fraud-on-the-court that occurred here.

**1.    The Court's Prior Opinion Does Not and Cannot Foreclose the Possibility that Gerace Committed a Crime.**

The Court's prior decision does not and cannot exculpate Gerace, which is presumably why the Court has asked about the existence of actual or potential conflicts related to Attorney Soehnlein's continued participation in this case.  On that score, the government offers the following juxtaposition of the defense team's representations regarding Witness 171 and Witness 240 against those witnesses' accounts to the FBI, as well what Attorney Cohen represented to Judge Sinatra and what Gerace personally represented to this Court in an *ex parte* communication kept from the government until after the adjudication of the Revised and Superseding Motion to Disqualify:

| Discrepancies Between What Gerace's Attorneys Represented & What the Witnesses and Gerace Report | | |
|---|---|---|
| **No.** | **What Gerace's Attorneys Represented** | **What the Witnesses Said to the FBI or What Grand Jury Testimony Shows** |
| 1. | **Re: Witness 171:** Gerace's witness list provides that: "[Witness 171] is expected to testify about his relationship with Peter Gerace, and what he personally observed during the course of his relationship with | Witness 171 said he knew "nothing" about Gerace;<br><br>Witness 171 met Gerace once twenty or thirty years ago; |

| | | |
|---|---|---|
| | Gerace." Def. Gerace Witness List, at 31, (ECF No. 529) (filed June 20, 2023).[6] | Witness 171 has never dealt with Gerace, either on the job or in his personal life. |
| 2. | **Re: Witness 171 and Witness 240:** Attorney Cohen represented: "The Grand Jury testimony that we've been given access to brings those names up significantly." Status Conf. Tran., at 5, (dated June 21, 2023). | Witness 171's name never appeared in the Grand Jury testimony;<br><br>Witness 240's name appeared tangentially and mainly in connection with a business he runs. |
| 3. | **Re: Witness 171 and Witness 240:** Attorney Cohen stated: "If you are asking whether I intend to call them, we have to see how the case plays out. I don't know yet but, certainly, the government felt it was important enough to question [sic] about these . . . we'll say the two individuals."<br><br>Status Conf. Tran., at 5, (dated June 21, 2023). | The government did not ask any questions in the Grand Jury related to Witness 171;<br><br>Two witnesses made limited statements about Witness 240 related to Witness 240's business. |
| 4. | **Re: Witness 171:** Attorney Soehnlein stated that Gerace "has a particularly close relationship with [Witness 171], that is included in payment of money for various things, various charitable contributions, and things of that nature." Status Conf. Tran., at 12, (dated June 21, 2023). | Witness 171 stated that he does not have any relationship with Gerace, let alone a "close relationship."<br><br>When told that Gerace's defense team represented that he has a "particularly close relationship" with Gerace, Witness 171 responded that that representation is "bullshit."<br><br>Furthermore, Witness 171 stated that he has not received payment of money from Gerace for anything, including various charitable contributions and other things of that nature. Witness 171 stated that he had never taken or received a dime from Gerace. |
| 5. | **Re: Witness 240:** Gerace's witness list provides that Witness 240 is a "███████ | Witness 240 advised the FBI that he is not a friend of Gerace's. |

---

[6]    Though quoted from a sealed filing, this information was publicly disclosed during the June 21st status conference. *See* Status Conf. Tran., at 6 (The Court: "171 says that he's going to testify about his relationship with your client, Mr. Cohen, and what 171 personally observed during the course of his relationship with your client and it's pretty similar to the way 240 reads.").

| | | |
|---|---|---|
| | ████████████ He is expected to testify about his relationship with and observations of Peter Gerace." Def. Gerace Witness List, at 43, (ECF No. 529) (filed June 20, 2023). | Witness 240 further advised that he has never been to Gerace's house, nor have they had dinner together, and they were not "chummy" with each other.<br><br>Witness 240 advised that he would not described his knowledge of, and any interactions with, Gerace as constituting a social relationship between the two, and that he was "absolutely not" in a position to testify as a character witness for Gerace, and that it was "ridiculous" to suggest he could act as Gerace's character witness. |
| 6. | **Re: Witness 171 and Witness 240**, Attorney Cohen proffered to Judge Sinatra: "[Y]ou're right if you are suggesting, Judge, this is a character case. That's all this case is is a character case. This is not going to be a case where the government is going to be pointing to the table and showing these are the drugs that were seized or this is the evidence that was seized during numerous warrant searches, because nothing was turned up. It's all about second and thirdhand, sometimes firsthand testimony from | On Page 5 of Gerace's *ex parte* communication with this Court, Gerace contradicts his counsel's representations before Judge Sinatra, stating that his witnesses—171 and 204—"are not character witnesses, but rather rebuttal witnesses to the government's case in chief."[7] |

---

[7]       Gerace asked either the Chief Judge, this Court, or both to "admonish[]" Judge Sinatra for expressing his skepticism of the defense team's tactics" and concern they were engaged in "gamesmanship," and then proceeded to falsely accuse *Judge Sinatra* of inventing Witnesses 171 and 240's status as "character witnesses" during the proceedings, as pictured below.



acknowledged early on. (see Exhibit J). Additionally Judge John Sinatra Jr should be admonished stating on the record and publicly that Mr. Gerace's need to call these witnesses was "gamesmanship" "a tactical maneuver that he was skeptical of." Moreover, contrary to what Judge John Sinatra said at these June 6, 2023 Court proceedings, Mr. Gerace's witnesses named herein are not character witnesses, but rather rebuttal witnesses to the governments case in chief. (Exhibit J) On June 21, 2023 Judge John Sinatra Jr. Finally recused himself...

As Attorney Cohen's on-the-record representations make plain, the genesis of the almost certainly false "character witness" narrative rests with the defendant—not Judge Sinatra.

| people who are largely incredible.  And I also intend to be able to — as a character chase, to not only be put on in my direct case to show the character of my client, but it can also be used to impeach the character of the witnesses upon which the U.S. Attorney is relying." Status Conf. Trans., at 7, (dated June 21, 2023). |  |
|---|---|

Gerace has never—not once—tried to reconcile these irreconcilable accounts through the adversarial process, and his most recent response brief is no exception.  Rather, he declares that "[t]he facts otherwise demonstrate there was a wholly legitimate, non-nefarious basis for [his] filing."  Resp. in Opp., at 10, (ECF No. 973) (dated May 22, 2024).  But what matters for Gerace is not what Gerace *could have* written in his witness list, what he *could have* proffered to Judge Sinatra, or what he *could have* told his attorneys in some alternative universe or through some second stab at crafting his witness list.  What matters is what *actually*, in *reality*, and on *the record* occurred.  That is not a truth Gerace wishes to confront, but it is one the government must raise if the *Curcio* process is to be at all substantively valid.

