IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————————————————————

UNITED STATES OF AMERICA,

           v.

PETER GERACE JR.,

               Defendant.

                            19-CR-227-LJV
                            23-CR-37-LJV
                            **(REDACTED)**

———————————————————————

**GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S
MOTION TO DISMISS AND CROSS-MOTION FOR DISCLOSURE OF MR.
SOEHNLEIN'S EX PARTE AND SEALED AFFIDAVIT AND MEMORANDUM OF
LAW IN SUPPORT OF HIS MOTION TO WITHDRAW [ECF NO. 541]**

The government submits this response in opposition to the defendant's motion to dismiss and to disqualify the United States Attorney's Office, and cross motion for disclosure of Eric Soehnlein, Esq.'s ex parte and sealed affidavit and memorandum of law in support of with motion to withdraw as counsel for defendant Gerace.

## I.     INTRODUCTION

Given the breadth of defendant Peter Gerace's recent filing, it is important to go back to the beginning and state the obvious: Gerace is a prior federally convicted felon with substantial connections to both organized crime elements operating in the Western District of New York and individuals from various walks of life who are involved in narcotics possession, use, and distribution. As charged, Gerace used his position, contacts, influence, and power to distribute controlled substances and to disadvantage vulnerable members of the community—young women whom he coerced and exploited through their drug addictions

and his position of authority to be used as playthings—to satisfy the sexual desires of Gerace, his friends, and those in positions of prominence and power aligned with him.  Despite Gerace's outrage as to where the facts have lead, and the individuals whose conduct may be exposed as a result of his prosecution, the United States Attorney's Office for the Western District of New York has and will continue to follow the facts wherever they lead, without fear or favor, because a two-tiered system of justice is antithetical to our system of justice and the Constitution of the United States.

Notwithstanding the foregoing, and regardless of the severity and the government's belief in the righteousness of the charges, the defendant is presumed innocent until proven guilty beyond a reasonable doubt.  As it pursues justice, the government expects and welcomes a robust defense by skilled attorneys—similar to the defense that codefendant Bongiovanni recently received during his own recent trial.  On that note, and because of the allegations set forth in Gerace's motion, the government must state what should be obvious: the government does not care one iota who Gerace's attorneys are.  Whether Gerace's attorneys consisted of legendary defense attorneys such as Clarence Darrow, Gerry Spence, F. Lee Bailey, or seasoned and highly-respected members of the local federal defense bar, or Eric Soehnlein—is utterly irrelevant to the government.  Attorneys for the government have no personal animus towards Mr. Soehnlein, but it is unquestioned that he was involved in a fact-pattern that is, to the government's knowledge, unprecedented in the United States District Court for the Western District of New York.[1]

---

[1] The government's research has not revealed a single case wherein a defendant's attorneys included the relatives of a District Judge as claimed "character witnesses" for the defendant, which resulted in the recusal of a District Judge.

As the record demonstrates, since the inception of the case, the government has been the party endeavoring to get the case to trial.  However, facts and circumstances that were not caused by the government, were unanticipated, and are certainly unfortunate required the government to bring matters to the Court's attention and evaluate conduct in light of a dynamic and rapidly evolving fact pattern, and the government did that in good faith.[2]

This is not about Mr. Soehnlein's right to remain on a case he wants to be on, or whether being part of a high-profile case will be good for his career after leaving his partnership at a law firm to go out on his own and try this case.  It is about the integrity of the case and proceedings in federal court.[3]  In the end, while the government and defense have strong disagreements about the relevant facts and law, what is of critical importance is that Gerace's trial be conducted by attorneys unconstrained by conflicts of interest such that proceedings are fair to all those who observe them, and that those considerations are appropriately balanced against Gerace's Sixth Amendment right to counsel of his choice. From the outset, those considerations—and not any other—have animated the government's positions in this litigation.  And that is why Gerace's motion to dismiss and for sanctions fail.

---

[2] The Court acknowledged that the *per se* conflict issue was a "close one," *see* ECF No. 889 at n.2, and further described the Court's application of the Safe Harbor provision as a matter of "first impression," *id.* at 24.

[3] After Mr. Soehnlein reentered the case on September 6, 2023, he candidly advised members of the prosecution that, in sum and substance, he left his partnership at his prior law firm and was sharing space at the office of his current ethics counsel because he wanted to try this case and he was not going to be able to do so as a partner at his former law firm.  It is the government's understanding that he made similar comments to others before the government became aware of the information that culminated in its motion to disqualify.

## II.  **BACKGROUND**

A detailed rendition of the background, particularly given the far-fetched and wide-ranging accusations in the defendant's motion, makes clear that the defendant's motion to dismiss, for sanction, and to recuse the U.S. Attorneys' Office for the Western District of New York is baseless.

As this Court is aware from the trial conducted in *United States v. Bongiovanni*, the U.S. Attorney's Office investigation into Gerace commenced in or about the summer of 2018 following a lengthy RICO trial involving the Kingsmen Motorcycle Club ("KMC"), *see* Case No. 15-CR-142-EAW.[4]  There was information indicating that meetings between members of the KMC and Outlaws Motorcycle Club ("OMC") occurred at Pharaoh's Gentlemen's Club ("PGC"), which is owned by Gerace.  Members of the OMC attended and observed every day of the KMC RICO trial, which was conducted by United States District Court for the Western District of New York, Chief Judge, Elizabeth A. Wolford.

On July 20, 2018, a witness proffered with the government and that proffer shifted the immediate focus of investigation to DEA Special Agent Joseph Bongiovanni.  The investigation developed over time and the evidence demonstrated that Bongiovanni had a corrupt relationship with Gerace and others.  By the Fall of 2018, Bongiovanni was aware that his relationship with Gerace was under scrutiny, and Bongiovanni seemingly abruptly retired from the DEA on February 1, 2019.

---

[4] The KMC trial ended in May 2018.

On March 27, 2019, Bongiovanni provided a voluntary interview to federal agents, and statements Bongiovanni made during the interview about his relationship with Gerace formed part of the basis of false statement charges against Bongiovanni.

On separate days in April of 2019, both of Gerace and Bongiovanni's cellular phones were detained pursuant to border search authority following international travel.  Gerace's phone revealed information substantial information about his relationship with Bongiovanni and others.

On June 6, 2019, law enforcement executed a federal search warrant at Bongiovanni's residence and seized relevant evidence.

On June 18, 2019, attorney Paul Cambria reached out to the government on Bongiovanni's behalf, and Mr. Cambria was advised he had an actual conflict of interest. Specifically, attorney Herbert Greenman Esq., a partner in Mr. Cambria's law firm, represented ▮▮▮▮▮, who was the source of at least $250,000 in bribes to Bongiovanni.  Mr. Greenman also represented several other witnesses and an uncharged coconspirator.  Later, after Bongiovanni was indicted and during ensuing litigation regarding Mr. Cambria's conflicts of interest, the government stated, "It is alarming that the law firm is endeavoring to represent five (5) parties (Bongiovanni, CW-1 [▮▮▮], CW-2, CW-3, and Coconspirator 3) with varied and competing interests concurrently in the same litigation while also owing an ethical duty to a former client (Coconspirator 1 [Peter Gerace]) in the same case."  *See* ECF No. 946.

On August 23, 2019, law enforcement executed search warrants and seized relevant evidence from the residences of two individuals Bongiovanni is charged with protecting. Individuals Bongiovanni is charged with protecting include members or associates of Italian Organized Crime ("IOC"), such as Michael Masecchia and defendant Gerace.   After the search warrants, investigation into all aspects of the case continued.

### A.       The Original Indictment and Motion to Disqualify Paul Cambria

On October 31, 2019, Bongiovanni was indicted, but an investigation remained ongoing.   *See* ECF No. 1.   At Bongiovanni's arraignment on November 5, 2019, the government advised United States Magistrate Judge Michael J. Roemer  that there were conflicts of interest that would require Mr. Cambria's disqualification.  *See* Doc. No. 9 at 15: 2-7.   As set forth above, Mr. Cambria knew approximately four months earlier that the government's position was that  myriad of conflicts required his disqualification.

On November 27, 2019, the government filed its motion to disqualify Mr. Cambria because his law firm represented one of the main witnesses against defendant Bongiovanni, multiple other witnesses, and an unindicted coconspirator.  *See* Doc. No. 10.   Rather than acknowledging the obvious and serious conflicts Bongiovanni chose to oppose the government's motion until February 28, 2020.  *See* Doc. Nos. 10, 16, 18, 23, 26, 30, 31, 33-35, 37.   On March 9, 2020, Magistrate Judge Roemer granted Mr. Cambria's motion to withdraw as counsel for Bongiovanni.  *See* Doc. No. 38.

As detailed *infra*, Gerace's motion, in which he avers that the government's motion to disqualify Bongiovanni's attorney is evidence of bad faith in support of his request to dismiss his case, or alternatively to disqualify or sanction the U.S. Attorney's Office for the Western District of New York, is illogical and meritless.

### B.     Federal Search Warrants Executed at Gerace's Business and Residence

On December 12, 2019, law enforcement executed federal search warrants at Gerace's residence and his business, PGC. The search warrants were authorized by Magistrate Judge Roemer, and permitted agents to search for evidence of RICO Conspiracy, RICO, Money Laundering Conspiracy, Money Laundering, Misprision of a Felony, Accessory After the Fact, Aiding and Abetting, Use of a Telephone to Commit Drug Felonies, Drug Possession, Maintaining a Drug-Involved Premises, and Conspiracy to Distribute Controlled Substances, as follows:

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*.

Evidence as more fully set forth in Attachment B, attached hereto and incorporated by reference herein.

All of which are evidence, fruits, and instrumentalities of a violations of Title 18, United States Code, Sections 1962(c), 1962(d), 1956, 1957, 4, 3, and 2, and Title 21, United States Code, Sections 843(b), 844, 856(a)(1), 846. and all of which are more particularly described in the application for this warrant which is incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before  December 13, 2019
    *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Michael J. Roemer
    *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*.  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: November 29, 2019
    10:37 AM

City and State:  Youngstown, New York        HONORABLE MICHAEL J. ROEMER
                                      UNITED STATES MAGISTRATE JUDGE

On or about December 13, 2019, after the search warrants were executed, Gerace's ex-wife, ███████, reported to law enforcement that defendant Gerace contacted her,

blamed her for the search warrants, and threatened her.[5]   Notably, at that point, ███ had

not previously been interviewed in connection with the federal grand jury investigation into

defendant Gerace, and no information from ███ formed part of the probable cause to search

Gerace's residence and business.


On January 13, 2020, law enforcement interviewed ███ at the United States

Attorney's Office for the Western District of New York.


On February 13, 2020, ███ testified before a federal grand jury and, by that time,

she was assigned an attorney, Brain Comerford Esq., and had entered a proffer agreement.[6]


## C.   The Government Obtained an Injunction because Gerace Filed a Civil Lawsuit Targeting Government Witnesses

On October 12, 2020, after Gerace undoubtedly knew he was "Coconspirator 1" in

Bongiovanni's indictment, Gerace initiated a civil action in the State of New York, Supreme

Court, County of Erie against his ex-wife ███████ and ███████.   By that point,

---

[5] In the context of the defendant's motion to dismiss, he has made irrelevant credibility arguments pertaining to government witness, ███████.   Nevertheless, contrary to the defendant's aspersions, much of ███████ information has generally been corroborated by phone records, photos, or other witnesses.

[6] After ███████ was interviewed, the FBI made efforts to interview New York State Judge John Michalski (and others).   After the FBI made those efforts, and the same day the Buffalo News reported that ███████ was a witness in the Gerace investigation, Judge Michalski attempted suicide by laying down in front of a train.   Additionally, some information about the corrupt relationship between Gerace and Michalski, and some of their text message discussions about ███████ pre-dating the government's investigation into Gerace, are set forth in the Government's Pre-Trial Memorandum, *see* ECF No. 441.   These are just some examples of the circumstances that corroborate information ███████ provided.

both ███ and ███ had testified before the federal grand jury and had reported threats to their physical well-being.[7]  Indeed, ███ and ███ each worked at PGC, at one time had an intimate relationship with the defendant, and were privy to details about criminal activity engaged in by Gerace and occurring at PGC.[8]

The government filed an *ex parte* motion for an injunction of the state civil lawsuit Gerace.  *See* ECF Nos. 114, 115.  As part of its *ex parte* motion for an injunction, the government provided United States District Court Judge John L. Sinatra Jr. with ███ and ███ grand jury transcripts.  Judge Sinatra granted the injunction, *see* ECF Nos. 116,117, and denied Gerace's motion to vacate the injunction.  *See United States v. Gerace,* No. 19CR227JLSMJR, 2021 WL 4134886, at *1 (W.D.N.Y. Sept. 10, 2021), aff'd, No. 21-2419, 2023 WL 3243477 (2d Cir. May 4, 2023).

The Second Circuit affirmed Judge Sinatra's decision, described the circumstances justifying the injunction as "**extraordinary**," and further stated that "**this is exactly the type of case—where a criminal enterprise thrives off of gathering and using confidential law**

---

[7] On June 4, 2020, a superseding indictment added codefendant Michael Masecchia to the case.  *See* Doc. No. 46.  The initial indictment and superseding indictment referenced Gerace as Coconspirator 1, but the investigation was continuing.

[8] At the time of the state lawsuit, both ███ and ███ were victims under the Victims' Rights and Restitution Act ("VRRA"), *see* 34 U.S.C. § 20141(e)(2) (2017), *formerly codified at* 42 U.S.C. § 10607(e)(2) (2006).  The VRRA obligates the government to take steps to "arrange for a victim to receive reasonable protection from a suspected offender and persons acting in concert with or at the behest of the suspected offender."   34 U.S.C. § 20141(c)(2).  Additionally, ███ and ███ were victims under the Crime Victims' Rights Act ("CVRA"), *see* 18 U.S.C. § 3771.  As victims and witnesses, ███ and ███ Hunt were entitled to be treated with fairness and with respect for their dignity.

enforcement intelligence—that merits the relief granted by the district court." *United States v. Gerace*, No. 21-2419, 2023 WL 3243477, at *2 (2d Cir. May 4, 2023) (emphases added).

The attorney who filed the civil lawsuit on Gerace's behalf was Steven Cohen, Esq., and the "extraordinary" act of suing federal witnesses in state court in an effort to circumvent federal grand jury secrecy and discovery rules was just foreshadowing of the tactics and lengths to which Gerace would resort to in this case.

### D.   Motion to Determine Conflict of Interest as to Attorney Joel Daniels

On June 25, 2021, after litigating issues related to the injunction of Gerace civil lawsuit, the government filed a motion to determine whether a conflict of interest existed with regard to Joel Daniels, Esq.'s representation of Gerace.  *See* ECF Nos. 135-136.

