UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

   - vs. -                                      Case No. 19-CR-227-LJV

JOSEPH BONGIOVANNI,

        *Defendant.*
_____

### DEFENDANT JOSEPH BONGIOVANNI'S
### RETRIAL MOTIONS IN *LIMINE*

Defendant Joseph Bongiovanni, by and through undersigned counsel, hereby moves in *limine* for various relief in anticipation of the retrial on the Second Superseding Indictment's remaining counts. General familiarity with the facts underlying these motions is presumed from the Court's handling of Mr. Bongiovanni's first trial; details are set forth as necessary to discuss the issues.

### I.  Motion to Exclude Evidence of Certain Topics

Mr. Bongiovanni moved in *limine* in advance of his first trial to exclude evidence of certain broad topics at trial. He now renews, supplements and adds to those motions based on an understanding of how the evidence was presented in the context of the first trial.

#### A.  Judge Michalski Evidence

The jury in Mr. Bongiovanni's first trial heard evidence about New York State Supreme Court Justice John Michalski, including from witness Katrina Nigro that he allegedly presided over a sham marriage to Peter Gerace, Jr. and that he

was present at Pharoah's Gentlemen's Club ("PGC"). This evidence should be excluded as irrelevant, misleading and prejudicial.

The evidence about Judge Michalski comprised such a small amount of the total evidence at trial that its probative value, if anything, was extremely limited. The government appears to have been attempting to tell a story that Michalski was an important person with whom Gerace associated and who may have participated in illegal activity at PGC. However, Mr. Bongiovanni faces a retrial on counts of bribery and a narcotics conspiracy as it concerns his alleged protection of Gerace. None of those counts link to the evidence the jury heard about Michalski: no evidence was adduced that Bongiovanni had any knowledge of, or dealings with, Gerace's allegedly sham marriage to Nigro, or with Michalski directly.

If admitted at the retrial, this evidence does nothing to make any fact of consequence more or less probable that it would be without the evidence. *See* FED. R. EVID. 401. This evidence is also prejudicial and misleading because it does nothing other than sensationalize the activity surrounding Gerace without any defined connection to Bongiovanni, and it draws the jury's attention away from the heart of any alleged narcotics conspiracy. *See* FED. R. EVID. 403. Accordingly, the Court should preclude testimony about Judge Michalski in the retrial.

B.    **Matthew Albert Evidence**

The jury at Mr. Bongiovanni's first trial heard evidence from Attorney Matthew Albert regarding drug use/distribution connected to Gerace, as well as that Albert engaged in (or attempted to engage in) a sex act with a woman from

PGC off-site at a hotel as compensation or reward for his successful representation of Katrina Nigro in a criminal case. While the first category of evidence (drug use/distribution) is unquestionably relevant, the second is not. Overt Act 36 of Count 2 of the Second Superseding Indictment alleges that Gerace maintained PGC to facilitate prostitution, ECF No. 89 at 26, but the incident to which Albert testified did not even occur at PGC. The act further lacked a connection to drug use and/or distribution such that it could be said the sexual activity was part and parcel of an alleged scheme to further a narcotics conspiracy (i.e., the woman was provided drugs as compensation to engage in a sexual act with Albert). Rather, as it was told, the act was a reward or compensation for legal services unconnected to PGC. Accordingly, this evidence should be precluded as irrelevant.

### C.    Joseph Bella Evidence

The jury at Mr. Bongiovanni's first trial heard evidence about an individual named Joseph Bella, who was portrayed as being associated with Italian Organized Crime ("IOC"). A bartender named Nancy Standish testified that she observed Bella and Bongiovanni at the same end of a bar she worked at many years ago. DEA Special Agent Anthony Casullo and HSI Special Agent Thomas Mozg testified about a debriefing meeting Mr. Bongiovanni attended in 2016 wherein information from HSI was shared with DEA about potential targets, including Joseph Bella.[1] Summary evidence was admitted showing Bella's phone number in various

---

[1] Mozg testified that Bongiovanni's reaction to the information was hostile and off-putting; Casullo testified that he recalled nothing out of the ordinary occurring.

-2-

individuals' phones. Bella, as we now know from the presentation of evidence, is connected to the indictment via Overt Act ¶ 52 of Count 1 (the conspiracy to defraud count pertaining to the Ronald Serio Drug Trafficking Organization). *See* ECF No. 89 at 16.

