IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

           v.                                 19-CR-227-JLS

JOSEPH BONGIOVANNI,

              Defendant
_____


## AMENDED GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE ANY HANDWRITING EXPERT OPINION TESTIMONY, TO QUASH SUBPOENA FOR 25 HANDWRITING EXEMPLARS, OR, ALTERNATIVELY, MOTION IN LIMINE TO LIMIT CUMULATIVE IMPEACHMENT EVIDENCE

The UNITED STATES OF AMERICA, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys, hereby moves to (1) preclude admission of any handwriting expert opinion testimony; (2) quash the subpoena issued to the Drug Enforcement Administration for 25 handwriting exemplars from DEA Special Agent David Leary; or, alternatively, (3) limit cumulative impeachment evidence regarding the signatures.

## I.    FACTUAL BACKGROUND

### A.    Bongiovanni's Handwriting Expert and the Rule 17(c) Subpoena

The government assumes the Court's and the defense's familiarity with the facts but notes the following. On February 11, 2024, Mr. Bongiovanni filed his third amended witness list, which identified Jennifer L. Naso as a potential witness whose testimony would "rebut the proof and testimony introduced in the government's case in chief" regarding handwriting samples. Def.'s Third Am. Witness List at 2.

During the course of discovery and disclosure of 3500 materials, the government produced documents, namely waiver forms in connection with DEA Special Agent David Leary's interviews with Department of Justice, Office of Inspector General (DOJ-OIG). These waiver forms contain SA Leary's known signature on five documents. As the Court will recall, examples of SA Leary's signatures are on DOJ-OIG forms marked as Exhibits 3524B at 1–2, 3524C-3, 3524D-2, 3524D-3, and the defense utilized all these signatures during cross-examination (and entered a demonstrative exhibit during cross-examination, DE L.1), during cross-examination at the first trial.

On July 2, 2024, following a court appearance in this case, counsel for the defendant informally requested twenty additional DEA 6s or other documents with exemplars of SA Leary's signature for use during defendant Bongiovanni's upcoming re-trial. An attorney for the government asked if Mr. Bongiovanni intended to introduce expert opinion testimony and counsel for Mr. Bongiovanni answered noncommittally.

Just a few hours after Mr. Bongiovanni's informal request and after conducting preliminary research, the government responded to the defense that there was a dearth of caselaw supporting the defendant's notion that the government must produce handwriting exemplars of its witnesses under Rule 16 or other sources of law. Similarly, the government indicated that there did not appear to be caselaw supporting the request for upwards of 20 examples of a government's trial witness signature for purposes of impeachment (or any other reason). The government explained that, in its view, the dearth of caselaw is particularly significant where, as here, the defense has several examples of the witness's signature and have utilized them during cross-examination at trial. Notably, the DEA is not a part of the

prosecution team in this case, and the prosecution team in this case is not in possession of the 20 additional exemplars Mr. Bongiovanni requested on July 2nd.

Eight days after this informal request and government's response, on Thursday, July 10, 2024, at approximately 3:34 p.m., Mr. Bongiovanni provided the government a <u>pre-trial</u> subpoena issued from the Court pursuant to Federal Rule of Criminal Procedure 17. The subpoena requires the Drug Enforcement Administration to produce copies of twenty-five documents or forms from over a decade ago—2011 to 2012, to be precise—containing Special Agent David Leary's signature. Moreover, it requires Special Agent Leary to affirmatively generate evidence for the defense—to wit, a declaration attesting to the exemplars' authenticity. And it gives the DEA all of four business days to do this.

Mr. Bongiovanni's letter in support of his Rule 17(c) subpoena reflects one principal basis for his request: to develop expert opinion testimony. *See* **Ex. A**, Ltr., at 2 (stating that Ms. Naso, the defense's handwriting expert, "indicated that she did not have a sufficient number of signatures to run an analysis" and arguing that "[t]he signatures requested in this subpoena will provide our expert a large enough data set to properly compare the signatures on GE 8A-3 and 8A-4 to SA Leary's authenticated signature."); *id.* at 5 ("Here, permitting the defense handwriting expert to conduct a full comparison of SA Leary's signatures— something our expert is not currently in the position to do—may contradict SA Leary's claim of forgery."); *id.* at 6 ("The defense also limited this request to the minimum number of records that its expert requires to conduct a full analysis."). Less prominently featured is perhaps a second rationale for the Rule 17(c) subpoena: to acquire additional impeachment material against Special Agent Leary. *See also id.* at 2 ("We opposed this testimony through

cross-examination of SA Leary. During cross-examination we entered into evidence DE L.1.").

The DEA, through their counsel, has advised the United States Attorney's Office that they oppose Mr. Bongiovanni's request; indicated they will not consent to this *Touhy* request; and further advised that it does not believe it is appropriate for Special Agent Leary to sign any certification or attestation regarding the exemplars Mr. Bongiovanni seeks.[1] Furthermore, as DEA counsel has pointed out, the subpoena is directed towards SA Leary, but the records do not belong to him and he cannot produce them—the records belong to the DEA.

## II.   LEGAL FRAMEWORKS

### A.   Standing

Rule 17(c)(2) of the Federal Rules of Criminal Procedure states that the Court may quash a subpoena if a party's compliance with it would be unreasonable or oppressive. Courts have consistently held that Rule 17(c)(2) is not intended to provide an additional means of discovery for criminal cases, nor is it intended to allow a party an opportunity to go on a "fishing expedition" for evidence. *United States v. Nixon*, 418 U.S. 683, 698–700 (1974); *United States v. Salvagno*, 267 F. Supp. 2d 249, 252 (N.D.N.Y. 2003) (citing *Nixon*); *see also United*

---

[1]       *Touhy* regulations are authorized by 5 U.S.C. § 301, which provides that the "head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." In *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467-70 (1951), the Supreme Court held that an FBI agent could not be held in contempt for refusing to produce certain documents subpoenaed by a state prisoner in a federal habeas proceeding where the FBI had not authorized disclosure under its *Touhy* regulations. Moreover, the defendant has not provided any authority for his demand that SA Leary create evidence for him, *i.e.,* to review exemplars and sign an affidavit proposed by the defendant.

*States v. Vasquez*, 258 F.R.D. 68, 72 (E.D.N.Y. 2009) ("Courts have been careful to point out that Rule 17(c), by contrast, should not be construed as a broad discovery device."). To ensure that it is not misused in such a way, the Rule requires that a subpoena be made with specificity. *United States v. RW Professional Leasing Services Corp.*, 228 F.R.D. 158, 163-64 E.D.N.Y. 2005).

