09:18AM

                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF NEW YORK

_____
UNITED STATES OF AMERICA,
                                      Case No. 1:19-cr-227
                Plaintiff,                      (LJV)
v.
                                      August 7, 2024
JOSEPH BONGIOVANNI,

                Defendant.
_____


   TRANSCRIPT EXCERPT - CONTINUED EXAMINATION OF THOMAS HERBST
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
                   UNITED STATES DISTRICT JUDGE

**APPEARANCES:**          **TRINI E. ROSS, UNITED STATES ATTORNEY**
                          **BY: JOSEPH M. TRIPI, ESQ.**
                          **    NICHOLAS T. COOPER, ESQ.**
                          **    CASEY L. CHALBECK, ESQ.**
                          Assistant United States Attorneys
                          Federal Centre, 138 Delaware Avenue
                          Buffalo, New York 14202
                          For the Plaintiff

                          **SINGER LEGAL PLLC**
                          **BY: ROBERT CHARLES SINGER, ESQ.**
                          80 East Spring Street
                          Williamsville, New York 14221
                             And
                          **LAW OFFICES OF PARKER ROY MacKAY**
                          **BY: PARKER ROY MacKAY, ESQ.**
                          3110 Delaware Avenue
                          Kenmore, New York 14217
                             And
                          **OSBORN, REED & BURKE, LLP**
                          **BY: JOHN J. GILSENAN, ESQ.**
                          120 Allens Creek Road
                          Rochester, New York 14618
                          For the Defendant

**PRESENT:**              **BRIAN A. BURNS,** FBI Special Agent
                          **MARILYN HALLIDAY,** HSI Special Agent
                          **KAREN A. CHAMPOUX,** USA Paralegal

**LAW CLERK:**            **REBECCA FABIAN IZZO, ESQ.**

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**  **COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:**      **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *    *    *    *    *    *    * |
| 7 | |

09:48AM    8    (Excerpt commenced at 9:48 a.m.)

09:48AM    9    (Jury seated at 9:48 a.m.)

09:49AM    10    **THE COURT:**  Good morning, everyone.

09:49AM    11    **JURORS:**  Good morning.

09:49AM    12    **THE COURT:**  The record will reflect that all our

09:49AM    13    jurors, again, are present.

09:49AM    14    I remind the witness that he's still under oath.

09:49AM    15    And, Mr. Singer, you may continue.

09:49AM    16    **MR. SINGER:**  Thank you, Judge.

09:49AM    17

09:49AM    18    **T H O M A S   H E R B S T**, having been previously duly called

09:49AM    19    and sworn, continued to testify as follows:

09:49AM    20

09:49AM    21    **CROSS-EXAMINATION BY MR. SINGER (CONT'D):**

09:49AM    22    Q.  Good morning, Mr. Herbst, again.

09:49AM    23    A.  Good morning, Mr. Singer.

09:49AM    24    Q.  You didn't have any pieces of paper, or any type of items

09:49AM    25    that you referenced over the night hours regarding your

09:49AM 1    testimony, correct?

09:49AM 2    A.  I did not.

09:49AM 3    Q.  And you didn't talk to anybody about your testimony, of

09:49AM 4    course.

09:49AM 5    A.  I did not.

09:49AM 6    Q.  Good.  So where we left off yesterday, we were talking

09:49AM 7    about the meetings that you had leading up to the meeting

09:49AM 8    with Agent Bongiovanni and Peter Gerace on November 23rd of

09:49AM 9    2009, right?

09:49AM 10   A.  Regarding -- with probation?

09:49AM 11   Q.  Yes.

09:49AM 12   A.  Yes.

09:49AM 13   Q.  And we talked about how you had not kept a lot of notes

09:50AM 14   regarding some of these meetings or phone calls that led up

09:50AM 15   to the meeting with Peter Gerace.

09:50AM 16   A.  That's correct.

09:50AM 17   Q.  Okay.  So a lot of testimony that you're giving in court

09:50AM 18   is based on your memory, correct?

09:50AM 19   A.  Yes.

09:50AM 20   Q.  Okay.  So with regard to the meeting with Peter Gerace,

09:50AM 21   you testified yesterday that you didn't have any specific

09:50AM 22   notes that you took during that meeting, right?

