10:09AM

1              UNITED STATES DISTRICT COURT
2              WESTERN DISTRICT OF NEW YORK

3 _____
  UNITED STATES OF AMERICA,
                              Case No. 1:19-cr-227
4            Plaintiff,                  (LJV)
  v.
5                             August 7, 2024
  JOSEPH BONGIOVANNI,
6
                Defendant.
7 _____

8   TRANSCRIPT EXCERPT - EXAMINATION OF CHRISTOPHER WISNIEWSKI
           BEFORE THE HONORABLE LAWRENCE J. VILARDO
9               UNITED STATES DISTRICT JUDGE

10 **APPEARANCES:**         **TRINI E. ROSS, UNITED STATES ATTORNEY**
                         **BY: JOSEPH M. TRIPI, ESQ.**
11                           **NICHOLAS T. COOPER, ESQ.**
                             **CASEY L. CHALBECK, ESQ.**
12                       Assistant United States Attorneys
                         Federal Centre, 138 Delaware Avenue
13                       Buffalo, New York 14202
                         For the Plaintiff
14
                         **SINGER LEGAL PLLC**
15                       **BY: ROBERT CHARLES SINGER, ESQ.**
                         80 East Spring Street
16                       Williamsville, New York 14221
                             And
17                       **LAW OFFICES OF PARKER ROY MacKAY**
                         **BY: PARKER ROY MacKAY, ESQ.**
18                       3110 Delaware Avenue
                         Kenmore, New York 14217
19                           And
                         **OSBORN, REED & BURKE, LLP**
20                       **BY: JOHN J. GILSENAN, ESQ.**
                         120 Allens Creek Road
21                       Rochester, New York 14618
                         For the Defendant
22
   **PRESENT:**            **BRIAN A. BURNS,** FBI Special Agent
23                       **MARILYN K. HALLIDAY,** HSI Special Agent
                         **KAREN A. CHAMPOUX,** USA Paralegal
24
   **LAW CLERK:**          **REBECCA FABIAN IZZO, ESQ.**
25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:  COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:**        **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *    *    *    *    *    *    * |
| 7 | |
| 8 | (Excerpt commenced at 10:09 a.m.) |
| 9 | (Jury is present.) |

10:09AM    10    **THE COURT:**  The government can call its next witness.

10:09AM    11    **MR. COOPER:**  Thank you, Judge.  The government calls

10:09AM    12  Special Agent Chris Wisniewski from the DEA.

10:09AM    13

10:09AM    14  **C H R I S T O P H E R   W I S N I E W S K I,** having been duly

10:10AM    15  called and sworn, testified as follows:

10:10AM    16    **MR. COOPER:**  May I inquire, Judge?

10:10AM    17    **THE COURT:**  You may.

10:10AM    18

10:10AM    19             **DIRECT-EXAMINATION BY MR. COOPER:**

10:10AM    20  Q.  Good morning, sir.  Would you introduce yourself to the

10:10AM    21  jury, please?

10:10AM    22  A.  Good morning, jury.  My name is Chris Wisniewski.  I'm a

10:10AM    23  special agent with the DEA here in Buffalo.

10:10AM    24  Q.  And how old are you, Chris?

10:10AM    25  A.  I'm going to be 50 this year.

| | | |
|---|---|---|
| 10:10AM | 1 | Q.  Where did you grow up at? |
| 10:10AM | 2 | A.  Connecticut. |
| 10:10AM | 3 | Q.  And you mentioned that you're a special agent with the |
| 10:10AM | 4 | DEA here in Buffalo? |
| 10:10AM | 5 | A.  Yes. |
| 10:10AM | 6 | Q.  When did you begin your career with the DEA? |
| 10:10AM | 7 | A.  I was hired in 1998. |
| 10:10AM | 8 | Q.  And before that, what kind of educational background did |
| 10:10AM | 9 | you have? |
| 10:10AM | 10 | A.  I went to college and law school. |
| 10:10AM | 11 | Q.  And did you apply for a job with the DEA sometime after |
| 10:10AM | 12 | finishing law school? |
| 10:10AM | 13 | A.  While I was in law school. |
| 10:10AM | 14 | Q.  You applied while you were in law school? |
| 10:10AM | 15 | A.  Yes. |
| 10:10AM | 16 | Q.  That's auspicious.  And what year did you begin work at |
| 10:10AM | 17 | the DEA? |
| 10:10AM | 18 | A.  In 1998. |
| 10:10AM | 19 | Q.  And do you go through some training at the beginning of |
| 10:11AM | 20 | your career? |
| 10:11AM | 21 | A.  Yes. |
| 10:11AM | 22 | Q.  Can you explain that for the jurors? |
| 10:11AM | 23 | A.  After you get hired from your office of hire, you get |
| 10:11AM | 24 | sent down to Quantico, Virginia where, at the time, all DEA |
| 10:11AM | 25 | agents trained at the FBI Academy.  Separate classes, but |

10:11AM  1  same buildings, same dormitories, same ranges, things of that

10:11AM  2  nature.

10:11AM  3      I want to say that the course is about 16 weeks long, and

10:11AM  4  covered basic law enforcement procedures, tactics, law,

10:11AM  5  things of that nature.

10:11AM  6  Q.  After that 16-week academy, do you receive an initial

10:11AM  7  assignment, a location where you have to go work?

10:11AM  8  A.  At some point in the academy, they -- yes, they give you

10:11AM  9  a preference sheet, and then you can pick at the time when

10:11AM  10  you went there you can pick three locations off the list.

10:11AM  11  Q.  And where did you go first after Quantico?

10:11AM  12  A.  To Buffalo.

10:11AM  13  Q.  When you arrived at Buffalo, what was your title there?

10:12AM  14  A.  Special agent.

10:12AM  15  Q.  Okay.  And what kinds of crimes, generally, just give

10:12AM  16  them an idea, what kind of crimes did you investigate?

10:12AM  17  A.  Drug crimes, financial crimes.

10:12AM  18  Q.  I want to speak with you now about the timeframe of 2008,

10:12AM  19  okay?

10:12AM  20  A.  Okay.

10:12AM  21  Q.  In 2008, were you working as a special agent at the DEA?

10:12AM  22  A.  Yes.

10:12AM  23  Q.  Okay.  And at that point, would it be fair to say that

10:12AM  24  you've been a special agent for about ten years?

10:12AM  25  A.  Yes.

10:12AM  1    Q.  Do you have some experience at that point?

10:12AM  2    A.  Yes.

10:12AM  3    Q.  Have you handled a number of different types of cases?

10:12AM  4    A.  Yes.

10:12AM  5    Q.  Where was the DEA office base physically located in 2008?

10:12AM  6    A.  I believe it was in the Electric Tower at that point.

10:12AM  7    Q.  At some point around that timeframe, did the DEA move to

10:12AM  8    the Electric Tower?

10:12AM  9    A.  Yes, we started in the Guaranty Building, and then at

10:12AM  10   some point during my career we moved over there to the

10:12AM  11   Electric Tower.

10:12AM  12   Q.  Can you describe for the jury generally what the office

10:12AM  13   space inside the Electric Tower looked like at the DEA?

10:13AM  14   A.  We had one whole floor, one entire floor, probably a half

10:13AM  15   of another floor.  Most of the work spaces were just what we

10:13AM  16   called open bays.  They were rows, long rows of low cubicles

10:13AM  17   where the agents and task force officers faced each other and

10:13AM  18   sat side by side in a long line.  Pardon me.

10:13AM  19        And then the supervisor's office was located at one of

10:13AM  20   the ends.

10:13AM  21   Q.  You mentioned that there were those kind of low cubicles

10:13AM  22   and a low bay, as you described it, would it be fair to say

10:13AM  23   that it was easy to overhear conversations that were going on

10:13AM  24   from other agents and other task force officers?

10:13AM  25   A.  Yes.

| 10:13AM | 1 | Q.  Did the space appear, in your estimation, to be designed |
| 10:13AM | 2 | to facilitate open communication? |
| 10:13AM | 3 | A.  Yes. |
| 10:13AM | 4 | Q.  Is open communication between special agents and task |
| 10:14AM | 5 | force officers an important part of work as a special agent? |
| 10:14AM | 6 | A.  Yes. |
| 10:14AM | 7 | Q.  Why?  Can you tell them? |
| 10:14AM | 8 | A.  The way that we investigate drug cases, you basically |
| 10:14AM | 9 | can't do it alone.  You, for almost any kind of operation you |
| 10:14AM | 10 | go on, you have to take team members with you.  Even when |
| 10:14AM | 11 | you're doing something simple like conducting interviews, you |
| 10:14AM | 12 | have another person with you.  Surveillance operations where |
| 10:14AM | 13 | we would go and watch people, we would take, you know, |
| 10:14AM | 14 | multiple vehicles and people. |
| 10:14AM | 15 | So, sharing information is pretty vital in that line of |
| 10:14AM | 16 | work. |
| 10:14AM | 17 | Q.  Now, you mentioned that sometimes, if you're going to do |
| 10:14AM | 18 | an interview you'd bring a partner with you.  Did DEA have or |
| 10:14AM | 19 | did DEA special agents frequently work with a partner? |
| 10:14AM | 20 | A.  Yes.  Yes. |
| 10:14AM | 21 | Q.  And was that kind of a formalized partnership, selected |
| 10:15AM | 22 | by management?  Or informal, selected by the people who are |
| 10:15AM | 23 | working together? |
| 10:15AM | 24 | A.  It was mostly informal. |
| 10:15AM | 25 | Q.  Do you know a person by the name of Joseph Bongiovanni? |

10:15AM    1    A.  I do.

10:15AM    2    Q.  How do you know that person?

10:15AM    3    A.  We worked together.

10:15AM    4    Q.  Did you work together -- approximately how long would you

10:15AM    5    say you worked with that individual?

10:15AM    6    A.  We met at the academy, so over 25 years.

10:15AM    7    Q.  As you sit here today, do you have any strong personal

10:15AM    8    feelings about him?

10:15AM    9    A.  Not one way or the other.  I like the guy.

10:15AM    10   Q.  Do you have any animosity towards him?

10:15AM    11   A.  No.

10:15AM    12   Q.  Are you excited about being here today?

10:15AM    13   A.  No.

10:15AM    14   Q.  Was he ever your partner?

10:15AM    15   A.  No.

10:15AM    16   Q.  Is he in court today?

10:15AM    17   A.  Yes.

10:15AM    18   Q.  Would you point him out and identify an article of

10:15AM    19   clothing for the record?

10:15AM    20   A.  He's the gentleman in the red and blue tie, sitting in

10:15AM    21   the middle.

10:15AM    22        MR. COOPER:  For the record, Judge, indicating the

10:15AM    23   defendant.

10:15AM    24        THE COURT:  It does.

10:15AM    25        MR. COOPER:  Thank you.

|          |     | **BY MR. COOPER:** |
|----------|-----|--------------------|
| 10:15AM  | 1   | **BY MR. COOPER:** |
| 10:15AM  | 2   | Q.  Despite the fact that you never partnered up with the |
| 10:15AM  | 3   | defendant, were there times when you would engage in |
| 10:16AM  | 4   | investigative activity together? |
| 10:16AM  | 5   | A.  Yes. |
| 10:16AM  | 6   | Q.  Was he a frequent person you would seek out to work with? |
| 10:16AM  | 7   | A.  We were on the same groups together, yes, we worked |
| 10:16AM  | 8   | together almost on a daily basis. |
| 10:16AM  | 9   | Q.  So my question is:  Is he someone you would seek out to |
| 10:16AM  | 10  | go out and do something with? |
| 10:16AM  | 11  | A.  No, I usually go with my partner. |
| 10:16AM  | 12  | Q.  Okay.  Have you heard the term DEA-6? |
| 10:16AM  | 13  | A.  Yes. |
| 10:16AM  | 14  | Q.  Okay.  I'm sure you've heard it quite a bit, right? |
| 10:16AM  | 15  | A.  Yes. |
| 10:16AM  | 16  | Q.  Can you tell the jury what a DEA-6 is? |
| 10:16AM  | 17  | A.  It's a standard narrative report form where we write |
| 10:16AM  | 18  | about investigative steps that we took. |
| 10:16AM  | 19  | Q.  Is that something all DEA special agents learn to do |
| 10:16AM  | 20  | pretty early on? |
| 10:16AM  | 21  | A.  Right from the academy. |
| 10:16AM  | 22  | Q.  Okay.  And is it important that when you generate a DEA-6 |
| 10:16AM  | 23  | and you write information in it, that that information be |
| 10:16AM  | 24  | accurate? |
| 10:16AM  | 25  | A.  Yes. |

Case 1:19-cr-00227-LJV-MJR    Document 1144    Filed 08/24/24    Page 9 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

9

| | | |
|---|---|---|
| 10:16AM | 1 | Q.  Is it important that, to the best of your ability, the |
| 10:17AM | 2 | information that you report be truthful? |
| 10:17AM | 3 | A.  Yes. |
| 10:17AM | 4 | Q.  Why is that important? |
| 10:17AM | 5 | A.  Because all these reports are later used in prosecution. |
| 10:17AM | 6 | They can be used to launch other cases.  They're used to |
| 10:17AM | 7 | facilitate forfeiture actions.  And we rely on those reports |
| 10:17AM | 8 | to refresh our recollection when we come to court. |
| 10:17AM | 9 | Q.  When you work at the DEA investigating drug-trafficking |
| 10:17AM | 10 | offenses, would it be fair to say that a lot of the cases you |
| 10:17AM | 11 | investigate involve more than one target or suspect? |
| 10:17AM | 12 | A.  Yes. |
| 10:17AM | 13 | Q.  Are you often targeting organizations? |
| 10:17AM | 14 | A.  Yes. |
| 10:17AM | 15 | Q.  Have you heard of something called an organizational |
| 10:17AM | 16 | chart? |
| 10:17AM | 17 | A.  Yes. |
| 10:17AM | 18 | Q.  Can you describe for the jury what an organizational |
| 10:17AM | 19 | chart is? |
| 10:17AM | 20 | A.  An organization -- sorry, an organizational chart is |
| 10:17AM | 21 | basically -- most times it's like a box, a circle, or line |
| 10:18AM | 22 | diagram where you list names, phone numbers, addresses, and |
| 10:18AM | 23 | you sort of arrange them in a way that makes sense as a |
| 10:18AM | 24 | picture for investigators to sort of look at it and |
| 10:18AM | 25 | understand what you're dealing with as far as your case goes |

10:18AM  1   at that time.

