**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

                        Case No. 1:19-cr-227
           Plaintiff,              (LJV)
v.

                        September 4, 2024
**JOSEPH BONGIOVANNI,**

          Defendant.
_____

**TRANSCRIPT EXCERPT - EXAMINATION OF DAVID TURRI**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **APPEARANCES:** | **TRINI E. ROSS, UNITED STATES ATTORNEY** |
| | **BY: JOSEPH M. TRIPI, ESQ.** |
| | **NICHOLAS T. COOPER, ESQ.** |
| | **CASEY L. CHALBECK, ESQ.** |
| | Assistant United States Attorneys |
| | Federal Centre, 138 Delaware Avenue |
| | Buffalo, New York 14202 |
| | For the Plaintiff |
| | |
| | **SINGER LEGAL PLLC** |
| | **BY: ROBERT CHARLES SINGER, ESQ.** |
| | 80 East Spring Street |
| | Williamsville, New York 14221 |
| | And |
| | **LAW OFFICES OF PARKER ROY MacKAY** |
| | **BY: PARKER ROY MacKAY, ESQ.** |
| | 3110 Delaware Avenue |
| | Kenmore, New York 14217 |
| | And |
| | **OSBORN, REED & BURKE, LLP** |
| | **BY: JOHN J. GILSENAN, ESQ.** |
| | 120 Allens Creek Road |
| | Rochester, New York 14618 |
| | For the Defendant |
| | |
| **PRESENT:** | **BRIAN A. BURNS,** FBI Special Agent |
| | **MARILYN K. HALLIDAY,** HSI Special Agent |
| | **KAREN A. CHAMPOUX,** USA Paralegal |
| | |
| **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |

**COURT DEPUTY CLERK:**   **COLLEEN M. DEMMA**

**COURT REPORTER:**        **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
Robert H. Jackson Federal Courthouse
2 Niagara Square
Buffalo, New York  14202
Ann_Sawyer@nywd.uscourts.gov


*     *     *     *     *     *     *


(Excerpt commenced at 4:06 p.m.)

(Jury is present.)

**THE COURT:**  Government can call your next witness.

**MR. COOPER:**  Thank you.  The government calls Dave Turri from the IRS.


**D A V I D   T U R R I**, having been duly called and sworn, testified as follows:


**DIRECT EXAMINATION BY MR. COOPER:**

Q.  Good afternoon.

A.  Good afternoon.

Q.  Can you introduce yourself to the jury, please?

A.  My name is David Turri.

Q.  Okay.  And are you working right now?

A.  Yes.

Q.  Can you tell them what kind of work you do?

A.  I work for a company called Professional Risk Management as a senior financial investigator on a contract to the FBI.

Q.   And how long have you had that work for?

A.   About eight months.

Q.   Prior to that employment, what kind of work did you do?

A.   I worked for M&T Bank as a money-laundering investigator for about ten months, and prior to that 33 years with the government, the last 25 years as a special agent with the IRS.

Q.   Okay.  I want to focus on that 25 years that you spent working as a special agent with the IRS, okay?

     Can you tell the jury, like, a 30,000-foot view, what was your job, what were your responsibilities at the IRS?

A.   Well, primarily to work criminal tax investigations, but also money-laundering investigations.

Q.   Can you tell us what money laundering is?

A.   It's taking the proceeds from what's called specified unlawful activity, and conducting financial transactions in a way that makes the money appear legitimate.

Q.   You mentioned specified unlawful activity.  Does the law set aside certain types of activity that have to exist in connection with the money in order for a money-laundering case to be charged?

A.   Yes.

Q.   Okay.  Is one of those types of activity drug trafficking?

A.   Yes.

Q.   When you worked at the IRS, did you work with other law enforcement agencies?

A.   Yes.

Q.   Which ones did you work with?

A.   Primarily FBI and DEA.  Occasionally Homeland Security, ATF.

Q.   Were you located here in the Buffalo area?

A.   For the last 20 years of my career, I was in Buffalo.

Q.   Where were you before that?

A.   Connecticut for five years.

Q.   Got it.  During the 20 years that you worked here in Buffalo, did you work with the Buffalo DEA resident office?

A.   Yes.

Q.   Approximately how many times during your career do you think you worked jointly on an investigation with the DEA here in Buffalo?

A.   Oh.  Well, a numbered investigation?  Probably a couple dozen.  But all in all, I probably assisted on over 100 investigations.

Q.   And let's -- let's kind of focus on that distinction for a second.

     Are there cases that you formally join onto with other federal agencies?

A.   Yes.

Q.   Okay.  Are those generally OCDETF cases?

A.   For drug cases, yes.

Q.   Okay.  And then separate from that, do you provide assistance when you're asked from other law enforcement partners?

A.   Yes.

Q.   Is that the distinction that you were drawing a second ago?

A.   Yes.

Q.   When you would work jointly on an investigation, and let's specify with the DEA at this point, would there always be a DEA special agent or task force officer assigned as the primary investigator from DEA?

A.   Yes.

Q.   Okay.  And, so, if you were involved in an investigation, did you ever take over and become the primary investigator on the drug side of the investigation?

A.   No.

Q.   Were there instances during the 20 years that you worked here in Buffalo as an IRS agent where you provided guidance or advice to agents regarding cases that they were working on, even if you weren't formally assigned to the case?

A.   Yes.

Q.   Was there a time in your career where you actually physically reported to work at the DEA?

A.   Yes.

Q.  Can you explain, just tell the jury a little bit about that?

A.  Well, I was assigned to the DEA task force on multiple different occasions, if there was a significant investigation going on.

Q.  Did you get to know the people at the DEA well over that time?

A.  Yes.

Q.  Do you remember the time periods that you were assigned to the DEA task force?

A.  It was off and on from the summer of 2004 up until my retirement in January of 2023.

Q.  Would you describe that as sporadic?

A.  Yes.

Q.  During the time when you were working with the DEA, would you act as a resource to answer questions from agents about financial investigations?

