**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

                Case No. 1:19-cr-227

        Plaintiff,          (LJV)

v.

                September 5, 2024

**JOSEPH BONGIOVANNI,**

        Defendant.

_____

**TRANSCRIPT EXCERPT – EXAMINATION OF DAVID TURRI – DAY 2**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **APPEARANCES:** | **TRINI E. ROSS, UNITED STATES ATTORNEY** |
| | **BY: JOSEPH M. TRIPI, ESQ.** |
| | **NICHOLAS T. COOPER, ESQ.** |
| | **CASEY L. CHALBECK, ESQ.** |
| | Assistant United States Attorneys |
| | Federal Centre, 138 Delaware Avenue |
| | Buffalo, New York 14202 |
| | For the Plaintiff |
| | |
| | **SINGER LEGAL PLLC** |
| | **BY: ROBERT CHARLES SINGER, ESQ.** |
| | 80 East Spring Street |
| | Williamsville, New York 14221 |
| | And |
| | **LAW OFFICES OF PARKER ROY MacKAY** |
| | **BY: PARKER ROY MacKAY, ESQ.** |
| | 3110 Delaware Avenue |
| | Kenmore, New York 14217 |
| | And |
| | **OSBORN, REED & BURKE, LLP** |
| | **BY: JOHN J. GILSENAN, ESQ.** |
| | 120 Allens Creek Road |
| | Rochester, New York 14618 |
| | For the Defendant |
| | |
| **PRESENT:** | **BRIAN A. BURNS,** FBI Special Agent |
| | **MARILYN K. HALLIDAY,** HSI Special Agent |
| | **KAREN A. CHAMPOUX,** USA Paralegal |
| | |
| **LAW CLERK:** | **REBECCA FABIAN IZZO, ESQ.** |

**COURT DEPUTY CLERK:**   **COLLEEN M. DEMMA**

**COURT REPORTER:**        **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
Robert H. Jackson Federal Courthouse
2 Niagara Square
Buffalo, New York  14202
Ann_Sawyer@nywd.uscourts.gov


*    *    *    *    *    *    *


(Excerpt commenced at 9:46 a.m.)

(Jury seated at 9:46 a.m.)

**THE COURT:**  Good morning, everyone.

**JURORS:**  Good morning.

**THE COURT:**  I remind -- oh, the record will reflect all our jurors are present.

I remind the witness he's still under oath.

And, Mr. Singer, you may continue.


**D A V I D   T U R R I**, having been previously duly called and sworn, continued to testify as follows:


**(CONT'D) CROSS-EXAMINATION BY MR. SINGER:**

Q.  Good morning, Mr. Turri.

A.  Good morning.

Q.  Did you get some good sleep last night?

A.  Yes, sir.

Q.  I wish I could say the same.  So where we left off yesterday when we broke was --

MR. SINGER:  Ms. Champoux, would you mind bringing up H.3 onto the witness's screen only again?

BY MR. SINGER:

Q.  So we're -- we're talking about this document and this was email that was traded back and forth between you and DEA back on May 23rd, 2013, in the morning?

A.  Yes.

Q.  And it was in a fair and accurate condition as when you remember it back then?

A.  Yes.

MR. SINGER:  And so at this time, Your Honor, the defense is offering this under the Rule of Completeness, but in the alternative also to demonstrate Mr. Bongiovanni's state of mind or effect on the elicitor the email had.

MR. COOPER:  Judge, the government objects as we discussed yesterday to the exhibit coming in substantively under the Rule of Completeness.

THE COURT:  That -- that objection is sustained.

MR. COOPER:  And that's all.

THE COURT:  Okay.

MR. COOPER:  And I'd ask for a limiting instruction if you permit it.

THE COURT:  Yeah, yeah.  So -- so we are going to admit this exhibit, but it's going to be admitted only for the purpose of showing the defendant's state of mind, that is the

defendant knew that this exhibit -- that this -- that this email was sent, and the information was sent to the defendant.

It's not being admitted for the substance, and I can explain it a little bit better once we get into the substance of the email.  So why don't we do that.  So it's admitted for that limited purpose.  We can show the jury.

**(GOV Exhibit H.3 was received in evidence.)**

**MR. SINGER:**  Certainly.  If we could publish H.3 to the jury.

**THE CLERK:**  You're all set.

**MR. SINGER:**  Thank you.  And if we can expand up on the text, Ms. Champoux.  Thank you.

**BY MR. SINGER:**

Q.  All right.  So, I just want to run through a couple of different things in the email, Mr. Turri.

So the person that the email is sent from, that's John Flickinger?

A.  Yes.

Q.  And -- and who is John Flickinger back in May of 2013?

A.  He was the group -- group supervisor.

Q.  And he was Mr. Bongiovanni's direct supervisor at that point in time?

A.  Yes.

Q.  And he was the group supervisor for D-57?

A.  Correct.

Q.   And then the email, when is it sent again?

A.   May 23rd, 2013.

Q.   And what time is it sent, sir?

A.   11:37 a.m.

Q.   And who is the email addressed to and also cc'd to?

A.   It's addressed to Stephen Bevilacqua, with ccs to myself, Joseph Bongiovanni, and Shane Nastoff.

Q.   And so again, Mr. Bevilacqua, Bevo, he's somebody who works as an intel analyst at the DEA at the time?

A.   Yes.

Q.   And he is someone who is assisting with the investigation with Agent Bongiovanni?

A.   Yes.

Q.   And Shane Nastoff, he was another special agent in D-57 at the time?

A.   Yes.

Q.   And did you understand him to be the co-case agent on the case involving Ron Serio?

A.   Yes.

Q.   And the subject we talked about this yesterday, 132 Rhode Island, that was a potential grow location to your understanding?

A.   Yes.

Q.   Can you please read the text that G.S. Flickinger writes to Stephen Bevilacqua that morning?

A.    Bevo.   Yesterday the case agents further identified a house/warehouse located at 132 Rhode Island, Buffalo, New York which may be a possible marijuana grow house for the Serio DTO.

The property has a recently constructed ten-foot high fence around the property line.

Can you check utilities on the property.  It is owned by the Ronald Serio LLC, and recent electric usage to help develop P.C. if it is a grow.

Also, maybe we can get something back on the financials of the Ronald Serio LLC given the possibility it is a grow house and connected with the main target.  Thank you.

**THE COURT:**  So let me now explain what this is -- the purpose of this admission.

So, it's not being admitted for the truth of what's in here.  So yesterday, the case agents identified a house, warehouse located at 132 Rhode Island, Buffalo, New York. Whether that's true or not, we don't know.

We do know that Mr. Flickinger sent this email that was sent to Mr. Bongiovanni, so we know that Mr. Bongiovanni was told this.  But that's why it's being admitted, not for the truth of it.

So whether case agents did identify this, whether the property really has a constructed ten-foot high fence, whether the property is owned by the Ronald Serio LLC, none of that is

to be assumed by you as true, because that's not why this is being admitted.  But Mr. Bongiovanni was told this, and thought this.  That's why it's being admitted.  Okay?

Go ahead.

MR. SINGER:  Thank you, Judge.

So Ms. Champoux, if we can un-expand out of H.3, if and we could bring up side by side to H.3, Government Exhibit 22I.

BY MR. SINGER:

Q.  So, this email, to your understanding, was -- was sent on May 23rd at 11:37 a.m.; is that right, sir?

A.  Correct.

Q.  And we talked about 22I yesterday.  This particular part of the message string in 22I is where Mr. Bongiovanni talks about how agents were making strides on the street and will report back soon to you?

