09:18AM

1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
    _____
3   UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
4                   Plaintiff,                    (LJV)
    v.
5                                       September 11, 2024
    JOSEPH BONGIOVANNI,
6
                    Defendant.
7   _____

8       TRANSCRIPT EXCERPT – EXAMINATION OF CURTIS RYAN – DAY 2
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                   UNITED STATES DISTRICT JUDGE

10  **APPEARANCES:**        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                            **BY: JOSEPH M. TRIPI, ESQ.**
11                          **   NICHOLAS T. COOPER, ESQ.**
                            **   CASEY L. CHALBECK, ESQ.**
12                          Assistant United States Attorneys
                            Federal Centre, 138 Delaware Avenue
13                          Buffalo, New York 14202
                            For the Plaintiff
14
                            **SINGER LEGAL PLLC**
15                          **BY: ROBERT CHARLES SINGER, ESQ.**
                            80 East Spring Street
16                          Williamsville, New York 14221
                                And
17                          **LAW OFFICES OF PARKER ROY MacKAY**
                            **BY: PARKER ROY MacKAY, ESQ.**
18                          3110 Delaware Avenue
                            Kenmore, New York 14217
19                              And
                            **OSBORN, REED & BURKE, LLP**
20                          **BY: JOHN J. GILSENAN, ESQ.**
                            120 Allens Creek Road
21                          Rochester, New York 14618
                            For the Defendant
22
    **PRESENT:**            **BRIAN A. BURNS,** FBI Special Agent
23                          **MARILYN K. HALLIDAY,** HSI Special Agent
                            **KAREN A. CHAMPOUX,** USA Paralegal
24
    **LAW CLERK:**          **REBECCA FABIAN IZZO, ESQ.**
25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**  **COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:**       **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square |
| | Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *     *     *     *     *     *     * |
| 7 | |

09:43AM    8        (Excerpt commenced at 9:43 a.m.)

09:43AM    9        (Jury seated at 9:43 a.m.)

09:43AM   10        **THE COURT:**  Good morning, everyone.

09:43AM   11        **JURORS:**  Good morning.

09:43AM   12        **THE COURT:**  The record will reflect that all our

09:43AM   13   jurors are present again.

09:43AM   14        I remind the witness he's still under oath.

09:43AM   15        Mr. Tripi, you may continue.

09:43AM   16        **MR. TRIPI:**  Thank you, Your Honor.

09:43AM   17

09:43AM   18   **C U R T I S   R Y A N**, having been previously duly called and

09:43AM   19   sworn, continued to testify as follows:

09:43AM   20

09:43AM   21            **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

09:43AM   22   Q.  Special Agent Ryan, we last -- let me start over.

09:44AM   23      Where we left off yesterday, you were at the point of the

09:44AM   24   interview where colleagues of yours brought over the -- the

09:44AM   25   DEA evidence box, which contained the file labeled Ron Serio

09:44AM   1   on it; remember that?

09:44AM   2   A.   Yes.

09:44AM   3   Q.   Okay.  I'd like to pick it up from there.  Okay?

09:44AM   4        At that point when you were alerted to that, did you ask

09:44AM   5   the defendant why he had reports related to Ron Serio in his

09:44AM   6   home?

09:44AM   7   A.   I did.

09:44AM   8   Q.   What was the defendant's response to your question?

09:44AM   9   A.   He said that he was aware that there was an organized

09:44AM  10   crime investigation ongoing, that Serio's name qualified as

09:44AM  11   being part of that investigation, and that he brought that

09:44AM  12   file home because he wanted to show that the investigation

09:44AM  13   that he had done was on the up and up.

09:44AM  14   Q.   And when he referenced organized crime investigation,

09:44AM  15   did -- did he characterize it as, like, an Italian Organized

09:45AM  16   Crime case?

09:45AM  17   A.   He did.

09:45AM  18   Q.   Did he mention anything about Serio's last name in giving

09:45AM  19   you that answer?

09:45AM  20   A.   He did.  He --

09:45AM  21   Q.   What did he say?

09:45AM  22   A.   That Serio's last name qualified, which I understood to

09:45AM  23   mean it was an Italian last name.  So, that it could be

09:45AM  24   related to the Italian Organized Crime case.

09:45AM  25   Q.   During the course of your interview, did there come a

09:45AM   1    point where the Bongiovanni -- where Mr. Bongiovanni made

09:45AM   2    statements to you regarding the fact that you were asking him

09:45AM   3    about names of Italian ancestry?

09:45AM   4    A.  He did.

09:45AM   5    Q.  Can you describe how that came up and that interaction

09:45AM   6    between yourself and the defendant?

09:45AM   7    A.  There were a couple times where he asked why we were only

09:45AM   8    asking about people with Italian last names.  I think the

09:46AM   9    first time it came up I said -- it was when we were going

09:46AM   10   through the contacts in the phone.  And I explained I'm

09:46AM   11   asking you about the contacts that I know were in your phone,

09:46AM   12   it doesn't, you know, I'm not thinking about what kind of

09:46AM   13   last name it is.

09:46AM   14       And then he brought it up at least one other time, maybe

09:46AM   15   more than one other time because it did start to irritate me.

09:46AM   16   And eventually I got fed up with it.  And I said, hey, look,

09:46AM   17   there's an Irish mob, too, but that's not why we're here

09:46AM   18   today, or something along those lines.

09:46AM   19   Q.  When you saw the DEA evidence box and the file in it that

09:46AM   20   had the label of Ron Serio and some other names on it, did

09:46AM   21   you believe that file to be a DEA working file when you

09:47AM   22   looked at it?

09:47AM   23   A.  From first glance, yes.

09:47AM   24   Q.  Now, you've worked at the DEA, right?

09:47AM   25   A.  Yes.

09:47AM  1   Q.  In terms of DEA policy and procedure, are DEA file

09:47AM  2   materials supposed to remain in DEA secure space?

09:47AM  3   A.  Yes.

09:47AM  4   Q.  And at the time the defendant had it, he was retired from

09:47AM  5   the DEA, correct?

09:47AM  6   A.  Yes.

09:47AM  7   Q.  Did you then continue to ask Mr. Bongiovanni questions,

09:47AM  8   and in particular, did you ask about a situation where he was

09:47AM  9   at Buffalo RiverWorks with Mr. Gerace?

09:47AM  10  A.  I did.  I asked questions based off those -- the text

09:47AM  11  messages.

09:47AM  12  Q.  Now, were those text messages that you showed him, or

09:47AM  13  ones that you had remembered?

09:48AM  14  A.  That I had remembered.

09:48AM  15  Q.  Okay.  So, what was your question and what was his

09:48AM  16  response regarding that topic?

09:48AM  17  A.  I just, I asked him if he remembered the time at Buffalo

09:48AM  18  RiverWorks and how that came to be.

09:48AM  19  Q.  And what did the defendant say?

09:48AM  20  A.  That it was another chance encounter.  That he didn't

09:48AM  21  meet Mr. Gerace there as part of any plan.

09:48AM  22  Q.  Did he give you any details about what happened that

09:48AM  23  night?

09:48AM  24  A.  He did say that there was another person there, the name

09:48AM  25  escapes me, within that night.  And I -- I think he said that

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

6

09:48AM    1    he did confirm that Peter helped him help Lindsay to the car.

09:48AM    2    Q.  So, there was discussion about his wife Lindsay being

09:48AM    3    intoxicated?

09:48AM    4    A.  Yes.

09:48AM    5    Q.  In terms of his relationship with Gerace, did there come

09:49AM    6    a point in your interview where the defendant indicated to

09:49AM    7    you that Gerace obsessively called the defendant, and has

09:49AM    8    been for a long time?

09:49AM    9    A.  Yes.  That was how he characterized it.

09:49AM   10    Q.  How did that come up?

09:49AM   11    A.  It was -- I wasn't satisfied with the answers about the

09:49AM   12    communication, so I asked some questions about it.  It didn't

09:49AM   13    seem, to me, it didn't seem one way like he had characterized

09:49AM   14    it earlier in the interview, so, I circled back to it and

09:49AM   15    asked about it again.

09:49AM   16        And again, he left me with the impression that

09:49AM   17    communication and the relationship was one way.  Mr. Gerace

09:49AM   18    called him, he didn't return phone calls.

09:49AM   19    Q.  Now yesterday you also mentioned a part of the discussion

09:49AM   20    where you asked him about the contact, Kim Mecca, in his

09:49AM   21    phone; do you remember that?

09:49AM   22    A.  Yes.

09:49AM   23    Q.  And you explained how he put his head down and his elbows

09:50AM   24    on his knees?

09:50AM   25    A.  Yes.

09:50AM 1    Q.  When he indicated to you that Kim Mecca was Lou Selva's

09:50AM 2    girlfriend, did you follow up and ask questions about Lou

09:50AM 3    Selva?  Or did he tell you anything about who Lou Selva was?

09:50AM 4    A.  He did.  I can't remember if it was in response to a

09:50AM 5    question, or if it was a follow-on from saying the name when

09:50AM 6    I said whose girlfriend.

09:50AM 7        But I remember him saying that, he had -- Lou Selva had

09:50AM 8    recently graduated from the Erie County Sheriff's Academy.

09:50AM 9    Q.  As a corrections officer?

09:50AM 10   A.  Yes, as a corrections deputy.

09:50AM 11       **MR. TRIPI:**  Ms. Champoux, can we pull up

09:50AM 12   Exhibit 109AA and 109AC, they're both in evidence.  Just put

09:50AM 13   them side by side.

09:51AM 14       **BY MR. TRIPI:**

09:51AM 15   Q.  And just for clarification, Government Exhibit 109AA on

09:51AM 16   the left of your screen, is Mr. Selva the individual in the

09:51AM 17   middle in the sheriff's outfit?

09:51AM 18   A.  He is.

09:51AM 19   Q.  And in Government Exhibit 109AC, is Mr. Selva the person

09:51AM 20   to the far right of the picture?

09:51AM 21   A.  Yes.

09:51AM 22   Q.  And Mr. Bongiovanni is in both pictures with him?

09:51AM 23   A.  Yes, he is.

09:51AM 24       **MR. TRIPI:**  Okay.  We can take that down,

09:51AM 25   Ms. Champoux.

09:51AM 1      **BY MR. TRIPI:**

09:51AM 2  Q.  Explain for this jury sort of how you -- how you closed

09:51AM 3  the interview, how you wound it down?

09:51AM 4  A.  Well, I asked about the working file again.

09:51AM 5  Q.  Why?

09:51AM 6  A.  The first answer didn't make sense to me.  I just wanted

09:51AM 7  to ask about it again.

09:51AM 8  Q.  Why didn't it make sense to you?

09:51AM 9  A.  Didn't make sense to me that he had the file.  It didn't

09:51AM 10  make sense because of Mr. Serio's disclosure.  It didn't make

09:51AM 11  sense in the context of why we were there.  It just -- I felt

09:51AM 12  like I needed to ask another question.

09:51AM 13  Q.  So, what'd you ask him?

09:52AM 14  A.  I just asked him again, I said, hey, why did you bring

09:52AM 15  this home?  Why this one?

09:52AM 16  Q.  What did the defendant say sort of the second time

09:52AM 17  around?

09:52AM 18  A.  He said that he had burned his other papers, but that he

09:52AM 19  brought the Serio file home.

09:52AM 20  Q.  Did he say when he brought it home?

09:52AM 21  A.  At retirement.

09:52AM 22  Q.  Okay.  And retirement, just remind the jury, his last day

09:52AM 23  was February 1st, 2019?

09:52AM 24  A.  Yes.

09:52AM 25  Q.  Okay.  Please continue.

| | | |
|---|---|---|
| 09:52AM | 1 | A.  And then we talked a little bit about the case.  And I |
| 09:52AM | 2 | just, I asked him, what happened with the investigation? |
| 09:52AM | 3 | Q.  To be clear, the Serio investigation? |
| 09:52AM | 4 | A.  Yes.  The Serio investigation. |
| 09:52AM | 5 | Q.  What did he say? |
| 09:52AM | 6 | A.  He said that the -- his source in the case was arrested |
| 09:52AM | 7 | for selling fentanyl and maybe another controlled substance, |
| 09:52AM | 8 | And that that effectively ended the case. |
| 09:52AM | 9 | And then I asked him who -- |
| 09:52AM | 10 | Q.  Let me jump in with a question here. |
| 09:52AM | 11 | A.  Sure. |
| 09:52AM | 12 | Q.  When he said his source in the case, in the context of |
| 09:53AM | 13 | the conversation you were having, what did you understand his |
| 09:53AM | 14 | use of the word "source" to mean? |
| 09:53AM | 15 | A.  Confidential source or informant. |
| 09:53AM | 16 | Q.  Did he tell you who that person was? |
| 09:53AM | 17 | A.  I asked him who it was, and he said it was Peter |
| 09:53AM | 18 | Militello. |
| 09:53AM | 19 | Q.  And did he tell you why his source in the case, Peter |
| 09:53AM | 20 | Militello, became unavailable? |
| 09:53AM | 21 | A.  He did.  He said he was arrested. |
| 09:53AM | 22 | Q.  For what? |
| 09:53AM | 23 | A.  For selling fentanyl and maybe one other controlled |
| 09:53AM | 24 | substance.  I think there was another one. |
| 09:53AM | 25 | Q.  Would your report refresh your recollection? |

09:53AM  1   A.  Yes.

09:53AM  2   Q.  I'm going to hand you up Government Exhibit 3594BJ-1 for

09:53AM  3   identification.  Take a look at it, and when you're done look

09:53AM  4   up.

09:54AM  5       Does that refresh your recollection as to the other

09:54AM  6   substance he indicated Mr. Militello was arrested for

09:54AM  7   selling?

09:54AM  8   A.  Yes.

09:54AM  9   Q.  What was it?

09:54AM  10  A.  Heroin.

09:54AM  11  Q.  Okay.  Now, at that time, as you sat there in that

09:54AM  12  interview, did you know who the informant was that

09:54AM  13  Mr. Bongiovanni had into the Serio investigation?

09:54AM  14  A.  I mean --

09:54AM  15  Q.  Or did you learn that later?

09:54AM  16  A.  I had heard some names of possible informants, but

09:54AM  17  nothing solid until later.

09:54AM  18  Q.  Okay.  So my question is:  Did you verify later who the

09:54AM  19  actual informant was --

09:54AM  20  A.  Yes.

09:54AM  21  Q.  -- in the investigation?

09:54AM  22       MR. TRIPI:  Okay.  Ms. Champoux, let's pull up

09:54AM  23  Exhibit 9E-2.  This is in evidence, Your Honor.

09:54AM  24       BY MR. TRIPI:

09:55AM  25  Q.  Do you recognize this as a DEA confidential source

09:55AM  1    agreement?

09:55AM  2    A.  Yes.

09:55AM  3        **MR. TRIPI:**  And can we go to the signature blocks,

09:55AM  4    Ms. Champoux?

09:55AM  5        **BY MR. TRIPI:**

09:55AM  6    Q.  And who was the informant in that actual investigation?

09:55AM  7    A.  R.K.

09:55AM  8    Q.  And do you see who the handling agent or the controlling

09:55AM  9    investigator was who signed under Mr. R.K.'s source number?

09:55AM  10   A.  Yes.

09:55AM  11   Q.  Who's that?

09:55AM  12   A.  Mr. Bongiovanni.

09:55AM  13       **MR. TRIPI:**  Okay.  We can take that down,

09:55AM  14   Ms. Champoux.

09:55AM  15       **BY MR. TRIPI:**

09:55AM  16   Q.  And again, after this interview with Mr. Bongiovanni, did

09:55AM  17   there come a point where you were able to review Exhibit 8A,

09:55AM  18   which is file -- the actual DEA file for C2-13-0026?

09:55AM  19   A.  Yes.

09:55AM  20   Q.  Was the informant in that file actually R.K.?

09:55AM  21   A.  Yes.

09:55AM  22   Q.  And there's no reference to Peter Militello in that file

09:56AM  23   whatsoever; is that correct?

09:56AM  24   A.  None at all.

09:56AM  25   Q.  At that point in the interview, did Mr. Bongiovanni

09:56AM   1   indicate to you that he knew that you guys were investigating

09:56AM   2   Ronald Serio?

09:56AM   3   A.   He did.   He made that statement.

09:56AM   4   Q.   And when he said "you guys," who was he referring to?

09:56AM   5   A.   He gestured toward me, which I took to mean HSI.

09:56AM   6       That was just my understanding of his body language and

09:56AM   7   his answer at the time.

09:56AM   8   Q.   Did you follow up with a question?

09:56AM   9   A.   I did.   I asked him how he learned about the

09:56AM   10  investigation, because we had made efforts to keep that

09:56AM   11  information held as closely as possible.

09:56AM   12      And he said that Special Agent Carpenter had told him

09:56AM   13  about it in his OIG interview.

09:57AM   14  Q.   And when you say "it," are you referring to the

09:57AM   15  investigation of Serio?

09:57AM   16  A.   The Serio investigation.

09:57AM   17  Q.   Okay.   And was that his explanation of why he took his

09:57AM   18  Serio file home --

09:57AM   19  A.   Yes.

09:57AM   20  Q.   -- at retirement?

09:57AM   21      Now, earlier you mentioned that Bongiovanni's retirement

09:57AM   22  was February 1st, 2019, right?

09:57AM   23  A.   Yes.

09:57AM   24  Q.   And earlier you mentioned that Special Agent Carpenter's

09:57AM   25  interview with Mr. Bongiovanni was March 29th, 2019, correct?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

13

| | | |
|---|---|---|
| 09:57AM | 1 | A.  Yes. |
| 09:57AM | 2 | Q.  So, the interview by DOJ OIG was after Mr. Bongiovanni |
| 09:57AM | 3 | had retired; is that right? |
| 09:57AM | 4 | A.  Yes. |
| 09:57AM | 5 | Q.  Given the timeline of events, was it possible for |
| 09:57AM | 6 | Mr. Bongiovanni to remove the Serio file on February 1st, |
| 09:57AM | 7 | 2019, based upon an interview that had not yet happened with |
| 09:57AM | 8 | Special Agent Carpenter? |
| 09:57AM | 9 | A.  No. |
| 09:57AM | 10 | Q.  When you completed the interview, was it your intent to |
| 09:58AM | 11 | further investigate? |
| 09:58AM | 12 | A.  Yes. |
| 09:58AM | 13 | Q.  And did you do so? |
| 09:58AM | 14 | A.  Yes. |
| 09:58AM | 15 | Q.  So, Mr. Bongiovanni was not arrested that day, correct? |
| 09:58AM | 16 | A.  No. |
| 09:58AM | 17 | Q.  He was not charged? |
| 09:58AM | 18 | A.  No, not charged that day. |
| 09:58AM | 19 | Q.  Okay.  Now, during the course of that same interview, was |
| 09:58AM | 20 | Mr. Bongiovanni's personal cell phone obtained from HSI? |
| 09:58AM | 21 | A.  Yes. |
| 09:58AM | 22 | Q.  Was it brought to you during your interview of him? |
| 09:58AM | 23 | A.  Yes. |
| 09:58AM | 24 | Q.  And did he confirm for you his pass code to get into that |
| 09:58AM | 25 | phone? |

09:58AM    1    A.  Yes.

09:58AM    2    Q.  And later on, that phone was searched; is that right?

09:58AM    3    A.  Yes.

09:59AM    4         **MR. TRIPI:**  One moment please, Your Honor.

10:00AM    5         **BY MR. TRIPI:**

10:00AM    6    Q.  And was information later extracted from

10:00AM    7    Mr. Bongiovanni's personal phone --

10:00AM    8    A.  Yes.

10:00AM    9    Q.  -- pursuant to a federal search warrant?

10:00AM   10    A.  Yes.

10:00AM   11         **MR. TRIPI:**  Judge, we've read the stip, but I would

10:00AM   12    just like to reread the stipulation we've previously entered

10:00AM   13    in context for the jury, because we read it out of context

10:00AM   14    last time.

10:00AM   15         **MR. MacKAY:**  No objection.

10:00AM   16         **THE COURT:**  Go ahead.

10:00AM   17         **MR. TRIPI:**  This is Court's Exhibit 6, United States

10:00AM   18    of America by and through its attorneys.

10:00AM   19         I'm going to skip, actually, the introduction

10:00AM   20    paragraph.

10:00AM   21         Hereby stipulate to the admissibility into evidence

10:00AM   22    at trial in this case the following facts regarding specific

10:00AM   23    government exhibits:

10:00AM   24         Or on or about June 26, 2019, HSI Special Agent

10:00AM   25    Curtis Ryan seized Joseph Bongiovanni's personal cell phone,

Case 1:19-cr-00227-LJV-MJR    Document 1245    Filed 09/28/24    Page 15 of 177
USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

15

10:00AM    1    Samsung Galaxy J3, with unique identifier IMEI number

10:00AM    2    3542-720-908-09267.

10:00AM    3         The Department of Justice Office of Inspector General

10:01AM    4    extracted the data that was stored on Mr. Bongiovanni's

10:01AM    5    personal cell phone and examined the data.  The results of the

10:01AM    6    examination are marked as Government Exhibit 109A, and

10:01AM    7    sub-exhibits of the examination are marked as Government

10:01AM    8    Exhibits 109B through 109Z, and 109AA through 109AH.

10:01AM    9         Those exhibits are authentic and accurate copies of

10:01AM   10    the data that was extracted -- excuse me, that was on

10:01AM   11    Mr. Bongiovanni's personal cell phone.

10:01AM   12         The parties stipulate and agree that the following

10:01AM   13    exhibits shall be received into evidence:

10:01AM   14         Government Exhibit 109F, 109I, 109N, 109O, 109P,

10:01AM   15    109R, 109V, 109X, 109Z, 109AA, 109AB, 109AC, and 109AE.

10:01AM   16         And that was signed by all parties on August 26th,

10:02AM   17    2024, Your Honor.

10:02AM   18         Thank you for that indulgence.

10:02AM   19    **BY MR. TRIPI:**

10:02AM   20    Q.  After that interview was completed, after you obtained

10:02AM   21    Mr. Bongiovanni's phone and the file materials which we'll

10:02AM   22    get into in a little bit, did that essentially end the

10:02AM   23    investigation that day in Mr. Bongiovanni's residence?

10:02AM   24    A.  Yes.

10:02AM   25    Q.  As part of your continuing investigation, did Homeland

10:02AM    1    Security Investigations obtain additional search warrants on

10:02AM    2    August 23rd -- that were executed on or about August 23rd,

10:02AM    3    2019, to search residences associated with Michael Masecchia

10:02AM    4    and Lou Selva?

10:02AM    5    A.   Yes.

10:02AM    6    Q.   So, within approximately one year of the investigation,

10:03AM    7    both of those residences were searched and items of evidence

10:03AM    8    were seized?

10:03AM    9    A.   Yes.

10:03AM    10   Q.   Were you the lead HSI case agent at the Masecchia

10:03AM    11   residence?

10:03AM    12   A.   I was.

10:03AM    13   Q.   And from the FBI, was Special Agent Burns there with you?

10:03AM    14   A.   Yes, he was.

10:03AM    15   Q.   And were there other individuals who helped with that

10:03AM    16   search from your agency?

10:03AM    17   A.   Yes.

10:03AM    18   Q.   As to the Selva search warrant, obviously he lives in a

10:03AM    19   different location; is that right?

10:03AM    20   A.   Yes.

10:03AM    21   Q.   Who was the head of that search team?

10:03AM    22   A.   Special Agent Halliday.

10:03AM    23   Q.   And she's with HSI, correct?

10:03AM    24   A.   Yes.

10:03AM    25   Q.   All right.  Regarding the Masecchia search warrant on

Case 1:19-cr-00227-LJV-MJR   Document 1245   Filed 09/28/24   Page 17 of 177
USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

17

10:03AM   1   August 23rd, 2019, and the Selva search warrant that same

10:03AM   2   day, were they executed simultaneously?

10:03AM   3   A.   Yes.

10:03AM   4   Q.   Was that for the same logic and reasoning that the

10:03AM   5   Anthony Gerace and Michael Sinatra search warrants were

10:03AM   6   executed simultaneously?

10:03AM   7   A.   Yes.

10:03AM   8   Q.   Would all your answers, if I asked the same questions, be

10:04AM   9   the same to this jury about why that was done that way?

10:04AM   10  A.   Yes, they would.

10:04AM   11  Q.   Okay.  Now, with regard to the Masecchia warrant

10:04AM   12  execution, can you describe for the jury what happened that

10:04AM   13  day, and give them an overview of what was seized?

10:04AM   14  A.   So, that was another tactical team entry.  So, they

10:04AM   15  searched the residence for people.  Mr. Masecchia was there,

10:04AM   16  his wife, two or maybe three of his children, so they were

10:04AM   17  secured and brought outside.

10:04AM   18       Special Agent Burns and I conducted a short interview

10:04AM   19  with Mr. Masecchia.  After that was over, I assisted with the

10:04AM   20  search.

10:04AM   21  Q.   Okay.

10:04AM   22  A.   And then -- do you want me to go through some of the

10:04AM   23  things we found, or --

10:04AM   24  Q.   Yeah.  Let me ask a follow-up question.

10:04AM   25       Where did Mr. Masecchia live?  Where was his residence?

10:04AM    1    A.  On Main Street in Williamsville.  5907, I think is the

10:05AM    2    number.  I'm not remembering right.  But across the street

10:05AM    3    from Williamsville South High School.

10:05AM    4    Q.  Okay.  Was your conversation with Mr. Masecchia

10:05AM    5    relatively brief?

10:05AM    6    A.  Yes.

10:05AM    7    Q.  Did it ever make it to any substance of any of the

10:05AM    8    matters at hand?

10:05AM    9    A.  No.

10:05AM   10    Q.  Okay.  Did Special Agent Burns, at Mr. Masecchia's

10:05AM   11    request, actually call an attorney of Mr. Masecchia's choice

10:05AM   12    for him?

10:05AM   13    A.  Either Special Agent Burns did or I did.

10:05AM   14    Q.  One of the two of you?

10:05AM   15    A.  One of the two of us did.  I think between the two of us,

10:05AM   16    we had the number, and we called on Mr. Masecchia's behalf.

10:05AM   17    Q.  And getting to the search now, can you tell the jury,

10:05AM   18    give them an overview of the items that were located and

10:05AM   19    seized by Homeland Security?

10:05AM   20    A.  Yes.  Most of the items were found in the upstairs master

10:05AM   21    bedroom.  There were eight firearms.  $27,950 --

10:06AM   22    Q.  In United States currency?

10:06AM   23    A.  Yes.  About 100 rounds of ammunition.  There was

10:06AM   24    marijuana.  There was at least some THC-based edibles.  I'm

10:06AM   25    trying to remember what else.

10:06AM    1    Q.  Was there some cocaine in his truck?

10:06AM    2    A.  There was cocaine in the truck.

10:06AM    3    Q.  Was there some steroids on the scene?

10:06AM    4    A.  And there were steroids, yes.

10:06AM    5    Q.  And I'm sorry, I missed the number of firearms.

10:06AM    6    A.  Eight.

10:06AM    7    Q.  And was ammunition in proximity to the firearms?

10:06AM    8    A.  Yes.

10:06AM    9    Q.  Were the firearms in proximity to marijuana and that

10:06AM   10    $27,950?

10:06AM   11    A.  Yes.  So, the currency was in the closet in the bedroom.

10:06AM   12    And then there was one firearm in particular that was at the

10:07AM   13    side of the bed by a nightstand where ammunition and

10:07AM   14    marijuana were found.

10:07AM   15    Q.  Did it appear that that firearm was, like, in a ready

10:07AM   16    position in proximity to where Mr. Masecchia would be

10:07AM   17    sleeping?

10:07AM   18    A.  Yes.

10:07AM   19    Q.  Shortly after that search, was Mr. Masecchia charged?

10:07AM   20    A.  Yes.

10:07AM   21    Q.  After he was charged, did he come in for what's called a

10:07AM   22    proffer interview?

10:07AM   23    A.  He did.

10:07AM   24    Q.  Did he come in a few times?

10:07AM   25    A.  At least twice.

10:07AM   1   Q.  Did you ask him questions during those proffer

10:07AM   2   interviews?

10:07AM   3   A.  Yes.

10:07AM   4   Q.  What was his demeanor when you asked Mr. Masecchia

10:07AM   5   questions?

10:07AM   6   A.  He was evasive.

10:07AM   7   Q.  Without getting into any results or questions asked, was

10:08AM   8   he polygraphed?

10:08AM   9   A.  Yes.

10:08AM  10   Q.  After that, did he ever submit to any further interviews

10:08AM  11   after that?

10:08AM  12   A.  No.

10:08AM  13   Q.  Ultimately, did Mr. Masecchia plead guilty in his own

10:08AM  14   case to conspiracy to distribute marijuana?

10:08AM  15   A.  Yes.

10:08AM  16   Q.  Did he not cooperate?

10:08AM  17   A.  He did not.

10:08AM  18   Q.  I'd like to ask you about Lou Selva.

10:08AM  19       After the search warrant that was led by Special Agent

10:08AM  20   Halliday that same day, without getting into what Special

10:08AM  21   Agent Halliday told you, did you learn details about what had

10:08AM  22   transpired at Mr. Selva's residence at 128 Rebecca Court that

10:08AM  23   day?

10:08AM  24   A.  Yes.

10:08AM  25   Q.  All right.  Did you get to review the evidence that was

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 10:08AM | 1 | obtained from Mr. Selva's residence? |
| 10:08AM | 2 | A.  Yes. |
| 10:08AM | 3 | Q.  Within a short time after Mr. Selva's search warrant, did |
| 10:09AM | 4 | he come in for a proffer interview? |
| 10:09AM | 5 | A.  Yes. |
| 10:09AM | 6 | Q.  Did Mr. Selva also -- had you become aware by that point |
| 10:09AM | 7 | he had agreed to turn his cell phone over to be searched? |
| 10:09AM | 8 | A.  Yes. |
| 10:09AM | 9 | Q.  Did Mr. Selva come in for several proffers that you were |
| 10:09AM | 10 | in? |
| 10:09AM | 11 | A.  Yes. |
| 10:09AM | 12 | Q.  Ultimately, was he polygraphed? |
| 10:09AM | 13 | A.  Yes. |
| 10:09AM | 14 | Q.  Without getting into the questions of the polygraph or |
| 10:09AM | 15 | the results, after Mr. Selva was polygraphed, did he come in |
| 10:09AM | 16 | for more proffer interviews? |
| 10:09AM | 17 | A.  Yes. |
| 10:09AM | 18 | Q.  As time went on, can you describe how Mr. Selva's |
| 10:09AM | 19 | demeanor was in the beginning and how it progressed over time |
| 10:09AM | 20 | over the course of the interviews following his polygraph? |
| 10:09AM | 21 | A.  He was very nervous, even scared in the beginning. |
| 10:10AM | 22 | Q.  Was he -- did he appear at times in the beginning to be |
| 10:10AM | 23 | evasive? |
| 10:10AM | 24 | A.  Yes. |
| 10:10AM | 25 | Q.  Did he appear to be minimizing to you at times? |

10:10AM    1    A.  Yes.

10:10AM    2    Q.  As time went on, what did you notice with respect to that

10:10AM    3    portion of his demeanor?

10:10AM    4    A.  As time went on, he became less evasive, more

10:10AM    5    forthcoming.

10:10AM    6    Q.  Did he become less evasive after the polygraph, in your

10:10AM    7    review?

10:10AM    8    A.  Yes.

10:10AM    9    Q.  Ultimately, Mr. Selva went into grand jury?

10:10AM   10    A.  He did.

10:10AM   11    Q.  Did he remain scared and nervous?

10:10AM   12    A.  Yes.

10:10AM   13    Q.  Did that ever change?

10:11AM   14    A.  No.

10:11AM   15    Q.  Now, after Mr. Selva started proffering again, without

10:11AM   16    getting into what he said in the proffers, did he provide you

10:11AM   17    information that enabled you to go back and ask more specific

10:11AM   18    questions to Mr. Serio?

10:11AM   19    A.  Yes.

10:11AM   20    Q.  Did the information that Mr. Selva provided you in his

10:11AM   21    interviews result in better questions that you were able to

10:11AM   22    ask Mr. Serio?  More pointed questions, I should say?

10:11AM   23    A.  Yes.

10:11AM   24    Q.  Did Mr. Serio then provide you more information?

10:11AM   25    A.  Yes.

10:11AM   1   Q.  In terms of the amount of money that Mr. Serio had

10:11AM   2   initially indicated to you was involved in the bribes, what

10:11AM   3   did Mr. Serio -- how did he modify his answer?

10:11AM   4   A.  Increased significantly, the amount.

10:11AM   5   Q.  Did you tell him the amount that he bribed the defendant?

10:11AM   6   A.  No.

10:11AM   7   Q.  Did that information come from Mr. Serio?

10:11AM   8   A.  Yes.

10:11AM   9   Q.  Did you ever tell Mr. Serio, hey, Lou Selva told me X?

10:12AM  10       Did you ever tell Serio you were talking to Selva?

10:12AM  11   A.  No.

10:12AM  12   Q.  Did you ever tell Selva you were talking to Serio?

10:12AM  13   A.  No.

10:12AM  14   Q.  I'd like to move on to talk a little bit more about --

10:12AM  15   I'd like to actually go back and ask you a few more questions

10:12AM  16   about evidence that was recovered from Alder Place.  I

10:12AM  17   apologize to circle back to that, but I forgot to ask a

10:12AM  18   couple questions.  Okay?

