08:52AM

```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
 2
    _____
 3  UNITED STATES OF AMERICA,

                                        Case No. 1:19-cr-227
 4               Plaintiff,                        (LJV)
    v.
 5                                      September 12, 2024

    JOSEPH BONGIOVANNI,
 6
                    Defendant.
 7  _____


 8      TRANSCRIPT EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 3
               BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                   UNITED STATES DISTRICT JUDGE

10  APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
                          BY: JOSEPH M. TRIPI, ESQ.
11                            NICHOLAS T. COOPER, ESQ.
                              CASEY L. CHALBECK, ESQ.
12                        Assistant United States Attorneys
                          Federal Centre, 138 Delaware Avenue
13                        Buffalo, New York 14202
                          For the Plaintiff
14
                          SINGER LEGAL PLLC
15                        BY: ROBERT CHARLES SINGER, ESQ.
                          80 East Spring Street
16                        Williamsville, New York 14221
                             And
17                        LAW OFFICES OF PARKER ROY MacKAY
                          BY: PARKER ROY MacKAY, ESQ.
18                        3110 Delaware Avenue
                          Kenmore, New York 14217
19                           And
                          OSBORN, REED & BURKE, LLP
20                        BY: JOHN J. GILSENAN, ESQ.
                          120 Allens Creek Road
21                        Rochester, New York 14618
                          For the Defendant
22
    PRESENT:              BRIAN A. BURNS, FBI Special Agent
23                        MARILYN K. HALLIDAY, HSI Special Agent
                          KAREN A. CHAMPOUX, USA Paralegal
24
    LAW CLERK:            REBECCA FABIAN IZZO, ESQ.
25
```

1    **COURT DEPUTY CLERK:    COLLEEN M. DEMMA**

2    **COURT REPORTER:        ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                             Robert H. Jackson Federal Courthouse
3                            2 Niagara Square
                             Buffalo, New York  14202
4                            Ann_Sawyer@nywd.uscourts.gov

5

6                        *     *     *     *     *     *     *

7

09:11AM    8            (Excerpt commenced at 9:11 a.m.)

09:11AM    9            (Witness and Jury seated at 9:11 a.m.)

09:11AM   10            **THE COURT:**  Good morning.

09:11AM   11            **JURORS:**  Good morning.

09:11AM   12            **THE COURT:**  You all look great in your blue and

09:12AM   13    white.

09:12AM   14            **JURORS:**  Theme day.

09:12AM   15            **THE COURT:**  The record will reflect that all our

09:12AM   16    jurors are present again.

09:12AM   17            I remind the witness that he's still under oath.

09:12AM   18            And, Mr. MacKay, you may continue.

09:12AM   19

09:12AM   20    **C U R T I S   R Y A N,** having been previously duly called and

09:12AM   21    sworn, continued to testify as follows:

09:12AM   22

09:12AM   23                **(CONT'D) CROSS-EXAMINATION BY MR. MacKAY:**

09:12AM   24    Q.  Good morning again, Agent Ryan.

09:12AM   25    A.  Good morning.

09:12AM    1    Q.  I just want to kind of recenter us and get us back on

09:12AM    2    track of what we were talking about yesterday.

09:12AM    3        You were one of the two lead investigators into

09:12AM    4    Mr. Bongiovanni, correct?  With HSI?

09:12AM    5    A.  Yes.

09:12AM    6    Q.  Okay.  That would be you and Agent Halliday, correct?

09:12AM    7    A.  Yes.

09:12AM    8    Q.  And then there was obviously an OIG component with Agents

09:12AM    9    Fusco and Carpenter, correct?

09:12AM    10   A.  Yes.

09:12AM    11   Q.  Okay.  I think we discussed yesterday, when you sat

09:12AM    12   Mr. Bongiovanni down in June of 2019, one of the -- at least

09:12AM    13   part of the answer he gave to you for why he brought the

09:13AM    14   Serio file home was that he wanted to show that he did

09:13AM    15   legitimate work on the file, correct?

09:13AM    16   A.  Yes.

09:13AM    17   Q.  And you had testified that after that July 20th, 2018

09:13AM    18   date, you had tried to keep any investigation about

09:13AM    19   Mr. Bongiovanni in connection to Serio from Mr. Bongiovanni,

09:13AM    20   correct?

09:13AM    21   A.  Yes.

09:13AM    22   Q.  And we walked through, though, I showed you Government

09:13AM    23   Exhibit 26E that was a DARTS email about a month and a day

09:13AM    24   later that you caused to be generated, correct?

09:13AM    25   A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

4

09:13AM   1    Q.   And we saw in there, if you recall, there's reference in

09:13AM   2    there to the Ron Serio drug-trafficking organization,

09:13AM   3    correct?

09:13AM   4    A.   Yes.

09:13AM   5    Q.   And the Ron Serio drug-trafficking organization was what

09:13AM   6    you understood Mr. Bongiovanni was investigating back in 2013

09:13AM   7    with the Wayne Anderson/Ron Serio file, correct?

09:13AM   8    A.   Yes.

09:13AM   9    Q.   Okay.  And 100A, that's that Redweld you talked about,

09:13AM   10   correct?

09:13AM   11   A.   Yes.

09:13AM   12   Q.   You reviewed that, ultimately, prior to testifying here

09:14AM   13   today, correct?

09:14AM   14   A.   Yes.

09:14AM   15   Q.   As part of your investigation, you went through all the

09:14AM   16   documents, correct?

09:14AM   17   A.   Yes.

09:14AM   18   Q.   And part of that was you actually had to scan them in and

09:14AM   19   make them into a digital version, correct?

09:14AM   20   A.   I didn't scan them all, but I helped with that, yes.

09:14AM   21   Q.   Right, you were part of that process to ultimately

09:14AM   22   produce what we're going to go though as 100A.1, correct?

09:14AM   23   A.   Yes.

09:14AM   24   Q.   All right.  Now, in your experience with -- as HSI agent

09:14AM   25   working over with the DEA, just remind the jury, working

09:14AM  1   files, is it fair to characterize them as sort of the agent's

09:14AM  2   personal collection of papers on a file while they're working

09:14AM  3   the file?

09:14AM  4   A.  It's the documents that don't go to the official file in

09:14AM  5   the file room.

09:14AM  6   Q.  Okay.  Fair to characterize it's something like the

09:14AM  7   documents sort of immediately needed for the agent that they

09:14AM  8   might thumb through when they're working on the case?

09:14AM  9   A.  Yes.

09:14AM  10  Q.  It's kind of the quick reference to the file, maybe?

09:15AM  11  A.  That's one reason to have those, yes.

09:15AM  12  Q.  Right, yeah.  I'm just kind of trying to paint the

09:15AM  13  picture, that the working file is something that the agent

09:15AM  14  has at their quick disposal so that they don't have to go to

09:15AM  15  the sort of master file to get the stuff out of every time,

09:15AM  16  correct?

09:15AM  17  A.  Right.

09:15AM  18  Q.  And ultimately, the agent, according to policy, should

09:15AM  19  put everything in the final master file, correct?

09:15AM  20  A.  Yes.

09:15AM  21  Q.  And at that time back in 2013, DEA was transitioning to

09:15AM  22  an electronic file system, correct?

09:15AM  23  A.  I don't know, I wasn't there in 2013.

09:15AM  24  Q.  No, when -- you came on board, again, when?  At the DEA

09:15AM  25  as a task force officer.

09:15AM   1   A.  Late '16, early '17, somewhere in there.

09:15AM   2   Q.  By then, the -- the shared or master files were all

09:15AM   3   electronic?

09:15AM   4   A.  No.  There were still paper case files in the file room

09:15AM   5   then.

09:15AM   6   Q.  Okay.  So, fair to say it was still in transition working

09:15AM   7   its way from paper to electronic?

09:15AM   8   A.  Yes.

09:15AM   9   Q.  And then at some point in time after that, the files do

09:15AM  10   become fully electronic?

09:16AM  11   A.  Not while I was there.  I don't know.

09:16AM  12   Q.  Okay.  All right.  So, I want to go through some of the

09:16AM  13   things in 100A.1.

09:16AM  14        **MR. MacKAY:**  Ms. Champoux, can you pull up Government

09:16AM  15   Exhibit 100A.1?

09:16AM  16        Can we start with the 4-19-13 subscriber list PDF

09:16AM  17   right at the top?

09:16AM  18        And can we just rotate that, please?

09:16AM  19        **BY MR. MacKAY:**

09:16AM  20   Q.  Okay.  This is a subscriber list, correct?

09:16AM  21   A.  Yes.

09:16AM  22   Q.  Tell the jury again what this, what we're looking at

09:16AM  23   here, what one of these documents does?

09:16AM  24   A.  I think this is a report from PenLink, that's what it

09:16AM  25   looks like to me.  So, it's a list of the subscribers

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

| | | |
|---|---|---|
| 09:16AM | 1 | identified in that subset of the data in PenLink. |
| 09:16AM | 2 | Q.  So, what I'm trying to get the jury to understand is how |
| 09:17AM | 3 | do we get this list, how does somebody get this list |
| 09:17AM | 4 | produced?  Does it come from a phone number that's already |
| 09:17AM | 5 | been generated somewhere?  How do we wind up with this |
| 09:17AM | 6 | document? |
| 09:17AM | 7 | A.  Subpoenas of all of these phone numbers for the |
| 09:17AM | 8 | subscriber information. |
| 09:17AM | 9 | Q.  Okay.  And in your experience, typically it's the intel |
| 09:17AM | 10 | analyst who worked to produce the subpoenas and get the |
| 09:17AM | 11 | subpoena returns back? |
| 09:17AM | 12 | A.  I always produced my own, but I know the intel analysts |
| 09:17AM | 13 | often did it, as well. |
| 09:17AM | 14 | Q.  And obviously there's two parts of that.  The subpoena |
| 09:17AM | 15 | has to go out the door to get the information, correct? |
| 09:17AM | 16 | A.  Yes. |
| 09:17AM | 17 | Q.  And then the subpoena return comes back to the DEA with |
| 09:17AM | 18 | raw data, correct? |
| 09:17AM | 19 | A.  Yes. |
| 09:17AM | 20 | Q.  And then that data has to be essentially parsed and |
| 09:17AM | 21 | sorted into something, and is it fair to say that that's sort |
| 09:17AM | 22 | of what was this something is that we're looking at? |
| 09:17AM | 23 | A.  Yes, it's a report from the something, which I think at |
| 09:17AM | 24 | the time was a software called PenLink. |
| 09:17AM | 25 | Q.  Right.  Yeah.  Again, I know it's a little painful to |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

8

09:18AM  1   step through step by step, but I want to go through that, you

09:18AM  2   know, a subpoena goes out the door, information comes back,

09:18AM  3   it's put into a program that ultimately generates a report

09:18AM  4   like this, correct?

09:18AM  5   A.  Yes.

09:18AM  6   Q.  And in your experience, agents use this to sort of, for

09:18AM  7   example, find out what numbers are most calling a specific

09:18AM  8   number, correct?

09:18AM  9   A.  Well, this one, the hot sheet is the what numbers most

09:18AM  10  called.  This is more about who the people are that are

09:18AM  11  calling.

09:18AM  12  Q.  Okay.  Yeah, we'll get to one of those there.  This is

09:18AM  13  just, usually this is organized by alphabetical list,

09:18AM  14  correct?  Alphabetically by last name, it looks like,

09:18AM  15  correct?

09:18AM  16  A.  Yes.

09:18AM  17  Q.  So, what this list shows is for a specific number that

09:18AM  18  was subpoenaed, these are the numbers that are calling that

09:18AM  19  number, correct?

09:18AM  20  A.  I don't --

09:18AM  21  Q.  Interacting with that number?

09:18AM  22  A.  I think this is all of the -- this is based on all of the

09:18AM  23  numbers that were subpoenaed in that case file.  You'd have

09:18AM  24  to run a different report to figure out which numbers where

09:19AM  25  interacting with which.

| | | |
|---|---|---|
| 09:19AM | 1 | Q.  And what's that report? |
| 09:19AM | 2 | A.  It could be a hot list.  Or you could query by the one |
| 09:19AM | 3 | number that you're talking about, and then it would -- you |
| 09:19AM | 4 | know, if you set the query up properly, it would return all |
| 09:19AM | 5 | the numbers that talked to that number. |
| 09:19AM | 6 | Q.  Okay.  And again, you said that oftentimes it's the -- |
| 09:19AM | 7 | well, not in your experience with what do you with your own |
| 09:19AM | 8 | reports, but you know that a lot of times the analysts run |
| 09:19AM | 9 | this actual, like, I think you said, PenLink software? |
| 09:19AM | 10 | A.  Yes. |
| 09:19AM | 11 | Q.  And then they produce the reports and turn them over to |
| 09:19AM | 12 | the agents, correct? |
| 09:19AM | 13 | A.  Yes. |
| 09:19AM | 14 | **MR. MacKAY:**  Now, Ms. Champoux, can we pull up -- can |
| 09:19AM | 15 | we take this down, and can we pull up the file 81513 |
| 09:19AM | 16 | electronic records, electric records? |
| 09:19AM | 17 | Okay. |
| 09:19AM | 18 | **BY MR. MacKAY:** |
| 09:19AM | 19 | Q.  Okay.  All right.  This is another document in the file; |
| 09:19AM | 20 | fair to say? |
| 09:19AM | 21 | A.  Yes. |
| 09:19AM | 22 | **MR. MacKAY:**  And this -- can we go to, I think it's |
| 09:19AM | 23 | page 2. |
| 09:19AM | 24 | **BY MR. MacKAY:** |
| 09:19AM | 25 | Q.  Okay.  This looks like a return for some sort of |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

| | | |
|---|---|---|
| 09:20AM | 1 | information request regarding utilities at an address, |
| 09:20AM | 2 | correct? |
| 09:20AM | 3 | A.  It's for electric from National Grid. |
| 09:20AM | 4 | Q.  Right.  So, something -- so a request went out to |
| 09:20AM | 5 | National Grid, and this is what came back regarding a |
| 09:20AM | 6 | specific address, correct? |
| 09:20AM | 7 | A.  Yes. |
| 09:20AM | 8 | Q.  And in this specific document, it's the address of 1195 |
| 09:20AM | 9 | Hertel Avenue, correct? |
| 09:20AM | 10 | A.  Yes. |
| 09:20AM | 11 | Q.  And, you know, based on the name, it appears that the |
| 09:20AM | 12 | person in whom the utilities are named is John Suppa, |
| 09:20AM | 13 | correct? |
| 09:20AM | 14 | A.  Yes. |
| 09:20AM | 15 | Q.  And did you understand this 1195 Hertel Avenue in the |
| 09:20AM | 16 | course of your investigation to have any significance? |
| 09:20AM | 17 | A.  There were several addresses that were controlled by Ron |
| 09:20AM | 18 | Serio.  I wasn't reinvestigating all of this, so this wasn't |
| 09:20AM | 19 | all that important to me -- |
| 09:20AM | 20 | Q.  Well, did you understand -- |
| 09:20AM | 21 | A.  -- the actual address. |
| 09:20AM | 22 | Q.  Did you understand this address to come up in the |
| 09:20AM | 23 | investigation at any point, this 1195 Hertel Avenue? |
| 09:20AM | 24 | A.  Which investigation? |
| 09:21AM | 25 | Q.  When you were reviewing the Wayne Anderson file, in |

09:21AM    1    looking at what had been done back in 2013, and reviewing the

09:21AM    2    original investigation, did you understand this 1195 Hertel

09:21AM    3    Avenue address to come up?

09:21AM    4    A.  I mean, I know it came up because it's here, I don't

09:21AM    5    remember anything else about it.

09:21AM    6    Q.  Okay.  And, so, you don't know whether they were

09:21AM    7    investigating this location as a grow location, correct?

09:21AM    8    A.  I know they were investigating grow locations, I don't

09:21AM    9    remember the addresses.

09:21AM   10    Q.  Okay.  And subpoenaing utilities is one way agents can

09:21AM   11    investigate whether a location may be a grow location,

09:21AM   12    correct?

09:21AM   13    A.  One way.

09:21AM   14    Q.  Because they're looking for out of the ordinary

09:21AM   15    electronic usage, correct?

09:21AM   16    A.  Yes.

09:21AM   17         **MR. MacKAY:**  All right.  Ms. Champoux, can we take

09:21AM   18    that down?  Can we pull up the file 467 Tacoma, elec sub?

09:21AM   19         Can we zoom out a little bit, please?

09:22AM   20         **BY MR. MacKAY:**

09:22AM   21    Q.  And this, for example, what we're looking at, this is a

09:22AM   22    subpoena for electric records, correct?

09:22AM   23    A.  Yes.

09:22AM   24    Q.  Okay.  And it appears to be associated with this address,

09:22AM   25    467 Tacoma Avenue?

09:22AM | 1 | A.  And also 469.

09:22AM | 2 | Q.  And 469.

09:22AM | 3 |       **MR. MacKAY:**  Can we scroll down on that?

09:22AM | 4 |       **BY MR. MacKAY:**

09:22AM | 5 | Q.  Okay.  It also appears in the same document to have

09:22AM | 6 | that -- there's a reference to this 132 Rhode Island Street?

09:22AM | 7 | A.  Yes.

09:22AM | 8 | Q.  Okay.

09:22AM | 9 | A.  I don't know if that -- that could be something that I

09:22AM | 10 | caused, or shuffling of the papers caused, I don't

09:22AM | 11 | necessarily know that they go together.

09:22AM | 12 | Q.  Okay.  But you had said, you know, at least from what you

09:22AM | 13 | could see and what you knew about the Wayne Anderson

09:22AM | 14 | investigation, that there were some grow locations being

09:22AM | 15 | investigated, correct?

09:22AM | 16 | A.  Yes.

09:22AM | 17 |       **MR. MacKAY:**  All right.  Can we scroll down a little

09:22AM | 18 | further, Ms. Champoux?

09:22AM | 19 |       **BY MR. MacKAY:**

09:22AM | 20 | Q.  And again, here, I think we're on page 3 now, again, this

09:23AM | 21 | is a return for an electric subpoena, correct?

09:23AM | 22 | A.  Yes.

09:23AM | 23 | Q.  And it's just showing who properties might be associated

09:23AM | 24 | with, correct?

09:23AM | 25 | A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

09:23AM  1      **MR. MacKAY:**  All right.  Let's take that down,

09:23AM  2  Ms. Champoux, can we go to document that begins with a 561801?

09:23AM  3  That one right there.

09:23AM  4      **BY MR. MacKAY:**

09:23AM  5  Q.  Okay.  Now, this, I think you looked at this on direct,

09:23AM  6  this is what's called a hot sheet, correct?

09:23AM  7  A.  Yes.

09:23AM  8  Q.  This looks kind of similar to what we were looking at

09:23AM  9  before but it's a little bit different, correct?

09:23AM  10  A.  It's different in that it's organized by the number of

09:23AM  11  times the number's been called from most times to least.

09:23AM  12  Q.  Okay.  So, it's circled up here and it's -- you can see

09:23AM  13  it says hot number list is what you're referring to as a hot

09:23AM  14  sheet, correct?

09:23AM  15  A.  Yes.

09:23AM  16  Q.  Okay.  And this one appears to have been on

09:23AM  17  November 30th, 2012, correct?

09:24AM  18  A.  Yes.

09:24AM  19  Q.  Okay.  Now, and the number, you knew that to be from your

09:24AM  20  investigation Tom Serio's number?

09:24AM  21  A.  Yes.

09:24AM  22  Q.  Okay.  And again, I think you were directing everybody's

09:24AM  23  attention to the way this is organized.  So if you look from

09:24AM  24  rows one down further, fair to say what you're telling us is

09:24AM  25  that this report organizes the numbers that called this

| | | |
|---|---|---|
| 09:24AM | 1 | 561-801-0221 number in order of who called the most and who |
| 09:24AM | 2 | called the least, correct? |
| 09:24AM | 3 | A.  The calls both directions, but yes. |
| 09:24AM | 4 | Q.  Yes.  So, so, what this report generates is looking at |
| 09:24AM | 5 | all the calls both directions, in and out of that cell phone |
| 09:24AM | 6 | number of Tom Serio's, and its ranking them by where the most |
| 09:24AM | 7 | frequent to least frequent, correct? |
| 09:24AM | 8 | A.  Yes. |
| 09:24AM | 9 | Q.  Okay.  And what's the investigative use for one of these |
| 09:24AM | 10 | in an DEA investigation? |
| 09:24AM | 11 | A.  Well, this one to me looks like a starting point.  And |
| 09:25AM | 12 | then you have to make a decision about whether or not you're |
| 09:25AM | 13 | going to subpoena all of these numbers in the tolls, or |
| 09:25AM | 14 | select certain ones, prioritize the order you're going to do |
| 09:25AM | 15 | the next round of subpoenas in. |
| 09:25AM | 16 | Q.  Okay.  And you're talking about there's multiple rounds |
| 09:25AM | 17 | of subpoenas.  This hot sheet list, does this come after one |
| 09:25AM | 18 | subpoena has already been sent out and information has come |
| 09:25AM | 19 | back about phone numbers for -- connected to a specific phone |
| 09:25AM | 20 | number? |
| 09:25AM | 21 | A.  To me, this looks like one of the first subpoenas done in |
| 09:25AM | 22 | the file. |
| 09:25AM | 23 | Q.  Okay. |
| 09:25AM | 24 | A.  Because of the -- there are so many no subscriber |
| 09:25AM | 25 | entries, if previous subpoenas had been done that identified |

09:25AM  1    subscribers, some of those should populate.

09:25AM  2    Q.  Yeah, I guess, so the question I have is the previous

09:25AM  3    document we looked at, that subscriber list, you send out a

09:25AM  4    subpoena in general to a number and you get back the

09:25AM  5    information about it, correct?

09:25AM  6    A.  Yes.

09:25AM  7    Q.  Now, what we saw before was the alphabetically organized

09:25AM  8    list, now we've got the hot sheet.  Do those two reports get

09:26AM  9    generated at the same time, or is it sort of one after

09:26AM  10   another in practice?

09:26AM  11   A.  The subscriber list filled in like that one was --

09:26AM  12   Q.  Yes.

09:26AM  13   A.  -- would have to come after several rounds of subpoenas.

09:26AM  14   Q.  Okay.  So, I mean, again, we're just kind of going

09:26AM  15   through it step by step.  But the first stage is you've got

09:26AM  16   to figure out what numbers generally are calling or being

09:26AM  17   called by a number, correct?

09:26AM  18   A.  Yes.

09:26AM  19   Q.  So, that's the first round of subpoenas that goes out,

09:26AM  20   and you get back that information presumably in response to

09:26AM  21   the subpoena, correct?

09:26AM  22   A.  Yes.

09:26AM  23   Q.  And then what an agent might do then is produce that list

09:26AM  24   that we saw before that shows all of the numbers that call

09:26AM  25   it, correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

16

| | | |
|---|---|---|
| 09:26AM | 1 | A.  Yes. |
| 09:26AM | 2 | Q.  Or -- or are being called by that number, correct? |
| 09:26AM | 3 | A.  Right. |
| 09:26AM | 4 | Q.  And then the next stage would be if there's a lot of no |
| 09:26AM | 5 | subscribers, they would have to further subpoena who those |
| 09:26AM | 6 | numbers are and figure out, like, I'm sorry, they would have |
| 09:26AM | 7 | to subpoena those numbers to figure out who the actual |
| 09:26AM | 8 | subscriber is, correct? |
| 09:26AM | 9 | A.  Right. |
| 09:26AM | 10 | Q.  So, if we look at this report dated 11/30/2012, and we'll |
| 09:27AM | 11 | just take for example row number 2, there's a number, but |
| 09:27AM | 12 | there's no subscriber; fair to say? |
| 09:27AM | 13 | A.  Yes. |
| 09:27AM | 14 | Q.  So, what this says is that in November of 2012, whoever's |
| 09:27AM | 15 | viewing this report knows that this 533-6338 number called |
| 09:27AM | 16 | Tom Serio's number, but they don't know who it is, correct? |
| 09:27AM | 17 | A.  Right. |
| 09:27AM | 18 | Q.  Because they, you know, it says no subscriber, so -- |
| 09:27AM | 19 | correct? |
| 09:27AM | 20 | **MR. TRIPI:**  Objection as to what someone else knows, |
| 09:27AM | 21 | and who are "they." |
| 09:27AM | 22 | **THE COURT:**  No. |
| 09:27AM | 23 | **MR. TRIPI:**  Speculative, Judge. |
| 09:27AM | 24 | **THE COURT:**  I understand what you're saying, |
| 09:27AM | 25 | Mr. Tripi, but no, I think it's a fair question. |

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 09:27AM | 1  | **BY MR. MacKAY:**                                           |
| 09:27AM | 2  | Q.  All right.  So, somebody viewing this would not know      |
| 09:27AM | 3  | the -- who that 533 number is associated with because the    |
| 09:27AM | 4  | report is saying no subscriber, correct?                     |
| 09:27AM | 5  | A.  Unless they already knew the number, right, the report   |
| 09:27AM | 6  | doesn't tell you.                                            |
| 09:27AM | 7  | Q.  Right.  But this report alone just says no subscriber,   |
| 09:27AM | 8  | correct?                                                     |
| 09:27AM | 9  | A.  Right.                                                   |
| 09:27AM | 10 | Q.  So, the next step is that 533 number would have to be    |
| 09:28AM | 11 | subpoenaed independently, correct?                          |
| 09:28AM | 12 | A.  Yes.                                                     |
| 09:28AM | 13 | Q.  And then that subpoena would return information          |
| 09:28AM | 14 | presumably identify who's -- who the subscriber for the 533  |
| 09:28AM | 15 | number is, correct?                                          |
| 09:28AM | 16 | A.  If it's the type of phone where the company has the      |
| 09:28AM | 17 | subscriber data, then yes.                                   |
| 09:28AM | 18 | Q.  Right.  So, in order to get a list like this ultimately  |
| 09:28AM | 19 | filled in that doesn't say no subscribers, you've got to do a|
| 09:28AM | 20 | second round of subpoenas to get the subscribers from all of |
| 09:28AM | 21 | these numbers, correct?                                      |
| 09:28AM | 22 | A.  Yes.                                                     |
| 09:28AM | 23 | Q.  So, that's what, if I'm understanding it correctly, when |
| 09:28AM | 24 | you first said this looks like a very early on in the        |
| 09:28AM | 25 | investigation document, it's because none of these numbers   |

09:28AM    1    have the subscribers associated with them yet, correct?

09:28AM    2    A.  Correct.

09:28AM    3    Q.  Okay.  And you said generally investigation, I think,

09:28AM    4    you've got do multiple rounds of these subpoenas to sort of

09:28AM    5    fill in and identify who all these folks are that call each

09:28AM    6    other, correct?

09:28AM    7    A.  Yes.

09:28AM    8    Q.  And then a separate level of investigation might be, in

09:29AM    9    your experience, to then take the subscriber names that you

09:29AM   10    find from these numbers and subpoena utilities associated

09:29AM   11    with the addresses, correct?

09:29AM   12    A.  You could, yes.

09:29AM   13    Q.  If there's a suspicion that that might be a grow

09:29AM   14    location, you would do, for example, the utilities subpoenas,

09:29AM   15    correct?

09:29AM   16    A.  Well, I don't think that's the track.  If I had a

09:29AM   17    suspicion about a location, I would subpoena the location.

09:29AM   18    If I was looking at a person, then I would subpoena by the

09:29AM   19    person.

09:29AM   20    Q.  Right.  But I guess what I'm saying is you might not in

09:29AM   21    your investigation know where a location is until you have it

09:29AM   22    off of a subscriber information subpoena return, correct?

09:29AM   23    A.  That's correct.

09:29AM   24    Q.  And you might not even know who the subscriber is in the

09:29AM   25    first place until you have that back from the subpoena

09:29AM    1    return, correct?

09:29AM    2    A.    Correct.

09:29AM    3    Q.    So, what I'm saying generally speaking is sometimes

09:29AM    4    multiple rounds of subpoenas are necessary to get to the

09:30AM    5    point where you as an agent have names and addresses that you

09:30AM    6    can work further in your investigation, correct?

09:30AM    7    A.    Yes.

09:30AM    8    Q.    Okay.  And I think you went through this earlier, but at

09:30AM    9    the top it's circled it says, C2-11-0126, that file number,

09:30AM    10    correct?

09:30AM    11    A.    Yes.

09:30AM    12    Q.    And that was not the Wayne Anderson file, correct?

09:30AM    13    A.    It's not.

09:30AM    14    Q.    And below it, it says the name Bongo, right?

09:30AM    15    A.    Yes.

09:30AM    16    Q.    And you understood that in your investigation or your

09:30AM    17    personal time at the DEA to be Joe Bongiovanni's nickname,

09:30AM    18    correct?

09:30AM    19    A.    Yes.

09:30AM    20    Q.    So, and I think you told us on direct it's common for

09:30AM    21    intel analysts to write this sort of information on the top

09:30AM    22    of one of these reports, correct?

09:30AM    23    A.    Yes.

09:30AM    24    Q.    Because ultimately, they have to give these reports in

09:30AM    25    paper form to one of the agents, correct?

| | | |
|---|---|---|
| 09:30AM | 1 | A.  Yes. |
| 09:30AM | 2 | Q.  So, at least from what you can tell in this report, it |
| 09:30AM | 3 | looks like an agent wrote this case number and Joe |
| 09:31AM | 4 | Bongiovanni's nickname to provide him with this report that |
| 09:31AM | 5 | we see here, correct? |
| 09:31AM | 6 | A.  Yes. |
| 09:31AM | 7 | Q.  Okay.  And in your experience with the DEA as a TFO, it's |
| 09:31AM | 8 | not uncommon for agents to work other agents' cases, correct? |
| 09:31AM | 9 | A.  To assist each other? |
| 09:31AM | 10 | Q.  To assist, yes. |
| 09:31AM | 11 | A.  Yes, that's correct. |
| 09:31AM | 12 | Q.  Okay. |
| 09:31AM | 13 |         MR. MacKAY:  All right.  Ms. Champoux, can we take |
| 09:31AM | 14 | that down and can we pull up -- it's the next one down, |
| 09:31AM | 15 | 716-481-8002 toll analysis. |
| 09:31AM | 16 |         BY MR. MacKAY: |
| 09:31AM | 17 | Q.  Okay.  So now, we're looking at another toll analysis, |
| 09:31AM | 18 | correct? |
| 09:31AM | 19 | A.  Yes. |
| 09:31AM | 20 | Q.  Okay.  And, you know, based on the file number, and this |
| 09:32AM | 21 | number circled at the top, you understand this to be John |
| 09:32AM | 22 | Robinson's phone number? |
| 09:32AM | 23 | A.  I don't see a file number.  I recognize that telephone |
| 09:32AM | 24 | number. |
| 09:32AM | 25 | Q.  Oh, when I was talking about the file number at the top, |

USA v Bongiovanni - Ryan - MacKay/Cross - 9712/24
21

09:32AM   1    I guess I meant the actual file number PDF.

09:32AM   2    A.  Oh, the file name?  Yes.

09:32AM   3    Q.  But do you recognize both from that file name and from

09:32AM   4    the number that's here, do you recognize that to be John

09:32AM   5    Robinson's cell phone number?

09:32AM   6    A.  Yes.

09:32AM   7    Q.  Okay.  Now when we go back, do you recall that being a

09:32AM   8    number that -- strike that.

09:32AM   9        So, this is occurring on April 19th of 2013, correct?

09:32AM   10   A.  Yes.

09:32AM   11   Q.  Okay.  And this is, you know, about six months almost

09:32AM   12   after that initial Tom Serio document we looked at, correct?

09:32AM   13   A.  Yes.

