02:46PM

1                    **UNITED STATES DISTRICT COURT**
                     **WESTERN DISTRICT OF NEW YORK**
2

3    _____
     **UNITED STATES OF AMERICA,**
                                         Case No. 1:19-cr-227
4                    Plaintiff,                   (LJV)
     v.
5                                        September 13, 2024
     **JOSEPH BONGIOVANNI,**
6
                     Defendant.
7    _____

8     **TRANSCRIPT EXCERPT - EXAMINATION OF PROTECTED WITNESS 6, R.A.**
                **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
9                    **UNITED STATES DISTRICT JUDGE**

10   <u>**APPEARANCES:**</u>        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                           **BY: JOSEPH M. TRIPI, ESQ.**
11                             **NICHOLAS T. COOPER, ESQ.**
                               **CASEY L. CHALBECK, ESQ.**
12                         Assistant United States Attorneys
                           Federal Centre, 138 Delaware Avenue
13                         Buffalo, New York 14202
                           For the Plaintiff
14
                           **SINGER LEGAL PLLC**
15                         **BY: ROBERT CHARLES SINGER, ESQ.**
                           80 East Spring Street
16                         Williamsville, New York 14221
                               And
17                         **LAW OFFICES OF PARKER ROY MacKAY**
                           **BY: PARKER ROY MacKAY, ESQ.**
18                         3110 Delaware Avenue
                           Kenmore, New York 14217
19                             And
                           **OSBORN, REED & BURKE, LLP**
20                         **BY: JOHN J. GILSENAN, ESQ.**
                           120 Allens Creek Road
21                         Rochester, New York 14618
                           For the Defendant
22
     <u>**PRESENT:**</u>           **BRIAN A. BURNS,** FBI Special Agent
23                         **MARILYN K. HALLIDAY,** HSI Special Agent
                           **KAREN A. CHAMPOUX,** USA Paralegal
24
     <u>**LAW CLERK:**</u>         **REBECCA FABIAN IZZO, ESQ.**
25

| | | |
|---|---|---|
| 1 | **COURT DEPUTY CLERK:   COLLEEN M. DEMMA** | |
| 2 | **COURT REPORTER:** | **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | | Ann_Sawyer@nywd.uscourts.gov |

5

6                    *     *     *     *     *     *     *

7

8              (Excerpt commenced at 2:46 p.m.)

9              (Jury is present.)

02:46PM   10         **THE COURT:**  The government can call its next witness.

02:46PM   11         **MR. COOPER:**  The government calls R.A., Judge.

02:46PM   12

02:48PM   13  **R. A.,** after being duly called and sworn, testified as

02:48PM   14  follows:

02:48PM   15              **MR. COOPER:**  May I inquire, Judge?

02:48PM   16              **THE COURT:**  You may.

02:48PM   17

02:48PM   18                    **DIRECT EXAMINATION BY MR. COOPER:**

02:48PM   19  Q.  Good afternoon, ma'am.

02:48PM   20  A.  Good afternoon.

02:48PM   21  Q.  Would you introduce yourself to the jury?

02:48PM   22  A.  My name is R.A.

02:48PM   23  Q.  And how old are you, Ms. R.A.?

02:48PM   24  A.  I am 42.

02:48PM   25  Q.  Where did you grow up at?

02:48PM    1    A.  Pendleton, New York.

02:48PM    2    Q.  And can you tell the jury a little bit about your

02:48PM    3    educational background?

02:48PM    4    A.  Yes.  I graduated from Starpoint High School.  I have a

02:49PM    5    degree from University of Buffalo in behavioral science.  And

02:49PM    6    I am currently in graduate school for clinical mental health

02:49PM    7    counseling.

02:49PM    8    Q.  Now, when you graduated from high school, did you start

02:49PM    9    working at that point, or did you go to school?

02:49PM    10   A.  I went to school.

02:49PM    11   Q.  Okay.  And where did you go to school initially after

02:49PM    12   high school?

02:49PM    13   A.  Syracuse University.

02:49PM    14   Q.  Okay.  And did you finish up your education at Syracuse

02:49PM    15   University at that time?

02:49PM    16   A.  No.

02:49PM    17   Q.  Okay.  What happened?

02:49PM    18   A.  I kind of took the wrong path, and started working in the

02:49PM    19   bar business.

02:49PM    20   Q.  Okay.  Did you remain working in the bar business --

02:49PM    21   first of all, what age did that start when you started

02:49PM    22   working at bars?

02:49PM    23   A.  About 19, 20.

02:49PM    24   Q.  And did you start drinking around that time?

02:49PM    25   A.  Yes.

| | | |
|---|---|---|
| 02:49PM | 1 | Q.  Did you start using marijuana? |
| 02:49PM | 2 | A.  Yes. |
| 02:49PM | 3 | Q.  Okay.  And did that kind take your life down a different |
| 02:49PM | 4 | path than you had initially expected? |
| 02:49PM | 5 | A.  Absolutely. |
| 02:49PM | 6 | Q.  Okay.  After you started working in the bar business, did |
| 02:49PM | 7 | you start working in exotic dancing? |
| 02:50PM | 8 | A.  Yes. |
| 02:50PM | 9 | Q.  At some point in your life, did alcohol use become a |
| 02:50PM | 10 | problem for you? |
| 02:50PM | 11 | A.  Yes. |
| 02:50PM | 12 | Q.  Okay.  About what age was that? |
| 02:50PM | 13 | A.  I would have to say around 19 and 20, it started |
| 02:50PM | 14 | escalating. |
| 02:50PM | 15 | Q.  Okay.  And was in something you struggled with for a |
| 02:50PM | 16 | number of years? |
| 02:50PM | 17 | A.  Absolutely. |
| 02:50PM | 18 | Q.  Is it something that is a problem the same way for you |
| 02:50PM | 19 | today? |
| 02:50PM | 20 | A.  No. |
| 02:50PM | 21 | Q.  When's the last time you drank alcohol? |
| 02:50PM | 22 | A.  January 5th, 2017. |
| 02:50PM | 23 | Q.  What's the last time you used drugs? |
| 02:50PM | 24 | A.  2016. |
| 02:50PM | 25 | Q.  From that age, 19 or 20, that you told us about a moment |

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

5

| 02:50PM | 1 | ago, did the alcohol use and drug use progress? |
| 02:50PM | 2 | A.   Yes. |
| 02:50PM | 3 | Q.   Did it get worse over time? |
| 02:50PM | 4 | A.   Yes. |
| 02:50PM | 5 | Q.   What kind of drugs did you use during that time in your |
| 02:50PM | 6 | life? |
| 02:50PM | 7 | A.   I used a lot of drugs.  I used cocaine, heroin, ecstasy, |
| 02:50PM | 8 | pretty much anything I could get my hands on. |
| 02:50PM | 9 | Q.   When you -- when you left Syracuse, you said you started |
| 02:51PM | 10 | working at bars; is that right? |
| 02:51PM | 11 | A.   Yes. |
| 02:51PM | 12 | Q.   What bars were you working at? |
| 02:51PM | 13 | A.   Mademoiselle's, Rick's Tally-Ho, Colonie. |
| 02:51PM | 14 | Q.   Okay.  And Mademoiselle's, is that a bar that also offers |
| 02:51PM | 15 | exotic dancing there? |
| 02:51PM | 16 | A.   Yes. |
| 02:51PM | 17 | Q.   And how about Rick's Tally-Ho? |
| 02:51PM | 18 | A.   Yes. |
| 02:51PM | 19 | Q.   And Colonie, is that an exotic dancing club? |
| 02:51PM | 20 | A.   Yes. |
| 02:51PM | 21 | Q.   Can you describe for the jury how working in that |
| 02:51PM | 22 | industry in strip clubs impacted your drug and alcohol use? |
| 02:51PM | 23 | A.   Of course.  Usually, it's very difficult to work a job |
| 02:51PM | 24 | like that sober.  There's a -- it's a very hostile |
| 02:51PM | 25 | environment.  You're working with other exotic dancers, men, |

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

02:51PM  1   you don't know who they are or where they're from.  And drug

02:51PM  2   use is very common.

02:51PM  3   Q.  Did working in that industry cause your drug use to

02:51PM  4   escalate?

02:51PM  5   A.  Yes.

02:51PM  6   Q.  Was there a time when you were working in that exotic

02:52PM  7   dancing industry when you began using cocaine basically every

02:52PM  8   day that you worked?

02:52PM  9   A.  Yes.

02:52PM  10  Q.  And at some point, did you switch from working as a

02:52PM  11  bartender to working as a dancer in those clubs?

02:52PM  12  A.  Yes.

02:52PM  13  Q.  What's the total timeframe that you worked in that

02:52PM  14  industry?  From what age to what age?

02:52PM  15  A.  I would have to say from 19 to about 22.

02:52PM  16  Q.  Okay.  And would that be sometime around 2004, 2005 when

02:52PM  17  you were 22?

02:52PM  18  A.  Yes.

02:52PM  19  Q.  Okay.  Did there come a time when you met a person by the

02:52PM  20  name of Craig Border?

02:52PM  21  A.  Yes.

02:52PM  22  Q.  Was there a time in your life when Craig Border was a

02:52PM  23  boyfriend of yours?

02:52PM  24  A.  He was someone I dated.

02:52PM  25  Q.  How long did you date Craig Border for?

02:52PM   1    A.   Maybe to two or three months.

02:52PM   2    Q.   And during the two or three months that you were dating

02:53PM   3    Craig Border, I'm not trying to embarrass you, did Craig

02:53PM   4    Border have some photographs of you in some lingerie or some

02:53PM   5    revealing clothing?

02:53PM   6    A.   Yes.

02:53PM   7    Q.   Did you know that he had those photos of you?

02:53PM   8    A.   I wasn't sure if I knew he had photos, but I definitely

02:53PM   9    took the photos --

02:53PM   10   Q.   Okay.

02:53PM   11   A.   -- or, he took the photos.

02:53PM   12   Q.   Okay.  Let me try to --

02:53PM   13   A.   Okay.

02:53PM   14   Q.   You were aware at some time during your two- or

02:53PM   15   three-month relationship with Craig Border that he took some

02:53PM   16   pictures of you in some lingerie or some kind of outfit?

02:53PM   17   A.   Yes.

02:53PM   18   Q.   Yeah?

02:53PM   19   A.   Yes.

02:53PM   20   Q.   Did there -- we're going to come back to that in a

02:53PM   21   minute.  Did there come a time when you met an individual

02:53PM   22   named Peter Gerace?

02:53PM   23   A.   Yes.

02:53PM   24   Q.   How did you meet that person?

02:53PM   25   A.   I met him at Mademoiselle's, and I also had met him at

| | | |
|---|---|---|
| 02:53PM | 1 | his restaurant at the time. |
| 02:53PM | 2 | Q.  Okay.  And what restaurant was that? |
| 02:53PM | 3 | A.  It was called Pietro's. |
| 02:53PM | 4 | Q.  When you met him at Mademoiselle's, was that a time when |
| 02:53PM | 5 | you were working there? |
| 02:53PM | 6 | A.  Yes. |
| 02:53PM | 7 | Q.  Was he working there at that time? |
| 02:53PM | 8 | A.  No. |
| 02:53PM | 9 | Q.  Was he a patron when you met him? |
| 02:53PM | 10 | A.  Yes. |
| 02:54PM | 11 | Q.  Okay.  And did you develop or eventually develop a |
| 02:54PM | 12 | relationship with Peter Gerace? |
| 02:54PM | 13 | A.  Yes. |
| 02:54PM | 14 | Q.  Can you describe that for the jury? |
| 02:54PM | 15 | A.  Yes.  I eventually married him, and we had a child |
| 02:54PM | 16 | together. |
| 02:54PM | 17 | Q.  What was the period of time from when you first met Peter |
| 02:54PM | 18 | Gerace at Mademoiselle's to when you began a relationship |
| 02:54PM | 19 | with him? |
| 02:54PM | 20 | A.  It really progressed very quickly.  Probably within a |
| 02:54PM | 21 | matter of two weeks. |
| 02:54PM | 22 | Q.  Okay.  And eventually you said that you and Peter had a |
| 02:54PM | 23 | child together? |
| 02:54PM | 24 | A.  Yes. |
| 02:54PM | 25 | Q.  What year was that that you had a child? |

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

9

| | | |
|---|---|---|
| 02:54PM | 1 | A.  2006. |
| 02:54PM | 2 | Q.  In those couple months -- I'm going to withdraw that. |
| 02:54PM | 3 | Do you remember what year you first met Peter? |
| 02:54PM | 4 | A.  2004, 2005. |
| 02:54PM | 5 | Q.  Okay.  And then by about a year later, give or take, you |
| 02:54PM | 6 | guys had a child together? |
| 02:54PM | 7 | A.  Yes. |
| 02:54PM | 8 | Q.  Okay.  During the period of months while you were dating |
| 02:55PM | 9 | Peter but before you had a child together, were you guys |
| 02:55PM | 10 | living together? |
| 02:55PM | 11 | A.  Yes. |
| 02:55PM | 12 | Q.  Did you socialize together? |
| 02:55PM | 13 | A.  Yes. |
| 02:55PM | 14 | Q.  Did you go out with other people and hang out? |
| 02:55PM | 15 | A.  Yes. |
| 02:55PM | 16 | Q.  Did you get to know some of Peter's friends? |
| 02:55PM | 17 | A.  Yes. |
| 02:55PM | 18 | Q.  Now you told the jury a few moments ago that in that age |
| 02:55PM | 19 | range of, like, 19 to 22, cocaine use and alcohol use had |
| 02:55PM | 20 | become a problem for you; is that right? |
| 02:55PM | 21 | A.  Yes. |
| 02:55PM | 22 | Q.  Did something cause your cocaine use to drop off pretty |
| 02:55PM | 23 | significantly at one point? |
| 02:55PM | 24 | A.  Yes, I became pregnant. |
| 02:55PM | 25 | Q.  Okay.  And did that cause you to stop going out and |

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

02:55PM   1   partying with cocaine or using it at work?

02:55PM   2   A.  Yes, I stopped using completely.

02:55PM   3   Q.  Do you know an individual by the name of Joe Bongiovanni?

02:55PM   4   A.  Yes.

02:55PM   5   Q.  How do you know that person?

02:55PM   6   A.  He was friends with Peter.

02:55PM   7   Q.  When did you first meet Joe Bongiovanni?

02:55PM   8   A.  I met him, I think, either -- probably 2004.

02:55PM   9   Q.  Did you meet him by yourself, or were you with someone?

02:55PM  10   A.  I was with Peter.

02:56PM  11   Q.  And did Peter introduce you to Joe?

02:56PM  12   A.  Yes.

02:56PM  13   Q.  What did he say?

02:56PM  14   A.  This is my friend Joe.

02:56PM  15   Q.  Was that the only time that you remember meeting him?

02:56PM  16   A.  No.

02:56PM  17   Q.  Okay.  Have you seen him and socialized with him at

02:56PM  18   different places other than just SoHo?

02:56PM  19   A.  Yes.

02:56PM  20   Q.  Can you describe some of the things that you did with

02:56PM  21   Peter and Joe Bongiovanni?

02:56PM  22   A.  We went to dinner.  We went on a trip.  So, I don't know,

02:56PM  23   we did kind of socialization things.

02:56PM  24   Q.  Okay.  Where did you go on a trip together?

02:56PM  25   A.  We went to Ellicottville.

02:56PM  1   Q.  What's Ellicottville?

02:56PM  2   A.  It's, like, a ski country with shops and bars.  It's

02:56PM  3   cute, quaint town.

02:56PM  4   Q.  Okay.  And was that trip to Ellicottville with Peter and

02:56PM  5   Joe, was that something that was planned in advance?

02:56PM  6   A.  Yes.

02:56PM  7   Q.  Who else was on that trip, do you remember?

02:56PM  8   A.  Joe, me, Peter, and his girlfriend at the time, I don't

02:56PM  9   recall her name.

02:56PM  10  Q.  Whose girlfriend?

02:56PM  11  A.  Joe's girlfriend.

02:56PM  12  Q.  Okay.  So it was the four of you?

02:56PM  13  A.  Yes.

02:56PM  14       MR. COOPER:  Ms. Champoux, can we pull up what's

02:57PM  15  already in evidence as Government Exhibit 421 -- or, 426-1, I

02:57PM  16  apologize.  You can put that up for everybody.  Thank you.

02:57PM  17       BY MR. COOPER:

02:57PM  18  Q.  Do you see the picture on your screen?

02:57PM  19  A.  Yes.

02:57PM  20  Q.  You have a screen right there, too.

02:57PM  21  A.  Oh, right there.  Thank you.

02:57PM  22  Q.  Do you see that picture?

02:57PM  23  A.  Yes.

02:57PM  24  Q.  Who's in the red shirt right there?

02:57PM  25  A.  That's me.

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

12

02:57PM   1   Q.  And to the right side of the photograph in the green

02:57PM   2   shirt, who's that?

02:57PM   3   A.  Peter.

02:57PM   4   Q.  And all the way on the left in the burgundy shirt, who's

02:57PM   5   that?

02:57PM   6   A.  Joe.

02:57PM   7   Q.  And in the shirt, the cream-colored shirt or white shirt,

02:57PM   8   who's that?

02:57PM   9   A.  His girlfriend at the time.

02:57PM  10   Q.  And do you recall her name as you sit here today?

02:57PM  11   A.  No.

02:57PM  12   Q.  Is that the same group of four people that went out to

02:57PM  13   Ellicottville together?

02:57PM  14   A.  Yes.

02:57PM  15   Q.  And is that around the same time generally?

02:57PM  16   A.  Yes.

02:57PM  17   Q.  Do you remember this night in particular?

02:57PM  18   A.  Yes.

02:57PM  19   Q.  What was this night about?

02:57PM  20   A.  We went out to dinner, I think we had some drinks.  I

02:57PM  21   think we were at a bar called Balloons.

02:58PM  22   Q.  And was that a planned event?

02:58PM  23   A.  Yes.

02:58PM  24   Q.  Did there come a time when you learned what Joe --

02:58PM  25   Peter's friend Joe Bongiovanni did for work?

02:58PM  1    A.  Yes.

02:58PM  2    Q.  Okay.  And what was that?

02:58PM  3    A.  I -- well, Peter told me that he worked for the DEA.

02:58PM  4    Q.  Can you describe for this jury how you learned, like, the

02:58PM  5    context of how you learned that Joe Bongiovanni worked for

02:58PM  6    the DEA?

02:58PM  7    A.  I guess what had happened was -- was Peter had came up to

02:58PM  8    me and said that he -- or, Joe had seen --

02:58PM  9             **MR. SINGER:**  Objection, hearsay.

02:58PM  10            **MR. COOPER:**  Judge, can we come up?

02:58PM  11            **THE COURT:**  Sure.

02:58PM  12            (Sidebar discussion held on the record.)

02:59PM  13            **MR. COOPER:**  So, Judge, this is the same question and

02:59PM  14   answer that we did at the last trial.

02:59PM  15            I do think that we litigated it at the last trial.

02:59PM  16   There's not an objection right here in the direct.

02:59PM  17            But essentially, the chain of events is Peter

02:59PM  18   confronts her with this and says there's this picture of you,

02:59PM  19   whatever.  Joe told me he pulled it out of some guy's house.

02:59PM  20            The context of him -- of her learning that the

02:59PM  21   defendant works for the DEA is the conversation with Peter

02:59PM  22   where he tells her, you know, I'm doing -- Peter tells her Joe

02:59PM  23   showed me this photograph.

02:59PM  24            And, so, I -- first of all, I don't think it's in

02:59PM  25   dispute at the trial that the defendant works for the DEA.  He

| | | |
|---|---|---|
| 02:59PM | 1 | works for the DEA.  And the confronting her with -- about the |
| 02:59PM | 2 | photograph is nonhearsay, so -- |
| 03:00PM | 3 | **MR. SINGER:**  The confrontation about the photograph |
| 03:00PM | 4 | is hearsay, Judge. |
| 03:00PM | 5 | **THE COURT:**  Why? |
| 03:00PM | 6 | **MR. SINGER:**  It's not in furtherance of the |
| 03:00PM | 7 | conspiracy.  This is a statement made by Peter Gerace.  The |
| 03:00PM | 8 | government's attempting to offer it for the truth of the |
| 03:00PM | 9 | matter asserted.  It has nothing to do with furthering the |
| 03:00PM | 10 | conspiracy whatsoever at that point in time, it's hearsay. |
| 03:00PM | 11 | I mean, I realize -- |
| 03:00PM | 12 | **THE COURT:**  If he says the defendant told me that |
| 03:00PM | 13 | there are pictures that he found on his job. |
| 03:00PM | 14 | **MR. SINGER:**  Um-hum. |
| 03:00PM | 15 | **THE COURT:**  Right? |
| 03:00PM | 16 | **MR. SINGER:**  It's hearsay. |
| 03:00PM | 17 | **THE COURT:**  It's a statement -- Bongiovanni's |
| 03:00PM | 18 | statement -- |
| 03:00PM | 19 | **THE REPORTER:**  I can't hear the judge. |
| 03:00PM | 20 | **THE COURT:**  I'm thinking out loud, Ann. |
| 03:00PM | 21 | Bongiovanni's statement that Peter is not hearsay, |
| 03:00PM | 22 | why isn't Peter's statement to her hearsay? |
| 03:00PM | 23 | **MR. COOPER:**  So, first of all, Judge, I think that |
| 03:00PM | 24 | the defendant is searching a drug dealer's house.  He finds |
| 03:00PM | 25 | these pictures of somebody related to Peter -- |

03:00PM  1        **THE COURT:**  But that's --

03:00PM  2        **MR. COOPER:**  Hold on.  I'm just -- may I --

03:00PM  3        I apologize.

