09:34AM

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                Case No. 1:19-cr-227
 4            Plaintiff,                  (LJV)
   v.
 5                              September 23, 2024
   JOSEPH BONGIOVANNI,
 6
   _____Defendant._____
 7

 8     TRANSCRIPT EXCERPT - EXAMINATION OF DAVID CARPENTER
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                UNITED STATES DISTRICT JUDGE

10 APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
                         BY: JOSEPH M. TRIPI, ESQ.
11                           NICHOLAS T. COOPER, ESQ.
                             CASEY L. CHALBECK, ESQ.
12                       Assistant United States Attorneys
                         Federal Centre, 138 Delaware Avenue
13                       Buffalo, New York 14202
                         For the Plaintiff
14
                         SINGER LEGAL PLLC
15                       BY: ROBERT CHARLES SINGER, ESQ.
                         80 East Spring Street
16                       Williamsville, New York 14221
                           And
17                       LAW OFFICES OF PARKER ROY MacKAY
                         BY: PARKER ROY MacKAY, ESQ.
18                       3110 Delaware Avenue
                         Kenmore, New York 14217
19                         And
                         OSBORN, REED & BURKE, LLP
20                       BY: JOHN J. GILSENAN, ESQ.
                         120 Allens Creek Road
21                       Rochester, New York 14618
                         For the Defendant
22
   PRESENT:              BRIAN A. BURNS, FBI Special Agent
23                       MARILYN K. HALLIDAY, HSI Special Agent
                         KAREN A. CHAMPOUX, USA Paralegal
24
   LAW CLERK:            REBECCA FABIAN IZZO, ESQ.
25
```

| | | |
|---|---|---|
| | 1 | **COURT DEPUTY CLERK:**   **COLLEEN M. DEMMA** |
| | 2 | **COURT REPORTER:**        **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| | 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| | 4 | Ann_Sawyer@nywd.uscourts.gov |
| | 5 | |
| 12:09PM | 6 | *   *   *   *   *   *   * |
| 12:09PM | 7 | |
| 12:09PM | 8 | (Excerpt commenced at 12:09 p.m.) |
| 12:09PM | 9 | (Jury is present.) |
| 12:09PM | 10 | **THE COURT:**  The government may call its next witness. |
| 12:09PM | 11 | **MS. CHALBECK:**  Thank you, Your Honor.  The government |
| 12:09PM | 12 | calls David Carpenter. |
| 12:09PM | 13 | And, Judge, just so I know, the Court wants to stop |
| 12:09PM | 14 | around 12:30? |
| 12:09PM | 15 | **THE COURT:**  Around then is fine. |
| 12:09PM | 16 | **MS. CHALBECK:**  If I get to a good place?  Thank you. |
| 12:09PM | 17 | |
| 12:09PM | 18 | **D A V I D   C A R P E N T E R**, having been duly called and |
| 12:10PM | 19 | sworn, testified as follows: |
| 12:10PM | 20 | **MS. CHALBECK:**  May I inquire, Judge? |
| 12:10PM | 21 | **THE COURT:**  You may. |
| 12:10PM | 22 | |
| 12:10PM | 23 | **DIRECT EXAMINATION BY MS. CHALBECK:** |
| 12:10PM | 24 | Q.  Good afternoon, Mr. Carpenter. |
| 12:10PM | 25 | A.  Good afternoon. |

| | | |
|---|---|---|
| 12:10PM | 1 | Q.  Please introduce yourself to the jury. |
| 12:10PM | 2 | A.  My name is David Carpenter.  I'm an assistant special |
| 12:10PM | 3 | agent in charge for the Treasury Inspector General for Tax |
| 12:10PM | 4 | Administration, the acronym is TIGTA. |
| 12:10PM | 5 | Q.  Now, assistant special agent in charge, is that ASAC for |
| 12:10PM | 6 | short? |
| 12:10PM | 7 | A.  Yes. |
| 12:10PM | 8 | Q.  I think that's an acronym that this jury has probably |
| 12:10PM | 9 | heard before, so I might refer to you as that. |
| 12:10PM | 10 |     And then I think you said you work for the Treasury |
| 12:10PM | 11 | Inspector General for Tax Administration? |
| 12:11PM | 12 | A.  Yes. |
| 12:11PM | 13 | Q.  And can I call that TIGTA for short? |
| 12:11PM | 14 | A.  Yes. |
| 12:11PM | 15 | Q.  Okay.  What do you do as the ASAC for TIGTA? |
| 12:11PM | 16 | A.  I supervise seven special agents and one support staff. |
| 12:11PM | 17 | Q.  And what sort of -- is TIGTA -- does TIGTA investigate |
| 12:11PM | 18 | criminal acts? |
| 12:11PM | 19 | A.  Yes. |
| 12:11PM | 20 | Q.  What sort of offenses does TIGTA investigate? |
| 12:11PM | 21 | A.  TIGTA investigates attempts to corrupt the tax |
| 12:11PM | 22 | administration. |
| 12:11PM | 23 | Q.  Does that include, like, left it by taxpayers, threats -- |
| 12:11PM | 24 | A.  Yes.  We -- that's -- theft of refunds from taxpayers. |
| 12:11PM | 25 | Threats to IRS employees from taxpayers, if they don't feel a |

Case 1:19-cr-00227-LJV-MJR    Document 1325    Filed 10/27/24    Page 4 of 172
USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

4

| | | |
|---|---|---|
| 12:11PM | 1 | resolution is going favorably for them.  Threats of harm that |
| 12:11PM | 2 | taxpayers may say against themselves as a way of trying to |
| 12:12PM | 3 | expedite handling of an issue they have.  Another example, an |
| 12:12PM | 4 | attempt to bribe an IRS employee for a more favorable outcome |
| 12:12PM | 5 | to a despite. |
| 12:12PM | 6 | Q.  Okay.  And how long have you been the ASAC for TIGTA? |
| 12:12PM | 7 | A.  About 90 days. |
| 12:12PM | 8 | Q.  And prior to being the ASAC, what were you? |
| 12:12PM | 9 | A.  I was a special agent. |
| 12:12PM | 10 | Q.  And were you, as a special agent, investigating all of |
| 12:12PM | 11 | those kinds of offenses that you just described for this |
| 12:12PM | 12 | jury? |
| 12:12PM | 13 | A.  Yes. |
| 12:12PM | 14 | Q.  Now, prior to joining TIGTA, where did you work? |
| 12:12PM | 15 | A.  I was a special agent with the Department of Justice |
| 12:12PM | 16 | Office of Inspector General's office. |
| 12:12PM | 17 | Q.  I think that's another office or agency that this jury |
| 12:12PM | 18 | has heard about.  Can I call it OIG for short? |
| 12:12PM | 19 | A.  Yes. |
| 12:12PM | 20 | Q.  And you're going to know what I'm talking about? |
| 12:12PM | 21 | A.  Yes. |
| 12:12PM | 22 | Q.  Okay.  Over what period of time did you work for OIG? |
| 12:12PM | 23 | A.  From May of 2018 to September of 2020. |
| 12:12PM | 24 | Q.  And what sorts of crimes or offenses does OIG |
| 12:13PM | 25 | investigate? |

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

5

12:13PM    1    A.  We investigated allegations of misconduct by employees of

12:13PM    2    the Department of Justice regarding their employment there.

12:13PM    3    Q.  And you said you investigate claims of misconduct by

12:13PM    4    employees within the Department of Justice.  Does the

12:13PM    5    Department of Justice have a bunch of agencies kind of under

12:13PM    6    that broader umbrella?

12:13PM    7    A.  Yes.

12:13PM    8    Q.  Is the DEA one of the agencies kind of housed within the

12:13PM    9    greater Department of Justice?

12:13PM    10   A.  Yes.

12:13PM    11   Q.  And so if there was -- if there were allegations of

12:13PM    12   wrongdoing against a DEA employee, would OIG be one of the

12:13PM    13   agencies to investigate that?

12:13PM    14   A.  Yes.

12:13PM    15   Q.  Would the DEA really investigate that?

12:13PM    16   A.  No.

12:13PM    17   Q.  Why not?

12:13PM    18   A.  The DEA would not be involved in investigating their own

12:13PM    19   so that a -- it avoids any conflict of interest that may

12:14PM    20   arise from the investigation as a way of walling off the DEA,

12:14PM    21   the Department of Justice is taking a step further to ensure

12:14PM    22   an unbiased investigation.

12:14PM    23   Q.  Is that kind of why Offices of Inspector Generals were

12:14PM    24   created, to investigate in an unbiased and accurate way

12:14PM    25   claims that might trigger a conflict of interest?

12:14PM   1    A.  Yes.

12:14PM   2              **MR. SINGER:**  Objection.

12:14PM   3              **THE WITNESS:**  Yes.

12:14PM   4              **MR. SINGER:**  Sorry.  Is everyone awake?

12:14PM   5              Objection to bolstering, Judge.

12:14PM   6              **THE COURT:**  No.  Overruled.

12:14PM   7              **BY MS. CHALBECK:**

12:14PM   8    Q.  Okay.  Moving right along, prior to working at OIG, where

12:14PM   9    did you work?

12:14PM   10   A.  I was a special agent with the United States Secret

12:14PM   11   Service for about eight and a half years.

12:14PM   12   Q.  And can you just generally and briefly describe what you

12:14PM   13   did in your capacity as a special agent with the Secret

12:15PM   14   Service?

12:15PM   15   A.  The Secret Service has what they refer to as a dual

12:15PM   16   mission.  Half their mission is investigating financial

12:15PM   17   fraud, and the other half is regarding the protection of

12:15PM   18   domestic protectees and foreign heads of state when they

12:15PM   19   visit America.

12:15PM   20   Q.  And when you worked at the Secret Service, did you kind

12:15PM   21   of work towards both missions?  Did you at one point

12:15PM   22   investigate financial fraud, and then at another point were

12:15PM   23   you on protective details?

12:15PM   24   A.  Yes.  For the first seven years or so of my time in

12:15PM   25   Secret Service I was doing both financial investigations as

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24      7

| 12:15PM | 1 | well as protection assignments. |
| 12:15PM | 2 | In my last year there, I was assigned full time to the |
| 12:15PM | 3 | presidential protective detail exclusively doing protection. |
| 12:15PM | 4 | Q.  Okay.  And prior to working for the Secret Service, where |
| 12:15PM | 5 | were did you work? |
| 12:15PM | 6 | A.  I was a probation and parole officer for the State of |
| 12:15PM | 7 | North Carolina. |
| 12:15PM | 8 | Q.  Now I want to bring you back to your time with OIG, the |
| 12:16PM | 9 | Office of Inspector General within DOJ. |
| 12:16PM | 10 | When did you -- withdrawn. |
| 12:16PM | 11 | Around August of 2018, did you begin working on an |
| 12:16PM | 12 | investigation into Joseph Bongiovanni? |
| 12:16PM | 13 | A.  I did. |
| 12:16PM | 14 | Q.  Do you see Mr. Bongiovanni present in the courtroom |
| 12:16PM | 15 | today? |
| 12:16PM | 16 | A.  I do. |
| 12:16PM | 17 | Q.  Have you met him before? |
| 12:16PM | 18 | A.  I have. |
| 12:16PM | 19 | Q.  Could you please identify him by an article of clothing |
| 12:16PM | 20 | that he's wearing? |
| 12:16PM | 21 | A.  Red tie -- or, glasses. |
| 12:16PM | 22 | Q.  Okay. |
| 12:16PM | 23 | **MS. CHALBECK:**  Judge, may the record reflect that the |
| 12:16PM | 24 | witness has identified the defendant. |
| 12:16PM | 25 | **THE COURT:**  It does. |

| | | |
|---|---|---|
| 12:16PM | 1 | **MS. CHALBECK:**  I was seeing two red ties there, |
| 12:16PM | 2 | Your Honor. |
| 12:16PM | 3 | **MR. SINGER:**  Go Bills. |
| 12:16PM | 4 | **BY MS. CHALBECK:** |
| 12:16PM | 5 | Q.  At the time that you began investigating the defendant, |
| 12:16PM | 6 | what was his job? |
| 12:16PM | 7 | A.  He was a special agent with the DEA. |
| 12:16PM | 8 | Q.  And I should have asked earlier, when you started |
| 12:16PM | 9 | investigating the defendant, were you the only investigator |
| 12:17PM | 10 | on that case? |
| 12:17PM | 11 | A.  No. |
| 12:17PM | 12 | Q.  Was OIG the only agency involved in that case? |
| 12:17PM | 13 | A.  No. |
| 12:17PM | 14 | Q.  Who were the other -- what other agencies were involved |
| 12:17PM | 15 | in investigating the defendant? |
| 12:17PM | 16 | A.  HSI was involved, with Special Agent Curtis Ryan. |
| 12:17PM | 17 |     And then later on, the FBI became involved. |
| 12:17PM | 18 | Q.  And did -- when you joined the investigation, were you |
| 12:17PM | 19 | able to get connected with Special Agent Curtis Ryan at HSI? |
| 12:17PM | 20 | A.  Yes. |
| 12:17PM | 21 | Q.  Was the DEA part of the investigative team? |
| 12:17PM | 22 | A.  No. |
| 12:17PM | 23 | Q.  And why not? |
| 12:17PM | 24 | A.  Again, there were -- they were walled off from the |
| 12:17PM | 25 | investigation to prevent any conflicts of interest that may |

12:17PM    1    have been there, to provide a more unbiased investigation.

12:17PM    2    Q.  And in addition to that, were some DEA employees viewed

12:17PM    3    by the investigative team as potential subjects or witnesses?

12:17PM    4    A.  Yes.

12:17PM    5    Q.  Just in general terms, can you explain the division of

12:18PM    6    labor between you and OIG on the one hand, and Curtis Ryan

12:18PM    7    and Homeland Security on the other?

12:18PM    8    A.  We worked together on this investigation.  However, we

12:18PM    9    were -- we were separate in our attentions.

12:18PM    10       Curtis Ryan was focusing on a -- a drug-trafficking

12:18PM    11   organization involving Ron Serio.

12:18PM    12       And I was focusing my investigation into allegations made

12:18PM    13   against Joseph Bongiovanni.

12:18PM    14   Q.  So though you had a focus on -- withdrawn.

12:18PM    15       Though Curtis was -- Special Agent Ryan was focused on

12:18PM    16   maybe the Ron Serio leg of the investigation into the

12:18PM    17   defendant, did he investigate all the other claims involving

12:19PM    18   the defendant, too?

12:19PM    19   A.  I'm not sure of the --

12:19PM    20   Q.  I'll rephrase my question.

12:19PM    21       I think you just testified, Mr. Carpenter, that your

12:19PM    22   focus was on certain allegations into the defendant?

12:19PM    23   A.  Yes.

12:19PM    24   Q.  Were those allegations his relationship with Peter

12:19PM    25   Gerace, and his alleged use of racial slurs in reference to

12:19PM    1    DEA targets?

12:19PM    2    A.  Yes.

12:19PM    3    Q.  Okay.  And then I think you testified that Special Agent

12:19PM    4    Curtis Ryan and his team at Homeland Security were focused on

12:19PM    5    the Ron Serio investigation as it relates to this defendant;

12:19PM    6    is that correct?

12:19PM    7    A.  Yes.

12:19PM    8    Q.  Okay.  Now, though you were focused on the defendant's

12:19PM    9    relationship with Peter Gerace, and his use of racial slurs,

12:19PM   10    his alleged use of racial slurs, is it fair to say that

12:19PM   11    Curtis Ryan was not so limited?  His investigation

12:19PM   12    encompassed all of the allegations?

12:19PM   13    A.  Correct.

12:19PM   14    Q.  Okay.  But yours, by contrast, was focused just on his

12:19PM   15    relationship with Peter Gerace, that being the defendant's,

12:20PM   16    and the alleged use of racial slurs?

12:20PM   17    A.  Correct.

12:20PM   18    Q.  Okay.  You said that you became involved in the

12:20PM   19    investigation into the defendant around August of 2018.  I

12:20PM   20    want to speed up to -- and fast forward to March 29th of

12:20PM   21    2019.

12:20PM   22       Were you still working on the investigation on that day?

12:20PM   23    A.  I was.

12:20PM   24    Q.  What was just the general status of the investigation in

12:20PM   25    March of 2019?

12:20PM   1   A.   The investigation was active and ongoing.  They were

12:20PM   2   still collecting evidence and vetting information.

12:20PM   3   Q.   And was it still focused on those three categories that I

12:20PM   4   outlined earlier:  The Serio leg, the Gerace leg, and the

12:20PM   5   racial slurs leg?

12:20PM   6   A.   Yes.

12:20PM   7   Q.   Now prior to March of 2019, had you ever spoken with this

12:20PM   8   defendant about the investigation?

12:21PM   9   A.   No.

12:21PM  10   Q.   But in March of 2019, did you make contact with him?

12:21PM  11   A.   Yes.

12:21PM  12   Q.   What did you make contact with him for?

12:21PM  13   A.   I called him on the phone, and I asked him if he would be

12:21PM  14   willing to meet with me for a voluntary interview regarding

12:21PM  15   allegations of him using racial slurs to a fellow DEA agent,

12:21PM  16   and allegations of his relationship with Peter Gerace and

12:21PM  17   providing law enforcement information to him.

12:21PM  18   Q.   Now we'll get into that in a minute, but just more

12:21PM  19   generally, when you're doing an investigation, can it be

12:21PM  20   valuable as an investigator to speak to the person you're

12:21PM  21   investigating?

12:21PM  22   A.   Yes.

12:21PM  23   Q.   Why is that?

12:21PM  24   A.   It allows us the opportunity to hear directly from them

12:21PM  25   their side of the story.  It allows them to explain their

12:21PM    1    perspective.  It allows them to provide a context to their

12:21PM    2    actions.  It allows them to explain any intent that was

12:21PM    3    behind any -- any -- any activities that they did.

12:22PM    4    Q.  In that context, is it important for the person being

12:22PM    5    interviewed to tell the truth?

12:22PM    6    A.  Yes.

12:22PM    7    Q.  Why is it important for your investigation for the person

12:22PM    8    you're interviewing to tell the truth?

12:22PM    9    A.  As we're investigating his activities, failure to tell

12:22PM   10    the truth would provide us with falls leads, false

12:22PM   11    information, it could result in an unfair, unbiased, and

12:22PM   12    incomplete investigation.

12:22PM   13    Q.  What is the ultimate goal, you know, when you're

12:22PM   14    investigating?

12:22PM   15    A.  Our ultimate goal is to find the truth, whatever it is.

12:22PM   16    Q.  So if someone is dishonest, it frustrates that goal?

12:22PM   17    A.  Yes.

12:22PM   18    Q.  So did there come a time in March of 2019, I think you

12:22PM   19    said that you invited the defendant for a voluntary

12:22PM   20    interview?

12:22PM   21    A.  Yes.

12:23PM   22    Q.  How did the defendant respond?

12:23PM   23    A.  He agreed to meet with me.

12:23PM   24    Q.  And did you tell him over the phone that it was a

12:23PM   25    voluntary interview?

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

13

12:23PM    1    A.   I did.

12:23PM    2    Q.   Did you explain what that meant?

12:23PM    3    A.   Yes.

12:23PM    4    Q.   Tell the jury what you said.

12:23PM    5    A.   I explained to them that this was a voluntary interview.

12:23PM    6    That he was free not to participate.  That there was no

12:23PM    7    punishment or consequence to his declining of this interview.

12:23PM    8    Q.   And you did also over the phone notify him kind of the

12:23PM    9    general topics that you wanted to discuss with him?

12:23PM   10    A.   Yes.  I told him what -- I told him the two topics that I

12:23PM   11    wanted to discuss, which were the allegations made that he

12:23PM   12    used racial slurs to a follow DEA agent, as well as his

12:23PM   13    relationship with Peter Gerace and providing law-enforcement

12:23PM   14    sensitive information.

12:23PM   15    Q.   Why did you tell the defendant the topics that you wanted

12:23PM   16    to discuss with him in this interview?

12:23PM   17    A.   I thought it was important so he would know up front what

12:23PM   18    the interview was all about so he could make an informed

12:23PM   19    decision on whether he wanted to participate or not so that

12:24PM   20    we could start off the interview on a trusting level as a way

12:24PM   21    of developing a rapport.

12:24PM   22    Q.   Okay.  And after you said this, but did he agree to be

12:24PM   23    interviewed?

12:24PM   24    A.   Yes.

12:24PM   25    Q.   When was that interviewed ultimately scheduled?

12:24PM   1   A.   March 29th of 2019.

12:24PM   2   Q.   Where was it scheduled to take place?

12:24PM   3   A.   The U.S. Attorney's Office here in Buffalo.

12:24PM   4   Q.   Why did you schedule the interview to take place at the

12:24PM   5   U.S. Attorney's Office?

12:24PM   6   A.   U.S. Attorney's Office is a spot where -- I was trying to

12:24PM   7   create an environment for him that would be conducive to an

12:24PM   8   honest discussion.  The U.S. Attorney's Office conference

12:24PM   9   rooms there tend to be pretty comfortable, it's a spot that

12:24PM  10   he was familiar with, that he should have felt comfortable

12:24PM  11   there.  So that's why I -- why I used it.

12:24PM  12   Q.   Did you understand that the defendant, as a DEA special

12:24PM  13   agent, had walked the halls of the U.S. Attorney's Office

12:24PM  14   many times before?

12:24PM  15   A.   Yes.

12:24PM  16   Q.   And when you began the interview, did you reiterate to

12:25PM  17   him that it was voluntary?

12:25PM  18   A.   I did.

12:25PM  19   Q.   Did he say anything in response to that reiteration?

12:25PM  20   A.   He said that as a 20-year plus law enforcement officer,

12:25PM  21   he knew his rights.

12:25PM  22   Q.   And did you -- I think you testified earlier,

12:25PM  23   Mr. Carpenter, that you told the defendant over the phone

12:25PM  24   what the topics would be.

12:25PM  25        Did you reiterate those topics again in person when the

12:25PM     1    defendant arrived?

12:25PM     2    A.   I did.

12:25PM     3    Q.   You told him it was -- the interview was gonna be focused

12:25PM     4    on his relationship with Peter Gerace?

12:25PM     5    A.   Yes.

12:25PM     6    Q.   And his alleged use of racial slurs referring to DEA

12:25PM     7    targets?

12:25PM     8    A.   Yes.

12:25PM     9    Q.   Why did you not want to talk with him about the Ron Serio

12:25PM    10    leg of the investigation?

12:25PM    11    A.   As I was not a part of that investigation, it would have

12:26PM    12    been -- it was not my place to interview him regarding that.

12:26PM    13    Q.   Did -- withdrawn.

12:26PM    14        Was it your understanding that topics or matters related

12:26PM    15    to the Ron Serio investigation were to be avoided in order to

12:26PM    16    not compromise that investigation?

12:26PM    17    A.   Yes.

12:26PM    18    Q.   And in other words, if you had said, hey,

12:26PM    19    Mr. Bongiovanni, I want to talk with you about Ron Serio,

12:26PM    20    would that have tipped this defendant off that you were

12:26PM    21    investigating or someone in DOJ was investigating Ron Serio?

12:26PM    22    A.   Yes.

12:26PM    23    Q.   And I think you said earlier that when you spoke to the

12:27PM    24    defendant on the phone and told him about the topics you did

12:27PM    25    want to cover, it was to build a rapport with him; is that

12:27PM  1    the same reason why you reiterated the topics when the

12:27PM  2    interview began?

12:27PM  3    A.   Yes.

12:27PM  4    Q.   Did you want this defendant to be comfortable speaking to

12:27PM  5    you?

12:27PM  6    A.   Yes.

12:27PM  7    Q.   Did you want to get his side of the story?

12:27PM  8    A.   Yes.

12:27PM  9    Q.   Now, before we get into what the defendant told you about

12:27PM  10   his relationship with Peter Gerace and the alleged use of

12:27PM  11   racial slurs, I want to ask you a couple of questions about

12:27PM  12   the Ron Serio investigation and some names that you dropped

12:27PM  13   during your interview with the defendant; is that all right?

12:27PM  14   A.   Yes.

12:27PM  15   Q.   All right.   To be clear, were you part of the Ron Serio

12:28PM  16   investigation?

12:28PM  17   A.   No.

12:28PM  18   Q.   To the extent that you assisted in that investigation at

12:28PM  19   all, was it to deliver documents to Special Agent Ryan?

12:28PM  20   A.   I was a conduit of information, yes.

12:28PM  21   Q.   Was the Ron Serio investigation top secret for a lack of

12:28PM  22   a better way of putting it, and not a lot of people were

12:28PM  23   supposed to know about it?

12:28PM  24   A.   Correct.

12:28PM  25   Q.   And you were with OIG, and that was not OIG's focus; is

| | | |
|---|---|---|
| 12:28PM | 1 | that fair? |
| 12:28PM | 2 | A.  Yes. |
| 12:28PM | 3 | Q.  Nevertheless, were you in communication with Special |
| 12:28PM | 4 | Agent Ryan when this interview was coming down the pipeline? |
| 12:28PM | 5 | A.  Yes. |
| 12:28PM | 6 | Q.  Did Special Agent Ryan give you a list of seven names to |
| 12:28PM | 7 | bring up in the interview? |
| 12:28PM | 8 | A.  He did. |
| 12:28PM | 9 | Q.  What were those names? |
| 12:29PM | 10 | A.  The first one I only had a single name for, and that was |
| 12:29PM | 11 | Dwyer.  There was T.S.  There was Michael Clark.  There was |
| 12:29PM | 12 | Charles Newkirk.  There was Jay Neil.  There was -- last |
| 12:29PM | 13 | name -- first name, single name only, was Krule. |
| 12:29PM | 14 | Excuse me one second. |
| 12:29PM | 15 | Q.  Was there someone with the last name of Ziccari? |
| 12:29PM | 16 | A.  Yes, Ziccari. |
| 12:29PM | 17 | Q.  And were those the seven people, the seven names that |
| 12:29PM | 18 | Special Agent Ryan asked you to bring up? |
| 12:29PM | 19 | A.  Yes. |
| 12:29PM | 20 | Q.  When you brought up those names, did you say, hey, |
| 12:30PM | 21 | Mr. Bongiovanni, I want to talk with you about some people |
| 12:30PM | 22 | connected to the Ron Serio investigation? |
| 12:30PM | 23 | A.  No. |
| 12:30PM | 24 | Q.  That didn't happen? |
| 12:30PM | 25 | A.  No. |

12:30PM     1    Q.  At the time that you were interviewing this defendant,

12:30PM     2    did you know if any of those people even related to the Ron

12:30PM     3    Serio investigation?

12:30PM     4    A.  I -- at the time, I don't believe so.

12:30PM     5    Q.  At the time that you brought them up --

12:30PM     6    A.  I believe -- I believe one was, yes.  At the time -- I

12:30PM     7    apologize.

12:30PM     8        At the time I brought them up, I don't believe -- I don't

12:30PM     9    know what their relationship to the Serio investigation was.

12:30PM    10    Q.  Did you find out later on that one of those people had a

12:30PM    11    connection --

12:30PM    12    A.  Yes.

12:30PM    13    Q.  -- to the Ron Serio investigation?

12:30PM    14    A.  I did.

12:30PM    15    Q.  Which person?

12:30PM    16    A.  T.S.

12:30PM    17    Q.  And did you sandwich T.S.'s name in between six other

12:31PM    18    names?

12:31PM    19    A.  Yes.

12:31PM    20    Q.  Did you know the purpose behind asking the defendant

12:31PM    21    about those seven people?

12:31PM    22    A.  I did not.

12:31PM    23    Q.  Nevertheless, Mr. Carpenter, do you remember testifying

12:31PM    24    in a prior proceeding?

12:31PM    25    A.  Yes.

USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24
19

12:31PM    1    Q.  Do you recall being asked questions related to the same

12:31PM    2    questions that I just asked you?

12:31PM    3    A.  Yes.

12:31PM    4    Q.  Specifically, and I'll direct counsel's attention to

12:31PM    5    Government Exhibit --

12:31PM    6              MR. SINGER:  Objection.  Improper impeachment judge.

12:31PM    7              THE COURT:  I don't know that this is impeachment.

12:31PM    8              MS. CHALBECK:  Can we approach?

12:31PM    9              THE COURT:  Let's take our break now for the

12:31PM   10    afternoon.  I have a couple of matters that I need to do over

12:31PM   11    the lunch hour, so we're going to take a little bit longer

12:32PM   12    than usual.

12:32PM   13              Please remember my instructions about not

12:32PM   14    communicating about the case with anyone, including each

12:32PM   15    other.  Don't use tools of technology to learn anything about

12:32PM   16    the case or to communicate about the case.

12:32PM   17              Don't read, or watch, or listen to any news coverage

12:32PM   18    of the case, if there is any, while the case is in progress.

12:32PM   19    And don't make up your mind until you start deliberating.

12:32PM   20              We'll see you back here at quarter to 2.  You may

12:32PM   21    have to wait a little bit, but let's start with quarter to 2.

12:32PM   22    Okay?  Thanks.

12:32PM   23              (Jury excused at 12:32 p.m.)

12:32PM   24              MS. CHALBECK:  Your Honor, could we excuse the

12:33PM   25    witness?

| | | |
|---|---|---|
| 12:33PM | 1 | **THE COURT:**  Yeah, but we're not going to argue it |
| 12:33PM | 2 | now. |
| 12:33PM | 3 | **MS. CHALBECK:**  Okay. |
| 12:33PM | 4 | **THE COURT:**  We'll do it when we come back.  Anything |
| 12:33PM | 5 | other than that that you want to do right now? |
| 12:33PM | 6 | **MS. CHALBECK:**  No, Your Honor. |
| 12:33PM | 7 | **THE COURT:**  Anything else? |
| 12:33PM | 8 | **MR. SINGER:**  I want to warn the witness. |
| 12:33PM | 9 | **THE COURT:**  Yeah.  So you're not to talk to anybody |
| 12:33PM | 10 | about your testimony during the break, okay? |
| 12:33PM | 11 | **THE WITNESS:**  Yes, Your Honor. |
| 12:33PM | 12 | **THE COURT:**  Okay.  And we'll see you then. |
| 12:33PM | 13 | (Off the record at 12:33 p.m.) |
| 01:56PM | 14 | (Back on the record at 1:56 p.m.) |
| 01:56PM | 15 | (Jury not present.) |
| 01:56PM | 16 | **THE CLERK:**  All rise. |
| 01:56PM | 17 | **THE COURT:**  Please be seated. |
| 01:56PM | 18 | **THE CLERK:**  We are back on the record for the |
| 01:56PM | 19 | continuation of the jury trial in case number 19-cr-227, |
| 01:56PM | 20 | United States of America versus Joseph Bongiovanni. |
| 01:56PM | 21 | All counsel and parties are present. |
| 01:56PM | 22 | **THE COURT:**  Okay.  So let's argue the objection. |
| 01:56PM | 23 | Where are we going with this? |
| 01:56PM | 24 | **MS. CHALBECK:**  Judge, as the Court knows under |
| 01:56PM | 25 | Rule 607, any party, including the party that's calling the |

01:56PM  1    witness, may impeach that witness including by bringing up

01:56PM  2    prior inconsistent statements.

01:56PM  3            I think if Mr. Singer has an objection to my bringing

01:56PM  4    in the prior testimony, like, word for word and introducing

01:56PM  5    the transcript, I can probably circumvent that issue by asking

01:56PM  6    a different question.  Specifically, I can just ask about did

01:56PM  7    you provide erroneous answers during a prior proceeding when

01:56PM  8    Mr. Singer cross-examined you?