To be sure, there are portions of the Court's opinion that might support Gerace's approach.  For instance, two conclusions advanced in Footnote 21 of the Court's order are especially relevant:

i.    Based on the parties' submissions, the Court sees no reasonable possibility that the defense team "lied" about the possibility that at least one of these individuals was "likely" to be called as a material witness in Gerace's trial.

ii.   But in any event, as noted above, the defense has given an objectively legitimate explanation for why these witnesses may be material if the need arises to call them, and no more is required.

*Gerace*, 2024 WL 1793022, at *14 & n.21.

The latter conclusion—that Gerace's attorneys had "an objectively legitimate explanation" to identify the witnesses as "material" to Gerace's defense—lends itself to two diverging inferences, only one of which is reconcilable with the Court's first conclusion and its findings elsewhere.   The first inference goes something like this: Gerace's attorneys knowingly misrepresented facts to Judge Sinatra to fraudulently induce him into recusing but, their misrepresentations are immaterial because they possessed—albeit did not proffer—an actual legitimate basis to include the witnesses and call them material.  In this telling of events, there was no foul because the attorneys could have told the truth and achieved the same result, even though they did not.   However, a second, more plausible inference—one that is reconcilable with the Court's other findings and the evidence in this case—exists: Gerace fed his attorneys false information regarding his relationships with Witness 171 and Witness 240 and used Attorney Soehnlein as an unwitting tool in furtherance of his obstructive scheme to fraudulently induce Judge Sinatra into recusing.  These two competing inferences and their failures vis-à-vis the Court's existing opinion are illustrated in Figure 1, below:

**Figure 1: Competing Inferences Regarding the Evidence and the Court's Prior Order**

Inference 1: There is no wrongdoing where Gerace's attorneys knowingly misrepresented facts but could have represented the truth and achieved the same result.

→

Fails because: (1) inconsistent with Court's determination that the attorneys did not lie; (2) cannot undo a completed fraud-on-the-court by advancing a different explanation of materiality today.

| | |
|---|---|
| Inference 2: Gerace told his attorneys falsehoods to fraudulently induce Judge Sinatra into recusing. | Is a plausible and viable theory of conflict because: (1) consistent with Court's determination that Attorney Soehnlein did not knowingly misrepresent facts to Judge Sinatra; (2) is consistent with the evidence to which both parties have been given access. |

As Figure 1 suggests, the proposition that a "legitimate" explanation offered *today* allows Gerace's defense team to retcon *yesterday's* falsehoods is untenable because it assumes an outcome—namely, Judge Sinatra's recusal—following a basis that cannot be tested by Judge Sinatra; overlooks entirely that fraud-on-the-court "hinder[s] . . . [an] adversary's defense of the action," such as the government's ability to contest the representations, agree to suppress a portion of its case, and the like; and is at war with this Court's determination that the defense attorneys did not "lie[]," i.e., **did not intentionally misrepresent facts**. *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002); *Lie*, OXFORD                    ENGLISH                    DICTIONARY, https://www.oed.com/dictionary/lie_n1?tab=meaning_and_use#39430865, (to make "a false statement . . . with *intent* to deceive") (emphasis added) (last visited June 4, 2024)).  At bottom, it would require the parties and the Court to embrace an absurdity: that no fraud on the court, or other sanctionable conduct, occurred in the past because the party who misrepresented facts could have told the truth and gotten the same result.

As the Fourth Circuit wisely explained, that is not how candor to the court works:

> Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice.  However, because no one has an exclusive insight into truth, the process depends on the *adversarial presentation of evidence*, precedent and custom, and

argument to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition.  Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent.

. . . .

Each lawyer undoubtedly has an important duty of confidentiality to his client and must surely advocate his client's position vigorously, *but only if it is truth which the client seeks to advance*. The system can provide no harbor for clever devices to divert the search, *mislead opposing counsel or the court*, or cover up that which is necessary for justice in the end.  It is without note, therefore, that we recognize that the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit.

*United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir. 1993) (emphases added); *see also United States v. McCabe*, 323 F. App'x 580, 581 (9th Cir. 2009) (unpublished) (holding, in decision affirming $10,000 monetary sanction on defense attorney, that attorneys "misrepresentations were material because the district court's inquiry into the potential intimidation of the government witness was aborted"); *Aboah v. Fairfield Healthcare Servs., Inc.*, No. 3:20-CV-00763 (SVN), 2023 WL 7366416, at *7 (D. Conn. July 28, 2023) (concluding that "half-truths and misrepresentations demonstrate a troubling lack of regard on the part of Attorney [] for his obligation to be candid with the Court."); *In re Sterling Optical Corp.*, 302 B.R. 792, 798 n. 6 (S.D.N.Y. 2003) ("The Court notes, for the benefit of the Bar, that even in an adversarial litigation process, half-truths are not acceptable to this Court.").

However, a second, more plausible inference reconcilable with this Court's opinion exists: though Attorney Soehnlein did not knowingly or intentionally make false representations to Judge Sinatra, the statements they made within the June 20th witness list and during the June 21st status conference were not factually accurate (read: truthful)—and,

when viewed in connection with the recording, Gerace and others are the genesis of the falsehoods.

Under this inference, it is no defense for <u>Gerace</u> that <u>Attorney Soehnlein</u> had "an objectively legitimate explanation for why these witnesses may be material."  *Gerace*, 2024 WL 1793022, at *14 & n.21.  Indeed, although there appears to be no evidence shared with the government to support the inference, the government could imagine that Attorney Soehnlein would have an "objectively legitimate" reason for believing the witnesses were "material" to Gerace's defense if Gerace told him he had a "relationship" with Witness 171 and was "friends" with Witness 240.  However, if Gerace was providing his attorneys false information regarding his relationship with Witnesses 171 and 240, it means he is culpable for obstruction under § 1503 (or contempt under § 401 or the *Klein* conspiracy with which he is already charged), thereby making Attorney Soehnlein a witness to his client's crime.  This theory of actual or potential conflict is consistent with the Court's opinion, and, as it relates to the crime-fraud exception, explored in greater detail below.