By way of background, during her interview on January 13, 2020, ▌▌▌▌ provided information about, ▌▌▌▌▌▌▌▌▌▌▌, ▌▌▌▌▌▌▌▌▌▌▌▌▌ ▌▌▌▌▌

On February 13, 2020, ▌▌▌▌ testified before a federal grand jury.  ▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

███████████████████████████████████████████████ ██████

█████████████████████████████████████████████████████

████████████████████ █

As set forth above, during litigation related to the injunction, the government provided

████████████ grand jury transcript to Judge Sinatra as a part of its *ex parte* motion for an

injunction.  As a result, after Gerace's indictment was pending before Judge Sinatra, Judge

Sinatra flagged the conflict issue related to Mr. Daniels and contacted the government,

through his law clerk, to inquire as to whether the government had identified the issue.

Indeed, the government had identified the issue and was intent upon working through it.[11]


On April 29, 2021, AUSA Tripi and former AUSA Cullinane had a conversation with

Mr. Daniels, which was documented and summarized by former AUSA Cullinane as follows:



---

[9] ███████ █████████████████████████████████████████████████
████████████████████████████████████████████

[10] On February 25, 2021, defendant Gerace was indicted.  Gerace was arrested and arraigned in Florida, and Mr. Daniels appeared for Gerace during the arraignment (which was conducted via Zoom as this occurred during the COVID-19 pandemic).  Before Gerace was charged, grand jury secrecy rules prohibited the government from discussing any grand jury information with Mr. Daniels.  *See* Fed. R. Crim. P. 6(e).

[11] This was consistent with Judge Sinatra's independent obligation to ensure that "that criminal trials are conducted within the ethical standards of the [legal] profession and that legal proceedings appear fair to all who observe them."  *Wheat v. United States*, 486 U.S. 153, 160 (1988); *see United States v. Williams*, 372 F.3d 96, 110 (2d Cir. 2004) (admonishing the United States District Court for the Western District of New York for not independently raising a conflict of interest matter with the defendant).



On May 13, 2021, Judge Sinatra's chambers requested an update via email as to the

"potential conflict issue," and the government provided an update via email, as follows:

> We discussed the matter with Joel Daniels.  [The government's] next steps are
> being evaluated, including whether to meet further with the witness, to prepare
> a filing for consideration, or more likely to do both.  [The government's] goal
> is to meet with the witness next week after [the government] speak[s] with her
> counsel, Brian Comerford, and then proceed expeditiously from there.

On May 17, 2021, the FBI and assigned AUSAs [Tripi and Cullinane] reinterviewed

███████████, with her attorney Mr. Comerford present on the phone, ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████



On June 25, 2021, the government filed a motion to determine whether a conflict of interest existed as to Mr. Daniels.  *See* ECF No. 135.  The government explained to Judge Sinatra that ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  *See* ECF No. 136 at ¶ 17.  ████████████████

████████████████████████████████████████████████████████

██████

████████████████████████████████████████████████████████████████████████████████

---

[12] The government has also discussed matters with ████████ attorney, and those conversations support the inference that ████████ has been victimized and traumatized by Gerace (which is consistent with information the government has related to other of Gerace's intimate partners).  ████████ attorney believes she has consistently made efforts to recall information accurately and to the best of her ability.  In turn, the government has identified corroboration for much of ████████ testimony.  As to matters ████████ has discussed wherein her information may be may be singular in nature, or that has limited corroboration, ultimately it will be up to a jury to determine whether or to what extent to credit ████████ testimony—that is what trials are for.  *California v. Green*, 399 U.S. 149, 158(1970) (cross-examination is "the 'greatest legal engine ever invented for the discovery of truth." (citing 5 Wigmore s 1367)).

[13] *United States v. Fulton*,  5 F.3d 605, 609 (2d Cir. 1993).



*\*\**

*Id.* at ¶¶ 18, 25.

Judge Sinatra assigned Kevin W. Spitler, Esq., as independent *Curcio* counsel and Gerace decided to replace Mr. Daniels with Mr. Cohen, who had been his civil attorney, as his lead criminal defense attorney. *See* ECF Nos. 170, 172, and Minute Entry 08/10/2021.[14] Simply put, the record establishes that Gerace chose an attorney, Mr. Cohen, who was willing to sue witnesses in state court, say outrageous things to the media, *see* ECF No. 543 (Mot. for Gag Order), and who would later seek to manipulate the media narrative surrounding Crystal Quinn's death, described *infra*, over Mr. Daniels.

---

[14] Up until that point, Mr. Daniels was Gerace's criminal attorney and Mr. Cohen was Gerace's civil attorney.

In sum, the government's conduct in filing its motion to determine whether there was a conflict of interest regarding Mr. Daniels's representation of Gerace was wholly appropriate. Just as the Judge Sinatra recognized, the government's was obligated to raise the conflict issue, and its subsequent motion did just that. Gerace, then, made his choice. Any defense effort to spin these facts to conjure nonexistent evidence of bad faith should be rejected.

### E.   Attorney Eric Soehnlein Enters and Exits the Case as Counsel for Defendant Gerace

Defendant Gerace proceeded with attorney Mr. Cohen as his lead criminal attorney until February 24, 2023, when Mr. Soehnlein filed his notice of appearance. *See* ECF No. 377. Prior to Mr. Soehnlein entering the case, Mr. Soehnlein represented a potential witness, Gerace's accountant, and discussed with the government whether or not the government was intent upon calling Gerace's accountant as a witness. The government advised Mr. Soehnlein that the government would reserve it's right to call Gerace's accountant, but that it was unlikely given the fact that there were not any charged financial crimes. The government advised Mr. Soehnlein that the situation likely presented a waivable conflict of interest. Once Mr. Soehnlein filed his notice of appearance, the government followed up with an email, as follows:



The cordial email exchange excerpted above, coupled with the government's indication to Mr. Soehnlein that his representation of Gerace's accountant likely presented a waivable conflict, should be proof positive that there was no government plan or effort to prevent Mr. Soehnlein from representing Gerace. Indeed, counsel for the government thought well of Mr. Soehnlein and welcomed the degree of professionalism the government anticipated he would bring to Gerace's defense team.

On March 13, 2023, consistent with its discussion with Mr. Soehnlein and its obligation to identify conflicts of interest,[15] the government filed a *Curcio* motion as to Mr.

---

[15] The Second Circuit's decision in *United States v. Fulton,* 5 F.3d 605, 613 (2d Cir. 1993), requires the government to promptly disclose the existence of conflicts. In *Fulton*, the Court

Soehnlein.  *See* ECF Nos. 379,80.  In its *Curcio* motion, consistent with its informal discussions with Mr. Soehnlein, the government asked Judge Sinatra to hold a hearing (1) to determine whether the conflict is waivable, (2) if waivable, whether the defendant wishes to waive the conflict, and (3) to conduct a *Curcio* colloquy to ensure that the Gerace's waiver is knowing and voluntary.  *Id.*  The defendant responded to the government's motion, Judge Sinatra again assigned Mr. Spitler as *Curcio* counsel, and on April 18, 2023, Judge Sinatra accepted Gerace's waiver.  *See* ECF Nos. 393, 409, 410, 436.

In March 2023, the government moved to revoke Gerace's bail following the return of a four-count Indictment against him alleging, among other crimes, witness tampering in violation of 18 U.S.C. § 1512(b)(1) and (2).  *See* Indict.,1:23-CR-37, ECF No. 1, (dated Mar. 23, 2023). Mr. Gerace was represented by Attorneys Cohen and Soehnlein.

On March 28, 2023, following a detention hearing, Judge Sinatra ordered Gerace detained. *See id.*, Order of Detention, ECF No. 8 (dated Mar. 28, 2023).  Thereafter, the two indictments (23-CR-37 and 19-CR-227) were joined, and on May 31, 2023, Judge Sinatra denied Gerace's motion for release and to re-open his detention hearing.  *See* ECF No. 499.

**F.     The May 17, 2023, Status Conference**

On May 17, 2023, Judge Sinatra held a status conference.   During the status conference, Mr. Soehnlein and Mr. Cohen raised the specter of a relationship between ███

---

admonished the government for not disclosing the conflict it discovered in a timely fashion. *Id.*



("Witness 171").  Significantly, neither Mr. Soehnlein nor Mr. Cohen gave any inkling that they were considering putting Judge Sinatra's relatives, namely his ████ ("Witness 171") and ████ ("Witness 240"), on the defense witness list as supposed "character" witnesses.  Specifically, Mr. Soehnlein stated:



*See* Status Conf. Tran., May 17, 2023 at 3:3-17 (sealed sidebar).  Not a single word uttered by Mr. Soehnlein indicated, either to Judge Sinatra or prosecutors, that the Gerace defense team was intent upon placing Judge Sinatra's relatives on their witness list.

Similarly, Mr. Soehnlein's co-counsel, Mr. Cohen, **never** stated that the names (of 171 and 240) would be placed on defendant Gerace's witness list.  ████████████



*See* Tr., May 17, 2023 at 3:18-25, 4:1-6 (sealed sidebar).  Again, not a single word uttered by

Mr. Soehnlein or Mr. Cohen on May 17, 2023, indicated that they were intent upon placing

District Judge Sinatra's relatives' names on defendant Gerace's witness list.[16]

---

[16] It strains credulity that, based upon this May 17, 2023, sealed sidebar, on March 15, 2024, ethics counsel for Mr. Soehnlein claimed:

> In light of the transcript that I've referred to that the government had possession of at the time they brought this motion, **the government was present at the proceeding when the former judge made these observations about <u>exactly</u> what was done, and that it was okay. Five weeks later, took a different view. Why? I don't know**.

Oral Argument, Tr. March, 15, 2024 at 53: 8-13 (emphasis added).  When AUSA Chalbeck attempted to correct the record and read what Judge Sinatra actually said, as opposed to what ethics counsel recounted, she was cut off.  *Id.* at 56:7-24.  Obviously, Judge Sinatra did not "ma[k]e observations about exactly what was done [by placing names of his relatives of Gerace's witness list] and it was okay."

After Mr. Cohen and Mr. Soehnlein made the above-referenced remarks, Judge Sinatra addressed the issue and advised them to make a motion if they desired, as follows:



*See* Tr., May 17, 2023 at 5-6 (sealed sidebar).

Clearly, when Judge Sinatra stated, "If there is a motion, make it promptly," he was referring to a recusal motion based upon appearance of partiality in connection with the relationships, or lack thereof, raised by attorneys Soehnlein and Cohen. Judge Sinatra was not concerned that any relationships raised by Mr. Soehnlein or Mr. Cohen on May 17, 2023, were of the sort that would make him recuse himself because, for example: his impartiality might reasonably be questioned, *see* 28 U.S.C. § 455(a); or because he had a personal bias or prejudice concerning a party or of disputed facts, *see* 28 U.S.C. § 455(b)(1); or because in private practice he served as a lawyer in the matter in controversy, *see* 28 U.S.C. § 455(b)(2);

---

[17] Highlighting has been added for ease of reference.

or because he served in governmental employment and participated in the proceeding or expressed an opinion on the merits, *see* 28 U.S.C. § 455(b)(3); or because he, his spouse, or minor child had a financial or other interest in the matter, 28 U.S.C. § 455(b)(4).

In sum, neither Mr. Soehnlein or Mr. Cohen, who speak and write the English language for a living every day, ever stated on May 17, 2023, or at any other time prior to filing their bombshell witness list, that they were intent upon placing members of Judge Sinatra's family on Gerace's witness list. As a result, the notion that Judge Sinatra's relatives were going to be on Gerace's witness list as "character witnesses" was nonexistent. Neither Judge Sinatra nor the prosecutors had a crystal ball enabling them to predict that a month later, as Judge Sinatra's chambers and the government prosecutors were diligently preparing for an anticipated 16 week trial, Gerace and his attorneys would file a witness list triggering the mandatory recusal provisions of 28 U.S.C. § 455(b)(5)(iv), which require a judge to recuse where a person within the third degree of separation is "likely to be a material witness in the proceeding."

### G.     Judge Sinatra Ruled Against Gerace Prior to the Filing of Gerace's Witness List

On May 24, 2023, Gerace, who was previously ordered detained by Judge Sinatra, moved for reconsideration of Judge Sinatra's detention order and to reopen his detention hearing. *See* Mot. for Reconsideration, 19-CR-227, ECF No. 491, (dated May 24, 2023).

On May 31, 2023, Judge Sinatra denied Gerace's motion for release and to reopen his detention hearing. *See* ECF No. 499. That same day, Mr. Cohen told the Buffalo News,

"**The government is doing everything in its power to prevent Gerace's defense from preparing for trial . . . .  Regrettably, they have found a _sympathetic_ judge who has ordered all these restrictions**."  *See id.*, Govt's Mot. for Gag Order at 9, ECF No. 543, (dated June 27, 2023) (hereinafter "Motion for Gag Order") (emphasis added).

On June 6, 2023, Judge Sinatra issued a Decision and Order that denied the motion for reconsideration, continuing Mr. Gerace's detention. *See* ECF No. 504 .  The same day, Mr. Cohen told the Buffalo News, **"This judge continues to be particularly harsh to Mr. Gerace, and we see no legitimate basis for that,"** and **"[H]e appears to accept whatever the prosecution says at face value, even though they are bare allegations not supported by evidence."**  *See* ECF No. 543 (Mot. for Gag Order) at 9.

### H.    Mr. Soehnlein and Mr. Cohen File Gerace's Witness List

Litigation continued in the lead up to trial until on or about June 16, 2023, when Mr. Soehnlein and Mr. Cohen transmitted and filed a witness list on behalf of defendant Gerace to Judge Sinatra, which they later requested to be filed under seal. *See* ECF No. 525-1 (Declaration, June 20, 2023).

On June 21, 2023, the parties, including Mr. Soehnlein, appeared before Judge Sinatra as directed for a status conference.  *See* ECF No. 526.  During the status conference, Judge Sinatra discussed certain individuals listed on defendant Gerace's witness list and stated, "Mr. Cohen, why did you list 171 and 240 as witnesses and do you have any proffer that you would

like to make, other than what's on the witness list?"  *See* ECF No. 660 at 4-5.  Mr. Soehnlein's

former co-counsel, Mr. Cohen, responded:

> Your Honor, I would say that with regard to all three of those witnesses, 239,
> 240 and 171, **we're getting that from the material that the Government has
> turned over to us as part of its Jencks. The Grand Jury testimony that we've
> been given access to brings those names up significantly** and I have a duty to
> reserve my rights to call them. If you are asking whether I intend to call them,
> we have to see how the case plays out. I don't know yet, but, certainly, the
> Government felt it was important enough to question about these three
> individuals -- we'll say the two individuals. And they are on my list and they
> have to stay there and whether I use them depends upon the case that the
> Government puts on.