At best, Bella was simply presented as someone with whom Mr. Bongiovanni might have had limited bar-related interactions in the distant past, someone whom the FBI believed was associated with IOC because of pictures and contacts contained on his cell phone, and someone whose name was raised in Mr. Bongiovanni's presence at one meeting. But if the government's theory was that Mr. Bongiovanni's allegedly aggressive reaction to Agent Mozg's presentation of information was Bongiovanni's attempt to dissuade investigation (and thereby defraud the government in Count 1), the evidence on that point was contradictory and slim: the person with whom Bongiovanni undoubtedly had the most acrimonious relationship at DEA, SA Casullo, testified to a different version of that same meeting:

> "[Agent Mozg] had a chart. He had a lot of good information. *But my opinion was, and Joe's as well*, was that there was an informant that we could utilize at the time that they already had to make a quick entry into the investigation, like purchase narcotics, do undercover meetings. It was intelligence based. It was a lot of information. It was a chart. But at the end of the day, we had just either finished that wire, and were cleaning up that case, and we're still busy from the wire. *We didn't really brush [Agent Mozg] off, but it was our opinion that it was good intelligence, but nothing that we were—could act on at that time.*"

Tr. of Anthony Casullo at 24:15-25 (3/21/24) (emphasis added).

Given that limited proof, the Court should not permit evidence about Joseph Bella in the retrial. The government's proof the first time around could not even conclusively establish that Mr. Bongiovanni did anything illegal in relation to Bella, and it certainly did not establish that Bella was under the mantle of protection that Serio sought to extend. In fact, there is no evidence that Bella had any connection to Serio or the Serio DTO *at all*. Thus, evidence about Joseph Bella is irrelevant and misleading because it invites the jury to improperly make a connection where none exists.

In other words, where a charge of conspiracy requires Mr. Bongiovanni to enter into an agreement with another person, and (1) Joseph Bella is never meaningfully connected to anyone in the Ronald Serio Drug Trafficking Organization, and (2) it is not even established by the government's own witnesses that Mr. Bongiovanni did anything wrong when a trained federal agent (SA Casullo) affirmatively says both he and Mr. Bongiovanni jointly believed there was nothing to act upon, it cannot be shown that Mr. Bongiovanni conspired with anyone to defraud the government as it concerns Joseph Bella. Accordingly, evidence about him adds nothing probative to the trial and only serves to confuse the jury.

### D.   Robert Missana Evidence

The same concern applies to evidence regarding Robert Missana. The jury at Mr. Bongiovanni's first trial heard evidence from Louis Selva about how Missana was a friend both he and Bongiovanni had known since their teen years. *See* tr. of

Louis Selva 129-130.  The jury was told Missana was a bartender at a bar he and Bongiovanni would frequent (Mother's), and, that on *one* occasion, Missana handed off cocaine to a customer at the bar in their proximity.  Missana's name was then mentioned at the 2016 meeting with HSI SA Thomas Mozg.

Just like with Joseph Bella, the connection of Robert Missana to the Serio DTO is non-existent.  SA Casullo's testimony established that both he and Bongiovanni were in agreement about why action was taken at the 2016 meeting and that nothing out-of-the-ordinary happened.  And Missana was never connected to the Ronald Serio Drug Trafficking Organization *at all*.  What's more, unlike Bella, absolutely no connection was made between Missana and IOC.  Thus, where Count 1 of the Second Superseding Indictment alleges that "[i]t was part of the conspiracy that, in exchange for payments he received, and to ingratiate himself to individuals he believed to be connected to or associated with IOC," ECF No. 89 at 6 ¶ 6, the connection between Missana and IOC to help prove this count was never established.  Accordingly, like Bella, nothing presented made it more probable than not that Mr. Bongiovanni conspired with anyone to defraud the government in relation to Robert Missana.

E.  **John McDonald Evidence**

The jury in Mr. Bongiovanni's first trial heard testimony from a cooperating witness named John McDonald.  While his testimony was colorful and lengthy, and, at times, humorous, it was, in essence, presented only to show (1) that an individual named Michael Sinatra was a drug trafficker (as evidenced by the contents of a safe

McDonald stole from Sinatra's house), and (2) that he could buy drugs at PGC easily (from his personal experience doing so). Knowing that, the backdrop of his story was largely irrelevant, from the details about how he fled a federal law enforcement raid and went down to Florida, how he was arrested, with whom he was associating, etc. The Court should accordingly set reasonable boundaries on his testimony for the retrial circumscribed by general principles of relevance, as most of his testimony did not make any material fact more or less probable. *See* FED. R. EVID. 401.

      **F.    Jeffrey Anzalone Evidence**

Jeffrey Anzalone was another witness, like McDonald, whose testimony at Mr. Bongiovanni's first trial significantly expanded in scope beyond the core relevant testimony that (1) he patronized PGC and obtained drugs there, and (2) he had limited drug dealings with Anthony Gerace, including witnessing what appeared to be a larger transaction on one occasion. Like McDonald, the Court should set reasonable boundaries on his testimony for the retrial circumscribed by general principles of relevance.