The party moving to quash a subpoena does not need to be the party to whom the subpoena was served, and under some circumstances, the prosecution or the defense can move to quash a subpoena served on a third party. *See, e.g., United States v. Chen De Yian*, No. 94-CR-719, 1995 WL 614563, *2 (S.D.N.Y. 1995) ("[I]n some circumstances a party has standing to quash a subpoena issued against a third party . . . ."); *United States v. Debolt*, 5:09-CR-24, 2010 WL 4281699,*5 (N.D. W. Va. 2010) ("Given the considerable precedent in support of its position, this Court agrees that the United States does have standing in this instance to challenge the subpoena duces tecum directed at Harmony House [a third party].").

When moving to quash a third-party subpoena, a party must show that its "legitimate interests" are affected by it. *Vasquez*, 258 F.R.D. at 71. Legitimate interests include "[the party's] interest in preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial over-emphasis on [the witness's] credibility." *United States v. Nachamie*, 91 F. Supp. 2d 552, 558 (S.D.N.Y. 2000) (quoting *United States v. Giampa*, No. S-92-CR-437, 1992 WL 296440, at *1 (S.D.N.Y. 1992)). They also include a "claim of privilege or a proprietary interest in the subpoenaed material." *United States v. Reyes*, 162 F.R.D. 468, 470 (S.D.N.Y. 1996).

In determining whether the government has a legitimate interest that is affected by the subpoena, the Court must consider two additional factors: (1) whether the subpoenaed party

is joining in the government's motion to quash, *Vasquez*, 258 F.R.D. at 71 , and (2) whether its own responsibility to evaluate the propriety of the subpoena requires that the merits of the motion to quash be addressed. *See id*. at 72. Specifically, a court has a duty to consider "whether the subpoena itself comports with the requirements of Rule 17." *Id.*

### B.      Expert Opinion Testimony

Two sources of law govern the admission of expert opinion testimony: the Federal Rules of Criminal Procedure and the *Daubert* doctrine.

### 1.      Federal Rule of Criminal Procedure 16

Federal Rule of Criminal Procedure 16(b)(1)(C)(ii) dictates that, before a party seeks to admit expert opinion testimony, he or she must disclose the expected testimony "sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence."   Additionally, expert disclosures "must contain . . . a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief; the bases and reasons for them; the witness's qualifications . . . ; and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert."  FED. R. CRIM. P. 16(b)(1)(C)(iii).

These rules, in turn, serve "to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." FED. R. CRIM. P. 16, Advisory Committee's Note to 1993 Amendments.  "As this official commentary recognizes, the prior practice [embraced by the Rules] of merely providing a [party] with a brief 'summary' of a[n] . . . expert's opinions proved to be woefully inadequate."

*United States v. Mrabet*, No. 23-CR-69 (JSR), 2023 WL 8179685, at *2 (S.D.N.Y. Nov. 27, 2023) (Rakoff, J.).

> ## 2.    Federal Rule of Evidence 702 and the *Daubert* Doctrine

After making his Rule 16 disclosures, "[t]he proponent of the expert testimony" bears the additional burden of establishing its admissibility under both Federal Rule of Evidence 702 and the framework the Supreme Court erected in its seminal decision applicable to expert opinion testimony, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 1993). *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 243 (E.D.N.Y. 2014).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

In addition to "consider[ing] the indicia of reliability identified in [Rule] 702" when "assessing [the] reliability" of the proposed expert opinion, district courts "consider those enumerated in *Daubert*," including: "(1) whether the methodology or theory has been or can be tested; (2) whether the methodology or theory has been subjected to peer review and publication; (3) the methodology's error rate; and (4) whether the methodology or technique has gained general acceptance in the relevant scientific community." *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 (2d Cir. 2021) (citing *Daubert*, 509 U.S. at 593–94).

Importantly, while "Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005), "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997). Rather, *Daubert* has "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony" and junk science from the courtroom. FED. R. EVID. 702 advisory committee's note to 2000 amendment.

In elucidating the responsibilities attending to this "gatekeeper" function, Judge Rakoff aptly summarized as follows:

> With respect to expert opinions purporting to offer scientific conclusions in particular, *Daubert* states that courts should ordinarily pay particular attention to whether the expert's methodology has or can be tested, whether it has been subject to peer review and publication, whether it has a known error rate, whether it is subject to internal controls and standards, and whether it has received general acceptance in the relevant scientific community.

*Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 415 (S.D.N.Y. 2016) (citing *Daubert*, 509 U.S. at 593–94).

## C. Federal Rule of Criminal Procedure 17

Federal Rule of Criminal Procedure 17 provides in pertinent part:

> The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

FED. R. CRIM. P. 17(c). Though broadly worded, courts at the highest level have recognized that Rule 17(c) does not generally provide "a means of discovery for criminal cases." *United States v. Nixon*, 418 U.S. 683, 698–99 (1974); *see United States v. Cherry*, 876 F. Supp. 547, 552

(S.D.N.Y. 1995) ("Rule 17(c) is not a method of discovery in criminal cases.").  These limitations have generated two sets of caselaw, one applicable to the timing of the production—*i.e.*, pre-trial or during trial—and the other pertinent to the nature and scope of the material sought—*i.e.*, impeachment evidence or something else.  And as it relates to impeachment material, these two doctrines are not necessarily coextensive: the weight of the authority establishes that a Rule 17(c) "pre-trial" subpoena may not be used to procure the kind of impeachment material that Mr. Bongiovanni seeks here.

### 1.    The Timing of Rule 17(c) Productions

There are, in effect, two kinds of Rule 17(c) subpoenas: "pre-trial subpoenas" used to obtain admissible evidence and "trial subpoenas" which may be used to obtain impeachment material."  *United States v. Percoco*, No. 16 Cr. 776(VES), 2018 WL 9539131, at *1 (S.D.N.Y. June 14, 2018) (citing *United States v. Skelos*, No. 15-CR-317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018); *United States v. Seabrook*, No. 16-CR-467 (ALC), 2017 WL 4838311, at *2 (S.D.N.Y. Oct. 23, 2017); *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980)).

### 2.    Rule 17(c) Material, Generally

To prevent Rule 17(c) from serving as discovery dragnets, the Supreme Court has limited their reach to "evidentiary" material.  *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951).  For the purposes of the Rule, material is "evidentiary" if it is (1) relevant; (2) unable to be procured in advance of trial through the exercise of due diligence; (3) necessary to the party's preparation for trial.  *Nixon*, 418 U.S. at 698.  Moreover, applications for the material must be made in good faith, *id.*, and the party seeking the subpoena must show that the material is both admissible and specific, *see id.* at 700.  *See United States v. Murray*, 297 F.2d

812, 821 (2d Cir. 1962) ("Rule 17(c) is a device solely for the obtaining of evidence for the use of the moving party, permitting him to examine the material obtained before trial only where . . . it is necessary that he do so in order to make use of the material as evidence.").