09:50AM 23   A.  The meeting at DEA?

09:50AM 24   Q.  Yes.

09:50AM 25   A.  No, that's correct.

09:50AM   1   Q.  And you didn't write a report about it after the meeting,

09:50AM   2   correct?

09:50AM   3   A.  I did not.

09:50AM   4   Q.  Okay.  But following the 23rd of November, do you

09:50AM   5   remember -- or, following the meeting on the 23rd of

09:50AM   6   November, do you remember having a conversation with

09:50AM   7   Mr. Lepiane about the fact that you had a meeting?

09:50AM   8   A.  I'm sure I would have had that conversation, yes.

09:50AM   9   Q.  So you recall following up with Mr. Lepiane of, hey, this

09:51AM  10   meeting we've been waiting to get with Peter Gerace has

09:51AM  11   finally happened?

09:51AM  12   A.  Yeah, right.  That's correct.

09:51AM  13   Q.  Okay.  And you remember talking to him about the fact

09:51AM  14   that there wasn't anything that substantively was discussed

09:51AM  15   in the meeting that would assist you in your investigation?

09:51AM  16   A.  Yes.

09:51AM  17   Q.  And you remember talking to him about how you were going

09:51AM  18   to continue to try to work with Peter Gerace to the extent

09:51AM  19   you could?

09:51AM  20   A.  That could be true.

09:51AM  21   Q.  Okay.  And as far as that telephone is concerned,

09:51AM  22   telephone call is concerned, did Mr. Lepiane inform you about

09:51AM  23   what was going to happen with Peter Gerace vis-à-vis his

09:51AM  24   violation of supervision?

09:51AM  25   A.  He may have.

09:51AM  1   Q.  Do you recall if Mr. Lepiane talked to you about how

09:51AM  2   Mr. Gerace was going to be cited for location monitoring and

09:51AM  3   that was going to be a change to his supervision?

09:51AM  4   A.  I don't have a specific recollection about that as I sit

09:51AM  5   here today.  But that, I'm sure if it's in his report, that's

09:51AM  6   correct.

09:51AM  7   Q.  Did you have any memory of a conversation that you had

09:52AM  8   about the fact that Mr. Gerace was not going to be going to

09:52AM  9   jail as a result of what happened on the Halloween search?

09:52AM  10  A.  Yeah, I do have that understanding.

09:52AM  11  Q.  Okay.  So you at least knew he wasn't going to be going

09:52AM  12  to jail based on the violation?

09:52AM  13  A.  Yes.

09:52AM  14  Q.  Okay.  And when you talked yesterday in your testimony,

09:52AM  15  you were talking about how you left the meeting on the 23rd

09:52AM  16  of November of 2009 at DEA with the impression or assumption

09:52AM  17  that Peter Gerace was going to act as some type of

09:52AM  18  confidential source for the DEA?

09:52AM  19  A.  Yes, definitely.

09:52AM  20  Q.  And I guess I want to delve into that a little bit more.

09:52AM  21  A.  Sure.

09:52AM  22  Q.  At the meeting with you and Bongiovanni and Gerace,

09:52AM  23  Mr. Bongiovanni never told you Peter Gerace is a confidential

09:52AM  24  source of mine, correct?

09:52AM  25  A.  No.  I mean, he never used those words, but that would be

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:52AM 1   an odd thing to say.

09:52AM 2   Q.  Yeah.  Peter Gerace never said in that meeting I'm a

09:52AM 3   confidential source for the DEA, correct?

09:53AM 4   A.  No, of course not.

09:53AM 5   Q.  Okay.  So neither Bongiovanni or Gerace mentioned the

09:53AM 6   word "confidential source," correct?

09:53AM 7   A.  That's correct.

09:53AM 8   Q.  Okay.  And as far as your case is concerned, you say that

09:53AM 9   after that meeting, based on the assumption that Peter Gerace

09:53AM 10  was going to be working with the DEA, you stopped

09:53AM 11  investigating him?