10:18AM  2   Q.  You said a -- a box and line diagram, or a circle and

10:18AM  3   line diagram; is that correct?

10:18AM  4   A.  Yes.  Yes.

10:18AM  5   Q.  And generally, just speaking in generalities, would it

10:18AM  6   have names of different individuals involved in an

10:18AM  7   organization?

10:18AM  8   A.  It could.

10:18AM  9   Q.  And would the lines indicate connections between those

10:18AM  10  individuals?

10:18AM  11  A.  Yes.

10:18AM  12  Q.  And, generally, is there -- at least there's intended to

10:18AM  13  be some rhyme or reason in terms of how the organizational

10:18AM  14  chart is organized, right?

10:18AM  15  A.  Yes.

10:18AM  16  Q.  Trying to kind of create an image out of an organization

10:18AM  17  that exists in real life, right?

10:18AM  18  A.  Yes.

10:18AM  19  Q.  Is an organizational chart related to an organization

10:19AM  20  that the DEA is actively investigating a document that needs

10:19AM  21  to be handled delicately?

10:19AM  22  A.  Usually, yes, sir.

10:19AM  23  Q.  Is it something that you'd go home and post on your

10:19AM  24  Facebook account?

10:19AM  25  A.  No.

10:19AM   1   Q.  Would you show it to a friend at a bar who wasn't

10:19AM   2   involved in law enforcement?

10:19AM   3   A.  No.

10:19AM   4   Q.  Would it be fair to say that if an organizational chart

10:19AM   5   ended up in the hands of a wrong person, it could derail an

10:19AM   6   investigation?

10:19AM   7   A.  Potentially.

10:19AM   8   Q.  During the course of your career, did you participate in

10:19AM   9   an investigation involving an individual named David Gambino?

10:19AM   10  A.  Yes.

10:19AM   11  Q.  What was your role at the DEA in that investigation?

10:19AM   12  A.  When the case started, I was one of the case agents.

10:19AM   13  Q.  Now you said when the case started.  Can you estimate for

10:19AM   14  the jury when that case started from your point of view?

10:20AM   15  A.  I don't recall specifically.  It was a very long time

10:20AM   16  ago.  But I want to say that it was an '06 file number, so

10:20AM   17  the case would have formally been opened in 2006.

10:20AM   18  Q.  And those file numbers operate off of the fiscal year,

10:20AM   19  right?

10:20AM   20  A.  Yes.

10:20AM   21  Q.  So, and you indicated this, but you're estimating

10:20AM   22  somewhere around 2006; is that correct?

10:20AM   23  A.  Yes.

10:20AM   24  Q.  Was DEA the only law enforcement agency that was involved

10:20AM   25  in that investigation?

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

12

| | | |
|---|---|---|
| 10:20AM | 1 | A.  No. |
| 10:20AM | 2 | Q.  Can you tell the jury what other law enforcement agencies |
| 10:20AM | 3 | were involved? |
| 10:20AM | 4 | A.  It was designated as a higher level investigation.  So, |
| 10:20AM | 5 | the main partner agencies were ICE -- or Homeland Security |
| 10:20AM | 6 | Investigations, as it's known now -- the IRS, ATF was pretty |
| 10:20AM | 7 | heavily involved at the beginning, of course the DEA.  We |
| 10:20AM | 8 | also partnered with the FBI, Buffalo police, sheriff's |
| 10:21AM | 9 | department, Amherst police, Town of Tonawanda. |
| 10:21AM | 10 | Basically, wherever the organization operated, we sought |
| 10:21AM | 11 | assistance and information from the local and state |
| 10:21AM | 12 | authorities there. |
| 10:21AM | 13 | Q.  And one of the agencies that you mentioned was HSI or |
| 10:21AM | 14 | ICE; is that correct? |
| 10:21AM | 15 | A.  Yes. |
| 10:21AM | 16 | Q.  And that's Homeland Security Investigations? |
| 10:21AM | 17 | A.  Yes. |
| 10:21AM | 18 | Q.  Was there a point person or a lead agent from HSI |
| 10:21AM | 19 | involved in the Gambino investigation when you were involved |
| 10:21AM | 20 | in it? |
| 10:21AM | 21 | A.  Yes. |
| 10:21AM | 22 | Q.  Who was that person? |
| 10:21AM | 23 | A.  Initially it was Joseph Dubreville, but he was replaced |
| 10:21AM | 24 | by TJ Webb. |
| 10:21AM | 25 | Q.  Are those both special agents with Homeland Security? |

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

13

10:21AM  1   A.  Yes.

10:21AM  2   Q.  Can you give a brief summary, like just a 30,000-foot

10:21AM  3   view for the jury, what that investigation entailed, what was

10:21AM  4   it about?

10:21AM  5   A.  It was an interstate cocaine and marijuana case.

10:22AM  6   Q.  Was there a general geographic location in Western

10:22AM  7   New York where targets of that investigation either lived or

10:22AM  8   hung out?

10:22AM  9   A.  A lot of the targets were from, like, the North Buffalo

10:22AM  10  area.  They lived and hung out in that area near the

10:22AM  11  Tonawanda/Amherst lines.

10:22AM  12  Q.  Was there a suspected nexus to Italian Organized Crime

10:22AM  13  involved in that investigation?

10:22AM  14  A.  Yes.

10:22AM  15  Q.  I want to -- so sometime around 2006, you indicated you

10:22AM  16  became involved in the Gambino investigation, right?

10:22AM  17  A.  Yes.

10:22AM  18  Q.  And you've described it was kind of a large

10:22AM  19  investigation, right?

10:22AM  20  A.  Yes.

10:22AM  21  Q.  Did it go on for a number of years?

10:22AM  22  A.  Yes.

10:22AM  23  Q.  I want to fast forward now to 2008.

10:22AM  24      In 2008, do you remember getting contacted by somebody

10:22AM  25  regarding an organizational chart in the Gambino

| | | |
|---|---|---|
| 10:22AM | 1 | investigation? |
| 10:22AM | 2 | A.  Yes. |
| 10:22AM | 3 | Q.  Who contacted you? |
| 10:22AM | 4 | A.  Special Agent Webb. |
| 10:22AM | 5 | Q.  Is that TJ Webb from HSI that we just spoke about? |
| 10:23AM | 6 | A.  Yes. |
| 10:23AM | 7 | Q.  Before Special Agent Webb contacted you about that |
| 10:23AM | 8 | organizational chart, had anyone else ever contacted you |
| 10:23AM | 9 | about the organizational chart? |
| 10:23AM | 10 | A.  Not that I recall. |
| 10:23AM | 11 | Q.  Was Special Agent Webb, based on your -- was that a phone |
| 10:23AM | 12 | call or an in-person discussion? |
| 10:23AM | 13 | A.  Again, it was a really long time ago.  But from what I |
| 10:23AM | 14 | recall, I believe he called me initially to tell me what he |
| 10:23AM | 15 | learned. |
| 10:23AM | 16 | Q.  Where were you when you got that phone call? |
| 10:23AM | 17 | A.  I believe I was at the U.S. Attorney's office. |
| 10:23AM | 18 | Q.  On the Gambino case, or another case? |
| 10:23AM | 19 | A.  I don't recall. |
| 10:23AM | 20 | Q.  So you're at the U.S. Attorney's Office, and you receive |
| 10:23AM | 21 | a phone call from Special Agent Webb; is that correct? |
| 10:23AM | 22 | A.  I believe so. |
| 10:23AM | 23 | Q.  And did Special Agent Webb appear excited or interested |
| 10:23AM | 24 | in the information that he had learned? |
| 10:23AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:23AM | 1 | Q. Did you agree to meet with him and discuss it? |
| 10:23AM | 2 | A. Yes. |
| 10:23AM | 3 | Q. Now, as you sit here today in 2024, do you remember if |
| 10:24AM | 4 | that meeting occurred the same day or shortly thereafter? |
| 10:24AM | 5 | A. I don't recall.  It was -- if it wasn't that same day, |
| 10:24AM | 6 | then was shortly thereafter. |
| 10:24AM | 7 | Q. Do you recall ultimately having a meeting with Special |
| 10:24AM | 8 | Agent Webb to discuss the organizational chart? |
| 10:24AM | 9 | A. Yes. |
| 10:24AM | 10 | Q. Where did that meeting occur? |
| 10:24AM | 11 | A. In my office, in my bay. |
| 10:24AM | 12 | Q. Is that at the Electric Tower? |
| 10:24AM | 13 | A. Yes. |
| 10:24AM | 14 | Q. And your "bay," as you described earlier, are those kind |
| 10:24AM | 15 | of low cubicles in the open area; is that correct? |
| 10:24AM | 16 | A. Yes. |
| 10:24AM | 17 | Q. Are there other DEA agents milling around when you're |
| 10:24AM | 18 | having conversations like that? |
| 10:24AM | 19 | A. Yes. |
| 10:24AM | 20 | Q. Are there other task force officers milling around when |
| 10:24AM | 21 | you're having conversations? |
| 10:24AM | 22 | A. Yes. |
| 10:24AM | 23 | Q. Did Special Agent Webb bring that organizational chart to |
| 10:24AM | 24 | the meeting with you? |
| 10:24AM | 25 | A. Yes. |

| | | |
|---|---|---|
| 10:24AM | 1 | Q.  Did you discuss what was contained on it? |
| 10:24AM | 2 | A.  Yes. |
| 10:24AM | 3 | Q.  Does DEA sometimes assign cold case agents to cases? |
| 10:25AM | 4 | A.  Yes. |
| 10:25AM | 5 | Q.  Did you have a cold case agent from the DEA on the |
| 10:25AM | 6 | Gambino investigation? |
| 10:25AM | 7 | A.  I did, yes. |
| 10:25AM | 8 | Q.  Who was it? |
| 10:25AM | 9 | A.  My partner, Christian Ulmer. |
| 10:25AM | 10 | Q.  Was the defendant the co-case agent on the Gambino |
| 10:25AM | 11 | investigation? |
| 10:25AM | 12 | A.  I'm sorry? |
| 10:25AM | 13 | Q.  Was the defendant, Joe Bongiovanni, a co-case agent on |
| 10:25AM | 14 | the Gambino investigation? |
| 10:25AM | 15 | A.  Oh, I'm sorry.  No, he wasn't. |
| 10:25AM | 16 | Q.  At some point after Special Agent Webb brought this |
| 10:25AM | 17 | organizational chart to the DEA, and you had a discussion |
| 10:25AM | 18 | with him about it in the bay, did defendant Joseph |
| 10:25AM | 19 | Bongiovanni approach you to discuss a name that was on that |
| 10:25AM | 20 | organizational chart? |
| 10:25AM | 21 | A.  Yes. |
| 10:25AM | 22 | Q.  Who was the person he came up to you to discuss? |
| 10:26AM | 23 | A.  Peter Gerace. |
| 10:26AM | 24 | Q.  Was his name on the organizational chart? |
| 10:26AM | 25 | A.  Yes. |

Case 1:19-cr-00227-LJV-MJR   Document 1144   Filed 08/24/24   Page 17 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

17

10:26AM   1   Q.  I'm holding what's marked as Government Exhibit 30B.