A.  Yes.

Q.  How often would that occur when you were present at the DEA?

A.  Oh, pretty much every day when I was physically there.

Q.  Do you know a person by the name of Joseph Bongiovanni?

A.  Yes.

Q.  How do you know that person?

A.  I worked with Joe, and I sat across from him for the last

couple years I was assigned over there.

Q.   When did you meet him?

A.   It would have been the summer of 2004.

Q.   During the time that you were working as an IRS special agent and Joe was a DEA agent, did you ever work on cases with him?

A.   Yes.

Q.   Are you familiar with what he looks like?

A.   Yes.

Q.   Is he in court today?

A.   Yes.

Q.   Can you just identify him by an article of clothing he's wearing or where he's sitting?

A.   He's sitting at the defense table to my left wearing a red tie, dark suit.

        MR. COOPER:  For the record, Judge, the witness identified the defendant?

        THE COURT:  He did.

        BY MR. COOPER:

Q.   Can you describe for the jury, what was your relationship like with the defendant when you worked there?

A.   Well, we worked together on several different --
field-type work.  We would make controlled buys, controlled deliveries.

Q.   So I'm asking what your relationship was like with him.

Were you friendly?  Not friendly?  How would you describe that?

A.   We were friendly, sure.

Q.   Friendly?  A moment ago, you told the jury how DEA agents would frequently ask you questions about financial investigations, I think you said, nearly every day that you were there.  Did the defendant ever pose those sorts of questions to you?

A.   I'm sure he did, yes.

Q.   Was there a particular case around the 2013 timeframe that you worked on with the defendant?

A.   Yes.

Q.   Okay.  Who was that investigation targeting?

A.   Ron Serio.

Q.   Who asked you to join on and become a part of that; do you remember?

A.   I think originally it was John Flickinger, who was the supervisor at the time.

Q.   What was your -- did you develop an understanding as to who the case agent was, the lead agent?

A.   Yes.

Q.   Who was that?

A.   Agent Bongiovanni.

Q.   Did you agree to get involved in that case?

A.   At the time, no, because our agency typically only got

involved in what's called the OCDETF cases just because we have limited resources.  So we tried to develop or try to work cases that have the most significant impact.  At that time, that case was not an OCDETF case, so I was just assisting with it.

Q.  So, I guess I asked you if you got involved with it. Were you formally assigned to work on it as an OCDETF case?

A.  It wasn't an OCDETF case.  So my assistance was just as an on need, as-needed-type thing.

Q.  And I guess regardless of whether it was formal or informal, did you participate in working on that case?

A.  Yes.

Q.  What was your role in participating in that case?

A.  Scott Deming was a financial investigator with the U.S. Attorney's Office.  He had the lead on the financials.  So he was analyzing the bank records.  And my role at that time was just to review them to see if there were items of potential money laundering.

Q.  Did you assist Deming in doing that?

A.  Yes.

Q.  Would you consider your role on the Serio investigation to have been a limited role?

A.  Yes.

Q.  What was the lead agency on that investigation?

A.  DEA.

Q.   Was your job on the team to review the financials that came in via grand jury subpoena?

A.   Yes.

Q.   Did you do that?

A.   Yes.

Q.   A moment ago you mentioned Scott Deming as a member of the investigative team.  Would you have considered him the lead on the financial side of the investigation?

A.   Yes.

Q.   As the IRS agent informally assisting on the financial side of the investigation, was it your job to direct the drug side of the investigation?

A.   No.

Q.   Was it your job to handle confidential informants?

A.   Not in that particular case.

Q.   So, yeah.  All my questions are just right now going to be about that particular case.  Was it your job to schedule drug buys?

A.   No.

Q.   Was it your job to set up controlled calls?

A.   No.

Q.   Was it your job to organize surveillances?

A.   No.

Q.   Was it your job to interface with local law enforcement agencies and find out what information they had?

A.   Not that case.

Q.   Based on your involvement in the Serio investigation in 2013, who was responsible for moving the drug case forward?

A.   The DEA.

Q.   Who at the DEA was working on that case?

A.   Agent Bongiovanni, and I believe Agent Nastoff.

Q.   Who was the lead case agent?

A.   Agent Bongiovanni.

Q.   Are you aware of whether there was a confidential informant at some point in that investigation?

A.   Yes.

Q.   Did you ever meet the confidential informant?

A.   No.

Q.   Did the defendant ever tell you their name?

A.   No.

Q.   Did the defendant ever share information that he learned from the informant with you?

A.   Yes.

Q.   Can you describe that?

A.   They were trying to locate the marijuana grow, and apparently the informant had information about that.

Q.   Okay.  And is that communication that he had with you by email or in person?

A.   I believe both.

Q.   Okay.  Are you aware of whether the defendant ever used

the informant to make controlled purchases?

A. No.

Q. Are you aware of whether the defendant ever used the informant to record conversations with Ron Serio?

A. No.

Q. Are you aware of whether he ever used the informant to record conversations with Tom Serio?

A. No.

Q. At some point, did you receive an email from the defendant telling you that he was working on GPS tracker warrants?

A. Yes.

Q. Okay. Did you ever see drafts of those affidavits?

A. No.

Q. Did he ever ask you for input on them?

A. No.

Q. Did he ever ask for your advice about what financial information to include in them?

A. No.

Q. As far as you know, do you know if he ever sent those to a prosecutor?

A. Not to my knowledge.

Q. Do you know if he ever sent them, or had them presented to a judge or a magistrate?

A. No.

Q. As an IRS special agent have you executed search warrants before?

A. Yes.

Q. Do they have to be signed by a judge?

A. Yes.

Q. Do they have to be sent to a prosecutor?

A. Yes, before it goes to the judge.

Q. I'm going to call you Special Agent Turri still.

Special Agent Turri, from your perspective, how long did the investigation into Ron Serio last?