A.  Yes.

Q.  And this particular email that was sent by Agent Bongiovanni, when was it sent on the 23rd of May?

A.  11:59 a.m.

Q.  So a little less than 20 minutes after the communication from G.S. Flickinger?

A.  A little more than 20 minutes.

Q.  A little more than 20 minutes.  Actually, I think it's 22 minutes; is that right?

A.   Yes, sir.

Q.   22 actually, I got that right.  I'm surprised.

So shortly after he received that email from -- from G.S. Flickinger, his boss?

A.   Yes.

Q.   Okay.  And I know I asked you earlier, the strides on the streets question, your understanding about the strides in the streets were being made at that point in time was the identification of grow houses?

A.   I assume that was part of it, yes.

Q.   Okay.  So as far as 132 Rhode Island is concerned, you did a little digging into that particular address; is that right?

A.   Yes.

Q.   And -- and you identified that there was a possible connection to Ron Serio on that particular address?

A.   My recollection is that the findings with respect to 132 Rhode Island were inconclusive, but there was property, I think, at another address close by, maybe 140 Rhode Island --

Q.   Okay.

A.   -- that I had discovered that he owned.

Q.   Okay.  So -- so, there -- there seemed to be some potential connection to Ron Serio at this particular address that G.S. Flickinger may have been talking about in that email?

A.   That address, or an address close to it.

Q.   Okay.  And are you aware of the fact that -- that agents from the DEA, and Stephen Bevilacqua more specifically, subpoenaed records regarding the utilities?

A.   Yes.

MR. SINGER:   So Ms. Champoux, if we could bring down these two -- two exhibits, and if we could bring up Government Exhibit 8.

If we could go to the 5612 PDF.  And advance to page -- sorry, let's leave it right here.

BY MR. SINGER:

Q.   So this particular subpoena, you would agree with me, was -- was signed out on the 6th day of August of -- of 2023?

A.   Yes.

Q.   And it also requests records from National Grid?

A.   Yes.

Q.   And you understand National Grid to be an electric service company?

A.   Yes.

Q.   And it also requests particular records for a number of addresses, but 132 Rhode Island is one of those addresses?

A.   Yes.

MR. SINGER:   Ms. Champoux, can we advance to page 12 of the document, please.

If we could straighten that out.  Thank you very

much.

**BY MR. SINGER:**

Q.   So, do you see a return date on these particular records, sir?

A.   There's a date at the top of the document, yes.

Q.   Okay.  Now, with regard to the 132 Rhode Island address, you see how there's a return regarding a potential person who subscribed to the utilities of that address?

A.   Yes.

Q.   And who's that person?

A.   Joseph Cardina.

Q.   As far as Mr. Cardina is concerned, do you see when the account for that particular location was opened?

A.   Yes.

Q.   And what is the date on the account opening?

A.   August 6th, 2013.

Q.   So it appears like it was very close in time to when the subpoena was issued?

A.   Yes.

        **MR. SINGER:**  Now, if we could advance to the next page of that document, Ms. Champoux.

        **BY MR. SINGER:**

Q.   So it looks like this is more information regarding Joseph Cardina, the person who is subscribing to that account?

A.   Correct.

MR. SINGER:   And if we can advance to the next page.

BY MR. SINGER:

Q.   So it looks like these are kilowatt/hour readings regarding that particular location?

A.   Yes.

Q.   And so it appears like there was really not too much to report because the service had just been activated a few days before the subpoena was returned?

A.   Yes.

Q.   So there wasn't a lot of information in this response to indicate what the usage was at that point in time, right?

A.   Correct.

MR. SINGER:   Can we advance to the next document -- I'm sorry, the next page, Ms. Champoux.

BY MR. SINGER:

Q.   As far as the electrical usage on this particular location, what are these records on here reflecting, sir?

A.   I'm sorry, is there a specific question?

Q.   Sure.  So, with regard to the top portion up here, what is that reflecting, to your understanding?

A.   Well --

Q.   I'll get a -- I'll get a little more specific.

So with regard to the -- the entry in the black that's on this line, do you see how it talks about the electrical

service being removed?

A.   Yes.

Q.   And it looks like the removal date is July 6th of 2011?

A.   Yes.

Q.   And then it looks like there's an activation date that appears below that?

A.   Yes.

Q.   And that activation date was the one that we talked about earlier, the 8/6/2013 date?

A.   Yes.

Q.   So it appears like there was no electrical service at this particular building between 2011 and 2013?

A.   That would have -- that's what it appears to me.

Q.   And that would create an issue with determining whether or not it was a grow house, correct?

A.   Yes, correct.

          **MR. SINGER:**  If we could advance to the next page of the document, please, Ms. Champoux.

          **BY MR. SINGER:**

Q.   So it looks like there's another unit that electrical service is connected to at this particular address; is that correct?

A.   I'm sorry, another unit, you say.

Q.   Sure, so 132 Rhode Island, you see unit 2 there?

A.   Oh, yes.

Q.  Okay.  And sometimes when you're pulling electrical information, utility information from an address, there might be more than one hookup?

A.  Correct.

Q.  And so it looks like this account was opened the same date the first one that we looked at was, 8/6/2013?

A.  Yes.

MR. SINGER:  If we could advance to the next page of the document, Ms. Champoux.  And if we could advance to the next page again.

BY MR. SINGER:

Q.  And again, it looks like on this particular unit, the same thing occurred where electrical service was nonexistent at the address on 7/6/2011 and was not turned on again until 8/6/2013?

A.  Yes.

Q.  It would be difficult to run a grow house without the electrical service, right sir, in your experience?

A.  Well, there are multiple ways that you can, I'll say finagle that, but yes, you need electricity.

Q.  But I guess, you know, if people are using generators, you'd have to have some type of evidence of that, correct?

A.  Yes.

Q.  And why you're running these utilities is trying to establish if there's higher usage than normal, right?

A.   Yes.

Q.   So that you can potentially develop probable cause to get a warrant to search the location, correct?

A.   Yes.

Q.   And based on the record returns on this particular address, there's no probable cause to search at this particular time, correct?

A.   Not based on this, correct.

Q.   Okay.  Now, 82 Sycamore was another address that we talked about yesterday, correct?

A.   Yes.

Q.   And that was the other one that was potentially connected that you spoke about a minute ago?

A.   Yes.

Q.   And in that particular address, I won't go through the utility pulls, we've already done that with another witness, but were you aware of the fact that the DEA also subpoenaed records on that location?

A.   Not specific to that location.

Q.   Okay.  Well, I won't go through that again for the sake of time.

     As far as the investigation, you're -- you're aware of the fact that the investigation from the DEA's narcotics perspective continues through the summer of 2013 and into the fall of 2013?

A.   As far as I was aware, yes.

Q.   And they're still trying to identify particular grow locations to get that SUA nexus for the narcotics part of the case?

A.   Yes.

Q.   And I think the government asked you yesterday about if you're aware of GPS warrants or trackers that were attempted to be affixed to vehicles at that time?

A.   Correct.

Q.   Are you aware of what was done in that?  Specifically, are you aware of efforts that were made on that?

A.   No.

Q.   Okay.  I won't go through that with you for sake of time.

     So, at the end of the summer of 2013, and kind of leading into the fall of 2013, AUSA McCabe, you're familiar with who he is?

A.   Yes.

Q.   He was the AUSA who was assigned to this case originally?

A.   Originally, yes.

Q.   He eventually decides to -- to move on from the U.S. Attorney's Office, correct?

A.   Yes.

Q.   And, so, do you recall when it was that AUSA McCabe resigned his position at the office?

A.   Not specifically.  It was sometime in the summer of 2013

as I recall.