10:12AM  19       So, going backwards in the timeline again, back to

10:12AM  20   June 6th, 2019, okay?

10:12AM  21   A.  Yes.

10:12AM  22   Q.  As a part of the -- essentially the lead case agent on

10:13AM  23   that matter, did you ultimately review all the evidence that

10:13AM  24   was seized and secured that day?

10:13AM  25   A.  Yes.

10:13AM  1    Q.  Did you seize some wedding cards that HSI had recovered

10:13AM  2    from Mr. Bongiovanni's residence?

10:13AM  3    A.  Yes.

10:13AM  4    Q.  Okay.  I'm going to hand you up another exhibit.  I'm

10:13AM  5    going to hand up what's previously been marked as Government

10:13AM  6    Exhibit 100D. D, as in dog, sorry.

10:13AM  7        Generally, do you recognize Government Exhibit 100D?

10:14AM  8    A.  Yes.

10:14AM  9    Q.  Do you recognize 100D to be the different wedding cards

10:14AM  10   that were seized during the search of Mr. Bongiovanni's

10:14AM  11   residence by HSI on June 6th, 2019?

10:14AM  12   A.  I do.

10:14AM  13   Q.  Are they in the same or substantially same condition

10:14AM  14   today as when you last saw them, other than now that there's

10:14AM  15   a hole in the bag that you ripped open?

10:14AM  16   A.  Yes.

10:14AM  17   Q.  Can I see those cards for one moment?

10:14AM  18       Within that bag, are there two cards marked Government

10:14AM  19   Exhibit 100D-1 and 100D-2?

10:14AM  20   A.  Yes.

10:14AM  21   Q.  Okay.  I'd like to focus you in on those.  Is 100D-1, a

10:14AM  22   card that was seized, that is in the same or substantially

10:14AM  23   same condition today as when it was recovered from

10:15AM  24   Mr. Bongiovanni's residence?

10:15AM  25   A.  Yes.

10:15AM  1   Q.  And with regard to 100D-2, is that a wedding card that

10:15AM  2   was seized from Mr. Bongiovanni's residence, and is it in the

10:15AM  3   same or substantially same condition today as when it was

10:15AM  4   seized?

10:15AM  5   A.  Yes.

10:15AM  6        MR. TRIPI:  The government offers just 100D-1 and

10:15AM  7   100D-2, Your Honor.

10:15AM  8        MR. MacKAY:  No objection, Your Honor.

10:15AM  9        THE COURT:  They are received without objection.

10:15AM  10       **(GOV Exhibits 100D-1 and 2 were received in evidence.)**

10:15AM  11       MR. TRIPI:  Thank you.

10:15AM  12       BY MR. TRIPI:

10:15AM  13  Q.  Starting with 100D-1, if you wouldn't mind, who is that

10:15AM  14  wedding card from?

10:15AM  15  A.  It's signed by Lou Selva.

10:15AM  16  Q.  Okay.  And can you move on to 100D-2?

10:15AM  17       Could you tell the jury who that wedding card is from?

10:15AM  18  A.  Hot Dog and Lynn.

10:15AM  19  Q.  Now, through this investigation, do you know Hot Dog to

10:15AM  20  be the nickname of a particular individual?

10:15AM  21  A.  Paul Francoforte.

10:15AM  22  Q.  And can you read for the jury what's written in the card

10:16AM  23  from Hot Dog and Lynn?

10:16AM  24  A.  It says, Love, Hot Dog and Lynn.  Honored to be your

10:16AM  25  friends.  Many years of happiness.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 10:16AM | 1 | Q.  Okay.  I'd like you to put that card down. |
| 10:16AM | 2 | **MR. TRIPI:**  Ms. Champoux, can we please pull up |
| 10:16AM | 3 | Government Exhibit 8A and go to page 347? |
| 10:16AM | 4 | Just one moment, Your Honor. |
| 10:16AM | 5 | **BY MR. TRIPI:** |
| 10:16AM | 6 | Q.  Do you recognize this document from the DEA file title |
| 10:16AM | 7 | Wayne Anderson C2-13-0026? |
| 10:16AM | 8 | A.  Yes. |
| 10:16AM | 9 | Q.  Is this a response -- a phone record for subscriber |
| 10:16AM | 10 | information related to an administrative subpoena for Paul |
| 10:16AM | 11 | Francoforte's phone number? |
| 10:16AM | 12 | A.  Yes. |
| 10:16AM | 13 | Q.  Is that phone number 716-866-2687? |
| 10:16AM | 14 | A.  Yes, I see it. |
| 10:17AM | 15 | Q.  Based upon your knowledge of the DEA DARTS system, is a |
| 10:17AM | 16 | subscriber subpoena like this for phone information |
| 10:17AM | 17 | sufficient to get an individual's name and number into DARTS |
| 10:17AM | 18 | for deconfliction purposes? |
| 10:17AM | 19 | A.  Yes. |
| 10:17AM | 20 | Q.  So, if an agent causes this to be put in DARTS associated |
| 10:17AM | 21 | with them, if this ever comes up on a wiretap, that agent |
| 10:17AM | 22 | will be notified? |
| 10:17AM | 23 | A.  Yes. |
| 10:17AM | 24 | **MR. TRIPI:**  We can take that down. |
| | 25 | |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

|  |  |  |
|---|---|---|
| 10:17AM | 1 | **BY MR. TRIPI:** |
| 10:17AM | 2 | Q.  During the course of your investigation, did you also |
| 10:17AM | 3 | have an opportunity to locate and review an online digital |
| 10:17AM | 4 | memorial for Joseph Todaro Sr.? |
| 10:17AM | 5 | A.  Yes. |
| 10:17AM | 6 | Q.  And did that online memorial have a number of photographs |
| 10:17AM | 7 | that were part of the memorial? |
| 10:17AM | 8 | A.  It did. |
| 10:17AM | 9 | Q.  I'm going to hand you up what's now marked Government |
| 10:18AM | 10 | Exhibit 393.  Do you recognize Exhibit 393? |
| 10:18AM | 11 | A.  I do. |
| 10:18AM | 12 | Q.  What do you recognize that to be? |
| 10:18AM | 13 | A.  Its a photograph that was included in the memorial. |
| 10:18AM | 14 | Q.  And whose online memorial is that? |
| 10:18AM | 15 | A.  Joseph Todaro Sr. |
| 10:18AM | 16 | Q.  And during your interview of Mr. Bongiovanni, remind the |
| 10:18AM | 17 | jury what he told you in terms of the position that |
| 10:18AM | 18 | Todaro Sr. had. |
| 10:18AM | 19 | A.  That he was the head of the Buffalo Mafia. |
| 10:18AM | 20 | Q.  As well as Gerace's grandfather? |
| 10:18AM | 21 | A.  Yes. |
| 10:18AM | 22 | Q.  Is that photo -- |
| 10:18AM | 23 | A.  Actually, I should say that he had something to do with |
| 10:19AM | 24 | the Buffalo Mafia. |
| 10:19AM | 25 | Q.  Thank you for the clarification. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

10:19AM  1     In terms of the law enforcement reputation for

10:19AM  2  Todaro Sr., were you familiar with that?

10:19AM  3  A.  Yes.

10:19AM  4  Q.  And what was that reputation?

10:19AM  5  A.  That he was the head of the Buffalo Mafia.

10:19AM  6  Q.  Okay.  Is Government Exhibit 393, does it fairly and

10:19AM  7  accurately depict a photo that was on part of the Todaro Sr.

10:19AM  8  online memorial?

10:19AM  9  A.  Yes.

10:19AM  10     MR. TRIPI:  The government offers Exhibit 393,

10:19AM  11  Your Honor.

10:19AM  12     MR. MacKAY:  No objection.

10:19AM  13     THE COURT:  Received without objection.

10:19AM  14     (GOV Exhibit 393 was received in evidence.)

10:19AM  15     MR. TRIPI:  Ms. Champoux, can we publish Exhibit 393?

10:19AM  16     BY MR. TRIPI:

10:19AM  17  Q.  Now, your screen is a touchscreen like a football

10:19AM  18  telestrator.  Can you show the jury who Mr. Todaro Sr. is in

10:19AM  19  that photo by tapping your finger on the screen?

10:19AM  20     MR. TRIPI:  May the record reflect he's placed a mark

10:19AM  21  in green on the individual in the front row wearing a light

10:19AM  22  green shirt on the photo.

10:19AM  23     BY MR TRIPI:

10:19AM  24  Q.  Let's see here.  Do you see Paul Francoforte, also known

10:20AM  25  as Hot Dog in this photo?

10:20AM  1    A.  Yes.

10:20AM  2    Q.  Can you make a mark on him, please?

10:20AM  3        All right.  I thought I changed the color, but we have

10:20AM  4    another green mark placed on the individual whose left hand

10:20AM  5    is on the shoulder of Todaro Sr.  Is that an accurate

10:20AM  6    description, Agent Ryan?

10:20AM  7    A.  Yes.

10:20AM  8    Q.  He's wearing a tan shirt?

10:20AM  9    A.  Yes.

10:20AM  10   Q.  And you've made a now plus mark on him, correct?

10:20AM  11   A.  Yes.

10:20AM  12   Q.  Okay.  Is that the same person whose phone number was in

10:20AM  13   that DARTS entry -- withdrawn -- in that subscriber subpoena

10:20AM  14   response we just looked at?

10:20AM  15   A.  Yes.

10:20AM  16   Q.  Is that the same person who wrote Mr. Bongiovanni a

10:20AM  17   wedding card?

10:20AM  18   A.  Yes.

10:20AM  19           **MR. TRIPI:**  Okay.  We can take that down,

10:20AM  20   Ms. Champoux.  Thank you.

10:20AM  21           **BY MR. TRIPI:**

10:21AM  22   Q.  We had just read stipulation Court Exhibit 6.  Exhibit

10:21AM  23   109F is in evidence.  You reviewed Mr. Bongiovanni's contacts

10:21AM  24   that were in his phone?

10:21AM  25   A.  Yes.

10:21AM  1          **MR. TRIPI:**  Ms. Champoux, let's pull up Exhibit 109F.

10:21AM  2          **BY MR. TRIPI:**

10:21AM  3  Q.  And you see contact number 1 listed on Exhibit 109F?

10:21AM  4  A.  I do.

10:21AM  5  Q.  And who is that?

10:21AM  6  A.  It says Louie.

10:21AM  7  Q.  And is that the phone number for Mr. Selva?

10:21AM  8  A.  It is.

10:21AM  9          **MR. TRIPI:**  Ms. Champoux, can we go back for a moment

10:22AM  10  to Government Exhibit 8A?

10:22AM  11          And can you control F the last name Selva?  I

10:22AM  12  apologize, I don't have a page number, but I think there

10:22AM  13  should be only one entry.

10:22AM  14          **BY MR. TRIPI:**

10:22AM  15  Q.  Okay.  We're now at Exhibit 8A on page 197.  Do you

10:22AM  16  recognize this to be an administrative subpoena response?

10:22AM  17  A.  Yes.

10:22AM  18  Q.  That's in file C2-13-0026?

10:22AM  19  A.  Yes.

10:22AM  20  Q.  Is that for Lou Selva, and his phone number 903-1654?

10:22AM  21  A.  Yes.

10:22AM  22  Q.  That's the person that the defendant told you he was

10:22AM  23  friends with during his interview?

10:22AM  24  A.  Yes.

10:22AM  25  Q.  Let's go back now to Exhibit 109F, please.  Is that the

| | | |
|---|---|---|
| 10:22AM | 1 | same phone number the defendant had? |
| 10:23AM | 2 | A.  Yes. |
| 10:23AM | 3 | Q.  Again, that administrative subpoena response for |
| 10:23AM | 4 | Mr. Selva, is that sufficient to get Mr. Selva's phone number |
| 10:23AM | 5 | in DARTS? |
| 10:23AM | 6 | A.  The entry, yes.  The -- the requesting of the subpoena |
| 10:23AM | 7 | is, yes. |
| 10:23AM | 8 | Q.  Because the administrative subpoena is run through DARTS, |
| 10:23AM | 9 | correct? |
| 10:23AM | 10 | A.  They're generated through the DARTS system, yes. |
| 10:23AM | 11 | Q.  And is that sufficient to be able to make sure that the |
| 10:23AM | 12 | agent associated with the entry, in this case |
| 10:23AM | 13 | Mr. Bongiovanni, would be notified if Mr. Selva's phone |
| 10:23AM | 14 | number was ever on a wiretap? |
| 10:23AM | 15 | A.  Yes. |
| 10:23AM | 16 | Q.  Do you enter any of your close personal friends in DARTS? |
| 10:23AM | 17 | A.  No. |
| 10:23AM | 18 | **MR. TRIPI:**  At this point, Ms. Champoux, can we go |
| 10:23AM | 19 | down to Government Exhibit 109F?  Go to entry number 49 back |
| 10:24AM | 20 | to Hot Dog for a moment. |
| 10:24AM | 21 | Can we zoom in on that? |
| 10:24AM | 22 | **BY MR. TRIPI:** |
| 10:24AM | 23 | Q.  Again, did Mr. Bongiovanni have the personal phone number |
| 10:24AM | 24 | for Hot Dog in his phone? |
| 10:24AM | 25 | A.  Yes. |

10:24AM  1    Q.  Is that the same phone number that he subpoenaed that we

10:24AM  2    looked at a moment ago?

10:24AM  3    A.  Yes.

10:24AM  4    Q.  Now you've also reviewed contacts from Mr. Serio, one of

10:24AM  5    Mr. Serio's phones; is that right?

10:24AM  6    A.  Yes.

10:24AM  7    Q.  Did Mr. Serio also have the contact information with this

10:24AM  8    same phone number for Hot Dog in his phone?

10:24AM  9    A.  He did.

10:24AM  10   Q.  Did Mr. Serio have the same contact information and phone

10:24AM  11   number for Lou Selva in his phone?

10:24AM  12   A.  Yes.

10:24AM  13         **MR. TRIPI:**  Could we go to Exhibit 109F entry number

10:24AM  14   72, please?

10:24AM  15         **BY MR. TRIPI:**

10:25AM  16   Q.  Is there an entry for Parisi there?

10:25AM  17   A.  Yes.

10:25AM  18   Q.  And in Mr. Serio's phone, did you review that, was there

10:25AM  19   an entry for a Frank Parisi with that same phone number?

10:25AM  20   A.  Yes.

10:25AM  21         **MR. TRIPI:**  Can we go to 109F number 6?

10:25AM  22         **BY MR. TRIPI:**

10:25AM  23   Q.  Do you know through this investigation Mr. Bongiovanni to

10:25AM  24   have a sister-in-law named Ashley Schuh?

10:25AM  25   A.  Yes.

| | | |
|---|---|---|
| 10:25AM | 1 | Q.  Do you see an entry for an Ashley in record number 6 in |
| 10:25AM | 2 | his contact list? |
| 10:25AM | 3 | A.  Yes. |
| 10:25AM | 4 | Q.  Did Mr. Serio in the contacts of his phone have an Ash S |
| 10:25AM | 5 | with the same phone number? |
| 10:25AM | 6 | A.  Yes. |
| 10:25AM | 7 | **MR. TRIPI:**  Can we go to 109F at number 5, please? |
| 10:25AM | 8 | **BY MR. TRIPI:** |
| 10:25AM | 9 | Q.  Are you familiar with the name Angelo Natale in this |
| 10:25AM | 10 | investigation? |
| 10:25AM | 11 | A.  Yes. |
| 10:25AM | 12 | Q.  Do you see a phone number there for a person named |
| 10:26AM | 13 | Angelo? |
| 10:26AM | 14 | A.  Yes. |
| 10:26AM | 15 | Q.  When you looked at Mr. Serio's contacts from his phone, |
| 10:26AM | 16 | did he have an Angelo Natale in his contacts with that same |
| 10:26AM | 17 | phone number? |
| 10:26AM | 18 | A.  Yes. |
| 10:26AM | 19 | **MR. TRIPI:**  Could we go to entry number 68 please in |
| 10:26AM | 20 | 109F? |
| 10:26AM | 21 | **BY MR. TRIPI:** |
| 10:26AM | 22 | Q.  Do you see an entry there for Mike Sinatra? |
| 10:26AM | 23 | A.  Yes. |
| 10:26AM | 24 | Q.  Is that the Mike Sinatra who HSI executed a search |
| 10:26AM | 25 | warrant at his residence on January 28th, 2019? |

| | | |
|---|---|---|
| 10:26AM | 1 | A.  Yes. |
| 10:26AM | 2 | MR. TRIPI:  Can we go to number 82, please? |
| 10:26AM | 3 | BY MR. TRIPI: |
| 10:26AM | 4 | Q.  Do you see an entry for T-H-O-M-A-D Napoli? |
| 10:26AM | 5 | A.  I do. |
| 10:26AM | 6 | Q.  Do you believe that to be Thomas Napoli, just a typo? |
| 10:26AM | 7 | A.  Yes. |
| 10:26AM | 8 | Q.  Thomas Napoli is someone we've seen in several photos, in |
| 10:26AM | 9 | particular 126, that we looked at yesterday? |
| 10:27AM | 10 | A.  Yes. |
| 10:27AM | 11 | MR. TRIPI:  Below that, can we go to the next entry, |
| 10:27AM | 12 | number 83? |
| 10:27AM | 13 | BY MR. TRIPI: |
| 10:27AM | 14 | Q.  Do you see an entry for Doctor Tommy? |
| 10:27AM | 15 | A.  Yes. |
| 10:27AM | 16 | Q.  Did we see Tom Doctor in photo and Exhibit 127 yesterday? |
| 10:27AM | 17 | A.  Yes. |
| 10:27AM | 18 | Q.  Okay.  I won't show those again. |
| 10:27AM | 19 | MR. TRIPI:  Okay.  We can take 109F down, please. |
| 10:27AM | 20 | BY MR. TRIPI: |
| 10:27AM | 21 | Q.  Yesterday we talked a little bit about your participation |
| 10:27AM | 22 | in the search of Pharaoh's Gentlemen's Club; do you remember |
| 10:27AM | 23 | that? |
| 10:27AM | 24 | A.  Yes, I do. |
| 10:27AM | 25 | Q.  Now, during the course of your investigation, subsequent |

10:27AM  1    to the execution of that search warrant, did you acquire

10:27AM  2    various photos online and subpoena records regarding

10:28AM  3    photographs that were of individuals inside Pharaoh's?

10:28AM  4    A.  Yes.

10:28AM  5    Q.  Generally, just to clarify the timeline, before the

10:28AM  6    search warrant at Pharaoh's and at Mr. Gerace's residence on

10:28AM  7    December 12th, 2019, fair to say Ms. Nigro had not been

10:28AM  8    interviewed as part of this investigation?

10:28AM  9    A.  She had not.

10:28AM  10   Q.  So none of her information was part of how you got the

10:28AM  11   search warrants, right?

10:28AM  12   A.  That's correct.

10:28AM  13   Q.  When you did start, when law enforcement did start

10:28AM  14   interviewing her, did she provide certain information

10:28AM  15   regarding individuals who frequented Pharaoh's?

10:28AM  16   A.  Yes.

10:28AM  17   Q.  Did you see some of the photos of people that she

10:28AM  18   mentioned in the photos that you acquired?

10:28AM  19   A.  Yes.

10:28AM  20   Q.  Did that include some of the -- an attorney she

10:28AM  21   mentioned?

10:28AM  22   A.  Yes.

10:28AM  23   Q.  In the texts in Mr. Gerace's phone, did he have other

10:29AM  24   text threads that Special Agent Halliday reviewed and you

10:29AM  25   later became aware of?

10:29AM    1    A.  Yes.

10:29AM    2    Q.  Did -- did Gerace's phone contain text threads between

10:29AM    3    him and former New York State Supreme Court Judge John

10:29AM    4    Michalski?

10:29AM    5    A.  Yes.

10:29AM    6    Q.  I'd like to ask you a little bit about Mr. Bongiovanni's

10:29AM    7    partner at the DEA, Joseph Palmieri, okay?

10:29AM    8    A.  Okay.

10:29AM    9    Q.  Along the way, did he also become a subject of the

10:30AM   10    investigation?

10:30AM   11    A.  Yes.

10:30AM   12    Q.  Was he notified by letter that he was a subject of the

10:30AM   13    investigation?

10:30AM   14    A.  Yes.

10:30AM   15    Q.  Did you participate in several interviews of him?

10:30AM   16    A.  Yes.

10:30AM   17    Q.  What was his demeanor during the interviews you

10:30AM   18    conducted?

10:30AM   19    A.  Evasive.

10:30AM   20    Q.  Did he get -- did he take a polygraph?

10:30AM   21    A.  Yes.

10:30AM   22    Q.  Did he talk to you any more after that?

10:30AM   23    A.  No.

10:30AM   24    Q.  Did you acquire a search warrant and search his

10:30AM   25    residence?

10:30AM  1    A.  Yes.

10:30AM  2    Q.  Did another person who had worked with Bongiovanni at

10:30AM  3    DEA, Special Agent Mike Hill, become a subject of

10:30AM  4    investigation after he was interviewed?

10:30AM  5    A.  Yes.

10:30AM  6    Q.  Did he receive a notification that he was a subject of

10:30AM  7    this investigation?

10:30AM  8    A.  Yes.

10:30AM  9    Q.  Did Special Agent Greg Yensan who had worked with the

10:30AM  10   defendant and later became his supervisor, did he submit to a

10:30AM  11   series of interviews?

10:30AM  12   A.  Yes.

10:30AM  13   Q.  Was he later informed he was a subject of the

10:30AM  14   investigation?

10:30AM  15   A.  Yes.

10:30AM  16   Q.  Specifically was Palmieri, the one that we looked at

10:31AM  17   yesterday, that pulled the Wayne Anderson arrest reports in

10:31AM  18   that file?

10:31AM  19   A.  Yes.

10:31AM  20   Q.  Specifically the Wayne Anderson report, the day after

10:31AM  21   Wayne Anderson's arrest?

10:31AM  22   A.  Yes.

10:31AM  23   Q.  Was Mike Hill one of the case agents on the 2004 Mike

10:31AM  24   Masecchia case that had Mr. Bongiovanni listed as an "other

10:31AM  25   officer?"

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

38

| | | |
|---|---|---|
| 10:31AM | 1 | A. Yes. |
| 10:31AM | 2 | Q. Did Greg Yensan have some involvement, as far as you |
| 10:31AM | 3 | understood it, in C2-13-0026? |
| 10:31AM | 4 | A. Yes. |
| 10:31AM | 5 | Q. Were all three of them interviewed and asked questions |
| 10:31AM | 6 | about their knowledge of Bongiovanni's activities? |
| 10:31AM | 7 | A. Yes. |
| 10:31AM | 8 | Q. In the context of those questions, were all three of them |
| 10:31AM | 9 | evasive? |
| 10:31AM | 10 | A. Yes. |
| 10:32AM | 11 | Q. How would you contrast their demeanor to the interviews |
| 10:32AM | 12 | of Dave Leary, Shane Nastoff, and other DEA personnel? |
| 10:32AM | 13 | **MR. MacKAY:** Objection. |
| 10:32AM | 14 | **THE COURT:** Sustained. |
| 10:32AM | 15 | **BY MR. TRIPI:** |
| 10:32AM | 16 | Q. Do you believe Shane Nastoff was ever evasive? |
| 10:32AM | 17 | **MR. MacKAY:** Objection. |
| 10:32AM | 18 | **THE COURT:** Sustained. |
| 10:32AM | 19 | **BY MR. TRIPI:** |
| 10:32AM | 20 | Q. Did you interview Shane Nastoff? |
| 10:32AM | 21 | A. No. |
| 10:32AM | 22 | Q. Okay. Earlier I asked you about Lou Selva. And you had |
| 10:32AM | 23 | talked about him being nervous and scared; do you remember |
| 10:32AM | 24 | that? |
| 10:32AM | 25 | A. Yes. |

Case 1:19-cr-00227-LJV-MJR    Document 1245    Filed 09/28/24    Page 39 of 177
USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

39

10:32AM   1   Q.  Now, after the search warrant at Mr. Bongiovanni's

10:33AM   2   residence, and then after the search warrant at Mr. Selva's

10:33AM   3   residence, did you make a decision to not attempt to use

10:33AM   4   Mr. Selva to make recordings regarding Mr. Bongiovanni?

10:33AM   5   A.  Yes.

10:33AM   6   Q.  Can you explain why you didn't think that would be an

10:33AM   7   effective strategy for this investigation?

10:33AM   8   A.  Given his demeanor, I didn't think he was capable of it.

10:33AM   9   Q.  Was he nervous?

10:33AM  10   A.  Yes.

10:33AM  11   Q.  As far as you understood it through working with this

10:33AM  12   defendant and being a member of law enforcement, did you

10:33AM  13   believe the defendant was trained in handling sources and the

10:33AM  14   methods that law enforcement used to wire up people?

10:33AM  15   A.  Yes.

10:33AM  16   Q.  Did that create an additional challenge to the

10:33AM  17   investigation?

10:33AM  18   A.  Yes.

10:33AM  19   Q.  Did that combination cause you to not try that technique

10:33AM  20   with Mr. Selva?

10:33AM  21   A.  Yes.

10:33AM  22   Q.  Did you believe you would be able to get the defendant in

10:34AM  23   a controlled situation with Mr. Selva?

10:34AM  24          **MR. MacKAY:**  Objection, speculation.

10:34AM  25          **THE COURT:**  Sustained.

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

40

10:34AM  1          **MR. TRIPI:**  It's his own belief, it's his own

10:34AM  2    investigation.  Can I argue it, Judge?

10:34AM  3          **THE COURT:**  Sure, come on up.

10:34AM  4          (Sidebar discussion held on the record.)

10:34AM  5          **THE COURT:**  I'll tell you, a lot of the stuff that

10:34AM  6    you're doing, the defense is not objecting.  But evasive, for

10:34AM  7    instance, is not an observation about how someone is behaving.

10:34AM  8    It's --

10:34AM  9          **MR TRIPI:**  I believe--

10:34AM  10         **THE COURT:**  -- it's an observation about whether

10:34AM  11   their answers are truthful or consistent, or whether they're

10:34AM  12   trying to avoid answering questions.  So I don't think that is

10:34AM  13   fair game.

10:34AM  14         **MR. TRIPI:**  Judge, I--

10:34AM  15         **THE COURT:**  But there haven't been any objection.

10:34AM  16         **MR. TRIPI:**  Respectfully, I've gotten that type of

10:34AM  17   testimony in at dozens of trials, so you may have a different

10:35AM  18   view, but I think it's within a 701 opinion, firmly.

10:35AM  19         **THE COURT:**  Evasive?

10:35AM  20         **MR. TRIPI:**  Yeah.  When you're asking questions.  If

10:35AM  21   you ask me questions, Judge, and I don't answer you, you can

10:35AM  22   form an opinion I'm being evasive.

10:35AM  23         **THE COURT:**  I don't know.

10:35AM  24         **MR. TRIPI:**  You've probably done that at times

10:35AM  25   sitting on the bench in terms of you're asking questions to

10:35AM   1   parties and they're not answering your questions.  And you

10:35AM   2   say -- you form a belief that they're being evasive, and you

10:35AM   3   say, answer my question.

10:35AM   4          I think I've been on the other side of some of those.

10:35AM   5          **THE COURT:**  Maybe.  Maybe.  But anyway, so let's talk

10:35AM   6   about this one.

10:35AM   7          **MR. TRIPI:**  Okay.  So, can you refresh my memory why

10:35AM   8   we -- oh, what was the objection?

10:35AM   9          **MR. MacKAY:**  About --

10:35AM   10          **THE COURT:**  Whether he thought he could get

10:35AM   11   Bongiovanni --

10:35AM   12          **MR. TRIPI:**  It might be a foundational issue, Judge.

10:35AM   13   I did go right to the question.  But they crossed another

10:35AM   14   witness, and I think they opened on no recordings and stuff

10:35AM   15   like that.  And so --

10:35AM   16          **THE COURT:**  He's already said that he --

10:35AM   17          **MR. TRIPI:**  He didn't use the tactic, but I think a

10:35AM   18   little explanation about why beyond, you know, you have to be

10:35AM   19   in a controlled -- I can certainly lay more foundation, but

10:36AM   20   you have to be in a controlled environment controlled by law

10:36AM   21   enforcement, and where I'm driving at is that he -- part of

10:36AM   22   his assessment is he didn't think he would be able -- after

10:36AM   23   the search warrant at Selva's house, he didn't think he'd be

10:36AM   24   able to create a scenario that was controlled and safe.  And I

10:36AM   25   don't have to use the word "safe," but controlled by law

10:36AM    1    enforcement to be able to use that tactic.

10:36AM    2          Now I've got pieces of it out, but that was sort of

10:36AM    3    the last prong that I wanted to cover.

10:36AM    4          **THE COURT:**  Okay.  If you want to try to lay more

10:36AM    5    foundation, I'll --

10:36AM    6          **MR. TRIPI:**  Okay.

10:36AM    7          **THE COURT:**  -- I'll consider it.  But I don't think

10:36AM    8    there's enough there.

10:36AM    9          Go ahead, Mr. --

10:36AM    10         **MR. MacKAY:**  And the objection I think, too, is that

10:36AM    11   it's sort of pre-loading the answer of that when we think

10:36AM    12   we're gonna do that because we think we're gonna trip him up

10:36AM    13   he's gonna be guilty.  It sort of front loads that assumption

10:36AM    14   to the jury that they're trying to catch him in something, and

10:36AM    15   that -- it's inserting his belief that he believes he's

10:36AM    16   guilty, and he's gonna try to set that up.

10:36AM    17         **MR. TRIPI:**  I'll try to lay more foundation, Judge --

10:36AM    18         **THE COURT:**  Go ahead.

10:37AM    19         **MR. TRIPI:**  -- and I'll move on if we can't.

10:37AM    20         **THE COURT:**  Okay.

10:37AM    21         (End of sidebar discussion.)

10:37AM    22         **BY MR. TRIPI:**

10:37AM    23   Q.  All right.  I'd like to try to ask you a couple more

10:37AM    24   questions on the issue of controlled recordings using Lou

10:37AM    25   Selva.  Okay?

10:37AM    1    You've talked a little bit about some of your

10:37AM    2    decisionmaking process, but let me step back for a second.

10:37AM    3    When you use that law enforcement technique, is -- do you

10:37AM    4    have to ensure the safety of the operation?

10:37AM    5    A.  Yes.

10:37AM    6    Q.  Is part of ensuring the safety of the operation, does it

10:37AM    7    relate to law enforcement being able to control the scenario

10:37AM    8    where the person with the recording and the person who you

10:37AM    9    want to record will be situated?

10:37AM   10    A.  Yes.

10:37AM   11    Q.  Generally can you describe for the jury, just in a

10:37AM   12    general case, how that's done?

10:37AM   13    A.  Primarily, by trying to always dictate the location so

10:37AM   14    that it's a location that law enforcement, the cover team,

10:38AM   15    has advanced notice of.

10:38AM   16    Q.  What do you mean by "cover team?"

10:38AM   17    A.  The people closest to either an undercover agent or the

10:38AM   18    person cooperating with law enforcement.

10:38AM   19    Q.  Is that for safety purposes?

10:38AM   20    A.  They're primarily responsible for the safety of the

10:38AM   21    person in the covert role.

10:38AM   22    Q.  Okay.  And generally speaking, could this be a dangerous

10:38AM   23    technique to utilize?

10:38AM   24    A.  Yes.

10:38AM   25    Q.  Now, did -- did -- did those considerations factor also

10:38AM    1    into your decisionmaking ability or your decision making with

10:38AM    2    respect to whether you were going to ask Mr. Selva to try

10:38AM    3    that technique with the defendant?

10:38AM    4            **MR. MacKAY:**  Same objection, Judge.

10:38AM    5            **THE COURT:**  Yeah, sustained.

10:38AM    6            **BY MR. TRIPI:**

10:38AM    7    Q.  Okay.  Ultimately, you didn't use that technique for the

10:38AM    8    reasons that you've at least stated already?

10:38AM    9    A.  Yes.

10:38AM   10            **MR. MacKAY:**  Same objection, Judge.

10:38AM   11            **MR. TRIPI:**  He's answered some portions of it.

10:38AM   12            **THE COURT:**  That's overruled.

10:38AM   13            **MR. MacKAY:**  The remainder, I thought he said, for

10:39AM   14    the reasons you just stated.

10:39AM   15            **MR. TRIPI:**  He had answered some of it earlier,

10:39AM   16    Your Honor.

10:39AM   17            **THE COURT:**  No, so -- so, ultimately, you didn't use

10:39AM   18    that technique is fine.

10:39AM   19            For the same reasons, no, that's the same objection

10:39AM   20    and that is sustained.

10:39AM   21            So the jury will strike that answer.

10:39AM   22            You can ask another question, but not that question.

10:39AM   23            **MR. TRIPI:**  Okay.

10:39AM   24            **BY MR. TRIPI:**

10:39AM   25    Q.  All right.  We're going to move on, okay?

10:39AM  1      All right.  I'd like to get back to the file that was

10:39AM  2  seized on June 6th, 2019.  Okay?

10:39AM  3  A.  Yes.

10:39AM  4  Q.  Okay.  Government Exhibit 100A is in evidence.  Are there

10:39AM  5  a couple documents that were originally in 100A that at

10:39AM  6  various other proceedings got marked separately?