09:32AM   14   Q.  Okay.  All right.  Now, so what this -- what this is, so

09:32AM   15   the jury understands, is a list of numbers that are calling

09:32AM   16   or being called by John Robinson's phone number, correct?

09:33AM   17   A.  Yes.

09:33AM   18   Q.  Okay.  And, you know, some numbers we see here are Tom

09:33AM   19   Serio, correct?

09:33AM   20   A.  Yes.

09:33AM   21       **MR. MacKAY:**  Ms. Champoux, can we go to the next

09:33AM   22   page, please?

09:33AM   23           Just rotate that.

09:33AM   24       **BY MR. MacKAY:**

09:33AM   25   Q.  And okay.  Some other names came up that you knew had

09:33AM    1    some significance in the Wayne Anderson investigation.  Do

09:33AM    2    you recall the name T.S.?

09:33AM    3    A.   Yes.

09:33AM    4    Q.   Okay.  Do you recall Hard Core Tattoo?

09:33AM    5    A.   Yes.

09:33AM    6    Q.   Okay.  You say there was Ron Serio, correct?

09:33AM    7    A.   Yes.

09:33AM    8    Q.   Michael Moynihan?

09:33AM    9    A.   Yes.

09:33AM   10    Q.   We've talked about him already, but Tom Serio?

09:34AM   11    A.   Yes.

09:34AM   12            MR. MacKAY:  Can we go to the next page,

09:34AM   13    Ms. Champoux?

09:34AM   14            BY MR. MacKAY:

09:34AM   15    Q.   Here we see Michael Masecchia?

09:34AM   16    A.   Yes.

09:34AM   17    Q.   Chris Baker?

09:34AM   18    A.   Yes.

09:34AM   19    Q.   Looks like there's a couple different numbers there for

09:34AM   20    him, correct?

09:34AM   21    A.   Two.

09:34AM   22    Q.   Paul Francoforte?

09:34AM   23    A.   Yes.

09:34AM   24    Q.   Michael Buttitta?

09:34AM   25    A.   Yes.

09:34AM    1    Q.  Okay.

09:34AM    2         MR. MacKAY:  Then can we go to the next page,

09:34AM    3    Ms. Champoux?

09:34AM    4         BY MR. MacKAY:

09:34AM    5    Q.  Mark Kagan, correct?

09:34AM    6    A.  Yes.

09:34AM    7    Q.  And Mark Kagan, you understood in the course of your

09:34AM    8    investigation, to have some source of supply -- source of

09:34AM    9    supply relationship with Ron Serio?

09:34AM   10    A.  Source of supply, or maybe brokers of source of supply.

09:35AM   11    Q.  Okay.  Now, when you looked at one of the earlier

09:35AM   12    documents, when we looked at one of the documents earlier in

09:35AM   13    you testimony here, I think you described as being relatively

09:35AM   14    early on in the process of an investigation, correct?

09:35AM   15    A.  Are you talking about the Tom Serio subpoena?

09:35AM   16    Q.  Yes.

09:35AM   17    A.  Yes.

09:35AM   18    Q.  Now, compared to that one, fair to say this one

09:35AM   19    represents sort of a further step in the investigation,

09:35AM   20    correct?

09:35AM   21    A.  That's more filled in, yes.

09:35AM   22    Q.  Yes, that's what I mean.  Because there's more

09:35AM   23    information here, it's fair to assume this is sort of further

09:35AM   24    along in the investigative process, correct?

09:35AM   25    A.  As far as subpoenas go anyways, yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

24

09:35AM    1    Q.  Right, because you talked about how there's multiple

09:35AM    2    rounds of subpoenas this looks like it came after several

09:35AM    3    rounds, correct?

09:35AM    4    A.  Yes.

09:35AM    5    Q.  Okay.  And we know in any event that date-wise it's a

09:35AM    6    number of months after that Tom Serio sheet, correct?

09:35AM    7    A.  Yes.

09:35AM    8        MR. MacKAY:  Can we take that down, Ms. Champoux?

09:35AM    9        Can we pull up the -- going to the next one down,

09:36AM   10    716-578-5296.  Okay.

09:36AM   11        BY MR. MacKAY:

09:36AM   12    Q.  All right.  So, and this is another hot sheet, correct?

09:36AM   13    A.  Yes.

09:36AM   14    Q.  But this one, this goes back, crossed it right out but I

09:36AM   15    was trying to underline, this goes back to July 16th of 2012,

09:36AM   16    correct?

09:36AM   17    A.  It does.

09:36AM   18    Q.  So, this is even earlier than that prior sheet we looked

09:36AM   19    at with Tom Serio, correct?

09:36AM   20    A.  Yes.

09:36AM   21    Q.  And this one, there's a case number in the upper

09:36AM   22    right-hand corner C2-12-0090, correct?

09:36AM   23    A.  Yes.

09:36AM   24    Q.  And that is not the Wayne Anderson file, correct?

09:36AM   25    A.  It is not.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

25

09:36AM    1    Q.  And that is, do you recall that being the G.R. file

09:36AM    2    number?

09:36AM    3    A.  I remember the name G.R., I'd need to see the documents

09:36AM    4    to be able to say for sure that it's -- that's the right case

09:36AM    5    number.

09:36AM    6    Q.  Okay.  If I told you that was the number from the case

09:36AM    7    file, would you have any reason to disagree with me?

09:37AM    8    A.  I'd like to see the documents before I say that it is or

09:37AM    9    it isn't.

09:37AM   10    Q.  Okay.  I don't want to break off and kind of pull that

09:37AM   11    off and go back, so let's stick with this document for a

09:37AM   12    moment.

09:37AM   13       This is a different number that's being looked up,

09:37AM   14    correct?  This -- this is a different number than the one in

09:37AM   15    November that's being looked up, correct?

09:37AM   16    A.  Yes.

09:37AM   17    Q.  This is a 716 area code, correct?

09:37AM   18    A.  Yes.

09:37AM   19    Q.  The one in November was a 561 area code, correct?

09:37AM   20    A.  Yes.

09:37AM   21    Q.  But based on the address and the name that's written next

09:37AM   22    to it, it looks like this is also for Tom Serio though,

09:37AM   23    correct?

09:37AM   24    A.  Yes.

09:37AM   25    Q.  Just generally speaking, the G.R. file, do you recall

09:37AM    1    that being one of Shane Nastoff's files?

09:37AM    2    A.  I don't.

09:37AM    3    Q.  Do you recall who worked it?

09:37AM    4    A.  No.

09:37AM    5    Q.  It wasn't Joe Bongiovanni; is that fair to say?

09:37AM    6    A.  I don't know that either.

09:38AM    7    Q.  Okay.

09:38AM    8            MR. MacKAY:  Ms. Champoux, can we show the witness

09:38AM    9    only --

09:38AM   10            BY MR. MacKAY:

09:38AM   11    Q.  Would it help to refresh anything -- refresh your memory

09:38AM   12    to show you something?

09:38AM   13    A.  I mean, if I saw a report with names and case numbers on

09:38AM   14    it, then yes.

09:38AM   15            MR. MacKAY:  Sure.  So Ms. Champoux, can we show for

09:38AM   16    the witness only Government Exhibit 8J?

09:38AM   17            MS. CHAMPOUX:  J?

09:38AM   18            MR. MacKAY:  J as in Jim.

09:38AM   19            BY MR. MacKAY:

09:38AM   20    Q.  Just take a look at that for a moment to yourself, let me

09:38AM   21    know if that refreshes your recollection.

09:38AM   22    A.  Yes.  It's a --

09:38AM   23            MR. MacKAY:  Let me just take that down.

09:38AM   24    Ms. Champoux, you can take that down.

          25

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

27

09:38AM 1         BY MR. MacKAY:

09:38AM 2  Q.  Does that refresh your recollection that the G.R. file

09:38AM 3  was, number 1, the case number was C2-12-0090?

09:38AM 4  A.  I saw the case number and the agents.  Could I see the

09:38AM 5  file title again?

09:38AM 6         MR. MacKAY:  Yeah, can we show that again

09:38AM 7  Ms. Champoux?

09:39AM 8         THE WITNESS:  Okay.

09:39AM 9         MR. MacKAY:  Okay.  All right.  We can take that

09:39AM 10  down, Ms. Champoux.

09:39AM 11         BY MR. MacKAY:

09:39AM 12  Q.  So, again, back to both of my questions.  Does that

09:39AM 13  refresh your recollection first on what the case number for

09:39AM 14  G.R. was?

09:39AM 15  A.  C2-12-0090.

09:39AM 16  Q.  And number two, who the agent was who worked that case?

09:39AM 17  A.  Shane Nastoff.

09:39AM 18  Q.  Okay.

09:39AM 19         MR. MacKAY:  We can take that down, Ms. Champoux.

09:39AM 20  Can we pull up the next one down -- actually, I'm sorry, one

09:39AM 21  more down.  716-830-3226 hot sheet.

09:39AM 22         BY MR. MacKAY:

09:39AM 23  Q.  Okay.  Now, this is another hot sheet that's run,

09:39AM 24  correct?

09:39AM 25  A.  Yes.

09:39AM  1   Q.  So, again, for the jury, that's the report that itemizes

09:39AM  2   in order of most called to the least called, the numbers

09:39AM  3   interacting with the main number, correct?

09:39AM  4   A.  Yes.

09:39AM  5   Q.  And the number being focused on here is the 716-830-3226

09:40AM  6   number, correct?

09:40AM  7   A.  Yes.

09:40AM  8   Q.  And you understand that to be Ron Serio's cell phone

09:40AM  9   number?

09:40AM 10   A.  I think it was one of them, yes.

09:40AM 11   Q.  Okay.  And this is occurring, this report is being run,

09:40AM 12   April 19th of 2013?

09:40AM 13   A.  Yes.

09:40AM 14   Q.  Okay.  So again, some of the same names were showing up,

09:40AM 15   I'm going to go through the names here, and let me know if

09:40AM 16   these are the same names you saw on some of the other hot

09:40AM 17   sheets and subscriber lists I showed you.

09:40AM 18       Chris Baker, correct?

09:40AM 19   A.  Yes.

09:40AM 20   Q.  Okay.  Looks like he's interacting with Ron Serio's phone

09:40AM 21   number, he's either calling him or getting called by Chris

09:40AM 22   Baker 446 times, correct?

09:40AM 23   A.  Yes.

09:40AM 24   Q.  There's his brother, Tom Serio, correct?

09:40AM 25   A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

29

| | | |
|---|---|---|
| 09:40AM | 1 | Q.  127 times they're calling or -- in some fashion, correct? |
| 09:41AM | 2 | A.  Yes. |
| 09:41AM | 3 | Q.  Mike Buttitta, correct? |
| 09:41AM | 4 | A.  Yes. |
| 09:41AM | 5 | Q.  And that's 77 times? |
| 09:41AM | 6 | A.  Yes, it is. |
| 09:41AM | 7 | Q.  T.S.? |
| 09:41AM | 8 | A.  Yes, I see that. |
| 09:41AM | 9 | **MR. MacKAY:**  Go to the next page, Ms. Champoux. |
| 09:41AM | 10 | **BY MR. MacKAY:** |
| 09:41AM | 11 | Q.  Michael Masecchia? |
| 09:41AM | 12 | A.  Yes. |
| 09:41AM | 13 | Q.  Michael Moynihan? |
| 09:41AM | 14 | A.  Yes. |
| 09:41AM | 15 | Q.  Mark Kagan? |
| 09:41AM | 16 | A.  Yes. |
| 09:41AM | 17 | Q.  Paul Francoforte? |
| 09:41AM | 18 | A.  Yes. |
| 09:41AM | 19 | Q.  Hard Core Tattoos? |
| 09:41AM | 20 | A.  Yes. |
| 09:41AM | 21 | Q.  Okay.  And just those were some of the same numbers we |
| 09:41AM | 22 | saw, appear to have interacted with some of the prior numbers |
| 09:41AM | 23 | that were in prior subscriber lists and hot sheets, correct? |
| 09:41AM | 24 | A.  Yes. |
| 09:42AM | 25 | Q.  Okay.  So, it seems to be that at least from what you can |

USA v Bongiovanni - Ryan - MacKay/Cross - 9712/24

30

| | | |
|---|---|---|
| 09:42AM | 1 | see there's several reports here that have an overlap in the |
| 09:42AM | 2 | same names and numbers being called, correct? |
| 09:42AM | 3 | A.  Yes. |
| 09:42AM | 4 | Q.  Now, you were shown in exhibit, Government |
| 09:42AM | 5 | Exhibit 100E-1, do you remember that one?  That's the list, |
| 09:42AM | 6 | the handwritten list of numbers? |
| 09:42AM | 7 | A.  Yes. |
| 09:42AM | 8 | Q.  And that came out of the Redweld which you know to be |
| 09:42AM | 9 | Government Exhibit 100A, correct? |
| 09:42AM | 10 | A.  Yes. |
| 09:42AM | 11 | Q.  Fair to say a lot of the names we just went through were |
| 09:42AM | 12 | names and numbers that were on that handwritten sheet, |
| 09:42AM | 13 | correct? |
| 09:42AM | 14 | A.  Yes. |
| 09:42AM | 15 | Q.  Okay. |
| 09:42AM | 16 | **MR. MacKAY:**  Ms. Champoux, we can take down that |
| 09:42AM | 17 | document. |
| 09:42AM | 18 | Let's go two more down.  We've got the cursor, Baker |
| 09:42AM | 19 | C rap sheet. |
| 09:42AM | 20 | If we can zoom out a little bit. |
| 09:42AM | 21 | **BY MR. MacKAY:** |
| 09:42AM | 22 | Q.  Okay.  This, you know to be sort of a criminal history |
| 09:42AM | 23 | check of somebody, correct? |
| 09:43AM | 24 | A.  Yes.  It's a -- we call it a "triple I check," it stands |
| 09:43AM | 25 | for Interstate Identification Index. |

| | | |
|---|---|---|
| 09:43AM | 1 | Q.  Okay.  And sort of layman's terms, is this like running a |
| 09:43AM | 2 | rap sheet on somebody? |
| 09:43AM | 3 | A.  No, this won't necessarily give you the rap sheet.  The |
| 09:43AM | 4 | triple I check tells you if someone has a rap sheet and then |
| 09:43AM | 5 | there's another step you take to go find it. |
| 09:43AM | 6 | Q.  Okay.  So, this is sort of the initial step of finding |
| 09:43AM | 7 | out whether somebody has a prior criminal history, correct? |
| 09:43AM | 8 | A.  Yes. |
| 09:43AM | 9 | Q.  So, you have a name and some personal identification |
| 09:43AM | 10 | information, you can send out a query to this NCIC |
| 09:43AM | 11 | organization and you get back, in this sort of report, an |
| 09:43AM | 12 | initial response of whether there's a rap sheet to be found |
| 09:43AM | 13 | for that individual, correct? |
| 09:43AM | 14 | A.  Right. |
| 09:43AM | 15 | Q.  Could come back and there's no criminal history, correct? |
| 09:43AM | 16 | A.  It would come back and say no record on file, but yeah, |
| 09:43AM | 17 | means a person's not in there. |
| 09:44AM | 18 | Q.  Yeah, and then opposite would be it says there is |
| 09:44AM | 19 | something in there, correct? |
| 09:44AM | 20 | A.  Yes. |
| 09:44AM | 21 | Q.  And then you can do a further search to find out what the |
| 09:44AM | 22 | person's prior criminal history is, correct? |
| 09:44AM | 23 | A.  Yes. |
| 09:44AM | 24 | Q.  And you can see this report is being run by |
| 09:44AM | 25 | Mr. Bongiovanni, correct? |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

32

09:44AM  1    A.  Yes.

09:44AM  2    Q.  And it's being run on that same date as that hot sheet

09:44AM  3    you saw before, April 19th, 2013, correct?

09:44AM  4    A.  Yes.

09:44AM  5    Q.  And we saw the name Chris Baker on that April 19th, 2013

09:44AM  6    hot sheet, correct?

09:44AM  7    A.  Yes.

09:44AM  8    Q.  So, is it fair to say a standard investigative procedure

09:44AM  9    is to start doing some criminal history inquiries into

09:44AM  10   individuals that show up on hot sheets?

09:44AM  11   A.  Yes.

09:44AM  12   Q.  Fair to say that, sort of, we talked about earlier and I

09:44AM  13   don't want to keep going through every little step, but that

09:44AM  14   there's multiple rounds of subpoenas to get information on

09:45AM  15   phone numbers and individuals, correct?

09:45AM  16   A.  Yes.

09:45AM  17   Q.  And that helps to identify, in your experience, who's

09:45AM  18   most in contact with a phone number, correct?

09:45AM  19   A.  Yes.

09:45AM  20   Q.  And then, if you're investigating that contact the next

09:45AM  21   step might be something like this, which is figuring out

09:45AM  22   whether any of these individuals have prior criminal

09:45AM  23   histories, correct?

09:45AM  24   A.  Yes.

09:45AM  25   Q.  All right.

09:45AM    1    **MR. MacKAY:** Can we take this down, Ms. Champoux?

09:45AM    2    And then can we go to the next down, Baker C, toll

09:45AM    3    analysis? Okay.

09:45AM    4    **BY MR. MacKAY:**

09:45AM    5    Q. Now, what are we looking at here in this document?

09:45AM    6    A. Well, in the first page, it's subscriber information for

09:45AM    7    Chris Baker.

09:45AM    8    Q. Okay.

09:45AM    9    **MR. MacKAY:** Can we scroll down a little bit,

09:45AM    10    Ms. Champoux?

09:45AM    11    **BY MR. MacKAY:**

09:45AM    12    Q. And then what are we seeing here?

09:45AM    13    A. Then this is a hot list for 716-830-3226.

09:45AM    14    Q. And that was Ron, one of Ron Serio's phone numbers,

09:45AM    15    correct?

09:45AM    16    A. Yes.

09:45AM    17    Q. And this hot sheet was being run about a month before on

09:45AM    18    the April date on March 19th, 2013, correct?

09:46AM    19    A. Yes.

09:46AM    20    Q. And, again, what this shows in common parlance is the

09:46AM    21    most called numbers to and from Ron Serio's phone number,

09:46AM    22    correct?

09:46AM    23    A. Yes.

09:46AM    24    Q. Because this would have been run, you know, a month

09:46AM    25    before the April date, is it fair to say this sort of

09:46AM   1   captures a further back date as far as what the calls were?

09:46AM   2   Does that make sense?

09:46AM   3   A.   I would have to go back and look at the date range again

09:46AM   4   to see how they match up, they're similar, but it, I mean, it

09:46AM   5   has to be at least, so, in other words, there's the date of

09:46AM   6   the report and then there's the date of the records.

09:46AM   7   Q.   Okay.

09:46AM   8   A.   You could run the report on multiple days without the

09:46AM   9   records changing, that's why the date range on right column

09:46AM   10  matters.

09:46AM   11  Q.   Okay.  So, that's right there.  Yeah.  So, I guess what

09:46AM   12  I'm asking is --

09:46AM   13  A.   Well, no.  Not that date range, the -- the -- that's the

09:46AM   14  date range that's queried.  So basically, the query is run

09:46AM   15  against all records for all time right, because it goes from

09:47AM   16  1980 to 2099.

09:47AM   17  Q.   Okay.

09:47AM   18  A.   The date of the records is -- can I mark the screen?

09:47AM   19  Q.   Yes.

09:47AM   20  A.   It's this column.

09:47AM   21  Q.   Okay.  So, what this is saying, glad you sort of cleared

09:47AM   22  this up because I might not have explained it well.

09:47AM   23      What it's saying is the report date here encompasses in

09:47AM   24  some fashion February 10th of 2013 to March 11th of 2013,

09:47AM   25  correct?

09:47AM    1    A.   Right.  And so --

09:47AM    2    Q.   And what does that date represent in terms of what this

09:47AM    3    report is showing?

09:47AM    4    A.   That's the date range of the phone records.

09:47AM    5    Q.   Okay.

09:47AM    6    A.   That are available for the system to analyze.

09:47AM    7    Q.   Right.  So, what that means is, is it fair to say that

09:47AM    8    that's what this report is operating off of that got back

09:47AM    9    from the subpoena?

09:47AM   10    A.   Well --

09:47AM   11    Q.   I'm trying to find out the easiest way to explain this.

09:47AM   12        So when the report -- the subpoena goes out, and you get

09:47AM   13    back the subscriber information and the calls, is that what

09:48AM   14    this date column is representing?

09:48AM   15    A.   Yes.

09:48AM   16    Q.   Is what was returned from the phone company as far as

09:48AM   17    dates of activity?

09:48AM   18    A.   Yes.

09:48AM   19    Q.   Okay.  So, at this point in time, it's analyzing

09:48AM   20    February 10th, 2013, to March 11th, 2013, correct?

09:48AM   21    A.   Yes.

09:48AM   22         **MR. MacKAY:**  Ms. Champoux, can we jump back two

09:48AM   23    documents to this one I've marked up there, the 716830.

09:48AM   24         **BY MR. MacKAY:**

09:48AM   25    Q.   And this one, again, was the hot sheet that was run on

09:48AM  1   April 19th, 2013, correct?

09:48AM  2   A.   Yes.

09:48AM  3   Q.   Looks like in some places, in that same column the dates

09:48AM  4   are about the same?

09:48AM  5   A.   They're similar.  So, that that means that so, for

09:48AM  6   example, in the first line for the number ending 0664, for

09:48AM  7   Michael Masecchia, there are 37 contacts between the number

09:48AM  8   that was queried and Michael Masecchia's number from

09:49AM  9   February 12th to March 11th.

09:49AM  10      But then when you see that date range change, it just

09:49AM  11  means that the outside limits of when the contacts occurred

09:49AM  12  are different for the different numbers.

09:49AM  13  Q.   From what you can see in the date column here versus the

09:49AM  14  date column in last document we looked at, it looks like the

09:49AM  15  records are all in the approximately February to March

09:49AM  16  timeframe of 2013, correct?

09:49AM  17  A.   Yes.

09:49AM  18  Q.   Okay.

09:49AM  19       **MR. MacKAY:**  Okay.  You can close that out,

09:49AM  20  Ms. Champoux.

09:49AM  21       Can we go to -- can we jump down two more to

09:49AM  22  Buttitta M rap sheet?

09:49AM  23       And just zoom out, thank you.

09:49AM  24       **BY MR. MacKAY:**

09:49AM  25  Q.   Okay.  This is another one of these what you said was a

| | | |
|---|---|---|
| 09:49AM | 1 | triple I check? |
| 09:49AM | 2 | A.  Yes. |
| 09:49AM | 3 | Q.  Again, run by Mr. Bongiovanni, correct? |
| 09:49AM | 4 | A.  Yes. |
| 09:49AM | 5 | Q.  Run on April 19th, 2013, correct? |
| 09:49AM | 6 | A.  Yes. |
| 09:49AM | 7 | Q.  And it's being run for an individual named Michael |
| 09:50AM | 8 | Buttitta, correct? |
| 09:50AM | 9 | A.  Yes. |
| 09:50AM | 10 | Q.  And again, this is the document that -- it's the return |
| 09:50AM | 11 | of a query to tell whether somebody has a criminal history or |
| 09:50AM | 12 | not, correct? |
| 09:50AM | 13 | A.  Yes. |
| 09:50AM | 14 | Q.  And do you recall Michael Buttitta is a name that shows |
| 09:50AM | 15 | up in some of those subscriber and hot sheets that we've |
| 09:50AM | 16 | already gone through, correct? |
| 09:50AM | 17 | A.  Yes. |
| 09:50AM | 18 | Q.  Okay.  So, again, this represents, like, I think you said |
| 09:50AM | 19 | before, the next step of looking into the specific |
| 09:50AM | 20 | individuals who might be identified as subscribers in one of |
| 09:50AM | 21 | these reports, correct? |
| 09:50AM | 22 | A.  Yes. |
| 09:50AM | 23 | Q.  Okay. |
| 09:50AM | 24 | **MR. MacKAY:**  You can close that out, Ms. Champoux. |
| 09:50AM | 25 | Can we pull up handwritten notes?  Can we zoom out a |

09:50AM    1    little bit?

09:50AM    2        A little bit more so we can just capture it all.

09:50AM    3        **BY MR. MacKAY:**

09:50AM    4    Q.  Okay.  And do you recall this handwritten sheet of notes

09:50AM    5    being in the file?

09:50AM    6    A.  Yes.

09:50AM    7    Q.  Okay.  And in your investigation, did you understand this

09:50AM    8    to be a document written by Joseph Bongiovanni?

09:51AM    9    A.  I don't know who authored it.

09:51AM    10   Q.  Okay.  In your experience as a DEA agent, is it -- as a

09:51AM    11   TFO with the DEA, is it fair to say sometimes you get

09:51AM    12   information coming in from sources that you sit down and have

09:51AM    13   an interview with?

09:51AM    14   A.  Yes.

09:51AM    15   Q.  Yeah.  I mean, in common parlance, you sit down with

09:51AM    16   somebody who's got information to give you, and you make

09:51AM    17   notes of what they said, right?

09:51AM    18   A.  Yes.

09:51AM    19   Q.  And sometimes that's one of your confidential sources who

09:51AM    20   comes in with information, correct?

09:51AM    21   A.  Yes.

09:51AM    22   Q.  Sometimes you get sort of unsolicited tips and things off

09:51AM    23   the street?

09:51AM    24   A.  You could.

09:51AM    25   Q.  Sometimes you get sources of information who want to walk

09:51AM    1    in and tell you something, but don't want to really act as a

09:51AM    2    confidential source, correct?

09:51AM    3    A.   You could.

09:51AM    4    Q.   Okay.  At least from what you can see in using your own

09:51AM    5    experience, does this appear to be memorialization of some

09:52AM    6    sort of notes that, you know, an agent may have made

09:52AM    7    regarding an interview or discussion with somebody?

09:52AM    8    A.   I -- there's no way that I could say that, either way.

09:52AM    9    Q.   Okay.  But you see a couple names that you recognize from

09:52AM   10    the Wayne Anderson investigation on here, correct?

09:52AM   11    A.   I, yes.

09:52AM   12    Q.   Who specifically do you see?

09:52AM   13    A.   I see Ron Serio and Dave Oddo, those are the first two.

09:52AM   14    Q.   Okay.  You see Tom Serio as well, too?

09:52AM   15    A.   I do.

09:52AM   16    Q.   Do you see right next to it, you see what says Creme

09:52AM   17    Beame?

09:52AM   18    A.   Yes.

09:52AM   19    Q.   Did you understand Tom Serio sometime in the 2012, 2013

09:52AM   20    timeframe to drive a white BMW?

09:52AM   21    A.   No.

09:52AM   22    Q.   Okay.  Did you see the phone number below that?

09:52AM   23    A.   Yes.

09:52AM   24    Q.   578 phone number, did you understand that to be a cell

09:52AM   25    phone number that associated with Tom Serio in your

09:52AM    1    investigation?

09:52AM    2    A.  I have to go back and look at records.

09:52AM    3         MR. MacKAY:  Yeah if we -- Ms. Champoux, I've just

09:53AM    4    kind of marked a window up there, can we flip back to that

09:53AM    5    document?

09:53AM    6         BY MR. MacKAY:

09:53AM    7    Q.  Okay.  And we're looking at the 716-578-5296 document?

09:53AM    8    A.  Okay.

09:53AM    9    Q.  So, do you understand that number that you saw in the

09:53AM    10   hand-written notes to be Tom Serio's cell phone number?

09:53AM    11   A.  Yes.

09:53AM    12        MR. MacKAY:  All right.  Can we take that down,

09:53AM    13   Ms. Champoux?  All right.

09:53AM    14        Can we go a few more down.  Can we go to the Jeremie

09:53AM    15   Jones misc pdf?  Can we zoom out?

09:53AM    16        BY MR. MacKAY:

09:53AM    17   Q.  Now, Jeremie Jones was a name that you knew came up in

09:53AM    18   the Wayne Anderson file, correct?

09:53AM    19   A.  I mean, I only know about it because its in the file.

09:53AM    20   Q.  Would you recall reviewing the entire file and seeing a

09:53AM    21   DEA-202 for Jeremie Jones?

09:53AM    22   A.  In the Anderson file?

09:53AM    23   Q.  Yes.

09:53AM    24   A.  I don't recall that.

09:54AM    25   Q.  Okay.  Do you remember that there were two DEA-202 forms

09:54AM    1    for both Tom Serio and Ron Serio?

09:54AM    2    A.  I do remember those.

09:54AM    3    Q.  Those were the forms that put somebody in the file,

09:54AM    4    correct?

09:54AM    5    A.  And then Wayne Anderson, I remember, Damian Abbate.

09:54AM    6    Q.  And do you remember David Oddo?

09:54AM    7    A.  Yes.

09:54AM    8    Q.  Okay.  And do you remember about the same date there's

09:54AM    9    also one for Jeremie Jones?

09:54AM   10    A.  I, I don't recall Jeremie Jones, no.

09:54AM   11    Q.  Okay.

09:54AM   12         MR. MacKAY:  Ms. Champoux, can--

09:54AM   13         BY MR. MacKAY:

09:54AM   14    Q.  Would it help to refresh your recollection to look at

09:54AM   15    something from the file?

09:54AM   16    A.  Yes.

09:54AM   17         MR. MacKAY:  Ms. Champoux, can we show Government

09:54AM   18    Exhibit -- well, it's in evidence, can we show Government

09:54AM   19    Exhibit 8A at page 59?

09:54AM   20         BY MR. MacKAY:

09:54AM   21    Q.  Can you see that clearly on your screen?

09:54AM   22    A.  I can.

09:54AM   23    Q.  That's the, that's a 202 for Jeremie Jones, correct?

09:54AM   24    A.  It is.

09:54AM   25    Q.  It looks like it was prepared on January 2nd, 2013?

| | | |
|---|---|---|
| 09:54AM | 1 | A.  Yes. |
| 09:54AM | 2 | Q.  So, in your experience, the 202 is a document created by |
| 09:54AM | 3 | an agent to associate a name with a file, correct? |
| 09:54AM | 4 | A.  Yes.  And then the next page should have some remarks |
| 09:55AM | 5 | that explain the association. |
| 09:55AM | 6 | Q.  Okay.  Now, I want to jump back to that document that we |
| 09:55AM | 7 | were at.  The Jeremie Jones misc pdf.  What it looks like |
| 09:55AM | 8 | here, this looks like a mugshot, correct? |
| 09:55AM | 9 | A.  That looks like that, yes. |
| 09:55AM | 10 | MR. MacKAY:  And can we go to the next page, |
| 09:55AM | 11 | Ms. Champoux? |
| 09:55AM | 12 | BY MR. MacKAY: |
| 09:55AM | 13 | Q.  And at the top, you see this looks like a -- the document |
| 09:55AM | 14 | that follows from page 2, that appears to be a booking sheet? |
| 09:55AM | 15 | A.  Yes. |
| 09:55AM | 16 | Q.  Okay.  And it looks like this booking sheet from what you |
| 09:55AM | 17 | can see from the upper right-hand corner was run -- was the |
| 09:55AM | 18 | report was run on January 2nd, 2013, at about 9:33 in the |
| 09:55AM | 19 | morning? |
| 09:55AM | 20 | A.  Could we zoom on that? |
| 09:55AM | 21 | Q.  Yeah.  I'll clear that. |
| 09:55AM | 22 | A.  That's better, yes, January 2nd, 2013. |
| 09:55AM | 23 | Q.  And then that report is run by Joseph Palmieri, correct? |
| 09:55AM | 24 | A.  Yes. |
| 09:55AM | 25 | Q.  And from what you just looked at in Government |

09:55AM      1    Exhibit 8A, that's the same day Jeremie Jones is entered in

09:56AM      2    the file, correct?

09:56AM      3    A.  Yes.

09:56AM      4         MR. MacKAY:  Can we go to page 7 of this document,

09:56AM      5    please?