03:00PM  4        I think it is a statement that's made in furtherance

03:01PM  5   of the -- the statement that Bongiovanni makes to him, working

03:01PM  6   our way back, would be a party opponent, but also in

03:01PM  7   furtherance of the conspiracy.

03:01PM  8        **THE COURT:**  I agree.

03:01PM  9        **MR. COOPER:**  It's like, hey, your girlfriend has nude

03:01PM  10  pictures or whatever in a drug dealer's house.

03:01PM  11       **THE COURT:**  Yep.

03:01PM  12       **MR. COOPER:**  The statement that Peter makes to her is

03:01PM  13  it's somebody he socializes with, that lives with him, there's

03:01PM  14  an association between her and a drug dealer, he learns it

03:01PM  15  from the defendant, and he confronts her with it.

03:01PM  16       So it's information related to a drug investigation

03:01PM  17  that the defendant passes to the person that he's allegedly

03:01PM  18  bribed by, that's what this trial is about.

03:01PM  19       And this woman, who has an association with that

03:01PM  20  drug trafficker, is informed by Peter Gerace the DEA searched

03:01PM  21  this guy's house.

03:01PM  22       **MR. TRIPI:**  If I can just jump in for a case to

03:01PM  23  amplify the point?  On the coconspirator argument, what

03:01PM  24  Mr. Cooper's arguing is essentially it's a coconspirator

03:01PM  25  statement.  The problem that I think defense and you have is

03:01PM    1    Ms. M.U. is not part of that conspiracy, right?

03:01PM    2            THE COURT:  R.A.

03:02PM    3            MR. TRIPI:  I'm sorry, I'm confused.  R.A. is not

03:02PM    4    part of the conspiracy.

03:02PM    5            I believe that's the Beechnut case in the 2nd Circuit

03:02PM    6    which says essentially you don't have to be a member of the

03:02PM    7    conspiracy to be the recept --

03:02PM    8            THE COURT:  Receive the --

03:02PM    9            MR. TRIPI:  -- and to transmit the coconspirator's

03:02PM    10   statement.

03:02PM    11           So, I would ask the Court to look at that, perhaps,

03:02PM    12   for five minutes before saying no.

03:02PM    13           THE COURT:  No, no, I'm not -- I'm more saying yes

03:02PM    14   than no right now.

03:02PM    15           MR. TRIPI:  Yeah, okay.

03:02PM    16           THE COURT:  Tell me why he's not -- so the statement

03:02PM    17   from Bongiovanni -- do you agree with me the statement from

03:02PM    18   Bongiovanni to Gerace is not hearsay?

03:02PM    19           MR. SINGER:  Yeah, it's a party opponent, so I don't

03:02PM    20   have any argument on that.  So it's hearsay within hearsay.

03:02PM    21           THE COURT:  It's the Gerace statement to her --

03:02PM    22           MR. SINGER:  Yeah, that was my objection, was based

03:02PM    23   on the hearsay that Gerace is providing to R.A.  So, again,

03:02PM    24   like, if you look at --

03:02PM    25           THE COURT:  Gerace says Joe Bongiovanni told me.

03:02PM  1          **MR. SINGER:**  X, Y, Z.

03:03PM  2          **THE COURT:**  Yes.

03:03PM  3          **MR. SINGER:**  And that's hearsay.

03:03PM  4          **THE COURT:**  No, well, let's think about this for a

03:03PM  5  second.

03:03PM  6          **MR. SINGER:**  Okay.

03:03PM  7          **THE COURT:**  Joe Bongiovanni -- so, so the -- the

03:03PM  8  truth of the fact that Joe Bongiovanni told him that is what

03:03PM  9  you're admitting the statement for?

03:03PM 10          **MR. SINGER:**  Yeah, they're offering it -- it's not to

03:03PM 11  show the effect on the listener or anything like that.  It's

03:03PM 12  being offered --

03:03PM 13          **MR. COOPER:**  Yeah, and I haven't argued that it was.

03:03PM 14  It's a coconspirator statement.

03:03PM 15          **THE COURT:**  Right.  So it's a coconspirator

03:03PM 16  statement.  How is it in furtherance of the conspiracy?

03:03PM 17          **MR. COOPER:**  Because his child's -- the person who

03:03PM 18  becomes his child's mother, who's living with him at the time,

03:03PM 19  has an association with a drug trafficker.

03:03PM 20          The DEA agent that Peter Gerace is allegedly

03:03PM 21  bribing -- right, what this trial is about -- is providing him

03:03PM 22  information.  Hey, a person you live with has this association

03:03PM 23  to a drug dealer whose house we just raided.

03:03PM 24          I mean, that -- it's --

03:03PM 25          **MR. TRIPI:**  It's Gerace weaponizing the information

03:03PM    1    that he's received as part of the conspiracy.  And this is

03:03PM    2    what he needs to --

03:03PM    3         **THE COURT:**  How is Gerace's statement to --

03:04PM    4    R.A.?

03:04PM    5         **MR. COOPER:**  Yes.

03:04PM    6         **THE COURT:**  -- how is Gerace's statement to R.A. in

03:04PM    7    furtherance of the conspiracy?  How does that further the

03:04PM    8    conspiracy?

03:04PM    9         **MR. COOPER:**  It's -- it's alerting her that the DEA

03:04PM   10    has raided the home of a drug trafficker, which is information

03:04PM   11    that Peter never should have had that he received from the

03:04PM   12    defendant.

03:04PM   13         He conveys it to this person whom he's close with

03:04PM   14    because she's a cocaine user, this guy's a drug dealer, and

03:04PM   15    he's telling her the DEA was in this person's house searching.

03:04PM   16         **MR. TRIPI:**  Judge, if I may?

03:04PM   17         **THE COURT:**  Yeah.

03:04PM   18         **MR. TRIPI:**  The coconspirator statement is the

03:04PM   19    statement Bongiovanni to Gerace we, in sum and substance, we

03:04PM   20    raided a drug dealer's house, and R.A. has pictures in the

03:04PM   21    house.  That's the statement.

03:04PM   22         **THE COURT:**  I get that.

03:04PM   23         **MR. TRIPI:**  Right?  So --

03:04PM   24         **THE COURT:**  No, no, the statement -- the statement

03:04PM   25    that she's going to testify to is Gerace says Bongiovanni --

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24
19

03:04PM    1    **MR. TRIPI:** Told me. Right? So that's the

03:05PM    2    coconspiracy. Bongiovanni told me --

03:05PM    3    **THE COURT:** Bongiovanni told me.

03:05PM    4    **MR. TRIPI:** So that goes -- that's the Beechnut case.

03:05PM    5    That is --

03:05PM    6    **THE COURT:** Okay. I'm going to look at the case.

03:05PM    7    **MR. TRIPI:** -- she needs -- she can transmit the

03:05PM    8    Joe/Peter conversation even if she's not a coconspirator.

03:05PM    9    So on the analysis on the furtherance prong that you

03:05PM    10    asked about is: Is the conversation, that statement, Joe to

03:05PM    11    Peter, in furtherance of.

03:05PM    12    **THE COURT:** No.

03:05PM    13    **MR. TRIPI:** We would submit --

03:05PM    14    **THE COURT:** No, no. The furtherance has to be the

03:05PM    15    statement from Peter to her.

03:05PM    16    **MR. SINGER:** Correct.

03:05PM    17    **THE COURT:** Is that in furtherance of a conspiracy.

03:05PM    18    Because that's -- that's the --

03:05PM    19    **MR. TRIPI:** But that's the --

03:05PM    20    **MR. SINGER:** That's the basis of my objection.

03:05PM    21    **MR. TRIPI:** -- that's the back end of the information

03:05PM    22    he received. So it doesn't further anything if it's not

03:05PM    23    information important to Peter that he's going to use to

03:05PM    24    confront this person.

03:05PM    25    **MR. SINGER:** Right.

03:05PM    1           **THE COURT:**  But the point -- so, this is hearsay

03:05PM    2    within hearsay, right?  And the hearsay statement -- okay,

03:05PM    3    let's excuse the jury.

03:05PM    4           **MR. TRIPI:**  I'm sorry, Your Honor.

03:05PM    5           **THE COURT:**  No, no, that's okay.  This is an

03:05PM    6    interesting question.

03:05PM    7           (End of sidebar discussion.)

03:05PM    8           **THE COURT:**  Okay, folks.  We have a pretty

03:06PM    9    interesting legal issue that we need to argue outside your

03:06PM   10    presence, so we'll take our second and last afternoon break

03:06PM   11    now.

03:06PM   12           Please remember my instructions about not talking

03:06PM   13    about the case even with each other, and not making up your

03:06PM   14    mind.  We'll see you back here as soon as we're done.

03:06PM   15           (Jury excused at 3:06 p.m.)

03:06PM   16           **THE COURT:**  Mr. Tripi, do you have a cite for the

03:06PM   17    Beechnut case?

03:06PM   18           **MR. TRIPI:**  In my --

03:06PM   19           **MS. CHALBECK:**  I've got it, Judge.

03:06PM   20           **MR. TRIPI:**  Thank you.

03:06PM   21           **MS. CHALBECK:**  I believe it's 871 F.2d 1181,

03:06PM   22    2nd Circuit, 1989.

03:06PM   23           **THE COURT:**  Can you find that?

03:06PM   24           **MS. IZZO:**  Ms. Chalbeck, could you say that again?

03:07PM   25    Sorry.

03:07PM    1            **MR. COOPER:**  Slower.

03:07PM    2            **THE COURT:**  Oh, look who's talking.

03:07PM    3            **MS. CHALBECK:**  871 F.2d 1181, 2nd Circuit, 1989.  I

03:07PM    4    think it's United States versus Beechnut Nutrition Corp.

03:07PM    5            Does that sound right, Joe?

03:07PM    6            **MR. TRIPI:**  That sounds right.

03:07PM    7            **THE COURT:**  Okay.  So here's -- I'm going to --

03:07PM    8    everybody can sit.

03:07PM    9            **MR. COOPER:**  Can we excuse the witness?

03:07PM    10           **THE COURT:**  Oh, I'm sorry.  Yeah.

03:07PM    11           **MR. COOPER:**  Thank you.

03:07PM    12           **THE COURT:**  You can step down, ma'am, please.

03:07PM    13           **THE WITNESS:**  Oh, okay.

03:07PM    14           **MR. COOPER:**  You didn't do anything wrong.

03:07PM    15           **THE COURT:**  No, you didn't do anything wrong.

03:07PM    16           **MS. CHALBECK:**  We did something wrong.

03:07PM    17           **MR. COOPER:**  Yeah, we just have to have a legal

03:07PM    18    argument in here without you.

03:07PM    19           **THE COURT:**  I forgot she was still there.

03:07PM    20           (Witness excused at 3:07 p.m.)

03:07PM    21           **THE COURT:**  So as understand it, what's being

03:07PM    22    elicited right now is the fact that Gerace says to her:

03:08PM    23    Bongiovanni told me that law enforcement has some photos of

03:08PM    24    you, some photos of you in lingerie.

03:08PM    25           And so that's -- so this is -- so there's two

03:08PM    1    statements that we're talking about here.

03:08PM    2         **MR. COOPER:**  Before we -- can I read you -- because I

03:08PM    3    think the words that I expect her to say are important for the

03:08PM    4    analysis on the --

03:08PM    5         **THE COURT:**  Go right ahead.

03:08PM    6         **MR. COOPER:**  So the answer that she gave, I asked

03:08PM    7    her:

03:08PM    8         "Question:  What does Pete say to you?

03:08PM    9         This is page 13 of her trial transcript.

03:08PM    10        "Answer:  Pete says to me, oh, Joe saw a picture of

03:08PM    11   you in this guy's house, this drug dealer's house or

03:08PM    12   something."

03:08PM    13        So that's the -- the statement that she makes, and

03:08PM    14   then she further clarifies that he tells her --

03:08PM    15        **THE COURT:**  Okay.

03:08PM    16        **MR. COOPER:**  -- that he's a DEA agent.

03:08PM    17        **THE COURT:**  So Bongiovanni says to Gerace:  I saw a

03:08PM    18   picture of R.A. in a drug dealer's house?

03:08PM    19        **MR. COOPER:**  Or he gives it to him, but yeah,

03:08PM    20   something like that.

03:08PM    21        **THE COURT:**  Whatever -- that's not -- that's not

03:08PM    22   hearsay, because that's a statement by a party --

03:09PM    23        **MR. COOPER:**  Agreed.

03:09PM    24        **THE COURT:**  -- and -- and probably in furtherance of

03:09PM    25   the conspiracy as well.

03:09PM    1      But the statement from Gerace to R.A. that

03:09PM    2   Bongiovanni said to me, he saw a photo of you in lingerie in a

03:09PM    3   drug dealer's house, that's hearsay.

03:09PM    4      And unless it's a statement of a coconspirator in

03:09PM    5   furtherance of the conspiracy, and I don't see how that's in

03:09PM    6   furtherance of the conspiracy --

03:09PM    7      **MR. COOPER:**  So if John Smith and Jane Smith live

03:09PM    8   together.  And John Smith's in a conspiracy with another

03:09PM    9   person, a drug conspiracy.  And the other person says, hey,

03:09PM   10   Jane Smith was interacting with this other drug dealer, and

03:09PM   11   that person's hot.  Law enforcement searched their house,

03:09PM   12   they're on to them.  And John Smith conveys that to Jane

03:09PM   13   Smith:  You were at a person's house, or there's pictures of

03:09PM   14   you in a person's house who's on law enforcement's radar.

03:10PM   15      It's protecting John Smith.  Because a person who

03:10PM   16   lives with him has exposure to someone who's on law

03:10PM   17   enforcement's radar.

03:10PM   18      **THE COURT:**  But isn't that --

03:10PM   19      **MR. COOPER:**  So they're --

03:10PM   20      **THE COURT:**  -- different than here where the reason

03:10PM   21   that he's telling her that there's photos of her is that he

03:10PM   22   wants to, I mean, he's concerned about the fact that there are

03:10PM   23   photos of his girlfriend out there.  That's different than --

03:10PM   24      **MR. COOPER:**  I don't know that to be the case, and

03:10PM   25   there's not that testimony.  He's --

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:10PM  1    **THE COURT:**  What's the protection?  Is she a

03:10PM  2  conspirator?

03:10PM  3    **MR. COOPER:**  I don't believe so.

03:10PM  4    **THE COURT:**  Okay.  So what's then the protection that

03:10PM  5  is gonna happen by virtue of his telling her that?

03:10PM  6    **MR. COOPER:**  So the inference, and I would suggest to

03:10PM  7  the Court, is that she's going to stay away from this person

03:10PM  8  whose house was just raided by law enforcement, because

03:10PM  9  Peter's telling her this person's house was just raided by law

03:10PM  10  enforcement and your picture was in there.

03:10PM  11    And that protects Peter.  Because Peter lives with

03:10PM  12  her, and they socialize together.  And I expect that there is

03:11PM  13  going to be testimony that there's heavy cocaine use by her

03:11PM  14  and by Peter.

03:11PM  15    And it doesn't -- I don't think that it needs to be

03:11PM  16  her being a conspirator for it to be protecting of Peter to

03:11PM  17  say, hey, this guy's hot right now.  Your picture was in his

03:11PM  18  house.  The Feds just raided his house.

03:11PM  19    That helps Peter isolate Peter.

03:11PM  20    **THE COURT:**  Yeah, why not, Mr. Singer?

03:11PM  21    **MR. SINGER:**  So in our initial brief, Judge, we cited

03:11PM  22  one case, United States v -- I'm gonna butcher this, sorry,

03:11PM  23  Katsougrakis, which is K-A-T-S-O-U-G-R-A-K-I-S --

03:11PM  24    **THE COURT:**  That's not as bad as Mr. Cooper butchered

03:11PM  25  Buscaglia.

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:11PM 1       **MR. SINGER:**  So it's 715 F.2d 769, 2nd Circuit, 1983.

03:11PM 2       And so what the 2nd Circuit said in that case is that

03:11PM 3  when you're talking about statements made in furtherance under

03:11PM 4  801(d)(2)(E), it has to prompt the listener to respond in a

03:11PM 5  way that facilitates the carrying out of some type of criminal

03:12PM 6  activity.

03:12PM 7       And so what we've had in this case is, you know,

03:12PM 8  like, we've had situations where Lou Selva was testifying to

03:12PM 9  statements made by other coconspirators involved in the Serio

03:12PM 10  DTO that would have prompted him to engage in the criminal

03:12PM 11  activity, or prompted other people to take certain actions as

03:12PM 12  part of the criminal activity.

03:12PM 13       **THE COURT:**  Right.

03:12PM 14       **MR. SINGER:**  And that's why the Courts let them in,

03:12PM 15  and that's why for the most part we haven't objected to a lot

03:12PM 16  of those statements.  That's easy.

03:12PM 17       So this is a little different.  And so it's different

03:12PM 18  in a couple different ways.

03:12PM 19       First off is that the distinction between Ms. R.A.

03:12PM 20  and many of the other witnesses who came in here who happen to

03:12PM 21  be exotic dancers is that the others all worked at Pharaoh's.

03:12PM 22       Ms. R.A. never worked at Pharaoh's.  So that's a

03:12PM 23  distinction right there.

03:12PM 24       The second thing about it --

03:12PM 25       **THE COURT:**  Why does that matter with this issue?

03:12PM  1          **MR. SINGER:**  Because what the theory the government

03:12PM  2   has made in a lot of these cases where they're saying

03:12PM  3   statements are made in furtherance is that all of these ladies

03:12PM  4   who are coming in are also coconspirators.

03:12PM  5          And as the government conceded earlier --

03:12PM  6          **THE COURT:**  I understand that.  But the fact that

03:13PM  7   she's not a co --

03:13PM  8          So Mr. Cooper's argument I think is that the

03:13PM  9   reason -- this is not made to protect her, it's made to

03:13PM  10  protect Gerace.  It's made in furtherance of a conspiracy,

03:13PM  11  because Gerace is basically messaging his girlfriend, fiancée,

03:13PM  12  not to go to this house of the drug dealer, and -- because

03:13PM  13  that might connect him to the drug dealer.

03:13PM  14         **MR. SINGER:**  So, again, if you kind of work through

03:13PM  15  that, it's preposterous on its face, Judge.

03:13PM  16         Ms. R.A. doesn't have a relationship with Craig

03:13PM  17  Border at all at that point.  And it's not like she had a

03:13PM  18  relationship with him very recently.  It was over and done

03:13PM  19  with, at least in my understanding of the situation, like,

03:13PM  20  years ago.

03:13PM  21         So she has no relationship to this individual at all.

03:13PM  22  Mr. Border doesn't have any relationship to the drug

03:13PM  23  conspiracy involved in this case at all.

03:13PM  24         Ms. R.A.'s not involved in the drug conspiracy that's

03:14PM  25  alleged in the indictment at all.  And so none of those things

03:14PM    1    connect her in any way whatsoever.

03:14PM    2         And that's the basis of the objection of the hearsay,

03:14PM    3    is that while I didn't object, and I would concede that on the

03:14PM    4    first layer of hearsay, which is the statement Bongiovanni

03:14PM    5    made to Gerace, comes in at least as an admission of a party

03:14PM    6    opponent, the second layer doesn't fulfill the in-furtherance

03:14PM    7    requirement, because Peter Gerace is communicating something,

03:14PM    8    a hearsay statement that's being offered to prove the truth of

03:14PM    9    the matter asserted in this Border search issue where they're

03:14PM    10   trying to prove up something in the indictment that's charged,

03:14PM    11   and the issue is is that it's hearsay.  It's just rank

03:14PM    12   hearsay.

03:14PM    13        I realize it didn't come up at the first trial but,

03:14PM    14   you know, like, we missed the objection.  We missed the

03:14PM    15   objection.

03:14PM    16        **MR. COOPER:**  Judge, it's not years apart.  That's

03:14PM    17   factually inaccurate.