01:56PM  9            **MR. SINGER:**  I guess, I mean, you use impeachment for

01:57PM  10   inconsistency when the person is testifying not at a previous

01:57PM  11   hearing, but at the hearing here.

01:57PM  12           So what is the inconsistency with the testimony

01:57PM  13   today?  That's why I lodged the objection, because it wasn't

01:57PM  14   really clear to me what we're impeaching.

01:57PM  15           **MS. CHALBECK:**  Okay.  So I'm reading off Government

01:57PM  16   Exhibit 3595.

01:57PM  17           **THE COURT:**  What did he say today first that's

01:57PM  18   inconsistent?

01:57PM  19           **MS. CHALBECK:**  So today he said that the names that

01:57PM  20   he dropped during the March 29th, 2019 interview with

01:57PM  21   Mr. Bongiovanni that he did not have any awareness at the time

01:57PM  22   that those names were related to the Ron Serio investigation.

01:57PM  23           **THE COURT:**  Okay.

01:57PM  24           **MS. CHALBECK:**  He similarly I think testified on

01:57PM  25   direct that he did not know the purpose of him asking those

01:57PM    1    questions.

01:57PM    2         In the prior proceeding, which was March 21st of this

01:57PM    3    year, that's 3595CW, on cross-examination Mr. Singer asked,

01:58PM    4    quote:

01:58PM    5         "And another person you had brought up was a person

01:58PM    6    by the name of Charles Newkirk.

01:58PM    7         "Answer:  Yes.

01:58PM    8         "And those are things, that was another person that

01:58PM    9    was associated with the Ron Serio investigation, correct?

01:58PM   10         "Answer:  I believe so, yes.

01:58PM   11         And then as you go further on in the

01:58PM   12    cross-examination, he answers yes to the question.

01:58PM   13         And the purpose of you bringing up those names was to

01:58PM   14    further the Ron Serio investigation, which is directly

01:58PM   15    inconsistent his testimony today.

01:58PM   16         **THE COURT:**  Well, no, I'm not so sure it is.

01:58PM   17         He -- if you show -- okay.  Hang on.  Let me go look

01:58PM   18    at what he testified to today.

01:58PM   19         Did you know the purpose behind asking the defendant

02:01PM   20    about those seven people?

02:01PM   21         I did not.

02:01PM   22         Is that the statement you're going to impeach him on?

02:01PM   23         **MS. CHALBECK:**  Well, there are three statements.

02:01PM   24         One is:  Was Charles Newkirk someone associated with

02:01PM   25    the Ron Serio investigation?

02:01PM    1        On cross last time, I'm going -- there are going to

02:01PM    2  be three statements total, that's one of the statements,

02:01PM    3  Your Honor, there are two others.

02:01PM    4        **THE COURT:**  What are the others?

02:01PM    5        **MS. CHALBECK:**  The second one is:  What was the

02:01PM    6  purpose -- or, I'm sorry.  The second one was:  Was Charles

02:01PM    7  Newkirk someone who was associated with the Ron Serio

02:01PM    8  investigation?

02:01PM    9        **THE COURT:**  You asked him that today.

02:01PM  10        **MS. CHALBECK:**  If I haven't asked him yet, then I

02:01PM  11  will ask him.  But in the last proceeding, he testified yes.

02:01PM  12        I anticipate that the -- the witness will answer no,

02:01PM  13  I didn't know Charles Newkirk was associated with the Ron

02:01PM  14  Serio investigation.

02:01PM  15        **THE COURT:**  And tell me what he said at the last

02:01PM  16  proceeding.

02:01PM  17        **MS. CHALBECK:**  Question:  And another person you

02:01PM  18  brought up was a person by the name of Charles Newkirk.

02:01PM  19        Answer:  Yes.

02:01PM  20        That was another person that was associated with the

02:01PM  21  Ron Serio investigation, correct?

02:01PM  22        Answer:  I believe so, yes.

02:01PM  23        **THE COURT:**  That doesn't say he knew about it at the

02:01PM  24  time.

02:01PM  25        **MS. CHALBECK:**  Well, I also anticipate that witness

02:01PM    1    will say that he doesn't know if Charles Newkirk was

02:01PM    2    associated with the Ron Serio investigation period.

02:01PM    3         **THE COURT:**  Well if he says that, then you can

02:01PM    4    impeach him with that, but you can't impeach him with that yet

02:01PM    5    because you haven't shown me something that's inconsistent

02:01PM    6    with what was he said.  He said today that he didn't know at

02:01PM    7    the time.  So if you've got something to say, yeah, I knew at

02:01PM    8    the time that what I was asking about were people involved in

02:01PM    9    the Serio drug-trafficking organization, that's good

02:01PM    10   impeachment.

02:01PM    11        **MS. CHALBECK:**  And I was -- I'm sorry.

02:01PM    12        **THE COURT:**  That's okay.  But it has to be

02:01PM    13   inconsistent with what he testified to today, and I'm not

02:01PM    14   hearing any inconsistency.

02:01PM    15        **MS. CHALBECK:**  I think I can -- I can correct that by

02:01PM    16   modifying the question slightly.

02:01PM    17        **MR. SINGER:**  Yeah, I mean, if there's an

02:01PM    18   inconsistency, I'm not going to object to it.  I didn't feel

02:01PM    19   like there was basis on that point and time.

02:01PM    20        **THE COURT:**  I didn't hear it, that question is going

02:01PM    21   to be sustained.  But you can use to impeach.  But it's got to

02:01PM    22   be inconsistent before we do that.

02:01PM    23        **MS. CHALBECK:**  Okay.

02:01PM    24        **THE COURT:**  Anything else before we resume?

02:01PM    25        **MS. CHALBECK:**  Not from the government.

02:01PM    1           **MR. SINGER:**  No, Judge.

02:01PM    2           **THE COURT:**  Okay.

02:01PM    3           **MS. CHALBECK:**  Mr. Carpenter, you can stand up there.

02:02PM    4           (Jury and witness seated at 2:02 p.m.)

02:02PM    5           **THE COURT:**  Okay.  Welcome back, everybody.

02:02PM    6           A couple things before we resume.  First of all, last

02:03PM    7    week, one of the jurors asked a question, and I responded to

02:03PM    8    that by saying you can't ask questions, and I may have done

02:03PM    9    that harshly because I understand that the juror was concerned

02:03PM   10    about that afterwards, and I certainly did not mean to be

02:03PM   11    harsh.

02:03PM   12           You folks don't know the rules, and I'm here to tell

02:03PM   13    you about the rules.  But please don't be concerned about

02:03PM   14    anything like that.  Okay?  I will let you know if there's

02:03PM   15    something that you want that you can't have.

02:03PM   16           You folks can't ask questions of the witnesses.

02:03PM   17    That's just not allowed in the system.  The lawyers do that.

02:03PM   18    But you have no way of knowing that.

02:03PM   19           So please don't be upset with yourselves if do you

02:03PM   20    something that you didn't know about.

02:03PM   21           And then number 2, when I noticed number 4 on the

02:03PM   22    shirt of juror number -- 1, 2, 3, 4, 5 -- 6, it reminded me

02:03PM   23    that over the weekend that I was babysitting my two-year old

02:03PM   24    granddaughter, and she had a little toy, she had several

02:03PM   25    little Bills toys, one of them had number 4 on it.

02:04PM   1          And I said to her, is that your Buffalo Bills toy?

02:04PM   2          And she said no, Papa, that's Cook.

02:04PM   3          So, even the little ones know about this now.  You

02:04PM   4    know, like, Papa's an idiot.  Don't you know that's James

02:04PM   5    Cook?

02:04PM   6          Okay.  I remind the witness he's still under oath.

02:04PM   7          And you may continue.

02:04PM   8          **MS. CHALBECK:**  Thank you, Your Honor.

02:04PM   9          **BY MS. CHALBECK:**

02:04PM   10   Q.  Mr. Carpenter, I think before the break, we were talking

02:04PM   11   about names that you had dropped during your March 29th, 2019

02:04PM   12   interview with this defendant; does that sound, right?

02:04PM   13   A.  Yes.

02:04PM   14   Q.  And those names were provided -- there were seven names,

02:04PM   15   and those names were provided to you by Special Agent Curtis

02:04PM   16   Ryan; is that correct?

02:04PM   17   A.  Correct.

02:04PM   18   Q.  And I think you testified earlier, and just to provide

02:04PM   19   some further context, Special Agent Ryan, he was

02:04PM   20   investigating the reports that this defendant was protecting

02:04PM   21   the Ron Serio drug-trafficking organization; is that right?

02:05PM   22   A.  Yes.

02:05PM   23   Q.  Okay.  And then in addition to that, he was investigating

02:05PM   24   the defendant's conduct as it related to Peter Gerace, and as

02:05PM   25   it related to racial slurs said in -- in respect to DEA

02:05PM     1    targets; is that correct?

02:05PM     2    A.   Yes.

02:05PM     3    Q.   Okay.  With respect to those names, I think you mentioned

02:05PM     4    that Charles Newkirk was someone who you had mentioned --

02:05PM     5    A.   Yes.

02:05PM     6    Q.   -- is that right?

02:05PM     7         Do you know if that person had any association with the

02:05PM     8    Ron Serio drug-trafficking organization?

02:05PM     9    A.   I do not.

02:05PM    10    Q.   Do you know -- did you know at the time that you asked

02:05PM    11    whether any of those people, those seven names, had a

02:06PM    12    connection to the Ron Serio drug-trafficking organization?

02:06PM    13    A.   I did not.

02:06PM    14    Q.   As you sit here today, do you know if any of those people

02:06PM    15    have a connection to the Ron Serio drug-trafficking

02:06PM    16    organization?

02:06PM    17    A.   I know one, T.S..

02:06PM    18    Q.   Okay.  Do you know the purpose behind your asking about

02:06PM    19    those names?

02:06PM    20    A.   No.

02:06PM    21    Q.   You don't know if the purpose was to further an

02:06PM    22    investigation into this defendant's protection of the Ron

02:06PM    23    Serio drug-trafficking organization, or something else; is

02:06PM    24    that correct?

02:06PM    25              **MR. SINGER:**  Objection.  Speculation.  Witness said

02:06PM 1  he doesn't know.

02:06PM 2              **THE COURT:**  Say it again?

02:06PM 3          **MR. SINGER:**  Speculation, lack of personal knowledge.

02:06PM 4              **THE COURT:**  Well, no, she's asking whether he knows

02:06PM 5  about it.  So how can that be?

02:06PM 6              **MR. SINGER:**  Just based on his last answer, Judge.

02:06PM 7              **THE COURT:**  No, overruled.

02:06PM 8              **BY MS. CHALBECK:**

02:06PM 9  Q.  You may answer.

02:06PM 10 A.  Can you repeat the question?

02:06PM 11             **MS. CHALBECK:**  Ann, can you -- Ms. Sawyer, can you

02:06PM 12 read back the last question?

02:06PM 13         (The above-requested question was then read by the

02:06PM 14 reporter.)

02:07PM 15             **THE WITNESS:**  That is correct.

02:07PM 16             **BY MS. CHALBECK:**

02:07PM 17 Q.  Mr. Carpenter, nevertheless, do you recall being asked

02:07PM 18 kind of those same series of questions in a prior proceeding

02:07PM 19 earlier this year on cross-examination by Mr. Singer?

02:07PM 20 A.  Yes.

02:07PM 21 Q.  Did you give erroneous answers to those questions?

02:07PM 22 A.  Yes.

02:07PM 23 Q.  Just tell the jury your errors.

02:07PM 24 A.  During prior testimony, I stated that that information

02:07PM 25 was in furtherance of the Ron Serio investigation when, in

02:08PM   1   fact, I had no direct knowledge of the purpose of those

02:08PM   2   names.  Mr. Ryan never told me the purpose of those names.  I

02:08PM   3   leapt to a conclusion which was unfounded based on

02:08PM   4   assumptions that I made, which turned out to be -- which was

02:08PM   5   baseless on my part and careless on my part.

02:08PM   6   Q.  Was that your first time testifying in a federal criminal

02:08PM   7   trial?

02:08PM   8   A.  It was.

02:08PM   9   Q.  Is it a nerve-racking experience being up here and being

02:08PM   10  asked questions, having everything you say, you know, being

02:08PM   11  taken down?

02:08PM   12  A.  I find it nerve-racking, yes.

02:08PM   13  Q.  Okay.  Were you in a rhythm during the prior proceeding

02:08PM   14  on cross-examination where Mr. Singer was asking you a bunch

02:08PM   15  of question where the answer was yes and correct and --

02:08PM   16           **MR. SINGER:**  Objection.

02:08PM   17           **THE COURT:**  Sustained.

02:08PM   18           **BY MS. CHALBECK:**

02:08PM   19  Q.  Are you telling this jury the truth to the best of your

02:08PM   20  ability?

02:08PM   21  A.  Yes.

02:08PM   22  Q.  Other than T.S., as you sit here today, do any of those

02:09PM   23  names have a connection to the Ron Serio drug-trafficking

02:09PM   24  organization?

02:09PM   25  A.  I do not know.

02:09PM   1   Q.  And is it your testimony today, Mr. Carpenter, that you

02:09PM   2   did not bring up the Ron Serio investigation to this

02:09PM   3   defendant when you met with him on March 29th, 2019?

02:09PM   4          MR. SINGER:  Objection, asked and answered.

02:09PM   5          THE COURT:  Overruled.

02:09PM   6          BY MS. CHALBECK:

02:09PM   7   Q.  You may answer.

02:09PM   8   A.  I did not mention the name Ron Serio during my interview

02:09PM   9   with Mr. Bongiovanni.

02:09PM   10  Q.  Okay.  I want to talk with you about the topics that you

02:09PM   11  did discuss with this defendant, Peter Gerace and the racial

02:09PM   12  slurs.

02:09PM   13       Before you started asking those questions, did you ask

02:10PM   14  the defendant to describe his background to you?

02:10PM   15  A.  I did.

02:10PM   16  Q.  What did he say about his own professional experience?

02:10PM   17  A.  He described his professional law enforcement experience

02:10PM   18  as starting off in 1995 when he was hired by the Erie County

02:10PM   19  Sheriff's Department.

02:10PM   20       He went on to complete -- he left the Erie County

02:10PM   21  Sheriff's Department, and went on to the DEA where he

02:10PM   22  graduated from the academy in 1998.  His first office was in

02:10PM   23  Orlando, Florida, where he stayed for about three years.  And

02:10PM   24  then he transferred back to Buffalo until his retirement in

02:10PM   25  2019.

02:10PM    1    Q.  And was it after you kind of got his professional

02:10PM    2    background that you then started asking him questions about

02:10PM    3    Peter Gerace?

02:10PM    4    A.  I did.

02:10PM    5    Q.  Why were you interested in learning about the defendant's

02:10PM    6    story, or telling of his relationship with Peter Gerace?

02:10PM    7    A.  I wanted to know and hear from him directly about his

02:10PM    8    relationship with Peter Gerace.  What type of, if any,

02:11PM    9    relationship they had.  What, if any, contact/communications

02:11PM   10    they had.  Learn more about them and the relationship to see

02:11PM   11    if there was opportunity to provide law-enforcement sensitive

02:11PM   12    information to Gerace.

02:11PM   13    Q.  And so to that end, was it important for you to kind of

02:11PM   14    learn the kinds of communications and the frequency of

02:11PM   15    communication that this defendant had with Peter Gerace?

02:11PM   16    A.  Yes.

02:11PM   17    Q.  Did that go to direct -- did that directly go to your

02:11PM   18    concern about whether the defendant had an opportunity to

02:11PM   19    share law-enforcement sensitive information with Mr. Gerace?

02:11PM   20    A.  Yes.

02:11PM   21    Q.  How did he describe his relationship?

02:11PM   22    A.  He stated that as growing up, that the Bongiovanni family

02:11PM   23    and the Gerace family were family friends.

02:11PM   24        That in his late teens, early 20s, the defendant was a

02:12PM   25    bartender, and he taught Mr. Gerace how to bartend.

02:12PM    1    That they fell out of contact when he moved to Orlando

02:12PM    2    with the DEA.

02:12PM    3    That when he came back to Buffalo, he saw Mr. Gerace and

02:12PM    4    they became reacquainted.

02:12PM    5    He went on to say that Gerace is somebody that he likes

02:12PM    6    to -- tries to keep at an arm's length.  That -- he described

02:12PM    7    Mr. Gerace as a police groupie.

02:12PM    8    He stated that Gerace is someone that he has denied ever

02:12PM    9    initiating contact with, and that he denied ever witnessing

02:12PM    10   Mr. Gerace consume narcotics.

02:12PM    11   Q.  Did he also deny ever going to Mr. Gerace's home?

02:12PM    12   A.  He did.

02:12PM    13   Q.  And did he say something about a desire to investigate

02:12PM    14   Pharaoh's?

02:12PM    15   A.  He stated that -- he stated that he liked -- wanted to

02:13PM    16   keep Mr. Gerace on a short leash with the hope of obtaining

02:13PM    17   information to investigate Pharaoh's.

02:13PM    18   Q.  "Short leash," Mr. Carpenter, is that like an exact quote

02:13PM    19   of what defendant said?

02:13PM    20   A.  Yes.

02:13PM    21   Q.  Okay.  I want to break down some of those statements.

02:13PM    22   You mentioned that the defendant said that he liked to

02:13PM    23   keep Mr. Gerace at arms length, and he denied ever initiating

02:13PM    24   contact with him; is that correct?

02:13PM    25   A.  Yes.

| | | |
|---|---|---|
| 02:13PM | 1 | **MS. CHALBECK:**  Ms. Champoux, can we please pull up |
| 02:13PM | 2 | Government Exhibit 310D as in David. |
| 02:13PM | 3 | This is already in evidence, Your Honor. |
| 02:13PM | 4 | **BY MS. CHALBECK:** |
| 02:13PM | 5 | Q.  Generally, Mr. Carpenter, do you understand that this is |
| 02:13PM | 6 | a series of text messages between the defendant and Peter |
| 02:13PM | 7 | Gerace? |
| 02:13PM | 8 | A.  Yes. |
| 02:14PM | 9 | **MS. CHALBECK:**  Can we go to page 5, Ms. Champoux. |
| 02:14PM | 10 | **BY MS. CHALBECK:** |
| 02:14PM | 11 | Q.  I'm going to circle this text message from March 10th, |
| 02:14PM | 12 | 2015.  Mr. Carpenter, when this defendant told you that he |
| 02:14PM | 13 | kept Peter Gerace at an arms length, did he tell you that he |
| 02:14PM | 14 | invited Peter over to a Saint Patrick's Day party at his |
| 02:14PM | 15 | house? |
| 02:14PM | 16 | A.  No. |
| 02:14PM | 17 | Q.  Do you see what -- how Mr. Gerace responds to that |
| 02:14PM | 18 | invitation? |
| 02:14PM | 19 | A.  Yes. |
| 02:14PM | 20 | Q.  What does he say? |
| 02:14PM | 21 | A.  Cool, thanks. |
| 02:14PM | 22 | Q.  And how does the defendant reply? |
| 02:14PM | 23 | A.  Hope you can make it bro. |
| 02:14PM | 24 | **MS. CHALBECK:**  Can we go to page 6, please, |
| 02:14PM | 25 | Ms. Champoux. |

| | | |
|---|---|---|
| 02:14PM | 1 | **BY MS. CHALBECK:** |
| 02:15PM | 2 | Q.  And do you understand that the text messages in blue are |
| 02:15PM | 3 | from Mr. Gerace, and that the text messages in gray are from |
| 02:15PM | 4 | Mr. Bongiovanni? |
| 02:15PM | 5 | A.  Yes. |
| 02:15PM | 6 | Q.  Okay.  When this defendant said that he kept Peter Gerace |
| 02:15PM | 7 | at an arms length, did he tell you that Peter Gerace had |
| 02:15PM | 8 | gifts for him? |
| 02:15PM | 9 | A.  No. |
| 02:15PM | 10 | Q.  Do you see a text message from May 1st, 2015? |
| 02:15PM | 11 | A.  Yes. |
| 02:15PM | 12 | Q.  What does that text message say? |
| 02:15PM | 13 | A.  Thanks.  I still have a gift for you. |
| 02:15PM | 14 | Q.  And how does this defendant respond? |
| 02:15PM | 15 | A.  Just get better, bro, and I'll pick you up in the old |
| 02:15PM | 16 | Buick and we'll hang out. |
| 02:15PM | 17 | Q.  And I should have asked, Mr. Carpenter, but did the |
| 02:16PM | 18 | defendant deny that he was close friends with Mr. Gerace? |
| 02:16PM | 19 | A.  Yes. |
| 02:16PM | 20 | Q.  Is he calling him "bro" in this text message here? |
| 02:16PM | 21 | A.  Yes. |
| 02:16PM | 22 | Q.  Did he tell you about Peter Gerace's gift for him when he |
| 02:16PM | 23 | denied being close friends with Peter? |
| 02:16PM | 24 | A.  No. |
| 02:16PM | 25 | Q.  Did he tell you about Peter Gerace's gift for him when he |

02:16PM    1    said that he kept Peter at an arms length?

02:16PM    2    A.  No.

02:16PM    3         MS. CHALBECK:  Ms. Champoux, can we please go to

02:16PM    4    page 12.

02:16PM    5         BY MS. CHALBECK:

02:16PM    6    Q.  Do you see a text message here from July 15th, 2015 from

02:16PM    7    the defendant to Peter Gerace?

02:16PM    8    A.  Yes.

02:16PM    9    Q.  Does that text message appear to -- withdrawn.

02:17PM   10         Can you read that text message, Mr. Carpenter?

02:17PM   11    A.  We are meeting at my house for drinks then to Boss or

02:17PM   12    Scinta's if it don't rain at the festival.  Come over, bro.

02:17PM   13    Q.  When this defendant said that he kept Peter Gerace at an

02:17PM   14    arms length and denied being close friends with him, did he

02:17PM   15    tell you about the time that he invited Peter Gerace over for

02:17PM   16    drinks?

02:17PM   17    A.  No.

02:17PM   18         MS. CHALBECK:  Can we go to page 14, Ms. Champoux.

02:17PM   19    Is this page 14?  Okay.

02:17PM   20         Can we go to page 15?  Oh, excuse me.  I'm sorry.

02:17PM   21    I'm blind and couldn't see it.

02:18PM   22         BY MS. CHALBECK:

02:18PM   23    Q.  Do you see a text message from this defendant to Peter

02:18PM   24    Gerace on July 18th, 2015?

02:18PM   25    A.  I see a few.

02:18PM   1   Q.  Do you see -- what's the second typed message?

02:18PM   2   A.  To Boss.  Don't mention the golf tournament to Lindsay.

02:18PM   3   Q.  And how does Peter Gerace reply?

02:18PM   4   A.  I know.  What time Boss?

02:18PM   5   Q.  Do you understand that the golf tournament was a

02:18PM   6   Pharaoh's golf tournament, a stripper golf tournament that

02:18PM   7   Peter Gerace was sponsoring?

02:18PM   8   A.  Yes.

02:18PM   9   Q.  And is this the defendant texting Peter saying don't

02:18PM   10  bring that up to my wife?

02:18PM   11  A.  Yes.

02:18PM   12  Q.  And does Peter Gerace say, I know?

02:18PM   13  A.  Yes.

02:18PM   14  Q.  So did the defendant tell you that when he denied being

02:18PM   15  close friends with Peter Gerace and said that he kept him at

02:18PM   16  an arms length?

02:18PM   17  A.  No.

02:18PM   18       **MS. CHALBECK:**  Can we go to page 17, please,

02:18PM   19  Ms. Champoux?

02:19PM   20       **BY MS. CHALBECK:**

02:19PM   21  Q.  Do you see at the bottom of your screen, Mr. Carpenter, a

02:19PM   22  text message from the defendant to Peter Gerace where it says

02:19PM   23  that he wanted to send Peter a letter, and he's asking for

02:19PM   24  his address?

02:19PM   25  A.  Yes.

02:19PM  1   Q.  Did the defendant tell you that he tried to send Peter a

02:19PM  2   letter in the mail when he denied being close friends with

02:19PM  3   him, and said he kept him at an arms length?

02:19PM  4   A.  No.

02:19PM  5   Q.  A letter in the mail.  I think you also said,

02:19PM  6   Mr. Carpenter, that the defendant denied ever initiating

02:19PM  7   contact with Peter; is that correct?

02:19PM  8   A.  Correct.

02:19PM  9   Q.  So is sending Peter Gerace a letter in the mail

02:19PM  10  consistent or inconsistent with that denial?

02:19PM  11  A.  It would be inconsistent.

02:19PM  12       **MS. CHALBECK:**  Can we go to page 18, Ms. Champoux?

02:19PM  13       I'm sorry, can we go to page 28.

02:20PM  14       Can we go to page 29, Ms. Champoux?

02:20PM  15       **BY MS. CHALBECK:**

02:20PM  16  Q.  Do you see a text message from June 18th, 2016 --

02:20PM  17  A.  I do.

02:20PM  18  Q.  -- from this defendant to Peter Gerace?

02:20PM  19  A.  Yes.

02:20PM  20  Q.  What does -- what does that text message say?

02:20PM  21  A.  Great time last night.  It was great to see you -- your

02:20PM  22  parents.  Thanks again for the invitation.

02:20PM  23  Q.  When this defendant said that he kept Peter Gerace at an

02:20PM  24  arms length and denied being close friends with him, did he

02:20PM  25  tell you that he attended Peter Gerace's family's functions?

02:20PM    1   A.  No.

02:20PM    2        **MS. CHALBECK:**  Can we go to page 30, Ms. Champoux?

02:21PM    3        **BY MS. CHALBECK:**

02:21PM    4   Q.  Do you see a text message at the bottom here?

02:21PM    5   A.  Yes.

02:21PM    6   Q.  What does that text message say?

02:21PM    7   A.  Nice.  Hope you had a good time.

02:21PM    8      I'm trying to get a crew together for the Bills game in

02:21PM    9   Miami in October.

02:21PM   10   Q.  So when the defendant said to you that he kept Peter

02:21PM   11   Gerace at an arms length and denied being close friends with

02:21PM   12   him, did he tell you that he once invited Peter Gerace to be

02:21PM   13   part of his crew to go to a Bills game in Miami?

02:21PM   14   A.  No.

02:21PM   15        **MS. CHALBECK:**  Can we go to page 34, Ms. Champoux?

02:21PM   16        **BY MS. CHALBECK:**

02:21PM   17   Q.  Do you see text messages between Peter Gerace and the

02:21PM   18   defendant on pages 34 and 35 of this exhibit where they

02:21PM   19   appear to be complaining about their wives?

02:22PM   20        **MS. CHALBECK:**  Can we scroll up a little bit?

02:22PM   21        **THE WITNESS:**  Thank you.

02:22PM   22        **MS. CHALBECK:**  And can we scroll down, Ms. Champoux?

02:22PM   23        **BY MS. CHALBECK:**

02:22PM   24   Q.  What does this defendant say to Peter Gerace on

02:22PM   25   September 6th, 2016?

02:22PM  1   A.  I going through the same shit.  Always accusing me of

02:22PM  2   cheating.

02:22PM  3   Q.  Do you understand that the defendant was married to

02:22PM  4   Lindsay Bongiovanni at the time?

02:22PM  5   A.  Yes.

02:22PM  6   Q.  So does it appear that he's telling Peter Gerace that he

02:22PM  7   also has marital difficulties?

02:22PM  8   A.  Yes.

02:22PM  9   Q.  Is that consistent or inconsistent with his denial to you

02:22PM  10  that they were close friends?

02:22PM  11  A.  It would appear that they be close friends.

02:23PM  12  Q.  Did you review all of the text messages between this

02:23PM  13  defendant and Peter Gerace contained in Government

02:23PM  14  Exhibit 310D?

02:23PM  15  A.  Yes.

02:23PM  16  Q.  How many times does this defendant tell Peter Gerace that

02:23PM  17  he loves him in this exhibit?

02:23PM  18  A.  I saw five times.

02:23PM  19  Q.  What dates were those?

02:23PM  20  A.  I saw August 6th of 2015.  I saw May 29th of 2016.  I saw

02:23PM  21  June 26th of 2016.  I saw September 29th of 2017.  And

02:23PM  22  February 22nd of 2018.

02:23PM  23  Q.  That's five times in the course of a handful of years

02:23PM  24  this defendant is telling Peter Gerace that he loves him?

02:23PM  25  A.  Yes.

02:23PM  1  Q.  Did he tell you that when he denied being close friends

02:23PM  2  with Peter and told you that he kept him at an arms length?

02:23PM  3  A.  No.

02:24PM  4       MS. CHALBECK:  We can get out of this exhibit,

02:24PM  5  Ms. Champoux.  And can we please bring up Government

02:24PM  6  Exhibit 426-1 in evidence.

02:24PM  7       BY MS. CHALBECK:

02:24PM  8  Q.  When the defendant denied being close friends with Peter

02:24PM  9  Gerace and told him he kept him at an arms length, did he

02:24PM 10  tell you that he went on double dates with Peter Gerace?

02:24PM 11  A.  He did not.

02:24PM 12  Q.  He didn't say, oh, yeah, I used to go on carriage rides

02:24PM 13  with Peter Gerace and my ex fiancée at Niagara-on-the-Lake?

02:24PM 14       MR. SINGER:  Objection.

02:24PM 15       THE COURT:  Basis?

02:24PM 16       MR. SINGER:  I'll withdraw it, Judge.

02:24PM 17       THE COURT:  Okay.

02:24PM 18       BY MS. CHALBECK:

02:24PM 19  Q.  You can answer the question.

02:24PM 20  A.  He did not.

02:24PM 21  Q.  Did you ask the defendant if he ever went on vacations

02:24PM 22  with Peter Gerace?

02:24PM 23  A.  I did.

02:24PM 24  Q.  And what did he say when you asked that question?

02:25PM 25  A.  He denied ever going on vacations or vacationing with

02:25PM    1    Peter Gerace.

02:25PM    2    Q.  After he denied it, did he give a followup to that

02:25PM    3    question?

02:25PM    4    A.  He did.

02:25PM    5    Q.  What did he say?

02:25PM    6    A.  He did mention that there was one trip that he -- the

02:25PM    7    defendant took to Las Vegas.  While out there, he ran into

02:25PM    8    Peter Gerace.  He said there was no preplanning of that trip,

02:25PM    9    that was just a purely coincidental running in.

02:25PM   10         MS. CHALBECK:  Ms. Champoux, can we please pull up

02:25PM   11    Government's Exhibit 490A, as in alpha.  It's already in

02:25PM   12    evidence.

02:25PM   13         BY MS. CHALBECK:

02:25PM   14    Q.  Mr. Carpenter, do you see a photo of this defendant

02:25PM   15    standing next to Peter Gerace?

02:25PM   16    A.  Yes.

02:25PM   17    Q.  Do you understand that this photograph was taken in

02:25PM   18    Las Vegas?

02:25PM   19    A.  Yes.

02:25PM   20    Q.  And can you just read the date in the lower left-hand

02:25PM   21    corner of the picture?

02:25PM   22    A.  August 25th, 2011.