> **2.     The Facts and the Second Superseding Indictment in 23-CR-99 Establish Probable Cause that a Fraud or Crime has Been Committed**.

To avail itself of the crime-fraud exception, the government must show that there is probable cause to believe that the litigation, or an aspect thereof, has little or no factual basis and was carried on substantially for the purpose of furthering the crime or fraud.  *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999).  The government has carried that burden: whether viewed through the lens of § 1503, § 401, or *Klein*, there is probable cause to show that Gerace committed a crime vis-à-vis the orchestrated, fraudulent recusal before Judge Sinatra.

First, consider the actors of the crime.  As discussed above, the Court's order does not foreclose the possibility that <u>Gerace</u> provided his attorneys false information to fraudulently

induce Judge Sinatra into recusing himself, and therefore committed a crime.  How could it?
The Court's order was almost entirely devoted to § 1515(c), which is facially limited to
attorneys, "and even advocates favoring a robust articulation of the § 1515(c) affirmative
defense acknowledge that the provision ought not to extend 'to protect legal services
administered to help a client's underlying crime or fraud.'"  Govt. Reply in Support of Rev'd
& Super. Mot. to Disqualify at 15 (quoting Note, *The Boundary Between Zealous Advocacy and
Obstruction of Justice After Sarbanes-Oxley*, 68 N.Y.U. ANN. SURV. AM. L. 397, 437 (2012)).
Consequently, that the Court concluded that 18 U.S.C. § 1515(c) protects Attorney Soehnlein
from prosecution has no bearing on Gerace's criminal liability under § 1503, let alone *Klein*
or even 18 U.S.C. § 401 for orchestrating Judge Sinatra's recusal under false pretenses.

Next consider the nature of the offense.  The government has argued (at length) that
orchestrating the recusal of a federal judge under false pretenses—that is, fraudulently
inducing a federal judge to recuse—may constitute criminal obstruction in and of itself.  *See*
Govt. Rev'd & Super. Mot. to Disqualify at 33–57.  That is an established prosecutorial theory
unrebutted by either the Court or the defense as it relates to non-lawyers.  *See United States v.
Rankin*, 870 F.2d 109, 111–12 (3d Cir. 1989) (reversing district court's dismissal of indictment
alleging a *Klein* conspiracy where defendant filed false affidavit to secure federal judge's
recusal); *cf. United States v. Buffalano*, 727 F.3d 50, 55 (2d Cir. 1984) (concluding that the
evidence did not sufficiently establish that defendants charged with obstruction of justice
intended to force district judge's recusal but not rejecting the forced-recusal as a theory of
prosecution); *United States v. Atkin*, 107 F.3d 1213, 1219 (6th Cir. 1997) (sustaining conviction
for obstruction of justice where defendant's "act of accepting money from [individual] under

the pretense of making a bribe . . . caused a thorough investigation of a federal judge's finances and could foreseeably have led to his recusal").

In fact, this particular species of fraudulent inducement/obstruction has earned at least one other criminal defendant within the Second Circuit an obstruction enhancement at sentencing.  For example, in *United States v. Morrison*, Judge Wood applied a two-level obstruction enhancement under U.S.S.G. § 3C1.1 to a *pro se* defendant after he added her husband to his witness list and "fabricated a story about having had business dealings with [her] husband" to "force her recusal."  Br. United States of Am., *United States v. Morrison*, No. 97-1370, 1997 WL 33621975, at *126, 123 (dated Dec. 9, 1997).  Here, there is evidence that at least Gerace invented entire relationships with Witness 171 and Witness 240 in the same way that Morrison fabricated business dealings with Judge Wood's husband.  The principal distinguishing feature between the cases is that Gerace executed his obstruction through attorneys.  But that is a distinction without legal significance because the law penalizes a defendant's obstruction regardless of whether he accomplished it himself or through an unwitting attorney.  *See* U.S.S.G. § 3C1.1 cmt. 9 ("Under this section, the defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, *induced*, procured, or willfully caused." (emphasis added)).[8]  Consequently, that Gerace likely used his attorneys "as front men in a scheme to subvert the judicial process" is no defense for Gerace to an obstruction and/or crime-fraud inquiry, as other courts have made clear.  *United States v. Boender*, 649 F.3d 650, 653 (7th Cir. 2011).

---

[8]        The government raised *Morrison* in its April 22nd Letter to the Court.  *See* ECF No. 886.  Once again, the government is operating under the assumption that the Court declined to address *Morrison* because it because it believes that Attorney Soehnlein's potential status as a witness falls under the actual or serious potential conflict framework and not because the Court overlooked an argument.

Then consider the subversion of the judicial process: not a single <u>actual</u>, <u>on-the-record</u>, <u>in-reality</u> representation made by Gerace to Judge Sinatra in the context of whether he was required to recuse escapes factual contest: (1) Gerace's witness list claimed that Gerace has a "relationship" with Witness 171 but Witness 171 claims he knows "nothing" about Gerace; (2) Gerace's witness list claimed that Gerace is "███████" with Witness 240 but Witness 240 claims that he is not friends with Gerace and hardly knows him; (3) Attorney Cohen represented that the witnesses' names came up "significantly" in "the Grand Jury testimony" but, in truth and in fact, Witness 171's name appears literally nowhere in the Grand Jury testimony and Witness 240 appears only tangentially; (4) Attorney Cohen represented that "the government felt it was important enough" to ask questions about the witnesses but, in truth and in fact, the government did not ask about Witness 171 before the Grand Jury; (5) Attorney Soehnlein stated that Gerace "has a particularly close relationship" with Witness 171, to include the payment of money but Witness 171, again, claims to have never had any kind of relationship with Gerace and to have never given nor received a dime from Gerace; and (6) Attorney Cohen represented that these witnesses were character witnesses but both witnesses rejected the notion that they could possibly testify to Gerace's character *and even Gerace*, in the context of advancing yet another lie, claimed that the witnesses were not character witnesses but rebuttal witnesses. On top of all that, there is a recording of ████████ ████████████ about (7) ████████████████████████████████████████████ ████████████████████████████████████████████████████ and (8) ██████████ ████████████████████, thus evincing an additional layer of motive for the orchestrated recusal.