*Id.* at 5:3-17 (Emphasis added).



Additionally, regarding the materiality of the witnesses, Mr. Cohen framed the

Judge's relatives as important character witnesses to Gerace's defense, stating:

> [Y]ou're right if you are suggesting, Judge, this is a character case.
> That's all this case is is a character case.  This is not going to be a case
> where the government is going to be pointing to the table and showing
> these are the drugs that were seized or this is the evidence that was
> seized during numerous warrant searches, because nothing was turned
> up.  It's all about second and thirdhand, sometimes firsthand testimony
> from people who are largely incredible.  And I also intend to be able to
> — as a character chase, to not only be put on in my direct case to show
> the character of my client, but it can also be used to impeach the
> character of the witnesses upon which the U.S. Attorney is relying.

Status Conf. Trans., at 7, (dated June 21, 2023).



Judge Sinatra promptly expressed his view that he was "skeptical of this tactic," and

that the placement of the witnesses on the list "appear[ed] to be gamesmanship."  *See* ECF

660 at 10.  After observing Judge Sinatra's reaction and hearing the comment about

"gamesmanship," Mr. Soehnlein asked to approach the bench and stated that the placement

of the name on the witness list "wasn't taken lightly," as follows:

```
           USA v Bongiovanni and Gerace - Proceedings - 6/21/23     12

 1          MR. SOEHNLEIN:  Thank you, Judge.  I was concerned
 2     about your comments about gamesmanship and so I want to make the
 3     record crystal clear on that point, okay?
 4          With respect to Mr. ████████, (Witness 171), a number
 5     of allegations the Government has made in this case has to do
 6     with Mr. Gerace's relationship with law enforcement, payment of
 7     money to law enforcement for alleged improper purposes.
 8          He does have a relationship with several members of
 9     law enforcement.  He has a particularly close relationship with
10     that individual, that is included in payment of money for
11     various things, various charitable contributions and things of
12     that nature.
13          As a defense attorney and a trial practitioner, that
14     is a very important thing to bring out in front of a jury and I
15     think it's important.
16          I wanted the record to be made clear and I wanted Your
17     Honor to understand that the decision to include that name
18     wasn't taken lightly.  It really wasn't, okay?
19          Thank you for letting us come up and make the record,
20     Judge.  I appreciate it.
```

*See* ECF No. 660 (Tr. of Proceedings, June 21, 2023) at 12:1-20.  Judge Sinatra recused

himself, and in doing so stated, "[G]iven Defendant Peter Gerace, Jr.'s inclusion of two

individuals as **supposed character witnesses** among the hundreds of individuals on his

witness list, recusal even in the absence of any bias, prejudice, or partiality is now required

under 28 U.S.C. 455(b)(5)(iv). The undersigned is hereby recused."  *See* ECF No. 535 (Text

Order) (emphasis added).[18]

---

[18] On January 5, 2024, a Federal Grand Jury returned an Indictment related to the murder of
a federal witness, Crystal Quinn, which alleges, in part, that defendant Gerace and Gerace
Attorney 1 (who is not Mr. Soehnlein) did, in fact, file a witness list that resulted in Judge
Sinatra's recusal.  *See* Case No. 23-CR-99, Count 1, Overt Act ¶ 24.

Immediately following Judge Sinatra's decision and his concern about the defense team's tactical "gamesmanship," in an interview with *The Buffalo News*, Mr. Cohen stated: "We don't know until the government puts on their case why they brought up these names. . . . So we are reserving our right to call them, and let's see how the case fleshes out. That's it." Patrick Lakamp, *Judge Recuses Himself from Strip Club Owner Case after Voicing Suspicion of Legal 'Gamesmanship'*, THE BUFFALO NEWS, (dated June 21, 2023).

Mr. Soehnlein also gave a statement to *The Buffalo News* defending the defense tactic:

> We don't have to pick a way to defend [Gerace] until we see the government's proof. That's fair to us. . . . And one very plausible, very likely way to defend this case involves testimony from those individuals. **Because they're going to be talking about Mr. Gerace in connection to circumstances that are very close to the allegations of the government's case**. And so we have reserved the right to put on that kind of case. It's our duty to reserve that right.

*Id.* (emphasis added).

Fast forwarding to December 2023, as a part of the FBI's investigation into the potential that Gerace, Mr. Soehnlein, and others fraudulently orchestrated Judge Sinatra's recusal by manipulating the mandatory federal recusal statute, *see* § 455(b)(4)(iv), the FBI interviewed the witnesses that Mr. Soehnlein stated that the placement of the name on the witness list "wasn't taken lightly," *see* ECF No. 660 at 12:18, and whom he told the public would "likely" be called as part of Gerace's defense because "they're going to be talking about Mr. Gerace in connection to circumstances that are very close to the allegations of the government's case."

25

Witness 171's interview established: (1) that 171 has no relationship with Gerace, let alone a close relationship; (2) that 171 was never approached by Gerace's defense team to be a witness; and (3) that 171 has never personally financially transacted with Gerace, as follows:



█████████████████████████, was interviewed at the offices of the FBI, One FBI Plaza, Buffalo, NY 14202. After being advised of the identities of the interviewing Agents and the nature of the interview, █████ provided the following information:

    █████ is Federal Judge John Sinatra's █████
    █████ was asked what he knows about PETER GERACE. █████ responded "nothing". █████ met GERACE once twenty or thirty years ago. █████can not say for sure how he met GERACE, but believes it may have been through the former police commissioner. █████ GERACE may have attended a function they were both at. █████ has never been to Pharoahs. He has never dealt with GERACE, either on the job or in his personal life. He did not work any cases involving GERACE when he was a Detective with the Buffalo Police Department. █████never received a payment from GERACE nor did he pay GERACE any money.

    █████ was a member of the Italian Police Association of Western New York and participated in fundraising for the organization. Former DEA Agent Joseph Bongiovanni may have also been a member of the organization. The organization sold tickets for different events for fundraising. █████ believes that LaNova Pizza may have purchased blocks of tickets for various events throughout the years. GERACE may have purchased tickets for these events; however, █████ never collected money from GERACE.

    █████ believes that he purchased clams from a restaurant called Rascals for one of the fundraisers. He believes one of the younger GERACE brothers, possibly named Anthony, sold him the clams. █████ was shown a photograph of Peter Gerace with another individual, attached as a 1A (photograph of Anthony Gerace), and identified the other individual depicted in the photograph as the individual he purchased the clams from. The dollar amount for the purchase of the clams was nominal.


    █████ has never been contacted by attorney STEVEN COHEN, attorney ERIC SOEHNLEIN, private investigator █████ or anyone else from GERACE'S defense team. █████does not have any relationship with GERACE, let alone a "close relationship". When █████ was told that the defense is representing that he has a "particularly close relationship" with GERACE, █████responded that is "bullshit" and I will testify to that. Likewise, █████ has not received payment of money from GERACE for anything, including various charitable contributions and other things of that nature. There have never been any monetary transactions between █████and GERACE. █████ has never taken or received a dime from GERACE.

Similarly, Witness 240's interview established that he did not have a social relationship with Gerace, such that the notion of serving as a character witness for Gerace was, in his words, "ridiculous." Witness 240's relationship with Gerace was so tenuous that the last interaction he could recall having with Gerace "may have been twelve years ago," and involved the purchase of wine from a closing restaurant.

Finally, to the extent that Mr. Cohen stated, in Mr. Soehnlein's presence and in support of the notion that 171 and 240 would be character witnesses, "**we're getting that from the material that the Government has turned over to us as part of its Jencks. The Grand Jury testimony that we've been given access to brings those names up significantly**," the statement is belied by reality. As the government has explained, the two defense witnesses (171 and 240) that Judge Sinatra questioned defense counsel about on June 21, 2023, were not names that were brought up in Grand Jury testimony significantly. First, Witness 171 was not referenced in Grand Jury testimony at all. Second, Witness 240 was only tangentially and minimally referenced principally in relation to being the owner of a business. *See* ECF No. 919; *see also* ECF No. 595, n. 9; ECF No 660 at 5–6 (transcript of proceedings 06/21/2023), and Transcript 12/1/2023 at 5-6 (under seal).

## I.     <u>Transfer of the Case to this Court</u>

After Judge Sinatra recused, the case was transferred to this Court. *See id.*, ECF No. 660, (dated June 21, 2023). There followed a series of events and counsel changes as to Gerace that ultimately resulted in the trial being adjourned from August 14, 2023, to October 23, 2023. Notably, contrary to assertions of bad faith in the defendant's motion to dismiss, the government did not move to disqualify Mr. Soehnlein based upon the information it knew at that time, and the government was intent upon proceeding to trial with Mr. Cohen and Mr. Soehnlein as counsel for defendant Gerace.

On June 26, 2023, less than a week after Mr. Cohen and Mr. Soehnlein's submission of the witness list to Judge Sinatra, Mr. Soehnlein moved to withdraw as counsel for Mr.

Gerace.  *See* Mot. to Withdraw, ECF No. 541, (dated June 26, 2023).  It was Mr. Soehnlein who first flagged the ethical concerns that would later, after the government came into possession of additional information, form part of the basis for the government's motion to disqualify Mr. Soehnlein.

In particular, the rules that Mr. Soehnlein cited included Rule 1.16(b), which states: that "a lawyer **shall** withdraw from the representation of a client when: (b)(1) the lawyer knows or reasonably should know that the representation will result in a violation of these Rules or of law; or […] (b)(4) the lawyer knows or reasonably should know that the client is bringing the legal action, conducting the defense, or asserting a position in the matter, or is otherwise having steps taken, merely for the purpose of harassing or maliciously injuring any person."  (Emphasis added).

Additionally, Mr. Soehnlein also cited Rule 1.16(c), which provides, "a lawyer **may** withdraw from representing a client when," among other things, "(2) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent; (3) the client has used the lawyer's services to perpetrate a crime or fraud; or (4) the client insists upon taking action with which the lawyer has a fundamental disagreement." (Emphasis added).  Based upon the publicly cited reasons for Mr. Soehnlein's motion to withdraw, and in light of the conduct that had recently transpired before Judge Sinatra on June 21, 2023, which resulted in Judge Sinatra's recusal, the government did not object to Mr. Soehnlein's motion to withdraw as counsel for defendant Gerace.  *See* ECF Nos. 546, 553 at 8.

On July 12, 2023, this Court granted Mr. Soehnlein' s unopposed motion to withdraw as counsel for defendant Gerace.  *See* ECF No. 559.  Just three days later, on July 15, 2023, Mr. Cohen sent a letter to the Court advising that defendant Gerace "terminated" him.  *See* ECF No. 567.  Mr. Soehnlein's withdrawal and Mr. Cohen's "termination" delayed trial once again.

### J.        Government Witness Crystal Quinn's Death and Investigation

On August 2, 2023, the government learned that one of its trial witnesses, Crystal Quinn, was found dead on August 1, 2023, of an apparent drug overdose in Wellsville, New York.  Ms. Quinn was a former Pharaoh's employee who later became Mr. Gerace's housekeeper and friend.  Her testimony was expected to cover a variety of topics related to Mr. Gerace's involvement in cocaine distribution, sex trafficking, witness tampering, and Gerace's relationship with Bongiovanni.  The government immediately opened an investigation into the circumstances surrounding Ms. Quinn's death.

On August 4, 2023, just days after Ms. Quinn died, this Court held a status conference to address the status of defendant Gerace's representation.  *See* Minute Entry, ECF No. 580, (dated Aug. 4, 2023).  At that appearance, the government emphasized that the trial could not continue to be delayed because, among other reasons, "a key government witness has died under circumstances that are under investigation, and under circumstances where it's a witness who previously had rats placed on her vehicle at an earlier stage of this case."  *See* ECF No. 581 at 8:13–17.  The government continued:

> If this case had gone June 21st, and I'm not, you know, disparaging this Court certainly, or any Court, but if it had, by way of example, if it had gone June 21st, that witness would have testified already, and that information would have been evaluated by a jury, that important key information. Now they may never know about it. They may never know about it.

*Id.* at 8:21-25, 9:1-2.  This was the first time that the government publicly disclosed that Ms. Quinn had died.  Almost immediately thereafter, Mr. Cohen then stated that "this is the second witness who has ***killed themselves*** [sic] because of pressure that they were under with respect to this case which I verily believe, Your Honor, is pressure that's coming from the U.S. Attorney's Office." *Id.* at 9:13–15 (emphasis added).  Mr. Cohen did not provide any evidence to support his statement that Ms. Quinn had committed suicide—statements he later repeated to the media on television.  Indeed, the Medical Examiner had not even provided a report as to the cause of Ms. Quinn's death, which had only occurred three days earlier.[19]

Meanwhile, as the government began to investigate Ms. Quinn's death, defendant Gerace attempted seize upon it to gain his release on bail by arguing, in part, that Ms. Quinn's death presented a change in circumstances meriting the reopening of the detention hearing. *See* Tran. Oral Arg., at 3–6, 25, ECF No. 606, (dated Aug. 18, 2023); Reply in Support of Release, ECF No. 604, (dated Aug. 15, 2023).  The Court granted that request.  *See* Minute Entry, ECF No. 580, (dated Aug. 4, 2023).  Mr. Gerace filed his sealed motion for release the next day. *See* Sealed Mot. for Release, ECF No. 585, (entered Aug. 9, 2023).  He subsequently

---

[19] The government maintains that enabling Mr. Soehnlein to continue as counsel for Gerace would inject structural error, likely result in a reversal of any conviction, and/or would provide substantial grist for an ineffective assistance of counsel claim via 28 U.S.C. § 2255, concerns that are especially potent given the Grand Jury's return of an indictment charging him with conspiring to murder Ms. Quinn.

filed a reply memorandum on August 15, 2023.  Reply Mem. in Further Support of Def.'s

Mot. for Release, ECF No. 604, (entered Aug. 17, 2023).  As part of the reply, Mr. Cohen

provided an affidavit from himself, which, in turn, attached affidavits from Ms. Quinn's

mother and live-in friend.  *See id.*

The affidavits that Mr. Cohen submitted as part of the reply buttressed his August 4,

2023, proclamation that Ms. Quinn committed suicide. ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████Additionally, Mr. Cohen's affidavit described the apparent circumstances surrounding

the creation and obtaining of the affidavits as follows:





In paragraph 8, Mr. Cohen unambiguously stated, "█████████████████████████

████████████████████████████████████████████████████████████

██████████████ In other words, Mr. Cohen, who was Gerace's only criminal attorney at

the time, expressly indicated that the private investigator was not a member or agent of the

defense team.