**II.    Motion to Preclude Hearsay Evidence Concerning IOC Membership and/or Association of Individuals, or in the Alternative, to Disclose Underlying Records**

Throughout Mr. Bongiovanni's first trial, the jury heard law enforcement assessments as to who was believed to be involved in or associated with IOC. In advance of the first trial, the Court ruled that evidence of what Mr. Bongiovanni

believed on that subject would be relevant and admissible. However, as the government's case-in-chief proceeded, it became clear that many of the witnesses on this point were simply speaking to information of which they had no personal knowledge, that was rumor and innuendo, and/or that the witness learned only through review of old files or information of law enforcement agencies or non-testifying agents. What's more, it was unclear whether the witness was testifying to these "facts" as a lay witness or an expert witness. This sort of evidence should not be permitted at Mr. Bongiovanni's retrial—or at least not without provision to the defense of the underlying records supporting these assessments so that effective cross-examination on this testimony can occur.

As the Court knows from extensive pretrial litigation, Mr. Bongiovanni's objection to this sort of evidence has always arisen from the fact that the Western District of New York contains no substantiated IOC convictions. Therefore, no government witness can point to an individual as a confirmed, convicted member of IOC. At trial, the jury heard no cooperating witness who claimed membership in IOC or direct, confirmed dealings with admitted IOC members. The closest the jury heard was various witnesses' testimony about what Michael Masecchia said to them and how his statements cause them to believe that he was an IOC member—but Masecchia's association with IOC was not established at all.

These assessments by law enforcement about non-testifying individuals (both alive and dead) are hearsay insofar as they are based upon out-of-court statements necessarily offered to prove the truth of the matters asserted. *See* FED. R. EVID.

801(c)(2). While there may be limited times where testimony about one of these assessments concerns what was directly communicated to Mr. Bongiovanni, the evidence from the first trial went far beyond that to include testifying agents' general beliefs on membership and associations.  For instance, HSI SA Thomas Mozg spent an extensive amount of time talking about Frank BiFulco and how Mogz believed he and Joseph Bella were associated merely because of their presence together in photographs, not because Mogz had established – directly or via another law enforcement witness or agent – that BiFulco and/or Bella was a made member of IOC.  The trial began with FBI SA Thomas Herbst's discussion about old FBI cold case files, but these reports involved the beliefs of law enforcement, not something independently established through an insider.  The location of 1234 Hertel Avenue was referenced as being an IOC hang out, but, once again, no witness established why that was a verified fact. [2]  The Court should not permit this sort of hearsay testimony, based on rumor, innuendo, and rank speculation in the retrial.

      Moreover, without provision of the underlying records/reports/evidence as to how these assessments were made, admission of testimony about these assessments also violates Mr. Bongiovanni's Sixth Amendment right to confrontation because he

---

[2] Louis Selva, at times, testified to the "reputation" of various older Italian-American individuals in the community being IOC members as he and Bongiovanni were growing up.  *See* tr. of Selva (2/21/24) at 44, 48, 50, 52, 96, 105.  This is not a proper use of "reputation" under the Federal Rules of Evidence insofar as it is not "evidence of a person's character or character trait."  FED. R. EVID. 405; *see also* FED. R. EVID. 404(a).  This evidence serves neither of the purposes for which character evidence may arise as discussed by the comments to Rule 404: as "an element of a crime, claim, or defense" or for "suggesting an inference that the person acted on the occasion in question consistently with his character."

is left with no way to meet this evidence with the witness presently on the stand through any form of effective cross examination. "The Confrontation Clause guarantees a criminal defendant the right to cross-examine government witnesses at trial. *United States v. Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008) (citing U.S. CONST. AMEND. VI). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness.

*Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (internal quotation marks and ellipsis omitted).

Inasmuch as cross examination is "the greatest engine ever invented for the discovery of truth," *California v. Green*, 399 U.S. 149, 158 (1979), that engine cannot function where the defense is left with witnesses whose only basis of knowledge is second-hand yet is repeated as gospel (and then presented to the jury as unassailable fact). Being that the concept of IOC membership and association was frequently referenced throughout the first trial, the defense cannot fairly meet that evidence in a retrial now knowing what it looks like without provision of the records or reports that give rise to the testimony. Accordingly, the Court should either preclude hearsay testimony on this subject (when it does not explicitly invoke

an exception to the rules of evidence or is non-hearsay, such as what was communicated to Mr. Bongiovanni for the purpose of making him aware of membership/associations) or it should order the appropriate underlying records disclosed so that the defense can effectively cross examine these witnesses as to the conclusions that will be presented to the jury.

Dated: June 22, 2024
       Kenmore, New York       Respectfully submitted,

s/Parker R. MacKay
**The Law Office of Parker R. MacKay**
 By: PARKER R. MacKAY, ESQ.
 3110 Delaware Avenue
 Kenmore, NY 14217
 Ph: (716) 803-8166
 Fx: (716) 408-1651
 Em: Parker@MacKayLawOffice.com

s/Robert C. Singer



Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com

*Attorneys for Joseph Bongiovanni*