Thus, where the material is inadmissible, it cannot be procured via a Rule 17(c) subpoena. *See, e.g.*, *United States v. Reed*, 726 F.2d 570, 577 (9th Cir. 1984) (court properly quashed subpoena seeking production of documents which would not have been admissible "under the limitations of Federal Rules of Evidence 803(8)(B)"); *United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir. 1981) (materials which were hearsay on their face and therefore not admissible as evidence at trial were not subject to Rule 17(c) subpoena).

### 3.    The Use of Rule 17(c) Motions for Impeachment Evidence

As the Supreme Court once advised, "the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *Nixon*, 418 U.S. at 701–02 (emphasis added).[2]   Though *Nixon* concerned a pre-trial subpoena, several courts in this circuit have concluded that there is "an absolute prohibition on the use of a Rule 17(c) subpoena solely for impeachment purposes." *United States v. Weissman*, No. 01 CR. 529 (BSJ), 2002 WL 31875410, at *1 (S.D.N.Y. Dec. 26, 2002); *see Cherry*, 876 F. Supp. at 553 ("[D]ocuments are not evidentiary for Rule 17(c) purposes if their use is limited to impeachment."); *Nachamie*, 91 F. Supp. 2d at 564 (characterizing subpoenaed items as "impeachment material rather than evidence" in granting motion to quash).

Other courts, however, have determined that impeachment material may be sought through a *trial subpoena*, as opposed to a *pre-trial* subpoena.  As Judge Wood explained in *United States v. Skelos*,

---

[2]         The government has amended its brief to delete an inaccurate citation to the *Nixon* opinion.

> [e]vidence showing a witness's motive to cooperate, showing bias, or containing prior inconsistent statements . . . does not become relevant until the witness testifies. For this reason, many courts have held that production of impeaching evidence pursuant to Rule 17(c) is not required until after the witness testifies.

No. 15-CR-317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018) (internal citations omitted); *see also United States v. Cole*, No. 19 CR. 869 (ER), 2021 WL 912425, at *4 (S.D.N.Y. Mar. 10, 2021) (explaining that "the *Nixon* Court did not hold that subpoenas pursuant to Rule 17(c) could not be used to procure impeachment evidence *at trial*. Here, Cole propounded *trial subpoenas*, and at trial, impeachment evidence is certainly relevant to a witness's testimony." (emphases added)); *United States v. Percoco*, No. 16-CR-776 (VEC), 2018 WL 9539131, at *1 (S.D.N.Y. June 14, 2018) ("In addition to authorizing the use of so called 'pre-trial subpoenas' to obtain admissible evidence, Rule 17(c) also authorizes service of subpoenas that are returnable at trial ("trial subpoenas") to obtain impeachment material.").

So, in sum, courts disagree as to whether Rule 17(c) materials can be used to acquire impeachment material at all and those that do hold that only *trial subpoenas* may be used to acquire impeachment material.

### D. Cumulative Evidence under Rule 403

Federal Rule of Evidence 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. "Evidence is cumulative when it replicates other admitted evidence." *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983).

### III.   ARGUMENT

The Court should preclude admission of any expert handwriting opinion testimony, as any such testimony is untimely under Federal Rule of Criminal Procedure 16 16(b)(1)(C)(iii).   There is simply insufficient time for (1) Mr. Bongiovanni to disclose a "complete statement" of Ms. Naso's opinions, as she evidently has not even initiated her analysis; (2) engage in lengthy *Daubert* litigation; and (3) for the government to acquire its own handwriting expert to rebut any opinion offered during the defense case.

In conjunction with precluding admission of expert testimony, this Court should quash Mr. Bongiovanni's subpoena for 25 handwriting exemplars from DEA Special Agent Dave Leary, as it appears the chief reason Ms. Bongiovanni seeks the exemplars is to inform Ms. Naso's opinion—an opinion she has not developed, has not provided to the defense, and that the defense has not disclosed.   Further, should Mr. Bongiovanni instead seek impeachment evidence for the purposes of impeachment cross-examination, the Court should quash the subpoena because: (1) Rule 17(c) does not permit the acquisition of impeachment material for cross-examination; or, alternatively (2) pre-trial subpoenas of the sort issued here cannot be used to acquire impeachment material because SA Leary's signatures are not operative unless and until he testifies, *see Nixon*, 418 U.S. at 701.

Finally, to the extent the Court permits the use of handwriting exemplars as impeachment evidence, it should place strict guardrails on the number of exemplars available to the defense pursuant to Federal Rule of Evidence 403.   Indeed, during the last trial, the Court prevented the government from introducing association evidence that, in its view, was cumulative.   The Court's aversion to cumulative evidence should compel a similar limitation here.

### A.     The government has standing to move to quash the subpoena.

The government has standing to object to Mr. Bongiovanni's Rule 17(c) subpoena for three reasons.  First, the subpoena infringes upon the government's legitimate interests, including "preventing [the] undue lengthening of the trial" that will inevitably result from having to complete the *Daubert* process mid-trial, as well as preventing "the prejudicial over-emphasis on" Special Agent Leary's credibility through the introduction of cumulative impeachment evidence. *United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982); *United States v. Nix*, 251 F. Supp. 3d 555, 562 (W.D.N.Y. 2017) (Wolford, C.J.) (same and collecting cases). The government's standing is further established by the DEA's objection to the subpoena. *Cf. United States v. Ray*, 337 F.R.D. 561, 571 (S.D.N.Y. 2020) ("Following the majority rule in this District, the Government may move to quash the subpoenas only if the alleged victim has asked it to, or if the Government can assert legitimate interests of its own in quashing the subpoenas.").  And, finally, Mr. Bongiovanni asks that Special Agent Leary be compelled to affirmatively produce evidence, and the government "has a legitimate interest in controlling the timing of disclosures"—or, here, the production of evidence—"as to its cooperating witness."  *Cole*, 2021 WL 912425, at *2..

Finally, because the government contends that the Rule 17(c) opinion seeks materially for inadmissible expert opinion testimony and otherwise is an improper vehicle to obtain impeachment evidence, the Court has an independent duty to consider "whether the subpoena itself comports with the requirements of Rule 17." *Vasquez*, 258 F.R.D. at 72.