09:53AM 12  A.  Yes, that's correct.  I did not stop investigating my

09:53AM 13  case, but I -- that was one of the avenues I was going to

09:53AM 14  pursue to bolster my case, but I stopped pursuing that.  I

09:53AM 15  think we -- I don't know if it was you, I think it was

09:53AM 16  Mr. Cooper asked about a sub file.  So I stopped

09:53AM 17  investigating the sub file against Mr. Gerace.

09:53AM 18  Q.  So you ceased the investigation into potential drug

09:53AM 19  dealing going on at Pharaoh's Gentlemen's Club involving

09:53AM 20  Peter Gerace?

09:53AM 21  A.  Yes.

09:53AM 22  Q.  So I want to delve into that a little bit more.

09:53AM 23      So like you just testified, that wasn't the only inroad

09:53AM 24  into this cold case file that you were trying to develop,

09:54AM 25  correct?

09:54AM    1    A.  I'm not sure what you mean by "inroad" in this context.

09:54AM    2    Q.  Sure.  So another target of your investigation to help

09:54AM    3    develop leads in this cold case file was a person by the name

09:54AM    4    of Anthony Gerace, correct?

09:54AM    5    A.  I know Anthony Gerace, I know he's Peter brother, and I

09:54AM    6    had heard that name as him being involved in narcotics

09:54AM    7    trafficking, too, but I've never personally talked to Anthony

09:54AM    8    Gerace.

09:54AM    9    Q.  Yeah.  And so I guess what I'm getting at is similar to

09:54AM    10   how you learned about Peter Gerace being involved in

09:54AM    11   narcotics activity, people at your office also brought to

09:54AM    12   your attention that Anthony Gerace was another person who may

09:54AM    13   be involved in narcotics activity?

09:54AM    14   A.  Yeah, I definitely was -- I definitely was aware at that

09:54AM    15   time that Anthony Gerace was involved in narcotics activity.

09:54AM    16   I never talked to him or pursued an investigation against

09:55AM    17   him.

09:55AM    18   Q.  Yeah.  And I guess -- so your group, Squad 4 in the Safe

09:55AM    19   Streets Task Force, you have involvement in what's called

09:55AM    20   OCDETF investigations, correct?

09:55AM    21   A.  Yes.

09:55AM    22   Q.  And what is an OCDETF investigation?

09:55AM    23   A.  Organized Crime Drug Enforcement -- something like that.

09:55AM    24   Drug enforcement.

09:55AM    25   Q.  Would you agree Organized Crime Drug Enforcement Task

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:55AM   1   Force?

09:55AM   2   A.   Yes.

09:55AM   3   Q.   So those particular investigations are looking into

09:55AM   4   organizational defendants or organizations that engage in

09:55AM   5   criminal activity?

09:55AM   6   A.   Yes.  But the primary work at Squad 4 was the Safe

09:55AM   7   Streets, so it was gang related, so not so much OCDETF.

09:55AM   8   Q.   But FBI does have involvement as a task force in OCDETF

09:55AM   9   investigations?

09:55AM   10  A.   Yes, absolutely.

09:55AM   11  Q.   And you remember a couple different people being

09:55AM   12  investigated at the same time.  Do you remember a David

09:56AM   13  Gambino being investigated as part of an OCDETF

09:56AM   14  investigation?

09:56AM   15  A.   I believe David Gambino may have been before my time.  It

09:56AM   16  might have been continuing.  And I'm not sure the FBI was the

09:56AM   17  primary investigative agency on that case, I don't have any

09:56AM   18  personal -- I know his name, I know what he was involved in.

09:56AM   19  I know he's, like, into drug trafficking.  I never personally

09:56AM   20  investigated him.  I don't even know if anybody in our office

09:56AM   21  did, but I'm certainly aware of him.

09:56AM   22  Q.   Are you aware of David Reynolds being investigated and

09:56AM   23  prosecuted?

09:56AM   24  A.   I don't know David Reynolds' name.

09:56AM   25  Q.   How about Ralph Acquino?  Do you recall that name as part

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:56AM  1   of your --

09:56AM  2   A.  I don't know that name either.

09:56AM  3   Q.  So you do remember Gambino?

09:56AM  4   A.  I do.

09:56AM  5   Q.  But you don't remember the other two?