10:26AM   2           **MR. COOPER:**  May I approach the witness?

10:26AM   3           **THE COURT:**  You may.

10:26AM   4           **BY MR. COOPER:**

10:26AM   5   Q.  Take a moment and look through that three-page document,

10:26AM   6   sir, and when you're finished look up.

10:26AM   7       Do you recognize that?

10:26AM   8   A.  I do.  From my trial prep.

10:26AM   9   Q.  Is that a DEA-6 report?

10:26AM   10  A.  Yes.

10:26AM   11  Q.  Is there a case number on it?

10:26AM   12  A.  Yes.

10:26AM   13  Q.  Do you recognize the case number?

10:26AM   14  A.  Yes.

10:26AM   15  Q.  Okay.

10:26AM   16  A.  I do.

10:26AM   17  Q.  On the third page, or it's the second piece of paper,

10:27AM   18  it's double sided, is there an organizational chart?

10:27AM   19  A.  Yes.

10:27AM   20  Q.  Do you recognize that?

10:27AM   21  A.  Yes.

10:27AM   22  Q.  Starting with that organizational chart, is that a fair

10:27AM   23  and accurate depiction of the organizational chart that

10:27AM   24  Special Agent Webb brought to you and discussed with you at

10:27AM   25  the DEA?

| | | |
|---|---|---|
| 10:27AM | 1 | A.  Yes. |
| 10:27AM | 2 | Q.  And that DEA-6, is that a fair and accurate depiction of |
| 10:27AM | 3 | a DEA-6 report that was entered into your file on the, as |
| 10:27AM | 4 | you've called it, the David Gambino investigation? |
| 10:27AM | 5 | A.  Yes. |
| 10:27AM | 6 | **MR. COOPER:**  Judge, I'd offer Exhibit 30B into |
| 10:27AM | 7 | evidence. |
| 10:27AM | 8 | **MR. MacKAY:**  No objection. |
| 10:27AM | 9 | **THE COURT:**  Received without objection. |
| 10:27AM | 10 | **(GOV Exhibit 30B was received in evidence.)** |
| 10:27AM | 11 | **BY MR. COOPER:** |
| 10:27AM | 12 | Q.  May I have that back, sir? |
| 10:27AM | 13 | A.  Sure. |
| 10:27AM | 14 | **MR. COOPER:**  If we can publish to the jury just the |
| 10:27AM | 15 | third page of Exhibit 30B right now. |
| 10:27AM | 16 | **BY MR. COOPER:** |
| 10:28AM | 17 | Q.  Sir, can you see that up on your screen? |
| 10:28AM | 18 | A.  Yes. |
| 10:28AM | 19 | Q.  Can you circle the name that the defendant came up to |
| 10:28AM | 20 | speak with you about? |
| 10:28AM | 21 | If you touch the screen, it should draw on it, hopefully. |
| 10:28AM | 22 | A.  This one. |
| 10:28AM | 23 | **MR. COOPER:**  Just for the record, Judge, there's a |
| 10:28AM | 24 | green circle surrounding the box with Peter "Gerasi" Jr. |
| 10:28AM | 25 | towards the top of the center of the exhibit? |

Case 1:19-cr-00227-LJV-MJR   Document 1144   Filed 08/24/24   Page 19 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

19

10:28AM   1    **THE COURT:**  That's accurate.

10:28AM   2    **BY MR. COOPER:**

10:28AM   3    Q.  Special Agent Webb, the location of that name on this

10:28AM   4    organizational chart, would you term that as towards the top

10:28AM   5    of the chart?

10:28AM   6    A.  Yeah, top middle, upper middle.

10:28AM   7    Q.  And you just got my next question, but it's in the

10:28AM   8    center, right?

10:28AM   9    A.  Yes.

10:28AM   10   Q.  You described for us before that these organizational

10:28AM   11   charts are often box and line diagrams, right?

10:28AM   12   A.  Yes.

10:28AM   13   Q.  Is that what this chart is?

10:28AM   14   A.  Yes.

10:28AM   15   Q.  Are there a bunch of different lines coming off the name

10:29AM   16   Peter "Gerasi" Jr.

10:29AM   17   A.  Yes.

10:29AM   18   Q.  Those go to a variety of different names and individuals;

10:29AM   19   is that right?

10:29AM   20   A.  Yes.

10:29AM   21   Q.  When you got this chart from Special Agent TJ Webb did

10:29AM   22   you bring it over to the defendant and hand it to him?

10:29AM   23   A.  No.

10:29AM   24   Q.  Did you try to start a discussion with him about it?

10:29AM   25   A.  I don't recall.

| | | |
|---|---|---|
| 10:29AM | 1 | Q.  Who started the discussion about the name Peter Gerace? |
| 10:29AM | 2 | A.  I believe it was Special Agent Webb when we initially |
| 10:29AM | 3 | were reviewing the chart. |
| 10:29AM | 4 | Q.  And was the defendant a part of that initial conversation |
| 10:29AM | 5 | with Special Agent Webb? |
| 10:29AM | 6 | A.  I don't believe so, no. |
| 10:29AM | 7 | Q.  So at some point later, the defendant comes up to talk to |
| 10:29AM | 8 | you about this name Peter "Gerasi" on the chart? |
| 10:29AM | 9 | A.  Yes. |
| 10:29AM | 10 | **MR. COOPER:**  Ms. Champoux, can we go to page 1 of |
| 10:29AM | 11 | this exhibit?  If we can zoom out so we get the whole thing? |
| 10:30AM | 12 | Thank you. |
| 10:30AM | 13 | Can we zoom in on the top portion through box 10? |
| 10:30AM | 14 | Thank you. |
| 10:30AM | 15 | **BY MR. COOPER:** |
| 10:30AM | 16 | Q.  Can you see that, Special Agent Wisniewski? |
| 10:30AM | 17 | A.  Yes. |
| 10:30AM | 18 | Q.  At the box number 3, there's a file number; is that |
| 10:30AM | 19 | correct? |
| 10:30AM | 20 | A.  Yes. |
| 10:30AM | 21 | Q.  C2-06-0120? |
| 10:30AM | 22 | A.  Yes. |
| 10:30AM | 23 | Q.  Was that the file number for your David Gambino |
| 10:30AM | 24 | investigation? |
| 10:30AM | 25 | A.  Yes. |

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

| | | |
|---|---|---|
| 10:30AM | 1 | Q.  Now in the box where it says file title, that says |
| 10:30AM | 2 | Matthew Scalia; is that correct? |
| 10:30AM | 3 | A.  Correct. |
| 10:30AM | 4 | Q.  Can you just explain to the jury why it doesn't say David |
| 10:30AM | 5 | Gambino? |
| 10:30AM | 6 | A.  Because when we initiate -- when DEA initiates cases, |
| 10:30AM | 7 | usually you will name the first person that you think most |
| 10:30AM | 8 | likely you'll be able to arrest.  In this instance, where we |
| 10:30AM | 9 | started the case it was a person by the name Matthew Scalia. |
| 10:30AM | 10 | We purchased cocaine from him, and eventually arrested him. |
| 10:31AM | 11 | And that took us to other parts of the case. |
| 10:31AM | 12 | Q.  Based upon your investigation, did you use this file |
| 10:31AM | 13 | title, Matthew Scalia, to continue to investigate the Gambino |
| 10:31AM | 14 | organization? |
| 10:31AM | 15 | A.  Yes. |
| 10:31AM | 16 | Q.  Were there links between Scalia and Gambino? |
| 10:31AM | 17 | A.  I believe so, yes. |
| 10:31AM | 18 | Q.  Would it have been appropriate to build the Gambino |
| 10:31AM | 19 | investigation into a file that had nothing to do with |
| 10:31AM | 20 | Gambino? |
| 10:31AM | 21 | A.  I'm sorry, say that again? |
| 10:31AM | 22 | Q.  Would it have been appropriate to build the Gambino |
| 10:31AM | 23 | investigation out in a file that had nothing to do with |
| 10:31AM | 24 | Gambino? |
| 10:31AM | 25 | A.  Generally not, no. |

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

10:31AM    1    Q.  So if it's under the Scalia file title, based on your

10:31AM    2    training and experience, you'd expect there to be a link

10:31AM    3    between those two?

10:31AM    4    A.  Yes.

10:31AM    5    Q.  Okay.  What's the date that this report was prepared?

10:31AM    6    A.  It says -- it says December 2nd, 2008.

10:31AM    7    Q.  And who's the author of this report?

10:31AM    8    A.  Special Agent Joseph Bongiovanni.

10:31AM    9    Q.  Are there other officers listed?

10:31AM   10    A.  Yes.

10:31AM   11    Q.  Who are they?

10:31AM   12    A.  Myself, and police -- Buffalo Police Captain Mark

10:32AM   13    Marchiello.

10:32AM   14    Q.  You see the initials AGS in front of your name?

10:32AM   15    A.  Yes.

10:32AM   16    Q.  What does that mean, can you tell them?

10:32AM   17    A.  At the time of this report's writing, I was the acting

10:32AM   18    group supervisor.  So that basically means our supervisor

10:32AM   19    moved up a rank to run the office at the time, and I was

10:32AM   20    temporarily running the team.

10:32AM   21    Q.  In box 10, is that kind of a summary of what this report

10:32AM   22    is supposed to be about?

10:32AM   23    A.  Yes.

10:32AM   24    Q.  Can you read for the jury what it says in box 10?

10:32AM   25    A.  Acquisition of flowchart associated to the David Gambino

| | | |
|---|---|---|
| 10:32AM | 1 | organization. |
| 10:32AM | 2 | Q.  You didn't write this DEA-6, did you? |
| 10:32AM | 3 | A.  No. |
| 10:32AM | 4 | Q.  Did you direct that this DEA-6 be written? |
| 10:32AM | 5 | A.  I don't recall the production of this DEA-6.  Again, it |
| 10:32AM | 6 | was written a long time ago. |
| 10:32AM | 7 | **MR. COOPER:**  Ms. Champoux, you can zoom out of that. |
| 10:32AM | 8 | And we can take the exhibit down for just a minute.  Thank |
| 10:32AM | 9 | you, ma'am. |
| 10:33AM | 10 | **BY MR. COOPER:** |
| 10:33AM | 11 | Q.  Would it be fair to say that an organizational chart like |
| 10:33AM | 12 | the one we just looked at, the purpose of it is to map out |
| 10:33AM | 13 | relationships between suspected criminal actors? |
| 10:33AM | 14 | A.  Yes. |
| 10:33AM | 15 | Q.  Okay.  Now at the time you got that chart, do you know |
| 10:33AM | 16 | whether the information on it was accurate? |
| 10:33AM | 17 | A.  I suspected that it might be.  That chart was not |
| 10:33AM | 18 | prepared by law enforcement, it was prepared by -- it was |
| 10:33AM | 19 | obtained by a confidential informant from the Buffalo Police |
| 10:33AM | 20 | Department, so we didn't really know what was on that chart. |
| 10:33AM | 21 | And then we -- a lot of the discussion was trying to figure |
| 10:33AM | 22 | out what it actually meant and who was who and what was what. |
| 10:33AM | 23 | Q.  Would it be fair to say it would require some follow-up |
| 10:33AM | 24 | investigation to find out if the information contained on |
| 10:33AM | 25 | here was accurate? |

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

| | | |
|---|---|---|
| 10:33AM | 1 | A.  Yes. |
| 10:33AM | 2 | Q.  What the -- would it be also fair to say, though, that |
| 10:34AM | 3 | what the chart purports to be is relationships between |
| 10:34AM | 4 | criminal actors? |
| 10:34AM | 5 | A.  Yes. |
| 10:34AM | 6 | Q.  Now, a few minutes ago you told the jury that the |
| 10:34AM | 7 | defendant came up and approached you about the name Peter |
| 10:34AM | 8 | Gerace being on your chart; do you remember that? |
| 10:34AM | 9 | A.  Yes. |
| 10:34AM | 10 | Q.  What did the defendant say to you when he approached you |
| 10:34AM | 11 | about Peter Gerace being on this chart? |
| 10:34AM | 12 | A.  He said that he knew him from the old neighborhood.  And |
| 10:34AM | 13 | that he could talk to him and try to do what's called a cold |
| 10:34AM | 14 | approach to see if he would cooperate with us. |
| 10:34AM | 15 | Q.  You used the term "cold approach."  Can you just define |
| 10:34AM | 16 | that for the jury? |
| 10:34AM | 17 | A.  A cold approach is a technique where we just approach |
| 10:34AM | 18 | someone that we think can help us, and either bluff them that |
| 10:35AM | 19 | they have charges pending or could have charges pending, or |
| 10:35AM | 20 | because they're a good citizen they help us out. |
| 10:35AM | 21 | Q.  Is that a technique of first resort for you as -- |
| 10:35AM | 22 | A.  Not generally, because it's a little on the riskier side. |
| 10:35AM | 23 | Q.  When you say it's "a little on the riskier side," can you |
| 10:35AM | 24 | explain to the jury what the risks are on a cold approach? |
| 10:35AM | 25 | A.  If you're approaching a potential person under |

10:35AM 1    investigation, then you've tipped your hand that he's under

10:35AM 2    investigation.  And during the discussion, he may or may not

10:35AM 3    learn of the scope of your investigation and, like, some of

10:35AM 4    the goings on if you're not careful in the -- how you

10:35AM 5    approach the situation.