A. From my perspective? About six months.

Q. Okay. And what was that, give me an idea, what six-month period, month and year?

A. Approximately March of 2013 to September of 2013.

Q. And as far as you know, being involved in it to the extent you were, were there any successful controlled buys as part of the investigation?

A. No.

Q. Were there ever any warrants secured as a part of the investigation?

A. No.

Q. Was anyone ever interviewed other than the one CS that you've spoken about as a part of the investigation?

A. Not to my knowledge.

Q. Were you ever asked to go out on surveillance?

Case 1:19-cr-00227-LJV-MJR   Document 1213   Filed 09/23/24   Page 14 of 52
USA v Bongiovanni - Turri - Cooper/Direct - 9/4/24

14

A.   No.

Q.   Did you do that from time to time when you worked at the DEA?

A.   Yes.

Q.   Would you go out and help the guys with surveillance?

A.   Yes.

Q.   Did the defendant ever ask you for help doing surveillance on the Serio case?

A.   No.

Q.   I'm going to fast forward a couple years for a moment. Did you become aware that Ron Serio was arrested by the Erie County Sheriff's Office and the FBI in 2017?

A.   Yes.

Q.   That's a separate investigation from the one that we've been talking about back from 2013?

A.   As far as I'm aware, yes.

Q.   Mr. Turri, are you familiar with the name Michael Masecchia?

A.   Yes.

Q.   Can you tell the jury how you became familiar with Mr. Masecchia?

A.   When I reported to the Buffalo office in 2004, I inherited our agency's Strike Force files.  The Strike Force was an organized crime task force that was set up in certain cities to investigate organized crime.

Q.   And in the context of that responsibility that you learned at work, did you learn the name Mike Masecchia?

A.   Yes.

        MR. COOPER:  Ms. Champoux, for the witness only, can you pull up Government Exhibit 22S, as in Sam?

        BY MR. COOPER:

Q.   We're going to zoom in on that so you can see it, Dave. Can you see that on your screen?

A.   Yes.

Q.   Take a moment and review that, and look back up at me when you're finished.

     Do you recognize that document?

A.   I do.

Q.   There's some black boxes or redactions at the bottom of it, right?

A.   Yes.

Q.   Is that document an email that you sent to the defendant and several other people, Stephen Bevilacqua, Scott Deming, and Mike McCabe?

A.   Yes.

Q.   Okay.  With the exception of the black boxes, the redactions, is that a fair and accurate copy of the email that you sent to those people on July 11th, 2013?

A.   Yes.

        MR. COOPER:  With that foundation, I'd offer 22S into

Case 1:19-cr-00227-LJV-MJR    Document 1213    Filed 09/23/24    Page 16 of 52
USA v Bongiovanni - Turri - Cooper/Direct - 9/4/24

16

evidence.

MR. SINGER:  No objection.

THE COURT:  Received without objection.

(GOV Exhibit 22S was received in evidence.)

BY MR. COOPER:

Q.  What's the subject line of your email?

A.  Serio Associates.

Q.  Can you read what you wrote to the jury?

A.  In checking my file, Krista Masecchia is the daughter of Bart Mazzara, deceased, 10/25/2003, and the spouse of Michael Masecchia.

Mazzara was a made member of the LCN family in Buffalo, and was a bookmaker, loan shark, and strong arm for the family.

Michael Masecchia is an associate and possibly a made member of the Buffalo LCN family.

DEA Buffalo had information approximately five years ago that Michael Masecchia had ties to OC elements operating in Las Vegas.

Q.  Can we define a couple of those terms that you used?

What did you mean when you wrote "Buffalo LCN family?"

A.  LCN stands for La Cosa Nostra, which is an Italian Organized Crime organization.

Q.  What did you mean when you wrote "made member" of the Buffalo LCN family?

A.   A made member is someone who's gone through a formal induction ceremony into the family, which gives them certain rights, and also confers on them some duties and obligations.

Q.   Okay.  The subject line of the email here, Serio Associates, did you write that?

A.   Yes.

Q.   Why did you write that?

A.   Well, as I recall, I was asked to research certain individuals who come up in the case as potential associates of Ron Serio.

Q.   Did you do that when you were asked to do that?

A.   Yes.

Q.   Do you remember who asked you to do that?

A.   I do not.

Q.   Did you find out through whatever work you did that -- or, did you come to believe that Masecchia was associated with Ron Serio?

A.   I didn't have that information, but apparently somebody in the investigative team did.

Q.   And you followed up by providing this information on Masecchia?

A.   Yes.

Q.   Why did you send an email identifying Masecchia as affiliated with Italian Organized Crime to the defendant?

A.   Well, as I mentioned earlier, the case at that time was

not an OCDETF investigation.  But if we could develop a tie to an organization like the Buffalo La Cosa Nostra family, it would be easier to make an OCDETF case.

Q.   Would that get more funding for the investigation?

A.   Yes.

Q.   Would it -- would it also cause the investigation to become more common knowledge among other federal law enforcement agencies?

A.   Possibly.

Q.   OCDETF requires that there be partners from federal law enforcement agencies, right?

A.   Yes.

Q.   Are you familiar with the process for a case to become approved for OCDETF?

A.   Yes.

Q.   You have to submit a proposal, right?

A.   Correct.

Q.   And are you aware that there's an -- are you aware of whether there's a meeting to discuss whether cases should be approved for OCDETF status?

A.   There's a local meeting, and then there's a regional meeting.

Q.   And in that local meeting, do members from the different federal law enforcement agencies sit and attend?

A.   Yes.

Case 1:19-cr-00227-LJV-MJR   Document 1213   Filed 09/23/24   Page 19 of 52
USA v Bongiovanni - Turri - Cooper/Direct - 9/4/24

19

Q.   And are you aware of that?

A.   Yes.

Q.   Your work has caused you to work on a lot of OCDETF cases, correct?

A.   Correct.

Q.   So if this case had been submitted to become an OCDETF case back in July of 2013, would that have caused the case to get on the radar of different federal law enforcement agencies?