Q.   And then as far as reassignment of the case, I know you don't have anything specifically to do with reassigning a case in the U.S. Attorney's Office, right?

A.   No.

Q.   But you're aware of the fact that when an AUSA leaves, the case gets reassigned to another AUSA to take part in it?

A.   Yes.

Q.   And in this particular situation, are you aware that AUSA Lynch was the one who took cognizance over the case at that time?

A.   Yes.

Q.   And as far as AUSA Lynch is concerned, he was AUSA McCabe's boss; is that right?

A.   At one point, he was.  I'm not sure at that point if he was or not.

Q.   But when AUSA Lynch takes over the case, are you aware of a meeting that he scheduled with -- with you and Agent Bongiovanni and others to determine, hey, what's going on in this case to learn more about it?

A.   Yes.

Q.   Are you aware of the fact that that meeting took place back in September of -- of 2013?

A.   That's my recollection.

Q.   And as far as the participants in the meeting, you were a

participant in that meeting, correct?

A.   Yes.

Q.   And Agent Bongiovanni was a participant at that meeting?

A.   I believe so.

Q.   Are you aware if another agent from the DEA, Special Agent Greg Yensan, was a participant in that meeting?

A.   I don't specifically recall that.

Q.   As far as the other person who was helping you out, Mr. Deming on the financial part of the investigation, he was a participant at that meeting, correct?

A.   I believe so.

Q.   Let me see if I can help refresh your memory.

        MR. SINGER:   Ms. Champoux, if we could bring down this exhibit and if we could bring up only on the witness's screen Government Exhibit 3518B.

        And if we can advance to page 70 of that document.

        BY MR. SINGER:

Q.   Now, I'm going to ask you to read this particular page and I'll advance backwards one, Mr. Turri, and see if it can help refresh your memory as to who was present at the meeting?

A.   Would you like me to --

Q.   No, I don't want you to -- I don't want you to read it. Just read it to yourself, okay?

        MR. SINGER:   And if we could go back one to 69,

Ms. Champoux.  Thank you.

**BY MR. SINGER:**

Q.  And you can continue to read that page and see if it helps refresh your memory, sir.

You've had enough time to look at the document, sir?

A.  I believe so.

**MR. SINGER:**  So if we can bring that document down, Ms. Champoux.

**BY MR. SINGER:**

Q.  So does that refresh your memory as to whether or not Mr. Deming was a participant at that meeting?

A.  Yes.

Q.  And was he a participant in that meeting?

A.  It appears so, yes.

Q.  And, so, you and Special Agent Bongiovanni, Mr. Deming, and AUSA Lynch discussed this case and -- and where was at that particular point in time?

A.  Yes.

Q.  And that included the financial part of the investigation?

A.  Correct.

Q.  That also included the narcotics side of the investigation?

A.  Yes.

Q.  And as you continue forward in the fall of 2013, moving

into 2014, it's your understanding working on this case with Agent Bongiovanni and others that the narcotics side of the -- of the case starts to stall out; is that your understanding?

A.   Yes.

Q.   Those grow house locations that were attempted to be identified throughout the summer and a little bit into the fall of 2013, there's nothing that really materializes on that front?

A.   Correct.

Q.   And there wasn't any type of viable confidential source that was providing information or an insider, so to speak, to get into the Serio drug-trafficking organization through that method?

A.   From my perspective, yes.

Q.   And, so, I mean that's not something you -- you've never seen before in investigation, correct?

A.   Correct.

Q.   Sometimes things just don't pan out?

A.   Correct.

Q.   And that could be true of the financial part of an investigation, correct?

A.   Correct.

Q.   Just as much as it can be for the drug side of the investigation, correct?

A.   Yes.

Q.   So -- so after these leads start to dry up a little bit, do you recall that you had conversations with Mr. Bongiovanni about some of the other things that Ron Serio was doing?

A.   Yes.

Q.   And one of the other things that Ron Serio was involved in back then was debt collection; is that right?

A.   Yes.

Q.   And as far as debt collection is concerned, there are certain activities that -- that debt collectors may engage in that would be a violation of federal law, correct?

A.   Yes.

Q.   And when you're pursuing a money-laundering case, we talked a lot about how the SUA, the specified unlawful activity, to -- to prove up a money-laundering case includes a narcotics nexus; is that right?

A.   Yes.

Q.   But there's also a way to help prove up SUA independent of narcotics, correct?

A.   Yes.

Q.   And that can include things like illegal debt collection practices?

A.   Yes, wire fraud, things of that nature.

Q.   And so as far as Mr. Serio was concerned, you are familiar with debt collection agencies that he was involved

in at that time, correct?

A.   At least one.

Q.   And you were familiar with the fact that you had some suspicions about him engaging in illegal debt collection practices?

A.   Yes.

Q.   What were some of those illegal debt collection practices that you suspected him of engaging at the time?

A.   You know, I don't have a specific recollection to that. Typically, it's just abusive collection techniques, making threats, basically extorting money.

Q.   So that's not the type of crime, you would agree with me, that the DEA traditionally investigates, correct?

A.   Correct.

Q.   That's more of something that the IRS investigates?

A.   IRS, FBI, yes.

Q.   And as far as you're concerned, I know that you help out the DEA a lot on narcotics-based investigations with a financial component, correct?

A.   Yes.

Q.   But there are other people in your office at the IRS who are special agents, right?

A.   Yes.

Q.   And do they have sometimes more of an emphasis or concentration on those illegal debt collection practice

cases?

A.   Yes.

Q.   And so as far as -- as -- as that's concerned, the other agents in your office, are they like Special Agent Bongiovanni and others at the DEA where, unlike Mr. Deming, you have arrest powers, correct?

A.   Correct.

Q.   You are what they deem an 1811 officer?

A.   Yes, a law enforcement officer.

Q.   So that means that you can investigate federal violations independent of the DEA, correct?

A.   Correct.

Q.   And if you see potential violations of the federal statute, you can affect an arrest, correct?

A.   Correct.

Q.   You can open up a case on that particular target independent of the DEA?

A.   Yes.

Q.   And do you recall talking about Mr. Serio to a Special Agent Ryan Puckett in your office?

A.   Yes.

Q.   Is Ryan Puckett one of those special agents at the IRS at the time who doesn't necessarily concentrate on narcotics cases like you, but more so on the illegal debt collection practice cases?

A.   That was one of his areas of expertise, yes.

Q.   Do you know what Special Agent Puckett did to pursue any investigation regarding Ron Serio?

A.   I do not.

Q.   So, as far as the Serios are concerned, one of the other things that was brought up yesterday is that, based on your research, you identified the -- the fact that Michael Masecchia had ties to Italian Organized Crime.

A.   It was alleged so, yes.

Q.   And -- and that link, I think you testified, was important because potentially it could be used as a mechanism to -- to get this case into an OCDETF category of case?

A.   Yes.

Q.   As far as the Italian Organized Crime part was concerned, when we're talking about debt collection cases, so illegal debt collection practices case -- based cases, when you're using that as the SUA for the money-laundering offense, when those type of cases have an Italian Organized Crime connection, can they also be converted into OCDETF cases?

A.   If it's debt collection?

Q.   Correct.

A.   No.

Q.   So there has to be some type of drug component to them?

A.   Yes.

Q.   And as far as back in that point in time, do you recall

working on a case involving a Frank Tripi?

A.   Yes.

Q.   And Frank Tripi, he was somebody who had some connections to possible organized crime figures?

A.   Yes.  That was the allegation.

Q.   And he was somebody who also was engaged in the practice of debt collecting?

A.   Yes.

Q.   And he was someone who people in law enforcement had concerns about engaging in improper or illegal debt collection practices?