10:39AM  7  A.  Yes.

10:39AM  8  Q.  So I'd like to show you those documents if I can now and

10:39AM  9  ask you a few questions.  Okay?

10:40AM  10     First I'm going to hand up, for the record, Government

10:40AM  11  Exhibit 100E-1 and 100F-1.  Do you need to see those?

10:40AM  12        **MR. TRIPI:**  All right.  Judge, I'm handing up 100E-1

10:40AM  13  and 100F-1.

10:40AM  14        I'm also handing up 100A, which is already in

10:40AM  15  evidence.

10:40AM  16        **BY MR. TRIPI:**

10:40AM  17  Q.  Do you recognize 100E-1 and 100F-1 to be documents that

10:41AM  18  are marked separately, but were also part of the original

10:41AM  19  case file that was recovered from the defendant's residence?

10:41AM  20  A.  Yes.

10:41AM  21        **MR. TRIPI:**  The government offers 100E-1 and 100F-1,

10:41AM  22  Your Honor.

10:41AM  23        **MR. MacKAY:**  No objection.

10:41AM  24        **THE COURT:**  Received without objection.

10:41AM  25  **(GOV Exhibits 100E-1 and 100F-1 were received in evidence.)**

| | | |
|---|---|---|
| 10:41AM | 1 | **MR. MacKAY:**  Judge, is it possible we could |
| 10:41AM | 2 | potentially take a comfort break? |
| 10:41AM | 3 | **THE COURT:**  Sure, absolutely.  So let's take -- |
| 10:41AM | 4 | **MR. TRIPI:**  No objection. |
| 10:41AM | 5 | **THE COURT:**  Yeah.  Let's take our morning break right |
| 10:41AM | 6 | now.  Remember my instructions about not communicating about |
| 10:41AM | 7 | the case even with each other, and not making up your mind. |
| 10:41AM | 8 | See you back here in about 15 minutes. |
| 10:41AM | 9 | (Jury excused at 10:41 a.m.) |
| 10:42AM | 10 | **THE COURT:**  Okay, anything for the record? |
| 10:42AM | 11 | **MR. TRIPI:**  No, Your Honor. |
| 10:42AM | 12 | **THE COURT:**  Anything? |
| 10:42AM | 13 | **MR. MacKAY:**  No, Judge.  Thank you. |
| 10:42AM | 14 | Mr. Bongiovanni just -- |
| 10:42AM | 15 | **THE COURT:**  That's fine. |
| 10:42AM | 16 | **THE DEFENDANT:**  Thank you, Your Honor. |
| 10:42AM | 17 | **THE CLERK:**  All rise. |
| 10:42AM | 18 | (Off the record at 10:42 a.m.) |
| 11:02AM | 19 | (Back on the record at 11:02 a.m.) |
| 11:02AM | 20 | (Jury not present.) |
| 11:02AM | 21 | **THE CLERK:**  All rise. |
| 11:02AM | 22 | **THE COURT:**  We are back on the record for the |
| 11:02AM | 23 | continuation of the jury trial in case number 19-cr-227, |
| 11:02AM | 24 | United States of America versus Joseph Bongiovanni. |
| 11:02AM | 25 | All counsel and parties are present. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9711/24
47

11:03AM    1            (Jury seated at 11:03 a.m.)

11:03AM    2        **THE COURT:**  Okay.  The record will reflect that all

11:03AM    3    our jurors are present.

11:03AM    4        I have a couple requests from you folks on the jury.

11:03AM    5    First, you've asked whether you can wear Buffalo Bills gear

11:03AM    6    tomorrow.  The answer to that is:  Yes, you're welcome to.

11:03AM    7        And question number 2 is that one of the jurors has a

11:03AM    8    reservation for dinner and an overnight stay at Salvatore's

11:03AM    9    next week, and the question is whether she can keep that

11:03AM    10   reservation because the trial is ongoing, and I've instructed

11:03AM    11   you not to visit places that have been mentioned.

11:03AM    12       We've talked about it.  There's no reason not to do

11:03AM    13   that.  I don't know which of the jurors has that request, but

11:04AM    14   there's no reason for you not to go.  There's nothing about

11:04AM    15   that place that might, we don't think, that might affect your

11:04AM    16   ability to be fair.

11:04AM    17       Anything you see, obviously, if there's something

11:04AM    18   that changes as a result of your going there, let us know.

11:04AM    19   But we don't -- none of the lawyers nor I see any reason why

11:04AM    20   you can't go there.  So the answer is:  Yes, you can go.

11:04AM    21       I remind the witness he's still under oath.

11:04AM    22       And, Mr. Tripi, you may continue.

11:04AM    23       **MR. TRIPI:**  Thank you, Your Honor.

11:04AM    24       **BY MR. TRIPI:**

11:04AM    25   Q.  Earlier I handed up Government Exhibit 100A.  I just want

11:04AM    1    to ask you a few more questions about that.

11:04AM    2        Regarding the documents that are -- that are in the file,

11:04AM    3    including 100A, 100E-1 and 100F-1, did you and Special Agent

11:04AM    4    Halliday work together to scan the documents and to

11:04AM    5    potentially try to make it easier to review them in court as

11:05AM    6    opposed to thumbing through each of the documents?

11:05AM    7    A.  Yes.

11:05AM    8    Q.  And when you did that, did you try to organize the

11:05AM    9    documents that were in there in a way that made it logical?

11:05AM    10   A.  Yes.

11:05AM    11   Q.  However, sometimes did you scan documents that might not

11:05AM    12   belong in the same PDF, for lack of a better ways to phrase

11:05AM    13   it?

11:05AM    14   A.  Possibly, yes.

11:05AM    15   Q.  Okay.  Now, this Government Exhibit 100A.1 is already in

11:05AM    16   evidence, but is that the exhibit that was generated in terms

11:05AM    17   of the PDF scans that you and Special Agent Halliday did?

11:05AM    18   A.  Yes.

11:05AM    19        **MR. TRIPI:**  If we could, please, bring up

11:05AM    20   Exhibit 100A.1.

11:05AM    21        **BY MR. TRIPI:**

11:05AM    22   Q.  And are these the scans that you guys created?

11:05AM    23   A.  Yes.

11:05AM    24   Q.  All right.  I'd like to work through just a couple of

11:05AM    25   these.  Okay?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

49

11:05AM   1        First of all, before I get into specific documents, in

11:06AM   2    terms of your work as a trained agent at the DEA and Homeland

11:06AM   3    Security, by monitoring a lead phone, does that -- of an

11:06AM   4    organization, does that usually also help you get to the

11:06AM   5    subordinates of the organization?

11:06AM   6    A.   Something bumped and I wasn't able to hear the middle of

11:06AM   7    your question, I'm sorry.

11:06AM   8    Q.   By monitoring -- if you were to get a wiretap to monitor

11:06AM   9    a lead phone of a leader of an organization, does that also

11:06AM  10    help you to get to the subordinates in the organization who

11:06AM  11    are in contact with the leadership?

11:06AM  12    A.   Yes, it could.

11:06AM  13    Q.   And it is a main goal and objective usually in an

11:06AM  14    investigation to get to the leadership's phones?

11:06AM  15    A.   Yes.

11:06AM  16    Q.   For a wiretap?

11:06AM  17    A.   Yes.

11:06AM  18    Q.   And we've heard a lot about that, but is that a lengthy

11:06AM  19    process of doing enough investigation to get up to a wiretap?

11:06AM  20    A.   Yes.

11:07AM  21    Q.   Okay.

11:07AM  22        **MR. TRIPI:**  Now, Ms. Champoux, I'd like you to click

11:07AM  23    on the PDF that's labeled, there's a long number in front of

11:07AM  24    it, but Serio toll analysis.  Do you see that?  Right there.

11:07AM  25    Serio T, toll analysis.  All right.

|  |  |  |
|---|---|---|
| 11:07AM | 1 | **BY MR. TRIPI:** |
| 11:07AM | 2 | Q.  Do you see this document that was recovered in the file |
| 11:07AM | 3 | that was in the defendant's residence? |
| 11:07AM | 4 | A.  Yes. |
| 11:07AM | 5 | Q.  Are you familiar generally, with these types of |
| 11:07AM | 6 | documents? |
| 11:07AM | 7 | A.  Yes. |
| 11:07AM | 8 | Q.  What does this appear to be to you, based on your time at |
| 11:07AM | 9 | DEA Buffalo office? |
| 11:07AM | 10 | A.  It's the subscriber report for -- generated from subpoena |
| 11:07AM | 11 | results. |
| 11:07AM | 12 | Q.  And the way, in the ordinary course and practice at DEA |
| 11:07AM | 13 | Buffalo, do intel analysts work with case agents and special |
| 11:08AM | 14 | agents to subpoena phone records and create these types of |
| 11:08AM | 15 | reports? |
| 11:08AM | 16 | A.  Yes.  And then this one is what we would typically -- the |
| 11:08AM | 17 | jargon for it is a "hot sheet."  So, it goes from most-dialed |
| 11:08AM | 18 | number to least-dialed number from the target phone for |
| 11:08AM | 19 | whatever the period of tolls is. |
| 11:08AM | 20 | Q.  So, you're talking about this row here that talks about |
| 11:08AM | 21 | frequency? |
| 11:08AM | 22 | A.  Yes. |
| 11:08AM | 23 | Q.  And that number in there is the number of contacts that |
| 11:08AM | 24 | the target number has with the phone number listed in the |
| 11:08AM | 25 | chart? |

11:08AM    1    A.   Yes.

11:08AM    2    Q.   And this particular hot number list, it relates to a

11:08AM    3    phone number 561-801-0221; is that right?

11:08AM    4    A.   Yes.

11:08AM    5    Q.   And it was associated to a DEA file C2-11-0126?

11:08AM    6    A.   Yes.

11:08AM    7    Q.   Under that, there's a name Bongo; do you see that?

11:08AM    8    A.   I do.

11:08AM    9    Q.   Is that ordinary practice for the intel analyst to list

11:08AM   10    the case number and the agent on the hot sheet?

11:09AM   11    A.   Yes.

11:09AM   12    Q.   And then there's some hand-written information regarding

11:09AM   13    Thomas Serio, sort of above the spreadsheet?

11:09AM   14    A.   Yes, I see that.

11:09AM   15    Q.   Or at the top of the list, I should say?  Do you see that

11:09AM   16    there?

11:09AM   17    A.   I do.

11:09AM   18    Q.   Okay.  If we go down to entry number 15, do you see that

11:09AM   19    name, John Robinson?

11:09AM   20    A.   I do.

11:09AM   21    Q.   Do you recognize that name?

11:09AM   22    A.   Yes.

11:09AM   23    Q.   Is that someone you interviewed in the course of your

11:09AM   24    investigation of these matters?

11:09AM   25    A.   Yes.

11:09AM  1  Q.  What year did you interview John Robinson?

11:09AM  2  A.  2019, 2020 -- oh, no.  2020.  At least that late.

11:09AM  3  Q.  Did you interview him a couple of times?

11:09AM  4  A.  Yes.

11:09AM  5  Q.  By the time you went to interview John Robinson, was it

11:09AM  6  your understanding he was a member of the Ron Serio

11:09AM  7  trafficking organization?

11:09AM  8  A.  I mean, his name appeared several times in the file.  One

11:10AM  9  of the reasons for locating him and interviewing him was to

11:10AM  10  try to understand that relationship and if and how he --

11:10AM  11  involved he was with the Ron Serio organization.

11:10AM  12  Q.  And that was a name that, in part, you learned through

11:10AM  13  the documents that were in Mr. Bongiovanni's basement?

11:10AM  14  A.  Yes.

11:10AM  15  Q.  All right.  Now, do you see this hot number list at the

11:10AM  16  top, do you see run date?

11:10AM  17  A.  Yes.

11:10AM  18  Q.  What date does that say?

11:10AM  19  A.  November 30th, 2012.

11:10AM  20  Q.  And do you see the case file that that's run out of?

11:10AM  21  A.  According to the handwritten note, it's C2-11-0126.

11:10AM  22  Q.  And under that you see a name Bongo.  Was that a nickname

11:11AM  23  for somebody in the DEA Buffalo office?

11:11AM  24  A.  Mr. Bongiovanni.

11:11AM  25  Q.  So is that an indication that this was a hot list for him

11:11AM  1   that an analyst did?

11:11AM  2   A.  Yes.

11:11AM  3   Q.  Now, what's the date that the subpoena and that hot list

11:11AM  4   was run, the run date?

11:11AM  5   A.  Oh.  November 30th, 2012.

11:11AM  6        MR. TRIPI:  And, Ms. Champoux, can we go to

11:11AM  7   Government Exhibit 8A at page 365?

11:11AM  8        BY MR. TRIPI:

11:11AM  9   Q.  Now, this is a subpoena response regarding Thomas Serio

11:11AM  10  in file C2-13-0026; is that right?

11:11AM  11  A.  Yes.

11:11AM  12  Q.  And what date is this subpoena?

11:11AM  13  A.  March 13th, 2013.

11:11AM  14  Q.  Is it the same phone number for the hot list that we just

11:12AM  15  looked at, that was in the box in the basement?

11:12AM  16  A.  Could I see the other one again, please?

11:12AM  17  Q.  Yeah, we can't toggle them next to each other, so let's

11:12AM  18  pull that back up.  We're looking again at a PDF, just for

11:12AM  19  the record, in Exhibit 100A.1, it's 5618010221 Serio T toll

11:12AM  20  analysis PDF.

11:12AM  21  A.  Yes.  It's the same number.

11:12AM  22  Q.  So, this was run out of a different file?

11:12AM  23  A.  Yes.

11:12AM  24        MR. TRIPI:  Let's go back to Exhibit 8A as page 365.

         25

11:13AM   1          **BY MR. TRIPI:**

11:13AM   2     Q.  Approximately five months or so later, it was subpoenaed

11:13AM   3     again in the Wayne Anderson file?

11:13AM   4     A.  Yes.

11:13AM   5          **MR. TRIPI:**  Ms. Champoux, can we go to Exhibit 8A at

11:13AM   6     page 54?  Can we scroll to page maybe 53?

11:13AM   7          **BY MR. TRIPI:**

11:13AM   8     Q.  Do you see this DEA-202 for Tom Serio?

11:13AM   9     A.  Yes.

11:13AM  10     Q.  And this is how an individual gets added to a file; is

11:13AM  11     that right?

11:13AM  12     A.  Yes.

11:13AM  13     Q.  Do you see box number 45 where it says submission,

11:13AM  14     initial?  Down at the bottom of the page?

11:13AM  15     A.  Yes.

11:13AM  16     Q.  What date was this DEA-202 in that file?

11:13AM  17          Look at box 6, please.

11:13AM  18     A.  December 24th, 2012.

11:14AM  19     Q.  So, that's approximately a month after Mr. Serio, Tom

11:14AM  20     Serio's tolls were run out of a different file?

11:14AM  21     A.  Yes.

11:14AM  22          **MR. TRIPI:**  And let's go to the signature blocks

11:14AM  23     here.  On the second page of -- we're now at page 54, we were

11:14AM  24     at page 53 of 8A, we're now at page 54.

         25

11:14AM    1            **BY MR. TRIPI:**

11:14AM    2    Q.  Who was the agent who submitted this 202 --

11:14AM    3    A.  Joseph --

11:14AM    4    Q.  -- on Christmas Eve in 2012?

11:14AM    5    A.  -- Joseph Bongiovanni.

11:14AM    6            **MR. TRIPI:**  And, Ms. Champoux, if we can go to page 4

11:14AM    7    of Exhibit 8A?

11:14AM    8            **BY MR. TRIPI:**

11:14AM    9    Q.  This is a case closing DEA-6 for that file; is that

11:14AM    10   right?

11:14AM    11   A.  Yes.

11:14AM    12   Q.  And Tom Serio is not indexed in the closing, correct?

11:15AM    13   A.  He's not.

11:15AM    14           **MR. TRIPI:**  Ms. Champoux, can we go to, I think, page

11:15AM    15   16.  Let's try 19.  Scroll down a little bit.

11:15AM    16           I'm sorry, I have the page number wrong.  We'll get

11:15AM    17   there in a second.

11:15AM    18           Okay.  We're at Exhibit 8A at page 22.  If you can

11:15AM    19   scroll down to the second page of that particular -- now on

11:15AM    20   page 23.  Let's go to page 24.  All right.

11:15AM    21           **BY MR. TRIPI:**

11:15AM    22   Q.  So in this DEA-6 prepared November 28th, 2012, Tom

11:15AM    23   Serio's not indexed, correct?

11:15AM    24   A.  Correct.

11:15AM    25           **MR. TRIPI:**  Ms. Champoux, can you scroll upwards, so

| | | |
|---|---|---|
| 11:16AM | 1 | to the next DEA-6 in the file, and I'll call out the page |
| 11:16AM | 2 | number that it is. |
| 11:16AM | 3 | Scroll to the second page of that.  Third page. |
| 11:16AM | 4 | Sorry.  All right. |
| 11:16AM | 5 | **BY MR. TRIPI:** |
| 11:16AM | 6 | Q.  There's a DEA-6 that's cross-referenced to the file |
| 11:16AM | 7 | prepared January 17th, 2013.  Is Tom Serio indexed there? |
| 11:16AM | 8 | A.  No. |
| 11:16AM | 9 | **THE COURT:**  Can you state the page? |
| 11:16AM | 10 | **MR. TRIPI:**  Oh, I'm sorry, yes, Your Honor.  We are |
| 11:16AM | 11 | looking at now Exhibit 8A at page 21. |
| 11:16AM | 12 | Ms. Champoux, can we go up to the earlier DEA-6 now? |
| 11:16AM | 13 | Okay.  Let's stop there. |
| 11:16AM | 14 | **BY MR. TRIPI:** |
| 11:16AM | 15 | Q.  There's another DEA-6 in the file, February 7th, 2013; is |
| 11:17AM | 16 | that right? |
| 11:17AM | 17 | A.  Yes. |
| 11:17AM | 18 | Q.  And now we're looking at Exhibit 8A, page 18.  Is Tom |
| 11:17AM | 19 | Serio indexed there? |
| 11:17AM | 20 | A.  No. |
| 11:17AM | 21 | Q.  But we just looked -- his phone number was run out of a |
| 11:17AM | 22 | different file on a hot list November 30th, correct -- |
| 11:17AM | 23 | A.  Yes. |
| 11:17AM | 24 | Q.  -- of 2012? |
| 11:17AM | 25 | A.  Yes, 2012. |

11:17AM    1    Q.  Okay.

11:17AM    2         MR. TRIPI:  Let's go to the next DEA-6 in the file,

11:17AM    3    Ms. Champoux.  We're going to go to page 16 and 17.

11:17AM    4         BY MR. TRIPI:

11:17AM    5    Q.  All right.  So this one is a cross-reference to the file

11:17AM    6    of a source debriefing, correct?

11:17AM    7    A.  Yes.

11:17AM    8    Q.  And this is February 22nd, 2013?

11:17AM    9    A.  Yes.

11:17AM   10         MR. TRIPI:  All right.  Let's scroll down there and

11:17AM   11    see if he's indexed.

11:17AM   12         BY MR. TRIPI:

11:17AM   13    Q.  Now on February 22nd, 2012, the author of this report

11:17AM   14    indexed Thomas Serio; is that right?

11:17AM   15    A.  Yes.

11:17AM   16    Q.  And he provided the NADDIS number and a telephone number?

11:17AM   17    A.  Yes.

11:18AM   18    Q.  And this report was written from C2-12-0090; is that

11:18AM   19    right?

11:18AM   20    A.  Yes.

11:18AM   21         MR. TRIPI:  All right.  Ms. Champoux, let's go back

11:18AM   22    to Government Exhibit 108.1, that PDF we were looking at

11:18AM   23    earlier.

11:18AM   24         BY MR. TRIPI:

11:18AM   25    Q.  Nastoff's file is a different file than the one indicated

11:18AM    1    in the upper right-hand corner with the word Bongo under it;

11:18AM    2    is that correct?

11:18AM    3    A.  Yes.

11:18AM    4         MR. TRIPI:  Okay.  Let's go back to Exhibit 8A.

11:18AM    5         BY MR. TRIPI:

11:18AM    6    Q.  And for the record, this January -- February 22nd, 2013,

11:18AM    7    DEA-6 we just looked at was authored by Special Agent

11:18AM    8    Nastoff; is that right?

11:18AM    9    A.  Could I see that?  Yes.

11:18AM   10         MR. TRIPI:  Ms. Champoux, let's go to the next DEA-6

11:18AM   11    in the file.  We'll be heading to pages -- I think 13, 14, and

11:18AM   12    15, but let's go to the first page of that.

11:18AM   13         BY MR. TRIPI:

11:18AM   14    Q.  Okay.  Now we're looking at a DEA-6 in the Wayne Anderson

11:19AM   15    file, which you understand to be the Serio file; correct?

11:19AM   16    A.  Yes.

11:19AM   17    Q.  Date prepared is May 2nd, 2013?

11:19AM   18    A.  Yes.

11:19AM   19    Q.  This is the initial source debriefing of who we know is

11:19AM   20    R.K.; is that right?

11:19AM   21    A.  Yes.

11:19AM   22    Q.  Who's the author of this report?

11:19AM   23    A.  Joseph Bongiovanni.

11:19AM   24         MR. TRIPI:  Let's scroll.

11:19AM   25         THE COURT:  What page are we on?

| | | |
|---|---|---|
| 11:19AM | 1 | **MR. TRIPI:** Thank you, Judge. We're looking at |
| 11:19AM | 2 | Government Exhibit 8A at page 13. And it's page 1 of 3 of |
| 11:19AM | 3 | that DEA-6 dated May 2nd, 2013. |
| 11:19AM | 4 | **BY MR. TRIPI:** |
| 11:19AM | 5 | Q. Now, I'm not going to have you read the whole thing, but |
| 11:19AM | 6 | names that are mentioned are Ronald Serio, Thomas Serio, and |
| 11:19AM | 7 | David Oddo in this source debriefing among others, correct? |
| 11:19AM | 8 | A. Yes. |
| 11:19AM | 9 | **MR. TRIPI:** Okay. Let's scroll down, Ms. Champoux, |
| 11:19AM | 10 | and look at the indexing. |
| 11:19AM | 11 | **BY MR. TRIPI:** |
| 11:19AM | 12 | Q. Okay. Now this one was authored by Mr. Bongiovanni, |
| 11:19AM | 13 | correct? |
| 11:19AM | 14 | A. Yes. |
| 11:19AM | 15 | Q. We're looking at Exhibit 8A at page number 15. What did |
| 11:20AM | 16 | Mr. Bongiovanni write for Thomas Serio's NADDIS? |
| 11:20AM | 17 | A. He said it was negative. |
| 11:20AM | 18 | Q. Didn't we just look at one from February where there was |
| 11:20AM | 19 | a NADDIS number that Shane Nastoff wrote in there? |
| 11:20AM | 20 | A. Yes. |
| 11:20AM | 21 | **MR. TRIPI:** Now let's go to the next DEA-6. |
| 11:20AM | 22 | **BY MR. TRIPI:** |
| 11:20AM | 23 | Q. Is that the first time on a report that Mr. Bongiovanni's |
| 11:20AM | 24 | authoring in terms of a DEA-6 that Mr. Serio was indexed? |
| 11:20AM | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:20AM | 1 | Q.  Okay.  And I should say Thomas Serio, correct? |
| 11:20AM | 2 | A.  Thomas Serio, yes. |
| 11:20AM | 3 | **MR. TRIPI:**  Keep scrolling up.  Let's go to the next |
| 11:20AM | 4 | one. |
| 11:20AM | 5 | **BY MR. TRIPI:** |
| 11:20AM | 6 | Q.  Now we're looking at June 18th, 2013, surveillance DEA-6 |
| 11:20AM | 7 | authored by Defendant Bongiovanni.  We're at Exhibit 8A at |
| 11:20AM | 8 | page 12; is that right? |
| 11:20AM | 9 | A.  Yes. |
| 11:20AM | 10 | Q.  Who's the author of this report? |
| 11:20AM | 11 | A.  Joseph Bongiovanni. |
| 11:20AM | 12 | Q.  And what did he write for Thomas Serio's NADDIS number? |
| 11:21AM | 13 | A.  That it was pending. |
| 11:21AM | 14 | Q.  But we know from Nastoff's report there was a NADDIS |
| 11:21AM | 15 | number back in February of 2013; is that right? |
| 11:21AM | 16 | A.  Yes. |
| 11:21AM | 17 | **MR. TRIPI:**  Let's go to the next DEA-6 in the file. |
| 11:21AM | 18 | **BY MR. TRIPI:** |
| 11:21AM | 19 | Q.  Is this a DEA-6 authored by the defendant September 11th, |
| 11:21AM | 20 | 2013? |
| 11:21AM | 21 | A.  Yes. |
| 11:21AM | 22 | Q.  We're looking at Exhibit 8A at page 11; is that right? |
| 11:21AM | 23 | A.  Yes. |
| 11:21AM | 24 | Q.  What did he write for Thomas Serio's NADDIS number here? |
| 11:21AM | 25 | A.  Pending. |

11:21AM  1  Q.  But again, there was one back in February already,

11:21AM  2  correct?

11:21AM  3  A.  Yes.

11:21AM  4      MR. TRIPI:  Let's go to Exhibit 8A, the next page up,

11:21AM  5  page 10.  Let's go to page 9, I'm sorry.

11:21AM  6      BY MR. TRIPI:

11:21AM  7  Q.  This is a DEA-6 case status written by Defendant

11:21AM  8  Bongiovanni on December 31st, 2013?

11:21AM  9  A.  Yes.

11:21AM  10  Q.  And we're looking at Exhibit 8A at page 9 now, right?

11:21AM  11  A.  Yes.

11:21AM  12  Q.  Is Thomas Serio referenced anywhere in the indexing?

11:22AM  13  A.  No.

11:22AM  14      MR. TRIPI:  Let's go to the next DEA-6 in the file.

11:22AM  15  Let's go to the first page of it.  We're looking now at

11:22AM  16  Exhibit 8A at page 7.

11:22AM  17      BY MR. TRIPI:

11:22AM  18  Q.  Is this a status update, excuse me, written by the

11:22AM  19  defendant April 7th, 2014?

11:22AM  20  A.  Yes.

11:22AM  21  Q.  We're at Exhibit 8A at page 7.  Does it reference Thomas

11:22AM  22  Serio at all --

11:22AM  23  A.  No.

11:22AM  24  Q.  -- in the indexing?

11:22AM  25  A.  No, it does not.

| | | |
|---|---|---|
| 11:22AM | 1 | **MR. TRIPI:**  Let's go to Exhibit 8A at page 6. |
| 11:22AM | 2 | **BY MR. TRIPI:** |
| 11:22AM | 3 | Q.  Is this another case status written by the defendant, |
| 11:22AM | 4 | this one's July 7th, 2014? |
| 11:22AM | 5 | A.  Yes. |
| 11:22AM | 6 | Q.  Again, this is in file C2-13-0026, correct? |
| 11:22AM | 7 | A.  Yes. |
| 11:22AM | 8 | Q.  Does the indexing reference Tom Serio at all? |
| 11:22AM | 9 | A.  No. |
| 11:22AM | 10 | **MR. TRIPI:**  Let's go to the next DEA-6 in the file. |
| 11:22AM | 11 | **BY MR. TRIPI:** |
| 11:22AM | 12 | Q.  Is this another case status authored by the defendant, |
| 11:23AM | 13 | this one November 4th, 2014? |
| 11:23AM | 14 | A.  Yes. |
| 11:23AM | 15 | Q.  And we're at Exhibit 8A at page 5; is that right? |
| 11:23AM | 16 | A.  Yes. |
| 11:23AM | 17 | Q.  Does he index Thomas Serio at all? |
| 11:23AM | 18 | A.  No. |
| 11:23AM | 19 | **MR. TRIPI:**  And let's go to the final one in the |
| 11:23AM | 20 | file. |
| 11:23AM | 21 | **BY MR. TRIPI:** |
| 11:23AM | 22 | Q.  Looking at this, is this a case closing DEA-6 authored by |
| 11:23AM | 23 | the defendant, January 28th, 2015? |
| 11:23AM | 24 | A.  Yes. |
| 11:23AM | 25 | Q.  In this one, does he index either Ron Serio or Tom Serio? |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 11:23AM | 1 | A.  No. |
| 11:23AM | 2 | **THE COURT:**  Is this page 4? |
| 11:23AM | 3 | **MR. TRIPI:**  Yes, Exhibit 8A, page 4.  Thank you, |
| 11:23AM | 4 | Your Honor. |
| 11:23AM | 5 | We can zoom out of that, close that down, |
| 11:23AM | 6 | Ms. Champoux.  Now, let's go back to Exhibit 100A.1. |
| 11:24AM | 7 | **BY MR. TRIPI:** |
| 11:24AM | 8 | Q.  You've reviewed the DARTS deconflictions that are -- that |
| 11:24AM | 9 | are scanned in this exhibit; is that correct? |
| 11:24AM | 10 | A.  Yes. |
| 11:24AM | 11 | Q.  For the DARTS deconflictions regarding -- that relate to |
| 11:24AM | 12 | Thomas Serio, Ronald Serio, do those DARTS deconflictions |
| 11:24AM | 13 | indicate that there were no -- their phones were not being |
| 11:24AM | 14 | intercepted by any wiretaps? |
| 11:24AM | 15 | A.  Yes. |
| 11:24AM | 16 | Q.  As a result, any subordinates that were in touch with |
| 11:24AM | 17 | them on those phones would not be intercepted on any |
| 11:24AM | 18 | intercepts of Thomas or Ronald Serio's phones, correct? |
| 11:24AM | 19 | A.  Correct. |
| 11:24AM | 20 | **MR. TRIPI:**  Ms. Champoux, if we can go -- there's a |
| 11:24AM | 21 | PDF labeled DARTS email 01-07-2019.  Can you find that?  Thank |
| 11:24AM | 22 | you. |
| 11:24AM | 23 | **BY MR. TRIPI:** |
| 11:24AM | 24 | Q.  We've had testimony about this, but DARTS deconflictions |
| 11:25AM | 25 | are automatic email notices; is that right? |

11:25AM  1   A.  Yes.

11:25AM  2   Q.  In order for an email to make its way to a file folder

11:25AM  3   like Exhibit 100A, what steps need to occur for a DARTS email

11:25AM  4   to make it into a file folder like this?

11:25AM  5   A.  You would have to print it.

11:25AM  6   Q.  Then what?

11:25AM  7   A.  And then, well, I mean, where we found that, take it

11:25AM  8   home.

11:25AM  9   Q.  Put it in the file?

11:25AM  10  A.  Put it in the file, take it home.

11:25AM  11  Q.  And is this a DARTS deconfliction email that the

11:25AM  12  defendant received among others on January 7th, 2019?

11:25AM  13  A.  Yes.

11:25AM  14  Q.  And do you see where it says an investigative overlap was

11:25AM  15  created by?

11:25AM  16  A.  Yes.

11:25AM  17  Q.  Can you explain for jury what that means?

11:25AM  18  A.  It means that Special Agent Casullo and Shawn Hoerner,

11:26AM  19  who was an analyst, entered something that overlapped with a

11:26AM  20  file or entered a telephone number that overlapped with, or

11:26AM  21  excuse me, it was in common with numbers that the other

11:26AM  22  people who had entered or received this email entered

11:26AM  23  previously.

11:26AM  24  Q.  So, this is a -- this is a notification, this is an

11:26AM  25  example of the deconfliction database at work?

11:26AM   1   A.  Yes.

11:26AM   2   Q.  So some -- and a phone number, Special Agent Casullo was

11:26AM   3   investigating intersected with a phone number that

11:26AM   4   Mr. Bongiovanni had caused to be put in DARTS?

11:26AM   5   A.  Yes.

11:26AM   6        MR. TRIPI:  Ms. Champoux, this is only seven pages.

11:26AM   7   Can we scroll down, please?

11:26AM   8        Okay.  Stop there.

11:26AM   9        BY MR. TRIPI:

11:26AM   10  Q.  So, we have Trinity item 1.  We've heard some testimony

11:26AM   11  about what that means, but can you remind the jury what that

11:27AM   12  is?

11:27AM   13  A.  Telephone number that was entered.

11:27AM   14  Q.  Okay.  So this is the phone number that was entered --

11:27AM   15  A.  Yes.

11:27AM   16  Q.  -- right?

11:27AM   17     And the remarks section under priority 3, that first one

11:27AM   18  across, you got the request January 7, 2019.  Does that

11:27AM   19  indicate that was the same date as the -- date as the top of

11:27AM   20  the email, correct?

11:27AM   21  A.  Yes.

11:27AM   22  Q.  Does that indicate that that's the entry that caused this

11:27AM   23  overlap?

11:27AM   24  A.  Yes.