09:56AM      6         BY MR. MacKAY:

09:56AM      7    Q.  Okay.  Now, this is a NADDIS record being run for the

09:56AM      8    same person, Jeremie Jones, correct?

09:56AM      9    A.  Yes.

09:56AM     10    Q.  Okay.  And just so the jury understands, we've heard

09:56AM     11    about NADDIS before.  Can you just explain what they just saw

09:56AM     12    with the booking report versus what a NADDIS report is?

09:56AM     13    A.  The NADDIS records are DEA records.  The booking report

09:56AM     14    was a Buffalo PD record.

09:56AM     15    Q.  So, the previous document we looked concerns some arrest

09:56AM     16    Jeremie Jones had with the Buffalo Police, correct?

09:56AM     17    A.  Yes.

09:56AM     18    Q.  But what we're looking at now on page 7 is the internal

09:56AM     19    DEA record for whether there's any prior investigations or

09:56AM     20    cases open with Jeremie Jones, correct?

09:56AM     21    A.  Yes.

09:56AM     22    Q.  And if we look at the upper right-hand corner, this

09:57AM     23    NADDIS report is being run by Shane Nastoff, correct?

09:57AM     24    A.  Yes, that's what it says.

09:57AM     25    Q.  And it's being run on December 30th, 2012?

09:57AM    1    A.  Yes.

09:57AM    2    Q.  Okay.  So, you know, a couple days before you saw that,

09:57AM    3    that 202 in Government Exhibit 8A, that enters him into the

09:57AM    4    file, correct?

09:57AM    5    A.  Yes.

09:57AM    6    Q.  And you understood Shane Nastoff to be listed as the

09:57AM    7    co-case agent on the Wayne Anderson file, correct?

09:57AM    8    A.  I don't know that, I don't know that, no.

09:57AM    9    Q.  Did you know Shane Nastoff, you know, to appear in the

09:57AM   10    Wayne Anderson file on reports in some fashion?

09:57AM   11    A.  Yes.

09:57AM   12    Q.  Okay.

09:58AM   13         MR. MacKAY:  Can we close that out, Ms. Champoux?

09:58AM   14    Can we go to Masecchia M phone info?

09:58AM   15         BY MR. MacKAY:

09:58AM   16    Q.  Again, so, first page of this is -- we're looking at is

09:58AM   17    the subscriber information for, appears to be Michael

09:58AM   18    Masecchia, correct?

09:58AM   19    A.  Yes.

09:58AM   20    Q.  And again, it's circled at the top, Bongo, correct?

09:58AM   21    A.  Yes.

09:58AM   22    Q.  So, this at least from what you can review from this

09:58AM   23    document seen in front of you, that suggests that this

09:58AM   24    document is first produced to an intel analyst and then

09:58AM   25    there's some handwriting on it intending to be passed to

09:58AM    1    Mr. Bongiovanni?

09:58AM    2    A.   Yes.

09:58AM    3    Q.   Okay.  Because in your, again, I think you told us before

09:58AM    4    but in your experience, it's not uncommon for the subpoena

09:58AM    5    returns to come back directly to the intel analyst, correct?

09:58AM    6    A.   Yes.

09:58AM    7    Q.   Because they can sort through that information and have

09:58AM    8    the programs to analyze it, correct?

09:58AM    9    A.   Everybody had access to that program.  But, not everybody

09:58AM   10    did it the same way.

09:58AM   11    Q.   Okay.  Now, this is being run on --

09:59AM   12         MR. MacKAY:  Can we go to the next page,

09:59AM   13    Ms. Champoux?  Okay.  Can we zoom in a little bit?

09:59AM   14         I'm sorry.

09:59AM   15         BY MR. MacKAY:

09:59AM   16    Q.   Okay.  So, what are we seeing in front of us right now?

09:59AM   17    A.   Somebody, I'm trying to see if it says who, it's a print

09:59AM   18    screen from DARTS.

09:59AM   19    Q.   Okay.  So, what exactly is it that we're looking at, what

09:59AM   20    does that do?  What does this screen do in terms of DEA

09:59AM   21    activity?

09:59AM   22    A.   I'm not sure I understand the question.  What does the

09:59AM   23    screen do?

09:59AM   24    Q.   Yeah.  So, I mean, we said it's a screen from DARTS, what

09:59AM   25    we've seen already are DARTS emails, correct?

09:59AM  1    A.  Yes.

09:59AM  2    Q.  Those are the emails that get generated when there's an

09:59AM  3    overlap, correct?

09:59AM  4    A.  Yes.

09:59AM  5    Q.  Is this fair to say this is sort of the other end when a

10:00AM  6    number is getting put into DARTS?

10:00AM  7    A.  This, I think, is the subpoena return, because it has the

10:00AM  8    link for view packages in the view print.  It means that the

10:00AM  9    subpoena, this -- this C2 number here, C2-13-581484, is the

10:00AM  10   subpoena number.

10:00AM  11      The service provider it was sent to, case number, who

10:00AM  12   prepared it, that means that the tolls or whatever was

10:00AM  13   subpoenaed is ready for download.

10:00AM  14   Q.  Sure.  I just I just want to walk through this, because

10:00AM  15   it looks like a couple stages in a computer program that's

10:00AM  16   being used.  Because I think what you were referring to is

10:00AM  17   this is the link you're talking about where it says view

10:00AM  18   packages.

10:00AM  19   A.  Yes.

10:00AM  20   Q.  So, at the time in 2013, when agents or intel analysts

10:00AM  21   are subpoenaing information from phone companies, they're not

10:00AM  22   necessarily getting back physical paper records, correct?

10:00AM  23   A.  No.  This subpoena was sent electronically and returned

10:01AM  24   electronically.

10:01AM  25   Q.  Right.  That's what I'm getting towards, is the way

10:01AM   1   that -- in this case, Sprint Nextel Corporation produces the

10:01AM   2   records to DEA, is they send them some sort of electronic

10:01AM   3   link, correct?

10:01AM   4   A.  Yes.

10:01AM   5   Q.  And the link, it appears from what we can see from this

10:01AM   6   internet, internet explorer screenshot, it's sort of the link

10:01AM   7   is opened directly in the DARTS program?

10:01AM   8   A.  Yes.

10:01AM   9   Q.  Okay.  So, again, just -- I know we're going through some

10:01AM  10   of the steps a little bit slowly, but the subpoena goes out

10:01AM  11   the door, correct?

10:01AM  12   A.  Electronically in this case, yes.

10:01AM  13   Q.  So, you would send, if you identified a number, you would

10:01AM  14   subpoena Sprint Nextel by first preparing one of the actual

10:01AM  15   subpoena papers that we've seen before, correct?

10:01AM  16   A.  No.

10:01AM  17   Q.  Okay.  Wait, so, I mean, you have to prepare the actual

10:01AM  18   subpoena, correct?

10:01AM  19   A.  In this case, no.

10:01AM  20   Q.  Okay.

10:01AM  21   A.  It's all done electronically.

10:01AM  22   Q.  Well, so, I know previously and I think the jury has seen

10:01AM  23   what look to be like subpoenas, correct?

10:02AM  24   A.  Okay.  I guess when you said paper, it's -- it was

10:02AM  25   different by service provider when I was there.  So, there

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

10:02AM   1    was some service providers where you actually had to print a

10:02AM   2    paper subpoena, and then submit it through some other means.

10:02AM   3        There's no paper subpoena, there might be a subpoena form

10:02AM   4    generated, but there's no paper subpoena that's ever

10:02AM   5    generated for Sprint at the time.

10:02AM   6    Q.  Yeah, okay.  That's what I'm getting at.  Is with some of

10:02AM   7    the subpoenas, what you've got to do is actually prepare a

10:02AM   8    physical piece of paper, and then send it out to whoever

10:02AM   9    you're subpoenaing, correct?

10:02AM  10    A.  Yes.

10:02AM  11    Q.  But when you're dealing with some of these phone

10:02AM  12    companies, specifically Sprint Nextel, you go through the

10:02AM  13    DARTS -- the intel analyst or the agent goes through the

10:02AM  14    DARTS program and prepares some sort of form that goes out to

10:02AM  15    Sprint Nextel?

10:02AM  16    A.  We always go through DARTS.

10:02AM  17    Q.  Yes.

10:02AM  18    A.  I mean, whether you're sending a paper subpoena or an

10:02AM  19    electronic subpoena, DARTS prepares it either way.

10:02AM  20    Q.  Okay.  So, that's sort of the portal to send it out to

10:02AM  21    the company, correct?  Is that a fair way of characterizing

10:02AM  22    it?

10:02AM  23    A.  That's one thing that it does.

10:03AM  24    Q.  Okay.  But yeah, so when you're dealing with subpoenas

10:03AM  25    though, you're routing them all through this DARTS online

10:03AM    1    program, correct?

10:03AM    2    A.   Yes.

10:03AM    3    Q.   And then the return, for somebody like Sprint Nextel,

10:03AM    4    what you're saying is they send everything back through the

10:03AM    5    DARTS program through that same portal, correct?

10:03AM    6    A.   That's correct.

10:03AM    7    Q.   And then what the return -- the subpoena return recipient

10:03AM    8    gets is something that we're looking at in front of us,

10:03AM    9    correct?

10:03AM   10    A.   Yes.

10:03AM   11    Q.   This is basically a notification that says, hey, your

10:03AM   12    subpoena records are ready, click here, correct?

10:03AM   13    A.   Yes.

10:03AM   14    Q.   And then once this is, I presume, once you open this

10:03AM   15    package, that's how the numbers that are associated get

10:03AM   16    loaded into DARTS?

10:03AM   17    A.   No.

10:03AM   18    Q.   So, how do the numbers -- so, walk us through how when

10:03AM   19    you get a subpoena return back, how the actual numbers get

10:03AM   20    into DARTS.

10:03AM   21    A.   So at this point, just what I'm looking at this, the only

10:03AM   22    number that you can know for sure that's in DARTS is the

10:04AM   23    phone number here, 716-812-0664.  Because you have to put it

10:04AM   24    into DARTS first before DARTS will let you generate a

10:04AM   25    subpoena, that's happened or you wouldn't have a return.

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

50

10:04AM    1    Whatever numbers are on this return, the way I would have

10:04AM    2    done it, is put them in, take the return, get the return

10:04AM    3    loaded into PenLink so that I could actually see the numbers

10:04AM    4    on the spreadsheet.  And then you have to go from the PenLink

10:04AM    5    spreadsheet back to the first page of DARTS, and put the

10:04AM    6    numbers in and start the process all over again.

10:04AM    7    Q.  Okay.  So, again, so we're just catching all of the steps

10:04AM    8    here, this 812-0664 number you understood that to be Michael

10:04AM    9    Masecchia's phone number, correct?

10:04AM    10   A.  Yes.

10:04AM    11   Q.  Okay.  And what you're saying is that in order to get a

10:04AM    12   subpoena for that number, you've first got to put that number

10:04AM    13   into DARTS, correct?

10:04AM    14   A.  Yes.

10:04AM    15   Q.  You've got to generate the subpoena and send it out

10:04AM    16   through DARTS, correct?

10:04AM    17   A.  Yes.

10:04AM    18   Q.  And what you get back through DARTS is the subpoena

10:04AM    19   return, correct?

10:04AM    20   A.  Yes.

10:04AM    21   Q.  And that may have a bunch of further numbers that are

10:05AM    22   associated with Mike Masecchia's number, correct?

10:05AM    23   A.  It's going to be his toll records and the subscriber

10:05AM    24   information.

10:05AM    25   Q.  Right.  It's all, what you're gonna see is all the

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24
51

10:05AM  1  numbers that he's called or is calling, correct?

10:05AM  2  A.  Yes.

10:05AM  3  Q.  And then what I think you jut told us is in order to put

10:05AM  4  those further numbers into DARTS, you then have to go through

10:05AM  5  a separate step of inputting each one of those, correct?

10:05AM  6  A.  Yes.

10:05AM  7  Q.  Unless you were going through and subpoenaing each one of

10:05AM  8  those numbers themselves, correct?

10:05AM  9  A.  I mean, unless you had already subpoenaed it.  Yes.

10:05AM  10  Q.  Right.  So like, again, I'll give you an example.  You

10:05AM  11  get a random number back from this subpoena return.  If you'd

10:05AM  12  never seen it before, it's not going to be in DARTS, correct?

10:05AM  13  A.  If I -- it could be.  DARTS is going to tell me if it's

10:05AM  14  in DARTS or not.

10:05AM  15  Q.  Okay.  And if it's not, if you're not going to separately

10:05AM  16  then subpoena that number, you'd have to manually input it

10:05AM  17  into DARTS, correct?

10:05AM  18  A.  Yes.

10:05AM  19  Q.  Right.  So, I guess what I'm just trying to get at is

10:06AM  20  just because a number that goes out the door for a subpoena

10:06AM  21  and comes back with numbers on a return doesn't just

10:06AM  22  necessarily mean that all those numbers that are returned on

10:06AM  23  the subpoena return automatically go into DARTS; is that fair

10:06AM  24  to say?

10:06AM  25  A.  They do not.

10:06AM    1    Q.   Okay.   Okay.   Now on this one, the "prepared by" column

10:06AM    2    is Justin Borst, correct?

10:06AM    3    A.   Yes.

10:06AM    4    Q.   He's one of the intel analysts at the DEA at the time,

10:06AM    5    correct?

10:06AM    6    A.   Yes.

10:06AM    7    Q.   So, what you see from this is, does it appear by the way

10:06AM    8    he's getting -- by the way he's listed as the prepared by,

10:06AM    9    that indicates he prepared the subpoena to go out the door,

10:06AM   10    correct?

10:06AM   11    A.   Yes.

10:06AM   12    Q.   And then, he would be the person who -- for whom the

10:06AM   13    subpoena is returned, correct?

10:06AM   14    A.   Yes.

10:06AM   15    Q.   And that's what we're seeing here again, where he clicks

10:06AM   16    on the package, and it says view package, and that's how you

10:06AM   17    view the package, correct?

10:06AM   18    A.   Yes.

10:06AM   19    Q.   Okay.   And then, we've gone through this with some of the

10:07AM   20    prior reports, but what you said happens sometimes is that

10:07AM   21    the analyst will then take the numbers that come in from the

10:07AM   22    subpoena return, run it through this PenLink program, and you

10:07AM   23    get the reports that we've already seen, correct?

10:07AM   24    A.   Yes.

10:07AM   25    Q.   And then those reports in your experience, the intel

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

53

10:07AM    1    analysts sometimes print out label by the case number and

10:07AM    2    agent and then give it to the agent, correct?

10:07AM    3    A.  Yes.

10:07AM    4    Q.  Okay.  I think we've got all steps of the process now.

10:07AM    5           MR. MacKAY:  All right.  Can we close this one out

10:07AM    6    Ms. Champoux?

10:07AM    7           Can we jump down two more to Mettal docs?

10:07AM    8           BY MR. MacKAY:

10:07AM    9    Q.  First page, again, looks like one of those subscriber

10:07AM    10   returns, correct?

10:07AM    11   A.  Yes.

10:07AM    12   Q.  Again, it's labeled by what you know to be an intel

10:07AM    13   analyst directing it to Mr. Bongiovanni, from what you can

10:07AM    14   see, correct?

10:07AM    15   A.  Yes.

10:07AM    16   Q.  Return an address in Kew Garden Hills, correct?

10:07AM    17   A.  No, New Gar -- no, it is Kew Garden Hills, yes.

10:08AM    18   Q.  And do you understand that to be a municipality in

10:08AM    19   downstate near New York City?

10:08AM    20   A.  I don't know where it is.

10:08AM    21   Q.  But it's got the 11367 zip code?

10:08AM    22   A.  It does.

10:08AM    23           MR. MacKAY:  Let's go to the next page, Ms. Champoux.

10:08AM    24           BY MR. MacKAY:

10:08AM    25   Q.  Okay.  Looking at the top here, this again, this is a hot

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24
54

| | | |
|---|---|---|
| 10:08AM | 1 | sheet, correct? |
| 10:08AM | 2 | A.  Yes. |
| 10:08AM | 3 | Q.  So, what we're looking at again, is one of these reports |
| 10:08AM | 4 | that shows how many times certain numbers call or were called |
| 10:08AM | 5 | by the target number, correct? |
| 10:08AM | 6 | A.  Yes. |
| 10:08AM | 7 | Q.  And again, it's organized by most to least, correct? |
| 10:08AM | 8 | A.  Yes. |
| 10:08AM | 9 | Q.  And we know that the number that's being targeted is that |
| 10:08AM | 10 | 516 number, correct? |
| 10:08AM | 11 | A.  Yes. |
| 10:08AM | 12 | Q.  And this is being run on August 26th of 2013, correct? |
| 10:08AM | 13 | A.  Yes. |
| 10:08AM | 14 | Q.  Okay.  Now, do you recall in your review of the Wayne |
| 10:08AM | 15 | Anderson file the Robert Mettal name coming up? |
| 10:09AM | 16 | A.  Yes. |
| 10:09AM | 17 | Q.  And do you remember that -- and do you recall that being |
| 10:09AM | 18 | a name that the confidential source R.K. indicates he may be |
| 10:09AM | 19 | able to contact about purchases of narcotics? |
| 10:09AM | 20 | A.  I would need to review that report to be certain. |
| 10:09AM | 21 | Q.  Okay.  But he was a name that had come up in the file, |
| 10:09AM | 22 | correct? |
| 10:09AM | 23 | A.  Yes. |
| 10:09AM | 24 | Q.  All right.  So, do you recall what Mr. R.K.'s phone |
| 10:09AM | 25 | number was offhand? |

10:09AM    1    A.  No.

10:09AM    2            MR. MacKAY:  Okay.  Ms. Champoux we can't do side by

10:09AM    3    side with this document, can we?

10:09AM    4            MS. CHAMPOUX:  No.

10:09AM    5            MR. MacKAY:  Okay.  Can we pull up Government Exhibit

10:09AM    6    9E at page 5?  Okay.  Can we zoom in on block 20?

10:09AM    7            BY MR. MacKAY:

10:10AM    8    Q.  And while we've got part of the screen blown up, do you

10:10AM    9    understand this to be the CS establishment form for R.K.?

10:10AM   10    A.  I'm looking for the name to make sure I'm looking at

10:10AM   11    right one.

10:10AM   12    Q.  Yeah.

10:10AM   13            MR. MacKAY:  Ms. Champoux --

10:10AM   14            THE CLERK:  I'm sorry, is this in evidence?

10:10AM   15            MR. MacKAY:  Yes.

10:10AM   16            THE CLERK:  Is it 9-E, as in Edward?

10:10AM   17            MR. MacKAY:  Is it shown for the jury as well, too?

10:10AM   18            THE CLERK:  It is now.

10:10AM   19            THE WITNESS:  I see it, yes, it's for R.K.

10:10AM   20            BY MR. MacKAY:

10:10AM   21    Q.  So -- so, this was the CS establishment form for R.K.  We

10:10AM   22    can un-minimize it.  And going back to block 20, do you see

10:10AM   23    the phone number that's associated with him?

10:10AM   24    A.  I do.

10:10AM   25    Q.  It's 716-935-0252?

| | | |
|---|---|---|
| 10:10AM | 1 | A.  Yes. |
| 10:10AM | 2 | MR. MacKAY:  Can we take this down, Ms. Champoux. |
| 10:10AM | 3 | Can we go back to the Mettal document? |
| 10:10AM | 4 | Can you control F, search for that same number, |
| 10:11AM | 5 | 935-0252.  Okay. |
| 10:11AM | 6 | It's not OCR, so let's do it this way.  Can we scroll |
| 10:11AM | 7 | down -- go down to the next page, Ms. Champoux, please?  One |
| 10:11AM | 8 | more page, please.  One more page. |
| 10:11AM | 9 | BY MR. MacKAY: |
| 10:11AM | 10 | Q.  Okay.  Do you see where I'm indicating? |
| 10:11AM | 11 | A.  Yes. |
| 10:11AM | 12 | Q.  Do you see that's R.K.'s number there? |
| 10:11AM | 13 | A.  Yes.  Row 95. |
| 10:11AM | 14 | Q.  Okay.  And from what you can see from this report, it |
| 10:11AM | 15 | looks like there are three telephone calls with Robert |
| 10:11AM | 16 | Mettal, correct? |
| 10:11AM | 17 | A.  Yes. |
| 10:11AM | 18 | Q.  And we know that happens, from what you can see from the |
| 10:12AM | 19 | report, sorry, not very accurate with these marks, we can see |
| 10:12AM | 20 | that the date range in the report is May 17th, 2013 to |
| 10:12AM | 21 | May 17th, 2013, correct? |
| 10:12AM | 22 | A.  Yes. |
| 10:12AM | 23 | Q.  So, it looks, again, interpreting what that third column |
| 10:12AM | 24 | means, it looks like the only, so, when this -- this list was |
| 10:12AM | 25 | run, the only information about R.K.'s phone number connected |

10:12AM  1   to Mr. Mettal's phone number is limited to that one date on

10:12AM  2   May 17th, correct?

10:12AM  3   A.  Yes.

10:12AM  4   Q.  It's all the records that were returned, correct?  It's

10:12AM  5   all the information -- it's all the information that's being

10:12AM  6   returned about that phone number between that date, correct?

10:12AM  7   A.  Available in that particular case on -- in PenLink on

10:12AM  8   that day, yes.

10:12AM  9   Q.  Right.  So, so, again, what this line indicates is that

10:13AM  10  there appear to be three calls between R.K. and Robert Mettal

10:13AM  11  on May 17th, 2013, correct?

10:13AM  12  A.  Yes.

10:13AM  13  Q.  Okay.  And in your experience with these lists, you can't

10:13AM  14  tell if the calls were connected or not, correct?

10:13AM  15  A.  Not from this list, you would need to look at the actual

10:13AM  16  returned records.

10:13AM  17  Q.  Okay.  But at least this indicates that there's some

10:13AM  18  attempted contact or contact between those two phone numbers

10:13AM  19  on that specific date, correct?

10:13AM  20  A.  Yes.

10:13AM  21          **MR. MacKAY:**  You can take that down, Ms. Champoux.

10:13AM  22          Can we go to two down, Moynihan M, phone info.

10:13AM  23          **BY MR. MacKAY:**

10:13AM  24  Q.  Again, this is another one of those subscriber returns,

10:13AM  25  and it's for the individual named Michael Moynihan, correct?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24
58

| | | |
|---|---|---|
| 10:13AM | 1 | A.  Yes. |
| 10:13AM | 2 | Q.  Again, it's associated with the Wayne Anderson file |
| 10:14AM | 3 | number, correct? |
| 10:14AM | 4 | A.  Yes. |
| 10:14AM | 5 | Q.  And like prior versions of this document we've seen, it's |
| 10:14AM | 6 | got Mr. Bongiovanni's name on the top of the subscriber |
| 10:14AM | 7 | information return and handwriting? |
| 10:14AM | 8 | A.  His nickname, yes. |
| 10:14AM | 9 | Q.  Yeah.  And as you've said, you indicate this generally |
| 10:14AM | 10 | means to you that it's an intel analyst providing this |
| 10:14AM | 11 | document to Mr. Bongiovanni, correct? |
| 10:14AM | 12 | A.  Yes. |
| 10:14AM | 13 | Q.  Okay. |
| 10:14AM | 14 | MR. MacKAY:  Let's go to the next page. |
| 10:14AM | 15 | BY MR. MacKAY: |
| 10:14AM | 16 | Q.  Again, we went through this before with Michael |
| 10:14AM | 17 | Masecchia, but this is one of these same things, it's a |
| 10:14AM | 18 | subpoena return package for the number for Michael Moynihan, |
| 10:14AM | 19 | correct? |
| 10:14AM | 20 | A.  Yes. |
| 10:14AM | 21 | Q.  Again, prepared by Justin Borst the intel analyst, |
| 10:14AM | 22 | correct? |
| 10:14AM | 23 | A.  Yes. |
| 10:14AM | 24 | Q.  And it looks like the prepared date was April 19th, 2013, |
| 10:14AM | 25 | correct? |

10:14AM   1    A.  Yes.

10:14AM   2    Q.  Now, in your experience, when numbers are subpoenaed back

10:15AM   3    around this point in time and they're done solely through

10:15AM   4    this DARTS system and it's all electronic subpoena and

10:15AM   5    return, approximately how long do you remember it took to

10:15AM   6    actually get the return back?

10:15AM   7    A.  So, my experience with it is later, just for

10:15AM   8    clarification, but similar, it could be relatively quick.

10:15AM   9        Sprint may be a day to a week on the long end.  And that

10:15AM  10    wouldn't happen very often.

10:15AM  11    Q.  Okay.  Okay.  Can we go to the -- so, it looks like from

10:15AM  12    what we can see here the prepared date is April 19th, 2013,

10:15AM  13    correct?

10:15AM  14    A.  Yes.

10:15AM  15            MR. MacKAY:  Let's go to the next page.

10:15AM  16            BY MR. MacKAY:

10:15AM  17    Q.  Okay.  And then, again, we see one of these hot sheet

10:15AM  18    produced again?

10:15AM  19    A.  Yes.

10:15AM  20    Q.  This one is April 24th, 2013, correct?

10:16AM  21    A.  Yes, it is.

10:16AM  22    Q.  So, based on what you saw on the prior page, it looks

10:16AM  23    like subpoenas prepared on the 19th and then by the 24th,

10:16AM  24    there's enough information back to run one of these hot

10:16AM  25    sheets, correct?

10:16AM    1    A.  Yes.

10:16AM    2    Q.  And there what you can see based on the dialed name

10:16AM    3    column that a lot of those are no subscribers.  Do you

10:16AM    4    understand that to be sort of as you explained, an early step

10:16AM    5    in an investigation with this number?

10:16AM    6    A.  Yes.

10:16AM    7    Q.  Because at this point, there's no subscribers identified

10:16AM    8    with any of the numbers that are calling or being called by

10:16AM    9    Mike Moynihan's phone, correct?

10:16AM   10    A.  Well, there's -- I see at least one.  You'd have to

10:16AM   11    scroll through the rest of the document to know how many, but

10:16AM   12    there aren't many.

10:16AM   13    Q.  Okay.  So, again, in your experience this is generally

10:16AM   14    early on in an investigation because from what you can see,

10:16AM   15    there's not a lot of information available yet for this

10:16AM   16    report, correct?

10:16AM   17    A.  At least from this page, yes.

10:16AM   18    Q.  Okay.

10:17AM   19         **MR. MacKAY:**  Can we zoom out and scroll down a little

10:17AM   20    bit, Ms. Champoux?  I want to catch a little more of the page.

10:17AM   21    Okay.

10:17AM   22         **BY MR. MacKAY:**

10:17AM   23    Q.  I mean, like you said, you do see some names that are

10:17AM   24    already identified, correct?

10:17AM   25    A.  I see two on this page.

10:17AM    1    Q.  Do you actually see three?

10:17AM    2    A.  Oh, I'm sorry, I was looking in the address column.  Yes,

10:17AM    3    I see three.

10:17AM    4    Q.  So, Tom Serio and Chris Baker, correct?

10:17AM    5    A.  Yes.  And Robert Rine.

10:17AM    6    Q.  Yeah.  Now, Robert Rine, did you understand his name to

10:17AM    7    have some significance around the time Ron Serio was

10:17AM    8    arrested?

10:17AM    9    A.  Some.  That's not the thing that I remember the most

10:17AM    10   about Robert Rine though, no.

10:17AM    11   Q.  Okay.  What do you remember about Robert Rine?

10:17AM    12       MR. TRIPI:  Objection, hearsay.  Any awareness would

10:18AM    13   come through hearsay from a witness who has yet to testify in

10:18AM    14   this trial.

10:18AM    15       THE COURT:  No, I disagree with that, it could come

10:18AM    16   from reviewing a file, it could come from a lot of different

10:18AM    17   things.

10:18AM    18       BY MR. MacKAY:

10:18AM    19   Q.  Yeah, I mean, if you know, what do you recall about

10:18AM    20   Robert Rine?

10:18AM    21       MR. TRIPI:  Judge, same objection.  Unless he's going

10:18AM    22   to ask him if you reviewed that name in the file, same

10:18AM    23   objection.  Then it's going to come from hearsay.

10:18AM    24       THE COURT:  Overruled.

10:18AM    25       THE WITNESS:  My awareness is from an interview of

10:18AM    1    another person.

10:18AM    2             BY MR. MacKAY:

10:18AM    3    Q.   Was that Ron Serio?

10:18AM    4    A.   Yes.

10:18AM    5    Q.   Okay.  So, we'll leave that at this point for now.

10:18AM    6         But back to this hot sheet.  What it shows is that this

10:18AM    7    Mike Moynihan individual appears to be in contact with Tom

10:18AM    8    Serio and Chris Baker, correct?

10:18AM    9    A.   Yes.

10:18AM   10             MR. MacKAY:  Can we go to the next page of this

10:18AM   11    Ms. Champoux?

10:18AM   12             BY MR. MacKAY:

10:18AM   13    Q.   Again, the second page has a couple -- it's fair to say

10:19AM   14    it's mostly no subscribers, but there looks like there's

10:19AM   15    three names that are identified?

10:19AM   16    A.   Yes.

10:19AM   17    Q.   And that's Mark Falzone, Michael Buttitta, and it's Chris

10:19AM   18    Baker again, correct?

10:19AM   19    A.   Yes.

10:19AM   20    Q.   And again, those are names that you recall seeing on

10:19AM   21    Government Exhibit 100E-1, the handwritten note?

10:19AM   22    A.   Yes.

10:19AM   23             MR. MacKAY:  All right.  Can we take this document

10:19AM   24    down, Ms. Champoux?

10:19AM   25             Can we pull up Oddo NADDIS record?

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

63

```
10:19AM    1          BY MR. MacKAY:
10:19AM    2    Q.  Okay.  Similar to the Jeremie Jones documents, it appears
10:19AM    3    to be a mugshot of David Oddo?
10:19AM    4    A.  Yes.
10:19AM    5          MR. MacKAY:  Can we go to the next page,
10:19AM    6    Ms. Champoux?
10:19AM    7          BY MR. MacKAY:
10:19AM    8    Q.  Okay.  Up at the top, if you can see it, do you see the
10:19AM    9    date it was run?
10:19AM   10    A.  July 2nd, 2012.
10:20AM   11    Q.  It's being run by Shane Nastoff, correct?
10:20AM   12    A.  Yes.
10:20AM   13    Q.  Okay.  And this is back then in the summer of 2012 before
10:20AM   14    the Wayne Anderson file was opened, correct?
10:20AM   15    A.  Yes.
10:20AM   16    Q.  Okay.
10:20AM   17          MR. MacKAY:  All right.  Can we take that down,
10:20AM   18    Ms. Champoux?
10:20AM   19          Actually, I'm sorry, can we leave that up one more
10:20AM   20    time?
10:20AM   21          BY MR. MacKAY:
10:20AM   22    Q.  Now, at the bottom of this page, do you see there's an
10:20AM   23    associated case number?
10:20AM   24    A.  Yes.
10:20AM   25    Q.  And the file title appears to be Fred Weir?
```

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24
64

10:20AM    1    A.  Yes.

10:20AM    2    Q.  Okay.  Do you recall that name coming up in some of the

10:20AM    3    hot sheets that we've looked at before?

10:20AM    4    A.  I remember seeing it in the file, yes.

10:20AM    5    Q.  Okay.  And that indicates, we talked about NADDIS records

10:20AM    6    a little bit, but what that entry indicates is the DEA had a

10:20AM    7    file on Fred Weir at some point in time in the past before

10:20AM    8    this report was run, correct?

10:20AM    9    A.  Yes.

10:20AM   10         MR. MacKAY:  All right.  Can we take this down

10:20AM   11    Ms. Champoux?  Can we pull up two more down, its Robert Mettal

10:21AM   12    misc.  Zoom out, please.