03:14PM    18        You're gonna hear that the search warrant at Border's

03:14PM    19   house happened in December of 2005.

03:14PM    20        The photo of them all hanging out together, Peter and

03:15PM    21   the defendant, that photo is from 2005 in July.  So, July to

03:15PM    22   December is five months.

03:15PM    23        **THE COURT:**  Well, no, but he's saying the

03:15PM    24   relationship between R.A. and Border was over for a long time.

03:15PM    25        **MR. SINGER:**  Correct.  She testified that it was

03:15PM   1   between 2003 or '4 that they started up their relationship.

03:15PM   2   So she's long done with Border at that point.

03:15PM   3          **THE COURT:**  The relationship Peter started then.

03:15PM   4          **MR. SINGER:**  Correct.

03:15PM   5          **THE COURT:**  Right.  So we know she has not been in a

03:15PM   6   relationship with Border.  So the -- the timeframe that

03:15PM   7   Mr. Singer's talking about is the timeframe from when the

03:15PM   8   pictures were taken, when she had the relationship with

03:15PM   9   Border.  Not really when the pictures were taken, but when she

03:15PM   10  had the relationship with Border, until the statement is made.

03:15PM   11         So he's saying it's preposterous to think that Peter

03:15PM   12  is telling her that in furtherance of the conspiracy to say

03:15PM   13  don't go to Border's house, because she's never going to go to

03:15PM   14  Border's house.  She hasn't been in a relationship with the

03:15PM   15  guy in years.

03:15PM   16         **MR. COOPER:**  That's assuming that Peter knows all of

03:15PM   17  that to be true.

03:15PM   18         As opposed to Peter gets a call from the defendant

03:16PM   19  and says:  There's pictures of your girlfriend in this dude's

03:16PM   20  house.  He's a drug dealer.  We just raided his house.

03:16PM   21         There's no proof or evidence that Peter had in his

03:16PM   22  mind at the time he said it, that relationship's been over for

03:16PM   23  years.  She hasn't been there in years.

03:16PM   24         That's all out of thin air in this argument.  But

03:16PM   25  there's no proof or --

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:16PM   1      **THE COURT:**  He's telling her that though?  The reason

03:16PM   2   he's telling her that is because he learned his girlfriend has

03:16PM   3   pictures that he'd rather not have somebody else see in the

03:16PM   4   hands of somebody else.

03:16PM   5      **MR. COOPER:**  But what he says to her is:  This drug

03:16PM   6   dealer's house.  Found photos of you in this drug dealer's

03:16PM   7   house.

03:16PM   8      So I don't think it would be -- I don't think the

03:16PM   9   decision should ride on which way you cut on what's most

03:16PM   10  likely about what Peter indicated.

03:16PM   11     The words are:  There's pictures of you in a drug

03:16PM   12  dealer's house, and my buddy who's in the DEA was just in

03:16PM   13  there, and there's a reasonable inference there that he's

03:16PM   14  telling her stay away from that place.

03:16PM   15     They're both involved in drugs, Peter and R.A.  He's

03:17PM   16  telling her stay away from that place.

03:17PM   17     **THE COURT:**  You get the last word, then I'm going to

03:17PM   18  go read this case.

03:17PM   19     **MR. SINGER:**  And Judge, again, so if you kind of

03:17PM   20  break down the situation, so she starts dating Peter in like

03:17PM   21  2004.  Let's just put it there, because she wasn't able to

03:17PM   22  kind of establish whether it was earlier or later, but she

03:17PM   23  said 2004 clearly.

03:17PM   24     They start dating.  They eventually get married.

03:17PM   25     She testified about how she was pregnant in 2005,

03:17PM    1    that's why she stopped taking drugs.  She has a child with him

03:17PM    2    in 2006.

03:17PM    3            She's been dating Peter Gerace at that point in time

03:17PM    4    for two-plus years when, you know, the most logical point

03:17PM    5    where this potential conversation may have occurred, occurs.

03:17PM    6            So again, like, her relationship with Border is done.

03:17PM    7    I mean, it is not even coming back into existence.

03:17PM    8            MR. COOPER:  Peter's doesn't know that.

03:17PM    9            MR. SINGER:  And there's no evidence to suggest that

03:17PM   10    it ever would.  And so that's where, I realize the government

03:17PM   11    is saying, well, Peter Gerace would have no reason to believe

03:17PM   12    that.  The evidence clearly says otherwise, Judge.

03:17PM   13            MR. COOPER:  What evidence?  What evidence says

03:17PM   14    otherwise?  That Peter would have knowledge that the

03:18PM   15    relationship with Border ended years ago?  What evidence?

03:18PM   16            MR. SINGER:  Out of the witness's own mouth about the

03:18PM   17    fact that they're in an exclusive relationship at that point

03:18PM   18    in time.

03:18PM   19            MR. COOPER:  She didn't say that.

03:18PM   20            THE COURT:  Well, but --

03:18PM   21            MR. SINGER:  And she's pregnant with his child.

03:18PM   22            MS. CHALBECK:  We also don't know if Ms. R.A. was

03:18PM   23    buying drugs from the drug dealer.  I mean, that's another

03:18PM   24    point.

03:18PM   25            MR. COOPER:  Or that Peter thought that.  There's no

03:18PM    1    evidence of that.

03:18PM    2          So counsel can say he thinks it's most likely, but to

03:18PM    3    say that evidence supports that is not accurate.

03:18PM    4          **MR. SINGER:**  And I think now we're starting to get so

03:18PM    5    far afield.  Well, Ms. R.A. could have purchased drugs from

03:18PM    6    Mr. Border.

03:18PM    7          Like, Judge, the arguments that are being

03:18PM    8    proffered -- all right, I understand why they're making them,

03:18PM    9    but the government doesn't have any idea what was fact and

03:18PM   10    fiction in this.  And so it's just a stretch.

03:18PM   11          **MR. COOPER:**  The operative question is what's in

03:18PM   12    Peter's mind.  And the operative question is what's in Peter

03:18PM   13    mind at the time.

03:18PM   14          And so offering up alternative -- alternatives --

03:18PM   15          They have one alternative they want the Court to

03:18PM   16    accept as fact.  There's another alternative, which is Peter

03:18PM   17    doesn't know if she had a relationship with Craig, when it

03:18PM   18    ended.  All he knows is what she testifies to.

03:19PM   19          He says, my friend in the DEA found your photos in a

03:19PM   20    drug dealer's house.  Those are the facts.

03:19PM   21          **THE COURT:**  We don't even know the name of the drug

03:19PM   22    dealer necessarily, right?

03:19PM   23          **MR. COOPER:**  I don't even think she said that.

03:19PM   24          She said, Joe saw a picture of you in this guy's

03:19PM   25    house, this drug dealer's house.

| | | |
|---|---|---|
| 03:19PM | 1 | **THE COURT:**  Okay.  Let me go think about it. |
| 03:19PM | 2 | Thank you. |
| 03:19PM | 3 | (Off the record at 3:19 p.m.) |
| 03:19PM | 4 | (Back on the record at 3:27 p.m.) |
| 03:27PM | 5 | (Jury not present.) |
| 03:27PM | 6 | **THE CLERK:**  All rise.  We are back on the record for |
| 03:27PM | 7 | the continuation of the jury trial in case number 19-CR-227, |
| 03:27PM | 8 | United States of America versus Joseph Bongiovanni. |
| 03:27PM | 9 | All counsel and parties are present. |
| 03:27PM | 10 | **THE COURT:**  Okay.  So here's what the case says. |
| 03:28PM | 11 | Case says, first of all, there is no requirement that |
| 03:28PM | 12 | the person to whom the statement is made also be a member of |
| 03:28PM | 13 | the conspiracy.  So that's out. |
| 03:28PM | 14 | Whether a proper statement is made in furtherance of |
| 03:28PM | 15 | a conspiracy is a preliminary question of fact to be |
| 03:28PM | 16 | determined by the trial court by a preponderance of the |
| 03:28PM | 17 | evidence.  So the question is whether the statement promoted |
| 03:28PM | 18 | or was intended to promote the goals of the conspiracy. |
| 03:28PM | 19 | With respect to intended to promote, I think it's -- |
| 03:28PM | 20 | there's no way in the world that I can find by a preponderance |
| 03:28PM | 21 | of the evidence that Gerace said that to her intending to |
| 03:28PM | 22 | promote the conspiracy. |
| 03:28PM | 23 | He might have.  You're right, Mr. Cooper, it's |
| 03:28PM | 24 | conceivable that he did.  But I can't find by a preponderance |
| 03:28PM | 25 | of the evidence that that was the reason.  In fact, I |

03:28PM  1   personally think it was more likely that he told him that

03:28PM  2   because he was unhappy with the fact that somebody had a photo

03:29PM  3   of her in lingerie.

03:29PM  4        And so while you're right, I can't let my own

03:29PM  5   judgment about that color the valuation of it, I still can't

03:29PM  6   say by a preponderance of the evidence that that's why he said

03:29PM  7   it to her.

03:29PM  8        It's at least as likely that there was another

03:29PM  9   reason.  So the question becomes, did the statement promote

03:29PM 10   the conspiracy, and can I find by the preponderance of the

03:29PM 11   evidence that the statement in fact promoted the conspiracy.

03:29PM 12        And for that, I think we need a voir dire out of the

03:29PM 13   presence of the jury.

03:29PM 14        **MR. COOPER:**  Okay.

03:29PM 15        **THE COURT:**  I think we need to find out from her.

03:29PM 16   And, Mr. Singer, I'll let you ask questions.  But I think we

03:29PM 17   need to find out from her whether that statement had any

03:29PM 18   effect on her as to whether she did or did not do anything.

03:29PM 19        **MR. COOPER:**  Whether she, in fact, like, went on to

03:29PM 20   associate with Border, like, decided to --

03:29PM 21        **THE COURT:**  Yeah.

03:29PM 22        **MR. COOPER:**  -- associate with Border.

03:29PM 23        **THE COURT:**  Did it change -- did it -- did it affect

03:29PM 24   her decisions about whether to associate with this guy, did

03:30PM 25   she know who it was.

Case 1:19-cr-00227-LJV-MJR    Document 1321    Filed 10/27/24    Page 34 of 110
USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

34

03:30PM    1              **MR. COOPER:**  Okay.

03:30PM    2              **THE COURT:**  Did it affect her decisions whether to

03:30PM    3    associate with the guy.  You know, why did it affect her

03:30PM    4    decisions not to -- I mean, you know, she may say I was never

03:30PM    5    going to associate with him anyway.

03:30PM    6              **MR. COOPER:**  Sure.

03:30PM    7              **THE COURT:**  And if that's the case, then I don't

03:30PM    8    think so.

03:30PM    9              **MR. COOPER:**  Can I make a -- if -- before we do that,

03:30PM   10    can I make another argument as to a different -- I think

03:30PM   11    there's an argument as well that it's a statement against

03:30PM   12    Peter's penal interests to indicate to her that he's accepted

03:30PM   13    information that's law-enforcement sensitive about private

03:30PM   14    photos in a person's house, he's expressing that to her, it's

03:30PM   15    something we're going to offer against Peter at Peter's trial

03:30PM   16    in a couple months.  Peter's unavailable to us.  And so I

03:30PM   17    would argue as an alternative that Peter admitting this to her

03:30PM   18    is a statement against his penal interests.

03:30PM   19              **MR. SINGER:**  I think that's more far afield than some

03:30PM   20    of other arguments I've heard, Judge.

03:30PM   21              Statements against penal interest are something along

03:30PM   22    the lines of I shot the sheriff, you know?  Or yes, I engaged

03:31PM   23    in drug dealing all the time.

03:31PM   24              There's something where clearly it indicates to the

03:31PM   25    listener from the perspective of the declarant that I

```
03:31PM    1    committed some type of criminal activity, and I'm telling you

03:31PM    2    this which, of course, is against their penal interest to do.

03:31PM    3          What is being communicated here is that I found out

03:31PM    4    that from my law enforcement buddy that there are pictures of

03:31PM    5    you existing in this house.  That's not something that even

03:31PM    6    comes close to the clear-cut rule under declaration against

03:31PM    7    penal interest.  It just doesn't fit.

03:31PM    8          MR. COOPER:  Judge, not all cases are 711 robberies.

03:31PM    9    I shot the clerk is not the only statement.

03:31PM   10          This is a bribery case.  Mr. Singer said it's about

03:31PM   11    her perspective, it's not.  It doesn't require that you

03:31PM   12    analyze what her perspective is.

03:31PM   13          Peter is saying I received law-enforcement sensitive

03:31PM   14    information from a DEA agent.  That's a statement against his

03:31PM   15    penal interests, especially when the facts that exist in this

03:31PM   16    case exist surrounding it.  It's not in a vacuum.  You don't

03:32PM   17    have to consider it in isolation.  He's making an admission to

03:32PM   18    her that he received law-enforcement sensitive information

03:32PM   19    from the defendant.

03:32PM   20          Whether she knew that or not does not matter.

03:32PM   21          MR. SINGER:  And, again, I guess what you talk about

03:32PM   22    law-enforcement sensitive information, Judge, law-enforcement

03:32PM   23    sensitive information is:  Joe told me that the DEA's about to

03:32PM   24    execute a search at Craig Border's house.

03:32PM   25          That's law-enforcement sensitive information.
```

| 03:32PM | 1 | **MR. COOPER:** Not true, Judge. |
| 03:32PM | 2 | **THE COURT:** I'm not so sure that -- I'm not so sure |
| 03:32PM | 3 | that a statement about what someone found during a search of |
| 03:32PM | 4 | somebody's premises is not law-enforcement sensitive as well. |
| 03:32PM | 5 | Why wouldn't that be law-enforcement sensitive? |
| 03:32PM | 6 | **MR. SINGER:** Again, it -- it's not involving |
| 03:32PM | 7 | something that has to go to the -- the -- the entirety of the |
| 03:32PM | 8 | case that the law enforcement agency's building against a |
| 03:32PM | 9 | person. So like if, for instance, there was a communication |
| 03:32PM | 10 | of we found 4 ounces of cocaine at this one particular |
| 03:33PM | 11 | address. |
| 03:33PM | 12 | **THE COURT:** Easy. |
| 03:33PM | 13 | **MR. SINGER:** We found evidence that links you to this |
| 03:33PM | 14 | particular person in this particular crime because your |
| 03:33PM | 15 | fingerprints are on the -- |
| 03:33PM | 16 | **THE COURT:** Like a photograph. |
| 03:33PM | 17 | **MR. SINGER:** No, but the photograph is different |
| 03:33PM | 18 | because -- here's the difference, Judge. It wasn't a |
| 03:33PM | 19 | photograph of Peter that they found. They didn't find Peter |
| 03:33PM | 20 | Gerace's photograph -- |
| 03:33PM | 21 | **THE COURT:** Who cares? |
| 03:33PM | 22 | **MR. SINGER:** -- or mail or other things like that |
| 03:33PM | 23 | inside the residence. |
| 03:33PM | 24 | **THE COURT:** Who cares who the photograph is of? |
| 03:33PM | 25 | What I'm -- the question is, is this law-enforcement |

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

03:33PM   1   sensitive?  And I think that anything's that's found in a

03:33PM   2   search is law-enforcement sensitive because anything that's

03:33PM   3   found in the search might link someone to --

03:33PM   4        I mean, it's sort of like the Fifth Amendment inquiry

03:33PM   5   that we make when a witness says I decline to answer on the

03:33PM   6   grounds that it may incriminate me.  That doesn't have to be a

03:33PM   7   directly incriminatory statement, it could be something in a

03:33PM   8   link of things, right?

03:33PM   9        **MR. SINGER:**  So going back to the perspective of the

03:34PM  10   declarant, so Peter Gerace is the one who's making the

03:34PM  11   statement in the case, so he's the one who has to have some

03:34PM  12   type of awareness that it's against his penal interest --

03:34PM  13        **THE COURT:**  Yeah.

03:34PM  14        **MR. SINGER:**  -- to make a statement like that --

03:34PM  15        **THE COURT:**  Yeah.

03:34PM  16        **MR. SINGER:**  -- this is -- this is the issue is that

03:34PM  17   when it's very clear-cut about, like, they found drugs that

03:34PM  18   are connecting you to this, like, the declarant's going to

03:34PM  19   know, like, oh, my God, I'm screwed.

03:34PM  20        I mean, very similar to the Beechnut case where the

03:34PM  21   declarants are saying, we got away with it, I can't believe

03:34PM  22   it.  That's clear-cut.

03:34PM  23        **THE COURT:**  Yep.

03:34PM  24        **MR. SINGER:**  That's not the same thing when we found

03:34PM  25   a picture of your current girlfriend in this guy's house,

03:34PM    1    that's not something that meets the same bar, Judge.

03:34PM    2         **MR. COOPER:**  Judge --

03:34PM    3         **THE COURT:**  Well, there's no question that you're

03:34PM    4    right about that, but the question is does it -- does it -- is

03:34PM    5    it enough?

03:34PM    6         Go ahead.

03:34PM    7         **MR. COOPER:**  So Peter Gerace is telling this person,

03:34PM    8    I received what I think at least the government and the Court

03:34PM    9    agree is law-enforcement sensitive information from the

03:34PM   10    defendant.

03:34PM   11         And the context surrounding it is that this defendant

03:34PM   12    is on trial for receiving bribes from that person.  There's

03:34PM   13    so, the facts surrounding it are that Peter Gerace is

03:35PM   14    conspiring to bribe Joseph Bongiovanni, then saying to someone

03:35PM   15    I received law-enforcement sensitive information from Joseph

03:35PM   16    Bongiovanni is obviously, in his mind, a statement against his

03:35PM   17    penal interest.

03:35PM   18         They're never smart statements to make.  You would

03:35PM   19    never sit up there and think, like, should a person say this.

03:35PM   20    But do they, in their mind, know it's against their penal

03:35PM   21    interests to say I received law-enforcement sensitive

03:35PM   22    information from a DEA agent.

03:35PM   23         **THE COURT:**  Yeah, that -- it's a harder question for

03:35PM   24    me to decide.  And I don't know, is this the last argument

03:35PM   25    you're going to make on this?

03:35PM    1        If I go back, you're not going to come out and tell

03:35PM    2    me you've got another one, are you?

03:35PM    3        **MR. COOPER:**  I'm not.  And that one was brought to my

03:35PM    4    attention, if I'm being honest, in between the breaks.  So --

03:35PM    5        **THE COURT:**  Yeah.  So let me go and think about this,

03:35PM    6    too.  And I also want -- can we find a case that talks about

03:35PM    7    whether it is in fact -- Mr. Singer and I have been discussing

03:35PM    8    this as if it is a forgone conclusion that the standard is

03:36PM    9    what the person who made the statement was thinking when he

03:36PM   10    made the statement.  Did he have to know that it was against

03:36PM   11    his penal interests.

03:36PM   12        **MR. MacKAY:**  And, Judge, if I could supplement that a

03:36PM   13    little bit in response to Mr. Cooper's argument?

03:36PM   14        If I understand it, the government's argument is sort

03:36PM   15    of presuming the fact that they're in a bribery relationship,

03:36PM   16    and that's why he knows it's against his penal interest.  I

03:36PM   17    mean, the general idea of hearsay as I understand it is that

03:36PM   18    certain categories of statements are admissible because

03:36PM   19    they're independently trustworthy for other reasons here.

03:36PM   20        So in order to get to the government's theory, I

03:36PM   21    think it has to presume the fact that they're trying to prove

03:36PM   22    in the first place that there's some sort of elicit

03:36PM   23    relationship.

03:36PM   24        I mean, if somebody, I guess, walked up to me on the

03:36PM   25    street and told me your ex-girlfriend's photos are in this

03:36PM   1   house, I saw them and I'm a law enforcement officer, I'm not

03:36PM   2   sure that I would make that jump that it's law-enforcement

03:36PM   3   sensitive information and I'm somehow in trouble for telling

03:37PM   4   my current girlfriend that that's what's going on.

03:37PM   5       I think the government's argument presumes that in

03:37PM   6   the middle there's that elicit relationship that's the focus

03:37PM   7   of this case.

03:37PM   8       **MR. COOPER:**  When the Court considers it, you should

03:37PM   9   consider it in the context of the proof and the evidence that

03:37PM  10   you've heard about the nature of that illicit relationship --

03:37PM  11       **THE COURT:**  Of course.

03:37PM  12       **MR. COOPER:**  -- of cocaine together.

03:37PM  13       **THE COURT:**  Of course.

03:37PM  14       **MR. COOPER:**  And I would add, Judge, I'm reading from

03:37PM  15   Courtroom Evidence, Second Edition from February of 2001.

03:37PM  16   So -- 2001.