02:25PM   23         MS. CHALBECK:  And, Ms. Champoux, I'm sorry, can we

02:26PM   24    please bring back up and put side by side Government Exhibits

02:26PM   25    426-1.

02:26PM  1          **BY MS. CHALBECK:**

02:26PM  2  Q.  With respect to 426, Government Exhibit 426-1,

02:26PM  3  Mr. Carpenter, do you understand that this photograph was

02:26PM  4  taken approximately in the summer of 2005?

02:26PM  5  A.  Yes.

02:26PM  6  Q.  So that's about six years in between these photographs?

02:26PM  7  A.  Yes.

02:26PM  8  Q.  Mr. Bongiovanni is with two different women in this

02:26PM  9  photograph, fair to say -- in these photographs?

02:26PM  10  A.  Yes.

02:26PM  11  Q.  But Peter Gerace is still there?

02:26PM  12  A.  Correct.

02:26PM  13          **MS. CHALBECK:**  We can keep these up, Ms. Champoux.

02:26PM  14          **BY MS. CHALBECK:**

02:26PM  15  Q.  And, Mr. Carpenter, I want to turn to some other comments

02:26PM  16  that the defendant made during your interview with him.

02:27PM  17      I think he said earlier he liked to keep Peter Gerace on

02:27PM  18  a, quote, short leash, unquote, in an effort to gather

02:27PM  19  information about criminal activity at Pharaoh's; is that

02:27PM  20  correct?

02:27PM  21  A.  Yes.

02:27PM  22  Q.  What did you understand that to mean?

02:27PM  23  A.  I understood that to mean that to whatever extent there

02:27PM  24  was a relationship there, that he was using it as a way of

02:27PM  25  trying to obtain information that he could possibly use to

| | | |
|---|---|---|
| 02:27PM | 1 | investigate Pharaoh's. |
| 02:27PM | 2 | Q.  Do these photos show the defendant socializing with the |
| 02:27PM | 3 | owner of Pharaoh's? |
| 02:27PM | 4 | A.  Yes. |
| 02:27PM | 5 | Q.  What did the defendant say to you about his contact with |
| 02:27PM | 6 | Peter Gerace? |
| 02:27PM | 7 | A.  He denied ever initiating contact. |
| 02:27PM | 8 | Q.  Why was it important for you to understand whether the |
| 02:28PM | 9 | defendant ever initiated contact with Mr. Gerace? |
| 02:28PM | 10 | A.  I wanted to know if that relationship was a one-way or |
| 02:28PM | 11 | two-way street.  If the communication flowed both ways.  If |
| 02:28PM | 12 | one of them reached out more than the other, or if there was |
| 02:28PM | 13 | ignoring of communication on an end. |
| 02:28PM | 14 | **MS. CHALBECK:**  Ms. Champoux, can we take these down, |
| 02:28PM | 15 | and can we please pull up Government Exhibit 358-A. |
| 02:28PM | 16 | Judge, this is just a submarked exhibit of 358, which |
| 02:28PM | 17 | is already in evidence. |
| 02:28PM | 18 | **BY MS. CHALBECK:** |
| 02:28PM | 19 | Q.  Now, let's orient the jury a little bit to what we're |
| 02:28PM | 20 | looking at. |
| 02:28PM | 21 | Do you understand these to be the defendant's phone |
| 02:28PM | 22 | bills -- |
| 02:28PM | 23 | A.  Yes. |
| 02:28PM | 24 | Q.  -- from his DEA telephone number? |
| 02:28PM | 25 | A.  Yes. |

02:28PM  1   Q.  Okay.  Do you see DEA kind of in the address column

02:28PM  2   there?

02:28PM  3   A.  Yes.

02:28PM  4   Q.  Okay.  And does it look like these bills start in

02:29PM  5   December of 2013?

02:29PM  6   A.  Yes.

02:29PM  7   Q.  And they go to about 2018; is that correct?

02:29PM  8   A.  Yes.

02:29PM  9        MS. CHALBECK:  Ms. Champoux, can we please go to page

02:29PM 10   52.  Maybe we can zoom in, there's a telephone call from

02:29PM 11   March, we can start at the top.

02:29PM 12        Well, first, here -- withdrawn.

02:29PM 13        BY MS. CHALBECK:

02:29PM 14   Q.  Do you see the date in the top right-hand corner of these

02:29PM 15   bills, Mr. Carpenter?

02:29PM 16   A.  April 18th, 2014.

02:29PM 17   Q.  Okay.  So we're in the year 2014?

02:29PM 18   A.  Yes.

02:29PM 19        MS. CHALBECK:  And, Ms. Champoux, can we just zoom in

02:29PM 20   on maybe the first half?

02:29PM 21        BY MS. CHALBECK:

02:29PM 22   Q.  Now, do you see at this very top row, there's a line here

02:30PM 23   called incoming?  Do you see that?

02:30PM 24   A.  Yes.

02:30PM 25   Q.  Do you understand that to be how the bills register

Case 1:19-cr-00227-LJV-MJR    Document 1325    Filed 10/27/24    Page 45 of 172
USA v Bongiovanni - Carpenter - Chalbeck/Direct - 9/23/24

45

02:30PM   1   incoming calls?

02:30PM   2   A.   Yes.

02:30PM   3   Q.   And so if "incoming" is not there, is it your

02:30PM   4   understanding that that's an outgoing call?

02:30PM   5   A.   Yes.

02:30PM   6   Q.   A call that the defendant would place to some other

02:30PM   7   telephone number?

02:30PM   8   A.   Yes.

02:30PM   9   Q.   Do you see a call on March 19th, 2014, at 8:27 p.m. from

02:30PM  10   this defendant to Peter Gerace?

02:30PM  11   A.   Yes.

02:30PM  12   Q.   Is that the defendant initiating contact with Peter

02:30PM  13   Gerace?

02:30PM  14   A.   Yes.

02:30PM  15   Q.   Do you see Peter Gerace calling this defendant earlier in

02:30PM  16   the day?

02:30PM  17   A.   I do not.

02:30PM  18   Q.   Okay.

02:30PM  19        **MS. CHALBECK:**  Let's go to page 83 of this exhibit,

02:31PM  20   Ms. Champoux, to June 7th, 2014, at around 7:40 p.m.

02:31PM  21        **BY MS. CHALBECK:**

02:31PM  22   Q.   And just so that the record is clear, Mr. Carpenter,

02:31PM  23   Peter Gerace's number is 716-725-1931; is that correct?

02:31PM  24   A.   Yes.

02:31PM  25   Q.   On June 7th, 2014, at around 7:40 p.m., do you see this

02:31PM      1    defendant placing another call to Peter Gerace?

02:31PM      2    A.   Yes.

02:31PM      3    Q.   Did he tell you about that call when he denied initiating

02:31PM      4    contact with Peter Gerace?

02:31PM      5    A.   No.

02:31PM      6    Q.   Is this call consistent or inconsistent with his

02:31PM      7    statements to you?

02:31PM      8    A.   Inconsistent.

02:31PM      9           **MS. CHALBECK:**  Ms. Champoux, can we go to page 99.

02:31PM     10    And can -- thank you.

02:31PM     11           **BY MS. CHALBECK:**

02:31PM     12    Q.   Mr. Carpenter, do you see another call that this

02:31PM     13    defendant placed to Peter Gerace on July 23rd, at 9:47 a.m.?

02:32PM     14    A.   Yes.

02:32PM     15    Q.   How long is that call?

02:32PM     16    A.   Four minutes.

02:32PM     17    Q.   Did the defendant tell you about that when he denied ever

02:32PM     18    initiating contact with Peter Gerace?

02:32PM     19    A.   No.

02:32PM     20    Q.   But this is a call that this defendant placed to Peter on

02:32PM     21    that day; is that correct?

02:32PM     22    A.   Yes.

02:32PM     23           **MS. CHALBECK:**  Can we go to page 118, Ms. Champoux?

02:32PM     24    We're looking at September 4th at around 12:21 p.m.

02:32PM     25

02:32PM    1        **BY MS. CHALBECK:**

02:32PM    2    Q.  Do you see a call that this defendant placed to Peter

02:32PM    3    Gerace on September 4th at 12:21 p.m.?

02:32PM    4    A.  Yes.

02:32PM    5    Q.  How long is that call for?

02:32PM    6    A.  20 minutes.

02:32PM    7    Q.  20 minutes.  Did this defendant tell you about that call

02:33PM    8    when he denied ever initiating contact with Peter Gerace?

02:33PM    9    A.  No.

02:33PM   10    Q.  So is this 20-minute phone call that the defendant

02:33PM   11    initiated consistent or inconsistent with his comments to

02:33PM   12    you?

02:33PM   13    A.  Inconsistent.

02:33PM   14        **MS. CHALBECK:**  Could we go to page 154, Ms. Champoux?

02:33PM   15    And we're looking for December 8th, 2014, at around 12:52 p.m.

02:33PM   16        **BY MS. CHALBECK:**

02:33PM   17    Q.  Mr. Carpenter, do you see in about the top here, another

02:33PM   18    instance of this defendant initiating contact with Peter

02:33PM   19    Gerace?

02:33PM   20    A.  Yes.

02:33PM   21    Q.  Does it, in fact, actually look like he calls Peter, and

02:33PM   22    then Peter calls him back soon thereafter?

02:33PM   23    A.  Yes.

02:33PM   24    Q.  And you know that because "incoming," right?

02:33PM   25    A.  Correct.

02:33PM    1    Q.  Did he tell you about those calls when he denied ever

02:34PM    2    initiating contact?

02:34PM    3    A.  No.

02:34PM    4         MS. CHALBECK:  Ms. Champoux, can we please go to

02:34PM    5    page 211, to June 6th, 2015 at 3:55 p.m.

02:34PM    6         BY MS. CHALBECK:

02:34PM    7    Q.  ASAC Carpenter, do you see another instance of this

02:34PM    8    defendant calling Peter Gerace?

02:34PM    9    A.  Yes.

02:34PM   10    Q.  How long is the call?

02:34PM   11    A.  Six minutes.

02:34PM   12    Q.  Did he tell you about that when he denied ever initiating

02:34PM   13    contact with Peter Gerace?

02:34PM   14    A.  No.

02:34PM   15         MS. CHALBECK:  Can we go to page 212, Ms. Champoux,

02:35PM   16    to June 10th, 2015 at 6:29.

02:35PM   17         BY MS. CHALBECK:

02:35PM   18    Q.  And just a few days later, Mr. Carpenter, does this

02:35PM   19    defendant call Peter Gerace again?

02:35PM   20    A.  Yes.

02:35PM   21    Q.  How long is the call?

02:35PM   22    A.  Nine minutes.

02:35PM   23    Q.  Is that a call that this defendant initiated to Peter

02:35PM   24    Gerace?

02:35PM   25    A.  Yes.

02:35PM   1   Q.  Did he tell you about that call?

02:35PM   2   A.  No.

02:35PM   3           MS. CHALBECK:  Could we go to page 225, Ms. Champoux,

02:35PM   4   to July 13th, 2015, at 10:46 a.m.

02:35PM   5           BY MS. CHALBECK:

02:35PM   6   Q.  Do you see a call at 10:46 a.m. that this defendant

02:36PM   7   places to Peter Gerace, Mr. Carpenter?

02:36PM   8   A.  I do.

02:36PM   9   Q.  And does it look like, again, Peter called him back just

02:36PM  10   a short time later?

02:36PM  11   A.  Yes.

02:36PM  12   Q.  But when Peter calls him back, that's after this

02:36PM  13   defendant initiated contact, fair?

02:36PM  14   A.  That's correct.

02:36PM  15   Q.  Did he tell you about that?

02:36PM  16   A.  No.

02:36PM  17           MS. CHALBECK:  Can we please go to page 226,

02:36PM  18   Ms. Champoux, to July 19th at 3:01.  I think it's at the very

02:36PM  19   bottom.

02:36PM  20           BY MS. CHALBECK:

02:36PM  21   Q.  On this date, July 19th, do you see another instance of

02:36PM  22   this defendant initiating contact with Peter Gerace?

02:36PM  23   A.  Yes.

02:36PM  24   Q.  Is that a six-minute call?

02:37PM  25   A.  Yes.

02:37PM   1   Q.  Is that consistent or inconsistent with his denial that

02:37PM   2   he ever initiated contact with Peter Gerace?

02:37PM   3   A.  Inconsistent.

02:37PM   4   Q.  For that matter, is it consistent or inconsistent with

02:37PM   5   him saying that he kept Peter Gerace at an arms length?

02:37PM   6   A.  Inconsistent.

02:37PM   7          **MS. CHALBECK:**  Can we go to page 227, Ms. Champoux?

02:37PM   8   I'm looking for July 21st, 2015, at 9:34 a.m.

02:37PM   9          **BY MS. CHALBECK:**

02:37PM  10   Q.  Do you see a call here from this defendant to Peter

02:37PM  11   Gerace where he is initiating contact?

02:37PM  12   A.  Yes.

02:37PM  13   Q.  How long is that call for?

02:37PM  14   A.  Seven minutes.

02:37PM  15   Q.  Did he tell you about that during your interview with

02:37PM  16   him?

02:37PM  17   A.  No.

02:38PM  18          **MS. CHALBECK:**  Ms. Champoux, can we please go to page

02:38PM  19   234, to August 1st, 2015 at 6:18 p.m.?

02:38PM  20          **BY MS. CHALBECK:**

02:38PM  21   Q.  Do you see another instance here where this defendant is

02:38PM  22   calling Peter Gerace?

02:38PM  23   A.  Yes.

02:38PM  24   Q.  How long is that call for?

02:38PM  25   A.  Two minutes.

| | | |
|---|---|---|
| 02:38PM | 1 | Q.  I'm going to fast forward, Mr. Carpenter, to 2017. |
| 02:38PM | 2 | **MS. CHALBECK:**  Can you please go to page 450, |
| 02:38PM | 3 | Ms. Champoux? |
| 02:38PM | 4 | **BY MS. CHALBECK:** |
| 02:38PM | 5 | Q.  Now we were just looking at 2015 calls.  And now fair to |
| 02:39PM | 6 | say that we're in 2017? |
| 02:39PM | 7 | A.  Yes. |
| 02:39PM | 8 | Q.  Is it fair to say that there are a number of calls in |
| 02:39PM | 9 | between where we just were in 2015 to 2017 where this |
| 02:39PM | 10 | defendant calls Peter Gerace? |
| 02:39PM | 11 | A.  I'm sorry? |
| 02:39PM | 12 | Q.  Sorry, I asked a poorly-phrased question. |
| 02:39PM | 13 | So we've just fast forwarded two years roughly.  Is it |
| 02:39PM | 14 | fair to say that in that period, even though we didn't go |
| 02:39PM | 15 | through them one by one, that this defendant calls Peter |
| 02:39PM | 16 | Gerace several times -- |
| 02:39PM | 17 | A.  Yes. |
| 02:39PM | 18 | Q.  -- where he's initiating contact, telephone contact with |
| 02:39PM | 19 | Peter Gerace? |
| 02:39PM | 20 | A.  Yes. |
| 02:39PM | 21 | Q.  Now, on page 450 of this exhibit? |
| 02:39PM | 22 | **MS. CHALBECK:**  Ms. Champoux, can we zoom in on |
| 02:39PM | 23 | May 9th, 2017 at 10:57 a.m. |
| 02:39PM | 24 | **BY MS. CHALBECK:** |
| 02:39PM | 25 | Q.  Who called who in this call? |

02:39PM    1    A.  At 10:57, the defendant calls Peter Gerace.

02:39PM    2    Q.  How long does that call last?

02:40PM    3    A.  16 minutes.

02:40PM    4    Q.  He didn't tell you about that call?

02:40PM    5    A.  No.

02:40PM    6    Q.  Are all of these telephone calls that we went through and

02:40PM    7    then the ones in that interim two-year period, are those all

02:40PM    8    inconsistent with this defendant's denial that he ever

02:40PM    9    initiated contact with Peter Gerace?

02:40PM    10    A.  Yes.

02:40PM    11    **MS. CHALBECK:**  Ms. Champoux, can we please bring up

02:40PM    12    Government Exhibit 98 already in evidence?

02:40PM    13    **BY MS. CHALBECK:**

02:40PM    14    Q.  Are you familiar with this memo, Mr. Carpenter?

02:40PM    15    A.  Yes.

02:40PM    16    Q.  Did you review it prior to your interview with the

02:40PM    17    defendant on March 29th, 2019?

02:40PM    18    A.  Yes.

02:40PM    19    Q.  Is this a, you know, fair to say that this is a memo that

02:40PM    20    this defendant authored to his supervisors in the DEA?

02:40PM    21    A.  Yes.

02:40PM    22    Q.  And you see the subject in this upper left-hand corner?

02:40PM    23    A.  Communication with Peter Gerace.

02:40PM    24    Q.  And what's the date?

02:41PM    25    A.  December 10th, 2018.

02:41PM    1    Q.  Okay.

02:41PM    2          MS. CHALBECK:  Ms. Champoux, can we please go to

02:41PM    3    page 2.  And can we zoom in on that last sentence.

02:41PM    4          BY MS. CHALBECK:

02:41PM    5    Q.  Will you please read that last sentence into the record,

02:41PM    6    Mr. Carpenter?

02:41PM    7    A.  I have and will report all contact with Gerace to a DEA

02:41PM    8    supervisor like I have in the past and will in the future

02:41PM    9    should unsolicited communication with Gerace occur.

02:41PM    10   Q.  Now, in your capacity in this investigation, have you

02:41PM    11   seen anything suggesting that this defendant reported any of

02:41PM    12   those calls that we just went through to a DEA supervisor?

02:41PM    13   A.  No.

02:41PM    14   Q.  I want to pivot to other statements that this defendant

02:41PM    15   made during your March 29th interview.

02:41PM    16      Did you ask the defendant if he had ever seen Mr. Gerace

02:42PM    17   use illegal drugs?

02:42PM    18   A.  I believe I asked him if he'd seen him consume drugs.

02:42PM    19   Q.  Okay.

02:42PM    20   A.  And he denied seeing Peter Gerace consume drugs.

02:42PM    21   Q.  Okay.  Using drugs, consuming drugs, basically the same

02:42PM    22   thing?

02:42PM    23   A.  You can't use without consuming.

02:42PM    24   Q.  Okay.  Why did you ask him if he had ever seen Peter

02:42PM    25   Gerace consume illegal drugs?

02:42PM  1   A.  I wanted to know in the context of their friendship,

02:42PM  2   their relationship, to what extent their relationship was.

02:42PM  3   If that was somebody that he had seen use narcotics, that

02:42PM  4   would have indicated the type of relationship that they had.

02:42PM  5       Also would have indicated if it was true, to present an

02:42PM  6   opportunity for Mr. Bongiovanni to provide law-enforcement

02:42PM  7   sensitive information to somebody he witnessed using drugs.

02:42PM  8   And as people use narcotics continue to use narcotics knowing

02:42PM  9   they're illegal, if they're getting any information to allow

02:43PM  10  them to continue that illegal activity would be beneficial to

02:43PM  11  them, to continue that illegal activity is useful.

02:43PM  12  Q.  Okay.  Was knowing whether this defendant consumed --

02:43PM  13  withdrawn.

02:43PM  14      Is knowing whether this defendant saw Peter Gerace

02:43PM  15  consume narcotics important to your investigation?

02:43PM  16  A.  Yes.

02:43PM  17  Q.  And when you asked him that question, what response did

02:43PM  18  he give you?

02:43PM  19  A.  He denied seeing Peter Gerace consume narcotics.

02:43PM  20  Q.  I think you testified earlier, Mr. Carpenter, that the

02:43PM  21  defendant wanted to keep Peter Gerace on a short leash; is

02:43PM  22  that right?

02:43PM  23  A.  Yes.

02:44PM  24  Q.  And I think you testified that that was so that he could

02:44PM  25  investigate criminal activity at Pharaoh's?

02:44PM   1   A.  So he could obtain -- in the hopes of obtaining

02:44PM   2   information for investigative purposes, yes.

02:44PM   3   Q.  Did the defendant -- I'm sorry.  Did the defendant tell

02:44PM   4   you that he knew Peter Gerace was the owner of Pharaoh's?

02:44PM   5   A.  Yes.

02:44PM   6   Q.  Kind of in connection with that part of the interview,

02:44PM   7   Mr. Carpenter, did you ask the defendant if Peter Gerace had

02:44PM   8   ever called him while someone was actively overdosing?

02:44PM   9   A.  Yes.

02:44PM  10   Q.  And what did the defendant say?

02:44PM  11   A.  He denied receiving a phone call from Peter Gerace while

02:44PM  12   somebody was actively overdosing at Pharaoh's.

02:44PM  13      He said that Peter Gerace had asked him about what he

02:44PM  14   should do if somebody at Pharaoh's were to overdose.

02:45PM  15      And Mr. Bongiovanni stated that -- he advised him to

02:45PM  16   become trained in Narcan.

02:45PM  17   Q.  That's what this defendant said about what he told Peter

02:45PM  18   Gerace?

02:45PM  19   A.  Yes.

02:45PM  20   Q.  With respect to his comment about, you know, wanting to

02:45PM  21   investigate Pharaoh's, in your capacity in this

02:45PM  22   investigation, have you seen anything suggesting that this

02:45PM  23   defendant was ever investigating Pharaoh's?

02:45PM  24   A.  I have not.

02:45PM  25   Q.  So we've just talked about March 29th, 2019, your

02:45PM   1   interview with him.  I want to fast forward a few months to

02:45PM   2   June 6th of 2019.

02:45PM   3       Did you, along with Special Agent Curtis Ryan, interview

02:45PM   4   the defendant a second time that day?  Or a second time on

02:45PM   5   that day?

02:45PM   6   A.  Agent Ryan and I interviewed the defendant on June 6th,

02:46PM   7   yes.

02:46PM   8   Q.  Okay.  Can you just describe for the jury the context of

02:46PM   9   that interview?  What lead to it?

02:46PM   10  A.  A search warrant was conducted at the defendant's

02:46PM   11  residence.  And after the search warrant, after things had

02:46PM   12  settled down, the defendant was approached to see if he would

02:46PM   13  agree to be interviewed, which he agreed to do.

02:46PM   14  Q.  Was that a voluntary interview again?

02:46PM   15  A.  It was.

02:46PM   16  Q.  And fair to say that when the search warrant was first

02:46PM   17  being executed, there was like a SWAT-like team that entered

02:46PM   18  the residence?

02:46PM   19  A.  Yes.

02:46PM   20  Q.  Did your interview occur decently after that?

02:46PM   21  A.  Yes.

02:46PM   22  Q.  Okay.  There were still law enforcement agents in the

02:46PM   23  residence, correct?

02:46PM   24  A.  Yes.

02:46PM   25  Q.  Okay.  What was the defendant's demeanor when you

02:46PM    1    initiated the interview?

02:46PM    2    A.  He seemed calm.  He seemed relaxed.  He seemed

02:46PM    3    comfortable.

02:46PM    4    Q.  Who was leading the interview?

02:47PM    5    A.  Curtis Ryan.

02:47PM    6    Q.  And what was your job?

02:47PM    7    A.  My job was help Curtis, if he were to forget, help him

02:47PM    8    out.  If there's something said that needed a follow-up

02:47PM    9    question, to make sure that we stayed on task.  Just to help

02:47PM   10    facilitate the interview.  More of a passive participant in

02:47PM   11    it.

02:47PM   12    Q.  So fair to say you were just kind of there to assist if

02:47PM   13    needed?

02:47PM   14    A.  Yes.

02:47PM   15    Q.  I'm not going to ask questions about, you know, a lot of

02:47PM   16    what was said during that interview because the jury's

02:47PM   17    already heard it.  But just generally, did Special Agent Ryan

02:47PM   18    ask this defendant a series, like, of questions?

02:47PM   19    A.  Yes.

02:47PM   20    Q.  At some point, did the conversation turn to an individual

02:48PM   21    named Frank Parisi?

02:48PM   22    A.  Yes.

02:48PM   23    Q.  Did Special Agent Ryan ask the defendant about Frank

02:48PM   24    Parisi?

02:48PM   25    A.  He did.

02:48PM    1    Q.  Was the defendant answering those questions?

02:48PM    2    A.  I can't recall exactly how much he said about Frank

02:48PM    3    Parisi.

02:48PM    4    Q.  At some point during the conversation, Mr. Carpenter, did

02:48PM    5    the defendant's wife interject herself while you all were

02:48PM    6    talking about Frank Parisi?

02:48PM    7    A.  Yes.

02:48PM    8    Q.  When the defendant's wife interjected herself, what

02:48PM    9    happened to the defendant and Special Agent Ryan's, like,

02:48PM   10    attention?

02:48PM   11    A.  Their attention was refocused to her as she was coming

02:48PM   12    from a different part of the room.  So they instinctively

02:48PM   13    just turned towards her were and looking at her.

02:48PM   14    Q.  While Special Agent Ryan's attention was on the

02:49PM   15    defendant's wife, where was your focus?

02:49PM   16    A.  I looked -- I was looking at the defendant.

02:49PM   17    Q.  Did you see this defendant do anything while agents were

02:49PM   18    listening to his wife start talking about Frank Parisi?

02:49PM   19    A.  As she was speaking, I saw him shake his head in a left

02:49PM   20    to right no fashion.

02:49PM   21    Q.  Can you just demonstrate that for the jury?

02:49PM   22    A.  (Demonstrating.)

02:49PM   23    Q.  That's what this defendant did to his wife --

02:49PM   24    A.  Yes.

02:49PM   25    Q.  -- when she was talking about Frank Parisi?

02:49PM    1    A.  Yes.

02:49PM    2    Q.  I'm going to pause right there.

02:49PM    3         **MS. CHALBECK:**  Ms. Champoux, can we please bring up

02:49PM    4    Government Exhibit 46 already in evidence?  And can we go, I

02:49PM    5    think it's on page 2, I think it's the contact for Frank

02:49PM    6    Parisi.

02:50PM    7         **BY MS. CHALBECK:**

02:50PM    8    Q.  What's the telephone number for Frank Parisi in this

02:50PM    9    exhibit?

02:50PM   10    A.  716-481-8111.

02:50PM   11    Q.  Okay.

02:50PM   12         **MS. CHALBECK:**  We can pull that down, Ms. Champoux.

02:50PM   13         And then can we please pull back up Government

02:50PM   14    Exhibit 358A already in evidence.

02:50PM   15         **BY MS. CHALBECK:**

02:50PM   16    Q.  These are Mr. -- fair to say these are Mr. Bongiovanni's

02:50PM   17    bills, we were just looking at them?

02:50PM   18    A.  Yes.

02:50PM   19         **MS. CHALBECK:**  Okay.  And can we go to page 48.

02:50PM   20         **BY MS. CHALBECK:**

02:50PM   21    Q.  And at the very bottom, we're in April of 2014 of this

02:50PM   22    bill cycle, do you see an incoming call from Frank Parisi to

02:50PM   23    this defendant?

02:50PM   24    A.  Yes.

02:50PM   25    Q.  That's the same person who this defendant to his wife

02:51PM   1    went and look shook his head back and forth from left to,

02:51PM   2    right?

02:51PM   3    A.   Yes.

02:51PM   4    Q.   Okay.  Going back to your June 6th, 2019 interview with

02:51PM   5    the defendant, did there come a time when a box of DEA file

02:51PM   6    materials was discovered in the defendant's basement?

02:51PM   7    A.   Yes.

02:51PM   8    Q.   Do you recall Special Agent Ryan asking the defendant why

02:51PM   9    he had that box?

02:51PM   10   A.   Yes.

02:51PM   11   Q.   Did he actually end up asking the defendant two times why

02:51PM   12   he had the box?

02:51PM   13   A.   Yes.

02:51PM   14   Q.   As best as you can recall, Mr. Carpenter, what did the

02:51PM   15   defendant say?

02:51PM   16   A.   The first time the defendant stated that he had the box

02:51PM   17   because he knew that HSI was investigating Italian Organized

02:52PM   18   Crime and that this case fit that profile.  And he wanted to

02:52PM   19   hold onto it in case there were any inconsistencies.

02:52PM   20   Q.   Did the defendant explain how he knew that there was an

02:52PM   21   Italian Organized Crime investigation going on?

02:52PM   22   A.   He stated that during my March interview with him, that I

02:52PM   23   mentioned the name of Ron Serio and that led to this.

02:52PM   24   Q.   Okay.  Did he, at some point, tell you, though, both you

02:52PM   25   and Special Agent Ryan, that he took the box home at

02:52PM  1   retirement?

02:52PM  2   A.  Yes.

02:52PM  3   Q.  When do you understand that the defendant retired?

02:52PM  4   A.  His effective date of retirement was January 31st of

02:52PM  5   2021.  However, due to weather, the office was closed.  So he

02:52PM  6   was not able to gather his belongings until February 1st.  So

02:53PM  7   February 1st was the day he turned in all of his --

02:53PM  8   February 1st was his last effective day at the DEA.

02:53PM  9   Q.  Okay.  And did this defendant tell you that he took the

02:53PM  10  box home because he learned in your interview with him that

02:53PM  11  you all were investigating -- or, that someone was

02:53PM  12  investigating Ron Serio?

02:53PM  13  A.  Yes.

02:53PM  14  Q.  When did your interview with the defendant take place?

02:53PM  15  A.  March 29th of 2018.

02:53PM  16  Q.  It's almost -- almost two full months after the defendant

02:53PM  17  took the box home?

02:53PM  18  A.  Yes.

02:53PM  19  Q.  According to him?

02:53PM  20  A.  Yes.

02:53PM  21  Q.  Like, is that possible, Mr. Carpenter?

02:53PM  22          MR. SINGER:  Objection.

02:53PM  23          THE COURT:  Sustained.

02:53PM  24          BY MS. CHALBECK:

02:53PM  25  Q.  Is that consistent or inconsistent with, like, the timing

02:53PM   1    of events?

02:53PM   2              MR. SINGER:  Objection.

02:53PM   3              THE COURT:  Yeah, sustained.

02:54PM   4              BY MS. CHALBECK:

02:54PM   5    Q.  Your interview with this defendant occurred on March 29th

02:54PM   6    of 2019; is that correct?

02:54PM   7    A.  Yes.

02:54PM   8    Q.  This defendant told you all that he took the box home on

02:54PM   9    February 1st?

02:54PM   10   A.  Yes.

02:54PM   11   Q.  When you asked -- excuse me.  When Special Agent Ryan

02:54PM   12   asked why the defendant took the box home, did he in sum and

02:54PM   13   substance say it was because he learned from your March 29th

02:54PM   14   interview?

02:54PM   15   A.  Yes.

02:54PM   16   Q.  Okay.  During that March 29, 2019 interview, did you ever

02:54PM   17   bring up the name Ron Serio?

02:54PM   18   A.  No.

02:54PM   19   Q.  And in that list of names that you asked about during the

02:54PM   20   interview, were there seven people?

02:54PM   21   A.  Yes.

02:54PM   22   Q.  And T.S.'s name was sandwiched between six other folks?

02:54PM   23   A.  Yes.

02:54PM   24              MS. CHALBECK:  May I have one moment, Your Honor?