In evaluating probable cause, *In re Grand Jury Subpoena Dated March 2, 2015*, is instructive. 628 F. App'x 13 (2d Cir. 2015) (unpublished). In that case, the district court

concluded that there was "probable cause to believe that the Owner [of a company] was using his lawyers to further his fraudulent scheme" by litigating a "tax protest." *Id.* at 13–14. After *in camera review* of the privileged communications, a panel of the Second Circuit agreed that there "was probable cause to conclude that the tax protest was based on a false, undocumented transaction and that the Owner engaged in the tax protest as part of a strategy to further conceal [his] tax fraud and shirk his tax liabilities." *Id.* at 15. That same conclusion applies here: at minimum, the above-referenced contested facts create probable cause to believe that Gerace weaponized counsel to fraudulently induce Judge Sinatra's recusal. Thus, there remains probable cause to believe that a crime occurred when Gerace and others conspired to fraudulently induce Judge Sinatra into recusing himself. Attorney Soehnlein is, therefore, a witness to his client's crime and his communications with Gerace are subject to the crime-fraud exception.

But were there any doubt, in the crime-fraud context, the Court must conclude that the government has satisfied the probable cause burden where, as here, a grand jury has returned an indictment. *See DRC Ventures, LLC v. Dalpour*, No. 23-CV-7827 (JGLC), 2024 WL 2137828, at *2 (S.D.N.Y. May 13, 2024) ("An indictment provides probable cause to believe that the crime charged was committed, thus establishing "the first prong of the crime-fraud exception."); *United States v. Tucker*, 254 F. Supp. 3d 620, 624 (S.D.N.Y. 2017) (deferring to a prior determination of probable cause; there, a grand jury indictment); *United States v. Sabbeth*, 34 F. Supp. 2d 144, 150–51 (E.D.N.Y. 1999) (same). In *United States v. Gogolack*, 1:23-CR-99, the Second Superseding Indictment charges Gerace with conspiring to defraud the United States, to wit by trying to prevent Crystal Quinn from testifying. Part of the government's proof will show that Gerace intended to delay his trial via the recusal to obstruct

Quinn's testimony, and the Grand Jury returned an indictment identifying the filing of the witness list (and obtaining the recusal) as an overt act in that scheme.

As should be plain, the government's proof in relation to these overt acts will not be limited to the "self-authenticating" court filings as Gerace suggests, but rather will involve Gerace and his co-conspirators actions and corrupt motive leading up to these overt acts. Resp. in Opp. at 14. That is because, as the Second Circuit has explained, it is elemental to the *Klein* conspiracy charged that the government prove "interfer[ence] with or obstruct one of its lawful government functions by deceit, craft or trickery, or at least by means that are dishonest." *United States v. Coplan*, 703 F.3d 46, 60 (2d Cir. 2012) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). Thus, notwithstanding Gerace's specious insinuations to the contrary, the first prong of the crime-fraud exception has been met: whether viewed through the lens of § 1503, § 401, or *Klein*, there is probable cause to show that Gerace committed a crime by fraudulently orchestrating Judge Sinatra's recusal.[9, 10] *See Costanzo*, 2024 WL 2046053, at *2.

### 3. Gerace's communications were in furtherance of a crime or fraud.

---

[9] To put a finer point on it, there are "reasonable grounds to believe that a crime has been . . . committed, and that the information sought is reasonably needed for the successful completion of the investigation or prosecution." J.M. § 9-13.410(3).

[10] This Court's holding that § 1515(c)'s prohibition on evaluating obstructive intent does not extend to contempt offenses under § 401. Conduct amounts to contempt if it "constitute[s] misbehavior which rises to the level of an obstruction of and an imminent threat to the administration of justice, and it must be accompanied by the *intention* on the part of the contemnor to obstruct, disrupt or interfere with the administration of justice." *United States v. Allocco*, 994 F.2d 82, 85 (2d Cir. 1993) (emphasis added). As distinguished jurists like Judge Sutton have concluded, "[i]f a criminal defense attorney files a frivolous motion with no *motive* other than to obstruct proceedings or intimidate a witness, the contempt power potentially covers the conduct—and would be accompanied by the procedural protections of Rule 42, including the requirement that the attorney's guilt be proved beyond a reasonable doubt." *United States v. Aleo*, 681 F.3d 290, 311 (6th Cir. 2012) (Sutton, J., concurring) (emphasis added). Of course, the Court need not reconcile its § 1515(c) ruling with § 401's adverse authority because an available plausible inference is that Gerace used Attorney Soehnlein as an unwitting tool to accomplish his obstructive goals, which makes Attorney Soehnlein a witness.

*Second*, "the communications were in furtherance of a crime or fraud." *DRC Ventures, LLC*, 2024 WL 2137828, at *2. Here, there are at least seven reasons to believe that Gerace communicated with Attorney Soehnlein in furtherance of the fraud on the Court:

1.  Gerace's Witness List identifies Witness 171 as having a "relationship" with Gerace. But, as the above indicates, this is very likely false because Witness 171 reports to have no relationship with Gerace and met him once twenty or thirty years ago. Unless Gerace's attorneys invented this "relationship" out of whole cloth, they very likely obtained this false information from Gerace, who told his attorneys falsehoods to fraudulently induce Judge Sinatra into recusing.

2.  Gerace's Witness List identifies Witness 240 as being Gerace's " ███ " However, Witness 240 stated that he is not Gerace's friend and disclaimed having a social relationship with Gerace. Witness 240 further advised that he was "absolutely not" in a position to testify as a character witness for Gerace and claimed the notion that he could testify as Gerace's character witness was "ridiculous." Again, unless Attorneys Soehnlein and Cohen made up Witness 240's status as Gerace's " ███ ," they very likely obtained the false information reflected in their witness list from Gerace, who told his attorneys falsehoods to orchestrate Judge Sinatra's recusal.