### K.   Eric Soehnlein Re-Enters the Case as Counsel for Defendant Gerace

On September 6, 2023, after weeks of arguing about whether the Court should allow

Mr. Cohen off the case, Mr. Soehnlein reappeared, made assurances to the Court that "all

issues are resolved," and stated that he would once again represent defendant Gerace along

with current co-counsel, Mark Foti, Esq.  *See* ECF No. 622.  There was no colloquy

concerning the underlying basis or substance of the ethical issues that were initially raised by

Mr. Soehnlein's previous motion to withdraw as counsel for defendant Gerace less than 3

months earlier (*see* ECF No. 541).  Again, and contrary to defense claims that the government wanted to interfere with defendant Gerace's Sixth Amendment counsel of choice, the government did not object to Mr. Soehnlein re-entering the case.  The government's main focus was getting the case to trial as scheduled on January 8, 2024.

## L.    Investigation into Crystal Quinn's Death Continues

In early November 2023, as the parties were heading towards trial and while the government was simultaneously continuing to investigate the circumstances surrounding Ms. Quinn's death, the government obtained information that added context to Mr. Soehnlein's and Mr. Cohen's decision to file a witness list naming Judge Sinatra's relatives as supposed "character" witnesses.  In particular, the government obtained a recording which indicated that defendant Gerace's defense team as of the time of the filing of the witness list (which included Mr. Soehnlein from February 24 until July 12, 2023) may have tactically engaged in fraudulent conduct designed to orchestrate the recusal of Judge Sinatra in order to get Gerace's case to a judge who was more to his liking.[20]   As described above, the filing of the witness list came after a series of adverse bail decisions against Gerace and after his attorney, Mr. Cohen, openly criticized Judge Sinatra's decisions in the media.

---

[20] Similar to the Court's April 25, 2024, Decision and Order (*see* ECF No. 889, n. 5), the government is intentionally keeping its discussion of these facts high-level, although it notes that, consistent with what the Court has directed by virtue of disclosure of grand jury materials to Gerace and Mr. Soehnlein, and the information set forth in the Court's Decision and Order, Federal Rule of Criminal Procedure 6(e) permits the Court to unseal pertinent information related to the Grand Jury to aid judicial proceedings.

The government's investigation by that point indicated that Crystal Quinn was not suicidal, and that she died with enough fentanyl in her system to kill up to 400 people. In fact, the only information that Ms. Quinn was suicidal came from Simon Gogolack, who is charged with giving her the drugs that killed her and the originator of the false suicide cover story; Mr. Cohen, who made in-court proclamations of suicide within 72 hours of her death; and, in affidavits Mr. Cohen procured from Ms. Quinn's mother and live-in roommate after Mr. Cohen made those in-court statements. Indeed, well after Mr. Cohen's acquired the affidavits and submitted them to this Court in support of Gerace's motion for release, *see* Aff. of Attorney Steven M. Cohen, at 4 ¶ 18, ECF No. 604-1, (dated Aug. 14, 2023), ████████████████████████████████████████████████

████████████████████████████████████████. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

As a result, ████████████ ████████████████████████

████████████████████ on November 8, 2023.[21] ████████████████████

████████████████████████████████████████████████████

──────────────────

[21] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

or obtained from his interactions with or interviews of ███████ or ████████.
Notably, by that point, ███████████████████████████████████████,
the FBI had obtained search warrants from every United States Magistrate Judge in the
Western District of New York.  Those magistrate judges all found probable cause to issue a
myriad of search warrants related to the investigation into the death of federal witness, Ms.
Quinn.

Gerace's attorneys, Mr. Foti and Mr. Soehnlein, and ███████ attorney,
Thomas J. Eoannou, Esq., initially all tried to delay the Grand Jury's important investigation
into the death of a federal witness.  Initially, Mr. Eoannou, ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ contacted the government and tried to find out information about the grand jury
presentation, essentially inviting the government to break its secrecy obligations.  When no
information was provided, Mr. Eoannou asked to delay the grand jury presentation because
he claimed he was going to be on vacation on the day that ██████████ testimony was
scheduled (he nevertheless made it to the argument on the motion to quash filed by Mr. Foti
and Mr. Soehnlein, and was present outside the grand jury room during ███████████
testimony).

Next, Mr. Foti and Mr. Soehnlein emailed this Court and made inaccurate assertions
that they later retreated from due to their lack of understanding of representations Mr. Cohen
made under oath this Court about the private investigator, ███████████.  After the
government directed Mr. Foti and Mr. Soehnlein to Mr.  Cohen's affidavit, *see* ECF No. 604-

35

1, they acknowledged that Mr. Cohen's statements obviously gave the government grounds to believe that ⬛⬛⬛⬛ was not a part of the defense team when Mr. Cohen acquired affidavits from ⬛⬛⬛⬛ and ⬛⬛⬛⬛ via ⬛⬛⬛⬛. Indeed, Mr. Foti wrote an email to the government that stated, "Thank you for highlighting [Mr. Cohen's] affidavit for us. After going back to look at it, we understand why you did not reach out to us beforehand," as follows:



After that, Mr. Foti and Mr. Soehnlein asked the government to delay important grand jury testimony, but as they were not counsel of record when Mr. Cohen obtained and submitted the affidavits to this Court in support of Gerace's motion for release, the delay would have served no practical purpose, and the government was not obligated to delay the grand jury's investigation.

On November 7, 2023, defendant Gerace, through attorneys Mr. Soehnlein and Mr. Foti, moved to quash the subpoena directed to ███████████. The government responded *ex parte* and under seal because the subpoena related to an ongoing grand jury investigation. *See*, Case No. 23-cv-1163 (Mot. To Quash).

On November 8, 2023, United States District Court Judge Richard J. Arcara, who has supervised federal grand juries in the Western District of New York for decades, heard argument from the government, counsel for ███████████, and counsel for Gerace. During the argument, counsel for defendant Gerace raised claims of privilege, which were ultimately rejected by Judge Arcara. *See*, Case No. 23-cv-1163, Transcript of Sealed Proceedings, November 8, 2023.

During argument, Mr. Soehnlein stated to Judge Arcara that: ████████████ ██████████████████████████████████████████████████████████████████ However, the fact that Gerace's attorneys, including Mr. Soehnlein who was Gerace's attorney of record from February 24, 2023, until July 15, 2023, and again from September 6, 2023, until present, apparently did not have a clear understanding as to representations Mr. Cohen made to this Court about the defense investigator, is a problem that lies squarely upon the defense team. As detailed *infra*, any effort to somehow transform the lack of internal communication between and amongst Gerace's current and former counsel into a claim that

_____

[22] They had been aware of Mr. Cohen's affidavit, based upon the government's email on November 6, 2023, for two days, not ███████████ Additionally, Cohen entered his affidavit in support of Gerace's motion for release, which Attorneys Foti and Soehnlein ultimately litigated.

the government acted inappropriately defies logic, is meritless, and should be rejected.[23]

After Judge Arcara denied the motion to quash, Mr. Soehnlein and Mr. Eoannou



_____

[23]





*Id.* at 27-28.  Mr. Soehnlein, on behalf of defendant Gerace, made the following record:



*Id.* at 29-30.  Importantly, as this transcript evinces, the government's argument centered on

the privilege not applying and, even if it did, that the work-product privilege was overcome

by a substantial need.  *See id.*  After the above proceeding, ██████████ ████████

████████████████████████ the recording that would change the trajectory of this

litigation.[24]

_____

[24] To the extent the defendant avers that the government made misrepresentations to Judge
Arcara, any such claims are baseless.  The government submitted an affidavit ex parte and
under seal to Judge Arcara, and made arguments and factual statements to Judge Arcara.
The information and statements were consistent with myriad of search warrants that had been
executed and conducted up until that point, between August and November, during which
time various magistrate judges also determined probable cause to conduct various searches.
These and other facts ultimately resulted in a Federal Grand Jury returning an indictment
charging Gerace and others with tampering and retaliating against Crystal Quinn, causing her

**M.**   **The Recording**

On November 9, 2023, ███████████████████████████████████

███████████████████████████████████ AUSA Nicholas Cooper listened

to the ███████ recording.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████[25]

███████████████████████████████████████████████████████

---

death, and related charges.  The defendant's claims are rank and unfounded speculation belied
by a valid indictment, a Grand Jury's probable cause finding, and probable cause
determinations by several magistrate judges who issued search warrants.

■ ███████████████████████████████████████████████████████
███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

The recording was compared to, among other things:

1. The circumstances surrounding Mr. Soehnlein and Mr. Cohen's transmittal and filing of defendant Gerace's witness list on or about June 16, 2023 (including Judge Sinatra's decision to detain Gerace and denial of several motions for release);

2. The witness list's representation that Witness 171 had a "relationship" with Gerace and that Witness 240 was Gerace's ████████ which was belied by any information the government had developed to that point (and were representations later refuted by Witness 171 and Witness 240);

3. Mr. Cohen and Mr. Soehnlein's comments on June 21, 2023, to Judge Sinatra purportedly justifying the names they put on their witness list;

4. Mr. Cohen and Mr. Soehnlein's comments to the Buffalo News on June 21, 2023, justifying their tactical decision; and

5. Several quotes by Mr. Cohen to complaining about Judge Sinatra's fairness in the weeks preceding their decision to file the witness list that led to Judge Sinatra's recusal.

As detailed *infra*, the Executive Branch then determined that the circumstances merited further criminal investigation.

## N.    The Government's Motion to Disqualify Mr. Soehnlein

Due to the potential that two District Court Judges, namely Judge Sinatra and Judge Vilardo may have been impacted by an orchestrated recusal, the United States Attorney, Trini E. Ross, notified Chief Judge Wolford that the U.S. Attorney's Office has determined, in part, that attorney Mr. Soehnlein (and others) was a subject or target of a federal investigation relating to his representation of Gerace.  Specifically, United States Attorney Ross advised Chief Judge Wolford that the government had come into possession of evidence which it believed: (1) establishes probable cause to believe that a criminal conspiracy existed to manufacture District Judge John L. Sinatra, Jr.'s recusal from *United States v. Joseph Bongiovanni, et al.*, 19-CR-227, and (2) establishes probable cause to believe that a conspiracy existed to provide Judge Vilardo with materially false affidavits in support of defendant Peter Gerace's motion for release from custody.[26]   Other subjects and targets of the investigation, which was being conducted by different prosecutors, were also mentioned in the letter.  Once it became apparent that Gerace's current attorney, Mr. Soehnlein, was considered a subject

---

[26] The U.S. Attorney advised the Chief Judge of these events because the potential conspiracy impacted the judges of the court as a whole, and because a member of the potential conspiracy had a case pending sentencing before the Chief Judge.  *See* 28 U.S.C. § 136(b) (Congress stated that "[t]he chief judge shall have precedence and preside at any session which he attends.").

or target of investigation—the government was duty bound to notify the Court, and move to disqualify Mr. Soehnlein due to a *per se* conflict.  *See Fulton,* 5 F.3d at 613; *United States v. Cain,* 671 F.3d 271 (2d Cir. 2012) (applying the *per se* conflict of interest framework to attorney-witnesses of a client's crime, a status the "subject" distinction encompasses).

On November 21, 2023, the government filed its initial *ex parte* and sealed motion to disqualify Mr. Soehnlein for a *per se* conflict.  At the Court's suggestion, the government later withdrew its original motion and filed a revised and superseding motion to disqualify.  *See* ECF. Nos. 666, 689, 691.  Although the government's initial motion was *ex parte* due to its ongoing grand jury investigation, *see United States v. Rechnitz,* 75 F.4th 131, 146–47 (2d Cir. 2023) (explaining that the preservation of grand jury secrecy justifies moving *ex parte*); *In re John Doe Corp.,* 675 F.2d 482, 490 (2d Cir. 1982) (*in camera, ex parte* submission is appropriate where it is the only way to resolve an issue without compromising the need to preserve the secrecy of the grand jury), the Court directed the government to provide to both Gerace and his attorneys all relevant information underlying its investigation as it related to Mr. Soehnlein, *see* Transcript of Proceedings, December 1, 2023.

On December 1, 2023, the parties appeared before the Court on the government's *ex parte* and sealed motion to disqualify.  During the *in camera* portion of the government's colloquy with this Court, the government stated, in part, ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████  The government continued: █████████████████████████████████████████

████████████████████████████    ███████████████████████

████████████████████████████████████████████████████

████████████████████████████    *Id.* at 18-24.  In other words, at

the outset, the government acknowledged that it was surprised by the information it learned

on the recording ████████████ provided, which caused the U.S. Attorney to notify Chief

Judge Wolford that Mr. Soehnlein was then a subject or target of an investigation.   The

government continued to describe its ongoing investigation into Ms. Quinn's death, as

follows:



*Id.* at 10:16-25, 11:1-11.  The government continued to describe the circumstances leading up

to the motion to disqualify:





*Id.* at 12:2-24.

The government then explained that the investigation, as it related to Mr. Soehnlein, would be to determine whether there was a corrupt motive as it related to the filing of the witness list that forced Judge Sinatra to recuse himself.  As the investigation was in its infancy, the government acknowledged that ███████████████████████████████████████ ██████  *Id.* at 17:1-2.  The Court responded:



---

[27] Insofar as the Court might have been suggesting that it could be legitimate to put names on a witness where the primary motivation is to orchestrate a federal judge's recusal, a federal appellate court has rejected analogous reasoning.  *Cf. In re Mole*, 822 F.3d 798, 805 (5th Cir. 2016) ("Thus, we conclude that the action of hiring an attorney to *motivate* a recusal is prejudicial to the administration of justice and implies an ability to improperly influence a judge . . . ." (emphasis added)); *cf. also McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir. 1983) ("[A] lawyer may not enter a case for the *primary purpose* of forcing the presiding judge's recusal." (emphasis added)).  While this Court may disagree, the existence of contrary authority provides even further evidence that the government was acting in good faith in its application of facts to the law.

*Id.* at 17:3-17.  The government responded:



*Id.* at 17:18-25, 18:1-2.

The exchange between the Court and government counsel continued, in part, as follows:



*Id.* at 21:2-19.

After acknowledging the government statements that it had been the party trying to advance the case to trial (with Mr. Soehnlein as Gerace's attorney), and that there was nothing strategic with regard to the circumstances that had developed as to Mr. Soehnlein, the Court posed a question[28] that mirrors the argument the defendant now makes in support of his motion to dismiss:

---

[28] On March 15, 2024, the Court responded to AUSA Cooper's quote from Justice Sutherland in *Berger v. United States*, 295 U.S. 88 (1935), by stating, "While I have no doubt that this trial team is proceeding the way it has to proceed given decisions that are made in the office, I'm not so sure that I agree that everybody in your office reads that quote the same way, Mr. Cooper." Tr. of Oral Argument, March 15, 2024, at 5:16-19. The defense has now simply tailored their motion to dismiss to mirror public comments made by the Court. However, there was, and remains, no evidence of bad faith—a disagreement, even one that is firmly held and hotly contested, over the interpretation of the facts and applicable law between the Executive Branch and Judicial Branch is no substitute for evidence.