### B.     The Court should preclude admission of any handwriting expert opinion testimony.

Any opinion Ms. Naso might give regarding the handwriting exemplars would be facially untimely under the Federal Rules of Criminal Procedure, which dictate that the proponent of expert testimony must disclose a "complete statement" of the expert's opinions and the bases for them "sufficiently" prior to trial.  Here, it appears that Ms. Naso has not even begun her analysis, let alone started drafting a report.  As a consequence to Mr. Bongiovanni's belated efforts to prepare his expert, neither the Court nor the government will receive "a complete statement of all opinions that the defendant will elicit from the [expert] witness in the defendant's case-in-chief" and "the bases and reasons for them" "sufficiently **before trial** to provide a fair opportunity," which deprives the government of an adequate opportunity "to meet the [defendant's] evidence."  FED. R. CRIM. P. 16(b)(1)(C)(iii) (emphasis added).

Pre-trial submissions, such as the kind contemplated under Rule 16, were due June 21, 2024, in anticipation of trial beginning on July 29, 2024.  *See* Minute Entry, ECF No. 960, (dated May 17, 2024); FED. R. CRIM. P. 16(b)(1)(C)(ii) (providing that "[t]he court, by order or local rule, **must** set a time for the [party] to make its disclosures").  Consequently, Mr. Bongiovanni has known for almost two months that his second trial would commence July 29th and had at least one month to seek the twenty-five handwriting exemplars he now demands.

Mr. Bongiovanni is also familiar with the rules governing expert notices and Rule 16's "complete statement" requirement because the government previously moved—after trial began—to preclude admission of undisclosed expert opinion testimony that Mr. Bongiovanni's counsel alluded to during his opening statement.  *See* Mot. in *Limine*, at 3, (ECF 767) (filed Feb. 18, 2024) ("To the extent the defendant intends to offer expert

testimony, Federal Rule of Criminal Procedure 16(b)(1)(C)(ii) dictates that defendants disclose expert testimony sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence." (internal quotations omitted)).

Despite being armed with that knowledge, Mr. Bongiovanni—again—waited until nearly the last possible moment to even suggest he would solicit expert opinion testimony. Specifically, Mr. Bongiovanni did not serve his Rule 17(c) subpoena requesting signatures from over ten years ago until twenty days before trial, and eight days after the government responded to and denied his informal request.[3]  As other courts have recognized, "if [defense counsel] has a particular defense theory that requires evidence to support it, he must ensure that he has prepared a case to get such evidence in."  *United States v. Ulbricht*, No. 14-CR-68 KBF, 2015 WL 413318, at *1 (S.D.N.Y. Feb. 1, 2015), *affd*, 858 F.3d 71 (2d Cir. 2017). Waiting until the tenth hour to prepare an expert—and hoping that both the government and the Court will consent to a shoehorned *Daubert* process—is not the diligent preparation that the federal rules demand.

In that vein, as noted, it appears that Ms. Naso has not even begun her analysis of Special Agent Leary's signatures, let alone started drafting a report.  *See* **Ex. A**, Ltr., at 2 (stating that Ms. Naso "indicated that she did not have a sufficient number of signatures to run *an analysis*").  Notably, Mr. Bongiovanni offers no timeline as to when Ms. Naso's analysis will be done after she receives the exemplars.  But even assuming a quick turnaround, Mr. Bongiovanni would not be able to provide either the Court or the government with the **required** Rule 16 "complete statement" for Ms. Naso's opinion until very shortly before the

---

[3]     Mr. Bongiovanni's letter stating that the exemplars were necessary to develop Ms. Naso's expert analysis—which the government understands was reproduced, in sum and substance, to the Court—came as a surprise given Mr. Bongiovanni's noncommittal response on July 2nd, when a government attorney asked him if he intended to use an expert.

trial, at the earliest.  FED. R. CRIM. P. 16(b)(1)(C)(iii).  Worse, the complete statement might arrive during trial, as the government diligently works to meet its burden to establish Mr. Bongiovanni's guilt beyond a reasonable doubt.  Under either scenario, Mr. Bongiovanni has facially violated Rule 16's dictate that the proponent of expert testimony supply the complete statement "sufficiently before trial."  *Id.* at 16(b)(1)(C)(ii).

Such a late disclosure is prejudicial to **both** parties.  That is because providing the required "complete statement" of Ms. Naso's expected opinions marks the beginning—not the end—of any litigation concerning the expert opinion testimony she would offer, as the admissibility of her opinions will very likely require the Court to hold a *Daubert* hearing.  For example, in *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401 (S.D.N.Y. 2016), Judge Rakoff precluded expert opinion testimony by a handwriting analyst on the basis that the handwriting analysis at issue there—which concerned purportedly forged signatures—failed the *Daubert* test since: (1) there are no studies testing its reliability; (2) it is not subject to peer review; (3) there is little information about error rates, and available information indicates that error rates are high; (4) it lacks objective standards; and (5) it lacks general acceptance among the scientific community.  *Id.* at 419–23.  And Judge Rakoff was not alone: as he noted in his opinion, "[i]n recent years, however, *Daubert* has spurred some courts to scrutinize handwriting analysis anew, and several district courts have found testimony from purported handwriting experts inadmissible under *Daubert*."

Engaging in an intensive *Daubert* process will consume even more resources—from both the parties and the Court—when all three are on trial.  Though this distraction might prejudice the defense insofar as it saps resources from their ability to prepare for cross-examinations, the government bears the overwhelming brunt of Mr. Bongiovanni's tenth-

hour efforts to prepare his expert witness.  Specifically, the government has little—if any, at this point—ability to retain a handwriting expert of its own to rebut any (presently undeveloped and undisclosed) opinion Ms. Naso might offer.  And owing to Mr. Bongiovanni's demands for a Speedy Trial, the government cannot request additional time to fulsomely review any of Ms. Naso's opinions or retain its own expert.  *Cf.* Tran. Tr. Proceedings, at 59, (dated Mar. 28, 2024) (the Court advising the government that it will adjourn the proceedings to provide the government more time to prepare to cross-examine defense witness Thomas Devereaux).

This is simply not how federal litigation is supposed to work.  As Judge Forrest explained in *Ulbricht*:

> Proper expert disclosures are not a mere technicality with which compliance may be made or not—they are required by Rule 16 of the Federal Rules of Criminal Procedure. . . .  These rules are accompanied by an extensive body of case law—from the Supreme Court on down— requiring district courts to comply with the rules, and setting forth clear requirements as to the proper disclosure of expert witnesses and the trial court's role in evaluating whether expert testimony should be allowed or precluded.  These cases span decades and are consistent in their holdings.  They do not only apply to one side and not the other. There has not been a change of law, and there is no confusion in the law as to the relevant requirements.