09:56AM  6   A.  That's correct.

09:56AM  7   Q.  And you do remember receiving information that Anthony

09:56AM  8   Gerace is somebody who was involved in potential narcotics

09:56AM  9   activity who was under investigation?

09:56AM  10  A.  Yes.

09:56AM  11  Q.  So Anthony Gerace, as you mentioned previous, is a

09:56AM  12  brother to Peter Gerace, correct?

09:56AM  13  A.  That's correct.

09:56AM  14  Q.  And so he shares the same familial connection to the

09:57AM  15  Todaros that Peter Gerace does, right?

09:57AM  16  A.  He does.

09:57AM  17  Q.  And he's also somebody who potentially, if you garnered

09:57AM  18  leverage, could have potentially been used to get inside or

09:57AM  19  used as a source for these cold case murders you're trying to

09:57AM  20  investigate?

09:57AM  21  A.  Yes, that's true.

09:57AM  22  Q.  But you didn't take any type of investigative steps to --

09:57AM  23  A.  That's --

09:57AM  24  Q.  -- go about doing that --

09:57AM  25  A.  That's --

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

| | | |
|---|---|---|
| 09:57AM | 1 | **THE COURT:**  One at a time, guys. |
| 09:57AM | 2 | **BY MR. SINGER:** |
| 09:57AM | 3 | Q.  -- doing that with Anthony Gerace, correct? |
| 09:57AM | 4 | A.  That's correct. |
| 09:57AM | 5 | Q.  So getting back to Peter Gerace, you never followed up |
| 09:57AM | 6 | with Special Agent Bongiovanni regarding whether his |
| 09:57AM | 7 | cooperation with Peter Gerace was something that was still |
| 09:57AM | 8 | ongoing, right? |
| 09:57AM | 9 | A.  I did not. |
| 09:57AM | 10 | Q.  And you didn't follow up with Special Agent Bongiovanni |
| 09:57AM | 11 | regarding whether the cooperation with Peter Gerace was |
| 09:57AM | 12 | completed, correct? |
| 09:57AM | 13 | A.  No. |
| 09:57AM | 14 | Q.  When you came to the assumption that Peter Gerace was |
| 09:58AM | 15 | acting as some type of confidential source for the DEA, I |
| 09:58AM | 16 | know you stopped your investigation, but did you provide |
| 09:58AM | 17 | Special Agent Bongiovanni with any of the materials? |
| 09:58AM | 18 | **MR. COOPER:**  Objection as to the form of the |
| 09:58AM | 19 | question, Judge.  When you came to the assumption that. |
| 09:58AM | 20 | **MR. SINGER:**  That's what he testified to, Judge. |
| 09:58AM | 21 | **MR. COOPER:**  That's not what he testified to, Judge. |
| 09:58AM | 22 | **THE COURT:**  Overruled. |
| 09:58AM | 23 | **BY MR. SINGER:** |
| 09:58AM | 24 | Q.  So, again, when you came to the assumption that Peter |
| 09:58AM | 25 | Gerace was going to be used as a confidential source by the |

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:58AM    1    DEA, did you turn over any of your investigative files

09:58AM    2    regarding the activities that Peter Gerace was involved in?

09:58AM    3    A.  No.

09:58AM    4    Q.  And did you turn them over to Special Agent Bongiovanni?

09:58AM    5    A.  No.

09:58AM    6    Q.  Did you turn them over to the DEA in general?

09:58AM    7    A.  I did not.

09:58AM    8    Q.  You never followed up in any way whatsoever with the DEA

09:58AM    9    regarding what was going on with Peter Gerace?

09:58AM   10    A.  No, I -- I had the meeting with Agent Bongiovanni

09:58AM   11    regarding Peter Gerace and, you know, based on that meeting

09:59AM   12    and the calls from DEA to the FBI, and the conversation I had

09:59AM   13    with my supervisor at some point, I decided not to pursue

09:59AM   14    that after we knew of investigation because I thought that

09:59AM   15    Peter Gerace was -- meant more to DEA than he did to me, and

09:59AM   16    I had other avenues to pursue.