10:35AM 6    Q.  Now, would it be fair to say a cold approach could result

10:35AM 7    in gaining a valuable cooperator?

10:35AM 8    A.  If it works, it's very valuable.  It speeds up the

10:35AM 9    investigative process immensely.

10:35AM 10   Q.  And if it doesn't work, there are risks such as derailing

10:36AM 11   the investigation into that target, right?

10:36AM 12   A.  Yes.

10:36AM 13   Q.  Did you agree to allow the defendant to pursue that

10:36AM 14   investigative approach with Gerace?

10:36AM 15   A.  Yes.

10:36AM 16   Q.  At that time, when you had this conversation, was Gerace

10:36AM 17   the main target of your investigation?

10:36AM 18   A.  No.

10:36AM 19   Q.  Was he a key focus for you?

10:36AM 20   A.  No.

10:36AM 21   Q.  If he had been the main target, the head honcho in your

10:36AM 22   investigation, would you have a approved a cold approach out

10:36AM 23   of nowhere?

10:36AM 24   A.  It would have been a much lengthier, I think, discussion

10:36AM 25   with the partner agencies and leadership, management, about

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

26

| | | |
|--|--|--|
| 10:36AM | 1 | whether or not that would be appropriate. |
| 10:36AM | 2 | Q.  But in these circumstances, you agreed to allow the |
| 10:36AM | 3 | defendant to try that; is that correct? |
| 10:36AM | 4 | A.  Yes. |
| 10:36AM | 5 | Q.  During that discussion about the defendant volunteering |
| 10:36AM | 6 | to cold approach Peter Gerace, did he tell you that they were |
| 10:36AM | 7 | personal friends? |
| 10:36AM | 8 | A.  He didn't -- I don't really recall, he said he knew him |
| 10:37AM | 9 | from the old neighborhood. |
| 10:37AM | 10 | Q.  Okay.  Did he tell you that they went on double dates |
| 10:37AM | 11 | together? |
| 10:37AM | 12 | A.  No, I don't think so. |
| 10:37AM | 13 | Q.  If he had told you that, would that have stuck out in |
| 10:37AM | 14 | your mind? |
| 10:37AM | 15 | A.  Yes. |
| 10:37AM | 16 | Q.  Okay.  Does it stick out in your mind? |
| 10:37AM | 17 | A.  No. |
| 10:37AM | 18 | Q.  Did he tell you that him and Peter Gerace went on |
| 10:37AM | 19 | vacations together? |
| 10:37AM | 20 | A.  No. |
| 10:37AM | 21 | Q.  Did he tell you that he and Peter Gerace exchanged social |
| 10:37AM | 22 | phone calls together? |
| 10:37AM | 23 | A.  No. |
| 10:37AM | 24 | Q.  Did he tell you that he and Peter Gerace text messaged |
| 10:37AM | 25 | each other? |

| | | |
|---|---|---|
| 10:37AM | 1 | A.  No. |
| 10:37AM | 2 | Q.  If he had shared that information with you, would you |
| 10:37AM | 3 | have said, yeah, go out, do the cold approach, see how it |
| 10:37AM | 4 | goes? |
| 10:37AM | 5 | A.  I don't know.  But it definitely would have affected the |
| 10:37AM | 6 | decision-making process, it would have been a much lengthier |
| 10:37AM | 7 | discussion. |
| 10:37AM | 8 | Q.  Would you have brought this to a supervisor? |
| 10:37AM | 9 | A.  Most likely, yes. |
| 10:37AM | 10 | Q.  How many years have you been a DEA special agent? |
| 10:37AM | 11 | A.  Now?  Over 25, going on 26 years. |
| 10:38AM | 12 | Q.  Would you handle a close personal friend as a |
| 10:38AM | 13 | confidential source? |
| 10:38AM | 14 | A.  I would not, no. |
| 10:38AM | 15 | Q.  Would you handle a close personal friend as a source of |
| 10:38AM | 16 | information? |
| 10:38AM | 17 | A.  Probably not. |
| 10:38AM | 18 | Q.  Sometime after that conversation with the defendant, does |
| 10:38AM | 19 | he come and report back to you about his cold approach of |
| 10:38AM | 20 | Peter Gerace? |
| 10:38AM | 21 | A.  Yes. |
| 10:38AM | 22 | Q.  What does he tell you? |
| 10:38AM | 23 | A.  That it wasn't going to happen.  Mr. Gerace didn't -- I |
| 10:38AM | 24 | don't recall the exact conversation, again, it was a very |
| 10:38AM | 25 | long time ago, but he either didn't know the right people or |

| | | |
|---|---|---|
| 10:38AM | 1 | he couldn't get the right quantities of drugs.  And it turned |
| 10:38AM | 2 | out that it was going to be marijuana.  And I remember the |
| 10:38AM | 3 | discussion was around 10 pounds, he could only get around 10 |
| 10:38AM | 4 | or less than 10.  I don't recall specifically, but it |
| 10:38AM | 5 | didn't -- it wasn't going to work out. |
| 10:39AM | 6 | Q.  When the defendant came back to talk to you, did he |
| 10:39AM | 7 | encourage you to use Peter Gerace as a cooperator? |
| 10:39AM | 8 | A.  Did he encourage me? |
| 10:39AM | 9 | Q.  Did he encourage you. |
| 10:39AM | 10 | A.  I don't recall. |
| 10:39AM | 11 | Q.  Did the information that he provided you as you just |
| 10:39AM | 12 | related to the jury, is that he told you this guy's not going |
| 10:39AM | 13 | to help us, right? |
| 10:39AM | 14 | A.  Yes. |
| 10:39AM | 15 | Q.  That's not encouraging you to use him, is it? |
| 10:39AM | 16 | A.  No. |
| 10:39AM | 17 | Q.  Is there an inherent trust that exists between DEA |
| 10:39AM | 18 | special agents? |
| 10:39AM | 19 | A.  Yes. |
| 10:39AM | 20 | Q.  Do you believe something that another special agent tells |
| 10:39AM | 21 | you when you're at work? |
| 10:39AM | 22 | A.  Yes. |
| 10:39AM | 23 | Q.  Is that important? |
| 10:39AM | 24 | A.  Yes. |
| 10:39AM | 25 | Q.  Why is it important? |

10:39AM  1   A.  Because we handle a tremendous amount of information, and

10:39AM  2   you can't possibly check it all yourself, you have to rely on

10:39AM  3   the work of others and the word of others to sort of make the

10:39AM  4   cases move forward.

10:39AM  5   Q.  When the defendant told you after his cold approach with

10:39AM  6   Peter Gerace that Gerace didn't have information that could

10:40AM  7   help you, did you believe him?

10:40AM  8   A.  Yes.

10:40AM  9   Q.  Did you go and vet it yourself and talk to Gerace

10:40AM  10  yourself?

10:40AM  11  A.  I did not, no.

10:40AM  12  Q.  When the defendant reported back to you that his cold

10:40AM  13  approach of Peter Gerace had essentially failed, does that

10:40AM  14  diminish your ability or inroads you could have to

10:40AM  15  investigate Peter Gerace?

10:40AM  16  A.  It could.

10:40AM  17  Q.  How so?

10:40AM  18  A.  I mean, well, he now knows that, you know, we have

10:40AM  19  information that he may be involved in drug trafficking.  So

10:40AM  20  he could potentially, like, stop trafficking for a while.  He

10:40AM  21  can change, like, who he deals with.  He can change his

10:40AM  22  method of operations.

10:40AM  23  Q.  Is it a fairly basic concept in drug investigations that

10:40AM  24  you don't want the target of your investigation to know

10:41AM  25  they're under investigation?

Case 1:19-cr-00227-LJV-MJR    Document 1144    Filed 08/24/24    Page 30 of 64
USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

30

10:41AM    1    A.  Generally speaking, yes, sir.

10:41AM    2    Q.  It makes your job easier, right?

10:41AM    3    A.  Yes.

10:41AM    4    Q.  And to the contrary, if they know they're under

10:41AM    5    investigation, would that make your job harder?

10:41AM    6    A.  Yes.

10:41AM    7         **MR. COOPER:**  Ms. Champoux, can we go back to

10:41AM    8    Government Exhibit 30B on page 1, please.

10:41AM    9         Can you zoom in on paragraphs 1 and 2.

10:41AM   10         **BY MR. COOPER:**

10:41AM   11    Q.  This paragraph 1 sentence here, is that a standard

10:41AM   12    sentence that's used in DEA-6 reports?

10:41AM   13    A.  Sentence 1, yes.

10:41AM   14    Q.  Okay.  Can you just tell them, I think this may be the

10:41AM   15    first time we're going through it, can you explain to the

10:41AM   16    jury what that standard sentence is and what it means?

10:41AM   17    A.  So when we write that, we're linking this information to

10:42AM   18    the other information in the file.  When we report, some

10:42AM   19    agencies write one long comprehensive report.  When we do a

10:42AM   20    report, we do it by action.  So this information is here

10:42AM   21    because it is connected to other information in the file.

10:42AM   22    Q.  Can you read paragraph 2 for the jury?

10:42AM   23    A.  On December 1, 2008, at approximately 7:30 p.m., Special

10:42AM   24    Agent Bongiovanni met with Buffalo Police Captain Mark

10:42AM   25    Marchiello at Buffalo Police headquarters in Buffalo,

10:42AM  1  New York.  At that time, Captain Marchiello gave Special

10:42AM  2  Agent Bongiovanni an organizational chart listing drug

10:42AM  3  traffickers identified by target David Gambino.  The

10:42AM  4  organizational chart was sketched by Gambino himself, and

10:42AM  5  given to a confidential source utilized by BPD Captain

10:42AM  6  Marchiello.  The organizational chart describes significant

10:42AM  7  targets, both identified as drug traffickers and other

10:43AM  8  targets yet to be identified as those trafficking in cocaine

10:43AM  9  and marijuana in the Buffalo, New York area.

10:43AM  10          MR. COOPER:  Can you zoom out, Ms. Champoux?  And

10:43AM  11  zoom in on paragraph 3 and 4.

10:43AM  12          BY MR. COOPER:

10:43AM  13  Q.  Can you continue reading at paragraph 3, slowly?

10:43AM  14  A.  On December 2nd, 2008, Special Agent Bongiovanni turned

10:43AM  15  over the aforementioned chart to case agent -- Special Agent

10:43AM  16  Christopher Wisniewski in reference to case file C2-06-0120.

10:43AM  17      Special Agent Wisniewski stated he would contact BPD

10:43AM  18  Captain Marchiello to discuss the details of how the chart

10:43AM  19  was acquired.

10:43AM  20  Q.  Is the information in paragraph 3 accurate?

10:43AM  21  A.  I don't recall.  It -- it -- it's inconsistent with my

10:43AM  22  recollection.  I received the organizational chart from TJ

10:44AM  23  Webb.

10:44AM  24  Q.  Does the report say Special Agent Wisniewski received the

10:44AM  25  organizational chart from TJ Webb?

USA v Bongiovanni - Wisniewski - Cooper/Direct - 8/7/24

10:44AM  1    A.  No.

10:44AM  2    Q.  Is it accurate?

10:44AM  3    A.  Not in that aspect, no.

10:44AM  4    Q.  It says Special Agent Wisniewski stated that he would

10:44AM  5    contact BPD Captain Marchiello to discuss the details of how

10:44AM  6    the chart was acquired.  Did you state that?

10:44AM  7    A.  I don't recall stating that.  I don't recall that I ever

10:44AM  8    spoke with Captain Marchiello regarding the matter.  I

10:44AM  9    believe it was all TJ Webb doing that.

10:44AM  10          **MR. COOPER:**  You can zoom out, Ms. Champoux.