A.   Yes.

Q.   After you sent this email, so after July 11th, 2013, at 6:30 p.m., did the defendant ever come talk to you about investigating Mike Masecchia?

A.   No.

Q.   Did he ever come and tell you, hey, Masecchia is a close friend of mine, I grew up with him?

A.   No.

Q.   Did the defendant ever tell you that they went to high school together?

A.   No.

Q.   I'm sorry?

A.   No.

Q.   Did the defendant tell you that they went to college together?

A.   No.

Q.  Did the defendant tell you that they drove to college together in the same car?

A.  No.

Q.  Did the defendant disclose anything to you about his relationship with Mike Masecchia?

A.  No.

Q.  Did he respond to this and say, hey, Dave, great information, see what else can you find?

A.  No.

MR. COOPER:  May I just have one moment, Judge?

THE COURT:  Sure.

MR. COOPER:  I have no further direct.  Thank you, Judge.

THE COURT:  Cross?


CROSS-EXAMINATION BY MR. SINGER:

Q.  How are you doing, Mr. Turri?

A.  Good, sir.

Q.  Good to see you.

So, when was it you first got contacted by DEA or Special Agent Bongiovanni for your involvement in this case?

A.  I believe it was March 2013.

Q.  So roughly around the same time that Scott Deming got involved, you got involved as well?

A.  I think he was on a little bit before I was.

Q.   Okay.  So you were maybe a little bit later in the month of March, in the earlier part?

A.   I think it was right around the middle of March if I recall.

Q.   Okay.  And the way you understood your role in the investigation was that Mr. Deming was going to take lead on the financial investigation part of the Serio investigation?

A.   Yes, he already had the lead at that point.

Q.   And you described your role as more of a support role; is that right?

A.   That's correct.

Q.   And I think you gave a couple different reasons for that support role.  So one of them is that you're a special agent with the IRS; is that right?

A.   Yes.

Q.   And so you, I'm assuming, have other cases ongoing at that point in time; is that right?

A.   Yes.

Q.   And you also mentioned that the IRS is a smaller agency than the DEA?

A.   Yes.

Q.   You have less special agents in the office?

A.   That's correct.

Q.   And so they have limited resources.  You can provide help, but it can only go so far?

A.   That's correct.

Q.   And I think another reason you gave was that this wasn't yet an OCDETF case?

A.   Correct.

Q.   And so your primary role at the IRS was not just to investigate cases involving IRS targets, but it was also to assist on OCDETF investigations?

A.   Yes.

Q.   But your bosses generally wouldn't let you get too involved in a case that wasn't an OCDETF case outside your agency?

A.   Correct.

Q.   Okay.  So with regard to the OCDETF classification, you've been involved in those cases a number of times in your career, correct?

A.   Yes.

Q.   And as far as the OCDETF classification is concerned, Mr. Cooper asked you whether or not you recall Mr. Bongiovanni or anyone else applying for OCDETF classification for the Ron Serio investigation, right?

A.   I don't recall that specific question.

Q.   Okay.  But do you recall whether or not the Ron Serio investigation was applied for in an OCDETF investigation fashion?

A.   At the time I was involved, I don't believe so.

Q.   Okay.  So it wasn't -- it wasn't during the time you were involved that any type of OCDETF funding was requested, right?

A.   Correct.

Q.   And as far as the process for OCDETF funding, you're familiar with the fact that an agent can't just submit an application to the U.S. Attorney's Office alone, correct?

A.   Correct.

Q.   Like, a case agent, they have to prepare the request, correct?

A.   Yes.

Q.   And they also have to submit that request through their immediate supervisor, correct?

A.   Yep.

Q.   And their immediate superior needs to sign off on that particular application, correct?

A.   Yes, sir.

Q.   And in the DEA Buffalo, you're familiar with the fact that there was a resident agent in charge at that point in time in 2013?

A.   Yes.

Q.   And that's the boss of the group supervisor, for lack of a better word?

A.   Yes.  The resident agent in charge runs the entire office.

Q.   And so that individual would also have input on whether or not an OCDETF case should be submitted, correct?

A.   Yes.

Q.   And so if Mr. Bongiovanni wanted to open up an OCDETF case, he would have to get approval from his group supervisor, correct?

A.   Yes.

Q.   And he'd also have to get approval from the RAC at the office, correct?

A.   Yes.

Q.   And only then would the proposal be submitted to the U.S. Attorney's Office, correct?

A.   That's correct.

Q.   And the U.S. Attorney's Office, they also have a decision of whether or not to support that request, correct?

A.   Correct.

Q.   And so if they decided not to support the request, it wouldn't go any further than what I just described, correct?

A.   Correct.

Q.   And then beyond the U.S. Attorney's Office, is there another entity or person that holds approval authority over what the U.S. Attorney's Office in the Western District of New York wants to do?

A.   Yes.  Once the approval -- or, the proposal is approved at the local level, it will go to the regional counsel for

formal acceptance into the program.

Q.   Okay.  So that's another layer of approval in the process?

A.   Yes.

Q.   And these type of cases, when you submit the funding request for them, in your experience the case is not generally in its infancy, correct?

A.   Correct.

Q.   There's investigation that goes into it, correct?

A.   Yes.

Q.   To develop the organizational nexus that needs to be shown on the proposal, correct.

A.   Correct.

Q.   There's also investigation that goes into it on the financial side, correct?

A.   Yes.

Q.   And there's also investigation that goes into that specified unlawful activity, correct?

A.   In this case, it would be drug trafficking, yes, sir.

Q.   Yeah, so there's an investigation that goes into that part of it, as well?

A.   Yes.

Q.   So based on your understanding when you got brought onto this case in March of 2013, the investigation into the Serios was still in its infancy, right?