A.   Yes.

Q.   And he was also somebody who the law enforcement authorities had suspicion was engaging in narcotics-based offenses, correct?

A.   Correct.

Q.   And as far as that particular investigation was concerned, do you recall that that -- that case was being investigated by IRS?

A.   Our agency participated in that, yes.

Q.   And there was also DEA that was involved in that investigation at the time?

A.   Correct.

Q.   Do you recall that the -- the agent in charge, the case agent on that Frank Tripi investigation was a -- a task force

officer, Chris Clark?

A.   Correct.

Q.   And do you recall that -- that you were also assisting in that investigation in some way at that time?

A.   Yes.

Q.   And we're talking about going back to the March 2013 time period that this was all ongoing regarding Frank Tripi?

A.   I couldn't say for sure it was the same timeframe.  It seems like it was.

Q.   Okay.  As far as the Tripi investigation was concerned, that was a case that was proposed for -- for OCDETF, correct?

A.   Correct.

Q.   And I think you went through it yesterday, but when you proposed something for OCDETF, it's a written request, correct?

A.   There's a proposal, yes.

Q.   And that's something that, like, I think we talked about yesterday.  You have to staff it through your -- your group supervisor, right?

A.   Yes.

Q.   And then that's something that goes up to the -- the RAC in the DEA Buffalo office for approval?

A.   If it's DEA sponsored, yes.

Q.   And then after the -- the DEA at the local level approves it, partner agencies that join in, do they have to go through

a similar approval process?

A.   Not necessarily.  Not to my knowledge.

Q.   Yeah, so for instance, so if DEA makes a proposal for an OCDETF case and you or another IRS agent is supporting that case, do you have to go to your group supervisor to seek approval?

A.   To open a formal file, yes.

Q.   All right.  And as far as the proposal is concerned, is that something that -- that you have to show to your boss to -- to seek that type of approval?

A.   Yes.

Q.   And with regard to this particular investigation, Chris Clark is not someone who works in D-57 at that time, back in 2013, correct?

A.   Correct.  I think he was in D-58.

Q.   Yeah.  D-58 was -- was a different group within the DEA?

A.   Yes.

Q.   And John Flickinger wasn't the group supervisor of that group, Michelle Spahn at that time was the group supervisor?

A.   Yes.

Q.   And do you recall that -- that Stephen Bevilacqua was also working on the Frank Tripi case?

A.   Yes.

Q.   And you recall that Scott Deming was also working on the Frank Tripi case?

A.   I don't have a specific recollection about Scott working on that case.

Q.   Okay.  Well, you'd agree with me, he's the person who is primarily tasked with assisting on financial investigations involving OCDETF at the U.S. Attorney's Office?

A.   Yes.  But there's like a shared duty.  So in some cases, IRS would be the lead, and he would just be in an assisting role and then vice versa.

Q.   Okay.  I understand.  So as far as that point in time, I want to go back to -- to kind of the -- the summer leading into the fall of 2013.

You mentioned how you and Mr. Bongiovanni talked about Ron Serio's debt collection activities, correct?

A.   Yes.

Q.   And when the drug side of the investigation started to -- to falter a little bit, do you recall having conversations with him about the illegal debt collection practices?

A.   I recall one specific conversation.

Q.   And that would be possible alternative or alternate investigation to help move things forward on the case; is that right?

A.   Correct.

Q.   So, as far as the OCDETF is concerned, do you recall talking to Agent Bongiovanni about the Tripi OCDETF that was up for proposal at the same time?

MR. COOPER: Judge, I'm going to object at this point, ask if we can approach briefly.

THE COURT: Sure, come on up.

(Sidebar discussion held on the record.)

MR. COOPER: The defendant is welcome to testify, but eliciting statements that the defendant made to other witnesses is hearsay. When we do it, it's a statement of a party opponent. When Mr. Singer does it, it's hearsay.

THE COURT: I haven't heard any.

MR. SINGER: I haven't elicited a statement from --

MR. COOPER: The questions are being phrased as, did you have conversations with the defendant about X. A conversation is two people having a discussion. And so it's a carefully phrased question to elicit things that he wants the jury to think his client was talking to someone about.

I -- I understand that it's an end run or attempted end run, but the purpose is the same. The outcome is the same. It's eliciting things his client said, which is hearsay.

MR. SINGER: I mean, I would agree that if I asked him what did Mr. Bongiovanni tell you during that conversation, or what did he say to you, that would be a hearsay statement. And that's why I'm not asking you the questions of what did Mr. Bongiovanni tell you at that time.

THE COURT: What Mr. Cooper is saying that by asking

the question, did you talk with him about X, that gets in some of the substance of the conversation.

**MR. SINGER:**  But what I'm eliciting is what Mr. Turri stated.  What I'm eliciting is what Mr. Turri, not the exact, you know, copy of what he's saying, but the fact that they had discussion about it.

I can ask about discussions that may have occurred, can't get into the content of those discussions, that Mr. Bongiovanni responded back to.  That's the hearsay objection.  That's why I haven't asked a question like that.

**THE COURT:**  But his -- what he says is going to be hearsay as well.

**MR. SINGER:**  What -- what -- what -- again, I'm not asking him about the content of the conversation.

**THE COURT:**  You are by, so -- so, and Mr. Cooper's point is that you are asking him about the content of the conversation when you say about X.  That's the content of the conversation.

Why is that not content of the conversation?

**MR. SINGER:**  So, again, the hearsay statements revolve around the out-of-court statements made by somebody. And so -- and so -- and so as far as Mr. Bongiovanni -- again, I asked Mr. Turri what did Mr. Bongiovanni tell you about this.

**THE COURT:**  Right.

**MR. SINGER:** Did he say, you know, hey, this would be a great idea. Like, that would be a hearsay statement, Judge.

**THE COURT:** Yep.

**MR. SINGER:** I couldn't elicit that.

**THE COURT:** Yep.

**MR. SINGER:** But I can -- I can get into the fact that he had a conversation.

**THE COURT:** Yeah, I think he's right.

**MR. COOPER:** Judge, I would like to just weigh in briefly.

**THE COURT:** Go ahead. Go ahead.

**MR. COOPER:** So if the question was phrased directly as did you inform Mr. Bongiovanni about X, or did you say X to Mr. Bongiovanni, that -- to me, you could make the argument, which is what I think he's doing, that like okay, now we're talking about what was Mr. Bongiovanni aware of, which is not hearsay as we just discussed yesterday --

**THE COURT:** Yes.

**MR. COOPER:** -- afternoon and this morning --

**THE COURT:** Yes.

**MR. COOPER:** -- when the question is phrased ambiguously, did you and Mr. Bongiovanni have conversations about X, it's -- it's leaving that vague enough that it's -- there's --

**THE COURT:** I'll tell -- I'll tell you why,

Mr. Cooper.

Because -- because, so -- so there's no proof of a statement that's being admitted.

The hearsay -- the hearsay, so think about what hearsay is.

**MR. COOPER:** Um-hum.

**THE COURT:** Hearsay is, I -- I said to him something. He said to me something. You have no idea whether that something that he said to him is true or not.

This witness is testifying about that he had a conversation with him about something. That's not hearsay. There's no -- so -- so, what he's saying, he can be cross-examined on that. He can be asked questions about that, and it doesn't have to be about the content of the conversation.

But the fact that the conversation took place is not hearsay, so I'm going to allow that -- this -- I don't think that -- I don't think it's hearsay to say I talked with him about X.