11:27AM   25  Q.  And it gives you the case number.  And who was the

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

66

| | | |
|---|---|---|
| 11:27AM | 1 | request run by? |
| 11:27AM | 2 | A.  Special Agent Casullo and Shawn Hoerner. |
| 11:27AM | 3 | Q.  And what was the remark? |
| 11:27AM | 4 | A.  From numbers in contact with Mike Sinatra related to a |
| 11:27AM | 5 | burglary and drug trafficking in Buffalo and Niagara County. |
| 11:27AM | 6 | Q.  And then there's another entry related to that same file |
| 11:27AM | 7 | number a couple days -- with a different request date; do you |
| 11:28AM | 8 | see that? |
| 11:28AM | 9 | A.  Are you talking about the next one down? |
| 11:28AM | 10 | Q.  No, the one below that. |
| 11:28AM | 11 | A.  Two down?  From January 3rd? |
| 11:28AM | 12 | Q.  Yeah. |
| 11:28AM | 13 | A.  Yes. |
| 11:28AM | 14 | Q.  And was that also ran by Special Agent Casullo? |
| 11:28AM | 15 | A.  Yes. |
| 11:28AM | 16 | Q.  What were the remarks he put in there? |
| 11:28AM | 17 | A.  Numbers related to ongoing investigation in Tonawanda, |
| 11:28AM | 18 | New York, and worked jointly with HSI Buffalo.  Information |
| 11:28AM | 19 | provided by TTPD Detective Campanella. |
| 11:28AM | 20 | **MR. TRIPI:**  Let's scroll down. |
| 11:28AM | 21 | **BY MR. TRIPI:** |
| 11:28AM | 22 | Q.  We have another Trinity item here; is that right? |
| 11:28AM | 23 | A.  Yes. |
| 11:28AM | 24 | **MR. TRIPI:**  Can we go -- can we go down to Trinity |
| 11:28AM | 25 | item 1? |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 11:28AM | 1 | **BY MR. TRIPI:** |
| 11:28AM | 2 | Q.  With the phone number 716-866-2687, is that another |
| 11:28AM | 3 | request run January 7th, 2019, by Special Agent Casullo? |
| 11:28AM | 4 | A.  Yes. |
| 11:28AM | 5 | Q.  And he put some remarks in there? |
| 11:28AM | 6 | A.  Yes. |
| 11:28AM | 7 | Q.  Does that mean that according to what Casullo wrote, does |
| 11:29AM | 8 | that mean that this phone number, 866-2687, was a phone |
| 11:29AM | 9 | number in contact with Michael Sinatra? |
| 11:29AM | 10 | A.  Yes. |
| 11:29AM | 11 | Q.  And did Bongiovanni receive notice of that based upon |
| 11:29AM | 12 | something that he did in terms of a subpoena in 13-0026, the |
| 11:29AM | 13 | Wayne Anderson/Ron Serio file? |
| 11:29AM | 14 | A.  Yes. |
| 11:29AM | 15 | Q.  And in the remarks for that entry, what -- what did the |
| 11:29AM | 16 | analyst write, per Special Agent Bongiovanni? |
| 11:29AM | 17 | A.  Number part of ongoing narcotics investigation in contact |
| 11:29AM | 18 | with target number 716-830-3226. |
| 11:29AM | 19 | Q.  And through a review of the other DARTS entries in this |
| 11:29AM | 20 | file folder and the case, is that 830-3226 number, was that a |
| 11:29AM | 21 | phone number associated with Ron Serio? |
| 11:29AM | 22 | A.  Yes. |
| 11:30AM | 23 | Q.  Did your mic go out again? |
| 11:30AM | 24 | A.  It did, yes. |
| 11:30AM | 25 | Q.  All right. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9711/24

68

| | |
|---|---|
| 11:30AM | 1 |
| 11:30AM | 2 |
| 11:30AM | 3 |
| 11:30AM | 4 |

11:30AM    1        **MR. TRIPI:**  Ms. Champoux, I'd like you to go back to

11:30AM    2    Exhibit 8A, at page 347, so we can see whose phone number is

11:30AM    3    716 -- hang on one second, let me finish, sorry -- so we can

11:30AM    4    see who phone number 866-2687 belongs to.

11:30AM    5        All right.  Now we can go to Exhibit 8A at 347.

11:30AM    6        **BY MR. TRIPI:**

11:30AM    7    Q.  So whose phone number is that?

11:30AM    8    A.  Paul Francoforte.

11:30AM    9        **MR. TRIPI:**  Ms. Champoux, can you put up this

11:30AM   10    Exhibit 393 again?

11:30AM   11        **BY MR. TRIPI:**

11:30AM   12    Q.  Is that the person with his hand on Todaro Sr.'s

11:30AM   13    shoulder --

11:30AM   14    A.  Yes.

11:30AM   15    Q.  -- in Exhibit 393?  I should make a better record.

11:31AM   16    A.  Yes.

11:31AM   17        **MR. TRIPI:**  We can take 393 down, Ms. Champoux.

11:31AM   18        And could we go back to Exhibit 100A.1?

11:31AM   19        **BY MR. TRIPI:**

11:31AM   20    Q.  As part of the work that he originally was doing for

11:31AM   21    Mr. Bongiovanni as it related to Ron Serio, did Scott Deming

11:31AM   22    provide various financial spreadsheets to Mr. Bongiovanni in

11:31AM   23    that initial investigation?

11:31AM   24    A.  Yes.

11:31AM   25        **MR. TRIPI:**  Ms. Champoux, can you go to a PDF called

11:31AM    1    financial spreadsheet?  Thank you.  Can we open that up in

11:31AM    2    Exhibit 100A.1?

11:31AM    3            **BY MR. TRIPI:**

11:31AM    4    Q.  Now, it's 158 pages, but do you see on page 1 there's an

11:31AM    5    entry for Ronald Serio memo-loan?

11:31AM    6    A.  Yes.

11:32AM    7            **MR. TRIPI:**  Ms. Champoux, kind of just scroll

11:32AM    8    through, I'm going to ask some questions as we go.  Keep

11:32AM    9    going.

11:32AM    10            **BY MR. TRIPI:**

11:32AM    11    Q.  Have you looked at this document before?

11:32AM    12    A.  Yes.

11:32AM    13    Q.  Do you recognize this to be financial work that Scott

11:32AM    14    Deming did in the original Serio case file?

11:32AM    15    A.  Yes.  This -- it's part of a spreadsheet that's wider

11:32AM    16    than the page it was printed on, so this is probably the

11:32AM    17    far-right column of, you know, a spreadsheet of data.

11:32AM    18    Q.  And this was, again, to be clear, found in the

11:32AM    19    defendant's basement?

11:32AM    20    A.  Yes.

11:32AM    21            **MR. TRIPI:**  We can get out of there, Ms. Champoux.

11:32AM    22            Can we go to the next PDF I want to look at, it's

11:32AM    23    labeled FTR-2117.  Scroll down a little bit.  Withdrawn.

11:32AM    24            Scroll back up to the top.

           25

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

70

| | | |
|---|---|---|
| 11:32AM | 1 | **BY MR. TRIPI:** |
| 11:32AM | 2 | Q.  Did we see who ran this information from the document |
| 11:32AM | 3 | here? |
| 11:32AM | 4 | A.  Yes.  It says Joseph Bongiovanni. |
| 11:33AM | 5 | Q.  And what is this type of record? |
| 11:33AM | 6 | A.  Could you scroll down a little bit?  It looks like |
| 11:33AM | 7 | vehicle registration check. |
| 11:33AM | 8 | Q.  And so, who -- |
| 11:33AM | 9 | **MR. TRIPI:**  Let's stop there. |
| 11:33AM | 10 | **BY MR. TRIPI:** |
| 11:33AM | 11 | Q.  Who was Mr. Bongiovanni running a vehicle registration |
| 11:33AM | 12 | check on? |
| 11:33AM | 13 | A.  So, it looks like he was trying to identify the |
| 11:33AM | 14 | registered owner of a plate that's maybe off the top of the |
| 11:33AM | 15 | screen. |
| 11:33AM | 16 | Q.  Look at "registered to" at the top of the page. |
| 11:33AM | 17 | A.  Yeah, but the plate that he ran was registered to Louis |
| 11:33AM | 18 | Selva. |
| 11:33AM | 19 | Q.  Okay.  That's the person who you understood to be his |
| 11:33AM | 20 | best friend, correct? |
| 11:33AM | 21 | A.  Yes. |
| 11:33AM | 22 | **MR. TRIPI:**  Let's go back to the top of the page. |
| 11:33AM | 23 | **BY MR. TRIPI:** |
| 11:33AM | 24 | Q.  When did he run this? |
| 11:33AM | 25 | A.  May 22nd, 2013. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

11:34AM  1       **MR. TRIPI:**  Okay.  We can get out of that document.

11:34AM  2  Next, I'd like to go to PDF labeled SafetyNet, please.

11:34AM  3           SafetyNet submission.

11:34AM  4       **BY MR. TRIPI:**

11:34AM  5  Q.  Now, this is a six-page scan, but have you since

11:34AM  6  ascertained that the first page doesn't relate to the other

11:34AM  7  pages in this particular PDF scan?

11:34AM  8  A.  Yes.

11:34AM  9       **MR. TRIPI:**  Okay.  Let's go to the second page,

11:34AM 10  Ms. Champoux.  Okay.  Stop there.

11:34AM 11       **BY MR. TRIPI:**

11:34AM 12  Q.  What -- what is this document?

11:34AM 13  A.  It's a form to submit a name to SafetyNet that notifies

11:34AM 14  every user of SafetyNet that, in this case, DEA is

11:34AM 15  investigating.

11:34AM 16  Q.  We'll get into the names in a minute, but it's a state

11:34AM 17  deconfliction database?

11:34AM 18  A.  Yes.

11:34AM 19  Q.  Is it maintained by New York State?

11:34AM 20  A.  Yes.

11:35AM 21  Q.  And what was the date of this fax submission?

11:35AM 22  A.  January 4th.

11:35AM 23       **MR. TRIPI:**  Okay.  Let's scroll down.

11:35AM 24       **THE WITNESS:**  According to the fax machine.

25

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

11:35AM  1              **BY MR. TRIPI:**

11:35AM  2  Q.  2013?  2013?

11:35AM  3  A.  Yes.

11:35AM  4              **MR. TRIPI:**  Okay.  Scroll down, please.

11:35AM  5              **BY MR. TRIPI:**

11:35AM  6  Q.  And who does the -- the entry on page 2 indicate was the

11:35AM  7  investigator?

11:35AM  8  A.  Joseph Bongiovanni.

11:35AM  9              **MR. TRIPI:**  And scroll down a little bit, please.

11:35AM  10             **BY MR. TRIPI:**

11:35AM  11 Q.  And who was the individual that he was submitting into

11:35AM  12 SafetyNet?

11:35AM  13 A.  Thomas Serio.

11:35AM  14             **MR. TRIPI:**  And let's go to page 3, please.

11:35AM  15             **BY MR. TRIPI:**

11:35AM  16 Q.  Who was the -- is this also, the investigator is

11:35AM  17 Mr. Bongiovanni?

11:35AM  18 A.  Yes.

11:35AM  19 Q.  Does he list his DEA cell phone number there?

11:35AM  20 A.  Yes.

11:35AM  21 Q.  And what's that number, just for record purposes?

11:35AM  22 A.  716-818-0966.

11:36AM  23             **MR. TRIPI:**  And can we scroll down?

11:36AM  24             **BY MR. TRIPI:**

11:36AM  25 Q.  Did he leave the case blank on that particular

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24
73

| | | |
|---|---|---|
| 11:36AM | 1 | submission? |
| 11:36AM | 2 | A.  Can we scroll back to it? |
| 11:36AM | 3 | **MR. TRIPI:**  No.  Stay there.  Move up a little bit, |
| 11:36AM | 4 | Ms. Champoux. |
| 11:36AM | 5 | All right.  Scroll down a page, I apologize.  I said |
| 11:36AM | 6 | up, I meant down. |
| 11:36AM | 7 | **BY MR. TRIPI:** |
| 11:36AM | 8 | Q.  See the case number? |
| 11:36AM | 9 | A.  Yes.  It's blank. |
| 11:36AM | 10 | Q.  Okay. |
| 11:36AM | 11 | **MR. TRIPI:**  Keep scrolling down the page. |
| 11:36AM | 12 | **BY MR. TRIPI:** |
| 11:36AM | 13 | Q.  And who's -- who did he submit in this particular entry? |
| 11:36AM | 14 | A.  David Oddo. |
| 11:36AM | 15 | **MR. TRIPI:**  And let's go next to page 4. |
| 11:36AM | 16 | **BY MR. TRIPI:** |
| 11:36AM | 17 | Q.  And again, is the agent Mr. Bongiovanni? |
| 11:36AM | 18 | A.  Yes. |
| 11:36AM | 19 | **MR. TRIPI:**  Can we scroll down to see who he |
| 11:36AM | 20 | submitted, please? |
| 11:36AM | 21 | **BY MR. TRIPI:** |
| 11:36AM | 22 | Q.  Now, is that the wrong file number for C2-0026? |
| 11:37AM | 23 | A.  Yes. |
| 11:37AM | 24 | Q.  The actual case file was 13; is that right? |
| 11:37AM | 25 | A.  Yes. |

11:37AM    1    Q.  But Mr. Bongiovanni is the point of contact for this?

11:37AM    2    A.  Yes.

11:37AM    3    Q.  And who did he enter on this page?

11:37AM    4    A.  Ronald Serio.

11:37AM    5    Q.  And what address did he put into SafetyNet as being one

11:37AM    6    he wanted to get notice of if someone was investigating the

11:37AM    7    address?

11:37AM    8    A.  697 Lebrun in Buffalo.

11:37AM    9    Q.  And that's the purpose of SafetyNet, right?  If you have

11:37AM    10   an investigative interest in the same person, property,

11:37AM    11   location, or vehicle, it allows for agents to deconflict and

11:37AM    12   communicate; is that right?

11:37AM    13   A.  Yes.

11:37AM    14   Q.  Now in C2-13-0026, did you see any surveillances or any

11:37AM    15   investigative action that this defendant took at 697 Lebrun?

11:37AM    16   A.  No.

11:37AM    17   Q.  And do you know that to be Ron Serio's mansion?

11:37AM    18   A.  Yes.

11:38AM    19           **MR. TRIPI:**  Can we scroll down?

11:38AM    20           **BY MR. TRIPI:**

11:38AM    21   Q.  Did -- on Mr. Serio, did he also put in a vehicle

11:38AM    22   description?

11:38AM    23   A.  Yes.

11:38AM    24   Q.  And was that a 2007 Maserati?

11:38AM    25   A.  Yes.

11:38AM    1    Q.  Do you know of any investigative action that

11:38AM    2    Mr. Bongiovanni took that is documented in the file towards

11:38AM    3    this Maserati?

11:38AM    4    A.  I don't.

11:38AM    5    Q.  How about towards Mr. Serio's Range Rover?

11:38AM    6    A.  No, I don't.

11:38AM    7    Q.  No?

11:38AM    8    A.  No.

11:38AM    9    Q.  Okay.

11:38AM   10         MR. TRIPI:  We can exit out of that one,

11:38AM   11    Ms. Champoux, thank you.

11:38AM   12         Can we scroll down more?  All right.  Can you click

11:38AM   13    on Tripi O-C-D-E-T-F proposal?

11:39AM   14         BY MR. TRIPI:

11:39AM   15    Q.  Again, all these documents were found in the defendant's

11:39AM   16    basement; is that right?

11:39AM   17    A.  Yes.

11:39AM   18    Q.  Are you familiar with an OCDETF investigation initiation

11:39AM   19    form?

11:39AM   20    A.  Yes.

11:39AM   21    Q.  Tell the jury, we've heard a little bit about it, but

11:39AM   22    it's been a while.  Tell the jury what that is.

11:39AM   23    A.  So, it's a two-part form worksheet where you fill in

11:39AM   24    targets, and there's a series of questions about what kind of

11:39AM   25    activity the targets are engaged in, where they're engaged in

11:39AM   1   that activity geographically.

11:39AM   2       And then there's a second narrative portion where you

11:39AM   3   write a narrative description of the organization that you're

11:39AM   4   proposing to investigate.

11:39AM   5   Q.  Are all these documents we've been looking at law

11:39AM   6   enforcement sensitive?

11:39AM   7   A.  Yes.

11:39AM   8   Q.  Is an OCDETF, Drug Enforcement Task Force investigation

11:39AM   9   initiation form, a particularly sensitive document?

11:39AM  10   A.  Yes.

11:39AM  11   Q.  Does it provide details of investigations that are larger

11:40AM  12   in scope?

11:40AM  13   A.  Yes.

11:40AM  14           MR. TRIPI:  Scroll down this page.

11:40AM  15           BY MR. TRIPI:

11:40AM  16   Q.  Does each -- now, do you see there's an OCDETF

11:40AM  17   investigation number.  Would a completed form, a complete

11:40AM  18   form, have that full number filled in?

11:40AM  19   A.  Yes.

11:40AM  20   Q.  Does that indicate this is a draft?

11:40AM  21   A.  Yes.

11:40AM  22   Q.  The fact that it's empty?

11:40AM  23   A.  Yes, it hasn't been reviewed by the regional board, so it

11:40AM  24   doesn't have a number.

11:40AM  25   Q.  And does every operation get a name?

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 11:40AM | 1 | A.  Yes. |
| 11:40AM | 2 | Q.  And this particular draft form, what was the operation |
| 11:40AM | 3 | name? |
| 11:40AM | 4 | A.  Past Due. |
| 11:40AM | 5 | Q.  Okay.  Who was the case attorney? |
| 11:40AM | 6 | A.  Timothy Lynch. |
| 11:40AM | 7 | Q.  And as you understood it for a time, he was the chief of |
| 11:40AM | 8 | narcotics at the U.S. Attorney's Office? |
| 11:40AM | 9 | A.  Yes. |
| 11:40AM | 10 | Q.  Does it have the case agents listed? |
| 11:41AM | 11 | A.  Yes. |
| 11:41AM | 12 | Q.  Excuse me? |
| 11:41AM | 13 | A.  Yes. |
| 11:41AM | 14 | Q.  Do you know Chris Clark? |
| 11:41AM | 15 | A.  I do. |
| 11:41AM | 16 | Q.  Is he a task force officer with the DEA? |
| 11:41AM | 17 | A.  Yes, a Niagara Falls detective. |
| 11:41AM | 18 | Q.  Okay.  So, he's based out of Niagara Falls? |
| 11:41AM | 19 | A.  Yes. |
| 11:41AM | 20 | Q.  And then Dave Turri, is he an IRS agent? |
| 11:41AM | 21 | A.  Yes. |
| 11:41AM | 22 | Q.  And Jason Bernhard, is he an ATF agent? |
| 11:41AM | 23 | A.  I don't know Jason. |
| 11:41AM | 24 | Q.  He's listed as ATF though? |
| 11:41AM | 25 | A.  He is. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

| | | |
|---|---|---|
| 11:41AM | 1 | MR. TRIPI:  Can we please scroll down? |
| 11:41AM | 2 | BY MR. TRIPI: |
| 11:41AM | 3 | Q.  And in bold capital letters, what does it say at the |
| 11:41AM | 4 | bottom of that first page? |
| 11:41AM | 5 | A.  Law enforcement sensitive. |
| 11:41AM | 6 | MR. TRIPI:  Okay.  Please scroll down.  And stop |
| 11:41AM | 7 | there. |
| 11:41AM | 8 | BY MR. TRIPI: |
| 11:41AM | 9 | Q.  At the very bottom of the page, can you read what it says |
| 11:41AM | 10 | there? |
| 11:41AM | 11 | A.  The attached information must be protected and not |
| 11:41AM | 12 | released to unauthorized individuals. |
| 11:41AM | 13 | MR. TRIPI:  Can we scroll down further? |
| 11:41AM | 14 | BY MR. TRIPI: |
| 11:41AM | 15 | Q.  Again, now we're on page 2 of this particular PDF.  The |
| 11:42AM | 16 | number for this proposal is not filled in, correct? |
| 11:42AM | 17 | A.  Correct. |
| 11:42AM | 18 | MR. TRIPI:  If we can scroll down further. |
| 11:42AM | 19 | BY MR. TRIPI: |
| 11:42AM | 20 | Q.  Does this have an indication of the targets of Task Force |
| 11:42AM | 21 | Officer Clark's investigation? |
| 11:42AM | 22 | A.  Yes. |
| 11:42AM | 23 | Q.  And the number one person on the list, what's that |
| 11:42AM | 24 | person's name? |
| 11:42AM | 25 | A.  Frank Tripi. |

| | | |
|---|---|---|
| 11:42AM | 1 | Q. And who's the second person on the list? |
| 11:42AM | 2 | A. Lawrence Panaro. |
| 11:42AM | 3 | Q. And are there a number of other people, as well? |
| 11:42AM | 4 | A. Yes, 11 total. |
| 11:42AM | 5 | Q. Is this a document that's supposed to be kept in a secure |
| 11:42AM | 6 | space? |
| 11:42AM | 7 | A. Yes. |
| 11:42AM | 8 | Q. Is this a document that is supposed to leave the law |
| 11:42AM | 9 | enforcement agency's secure location? |
| 11:42AM | 10 | A. We could transport it from one law enforcement agency to |
| 11:42AM | 11 | another, but you would have to maintain custody of it and |
| 11:43AM | 12 | then when you're done with it, it should be kept in a secured |
| 11:43AM | 13 | space. |
| 11:43AM | 14 | Q. Sure. If you're bringing it to Tim Lynch to sign where |
| 11:43AM | 15 | he's supposed to sign on the document, you transport it, |
| 11:43AM | 16 | right? |
| 11:43AM | 17 | A. That's what I'm describing, yes. |
| 11:43AM | 18 | Q. And then you put it back in secure storage? |
| 11:43AM | 19 | A. Yes. |
| 11:43AM | 20 | Q. This is not a document you would take to your personal |
| 11:43AM | 21 | residence, correct? |
| 11:43AM | 22 | **MR. MacKAY:** Objection. |
| 11:43AM | 23 | **THE COURT:** Sorry? |
| 11:43AM | 24 | **MR. MacKAY:** Objection. |
| 11:43AM | 25 | **MR. TRIPI:** I'm asking him about -- |

| | | |
|---|---|---|
| 11:43AM | 1 | **THE COURT:**  Overruled. |
| 11:43AM | 2 | **BY MR. TRIPI:** |
| 11:43AM | 3 | Q.  Is this a document you would take to your personal |
| 11:43AM | 4 | residence? |
| 11:43AM | 5 | A.  No. |
| 11:43AM | 6 | Q.  Are there rules against removing it from secure space? |
| 11:43AM | 7 | A.  Yes.  It's a record.  And sensitive. |
| 11:43AM | 8 | Q.  Okay. |
| 11:43AM | 9 | **MR. TRIPI:**  Please scroll down, Ms. Champoux.  Let's |
| 11:43AM | 10 | go to page 3. |
| 11:43AM | 11 | **BY MR. TRIPI:** |
| 11:43AM | 12 | Q.  Just generally, does page 3 tell you the different |
| 11:43AM | 13 | agencies involved in the investigation? |
| 11:43AM | 14 | A.  Yes. |
| 11:43AM | 15 | Q.  And that's indicated by the Xs marked next to those |
| 11:43AM | 16 | various agencies? |
| 11:43AM | 17 | A.  Yes. |
| 11:43AM | 18 | Q.  And, so, you mentioned earlier that Chris Clark is a |
| 11:43AM | 19 | Niagara Falls police detective assigned to DEA as a task |
| 11:44AM | 20 | force officer? |
| 11:44AM | 21 | A.  Yes. |
| 11:44AM | 22 | Q.  So, Niagara Falls police is checked on the box? |
| 11:44AM | 23 | A.  Yes. |
| 11:44AM | 24 | **MR. TRIPI:**  Scroll down.  Let's go to the next page. |
| 11:44AM | 25 | Stop there, actually.  Sorry. |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

81

| | | |
|---|---|---|
| 11:44AM | 1 | **BY MR. TRIPI:** |
| 11:44AM | 2 | Q.  And these boxes at the bottom relate to funding? |
| 11:44AM | 3 | A.  Yes. |
| 11:44AM | 4 | Q.  Is that part of what happens in an OCDETF case that opens |
| 11:44AM | 5 | up additional funding? |
| 11:44AM | 6 | A.  Yes. |
| 11:44AM | 7 | **MR. TRIPI:**  Please scroll down.  Stop there. |
| 11:44AM | 8 | **BY MR. TRIPI:** |
| 11:44AM | 9 | Q.  Does this portion of the form indicate the different |
| 11:44AM | 10 | districts, states, and countries that investigators believe |
| 11:44AM | 11 | the criminal activity is linked to? |
| 11:44AM | 12 | A.  Yes. |
| 11:44AM | 13 | Q.  And on this form, what country is linked? |
| 11:44AM | 14 | A.  Canada. |
| 11:44AM | 15 | Q.  Now, in your case, when you were initially proffering |
| 11:45AM | 16 | Mr. Serio, his supplier, Jarrett Guy, was based out of |
| 11:45AM | 17 | Canada; is that right? |
| 11:45AM | 18 | A.  Yes. |
| 11:45AM | 19 | Q.  You're also familiar with California being a place that |
| 11:45AM | 20 | had legalized marijuana much earlier than New York State; is |
| 11:45AM | 21 | that right? |
| 11:45AM | 22 | A.  Yes. |
| 11:45AM | 23 | Q.  Did a lot of cases over the years, once California |
| 11:45AM | 24 | legalized, did a lot of people get involved transporting |
| 11:45AM | 25 | cross country large marijuana loads? |

USA v Bongiovanni - Ryan - Tripi/Direct - 9/11/24

11:45AM    1    A.   Yes.

11:45AM    2    Q.   From places like California?

11:45AM    3    A.   California.  And then Oregon once Oregon legalized.

11:45AM    4    Q.   Okay.  And we also have an indication of Nevada here?

11:45AM    5    A.   Yes.

11:45AM    6         MR. TRIPI:  If we can go down further.

11:45AM    7         BY MR. TRIPI:

11:45AM    8    Q.   Here the Task Force Officer Clark indicated the different

11:45AM    9    types of drugs he believed would be involved in this case; is

11:45AM   10    that right?

11:46AM   11    A.   Yes.

11:46AM   12    Q.   And what are drugs he checked?

11:46AM   13    A.   Cocaine, heroin, marijuana.

11:46AM   14    Q.   And did he indicate he believed there would be money

11:46AM   15    laundering involved in the case?

11:46AM   16    A.   Yes.

11:46AM   17    Q.   And what did he check for that?

11:46AM   18    A.   Bulk cash movement by air.  Oh.

11:46AM   19         MR. TRIPI:  You can keep on scrolling down.

11:46AM   20         BY MR. TRIPI:

11:46AM   21    Q.   And take a look, he checked several boxes of potential

11:46AM   22    money laundering, correct?

11:46AM   23    A.   He did.  Also, wire transfer, business fronts, casinos,

11:46AM   24    and property investments.

11:46AM   25         MR. TRIPI:  Okay scrolling down.

| | | |
|---|---|---|
| 11:46AM | 1 | **BY MR. TRIPI:** |
| 11:46AM | 2 | Q.  And then, we're at page 5 now.  It describes different |
| 11:46AM | 3 | types of law enforcement techniques that may be utilized? |
| 11:46AM | 4 | A.  Yes. |
| 11:46AM | 5 | Q.  And is that something that can evolve over time? |
| 11:46AM | 6 | A.  Yes. |
| 11:47AM | 7 | **MR. TRIPI:**  Keep scrolling down.  Go to the next |
| 11:47AM | 8 | page.  Let's go to page 6. |
| 11:47AM | 9 | **BY MR. TRIPI:** |
| 11:47AM | 10 | Q.  And just for the record, on every page, does it say law |
| 11:47AM | 11 | enforcement sensitive? |
| 11:47AM | 12 | A.  Yes, I think top and bottom. |
| 11:47AM | 13 | **MR. TRIPI:**  Keep scrolling down. |
| 11:47AM | 14 | **BY MR. TRIPI:** |
| 11:47AM | 15 | Q.  Now we're going past page 7, here's the signature lines, |
| 11:47AM | 16 | we see that nobody signed off on it yet; is that right? |
| 11:47AM | 17 | A.  Correct. |
| 11:47AM | 18 | Q.  Is that a further indication this is a draft? |
| 11:47AM | 19 | A.  Yes. |
| 11:47AM | 20 | **MR. TRIPI:**  Keep scrolling down. |
| 11:47AM | 21 | **BY MR. TRIPI:** |
| 11:47AM | 22 | Q.  Now we're at page 8.  Does this give a narrative that the |
| 11:47AM | 23 | case agent writes, in this particular matter Task Force |
| 11:47AM | 24 | Officer Clark, about the background of his investigation and |
| 11:47AM | 25 | the predication for making it an OCDETF case? |

11:47AM    1    A.  Yes.

11:47AM    2    Q.  And does this provide highly specific information about

11:48AM    3    what his investigation entails?

11:48AM    4    A.  Yes.

11:48AM    5         **MR. TRIPI:**  Lets scroll down a little bit,

11:48AM    6    Ms. Champoux.  Stop there.

11:48AM    7         Publishing it for the jury.  Just give me a moment,

11:48AM    8    Your Honor.

11:48AM    9         **BY MR. TRIPI:**

11:48AM   10    Q.  I'm not going to have you read it, I'm going to have the

11:48AM   11    jury take a look at it.

11:48AM   12         **MR. TRIPI:**  Ms. Champoux, can we bring the page down

11:48AM   13    a little bit?  Lets look at paragraphs C and D now.  We're

11:49AM   14    still on page 8 for record purposes of the Tripi OCDETF

11:49AM   15    proposal PDF.

11:49AM   16         **BY MR. TRIPI:**

11:49AM   17    Q.  We looked at Peter Gerace's phone contacts yesterday, was

11:49AM   18    there a contact for Frank Tripi in there?

11:49AM   19    A.  Yes.

11:49AM   20    Q.  Okay.

11:50AM   21         **MR. TRIPI:**  Let's scroll to the next page, page 9,

11:49AM   22    now, Ms. Champoux.

11:50AM   23         Bring it down a little bit further, Ms. Champoux, so

11:50AM   24    all of paragraph G is able to be read.  Thank you.

11:50AM   25         Let's scroll down a little bit further, Ms. Champoux.

11:51AM   1   We'll expose the rest of the page.  Let's go down to page 10.

11:51AM   2          BY MR. TRIPI:

11:51AM   3   Q.  They saw two names -- while they're reading that, they

11:51AM   4   saw two names on the list of targets; is that right?  The

11:51AM   5   first two names were Frank Tripi and Lawrence Panaro?

11:51AM   6   A.  Yes.

11:51AM   7   Q.  As far as the law enforcement that you -- the community

11:51AM   8   that you are a part of, were those -- those two names

11:51AM   9   believed to be associated in some way with Italian Organized

11:51AM  10   Crime, as far as you were concerned?

11:51AM  11   A.  Yes.

11:52AM  12          MR. TRIPI:  Scroll down a little bit further,

11:52AM  13   Ms. Champoux.

11:52AM  14          We can go to the next page, page 11.  Stop there.

11:52AM  15   All right.  Let's go all the way down to the bottom.

11:52AM  16          BY MR. TRIPI:

11:52AM  17   Q.  All right.  Was that a highly sensitive law enforcement

11:52AM  18   document that provided information of a sensitive nature

11:52AM  19   regarding targets that were operating -- believed to be

11:52AM  20   operating in multiple states and internationally?

11:52AM  21   A.  Yes.

11:52AM  22   Q.  Should a document like that ever be removed from secure

11:53AM  23   space?

11:53AM  24   A.  No.

11:53AM  25          MR. TRIPI:  One moment please, Your Honor.

11:53AM   1          I don't have any further direct examination,

11:53AM   2   Your Honor.

11:53AM   3          **THE COURT:**  Mr. MacKay, what's your thought?

11:53AM   4          **MR. MacKAY:**  I'm sorry?

11:53AM   5          **THE COURT:**  What's your thought?  Would you like to

11:53AM   6   break for lunch now and then come back at 1:30 and take the

11:53AM   7   witness out of order, then?

11:53AM   8          **MR. MacKAY:**  Yeah, why don't we do that, Judge.  That

11:53AM   9   makes it a little bit smoother.

11:53AM   10         **THE COURT:**  Okay.  So, we will -- we will break for

11:53AM   11  lunch now folks.  When we come back -- we'll break for an hour

11:54AM   12  and a half, when we come back at 1:30, we'll probably take

11:54AM   13  another witness out of order.  We're trying to streamline

11:54AM   14  things for you folks so that we don't have large gaps in the

11:54AM   15  testimony.  So, we're going to take a witness out of order,

11:54AM   16  and then come back for this witness's cross-examination.

11:54AM   17         So while you're gone, please remember, follow my

11:54AM   18  instructions about not communicating about the case, not using

11:54AM   19  tools of technology to research the case, or to communicate

11:54AM   20  about the case, and not read, or watch, or listen to any news

11:54AM   21  coverage, if there is any, while the trial is in progress.

11:54AM   22  And please don't make up your mind until the case has been

11:54AM   23  submitted to you for deliberations.

11:54AM   24         We'll see you back here at 1:30.  Thanks.

11:54AM   25         (Jury excused at 11:54 a.m.)

| 11:55AM | 1 | **THE COURT:**  Okay.  Anything we need to do? |
|---------|---|---|

11:55AM 1    **THE COURT:**  Okay.  Anything we need to do?

11:55AM 2    **MR. TRIPI:**  Just one thing, I'd like to make a record

11:55AM 3  of before we get into cross.  As you know, Judge, we ended

11:55AM 4  with sort of the Frank Tripi OCDETF proposal.  I had the FBI

11:55AM 5  interview Frank Tripi twice.  They generated reports.  I've

11:55AM 6  provided those reports to the defense.