10:21AM   13         BY MR. MacKAY:

10:21AM   14    Q.  Similar to both Oddo and Jeremie Jones, this appears to

10:21AM   15    be a mugshot of Robert Mettal, correct?

10:21AM   16    A.  Yes.

10:21AM   17    Q.  It looks like there's even a phone number associated with

10:21AM   18    it, correct?

10:21AM   19    A.  Yes.

10:21AM   20    Q.  Okay.  And you recall, you recall seeing that number in

10:21AM   21    one of the Robert Mettal subpoena documents that we looked at

10:21AM   22    before?

10:21AM   23    A.  I remember a 516 number, yes.

10:21AM   24         MR. MacKAY:  Okay.  Go to the next page,

10:21AM   25    Ms. Champoux, please?

|          |    |                                                           |
|----------|----|-----------------------------------------------------------|
| 10:21AM  | 1  | **BY MR. MacKAY:**                                        |
| 10:21AM  | 2  | Q.  Again, we did this with Jeremie Jones, but again, what |
| 10:21AM  | 3  | we're looking at right now is a Buffalo Police Department  |
| 10:21AM  | 4  | booking sheet.  So, that would indicate something associated |
| 10:21AM  | 5  | with an arrest Robert Mettal had by Buffalo police?        |
| 10:21AM  | 6  | A.  Yes.                                                   |
| 10:21AM  | 7  | Q.  Okay.  And this report, if you look at the upper       |
| 10:21AM  | 8  | right-hand corner, appears to be run by Joseph Palmieri?   |
| 10:21AM  | 9  | A.  Yes.  But could we zoom on that, please?  Or just make |
| 10:22AM  | 10 | the document larger?  Thank you.                           |
| 10:22AM  | 11 | Yes.  Joseph Palmieri.                                     |
| 10:22AM  | 12 | Q.  And the report dates May 6th, 2013, correct?           |
| 10:22AM  | 13 | A.  Yes.                                                   |
| 10:22AM  | 14 | Q.  So, pulling booking data sheets, that's an investigative |
| 10:22AM  | 15 | procedure DEA agents do from time to time, correct?        |
| 10:22AM  | 16 | A.  Background checks like this, yes.                      |
| 10:22AM  | 17 | Q.  Yes.  So, that's what I'm asking, this is part of a    |
| 10:22AM  | 18 | background check into a specific individual, correct?      |
| 10:22AM  | 19 | A.  Yes.                                                   |
| 10:22AM  | 20 | Q.  And do you recall that some of the documents we've shown |
| 10:22AM  | 21 | that identify Mr. Phone -- Mr. Mettal's phone activity, those |
| 10:22AM  | 22 | were in 2013, correct?                                     |
| 10:22AM  | 23 | A.  Yes.                                                   |
| 10:22AM  | 24 | Q.  Okay.                                                  |
| 10:22AM  | 25 | **MR. MacKAY:**  All right.  Can we take that down,        |

10:22AM    1    Ms. Champoux?  Can we go to Serio real property recs?

10:23AM    2            Okay.  Can we zoom out a little bit?

10:22AM    3            **BY MR. MacKAY:**

10:23AM    4    Q.  Okay.  And can you see at the bottom there's a date of

10:23AM    5    May 22nd, 2013?

10:23AM    6    A.  Yes.

10:23AM    7    Q.  So, this is occurring kind of around the same time in May

10:23AM    8    of 2013 from the document we just looked at, correct?

10:23AM    9    A.  Yes.

10:23AM   10    Q.  And this is, you know, again, we're all, fair to say that

10:23AM   11    most of the documents that we've been looking at so far, they

10:23AM   12    reflect activity occurring in March, April, and May of 2013?

10:23AM   13    A.  Yes.

10:23AM   14    Q.  Okay.  And what does this appear to be to you?

10:23AM   15    A.  It's from -- looks like it's from Google Maps.

10:23AM   16    Somebody's looking at something on an internet browser and

10:23AM   17    printed part of page 2 or all of page 2 of a three-page

10:23AM   18    document.

10:23AM   19    Q.  Okay.  Do you understand, do you understand from the file

10:23AM   20    from your review of the Wayne Anderson file, any of these

10:24AM   21    addresses to have any connection to Ron Serio?

10:24AM   22    A.  I see 467 and 469 Tacoma.

10:24AM   23    Q.  Okay.  And do you recall from your review of the file the

10:24AM   24    132 Rhode Island --

10:24AM   25    A.  That was.

10:24AM    1    Q.  -- address having some investigative activity associated

10:24AM    2    with it?

10:24AM    3            MR. TRIPI:  Objection.

10:24AM    4            THE COURT:  What's the basis for that?

10:24AM    5            MR. TRIPI:  602, investigative activity in the file

10:24AM    6    from this.

10:24AM    7            THE COURT:  From this, no, he's not asking that, he's

10:24AM    8    asking whether there was activity in the file shown with

10:24AM    9    respect to this address.  What's wrong with that?

10:24AM   10            MR. TRIPI:  I'll withdraw it.  Sorry.

10:24AM   11            THE WITNESS:  The picture.  But I'm unaware of

10:24AM   12    anything else.

10:24AM   13            BY MR. MacKAY:

10:24AM   14    Q.  Okay.  And specifically on this document, we see 132

10:24AM   15    Rhode Island circled and highlighted, correct?

10:24AM   16    A.  It is.

10:24AM   17    Q.  And it looks like somebody wrote in a date of

10:25AM   18    October 12th, 2012, correct?

10:25AM   19    A.  Yes.

10:25AM   20    Q.  So, and that's a date prior to the Wayne Anderson file

10:25AM   21    having been opened, correct?

10:25AM   22    A.  Yes.

10:25AM   23    Q.  So, I mean, just at least from what you can see here,

10:25AM   24    that there's some focus on 132 Rhode Island, the address of

10:25AM   25    132 Rhode Island before the Wayne Anderson file is ever even

10:25AM     1     opened?

10:25AM     2              **MR. TRIPI:**  Objection.

10:25AM     3              **THE COURT:**  Yeah, sustained to the form of the

10:25AM     4     question.

10:25AM     5              **BY MR. MacKAY:**

10:25AM     6     Q.  But in any event, the October date that's listed here,

10:25AM     7     that's at least several weeks before Wayne Anderson, that

10:25AM     8     file was opened, correct?

10:25AM     9     A.  The date is, but --

10:25AM    10     Q.  Yeah.

10:25AM    11     A.  -- this couldn't have been written before May 22nd or

10:25AM    12     3rd, or whatever it is, so I have no idea what it means.

10:25AM    13     Q.  Right.  So, I mean, the number, the date at the bottom,

10:25AM    14     do you understand that to be a date that the report is run?

10:25AM    15     A.  This is -- it's a -- it looks like a printout of a web

10:26AM    16     browser like I said was done in May of 2013.

10:26AM    17     Q.  Right.  So, what you can see from the report.  It looks

10:26AM    18     like this is a page printed out where the report is run on

10:26AM    19     May 22nd of 2013, correct?

10:26AM    20     A.  Yes.

10:26AM    21     Q.  And then somebody is circling the 132 Rhode Island Street

10:26AM    22     and writing a date of 10/12/2012 there, correct?

10:26AM    23     A.  Yes.

10:26AM    24     Q.  Okay.

10:26AM    25              **MR. MacKAY:**  And you can take that down,

| | | |
|---|---|---|
| 10:26AM | 1 | Ms. Champoux.  And can we pull up -- it's T.S. rap sheet.  Or |
| 10:26AM | 2 | S.T. rap sheet. |
| 10:26AM | 3 | **BY MR. MacKAY:** |
| 10:26AM | 4 | Q.  Okay.  Again, the T.S. name, that's a name you saw within |
| 10:26AM | 5 | the Wayne Anderson file, correct? |
| 10:26AM | 6 | A.  Yes. |
| 10:26AM | 7 | Q.  And you -- do you recall him having some association in |
| 10:26AM | 8 | some fashion with R.K., the confidential source? |
| 10:26AM | 9 | A.  Yes. |
| 10:26AM | 10 | Q.  Okay.  Again, this is a triple I check record done by |
| 10:26AM | 11 | Mr. Bongiovanni on April 19 of 2013, correct? |
| 10:27AM | 12 | A.  Yes. |
| 10:27AM | 13 | Q.  And do you recall that April 19, 2013 date being the same |
| 10:27AM | 14 | date as one of the hot sheets that was run for Ron Serio's |
| 10:27AM | 15 | cell phone number? |
| 10:27AM | 16 | A.  Yes. |
| 10:27AM | 17 | Q.  So it appears at least from what you can see from the |
| 10:27AM | 18 | records that Tom Serio's number's appearing in a hot sheet |
| 10:27AM | 19 | for Ron Serio on the same date that Mr. Bongiovanni is |
| 10:27AM | 20 | running Mr. T.S.'s name to see if there's a -- any criminal |
| 10:27AM | 21 | history for Mr. T.S.? |
| 10:27AM | 22 | A.  I think you said Tom Serio's number and then -- |
| 10:27AM | 23 | Q.  I might have misspoken. |
| 10:27AM | 24 | A.  -- Mr. T.S.'s name.  Which one do you mean? |
| 10:27AM | 25 | Q.  Yeah, I'm sorry, I misspoke there. |

```
10:27AM    1        From the records you've reviewed, you can see that on the
10:27AM    2    same date T.S.'s name is showing up in a hot sheet for Ron
10:27AM    3    Serio's number, Mr. Bongiovanni appears to be running a
10:27AM    4    report to see if Mr. T.S. has any criminal history, correct?
10:27AM    5    A.  Yes.
10:27AM    6            THE COURT:  Mr. MacKay, do you have a sense of how
10:28AM    7    much longer you're going to be?
10:28AM    8            MR. MacKAY:  45 minutes.
10:28AM    9            THE COURT:  Okay.  So let's take a break, folks.
10:28AM   10        Remember my instructions about not talking about the
10:28AM   11    case, even with each other, and not making up your minds.
10:28AM   12            See you back here in about ten or 15 minutes.
10:28AM   13            (Jury excused at 10:28 a.m.)
10:28AM   14            THE COURT:  Okay.  Anything for the record before we
10:28AM   15    break, Mr. MacKay?
10:28AM   16            MR. MacKAY:  No, Your Honor.
10:28AM   17            THE COURT:  Mr. Tripi.
10:29AM   18            MR. TRIPI:  No, thank you, Judge.
10:29AM   19            THE COURT:  Okay, see you in a few minutes.
10:29AM   20            THE CLERK:  All rise.
10:29AM   21            (Off the record at 10:29 a.m.)
10:48AM   22            (Back on the record at 10:48 a.m.)
10:48AM   23            (Jury not present.)
10:48AM   24            THE CLERK:  All rise.
10:48AM   25            THE COURT:  Please be seated.
```

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24
71

| | | |
|---|---|---|
| 10:48AM | 1 | **THE CLERK:**  We are back on the record for the |
| 10:48AM | 2 | continuation of the jury trial in case number 19-cr-227, |
| 10:48AM | 3 | United States of America versus Joseph Bongiovanni. |
| 10:48AM | 4 | All counsel and parties are present. |
| 10:48AM | 5 | **THE COURT:**  Ready to go? |
| 10:48AM | 6 | **MR. MacKAY:**  I am. |
| 10:48AM | 7 | **THE COURT:**  Anything? |
| 10:48AM | 8 | **MR. TRIPI:**  No. |
| 10:48AM | 9 | **THE COURT:**  Let's bring them in, please.  Let's get |
| 10:48AM | 10 | the witness in, too. |
| 10:49AM | 11 | **MR. MacKAY:**  Judge, I think I'm well more than |
| 10:49AM | 12 | halfway done.  I'm just having trouble estimating time. |
| 10:49AM | 13 | **THE COURT:**  No, no, no, look it, I understand. |
| 10:50AM | 14 | (Witness and Jury seated at 10:50 a.m.) |
| 10:50AM | 15 | **THE COURT:**  The report will reflect that all our |
| 10:50AM | 16 | jurors, again, are present. |
| 10:50AM | 17 | I remind the witness he's still under oath. |
| 10:50AM | 18 | And, Mr. MacKay, you may continue. |
| 10:50AM | 19 | **BY MR. MacKAY:** |
| 10:50AM | 20 | Q.  Agent Ryan, before I continue, I want to go back and |
| 10:50AM | 21 | clarify something we were talking about and make sure I'm |
| 10:50AM | 22 | clear on it. |
| 10:50AM | 23 | **MR. MacKAY:**  Ms. Champoux, can we go back to the |
| 10:50AM | 24 | Government Exhibit 100A.1, and can we pull up the C Baker toll |
| 10:50AM | 25 | analysis? |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

72

| | | |
|---|---|---|
| 10:50AM | 1 | **BY MR. MacKAY:** |
| 10:50AM | 2 | Q.  Okay.  We looked at this before.  This was a subpoena |
| 10:50AM | 3 | return you understood for Chris Baker, correct? |
| 10:50AM | 4 | A.  It's -- this is not the actual return, this is the |
| 10:50AM | 5 | information loaded into PenLink, I think. |
| 10:50AM | 6 | Q.  Okay.  And then the phone number, the 830-3226 number, |
| 10:51AM | 7 | you understood that to be associated with Ron Serio? |
| 10:51AM | 8 | A.  I don't remember the phone number from the case.  I can't |
| 10:51AM | 9 | remember without looking at records. |
| 10:51AM | 10 | Q.  Okay. |
| 10:51AM | 11 | A.  If it's -- I mean, according to this, it's Chris Baker. |
| 10:51AM | 12 | I need to look at something else to see if there's another |
| 10:51AM | 13 | record that associates it's Ron Serio. |
| 10:51AM | 14 | Q.  Okay.  But what I want to -- |
| 10:51AM | 15 | **MR. MacKAY:**  Can we go to page 2 again.  All right. |
| 10:51AM | 16 | **BY MR. MacKAY:** |
| 10:51AM | 17 | Q.  So, I just want to focus in on something I think you told |
| 10:51AM | 18 | us earlier.  This was a hot sheet, and this is one of the |
| 10:51AM | 19 | ones that has primarily no subscribers on it, correct? |
| 10:51AM | 20 | A.  Right, it's mostly no subscribers. |
| 10:51AM | 21 | Q.  Right.  Meaning that there's no subscriber information |
| 10:51AM | 22 | known for the phone numbers, correct? |
| 10:51AM | 23 | A.  For the ones that say no subscriber, that's correct. |
| 10:51AM | 24 | Q.  Right.  And so what it means is if you've got an entry |
| 10:51AM | 25 | like this, indicating line 7 where it says Tom Serio is, you |

10:51AM  1    know, in the -- instead of no subscriber, that means -- am I

10:52AM  2    understanding it to mean that Tom Serio's number is already

10:52AM  3    in the DARTS system?

10:52AM  4    A.  No.  This is separate from DARTS.

10:52AM  5    Q.  Okay.

10:52AM  6    A.  So, DARTS deconflicts telephone numbers and generates

10:52AM  7    subpoenas.  Very generally, right.

10:52AM  8    Q.  Yeah.  Why would Tom Serio's name already be in one of

10:52AM  9    these hot sheet lists rather than one with no subscriber?

10:52AM  10   A.  Because there was a previous subpoena return for that

10:52AM  11   phone, that 561 phone number, that's been you uploaded to

10:52AM  12   this set of data in PenLink.

10:52AM  13   Q.  Okay.  So, if you see no subscriber in one of these

10:52AM  14   reports, it means there's never been a subpoena to that

10:52AM  15   number before?

10:52AM  16   A.  No.

10:52AM  17   Q.  What does it mean then?  Or did you say no, as in there's

10:52AM  18   never been a subpoena?

10:52AM  19   A.  I'm saying it doesn't necessarily mean that, because

10:52AM  20   you're talking about two different -- two different

10:52AM  21   databases.

10:52AM  22       So PenLink is small, local.  It only has what, you know,

10:53AM  23   what you put in it.

10:53AM  24       If my recollection is correct, even the data within

10:53AM  25   PenLink is separated by cases.  So, I mean, so you were

10:53AM  1    asking about a phone number that says no subscriber, right?

10:53AM  2    Q.  Right.

10:53AM  3    A.  It could be identified -- I think I'm correct about this,

10:53AM  4    it could be identified in 15 other cases in PenLink, but it's

10:53AM  5    not identified in this one.

10:53AM  6    Q.  Okay.

10:53AM  7    A.  But if it's -- once it goes into DARTS, it's in DARTS.

10:53AM  8    Q.  Okay.  So in your experience, when an agent receives one

10:53AM  9    of those hot lists and sees no subscriber, that's generally

10:53AM  10   an indication that they're going to need to subpoena that

10:53AM  11   number to get the information and to find out who the

10:53AM  12   subscriber is?

10:53AM  13   A.  Yes.

10:53AM  14        MR. MacKAY:  So can we go to the next page of this

10:53AM  15   document?

10:53AM  16        BY MR. MacKAY:

10:53AM  17   Q.  All right.  There up at the top, the 812-0664 number,

10:53AM  18   that you recall to be Michael Masecchia's number?

10:53AM  19   A.  I think that's correct.

10:54AM  20   Q.  So in this column we see that it's no subscriber,

10:54AM  21   correct?

10:54AM  22   A.  Yes.

10:54AM  23   Q.  So, that means to you that within the context of a

10:54AM  24   PenLink, Michael Masecchia's name and number have never been

10:54AM  25   associated there before?  That's what I'm trying to

| | | |
|---|---|---|
| 10:54AM | 1 | understand. |
| 10:54AM | 2 | A.  In this data set. |
| 10:54AM | 3 | Q.  Okay. |
| 10:54AM | 4 | A.  It's my recollection that PenLink is the data sets were |
| 10:54AM | 5 | unique by case.  So each time you started a case, you were |
| 10:54AM | 6 | starting from scratch in PenLink to build a new data set. |
| 10:54AM | 7 | Q.  Okay.  And then I think we did this before, but this hot |
| 10:54AM | 8 | sheet's run on March 19, 2013, correct? |
| 10:54AM | 9 | A.  Yes. |
| 10:54AM | 10 | Q.  Okay. |
| 10:54AM | 11 | **MR. MacKAY:**  Ms. Champoux, can you pull up Government |
| 10:54AM | 12 | Exhibit 8A, page 348. |
| 10:54AM | 13 | **BY MR. MacKAY:** |
| 10:54AM | 14 | Q.  Okay.  And this appears to be a subpoena cover letter for |
| 10:54AM | 15 | a subpoena that's generated in connection with the Wayne |
| 10:55AM | 16 | Anderson case, correct? |
| 10:55AM | 17 | A.  It looks like it's from Sprint to Justin Borst in |
| 10:55AM | 18 | connection with the Wayne Anderson case. |
| 10:55AM | 19 | Q.  Okay.  So it's the subpoena -- it's the return side of |
| 10:55AM | 20 | the subpoena, correct? |
| 10:55AM | 21 | A.  Yes. |
| 10:55AM | 22 | Q.  And that's coming back on March 20th, 2013? |
| 10:55AM | 23 | A.  Yes. |
| 10:55AM | 24 | Q.  Okay. |
| 10:55AM | 25 | **MR. MacKAY:**  And then can we go to the next page, |

USA v Bongiovanni - Ryan - MacKay/Cross - 9712/24

76

| | | |
|---|---|---|
| 10:55AM | 1 | please, Ms. Champoux. |
| 10:55AM | 2 | **BY MR. MacKAY:** |
| 10:55AM | 3 | Q.  And it looks like it's that same 812-0664 number, |
| 10:55AM | 4 | correct? |
| 10:55AM | 5 | A.  Yes. |
| 10:55AM | 6 | Q.  So what this is telling you, at least looking at the |
| 10:55AM | 7 | records, is that Justin Borst is getting back a subpoena |
| 10:55AM | 8 | return regarding this number on -- or at least it was -- the |
| 10:55AM | 9 | return was sent from Sprint on March 20th, 2013, correct? |
| 10:55AM | 10 | A.  Yes. |
| 10:55AM | 11 | Q.  And then what we just looked at over in the Government |
| 10:55AM | 12 | Exhibit 100A.1 file, when the report had been run on |
| 10:55AM | 13 | March 19th, 2013 there was no name associated with that |
| 10:55AM | 14 | 812-0664 number at that time, correct? |
| 10:56AM | 15 | A.  In the PenLink. |
| 10:56AM | 16 | Q.  In PenLink. |
| 10:56AM | 17 | So at least from what you can see from the documents, it |
| 10:56AM | 18 | looks like following the PenLink or around the same time, I'm |
| 10:56AM | 19 | sorry, following the generation of a hot sheet, Justin Borst |
| 10:56AM | 20 | sent out a subpoena for that 812-0664 number? |
| 10:56AM | 21 | A.  Yes. |
| 10:56AM | 22 | Q.  And you know it was Justin Borst because it indicates he |
| 10:56AM | 23 | was the individual to receive the return, correct? |
| 10:56AM | 24 | A.  Yes. |
| 10:56AM | 25 | Q.  All right. |

USA v Bongiovanni - Ryan - MacKay/Cross - 9712/24
77

| | | |
|---|---|---|
| 10:56AM | 1 | **MR. MacKAY:** You can take that down, Ms. Champoux. |
| 10:56AM | 2 | Can we go to the Tripi OCDETF proposal in Government |
| 10:56AM | 3 | Exhibit 100A.1. |
| 10:56AM | 4 | **BY MR. MacKAY:** |
| 10:56AM | 5 | Q. Okay. And you went through this document quite a bit on |
| 10:57AM | 6 | direct; do you remember that? |
| 10:57AM | 7 | A. I do. |
| 10:57AM | 8 | Q. This is what you understand to be a draft OCDETF proposal |
| 10:57AM | 9 | regarding Operation Past Due, correct? |
| 10:57AM | 10 | A. Yes. |
| 10:57AM | 11 | Q. Now, based on some of the names that are here, you see |
| 10:57AM | 12 | Special Agent Dave Turri of the IRS, correct? |
| 10:57AM | 13 | A. I do. |
| 10:57AM | 14 | Q. TFA Chris Clark, he's with the DEA, correct? |
| 10:57AM | 15 | A. Yes. |
| 10:57AM | 16 | Q. And then Tim Lynch who is with the U.S. Attorney's |
| 10:57AM | 17 | Office, correct? |
| 10:57AM | 18 | A. Yes. |
| 10:57AM | 19 | Q. Now, two of those three names, Dave Turri and Tim Lynch, |
| 10:57AM | 20 | you understood from the review of the file to be associated |
| 10:57AM | 21 | with the Wayne Anderson case, correct? |
| 10:57AM | 22 | A. Yes. |
| 10:57AM | 23 | **MR. MacKAY:** Can we scroll down to page 6. |
| 10:57AM | 24 | **BY MR. MacKAY:** |
| 10:57AM | 25 | Q. Now, in this box for Section 8, it looks like there's -- |

10:57AM    1    it's indicating in some fashion that intel analyst Steve

10:58AM    2    Bevilacqua is going to be involved in this operation?

10:58AM    3    A.  It looks like he's identified as having sent information

10:58AM    4    to SOD already.

10:58AM    5    Q.  What does that mean?

10:58AM    6    A.  Well, it says communication devices previously submitted

10:58AM    7    to SOD.  Yes.  And then submitted by, and it says I.A.

10:58AM    8    Stephen Bevilacqua.

10:58AM    9    Q.  Okay.  So, is it fair to say from this part of the record

10:58AM   10    Stephen Bevilacqua is intended to have some interaction with

10:58AM   11    the OCDETF operations being drafted?

10:58AM   12    A.  Or he had already done something in support of it, yes.

10:58AM   13    Q.  Yeah.  I guess that's what I'm asking.  Him showing up

10:58AM   14    here shows he's done some work or might do some work if this

10:58AM   15    project gets off the ground, correct?

10:58AM   16    A.  Well, I don't know if I agree with gets off the ground.

10:58AM   17    It's not really at that stage.  Right, if this operation is

10:59AM   18    approved, there was a case that was already going.

10:59AM   19    Q.  Okay.  And it looks like this is being generated on or

10:59AM   20    about March 13th of 2013, from what you can see?

10:59AM   21    A.  It looks like that's that he made the submission to SOD.

10:59AM   22    Q.  Okay.  And do you understand from your review of the

10:59AM   23    file, of your review of the Wayne Anderson file, that Stephen

10:59AM   24    Bevilacqua had performed some work in connection with the

10:59AM   25    Wayne Anderson file?

| | | |
|---|---|---|
| 10:59AM | 1 | A.  I think he had, yes. |
| 10:59AM | 2 | Q.  All right.  And we've talked about the name Justin Borst, |
| 10:59AM | 3 | he's also an -- Stephen Bevilacqua is also an intel analyst |
| 10:59AM | 4 | at the time at the DEA, correct? |
| 10:59AM | 5 | A.  I think so.  I wasn't there then, but I think he was |
| 10:59AM | 6 | there then. |
| 10:59AM | 7 | MR. MacKAY:  Okay.  Can we go to page 8. |
| 10:59AM | 8 | BY MR. MacKAY: |
| 11:00AM | 9 | Q.  We don't have to go through all of the information in |
| 11:00AM | 10 | here, but this is essentially the background of the facts of |
| 11:00AM | 11 | the case that would support why an operation is being |
| 11:00AM | 12 | proposed? |
| 11:00AM | 13 | A.  Yes. |
| 11:00AM | 14 | Q.  Targets were involved in debt collection, to your |
| 11:00AM | 15 | understanding, correct? |
| 11:00AM | 16 | A.  Yes. |
| 11:00AM | 17 | Q.  They're also involved in marijuana trafficking in some |
| 11:00AM | 18 | connection, correct? |
| 11:00AM | 19 | A.  Yes. |
| 11:00AM | 20 | Q.  And this arose at least from what you can see from the |
| 11:00AM | 21 | report here something regarding the Niagara Falls Police |
| 11:00AM | 22 | Department having some sort of confidential source regarding |
| 11:00AM | 23 | marijuana dealers in the Niagara Falls area? |
| 11:00AM | 24 | A.  Yes. |
| 11:00AM | 25 | MR. MacKAY:  Can we go to the next page, |

| | | |
|---|---|---|
| 11:00AM | 1 | Ms. Champoux. |
| 11:00AM | 2 | **BY MR. MacKAY:** |
| 11:00AM | 3 | Q.  All right.  There's also information that targets in this |
| 11:00AM | 4 | operation, proposed operation involving in cocaine |
| 11:00AM | 5 | trafficking, correct? |
| 11:01AM | 6 | A.  Can we zoom back in, please?  Yes. |
| 11:01AM | 7 | Q.  As well as heroin trafficking? |
| 11:01AM | 8 | A.  Yes. |
| 11:01AM | 9 | Q.  As well as money laundering? |
| 11:01AM | 10 | A.  Yes. |
| 11:01AM | 11 | Q.  There's information that the CS with the Niagara Falls |
| 11:01AM | 12 | Police Department may also have information regarding the |
| 11:01AM | 13 | money-laundering activities? |
| 11:01AM | 14 | A.  Are you pointing to a particular sentence? |
| 11:01AM | 15 | Q.  I'll just withdraw the question.  I'll ask it this way. |
| 11:01AM | 16 | So it appears that the proposed operation involved a CS |
| 11:01AM | 17 | with a Niagara Falls Police Department, correct? |
| 11:01AM | 18 | A.  Yes. |
| 11:01AM | 19 | Q.  And that confidential source appeared to have some |
| 11:01AM | 20 | information about what was going up -- what was going on up |
| 11:01AM | 21 | in Niagara Falls, correct? |
| 11:02AM | 22 | A.  Yes. |
| 11:02AM | 23 | Q.  I think you told us on direct that this individual, Frank |
| 11:02AM | 24 | Tripi, you believed he had, based on law enforcement |
| 11:02AM | 25 | reputation, some connection to Italian Organized Crime, |

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

81

11:02AM  1    correct?

11:02AM  2    A.  Yes.

11:02AM  3    Q.  That was possibly based on family connections?

11:02AM  4    A.  Family connections, his past activity, it was just his

11:02AM  5    reputation.

11:02AM  6    Q.  Okay.  So I just want to review, the information that's

11:02AM  7    at least embodied in this report, is it fair to say there's

11:02AM  8    some of the same types of criminal activity being

11:02AM  9    investigated that the Ron Serio investigation with the Wayne

11:02AM  10   Anderson case focused on?

11:02AM  11   A.  Are you saying the crossover with the types of drugs?

11:02AM  12   Q.  Yes, for one.

11:02AM  13   A.  I mean, the there's no mention of the counterfeit

11:02AM  14   oxycodone in here.  There's mention of marijuana.

11:02AM  15   Q.  Let me ask it this way.  The Ron Serio investigation

11:02AM  16   that's being conducted back in 2013, that involved marijuana

11:02AM  17   to some degree, correct?

11:03AM  18   A.  Yes.

11:03AM  19   Q.  It involved at least the possibility of some cocaine

11:03AM  20   being investigated, correct?

11:03AM  21   A.  Yes.

11:03AM  22   Q.  And it involved money laundering as well, correct?

11:03AM  23   A.  It did.

11:03AM  24   Q.  And as we saw on the first page, some of the individuals

11:03AM  25   that are in this proposed operation are the same folks that

USA v Bongiovanni - Ryan - MacKay/Cross - 9/12/24

82

| | | |
|---|---|---|
| 11:03AM | 1 | are also involved in the Wayne Anderson case as well, too, |
| 11:03AM | 2 | correct? |
| 11:03AM | 3 | A.  Talking about Tim Lynch and -- |
| 11:03AM | 4 | Q.  Yes. |
| 11:03AM | 5 | A.  Yes. |
| 11:03AM | 6 | Q.  And then there's also potential -- do you recall that the |
| 11:03AM | 7 | Ron Serio investigation back in 2013, there was some thought |
| 11:03AM | 8 | about connections to organized crime? |
| 11:03AM | 9 | A.  I don't remember seeing that in that file. |
| 11:03AM | 10 | MR. MacKAY:  You can take that down, Ms. Champoux. |
| 11:03AM | 11 | BY MR. MacKAY: |
| 11:03AM | 12 | Q.  All right.  So just to finish up, on your direct, you had |
| 11:03AM | 13 | talked about you had been involved in a number of interviews |
| 11:04AM | 14 | with other DEA employees of the Buffalo office, right? |
| 11:04AM | 15 | A.  No, I said that I was not involved with the interviews of |
| 11:04AM | 16 | the DEA employees at the office. |
| 11:04AM | 17 | Q.  Okay.  But I think you did tell us though that there were |
| 11:04AM | 18 | a number of DEA officials that were interviewed in some |
| 11:04AM | 19 | capacity, correct? |
| 11:04AM | 20 | A.  There were. |
| 11:04AM | 21 | Q.  Like, Joseph Palmieri, correct? |
| 11:04AM | 22 | A.  Yes. |
| 11:04AM | 23 | Q.  Mark Gentile? |
| 11:04AM | 24 | A.  I -- yes. |
| 11:04AM | 25 | Q.  Okay.  Shane Nastoff, correct? |

USA v Bongiovanni - Ryan - MacKay/Cross - 9712/24
83

| | | |
|---|---|---|
| 11:04AM | 1 | A.  Yes. |
| 11:04AM | 2 | Q.  Mike Hill, correct? |
| 11:04AM | 3 | A.  I believe so, yes. |
| 11:04AM | 4 | Q.  Brian Chella, correct? |
| 11:04AM | 5 | A.  Yes. |
| 11:04AM | 6 | Q.  And I think you told us on direct there was a |
| 11:04AM | 7 | characterization that some of these individuals were evasive |
| 11:04AM | 8 | in their interviews? |
| 11:04AM | 9 | A.  So, I can only talk about the ones that I participated |
| 11:04AM | 10 | in.  I did talk to Mr. Palmieri.  And I talked to Mr. Yensan. |
| 11:04AM | 11 | I was part of those interviews. |
| 11:04AM | 12 | Q.  I left out the name, so, Mr. Yensan, he was at the time, |
| 11:05AM | 13 | at one point in time a supervisor at the DEA, correct? |
| 11:05AM | 14 | A.  Yes. |
| 11:05AM | 15 | Q.  And, so from your testimony, you were saying that both |
| 11:05AM | 16 | Yensan and Palmieri, in your opinion, presented as evasive, |
| 11:05AM | 17 | correct? |
| 11:05AM | 18 | A.  Yes. |
| 11:05AM | 19 | Q.  And in response to that, those individuals were both sent |
| 11:05AM | 20 | subject or target letters, correct? |
| 11:05AM | 21 | A.  Not solely in response to that, but ultimately that did |
| 11:05AM | 22 | happen. |
| 11:05AM | 23 | Q.  Did you understand that at some point in time Greg Yensan |
| 11:05AM | 24 | was moved out of a supervisor position at the DEA? |
| 11:05AM | 25 | A.  I do know that he moved out of his supervisory position, |

11:05AM    1    yes.