03:37PM  17       But note that the relevant inquiry is whether the

03:37PM  18   declarant believed the statement to be contrary to his or her

03:37PM  19   own interest at the time the statement was made, not whether

03:37PM  20   the statement actually was against their interest.

03:37PM  21       I assume that hasn't changed since 2001, but it may

03:37PM  22   have.

03:37PM  23       **MR. TRIPI:**  Judge, I would just note that Count 2,

03:37PM  24   the charge between the defendant and Mr. Gerace goes all the

03:37PM  25   way back to 2005, so I think that undercuts it a little bit

03:37PM   1   about what Mr. MacKay just argued.

03:37PM   2        **THE COURT:**  Yeah, I'm not so sure the thing you just

03:38PM   3   read to me, Mr. Cooper, cuts.  I mean, this statement

03:38PM   4   certainly was against his penal interest.  So, it actually

03:38PM   5   was.

03:38PM   6        The question is, did he -- did he recognize that it

03:38PM   7   was against his penal interest when he made it.

03:38PM   8        Okay.  Let me go think.

03:38PM   9        **THE CLERK:**  Okay, all rise.

03:38PM  10        **MR. TRIPI:**  We appreciate the Court taking a hard

03:38PM  11   look at this.

03:38PM  12        **THE COURT:**  Oh, no, no, no.  These are -- you know,

03:38PM  13   again, these are interesting issues.  And I want to get it

03:38PM  14   right.  And I want to get it right.

03:38PM  15        **MR. COOPER:**  Thanks, Judge.

03:38PM  16        (Off the record at 3:38 p.m.)

03:43PM  17        (Back on the record at 3:43 p.m.)

03:43PM  18        (Jury not present.)

03:43PM  19        **THE CLERK:**  All rise.

03:43PM  20        **THE COURT:**  Like a Jack-in-the-Box, right.

03:43PM  21        **THE CLERK:**  We are back.

03:43PM  22        **THE COURT:**  Please be seated.

03:43PM  23        **THE CLERK:**  We are back on the record for the

03:43PM  24   continuation of the jury trial in case number 19-cr-227,

03:43PM  25   United States of America versus Joseph Bongiovanni.

03:43PM  1          All counsel and parties are present.

03:43PM  2          **THE COURT:**  Okay.  You guys are making me earn every

03:43PM  3  penny of my salary today.

03:43PM  4          So the question with respect to statement against

03:44PM  5  interest is whether the offered statement would be perceived

03:44PM  6  by a reasonable person to be detrimental to his or her own

03:44PM  7  penal interest.  And I'm citing United States versus Ojudun,

03:44PM  8  915 F.3d 875, a 2nd Circuit case from 2019.

03:44PM  9          And so -- and I don't think that a reasonable person

03:44PM  10  who's not a prosecutor, not a defense lawyer, just a regular

03:44PM  11  average schmoe, would perceive that as being against his penal

03:44PM  12  interest.  It's just too -- there's too many steps there.  And

03:44PM  13  so I don't think it crosses that threshold.

03:44PM  14          I do still think we have the issue of whether the

03:44PM  15  statement was, in fact, in furtherance of the conspiracy,

03:44PM  16  whether accomplished something to further the conspiracy.  So

03:45PM  17  I think we need to do a brief voir dire on that.

03:45PM  18          And, again, I'll let you ask some questions --

03:45PM  19          **MR. COOPER:**  Yeah.

03:45PM  20          **THE COURT:**  I'll let Mr. Singer ask some questions,

03:45PM  21  and then I'll make a decision.

03:45PM  22          **MR. COOPER:**  Understood.  Thanks, Judge.

03:45PM  23          Can we bring her back in, Brian?  Thank you.

03:45PM  24          Ann, can you tell me that last question real quick?

03:45PM  25          (The above-requested question was then read by the

03:45PM    1    reporter.)

03:45PM    2            **MR. COOPER:**  Okay.

03:46PM    3            (Witness seated at 3:46 p.m.)

03:46PM    4            (Jury not present.)

03:46PM    5            **MR. COOPER:**  Ann, will you let me know when you're

03:46PM    6    ready?

03:46PM    7            Judge, may I inquire?

03:46PM    8            **THE COURT:**  You may.

03:46PM    9

03:46PM   10        **VOIR DIRE EXAMINATION - NO JURY - BY MR. COOPER:**

03:46PM   11    Q.  So, ma'am, we're going to ask you some questions without

03:46PM   12    the jury here just to decide a legal issue about whether

03:46PM   13    something's admissible or not.  It doesn't have anything to

03:46PM   14    do with anything you said right or wrong; do you understand?

03:46PM   15    A.  Yes.

03:46PM   16    Q.  Okay.  Peter Gerace ultimately tells you that -- well,

03:46PM   17    let me read it.

03:46PM   18        Peter tells you, Joe saw a picture of you in this drug

03:46PM   19    dealer's house or something like that --

03:46PM   20    A.  Yeah.

03:46PM   21    Q.  -- is that right?

03:46PM   22    A.  Along the context of that.

03:46PM   23    Q.  Okay.  And when Peter said that to you, did that cause

03:46PM   24    you in the future to avoid associating with Craig Border?

03:46PM   25    A.  I don't think it necessarily avoided me associating with

03:46PM 1    him.  He ended up just going to jail.

03:46PM 2    Q.  Okay.  Well, I guess not whether it did cause you to

03:46PM 3    avoid associating with him, but in your head, were you like,

03:46PM 4    oh, I'm going to stay away from that guy.  Now did that

03:47PM 5    thought cross your mind when Peter told you this?

03:47PM 6    A.  Potentially.  But it was more so that I was dating Peter,

03:47PM 7    so I was no longer dating Craig.

03:47PM 8    Q.  I get that.  But the question is, did -- I'm asking did

03:47PM 9    the thought cross your mind, like, I better stay away from

03:47PM 10   Craig 'cuz he's a drug dealer, and a DEA agent raided his

03:47PM 11   house?

03:47PM 12   A.  Truthfully, I -- I -- I mean, I was -- I don't think it

03:47PM 13   really made a difference.  I mean, I'm not gonna, like --

03:47PM 14   Q.  All we want is the truth.

03:47PM 15        **THE COURT:**  That's right.  He's not trying to get you

03:47PM 16   to say anything.

03:47PM 17        We just want to know when you heard that, did you

03:47PM 18   think to yourself, I shouldn't go see Craig Border because

03:47PM 19   he's a drug dealer who's being investigated?

03:47PM 20        **THE WITNESS:**  Yes.

03:47PM 21        **MR. COOPER:**  Okay.

03:47PM 22        **THE COURT:**  You did think that?

03:47PM 23        **THE WITNESS:**  I thought that.

03:47PM 24        **THE COURT:**  Okay.  Mr. Singer, do you want to ask

03:47PM 25   some questions?

USA v Bongiovanni - R.A. - Singer/Voir Dire - 9/13/24

03:47PM  1

03:47PM  2  **VOIR DIRE EXAMINATION - NO JURY - BY MR. SINGER:**

03:47PM  3  Q.  So Ms. R.A. -- I'm sorry, I'll go from here.

03:47PM  4     So Ms. R.A., so let's break it down a little bit.

03:48PM  5     So you and Peter are together in a room when you have

03:48PM  6  this conversation?

03:48PM  7  A.  I'm sorry, I didn't hear you.

03:48PM  8  Q.  Where are you and Peter when Peter tells you about this

03:48PM  9  photograph that was found in Craig Border's house?

03:48PM  10  A.  I think we were at our house, or our apartment.

03:48PM  11  Q.  So you're in your house, to the best of your memory,

03:48PM  12  right?

03:48PM  13  A.  Yes.

03:48PM  14  Q.  And then when Peter is bringing this up in conversation,

03:48PM  15  was this something that just came out of the blue?  Or were

03:48PM  16  you guys involved in some type of conversation at the time?

03:48PM  17  A.  I just think, like, Peter had tendency to be a little

03:48PM  18  jealous sometimes, so I think it came in -- like, came up in

03:48PM  19  a disagreement probably from -- because of what I did in my

03:48PM  20  past or whatever.  He's kind of like, oh, by the way, like,

03:48PM  21  you know, this happened.

03:48PM  22  Q.  So I'm guilty of this sometimes where my wife tells me I

03:48PM  23  do something wrong, and I say well, hold on a second, do you

03:48PM  24  remember when you did this?

03:48PM  25  A.  Right.

03:48PM  1    Q.  Was that kind of the context of something that this came

03:49PM  2    up in?

03:49PM  3    A.  Yes.

03:49PM  4    Q.  All right.

03:49PM  5    A.  It was like that.

03:49PM  6    Q.  So when he made the statement to you, Peter, about what

03:49PM  7    Joe Bongiovanni purportedly found in the house --

03:49PM  8    A.  Um-hum.

03:49PM  9    Q.  -- what was the first thing that came in your head after

03:49PM  10   that statement was made?

03:49PM  11   A.  Actually, I was kind of embarrassed because, oh, like,

03:49PM  12   his friend saw me in some lingerie.  I mean, that's really

03:49PM  13   kind of what the first thing that came into my head was.

03:49PM  14   Q.  So the first thing that came up in your head was

03:49PM  15   embarrassment.

03:49PM  16   A.  Yes.

03:49PM  17   Q.  As -- as time progressed, what was the next thing that

03:49PM  18   came up in your mind about what you'd just been told?

03:49PM  19   A.  Well, like, what do you mean by that?

03:49PM  20   Q.  Yeah.  So I guess one of the things you just stated

03:49PM  21   during this question-and-answer process is that you had some

03:49PM  22   type of concerns about I shouldn't hang out with this guy.

03:50PM  23       I realize, like, that's what the judge asked you and

03:50PM  24   that's what prosecutor asked you, right?

03:50PM  25   A.  Um-hum.

03:50PM  1   Q.  But what I'm trying to determine is when did that thought

03:50PM  2   enter your head?

03:50PM  3   A.  I wasn't hanging out with him at all anyway.  I wasn't,

03:50PM  4   like, he was already, like, in jail I think.  Or -- I'm not

03:50PM  5   really sure how that all came about.

03:50PM  6      But I didn't think I'm not going to hang out with him

03:50PM  7   because I'm wouldn't hang out with him anyway because I'm

03:50PM  8   dating Peter.

03:50PM  9   Q.  Yeah, and so let's kind of backtrack a little bit.

03:50PM  10      So you testified on direct about --

03:50PM  11   A.  Right.

03:50PM  12   Q.  -- you started dating Peter sometime in -- when?  What

03:50PM  13   year?

03:50PM  14   A.  2005, it had to be.

03:50PM  15   Q.  So we saw the picture of you and Peter at the restaurant,

03:50PM  16   right?

03:50PM  17   A.  Yes.

03:50PM  18   Q.  That was July of '05, correct?

03:50PM  19   A.  Yes.

03:50PM  20   Q.  So did you start dating Peter before that?

03:50PM  21   A.  Yes.

03:50PM  22   Q.  How much more before that July dinner photo did you date

03:50PM  23   Peter?

03:50PM  24   A.  Let's see.  Probably two months before that.

03:51PM  25   Q.  All right.  So it would have been summer of 2005 when you

03:51PM 1  started dating?

03:51PM 2  A.  Yes.

03:51PM 3  Q.  Fast forward, this particular conversation, when do you

03:51PM 4  believe this conversation occurred?

03:51PM 5  A.  In September.

03:51PM 6  Q.  So were you pregnant at the time?

03:51PM 7  A.  I just found out I was pregnant.

03:51PM 8  Q.  All right.  So you just found out you were pregnant.

03:51PM 9      Were you married at the time to Peter at that time?

03:51PM 10 A.  Was I married to him?

03:51PM 11 Q.  Yes.

03:51PM 12 A.  No.

03:51PM 13 Q.  Okay.  So you're still -- were you engaged at that time?

03:51PM 14 A.  No.

03:51PM 15 Q.  So in September of 2005, how much time had elapsed since

03:51PM 16 you ended your relationship with Craig Border?

03:51PM 17 A.  Well, I was dating Craig right before I met Peter.  Like

03:52PM 18 right before, probably like a month before.

03:52PM 19 Q.  And you said you started up your relationship with Peter

03:52PM 20 sometime in May of 2005?

03:52PM 21 A.  Yes.

03:52PM 22 Q.  So would you have been dating Craig up to when in '05?

03:52PM 23 A.  Probably beginning of July maybe.  No, I'm sorry, June.

03:52PM 24 Q.  I'm sorry?

03:52PM 25 A.  May and June.  I only dated him for like a month.

03:52PM 1  Q.  Yeah, and I guess -- so I'm a little confused.  So you

03:52PM 2  started dating Peter you just said in May of '05; is that

03:52PM 3  right?

03:52PM 4  A.  Yes.

03:52PM 5  Q.  Because that was -- that was roughly about two months

03:52PM 6  before that July dinner photo that we saw in 2005, correct?

03:52PM 7  A.  What?

03:52PM 8  Q.  So the picture that you got shown on direct?

03:52PM 9  A.  Okay, yes.  This is a really long time ago, so --

03:52PM 10  Q.  No, no, no, I know.  I'm sorry, I'm trying to work

03:52PM 11  through it.  So that particular photograph was taken in July

03:52PM 12  of 2005?

03:52PM 13  A.  Yes.

03:52PM 14  Q.  We know that from the stamp on the back of it.

03:53PM 15  A.  Um-hum.

03:53PM 16  Q.  So, you said that you started dating Peter in May of

03:53PM 17  2005, right?

03:53PM 18  A.  Um-hum.

03:53PM 19  Q.  So, you just said that you were dating Craig in June of

03:53PM 20  '05.

03:53PM 21  A.  I'm sorry, so it had to have been in April then.

03:53PM 22  Q.  Okay.

03:53PM 23  A.  Like a month before.

03:53PM 24  Q.  Yeah.  No, no, that's what I was getting at.

03:53PM 25  Okay.  So, yeah.  So your relationship with Border

03:53PM  1   completely ends before you start dating Peter?

03:53PM  2   A.  Yes.

03:53PM  3   Q.  So the last possible time you could have probably been

03:53PM  4   dating him was in April of 2005?

03:53PM  5   A.  Yes.

03:53PM  6   Q.  So, April to September of '05, that's a number of months,

03:53PM  7   correct?

03:53PM  8   A.  Um-hum.

03:53PM  9   Q.  And had you seen Craig Border at all in that period of

03:53PM  10  time after you broke up with him and started dating Peter?

03:53PM  11  A.  No.

03:53PM  12  Q.  Had you talked to him on the phone?

03:53PM  13  A.  No.

03:53PM  14  Q.  Had you ever purchased any type of drugs from him?

03:53PM  15  A.  No.

03:53PM  16       THE COURT:  Would you have seen him if Peter had not

03:53PM  17  told you that there was a -- that somebody saw a photograph of

03:53PM  18  you at his house and he was being investigated for drugs?

03:54PM  19       THE WITNESS:  I probably wouldn't talk to him,

03:54PM  20  because I'd be like, oh, well, he's being investigated.  Like,

03:54PM  21  you know.

03:54PM  22       THE COURT:  No, no.  But I'm saying if Peter hadn't

03:54PM  23  said that to you, would you have seen him and talked to him?

03:54PM  24       THE WITNESS:  I wouldn't be afraid to if I saw him.

03:54PM  25       THE COURT:  Yeah, but the question I have is, I mean,

03:54PM    1    so you broke up with him.

03:54PM    2    **THE WITNESS:**  Yes.

03:54PM    3    **THE COURT:**  And now we're six months down the road.

03:54PM    4    **THE WITNESS:**  Right.

03:54PM    5    **THE COURT:**  And now the question is, would you have

03:54PM    6    seen him?  Would you have had occasion to see him, would you

03:54PM    7    have had reason to see him, had Peter not said that to you?

03:54PM    8    Did it make a difference?

03:54PM    9    **THE WITNESS:**  No.

03:54PM   10    **THE COURT:**  It didn't make a difference.

03:54PM   11    **THE WITNESS:**  I don't think it made a difference.

03:54PM   12    I'm sorry, I'm really confused.

03:54PM   13    **MR. COOPER:**  You're doing fine.  This is legal stuff

03:55PM   14    for us to argue about.  All you have to do is answer the

03:55PM   15    questions.  You're doing fine.

03:55PM   16    Judge, I have I think a little argument depending on

03:55PM   17    which way you're coming down here, but I'll wait.

03:55PM   18    **THE COURT:**  Do you want -- well, let's see if

03:55PM   19    Mr. Singer has any more questions.

03:55PM   20    **MR. SINGER:**  Just one moment, Judge.

03:55PM   21    **THE WITNESS:**  I mean, I'm just thinking of -- oh.

03:55PM   22    **BY MR. SINGER:**

03:55PM   23    Q.  I think the only other question I had is when you broke

03:55PM   24    up with Border, you just left him completely, correct?

03:55PM   25    A.  Yes.

03:55PM   1   Q.  And there really wasn't a lot of communication about the

03:55PM   2   breakup between both of you?

03:55PM   3   A.  No.

03:55PM   4   Q.  And that's why there wasn't any communication --

03:55PM   5   A.  Right.

03:55PM   6   Q.  -- between the both of you?

03:55PM   7   A.  Um-hum.

03:55PM   8   Q.  Did you leave on bad terms?

03:55PM   9   A.  No, it was just really short lived.

03:55PM  10   Q.  Okay.  So it was a -- kind of a superficial relationship?

03:56PM  11   A.  Yeah, a relationship of opportunity, I would have to say

03:56PM  12   that.

03:56PM  13   Q.  And how long was that relationship with Craig again?

03:56PM  14   A.  Probably a month.

03:56PM  15   Q.  All right.

03:56PM  16         **THE COURT:**  Did you ever see him after that?

03:56PM  17         **THE WITNESS:**  No.

03:56PM  18         **THE COURT:**  To this day?

03:56PM  19         **THE WITNESS:**  No.

03:56PM  20         **THE COURT:**  Okay.  Anything?

03:56PM  21         **MR. COOPER:**  I don't have any -- I don't think I need

03:56PM  22   to ask more questions.

03:56PM  23         **THE COURT:**  Fine.

03:56PM  24         Okay.  So why don't you step out, ma'am.

03:56PM  25         (Witness excused at 3:56 p.m.)

03:56PM    1              (Jury not present.)

03:56PM    2         **MR. COOPER:**  So focusing only on the second prong

03:56PM    3    that Your Honor brought her in for the voir dire for.

03:56PM    4         **THE COURT:**  Right.

03:56PM    5         **MR. COOPER:**  The second prong is about whether it in

03:56PM    6    fact furthered a goal of the conspiracy.

03:56PM    7              What she said was if he hadn't said anything to me,

03:56PM    8    had not said anything to me, I wouldn't have been concerned

03:57PM    9    about interacting with Border in the future.

03:57PM   10              Because he did say something to me -- because he did

03:57PM   11    say something to me, I would have been concerned to interact

03:57PM   12    with him in the future.

03:57PM   13         **THE COURT:**  She said it wouldn't have made any

03:57PM   14    difference.

03:57PM   15         **MR. COOPER:**  But, Judge, what we were asking her to

03:57PM   16    do with those questions is speculate whether she ever would

03:57PM   17    have ever seen that person again.

03:57PM   18              But at the moment she's hearing it, it causes her to

03:57PM   19    say if he hadn't said it, I wouldn't have had any problem

03:57PM   20    associating with him.  Once he said it, I would have a

03:57PM   21    problem.

03:57PM   22              Those were the operative questions.  Your Honor, I

03:57PM   23    think, hit both of them.  But that's the analysis for that

03:57PM   24    second prong.

03:57PM   25         **MR. SINGER:**  So, Judge, if you notice the approach

03:57PM  1   that I took in contrast, with all due respect, to yourself and

03:57PM  2   Mr. Cooper, I asked very open-ended questions about what was

03:57PM  3   the first thing in your mind, and allowed Ms. R.A. to fill in

03:57PM  4   the blank.

03:57PM  5        What did I not do is say, hey, did this put in your

03:57PM  6   head that you should stay away from him?

03:57PM  7        And if you noticed, when I asked her the open-ended

03:58PM  8   question, I think we got the most truthful and accurate

03:58PM  9   answer, versus when we asked her the close-ended question of

03:58PM 10   simply getting out the answer which would allow this to become

03:58PM 11   admissible from the government's perspective.

03:58PM 12        And when you start to further dive into the context,

03:58PM 13   Judge, this is happening during some type of lover's quarrel

03:58PM 14   or something elsewhere where, you know, she says one thing, he

03:58PM 15   says the other, and then he kind of he retorts back, well, you

03:58PM 16   know what?  I know that you have pictures over here because

03:58PM 17   someone told me.

03:58PM 18        And she, as she testified, the first thing in her

03:58PM 19   head is like, oh, my God that's embarrassing.

03:58PM 20        That's what's going on.