02:54PM   25              THE COURT:  Yes.

02:54PM  1              **BY MS. CHALBECK:**

02:55PM  2   Q.  Going back to the June 6th interview with the search

02:55PM  3   warrant at the defendant's home.

02:55PM  4      Did this defendant say at the table when you were

02:55PM  5   interviewing him that he kept the file to confirm that

02:55PM  6   everything was on the up and up?

02:55PM  7   A.  I believe that was the quote, yes.

02:55PM  8          **MS. CHALBECK:**  Nothing further, Your Honor.

02:55PM  9          **THE COURT:**  Mr. Singer.

02:55PM  10

02:55PM  11              **CROSS-EXAMINATION BY MR. SINGER:**

02:56PM  12  Q.  All right.  So, Mr. Carpenter, so the way that I

02:56PM  13  understand it is that you got involved in this investigation

02:56PM  14  in 2018; is that right?

02:56PM  15  A.  Yes.

02:56PM  16  Q.  And at the time, I know that you had a number of

02:56PM  17  different jobs in law enforcement.  But at that one

02:56PM  18  particular period of time, you were working as -- was it an

02:56PM  19  inspector for the Department of Justice OIG?  Or what was

02:56PM  20  your title?

02:56PM  21  A.  Special agent, criminal investigator.

02:56PM  22  Q.  Special agent, okay.  So your principal job at the OIG,

02:56PM  23  that's Office of Inspector General, right?

02:56PM  24  A.  Yes.

02:56PM  25  Q.  Your principal job at the OIG's office was to investigate

02:57PM 1 allegations of misconduct that rose to a criminal level

02:57PM 2 involving employees that worked for the Department of Justice

02:57PM 3 or its subdepartments?

02:57PM 4 A. Yes.

02:57PM 5 Q. And I think you mentioned that the distinction between

02:57PM 6 you and someone like Frank DiCarlo is that Mr. DiCarlo, he at

02:57PM 7 the time was working at the DEA's Office of Professional

02:57PM 8 Responsibility?

02:57PM 9 A. I don't recall discussing Mr. DiCarlo.

02:57PM 10 Q. Okay.  You know who Frank DiCarlo is though?

02:57PM 11 A. I do.

02:57PM 12 Q. He's somebody who works, at that time, at the DEA Office

02:57PM 13 of Professional Responsibility?

02:57PM 14 A. Yes.

02:57PM 15 Q. That's nicknamed OPR for short?

02:57PM 16 A. Yes.

02:57PM 17 Q. And OPR was different than OIG, because OPR took more

02:57PM 18 administrative misconduct cases?

02:57PM 19 A. Correct.

02:57PM 20 Q. Ones that didn't rise to a criminal level as far as the

02:57PM 21 investigative activities were concerned?

02:57PM 22 A. Yes.

02:57PM 23 Q. And so that was the distinction between you two, correct?

02:57PM 24 A. Yes.

02:57PM 25 Q. And then you also talked about a distinction that also

02:57PM  1  existed between yourself and Special Agent Ryan, correct?

02:58PM  2  A.  Correct.

02:58PM  3  Q.  And so Special Agent Ryan, he worked for the Department

02:58PM  4  of Homeland Security?

02:58PM  5  A.  Yes.

02:58PM  6  Q.  HSI?

02:58PM  7  A.  Yes.

02:58PM  8  Q.  Okay.  And he was tasked with a criminal investigation

02:58PM  9  regarding Ron Serio?

02:58PM  10  A.  Yes.

02:58PM  11  Q.  But there were also some allegations involving

02:58PM  12  Mr. Bongiovanni in that case, correct?

02:58PM  13  A.  Yes.

02:58PM  14  Q.  And, so, he was also investigating Mr. Bongiovanni on a

02:58PM  15  criminal level, correct?

02:58PM  16  A.  Yes.

02:58PM  17  Q.  And I think the way that you described it was that you

02:58PM  18  two agreed -- or, was it you two, or was it somebody else

02:58PM  19  above you?  How was the line drawn between your investigation

02:58PM  20  and Special Agent Ryan's investigation?

02:58PM  21  A.  My investigation was focused on the allegations made

02:58PM  22  against the defendant and as related to the Ron Serio piece.

02:58PM  23  Q.  Yeah.  No, no, I think you established that on direct.

02:58PM  24  What I'm getting at is who was it that tried to draw this

02:58PM  25  line between your two investigations?

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

02:58PM   1    A.   I can't recall.

02:58PM   2    Q.   Okay.  Was it one of your superiors that did this?  Or

02:59PM   3    was it you and Agent Ryan that had this agreement?

02:59PM   4    A.   I don't recall who the -- how it came down.

02:59PM   5    Q.   Okay.  But you do recall that at least in some fashion,

02:59PM   6    you and Special Agent Ryan had a gentleman's agreement, let's

02:59PM   7    put it that way, where you would stick your investigation

02:59PM   8    focused solely on the racial allegation that Mr. Casullo made

02:59PM   9    against Mr. Bongiovanni, right?

02:59PM   10   A.   Yes.

02:59PM   11   Q.   And then also focus it on whether there was an

02:59PM   12   inappropriate relationship with Peter Gerace, between Mr.

02:59PM   13   Bongiovanni and Mr. Gerace, correct?

02:59PM   14   A.   Yes.

02:59PM   15   Q.   And then Special Agent Ryan would focus his investigation

02:59PM   16   on Ron Serio and whether Mr. Bongiovanni did anything

02:59PM   17   inappropriate there?

02:59PM   18   A.   That's part of his organization -- as part of his larger

02:59PM   19   investigation, yes.

02:59PM   20   Q.   Okay.  So that was the line that you two drew, correct?

02:59PM   21   A.   Yes.

02:59PM   22   Q.   All right.  So, before I get into that, I just want to go

02:59PM   23   through a couple things going on.

02:59PM   24        So you talked about how your part of the investigation

02:59PM   25   didn't only involve Mr. Bongiovanni at the DEA; is that

02:59PM    1    right?

03:00PM    2    A.  I don't recall.  I only recall discussing

03:00PM    3    Mr. Bongiovanni.

03:00PM    4    Q.  Sure.  So OIG at the time that you're involved in this

03:00PM    5    case was investigating other agents at the DEA office in

03:00PM    6    Buffalo, correct?

03:00PM    7    A.  Not that I know of.

03:00PM    8    Q.  You don't know of any other agents that were being

03:00PM    9    investigated?

03:00PM    10   A.  No.

03:00PM    11   Q.  Well, sir, you talked about subject letters.  Remember

03:00PM    12   that part of your direct testimony?

03:00PM    13   A.  I don't recall discussing subject letters.

03:00PM    14   Q.  You don't recall discussing any type of subject letters?

03:00PM    15   A.  No.

03:00PM    16   Q.  Did you serve any subject letters on any other DEA agents

03:00PM    17   who worked at the Buffalo office as part of your

03:00PM    18   investigation?

03:00PM    19   A.  I recall serving one.

03:00PM    20   Q.  Okay.  That was to Joe Palmieri, correct?

03:00PM    21   A.  Yes.

03:00PM    22   Q.  And Mr. Palmieri, we've heard his name before, he was a

03:00PM    23   task force officer assigned to the DEA Buffalo office?

03:00PM    24   A.  Yes.

03:00PM    25   Q.  And he was somebody who was also associated with

03:00PM    1    Mr. Bongiovanni as a partner for several years during the

03:00PM    2    time period you were investigating?

03:00PM    3    A.  Yes.

03:00PM    4    Q.  Okay.  So there were other people in the DEA office under

03:00PM    5    investigation at the same time you were working this case,

03:00PM    6    correct?

03:00PM    7    A.  Palmieri, correct.

03:01PM    8    Q.  All right.  And there were also other agents that were

03:01PM    9    being investigated at that same time to your awareness,

03:01PM   10    correct?

03:01PM   11    A.  Not that I'm aware of.

03:01PM   12    Q.  So you don't know of any other agents that were being

03:01PM   13    served subject letters or being investigated by OIG at that

03:01PM   14    time?

03:01PM   15    A.  No.

03:01PM   16    Q.  Okay.  So to prepare for this March 2019 interview that

03:01PM   17    you conducted at the U.S. Attorney's Office, you did a couple

03:01PM   18    of different things before you went into the interview,

03:01PM   19    correct?

03:01PM   20    A.  Yes.

03:01PM   21    Q.  Like, you talked about how you called Agent Bongiovanni

03:01PM   22    and invited him into the interview, correct?

03:01PM   23    A.  Yes.

03:01PM   24    Q.  But before you did that, you took a couple of

03:01PM   25    investigative steps to orient yourself to potential questions

03:01PM  1   you may want to ask him, right?

03:01PM  2   A.  Yes.

03:01PM  3   Q.  And you conducted your own investigation into the

03:01PM  4   allegations, correct?

03:01PM  5   A.  Yes.

03:01PM  6   Q.  Because that's good police practice, correct?

03:01PM  7   A.  Yes.

03:01PM  8   Q.  So, with regard to Mr. Bongiovanni's DEA cell phone, you

03:02PM  9   talked on your direct testimony about phone records that were

03:02PM  10  recovered regarding Mr. Bongiovanni's cell phone, right?

03:02PM  11  A.  We reviewed them, yes.

03:02PM  12  Q.  Yeah.  But that's not something you reviewed prior to

03:02PM  13  your March 2019 interview, correct?

03:02PM  14  A.  Correct.

03:02PM  15  Q.  So, whatever we talked about today happened after your

03:02PM  16  March 2019 interview?

03:02PM  17  A.  Yes.

03:02PM  18  Q.  It happened after your June 2019 interview at his house,

03:02PM  19  correct?

03:02PM  20  A.  Yes.

03:02PM  21  Q.  It happened years after, right?

03:02PM  22  A.  I'm not sure about years, I don't --

03:02PM  23  Q.  Well, when did you first review the phone records that

03:02PM  24  you were testifying to today?

03:02PM  25  A.  I don't recall the exact date on that.

03:02PM    1    Q.  I mean, are we talking about yesterday?

03:02PM    2    A.  No.

03:02PM    3    Q.  Are we talking about a year ago?

03:02PM    4    A.  It's been years since I've left the DOJ.  I -- I don't

03:02PM    5    recall when we received the phone records, or when my first

03:02PM    6    review of them was.

03:02PM    7    Q.  Okay.  But you know in any event, your review of those

03:03PM    8    records happened after the March 2019 interview?

03:03PM    9    A.  Yes.

03:03PM    10    Q.  It happened after the June 2019 interview?

03:03PM    11    A.  I can't say for sure, but --

03:03PM    12    Q.  Okay.  But you just don't recall at this point?

03:03PM    13    A.  Correct.

03:03PM    14    Q.  And you testified to several text messages as well; is

03:03PM    15    that right?

03:03PM    16    A.  Yes.

03:03PM    17    Q.  Those text messages were not something that you reviewed

03:03PM    18    prior to your March 2019 interview, right?

03:03PM    19    A.  Correct.

03:03PM    20    Q.  And they weren't something you reviewed prior to your

03:03PM    21    June 2019 interview, correct?

03:03PM    22    A.  Correct.

03:03PM    23    Q.  So, with regard to the DEA cell phone, your understanding

03:03PM    24    was that Mr. Bongiovanni, like every other agent in the DEA,

03:03PM    25    has a cell phone that's issued to him by the organization,

03:03PM  1    correct?

03:03PM  2    A.  Yes.

03:03PM  3    Q.  And so as part of your investigation, when did you first

03:03PM  4    get assigned to this case?

03:03PM  5    A.  August of 2018.

03:03PM  6    Q.  All right.  So, Mr. Bongiovanni, back in August of 2018,

03:03PM  7    is still working at the DEA, correct?

03:03PM  8    A.  Yes.

03:03PM  9    Q.  He's not going to retire until February 1st of 2019?

03:04PM  10   A.  I don't know what his retirement plans were at that time.

03:04PM  11   Q.  Okay.  But you understood that he did retire from the DEA

03:04PM  12   in February of 2019, correct?

03:04PM  13   A.  Yes.

03:04PM  14   Q.  And so as far as, you know, that's concerned, you started

03:04PM  15   on this case in August, right?  So that's August, September,

03:04PM  16   October, November, December, January, February 1st he

03:04PM  17   retires.  So that's six months before his retirement,

03:04PM  18   correct?

03:04PM  19   A.  Yes.

03:04PM  20   Q.  And you were aware of the fact that there are allegations

03:04PM  21   at that point in time that he had an inappropriate

03:04PM  22   relationship with Peter Gerace as alleged in the case,

03:04PM  23   correct?

03:04PM  24   A.  Yes.

03:04PM  25   Q.  You were also aware of a memoranda that we went through

03:04PM 1 where he referenced text messages that he exchanged between

03:04PM 2 Peter Gerace and explained what was happening in those text

03:04PM 3 messages?

03:04PM 4 A.  Yes.

03:04PM 5 Q.  And you reviewed those memoranda, correct?

03:04PM 6 A.  Yes.

03:04PM 7 Q.  So you knew that there was contact between Peter Gerace

03:04PM 8 and Joe Bongiovanni occurring on the DEA cell phone that he

03:04PM 9 possessed, correct?

03:04PM 10 A.  I don't know where that contact was occurring.

03:04PM 11 Q.  Okay.  Well, you knew was happening on a phone, right?

03:05PM 12 A.  Correct.

03:05PM 13 Q.  And at the time you knew that he was issued a DEA cell

03:05PM 14 phone, correct?

03:05PM 15 A.  Yes.

03:05PM 16 Q.  So, you never made any efforts to seize Mr. Bongiovanni's

03:05PM 17 DEA cell phone prior to his retirement date, correct?

03:05PM 18 A.  Correct.

03:05PM 19 Q.  In fact, you only asked about his DEA cell phone after

03:05PM 20 his retirement, correct?

03:05PM 21 A.  Yes.

03:05PM 22 Q.  The DEA cell phone that he possessed, that's government

03:05PM 23 property, right?

03:05PM 24 A.  Yes.

03:05PM 25 Q.  So you can take that at any time, correct?

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

73

03:05PM 1   A.  Yes.

03:05PM 2   Q.  You don't require a search warrant to get that phone from

03:05PM 3   Mr. Bongiovanni, correct?

03:05PM 4   A.  Correct.

03:05PM 5   Q.  You can go to the DEA office and request the phone

03:05PM 6   records for that phone, correct?

03:05PM 7   A.  Yes.

03:05PM 8   Q.  You don't require a search warrant for that either?

03:05PM 9   A.  Correct.

03:05PM 10  Q.  But you didn't take any of those steps prior to his

03:05PM 11  retirement?

03:05PM 12  A.  Correct.

03:05PM 13  Q.  You didn't take any of those steps prior to your March

03:05PM 14  2019 interview?

03:05PM 15  A.  Correct.

03:05PM 16  Q.  With the exception of asking for his cell phone after he

03:05PM 17  already left the DEA, correct?

03:05PM 18  A.  Correct.

03:05PM 19  Q.  And I think you understood that after you made that

03:05PM 20  request following his retirement, you found out that the

03:06PM 21  phone had been wiped; is that right?

03:06PM 22  A.  Yes.

03:06PM 23  Q.  We've heard a couple things about wiping.

03:06PM 24      You understood that it was DEA policy that when an agent

03:06PM 25  turns in a phone, that phone is cleared of its data, correct?

03:06PM    1    A.  I'm not sure of that policy at all.

03:06PM    2    Q.  You're not sure of that policy?

03:06PM    3    A.  No.

03:06PM    4    Q.  Have you turned in a phone when you worked for the DOJ,

03:06PM    5    sir?

03:06PM    6    A.  Yes.

03:06PM    7    Q.  Did it contain information that was proprietary to the

03:06PM    8    DOJ?

03:06PM    9    A.  I turned in my cell phone, I don't recall any policy

03:06PM    10   specific to wiping it.

03:06PM    11   Q.  Okay.  So you don't know what the DEA policy was?

03:06PM    12   A.  Correct.

03:06PM    13   Q.  Okay.  So you did review the text messages after the

03:06PM    14   fact; is that right?

03:06PM    15   A.  Yes.

03:06PM    16   Q.  And you'd agree with me that your review of those text

03:06PM    17   messages, there was no discussion about bribes, correct?

03:06PM    18   A.  Correct.

03:06PM    19   Q.  There's no discussion involving legal activity, correct?

03:06PM    20   A.  That would be correct.

03:06PM    21   Q.  The text messages we're talking about is about almost 400

03:07PM    22   text messages over the course of that period of time where

03:07PM    23   the cell phone messages exist; is that right?

03:07PM    24   A.  Almost, yes.

03:07PM    25   Q.  And that was between 2015 to roughly 2018, 2019?

03:07PM   1   A.   Yes.

03:07PM   2   Q.   The messages that you reviewed, there were more messages

03:07PM   3   on that phone from Peter Gerace to Joe Bongiovanni than the

03:07PM   4   other way around, correct?

03:07PM   5   A.   I didn't count the -- I didn't count the numbers.

03:07PM   6   Q.   Well, you talked about, sir, about the importance in your

03:07PM   7   investigation about knowing how often Peter Gerace and Joe

03:07PM   8   Bongiovanni would interact, correct?

03:07PM   9   A.   Yes.

03:07PM  10   Q.   And one of the questions that you asked in the interview

03:07PM  11   was whether Mr. Bongiovanni initiated contact, quote,

03:07PM  12   unquote, with Peter Gerace, right?

03:07PM  13   A.   Yes.

03:07PM  14   Q.   And it was important, as you testified on direct, to know

03:07PM  15   how often that may have occurred, right?

03:07PM  16   A.   Yes.

03:07PM  17   Q.   But you never counted?

03:07PM  18   A.   I didn't count the back and forth between them, no.

03:08PM  19   Q.   If you did count, do you think you would have found

03:08PM  20   consistent with the messages that Peter Gerace contacted Joe

03:08PM  21   Bongiovanni more often than the other way around?

03:08PM  22   A.   I don't know what I would have found.

03:08PM  23   Q.   You just don't know?

03:08PM  24   A.   Correct.

03:08PM  25   Q.   Because you never looked?

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

03:08PM  1    A.  I didn't add them up, correct.

03:08PM  2    Q.  When you reviewed these messages, did you see points in

03:08PM  3    time where Mr. Bongiovanni did not respond to Peter Gerace?

03:08PM  4    A.  Yes.

03:08PM  5    Q.  And that was more than one time, right?

03:08PM  6    A.  I can't recall the exact number, but yes.

03:08PM  7    Q.  Did you not count those either, sir?

03:08PM  8    A.  No.

03:08PM  9    Q.  All right.  So, let's move on to a different topic.

03:08PM  10       One of the things that you learned throughout the course

03:08PM  11   of this investigation is that there are allegations that Joe

03:08PM  12   Bongiovanni used illegal narcotics during the time he was a

03:08PM  13   DEA agent, correct?

03:08PM  14   A.  I'm sorry, can you repeat that.

03:08PM  15   Q.  You learned during the course of your investigation that

03:08PM  16   there were allegations that Joe Bongiovanni used illegal

03:09PM  17   narcotics during the time he was a DEA agent, correct?

03:09PM  18   A.  Yes.

03:09PM  19   Q.  And one of the steps that you took to verify whether

03:09PM  20   there was information relevant to that was to look at drug

03:09PM  21   testing records that the DEA possessed, correct?

03:09PM  22   A.  I requested them, yes.

03:09PM  23   Q.  Because it was your understanding that the DEA conducts

03:09PM  24   drug testing of its agents, correct?

03:09PM  25   A.  It does to my understanding, yes.

03:09PM    1    Q.  And so you asked Mr. DiCarlo to try to track down those

03:09PM    2    records for you; is that right?

03:09PM    3    A.  Yes.

03:09PM    4    Q.  And Mr. DiCarlo reported back to you, right?

03:09PM    5    A.  Yes.

03:09PM    6    Q.  And there were no records of positive results involving a

03:09PM    7    drug test from Joe Bongiovanni, right?

03:09PM    8    A.  There are no records at all.

03:09PM    9    Q.  And that was for the duration of his entire career?

03:09PM   10    A.  Yes.

03:09PM   11    Q.  So, another thing that you took a look at was you took a

03:09PM   12    look at whether or not T.S., which was a name that we were

03:09PM   13    talking about on direct, was ever a DEA confidential source;

03:10PM   14    is that right?

03:10PM   15    A.  Yes.

03:10PM   16    Q.  Because that's something that came up during the course

03:10PM   17    of the investigation, right?

03:10PM   18    A.  Yes.

03:10PM   19    Q.  And you looked into the records with regard to that,

03:10PM   20    right?

03:10PM   21    A.  I requested them, yes.

03:10PM   22    Q.  And one of the things that you received back in response

03:10PM   23    was a report that was in the possession of the DEA in the

03:10PM   24    New York City office?

03:10PM   25    A.  I don't recall if it was a report, but I did receive

03:10PM     1    something back, yes.

03:10PM     2    Q.  Correct.  And so your understanding was is that when the

03:10PM     3    DEA signs up someone as a confidential source, that's

03:10PM     4    something that requires documentation; is that right?

03:10PM     5    A.  Yes.

03:10PM     6    Q.  And it's a closely guarded secret, correct?

03:10PM     7    A.  Yes.

03:10PM     8    Q.  Your understanding is that the process is, is that when

03:10PM     9    the request for the CS is approved locally for an individual

03:10PM    10    agent requesting that someone gets signed up as a CS, it's

03:10PM    11    then sent down to New York City?

03:10PM    12    A.  I'm not exactly sure of the whole process or the policy

03:10PM    13    on it as I sit here today.

03:10PM    14    Q.  You don't know the DEA's policy with regard to how a CS

03:10PM    15    request is routed?

03:10PM    16    A.  Not as I sit here today, no.

03:11PM    17    Q.  Did you ever talk to anyone about it?

03:11PM    18    A.  I can't recall if I did or didn't.

03:11PM    19    Q.  Did you talk to Frank DiCarlo about it?

03:11PM    20    A.  I can't recall any specific conversation with him about

03:11PM    21    it.

03:11PM    22    Q.  Okay.  Okay.  Well, as far as the CS records are

03:11PM    23    concerned, you understand that New York City keeps those

03:11PM    24    records under lock and key; is that right?

03:11PM    25    A.  I hope so, yes.

03:11PM    1    Q.  And your understanding is that there's very limited

03:11PM    2    access to those records, correct?

03:11PM    3    A.  Yes.

03:11PM    4    Q.  That individual agents just can't go query the DEA system

03:11PM    5    as to, hey, is this person a confidential source?

03:11PM    6    A.  I'm not sure what the -- I don't -- I don't believe so,

03:11PM    7    correct.

03:11PM    8    Q.  I'm sorry, can you --

03:11PM    9    A.  I don't believe they can query for that information,

03:11PM    10    correct.

03:11PM    11    Q.  Okay.  So the record that you got back indicated that

03:11PM    12    T.S. was a confidential source for the DEA from January of

03:11PM    13    2009 to September of 2009?

03:11PM    14    A.  I believe so.

03:11PM    15    Q.  And Mr. Bongiovanni wasn't the case agent on the case

03:12PM    16    that T.S. was signed up as a source, correct?

03:12PM    17    A.  I don't recall the specific case, no.

03:12PM    18         **MR. SINGER:**  Just one moment, Judge.

03:12PM    19         Ms. Champoux, will you mind bringing up Government

03:12PM    20    Exhibit 16, please?  And if we can scroll to the -- I think

03:12PM    21    it's the third page, please.

03:12PM    22         And if we can expand on that section.

03:12PM    23         **BY MR. SINGER:**

03:12PM    24    Q.  So this is the record we've just been talking about for a

03:12PM    25    couple minutes, correct, sir?

03:12PM 1    A.  Thank you.

03:12PM 2    Q.  And as far as the agents that are involved in the case,

03:12PM 3    do you see them down at the bottom?

03:12PM 4    A.  I do.

03:12PM 5    Q.  None of those people are Joe Bongiovanni, correct?

03:12PM 6    A.  That's correct.

03:12PM 7    Q.  Your understanding was that Mr. T.S. was not signed up to

03:13PM 8    investigate Ron Serio, right?

03:13PM 9    A.  As it relates to his role as a DEA operations, I don't

03:13PM 10   recall what he was -- what his case file was on that.

03:13PM 11   Q.  Okay.  Well, you're familiar with the fact that the Ron

03:13PM 12   Serio investigation wasn't opened until earliest November of

03:13PM 13   2012, correct?

03:13PM 14   A.  I'm not really familiar with the Ron Serio investigation.

03:13PM 15   Q.  Okay.  You're not familiar with that at all?

03:13PM 16   A.  Not -- not particularly, no.

03:13PM 17   Q.  All right.  You didn't find any evidence that Joe

03:13PM 18   Bongiovanni was in contact with T.S. during the entirety of

03:13PM 19   his career, correct?

03:13PM 20   A.  In the documents I reviewed, I didn't see any.

03:13PM 21        **MR. SINGER:**  You can bring that down, Ms. Champoux,

03:13PM 22   thank you.

03:13PM 23        **BY MR. SINGER:**

03:13PM 24   Q.  So one of the other things that we talked about in this

03:13PM 25   case is the DARTS system.  You have a familiarity with what

03:14PM    1    DARTS is, correct?

03:14PM    2    A.  Yes.

03:14PM    3    Q.  So DARTS is a deconfliction database; is that right?

03:14PM    4    A.  Yes.

03:14PM    5    Q.  It's a place where phone numbers are kept that are run on

03:14PM    6    particular targets and subjects of investigation?

03:14PM    7    A.  Yes.

03:14PM    8    Q.  And it's something that is specific to the DEA, correct?

03:14PM    9    A.  Yes.

03:14PM    10   Q.  And the DARTS system, unlike the CS system that we were

03:14PM    11   just talking about, that's something that individual agents

03:14PM    12   do have access to, correct?

03:14PM    13   A.  Yes.

03:14PM    14   Q.  And people can perform searches inside the DARTS system

03:14PM    15   for particular names or numbers?

03:14PM    16   A.  Yes.

03:14PM    17   Q.  And, so, prior to the March 2019 interview, you performed

03:14PM    18   a search of the DARTS system to determine whether or not Joe

03:14PM    19   Bongiovanni ever searched for names or numbers of people

03:14PM    20   associated with the Ron Serio drug-trafficking organization,

03:14PM    21   correct?

03:14PM    22   A.  I requested information to the DEA at the request of

03:14PM    23   Curtis Ryan.

03:14PM    24   Q.  Okay.  And when you got back the results of that, no

03:14PM    25   records were found indicating that Joe Bongiovanni did any

03:15PM   1    search into DARTS for those people, correct?

03:15PM   2    A.   That's correct.

03:15PM   3    Q.   You also took a look into another person by the name of

03:15PM   4    Michael Sinatra; is that right?

03:15PM   5    A.   Yes.

03:15PM   6    Q.   And Mike Sinatra, you also asked the DEA to search for

03:15PM   7    records indicating whether or not Joe Bongiovanni had

03:15PM   8    searched the DARTS system for his name and number, correct?

03:15PM   9    A.   Yes.

03:15PM   10   Q.   And once again, nothing came back to indicate that Joe

03:15PM   11   Bongiovanni conducted a search like that?

03:15PM   12   A.   Correct.

03:15PM   13   Q.   You also did a similar request with regard to the Peter

03:15PM   14   Gerace and people associated with him and his

03:15PM   15   drug-trafficking organization, correct?

03:15PM   16   A.   Is there anybody specific?  I don't recall any

03:15PM   17   specific --

03:15PM   18   Q.   Do you recall a person by the name of John Ermin?

03:15PM   19   A.   Yes.

03:15PM   20   Q.   He was somebody who was associated with Peter Gerace,

03:15PM   21   correct?

03:15PM   22   A.   Yes.

03:15PM   23   Q.   And you did a search of the system to determine whether

03:16PM   24   or not Joe Bongiovanni ever performed a search of the system

03:16PM   25   for him in DARTS?

03:16PM  1   A.  I don't recall a DARTS request for that.

03:16PM  2   Q.  You don't recall making the request, or you don't recall

03:16PM  3   the result?

03:16PM  4   A.  Either one.

03:16PM  5        MR. SINGER:  Just one moment, Judge.

03:16PM  6        I don't know when you're thinking about the afternoon

03:17PM  7   break, Judge.  I can continue if you want to, but I just don't

03:17PM  8   want to hold anyone up.

03:17PM  9        THE COURT:  I'm thinking sometime around 3:30 --

03:17PM 10        MR. SINGER:  I'll keep going.

03:17PM 11        THE COURT:  -- is a good time to balance the two

03:17PM 12   halves.

03:17PM 13        MR. SINGER:  That's perfectly fine, Judge.

03:17PM 14        BY MR. SINGER:

03:17PM 15   Q.  So, Mr. Carpenter, so another thing that you talked about

03:17PM 16   was the memoranda that you reviewed regarding, sorry --

03:17PM 17   strike that.

03:17PM 18        Another thing you discussed was the memoranda that

03:17PM 19   Mr. Bongiovanni provided towards the end of his tenure at

03:17PM 20   DEA; is that right?

03:17PM 21   A.  Yes.

03:17PM 22   Q.  And he provided three different memos with regard to his

03:17PM 23   interactions involving Peter Gerace, as well as Tony's

03:17PM 24   Casullo's interactions with someone associated with Peter

03:17PM 25   Gerace, correct?

03:17PM    1    A.  Yes.

03:17PM    2    Q.  So with regard to one of those memoranda, it was in

03:17PM    3    January of 2019 just before Mr. Bongiovanni left the DEA that

03:18PM    4    he provided a memorandum regarding Tony Casullo; is that

03:18PM    5    right?

03:18PM    6    A.  I don't recall the date, but I do recall him providing a

03:18PM    7    memo, yes.

03:18PM    8         MR. SINGER:  Ms. Champoux, can we bring up Government

03:18PM    9    Exhibit 99, please?

03:18PM   10         BY MR. SINGER:

03:18PM   11    Q.  So, does this help refresh your memory as to the

03:18PM   12    memoranda that was submitted regarding Tony Casullo?

03:18PM   13    A.  Thank you.

03:18PM   14    Q.  So with regard to this particular memoranda,

03:18PM   15    Mr. Bongiovanni talks about a number of things; is that

03:18PM   16    right?

03:18PM   17    A.  Yes.

03:18PM   18         MR. SINGER:  So, Ms. Champoux, if we can please

03:18PM   19    expand into the first paragraph of this memo.

03:18PM   20         BY MR. SINGER:

03:18PM   21    Q.  Can you please read that for the jury?

03:18PM   22    A.  S.A. Joseph Bongiovanni is writing to inform you of

03:18PM   23    information that he has acquired regarding the social

03:18PM   24    affiliation and recent communications with Peter Gerace by

03:19PM   25    S.A. Anthony Casullo, and S.A.'s Casullo brother-in-law, Phil

03:19PM   1   Domiano.