3.  Regarding Witness 171 and Witness 240, Attorney Cohen represented to Judge Sinatra that their names were brought up "significantly." However, Witness 171's name never appeared in the Grand Jury testimony and Witness 240's name appeared only tangentially. Thus, objectively, these representations were false. A reasonably prudent person could conclude that such utterances embellished the significance of Witness 171 and Witness 240's presence in the Grand Jury materials to induce Judge Sinatra into believing that his relatives were "material" witnesses to Gerace's defense, thereby mandating his recusal. This lends significant credence to the government's view that at least some portion of Gerace's communications with Attorney Soehnlein in connection with Witness 171 and Witness 240 were done in furtherance of Gerace's fraud.

4.  Regarding Witness 171 and Witness 240, Attorney Cohen also represented to Judge Sinatra: "If you are asking whether I intend to call them, we have to see how the case plays out. I don't know yet but, certainly, the government felt it was important enough to question [sic] about these . . . we'll say the two individuals." The government did not ask any questions about Witness 171. Again, a reasonably prudent person could conclude that these utterances were designed to induce Judge Sinatra into believing that his relatives were "material" witnesses to Gerace's defense and thus required his recusal. As

stated above, this too adds weight to the likelihood that at least some of Gerace's communications with Attorney Soehnlein were done in furtherance of his fraud.

5.      Attorney Soehnlein stated that Gerace "has a particularly close relationship with" Witness 171, to "include[] in payment of money to various things, various charitable contributions, and things of that nature." This Court found that there was no reasonable possibility that Attorney Soehnlein *knowingly* gave false or misleading information to Judge Sinatra, but stopped short of affirming Attorney Soehnlein's representations as true. *Gerace*, 2024 WL 1793022, at *11 & n. 14. That is because what Attorney Soehnlein said to Judge Sinatra is very likely false: Witness 171 knows "nothing" about Gerace; met Gerace once twenty or thirty years ago; has never dealt with Gerace, either through his job or in his personal life; and neither received a payment from Gerace nor gave Gerace any money. *See* Supp. Rev'd & Super. Mot. to Disqualify, Ex. 1, at 1–2. This Court's finding that Attorney Soehnlein did not "knowingly" misrepresent facts to Judge Sinatra strongly supports the inference that he served as an unwitting mouthpiece for Gerace's falsehoods. Afterall, who else could he have received this information from?[11] That inference, in turn, supports the conclusion that Gerace told Attorney Soehnlein materially false information with the intent of inducing Judge Sinatra's recusal, even if that particular representation did not accomplish the recusal.

6.      Based on Gerace's witness list identifying Witness 171 and Witness 240 as having a relationship with, and being a ▮▮▮ of, Gerace; Attorney Cohen's statements regarding Witness 171 and Witness 240's role as character witnesses; and Attorney Soehnlein's representation that Gerace had a "particularly close" relationship with Witness 171; Gerace's attorneys clearly believed that Gerace had substantive relationships with Witness 171 and Witness 240. But both witnesses flatly reject the notion that they have any relationship with Gerace. This strongly indicates that Gerace provided false information to his attorneys.

7.      The ▮▮▮▮▮▮ recording outlines ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To that end, it appears based on the recording that ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In the strongest terms possible,

---

[11]      Not anyone who could assert the attorney-client privilege that Attorney Soehnlein raised in his response brief.

the government submits that this, too, supports the inference that Gerace told his attorneys falsehoods to orchestrate Judge Sinatra's recusal.

In short, there is no way to reconcile the divergent accounts of Gerace's relationships (or lack thereof) with Witnesses 171 and 240: someone is not telling the truth. And for the purposes of conflict motion, the options are either that Gerace lied to Attorney Soehnlein or Attorneys Soehnlein and Cohen invented Witness 171 and Witness 240's purported relationships with Gerace. Only one of these options is consistent with this Court's prior findings that Gerace's attorneys did not knowingly misrepresent facts.

In that vein, the recording, Gerace's well-publicized criticisms of Judge Sinatra, and the legal significance attached to the attorney proffer to Judge Sinatra all point to Gerace as the genesis of the dishonesty that permeated through last year's court proceedings. Regarding the legal import of the witnesses' relationships with Gerace, under the federal recusal statute, Gerace could not secure Judge Sinatra's recusal unless Witnesses 171 and 240 were "material" to his defense. 28 U.S.C. § 455(b)(iv) (providing that the Judge shall recuse where "a person within the third degree of relationship" to him "is **to the judge's knowledge** likely to be a **material** witness in the proceeding" (emphasis added)).

Thus, Gerace needed one of his attorneys to represent to Judge Sinatra that Witnesses 171 and 240 came up "significantly" within Grand Jury materials (they did not); that he had a "relationship" with Witness 171 (he does not); and that he is "███████" with Witness 240 (he is not); and that both Witnesses 171 and 240 were capable of testifying as character witnesses on his behalf (they cannot). Had Gerace told his attorneys the likely truth about his relationships with Witnesses 171 and 240—that is, that he does not have one with either person—Attorney Soehnlein could not ethically acquiesce to Attorney Cohen's representations to Judge Sinatra that Witness 171 had a "relationship" with Gerace or that

19

Witness 240 was Gerace's "█████."  Moreover, in the absence of those distinctions, Attorney Cohen would not have been able to frame Witness 171 and Witness 240 as character witnesses central—that is, "material"—to Gerace's defense. § 455(b)(iv).  And short of being character witnesses, it is difficult—indeed, nearly impossible—to imagine how § 455(b)(iv) would have <u>mandated</u> Judge Sinatra's recusal.

Instead, to boot Judge Sinatra from the case and obtain his desired adjournment, Gerace would have had to file a motion under § 455(a), as Judge Sinatra directed him to do on May 17th, and litigate the issue of recusal fair and square.  But, because he knew based on Judge Sinatra's comments during the May 17th hearing that he would likely lose such a motion, he engineered his desired outcomes through deceit and trickery, violating the norms and rules that distinguish the American federal judiciary worldwide.  *See Shaffer Equip. Co.*, 11 F.3d at 457 ("Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process.  As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent.").