Moreover, the government understood the Court's comments on December 1, 2023, and March 15, 2024, to be in the spirit of vigorous debate in an effort to make its legal point. At no time did this Court state there was evidence of bad faith, or that it in fact believed there was bad faith, and it did not suggest that the defense file a motion alleging bad faith predicated upon hypotheticals or statements made by the Court. To the contrary, on December 14, 2023, this Court recognized the importance of the various branches of government when it stated:

> [T]he decisions that are being made in connection with the Government's motion are being made by the executive branch, not the judicial branch, I honestly don't know how I can't disqualify Mr. Soehnlein. In other words, this is not anything that I have any control over. The Government has control over it. The Government says it's a per se conflict. I think they may well be right.

Tr. Status Conf. (12/14/23) at 6:14-20. In fact, when the Court later denied the government's motion to disqualify, *see* ECF No. 889, it only did so after analysis of a Safe Harbor provision under circumstances it described as "a matter of first impression." *Id.* at 1. In response to the Court's analysis, operating in good faith, on May 16, 2024, the U.S. Attorney for the Western District of New York provided an immunity letter to ethics counsel for Mr. Soehnlein and confirmed that its investigation into Mr. Soehnlein was closed. *See* **Exhibit A**, attached hereto an incorporated herein by reference.



*Id.* at 30:10-23.

Simply put, as the government has explained since the beginning of the disqualification issue, there was nothing personal about investigation or the filing of the motion to disqualify. The mission of the Department of Justice ("DOJ") is to uphold the rule of law, and its values of independence and impartiality require prosecutors to earn the public's trust by following the facts and the law wherever they may lead, without prejudice or improper influence—and that is all prosecutors tried to do in this case.

### O.     The Second Superseding Indictment Witness Tampering and Retaliation Conspiracy for the Murder of Federal Witness Crystal Quinn

On January 5, 2024, a Federal Grand Jury returned a Second Superseding Indictment charging defendant Gerace and others, including members of the Rare Breed Motorcycle Club

---

[29] Counsel for the government have tried federal cases against most of the experienced federal defense attorneys who frequently try cases in federal court in the district's Buffalo division. To the extent the Court posited about the government being ▊▊▊▊ about Mr. Soehnlein being on the Gerace defense team, the comment has no basis in fact.  Notably, as relevant to the foregoing and to underscore the lack of factual basis for the notion that the government is ▊▊▊▊ of Mr. Soehnlein, the government is unaware of Mr. Soehnlein ever trying a federal criminal case in United States District Court for the Western District of New York.

(RBMC) and OMC, with, among other things, Obstruction of Justice Conspiracy, Witness Tampering Conspiracy, and Witness Retaliation Conspiracy for murdering Crystal Quinn, who was a federal witness anticipated to testify at trial in Case Nos. 19-CR-227 and 23-CR-37.  *See United States v. Peter Gerace Jr., et al.*, 23-CR-99.

As set forth in government filings related to Mr. Soehnlein's remaining conflicts, *see* ECF Nos. 919 and 997, he is a witness to several overt acts in Case No. 23-CR-99, which charges Gerace and others with witness tampering and retaliation conspiracies, in addition to an ongoing investigation of Gerace's obstruction.  The government incorporates its filings at ECF Nos. 919 and 997 as set forth fully herein.

### P.      The Court's Decision Denying the Motion to Disqualify Mr. Soehnlein

On April 25, 2024, the Court issued a written decision and concluded that Mr. Soehnlein does not have a *per se* conflict of interest because (1) that there is no reasonable possibility that Mr. Soehnlein committed a crime when he put two names on a witness list that required Judge Sinatra to recuse himself; and (2) that Mr. Soehnlein is not a witness to procuring false affidavits related to Crystal Quinn's death.  *See* ECF No. 889.  The Court acknowledged that its decision did not resolve whether Mr. Soehnlein continues to labor under actual or potential conflicts of interests that are waivable by defendant Gerace.  *Id.* at 18, n. 9.

Prior to rendering its decision, this Court commented regarding Mr. Soehnlein, ██████ ████████████████████████████████████████████████, and "[t]he government says it's a *per se* conflict, may well be right [regarding disqualification], *see* Tr. of

Proceedings, Dec. 14, 2023, at 6.  Consistent with its comments earlier in the litigation, in reaching its decision, this Court acknowledged that the question of whether there was a *per se* conflict requiring disqualification was a "close one," and further held "as a matter of first impression" that "an attorney is protected by the safe harbor provision if he or she has an objectively legitimate reason for making a strategic decision on behalf of a client regardless of whether there is a 'mixed motive' for that decision." *See* ECF No. 889 at 3 (n. 2), 24.  Indeed, the Court's decision acknowledged that the facts were complex and the decision whether there was a *per se* conflict was a close call.

In its April 25, 2024, decision, the Court indicated that it would "schedule a status conference to discuss the question of whether Soehnlein has a potential or lesser actual conflict that requires a full-blown Curcio hearing and, if necessary, will order further briefing on that question. Gerace, through counsel, has made clear his view that "[t]here is no conflict." Docket Item 771 at 33. **But the government has not yet had an opportunity to address whether there is still a conflict in light of this Court's analysis of the safe harbor provision**." *See* ECF No. 889 at n 9 (emphasis added).  Subsequently, during a status conference on May 1, 2024, the Court stated:

> So, there's a few things that we need to discuss. So first of all, in the Gerace case, now that I've made the decision on the disqualification motion, **I think I need to give the government a chance to comment on whether there's still a lesser actual or potential conflict** in light of my Safe Harbor analysis. Does the government want to take a position now, or do you want time to think about it and submit something? **I think I said in that decision in a footnote that I wanted to consider anything the government would have to say on that**.

Status Conf. Tran., at 3, (dated May 1, 2024) (emphases added); *see also* ECF No. 935.

On May 6, 2024, consistent with the Court's April 25, 2024, Decision and Order and comments made a status conference on May 1, 2024, *see* ECF Nos. 889, n.9; 903, the government filed a memorandum seeking to resolve any actual and potential conflicts that remain regarding Mr. Soehnlein's representation of Gerace.  *See* ECF No. 919.  In its filing, *see* ECF No. 919, which the Court later construed as a new motion to disqualify, the government explained that the Court should decline to accept a waiver because Mr. Soehnlein is a witness in Case No. 23-CR-99.  *See also* ECF No. 997.

### Q.   The U.S. Attorney for the Western District of New York Provides and Immunity Letter to Ethics Counsel and Mr. Soehnlein

On May 16, 2024, the U. S. Attorney for the Western District of New York, Trini E. Ross, sent a letter to ethics counsel for Mr. Soehnlein, which advised that in light of this Court's April 25, 2024, Decision and Order "that the USAO WDNY will not prosecute Mr. Soehnlein for any federal criminal offenses committed in the Western District of New York related to the alleged orchestrated recusal of Judge Sinatra in Case No. 19-CR-227, or the filing of allegedly false affidavits by attorney Steven M. Cohen in Case No. 19-CR-227, as referenced in Judge Vilardo's April 25, 2024, Decision and Order."  *See* **Exhibit A**, attached.

On May 17, 2024, U.S. Attorney Ross sent another letter to Mr. Soehnlein's ethics counsel, which stated: "In response to your email dated May 17, 2024, attached, and in accordance with the letter sent on May 16, 2024, there are no remaining investigations regarding Mr. Soehnlein."

Despite filing an 84 page opus attempting to relitigate virtually everything that has occurred in this complex case, the defendant omitted a very salient point—that notwithstanding the fact that the U.S. Attorney's Office interpreted the law vis-à-vis obstruction of justice and *Klein* conspiracy differently than the defendant, when it was presented with this Court's legal analysis and opinion in what this Court described as a matter of "first impression," *see* ECF No. 889 at 1, it provided letter immunity to Mr. Soehnlein.

**R.**    **The Defendant Files a Motion to Dismiss and Declines to Inform the Court that the U.S Attorney's Office for the Western District of New York Provided Mr. Soehnlein an Immunity Letter**

Defendant Gerace filed the instant motion to dismiss on or about May 23, 2024.[30]  The crux of the defendant's motion is that the case should be dismissed because the government moved to disqualify Mr. Soehnlein.  The defendant's motion relies heavily upon comments this Court made in its April 25, 2024, D&O to cobble together his weak argument—wholly devoid of actual evidence— that the government acted in bad faith.

The defense filed the instant motion six or seven days after Mr. Soehnlein received letter immunity, yet declined to advise this Court that, in response to this Court's analysis of the Safe Harbor, the U.S. Attorney conferred letter immunity and ended its investigation into Mr. Soehnlein.  Rather than accurately advise this Court of Mr. Soehnlein's current status, the defendant chose to ignore the fact that Mr. Soehnlein was immunized by the U.S. Attorney and to press forward and allege, 22 times over 84 pages, that the government acted in bad faith.  The defendant's motion is baseless and should be denied.

---

[30] The filing is dated May 22, 2024, but the transmittal of the filing was on May 23, 2024.

### III.   THE GOVERNING LAW

Where serious criminal conduct is involved, "dismissal of an indictment must be reserved for the truly extreme cases." *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979).   As the Court of Appeals for the Second Circuit has "repeatedly emphasized, the exercise of a court's supervisory authority to dismiss an indictment is a 'drastic remedy' that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (quoting *United States v. Brown*, 602 F.2d 1073, 1076 (2d Cir. 1979)).

The Sixth Amendment encompasses "the right to select and be represented by one's preferred attorney." *Wheat v. United States,* 486 U.S. 153, 159 (1988).   However, even where there is a Sixth Amendment violation, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *United States v. Morrison*, 449 U.S. 361, 365 (1981).   "A choice of counsel violation occurs whenever the defendant's choice-of-counsel is wrongfully denied." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006).

It is well-settled that a defendant's right to trial counsel of his choice is not an absolute one, *see United States v. Osterer*, 597 F.2d 337, 341 (2d Cir. 1979), and the defendant's choice may be limited where counsel is burdened by ethical conflicts.   "The right to the effective assistance of counsel also includes the right to be represented by an attorney who is free from conflicts of interest." *United States v. Perez,* 325 F.3d 115, 25 (2d Cir. 2003) (citing cases). "[W]hile a defendant generally may waive his Sixth Amendment right to an unconflicted attorney, 'the essential aim of the Sixth Amendment is to guarantee an effective advocate for

55

each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'" *Fulton*, 5 F.3d at 612  (quoting *Wheat*, 486 U.S. at 159). Courts must ensure that "criminal trials are conducted within the ethical standards of the [legal] profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160.  As the Supreme Court stated in *Wheat,* the court:

> must recognize a presumption in favor of a defendant's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of serious potential for conflict.  The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

486 U.S at 164.

The Second Circuit's decision in *Fulton,* requires the government to promptly disclose the existence of conflicts and admonished the government for not disclosing the conflict it discovered in a timely fashion.  *Id.* at 613.

The government's research has not revealed a single case that has been dismissed due to the government's filing of a *Curcio* motion or a motion to disqualify counsel for conflicts of interest in light of *Fulton* and its progeny.

## IV.   ARGUMENT

The defendant's motion to dismiss the joined indictments purportedly due to a violation of Gerace's Sixth Amendment right to counsel is not anchored in facts or reality. The defendant claims that (1) the "disqualification" of Joel Daniels; (2) the subpoena to procure evidence from Mr. Gerace's defense investigator; and (3) the "repeated" efforts to

disqualify Mr. Soehnlein merit dismissal of his case, or alternatively disqualification of the U.S . Attorney's Office.  The defendant's motion lacks merit.

Throughout the investigation and prosecution of this case, the defendant has consistently demonstrated a willingness and desire to retaliate against anyone involved in this matter—ranging from initiating civil lawsuits against witnesses, conspiring with others to retaliate and tamper with a government witness (*see* Case No. 23-CR-99), to making false and frivolous accusations against the government for pursuing its investigation and prosecution.[31] Consistent with the defendant's pattern and strategy of attacking the messengers of the facts, the defendant filed his motion to dismiss after the defendant filed complaints with virtually every local police department in the Buffalo area seeking to have the lead prosecutor investigated for prosecuting this case; issued complaints about the FBI, the lead prosecutor, and Judge Sinatra in lengthy submissions sent to various media outlets and to Chief Judge Wolford; and filed complaints about the lead prosecutor to the DOJ and elsewhere, in an effort to ostensibly deselect his prosecutor.  Much like Magistrate Judge Roemer's observation on October 27, 2021, that "you have no evidence of [animus] other than [the prosecution] is aggressively pursuing this case," *see* ECF No. 224 at 12: 8-10, the defendant's instant motion

---

[31] The defendant previously alleged that the indictment against him was sought and obtained relying on certain "unfounded ethnically charged stereotypes."  ECF No. 515-1 at 2.  The government responded, *see* ECF No. 556,the defendant replied, *see* ECF No. 557, and the motion was denied, *see* ECF Nos. 565, 657.  The defendant's former attorney also previously alleged that, "I think Mr. Tripi, you know, has some animus towards my client that I don't have any evidence to support the basis for the animus."  *See* ECF No. 224 at 12: 8-10 (Oral Argument, Oct. 27, 2021).  The Court responded: I'll tell you, I don't like when accusations are thrown around. You just said you have no evidence of that other than he is aggressively pursuing this case. And if he said the same thing about you, I would not to like hear it from him."  *Id.* at 12:11-17.

is not based upon any evidence, but rather a disagreement with the fact that the government initiated an investigation into fraudulent inducement of a federal judge's recusal, which triggered the government's obligations under *Curcio* and *Fulton.*

This Court should not permit the defendant to transform its April 25, 2024, D&O, wherein the Court rendered a decision based upon an unprecedented fact pattern in this District—in a what this Court admitted was a "matter of first impression" and "close" call—into what would be another unprecedented decision to dismiss a serious prosecution involving bribery of a DEA agent, drug trafficking, and sex trafficking merely because the government filed motions it was required to file under clear Second Circuit authority.  The government has been aggressively and righteously pursuing this case in good faith—nothing more, and nothing less.

In light of the detailed background set forth above, the defendant's instant motion— much like his diatribes to police agencies, the media, and anyone who will listen, and his prior motions to dismiss claiming the government had a bias against him because he is Italian— lacks merit and should be summarily rejected.