2015 WL 413318, at *2.

Precisely because "the rules do not allow trial by ambush," *id.*, courts in this circuit and others have had little difficulty precluding belatedly disclosed expert testimony regardless of who the offending party may be.  *See, e.g.*, *United States v. Daskal*, No. 21-CR-110 (NGG) (LB), 2023 WL 9424080, at *17 (E.D.N.Y. July 12, 2023) (precluding admission of government expert testimony where government provided deficient Rule 16 disclosures); *United States v. Mahaffy*, No. 05CR613(S-3)(ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr.

24, 2007) ("The Court will preclude defendant Mahaffy from presenting Mr. Cohen's expert testimony at trial due to his late submission," which he filed "the day the trial commenced."); *United States v. Botti*, No. 308-CR-00230 CSH, 2010 WL 749780, at *2 (D. Conn. Mar. 3, 2010) (precluding expert testimony where defendant did not provide statement of the expert's opinions until ten days before trial); *see also United States v. Hoffecker*, 530 F.3d 137, 184–87 (3d Cir. 2008) (disclosure three business days before jury selection was untimely and justified preclusion of expert's testimony); *United States v. Holmes*, 670 F.3d 586, 597–99 (4th Cir. 2012) (disclosure on Friday before Monday start date of trial was untimely and justified preclusion of expert's testimony); *United States v. Foley*, 111 F. App'x. 840, 840–41 (6th Cir. 2004) (unpublished) (finding that district court did not abuse its discretion in precluding expert testimony due to untimely and insufficient disclosure of summary statement pursuant to Rule 16(b)(1)(C)); *United States v. Blair*, 493 F. App'x 38, 53 (11th Cir. 2012) (disclosure on eighth day of trial was untimely and justified preclusion of expert's testimony);; *United States v. Perry*, 524 F.3d 1361, 1371–72 (D.C. Cir. 2008) (disclosure 48 hours before *Daubert* hearing was untimely and justified preclusion of expert's testimony); *cf. Mrabet*, --- F. Supp. 3d ----, 2023 WL 8179685, at *3 ("[T]he Court hereby puts the Government on notice that in the future the Court will require the Government to produce to the Court in advance of trial its expert disclosures under Rule 16, so that the Court can timely assess their adequacy.   The Government might also consider having its prosecutors take a look at expert witness reports in civil cases, which typically consist of 20 or more pages of specific opinions and detailed statements of the reasons for those opinions and the methodologies employed.   Going forward, the Court will not tolerate the shoddy noncompliance with amended Rule 16 that was encountered in this case.").

In sum, trial begins in fourteen days, Ms. Naso has not conducted any handwriting analysis, and neither the Court nor the government will receive a complete statement of her opinions until the eve of trial or, worse, after trial has commenced.  Mr. Bongiovanni's belated efforts to prepare his expert will invariably result in a facial violation of Rule 16.  Accordingly, the Court should preclude admission of Ms. Naso's testimony.[4]

**C.    After granting the government's motion to preclude, the Court should quash Bongiovanni's Rule 17(c) subpoena.**

The expert opinion testimony Mr. Bongiovanni hopes to solicit should be deemed inadmissible.  Should the Court preclude the testimony as untimely, it should the Rule 17(c) subpoena in its entirety, as the evidence would no longer satisfy *Nixon*'s admissibility requirement.  *See Cherry*, 876 F. Supp. at 552.

**D.    Bongiovanni's pre-trial subpoena cannot be used to acquire impeachment evidence.**

As set forth above, Mr. Bongiovanni has issued a pre-trial subpoena compelling the production of not only twenty-five handwriting exemplars but a DEA Special Agent's declaration in approximately four business days.  Without citation to any legal authority, and without any declaration from his purported expert, Mr. Bongiovanni argues that the twenty-five exemplars are relevant to "permit[] [his] defense handwriting expert to conduct a full comparison of SA Leary's signatures."  **Ex. A**, Ltr. at 5.  However, when discussing the exemplars' admissibility, he contends they are admissible pursuant to the "'business records' exception to the hearsay rule," and did not connect their admissibility to any opinion his expert may offer pursuant to Rule 702.  *Id.* (citing FED. R. EVID. 803(6)).  Coupled with his

---

[4]    Mr. Bongiovanni's failure to comply with Rule 16(b)(1)(C)(iii), despite knowing the rules, could support the inference that the belated effort to develop Ms. Naso was tactically timed.

acknowledgement that he previously used handwriting exemplars in an effort to impeach Special Agent Leary during cross-examination, *see* **Ex. A**, Ltr. at 2 ("We opposed this testimony through cross-examination of SA Leary."), Mr. Bongiovanni may instead seek to use the twenty-five exemplars as impeachment evidence during cross-examination. Caselaw in this circuit prohibits the use of Rule 17(c) subpoenas—and, particularly, pre-trial subpoenas—in this manner.

### 1.   Rule 17(c) subpoenas cannot be used to acquire impeachment material.

To the extent Mr. Bongiovanni seeks the exemplars in the hope that they may be used to impeach Special Agent Leary during cross-examination—and the government can imagine no plausible alternative if the Court precludes any expert opinion testimony—this is improper.

"[A] proposed subpoena does not satisfy the *Nixon*-three pronged test if it seeks material that could be [used] at trial only to impeach a witness." *United States v. Binday*, 908 F. Supp. 2d 485, 492 (S.D.N.Y. Dec. 10, 2012). Materials sought via Rule 17 subpoena "cannot be potentially relevant or admissible, they must meet the test of relevancy and admissibility at the time they are sought." *United States v. Marchisio*, 344 F.2d 653, 669 (2d Cir. 1965) (emphasis added), *overruled on other grounds* in *United States v. Mandanici*, 205 F.3d 519 (2d Cir. 2000); *see also Cherry*, 876 F. Supp. at 552 (same).

This prohibition is not purely one of judicial invention but, rather, flows directly from Federal Rule of Evidence 608(b), which generally prohibits the use of extrinsic evidence to impeach a witness. Indeed, Mr. Bongiovanni's failure to comply with Rule 16's expert disclosure requirements could support the inference that Ms. Naso is simply a consultant, and the requested exemplar signatures are to be used solely for impeachment purposes. The government has a legitimate interest in quashing a subpoena where, as here, "[the party's]

interest [is] in preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial over-emphasis on [the witness's] credibility." *United States v. Nachamie*, 91 F.Supp. 2d 552, 558 (S.D.N.Y. 2000) (quoting *United States v. Giampa*, 1992 WL 296440, at *1 (S.D.N.Y. 1992)).  Accordingly, and consistent with these cases, this Court should quash the subpoena in its entirety insofar as it seeks evidence solely to impeach Special Agent Leary on cross-examination.