09:59AM   17    Q.  And as far as the cold case files is concerned, we talked

09:59AM   18    about how you didn't use Peter Gerace to get any inroads in

09:59AM   19    that file.

09:59AM   20    A.  That's correct.

09:59AM   21    Q.  And we talked about how you didn't use Anthony Gerace to

09:59AM   22    get any inroads on that file?

09:59AM   23    A.  That's correct.

09:59AM   24    Q.  And before you retired, that file wasn't closed out,

09:59AM   25    correct?

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

09:59AM    1    A.  It was not.

09:59AM    2    Q.  Okay.  How many other cases do you think you investigated

09:59AM    3    during that time period besides this murder investigation

09:59AM    4    that you wanted to get into again?

09:59AM    5    A.  Maybe five or six at one time, including -- including a

09:59AM    6    wire.  You know --

09:59AM    7    Q.  Yeah.  And I guess, you know, what I'm getting at is you

09:59AM    8    joined Safe Streets Task Force when again?

10:00AM    9    A.  I went to the FBI office in Buffalo in November of 2007,

10:00AM    10   sometime right after Thanksgiving.  I was on another squad

10:00AM    11   for a short period of time.  So sometime in 2008, I can't

10:00AM    12   tell you exactly.

10:00AM    13   Q.  And you retired from FBI Buffalo at what point?

10:00AM    14   A.  2013.

10:00AM    15   Q.  And during that time period, '08 to '13, how many

10:00AM    16   different cases do you think you investigated on Squad 4?

10:00AM    17   A.  Boy.  At some point I switched to a different squad.  But

10:00AM    18   I would say a half dozen, maybe.

10:00AM    19   Q.  So this cold case murder case was one of those cases?

10:00AM    20   A.  Yes.

10:00AM    21   Q.  And the Peter Gerace case was one of those cases?

10:00AM    22   A.  Peter Gerace was, again, a sub file of the main file that

10:00AM    23   I was investigating.  So, yes.  But I'm not counting it as a

10:00AM    24   separate case, when I gave you the number of a half dozen,

10:01AM    25   but I'm not counting it as a separate case.

USA v Bongiovanni - Herbst - Singer/Cross - 8/7/24

10:01AM   1   Q.  So you mentioned that one of those other cases that you

10:01AM   2   were working on, that involved a wire investigation?

10:01AM   3   A.  Yes.

10:01AM   4   Q.  And that's a pretty intensive type of investigation?

10:01AM   5   A.  Yes, sir.

10:01AM   6   Q.  How many hours do you think you put into that one

10:01AM   7   particular case?

10:01AM   8   A.  A lot.

10:01AM   9   Q.  Yeah.  I guess, you know, I know -- we may know what "a

10:01AM  10   lot" is, but if you can explain to the jury:  What does "a

10:01AM  11   lot" mean in your parlance?

10:01AM  12   A.  More than Monday through Friday, and more than more than

10:01AM  13   9 to 5.  But each day is different, obviously.

10:01AM  14   Q.  So those cases require a substantial amount of resources

10:01AM  15   and attention?

10:01AM  16   A.  Absolutely.

10:01AM  17   Q.  And the other cases that you're working on, did they

10:01AM  18   involve wires or any other type investigation?

10:01AM  19   A.  They were other than wires.

10:01AM  20   Q.  Were there resources that were devoted to those cases

10:01AM  21   that went in excess of the cold case murder case we're

10:01AM  22   talking about?

10:01AM  23   A.  My resources?

10:01AM  24   Q.  Yeah.

10:01AM  25   A.  Yeah.

10:01AM   1   Q.  And it's a fair statement that those cases were more of a

10:01AM   2   focus of your time when you're with -- with Squad 4 and Safe

10:02AM   3   Streets?

10:02AM   4   A.  I think they were more of a priority of the squad.  My

10:02AM   5   main focus and priority would have been the cold case

10:02AM   6   homicide, but we don't need to go in depth on this, but it's,

10:02AM   7   you know, the focus of the Squad was Safe Streets.  Although

10:02AM   8   we had, you know, that you -- you characterized it correctly,

10:02AM   9   Squad 4 was the umbrella squad.  We had all the violent crime

10:02AM   10  violations, but -- and Organized Crime.  But Safe Streets was

10:02AM   11  the main priority, and you have limited resources.  So, the

10:02AM   12  cases that fit into the Safe Streets umbrella would have

10:02AM   13  been, certainly, the supervisor's priority.