10:44AM  11          Can you zoom in on boxes 11, 12, 13, 14, and 15.

10:44AM  12   Thank you.

10:44AM  13          **BY MR. COOPER:**

10:44AM  14   Q.  Is this the signature block of DEA-6?

10:44AM  15   A.  Yes.

10:44AM  16   Q.  Who's the author of the report?

10:44AM  17   A.  Special Agent Bongiovanni.

10:44AM  18   Q.  Does it list you as the approver?

10:44AM  19   A.  Yes.

10:44AM  20   Q.  Do you have any independent recollection of approving

10:44AM  21   that?

10:44AM  22   A.  No.

10:44AM  23          **MR. COOPER:**  You can zoom out of that, Ms. Champoux.

10:45AM  24          **BY MR. COOPER:**

10:45AM  25   Q.  In this DEA-6, is there any mention of the name Peter

| 10:45AM | 1 | Gerace? |
| 10:45AM | 2 | A.  No. |
| 10:45AM | 3 | Q.  Is there any mention of a cold approach? |
| 10:45AM | 4 | A.  No. |
| 10:45AM | 5 | **MR. COOPER:**  Can you go to the next page, |
| 10:45AM | 6 | Ms. Champoux? |
| 10:45AM | 7 | **BY MR. COOPER:** |
| 10:45AM | 8 | Q.  Down here at the bottom, do you see -- it's really at the |
| 10:45AM | 9 | top, do you see where it says indexing? |
| 10:45AM | 10 | A.  Yes. |
| 10:45AM | 11 | Q.  How many people are indexed? |
| 10:45AM | 12 | A.  One. |
| 10:45AM | 13 | Q.  Who? |
| 10:45AM | 14 | A.  David Gambino. |
| 10:45AM | 15 | Q.  Is Peter Gerace indexed? |
| 10:45AM | 16 | A.  No. |
| 10:45AM | 17 | Q.  Is there any reference in this DEA-6 to a cold approach |
| 10:45AM | 18 | of Peter Gerace? |
| 10:45AM | 19 | A.  No. |
| 10:45AM | 20 | Q.  Is there any reference in this DEA-6 to the defendant, |
| 10:45AM | 21 | Joseph Bongiovanni, going and talking to Peter Gerace about |
| 10:45AM | 22 | the organizational chart? |
| 10:45AM | 23 | A.  No. |
| 10:45AM | 24 | **MR. COOPER:**  You can take that down, Ms. Champoux. |
| 10:45AM | 25 | Judge, may I approach the witness? |

| | | |
|---|---|---|
| 10:45AM | 1 | **THE COURT:**  Sure. |
| 10:45AM | 2 | **BY MR. COOPER:** |
| 10:45AM | 3 | Q.  I'm holding what's in evidence as Government Exhibit 30A. |
| 10:46AM | 4 | Can you take a moment and look at that, and when you're |
| 10:46AM | 5 | finished, look back up at me, sir. |
| 10:46AM | 6 | Is that a DEA-6 report? |
| 10:46AM | 7 | A.  Yes. |
| 10:46AM | 8 | Q.  When's the first time you recall seeing that report? |
| 10:46AM | 9 | A.  This morning. |
| 10:46AM | 10 | Q.  Before you were shown that report this morning, do you |
| 10:46AM | 11 | recall ever seeing it before? |
| 10:46AM | 12 | A.  No. |
| 10:46AM | 13 | Q.  What file is that report written into? |
| 10:46AM | 14 | A.  C2-06-0120, Matthew Scalfia. |
| 10:46AM | 15 | Q.  Is that the investigation into David Gambino that you |
| 10:46AM | 16 | were involved in between '06 and '08? |
| 10:46AM | 17 | A.  Yes. |
| 10:46AM | 18 | Q.  Did you write this DEA-6? |
| 10:46AM | 19 | A.  No. |
| 10:46AM | 20 | Q.  Who's the author of it? |
| 10:46AM | 21 | A.  Special Agent Joseph Bongiovanni. |
| 10:47AM | 22 | **MR. COOPER:**  Can we publish Exhibit 30A to the jury, |
| 10:47AM | 23 | please?  Thank you. |
| 10:47AM | 24 | Can we zoom in on paragraph 2 and 3? |
| 10:47AM | 25 | Ms. Champoux, can you highlight the second sentence |

10:47AM    1    in paragraph 2?  Starting here.  No, the second sentence.

10:47AM    2         Thank you.

10:47AM    3              **BY MR. COOPER:**

10:47AM    4    Q.  We highlighted the second sentence in paragraph 2 of

10:47AM    5    Government Exhibit 30A.  Do you see that?

10:47AM    6    A.  Yes.

10:47AM    7    Q.  Gerace has acted as a confidential source, and has been

10:47AM    8    able to provide information regarding individuals in this

10:47AM    9    case file and other narcotic investigation in the past.

10:48AM   10         Is that what it says?

10:48AM   11    A.  Yes.

10:48AM   12    Q.  Where it says this case file, is that reference to

10:48AM   13    C2-06-0120?

10:48AM   14    A.  I would assume so.

10:48AM   15    Q.  That's the file it's entered into, right?

10:48AM   16    A.  Yes.

10:48AM   17    Q.  Did the defendant ever tell you that Peter Gerace

10:48AM   18    provided information regarding individuals in C2-06-0120?

10:48AM   19    A.  Outside of what we've already discussed, no.

10:48AM   20    Q.  Well, what you discussed was he couldn't help you, right?

10:48AM   21    A.  Correct.

10:48AM   22    Q.  Is what's written in this DEA-6 consistent with what the

10:48AM   23    defendant told you about his meeting, his cold approach of

10:48AM   24    Peter Gerace?

10:48AM   25    A.  No.

| | | |
|---|---|---|
| 10:48AM | 1 | Q.  It's not? |
| 10:48AM | 2 | A.  I'm sorry, it's not consistent. |
| 10:48AM | 3 | **MR. COOPER:**  Okay.  You can zoom out, Ms. Champoux. |
| 10:48AM | 4 | Thank you.  Can you go to page 2 of this exhibit. |
| 10:48AM | 5 | **BY MR. COOPER:** |
| 10:49AM | 6 | Q.  Do you see at the bottom where it says indexing section? |
| 10:49AM | 7 | A.  Yes. |
| 10:49AM | 8 | Q.  Is Peter Gerace indexed on that DEA-6? |
| 10:49AM | 9 | A.  Yes. |
| 10:49AM | 10 | Q.  Do you see where it says NADDIS number pending? |
| 10:49AM | 11 | A.  Yes. |
| 10:49AM | 12 | Q.  What does "NADDIS number pending" mean? |
| 10:49AM | 13 | A.  That means information regarding that subject was entered |
| 10:49AM | 14 | into the system, and the system -- the information was to be |
| 10:49AM | 15 | processed, and it would generate a NADDIS number for that |
| 10:49AM | 16 | person. |
| 10:49AM | 17 | Q.  Now, just walk through this with me.  At the time you're |
| 10:49AM | 18 | creating a DEA-6, not this one in particular, but you're |
| 10:49AM | 19 | creating a DEA-6, and you enter someone into NADDIS.  Are you |
| 10:49AM | 20 | checking to see if they already have a NADDIS number? |
| 10:49AM | 21 | A.  You should, yes. |
| 10:49AM | 22 | Q.  Okay.  And if they already have a NADDIS number, do you |
| 10:49AM | 23 | put that NADDIS number in? |
| 10:49AM | 24 | A.  Yes. |
| 10:49AM | 25 | Q.  How do you check to see if someone already has a NADDIS |

| | | |
|---|---|---|
| 10:49AM | 1 | number? |
| 10:49AM | 2 | A.  You access NADDIS and run their name. |
| 10:49AM | 3 | Q.  Is it hard? |
| 10:50AM | 4 | A.  No, it only takes a few minutes. |
| 10:50AM | 5 | Q.  As an experienced DEA special agent, do you know how to |
| 10:50AM | 6 | check if someone has a NADDIS number? |
| 10:50AM | 7 | A.  Yes. |
| 10:50AM | 8 | Q.  Before you index someone, do you check to see if they |
| 10:50AM | 9 | have a NADDIS number? |
| 10:50AM | 10 | A.  Do I?  Yes, I do. |
| 10:50AM | 11 | Q.  Okay.  In NADDIS, can that include information about a |
| 10:50AM | 12 | person, like their phone number? |
| 10:50AM | 13 | A.  Yes. |
| 10:50AM | 14 | Q.  Can it include their address? |
| 10:50AM | 15 | A.  Yes. |
| 10:50AM | 16 | Q.  Is it something that helps the DEA to investigate people? |
| 10:50AM | 17 | A.  Yes. |
| 10:50AM | 18 | **MR. COOPER:**  Judge, may I approach the witness? |
| 10:50AM | 19 | **THE COURT:**  You may. |
| 10:50AM | 20 | **BY MR. COOPER:** |
| 10:50AM | 21 | Q.  I'm holding what's in evidence subject to connection and |
| 10:50AM | 22 | subject to authentication as Exhibit 437.  Do you recognize |
| 10:50AM | 23 | that document, sir? |
| 10:50AM | 24 | A.  Yes. |
| 10:50AM | 25 | Q.  Is that a NADDIS printout? |

10:50AM    1    A.  Yes.

10:50AM    2    Q.  Who does it pertain to?

10:50AM    3    A.  Peter Gerace.

10:50AM    4    Q.  Towards the top of that document, is there an indication

10:51AM    5    as to when Peter Gerace was assigned a NADDIS number?

10:51AM    6    A.  Yes.

10:51AM    7    Q.  When is it?

10:51AM    8    A.  It says date of record, January 16, 1992.

10:51AM    9    Q.  Do NADDIS records expire after six months?

10:51AM   10    A.  No.

10:51AM   11    Q.  Do they last a long time?

10:51AM   12    A.  Yes.

10:51AM   13    Q.  Does that help you in investigations?

10:51AM   14    A.  Yes.

10:51AM   15    Q.  Is it important that you be able to look back and see if

10:51AM   16    someone had come up in 1992?

10:51AM   17    A.  It's helpful, yes.

10:51AM   18    Q.  Okay.  So based on your 25-plus years of experience at

10:51AM   19    the DEA, if you ran Peter Gerace in NADDIS in 2008, would he

10:51AM   20    have shown up?

10:51AM   21    A.  He should have.

10:51AM   22    Q.  He's been in NADDIS since 1992, right?

10:51AM   23    A.  Yes.

10:51AM   24            MR. COOPER:  May I approach, Judge?

10:51AM   25            THE COURT:  Yes.

| | | |
|---|---|---|
| 10:51AM | 1 | **MR. COOPER:**  Thank you. |
| 10:51AM | 2 | **BY MR. COOPER:** |
| 10:51AM | 3 | Q.  When that report, Government Exhibit 30A, reports that |
| 10:51AM | 4 | Peter Gerace's NADDIS was pending, that was not accurate |
| 10:51AM | 5 | information, was it? |
| 10:51AM | 6 | A.  No. |
| 10:51AM | 7 | Q.  By volunteering to go do a cold approach on Peter Gerace, |
| 10:52AM | 8 | the defendant necessarily informed him that he was under a |
| 10:52AM | 9 | DEA investigation, right? |
| 10:52AM | 10 | **MR. MacKAY:**  Objection.  Objection.  Assumes facts |
| 10:52AM | 11 | not in evidence. |
| 10:52AM | 12 | **MR. COOPER:**  Judge, those facts are in evidence. |
| 10:52AM | 13 | **THE COURT:**  Overruled.  Overruled.  You don't need -- |
| 10:52AM | 14 | overruled. |
| 10:52AM | 15 | **THE WITNESS:**  I'm sorry, can you -- |
| 10:52AM | 16 | **MR. COOPER:**  Ann, can you read back that question, |
| 10:52AM | 17 | please? |
| 10:52AM | 18 | (The above-requested question was then read by the |
| 10:52AM | 19 | reporter.) |
| 10:52AM | 20 | **THE WITNESS:**  I don't know.  I wasn't part of that |
| 10:52AM | 21 | conversation.  I don't know what they discussed.  I would |
| 10:52AM | 22 | assume that the subject would put enough information together |
| 10:52AM | 23 | to realize that, you know, his name came up.  But, again, I |
| 10:53AM | 24 | wouldn't know for sure. |
| 10:53AM | 25 | **MR. COOPER:**  Okay.  I have no further questions, |

10:53AM     1    Judge.

10:53AM     2              **THE COURT:**  Mr. MacKay?

10:53AM     3

10:53AM     4              **CROSS-EXAMINATION BY MR. MacKAY:**

10:53AM     5    Q.  Good morning, Agent Wisniewski.  How are you?