A.   As far as I'm aware.

Q.   Yeah.  I mean, Scott Deming didn't start up with his financial review of any of the documents on Ron Serio at that point, correct?

A.   I'm not exactly sure when he began his financial investigation, but it was prior to March of -- the middle of March of 2013 when I was brought into it.

Q.   Yeah.  And I guess what I'm getting at is that when you were brought into the investigation in March, Scott Deming didn't come to you and drop 100 pages worth of files up on your desk and say, hey, can you help me out with this?  I need these documents reviewed for this case, correct?

A.   Not right at that moment, no.

Q.   Yeah, he needed to go out and subpoena the records first, correct?

A.   Yes, sir.

Q.   And in your experience, that's something that takes time to get, right?

A.   Typically.

Q.   And then after several weeks go by, the records get returned, right?

A.   Yes, sir.

Q.   And then you're in a position to help Scott go through the records, correct?

A.   If he needed help on that, yes.

Q.   And the analysis also takes some time, correct?

A.   Yes.

Q.   So all of those things are happening over the first couple of months of this investigation, correct?

A.   Yes.

Q.   And as far as the drug part of the investigation, I think you testified that you didn't have any specific involvement in the drug investigation into Ron Serio, correct?

A.   Correct.

Q.   So you're not really familiar with what steps the DEA was taking with regard to Ron Serio's investigation on the drug side?

A.   Other than trying to identify where the grow operation was, no.

Q.   Yeah.  And I guess with regard to the grow operation, that's -- that's something that also doesn't happen overnight, correct?

A.   Pardon?

Q.   With regard to identifying grow operations, in your experience, that's not something that happens overnight either, correct?

A.   No.

Q.   Sometimes agencies, they don't have the benefit of an insider, correct?

A.   Correct.

Q.   They don't have a CS who says, hey, I've been to this one particular grow location, and I can get you in there, correct?

A.   Correct.

Q.   And if the DEA is in possession of that type of insider, that's someone that potentially you could bring to a judge, correct?

A.   Correct.

Q.   And that's someone who could potentially provide probable cause of why a search warrant should be issued, correct?

A.   Yes.

Q.   And that's something where a search warrant might be quickly issued, correct?

A.   Correct, if there's probable cause, yes.

Q.   But when you don't have that type of insider -- you're familiar with how the DEA tries to track down potential grow locations, correct?

A.   Yes, sir.

Q.   Some of that's through issuing subpoenas for electric or utility records?

A.   Correct.

Q.   And some of that's trying to develop intelligence as to where a particular location might be used by a target, correct?

A.   Yes.

Q.   And that's something that generally sometimes takes some time to develop, correct?

A.   It can, yes.

Q.   And back in March of 2013, that was not information or intelligence that the DEA was in specific possession of based on your understanding, correct?

A.   Not that I'm aware, at that time.

Q.   Yeah.  So they needed to go out and get that information at that point in time?

A.   Correct.

Q.   And develop that information at that point in time?

A.   Yes.

Q.   So it would be a little premature in your experience to submit an OCDETF proposal in March of 2013, correct?

A.   Yes, at that time.

Q.   Okay.  Because it'd probably get rejected out of hand, correct?

A.   Correct.

Q.   All right.  So, with regard to your role in the investigation, you mentioned that you assisted Scott Deming with his review of records that were getting returned regarding financial information on Ron and Tom Serio, correct?

A.   Yes.

Q.   And this included things such as banking records?

A.   Yes.

Q.   This included things such as records involving properties owned or associated with Ron Serio?

A.   Yes.

Q.   This also included items involving Tom Serio, correct?

A.   Yes.

Q.   And as far as FinCEN was concerned, you're familiar with the FinCEN database, correct?

A.   Yes.

Q.   And the FinCEN database, it logs CTRs; is that right?

A.   Currency transaction reports, yes.

Q.   So with regard to those CTRs, we went through it a little bit with the prior witness, but those are reports that are triggered when a transaction in excess of $10,000 occurs at a financial institution, or another institution that handles financial transactions?

A.   Cash transactions exceeding $10,000, yes.

Q.   And a report is triggered when those things come into play?

A.   Yes.

Q.   And casinos are another entity that reports currency transactions exceeding $10,000, correct?

A.   Correct.

Q.   And so were you aware of the fact that when FinCEN records were checked that a number, hundreds of -- of CTRs

came back with regard to Ron Serio?

A.   I know there were a number.  I couldn't -- I couldn't tell you how many.

Q.   Okay.  Did you not run those reports yourself?

A.   I don't believe so.

Q.   Okay.  I understand.  So with regard to the particular information that was being requested by Scott Deming, we went through the fact that he's got to request it and then he's got to review it.  Your role was to help him review some of that information, correct?

A.   Correct.

Q.   And do you recall whether the information that was requested by Scott Deming was returned in April, or if it took longer than April to get that information back in full?

A.   I don't have a specific recollection.

         MR. SINGER:  So, Ms. Champoux, would you mind bringing up Government Exhibit 22I, please.

         And if we can scroll to the second page of this document, Ms. Champoux.  Thank you.

         BY MR. SINGER:

Q.   So, this is an email that you sent to Scott Deming on May 21st; do you recall that, sir?

A.   The bottom email?  I'm sorry.

Q.   Yes, the bottom email.

A.   Yes.

Q.   And in this particular email, it's just between you and Mr. Deming, you were asking him if there's anything new about the M&T records?