**MR. COOPER:** Okay.

**THE COURT:** That's not hearsay.

**MR. COOPER:** Understood.

**MR. TRIPI:** Judge, can I just --

**THE COURT:** Yeah. And -- and, look it, these things are hard. I understand. And I'm -- and I'm struggling to get

it right as well, but I think this is right.

Go ahead.

MR. TRIPI:  We understand what you just said, and I get it.

THE COURT:  Yeah.

MR. TRIPI:  But we are going to be on guard for wordsmithing that spill in content of the conversation.  So if you hear -- we're not going to --

THE COURT:  Yeah.

MR. TRIPI:  -- be shy --

THE COURT:  Did you have --

MR. TRIPI:  -- to object more --

THE COURT:  -- a conversation --

MR. TRIPI:  -- if it spills --

THE COURT:  -- with Mr. Bongiovanni.

MR. TRIPI:  -- more into --

THE COURT:  Yeah, yeah, you can't -- you can't do that.

MR. SINGER:  I know.

MR. TRIPI:  -- or if it backdoors it in some way --

THE COURT:  I get it.

MR. TRIPI:  I don't want you to get upset if we keep objecting --

THE COURT:  I hope --

MR. TRIPI:  -- because I'll be --

THE COURT:  I hope I never give you the impression that I get upset when you folks are objecting.  I mean, maybe I -- I -- I give off the air of impatience sometimes, and I apologize if I do, but I honest to God never get upset when lawyers object.

MR. TRIPI:  I wasn't suggesting that you do.  I just -- you know, we try to -- if we have an objection that you overruled and the same thing come up, not circle back to it.  But in this area, I've told Mr. Cooper to be hyperaware, and I'm elbowing him.

THE COURT:  Yep.

MR. TRIPI:  And so I just wanted to let you know that --

THE COURT:  Yeah.  And I don't want anyone on either side to do anything because they think it's going to make me happy.  I want you to do things that are in your client's best interest, both of you.  On both sides.

MR. TRIPI:  Thank you, Judge.

THE COURT:  I never get upset with objections.

MR. COOPER:  Thank you, Judge.

MR. SINGER:  We just need him to stop elbowing him.

(End of discussion at side bar.)

THE COURT:  Okay.  So the objection is overruled.  You can re-ask the question.

MR. SINGER:  Ann, would you mind stating that back?

I've lost my train of thought.  Thank you.

(The above-requested question was then read by the reporter.)

THE WITNESS:  No, I do not.

BY MR. SINGER:

Q.  You don't remember any type of conversations with him about that OCDETF investigation?

A.  No.

Q.  But you do recall speaking to him about the potential nexus of the debt collection being used to -- to further the investigation?

A.  The Serio investigation, yes.

Q.  Okay.  The particular operation involving Frank Tripi, that was operation named Past Due?

A.  Yes.

Q.  And do you recall believing that there was a potential association between Ron Serio and Operation Past Due?

A.  Not that I recall.

Q.  Let me see if I can refresh your recollection, sir.

MR. SINGER:  Ms. Champoux, can we bring up Government Exhibit 3522B, as in Bravo.

BY MR. SINGER:

Q.  I'm going to ask you to read the first two paragraphs of this document, sir.  And just see if it helps refresh your memory as to whether you thought there was a link between

Past Due and Ron Serio.

**BY MR. SINGER:**

Q. Does that document help refresh your memory as to whether or not you believe there was a link between Operation Past Due and Ron Serio?

A. I'm sorry, no.

Q. Okay. So as far as --

**MR. SINGER:** You can bring that down. Thanks, Ms. Champoux.

**BY MR. SINGER:**

Q. Fast forwarding through until -- until April of 2017, do you recall at that point in time receiving a call from the FBI regarding Ron Serio?

A. I don't know if it was a call or an email.

Q. But you received a communication from the FBI regarding Ron Serio?

A. Yes.

Q. And -- and the reason why they contacted you, the FBI, was because you were mentioned as a potential deconfliction point?

A. I don't know if that's why they contacted me.

Q. Why do you think the FBI contacted you, sir?

**MR. COOPER:** Objection, calls for speculation.

**THE COURT:** Yeah, sustained, unless you lay more foundation.

MR. SINGER:  Just one moment, Judge.

BY MR. SINGER:

Q.  So you're familiar with deconfliction databases; is that correct, sir?

A.  Yes.

Q.  And deconfliction databases are a tool used by law enforcement to help others in law enforcement understand cases that law enforcement agencies are working on, correct?

A.  Correct.

Q.  So if you have a particular target of an investigation, one of the first things you do is run deconfliction?

A.  Yes.

Q.  And that's to -- to find out if -- if that person is the target, is a target of another investigation?

A.  Yes.

Q.  And that's premised on officer safety, right?

A.  Among other reasons, yes.

Q.  Yeah.  And -- and also resources?

A.  Yes.

Q.  So, as far as deconflictions -- deconflictions concerned, there are databases where people's names are entered into systems that police officers can search, correct?

A.  Correct.

Q.  So one of them using New York State is called SafetyNet?

A.  Yes.

Q.   And when a person has a target of investigation, one of the things they do or one of the things they instruct their subordinates to do is to enter that person into the SafetyNet system?

A.   Correct.

Q.   That's something that a law enforcement agent can do, correct?

A.   Yes.

Q.   That's something that a subordinate of a law enforcement agent can do?

A.   Yes.

Q.   And then if another law enforcement agency commences an investigation regarding a target, they can check in to SafetyNet to see if anybody else is investigating that person?

A.   Correct.

Q.   And with regard to the Ron Serio investigation, the FBI contacted you on the basis of the deconfliction, correct?

A.   I don't know if that's why they contacted me.  My case had been closed for -- for some time.

Q.   Yeah.  So, I guess what I'm getting at is that you opened up a case into Ron Serio parallel to the DEA case, correct?

A.   Yes.

Q.   And when you opened that case, you entered Ron Serio's name into the deconfliction database?

A.   The IRS used TEC system, treasury enforcement communication system, at that time to deconflict.

Q.   So it's a different type of deconfliction software?

A.   Yes.

Q.   And that's something that law enforcement agencies throughout the federal government can search, correct?

A.   Correct.

Q.   FBI being one of them?

A.   Yes.

Q.   And so when you entered Mr. Serio's name into TECS, your name was essentially placed next to him as the agent who was investigating Ron Serio, correct?

A.   Yes.

Q.   And so when FBI reached out to you, it -- it didn't come as a complete surprise to you because you entered Ron Serio into TECS, correct?

A.   Correct.

Q.   And they contacted you, FBI, shortly after his arrest, correct?

A.   That's my recollection.

Q.   Are you aware of whether or not the FBI contacted Special Agent Bongiovanni?

A.   No.

        MR. SINGER:   Thank you, Mr. Turri.

        I don't have any further questions, Judge.

THE COURT:  Redirect?

MR. COOPER:  Yes, please.  Can I just have one minute to get prepared, or organized I guess is a better word for it.

THE COURT:  Sure.

**REDIRECT EXAMINATION BY MR. COOPER:**

Q.  Good morning, Mr. Turri.

A few minutes ago on cross-examination, maybe 15 or 20 minutes ago, defense counsel was asking you about the late summer or summer into fall of 2013, and the status of the Serio investigation at that point in time; do you remember that?

A.  Yes.

Q.  Okay.  And when Mr. Singer was asking you questions, at one point, he asked you if you became aware that there was, quote, no viable CS in the case, and I think you said, from your perspective, that was a yes; do you remember saying that?

A.  Yes.

Q.  Okay.

MR. COOPER:  Ms. Champoux, can we pull up what's in evidence as 22F, as in Frank.  Can you zoom in on the top portion of that email.