11:55AM 7    Obviously, I'm paraphrasing.  Big takeaway is

11:55AM 8  essentially he did not confirm that Mr. Bongiovanni provided

11:55AM 9  him any information.  Again, paraphrasing.  They have the

11:55AM 10  information, they can call him if they want, but I want to

11:55AM 11  make a clear record that I provided those reports.

11:55AM 12    **MR. MacKAY:**  We got them, Judge.  We're aware.

11:55AM 13    **THE COURT:**  Okay.  Great.  Anything from you before

11:55AM 14  we break?

11:55AM 15    **MR. MacKAY:**  No, Your Honor.

11:55AM 16    **THE COURT:**  Okay.  We'll see you folks at 1:30.

11:55AM 17    **MR. MacKAY:**  Thank you for letting us break this up.

11:55AM 18    **THE COURT:**  No, no, no, I think it makes sense to do

11:55AM 19  that.

11:56AM 20    (Off the record at 11:56 a.m.)

02:57PM 21    (Witness taken out of order from 1:33 to 2:57 p.m.)

02:57PM 22    **THE COURT:**  Let's begin the cross of Mr. Ryan.

02:57PM 23    **MR. COOPER:**  And I appreciate the indulgence with

02:57PM 24  the --

02:57PM 25    **THE COURT:**  Oh, that's fine.

02:58PM    1    **C U R T I S   R Y A N,** having been previously duly called and

02:58PM    2    sworn, continued to testify as follows:

02:58PM    3            **THE COURT:**  I remind the witness he's still under

02:58PM    4    oath.

02:58PM    5            And, Mr. MacKay, you may begin.

02:58PM    6            **MR. MacKAY:**  Thank you, Judge.

02:58PM    7            Just for planning purposes did the Court intend to

02:58PM    8    take another afternoon break?  Or --

02:58PM    9            **THE COURT:**  Yeah, I think it's probably a good idea

02:58PM   10    to take one more break since we've been at it for a little bit

02:58PM   11    and we have a long way to go this afternoon.  Wherever is a

02:58PM   12    convenient spot to stop.

02:58PM   13            **MR. MacKAY:**  Okay.  Flag me when it's good.  Let me

02:58PM   14    get set up here.

02:58PM   15

02:58PM   16            **CROSS-EXAMINATION BY MR. MacKAY:**

02:58PM   17    Q.  Welcome back, Agent Ryan.  I will try to get you done so

02:58PM   18    you can get back to the crossroads of America tonight.

02:58PM   19    A.  Thank you.

02:58PM   20    Q.  So, let's start with the search at 85 Alder Place.

02:58PM   21    That's Mr. Bongiovanni's residence, correct?

02:58PM   22    A.  Yes.

02:58PM   23    Q.  Okay.  That's executed about 6:02 in the morning,

02:58PM   24    correct?

02:59PM   25    A.  Yes.

02:59PM    1    Q.  Battering rams used to break down the door, correct?

02:59PM    2    A.  I think so, but I was down the street.

02:59PM    3        **MR. MacKAY:**  Okay.  Can we show, Ms. Champoux,

02:59PM    4    Government Exhibit 103-1.

02:59PM    5        **BY MR. MacKAY:**

02:59PM    6    Q.  Okay.  That's the door as it looked that day of the raid

02:59PM    7    of the search warrant execution.

02:59PM    8    A.  Are you talking about the mark next to the handle?

02:59PM    9    Q.  Yes.

02:59PM   10    A.  Yes.

02:59PM   11    Q.  That's consistent with using a battering ram, correct?

02:59PM   12    A.  Yes.

02:59PM   13        **MR. MacKAY:**  You can take that down, Ms. Champoux,

02:59PM   14    thank you.

02:59PM   15        **BY MR. MacKAY:**

02:59PM   16    Q.  All right.  To your recollection, a flash-bang device is

02:59PM   17    used outside the residence to distract?

02:59PM   18    A.  I heard one, yes.

02:59PM   19    Q.  Okay.  I mean, you said you heard one, and you were down

02:59PM   20    the street, correct?

02:59PM   21    A.  I was a distance away, yes.

02:59PM   22    Q.  I mean, just so the jury understands, they're pretty

02:59PM   23    loud, correct?

02:59PM   24    A.  Yes.

02:59PM   25    Q.  All right.  And to your knowledge, Mr. Bongiovanni's

03:00PM 1   handcuffed when he's encountered immediately inside, correct?

03:00PM 2   A.  Yes.

03:00PM 3   Q.  Because by the time you encounter him, he's still in

03:00PM 4   handcuffs, correct?

03:00PM 5   A.  Yes.

03:00PM 6   Q.  And do you recall him, you first encounter him, was he

03:00PM 7   outside the residence at that point in time?

03:00PM 8   A.  No, inside.

03:00PM 9   Q.  Do you recall if he was brought outside and then brought

03:00PM 10  back in?

03:00PM 11  A.  My recollection is that he was inside.

03:00PM 12  Q.  So your first encounter with him, he's back inside,

03:00PM 13  correct?

03:00PM 14  A.  Yes.

03:00PM 15  Q.  Do you recall him wearing, like, boxers and a T-shirt at

03:00PM 16  the time?

03:00PM 17  A.  No, I recall basketball shorts.  Like, mesh shorts almost

03:00PM 18  knee length and a t-shirt.

03:00PM 19  Q.  A little bit more formal, but still, you know, what he

03:00PM 20  might have slept in, for example?

03:00PM 21  A.  He may have, but when you say boxer shorts, I'm thinking

03:00PM 22  underwear.  These were not.

03:00PM 23  Q.  So was I, but we've got the picture.

03:00PM 24  A.  Okay.

03:00PM 25  Q.  So while that's happening, the entry team is securing the

03:01PM    1    rest of the premises, correct?

03:01PM    2    A.  No, that's done before I get close to the house.

03:01PM    3    Q.  Okay.  I don't want to get the timeline mixed up.  Once

03:01PM    4    the entry team enters, they secure Mr. Bongiovanni, correct?

03:01PM    5    A.  Yes.

03:01PM    6    Q.  And then the procedure is they then clear and secure the

03:01PM    7    house, correct?

03:01PM    8    A.  Yes.

03:01PM    9    Q.  And then that had all occurred, and then you encounter

03:01PM    10   Mr. Bongiovanni, correct?

03:01PM    11   A.  Yes.

03:01PM    12   Q.  And over your years of experience, you've been part of a

03:01PM    13   number of these search warrant executions, correct?

03:01PM    14   A.  Yes.

03:01PM    15   Q.  Now, just as background, sometimes when these are

03:01PM    16   occurring, it's just a search warrant, correct?

03:01PM    17   A.  Yes.

03:01PM    18   Q.  Meaning, the intention is just to go to a location and

03:01PM    19   look for evidence, correct?

03:01PM    20   A.  Yes.

03:01PM    21   Q.  Other times, there can be an arrest warranted coupled

03:01PM    22   with that?

03:01PM    23   A.  Yes, sir.

03:01PM    24   Q.  Which means not only might they be searching for

03:01PM    25   evidence, but somebody's going to be arrested that day,

03:01PM    1    correct?

03:01PM    2    A.  Yes.

03:01PM    3    Q.  Okay.  Now, again, in your experience, you've done both,

03:02PM    4    search warrant execution and an arrest execution, correct?

03:02PM    5    A.  Yes.

03:02PM    6    Q.  And you told the jury when you encountered

03:02PM    7    Mr. Bongiovanni, he asked a couple times whether this was a

03:02PM    8    search warrant or an arrest warrant, correct?

03:02PM    9    A.  He did.

03:02PM    10   Q.  In your experience, in executing search and arrest

03:02PM    11   warrants, fair to say it's fairly common for people to ask,

03:02PM    12   you know, if it's clear they're being placed under arrest

03:02PM    13   about things like posting bail and stuff?

03:02PM    14   A.  Sometimes.

03:02PM    15   Q.  Right.  I mean, sometimes people will ask, like, you know

03:02PM    16   can I have an opportunity to secure my residence; fair to

03:02PM    17   say?

03:02PM    18   A.  I -- I guess.  In what sense though?  Secure it from

03:02PM    19   what?

03:02PM    20   Q.  Well, if they know they're not coming back that day,

03:02PM    21   correct?

03:02PM    22   A.  I mean, it's our responsibility to secure the residence

03:02PM    23   after a search warrant, so that's not consistent with my

03:02PM    24   experience.

03:02PM    25   Q.  Yeah, I mean, but have you heard people sometimes when

03:02PM   1   they're in the process of being arrested express concerns

03:03PM   2   about, like, please contact somebody, or something like that,

03:03PM   3   correct?

03:03PM   4   A.   Yes.  I mean, generally, the questions are about what's

03:03PM   5   happening and what's gonna happen next.

03:03PM   6   Q.   Right.  So in it's your experience that we've seen people

03:03PM   7   in these situations they tend to be a bit flustered, correct?

03:03PM   8   A.   Sometimes.

03:03PM   9   Q.   And they're asking what's happening currently?

03:03PM   10  A.   Yes, sir.

03:03PM   11  Q.   And then they're asking what's happening next, right?

03:03PM   12  A.   Yes.

03:03PM   13  Q.   Now, and all this will was done, and you had known that

03:03PM   14  previously in March of that year, about three months earlier,

03:03PM   15  Mr. Bongiovanni had voluntarily come in to the U.S.

03:03PM   16  Attorney's Office to sit down and talk with OIG inspectors,

03:03PM   17  correct?

03:03PM   18  A.   Yes.

03:03PM   19  Q.   Right.  So, you know, this -- back in March, there wasn't

03:03PM   20  any sort of search warrant execution or anything that took

03:03PM   21  place at his house, right?

03:03PM   22  A.   Yes, that's correct.

03:03PM   23  Q.   That was -- the March interview you did not attend,

03:03PM   24  correct?

03:03PM   25  A.   I did not.

03:03PM   1   Q.  But to your knowledge, that, you know, Mr. Bongiovanni

03:04PM   2   was contacted and voluntarily appeared at a location to give

03:04PM   3   an interview, correct?

03:04PM   4   A.  Yes.

03:04PM   5   Q.  Okay.  Okay.  So after your initial account, initial

03:04PM   6   encounter, ultimately, you sit down with Mr. Bongiovanni at a

03:04PM   7   dining room table, correct?

03:04PM   8   A.  Correct.

03:04PM   9   Q.  It's you and it's two other agents, correct?

03:04PM   10   A.  Yes.

03:04PM   11   Q.  It was you, it was Special Agent Carpenter, and Special

03:04PM   12   Agent Fusco, correct?

03:04PM   13   A.  That's correct.

03:04PM   14   Q.  And you drew the diagram of where everybody was seated,

03:04PM   15   but this is occurring at his dining room table, correct?

03:04PM   16   A.  Yes.

03:04PM   17   Q.  And was it when you sat him down, or was it before that

03:04PM   18   you had told him, you know, I'll take the cuffs off if you,

03:04PM   19   quote, unquote, behave?

03:04PM   20   A.  The phrase I always use is are you going to be a

03:05PM   21   gentleman?  So that's what I said.  And it's as we're sitting

03:05PM   22   down --

03:05PM   23   Q.  Okay.

03:05PM   24   A.  -- or within a minute of when we first sat down.

03:05PM   25   Q.  Okay.  And so you ask him that.  He tells you I'm going

03:05PM   1    to be a gentleman?

03:05PM   2    A.   Yes.  It's a way to gauge if somebody's amped up to the

03:05PM   3    point that I shouldn't take the cuffs off, and then also I

03:05PM   4    want to hear the answer as part of the assessment.

03:05PM   5        But he said that he would, and so I took his cuffs off.

03:05PM   6    Q.   Right.  That was my question.  He did that, and then you

03:05PM   7    started to chat with him at the dining room table, correct?

03:05PM   8    A.   Yes.

03:05PM   9    Q.   Now at the same time the house is being searched by other

03:05PM   10   agents, correct?

03:05PM   11   A.   For evidence, yes.

03:05PM   12   Q.   Right.  So initially they do sort of a cursory search to

03:05PM   13   clear the house.  At that point in time, though, while you're

03:05PM   14   talking to Mr. Bongiovanni, the more intensive sort of

03:05PM   15   evidence search is occurring, correct?

03:06PM   16   A.   Yes.

03:06PM   17   Q.   I think you showed on one of the pictures there's a big

03:06PM   18   black box near the kitchen island; do you remember that

03:06PM   19   picture?

03:06PM   20   A.   Yes.

03:06PM   21   Q.   So there's boxes like that that are being set up in the

03:06PM   22   residence, correct?

03:06PM   23   A.   Just that one, but yes.

03:06PM   24   Q.   Okay.  And the rooms in the house are being designated by

03:06PM   25   different search -- I don't want to call them teams, but

USA v Bongiovanni - Ryan - MacKay/Cross - 9711/24
96

03:06PM   1   people are sort of pairing off and searching various rooms in

03:06PM   2   the house, correct?

03:06PM   3   A.   Yes.

03:06PM   4   Q.   Okay.  And that's all, you know, while Mr. Bongiovanni is

03:06PM   5   talking to you, correct?

03:06PM   6   A.   Yes.

03:06PM   7   Q.   And at the same time, his wife is present, correct?

03:06PM   8   A.   She is.

03:06PM   9   Q.   And his stepson is present, correct?

03:06PM  10   A.   Initially, and then he went to school.

03:06PM  11   Q.   But he, to your knowledge, the stepson was there when the

03:06PM  12   search warrant was first executed, correct?

03:06PM  13   A.   He was, because he was still there when I got to the

03:06PM  14   house.

03:06PM  15   Q.   Okay.  Now, you conduct an interview with Mr. Bongiovanni

03:06PM  16   at his dining room table, correct?

03:07PM  17   A.   Yes.

03:07PM  18   Q.   You had a Smartphone with you at the time?

03:07PM  19   A.   I did.

03:07PM  20   Q.   You didn't record the interview in any fashion with the

03:07PM  21   Smartphone, correct?

03:07PM  22   A.   I did not.

03:07PM  23   Q.   And to your knowledge, though, this would have been the

03:07PM  24   second interview conducted directly with Mr. Bongiovanni in

03:07PM  25   the course of your investigation, correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 9711/24

03:07PM    1    A.  Yes.

03:07PM    2    Q.  The first one being the one in March, and now you're

03:07PM    3    getting to this one at his house?

03:07PM    4    A.  Yes.

03:07PM    5    Q.  It involves multiple federal agencies, correct?

03:07PM    6    A.  Yes.

03:07PM    7    Q.  Involved potential allegations of corruption, correct?

03:07PM    8    A.  Yes.

03:07PM    9    Q.  And you had previously reviewed some evidence related to

03:07PM   10    the Michael Sinatra burglary in Tonawanda, correct?

03:07PM   11    A.  Yes.

03:07PM   12    Q.  And you were aware that in that investigation, Michael

03:07PM   13    Sinatra was video and audio recorded interviewed, correct?

03:07PM   14    A.  I don't know if that's accurate, no.  I remember

03:07PM   15    reviewing the police reports.

03:08PM   16    Q.  Okay.  So you don't know -- you don't know whether he was

03:08PM   17    video and audio recorded when he was interviewed?

03:08PM   18    A.  I don't.

03:08PM   19    Q.  Okay.  But when you did this interview, you walked into

03:08PM   20    it with specific topics you wanted to talk to Mr. Bongiovanni

03:08PM   21    about, correct?

03:08PM   22    A.  Yes.

03:08PM   23    Q.  I think you told the jury on direct, you were still in

03:08PM   24    the process of investigating, correct?

03:08PM   25    A.  Yes.

03:08PM  1    Q.  And obviously Mr. Bongiovanni's answers or non answers or

03:08PM  2    however he reacts to this interview are going to be important

03:08PM  3    for you in how you direct your investigation, correct?

03:08PM  4    A.  Yes.

03:08PM  5    Q.  Okay.  Now, you've interviewed, fair to say, a lot of

03:08PM  6    people in your career?

03:08PM  7    A.  Probably many hundreds, yes.

03:08PM  8    Q.  Yeah.  I was gonna ask a number.  Hundreds?

03:08PM  9    A.  Yes.

03:08PM  10   Q.  You've interviewed both witnesses and subjects of

03:08PM  11   investigation, correct?

03:08PM  12   A.  Yes.

03:08PM  13   Q.  Fair to say that when interviewing witnesses or subjects,

03:09PM  14   body language can be important?

03:09PM  15   A.  Yes.

03:09PM  16   Q.  Tone of voice can be important, correct?

03:09PM  17   A.  Yes.

03:09PM  18   Q.  Facial expressions can be important?

03:09PM  19   A.  Yes.

03:09PM  20   Q.  Because all of these help you as an interviewer to

03:09PM  21   determine what the words the person is actually saying might

03:09PM  22   mean, correct?

03:09PM  23   A.  Yes.

03:09PM  24   Q.  Okay.  It can help you to assess whether the individual

03:09PM  25   you're interviewing is potentially confused by a question,

USA v Bongiovanni - Ryan - MacKay/Cross - 9711/24

03:09PM  1    correct?

03:09PM  2    A.  It could.

03:09PM  3    Q.  You did record the interview in some fashion with

03:09PM  4    handwritten notes, correct?

03:09PM  5    A.  Yes.

03:09PM  6    Q.  Now, remind us again.  Were you the primary questioner of

03:09PM  7    Mr. Bongiovanni during this interview?

03:09PM  8    A.  I was.

03:09PM  9    Q.  Okay.  So you're both questioning him, and you're writing

03:09PM  10   notes, correct?

03:09PM  11   A.  Yes.

03:09PM  12   Q.  So fair to say your attention is sort of split between

03:10PM  13   doing both, correct?

03:10PM  14   A.  Yes.

03:10PM  15   Q.  Okay.  And then ultimately you reduce those notes to a

03:10PM  16   typewritten report, correct?

03:10PM  17   A.  Yes, a few days later.

03:10PM  18   Q.  Right.  So you get the handwritten notes, make

03:10PM  19   typewritten report a few days later, correct?

03:10PM  20   A.  Yes.

03:10PM  21   Q.  And then that's what you -- you reviewed that typewritten

03:10PM  22   report in preparation for testimony today, correct?

03:10PM  23   A.  Yes.

03:10PM  24   Q.  And that's now, you know, about five years later,

03:10PM  25   correct?

03:10PM    1    A.  Yes.

03:10PM    2    Q.  Okay.  So let's talk about some things Mr. Bongiovanni

03:10PM    3    says during the interview.

03:10PM    4        You asked him a little bit about Peter Gerace, correct?

03:10PM    5    A.  I did.

03:10PM    6    Q.  That subject comes up in the interview, correct?

03:10PM    7    A.  His relationship with Peter Gerace was the first thing

03:10PM    8    that came up, yes.

03:10PM    9    Q.  Okay.  And I think your testimony was he wouldn't

03:10PM   10    characterize his relationship --

03:10PM   11            **MR. TRIPI:**  Objection.

03:10PM   12            **MR. MacKAY:**  Did he -- I'll withdraw.

03:10PM   13            **THE COURT:**  Okay, withdrawn.

03:10PM   14            **BY MR. MacKAY:**

03:10PM   15    Q.  He used the -- did -- he said something to the effect

03:11PM   16    of --

03:11PM   17            **MR. TRIPI:**  Objection.

03:11PM   18            **THE COURT:**  What's the objection?

03:11PM   19            **MR. TRIPI:**  Hearsay.  He's asking what his client

03:11PM   20    said and rephrasing it in his words, it's hearsay.  He's not

03:11PM   21    the party opponent.

03:11PM   22            **MR. MacKAY:**  He said on direct.

03:11PM   23            **MR. TRIPI:**  Can we approach?

03:11PM   24            **THE COURT:**  Yeah, come up.

03:11PM   25            (Sidebar discussion held on the record.)

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

101

03:11PM  1          THE COURT:  This is cross-examination based on what

03:11PM  2  you got him to say on direct.

03:11PM  3          MR. TRIPI:  Yeah, there's nuance to it though,

03:11PM  4  Your Honor.  If he's asking a question about what this witness

03:11PM  5  said on direct, that's going to be fine.

03:11PM  6          But I thought I heard the rephrasing of his question

03:11PM  7  was, he's saying what Mr. Bongiovanni said during the

03:11PM  8  interview.

03:11PM  9          And counsel is not permitted under the rules of

03:11PM  10  hearsay to restate what their client said in the form of a

03:11PM  11  question in the format they so choose to drive at a yes.

03:11PM  12  That's hearsay.

03:11PM  13          THE COURT:  You can cross-examine on that.

03:11PM  14          MR. TRIPI:  Judge, that's hearsay.  They're not the

03:12PM  15  party opponent.

03:12PM  16          THE COURT:  I understand that.  This is

03:12PM  17  cross-examination.

03:12PM  18          MR. TRIPI:  But they don't get to restate it, and

03:12PM  19  then get to ask for yes or no.

03:12PM  20          THE COURT:  He can say to him you testified on direct

03:12PM  21  that Mr. Bongiovanni said I stole this document from my --

03:12PM  22  isn't it true that he didn't say that to you?  That he said

03:12PM  23  something else you.  He can't do that?

03:12PM  24          MR. TRIPI:  That's not what's happening though.

03:12PM  25          MR. MacKAY:  I'm just asking --

03:12PM    1          **MR. TRIPI:**  That's not what's happening.  I would

03:12PM    2    agree with you there, Judge.  I don't think that that's what

03:12PM    3    just happened.

03:12PM    4          **MR. MacKAY:**  I'm just asking, he characterized it as

03:12PM    5    not a close relationship, which I think is actually what he

03:12PM    6    reported that Mr. Bongiovanni said to him on direct.

03:12PM    7          **THE COURT:**  Right.  Yeah.  I'm going to allow this.

03:12PM    8          **MR. TRIPI:**  Judge --

03:12PM    9          **THE COURT:**  I'm going to allow this.

03:12PM   10          **MR. TRIPI:**  Okay.  Just in general terms --

03:12PM   11          **THE COURT:**  Make your record.

03:12PM   12          **MR. TRIPI:**  In general terms, I don't want to make a

03:12PM   13    record necessarily, but in general terms, Judge, they can't

03:12PM   14    elicit their client's own statements --

03:12PM   15          **THE COURT:**  I agree --

03:12PM   16          **MR. TRIPI:**  -- and rephrase --

03:12PM   17          **THE COURT:**  -- 100 percent.

03:12PM   18          **MR. TRIPI:**  -- it.  So that's where I'm at.

03:12PM   19          **THE COURT:**  I agree --

03:12PM   20          **MR. TRIPI:**  That's all.

03:12PM   21          **THE COURT:**  -- with you 100 percent on that.  I don't

03:12PM   22    think there's any question about that.  I think that it's not

03:12PM   23    hearsay when the party opponent introduces it.  It's hearsay

03:12PM   24    when the party himself or herself introduces it.  I understand

03:13PM   25    that very well.

03:13PM    1            This is cross-examination about what you elicited on

03:13PM    2    direct that his client said to the witness.  And there's no

03:13PM    3    doubt in my mind that it is appropriate to probe the witness

03:13PM    4    on those statements you made to him.

03:13PM    5            **MR. TRIPI:**  My only -- my only point to that, Judge,

03:13PM    6    I don't have any issue with that, but if they're restating

03:13PM    7    words in a way that's more favorable to their client in

03:13PM    8    driving at a yes, that's gonna be a hearsay objection.

03:13PM    9            **THE COURT:**  That's cross-examination.

03:13PM    10           (End of sidebar discussion.)

03:13PM    11           **BY MR. MacKAY:**

03:13PM    12   Q.  Okay.  So Mr. Bongiovanni attempted to characterize his

03:13PM    13   relationship with Peter Gerace, correct?

03:13PM    14   A.  He did.

03:13PM    15   Q.  And he said it was not a close relationship, correct?

03:14PM    16   A.  Correct, that's what he said.

03:14PM    17   Q.  That was a term he used, correct?

03:14PM    18   A.  Yes.

03:14PM    19   Q.  The phrase "close relationship" were the words that came

03:14PM    20   out of his mouth as you recall it, correct?

03:14PM    21   A.  It first came out of my mouth in the form of a question,

03:14PM    22   and then he responded to that.

03:14PM    23   Q.  Okay.  So, walk through.  What did you ask?  What was the

03:14PM    24   question you asked?

03:14PM    25   A.  Talk about the relationship.  Is it a close relationship?

03:14PM  1    Q.  And his answer was?

03:14PM  2    A.  That it was not.

03:14PM  3    Q.  Okay.  So, the sum and substance you took from that is

03:14PM  4    Mr. Bongiovanni's telling you it's not a close relationship,

03:14PM  5    correct?

03:14PM  6    A.  Correct.

03:14PM  7    Q.  Okay.  As you sit here, you don't know what he meant by

03:14PM  8    the phrase "close relationship," correct?

03:14PM  9    A.  I don't think that's accurate, because we asked some

03:14PM  10   follow-up questions about communication and --

03:14PM  11   Q.  Well --

03:14PM  12   A.  -- additional questions about the relationship.

03:14PM  13   Q.  Sure.  But you asked questions to understand what in fact

03:14PM  14   the relationship was between Mr. Gerace and Mr. Bongiovanni,

03:14PM  15   correct?

03:15PM  16   A.  Yes.

03:15PM  17   Q.  But as you sit here today, when Mr. Bongiovanni responded

03:15PM  18   to your question about whether it was a close relationship,

03:15PM  19   you don't know how he defines that term in his mind, correct?

03:15PM  20   A.  I did not ask him to define that term, no.

03:15PM  21   Q.  Right.  That's what I'm getting at.

03:15PM  22       There wasn't a series of questions to define generally

03:15PM  23   what Mr. Bongiovanni thought close relationship was, correct?

03:15PM  24   A.  No, again, I have to disagree with that a little bit,

03:15PM  25   because I think the one-way relationship comment doesn't come

| | | |
|---|---|---|
| 03:15PM | 1 | out if we're not talking about what that means. |
| 03:15PM | 2 | Q.  Okay.  So, beyond that though, Mr. Bongiovanni expressed |
| 03:15PM | 3 | annoyance about Peter, correct? |
| 03:15PM | 4 | A.  He did. |
| 03:15PM | 5 | Q.  Okay.  And then I think you just said it, but the other |
| 03:15PM | 6 | phrase that came up was that the relationship was one sided? |
| 03:15PM | 7 | A.  Yes. |
| 03:15PM | 8 | Q.  Okay.  That was his description of what the relationship |
| 03:15PM | 9 | was, correct? |
| 03:15PM | 10 | A.  Yes. |
| 03:16PM | 11 | Q.  And then fair to say you probed that explanation a little |
| 03:16PM | 12 | bit more with questions about contact between Mr. Gerace and |
| 03:16PM | 13 | Mr. Bongiovanni, correct? |
| 03:16PM | 14 | A.  Yes. |
| 03:16PM | 15 | Q.  And one of the questions you asked Mr. Bongiovanni was |
| 03:16PM | 16 | when he had last spoken to Peter Gerace, correct? |
| 03:16PM | 17 | A.  Yes. |
| 03:16PM | 18 | Q.  And you get the answer over a year ago, correct? |
| 03:16PM | 19 | A.  Yes. |
| 03:16PM | 20 | Q.  So Mr. Gerace's number, as you recall, it is |
| 03:16PM | 21 | 716-725-1931, correct? |
| 03:16PM | 22 | A.  Yes. |
| 03:16PM | 23 | Q.  And in connection with this investigation, you reviewed |
| 03:16PM | 24 | phone records, correct? |
| 03:16PM | 25 | A.  I did. |

03:16PM  1   Q.  You reviewed both Mr. Bongiovanni's phone records,

03:16PM  2   correct?

03:16PM  3   A.  In part, yes.

03:16PM  4   Q.  And Mr. Gerace's phone records, correct?

03:16PM  5   A.  In part, yes.

03:16PM  6   Q.  Okay.  Any reason to disagree with me that the last time

03:16PM  7   Mr. Bongiovanni and Mr. Gerace, that there's a phone call

03:16PM  8   reflected between them, is November 12th of 2017?

03:16PM  9   A.  Without looking at the records, I don't know.

03:17PM  10          **MR. MacKAY:**  Okay.  Ms. Champoux, can we pull up

03:17PM  11   what's in evidence as Government Exhibit 358.

03:17PM  12          Okay.  So we're -- just so the record's clear, we're

03:17PM  13   in a folder for Government Exhibit 358, can we go to the file

03:17PM  14   that begins with the PDF.

03:17PM  15          **THE COURT:**  This is all in evidence.

03:17PM  16          **MR. MacKAY:**  Yes.

03:17PM  17          **MR. TRIPI:**  Yes.

03:17PM  18          **MR. MacKAY:**  19013167bills.pdf.

03:17PM  19          Okay.  And can we control F, let's do 725-1931.  All

03:18PM  20   right.  We're not going to go through 560, I'm sorry, 55.

03:18PM  21          Can we go to page 505 in this record?

03:18PM  22          **BY MR. MacKAY:**

03:18PM  23   Q.  Okay.  Do you see that that's reflected, it's

03:18PM  24   November 11th, I'm sorry, November 12th.  Do you see

03:18PM  25   Mr. Gerace's number there?

03:18PM    1    A.  Yes.

03:18PM    2    Q.  And just so the jury's clear, we're looking at

03:18PM    3    Mr. Bongiovanni's phone records, correct?

03:18PM    4    A.  Yes, his DEA phone.

03:18PM    5    Q.  Okay.  And can you see up at the top the bill says due

03:18PM    6    date, 12/18/2017?

03:18PM    7    A.  Yes.

03:18PM    8    Q.  So, fair to say these calls here occur in November of

03:18PM    9    2017, correct?

03:18PM   10    A.  Yes.

03:18PM   11    Q.  From what you can see in the records, correct?

03:18PM   12    A.  From this page of this phone record, yes.

03:18PM   13    Q.  Yes.  Okay.

03:19PM   14         **MR. MacKAY:**  Okay.  Can we close that out,

03:19PM   15    Ms. Champoux.  And can we open Government Exhibit 359.

03:19PM   16         It's also in evidence.

03:19PM   17         It's going to be a folder.  Can we go to the one

03:19PM   18    that's -- that ends in underscore 2016 underscore 2018.pdf.

03:19PM   19         Can we go to page 990 here.

03:19PM   20         And can we scroll down a little bit further.  A

03:19PM   21    little bit further, please.

03:19PM   22         **BY MR. MacKAY:**

03:19PM   23    Q.  And can you see where I've highlighted, that's

03:20PM   24    Mr. Bongiovanni's number at the bottom there, correct?

03:20PM   25    A.  Yes.

03:20PM   1    Q.  818-0966, correct?

03:20PM   2    A.  Yes.

03:20PM   3    Q.  That's that same date, November 12th, 2017, correct?

03:20PM   4    A.  Yes.

03:20PM   5    Q.  And we can pull it back up, but do you have anything to

03:20PM   6    disagree with me that the 42-minute length corresponds to the

03:20PM   7    42 minutes that's in the other document?

03:20PM   8    A.  No.

03:20PM   9    Q.  So this is sort of a reflection of -- it's the other side

03:20PM  10    of the phone call that we see from the other -- that we've

03:20PM  11    now seen both sides of the phone records, correct?

03:20PM  12    A.  Yes.

03:20PM  13    Q.  Okay.

03:20PM  14        MR. MacKAY:  Now, Ms. Champoux can we go to

03:20PM  15    page 1056.  Scroll down a little bit further.

03:20PM  16        BY MR. MacKAY:

03:20PM  17    Q.  So we're now on a further page past what we looked at.

03:21PM  18    And do you see again Mr. Bongiovanni's phone number?

03:21PM  19    A.  Yes.

03:21PM  20    Q.  I might have drawn right over that, but same phone

03:21PM  21    number, the date is January 16th?

03:21PM  22    A.  Yes.

03:21PM  23    Q.  And do you see here where it says VM deposit CL?

03:21PM  24    A.  Yes.

03:21PM  25    Q.  Do you understand that when reviewing phone records to

03:21PM    1    mean that looks like Mr. Gerace attempted to call

03:21PM    2    Mr. Bongiovanni and left a voicemail?

03:21PM    3    A.   Yes.

03:21PM    4    Q.   Okay.  So the search process, I'm not going to go through

03:21PM    5    all of it, but any reason to disagree with me that the

03:21PM    6    remainder of these bills through 2/8/2018 his number doesn't

03:21PM    7    show up anymore?

03:21PM    8    A.   I don't know that that's true or not.

03:21PM    9    Q.   Okay.

03:21PM   10    A.   And I wasn't -- the question wasn't only about telephone

03:21PM   11    calls --

03:21PM   12    Q.   Okay.

03:21PM   13    A.   -- when I asked him.

03:21PM   14    Q.   Right.  And we're going to get to that.

03:21PM   15         So it would have talked about, and what we've seen here,

03:21PM   16    is that looks like --

03:21PM   17            **MR. MacKAY:**  You can take that down, Ms. Champoux,

03:21PM   18    thank you.

03:22PM   19            **BY MR. MacKAY:**

03:22PM   20    Q.   -- there were some phone calls in November of 2017,

03:22PM   21    correct?

03:22PM   22    A.   Yes.  According to the records.

03:22PM   23    Q.   From the records, it looks like Mr. Gerace tried to leave

03:22PM   24    Mr. Bongiovanni a voicemail in early 2018, correct?