11:05AM    2    Q.  Okay.  Now Shane Nastoff, he was an individual, I think

11:05AM    3    you said you might not have participated in the interview,

11:05AM    4    but you understand that he was interviewed in the context of

11:05AM    5    this whole case, correct?

11:05AM    6    A.  Yes.

11:05AM    7    Q.  And ultimately did you come to understand that he was

11:05AM    8    promoted to a group supervisor sometime following

11:05AM    9    Mr. Bongiovanni's retirement from the DEA?

11:05AM   10    A.  He was promoted, yes.

11:05AM   11    Q.  Okay.  And just so the jury understands, what is a target

11:06AM   12    or subject letter?

11:06AM   13    A.  It's a letter from the U.S. Attorney's Office to an

11:06AM   14    individual advising them that they're the target of an

11:06AM   15    investigation.

11:06AM   16    Q.  All right.

11:06AM   17            MR. MacKAY:  All right.  Judge, can I just have one

11:06AM   18    moment?

11:06AM   19            THE COURT:  Sure.

11:06AM   20            MR. MacKAY:  No further questions, Your Honor.

11:06AM   21            THE COURT:  Redirect.

11:06AM   22            MR. TRIPI:  Yes, Your Honor, thank you.

11:06AM   23

11:06AM   24                REDIRECT EXAMINATION BY MR. TRIPI:

11:06AM   25    Q.  So just to finish off that last thought, was Palmieri

11:06AM  1  served a subject letter before he was ever interviewed?

11:06AM  2  A.  I don't recall the sequence.

11:06AM  3  Q.  You don't recall?  That was served by Special Agent

11:06AM  4  Carpenter, correct?

11:06AM  5  A.  Yes.

11:06AM  6  Q.  And then just remind us, yesterday you said he sat for

11:06AM  7  several interviewed and then polygraphed, right?

11:06AM  8  A.  Yes.

11:06AM  9  Q.  And then after all that, a federal search warrant was

11:06AM  10  executed at his residence, correct?

11:06AM  11  A.  Yes.

11:06AM  12  Q.  All right.  I'm going to start with what was covered

11:07AM  13  today, and then I'm going to go back to yesterday, all right?

11:07AM  14      All right.  Right out of the gate, I just want to ask

11:07AM  15  you, you know, working as a DEA task force officer, do DEA

11:07AM  16  standards of conduct preclude agents and task force officers

11:07AM  17  from associating with known felons, drug dealers, and people

11:07AM  18  under investigation?

11:07AM  19  A.  Yes.

11:07AM  20          **MR. TRIPI:**  Let's pull up Exhibit 127.

11:07AM  21          **BY MR. TRIPI:**

11:07AM  22  Q.  As of June 30th, 2018, was Peter Gerace a federally

11:07AM  23  convicted felon?

11:07AM  24  A.  Yes.

11:07AM  25  Q.  As of June 30th, 2018, was Peter Gerace a suspected drug

11:07AM  1    dealer?

11:07AM  2    A.  Yes.

11:07AM  3    Q.  As of June 30th, 2018, was Peter Gerace someone who law

11:07AM  4    enforcement was -- had an investigative interest in?

11:07AM  5    A.  Yes.

11:07AM  6    Q.  So, all three of those things apply to Mr. Gerace who's

11:08AM  7    standing next to this defendant, right?

11:08AM  8    A.  They do.

11:08AM  9    Q.  Okay.

11:08AM 10         MR. TRIPI:  Let's take that down.

11:08AM 11         BY MR. TRIPI:

11:08AM 12    Q.  Now, from your time working at DEA, as well as your time

11:08AM 13    as a special agent for several agencies that are involved in

11:08AM 14    investigations, is it the case agent's job to make sure all

11:08AM 15    pertinent paperwork gets to the official file?

11:08AM 16    A.  Yes.

11:08AM 17    Q.  Okay.  So here, all of those hot sheets and subpoena

11:08AM 18    responses that Mr. MacKay showed you, were any of those in

11:08AM 19    the official DEA paper file that DEA had access to when you

11:08AM 20    got the file?

11:08AM 21    A.  I saw the scan of the official file.

11:08AM 22    Q.  Right.

11:08AM 23    A.  None of those were in the scan, or not all of those were

11:08AM 24    in the scan.

11:08AM 25         MR. TRIPI:  Let's pull up 8A, Ms. Champoux.

| | | |
|---|---|---|
| 11:08AM | 1 | **BY MR. TRIPI:** |
| 11:09AM | 2 | Q.  You've seen this file, right? |
| 11:09AM | 3 | A.  This is 1326, yes. |
| 11:09AM | 4 | Q.  Have you seen a hot sheet in this paper file? |
| 11:09AM | 5 | A.  No. |
| 11:09AM | 6 | Q.  Have you seen a hot sheet in the case management system |
| 11:09AM | 7 | file for C2-13-0026? |
| 11:09AM | 8 | A.  No. |
| 11:09AM | 9 | Q.  Did you see a hot sheet for Tom Serio in this paper file? |
| 11:09AM | 10 | A.  No. |
| 11:09AM | 11 | Q.  Did you see a hot sheet for Chris Baker in this paper |
| 11:09AM | 12 | file? |
| 11:09AM | 13 | A.  No. |
| 11:09AM | 14 | Q.  Did you see a hot sheet for Mike Moynihan in this paper |
| 11:09AM | 15 | file? |
| 11:09AM | 16 | A.  No. |
| 11:09AM | 17 | Q.  Did you see any of the documents that Mr. MacKay showed |
| 11:09AM | 18 | you regarding Mike Masecchia, the DARTS screen prints in this |
| 11:09AM | 19 | file? |
| 11:09AM | 20 | A.  No. |
| 11:09AM | 21 | Q.  What file did you see those in? |
| 11:09AM | 22 | A.  The Redweld that we found in Mr. Bongiovanni's house. |
| 11:09AM | 23 | Q.  Is that the only place you saw those documents? |
| 11:09AM | 24 | A.  Yes. |
| 11:09AM | 25 | Q.  All those documents in the defendant's basement are DEA |

| | | |
|---|---|---|
| 11:09AM | 1 | property though, right? |
| 11:10AM | 2 | A.  They're DEA records, yes. |
| 11:10AM | 3 | Q.  Just because he's a case agent, it doesn't make them his, |
| 11:10AM | 4 | correct? |
| 11:10AM | 5 | A.  Correct. |
| 11:10AM | 6 | Q.  You've been involved in drug investigations for a long |
| 11:10AM | 7 | time; is that right? |
| 11:10AM | 8 | A.  Yes. |
| 11:10AM | 9 | Q.  In all of those cases, have you ever made a drug case |
| 11:10AM | 10 | resulting in any arrests based simply on subpoenas and |
| 11:10AM | 11 | subpoena returns? |
| 11:10AM | 12 | A.  No. |
| 11:10AM | 13 | Q.  Is issuing subpoenas and receiving subpoena returns the |
| 11:10AM | 14 | bare minimum an agent can do in an investigation? |
| 11:10AM | 15 | **MR. MacKAY:**  Objection. |
| 11:10AM | 16 | **THE COURT:**  Sustained. |
| 11:10AM | 17 | **BY MR. TRIPI:** |
| 11:10AM | 18 | Q.  Would you feel like you were conducting a thorough |
| 11:10AM | 19 | investigation if all you did was subpoena records? |
| 11:10AM | 20 | **MR. MacKAY:**  Objection. |
| 11:10AM | 21 | **THE COURT:**  Sustained. |
| 11:10AM | 22 | **BY MR. TRIPI:** |
| 11:10AM | 23 | Q.  Will a bunch of -- would a bunch of subpoena returns |
| 11:11AM | 24 | without further investigative action result in a drug arrest? |
| 11:11AM | 25 | **MR. MacKAY:**  Objection. |

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

11:11AM    1          **MR. TRIPI:**  Judge, this is within the scope of --

11:11AM    2          **THE COURT:**  Wait, wait, wait.  Stop, stop, stop.  I

11:11AM    3    want to think about it.

11:11AM    4          **MR. MacKAY:**  I think it's speculation.

11:11AM    5          **MR. TRIPI:**  It wasn't speculation on cross.

11:11AM    6          **THE COURT:**  Let's -- let's -- let me think about

11:11AM    7    this, please.

11:11AM    8          Overruled.

11:11AM    9          **THE WITNESS:**  Could you ask the question again,

11:11AM   10    please?

11:11AM   11          **MR. TRIPI:**  Ms. Sawyer, would you please read the

11:11AM   12    question.

11:11AM   13          (The above-requested question was then read by the

11:11AM   14    reporter.)

11:11AM   15          **THE WITNESS:**  No.

11:11AM   16          **BY MR. TRIPI:**

11:11AM   17    Q.  In your review of Exhibit 8A, both the paper file and the

11:11AM   18    case management file, did you see any -- any interviews of

11:12AM   19    John Robinson?

11:12AM   20    A.  No.

11:12AM   21    Q.  Did you see any interviews of Mike Moynihan?

11:12AM   22    A.  No.

11:12AM   23    Q.  Did you see any interview of Chris Baker?

11:12AM   24    A.  No.

11:12AM   25    Q.  Did you see any interviews of Kelly Brace?

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24
90

| | | |
|---|---|---|
| 11:12AM | 1 | A.  No. |
| 11:12AM | 2 | Q.  Did you see any interviews of anyone who you understood |
| 11:12AM | 3 | to be a subordinate to Ron and Tom Serio in the Serio |
| 11:12AM | 4 | organization? |
| 11:12AM | 5 | A.  No. |
| 11:12AM | 6 | Q.  Did you see any interviews of anybody, anybody in the |
| 11:12AM | 7 | Serio drug-trafficking organization in the DEA-6s in the |
| 11:12AM | 8 | file? |
| 11:12AM | 9 | A.  Not in the 6s, no. |
| 11:12AM | 10 | Q.  Well, that's where they would be documented, right? |
| 11:12AM | 11 | A.  The only -- I'm thinking of -- |
| 11:12AM | 12 | Q.  I'm not asking you about the confidential source. |
| 11:12AM | 13 | A.  Understood. |
| 11:12AM | 14 | Q.  Put that aside.  Any of the other players? |
| 11:12AM | 15 | A.  No. |
| 11:12AM | 16 | Q.  Did you observe one single surveillance by Special Agent |
| 11:12AM | 17 | Dave Leary? |
| 11:12AM | 18 | A.  One. |
| 11:13AM | 19 | Q.  That was the only one, right? |
| 11:13AM | 20 | A.  Yes. |
| 11:13AM | 21 | Q.  Did you see any pen registers? |
| 11:13AM | 22 | A.  No. |
| 11:13AM | 23 | Q.  That's the next step, after getting all those subpoenas |
| 11:13AM | 24 | is to advance to a pen register; is that right? |
| 11:13AM | 25 | A.  That's one way to do it, yes.  It would be a more |

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24
91

| | | |
|---|---|---|
| 11:13AM | 1 | advanced technique. |
| 11:13AM | 2 | Q.  Did you see any recorded calls? |
| 11:13AM | 3 | A.  No. |
| 11:13AM | 4 | Q.  Did you see any controlled buys? |
| 11:13AM | 5 | A.  Some attempts, but none completed. |
| 11:13AM | 6 | Q.  Did you see any actual controlled buys? |
| 11:13AM | 7 | A.  No. |
| 11:13AM | 8 | Q.  Did you see any trash pulls? |
| 11:13AM | 9 | A.  No. |
| 11:13AM | 10 | Q.  You saw an operation plan for a buy into T.S. that never |
| 11:13AM | 11 | happened, correct? |
| 11:13AM | 12 | A.  That's what I'm thinking of, yes. |
| 11:13AM | 13 | Q.  And the case agent writes the operation plan; is that |
| 11:13AM | 14 | right? |
| 11:13AM | 15 | A.  Yes. |
| 11:13AM | 16 | Q.  That doesn't mean there was ever a buy actually planned |
| 11:13AM | 17 | though, does it? |
| 11:13AM | 18 | A.  There's no DEA-6 that documents an attempted buy. |
| 11:13AM | 19 | Q.  Okay.  There was no pole cameras put up, putting a video |
| 11:14AM | 20 | camera in front of Ron Serio's house on a telephone pole, was |
| 11:14AM | 21 | there? |
| 11:14AM | 22 | A.  No. |
| 11:14AM | 23 | Q.  Or any other address associated with Ron Serio, was |
| 11:14AM | 24 | there? |
| 11:14AM | 25 | A.  No. |

11:14AM  1   Q.  There were no arrests in the case, was there?

11:14AM  2   A.  Not after the ones the state police did, no.

11:14AM  3   Q.  Wayne Anderson and Damien Abbate were arrested, and then

11:14AM  4   the DEA, this defendant adopted that case, right?

11:14AM  5   A.  Yes.

11:14AM  6   Q.  After that, nobody got arrested?

11:14AM  7   A.  Correct.

11:14AM  8   Q.  There were no federal or state prosecutions after that,

11:14AM  9   correct?

11:14AM  10  A.  Correct.

11:14AM  11         **MR. TRIPI:**  Let's go to Exhibit 8A at page 13.

11:14AM  12         **BY MR. TRIPI:**

11:14AM  13  Q.  Do you recognize this to be the DEA-6 prepared May 2nd,

11:15AM  14  2013, the initial debriefing of R.K.?

11:15AM  15  A.  Yes.

11:15AM  16         **MR. TRIPI:**  And I'd like to scroll down to the next

11:15AM  17  page, page 14, Ms. Champoux.

11:15AM  18         **BY MR. TRIPI:**

11:15AM  19  Q.  Okay.  Do you see under the financial-related

11:15AM  20  information, do you see where it says DEA agents are

11:15AM  21  coordinating the investigation with the AUSA WDNY New York

11:15AM  22  State Attorney General, New York State Police, Buffalo FBI,

11:15AM  23  IRS, and are working towards wire intercepts?

11:15AM  24  A.  Yes.

11:15AM  25  Q.  Other than issuing some subpoenas, do you see a single

| | | |
|---|---|---|
| 11:15AM | 1 | investigative step that would satisfy an exhaustion |
| 11:15AM | 2 | requirement in a Title III wiretap application? |
| 11:15AM | 3 | A.  Only Dave Leary's surveillance. |
| 11:15AM | 4 | Q.  Okay.  Other than Dave Leary's surveillance, not a single |
| 11:15AM | 5 | step would satisfy exhaustion, right? |
| 11:15AM | 6 | A.  No. |
| 11:15AM | 7 | **MR. MacKAY:**  Objection.  That calls for a legal |
| 11:15AM | 8 | conclusion. |
| 11:16AM | 9 | **MR. TRIPI:**  It's not a legal conclusion, Your Honor. |
| 11:16AM | 10 | Agents know how to do wiretaps. |
| 11:16AM | 11 | **THE COURT:**  Mr. Tripi, please. |
| 11:16AM | 12 | **MR. TRIPI:**  I'm just briefly responding. |
| 11:16AM | 13 | **THE COURT:**  I understand.  When there's an objection, |
| 11:16AM | 14 | let me think about it.  If I need argument, I will ask for the |
| 11:16AM | 15 | argument.  Okay? |
| 11:16AM | 16 | **MR. TRIPI:**  You got it. |
| 11:16AM | 17 | **THE COURT:**  Okay. |
| 11:16AM | 18 | The objection is overruled. |
| 11:16AM | 19 | **BY MR. TRIPI:** |
| 11:16AM | 20 | Q.  And even in a case where you are making an application |
| 11:16AM | 21 | for Title III, you need to do more than one surveillance; is |
| 11:16AM | 22 | that right? |
| 11:16AM | 23 | A.  Yes, you would have to do many hours of surveillance over |
| 11:16AM | 24 | many days. |
| 11:16AM | 25 | Q.  Did anything like that happen in this case file that's |

11:16AM  1   been documented in any DEA-6s?

11:16AM  2   A.  No.

11:16AM  3   Q.  Earlier --

11:17AM  4        **MR. TRIPI:**  We can take that down.

11:17AM  5        **BY MR. TRIPI:**

11:17AM  6   Q.  -- you were shown Exhibit 101A.1, and Mr. MacKay showed

11:17AM  7   you the Chris Baker rap sheet, and then he showed you the

11:17AM  8   Baker toll analysis after that; do you remember that?

11:17AM  9   A.  I do.

11:17AM  10  Q.  And the rap sheet was actually run after the tolls were

11:17AM  11  obtained.  Do you remember those dates?  The rap sheet was

11:17AM  12  run in April, but the tolls were in March?

11:17AM  13  A.  Yes.

11:17AM  14  Q.  Did -- did the defendant document in any report anywhere

11:17AM  15  how he got those phone numbers?

11:17AM  16  A.  No.

11:17AM  17  Q.  How he knew these phone numbers?

11:17AM  18  A.  No.

11:17AM  19  Q.  Normally, as an investigator who works drug cases, when

11:18AM  20  you don't know someone's phone number, do you start with the

11:18AM  21  record checks on the person first to try to locate or find a

11:18AM  22  potential phone number?

11:18AM  23  A.  Yes.  Background checks, public record checks, something

11:18AM  24  that might point to a phone number.

11:18AM  25  Q.  You don't start with the phone number subpoena, right?

11:18AM   1    You've got to find that number.

11:18AM   2    A.  It has to come to you somehow, yes.

11:18AM   3    Q.  But here, you saw records showing that the subpoena

11:18AM   4    preceded the record check; is that right?

11:18AM   5    A.  Yes.

11:18AM   6    Q.  Same with Mike Buttitta that he showed you.  The criminal

11:18AM   7    record checks started after the subpoena response came in,

11:18AM   8    true?

11:18AM   9    A.  Yes.

11:18AM  10    Q.  And the defendant didn't write how he knew those numbers

11:18AM  11    in the file, did he?

11:18AM  12    A.  No.

11:19AM  13    Q.  Now, you went through a bunch of documents this morning

11:19AM  14    with Mr. MacKay in Exhibit 100A.1, which is that file, we've

11:19AM  15    shown it plenty of times, 100A, right?

11:19AM  16    A.  Yes.

11:19AM  17    Q.  Based on DEA policy, procedure, and your training and

11:19AM  18    experience, was this defendant permitted to remove a single

11:19AM  19    one of those documents Mr. MacKay showed you and keep it in

11:19AM  20    his basement at retirement?

11:19AM  21    A.  No.

11:19AM  22         **MR. TRIPI:**  Can we pull up Exhibit 100A.1 and go to

11:19AM  23    the Masecchia hot sheet.  Masecchia phone info and hot -- it

11:19AM  24    says, let me get the record correct, Masecchia M phone info

11:19AM  25    and hot sheet.  Thank you.

11:19AM    1              **BY MR. TRIPI:**

11:19AM    2    Q.  You looked at this earlier, right?

11:19AM    3    A.  Yes.

11:19AM    4    Q.  And it's a six-page scan?

11:19AM    5              **MR. TRIPI:**  Can we scroll down, Ms. Champoux.  We're

11:19AM    6    at page 2.

11:19AM    7              **BY MR. TRIPI:**

11:19AM    8    Q.  I think earlier you indicated that this is, like, this is

11:20AM    9    the DARTS for the subpoena related to Masecchia's number,

11:20AM   10    right?

11:20AM   11    A.  This is the screen in DARTS that shows that Sprint has

11:20AM   12    returned records, and that they're available for download.

11:20AM   13    Q.  Now I just want to be clear, Justin Borst is an intel

11:20AM   14    analyst, right?

11:20AM   15    A.  Yes.

11:20AM   16    Q.  Intel analysts oftentimes run the subpoenas for case

11:20AM   17    agents, correct?

11:20AM   18    A.  Yes.

11:20AM   19    Q.  But read the full Trinity remarks that Justin Borst wrote

11:20AM   20    as associated to this phone number 812-0664.  Read the whole

11:20AM   21    thing.

11:20AM   22    A.  Number part of ongoing narcotics investigation belonging

11:20AM   23    to Michael Masecchia per S.A. Bongiovanni.

11:20AM   24    Q.  Did the defendant write a single sentence in any report

11:20AM   25    and file C2-13-0026 explaining how Michael Masecchia was

11:20AM  1  connected to the Ron Serio case or Wayne Anderson?

11:21AM  2  A.   No.

11:21AM  3  Q.   Now, the Trinity remarks, based upon DEA protocol and

11:21AM  4  procedure, are reflective of what the agent has indicated to

11:21AM  5  the analyst preparing the DARTS subpoena, correct?

11:21AM  6  A.   Right.

11:21AM  7  Q.   That's how we get those remarks?

11:21AM  8  A.   Right.

11:21AM  9  Q.   It does not say there number part of investigation

11:21AM  10  belonging to Mike Masecchia, who Special Agent Bongiovanni

11:21AM  11  went to high school with, right?

11:21AM  12  A.   Correct.

11:21AM  13  Q.   It does not say number part of an ongoing narcotics

11:21AM  14  investigation belonging to Mike Masecchia who Special Agent

11:21AM  15  Bongiovanni drove to college with, correct?

11:21AM  16  A.   Correct.

11:21AM  17  Q.   It doesn't say part of an ongoing narcotics investigation

11:21AM  18  belonging to Mike Masecchia who Bongiovanni has known for 40

11:21AM  19  years, correct?

11:21AM  20  A.   Correct.

11:21AM  21       **MR. TRIPI:**  We can take that down.

11:21AM  22       **BY MR. TRIPI:**

11:21AM  23  Q.   That entry, though, that we saw is in DARTS, that means

11:22AM  24  Bongiovanni's going to get a notice any time that phone

11:22AM  25  number linked to Mike Masecchia comes up in DARTS; is that

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

11:22AM    1    right?

11:22AM    2    A.  Yes.

11:22AM    3    Q.  And that's the point of DARTS, the analysts get these

11:22AM    4    subpoenaed responses, and they push them into DARTS to

11:22AM    5    develop the robust deconfliction system that DEA has,

11:22AM    6    correct?

11:22AM    7    A.  Correct.  DARTS forces you to deconflict the number

11:22AM    8    before you do the subpoena.

11:22AM    9    Q.  In other words, you've got to put it into DARTS to do the

11:22AM    10   subpoena?

11:22AM    11   A.  Yes.

11:22AM    12   Q.  So if we were to see a subpoena for Lou Selva in that

11:22AM    13   case file, which we've seen already, that means it went into

11:22AM    14   DARTS?

11:22AM    15   A.  Yes.

11:22AM    16   Q.  We see a subpoena for Paul Francoforte, that means his

11:22AM    17   number went into DARTS?

11:22AM    18   A.  Yes.

11:22AM    19   Q.  We see subpoenas for Mike Masecchia, Ron Serio, that

11:23AM    20   means their numbers went into DARTS, right?

11:23AM    21   A.  Yes.

11:23AM    22   Q.  That means he gets notice any time that number hits

11:23AM    23   anywhere in the world, correct?

11:23AM    24   A.  Yes.

11:23AM    25   Q.  Not just the United States, the world, where DEA has

11:23AM  1    offices, correct?

11:23AM  2    A.   Yes.

11:23AM  3    Q.   Oh.   On that DEA DARTS report that we just had on the

11:23AM  4    screen for Masecchia, we don't have to pull it up again, but

11:23AM  5    it said for DEA official use only; do you remember that?

11:23AM  6    A.   I do.

11:23AM  7    Q.   Can a retired DEA agent conduct official business from

11:23AM  8    his basement?

11:23AM  9    A.   No.

11:23AM  10   Q.   Mr. MacKay showed you a hot sheet for 561 -- withdrawn.

11:23AM  11   I don't know if it's a hot sheet.

11:23AM  12          MR. TRIPI:   Let's pull up 100A.1.   561-801-0221.

11:24AM  13          THE COURT:   And this is from exhibit --

11:24AM  14          MR. TRIPI:   From Exhibit 100A.1.   It's near the top,

11:24AM  15   I believe, Ms. Champoux.

11:24AM  16          There you go.   You got it.   Thank you.

11:24AM  17          For the record, this is 561-801-0221, Serio T toll

11:24AM  18   analysis as in Exhibit 100A.1.

11:24AM  19          THE COURT:   This is a folder in that exhibit.

11:24AM  20          MR. TRIPI:   That is correct.   Thank you, Your Honor.

11:24AM  21          BY MR. TRIPI:

11:24AM  22   Q.   Now earlier you were talking about this document, and it

11:24AM  23   was a hot number list.   The number to the left, that shows

11:24AM  24   the number of times that number was called during a certain

11:24AM  25   time period, which is the date range to the far right,

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

100

| 11:24AM | 1 | correct? |
| 11:24AM | 2 | A.  Yes. |
| 11:24AM | 3 | Q.  And you went through sort of no subscriber with |
| 11:24AM | 4 | Mr. MacKay, but one other -- one other way you could see a no |
| 11:24AM | 5 | subscriber is sometimes they are prepaid phones where, like, |
| 11:25AM | 6 | a TracFone, where there is no subscriber, correct? |
| 11:25AM | 7 | A.  Yes. |
| 11:25AM | 8 | Q.  That could be another explanation for a phone that has no |
| 11:25AM | 9 | subscriber assigned to it? |
| 11:25AM | 10 | A.  I don't know if it would have a comment that says |
| 11:25AM | 11 | TracFone or something in there or not. |
| 11:25AM | 12 | Q.  Okay.  But just generally, I guess, the point of prepaid |
| 11:25AM | 13 | phones sometimes in terms of drug dealers' utilization of |
| 11:25AM | 14 | them is they don't have a subscriber associated with them. |
| 11:25AM | 15 | A.  Correct. |
| 11:25AM | 16 | Q.  All right.  Okay.  In here, the actual hot list, number |
| 11:25AM | 17 | 15 that's highlighted, had a phone number 716-481-8002 which |
| 11:25AM | 18 | you know to be John Robinson, correct? |
| 11:25AM | 19 | A.  Yes. |
| 11:25AM | 20 | Q.  That's somebody you've interviewed, correct? |
| 11:25AM | 21 | A.  I called that phone number and found him. |
| 11:25AM | 22 | Q.  And you did that in, like, 2020? |
| 11:25AM | 23 | A.  Yes. |
| 11:25AM | 24 | Q.  And then you went and talked to him? |
| 11:25AM | 25 | A.  Yes. |

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24
101

11:25AM   1   Q.  And that was the first time John Robinson was ever talked

11:25AM   2   to with anything related to this --

11:26AM   3   A.  Yes.

11:26AM   4   Q.  -- correct?  Was he a little surprised to see you at his

11:26AM   5   house in Corning, New York?

11:26AM   6   A.  He was.

11:26AM   7   Q.  And this hot number list was done in 2012?

11:26AM   8   A.  November 30th, yes.

11:26AM   9   Q.  And yet nobody ever talked to John Robinson until you

11:26AM  10   did; is that right?

11:26AM  11   A.  Yes.

11:26AM  12   Q.  And that was after you found this in the defendant's

11:26AM  13   basement?

11:26AM  14   A.  Yes.

11:26AM  15   Q.  That was someone that worked for Ron and Tom Serio,

11:26AM  16   correct?

11:26AM  17   A.  Yes, he did.

11:26AM  18   Q.  You were shown a bunch of local police reports that were

11:27AM  19   in Government Exhibit 100A, several of those Buffalo police

11:27AM  20   booking sheets.  I think you saw one for Robert Mettal and a

11:27AM  21   couple others that Mr. MacKay showed you a moment ago on

11:27AM  22   cross; do you remember that?

11:27AM  23   A.  Yes.

11:27AM  24   Q.  For all of the ones that you've looked at in court here

11:27AM  25   today and in the file, was it Joseph Palmieri who ran those

11:27AM  1  local police reports for the defendant?

11:27AM  2  A.  Yes.

11:27AM  3  Q.  So it seems from your review of the file and in court

11:27AM  4  here today that when this defendant wanted something done

11:27AM  5  locally in terms of running a police report, Joseph Palmieri

11:27AM  6  did it?

11:27AM  7          MR. MacKAY:  Objection, speculation.

11:27AM  8          MR. TRIPI:  I asked from his review of what was in

11:27AM  9  court and the file.  It's consistent with the line of

11:27AM 10  questioning from before.  I got you.

11:27AM 11          THE COURT:  So the question --

11:28AM 12          MR. TRIPI:  I can repeat it if you'd like, Judge.

11:28AM 13          BY MR. TRIPI:

11:28AM 14  Q.  So Joe Palmieri, from the reports you reviewed in court

11:28AM 15  and in the file, seems to run all the local police reports

11:28AM 16  the defendant wants in this case.

11:28AM 17          MR. TRIPI:  That's my question, Your Honor.

11:28AM 18          THE COURT:  Did you object to that?  Are you

11:28AM 19  objecting to that?  He reworded the question.  Do you object

11:28AM 20  to that question?

11:28AM 21          MR. MacKAY:  No, I'll withdraw the objection.

11:28AM 22          THE COURT:  Okay.

11:28AM 23          BY MR. TRIPI:

11:28AM 24  Q.  And your answer is?

11:28AM 25  A.  Yes, Joe Palmieri ran the local reports.

| | | |
|---|---|---|
| 11:28AM | 1 | Q.  And those generally were people associated with the Serio |
| 11:28AM | 2 | organization; is that right? |
| 11:28AM | 3 | A.  Yes. |
| 11:28AM | 4 | Q.  I'll get back to Operation Past Due in a moment, but -- |
| 11:29AM | 5 | **MR. TRIPI:**  Can we take this down? |
| 11:29AM | 6 | **BY MR. TRIPI:** |
| 11:29AM | 7 | Q.  -- yesterday, you talked about the January 6th, 2019 |
| 11:29AM | 8 | interview, do you remember that? |
| 11:29AM | 9 |      Obviously, it was part of the cross-examination today, |
| 11:29AM | 10 | direct yesterday, cross yesterday. |
| 11:29AM | 11 | A.  June 6th? |
| 11:29AM | 12 | Q.  June 6th.  Did I say January?  I'm sorry.  June 6th, |
| 11:29AM | 13 | 2019.  When you were sitting at the table, you had marked |
| 11:29AM | 14 | yesterday sort of where everyone was situated.  I think you |
| 11:29AM | 15 | marked yourself as next to the defendant on the same side of |
| 11:29AM | 16 | the table; is that right? |
| 11:29AM | 17 | A.  I was, to his right. |
| 11:29AM | 18 | Q.  Did you sort of turn or orient your chair, were you and |
| 11:29AM | 19 | him actually facing each other, even though you were both on |
| 11:29AM | 20 | that side of the table? |
| 11:29AM | 21 | A.  Yes, I was turned towards him. |
| 11:29AM | 22 | Q.  You were asked some questions yesterday about not |
| 11:29AM | 23 | recording your interview with the defendant on your iPhone; |
| 11:30AM | 24 | do you recall those questions? |
| 11:30AM | 25 | A.  Yes. |

11:30AM   1   Q.  Was that a conscientious decision by you?