03:58PM 21        On top of that, she has a very superficial

03:58PM 22   relationship with Mr. Border.  It lasts a month.  She never

03:58PM 23   purchased drugs from Mr. Border, so she doesn't really have

03:58PM 24   any understanding of what's going on with him with regard to

03:58PM 25   his drug-dealing activities.

03:58PM   1          And if, you know, she was -- she also testified that

03:58PM   2   she never would go there to go purchase drugs because she

03:58PM   3   didn't have any type of a relationship with him at all.

03:58PM   4          **THE COURT:**  Okay.

03:58PM   5          **MR. SINGER:**  That all falls apart right there.

03:59PM   6          I think if you go back to the Beechnut case, Judge,

03:59PM   7   this falls into that idle chatter or mere narrative which is

03:59PM   8   not in furtherance of the conspiracy.

03:59PM   9          **THE COURT:**  Okay.  You get the last word, Mr. Cooper.

03:59PM  10          **MR. COOPER:**  First of all, I -- I understand that the

03:59PM  11   open-ended, non-leading question, elicited the answer that was

03:59PM  12   obviously most in her mind, which makes sense, because it is

03:59PM  13   embarrassing, probably mortifying for her.  But that doesn't

03:59PM  14   mean the answer she gave the Court was inaccurate, or that you

03:59PM  15   put it in her -- in her mind.

03:59PM  16          You asked her, would it have made you less likely to

03:59PM  17   interact with the person in the future.  She answered that

03:59PM  18   question.

03:59PM  19          A separate question was, if he hadn't -- you asked

03:59PM  20   her, Judge, if he had not said anything to you, would that --

03:59PM  21   would you have?  And she said sure.

03:59PM  22          Like, the delineating fact there is Peter saying it

03:59PM  23   to her.  And so that's the final argument that I have, and

03:59PM  24   I'll submit to the Court's ruling.

03:59PM  25          **THE COURT:**  This is -- it's a very close question.

USA v Bongiovanni - R.A. - Cooper/Direct - 9/13/24

04:00PM    1    And I think what tips the balance for me was her statement

04:00PM    2    that it wouldn't have made any difference.

04:00PM    3            And I think that based on that, she would not have

04:00PM    4    seen him, and it's not in furtherance of the conspiracy.

04:00PM    5            So it's a close question.  I know we've rolled around

04:00PM    6    with it quite a bit, but I'm not going to let it in.  I'm not

04:00PM    7    going to let it in.

04:00PM    8            And it's, as I say, it's a -- if the standard weren't

04:00PM    9    a preponderance, then I would let it in.  But it is a

04:00PM   10    preponderance, I've got to find more likely than not, and I

04:00PM   11    just don't think I can in good conscience find it.

04:00PM   12            Okay.  Let's get the jury back in, let's bring her

04:00PM   13    back in.  How much longer are you going to be, Mr. Cooper?

04:00PM   14        **MR. COOPER:**  I've lost my place, give me a second.

04:00PM   15    It's been a while.

04:00PM   16        **THE COURT:**  Yeah, I know.

04:00PM   17        **MR. COOPER:**  Very short.  And I do plan to go about

04:00PM   18    this in different ways without eliciting hearsay.  So I'm not

04:01PM   19    trying to be sideways with it.  Obviously, he can object as

04:01PM   20    much as he wants, but I just want to be clear about that.

04:01PM   21        **MR. SINGER:**  I will object as much as I want.

04:01PM   22        **MR. COOPER:**  No, I didn't mean that in a --

04:01PM   23        **THE COURT:**  He didn't need your permission?

04:01PM   24        **MR. COOPER:**  Correct.  Definitely didn't think that.

04:01PM   25        **THE COURT:**  Who's after her?

| | | |
|---|---|---|
| 04:01PM | 1 | **MR. COOPER:**  Craig Border.  Less than 20 minutes. |
| 04:01PM | 2 | **MR. TRIPI:**  And he's going to say certain photos are |
| 04:01PM | 3 | missing in his residence. |
| 04:01PM | 4 | (Witness seated at 4:01 p.m.) |
| 04:03PM | 5 | (Jury seated at 4:03 p.m.) |
| 04:03PM | 6 | **THE COURT:**  Okay.  The record will reflect that all |
| 04:03PM | 7 | our jurors are present again. |
| 04:03PM | 8 | I apologize for the delay, but as I say, we had a |
| 04:03PM | 9 | legal issue that we needed to vet outside your presence. |
| 04:03PM | 10 | You may continue. |
| 04:03PM | 11 | I remind the witness she's still under oath. |
| 04:03PM | 12 | You may continue. |
| 04:03PM | 13 | **MR. COOPER:**  Thank you, Judge. |
| 04:03PM | 14 | |
| 04:03PM | 15 | **(CONT'D) DIRECT EXAMINATION BY MR. COOPER:** |
| 04:03PM | 16 | Q.  Ms. R.A., a little while ago, I was asking you questions |
| 04:03PM | 17 | about some photographs that someone took of you; do you |
| 04:03PM | 18 | remember those questions? |
| 04:03PM | 19 | A.  Yes. |
| 04:03PM | 20 | Q.  What was the name of the person who took those |
| 04:03PM | 21 | photographs? |
| 04:03PM | 22 | A.  Craig Border. |
| 04:03PM | 23 | Q.  Okay.  And that was like a boyfriend from before you met |
| 04:03PM | 24 | Peter Gerace, right? |
| 04:03PM | 25 | A.  Yes. |

04:03PM  1   Q.  Was he -- was your relationship with Border kind of the

04:03PM  2   one right before you got involved in a relationship with

04:03PM  3   Gerace?

04:03PM  4   A.  Yes.

04:03PM  5   Q.  Okay.  We talked about those photos before.  Was that

04:03PM  6   wearing, like, a Playboy Bunny outfit?

04:03PM  7   A.  Yes.

04:03PM  8   Q.  Okay.  And did you -- did you ever tell Peter Gerace

04:04PM  9   about the existence of those photos?

04:04PM  10  A.  No.

04:04PM  11  Q.  Did there come a time when Peter Gerace confronted you

04:04PM  12  about the existence of those photos?

04:04PM  13  A.  Yes.

04:04PM  14          **MR. SINGER:**  Objection.  Again, calls for hearsay.

04:04PM  15          **MR. COOPER:**  It's a confrontation, Judge.

04:04PM  16          **THE COURT:**  No.  No.  Overruled.

04:04PM  17          **BY MR. COOPER:**

04:04PM  18  Q.  Did Peter Gerace confront you about the existence of

04:04PM  19  those photos?

04:04PM  20  A.  Yes.

04:04PM  21  Q.  Is that -- you recall that happening specifically in your

04:04PM  22  mind?

04:04PM  23  A.  Yes.

04:04PM  24  Q.  I'm not going ask you what was said during that

04:04PM  25  confrontation, but was that the same time in your life when

04:04PM    1    you learned what this defendant did for work?

04:04PM    2    A.    Yes.

04:04PM    3    Q.    Was it the same day?

04:04PM    4    A.    No.

04:04PM    5    Q.    Without getting into the contents of what Peter Gerace

04:04PM    6    said to you, did you come to learn from talking with Peter

04:04PM    7    Gerace how Peter Gerace knew about those photos of you in the

04:05PM    8    Playboy Bunny outfit in Craig Border's house?

04:05PM    9    A.    Yes.

04:05PM    10            MR. SINGER:  Objection.  Calls for hearsay.

04:05PM    11            THE COURT:  No.  Did she learn, no.

04:05PM    12            BY MR. COOPER:

04:05PM    13    Q.    Did you come to learn that, ma'am?

04:05PM    14    A.    Yes.

04:05PM    15    Q.    Who's the person who told you that?  Who told you how

04:05PM    16    they learned of it?

04:05PM    17    A.    Peter.

04:05PM    18    Q.    Peter told you how he learned of it?

04:05PM    19    A.    Yes.

04:05PM    20    Q.    Okay.  During the course of your relationship with Peter

04:05PM    21    Gerace, did there come a time where you learned that he was

04:05PM    22    using cocaine?

04:05PM    23    A.    Yes.

04:05PM    24    Q.    Okay.  And did that cocaine use by Peter cause some

04:05PM    25    consternation in your relationship with him?

| 04:05PM | 1 | A.  Yes. |
| 04:05PM | 2 | Q.  Why? |
| 04:05PM | 3 | A.  Because he wouldn't come home sometimes. |
| 04:05PM | 4 | Q.  Okay.  Did you know where he worked when you were living |
| 04:05PM | 5 | with him in your relationship? |
| 04:05PM | 6 | A.  Yes. |
| 04:05PM | 7 | Q.  Where did he work? |
| 04:05PM | 8 | A.  Pharaoh's. |
| 04:05PM | 9 | Q.  Okay.  What was his role or his position there? |
| 04:05PM | 10 | A.  He ran it. |
| 04:05PM | 11 | Q.  Okay.  Did you understand him to be the owner? |
| 04:05PM | 12 | A.  Yes. |
| 04:05PM | 13 | **MR. COOPER:**  Can I just have one second, please, |
| 04:06PM | 14 | Judge? |
| 04:06PM | 15 | **THE COURT:**  Sure. |
| 04:06PM | 16 | **BY MR. COOPER:** |
| 04:06PM | 17 | Q.  Ma'am, that individual, Craig Border, as you sit here, do |
| 04:06PM | 18 | you recall where you -- where he lived when you were dating |
| 04:06PM | 19 | him? |
| 04:06PM | 20 | A.  Yes. |
| 04:06PM | 21 | Q.  Was that on Main Street? |
| 04:06PM | 22 | A.  Yes. |
| 04:06PM | 23 | Q.  Do you remember the exact address? |
| 04:06PM | 24 | A.  It was the Sidway Building. |
| 04:06PM | 25 | Q.  What's that? |

04:06PM    1    A.  It was the Sidway Building --

04:06PM    2    Q.  Okay.

04:06PM    3    A.  -- before it was U.B., whatever they have there.

04:06PM    4    Q.  Got it.

04:06PM    5            MR. COOPER:  I have no further direct.  Thank you,

04:06PM    6    Judge.

04:06PM    7            THE COURT:  Okay.  Cross?

04:06PM    8

04:06PM    9            CROSS-EXAMINATION BY MR. SINGER:

04:06PM   10    Q.  Hi, Ms. R.A.

04:06PM   11    A.  Hi.

04:06PM   12    Q.  So, you testified on direct that you first met Joe

04:07PM   13    Bongiovanni through Peter Gerace.

04:07PM   14    A.  Yes.

04:07PM   15    Q.  And that particular photograph that we saw of you four at

04:07PM   16    the restaurant, that was something that was taken right

04:07PM   17    around the same time that you started a relationship with

04:07PM   18    Peter Gerace?

04:07PM   19    A.  Yes.

04:07PM   20    Q.  So at that particular dinner, was anyone using drugs?

04:07PM   21    A.  No.

04:07PM   22    Q.  You came to learn that Peter and Joe Bongiovanni, they

04:07PM   23    were friends based on having a relationship for a number of

04:07PM   24    years?

04:07PM   25    A.  Yes.

04:07PM   1    Q.  And you dated Peter Gerace starting in 2005; is that

04:07PM   2    right?

04:07PM   3    A.  Yes.

04:07PM   4    Q.  When was it that your relationship with Peter Gerace

04:07PM   5    ended?

04:07PM   6    A.  Well, it was very tumultuous.  It probably lasted about

04:07PM   7    seven or eight years on and off.

04:07PM   8    Q.  Okay.  So it was an on-again-off-again situation?

04:07PM   9    A.  Yes.

04:07PM  10    Q.  You mentioned that you had a child together; is that

04:07PM  11    right?

04:07PM  12    A.  Yes.

04:07PM  13    Q.  When was it that your son was born, again?

04:07PM  14    A.  2006.

04:07PM  15    Q.  And how soon after your son was born did things start to

04:08PM  16    kind to become on and off with Peter?

04:08PM  17    A.  Pretty much immediately.

04:08PM  18    Q.  Okay.  So you were on again and off again from 2006

04:08PM  19    onward?

04:08PM  20    A.  Yes.

04:08PM  21    Q.  All right.  Now you recall that when you first started

04:08PM  22    dating Peter in 2005, that's when you saw Mr. Bongiovanni

04:08PM  23    more often?

04:08PM  24    A.  Yes.

04:08PM  25    Q.  But as your relationship progressed throughout the years,

04:08PM  1  you didn't see him as often?

04:08PM  2  A.  No.

04:08PM  3  Q.  You talked about a time where you, Peter, Joe, and his

04:08PM  4  girlfriend went down to Ellicottville?

04:08PM  5  A.  Yes.

04:08PM  6  Q.  And so Ellicottville, it's kind of like a ski town about

04:08PM  7  an hour south of here?

04:08PM  8  A.  Yes.

04:08PM  9  Q.  A bunch of shops and restaurants?

04:08PM  10  A.  Yeah, shops and restaurants.

04:08PM  11  Q.  Did you guys spend the night there, or did you just go

04:08PM  12  down there for the day?

04:08PM  13  A.  We spent the night there.

04:08PM  14  Q.  And was that just for a weekend?

04:08PM  15  A.  Yes.

04:09PM  16  Q.  Was that particular trip something that happened in 2005

04:09PM  17  before you got pregnant?

04:09PM  18  A.  Yes.

04:09PM  19  Q.  You also mentioned that you went to Niagara-on-the-Lake?

04:09PM  20  A.  Yes.

04:09PM  21  Q.  And that sounded like it was just a day trip?

04:09PM  22  A.  Yeah.

04:09PM  23  Q.  And I think you said that you did some horse-drawn

04:09PM  24  carriage and also went to some wineries?

04:09PM  25  A.  Yes.

04:09PM   1   Q.  And that you had some dinner?

04:09PM   2   A.  Yes.

04:09PM   3   Q.  And then you crossed the border and went on your separate

04:09PM   4   ways?

04:09PM   5   A.  Yes.

04:09PM   6   Q.  And so as far as Mr. Bongiovanni was concerned, you

04:09PM   7   wouldn't see him every day of the week --

04:09PM   8   A.  No.

04:09PM   9   Q.  -- when you were dating Peter?

04:09PM  10   A.  No.

04:09PM  11   Q.  No?

04:09PM  12   A.  No.

04:09PM  13   Q.  Safe to say you'd see him maybe one or two times a month?

04:09PM  14   A.  Yeah, safe to say that.  Maybe every other weekend, so,

04:09PM  15   yes.

04:09PM  16   Q.  And in the context that you'd see him, you'd see in kind

04:09PM  17   of a social situation like a bar or restaurant?

04:10PM  18   A.  Yes.

04:10PM  19   Q.  Did you ever see him use any type of illegal substances?

04:10PM  20   A.  Never.

04:10PM  21   Q.  Did you and Peter ever use illegal substances in his

04:10PM  22   presence?

04:10PM  23   A.  Never.

04:10PM  24   Q.  Peter also had another friend Dan Derenda; is that right?

04:10PM  25   A.  Yes.

04:10PM    1    Q.  And Daniel Derenda, he was the commissioner of police for

04:10PM    2    Buffalo?

04:10PM    3    A.  Um-hum.

04:10PM    4    Q.  I think he had a relationship with Peter based on the

04:10PM    5    fact that Mr. Derenda was a godfather to one of Peter's

04:10PM    6    children?

04:10PM    7    A.  Yes.

04:10PM    8    Q.  Is that your son?

04:10PM    9    A.  No.

04:10PM   10    Q.  Okay.  How often would you see Peter hanging out with Dan

04:10PM   11    Derenda?

04:10PM   12         **MR. COOPER:**  Objection, relevance.

04:10PM   13         **THE COURT:**  Overruled.

04:10PM   14         **THE WITNESS:**  Not very often.

04:10PM   15         **BY MR. SINGER:**

04:10PM   16    Q.  Was it kind of the same frequency as you saw Peter

04:10PM   17    hanging out with Joseph Bongiovanni?

04:10PM   18    A.  Yes, but less.

04:10PM   19    Q.  You talked a little bit about your experience within the

04:11PM   20    strip club industry?

04:11PM   21    A.  Yes.

04:11PM   22    Q.  And I think one of the things that you mentioned --

04:11PM   23         Excuse me, let me just get my pad.

04:11PM   24         -- one of the things you mentioned on direct is it was

04:11PM   25    very difficult to work a job like that sober; do you remember

04:11PM    1    testifying to that?

04:11PM    2    A.    Yes.

04:11PM    3    Q.    And in your experience, I think you also testified that

04:11PM    4    drug use is very common at exotic clubs like that?

04:11PM    5    A.    Yes.

04:11PM    6    Q.    And I think you also testified that based on the nature

04:11PM    7    of the work, and based on some of the pressures associated

04:11PM    8    with it, you started to use narcotics more often as time

04:11PM    9    progressed in the industry?

04:11PM    10   A.    Yes.

04:11PM    11   Q.    Was that your experience that other women who worked in

04:11PM    12   the industry would kind of go down a similar path?

04:11PM    13   A.    Absolutely.

04:11PM    14   Q.    Is that somewhat the culture that exists inside exotic

04:12PM    15   dance clubs?

04:12PM    16          MR. COOPER:    Objection as to culture.

04:12PM    17          THE COURT:    Go ahead.

04:12PM    18          MR. COOPER:    There's one club that's at issue in this

04:12PM    19   trial.    The culture in other clubs is not relevant to this

04:12PM    20   proceeding.

04:12PM    21          THE COURT:    Yeah.    Overruled.

04:12PM    22          THE WITNESS:    It's common through strip clubs

04:12PM    23   everywhere in America.

04:12PM    24          BY MR. SINGER:

04:12PM    25   Q.    Do you know a person by the name of Katrina Nigro?

04:12PM    1    A.  Yes.

04:12PM    2    Q.  How do you know Ms. Nigro?

04:12PM    3    A.  I used to dance with her in the early 2000s.  She owned a

04:12PM    4    clothing store, I bought some exotic clothing costumes from

04:12PM    5    her.

04:12PM    6    Q.  So what year do you think you first met Ms. Nigro?

04:13PM    7    A.  2003 or 2004.

04:13PM    8    Q.  And how -- I guess, was there a point in time where you

04:13PM    9    stopped seeing Ms. Nigro?

04:13PM    10    A.  Yes.

04:13PM    11    Q.  When do you think you stopped seeing Ms. Nigro?  When did

04:13PM    12    that time occur?

04:13PM    13    A.  What do you mean, stopped seeing her?

04:13PM    14    Q.  Sure.  So I guess I think you just testified that you

04:13PM    15    first met her in 2003; is that right?

04:13PM    16    A.  Yes.

04:13PM    17    Q.  And then after meeting her in 2003, you'd see her, it

04:13PM    18    sounds like, in work situations?

04:13PM    19    A.  Yes, in work situations.

04:13PM    20    Q.  You testified that she sold different types of clothing?

04:13PM    21    A.  Um-hum.

04:13PM    22    Q.  Were you a customer at her store?

04:13PM    23    A.  Yes.

04:13PM    24    Q.  And you also saw her at various clubs that you worked at?

04:13PM    25    A.  Yes.

04:13PM    1    Q.  And we're not talking about Pharaoh's Gentlemen's Club,

04:13PM    2    correct?

04:13PM    3    A.  No.

04:13PM    4    Q.  We're talking about other locations?

04:13PM    5    A.  Yes.

04:13PM    6    Q.  Were those locations within the City of Buffalo?

04:13PM    7    A.  No.

04:13PM    8    Q.  Where are those locations at?

04:13PM    9    A.  Erie, Pennsylvania.  Rochester.

04:13PM   10    Q.  Would you go down to -- trips to Erie, Pennsylvania, or

04:14PM   11    out to Rochester with Ms. Nigro?

04:14PM   12    A.  Yes.

04:14PM   13    Q.  Would the two of you drive together?

04:14PM   14    A.  I'm not sure if we drove together, it was a long time

04:14PM   15    ago.  But we, like, we would -- she would message me and tell

04:14PM   16    me this club is, you know, I'm working here tonight, or

04:14PM   17    there's money here, so I would obviously go to that club.

04:14PM   18              MR. COOPER:  Judge, I'm going to object at this point

04:14PM   19    to relevance on this line of questioning.

04:14PM   20              THE COURT:  Yes, I'm not getting the relevance

04:14PM   21    either.

04:14PM   22              MR. SINGER:  May we approach, Judge?

04:14PM   23              THE COURT:  Yeah, come on up.

04:14PM   24              (Sidebar discussion held on the record.)

04:14PM   25              THE COURT:  I'm giving you real wide berth in cross.

USA v Bongiovanni - R.A. - Singer/Cross - 9/13/24

04:14PM　　1　　　　　　**MR. SINGER:**  I understand, Judge.

04:14PM　　2　　　　　　And so we're preparing to lay foundation for Ms. R.A.