03:19PM   2       In the past, S.A. Bongiovanni has verbally informed you,

03:19PM   3   my group supervisor, Greg Yensan, and our ASAC, David T. Zon,

03:19PM   4   of information confirming the friendship of Domiano, Casullo,

03:19PM   5   and Gerace.

03:19PM   6       Furthermore, S.A. Bongiovanni has attached information

03:19PM   7   confirming that Domiano was a former manager of Pharaoh's

03:19PM   8   Gentlemen's Club in Cheektowaga, New York on behalf of

03:19PM   9   Gerace.

03:19PM  10   Q.  So the first paragraph in that particular memorandum is

03:19PM  11   talking about a familial relationship between Special Agent

03:19PM  12   Tony Casullo and Phil Domiano?

03:19PM  13   A.  Yes.

03:19PM  14   Q.  And you understood it, based on your reading of the

03:19PM  15   memoranda, that Phil Domiano is related to Tony Casullo by

03:20PM  16   marriage?

03:20PM  17   A.  Yes.

03:20PM  18   Q.  Phil Domiano, more specifically, is his brother-in-law,

03:20PM  19   correct?

03:20PM  20   A.  I'm sorry, whose brother?

03:20PM  21   Q.  So Phil Domiano -- I'm sorry, I asked that poorly.

03:20PM  22       Phil Domiano is related to Tony Casullo as Tony Casullo's

03:20PM  23   brother-in-law.

03:20PM  24   A.  Brother-in-law?

03:20PM  25   Q.  Yes.

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24
86

03:20PM   1   A.  Correct.

03:20PM   2   Q.  And so the relationship is is that Tony Casullo is

03:20PM   3   married to Phil Domiano's sister?

03:20PM   4   A.  Yes, that's how -- that's how it works.

03:20PM   5   Q.  Okay.  All right.  So this is something that was raised

03:20PM   6   to your attention as well, correct?

03:20PM   7   A.  Yes.

03:20PM   8   Q.  And this is something that the DEA had potential concerns

03:20PM   9   about, correct?

03:20PM  10   A.  I'm not sure if they did or didn't.

03:20PM  11   Q.  Okay.  That was not part of your investigation?

03:20PM  12   A.  No.

03:20PM  13        MR. SINGER:  Okay.  Ms. Champoux, can we please

03:20PM  14   un-expand out of that.  And if we can expand -- I'm sorry.  If

03:20PM  15   we can move on to the second page.  And stop right there.

03:21PM  16        BY MR. SINGER:

03:21PM  17   Q.  So attached to this particular memoranda that you

03:21PM  18   reviewed were a number of Facebook posts; is that right, sir?

03:21PM  19   A.  I think specific Facebook Message posts.

03:21PM  20   Q.  And these related to Phil Domiano, correct?

03:21PM  21   A.  Yes.

03:21PM  22   Q.  This is something that Special Agent Bongiovanni provided

03:21PM  23   as part of his memo to his supervisor, correct?

03:21PM  24   A.  Yes.

03:21PM  25   Q.  And it indicated contact that Peter Gerace had with Phil

03:21PM  1    Domiano; is that correct?

03:21PM  2    A.   Yes.

03:21PM  3    Q.   So, for instance, in this first page that we're looking

03:21PM  4    at, it's indicating that Peter Gerace is feeling excited with

03:21PM  5    Domiano at the Vegas Golden Knights arena; is that right?

03:21PM  6    A.   Yes.

03:21PM  7    Q.   And that particular post is dated March 2nd, 2018?

03:21PM  8    A.   Correct.

03:21PM  9         MR. SINGER:   You can scroll down to the next page,

03:21PM  10   Ms. Champoux.

03:21PM  11        BY MR. SINGER:

03:21PM  12   Q.   And this particular post, it's indicating that Peter

03:22PM  13   Gerace was eating dinner at Andiamo, Las Vegas in September

03:22PM  14   of 2017?

03:22PM  15   A.   Yes.

03:22PM  16   Q.   And that his great friends with Domiano?

03:22PM  17   A.   Yes.

03:22PM  18        MR. SINGER:   Can you go to the next page,

03:22PM  19   Ms. Champoux?

03:22PM  20        BY MR. SINGER:

03:22PM  21   Q.   This is another post by Phil Domiano; is that correct?

03:22PM  22   A.   Yes.

03:22PM  23   Q.   And that's dated August 20th of 2017?

03:22PM  24   A.   Yes.

03:22PM  25        MR. SINGER:   Go to the next page, Ms. Champoux.

03:22PM   1              **BY MR. SINGER:**

03:22PM   2   Q.  It looks like in response to this post, Peter Gerace

03:22PM   3   posted a message?

03:22PM   4   A.  Yes.

03:22PM   5              **MR. SINGER:**  Can we go on to the next page, please?

03:22PM   6              **BY MR. SINGER:**

03:22PM   7   Q.  So in this particular post, Mr. Domiano is indicating on

03:22PM   8   March 30th, 2014 that he's back in Buffalo; is that right?

03:22PM   9   A.  Yes.

03:22PM  10   Q.  And that he's managing Pharaoh's Gentlemen's Club at

03:22PM  11   999 Aero Drive?

03:22PM  12   A.  Yes.

03:22PM  13   Q.  And that's something that was liked by Peter Gerace?

03:23PM  14   A.  Yes.

03:23PM  15   Q.  And you understood Pharaoh's Gentlemen's Club to be owned

03:23PM  16   by Peter Gerace?

03:23PM  17   A.  Yes.

03:23PM  18   Q.  And so it looks like in this situation, Phil Domiano,

03:23PM  19   Tony Casullo's brother-in-law, is a manager of Pharaoh's

03:23PM  20   Gentlemen's Club?

03:23PM  21   A.  Yes.

03:23PM  22              **MR. SINGER:**  Can we go on to the next page, please?

03:23PM  23              **BY MR. SINGER:**

03:23PM  24   Q.  It looks like there's a picture posted; is that right?

03:23PM  25   A.  Yes.

03:23PM    1    Q.  It looks like Phil Domiano is pictured in a picture with

03:23PM    2    Peter Gerace?

03:23PM    3    A.  Yes.

03:23PM    4          MR. SINGER:  Go on to the next page, please.  And the

03:23PM    5    page after, Ms. Champoux.  Thank you.

03:23PM    6          BY MR. SINGER:

03:23PM    7    Q.  Another post on Facebook regarding Peter Gerace?

03:23PM    8    A.  Yes.

03:23PM    9          MR. SINGER:  Go to the next page, Ms. Champoux.  Stop

03:23PM   10    there.

03:23PM   11          BY MR. SINGER:

03:23PM   12    Q.  Looked like there's another connection vis-à-vis this

03:24PM   13    case, Joe Bella.  Do you know who that is, sir?

03:24PM   14    A.  No.

03:24PM   15    Q.  Does it appear like there's a Facebook friends

03:24PM   16    relationship at least that exists between Joe Bella and Phil

03:24PM   17    Domiano?

03:24PM   18    A.  Yes.

03:24PM   19          MR. SINGER:  Can you go to the next page,

03:24PM   20    Ms. Champoux?

03:24PM   21          THE WITNESS:  Actually, can I see that again?

03:24PM   22          BY MR. SINGER:

03:24PM   23    Q.  Sure.  Does it appear to you, based on your review of

03:24PM   24    this information, that there's a Facebook friend relationship

03:24PM   25    at least between Domiano and Joe Bella?

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

90

03:24PM    1    A.  I can't tell with this if the add friend is they're not

03:24PM    2    friends, or what that relationship is indicating.

03:24PM    3    Q.  Okay.  You're familiar with Facebook generally, right?

03:24PM    4    You're not -- you're not young enough where you're just doing

03:24PM    5    SnapChat, right?

03:24PM    6    A.  It's been many years since I've used Facebook.

03:24PM    7    Q.  Okay.

03:24PM    8    A.  So I'm familiar with it, but I'm not familiar with --

03:24PM    9    it's been years, probably 2016.

03:24PM   10    Q.  So -- so back -- going back to 2016, maybe I'm dating

03:25PM   11    myself on these questions, but when you bring up a list of

03:25PM   12    who someone's friends with on Facebook, it spits out a whole

03:25PM   13    list of people; do you recall that?

03:25PM   14    A.  This -- this is -- this is Domiano's friends list?

03:25PM   15    Q.  That's correct.

03:25PM   16    A.  Okay.  Thank you.

03:25PM   17    Q.  And so if you do it to your own profile, you have the

03:25PM   18    option of adding a friend by hitting a button?

03:25PM   19    A.  Understood.  Thank you.

03:25PM   20    Q.  Okay.  So does that help --

03:25PM   21    A.  Yes.

03:25PM   22    Q.  -- clear up the confusion?

03:25PM   23    A.  Yes, thank you.

03:25PM   24    Q.  No problem.

03:25PM   25              **MR. SINGER:**  And if we can scroll down to the next

03:25PM    1    page, Ms. Champoux.  And to the page after that?  And to the

03:25PM    2    page after that.

03:25PM    3            **BY MR. SINGER:**

03:25PM    4    Q.  Are you familiar with this particular picture?

03:25PM    5    A.  Yes.

03:25PM    6    Q.  This is the reunion picture for Saint Joe's high school

03:25PM    7    reunion back in 2015?

03:25PM    8    A.  Yes.

03:25PM    9    Q.  And you're under the understanding that Tony Casullo and

03:25PM    10   Peter Gerace are pictured in that same photograph, correct?

03:26PM    11   A.  Yes.

03:26PM    12   Q.  They attended the same reunion, correct?

03:26PM    13   A.  Yes, sir.

03:26PM    14   Q.  Because they attended the same high school class?

03:26PM    15   A.  Yes.

03:26PM    16            **MR. SINGER:**  Move down to the next photo, please,

03:26PM    17   Ms. Champoux.

03:26PM    18            **BY MR. SINGER:**

03:26PM    19   Q.  It looks like those two people are identified in this

03:26PM    20   photograph that's blown up?

03:26PM    21   A.  Yes.

03:26PM    22            **MR. SINGER:**  If we go to the last page.

03:26PM    23            **BY MR. SINGER:**

03:26PM    24   Q.  That looks like that's another blow-up?

03:26PM    25   A.  Correct.

03:26PM    1    **MR. SINGER:**  Okay.  If we can go back to the first

03:26PM    2    page of the memo, Ms. Champoux.

03:26PM    3        **BY MR. SINGER:**

03:26PM    4    Q.  So the purpose of this memo was not just to address

03:26PM    5    Casullo's relationship with Phil Domiano, correct?

03:26PM    6        **MS. CHALBECK:**  Objection, Your Honor.  I -- I don't

03:26PM    7    think the witness can answer what the defendant's purpose was

03:26PM    8    in offering the memo.  Lacks personal knowledge.

03:26PM    9        **THE COURT:**  Yeah, I think sustained.

03:26PM   10        **MR. SINGER:**  Certainly.

03:26PM   11        **THE COURT:**  But you can ask general questions about

03:26PM   12    that document.

03:26PM   13        **MR. SINGER:**  No problem.

03:26PM   14        Ms. Champoux, can we please expand on this one

03:26PM   15    particular paragraph?

03:27PM   16        **BY MR. SINGER:**

03:27PM   17    Q.  Mr. Carpenter, can you please read that to the jury?

03:27PM   18    A.  Also, S.A. Casullo's actions approximately eight months

03:27PM   19    ago by advising AUSA Joseph Tripi that S.A. Bongiovanni was a

03:27PM   20    racist in the presence of G.S. James McHugh was completely

03:27PM   21    unprofessional.

03:27PM   22        S.A. Casullo advised AUSA Tripi that Bongiovanni told

03:27PM   23    Casullo approximately two years ago that he, Casullo -- that

03:27PM   24    he, quote, Casullo shouldn't investigate Italians, but should

03:27PM   25    investigate -- racial slurs, end quote.

03:27PM   1    S.A. Casullo did not advise his chain of command prior to

03:27PM   2    making these allegations and has ruined S.A. Bongiovanni's

03:27PM   3    character.

03:27PM   4        This incident was not documented within DEA, and no

03:28PM   5    investigation was conducted against S.A. Casullo.

03:28PM   6        S.A. Bongiovanni completely denies making these

03:28PM   7    statements.

03:28PM   8    Q.  So we talked about purpose.  But the memorandum doesn't

03:28PM   9    just discuss Tony Casullo's relationship with Domiano,

03:28PM  10    correct?

03:28PM  11    A.  Correct.

03:28PM  12    Q.  It also takes on the allegations that Tony Casullo levied

03:28PM  13    against Mr. Bongiovanni, correct?

03:28PM  14    A.  Correct.

03:28PM  15    Q.  Regarding those racial slurs that your investigation was

03:28PM  16    initiated to investigate?

03:28PM  17    A.  Yes.

03:28PM  18    Q.  And in this particular memo, he denies making those

03:28PM  19    statements, correct?

03:28PM  20    A.  Yes.

03:28PM  21        **MR. SINGER:**  Ms. Champoux, if we could expand the

03:28PM  22    bottom paragraph.

03:28PM  23        **BY MR. SINGER:**

03:28PM  24    Q.  And, sir, could you please read that for the jury as

03:28PM  25    well?

03:28PM   1    A.  S.A. Joseph Bongiovanni is forwarding this information

03:28PM   2    through the DEA chain of command because he knows that this

03:29PM   3    will be required to be disclosed to OPR and the AUSO office

03:29PM   4    in the WDNY based on the ongoing investigation of Gerace.

03:29PM   5         Should you need any additional information, please

03:29PM   6    contact S.A. Joseph Bongiovanni.

03:29PM   7         Thank you for your attention to this matter.

03:29PM   8    Q.  So, with regard to Phil Domiano, did you investigate

03:29PM   9    Casullo with regard to his relationship to Phil Domiano?

03:29PM   10   A.  I did not.

03:29PM   11   Q.  Did you understand Phil Domiano to also have a nickname

03:29PM   12   of Vegas Phil?

03:29PM   13   A.  I've never heard that.

03:29PM   14   Q.  Are you aware of the relationship between Casullo and

03:29PM   15   Domiano at all?

03:29PM   16   A.  I don't know to what extent, no.

03:29PM   17   Q.  You just never looked into it?

03:30PM   18   A.  Correct.

03:30PM   19        **MR. SINGER:**  Ms. Champoux, if we can un-expand out of

03:30PM   20   this.  Go to the second page.

03:30PM   21        I'm sorry, if we can bring that exhibit down.

03:30PM   22        Do you want to take a break, Judge?

03:30PM   23        **THE COURT:**  Sure.  It's as good a time any.

03:30PM   24        So, folks, please remember my instructions.  Don't

03:30PM   25   communicate about the case with anyone including each other.

03:30PM  1  Don't make up your mind.

03:30PM  2       See you back here in about 15, 20 minutes.

03:30PM  3       (Jury excused at 3:30 p.m.)

03:30PM  4       **THE COURT:**  Okay.  Anything before we break,

03:30PM  5  Ms. Chalbeck?

03:30PM  6       **MS. CHALBECK:**  Not the government.

03:31PM  7       **THE COURT:**  Anything before we break?

03:31PM  8       **MR. SINGER:**  No, Your Honor.  Thank you.

03:31PM  9       **THE COURT:**  Great.  See you in about 15, 20 minutes.

03:31PM  10      **THE CLERK:**  All rise.

03:31PM  11      (Off the record at 3:31 p.m.)

03:51PM  12      (Back on the record at 3:51 p.m.)

03:51PM  13      (Jury not present.)

03:51PM  14      **THE CLERK:**  All rise.

03:51PM  15      **THE COURT:**  Please be seated.

03:51PM  16      **THE CLERK:**  We are back on the record for the

03:51PM  17  continuation of the jury trial in case number 19-cr-227,

03:51PM  18  United States of America versus Joseph Bongiovanni.

03:51PM  19      All counsel and parties are present.

03:51PM  20      **THE COURT:**  Okay.  Anything that we need to do before

03:51PM  21  we resume?

03:51PM  22      **MS. CHALBECK:**  Not from the government, Judge.

03:51PM  23      **MR. SINGER:**  No, Your Honor.

03:51PM  24      **THE COURT:**  Okay.  Let's bring them back, please,

03:51PM  25  Pat.

03:52PM    1            (Jury seated at 3:52 p.m.)

03:52PM    2        **THE COURT:**  The record will reflect that all our

03:53PM    3 jurors are present again.

03:53PM    4        I remind the witness that he's still under oath.

03:53PM    5        And you may continue, Mr. Singer.

03:53PM    6        **MR. SINGER:**  Thank you, Your Honor.

03:53PM    7        **BY MR. SINGER:**

03:53PM    8 Q.  All right.  So, Mr. Carpenter, I want to move on to a

03:53PM    9 different subject.  So let's get back to the voluntary

03:53PM   10 interview that you conducted with Mr. Bongiovanni back in

03:53PM   11 March of 2019.  All right?

03:53PM   12      So at that point in time, I think we reviewed,

03:53PM   13 Mr. Bongiovanni is retired from the DEA by a couple weeks,

03:53PM   14 several weeks at this point, correct?

03:53PM   15 A.  Yes.

03:53PM   16 Q.  And so you called him up to request whether or not he

03:53PM   17 wanted to come in and submit to an interview; is that right?

03:53PM   18 A.  Yes.

03:53PM   19 Q.  He was under no obligation to do that?

03:53PM   20 A.  Correct.

03:53PM   21 Q.  Like, he didn't work for the DEA anymore, so unlike other

03:53PM   22 agents who can't say no, he could say sorry, Dave, I just

03:53PM   23 don't feel like it?

03:53PM   24 A.  Yes.

03:53PM   25 Q.  But he said, you know what?  Like, I'll submit to the

03:53PM  1  interview, correct?

03:53PM  2  A.  Yes.

03:53PM  3  Q.  And this was a little bit different than the June 2019

03:53PM  4  interview, correct?

03:53PM  5  A.  How so?

03:53PM  6  Q.  Well, it happened at the U.S. Attorney's Office, right?

03:54PM  7  A.  Yes.

03:54PM  8  Q.  You didn't call up a SWAT team to escort Mr. Bongiovanni

03:54PM  9  to the March interview, correct?

03:54PM 10  A.  Correct.

03:54PM 11  Q.  He was never placed in handcuffs, correct?

03:54PM 12  A.  Correct.

03:54PM 13  Q.  Guns were never drawn?

03:54PM 14  A.  No.

03:54PM 15  Q.  No flash bang grenades were used?

03:54PM 16  A.  No.

03:54PM 17  Q.  So a little different, correct?

03:54PM 18  A.  Yes.

03:54PM 19  Q.  Okay.  So it's more of a professional business meeting;

03:54PM 20  is that a fair statement?

03:54PM 21  A.  Yes.

03:54PM 22  Q.  And you wanted to try to obtain some type of

03:54PM 23  incriminating statements from him at that point in time; is

03:54PM 24  that right?

03:54PM 25  A.  I wanted to obtain the truth from him.

03:54PM 1    Q.  All right.  So, you have it in a conference room at the

03:54PM 2    U.S. Attorney's Office; is that right?

03:54PM 3    A.  Yes.

03:54PM 4    Q.  There wasn't any type of recording equipment that was

03:54PM 5    contained in that office, correct?

03:54PM 6    A.  Correct.

03:54PM 7    Q.  So you've done interviews with people at police stations

03:54PM 8    before, right?

03:54PM 9    A.  Yes.

03:54PM 10   Q.  And oftentimes, they have some type of recording device

03:54PM 11   in an interview room?

03:54PM 12   A.  Yes, sir.

03:54PM 13   Q.  Which takes both audio and video recordings of an

03:54PM 14   interview?

03:54PM 15   A.  Yes.

03:55PM 16   Q.  And -- and that's something that can later be played back

03:55PM 17   in a courtroom?

03:55PM 18   A.  Yes.

03:55PM 19   Q.  But that wasn't something that you took advantage of to

03:55PM 20   conduct this interview, correct?

03:55PM 21   A.  Correct.

03:55PM 22   Q.  You didn't have any other type of recording equipment

03:55PM 23   that you used that that day to record the interview, correct?

03:55PM 24   A.  Correct.

03:55PM 25   Q.  And that's something that you have employed in other

03:55PM    1    aspects of this case; is that right?

03:55PM    2    A.    Yes.

03:55PM    3    Q.    So, for instance, do you remember interviewing another

03:55PM    4    DEA agent, Brian Chella?

03:55PM    5    A.    Yes, sir.

03:55PM    6    Q.    And that was in connection with this investigation as

03:55PM    7    well?

03:55PM    8    A.    Yes.

03:55PM    9    Q.    And you used a recording device for that -- for that

03:55PM    10   interview, correct?

03:55PM    11   A.    Yes.

03:55PM    12   Q.    But you didn't use one for him?

03:55PM    13   A.    Correct.

03:55PM    14   Q.    Sometimes, it comes up often, but we see on TV a lot of

03:55PM    15   state and local police officers wear body cams; are you

03:55PM    16   familiar with that?

03:55PM    17   A.    Yes.

03:55PM    18   Q.    And it kind of seems like it's ubiquitous nowadays.  As

03:55PM    19   far as your agency was concerned at Office of Inspector

03:55PM    20   General, did you wear a body cam when you went out into the

03:55PM    21   field?

03:55PM    22   A.    We did not have body cameras assigned to us at that time.

03:56PM    23   Q.    All right.  So the answer for the March 2019 interview is

03:56PM    24   no?

03:56PM    25   A.    Correct.

03:56PM     1    Q.  All right.  So during this particular March 2019

03:56PM     2    interview, you took handwritten notes, correct?

03:56PM     3    A.  Yes.

03:56PM     4    Q.  And it's not a verbatim record, but it's something that

03:56PM     5    you took contemporaneously with the answers that you were

03:56PM     6    given?

03:56PM     7    A.  Yes.

03:56PM     8    Q.  And so that's something that helps inform you about what

03:56PM     9    responses you got in response to your questions?

03:56PM    10    A.  Yes.

03:56PM    11    Q.  And it also contains kind of a general outline of the

03:56PM    12    points that you raised in your questions to Joseph

03:56PM    13    Bongiovanni?

03:56PM    14    A.  Yes.

03:56PM    15    Q.  Were there other agents that accompanied you during the

03:56PM    16    course of the March 2019 interview?

03:56PM    17    A.  OIG Agent David Fusco.

03:56PM    18    Q.  So it was you, Agent Fusco, Joseph Bongiovanni, and

03:56PM    19    anybody else in the room?

03:56PM    20    A.  No.

03:56PM    21    Q.  So just the three of you?

03:56PM    22    A.  Yes.

03:57PM    23    Q.  And I know that agents sometimes in their notes, they

03:57PM    24    have a practice of putting quotation marks around direct

03:57PM    25    statements made by a person they're interviewing?

03:57PM     1    A.  Yes.

03:57PM     2    Q.  Is that a practice that you use to make note of

03:57PM     3    statements that are made by a person during the course of an

03:57PM     4    interview?

03:57PM     5    A.  Yes.

03:57PM     6    Q.  And that's something that you used here as a practice,

03:57PM     7    correct?

03:57PM     8    A.  Yes.

03:57PM     9    Q.  So if those handwritten notes that you took during the

03:57PM    10    interview contained those quotation marks, it would be

03:57PM    11    consistent with what came out of his mouth?

03:57PM    12    A.  I recall some of them were exactly, and as you said, some

03:57PM    13    of them my notes were a summary of.  So I would put them

03:57PM    14    around places, and I knew as I was going back to my notes

03:57PM    15    what it was, yes.

03:57PM    16    Q.  Okay.  You also produced a report of investigation,

03:57PM    17    correct?

03:57PM    18    A.  Yes.

03:57PM    19    Q.  And I think the OIG refers to it as an MOI, a memorandum

03:57PM    20    of investigation?

03:57PM    21    A.  I believe so, yes.

03:57PM    22    Q.  And so that's something that you produce not during the

03:57PM    23    interview, but after the interview?

03:58PM    24    A.  Yes.

03:58PM    25    Q.  And you produced one of those after this interview; is

03:58PM    1    that right?

03:58PM    2    A.  Yes.

03:58PM    3    Q.  Now, there was a delay in getting that particular

03:58PM    4    memorandum approved by your supervisor; is that right?

03:58PM    5    A.  Yes.

03:58PM    6    Q.  It was almost 60 days before it got approved?

03:58PM    7    A.  I believe so, yes.

03:58PM    8    Q.  What was the reason for that delay?

03:58PM    9    A.  I can't recall specifically at the time what the

03:58PM    10    rationale was.  But I recall at the time our office was

03:58PM    11    overwhelmed with -- overwhelmed with paperwork, a lot of

03:58PM    12    investigations were going on.  I don't know what the specific

03:58PM    13    reason was.

03:58PM    14    Q.  Was this memorandum approved before your June 6th 2019

03:58PM    15    interview of Agent Bongiovanni?

03:58PM    16    A.  Yes.

03:58PM    17    Q.  And so the purpose of the MOI is to document the

03:58PM    18    interview, correct?

03:58PM    19    A.  Yes.

03:58PM    20    Q.  The details of what happened as far as the questions you

03:58PM    21    asked?

03:58PM    22    A.  Yes.

03:58PM    23    Q.  And the responses that were given by Mr. Bongiovanni

03:58PM    24    during the interview?

03:58PM    25    A.  Yes.

03:58PM  1    Q.  And so it's a tool to help you remember what transpired

03:58PM  2    several years ago, correct?

03:58PM  3    A.  Correct.

03:58PM  4    Q.  Because this interview happened in 2019 --

03:59PM  5    A.  Yes.

03:59PM  6    Q.  -- right?

03:59PM  7        We're in 2024 at this point.

03:59PM  8    A.  Yes.

03:59PM  9    Q.  And I know you've investigated a lot of cases in the

03:59PM  10   interim; is that right?

03:59PM  11   A.  Yes.

03:59PM  12   Q.  That includes cases working for OIG, right?

03:59PM  13   A.  Yes.

03:59PM  14   Q.  And it also includes cases after you left the OIG's

03:59PM  15   office?

03:59PM  16   A.  Correct.

03:59PM  17   Q.  I think I said that you left the OIG's office in the

03:59PM  18   spring of 2020?

03:59PM  19   A.  I left the Department of Justice in September of 2020,

03:59PM  20   yes.

03:59PM  21   Q.  And then you left to go to where again?  I'm sorry.

03:59PM  22   A.  TIGTA.  Treasury Inspector General for Tax

03:59PM  23   Administration.

03:59PM  24   Q.  And you continued to investigate matters for that entity,

03:59PM  25   correct?

03:59PM    1    A.  When I left OIG, I did, yes.  Now I'm a supervisor there,

03:59PM    2    yes.

03:59PM    3    Q.  And how long did you act as like a regular agent,

03:59PM    4    non-supervisor, investigating cases?

03:59PM    5    A.  Over three years.

03:59PM    6    Q.  And how many people do you think you've interviewed over

03:59PM    7    the course of your three years at TIGTA?

03:59PM    8    A.  Yes.  It's -- hundreds.

03:59PM    9    Q.  Okay.  So it's important to review both your notes and

04:00PM   10    the MOI to prepare yourself for your testimony today?

04:00PM   11    A.  Yes.

04:00PM   12    Q.  All right.  So with regard to the particular topics, I

04:00PM   13    want to go through some of those with you.

04:00PM   14        So one of the things you remarked about on direct was

04:00PM   15    that you wanted to delve into the particular relationship

04:00PM   16    between Joe Bongiovanni and Peter Gerace; is that right?

04:00PM   17    A.  Yes.

04:00PM   18    Q.  And so you related on direct that they knew each other

04:00PM   19    from a familial relationship that went back to the time that

04:00PM   20    they were kids?

04:00PM   21    A.  Yes.

04:00PM   22    Q.  And that's something that continued when they were

04:00PM   23    teenagers and into their early 20s?

04:00PM   24    A.  Yes.

04:00PM   25    Q.  Mr. Bongiovanni indicated that he would hang out with

04:00PM    1    Peter Gerace bartending and that kind of thing in their 20s?

04:00PM    2    A.   Yes.

04:00PM    3    Q.   But then after he joined the DEA and moved away, the

04:00PM    4    relationship kind of deteriorated, right?

04:00PM    5    A.   Yes.

04:00PM    6    Q.   There's a period of time where they were not really

04:00PM    7    speaking too much?

04:00PM    8    A.   Yes.

04:00PM    9    Q.   And that was because Mr. Bongiovanni was not in Buffalo?

04:00PM   10    A.   Correct.

04:00PM   11    Q.   And Peter Gerace was still here?

04:01PM   12    A.   Yes.

04:01PM   13    Q.   And then Mr. Bongiovanni also indicated to you that when

04:01PM   14    he moved back to Buffalo and joined the DEA office in

04:01PM   15    Buffalo, there was a rekindling of that relationship, for

04:01PM   16    lack of a better word?

04:01PM   17    A.   Yes.

04:01PM   18    Q.   And they would have more contact than they had over the

04:01PM   19    last several years?

04:01PM   20    A.   Yes.

04:01PM   21    Q.   And that's something that continued on for a couple

04:01PM   22    years?

04:01PM   23    A.   Yes.

04:01PM   24    Q.   Now according to the -- according to your testimony,

04:01PM   25    Mr. Bongiovanni denied that he and Peter Gerace were close

04:01PM    1    friends, quote, unquote; is that right?

04:01PM    2    A.  Yes.

04:01PM    3    Q.  And so the close friends, that's not something that's a

04:01PM    4    direct quote inside your notes, correct?

04:01PM    5    A.  Correct.

04:01PM    6    Q.  That's not a term, actually, that Mr. Bongiovanni even

04:01PM    7    used to describe his relationship with Peter Gerace, correct?

04:01PM    8    A.  I recall that -- I recall that phrase, yes, that's why

04:01PM    9    it's in the report.

04:01PM   10    Q.  Well, do you recall the phrase "inner circle," sir?

04:01PM   11    A.  That's in the notes, yes.

04:01PM   12    Q.  Yeah.  That's in the notes.  And that's in the quotation

04:02PM   13    marks in your notes, correct?

04:02PM   14    A.  I'd have to see my notes, but yes.

04:02PM   15    Q.  I'm going to withdraw that question because it's actually

04:02PM   16    not in quotation marks, so my apologies on that.

04:02PM   17        But it's in your notes about the inner circle, correct?

04:02PM   18    A.  Correct.

04:02PM   19    Q.  And that, to your understanding, is a term

04:02PM   20    Mr. Bongiovanni used to describe his relationship vis-à-vis

04:02PM   21    Peter Gerace, right?

04:02PM   22    A.  Yes.

04:02PM   23    Q.  Whether or not Peter Gerace was in his inner circle or

04:02PM   24    not, he answered to that question, or I guess in response to

04:02PM   25    your question about how close he was, that Peter Gerace is

04:02PM    1    not in my inner circle, right?

04:02PM    2    A.  He said he was not a close friend, correct.

04:02PM    3    Q.  Did he say anything about him being in the inner circle,

04:02PM    4    sir?