What should also be clear by now is that we will never know if some set of alternative facts would have required Judge Sinatra's recusal under the statute because the <u>actual</u>, <u>on-the-record</u> facts proffered to Judge Sinatra have effectively robbed him from being able to evaluate the materiality of whatever substitute truths Gerace offers this Court outside of the adversarial process.  But given the indictment, Gerace's well-publicized motive to obtain a different judge and the immediate adjournment he procured once his case was transferred to this Court—an adjournment that enlarged his window to tamper with and retaliate against a federal witness—there exists a "purposeful nexus" between the otherwise privileged

communications and the criminal/fraudulent orchestrated recusal. *Roe*, 68 F.3d at 40. That is, it is more than safe to say that there is probable cause to believe that any communications were "carried on substantially for the purpose of furthering the crime or fraud." *In re Grand Jury Subpoenas Dated March 2, 2015*, 628 F. App'x at 14–15. For those reasons, the crime-fraud exception applies. And because the crime-fraud exception applies, Attorney Soehnlein is eligible to be a witness against his client.

### 4. The Crime-Fraud Exception is not Limited to Criminal Acts.

For good measure, Gerace also misstates the law insofar as he implies that the crime-fraud exception is limited to criminal acts. *See* Resp. in Opp., at 9. In fact, as its name suggests, the crime-fraud exception applies to crimes *or* frauds, including frauds on the court. That is, "the attorney-client privilege does not protect communications in furtherance of an intentional tort that undermines the adversary system itself." *Brandon v. Kinter*, No. 913CV00939BKSATB, 2023 WL 3723136, at *2 (N.D.N.Y. May 30, 2023) (Sannes, C.J.) (quoting *Madanes v. Madanes*, 199 F.R.D. 135, 149 (S.D.N.Y. 2001)); *see see, e.g., In re St. Johnsbury Trucking Co., Inc.*, 184 B.R. 446, 454 (Bankr. D. Vt. 1995) (considering the "crime-fraud exception to the attorney-client privilege," in connection with a motion for sanctions for fraud on the court); *cf. Zimmerman v. Poly Prep Country Day School*, No. 09 Civ. 4586 (FB), 2012 WL 2049493, at *17–18 (E.D.N.Y. June 6, 2012) (holding that crime-fraud exception permitted disclosure of attorney's advice that was used to thwart legitimate investigation of allegations of sexual abuse of students). So, even assuming *arguendo* that no criminal act occurred, the fraud leg of the crime-fraud exception vitiates any attorney-client privilege and could make Attorney Soehnlein a witness for the same reasons discussed *supra*.

### B. That Attorney Soehnlein is a Witness to his Client's Obstruction Counsels Against Any Acceptance of Waiver.

Gerace next complains that "[t]here is no authority in the Second Circuit (or any other authority counsel can identify) that an attorney who is a potential witness relative to his client must be disqualified." Resp. in Opp. at 13. To the contrary, both caselaw and ethical rules underscore that Attorney Soehnlein's status as a witness counsel against accepting any waiver Gerace might provide during a *Curcio* inquiry.

Start with *Jones*. There, an attorney transmitted protected materials involving one client (Jones) to another client (Estrada), who was found in possession of the discovery during a drug raid of his apartment. *United States v. Jones*, 381 F.3d 114, 118 (2d Cir. 2004). Though the attorney "conceded that he could very easily end up being a witness in the government's case-in-chief," he withdrew from representing Estrada and advised the district court that Jones "was prepared to waive the resulting conflict arising from [the attorney's] *possible role as a witness*." *Id.* After previously noting that the potential conflict gave Jones "a good chance" at bringing "a successful appeal based on ineffective assistance of counsel," and without imposing artificial time constraints on timeliness of the Executive branch's "investigation of Estrada," the district court disqualified the attorney. *Id.* In affirming the district court's decision, the Second Circuit emphasized that the government's representation "that it was possible that [the attorney] would be a witness in the defendant's trial"—despite not being "assured of the path the trial would take"—created "actual grounds for disqualification." *Id.* at 121.

The Second Circuit doubled down on this principle in *Cain*,[12] where it concluded that an attorney who, though "not a potential target of the grand jury investigation" and had

---

[12]     Remarkably, though the government's motion discusses *United States v. Cain*, 671 F.3d 271 (2d Cir. 2012)—the published, binding Second Circuit case—Gerace cites only to *United States v. Cain*, 2008 U.S. Dist. LEXIS 130664, at \*9 (W.D.N.Y. Nov. 5, 2008)—the district court case—and then represents that there is no *authority* to support the proposition that attorney-witnesses ought to be disqualified.

testimony "less central to the prosecution" than the *Jones* attorney, was nonetheless at "risk" of "becom[ing] a witness against his client." *United States v. Cain*, 671 F.3d 271, 295 (2d Cir. 2012).

Neither *Jones* nor *Cain* are novel exemplars of the government's witness theory here but, rather, as *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) illustrates, more recent iterations of a longstanding Second Circuit norm. There, the circuit court explained that disqualification may be appropriate for attorneys who, due to witnessing the underlying criminal acts, "may be constrained from making certain arguments on behalf of [their] client[s]." *Id.* at 933. Nodding to the "ethical standards of the profession" the Second Circuit advised that an attorney's "role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Id.* Indeed, in discussing the prohibition against "unsworn witnesses," *see id.*, the Second Circuit cited *United States v. McKeon*, 738 F.2d 26, 34–35 (2d Cir. 1984) for the proposition that disqualification is "requir[ed] . . . where [an] attorney would be essentially acting as both an advocate and a witness.") *Locascio*, 6 F.3d at 933. Though *Locascio*'s principles apply most powerfully to *United States v. Gogolack*, 23-CR-99 (where Attorney Soehnlein has not yet filed a notice of appearance), they flatly refute Gerace's assertion that there "is no authority in the Second Circuit" that an attorney-witness must be disqualified. Resp. in Opp. at 13.

In any event, the Western District of New York is no stranger to applying these precedents to novel, varying fact patterns—another fact that Gerace overlooks. For example, in *United States v. Benacquista*, No. 08CR94A, 2008 WL 2371478, (W.D.N.Y. June 9, 2008), the defendants executed powers of attorney for Attorney Gary Borek, who, during the course

23

of a civil tax audit "made representations on defendants' behalf" that the government contended "were false and will be used against defendants in their criminal trial." *Id.* at *1. In the government's view, "Borek's actions furthered defendants' conspiracy to defraud the United States." *Id.* Like here, the defendants there countered "that the Government [was] precluded from calling Borek as a witness by the attorney-client and work product privileges." *Id.* at *2. The court disagreed with defendant, concluding that a defendant "who commits a crime in his attorney's presence" may then "expect to have that attorney called as a witness." *Id.* at *5 (citing *In re Grand Jury Subpoena*, 282 F.3d at 160). Applying that principle, the *Benacquista* Court concluded that "Defendant used Borek to make representations during the IRS civil audit that the Government now argues are part of the alleged continuing conspiracy to defraud the United States," thus making him a potential witness. *Id.* In the court's view, the ethical prohibitions against an attorney who ought to be called as a witness militated in favor of disqualification. *See id.* at *2–4.