### A.    The Government's Motion to Conduct a *Curcio* Hearing as to Attorney Joel Daniels was Appropriate.

A foundational tenet of the defendant's motion is the notion that the government concocted a diabolical scheme to interfere with the defendant's Sixth Amendment choice of counsel, and that the genesis of its scheme began when the government moved to disqualify the attorney, Mr. Cambria, for a different defendant (Bongiovanni) years before the defendant

was ever charged.  As illogical as that sounds, it also ignores the fact that any first year law student could have spotted the problem with Mr. Cambria's law firm representing both the source of at least $250,000 in bribe payments to Bongiovanni, and codefendant Bongiovanni. When coupled with the reality that the government's motion to disqualify also raised the specter of a myriad of other actual and potential conflicts, and that Mr. Cambria in consultation with his client, codefendant Bongiovanni, chose to withdraw, it is clear that the foundation of defendant's motion is imagined.

Undeterred by reality, the defendant's motion conflates the obvious conflict issues with respect to Mr. Cambria's efforts to represent codefendant Bongiovanni as a substitute for evidence that the government orchestrated Mr. Daniels' disqualification.  However, for reasons also identified by the federal judge who used to preside over this case, as set forth above, the government filed a relatively routine *Curcio* motion after making efforts to clarify what ███████████ about Joel Daniels.



---

[32] Both the Court and counsel for the defendant have ██████ grand jury testimony.

After the defendant was indicted, Judge Sinatra flagged the conflict issue because he had access to ▮▮▮▮▮ grand jury transcript, and the government communicated with Judge Sinatra's chambers that it was addressing the conflict issues.  *See* Section II(D), *supra*.

On April 29, 2021, as detailed *supra*, the government discussed the matter with Mr. Daniels.  Thereafter, on May 17, 2021, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮   As a result, the government filed a *Curcio* motion and presented the facts it had developed to Judge Sinatra.

The manner in which the government proceeded as to information related to Mr. Daniels was wholly appropriate.  As described above, *see* Section II(D), *supra*, the government conducted its due diligence in an effort to clarify information with regard to Mr. Daniels, and thereafter filed a *Curcio* motion.  In its motion, the government expressly stated that it was not claiming that Mr. Daniels had a *per se* conflict ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮



After being apprised of the nature of the conflict, and upon consultation with *Curcio* counsel, the defendant made a deliberate decision to proceed with Mr. Cohen as his lead counsel and declined to waive any actual or potential conflict of interest related to Mr. Daniels's representation.  "[W]hile a defendant generally may waive his Sixth Amendment right to an unconflicted attorney, 'the essential aim of the Sixth Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'"  *Fulton*, 5 F.3d 605, 612  (quoting *Wheat*, 486 U.S. at 159).  The defendant also has a "correlative right to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

In sum, defendant Gerace chose to proceed with an attorney, Mr. Cohen, who was willing to sue witnesses in state court, say outrageous things to the media, *see* ECF No. 543 (Mot. for Gag Order), and seek to manipulate the media narrative surrounding Crystal Quinn's death, over Mr. Daniels.  The government's conduct, far from interfering with

defendant Gerace's choice, ensured that he was armed with the necessary information to make the strategic decision he desired to make regarding his counsel of choice.

Furthermore, it should not be lost on this Court that Gerace never raised his interference-with-counsel argument before Judge Sinatra, the judge who presided over the proceedings and was best situated to evaluate any interference.  Instead, as with multiple other issues in this case, he apparently saved that complaint until after he procured Judge Sinatra's recusal.

Finally, the defendant's pre-trial efforts to discredit ██████ are unavailing in the context of the government's obligations under *Fulton*.  Beginning with his state civil lawsuit, which was enjoined by Judge Sinatra and affirmed by the Second Circuit, the defendant has endeavored to discredit ██████.  At trial, ██████ may testify the defendant's campaign to discredit her is not unlike his efforts he made to disadvantage her by leveraging his law enforcement and judicial contacts.  Moreover, the government will argue that much of ██████ ██████ information has been corroborated, to varying degrees, by other witnesses or information.  Furthermore, to the extent there is the information that the defendant claims discredits her, virtually all such information is information that the government later acquired and produced to the defense as 3500 material or in compliance with its *Giglio* obligations.  At bottom, the defendant will have an opportunity to cross-examine and discredit ██████, if it can, at trial where it will be up to a jury to determine whether or to what extent to credit ██████ testimony.  *Green*, 399 U.S. at 158 (cross-examination is "the 'greatest legal engine ever invented for the discovery of truth.'" (citing 5 Wigmore s 1367)).

Accordingly, the Court should reject any notion that the government acted inappropriately with regard to the filing of a *Curcio* motion, and the defendant's motion to dismiss or to disqualify the USAO-WDNY should be denied.

**B.      The Grand Jury Subpoena Issued to ████████████ was Appropriate and Judicially Authorized.**[33]

The facts related to the issuance of the subpoena to ████████ are described in Section II(L), *supra*. The defendant claims that this Court should make a finding of bad faith and dismiss the indictment, which charges Gerace with very serious crimes, because the government did not obtain a crime-fraud order before it subpoenaed ███████. The defendant's motion lacks merit and should be rejected.

First, the government issued its subpoena during the midst of ongoing investigation into the death of a federal witness, Crystal Quinn. Cases of witness tampering and retaliation of federal witnesses are among the most serious crimes investigated and prosecuted in federal court as such crimes constitute a "threat to the integrity of the trial process." *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) (citation omitted).

---

[33] The government has complied with this Court's prior directive to provide Mr. Soehnlein with all information related to his conduct. Nevertheless, the grand jury investigation that led to the information about Mr. Soehnlein remains open as of this writing and, as such, Fed. R. Crim. P. 6(e) applies and as a result the government will not provide any more details than have been previously provided to Mr. Soehnlein, or information and argument in which counsel for defendant Gerace participated during the motion to quash, which was argued before Judge Arcara on November 8, 2023.

Second, at the time the government issued its subpoena, there was significant time sensitivity because Gerace's joint-trial with Bongiovanni was approaching. As a result, determining whether and to what extent Gerace was involved in Crystal Quinn's death was important to the integrity of the trial proceedings. *LaFontaine*, 210 F.3d at 134. In particular, determining whether Ms. Quinn was killed as a result of her status as a federal witness was highly relevant to a number of issues related to the trial, such as issues related to witness security, the potential need for juror security, and the Court's determination of ongoing litigation related to the Protective Order and timing of the disclosure of Protected Witness identities. Further, Gerace's involvement in Ms. Quinn's demise would potentially impact whether this Court would admit Ms. Quinn's prior grand jury testimony at trial. *See United States v. Dhinsa*, 243 F.3d 635, 652 (2d Cir. 2001) ("the law [will not] allow a person to take advantage of his own wrong[.]") (citations omitted).



Third, Mr. Cohen, who was defendant Gerace's attorney during the timeframe when ███████████ acquired statements from ██████████ and ██████████, expressly stated under oath that ████████████████████████████████████████████ ████████████████████████████████████████ *See* ECF No. 604-1 at ¶ 8 (emphasis added). In other words, Mr. Cohen, who was Gerace's only attorney at the time the affidavits at issue were acquired and submitted to this Court, affirmatively represented that the private investigator, ██████████, was not a member of the defense team.

Fourth, on November 7, 2023, Gerace, through his current defense team and joined by ██████████ attorney, filed a motion to quash the government's subpoena.  *See* 23-CV-1163-A (Mot. To Quash).  While the defendant's motion to quash averred that ██████ ██████ materials sought pursuant to the subpoena were covered by the attorney-client and attorney work-product doctrine, the defendant *never* explicitly stated in his motion to quash that ██████████ was attorney Cohen's agent at the time the affidavits were procured from Ms. Quinn's mother and roommate.  Further, the defendant's motion to quash *never* explicitly stated that Mr. Cohen's statements, namely that ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████ were false and inaccurate.[34]  However, Mr. Soehnlein, on behalf of the defendant, acknowledged that ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████  *See* 23-CV-1163-A (Affidavit of Mr. Soehnlein) at ¶23 (emphasis added).


Fifth, Judge Arcara conducted a hearing in which counsel for defendant Gerace and ██████████ participated.  Counsel for defendant Gerace and ██████████ made

---

[34] Despite having been on Gerace's defense team from February 24, 2023, until July 15, 2023, at most Mr. Soehnlein stated that it was his ████████████████████████████████ ████████████████████████████████████████████████████████████  *See* 23-CV-1163-A (Affidavit of Mr. Soehnlein) at ¶10.  Nevertheless, Mr. Soehnlein should have had personal knowledge as he was part of Gerace's defense team from ██████████ until July 15, 2023.  Mr. Soehnlein further represented that ████████████████ **without stating that was the situation in August 2023, when the affidavits at issue were obtained**.

arguments in support of their motion to quash, and Judge Arcara agreed with the government's legal analysis and denied the motion to quash.

### i.      Legal Framework-Denial of Defendant's Motion to Quash

As it relates to the investigation into Ms. Quinn's death, Judge Arcara, who has supervised the grand jury in this district for decades, considered the appropriate legal framework in denying the motion to quash.

A grand jury is "charged with the responsibility of determining whether or not a crime has been committed," *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991), and "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950).  *See United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423–24 (1983) (noting that a grand jury holds "broad powers" to collect evidence through judicially enforceable subpoenas).

In carrying out these responsibilities, a grand jury may "inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." *R. Enterprises, Inc.*, 498 U.S. at 297; *see also Branzburg v. Hayes*, 408 U.S. 665, 701 (1972) ("A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'" (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970))). Indeed, "*nowhere* is the public's claim to each person's evidence *stronger* than in the context of a valid grand jury subpoena." *In re Grand Jury Proceedings*, 219 F.3d 175, 186 (2d Cir. 2000)

(emphases added) (citation omitted). That is because "[w]ithout thorough and effective investigation, the grand jury would be unable either to ferret out crimes deserving of prosecution, or to screen out charges not warranting prosecution." *Sells Eng'g, Inc.*, 463 U.S. at 424. These fundamental goals of the criminal justice system are "accomplished *only* if the grand jury has access to the data it needs to decide whether it should return an indictment." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 186 (2d Cir. 2007).

For these reasons, the Second Circuit has cautioned that "privilege claims that shield information from a grand jury proceeding or a criminal trial are not to be 'expansively construed, for they are in derogation of the search for truth.'" *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 185 (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 384 (2004)). In the instant case, the government sought, at most, fact-work-product. But it was not the government's burden to prove the existence of any privilege. Rather, the obligation of "establishing [the privilege's] applicability" falls squarely on the shoulders of "[t]he party invoking" it. *Id.* And even if the party establishes the fact-work-product privilege, a grand jury is nevertheless "entitled" to the subpoenaed information "where the government shows that the grand jury has a 'substantial need' for the materials and that it has 'exhausted other means of obtaining the relevant information it seeks.'" *Id.* at 186 (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 192 (2d Cir. 2000)).

First, defendant Gerace failed to carry his burden in showing that the materials the grand jury subpoena seeks were privileged in the first instance. Second, even if the fact-work-product privilege applied, the government had a substantial need for the requested materials

and exhausted other means of obtaining them—███████████ was not going to provide the information voluntarily (as further evinced by the fact he obtained an attorney and attempted to quash the subpoena).   And third, though Gerace's counsel speculated otherwise, the predominate purpose of the instant grand jury investigation could not have been more legitimate: investigating crimes associated with the death of a federal witness who was scheduled to testify in an approaching trial.

Judge Arcara agreed with the government and denied the motion to quash as set forth in the following exchange with the attorneys for defendant Gerace and ███████████:







Finally, Gerace's suggestion that the government needed a crime-fraud order to review fact work product is plain wrong. Even assuming *arguendo* that recording was privileged, it was protected by the fact work product doctrine, "meaning that the privilege can be overcome if the government shows that the grand jury has a 'substantial need' for the [material] and that the government has 'exhausted other means of obtaining the relevant information.'" *In re Grand Jury Subpoenas Dated June 5, 2008*, 329 F. App'x 302, 303 (2d Cir. 2009) (unpublished) (quoting *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 185–86 (2d Cir. 2007)). As set forth above, the government briefed this very issue, and Judge Arcara ruled in favor of

the government.  Thus, Gerace's claim that the government should have proceeded by seeking a crime fraud order lacks merit.[35]  While the defendant never argued in his motion to quash that a crime-fraud order was required, and even though the claim lacks merit, as set forth above, an *ex parte* submission of a crime fraud order would have ended in the same result. Any motion to quash following a crime fraud order would have resulted in the same argument that was conducted before Judge Arcara on November 8, 2023, and would have ended with the same result—a directive for ███████████ to comply with the subpoena.[36, 37]

Accordingly, defense claims of bad faith related to the government's efforts to investigate the death of a witness, Ms. Quinn, who was scheduled to testify against Gerace, are baseless and should be rejected.

---

[35] ████████████████████████████████████████████████████████
████████████████████████████████████████████████

[36] Relatedly, months later, after the USAO-WDNY determined it would investigate the so-called "orchestrated recusal" of Judge Sinatra, AUSAs who were assigned to investigate Mr. Soehnlein sought a crime fraud order in an abundance of caution.  This Court did not grant or deny the application and, when the government raised the issue during oral argument on March 15, 2024, this Court stated regarding the government's application for a crime-fraud order: "I don't know why the government needs a decision. I mean, that seems to me to be more or less an advisory opinion that they're asking the Court for, and I'm not so sure I'm inclined to give an advisory opinion on this." Tr. of Oral Argument (dated Mar. 15, 2024) at 55:17-19.

[37] Gerace or ██████████ could have appealed Judge Arcara's order but did not.

**C.** **The United States Attorney's Office Has Conducted A Legitimate Investigation into the Orchestrated Recusal of United States District Court Judge John L. Sinatra, Jr., and the Motion to Disqualify Mr. Soehnlein is Legitimate.**

As one attorney in the Department of Justice stated after hearing a description of this case "the orchestrated recusal of a District Court Judge is nothing to be trifled with." The sentiment that it is improper to orchestrate the recusal of a federal judge under false pretenses should not be controversial. However, only through investigation and after the facts are fully developed can prosecutors determine whether the application of the facts to the law merits a prosecution, that is, whether there is legally sufficient evidence to establish probable cause that a crime was committed and that the offender committed it. After prosecutors determine probable cause exists, they then assess whether it is more likely than not that a jury will find an offender guilty beyond a reasonable doubt.