### 2. To the extent Rule 17(c) subpoenas *can* be used to acquire impeachment material, they must be issued during trial, as opposed to pre-trial.

Alternatively, the Court should hold that a pre-trial subpoena such as the one issued here cannot be used to obtain impeachment material.  As the Supreme Court explained in *Nixon*, the need to impeach witnesses "is insufficient to require [the material's] production *in advance of trial*."  *Nixon*, 418 U.S. at 701 (emphasis added).  For that reason, "[m]any courts have held that impeachment material does not become relevant until after the witness testifies."  *United States v. Maxwell*, No. 20-CR-330 (AJN), 2021 WL 1625392, at *2 (S.D.N.Y. Apr. 27, 2021) (Nathan, J.) (citing *Skelos*, 2018 WL 2254538, at *2); *United States v. Scaduto*, No. 94-CR-311 (WK), 1995 WL 130511, at *1 (S.D.N.Y. Mar. 27, 1995) ("Potentially impeaching statements 'ripen into evidentiary material . . . only if and when the witness testifies at trial. . . ." (citation omitted)); *see also Avenatti*, 2020 WL 86768, at *6 (rejecting the argument that the defendant needed the recordings in question prior to trial in order "to demonstrate witnesses' bias or self-interest.").  Because such material does not ripen into relevant—and thus admissible—evidence until after the witness has testified, it cannot be obtained via a Rule 17(c) subpoena returnable pre-trial.

Applying these broadly recognized limits in *Maxwell*, Judge Nathan granted the government's motion to quash and advised that, going forward, "Maxwell presumably could

request that the Court issue a subpoena to require production of [certain materials] to the Court so that the information c[ould] be made available to Maxwell, if appropriate, at the conclusion of each witness's direct testimony."  2021 WL 1625392, at *2.

This approach accords with the multi-factor test adopted by the Supreme Court.  That test requires the proponent of the subpoena to establish that the material sought is "relevant." But, as Judge Nathan observed, "the mere fact that certain documents might be impeachment evidence does not render them 'relevant' for the purposes of rule 17(c); if, at all, those documents would become relevant only after a witness testifies."  *Maxwell*, 2021 WL 1625392, at *3; *see id.* ("Indeed, Maxwell concedes that the primary purpose of these documents will be for purposes of cross-examination, leaving little doubt as to the purported claim of relevance.").

Should Mr. Bongiovanni, like Ms. Maxwell, seek the twenty-five exemplars "for purposes of cross examination," this Court, like Judge Nathan, should have "little doubt" that their relevance springs entirely from their impeachment value.  *Id.* at *3.  In that regard, it is unnecessary for Mr. Bongiovanni to receive the exemplars in advance of trial, even if to enable his expert to develop an opinion, as a party cannot use cross-examination to backdoor expert opinion testimony into the record.[5]  Accordingly, the Court should quash Mr. Bongiovanni's *pre-trial* subpoena seeking the twenty-five exemplars.

### E.   Alternatively, the Court should limit the number of exemplars that Bongiovanni can use for impeachment purposes under Rule 403.

---

[5]   To make this point less abstract, consider the following hypothetical: suppose that defense counsel, when cross-examining Special Agent Leary, said, "did you know that Mr. Bongiovanni's handwriting expert reviewed all these signatures and concluded that they weren't forgeries?"  In the government's view, such a question would impermissibly inject an expert opinion into the trial under the guise of cross-examination—a wholly inappropriate trial strategy.

If the Court denies the motion to quash insofar as Mr. Bongiovanni seeks the twenty-five exemplars for impeachment purposes, it should nonetheless limit the number of exemplars that can be used.  The probative value of the exemplars is substantially outweighed by the danger of needlessly presenting cumulative evidence.  Indeed, during the first trial, the Court limited the number of photographs the government was able to introduce in its case in chief regarding the association between individuals connected to Italian Organized Crime. *See, e.g.*, Tr. Tran., at 35–36, (dated Mar. 12, 2024) (Test. Thomas Mozg) (limiting the introduction of a fifth photograph of Hot Dog and Mr. Bifulco).  Six, ten, fifteen, twenty, or twenty-five handwriting exemplars for the purposes of impeachment is cumulative—and Mr. Bongiovanni has already utilized five such exemplars during cross examination during the first trial—how many is enough?  Because the Rules of Evidence apply equally to both parties, this Court should (1) limit the number of exemplars Mr. Bongiovanni can use for the purposes of impeachment and (2) modify the subpoena to reflect that limited number.

## IV.   CONCLUSION

The government respectfully asks the Court to (1) preclude admission of any handwriting expert opinion testimony; (2) quash Mr. Bongiovanni's Rule 17(c) pre-trial subpoena insofar as it solicits evidence to develop precluded expert opinion testimony; (3) quash Mr. Bongiovanni's Rule 17(c) pre-trial subpoena insofar as it solicits impeachment for cross-examination; or, alternatively, (4) limit the number of exemplars that can be used to impeach Special Agent Leary's testimony.

DATED:  Buffalo, New York, July 15, 2024.


                                    TRINI E. ROSS
                                    United States Attorney

BY:   s/JOSEPH M. TRIPI
      s/NICHOLAS T. COOPER
      s/CASEY L. CHALBECK
      Assistant United States Attorney
      Western District of New York
      138 Delaware Avenue
      Buffalo, New York 14202
      716-843-5839
      Joseph.Tripi@usdoj.gov

Exhibit A



ROBERT C. SINGER, ESQ.
rob@singerlegalpllc.com

July 10, 2024

**By Email (joseph.tripi@usdoj.gov)**
Joseph Tripi, Esq.
United States Attorney's Office
  Fir the Western District of New York
138 Delaware Avenue
Buffalo, NY 14221

Dear Joe:

Re:  <em>Touhy</em> Request & Rule 17 Subpoena directed to DEA SA David Leary<br><em>USA v. Bongiovanni</em>, 19-CR-227-1-LJV (WDNY)

Please find enclosed a Rule 17 Subpoena issued by the United States District Court for the Western District of New York.  The Subpoena requests the production of the following items:

1) Copies of twenty-five (25) documents or forms within the possession of the Drug Enforcement Administration that were signed and produced by SA David Leary between 2011 to 2012 and that contain SA Leary's authentic signature.

2) A declaration executed by SA David Leary attesting to the fact that he has personally reviewed these twenty-five (25) documents or forms and agrees that his signature appearing on these forms was produced by him and is authentic.