10:02AM   14          **MR. SINGER:**  Understood.  Thank you very much.

10:02AM   15          Agent Herbst, I don't have any further questions.

10:02AM   16          **THE WITNESS:**  Thank you.

10:02AM   17          **THE COURT:**  Redirect?

10:02AM   18          **MR. COOPER:**  Just briefly, Judge.

10:02AM   19

10:02AM   20          **REDIRECT EXAMINATION BY MR. COOPER:**

10:02AM   21  Q.  Good morning, Special Agent Herbst.

10:02AM   22  A.  Good morning, sir.

10:02AM   23  Q.  You were asked some questions on cross-examination just

10:03AM   24  maybe two minutes ago about whether you provided Special

10:03AM   25  Agent Bongiovanni with your investigative materials into

USA v Bongiovanni - Herbst - Cooper/Redirect - 8/7/24

10:03AM    1    Peter Gerace's drug trafficking; do you remember when he

10:03AM    2    asked you those questions?

10:03AM    3    A.  I do.

10:03AM    4    Q.  Can you remind the jury, what did the defendant say to

10:03AM    5    you when you told him about the drug case that you had going

10:03AM    6    about Peter Gerace?

10:03AM    7    A.  He indicated it was not a very good case.

10:03AM    8    Q.  Did he seem interested in gathering your materials and

10:03AM    9    pursuing the case?

10:03AM    10   A.  Oh, no.  He wasn't going to pursue a case against Peter

10:03AM    11   Gerace, because Peter Gerace was working with him.  But

10:03AM    12   that's not the way it works.

10:03AM    13   Q.  He kind of pooh-poohed your case, right?

10:03AM    14   A.  He did.

10:03AM    15   Q.  Did anybody at the DEA ask you for your materials?

10:03AM    16   A.  No.

10:03AM    17   Q.  If they had, if he had called you and said, hey, Tom, can

10:03AM    18   you share your investigative materials with us?  Would you

10:03AM    19   have done that?

10:03AM    20   A.  Sure.

10:03AM    21   Q.  You were also asked some questions on cross-examination

10:04AM    22   about an -- I guess the word was used in the form of the

10:04AM    23   question that it was an assumption that Peter Gerace was this

10:04AM    24   defendant's source; do you remember being asked that

10:04AM    25   question?

USA v Bongiovanni - Herbst - Cooper/Redirect - 8/7/24

10:04AM  1   A.  I do.

10:04AM  2   Q.  Okay.  During the course of your lengthy career at the

10:04AM  3   FBI, have you had situations before where an informant has

10:04AM  4   been handed from one agency to another agency, or a

10:04AM  5   cooperator has been shared?

10:04AM  6   A.  It happens.  I don't know if I've had personal

10:04AM  7   experience.

10:04AM  8   Q.  Okay.  Did the defendant say to you during that meeting,

10:04AM  9   Tom, here's Peter, he can become your source?

10:04AM  10  A.  No.

10:04AM  11  Q.  Was there any form of those words at all used?

10:04AM  12  A.  No.

10:04AM  13  Q.  Was there a discussion about, hey, work with the FBI and

10:04AM  14  help them?

10:04AM  15  A.  No.

10:04AM  16  Q.  Did the defendant tell Peter Gerace in your presence,

10:04AM  17  hey, if you work with the FBI, maybe you can get yourself out

10:04AM  18  of trouble?

10:04AM  19  A.  No.

10:04AM  20  Q.  Did that topic come up at all?

10:04AM  21  A.  No.

10:04AM  22  Q.  You were asked some questions as well on

10:04AM  23  cross-examination about when's the last time you've looked at

10:05AM  24  some of your files and what reports you wrote, right?

10:05AM  25  A.  Correct.

10:05AM    1    Q.  Was there any substantive information conveyed to you at

10:05AM    2    all during the meeting with Peter Gerace and this defendant?