10:53AM     6    A.  Well, sir.  How are you?

10:53AM     7    Q.  I'm well, thanks for asking.

10:53AM     8        All right.  Let's start with timeframe.  Those events

10:53AM     9    occur in late 2008, correct?

10:53AM    10    A.  Yes.

10:53AM    11    Q.  16 years ago, correct?

10:53AM    12    A.  Yes.

10:53AM    13    Q.  And I think it came up in your direct testimony, but a

10:53AM    14    lot of the stuff you don't have a direct recollection of,

10:53AM    15    correct?

10:53AM    16    A.  It was a long time ago.

10:53AM    17    Q.  And that's my question.  You're not remembering specific

10:53AM    18    conversations, correct?

10:53AM    19    A.  Yes.

10:53AM    20    Q.  You're not remembering the words of the specific

10:53AM    21    conversations, correct?

10:53AM    22    A.  Not the specific ones, no, sir.

10:53AM    23    Q.  You might have some takeaway from the conversation, but

10:53AM    24    fair to say you're lacking a lot of -- you're lacking a

10:54AM    25    recall of a lot of the specifics, correct?

| | | |
|---|---|---|
| 10:54AM | 1 | A.  Yes. |
| 10:54AM | 2 | Q.  Okay.  Let's talk about DEA files. |
| 10:54AM | 3 | So Matt Scalia is the name of the C2 -- I'm sorry -- |
| 10:54AM | 4 | C2-06-0120 file, correct? |
| 10:54AM | 5 | A.  Yes. |
| 10:54AM | 6 | Q.  And I think you told us on direct, he's assigned a name |
| 10:54AM | 7 | probably because he's the first target or subject being |
| 10:54AM | 8 | looked at in that file, correct? |
| 10:54AM | 9 | A.  Yes. |
| 10:54AM | 10 | Q.  And that goes all the way back to around 2006, correct? |
| 10:54AM | 11 | A.  Yes. |
| 10:54AM | 12 | Q.  And at that point in time, you're what's called the case |
| 10:54AM | 13 | agent on the file, correct? |
| 10:54AM | 14 | A.  One of them, yes. |
| 10:54AM | 15 | Q.  The other one being Christian Ulmer, your partner? |
| 10:54AM | 16 | A.  Yes. |
| 10:54AM | 17 | Q.  You open that file up, right? |
| 10:54AM | 18 | A.  Yes. |
| 10:54AM | 19 | Q.  And from there, you told us a little bit on direct, DEA |
| 10:54AM | 20 | investigations can take different routes, right? |
| 10:54AM | 21 | A.  Yes. |
| 10:54AM | 22 | Q.  Start with one file that might branch off into |
| 10:54AM | 23 | investigating somebody else, correct? |
| 10:54AM | 24 | A.  Yes. |
| 10:54AM | 25 | Q.  And in this specific case, Dave Gambino becomes one |

10:55AM    1    avenue that the Matt Scalia file takes, correct?

10:55AM    2    A.   Yes.

10:55AM    3    Q.   Now, just kind of simplifying it, we've got the Matt

10:55AM    4    Scalia file, the whole file, correct?

10:55AM    5    A.   Yes.

10:55AM    6    Q.   Within there, you've got some information about Dave

10:55AM    7    Gambino, correct?

10:55AM    8    A.   Yes.

10:55AM    9    Q.   Now Dave Gambino is also connected to other law

10:55AM    10   enforcement agencies because he's the subject of an OCDETF

10:55AM    11   investigation, correct?

10:55AM    12   A.   Yes.

10:55AM    13   Q.   So when you're working on an investigation with Dave

10:55AM    14   Gambino, you're linking up with other agencies, correct?

10:55AM    15   A.   Yes.

10:55AM    16   Q.   And in that investigation, you had a lot of discussion

10:55AM    17   with a number of different agencies, correct?

10:55AM    18   A.   Yes.

10:55AM    19   Q.   And fair to say the Dave Gambino investigation took on a

10:55AM    20   life of its own?

10:55AM    21   A.   It was -- it became large, yes.

10:55AM    22   Q.   It was ultimately resulted in a prosecution where the

10:55AM    23   criminal complaint was filed by the DEA, correct?

10:55AM    24   A.   I believe so.

10:55AM    25   Q.   By Bobby Nunn?

USA v Bongiovanni - Wisniewski - MacKay/Cross - 8/7/24

43

| | | |
|---|---|---|
| 10:55AM | 1 | A.  At some point, I was taken off the case because I changed |
| 10:56AM | 2 | groups and I don't -- I don't have all the specifications of |
| 10:56AM | 3 | who was resolved. |
| 10:56AM | 4 | Q.  But within the David Gambino investigation, there was |
| 10:56AM | 5 | also the individual David Reynolds? |
| 10:56AM | 6 | A.  I believe so. |
| 10:56AM | 7 | Q.  Somewhere in that investigation, he's connected, correct? |
| 10:56AM | 8 | A.  I believe so. |
| 10:56AM | 9 | MR. MacKAY:  So, Ms. Champoux, can we pull up |
| 10:56AM | 10 | Government Exhibit 30B, please?  For everybody. |
| 10:56AM | 11 | THE CLERK:  All set. |
| 10:56AM | 12 | MR. MacKAY:  Can we go to page 3, the chart page. |
| 10:56AM | 13 | Okay. |
| 10:56AM | 14 | BY MR. MacKAY: |
| 10:56AM | 15 | Q.  Okay.  So in front of you, there's the chart that's |
| 10:56AM | 16 | attached to Government Exhibit 30B, do you see that? |
| 10:56AM | 17 | A.  Yes. |
| 10:56AM | 18 | Q.  Okay.  So it's your testimony that that chart, you |
| 10:56AM | 19 | specifically received from TJ Webb? |
| 10:56AM | 20 | A.  Yes. |
| 10:56AM | 21 | Q.  And you look at the bottom, you see TJ Webb's number on |
| 10:56AM | 22 | there, correct? |
| 10:56AM | 23 | A.  Yes. |
| 10:56AM | 24 | Q.  Right above that, I'm underlining it, do you see Mark |
| 10:57AM | 25 | Marchiello, and you see a phone number, correct? |

| | | |
|---|---|---|
| 10:57AM | 1 | A.  Yes. |
| 10:57AM | 2 | Q.  Your understanding is that somewhere along the process, |
| 10:57AM | 3 | this information that's depicted in this chart comes through |
| 10:57AM | 4 | Mark Marchiello from the Buffalo police? |
| 10:57AM | 5 | A.  That's my understanding, yes. |
| 10:57AM | 6 | Q.  Okay.  Over on the lower right, I'm sorry, lower left |
| 10:57AM | 7 | side, you've got a file title -- I'm sorry, a file number |
| 10:57AM | 8 | matching Matt Scalia, correct? |
| 10:57AM | 9 | A.  Yes. |
| 10:57AM | 10 | Q.  Now, right below there, I'm going to underline it, I |
| 10:57AM | 11 | realize it's going vertical, it says conj, C-O-N-J, period, |
| 10:57AM | 12 | W slash ICE.  Do you see that? |
| 10:57AM | 13 | A.  Yes. |
| 10:57AM | 14 | Q.  Is that -- I'm trying to spell that out, is that a fair |
| 10:57AM | 15 | depiction of what you see there? |
| 10:57AM | 16 | A.  I believe it says original with ice. |
| 10:57AM | 17 | Q.  Oh, that's what I was wondering, is what does that stand |
| 10:57AM | 18 | for.  And your understanding is that's -- |
| 10:58AM | 19 | A.  Original is with ICE. |
| 10:58AM | 20 | Q.  Okay. |
| 10:58AM | 21 | A.  So they maintained whatever Mark Marchiello had. |
| 10:58AM | 22 | Q.  Okay.  Now, your testimony on direct is that TJ Webb |
| 10:58AM | 23 | reaches out to you in a phone call when you're at the U.S. |
| 10:58AM | 24 | Attorney's Office, right? |
| 10:58AM | 25 | A.  I believe so, yes. |

10:58AM 1   Q.  Okay.  And at some point in time after that, you get some

10:58AM 2   sort of organizational chart that he turns over to you,

10:58AM 3   correct?

10:58AM 4   A.  Yes.

10:58AM 5   Q.  Okay.  And that was all in the discussion of the Dave

10:58AM 6   Gambino case, correct?

10:58AM 7   A.  Yes.

10:58AM 8   Q.  You did not prepare a DEA-6 on the receipt of that chart

10:58AM 9   though, correct?

10:58AM 10  A.  No.

10:58AM 11  Q.  Okay.  Nowhere in the Matt Scalia file was there any

10:58AM 12  DEA-6 regarding your acquisition of a chart, correct?

10:58AM 13  A.  No.

10:58AM 14  Q.  Now, you met with in conjunction with this investigation

10:58AM 15  against Mr. Bongiovanni, you met with the Department of

10:58AM 16  Justice Office of Inspector General, correct?

10:59AM 17  A.  Yes.

10:59AM 18  Q.  Okay.  Fair to say that was around June of 2020, correct?

10:59AM 19  A.  I believe so.

10:59AM 20  Q.  Okay.  And do you recall being shown this chart at that

10:59AM 21  time?

10:59AM 22  A.  Yes.

10:59AM 23  Q.  Okay.  What you told them at that time is that doesn't

10:59AM 24  look like the same chart I got from TJ Webb, correct?

10:59AM 25  A.  I don't remember what I told them, but I --

| | | |
|---|---|---|
| 10:59AM | 1 | Q.  Well, let me stop you there. |
| 10:59AM | 2 | Would it help to refresh your recollection to look at the |
| 10:59AM | 3 | report there? |
| 10:59AM | 4 | A.  Yes. |
| 10:59AM | 5 | Q.  Okay. |
| 10:59AM | 6 | MR. MacKAY:  Ms. Champoux, can we show for the |
| 10:59AM | 7 | witness only Government Exhibit 3508B-1.  Can we go to the |
| 10:59AM | 8 | second page. |
| 11:00AM | 9 | Just bear with us, we'll get it up for you. |
| 11:00AM | 10 | THE WITNESS:  Sure. |
| 11:00AM | 11 | MR. SINGER:  3501B-1? |
| 11:00AM | 12 | MR. MacKAY:  Yeah. |
| 11:00AM | 13 | MR. SINGER:  I've got it. |
| 11:00AM | 14 | MR. MacKAY:  May I approach, Judge? |
| 11:00AM | 15 | THE COURT:  Sure. |
| 11:00AM | 16 | MR. MacKAY:  Stand by.  We're having some technical |
| 11:00AM | 17 | difficulties, Agent Wisniewski. |
| 11:01AM | 18 | THE COURT:  Why don't we take a break since we have |
| 11:01AM | 19 | this technical difficulty, and we'll try to figure it out. |
| 11:01AM | 20 | Please remember my instructions about not |
| 11:01AM | 21 | communicating about the case with anyone, including each |
| 11:01AM | 22 | other, not making up your mind.  And we'll see you back here |
| 11:01AM | 23 | in about 10 or 15 minutes.  Thanks. |
| 11:01AM | 24 | (Jury excused at 11:01 a.m.) |
| 11:02AM | 25 | THE COURT:  Okay.  Anything for the record from the |

| | | |
|---|---|---|
| 11:02AM | 1 | government? |
| 11:02AM | 2 | **MR. TRIPI:**  No, Your Honor.  Thank you very much. |
| 11:02AM | 3 | **THE COURT:**  From the defense? |
| 11:02AM | 4 | **MR. MacKAY:**  No, Your Honor. |
| 11:02AM | 5 | **THE COURT:**  See you folks in a few minutes. |
| 11:02AM | 6 | **THE CLERK:**  All rise. |
| 11:02AM | 7 | (Off the record at 11:02 a.m.) |
| 11:02AM | 8 | (Back on the record at 11:16 a.m.) |
| 11:16AM | 9 | (Jury not present.) |
| 11:16AM | 10 | **THE CLERK:**  All rise. |
| 11:16AM | 11 | **THE COURT:**  Please be seated. |
| 11:16AM | 12 | **THE CLERK:**  We are back on the record for the |
| 11:16AM | 13 | continuation in the jury trial in case number 19-cr-227, |
| 11:16AM | 14 | United States of America versus Joseph Bongiovanni. |
| 11:16AM | 15 | All counsel and parties are present. |
| 11:16AM | 16 | **THE COURT:**  Okay.  Anything we need to do before we |
| 11:16AM | 17 | bring the jury back? |
| 11:16AM | 18 | **MR. TRIPI:**  No, Your Honor. |
| 11:16AM | 19 | **MR. MacKAY:**  No, Your Honor. |
| 11:16AM | 20 | **THE COURT:**  Okay.  I need to break at 12:30.  I've |
| 11:16AM | 21 | got a call that I need to make right at 12:30.  So whoever is |
| 11:16AM | 22 | up doing whatever they're doing when we get close to there, |
| 11:17AM | 23 | just when there's a convenient time to break, let me know. |
| 11:17AM | 24 | **MR. COOPER:**  We're going to break for lunch at 12:30? |
| 11:17AM | 25 | **THE COURT:**  We're going to break for lunch at 12:30. |

11:17AM   1    Exactly.  Exactly.