A.   Correct.

Q.   Because you were waiting on those records to come in, correct?

A.   Yes.

Q.   And this is in the middle of May at this point?

A.   May 21st.

Q.   And you got involved in this investigation officially back in March, mid March of 2013?

A.   Correct.

Q.   So a couple of months have gone by since your involvement started in the case, correct?

A.   Yes.

Q.   And Mr. Deming's --

A.   Again, I don't know when Mr. Deming started.

Q.   I got you.

    And so Mr. Deming in this email is indicating, hey, things are a little crazy for him right now, correct?

A.   The top email, yes.

Q.   Yes.  And so, there was -- there's some delay with getting the records; fair statement?

A.   I'm not sure at whose end the delay it was, but yes, there was a delay.

Q. Okay. And Mr. Deming, in your understanding, he just doesn't work one case at the U.S. Attorney's Office, correct?

A. Correct.

Q. He works dozens of cases at the U.S. Attorney's Office, right?

A. I assume so.

Q. Yeah. I mean, that's one of the reasons why you're put in place as a supporting role in these investigations, correct?

A. Not necessarily. No. There's plenty of cases where the IRS is the lead. On this particular one, it was Mr. Deming.

Q. Yeah. And I guess that's what I'm getting at, is that you were placed in a support role in this particular case, right?

A. In this one, yes.

Q. And it was because it was to help Mr. Deming with the analysis of the results of the financial documents he pulled, correct?

A. Correct.

Q. Because it was sometimes difficult for him to do it on his own?

A. Correct.

Q. Based on his workload, correct?

A. Yes.

Q. Okay. So do you recall that it took roughly until the

middle of June before Scott Deming and you were complete with analyzing all the records that were coming back from the banks and institutions?

A. It was sometime after May of 2013.

Q. All right. And in your experience, it's rare for you to get together with a meeting with the DEA, if they're the main agency investigating a target, to talk about the financial information until your analysis is complete, correct?

A. I wouldn't say that. That's an ongoing process.

Q. But when you're waiting for documents to come back from the banks, there's a lead time for that, right? We just talked about that, right?

A. Yes.

Q. And then there's also a time where you, or Scott, or both of you need go through the documents to find out what's in there, correct?

A. That's correct.

Q. And then only after that analysis is complete, can you go back to the agents investigating a target and say, hey, this is what we found inside the documents, that might help with your case, correct?

A. Correct.

Q. So a meeting usually occurs after that analysis is done, correct?

A. The reason I equivocate is because sometimes the records

come in piecemeal, and so there can be discussions before the full analysis is complete.

Q. Yeah. So in this particular case, do you recall that there was an extended amount of time that it took to get back particular casino records that you or Mr. Deming were interested in procuring?

A. I don't have a specific recollection about the casino records.

Q. But if the casino records came in after some of the banking information, like, that would be an instance of where you might have a meeting before the casino records came in, correct?

A. Correct.

Q. So with regard to the meetings, do you recall trying to get a meeting together in the beginning of July to sit down with the group of investigators to discuss the financial investigation?

A. Yes.

Q. And that was a particular meeting that was organized for July 1st, 2013, right before the holiday weekend?

A. It was around that time.

MR. SINGER: So, Ms. Champoux, if we can bring up 22D. My apologies, can we bring up 22O.

BY MR. SINGER:

Q. So do you recall this one particular email string about

setting up a meeting between yourself, Stephen Bevilacqua,

Mr. Deming, and Mr. Bongiovanni?

A.   Yes.

Q.   And so in this particular email string, you'd agree with

me that the meeting was set for July 1st of 2013?

A.   Yes.

Q.   And that meeting was supposed to include Mr. Bongiovanni,

correct?

A.   He's on the email string, so yes, sir.

Q.   Did he indicate up at the top here that it was okay for

him to meet on that day?

A.   Yes.

Q.   But that meeting, to your memory, did not occur as

planned, correct?

A.   Correct.

Q.   The reason for that meeting not occurring was because

Scott Deming's car broke down?

A.   I seem to recall that, yes.

Q.   Let me see if I can refresh your recollection.

        **MR. SINGER:**  Ms. Champoux, can we bring down that

exhibit, and bring up only for the witness on his screen

Government Exhibit 3518B.

        And if we can advance to page 63 of that document.

        **BY MR. SINGER:**

Q.   So, Mr. Turri, I'm going to ask you to take a look at

this one particular page in the document, the email string,

and see if that helps refresh your memory as to what happened

that day.

A.   Yes.

Q.   So that refreshes your memory about why the meeting did

not occur?

A.   Yes.

        **MR. SINGER:**   And if you can bring that document down,

Ms. Champoux.   Thank you.

        **BY MR. SINGER:**

Q.   So the reason was because Mr. Deming's car didn't operate

as planned, correct?

A.   He was having car problems of some kind.

Q.   And so as far as the car problems are concerned,

Mr. Deming, to your understanding, he didn't work in Buffalo,

correct?

A.   Correct.

Q.   He worked in Rochester?

A.   Yes.

Q.   And, of course, you need a car to get from Rochester to

Buffalo for a meeting, right?

A.   Yes.

Q.   So it wasn't that Mr. Bongiovanni cancelled that meeting,

correct?

A.   Correct.

Q.   It just didn't work out because Mr. Deming couldn't make it, right?

A.   Yes.

Q.   All right.  So, immediately or very shortly after that meeting is July 4th, correct?

A.   Yes.

Q.   Your understanding is, is that a lot of people take off during that time?

A.   Yes.

Q.   Do you recall if you took any type of days of leave during that time period of that week?

A.   I don't recall.

Q.   But it usually a pretty slow week in the office?

A.   It can be.

Q.   And so the meeting that you were supposed to have on July 1st that Mr. Deming had to cancel on, there's another meeting that's set up to make up for that, correct?

A.   I don't recall if the meeting was ever rescheduled with Mr. McCabe.

Q.   Well, let me see if I can help you out a little bit.

        **MR. SINGER:**  So can we bring up Government Exhibit 22?  If we can advance to the second page, Ms. Champoux?

        **BY MR. SINGER:**

Q.   I'm showing you what's already in evidence, it's a log

that's prepared by Scott Deming.  Do you see that a meeting is reflected as being scheduled on July 11th, 2013?