BY MR. COOPER:

Q.  This is from July 16th, right, sir?

A.   Correct.

Q.   Does this appear to be reporting information that the defendant is allegedly getting from a CI or a CS?

A.   Yes.

Q.   July is in the summer, right?

A.   Correct.

MR. COOPER:   Okay.  You can take that down, Ms. Champoux.  And if you can next pull up 22P, as in Peter. Zoom in on the top portion.  Thank you.

BY MR. COOPER:

Q.   The last sentence in this email from the defendant is that they are very close on the drug end, right?

A.   Correct.

Q.   This email was sent by the defendant on August 1st, 2013, right?

A.   Correct.

Q.   August 1st is in the late summer, right?

A.   Well, it's further in time than July, yes.

Q.   Summer starts in June, right?

A.   June to September.

Q.   Okay.  And so, in August of 2013, the defendant's reporting that they're very close on the drug end, right?

A.   Correct.

Q.   And that's about two weeks after he's claiming that he received information from a CS, right?

A.   A little more than two weeks, yes.

Q.   Okay.  Between two and three weeks, sir?

A.   Yes.

        MR. COOPER:  Okay.  You can take that down, Ms. Champoux.

        BY MR. COOPER:

Q.   Is it true that you have no idea whether there was a viable CS in the case in the fall of 2013; do you know that?

A.   As I said, from my perspective, I do not know.

Q.   Okay.  So when you answered from your perspective, yes, that there was no viable CS, that wasn't entirely accurate, right?  I mean, you don't know whether there was a viable CS?

A.   When I say from my perspective, I just meant that the investigation wasn't progressing so, from my perspective, the CS in this case was not viable.

Q.   So that's one possibility, right?

A.   Yes.

Q.   Another possibility would be the CS isn't being used, right?

A.   That's a possibility.

Q.   Is another possibility that the viable CS got shut down in July for no reason?

        MR. SINGER:  Objection.

        BY MR. COOPER:

Q.   Is that a possibility?

THE COURT:  Hold on.

Objection?

MR. SINGER:  Objection, Judge.

THE COURT:  To?

MR. SINGER:  To the form of the question.

THE COURT:  Sustained.

BY MR. COOPER:

Q.  Are there more than one possibility as to why the case wasn't progressing in late summer?

A.  Yes.

Q.  And as you've described, one possibility is that the CS wasn't viable, right?

A.  Correct.

Q.  Is another possibility that the CS was already closed?

A.  Yes.

Q.  Is it possible that a CS can be closed for no reason at all?

A.  For no reason?  I honestly don't know the DEA policy with closing sources for no reason.

MR. COOPER:  Okay.  Let's pull up Government Exhibit 8I, Ms. Champoux.  This is in evidence.

BY MR. COOPER:

Q.  Have you seen this document before?

A.  Not that I recall.

MR. COOPER:  Okay.  Let's zoom in on the top third of

the report here, Ms. Champoux.

**BY MR. COOPER:**

Q.  Who authored this report, Mr. Turri?

A.  This is Special Agent Bongiovanni.

Q.  Okay.  And what's the line 10, report regarding?  What kind of report is this?

A.  This is a CS initial debriefing of DEA confidential source and the source number.

Q.  Okay.

**MR. COOPER:**  You can zoom out of that, Ms. Champoux. And if you can zoom in on paragraph 1.

**BY MR. COOPER:**

Q.  Take a moment and read that to yourself so you're familiar with it and I'll ask you some questions about it.

Okay.  Have you had time to review that paragraph?

A.  Yes.

Q.  Okay.  Does that appear to be a CS providing information to this defendant about the Serio drug-trafficking organization?

A.  Yes.

Q.  Can you read that last sentence in paragraph 1 out loud for us?

A.  The CS stated that he/she could contact T.S. and Mettal in person and order any specific quantity of cocaine and marijuana.

**MR. COOPER:**  You can zoom out of that, please, Ms. Champoux.

**BY MR. COOPER:**

Q.   The date prepared on this report is May 2nd, 2013; do you see that?

A.   Yes.

Q.   Do you know between May 2nd of 2013 and July 30th of 2013, if the defendant ever asked that CS to make controlled phone calls?

**MR. SINGER:**  Your Honor, I object to this time.  The witness already testified he doesn't know.  He wasn't involved in that part of the investigation.

**THE COURT:**  Overruled.

**BY MR. COOPER:**

Q.   On cross-examination you were asked about whether there was ever a viable CS or whether that had dried up; do you remember that question?

A.   Yes.

Q.   Okay.  I want to talk to but what you know about the CS Did the defendant ever tell you, hey, I'm using the CS to make controlled calls; did he ever tell you that?

A.   No.

Q.   Did he ever tell you, hey, I'm setting up a controlled purchase to use the CS; Did he tell you that?

A.   No.

Q.  Did you ever learn of a successful controlled purchase into Mettal or T.S.?

A.  No.

Q.  When I asked you maybe a minute or two minutes ago about closing a CS for no reason, you seemed confused.  Were you confused by that question?

A.  Well, only because I don't know a DEA policy.

Q.  Would you agree that would be kind of unusual to close a CS for no reason, right?

A.  In my perspective, yes.

Q.  Okay.  If a CS is providing good information, you've worked with the DEA, they're gonna use that person, right?

A.  Yes.

Q.  Okay.  And we looked at an email from July 16th of 2013 where this defendant said CS is telling me eight to nine-week grow cycles, right?

A.  Yes.

Q.  You saw that email?

A.  I did.

        MR. COOPER:  Okay, let's go to Government Exhibit 9E-3, please, Ms. Champoux.  And can you zoom in on the top portion here?

        BY MR. COOPER:

Q.  What's this document called, sir?

A.  It's a confidential source deactivation.

Q.   That means shutting a CS down?

A.   Correct.

Q.   Okay.  And can you see what it says here in box number 5?

A.   Yes.

Q.   What does it say?

A.   The -- the box says explain why CS is being deactivated.
The reason given is the CS can no longer provide services or
information for any open investigation.

        MR. COOPER:  Can you zoom out of that, Ms. Champoux.
And I'd like to now zoom in on box 10 all the way across to
the right.

        BY MR. COOPER:

Q.   What's that say, sir?

A.   The last box?

Q.   Yeah.  Just read it from left to right for me.

A.   Was the CS notified of deactivation?  The checkmark is in
the yes box.
     Date notified, July 30th, 2013.
     How notified, in person.

Q.   Okay.  July 30th, 2013, is 14 days after July 16th, 2013,
right?

A.   Correct.

Q.   So 14 days after that email that this defendant sent that
you were on about the CS reporting information about eight to
nine-week grow cycles, right?

A.   Yes.

Q.   That's the date that that same CS is deactivated; do you see that?

A.   Yes.

        MR. COOPER:   Can you zoom out of that, Ms. Champoux?

        Can we zoom in back on box 5 for a second?

        Okay.  You can zoom out of that.

        You can take that document down, please.

        BY MR. COOPER:

Q.   So when Mr. Singer asked you questions about whether or not there was a viable CS in the case, did you have any personal knowledge of whether there was a viable CS?

A.   No.

Q.   Were you responsible for handling the CS?

A.   No.

Q.   On July 30th, or August 1st, or August 2nd, did the defendant come to you and tell you, hey, I shut down the CS into this case?

A.   No.

Q.   That didn't happen?

A.   No.

Q.   On cross-examination, you were asked some questions about the approval chain for OCDETF cases; do you remember that?