03:22PM   25    A.   Yes.

03:22PM   1   Q.  And then so that time period is approximately a year and

03:22PM   2   a half before you had interviewed Mr. Bongiovanni at his

03:22PM   3   house, correct?

03:22PM   4   A.  Yes.

03:22PM   5   Q.  Now, we went through those text messages in -- you went

03:22PM   6   through them on direct in Government Exhibit 310D; do you

03:22PM   7   recall all those?

03:22PM   8   A.  I do.

03:22PM   9   Q.  We're going to go through them later in detail, but do

03:22PM  10   you agree that with the exception of the June 30th, 2018

03:22PM  11   incident at the cottage, do you agree with me that after that

03:22PM  12   date, early -- I'm sorry, agree with me that after early

03:22PM  13   2018, and with the exception of that date at the cottage,

03:22PM  14   there's nothing in the text messages that reflects they ever

03:23PM  15   met up, correct?

03:23PM  16   A.  I'd have to go back and look at them.

03:23PM  17   Q.  I'll circle back to that later.  But you had understood

03:23PM  18   that they had potentially been together at a cottage on

03:23PM  19   June 30th of 2018, correct?

03:23PM  20   A.  Yes.

03:23PM  21   Q.  And by the time you interview Mr. Bongiovanni, that's

03:23PM  22   June 6th, 2019 at his house, correct?

03:23PM  23   A.  Yes.

03:23PM  24   Q.  That's almost a year in the past, but not quite, correct?

03:23PM  25   A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

111

03:23PM  1    Q.  Just about 11 months, correct?

03:23PM  2    A.  Yes.

03:23PM  3    Q.  Okay.  Now, the 2018 cottage party.

03:23PM  4        So when you walked into the interview with

03:23PM  5    Mr. Bongiovanni, the only evidence you had about this party

03:23PM  6    came from, was it, number 1, your review of these text

03:23PM  7    messages that had come from Mr. Gerace's phone, correct?

03:24PM  8    A.  From, well, from the memo.  There were some -- most of

03:24PM  9    the text messages or at least some of them were in the memos.

03:24PM  10   And then I reviewed Mr. Gerace's phone.  So I reviewed the

03:24PM  11   text messages from there also.

03:24PM  12   Q.  And then you had had some conversations with Phlycia Hunt

03:24PM  13   at that time?

03:24PM  14   A.  Not about the party, no.

03:24PM  15   Q.  Okay.  So at that point in time, she had not done that

03:24PM  16   circling on the photo, correct?

03:24PM  17   A.  No, that was four months later.

03:24PM  18   Q.  Okay.  Now you had the text messages that we've all seen

03:24PM  19   in 310D because they came from Mr. Gerace's phone?

03:24PM  20   A.  Yes.

03:24PM  21   Q.  But you had not walked through those text messages at the

03:24PM  22   time of this interview with Mr. Bongiovanni, correct?

03:24PM  23   A.  Not one text message at a time, no.  But I did walk

03:24PM  24   through them with my questions.  I mean, that's part of what

03:24PM  25   I was doing.

03:24PM   1   Q.  Okay.

03:24PM   2           **MR. MacKAY:**  Ms. Champoux, can we put up Government

03:25PM   3   Exhibit 310D on page 68.

03:25PM   4           **BY MR. MacKAY:**

03:25PM   5   Q.  And just before we start going through a few of these,

03:25PM   6   Mr. Bongiovanni had described this as sort of a chance

03:25PM   7   encounter, correct?

03:25PM   8   A.  Which encounter?

03:25PM   9   Q.  The June 30th cottage party.

03:25PM  10   A.  Yes.

03:25PM  11   Q.  Okay.  He described it as not a planned event, correct?

03:25PM  12   A.  Correct.

03:25PM  13   Q.  Okay.  I just want to set the stage here.

03:25PM  14       Let's start -- there's a text message from Mr. Gerace to

03:25PM  15   Mr. Bongiovanni that's April 24th, 2018, and he says, I know

03:25PM  16   brother, but life is going by fast, correct?

03:25PM  17   A.  Yes.

03:25PM  18   Q.  And then Mr. Bongiovanni sort of concludes the

03:26PM  19   conversation that day by texting, sure is, correct?

03:26PM  20   A.  Yes.

03:26PM  21   Q.  Now the next jump down is to June 5th, 2018.  And does

03:26PM  22   that appear to be sort of one of those advertisement blast

03:26PM  23   text messages that we've seen throughout the text string?

03:26PM  24   A.  I mean, it's not a golf outing, it's a different event.

03:26PM  25   But yes, it seems to be.

03:26PM   1   Q.  Yeah, I mean, what I was terming sort of an advertising

03:26PM   2   blast is like these text messages that advertise something

03:26PM   3   going on at Pharaoh's, correct?

03:26PM   4   A.  Yes.  But that wouldn't come as a blast from Mr. Gerace's

03:26PM   5   phone.

03:26PM   6   Q.  Well --

03:26PM   7   A.  What I'm saying is it's not like constant contact or

03:26PM   8   something like that.  It's a text message that's sent, but it

03:26PM   9   appears to be probably a copy of something and forwarded.

03:26PM  10   Q.  That's what I'm getting at.  Is in your experience, have

03:26PM  11   you sometimes seen that when things are being advertised by

03:26PM  12   text, somebody might cut and paste a standard message and

03:26PM  13   send it out to a bunch of people?

03:27PM  14   A.  Well, this isn't a text message with a bunch of people.

03:27PM  15   Q.  No, I mean, I'm saying they might send the same --

03:27PM  16   A.  Yeah.

03:27PM  17   Q.  -- worded text message to a bunch of people?

03:27PM  18   A.  Yes.

03:27PM  19   Q.  You've gotten those in your own life, you know,

03:27PM  20   advertising some event --

03:27PM  21   A.  Yes.

03:27PM  22   Q.  -- that's going on, correct?

03:27PM  23   A.  Yes.

03:27PM  24   Q.  Now, so that's June 5th, 2018.  Jumping down, the next

03:27PM  25   text message, Mr. Gerace says on June 30th, am I ever gonna

03:27PM   1   see you again, correct?

03:27PM   2   A.  Yes.

03:27PM   3   Q.  And, you know, the text messages show there's no text

03:27PM   4   message between June 5th and June 30th, correct?

03:27PM   5   A.  Not in the extraction anyway.

03:27PM   6   Q.  Okay.  And then you get Mr. Bongiovanni's response about

03:27PM   7   two hours after Mr. Gerace sends the message, it says miss

03:27PM   8   you bro.  I'm going you to Sunset today, correct?

03:27PM   9   A.  Yes.

03:27PM   10  Q.  Now in that text message, fair to say, he's not --

03:27PM   11  there's no explicit invite to join him at Sunset, correct?

03:28PM   12  A.  I think that's what their next several text messages are

03:28PM   13  about, isn't it?

03:28PM   14  Q.  Well, I'm gonna go through those, but in this text

03:28PM   15  message here, he's not saying, you know, come join me at

03:28PM   16  Sunset, correct?

03:28PM   17  A.  If you're asking me if that literally doesn't say come

03:28PM   18  see me at Sunset, then yes, that's correct.

03:28PM   19  Q.  But, you know, what he's actually saying, the actual

03:28PM   20  words are, miss you, bro, I'm going up to Sunset today,

03:28PM   21  correct?

03:28PM   22  A.  Yes, but you're asking me to take it out of context with

03:28PM   23  the rest of the text string.

03:28PM   24  Q.  I'm asking you to just talk about this one text message

03:28PM   25  first.

03:28PM    1          In that text message he's, in sum and substance, telling

03:28PM    2    him I'm going to Sunset today, correct?

03:28PM    3    A.  Yes.

03:28PM    4          **MR. MacKAY:**  Can we scroll down a little bit,

03:28PM    5    Ms. Champoux?

03:28PM    6          **BY MR. MacKAY:**

03:28PM    7    Q.  Now in the response a couple minutes later, Mr. Gerace

03:28PM    8    says do you have a cottage, correct?

03:28PM    9    A.  Yes.

03:28PM   10    Q.  And then the next text a couple minutes after that

03:28PM   11    Mr. Bongiovanni says, no, just going up.  Tommy Doc is in

03:29PM   12    town, and a couple of Lindsay's friends, correct?

03:29PM   13    A.  Yes.

03:29PM   14    Q.  And then Mr. Gerace responds 30 seconds later saying

03:29PM   15    cool.  Do you see that text?

03:29PM   16    A.  I do.

03:29PM   17    Q.  And the next text message, he says there's a -- I,

03:29PM   18    there's a girl in town from Las Vegas staying with me with

03:29PM   19    some other chick that works for me.  Let me see what they

03:29PM   20    want to do.  That's the next message, correct?

03:29PM   21    A.  Yes.

03:29PM   22    Q.  Okay.  Now --

03:29PM   23          **MR. MacKAY:**  Can you scroll up a little further

03:29PM   24    Ms. Champoux?

03:29PM   25          **MS. CHAMPOUX:**  Up or down.

03:29PM   1              MR. MacKAY:  Up.  What I meant was down.  Okay.

03:29PM   2    Thank you.

03:29PM   3              BY MR. MacKAY:

03:29PM   4    Q.  And then Mr. Bongiovanni responds I'll be cool for a

03:29PM   5    happy hour any time, I'm off the 4, 5, 6.  Do you see that

03:29PM   6    text message?

03:30PM   7    A.  I do.

03:30PM   8    Q.  And then what he says is okay, we are going in the

03:30PM   9    afternoon about 1 or 2.  That's the next text message,

03:30PM   10   correct?

03:30PM   11   A.  Yes.

03:30PM   12   Q.  And in context, you understand that to mean he's

03:30PM   13   reporting that he's -- when he might be going to Tommy

03:30PM   14   Doctor's cottage, correct?

03:30PM   15   A.  Yes.

03:30PM   16   Q.  Now, fair to say that the next few text messages are some

03:30PM   17   back and forth about a concert that might be occurring on the

03:30PM   18   holiday weekend, correct?

03:30PM   19   A.  And traffic difficulties to get to Sunset related --

03:30PM   20   Q.  Yep.

03:30PM   21   A.  -- to the concert.

03:30PM   22   Q.  Yep.

03:30PM   23              MR. MacKAY:  Now, can we scroll down a little bit

03:30PM   24   further, Ms. Champoux.  Little bit further please.  I think to

03:30PM   25   page 72.

03:30PM    1        **BY MR. MacKAY:**

03:30PM    2   Q.  Okay.  So we're on page 72 now, I think it is.

03:30PM    3      We're still on June 30th, 2018.  Peter Gerace texts and

03:31PM    4   says I'm thinking about taking them down to RiverWorks.  Last

03:31PM    5   time I was there, I was with you and Lindsay.  See that text

03:31PM    6   message?

03:31PM    7   A.  I do.

03:31PM    8   Q.  Okay.  Then next text message, he -- fair to say he

03:31PM    9   appears to be talking about a past time they went to Dock at

03:31PM   10   the Bay?

03:31PM   11   A.  After they were at RiverWorks, was the way I read that.

03:31PM   12   Q.  Right.  And so both of these two text messages they're

03:31PM   13   talking about the -- fair to say looks like they're

03:31PM   14   reminiscing about a past outing they had at some point in

03:31PM   15   time, correct?

03:31PM   16   A.  Yes.

03:31PM   17   Q.  Okay.  But in the first text message, what

03:31PM   18   Mr. Bongiovanni -- what Mr. Gerace is communicating is the

03:31PM   19   women that I'm with, I'm thinking of taking them to

03:31PM   20   RiverWorks; is that fair to say?

03:31PM   21   A.  Yes.

03:31PM   22   Q.  Okay.  The context of that message is Mr. Gerace

03:31PM   23   communicating the women that I've got in town, one of them in

03:31PM   24   from out of town from Vegas, I'm thinking of taking them to

03:32PM   25   RiverWorks, correct?

03:32PM    1    A.  Yes.

03:32PM    2    Q.  Okay.  And then Mr. Bongiovanni responds and says at the

03:32PM    3    end, yes, have fun, be safe.

03:32PM    4    A.  Yes.

03:32PM    5    Q.  Now, after that, I mean, so that occurs at about -- this

03:32PM    6    was 3:48 UTC, and help me with my math, that would be what

03:32PM    7    time?

03:32PM    8    A.  Four hours earlier in Buffalo that day.  So 11:48.

03:32PM    9    Q.  So it's about noon on the 30th, correct?

03:32PM   10    A.  Yes.

03:32PM   11    Q.  And then the next message in the string occurs -- help me

03:32PM   12    with my math again, it's going to be four hours before that,

03:32PM   13    so 8:43 p.m.; is that correct?

03:32PM   14    A.  Yeah.  No.  7.

03:32PM   15    Q.  7.  7:43 p.m.  He says thanks brother, I'm home?

03:32PM   16        That's the message Mr. Gerace sends at that point in

03:32PM   17    time, correct?

03:33PM   18    A.  Yes.

03:33PM   19    Q.  And, again, right after that, the next message occurs --

03:33PM   20    what would essentially be early in the morning the next day,

03:33PM   21    July 1st, Mr. Bongiovanni stating glad you got home safe,

03:33PM   22    correct?

03:33PM   23    A.  Yes.

03:33PM   24    Q.  Okay.  So the last two messages that I've kind of

03:33PM   25    highlighted here, you understood the context of that to be

03:33PM    1    essentially Mr. Gerace texting Mr. Bongiovanni after he'd

03:33PM    2    gotten home from the cottage, correct?

03:33PM    3    A.   Yes.

03:33PM    4    Q.   Okay.  Meaning that you understood they had met up

03:33PM    5    before, and this is essentially glad to see you got home safe

03:33PM    6    text message at the back end of that, correct?

03:33PM    7    A.   I mean, if you're asking me is I read this in advance of

03:33PM    8    the interview, if I knew that had all related to the

03:33PM    9    cottage --

03:33PM   10    Q.   No, I'm saying as you sit here today, is that kind of

03:33PM   11    what you understand these text messages to mean?

03:33PM   12    A.   Yes.

03:33PM   13    Q.   Okay.  So, between this 3:48 p.m. -- or, well, we've

03:34PM   14    established to be 11:48 a.m., and the text message that

03:34PM   15    Mr. Gerace sends later at 7:43 p.m., there's no text messages

03:34PM   16    in here further about them specifically going to meet up at

03:34PM   17    the cottage, correct?

03:34PM   18    A.   No.

03:34PM   19    Q.   So, in the string of these text messages, the last text

03:34PM   20    message that Mr. Bongiovanni received that it shows in these

03:34PM   21    records is Peter Gerace saying he's going to RiverWorks,

03:34PM   22    correct?

03:34PM   23              **MR. TRIPI:**  Objection.  Misstates what the text says.

03:34PM   24              **THE COURT:**  Say it again?

03:34PM   25              **MR. TRIPI:**  Misstates what the text says.

03:34PM    1          **BY MR. MacKAY:**
03:34PM    2    Q.  I'm getting a little messy here, let me clear up some of
03:34PM    3    the things on the screen.
03:34PM    4          **THE COURT:**  Hang on.
03:34PM    5          **BY MR. MacKAY:**
03:34PM    6    Q.  So earlier in the day --
03:34PM    7          **THE COURT:**  Do you withdraw the question?
03:34PM    8          **MR. MacKAY:**  Yeah, I withdraw the question,
03:35PM    9    Your Honor.  Thank you.
03:35PM   10          **BY MR. MacKAY:**
03:35PM   11    Q.  So earlier in the day, Mr. Bongiovanni receives a text
03:35PM   12    where Peter's talking about going to RiverWorks, correct?
03:35PM   13    A.  He says I'm thinking about taking them down to
03:35PM   14    RiverWorks.
03:35PM   15    Q.  Right.  And RiverWorks, to your knowledge, that's in the
03:35PM   16    City of Buffalo, correct?
03:35PM   17    A.  It is.
03:35PM   18    Q.  It's kind of roughly in the area of the Sabres arena,
03:35PM   19    more or less?
03:35PM   20    A.  More or less.
03:35PM   21    Q.  More or less.  And Sunset Beach, that's about an hour
03:35PM   22    away in Chautauqua County, correct?
03:35PM   23    A.  I'm not sure how long it takes to drive there.
03:35PM   24    Q.  It's in Chautauqua County, correct?
03:35PM   25    A.  I never looked at a map to see where it -- what county

03:35PM   1   it's in.  I know it's on Lake Erie in that direction.

03:35PM   2   Q.  Okay.  Do you know it to be near Irving, New York?

03:35PM   3   A.  Sorry?

03:35PM   4   Q.  Do you know it to be near Irving, New York?

03:35PM   5   A.  That direction, yes.

03:35PM   6   Q.  Okay.  I mean, it's not right there in the City of

03:35PM   7   Buffalo; fair to say?

03:35PM   8   A.  No.  It's not.  It's further west down the lake.

03:35PM   9   Q.  Okay.  Further down south and west of the city, correct?

03:35PM  10   A.  Yes.

03:35PM  11   Q.  Okay.  So, other than a text message where there --

03:36PM  12   Mr. Gerace is communicating about a prior incident at the

03:36PM  13   Dock of the Bay, the text message before that, Mr. Gerace is

03:36PM  14   saying I'm going to RiverWorks, correct?

03:36PM  15   A.  He said he's thinking about going to RiverWorks.

03:36PM  16   Q.  Thinking of going to RiverWorks.

03:36PM  17       And we don't have to review all the phone records again,

03:36PM  18   but do you have any reason to disagree with me that there's

03:36PM  19   no phone contact in the records that can be seen between

03:36PM  20   Mr. Gerace and Mr. Bongiovanni on June 30th?

03:36PM  21   A.  No, I can't say that without seeing the records.

03:36PM  22   Q.  Okay.  Let's go to a different subject.

03:37PM  23       You asked Mr. Bongiovanni about this party in Toronto in

03:37PM  24   2016, correct?

03:37PM  25   A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

03:37PM   1   Q.  And you understood that to be his sister-in-law's 30th

03:37PM   2   birthday party, correct?

03:37PM   3   A.  Yes.

03:37PM   4   Q.  Now at that point in time, it would have been

03:37PM   5   approximately three and a half years before you sat down with

03:37PM   6   Mr. Bongiovanni's house to do this interview, correct?

03:37PM   7   A.  Yes.

03:37PM   8   Q.  All right.  February of 2016 versus June 2019, correct?

03:37PM   9   A.  Yep, so three years and a few months, yes.

03:37PM   10  Q.  And his answer to one of your questions was, in sum and

03:37PM   11  substance, he couldn't remember if Anthony Gerace was there,

03:37PM   12  correct?

03:37PM   13  A.  That is correct.  He said he could not remember.

03:37PM   14  Q.  Okay.  Now, I'm not going to put it back up on the

03:37PM   15  screen, but do you recall if you were shown that photo of a

03:37PM   16  number of gentlemen including Mr. Bongiovanni that was all

03:37PM   17  purported to be taken up in Toronto?

03:37PM   18  A.  Yes.

03:37PM   19  Q.  Okay.  And you'd agree with Mr. Gerace is not in that

03:38PM   20  photo, correct?

03:38PM   21  A.  Anthony or Peter.

03:38PM   22  Q.  Anthony Gerace.

03:38PM   23  A.  Neither of them are in the photo.

03:38PM   24  Q.  But specifically, Anthony Gerace was not in that photo,

03:38PM   25  correct?

03:38PM   1    A.   He was not.

03:38PM   2         **MR. MacKAY:**  Ms. Champoux, can we go to page 19,

03:38PM   3    Government Exhibit 310D.

03:38PM   4         **BY MR. MacKAY:**

03:38PM   5    Q.   Directing your attention to this text message here.  This

03:38PM   6    text message indicates Mr. Bongiovanni texted Mr. Gerace and

03:38PM   7    says:  What up, bro?  Saw you -- brother in Toronto last

03:38PM   8    weekend.  That's what it says, correct?

03:38PM   9    A.   Are you asking --

03:38PM   10   Q.   That's what that says, correct?

03:38PM   11   A.   Yes.

03:38PM   12   Q.   Looks like he misspelled -- "you" should have been

03:38PM   13   "your," correct?

03:38PM   14   A.   That's the way I read it, yes.

03:38PM   15   Q.   Now, you don't know as you sit here today whether Anthony

03:38PM   16   Gerace and Joseph Bongiovanni interacted at all while they

03:39PM   17   were up in Toronto for this birthday party weekend event,

03:39PM   18   correct?

03:39PM   19   A.   I was told they were at the party together.

03:39PM   20   Q.   Right.  And you were told by -- was that information you

03:39PM   21   received from, ultimately, somebody else through Kevin

03:39PM   22   Myszka?

03:39PM   23   A.   What do you mean by from somebody else?

03:39PM   24   Q.   Well, who -- when you were told that they were there

03:39PM   25   together, where did you receive that information from?

03:39PM    1    A.  From Kevin Myszka.

03:39PM    2    Q.  Right.  That -- so Kevin Myszka had reported -- was that

03:39PM    3    directly to you, or was that through somebody else?

03:39PM    4    A.  To me.

03:39PM    5    Q.  You were in an interview and he reported that?

03:39PM    6    A.  Yes.

03:39PM    7    Q.  Okay.  So by the time you get to your interview with

03:39PM    8    Mr. Bongiovanni in June of 2019, your understanding about

03:39PM    9    what may or may not have happened up at the party was based

03:39PM   10    on Kevin Myszka had previously told you, correct?

03:39PM   11    A.  And a corresponding border crossing.

03:39PM   12    Q.  Yeah, and you -- let's go through that.  You had reviewed

03:40PM   13    some border crossing records, correct?

03:40PM   14    A.  Yes.

03:40PM   15    Q.  And from reviewing those records, you knew that Anthony

03:40PM   16    Gerace had crossed the border to go to Canada, correct?

03:40PM   17    A.  Yes.

03:40PM   18    Q.  And you knew Mr. Bongiovanni had crossed the border to go

03:40PM   19    to Canada as well, too, correct?

03:40PM   20    A.  Yes.

03:40PM   21    Q.  But nothing in the review of those records showed that

03:40PM   22    they had, for example, crossed together in the same vehicle,

03:40PM   23    correct?

03:40PM   24    A.  No, they did not.

03:40PM   25    Q.  And we don't need to go into detail, but border crossing

03:40PM    1    records just essentially show, you know, for example, what

03:40PM    2    time and what port somebody crossed at, correct?

03:40PM    3    A.   That depends on how deeply you look into them.  But at

03:40PM    4    their most basic level, that's what they show.

03:40PM    5    Q.   Yeah.  And the records that you reviewed were -- was it

03:40PM    6    fair to say they were more towards the basic level than the

03:40PM    7    more in-depth records?

03:40PM    8    A.   Yes, I was looking at them for the timing of the

03:40PM    9    crossings --

03:40PM   10    Q.   Right, and --

03:40PM   11    A.   -- to see if they corresponded with the party.

03:40PM   12    Q.   Right.  So when you walked into the interview with

03:40PM   13    Mr. Bongiovanni, number 1, you had information from Kevin

03:41PM   14    Myszka who was reporting what his recollection of the party

03:41PM   15    was, correct?

03:41PM   16    A.   Yes.

03:41PM   17    Q.   And then you had some border crossing information that

03:41PM   18    confirmed when people crossed to and from Canada, correct?

03:41PM   19    A.   Yes.

03:41PM   20    Q.   Okay.

03:41PM   21    A.   And then also the text messages about the previous party

03:41PM   22    at Boss.

03:41PM   23    Q.   Okay.  Now, other than what Mr. Myszka reported, you

03:41PM   24    don't have any firsthand information about whether

03:41PM   25    Mr. Bongiovanni and Anthony Gerace interacted while up in

03:41PM   1   Toronto, correct?

03:41PM   2   A.  Are you asking me if I saw them interact?

03:41PM   3   Q.  Yeah.  From -- as you sit here today, obviously, you

03:41PM   4   weren't there in 2016 at the party, correct?

03:41PM   5   A.  I was not.

03:41PM   6   Q.  And so in -- you weren't there to observe what did or did

03:41PM   7   not happen up at the party, correct?

03:41PM   8   A.  That's correct, I was not at the party.

03:41PM   9   Q.  And then your only other observation -- the only other

03:41PM   10  information about somebody who was at the party was being

03:41PM   11  reported through Kevin Myszka, correct?

03:41PM   12  A.  Yes.

03:41PM   13  Q.  All right.  Now, a similar subject, you asked about Mike

03:42PM   14  Sinatra, correct?

03:42PM   15  A.  Yes.

03:42PM   16  Q.  And, again, he's in that same photo with all the

03:42PM   17  gentlemen up in Toronto, correct?

03:42PM   18  A.  Yes.

03:42PM   19  Q.  And, again, the only information when you walked in to

03:42PM   20  interview Mr. Bongiovanni in June of 2019, you had -- about

03:42PM   21  what Mike Sinatra what might or might not have done were

03:42PM   22  those same groups of information, the -- what Kevin Myszka

03:42PM   23  reported and the border crossings, correct?

03:42PM   24  A.  What do you mean by what I might or might not have done?

03:42PM   25  Q.  I'm sorry, that's kind of a bad question.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

03:42PM    1        When you're intending to question Mr. Bongiovanni about

03:42PM    2    Michael Sinatra, again, what you knew about whether Michael

03:42PM    3    Sinatra was up in Toronto for that party, that came from

03:42PM    4    information that was reported by Kevin Myszka, correct?

03:43PM    5    A.   About the party, yes.

03:43PM    6    Q.   Yeah.  And what I'm talking about whether is Michael

03:43PM    7    Sinatra was at that party, that information came from, number

03:43PM    8    1, the photo you reviewed, correct?

03:43PM    9    A.   Yes.

03:43PM   10    Q.   Number 2, what Kevin Myszka reported, correct?

03:43PM   11    A.   Yes.

03:43PM   12    Q.   And your review of border crossings, correct?

03:43PM   13    A.   Yes.

03:43PM   14    Q.   Okay.  And again, I may have asked this, but there was no

03:43PM   15    evidence that showed that Michael Sinatra and Joe Bongiovanni

03:43PM   16    either crossed to or from Canada together, correct?

03:43PM   17    A.   No, I think -- actually, well, I don't -- they didn't

03:43PM   18    cross together.  Mike Sinatra crossed with somebody else.  It

03:43PM   19    was either Kevin or Anthony, I don't recall which one.

03:43PM   20    Q.   Okay.  And Mr. Bongiovanni reported that he, in sum and

03:43PM   21    substance, he knew Mike Sinatra because it was his

03:43PM   22    landscaper, correct?

03:43PM   23    A.   That is what he said, yes.

03:43PM   24    Q.   Okay.  And you had looked into Mike Sinatra, and you know

03:44PM   25    that in fact he is a landscaper, correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

03:44PM   1    A.  He is a landscaper, and maybe something else, but yes, he

03:44PM   2    does have a landscape business.

03:44PM   3    Q.  Okay.  That's my question, he owns a landscape business,

03:44PM   4    correct?

03:44PM   5    A.  Yes.

03:44PM   6    Q.  And Mr. Bongiovanni reported he had done some --

03:44PM   7    Mr. Sinatra had done some work on his house?

03:44PM   8    A.  That's what he said, yes.

03:44PM   9         **MR. MacKAY:**  Judge, just based on the time, this

03:44PM  10    might be a good time to take the break before it gets too

03:44PM  11    late.

03:44PM  12         **THE COURT:**  Okay.  We'll take another break now.

03:44PM  13         Remember my instructions about not communicating

03:44PM  14    about the case and not making up your mind.

03:44PM  15         We'll see you back near ten or 15 minutes.

03:44PM  16         (Jury excused at 3:44 p.m.)

03:45PM  17         **THE COURT:**  Anything for the record?

03:45PM  18         **MR. MacKAY:**  No, Your Honor.

03:45PM  19         **MR. COOPER:**  No, thank you, Judge.

03:45PM  20         **THE COURT:**  Great.  See you in a few minutes.

03:45PM  21         (Off the record at 3:45 p.m.)

04:02PM  22         (Back on the record at 4:02 p.m.)

04:02PM  23         (Jury not present.)

04:02PM  24         **THE CLERK:**  All rise.

04:02PM  25         **THE COURT:**  Please be seated.

| | | |
|---|---|---|
| 04:02PM | 1 | **THE CLERK:** We are back on the record for the |
| 04:02PM | 2 | continuation of the jury trial in case number 19-cr-227, |
| 04:02PM | 3 | United States of America versus Joseph Bongiovanni. |
| 04:02PM | 4 | All counsel and parties are present. |
| 04:02PM | 5 | **THE COURT:** Anything before we resume? |
| 04:02PM | 6 | **MR. TRIPI:** Not from the government, Judge. |
| 04:02PM | 7 | **MR. MacKAY:** No, Your Honor. |
| 04:02PM | 8 | **THE COURT:** Okay. Let's bring the jury in, please. |
| 04:02PM | 9 | We're still going to finish today? |
| 04:02PM | 10 | **MR. MacKAY:** It's going a little slower than I |
| 04:02PM | 11 | expected, Judge. |
| 04:02PM | 12 | **MR. TRIPI:** We just talked about that. Probably not. |
| 04:02PM | 13 | It's close, but -- |
| 04:03PM | 14 | (Jury seated at 4:03 p.m.) |
| 04:04PM | 15 | **THE COURT:** The record will reflect that all our |
| 04:04PM | 16 | jurors, again, are present. |
| 04:04PM | 17 | I remind the witness that he's still under oath. |
| 04:04PM | 18 | We'll go until 5:00 and break then. |
| 04:04PM | 19 | You may continue, Mr. MacKay. |
| 04:04PM | 20 | **BY MR. MacKAY:** |
| 04:04PM | 21 | Q. Okay. Mr. Ryan, we were talking about Mike Sinatra; do |
| 04:04PM | 22 | you remember that? |
| 04:04PM | 23 | A. Yes. |
| 04:04PM | 24 | Q. Kevin Myszka had reported information about Joe |
| 04:04PM | 25 | Bongiovanni and Mike Sinatra being present in Toronto, |

04:04PM   1   direct?

04:04PM   2   A.  Yes, sir.

04:04PM   3   Q.  You had no other information, though, that Mike Sinatra

04:04PM   4   and Joe Bongiovanni socialized together, correct?

04:04PM   5   A.  As I was doing the interview, you're asking?  Yes, that's

04:04PM   6   correct.

04:04PM   7   Q.  Now you also asked Mr. Bongiovanni questions about Peter

04:04PM   8   Gerace, you know, and there were responses about whether he

04:04PM   9   was a confidential source, correct?

04:04PM  10   A.  Yes.

04:05PM  11          **MR. MacKAY:**  Ms. Champoux, can we show Government

04:05PM  12   Exhibit 30A.

04:05PM  13          **BY MR. MacKAY:**

04:05PM  14   Q.  Do you recall being shown this on your direct, correct?

04:05PM  15   A.  Yes.

04:05PM  16   Q.  Are you familiar this is a report that Mr. Bongiovanni

04:05PM  17   writes back in 2009, correct?

04:05PM  18   A.  Yes.

04:05PM  19   Q.  And without going through it all, some part of it

04:05PM  20   reflects that Mr. Gerace was -- had acted as a confidential

04:05PM  21   source, correct?

04:05PM  22   A.  Yes, it says that.

04:05PM  23   Q.  Yep.  Now, this had occurred a decade before you

04:05PM  24   questioned Mr. Bongiovanni, correct?

04:05PM  25   A.  Yes.

04:05PM    1    Q.  This report was not in the context of the discussion you

04:05PM    2    were having about Mr. Gerace and being a confidential source

04:05PM    3    shown to him at any point in time?

04:05PM    4    A.  No.  I did not show him the report.

04:05PM    5    Q.  Meaning, you weren't having him review this report and

04:05PM    6    tell you what he meant by it, correct?

04:05PM    7    A.  Correct.

04:05PM    8    Q.  Now you're aware that Special Agent Chris Wisniewski had

04:06PM    9    a case in or about 2008, in relation to that case he

04:06PM   10    approached his supervisors about permitting Mr. Bongiovanni

04:06PM   11    to do a cold approach with Peter Gerace in relation to that

04:06PM   12    case; were you aware of that?

04:06PM   13    A.  No.

04:06PM   14    Q.  So you're not aware of any details of a cold approach

04:06PM   15    Mr. Bongiovanni may have done of Peter Gerace back in 2018 or

04:06PM   16    2009?

04:06PM   17    A.  Is this the Gambino case?  What case are we talking

04:06PM   18    about?

04:06PM   19    Q.  Well, I'm asking you just generally.  Do you have any

04:06PM   20    knowledge about Mr. Bongiovanni doing a cold -- what's -- let

04:06PM   21    me -- do you know what a cold approach is?

04:06PM   22    A.  Yes.

04:06PM   23    Q.  Okay.  Do you, as you sit here, do you -- do you have any

04:06PM   24    knowledge of any details of a potential cold approach

04:06PM   25    Mr. Bongiovanni did with Mr. Gerace or purportedly did with

04:07PM   1   Mr. Gerace back in 2008 or 2009?

04:07PM   2   A.   The information I have about '8 or '9 is that there was

04:07PM   3   information that came in that said Peter Gerace was involved

04:07PM   4   in a drug-trafficking organization, and that Mr. Bongiovanni

04:07PM   5   and Mr. Palmieri would interview him.