11:30AM   2   A.  Yes.

11:30AM   3   Q.  Can you please explain why, based on your training and

11:30AM   4   experience, you chose to conduct the interview the way you

11:30AM   5   did?  Explain to the jury.

11:30AM   6   A.  Specifically with the iPhone, if the phone rings, it

11:30AM   7   interferes with the recording.  When you're the case agent on

11:30AM   8   search warrant day, you can expect your phone to ring, so

11:30AM   9   it's not a good recording tool.

11:30AM   10      Then the other problem with a recording in that kind of

11:30AM   11   environment in my experience is that the background noise

11:30AM   12   tends to block out the conversation that you're trying to

11:30AM   13   record.  Not completely, but in large sections.  And if you

11:30AM   14   can imagine furniture is moving, people are walking around,

11:30AM   15   boxes and other things are being moved around, there's a lot

11:30AM   16   of background noise.

11:30AM   17   Q.  Was the interview and the way you documented what the

11:30AM   18   defendant said consistent with your training and experience

11:31AM   19   as an Army CID investigator?

11:31AM   20   A.  Yes.

11:31AM   21   Q.  Was it consistent with your training and experience as an

11:31AM   22   NCIS investigator?

11:31AM   23   A.  Yes.

11:31AM   24   Q.  Was it consistent with your training and experience as a

11:31AM   25   Department of Defense investigator?

11:31AM 1   A.  Yes.

11:31AM 2   Q.  Was it consistent with your training and experience as a

11:31AM 3   Department of Justice Office of Inspector General

11:31AM 4   investigator?

11:31AM 5   A.  Yes.

11:31AM 6   Q.  Was it consistent with your training as a Homeland

11:31AM 7   Security special agent?

11:31AM 8   A.  Yes.

11:31AM 9   Q.  Did you take your notes contemporaneous to the

11:31AM 10  conversation you were having?

11:31AM 11  A.  Yes.

11:31AM 12  Q.  Are you able to do two things at once?

11:31AM 13  A.  Yes.

11:31AM 14  Q.  Can you talk to someone and also take some notes?

11:31AM 15  A.  Yes.

11:31AM 16  Q.  If you need to clarify something, do you go back and

11:31AM 17  write more notes?

11:31AM 18  A.  Yes.  Or ask a clarifying question.

11:31AM 19  Q.  And do you have a memory?

11:31AM 20  A.  Yes.

11:31AM 21  Q.  Were these things important to you during your

11:31AM 22  investigation?

11:31AM 23  A.  Yes.

11:31AM 24  Q.  Were you intent upon remembering the things that happened

11:31AM 25  that day?

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

| | | |
|---|---|---|
| 11:31AM | 1 | A.  Yes. |
| 11:31AM | 2 | Q.  Was the interview you conducted in the defendant's living |
| 11:31AM | 3 | room consistent with the policies and procedures of your |
| 11:32AM | 4 | agency? |
| 11:32AM | 5 | A.  Yes. |
| 11:32AM | 6 | Q.  You were asked about recording back at the police |
| 11:32AM | 7 | station.  That was a different -- that wasn't the interview |
| 11:32AM | 8 | that was conducted that day, right? |
| 11:32AM | 9 | A.  Correct. |
| 11:32AM | 10 | Q.  You weren't arresting the defendant, right? |
| 11:32AM | 11 | A.  We did not. |
| 11:32AM | 12 | Q.  You were in his living room talking to him, weren't you? |
| 11:32AM | 13 | A.  In the dining room, yes. |
| 11:32AM | 14 | Q.  At that point in your investigation, you were just happy |
| 11:32AM | 15 | that he was talking to you, right? |
| 11:32AM | 16 | A.  Yes. |
| 11:32AM | 17 | Q.  Did you expect him to talk to you? |
| 11:32AM | 18 | A.  No. |
| 11:32AM | 19 | Q.  The manner which you conducted the interview, in your |
| 11:32AM | 20 | training and experience, is an interview of the sort that you |
| 11:32AM | 21 | conducted that day different from an interrogation? |
| 11:32AM | 22 | A.  Yes. |
| 11:32AM | 23 | Q.  Tell the jury, what's the difference between those two |
| 11:32AM | 24 | techniques. |
| 11:32AM | 25 | A.  An interview involves open-ended questions.  Not much |

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

11:33AM    1    talking by the person that's doing the interviewing other

11:33AM    2    than open-ended questions and maybe a clarifying question.

11:33AM    3    And then you allow the person that you're interviewing do

11:33AM    4    most of the talking.

11:33AM    5        An interrogation is very different.  In an interrogation,

11:33AM    6    if I'm doing it, I'm doing almost all of the talking.  And

11:33AM    7    most of the questions are going to have short answers like

11:33AM    8    yes or no.

11:33AM    9    Q.  In an interrogation, are you confronting people with

11:33AM   10    evidence you've acquired?

11:33AM   11    A.  Yes.

11:33AM   12    Q.  And you didn't do too much of that during your interview

11:33AM   13    with the defendant other than showing him a couple pictures?

11:33AM   14    A.  The two pictures.

11:33AM   15    Q.  In your experience interviewing people, do individuals

11:33AM   16    sometimes provide interviews -- withdrawn.

11:33AM   17        In your experience interviewing people, are you cognizant

11:33AM   18    of the fact that sometimes the questions or the more

11:33AM   19    specificity that's in your questions, it could -- it could

11:34AM   20    provide details of your investigation?

11:34AM   21    A.  Always.

11:34AM   22    Q.  Is that part of the assessment you make when deciding how

11:34AM   23    much detail to provide or confront somebody with during an

11:34AM   24    interview?

11:34AM   25    A.  How much detail to provide, or even which questions to

11:34AM  1  ask.

11:34AM  2  Q.  And as of that date in June, you were still intent upon

11:34AM  3  further investigating, right?

11:34AM  4  A.  Yes.

11:34AM  5  Q.  Mr. Bongiovanni didn't get arrested until the

11:34AM  6  following -- until October of 2019; is that right?

11:34AM  7  A.  October or November.  Maybe the first week of November,

11:34AM  8  yes, sir.

11:34AM  9  Q.  Okay.  So, this was just one part of the investigation;

11:34AM  10  is that right?

11:34AM  11  A.  Yes.

11:34AM  12  Q.  But to sum it up, was it an interview that you did not

11:34AM  13  want to at that point put all your cards on the table?

11:34AM  14  A.  Yes.

11:35AM  15  Q.  Because you were still investigating?

11:35AM  16  A.  Yes.

11:35AM  17  Q.  Were you still learning information?

11:35AM  18  A.  Yes.

11:35AM  19  Q.  For example, if you had had and had time to review every

11:35AM  20  single document that the defendant was storing in his

11:35AM  21  basement, would you have had a lot more questions to ask?

11:35AM  22  A.  Many.  Yes.

11:35AM  23  Q.  You were asked yesterday about if you determined whether

11:35AM  24  the defendant was confused, or if he seemed confused by any

11:35AM  25  of your questions.  Did the defendant seem confused by your

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

11:35AM  1    questions at any point?

11:35AM  2    A.  Not at all.

11:35AM  3    Q.  If the defendant had been confused about anything, would

11:35AM  4    you have made sure to clarify your question to make sure he

11:35AM  5    understood?

11:35AM  6    A.  Yes.

11:35AM  7    Q.  Do you recall needing to do that at all?

11:35AM  8    A.  No.

11:35AM  9    Q.  Did the defendant ever say to you, I'm confused by your

11:35AM  10   questions?

11:35AM  11   A.  I don't remember that, no.

11:35AM  12   Q.  As -- as you walked in the door that day to do your

11:36AM  13   interview, you had an awareness that the defendant was a

11:36AM  14   20-year veteran special agent similar to yourself, correct?

11:36AM  15   A.  Yes.

11:36AM  16   Q.  As you walked in there, do you believe the defendant had

11:36AM  17   similar training as it relates to interview and interrogation

11:36AM  18   tactics?

11:36AM  19   A.  Yes.

11:36AM  20   Q.  Was that also a consideration as to part of your approach

11:36AM  21   how to deal with him?

11:36AM  22   A.  Yes.

11:36AM  23   Q.  Is remembering important details and documenting them an

11:36AM  24   important part of your job training experience?

11:36AM  25   A.  Yes.

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

| | | |
|---|---|---|
| 11:36AM | 1 | Q.  You were asked some questions on cross-examination about |
| 11:36AM | 2 | what the defendant meant when he said that he and Peter |
| 11:36AM | 3 | Gerace were not in a close relationship; do you remember |
| 11:36AM | 4 | that?  I think yesterday, Mr. MacKay asked you, you didn't |
| 11:36AM | 5 | have him define "close relationship," right? |
| 11:36AM | 6 | A.  I did not. |
| 11:36AM | 7 | Q.  You remember those questions yesterday? |
| 11:37AM | 8 | A.  I do. |
| 11:37AM | 9 | Q.  Did you need an English dictionary to understand what the |
| 11:37AM | 10 | defendant meant when he said him and Peter Gerace were not in |
| 11:37AM | 11 | a close relationship? |
| 11:37AM | 12 | A.  No. |
| 11:37AM | 13 | Q.  You were asked questions yesterday about the defendant's |
| 11:37AM | 14 | statement to you wherein in your interview he claimed he |
| 11:37AM | 15 | could not remember whether Anthony was at the party in |
| 11:37AM | 16 | Toronto; do you remember being asked those questions |
| 11:37AM | 17 | yesterday? |
| 11:37AM | 18 | A.  I do. |
| 11:37AM | 19 | Q.  But the text messages that we looked at, Exhibit 310D, at |
| 11:37AM | 20 | least during that time period when he was texting with Peter |
| 11:37AM | 21 | Gerace, the defendant remembered Anthony Gerace being at the |
| 11:37AM | 22 | party in Toronto; is that right? |
| 11:37AM | 23 | A.  That's how it appears, yes. |
| 11:37AM | 24 | Q.  And we looked at those text messages yesterday, right? |
| 11:38AM | 25 | A.  Yes. |

11:38AM   1   Q.   In 20 -- in or about 2019 when Kevin Myszka was

11:38AM   2   interviewed --

11:38AM   3          **MR. TRIPI:**  Let's pull up exhibit 126, Ms. Champoux.

11:38AM   4          **BY MR. TRIPI:**

11:38AM   5   Q.   -- Kevin Myszka was interviewed about three years after

11:38AM   6   the trip to Toronto; is that right?

11:38AM   7   A.   Yes.

11:38AM   8   Q.   And Kevin Myszka remembered Anthony Gerace --

11:38AM   9          **MR. MacKAY:**  Objection.  Calls for hearsay.

11:38AM  10          **MR. TRIPI:**  I'm asking what he indicated he

11:38AM  11   remembered.

11:38AM  12          **THE COURT:**  No.  Sustained.

11:38AM  13          **BY MR. TRIPI:**

11:38AM  14   Q.   Did Kevin Myszka provide details in an interview that you

11:38AM  15   were able to corroborate through a border crossing record?

11:38AM  16   A.   Yes.

11:38AM  17   Q.   Did that border crossing record establish that Anthony

11:38AM  18   Gerace was in Toronto?

11:38AM  19          **MR. MacKAY:**  Objection, calls for hearsay.

11:38AM  20          **MR. TRIPI:**  Does not.  It's a border crossing record

11:38AM  21   that he reviewed.

11:38AM  22          **THE COURT:**  Mr. Tripi, please.

11:38AM  23          Overruled.

11:38AM  24          **THE WITNESS:**  It established that he was in Canada,

11:38AM  25   yes.

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

| | | |
|---|---|---|
| 11:38AM | 1 | **BY MR. TRIPI:** |
| 11:38AM | 2 | Q.  I'm sorry, Toronto is in Canada. |
| 11:39AM | 3 | A.  Yes. |
| 11:39AM | 4 | Q.  Now the defendant told you he knew you were conducting an |
| 11:39AM | 5 | Italian Organized Crime investigation; is that right? |
| 11:39AM | 6 | A.  Yes. |
| 11:39AM | 7 | Q.  Now you never told the defendant when you guys worked |
| 11:39AM | 8 | together that you were conducting an IOC, Italian Organized |
| 11:39AM | 9 | Crime, investigation, correct? |
| 11:39AM | 10 | A.  I did not. |
| 11:39AM | 11 | Q.  Did the defendant ever explain to you how he found out |
| 11:39AM | 12 | you were conducting an IOC investigation? |
| 11:39AM | 13 |     An IOC investigation, not talking about Ron Serio. |
| 11:39AM | 14 | A.  No. |
| 11:39AM | 15 | Q.  Now on cross-examination, you were asked about the |
| 11:39AM | 16 | defendant's first explanation about why the file, the Ron |
| 11:39AM | 17 | Serio file, was in his house. |
| 11:39AM | 18 |     And he told you he knew that you were conducting an |
| 11:39AM | 19 | investigation into Italian Organized Crime, and that he took |
| 11:39AM | 20 | the Serio file home at retirement to, in his words, verify |
| 11:39AM | 21 | that he -- everything's on the up and up, or that he did a |
| 11:39AM | 22 | legitimate investigation, right? |
| 11:39AM | 23 | A.  Yes. |
| 11:39AM | 24 | Q.  Does taking the file and removing it from DEA and putting |
| 11:40AM | 25 | it in his basement in any way help you verify that he did a |

11:40AM   1   legitimate investigation?

11:40AM   2   A.   No.

11:40AM   3   Q.   Does it do the opposite of helping you verify that?

11:40AM   4   A.   Yes.

11:40AM   5   Q.   So as you sat in an interview, did you understand the

11:40AM   6   defendant's explanation to be that he took the file out of

11:40AM   7   DEA to a place that no one in the DEA or law enforcement

11:40AM   8   would ever see it so that he could some day show law

11:40AM   9   enforcement that he conducted an legitimate investigation?

11:40AM   10          **MR. MacKAY:**  Objection.

11:40AM   11          **THE COURT:**  Sustained.

11:40AM   12          **BY MR. TRIPI:**

11:40AM   13   Q.   Did his explanation that he did give you make any sense

11:40AM   14   to you?

11:40AM   15   A.   No, that's why I asked him the other question, or asked

11:40AM   16   him about it again.

11:40AM   17          **MR. TRIPI:**  All right.  Ms. Champoux, let's pull down

11:40AM   18   Exhibit 126, and let's go to Exhibit 26E.

11:40AM   19          **BY MR. TRIPI:**

11:41AM   20   Q.   This was shown to you yesterday as we get it up; do you

11:41AM   21   remember this?

11:41AM   22   A.   Yes.

11:41AM   23   Q.   You began to explain yesterday, I think, during cross

11:41AM   24   that this isn't an actual -- that the from email from

11:41AM   25   Mr. Bongiovanni to Mr. Yensan is not the email from DARTS.

11:41AM   1    Can you describe that again for the jury?

11:41AM   2    A.   Yes.  So this email as it appears is a forwarded DARTS

11:41AM   3    email from Mr. Bongiovanni to Greg Yensan who was at the time

11:41AM   4    his supervisor.

11:41AM   5    Q.   And do you notice other than sent from my iPhone, it's

11:41AM   6    forwarded to Greg Yensan without comment?

11:41AM   7    A.   Yes.

11:41AM   8    Q.   And it's forwarded on what date?  The sent date on the

11:41AM   9    top.

11:42AM   10   A.   I see it, August 21st, 2018.

11:42AM   11   Q.   Is that about a month after the July 20th, 2018 proffer

11:42AM   12   that you and Special Agent Casullo and several others were in

11:42AM   13   with Ron Serio?

11:42AM   14   A.   Yes.

11:42AM   15   Q.   Is that about three weeks after Special Agent Casullo

11:42AM   16   reported Bongiovanni's race-related comments?

11:42AM   17   A.   Yes.

11:42AM   18          MR. TRIPI:   And, Ms. Champoux, if we can now go to

11:42AM   19   sort of the -- blow this up so he can see it maybe better.

11:42AM   20          BY MR. TRIPI:

11:42AM   21   Q.   Now we're moving to the lower part of the document.  In

11:42AM   22   the to line, I'm sorry, in the from line, the forwarding of

11:42AM   23   the DARTS email indicates that this is based upon an

11:42AM   24   investigative overlap created by you.  What does that mean?

11:42AM   25   A.   So if you look at the -- if we just use the first Trinity

11:43AM  1   item as an example, that means that I entered that phone

11:43AM  2   number because I wanted to subpoena the tolls and the

11:43AM  3   subscriber DARTS forces you to deconflict it first.  And that

11:43AM  4   deconfliction overlapped with the same phone number appearing

11:43AM  5   in C2-13-0026 in the DARTS database.

11:43AM  6   Q.  So now yesterday you were asked about this C2-16-0087

11:43AM  7   file that was for you, and you said you thought was either

11:43AM  8   Jarrett Guy or Joseph Bella; do you remember that?

11:43AM  9   A.  Yes.

11:43AM  10  Q.  Now you were asking Mr. Serio about Jarrett Guy in 2017,

11:43AM  11  do you recall that in your professors with him?

11:43AM  12  A.  Yes.

11:43AM  13  Q.  Does that help you recall whether it was Joseph Bella or

11:43AM  14  Jarrett Guy on that file, C2-16-0087?

11:43AM  15  A.  I believe it was Joseph Bella.

11:43AM  16  Q.  Okay.  So your file that you had on Joseph Bella had an

11:43AM  17  overlap with this number, came up in both your file and the

11:44AM  18  Wayne Anderson case file; is that right?

11:44AM  19  A.  Yes.

11:44AM  20  Q.  And this is why the DARTS is getting generated?

11:44AM  21  A.  Yes.

11:44AM  22  Q.  And you wrote in the comments, what was -- withdrawn.

11:44AM  23  What were the remarks?

11:44AM  24  A.  My remarks?

11:44AM  25  Q.  Did you write your own remarks?

11:44AM    1    A.  Yes.

11:44AM    2    Q.  Okay.  What did you write?

11:44AM    3    A.  Numbers associated with Ron Serio DTO.

11:44AM    4    Q.  And if we look to Mr. Bongiovanni's case, what did Justin

11:44AM    5    Borst write in the remarks?

11:44AM    6    A.  Number part of ongoing narcotics investigation in contact

11:44AM    7    with target number 716-830-3226 per S.A. Bongiovanni.

11:44AM    8    Q.  Per S.A. Bongiovanni; what does that indicate?

11:44AM    9    A.  If those -- he only knows those remarks because he

11:44AM   10    received the information from Mr. Bongiovanni.

11:45AM   11    Q.  So Bongiovanni told Borst?

11:45AM   12    A.  Yes.

11:45AM   13        **MR. TRIPI:**  Okay.  Let's zoom out of that, and let's

11:45AM   14    scroll down a little bit further.  And let's stop there.  And

11:45AM   15    if can we zoom in on this one, please.

11:45AM   16        **BY MR. TRIPI:**

11:45AM   17    Q.  We're at page 2 of the document, and we're looking at a

11:45AM   18    Trinity item for 716-812-0664.  We've looked at that number

11:45AM   19    several times.  Is that associated with Michael Masecchia?

11:45AM   20    A.  Yes.

11:45AM   21        **MR. TRIPI:**  Ms. Champoux, can we go to -- just let's

11:45AM   22    verify it.  Let's pull up Exhibit 8A at page 134 next to this.

11:45AM   23        **BY MR. TRIPI:**

11:46AM   24    Q.  And so we see at the top subscription information,

11:46AM   25    there's a different number being subpoenaed in 13-0026 at the

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24      117

11:46AM   1   top, right?

11:46AM   2   A.  Yes.

11:46AM   3   Q.  But in the account details, the account information we

11:46AM   4   have 812-0664 associated with Masecchia; is that right?

11:46AM   5   A.  Yes.

11:46AM   6         MR. TRIPI:  Ms. Champoux, can we go up a prior page

11:46AM   7   so I can check exhibit -- let's go to 133.  And let's scroll

11:46AM   8   back up a little bit higher on 26E.  Stay there on 8A.  Let's

11:46AM   9   go up.  All right.

11:46AM   10        Thank you for that.  Okay.  We can take down

11:46AM   11  Exhibit 8A.  Keep up 26E.  So again, we can zoom in on this.

11:47AM   12        BY MR. TRIPI:

11:47AM   13  Q.  What's the comment that you wrote in your DARTS

11:47AM   14  deconfliction for that phone number August 21st, 2018?

11:47AM   15  A.  Numbers associated with Ron Serio DTO.

11:47AM   16  Q.  And we just looked back at Exhibit 8A.  At the time, you

11:47AM   17  had not reviewed Exhibit 8A, the actual Wayne Anderson file

11:47AM   18  in August?

11:47AM   19  A.  No, I had not.

11:47AM   20  Q.  Okay.  Now you know that there was -- that that number

11:47AM   21  was associated with Mike Masecchia though, right?

11:47AM   22  A.  Yes.

11:47AM   23  Q.  And if we look at the entry for March 20th, 2013, what

11:47AM   24  were the remarks that Justin Borst wrote into DARTS per

11:47AM   25  Special Agent Bongiovanni for that Masecchia number?

11:47AM  1   A.  Number part of ongoing narcotics investigation in contact

11:48AM  2   with target number 716-830-3226.

11:48AM  3   Q.  And what did he write, or what did Borst write again in

11:48AM  4   another DARTS deconfliction on April 19th, 2013?

11:48AM  5   A.  Number part of ongoing narcotics investigation belonging

11:48AM  6   to Michael Masecchia per S.A. Bongiovanni.

11:48AM  7   Q.  So, almost a year in August of 2018, about ten months or

11:48AM  8   so before your June 2019 interview of Bongiovanni, he was

11:48AM  9   getting DARTS deconflictions related to Ron Serio and Mike

11:48AM  10  Masecchia through entries that you were putting into DARTS?

11:48AM  11  A.  Yes.

11:48AM  12  Q.  He never said during your interview when you asked him

11:48AM  13  how he knew of your IOC investigation, he never said:  I saw

11:48AM  14  your DARTS entry, so I knew you were investigating Italian

11:48AM  15  Organized Crime.  Did he?

11:49AM  16  A.  No.

11:49AM  17  Q.  Is this an example of the defendant's deconflictions

11:49AM  18  working to give him notice through DARTS?

11:49AM  19  A.  Yes.

11:49AM  20          MR. MacKAY:  Objection.

11:49AM  21          THE COURT:  Sustained.

11:49AM  22          MR. TRIPI:  Judge, can we approach on that?

11:49AM  23          THE COURT:  Sure.

11:49AM  24          (Sidebar discussion held on the record.)

11:49AM  25          MR. TRIPI:  The plain language of my question wasn't

| | | |
|---|---|---|
|11:49AM|1|argumentative or accusatory at all.  I asked him:  Is this|
|11:49AM|2|DARTS working for the numbers Bongiovanni put in?|
|11:49AM|3|I don't understand what's object -- he might not like|
|11:49AM|4|my tone of voice, but I don't understand what the plain|
|11:49AM|5|language is that's objectionable.  This is DARTS working as|
|11:49AM|6|it's supposed to.  I don't --  I just --|
|11:49AM|7|**THE COURT:**  I don't think there was a question.|
|11:49AM|8|**MR. MacKAY:**  Judge, the objection was it's|
|11:50AM|9|argumentative because it's argumentative in going to the|
|11:50AM|10|ultimate issue of whether DARTS is working in line with the|
|11:50AM|11|theory they're setting up.|
|11:50AM|12|**THE COURT:**  Yeah.  So that's -- that's what I|
|11:50AM|13|understood the question to be, as well.  Is DARTS working the|
|11:50AM|14|way the defendant intended DARTS to.|
|11:50AM|15|**MR. TRIPI:**  That's not what I said.|
|11:50AM|16|**THE COURT:**  Well --|
|11:50AM|17|**MR. TRIPI:**  I'm going to re-ask.  I'll take a shot at|
|11:50AM|18|reasking.|
|11:50AM|19|(End of sidebar discussion.)|
|11:50AM|20|**THE COURT:**  So the objection is sustained.|
|11:50AM|21|You can ask another question.|
|11:50AM|22|**BY MR. TRIPI:**|
|11:50AM|23|Q.  In this instance, did DARTS work in the manner in which|
|11:50AM|24|it was intended by design of the database to deconflict|
|11:50AM|25|numbers associated with Mike Masecchia and Ron Serio?|

11:50AM    1    A.  Yes.

11:50AM    2    Q.  Did the defendant, in August of 2018, get notice through

11:50AM    3    DARTS by this entry?

11:50AM    4    A.  Yes.

11:50AM    5    Q.  So this is an example of DARTS working in the manner in

11:51AM    6    which it's intended, to provide notice between two agents,

11:51AM    7    correct?

11:51AM    8    A.  Yes.

11:51AM    9    Q.  Did the defendant ever come over to you, he still worked

11:51AM    10   at the DEA in August, and say, hey, can I help you with

11:51AM    11   Masecchia and Serio?

11:51AM    12   A.  No.

11:51AM    13          **MR. TRIPI:**  We can take that down, Ms. Champoux.

11:51AM    14          Can we pull up Government Exhibit 100A.1, and there's

11:51AM    15   DARTS email for -- DARTS email 1-7-2019.

11:51AM    16          **BY MR. TRIPI:**

11:51AM    17   Q.  Okay.  Now we're back to Exhibit 100A.1.  This is the

11:51AM    18   file materials that were in the defendant's house, scanned,

11:51AM    19   correct?

11:51AM    20   A.  Yes.

11:51AM    21   Q.  And this particular one is labeled DARTS email 01-07-2019

11:52AM    22   scanned into that file, or this exhibit, correct?

11:52AM    23   A.  Yes.

11:52AM    24   Q.  Okay.  So who is Shawn Hoerner?

11:52AM    25   A.  He was an analyst at DEA.

11:52AM   1   Q.   Just like Justin Borst and Steve Bevilacqua whose names
11:52AM   2   we've seen?
11:52AM   3   A.   Yes, same kind of position.  Same position.
11:52AM   4   Q.   Who received this DARTS email from Shawn Hoerner.
11:52AM   5   A.   Anthony Casullo, Angelique Gunton, Nathan Schumaker,
11:52AM   6   Shawn Hoerner's copied again, Amy Wiltse, myself, James
11:52AM   7   McHugh, David Lamp, Joseph Bongiovanni.
11:52AM   8   Q.   And let's scroll down a little bit.  And we see that
11:52AM   9   again it says an investigative overlap was created by, and
11:53AM  10   this one has agent POC, does that mean point of contact?
11:53AM  11   A.   Yes.
11:53AM  12   Q.   And is that Anthony Casullo?
11:53AM  13   A.   Yes.
11:53AM  14        MR. TRIPI:   And can we scroll down a little bit.
11:53AM  15   Just to Trinity item 1 there.
11:53AM  16        BY MR. TRIPI:
11:53AM  17   Q.   On January 7th, 2019, that date was roughly three weeks
11:53AM  18   before Mr. Bongiovanni retired; is that about right?
11:53AM  19   A.   Yes.
11:53AM  20   Q.   And for the Trinity item 1, the request ran by Special
11:53AM  21   Agent Casullo, what were the remarks that Special Agent
11:53AM  22   Casullo put into DARTS when he deconflicted that number?
11:53AM  23   A.   Which date?
11:53AM  24   Q.   Very first one.
11:53AM  25   A.   Phone numbers in contact with Mike Sinatra related to

11:53AM    1    burglary and drug -- or related to a burglary and drug

11:53AM    2    trafficking in Buffalo and Niagara County.

11:53AM    3    Q.   And, so, everybody on that to line that we read earlier,

11:53AM    4    including the defendant, would be able to see that remark?

11:53AM    5    A.   Yes.

11:54AM    6    Q.   Okay.  And just by way of reminder, Michael Sinatra is

11:54AM    7    one of the people who HSI executed a search warrant for on

11:54AM    8    January 28th, 2019; is that right?

11:54AM    9    A.   Yes.

11:54AM   10         MR. TRIPI:  Okay.  Let's scroll down.  Let's go a

11:54AM   11    little bit further down.  Stop right there.

11:54AM   12         BY MR. TRIPI:

11:54AM   13    Q.   Another one I want to look at is this 866-2687 number,

11:54AM   14    we've seen that number earlier today.  But does Casullo write

11:54AM   15    the same remark essentially in relation to that number?

11:54AM   16    A.   Yes.  It appears that he entered a list of numbers, and

11:54AM   17    then, you know, whether you enter one number or 15, you put

11:54AM   18    the remarks in once, and then it gets associated with however

11:54AM   19    many you entered.

11:54AM   20    Q.   And this one is what triggers the email to Bongiovanni;

11:55AM   21    is that a correct understanding of this record?

11:55AM   22    A.   This one would trigger that email, yes.

11:55AM   23    Q.   Can you circle for the jury why through the DARTS system

11:55AM   24    Mr. Bongiovanni's notified?

11:55AM   25         Show them which -- which file creates the deconfliction

11:55AM  1    here.

11:55AM  2    A.  So, the number that you marked was entered in DARTS with

11:55AM  3    that case number at some point.

11:55AM  4    Q.  And by that point in time, it had been entered into DARTS

11:55AM  5    in March of 2013?

11:55AM  6    A.  Yes.

11:55AM  7    Q.  So, roughly a little less than six years earlier?

11:55AM  8    A.  Yes.

11:55AM  9    Q.  And what were the remarks that Justin Borst wrote into

11:55AM  10   DARTS in the remarks section?

11:55AM  11   A.  Number part of ongoing narcotics investigation in contact

11:55AM  12   with target number 716-830-3226 per S.A. Bongiovanni.

11:56AM  13           **MR. TRIPI:**  Okay.  Now, Ms. Champoux, let's go and

11:56AM  14   pull up Exhibit 109F.  And could we go to the entry for

11:56AM  15   Hot Dog?

11:56AM  16           **BY MR. TRIPI:**

11:56AM  17   Q.  We looked at this yesterday, this is Mr. Bongiovanni's

11:56AM  18   phone contacts from his personal phone that you acquired

11:56AM  19   during the search, correct?

11:56AM  20   A.  Yes.

11:56AM  21   Q.  Is that the same phone number?

11:56AM  22   A.  Yes.

11:56AM  23           **MR. TRIPI:**  Ms. Champoux, please pull up Exhibit 393.