04:14PM　　3　　to offer her opinion as to the character for truthfulness of

04:14PM　　4　　Ms. Nigro, as well as her reputation within the community or

04:14PM　　5　　the business community that she exists as far as truthfulness

04:14PM　　6　　is concerned.  I can adopt this witness as my own, or I can

04:14PM　　7　　recall her.  That's where I'm going.

04:15PM　　8　　　　　　**MR. COOPER:**  Well, I think he certainly think he has

04:15PM　　9　　to adopt the witness as his own, no question.

04:15PM　　10　　　　　　But I didn't make a leading objection.  I mean, I

04:15PM　　11　　actually think he was asking open-ended questions, so I'm not

04:15PM　　12　　trying to give him a hard time about that.  I didn't know

04:15PM　　13　　where we were headed with this, and I tried to give it a

04:15PM　　14　　little bit, but I still didn't know.

04:15PM　　15　　　　　　**THE COURT:**  Okay.  So you'll withdraw your objection?

04:15PM　　16　　You'll withdraw your relevance objection?

04:15PM　　17　　　　　　**MR. COOPER:**  I'll withdraw my relevance objection,

04:15PM　　18　　but I, yeah, I may lodge some additional objections as we go,

04:15PM　　19　　yeah.

04:15PM　　20　　　　　　**MR. SINGER:**  You can object as much as you like.

04:15PM　　21　　　　　　**MR. COOPER:**  Yeah.

04:15PM　　22　　　　　　(End of sidebar discussion.)

04:15PM　　23　　　　　　**THE COURT:**  So the objection is withdrawn?

04:15PM　　24　　　　　　**MR. COOPER:**  That's correct, Judge.

　　　　　　25

04:15PM    1              **BY MR. SINGER:**

04:15PM    2    Q.  So getting back to the times when you were in either

04:15PM    3    Erie, Pennsylvania, or Rochester.

04:15PM    4         Would you hang out with Katrina Nigro when you were at

04:15PM    5    those clubs with her?

04:15PM    6    A.  Yes, if we were with customers, if we were at the bar,

04:15PM    7    you know, I would see her and I would talk to her, yes.

04:15PM    8    Q.  And so you mentioned that you first started talking to

04:16PM    9    her and associating with her back in 2002, 2003.

04:16PM    10   A.  Um-hum.  Yes.

04:16PM    11   Q.  And I asked you a little bit about when was it that you

04:16PM    12   stopped hanging around her.

04:16PM    13   A.  Around the time I met Peter.

04:16PM    14   Q.  And so what time was that?

04:16PM    15   A.  2005.

04:16PM    16   Q.  And was there a period of time where you reassociated

04:16PM    17   with Ms. Nigro?

04:16PM    18   A.  No.  Well, she -- well, that's kind of, like, a

04:16PM    19   complicated question, because she eventually ended up

04:16PM    20   marrying Peter.  So she had to -- I had to coparent with this

04:16PM    21   woman.

04:16PM    22   Q.  Yeah.  And I guess that's what I was getting at.

04:16PM    23        So we talked a little bit earlier in your direct about

04:16PM    24   how you had a child in common with Peter?

04:16PM    25   A.  Yes.

04:16PM   1    Q.  It was a son who was born in 2006?

04:16PM   2    A.  Yes.

04:16PM   3    Q.  So after you said things started to get rocky with Peter,

04:16PM   4    you said it was a little on and off?

04:16PM   5    A.  Yes.

04:16PM   6    Q.  For a couple different years?

04:16PM   7    A.  Um-hum.

04:17PM   8    Q.  And during that period of time, did Peter start dating

04:17PM   9    Katrina Nigro at some point?

04:17PM  10    A.  Yes.

04:17PM  11    Q.  So when Peter was dating Katrina Nigro, what type of

04:17PM  12    interactions did you have with Ms. Nigro during that period?

04:17PM  13    A.  I didn't have the best interactions with her, but I did

04:17PM  14    have to be civil with her because she was with my son and she

04:17PM  15    was with Peter.

04:17PM  16    Q.  And how often would you see Ms. Nigro during that period?

04:17PM  17    A.  I really didn't see her very often.  It was more like

04:17PM  18    phone conversations, or through Messenger.  And, truthfully,

04:17PM  19    I really didn't -- I would prefer not to talk to her, I would

04:17PM  20    rather talk to Peter --

04:17PM  21    Q.  Okay.

04:17PM  22    A.  -- concerning my child.

04:17PM  23    Q.  But there were some type of interactions that you had

04:17PM  24    with her during that period that she dated Peter?

04:17PM  25    A.  Yes.

04:17PM    1    Q.  What years do you think that occurred as far as your

04:17PM    2    interaction with Katrina Nigro?

04:17PM    3    A.  Like 2015, 2016.

04:17PM    4    Q.  As far as your relationship, I'm sorry -- strike that.

04:17PM    5        As far as the child custody arrangement between you and

04:18PM    6    Peter at the time with your son, what was the arrangement at

04:18PM    7    that time?

04:18PM    8    A.  At that time, they had -- he had joint custody with my

04:18PM    9    parents.

04:18PM    10   Q.  And so how often would you interact with Peter regarding

04:18PM    11   custody matters involving your son?

04:18PM    12   A.  I mean, there really -- we didn't really interact that

04:18PM    13   much about it.  Are you talking about visitation, or --

04:18PM    14   Q.  Yeah, visitation.

04:18PM    15   A.  Yeah.  We had an open communication, so on a weekly

04:18PM    16   basis.

04:18PM    17   Q.  How often would you see Peter to visit your son?

04:18PM    18   A.  On a weekly basis.

04:18PM    19   Q.  And during these times that you would interact with

04:18PM    20   Peter, I think you testified that you also interacted with

04:18PM    21   Katrina sometimes?

04:18PM    22   A.  Yes.

04:18PM    23   Q.  It wasn't necessarily always by your choice, right?

04:18PM    24   A.  Yes.

04:18PM    25   Q.  But you still interacted with her?

04:18PM  1    A.  Um-hum.

04:18PM  2    Q.  Would you have conversations with her?

04:19PM  3    A.  Yeah, but they were far and few between.

04:19PM  4    Q.  And as far as your time in the exotic dancing business,

04:19PM  5    when was it that you first got involved in the exotic dancing

04:19PM  6    business?

04:19PM  7    A.  When was it that I got involved?

04:19PM  8    Q.  Yeah, year-wise.

04:19PM  9    A.  Between 2002, 2003.

04:19PM  10   Q.  And when was it that you left the exotic dancing

04:19PM  11   business?

04:19PM  12   A.  Why did I leave?

04:19PM  13   Q.  No, not why.  When was it that you left?

04:19PM  14   A.  2006.

04:19PM  15   Q.  And so during the time period that you were on the road

04:19PM  16   with Ms. Nigro either in Rochester or Erie, Pennsylvania, you

04:19PM  17   testified that you hung around with her, correct?

04:19PM  18   A.  Um-hum.

04:19PM  19   Q.  Did you also hang around with Ms. Nigro back here in the

04:19PM  20   City of Buffalo at various other establishments other than

04:19PM  21   Pharaoh's?

04:19PM  22   A.  Yes.

04:19PM  23   Q.  And how often would you see her in those establishments?

04:19PM  24   A.  It depended on when I worked.  I mean, if I worked five

04:20PM  25   days a week, sometimes I would see her all five days,

USA v Bongiovanni - R.A. - Singer/Cross - 9/13/24

04:20PM    1    sometimes I would see her two days.

04:20PM    2    Q.  And as far as work interaction, you talked a little bit

04:20PM    3    about how you would interact with her at work.  How was it

04:20PM    4    that you interacted with Ms. Nigro at work?  What kind of

04:20PM    5    context?

04:20PM    6    A.  The context usually was to do with, like, customers, or

04:20PM    7    making money, or drinking.

04:20PM    8    Q.  So in one context, would you two maybe speak to each

04:20PM    9    other when you were waiting to get on the stage?

04:20PM    10   A.  Yes.

04:20PM    11   Q.  And in another context, would you two speak to each other

04:20PM    12   when you were around the club when you were interacting with

04:20PM    13   customers?

04:20PM    14   A.  Yes.

04:20PM    15   Q.  And during this period, did you form an opinion with

04:20PM    16   regard to Ms. Nigro's character and truthfulness?

04:20PM    17   A.  Absolutely.

04:20PM    18        MR. COOPER:  Judge, I'd object at this point.  Can we

04:20PM    19   come up?

04:20PM    20        THE COURT:  Sure.

04:20PM    21        (Sidebar discussion held on the record.)

04:21PM    22        MR. COOPER:  What's permissible is opinion and

04:21PM    23   reputation, not the person's, not -- I don't believe that the

04:21PM    24   foundation has been properly laid to elicit what the question

04:21PM    25   that was asked.

USA v Bongiovanni - R.A. - Singer/Cross - 9713/24

04:21PM 1        THE COURT:  Did you form an opinion with respect to

04:21PM 2  Ms. Nigro's character and truthfulness.

04:21PM 3        MR. TRIPI:  I didn't think he said truthfulness.

04:21PM 4        THE COURT:  He said character and truthfulness.

04:21PM 5        MR. SINGER:  Character for truthfulness.

04:21PM 6        THE COURT:  For truthfulness.  Yes, I think that's

04:21PM 7  fine.

04:21PM 8        MR. COOPER:  Character for truthfulness.

04:21PM 9        THE COURT:  Right.

04:21PM 10        MR. COOPER:  Character --

04:21PM 11        MR. TRIPI:  I didn't hear the -- after the --

04:21PM 12  anything after the word.

04:21PM 13        MR. COOPER:  I think the word was "and," not "for,"

04:21PM 14  so --

04:21PM 15        THE COURT:  It says "and."  You meant to say "for?"

04:21PM 16        MR. SINGER:  I thought I said "for."

04:21PM 17        MR. TRIPI:  I didn't hear the word "truthfulness"

04:21PM 18  either.

04:21PM 19        THE COURT:  No, "truthfulness" he said.

04:21PM 20        MR. TRIPI:  Okay.

04:21PM 21        THE COURT:  I'm reading "truthfulness."

04:21PM 22        MR. TRIPI:  Okay.  My fault.

04:21PM 23        THE COURT:  So, and a witness's credibility may be

04:21PM 24  attacked or supported by the testimony about the witness's

04:21PM 25  reputation, or having a character for truthfulness or

04:22PM  1    untruthfulness, or by testimony in the form of an opinion

04:22PM  2    about that character that is for truthfulness or

04:22PM  3    untruthfulness.

04:22PM  4         So I will sustain the objection to the form of the

04:22PM  5    question because it says "and" --

04:22PM  6         **MR. SINGER:**  Okay.

04:22PM  7         **THE COURT:**  -- and you can re-ask.

04:22PM  8         (End of sidebar discussion.)

04:22PM  9         **THE COURT:**  The objection to the form of the question

04:22PM  10   is sustained.  You can ask another question.

04:22PM  11        **BY MR. SINGER:**

04:22PM  12   Q.  So I think I may have said "and" by mistake, so let me

04:22PM  13   re-ask the question again, Ms. R.A.

04:22PM  14       Did you form an opinion with regard to the character for

04:22PM  15   truthfulness of Ms. Nigro during this period?

04:22PM  16   A.  Yes, I did.

04:22PM  17   Q.  And what is your opinion?

04:22PM  18   A.  I think she's a compulsive liar, and I think she's

04:22PM  19   untruthful.

04:22PM  20   Q.  So you also mentioned that you worked a lot with

04:22PM  21   Ms. Nigro, correct?

04:22PM  22   A.  Yes.

04:22PM  23   Q.  How many different clubs do you think you worked with

04:22PM  24   Ms. Nigro during that 2003 to 2006 time period?

04:22PM  25   A.  Three or four.

04:22PM  1    Q.  And did you interact with other dancers during that

04:22PM  2    period?

04:22PM  3    A.  Yes.

04:22PM  4    Q.  Did Ms. Nigro interact with other dancers during that

04:23PM  5    period?

04:23PM  6    A.  Yes.

04:23PM  7    Q.  And you said that you worked in the same clubs as

04:23PM  8    Ms. Nigro?

04:23PM  9    A.  Yes.

04:23PM  10   Q.  How often would you think you saw her in those clubs

04:23PM  11   during that specific time period?

04:23PM  12   A.  A week, are you talking?

04:23PM  13   Q.  You know, during that 2003 to 2006 time period, how often

04:23PM  14   do you think you saw her inside the clubs and inside the

04:23PM  15   establishments you worked at?

04:23PM  16   A.  I mean, that's in a two-year period you're asking?

04:23PM  17   Q.  Yeah.

04:23PM  18   A.  Almost -- over 20 times.

04:23PM  19   Q.  And to your knowledge, did Ms. Nigro have a reputation

04:23PM  20   within that community as far as her truthfulness?

04:23PM  21   A.  Yes.

04:23PM  22   Q.  What was that reputation?

04:23PM  23        **MR. COOPER:**  Objection.  Improper foundation.  Again,

04:23PM  24   I'd like to come up, Judge.

04:23PM  25        **THE COURT:**  Sure.  Come on up.

04:23PM   1            (Sidebar discussion held on the record.)

04:23PM   2            **MR. COOPER:**  It's my understanding that the proper --

04:24PM   3    or, the necessary foundation for this line of questioning is

04:24PM   4    about did you have conversations with other people in that

04:24PM   5    community regarding this character trait eliciting, when those

04:24PM   6    conversations were, who they occurred with.

04:24PM   7            I don't think we have any of that.

04:24PM   8            **THE COURT:**  How does she know?

04:24PM   9            **MR. SINGER:**  I can lay a better foundation.

04:24PM  10            **THE COURT:**  Okay.

04:24PM  11            (End of sidebar discussion.)

04:24PM  12            **THE COURT:**  The objection is sustained.

04:24PM  13            **BY MR. SINGER:**

04:24PM  14    Q.  Ms. Nigro (sic), when you were working inside the clubs

04:24PM  15    during that time period, did you speak with other individuals

04:24PM  16    inside the clubs about Ms. Nigro?

04:24PM  17    A.  Yes.

04:24PM  18    Q.  And more specifically, did you have conversations with

04:24PM  19    other people inside of those clubs regarding their particular

04:24PM  20    thoughts on Ms. Nigro's truthfulness or untruthfulness?

04:24PM  21    A.  Yes.

04:24PM  22    Q.  How many people do you think you've spoken to in that

04:24PM  23    time period about Ms. Nigro's character for truthfulness?

04:24PM  24    A.  Quite a few.  The dancers there, whether or not, like, if

04:24PM  25    a customer -- like, she burned a customer or whatever, I

04:25PM  1    mean, it's a very intricate kind of, like, the club circuit

04:25PM  2    is very intricate.  So you find things out very fast.

04:25PM  3    Q.  And so we're talking about multiple conversations you had

04:25PM  4    with multiple people over that time period?

04:25PM  5    A.  Yes.

04:25PM  6    Q.  And they were focused on Ms. Nigro?

04:25PM  7    A.  Yes.

04:25PM  8    Q.  And they were focused on her character for truthfulness

04:25PM  9    or untruthfulness?

04:25PM  10   A.  Yes.

04:25PM  11   Q.  And did you form an opinion regarding what her reputation

04:25PM  12   in the community was with regard to her character for

04:25PM  13   truthfulness?

04:25PM  14   A.  I think she's a dishonest con artist.

04:25PM  15          **MR. COOPER:**  Objection.  I'd ask to strike that

04:25PM  16   answer --

04:25PM  17          **THE COURT:**  Yeah.

04:25PM  18          **MR. COOPER:**  -- as not responsive to the question.

04:25PM  19          **THE COURT:**  That answer is stricken.

04:25PM  20          Listen to the question --

04:25PM  21          **THE WITNESS:**  Okay.

04:25PM  22          **THE COURT:**  -- and answer the question, please.

04:25PM  23          The jury is not to consider that in your

04:25PM  24   deliberations.

04:25PM  25          Go ahead, Mr. Singer.

04:25PM    1             BY MR. SINGER:

04:25PM    2    Q.   Thank you.  So again, we -- we already got through what

04:25PM    3    your particular opinion is.

04:25PM    4    A.   Okay.

04:25PM    5    Q.   What I want to focus on is just Ms. Nigro's reputation

04:26PM    6    with the other people that you spoke with, and interacted

04:26PM    7    with in the exotic dancing community.

04:26PM    8    A.   Okay.

04:26PM    9    Q.   Did you have information which led you to conclude what

04:26PM   10    Katrina Nigro's reputation was within the exotic dancing

04:26PM   11    community regarding her character for truthfulness?

04:26PM   12    A.   Untruthful.

04:26PM   13    Q.   And that -- was that the reputation she had?

04:26PM   14    A.   Yes.

04:26PM   15             MR. SINGER:  Okay.  Thank you.  I have no further

04:26PM   16    questions, Judge.

04:26PM   17             MR. COOPER:  Judge, I'm going to start with the some

04:26PM   18    cross-examination from the adoption of the witness and --

04:26PM   19             THE COURT:  Yep.

04:26PM   20             MR. COOPER:  -- then maybe circle back.

04:26PM   21             THE COURT:  Go right ahead.

04:26PM   22

04:26PM   23    CROSS-EXAMINATION BY MR. COOPER (From Gov't Adopted Case):

04:26PM   24    Q.   Ma'am, you have a child with Peter Gerace, you told the

04:26PM   25    jury before, that was in 2006, right?

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

81

| | | |
|---|---|---|
| 04:26PM | 1 | A.  Yes. |
| 04:26PM | 2 | Q.  Okay.  And Peter's still involved in your child's life, |
| 04:26PM | 3 | right? |
| 04:26PM | 4 | A.  Yes. |
| 04:26PM | 5 | Q.  And you care about your child, right? |
| 04:26PM | 6 | A.  Yes. |
| 04:26PM | 7 | Q.  And during the time from, let's say, 2006 to 2024, is |
| 04:26PM | 8 | that 18 years? |
| 04:26PM | 9 | A.  Yes. |
| 04:26PM | 10 | Q.  Okay.  So for 18 years, you've had an association with |
| 04:26PM | 11 | Peter, right? |
| 04:27PM | 12 | A.  Yes. |
| 04:27PM | 13 | Q.  Whether willingly or unwillingly, I guess, right? |
| 04:27PM | 14 | A.  Yes. |
| 04:27PM | 15 | Q.  And you've had an association with Peter's family, right? |
| 04:27PM | 16 | A.  Yes. |
| 04:27PM | 17 | Q.  And Peter gives you money for his kid, right? |
| 04:27PM | 18 | A.  No. |
| 04:27PM | 19 | Q.  No, that doesn't happen? |
| 04:27PM | 20 | A.  No. |
| 04:27PM | 21 | Q.  Did Peter ever give you money for your child with him? |
| 04:27PM | 22 | A.  No. |
| 04:27PM | 23 | Q.  That never happened? |
| 04:27PM | 24 | A.  I -- I -- no.  He had -- no.  Because I don't have |
| 04:27PM | 25 | custody of my child.  My family does.  My mom does. |

| 04:27PM | 1 | Q. Does Peter -- maybe I phrased that question poorly. |
| 04:27PM | 2 | Has Peter ever, since your child was born, financially |
| 04:27PM | 3 | supported your child? |
| 04:27PM | 4 | A. Yes. |
| 04:27PM | 5 | Q. Is that a -- |
| 04:27PM | 6 | A. Sorry, sir. |
| 04:27PM | 7 | Q. That's okay. Are you okay? |
| 04:27PM | 8 | A. Yes. |
| 04:27PM | 9 | Q. Is that important to you? |
| 04:27PM | 10 | A. Yes. |
| 04:27PM | 11 | Q. Okay. And you're -- |
| 04:27PM | 12 | **MR. COOPER:** Can we come up real quick? I'm sorry. |
| 04:27PM | 13 | **THE COURT:** Sure. |
| 04:27PM | 14 | **MR. COOPER:** I want to be cautious here. |
| 04:27PM | 15 | (Sidebar discussion held on the record.) |
| 04:27PM | 16 | **MR. COOPER:** I just want to be cautious here. |
| 04:27PM | 17 | I don't think this is improper, but she's come to |
| 04:27PM | 18 | court for Peter, sat on Peter's side of the courtroom, |
| 04:27PM | 19 | appeared at court appearances. |
| 04:27PM | 20 | I'm about to say Peter has a court case, and I just |
| 04:28PM | 21 | want to front that for everybody. |
| 04:28PM | 22 | I think it's clear from the indictment as well, and I |
| 04:28PM | 23 | just want to front it. So, if you want to object, object. |
| 04:28PM | 24 | But -- |
| 04:28PM | 25 | **MR. SINGER:** Yeah, again, I mean, I object on 403 |

04:28PM    1    grounds, Judge.  I just think that the danger of unfair

04:28PM    2    prejudice to Mr. Bongiovanni --

04:28PM    3                (Simultaneous talking.)