04:02PM    5    A.  No.

04:02PM    6    Q.  He didn't say that at all?

04:02PM    7    A.  He denied that.

04:02PM    8    Q.  He denied that?

04:02PM    9    A.  Yeah.

04:02PM   10    Q.  But he used the term "inner circle."  That's what I'm

04:02PM   11    getting at.

04:02PM   12    A.  I recall close friends.

04:02PM   13    Q.  You recall close friends and not inner circle?

04:03PM   14    A.  Correct.

04:03PM   15    Q.  Why is inner circle reflected in your handwritten notes

04:03PM   16    about the interview?

04:03PM   17    A.  As I was taking notes, as I said earlier, it was a

04:03PM   18    summary of what was being said.  And as I was writing it

04:03PM   19    down, that's what I wrote down.  And then when I reviewed my

04:03PM   20    notes later, I recalled it being close friends.

04:03PM   21    Q.  Okay.  So, you recall testifying in a previous hearing in

04:03PM   22    this matter, correct?

04:03PM   23    A.  Yes.

04:03PM   24    Q.  And you recall talking about how inner circle is a term

04:03PM   25    that he used, right?

04:03PM    1    A.  I don't recall that.

04:03PM    2    Q.  You don't recall that.

04:03PM    3              **MR. SINGER:**  I direct counsel's attention to 3595CW

04:04PM    4    at page 66, starting on line 13.

04:04PM    5              **BY MR. SINGER:**

04:04PM    6    Q.  Do you recall giving the following answers to the

04:04PM    7    following questions in a previous hearing back in March of

04:04PM    8    2024, sir?

04:04PM    9        "Question:  You talked earlier about how Mr. Bongiovanni

04:04PM   10    stated to you that Peter Gerace was not in his inner circle

04:04PM   11    of friends; do you remember saying that on direct?

04:04PM   12        "Answer:  Yes.

04:04PM   13        "Question:  An inner circle of friends that you recall

04:04PM   14    was something that he said by --

04:04PM   15        "Answer:  Correct.

04:04PM   16        " -- by Mr. Bongiovanni, because you remember that was

04:04PM   17    something that was quoted.

04:04PM   18        "Answer:  Yes.

04:04PM   19        "Inside your report, right?

04:04PM   20        "Answer:  Yes.

04:04PM   21        "So the inner circle of friends was something that

04:04PM   22    Mr. Bongiovanni used in his interview with you, right?

04:04PM   23        "Answer:  Yes.

04:04PM   24        "And close friends is not something he used directly in

04:04PM   25    his interview with you, correct?

04:05PM  1      "Answer:  I can't recall him using it or not."

04:05PM  2      Do you remember giving those questions and answers, sir?

04:05PM  3  A.  Yes.

04:05PM  4  Q.  So I'll ask you again:

04:05PM  5      Inner circle was a term that Joe Bongiovanni used during

04:05PM  6  your interview in March of 2019, correct?

04:05PM  7  A.  I recall the phrase close friends.

04:05PM  8  Q.  So, Mr. Bongiovanni, when you interviewed him, he gave

04:05PM  9  you a number of different reasons why Peter Gerace was not in

04:05PM 10  his inner circle or a close friend of his, correct?

04:05PM 11  A.  Yes.

04:05PM 12  Q.  And he told you that, you know, kind of sum and

04:05PM 13  substance, if he saw Peter Gerace out, he'd buy him a drink

04:05PM 14  or he'd have a drink with him in a bar; is that right?

04:06PM 15  A.  Yes.

04:06PM 16  Q.  But Peter Gerace was not someone who was invited to his

04:06PM 17  wedding, correct?

04:06PM 18  A.  Yes.

04:06PM 19  Q.  Correct?

04:06PM 20  A.  Yes.

04:06PM 21  Q.  Not someone who he ever went over to Peter Gerace's

04:06PM 22  house, correct?

04:06PM 23  A.  Correct.

04:06PM 24  Q.  Did you ask Joe Bongiovanni when he was responding to

04:06PM 25  these questions and giving you descriptions about why Peter

04:06PM  1   Gerace was not in his inner circle or a close friend, how

04:06PM  2   many times he met out Peter Gerace?

04:06PM  3   A.  I don't recall asking him that.

04:06PM  4   Q.  And we talked earlier about how you didn't have the text

04:06PM  5   messages and the phone calls prior to your March 2019

04:06PM  6   interview?

04:06PM  7   A.  Correct.

04:06PM  8   Q.  So you didn't ask him any specific questions about that

04:06PM  9   either, correct?

04:06PM  10  A.  Correct.

04:06PM  11  Q.  So he didn't have the opportunity to respond back and

04:06PM  12  clarify any thoughts you had in your head about why it was

04:06PM  13  inconsistent with what you believe the relationship is?

04:06PM  14  A.  At the time of the interview, I was only asking him and

04:06PM  15  he was explaining to me what it was.  I didn't have any other

04:06PM  16  references to go by.

04:07PM  17  Q.  Okay.  Did you ask him about what his relationship -- Joe

04:07PM  18  Bongiovanni's definition was of a close friend or being in

04:07PM  19  the inner circle was?

04:07PM  20  A.  I did not.

04:07PM  21  Q.  Now, as an investigator, you're taught to ask clarifying

04:07PM  22  questions for things that are important to your interview,

04:07PM  23  correct?

04:07PM  24  A.  Follow-up questions if necessary, yes.

04:07PM  25  Q.  Um-hum.  And you'd agree with me that learning about the

04:07PM  1  way Joe Bongiovanni defines "close friends" or "inner circle"

04:07PM  2  is something that's important to the interview, correct?

04:07PM  3  A.  Could be, yes.

04:07PM  4  Q.  It could be?

04:07PM  5  A.  Could be, yes.

04:07PM  6  Q.  Because it's going to help clarify what he means by we're

04:07PM  7  not close friends, or we're not in the inner circle, correct?

04:07PM  8  A.  Yes.

04:07PM  9  Q.  But you didn't do that?

04:07PM  10  A.  No.

04:07PM  11  Q.  So, another thing you testified to on direct was that

04:08PM  12  Mr. Bongiovanni told you about how Peter Gerace was a, quote,

04:08PM  13  unquote, police groupie; is that right?

04:08PM  14  A.  Yes.

04:08PM  15  Q.  And that's something that he offered as a reason as to

04:08PM  16  why he was not that close to Peter Gerace, correct?

04:08PM  17  A.  Yes.

04:08PM  18  Q.  And your understanding of that, based on your

04:08PM  19  conversation with Mr. Bongiovanni, was that Mr. Gerace

04:08PM  20  sometimes would suck up to police; is that right?

04:08PM  21  A.  Yes.

04:08PM  22  Q.  And Mr. Bongiovanni, as you understood it, was a law

04:08PM  23  enforcement officer during the duration of this relationship

04:08PM  24  that they had, correct?

04:08PM  25  A.  Yes.

04:08PM  1    Q.  And so he had some concerns about whether Peter Gerace

04:08PM  2    was being a friend to him, or just sucking up to him because

04:08PM  3    he was a police officer, right?

04:08PM  4    A.  Yes.

04:08PM  5    Q.  And that's something that would be reflective of a

04:08PM  6    person's feeling about whether they were close with someone,

04:08PM  7    right?

04:08PM  8    A.  Correct.

04:08PM  9    Q.  It would be reflective of whether or not a person was

04:08PM  10   within an inner circle, correct?

04:08PM  11   A.  Correct.

04:08PM  12   Q.  I mean, you're a law enforcement officer, correct?

04:08PM  13   A.  Yes.

04:08PM  14   Q.  You've been a law enforcement officer for almost

04:09PM  15   20 years?

04:09PM  16   A.  Yes.

04:09PM  17   Q.  I'm sure you've had people try to suck up to you

04:09PM  18   sometimes based on your position when they learn what you do?

04:09PM  19   A.  Yes.

04:09PM  20   Q.  You wouldn't consider those type of people to be close to

04:09PM  21   you, would you?

04:09PM  22   A.  No.

04:09PM  23   Q.  They wouldn't be in your inner circle either, correct?

04:09PM  24   A.  No.

04:09PM  25   Q.  You also talked about the vacation.  And I think we saw

04:09PM  1    one of the pictures up.  That picture in 2011 of the vacation

04:09PM  2    to Las Vegas?

04:09PM  3    A.  Yes.

04:09PM  4    Q.  That's something that came up during the course of your

04:09PM  5    interview of Mr. Bongiovanni, correct?

04:09PM  6    A.  Yes.

04:09PM  7    Q.  And what Mr. Bongiovanni reported to you is that that was

04:09PM  8    not something that was planned, correct?

04:09PM  9    A.  Yes.

04:09PM  10   Q.  And that particular trip, at that point in time in 2019,

04:09PM  11   I mean, that was eight and a half years ago?

04:09PM  12   A.  I'm sorry, what year was that?

04:09PM  13   Q.  2011?

04:09PM  14   A.  What was -- can you repeat the question again.

04:09PM  15   Q.  Certainly.  So the particular trip to Vegas that we saw

04:09PM  16   in that one picture, that was August of 2011, correct?

04:09PM  17   A.  Yes.

04:09PM  18   Q.  And you had your interview in March of 2019?

04:09PM  19   A.  Yes.

04:09PM  20   Q.  So that was about eight and a half years ago that that

04:10PM  21   happened, correct?

04:10PM  22   A.  Yes.

04:10PM  23   Q.  Mr. Bongiovanni stated to you that he didn't coordinate

04:10PM  24   any type of flights together with Peter Gerace on that trip,

04:10PM  25   correct?

04:10PM  1    A.  Yes, that's correct.

04:10PM  2    Q.  He indicated to you that it was a party that was planned

04:10PM  3    to celebrate the recent engagement of his sister-in-law?

04:10PM  4    A.  I don't recall him giving a reason for the trip.

04:11PM  5    Q.  Did you investigate the flights they took out to

04:11PM  6    Las Vegas?

04:11PM  7    A.  I did not.

04:11PM  8    Q.  Now, one of the things we went through a little bit in

04:11PM  9    detail was initiating contact with Peter Gerace; do you

04:11PM  10   recall testifying to that on direct?

04:11PM  11   A.  Yes.

04:11PM  12   Q.  So as far as initiation of contact was concerned, those

04:11PM  13   were not Joe Bongiovanni's words, correct?

04:11PM  14   A.  Correct.

04:11PM  15   Q.  Like, he did not say:  I did not initiate contact with

04:11PM  16   Peter Gerace, correct?

04:11PM  17   A.  That's correct.

04:11PM  18   Q.  Those are your words?

04:11PM  19   A.  That was -- those are my words in a question which he --

04:11PM  20   I asked him, did you ever initiate contact with Peter Gerace?

04:11PM  21   He denied it.

04:11PM  22   Q.  Did you explain what you meant by that?

04:11PM  23   A.  No.

04:12PM  24   Q.  Did you ask any clarifying questions?

04:12PM  25   A.  No.

04:12PM    1    Q.  Did you provide a timeframe as to what you were asking

04:12PM    2    about when you asked him about whether or not he initiated

04:12PM    3    contact, quote, unquote?

04:12PM    4    A.  No.

04:12PM    5    Q.  Now, you were aware as part of your investigation that

04:12PM    6    Mr. Bongiovanni was directed to not have contact with Peter

04:12PM    7    Gerace in October of 2018?

04:12PM    8    A.  I don't recall any specific direction that he was not to

04:12PM    9    have contact with him, no.

04:12PM   10    Q.  You don't recall his supervisors telling him don't have

04:12PM   11    contact with Peter Gerace because he's under investigation,

04:12PM   12    he's a target?

04:12PM   13    A.  I don't recall any -- I don't recall that, no.

04:12PM   14    Q.  Do you recall the memoranda that he wrote twice regarding

04:12PM   15    contact he had with Peter Gerace in the fall of 2018,

04:12PM   16    correct?

04:12PM   17    A.  Yes.

04:12PM   18    Q.  Do you recall whether or not those are directed towards

04:12PM   19    why he was communicating with Peter Gerace?

04:13PM   20    A.  Yes.

04:13PM   21    Q.  But you don't recall that his leadership told him to

04:13PM   22    cease contact at this time?

04:13PM   23    A.  Correct.

04:13PM   24         **MR. SINGER:**  Ms. Champoux, can you please bring up

04:13PM   25    Government Exhibit 97.

| | | |
|---|---|---|
| 04:13PM | 1 | **THE COURT:** Is this -- |
| 04:13PM | 2 | **MR. SINGER:** This is in evidence. |
| 04:13PM | 3 | Ms. Champoux, can you please zoom in on the date |
| 04:13PM | 4 | portion? |
| 04:13PM | 5 | **BY MR. SINGER:** |
| 04:13PM | 6 | Q. So you reviewed this memoranda as part of your |
| 04:13PM | 7 | investigation, right, Mr. Carpenter? |
| 04:13PM | 8 | A. Yes. |
| 04:13PM | 9 | Q. This particular memorandum is dated November 1, 2018? |
| 04:13PM | 10 | A. Yes. |
| 04:13PM | 11 | **MR. SINGER:** If you can un-expand out of that, |
| 04:13PM | 12 | Ms. Champoux. |
| 04:13PM | 13 | **BY MR. SINGER:** |
| 04:13PM | 14 | Q. It's going Greg Yensan; is that correct? |
| 04:13PM | 15 | A. Looks like -- yes, Gregory Yensan. |
| 04:13PM | 16 | Q. And Greg Yensan, yours understanding, was Joe |
| 04:13PM | 17 | Bongiovanni's direct supervisor at that time? |
| 04:13PM | 18 | A. Yes. |
| 04:13PM | 19 | Q. It's also going to a person by the name of Ed Orgon? |
| 04:14PM | 20 | A. Yes. |
| 04:14PM | 21 | Q. And he was the person who was in command of the Buffalo |
| 04:14PM | 22 | office at the time? |
| 04:14PM | 23 | A. Yes. |
| 04:14PM | 24 | Q. So not the first-line supervisor, but Mr. Bongiovanni's |
| 04:14PM | 25 | second-line supervisor? |

04:14PM  1  A.  Correct.

04:14PM  2         **MR. SINGER:**  If we can expand in on the first

04:14PM  3  paragraph, Ms. Champoux?

04:14PM  4         **BY MR. SINGER:**

04:14PM  5  Q.  Can you please read that, sir?

04:14PM  6  A.  It was brought to my attention that Peter Gerace had

04:14PM  7  become a target of a federal investigation.

04:14PM  8      Based on the intelligence I have received, I have

04:14PM  9  attempted to terminate all contact with Gerace.

04:14PM  10     It should be known that any contact I have had with

04:14PM  11  Gerace in the past was minimal, in-person contact, and

04:14PM  12  primarily consisted of a random telephone communication based

04:14PM  13  on the fact we were childhood friends.

04:14PM  14     I would sometimes randomly encounter Gerace at a

04:14PM  15  restaurant or golf outing, and have not made personal plans

04:14PM  16  to meet him social in years.

04:14PM  17  Q.  Does that help refresh your memory about why he wrote

04:14PM  18  this memorandum?

04:14PM  19         **MS. CHALBECK:**  Objection, Your Honor.  The witness

04:14PM  20  lacks personal knowledge as to Mr. Bongiovanni's motivations

04:15PM  21  in writing the memorandum.

04:15PM  22         **THE COURT:**  So, sustained to the form of the

04:15PM  23  question.  You can ask.

04:15PM  24         **MR. SINGER:**  Certainly.

04:15PM  25         **BY MR. SINGER:**

04:15PM   1   Q.  So the first sentence in that particular memorandum talks

04:15PM   2   about it being brought to Mr. Bongiovanni's attention that

04:15PM   3   Peter Gerace had become a target of a federal investigation,

04:15PM   4   correct?

04:15PM   5   A.  Yes.

04:15PM   6   Q.  And the second sentence in that paragraph talks about how

04:15PM   7   he attempted to terminate contact with Gerace based on that

04:15PM   8   reason, correct?

04:15PM   9   A.  Yes.

04:15PM   10  Q.  So, again, based on your investigation, did you become

04:15PM   11  familiar that he was directed to not have contact with Peter

04:15PM   12  Gerace in the fall of 2018?

04:15PM   13  A.  I have nothing specific that DEA supervisors told him not

04:15PM   14  to the contact Peter Gerace.

04:15PM   15  Q.  You just don't know?

04:15PM   16  A.  Correct.

04:15PM   17  Q.  Okay.

04:15PM   18       MR. SINGER:  Ms. Champoux, if we can un-expand out of

04:15PM   19  that.  And if we can expand on the second two paragraphs.

04:16PM   20  Actually, the bottom two, as well, thank you.

04:16PM   21       BY MR. SINGER:

04:16PM   22  Q.  Sir, do you mind reading this for the jury, please?

04:16PM   23  A.  Sure.

04:16PM   24  Q.  Thank you.

04:16PM   25  A.  Over the past several months, I have received a series of

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

| | | |
|---|---|---|
| 04:16PM | 1 | phone calls from Gerace which I did not answer. |
| 04:16PM | 2 | On October 23rd and October 27th, 2018, I received a |
| 04:16PM | 3 | series of text messages from Gerace, which was out of the |
| 04:16PM | 4 | ordinary. |
| 04:16PM | 5 | In the aforementioned text messages, Gerace seemed very |
| 04:16PM | 6 | concerned by my failure to return his calls or text messages, |
| 04:16PM | 7 | and was questioning why I did not return a social text |
| 04:16PM | 8 | inquiry. |
| 04:16PM | 9 | In an effort to maintain a sense of normal activity, and |
| 04:16PM | 10 | with the hopes of not alerting Gerace that something may be |
| 04:16PM | 11 | wrong, I returned a text and stated that I was working, |
| 04:16PM | 12 | quote, midnights, unquote, and was sorry for my large gaps of |
| 04:16PM | 13 | no communication. |
| 04:16PM | 14 | I hoped -- I hoped that this reply would satisfy Gerace's |
| 04:17PM | 15 | curiosity as to my absence of returning calls and texts. |
| 04:17PM | 16 | Please see the attached text messages. |
| 04:17PM | 17 | I have reported this unsolicited contact with Gerace to |
| 04:17PM | 18 | my group supervisor, Gregory Yensan, and will continue to |
| 04:17PM | 19 | avoid any future contact. |
| 04:17PM | 20 | Q.  So in this part of the memorandum, Mr. Bongiovanni is |
| 04:17PM | 21 | talking about how he's trying to avoid contact with Gerace? |
| 04:17PM | 22 | A.  Correct. |
| 04:17PM | 23 | Q.  And about how, based on the messages that he was |
| 04:17PM | 24 | receiving, that he did make a response to Mr. Gerace? |
| 04:17PM | 25 | A.  Yes. |

04:17PM   1    Q.  But it wasn't a genuine response, correct?

04:17PM   2    A.  According to this memo, correct.

04:17PM   3    Q.  And your understanding was that Peter Gerace was under

04:17PM   4    investigation at that point in time by the DEA, correct?

04:17PM   5    A.  Yes.

04:17PM   6    Q.  He was a target of an investigation back in the fall of

04:17PM   7    2018?

04:17PM   8    A.  Actually, I don't know what was going on with the Gerace

04:17PM   9    investigation at the time.

04:18PM   10   Q.  You just don't know?

04:18PM   11   A.  Correct.

04:18PM   12   Q.  All right.

04:18PM   13           **MR. SINGER:**  So we can take that down, and move on to

04:18PM   14   the second page, Ms. Champoux.

04:18PM   15           **BY MR. SINGER:**

04:18PM   16   Q.  So we've been through some of these messages before,

04:18PM   17   you've been through these messages, too, correct, sir?

04:18PM   18   A.  I reviewed these messages, yes.

04:18PM   19   Q.  So these particular messages were sent out in the June

04:18PM   20   2018 timeframe, these are regarding the meet-up at Sunset

04:18PM   21   Bay?

04:18PM   22   A.  Yes.

04:18PM   23   Q.  And they were -- where they run into each other at Tom

04:18PM   24   Doctor's house?

04:18PM   25   A.  Yes.

04:18PM    1          **MR. SINGER:**  So, Ms. Champoux, can we advance to

04:18PM    2    page 12 of the document.

04:18PM    3          **BY MR. SINGER:**

04:18PM    4    Q.  And your review of the messages previous to this show

04:18PM    5    there's some invites to a Pharaoh's golf outing that occurs

04:18PM    6    back in July?

04:18PM    7    A.  Yes.

04:18PM    8    Q.  And then there's a gap in the messages, correct?

04:18PM    9    A.  Yes.

04:18PM    10   Q.  There's not responses going back and forth between Peter

04:18PM    11   Gerace and Joe Bongiovanni at that time?

04:19PM    12   A.  Correct.

04:19PM    13   Q.  And then we have messages that start to get exchanged

04:19PM    14   back on Tuesday, October 23rd; is that right?

04:19PM    15   A.  Yes.

04:19PM    16          **MR. SINGER:**  If you could advance to the next page,

04:19PM    17   Ms. Champoux.

04:19PM    18          **BY MR. SINGER:**

04:19PM    19   Q.  And so these particular messages is what Mr. Bongiovanni

04:19PM    20   is referring to in his memorandum, correct, sir?

04:19PM    21   A.  Yes.

04:19PM    22   Q.  Where Peter Gerace is asking him, hey, are you alive?

04:19PM    23   Did you get a new phone?  Is everything all right?

04:19PM    24   A.  What was the question?

04:19PM    25   Q.  He's asking whether he or not he's still alive?

04:19PM    1    A.  Yes.

04:19PM    2    Q.  He's asking whether or not he got a new phone?

04:19PM    3    A.  Correct.

04:19PM    4    Q.  He's asking whether or not he moved out of town?

04:19PM    5    A.  Correct.

04:19PM    6    Q.  So it appears on your examination of the messages, that

04:19PM    7    there hasn't really been a lot of phone contact between Joe

04:19PM    8    Bongiovanni and Peter Gerace for a while, right?

04:19PM    9    A.  Correct.

04:19PM   10    Q.  And it looks like there was a never a response to the

04:19PM   11    initial message, correct?

04:19PM   12    A.  Correct.

04:19PM   13    Q.  Peter Gerace then follows up with another text; is that

04:19PM   14    correct?

04:20PM   15    A.  It looks like a few hours later, correct.

04:20PM   16         **MR. SINGER:**  Can we go to next page, Ms. Champoux.

04:20PM   17         **BY MR. SINGER:**

04:20PM   18    Q.  And then this darker message here, this is a response

04:20PM   19    that Mr. Bongiovanni provided Peter Gerace at that time?

04:20PM   20    A.  Yes.

04:20PM   21    Q.  And that's consistent with what he writes in the memo,

04:20PM   22    correct?

04:20PM   23    A.  Yes.

04:20PM   24    Q.  Peter Gerace looks like he responds back, correct?

04:20PM   25    A.  Yes.

04:20PM   1    Q.  And then Mr. Bongiovanni sends back another response.

04:20PM   2    Hope all is well.  You're not the only one mad at me, LOL?

04:20PM   3    A.  Yes.

04:20PM   4         MR. SINGER:  Can we move forward to the next page,

04:20PM   5    Ms. Champoux?

04:20PM   6         BY MR. SINGER:

04:20PM   7    Q.  And it looks like Mr. Gerace responds, I'm not mad,

04:20PM   8    brother, just keep in touch?

04:20PM   9    A.  Yes.

04:20PM  10    Q.  So it appears, based on what you've read in these text

04:20PM  11    messages, that Peter Gerace is no longer concerned about the

04:20PM  12    lack of contact?

04:20PM  13    A.  Correct.

04:21PM  14         MR. SINGER:  Bring that down, Ms. Champoux.  If we

04:21PM  15    can go to Government Exhibit 98 in evidence.

04:21PM  16         BY MR. SINGER:

04:21PM  17    Q.  So this is another memorandum that you reviewed as part

04:21PM  18    of your investigation, sir?

04:21PM  19    A.  Yes.

04:21PM  20    Q.  And this was another memo that Mr. Bongiovanni submitted

04:21PM  21    to DEA leadership at the Buffalo office regarding Peter

04:21PM  22    Gerace and contact with him?

04:21PM  23    A.  Correct.

04:21PM  24    Q.  And this was submitted after the November 1st, 2018

04:21PM  25    memorandum that we looked at?

04:21PM   1   A.   Yes.

04:21PM   2   Q.   This was submitted on December 10th, of 2018?

04:21PM   3   A.   Correct.

04:21PM   4   Q.   And this is going to Mr. Bongiovanni's second-line

04:21PM   5   supervisor, Edward Orgon, the RAC of the office?

04:21PM   6   A.   Yes.

04:21PM   7          **MR. SINGER:**  Ms. Champoux if we can expand on the

04:21PM   8   first sentence in the first paragraph, please.

04:21PM   9          **BY MR. SINGER:**

04:21PM   10  Q.   Can you please read that for the jury, sir?  Thank you.

04:22PM   11  A.   On December 10th, 2018, I received an incoming phone call

04:22PM   12  from Peter Gerace and ignored the call.

04:22PM   13       Immediately following the call from Gerace, I received

04:22PM   14  another incoming call from the 716-525-6511, and I ignored

04:22PM   15  the call because I did not recognized the number.

04:22PM   16       Immediately after my failure to answer the aforementioned

04:22PM   17  calls, I received a series of text messages from Gerace out

04:22PM   18  of the ordinary and over a span of a couple minutes.

04:22PM   19       In the text messages, Gerace seemed very concerned, and

04:22PM   20  in his text Gerace asked me to text back, quote, on the

04:22PM   21  number they just called you on, unquote.

04:22PM   22       Gerace immediately followed the call with another text

04:23PM   23  which read, quote, ASAP, unquote.

04:23PM   24          **MR. SINGER:**  Ms. Champoux, if we can un-expand out of

04:23PM   25  that?  And can we expand on the paragraph below, please?

04:23PM   1              **BY MR. SINGER:**

04:23PM   2    Q.  Sorry, Mr. Carpenter, you're going to be my narrator

04:23PM   3    today.  Would you mind reading this paragraph again?

04:23PM   4    A.  I'll put my radio voice on then.

04:23PM   5    Q.  You sound great.

04:23PM   6    A.  In an effort to maintain a sense of normal activity, and

04:23PM   7    with hopes of not alerting Gerace that something may be

04:23PM   8    wrong, I responded and called the number 716-525-6511.

04:23PM   9         Gerace answered the phone, and I was agitated, and asked

04:23PM  10    Gerace why was he calling me over and over.

04:23PM  11         I then asked Gerace why he was calling me from a

04:23PM  12    different number.

04:23PM  13         Gerace stated that the 716-525-6511 belonged to his

04:23PM  14    girlfriend.

04:23PM  15         I stated that I did not respond to his calls and texts

04:24PM  16    because I was in court.

04:24PM  17         At that time, Gerace stated that he needed to tell me

04:24PM  18    something important, but he didn't want to talk on the phone.

04:24PM  19         I told Gerace that it was fine to talk on the phone, and

04:24PM  20    asked Gerace what was the problem?

04:24PM  21         Gerace stated that he, Gerace, was told that I was being

04:24PM  22    watched.

04:24PM  23         I asked Gerace who was watching me?

04:24PM  24         Gerace responded that he heard I was being watched by

04:24PM  25    internal affairs.

04:24PM   1        I responded is that so?

04:24PM   2        I asked Gerace who was giving him this information?

04:24PM   3        At that time, Gerace seemed to stumble and said that this

04:24PM   4   information was told to him by somebody he encountered while

04:24PM   5   he was dining or drinking at Salvatore's restaurant and

04:24PM   6   hotel.

04:24PM   7        Gerace stated that he did not recall the person's name.

04:24PM   8        Again, I asked Gerace, who said I was being -- excuse me,

04:25PM   9   who said I was being watched by internal affairs?

04:25PM  10        Again, Gerace failed to identify his source.

04:25PM  11        At that time, I told Gerace that his information was

04:25PM  12   quote, bullshit, unquote.

04:25PM  13        I also told Gerace that DEA does not even have a bureau

04:25PM  14   of internal affairs.

04:25PM  15             MR. SINGER:  If we can un-expand out of that,

04:25PM  16   Ms. Champoux.  If we can capture that last part of the

04:25PM  17   paragraph on the bottom page.

04:25PM  18             BY MR. SINGER:

04:25PM  19   Q.  Go ahead and take your time, Mr. Carpenter.

04:25PM  20        Don't worry, you're reading less than Frank DiCarlo, so

04:25PM  21   you're all good.

04:25PM  22        Can you please read that part of the paragraph?

04:25PM  23   A.  Gerace stated that the person believes that internal

04:25PM  24   affairs is watching me because Gerace and I have been friends

04:25PM  25   since we were kids, and now he owns Pharaoh's Gentlemen's

04:25PM    1    Club.

04:25PM    2        I responded that yes, we have been friends for years, but

04:26PM    3    I never came into your club.

04:26PM    4        Gerace said he agrees.

04:26PM    5            **MR. SINGER:**  And then if we can un-expand out of

04:26PM    6    that, and move to the next page, Ms. Champoux.

04:26PM    7            Can you expand on the remaining paragraphs?  So it

04:26PM    8    starts up with Gerace on that page.

04:26PM    9            **BY MR. SINGER:**

04:26PM   10    Q.  Thank you very much, Mr. Carpenter.  I'll leave it to

04:26PM   11    you.

04:26PM   12    A.  Gerace reiterated that we are friends.  And the reason

04:26PM   13    for the call was that Gerace was looking out for me.

04:26PM   14        I responded that there is nothing going on, and his

04:26PM   15    information was false.

04:26PM   16        Gerace sent me a text shortly after the conclusion of the

04:26PM   17    telephone call, and in sum and substance, stated that, quote,

04:26PM   18    we haven't talked in a while, but he considered me one of his

04:26PM   19    best friends, and that he always had my back, unquote.

04:26PM   20        As a continued effort to maintain a sense of normal

04:26PM   21    activity, I texted Gerace back.  Quote, we have been friends

04:26PM   22    for 25 years, bud, all good, unquote.

04:27PM   23        On December 8th, 2018, a received a reply text from

04:27PM   24    Gerace.  Quote, you mean 36 years, unquote.

04:27PM   25        I have and will report all contact with Gerace to a DEA

04:27PM   1   supervisor, like I have in the past, and will in the future,

04:27PM   2   should unsolicited communications with Gerace occur.

04:27PM   3   Q.   Thank you, Mr. Carpenter.

04:27PM   4        **MR. SINGER:**  Ms. Champoux, will you mind un-expanding

04:27PM   5   out of that?  And can we move to the next page in the

04:27PM   6   document?

04:27PM   7        **BY MR. SINGER:**

04:27PM   8   Q.   So you recall when you reviewed this memorandum,

04:27PM   9   Mr. Carpenter, that you also took a look at the text messages

04:27PM  10   that were appended to it?

04:27PM  11   A.   Yes.

04:27PM  12   Q.   And these particular text messages we're looking at right

04:27PM  13   now are the ones that are being referenced inside the

04:27PM  14   narrative above; is that correct?

04:27PM  15   A.   Yes.