Thus, in that case, the Court concluded:

> Borek transmitted documents and responses from defendants that the Government now contends somehow advanced the alleged conspiracy, and that Borek made representations the Government argues were part of the conspiracy to defraud the United States. Even if this case is not as extreme as faced by the attorney in *United States v. Fulton*, *supra*, 5 F.3d at 607, 609–11, where the defense attorney was accused of criminal conduct and (even if false) restricting defense cross-examination of the attorney's accuser, Borek's involvement in the alleged criminal conspiracy here is an actual conflict with Defendant.

*Id.* at *4.

Just as importantly, the *Benacquista* Court held that the "actual" conflict that was "so severe that Defendant cannot, as a reasonable client, be deemed to have waived it." *Id.* That same conclusion applies here because, as discussed *surpa*, Attorney Soehnlein is an

(immunized) witness in Case No. 23-CR-99 who ought to be called as a witness against his client's indicted obstruction.  To remedy Attorney Soehnlein's status, Gerace would very likely have to stipulate to facts that, at minimum, create strong evidence of corrupt intent or waive his right against self-incrimination and testify, risking cross-examination.  Neither of these options are good for Gerace, which is why no rational defendant—but especially not one facing life imprisonment in 23-CR-99—would elect to have Attorney Soehnlein represent him here, and why Gerace's interests are materially adverse to Attorney Soehnlein's.

The absence of any reasonable or viable stipulation for Gerace is why his reliance on *United States v. Perez*, 325 F.3d 115 (2d Cir. 2003)—which he cites for the proposition that an attorney may "continue [his] representation despite being a potential witness against his client"—is hopelessly misplaced.  Resp. in Opp. at 15.  As the Second Circuit explained in *Jones*, "the situation [in *Perez*] was such that the parties stipulated to the fact at issue, thereby eliminating the need for the government to call the lawyer as a witness." *Jones*, F.3d at 114; *see Perez*, 325 F.3d at 121 ("[The attorney] argued that his testimony was not needed to establish that [defendant] Perez worked for him as a paralegal, for that could be stipulated."); *id.* at 128 (concluding that there was no need to disqualify the attorney where both parties stipulated that the attorney employed the defendant).  Unless Gerace is willing to stipulate to obstruction of justice, *Perez* could not be more far afield from the case at bar.

### C. The Integrity of the Judicial Process Favors Not Accepting Gerace's Waiver.

The integrity of the judicial process likewise counsels in favor of declining any waiver Gerace might offer.  *See United States v. Manuel Ramos*, 350 F. Supp. 2d 413, 427 (S.D.N.Y. 2004) (Lynch, J.) (discussing the Court's "responsibility to assure the real and apparent fairness of the proceedings"). The integrity of the judicial process not only inures to the

25

parties' benefit—a concern especially acute here where the facts suggest that Gerace vetoed his assigned judge by fraudulently inducing him to recuse—but strengthens the public's confidence in the impartial, professional detachment of the judiciary and the ethical compass of the legal profession.

In that regard, perhaps Gerace will argue during the hearing that it is fundamentally unfair that his waiver be denied and the government identify Attorney Soehnlein as a witness. This complaint misses the fundamental purpose of the right to counsel: the privileged attorney-client relationship is a shield designed to foster trust for effective assistance, not a sword to be wielded to fraudulently induce a federal judge (by exploiting his family) to recuse so that the defendant can obtain the judge of his liking and adjourn the trial. For this reason, other courts from across the nation have rejected the suggestion that a "defendant's right to a particular counsel should be permitted to impose . . . artificial disadvantages upon the government by restricting whom it can call at trial." *United States v. Castellano*, 610 F.Supp. 1151, 1162 (S.D.N.Y.1985) (quoting *United States v. Cortellesso*, 663 F.2d 361, 363 (1st Cir. 1981)); *see also United States v. Bentvena*, 319 F.2d 916, 936 (2d Cir. 1963) ("An accused's right to select his own counsel, however, cannot be insisted upon or manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice."); *Grady v. United States*, 715 F.2d 402, 404 (8th Cir.1983) ("The government cannot be expected to risk its case by not calling defense counsel if his testimony is important"). To suggest otherwise would create "a no-win situation" for the government: "the defendant would have everything to gain, possibly including a most improper inference, and nothing to lose." *Cortellesso*, 663 F.3d at 363.

There should be nothing controversial about the notion that non-attorneys may be prosecuted for fraudulently inducing a federal judge to recuse himself in hopes of acquiring a judge more to their liking and obtaining an adjournment. *Cf. Rankin*, 870 F.2d at 111–12. It is irrelevant that it may be viewed as unpopular that Attorney Soehnlein—a member of the federal defense bar and the only immunized individual remotely involved in the obstruction conspiracy—is a witness. But there is no Peter Gerace-Eric Soehnlein exception to the foundational tenet that the attorney-client relationship "cannot at once be used as a shield and a sword." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *cf. Shaffer Equip. Co.*, 11 F.3d at 457. That is why the Supreme Court has held that "[t]he [attorney-client] privilege takes flight if the relation is abused." *Clark v. United States*, 289 U.S. 1, 15 (1933). In light of this Court's decision, the most plausible inference from the facts is that Gerace used Attorney Soehnlein as an unwitting conduit to inject his lies into the judicial process, resulting in a recusal and immediately thereafter an adjournment that he further weaponized. This Court should not accept a waiver.