A prosecutor may convene a grand jury to " investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," *Morton Salt Co.*, 338 U.S. at 642-43. A grand jury holds "broad powers" to collect evidence through judicially enforceable subpoenas. *Sells Eng'g, Inc.*, 463 U.S. at 423–24. "The United States Attorney is part of the executive branch, and, as such, his official discretion is not subject to control by the judiciary at the instance of private persons. *Dacey v. Dorsey*, 568 F.2d 275, 277 (2d Cir. 1978). "The decision to investigate, like the decision to prosecute, is one which the Constitution places in the executive branch. The constitutional separation of powers prevents the courts from interfering with the exercise of prosecutorial discretion except under the rarest of circumstances." *LaRouche v. Webster*, 566 F. Supp. 415, 417 (S.D.N.Y. 1983). "Where the prosecutor can demonstrate reasonable cause to believe that criminal activity may have taken

place, it is not the function of the courts to review the wisdom of the prosecutor's decision to investigate, or to inquire into the prosecutor's motives." *Id.* at 418.

At the time the U.S. Attorney's Office made the decision to investigate the potential orchestrated recusal of Judge Sinatra and informed Chief Judge Wolford via letter that the government had recently come into possession of evidence which: (1) establishes probable cause to believe that a criminal conspiracy existed to orchestrate District Judge John L. Sinatra, Jr.'s recusal from *United States v. Joseph Bongiovanni and Peter Gerace, Jr.*, 19-CR-227, and that Mr. Soehnlein's conduct was within the scope of that investigation, the following facts, at a minimum, had been established in the following general chronology:

1. Judge Sinatra ruled against defendant Gerace and order him detained;

2. Mr. Cohen openly complained to the media about Judge Sinatra's fairness;

3. ████████████████████████████████████

   ████████████████████████████████████

   ████████████████████████

4. Mr. Cohen and Mr. Soehnlein knew directly from Judge Sinatra that he recused himself in that same murder case wherein Witness 171 was a prosecution witness;

5. Mr. Cohen and Mr. Soehnlein filed defendant Gerace's witness list, and the witness list had the names of two of Judge Sinatra's relatives, Witnesses 171 and 240, that triggered the recusal provisions of 28 U.S.C. § 455(b)(5)(iv);

6. Mr. Cohen in Mr. Soehnlein's presence represented to Judge Sinatra:

> [W]e're getting that from the material that the Government
> has turned over to us as part of its Jencks. **The Grand Jury
> testimony that we've been given access to brings those names
> up significantly**, and I've got the Grand Jury testimony of the
> various people who testified about the relationships.

> And as I said, **I didn't whip up these names out of thin air. I've
> got chapter and verse of where they came from**, so if - and
> you're right if you are suggesting, Judge, **this is a character case.
> That's all this case is is a character case**.

7.  In fact, Witness 171 was not mentioned in "[t]he Grand Jury testimony,"
    at all, much less "significantly";

8.  In fact, Witness 240 was not mentioned in "[t]he Grand Jury testimony"
    significantly;

9.  No materials provided by the government established any basis for claiming
    either 171 or 240 would be character witnesses for defendant Gerace;

10. Judge Sinatra characterized the placement of the names of the witness list
    as "gamesmanship" and/or a "tactic of some sort";

11. Mr. Cohen defended the tactical decision to the media by stating:

> We don't know until the government puts on their case why they
> brought up these names. . . . So we are reserving our right to call
> them, and let's see how the case fleshes out. That's it.

12. Mr. Soehnlein defended the tactical decision to the media by stating:

> We don't have to pick a way to defend [Gerace] until we see the
> government's proof.  That's fair to us. . . . And one very
> plausible, very likely way to defend this case involves testimony
> from those individuals.  Because they're going to be talking about
> Mr. Gerace in connection to circumstances that are very close to
> the allegations of the government's case.  And so we have
> reserved the right to put on that kind of case. It's our duty to
> reserve that right.

13. Five days later, on June 26, 2023, Mr. Soehnlein filed a motion to withdraw and cited ethical rules, among others, related to attorney withdrawal in situations when the lawyer knows or reasonably should know that the representation will result in a violation of these [ethics] Rules or of law;

14. Gerace sought release and for reconsideration of detention after obtaining a new judge.

15. On November 9, 2023, the government reviewed a recording it obtained, wherein it learned ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████

Given the above facts, there is no question that there was sufficient information to trigger a criminal investigation into whether a conspiracy existed to orchestrate the recusal of Judge Sinatra so that Gerace could obtain a judge more to the defendant's liking. There was ample circumstantial evidence from which to infer motive, and there was direct evidence— the words ████████████ on recording— ████████████████████████████ ████████████████████████████████████████████████████.

In other words, there was evidence from which prosecutors, and potentially a grand jury, could infer there was a conspiracy to obstruct justice or defraud the United States.

### i. The Legal Framework- Obstruction of Justice and Klein Conspiracy

Applying the facts to the applicable legal framework underscores that the investigation that triggered Mr. Soehnlein's status as a subject or target was legitimate, and done in good faith.

"If two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371.  This language is the second clause (or "defraud prong") of the federal conspiracy statute that creates criminal liability for anyone who conspires "either to commit any offense against the United States, or to defraud the United States . . . ."  Pursuant to *United States v. Klein*, 247 F.2d 908, 921 (2d Cir. 1957), a so-called "*Klein* Conspiracy" is an agreement to defraud the United States by interfering or obstructing lawful government functions through "deceit, craft or trickery, [and] by means that are dishonest." *United States v. Caldwell*, 989 F.2d 1056, 1058 (9th Cir. 1993).

The elements require: (1) the defendant entered into an agreement, (2) to obstruct a lawful function of the Government, (3) by deceitful or dishonest means, and (4) committed at least one overt act in furtherance of the conspiracy. *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996).  A conspiracy to defraud charge is not unconstitutionally vague when the indictment alleges with particularity "the essential nature of the alleged fraud" and identifies the specific conduct which furthered the conspiracy. *United States v. Cueto*, 151 F.3d 620, 636 (7th Cir. 1998); *United States v. Helmsley*, 941 F.2d 71, 90-91 (2d Cir. 1991) ("What is required is only that an indictment charging a defraud clause conspiracy set forth with precision 'the essential nature of the alleged fraud.' ").  The meaning of "conspiracy to defraud" is framed in general terms; it is impossible for Congress to anticipate, identify, and define each and

every context in which an agreement to act would qualify as a conspiracy to defraud. *Cueto*, 151 F.3d at 635.

The statute places no condition on the method used to defraud the United States, and it reaches any "interference or obstruction of a lawful governmental function 'by deceit, craft or treachery or at least by means that are dishonest.' " *United States v. Collins*, 78 F. 3d 1021, 1037 (6th Cir. 1996). The statute encompasses "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of the government," and, importantly, "neither the conspiracy's goal nor the means used to achieve it need to be independently illegal." *Cueto*, 151 F.3d at 635.

A *Klein* conspiracy can apply to any federal agency or district court. *United States v. Rankin*, 870 F.2d 109, 113-14 (3d Cir. 1989) (U.S. District Court). The Government must prove that the conspirators intended to harm the Federal Government, which can be established through circumstantial evidence. *United States v. Whiteford*, 676 F.3d 348, 359 (3d Cir. 2012). A defendant may use a third party to reach and defraud the Government. *See United States v. Tanner*, 483 U.S. 107, 132 (1987).

Applied to the relevant fact pattern, it was reasonable for prosecutors to investigate whether overt acts in such a conspiracy could include, among others: ████████████ ████████████████████████████████████████████████████ ████████████████████ (ii) filing a witness list designed to trigger a mandatory recusal statute (before a pending motion to reconsider release was decided); (iii) making false,

fraudulent, and misleading statements about the basis of calling individuals listed on a witness list; (iv) "firing" an attorney to orchestrate an adjournment of a trial (thereby preventing a particular witness who was later murdered from testifying); (v) making false, fraudulent, and misleading statement in court regarding the cause of death of a federal witness in the context of continuing to seek release conditions; (vi) obtaining and falsifying false, fraudulent, and misleading affidavits in further support of the motion for release; (vi) continuing to proffer the death of the witness (while failing to withdraw the false affidavits) in support of a motion for the defendant's release before the newly assigned judge.

Individuals remain in a criminal conspiracy until they withdraw, or the objectives of the conspiracy have been achieved.  The Second Circuit has stated, that "(1) resignation from the enterprise does not, in and of itself, constitute withdrawal from a conspiracy as a matter of law; (2) total severing of ties with the enterprise may constitute withdrawal from the conspiracy; however (3) even if the defendant completely severs his or her ties with the enterprise, the defendant still may remain a part of the conspiracy if he or she continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations."  *United States v. Berger*, 224 F.3d 107, 119 (2d Cir. 2000).

While the declarant and a defendant must be members of the conspiracy, statements made during the course and in furtherance of a conspiracy simply "must be such as to prompt the listener ... to respond in a way that promotes or facilitates the carrying out of a criminal activity." *United States v. Maldonado–Rivera,* 922 F.2d 934, 958 (2d Cir.1990). Indeed, a statement is made in furtherance of a conspiracy if "designed to promote or facilitate

achievement of the goals of that conspiracy." *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996). A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy. *United States v. Green*, 887 F.2d 25, 27–28 (1st Cir. 1989)(coconspirator's statement to shooting victim admissible against co-defendant under Rule 801(d)(2)(E)); *see United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) (a statement need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E) because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement."). Alternatively, statements designed to recruit individuals to a conspiracy are also coconspirator statements. *United States v. Johnson*, 469 F. Supp. 3d 193, 216 (S.D.N.Y. 2019)(collecting cases).

Related, yet distinct from the above-described *Klein* conspiracy, obstruction of justice requires the government prove that the defendant had a specific intent to obstruct or impede a pending judicial proceeding. The elements are: (1) that there was a pending judicial proceeding, (2) that the defendant knew this proceeding was pending, and (3) that the defendant then corruptly endeavored to influence, obstruct, or impede the due administration of justice. There must be a "nexus" relationship in time, causation, or logic with the judicial proceedings so that the proscribed endeavor "must have the 'natural and probable effect' of interfering with the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995) There is no requirement that the defendant's endeavors succeed or even that they were capable of succeeding (as long as the accused was unaware of the futility of his efforts to obstruct). *United States v. Tackett*, 113 F.3d 603, 611 (6th Cir. 1997). Conspiracy to violate §1503 can also be prosecuted under the general conspiracy statute, 18 U.S.C. 371. *United States v. Bruno*, 383 F.3d 65, 87-88 (2d Cir. 2004).

In *Rankin*, a case that involved the district court's dismissal of indictment alleging a *Klein* conspiracy wherein the defendant filed false affidavit to secure federal judge's recusal, the defense argued that as a matter of law, the giving of false testimony, by affidavit or otherwise, cannot alone constitute obstruction of justice in violation of § 1503.  870 F.2d 109, 111 (3d Cir. 1989).  The Third Circuit disagreed and stated the indictment charging 18 USC 1503 "conform[ed] with both Rule 7(c) and the Constitution," *id.* at 112, and as to the charged *Klein* conspiracy under 18 USC 371, stated, "We do not understand the defendants to contend that one cannot conspire 'to defraud the United States' within the meaning of § 371 by agreeing to impede the functioning of a district court, *id.*" at 114.  In other words, orchestrating a recusal satisfied the elements of both 18 USC §§ 1503 and 371.

Finally, to the extent that conduct stemming from the Ms. Quinn's death investigation and the potential orchestrated recusal that was uncovered also encompass false statements within the meaning of 18 U.S.C. § 1001, the Supreme Court in *Hubbard v. United States*, 514 U.S. 695, 714 (1995), has essentially sanctioned the Department of Justice's use of statutes other that § 1001 to deter litigation related misconduct.  Specifically, the Supreme Court stated, "In view of the extensive array of statutes that already exist to penalize false statements within the Judicial Branch, *see, e.g.*, 18 U.S.C. § 1621 (perjury); § 1623 (false declarations before grand jury or court); § 1503 (obstruction of justice); § 287 (false claims against the United States), we doubt that prosecutors have relied on § 1001 as an important means of deterring and punishing litigation-related misconduct.  But we need not speculate, for we have direct evidence on this point. The United States Attorneys' Manual states quite plainly that '[p]rosecutions should not be brought under 18 U.S.C. § 1001 for false statements submitted in federal court proceedings'; it instead directs prosecutors to proceed under the perjury or

obstruction of justice statutes. U.S. Dept. of Justice, United States Attorneys' Manual ¶ 9-69.267 (1992).  Clearer evidence of nonreliance can scarcely be imagined." *Id.*

Based upon the foregoing, the extraordinary facts of the "orchestrated recusal" appeared to fit the elements of both a *Klein* conspiracy, and of obstruction of justice under 18 U.S.C. § 1503.  At a minimum, it should be obvious that there was a sufficient factual predicate for the Executive Branch to exercise its discretion *to investigate* potentially unprecedented efforts in the Western District of New York to orchestrate the recusal of a federal judge.

The government acknowledges that this Court's analyzed the Safe Harbor provision and concluded that there was no reasonable possibility that Mr. Soehnlein committed a crime related to the orchestrated recusal of Judge Sinatra.  This Court's also acknowledged that its decision was a "matter of first impression," *see* ECF No. 889 at 1, and that the question whether Mr. Soehnlein labored under a *per se* was a "close one," *see id.* at (n. 2).

The Court's analysis and conclusion, after months of briefing and deliberation, is not incongruent with the conclusion that prosecutors were analyzing unprecedented facts, during a dynamic situation during which time they were also investigating the potential murder of a federal witness and preparing for a lengthy trial, in good faith.  Indeed, there is no evidence of bad faith because no bad faith existed.  Simply put, the Executive Branch made a reasonable and sufficiently predicated decision (even if it was unpopular with this Court or amongst the

local federal defense bar)[38] to investigate extraordinary and seemingly unprecedented conduct that resulted in the recusal of a federal judge.  Once the investigation commenced, prosecutors were duty bound to raise the *per se* conflict with this Court under *Fulton* and its progeny—a fact this Court has acknowledged several times.[39]

---

[38] *See* Lakamp, Patrick, *"Judge orders separate trials for ex-DEA agent, strip club owner*," The Buffalo News (Jan. 4, 2023) (quoting a member of the local federal defense bar as saying, in part: "Eric is a rising star. […] they are clearly going after the wrong guy here. […] If this defendant was as bad as they claim, then the government should try its case instead of bringing these other issues up now and causing more delay.  The public is smart enough to see through all of the subterfuge.").  The decisions made by the Executive Branch prosecutors whether to investigate are not based upon the popularity, likability, or lack thereof of the individuals whose conduct falls within the scope of an investigation.