3) An FRE 902(11) certification executed by the custodian of records at DEA Section Office Buffalo, NY.

As this request is directed at a federal employee and requires the production of records maintained by an agency of the Department of Justice, this subpoena is governed not just by Federal Rule of Criminal Procedure 17, but also by *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) and 28 C.F.R. §§ 16.21 et seq.  Pursuant to DOJ regulations, your office is the appropriate office with whom the DEA will consult and that will represent the DEA's interests.  As such, I am directing this subpoena to your attention.  If another attorney will be handling this subpoena within your office, please direct this letter to his/her attention.  Also, please indicate whether your office will accept service of this subpoena on behalf of SA Leary.

As set forth below, we believe that the information sought is relevant, material, and admissible at Trial #2 of this matter, is limited in scope, and does not seek information Department regulations prohibit from disclosure.  As such, it is our hope that the DEA will comply with this subpoena without the need for litigation.

**SINGER LEGAL PLLC**

Joseph Tripi, Esq.
July 10, 2024
Page 2

### Justification for this Request

At Trial #1 in the above captioned matter, your office called SA David Leary as a witness for the government. SA Leary testified that his signature on two DEA-202 forms dated 12/24/2012 (GE 8A-3 and 8A-4) which entered Ron Serio and Tom Serio into the NADDIS database did not contain his true signature in Blk 75. SA Leary claimed that he did not sign the forms and does not recall signing the forms. The government presented this testimony to argue that Mr. Bongiovanni forged SA Leary's signature to open these cases clandestinely.

We opposed this testimony through cross-examination of SA Leary. During cross-examination, we entered into evidence DE L.1. The signatures we obtained to produce DE L.1 came from *Parker/Garrity* warning forms signed by SA Leary in 2019 and 2020 during the DOJ OIG investigation into the DEA Buffalo office. These were the only forms disclosed by the government with SA Leary's signature on them that SA Leary verified as legitimate.

The defense has employed a handwriting expert to assist with analysis of SA Leary's signatures in preparation for Trial #2. When we asked our handwriting expert to compare SA Leary's signatures on DE L.1 to the purportedly forged signatures on GE 8A-3 and 8A-4, she indicated that she did not have a sufficient number of signatures to run an analysis. The signatures requested in this subpoena will provide our expert a large enough data set to properly compare the signatures on GE 8A-3 and 8A-4 to SA Leary's authenticated signature. We have elected to subpoena these records and proceed in this fashion for several reasons.

First, SA Leary was employed at DEA Buffalo from 2011-2012. During this period, he was assigned cases as the Lead Case Agent or Co-Case Agent. In this role, SA Leary produced and signed DEA forms and documents, so we know that these records exist and are easily retrievable.

Second, the signatures we have are not just insufficient in number, but are dated. Since a person's signature changes over time, comparing SA Leary's 2019 or 2020 signature to a 2012 signature is not the best way to conduct the analysis.

Third, we explored the possibility of making a request that SA Leary produce handwriting exemplars by signing his signature over-and-over again, but this will not produce the best evidence. As stated above, the signatures will be produced in 2024 not 2012, so they are dated. More problematic, when a person signs a document or a piece of paper over-and-over again to produce a signature exemplar, the results produced may differ from documents previously signed in 2012 because the signer has a motive to alter his signature on the more recent exemplar and the process for producing an exemplar is more time-consuming and expensive. The signer may also suffer from fatigue. Finally, to produce an exemplar today, SA Leary will need to sign the exemplar using a process created by our expert. Our expert – who resides in NYC – will need to travel to Buffalo, NY to observe the exemplar process. And SA Leary will need to meet at a designated time and place with our expert to complete the process. This is why procuring forms that are already in the possession of DEA Buffalo is much easier and less costly.

**SINGER LEGAL PLLC**

Joseph Tripi, Esq.
July 10, 2024
Page 3

### What will SA Leary and DEA Buffalo be required to do to respond to this subpoena

We anticipate that to respond to this subpoena, DEA Buffalo will need to take the following steps:

1) SA Leary or a DEA records custodian will need to identify twenty-five (25) DEA forms/documents that SA Leary signed in 2011-2012. Every DEA Agent has a list of cases in which he/she served as a lead agent or co-agent. SA Leary and/or DEA Buffalo will have this information, so either SA Leary or DEA Buffalo will need to compile the list of cases SA Leary investigated in 2011-2012. SA Leary or the custodian will use this list to identify case names and numbers for which SA Leary would have signed records.

2) Once the case names/numbers are identified, SA Leary or the custodian will review the file and identify twenty-five records with SA Leary's signature.

3) SA Leary will review the records and confirm that his signature is authentic. He will execute a declaration attesting to the authenticity of the signatures.

4) SA Leary or the records custodian will redact all sensitive information from the documents containing his signatures.

5) The records custodian will execute a 902(11) declaration.

6) The records custodian will provide the subpoena response to the defense.

### Applicable Rules & Law

Rule 17 provides that a subpoena "may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." A party moving for a Rule 17 subpoena "must clear three hurdles: 1) relevancy; 2) admissibility; and, 3) specificity." *United States v. Nixon*, 418 U.S. 683, 700 (1974). The party requesting the subpoena must also show that the information sought is "not otherwise procurable reasonably in advance of trial by exercise of due diligence," that "the party cannot properly prepare for trial without such production," and that "the application is made in good faith and is not intended as a general 'fishing expedition.'" *Id.* at 699-700. Fed. R. Crim. P. 17(c)(1). "On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2).

As this request is directed at a federal employee and requires the production of records maintained by an agency of the Department of Justice, this subpoena is governed by *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) and 28 C.F.R. §§ 16.21 et seq. *Touhy* and 28 C.F.R. §§ 16.21 et seq. provide that no present or former employee of the Department of Justice may testify or produce Departmental records in response to subpoenas or demands of courts or other authorities issued in any state or federal proceeding without obtaining prior approval by an appropriate Department official.

**SINGER LEGAL PLLC**

Joseph Tripi, Esq.
July 10, 2024
Page 4

       28 C.F.R. § 16.26 outlines several considerations used to determine whether to respond to a subpoena.  For example, 28 C.F.R. § 16.26(a) states that the USAO-WDNY and the DEA should consider "(1) [w]hether such disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose, and (2) [w]hether disclosure is appropriate under the relevant substantive law concerning privilege.  Pursuant to 28 C.F.R. §§ 16.26(b), the DEA may deny the requested information in a subpoena if:

    (1)  Disclosure would violate a statute, such as the income tax laws, 26 U.S.C. 6103 and 7213, or a rule of procedure, such as the grand jury secrecy rule, F.R.Cr.P., Rule 6(e);

    (2)  Disclosure would violate a specific regulation;

    (3)  Disclosure would reveal classified information, unless appropriately declassified by the originating agency;

    (4)  Disclosure would reveal a confidential source or informant, unless the investigative agency and the source or informant have no objection;

    (5)  Disclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired; and

    (6) Disclosure would improperly reveal trade secrets without the owner's consent.