10:05AM    3    A.  No.

10:05AM    4    Q.  Was there anything to write in a report?

10:05AM    5    A.  No.

10:05AM    6    Q.  If the defendant had told you here's Peter Gerace, he has

10:05AM    7    information on kilo-level cocaine traffickers, you can use

10:05AM    8    him; would you have documented that?

10:05AM    9    A.  Yes.

10:05AM   10    Q.  He didn't tell you that, did he?

10:05AM   11    A.  He did not.

10:05AM   12    Q.  You were asked some questions about the last time you've

10:05AM   13    looked at files; do you remember that?

10:05AM   14    A.  Yes.

10:05AM   15    Q.  You retired in 2013, right?

10:05AM   16    A.  That's correct.

10:05AM   17    Q.  Did you steal files from the FBI and hide them in your

10:05AM   18    basement?

10:05AM   19    A.  No.

10:05AM   20            MR. COOPER:  I have no further questions, Judge.

10:05AM   21            THE COURT:  Anything more, Mr. Singer?

10:05AM   22            MR. SINGER:  Yeah.

10:05AM   23

10:05AM   24                    RECROSS-EXAMINATION BY MR. SINGER:

10:05AM   25    Q.  So, Agent Herbst, at this meeting with Peter Gerace, I

USA v Bongiovanni - Herbst - Singer/Recross - 8/7/24

| | | |
|---|---|---|
| 10:05AM | 1 | know you have a limited recollection of it, but I want to get |
| 10:05AM | 2 | into that a little bit more because you just got asked |
| 10:05AM | 3 | questions on redirect. |
| 10:05AM | 4 | Did Peter Gerace talk to you about any information that |
| 10:06AM | 5 | he had? |
| 10:06AM | 6 | A.  No. |
| 10:06AM | 7 | Q.  Did Peter Gerace tell you about cocaine information that |
| 10:06AM | 8 | he may have had? |
| 10:06AM | 9 | A.  No. |
| 10:06AM | 10 | Q.  Did Peter Gerace talk to you about why he wanted to |
| 10:06AM | 11 | cooperate with you vis-à-vis his violation? |
| 10:06AM | 12 | A.  No. |
| 10:06AM | 13 | Q.  So he didn't say much of anything, right? |
| 10:06AM | 14 | A.  He did not. |
| 10:06AM | 15 | Q.  And did you ask him any specific questions about |
| 10:06AM | 16 | information that he had? |
| 10:06AM | 17 | A.  No. |
| 10:06AM | 18 | Q.  So you never asked him any questions about whether he |
| 10:06AM | 19 | knew something about cocaine dealers? |
| 10:06AM | 20 | A.  No.  The meeting was more -- it was an odd meeting.  But |
| 10:06AM | 21 | it was more, again, I went over to the DEA office, I met with |
| 10:06AM | 22 | Agent Bongiovanni initially, went down to the mezzanine |
| 10:06AM | 23 | level.  And then I believe Mr. Gerace called, and Agent |
| 10:06AM | 24 | Bongiovanni told him to meet us at the -- in the mezzanine |
| 10:06AM | 25 | level as he walked in the lobby.  And we had the meeting. |

10:06AM     1      It was kind of, like, a get to know each other kind of

10:06AM     2   meeting.  I don't know how to describe it.  But it wasn't a

10:06AM     3   substantive meeting.  And I had -- I had already met

10:07AM     4   Mr. Gerace.

10:07AM     5   Q.  Again, so, this is somewhat similar to the same meeting

10:07AM     6   you had with Peter Gerace at Pharaoh's Gentlemen's Club back

10:07AM     7   on Halloween of 2009, correct?

10:07AM     8   A.  I think that's a correct characterization.

10:07AM     9   Q.  So you're just gabbing about things that don't have

10:07AM    10   anything to do with cases?

10:07AM    11   A.  Yes, sir.

10:07AM    12   Q.  Building a rapport?

10:07AM    13   A.  Yes.

10:07AM    14   Q.  But you're not getting down to the brass tacks of, hey,

10:07AM    15   this is the information that I have to provide you?

10:07AM    16   A.  That's correct.