11:17AM   2              Okay.  Let's bring them in, please, Pat.  Thank you.

11:18AM   3              (Jury seated at 11:18 a.m.)

11:18AM   4         **THE COURT:**  The record will reflect that all our

11:18AM   5    jurors, again, are present.

11:18AM   6              I remind the witness that he's still under oath.

11:19AM   7              And you may continue, Mr. MacKay.

11:19AM   8         **MR. MacKAY:**  Thank you, Your Honor.

11:19AM   9         **BY MR. MacKAY:**

11:19AM  10    Q.  All right.  So Agent Wisniewski, I want to back up a few

11:19AM  11    questions, because we took a break, I want to reorient you to

11:19AM  12    what we were talking about before I have you look at that.

11:19AM  13       So, 2020, as part of this investigation against

11:19AM  14    Mr. Bongiovanni, you go and you meet with the Office of

11:19AM  15    Inspector General for an interview, correct?

11:19AM  16    A.  I'm sorry.

11:19AM  17    Q.  You met in 2020 with the Office of Inspector General to

11:19AM  18    give an interview, correct?

11:19AM  19    A.  Yes.

11:19AM  20    Q.  Okay.  At that point in time, you had a lawyer with you,

11:19AM  21    correct?

11:19AM  22    A.  I believe I did, yes, on the telephone.

11:19AM  23    Q.  Okay.  And you were asked some questions about the case.

11:19AM  24    And I think you told us already you recall being shown this

11:19AM  25    chart that's in Government Exhibit 30B, correct?

| | | |
|---|---|---|
| 11:19AM | 1 | A.  Yes. |
| 11:19AM | 2 | Q.  But when you talked to OIG in 2020, you said that's not |
| 11:19AM | 3 | the same chart, correct? |
| 11:19AM | 4 | A.  I -- I want to -- I don't recall exactly what I told |
| 11:20AM | 5 | them. |
| 11:20AM | 6 | Q.  So -- so if you don't recall, what I'm going to say is |
| 11:20AM | 7 | would it help to refresh your recollection -- |
| 11:20AM | 8 | A.  Yes. |
| 11:20AM | 9 | Q.  -- to look at the MOI from that interview? |
| 11:20AM | 10 | A.  Yes. |
| 11:20AM | 11 | Q.  So you should have up on your screen there Government |
| 11:20AM | 12 | Exhibit 3501B-1.  I'm going to direct you to the second full |
| 11:20AM | 13 | paragraph.  Read that to yourself, and look up at me when |
| 11:20AM | 14 | you're done. |
| 11:20AM | 15 | Okay.  So does that refresh your recollection as to what |
| 11:20AM | 16 | you told OIG back in 2020? |
| 11:20AM | 17 | A.  It does. |
| 11:20AM | 18 | Q.  Okay.  And that the chart you were looking at, at 30B, is |
| 11:21AM | 19 | not the same one you were given by TJ Webb, correct? |
| 11:21AM | 20 | A.  I didn't really recognize the chart that they showed me, |
| 11:21AM | 21 | so I was a little taken aback, and I was trying to process |
| 11:21AM | 22 | like if it was the one I was looking at.  And for some reason |
| 11:21AM | 23 | I didn't recognize it. |
| 11:21AM | 24 | MR. MacKAY:  Ms. Champoux, can we put Government |
| 11:21AM | 25 | Exhibit 30B back up on the screen for the witness and the |

| | | |
|---|---|---|
| 11:21AM | 1 | jury? |
| 11:21AM | 2 | Can we go to the third page, the chart? |
| 11:21AM | 3 | **BY MR. MacKAY:** |
| 11:21AM | 4 | Q.  Do you see your handwriting anywhere on the chart? |
| 11:21AM | 5 | A.  Yes. |
| 11:21AM | 6 | Q.  Where? |
| 11:21AM | 7 | A.  The lower left corner. |
| 11:21AM | 8 | Q.  What specifically? |
| 11:21AM | 9 | A.  The C2-06-0120 copy, original with ICE.  Phone numbers |
| 11:21AM | 10 | might be mine.  It's hard to tell.  I have very -- my |
| 11:21AM | 11 | handwriting is just getting worse with age. |
| 11:21AM | 12 | Q.  Mine too, Agent. |
| 11:21AM | 13 | But we can agree, your handwriting's on there somewhere? |
| 11:21AM | 14 | A.  Yes. |
| 11:21AM | 15 | Q.  So you had this chart in your possession at some point in |
| 11:22AM | 16 | time, correct? |
| 11:22AM | 17 | A.  Yes. |
| 11:22AM | 18 | Q.  And I think I've already asked you, but just to clarify, |
| 11:22AM | 19 | when you purportedly received the chart from Special Agent |
| 11:22AM | 20 | Webb, you did not write a DEA-6 on that separately? |
| 11:22AM | 21 | A.  No. |
| 11:22AM | 22 | Q.  You had the opportunity to review the Matt Scalia file |
| 11:22AM | 23 | prior to testifying today? |
| 11:22AM | 24 | A.  A few reports. |
| 11:22AM | 25 | Q.  Would you have any reason to disagree with me that the |

| | | |
|---|---|---|
| 11:22AM | 1 | chart in front of you is the only handwritten organization |
| 11:22AM | 2 | chart in the entire Matt Scalia file? |
| 11:22AM | 3 | A.  I believe so. |
| 11:22AM | 4 | Q.  Okay.  All right.  So let's put this chart aside for a |
| 11:22AM | 5 | moment. |
| 11:22AM | 6 | MR. MacKAY:  Ms. Champoux, you can take that down. |
| 11:22AM | 7 | Thank you. |
| 11:22AM | 8 | BY MR. MacKAY: |
| 11:22AM | 9 | Q.  So, you have a discussion with Joseph Bongiovanni because |
| 11:22AM | 10 | the name Peter Gerace is raised, correct? |
| 11:22AM | 11 | A.  Yes. |
| 11:22AM | 12 | Q.  And we took the chart down, but it appears like Peter |
| 11:22AM | 13 | Gerace's name is on that chart, just misspelled in some |
| 11:22AM | 14 | fashion, correct? |
| 11:22AM | 15 | A.  That's what I assumed. |
| 11:22AM | 16 | Q.  Okay.  And if you recall it says "Gerasi," but it's |
| 11:23AM | 17 | spelled with an I instead of an E, correct? |
| 11:23AM | 18 | A.  Yes. |
| 11:23AM | 19 | Q.  So you have this conversation with Mr. Bongiovanni, and |
| 11:23AM | 20 | what comes out of it in sum and substance is Mr. Bongiovanni |
| 11:23AM | 21 | indicated he can make some -- what you called cold approach |
| 11:23AM | 22 | of Peter Gerace, correct? |
| 11:23AM | 23 | A.  Yes. |
| 11:23AM | 24 | Q.  And at that point in time, you are the acting G.S., |
| 11:23AM | 25 | correct? |

```
11:23AM     1   A.   Yes.

11:23AM     2   Q.   Acting G.S., so the jury understands again, you're

11:23AM     3   filling in as an acting supervisor, correct?

11:23AM     4   A.   Yes.

11:23AM     5   Q.   Who is the G.S. at the time?

11:23AM     6   A.   I want to say it was Brian Conneely.

11:23AM     7   Q.   And the RAC at the time?

11:23AM     8   A.   I think it was vacant.  I don't really recall.  I think

11:23AM     9   it was vacant, and I think Brian Conneely was the Acting RAC.

11:23AM    10   Q.   Do you recall whether Dale Kasprzyk held any supervisory

11:23AM    11   position at that point in time?

11:23AM    12   A.   I don't recall.  But --

11:23AM    13   Q.   Bottom line, even as the Acting G.S., you're still

11:23AM    14   reporting to somebody in Buffalo?

11:23AM    15   A.   Yes.

11:23AM    16   Q.   Whoever that is, there still is somebody above you?

11:24AM    17   A.   Yes.

11:24AM    18   Q.   Okay.  So you have this discussion with Mr. Bongiovanni

11:24AM    19   about a possible cold approach, yes?

11:24AM    20   A.   Yes.

11:24AM    21   Q.   Didn't take that up the chain to anybody else, correct?

11:24AM    22   A.   No, I discussed it with leadership and my other partners.

11:24AM    23   Q.   Who specifically?

11:24AM    24   A.   Most likely Brian Conneely.

11:24AM    25   Q.   And you got approved obviously?
```

11:24AM    1    A.   Yeah.   Everybody was in agreement that it was worth a

11:24AM    2    shot.

11:24AM    3    Q.   I mean, it might be putting the cart before the horse,

11:24AM    4    but if you're allowing him to go do that, that presumes he

11:24AM    5    has the authority to go do that, correct?

11:24AM    6    A.   Yes.

11:24AM    7    Q.   So somewhere along the line you're telling us that

11:24AM    8    somebody in leadership gave approval for Mr. Bongiovanni to

11:24AM    9    go make a connection to Peter Gerace, correct?

11:24AM   10    A.   Yes.

11:24AM   11    Q.   And you understood that happened because Mr. Bongiovanni

11:24AM   12    comes back on the other end of it and tells you that he did

11:24AM   13    do this cold approach, correct?

11:24AM   14    A.   Yes.

11:24AM   15    Q.   And it's your understanding that not much came out of it

11:24AM   16    though, correct?

11:24AM   17    A.   Correct.

11:24AM   18    Q.   Some information about possibly 10 kilograms or pounds of

11:25AM   19    marijuana?

11:25AM   20    A.   Yes.

11:25AM   21    Q.   Okay.

11:25AM   22    A.   Something -- something to that effect.

11:25AM   23    Q.   So there was -- you were in possession of some

11:25AM   24    information that Peter Gerace was involved in narcotics,

11:25AM   25    correct?

| | | |
|---|---|---|
| 11:25AM | 1 | A.  Yes. |
| 11:25AM | 2 | Q.  And from the chart that you're shown, Peter Gerace has |
| 11:25AM | 3 | some connection at least in this org chart to Dave Reynolds, |
| 11:25AM | 4 | correct? |
| 11:25AM | 5 | A.  Yes, sir. |
| 11:25AM | 6 | Q.  And from your recollection to the OCDETF investigation |
| 11:25AM | 7 | into Dave Gambino, there's some connection between Dave |
| 11:25AM | 8 | Gambino and Dave Reynolds, correct? |
| 11:25AM | 9 | A.  I believe so, yes. |
| 11:25AM | 10 | Q.  So, you would agree with me that it's a fair statement |
| 11:25AM | 11 | that around 2008, the end of the year, DEA comes into |
| 11:25AM | 12 | possession of some information from Peter Gerace, somehow |
| 11:25AM | 13 | connected to Dave Reynolds and Dave Gambino, correct? |
| 11:25AM | 14 | A.  Yes. |
| 11:25AM | 15 | Q.  Now, as you told the jury though, you don't -- you don't |
| 11:25AM | 16 | know what Mr. Bongiovanni said when he linked up with |
| 11:26AM | 17 | Mr. Gerace, correct? |
| 11:26AM | 18 | A.  No. |
| 11:26AM | 19 | Q.  But let's put this date in perspective.  Do you recall |
| 11:26AM | 20 | that Dave Reynolds is arrested by HSI in November of 2008? |
| 11:26AM | 21 | A.  I don't recall that, no. |
| 11:26AM | 22 | Q.  I think I might have touched on it already, but do you |
| 11:26AM | 23 | recall that Dave Gambino is arrested by DEA sometime later in |
| 11:26AM | 24 | late 2009? |
| 11:26AM | 25 | A.  Again, I don't -- I -- I don't really recall any of that. |

USA v Bongiovanni - Wisniewski - MacKay/Cross - 8/7/24

| | | |
|---|---|---|
| 11:26AM | 1 | I think I was already off the case by that point. |
| 11:26AM | 2 | Q.  Okay.  But in late 2008, you're still on the case in some |
| 11:26AM | 3 | fashion, correct? |
| 11:26AM | 4 | A.  Yes. |
| 11:26AM | 5 | Q.  You're helping to fashion the case, the Dave Gambino |
| 11:26AM | 6 | investigation, into a full prosecutable case, correct? |
| 11:26AM | 7 | A.  Yes. |
| 11:26AM | 8 | Q.  At that time, you came in receipt of some information |
| 11:26AM | 9 | that Peter Gerace is involved in narcotics trafficking, |
| 11:26AM | 10 | correct? |
| 11:26AM | 11 | A.  Yes. |
| 11:26AM | 12 | Q.  Okay.  Again, you didn't write a report on that, correct? |
| 11:26AM | 13 | A.  No. |
| 11:26AM | 14 | Q.  Do you recall taking that information up the chain to |
| 11:26AM | 15 | leadership to report back on what the cold approach was? |
| 11:27AM | 16 | A.  I don't recall, but they would have asked and I would |
| 11:27AM | 17 | have told them that nothing came of it. |
| 11:27AM | 18 | Q.  So it was procedure that on the back end of this cold |
| 11:27AM | 19 | approach, you still had to go back up to leadership and tell |
| 11:27AM | 20 | them what happened? |
| 11:27AM | 21 | A.  Yes. |
| 11:27AM | 22 | Q.  Okay.  And I guess what I'm getting towards is late 2008, |
| 11:27AM | 23 | you've got information that Peter Gerace is involved in |
| 11:27AM | 24 | narcotics trafficking, correct? |
| 11:27AM | 25 | A.  Yes. |

11:27AM    1    Q.  And did you have any information at that point in time

11:27AM    2    whether Peter Gerace is on supervised release?