A.   Yes.

Q.   And that was a meeting with AUSA McCabe, yourself, and Mr. Bevilacqua, and Mr. Deming?

A.   Yes.

Q.   And that was the meeting that was supposed to happen on July 1st but got cancelled?

A.   It appears so.  Yes, sir.

Q.   And you don't recall Mr. Bongiovanni being at that meeting, correct?

A.   Not that I recall.

Q.   You can't say why he was unable to attend that day?

A.   No.

Q.   Like, you don't know what he was working on at the DEA on that particular day?

A.   No.

Q.   You don't know what was going on in his life at that particular time?

A.   No.

Q.   But do you know Steven Bevilacqua is someone who works with Mr. Bongiovanni at the DEA?

A.   Yes.

Q.   He's an intel analyst who's worked there for many, many years?

A.   Yes.

Q.   And you know that he's someone who is also assisting Mr. Bongiovanni on his investigation at the DEA on this case, correct?

A.   Yes.

Q.   And you've seen instances before where the agent can't make it, but they send somebody in their stead?

A.   Yes.

Q.   And in this situation, that's what Mr. Bongiovanni did, correct?

        **MR. COOPER:**  Objection as to what Mr. Bongiovanni did or didn't do.  The witness can't know that.

        **THE COURT:**  Yes, so sustained.  Yes.

        Again, to the form of the question and foundation.

        **BY MR. SINGER:**

Q.   So at the meeting, Mr. Bevilacqua -- he wasn't just a nonparticipant, correct?

A.   I'm sorry?  Can you repeat that?

Q.   Sure.

     Mr. Bevilacqua participated in this meeting on July 11th, right?

A.   Yes.

Q.   He provided information to the group, correct?

A.   To the DEA group?

Q.   No.  To the group that you were in?

A.   During the meeting?

Q.   He provided information to you in this meeting, right?

A.   I don't have a specific recollection.

Q.   Sure.  But do you remember him talking and providing information?

A.   He was at the meeting.  I couldn't say what he provided.

Q.   So if it's in this one particular exhibit that we looked at in 22 on an entry, if it says Bevo advised that they believe they have identified possible grow -- locations of grow opers, O-P-E-R-S, Bevo is Stephen Bevilacqua, correct?

A.   Yes.

Q.   And you wouldn't have any reason to disagree that he might have a better recollection of the events than what you have today?

A.   Yeah, I --

         MR. COOPER:  Objection.

         THE COURT:  No, overruled.

         THE WITNESS:  -- I just don't have any recollection of it.

         BY MR. SINGER:

Q.   Okay.  And you don't have any reason to disagree that that's incorrect, correct?

A.   No.

Q.   Okay.  And so this information -- the -- the meeting also includes AUSA McCabe, right?

A.   Yes.

Q.   And he's the prosecutor responsible for this one particular investigation?

A.   At that time.

Q.   All right.  So inside of this document, it talks about possible grow locations that were trying to be identified by the DEA?

A.   Yes.

Q.   And you're aware of the fact that finding those grow locations is something we talked a little bit about it before that helps establish the narcotics trafficking activity, correct?

A.   Correct.

Q.   And that's something that's important in the investigation is taking place right now, because you need that SUA, the specified unlawful activity, to complete the money-laundering case, right?

A.   Correct.

Q.   And so the information that you and Mr. Deming are receiving back at that period of time in 2013 was there's -- there's some information that suggests that money-laundering activity's happening, correct?

A.   There was significant financial activity.

Q.   And the belief was, is that it may be connected to the narcotics-trafficking activity that the DEA was

investigating, right?

A.   Well, that was the purpose of the investigation.

Q.   And you need that narcotics activity to make the link between the two, correct?

A.   Yes.

Q.   To bring a case, you need both, not just one, correct?

A.   Yes.  They're both elements of the crime.

Q.   And when it comes down to OCDETF investigations, when you apply for funding for an OCDETF case, again, you need to establish facts that suggest that drug activity is ongoing, correct?

A.   Yes.

Q.   And that the financial activity is going on, correct?

A.   Yes.

Q.   And, so, like for instance, if you have a case where there's a lot of drug activity that you have proof of, follow me --

A.   Yes.

Q.   -- but when you go subpoena all the financial records it comes back that there's not a lot of information that shows money-laundering activity, right --

A.   Yes.

Q.   -- that's going to create a problem for that case you're trying to bring regarding the money laundering, right?

A.   Regarding the money laundering, yes.

Q.   The same is true if you're lacking on the narcotics investigation side of the house, right?

A.   Yes.  You can't have money laundering without drug trafficking or specified unlawful activity.

Q.   And so your understanding about what the DEA's doing, because you work in that office in some ways, correct?

A.   Off and on, yes.

Q.   And you assist in the DEA investigations every now and then, correct?

A.   Yes.

Q.   Is that the DEA is still trying to run down these grow houses, right?

A.   Yes.

Q.   And you and Mr. Deming are trying to help in any way that you can in trying to identify properties of interest for the DEA, correct?

A.   Correct.

Q.   So with regard to that particular part of the investigation, you're aware of addresses that the DEA was looking at in that summer of 2013 time period, right?

A.   Yes.

Q.   And you're aware of addresses that you're specifically trying to help the DEA investigate, correct?

A.   Correct.

Q.   So one of those particular addresses involved a property

at 132 Rhode Island; is that right?

A.  I don't recall the specific address, but we were checking on different properties.

Q.  All right.  Another particular address that you recall helping out the DEA identify is an 82 Sycamore Street address?

A.  Again, I don't recall the specific addresses.

MR. SINGER:  Ms. Champoux, can you please bring up Government Exhibit 22I.