A.   Yes.

Q.   Can the DEA arrest someone for selling drugs without the

case being an OCDETF case?

A.   Yes.

Q.   Does that happen all the time?

A.   Yes.

Q.   You were asked some questions yesterday towards the beginning of your cross-examination about whether you ever had enough to make a money laundering case; do you remember that?

A.   In this investigation?

Q.   Yes.

A.   Yes.

Q.   Regardless of whether you ever had enough to make a money-laundering case, can a drug case progress all on its own?

A.   Yes.

Q.   Do you need financial records to make a drug case against someone?

A.   No.

Q.   If you make controlled buys from a target, can you continue to do financial investigations down the road?

A.   Yes.

Q.   Bank records stick around for a while, right?

A.   Yes.

Q.   You were asked some questions about whether sometimes agencies don't have the benefit of a particular insider.  Do

you remember being asked those questions?

A.   Yes.

Q.   Okay.  A few minutes ago, I showed you what's in evidence as Government Exhibit 8I, the initial debriefing of a confidential informant; do you remember that?

A.   Yes.

Q.   You read paragraph 1 about the information that person had, right?

A.   Correct.

Q.   Have you sat in on debriefings of confidential informants before?

A.   Yes.

Q.   Have you helped the DEA build drug cases before?

A.   Yes.

Q.   Are you familiar with how they use confidential informants in drug investigations?

A.   Yes.

Q.   Would it be fair to describe that information as particular insider information?

A.   Yes.

Q.   Okay.  You were shown an email by John Flickinger about asking for work to be done on a grow house; do you remember that?

A.   Yes.

Q.   And then I believe you were asked some questions about

whether the DEA was trying to locate grow houses; do you remember that?

A.   Yes.

Q.   Okay.  That was John Flickinger's email, right?

A.   Correct.

Q.   So John Flickinger was trying to get work done to locate a grow house, right?

A.   It appeared so from that email.

Q.   Okay.  And the utilities subpoenas that you saw, those were Bevilacqua doing utility subpoenas, right?

A.   Well, at the direction of others, yes.

Q.   At the direction of others, meaning from the email from Flickinger?

A.   I don't know who asked Steve to run those utilities.

Q.   Well, you saw the email, it was from John, and it said --

A.   Yes, yes, yes.  My apologies, yes.

Q.   So it was John asking Bevilacqua do work on the case, right?

A.   In that instance, yes.

Q.   Okay.  You were asked some questions about the DEA still investigating in the summer into the fall; do you remember being asked that?

A.   Yes.

Q.   Do you have any personal knowledge of whether the defendant was actively investigating in the summer of 2013?

A.   No.

Q.   Do you have any personal knowledge of whether the defendant was actively investigating into the fall of 2013?

A.   Other than the emails, no, I do not.

Q.   Okay.  And in emails, you're -- when you receive an email from another member of law enforcement, do you accept what they're telling you as true?

A.   Yes.

Q.   Okay.  You were asked some questions on cross-examination about Frank Tripi; do you remember that?

A.   Yes.

Q.   And Mr. Singer asked you if you brought that up or had conversations with the defendant about it and you said no, I didn't; do you remember that?

A.   Yes.

Q.   That's because the defendant wasn't working on that case at all, right?

A.   To my knowledge, correct.

Q.   That was Chris Clark's case?

A.   Yes.

Q.   In a different group?

A.   Yes.

Q.   Did you work on that case?

A.   Yes.

Q.   Did you ever see the defendant work on that case?

A.   No.

Q.   Is there any reason that you're aware of that the -- oh, withdrawn.

Frank Tripi, do you believe him to be associated with organized crime?

A.   That was the allegation.

Q.   Did he have that reputation in the law enforcement community that you were a part of?

A.   Yes.

Q.   While you were investigating that case, did the investigators believe Frank Tripi was associated with organized crime?

A.   Yes.

Q.   Is there any reason that you're aware of that the defendant would have had Chris Clark's OCDETF proposal related to Frank Tripi in his basement after he retired from the DEA?

A.   No.

Q.   Those are law enforcement sensitive documents, right?

A.   Correct.

**MR. COOPER:**  Judge, may I just have one second?

**THE COURT:**  Sure.

**MR. COOPER:**  Thank you, sir.

It is just going to take one second for Mr. Singer to pull something up.

THE COURT: How much longer do you have?

MR. COOPER: This is it. Famous last words of an attorney, I know, but --

Okay. Judge, I'm holding what's marked for identification as 3518H. It's actually just a -- essentially a submarking of Defense Exhibit H.1, page 3. So yesterday that was shown to the witness. I've remarked just this single page. I showed it to Mr. Singer. He had a chance to pull it up.

May I approach the witness?

THE COURT: Sure.

MR. COOPER: Thank you.

BY MR. COOPER:

Q. Special Agent Turri, I just handed you what's been marked for identification as Government Exhibit 3518H as in Hector. Do you see that?

A. Yes.

Q. Is that an email that you sent?

A. Yes.

Q. Is it an email that was received by the defendant?

A. Yes.

Q. Okay. And does that fairly and accurately depict an email that you sent to the defendant in relation to the Serio investigation?

A. Yes.

Q.   Okay.

MR. COOPER:   With that foundation, Judge, I'd offer this exhibit as Government Exhibit 3518H.

MR. SINGER:   No objection.

THE COURT:   Received without objection.

**(GOV Exhibit 3518H was received in evidence.)**

MR. COOPER:   May I approach?

THE COURT:   You may.

MR. COOPER:   Can I have that?  I'm going to put it up on the ELMO.

Ms. Demma, may I have the ELMO?

THE CLERK:   You're all set.

MR. COOPER:   Thank you.

**BY MR. COOPER:**

Q.   Can you see this email, sir?

A.   Yes.

Q.   Okay.  You sent this email on May 23rd, 2013, right?

A.   Yes.

Q.   Okay.  And was this in relation to the Serio investigation?

A.   Yes.

Q.   And down here at the bottom of the email, this last sentence here, are you pointing out a location, a commercial space, at 82 Sycamore Street?

A.   Yes.

Q.  Did you inform the defendant in this email about the existence of that location?

A.  Yes.

Q.  Did you do that on May 23rd, 2013?

A.  Yes.

MR. COOPER:  I have no further direct, Judge -- redirect.

THE COURT:  Anything more?

MR. SINGER:  May we approach real quick, Judge?

THE COURT:  Sure.

(Sidebar discussion held on the record.)

MR. SINGER:  Two things, Judge.

First is, I believe that the line of redirect with Mr. Cooper when he asked to -- whether Agent Turri is assuming the truth of what's being stated in emails that are being communicated on May 23rd opened the door to have the H.3 exhibit admitted substantively for its truth at this point in time.

At this point, like, I can't erase that.  And simply limiting the jury to considering that for the effect on the listener doesn't cure the gap that's been created as a result of the question.  So I'd like to admit that substantively.

MR. COOPER:  It's a about -- the question was about the basis for his opinion when he testified to a question on cross-examination.  So on cross-examination he was asked a

question about whether he believed the investigation was stalling at a certain point or progressing at a certain point.

I wanted to -- what -- the point that I was making on redirect was that he's basing that off of what he's told, not based on what he personally observed.

THE COURT:  So, I'm not following, Mr. Singer, why -- why it comes in for the fact that case agents found this -- I forget the address --

MR. SINGER:  132 Rhode Island.

THE COURT:  -- found this 132 Rhode Island the -- the truth of the matter.  How does that come in based on this cross?

MR. SINGER:  Because what he's asking is, he's asking the witness whether or not he should assume the truth of those particular matters in the email.  That was the question.  And the answer to that question was yes.