04:07PM   6   Q.   Okay.  But that's the only information you have about

04:07PM   7   that, correct?

04:07PM   8   A.   Yes.

04:07PM   9   Q.   Now, another topic you discussed --

04:07PM   10          MR. MacKAY:  You can take that down, Ms. Champoux.

04:07PM   11          BY MR. MacKAY:

04:07PM   12   Q.   -- another topic you discussed was this file, 100A, that

04:07PM   13   was found in the basement, correct?

04:07PM   14   A.   Yes.

04:07PM   15   Q.   That's the physical file, so the jury remembers what I'm

04:07PM   16   talking about, correct?

04:07PM   17   A.   The Redweld folder.  Yes.

04:07PM   18   Q.   Yes.  You're doing your interview, and that's eventually

04:07PM   19   presented to you by some other agent while you're doing your

04:07PM   20   interview, correct?

04:07PM   21   A.   Yes, it was William Gamble.

04:07PM   22   Q.   And in sum and substance, you asked Mr. Bongiovanni what

04:07PM   23   it was there for.  And he said that it was to verify

04:08PM   24   everything's on the up and up?

04:08PM   25   A.   Yes.

04:08PM    1    Q.   Okay.  And you asked him a couple times about the

04:08PM    2    subject, correct?

04:08PM    3    A.   Twice.

04:08PM    4    Q.   And then, but one of the answers he gives you is that he

04:08PM    5    wanted to verify everything is on the up and up, correct?

04:08PM    6    A.   The first time, yes.

04:08PM    7    Q.   And that he knew there was an ongoing IOC investigation,

04:08PM    8    correct?

04:08PM    9    A.   Yes.

04:08PM   10    Q.   Now at that -- in late 2018, early 2019, you were in

04:08PM   11    group -- let me withdraw that.

04:08PM   12         You were always in group D-58, correct?

04:08PM   13    A.   Yes --

04:08PM   14    Q.   And I think --

04:08PM   15    A.   -- since my time with DEA.

04:08PM   16    Q.   -- and I think you told us on your direct towards the end

04:08PM   17    of 2018 you stopped reporting to DEA, correct?

04:08PM   18    A.   Sometime between, I would say, from Halloween on, very

04:09PM   19    irregular.  By the end of the year, not at all.

04:09PM   20    Q.   Okay.  Now in your work with D-58, did you have much, if

04:09PM   21    any, interactions with D-57?

04:09PM   22    A.   No.

04:09PM   23    Q.   Okay.  So as you sit here today, you don't know what, if

04:09PM   24    anything, was being said by members of D-57 about any

04:09PM   25    investigations that were going on with Mr. Bongiovanni in

04:09PM    1    late 2018, correct?

04:09PM    2    A.   Nobody from D-57 said anything to me.  I didn't hear

04:09PM    3    anybody say anything.

04:09PM    4    Q.   That was my question.  Nobody told anything to you,

04:09PM    5    correct?

04:09PM    6    A.   Correct.

04:09PM    7    Q.   Now, the phrase "on the up and up," those were

04:09PM    8    Mr. Bongiovanni's words, correct?

04:09PM    9    A.   I don't know that they were exactly his words.

04:09PM    10       The sum and substance of the exchange was that he wanted

04:09PM    11   to be able to show that he had done a legitimate

04:09PM    12   investigation of Ron Serio.

04:09PM    13   Q.   Okay.  So that's what you -- so, those words he told you

04:09PM    14   to explain why he had the Serio file at his home, correct?

04:10PM    15   A.   I don't know if that's an exact quote, no.

04:10PM    16   Q.   So --

04:10PM    17   A.   Like I said, the sum and substance of the exchange was

04:10PM    18   that he had taken a legitimate look at Ron Serio.

04:10PM    19   Q.   What are the exact words you remember Mr. Bongiovanni

04:10PM    20   saying?

04:10PM    21   A.   I don't recall his exact words.

04:10PM    22   Q.   Now, later, you returned -- you said you talked about why

04:10PM    23   the Serio file was in his home twice during the entire

04:10PM    24   interview, correct?

04:10PM    25   A.   Yes.

04:10PM    1    Q.  Now during the second time, you circle back to the

04:10PM    2    subject.  He tells you, well, I burned the rest of the files,

04:10PM    3    correct?

04:10PM    4    A.  His work papers, he was talking about.

04:10PM    5    Q.  Well, I mean, when he said work papers, what did you

04:10PM    6    understand that to mean?

04:10PM    7    A.  His other DEA work papers.

04:10PM    8    Q.  Yeah.  I'm asking you, what did you understand what

04:10PM    9    DEA -- what did you understand what DEA work papers to mean

04:10PM   10    when you heard that?

04:10PM   11    A.  I don't know.  I don't know what his other DEA work

04:11PM   12    papers were.

04:11PM   13    Q.  Well, when some -- well, generally speaking, if somebody

04:11PM   14    says DEA work papers, what do you understand that phrase to

04:11PM   15    mean?

04:11PM   16         **MR. TRIPI:**  Objection.  Asked and answered.

04:11PM   17         **THE COURT:**  Overruled.

04:11PM   18         **THE WITNESS:**  That can be a myriad of things.  All

04:11PM   19    the types of things that were in that file just related to

04:11PM   20    other cases.

04:11PM   21         **BY MR. MacKAY:**

04:11PM   22    Q.  And you know that agents generally keep working files

04:11PM   23    about the files they're working on at any one time, correct?

04:11PM   24    A.  When they're working on them, yes.

04:11PM   25    Q.  So, I think then you asked him about something about the

04:11PM    1    Serio investigation.  And he says he brought -- he -- he

04:11PM    2    learned about it in the March of 2019 interview, correct?

04:11PM    3    A.  I asked him why -- why this file, you know, if you're

04:11PM    4    only going to keep one, why this one?

04:11PM    5        And he said he learned about the Serio investigation

04:11PM    6    during the OIG interview.

04:11PM    7    Q.  Okay.  Now, when you were working this investigation, it

04:12PM    8    centered around Mr. Bongiovanni, you made a priority not to

04:12PM    9    let anybody else know about it other than very need-to-know

04:12PM   10    individuals, correct?

04:12PM   11    A.  Yes.

04:12PM   12    Q.  Okay.  You didn't talk to Mr. Bongiovanni about the fact

04:12PM   13    he was under investigation, correct?

04:12PM   14    A.  Correct.

04:12PM   15    Q.  And I'm focusing on the time after July 20th, 2018,

04:12PM   16    because that's the time period -- whether that's the exact

04:12PM   17    date, when there's an important revelation that's made,

04:12PM   18    correct?

04:12PM   19    A.  Yes.

04:12PM   20    Q.  So after that date, you don't tell Mr. Bongiovanni he's

04:12PM   21    under investigation in any fashion, correct?

04:12PM   22    A.  I did not.

04:12PM   23    Q.  You didn't tell Mr. Bongiovanni after that date that you

04:12PM   24    were investigating Ron Serio, correct?

04:12PM   25    A.  I did not.

04:12PM   1    Q.  Okay.  And, I mean, you had previously been investigating

04:12PM   2    Ron Serio before you walked into the July 20th, 2018, meeting

04:12PM   3    with him, correct?

04:12PM   4    A.  Yes.

04:12PM   5    Q.  Because you had attended a proffer back in February of

04:13PM   6    2018, correct?

04:13PM   7    A.  Yes.

04:13PM   8    Q.  And that was also of Mr. Serio, correct?

04:13PM   9    A.  Yes.  I would say, though, to say that we were

04:13PM   10   investigating Mr. Serio is not an accurate characterization

04:13PM   11   of it.  I mean, Mr. Serio was done at that point.

04:13PM   12   Q.  Because he had been arrested by the FBI and Erie County

04:13PM   13   Sheriffs, and charged in federal court, correct?

04:13PM   14   A.  Right.

04:13PM   15   Q.  But you were doing an investigation that involved Ron

04:13PM   16   Serio through 2018, correct?

04:13PM   17   A.  That's true.

04:13PM   18   Q.  And you did not share any information that you were

04:13PM   19   investigating any Ron Serio DTO with Joe Bongiovanni,

04:13PM   20   correct?

04:13PM   21   A.  I did not.

04:13PM   22   Q.  Now, you talked about that you and Special Agent Dave

04:13PM   23   Carpenter met and discussed in relation to how this March

04:13PM   24   2019 interview would be conducted, and there was a decision

04:13PM   25   made that the Serio component of the case would not be

04:14PM    1    discussed with Mr. Bongiovanni, correct?

04:14PM    2    A.   Yes.

04:14PM    3    Q.   It was your understanding that when Mr. -- when Agent

04:14PM    4    Carpenter was going to interview Mr. Bongiovanni in March of

04:14PM    5    2019, he wasn't going to talk in any fashion about the Serio

04:14PM    6    investigation, correct?

04:14PM    7    A.   Yes.

04:14PM    8    Q.   The intention was for him to talk only about this race

04:14PM    9    comments investigation, correct?

04:14PM   10    A.   Yes.

04:14PM   11    Q.   Okay.  And the purpose of doing so, and why you had these

04:14PM   12    discussions, was that so this March 2019 interview would not

04:14PM   13    alert Mr. Bongiovanni to any investigation that was occurring

04:14PM   14    about Ron Serio and him, correct?

04:14PM   15    A.   By --

04:14PM   16    Q.   Him --

04:14PM   17    A.   -- Ron Serio and Mr. Bongiovanni?

04:14PM   18    Q.   Yes.

04:14PM   19    A.   Yes.

04:14PM   20    Q.   Now, you're aware, though, that Special Agent Carpenter

04:14PM   21    didn't follow those rules when he conducted the interview,

04:14PM   22    correct?

04:14PM   23         **MR. TRIPI:**  Objection.  Calls for hearsay, and

04:14PM   24    argumentative, and speculative.

04:14PM   25         **THE COURT:**  Overruled.

04:15PM    1          BY MR. MacKAY:

04:15PM    2    Q.  Are you aware he didn't follow that plan that you

04:15PM    3    discussed, correct?

04:15PM    4    A.  No.

04:15PM    5    Q.  Okay.  You're aware -- are you aware that he asked

04:15PM    6    questions about T.S. in that March 2019 interview?

04:15PM    7    A.  I don't recall.

04:15PM    8    Q.  Okay.  And you're aware from your investigation

04:15PM    9    separately that T.S. had some connection to Ron Serio,

04:15PM   10    correct?

04:15PM   11    A.  Yes.

04:15PM   12          MR. MacKAY:  Ms. Champoux, can we show Government

04:15PM   13    Exhibit 26E?

04:15PM   14          MS. CHAMPOUX:  E as in Edward?

04:15PM   15          MR. MacKAY:  Yes.

04:15PM   16          THE COURT:  In evidence?

04:15PM   17          MR. MacKAY:  Yes.

04:15PM   18          BY MR. MacKAY:

04:15PM   19    Q.  All right.  So I'm showing you Government Exhibit 26E.

04:15PM   20    Do you recognize that to be a DARTS email?

04:15PM   21    A.  Yes.

04:15PM   22    Q.  Okay.  And we've done this throughout this trial a lot,

04:15PM   23    but I just want to orient the jury again.  This is an email

04:16PM   24    that members of law enforcement receive when there's an

04:16PM   25    overlap about numbers that are put into DARTS; is that fair

04:16PM  1   to say?

04:16PM  2   A.  This particular email doesn't originate from DARTS.

04:16PM  3   Q.  Okay.

04:16PM  4   A.  It's been forwarded once.

04:16PM  5   Q.  Okay.  Where was it forwarded from originally?

04:16PM  6   A.  Well, it's from Joseph Bongiovanni, using his iPhone, to

04:16PM  7   Gregory Yensan.

04:16PM  8   Q.  Yeah, let me narrow this a little bit better.

04:16PM  9       I'm talking about, sort of, the lower half of the email.

04:16PM  10  A.  So the part that's from, and has my name and email

04:16PM  11  address down, yes, that's from DARTS.

04:16PM  12  Q.  Okay.  So that's, like, let's just -- I kind of want to

04:16PM  13  just ignore the top here.

04:16PM  14      But what's below that is a -- what we can refer to it as

04:16PM  15  a DARTS email, correct?

04:16PM  16  A.  Yes.

04:16PM  17  Q.  Okay.  That's the email that's automatically generated

04:16PM  18  when there's overlap in numbers, correct?

04:16PM  19  A.  Yes.

04:16PM  20  Q.  And the date this occurs is August 21st, 2018, correct?

04:17PM  21  A.  Yes.

04:17PM  22  Q.  And it's being sent from your email address, correct?

04:17PM  23  A.  It doesn't show up in your out box, but that's the way

04:17PM  24  they're formatted, yes.

04:17PM  25  Q.  So it's being automatically generated but, you know, it's

04:17PM    1    not like you -- and it's being associated with you, but it's

04:17PM    2    not that you're personally sending this email; is that a way

04:17PM    3    of characterizing it?

04:17PM    4    A.   Yes.

04:17PM    5    Q.   Okay.  But this DARTS entry that occurs on this date is

04:17PM    6    generated because of action you take on that date, correct?

04:17PM    7    A.   Yes.

04:17PM    8    Q.   And that's why it shows as coming from your email,

04:17PM    9    correct?

04:17PM    10   A.   Yes.

04:17PM    11          **MR. MacKAY:**  Ms. Champoux, can we blow up the from

04:17PM    12   date and to section there?  Okay.

04:17PM    13          **BY MR. MacKAY:**

04:18PM    14   Q.   And then when there's a DARTS overlap, generally what

04:18PM    15   happens is anybody who has a -- withdrawn.  Let me reword

04:18PM    16   that.

04:18PM    17        When one of these emails is sent, it's sent out to other

04:18PM    18   people who might cross-reference or overlap with the numbers

04:18PM    19   in the DARTS system, correct?

04:18PM    20   A.   Yes.

04:18PM    21   Q.   And that's who the -- who's encompassed to this "to"

04:18PM    22   section, correct?

04:18PM    23   A.   Yes.

04:18PM    24   Q.   Okay.  And it's -- Mr. Bongiovanni is noted as one of the

04:18PM    25   recipients, correct?

04:18PM    1    A.  Yes.

04:18PM    2    Q.  So in simple parlance, he's getting one of these DARTS

04:18PM    3    emails on that date that purports to originate from you,

04:18PM    4    correct?

04:18PM    5    A.  Yes.

04:18PM    6         MR. MacKAY:  Can we unblow that up, Ms. Champoux.

04:18PM    7         And now can we go down and blow up the lower half of

04:18PM    8    the page?

04:18PM    9         BY MR. MacKAY:

04:18PM   10    Q.  So for this first entry, it's indicating that you're

04:19PM   11    logging a number here, correct?

04:19PM   12    A.  Yes.

04:19PM   13    Q.  I might not have the parlance exactly, but what's going

04:19PM   14    on here is that this is a number that you're somehow entering

04:19PM   15    where I circled, and that's going into the DARTS system and

04:19PM   16    generating an overlap, correct?

04:19PM   17    A.  Yes.

04:19PM   18    Q.  And the remarks you're putting in in association with

04:19PM   19    running this number are numbers associated with Ron Serio

04:19PM   20    DTO, correct?

04:19PM   21    A.  Yes.

04:19PM   22    Q.  And you are identifying a DEA file number here, correct?

04:19PM   23    A.  Yes.

04:19PM   24    Q.  Okay.  And then the overlap is created the next entry

04:19PM   25    down with similar number that Justin Borst, the intel

04:19PM   1   analyst, entered, correct?

04:19PM   2   A.   Yes.

04:19PM   3        **MR. MacKAY:**  Okay.  Can we unblow that up?  I don't

04:19PM   4   know a better word.

04:19PM   5        **BY MR. MacKAY:**

04:19PM   6   Q.   So, Mr. Bongiovanni is receiving this email on

04:20PM   7   August 21st, 2018, correct?

04:20PM   8   A.   Yes.

04:20PM   9   Q.   And he's able, I mean, based on what's in the email, he's

04:20PM   10  able to see that you're running a number associated with the

04:20PM   11  Ron Serio DTO on August 21st, 2018, correct?

04:20PM   12  A.   Yes.

04:20PM   13  Q.   Okay.  And he can see, presumably based on what's in this

04:20PM   14  email, that it has some overlap with the case he did, which

04:20PM   15  was the Wayne Anderson case, correct?

04:20PM   16  A.   Yes.  The number overlapped.

04:20PM   17  Q.   Right.  I circled the number there.  That's the Wayne

04:20PM   18  Anderson file number, correct?

04:20PM   19  A.   Yes.

04:20PM   20  Q.   Okay.  And this date is August 21st, 2018, is a month

04:20PM   21  after you interviewed Ron Serio, correct?

04:20PM   22  A.   Yes.

04:20PM   23  Q.   And you're logging this number associated with the Ron

04:21PM   24  Serio DTO under a C2-16-0087 file number, correct?

04:21PM   25  A.   Yes.

04:21PM    1    Q.  And do you recall as you sit here what the file title for

04:21PM    2    that case number was?

04:21PM    3    A.  It may have been Joe Bella, or it may have been Jarrett

04:21PM    4    Guy.

04:21PM    5    Q.  Okay.  But at the same time, I think you've already

04:21PM    6    testified, in August of 2018, you're not talking to

04:21PM    7    Mr. Bongiovanni about Ron Serio in any fashion though,

04:21PM    8    correct?

04:21PM    9    A.  That's correct.

04:21PM   10        MR. MacKAY:  Now, Ms. Champoux, can you take that

04:21PM   11    down?  Can we pull up in Government Exhibit 100A.1, the file

04:22PM   12    entitled DARTS email 1/7/19.

04:22PM   13        MR. TRIPI:  I'm sorry, I missed the exhibit number.

04:22PM   14        MR. MacKAY:  100A.1.

04:22PM   15        MR. TRIPI:  Thank you.

04:22PM   16        MR. MacKAY:  Sorry about that.  It was DARTS email

04:22PM   17    1/7/19.

04:22PM   18        Can we zoom out just a little bit?

04:22PM   19        BY MR. MacKAY:

04:22PM   20    Q.  And this is another of these DARTS emails, correct?

04:22PM   21    A.  Yes.

04:22PM   22    Q.  And this one, from what you can see, it's occurring on

04:22PM   23    January 7th, 2019, correct?

04:22PM   24    A.  Yes.

04:22PM   25    Q.  And it's got your name as one of the recipients, correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

145

04:22PM   1   A.  Yes.

04:22PM   2   Q.  And it's got Joseph Bongiovanni's name as one of the

04:22PM   3   recipients, correct?

04:22PM   4   A.  It does.

04:22PM   5        **MR. MacKAY:**  Okay.  Can we scroll down a little bit,

04:22PM   6   Ms. Champoux.  Okay.  Actually, just a little bit further up.

04:22PM   7        **BY MR. MacKAY:**

04:23PM   8   Q.  So, again, based on how DARTS emails work, this is a

04:23PM   9   copy -- I'm sorry, this is an email that Mr. Bongiovanni

04:23PM  10   would have seen, correct?

04:23PM  11   A.  Yes.

04:23PM  12   Q.  Because he would have --

04:23PM  13   A.  Presumably.

04:23PM  14   Q.  -- because he would have received it, correct?

04:23PM  15   A.  He would have received it, yes, sir.

04:23PM  16   Q.  And in fact, this is a scan of a printout that was in

04:23PM  17   100A, correct?

04:23PM  18   A.  Yes.

04:23PM  19   Q.  Okay.  Now, this first entry, do you see here it says

04:23PM  20   1/7/19, correct?

04:23PM  21   A.  Yes.

04:23PM  22   Q.  And it's Anthony Casullo is running a number, correct?

04:23PM  23   A.  Yes.

04:23PM  24   Q.  And it shows that it's a -- phone numbers in contact with

04:23PM  25   Mike Sinatra related to a burglary and drug trafficking in

04:23PM    1    Buffalo and Niagara County, correct?

04:23PM    2    A.   Yes.

04:23PM    3    Q.   And then two entries down, it shows an entry that, again,

04:24PM    4    Anthony Casullo put in, correct?

04:24PM    5    A.   Yes.

04:24PM    6    Q.   It was a couple days earlier on January 3rd, 2019,

04:24PM    7    correct?

04:24PM    8    A.   Yes.

04:24PM    9    Q.   And it's numbers related to ongoing investigation in

04:24PM   10    Tonawanda, New York, and worked jointly with HSI Buffalo,

04:24PM   11    correct?

04:24PM   12    A.   Yes.

04:24PM   13    Q.   As you were interviewing Mr. Bongiovanni, at one point in

04:24PM   14    time during the interview in his house, he indicates that he

04:24PM   15    knew -- something to the effect that he knew you guys were

04:24PM   16    looking at Serio, correct?

04:24PM   17    A.   Yes.

04:24PM   18    Q.   And you took that to mean HSI, correct?

04:24PM   19    A.   He gestured towards me, yes.

04:24PM   20    Q.   Okay.  And at the time, you were still with HSI, correct?

04:24PM   21    A.   Yes.

04:24PM   22    Q.   All right.

04:24PM   23         **MR. MacKAY:**  You can take that down, Ms. Champoux,

04:24PM   24    thank you.

04:24PM   25             Oops, I'm sorry.  Can you leave that up for one

04:24PM    1    second?  Can you go down to the next page?

04:25PM    2            **BY MR. MacKAY:**

04:25PM    3    Q.  All right.  So we're on the second page now.  This is

04:25PM    4    another number that's run, correct?

04:25PM    5    A.  Yes.

04:25PM    6    Q.  And, again, it shows on January 7th, 2019, an overlap

04:25PM    7    that Anthony Casullo is running a number related to the Mike

04:25PM    8    Sinatra burglary, in sum and substance, correct?

04:25PM    9    A.  Yes.

04:25PM   10    Q.  And below that, it ties to an entry that was inputted

04:25PM   11    back in 2013 with Justin Borst, correct?

04:25PM   12    A.  It does.

04:25PM   13    Q.  And it's got that same entry again regarding Anthony

04:25PM   14    Casullo inputting something on January 3, 2019, correct?

04:25PM   15    A.  Yes.

04:25PM   16    Q.  That one also refers to the joint investigation with HSI,

04:25PM   17    correct?

04:25PM   18    A.  Yes.

04:25PM   19    Q.  And that middle entry, that was also in reference to the

04:25PM   20    Wayne Anderson file, correct?

04:25PM   21    A.  Are you talking about C2-13-0026, yes.

04:26PM   22    Q.  Yes.  So, based on this email, Mr. Bongiovanni is

04:26PM   23    receiving an email that shows that there's some overlap

04:26PM   24    between the Wayne Anderson file he investigated back in 2013,

04:26PM   25    and the current ongoing investigation worked jointly with

04:26PM    1    HSI, correct?

04:26PM    2    A.  Well, it's specific to phone numbers, so that's the

04:26PM    3    overlap.

04:26PM    4    Q.  Right.  But there's some overlap between an investigation

04:26PM    5    HSI is doing in early 2019, and something he did in Wayne

04:26PM    6    Anderson back in 2013, correct?

04:26PM    7    A.  It's correct.  There's an overlap.  I'm just elaborating

04:26PM    8    that it's specific to phone numbers.  So it's not the sum

04:26PM    9    overlap.  The overlap is the phone numbers.

04:26PM    10   Q.  Right.  So there's an overlap between the phone numbers

04:26PM    11   which is some part of the investigation that was done back in

04:26PM    12   2013, overlaps with something that's occurring in 2019,

04:26PM    13   correct?

04:26PM    14   A.  I just -- I feel like you're trying to make it more

04:26PM    15   general than it is, when it's very specific.

04:27PM    16       It's very specifically the phone number that's overlaps.

04:27PM    17   Q.  Let me ask it again.

04:27PM    18       The phone numbers in 2019 that are being investigated in

04:27PM    19   a joint investigation of HSI and DEA overlap with phone

04:27PM    20   numbers that are associated with the Wayne Anderson file back

04:27PM    21   in 2013, correct?

04:27PM    22   A.  Yes.  Yes.

04:27PM    23           **MR. MacKAY:**  You can take that down, Ms. Champoux.

04:27PM    24           **BY MR. MacKAY:**

04:27PM    25   Q.  Now another subject you talked about was generally about

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24
149

04:27PM    1    Peter Militello, correct?  During the interview with

04:27PM    2    Mr. Bongiovanni?

04:27PM    3    A.  No, not generally about Peter Militello.  That was in

04:27PM    4    response to a question.

04:27PM    5    Q.  Well, it's a subject that came up in the interview,

04:27PM    6    correct?

04:27PM    7    A.  Peter Militello?  That name was a response to a specific

04:27PM    8    question, so yes, it came up in that context.

04:27PM    9    Q.  Yes.  So the name Peter Militello came up in your

04:27PM    10   interview with Joe Bongiovanni in June of 2019, correct?

04:28PM    11   A.  Yes.

04:28PM    12   Q.  Now, this was in relation to who -- the questions about

04:28PM    13   who the source in the Wayne Anderson file was, correct?

04:28PM    14   A.  Yes.

04:28PM    15   Q.  Okay.  You asked Mr. Bongiovanni some questions, and he

04:28PM    16   responded that the source was Peter Militello; is that fair

04:28PM    17   to say?

04:28PM    18   A.  No, not the source.  I was asking him what happened with

04:28PM    19   his Ron Serio investigation.

04:28PM    20   Q.  Okay.

04:28PM    21   A.  He said his source was arrested for selling fentanyl and

04:28PM    22   heroin, meaning his confidential source, his source into Ron

04:28PM    23   Serio.  So that effectively ended his investigation.

04:28PM    24   Q.  Okay.  Now, you had previously reviewed the Wayne

04:28PM    25   Anderson file prior to interviewing Mr. Bongiovanni, correct?

04:28PM  1    A.  Yes.

04:28PM  2    Q.  And you knew that Peter Militello was not in any way a

04:28PM  3    confidential source in the Wayne Anderson file, correct?

04:28PM  4    A.  I didn't know that as I sat there, no.

04:28PM  5    Q.  You had not seen Peter Militello's name in the Wayne

04:29PM  6    Anderson file, correct?

04:29PM  7    A.  If he was the source in the file, it wouldn't be in

04:29PM  8    there.

04:29PM  9    Q.  So my question to you was:  You did not see Peter's

04:29PM  10   Militello name in the Wayne Anderson file, correct?

04:29PM  11   A.  I thought your question was whether or not I knew if he

04:29PM  12   was the source in the Wayne Anderson file.

04:29PM  13   Q.  So what I'm getting toward is when you reviewed the Wayne

04:29PM  14   Anderson file prior to interviewing Mr. Bongiovanni, you

04:29PM  15   didn't see Peter Militello's name in that file?

04:29PM  16        **MR. TRIPI:**  Objection.

04:29PM  17        **MR. MacKAY:**  Correct?

04:29PM  18        **MR. TRIPI:**  Presumes facts not in evidence.  I don't

04:29PM  19   think there was any evidence that he reviewed it before the

04:29PM  20   interview.

04:29PM  21        **THE COURT:**  I'll sustain the objection to the form of

04:29PM  22   the question.  Ask another question.

04:29PM  23        **BY MR. MacKAY:**

04:29PM  24   Q.  Did you review the Wayne Anderson file prior to

04:29PM  25   interviewing Joseph Bongiovanni in June of 2019?

04:29PM    1    A.  At least the DEA-6s.

04:29PM    2    Q.  Okay.  And in those DEA-6s, fair to say there's no

04:29PM    3    mention of Peter Militello, correct?

04:29PM    4    A.  There is not.

04:29PM    5    Q.  Peter Militello is not identified as a confidential

04:30PM    6    source in any of those DEA-6s, correct?

04:30PM    7    A.  No one would be identified by a name as a confidential

04:30PM    8    source in a DEA-6.

04:30PM    9    Q.  My question was:  Peter Militello is never identified as

04:30PM   10    any sort of confidential source in those DEA-6s, correct?

04:30PM   11    A.  No.

04:30PM   12    Q.  Okay.  His name doesn't appear in any fashion,

04:30PM   13    confidential source or otherwise, in those DEA-6s, correct?

04:30PM   14    A.  It doesn't.

04:30PM   15    Q.  Okay.  So you were not familiar with the Peter Militello

04:30PM   16    name from the Wayne Anderson file when you sat down with Joe

04:30PM   17    Bongiovanni in June of 2019, correct?

04:30PM   18    A.  Not from the file, no.

04:30PM   19    Q.  Okay.

04:30PM   20    A.  I don't know if I already knew about his case or not.

04:30PM   21    Q.  Now your review of the DEA-6s indicated that R.K. was

04:30PM   22    potentially associated with the Wayne Anderson file as a

04:30PM   23    confidential source, correct?

04:30PM   24    A.  That didn't come from a review of the 6s, no.

04:30PM   25    Q.  Okay.  That came of a review of other documents

04:31PM  1  associated with the DEA in some fashion?

04:31PM  2  A.  Well, I mean, at some point the DEA turned over the

04:31PM  3  source file to DOJ OIG.

04:31PM  4  Q.  Okay.  So when you went in to sit down with

04:31PM  5  Mr. Bongiovanni in June of 2019, were you familiar with the

04:31PM  6  name R.K.?

04:31PM  7  A.  I can't recall if I heard it before or not.

04:31PM  8  Q.  But you asked Mr. Bongiovanni questions about who the

04:31PM  9  confidential source was in that -- in that file?

04:31PM  10  A.  I asked what happened to his investigation, what the

04:31PM  11  result was.  He said his source was arrested.  And I said,

04:31PM  12  oh, who was your source?  And he told me Peter Militello.

04:31PM  13  Q.  Okay.  And I'm just trying to clarify that's the first

04:31PM  14  time you hear Peter Militello's name?

04:31PM  15  A.  I think so, yes.

04:31PM  16  Q.  And it's your testimony that Joseph Bongiovanni was

04:31PM  17  describing him as a, quote, unquote, confidential source?

04:31PM  18  A.  Yes, his source.

04:31PM  19  Q.  His source.  So I want to get the wording clear.

04:32PM  20      What he's saying is it's, quote, unquote, his source?

04:32PM  21  A.  Yes.  So, it's two law enforcement guys talking in our

04:32PM  22  jargon, the sum and substance of it is that Peter Militello

04:32PM  23  is his source.

04:32PM  24  Q.  Okay.  So the words he used were, quote, unquote, his

04:32PM  25  source?

04:32PM 1    A.  Yes.

04:32PM 2    Q.  Okay.  He didn't use the word "confidential source"

04:32PM 3    directly to you, correct?

04:32PM 4    A.  No.

04:32PM 5    Q.  Okay.  All right.  So did you come to learn -- I mean,

04:32PM 6    did you further investigate that name Peter Militello after

04:32PM 7    that interview?

04:32PM 8    A.  Yes.

04:32PM 9    Q.  Okay.  And you came to learn that Peter Militello was not

04:32PM 10   in any way a, quote, unquote, confidential source, correct?

04:32PM 11   A.  No.  I don't think he ever was.

04:32PM 12   Q.  He was a target of an investigation, correct?

04:32PM 13   A.  Yes.

04:32PM 14   Q.  And he was arrested for selling fentanyl, correct?

04:32PM 15   A.  Yes.

04:32PM 16   Q.  And that was an investigation Joseph Bongiovanni worked,

04:32PM 17   correct?

04:33PM 18   A.  Yes.

04:33PM 19   Q.  And did you review the file at some point prior to

04:33PM 20   testifying that that investigation was worked out of

04:33PM 21   regarding Peter Militello?

04:33PM 22   A.  I have seen it, yes.

04:33PM 23   Q.  And do you recall in those DEA-6s associated with that

04:33PM 24   file that Peter Militello is also identified as being a

04:33PM 25   source of supply?

04:33PM   1    A.  I don't.

04:33PM   2    Q.  Now, when you started the conversation with

04:33PM   3    Mr. Bongiovanni, this interview, at some point in time after

04:33PM   4    the start, you orient him to the fact that you're talking

04:33PM   5    about Italian Organized Crime, correct?

04:33PM   6    A.  Actually, that comes up talking about Peter.  He mentions

04:34PM   7    that Peter's grandfather had something to do with organized

04:34PM   8    crime.  And then I asked him what he thought about that.

04:34PM   9    Q.  Okay.  And Peter was one of the first subjects you

04:34PM  10    covered in the interview, correct?

04:34PM  11    A.  The first.

04:34PM  12    Q.  Okay.  And then at some point in time in the interview,

04:34PM  13    you start going through a list of names with Mr. Bongiovanni,

04:34PM  14    correct?

04:34PM  15    A.  Yes.

04:34PM  16    Q.  And those had come from where again?

04:34PM  17    A.  From the border search of his phone.

04:34PM  18    Q.  Okay.  And you went through a number of those on direct,

04:34PM  19    but ultimately you get to the name Kim Mecca, correct?

04:34PM  20    A.  Yes.

04:34PM  21    Q.  And he mentions the -- Mr. Bongiovanni mentions the

04:34PM  22    connection between Kim Mecca and who her boyfriend is,

04:34PM  23    correct?

04:34PM  24    A.  He said that Kim Mecca was the girlfriend of a friend of

04:34PM  25    his.

04:34PM  1  Q.  And then ultimately tells you that friend is Lou Selva,

04:34PM  2  correct?

04:34PM  3  A.  Yes.

04:34PM  4  Q.  And then he -- I think you demonstrated the reaction he

04:34PM  5  had, some sort of physical reaction when he brought up Lou

04:35PM  6  Selva's name, correct?