11:57AM  24           **BY MR. TRIPI:**

11:57AM  25   Q.  Is this the photo with Hot Dog with his hand on

| | | |
|---|---|---|
| 11:57AM | 1 | Todaro Sr.'s shoulder? |
| 11:57AM | 2 | A.  Yes. |
| 11:57AM | 3 | **MR. TRIPI:**  Let's go to Exhibit 8A at 347. |
| 11:57AM | 4 | **BY MR. TRIPI:** |
| 11:57AM | 5 | Q.  Is this the administrative subpoena to AT&T in file |
| 11:57AM | 6 | C2-13-0026 that resulted in that phone number going into |
| 11:57AM | 7 | DARTS? |
| 11:57AM | 8 | A.  I think this is the return for that subpoena, but yes, |
| 11:57AM | 9 | that's all connected. |
| 11:57AM | 10 | Q.  Same phone number, same person? |
| 11:57AM | 11 | A.  Yes. |
| 11:57AM | 12 | Q.  And you had indicated yesterday, I think, that you had |
| 11:57AM | 13 | reviewed a border crossing where the defendant and Hot Dog or |
| 11:57AM | 14 | Paul Francoforte had crossed into Canada together? |
| 11:57AM | 15 | A.  Returning from Canada. |
| 11:57AM | 16 | Q.  Oh, my fault.  Okay. |
| 11:58AM | 17 | You were asked yesterday about phone records and if you |
| 11:58AM | 18 | looked at some phone records for Mr. Bongiovanni; do you |
| 11:58AM | 19 | remember that? |
| 11:58AM | 20 | A.  Yes. |
| 11:58AM | 21 | **MR. TRIPI:**  Ms. Champoux, let's pull up Exhibit 358 |
| 11:58AM | 22 | which is in evidence. |
| 11:58AM | 23 | Let's scroll down just a little bit. |
| 11:58AM | 24 | **BY MR. TRIPI:** |
| 11:58AM | 25 | Q.  Do you understand this to be the bills related to |

| | | |
|---|---|---|
| 11:58AM | 1 | Mr. Bongiovanni's DEA cell phone beginning back in 2013? |
| 11:58AM | 2 | A.  Yes. |
| 11:58AM | 3 | **MR. TRIPI:**  Let's scroll down a little bit. |
| 11:59AM | 4 | Ms. Champoux, we're going to stay in this year 2013, and let's |
| 11:59AM | 5 | go to page number 10.  And go to December 2nd at 8:07 p.m. |
| 11:59AM | 6 | **BY MR. TRIPI:** |
| 11:59AM | 7 | Q.  Do you see a call, a ten-minute call between the |
| 11:59AM | 8 | defendant and Hot Dog on December 2nd, 2013? |
| 11:59AM | 9 | A.  Yes, it's an incoming call. |
| 11:59AM | 10 | Q.  And is that about -- is that while the Wayne Anderson |
| 11:59AM | 11 | file was open, C2-13-0026? |
| 11:59AM | 12 | A.  It was still open. |
| 11:59AM | 13 | Q.  In your narcotics investigations, do you call subjects or |
| 11:59AM | 14 | targets of your investigation that you put into DARTS? |
| 11:59AM | 15 | **MR. MacKAY:**  Objection. |
| 11:59AM | 16 | **THE COURT:**  Sustained. |
| 12:00PM | 17 | **MR. TRIPI:**  Let's go to -- I'd like to move into |
| 12:00PM | 18 | February of 2014 on this record.  Let's move down to page 42. |
| 12:00PM | 19 | And go to the top for a moment.  Can you go up another page. |
| 12:00PM | 20 | **BY MR. TRIPI:** |
| 12:00PM | 21 | Q.  The way these bills are printed, you basically have to |
| 12:00PM | 22 | scroll through the whole year to see the date in the first, |
| 12:00PM | 23 | right? |
| 12:00PM | 24 | A.  Yes. |
| 12:00PM | 25 | Q.  As we get to page 42 here, have we gone through a couple |

12:00PM   1   years already?

12:00PM   2   A.  Yes.

12:00PM   3   Q.  So we're gonna go to an entry February 21st, 2014 at

12:01PM   4   12:29 p.m.  Do you see another call between the defendant and

12:01PM   5   Paul Francoforte on the record?

12:01PM   6   A.  Yes.  There's an outgoing call for one minute, and then

12:01PM   7   an oncoming call for 11 minutes.

12:01PM   8   Q.  Right below it, correct?

12:01PM   9   A.  Yes.

12:01PM  10   Q.  Let's stay in that same year, and let's go to page 48.

12:01PM  11   And we're going to go to March 6th at 12:47 p.m.  Do you see

12:01PM  12   another call between the defendant and Paul Francoforte?

12:01PM  13   A.  Yes, incoming call for 11 minutes.

12:02PM  14   Q.  By incoming call, you mean Francoforte's calling the

12:02PM  15   defendant?

12:02PM  16   A.  Yes.

12:02PM  17   Q.  Let's stay in that same year, let's go to page number 50.

12:02PM  18   And March 11th at 3:28 p.m.  Do you see another call from

12:02PM  19   Francoforte to the defendant on that day?

12:02PM  20   A.  Yes.

12:02PM  21   Q.  For how long?

12:02PM  22   A.  Six minutes.

12:02PM  23   Q.  We'll stay in that same year, let's go to page 52.  And

12:02PM  24   I'm looking for March 19th at 8:28 p.m.  do you see another

12:02PM  25   call from Francoforte there?

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24

| | | |
|---|---|---|
| 12:02PM | 1 | A.  Yes. |
| 12:02PM | 2 | Q.  For how long? |
| 12:02PM | 3 | A.  Five minutes. |
| 12:02PM | 4 | Q.  For all these calls, the Wayne Anderson file/Ron Serio |
| 12:03PM | 5 | file is still open, and the DEA -- the defendant has that |
| 12:03PM | 6 | file open still, correct? |
| 12:03PM | 7 | A.  Yes. |
| 12:03PM | 8 | Q.  Okay.  Let's go to that same year, let's go to page 77. |
| 12:03PM | 9 | May 21, 2014 at 7:10 p.m.  5/21.  And do we see another |
| 12:03PM | 10 | incoming call from Hot Dog to the defendant? |
| 12:03PM | 11 | A.  Yes. |
| 12:03PM | 12 | Q.  How long is that one? |
| 12:03PM | 13 | A.  Two minutes. |
| 12:03PM | 14 | Q.  Let's go to May 23rd, 2014 at 4:06 p.m., that should be |
| 12:03PM | 15 | page 77 as well.  Do we see another incoming call from |
| 12:03PM | 16 | Hot Dog to the defendant on that day? |
| 12:03PM | 17 | A.  Yes, for 13 minutes. |
| 12:03PM | 18 | Q.  And again, file C2-13-0026 is still open, correct? |
| 12:03PM | 19 | A.  Yes. |
| 12:03PM | 20 | Q.  Let's go to page 85, June 17th, 2014, at 4:38 p.m.  Is |
| 12:04PM | 21 | that another call from Hot Dog to the defendant on that day? |
| 12:04PM | 22 | A.  Yes. |
| 12:04PM | 23 | Q.  And that one's approximately one minute? |
| 12:04PM | 24 | A.  Yes. |
| 12:04PM | 25 | Q.  And do we have another one at 4:50? |

12:04PM    1    A.  Yes, for one minute.

12:04PM    2    Q.  Let's go to page 87, June 21st, 2014 at 3:15 p.m.  Is

12:04PM    3    this another incoming call from Hot Dog to the defendant?

12:04PM    4    A.  Yes, for six minutes.

12:04PM    5    Q.  Is file C2-13-0026 still open?

12:04PM    6    A.  Yes.

12:04PM    7    Q.  Let's go to page number 90.  June 25th, 2014, at -- I'm

12:05PM    8    sorry, 3:33 p.m.  Is that another incoming call from Hot Dog

12:05PM    9    to the defendant?

12:05PM   10    A.  Yes, for three minutes.

12:05PM   11    Q.  Let's go to page 91.  I'm looking for June 27th at

12:05PM   12    9:45 a.m.

12:05PM   13    A.  I see it.

12:05PM   14    Q.  Is that another call from Hot Dog to the defendant?

12:05PM   15    A.  Yes, for ten minutes.

12:05PM   16    Q.  And let's go to August 18th, 2014, that should be

12:05PM   17    page 111, at 12 p.m.  Do you see that call?

12:05PM   18    A.  I do.

12:05PM   19    Q.  And was that about a one minute outgoing call from the

12:05PM   20    defendant?

12:05PM   21    A.  Yes.

12:06PM   22    Q.  Let's go to August 24th, 2014, 4:25 p.m., that should be

12:06PM   23    at page 115.

12:06PM   24         **MR. MacKAY:**  Judge, I'm going to object at some point

12:06PM   25    to cumulativeness under 403.

| | | |
|---|---|---|
| 12:06PM | 1 | **THE COURT:** I've been waiting for that. |
| 12:06PM | 2 | Mr. Tripi, how long are we going to do this? |
| 12:06PM | 3 | **MR. TRIPI:** Can we step up to let you know. |
| 12:06PM | 4 | **THE COURT:** Come on up. |
| 12:06PM | 5 | (Sidebar discussion held on the record.) |
| 12:06PM | 6 | **MR. TRIPI:** They're all different calls, so each one |
| 12:06PM | 7 | is not cumulative. They're all through the -- I'm not even |
| 12:06PM | 8 | through the time he's got the file open yet. Not even through |
| 12:06PM | 9 | 2015 yet, Judge. And so this is important evidence. He's |
| 12:06PM | 10 | subpoenaing a number of a person who we just saw the photo |
| 12:06PM | 11 | and -- |
| 12:06PM | 12 | **THE COURT:** At some point -- at some point -- |
| 12:06PM | 13 | **MR. TRIPI:** There's 50 calls, I'm through 17 of them. |
| 12:06PM | 14 | **THE COURT:** You're going to go through all 50. |
| 12:07PM | 15 | **MR. TRIPI:** I think I'm moving quickly through them. |
| 12:07PM | 16 | **THE COURT:** Mr. Tripi, if you think this is |
| 12:07PM | 17 | effective, you go right ahead. |
| 12:07PM | 18 | **MR. TRIPI:** I do, Judge. |
| 12:07PM | 19 | **THE COURT:** You go right ahead. |
| 12:07PM | 20 | **MR. TRIPI:** Thank you. |
| 12:07PM | 21 | (End of sidebar discussion.) |
| 12:07PM | 22 | **THE COURT:** Okay. We're going to keep going. |
| 12:07PM | 23 | **MR. TRIPI:** Okay. September 22nd, 2014 at 7:51 p.m. |
| 12:07PM | 24 | Let's go to page 124. I think 7:51 p.m. 9/22. Yeah. |
| 12:07PM | 25 | **BY MR. TRIPI:** |

12:07PM    1    Q.  Is that another call from Hot Dog to the defendant?

12:07PM    2    A.  Yes.

12:07PM    3    Q.  For how long?

12:07PM    4    A.  Two minutes.

12:07PM    5    Q.  And let's go to page 127.  And here September 24th, 2014,

12:07PM    6    I'm looking for 6:05 p.m.  Is that another call from Hot Dog

12:07PM    7    to the defendant?

12:07PM    8    A.  Yes.

12:07PM    9    Q.  That one's for one minute?

12:08PM   10    A.  Yes.

12:08PM   11    Q.  Let's go to September 27th, 2014.  This should be page

12:08PM   12    127.  By this date, is the Wayne Anderson file, the file that

12:08PM   13    Mr. Bongiovanni subpoenaed Francoforte's number, still open?

12:08PM   14    A.  Yes.

12:08PM   15    Q.  And how long is this call on September 27th?

12:08PM   16    A.  It's an outgoing call for three minutes.

12:08PM   17    Q.  So the defendant called Hot Dog?

12:08PM   18    A.  Yes.

12:08PM   19    Q.  Let's go to page 165, this should be January 7th, 2015.

12:08PM   20    At 9:51 p.m.

12:08PM   21         **MR. TRIPI:**  January 7th, 2015, second one from the

12:09PM   22    top, Karen.  Thank you.

12:09PM   23              **BY MR. TRIPI:**

12:09PM   24    Q.  And is this a call from the defendant to Hot Dog?

12:09PM   25    A.  Yes, for six minutes.

12:09PM    1    Q.  And the Wayne Anderson file was still open, that was

12:09PM    2    closed January 28th, 2015; is that right?

12:09PM    3    A.  Yes.

12:09PM    4    Q.  Do they continue to talk after that?  Let's look at

12:09PM    5    page 186, March 17th, 2015 at 1:29 p.m.  Is that an outgoing

12:09PM    6    call from the defendant to Hot Dog for eight minutes?

12:09PM    7    A.  Yes.

12:09PM    8    Q.  Let's go to March 25th, 2015, at page 198.  I'm looking

12:10PM    9    for April 25th at 6:23 p.m.  Does the defendant call Hot Dog

12:10PM   10    again?

12:10PM   11    A.  Yes.

12:10PM   12    Q.  For how long?

12:10PM   13    A.  Two minutes.

12:10PM   14    Q.  Let's go to April 26th, at 2:25 p.m.  Does the defendant

12:10PM   15    call Hot Dog again?

12:10PM   16    A.  Yes.

12:10PM   17         **MR. TRIPI:**  Ms. Champoux, let's just search now that

12:10PM   18    number, 716-866-2687, can we do that?  How many -- may the

12:10PM   19    record reflect the search indicated there are 50 entries.

12:10PM   20         And, Ms. Champoux, can you just keep clicking through

12:10PM   21    them and we'll go through it that way.

12:12PM   22         May the record reflect we've clicked through 50 of

12:12PM   23    them.

12:12PM   24         **BY MR. TRIPI:**

12:12PM   25    Q.  Is it your understanding that the last entry, let's go to

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24
                                                                    132

12:12PM    1   page 558 in the bills here, so we're in 19013167 bills pdf of

12:12PM    2   Exhibit 358.

12:12PM    3        Is it your understanding the last entry is May 9th, 2018,

12:12PM    4   at 2:26 p.m.

12:12PM    5   A.   That appears to be, yes.

12:12PM    6   Q.   For this portion of the records?

12:12PM    7   A.   Yes.

12:12PM    8   Q.   And is that an eight-minute call?

12:12PM    9   A.   It's an eight-minute incoming phone call.

12:12PM   10   Q.   Okay.  So we've covered from 2013 to 2018.  And just to

12:12PM   11   summarize, there was communication through all of those

12:12PM   12   years?

12:12PM   13   A.   Yes.

12:12PM   14        MR. TRIPI:  And, Ms. Champoux, if we close out of

12:12PM   15   that, and briefly open the Volte spreadsheet.

12:13PM   16        BY MR. TRIPI:

12:13PM   17   Q.   We're opening an Excel spreadsheet now, 190131677,

12:13PM   18   V-O-L-T-E.

12:13PM   19        Special Agent Ryan is it your understanding that when

12:13PM   20   records are of a certain age, only bills like we looked at in

12:13PM   21   those pdfs are available, but closer in time to the subpoena,

12:13PM   22   sometimes call detail records become available?

12:13PM   23   A.   Yes.

12:13PM   24   Q.   And is that a what a Volte spreadsheet is?

12:13PM   25   A.   For Verizon, yes.

| | | |
|---|---|---|
| 12:13PM | 1 | Q.  For Verizon.  Thank you. |
| 12:13PM | 2 | **MR. TRIPI:**  I just want to look at one here. |
| 12:13PM | 3 | Ms. Champoux, can we go to January 28th, 2019.  Can you expand |
| 12:14PM | 4 | some of these columns first, expand B and C so they can see. |
| 12:14PM | 5 | Can you expand B.  All right.  Thank you. |
| 12:14PM | 6 | Now go down to January 28th, 2019, please.  We're |
| 12:14PM | 7 | past it. |
| 12:14PM | 8 | **BY MR. TRIPI:** |
| 12:14PM | 9 | Q.  Okay.  Do you see an incoming call from Hot Dog to |
| 12:14PM | 10 | Mr. Bongiovanni's DEA phone that day? |
| 12:14PM | 11 | A.  I'm trying to figure out the direction. |
| 12:14PM | 12 | Q.  Do you need to see the top? |
| 12:14PM | 13 | **MR. TRIPI:**  Go back up to the top, Ms. Champoux, so |
| 12:15PM | 14 | he can see what E and F are.  Scroll all the way to the top. |
| 12:15PM | 15 | **THE WITNESS:**  Okay.  So, E is the call number column, |
| 12:15PM | 16 | thank you. |
| 12:15PM | 17 | **MR. TRIPI:**  Now go back down, Ms. Champoux, to |
| 12:15PM | 18 | January 28th, 2019.  It should be 1407 GMT. |
| 12:15PM | 19 | **THE COURT:**  Folks, we're going to take our second |
| 12:16PM | 20 | break now. |
| 12:16PM | 21 | Please remember my instructions about not talking |
| 12:16PM | 22 | about the case and not making up your mind.  We'll see you |
| 12:16PM | 23 | back here in about ten or 15 minutes. |
| 12:16PM | 24 | (Jury excused at 12:16 p.m.) |
| 12:16PM | 25 | **THE COURT:**  Anything before we break from the |

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24
                                                                    134

| 12:16PM | 1 | defense? |

12:16PM    1    defense?

12:16PM    2         **MR. MacKAY:**  No, Your Honor.

12:16PM    3         **THE COURT:**  From the government?

12:16PM    4         **MR. TRIPI:**  No, Your Honor.

12:16PM    5         **THE COURT:**  Okay.  See you in a few minutes.

12:16PM    6         **THE CLERK:**  All rise.

12:16PM    7         (Off the record at 12:16 p.m.)

12:32PM    8         (Back on the record at 12:32 p.m.)

12:32PM    9         (Jury not present.)

12:32PM   10         **THE CLERK:**  All rise.

12:32PM   11         **THE COURT:**  Please be seated.

12:32PM   12         **THE CLERK:**  We are back on the record for the

12:32PM   13    continuation of the jury trial in case number 19-cr-227,

12:32PM   14    United States of America versus Joseph Bongiovanni.

12:33PM   15         All counsel and parties are present.

12:33PM   16         **THE COURT:**  Okay.  Are we ready to go?

12:33PM   17         **MR. TRIPI:**  Yes, Your Honor, thank you.

12:33PM   18         **THE COURT:**  Anything?

12:33PM   19         **MR. MacKAY:**  No.

12:33PM   20         **THE COURT:**  Great.  Let's bring them in.

12:34PM   21         (Jury seated at 12:34 p.m.)

12:34PM   22         **THE COURT:**  The record will reflect that all our

12:34PM   23    jurors are present.

12:34PM   24         I remind the witness he's still under oath.

12:34PM   25         Mr. Tripi, you may continue.

USA v Bongiovanni - Ryan - Tripi/Redirect - 9/12/24
135

| | | |
|---|---|---|
| 12:34PM | 1 | **MR. TRIPI:**  Thank you. |
| 12:34PM | 2 | I'd like to show you one more call related to Paul |
| 12:34PM | 3 | Francoforte, and we were having a little trouble before with |
| 12:34PM | 4 | the spreadsheet.  I think we got that squared away. |
| 12:34PM | 5 | I thank the Court and the jury for its indulgence. |
| 12:34PM | 6 | Let's pull that up, Ms. Champoux, the 19013167 |
| 12:34PM | 7 | V-O-L-T-E spreadsheet.  We've honed in on an entry at row 2511 |
| 12:35PM | 8 | dated January 28th, 2019. |
| 12:35PM | 9 | **BY MR. TRIPI:** |
| 12:35PM | 10 | Q.  And you've oriented yourself to this spreadsheet now. |
| 12:35PM | 11 | Can you tell the jury what this call is? |
| 12:35PM | 12 | A.  It's a call from 866-2687 to 818-0966 for 15 minutes. |
| 12:35PM | 13 | Q.  So that's Francoforte calling to Bongiovanni? |
| 12:35PM | 14 | A.  Yes. |
| 12:35PM | 15 | Q.  For 15 minutes or seconds? |
| 12:35PM | 16 | A.  Actually, no, that's probably seconds.  Now that I see |
| 12:35PM | 17 | the rest of those numbers without seeing the top. |
| 12:35PM | 18 | Q.  That same day, January 28th, 2019, is that the same day |
| 12:35PM | 19 | that HSI executed a search warrant at Michael Sinatra's |
| 12:35PM | 20 | residence? |
| 12:35PM | 21 | A.  Yes. |
| 12:35PM | 22 | Q.  Is there a familial relationship between Paul Francoforte |
| 12:35PM | 23 | and Michael Sinatra? |
| 12:35PM | 24 | A.  Yes. |
| 12:35PM | 25 | Q.  And what is that relationship? |

12:35PM    1    A.  Michael Sinatra is married to Paul Francoforte wife's

12:36PM    2    daughter.

12:36PM    3    Q.  Is there any explanation documented in any report in this

12:36PM    4    defendant's file, C2-13-0026, explaining Paul Francoforte's

12:36PM    5    connection to anyone in that file?

12:36PM    6    A.  None that I saw, no.

12:36PM    7           **MR. TRIPI:**  You can take that down, Ms. Champoux.

12:36PM    8           **BY MR. TRIPI:**

12:36PM    9    Q.  Yesterday you were shown Exhibit 72A-55.

12:36PM   10           **MR. TRIPI:**  Can we pull that up very briefly.  And I

12:36PM   11    think -- you can zoom in on 14, if we could.

12:36PM   12           **BY MR. TRIPI:**

12:36PM   13    Q.  Mr. MacKay directed you to a person in row number 14,

12:36PM   14    first name Wayne; do you remember that?

12:36PM   15    A.  Yes.

12:36PM   16    Q.  In this -- in this case in the investigation you

12:37PM   17    conducted, other than Wayne Anderson, did you identify any

12:37PM   18    Wayne that was connected to Joe Bongiovanni?

12:37PM   19    A.  No.

12:37PM   20    Q.  Did you identify any Wayne that had any connection to Lou

12:37PM   21    Selva?

12:37PM   22    A.  No.

12:37PM   23    Q.  Did you identify any Wayne other than Wayne Anderson that

12:37PM   24    had any connection with Anthony Gerace?

12:37PM   25           **MR. MacKAY:**  Objection to this line of questioning at

12:37PM  1   this point as relevant to what's connected to Joe Bongiovanni.

12:37PM  2            THE COURT:  Yeah, I agree.  What's the point,

12:37PM  3   Mr. Tripi?

12:37PM  4            MR. TRIPI:  I'll withdraw as to Bongiovanni.  I'll

12:37PM  5   re-ask it.

12:37PM  6            BY MR. TRIPI:

12:37PM  7   Q.  Did you identify any other Wayne that had a connection to

12:37PM  8   Anthony Gerace other than Wayne Anderson?

12:37PM  9            MR. MacKAY:  Objection.

12:37PM  10           THE COURT:  Yeah, sustained.  I don't understand what

12:37PM  11  the point is.  How do we know this Wayne is connected to

12:37PM  12  anybody -- there's thousands, maybe millions of people in this

12:37PM  13  world named Wayne, aren't there?

12:37PM  14           MR. TRIPI:  I think there's a logical inference to be

12:37PM  15  drawn from the question, Judge, but if the Court disagrees,

12:37PM  16  I'll move on.

12:37PM  17           THE COURT:  Yeah, please.

12:37PM  18           BY MR. TRIPI:

12:37PM  19  Q.  I'll ask it one different way.  The only Wayne Anderson

12:38PM  20  identified in this investigation is the Wayne Anderson that's

12:38PM  21  file title C2-13-0026; is that right?

12:38PM  22  A.  Yes.

12:38PM  23           MR. TRIPI:  We can take that down.  Ms. Champoux, can

12:38PM  24  we pull up Exhibit 310D.

12:38PM  25           BY MR. TRIPI:

12:38PM   1   Q.  Those were the text messages that you reviewed all day

12:38PM   2   yesterday essentially; do you recall that?

12:38PM   3   A.  I do.

12:38PM   4   Q.  Yesterday, Mr. MacKay cross-examined you about

12:38PM   5   communications and gaps in communication in the text

12:38PM   6   messages, generally; do you remember that line of

12:38PM   7   questioning?

12:38PM   8   A.  Yes.

12:38PM   9   Q.  Okay.  But you've reviewed at least some of the phone

12:38PM  10   records associated with Mr. Gerace and Mr. Bongiovanni; is

12:38PM  11   that true?

12:38PM  12   A.  Yes.

12:38PM  13   Q.  In between those gaps in text messages, did you observe

12:38PM  14   phone contact?

12:38PM  15   A.  Yes.

12:38PM  16   Q.  I'd like to just go through some examples of that.

12:39PM  17         **MR. TRIPI:**  We can take this down Ms. Champoux.  And

12:39PM  18   let's pull up Government Exhibit 359.  And I'm looking for the

12:39PM  19   pdf 190115566 billed calls 2014_2015.

12:39PM  20         **BY MR. TRIPI:**

12:39PM  21   Q.  And I'd like to -- so it's your understanding that the

12:39PM  22   beginning of this begins in 2014, then we go into 2015, do

12:39PM  23   you see that?

12:39PM  24   A.  Well, is this December 2013 or 2014?  Can I see when this

12:39PM  25   bill is due?

| | | |
|---|---|---|
| 12:39PM | 1 | Q.  I think we have to go to the first batch. |
| 12:39PM | 2 | A.  I think we're at the top page. |
| 12:40PM | 3 | MR. TRIPI:  One moment.  Let's zoom out of this, |
| 12:40PM | 4 | Ms. Champoux.  And let's go to billed calls 2012, 2013 for a |
| 12:40PM | 5 | moment.  Go all the way to the bottom. |
| 12:40PM | 6 | BY MR. TRIPI: |
| 12:40PM | 7 | Q.  Okay.  So you see the last date there, end of 2013 is |
| 12:40PM | 8 | 12/25? |
| 12:40PM | 9 | A.  Yes. |
| 12:40PM | 10 | Q.  Okay.  So let's go to the next pdf now.  We're still in |
| 12:40PM | 11 | 2013 here? |
| 12:40PM | 12 | A.  12/26/2013. |
| 12:40PM | 13 | Q.  Now you're oriented? |
| 12:40PM | 14 | A.  Yes.  Thank you. |
| 12:40PM | 15 | Q.  You're welcome. |
| 12:40PM | 16 | MR. TRIPI:  I'm looking for a call January 10th, |
| 12:40PM | 17 | 2015, Ms. Champoux, and I'd like to go to page 654 of this |
| 12:41PM | 18 | pdf. |
| 12:41PM | 19 | MR. MacKAY:  Judge, I'm going to object at this point |
| 12:41PM | 20 | as beyond the scope.  I believe my cross only focused on the |
| 12:41PM | 21 | June 30th cottage time and then I think it's post November |
| 12:41PM | 22 | 2017. |
| 12:41PM | 23 | MR. TRIPI:  Judge, I disagree.  I think he |
| 12:41PM | 24 | cross-examined him generally about gaps in communication. |
| 12:41PM | 25 | THE COURT:  About? |

| | | |
|---|---|---|
| 12:41PM | 1 | **MR. TRIPI:**  Gaps in communication regarding the text |
| 12:41PM | 2 | messages. |
| 12:41PM | 3 | **THE COURT:**  I'll allow it.  I'll allow it. |
| 12:41PM | 4 | **MR. TRIPI:**  Looking for a call January 10th |
| 12:41PM | 5 | between -- okay.  Thank you.  You caught it for me. |
| 12:41PM | 6 | **BY MR. TRIPI:** |
| 12:41PM | 7 | Q.  So we see this is the call detail record we're looking at |
| 12:41PM | 8 | for Mr. Gerace; do you see that? |
| 12:41PM | 9 | A.  Yes. |
| 12:41PM | 10 | Q.  And do you see a number that -- that's associated with |
| 12:41PM | 11 | Mr. Bongiovanni on January 10th, what is it, 2015 in this |
| 12:41PM | 12 | record? |
| 12:41PM | 13 | A.  Yes, that's 7:12 p.m. |
| 12:42PM | 14 | Q.  And is that an incoming or outgoing call? |
| 12:42PM | 15 | A.  That is an outgoing call from Mr. Gerace. |
| 12:42PM | 16 | Q.  So that's from Mr. Gerace to Mr. Bongiovanni |
| 12:42PM | 17 | January 10th? |
| 12:42PM | 18 | A.  Yes. |
| 12:42PM | 19 | **MR. TRIPI:**  Okay.  If we can go to page 704.  And |
| 12:42PM | 20 | look at February 16th, at 2:40. |
| 12:42PM | 21 | **BY MR. TRIPI:** |
| 12:42PM | 22 | Q.  Do we see a call there from Mr. Gerace to |
| 12:42PM | 23 | Mr. Bongiovanni? |
| 12:42PM | 24 | A.  Yes.  2:45 p.m. for six minutes. |
| 12:42PM | 25 | **MR. TRIPI:**  All right.  Now Ms. Champoux, I'd like |

12:42PM   1    you to go to Exhibit 358 for a moment.  And I'd like you to

12:43PM   2    open the bills at the top.

12:43PM   3              **BY MR. TRIPI:**

12:43PM   4    Q.  We're in Exhibit 358 now.  This is Mr. Bongiovanni's

12:43PM   5    billed records, we looked at those earlier; do you see that?

12:43PM   6    A.  Yes.

12:43PM   7              **MR. TRIPI:**  Ms. Champoux, can we go to page 177.

12:43PM   8    Looking for a call that same day, February 16th, 2015.

12:43PM   9              **BY MR. TRIPI:**

12:43PM  10    Q.  Do you see a call to Mr. Gerace?

12:43PM  11    A.  Yes, at 2:40 for one minute.

12:43PM  12    Q.  From Mr. Bongiovanni?

12:43PM  13    A.  Yes.

12:43PM  14    Q.  So that's -- is that an example of them calling each

12:43PM  15    other?

12:43PM  16    A.  Yes.

12:43PM  17    Q.  Two-way communication?

12:43PM  18    A.  Yes.

12:43PM  19    Q.  Now in your interview with Mr. Bongiovanni, he indicated

12:43PM  20    to you the communication was one way?

12:44PM  21    A.  Yes, that's correct.

12:44PM  22    Q.  I'd like to stay in this exhibit, and walk through a

12:44PM  23    couple examples.  Okay?

12:44PM  24              **MR. TRIPI:**  Ms. Champoux, if we can go to page 211,

12:44PM  25    call June 6th, 2015 at 3:55 p.m.

12:44PM    1          **BY MR. TRIPI:**

12:44PM    2    Q.  Is that an example of a call from Mr. Bongiovanni to

12:44PM    3    Mr. Gerace?

12:44PM    4    A.  Yes.

12:44PM    5    Q.  And what's the duration?

12:44PM    6    A.  Six minutes.

12:44PM    7    Q.  I'd like to stay in the same exhibit.  Let's go to

12:44PM    8    page 212, looking for a call on that day.  June 10th.

12:44PM    9        Is this an example of a nine-minute call June 10th, 2015,

12:44PM   10    from Mr. Bongiovanni to Mr. Gerace?

12:45PM   11    A.  Yes, at 6:29 p.m.

12:45PM   12    Q.  And then you see two calls below that, a call from

12:45PM   13    Mr. Bongiovanni to 903-1654?

12:45PM   14    A.  I see one above to 1654.  Oh, I see it.

12:45PM   15    Q.  Is that 903-1654, is that Lou Selva's phone number?

12:45PM   16    A.  Yes.

12:45PM   17    Q.  Let's go to a call July 19th, it's going to be at

12:45PM   18    page 226, 3:01 p.m.  Is that another example of a call in

12:45PM   19    Exhibit 358 from Mr. Bongiovanni to Mr. Gerace on July --

12:45PM   20    that one's July 19th?

12:46PM   21    A.  Yes, at 3:01 p.m. for six minutes.

12:46PM   22    Q.  I'm looking next for a call July 21st, 2015, it's going

12:46PM   23    to be at page 227.  This will be at 9:30 a.m. on July 21st.

12:46PM   24    9:34 a.m.  Sorry, I misspoke.  Is this another call from

12:46PM   25    Mr. Bongiovanni to Mr. Gerace?

12:46PM   1   A.  Yes, for seven minutes.

12:46PM   2   Q.  I'd like to go to August 1st, 2015.  It's going to be

12:46PM   3   page 234.  It should be at 6:18 p.m.  Is that another example

12:46PM   4   of a call from Mr. Bongiovanni to Mr. Gerace?

12:46PM   5   A.  Yes, for two minutes.

12:46PM   6   Q.  I'd like to go to page 244.  It should be a call at

12:47PM   7   7:25 p.m. on 9/1.  Is that an example of a call

12:47PM   8   September 21st from Mr. Bongiovanni to Mr. Gerace at

12:47PM   9   7:25 p.m.?

12:47PM  10   A.  Yes.

12:47PM  11   Q.  For how long?

12:47PM  12   A.  Two minutes.