04:28PM    4         MR. COOPER:  This door got opened --

04:28PM    5         THE COURT:  Stop.  I think you can ask have you been

04:28PM    6    to court for a court case that Peter has.

04:28PM    7                You need to link it to this.

04:28PM    8         MR. COOPER:  Absolutely.  Yeah.  It's the substance

04:28PM    9    of this case, her child's father is charged in the case.

04:28PM    10         MR. SINGER:  Count 2 of --

04:28PM    11                (Indecipherable speech.)

04:28PM    12         MR. COOPER:  It's bias.  I have to be able to explore

04:28PM    13    bias when this line of questioning comes out.  It didn't

04:28PM    14    happen last time, so I didn't front it.  But I've got to --

04:28PM    15         THE COURT:  Yeah, I think you can do that.

04:28PM    16         MR. SINGER:  So the bias, I think, Judge, though, if

04:28PM    17    they're probing on bias is that she showed up and supported

04:28PM    18    him in court.  I don't think you need to get into the

04:29PM    19    particular case --

04:29PM    20         MR. COOPER:  It's way more bias when it's this case.

04:29PM    21         MR. TRIPI:  She's got a rooting interest in this case

04:29PM    22    as it relates to Peter --

04:29PM    23         THE COURT:  As it relates --

04:29PM    24         MR. TRIPI:  -- and Katrina is linked heavily, as you

04:29PM    25    know, to that case as well.  The charges overlap with this

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

84

04:29PM    1    defendant, because Peter is charged with bribing this

04:29PM    2    defendant in this case, and charged with conspiring in Count 2

04:29PM    3    of this case.

04:29PM    4        **THE COURT:**  Okay.  But why does that have to be

04:29PM    5    related to this case.

04:29PM    6        **MR. COOPER:**  Judge --

04:29PM    7        **THE COURT:**  Just listen.  Just listen to me for just

04:29PM    8    a second.

04:29PM    9        Why isn't the fact that she knows that there is

04:29PM    10   another case against Peter in which Nigro is a witness, why

04:29PM    11   isn't that enough?  Why does it have to be related to this

04:29PM    12   particular case?

04:29PM    13       **MR. COOPER:**  Because Nigro's testifying against this

04:29PM    14   particular defendant in this particular case that's linked to

04:29PM    15   her husband -- that's linked to -- they're inextricably

04:29PM    16   intertwined.  The bias is inextricably intertwined.  And I

04:30PM    17   didn't bring this up --

04:30PM    18       **THE COURT:**  Right.

04:30PM    19       **MR. COOPER:**  -- and it didn't come up at the last

04:30PM    20   trial, so I wasn't prepared to front it for the Court.

04:30PM    21       I'm sure Mr. Singer knew he was gonna do it, I'm sure

04:30PM    22   he intentionally didn't tell me, so now we're making the

04:30PM    23   argument up here.

04:30PM    24       But it's fair game, Judge, when they --

04:30PM    25       **THE COURT:**  I think it is fair game.

04:30PM    1    **MR. SINGER:** Yeah.

04:30PM    2    (End of sidebar discussion.)

04:30PM    3    **BY MR. COOPER:**

04:30PM    4    Q. Peter's charged with conduct that got him charged here in

04:30PM    5    federal court, right?

04:30PM    6    A. Yes.

04:30PM    7    Q. And you're aware of that, right?

04:30PM    8    A. Yes.

04:30PM    9    Q. And you've been aware of it since it happened, right?

04:30PM   10    A. Yes.

04:30PM   11    Q. And you've got some pretty strong feelings about it,

04:30PM   12    right?

04:30PM   13    A. Yes.

04:30PM   14    Q. Not happy about it, right, ma'am?

04:30PM   15    A. No.

04:30PM   16    Q. Okay. And you're aware that the conduct is some of the

04:30PM   17    same conduct that's being discussed here in this case, right?

04:30PM   18    A. Yes.

04:30PM   19    Q. And you're aware that a lot of the witnesses that are in

04:30PM   20    the case involving your child's father are the same witnesses

04:30PM   21    that will be here in this case, right?

04:30PM   22    A. Yes.

04:30PM   23    Q. Okay. And you've shown up in court on Peter's case

04:31PM   24    before, right?

04:31PM   25    A. Yes.

04:31PM   1   Q.  And you've walked in and sat with his family behind him,

04:31PM   2   right?

04:31PM   3   A.  Yes.

04:31PM   4   Q.  Okay.  So fair to say you have a rooting interest in the

04:31PM   5   outcome of the case against Peter, right, ma'am?

04:31PM   6   A.  A rooting outcome?

04:31PM   7   Q.  A rooting interest.  You'd like to see something happen

04:31PM   8   in that case, right?

04:31PM   9   A.  Like, what would I like to see?  What are you implying?

04:31PM  10   Q.  Well, no, no.

04:31PM  11   A.  I'm sorry.

04:31PM  12   Q.  I'm asking you, just be honest with the jury here, not

04:31PM  13   hard, do you have a rooting interest in the outcome of the

04:31PM  14   case against Peter?

04:31PM  15   A.  Yes.

04:31PM  16   Q.  Yes, you do, right?

04:31PM  17       And that's causing you to have some bias when you talk

04:31PM  18   about Ms. Nigro, right, ma'am?

04:31PM  19   A.  No.

04:31PM  20   Q.  You dislike Ms. Nigro, right?

04:31PM  21   A.  Do I dislike her?  I don't like her character.

04:31PM  22   Q.  So my --

04:31PM  23   A.  And I know some of --

04:31PM  24   Q.  Ma'am, I'm going to ask questions.  And I'd ask for

04:31PM  25   you -- I'm going to be respectful to you, and I'd ask that

04:31PM    1    you be respectful to me.

04:31PM    2    A.  Okay.

04:31PM    3    Q.  And we'll work through it, okay?

04:31PM    4        Just a simple "yes" or "no":  Do you dislike Ms. Nigro?

04:31PM    5    A.  Yes.

04:31PM    6    Q.  Okay.  And you have strong feelings for Peter Gerace,

04:31PM    7    right?

04:31PM    8    A.  No.

04:31PM    9    Q.  No?  You sure?

04:31PM   10    A.  I don't have strong feelings for him.

04:32PM   11    Q.  Okay.  You show up in court, and you sit with his family,

04:32PM   12    right?

04:32PM   13    A.  For support of my son, I'm his mother.

04:32PM   14    Q.  Okay.  So my question is:  Do you show up in court and

04:32PM   15    sit with his family?

04:32PM   16    A.  Once.

04:32PM   17    Q.  Okay.  That's a yes, right?

04:32PM   18    A.  Yes.

04:32PM   19    Q.  Okay.  So you sit there.  And the reason that you show up

04:32PM   20    is to show support for Peter in front of his family, right,

04:32PM   21    ma'am?

04:32PM   22    A.  No, it's to show support for my son.

04:32PM   23    Q.  Okay.  It's not your son who's charged in the case,

04:32PM   24    right?

04:32PM   25    A.  I understand that, but it is his father.

04:32PM  1    Q.  Okay.  You talked about these conversations that you had

04:32PM  2    with other people about Ms. Nigro, right?

04:32PM  3    A.  Yes.

04:32PM  4    Q.  Can you name the people that you've had these

04:32PM  5    conversations with?

04:32PM  6    A.  Customers, other dancers.

04:32PM  7    Q.  Names, ma'am.  Do you know what a -- a name.  Do you know

04:32PM  8    their names?

04:32PM  9    A.  Name?  No.

04:32PM  10   Q.  One name, you can't give?

04:32PM  11   A.  It was too long ago, no, I don't know any names.

04:32PM  12   Q.  Not a single one?

04:32PM  13   A.  Do you want stage names?

04:32PM  14   Q.  No, no, no.  I'm asking you:  Mr. Singer just asked you

04:32PM  15   all these questions, you were happy to answer them, and you

04:32PM  16   were explaining all these various people that you had these

04:32PM  17   conversations with about Katrina Nigro's character for

04:32PM  18   truthfulness --

04:32PM  19   A.  Well, it's really not --

04:33PM  20   Q.  Ma'am, I'm still asking a question, so wait until I

04:33PM  21   finish the question, and then answer it, okay?

04:33PM  22       I'm going to be respectful to you, but I need to finish

04:33PM  23   my questions, okay?

04:33PM  24   A.  Okay.

04:33PM  25   Q.  Mr. Singer asked you questions about all the different

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

89

04:33PM  1   people that you had these conversations with.

04:33PM  2   A.  Um-hum.

04:33PM  3   Q.  What I'm asking you to do is tell them one name.

04:33PM  4   A.  I don't know one name.

04:33PM  5   Q.  Okay.

04:33PM  6       Before you came here to testify, we've met and we've

04:33PM  7   prepared and we've gone over some questions and answers,

04:33PM  8   right?

04:33PM  9   A.  Yes.

04:33PM  10  Q.  Okay.  And during those times, we've never had any

04:33PM  11  consternation like this before, right?

04:33PM  12  A.  No.

04:33PM  13  Q.  Okay.  You've been treated with respect by the FBI agents

04:33PM  14  when they've interviewed you or came to talk to?

04:34PM  15          **MR. SINGER:**  Objection, relevance.

04:34PM  16          **MR. COOPER:**  I'll move on Judge.

04:34PM  17          **BY MR. COOPER:**

04:34PM  18  Q.  Let me ask you a question.

04:34PM  19      Your child's grandmother, would it be fair to say that

04:34PM  20  the charges against Peter have been pretty devastating for

04:34PM  21  that person?

04:34PM  22  A.  Yes.

04:34PM  23  Q.  Okay.  And would it be a fair statement to say that the

04:34PM  24  charges against Peter have been devastating for your son?

04:34PM  25  A.  Yes.

04:34PM   1    Q.  Your son's been -- and I'm not trying to make light of

04:34PM   2    this at all, but your son's been bullied in school as a

04:34PM   3    result of having human trafficking charges pending against

04:34PM   4    his father, right?

04:34PM   5    A.  Yes.

04:34PM   6    Q.  That's upsetting to you, right?

04:34PM   7    A.  Of course.

04:34PM   8    Q.  I understand that.

04:34PM   9        Before you came up here to testify today, you knew that

04:34PM  10    Ms. Nigro was a witness in this case, right?

04:34PM  11    A.  Yes, it's in the newspapers.

04:34PM  12    Q.  Okay.  So I'm just asking if you're aware of it, that's

04:34PM  13    all.  You knew that, right?

04:34PM  14    A.  Yes.

04:34PM  15    Q.  Okay.  If Ms. Nigro said Joe Bongiovanni is friends with

04:35PM  16    Peter Gerace, you wouldn't have any reason to disagree with

04:35PM  17    that, right?

04:35PM  18    A.  No.

04:35PM  19    Q.  None at all, right?

04:35PM  20    A.  No.

04:35PM  21    Q.  Okay.  During the timeframe that Mr. Singer asked you

04:35PM  22    about when you were, I think, seeing Peter on a weekly basis

04:35PM  23    to have visitation with your son, like 2015, 2016 is that

04:35PM  24    when you were sometimes interacting with Ms. Nigro?

04:35PM  25    A.  Yes.

04:35PM  1   Q.  Would it be fair to say during that time Ms. Nigro was

04:35PM  2   seeing a lot more of Peter Gerace than you were?

04:35PM  3   A.  Yes.

04:35PM  4   Q.  Okay.  And at that name your life, 2015, 2016, were you

04:35PM  5   at Pharaoh's frequently?

04:35PM  6   A.  Never.

04:35PM  7   Q.  Not at all?

04:35PM  8   A.  Not at all.

04:35PM  9   Q.  Okay.  Do you think Katrina was at Pharaoh's at that

04:35PM  10  time?

04:35PM  11  A.  Yes.

04:35PM  12  Q.  Okay.  So would it be a fair statement for me to say you

04:35PM  13  couldn't tell this jury anything about what was happening at

04:35PM  14  Pharaoh's in 2015, could you?

04:35PM  15  A.  I could.  She posted it on social media.

04:35PM  16  Q.  That's not my question.

04:35PM  17      My question is:  If could you tell the jury based on your

04:36PM  18  own observations of what was happening inside Pharaoh's?

04:36PM  19  A.  No.

04:36PM  20  Q.  You couldn't do that, right?

04:36PM  21  A.  No.

04:36PM  22  Q.  Okay.

04:36PM  23           THE COURT:  How much more do you have, Mr. Cooper?

04:36PM  24           MR. COOPER:  I'm not sure, Judge.

04:36PM  25           BY MR. COOPER:

| 04:36PM | 1 | Q.  Earlier on direct examination, towards the end of the |
| 04:36PM | 2 | direct examination, I asked you a question about did you have |
| 04:36PM | 3 | a confrontation with Peter about these photos; do you |
| 04:36PM | 4 | remember being asked that question? |
| 04:36PM | 5 | A.  Yes. |
| 04:36PM | 6 | Q.  Okay.  And I asked you if that happened close in time |
| 04:36PM | 7 | to -- or, the same day, rather, to finding out what the |
| 04:36PM | 8 | defendant did for work; do you remember that question? |
| 04:36PM | 9 | A.  Yes. |
| 04:36PM | 10 | Q.  And you said you didn't think it was the same day; do you |
| 04:36PM | 11 | remember that? |
| 04:36PM | 12 |     When I just -- |
| 04:36PM | 13 | A.  Can you -- |
| 04:36PM | 14 | Q.  That you didn't learn what the defendant did for work on |
| 04:37PM | 15 | the same day that you had this confrontation with Peter about |
| 04:37PM | 16 | the Playboy Bunny photos; do you remember that? |
| 04:37PM | 17 | **MR. SINGER:**  Objection.  Outside the scope. |
| 04:37PM | 18 | **MR. COOPER:**  Judge, I think -- |
| 04:37PM | 19 | **THE COURT:**  No, overruled. |
| 04:37PM | 20 | **BY MR. COOPER:** |
| 04:37PM | 21 | Q.  Do you remember I asked you that on direct? |
| 04:37PM | 22 | A.  Yes. |
| 04:37PM | 23 | Q.  And you said you didn't think that happened on the same |
| 04:37PM | 24 | day? |
| 04:37PM | 25 | A.  I don't think that happened.  But I learned he was a DEA |

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

| | | |
|---|---|---|
| 04:37PM | 1 | agent -- |
| 04:37PM | 2 | Q.  Okay. |
| 04:37PM | 3 | A.  -- on that day particularly. |
| 04:37PM | 4 | Q.  Okay.  So that's what I'm getting at, ma'am.  The day |
| 04:37PM | 5 | Peter confronts you about these photos of you in the bunny |
| 04:37PM | 6 | outfit -- |
| 04:37PM | 7 | A.  Yes. |
| 04:37PM | 8 | Q.  -- is that the same day that you learned that this |
| 04:37PM | 9 | defendant works as a DEA agent? |
| 04:37PM | 10 | A.  Yes. |
| 04:37PM | 11 | Q.  Okay. |
| 04:37PM | 12 | A.  I mean, obviously he -- yeah, he's a -- |
| 04:37PM | 13 | Q.  Just yes, right?  Is that the answer? |
| 04:37PM | 14 | A.  Yes. |
| 04:37PM | 15 | Q.  Okay. |
| 04:37PM | 16 | **MR. COOPER:**  Can I just have one second, Judge? |
| 04:37PM | 17 | **THE COURT:**  Yes. |
| 04:37PM | 18 | **BY MR. COOPER:** |
| 04:38PM | 19 | Q.  As you sit here today, were you at the Boss Restaurant |
| 04:38PM | 20 | with the defendant and Peter Gerace and Katrina Nigro in |
| 04:38PM | 21 | 2016? |
| 04:38PM | 22 | A.  Was I at -- the what? |
| 04:38PM | 23 | Q.  The Boss, a restaurant.  Did you go to that? |
| 04:38PM | 24 | **MR. SINGER:**  Objection, outside the scope. |
| 04:38PM | 25 | **MR. COOPER:**  No, Judge. |

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

94

04:38PM   1          **THE COURT:**  How is that --

04:38PM   2          **MR. COOPER:**  I don't want to argue in front of the

04:38PM   3   jury.  I mean, I'll come up.

04:38PM   4          **THE COURT:**  Come on up.  Come on up.  Come on up.

04:38PM   5          (Sidebar discussion held on the record.)

04:38PM   6          **MR. COOPER:**  So what I'm going to do with -- what I

04:38PM   7   intend to do with this line of questioning, if I'm permitted,

04:38PM   8   is show different access to information, different access to

04:38PM   9   Peter and the defendant.

04:38PM   10          So Mr. Singer brought up through this impeachment

04:39PM   11   about character and truthfulness, he brought up how much she

04:39PM   12   interacted with Peter, how much she interacted with Katrina,

04:39PM   13   and when those things happened.

04:39PM   14          I'd like to now clarify on my cross-examination that

04:39PM   15   she wasn't around for other periods of time.

04:39PM   16          That's directly responsive to the direct that

04:39PM   17   Mr. Singer did.

04:39PM   18          **MR. SINGER:**  So she -- she already testified to the

04:39PM   19   exact periods that she had interaction with Peter.

04:39PM   20          **THE COURT:**  Why can't he explore that in response to

04:39PM   21   your cross-examination -- or, direct examination?

04:39PM   22          **MR. SINGER:**  Because this is going into a totally

04:39PM   23   different direction, Judge.  This has nothing to do with how

04:39PM   24   often she would see Peter, or how often she would see Katrina

04:39PM   25   Nigro.  It has absolutely nothing to do with that.

04:39PM    1          **MR. COOPER:**  Judge, I'm very familiar with the way

04:39PM    2    that you rule on questions for a cross-examination, and I

04:39PM    3    think that this falls squarely within, hey, you went in one

04:39PM    4    direction on direct, now cross gets to show a different piece

04:39PM    5    of that.

04:39PM    6          **MR. SINGER:**  But how does the --

04:39PM    7          **MR. COOPER:**  That's how cross is.

04:39PM    8          **MR. SINGER:**  -- interactions from Boss inform

04:39PM    9    anything about what she testified to?  I guess that's where

04:39PM   10    I'm missing the link here.

04:39PM   11          **MR. COOPER:**  Because she wasn't there for it, that's

04:39PM   12    the point.

04:39PM   13          He doesn't have to like the question, but it's --

04:39PM   14          **THE COURT:**  Easy.

04:40PM   15          **MR. COOPER:**  -- responsive to --

04:40PM   16          **THE COURT:**  Easy.

04:40PM   17          **MR. COOPER:**  -- how much time --

04:40PM   18          **THE COURT:**  Easy.

04:40PM   19          **MR. COOPER:**  -- they spent together.

04:40PM   20          **THE COURT:**  Everybody calm down.  Let's do this

04:40PM   21    slowly and logically.

04:40PM   22          So you're trying to show that she doesn't have the

04:40PM   23    kind of access to Katrina Nigro --

04:40PM   24          **MR. COOPER:**  To Peter and Katrina during time frames

04:40PM   25    that Katrina came in and offered testimony to this jury about,

USA v Bongiovanni - R.A. - Cooper/Cross - 9/13/24

96

| | | |
|---|---|---|
| 04:40PM | 1 | right?  So they choose to -- |
| 04:40PM | 2 | **THE COURT:**  Yes. |
| 04:40PM | 3 | **MR. COOPER:**  -- go through this door -- |
| 04:40PM | 4 | **THE COURT:**  Okay. |
| 04:40PM | 5 | **MR. COOPER:**  -- without it -- |
| 04:40PM | 6 | **MR. SINGER:**  So she -- |
| 04:40PM | 7 | **THE COURT:**  But what he's saying is that during these |
| 04:40PM | 8 | time periods that are crucial to Katrina's testimony, this |
| 04:40PM | 9 | witness is not having -- is not in contact with her and Peter. |
| 04:40PM | 10 | **MR. SINGER:**  So she testified to the fact that she |
| 04:40PM | 11 | would interact with Peter and with Katrina during the child |
| 04:40PM | 12 | care turnover visitations. |
| 04:40PM | 13 | **THE COURT:**  Right. |
| 04:40PM | 14 | **MR. SINGER:**  And that was the extent of her |
| 04:40PM | 15 | interaction during that period. |
| 04:40PM | 16 | **THE COURT:**  Right. |
| 04:40PM | 17 | **MR. SINGER:**  That's all.  So I guess the purpose of a |
| 04:40PM | 18 | cross is to show a contradiction in that.  There's no |
| 04:40PM | 19 | contradiction -- |
| 04:40PM | 20 | **THE COURT:**  No, no, no.  I don't think so.  I think |
| 04:40PM | 21 | the purpose of the cross is to show that the interaction was |
| 04:41PM | 22 | even more limited, and of course he can do that. |
| 04:41PM | 23 | **MR. COOPER:**  Thank you. |
| 04:41PM | 24 | (End of sidebar discussion.) |
| | 25 | |

04:41PM    1         **BY MR. COOPER:**

04:41PM    2    Q.  You need another water?