04:27PM  16        **MR. SINGER:**  If we can move to the next page,

04:27PM  17   Ms. Champoux.

04:28PM  18        **BY MR. SINGER:**

04:28PM  19   Q.   And, again, this is a continuation of that conversation

04:28PM  20   that was referenced?

04:28PM  21   A.   Yes.

04:28PM  22   Q.   And so when Mr. Bongiovanni is talking about the

04:28PM  23   friendship that he has with Peter Gerace at this particular

04:28PM  24   time, there's a context to it, correct?

04:28PM  25   A.   Yes.

04:28PM 1  Q.  And that context is being explained in the memorandum

04:28PM 2  above?

04:28PM 3  A.  Yes.

04:28PM 4         MR. SINGER:  Can we move on to the next page,

04:28PM 5  Ms. Champoux?

04:28PM 6         Oh, yeah, just a little.  That is the last page.

04:28PM 7  Excuse me.  And we can bring that down, Ms. Champoux.

04:28PM 8         BY MR. SINGER:

04:28PM 9  Q.  So, you read these memoranda prior to going into the

04:28PM 10 March 2019 interview, right?

04:28PM 11 A.  Yes.

04:28PM 12 Q.  And I know you talked about on direct several text

04:28PM 13 messages that are in addition to these, correct, that you

04:28PM 14 looked at?

04:28PM 15 A.  Yes.

04:28PM 16 Q.  That was in Government Exhibit 310D?

04:28PM 17 A.  I believe that's the exhibit.

04:28PM 18 Q.  And that's the longer string of text messages that go

04:28PM 19 from 2015 all the way to 2018?

04:29PM 20 A.  Yes.

04:29PM 21 Q.  And as far as those text messages, you were asked a

04:29PM 22 number of questions about those text messages.  So I just

04:29PM 23 want to go kind of quickly go through those.

04:29PM 24     The government talked to you about Saint Patrick's Day

04:29PM 25 party invitation that occurred, correct?

04:29PM  1    A.  Yes.

04:29PM  2    Q.  That occurred back in 2015?

04:29PM  3    A.  Yes.

04:29PM  4    Q.  They also talked to you about the text message in 2015

04:29PM  5    that related to Mr. Gerace wanted to give Joe Bongiovanni a

04:29PM  6    gift; do you remember that?

04:29PM  7    A.  Yes.

04:29PM  8    Q.  And you're aware of the fact that Mr. Bongiovanni was

04:29PM  9    married, correct?

04:29PM  10   A.  Yes.

04:29PM  11   Q.  You're aware of the fact that Peter Gerace did not attend

04:29PM  12   the wedding, correct?

04:29PM  13   A.  Yes.

04:29PM  14   Q.  Are you aware of the fact that that's what the gift that

04:29PM  15   Peter Gerace wanted to give Joe Bongiovanni is referenced in

04:29PM  16   that email or text message?

04:29PM  17   A.  I was not.

04:29PM  18   Q.  The government also talked to you about another July 2015

04:29PM  19   invitation regarding a birthday that was going on for

04:29PM  20   Mr. Bongiovanni?

04:29PM  21   A.  Yes.

04:30PM  22   Q.  And that was at the house followed by Boss Restaurant?

04:30PM  23   A.  Yes.

04:30PM  24   Q.  And then I think there was another text message that was

04:30PM  25   referenced in August of 2015 where Mr. Bongiovanni asked him,

04:30PM   1   you know, if I needed to send you a letter, what's your

04:30PM   2   address?

04:30PM   3   A.  Yes.

04:30PM   4   Q.  And that's after that birthday party, correct?

04:30PM   5   A.  Yes.

04:30PM   6   Q.  It's after the text where Peter Gerace is talking about

04:30PM   7   providing some type of gift to Mr. Bongiovanni?

04:30PM   8   A.  Yes.

04:30PM   9   Q.  Do you know what the particular reference is being made

04:30PM  10   as far as why Mr. Bongiovanni wants to send him a letter?

04:30PM  11   A.  No.

04:30PM  12   Q.  Could it be a thank you though?

04:30PM  13   A.  I don't know the context.

04:30PM  14   Q.  Well, you just saw those two messages that the government

04:30PM  15   brought to your attention on direct, correct?

04:30PM  16   A.  Yes.

04:30PM  17           **MS. CHALBECK:**  Objection, argumentative.

04:30PM  18           **THE COURT:**  Overruled.

04:30PM  19           **BY MR. SINGER:**

04:30PM  20   Q.  Another message that the government brought you through

04:30PM  21   was something that occurred back in June of 2016 regarding

04:30PM  22   Peter Gerace's parents having some type of anniversary or

04:31PM  23   birthday party; is that right?

04:31PM  24   A.  I don't know.  There was an event with the parents,

04:31PM  25   correct.

04:31PM  1    Q.  But you don't know what the particular event was?

04:31PM  2    A.  No.

04:31PM  3    Q.  In your review of the text messages, it's a fair

04:31PM  4    statement that the contact between Joe Bongiovanni and Peter

04:31PM  5    Gerace starts to drop off moving through 2016 and into 2017

04:31PM  6    and 2018, correct?

04:31PM  7    A.  I'm not exactly sure the frequency of the drop off, but I

04:31PM  8    can't say for sure on that.

04:31PM  9    Q.  Okay.  So, I know you reviewed these messages, but you

04:31PM  10   can't say for certain whether or not contact between the two

04:31PM  11   dropped off?

04:31PM  12   A.  Around that timeframe, correct.

04:31PM  13   Q.  You can't say whether or not Mr. Bongiovanni's initiation

04:31PM  14   of contact dropped off?

04:31PM  15   A.  Correct.

04:31PM  16   Q.  You can't say whether or not Peter Gerace's initiation of

04:31PM  17   contact was greater than Mr. Bongiovanni?

04:32PM  18   A.  Correct.

04:32PM  19   Q.  Because you just didn't count out the messages yourself?

04:32PM  20   A.  Yes.

04:32PM  21   Q.  The government talked about some phone logs and phone

04:32PM  22   calls that were made between Peter Gerace and Joe

04:32PM  23   Bongiovanni; is that right?

04:32PM  24   A.  Yes.

04:32PM  25   Q.  Those phone logs were not something that you reviewed

04:32PM   1   prior to your April 29 -- sorry, prior to your March 2019

04:32PM   2   interview?

04:32PM   3   A.  Correct.

04:32PM   4   Q.  But those are ones that you reviewed in some degree

04:32PM   5   before today?

04:32PM   6   A.  Yes.

04:32PM   7   Q.  Did you go through all the times that were -- Peter

04:32PM   8   Gerace and Joe Bongiovanni were in contact?

04:32PM   9   A.  I can't say about all of them.

04:32PM  10   Q.  Did you count out the times that Peter Gerace called Joe

04:32PM  11   Bongiovanni?

04:32PM  12   A.  I did not.

04:32PM  13   Q.  Did you count out the number of times that Joe

04:32PM  14   Bongiovanni called Peter Gerace?

04:32PM  15   A.  No.

04:32PM  16   Q.  Did you cross-reference those calls with the text

04:32PM  17   messages to figure out who was calling who and why?

04:33PM  18   A.  The call logs indicate who was calling who.

04:33PM  19   Q.  All right.  Well, how about those text messages you

04:33PM  20   reviewed.  You reviewed those, right?

04:33PM  21   A.  Correct.

04:33PM  22   Q.  And they posed questions, Peter Gerace poses questions to

04:33PM  23   Joe Bongiovanni, right?

04:33PM  24   A.  Yes.

04:33PM  25   Q.  Joe Bongiovanni poses questions to Peter Gerace?

04:33PM   1    A.  Yes.

04:33PM   2    Q.  And sometimes there are references in those text messages

04:33PM   3    to call me?

04:33PM   4    A.  Yes.

04:33PM   5    Q.  Did you cross-reference to see whether or not the phone

04:33PM   6    logs match up with those text messages in any way?

04:33PM   7    A.  I did not.

04:33PM   8         MR. SINGER:  Ms. Champoux, can you bring up

04:33PM   9    Government Exhibit 426-1.

04:33PM  10         BY MR. SINGER:

04:33PM  11    Q.  So we talked about this particular picture on direct,

04:33PM  12    correct?

04:33PM  13    A.  Yes.

04:33PM  14    Q.  And your understanding this was this picture was taken

04:33PM  15    more than ten years ago prior to your interview in March of

04:33PM  16    2019?

04:33PM  17    A.  Yes.

04:33PM  18    Q.  Not very recent, you would agree with me, correct?

04:33PM  19    A.  Yes.

04:33PM  20         MR. SINGER:  You can bring that down, Ms. Champoux.

04:34PM  21         Can you bring up 490A please?

04:34PM  22         MS. CHAMPOUX:  490A.

04:34PM  23         MR. SINGER:  490A, as in alpha.

04:34PM  24         BY MR. SINGER:

04:34PM  25    Q.  This is another picture you talked about on your direct;

04:34PM    1    is that correct?

04:34PM    2    A.  Yes, sir.

04:34PM    3    Q.  And this particular picture, it's got a date stamp on it

04:34PM    4    of August 2011, correct?

04:34PM    5    A.  Yes.

04:34PM    6    Q.  And this was something that was more than eight years

04:34PM    7    before the interview you conducted in March of 2019?

04:34PM    8    A.  Correct.

04:34PM    9    Q.  Not very recent?

04:34PM    10   A.  Correct.

04:34PM    11            **MR. SINGER:**  You can bring that down, Ms. Champoux.

04:34PM    12            **BY MR. SINGER:**

04:34PM    13   Q.  So when you asked Mr. Bongiovanni, getting back to your

04:34PM    14   interview in March of 2019, about initiation of contact, you

04:34PM    15   testified that you didn't provide him any type of timeframe;

04:34PM    16   is that right?

04:34PM    17   A.  Ever.

04:34PM    18   Q.  But when you're talking about this with him, this is

04:34PM    19   after all those memoranda that we just talked about occurred,

04:34PM    20   correct?

04:34PM    21   A.  Um-hum.  Yes.

04:35PM    22   Q.  So the November 1st, 2018 memorandum was filed with the

04:35PM    23   DEA, right?

04:35PM    24   A.  Yes.

04:35PM    25   Q.  And in that memoranda, Mr. Bongiovanni indicated that he

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24

136

04:35PM 1    was made aware that Peter Gerace was a target of

04:35PM 2    investigation?

04:35PM 3    A.   Yes.

04:35PM 4    Q.   And the December 10th memoranda that was filed on Peter

04:35PM 5    Gerace, do you remember seeing that?

04:35PM 6    A.   Yes.

04:35PM 7    Q.   That occurred prior to the March 2019 interview, correct?

04:35PM 8    A.   Yes.

04:35PM 9    Q.   Where he's explaining why he had particular contact with

04:35PM 10   Peter Gerace?

04:35PM 11   A.   Yes.

04:35PM 12   Q.   And whether or not he initiated those contacts?

04:35PM 13   A.   I don't recall the initiated -- I'm sorry, can you

04:35PM 14   clarify the question?

04:35PM 15   Q.   Certainly.  So inside of those memoranda, he's explaining

04:35PM 16   whether he initiated contact with Mr. Gerace, correct?

04:35PM 17   A.   I don't think he clarified if he was initiating or not,

04:35PM 18   but --

04:35PM 19   Q.   Okay.  But he's indicating why he's responding back to

04:35PM 20   the messages, correct?

04:35PM 21   A.   Correct.

04:35PM 22   Q.   Why he's responding back to these calls?

04:35PM 23   A.   Yes.

04:35PM 24   Q.   So it appears, since he's noting his response, that Peter

04:35PM 25   Gerace is initiating contact on those times, correct?

04:35PM   1   A.  Yes.

04:35PM   2   Q.  And that's what's in his head during this March 2019

04:36PM   3   interview, correct?

04:36PM   4            MS. CHALBECK:  Objection, Your Honor.  I -- perhaps

04:36PM   5   to form, if not to personal knowledge.  I think it's -- what's

04:36PM   6   in the defendant's head?

04:36PM   7            THE COURT:  Yeah, sustained.

04:36PM   8            BY MR. SINGER:

04:36PM   9   Q.  You'd agree with me that when you had this interview in

04:36PM  10   March of 2019, it's after all these memoranda are written,

04:36PM  11   correct?

04:36PM  12   A.  Yes, sir.

04:36PM  13   Q.  Several months after that?

04:36PM  14   A.  Yes.

04:36PM  15   Q.  And you discussed the memoranda, correct?

04:36PM  16   A.  Yes.

04:36PM  17   Q.  So as part the March 2019 interview, there was also

04:36PM  18   discussion about overdoses, and Peter Gerace, and whether or

04:36PM  19   not he made a phone call to Joe Bongiovanni; do you remember

04:36PM  20   that?

04:36PM  21   A.  Yes.

04:36PM  22   Q.  And you asked him that question because this is one of

04:36PM  23   the allegations that Agent Casullo levied against Joe

04:37PM  24   Bongiovanni, correct?

04:37PM  25   A.  Correct.

04:37PM    1    Q.  And this is one of the allegations that Joe Bongiovanni

04:37PM    2    denied inside the memoranda that we read before the break,

04:37PM    3    correct?

04:37PM    4    A.  Yes.

04:37PM    5    Q.  So, part of your investigation was into, hey, what

04:37PM    6    happened with this, correct?

04:37PM    7    A.  Yes.

04:37PM    8    Q.  And, so, you asked the question about whether or not

04:37PM    9    Peter Gerace called Joe Bongiovanni during an active overdose

04:37PM    10    situation, correct?

04:37PM    11    A.  Correct.

04:37PM    12    Q.  Do you remember the exact words you used when you asked

04:37PM    13    him that question?

04:37PM    14    A.  I don't recall the exact words.  But I know he denied it

04:37PM    15    happening.

04:37PM    16    Q.  Okay.  So he denied that it happened.  But he provided

04:37PM    17    you other information about conversations that he did have

04:37PM    18    with Gerace, correct?

04:37PM    19    A.  Correct.

04:37PM    20    Q.  And what he indicated to you was that he did receive

04:37PM    21    calls in the past from Peter Gerace, correct?

04:37PM    22    A.  Yes.

04:37PM    23    Q.  They were not in an emergent situation of someone

04:37PM    24    overdosing, correct?

04:37PM    25    A.  Correct.

04:37PM  1   Q.  But given his line of work, he was concerned that if a

04:37PM  2   patron or employee overdosed at Pharaoh's Gentlemen's Club,

04:38PM  3   what should he do, correct?

04:38PM  4        MS. CHALBECK:  Objection to form.  And lack of

04:38PM  5   personal knowledge as to what Mr. Bongiovanni was concerned

04:38PM  6   about.

04:38PM  7        THE COURT:  Yeah, sustained Mr. Singer.  You keep

04:38PM  8   asking the questions that way.  You can't ask them that way.

04:38PM  9        MR. SINGER:  I got it, Judge.

04:38PM  10        BY MR. SINGER:

04:38PM  11   Q.  What was explained to you was Peter Gerace had concerns

04:38PM  12   about an employee or patron overdosing at the club?

04:38PM  13   A.  Yes.

04:38PM  14   Q.  And that was the reason for the contact with

04:38PM  15   Mr. Bongiovanni?

04:38PM  16   A.  Yes.

04:38PM  17   Q.  And what Mr. Bongiovanni told Peter Gerace was that he

04:38PM  18   should get certified in Narcan?

04:38PM  19   A.  Yes.

04:38PM  20   Q.  But he denied anything about telling Peter Gerace get the

04:38PM  21   stripper out of there, or something to that effect, correct?

04:38PM  22   A.  Correct.

04:38PM  23   Q.  You also talked about on direct the question about how

04:39PM  24   Mr. Bongiovanni denied ever witnessing Peter Gerace consume

04:39PM  25   or use narcotics; do you recall that?

04:39PM    1    A.  Yes.

04:39PM    2    Q.  So, that particular part of your testimony, it's not

04:39PM    3    consistent with your notes, correct?

04:39PM    4    A.  My handwritten notes may reflect a different wordage, but

04:39PM    5    the report reflects consume narcotics.

04:39PM    6    Q.  Yeah.  So for instance, your notes reflect that you asked

04:39PM    7    Mr. Bongiovanni whether or not you've ever seen Peter Gerace

04:39PM    8    with drugs, correct?

04:39PM    9    A.  I believe that's what they reflect, yes.

04:39PM   10    Q.  And he responded back to that answer in the negative,

04:39PM   11    correct?

04:39PM   12    A.  Yes.

04:39PM   13    Q.  And you'd agree with me that seeing someone with drugs

04:39PM   14    versus seeing someone use drugs, that's something that's

04:39PM   15    different, correct?

04:39PM   16    A.  Yes.

04:39PM   17    Q.  But the way you reported it in your testimony was that

04:39PM   18    he'd never seen Gerace use drugs; is that right?

04:39PM   19    A.  Yes.

04:39PM   20    Q.  You also talked about the short leash comment; is that

04:39PM   21    right?

04:40PM   22    A.  Yes.

04:40PM   23    Q.  Now your handwritten notes, they differ from your report,

04:40PM   24    correct?

04:40PM   25    A.  Yes.

04:40PM    1    Q.  The short port of that short leash is omitted from your

04:40PM    2    notes, correct?

04:40PM    3    A.  Correct.

04:40PM    4    Q.  It your notes, it's just reflected as leash, correct?

04:40PM    5    A.  Yes.

04:40PM    6    Q.  So are you paraphrasing there, sir?

04:40PM    7    A.  No.

04:40PM    8    Q.  That's something that you believe that Mr. Bongiovanni

04:40PM    9    told you directly in the interview?

04:40PM    10   A.  Yes.

04:40PM    11   Q.  Even though it's not reported in your notes?

04:40PM    12   A.  Correct.

04:40PM    13   Q.  Now, with regard to the racial comment that Special Agent

04:40PM    14   Casullo made allegations about.  You talked to

04:40PM    15   Mr. Bongiovanni about that, as well, correct?

04:40PM    16   A.  Correct.

04:40PM    17   Q.  And we talked about the memorandum, that's something he

04:40PM    18   denied ever happening, correct?

04:40PM    19   A.  Correct.

04:40PM    20   Q.  With regard to Ron Serio, I think the government asked

04:41PM    21   you almost a dozen times whether or not you ever used the

04:41PM    22   name Ron Serio in your March 2019 interview; do you remember

04:41PM    23   that?

04:41PM    24   A.  Yes.

04:41PM    25   Q.  And I think on each and every occasion, you said no, I

04:41PM  1   never used the name Ron Serio?

04:41PM  2   A.   Correct.

04:41PM  3   Q.   So, as far as Ron Serio's concerned, you also testified

04:41PM  4   that prior to this particular interview, you had some type of

04:41PM  5   meeting or call with Special Agent Ryan from HSI; is that

04:41PM  6   right?

04:41PM  7   A.   Yes.

04:41PM  8   Q.   And your testimony today is that during this particular

04:41PM  9   call, or meeting, Agent Ryan gave you seven different names

04:41PM  10  of people to ask about during your March 2019 interview,

04:41PM  11  correct?

04:41PM  12  A.   Yes.

04:41PM  13  Q.   And you testified today that Agent Ryan asked you to do

04:41PM  14  this, but never brought out any reasoning as to why he wanted

04:41PM  15  you to ask about these names?

04:41PM  16  A.   Correct.

04:41PM  17  Q.   Did you take any notes about these particular names prior

04:41PM  18  to the March 2019 interview?

04:42PM  19  A.   Not that I recall, no.

04:42PM  20  Q.   How did you remember all these names?

04:42PM  21  A.   I did, I -- I can't say how.

04:42PM  22  Q.   Yeah, I mean, I guess, would it be difficult to memorize

04:42PM  23  these names if you were never provided any context as to why

04:42PM  24  they were relevant to ask about?

04:42PM  25  A.   I'm -- I remember the names from the interview, I'm not

04:42PM   1   sure what --

04:42PM   2   Q.  And you remember talking about earlier about how you have

04:42PM   3   a particular investigation that's separate and apart from

04:42PM   4   Agent Ryan's investigation, correct?

04:42PM   5   A.  Yes.

04:42PM   6   Q.  It was the intent of both of you not to cross streams,

04:42PM   7   correct?

04:42PM   8   A.  Yes.

04:42PM   9   Q.  And the reason for that is that you didn't want to do

04:42PM  10   anything to alert Agent Bongiovanni to the fact that he was

04:42PM  11   under investigation vis-à-vis the Ron Serio investigation,

04:42PM  12   correct?

04:42PM  13   A.  That's part of the reason, yes.

04:42PM  14   Q.  And so as far as these names are concerned, one of the

04:42PM  15   names that you know, T.S. is associated with the Joe

04:43PM  16   Bongiovanni investigation -- sorry, the Ron Serio

04:43PM  17   investigation, correct?

04:43PM  18   A.  I know that now, correct.

04:43PM  19   Q.  But you claim that you didn't know that back in March of

04:43PM  20   2019?

04:43PM  21   A.  Correct.

04:43PM  22   Q.  But you knew when you were asking that question in the

04:43PM  23   interview when you got the response from Agent Bongiovanni it

04:43PM  24   was related to the Ron Serio investigation, right?

04:43PM  25   A.  I cannot recall his answer offhand regarding that name.

04:43PM    1    Q.  Would taking a look at your notes help refresh your

04:43PM    2    memory about that?

04:43PM    3    A.  It would.

04:43PM    4    Q.  So I'm going to direct your attention to page 10 of

04:43PM    5    Government Exhibit 3595 Bravo Victor.

04:43PM    6        I'll make two Xs on the page, sir.

04:43PM    7        When you're done, take a look at that, please look up at

04:43PM    8    me.

04:44PM    9        I'm going to take that away from you, Mr. Carpenter.

04:44PM   10        Did that help refresh your memory as to what was said

04:44PM   11    vis-à-vis T.S.?

04:44PM   12    A.  Yes.

04:44PM   13    Q.  All right.  So T.S., he was someone who Mr. Bongiovanni,

04:44PM   14    unlike some of the other people you asked about, did know

04:44PM   15    about, correct?

04:44PM   16    A.  Yes.

04:44PM   17    Q.  And he was someone who Mr. Bongiovanni was familiar about

04:44PM   18    because he was the target of a controlled buy that

04:44PM   19    Mr. Bongiovanni attempted during the Ron Serio investigation,

04:44PM   20    correct?

04:44PM   21    A.  What I recall in the interview, refreshed from my notes,

04:44PM   22    is that he was tried to be recruited as a source of

04:44PM   23    information, but wasn't successful.

04:44PM   24    Q.  So your notes reflect that he was being recruited as a

04:45PM   25    source of information?

04:45PM 1   A.   That's what I believe I just read, yes.

04:45PM 2   Q.   And do you recall talking to Mr. Bongiovanni about the

04:45PM 3   fact that -- that R.K. was used for an attempted controlled

04:45PM 4   buy of T.S.?

04:45PM 5   A.   I don't recall the part of the conversation.

04:45PM 6   Q.   Don't recall that part of the conversation?

04:46PM 7       Do you remember testifying in a previous hearing back in

04:46PM 8   March of 2024?

04:46PM 9   A.   I do.

04:46PM 10          MR. SINGER:   I'll direct counsel's attention to

04:46PM 11   Exhibit 3595CW at 97, line 11.

04:46PM 12          BY MR. SINGER:

04:46PM 13   Q.   Do you remember giving the following responses to the

04:46PM 14   following questions:

04:46PM 15       "Question:   And in his response -- referring to

04:46PM 16   Mr. Bongiovanni -- was is that he knew that the person was

04:46PM 17   someone associated with someone they were trying to buy drugs

04:46PM 18   from when they had R.K. as a source, correct?

04:46PM 19       Answer:   Yes, I believe so."

04:46PM 20       Do you remember giving that answer, sir?

04:46PM 21   A.   Yes.

04:46PM 22   Q.   So, T.S., as explained to you by Mr. Bongiovanni, was

04:46PM 23   somebody who they were trying do a controlled buy through

04:46PM 24   R.K. through, correct?

04:46PM 25   A.   Yes.

04:46PM  1   Q.  And that was relating to the Ron Serio investigation,

04:46PM  2   correct?

04:46PM  3   A.  I'm not sure what it was related to.

04:46PM  4   Q.  Well, you know now, correct?

04:46PM  5   A.  Okay.

04:47PM  6   Q.  I'm asking you.  You know now?

04:47PM  7   A.  I don't know much -- I don't really know anything about

04:47PM  8   the Ron Serio investigation.

04:47PM  9   Q.  You just don't know?

04:47PM  10  A.  I never was a part of it.

04:47PM  11  Q.  So, kind of fast forwarding back to June of 2019, you sit

04:47PM  12  down with Mr. Bongiovanni again at his house, correct?

04:47PM  13  A.  Yes.

04:47PM  14  Q.  And that's after the SWAT team entered and cleared the

04:47PM  15  house?

04:47PM  16  A.  Yes, sir.

04:47PM  17  Q.  After the flash bang was let off, correct?

04:47PM  18  A.  Yes.

04:47PM  19  Q.  After he's placed in handcuffs, correct?

04:47PM  20  A.  I don't know if he was placed in handcuffs, I wasn't part

04:47PM  21  of that.

04:47PM  22  Q.  Were you down the street like Agent Ryan waiting for the

04:47PM  23  SWAT team to get finished clearing the house?

04:47PM  24      I'm sorry you I didn't hear your answer on that.

04:47PM  25  A.  Yes.

04:47PM   1   Q.  Thank you.  So you sit down and talk to him, and the

04:47PM   2   topic of Ron Serio comes up, correct?

04:48PM   3   A.  Correct.

04:48PM   4   Q.  And one of things that happens was that Mr. Bongiovanni

04:48PM   5   pointed to you and said, you know, I know that's the focus of

04:48PM   6   your investigation in some way, because we talked about it in

04:48PM   7   March of 2019, correct?

04:48PM   8   A.  Yes.

04:48PM   9   Q.  And, so, you testified that that just didn't seem

04:48PM  10   correct, right?

04:48PM  11   A.  Yes.

04:48PM  12   Q.  Based on the fact that you did not use the name Ron Serio

04:48PM  13   back in March of 2019?

04:48PM  14   A.  Correct.

04:48PM  15   Q.  But you would agree with me that you did use the name

04:48PM  16   T.S., correct?

04:48PM  17   A.  I did.

04:48PM  18   Q.  And Mr. Bongiovanni is the case agent on the Ron Serio

04:48PM  19   investigation, correct?

04:48PM  20   A.  I believe so, yes.

04:48PM  21   Q.  And I know that you don't know much about the case, but

04:48PM  22   safe to say if he's the case agent, he's going to know a lot

04:48PM  23   about the case?

04:48PM  24   A.  I hope so.

04:48PM  25   Q.  And so if you drop names that are relevant to the case,

04:48PM    1    that's going to alert him to what's going on in the

04:48PM    2    investigation, correct?

04:48PM    3    A.   Drop a name, yes.

04:48PM    4    Q.   And back in March of 2019, you said that your focus was I

04:49PM    5    want to learn information about Peter Gerace --

04:49PM    6    A.   Um-hum.

04:49PM    7    Q.   -- and your with relationship him, correct?

04:49PM    8    A.   Yes.

04:49PM    9    Q.   And I also want to talk to you about the racial comments

04:49PM   10    that Tony Casullo allege you made, right?

04:49PM   11    A.   Yes.

04:49PM   12    Q.   But then you also start talking about other names that

04:49PM   13    Curtis Ryan gave you, correct?

04:49PM   14    A.   Yes, sir.

04:49PM   15    Q.   And one of those names being T.S.?

04:49PM   16    A.   Correct.

04:49PM   17    Q.   And you know you may not know 100 percent, but you'd

04:49PM   18    agree with me that there's some relationship that T.S. has to

04:49PM   19    the Ron Serio investigation, right?

04:49PM   20    A.   I believe so.  I can't say for certain.

04:49PM   21    Q.   All right.  And as far as the June 2019 interview is

04:49PM   22    concerned, so, you testified on direct that you believe that

04:49PM   23    Agent Bongiovanni at that point in time was calm during the

04:49PM   24    interview; is that right?

04:49PM   25    A.   Yes.

USA v Bongiovanni - Carpenter - Singer/Cross - 9/23/24
149

04:49PM   1   Q.  And that's just after the house gets raided by a bunch of

04:49PM   2   tactical officers, correct?

04:49PM   3   A.  Yes.

04:49PM   4   Q.  Right after the flash bang was used, correct?

04:49PM   5   A.  I wouldn't say right after, but after.

04:49PM   6   Q.  After for some period of time, correct?

04:49PM   7   A.  Yes.

04:49PM   8   Q.  But you would agree with me that the context of the

04:50PM   9   interview was much different than the one back in March of

04:50PM  10   2019, right?

04:50PM  11   A.  Yes, sir.

04:50PM  12   Q.  There was no invitation to this particular interview,

04:50PM  13   correct?

04:50PM  14   A.  There was.

04:50PM  15   Q.  Well, did you call him up in advance and say, hey, Joe,

04:50PM  16   would you mind meeting up with me again?

04:50PM  17   A.  He was asked if he wanted to have a voluntary interview

04:50PM  18   with us in June.

04:50PM  19   Q.  And what I asked you was did you extend an invitation in

04:50PM  20   advance and say, hey, would you mind coming down and speaking

04:50PM  21   with me about this situation?

04:50PM  22   A.  No.

04:50PM  23   Q.  So you didn't do that, right?

04:50PM  24   A.  No.

04:50PM  25   Q.  You didn't say, hey, it's purely voluntary for you to

04:50PM   1   kind of sit down and do this.

04:50PM   2   A.  We did.

04:50PM   3   Q.  Talked to him at that morning and time about that?

04:50PM   4   A.  He knew it was voluntary, yes.

04:50PM   5   Q.  Okay.  And you talked about Frank Parisi is somebody who

04:50PM   6   came up; do you remember that, sir?

04:50PM   7   A.  Yes.

04:50PM   8   Q.  And it was somebody who was discussed inside this June

04:50PM   9   2019 interview, correct?

04:50PM   10  A.  Yes.

04:50PM   11  Q.  And you talked about the particular number that Frank

04:50PM   12  Parisi had, correct?

04:51PM   13  A.  Yes.

04:51PM   14       MR. SINGER:  And Ms. Champoux, can we bring up

04:51PM   15  Government Exhibit 358A, please?  And can we do a search for

04:51PM   16  481-8111.

04:51PM   17       MS. CHALBECK:  Yeah, you can't do that in the

04:51PM   18  submarked.

04:51PM   19       MR. SINGER:  I'm sorry.  I can do it on my copy.

04:51PM   20       MR. COOPER:  You have to go to the PDF.

04:51PM   21       BY MR. SINGER:

04:51PM   22  Q.  Don't worry, we don't need to do that.

04:51PM   23       So you talked about this one particular call happening in

04:51PM   24  the March 2014 timeframe?