### D.   There Are Ethical Implications to Engaging in an Orchestrated Recusal

Gerace avers that there are no ethical implications to Attorney Soehnlein's conduct. This might be true if Attorney Soehnlein had no knowledge of Gerace's obstructive scheme, which for the purposes of this specific reply brief the government will assume *arguendo*. However, the government certainly would not want to overlook, as Gerace apparently did, the published Fifth Circuit decision of *In re Mole*, 822 F.3d 798 (5th Cir. 2016). In that case, Attorney Mole appealed a one-year suspension imposed by the en banc court of the Eastern District of Louisiana. *Id.* at 800. Mole represented Lifemark Hospitals in a civil lawsuit against Lilejberg Enterprises in which former U.S. District Judge Porteous presided. *See id.*

Shortly before the case went to trial, Liljeberg retained two attorneys who were "close friends of Porteous." *Id.* "Mole filed a motion to recuse Porteous based on the appearance of impropriety created by the enrollment of his close friends as counsel for Liljeberg." *Id.* Porteous denied the motion, and the Fifth Circuit denied Mole's writ of mandamus. *See id.* Perhaps understandably, "Lifemark was concerned that the presence of [the two friends] would create an unfair advantage for Liljeberg, so—according to Mole—it insisted that he locate an attorney familiar with Porteous to join the case and help gain equal access to Porteous." *Id.* Mole eventually "identified and hired" another "close friend of Porteous." *Id.* Though an attorney, the friend "had no useful experience in the type of litigation pending, and by his own admission, [ ] was hired because Lifemark 'wanted to have a pretty face . . . someone who knew the judge.'" *Id.* Mole drafted a retainer agreement between Lifemark and the friend, setting out the terms of the friend's compensation; that agreement included a $100,000 severance fee "in the event that Judge Porteous withdraws or if the case settles prior to trial." *Id.*

But "Porteous did not withdraw, and the case proceeded to a bench trial" in which Porteous ruled "overwhelmingly in favor of Liljeberg" and was "overwhelming reversed on appeal." *Id.* at 800–01. The Fifth Circuit "later issued an Order and Public Reprimand" against Porteous "for conduct that included violations of 'several criminal statutes and ethical canons' while presiding over the Liljeberg litigation, including his denial of Lifemark's motion to recuse." Ultimately, "two district judges in the Eastern District of Louisiana filed a disciplinary complaint against [the attorneys involved in the litigation] for committing acts 'to improperly influence [Porteous] **to achieve results that were prejudicial to the administration of justice**, including receiving either favorable treatment for their respective

clients **or a voluntary recusal**," in violation of Rules 8.4(d), (e), and (f) of the Louisiana Rules of Professional Conduct.[13]   Initially, Mole's disciplinary hearing went to a judge who concluded that he "represented his client at all times in a manner that is a credit to the profession" and that "any misconduct by Mole was, 'at most, negligent and time-barred.'" *Id.* at 801.   Indeed, Mole appears to have offered a theory that at least facially undercut some of the fraud-on-the-court concerns: "that [the friend's] role was to provide insight into Porteous's temperament and thought process, a role that would be useful only so long as Porteous remained on the case." *Id.* at 803.

But then Mole's disciplinary proceedings went en banc.  And the en banc district court disagreed with the single district court's evaluation of the evidence . *See id.* at 801.  "It found that 'the clear and convincing evidence introduced at the Senate hearing and before this Court establishes Mr. Mole selected and recommended [the friend] to represent Lifemark because of [the friend's] close friendship with Porteous and with the *intent* to get Porteous recused," and that "the clear and convincing evidence establishes the [$100,000] severance fee in the letter agreement was intended to provide an incentive for Mr. Gardner to *achieve this result*." *Id.* (emphases added).   Specifically, the en banc court looked to, among other items of evidence, Mole's admission in impeachment proceedings that "getting the judge to recuse himself would be the only way to get a fair outcome"; "getting Judge Porteous to recuse himself was a priority with [him], and one of the things [he] hope [the friend's] presence in the case . . . would accomplish"; and that he "certainly considered that maybe if [the friend] got involved . . . Porteous didn't have a legal responsibility to recuse himself because of that but that he might." *Id.* at 804.

---

[13]     New York's Rule 8.4 is analogous to the Louisiana Rule.

On appeal to the Fifth Circuit, Mole argued that none of that amounted to any misconduct.  The Fifth Circuit strongly disagreed.  It stated:

> We have previously held that "a lawyer may not enter a case for the primary purpose of forcing the presiding judge's recusal."  *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir.1983).  "A lawyer's acceptance of employment solely or primarily for the purpose of disqualifying a judge creates the impression that . . . the lawyer is available for sheer manipulation of the judicial system. . . . .  To tolerate such gamesmanship would **tarnish the concept of impartial justice**."  *Id.*

> Mole did not personally accept employment to disqualify Porteous but instead employed another attorney to achieve the same purpose.  A common sense application of *McCuin* shows that this is improper: If a lawyer may not enter a case to force the presiding judge's recusal, then it would be irrational to argue that a lawyer could simply hire another lawyer to force the recusal.  Thus, we conclude that **the action of hiring an attorney to motivate a recusal is prejudicial to the administration of justice** and implies an ability to improperly influence a judge in violation of Louisiana Rules of Professional Conduct 8.4(d) and (e)

*Id.* at 805–06 (emphases added).

That same logic applies here.  If attorneys add a judge's family members onto a witness list with "the *primary* purpose of forcing the presiding judge's recusal," *id.* (emphasis added), they have prejudicially manipulated the judicial system and are subject to sanction even if, under this Court's view of the law, they cannot be criminally prosecuted due to some theory of facially plausible deniability.[14]  *Id.* at 805.  That said, a finding that there is probable cause that Gerace wielded Attorney Soehnlein as an unwitting participant in his fraudulent, obstructionist scheme, would dull the sharpest edge of these ethical concerns as it relates to Attorney Soehnlein.  Regardless, the panoply of misrepresentations cataloged *supra*, as well as the recording ███████████████, suggests that dishonesty—at a minimum from

---

[14]     In other words, ethical consequences may attach even to mixed motive actions.

Gerace—corrupted the judicial process in June 2023 in a way that makes Attorney Soehnlein a witness.

## II.  CONCLUSION

For the reasons stated above and discussed in the government's Motion to Resolve Actual and Potential Conflicts (ECF No. 919), the government respectfully asks that the Court decline to accept any waiver offer by Gerace.

DATED:  Buffalo, New York, March 5, 2024.


TRINI E. ROSS
United States Attorney


BY:   s/JOSEPH M. TRIPI
s/ NICHOLAS T. COOPER
s/CASEY L. CHALBECK
Assistant United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5839
Joseph.Tripi@usdoj.gov