[39] To the extent that, on March 15, 2024, the Court made critical comments regarding the fact that the government's briefing did not identify the Safe Harbor provision, the government acknowledged candidly that it missed it in its briefing.  *See* Tr. of Proceedings (March 15, 2024) at 8:25.  However, as to the relevance of § 1515(c) to the government's motion for disqualification, the government notes that not a single case citing the Second Circuit's decision in *Fulton* cites § 1515(c), even though several concern disqualification motions for attorneys implicated in a client's obstruction.  *See, e.g.*, *United States v. Elder*, 311 F. Supp. 589, 595–96 (E.D.N.Y 2018) (no mention of § 1515(c) in disqualification matter regarding attorney alleged to have helped client avoid arrest); *United States v. Napoli*, No. 10-CR-150(JG), 2010 WL 1687669, at *3 (E.D.N.Y. Apr. 27, 2010) (no mention of § 1515(c) in disqualification matter regarding attorney who told witness "that he had a legal right to refuse to speak to law enforcement" alongside client who admonished witness not to talk with law enforcement); *id.* (rejecting also proposition that government's allegations must be "proved" at the disqualification stage "to the satisfaction of a jury"); *United States v. Benacquista*, No. 08CR94A, 2008 WL 2371478, at *4 (W.D.N.Y. June 9, 2008) (no mention of § 1515(c) in disqualification matter regarding attorney who allegedly transmitted documents advancing a conspiracy to defraud the United States).  In a similar vein, not a single case citing to the Supreme Court's seminal decision on conflicts of interest, *Wheat v. United States*, 486 U.S. 153 (1988), cites to § 1515(c).  Moreover, as the government's April 22nd Letter to the Court explained, not a single court ever citing to § 1515(c) adopted the interpretation of the statute that this Court did in its D&O.  Thus, that § 1515(c) was overlooked for the proposition that the Court ultimately embraced stems directly from the paucity of caselaw interpretating § 1515(c) in a comparable fashion.

As this Court acknowledged, the decision it rendered was a matter of first impression. Nevertheless, the government's decision to initiate an investigation into the potential orchestrated recusal of a federal judge was warranted, and done in good faith, even if this Court's analysis of the Safe Harbor provision concluded that there was no reasonable possibility that Mr. Soehnlein committed a crime in connection with his role in filing Gerace's witness list.[40]


### D.    Disqualification of the United States Attorney's Office, and any other Sanctions, is Unwarranted.

This Court's decision regarding the Safe Harbor provision does not preclude a finding that Gerace used others to orchestrate Judge Sinatra's recusal.  Thus, if this Court were to grant defendant Gerace's motion to disqualify the United States Attorneys Office for the Western District of New York or any of its prosecutors, it would effectively mean that defendant Gerace has engaged in tactics and strategy effectively vetoing both his assigned federal judge and the prosecutors assigned to his case.  The idea that a criminal defendant could manipulate and maneuver the system to veto both his assigned federal judge and the prosecutors on his case at should give this Court every bit the same chill as it had when

---

[40] Finally, the defendant avers that an FBI agent intentionally called Mr. Soehnlein in order to persuade him to speak with prosecutors.  The accusation is untrue.  First, the FBI agent and Mr. Soehnlein live in the same town and have personal connections.  Second, during the phone call at issue, the FBI agent was attempting to call another FBI Agent, first name "Eric" and last name beginning with an "S."  The FBI agent has advised the undersigned that he has accidentally called Mr. Soehnlein in the past while attempting to call his fellow agent.  Third, when the agent heard Mr. Soehnlein's voice, the agent was surprised, but it was Mr. Soehnlein who asked "[Agent] am I okay?"  The agent responded, in sum and substance, that is between you and the prosecutors.  It is shocking that the defense has endeavored to spin this call into something it was not.

it discussed the idea that defense attorneys could potentially be prosecuted for placing names on a witness list and lying about their materiality.

While the defendant's motion is devoid of any legal authority supporting his request to disqualify,[41] "[a]n entire U.S. Attorney's Office should only be disqualified, if ever, when special circumstances demonstrate the interest of justice could only be advanced by this drastic remedy." *United States v. Basciano*, 763 F. Supp. 2d 303, 314 (E.D.N.Y. 2011).  Based on the undersigned's research it appears that, "'[e]very circuit that has considered the disqualification of an entire United States Attorney's office has reversed the disqualification.' " *Id.* at 313 (quoting *United States v. Bolden*, 353 F.3d 870, 879 (10th Cir. 2003)).  Consistent with Magistrate Judge Roemer's observation that there was no evidence of animus by prosecutors, *see* ECF No. 224 at 12: 11-17 ("I'll tell you, I don't like when accusations are thrown around.  You just said you have no evidence of that other than he is aggressively pursuing this case."), prosecutors here have no more than "the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984).  Indeed, it would be baseless to disqualify any members of the U.S. Attorney's Office particularly where the defendant has feigned a desire for a speedy trial and "substitution would often disqualify the prosecutor most familiar with the case and require duplicative work by a substitute prosecutor, a substantial hardship in a major case." *United States v. Johnston*, 690 F.2d 638, 645 (7th Cir. 1982).

---

[41] The defendant's citation to *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) is inapposite.  That case involved improper comments and misrepresentations a prosecutor made during a state trial in Ohio.

In light of the foregoing, the defendant's motion to disqualify, and for any other sanctions, should be denied.

## V.     CROSS-MOTION FOR DISCLOSURE OF MR. SOEHNLEIN'S EX PARTE AND SEALED AFFIDAVIT AND MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO WITHDRAW

In its motion seeking to resolve actual and potential conflicts of interest, *see* ECF No. 919 at 5-7, the government requested access, in full or appropriately redacted form, to Mr. Soehnlein's affidavit and memorandum of law in support of his motion to withdraw, *see* ECF No. 541, as counsel for defendant Gerace.  As set forth above, the defendant has alleging bad faith by the government for moving to disqualify Mr. Soehnlein despite that fact that Mr. Soehnlein promptly moved to withdraw after he identified ethical issues in the immediate aftermath of Judge Sinatra's recusal.  It is astounding that on the one hand, Mr. Soehnlein believed that New York's ethical rules required or permitted him to withdraw in the aftermath of Judge Sinatra's forced recusal, and on the other hand defendant Gerace accuses the government of bad faith after it unearthed more information that added context to the timeframe leading up to Mr. Soehnlein's withdrawal.  Mr. Soehnlein's affidavit is also undoubtedly relevant to the actual and potential conflict issues presently being litigated.  *See* ECF Nos. 919, 973, 997.

Specifically, as detailed above, just five days after Judge Sinatra recused himself, Mr. Soehnlein filed a motion to withdraw citing ethical rules that required, or at least permitted, Mr. Soehnlein to withdraw, in part, because Mr. Soehnlein knew or reasonably should know that the representation will result in a violation of ethical rules or the law.  *See* ECF No. 541 at at 5-6.  In addition to the fact that Mr. Soehnlein's affidavit will likely significantly

undermine the arguments Gerace has cobbled together in support of his motion to dismiss, knowing what Mr. Soehnlein said about his ethical obligations, and why he felt he was no longer ethically able to represent defendant Gerace will provide critical insight into the actual and potential conflicts that were not extinguished by this Court's April 25, 2024, Decision and Order.

Access and disclosure of the requested documents is consistent with the Court's initial treatment of the government's investigative information pertaining to the "orchestrated recusal" issue. *See* ECF No. 919 at n.4. Mr. Soehnlein's affidavit and memorandum of law are judicial documents to which there is a strong presumption in favor of access and disclosure. *Lugosch v. Pyramid Co., of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006) (documents filed in relation to a motion are judicial documents to which a presumption of public access attaches); *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) ("A document is thus 'relevant to the performance of the judicial function' if it would reasonably have the *tendency* to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision."). Moreover, because the government could not predict the future, it consented to the Court's *ex parte* acceptance of Mr. Soehnlein's sealed affidavit and memorandum of law and, as a result, the Court never balanced any competing interests regarding the *ex parte* nature of Mr. Soehnlein's sealed affidavit and memorandum of law. *Compare with United States v. Gerace*, No. 21-2419, 2023 WL 3243477, at *3 (2d Cir. May 4, 2023) (citing *Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 670 (2d Cir. 1983) ("Although in

camera submissions of affidavits are not to be routinely accepted, an exception to this general rule may be made where an ongoing interest in grand jury secrecy is at stake.")).

Now, the landscape has changed considerably and the documents are highly relevant to hotly contested conflict issues.  *See* ECF No. 889 at 18 ("[T]his Court finds that *even if there is a conflict—actual or potential—in Soehnlein's continued representation of Gerace*, it is not an unwaivable per se conflict.") (emphasis added).  Undoubtedly, the documents sought by the government are highly relevant given the facts and circumstances that have developed since Mr. Soehnlein re-entered the case on September 6, 2023.

The government's position, *see* ECF Nos. 919 and 997, that this Court should decline to accept a waiver from Gerace is bolstered by the obscurity surrounding Mr. Soehnlein's stated reasons for exiting the case, and his conclusory assurances that "all issues are resolved" upon reentering the case.  At best, it is unclear whether or not even defendant Gerace knows *precisely* what Mr. Soehnlein alleged to this Court in his *ex parte* and sealed affidavit and memorandum of law in support of his motion to withdraw.  *See* ECF No. 541-1 at ¶7 ("I am submitting an ex parte declaration and memorandum of law **to the Court** in order to provide additional information.") (emphasis added).   "Before a defendant can waive his attorney's conflict, he must be advised of the conflict's significant strategic consequences."  *United States v. Arrington*, 941 F.3d 24, 42 (2d Cir. 2019).  In this regard, it is inconceivable for a defendant to waive, or a Court to accept a waiver, of a conflict where the record is bereft of information disclosing to the defendant the precise nature, scope, and extent of how the defendant and his attorney's interests have diverged during the course of the representation.

"An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002) (internal quotation marks and citation omitted). Unquestionably, Mr. Soehnlein and the defendant's interests diverged in this case when Mr. Soehnlein made his motion to withdraw. In his motion, Mr. Soehnlein acknowledged that he "reviewed the New York State Rules of Professional Conduct Rule 1.16(b)-(e) and the other relevant Federal Rules of Criminal and Civil Procedure as well as the applicable Local Rules," and "[b]ased upon that review, I believe that good cause exists for my withdrawal." *See* ECF No. 541 at 2. Specifically, Mr. Soehnlein cited New York State Rules of Professional Conduct Rule 1.16(b), which provides, in part, "a lawyer shall withdraw from the representation of a client when: (b)(1) the lawyer knows or reasonably should know that the representation will result in a violation of these Rules or of law; or [...] (b)(4) the lawyer knows or reasonably should know that the client is bringing the legal action, conducting the defense, or asserting a position in the matter, or is otherwise having steps taken, merely for the purpose of harassing or maliciously injuring any person." The defendant's motion to dismiss completely ignores these critical facts.[42]

---

[42] On April 25, 2024, the Court acknowledged that "the government has not yet had an opportunity to address whether there is still a conflict in light of this Court's analysis of the safe harbor provision." *See* ECF No. 889 at n. 9. On May 1, 2024, the Court invited the government to brief its position regarding actual or potential conflicts of interest. *See* Status Conf. Tran., at 3, (dated May 1, 2024) ("So first of all, in the Gerace case, now that I've made the decision on the disqualification motion, I think I need to give the government a chance to comment on whether there's still a lesser actual or potential conflict in light of my Safe Harbor analysis."). On May 6, 2024, the government requested access to Mr. Soehnlein's *ex parte* and sealed affidavit and memorandum of law. *See* ECF No. 919 at n. 4. On May 22, 2024, defendant Gerace filed an 84-page screed in opposition to the government's motion and did

Under the circumstances, and considering the facts that have been illuminated since the Court granted Mr. Soehnlein's motion to withdraw, access and disclosure is necessary. Accordingly, in light of the foregoing and the defendant's lack express opposition to the government's request for disclosure, the Court should disclose to the government Mr. Soehnlein's *ex parte* and sealed affidavit and memorandum of law in support of his motion to withdraw.

## CONCLUSION[43]

The Court should deny the defendant's motion in its entirety and grant the government's cross-motion for disclosure.


DATED:  Buffalo, New York, June 7, 2024.


TRINI E. ROSS
United States Attorney


BY:   s/JOSEPH M. TRIPI
s/NICHOLAS T. COOPER
s/CASEY L. CHALBECK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5839
Joseph.Tripi@usdoj.gov

---

not muster a single sentence in opposition to the government's request for access and disclosure, or in support of continued sealing.

[43] Consistent with the practice in this case, the government intends to file a redacted version of this response in opposition on the public docket, with an unredacted version to be filed under seal.

Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Western District of New York*

| | |
|---|---|
| *Federal Center* | *716/843-5700* |
| *138 Delaware Avenue* | *fax 716/551-3052* |
| *Buffalo, New York 14202* | *Writer's Telephone:  716/843-5700* |

May 16, 2024

<u>VIA EMAIL</u>

Rodney O. Personius, Esq.
Personius Melber LLP
2100 Main Place Tower
Buffalo, NY  14202
(716)  855-1050 x101

      RE:    Investigation of Eric M. Soehnlein

Dear Mr. Personius:

      This letter is intended to update your client, Eric M. Soehnlein, Esq., regarding his status in the investigation conducted by the United States Attorney's Office for the Western District of New York ("USAO WDNY") into the events which caused the recusal of the Honorable John L. Sinatra ("Judge Sinatra") in *United States v. Joseph Bongiovanni and Peter Gerace Jr.,* Case Nos. 19-CR-227 and 23-CR-37, and the submission of allegedly false affidavits by attorney Steven M. Cohen as attachments to defendant Gerace's Reply Memorandum in Further Support of Defendant's Motion to Release. *See* Doc. No. 604.[1]

      As you are aware, the government moved to disqualify Mr. Soehnlein from continuing to represent Mr. Gerace due to a *per se* conflict of interest.  The *per se* conflict of interest issue was briefed and argued extensively by the parties and, on April 25, 2024, the Honorable Lawrence J. Vilardo ("Judge Vilardo") issued a Decision and Order ("Decision and Order") denying the government's motion.  *See* Doc. No. 889.  In particular, the Court ruled that Mr. Soehnlein does not have a *per se* conflict of interest because: (1) there is "no reasonable possibility" that Mr. Soehnlein committed a crime when he put two names on a witness list that required Judge Sinatra to recuse himself; and (2) Mr. Soehnlein is not a witness to the procurement of the allegedly false affidavits related to Crystal Quinn's death.  *Id.*

      Although the government does not agree with the determinations reached by Judge Vilardo, in light of the Decision and Order, be advised that the USAO WDNY will not prosecute Mr. Soehnlein for any federal criminal offenses committed in the Western District

---

[1]  All docket citations herein relate to the docket entries in Case No. 19-CR-227.

of New York related to the alleged orchestrated recusal of Judge Sinatra in Case No. 19-CR-227, or the filing of allegedly false affidavits by attorney Steven M. Cohen in Case No. 19-CR-227, as referenced in Judge Vilardo's April 25, 2024, Decision and Order.

Very truly yours,

TRINI E. ROSS
United States Attorney

TER/lr