### This Subpoena does not implicate 28 C.F.R. § 16.26 concerns

       28 C.F.R. §§ 16.21 et seq. permits the DEA to deny this request if the subpoenaed information concerns privileged information or otherwise does not comply with the rules of procedure.  The information sought is appropriate under Rule 17 (see below) and is not privileged.  Furthermore, the factors promulgated in 28 C.F.R. § 16.26(b) do not restrict disclosure of the information requested because doing so will not disclose classified, law enforcement, confidential source, trade secret, or grand jury information.  And to the extent that producing documents with SA Leary's signature would disclose such information, the defense already has consented to the redaction of such information, making any objection on that basis moot.

**SINGER LEGAL PLLC**

Joseph Tripi, Esq.
July 10, 2024
Page 5

**The Subpoena Complies with Rule 17**

This subpoena satisfies each of the *Nixon* factors.

**1)   The records requested are relevant and material to the defense.**

Production of DEA records with SA Leary's signature, a declaration by SA Leary that the signatures on the records are authentic, and a, FRE 902(11) certification from the records custodian is relevant evidence that is material to the defense.  Pursuant to FRE 401, evidence is "relevant" if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Here, permitting the defense handwriting expert to conduct a full comparison of SA Leary's signatures – something our expert is not currently in the position to do – may contradict SA Leary's claim of forgery.  This is a "fact of consequence" in determining whether the charges in the indictment are true.  This is why this evidence is material to the defense.

**2)   The records requested are admissible.**

The records in the possession of DEA Buffalo containing SA Leary's signature are admissible at trial under the "business records" exception to the hearsay rule.  FRE 803(6) provides that records of a regularly conducted business activity that contain the "record of an act, event, condition, opinion, or diagnosis" are not hearsay and are admissible under the rules of evidence provided that the following requirements are met: "(A) the record was made at or near the time by – or from information transmitted by – someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by . . . a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) neither the opponent does not show that the source of information nor or the method or circumstances of preparation indicate a lack of trustworthiness."  *See* FRE 803(6).

Here, the records sought from DEA Buffalo, to wit: twenty-five (25) DEA forms or documents signed by SA Leary between 2011 and 2012, meet all of the requirements of FRE 803(6).  First, the records were made by SA Leary at or near the time that SA Leary claims his signature was forged.  The records were made by a person/entity with knowledge of the content of the records (SA Leary).  The records sought contain time/date information for all entries as well as information regarding the signatory (SA Leary).  Additionally, both SA Leary and the Records Custodian for these records are expected to affirm this fact in his/her declaration attached to the subpoena.  Second, the records are kept in the course of a regularly conducted activity of a business.  Trial evidence confirmed that DEA Special Agents produce forms like DEA-6s, DEA-202s, DEA-7s, etc. regularly and, in the case of DEA-6s, on at least a quarterly basis (or more often) to document investigative activities and milestones.  Third, the making of the records is a regular practice of the business of the DEA.  Trial evidence also demonstrated that DEA Special Agents are required to produce these forms as part of their job.  Fourth, all these

**SINGER LEGAL PLLC**

Joseph Tripi, Esq.
July 10, 2024
Page 6

conditions will be shown to be met by the affidavit of a custodian and this certification complies with Rule 902(11). Fifth, the defense does not believe that the government can (or will) show that the source of information or the method or circumstances of preparation of these records indicate a lack of trustworthiness. In fact, to moot this concern, the defense, as part of this subpoena, has requested that SA Leary attest to the authenticity of his signature on the produced documents. As such, all of the requirements of FRE 803(6) are met and the records should be admitted at a trial.

**3) The subpoena request is specific and permits for the redaction of sensitive information not responsive to the request.**

Mr. Bongiovanni has requested twenty-five (25) DEA forms/documents that contain SA Leary's signature produced between 2011-2012. The DEA can pick and choose which documents that it desires to produce. The DEA or your office can redact sensitive information from the documents since the only information sought is SA Leary's signature. The defense has limited this request to records which contain information relevant to this case only. The defense also limited this request to the minimum number of records that its expert requires to conduct a full analysis. We could have requested more records, but we did not to expedite matters. Consequently, the subpoena is appropriately limited and specific in this case.

**4) The information requested in the subpoena is not otherwise procurable reasonably in advance of trial by exercise of due diligence, the defense cannot properly prepare for trial without such production, and this application is made in good faith and is not intended as a general "fishing expedition."**

The defense cannot procure this information in advance of trial by exercise of reasonable diligence. DEA Buffalo is the only entity that possesses these records. And since some of the records may contain law enforcement or other confidential information, there is no other mechanism available to the defense to obtain these records other than through a subpoena.

The defense also cannot prepare for trial without the subpoenaed information. Analysis of the purportedly forged signatures will not be possible without a sufficient number of exemplars of SA Leary's signature. These records may prove critical to providing an alternative argument to the theory of the government at trial.

This request also is made in "good faith" and is not a "fishing expedition." As set forth above, this request is not made with the intent to harass DEA Buffalo; rather, the defense has a valid reason to believe that these records contain relevant, material, and admissible evidence. Signatures produced during this time frame on DEA forms is the most probative evidence of what SA Leary's signature appeared like in 2012. As stated previously, requesting that SA Leary produce handwriting exemplars today is not a viable option. That process also is more time-consuming and expensive than procuring and redacting forms that are already in the possession of DEA Buffalo. Finally, DEA Buffalo maintains this information for purposes of its business, so the records inevitably contain the information sought. As such, this subpoena is not based on suspicion, speculation, or a hunch that the record contains

**SINGER LEGAL PLLC**

Joseph Tripi, Esq.
July 10, 2024
Page 7

the information sought.  The subpoena request also is limited to the records that contain this information and relate to the pertinent time period of the allegations only, and nothing more.

#              #              #

For each of these reasons, the Court agreed to issue the subpoena under the parameters requested by the defense.  It is our hope that your office and DEA will produce this information without the need for protracted litigation.  In the event you or the DEA requires further information, please do not hesitate to contact me at (716) 222-3288.  I am also willing to discuss alternatives to accomplish compliance with this subpoena if you feel that will assist production of these records.  Thank you.

Very truly yours,

Robert C. Singer

Encl