10:07AM    17   Q.  And you've had situations before in your career where the

10:07AM    18   hope is, is that a person may be developed as a source,

10:07AM    19   right?

10:07AM    20   A.  Yes.

10:07AM    21   Q.  But ultimately that doesn't happen, correct?

10:07AM    22   A.  That's correct.

10:07AM    23   Q.  Because sometimes a source is not willing to move forward

10:07AM    24   with the information they have and tell you about it,

10:07AM    25   correct?

10:07AM  1   A.  That's correct.

10:07AM  2   Q.  And there could be a variety of reasons in your training

10:07AM  3   and experience why that happens, correct?

10:07AM  4   A.  That's correct.

10:07AM  5   Q.  So, for instance, a source can get fearful about

10:07AM  6   retaliation and, therefore, not share that information,

10:07AM  7   correct?

10:07AM  8   A.  That's correct.

10:07AM  9   Q.  Or a source can no longer be subject to the same type of

10:08AM  10  leverage that you think you may have, and therefore they make

10:08AM  11  the conclusion I don't really have to cooperate here,

10:08AM  12  correct?

10:08AM  13  A.  Correct.

10:08AM  14        MR. COOPER:  I would object, outside the scope.

10:08AM  15        THE COURT:  No, I don't think so.  Overruled.

10:08AM  16        THE WITNESS:  That's correct.

10:08AM  17        BY MR. SINGER:

10:08AM  18  Q.  That's correct.  So you learned about later, like you

10:08AM  19  talked about on cross-examination, that Mr. Lepiane's office

10:08AM  20  was going to cite Mr. Gerace for a violation, correct?

10:08AM  21  A.  Correct.

10:08AM  22  Q.  But that violation was only going to require location

10:08AM  23  monitoring?

10:08AM  24        MR. COOPER:  Objection.  Again, outside redirect,

10:08AM  25  Judge.

10:08AM    1        **THE COURT:**  No.  Overruled.

10:08AM    2        **THE WITNESS:**  Correct.

10:08AM    3        **BY MR. SINGER:**

10:08AM    4    Q.  Wasn't going to involve jail time anymore, correct?

10:08AM    5    A.  Correct.

10:08AM    6    Q.  And after learning that fact, you never heard from Peter

10:08AM    7    Gerace again, correct?

10:08AM    8    A.  Well, I wouldn't have expected to hear from Peter Gerace.

10:08AM    9    I would have expected -- in that context, I would have

10:08AM   10    expected to hear from Agent Bongiovanni, you know, if, in

10:08AM   11    fact, the FBI was getting involved in the investigation, but

10:08AM   12    I didn't expect to hear from Peter Gerace.

10:08AM   13    Q.  But you didn't hear from DEA after that point either, did

10:08AM   14    you?

10:08AM   15    A.  I did not.

10:09AM   16        **MR. SINGER:**  Thank you.  I have no further questions,

10:09AM   17    Judge.

10:09AM   18        **THE COURT:**  Anything more?

10:09AM   19        **MR. COOPER:**  No, thank you, Judge.

10:09AM   20        **THE COURT:**  You can step down, sir.

10:09AM   21        **THE WITNESS:**  Thank you, Your Honor.

          22        (Witness excused at 10:09 a.m.)

          23        (Excerpt concluded at 10:09 a.m.)

          24            *    *    *    *    *    *    *

          25

1

2                    **CERTIFICATE OF REPORTER**

3

4                    In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on August 7, 2024.

8

9

10                           s/ Ann M. Sawyer
                             Ann M. Sawyer, FCRR, RPR, CRR
11                           Official Court Reporter
                             U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **TRANSCRIPT INDEX**

3          **EXCERPT - CONTINUED EXAMINATION OF THOMAS HERBST**

4                            **AUGUST 7, 2024**

5

6

7    **W I T N E S S**                              **P A G E**

8    **T H O M A S   H E R B S T**                    2

9      CROSS-EXAMINATION BY MR. SINGER (CONT'D):      2

10     REDIRECT EXAMINATION BY MR. COOPER:            14

11     RECROSS-EXAMINATION BY MR. SINGER:             17

12

13

14

15

16

17

18

19

20

21

22

23

24

25