11:27AM    3    A.  I don't recall that, knowing that, no.

11:27AM    4    Q.  But after you have this discussion with Mr. Bongiovanni

11:27AM    5    about the cold approach not working out, you don't take any

11:27AM    6    further investigative steps to investigate Peter Gerace,

11:27AM    7    correct?

11:27AM    8    A.  I don't recall that I did, no.

11:27AM    9    Q.  Okay.

11:27AM   10        MR. MacKAY:  Judge, could I just have one moment,

11:27AM   11    please?

11:27AM   12        THE COURT:  Yep.

11:28AM   13        MR. MacKAY:  I have no further questions, Your Honor.

11:28AM   14        MR. COOPER:  Just one second, please, Judge.

11:28AM   15        THE COURT:  Sure.

11:29AM   16

11:29AM   17            REDIRECT EXAMINATION BY MR. COOPER:

11:29AM   18    Q.  Special Agent Wisniewski, on cross-examination a moment

11:29AM   19    ago, you were asked some questions by Mr. MacKay about your

11:29AM   20    status as the acting group supervisor at or around the time

11:29AM   21    that the defendant recommended doing a cold approach of Peter

11:29AM   22    Gerace, right?

11:29AM   23    A.  Yes.

11:29AM   24    Q.  And Mr. MacKay said, oh, you approved that, right?

11:29AM   25    A.  Yes.

11:29AM  1   Q.  In 2008, when this is happening, about how long had you

11:29AM  2   worked with the defendant for, approximately?

11:29AM  3   A.  Again, we met each other at the academy, 1998, 1999.  And

11:30AM  4   we were on the same team multiple times.  I would say I've

11:30AM  5   known him pretty much my entire career.

11:30AM  6   Q.  At that time, you've known him about a decade; is that

11:30AM  7   correct?

11:30AM  8   A.  Yes.

11:30AM  9   Q.  Do you occasionally socialize with other agents?

11:30AM  10  A.  Yes.

11:30AM  11  Q.  Do you have a friendly atmosphere in the office?

11:30AM  12  A.  Yes.

11:30AM  13  Q.  Did you trust him at that time?

11:30AM  14  A.  I did.

11:30AM  15  Q.  When the defendant recommended doing a cold approach and

11:30AM  16  when you approved it, did he tell you that he was friends

11:30AM  17  with the person?

11:30AM  18  A.  He said that he knew him from the old neighborhood is

11:30AM  19  what I recall.

11:30AM  20  Q.  Did he tell you they were close personal friends?

11:30AM  21  A.  I don't recall having an extended conversation about the

11:30AM  22  nature of their relationship.

11:30AM  23  Q.  Did he tell you they went to dinner together?

11:30AM  24  A.  No.

11:30AM  25  Q.  Did he tell you that they went on dates together?

| 11:30AM | 1 | A.  No. |

11:30AM 1 A.  No.

11:30AM 2 Q.  Did he tell you that they texted and talked on the phone?

11:30AM 3 A.  No, not that I recall.

11:30AM 4 Q.  Are there ethical standards for DEA special agents about

11:30AM 5 who you can and can't investigate when you have a

11:30AM 6 relationship with a person?

11:30AM 7 A.  Yes.

11:30AM 8 Q.  Is it appropriate for a DEA special -- agent as an acting

11:31AM 9 group supervisor, would you approve a DEA special agent

11:31AM 10 investigating someone he's personal friends with?

11:31AM 11 A.  I would definitely run that up the chain of command.

11:31AM 12 There is a policy in place where you're supposed to report

11:31AM 13 the connection, and then there's an internal process where

11:31AM 14 things like that get reviewed.  And I would say most times

11:31AM 15 the agent that's close personal friends does not work that

11:31AM 16 case.

11:31AM 17 Q.  There are some pretty obvious problems investigating your

11:31AM 18 close personal friends, right, sir?

11:31AM 19 A.  Yes.

11:31AM 20     MR. MacKAY:  Objection, leading.

11:31AM 21     THE COURT:  Sustained.

11:31AM 22     BY MR. COOPER:

11:31AM 23 Q.  Would you approve somebody --

11:31AM 24     THE COURT:  Stop, stop, stop.

11:31AM 25     The jury will strike that last question and answer.

| | | |
|---|---|---|
| 11:31AM | 1 | Go ahead, Mr. Cooper. |
| 11:31AM | 2 | **BY MR. COOPER:** |
| 11:31AM | 3 | Q.  As an acting group supervisor, would you approve someone |
| 11:31AM | 4 | to investigate their close personal friend? |
| 11:31AM | 5 | A.  Probably not. |
| 11:32AM | 6 | Q.  If you had known in 2008 when you approved the defendant |
| 11:32AM | 7 | to do the cold approach that he was close personal friends |
| 11:32AM | 8 | with Peter Gerace, would you have approved it? |
| 11:32AM | 9 | A.  Again, as I stated earlier, I would definitely -- it |
| 11:32AM | 10 | would definitely affect the decision-making process.  It |
| 11:32AM | 11 | would be discussed above my level.  And then I probably |
| 11:32AM | 12 | wouldn't be the one making that decision. |
| 11:32AM | 13 | Q.  That's not what happened, though, right? |
| 11:32AM | 14 | A.  No. |
| 11:32AM | 15 | Q.  Do you know a person by the name of Dale Kasprzyk? |
| 11:32AM | 16 | A.  Yes. |
| 11:32AM | 17 | Q.  Would it be fair to say he became a group supervisor |
| 11:32AM | 18 | sometime at or after 2009? |
| 11:32AM | 19 | A.  Again, I don't recall specifically, but that sounds like |
| 11:32AM | 20 | it could be correct. |
| 11:32AM | 21 | Q.  Do you -- can you just tell the jury who specifically are |
| 11:32AM | 22 | the people that you recall discussing the defendant doing a |
| 11:32AM | 23 | cold approach with? |
| 11:32AM | 24 | A.  TJ Webb, Dave Turri from the IRS, partner agencies. |
| 11:33AM | 25 | Brian Conneely.  And I don't know if Dale Kasprzyk was a part |

11:33AM   1   of those conversations, or not.

11:33AM   2   Q.   You don't have any recollection of discussing it with

11:33AM   3   Dale Kasprzyk?

11:33AM   4   A.   I don't.

11:33AM   5   Q.   Okay.  And you were asked some questions on

11:33AM   6   cross-examination at the beginning of the cross about the

11:33AM   7   passage of time that's occurred between when this incident

11:33AM   8   happened and your testimony here today, right?

11:33AM   9   A.   Yes.

11:33AM   10  Q.   And you were asked some questions about your ability to

11:33AM   11  recall details of conversations, right?

11:33AM   12  A.   Yes, right.

11:33AM   13  Q.   When you didn't remember something, when you were asked a

11:33AM   14  question, did you say you didn't remember?

11:33AM   15  A.   I believe I did.

11:33AM   16  Q.   Okay.  Have you made anything up from the witness stand,

11:33AM   17  sir?

11:33AM   18  A.   No.

11:33AM   19  Q.   Did you want to come here and testify against your former

11:33AM   20  coworker?

11:33AM   21  A.   No, I did not.

11:33AM   22  Q.   When you told the jury that you remembered something, did

11:34AM   23  you remember it?

11:34AM   24  A.   Yes.

11:34AM   25  Q.   Did you tell them the details that you remembered?

Case 1:19-cr-00227-LJV-MJR    Document 1144    Filed 08/24/24    Page 61 of 64
USA v Bongiovanni - Wisniewski - MacKay/Recross - 8/7/24

61

11:34AM    1    A.  Yes.

11:34AM    2    Q.  Did you make any of that up?

11:34AM    3    A.  No.

11:34AM    4          **MR. COOPER:**  No further questions, Judge.

11:34AM    5

11:34AM    6              **RECROSS-EXAMINATION BY MR. MacKAY:**

11:34AM    7    Q.  Just to finish up, Agent Wisniewski, discussing this cold

11:34AM    8    approach, that's a connection that the office would try to

11:34AM    9    make to Peter Gerace, correct?

11:34AM    10    A.  Yes.

11:34AM    11    Q.  Wouldn't necessarily change who was investigating the

11:34AM    12    case, correct?

11:34AM    13    A.  No.

11:34AM    14    Q.  I mean, let's say a cold approach was theoretically

11:34AM    15    successful, it doesn't mean that Mr. Bongiovanni is going to

11:34AM    16    take the case over, correct?

11:34AM    17    A.  Correct.

11:34AM    18    Q.  It was still in your hands or whoever was handling the

11:34AM    19    case, correct?

11:34AM    20    A.  Correct.

11:34AM    21    Q.  You testified earlier that you were the case agent for a

11:34AM    22    long time on the Matt Scalia file, correct?

11:34AM    23    A.  Yes.

11:34AM    24    Q.  Okay.  Regarding, again, this discussion about starting

11:34AM    25    the cold approach, as you sit here today do you remember that

| | | |
|---|---|---|
| 11:35AM | 1 | you did discuss this with leadership in some way, correct? |
| 11:35AM | 2 | A.   Yes. |
| 11:35AM | 3 | Q.   There were people you told who were above you, correct? |
| 11:35AM | 4 | A.   Yes. |
| 11:35AM | 5 | Q.   And as best you can fathom it, it obviously got approved, |
| 11:35AM | 6 | because you told Mr. Bongiovanni he could go do it? |
| 11:35AM | 7 | A.   Yes. |
| 11:35AM | 8 | Q.   You said he also made links to outside agencies telling |
| 11:35AM | 9 | them that this was gonna happen, correct? |
| 11:35AM | 10 | A.   Yes. |
| 11:35AM | 11 | Q.   And -- |
| 11:35AM | 12 | MR. MacKAY:  Just checking my notes here. |
| 11:35AM | 13 | That's all the questions I have.  Thank you. |
| 11:35AM | 14 | THE COURT:  Anything more, Mr. Cooper? |
| 11:35AM | 15 | MR. COOPER:  No, thank you, Judge. |
| 11:35AM | 16 | THE COURT:  You can step down, sir. |
| 11:35AM | 17 | THE WITNESS:  Yes, Judge. |
| 11:35AM | 18 | (Witness excused at 11:35 a.m.) |
| | 19 | (Excerpt concluded at 11:35 a.m.) |
| | 20 | *    *    *    *    *    *    * |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

2                      **CERTIFICATE OF REPORTER**

3

4                In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on August 7, 2024.

8

9

10                         s/ Ann M. Sawyer
                           _____
                           Ann M. Sawyer, FCRR, RPR, CRR
11                         Official Court Reporter
                           U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                        TRANSCRIPT INDEX
 3        EXCERPT - EXAMINATION OF CHRISTOPHER WISNIEWSKI
 4                         AUGUST 7, 2024
 5
 6
 7    W I T N E S S                              P A G E
 8    C H R I S T O P H E R   W I S N I E W S K I    2
 9      DIRECT-EXAMINATION BY MR. COOPER:          2
10      CROSS-EXAMINATION BY MR. MacKAY:          40
11      REDIRECT EXAMINATION BY MR. COOPER:       56
12      RECROSS-EXAMINATION BY MR. MacKAY:        61
13
14
15    E X H I B I T                              P A G E
16    GOV Exhibit 30B                             18
17
18
19
20
21
22
23
24
25
```