Actually, I'm sorry.  Can you bring up just only please for the witness Defense Exhibit H.1.

BY MR. SINGER:

Q.  I'm going to ask you to take a look at this one particular document, Mr. Turri, and see if it helps refresh your memory as to a particular address the DEA was interested in.

A.  Yes.

MR. SINGER:  And so, Ms. Champoux, you can bring that down.

BY MR. SINGER:

Q.  So 132 Rhode Island was a possible location hat DEA had interest in, correct?

A.  Yes.

Q.  And that was a location that you were also trying to assist the DEA with identifying information that may be

helpful?

A.   Yes.

Q.   And another address -- do you recall 82 Sycamore at all?

A.   I do not.

Q.   Let me see if I can help refresh your recollection on that.

        MR. SINGER:  Ms. Champoux, would you mind bringing up Defense Exhibit H.1 again?  If you can turn to page 2 of that document.  Actually, 3, I'm sorry.

        BY MR. SINGER:

Q.   Did that help refresh your recollection regarding an 82 Sycamore address being investigated?

A.   It appears that connection came from --

Q.   No, I don't want you to read off the document, I'm asking you whether that refreshes --

A.   No, I wasn't going to.

Q.   Certainly.

A.   But it came from other information.

Q.   And do you recall being involved in communicating that particular address to the DEA?

A.   Yes.

        MR. SINGER:  You can take that document down, Ms. Champoux.

        BY MR. SINGER:

Q.   So these are two particular addresses the DEA is looking

into as potential grow sites at that time?

A.   Yes.

MR. SINGER:   And Ms. Champoux, can you bring up Government Exhibit 22I.

BY MR. SINGER:

Q.   So, with regard to this one particular communication on May 23rd, 22I has an email string of discussions about the banking records, correct?

A.   Yes.

Q.   But in the middle here, do you see a communication from Mr. Bongiovanni talking about how the DEA and him are making strides on the street?

A.   Yes.

Q.   So with regard to that particular email, are you aware of the strides that the DEA is making in the street?

A.   At that time, no.

Q.   On that same date, are there discussions ongoing about the grow location possibilities being identified?

A.   I'm sorry, I -- the dates, if we can --

Q.   Sure?

MR. SINGER:   So we can bring that exhibit down again. If we can bring up Exhibit H.1 only on the witness's screen.

BY MR. SINGER:

Q.   If you can take a look at that document.  If you need me to advance any pages to figure out whether it refreshes your

memory on the dates, sir?

A.  Yes.

Q.  And so the discussion regarding these potential grow locations, they're occurring on May 23rd, right?

A.  Correct.

Q.  Now I want to show you another defense exhibit that's not in evidence, Defense Exhibit H.3.

        MR. SINGER:  Would you mind bringing that up, Ms. Champoux?

        BY MR. SINGER:

Q.  Now, this is an email that was sent out on May 23rd of 2013, correct, sir?

A.  Yes.

Q.  And this is part of that string that I tried to refresh your memory with, correct?

A.  It appears so, yes.

Q.  And this is a communication that's made in the regular course of the business of the DEA and the IRS, correct?

A.  Yes.

Q.  This email includes yourself as a person on the email, correct?

A.  Yes.

Q.  And it's substantially in the same condition as when you viewed it on that date on May 23rd of 2013?

A.  Yes.

Q.  And you believe it's authentic, correct?

A.  Yes.

**MR. SINGER:**  Your Honor, at this time, the defense would move to introduce Defense Exhibit H.3 for the purpose of showing Mr. Bongiovanni's state of mind.

**MR. COOPER:**  Objection.  Hearsay.

**THE COURT:**  To show his state -- this is sent to the defendant.

**MR. COOPER:**  So, Judge, I can -- I can argue it further, but I think I would rather go to the bench.  I don't want to argue in front of the jury.

**THE COURT:**  Okay.  How much longer do you have for your cross?

**MR. SINGER:**  Oh, I probably have 25 minutes maybe, Judge.

**THE COURT:**  Okay.  So we're going to break for the day.  Remember my instructions about not communicating about the case.  Don't use tools of technology to research the case or to communicate about the case.  Don't read, or watch, or listen to any news coverage of the case, if there is any, while the case is in progress.  And don't make up your mind until the case has been submitted to you for deliberations.

We'll see you tomorrow morning at 9:30 again.

Remember, so this week we're going to be on -- today is Wednesday.  We'll be on tomorrow all day, and then Friday

afternoon.  Next week we'll be on Monday and Tuesday, we'll be down Wednesday and Thursday, and we'll be on all day Friday. Okay?  So see you folks tomorrow morning.

**JURORS:**  That's the week after.

**THE COURT:**  No?  That's the week after.  Thank you.

So next week will meet Monday, Tuesday, Wednesday, Thursday, half a day Friday.  And then the next week will be Monday, Tuesday, and Friday.

So you know it better than I do.  Thank you.

See you tomorrow.

(Jury excused at 4:59 p.m.)

**THE COURT:**  Okay.  You can step down, sir.  Thank you.  And you're not to talk to anybody about your testimony between now and then, okay?  Please.

**THE WITNESS:**  Yes, Your Honor.

**THE COURT:**  Thank you.

(Witness excused at 4:59 p.m.)

*     *     *     *     *     *     *

**CERTIFICATE OF REPORTER**

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on September 4, 2024.

s/ Ann M. Sawyer
Ann M. Sawyer, FCRR, RPR, CRR
Official Court Reporter
U.S.D.C., W.D.N.Y.

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF DAVID TURRI**

**SEPTEMBER 4, 2024**

**W I T N E S S**                                    **P A G E**

**D A V I D   T U R R I**                             2

  DIRECT EXAMINATION BY MR. COOPER:                  2

  CROSS-EXAMINATION BY MR. SINGER:                   20


**E X H I B I T**                                    **P A G E**

GOV Exhibit 22S                                       16