THE COURT:  Right.

MR. SINGER:  And so what that does is that it leaves this gap where we've admitted it for a limited purpose --

THE COURT:  Right.

MR. SINGER:  -- but then the question by the government is creating an aura that, well, should -- should -- we should just assume the truth of it.  And so it leaves the jury in this murky area where, like, they're not supposed to --

MR. COOPER:  Not at all.  Not at all.

THE COURT:  Nope.

MR. SINGER:  The other -- the other part of it, too, Judge, is that based on the government admission of the prior -- the email that just went in regarding Turri, so there's a previous communication regarding 132 that is initiated earlier in that day.

Do you remember the email talks about, hey, I may have been a little bit wrong on the initial comment about who was the owner of that particular property?

THE COURT:  Okay.

MR. SINGER:  So under the Rule of Completeness, we're going to move -- or, we're going to ask to move H.1, page 1, which is the prior email, into evidence.

I realize that it's hearsay, Judge, but of course under the Rule of Completeness, there's no -- you can admit hearsay.

MR. COOPER:  That's about a different property, Judge.  We're asking about 82 Sycamore in the exhibit that we put in.

MR. SINGER:  And it -- and it speaks directly about 132 Rhode Island as well.

So, I mean, they may have admitted it for one particular purpose.

THE COURT:  No.  No.

(End of sidebar discussion.)

THE COURT:  Okay.  Anything more, Mr. Singer?

MR. SINGER:  Quickly, Judge.


RECROSS-EXAMINATION BY MR. SINGER:

Q.  So, Mr. Turri, Mr. Cooper asked you about two particular emails, that's the 22F and the 22P email; remember those emails?

A.  Yes.

Q.  They were sent on July 16th and August 1st?

A.  Yes.

Q.  That's pretty much in the summer, correct?

A.  Correct.

Q.  But what I asked you on -- on -- on cross-examination was whether the investigation started to fail moving forward into 2013 and into the fall, right?

A.  Correct.

Q.  And these two emails, they were sent at the same time that the DEA is actively investigating grow houses, correct?

A.  Correct.

Q.  You're helping with the identification of potential properties that could be grow houses, correct?

A.  Correct.

Q.  And when Mr. Bongiovanni's sending these emails and talking about, hey, we're getting closer, that's at the same

time that all of you were discussing these potential leads on the grow houses, correct?

A.   Roughly, yes.

Q.   Yeah.  And it's before the utility subpoenas are returned that we went through, correct?

A.   Correct.

Q.   Which showed that there wasn't much usage at that point, right?

A.   Under that owner, correct.

Q.   Yeah.  And so I realize that, you know, we're only talking about a week later when the subpoena results come in, but things changed from when those communications were sent in the middle of July and the 1st of August, moving into August, right?

A.   It appears so.

Q.   Yeah, it does.  So --

MR. COOPER:  Objection.  Objection.

THE COURT:  Sus --

MR. SINGER:  I'll withdraw that.

BY MR. SINGER:

Q.   So, as far as the DEA-6 that you were sent regarding the -- the confidential source that was brought into the DEA office on April 30th of 2013; do you remember that?

A.   Yes.

Q.   I think we've been through this before, but your role in

this investigation is the financial part, correct?

A.   Correct.

Q.   You don't sit down with the source?

A.   In this case, no.

Q.   You don't go out on potential controlled buys, correct?

A.   In this case, no.

Q.   Your role was -- was helping Agent Bongiovanni with the financial side of the investigation?

A.   Agent Deming, but yes, the investigative team.

Q.   Yes.  So, unlike some other DEA cases that you worked, you weren't out in the field on this one, right?

A.   Not on this one, correct.

Q.   So you have no awareness of what type of controlled buy operations were put together by Agent Bongiovanni, right?

A.   Correct.

Q.   Because you wouldn't have any involvement in those based on your role in the investigation?

A.   Correct.

Q.   You wouldn't have any understanding of what was communicated in a confidential source meeting, correct?

A.   That's correct.

Q.   Because you didn't sit in that because, that wasn't your role in the case, correct?

A.   Correct.

Q.   You wouldn't have any awareness of any type of controlled

Case 1:19-cr-00227-LJV-MJR   Document 1214   Filed 09/23/24   Page 61 of 64
USA v Bongiovanni - Turri - Singer/Recross - 9/5/24

61

buys that were planned for T.S., correct?

A.   Correct.

Q.   And you wouldn't have any awareness about whether those controlled buys failed, right?

A.   Correct.

Q.   You wouldn't even know the reason for that, correct?

A.   Correct.

Q.   You wouldn't have any information about whether Robert Mettal was contacted by the confidential source, right?

A.   Correct.

Q.   As far as the confidential source is concerned, we talked a little bit about how the records that you're aware of indicated that the CS was providing information somewhere around July 11th regarding grow houses?

A.   I don't know the specific date, but, if you could show the document again, but it was around that time.

Q.   Yeah.  So, we're talking before August, correct?

A.   Correct.

Q.   And you saw a document that the government showed you about when this particular CS was closed out, correct?

A.   Correct.

Q.   He was notified of the closure on 7/30/2013, correct?

A.   Correct.

Q.   So, as far as your understanding of the -- the course of events in this case, the CS was still active in the beginning

part of July, right?

A.   Correct.

Q.   And your understanding is, when CSs are still active, they're still able to provide information, correct?

A.   Correct.

Q.   It's not until they're closed out, a source is, where they're no longer providing information, right?

A.   Correct.

Q.   As far as the CS is concerned, you didn't have any direct involvement with the CS in this case, right?

A.   I did not.

Q.   So you don't know the reasons why the person was closed out at all, correct?

A.   I do not.

Q.   You mentioned that when it comes to OCDETF cases and non-OCDETF cases, the DEA has the possibility of arresting someone when there's not an OCDETF case in play, correct?

A.   Correct.

Q.   But that, of course, requires some type of evidence of narcotics activity, right?

A.   Yes.

Q.   And if you don't have the narcotics activity evidence, you can't make the arrest, right?

A.   Not on a drug charge, yes.

        **MR. SINGER:**  That's all I have, Judge.  Thank you.

**RE-REDIRECT EXAMINATION BY MR. COOPER:**

Q.   In the Ron Serio investigation, whose job was it to find drug evidence?

A.   DEA was the lead.

Q.   Who was the lead agent?

A.   Agent Bongiovanni.

     **MR. COOPER:**  I have no further questions, Judge.

     **THE COURT:**  Anything more, Mr. Singer?

     **MR. SINGER:**  No, Judge.

     **THE COURT:**  Okay.  You can step down, sir.

     (Witness excused at 10:58 a.m.)

     (Excerpt concluded at 10:58 a.m.)

     *     *     *     *     *     *     *

**CERTIFICATE OF REPORTER**

     In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on September 9, 2024.

     s/ Ann M. Sawyer
     Ann M. Sawyer, FCRR, RPR, CRR
     Official Court Reporter
     U.S.D.C., W.D.N.Y.

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF DAVID TURRI - DAY 2**

**SEPTEMBER 5, 2024**

**W I T N E S S**                                           **P A G E**

**D A V I D    T U R R I**                                    2

  (CONT'D) CROSS-EXAMINATION BY MR. SINGER:       2

  REDIRECT EXAMINATION BY MR. COOPER:             39

  RECROSS-EXAMINATION BY MR. SINGER:              58

  RE-REDIRECT EXAMINATION BY MR. COOPER:          63


**E X H I B I T S**                                         **P A G E**

GOV Exhibit H.3                                              4

GOV Exhibit 3518H                                           54