04:35PM  7  A.  In between, like, saying the girlfriend of a friend

04:35PM  8  through the Lou Selva answer, yes.

04:35PM  9  Q.  Okay.  Now, and when you're going through these names

04:35PM  10  with Mr. Bongiovanni, these names weren't all random names,

04:35PM  11  correct?

04:35PM  12  A.  No, they were the only names that I had.

04:35PM  13  Q.  Okay.  Well, that you had -- so is it fair to say you had

04:35PM  14  an interest in asking about these names because you brought

04:35PM  15  this list of who these names were to the interview?

04:35PM  16  A.  But it's not a list that I made.  It was the totality of

04:35PM  17  what we knew from the border encounter.

04:35PM  18  Q.  Okay.  Yeah.  Let's talk about how you get some of that

04:35PM  19  information.

04:35PM  20      When there's an extraction done of a phone, it produces

04:35PM  21  list of contacts, correct?

04:35PM  22  A.  Yes.

04:35PM  23  Q.  And did you have the entire list of contacts from

04:35PM  24  Mr. Bongiovanni's phone?

04:36PM  25  A.  No.

04:36PM  1   Q.  Okay.  What you had was a subreport of some contacts of

04:36PM  2   Mr. Bongiovanni's phone?

04:36PM  3   A.  It wasn't a subreport from an extraction.  No extraction

04:36PM  4   was ever done.  It was photographs taken of the phone as

04:36PM  5   somebody thumbed through it.

04:36PM  6   Q.  Okay.  I want to sort of orient the jury to this.

04:36PM  7       Mr. Bongiovanni's phone at the border was never fully

04:36PM  8   extracted, correct?

04:36PM  9   A.  That's correct.

04:36PM  10  Q.  What you got in response was an HSI agent somewhere

04:36PM  11  basically taking photos of -- screenshots of his phone,

04:36PM  12  correct?

04:36PM  13  A.  Yes.

04:36PM  14  Q.  Okay.  And those are what you review prior to going into

04:36PM  15  the interview with Mr. Bongiovanni, correct?

04:36PM  16  A.  Yes.

04:36PM  17  Q.  Now, the photos that you were looking at of the

04:36PM  18  screenshots of Mr. Bongiovanni's phone, those weren't every

04:36PM  19  one of his contacts, correct?

04:36PM  20  A.  No.

04:36PM  21  Q.  No, it was --

04:36PM  22  A.  I don't think so.

04:36PM  23  Q.  Did it appear to you that there were specific contacts

04:37PM  24  that had been singled out?

04:37PM  25  A.  I don't know how they were singled out, if that's what

04:37PM    1    you're asking me.

04:37PM    2    Q.  No, I --

04:37PM    3    A.  I think it was a -- it was a selection of contacts from

04:37PM    4    his phone --

04:37PM    5    Q.  That's what I'm asking.

04:37PM    6    A.  -- done by somebody else.

04:37PM    7    Q.  It was a selection of the contacts in some fashion,

04:37PM    8    correct?

04:37PM    9    A.  Yes.

04:37PM    10   Q.  It was not the entire list of contacts, correct?

04:37PM    11       From what you could see, based on how you received these

04:37PM    12   photos?

04:37PM    13   A.  I mean, I -- to know absolutely it was every contact?

04:37PM    14   No.  But nobody's phone has 11 contacts in it, or whatever

04:37PM    15   that was.  It just didn't seem like enough to be all of them.

04:37PM    16   Q.  Okay.  And so you estimated approximately 11 contacts

04:37PM    17   here?

04:37PM    18   A.  I -- I'm guessing.  It's around ten.  It's not a long

04:37PM    19   list.

04:37PM    20   Q.  Okay.  So prior to entering the interview with

04:37PM    21   Mr. Bongiovanni, those contacts had some significance

04:37PM    22   because, as you just said, they weren't all of the contacts

04:37PM    23   in his phone, correct?

04:37PM    24   A.  I don't understand that question now.

04:37PM    25   Q.  Meaning you had received a number of contacts of

04:38PM    1    Mr. Bongiovanni's phone, and they weren't all of the contacts

04:38PM    2    in the phone, correct?

04:38PM    3    A.  That's correct.

04:38PM    4    Q.  And you proceeded to ask him questions about these

04:38PM    5    specific contacts, correct?

04:38PM    6    A.  Yes.

04:38PM    7    Q.  Okay.  Now, we'll move on to a different subject.

04:38PM    8        You directed the search at Anthony Gerace's house in

04:38PM    9    Clarence, correct?

04:38PM   10    A.  Yes.

04:38PM   11    Q.  It was in January of 2019, correct?

04:38PM   12    A.  Yes.

04:38PM   13    Q.  You testified there was approximately $103,000 that were

04:38PM   14    found -- that was found there, correct?

04:38PM   15    A.  Yes.

04:38PM   16    Q.  We looked at, on your direct, what appeared to be a

04:38PM   17    Super Bowl ledger book; do you recall that?

04:38PM   18    A.  The spiral notebook?  Yes.

04:38PM   19         **MR. MacKAY:**  Yeah, Ms. Champoux, can we put that up,

04:38PM   20    Government Exhibit 72A-55.

04:39PM   21         **BY MR. MacKAY:**

04:39PM   22    Q.  That's the photo of the physical notebook you reviewed,

04:39PM   23    correct?

04:39PM   24    A.  Yes.

04:39PM   25    Q.  And you went through some names on direct with Mr. Tripi,

04:39PM  1   correct?

04:39PM  2   A.  Yes.

04:39PM  3          MR. MacKAY:  Can we blow that up a little bit,

04:39PM  4   Ms. Champoux?  Yeah, that -- that quarter is good.

04:39PM  5          BY MR. MacKAY:

04:39PM  6   Q.  Let me give you a number, number 34.  That's 67 West.  Do

04:39PM  7   you see that?

04:39PM  8   A.  Yes.

04:39PM  9   Q.  You know that to be a bar on Chippewa in Buffalo,

04:39PM  10  correct?

04:39PM  11  A.  No, I don't, but --

04:39PM  12  Q.  Okay.  You have no reason to disagree with me that that's

04:39PM  13  a bar on Chippewa?

04:39PM  14  A.  No, I don't.

04:39PM  15  Q.  Okay.  Number 40, you see that it says Wing Kings?

04:39PM  16  A.  Yes.

04:40PM  17  Q.  Do you understand that to be a restaurant on Elmwood

04:40PM  18  Avenue at one point in time?

04:40PM  19  A.  I have no idea.

04:40PM  20  Q.  No reason to disagree with me there was a restaurant

04:40PM  21  named Wing Kings on Elmwood Avenue at one point?

04:40PM  22  A.  I just don't know.

04:40PM  23  Q.  All right.  Now, there was -- I think it was in the first

04:40PM  24  column.

04:40PM  25          MR. MacKAY:  Ms. Champoux, can you blow up number 14?

04:40PM    1         **BY MR. MacKAY:**

04:40PM    2    Q.   It says Wayne.  Do you see that one?

04:40PM    3    A.   Yes.

04:40PM    4    Q.   Are you familiar with the name Wayne Anderson from your

04:40PM    5    review of C2-13-0026, correct?

04:40PM    6    A.   Yes.

04:40PM    7    Q.   This one doesn't have any last name associated with it

04:40PM    8    though, correct?  Here, what you see?

04:40PM    9    A.   No, there's no last name there.

04:40PM   10    Q.   So, no idea whether that's in reference to the same Wayne

04:40PM   11    Anderson, correct?

04:40PM   12    A.   Just that it's Wayne.

04:40PM   13         **MR. MacKAY:**  Okay.  Can we zoom out, Ms. Champoux.

04:40PM   14         **BY MR. MacKAY:**

04:40PM   15    Q.   Let's go to number 76.  That name is Rodney Giove.  Do

04:41PM   16    you understand him to be a lawyer in the Niagara Falls area?

04:41PM   17    A.   Rodney Giove?

04:41PM   18    Q.   Yeah.

04:41PM   19    A.   Yes.

04:41PM   20         **MR. MacKAY:**  Can you zoom out, and can we go to

04:41PM   21    number 88.

04:41PM   22         **BY MR. MacKAY:**

04:41PM   23    Q.   That says Jay Dockside.  Do you understand that to be Jay

04:41PM   24    Shepard, the gentleman who owns Dockside Restaurant in NT?

04:41PM   25    A.   I know that there's a Dockside Restaurant in NT.  I have

04:41PM    1    no idea who owns it.

04:41PM    2    Q.  Would you have any reason to disagree with me that that

04:41PM    3    restaurant is owned by a gentleman named Jay Shepard?

04:41PM    4    A.  I just don't know who owns it.

04:41PM    5         MR. MacKAY:  Okay.  And, Ms. Champoux, can we go to

04:41PM    6    number 23.

04:41PM    7         BY MR. MacKAY:

04:41PM    8    Q.  And that one says Russell Jr.; do you see that one?

04:41PM    9    A.  Yes.

04:41PM   10    Q.  Now, you're familiar there's a Russell Salvatore who owns

04:41PM   11    Salvatore's Hotel in the area, correct?

04:41PM   12    A.  Yes.

04:41PM   13    Q.  That's Russell Sr., not Russell Jr., correct?

04:41PM   14    A.  I don't recall as I sit here.  I know there's a

04:42PM   15    father/son in the other place, I don't know --

04:42PM   16    Q.  Yeah.

04:42PM   17    A.  -- I don't know if it's Jr. or III or the --

04:42PM   18    Q.  Do you understand one to be older, and one to be quite

04:42PM   19    younger?

04:42PM   20    A.  Yes.

04:42PM   21    Q.  Okay.  And do you understand the older one to own the

04:42PM   22    restaurant -- I'm sorry, to own the hotel?

04:42PM   23    A.  I think they both do, right?

04:42PM   24    Q.  I'm asking you what you understand.

04:42PM   25    A.  Yes.

| | | |
|---|---|---|
| 04:42PM | 1 | **MR. MacKAY:** Okay. Now, number 37. Can we blow that |
| 04:42PM | 2 | one up? |
| 04:42PM | 3 | **BY MR. TRIPI:** |
| 04:42PM | 4 | Q. That's Ron Serio, correct? |
| 04:42PM | 5 | A. Yes. |
| 04:42PM | 6 | Q. And he was arrested in April of 2017, correct? |
| 04:42PM | 7 | A. Yes. |
| 04:42PM | 8 | Q. Did you understand as part of his release conditions that |
| 04:42PM | 9 | he was to refrain from any type of gambling activity? |
| 04:42PM | 10 | A. I don't know. |
| 04:42PM | 11 | **MR. TRIPI:** Objection, 403. |
| 04:42PM | 12 | **THE COURT:** I'm sorry? |
| 04:42PM | 13 | **MR. TRIPI:** 403, his release conditions. |
| 04:42PM | 14 | **THE COURT:** Overruled. |
| 04:42PM | 15 | **THE WITNESS:** I don't know what his release |
| 04:43PM | 16 | conditions were. I never read them. |
| 04:43PM | 17 | **MR. MacKAY:** Okay. Can we go to the upper left-hand |
| 04:43PM | 18 | corner? |
| 04:43PM | 19 | **BY MR. MacKAY:** |
| 04:43PM | 20 | Q. It says $105,000; is that fair to say? |
| 04:43PM | 21 | A. Yes. |
| 04:43PM | 22 | Q. Now, as you viewed this ledger and the related Super Bowl |
| 04:43PM | 23 | squares, fair to say you understood this to mean that Anthony |
| 04:43PM | 24 | Gerace was running some sort of Super Bowl pool, correct? |
| 04:43PM | 25 | A. Yes. |

04:43PM  1   Q.  And we actually looked at the Super Bowl squares chart on

04:43PM  2   your direct.

04:43PM  3           MR. MacKAY:  Ms. Champoux, can we show Government

04:43PM  4   Exhibit 72A-56?

04:43PM  5           BY MR. MacKAY:

04:43PM  6   Q.  Okay.  And that's the actual Super Bowl squares, correct?

04:43PM  7   A.  Yes.

04:43PM  8   Q.  You can see both the horizontal and vertical axis.  This

04:43PM  9   was Philadelphia Eagles, and the New England Patriots,

04:43PM  10  correct?

04:44PM  11  A.  Yes.

04:44PM  12  Q.  Do you understand that was the 2018 Super Bowl?

04:44PM  13  A.  Yes, it was -- yeah, the year before.

04:44PM  14  Q.  Right.  So that's what I'm asking.  This was the

04:44PM  15  Super Bowl the year before -- almost a year before when the

04:44PM  16  search warrant was executed at his house, correct?

04:44PM  17  A.  Yes.

04:44PM  18  Q.  The 2019 Super Bowl hadn't yet occurred, correct?

04:44PM  19  A.  Right.

04:44PM  20  Q.  Okay.  Now, Ron Serio's name is nowhere to be found on

04:44PM  21  that chart, correct?

04:44PM  22  A.  I don't -- do you want me to search the whole chart?

04:44PM  23  Q.  Sure.

04:44PM  24  A.  I don't see -- I don't see it.

04:44PM  25  Q.  Now --

04:44PM 1  A.  Was that Ron at the intersection of 9 and 8?  It's hard

04:45PM 2  to tell with the fold.

04:45PM 3       **MR. MacKAY:**  Yeah, we can blow that up.

04:45PM 4       **THE WITNESS:**  No.  It says R and W.

04:45PM 5       **BY MR. MacKAY:**

04:45PM 6  Q.  Okay.  All right.  So fair to say it doesn't show Ron

04:45PM 7  Serio's name anywhere on this chart, correct?

04:45PM 8  A.  I don't see it.

04:45PM 9  Q.  Okay.  Now, I want to go to the lower corner of the

04:45PM 10  document.

04:45PM 11       **MR. MacKAY:**  Can you blow that up, Ms. Champoux?

04:45PM 12       **BY MR. MacKAY:**

04:45PM 13  Q.  Okay.  See where it says on the left there, 10 percent

04:45PM 14  commission taken out of all prizes besides touching squares?

04:45PM 15  A.  Yes.

04:45PM 16  Q.  Generally speaking, do you understand that under New York

04:45PM 17  law, to take a commission out of a Super Bowl pool, that

04:45PM 18  that's not legal?

04:45PM 19  A.  I do.

04:45PM 20  Q.  And just explain that for the jury, what that means?

04:45PM 21  A.  So it's the difference between, you know, doing Super

04:45PM 22  Bowls squares, I guess, for your hockey team or something,

04:45PM 23  and all the money that comes in is all paid out.  That's

04:46PM 24  okay.  That's my understanding.

04:46PM 25       But if the organizer of the game keeps a percentage of

04:46PM  1   the money, that that makes it illegal under New York law.

04:46PM  2   Q.  Okay.  And you had seen some packaged cash, I think we

04:46PM  3   talked about, in Mr. Gerace's house, correct?

04:46PM  4   A.  Yes.

04:46PM  5   Q.  And you opined that it was -- that you have seen similar

04:46PM  6   packagings of cash in relation to narcotics trafficking,

04:46PM  7   correct?

04:46PM  8   A.  Yes.

04:46PM  9   Q.  But you can see here from at least what it shows here in

04:46PM  10  the Super Bowl pool, Mr. Gerace -- Mr. Anthony Gerace appears

04:46PM  11  to be running a Super Bowl pool that's not in conjunction

04:46PM  12  with the law, that he's taking cuts out of, correct?

04:46PM  13  A.  Well, the year before, correct.

04:46PM  14  Q.  Yeah, the year before, correct?

04:46PM  15  A.  Yes.

04:46PM  16  Q.  And as you sit here today, you don't know how many years

04:46PM  17  Mr. Anthony Gerace had been running any Super Bowl pools,

04:46PM  18  correct?

04:46PM  19  A.  I don't.

04:46PM  20       MR. MacKAY:  We can take that down, Ms. Champoux,

04:47PM  21  thank you.

04:47PM  22       BY MR. MacKAY:

04:47PM  23  Q.  All right.  So let's talk about how you get started in

04:47PM  24  this investigation with -- that involves Ron Serio.

04:47PM  25       You were present for a proffer in February of 2018,

04:47PM   1   correct?

04:47PM   2   A.   Yes.

04:47PM   3   Q.   And then you then attend a proffer with Mr. Serio in July

04:47PM   4   of 2018, correct?

04:47PM   5   A.   Yes.

04:47PM   6   Q.   And it's the -- it's what's revealed in the July 2018

04:47PM   7   proffer that sort of all begins the investigation into

04:47PM   8   Mr. Bongiovanni, correct?

04:47PM   9   A.   Yes.

04:47PM  10   Q.   Now, DEA Special Agent Casullo, he's present for the July

04:47PM  11   proffer, correct?

04:47PM  12   A.   Yes.

04:47PM  13   Q.   But he's not present for the February proffer, correct?

04:47PM  14   A.   Correct.

04:47PM  15   Q.   Now, you understood that by that point in time, he was

04:47PM  16   handling a case related to Kevin Myszka, correct?

04:47PM  17   A.   Are you asking me if I knew that in July?

04:47PM  18   Q.   Yeah.  By the time you got to the July proffer --

04:47PM  19   A.   No, I wasn't aware of that case then.

04:47PM  20   Q.   Okay.  But you and -- by the time, you know, we're

04:48PM  21   talking July 2018, were you and Mr. Casullo working together

04:48PM  22   as partners in any cases?

04:48PM  23   A.   That he had just moved from 57 to 58.

04:48PM  24   Q.   Yeah.  Do you recall when he moved from D-57 to D-58?

04:48PM  25   A.   Not exactly.  But I'd say it was within weeks or maybe a

04:48PM    1    month before that.

04:48PM    2    Q.  Okay.  And do you recall whether that was prompted by any

04:48PM    3    tensions between him and Mr. Bongiovanni?

04:48PM    4    A.  I had no idea why he moved.

04:48PM    5    Q.  Okay.  But ultimately, once he moves to duty 58, do you

04:48PM    6    partner up with him on cases?

04:48PM    7    A.  On a few things.

04:48PM    8    Q.  Okay.  Now, so the February proffer, the federal

04:48PM    9    prosecutor who's in that that invites you to that, that's

04:48PM    10   Paul Parisi, correct?

04:48PM    11   A.  Yes.

04:48PM    12   Q.  And then it's Mr. Tripi who's the prosecutor for the July

04:48PM    13   proffer, correct?

04:48PM    14   A.  Yes.

04:48PM    15   Q.  And in the July proffer, you've also got FBI Special

04:49PM    16   Agent Greg Mango, correct?

04:49PM    17   A.  He's an HSI special agent, but yes.

04:49PM    18   Q.  Oh, I'm sorry, I mislabeled him.  He's HSI, but he's --

04:49PM    19   A.  He's --

04:49PM    20   Q.  -- let me just ask the question, he's new to the proffer

04:49PM    21   in July, correct?

04:49PM    22   A.  Yes.

04:49PM    23   Q.  Okay.  Meaning he hadn't been at the February proffer,

04:49PM    24   correct?

04:49PM    25   A.  He had not.

04:49PM    1    Q.  And I think you told us on direct, he had recently

04:49PM    2    completed the Kingsmen trial, correct?

04:49PM    3    A.  Yes.

04:49PM    4    Q.  And there was some information that had come out of that

04:49PM    5    trial linking motorcycle clubs and Pharaoh's Gentlemen's

04:49PM    6    Club, correct?

04:49PM    7    A.  Yes.

04:49PM    8    Q.  Okay.  And in the meantime, between February and July of

04:49PM    9    2018, that those professors you had attended, I think you

04:49PM   10    said, some out of the country training about IOC?

04:49PM   11    A.  In Canada.

04:49PM   12    Q.  Okay.  But that occurred between those two proffers,

04:49PM   13    correct?

04:49PM   14    A.  It was in the month of April.  It may not have been --

04:49PM   15    actually, it may not have been until the April after the July

04:50PM   16    proffer.

04:50PM   17    Q.  Okay.  I just wanted to clarify.  I think you said on

04:50PM   18    direct that you thought it might have occurred between the

04:50PM   19    two proffers?

04:50PM   20    A.  No, I think it was the April after.

04:50PM   21    Q.  Okay.

04:50PM   22    A.  I'm certain it was after.

04:50PM   23    Q.  But at some point in time after the July 2018 proffer,

04:50PM   24    you understood Special Agent Casullo was directed not to have

04:50PM   25    any further part as an investigating agent in the

| | | |
|---|---|---|
| 04:50PM | 1 | investigation, correct? |
| 04:50PM | 2 | A.  Saying after the -- at some point after the July proffer? |
| 04:50PM | 3 | Q.  Yes. |
| 04:50PM | 4 | A.  Yes. |
| 04:50PM | 5 | Q.  And part of that had to do with the fact that he was |
| 04:50PM | 6 | deemed to be a fact witness, correct? |
| 04:50PM | 7 | A.  Yes. |
| 04:50PM | 8 | Q.  And that related to allegations that were made about the |
| 04:50PM | 9 | race-related comments, correct? |
| 04:50PM | 10 | A.  I wasn't aware of what the allegations were.  I mean, I |
| 04:51PM | 11 | had -- I was generally aware of them at the time, not too |
| 04:51PM | 12 | much of the specifics of them.  But, yes, I knew the reason. |
| 04:51PM | 13 | Q.  Right.  That's what I'm getting toward, is that he's |
| 04:51PM | 14 | deemed to be a fact witness, regardless of what the |
| 04:51PM | 15 | allegations were he's deemed to be a fact witness because of |
| 04:51PM | 16 | whatever was surrounding the race-related comment issue, |
| 04:51PM | 17 | correct? |
| 04:51PM | 18 | A.  Yes. |
| 04:51PM | 19 | Q.  All right.  He's not at this point in time a fact witness |
| 04:51PM | 20 | regarding anything with Ron Serio, correct? |
| 04:51PM | 21 | A.  I'm sorry, could you -- |
| 04:51PM | 22 | Q.  Meaning that when he's deemed to be a fact witness, it's |
| 04:51PM | 23 | not arising from something regarding what was said in the |
| 04:51PM | 24 | July 20th, 2018 proffer, correct? |
| 04:51PM | 25 | A.  That's correct. |

04:51PM   1   Q.  He's not a fact witness to anything that's being revealed

04:51PM   2   at that point in time, correct?

04:51PM   3   A.  That's correct.

04:51PM   4   Q.  Now, when you -- when Mr. Casullo -- when Agent Casullo

04:52PM   5   comes to the July 2018 proffer, did he make mention in any

04:52PM   6   fashion of whether he had reviewed any files related to Ron

04:52PM   7   Serio before he came into that proffer?

04:52PM   8   A.  I don't remember him mentioning that, no.  But we had all

04:52PM   9   done that, so I would assume that he had.

04:52PM  10   Q.  When you say you "had all done that," what do you mean

04:52PM  11   specifically?

04:52PM  12   A.  As part of getting that investigation going, we had all,

04:52PM  13   we had queried the systems that we had access to to look for

04:52PM  14   reports that could connect to that proffer and what we wanted

04:52PM  15   to look at.

04:52PM  16   Q.  Okay.  And you were querying the Ron Serio name, correct?

04:52PM  17   A.  Not just the Ron Serio name.  It was anything to do with

04:52PM  18   Pharaoh's, Gerace.  It was broader than that.

04:52PM  19   Q.  Okay.  So that's what I want to get toward, is by the

04:52PM  20   time you go into the July 2018 proffer, both you and Anthony

04:52PM  21   Casullo have looked up, as far as you understood it,

04:52PM  22   everything that you could search in the DEA databases about,

04:53PM  23   for example, Ron Serio, correct?

04:53PM  24   A.  Well, I searched HSI databases.

04:53PM  25   Q.  Okay.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/11/24

04:53PM    1   A.  I assumed Tony searched DEA.

04:53PM    2   Q.  Okay.  Because, well, when Mr. Casullo came to the July

04:53PM    3   2018 proffer, was it fair to say he appeared to understand at

04:53PM    4   least something about Mr. Serio, correct?

04:53PM    5   A.  Yes.

04:53PM    6   Q.  I mean, he didn't come into the meeting blind; it's fair

04:53PM    7   to say, correct?

04:53PM    8   A.  Yes.

04:53PM    9   Q.  He appeared to have come in prepped knowing at least some

04:53PM   10   information about Ron Serio, correct?

04:53PM   11   A.  Yes.

04:53PM   12   Q.  And based on what you did with reviewing HSI records, you

04:53PM   13   made the conclusion that Anthony Casullo had looked up

04:53PM   14   records about Ron Serio that were DEA related.

04:53PM   15   A.  Yes.

04:53PM   16        **MR. MacKAY:**  Judge, it's 5 to.  Before I go into a

04:53PM   17   new area --

04:53PM   18        **THE COURT:**  Yeah, that's fine.  So we will now break

04:53PM   19   for the day.

04:53PM   20        Remember tomorrow, 9:00 until 2.  Brings snacks.

04:53PM   21   We're not going to take a lunch break, 9 until 2.

04:53PM   22        And Friday, 12:30 until 5-ish.  Maybe a little before

04:54PM   23   5.  Close to 5.

04:54PM   24        So please remember my instructions about not talking

04:54PM   25   about the case with each other or anybody else, not using

04:54PM    1    tools of technology to research the case or to communicate

04:54PM    2    about the case, and not watching or listening or reading any

04:54PM    3    news coverage of the case if there is any.

04:54PM    4         Don't make up your mind either until the case has

04:54PM    5    been submitted to you to deliberate.

04:54PM    6         We'll see you tomorrow morning at 9.  Get a good

04:54PM    7    night's sleep.  Leave a little earlier tomorrow to get to

04:54PM    8    court, and we'll see you then.

04:54PM    9         (Jury excused at 4:54 p.m.)

04:54PM   10         **THE COURT:**  Anything for the record?

04:55PM   11         **MR. TRIPI:**  No, Your Honor.

04:55PM   12         **MR. MacKAY:**  No, Your Honor.

04:55PM   13         **MR. COOPER:**  Just thank you again to the parties and

04:55PM   14    to the Court for letting us get Mr. C.C. up and down.  I know

04:55PM   15    it's a pain in the butt for them, so I'm grateful.

04:55PM   16         **THE COURT:**  Yeah.  So I want to talk for just a

04:55PM   17    second about the discussion we had at the bench about the

04:55PM   18    witness's testimony about whether somebody he was interviewing

04:55PM   19    was -- what was the word that you used?

04:55PM   20         **COURT REPORTER:**  Evasive.

04:55PM   21         **THE COURT:**  Evasive, thank you, Ann.  Evasive.

04:55PM   22         The reason I have a problem with that, Mr. Tripi, and

04:55PM   23    you said that comes in all the time, and maybe it does.

04:55PM   24         **MR. TRIPI:**  Of course that doesn't mean you need to

04:55PM   25    let it in.

04:55PM   1         **THE COURT:**  No, no.

04:55PM   2         **MR. TRIPI:**  I mean, I understand the Court's

04:55PM   3   decision.

04:55PM   4         **THE COURT:**  I want to explain my thought process.

04:55PM   5         So, you couldn't ask a witness for his or her opinion

04:55PM   6   about whether the person was being truthful, right?  That

04:55PM   7   certainly would be off limits.

04:55PM   8         **MR. TRIPI:**  Sure.

04:55PM   9         **THE COURT:**  You can ask what the person looked like?

04:55PM  10   Was the person -- and it's -- even though it's lay opinion

04:55PM  11   testimony, he can testify that the person appeared nervous,

04:56PM  12   that the person appeared jittery, that the person, you know,

04:56PM  13   the car appeared to be speeding.  Those kinds of things are

04:56PM  14   lay opinion, legitimate lay opinion.

04:56PM  15         Asking whether a witness is evasive, I think, is

04:56PM  16   closer to the truthful than it is to the nervous.  Because

04:56PM  17   evasive involves the content of what the witness is saying,

04:56PM  18   not the way the witness is saying it.  Unless you make more of

04:56PM  19   a foundation with respect to what "evasive" means.  And if

04:56PM  20   evasive means, you know, he was looking around like this,

04:56PM  21   or -- or -- or something like that --

04:56PM  22         **MR. TRIPI:**  Okay.

04:56PM  23         **THE COURT:**  -- but that's -- that's the -- my thought

04:56PM  24   process is that you can't ask for a lay opinion about whether

04:56PM  25   a witness is being truthful.  You can ask for a lay opinion

04:56PM   1   about whether a witness is nervous or other things that you

04:56PM   2   can observe.  And the word "evasive" seems to me to go to the

04:56PM   3   content of what is being said rather than the witness's

04:56PM   4   demeanor.

04:57PM   5           MR. COOPER:  Can I ask a follow-up question on that?

04:57PM   6           THE COURT:  Yeah, you go right ahead.

04:57PM   7           And I'm not saying I'm right on this.  I'm just

04:57PM   8   telling you that's where I'm coming from.

04:57PM   9           MR. COOPER:  I'm following your train of thought.  I

04:57PM  10   guess my follow-up question would be envisioning a scenario,

04:57PM  11   and I think this came up at the bench with Mr. Tripi where

04:57PM  12   direct questions are being asked of a witness, and a witness

04:57PM  13   is kind of skirting around answering those.  I mean, we've all

04:57PM  14   in our life experience/encountered a situation like that.

04:57PM  15           And without getting into content, I think a trained

04:57PM  16   law enforcement officer can offer a lay opinion that they were

04:57PM  17   asking direct questions, like is the sky blue, and a witness

04:57PM  18   is saying, well, you know, I haven't looked at the sky in a

04:57PM  19   while.  And that could be an example where you're not

04:57PM  20   expressly providing content, and in your common-sense life

04:57PM  21   experience, you are just using the word "evasive" because

04:57PM  22   that's the word anyone would use to describe that.

04:57PM  23           THE COURT:  Maybe.  Maybe.  Maybe.  I get it.  And

04:57PM  24   maybe you're right.  And I'm not saying that this is how I'm

04:57PM  25   going to rule on this in the future where there hasn't been an

04:58PM     1    objection to this yet, I'm just telling you.

04:58PM     2           And that's a good response, Mr. Cooper, and I will

04:58PM     3    think about that.

04:58PM     4           But, the -- the lay opinion, I think when it goes to

04:58PM     5    the content of what's being said, it's a little more

04:58PM     6    problematic.  And I'm just saying I think "evasive" may be --

04:58PM     7    I don't know, maybe you're right, maybe you're right.

04:58PM     8           **MR. COOPER:**  I think that you're right about the

04:58PM     9    truthful, and I think we can ask questions in a slightly

04:58PM    10    different way.  And sometimes this is how it's resolved, we

04:58PM    11    can ask questions in a slightly different way.  Were you

04:58PM    12    asking direct questions and receiving direct answers, or was

04:58PM    13    something else happening?

04:58PM    14           **THE COURT:**  Yeah.

04:58PM    15           **MR. COOPER:**  So we can work on it as well.

04:58PM    16           **THE COURT:**  Yeah.  Okay.  Great.

04:58PM    17           Anything you folks want to say?

04:58PM    18           **MR. MacKAY:**  No, Your Honor, point well taken.

04:58PM    19           **THE COURT:**  Okay.  You know, I love this stuff so

04:58PM    20    much, as you probably can tell, and it --

04:58PM    21           **MR. TRIPI:**  It's helpful to have that type of

04:58PM    22    dialogue sometimes.  You get an objection sustained or

04:58PM    23    overruled, and you have no idea why that happened, and so I

04:58PM    24    think it's nice to get some insight.

04:58PM    25           **THE COURT:**  Good.

04:58PM   1           **MR. TRIPI:**  So I appreciate it.

04:58PM   2           **THE COURT:**  Terrific.

04:58PM   3           **MR. MacKAY:**  I'm better schooled and better versed in

04:59PM   4  evidence than I was one and a half trials ago.

04:59PM   5           **THE COURT:**  I guess that's a good thing.  Thanks,

04:59PM   6  everybody.

04:59PM   7           **MR. COOPER:**  So tomorrow is 9 a.m.?

04:59PM   8           **THE COURT:**  9 a.m.  Yep.  Be on time.

04:59PM   9           **MR. COOPER:**  Yes.  I'll do my darndest.

04:59PM  10           **MR. TRIPI:**  I won't be involved in drop-offs

04:59PM  11  tomorrow.

        12           (Excerpt concluded at 4:59 p.m.)

        13        *       *       *       *       *       *       *

        14

        15                   **CERTIFICATE OF REPORTER**

        16

        17           In accordance with 28, U.S.C., 753(b), I

        18  certify that these original notes are a true and correct

        19  record of proceedings in the United States District Court for

        20  the Western District of New York on September 11, 2024.

        21

        22

        23           s/ Ann M. Sawyer
                     Ann M. Sawyer, FCRR, RPR, CRR
        24           Official Court Reporter
                     U.S.D.C., W.D.N.Y.

        25

1

2                                **TRANSCRIPT INDEX**

3              **EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 2**

4                            **SEPTEMBER 11, 2024**

5

6

7    **W I T N E S S**                                    **P A G E**

8    **C U R T I S   R Y A N**                            2

9       (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:        2

10      CROSS-EXAMINATION BY MR. MacKAY:                 88

11

12

13   **E X H I B I T S**                                  **P A G E**

14   GOV Exhibits 100D-1 and 2                           25

15   GOV Exhibit 393                                     28

16   GOV Exhibits 100E-1 and 100F-1                      45

17

18

19

20

21

22

23

24

25