12:47PM  13   Q.  I'd like to go to September 15th at 9:58 p.m.  That

12:47PM  14   should be at page 246 at 9:58 p.m.  Is that another example

12:47PM  15   of a call September 12th, 2015 from Mr. Bongiovanni to

12:47PM  16   Mr. Gerace at 9:58 p.m.?

12:47PM  17   A.  Yes.

12:47PM  18   Q.  And that was for a minute?

12:47PM  19   A.  One minute.

12:47PM  20   Q.  Next I'm looking for a call October 23rd, 2015, at

12:48PM  21   12:48 p.m.  That should be at page 258, at 12:48 p.m. on the

12:48PM  22   23rd.  And is that an example of an 11-minute call from

12:48PM  23   Mr. Bongiovanni to Mr. Gerace on that date, October 23rd?

12:48PM  24   A.  Yes.

12:48PM  25   Q.  Do those calls that we've just gone through fill some of

12:48PM  1   the gaps in the text messaging that was in Exhibit 310D?

12:48PM  2   A.  Yes.

12:48PM  3          MR. MacKAY:  Objection, argumentative.

12:48PM  4          MR. TRIPI:  I'm trying to frame it.

12:48PM  5          THE COURT:  No, overruled.

12:48PM  6          BY MR. TRIPI:

12:48PM  7   Q.  Was there also a gap in texts in the text thread that you

12:48PM  8   looked at from roughly November 30th, 2015 to February 22nd,

12:49PM  9   2016 where you didn't see a lot of texts from Bongiovanni

12:49PM 10   back to Gerace?

12:49PM 11   A.  Yes.

12:49PM 12   Q.  In that gap in time, were there some text -- withdrawn,

12:49PM 13   some phone calls between the two of them?

12:49PM 14   A.  Yes.

12:49PM 15          MR. TRIPI:  I'd like to stay in this exhibit,

12:49PM 16   Ms. Champoux.  And let's go to a date January 6th, 2016, at

12:49PM 17   8:16 a.m.  It should be on page 289.  And, again, that time is

12:49PM 18   8:16 a.m. on January 6th.

12:49PM 19          BY MR. TRIPI:

12:49PM 20   Q.  Is this another example of a call from Mr. Bongiovanni to

12:49PM 21   Mr. Gerace during that -- on that day?

12:49PM 22   A.  Yes.  It's a two-minute call.

12:49PM 23   Q.  And is there another call at 8:28 a.m. that same day?

12:49PM 24   A.  Yes, for four minutes.

12:49PM 25   Q.  Is that other another outgoing call from Mr. Bongiovanni

12:50PM    1    to Mr. Gerace?

12:50PM    2    A.   It is.

12:50PM    3    Q.   Was there another sort of window of time in the text

12:50PM    4    messages that you looked at in Exhibit 310D from roughly

12:50PM    5    February 22nd, 2016 until April 19th where there were less

12:50PM    6    text communications where Mr. Bongiovanni was texting back?

12:50PM    7    A.   Yes.

12:50PM    8    Q.   But were there -- were there calls that you saw during

12:50PM    9    that window of time?

12:50PM   10    A.   Yes.

12:50PM   11         **MR. TRIPI:**  Ms. Champoux, can we go to April 1, 2016?

12:50PM   12    This should be in the same exhibit on page 321.  It's going to

12:50PM   13    be April 1st, 2016 at 9:37 a.m.

12:50PM   14         **BY MR. TRIPI:**

12:50PM   15    Q.   Do you see a call from Mr. Bongiovanni to Mr. Gerace that

12:50PM   16    day?

12:50PM   17    A.   That's an incoming call.  So --

12:50PM   18    Q.   I'm sorry --

12:50PM   19    A.   -- the other direction for 31 minutes.

12:51PM   20    Q.   So from Mr. Gerace to Mr. Bongiovanni?

12:51PM   21    A.   Yes.

12:51PM   22    Q.   And how long was it for?

12:51PM   23    A.   31 minutes.

12:51PM   24    Q.   And I'd like to stick with that same date, April 21st,

12:51PM   25    2016, at 3:03 p.m.

12:51PM   1    A.  I see it.

12:51PM   2    Q.  In which direction is that call?

12:51PM   3    A.  From Mr. Bongiovanni to Mr. Gerace for two minutes.

12:51PM   4    Q.  Were you able to look at or ascertain what day of the

12:51PM   5    week it was on April 1st, 2016, if you -- if you recall?

12:51PM   6    A.  I recall doing it, I can't recall the day right now.

12:51PM   7    Q.  Let's go to April 18th, 2016.  Let's look at a call on

12:51PM   8    that date, it's going to be at page 326, at 10:36 p.m.

12:52PM   9        Is that an incoming call from Mr. Gerace to

12:52PM  10    Mr. Bongiovanni at 10:36 p.m. that day?

12:52PM  11    A.  Yes, for six minutes.

12:52PM  12    Q.  Again, this is addressing that window from February to

12:52PM  13    April of 2016, right?

12:52PM  14    A.  Yes.

12:52PM  15    Q.  And then if we go -- if you go back to 310D, after that

12:52PM  16    call, texts pick back up; is that right?  On April 19th,

12:52PM  17    2016?

12:52PM  18        **MR. TRIPI:**  Can we scroll down 310D to texts in April

12:52PM  19    of 2016, Ms. Champoux?  Scroll up a little bit further.  Yeah,

12:53PM  20    right there.

12:53PM  21        **BY MR. TRIPI:**

12:53PM  22    Q.  So we had some text communication in March, and then we

12:53PM  23    pick back up April 19th; is that right?

12:53PM  24    A.  Yes.

12:53PM  25        **MR. TRIPI:**  You can take that down.  Go back to

12:53PM    1    Exhibit 358, Ms. Champoux.

12:53PM    2    **BY MR. TRIPI:**

12:53PM    3    Q.  I'd like to show you another one.  Looking for May 28th,

12:53PM    4    2016, should be at page 340 at 2:16 p.m.  May 28th, page 340,

12:53PM    5    2:16 p.m.

12:54PM    6    Do you see calls -- a call on that day from the defendant

12:54PM    7    to Mr. Gerace?

12:54PM    8    A.  Yes, for four minutes.

12:54PM    9    Q.  And then later that day, do you see two more calls?

12:54PM    10    A.  Yes.  For two minutes, and then for three minutes.

12:54PM    11    Q.  So there are calls at 2:16, 3:37, and 3:44 p.m.?

12:54PM    12    A.  Yes.

12:54PM    13    Q.  And, again, those were just some of the calls you looked

12:54PM    14    at, you didn't look at all the records; is that right?

12:54PM    15    A.  That's right.

12:54PM    16    **MR. TRIPI:**  We can take that down, Ms. Champoux.

12:54PM    17    **BY MR. TRIPI:**

12:55PM    18    Q.  You were asked some questions yesterday about what

12:55PM    19    Special Agent Casullo did or didn't do before the Ron Serio

12:55PM    20    proffer; do you recall being asked questions about what

12:55PM    21    Special Agent Casullo did?

12:55PM    22    A.  Yes.

12:55PM    23    Q.  Fair to say Special Agent Casullo will know more about

12:55PM    24    what he did or didn't do before that proffer than you would?

12:55PM    25    **MR. MacKAY:**  Objection.

12:55PM    1          MR. TRIPI:  He was asked to speculate what someone

12:55PM    2    else did yesterday, I'm just trying to address that.

12:55PM    3          THE COURT:  What's the basis of the objection?

12:55PM    4          MR. MacKAY:  Withdrawn.

12:55PM    5          BY MR. TRIPI:

12:55PM    6    Q.  Fair to say -- can you answer that question?

12:55PM    7    A.  He will know better.

12:55PM    8    Q.  He'll know better, right?

12:55PM    9    A.  Yes.

12:55PM   10    Q.  All right.  I want to cover one more thing with you, and

12:55PM   11    then we'll be done.

12:55PM   12          MR. TRIPI:  If we can pull up 100A.1 and go back to

12:56PM   13    that OCDETF report that we looked at, Ms. Champoux.

12:56PM   14          BY MR. TRIPI:

12:56PM   15    Q.  We looked at this yesterday.  This is the Frank Tripi

12:56PM   16    OCDETF report, for lack of a better way to describe it,

12:56PM   17    correct?

12:56PM   18    A.  Yes.

12:56PM   19          MR. TRIPI:  Okay.  Ms. Champoux, let's show them

12:56PM   20    Exhibit 310AT, please.  Take this one down for a moment.

12:56PM   21          BY MR. TRIPI:

12:56PM   22    Q.  And these were the contacts in Mr. Gerace's phone; do you

12:56PM   23    remember that?

12:56PM   24    A.  Yes.

12:56PM   25          MR. TRIPI:  Ms. Champoux, can we show the entry for

12:56PM    1    Frank Tripi in this record?

12:56PM    2             BY MR. TRIPI:

12:57PM    3    Q.  Do you see that phone number, there 716-429-06 -- I'm

12:57PM    4    sorry, 429-6445?

12:57PM    5    A.  Yes.  Yes, I do.

12:57PM    6    Q.  And although the last name is spell wrong, that's a

12:57PM    7    contact in Peter Gerace's phone?

12:58PM    8    A.  Yes.

12:58PM    9    Q.  And yesterday you indicated you reviewed contacts in Ron

12:58PM   10    Serio's phone as well?

12:58PM   11    A.  Yes.

12:58PM   12    Q.  He had the same number and the same contact for Frank

12:58PM   13    Tripi, correct?

12:58PM   14    A.  Yes.

12:58PM   15             MR. TRIPI:  And I'd like to pull up Exhibit 30,

12:58PM   16    Ms. Champoux.

12:58PM   17             BY MR. TRIPI:

12:58PM   18    Q.  Now you indicated yesterday Mr. Bongiovanni's retirement

12:58PM   19    was on or about February 1st, 2019; do you recall that?

12:58PM   20    A.  Yes.

12:58PM   21             MR. TRIPI:  Can we go down to October training, is

12:58PM   22    October trainings in 2018?  I was wrong.  It's September,

12:58PM   23    right there.

12:58PM   24             BY MR. TRIPI:

12:58PM   25    Q.  Do you see, preretirement seminar he took on

| | | |
|---|---|---|
| 12:59PM | 1 | September 21st, 2018? |
| 12:59PM | 2 | A.  Yes. |
| 12:59PM | 3 | Q.  Is that date, September 21st, 2018, a date after the Ron |
| 12:59PM | 4 | Serio proffer and a date after Casullo reported the |
| 12:59PM | 5 | race-related comments? |
| 12:59PM | 6 | A.  Yes. |
| 12:59PM | 7 | Q.  Okay.  Now let's go take a look at -- go back to |
| 12:59PM | 8 | Exhibit 358 at page 610.  And we're in the 190131677 bills |
| 12:59PM | 9 | pdf.  And we're in 2018 billing cycle; do you see that? |
| 12:59PM | 10 | A.  Yes. |
| 12:59PM | 11 | Q.  So we're gonna go to a call, October 28th, 2018, with |
| 12:59PM | 12 | 429-6445.  We're looking for -- |
| 01:00PM | 13 | **MR. TRIPI:**  I might have misspoke, October 18th, |
| 01:00PM | 14 | Ms. Champoux.  It's right here.  Can you highlight that? |
| 01:00PM | 15 | **BY MR. TRIPI:** |
| 01:00PM | 16 | Q.  Do you see several calls actually on that day with that |
| 01:00PM | 17 | Frank Tripi phone?  5:30, 5:38? |
| 01:00PM | 18 | A.  Yes, I see them. |
| 01:00PM | 19 | Q.  And do you see another one on October 19th at 2:14 p.m.? |
| 01:00PM | 20 | A.  Yes. |
| 01:00PM | 21 | Q.  I misspoke, I got that one wrong.  I'm sorry.  There's |
| 01:00PM | 22 | two.  Do you see those? |
| 01:00PM | 23 | A.  October 18th at 5:30 and 5:38 p.m. |
| 01:00PM | 24 | Q.  And the outgoing call is from Mr. Bongiovanni to that |
| 01:01PM | 25 | number, 429-6445? |

01:01PM    1    A.   Yes.

01:01PM    2    Q.   And if we go to page 611, I'm looking for -- all right,

01:01PM    3    now that's the -- October of 2018 is about four months or so

01:01PM    4    and change before Mr. Bongiovanni retired?

01:01PM    5    A.   Yes.

01:01PM    6         MR. TRIPI:   And let's go back to 100A.1 and go to the

01:01PM    7    OCDETF report.   Let's scroll down.   Scroll down to the

01:02PM    8    narrative sort of the second-to-last page.   Scroll up a little

01:02PM    9    bit.   Keep going.

01:02PM   10         BY MR. TRIPI:

01:02PM   11    Q.   As she's doing that, did you see some dates in here

01:02PM   12    earlier -- there it is, March 11th, 2013?

01:02PM   13    A.   Yes.

01:02PM   14    Q.   That's a date around the time this draft is being

01:02PM   15    prepared, fair to say?

01:02PM   16    A.   I would say that this draft is prepared sometime soon

01:02PM   17    after that.

01:02PM   18    Q.   Okay.   A little over five years later, this defendant is

01:02PM   19    in phone contact with Frank Tripi from the records we just

01:02PM   20    saw?

01:02PM   21    A.   Yes.

01:02PM   22    Q.   And then this document is found in the defendant's

01:02PM   23    basement at retirement; is that right?

01:02PM   24    A.   After retirement, yes.

01:03PM   25         MR. TRIPI:   Just a moment, Judge.

| | | |
|---|---|---|
| 01:03PM | 1 | I don't have any further redirect.  Thank you, |
| 01:03PM | 2 | Your Honor. |
| 01:03PM | 3 | **THE COURT:**  Mr. MacKay? |
| 01:03PM | 4 | |
| 01:03PM | 5 | **RECROSS-EXAMINATION BY MR. MacKAY:** |
| 01:03PM | 6 | Q.  Okay.  I'll try to be brief here, Agent Ryan.  I know |
| 01:03PM | 7 | you've been here for a few days. |
| 01:03PM | 8 | **MR. MacKAY:**  All right.  So, Ms. Champoux, can we |
| 01:03PM | 9 | pull up Government Exhibit 310AT. |
| 01:03PM | 10 | **MR. TRIPI:**  Did you say AT? |
| 01:03PM | 11 | **MR. MacKAY:**  Yeah, AT, yeah, what we were looking at |
| 01:03PM | 12 | with the contacts. |
| 01:03PM | 13 | **MR. TRIPI:**  I'm sorry. |
| 01:03PM | 14 | **MR. MacKAY:**  Actually, no, let me skip this.  You can |
| 01:03PM | 15 | take this down.  Can we go back to Exhibit 358, |
| 01:03PM | 16 | Mr. Bongiovanni's call records. |
| 01:04PM | 17 | Pull up the 190 bills.  And can we again control F |
| 01:04PM | 18 | Mr. Tripi's number, 429-6445. |
| 01:04PM | 19 | Looks like it's not searching for it exactly. |
| 01:04PM | 20 | **MS. CHALBECK:**  Parker, it's easier if you just do the |
| 01:04PM | 21 | last four. |
| 01:04PM | 22 | **MR. MacKAY:**  Okay.  Can you do just 6445? |
| 01:04PM | 23 | **BY MR. MacKAY:** |
| 01:04PM | 24 | Q.  Okay.  So it comes up three times here you see in the |
| 01:04PM | 25 | search, correct? |

USA v Bongiovanni - Ryan - MacKay/Recross - 9/12/24

01:04PM    1    A.  Yes.

01:04PM    2    Q.  Okay.  October 18th, here?

01:04PM    3    A.  I see that.

01:04PM    4    Q.  Can we go to the next -- and then those two that

01:04PM    5    Mr. Tripi asked you about, Mr. Tripi asked you about

01:04PM    6    Mr. Tripi's calls.  So all three are on October 18th,

01:04PM    7    correct?

01:04PM    8    A.  October 18th, 2018, yes.

01:05PM    9    Q.  Are you aware of whether Mr. Bongiovanni was in contact

01:05PM   10    with Mr. Tripi about buying a Roomba vacuum on Facebook

01:05PM   11    marketplace?

01:05PM   12    A.  I'm not aware.

01:05PM   13    Q.  Do you know whether the FBI, prior to this trial,

01:05PM   14    interviewed Mr. Tripi about that situation, alleged

01:05PM   15    situation?

01:05PM   16    A.  I don't know.

01:05PM   17    Q.  And you don't know whether he confirmed that, do you?

01:05PM   18    A.  No.

01:05PM   19          **MR. MacKAY:**  You can take that down, Ms. Champoux,

01:05PM   20    thank you.

01:05PM   21          **BY MR. MacKAY:**

01:05PM   22    Q.  Okay.  You were asked about what Mr. -- Agent Casullo may

01:05PM   23    or may not have done prior to the July 2018 Ron Serio

01:05PM   24    proffer, correct?

01:05PM   25    A.  Yes.

USA v Bongiovanni - Ryan - MacKay/Recross - 9/12/24

01:05PM    1    Q.  Okay.  And obviously the way you reported it, it was he's

01:05PM    2    gonna know what he knows, correct?

01:05PM    3    A.  Yes.

01:05PM    4    Q.  But fair to say from what you were able to observe in

01:05PM    5    your dealings in the proffer, Mr. Casullo came to the proffer

01:06PM    6    prepared to talk about Ron Serio and the subjects that were

01:06PM    7    discussed?

01:06PM    8    A.  Yes.

01:06PM    9    Q.  Appeared -- you could tell, again, he didn't go in blind,

01:06PM   10    correct?

01:06PM   11    A.  It didn't look that way, no.

01:06PM   12    Q.  He appeared to know about the topics being discussed on

01:06PM   13    Mr. Serio, correct?

01:06PM   14    A.  Yes.

01:06PM   15    Q.  Okay.  You were shown a lot of phone logs here with the

01:06PM   16    phone bills, you went through with Mr. Tripi, and you saw all

01:06PM   17    the dates; do you remember those?

01:06PM   18    A.  I don't remember each date, but I remember doing it.

01:06PM   19    Q.  No, but you remember the format of those bills; is that

01:06PM   20    fair to say?

01:06PM   21    A.  Yes.

01:06PM   22    Q.  What those looked like?  I just don't want to go through

01:06PM   23    them all.  But is it your experience typically when you see

01:06PM   24    an entry on a phone bill and you see a one-minute entry,

01:06PM   25    that's consistent sometimes with a phone call not even

01:06PM    1    connecting?

01:06PM    2    A.   I think it's at least connected.

01:06PM    3    Q.   But beyond that, it's not clear whether there's any

01:06PM    4    contact on a one-minute call, correct?

01:07PM    5    A.   Something up to a minute, it could be a voicemail, it

01:07PM    6    could be a brief conversation.

01:07PM    7    Q.   Right.  It could be as little as, like, a second or two

01:07PM    8    long call and just registers as one minute is the least

01:07PM    9    amount of time that shows on the bills, correct?

01:07PM   10    A.   Yes.

01:07PM   11    Q.   Okay.

01:07PM   12         MR. MacKAY:   Okay.  Can we show Government Exhibit

01:07PM   13    26E please, Ms. Champoux.

01:07PM   14         BY MR. MacKAY:

01:07PM   15    Q.   Okay.  We went through this before.  This is the DARTS

01:07PM   16    email.  And the way you described it is the lower part is

01:07PM   17    sort of the original DARTS email that Mr. Bongiovanni would

01:07PM   18    have received on August 21st, 2018, correct?

01:07PM   19    A.   Yes.

01:07PM   20    Q.   And when we went through this, it would have alerted him

01:07PM   21    based on what you can see, about you doing something in

01:07PM   22    relation to the Ron Serio DTO investigation, correct?

01:07PM   23    A.   I entered those phone numbers.

01:08PM   24    Q.   Right.  So my question, though, was this email would have

01:08PM   25    shown him that you were working on something associated with

01:08PM    1    investigating a Ron Serio DTO, correct?

01:08PM    2    A.   You mean, you're asking me to decide what he concluded?

01:08PM    3    Q.   No.  I'm asking you not what he concluded, but what he's

01:08PM    4    able to see based on what he receives here in this record.

01:08PM    5    A.   And I'm just saying it's, again, like, yesterday or

01:08PM    6    whatever it was that we went through it, it's specific to

01:08PM    7    telephone numbers.  So I'm just trying to keep my answers

01:08PM    8    specific to what the email shows.

01:08PM    9    Q.   Right.  I mean --

01:08PM   10    A.   I entered a phone number, and I said it was associated to

01:08PM   11    the Ron Serio DTO.  And that's the extent of what it shows.

01:08PM   12    Q.   Yes.  And maybe we're dancing around it, but ultimately

01:08PM   13    this email Mr. Bongiovanni receives, correct?

01:08PM   14    A.   Yes.

01:08PM   15    Q.   And it's got something to do with the Ron Serio DTO,

01:08PM   16    correct?  From what you can see on the email?

01:08PM   17    A.   The phone number is associated with the Ron Serio DTO.

01:08PM   18    Yes.

01:08PM   19    Q.   And that record shows that you're doing some work with

01:08PM   20    that phone number, correct?

01:08PM   21    A.   Yes.

01:09PM   22    Q.   And then what Mr. Bongiovanni does after that, about an

01:09PM   23    hour or more after that email is sent, he appears to forward

01:09PM   24    it to his boss, correct?

01:09PM   25    A.   Yes.

01:09PM  1   Q.  Greg Yensan was his group boss at that time, correct?

01:09PM  2   A.  Yes.

01:09PM  3   Q.  So what we can tell just by looking at the email is

01:09PM  4   Mr. Bongiovanni received this, and he forwarded it to his

01:09PM  5   boss?

01:09PM  6   A.  Yes.

01:09PM  7   Q.  And just to be clear, at this time, Greg Yensan is the

01:09PM  8   D-57 boss, group supervisor in which Mr. Bongiovanni is in

01:09PM  9   that group, correct?

01:09PM  10  A.  That's correct.

01:09PM  11  Q.  But you were over in D-58 at the time, correct?

01:09PM  12  A.  Yes.

01:09PM  13         **MR. MacKAY:**  Now, you can take that down,

01:09PM  14  Ms. Champoux.  Thank you.

01:09PM  15         **BY MR. MacKAY:**

01:09PM  16  Q.  You were asked some questions on redirect about the term

01:10PM  17  "close relationship;" do you remember that?

01:10PM  18  A.  Yes.

01:10PM  19  Q.  And that was in the interview about describing the

01:10PM  20  relationship between Mr. Bongiovanni and Mr. Gerace, correct?

01:10PM  21  A.  Yes.

01:10PM  22  Q.  My -- remind me, I think you said on cross, though, you

01:10PM  23  don't remember what Mr. Bongiovanni actually said to describe

01:10PM  24  the relationship, correct?

01:10PM  25  A.  Right.  The sum and substance of his statements were that

01:10PM    1    it was a relationship that was not a close relationship.  And

01:10PM    2    a relationship where communication went one way from

01:10PM    3    Mr. Gerace to Mr. Bongiovanni.

01:10PM    4    Q.  Okay.  But I just want to be clear, the way you're

01:10PM    5    describing it, Mr. Bongiovanni doesn't use the term "close

01:10PM    6    relationship," correct?  He doesn't use that phrase, whether

01:10PM    7    he's referring to whether something is a close relationship

01:10PM    8    or not a close relationship, he doesn't use that phrase?

01:10PM    9    A.  I don't remember if he used that exact phrasing, no.

01:10PM    10    Q.  Because you can't remember the exact words he used as you

01:10PM    11    sit here today, correct?

01:10PM    12    A.  No, I remember his message.

01:10PM    13    Q.  Okay.  Okay.  And then we can respond to some of

01:11PM    14    Mr. Tripi's questions.  You talked about that there were a

01:11PM    15    lot of subpoenas and subpoena records in the Wayne Anderson

01:11PM    16    file that you reviewed, correct?

01:11PM    17    A.  Yes.

01:11PM    18    Q.  Now, there was other information and other papers in that

01:11PM    19    file as well, too, correct?

01:11PM    20    A.  Yes.

01:11PM    21    Q.  And we're talking not just about the --

01:11PM    22    A.  Actually, can I -- can we differentiate which Wayne

01:11PM    23    Anderson file you're asking about?

01:11PM    24    Q.  Yeah, I'm gonna actually expand it to be both, both the

01:11PM    25    shared file and the physical file that you found at

01:11PM    1    Mr. Bongiovanni's house.

01:11PM    2    A.  But specific to the last question, which one are you

01:11PM    3    asking me about?

01:11PM    4    Q.  I'm asking about both.

01:11PM    5    A.  Okay.

01:11PM    6    Q.  You saw things like photos that appeared to be some sort

01:11PM    7    of surveillance, correct?

01:11PM    8    A.  No.  That was a Google Maps photo.

01:11PM    9    Q.  I'm saying, did you review the shared file contents?  The

01:11PM   10    shared file contents of the Wayne Anderson file.

01:12PM   11    A.  Online shared file?

01:12PM   12    Q.  Yes.

01:12PM   13    A.  Yeah.  There were -- yes, there were photos in there.

01:12PM   14    Q.  There were photos.  That contained subpoenas, correct?

01:12PM   15    A.  Yes.

01:12PM   16    Q.  It contained the hot sheets and reports that are

01:12PM   17    generated in response to subpoenas, correct?

01:12PM   18    A.  Yes.

01:12PM   19    Q.  There were a number of subpoena utility returns, correct?

01:12PM   20    A.  There were some, yes.

01:12PM   21    Q.  You said there were some maps and locations of Google

01:12PM   22    Maps, correct?

01:12PM   23    A.  Yes.

01:12PM   24    Q.  Okay.  Appeared to be criminal histories that were run,

01:12PM   25    correct?

01:12PM    1    A.  You -- the line of questioning is a little bit of

01:12PM    2    confusing though, because you're talking about online shared

01:12PM    3    files, you're conflating them with what was in his basement.

01:12PM    4    Q.  I'm talking about in relation to the entire Wayne

01:12PM    5    Anderson investigation.  Whether it was in a physical copy or

01:12PM    6    whether it was on the shared --

01:12PM    7            MR. TRIPI:  Judge --

01:12PM    8            MR. MacKAY:  I --

01:12PM    9            MR. TRIPI:  -- I object under 403.  It's clearly the

01:12PM    10   witness is saying he's conflating two files, he can't answer

01:13PM    11   it in the way it's being asked.

01:13PM    12           THE COURT:  He hasn't asked a question yet.

01:13PM    13           MR. TRIPI:  It was right before --

01:13PM    14           THE COURT:  Ask a question.

01:13PM    15           BY MR. MacKAY:

01:13PM    16   Q.  In relation to all of the material that you saw

01:13PM    17   associated with the Wayne Anderson investigation, that's what

01:13PM    18   my -- that was done in 2013 -- that was started in 2012, went

01:13PM    19   into 2013, so I'm talking about both the physical file you

01:13PM    20   saw at Mr. Bongiovanni's house and I'm talking about the

01:13PM    21   online file, all those things I just went through, you saw

01:13PM    22   them somewhere in that investigation, correct?

01:13PM    23           MR. TRIPI:  Objection as to the term "investigation."

01:13PM    24           THE COURT:  No, I don't have a problem with that.

01:13PM    25   But the "all that" I have a problem with.

01:13PM     1        **MR. MacKAY:** Well --

01:13PM     2        **THE COURT:** So I'm going to sustain the objection to

01:13PM     3 the form of the question.

01:13PM     4        **BY MR. MacKAY:**

01:13PM     5 Q. Okay. So I listed a bunch of different things that we

01:13PM     6 talked about, different -- we'll call them investigative

01:13PM     7 materials. Do you recall all of those I just went through?

01:14PM     8 A. Yes.

01:14PM     9 Q. Like the subpoenas, correct?

01:14PM    10 A. Yes.

01:14PM    11 Q. Photos, correct?

01:14PM    12 A. Yes.

01:14PM    13 Q. The subpoena returns for utilities, correct?

01:14PM    14 A. Yes.

01:14PM    15 Q. Criminal histories, correct?

01:14PM    16 A. Yes.

01:14PM    17 Q. NADDIS searches, correct?

01:14PM    18 A. Yes.

01:14PM    19 Q. DMV records, correct?

01:14PM    20 A. Yes.

01:14PM    21 Q. Now those are all things that, in your experience as a

01:14PM    22 DEA agent, are things that are associated with investigative

01:14PM    23 steps in an investigation with the DEA, correct?

01:14PM    24 A. They're part of doing the background on targets, yes.

01:14PM    25 Q. Right. So those are background steps that are taken in

01:14PM   1   an investigation for the DEA, correct?

01:14PM   2   A.   Yes.

01:14PM   3   Q.   And no matter where the pieces of the Wayne Anderson file

01:14PM   4   were located -- on a share file, in the physical file at his

01:14PM   5   house -- you saw those things that we just went through,

01:14PM   6   correct?

01:14PM   7   A.   I guess if you're talking about after the search warrant

01:14PM   8   at his house, then yes, that's correct.

01:14PM   9   Q.   Through the course of your investigation, you came to sit

01:15PM   10   here today and you reviewed all of that material, you saw all

01:15PM   11   of those things, correct?

01:15PM   12   A.   Yes.

01:15PM   13         **MR. MacKAY:**   Okay.   No further questions, Your Honor.

01:15PM   14         **MR. TRIPI:**   I just have one, Judge.

01:15PM   15

01:15PM   16         **RE-REDIRECT EXAMINATION BY MR. TRIPI:**

01:15PM   17   Q.   To be clear, just because there was some confusion a

01:15PM   18   minute ago, there were no hot sheets or phone analysis in the

01:15PM   19   official DEA files, either in hard copy or in the shared

01:15PM   20   file, that you had access to before you did the search

01:15PM   21   warrant at the defendant's house, correct?

01:15PM   22   A.   No.   None that I saw, no.

01:15PM   23   Q.   So, correct?

01:15PM   24   A.   Correct, yes.

01:15PM   25   Q.   Those were in his basement?

Case 1:19-cr-00227-LJV-MJR   Document 1246   Filed 09/29/24   Page 163 of 164
USA v Bongiovanni - Ryan - Tripi/Re-Redirect - 9/12/24

163

01:15PM    1    A.   Yes.

01:15PM    2             **MR. TRIPI:**  Nothing further.

01:15PM    3             **MR. MacKAY:**  No further questions, Your Honor.

01:15PM    4             **THE COURT:**  Amen.  You are -- you are finally done.

           5    You may step down.  Thank you.

01:15PM    6             **THE WITNESS:**  Thank you, Your Honor.

           7             (Witness excused at 1:15 p.m.)

           8             *       *       *       *       *       *       *

           9

          10

          11                   **CERTIFICATE OF REPORTER**

          12

          13             In accordance with 28, U.S.C., 753(b), I

          14    certify that these original notes are a true and correct

          15    record of proceedings in the United States District Court for

          16    the Western District of New York on September 12, 2024.

          17

          18                          s/ Ann M. Sawyer
                                       Ann M. Sawyer, FCRR, RPR, CRR
          19                          Official Court Reporter
                                       U.S.D.C., W.D.N.Y.

          20

          21

          22

          23

          24

          25

1

2                              **TRANSCRIPT INDEX**

3          **EXCERPT - EXAMINATION OF CURTIS RYAN - DAY 3**

4                         **SEPTEMBER 12, 2024**

5

6

7     **W I T N E S S**                              **P A G E**

8     **C U R T I S   R Y A N**                       2

9       (CONT'D) CROSS-EXAMINATION BY MR. MacKAY:      2

10      REDIRECT EXAMINATION BY MR. TRIPI:            84

11      RECROSS-EXAMINATION BY MR. MacKAY:            152

12      RE-REDIRECT EXAMINATION BY MR. TRIPI:         162

13

14

15

16

17

18

19

20

21

22

23

24

25