04:41PM    3    A.  No, I'm good.  Thank you.

04:41PM    4    Q.  Okay.  I need some water.  Give me one second.

04:41PM    5         Were you invited to a dinner with Joe Bongiovanni, Peter

04:41PM    6    Gerace, and Katrina Nigro in 2016?

04:41PM    7    A.  No.

04:41PM    8    Q.  Okay.  Did you attend a dinner with those people in 2016?

04:41PM    9    A.  No.

04:41PM   10    Q.  So do you know what happened there?

04:41PM   11    A.  No.

04:41PM   12    Q.  Okay.  Did you work at Pharaoh's Gentlemen's Club between

04:41PM   13    2013 and 2016?

04:41PM   14    A.  No.

04:41PM   15    Q.  Katrina worked there during that timeframe, right?

04:41PM   16    A.  Yes.

04:41PM   17    Q.  Thank you.

04:41PM   18         You didn't interact with Ms. Nigro -- with Ms. Nigro for

04:41PM   19    years directly at all, right?

04:41PM   20         Years would go by where you didn't interact with her at

04:41PM   21    all, right?

04:41PM   22    A.  Yes.

04:41PM   23    Q.  Okay.  As you sit here today, you're not aware of whether

04:42PM   24    there's text messages about a dinner that occurred at the

04:42PM   25    Boss Restaurant in 2016, right?

USA v Bongiovanni - R.A. - Cooper/Cross - 9713/24

| | | |
|---|---|---|
| 04:42PM | 1 | A.  No. |
| 04:42PM | 2 | Q.  You never saw those? |
| 04:42PM | 3 | A.  I never saw text messages. |
| 04:42PM | 4 | Q.  You wouldn't know if they exist, right? |
| 04:42PM | 5 | A.  No. |
| 04:42PM | 6 | Q.  You're not aware of whether Joe Bongiovanni ever texted |
| 04:42PM | 7 | Peter Gerace and said, hey, what's your address so I can send |
| 04:42PM | 8 | you a thank you card? |
| 04:42PM | 9 | You don't know if that happened, right? |
| 04:42PM | 10 | A.  No. |
| 04:42PM | 11 | Q.  Okay.  And you weren't there for the dinner, so you don't |
| 04:42PM | 12 | know what happened at the dinner either, right? |
| 04:42PM | 13 | A.  No. |
| 04:42PM | 14 | Q.  Okay.  You testified on one of your examinations, I don't |
| 04:42PM | 15 | recall which one, about women who work in exotic dance clubs |
| 04:42PM | 16 | using drugs, right? |
| 04:42PM | 17 | A.  Yes. |
| 04:42PM | 18 | Q.  That's something that happens, right? |
| 04:42PM | 19 | A.  Yes. |
| 04:42PM | 20 | Q.  Have you seen women that work in exotic dancing clubs |
| 04:42PM | 21 | that have track marks on their arms? |
| 04:42PM | 22 | A.  I haven't seen that personally. |
| 04:42PM | 23 | Q.  Okay. |
| 04:42PM | 24 | A.  I mean, I worked before the opiate epidemic, so I didn't |
| 04:42PM | 25 | see that. |

04:42PM   1   Q.  Got it.  Did you see woman who showed signs of severe

04:43PM   2   drug addiction working at those clubs?

04:43PM   3   A.  Yes.

04:43PM   4   Q.  Did you see drugs distributed at the clubs?

04:43PM   5   A.  Yes.

04:43PM   6           MR. SINGER:  Just for clarification, are we back on

04:43PM   7   redirect now?

04:43PM   8           MR. COOPER:  Crossing.

04:43PM   9           THE COURT:  I'm -- okay, he's still crossing.

04:43PM  10           MR. SINGER:  Can we approach?

04:43PM  11           THE COURT:  Sure.

04:43PM  12           (Sidebar discussion held on the record.)

04:43PM  13           MR. SINGER:  That's the reason I interrupted, Judge,

04:43PM  14   is because it's a leading objection.

04:43PM  15           If we're back on redirect, which I think we are, all

04:43PM  16   these questions start to go to information I solicited not

04:43PM  17   having to do with anything about an opinion or reputation

04:43PM  18   regarding truthfulness, but with regard to what Ms. R.A.

04:43PM  19   testified to on direct.

04:43PM  20           So if we're back into that area, which I think we

04:43PM  21   squarely are, then we've got to go back into -- he's direct

04:43PM  22   and cross.

04:43PM  23           THE COURT:  It wasn't leading.

04:43PM  24           MR. COOPER:  This is --

04:43PM  25           THE COURT:  I didn't think the questions were

04:43PM  1   leading.

04:43PM  2          **MR. COOPER:**  I think my tone of voice invokes

04:43PM  3   objection sometimes, but I'm --

04:44PM  4          **THE COURT:**  Don't lead now.

04:44PM  5          **MR. COOPER:**  Well, Judge, I would just -- there's a

04:44PM  6   line of cross-examination about -- so, he evokes this

04:44PM  7   reputation, we talk about access to Pharaoh's when there was

04:44PM  8   access to Pharaoh's --

04:44PM  9          **THE COURT:**  Right.

04:44PM  10          **MR. COOPER:**  -- with whether she knows it or not,

04:44PM  11   whether she knows it or not, this jury's heard testimony from

04:44PM  12   lots of witnesses about stuff that's gone on at Pharaoh's with

04:44PM  13   respect to drug addiction.  So I'm exploring that now in the

04:44PM  14   context of my cross-examination of her that I didn't expect to

04:44PM  15   be doing today.  But this is where we were.  I don't have a

04:44PM  16   cross written out because I found out about it 25 minutes ago.

04:44PM  17          **THE COURT:**  We're ending at 5, so --

04:44PM  18          **MR. COOPER:**  Okay.

04:44PM  19          **THE COURT:**  If we've got to bring her back Monday,

04:44PM  20   we'll bring her back Monday.

04:44PM  21          **MR. COOPER:**  Okay.

04:44PM  22          (End of sidebar discussion.)

04:44PM  23          **BY MR. COOPER:**

04:44PM  24   Q.  You've seen signs of somebody that's heavily using drugs

04:44PM  25   when you've worked in these clubs, right?

04:44PM    1    A.  Yes.

04:44PM    2    Q.  That's something that happens?

04:44PM    3    A.  Yes.

04:44PM    4    Q.  You've seen people distributing drugs in those contests,

04:44PM    5    right?

04:44PM    6    A.  In other clubs?

04:44PM    7    Q.  In clubs, yeah.

04:45PM    8    A.  Yes.

04:45PM    9    Q.  Okay.  So if Ms. Nigro said that women use drugs at

04:45PM    10   Pharaoh's, you wouldn't have any reason to disagree with

04:45PM    11   that, right?

04:45PM    12           **MR. SINGER:**  Objection to the hearsay.

04:45PM    13           **THE COURT:**  Sus --

04:45PM    14           **MR. COOPER:**  So I'm not asking her to --

04:45PM    15           **THE COURT:**  Hang on.

04:45PM    16           **MR. COOPER:**  -- elicit an out-of-court statement.

04:45PM    17           **THE COURT:**  Yeah.  Overruled.  I'll allow that.

04:45PM    18           **BY MR. COOPER:**

04:45PM    19   Q.  If Ms. Nigro said women who worked at Pharaoh's used

04:45PM    20   drugs, you wouldn't have any reason to disagree with that,

04:45PM    21   right?

04:45PM    22   A.  No.

04:45PM    23   Q.  If she said women who worked at Pharaoh's had opiate

04:45PM    24   addictions, you wouldn't have any reason to disagree with

04:45PM    25   that, right?

| 04:45PM | 1 | MR. SINGER: Objection, same basis. |
| 04:45PM | 2 | THE COURT: Overruled. |
| 04:45PM | 3 | BY MR. COOPER: |
| 04:45PM | 4 | Q. If she said that women who worked at Pharaoh's bought |
| 04:45PM | 5 | drugs from people at Pharaoh's, you wouldn't have any reason |
| 04:45PM | 6 | to disagree with that, right? |
| 04:45PM | 7 | A. No. |
| 04:45PM | 8 | MR. SINGER: Sorry, Judge. Again, I'll have to |
| 04:45PM | 9 | object for the record. |
| 04:45PM | 10 | THE COURT: I understand. I understand. |
| 04:45PM | 11 | Overruled. |
| 04:45PM | 12 | BY MR. COOPER: |
| 04:45PM | 13 | Q. If she said Peter blew lines of coke, would you have any |
| 04:45PM | 14 | reason to disagree with that? |
| 04:45PM | 15 | A. No. |
| 04:46PM | 16 | Q. If she said that women at Pharaoh's were put in |
| 04:46PM | 17 | precarious situations with men that came to Pharaoh's, would |
| 04:46PM | 18 | you have any reason to disagree with that? |
| 04:46PM | 19 | MR. SINGER: Objection, hearsay and 403. |
| 04:46PM | 20 | THE COURT: Overruled. |
| 04:46PM | 21 | THE WITNESS: Yes. |
| 04:46PM | 22 | BY MR. COOPER: |
| 04:46PM | 23 | Q. You told the jury earlier that people who work at these |
| 04:46PM | 24 | clubs are -- are put in uncomfortable situations with men |
| 04:46PM | 25 | when I was asking you questions on direct; do you -- |

04:46PM   1    A.  What does "vicarious" mean?  I mean, what are you trying

04:46PM   2    to ask me?

04:46PM   3    Q.  No, precarious.

04:46PM   4    A.  What -- okay, so what does that entail?

04:46PM   5    Q.  Dangerous.  Uncomfortable.

04:46PM   6    A.  Sure, uncomfortable.  Being a stripper's uncomfortable.

04:46PM   7    Q.  That's what I'm getting at, ma'am.

04:46PM   8    A.  Okay.

04:46PM   9    Q.  Katrina Nigro, if she testified, or if she told you that

04:46PM   10   Joe Bongiovanni and Peter Gerace were friends, you wouldn't

04:46PM   11   have any reason to disagree with that either, right, ma'am?

04:46PM   12   A.  No.

04:46PM   13        **MR. COOPER:**  Okay.  I'm good.  Thank you, Judge.

04:47PM   14

04:47PM   15             **RECROSS-EXAMINATION BY MR. SINGER:**

04:47PM   16   Q.  Ms. Nigro, the government challenged your opinion

04:47PM   17   regarding -- sorry.

04:47PM   18      Ms. R.A., the government challenged your opinion

04:47PM   19   regarding Ms. Nigro, and I want to get into a couple reasons

04:47PM   20   why you hold that opinion.  Okay?

04:47PM   21   A.  Yes.

04:47PM   22   Q.  Did Ms. Nigro tell you and others that she --

04:47PM   23        **MR. COOPER:**  Objection.  Specific instances are

04:47PM   24   improper, Judge.

04:47PM   25        **MR. SINGER:**  Unless the witness is impeached.

USA v Bongiovanni - R.A. - Singer/Recross - 9/13/24

04:47PM   1        **THE COURT:**  Okay.  We are going to quit for the day,

04:47PM   2   folks.  So remember my instructions about not making up your

04:48PM   3   mind about anything until the case has been given to you to

04:48PM   4   deliberate.  Don't communicate about the case with anyone.

04:48PM   5        Again, this is a weekend, so you'll be together with

04:48PM   6   family, don't tell them anything about this case.  Don't use

04:48PM   7   tools of technology to try to learn anything about the case or

04:48PM   8   to communicate about the case.  If there's any news coverage

04:48PM   9   about the case whatsoever, in the newspaper, on the radio, on

04:48PM  10   TV, on the internet, don't watch or listen or read that while

04:48PM  11   the case is in progress.  You'll be able to read plenty when

04:48PM  12   it's over, if there is any, but don't look for anything now.

04:48PM  13   And if you see anything inadvertently, let me know about it.

04:48PM  14   Okay?

04:48PM  15        We'll see you Monday at 9:30.  Monday, Tuesday, at

04:48PM  16   9:30.  And then Friday at 9:30.

04:48PM  17        But Wednesday and Thursday we will be down.  Okay?

04:48PM  18        Everybody have a great weekend, and I guess that's

04:49PM  19   it.  Thanks.

04:49PM  20        (Jury excused at 4:49 p.m.)

04:49PM  21        **THE COURT:**  Okay.  So, I understand -- let's excuse

04:49PM  22   the witness.

04:49PM  23        **MR. COOPER:**  I agree.

04:49PM  24        **THE COURT:**  I don't want to do argument now, but

04:49PM  25   ma'am, you can step down.

| | | |
|---|---|---|
| 04:49PM | 1 | **THE WITNESS:**  Thank you. |
| 04:49PM | 2 | **THE COURT:**  You're not to talk to anybody about your |
| 04:49PM | 3 | testimony at all -- |
| 04:49PM | 4 | **THE WITNESS:**  Yes, sir. |
| 04:49PM | 5 | **THE COURT:**  -- between now and when you come back on |
| 04:49PM | 6 | Monday, okay? |
| 04:49PM | 7 | **THE WITNESS:**  Yep. |
| 04:49PM | 8 | **THE COURT:**  Okay? |
| 04:49PM | 9 | **THE WITNESS:**  Thank you. |
| 04:49PM | 10 | (Witness excused at 4:49 p.m.) |
| 04:49PM | 11 | **MR. TRIPI:**  What time Monday, Judge? |
| 04:49PM | 12 | **THE COURT:**  9:30. |
| 04:50PM | 13 | So a couple things.  Do you guys want to brief this? |
| 04:50PM | 14 | **MR. COOPER:**  So I guess I'll beat the same drum that |
| 04:50PM | 15 | I've been beating since the beginning of this trial, which is |
| 04:50PM | 16 | we can have an opportunity to brief things for the Court and |
| 04:50PM | 17 | not argue them for 20 or 30 minutes at the sidebar when we |
| 04:50PM | 18 | know that issues are going to arise.  And over and over again |
| 04:50PM | 19 | during the course of the trial, the defense has chosen to |
| 04:50PM | 20 | operate by trial by surprise -- |
| 04:50PM | 21 | **THE COURT:**  So let me go back and ask the question: |
| 04:50PM | 22 | Do you want to brief this? |
| 04:50PM | 23 | **MR. COOPER:**  Yes. |
| 04:50PM | 24 | **THE COURT:**  Okay.  By Sunday at midnight? |
| 04:50PM | 25 | **MS. CHALBECK:**  Works for us, Judge.  We'll try to get |

| | | |
|---|---|---|
| 04:50PM | 1 | it to you sooner. |
| 04:50PM | 2 | **THE COURT:**  Simultaneous briefs. |
| 04:50PM | 3 | **MR. SINGER:**  Yeah, that's fine, Judge.  Just give me |
| 04:50PM | 4 | a deadline. |
| 04:50PM | 5 | **MR. TRIPI:**  Judge, the question is, I just want to |
| 04:51PM | 6 | frame the question, the question is now that Mr. Singer is |
| 04:51PM | 7 | back up on his recross -- |
| 04:51PM | 8 | **MR. COOPER:**  Redirect. |
| 04:51PM | 9 | **MR. TRIPI:**  -- redirect, or whatever it is, can he |
| 04:51PM | 10 | get into specific instances of conduct that bolster the |
| 04:51PM | 11 | opinion testimony as to Ms. Nigro's credibility that he's |
| 04:51PM | 12 | elicited from R.A.  That was -- |
| 04:51PM | 13 | **THE COURT:**  Because, because it's -- because her |
| 04:51PM | 14 | credibility has been attacked on that -- |
| 04:51PM | 15 | **MR. TRIPI:**  Yeah. |
| 04:51PM | 16 | **THE COURT:**  -- on cross. |
| 04:51PM | 17 | **MR. TRIPI:**  So can -- but he's asking not for |
| 04:51PM | 18 | specific instances of conduct to bolster Ms. R.A.'s |
| 04:51PM | 19 | credibility, he's asking for specific instances of conduct to |
| 04:51PM | 20 | bolster her opinion testimony about Ms. Nigro.  That's the |
| 04:51PM | 21 | objection, and that's what we'll be briefing. |
| 04:51PM | 22 | **MR. SINGER:**  Well, I phrased it a different way. |
| 04:51PM | 23 | She offered her opinion about Ms. Nigro's |
| 04:51PM | 24 | untruthfulness.  She also offered her opinion regarding the |
| 04:51PM | 25 | reputation of Ms. Nigro for her untruthfulness. |

04:51PM  1        On cross-examination, the government did two things:

04:52PM  2        1, is that they attacked her credibility on the basis

04:52PM  3  of her opinion on bias grounds.

04:52PM  4        Number 2, they offered multiple instances of specific

04:52PM  5  acts of what they would believe are truthful statements

04:52PM  6  that -- that the witness would not disagree were untruthful.

04:52PM  7        That is what I believe opened the door, Judge, to

04:52PM  8  specific acts that I can get into regarding her opinion.

04:52PM  9        I didn't open that door.  I actually leveled some

04:52PM  10  objections to some of those questions.  That's why the door is

04:52PM  11  open.

04:52PM  12        **MR. COOPER:**  Judge, I would respond to that that my

04:52PM  13  questions were about the -- her ability to make certain

04:52PM  14  perceptions when she was associated with Peter, when she was

04:52PM  15  associated with Katrina, if she was invited to certain events.

04:52PM  16  That's completely extraneous to what she wants -- what would

04:52PM  17  like to have this witness talk about, which are totally

04:52PM  18  unrelated things where she thinks --

04:52PM  19        **THE COURT:**  And you can put that in your papers, and

04:52PM  20  Mr. Singer can argue to the contrary in his papers.

04:52PM  21        **MR. COOPER:**  Got it.  Understood.

04:53PM  22        **THE COURT:**  The only other thing I wanted to raise

04:53PM  23  was so we had that go-around on the coconspirator statement,

04:53PM  24  that whole big go-around.  And there was -- and you might want

04:53PM  25  to look at the transcript, Mr. Singer and Mr. MacKay, because

USA v Bongiovanni - Proceedings - 9/13/24

04:53PM  1   at the beginning of that, there was a question and an answer

04:53PM  2   and an objection that was never really ruled on.  And I think

04:53PM  3   that the answer that came out may be contrary to the ruling

04:53PM  4   that I made.  So we may need to do a curative instruction on

04:53PM  5   that.

04:53PM  6          So, Ann, if you can get them the transcript of that,

04:53PM  7   just the beginning, before that whole roll-around with the

04:53PM  8   long argument that we had on the -- the coconspirator

04:53PM  9   statement, whether it came in as a coconspirator statement,

04:53PM  10  whether it came in as a statement against penal interests, the

04:53PM  11  very beginning of it.

04:53PM  12         **THE REPORTER:**  Sure, Judge.

04:53PM  13         **THE COURT:**  The question that triggered that had an

04:54PM  14  answer that I think may be problematic.  Okay?  So take a look

04:54PM  15  at that, and we can decide what to do about it.

04:54PM  16         **MR. SINGER:**  Okay, Judge.

04:54PM  17         **THE COURT:**  Okay?  Anything else from the government?

04:54PM  18         **MR. TRIPI:**  No, thank you, Judge.

04:54PM  19         **THE COURT:**  Anything from the defense?

04:54PM  20         **MR. SINGER:**  No, Your Honor.  Have a good weekend.

04:54PM  21         **THE CLERK:**  All rise.

04:54PM  22         (Proceedings concluded at 4:54 p.m.)

         23         (Excerpt concluded at 4:54 p.m.)

         24              *    *    *    *    *    *    *

         25

1

2                    **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on September 13, 2024.

8

9                         s/ Ann M. Sawyer
                         Ann M. Sawyer, FCRR, RPR, CRR
10                        Official Court Reporter
                         U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **TRANSCRIPT INDEX**

3        **EXCERPT - EXAMINATION OF PROTECTED WITNESS 6, R.A.**

4                          **SEPTEMBER 13, 2024**

5

6    **W I T N E S S**                                **P A G E**

7    **R.A.**                                              2

8       DIRECT EXAMINATION BY MR. COOPER:                  2

9           VOIR DIRE EXAMINATION BY MR. COOPER:          43

10          VOIR DIRE EXAMINATION BY MR. SINGER:          45

11       (CONT'D) DIRECT EXAMINATION BY MR. COOPER:        57

12       CROSS-EXAMINATION BY MR. SINGER:                  61

13       CROSS-EXAMINATION BY MR. COOPER (Gov Adopted):    80

14       RECROSS-EXAMINATION BY MR. SINGER:               103

15

16

17

18

19

20

21

22

23

24

25