04:51PM   25  A.  Yes.

| | | |
|---|---|---|
| 04:51PM | 1 | Q.  This is the four-minute call that was incoming to Joe |
| 04:51PM | 2 | Bongiovanni, correct? |
| 04:51PM | 3 | A.  Yes. |
| 04:51PM | 4 | Q.  But you've also reviewed the records of the phone calls |
| 04:51PM | 5 | between Mr. Bongiovanni and Mr. Parisi moving forward, |
| 04:51PM | 6 | correct? |
| 04:51PM | 7 | A.  I did not review all those records, correct. |
| 04:51PM | 8 | Q.  Do you have any reason to disagree that that's the only |
| 04:51PM | 9 | phone call in the records? |
| 04:51PM | 10 | A.  I don't have any information other than that one phone |
| 04:52PM | 11 | call. |
| 04:52PM | 12 | Q.  So you didn't look? |
| 04:52PM | 13 | A.  Correct. |
| 04:52PM | 14 | MR. SINGER:  May I just have a minute, Judge? |
| 04:52PM | 15 | THE COURT:  Sure. |
| 04:52PM | 16 | MR. SINGER:  Thank you, Agent Carpenter.  And thanks |
| 04:52PM | 17 | for being a narrator today.  I appreciate it. |
| 04:52PM | 18 | THE WITNESS:  Want my book on tape? |
| 04:52PM | 19 | THE COURT:  Any redirect? |
| 04:52PM | 20 | MS. CHALBECK:  Yes, Your Honor. |
| 04:52PM | 21 | |
| 04:52PM | 22 | REDIRECT EXAMINATION BY MS. CHALBECK: |
| 04:53PM | 23 | Q.  Just now on cross-examination, you were asked questions |
| 04:53PM | 24 | regarding the June 9th, 2019 interview; do you recall |
| 04:53PM | 25 | generally that topic? |

04:53PM    1    A.   Yes.

04:53PM    2    Q.   And I think specifically Mr. Singer asked you if prior to

04:53PM    3    that interview, you called Mr. Bongiovanni up and said, hey,

04:53PM    4    do you want to sit for a voluntary interview?  Do you recall

04:53PM    5    being asked that question?

04:53PM    6    A.   Yes.

04:53PM    7    Q.   When law enforcement is investigating a criminal target

04:53PM    8    and they're preparing to execute a search warrant, do they

04:53PM    9    tip the target of the search warrant off before they execute

04:53PM   10    it?

04:53PM   11    A.   No.

04:53PM   12    Q.   Why is that?

04:53PM   13    A.   So that the search warrant would be a surprise in order

04:53PM   14    to preserve any evidence and prevent the destruction of if.

04:53PM   15    Q.   And speaking of evidence, when law enforcement searched

04:53PM   16    this defendant's home, did they find the box containing the

04:53PM   17    Ron Serio file in his basement?

04:54PM   18    A.   Yes.

04:54PM   19    Q.   Is that why you didn't call him up beforehand and say,

04:54PM   20    hey, do you want to have an interview on this date?

04:54PM   21    A.   Yes.

04:54PM   22    Q.   I'm going to go back to the March 29, 2019 interview.

04:54PM   23    You were asked questions on cross-examination about whether

04:54PM   24    Mr. Bongiovanni, or whether you asked Mr. Bongiovanni if he

04:54PM   25    had ever seen Peter Gerace consume narcotics or whether he

04:54PM   1   had ever seen Peter Gerace with narcotics; do you recall

04:54PM   2   being asked that question?

04:54PM   3   A.   Yes.

04:54PM   4   Q.   Can someone consume narcotics if they don't -- if they're

04:54PM   5   not with narcotics?

04:54PM   6   A.   No.

04:54PM   7   Q.   Are your notes, like, a shorthand to help you remember

04:54PM   8   what someone says?

04:54PM   9   A.   Yes.

04:54PM   10  Q.   Did Mr. Bongiovanni say that he did not see Peter Gerace

04:55PM   11  consume narcotics?

04:55PM   12  A.   To my memory, that's correct.

04:55PM   13  Q.   You were also asked questions on cross-examination about

04:55PM   14  photos that Mr. Bongiovanni was in with Peter Gerace; do you

04:55PM   15  recall being asked those questions?

04:55PM   16  A.   Yes.

04:55PM   17  Q.   And I think specifically Mr. Singer asked you about

04:55PM   18  Government Exhibit -- I think it was 426-1, which is a 2005

04:55PM   19  aerial photograph, and 490A from 2011.  Do you recall being

04:55PM   20  asked those questions?

04:55PM   21  A.   The Las Vegas photograph?

04:55PM   22  Q.   Yes.

04:55PM   23  A.   Correct, I recall.

04:55PM   24          **MS. CHALBECK:**  Ms. Champoux, can we pull up

04:55PM   25  Government Exhibit 127.

04:55PM    1              **BY MS. CHALBECK:**

04:55PM    2    Q.   I think Mr. Singer was asking you about whether those

04:55PM    3    photographs that I just referenced were, like, far back in

04:55PM    4    time; do you recall being asked that?

04:55PM    5    A.   Yes.

04:55PM    6    Q.   Did Mr. Bongiovanni ever tell you in any of your

04:55PM    7    conversations with him about this photograph with him and

04:55PM    8    Peter Gerace from 2018?

04:55PM    9    A.   No.

04:56PM   10    Q.   Is 2018 closer in time to 2019 than 2011?

04:56PM   11    A.   Yes.

04:56PM   12    Q.   Not a lot of distance there temporally; is that fair?

04:56PM   13    A.   Correct.

04:56PM   14    Q.   You were also asked on cross-examination, and this was in

04:56PM   15    reference to Government Exhibit 310D about questions that

04:56PM   16    Peter Gerace would ask the defendant, and some questions that

04:56PM   17    the defendant would ask to Peter Gerace; do you recall being

04:56PM   18    asked those questions?

04:56PM   19    A.   I'm sorry, yeah.

04:56PM   20              **MS. CHALBECK:**  Ms. Champoux, can we please pull up

04:56PM   21    310D, as in David, and go to page 42.

04:56PM   22              **BY MS. CHALBECK:**

04:56PM   23    Q.   Mr. Carpenter, on May 4th, 2017, do you see like an

04:57PM   24    incoming audio attachment?

04:57PM   25    A.   Yes.

04:57PM   1   Q.  Excuse me, an audio attachment in this?

04:57PM   2   A.  I do.

04:57PM   3          **MS. CHALBECK:**  Ms. Champoux, can we pull up

04:57PM   4   Government Exhibit 311?  Can we play that, Ms. Champoux?

04:57PM   5          (Audio was played.)

04:57PM   6          **MS. CHALBECK:**  Thank you, Ms. Champoux.

04:57PM   7          **BY MS. CHALBECK:**

04:57PM   8   Q.  Mr. Carpenter, were you able to hear that Peter Gerace

04:57PM   9   asked this defendant about how law enforcement could track a

04:58PM  10   drug dealer's TracFone?

04:58PM  11   A.  Yes.

04:58PM  12   Q.  Is that an example of the kinds of questions that Peter

04:58PM  13   Gerace would ask him?

04:58PM  14   A.  Yes.

04:58PM  15          **MS. CHALBECK:**  And, Ms. Champoux, can we go back to

04:58PM  16   Government Exhibit 310D, to page 42 again.

04:58PM  17          Could we scroll down, maybe it's page 43.

04:58PM  18          May I have one moment, Your Honor?

04:58PM  19          **THE COURT:**  Sure.

04:58PM  20          **MS. CHALBECK:**  Thank you, Ms. Champoux.

04:58PM  21          **BY MS. CHALBECK:**

04:58PM  22   Q.  So we zoomed into the text message from May 4, 2017.  Do

04:59PM  23   you see a response that Mr. Bongiovanni gave to Peter Gerace

04:59PM  24   in answering his question?

04:59PM  25   A.  I do.

Case 1:19-cr-00227-LJV-MJR    Document 1325    Filed 10/27/24    Page 156 of 172
USA v Bongiovanni - Carpenter - Chalbeck/Redirect - 9/23/24

156

04:59PM    1    Q.  Please read that into the record, Mr. Carpenter.

04:59PM    2    A.  Yes.  But you would need a warrant to get a ping order.

04:59PM    3    Q.  I think earlier you had testified that one of the objects

04:59PM    4    of the investigation was to determine if this defendant

04:59PM    5    provided Peter Gerace law-enforcement sensitive information;

04:59PM    6    is that correct?

04:59PM    7    A.  Yes.

04:59PM    8    Q.  Is this an example of the defendant providing Peter

04:59PM    9    Gerace law-enforcement sensitive information?

04:59PM   10    A.  Yes.

04:59PM   11         **MS. CHALBECK:**  Thank you, Ms. Champoux.

04:59PM   12         **BY MS. CHALBECK:**

04:59PM   13    Q.  Elsewhere in Government Exhibit 310D, on

04:59PM   14    cross-examination you were asked about the gift that Peter

04:59PM   15    Gerace references in a text message; do you recall being

04:59PM   16    asked questions about that?

04:59PM   17    A.  Yes.

04:59PM   18    Q.  Do you have any idea what that gift is that Peter Gerace

04:59PM   19    was referencing?

05:00PM   20    A.  No.

05:00PM   21         **MS. CHALBECK:**  Ms. Champoux, can we please pull up

05:00PM   22    Government Exhibit 98.  And can we please zoom in on the

05:00PM   23    second paragraph.

05:00PM   24         **BY MS. CHALBECK:**

05:00PM   25    Q.  Mr. Carpenter, on cross-examination, you were asked

USA v Bongiovanni - Carpenter - Chalbeck/Redirect - 9/23/24    157

05:00PM    1    questions about what the defendant said in this memorandum

05:00PM    2    regarding his telling of a phone call he had with Peter

05:00PM    3    Gerace; do you recall being asked those questions?

05:00PM    4    A.  Yes.

05:00PM    5    Q.  Do you have any idea if a single word of this story is

05:00PM    6    true?

05:00PM    7    A.  I do not.

05:00PM    8    Q.  Pivoting back to your March 29th interview, you were

05:01PM    9    asked on cross-examination about whether you had clarified to

05:01PM    10   the defendant what you meant when you asked him if he had

05:01PM    11   ever initiated contact with Peter Gerace; do you recall being

05:01PM    12   asked that question?

05:01PM    13   A.  Yes.

05:01PM    14   Q.  At the time that you interviewed this defendant, did you

05:01PM    15   feel like you needed a dictionary to explain what initiated

05:01PM    16   contact meant?

05:01PM    17   A.  No.

05:01PM    18   Q.  You were also asked on cross-examination questions about

05:01PM    19   what you meant or what the defendant meant by close friend.

05:01PM    20   What those terms mean; do you recall being asked questions

05:02PM    21   about that?

05:02PM    22   A.  Yes.

05:02PM    23   Q.  And I think one of the series of questions Mr. Singer

05:02PM    24   asked you was whether someone being a suck-up to a member of

05:02PM    25   law enforcement might be a reason why that law enforcement

USA v Bongiovanni - Carpenter - Chalbeck/Redirect - 9/23/24    158

05:02PM    1    officer would try to keep some distance between themselves

05:02PM    2    and that other person; do you recall that?

05:02PM    3    A.  Yes.

05:02PM    4    Q.  Kind of in that same line of hypothetical, is complaining

05:02PM    5    about your wife consistent with close friendship?

05:02PM    6    A.  I only complain about mine to close friends.

05:02PM    7    Q.  Is that consistent or inconsistent with keeping someone

05:02PM    8    at an arms length?

05:02PM    9    A.  I'm not sure -- I'm not sure of the --

05:02PM    10   Q.  That was a badly -- a poorly-phrased question.  I'll ask

05:02PM    11   again, or I'll try.

05:03PM    12       Is complaining about one's spouse consistent or

05:03PM    13   inconsistent with keeping someone at arms length?

05:03PM    14   A.  That topic tends to build trust in a relationship, so

05:03PM    15   it's opposite of keeping somebody at arms length.

05:03PM    16   Q.  You were also asked on cross-examination questions about

05:03PM    17   the timeline that took for your supervisor to approve the

05:03PM    18   memorandum of investigation that you authored in relation to

05:03PM    19   that March 29th interview; do you recall being asked those

05:03PM    20   questions?

05:03PM    21   A.  Yes.

05:03PM    22   Q.  To be clear, did you write and draft the memorandum of

05:03PM    23   investigation within a handful of days of your interview with

05:03PM    24   this defendant?

05:03PM    25   A.  Yes.

05:03PM    1   Q.  Okay.  And it just took a while for it to be approved by

05:03PM    2   a supervisor?

05:03PM    3   A.  Correct.

05:03PM    4   Q.  You were also asked, I think, a series of questions about

05:04PM    5   DARTS.

05:04PM    6   A.  Yes.

05:04PM    7   Q.  Do you recall being asked questions about DARTS?

05:04PM    8   A.  Yes.

05:04PM    9   Q.  I think one of the specific questions you were asked was

05:04PM   10   whether there was any record of this defendant searching

05:04PM   11   DARTS, like, as a -- DARTS is a search engine; do you recall

05:04PM   12   being asked that?

05:04PM   13   A.  Yes.

05:04PM   14   Q.  Do you even know if DARTS is searchable?

05:04PM   15   A.  I do not.

05:04PM   16   Q.  You've never been a DEA agent, right?

05:04PM   17   A.  Correct.

05:04PM   18   Q.  Have you even ever used DARTS?

05:04PM   19   A.  No.

05:04PM   20   Q.  Who would know more about DARTS, you or Inspector Francis

05:04PM   21   DiCarlo with the DEA?

05:04PM   22   A.  Mr. DiCarlo.

05:04PM   23   Q.  Similarly, if the defendant had -- withdrawn.

05:05PM   24       You were asked questions on cross-examination about

05:05PM   25   whether this defendant did something specific with DARTS; do

05:05PM  1    you recall that?

05:05PM  2    A.  Yes.

05:05PM  3    Q.  If the defendant had intel analysts putting telephone

05:05PM  4    numbers into DARTS, and those intel analysts said putting

05:05PM  5    this telephone number in per S.A. Bongiovanni's instructions,

05:05PM  6    would you necessarily have seen that on your search?

05:05PM  7            MR. SINGER:  Objection.

05:05PM  8            Actually, I'll withdraw it, Judge.  I'm sorry.

05:05PM  9            BY MS. CHALBECK:

05:05PM  10   Q.  You can answer the question.

05:05PM  11   A.  It relates to Bongiovanni's -- the defendant's use of

05:05PM  12   DARTS?  No, it would not have come up.

05:05PM  13   Q.  You were also asked questions on cross-examination about

05:06PM  14   T.S.; do you recall being asked that?

05:06PM  15   A.  Yes.

05:06PM  16   Q.  And I think Mr. Singer showed you T.S.'s confidential

05:06PM  17   informant, like, paperwork; do you recall that?

05:06PM  18   A.  Yes.

05:06PM  19   Q.  And I think the case agent or the special agent who

05:06PM  20   worked with T.S. was someone by the name of Mike Hill; do you

05:06PM  21   recall that?

05:06PM  22   A.  Yes.

05:06PM  23   Q.  Do you know that Mike Hill worked closely with this

05:06PM  24   defendant?

05:06PM  25   A.  No.

05:06PM    1    Q.  You were also asked questions on cross-examination about

05:06PM    2    a memorandum that this defendant authored regarding Special

05:06PM    3    Agent Tony Casullo and his brother-in-law, Phil Domiano; do

05:07PM    4    you recall being asked those questions?

05:07PM    5    A.  Yes.

05:07PM    6    Q.  And I think that memorandum contained a series of

05:07PM    7    photographs about Phil Domiano and Tony Casullo; do you

05:07PM    8    recall reading that and describing it to the jury?

05:07PM    9    A.  Yes.

05:07PM    10    Q.  Did this defendant ever produce a memorandum containing

05:07PM    11    photographs of him and Peter Gerace?

05:07PM    12    A.  No.

05:07PM    13    Q.  So those three photographs that we've seen during your

05:07PM    14    testimony today, you didn't see those in a memorandum

05:07PM    15    authored by this defendant when he was talking about his

05:07PM    16    relationship with Peter Gerace?

05:07PM    17    A.  Correct.

05:07PM    18    Q.  Speaking of that memorandum regarding Tony Casullo, in it

05:07PM    19    the defendant denies using racial slurs; do you recall seeing

05:07PM    20    that in the memorandum?

05:08PM    21    A.  Yes.

05:08PM    22    Q.  Did this defendant also deny ever initiating contact with

05:08PM    23    Peter Gerace?

05:08PM    24    A.  He denied ever initiating contact with Peter Gerace.

05:08PM    25         **MS. CHALBECK:**  I don't have any further redirect,

05:08PM    1    Your Honor.

05:08PM    2            **THE COURT:**  Anything more, Mr. Singer?

05:08PM    3

05:08PM    4            **RECROSS-EXAMINATION BY MR. SINGER:**

05:08PM    5    Q.  Do you remember being asked by Ms. Chalbeck about whether

05:08PM    6    you tip off someone when you're doing a search warrant, sir?

05:08PM    7    A.  Yes, sir.

05:08PM    8    Q.  And the answer to that question was no?

05:08PM    9    A.  Correct.

05:08PM   10    Q.  But one of the things that do you after the search

05:08PM   11    warrant is you try to interview people, correct?

05:08PM   12    A.  Yes.

05:08PM   13    Q.  And one of the reasons why you do that is because they're

05:08PM   14    rattled, correct?

05:08PM   15    A.  No, because they're there.

05:08PM   16    Q.  So there's no tactic that goes into we'll open someone's

05:08PM   17    door in the middle of the morning, and then asking them to be

05:08PM   18    interviewed right after that?

05:08PM   19    A.  For interview tactic?  No.

05:08PM   20    Q.  That's not a police tactic, sir?

05:08PM   21    A.  As it relates for -- it's done, I don't know if it's an

05:08PM   22    effective one.

05:09PM   23    Q.  How many police interviews have you done after a search

05:09PM   24    warrant was executed?

05:09PM   25    A.  I can't recall offhand.

05:09PM    1    Q.   Are we talking about five or ten?  Or what do you think?

05:09PM    2    A.   Probably -- probably ten.  Tennish.  Somewhere like that,

05:09PM    3    yes.

05:09PM    4    Q.   And you've seen people after a warrant is executed in

05:09PM    5    that fashion, correct?

05:09PM    6    A.   After the fashion of Mr. Bongiovanni's?  No.

05:09PM    7    Q.   You've never seen a warrant executed like that one?

05:09PM    8    A.   No.

05:09PM    9    Q.   So that was the first time you've ever seen this?

05:09PM   10    A.   With -- the first time a flash bang was used, yes.

05:09PM   11    Q.   And you would agree with me that Agent Ryan is an

05:09PM   12    experienced law enforcement officer, correct?

05:09PM   13    A.   Yes.

05:09PM   14    Q.   More experienced than you at that point in time?

05:09PM   15    A.   Yes.

05:09PM   16    Q.   More experience with doing interviews right after that

05:09PM   17    type of search warrant is executed?

05:09PM   18    A.   I don't know how many he's done at that point after a

05:09PM   19    search warrant.

05:09PM   20    Q.   But more experienced than just the one that you did that

05:09PM   21    one particular day, correct?

05:09PM   22    A.   Yes.

05:09PM   23    Q.   With regard to the photo number 127 that the government

05:10PM   24    asked you about --

05:10PM   25            **MR. SINGER:**  Ms. Champoux, can we bring that up,

05:10PM   1   please?

05:10PM   2         **BY MR. SINGER:**

05:10PM   3   Q.  Do you remember being asked about this on redirect, sir?

05:10PM   4   A.  Yes.

05:10PM   5   Q.  So this particular photo, Ms. Chalbeck asked you whether

05:10PM   6   or not Mr. Bongiovanni ever brought this up during the

05:10PM   7   interview, right?

05:10PM   8   A.  Correct.

05:10PM   9   Q.  Did you ask him any specific questions about this

05:10PM   10  particular photograph, sir?

05:10PM   11  A.  No.

05:10PM   12  Q.  And one of the reasons why you didn't ask any questions

05:10PM   13  about that, because this came out of his cell phone text

05:10PM   14  messages, correct?

05:10PM   15  A.  I believe so, yes.

05:10PM   16  Q.  Which were not in your possession back at that time in

05:10PM   17  April of 2019, correct?

05:10PM   18  A.  March of 2019.

05:10PM   19  Q.  March of 2019?

05:10PM   20  A.  Correct.

05:10PM   21  Q.  All right.  That was the reason why you didn't ask him

05:10PM   22  about this particular photo, you didn't know about it,

05:10PM   23  correct?

05:10PM   24  A.  Correct.

05:10PM   25  Q.  But did you have any particular discussion about this one

05:10PM    1    date in June of 2018 that Mr. Bongiovanni and Mr. Gerace saw

05:10PM    2    each other?

05:10PM    3    A.  Is this -- probably some context to what one this one is.

05:11PM    4    Is the lake?  It was at the lake?

05:11PM    5    Q.  Yes.  You knew about it, correct?

05:11PM    6    A.  I knew they met up at the lake, yes.

05:11PM    7    Q.  And you knew about that because Government Exhibit 97,

05:11PM    8    which is the memorandum -- the first one that Mr. Bongiovanni

05:11PM    9    wrote, was right about this incident, correct?

05:11PM   10    A.  Yes.

05:11PM   11    Q.  He shared all the text messages about it, correct?

05:11PM   12    A.  He shared text messages, correct.

05:11PM   13         **MR. SINGER:**  Ms. Champoux, can we please bring this

05:11PM   14    one down, and bring up Government Exhibit 97 again.

05:11PM   15         **BY MR. SINGER:**

05:11PM   16    Q.  And so the text messages that follow this one page

05:11PM   17    memorandum --

05:11PM   18         **MR. SINGER:**  Start scrolling, Ms. Champoux, until we

05:11PM   19    get to page 9.

05:11PM   20         **BY MR. SINGER:**

05:11PM   21    Q.  -- they talk about what leads up to this meeting between

05:11PM   22    Gerace and Bongiovanni at Sunset Bay on June 30th of 2018?

05:11PM   23    A.  Yes.

05:11PM   24    Q.  And it talks about what they were talking about before it

05:11PM   25    happened, correct?

05:11PM    1    A.   Yes.

05:11PM    2    Q.   And when we get to, you know, you reviewed all these

05:11PM    3    different messages, right?

05:11PM    4    A.   Yes.

05:11PM    5    Q.   And they're talking about traffic and concerts that are

05:12PM    6    going on, correct?

05:12PM    7    A.   Correct.

05:12PM    8    Q.   But when we get to page 9 of this particular exhibit,

05:12PM    9    Peter Gerace up at the top says I'm thinking about taking

05:12PM   10    them down, referring to the girls he's with, to RiverWorks.

05:12PM   11    Last time I was there was with you and Lindsay.  Then he

05:12PM   12    states, went to the Dock of the Bay, remember that?  Helped

05:12PM   13    Lindsay through the parking lot.  You read that, correct?

05:12PM   14    A.   Yes.

05:12PM   15    Q.   And then do you see a response from Mr. Bongiovanni

05:12PM   16    saying, yes, I do.  Have fun.  Be safe, correct?

05:12PM   17    A.   Correct.

05:12PM   18    Q.   So at that point in time, Mr. Bongiovanni doesn't think

05:12PM   19    that Peter Gerace is coming, correct?

05:12PM   20         **MS. CHALBECK:**  Objection.

05:12PM   21         **THE COURT:**  Sustained.

05:12PM   22         **BY MR. SINGER:**

05:12PM   23    Q.   Did you ask any particular questions about this one day

05:12PM   24    in the meeting that you had?

05:12PM   25    A.   No.

05:12PM  1   Q.  Never came up in the interview in March?

05:12PM  2   A.  No.

05:12PM  3   Q.  But you're aware the memorandum is written about it,

05:12PM  4   correct?

05:12PM  5   A.  Correct.

05:12PM  6   Q.  You could have asked?

05:12PM  7   A.  I could have.

05:12PM  8   Q.  But you never did?

05:12PM  9   A.  Correct.

05:12PM  10  Q.  And since that conversation never came up as a topic,

05:12PM  11  Mr. Bongiovanni didn't raise that with you, correct?

05:12PM  12  A.  He had the opportunity to explain that when he was

05:13PM  13  explaining his friendship with him, yes.

05:13PM  14  Q.  But you never asked him about that one particular day,

05:13PM  15  correct?

05:13PM  16  A.  Correct.

05:13PM  17  Q.  You were also asked about this one particular TracFone

05:13PM  18  and whether a warrant needs -- is needed for a ping order,

05:13PM  19  remember that?

05:13PM  20  A.  Yes.

05:13PM  21  Q.  And so Ms. Chalbeck phrased it as being law-enforcement

05:13PM  22  sensitive information; do you recall that, sir?

05:13PM  23  A.  Yes.

05:13PM  24  Q.  So, with regard to whether or not someone needs a

05:13PM  25  warrant, that's not really law-enforcement sensitive

05:13PM   1   information at all, correct?

05:13PM   2   A.  The context and the methods used to obtain information is

05:13PM   3   considered law-enforcement sensitive, yes.

05:13PM   4   Q.  Could Mr. Gerace go to an attorney and ask, hey, is there

05:13PM   5   a possibility that a warrant's required to get a ping order

05:13PM   6   on a phone?

05:13PM   7   A.  Yes.

05:13PM   8   Q.  I mean, you go to counsel inside of your office as an

05:13PM   9   investigator all the time, right --

05:13PM  10   A.  Yes.

05:13PM  11   Q.  -- to ask legal questions?

05:13PM  12   A.  Yes, sir.

05:13PM  13   Q.  Because lawyers generally have answers to questions on

05:13PM  14   legal matters, right?

05:13PM  15   A.  Yes.

05:13PM  16   Q.  And they generally know about the law of whether or not

05:13PM  17   the Fourth Amendment requires a warrant for particular things

05:14PM  18   to happen, correct?

05:14PM  19   A.  Correct.

05:14PM  20   Q.  So Mr. Gerace could have gotten the answer from a lawyer,

05:14PM  21   correct?

05:14PM  22   A.  Yes.

05:14PM  23   Q.  And I don't possess, as a lawyer, any type of specific

05:14PM  24   law-enforcement sensitive information, right?

05:14PM  25   A.  Through your career, I assume you have.

05:14PM    1    Q.  But when it comes to what the law says about warrants, I

05:14PM    2    can just look it up in a law book, right?

05:14PM    3    A.  Correct.

05:14PM    4    Q.  And that's not law-enforcement sensitive information if

05:14PM    5    it's published in the public, correct?

05:14PM    6    A.  Correct.

05:14PM    7    Q.  All right.  Mr. Gerace also could have Googled that

05:14PM    8    answer, right?

05:14PM    9    A.  Sure.

05:14PM   10    Q.  Did you ever Google a legal question before?

05:14PM   11    A.  I've Googled a lot of things, I don't know legal

05:14PM   12    questions.

05:14PM   13    Q.  Did you ever see someone Google a legal question before?

05:14PM   14    A.  Actually, I Googled law once.  I'll take that back.

05:14PM   15    Q.  Okay.  So you at least try Google legal questions

05:14PM   16    sometimes yourself, correct?

05:14PM   17    A.  Correct.

05:14PM   18    Q.  And that's another particular place that Mr. Gerace could

05:14PM   19    have found that answer out, correct?

05:14PM   20    A.  Yes.

05:14PM   21    Q.  And you're a police officer, right?

05:14PM   22    A.  Yes.

05:14PM   23    Q.  You've been in law enforcement for several years at this

05:14PM   24    point, correct?

05:14PM   25    A.  Yes.

05:14PM    1    Q.  You have people who ask you legal questions as a law

05:15PM    2    enforcement officer, correct?

05:15PM    3    A.  Yes.

05:15PM    4    Q.  So that's not outside the ordinary, right?

05:15PM    5    A.  To be asked questions, no.

05:15PM    6        **MR. SINGER:**  Okay.  Thank you.  I have no further

05:15PM    7    questions, Judge.

05:15PM    8        **THE COURT:**  Anything else?

05:15PM    9        **MS. CHALBECK:**  Yes, briefly, Your Honor.

05:15PM   10

05:15PM   11        **RE-REDIRECT EXAMINATION BY MS. CHALBECK:**

05:15PM   12    Q.  Mr. Carpenter, in that recording that Peter Gerace sent

05:15PM   13    to the defendant, was he asking whether warrants worked on

05:15PM   14    TracFones?

05:15PM   15    A.  I believe so.

05:15PM   16    Q.  That's a little bit different than the questions that

05:15PM   17    Mr. Singer was asking you just now, wouldn't you say?

05:15PM   18    A.  Yes.

05:15PM   19    Q.  Is the question whether warrants work on TracFones

05:15PM   20    something that's law-enforcement sensitive?

05:15PM   21    A.  Yes.

05:15PM   22    Q.  Finally, you were asked on recross-examination questions

05:15PM   23    about the nature of the interview on June 9th, 2019; do you

05:16PM   24    recall that?

05:16PM   25    A.  Yes.

05:16PM  1  Q.  When you interviewed this defendant on March 29th, 2019,

05:16PM  2  so just a few months earlier, and you told him that was

05:16PM  3  voluntary, remind the jury what he said?

05:16PM  4  A.  He stated that as a law enforcement officer with 20-plus

05:16PM  5  years of experience, he knew his rights.

05:16PM  6          **MS. CHALBECK:**  That's it.

05:16PM  7          **MR. SINGER:**  Nothing further, Judge.

05:16PM  8          **THE COURT:**  You can step down.

05:16PM  9          **THE WITNESS:**  Thank you, Your Honor.

       10          (Witness excused at 5:16 p.m.)

       11          (Excerpt concluded at 5:16 p.m.)

       12          *     *     *     *     *     *     *

       13

       14                 **CERTIFICATE OF REPORTER**

       15

       16          In accordance with 28, U.S.C., 753(b), I

       17  certify that these original notes are a true and correct

       18  record of proceedings in the United States District Court for

       19  the Western District of New York on September 23, 2024.

       20

       21                    s/ Ann M. Sawyer
                             Ann M. Sawyer, FCRR, RPR, CRR
       22                    Official Court Reporter
                             U.S.D.C., W.D.N.Y.
       23

       24

       25

1

2                        **TRANSCRIPT INDEX**

3            **EXCERPT - EXAMINATION OF DAVID CARPENTER**

4                        **SEPTEMBER 23, 2024**

5

6

7    **W I T N E S S**                              **P A G E**

8    **D A V I D   C A R P E N T E R**              2

9      DIRECT EXAMINATION BY MS. CHALBECK:          2

10     CROSS-EXAMINATION BY MR. SINGER:             63

11     REDIRECT EXAMINATION BY MS. CHALBECK:        151

12     RECROSS-EXAMINATION BY MR. SINGER:           162

13     RE-REDIRECT EXAMINATION BY MS. CHALBECK:     170

14

15

16

17

18

19

20

21

22

23

24

25