09:23AM

1                    **UNITED STATES DISTRICT COURT**
                     **WESTERN DISTRICT OF NEW YORK**
2

_____
3    **UNITED STATES OF AMERICA,**

                                      Case No. 1:19-cr-227
4                  Plaintiff,                    (LJV)
     v.
5                                     September 24, 2024

     **JOSEPH BONGIOVANNI,**
6

                   Defendant.
_____
7

8     **TRANSCRIPT EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 1**
             **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
9                   **UNITED STATES DISTRICT JUDGE**

10   <u>**APPEARANCES:**</u>          **TRINI E. ROSS, UNITED STATES ATTORNEY**
                              **BY: JOSEPH M. TRIPI, ESQ.**
11                               **NICHOLAS T. COOPER, ESQ.**
                                 **CASEY L. CHALBECK, ESQ.**
12                            Assistant United States Attorneys
                              Federal Centre, 138 Delaware Avenue
13                            Buffalo, New York 14202
                              For the Plaintiff
14
                              **SINGER LEGAL PLLC**
15                            **BY: ROBERT CHARLES SINGER, ESQ.**
                              80 East Spring Street
16                            Williamsville, New York 14221
                                 And
17                            **LAW OFFICES OF PARKER ROY MacKAY**
                              **BY: PARKER ROY MacKAY, ESQ.**
18                            3110 Delaware Avenue
                              Kenmore, New York 14217
19                               And
                              **OSBORN, REED & BURKE, LLP**
20                            **BY: JOHN J. GILSENAN, ESQ.**
                              120 Allens Creek Road
21                            Rochester, New York 14618
                              For the Defendant
22
     <u>**PRESENT:**</u>              **BRIAN A. BURNS,** FBI Special Agent
23                            **MARILYN K. HALLIDAY,** HSI Special Agent
                              **KAREN A. CHAMPOUX,** USA Paralegal
24
     <u>**LAW CLERK:**</u>            **REBECCA FABIAN IZZO, ESQ.**
25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**   **COLLEEN M. DEMMA / JENNIFER L. VERNEN** |
| 2 | **COURT REPORTER:**        **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |

5

6                           *    *    *    *    *    *    *

7

8               (Excerpt commenced at 10:35 a.m.)

10:35AM   9               (Jury is present.)

10:35AM  10          **THE COURT:**  The government can call its next witness.

10:35AM  11          **MR. COOPER:**  Thank you, Judge, the government calls

10:35AM  12   Anthony Casullo.

10:35AM  13

10:35AM  14   **A N T H O N Y   C A S U L L O**, having been duly called and

10:36AM  15   sworn, testified as follows:

10:36AM  16          **MR. COOPER:**  Judge, what time are you looking to

10:36AM  17   break this morning?

10:36AM  18          **THE COURT:**  About 11, I guess.

10:36AM  19          **MR. COOPER:**  Great.  Thank you.

10:36AM  20

10:36AM  21                   **DIRECT EXAMINATION BY MR. COOPER:**

10:36AM  22   Q.  Good morning, sir.

10:36AM  23   A.  Good morning.

10:36AM  24   Q.  Can you please introduce yourself to the jury?

10:36AM  25   A.  Yes, my name is Anthony Casullo.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

10:36AM   1   Q.  And where do you live currently?

10:36AM   2   A.  I live in Clarence, New York.

10:36AM   3   Q.  How long have you lived in this area?

10:36AM   4   A.  I initially grew up in Buffalo, moved away, and came back

10:36AM   5   to Buffalo about 2015.  Moved the family back before me

10:36AM   6   around 2012, but I came back about 2015.

10:36AM   7   Q.  Okay.  And we're going to get into that timeline in a

10:36AM   8   little more detail later.  You said you grew up here?

10:36AM   9   A.  That's correct.

10:37AM  10   Q.  What neighborhood did you grow up in?

10:37AM  11   A.  I grew up in Kenmore, New York.

10:37AM  12   Q.  Where did you go to school at?

10:37AM  13   A.  I went to high school at Saint Joseph's Collegiate

10:37AM  14   Institute.  Saint Joe's.

10:37AM  15   Q.  What year did you graduate from Saint Joe's Collegiate?

10:37AM  16   A.  1985.

10:37AM  17   Q.  Are you working right now?

10:37AM  18   A.  I am currently working.

10:37AM  19   Q.  What kind of work do you do?

10:37AM  20   A.  My job is as -- the title is a subject matter expert for

10:37AM  21   law enforcement investigations.  So what that means is I work

10:37AM  22   for a U.S. contract company, it's a veteran-owned contract

10:37AM  23   company.  And we have technical engineers that build border

10:37AM  24   security systems for the government, foreign governments,

10:37AM  25   through the State Department.  Our contract is through the

| | | |
|---|---|---|
| 10:37AM | 1 | State Department.  And I advise them on how to build border |
| 10:37AM | 2 | security systems from an investigative perspective. |
| 10:37AM | 3 | Q.  How long have you had that work for? |
| 10:37AM | 4 | A.  Since August of 2023.  So a little over a year now. |
| 10:37AM | 5 | Q.  What did you do before that? |
| 10:37AM | 6 | A.  Before that, I had an approximately 33-year career in law |
| 10:38AM | 7 | enforcement, working for several different agencies. |
| 10:38AM | 8 | Q.  Let's kind of walk through that.  Where did your career |
| 10:38AM | 9 | in law enforcement start, sir? |
| 10:38AM | 10 | A.  So my first job in law enforcement started after I |
| 10:38AM | 11 | graduated from Canisius College.  I worked for the |
| 10:38AM | 12 | Immigration Service.  I was hired in December 1990 and worked |
| 10:38AM | 13 | there for about six years. |
| 10:38AM | 14 | Q.  After the Immigration Service for six years, what did you |
| 10:38AM | 15 | do next? |
| 10:38AM | 16 | A.  From there, I accepted a job as a police officer in the |
| 10:38AM | 17 | Town of Tonawanda in the area where I grew up, Kenmore is |
| 10:38AM | 18 | part of Tonawanda.  And I decided to leave the Immigration |
| 10:38AM | 19 | Service and become a police officer. |
| 10:38AM | 20 | Q.  How long were you a police officer in the Town of |
| 10:38AM | 21 | Tonawanda? |
| 10:38AM | 22 | A.  About three years. |
| 10:38AM | 23 | Q.  What did you do after that? |
| 10:38AM | 24 | A.  After that, I was hired as a special agent by the DEA, |
| 10:38AM | 25 | Drug Enforcement Administration. |

10:38AM  1   Q.  Can you describe for the jury, give us like a general

10:38AM  2   timeframe, when did you get hired on by the DEA?

10:38AM  3   A.  Yeah.  I was hired on -- I believe I started the academy

10:38AM  4   summer of 1999.

10:39AM  5   Q.  You said you started the academy.  Is that like a formal

10:39AM  6   training?

10:39AM  7   A.  Right.  I went through formal training in Quantico,

10:39AM  8   Virginia.  It was four months.  Upon graduation, came back to

10:39AM  9   Buffalo, which is the office that I hired out of for a short

10:39AM  10  period of time, I think it was 30 days, and reported for my

10:39AM  11  first assignment in Las Vegas, Nevada.

10:39AM  12  Q.  Do you get to pick where you're assigned when you

10:39AM  13  graduate from the DEA academy?  How does that work?

10:39AM  14  A.  How it works, at least when I was hired, it may have

10:39AM  15  changed, but when I was hired, when they offer you the job,

10:39AM  16  you don't know where you're going to go.  So you accept the

10:39AM  17  job not knowing.

10:39AM  18      When I was at the academy, maybe week six, they give a

10:39AM  19  list to your class.  So if there's 50 students in a class,

10:39AM  20  there's a list of 50 slots.  And you, along with your other

10:39AM  21  students with no instructors, you all pick where you want to

10:39AM  22  go, and pick three choices.

10:40AM  23      So if everybody picks the same, then a lot of people

10:40AM  24  aren't going to get what they want.  They're doing that

10:40AM  25  intentionally to see how you work with your class, how you

10:40AM  1  get along.

10:40AM  2       I was lucky, we had a good class, a lot of good slots.

10:40AM  3  And so I got Las Vegas.

10:40AM  4  Q.  Was Las Vegas a spot you desired for a specific reason?

10:40AM  5  A.  Yes, my wife grew up in Buffalo, did not want to leave

10:40AM  6  Buffalo, was happy about the job but not about moving.  And

10:40AM  7  she had a brother that lived in Las Vegas and family that

10:40AM  8  lived there.  Well, the brother lived there and her parents

10:40AM  9  spent a lot of time there.

10:40AM  10      So I chose that as a first choice to make things good at

10:40AM  11  home, I guess, and it worked out.

10:40AM  12  Q.  Is Las Vegas a large office for the DEA?

10:40AM  13  A.  It's a district office.  So there's divisional offices

10:40AM  14  which are the biggest offices, and underneath the division

10:40AM  15  there's a district office and a resident office.  So Vegas is

10:41AM  16  a district office of the Los Angeles field division, so it's

10:41AM  17  a midsized office, one of the bigger midsized offices.

10:41AM  18  Q.  Okay.  And we've heard a lot about all the different

10:41AM  19  types of work that special agents at the DEA do, so we're

10:41AM  20  going to skip that section here and we're gonna move on.

10:41AM  21      How long were you at the Las Vegas district office for --

10:41AM  22  A.  Right.

10:41AM  23  Q.  -- the first time?

10:41AM  24  A.  So I was there twice.  Well, the first time, I reported

10:41AM  25  initially in December of 1999.  And I stayed there until -- I

10:41AM      1    believe it was June of 2002.

10:41AM      2    Q.   Okay.   And what caused you to transition out of the

10:41AM      3    Las Vegas office around June of 2002?

10:41AM      4    A.   So when I applied to DEA, which was around the time I was

10:41AM      5    a police officer, I think it was even before that.   I applied

10:41AM      6    to the FBI at the same timeframe.   I got hired at DEA first

10:41AM      7    when I was halfway through the process with FBI, was very

10:41AM      8    happy with DEA, they're both great agencies.

10:41AM      9         And then 9/11 happened while I was an agent in Las Vegas.

10:42AM     10    Like some other people I knew in law enforcement, I felt

10:42AM     11    strongly about what happened.   I wanted to work

10:42AM     12    counterterrorism investigations, and spoke to my wife about

10:42AM     13    it, said there might be a chance that we could move back

10:42AM     14    east.

10:42AM     15         So I contacted the FBI in Las Vegas, reopened my

10:42AM     16    application.   I was halfway through the process.   And I

10:42AM     17    actually applied with the FBI and CIA.   And I was hired by

10:42AM     18    FBI within six months.

10:42AM     19         I went back -- or, I went through the panel interview,

10:42AM     20    phase two testing, I believe within -- maybe six or seven

10:42AM     21    months I was hired by the FBI as a special agent.

10:42AM     22    Q.   Was kind of switching gears there and pursuing a career

10:42AM     23    with the FBI because you wanted to work on those

10:42AM     24    counterterrorism cases?

10:42AM     25    A.   Yes.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

8

10:42AM 1   Q.  Did you expect there would be more of an opportunity for

10:42AM 2   you to do that at the FBI than at the DEA?

10:43AM 3   A.  Yeah.  FBI was the, still is today, the lead federal law

10:43AM 4   enforcement agency in terrorism investigations.  They run the

10:43AM 5   JTTF, which is the Joint Terrorism Task Force.  And they're

10:43AM 6   the lead agency in those investigations.

10:43AM 7   Q.  Did you ultimately go through Quantico and receive a

10:43AM 8   posting or a position at the FBI as a special agent?

10:43AM 9   A.  Yes.  Yes, I did.  I was hired and went to the academy

10:43AM 10  for the FBI, I believe it was June of 2002.  So, it wasn't

10:43AM 11  even a year after 9/11.

10:43AM 12      And so same thing with FBI, they don't tell you initially

10:43AM 13  where you're going, you find out when you're there.  Their

10:43AM 14  process is a little different.  You list all the field

10:43AM 15  divisions that they have from 1 all the way down to -- I

10:43AM 16  can't remember how many they had, maybe there were 30 of

10:43AM 17  them.  You rank them 1 through 30 with the choice that you

10:43AM 18  want most at the top.

10:43AM 19      I put Buffalo first, and I put the Charlotte field

10:43AM 20  division second, and I can't remember after that.  And I was

10:44AM 21  chosen for the Charlotte field division initially.

10:44AM 22      But they said if you have a prior law enforcement

10:44AM 23  experience, you can go to one of their smaller offices, which

10:44AM 24  is called a resident agency in the FBI, similar to the DEA

10:44AM 25  with resident office.

10:44AM  1       And that's exactly what happened to me.  About two weeks

10:44AM  2   later, I was informed that I was selected to go to

10:44AM  3   Fayetteville, North Carolina, which I knew nothing of.

10:44AM  4   Q.  Okay.  So you were initially told Charlotte, and then it

10:44AM  5   was switched to a smaller satellite office inside the

10:44AM  6   Charlotte area of operation called Fayetteville?

10:44AM  7   A.  Yeah.  It was within the Charlotte division, a resident

10:44AM  8   office.  It was a small office.  There were only other three

10:44AM  9   other agents that were there.

10:44AM  10       I was told because of my law enforcement background that

10:44AM  11  me and two other agents were going to small offices like

10:44AM  12  this.  And that's where I went.

10:44AM  13  Q.  Was that small, kind of, four-agent office in

10:44AM  14  Fayetteville a dramatic difference from what you had

10:44AM  15  experienced in the Las Vegas division in the DEA?

10:44AM  16  A.  Yeah.  It was -- it was very different.  With DEA, I was

10:45AM  17  in a larger group-type setting where I worked on a task

10:45AM  18  force, a gang task force, with officers from the Las Vegas

10:45AM  19  Police Department.  I believe three were ten of us at the

10:45AM  20  time in a group.  So you work closely in a group-type

10:45AM  21  environment working cases.

10:45AM  22       This with the FBI was pretty different.  There were just

10:45AM  23  three of us.  There was a fourth agent there doing something

10:45AM  24  different for headquarters.  So a lot of times, you were on

10:45AM  25  your own doing leads, following leads that were given,

10:45AM 1    working with local agencies.

10:45AM 2      There were a lot of bank robberies.  There was very

10:45AM 3    little terrorism work.  I think I covered one lead where I

10:45AM 4    interviewed a cook, an Iraqi cook at a Waffle House before

10:45AM 5    the U.S. invaded Iraq.  It wasn't what I thought in terms of

10:45AM 6    a task force that I was used to.

10:45AM 7    Q.  Did you immediately bring your family from Las Vegas out

10:45AM 8    to that Fayetteville office?

10:45AM 9    A.  No.  No.  I didn't -- told my wife don't sell the house

10:46AM 10   yet until we figure this out.  Fayetteville was a smaller

10:46AM 11   town.  It was just outside of Fort Bragg.  And I just said

10:46AM 12   let me see how this works out, because I had two years to go

10:46AM 13   back to DEA without having to reapply essentially, or go

10:46AM 14   through the academy.  And that's essentially what happened.

10:46AM 15   Q.  So you said you had two years to go back to DEA, so is it

10:46AM 16   fair to say that within the confines of the rules, if you

10:46AM 17   changed your mind you could have gone back any time within

10:46AM 18   two years?

10:46AM 19   A.  There was still a process involved but not an entire

10:46AM 20   process.  It was like a modified process, and one where I

10:46AM 21   wouldn't have to go back through the DEA academy all over

10:46AM 22   again.  But I had just gone through in '99, and then I had

10:46AM 23   gone through with the FBI in 2002.  So I wasn't gonna do it a

10:46AM 24   third time.  So I had that two-year window.

10:46AM 25   Q.  Did you ultimately decide to go back to DEA?

| | | |
|---|---|---|
| 10:46AM | 1 | A.  I did, yep. |
| 10:46AM | 2 | Q.  Where did you go back to? |
| 10:47AM | 3 | A.  So when I first reached out to DEA, it was supervisors |
| 10:47AM | 4 | that I had worked with, one in particular that was a |
| 10:47AM | 5 | supervisor in Las Vegas when I was on the task force.  He was |
| 10:47AM | 6 | at headquarters, and he was familiar with the people in |
| 10:47AM | 7 | Washington, which is where ultimately I'd be hired back from. |
| 10:47AM | 8 | And he told me that he knew the special agent in charge in |
| 10:47AM | 9 | LA, and that he had spoken to her, and that I would go back |
| 10:47AM | 10 | to Las Vegas once they were done processing the application. |
| 10:47AM | 11 | And that's what happened.  I went back to Vegas. |
| 10:47AM | 12 | Q.  On that second stretch in Vegas, how long did you stay |
| 10:47AM | 13 | there and work there for? |
| 10:47AM | 14 | A.  So I would have been back in Vegas, it would have been |
| 10:47AM | 15 | summer of 2003.  And then I stayed in Vegas until I believe |
| 10:47AM | 16 | it was December of 2013. |
| 10:47AM | 17 | Q.  So about ten years? |
| 10:47AM | 18 | A.  Yeah. |
| 10:47AM | 19 | Q.  Okay.  And eventually as your kids got older, were you |
| 10:48AM | 20 | hoping to come back to the Buffalo area? |
| 10:48AM | 21 | A.  So our plan initially was to come back to Buffalo the |
| 10:48AM | 22 | first opportunity we had.  But we decided to stay a little |
| 10:48AM | 23 | bit longer.  We -- we formed some roots there with friends |
| 10:48AM | 24 | and family and our kids growing up there, so we stayed there |
| 10:48AM | 25 | a while. |

10:48AM   1    But at the end of the day, we still wanted to come back

10:48AM   2   home.  This is where I was from, my wife was from, and we

10:48AM   3   wanted our kids to go to school in New York State, which had

10:48AM   4   a much better education system.

10:48AM   5    And they were getting older, high school age, so that was

10:48AM   6   the time when I started applying to come back.

10:48AM   7   Q.  Okay.  And when you say applying to come back, was that

10:48AM   8   to come back to the New York field division generally?

10:48AM   9   A.  For me, it was -- you know, Buffalo was the goal, which

10:48AM  10   was part of the New York field division, and there were other

10:48AM  11   offices that they had offered me which I ultimately took.

10:48AM  12    Because at time when I wanted to come back to Buffalo,

10:48AM  13   there were no vacancies, they had a full office.  They were

10:49AM  14   waiting for someone to retire.

10:49AM  15    They offered me -- I believe it was Plattsburgh,

10:49AM  16   New York, then New York City, to get back into the field

10:49AM  17   division.  And I chose to go to New York City.

10:49AM  18   Q.  Were you -- was it represented to you that if you came

10:49AM  19   back to New York, once a spot opened in Buffalo you would be

10:49AM  20   able to transition there?

10:49AM  21   A.  So the same supervisor that knew the woman -- the agent

10:49AM  22   in charge in LA who was my first supervisor, knew the agent

10:49AM  23   in charge in New York.  Because he was an agent in charge in

10:49AM  24   San Diego, they all knew each other pretty well, that's the

10:49AM  25   way the agency works.  He had specifically spoken to the

10:49AM    1    agent in charge in New York City.

10:49AM    2        And they said have him come back, work in New York.  As

10:49AM    3    soon as there's a vacancy in Buffalo, we'll transfer him.

10:49AM    4    And that's exactly what happened.

10:49AM    5    Q.  Did you bring your family with you to New York City, or

10:49AM    6    what happened to them?

10:49AM    7    A.  I bought our house in Clarence in 2012.  And then still

10:49AM    8    wasn't sure -- still wasn't assigned to New York yet.  It was

10:50AM    9    back and forth about Buffalo, not being an opening in

10:50AM    10   Buffalo, so I decided to buy the house anyways.

10:50AM    11       So I spent a little time in Vegas while I had the house

10:50AM    12   in Buffalo and my family was in Buffalo.  And then went to

10:50AM    13   New York field division for almost two years, and then came

10:50AM    14   back.

10:50AM    15       So there was a timeframe where I had a house in Clarence,

10:50AM    16   New York, but lived in an apartment in New York City while I

10:50AM    17   worked until I was transferred back, and then just moved back

10:50AM    18   to our house.

10:50AM    19   Q.  During that timeframe when your family's living in the

10:50AM    20   house in Clarence and you're assigned to work in the City of

10:50AM    21   New York, did you make some trips back to Buffalo to kind of

10:50AM    22   visit with your family when you could?

10:50AM    23   A.  Yeah, I tried to come home as much as possible.  I had

10:50AM    24   four kids at home and a wife, so as much as I could, yeah.

10:50AM    25   Q.  Okay.  And we're going to cover this in more detail in a

| | | |
|---|---|---|
| 10:50AM | 1 | little bit, that topic of making trips home.  But generally, |
| 10:50AM | 2 | on those trips when you're coming back to Buffalo from |
| 10:50AM | 3 | New York City, did you get to meet and start interacting with |
| 10:50AM | 4 | some of the agents that worked in DEA Buffalo resident |
| 10:51AM | 5 | office? |
| 10:51AM | 6 | A.  When I came home -- |
| 10:51AM | 7 | Q.  When you were coming back to Buffalo kind of on these |
| 10:51AM | 8 | trips, did you meet or interact with any of the DEA Buffalo |
| 10:51AM | 9 | agents? |
| 10:51AM | 10 | A.  Not -- not so much then.  I mean, I had known a lot of |
| 10:51AM | 11 | the Buffalo agents from when I lived in Las Vegas, we'd come |
| 10:51AM | 12 | home for summers because my family still lived in Buffalo, my |
| 10:51AM | 13 | mother, my father, my sisters, nieces, nephews, things like |
| 10:51AM | 14 | that.  So we spent almost every summer in Buffalo.  It was |
| 10:51AM | 15 | during that timeframe that -- I had a close friend that was a |
| 10:51AM | 16 | classmate from the academy who worked in Buffalo, so there |
| 10:51AM | 17 | were times in the summer that I'd meet him out with other |
| 10:51AM | 18 | agents from Buffalo. |
| 10:51AM | 19 | Q.  Okay.  So I think I missed up my own timeline there.  So |
| 10:51AM | 20 | it's when you're working out in Vegas, but visiting Buffalo |
| 10:51AM | 21 | over the summers, that you met some of the Buffalo agents; is |
| 10:51AM | 22 | that correct? |
| 10:51AM | 23 | A.  Yeah, that's more accurate. |
| 10:51AM | 24 | Q.  Okay.  Did there come a time ultimately when you got that |
| 10:51AM | 25 | transfer you were promised back to the Buffalo resident |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| 10:51AM | 1 | office? |

10:51AM  1    office?

10:51AM  2    A.  Yes, I was eventually transferred back to Buffalo.

10:51AM  3    Q.  Okay.  Are there a couple of different groups that you

10:51AM  4    can be assigned to in the Buffalo resident office?

10:51AM  5    A.  So at that time there were three groups.  I think there

10:52AM  6    still are.  So they had them numbered, my number is D-57,

10:52AM  7    D-58, and then a tactical diversion squad which worked more

10:52AM  8    pharmaceutical-type cases.  And I was assigned group D-57.

10:52AM  9    Q.  We've heard some discussion during the trial about the

10:52AM  10   agent group and the task force group.  Does that sound

10:52AM  11   familiar to you?

10:52AM  12   A.  There is an agent group.  It's called -- it was called

10:52AM  13   the agent group, D-57, because it was mostly agents, but

10:52AM  14   there were task force officers on it as well.  So it was a

10:52AM  15   mix of agents and some local police officers assigned to DEA.

10:52AM  16       And then the official task force group is D-58, which has

10:52AM  17   more task force officers and less agents.

10:52AM  18   Q.  So when you initially came to the Buffalo resident

10:52AM  19   office, you were in D-57, which is sometimes colloquially

10:52AM  20   referred to as the agent group?

10:52AM  21   A.  Yes.

10:52AM  22   Q.  Okay.  While you worked at the DEA, what kinds of cases

10:52AM  23   did you investigate?

10:52AM  24   A.  During my whole career?

10:52AM  25   Q.  During your whole career.

10:53AM    1    A.   Yeah.  I worked a wide range of cases.  From street-level

10:53AM    2    gang narcotics cases with violent gang members to Mexican

10:53AM    3    drug-trafficking organizations that operate at the mid level,

10:53AM    4    to international cases where I traveled to Colombia, Panama,

10:53AM    5    Nicaragua, probably traveled overseas on nine occasions.  So

10:53AM    6    I worked them from top all the way to international cases.

10:53AM    7              MR. COOPER:  Judge, I know I'm a couple minutes

10:53AM    8    early, but I think this is a good time for me to break, if

10:53AM    9    you're --

10:53AM   10              THE COURT:  That's fine.

10:53AM   11              MR. COOPER:  Thank you.

10:53AM   12              THE COURT:  We'll take our morning break now.  Please

10:53AM   13    remember my instructions about not talking about the case even

10:53AM   14    with each other and not making up your mind.

10:53AM   15              See you back here in about 15 minutes or so.

10:53AM   16              (Jury excused at 10:53 a.m.)

10:54AM   17              THE COURT:  Anything for the record before we break?

10:54AM   18              MR. COOPER:  No, Your Honor.

10:54AM   19              THE COURT:  Anything?

10:54AM   20              MR. SINGER:  No, Your Honor.

10:54AM   21              THE COURT:  Okay.  We'll see you in about 15 minutes

10:54AM   22    or so.

10:54AM   23              (Off the record at 10:54 a.m.)

11:16AM   24              (Back on the record at 11:16 a.m.)

11:16AM   25              (Jury not present.)

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 11:16AM | 1 | **THE CLERK:**  All rise. |
| 11:16AM | 2 | **THE COURT:**  Please be seated. |
| 11:16AM | 3 | **THE CLERK:**  We are back on the record for the |
| 11:16AM | 4 | continuation of the jury trial in case number 19-cr-227, |
| 11:16AM | 5 | United States of America versus Joseph Bongiovanni. |
| 11:16AM | 6 | All counsel and parties are present. |
| 11:16AM | 7 | **THE COURT:**  Ready to go. |
| 11:16AM | 8 | **MR. COOPER:**  Yes, Judge. |
| 11:16AM | 9 | **THE COURT:**  Anything from the defense? |
| 11:16AM | 10 | **MR. SINGER:**  No, sorry. |
| 11:16AM | 11 | **THE COURT:**  Great.  Okay.  Let's bring them in, |
| 11:16AM | 12 | please, Pat. |
| 11:16AM | 13 | And let's get our witness back. |
| 11:18AM | 14 | (Witness and Jury seated at 11:18 a.m.) |
| 11:18AM | 15 | **THE COURT:**  The record will reflect that all our |
| 11:18AM | 16 | jurors, again, are present. |
| 11:18AM | 17 | I remind the witness that he's still under oath. |
| 11:19AM | 18 | And you may continue, Mr. Cooper. |
| 11:19AM | 19 | **MR. COOPER:**  Thank you, Judge. |
| 11:19AM | 20 | **BY MR. COOPER:** |
| 11:19AM | 21 | Q.  You may have a seat.  Thank you. |
| 11:19AM | 22 | When we broke, I think we left off talking about the |
| 11:19AM | 23 | different types of investigations that you worked on at the |
| 11:19AM | 24 | DEA during the course of your career; is that right? |
| 11:19AM | 25 | A.  Correct. |

11:19AM   1    Q.  Okay.  And I want to ask you specifically, at any point

11:19AM   2    during your career, did you get the opportunity to work on

11:19AM   3    organized crime cases?

11:19AM   4    A.  I did.

11:19AM   5    Q.  Okay.  And when was the first time that you got the

11:19AM   6    chance to work on an organized crime case?

11:19AM   7    A.  It was in Las Vegas, when I worked in Las Vegas.

11:19AM   8    Q.  Okay.  And can you just describe for the jury generally

11:19AM   9    how did that come up that you got the opportunity to start

11:19AM   10   working on an O.C. case?

11:19AM   11   A.  Sure.  So I think it was around 2004.  My supervisor in y

11:19AM   12   group at the time, he used to work in New York City before he

11:19AM   13   became a supervisor, and he had worked organized crime cases,

11:19AM   14   drug-related organized crime cases with DEA when he was in

11:19AM   15   New York City.

11:19AM   16       So when he came to Las Vegas, he still had an interest in

11:20AM   17   working those types of cases.  So that's how I initially

11:20AM   18   became involved.

11:20AM   19   Q.  When you initially became involved in working on those

11:20AM   20   cases, did you develop an interest for it?

11:20AM   21   A.  Oh, yeah.  Yeah.  I thought it was interesting.  It was

11:20AM   22   different than some of the other cases that I had worked in

11:20AM   23   Las Vegas, so, yes, I did find it interesting.

11:20AM   24   Q.  We're going to cover in some detail that topic a little

11:20AM   25   more.  But first, I want to ask you about the

| | | |
|---|---|---|
| 11:20AM | 1 | responsibilities that you have as a DEA special agent. |
| 11:20AM | 2 | When you become a DEA special agent, do you take an oath? |
| 11:20AM | 3 | A.  Yes, you do. |
| 11:20AM | 4 | Q.  Generally, what do you promise when you take that oath? |
| 11:20AM | 5 | **MR. SINGER:**  Objection as cumulative at this time. |
| 11:20AM | 6 | We've heard the same testimony from several witnesses. |
| 11:20AM | 7 | **MR. COOPER:**  Judge, I can come up on it and argue it. |
| 11:20AM | 8 | **THE COURT:**  Yeah, come on up. |
| 11:20AM | 9 | (Sidebar discussion held on the record.) |
| 11:21AM | 10 | **MR. COOPER:**  So, I think it's about a 30-second |
| 11:21AM | 11 | answer or less.  And the reason that I think it's important to |
| 11:21AM | 12 | have it come in through this witness is because it's not so |
| 11:21AM | 13 | much about whether the jury has heard the testimony, it's |
| 11:21AM | 14 | about what this witness's understanding of that oath is. |
| 11:21AM | 15 | And so it's -- this is a witness that's gonna be |
| 11:21AM | 16 | subjected to heavy attack.  He was subjected to heavy attack |
| 11:21AM | 17 | at the last trial.  And so I think it's appropriate for a |
| 11:21AM | 18 | 30-second answer to let him answer this. |
| 11:21AM | 19 | **MR. SINGER:**  And again, it's cumulative, Judge. |
| 11:21AM | 20 | We've heard it through six or seven witnesses at this time. |
| 11:21AM | 21 | Every single DEA witness cannot come up here and talk about |
| 11:21AM | 22 | the same -- |
| 11:21AM | 23 | **THE COURT:**  I think Mr. Cooper's given me a good |
| 11:21AM | 24 | reason why this witness should be allowed to testify or to |
| 11:21AM | 25 | talk about this. |

| | | |
|---|---|---|
| 11:21AM | 1 | **MR. COOPER:**  Thank you. |
| 11:21AM | 2 | (Sidebar discussion ended.) |
| 11:21AM | 3 | **THE COURT:**  The objection is overruled. |
| 11:21AM | 4 | **BY MR. COOPER:** |
| 11:21AM | 5 | Q.  Generally, what did you promise to do when you took that |
| 11:21AM | 6 | oath at the DEA? |
| 11:21AM | 7 | A.  Generally, to enforce the drug laws of the United States, |
| 11:21AM | 8 | to protect the United States and the U.S. Constitution from |
| 11:21AM | 9 | all enemies, foreign and abroad. |
| 11:22AM | 10 | Q.  Was there any part of that oath that told you that you |
| 11:22AM | 11 | should pick and choose who you investigate based on the color |
| 11:22AM | 12 | of their skin? |
| 11:22AM | 13 | A.  No, absolutely not. |
| 11:22AM | 14 | Q.  Was there a DEA policy that existed while you worked |
| 11:22AM | 15 | there about investigating people based on the color of their |
| 11:22AM | 16 | skin? |
| 11:22AM | 17 | A.  Yes, of course. |
| 11:22AM | 18 | Q.  What was that policy? |
| 11:22AM | 19 | A.  That that could not be a determining factor of who was |
| 11:22AM | 20 | gonna be involved in your investigation.  It couldn't be |
| 11:22AM | 21 | based on race. |
| 11:22AM | 22 | Q.  How about ethnicity, or where somebody's from?  Is that |
| 11:22AM | 23 | something that you're allowed to make the determining factor |
| 11:22AM | 24 | in whether or not to investigate someone? |
| 11:22AM | 25 | A.  No.  Absolutely not.  And it's been that way throughout |

11:22AM    1    my entire law enforcement career.  Wherever I've worked,

11:22AM    2    whether it was Immigration Service, the DEA, the FBI, I

11:22AM    3    worked at the State Attorney General's Office at the end of

11:22AM    4    my career, that's consistent throughout anybody I worked for.

11:22AM    5    Q.  You told us a moment ago that eventually you came back

11:22AM    6    and you were assigned to group D-57 in the Buffalo resident

11:22AM    7    office.  When did you return and start working in group D-57

11:23AM    8    at the Buffalo resident office?

11:23AM    9    A.  So I came back December of 2015.  I came back to Buffalo

11:23AM   10    and was assigned to D-57.

11:23AM   11    Q.  Do you know a person by the name of Joseph Bongiovanni?

11:23AM   12    A.  Yes, I do.

11:23AM   13    Q.  How do you know that person?

11:23AM   14    A.  I know -- I know him because we worked together in group

11:23AM   15    D-57 when I was an agent.

11:23AM   16    Q.  Is he in court today?

11:23AM   17    A.  Yes, he is.

11:23AM   18    Q.  Can you point him out and identify something he's wearing

11:23AM   19    for the record?

11:23AM   20    A.  He's wearing a gray suit and light blue tie, sitting

11:23AM   21    between his attorneys.

11:23AM   22          **MR. COOPER:**  For the record, the witness has

11:23AM   23    identified the defendant.

11:23AM   24          **THE COURT:**  It does.

11:23AM   25          **MR. COOPER:**  Thank you.

| | | |
|---|---|---|
| 11:23AM | 1 | **BY MR. COOPER:** |
| 11:23AM | 2 | Q.  How long did you work with the defendant at the DEA? |
| 11:23AM | 3 | A.  In general?  While I was in that group?  Or -- |
| 11:23AM | 4 | Q.  The total time that you worked with, you know, with him |
| 11:23AM | 5 | at the DEA, regardless of whether you were in the same group |
| 11:23AM | 6 | or not. |
| 11:23AM | 7 | A.  Oh.  So I started in Buffalo in December of 2015, and I |
| 11:24AM | 8 | retired in March of 2022. |
| 11:24AM | 9 | Q.  Did he retire before you did? |
| 11:24AM | 10 | A.  I believe so, yes. |
| 11:24AM | 11 | Q.  Okay. |
| 11:24AM | 12 | A.  Yes. |
| 11:24AM | 13 | Q.  So if the defendant retired in January or February of |
| 11:24AM | 14 | 2019, would your time working with him be from December of |
| 11:24AM | 15 | '15 when you arrived, until January or February of '19? |
| 11:24AM | 16 | A.  Yes. |
| 11:24AM | 17 | Q.  Okay.  Three and a half or four years? |
| 11:24AM | 18 | A.  Correct. |
| 11:24AM | 19 | Q.  Okay.  When you first arrived in group D-57, was the |
| 11:24AM | 20 | defendant in that same group with you? |
| 11:24AM | 21 | A.  Yes. |
| 11:24AM | 22 | Q.  You mentioned earlier that there's three groups, D-57 and |
| 11:24AM | 23 | D-58 are two of them.  What's the third group? |
| 11:24AM | 24 | A.  The third one is called a tactical diversion squad, TDS. |
| 11:24AM | 25 | They primarily investigate the diversion of pharmaceutical |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

11:25AM   1   drugs, some cases that involve pharmacies, doctors, things

11:25AM   2   like that.

11:25AM   3   Q.   If an agent works in the pharmaceutical group or the

11:25AM   4   diversion group, as you've described it, do you know if they

11:25AM   5   still have access to DEA databases?

11:25AM   6   A.   Yeah.  It's the same as in other groups as far as what

11:25AM   7   they have access to.

11:25AM   8   Q.   Okay.  So if an agent was working in the diversion group,

11:25AM   9   could they still access on the deconfliction databases at the

11:25AM  10   DEA?

11:25AM  11   A.   Yes.  They can.  I think it's pretty much every system.

11:25AM  12   They may have even more access because of the types of cases.

11:25AM  13   But as me as an agent in an enforcement group, they have the

11:25AM  14   same access to things that I do.

11:25AM  15   Q.   Okay.  Did all those groups -- 57, and 58, and TDS

11:25AM  16   tactical diversion -- did they all work in the same office?

11:25AM  17   A.   It was the same building.  I believe I was on the fifth

11:25AM  18   floor with -- so 57 and 58 were on the same floor.  And the

11:25AM  19   TDS group just was a floor beneath us in the same building.

11:25AM  20   Q.   Can you describe for this jury your relationship with the

11:26AM  21   defendant when you first started working at the DEA Buffalo

11:26AM  22   resident office in December of 2015?

11:26AM  23   A.   Yeah.  It was fine.  We knew each other a little bit

11:26AM  24   before.  So it was -- it was fine.

11:26AM  25   Q.   You said "we knew each other a little bit before."  Can

| | | |
|---|---|---|
| 11:26AM | 1 | you describe what you mean by that? |
| 11:26AM | 2 | A.  So, those times when I mentioned I would come home in the |
| 11:26AM | 3 | summer and see people from the Buffalo office, I met Joe at |
| 11:26AM | 4 | least once, maybe twice, when I was out with friends from the |
| 11:26AM | 5 | DEA Buffalo office while I was still working in Vegas. |
| 11:26AM | 6 | Q.  Okay.  And so were those interactions generally like |
| 11:26AM | 7 | social interactions? |
| 11:26AM | 8 | A.  Yeah, just social interactions.  We were out.  And I |
| 11:26AM | 9 | can't remember specifically what it was, I think -- I can't |
| 11:26AM | 10 | remember, I think was one was a DEA party somewhere in |
| 11:26AM | 11 | downtown Buffalo. |
| 11:26AM | 12 | Q.  Once you came back to start working at the DEA Buffalo |
| 11:26AM | 13 | resident office, did you ever work together with the |
| 11:26AM | 14 | defendant on investigations? |
| 11:26AM | 15 | A.  We did.  We did.  We were partners when I first came back |
| 11:27AM | 16 | to Buffalo. |
| 11:27AM | 17 | Q.  Did you get along with him at that time? |
| 11:27AM | 18 | A.  Yes. |
| 11:27AM | 19 | Q.  Did you have any negative feelings towards him at that |
| 11:27AM | 20 | time? |
| 11:27AM | 21 | A.  No, I did not. |
| 11:27AM | 22 | Q.  Did that relationship that you had with the defendant |
| 11:27AM | 23 | that you've just described, did that change over time? |
| 11:27AM | 24 | A.  Yes, it did.  It did. |
| 11:27AM | 25 | Q.  Without getting into the specifics right now, did that |

11:27AM    1    relationship change because of some things this defendant

11:27AM    2    said to you?

11:27AM    3    A.  Yes, it did.

11:27AM    4    Q.  All right.  We're going to get there in a minute.

11:27AM    5        Sitting here today, Mr. Casullo, can you tell the jury

11:27AM    6    how you feel about the defendant today?

11:27AM    7    A.  I have -- I have no feelings.  I'm hollow inside.  I've

11:27AM    8    gone through a lot of feelings through this whole thing.

11:27AM    9    It's been very difficult.  But at this point, I have no

11:27AM   10    relationship with him whatsoever.  Just hollow inside.

11:28AM   11    Q.  I want to pivot now and talk about a person by the name

11:28AM   12    of Michael Masecchia.  Do you know that name?

11:28AM   13    A.  Yes, I do.

11:28AM   14    Q.  How do you know that name?

11:28AM   15    A.  I know that name from -- well, first, I had heard that

11:28AM   16    name growing up when I grew up in Kenmore/Tonawanda, when I

11:28AM   17    was in college and worked out at a gym called Fitness

11:28AM   18    Factory.  The guy who walked in and out, walked behind the

11:28AM   19    counter, meet with the owner, I remember asking someone I was

11:28AM   20    working out with, who is that guy?  And they said it was Mike

11:28AM   21    Masecchia.

11:28AM   22        I never met him, never spoke to him, but I had remembered

11:28AM   23    that.

11:28AM   24        And then fast forward to 2004, he became a target of our

11:28AM   25    investigation in Las Vegas.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

11:28AM    1    Q.   So 2004, you were working in the Las Vegas district

11:28AM    2    office; is that correct?

11:28AM    3    A.   Yes.

11:28AM    4    Q.   And you said that Mike Masecchia became a target of an

11:28AM    5    investigation you had out there; is that correct?

11:28AM    6    A.   That's correct.

11:28AM    7    Q.   Can you describe generally what your investigation in

11:28AM    8    Las Vegas had to do with Mike Masecchia here in the Buffalo

11:29AM    9    area?

11:29AM   10    A.   Yes.  At the time, the information we had was that

11:29AM   11    Michael Masecchia was a school teacher in Buffalo, New York,

11:29AM   12    and that he was going to be moving to Las Vegas, and he was

11:29AM   13    going to be living in a house that was owned by one of the

11:29AM   14    targets that we were looking at.

11:29AM   15        We were looking at a group of people.  Most of the people

11:29AM   16    that were part of what we were looking at at the time were

11:29AM   17    either from Buffalo or their parents were from Buffalo, and

11:29AM   18    they were living together in Las Vegas.  They were living in

11:29AM   19    Las Vegas.  And they were associated with each other, and the

11:29AM   20    people that we're looking at.

11:29AM   21        And it was a drug investigation at the time.  So, it had

11:29AM   22    a drug nexus.  And I -- I can't remember that specific time

11:29AM   23    if it had organized crime ties -- yes, it did.  Because some

11:29AM   24    of the targets, their family members and some of the things

11:29AM   25    that were in our intelligence database indicated that there

11:29AM    1    were ties to organized crime through the family and through

11:29AM    2    who they were, different things.

11:29AM    3    Q.  So did you have an initial investigation into

11:30AM    4    Las Vegas-based targets where Masecchia's name came up?

11:30AM    5    A.  Yeah.  We were initially looking at a group of people.

11:30AM    6    Q.  Okay.  And was that group of people in your investigation

11:30AM    7    associated with Italian Organized Crime?

11:30AM    8    A.  Yes.  Either they were, the people we were looking at, or

11:30AM    9    their family was.  One particular -- yeah.

11:30AM    10   Q.  I'll ask a more general question.

11:30AM    11   A.  Sure.

11:30AM    12   Q.  Was there kind of a nexus to organized crime in the

11:30AM    13   investigation that you were working?

11:30AM    14   A.  Absolutely.

11:30AM    15   Q.  Okay.  As a result of learning this information that

11:30AM    16   Masecchia might be moving out to Las Vegas, did you

11:30AM    17   coordinate with or involve any other DEA offices around the

11:30AM    18   country?

11:30AM    19   A.  We did.  Discussing the case with my supervisor, we

11:30AM    20   thought it would be a good idea, since we saw ties back to

11:30AM    21   Buffalo either through family members or through phone

11:30AM    22   records, to contact the Buffalo office.

11:30AM    23       My supervisor asked me if I knew any agents in the

11:30AM    24   Buffalo office, which I said I did.

11:30AM    25       I had a particular friend that was a classmate from the

11:31AM    1    academy that was working in Buffalo, his name is Mike Hill,

11:31AM    2    and that's who I wanted to reach out to.

11:31AM    3    Q.  Is that a normal thing to do on an investigation at the

11:31AM    4    DEA is, you know, reach out to another district office or

11:31AM    5    resident office if something comes up that's kind of tied to

11:31AM    6    that location?

11:31AM    7    A.  Yeah.  It happens all the time.  If you're lucky, someone

11:31AM    8    in your office already has a contact there, someone that they

11:31AM    9    have some rapport with or worked with before.  And I did in

11:31AM   10    this case.

11:31AM   11       So, yeah, I mean, that happens all the time.  That's how

11:31AM   12    you coordinate cases.

11:31AM   13    Q.  And how can coordinating cases like that help an

11:31AM   14    investigation?

11:31AM   15    A.  Well, especially at the DEA where the majority of the

11:31AM   16    cases were multi jurisdictional, they weren't just in the

11:31AM   17    place we were working.  A lot of times they had ties to

11:31AM   18    another state, another city, another country.

11:31AM   19       And since I'm not physically working in that place, it

11:31AM   20    was extremely beneficial to have agents that did that you

11:31AM   21    could call on the phone and that could assist you in your

11:31AM   22    investigation.

11:31AM   23    Q.  You mentioned that you planned to reach out to a special

11:31AM   24    agent named Mike Hill because you knew that person from the

11:32AM   25    academy; is that right?

11:32AM    1    A.  Yeah.  Mike and I met at the DEA academy when we were

11:32AM    2    going through as basic agent trainees.

11:32AM    3    Q.  Okay.  And so did you ultimately reach out to that

11:32AM    4    person, Mike Hill, from the DEA in Buffalo?

11:32AM    5    A.  I did.

11:32AM    6    Q.  Did you discuss the case that you had involving Masecchia

11:32AM    7    with him?

11:32AM    8    A.  Yeah.  Generally, gave an idea of what we had going on in

11:32AM    9    Las Vegas.

11:32AM    10   Q.  At the time that you called Mike Hill and spoke about

11:32AM    11   Masecchia, did he seem to know what you were talking about?

11:32AM    12   Or were you telling him about it for the first time?

11:32AM    13   A.  Yeah.  Mike -- it was all new to Mike.  Mike didn't have

11:32AM    14   anything.  I was telling him what we had.

11:32AM    15   Q.  Okay.  And after you called Mike Hill at the DEA in

11:32AM    16   Buffalo to tell him what you had going on into Mike

11:32AM    17   Masecchia, did you receive a phone call from someone else in

11:32AM    18   the DEA Buffalo office about that case?

11:32AM    19   A.  I did.

11:32AM    20   Q.  Who called you?

11:32AM    21   A.  Joe Bongiovanni.

11:32AM    22   Q.  Were you expecting that call?

11:32AM    23   A.  No.  It was unsolicited.  I wasn't expecting it.  Mike

11:32AM    24   never mentioned that someone was gonna call me, so I didn't

11:33AM    25   expect it.

11:33AM  1  Q.  All right.  I want to focus in on that conversation.

11:33AM  2      You said the defendant called you after your conversation

11:33AM  3  with Mike Hill; is that correct?

11:33AM  4  A.  Correct.

11:33AM  5  Q.  So is this after you had told Mike Hill that you were

11:33AM  6  investigating Mike Masecchia?

11:33AM  7  A.  Yes.

11:33AM  8  Q.  When the defendant calls you, describe that conversation

11:33AM  9  for the jury.  Walk us through it.

11:33AM  10  A.  Okay.  So I received a call.  I believe it was on my cell

11:33AM  11  phone.  And when I answered it, he said it was Joe

11:33AM  12  Bongiovanni.  It kind of caught me off guard.

11:33AM  13      But he said that he had heard through Mike Hill that we

11:33AM  14  were working on investigation, and that Michael Masecchia's

11:33AM  15  name came up.  And that he knew Michael Masecchia from

11:33AM  16  growing up in North Buffalo.  And that he could -- his name

11:33AM  17  couldn't be on any reports, but he could possibly help

11:33AM  18  providing information.

11:34AM  19      He also mentioned that he had heard that this -- I

11:34AM  20  thought it was the Erie County Sheriff's Department was

11:34AM  21  investigating Masecchia for operating an outdoor marijuana

11:34AM  22  grow operation in the Southern Tier of New York, south of the

11:34AM  23  city.

11:34AM  24  Q.  When the defendant called you and told you he could help

11:34AM  25  but he couldn't put his name on any reports, did that stick

| | | |
|---|---|---|
| 11:34AM | 1 | out in your memory? |
| 11:34AM | 2 | A.  Yeah, it sticks out. |
| 11:34AM | 3 | Q.  Why? |
| 11:34AM | 4 | A.  It sticks out.  I mean, there are occasions where you may |
| 11:34AM | 5 | know someone that comes up in an investigation, but you're |
| 11:34AM | 6 | either in or your out.  You're not both. |
| 11:34AM | 7 | You can't -- you provide information, you're a witness. |
| 11:34AM | 8 | If you're a witness, your name has to be on a report.  You're |
| 11:34AM | 9 | either in or your out. |
| 11:34AM | 10 | And what I mean by that is if a determination is made |
| 11:34AM | 11 | that you can be involved, and that there is no conflict of |
| 11:34AM | 12 | interest, then you work that investigation.  You provide |
| 11:34AM | 13 | information, you're a witness, your name goes on reports. |
| 11:34AM | 14 | If you can't, then you shouldn't be involved at all.  You |
| 11:35AM | 15 | shouldn't be calling people.  You shouldn't be providing |
| 11:35AM | 16 | information.  You probably should have a discussion with the |
| 11:35AM | 17 | supervisor in your group saying, hey, there's a conflict of |
| 11:35AM | 18 | interest here.  Our group's gonna work this, then I probably |
| 11:35AM | 19 | shouldn't be involved in this case. |
| 11:35AM | 20 | So, that's my experience. |
| 11:35AM | 21 | Q.  During that conversation with the defendant, did you |
| 11:35AM | 22 | provide at least some general information about what you at |
| 11:35AM | 23 | the DEA in Las Vegas were working on? |
| 11:35AM | 24 | A.  Yeah.  Generally, and at that point, we didn't have a, |
| 11:35AM | 25 | like, a -- it was at the beginning stages of the |

11:35AM  1  investigation, it progressed afterwards.  But the beginning

11:35AM  2  stages provided general information that we had phone

11:35AM  3  records, and we were looking at phone records, and there were

11:35AM  4  some 716 area code Buffalo numbers were coming up that I

11:35AM  5  could pass to them that hopefully they could maybe identify

11:35AM  6  and help us expand the investigation.

11:35AM  7      We would do the Vegas side, they would do the Buffalo

11:35AM  8  side.  And working jointly together, again, collaborate and

11:36AM  9  expand the investigation.

11:36AM  10  Q.  Now, you mentioned at the beginning of this series of

11:36AM  11  questions about your phone call with the defendant that he

11:36AM  12  told you that he knew Mike Masecchia from growing up; is that

11:36AM  13  correct?

11:36AM  14  A.  Yeah.  I believe from growing up in North Buffalo area.

11:36AM  15  Q.  Did the defendant tell you during that phone call that he

11:36AM  16  was friends with Mike Masecchia?

11:36AM  17  A.  No.

11:36AM  18  Q.  Did he tell you during that phone call that he and Mike

11:36AM  19  drove to college together every day?

11:36AM  20  A.  No.

11:36AM  21  Q.  That didn't come up?

11:36AM  22  A.  No.  No, it did not.

11:36AM  23  Q.  You told us a few moments ago that what kind of started

11:36AM  24  your contact with the Buffalo office and Mike Hill generally

11:36AM  25  was that you expected Mike Masecchia to be moving out to the

| | | |
|---|---|---|
| 11:36AM | 1 | Las Vegas area where you had an investigation going on, |
| 11:36AM | 2 | right? |
| 11:37AM | 3 | A.  Yeah.  At the time, that was the information we had, that |
| 11:37AM | 4 | he was going to be moving out. |
| 11:37AM | 5 | Q.  After you called the Buffalo office and conveyed that |
| 11:37AM | 6 | information, did Mike Masecchia ever end up moving to the |
| 11:37AM | 7 | Las Vegas area? |
| 11:37AM | 8 | A.  Yeah -- to the best of our knowledge working that case, |
| 11:37AM | 9 | no, we never saw him out there.  We conducted extensive |
| 11:37AM | 10 | surveillance.  He was never identified as being out there. |
| 11:37AM | 11 | We never -- we eventually went up on a wiretap on telephones. |
| 11:37AM | 12 | We never intercepted any telephone calls with him.  So, no. |
| 11:37AM | 13 | Q.  Did the defendant ever call you back after that first |
| 11:37AM | 14 | phone call and offer more information about Masecchia? |
| 11:37AM | 15 | A.  No. |
| 11:37AM | 16 | Q.  Did you eventually close your investigation into |
| 11:37AM | 17 | Masecchia? |
| 11:37AM | 18 | A.  We did at some point. |
| 11:37AM | 19 | Q.  Now, we spoke a moment ago about your call to Mike Hill. |
| 11:37AM | 20 | Did you learn that after your call to Mike Hill, he opened a |
| 11:37AM | 21 | kind of a collateral or parallel case in DEA Buffalo? |
| 11:37AM | 22 | A.  Yeah.  So, we had a case open.  Our file title was |
| 11:38AM | 23 | Michael Masecchia, because at the time we thought he was |
| 11:38AM | 24 | moving out to Vegas.  And Mike Hill opened a criminal file as |
| 11:38AM | 25 | well with the same file title, Michael Masecchia.  So, yeah. |

11:38AM   1        I wouldn't -- it was kind of a parallel investigation,

11:38AM   2    but there were two criminal investigations, one open in

11:38AM   3    Buffalo, one open in Vegas.

11:38AM   4    Q.  Once those two investigations into the same target are

11:38AM   5    opened, does it cause some of the reports to be shared

11:38AM   6    between the offices?

11:38AM   7    A.  Yeah.  What typically happens is if you're working

11:38AM   8    closely with an office, you can either provide the reports to

11:38AM   9    them at the time using the fax machine, send them to that

11:38AM   10   agent in the office so they had an idea of what was going on.

11:38AM   11       Or you could write on the report, there was a section on

11:38AM   12   a DEA-6 a report of investigation a distribution section

11:38AM   13   where you could put another office and another agent.  So

11:38AM   14   when that report went through the process of being approved

11:39AM   15   and distributed, it could go -- it could go to that agent

11:39AM   16   automatically through the process.

11:39AM   17   Q.  Are you aware of whether some of the reports from your

11:39AM   18   Vegas file ended up being distributed to the Buffalo office?

11:39AM   19   A.  Yes.  Yes.

11:39AM   20   Q.  Were they?

11:39AM   21   A.  Yes.

11:39AM   22   Q.  Now you later came to work in the Buffalo office.  As an

11:39AM   23   agent working in a group in the Buffalo office, would you

11:39AM   24   have access to the reports in different case files around the

11:39AM   25   office if you wanted to go look at them?

11:39AM    1    A.  Oh, yeah.  Yes.  I mean, you're working in a specific

11:39AM    2    group, but yeah, there was a file room, and yes.

11:39AM    3        In the case management system, you -- you had access to

11:39AM    4    your cases.  But the physical files were in a case file room.

11:39AM    5    All the agents had access to that room.

11:39AM    6    Q.  Okay.  So the answer is yes, you could access the

11:39AM    7    physical file as an agent?

11:39AM    8    A.  Absolutely.

11:39AM    9    Q.  Did you learn ultimately that the DEA Buffalo also closed

11:40AM   10    their file into Masecchia?

11:40AM   11    A.  Yep.  At some point.  Ours was still going on and

11:40AM   12    progressing, and they closed theirs before ours at some

11:40AM   13    point.

11:40AM   14    Q.  Got it.  Did Masecchia end up getting charged in your

11:40AM   15    case back in 2004?

11:40AM   16    A.  No.

11:40AM   17    Q.  I want to talk now about 2009 and fast forward a second.

11:40AM   18        In 2009 were you still working at the DEA?

11:40AM   19    A.  Yes, in Las Vegas.

11:40AM   20    Q.  As far as you're aware, was the defendant a DEA special

11:40AM   21    agent in Buffalo in 2009?

11:40AM   22    A.  To the best of my knowledge.

11:40AM   23    Q.  I'd like to show Government Exhibit 12B in evidence.  I

11:40AM   24    believe in evidence.  Got those reading glasses ready?

11:41AM   25    A.  Yeah.

11:41AM   1   Q.  We're looking at Government Exhibit 12B here.

11:41AM   2           **MR. COOPER:**  And I'm going to ask, Ms. Champoux,

11:41AM   3   first if we can zoom in on the top one third of the screen

11:41AM   4   here, just to make it a little easier for Tony.

11:41AM   5           **BY MR. COOPER:**

11:41AM   6   Q.  Is this a DEA-6 opening a case?

11:41AM   7   A.  Yes, case initiation.

11:41AM   8   Q.  Okay.  And what's the date the 6 was prepared?

11:41AM   9   A.  This DEA-6 was prepared on June 8th, 2009.

11:41AM  10   Q.  Okay.  And who drafted this DEA-6 according to box 5 on

11:41AM  11   the left there?

11:41AM  12   A.  It was drafted by Task Force Agent Cory Higgins.

11:41AM  13   Q.  And who's the file title?

11:41AM  14   A.  The file title of the case is Mark Suppa.

11:41AM  15           **MR. COOPER:**  You can zoom out of that, Ms. Champoux.

11:41AM  16           Can you zoom in on the basis of investigation

11:41AM  17   section.

11:41AM  18           **BY MR. COOPER:**

11:42AM  19   Q.  I'm not going to have you read the whole thing, but is

11:42AM  20   this DEA-6 generally about marijuana grows in the Southern

11:42AM  21   Tier area of New York?

11:42AM  22   A.  Yes.

11:42AM  23           **MR. COOPER:**  You can zoom out of that, Ms. Champoux.

11:42AM  24   Scroll to the next page, please.

11:42AM  25           Can you zoom in on targets of investigation all the

11:42AM    1    way to the bottom of indexing?  Thank you.  That's perfect.

11:42AM    2            **BY MR. COOPER:**

11:42AM    3    Q.  Can you see this, sir?

11:42AM    4    A.  Yes, I can.

11:42AM    5    Q.  Can you read --

11:42AM    6    A.  Yes.

11:42AM    7    Q.  That's all right.  Just speak right into the mic for me.

11:42AM    8    Yeah.

11:42AM    9        Can you read who the targets of Cory Higgins's

11:42AM   10    investigation were?

11:42AM   11    A.  Targets of investigation will be Mark Suppa, Matt Suppa,

11:42AM   12    and Mike Masecchia, and others involved in this drug

11:42AM   13    organization.

11:42AM   14    Q.  This indexing section at the bottom, is that an area to

11:42AM   15    list information about the people you're investigating?

11:42AM   16    A.  Yeah.  Typically, you would -- you would put your targets

11:42AM   17    down there in the indexing section.

11:42AM   18    Q.  Is Mike Masecchia listed as a target there?

11:42AM   19    A.  Yes, he is.

11:43AM   20    Q.  Does it identify him as a possible partner or partner to

11:43AM   21    Mark Suppa?

11:43AM   22    A.  Yes, according to this report, he's a partner to Mark

11:43AM   23    Suppa and possible money launderer.

11:43AM   24    Q.  And I apologize, I misspoke.  I think that name is -- no,

11:43AM   25    it's Mark Suppa.  Is Mark Suppa indexed?

11:43AM    1    A.  Yes, he is.

11:43AM    2    Q.  Is Matt Suppa indexed?

11:43AM    3    A.  Yes.

11:43AM    4         MR. COOPER:  You can zoom out of that, Ms. Champoux,

11:43AM    5    and just leave the report up, please.

11:43AM    6         BY MR. COOPER:

11:43AM    7    Q.  In 2009, my question specifically is, in the year 2009,

11:43AM    8    were you ever made aware that Cory Higgins was investigating

11:43AM    9    Mike Masecchia for drug trafficking?

11:43AM   10    A.  No.

11:43AM   11    Q.  You didn't know that?

11:43AM   12    A.  No, not at that time.

11:43AM   13    Q.  Now, you told us a few minutes ago that the defendant

11:43AM   14    called you in 2004 about your Masecchia case.

11:43AM   15         Did the defendant ever call you in 2009 to discuss

11:43AM   16    Masecchia?

11:44AM   17    A.  No.

11:44AM   18    Q.  Did the defendant ever call you and say.  Hey, reach out

11:44AM   19    to Cory Higgins, he's investigating your guy Mike Masecchia?

11:44AM   20    A.  No.

11:44AM   21    Q.  Were you ever asked to share information about your

11:44AM   22    earlier 2004 Masecchia case with Cory Higgins?

11:44AM   23    A.  No.

11:44AM   24    Q.  Had you spoken with the defendant about your Masecchia

11:44AM   25    case before this 2009 investigation in Buffalo?

11:44AM    1    A.   Yeah.   When we first opened our case and they were

11:44AM    2    considering opening theirs.

11:44AM    3              MR. COOPER:   You can take that down, please,

11:44AM    4    Ms. Champoux.

11:44AM    5              BY MR. COOPER:

11:44AM    6    Q.   All right.   We're going to fast forward again for a

11:44AM    7    moment here.   And now I want to talk with you about your

11:44AM    8    first year in the Buffalo office around 2015.   December of

11:44AM    9    2015 is when you arrived, right?

11:44AM   10    A.   Correct.

11:44AM   11    Q.   When you arrive, did ever hear the name Ron Serio?

11:44AM   12    A.   At some point, I did.

11:44AM   13    Q.   Okay.   Did the hear the defendant talking about Ron

11:45AM   14    Serio?

11:45AM   15    A.   I did, in a conversation with him.

11:45AM   16    Q.   Okay.   And what did the defendant say to you about his --

11:45AM   17    or, about Mr. Serio in around 2015?

11:45AM   18    A.   Generally, it was in a conversation around -- I think it

11:45AM   19    was at Joe's desk.   He had a file on his desk, it was a

11:45AM   20    criminal file, DEA criminal file.   It was about that thick,

11:45AM   21    so it was pretty thick.

11:45AM   22        And I can't remember if he mentioned it to me or I asked

11:45AM   23    him about it.   But he said that he had a case on a big

11:45AM   24    organization, on the Serio organization, which was Ron and

11:45AM   25    Tom Serio.

11:45AM  1        So, generally, that's what the conversation was.

11:45AM  2   Q.  And you didn't arrive in Buffalo until December of '15;

11:45AM  3   is that correct?

11:45AM  4   A.  Correct.

11:45AM  5   Q.  So this conversation had to have occurred either December

11:45AM  6   of 2015 or after, right?

11:45AM  7   A.  Correct.

11:45AM  8   Q.  Okay.  Based on the conversation you had with the

11:45AM  9   defendant where he told you he had a big case on these guys,

11:45AM  10  did it -- was he representing to you that this was an active

11:46AM  11  or open case?

11:46AM  12       **MR. SINGER:**  Objection.

11:46AM  13       **MR. COOPER:**  He was a participant in the

11:46AM  14  conversation.

11:46AM  15       **THE COURT:**  Hang on.  Overruled.

11:46AM  16       **THE WITNESS:**  Could you repeat the question, please?

11:46AM  17       **BY MR. COOPER:**

11:46AM  18  Q.  Yeah.  Was the defendant representing to you, when he

11:46AM  19  said I've got a big case on these guys, that he had an active

11:46AM  20  case into Serio?

11:46AM  21  A.  Yes.

11:46AM  22  Q.  Was that how you took it when he said it to you?

11:46AM  23  A.  My belief was it was an open case.

11:46AM  24       **MR. COOPER:**  Ms. Champoux, can we please bring up

11:46AM  25  Government Exhibit 8B as in boy in evidence.

| 11:46AM | 1 | Can you zoom in on the top third of the page there? |
| 11:46AM | 2 | Yeah.  Thanks. |
| 11:46AM | 3 | **BY MR. COOPER:** |
| 11:46AM | 4 | Q.  Is this a DEA-6 called a case closing? |
| 11:46AM | 5 | A.  Yes, it is. |
| 11:46AM | 6 | Q.  And what's the date that it's prepared? |
| 11:46AM | 7 | A.  That date is January 28th, 2015. |
| 11:46AM | 8 | Q.  Is that, you know, give or take a month, is that about a |
| 11:46AM | 9 | year before this conversation that you had in December of |
| 11:47AM | 10 | 2015? |
| 11:47AM | 11 | A.  Yes. |
| 11:47AM | 12 | **MR. COOPER:**  You can zoom out of that, Ms. Champoux. |
| 11:47AM | 13 | **BY MR. COOPER:** |
| 11:47AM | 14 | Q.  Who authored this report, sir? |
| 11:47AM | 15 | A.  Joseph Bongiovanni. |
| 11:47AM | 16 | Q.  And as you sit here today, do you know this Wayne |
| 11:47AM | 17 | Anderson file title to be associated with the defendant's |
| 11:47AM | 18 | purported Ron Serio investigation? |
| 11:47AM | 19 | A.  Yes. |
| 11:47AM | 20 | Q.  Did he tell you in that conversation that he closed the |
| 11:47AM | 21 | file eleven months or twelve months earlier? |
| 11:47AM | 22 | A.  On this Wayne Anderson case? |
| 11:47AM | 23 | Q.  On his Serio investigation.  Did the defendant tell you, |
| 11:47AM | 24 | hey, it's been closed for a year? |
| 11:47AM | 25 | A.  Oh, no.  No. |

| 11:47AM | 1 | Q.  He didn't say that? |
| 11:47AM | 2 | A.  No. |
| 11:47AM | 3 | MR. COOPER:  Okay.  You can take that down, |
| 11:47AM | 4 | Ms. Champoux. |
| 11:47AM | 5 | BY MR. COOPER: |
| 11:47AM | 6 | Q.  Mr. Casullo, we've been talking quite a bit about Mike |
| 11:48AM | 7 | Masecchia.  During that conversation where the defendant |
| 11:48AM | 8 | tells you that he's got a big case into these guys including |
| 11:48AM | 9 | Ron Serio, does he tell you Mike Masecchia came up in the |
| 11:48AM | 10 | case? |
| 11:48AM | 11 | A.  No. |
| 11:48AM | 12 | Q.  He didn't say that? |
| 11:48AM | 13 | A.  No. |
| 11:48AM | 14 | Q.  Now you guys kind of had a connection from years earlier |
| 11:48AM | 15 | about Mike Masecchia, right? |
| 11:48AM | 16 | A.  Yes. |
| 11:48AM | 17 | Q.  The name Mike Masecchia didn't come up when the defendant |
| 11:48AM | 18 | told you about his Serio case? |
| 11:48AM | 19 | A.  No. |
| 11:48AM | 20 | Q.  If it had, that would have been of interest to you, |
| 11:48AM | 21 | right? |
| 11:48AM | 22 | A.  Yeah.  That would have been interesting. |
| 11:48AM | 23 | Q.  Did the defendant tell you that he got toll records for |
| 11:48AM | 24 | Mike Masecchia? |
| 11:48AM | 25 | A.  No. |

11:48AM  1    Q.  Did he tell you that he ran his subscriber information?

11:48AM  2    A.  No.

11:48AM  3    Q.  Did he tell you he caused him to be entered into DARTS?

11:48AM  4    A.  No.

11:48AM  5    Q.  Did he ask you to help him work on that Serio case?

11:48AM  6    A.  No.

11:48AM  7    Q.  And this was back when you guys got along, right?

11:48AM  8    A.  Yes.

11:48AM  9    Q.  You didn't have any problem with him at that time?

11:48AM  10   A.  No.

11:48AM  11   Q.  To your knowledge, did he have any problem with you at

11:48AM  12   that time?

11:48AM  13   A.  No.

11:48AM  14   Q.  Had you worked other cases together at that time period?

11:49AM  15   A.  Again, I can't remember when that exact conversation took

11:49AM  16   place, but, yes, we had worked -- I can't remember if our

11:49AM  17   wiretap investigation was going on at the time where we were

11:49AM  18   partners, or another case where we did a controlled delivery

11:49AM  19   together, but we had worked together.

11:49AM  20   Q.  Were you in the same group with him?

11:49AM  21   A.  Oh, yes.

11:49AM  22   Q.  Did he ever tell you, hey, Tony, I'm just too busy to do

11:49AM  23   surveillance on this, maybe you could help me?  Did that ever

11:49AM  24   happen?

11:49AM  25   A.  No.

11:49AM  1  Q.  At the DEA, what's the deconfliction database used by

11:49AM  2  agents called?

11:49AM  3  A.  It's called DARTS, D-A-R-T-S.  It's an acronym, I can't

11:49AM  4  remember what it stands for.

11:49AM  5  Q.  That's all right.

11:49AM  6     If you enter a phone number into DARTS, and someone else

11:49AM  7  has already entered that phone number into DARTS, what

11:50AM  8  happens?

11:50AM  9  A.  It generally, if you enter a number to see if anybody

11:50AM  10  else is looking at the same phone number, possibly the same

11:50AM  11  targets, if someone has already entered that number in, I'll

11:50AM  12  get a response back on that system, DARTS, on a screen, and

11:50AM  13  it will show on the screen the case that it overlaps with.

11:50AM  14     So the other person that ran it, it will have their case

11:50AM  15  number.  It will have the case agent's name.  Maybe the

11:50AM  16  analyst that the agent's working with.

11:50AM  17     There's a remarks section, so if it was another DEA case,

11:50AM  18  it will be a, like, a short synopsis of why they put it into

11:50AM  19  the system.

11:50AM  20     But you could also have deconflictions with other

11:50AM  21  agencies outside of DEA, like FBI or Homeland Security.  It

11:50AM  22  was like the same way.  It would have the agent's name or the

11:50AM  23  analyst's name, but you could not read the remarks section if

11:50AM  24  it was another agency.

11:50AM  25     And then in addition to that, you would have an email

11:50AM   1   that would be automatically generated that would go to your

11:51AM   2   inbox showing the same overlap.

11:51AM   3       Like, the same thing that I'm looking at on the screen, I

11:51AM   4   also get an email that shows the same thing.

11:51AM   5       And it works that way on the other end where if somebody

11:51AM   6   runs a number that you put in, that will go to the agent that

11:51AM   7   initially put it in.  So there's emails going on both ends.

11:51AM   8   So both people are aware that there's an overlap.

11:51AM   9   Q.  Is the purpose of that DARTS deconfliction system to

11:51AM   10  encourage DEA agents to share information with one another?

11:51AM   11  A.  Yes, it's to collaborate, it's to coordinate, to expand

11:51AM   12  investigations, officer safety.  All of those types of

11:51AM   13  things.

11:51AM   14  Q.  So hypothetically, if I put John -- if I was a DEA agent

11:51AM   15  and I put John Smith into DARTS, and then a year later you a

11:51AM   16  DEA agent puts John Smith into DARTS, am I gonna get an email

11:51AM   17  telling me that Tony Casullo just ran John Smith in DARTS?

11:51AM   18  A.  Yeah, it will be an email going both ways.

11:51AM   19  Q.  Are then you gonna get an email as well?

11:51AM   20  A.  Yes.

11:51AM   21  Q.  And is the purpose of that to encourage you and me to

11:51AM   22  talk to each other?

11:51AM   23  A.  Yes, absolutely, to put each other in contact with each

11:52AM   24  other.

11:52AM   25  Q.  Are those deconfliction emails auto-generated by the

| | | |
|---|---|---|
| 11:52AM | 1 | DARTS system? |
| 11:52AM | 2 | A.  Yes, they are. |
| 11:52AM | 3 | Q.  I'm holding what's marked for identification as |
| 11:52AM | 4 | Exhibit 26B, 26C, 26D, 26E, 26I, and 26M, as in Mary. |
| 11:52AM | 5 | **MR. COOPER:**  May I approach the witness? |
| 11:52AM | 6 | **THE COURT:**  You may. |
| 11:52AM | 7 | **BY MR. COOPER:** |
| 11:52AM | 8 | Q.  Take a moment, sir, and look at those.  And once you've |
| 11:53AM | 9 | had a chance to review all six of them, look back up at me. |
| 11:53AM | 10 | A.  Just quickly go through them? |
| 11:53AM | 11 | Q.  Yeah.  I want to know if you recognize them.  So take |
| 11:53AM | 12 | however much time you need, and see if you recognize them. |
| 11:54AM | 13 | Do you recognize those documents, sir? |
| 11:54AM | 14 | A.  Yeah, I know what they are. |
| 11:54AM | 15 | Q.  Are those DARTS deconfliction or emails? |
| 11:54AM | 16 | A.  Yes. |
| 11:54AM | 17 | Q.  Were you a recipient or initiator on each of those |
| 11:54AM | 18 | deconfliction notices? |
| 11:54AM | 19 | A.  I would have to look through to make sure that I was on |
| 11:54AM | 20 | every one of these, but -- |
| 11:54AM | 21 | Q.  Got it.  That's fine.  We'll take them one at a time, |
| 11:54AM | 22 | but -- |
| 11:54AM | 23 | A.  Yep. |
| 11:54AM | 24 | Q.  -- earlier we talked about how the conflict emails or the |
| 11:54AM | 25 | deconfliction emails are auto-generated; is that correct? |

11:55AM   1   A.  Right.

11:55AM   2   Q.  Are those examples of the auto-generated deconfliction

11:55AM   3   emails from DARTS?

11:55AM   4   A.  Yes.

11:55AM   5        **MR. COOPER:**  So these are already in evidence, Judge,

11:55AM   6   so I'm going to ask if I can approach the witness again.

11:55AM   7        **THE COURT:**  Sure.

11:55AM   8        **MR. COOPER:**  Thank you.

11:55AM   9        **BY MR. COOPER:**

11:55AM  10   Q.  May I have those back, Tony?

11:55AM  11        **MR. COOPER:**  And, Ms. Champoux, if we can pull up 26B

11:55AM  12   as in boy.

11:55AM  13        I'm sorry, ma'am.  26E.  I misspoke.

11:55AM  14        **BY MR. COOPER:**

11:55AM  15   Q.  All right.  So I just want to take a moment here to kind

11:55AM  16   of orient ourselves to what we're looking at.

11:55AM  17        At the top of this document, this is kind of the top of

11:55AM  18   an email generally, is that what that looks like to you?

11:55AM  19   A.  Yeah, it looks like the header information.

11:55AM  20   Q.  Okay.  Ask where it says from, the name Joseph

11:55AM  21   Bongiovanni is listed; is that correct?

11:55AM  22   A.  Yes, it is.

11:55AM  23   Q.  Now based on your experience using DARTS, receiving DARTS

11:56AM  24   deconflictions, is this an example of an email that's

11:56AM  25   auto-generated from DARTS?

11:56AM   1    A.  This looks that.  But the part at the top, I mean, this

11:56AM   2    whole thing is an auto-generated DARTS deconfliction.  But

11:56AM   3    the header at the top looks like something different.

11:56AM   4    Q.  Got it.  That's what I want to focus on here is at the

11:56AM   5    top, is this an actual email versus an auto-generated DARTS

11:56AM   6    deconfliction email?

11:56AM   7    A.  From looking at this, this looks to me on August 21st,

11:56AM   8    2018, Joe Bongiovanni looks like he forwarded this to Gregory

11:56AM   9    Yensan.

11:56AM   10   Q.  Okay.  And so do you see here where it says sent from my

11:56AM   11   iPhone?

11:56AM   12   A.  Yes.

11:56AM   13   Q.  That's not a common part of the auto-generated DARTS

11:56AM   14   deconflictions, right?

11:56AM   15   A.  No.

11:56AM   16   Q.  Underneath that, where it says begin forwarded message,

11:56AM   17   does this appear to be an auto-generated DARTS deconfliction

11:56AM   18   based on an entry that Curtis Ryan made into DARTS?

11:56AM   19   A.  Yes.

11:56AM   20   Q.  Where it says an investigative overlap was created by; is

11:57AM   21   that a reference to the fact that two people have looked into

11:57AM   22   the same number or target?

11:57AM   23   A.  Yes.

11:57AM   24   Q.  Below that, where it says DARTS request found, is that a

11:57AM   25   list of the different times that that target or number has

11:57AM    1    come up in DARTS?

11:57AM    2    A.   Yeah, that's where the overlaps are.

11:57AM    3    Q.   Okay.  What does it say right underneath DARTS requests

11:57AM    4    found?

11:57AM    5    A.   It is the responsibility of overlapped parties to contact

11:57AM    6    one another for sharing of information.

11:57AM    7    Q.   Is that the purpose of DARTS?

11:57AM    8    A.   Yes.

11:57AM    9    Q.   Where it says Trinity item here, what is the Trinity item

11:58AM    10   that's being referenced there?

11:58AM    11   A.   So, that's the telephone number that's being queried

11:58AM    12   through the system.

11:58AM    13   Q.   Okay.

11:58AM    14        MR. COOPER:  Ms. Champoux, if we can zoom in on this

11:58AM    15   bottom portion here for a second.

11:58AM    16        BY MR. COOPER:

11:58AM    17   Q.   So the Trinity item that's listed in Government Exhibit

11:58AM    18   26 Echo on the first page, the first one, Trinity item 1, is

11:58AM    19   a phone number 716-578-0544; is that correct?

11:58AM    20   A.   Correct.

11:58AM    21   Q.   Okay.  And then you said underneath that, it's going to

11:58AM    22   list the different times that that number's been run in

11:58AM    23   DARTS?

11:58AM    24   A.   Right.  So the first entry with Curtis Ryan, that shows

11:58AM    25   the individual that's running the number at that point.  So,

11:59AM    1    on that date.  And then his remarks.

11:59AM    2        And then beneath it were if that number was ever run

11:59AM    3    before.

11:59AM    4    Q.  Got it.  So let's work our way from the top, down.

11:59AM    5        The date that Curtis Ryan runs this number in DARTS,

11:59AM    6    what's that date?

11:59AM    7    A.  August 21st, 2018.

11:59AM    8    Q.  Okay.  And does he put -- what does he put in the remarks

11:59AM    9    section?

11:59AM   10    A.  Numbers associated with Ron Serio DTO.

11:59AM   11    Q.  Okay.  And did that cause a conflict in DARTS that

11:59AM   12    generated a deconfliction email?

11:59AM   13    A.  Yes, it did.

11:59AM   14    Q.  With what case?

11:59AM   15    A.  With case number C2-13-0026.

11:59AM   16    Q.  Okay.  And what date was the entry made for this phone

11:59AM   17    number in that case number?

11:59AM   18    A.  March 20th, 2013.

11:59AM   19         **MR. SINGER:**  Judge, I'm sorry to interrupt.  Can we

11:59AM   20    take a five-minute break?  I apologize.

11:59AM   21         **THE COURT:**  Yeah.  Let's take a quick break.

11:59AM   22         Please remember my instructions.  Don't discuss the

11:59AM   23    case with anyone, including each other.  Don't make up your

12:00PM   24    minds.

12:00PM   25         See you back here in just a few minutes.

| | | |
|---|---|---|
| 12:00PM | 1 | (Jury excused at 12:00 p.m.) |
| 12:01PM | 2 | **THE COURT:** Mr. Singer ran out, so I'll ask you, |
| 12:01PM | 3 | Mr. MacKay, anything from the defense? |
| 12:01PM | 4 | **MR. MacKAY:** I have nothing to offer on my behalf, |
| 12:01PM | 5 | Judge. |
| 12:01PM | 6 | **THE COURT:** Great. Anything, Mr. Cooper? |
| 12:01PM | 7 | **MR. COOPER:** No, Judge, thank you. |
| 12:01PM | 8 | **THE COURT:** We'll wait for Mr. Singer to get back and |
| 12:01PM | 9 | resume. |
| 12:01PM | 10 | (Off the record at 12:01 p.m.) |
| 12:01PM | 11 | (Back on the record at 12:06 p.m.) |
| 12:06PM | 12 | (Jury not present.) |
| 12:06PM | 13 | **THE COURT:** Are we ready to go? |
| 12:06PM | 14 | **MR. SINGER:** Yes, Judge. |
| 12:06PM | 15 | **THE COURT:** Are we ready to go? |
| 12:06PM | 16 | **MR. COOPER:** Yes, sir. |
| 12:06PM | 17 | **THE COURT:** Okay. Let's bring them back. |
| 12:07PM | 18 | (Jury seated at 12:07 p.m.) |
| 12:07PM | 19 | **THE COURT:** The record will reflect that all our |
| 12:07PM | 20 | jurors are present again. |
| 12:07PM | 21 | Mr. Cooper, you may continue. |
| 12:07PM | 22 | **MR. COOPER:** Thank you, Judge. |
| 12:07PM | 23 | **BY MR. COOPER:** |
| 12:07PM | 24 | Q. So, Special Agent Casullo, where we left off was talking |
| 12:07PM | 25 | about 26E. |

12:07PM    1          **MR. COOPER:**  And, Ms. Champoux, I asked if you could

12:07PM    2    bring that back up.  Awesome.

12:07PM    3          **BY MR. COOPER:**

12:07PM    4    Q.  And we were looking at this Trinity item for a number

12:07PM    5    ending in 0544, right?

12:08PM    6    A.  Yes.

12:08PM    7    Q.  And that's the number that generated the conflict?

12:08PM    8    A.  Yes.

12:08PM    9    Q.  And then we said the top line here is Curtis Ryan running

12:08PM   10    the number on August 21st of 2018, right?

12:08PM   11    A.  Correct.

12:08PM   12    Q.  And we read his remarks.  And then the next line down is

12:08PM   13    the number that conflicted with Curtis Ryan's DARTS entry,

12:08PM   14    right?

12:08PM   15    A.  Yes.

12:08PM   16    Q.  And that entry occurred on March 20th of 2013; is that

12:08PM   17    correct?

12:08PM   18    A.  Correct.

12:08PM   19    Q.  And where it says request ran by, who does it list as the

12:08PM   20    person who ran the request?

12:08PM   21    A.  Justin R. Borst.

12:08PM   22    Q.  Do you know him to be an intelligence analyst at the DEA?

12:08PM   23    A.  Yeah, he was a National Guard analyst assigned to our

12:08PM   24    office.

12:08PM   25    Q.  Okay.  Now, what do the remarks say for that second entry

12:08PM    1    for March 20th, 2013?

12:08PM    2    A.  Number part of ongoing narcotics investigation in contact

12:08PM    3    with target number 716-830-3226, per S.A. Bongiovanni.

12:09PM    4    Q.  Now, based on your experience working at the DEA and

12:09PM    5    working specifically in the Buffalo office, as well, does

12:09PM    6    this "per S.A. Bongiovanni" indicate to you that Bongiovanni

12:09PM    7    caused Borst to run this number in DARTS?

12:09PM    8    A.  Yeah.  In my experience, that would mean instead of

12:09PM    9    running the deconflictions himself, so you can run them

12:09PM   10    yourself as an agent, or if you're working with an analyst,

12:09PM   11    an analyst can help run those numbers for you, that you would

12:09PM   12    ask the analyst to help and run those numbers for you.

12:09PM   13         What an analyst typically would do is put per whoever

12:09PM   14    asked them to do it.

12:09PM   15    Q.  Now, I want to pause on that document for a second.

12:09PM   16         MR. COOPER:  And, Ms. Champoux, if we could take this

12:09PM   17    down, and pull up Government Exhibit 8A.

12:09PM   18         BY MR. COOPER:

12:09PM   19    Q.  Is this case number, C2-13-0026, the same case number as

12:10PM   20    that DARTS entry from March of 2013 that we just looked at?

12:10PM   21    A.  Yes.

12:10PM   22         MR. COOPER:  Can you take that down, Ms. Champoux?

12:10PM   23         And if we can go to Government Exhibit 100A.1 in

12:10PM   24    evidence.

12:10PM   25         And if you can click on image 0491.

| | | |
|---|---|---|
| 12:10PM | 1 | **BY MR. COOPER:** |
| 12:10PM | 2 | Q.  Do you see this phone number here, sir, 716-830-3226? |
| 12:10PM | 3 | A.  Yes. |
| 12:10PM | 4 | Q.  What's the name above that phone number? |
| 12:10PM | 5 | A.  Ron Serio. |
| 12:11PM | 6 | **MR. COOPER:**  Ms. Champoux, can you take that down and |
| 12:11PM | 7 | bring us back to 26 Echo, please. |
| 12:11PM | 8 | And if we can zoom in on the bottom section here |
| 12:11PM | 9 | again?  Thanks. |
| 12:11PM | 10 | **BY MR. COOPER:** |
| 12:11PM | 11 | Q.  Is that the same phone number here listed in the remarks |
| 12:11PM | 12 | section of Bongiovanni's deconfliction of this phone number? |
| 12:11PM | 13 | A.  Yes. |
| 12:11PM | 14 | Q.  So you can correct me if I'm wrong, but I want to see if |
| 12:11PM | 15 | we understand this.  The 716-578-0544 number was ran in DARTS |
| 12:11PM | 16 | in March of 20th of 2013 as a number that was in contact with |
| 12:11PM | 17 | Ron Serio's phone number; is that right? |
| 12:11PM | 18 | A.  Correct. |
| 12:11PM | 19 | **MR. COOPER:**  Can you take that down, Ms. Champoux, or |
| 12:11PM | 20 | zoom out for now?  Thank you. |
| 12:12PM | 21 | Judge, if I could just have one second to get a page |
| 12:12PM | 22 | number? |
| 12:12PM | 23 | **THE COURT:**  Yep. |
| 12:12PM | 24 | **BY MR. COOPER:** |
| 12:12PM | 25 | Q.  Special Agent Casullo, as you sit here today, do you know |

| 12:12PM | 1 | who that 0544 phone number belongs to? |
| 12:12PM | 2 | A.  No. |
| 12:12PM | 3 | Q.  Okay.  If you looked at phone records like subscriber |
| 12:12PM | 4 | information, would that help you know that information? |
| 12:12PM | 5 | A.  Yes. |
| 12:12PM | 6 | Q.  Okay.  That's all right.  We're going to come back in |
| 12:13PM | 7 | just a second.  I want to move on. |
| 12:13PM | 8 | **MR. COOPER:**  Ms. Champoux, can we pull up 26D as in |
| 12:13PM | 9 | David. |
| 12:13PM | 10 | **BY MR. COOPER:** |
| 12:13PM | 11 | Q.  All right.  And looking just at the first page of this |
| 12:13PM | 12 | document, sir, is this another auto-generated DARTS |
| 12:13PM | 13 | deconfliction? |
| 12:13PM | 14 | A.  Yes, it is. |
| 12:13PM | 15 | Q.  Down here at the bottom of page 1, who's the person who |
| 12:13PM | 16 | generated the investigative overlap? |
| 12:13PM | 17 | A.  That's me. |
| 12:13PM | 18 | Q.  Does it tell you when that investigative overlap was |
| 12:13PM | 19 | created? |
| 12:13PM | 20 | A.  March 13th, 2019. |
| 12:13PM | 21 | **MR. COOPER:**  Ms. Champoux, if we can go to page 4 of |
| 12:13PM | 22 | this document. |
| 12:13PM | 23 | **BY MR. COOPER:** |
| 12:13PM | 24 | Q.  All right.  At the top line of page 4 here, is this a |
| 12:14PM | 25 | reference to a number that you put in DARTS on March 13th of |

12:14PM   1    2019?

12:14PM   2    A.  Yes, it is.

12:14PM   3    Q.  Okay.  And what did you put in your remarks section?

12:14PM   4    A.  Numbers in contact with Frank Bifulco.

12:14PM   5    Q.  Okay.  Do you know Frank Bifulco to have a nickname or

12:14PM   6    alias?

12:14PM   7    A.  Yes, sir.

12:14PM   8    Q.  What was it?

12:14PM   9    A.  Butchie.

12:14PM   10   Q.  Okay.  And was he, in the law enforcement community, at

12:14PM   11   that time believed to be associated with Italian Organized

12:14PM   12   Crime?

12:14PM   13   A.  Yes.

12:14PM   14   Q.  Let's look down at the third item.

12:14PM   15       What's the date of that third item for that

12:14PM   16   deconfliction?

12:14PM   17   A.  March 20th, 2013.

12:14PM   18   Q.  What's the file number?

12:14PM   19   A.  C2-13-0026.

12:14PM   20   Q.  Okay.  And who ran that entry into DARTS on March 20th,

12:14PM   21   2013?

12:14PM   22   A.  Justin Borst.

12:14PM   23   Q.  Okay.  And can you read the remarks section for his

12:14PM   24   entry?

12:14PM   25   A.  Number part of ongoing narcotics investigation in contact

| | | |
|---|---|---|
| 12:14PM | 1 | with target number 716-830-3226, per S.A. Bongiovanni. |
| 12:15PM | 2 | Q.  Okay.  And is that 3226 number the same phone number for |
| 12:15PM | 3 | Ron Serio that we looked at in Government Exhibit 100A.1 a |
| 12:15PM | 4 | moment ago? |
| 12:15PM | 5 | A.  Yes, I believe so. |
| 12:15PM | 6 | Q.  And that file number, C2-13-0026, is that the same file |
| 12:15PM | 7 | number for the Wayne Anderson file title that we looked at in |
| 12:15PM | 8 | Exhibit 8A a moment ago? |
| 12:15PM | 9 | A.  Yes. |
| 12:15PM | 10 | Q.  I know there's a lot of phone numbers on these.  The |
| 12:15PM | 11 | phone number underneath your name, is that your contact |
| 12:15PM | 12 | information? |
| 12:15PM | 13 | A.  That's my DEA-issued cell phone number. |
| 12:15PM | 14 | Q.  Is the purpose of having that number listed on here to |
| 12:16PM | 15 | kind of encourage coordination if someone from a different |
| 12:16PM | 16 | office reaches out? |
| 12:16PM | 17 | A.  Yes. |
| 12:16PM | 18 | Q.  Okay.  Got it. |
| 12:16PM | 19 | **MR. COOPER:**  Can you scroll up a bit, Ms. Champoux? |
| 12:16PM | 20 | Right there is perfect. |
| 12:16PM | 21 | **BY MR. COOPER:** |
| 12:16PM | 22 | Q.  What's the phone number that's being run in DARTS that |
| 12:16PM | 23 | causes that deconfliction generation? |
| 12:16PM | 24 | A.  I believe it's 716-866-2687. |
| 12:16PM | 25 | Q.  Okay. |

| | | |
|---|---|---|
| 12:16PM | 1 | **MR. COOPER:** Ms. Champoux, can we zoom in on that for |
| 12:16PM | 2 | a second in the top here? |
| 12:16PM | 3 | **BY MR. COOPER:** |
| 12:16PM | 4 | Q.  Does that help? |
| 12:16PM | 5 | A.  Yes. |
| 12:16PM | 6 | Q.  Go ahead, read the number for us. |
| 12:16PM | 7 | A.  716-866-2687. |
| 12:16PM | 8 | Q.  Okay. |
| 12:16PM | 9 | **MR. COOPER:** You can zoom out of that, Ms. Champoux. |
| 12:16PM | 10 | And if we can go back to Government Exhibit 8A. |
| 12:17PM | 11 | And this time, go to page 347. |
| 12:17PM | 12 | **BY MR. COOPER:** |
| 12:17PM | 13 | Q.  Does the phone number that's listed on 26D match the |
| 12:17PM | 14 | phone number that's listed on Government Exhibit 8A, page |
| 12:17PM | 15 | 347, under user information here? |
| 12:17PM | 16 | A.  Yes, it does. |
| 12:17PM | 17 | Q.  And whose phone number is that associated with according |
| 12:17PM | 18 | to this record? |
| 12:17PM | 19 | A.  Paul Francoforte. |
| 12:17PM | 20 | Q.  Do you know that person to have an alias or another name |
| 12:17PM | 21 | they go by? |
| 12:17PM | 22 | A.  Yes. |
| 12:17PM | 23 | Q.  What's that? |
| 12:17PM | 24 | A.  Hot Dog. |
| 12:17PM | 25 | Q.  Okay.  And is it -- is that person's reputation in the |

12:17PM    1    law enforcement community one of being associated with or

12:17PM    2    involved in organized crime?

12:17PM    3    A.  Yes.

12:17PM    4         MR. COOPER:  You can take down 8A, please,

12:17PM    5    Ms. Champoux.

12:17PM    6         Let's go back to 26D for a moment.  Page 4.

12:17PM    7         And then just scroll up a tiny bit.  Yeah, perfect.

12:18PM    8    Thank you, ma'am.

12:18PM    9         BY MR. COOPER:

12:18PM    10   Q.  Special Agent Casullo, when you run Hot Dog's phone

12:18PM    11   number in DARTS, does that cause the other agents who have

12:18PM    12   previously entered Hot Dog's phone number in DARTS to get

12:18PM    13   notified?

12:18PM    14   A.  Yes.

12:18PM    15   Q.  Even if it's six years later like this is?

12:18PM    16   A.  Yes.

12:18PM    17   Q.  Is that how DARTS is designed to function?

12:18PM    18   A.  Yes, it is.

12:18PM    19        MR. COOPER:  We can take down 26D.

12:18PM    20        And if you wouldn't mind bringing up 26M, as in

12:18PM    21   Michael now.

12:18PM    22        BY MR. COOPER:

12:18PM    23   Q.  Are we looking at another example of a DARTS

12:18PM    24   deconfliction email, sir?

12:18PM    25   A.  Yes, it is.

| | | |
|---|---|---|
| 12:18PM | 1 | Q.  And is it again you who generated the conflict here? |
| 12:18PM | 2 | A.  Yes. |
| 12:18PM | 3 | MR. COOPER:  Can we go to page 2, Ms. Champoux? |
| 12:18PM | 4 | Thank you.  And let's -- I want to go now towards the bottom |
| 12:19PM | 5 | of this page, Trinity item, the bottom third of page 2.  If |
| 12:19PM | 6 | you can zoom in on that, Ms. Champoux.  Thank you. |
| 12:19PM | 7 | BY MR. COOPER: |
| 12:19PM | 8 | Q.  What's the number that was entered into DARTS on this |
| 12:19PM | 9 | deconfliction notice? |
| 12:19PM | 10 | A.  716-984-5198. |
| 12:19PM | 11 | Q.  Okay.  Let's work our way through here, again, at the |
| 12:19PM | 12 | top, is this the time that you ran the number into DARTS? |
| 12:19PM | 13 | A.  Yes. |
| 12:19PM | 14 | Q.  What was the date that you did that? |
| 12:19PM | 15 | A.  January 15th, 2019. |
| 12:19PM | 16 | Q.  Okay.  And on the right in the remarks section, what did |
| 12:19PM | 17 | you list there? |
| 12:19PM | 18 | A.  Numbers in contact with Amherst, New York marijuana |
| 12:19PM | 19 | trafficker, Dennis Tripi. |
| 12:20PM | 20 | Q.  Underneath that, can you walk us through the second row |
| 12:20PM | 21 | in this deconfliction? |
| 12:20PM | 22 | A.  Yes, starting with the date? |
| 12:20PM | 23 | Q.  Yep, that's perfect. |
| 12:20PM | 24 | A.  The date listed is March 20th, 2013.  The case number is |
| 12:20PM | 25 | C2-13-0026.  That number was ran by Justin Borst.  And the |

12:20PM  1  remarks indicate number part of ongoing narcotics

12:20PM  2  investigation in contact with 716-830-3226 per

12:20PM  3  S.A. Bongiovanni.

12:20PM  4  Q.  Okay.  And do you read what's written in that second row

12:20PM  5  to indicate that according to Special Agent Bongiovanni, this

12:20PM  6  phone number in the top left corner was in contact with Ron

12:20PM  7  Serio's phone number?

12:20PM  8  A.  Correct.

12:20PM  9  Q.  Now, again, this is an example of six years later, a

12:20PM  10 notification or a deconfliction being generated from a number

12:21PM  11 that you ran; is that correct?

12:21PM  12 A.  Correct.

12:21PM  13 Q.  Okay.  Would that cause the defendant to be notified

12:21PM  14 according to DARTS?

12:21PM  15 A.  Yes.

12:21PM  16    MR. COOPER:  Ms. Champoux, if we can take that down

12:21PM  17 and pull up 26B as in Bravo.

12:21PM  18    BY MR. COOPER:

12:21PM  19 Q.  Same thing, sir, another deconfliction email.

12:21PM  20 A.  Yes.

12:21PM  21 Q.  Okay.  And is this one, again, generated by something

12:21PM  22 that you did up here at the top?

12:21PM  23 A.  Yes, it is.

12:21PM  24    MR. COOPER:  Okay.  And if we scroll down,

12:21PM  25 Ms. Champoux, to page 2.

| 12:21PM | 1 | Let's zoom in on this top Trinity item here. |
| 12:21PM | 2 | **BY MR. COOPER:** |
| 12:21PM | 3 | Q. What's the number that you ran here? |
| 12:21PM | 4 | A. 716-390-5553. |
| 12:21PM | 5 | Q. What's the date that you ran that? |
| 12:21PM | 6 | A. August 2nd, 2018. |
| 12:21PM | 7 | Q. And what did you put in the remarks section when you ran |
| 12:22PM | 8 | that phone number? |
| 12:22PM | 9 | A. Numbers in contact with marijuana trafficker Anthony |
| 12:22PM | 10 | Gerace. |
| 12:22PM | 11 | Q. Had that number that you ran ever been put into DARTS |
| 12:22PM | 12 | before? |
| 12:22PM | 13 | A. Yes, it was. |
| 12:22PM | 14 | Q. When? |
| 12:22PM | 15 | A. March 20th, 2013. |
| 12:22PM | 16 | Q. Who did it? |
| 12:22PM | 17 | A. Justin Borst. |
| 12:22PM | 18 | Q. What did he write in the remarks section? |
| 12:22PM | 19 | A. Number part of ongoing investigation in contact with |
| 12:22PM | 20 | target number 716-578-5296 per S.A. Bongiovanni. |
| 12:22PM | 21 | **MR. COOPER:** Ms. Champoux, if you can zoom out of |
| 12:22PM | 22 | that, but keep the exhibit up. |
| 12:22PM | 23 | And then on the right, if you can pull up next to |
| 12:22PM | 24 | this Government Exhibit 8A.  And go to page 287. |
| | 25 | |

| | | |
|---|---|---|
| 12:22PM | 1 | **BY MR. COOPER:** |
| 12:22PM | 2 | Q.  Okay.  So the number that's listed in the remarks section |
| 12:22PM | 3 | here is 716-578-5296; did I get that right? |
| 12:23PM | 4 | A.  Correct. |
| 12:23PM | 5 | Q.  Do you see that listed on this subscriber information |
| 12:23PM | 6 | subpoena return on page 287 of Government Exhibit 8A? |
| 12:23PM | 7 | A.  Yes. |
| 12:23PM | 8 | Q.  Who's that phone number associated with according to this |
| 12:23PM | 9 | subscriber information subpoena return? |
| 12:23PM | 10 | A.  Thomas Serio. |
| 12:23PM | 11 | Q.  Now, in your DARTS deconfliction -- |
| 12:23PM | 12 | **MR. COOPER:**  Can you leave this up, please? |
| 12:23PM | 13 | **BY MR. COOPER:** |
| 12:23PM | 14 | Q.  In your DARTS deconfliction, who did you say that Thomas |
| 12:23PM | 15 | Serio was in contact with? |
| 12:23PM | 16 | A.  Anthony Gerace. |
| 12:23PM | 17 | Q.  Is that based upon phone records that you had received? |
| 12:23PM | 18 | A.  Yes.  Oh, I'm sorry, which number are we looking at? |
| 12:23PM | 19 | Which Trinity number? |
| 12:23PM | 20 | Q.  Oh, okay.  So, Trinity number here at the top. |
| 12:23PM | 21 | A.  Yes, 390-5553. |
| 12:23PM | 22 | Q.  That was a number in your investigation that was in |
| 12:23PM | 23 | contact with Anthony Gerace, right? |
| 12:24PM | 24 | A.  Correct. |
| 12:24PM | 25 | Q.  And I think I misspoke, but in the bottom here, does that |

12:24PM    1    indicate that that same phone number ending in 5553 was also

12:24PM    2    in contact with Tom Serio's phone number?

12:24PM    3    A.   Yes.

12:24PM    4    Q.   Okay.  And did this cause a deconfliction to notify the

12:24PM    5    defendant when you ran this number in DARTS?

12:24PM    6    A.   Yes.

12:24PM    7    Q.   And do your remarks essentially tell the other people who

12:24PM    8    put that number in what you were working on, what you're

12:24PM    9    doing?

12:24PM    10   A.   Yes.

12:24PM    11           **MR. COOPER:**  If we can pull up 26I, please.

12:24PM    12           **BY MR. COOPER:**

12:24PM    13   Q.   Is this another deconfliction email?

12:24PM    14   A.   Yes, it is.

12:24PM    15   Q.   Okay.  And is this one dated November 9, 2018?

12:24PM    16   A.   Yes.

12:24PM    17           **MR. COOPER:**  If we can go to page 3, please,

12:24PM    18   Ms. Champoux.

12:24PM    19           Let's look at the second Trinity item that's listed.

12:25PM    20   Thank you, ma'am.

12:25PM    21           **BY MR. COOPER:**

12:25PM    22   Q.   Can you see that better now?

12:25PM    23   A.   Yes.

12:25PM    24   Q.   What's the date there?

12:25PM    25   A.   November 9, 2018?

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

12:25PM  1  Q.  Okay.  Underneath that, can you see an earlier DARTS

12:25PM  2  entry that showed up related to that same phone number ending

12:25PM  3  in 7760?

12:25PM  4  A.  Yes.

12:25PM  5  Q.  Okay.  And what's the case number for that?

12:25PM  6  A.  C2-13-0026.

12:25PM  7  Q.  Is it entered by Borst again?

12:25PM  8  A.  Yes.

12:25PM  9  Q.  Do the remarks indicate that that was done on behalf of

12:25PM  10  Special Agent Bongiovanni again?

12:25PM  11  A.  Yes.

12:25PM  12  Q.  And is that 578-5296 phone number in the remarks section

12:25PM  13  the same phone number for Tom Serio that we were just looking

12:25PM  14  at?

12:25PM  15  A.  Yes.

12:25PM  16  Q.  Would this DARTS deconfliction have caused the defendant

12:26PM  17  to be notified that someone else ran this number that was in

12:26PM  18  contact with Tom Serio?

12:26PM  19  A.  Yes.

12:26PM  20        MR. COOPER:  You can take that down, please,

12:26PM  21  Ms. Champoux.  And I think last but not least, Government

12:26PM  22  Exhibit 26C as in Charlie.

12:26PM  23        BY MR. COOPER:

12:26PM  24  Q.  Is this another deconfliction email?

12:26PM  25  A.  Yes.

| | | |
|---|---|---|
| 12:26PM | 1 | **MR. COOPER:**  Can we zoom in on the bottom part of |
| 12:26PM | 2 | page 1 here, Ms. Champoux, the first Trinity item? |
| 12:26PM | 3 | **BY MR. COOPER:** |
| 12:26PM | 4 | Q.  What date did you run this phone number? |
| 12:26PM | 5 | A.  August 2nd, 2018. |
| 12:26PM | 6 | Q.  And is the phone number that you're running that same |
| 12:26PM | 7 | 578-5296 phone number? |
| 12:26PM | 8 | A.  Yes. |
| 12:26PM | 9 | Q.  Is that associated with Tom Serio? |
| 12:26PM | 10 | A.  Yes. |
| 12:26PM | 11 | Q.  When you ran that number on August 2nd, 2018, what did |
| 12:26PM | 12 | you put in your remarks? |
| 12:26PM | 13 | A.  Number part of ongoing marijuana investigation.  I |
| 12:27PM | 14 | remember running this one. |
| 12:27PM | 15 | Q.  Okay.  And are there two DARTS entries beneath that, or |
| 12:27PM | 16 | two rows beneath that indicating prior DARTS entries for |
| 12:27PM | 17 | Mr. Serio's phone number? |
| 12:27PM | 18 | A.  Yes. |
| 12:27PM | 19 | Q.  Okay.  We're going to go backwards in time, so we'll go |
| 12:27PM | 20 | to the bottom one first.  Is that March 12th of 2013? |
| 12:27PM | 21 | A.  Yes. |
| 12:27PM | 22 | Q.  Who entered that one on March 12th, 2013? |
| 12:27PM | 23 | A.  Stephen Bevilacqua. |
| 12:27PM | 24 | Q.  Is he another intel analyst at the DEA at that time? |
| 12:27PM | 25 | A.  He's a DEA analyst, yeah. |

12:27PM    1    Q.  And what did Analyst Bevilacqua put in the remarks

12:27PM    2    section of his March 12th, 2013 entry?

12:27PM    3    A.  Narcotics investigation number for Thomas Serio per

12:27PM    4    S.A. Bongiovanni.

12:27PM    5    Q.  Okay.  And then even before that in time, was there an

12:27PM    6    entry earlier from July 6 of 2012?

12:27PM    7    A.  Yes.

12:27PM    8    Q.  Was that a different case number from the one we just

12:27PM    9    looked at?

12:27PM   10    A.  Yes.

12:27PM   11    Q.  The one we just looked at, was that same 13-0026, right?

12:28PM   12    A.  Yes.

12:28PM   13    Q.  And then this middle one is a 12-0090; is that correct?

12:28PM   14    A.  Correct.

12:28PM   15    Q.  Was that ran by Justin Borst?

12:28PM   16    A.  Yes.

12:28PM   17    Q.  And does he say that was per Special Agent Nastoff?

12:28PM   18    A.  Yes, he does.

12:28PM   19    Q.  Okay.  And that's about a year, give or take a few

12:28PM   20    months, before the defendant causes Bevilacqua to run that

12:28PM   21    number, right?

12:28PM   22    A.  Correct.

12:28PM   23         **MR. COOPER:**  You can zoom out of that, Ms. Champoux.

12:28PM   24    Leave it up for now.

          25

| | | |
|---|---|---|
| 12:28PM | 1 | **BY MR. COOPER:** |
| 12:28PM | 2 | Q.  Sir, was there a time when you got phone records for a |
| 12:28PM | 3 | person named Anthony Gerace? |
| 12:28PM | 4 | A.  Yes, I subpoenaed those records. |
| 12:28PM | 5 | Q.  Okay.  And what caused you to subpoena phone records for |
| 12:28PM | 6 | Anthony Gerace? |
| 12:28PM | 7 | A.  I subpoenaed those records on several occasions, I |
| 12:28PM | 8 | believe.  Early on, he came up in the investigation when I |
| 12:29PM | 9 | was investigating Peter Gerace.  It's Peter Gerace's brother. |
| 12:29PM | 10 | Through conversations with agents in my group at the time, |
| 12:29PM | 11 | Chris Wisniewski mentioned that -- |
| 12:29PM | 12 | **MR. SINGER:**  Objection, hearsay. |
| 12:29PM | 13 | **MR. COOPER:**  I'll ask a follow-up question. |
| 12:29PM | 14 | **THE COURT:**  Well, just -- let me take a look at this. |
| 12:29PM | 15 | **MR. COOPER:**  Sure, Judge. |
| 12:29PM | 16 | **THE COURT:**  Yeah, sustained.  Don't tell us what -- |
| 12:29PM | 17 | Why don't you ask a follow-up question. |
| 12:29PM | 18 | **BY MR. COOPER:** |
| 12:29PM | 19 | Q.  So, Special Agent Casullo, at one point, did you run |
| 12:29PM | 20 | Anthony Gerace's phone records or, you know, subpoena his |
| 12:29PM | 21 | phone records related to the burglary at Michael Sinatra's |
| 12:29PM | 22 | house? |
| 12:29PM | 23 | A.  I did, yes.  Yes. |
| 12:29PM | 24 | Q.  You did that? |
| 12:29PM | 25 | A.  Yes. |

| 12:29PM | 1 | Q. Okay. When you did that, did that cause the defendant to |
| 12:29PM | 2 | get notified that you had ran Anthony Gerace's phone number |
| 12:29PM | 3 | in DARTS? |
| 12:29PM | 4 | A. Could you show me that specific -- |
| 12:29PM | 5 | Q. Sure. |
| 12:29PM | 6 | A. -- deconfliction? |
| 12:29PM | 7 | Is this the one you're speaking of? |
| 12:29PM | 8 | **MR. COOPER:** You can take that down for a second, |
| 12:29PM | 9 | Ms. Champoux. |
| 12:30PM | 10 | **THE WITNESS:** Okay. |
| 12:30PM | 11 | **BY MR. COOPER:** |
| 12:30PM | 12 | Q. Let's work -- let's work through it this way, sir. |
| 12:30PM | 13 | Did there come a time after you ran Anthony Gerace's |
| 12:33PM | 14 | phone records in DARTS when the defendant came up to discuss |
| 12:33PM | 15 | that with you? |
| 12:33PM | 16 | A. Oh, yes. |
| 12:33PM | 17 | Q. Okay. Can you tell the jury about that? |
| 12:33PM | 18 | A. Sure. Yeah. |
| 12:33PM | 19 | So I ran Anthony Gerace's phone records on different |
| 12:33PM | 20 | occasions, once early on I believe in 2016, then again in |
| 12:33PM | 21 | August 2018 I believe, and then again afterwards in -- I |
| 12:33PM | 22 | think it was, like, January of 2019. |
| 12:33PM | 23 | When I ran them in 2019, Anthony Gerace's phone records, |
| 12:33PM | 24 | it was related to the burglary at Michael Sinatra's house. |
| 12:33PM | 25 | Prior to that, I was running them specifically on the |

12:33PM     1    investigation of marijuana related to Anthony Gerace.

12:33PM     2        So, I believe it was the August 2018 when I ran Anthony

12:33PM     3    Gerace's phone records, on that occasion Bongiovanni came

12:33PM     4    over to my desk to speak to me.

12:33PM     5    Q.   What was his demeanor like when he came over to your desk

12:33PM     6    to speak to you?

12:33PM     7    A.   So, he walked over to our side of the group, which was

12:33PM     8    different from D-57.  I saw him walk in.  I saw him glance

12:33PM     9    towards my desk.

12:33PM    10        I believe at the time I was talking to Curtis Ryan from

12:33PM    11    Homeland Security, who was my partner during the

12:33PM    12    investigation of Anthony and Peter Gerace, at some point.

12:33PM    13        And he walked in to the part of the office where the

12:33PM    14    secretaries sat, and spoke to one of the secretaries, and

12:33PM    15    then came out.  And then he paced back.

12:33PM    16        And he did this, like, several times, and I'm noticing

12:33PM    17    this.

12:33PM    18        At some point, Curtis Ryan walks away, and then he came

12:33PM    19    over to my desk.

12:33PM    20        And when he came over to my desk, I can't remember if he

12:33PM    21    was holding the actual DARTS deconfliction or not, he came

12:33PM    22    over he said I noticed that you're running deconflictions for

12:33PM    23    Anthony Gerace.  It came up in your investigation, whatever

12:33PM    24    his words were, related to Anthony Gerace and the

12:33PM    25    deconfliction.

12:33PM 1    And he said, which -- at the time, I was pretty unsettled

12:33PM 2    of.  So, he mentions that he -- his wife is friends with

12:33PM 3    Anthony Gerace on Facebook or his friend group.  That he

12:33PM 4    couldn't help in the investigation, but his wife could

12:33PM 5    because they knew -- because she knew these people through

12:33PM 6    Facebook.  And that he has his loads of marijuana delivered

12:33PM 7    to him behind Santora's.  Has -- Anthony Gerace also supplies

12:33PM 8    his friends with cocaine.  And you better hurry up and

12:33PM 9    investigate him before they make marijuana legal.

12:33PM 10   Q.  When the defendant told you that, you better hurry up and

12:33PM 11   investigate Anthony Gerace before they make marijuana legal,

12:33PM 12   did you get the impression that he was mocking you for

12:33PM 13   investigating that?

12:33PM 14   A.  Mocking me.  I don't know if that was his way of trying

12:33PM 15   to dissuade me from investigating Anthony Gerace, but, yes.

12:33PM 16   Q.  Did the defendant -- you mentioned that the defendant

12:33PM 17   told you some information about where Anthony Gerace was

12:33PM 18   getting his loads of marijuana delivered; do you remember

12:33PM 19   that?

12:33PM 20   A.  Yes.

12:33PM 21   Q.  Did he tell you why he wasn't investigating Anthony

12:33PM 22   Gerace if he knew where he was getting loads of marijuana

12:33PM 23   delivered?

12:33PM 24   A.  No.

12:33PM 25   Q.  Did you want to continue that conversation?

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 12:33PM | 1 | A.  No.  Not at all.  I was squirming.  I was squirming. |
| 12:33PM | 2 | Q.  You said you were squirming.  Were you uncomfortable |
| 12:33PM | 3 | sitting there? |
| 12:33PM | 4 | A.  Extremely uncomfortable. |
| 12:33PM | 5 | Q.  Speaking of being uncomfortable, let's stay on this topic |
| 12:34PM | 6 | for a second. |
| 12:34PM | 7 | Have you testified at a previous proceeding before? |
| 12:34PM | 8 | A.  Yes. |
| 12:34PM | 9 | Q.  Okay.  Before you testified at the prior proceeding, |
| 12:34PM | 10 | before you came into this courtroom and sat in that chair, |
| 12:34PM | 11 | were you sitting outside in the hallway? |
| 12:34PM | 12 | A.  Are you talking about the -- |
| 12:34PM | 13 | Q.  The prior proceeding when you testified -- |
| 12:34PM | 14 | A.  Yes. |
| 12:34PM | 15 | Q.  -- in this courtroom -- |
| 12:34PM | 16 | A.  Yes. |
| 12:34PM | 17 | Q.  -- in that chair, were you sitting outside in the |
| 12:34PM | 18 | hallway? |
| 12:34PM | 19 | A.  Yeah, there was several occasions. |
| 12:34PM | 20 | Q.  Okay.  Was there an occasion while you were sitting |
| 12:34PM | 21 | outside in the hallway before getting in that chair to offer |
| 12:34PM | 22 | testimony that the defendant came over to you and made some |
| 12:34PM | 23 | comments to you? |
| 12:34PM | 24 | A.  He was walking by me as I was sitting with Special Agent |
| 12:34PM | 25 | Ralph Joseph. |

12:34PM    1    Q.  Did the defendant say something to you?

12:34PM    2    A.  Oh, he did, in --

12:34PM    3    Q.  And what did he say to you?

12:34PM    4    A.  In passing, he said that, what are you?  His protection?

12:34PM    5        Talking to me, and Ralph Joseph from the FBI.

12:34PM    6    Q.  Did that make you uncomfortable?

12:34PM    7    A.  Extremely uncomfortable.  Very unsettling.

12:34PM    8    Q.  Was that right before you came to sit in a chair just

12:34PM    9    like this one and offer testimony?

12:34PM   10    A.  Between breaks of testimony.  I was just testifying, and

12:35PM   11    getting ready to go back on and testify.

12:35PM   12    Q.  All right.  We're going to move on for a second.

12:35PM   13        I want to talk to you about a name Mark Vitale.  Are you

12:35PM   14    familiar with that name?

12:35PM   15    A.  I am.

12:35PM   16        MR. COOPER:  Ms. Champoux, if we can go to Government

12:35PM   17    Exhibit 100A.1, please, and pull up a PDF entitled Vitale

12:35PM   18    Sprint sub info.

12:35PM   19        Just if we can zoom out a couple of clicks there.

12:35PM   20    That's perfect.  Thank you.

12:35PM   21        BY MR. COOPER:

12:35PM   22    Q.  Do you see this document in front of you, sir?

12:35PM   23    A.  Yes.

12:35PM   24    Q.  Does this appear to be a response back from Sprint

12:35PM   25    regarding the subpoena that you issued?

| | | |
|---|---|---|
| 12:35PM | 1 | A.  Yes. |
| 12:35PM | 2 | Q.  Is it addressed to you at the top here? |
| 12:35PM | 3 | A.  Yes, it is. |
| 12:35PM | 4 | Q.  Okay.  Does this document indicate that at some point, |
| 12:36PM | 5 | you had caused a subpoena to be generated for phone records |
| 12:36PM | 6 | related to Mark Vitale? |
| 12:36PM | 7 | A.  I'm sorry, could you repeat that? |
| 12:36PM | 8 | Q.  Does that document indicate you, at some point, had |
| 12:36PM | 9 | caused a subpoena to be issued for Mark Vitale's phone |
| 12:36PM | 10 | records? |
| 12:36PM | 11 | A.  Does it say Mark Vitale? |
| 12:36PM | 12 | **MR. COOPER:**  Ms. Champoux, can you scroll down? |
| 12:36PM | 13 | Pause right there. |
| 12:36PM | 14 | **BY MR. COOPER:** |
| 12:36PM | 15 | Q.  Do you see the name listed here in the account details |
| 12:36PM | 16 | section? |
| 12:36PM | 17 | A.  Yes. |
| 12:36PM | 18 | Q.  And what's the name that's listed there? |
| 12:36PM | 19 | A.  Michelle Vitale. |
| 12:36PM | 20 | Q.  Is that the same last name as Mark Vitale that I'm asking |
| 12:36PM | 21 | you about? |
| 12:36PM | 22 | A.  Yes. |
| 12:36PM | 23 | Q.  And is the date range of these phone records |
| 12:36PM | 24 | November 2015 to December of 2015? |
| 12:36PM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:36PM | 1 | **MR. COOPER:** You can scroll back up to the first |
| 12:37PM | 2 | page. |
| 12:37PM | 3 | **BY MR. COOPER:** |
| 12:37PM | 4 | Q. Does this appear to you to be a subpoena for Vitale's |
| 12:37PM | 5 | toll records? |
| 12:37PM | 6 | A. Again, I don't remember this specifically, but yes. |
| 12:37PM | 7 | Q. Okay. It has your name on it, right? |
| 12:37PM | 8 | A. Yes. |
| 12:37PM | 9 | Q. Okay. And the name for the subscriber information has |
| 12:37PM | 10 | the last name Vitale -- |
| 12:37PM | 11 | A. Yes. |
| 12:37PM | 12 | Q. -- is that right? |
| 12:37PM | 13 | A. Yes. |
| 12:37PM | 14 | Q. Okay. And do you have any reason to think you didn't run |
| 12:37PM | 15 | this subpoena for Vitale subscriber? |
| 12:37PM | 16 | A. No. |
| 12:37PM | 17 | Q. Okay. The document that we're looking at, the PDF |
| 12:37PM | 18 | entitled to Vitale Sprint sub info.PDF, do you know where |
| 12:37PM | 19 | this document was recovered from, sir? |
| 12:37PM | 20 | A. No. |
| 12:37PM | 21 | Q. Is there any legitimate law enforcement reason that you |
| 12:37PM | 22 | know of for the defendant to have had this subpoena return |
| 12:37PM | 23 | for a subpoena that you issued related to Mark Vitale in his |
| 12:37PM | 24 | basement after he retired? |
| 12:37PM | 25 | **MR. SINGER:** Objection, speculation. |

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

| | | |
|---|---|---|
| 12:37PM | 1 | **THE COURT:** Overruled. |
| 12:37PM | 2 | **BY MR. COOPER:** |
| 12:37PM | 3 | Q. Any legitimate law enforcement reason for that, sir? |
| 12:38PM | 4 | A. No. |
| 12:38PM | 5 | **MR. COOPER:** You can take that down, Ms. Champoux. |
| 12:38PM | 6 | **BY MR. COOPER:** |
| 12:38PM | 7 | Q. I want to speak with you now briefly about a person named |
| 12:38PM | 8 | Tom Mozg. Do you know that person? |
| 12:38PM | 9 | A. Yes. |
| 12:38PM | 10 | Q. Is it your understanding that he works as an intelligence |
| 12:38PM | 11 | agent for Customs and Border Protection? |
| 12:38PM | 12 | A. Yes, for the border patrol. |
| 12:38PM | 13 | Q. Okay. Was there a time in the summer of 2016 where you |
| 12:38PM | 14 | attended a meeting with Tom Mozg about a target he was |
| 12:38PM | 15 | investigating named Joe Bella? |
| 12:38PM | 16 | A. Yes. |
| 12:38PM | 17 | Q. Generally during that meeting, did Tom Mozg share |
| 12:38PM | 18 | information with you that he had into in his investigation |
| 12:38PM | 19 | into Bella? |
| 12:38PM | 20 | A. Yes. |
| 12:38PM | 21 | Q. Had he started to work up kind of contacts about who |
| 12:38PM | 22 | Bella was in contact with? |
| 12:38PM | 23 | A. Yes. It was a, like, an organizational chart that we do |
| 12:39PM | 24 | during investigations, showing targets and how they're |
| 12:39PM | 25 | related to each other. And there were numerous targets on |

12:39PM     1    there, and Joe Bella was part of it.

12:39PM     2    Q.  Okay.  Did the defendant end up coming to that meeting?

12:39PM     3    A.  Yes.

12:39PM     4    Q.  Did he mention during that meeting whether he knew Joe

12:39PM     5    Bella or anything about that?

12:39PM     6    A.  No.

12:39PM     7    Q.  Did he mention that he saw Joe Bella socially at The

12:39PM     8    Crocodile Bar?

12:39PM     9    A.  No.

12:39PM    10         **MR. SINGER:**  Objection to the form of the question.

12:39PM    11         **MR. COOPER:**  I'm asking --

12:39PM    12         **MR. SINGER:**  Assumes a fact not in evidence.

12:39PM    13         **MR. COOPER:**  I'm asking if the defendant said

12:39PM    14    something during a meeting.  That's the only way to find out.

12:39PM    15         **THE COURT:**  Overruled.

12:39PM    16         **BY MR. COOPER:**

12:39PM    17    Q.  Did the defendant, when he walked into the meeting, say,

12:39PM    18    hey, Tom, your target of investigation, I see him sometimes

12:39PM    19    socially at The Crocodile Bar?

12:39PM    20         **MR. SINGER:**  Objection to the form of the question.

12:39PM    21    Seeing him socially, Judge, that wasn't established in the

12:39PM    22    evidence.

12:39PM    23         **THE COURT:**  Whether it was established or not, he's

12:39PM    24    asking whether the defendant said that to him.

12:39PM    25         So, and the jury understands that that facts assumed

| | | |
|---|---|---|
| 12:39PM | 1 | in a question, and I've instructed them before and I'll |
| 12:39PM | 2 | instruct them again, and I'll instruct them right now, facts |
| 12:40PM | 3 | that are assumed in a question are not necessarily true |
| 12:40PM | 4 | because they're assumed in the question.  Okay? |
| 12:40PM | 5 | So the question is:  Did the defendant say that he |
| 12:40PM | 6 | saw Joe Bella socially in The Crocodile Bar? |
| 12:40PM | 7 | The objection to that question is overruled. |
| 12:40PM | 8 | **BY MR. COOPER:** |
| 12:40PM | 9 | Q.  Did he say that during the meeting, sir? |
| 12:40PM | 10 | A.  No. |
| 12:40PM | 11 | Q.  Did he say anything about knowing Joe Bella at all during |
| 12:40PM | 12 | the meeting? |
| 12:40PM | 13 | A.  No. |
| 12:40PM | 14 | Q.  During the course of your career, Special Agent Casullo, |
| 12:40PM | 15 | have you ever had an agent mention during a deconfliction |
| 12:40PM | 16 | meeting or an intelligence-sharing meeting that they knew a |
| 12:40PM | 17 | subject or a target, or had seen them at a bar or a social |
| 12:40PM | 18 | setting? |
| 12:40PM | 19 | A.  Yeah, I've had that come up before. |
| 12:40PM | 20 | Q.  Okay.  Is it common for an agent to bring that up during |
| 12:40PM | 21 | a meeting like that, if it happens? |
| 12:40PM | 22 | A.  If it happened, it would be common for them to mention |
| 12:41PM | 23 | that they know a certain individual. |
| 12:41PM | 24 | Q.  Okay. |
| 12:41PM | 25 | A.  If a name comes up or you know someone during an |

12:41PM    1    investigation, yes.

12:41PM    2    Q.  Do drugs sometimes get distributed at bars?

12:41PM    3    A.  To the best of my knowledge and experience, yes.

12:41PM    4    Q.  Has that come up during some of your DEA investigations

12:41PM    5    in your career?

12:41PM    6    A.  It has for me in my career.

12:41PM    7    Q.  All right.  Let's move on from that, and let's talk about

12:41PM    8    Peter Gerace, okay?

12:41PM    9    A.  Yes.

12:41PM    10   Q.  Do you know who Peter Gerace is?

12:41PM    11   A.  Yes, I do.

12:41PM    12   Q.  How do you know who Peter Gerace is?

12:41PM    13   A.  I know Peter Gerace because I graduated from Saint Joe's

12:41PM    14   High School with him in 1985.

12:41PM    15   Q.  Okay.  When you went to high school, between 1981 and

12:41PM    16   1985, were you friends with Peter Gerace?

12:41PM    17   A.  No.

12:41PM    18   Q.  After you graduated from high school, when you were in

12:41PM    19   your late teens and early 20s, were you friends with Peter

12:41PM    20   Gerace?

12:41PM    21   A.  No.

12:41PM    22   Q.  In your mid 20s, were you friends with Peter Gerace?

12:41PM    23   A.  No.

12:41PM    24   Q.  How about your late 20s, sir?

12:41PM    25   A.  No.

```
12:41PM   1   Q.  When you were in your early 30s, were you friends with

12:41PM   2   Peter Gerace?

12:41PM   3   A.  No.

12:41PM   4   Q.  How about your mid 30s?

12:41PM   5   A.  No.

12:41PM   6   Q.  How about your late 30s?

12:41PM   7   A.  No.

12:41PM   8          MR. SINGER:  Objection, Judge.  I think we get the

12:41PM   9   idea.

12:41PM  10          THE COURT:  Sustained.

12:41PM  11          BY MR. COOPER:

12:41PM  12   Q.  At any point in your entire life, sir, have you ever been

12:42PM  13   friends with Peter Gerace?

12:42PM  14          MR. SINGER:  Objection.  Cumulative.

12:42PM  15          MR. COOPER:  It's a different question.

12:42PM  16          THE COURT:  No, no, that is a different question.

12:42PM  17          BY MR. COOPER:

12:42PM  18   Q.  I'll ask again.  Sir, at any point during your -- how old

12:42PM  19   are you?

12:42PM  20   A.  I am 57.

12:42PM  21   Q.  At any point in the 57 years that you've been on planet

12:42PM  22   Earth, have you ever been friends with Peter Gerace?

12:42PM  23   A.  No.

12:42PM  24   Q.  Do you have a family member who's friends with Peter

12:42PM  25   Gerace?
```

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

12:42PM   1   A.  Yes.

12:42PM   2   Q.  Who's that family member?

12:42PM   3   A.  My wife's brother, Phil Domiano, is friends with Peter

12:42PM   4   Gerace.

12:42PM   5   Q.  Can you describe your relationship with Mr. Domiano?

12:42PM   6   A.  I do not have a talking -- I -- I do not have a

12:42PM   7   relationship with Phil Domiano.  We don't talk.  He's not

12:42PM   8   allowed at our house.  And I haven't seen him in years.

12:42PM   9       And my wife won't even bring up his name in front of me.

12:42PM  10   Q.  Do you know or believe Mr. Domiano to associate with

12:43PM  11   people that you don't approve of?

12:43PM  12   A.  Yes, I believe so.

12:43PM  13   Q.  Has your relationship with Mr. Domiano influenced how you

12:43PM  14   do your job at the DEA in any way?

12:43PM  15   A.  No.

12:43PM  16   Q.  While we're on the topic of Phil Domiano and Peter

12:43PM  17   Gerace, let's bring up Government Exhibit 99.

12:43PM  18           MR. COOPER:  Ms. Champoux, can you zoom in on the top

12:43PM  19   one third of this document down to the exhibit sticker?

12:43PM  20           You've got to get the very top, too, for me.  I'm

12:43PM  21   sorry.

12:43PM  22           BY MR. COOPER:

12:43PM  23   Q.  Have you seen this before today?

12:43PM  24   A.  When I testified before.

12:43PM  25   Q.  You've looked at this before, right?

12:43PM    1    A.  Yes.

12:43PM    2    Q.  Does this appear to be a DEA memorandum?

12:43PM    3    A.  Yes, it is.

12:43PM    4    Q.  Okay.  And what's the subject line of the memorandum?

12:43PM    5    A.  Communication with Peter Gerace by Special Agent Anthony

12:44PM    6    Casullo and Phil Domiano.

12:44PM    7    Q.  What's the date the memorandum was drafted?

12:44PM    8    A.  January 28th, 2019.

12:44PM    9    Q.  Now we're going to cover the comments in a little bit,

12:44PM   10    and the -- what you reported.

12:44PM   11        But by January 28th of 2019, had you already reported

12:44PM   12    that this defendant made race-related comments in front of

12:44PM   13    you?

12:44PM   14    A.  Yes.

12:44PM   15    Q.  You had already reported that?

12:44PM   16    A.  Yes.

12:44PM   17    Q.  Who wrote the memo?

12:44PM   18    A.  S.A. Joseph Bongiovanni.

12:44PM   19    Q.  And who did he send it to?

12:44PM   20    A.  To Edward A. Orgon, the resident agent in charge in

12:44PM   21    charge of the Buffalo office.

12:44PM   22        **MR. COOPER:**  You can zoom out of that, please,

12:44PM   23    Ms. Champoux.

12:44PM   24        Let's look at the second sen -- zoom in on the first

12:44PM   25    paragraph, please.

| | | |
|---|---|---|
| 12:44PM | 1 | **BY MR. COOPER:** |
| 12:45PM | 2 | Q.  Do you see the second sentence that says:  In that past, |
| 12:45PM | 3 | S.A. Bongiovanni has verbally informed you, my group |
| 12:45PM | 4 | supervisor Greg Yensan, and our ASAC David T. Zon, of |
| 12:45PM | 5 | information confirming the friendship of Domiano, Casullo, |
| 12:45PM | 6 | and Gerace; do you see that, sir? |
| 12:45PM | 7 | A.  I see that. |
| 12:45PM | 8 | Q.  Are you friends with Phil Domiano? |
| 12:45PM | 9 | A.  No. |
| 12:45PM | 10 | Q.  Is that a lie, when it's written in that report? |
| 12:45PM | 11 | A.  That is a lie. |
| 12:45PM | 12 | Q.  Are you friends with Peter Gerace, sir? |
| 12:45PM | 13 | A.  No. |
| 12:45PM | 14 | Q.  Is it a lie when it's written in this memorandum? |
| 12:45PM | 15 | A.  That is a lie. |
| 12:45PM | 16 | **MR. COOPER:**  We can zoom out of that paragraph, |
| 12:45PM | 17 | please, Ms. Champoux. |
| 12:45PM | 18 | Can you zoom in on the second paragraph, please? |
| 12:45PM | 19 | **BY MR. COOPER:** |
| 12:46PM | 20 | Q.  Do you see this?  Can you read this out loud for the |
| 12:46PM | 21 | jury? |
| 12:46PM | 22 | A.  Yes.  S.A. Bongiovanni has personally witnessed |
| 12:46PM | 23 | S.A. Casullo meeting and drinking socially with Peter Gerace |
| 12:46PM | 24 | alone at the Big Ditch Brewery and later at Tappo Italian |
| 12:46PM | 25 | Restaurant in Buffalo, New York at approximately 9:45 p.m. on |

12:46PM   1   the evening of June 13th, 2015.

12:46PM   2   Q.  Sir, is that the truth, or is that a lie?

12:46PM   3   A.  That is a lie.

12:46PM   4   Q.  Can you tell the jury what actually happened there?

12:46PM   5   A.  Yes, I can.

12:46PM   6   Q.  Explain it to them.

12:46PM   7   A.  So, on that date of June 13th, 2015, that, I believe, is

12:46PM   8   the date of my high school reunion for Saint Joe's.  It was

12:46PM   9   our 30-year reunion.

12:46PM  10       I was still working in New York City.  I would come home

12:46PM  11   on weekends when I could to visit my family.

12:46PM  12       On this particular weekend, we had our high school

12:46PM  13   reunion, which I attended.  While I was at the reunion, Peter

12:46PM  14   Gerace was there.  We probably had about 50 classmates that I

12:47PM  15   can remember, approximately, at the reunion.

12:47PM  16       At some point, Peter started talking to me.  And he had

12:47PM  17   mentioned that Bongiovanni was across the street at Tappo

12:47PM  18   Restaurant, and if I wanted to go see him.

12:47PM  19       And I said no, initially, I did not want to walk across

12:47PM  20   the street with Peter Gerace.

12:47PM  21       He mentioned it a second time.  Like, he asked me again

12:47PM  22   right after that, and I said no.

12:47PM  23       And then he mentioned that he's across the street with my

12:47PM  24   brother, let's just walk across the street.  It's right over

12:47PM  25   there.  Which it is, it is right across the street, and I

12:47PM    1    agreed.  I wanted to see with my own eyes that he was hanging

12:47PM    2    out with Anthony Gerace.

12:47PM    3        So I walked across the street with Peter.  We walked into

12:47PM    4    Tappo Restaurant.  And at the bar was sitting Joe Bongiovanni

12:47PM    5    and it was three or four other individuals that I didn't

12:47PM    6    recognize.

12:47PM    7        When we walked up to Joe, he looked extremely surprised

12:47PM    8    to see me.  It looked like he wanted to crawl under the bar.

12:48PM    9        He had said, what are you doing here, I thought you're

12:48PM    10   working in New York?

12:48PM    11       I said I am, I'm working in New York, and I'm home on the

12:48PM    12   weekend for my high school reunion.

12:48PM    13       I can't remember what he said right after that, but

12:48PM    14   shortly thereafter he said -- he introduced me to the other

12:48PM    15   people that he was with.  The first person that he introduced

12:48PM    16   me to, which was right next to him, was Anthony Gerace.

12:48PM    17       Anthony Gerace, this is Tony Casullo.

12:48PM    18       Looked at him -- I looked at him.  He tried to avoid eye

12:48PM    19   contact with me.  Shook his hand.

12:48PM    20       He introduced me to the other individuals who I can't

12:48PM    21   remember because I was kind of fixated on Anthony Gerace.

12:48PM    22   Shook their hands.

12:48PM    23       Had a couple moments of conversation.  I can't remember

12:48PM    24   how long.  Not long, maybe several minutes.

12:48PM    25       And Joe agreed to walk back across to our reunion.  I

12:48PM    1    said I want to get back to the reunion.  And me, Peter

12:48PM    2    Gerace, and Bongiovanni walked back over to Tappo's, there's

12:49PM    3    an outside area and an inside, I believe at the time.  The

12:49PM    4    reunion was in both locations, but most people were outside.

12:49PM    5    We walked back into the outside area.

12:49PM    6        I walked off into my group of friends, which were more

12:49PM    7    like the hockey guys that I played with.  And Bongiovanni

12:49PM    8    kind of faded off into a group with other people.  I remember

12:49PM    9    one particular individual that I went to high school with

12:49PM   10    that was a football player, I remember them hugging each

12:49PM   11    other because they must have known each other.

12:49PM   12        And, yeah, that's pretty much it.

12:49PM   13    Q.  When this sentence says that Special Agent Bongiovanni

12:49PM   14    witnessed you, Tony Casullo, drinking socially with Peter

12:49PM   15    Gerace alone, is that true?

12:49PM   16    A.  That's a lie.

12:49PM   17    Q.  Did that happen?

12:49PM   18    A.  No.

12:49PM   19    Q.  Who was alone drinking with Anthony Gerace?

12:49PM   20    A.  It was Joe Bongiovanni with Anthony Gerace and two or

12:49PM   21    three other individuals.

12:49PM   22        MR. COOPER:  You can zoom out of that, Ms. Champoux.

12:50PM   23    Take down Exhibit 99.  Thank you.

12:50PM   24        BY MR. COOPER:

12:50PM   25    Q.  During your time at the DEA, did you ever attempt to

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24    87

12:50PM   1   investigate Peter Gerace?

12:50PM   2   A.  Yes.

12:50PM   3   Q.  Did that investigation include Pharaoh's Gentlemen's

12:50PM   4   Club?

12:50PM   5   A.  Yes.

12:50PM   6   Q.  Was there actually something that was said to you by a

12:50PM   7   different person at your high school reunion that was a part

12:50PM   8   of what made you interested in investigating Peter Gerace?

12:50PM   9   A.  That was part of it.

12:50PM   10  Q.  Okay.  So that -- what someone else said to you, did that

12:50PM   11  form part of the reason why you pursued an investigation into

12:50PM   12  Peter?

12:50PM   13  A.  Oh, yes.

12:50PM   14  Q.  Can you tell the jury what that person said to you?

12:50PM   15  A.  I had one particular classmate who works for the district

12:50PM   16  attorney's office in a law enforcement capacity as a

12:50PM   17  prosecutor.  He had told me that --

12:50PM   18          MR. SINGER:  Objection, hearsay.

12:50PM   19          MR. COOPER:  Judge, I can come up?

12:50PM   20          THE COURT:  Well, so, this is being offered for the

12:50PM   21  reason why this witness did what he did in investigating Peter

12:50PM   22  Gerace.  It's not being offered for the truth.  So, again, you

12:50PM   23  can't assume that what the person said to him is true.  You're

12:51PM   24  being told this only insofar as it prompted this witness to do

12:51PM   25  something.  Okay?

12:51PM   1          The objection is sustained in part and overruled in

12:51PM   2   part.  We can go on.

12:51PM   3          **MR. COOPER:**  Thank you, Judge.

12:51PM   4          **BY MR. COOPER:**

12:51PM   5   Q.  Go on, tell them what this person said to you.

12:51PM   6   A.  So the one classmate who is a friend of mine from high

12:51PM   7   school also grew up in Tonawanda, anyways, he was a

12:51PM   8   prosecutor, may still be, at the District Attorney's Office.

12:51PM   9   He told me that he heard that Peter Gerace was videotaping

12:51PM  10   all the people coming in his club.

12:51PM  11          And I took it as in order to blackmail people.  He had

12:51PM  12   recordings of people with strippers, and he said Peter's

12:51PM  13   recording everybody that's going in there, you know.

12:51PM  14          I was, like, no, I didn't know that.

12:51PM  15          I had an another classmate tell me, screaming at me with

12:51PM  16   his group of friends that they were all gonna go to Pharaoh's

12:51PM  17   and snort coke off strippers' asses.

12:51PM  18   Q.  Is that something that you were gonna -- you were

12:51PM  19   interested in going to do?

12:52PM  20   A.  No.  No.

12:52PM  21   Q.  Not the social activity for you, sir?

12:52PM  22   A.  No.

12:52PM  23   Q.  Okay.  Did you hear people say that?

12:52PM  24   A.  I heard my classmate say it directly to me.  He actually

12:52PM  25   said, hey, Casullo, we're all going over to Pharaoh's to

12:52PM    1    sniff coke off strippers' asses.

12:52PM    2    Q.  Okay.  Did that impact your interest in investigating

12:52PM    3    Peter and Pharaoh's?

12:52PM    4    A.  Yes.

12:52PM    5    Q.  Did the fact that you went to high school with Peter have

12:52PM    6    anything to do with whether or not you were going to

12:52PM    7    investigate him?

12:52PM    8    A.  No.

12:52PM    9    Q.  Were you his friend?

12:52PM    10   A.  No.

12:52PM    11   Q.  What year did you begin your investigation into Peter

12:52PM    12   Gerace?

12:52PM    13   A.  It was, I believe, the summer of 2016.  Maybe June of

12:52PM    14   2016, approximately.

12:52PM    15   Q.  So just to get this timeline squared aware here, you

12:52PM    16   arrived in the Buffalo resident office at the very end of

12:52PM    17   2015; is that right?

12:52PM    18   A.  It was September of 2015.

12:52PM    19   Q.  Okay.  So the fall of 2015?

12:52PM    20   A.  Yes.

12:52PM    21   Q.  Okay.  And so within your first year in the Buffalo

12:53PM    22   office, you begin an investigation into Peter Gerace; is that

12:53PM    23   correct?

12:53PM    24   A.  Yes.

12:53PM    25   Q.  Were you aware at the time you began that investigation

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

90

| | | |
|---|---|---|
| 12:53PM | 1 | that Mr. Gerace had previously been convicted of a felony? |
| 12:53PM | 2 | A.  Yes. |
| 12:53PM | 3 | Q.  When you first began that investigation into Peter |
| 12:53PM | 4 | Gerace, what investigative step did you take? |
| 12:53PM | 5 | A.  Before I did anything, I mentioned it to my supervisor, |
| 12:53PM | 6 | Greg Yensan. |
| 12:53PM | 7 | I mentioned, hey, how do you feel about if we take a look |
| 12:53PM | 8 | at start investigating Peter Gerace?  And he said he thought |
| 12:53PM | 9 | it was a good idea.  That we may -- |
| 12:53PM | 10 | **MR. SINGER:**  Objection, hearsay. |
| 12:53PM | 11 | **MR. COOPER:**  Judge, I don't even think it's offered |
| 12:53PM | 12 | for its truth, it's about how he got to be investigating |
| 12:53PM | 13 | Peter. |
| 12:53PM | 14 | **THE COURT:**  Hang on. |
| 12:53PM | 15 | Well, why don't you answer the question he asked, |
| 12:54PM | 16 | which is:  What investigative steps did you take? |
| 12:54PM | 17 | **MR. COOPER:**  I'll ask some more specific questions |
| 12:54PM | 18 | and see if we can avoid -- we'll just get through it. |
| 12:54PM | 19 | **BY MR. COOPER:** |
| 12:54PM | 20 | Q.  Did you, when you decided to investigate Peter Gerace, go |
| 12:54PM | 21 | and discuss that with your supervisor? |
| 12:54PM | 22 | A.  Yes. |
| 12:54PM | 23 | Q.  Why did you do that, sir? |
| 12:54PM | 24 | A.  Because when you start an investigation, you as the agent |
| 12:54PM | 25 | you have freedom -- in my experience, had the freedom to open |

12:54PM  1   the investigation.  But you coordinated that with your

12:54PM  2   supervisor.

12:54PM  3       And I've worked in an acting capacity as a supervisor for

12:54PM  4   many years.  A supervisor does not want to be blinded by an

12:54PM  5   investigation that they're not even aware of, or an

12:54PM  6   investigation that's open.  They want to be aware, like most

12:54PM  7   supervisors.

12:54PM  8       So in the normal course of business, I had that

12:54PM  9   discussion with my supervisor.  Hey, what do you think about

12:54PM 10   this?  What's your opinion?  Because this is what I'd like to

12:54PM 11   do.  I'd like to start looking into this, his club, and him.

12:54PM 12       And he agreed.  He said, I don't know if we will seize a

12:55PM 13   lot of drugs directly from Gerace.  I don't consider him,

12:55PM 14   like, a higher-level trafficker, and this is Greg talking,

12:55PM 15   but that through the investigation hopefully we can identify

12:55PM 16   a source of supply.  And, yeah, that we should look into

12:55PM 17   this.

12:55PM 18   Q.  Is that what you do at the DEA is work your way up

12:55PM 19   towards sources of supply?

12:55PM 20   A.  Yes.

12:55PM 21   Q.  You want to get the bigger drug targets?

12:55PM 22   A.  Yes.

12:55PM 23   Q.  Okay.  At some point, did you make a determination that

12:55PM 24   you were going to subpoena Peter Gerace's phone records?

12:55PM 25   A.  Yeah, and I mentioned that to Greg as well.

| | | |
|---|---|---|
| 12:55PM | 1 | **THE COURT:** Mr. Cooper, when it's a good time to |
| 12:55PM | 2 | break, we should break. |
| 12:55PM | 3 | **MR. COOPER:** 10/4, Judge. |
| 12:55PM | 4 | **THE COURT:** Now? |
| 12:55PM | 5 | **MR. COOPER:** Yes, sir. |
| 12:55PM | 6 | **THE COURT:** Let's do it. Remember my instructions. |
| 12:55PM | 7 | And look it, I'm as sick of saying this just as you |
| 12:55PM | 8 | are of hearing this, but I do it because it's so darn |
| 12:56PM | 9 | important. |
| 12:56PM | 10 | Don't communicate about the case with anyone. Don't |
| 12:56PM | 11 | read, watch, or listen to any news coverage, if there is any, |
| 12:56PM | 12 | while the case is in progress. And don't make up your mind |
| 12:56PM | 13 | until you finally start deliberating. |
| 12:56PM | 14 | See you back here at 2:00. Thanks. |
| 12:56PM | 15 | (Jury excused at 12:56 p.m.) |
| 12:57PM | 16 | **THE COURT:** Okay. Anything before we break? |
| 12:57PM | 17 | **MR. COOPER:** No, thank you. |
| 12:57PM | 18 | **THE COURT:** Anything before we break? |
| 12:57PM | 19 | **MR. SINGER:** No, Your Honor. |
| 12:57PM | 20 | **THE COURT:** Okay. Mr. Casullo, please do not discuss |
| 12:57PM | 21 | anything about your testimony with anyone during the break. |
| 12:57PM | 22 | **THE WITNESS:** Yes, Judge. |
| 12:57PM | 23 | **THE COURT:** Okay. See you back at 2:00. |
| 12:57PM | 24 | **MR. COOPER:** Thank you, Judge. |
| 12:57PM | 25 | **THE CLERK:** All rise. |

| | | |
|---|---|---|
| 12:57PM | 1 | (Off the record at 12:57 p.m.) |
| 02:06PM | 2 | (Back on the record at 2:06 p.m.) |
| 02:06PM | 3 | (Jury not present.) |
| 02:06PM | 4 | **THE CLERK:**  All rise. |
| 02:06PM | 5 | **THE COURT:**  Please be seated. |
| 02:06PM | 6 | **THE CLERK:**  We are back on the record for the |
| 02:06PM | 7 | continuation of the jury trial in case number 19-cr-227, |
| 02:06PM | 8 | United States of America versus Joseph Bongiovanni. |
| 02:06PM | 9 | All counsel and parties are present. |
| 02:06PM | 10 | **THE COURT:**  Ready to go? |
| 02:06PM | 11 | **MR. COOPER:**  Yes, Judge. |
| 02:06PM | 12 | **THE COURT:**  Anything? |
| 02:06PM | 13 | **MR. SINGER:**  No, Judge. |
| 02:06PM | 14 | **THE COURT:**  Okay.  Great.  Let's bring them in, |
| 02:06PM | 15 | please. |
| 02:08PM | 16 | (Jury seated at 2:08 p.m.) |
| 02:08PM | 17 | **THE COURT:**  The record will reflect that all our |
| 02:08PM | 18 | jurors are present. |
| 02:08PM | 19 | I remind the witness that he's still under oath. |
| 02:08PM | 20 | And, Mr. Cooper, you may continue. |
| 02:08PM | 21 | **MR. COOPER:**  Thank you, Judge. |
| 02:08PM | 22 | **BY MR. COOPER:** |
| 02:08PM | 23 | Q.  Special Agent Casullo, before the break, we had covered a |
| 02:08PM | 24 | bunch of different DARTS deconfliction notices, and I think |
| 02:08PM | 25 | the first one that we covered -- I kind of lost my place, and |

02:08PM  1   I want to pivot back to that real quick.

02:08PM  2            MR. COOPER:  Ms. Champoux, if we can pull up 26E as

02:08PM  3   in echo.

02:08PM  4            And then on the right side of the screen, ma'am, can

02:08PM  5   you pull up Government Exhibit 8A.

02:08PM  6            BY MR. COOPER:

02:08PM  7   Q.  So on the left side of your screen, Special Agent

02:09PM  8   Casullo, can you see this was that first DARTS deconfliction

02:09PM  9   that we looked at that looks like it was forwarded from the

02:09PM  10  defendant to Greg Yensan on August 21st of 2018?

02:09PM  11  A.  Correct.

02:09PM  12           MR. COOPER:  Ms. Champoux, can we scroll down the

02:09PM  13  next page, please?  Thank you.

02:09PM  14           BY MR. COOPER:

02:09PM  15  Q.  So earlier I had you look at the first set of Trinity

02:09PM  16  items in the first set of deconflictions.  I want to --

02:09PM  17           MR. COOPER:  Stop scrolling.  Can we go back down.

02:09PM  18  Thank you.

02:09PM  19           BY MR. COOPER:

02:09PM  20  Q.  -- I want to focus you in now on this next Trinity item

02:09PM  21  that I just circled.  Do you see the phone number there,

02:09PM  22  716-812-0664?

02:09PM  23  A.  Yes.

02:09PM  24  Q.  Okay.  And is that the phone number that's being entered

02:09PM  25  into DARTS that's causing the conflict that we see inside the

02:09PM    1    box here?

02:09PM    2    A.  Yes.

02:09PM    3    Q.  Okay.

02:09PM    4         MR. COOPER:  Ms. Champoux, on Exhibit 8A, if you can

02:09PM    5    go to page 134, please.  And can you move the cursor, ma'am?

02:10PM    6    Thank you.

02:10PM    7         BY MR. COOPER:

02:10PM    8    Q.  Do you see, Special Agent Casullo, the name down here

02:10PM    9    that's associated with this subscriber information subpoena

02:10PM   10    return?

02:10PM   11    A.  Yes.

02:10PM   12    Q.  What's the name?

02:10PM   13    A.  Michael Masecchia.

02:10PM   14    Q.  And down here where it lists account contact numbers,

02:10PM   15    what's the phone number that's listed?

02:10PM   16    A.  716-812-0664.

02:10PM   17    Q.  And if we pivot back now to Government Exhibit 26E, is

02:10PM   18    this a deconfliction for Mike Masecchia's phone number?

02:10PM   19    A.  Yes.

02:10PM   20    Q.  Did Curtis Ryan run that number on August 21st of 2018?

02:10PM   21    A.  Yes, he did?

02:10PM   22    Q.  Before that, are there entries for Mike Masecchia's phone

02:10PM   23    number into DARTS in case file number C2-13-0026?

02:10PM   24    A.  Yes.

02:10PM   25    Q.  Did those occur in March and April of 2013?

02:10PM  1    A.  Yes.

02:10PM  2    Q.  Are those entered by an intel analyst on behalf of

02:11PM  3    Special Agent Bongiovanni?

02:11PM  4    A.  Yes.

02:11PM  5    Q.  Does that show up as a number that's in contact with this

02:11PM  6    Ron Serio phone number that we looked up earlier?

02:11PM  7    A.  I can't remember Serio's number, but it's 716-830-3226.

02:11PM  8    Q.  Okay.  And so if we looked that up earlier and that was

02:11PM  9    Serio's number, that would be saying this Mike Masecchia

02:11PM  10   number on the top here was in contact with this 830-3226

02:11PM  11   phone number; is that right?

02:11PM  12   A.  Correct.

02:11PM  13        **MR. COOPER:**  All right.  Thanks, Ms. Champoux.  You

02:11PM  14   can take those two down now.

02:11PM  15        **BY MR. COOPER:**

02:11PM  16   Q.  All right.  And then pivoting back to where we left off,

02:11PM  17   excuse me, we spoke about your investigation into Peter

02:11PM  18   Gerace; do you remember I was talking about that?

02:11PM  19   A.  Yes.

02:11PM  20   Q.  Now earlier you mentioned that part of the predication

02:11PM  21   for your investigation, some of the things that led you to

02:11PM  22   initiate that investigation, were some comments that were

02:11PM  23   made by your classmates at your reunion; do you remember

02:12PM  24   that?

02:12PM  25   A.  Yes.

02:12PM  1    Q.  Now your reunion, wasn't that before you came back to

02:12PM  2    Buffalo?

02:12PM  3    A.  Yes.

02:12PM  4    Q.  Okay.  So when you hear those things, are you still

02:12PM  5    working at the New York City office?

02:12PM  6    A.  Yes.

02:12PM  7    Q.  Were you planning to come back to Buffalo when you were

02:12PM  8    at that reunion?

02:12PM  9    A.  I hadn't heard yet.  I mean, the plan was all along to

02:12PM  10   come back to Buffalo.  But at that point, I had no idea when

02:12PM  11   I was coming back.

02:12PM  12   Q.  Okay.  And so my question was at the time you're hearing

02:12PM  13   those things from your classmates, is it your hope to one day

02:12PM  14   come back and work in the Buffalo office?

02:12PM  15   A.  Yes.

02:12PM  16   Q.  But at the time, were you still in New York City?

02:12PM  17   A.  Yes.

02:12PM  18   Q.  Did you file that information away in your brain in case

02:12PM  19   you came back to work in Buffalo?

02:12PM  20   A.  Oh, I remembered.

02:12PM  21   Q.  Okay.  And when you came back in fall of 2015, and you

02:12PM  22   started working in Buffalo, did you still remember what had

02:12PM  23   happened months earlier in the class reunion?

02:12PM  24   A.  Oh, sure.

02:12PM  25   Q.  Okay.  Now, where we left off, I was talking about

02:12PM   1   Gerace's phone records; do you remember that?

02:12PM   2   A.  Yes.

02:12PM   3   Q.  Did you make a decision that you were going to subpoena

02:13PM   4   Peter Gerace's phone records?

02:13PM   5   A.  I did.

02:13PM   6   Q.  Okay.  And did you have a discussion with your supervisor

02:13PM   7   about doing that?

02:13PM   8   A.  Yes.

02:13PM   9   Q.  Tell this jury why you decided to talk to your supervisor

02:13PM  10   about pulling Peter Gerace's phone records.

02:13PM  11   A.  Again, if you're going to start an investigation, a new

02:13PM  12   investigation, you should talk to the supervisor so they know

02:13PM  13   what's going on so they're not blindsided by some subpoena

02:13PM  14   that comes across their desk or information that comes across

02:13PM  15   their desk.

02:13PM  16       If I were to complete the online process to do a

02:13PM  17   subpoena, it would have to be approved by a supervisor.  So

02:13PM  18   he needed to be aware of what was going on.

02:13PM  19       And also, genuinely, I wanted his opinion on it as well,

02:13PM  20   and any feedback that he could give.

02:13PM  21   Q.  Did there come a time when discussing Peter Gerace's

02:13PM  22   phone records with your supervisor that the defendant

02:13PM  23   Mr. Bongiovanni came up?

02:13PM  24   A.  Did his phone number come up?

02:13PM  25   Q.  No.  Did you discuss with your supervisor Mr. Bongiovanni

02:13PM    1    in the context of Peter Gerace's phone records?

02:13PM    2    A.   Yeah.   Before I subpoenaed the numbers, I had a

02:14PM    3    conversation with Greg.

02:14PM    4    Q.   Can you describe your conversation with Greg to this jury

02:14PM    5    about before you subpoenaed the phone numbers that involved

02:14PM    6    this defendant.

02:14PM    7    A.   Yes.

02:14PM    8         MR. SINGER:   Judge, I'd just want to -- I object to

02:14PM    9    hearsay.   If Mr. Casullo is going to share what he said to

02:14PM   10    Yensan, that's allowable.   But I just want to make sure we're

02:14PM   11    not talking about what Yensan said back.

02:14PM   12         THE COURT:   I'm not sure why -- why is -- why there a

02:14PM   13    difference between what he said and what Yensan said?

02:14PM   14         MR. COOPER:   If we're going to argue it, I'd ask that

02:14PM   15    we come up to the bench.

02:14PM   16         THE COURT:   Okay.  Yeah, come on up.

02:14PM   17         (Sidebar discussion held on the record.)

02:14PM   18         MR. SINGER:   So if you remember back at the last

02:14PM   19    trial, Mr. Casullo sometimes goes on for a little while.

02:14PM   20         THE COURT:   I know.  Yeah, he's doing that now.

02:14PM   21         MR. SINGER:   So if he's testifying about -- about I

02:14PM   22    told Greg Yensan X, Y, Z --

02:14PM   23         THE COURT:   Yes.

02:14PM   24         MR. SINGER:   -- I don't have an objection to that.

02:14PM   25    He's here, I can cross-examine him.

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

02:14PM   1          But if he's talking about what Yensan said in he

02:14PM   2   response, that's the problem, Judge, that's hearsay.

02:14PM   3          **THE COURT:**  They're both hearsay.  They're both

02:14PM   4   hearsay.

02:15PM   5          **MR. COOPER:**  So here's the reason.

02:15PM   6          **THE COURT:**  Go ahead.

02:15PM   7          **MR. COOPER:**  It impacts -- the discussions that he

02:15PM   8   has with his supervisor are contexts surrounding the decision

02:15PM   9   to order the phone records, and things that come up

02:15PM  10   afterwards.  There's no question that it's gonna come up that

02:15PM  11   the defendant's phone shows up in Peter Gerace's tolls.

02:15PM  12   There's gonna be -- there's gonna be extensive direct and

02:15PM  13   extensive cross on the consternation that that caused by the

02:15PM  14   defendant.

02:15PM  15          The fact that Mr. Casullo discussed that with his

02:15PM  16   supervisor in advance is probative.

02:15PM  17          What Tony says to his supervisor is, hey, I think,

02:15PM  18   you know, I expect, in sum and substance, hey, Bongiovanni's

02:15PM  19   phone number might show up if I order these records.  Is it

02:15PM  20   okay if I do that?

02:15PM  21          **THE COURT:**  Hang on.

02:15PM  22          **MR. SINGER:**  So, yeah, I don't have an issue, and I

02:15PM  23   didn't object last time to him sharing the fact that his boss

02:15PM  24   that I have a concern that Joe might show up in these records

02:15PM  25   and, you know, he ran with it, and he reported it back to his

02:15PM 1   boss Joe did show up in the records.  Like, that's part of the

02:15PM 2   narrative.  I get that, Judge, and I didn't object to that.

02:16PM 3           **THE COURT:**  What's Yensan gonna say?

02:16PM 4           **MR. COOPER:**  So, I don't -- word for word, I don't

02:16PM 5   recall, so I'm not positive.  But I expect that what the

02:16PM 6   testimony will be is that Yensan says we'll deal with it, go

02:16PM 7   ahead and do it, which is a directive, it's not hearsay.

02:16PM 8           **THE COURT:**  Right, that's not hearsay.

02:16PM 9           **MR. SINGER:**  So I didn't object to that.

02:16PM 10          **THE COURT:**  (Indecipherable.)

02:16PM 11          **MR. COOPER:**  It didn't come in yet, I expect so.

02:16PM 12          **MR. SINGER:**  If that's the extent of it, then --

02:16PM 13          **THE COURT:**  Why don't you lead a little bit, because

02:16PM 14  he does go on and on.

02:16PM 15          **MR. COOPER:**  Sure.

02:16PM 16          **THE COURT:**  So why don't you lead -- you're going

02:16PM 17  gonna object to that?

02:16PM 18          **MR. SINGER:**  No, I won't object to leading.

02:16PM 19          **THE COURT:**  Let him lead to get this stuff in.

02:16PM 20          **MR. COOPER:**  Sure.

02:16PM 21          **MR. SINGER:**  Thank you.

02:16PM 22          (End of sidebar discussion.)

02:16PM 23          **THE COURT:**  Okay.  So the objection is withdrawn.

02:16PM 24  The question is withdrawn.  So let's ask another question.

        25

02:16PM    1              **BY MR. COOPER:**

02:16PM    2    Q.  Sure.  So Mr. Casullo, I'm going to ask you some leading

02:16PM    3    or more specific questions now, and just answer specifically

02:16PM    4    what I'm asking; is that fair?

02:16PM    5    A.  Yes.

02:16PM    6    Q.  Okay.  There came a time when you went to have a

02:16PM    7    discussion with Greg Yensan about the fact that you were

02:16PM    8    gonna be doing a subpoena for Peter Gerace's phone records,

02:16PM    9    right?

02:16PM   10    A.  Yes.

02:16PM   11    Q.  Okay.  And Greg Yensan at that time was your supervisor,

02:16PM   12    right?

02:16PM   13    A.  Correct.

02:16PM   14    Q.  And you told him, hey, I plan to run Peter Gerace's phone

02:17PM   15    records, right?

02:17PM   16    A.  Yes.

02:17PM   17    Q.  Did you tell Greg Yensan during that conversation that

02:17PM   18    you thought that this defendant's phone number might show up

02:17PM   19    in Peter Gerace's phone records?

02:17PM   20    A.  Yes.

02:17PM   21    Q.  Okay.  Did Greg Yensan respond to that?

02:17PM   22    A.  Yeah, he did.

02:17PM   23    Q.  Yes, he did?

02:17PM   24    A.  Yes, he did.

02:17PM   25    Q.  Did he give you a directive essentially that said go

02:17PM  1  ahead and do it, and we'll handle it?

02:17PM  2  A.  Yes.  He said run the -- order the tolls, and if his

02:17PM  3  phone number comes up, let me know.

02:17PM  4  Q.  At the time that you went to your supervisor, Greg

02:17PM  5  Yensan, and informed him that you were planning to do this

02:17PM  6  subpoena and that you thought the defendant's phone number

02:17PM  7  might show up in Peter Gerace's records, were you doing that

02:17PM  8  because you wanted to get the defendant in trouble?

02:17PM  9  A.  No.

02:17PM  10  Q.  Did you have any issue with the defendant at the time?

02:17PM  11  A.  No.

02:17PM  12  Q.  Did you ultimately issue a subpoena and get Peter

02:17PM  13  Gerace's phone records?

02:17PM  14  A.  I did.

02:17PM  15  Q.  Did Peter Gerace's phone records -- and, again, now we're

02:18PM  16  talking -- give me a timeframe here, this is when your

02:18PM  17  investigation is beginning?

02:18PM  18  A.  I think it was June of 2016, beginning of June.

02:18PM  19  Q.  Okay.  So in June of 2016 when you order Peter Gerace's

02:18PM  20  phone records by subpoena, did you see who he was in contact

02:18PM  21  with?

02:18PM  22  A.  I eventually did, yes.

02:18PM  23  Q.  Okay.  Did you get responses back from the subpoena?

02:18PM  24  A.  Got the response back from the subpoena, and then we

02:18PM  25  generated a list of the numbers that the Gerace number was in

02:18PM    1    contact with.

02:18PM    2    Q.  Okay.  Was the defendant's phone number one of the phone

02:18PM    3    numbers that Peter Gerace's phone was in contact with?

02:18PM    4    A.  Yes.

02:18PM    5    Q.  When you saw that the defendant and Mr. Gerace had been

02:18PM    6    in contact with one another, describe for the jury what you

02:18PM    7    did at that point.

02:18PM    8    A.  I brought it to Greg's attention.  I brought him the toll

02:18PM    9    records over, and said here.  Essentially.

02:18PM    10    Q.  Was that consistent with what he had asked you to do

02:18PM    11    during your prior conversion?

02:18PM    12    A.  Yes.

02:18PM    13    Q.  Was getting those records a part of your investigation

02:19PM    14    into Peter Gerace for drug trafficking?

02:19PM    15    A.  Yeah.  That's a normal part of investigations.  Getting

02:19PM    16    phone records to see who the person that you're looking at is

02:19PM    17    in contact with to get an idea of the drug-trafficking

02:19PM    18    organization, possible other criminals who

02:19PM    19    drug traffickers -- that your person that you're looking at

02:19PM    20    is in contact with.  That's the way investigators and

02:19PM    21    analysts start building out their investigation.

02:19PM    22    Q.  After you got that subpoena, saw the defendant's phone --

02:19PM    23    phone in contact with Peter Gerace's phone, and provided it

02:19PM    24    to your supervisor, Greg Yensan, did you notice a difference

02:19PM    25    in how the defendant started acting towards you?

02:19PM   1   A.  Oh, yes.

02:19PM   2   Q.  Can you describe that for the jury?

02:19PM   3   A.  Yeah.  Shortly thereafter, he essentially stopped talking

02:19PM   4   to me.  I could tell he was upset and he wasn't talking to

02:19PM   5   me.  And the prior to that, it wasn't like that.

02:19PM   6   Q.  Okay.  So, are you working in group D-57 at this time?

02:19PM   7   A.  Yes.

02:19PM   8   Q.  Is Joe Bongiovanni in group D-57?

02:19PM   9   A.  Yes.

02:19PM  10   Q.  Okay.  Is that about, give or take, about a dozen agents

02:19PM  11   and TFOs that work in the group?

02:20PM  12   A.  Yeah, maybe.

02:20PM  13   Q.  Okay.  So is that kind of a small number of people that

02:20PM  14   are working together?

02:20PM  15   A.  Yeah, I mean, that's a typical size of a group.  And we

02:20PM  16   were in a small space.

02:20PM  17   Q.  Do you see each other all the time at work?

02:20PM  18   A.  Daily.

02:20PM  19   Q.  You interact with each other frequently in a group like

02:20PM  20   that?

02:20PM  21   A.  Yeah.

02:20PM  22   Q.  Was it obvious to you that something was different

02:20PM  23   between you and the defendant after you ran that subpoena?

02:20PM  24   A.  Yeah, it was obvious to me.

02:20PM  25   Q.  Was it comfortable for you?

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

02:20PM   1   A.  No, it was uncomfortable.  I hadn't even been back to the

02:20PM   2   office for a year.  I had worked a prior case with him that

02:20PM   3   was extremely successful, so yeah, it was uncomfortable.

02:20PM   4   Q.  Did you want to try to clear the air, so to speak?

02:20PM   5   A.  Yeah.  Yeah.  I wasn't looking to get him into trouble.

02:20PM   6   I was targeting an individual, or beginning to.  And I wasn't

02:20PM   7   trying to get anybody in trouble.

02:20PM   8   Q.  Describe for the jury what you did to try to clear the

02:20PM   9   air.

02:20PM   10  A.  I asked him if he'd be willing to speak with me in the

02:20PM   11  conference room.  In our group -- in our group, which is

02:20PM   12  maybe 12 desks, and then a supervisor's office, there's also

02:21PM   13  a conference room off to the side that had a closed door.

02:21PM   14  Q.  So you've described for the jury here that after you run

02:21PM   15  this subpoena, there's a noticeable difference in how the

02:21PM   16  defendant interacts with you; is that correct?

02:21PM   17  A.  Yes.

02:21PM   18  Q.  After that noticeable difference starts, do you ask the

02:21PM   19  defendant if he'll come and speak with you about it?

02:21PM   20  A.  I did.  I asked -- I asked him if he'd be willing to talk

02:21PM   21  to me in the conference room, and he agreed.

02:21PM   22  Q.  And we're going to go into some detail about that

02:21PM   23  conversation.  But before we get there, does that day and

02:21PM   24  that conversation, does that stick out in your mind?

02:21PM   25  A.  Yes.

| | | |
|---|---|---|
| 02:21PM | 1 | Q.  We're talking about the summer of 2016, right? |
| 02:21PM | 2 | A.  Yes. |
| 02:21PM | 3 | Q.  It's 2024, it's eight years later.  Is it still fresh in |
| 02:21PM | 4 | your mind? |
| 02:21PM | 5 | A.  I still remember it well. |
| 02:21PM | 6 | Q.  When you went over and asked the defendant if he'd be |
| 02:21PM | 7 | willing to speak with you, did he agree? |
| 02:21PM | 8 | A.  He agreed. |
| 02:21PM | 9 | Q.  Where did the conversation occur? |
| 02:21PM | 10 | A.  In the conference room.  We walked into the conference |
| 02:21PM | 11 | room. |
| 02:21PM | 12 | Q.  Was there anybody else in there at the time? |
| 02:21PM | 13 | A.  No, it was just Joe and I.  And I shut the door, so the |
| 02:22PM | 14 | door was closed. |
| 02:22PM | 15 | Q.  Did you invite anyone else in? |
| 02:22PM | 16 | A.  No. |
| 02:22PM | 17 | Q.  Did you want it to be a private conversation? |
| 02:22PM | 18 | A.  Yes. |
| 02:22PM | 19 | Q.  You mentioned that you shut the door; is that correct? |
| 02:22PM | 20 | A.  That's correct. |
| 02:22PM | 21 | Q.  Once you shut the door, who spoke first? |
| 02:22PM | 22 | A.  It was me.  I told him that I didn't want him -- I |
| 02:22PM | 23 | noticed that he was upset, and that I wasn't trying to get |
| 02:22PM | 24 | him in trouble essentially.  I ordered the records, but I'm |
| 02:22PM | 25 | not trying to get you in any type of trouble. |

02:22PM    1    Q.  When you said those words to the defendant, did the

02:22PM    2    defendant respond?

02:22PM    3    A.  He did.

02:22PM    4    Q.  I want to take this step by step, so just one thing at a

02:22PM    5    time.  Tell the jury, what was the first thing the defendant

02:22PM    6    said to you when you mentioned to him you weren't trying to

02:22PM    7    get him in trouble?

02:22PM    8    A.  He said this is bullshit.

02:22PM    9    Q.  Was he calm when he said that?

02:22PM    10   A.  No, he was upset.  He was visibly upset.

02:22PM    11   Q.  Upset, like he was crying?  Or upset, like he was angry?

02:22PM    12   A.  No, he wasn't crying.  He was like, angry upset.

02:23PM    13   Q.  When he said this is bullshit, was his voice -- tone of

02:23PM    14   voice, like volume, conversational or elevated?

02:23PM    15   A.  No, it was elevated.  He wasn't screaming, but it was

02:23PM    16   elevated.

02:23PM    17   Q.  After the defendant says to you this is bullshit, in an

02:23PM    18   elevated voice, who's the next person to speak after that?

02:23PM    19   You or him?

02:23PM    20   A.  It was him.

02:23PM    21   Q.  What did he say after that?

02:23PM    22   A.  He said, that kid called me when a stripper overdosed in

02:23PM    23   his club.  And I told him to get her out of there.

02:23PM    24   Q.  Was the defendant worked up when he said that to you?

02:23PM    25   A.  Yes.

02:23PM   1    Q.  Was he elevated?

02:23PM   2    A.  Yes.

02:23PM   3    Q.  Was he angry?

02:23PM   4    A.  Yeah, he was definitely excited.

02:23PM   5    Q.  You mentioned that the defendant said to you, that kid

02:23PM   6    called me.

02:23PM   7        In the context of your conversation, who was "that kid"

02:23PM   8    referring to?

02:23PM   9    A.  Peter Gerace.

02:23PM   10   Q.  Do those -- were those his exact words to the best of

02:23PM   11   your ability?

02:23PM   12   A.  Yes.

02:23PM   13   Q.  Does that stand out in your memory eight years later?

02:23PM   14   A.  Oh, it does.  I mean, even the word "kid."  Calling

02:23PM   15   someone a kid, but yes.

02:24PM   16   Q.  After the defendant told you, that kid called me when a

02:24PM   17   stripper overdosed, and I told him to get her out of there,

02:24PM   18   what -- what was your immediate reaction to hearing that?

02:24PM   19   A.  Just shock.  Trying to process what he had just said.

02:24PM   20   Why he had just said that.  It came completely unsolicited.

02:24PM   21   And I was blindsided.

02:24PM   22   Q.  When you walked into the conference room to try to clear

02:24PM   23   the air, were you expecting that -- that type of topic to

02:24PM   24   come up?

02:24PM   25   A.  No, not at all.

02:24PM   1    Q.  Were you taken aback by that?

02:24PM   2    A.  Yes.  I was reeling, is a good way to describe it.

02:24PM   3    Q.  After the defendant said that Peter Gerace, or that kid,

02:24PM   4    had called him when a stripper overdosed, and he told him to

02:24PM   5    get her out of there, who spoke next?  You or the defendant?

02:24PM   6    A.  He did.

02:24PM   7    Q.  What did he say after that?

02:24PM   8    A.  He said, isn't he friends with your brother-in-law?

02:24PM   9    Referring to my wife's brother, Phil Domiano.

02:24PM   10   Q.  That's break that down.

02:24PM   11       Isn't he friends with your brother-in-law; who's the "he"

02:24PM   12   in that sentence?

02:24PM   13   A.  Gerace.

02:24PM   14   Q.  Okay.  And when the defendant said, isn't he friends with

02:25PM   15   your brother-in-law, what was the defendant's tone of voice

02:25PM   16   when he said that to you?

02:25PM   17   A.  Very direct.  I mean, almost accusatory.  I -- I -- I

02:25PM   18   took it as what does that have to do with anything.

02:25PM   19   Q.  Was it phrased as a question?  Was it inquisitorial?

02:25PM   20   A.  More rhetorical.  Almost like accusatory.

02:25PM   21       Almost like, hey, if you want to start looking up phone

02:25PM   22   numbers and my name's brought up, then here you go.  He's

02:25PM   23   friends with your brother-in-law.

02:25PM   24       That's how I took it.

02:25PM   25   Q.  Who spoke next after the defendant said, isn't he friends

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

111

02:25PM   1   with your brother-in-law?

02:25PM   2   A.  I did.

02:25PM   3   Q.  What did you say?

02:25PM   4   A.  I said, yeah.  Yeah, he is.  And my brother-in-law's

02:25PM   5   caused me and my family a lot of problems in the past.

02:25PM   6   Q.  After you said that, who spoke next?

02:25PM   7   A.  Bongiovanni.

02:25PM   8   Q.  What did he say?

02:25PM   9   A.  He said, do you hate Italians?

02:25PM   10  Q.  Now you described what his demeanor was like when the

02:25PM   11  conversation started.  What was the defendant's demeanor like

02:26PM   12  when he said to you, do you hate Italians?

02:26PM   13  A.  He was still very direct, upset.

02:26PM   14  Q.  In the context of the conversation that you were having

02:26PM   15  with the defendant, what did you interpret his meaning by, do

02:26PM   16  you hate Italians?

02:26PM   17  A.  His meaning was to me, Peter Gerace is Italian, and he

02:26PM   18  didn't want me to investigate Italians.  He didn't want me to

02:26PM   19  investigate Gerace, essentially.

02:26PM   20      He could say Italians, but it was Gerace, that's how I

02:26PM   21  took it.

02:26PM   22  Q.  Who spoke next, you or the defendant?

02:26PM   23  A.  I did.

02:26PM   24  Q.  And what did you say?

02:26PM   25  A.  And I said, no, no, I don't hate Italians.  I'm of

02:26PM    1   Italian descent, my wife is of Italian descent, my kids are,

02:26PM    2   my grandparents are.  I mean, that's ridiculous.  It's silly.

02:26PM    3       But it wasn't silly, because he had a point.

02:26PM    4   Q.  After you said no, I don't hate Italians.  My wife's

02:27PM    5   Italian, I'm Italian, who spoke next after that?

02:27PM    6   A.  He did.

02:27PM    7   Q.  What did the defendant say?

02:27PM    8   A.  He said a horrible racial slur and statement.

02:27PM    9   Q.  All right.  Special Agent Casullo, I'm going to ask you,

02:27PM   10   use the words that the defendant said -- withdrawn.

02:27PM   11       I'm going to ask you to recount what the defendant said

02:27PM   12   to you, but do not say the racial slur words in this

02:27PM   13   courtroom.  But recount for the jury what the defendant said

02:27PM   14   to you at that part in the conversation.

02:27PM   15   A.  He said that we should be investigating -- and he used

02:27PM   16   the "N word" to refer to black people, and he used the "S

02:27PM   17   word" to refer to Hispanic people.

02:27PM   18   Q.  When the defendant told you that you should be

02:27PM   19   investigating "N words" and "S words," what was his tone of

02:27PM   20   voice like?

02:27PM   21   A.  A little more quiet.  He wasn't screaming.  He almost

02:27PM   22   said it -- he said it quietly.

02:27PM   23   Q.  Compared with earlier in the conversation, did he lower

02:27PM   24   his voice when he said that?

02:28PM   25   A.  Yes, he did.

02:28PM     1   Q.  Were you inside of a federal law enforcement workplace at

02:28PM     2   that point?

02:28PM     3   A.  Yes.

02:28PM     4   Q.  When the defendant told you that you should be

02:28PM     5   investigating "N words" and "S words," what was your

02:28PM     6   immediate reaction?

02:28PM     7   A.  Again, reeling again.  At this point, I'm trying to

02:28PM     8   process basically everything that's happening.  And saying

02:28PM     9   this is a different person who I just worked an eight month,

02:28PM    10   extremely successful investigation from.

02:28PM    11       This is a different person that I met in the summer, who

02:28PM    12   was typically respectful and polite.

02:28PM    13       This was someone that was different from someone that I

02:28PM    14   considered to an extent a friend, a coworker, and someone

02:28PM    15   that I trusted.  It was someone I didn't know.

02:28PM    16   Q.  Were you shocked when you heard that?

02:28PM    17   A.  I was shocked.  Shocking.

02:28PM    18   Q.  Who's the next person that spoke after the defendant told

02:28PM    19   you you should be investigate "N words" and "S words?"

02:28PM    20   A.  I did.  At this point, I'm in the mode of trying to stay

02:28PM    21   calm, not trying to overreact.  Not trying to make it like

02:29PM    22   I'm overly concerned, although -- although I am.

02:29PM    23       And I said, I think we should be investigating all

02:29PM    24   criminals.

02:29PM    25   Q.  What -- at that moment in the conversation when you

02:29PM   1   respond to the remark the defendant say to you, you say we

02:29PM   2   should be investigating all criminals, what's your goal at

02:29PM   3   that point in the conversation?

02:29PM   4   A.  I'm at the point where I am, like, I want to get out of

02:29PM   5   the conference room at this point.

02:29PM   6       I want to get out at the point we're not -- where he is

02:29PM   7   not overly alarmed about how I'm feeling about all of this.

02:29PM   8       I'm trying to process it.  I'm trying to figure this out.

02:29PM   9   I'm trying to do this in my head of how can I get out of this

02:29PM   10   situation essentially.

02:29PM   11   Q.  After you told the defendant that you should be

02:29PM   12   investigating criminals, all criminals, who spoke next, you

02:29PM   13   or the defendant?

02:29PM   14   A.  He did.

02:29PM   15   Q.  What did he say?

02:29PM   16   A.  It kind of started to walk back at that point, which was

02:29PM   17   good.  It's what I was hoping for at some point.

02:30PM   18       And he had said that Gerace wasn't a trafficker, he was

02:30PM   19   more of a white-collar type, fraud-type criminal.  He was

02:30PM   20   more of a drug user.  And that if he was dirty, he'd nail him

02:30PM   21   to the wall.

02:30PM   22   Q.  When the defendant told you that if Gerace was dirty,

02:30PM   23   he'd nail him to the wall, did you believe that?

02:30PM   24   A.  No.

02:30PM   25   Q.  Was it consistent with the context of your conversation

02:30PM    1    leading up to that point?

02:30PM    2    A.  No, based on everything that was said before that, it was

02:30PM    3    completely inconsistent with everything prior.

02:30PM    4    Q.  Did you argue with him about that --

02:30PM    5    A.  No --

02:30PM    6    Q.  -- and continue the conversation?

02:30PM    7    A.  -- I was happy to hear that.  It was a way out, and a way

02:30PM    8    to walk back the conversation, so that I could hopefully walk

02:30PM    9    out at some point.

02:30PM   10    Q.  What did you do next?  Who spoke next?  Let me ask you

02:30PM   11    that.

02:30PM   12    A.  At that point, it's towards the end, and he also

02:30PM   13    mentioned -- I can't remember exactly what was said after

02:30PM   14    that, other than he mentioned at some point shortly after

02:30PM   15    that and towards the end of the conversation that his

02:30PM   16    parents -- his mother and father were going to be going to a

02:31PM   17    50-year reunion for Gerace's parents, like either that night

02:31PM   18    or the next day.

02:31PM   19        Which in my head I'm, like, completely unaware that he

02:31PM   20    was that close with his family, that his parents were that

02:31PM   21    close with his family.

02:31PM   22        I mean, and that's how it was from the beginning.  I had

02:31PM   23    no idea that he was that close with this person.  But I found

02:31PM   24    out certain things through that conversation, that's for

02:31PM   25    sure.

02:31PM    1    Q.  Special Agent Casullo, you mentioned that when the

02:31PM    2    defendant said to you, do you hate Italians?  You interpreted

02:31PM    3    him to be talking about Gerace; is that correct?

02:31PM    4    A.  Yes.

02:31PM    5    Q.  This conversation that you have with the defendant in the

02:31PM    6    conference room, was Gerace the only topic that came up?

02:31PM    7    A.  No.

02:31PM    8    Q.  I mean, this was a conversation that -- let me rephrase

02:31PM    9    that question.

02:31PM   10        When you started the conversation, it was about clearing

02:31PM   11    the air because of the Gerace subpoena, right?

02:31PM   12    A.  Correct.

02:31PM   13    Q.  And when the defendant said that kid called me, was that

02:31PM   14    a comment about Gerace?

02:31PM   15    A.  Yes.

02:31PM   16    Q.  And when he said isn't he friends with your

02:31PM   17    brother-in-law, was that a comment about Gerace?

02:31PM   18              MR. SINGER:  Objection, asked and answered.

02:32PM   19              MR. COOPER:  It's a different question.

02:32PM   20              THE COURT:  Overruled.

02:32PM   21              BY MR. COOPER:

02:32PM   22    Q.  Was that a comment about Gerace?

02:32PM   23    A.  Yes.

02:32PM   24    Q.  And did the fact that the whole conversation up to that

02:32PM   25    point had been about Gerace cause you to believe that the

02:32PM  1   comment, what, do you hate Italians, was also about Gerace?

02:32PM  2   A.  Yes, of course.

02:32PM  3   Q.  Did you walk out of that room with the impression that

02:32PM  4   the defendant wanted you to stop investigating Gerace?

02:32PM  5   A.  Oh, he did not want me to investigate Peter Gerace.  That

02:32PM  6   was one thing that was clear when that conversation ended.

02:32PM  7   Q.  In June of 2016, at the time of this conversation in the

02:32PM  8   conference room, how long had you been a special agent in the

02:32PM  9   Buffalo resident office?

02:32PM  10  A.  So June of 2016, I got there September of '15.  So you're

02:32PM  11  talking about nine months maybe.

02:32PM  12  Q.  Had the defendant been in the Buffalo office much longer

02:32PM  13  than you?

02:32PM  14  A.  Oh, yeah.  I think almost his whole career except for a

02:32PM  15  year he spent in Florida, I believe, Orlando, I think.

02:33PM  16  Q.  Special Agent Casullo, when you walked out of that

02:33PM  17  conference room after the defendant made those remarks to

02:33PM  18  you, did you walk down the hallway to a supervisor's office

02:33PM  19  and report it?

02:33PM  20  A.  No.  I did not.

02:33PM  21  Q.  Did you wait a long time before you ever told anybody

02:33PM  22  about what the defendant said to you in that conference room?

02:33PM  23  A.  I waited a long time to tell anybody in a managerial

02:33PM  24  position.  I did tell other agents that I was close friends

02:33PM  25  with that I had worked with, one that was working in Miami

02:33PM 1    who was my field training agent.

02:33PM 2          **MR. SINGER:**  Objection, hearsay.

02:33PM 3          **MR. COOPER:**  I don't believe hearsay is telling who

02:33PM 4    you spoke to about something.

02:33PM 5          **THE COURT:**  Hang on.

02:33PM 6          Yeah, overruled.

02:33PM 7          **BY MR. COOPER:**

02:33PM 8    Q.  You mentioned that you told a couple of associates at the

02:33PM 9    DEA over time; is that correct?

02:33PM 10   A.  Yeah, several close -- close friends and fellow agents.

02:34PM 11   Q.  Did there come a time ultimately when you reported it to

02:34PM 12   your management?

02:34PM 13   A.  Yes.

02:34PM 14   Q.  About how much time passed from the time the defendant

02:34PM 15   said those things to you in the conference room until you

02:34PM 16   reported it to management?

02:34PM 17   A.  I think it was about two years, it was kind of long.

02:34PM 18   Q.  I want you to explain to the jury why you didn't walk

02:34PM 19   down the hall when you heard that and report it to your

02:34PM 20   supervisor.  Tell them.

02:34PM 21   A.  Well, several reasons.  Trying to process everything at

02:34PM 22   the same time, or all at once.

02:34PM 23       Concerned, now knowing he's a lot closer with Gerace than

02:34PM 24   I knew he was.  That he was possibly going to tell Gerace

02:34PM 25   that I was investigating him.  That definitely crossed my

USA v Bongiovanni - Casullo - Cooper/Direct - 9/24/24

02:34PM   1   mind.

02:34PM   2      It crossed my mind of -- I'm still trying to figure out

02:34PM   3   what he means about a stripper overdosing at the club and he

02:34PM   4   called him.  Why a criminal is calling a DEA agent about a

02:34PM   5   stripper overdosing?  I don't know.  Like, to me, that's not

02:34PM   6   something that's normal.

02:34PM   7      Is there something more to that?  Is there possibly a

02:35PM   8   crime involved?  Is there some type of cover up?  I don't

02:35PM   9   know.  I'm trying to process all this.

02:35PM  10      And at the same time, in a very selfish way, I knew from

02:35PM  11   past experience if you're an agent and you're telling

02:35PM  12   supervisors about someone that's using racial slurs, and as

02:35PM  13   horrible as this is, that there's -- there's backlash to

02:35PM  14   that.

02:35PM  15      There's backlash from your management, because they think

02:35PM  16   that you're a troublemaker, that the office is gonna come

02:35PM  17   under spotlight, and that they're gonna be possibly

02:35PM  18   investigated.

02:35PM  19      You are questioned by other agents, that they think

02:35PM  20   you're a snitch, snitching on another agent.

02:35PM  21      That thin blue line thing, it -- it certainly factors in.

02:35PM  22   And I knew that.

02:35PM  23      I had known other agents, very good agents, that came

02:35PM  24   forth and said things to people in particular that were

02:35PM  25   fantastic agents, and I saw what they went through.  I saw

02:35PM    1   what happened to their reputation.  I saw what happened to

02:35PM    2   their career.  Both had to leave offices and go and work in

02:35PM    3   other places because it was so horrible.

02:35PM    4      So I was very aware of that.  So in a selfish way,

02:36PM    5   instead of doing the right thing, and maybe focusing on an

02:36PM    6   investigation as opposed to the right thing of going forth

02:36PM    7   and saying what he said to me, which was absolutely racist

02:36PM    8   and that he is a racist, I didn't do that.  I didn't do that.

02:36PM    9   Q.  Were you worried about being ostracized in the office

02:36PM   10   that you had just joined?

02:36PM   11   A.  100 percent.

02:36PM   12   Q.  Were you worried about being isolated in a place that you

02:36PM   13   had finally gotten back to?

02:36PM   14   A.  Yes.  I was there less than a year.  Even though I had

02:36PM   15   been an agent for all these years, I was new to Buffalo.  And

02:36PM   16   a lot of the agents had been there a long time.

02:36PM   17   Q.  Looking back, do you think you should have walked down

02:36PM   18   the hall and reported it to a supervisor immediately?

02:36PM   19   A.  Yes.  I should have reported that to someone in

02:36PM   20   management immediately, and I didn't.

02:36PM   21   Q.  After that meeting, can you describe for the -- for the

02:36PM   22   jury the context of -- actually, withdrawn.

02:36PM   23      Before we get there, after that conference room

02:36PM   24   conversation with the defendant where he says these things to

02:37PM   25   you, did you personally hear from Peter Gerace?

02:37PM    1    A.   So, about two or three weeks after that, I got a phone

02:37PM    2    call from a 716 number on my personal cell phone.  Didn't

02:37PM    3    recognize the number.  And I answered the phone.  And someone

02:37PM    4    said, hey, what's up agent?  Or something to that effect.

02:37PM    5         And I said, who is this?  And he said, it's Peter Gerace.

02:37PM    6         So, yeah, I got a phone call about three weeks later from

02:37PM    7    Peter Gerace.

02:37PM    8    Q.   Were you expecting that?

02:37PM    9    A.   No.  No, I wasn't.  Peter Gerace had never called me in

02:37PM   10    any entire life.  And he called me about two or three weeks

02:37PM   11    after that to tell me in a social conversation, how are you

02:37PM   12    doing?  Oh, I'm in Ellicottville, and I saw a friend of

02:37PM   13    yours, that I didn't even know he knew was a friend of mine.

02:37PM   14    And that he just wanted to call and tell me.

02:37PM   15         And I said, okay, that's great.  And, yeah, ended the

02:37PM   16    conversation shortly after that.

02:37PM   17         And 100 percent took note of that.  And I did report that

02:38PM   18    to a supervisor.

02:38PM   19    Q.   Did you believe that was a coincidence that Peter Gerace

02:38PM   20    called you two or three weeks after this defendant made those

02:38PM   21    comments to you in the conference room?

02:38PM   22    A.   No.

02:38PM   23              **MR. SINGER:**  Objection, speculation.

02:38PM   24              **THE COURT:**  Sustained.

          25

02:38PM    1          **BY MR. COOPER:**

02:38PM    2    Q.  In your whole life, before that, had Peter Gerace ever

02:38PM    3    called you?

02:38PM    4    A.  Never.

02:38PM    5          **MR. SINGER:**  Objection, asked and answered.

02:38PM    6          **THE COURT:**  Overruled.

02:38PM    7          **BY MR. COOPER:**

02:38PM    8    Q.  After the defendant said those things to you in the

02:38PM    9    conference room, did he call you within a month after that?

02:38PM   10    A.  No, it was a couple weeks.

02:38PM   11    Q.  Okay.  Do you know how Peter Gerace got your phone

02:38PM   12    number?

02:38PM   13    A.  Yes.  Yes.

02:38PM   14    Q.  Can you describe that to the jury?

02:38PM   15    A.  So I gave Peter Gerace my phone number.

02:38PM   16         Years prior, when I was in New York City, I was home on a

02:38PM   17    weekend from Buffalo.  Typically, I would drive in on a

02:38PM   18    Friday, come home late, and there's no dinner at home.  So I

02:38PM   19    stopped at Brennan's Tavern, which is on Transit, that no

02:38PM   20    longer -- I think it's closed now, to get some wings.

02:39PM   21         And then I called my wife and to say I'm gonna stop at

02:39PM   22    Brennan's to get wings before I come home.

02:39PM   23         And she had told me that her brother, who living in

02:39PM   24    Buffalo at that time, he moved from Las Vegas back to Buffalo

02:39PM   25    while I was in New York City, was up there with another

02:39PM 1    friend.  I said okay.

02:39PM 2        So I went to Brennan's.  And sure enough, when I walked

02:39PM 3    in, I saw her brother.  He was at the bar.  It wasn't as bad

02:39PM 4    at that point that it is now, and afterwards.  So this is

02:39PM 5    somewhere maybe around -- I'm in New York between maybe 2013,

02:39PM 6    2014 timeframe.  So I said hi to him when I walked in.

02:39PM 7        I ordered my wings.  He was there with his other friend,

02:39PM 8    who I also knew, too, from growing up prior before I even met

02:39PM 9    my wife's family.

02:39PM 10       And about 15 minutes later, and he never told me this,

02:39PM 11   Peter Gerace came walking in to the bar and walked up to us.

02:39PM 12   Q.  When you say he never told me, who is the "he" in that

02:39PM 13   sentence?

02:39PM 14   A.  My brother-in-law never mentioned while I was sitting

02:40PM 15   there having wings that Peter Gerace was gonna be showing up.

02:40PM 16   That Peter was meeting him there.  He showed up.

02:40PM 17   Q.  What happened when Peter showed up?

02:40PM 18   A.  He showed up, caught me off guard obviously.  A little

02:40PM 19   annoyed, feeling that why didn't you mention this to me?

02:40PM 20   Because Peter Gerace isn't someone I want to hang out with.

02:40PM 21   And, yeah.

02:40PM 22       Peter just joined the conversation.  And it was towards

02:40PM 23   the end of my time having wings there.  And while I was

02:40PM 24   there, my wife called me wondering where I was at.

02:40PM 25       And I answered the phone, and told her I was just having

02:40PM  1  wings, I was finishing them, that her brother was there, and

02:40PM  2  that I was going to be coming home shortly.

02:40PM  3  Q.  How did Peter Gerace ultimately get your phone number as

02:40PM  4  a result of that?

02:40PM  5  A.  So at the end of the conversation, caught pretty much off

02:40PM  6  guard, Peter Gerace asked me for my cell phone number.  And I

02:40PM  7  couldn't think quick enough for a reason why not to give it

02:40PM  8  to him, so I gave him my personal cell phone number.

02:40PM  9  Q.  From the time in, like, 2012 or 2013, whenever you said

02:40PM  10  that meeting was at the wing restaurant, until the summer of

02:41PM  11  2016, did Peter Gerace ever call you.

02:41PM  12  A.  Never.

02:41PM  13  Q.  Did he ever text you?

02:41PM  14  A.  He did text me once after -- when I gave him that number

02:41PM  15  at the bar that night he texted me, I can't remember.  Maybe

02:41PM  16  it was six months afterwards.  I remember it was during a

02:41PM  17  snowstorm, because I was shovelling snow, and I got a text

02:41PM  18  message again from a 716 number, probably the same number, I

02:41PM  19  don't know, because it wasn't saved in my phone.  And it said

02:41PM  20  the same thing, hey, what's up how's things in New York?

02:41PM  21      And I texted back, who is this?  And he said it was Peter

02:41PM  22  Gerace.

02:41PM  23      So the only other time he ever reached out to me or

02:41PM  24  communicated with me was that time which was before I moved

02:41PM  25  back from New York to Buffalo.  And it was text message.

02:41PM   1   Q.  In that text message, did you carry on months-long

02:41PM   2   conversations with him?

02:41PM   3   A.  No, it was very short.  Very short.  Things are fine in

02:41PM   4   New York.  I'm home for the weekend type thing, and that was

02:41PM   5   it.

02:41PM   6   Q.  Did you ever meet him out and hang out with him?

02:41PM   7   A.  No.

02:41PM   8   Q.  Did you ever invite him to your birthday party?

02:42PM   9   A.  No.

02:42PM   10  Q.  Can you describe for the jury the context of how you

02:42PM   11  ultimately report to a DEA supervisor the comments that the

02:42PM   12  defendant made to you in the conference room in June of 2016?

02:42PM   13  A.  We were at the U.S. Attorney's Office for a meeting

02:42PM   14  regarding the investigation of Peter Gerace and Anthony

02:42PM   15  Gerace.  And this was after -- this was after I pulled the

02:42PM   16  phone records, this was after a proffer I conducted with an

02:42PM   17  individual who mentioned Joe was passing informant's names.

02:42PM   18  This was after I found a report where Joe was calling Peter

02:42PM   19  Gerace his informant in a report that I gave to the U.S.

02:42PM   20  Attorney's Office and said this is a fake report.

02:42PM   21      It was at that point that I told them that we had had

02:42PM   22  this conversation, and Joe used those racial slurs that I

02:42PM   23  described, and said what he said about the stripper

02:43PM   24  overdosing and Gerace calling him about it.

02:43PM   25  Q.  Was that conversation that you had with the defendant and

02:43PM  1   the things he said to you in the conference room something

02:43PM  2   that you had kind of buried inside you for a long time?

02:43PM  3   A.  Yeah.  I mean, the only people that I shared that with

02:43PM  4   were close fellow agents.  And, yeah, it was difficult.

02:43PM  5   Q.  Was it comfortable to bring it up to a supervisor at the

02:43PM  6   DEA?

02:43PM  7   A.  No.  No.  Because I knew.  I knew where it was gonna go.

02:43PM  8   That's exactly where it went afterwards.

02:43PM  9   Q.  What do you mean by that?

02:43PM  10  A.  I mean that I knew would go to internal affairs, which is

02:43PM  11  where it should go.  And those things that I mentioned with

02:43PM  12  fellow agents, many of those things happened to me in my

02:43PM  13  office.

02:43PM  14  Q.  Did you get ostracized?

02:43PM  15  A.  I was -- there were numerous things that happened.  I was

02:43PM  16  no longer the acting supervisor for my group, his backup.

02:44PM  17      I was supposed to be going to a leadership class that I

02:44PM  18  no longer was selected to go to.  Which was bad enough, but

02:44PM  19  then from a personal perspective, people in the office

02:44PM  20  started to ignore me.

02:44PM  21      People that I had known for years stopped talking to me.

02:44PM  22      One task force officer in particular, who I had known

02:44PM  23  20 years, I went to the police academy with her, who I

02:44PM  24  considered a friend, when I was walking into the office

02:44PM  25  actually crossed the street go to the other side of the road.

02:44PM   1      Agents in my office making snide remarks about the U.S.

02:44PM   2   Attorney's Office knowing that I was working cases with

02:44PM   3   people at the U.S. Attorney's Office, one agent saying that

02:44PM   4   we should take a crane to the U.S. Attorney's Office.

02:44PM   5      Another agent saying in front of me about my partner,

02:44PM   6   Curtis Ryan, who had to leave the office because of the same

02:44PM   7   type of treatment, that he was a rat bastard and some day

02:45PM   8   he'd get his.

02:45PM   9      And this is after having -- I've been in law enforcement

02:45PM  10   at that point 20-something years, a DEA agent 20-something

02:45PM  11   years, and it was devastating.  I mean, the leadership, not

02:45PM  12   being a supervisor?  No big deal.  Whatever.

02:45PM  13      But to have people think those things of me and to be

02:45PM  14   treated that way, and I saw it coming.  And I knew it.  And I

02:45PM  15   knew it.  And my wife saw it --

02:45PM  16   Q.  Sir, were those all things that you were worried about

02:45PM  17   before you reported it?

02:45PM  18   A.  Those are all things that I knew.  I had seen it before.

02:45PM  19   Q.  Did all those things happen to you after you reported it?

02:45PM  20   A.  Yes.  Those things I mentioned were the things that

02:45PM  21   happened.  I went to the point of, thankfully, my group at

02:45PM  22   the time in the task force was working a wiretap

02:45PM  23   investigation.  It got to the point that it was so unbearable

02:45PM  24   that I volunteered for all the nightshifts so I wouldn't have

02:45PM  25   to go to into the office.  I just went straight out on a

02:45PM   1   surveillance so I wouldn't have to deal with this.

02:46PM   2   Q.  Has it been a pleasant experience for you since you

02:46PM   3   reported those things?

02:46PM   4   A.  It was horrible.  It was horrible.  Yeah.  It was -- it

02:46PM   5   was a low point in my career.

02:46PM   6       It still bothers me.  And I've been retired from DEA for

02:46PM   7   over two years, and it -- it still bothers me.

02:46PM   8   Q.  At some point after the comments that the defendant makes

02:46PM   9   to you in the June 2016 conference room meeting, does the

02:46PM   10  investigation into Peter Gerace pick up steam again?

02:46PM   11  A.  Yeah, after that, not like right after that.  It was

02:46PM   12  somewhere in like early 2017 maybe that I worked an

02:46PM   13  investigation.  And then we worked an investigation, Joe

02:46PM   14  Bongiovanni was initially somewhat involved at that point.

02:46PM   15  We were not totally not communicating at this point.

02:46PM   16      But then we started targeting an individual who he was

02:46PM   17  familiar with, and he told me he didn't want to be part of it

02:47PM   18  anymore, and he didn't trust the informant, who was already

02:47PM   19  providing us good information.  So he wasn't working with me

02:47PM   20  anymore at that point.

02:47PM   21  Q.  Did there come a time when you conducted a proffer

02:47PM   22  interview of an individual named Kevin Myszka?

02:47PM   23  A.  Yes.

02:47PM   24  Q.  Did that kind of reignite the Peter Gerace investigation?

02:47PM   25  A.  Yes, that was it.  So that case, the person that he knew

02:47PM  1   was Kevin Myszka.  We arrested Kevin Myszka, my group did.

02:47PM  2   And he wasn't case agent with me at this point, but he was

02:47PM  3   still in the group.  And we arrested Kevin Myszka, and he

02:47PM  4   ended up cooperating.

02:47PM  5       And we conducted several interviews of Kevin Myszka.  And

02:47PM  6   during those interviews, I didn't know if he knew Gerace or

02:47PM  7   not, but at that point I'm looking for anybody that can

02:47PM  8   provide intel, like an informant or a source.

02:47PM  9       And Kevin Myszka, from what I knew and from the

02:47PM 10   investigation, I knew that he grew up in Amherst, New York.

02:47PM 11   I knew the Geraces lived -- Peter and Anthony both, I think,

02:48PM 12   lived in Amherst, New York.  Anthony was somewhere around the

02:48PM 13   same age as Kevin Myszka.

02:48PM 14       So long story short, I asked him.  I asked him if he was

02:48PM 15   familiar with Pharaoh's and the Geraces, and he was.  He was.

02:48PM 16   Q.  Did Myszka, without getting into the details of what he

02:48PM 17   said, did Myszka provide some information about Gerace?

02:48PM 18   A.  He did, yep.

02:48PM 19   Q.  Okay.  In the course of your investigation into Peter

02:48PM 20   Gerace, did you look in DEA databases for any other reports

02:48PM 21   that referenced Peter Gerace?

02:48PM 22   A.  I did.  After meeting with the U.S. Attorney's Office, we

02:48PM 23   had a coordinating meeting at some point.  The prosecutor was

02:48PM 24   willing to look at historical information.  So not just

02:48PM 25   current, like, current wiretap information if we were

02:48PM    1    listening to a phone, or an informant that was providing

02:48PM    2    realtime.  The prosecutor was willing to take historical

02:48PM    3    information that occurred basically at any time to build an

02:48PM    4    investigation.

02:48PM    5        That was new to me.  A lot of the prosecutors in Vegas

02:48PM    6    didn't work cases that way.  They were more into the

02:48PM    7    realtime-type investigation, mostly wiretaps, because that's

02:48PM    8    predominantly what I worked so that's what I did.

02:48PM    9        I went back to the office, and I searched for historical

02:49PM   10    reporting on Peter and Anthony Gerace.

02:49PM   11    Q.  Okay.

02:49PM   12        MR. COOPER:  Can we pull up Government Exhibit 30A in

02:49PM   13    evidence.

02:49PM   14        BY MR. COOPER:

02:49PM   15    Q.  I think earlier during a longer answer that you gave, you

02:49PM   16    mentioned a -- you called it a fake report that you found.

02:49PM   17    Is this what you were talking about?

02:49PM   18    A.  Yes.  Yes.

02:49PM   19    Q.  Did you find this report when you went back to pull up

02:49PM   20    old reports mentioning the name Peter Gerace?

02:49PM   21    A.  Yes, I did.

02:49PM   22    Q.  When you found this report, did you produce it to the

02:49PM   23    U.S. Attorney's Office?

02:49PM   24    A.  Yes, I did.

02:49PM   25    Q.  Who drafted this report?

02:49PM    1    A.  Joseph Bongiovanni.

02:49PM    2    Q.  What's the subject of the report?

02:49PM    3    A.  Information offer by Peter Gerace regarding narcotics

02:49PM    4    investigation.

02:49PM    5    Q.  What's the date the report was prepared?

02:49PM    6    A.  November 6th, 2009.

02:49PM    7    Q.  Do you see a sentence starting here, the second sentence

02:49PM    8    of paragraph 2, that indicates that Gerace has acted as a

02:49PM    9    confidential source and has been able to provide information

02:50PM   10    regarding individuals in this case file and other narcotic

02:50PM   11    investigations in the past.

02:50PM   12    A.  Yes.  I see that.

02:50PM   13    Q.  Who wrote those words?

02:50PM   14    A.  Joseph Bongiovanni.

02:50PM   15        **MR. COOPER:**  You can take that down, Ms. Champoux.

02:50PM   16        **BY MR. COOPER:**

02:50PM   17    Q.  Why did you bring this report to the U.S. Attorney's

02:50PM   18    Office?

02:50PM   19    A.  Well, first, I was tasked with pulling up historical

02:50PM   20    reporting.  Peter Gerace was a target of the investigation.

02:50PM   21    But more importantly, at this point, based on how that report

02:50PM   22    was written, I -- I believed it to be a fake report.

02:50PM   23       You don't mention an individual by name if they were a

02:50PM   24    confidential source before, you refer to them as a

02:50PM   25    deactivated confidential source.  Those names are highly

02:50PM    1    protected.

02:51PM    2        But even more, I knew it was his friend.  You're not

02:51PM    3    allowed to even sign someone up and run an informant that's a

02:51PM    4    personal friend.

02:51PM    5        There were multiple things on the report.  You refer to

02:51PM    6    an informant by an informant number.  An agent that's out of

02:51PM    7    the academy, and I was a field training agent --

02:51PM    8            MR. SINGER:  Your Honor, I'm going to object as to

02:51PM    9    nonresponsive at this point.

02:51PM   10            THE COURT:  So, Mr. Casullo, please listen to the

02:51PM   11    questions and just answer the question that he's asking you.

02:51PM   12            THE WITNESS:  Yes, Judge.

02:51PM   13            THE COURT:  Ask another question.

02:51PM   14            MR. COOPER:  Yes, Judge.

02:51PM   15            BY MR. COOPER:

02:51PM   16    Q.  After -- you were describing some of the reasons why you

02:51PM   17    submitted this report to the U.S. Attorney's Office.  Was one

02:51PM   18    of the reasons that they had asked you to look up historical

02:51PM   19    reporting on Peter Gerace?

02:51PM   20    A.  Yes.

02:51PM   21    Q.  Was that part of the investigative plan in that case?

02:51PM   22    A.  Yes, it was.

02:51PM   23    Q.  Did you look up the report as part of the investigative

02:51PM   24    plan?

02:51PM   25    A.  Yes, I did.

02:51PM    1    Q.  When you saw what was written in the report, did it

02:51PM    2    strike you as suspicious and odd?

02:51PM    3    A.  Yes.

02:51PM    4    Q.  Did you forward it along to the U.S. Attorney's Office?

02:52PM    5    A.  Yes.

02:52PM    6    Q.  Were you doing that because you wanted to target the

02:52PM    7    defendant in any way?

02:52PM    8    A.  No.

02:52PM    9    Q.  After you brought that report to the U.S. Attorney's

02:52PM   10    Office, did the defendant ever approach you about doing that?

02:52PM   11    A.  Yes, he did.

02:52PM   12    Q.  What did he say?

02:52PM   13    A.  He came over and he said -- to my desk again, when I was

02:52PM   14    alone, caught me off guard, I didn't see him.  I was in a

02:52PM   15    task force group at this time.

02:52PM   16       He came to my desk and he said, what is this, I hear you

02:52PM   17    sent some bullshit report that I wrote years ago over to the

02:52PM   18    U.S. Attorney's Office, over to Joe Tripi?

02:52PM   19    Q.  What was his demeanor like?

02:52PM   20    A.  He was angry, and said I don't trust that guy.

02:52PM   21    Q.  Does the DEA work basically on all their cases with the

02:52PM   22    U.S. Attorney's Office?

02:52PM   23    A.  The majority of them.

02:52PM   24    Q.  Okay.  Is it strange or unusual for a DEA agent to send a

02:52PM   25    DEA report about a suspected drug dealer to the U.S.

02:52PM    1    Attorney's Office?

02:52PM    2    A.  No, we do it all the time.

02:52PM    3    Q.  I want to just get a timeline down to clear up.

02:53PM    4        You mentioned that the conversation in the conference

02:53PM    5    room is June of 2016, right?

02:53PM    6    A.  Yes.

02:53PM    7    Q.  Okay.  Earlier, we spoke before the break about an

02:53PM    8    interaction where you had run Anthony Gerace's tolls, and the

02:53PM    9    defendant came over and made some comments to you about

02:53PM   10    Anthony Gerace; do you remember that?

02:53PM   11    A.  I do.

02:53PM   12    Q.  That's the time when you were first with Curtis Ryan, and

02:53PM   13    after Curtis Ryan walks away the defendant comes over to you;

02:53PM   14    is that right?

02:53PM   15    A.  Yes.

02:53PM   16    Q.  Okay.  That occurred after the conversation in June of

02:53PM   17    2016; is that right?

02:53PM   18    A.  With Anthony Gerace -- regarding Anthony Gerace?

02:53PM   19    Q.  Yes.

02:53PM   20    A.  Yes.

02:53PM   21    Q.  Okay.  And so when you described for the jury earlier

02:53PM   22    that that conversation and the comments that the defendant

02:53PM   23    made to you about Anthony Gerace made you feel like you

02:53PM   24    wanted to squirm, I think is what you said, is that in the

02:53PM   25    context of this conversation about Peter Gerace from June of

02:53PM    1    2016?

02:53PM    2    A.  It was in the context of everything that had occurred up

02:53PM    3    to that point.

02:53PM    4    Q.  Okay.  So that Anthony Gerace thing happens after the

02:54PM    5    conference room conversation, right?

02:54PM    6    A.  Yes.  Yes.  Years.  I think it was two years.

02:54PM    7    Q.  I want to talk with you about July of 2018 now, and an

02:54PM    8    individual named Ron Serio.  Are you aware of that person?

02:54PM    9    A.  Yes.

02:54PM   10    Q.  Did you know about July of 2018 that Ron Serio had

02:54PM   11    previously been arrested by the ECSO, the Erie County

02:54PM   12    Sheriff's Office and the FBI?

02:54PM   13    A.  At some point, I was made aware of that.

02:54PM   14    Q.  Okay.  And did you attend a proffer with Ron Serio in

02:54PM   15    July of 2018?

02:54PM   16    A.  Yes, I did.

02:54PM   17    Q.  Did the U.S. Attorney's Office set up that proffer

02:54PM   18    meeting?

02:54PM   19    A.  Yes, they did.

02:54PM   20    Q.  Did prosecutors that were handling that proffer tell you

02:54PM   21    to join the proffer?

02:54PM   22    A.  Yes, they did.

02:54PM   23    Q.  After the proffer happened, did you ever get a chance to

02:55PM   24    look at the defendant's purported Serio case file?

02:55PM   25    A.  Yeah.  Yeah.  I asked my supervisor at the time in the

02:55PM   1   task force group if I could look at that file.

02:55PM   2   Q.  Why did you do that?

02:55PM   3   A.  Because we were looking at Anthony Gerace and individuals

02:55PM   4   that -- the reason we went to proffer Serio was because I

02:55PM   5   found a report on Anthony Gerace where Serio proffered that

02:55PM   6   he had supplied Anthony Gerace marijuana in the past.

02:55PM   7       So based on that, I told Curtis we should go over and

02:55PM   8   interview Serio again.  So I did.

02:55PM   9       So I wanted to look at the Serio file because I could see

02:55PM   10  that they were connected at this point.

02:55PM   11  Q.  Okay.  What, if anything, did you notice about the

02:55PM   12  defendant's file on Serio as you reviewed it?

02:55PM   13  A.  I -- I went through it.  I retrieved the file from the

02:55PM   14  DEA file room.  I went to the DEA-6 section, the reports of

02:55PM   15  investigation, which is where the narratives are in terms of

02:55PM   16  like a surveillance or an undercover report.  I wanted to

02:56PM   17  read through those to see if there were any undercover

02:56PM   18  purchases of narcotics, informant briefings, things that were

02:56PM   19  more proactive, operational-type reports.

02:56PM   20       **MR. COOPER:**  Ms. Champoux, can we pull up 8A-6.

02:56PM   21       **BY MR. COOPER:**

02:56PM   22  Q.  Is this a list of all the 6s that were contained in that

02:56PM   23  DEA case file into Serio?

02:56PM   24  A.  I -- I don't know for sure.

02:56PM   25  Q.  Okay.

02:56PM    1          MR. COOPER:  You can take it down, Ms. Champoux.

02:56PM    2          BY MR. COOPER:

02:56PM    3    Q.  After the proffer, did you learn that you could no longer

02:56PM    4    be a case agent investigating Peter Gerace or Ron Serio?

02:56PM    5    A.  There was a point when I was told to no longer -- that I

02:56PM    6    was no longer going to be involved in the investigation of

02:56PM    7    Peter Gerace.

02:56PM    8    Q.  Was that after you reported the race-related comments

02:56PM    9    that the defendant made to you in the conference room?

02:56PM   10    A.  It was after that.  I was called in to a meeting with our

02:56PM   11    resident agent in charge and my supervisor, told several

02:56PM   12    things and one of them was that I was off the Gerace

02:57PM   13    investigation.

02:57PM   14    Q.  Were you happy about that?

02:57PM   15    A.  No.  No.  No, things were starting to progress at that

02:57PM   16    point.  And we had some really good information.  So I was

02:57PM   17    upset about it.

02:57PM   18    Q.  Okay.  Did you understand why the decision was being

02:57PM   19    made?

02:57PM   20    A.  Not so much at the time, but I eventually understood why

02:57PM   21    afterwards.

02:57PM   22    Q.  Is that because you had become a fact witness in the

02:57PM   23    investigation?

02:57PM   24    A.  Yes.  Yes.

02:57PM   25    Q.  Okay.

| | | |
|---|---|---|
| 02:57PM | 1 | **MR. COOPER:**  Just one second, please, Judge. |
| 02:57PM | 2 | **THE COURT:**  Sure. |
| 02:58PM | 3 | **BY MR. COOPER:** |
| 02:58PM | 4 | Q.  Just a few more questions to close up here, Special Agent |
| 02:58PM | 5 | Casullo. |
| 02:58PM | 6 | That Serio proffer that you attended that we discussed, |
| 02:58PM | 7 | did that occur on July 20th of 2018? |
| 02:58PM | 8 | A.  It could have, I don't remember the exact date.  But |
| 02:58PM | 9 | around that timeframe. |
| 02:58PM | 10 | Q.  Okay.  Did you -- when you reported the race-related |
| 02:58PM | 11 | comments from the June 2016 conference room interaction, was |
| 02:58PM | 12 | that to the U.S. Attorney's Office as well as your supervisor |
| 02:58PM | 13 | from the DEA? |
| 02:58PM | 14 | A.  Yes. |
| 02:58PM | 15 | Q.  At the same time? |
| 02:58PM | 16 | A.  Yeah, it was a meeting at the U.S. Attorney's Office, and |
| 02:58PM | 17 | my supervisor was present. |
| 02:58PM | 18 | Q.  Who was your supervisor that was present? |
| 02:58PM | 19 | A.  Jim McHugh. |
| 02:58PM | 20 | Q.  Okay.  And did that meeting where you reported those |
| 02:58PM | 21 | race-related comments happen on or about August 1st, 2018? |
| 02:58PM | 22 | A.  Yeah, it certainly could have been around that time. |
| 02:58PM | 23 | Q.  Was it after that Serio proffer happened? |
| 02:58PM | 24 | A.  Yes. |
| 02:58PM | 25 | Q.  Okay.  The last thing I want to speak with you about is |

02:58PM    1    one of the comments that were made during that June 2016

02:58PM    2    conference room discussion with the defendant.

02:58PM    3        The one about that kid called me when a dancer overdosed

02:58PM    4    at the club, and I told him to get her out of there.

02:59PM    5        Does the DEA investigate drug overdoses?

02:59PM    6    A.  Oh, yes.

02:59PM    7    Q.  Okay.  Is that something that happened in 2016?  Did the

02:59PM    8    DEA investigate overdoses back in 2016?

02:59PM    9    A.  Oh, yes.

02:59PM   10    Q.  Okay.  Are those some of the most serious crimes that the

02:59PM   11    DEA investigates?

02:59PM   12    A.  They can be, if someone dies.

02:59PM   13    Q.  If a person overdoses, can the DEA investigate who

02:59PM   14    provided that person the drugs?

02:59PM   15    A.  Oh, absolutely.

02:59PM   16    Q.  Okay.  And is that conduct that's chargeable in federal

02:59PM   17    court?

02:59PM   18    A.  It can be.

02:59PM   19    Q.  Okay.  Is the DEA charged with investigating overdoses

02:59PM   20    related to drug distribution?

02:59PM   21    A.  In terms of enforcing the U.S. drug laws, yes.

02:59PM   22    Q.  Is there a U.S. drug law about drug overdoses?

02:59PM   23    A.  I don't know specific to drug overdoses, but specific to

02:59PM   24    drug trafficking and possession of narcotics and those types

02:59PM   25    of things.

| | | |
|---|---|---|
| 02:59PM | 1 | Q.  Okay.  So if someone is dealing drugs, and it causes an |
| 02:59PM | 2 | overdoes, is that within what the DEA is charged with |
| 03:00PM | 3 | investigating? |
| 03:00PM | 4 | A.  Yes. |
| 03:00PM | 5 | Q.  Did the defendant tell you that during his conversation |
| 03:00PM | 6 | with Gerace, he had started investigating that overdose? |
| 03:00PM | 7 | A.  No. |
| 03:00PM | 8 | MR. COOPER:  I have no further direct, Judge.  Thank |
| 03:00PM | 9 | you. |
| 03:00PM | 10 | THE COURT:  Mr. Singer? |
| 03:00PM | 11 | |
| 03:00PM | 12 | CROSS-EXAMINATION BY MR. SINGER: |
| 03:00PM | 13 | Q.  We can start.  I just want to lock down a couple of |
| 03:00PM | 14 | dates, Mr. Casullo.  So I'm going to hand you of a copy of |
| 03:00PM | 15 | what's marked as Government Exhibit 3557U. |
| 03:00PM | 16 | I'm going to hand you page 4 of that.  It's a narrative. |
| 03:01PM | 17 | I'll just ask you to review that, please, see if that helps |
| 03:01PM | 18 | refresh your memory as to the exact date you sat down at the |
| 03:01PM | 19 | U.S. Attorney's Office. |
| 03:01PM | 20 | MR. TRIPI:  Can you repeat the exhibit? |
| 03:01PM | 21 | MR. SINGER:  3557U. |
| 03:01PM | 22 | BY MR. SINGER: |
| 03:01PM | 23 | Q.  Does that help refresh your memory as to the date you met |
| 03:01PM | 24 | at the U.S. Attorney's Office, sir? |
| 03:01PM | 25 | A.  It says August 1st, 2 -- yes. |

03:01PM  1   Q.  I don't want to ask you what it says?

03:01PM  2   A.  Yes.

03:01PM  3   Q.  Does it refresh --

03:01PM  4   A.  Yes.

03:01PM  5   Q.  And that date was August 1st?

03:01PM  6   A.  August 1st.

03:01PM  7   Q.  So the conversation that you allege you had in the

03:01PM  8   conference room at the DEA with Mr. Bongiovanni, that occurs

03:01PM  9   in June of 2016 sometime?

03:01PM  10  A.  Yes.

03:01PM  11  Q.  The conversation that you have at your desk regarding

03:02PM  12  Anthony Gerace, that occurs in August of 2018?

03:02PM  13  A.  I believe so.

03:02PM  14  Q.  The proffer that you have with Ron Serio, that occurs

03:02PM  15  prior to the August 1st U.S. Attorney's Office meeting,

03:02PM  16  right?

03:02PM  17  A.  Yes.

03:02PM  18  Q.  And I know Mr. Cooper threw a date at you of July 20th of

03:02PM  19  that proffer.  I'll throw the same date out with you.  Do you

03:02PM  20  have any reason to disagree with both of us that's when that

03:02PM  21  happened?

03:02PM  22  A.  No.

03:02PM  23  Q.  Okay.  All right.

03:02PM  24  A.  Sir, and just -- unless I read that wrong, I believe it

03:02PM  25  says on or about.  On or about.  I could be wrong.  If I look

03:02PM   1   at it again, but it says on or about.

03:02PM   2   Q.  So I'll hand you back 3557U.  I'll just direct your

03:02PM   3   attention to that last full paragraph, first sentence.

03:02PM   4   A.  Yep.  It's on.  It's not on or about.  Yep.  Sorry.

03:02PM   5   Q.  So I'm going to take that away from you.

03:02PM   6       So you're confident at this point August 1st, 2018 is

03:02PM   7   that date you met at the U.S. Attorney's Office?

03:02PM   8   A.  Yeah, based on that report.

03:02PM   9   Q.  Okay.  All right.  Perfect.

03:03PM  10       So you start your career with the DEA in 1999; is that

03:03PM  11   right?

03:03PM  12   A.  1999.  July of '99.

03:03PM  13   Q.  And your first duty station was Las Vegas, correct?

03:03PM  14   A.  It was.

03:03PM  15   Q.  And part of your duties at DEA Las Vegas was you

03:03PM  16   investigated narcotics-related crimes, correct?

03:03PM  17   A.  Yes.

03:03PM  18   Q.  So some of those investigations you mentioned involved

03:03PM  19   figures, because law enforcement had a belief, also had an

03:03PM  20   association or nexus to Italian Organized Crime?

03:03PM  21   A.  For me, that came up.  Yep.

03:03PM  22   Q.  And that was because one of your bosses, I think he had

03:03PM  23   worked in the LA division at some point; is that right?

03:03PM  24   A.  New York.

03:03PM  25   Q.  New York?

03:03PM   1   A.  Yep.

03:03PM   2   Q.  He investigated crimes involving potential IOC

03:03PM   3   connections, as well?

03:03PM   4   A.  He did.

03:03PM   5   Q.  And that was something you that he brought to the office

03:03PM   6   out in Vegas?

03:03PM   7   A.  He did.  Again, he was a supervisor, but there were

03:03PM   8   several cases --

03:03PM   9   Q.  Okay.

03:03PM   10  A.  -- that he was involved in in one way or another.

03:03PM   11  Q.  And some of those cases they involve possible IOC nexuses

03:04PM   12  in Vegas that you worked on?

03:04PM   13  A.  Yes.

03:04PM   14  Q.  That's how you got exposed to those type of cases?

03:04PM   15  A.  Yes.

03:04PM   16  Q.  All right.  So as part of your work out in Vegas, in

03:04PM   17  2004, your investigation into other drug traffickers who had

03:04PM   18  a potential IOC nexus to Buffalo as well, that identified

03:04PM   19  Mike Masecchia as a potential target of the investigation?

03:04PM   20  A.  He was at some point.

03:04PM   21  Q.  Okay.  And so the way I understood it was that Michael

03:04PM   22  Masecchia had some type of connection to people in Las Vegas

03:04PM   23  you were looking at who came from Buffalo at one point in

03:04PM   24  time?

03:04PM   25  A.  Pretty much.

03:04PM     1    Q.  Or they had relatives back in Buffalo?

03:04PM     2    A.  They were relatives, yeah.

03:04PM     3    Q.  All right.  So Mike Masecchia at that point in time, he's

03:04PM     4    not living in Las Vegas, correct?

03:04PM     5    A.  No.  To the best of my knowledge, no.

03:04PM     6    Q.  Yes.  Because you took a look and made sure that he

03:04PM     7    wasn't living in Vegas, correct?

03:04PM     8    A.  We were doing surveillance and we never saw him there.

03:04PM     9    Q.  So you come to a belief, based on intelligence you

03:05PM    10    received, that Michael Masecchia may be moving out to

03:05PM    11    Las Vegas at some point in the future?

03:05PM    12    A.  Correct.

03:05PM    13    Q.  And that was potentially to live at a relative's house in

03:05PM    14    Las Vegas, correct?

03:05PM    15    A.  He was supposed to move into a house one of the people

03:05PM    16    that we were targeting, and I believe through marriage they

03:05PM    17    were related somehow.

03:05PM    18    Q.  And so that's why you ended up calling Special Agent Mike

03:05PM    19    Hill at the Buffalo office, correct?

03:05PM    20    A.  We did, because we knew Masecchia was from Buffalo, he

03:05PM    21    was a school teacher there.  And at that point we had pulled

03:05PM    22    phone records on some of the targets we were looking at in

03:05PM    23    Las Vegas, and some of those targets were in contact with 716

03:05PM    24    phone numbers.

03:05PM    25    Q.  Yeah.  And so you mentioned on direct that Special Agent

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

145

03:05PM   1   Hill, he's somebody who you went to the academy with,

03:05PM   2   correct?

03:05PM   3   A.  Yes, sir.

03:05PM   4   Q.  Somebody that you trusted, correct?

03:05PM   5   A.  Yes.

03:05PM   6   Q.  He was someone who was located locally in Buffalo at the

03:05PM   7   time?

03:05PM   8   A.  He was.

03:05PM   9   Q.  He worked in the Buffalo office right here?

03:05PM   10  A.  Yes.

03:05PM   11  Q.  Right down the street?

03:05PM   12  A.  Yes.

03:05PM   13  Q.  And you had no reason to believe that Mike Masecchia was

03:05PM   14  living in Las Vegas, right?

03:06PM   15  A.  Not at that point.

03:06PM   16  Q.  But you did have reason to believe that he was living in

03:06PM   17  Buffalo, correct?

03:06PM   18  A.  At that point, we still thought he was in Buffalo.

03:06PM   19  Q.  So naturally you would reach out to the office closest to

03:06PM   20  him to see if they could help you out with the investigation

03:06PM   21  you're conducting?

03:06PM   22  A.  Yes.

03:06PM   23  Q.  So Agent Mike Hill, you briefed him on the investigation

03:06PM   24  that was ongoing in Las Vegas, right?

03:06PM   25  A.  Yeah, gave him a general idea of it.

03:06PM    1    Q.  And you gave him a little better understanding of how

03:06PM    2    Mike Masecchia related to the investigation in Las Vegas,

03:06PM    3    correct?

03:06PM    4    A.  Yes.

03:06PM    5    Q.  And you also told him that Mike Masecchia was somebody

03:06PM    6    who you believe was residing in the Buffalo area?

03:06PM    7    A.  Believed that he was still in Buffalo, and possibly

03:06PM    8    moving out to Vegas.

03:06PM    9    Q.  And that was based on the intelligence you received,

03:06PM    10   correct?

03:06PM    11   A.  At the time.

03:06PM    12   Q.  And it was also based on the phone numbers that you had

03:06PM    13   looked up associated with Mike Masecchia, right?

03:06PM    14   A.  Yeah.  I don't remember at that point if we had

03:06PM    15   Masecchia's number identified at that point.  So what I can

03:06PM    16   say is that the targets that we were looking at in Vegas at

03:06PM    17   that time were in contact with some 716 numbers.  I don't

03:07PM    18   remember if Masecchia was one of them at that point.

03:07PM    19   Q.  All right.  So, sum and substance is that you asked

03:07PM    20   Special Agent Hill, since he was located in Buffalo and Mike

03:07PM    21   Masecchia was located in Buffalo, to investigate Mike

03:07PM    22   Masecchia and see what nexus he and you could draw to what

03:07PM    23   was going on in Vegas, correct?

03:07PM    24   A.  Yeah.  To see if they could identify the phone numbers

03:07PM    25   that we were providing them, and to see what they could

03:07PM    1    develop on Masecchia as well.

03:07PM    2    Q.  So Mike Hill, he opens up a file title Mike Masecchia in

03:07PM    3    Buffalo, correct?

03:07PM    4    A.  He eventually did, yep.

03:07PM    5    Q.  That's a new investigation that's different from yours,

03:07PM    6    but related?

03:07PM    7    A.  Correct.

03:07PM    8    Q.  And I think we've been through this before in the trial,

03:07PM    9    but when you have a situation like that, agents tend to

03:07PM   10    cross-reference reports they write on their file to the other

03:07PM   11    file in existence at the different office?

03:07PM   12    A.  That's correct.

03:07PM   13    Q.  So you were doing that for your Vegas reports, you were

03:07PM   14    cross-referencing them to the Buffalo file?

03:07PM   15    A.  Yes.

03:07PM   16    Q.  And Mike -- sorry, Michael Hill, he was cross-referencing

03:08PM   17    his reports he wrote here to your file?

03:08PM   18    A.  He should have been.  I can't remember if he did for

03:08PM   19    sure, or if he was just faxing them to me.  But either way, I

03:08PM   20    was getting the reports.

03:08PM   21    Q.  You so you were getting the information about what they

03:08PM   22    were doing here in Buffalo?

03:08PM   23    A.  Yes.

03:08PM   24    Q.  And your understanding was that what they were doing here

03:08PM   25    in Buffalo is they had subpoenaed records to figure out

03:08PM   1   whether the phone numbers you had in Vegas were associated
03:08PM   2   with Mike Masecchia, correct?
03:08PM   3   A.  It wasn't specific to Mike, it was here's a list of 716
03:08PM   4   numbers.  Can you identify these numbers, and see who they
03:08PM   5   belong to, if it's other criminals or whoever.  It wasn't
03:08PM   6   specific to Mike.
03:08PM   7       But again, we gave him the information on Mike as well to
03:08PM   8   see what they could develop on Mike.
03:08PM   9   Q.  Okay.  And then eventually at some point in time you
03:08PM  10   receive a call from Special Agent Bongiovanni about Mike
03:08PM  11   Masecchia, correct?
03:08PM  12   A.  I did.
03:08PM  13   Q.  So he called you up, I think you said, it was a little
03:08PM  14   out of the blue, right?
03:08PM  15   A.  Unexpected.
03:08PM  16   Q.  And it was unexpected because you had spoken with Mike
03:08PM  17   Hill who you were good friends with based on your academy
03:09PM  18   relationship?
03:09PM  19   A.  Unexpected because I would have expected Mike to give me
03:09PM  20   a heads-up if anybody was going to call me.
03:09PM  21   Q.  All right.  But Mike didn't give you a heads-up about
03:09PM  22   that, right?
03:09PM  23   A.  He didn't.
03:09PM  24   Q.  But you're aware of the fact that Agent Bongiovanni at
03:09PM  25   the time works in the same group as Mike Hill, right?

03:09PM      1   A.   I don't know if I knew that when I initially spoke to

03:09PM      2   Mike, but I found out after Bongiovanni called me.

03:09PM      3   Q.   All right.  And, I mean, you've been in the DEA at that

03:09PM      4   point in time for a couple years, but you had a 20-year-plus

03:09PM      5   career, correct?

03:09PM      6   A.   Total?

03:09PM      7   Q.   Yeah.

03:09PM      8   A.   Yes.

03:09PM      9   Q.   Okay.  And it's not uncommon for people who work in the

03:09PM     10   same group to assist other agents with investigations they

03:09PM     11   might not be the case agent on, right?

03:09PM     12   A.   That's not uncommon.

03:09PM     13   Q.   All right.  So, Agent Bongiovanni gives you a call, and

03:09PM     14   he mentions, hey, you know, I know Mike Masecchia based on

03:09PM     15   the fact that I grew up with him and went to school with him,

03:09PM     16   correct?

03:09PM     17   A.   He said that.

03:09PM     18   Q.   And, you know, that's not something that's uncommon in

03:09PM     19   the City of Buffalo, right?

03:09PM     20   A.   No.

03:09PM     21   Q.   You're from here, correct?

03:09PM     22   A.   Yes.

03:09PM     23   Q.   In fact, you testified on direct that you knew who Mike

03:09PM     24   Masecchia was before you even started the investigation,

03:09PM     25   right?

03:10PM 1    A.  Correct.

03:10PM 2    Q.  That was based on the fact that you grew up in the North

03:10PM 3    Buffalo area?

03:10PM 4    A.  I grew up in Kenmore.

03:10PM 5    Q.  Yeah, Kenmore, I'm sorry.  But you went to the Fitness

03:10PM 6    Factory gym; is that right?

03:10PM 7    A.  That's correct.

03:10PM 8    Q.  And that's where you had seen Mike Masecchia?

03:10PM 9    A.  That's the first time I ever saw him.

03:10PM 10   Q.  And you're familiar with him based on seeing him at the

03:10PM 11   gym?

03:10PM 12   A.  Pretty much.

03:10PM 13   Q.  Okay.  So Mr. Bongiovanni, during that phone call, he

03:10PM 14   mentions this information, correct, that he has.  That I know

03:10PM 15   him, I grew up with him?

03:10PM 16   A.  I grew up with him -- to the effect that I grew up with

03:10PM 17   him in North Buffalo.

03:10PM 18   Q.  And he also mentions that based on what he's heard, the

03:10PM 19   Erie County Sheriff's Office has some type of investigation

03:10PM 20   going on into marijuana grow operations somewhere in the

03:10PM 21   Southern Tier of New York?

03:10PM 22   A.  Related to Masecchia.

03:10PM 23   Q.  Correct.  Related to Mike Masecchia, right?

03:10PM 24   A.  Yes.

03:10PM 25   Q.  And so your case out in Vegas, it involves obviously a

03:10PM    1    drug nexus, correct?

03:10PM    2    A.  Correct.

03:10PM    3    Q.  And your case also involves a potential nexus with

03:11PM    4    Italian Organized Crime, right?

03:11PM    5    A.  Yes.  Yep.

03:11PM    6    Q.  At that point in time, Mr. Bongiovanni provided you

03:11PM    7    information about there may be a drug nexus that perhaps

03:11PM    8    exists out here, correct?

03:11PM    9    A.  Yeah, specific to what we said about the outdoor grows.

03:11PM    10   Q.  And that might have some relationship to the targets

03:11PM    11   you're looking at in Vegas, right?

03:11PM    12   A.  It gave us a drug nexus that we didn't have before.  We

03:11PM    13   didn't have that knowledge before regarding Masecchia.

03:11PM    14   Q.  So that was valuable information, right?

03:11PM    15   A.  It was good intelligence.

03:11PM    16   Q.  And when you got this call, did you ask him any specific

03:11PM    17   questions about what he knew about Mike Masecchia based on

03:11PM    18   the fact that they grew up?

03:11PM    19   A.  No, we really didn't talk much -- I'm sorry, specific to

03:11PM    20   what?  Could you ask that again?

03:11PM    21   Q.  Sure.  Did you ask him any specific questions about -- so

03:11PM    22   you just said that you grew up with Mike Masecchia, what can

03:11PM    23   you tell me about him?  Did you ever ask him a question about

03:11PM    24   that?

03:11PM    25   A.  No, we really didn't talk much about that, other than him

03:12PM   1   providing what he provided, about him possibly being involved

03:12PM   2   with the outdoor marijuana grows and the Erie County

03:12PM   3   Sheriff's Office was investigating that, I don't think I

03:12PM   4   asked many questions.

03:12PM   5   Q.  Did you note that in any type of report that you had on

03:12PM   6   the case?

03:12PM   7   A.  Did I note what?

03:12PM   8   Q.  The conversation you had with Agent Bongiovanni?

03:12PM   9   A.  I did not do a DEA-6 specific to the conversation with

03:12PM  10   Joe Bongiovanni.

03:12PM  11   Q.  Was there a reason why you didn't do that?

03:12PM  12   A.  Yeah.  It really wasn't that long of a conversation.  At

03:12PM  13   the time, I didn't think it was that significant other than

03:12PM  14   the intelligence regarding the outdoor grow, but I chose not

03:12PM  15   to.

03:12PM  16   Q.  So, you hang up the phone with him, correct?

03:12PM  17   A.  At some point.

03:12PM  18   Q.  And your understanding is that Mike Hill continues to try

03:12PM  19   to work the telephone numbers that you provided him?

03:12PM  20   A.  He said he would look into the telephone numbers.  And at

03:12PM  21   some point I don't know if he said at the time they were

03:12PM  22   going to open up a case, but they would start looking at it.

03:12PM  23   Q.  To your understanding, though, the Mike Masecchia

03:13PM  24   connection to who you're looking at in Vegas never really

03:13PM  25   materializes, right?

03:13PM   1   A.  To the best of our knowledge, he never moved out to

03:13PM   2   Vegas.

03:13PM   3   Q.  Yeah.  There are a couple reasons for that.  One of those

03:13PM   4   reasons is that Mike Masecchia never moves out to Vegas,

03:13PM   5   right?

03:13PM   6   A.  Again, to the best of my knowledge.  We never saw him out

03:13PM   7   there, so I don't think he did.

03:13PM   8   Q.  Another reason you provided on direct that Mike

03:13PM   9   Masecchia, when you're doing these wire intercepts, never

03:13PM   10  shows up on the wire intercepts?

03:13PM   11  A.  We never intercepted him on the wire.

03:13PM   12  Q.  Another reason why you provided is that you were not

03:13PM   13  really interested in investigating the drug nexus that may

03:13PM   14  exist in the Southern Tier, correct?

03:13PM   15  A.  That wouldn't be something that we would do.  That would

03:13PM   16  be something that the Buffalo office would do.

03:13PM   17  Q.  It's out of your jurisdiction, for lack of a better term?

03:13PM   18  A.  Yeah.  Operationally, that's for them to do, not us.

03:13PM   19  Q.  You're over in Vegas, and they're up here in New York

03:13PM   20  and --

03:13PM   21  A.  Yep.

03:13PM   22  Q.  -- you're not going to pick up a marijuana grow up in

03:13PM   23  New York?

03:13PM   24  A.  That would be something they would do.

03:13PM   25  Q.  Now if your investigation revealed there was marijuana

03:13PM 1  being transported from New York down to Vegas, that's

03:14PM 2  something you might be interested in, right?

03:14PM 3  A.  That would be of more interest at that point, because

03:14PM 4  then there's more of a direct nexus to Vegas in terms of a

03:14PM 5  drug nexus.

03:14PM 6  Q.  And Mike Hill never informs you that the Sheriff's Office

03:14PM 7  investigation into this grow yielded any results, correct?

03:14PM 8  A.  I never heard about it again.  Mike never mentioned it.

03:14PM 9  Q.  As far as the phone number that you provided, Mike Hill

03:14PM 10 provides you information that nothing really materializes on

03:14PM 11 those either, correct?

03:14PM 12 A.  They subpoenaed the phone numbers.  I think they

03:14PM 13 identified some of the phone numbers.  But they never got to

03:14PM 14 the point that they were actually working a wiretap

03:14PM 15 investigation.

03:14PM 16 Q.  So, safe to say that Mike Masecchia connection to your

03:14PM 17 2004 Vegas investigation really doesn't go anywhere, right?

03:14PM 18 A.  As far as regarding Masecchia?  No.  We never saw him.

03:14PM 19 We never got him on our wires.  We never indicted him.

03:14PM 20 Q.  And as far as I guess the conversation you had, one of

03:15PM 21 the things you mentioned, Mr. Casullo, was that

03:15PM 22 Mr. Bongiovanni mentioned to you that he could not have his

03:15PM 23 name associated with the file; is that right?

03:15PM 24 A.  He said he couldn't have his name on any reports.

03:15PM 25 Q.  And, you know, the reason why he gave to you that

03:15PM   1   was that he grew up with this guy who lives in North Buffalo,

03:15PM   2   and sometimes he sees him, right?

03:15PM   3   A.  I don't know if he sees him, or not.  But he mentioned

03:15PM   4   that he grew up with him, and that he knew him.

03:15PM   5   Q.  And they live in the same area to your understanding,

03:15PM   6   correct?

03:15PM   7   A.  He mentioned North Buffalo.  I don't know if Masecchia

03:15PM   8   still lived in North Buffalo at the time, but again, they

03:15PM   9   grew up together.  I don't know if they were currently close

03:15PM  10   in terms of geographic location or not.

03:15PM  11   Q.  Yeah.  So, for instance, you mentioned earlier that you

03:15PM  12   went to the Fitness Factory when you lived back in Buffalo?

03:15PM  13   A.  Yes.

03:15PM  14   Q.  You saw Mike Masecchia at the Fitness Factory?

03:15PM  15   A.  I did, several times.

03:15PM  16   Q.  And so your understanding of the investigation is

03:15PM  17   obviously as investigations are ongoing, the information

03:15PM  18   that's possessed by a law enforcement agency is secret,

03:16PM  19   correct?

03:16PM  20   A.  It's considered law enforcement sensitive.

03:16PM  21   Q.  And that's not something that's disclosed to the target

03:16PM  22   of an investigation at that time, correct?

03:16PM  23   A.  No.

03:16PM  24   Q.  But after someone is charged with a crime, they're

03:16PM  25   entitled to discovery, correct?

03:16PM    1    A.  There's a discovery process where those reports would be

03:16PM    2    turned over.

03:16PM    3    Q.  Yeah.  And so after someone is charged with a crime, a

03:16PM    4    defense attorney like me makes a discovery request to the

03:16PM    5    government, right?

03:16PM    6    A.  Correct.

03:16PM    7    Q.  And then the reports that you generate as a result of

03:16PM    8    your investigation onto that target, they get turned over to

03:16PM    9    the defense, correct?

03:16PM   10    A.  That's correct.

03:16PM   11    Q.  And the defendant in a criminal case has the right to

03:16PM   12    review those materials to help his or her defense attorney

03:16PM   13    prepare a case, right?

03:16PM   14    A.  Correct.

03:16PM   15    Q.  So at that point in time, they can look at the reports

03:16PM   16    and see someone's name on it, right?

03:16PM   17    A.  Correct.

03:16PM   18    Q.  Like, you had this situation pop up in the Myszka case,

03:16PM   19    correct?

03:16PM   20    A.  Could you be more specific?

03:16PM   21    Q.  Certainly.  So as part of the investigation you had into

03:16PM   22    Kevin Myszka, a person associated with Kevin Myszka was a

03:16PM   23    person by the name of Wolfson?

03:16PM   24    A.  Jordan Wolfson.

03:17PM   25    Q.  Jordan Wolfson.  And there was a connection that you had

03:17PM    1    to Jordan Wolfson completely divorced from your

03:17PM    2    responsibilities at the DEA, correct?

03:17PM    3    A.   Found out afterwards.

03:17PM    4    Q.   Right.  So Jordan Wolfson was someone who I think was --

03:17PM    5    your children were on the same sports team as his children?

03:17PM    6    A.   Correct.

03:17PM    7    Q.   And, you know, if your name showed up on a report where

03:17PM    8    Jordan Wolfson was a target, that would create a little bit

03:17PM    9    of an awkward situation, right?

03:17PM   10    A.   I did write a report with his name.

03:17PM   11    Q.   Um-hum.  And if Jordan Wolfson got a report, that's

03:17PM   12    something that would potentially create an awkward situation,

03:17PM   13    right?

03:17PM   14    A.   It would be awkward.

03:17PM   15    Q.   And so, you know, kind of going back to Mr. Bongiovanni

03:17PM   16    and your conversation with him in 2004, that may be a reason

03:17PM   17    why he said, hey, I just don't want to have my name on --

03:17PM   18         **MR. COOPER:**  Objection as to there may be a reason

03:17PM   19    why, Judge, he's asking him to speculate.

03:17PM   20         **THE COURT:**  No, I think it's fair in this context.

03:17PM   21    Overruled.

03:17PM   22         **THE WITNESS:**  Could you repeat the question, please?

03:17PM   23         **BY MR. SINGER:**

03:17PM   24    Q.   Sure.  And so going back to 2004, going back to Joe

03:17PM   25    Bongiovanni's conversation with you in 2004, for the same

03:17PM   1   reason, he might have had some concerns about being on a

03:17PM   2   report involving Mike Masecchia?

03:17PM   3   A.  It could be.

03:18PM   4         **MR. SINGER:**  3:30, Judge?  Or --

03:18PM   5         **THE COURT:**  Any time.  Well, I was thinking around

03:18PM   6   3:40 actually.

03:18PM   7         **MR. SINGER:**  Sure.

03:18PM   8         **THE COURT:**  Which would be about a halfway split.

03:18PM   9         **MR. SINGER:**  I can keep going, Judge, no problem.

03:18PM  10         **BY MR. SINGER:**

03:18PM  11   Q.  So, your case doesn't involve Masecchia in 2005, but it

03:18PM  12   does result in arrests of some targets that you're looking

03:18PM  13   into out in Vegas?

03:18PM  14   A.  It did, ultimately.

03:18PM  15   Q.  And those individuals are eventually charged and

03:18PM  16   convicted?

03:18PM  17   A.  They were charged, and they were convicted, correct.

03:18PM  18   They pled, I believe.

03:18PM  19   Q.  So you were also asked about the 2009 time period of a

03:18PM  20   Buffalo DEA file opened up on Masecchia; do you remember

03:18PM  21   that, sir?

03:18PM  22   A.  I do.

03:19PM  23   Q.  And this was is the Mark Suppa file?

03:19PM  24   A.  Yes.

03:19PM  25         **MR. SINGER:**  Ms. Champoux, can we bring up Government

03:19PM    1    Exhibit 12B, please?  As in boy.

03:19PM    2              **BY MR. SINGER:**

03:19PM    3    Q.  This is what we were talking about that you saw on

03:19PM    4    direct, sir?

03:19PM    5    A.  Yes.

03:19PM    6    Q.  And so the Suppa file, to your understanding, was opened

03:19PM    7    up by an individual by the name of Task Force Officer Cory

03:19PM    8    Higgins?

03:19PM    9    A.  Correct.

03:19PM   10    Q.  And Cory Higgins, he was somebody, based on the report

03:19PM   11    you're looking at in 12B, you don't know Cory Higgins before

03:19PM   12    you moved back to Buffalo, right?

03:19PM   13    A.  I don't know if I ever met Cory Higgins before I came

03:19PM   14    back.  I may have met him, again, coming home during summers.

03:19PM   15    I can't remember if I knew him or not.

03:19PM   16    Q.  But, like, 2009 time period, you guys don't know each

03:19PM   17    other to the extent where you would contact each other on,

03:19PM   18    like, a personal level?

03:19PM   19    A.  No.

03:19PM   20    Q.  All right.  So he works, based on the report, in a group

03:19PM   21    D-58?

03:20PM   22    A.  Correct.

03:20PM   23    Q.  So D-58 opens up an investigation into marijuana grows

03:20PM   24    with the target of Mark Suppa, correct?

03:20PM   25    A.  That's correct.

03:20PM    1          **MR. SINGER:**  If we can move to the second page of

03:20PM    2    this document, Ms. Champoux.  Thank you.

03:20PM    3          And if we can blow up the indexing section.

03:20PM    4          **BY MR. SINGER:**

03:20PM    5    Q.  So, the government asked -- I think the term was used,

03:20PM    6    did anyone ask you about Mike Masecchia, and they referred to

03:20PM    7    as "your guy;" do you remember that?

03:20PM    8    A.  I don't remember the exact words, but generally, I

03:20PM    9    remember what you're talking about.

03:20PM   10    Q.  And I think the question that was asked is why nobody

03:20PM   11    contacted about "your guy" when Mike Masecchia all of a

03:20PM   12    sudden came under investigation in 2009; do you recall that?

03:20PM   13    A.  Generally, yes.

03:20PM   14    Q.  All right.  So, Mike Masecchia, at that point in time in

03:20PM   15    2009, wasn't living out in Las Vegas, correct?

03:20PM   16    A.  Not to the best of my knowledge.  We weren't

03:21PM   17    investigating him, so I have no idea.

03:21PM   18    Q.  Yeah.  And so that's what I'm getting at.  Your case that

03:21PM   19    you opened up that involved Mike Masecchia in 2004, that was

03:21PM   20    closed?

03:21PM   21    A.  That was closed.

03:21PM   22    Q.  Like, many years prior to 2009, correct?

03:21PM   23    A.  I don't remember the exact year, but maybe 2006.  Maybe.

03:21PM   24    Around there.

03:21PM   25    Q.  So at that point, possibly three or more years?

03:21PM  1    A.  Yeah.

03:21PM  2    Q.  And so at that point in time, you really don't have any

03:21PM  3    reason to discuss Mike Masecchia, correct?

03:21PM  4    A.  That all depends.

03:21PM  5    Q.  Yeah.  It depends.  So, like, for instance, your case

03:21PM  6    file is closed, right?

03:21PM  7    A.  My case file was closed at that point.

03:21PM  8    Q.  But just because a case file is closed doesn't mean that

03:21PM  9    you never, ever look at a target of investigation again,

03:21PM  10   correct?

03:21PM  11   A.  No.  Right.  That's correct.

03:21PM  12   Q.  Yeah.  So, like, if a new lead develops on a target of

03:21PM  13   investigation, and the case file is closed, you can open up

03:21PM  14   the case file again, correct?

03:21PM  15   A.  Possibly.  Depending on the facts.

03:21PM  16   Q.  Yeah, it depends on the nature of the lead, right?

03:22PM  17   A.  Correct.

03:22PM  18   Q.  So if a lead develops something that's fruitful for you

03:22PM  19   to use, you can reopen the case file, correct?

03:22PM  20   A.  You could.

03:22PM  21   Q.  But if the lead is not something that's really useful,

03:22PM  22   you're probably gonna make the decision, well, I'm gonna just

03:22PM  23   keep this closed, because it's not going to help me, correct?

03:22PM  24   A.  Yeah.  If there's nothing new that would help us, then we

03:22PM  25   wouldn't open a case.

03:22PM  1   Q.  All right.  So going back to the opening of this case

03:22PM  2   file.  Your understanding is that Joe Bongiovanni was not

03:22PM  3   involved in Cory Higgins's investigation into Mike Masecchia

03:22PM  4   in 2009, right?

03:22PM  5   A.  I don't know that.

03:22PM  6   Q.  You have no idea?

03:22PM  7   A.  I don't -- I don't even know what group he's in at that

03:22PM  8   point.

03:22PM  9   Q.  Okay.  So you don't know if Joe Bongiovanni is in group

03:22PM  10  D-57 or D-58?

03:22PM  11  A.  No.

03:22PM  12  Q.  You don't know if they have, you know, the same group?

03:22PM  13  A.  No.

03:22PM  14  Q.  So, you at least know that Cory Higgins works in D-58

03:22PM  15  this time, correct?

03:22PM  16  A.  He's a task force officer.  And based on the report,

03:22PM  17  again, because there's task force officers in both groups,

03:22PM  18  but that's, like, the formal task force group.

03:23PM  19      But reading that report, I can certainly see that he was

03:23PM  20  assigned to D-58.

03:23PM  21  Q.  Okay.  So as far as Higgins is concerned, when Higgins

03:23PM  22  opens up this particular file, he indexes three people,

03:23PM  23  correct?

03:23PM  24  A.  Correct.

03:23PM  25  Q.  So the first person that's is in that indexing section,

03:23PM   1   that's Mark Suppa?

03:23PM   2   A.  That's correct.

03:23PM   3   Q.  And Suppa is the file title on this case, correct?

03:23PM   4   A.  That's correct.

03:23PM   5   Q.  Yeah.  See it right up there?

03:23PM   6   A.  Now I do.

03:23PM   7   Q.  August 3?

03:23PM   8   A.  Yep.  Now I do.

03:23PM   9   Q.  Okay.  Perfect.  So he's the file title, so naturally

03:23PM  10   he's gonna be number 1 in the indexing section, right?

03:23PM  11   A.  It doesn't have to be, but that makes sense, right.

03:23PM  12   Q.  And so as far as entry into the system, it looks like --

03:23PM  13   where it says negative here, and you have this other number

03:23PM  14   appearing right up here, it looks like Mark Suppa didn't have

03:23PM  15   a NADDIS number back in 2009 when this file was opened up?

03:23PM  16   A.  If it says negative, then based on what I'm reading here,

03:23PM  17   then he didn't have a NADDIS number.

03:24PM  18   Q.  So it looks like when the electronic system kind of

03:24PM  19   caught up to the paperwork, the NADDIS number, which is that

03:24PM  20   circle on the right, was entered onto the DEA-6, right?

03:24PM  21   A.  That's what it looks like.

03:24PM  22   Q.  And the same thing for Matt Suppa, who's the second

03:24PM  23   indexing person there?

03:24PM  24   A.  Correct.

03:24PM  25   Q.  Looks like negative NADDIS number at first, right?

03:24PM  1    A.  Correct.

03:24PM  2    Q.  But then the NADDIS number was entered, correct?

03:24PM  3    A.  Yeah, same as for Mark.

03:24PM  4    Q.  But it appears like Mike Masecchia does have a NADDIS

03:24PM  5    number, correct?

03:24PM  6    A.  Based on how this is written.  If he didn't, or they

03:24PM  7    couldn't find it, it should say negative.

03:24PM  8    Q.  And naturally, he should have a NADDIS number, correct,

03:24PM  9    sir?

03:24PM  10   A.  Oh, I know -- I know that we had him indexed in our case.

03:24PM  11   Q.  Yeah.  That's exactly what I'm getting at.

03:24PM  12       So that when you opened up an investigation into Mike

03:24PM  13   Masecchia in Las Vegas in 2004, when you indexed him, and he

03:24PM  14   didn't have a NADDIS number, you made sure he got a NADDIS

03:24PM  15   number, correct?

03:24PM  16   A.  And that's what I remember, that he doesn't have a NADDIS

03:24PM  17   number.  And that I identified him, indexed him, and then he

03:25PM  18   got the NADDIS number.

03:25PM  19   Q.  And so when someone gets a NADDIS number in the DEA

03:25PM  20   system, it's not local to the particular office you're in,

03:25PM  21   correct?

03:25PM  22   A.  No, that's a NADDIS number.

03:25PM  23       The way it should work is if someone's previously

03:25PM  24   identified a target, they would describe them in the indexing

03:25PM  25   section.  When that report gets approved and goes through the

03:25PM   1    administrative process, at some point a NADDIS number should

03:25PM   2    be assigned to that target.  So it's specific to that target.

03:25PM   3    Q.  So, Masecchia has a NADDIS number.  And your experience

03:25PM   4    as a DEA agent, when someone has a NADDIS number you can look

03:25PM   5    up in the NADDIS system why they received a NADDIS number in

03:25PM   6    the past, right?

03:25PM   7    A.  If someone has a NADDIS number, you can go in and check

03:25PM   8    the system or pull up that NADDIS record based on that NADDIS

03:25PM   9    number.  And it should, in that record, present some facts

03:25PM   10   about the previous case that that name was involved in.

03:25PM   11   Q.  Correct.  So when someone has one NADDIS number, if they

03:26PM   12   have three cases opened up under the same NADDIS number, they

03:26PM   13   are going to have three different cases associated with their

03:26PM   14   NADDIS number, right?

03:26PM   15   A.  It should.  And there's times where people make a

03:26PM   16   mistake, and they don't do it properly.

03:26PM   17       And then sometimes there's multiple NADDIS numbers

03:26PM   18   assigned to an individual.

03:26PM   19       And then in that case, you have to sort it out, request a

03:26PM   20   merging of the records.  That happens on occasion.

03:26PM   21   Q.  Yeah, we heard about that in this case.

03:26PM   22       But in this situation, it looks like Mike Masecchia has a

03:26PM   23   NADDIS number, right?

03:26PM   24   A.  Based on what I'm looking at here, the fact that it

03:26PM   25   doesn't say negative like that should, the way the process

03:26PM    1   should work is if you run a name and you don't find that name

03:26PM    2   in the system, you should write "NADDIS negative."

03:26PM    3       So based on what I'm seeing here, I don't know, but this

03:26PM    4   is weird because there's something redacted before negative.

03:26PM    5   I don't know why that would be redacted, because it's

03:26PM    6   consistent with a NADDIS number.

03:26PM    7       So I don't know why they put something redacted, and then

03:26PM    8   negative.  It should just be NADDIS negative.

03:27PM    9       But it looks like all three here had numbers, because

03:27PM   10   there's a redaction for all three.  So that's why I don't

03:27PM   11   understand.

03:27PM   12          **MR. COOPER:**  Judge, I'm just going to object.  I

03:27PM   13   think if we can come up, we can maybe work this out.

03:27PM   14          **MR. SINGER:**  I'm done with my questioning on this

03:27PM   15   point, Judge.

03:27PM   16          **THE COURT:**  Okay.  So the objection is overruled.

03:27PM   17          Go ahead.

03:27PM   18          **MR. COOPER:**  Okay.  We'll deal with it on our

03:27PM   19   redirect.  Thanks.

03:27PM   20          **BY MR. SINGER:**

03:27PM   21   Q.  So since there's a NADDIS entered in the system, Cory

03:27PM   22   Higgins is the case agent to your understanding, correct?

03:27PM   23   A.  He wrote the case initiation, so it's most likely that

03:27PM   24   he's the case agent.

03:27PM   25   Q.  So he could have picked up the phone and made a call to

03:27PM    1    you, right?

03:27PM    2    A.  If Cory Higgins ran Michael Masecchia in NADDIS, and that

03:27PM    3    NADDIS number -- and found a NADDIS number, which was the

03:27PM    4    same NADDIS number that I had him indexed under, then he

03:27PM    5    could see that there -- and I'm trying to remember this, when

03:27PM    6    you run a NADDIS number, you could see the other office that

03:27PM    7    had that person indexed.

03:27PM    8        So you can investigate.  You could then take that case

03:28PM    9    number and run it in the system and see who the case agents

03:28PM   10    were.

03:28PM   11    Q.  And so that would lead back to you, right, because you

03:28PM   12    were one --

03:28PM   13    A.  I was --

03:28PM   14    Q.  -- of the case agents?

03:28PM   15    A.  -- one of the case agents.

03:28PM   16    Q.  And so he could have made a phone call to Las Vegas, and

03:28PM   17    said, hey, what's up with this Mike Masecchia investigation

03:28PM   18    you had going on in 2004, right?

03:28PM   19    A.  If Cory Higgins want to do the research on that NADDIS

03:28PM   20    number, he could go through that process I just mentioned.

03:28PM   21    Q.  And the same thing is true with Mike Hill's

03:28PM   22    investigation, correct?

03:28PM   23        So Mike Hill opened up a separate investigation to yours

03:28PM   24    out of DEA Buffalo --

03:28PM   25    A.  Correct.

03:28PM    1    Q.  -- office in 2004, to your understanding, correct?

03:28PM    2    A.  Correct.

03:28PM    3    Q.  So that case investigation and case number would have

03:28PM    4    been associated with a NADDIS number for Mike Masecchia?

03:28PM    5    A.  Especially since we were coordinating so closely.

03:28PM    6        And from what I remember, Mike was aware that we indexed

03:28PM    7    him.  And so when he indexed him, he used our NADDIS number.

03:28PM    8    Q.  So Cory Higgins could have, not just picked up the phone,

03:28PM    9    he could have walked down the hallway and talked to Mike

03:28PM   10    Hill, right?

03:28PM   11    A.  Again, if he ran that number, which was the same NADDIS

03:29PM   12    number that we had Michael Masecchia indexed under, it should

03:29PM   13    be the same number that they had, though he -- what should

03:29PM   14    happen is he would see that that NADDIS number is related to

03:29PM   15    both the Las Vegas case and the Buffalo case.

03:29PM   16    Q.  All right.  So, you never received any call from Cory

03:29PM   17    Higgins in 2009, correct?

03:29PM   18    A.  I never received a call from Cory.

03:29PM   19    Q.  You didn't receive any call from anyone out of the

03:29PM   20    Buffalo office regarding the 2009 Suppa investigation

03:29PM   21    involving Mike Masecchia, correct?

03:29PM   22    A.  No.

03:29PM   23    Q.  Did anyone get indicted for failing to do that, to your

03:29PM   24    knowledge, sir?

03:29PM   25    A.  Did anyone -- what, sir?

03:29PM  1  Q.  Did anyone get indicted for failing to do that, to your

03:29PM  2  knowledge?

03:29PM  3  A.  Indicted?

03:29PM  4  Q.  Yeah.  Did anyone get charged with a felony for not

03:29PM  5  calling you up in 2009 to talk to you about your 2004

03:29PM  6  Masecchia investigation?

03:29PM  7        **MR. COOPER:**  Objection, Judge.

03:29PM  8        **THE COURT:**  Yeah, sustained.

03:29PM  9        **MR. SINGER:**  We can move on, Judge.

03:29PM  10        **BY MR. SINGER:**

03:29PM  11  Q.  So, in December of 2015, you said that you moved back to

03:30PM  12  the Buffalo office, correct?

03:30PM  13  A.  December of -- no, I'm sorry.  September of '15, it was.

03:30PM  14  Q.  It's September of '15?

03:30PM  15  A.  September of '15, correct.  It was right around Labor

03:30PM  16  Day, I remember.

03:30PM  17  Q.  All right.  So September of 2015, not December, is when

03:30PM  18  you moved back to Buffalo?

03:30PM  19  A.  September '15 is when I got assigned to the Buffalo

03:30PM  20  office.

03:30PM  21  Q.  And so the government asked you whether or not Joe

03:30PM  22  Bongiovanni, at that point in time you got back to the DEA

03:30PM  23  office in Buffalo, asked you any questions about how your

03:30PM  24  2004 Mike Masecchia investigation went; do you remember that?

03:30PM  25        **MR. COOPER:**  Objection.  I didn't ask that question.

03:30PM | 1     **THE COURT:**  Then he can answer.  Overruled.

03:30PM | 2     **THE WITNESS:**  I'm sorry, sir, could you ask the

03:30PM | 3  question again, please?

03:30PM | 4     **BY MR. SINGER:**

03:30PM | 5  Q.  Sure.  When you got back to the DEA office --

03:30PM | 6  A.  Yes.

03:30PM | 7  Q.  -- in September of 2015 --

03:30PM | 8  A.  Yes.

03:30PM | 9  Q.  -- moving forward --

03:30PM | 10  A.  September of '15, yep.

03:30PM | 11  Q.  -- from September 2015 moving forward, your testimony was

03:30PM | 12  that Joe Bongiovanni never asked you about your 2004 Mike

03:31PM | 13  Masecchia investigation?

03:31PM | 14  A.  No.

03:31PM | 15  Q.  Never asked you?

03:31PM | 16  A.  No.

03:31PM | 17  Q.  And as far as that particular investigation was

03:31PM | 18  concerned, were you aware that the -- the Ron Serio file was

03:31PM | 19  closed several months before you got back to Buffalo, sir?

03:31PM | 20  A.  No.  My belief was that it was still open, based on what

03:31PM | 21  he told me when I saw the file sitting on his desk.

03:31PM | 22  Q.  Oh, I understand that that's what you believed, sir.

03:31PM | 23     But do you know that that investigation was closed in

03:31PM | 24  January of 2015 --

03:31PM | 25  A.  No.

03:31PM   1   Q.  -- before you got to the office?

03:31PM   2   A.  No.  He told me he had an open case on him.

03:31PM   3   Q.  Well, he didn't say that he had an open case.

03:31PM   4       MR. COOPER:  Objection.  Argumentative.

03:31PM   5       BY MR. SINGER:

03:31PM   6   Q.  You testified earlier --

03:31PM   7       MR. COOPER:  Objection.  Argumentative.

03:31PM   8       THE COURT:  Well, yes, you can ask a question,

03:31PM   9   Mr. Singer, you can't testify, so --

03:31PM   10      MR. SINGER:  No problem.

03:31PM   11      BY MR. SINGER:

03:31PM   12  Q.  You testified earlier on direct, sir, that Joe

03:31PM   13  Bongiovanni, you took from what he told you that the case was

03:31PM   14  still open; do you remember that?

03:31PM   15      MR. COOPER:  Objection as to the form of the

03:31PM   16  question.

03:31PM   17      THE COURT:  No overruled.

03:31PM   18      MR. COOPER:  Joe Bongiovanni took from what he told

03:32PM   19  you earlier?

03:32PM   20      MR. SINGER:  That's not what I said, Judge.

03:32PM   21      MR. COOPER:  Read it back.

03:32PM   22      THE COURT:  Ask another question.

03:32PM   23      MR. SINGER:  Certainly.

03:32PM   24      BY MR. SINGER:

03:32PM   25  Q.  You took from the conversation -- you testified earlier

03:32PM   1   on direct you took from the conversation you had with Joe

03:32PM   2   Bongiovanni that Joe Bongiovanni had a case file open with

03:32PM   3   the Serios still; do you remember testifying to that?

03:32PM   4   A.  That was my -- that was my belief after a conversation

03:32PM   5   with Joe at his desk.

03:32PM   6   Q.  But you don't know the official status of the

03:32PM   7   investigation, whether it was open or closed at that point in

03:32PM   8   time?

03:32PM   9   A.  No.

03:32PM  10   Q.  No.  You don't.

03:32PM  11   A.  I -- I don't know the official status, other than what he

03:32PM  12   had told me.

03:32PM  13   Q.  Yes.  You surmised, based on your conversation, that it

03:32PM  14   was open, but you didn't know at the time.

03:32PM  15   A.  I believe, based on what he told me, that it was an open

03:32PM  16   case.

03:32PM  17   Q.  And so the 2004 investigation that you conducted into

03:32PM  18   Mike Masecchia, that really didn't produce any results,

03:32PM  19   right?

03:32PM  20   A.  My investigation?

03:32PM  21   Q.  Yes.

03:32PM  22   A.  Our Las Vegas investigation?

03:32PM  23   Q.  Yes.

03:32PM  24   A.  It had results, yes.

03:32PM  25   Q.  Well, I'm talking about vis-à-vis Mike Masecchia.  Like,

03:32PM  1  you didn't --

03:32PM  2  A.  We never indicted Michael Masecchia.

03:32PM  3  Q.  And you didn't really gather any information about him

03:33PM  4  engaging in criminal activity either, correct?

03:33PM  5  A.  No.

03:33PM  6  Q.  Never caught him on a wire, right?

03:33PM  7  A.  Never caught him on a wire.

03:33PM  8  Q.  You never caught him on any type of phone logs?

03:33PM  9  A.  Again, at the time, I don't know if we had Michael

03:33PM 10  Masecchia's number identified, so his number could have been

03:33PM 11  on a phone logs.  I just don't remember if we had it

03:33PM 12  identified at that point.

03:33PM 13  Q.  Yeah.  So, basically, even if Mr. Bongiovanni asked you,

03:33PM 14  hey, how did the 2004 investigation go, there was really

03:33PM 15  nothing much to say, right?

03:33PM 16  A.  No.  If you asked it the way you just said, I would say

03:33PM 17  it was extremely successful, because we indicted several

03:33PM 18  people.  Identified a source of supply.

03:33PM 19  Q.  Again, sir, I'm not asking you questions about other

03:33PM 20  targets in that investigation.

03:33PM 21  A.  You didn't say specifically Mike Masecchia.

03:33PM 22  Q.  I'm asking you about Mike Masecchia.

03:33PM 23  A.  But you didn't say that --

03:33PM 24       **THE COURT:**  Let's stop the back and forth, folks.

03:33PM 25  Questions and answers please.

03:33PM  1          **BY MR. SINGER:**

03:33PM  2  Q.  Mike Masecchia in 2004, your investigation didn't reveal

03:33PM  3  any results, right?

03:33PM  4  A.  Correct.

03:33PM  5  Q.  So telling Mr. Bongiovanni about your 2004 investigation

03:33PM  6  regarding Mike Masecchia really wasn't worth much at all,

03:33PM  7  correct?

03:34PM  8          **MR. COOPER:**  Objection as to form of the question,

03:34PM  9  whether it was worth much at all.

03:34PM 10          **THE COURT:**  The objection to the form of the question

03:34PM 11  is sustained.

03:34PM 12          **BY MR. SINGER:**

03:34PM 13  Q.  Your conversation with Mr. Bongiovanni about the case

03:34PM 14  file in 2015; do you remember that?

03:34PM 15  A.  The conversation about the Serio case file.

03:34PM 16  Q.  Yes.

03:34PM 17  A.  Yes.

03:34PM 18  Q.  Mike Masecchia, you investigated him in 2004, right?

03:34PM 19  A.  Yes, we did.

03:34PM 20  Q.  You didn't have anything produced as far as results

03:34PM 21  regarding Mike Masecchia in that investigation, right?

03:34PM 22  A.  No, we didn't.

03:34PM 23  Q.  The 2015 conversation that you had with Mr. Bongiovanni

03:34PM 24  about the Ron Serio file didn't involve the name Mike

03:34PM 25  Masecchia, right?

03:34PM   1    A.   He never brought up Masecchia.

03:34PM   2    Q.   And even if he did, there wasn't really much for you to

03:34PM   3    report about in 2004 of Mike Masecchia, right?

03:34PM   4         **MR. COOPER:**  Objection as to the relevance of that,

03:34PM   5    Judge.

03:34PM   6         **THE COURT:**  Overruled.

03:34PM   7         **THE WITNESS:**  If he had brought up Michael Masecchia

03:34PM   8    when I was at his desk for that conversation, that would have

03:34PM   9    been of interest to me.

03:35PM   10        **BY MR. SINGER:**

03:35PM   11   Q.   I'm not asking whether it was of interest to you, sir.

03:35PM   12   A.   Yep.

03:35PM   13   Q.   What I'm asking you is that you didn't have much

03:35PM   14   information to report to him in 2015 about what you did in

03:35PM   15   2004; is that right?

03:35PM   16   A.   Yeah, we didn't do much with Michael Masecchia.  Nothing

03:35PM   17   came of -- not much came of Michael Masecchia during that

03:35PM   18   2000 investigation in Las Vegas.

03:35PM   19   Q.   Thank you.

03:35PM   20        **MR. SINGER:**  I think it's a good time for a break,

03:35PM   21   Judge.

03:35PM   22        **THE COURT:**  Okay.  So let's take a break, folks.

03:35PM   23        Remember my instructions.  Don't communicate about

03:35PM   24   the case, even with each other.  Don't make up your minds.

03:35PM   25        See you back here in about 15 minutes or so.

| | | |
|---|---|---|
| 03:35PM | 1 | (Jury excused at 3:35 p.m.) |
| 03:35PM | 2 | **THE COURT:**  Okay.  You can step down, sir. |
| 03:36PM | 3 | You're not to talk with anybody about your testimony |
| 03:36PM | 4 | during the break. |
| 03:36PM | 5 | **THE WITNESS:**  Yes, sir. |
| 03:36PM | 6 | **THE COURT:**  Anything? |
| 03:36PM | 7 | **MR. SINGER:**  No, Judge. |
| 03:36PM | 8 | **THE COURT:**  Anything from the government? |
| 03:36PM | 9 | **MR. COOPER:**  No, thank you, Judge. |
| 03:36PM | 10 | **THE COURT:**  Okay.  Great.  See you in about 15, 20 |
| 03:36PM | 11 | minutes or so. |
| 03:36PM | 12 | **THE CLERK:**  All rise. |
| 03:36PM | 13 | (Off the record at 3:36 p.m.) |
| 03:51PM | 14 | (Back on the record at 3:51 p.m.) |
| 03:51PM | 15 | (Jury not present.) |
| 03:51PM | 16 | **THE CLERK:**  All rise. |
| 03:51PM | 17 | **THE COURT:**  Please be seated. |
| 03:51PM | 18 | **THE CLERK:**  We are back on the record for the |
| 03:51PM | 19 | continuation of the jury trial in case number 19-cr-227, |
| 03:52PM | 20 | United States of America versus Joseph Bongiovanni. |
| 03:52PM | 21 | All counsel and parties are present. |
| 03:52PM | 22 | **THE COURT:**  Are you ready to go? |
| 03:52PM | 23 | **MR. SINGER:**  Ready to go. |
| 03:52PM | 24 | **THE COURT:**  Are you going to finish this afternoon? |
| 03:52PM | 25 | **MR. SINGER:**  Oh, yeah.  No, I anticipate that.  I |

03:52PM  1    think Mr. Cooper and I were saying that maybe we have time to

03:52PM  2    go through a direct of the next witness, maybe not.

03:52PM  3            **THE COURT:**  Okay.  Good.

03:52PM  4            Anything from the government?

03:52PM  5            **MR. COOPER:**  I actually cut the next witness because

03:52PM  6    I thought we were finishing on Mr. Casullo today based on

03:52PM  7    where I ended.

03:52PM  8            **MR. SINGER:**  Yeah.  But what we talked about is maybe

03:52PM  9    there would be 15 or 20 minutes left over.

03:52PM  10           Mr. MacKay -- just so you know, Judge, Mr. MacKay,

03:52PM  11   he's got some hearing that he's, like, I need to get out of

03:52PM  12   here at 5:30.

03:52PM  13           **THE COURT:**  I understand that.  So we'll quit a

03:52PM  14   little early if we have to.  Not a big deal.

03:52PM  15           Okay.  Anything else?

03:52PM  16           **MR. COOPER:**  Yeah, just one thing, Judge.  There was

03:52PM  17   a question and there was an objection sustained, and I just

03:52PM  18   want to make sure it's not gonna happen again, which is

03:52PM  19   questions about prosecutorial charging decisions.

03:52PM  20           We briefed this.  The Court made a pretrial ruling

03:53PM  21   that that wasn't something that was going to be gotten into.

03:53PM  22   The question has no basis other than that.  It's a question

03:53PM  23   about this defendant, it reeks of jury nullification, and so I

03:53PM  24   just want to confirm that it was a slipup and it's not going

03:53PM  25   to happen again.

03:53PM      1          **THE COURT:**  Yeah, I sustained the objection, and

03:53PM      2   there was no answer to the question, so no harm done.

03:53PM      3          **MR. COOPER:**  Okay.  Then I'm good to go.

03:53PM      4          **THE COURT:**  Okay.  Let's bring them in, please, Pat.

03:53PM      5          Let's get the witness back, too.

03:54PM      6          (Witness and Jury seated at 3:54 p.m.)

03:54PM      7          **THE COURT:**  The record will reflect that all our

03:54PM      8   jurors again are present.

03:54PM      9          I remind the witness that he's still under oath.

03:54PM     10          And you may continue, Mr. Singer.

03:54PM     11          **MR. SINGER:**  Thank you, Judge.

03:54PM     12          **BY MR. SINGER:**

03:54PM     13   Q.  All right.  So, Mr. Casullo, I want to get into a couple

03:54PM     14   of exhibits that the government showed you.

03:54PM     15          **MR. SINGER:**  So, Ms. Champoux, is it possible to

03:54PM     16   bring up Government Exhibit 26E as in echo, please.

03:54PM     17          And if we can turn to page 2.  And blow up the middle

03:55PM     18   section, please.

03:55PM     19          **BY MR. SINGER:**

03:55PM     20   Q.  So, you recall being asked some questions about 26C,

03:55PM     21   correct, sir?

03:55PM     22   A.  Yes.

03:55PM     23   Q.  And this particular part on page 2 of 26C, this is one of

03:55PM     24   the DARTS reports regarding phone numbers, correct?

03:55PM     25   A.  Yes.

03:55PM    1    Q.  And the particular phone number on the top left corner,

03:55PM    2    that's a number that was associated with Mike Masecchia,

03:55PM    3    right?

03:55PM    4    A.  Yes.

03:55PM    5    Q.  So this particular entry shows three different things, so

03:55PM    6    I want to go through them.

03:55PM    7        So the first thing it shows, moving down from the bottom,

03:55PM    8    is that that particular number was entered into DARTS --

03:55PM    9    sorry, I'm going out of order here.  My apologies.

03:55PM   10        Let's start with the middle section.

03:55PM   11        So middle section indicates that the particular number up

03:55PM   12    in the upper left, that was entered into the DARTS system on

03:56PM   13    3/20/2013, correct?

03:56PM   14    A.  Correct.

03:56PM   15    Q.  And then the second entry with regard to this number that

03:56PM   16    appears in the bottom part, the 4/19/2013 entry, correct?

03:56PM   17    A.  Correct.

03:56PM   18    Q.  And so the difference between entry number 1 and entry

03:56PM   19    number 2 is that it appears like this entry indicates that

03:56PM   20    the subscriber of that number still has yet to be identified,

03:56PM   21    right?

03:56PM   22    A.  It just says number part of ongoing narcotics

03:56PM   23    investigation in contact with that number.

03:56PM   24    Q.  Okay.

03:56PM   25    A.  So I don't know if he got subscriber back, or not

03:56PM    1    identified.  I just know based on the remarks, it says in

03:56PM    2    contact with that number.

03:56PM    3    Q.  All right.  And then this particular entry for the second

03:56PM    4    entry in the bottom of 4/19/2013 entry, that indicates that

03:56PM    5    it's a number that belongs to Mike Masecchia, correct?

03:56PM    6    A.  Correct.

03:56PM    7    Q.  So roughly about a month later, there's a name associated

03:56PM    8    with the number?

03:57PM    9    A.  That's what it looks like.

03:57PM   10    Q.  And then the third entry which appears up at the top,

03:57PM   11    that's an entry that's put in associating that number with

03:57PM   12    the Ron Serio DTO?

03:57PM   13    A.  Correct.

03:57PM   14    Q.  So the first two entries, they involve the same case

03:57PM   15    number, correct?

03:57PM   16    A.  Correct.

03:57PM   17    Q.  The C2-13-0026 number?

03:57PM   18    A.  Yes.

03:57PM   19    Q.  And that's the Wayne Anderson file, to your

03:57PM   20    understanding, sir?

03:57PM   21    A.  I don't remember exactly, but it could be.

03:57PM   22    Q.  Okay.  You don't have any reason to disagree with me

03:57PM   23    that's the Wayne Anderson file, right?

03:57PM   24    A.  No.

03:57PM   25    Q.  And then the number that appears in that third entry

03:57PM  1    entered an Agent Ryan, that's a different case file number,

03:57PM  2    correct?

03:57PM  3    A.  That's different.

03:57PM  4    Q.  And so that particular entry was put into DARTS

03:57PM  5    8/21/2018?

03:57PM  6    A.  Correct.

03:57PM  7    Q.  All right.  So the government asked you a couple

03:57PM  8    questions about DARTS, and I just want to review for the jury

03:57PM  9    how it is all this gets in here.

03:57PM  10       So this first entry for 3/20/2013, there's no name

03:58PM  11   associated with the telephone number up at the top left yet,

03:58PM  12   correct?

03:58PM  13   A.  Based on the second one and the remarks section, there's

03:58PM  14   no -- there's not a name associated with it based on the

03:58PM  15   remarks.

03:58PM  16   Q.  But then that changes a month later like we talked about,

03:58PM  17   right?

03:58PM  18   A.  Correct.

03:58PM  19          **MR. SINGER:**  So, Ms. Champoux, can we bring down this

03:58PM  20   exhibit.  And can we bring up Government Exhibit 100A.1,

03:58PM  21   please?  And can we open up the file C Baker toll analysis.

03:58PM  22          Baker C toll analysis.

03:58PM  23          **THE COURT:**  This is in evidence?

03:58PM  24          **MR. SINGER:**  This is in evidence, Judge.

03:58PM  25          And if we can move to the next page, Ms. Champoux.

Case 1:19-cr-00227-LJV-MJR   Document 1335   Filed 11/02/24   Page 182 of 261
USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

182

03:59PM     1              **BY MR. SINGER:**

03:59PM     2    Q.  So, you're familiar with what this document is, right,

03:59PM     3    sir?

03:59PM     4    A.  Yes.  It's a frequency report.

03:59PM     5    Q.  Yeah.  So this is also referred to as a hot list?

03:59PM     6    A.  Yes.

03:59PM     7    Q.  And the hot list is being run on this particular number

03:59PM     8    up here?

03:59PM     9    A.  Yes.

03:59PM    10    Q.  That's the 830-3226 number?

03:59PM    11    A.  Correct.

03:59PM    12    Q.  And you're familiar, based on your direct, that's the

03:59PM    13    number associated with Ron Serio, correct?

03:59PM    14    A.  Again, I can't remember but --

03:59PM    15    Q.  No reason to disagree with me on that though, right, sir?

03:59PM    16    A.  No.

03:59PM    17    Q.  Okay.  It appears like this particular hot list is run on

03:59PM    18    3/19/2013; is that right?

03:59PM    19    A.  Looks like it.

03:59PM    20              **MR. SINGER:**  And, Ms. Champoux, can we advance to

03:59PM    21    page 3 of the document, please?

03:59PM    22              **BY MR. SINGER:**

03:59PM    23    Q.  So row 23 up at the top, do you see that row, sir?

03:59PM    24    A.  Yes.

04:00PM    25    Q.  The number that appears in the DARTS entry, the

04:00PM    1    716-812-0664 number, that appears in this hot list?

04:00PM    2    A.  Correct.

04:00PM    3    Q.  And you see the dialed name entry there?

04:00PM    4    A.  Correct.

04:00PM    5    Q.  What does it reflect again?

04:00PM    6    A.  No subscriber.

04:00PM    7    Q.  And in your understanding of doing these over the course

04:00PM    8    of your 20-plus-year career, what that means is that at that

04:00PM    9    point in time when you're running the hot list, there's no

04:00PM   10    subscriber associated with that number yet, correct?

04:00PM   11    A.  Yeah.  Typically, yes.

04:00PM   12    Q.  And that's different than line 34 here where Mark Kagan

04:00PM   13    is listed?

04:00PM   14    A.  Correct.

04:00PM   15    Q.  And what that means is that DEA possesses information

04:00PM   16    when they run this hot list that that number is associated

04:00PM   17    with Mark Kagan, correct?

04:00PM   18    A.  It most likely means that a subpoena came back, and that

04:00PM   19    number has a subscriber to that particular person.

04:00PM   20    Q.  Yeah.  And that's what I'm getting at.

04:00PM   21        So to figure out the no subscribers when you got a hot

04:00PM   22    list, the next step in the process is either you or an intel

04:01PM   23    analyst sends a subpoena to the phone company to figure out

04:01PM   24    who is the subscriber to that number you don't know, right?

04:01PM   25    A.  Right.

04:01PM  1    Q.  So as far as DARTS is concerned, we took a look at it

04:01PM  2    just a moment ago, but on Exhibit 26E, with that particular

04:01PM  3    entry regarding the Mike Masecchia number, the first entry

04:01PM  4    doesn't indicate who that number's associated with, correct?

04:01PM  5    A.  Right.

04:01PM  6    Q.  All it says is that it's associated with having calls in

04:01PM  7    place with the Ron Serio number, right, the 3226 number?

04:01PM  8    A.  Right.

04:01PM  9    Q.  And so the next step in the process is that an intel

04:01PM  10   analyst or an agent is going to send a subpoena off to figure

04:01PM  11   out who is the subscriber to that number that we don't know

04:01PM  12   at this point?

04:01PM  13   A.  That's how it should work.

04:01PM  14   Q.  And so when you enter a number into DARTS, what usually

04:01PM  15   happens is you -- you subpoena that record, right?

04:01PM  16   A.  You subpoena that record -- when you run a number in

04:01PM  17   DARTS, you don't have to subpoena the record, you can just

04:01PM  18   run it to see if there's an overlap.  Or, you can take it one

04:02PM  19   step further and then subpoena that number.

04:02PM  20   Q.  Yeah.  And that looks like that's what napped that case,

04:02PM  21   right?  So 26E, remember looking back at it, the 3/20/2013

04:02PM  22   entry?

04:02PM  23   A.  It says no subscriber.  It could, I mean, if that was

04:02PM  24   run, it could be that they just didn't get the subscriber

04:02PM  25   back from the phone company.  But based on what this says

04:02PM   1   here, there's no information available in PenLink that lists

04:02PM   2   subscriber to that phone.

04:02PM   3       PenLink is different than DARTS.  So this isn't DARTS,

04:02PM   4   this is PenLink, a system where you put the numbers and keep

04:02PM   5   track of the numbers.

04:02PM   6   Q.  Yeah, we talked about PenLink before.

04:02PM   7   A.  Okay.  Got you.

04:02PM   8   Q.  So when a subscriber's information is retrieved from a

04:02PM   9   subpoena sent to a phone company, DEA agents or analysts can

04:02PM  10   enter that phone number and subscriber information into

04:02PM  11   PenLink, right?

04:02PM  12   A.  Yes.

04:02PM  13   Q.  And PenLink is what essentially populates the hot list

04:02PM  14   with this is who this number belongs to, correct?

04:02PM  15   A.  Yeah.  Again, when they get that subpoena back, an

04:02PM  16   analyst should update PenLink.

04:03PM  17   Q.  Um-hum.

04:03PM  18   A.  Hopefully they do it quickly, so that's how it should

04:03PM  19   work.

04:03PM  20   Q.  Yeah.  And as far as the subpoena is concerned, so to

04:03PM  21   obtain a subpoena on a particular number, DARTS is used for

04:03PM  22   that as well, right?

04:03PM  23   A.  Yeah.  It the process is automated through DARTS.

04:03PM  24   Q.  So when an analyst or an agent wants to figure out who a

04:03PM  25   subscriber to line 23 belongs to, right, they enter into

04:03PM     1    DARTS information to request a subpoena for the cell phone,

04:03PM     2    correct?

04:03PM     3    A.   If they want to request a subpoena, they would do it

04:03PM     4    through DARTS.  So they would put the number into DARTS, it

04:03PM     5    would show if there is or isn't a deconfliction, and then you

04:03PM     6    can take it one step further to request the subscriber

04:03PM     7    information.

04:03PM     8         MR. SINGER:  All right.  So if we can go back to

04:03PM     9    26 -- actually, why don't we -- can we close out of this one

04:03PM    10    document, Ms. Champoux?

04:03PM    11         And if we could go to a different document, 100A.1.

04:03PM    12    If we can go to the 4/19/13 subscriber list.

04:04PM    13         And if we can advance to page 2, please.

04:04PM    14         BY MR. SINGER:

04:04PM    15    Q.   So, with regard to that 812-0664 number, do you see that,

04:04PM    16    sir?

04:04PM    17    A.   Yes.

04:04PM    18    Q.   It appears like there was information that was obtained

04:04PM    19    pursuant to subpoena to populate PenLink with Michael

04:04PM    20    Masecchia being the subscriber on that number, correct?

04:04PM    21    A.   Correct.

04:04PM    22    Q.   And that happens on 4/19 of 2013?

04:04PM    23    A.   That hot list was run on 4/19/2013.

04:04PM    24    Q.   All right.

04:04PM    25         MR. SINGER:  So if we can close out of this exhibit

04:04PM      1   and go back to 26E, Ms. Champoux.  And go back to page 2.

04:05PM      2          And blow up that middle section again, please.

04:05PM      3          **BY MR. SINGER:**

04:05PM      4   Q.  All right.  So you saw the initial hot list that was run

04:05PM      5   on Ron Serio's number on 3/19/2013?

04:05PM      6   A.  Correct.

04:05PM      7   Q.  And so it looks like what happened was that an intel

04:05PM      8   analyst or an agent, it looks like in this case Justin Borst,

04:05PM      9   intel analyst, right?

04:05PM     10   A.  Yes.

04:05PM     11   Q.  Entered this particular number as being associated with

04:05PM     12   Ron Serio's number?

04:05PM     13   A.  In contact with that number, correct.

04:05PM     14   Q.  And then it looks like based on as far as the subscriber

04:05PM     15   list, they received information regarding who owned that 0664

04:05PM     16   number in April of 2013, correct?

04:05PM     17   A.  I can't remember, but --

04:05PM     18   Q.  Well, you recall that the second document we looked at,

04:05PM     19   that was the information on the 4/19/2013 subscriber list,

04:05PM     20   right?

04:05PM     21   A.  Yes.

04:05PM     22   Q.  And you see the same date right here, correct?

04:06PM     23   A.  Yep.

04:06PM     24   Q.  And you see an association between this number up here

04:06PM     25   and Mike Masecchia, correct?

04:06PM  1    A.  Yes.

04:06PM  2    Q.  So it appears like on 4/19/2013, there was an update into

04:06PM  3    DARTS to associate that number with Mike Masecchia, correct?

04:06PM  4    A.  Correct.

04:06PM  5    Q.  And that's how this information gets into the system in

04:06PM  6    DARTS, correct?

04:06PM  7    A.  That's how it gets into DARTS, correct.

04:06PM  8    Q.  Like, you as an agent don't just go up to a computer and

04:06PM  9    type in this number belongs to Mike Masecchia, right?  It

04:06PM  10   doesn't work that way, right?

04:06PM  11   A.  What do you mean?

04:06PM  12   Q.  So when you want to get a number associated with someone

04:06PM  13   in DARTS that you don't know, you have to subpoena

04:06PM  14   information, correct?

04:06PM  15   A.  That's the first thing you should do is a subpoena.  But

04:06PM  16   you also have to take into consideration that a lot of -- in

04:06PM  17   my experience, a lot of times subscriber will come back to a

04:06PM  18   fictitious name, or someone that doesn't use the phone.  It

04:06PM  19   could be a girlfriend, it could be just a bogus name.  Which

04:06PM  20   I've had that experience, too.  Where someone lists Tony

04:07PM  21   Stark, who's a character from a movie.  That was very

04:07PM  22   frequent out in Las Vegas.

04:07PM  23       So subscriber isn't like an end-all be-all.

04:07PM  24       Actually, when I was out in Las Vegas, it was more often

04:07PM  25   than not that when subscriber came back on the targets we

04:07PM   1   were looking at, it wasn't the real name of the target.  So

04:07PM   2   what would you do to further that to try to identify the

04:07PM   3   phone --

04:07PM   4   Q.  You'd do a little more investigation, right, sir?

04:07PM   5   A.  You use CHARMS, you run it through CHARMS and local/

04:07PM   6   county systems to see if there's a police report tied to that

04:07PM   7   number.  So if you identified the number that way, you could

04:07PM   8   put it into DARTS in the remarks section based on that

04:07PM   9   information.  You wouldn't be specific in the remarks and say

04:07PM   10  that, you would put it how it was put here.  Number belonging

04:07PM   11  to.

04:07PM   12      So, it wasn't from the subpoena, it was from however else

04:07PM   13  you identify it.  So that was my point.

04:07PM   14  Q.  Yeah.  So it's subscriber information is one part of the

04:07PM   15  process, right?

04:07PM   16  A.  It could be.

04:07PM   17  Q.  Further investigation is another part of the process?

04:07PM   18  A.  Could be.

04:07PM   19  Q.  And when you're confident that that number is associated

04:07PM   20  with somebody else, you update the system accordingly, right?

04:07PM   21  A.  You should.

04:08PM   22  Q.  But it's not a situation where somebody just types a

04:08PM   23  number into DARTS, gives it a name, and that's it, right?

04:08PM   24  A.  No, you should have information on why you're saying it

04:08PM   25  belongs to a specific person.  If you don't -- even if you

04:08PM   1   don't put why in the remarks section, you need to have a

04:08PM   2   reason why.  You just can't put any random name.

04:08PM   3   Q.  So as far as this particular entry, so we know the 2013

04:08PM   4   entry, right?

04:08PM   5   A.  2013, correct.

04:08PM   6   Q.  But then there's the other entry that occurs in August of

04:08PM   7   2018, correct?

04:08PM   8   A.  That is correct.

04:08PM   9   Q.  And that particular entry is put into the system by

04:08PM  10   Curtis Ryan; is that right?

04:08PM  11   A.  That is correct.

04:08PM  12   Q.  Curtis Ryan, at that point in time, he's a task force

04:08PM  13   officer at the DEA working in D-58, correct?

04:08PM  14   A.  He was assigned to that group, and still using the system

04:08PM  15   as that.  There was a time where he left because of this full

04:08PM  16   investigation, and I don't remember when.  But according to

04:08PM  17   this --

04:08PM  18   Q.  Is the answer yes?

04:08PM  19   A.  Yes.

04:08PM  20   Q.  Okay.  And you were in D-58 at that point in time,

04:08PM  21   correct?

04:09PM  22   A.  I was still in D-58, correct.

04:09PM  23   Q.  All right.  So based on the fact that Ryan enters this

04:09PM  24   number into the DARTS system on 8/21/2018, kind of like we

04:09PM  25   talked about before, because Mr. Bongiovanni's associated

04:09PM    1    with that number in other contexts, he's gonna get an alert,

04:09PM    2    right?

04:09PM    3    A.  Yes.

04:09PM    4            MR. SINGER:  So if we could un-expand out of that,

04:09PM    5    Ms. Champoux, And go back to the first page.

04:09PM    6            If we can just blow up this one particular section

04:09PM    7    right here.

04:09PM    8            BY MR. SINGER:

04:09PM    9    Q.  So, that's why he shows up as one of the two people in

04:09PM   10    this email, correct?

04:09PM   11    A.  So in this email, it looks like -- from looking at this,

04:09PM   12    Curtis runs the number, but the deconfliction goes to those

04:09PM   13    listed people.

04:09PM   14    Q.  Correct.  And Joe Bongiovanni is one of those people?

04:10PM   15    A.  Correct.

04:10PM   16    Q.  So this would have alerted Mr. Bongiovanni that Curtis

04:10PM   17    Ryan was investigating Mike Masecchia in some capacity --

04:10PM   18    A.  It would have.

04:10PM   19    Q.  -- back in August of 2018, correct?

04:10PM   20    A.  It would have alerted him based on the deconfliction that

04:10PM   21    Curtis Ryan was investigating that number, because he doesn't

04:10PM   22    put it in his comments who it belongs to.

04:10PM   23        But it -- when you read the comments, it just says

04:10PM   24    whatever's said, a general statement about being part of the

04:10PM   25    Serio investigation.  He doesn't mention specifically who

04:10PM    1   that phone belongs to.

04:10PM    2          MR. SINGER:  And if you can un-expand out of that,

04:10PM    3   Ms. Champoux.

04:10PM    4          BY MR. SINGER:

04:10PM    5   Q.  And we talked about this on direct, but you noted how

04:10PM    6   Mr. Bongiovanni forwards this particular message to Greg

04:10PM    7   Yensan; is that right?

04:10PM    8   A.  That's what it looks like.

04:10PM    9   Q.  And Greg Yensan at that time, he's the G.S., so he's the

04:10PM   10   group supervisor for D-57?

04:10PM   11   A.  57.

04:10PM   12   Q.  He as your old boss, right?

04:10PM   13   A.  My old boss.

04:10PM   14   Q.  And he's Mr. Bongiovanni's current boss?

04:10PM   15   A.  Yes.

04:10PM   16   Q.  So he obviously had awareness of this, because he

04:11PM   17   forwards it off to his boss the same day, correct?

04:11PM   18   A.  He forwarded it to him.

04:11PM   19          MR. SINGER:  Can you bring that exhibit down,

04:11PM   20   Ms. Champoux, and can you bring up Exhibit 26D as in dog.

04:11PM   21          All right.  So this is another exhibit that the

04:11PM   22   government asked you about.

04:11PM   23          Ms. Champoux, can we scroll in between pages 3 and 4?

04:11PM   24          BY MR. SINGER:

04:11PM   25   Q.  All right.  So we were talking about this one particular

04:11PM   1   entry right here; do you remember that?

04:11PM   2   A.   Yes.

04:11PM   3   Q.   And that was the number up there that 866-2687 number

04:11PM   4   that was associated with Hot Dog, correct?

04:11PM   5   A.   Again, I can't remember specifically.  I have no reason

04:11PM   6   to doubt you that's Hot Dog's number.

04:11PM   7   Q.   All right.  So it looks like -- kind of going.  Through

04:11PM   8   the entries here, this number for Hot Dog is entered into

04:11PM   9   DARTS on 3/20/2013.

04:12PM  10   A.   Correct.

04:12PM  11         **MR. SINGER:**  Ms. Champoux, can we close out of this

04:12PM  12   exhibit and go back to 100A.1.

04:12PM  13         And can we open up the C Baker phone analysis.  I

04:12PM  14   think it's still in the PDF.  All right.  Perfect.

04:12PM  15         And if we can go to line -- can we go to page 3,

04:12PM  16   again?  Looks like we're there.  Thank you very much.

04:12PM  17         **BY MR. SINGER:**

04:12PM  18   Q.   So I direct your attention to line 38, sir.

04:12PM  19   A.   Yes.

04:12PM  20   Q.   That number that we're dealing with in the DARTS entry,

04:12PM  21   that appears on this hot list, correct?

04:12PM  22   A.   Correct.

04:12PM  23   Q.   And that's that 3/19/2013 date that we were talking about

04:12PM  24   previously with Mike Masecchia's cell number?

04:12PM  25   A.   Correct.

04:12PM    1    Q.   So, once again, it indicates that there's no subscriber

04:12PM    2    information for that number on 3/19/2013, correct?

04:12PM    3    A.   According to this document, no.

04:12PM    4    Q.   So it appears like that particular number doesn't have a

04:13PM    5    subscriber associated with it in PenLink at that time the

04:13PM    6    report is run, correct?

04:13PM    7    A.   That's what it looks like.

04:13PM    8    Q.   So the natural thing that would happen would be that to

04:13PM    9    enter that number into PenLink or to figure out who it's

04:13PM   10    from, there would a subpoena sent to the cell phone company,

04:13PM   11    correct?

04:13PM   12    A.   You should send a subpoena out and like -- that would be

04:13PM   13    the first step typically.

04:13PM   14    Q.   And that's something that enters the number into DARTS,

04:13PM   15    correct?

04:13PM   16    A.   When you request a subpoena, you have to do that through

04:13PM   17    DARTS, correct.

04:13PM   18         **MR. SINGER:**  All right.  So, Ms. Champoux, can we go

04:13PM   19    back to 26D, please?

04:13PM   20         And if we could go down to page 5, please.

04:13PM   21         **BY MR. SINGER:**

04:13PM   22    Q.   So, we saw where that number was entered back in 2013.

04:13PM   23    Now I want to direct your attention down to a different

04:14PM   24    entry.  Do you see the one down at the bottom?

04:14PM   25    A.   I do.

04:14PM   1        **MR. SINGER:**  Ms. Champoux, is it possible to blow

04:14PM   2   that up for everybody?

04:14PM   3        **BY MR. SINGER:**

04:14PM   4   Q.  So, this particular entry doesn't say DARTS, it says

04:14PM   5   DICE.  So, I think we had some testimony about DICE, but just

04:14PM   6   to kind of review what it is.  So DICE is a different version

04:14PM   7   of DARTS, for lack of a better word?

04:14PM   8   A.  It's the acronym that's used for agencies outside of DEA,

04:14PM   9   it's essentially the same system.

04:14PM  10   Q.  Yeah.  So DEA has a telephone number deconfliction system

04:14PM  11   named DARTS, right?

04:14PM  12   A.  Correct.

04:14PM  13   Q.  And other federal agencies other than DEA have the same

04:14PM  14   system, but it's named DICE?

04:14PM  15   A.  Pretty much.

04:14PM  16   Q.  And what you said was that DICE and DARTS interact,

04:14PM  17   right?

04:14PM  18   A.  They do.  I don't know if they interact from a technical

04:14PM  19   perspective, but they're essentially the same system.

04:14PM  20   Q.  Yeah.  The systems speak to each other, is what I'm

04:15PM  21   getting at.

04:15PM  22   A.  Okay.

04:15PM  23   Q.  The only difference is is that if you run a number in

04:15PM  24   DARTS you can get back information about the number and the

04:15PM  25   request and who the agents associated with the number is,

04:15PM    1    you're just not gonna get back the remarks, correct?

04:15PM    2    A.  If it's outside DEA, correct?

04:15PM    3    Q.  Okay.  So for this particular number, this 561-801-0221

04:15PM    4    number, we talked about Tom Serio in your direct testimony;

04:15PM    5    do you remember that?

04:15PM    6    A.  We did.

04:15PM    7    Q.  And there were two different numbers associated with Tom

04:15PM    8    Serio, correct?

04:15PM    9    A.  To the best of my recollection.

04:15PM    10   Q.  And this is one of the cell numbers associated with Tom

04:15PM    11   Serio, right?

04:15PM    12   A.  Again, I don't remember the specific numbers.  I don't

04:15PM    13   doubt you.

04:15PM    14   Q.  Understand.  So as far as this number is concerned, it

04:15PM    15   looks like there were two other entries entered into DICE,

04:15PM    16   correct?

04:15PM    17   A.  There were two, yes.

04:15PM    18   Q.  And so as far as the entries are concerned, it looks like

04:15PM    19   the first one happens on October 14th of 2015?

04:15PM    20   A.  Yes.

04:16PM    21   Q.  And it looks like the agent associated with that entry is

04:16PM    22   Charles Tolias?

04:16PM    23   A.  Charles Tolias.

04:16PM    24   Q.  And it looks like he works for the Department of Homeland

04:16PM    25   Security?

04:16PM    1    A.   That's what it looks like.

04:16PM    2    Q.   And so that entry was put in place at that point in time,

04:16PM    3    and the way the system works is that if he enters this

04:16PM    4    number, based on the fact that it's associated in some way

04:16PM    5    with other investigations, Joe Bongiovanni would get alerted

04:16PM    6    of that, correct?

04:16PM    7    A.   If he had put this number in.  If this -- if he had put

04:16PM    8    in number in previously, then he would get an alert.

04:16PM    9    Q.   Okay.  It looks like there's a second entry that

04:16PM   10    Mr. Tolias puts into it that occurs on February 2nd of 2017,

04:16PM   11    correct?

04:16PM   12    A.   Correct.

04:16PM   13    Q.   And that would occurred -- that would have caused another

04:16PM   14    alert to be sent to Agent Bongiovanni, correct?

04:16PM   15    A.   Again, if he had put that number in previously, that's

04:16PM   16    how it should work.

04:16PM   17    Q.   All right.  And so this one particular date that we're

04:16PM   18    talking about here, that is roughly about two months before

04:16PM   19    Ron Serio was arrested, correct?

04:16PM   20    A.   I don't remember.  I don't doubt you.

04:17PM   21    Q.   Yeah.  You don't have any reason to disagree that Ron

04:17PM   22    Serio was arrested in April of 2017?

04:17PM   23    A.   No.

04:17PM   24    Q.   Okay.

04:17PM   25           **MR. SINGER:**  Ms. Champoux, if we can un-expand out of

04:17PM    1    that, and if we move back to page 3 and 4 please, split.

04:17PM    2    Thank you.

04:17PM    3             **BY MR. SINGER:**

04:17PM    4    Q.  So getting back to this one number involving Hot Dog.

04:17PM    5         So it looks like on 1/7 of 2019, you enter in Hot Dog's

04:17PM    6    number into DARTS, correct?

04:17PM    7    A.  So, yes.

04:17PM    8    Q.  And what you note in your notes about that phone number

04:17PM    9    is that you believe that that phone number is associated with

04:17PM   10    a person you're investigating at the time, Michael Sinatra;

04:17PM   11    is that correct?

04:17PM   12    A.  So, right.  So I ran it on two separate occasions.  The

04:17PM   13    first time I ran it, I just had it as a phone number in

04:17PM   14    contact with Michael Sinatra.  Correct.

04:17PM   15    Q.  Correct.

04:17PM   16    A.  Correct.

04:17PM   17    Q.  And this is an alert that Mr. Bongiovanni would have

04:18PM   18    received, correct?

04:18PM   19    A.  Again, I'd have to see the email distribution.  If he put

04:18PM   20    that number in prior, then he should.

04:18PM   21    Q.  Well, you'd agree me that it was --

04:18PM   22    A.  Oh, sorry, I didn't see that.

04:18PM   23    Q.  No problem.

04:18PM   24    A.  Yes.

04:18PM   25    Q.  So he would have received an alert, correct?

04:18PM    1    A.  Yes.

04:18PM    2    Q.  And this occurs roughly a month before Mr. Bongiovanni

04:18PM    3    retires from the DEA?

04:18PM    4    A.  So I put it in January of 2019.  I don't remember when he

04:18PM    5    retired.

04:18PM    6    Q.  Is there any reason to disagree --

04:18PM    7    A.  No.

04:18PM    8    Q.  -- that he retired on February 1st 2019?

04:18PM    9    A.  No.

04:18PM    10   Q.  That's about a month or so before, correct?

04:18PM    11   A.  Correct.

04:18PM    12          MR. SINGER:  If we can bring up Government Exhibit

04:18PM    13   26M as in Mike, Ms. Champoux.  If we can go to page 2.

04:18PM    14          BY MR. SINGER:

04:18PM    15   Q.  This one particular number right here, do you see that,

04:18PM    16   sir?

04:18PM    17   A.  Yes.

04:18PM    18   Q.  So it looks like the initial entry of this number occurs

04:19PM    19   on 3/20/2013?

04:19PM    20   A.  Correct.

04:19PM    21   Q.  And that was associated with Ron Serio's number --

04:19PM    22   A.  Yes, sir.

04:19PM    23   Q.  -- in the Ron Serio investigation?

04:19PM    24   A.  Yes.

04:19PM    25   Q.  It appears like you also entered that number into the

04:19PM   1   system in 2019, January 15th of 2019 to be more exact?

04:19PM   2   A.   Correct.

04:19PM   3   Q.   And so based on the fact that the same number is entered,

04:19PM   4   and Mr. Bongiovanni has entered that number before, he's

04:19PM   5   going to receive an alert on that, correct?

04:19PM   6   A.   Correct.

04:19PM   7   Q.   This person, if you recall, associated with this number

04:19PM   8   up here -- I have a lot of circles going on here, so let me

04:19PM   9   clear it out for a second.

04:19PM   10       This number up here was associated with a person named

04:19PM   11   Dennis Tripi; do you remember that?

04:19PM   12   A.   I remember Dennis Tripi, but I don't know if that's his

04:19PM   13   number.

04:19PM   14       From my comments, it just says numbers in contact with

04:19PM   15   Dennis Tripi.  So it looks like from this DARTS request, that

04:20PM   16   number was a number in contact with Dennis Tripi.

04:20PM   17   Q.   Okay.  Yeah, I think I got that wrong, so my apologies.

04:20PM   18       This number up here is associated with calling a number

04:20PM   19   that Dennis Tripi uses, correct?

04:20PM   20   A.   Yes.  That's a number that's in contact with Dennis

04:20PM   21   Tripi.

04:20PM   22   Q.   Dennis Tripi, he's someone, based on your law enforcement

04:20PM   23   experience, that is a cousin with a person by the name of

04:20PM   24   Frank Tripi?

04:20PM   25   A.   From my investigation, yes.

04:20PM  1  Q.  And Frank Tripi, he's somebody who has been alleged to

04:20PM  2  have nexuses with drug trafficking?

04:20PM  3  A.  Correct.

04:20PM  4  Q.  He's also someone who is alleged to have some type of

04:20PM  5  nexus to Italian Organized Crime up here in Buffalo?

04:20PM  6  A.  Correct.

04:20PM  7  Q.  And in Bongiovanni receives this particular notification

04:20PM  8  two weeks about before his retirement?

04:20PM  9  A.  Correct.

04:20PM  10       MR. SINGER:  If we can bring down this exhibit,

04:20PM  11  Ms. Champoux, and go to Exhibit 26B.

04:21PM  12       And if we can advance to page 2, please.

04:21PM  13       If we can expand up on the top part, Ms. Champoux.

04:21PM  14       BY MR. SINGER:

04:21PM  15  Q.  And so on this particular entry, same kind of thing.

04:21PM  16  Looks like 3/20/2013 is when this one number goes into the

04:21PM  17  DARTS system for the first time?

04:21PM  18  A.  Correct.

04:21PM  19  Q.  And that's associated with the Ron Serio investigation?

04:21PM  20  A.  Correct.

04:21PM  21  Q.  Based on --

04:21PM  22  A.  I'm sorry.  Let me look at that number part of --

04:21PM  23       Again, I don't remember the file titles for those

04:21PM  24  specific cases.  C2-13-0026, if that's Serio or Wayne

04:21PM  25  Anderson, and it doesn't say in the remarks.  So I don't know

04:21PM    1    which case that relates to.

04:21PM    2    Q.  No, I got you.  But you do recall that that's Tom Serio's

04:21PM    3    other cell phone number?  Like, we looked at the other 561

04:22PM    4    number, but this is the other one?

04:22PM    5    A.  It could be, I'm sorry, I just don't remember all of the

04:22PM    6    different numbers, who they belong to.

04:22PM    7    Q.  No reason to disagree with me, though, right?

04:22PM    8    A.  No.

04:22PM    9    Q.  Okay.  So, during your time, it looked like you ran this

04:22PM   10    particular number up here in the top left?

04:22PM   11    A.  Correct.

04:22PM   12    Q.  You also did a hot list on that, correct?

04:22PM   13    A.  I may have.  I don't know.  You could show me the hot

04:22PM   14    list, I don't know if I did a hot list or not.

04:22PM   15    Q.  No problem.  But at any rate, that number up in the top

04:22PM   16    left you found to be associated and in contact with Anthony

04:22PM   17    Gerace, correct?

04:22PM   18    A.  Based on my remarks in the remarks section.  So that

04:22PM   19    number is in contact with Anthony Gerace.

04:22PM   20    Q.  And so this is an alert that Mr. Bongiovanni would

04:22PM   21    receive based on the fact that there's a match between the

04:22PM   22    numbers?

04:22PM   23    A.  Yes.

04:22PM   24         MR. SINGER:  If we could un-expand out of that,

04:22PM   25    Ms. Champoux.

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 04:22PM  | 1  | **BY MR. SINGER:**                                                  |
| 04:23PM  | 2  | Q.  So you talked about how when you started investigating          |
| 04:23PM  | 3  | Anthony Gerace back in August of 2018, Joe Bongiovanni walked       |
| 04:23PM  | 4  | up to your desk at some point in time, right?                       |
| 04:23PM  | 5  | A.  I started investigating Anthony Gerace in the summer of         |
| 04:23PM  | 6  | '16.                                                                |
| 04:23PM  | 7  | Q.  Yeah.  No, I think you made that clear that you started         |
| 04:23PM  | 8  | your initial investigation in 2016, correct?                        |
| 04:23PM  | 9  | A.  Yes.  I ran his tolls, I believe once then, and once           |
| 04:23PM  | 10 | August of '18.  And then I think again in January of '19.          |
| 04:23PM  | 11 | Q.  Yeah.  When you ran the tolls back in 2016, Joe                 |
| 04:23PM  | 12 | Bongiovanni didn't talk to you about Anthony Gerace at all,         |
| 04:23PM  | 13 | correct?                                                            |
| 04:23PM  | 14 | A.  Correct.                                                        |
| 04:23PM  | 15 | Q.  But when you ran the tolls in 2018, that's when you say         |
| 04:23PM  | 16 | that Joe Bongiovanni came up to you, correct?                       |
| 04:23PM  | 17 | A.  Correct.                                                        |
| 04:23PM  | 18 | Q.  I think it was the conversation you had cited at first          |
| 04:23PM  | 19 | you were talking with Special Agent Ryan at your desk; is           |
| 04:23PM  | 20 | that right?                                                         |
| 04:23PM  | 21 | A.  Yes.                                                            |
| 04:23PM  | 22 | Q.  And Joe was passing back and forth, pacing back and            |
| 04:23PM  | 23 | forth?                                                              |
| 04:23PM  | 24 | A.  Couple times, up near where the secretaries were.               |
| 04:23PM  | 25 | Q.  And eventually Ryan leaves your desk?                           |

04:23PM   1   A.  Correct.

04:23PM   2   Q.  You were alone?

04:23PM   3   A.  I was alone.

04:23PM   4   Q.  And then Mr. Bongiovanni walks up to the desk?

04:24PM   5   A.  He did.

04:24PM   6   Q.  And that's where you state that he makes these comments

04:24PM   7   in a sarcastic tone; is that right?

04:24PM   8   A.  He did.  About, you better hurry up and investigate him

04:24PM   9   before -- you better hurry up and arrest him before they make

04:24PM   10  marijuana legal, is what he said.  Towards the end.

04:24PM   11  Q.  And so that was the conversation that made you squirm,

04:24PM   12  right?

04:24PM   13  A.  I was very uncomfortable when he came over to my desk at

04:24PM   14  that point.

04:24PM   15  Q.  So this, based on the DARTS entries, appears to have

04:24PM   16  occurred on or about August 2nd of 2018, right?

04:24PM   17  A.  I that was the date.

04:24PM   18  Q.  So same day you believe it was?

04:24PM   19  A.  Yeah, it was definitely within that timeframe.  Either on

04:24PM   20  that day, or shortly thereafter.

04:24PM   21  Q.  All right.  So based on your direct testimony, that

04:24PM   22  encounter occurs after the Ron Serio proffer, correct?

04:24PM   23  A.  I don't remember the exact date, but I think it was July

04:24PM   24  of '18.

04:24PM   25  Q.  Yeah, July 20th of 2018?

04:24PM    1   A.  So it would have happened afterwards.

04:25PM    2   Q.  It also happened after the meeting you had at the U.S.

04:25PM    3   Attorney's Office on August 1st of 2018?

04:25PM    4   A.  If that was the date, I believe it was after that

04:25PM    5   meeting.

04:25PM    6   Q.  Yeah, remember --

04:25PM    7   A.  Yes.

04:25PM    8   Q.  -- before we started today, I gave you the document to

04:25PM    9   help refresh your memory that it was on August 1st, 2018,

04:25PM   10   that you met with the U.S. Attorney's Office?

04:25PM   11   A.  Based on that document, yes.

04:25PM   12   Q.  And that's when you made the allegations regarding the

04:25PM   13   racial comments?

04:25PM   14   A.  Yes.

04:25PM   15   Q.  That's where you made the allegations regarding the

04:25PM   16   stripper overdosing, correct?

04:25PM   17   A.  Yes.

04:25PM   18   Q.  That's where you presented the document, the 30A

04:25PM   19   document, to the U.S. Attorney's Office, right?

04:25PM   20   A.  No, I sent that over before that.

04:25PM   21   Q.  Sent it before?

04:25PM   22   A.  Yep.

04:25PM   23   Q.  Okay.  So all those things happened before this

04:25PM   24   conversation between you and Bongiovanni about this DARTS

04:25PM   25   entry --

04:25PM    1    A.   Yes, sir.

04:25PM    2    Q.   -- on Anthony Gerace?

04:25PM    3    A.   Yes.

04:25PM    4    Q.   And you believed him to be potentially guilty of federal

04:25PM    5    crimes at that point in time, right?

04:25PM    6              MR. COOPER:   Objection.   I just don't know who the

04:25PM    7    "he" is in the question.

04:25PM    8              BY MR. SINGER:

04:25PM    9    Q.   Sure.   So you suspected Agent Bongiovanni of being guilty

04:26PM   10    of maybe taking bribes from Ron Serio at that point in time?

04:26PM   11              MR. COOPER:   Objection.   Objection.

04:26PM   12              THE COURT:   Hold on.

04:26PM   13              MR. COOPER:   I'd ask to approach to explain my

04:26PM   14    objection.

04:26PM   15              THE COURT:   Come on up.

04:26PM   16              (Sidebar discussion held on the record.)

04:26PM   17              MR. COOPER:   I'm not sure what answer is going to

04:26PM   18    come out, because I don't think this was covered last time.

04:26PM   19    But what I'm concerned about coming out is this witness's

04:26PM   20    opinion.   The way the question was phrased is you thought he

04:26PM   21    was guilty of federal crimes at that point.

04:26PM   22              I don't think this witness offering an opinion about

04:26PM   23    that is the way trials are supposed to work.   The jury is

04:26PM   24    going to decide whether the defendant is guilty of federal

04:26PM   25    crimes.   So I'm uncomfortable with --

04:26PM  1          MR. SINGER:  So I changed the question up to you

04:26PM  2   suspected him of committing a federal crime or taking bribes.

04:26PM  3          THE COURT:  Okay.

04:26PM  4          MR. SINGER:  So, like, I'm just trying to establish

04:26PM  5   that's what was in his frame of reference or his state of mind

04:26PM  6   at the time that this conversation occurs.

04:26PM  7          THE COURT:  Okay.  You don't have an objection to

04:27PM  8   that.

04:27PM  9          MR. COOPER:  No, I want to be -- protect the record

04:27PM  10  and be cautious that the witness shouldn't offer an opinion

04:27PM  11  about his --

04:27PM  12         MR. SINGER:  Yeah.

04:27PM  13         MR. COOPER:  Thank you.

04:27PM  14         THE COURT:  Ask another question.

04:27PM  15         (Sidebar discussion ended.)

04:27PM  16         THE COURT:  The objection is withdrawn.  The question

04:27PM  17  is withdrawn.

04:27PM  18         Mr. Singer will ask another question.

04:27PM  19         BY MR. SINGER:

04:27PM  20  Q.  So, at -- at the time that you had this conversation

04:27PM  21  regarding Anthony Gerace, you suspected that Joe Bongiovanni

04:27PM  22  may have engaged in misconduct vis-à-vis Ron Serio, right?

04:27PM  23  A.  Correct.

04:27PM  24  Q.  And he makes this comment to you about Anthony Gerace in

04:27PM  25  a sarcastic tone of you better hurry up on your

04:27PM    1    investigation, right, sir?

04:27PM    2    A.  Better hurry up and arrest him before they make marijuana

04:27PM    3    legal.

04:27PM    4    Q.  And you also stated on direct that he provided

04:27PM    5    information about, hey, this is where Anthony Gerace gets

04:27PM    6    marijuana shipments, right?

04:27PM    7    A.  Yes.

04:27PM    8    Q.  Or that he deals cocaine to his friends, correct?

04:27PM    9    A.  Yes.

04:27PM   10    Q.  But you didn't put that into a DEA-6?

04:27PM   11    A.  I didn't put any of that in a DEA-6.  I think I put it in

04:27PM   12    an email to myself, but never in a 6.

04:27PM   13    Q.  So you didn't report that conversation to anybody who was

04:28PM   14    investigating --

04:28PM   15    A.  I believe from what I remember, I spoke to Curtis Ryan

04:28PM   16    about that.

04:28PM   17    Q.  Okay.  Did he write a DEA-6 about it?

04:28PM   18    A.  I have no idea.

04:28PM   19    Q.  No idea?

04:28PM   20    A.  I don't know if he wrote a DEA-6.  He may have been

04:28PM   21    writing reports regarding this investigation at this point

04:28PM   22    after the Serio proffer in his HSI case management system,

04:28PM   23    because of what was said about Bongiovanni passing names in

04:28PM   24    that proffer.

04:28PM   25    Q.  And you didn't go to your G.S., Jim McHugh, and make an

04:28PM   1   allegation about, oh, my God, this just happened.  Can you

04:28PM   2   believe this, Jim?

04:28PM   3   A.  I didn't go to Jim McHugh, I sent an email to myself.

04:29PM   4        **MR. SINGER:**  Ms. Champoux, can you bring up

04:29PM   5   Government Exhibit 26C, please.

04:29PM   6        All right.  So, if we can expand in on this first

04:29PM   7   entry, Ms. Champoux, please?

04:29PM   8        Thank you.

04:29PM   9        **BY MR. SINGER:**

04:29PM  10   Q.  All right.  So, this is that 578-5296 number that we were

04:29PM  11   talking about previously, correct?

04:29PM  12   A.  Okay.

04:29PM  13   Q.  That's the one associated with Tom Serio, that's the

04:29PM  14   other cell phone number, correct?

04:29PM  15   A.  I believe you.

04:29PM  16   Q.  It states it right down there, correct?

04:29PM  17   A.  Correct.

04:29PM  18   Q.  So it looks like this number first went into the system

04:29PM  19   on 3/12/2013?

04:29PM  20   A.  Based on what I'm looking at here, yes.

04:29PM  21   Q.  Oh, sorry.  You know what?  I think both of us are wrong.

04:29PM  22   My apologies.

04:29PM  23   A.  Are there more?

04:29PM  24   Q.  Let's look at this middle section first.

04:29PM  25        7/6/2012, do you see that date, sir?

04:30PM    1    A.  Yes.

04:30PM    2    Q.  It appears that was the first time this particular number

04:30PM    3    was entered into the DARTS system?

04:30PM    4    A.  Correct.

04:30PM    5    Q.  And it appears like at that point in time, it was

04:30PM    6    indicating that it was part of an ongoing narcotics

04:30PM    7    operation, correct?

04:30PM    8    A.  Correct.

04:30PM    9    Q.  And it looks like the number at that point in time still

04:30PM   10    had not been positively identified as Tom Serio's?

04:30PM   11    A.  Just says possibly belonging to Tom Serio per --

04:30PM   12    Q.  And in your experience, that -- when it's not definitive

04:30PM   13    who was the subscriber to that particular number, someone's

04:30PM   14    going to put in a clarifier in there, correct?

04:30PM   15    A.  I'm sorry, sir, what's your question?

04:30PM   16    Q.  Yeah, I'm sorry, we had some coughing going on in the

04:30PM   17    background.

04:30PM   18        So when someone enters into DARTS and they're not

04:30PM   19    100 percent positive who the subscriber to the number is,

04:30PM   20    they'll put in a little bit of a clarifier, like a possibly

04:30PM   21    belonging to?

04:30PM   22    A.  Knowing Shane Nastoff, he was very specific about what he

04:30PM   23    wrote at times.  For whatever the reason was, he wrote

04:30PM   24    possibly belonging to.  I don't know what the facts were at

04:31PM   25    the time.

04:31PM   1   Q.  Yeah, you weren't at the office back in 2012, right, sir?

04:31PM   2   A.  No.  No.  I would put it either belongs to, or it

04:31PM   3   doesn't.

04:31PM   4   Q.  Okay.  That's what you do, but this is the way it reads,

04:31PM   5   right, sir?

04:31PM   6   A.  It is the way it reads.

04:31PM   7   Q.  And it appears like this particular number eventually is

04:31PM   8   identify as belonging to Tom Serio, correct?

04:31PM   9   A.  That is correct.

04:31PM  10   Q.  And the first person to start investigating this was

04:31PM  11   Shane Nastoff back in July of 2012, correct?

04:31PM  12   A.  That's what it looks like.

04:31PM  13   Q.  And the number comes up again for the second time on the

04:31PM  14   bottom entry, correct?

04:31PM  15   A.  It does.

04:31PM  16   Q.  That's entered into the DARTS system on 3/12/2013?

04:31PM  17   A.  Correct.

04:31PM  18   Q.  And it's a different case number, correct?

04:31PM  19   A.  Correct.

04:31PM  20   Q.  This particular case number is associated with Wayne

04:31PM  21   Anderson, correct?

04:31PM  22   A.  I just can't remember the cases who they belong to, so

04:31PM  23   it's either Wayne Anderson or Serio, I believe.  One or the

04:31PM  24   other.  If you say it's Wayne Anderson, I believe you.

04:31PM  25   Q.  Okay.  And this particular number is different, correct?

04:31PM   1    A.  It is.

04:31PM   2    Q.  And so the third entry in the system appears up at the

04:32PM   3    top, correct?

04:32PM   4    A.  Third, at the top.  Correct.

04:32PM   5    Q.  And that particular entry is entered by you, correct?

04:32PM   6    A.  That is correct.

04:32PM   7    Q.  That entry occurs on 8/2/2018, correct?

04:32PM   8    A.  Correct.

04:32PM   9    Q.  So, the same date that you ran the Anthony Gerace number

04:32PM  10    or association, I should say?  I'm sorry.

04:32PM  11    A.  It was the same hot list, I believe.  I just changed the

04:32PM  12    remarks.

04:32PM  13    Q.  All right.  You indicated that that number is part of an

04:32PM  14    ongoing marijuana investigation that you were in charge of?

04:32PM  15    A.  I did that for a specific reason, different than the

04:32PM  16    first time I ran the first batch, when I said it was specific

04:32PM  17    to Anthony Gerace.

04:32PM  18    Q.  And this particular entry indicates that you ran that

04:32PM  19    under a different case number, correct?

04:32PM  20    A.  I can't remember what I ran it under with the other case.

04:32PM  21    Q.  Okay.  But I'm referring to this particular document

04:32PM  22    right here, sir.

04:32PM  23    A.  Oh, this case is different than the other two, correct.

04:32PM  24    Q.  Yeah.  And this was a number that Joe Bongiovanni would

04:32PM  25    have received an alert on based on the overlap, correct?

04:32PM   1    A.  Correct.

04:33PM   2         MR. SINGER:  If we can un-expand out of this,

04:33PM   3    Ms. Champoux.  And if we go to the second page of the

04:33PM   4    document.  Pause right there.  If question blow up this one

04:33PM   5    section here.

04:33PM   6         BY MR. SINGER:

04:33PM   7    Q.  So, similarly looking at in other government exhibits,

04:33PM   8    this is the Tom Serio cell number we're talking about, right?

04:33PM   9    A.  If you say it's his number, I believe you.

04:33PM  10    Q.  Yeah.  And it looks like Charles Tolias, he's the HSI

04:33PM  11    officer, correct?

04:33PM  12    A.  Yes, someone in DHS I'm guessing, with HSI.

04:33PM  13    Q.  And he runs a request in the DICE system for this number

04:33PM  14    on 10/14/2015?

04:33PM  15    A.  Correct.

04:33PM  16    Q.  And given the overlap, this is a notification that would

04:33PM  17    have been received by Joe Bongiovanni, correct?

04:33PM  18    A.  If he had entered it previously.

04:34PM  19         MR. SINGER:  Yeah.  And if we can un-expand out of

04:34PM  20    that, Ms. Champoux.  And just move up to the first page again.

04:34PM  21         BY MR. SINGER:

04:34PM  22    Q.  And he entered it previously, correct?

04:34PM  23    A.  Correct.

04:34PM  24    Q.  So he would have received a notification, correct?

04:34PM  25    A.  Yes.

04:34PM    1    Q.  So, at the time you would have -- I'm sorry, Joe

04:34PM    2    Bongiovanni would have received information that you were

04:34PM    3    investigating Tom Serio?

04:34PM    4    A.  When I ran it in August of '18, he would have received an

04:34PM    5    alert.

04:34PM    6            MR. SINGER:  All right.  You can take that down,

04:34PM    7    Ms. Champoux.  Thank you.

04:34PM    8            BY MR. SINGER:

04:34PM    9    Q.  So the government also asked you about a 2016 meeting

04:34PM   10    that you had with Tom Mozg; do you remember that?

04:34PM   11    A.  Yes.

04:34PM   12    Q.  So this was a meeting that Mr. Mozg reached out to you

04:34PM   13    regarding a target of his investigation, correct?

04:34PM   14    A.  He did.  Well, he didn't -- I don't -- he didn't reach

04:34PM   15    out to me initially.  I believe he -- either he or his

04:35PM   16    analyst reached out to our analyst, Steve Bevilacqua.  And

04:35PM   17    then Steve reached out to me.

04:35PM   18    Q.  Okay.  So someone from Customs and Border Protection

04:35PM   19    reached out to someone at DEA --

04:35PM   20    A.  Yeah.

04:35PM   21    Q.  -- possibly the intel analyst?

04:35PM   22    A.  Either Tom or his analyst reached out to Steve

04:35PM   23    Bevilacqua.

04:35PM   24    Q.  Okay.  And then the intel analyst that worked at DEA,

04:35PM   25    Steve Bevilacqua, Bevo I think we've heard him referred to,

04:35PM 1    yes?

04:35PM 2    A.  Bevo, yes.

04:35PM 3    Q.  Bevo reaches out to you saying, hey, I got a call from

04:35PM 4    guys over at CBP, and they want to talk to you about Joe

04:35PM 5    Bella?

04:35PM 6    A.  Yeah, it wasn't to me.  Like, they were asking for me.

04:35PM 7    For some reason, Steve reached out to me either because of

04:35PM 8    something he thought I was working on before.  It was kind of

04:35PM 9    generally, hey, would you be willing to talk to Tom about

04:35PM 10   this?  I was like, yeah, sure.

04:35PM 11   Q.  Okay.  And so a meeting is arranged at the DEA office to

04:35PM 12   meet up with Tom, correct?

04:35PM 13   A.  It was.

04:35PM 14   Q.  And you recall that Bongiovanni wasn't present for the

04:36PM 15   first part of the meeting, at some point in time Joe

04:36PM 16   Bongiovanni walks into the meeting?

04:36PM 17   A.  Shortly -- yeah, it wasn't long after the meeting

04:36PM 18   started.

04:36PM 19   Q.  And both of you, you're working in D-57 at the time,

04:36PM 20   correct?

04:36PM 21   A.  Yeah, what was the date again?

04:36PM 22   Q.  2016 is the best, I think, that we've heard?

04:36PM 23   A.  2016.  In summer of 2016, was it, the meeting with Tom?

04:36PM 24   Q.  I'm asking you.  What do you recall?

04:36PM 25   A.  It was when I was still in D-57.

04:36PM   1   Q.   Okay.  You recall that.

04:36PM   2   A.   And it's -- it's very possible that it would have been

04:36PM   3   summer of '16.

04:36PM   4   Q.   All right.  And you remember that at that time that you

04:36PM   5   had the meeting with Tom Mozg, you and Mr. Bongiovanni -- you

04:36PM   6   were still working together?

04:36PM   7   A.   Yeah, we were still talking.

04:36PM   8   Q.   Okay.  And so at this particular meeting, you recall that

04:36PM   9   Mr. Mozg presents you with some information that he has as

04:36PM  10   far as intelligence?

04:36PM  11   A.   Yes.  I believe he had a chart.

04:36PM  12   Q.   So some type of chart that he presents you showing

04:36PM  13   connections between certain people?

04:36PM  14   A.   Correct.

04:37PM  15   Q.   And at the meeting, you're conversing back with Tom Mozg;

04:37PM  16   is that right?

04:37PM  17   A.   Yeah, we were conversing.  Tom did the presentation, and

04:37PM  18   I listened.

04:37PM  19   Q.   Okay.  Joe Bongiovanni, he's listening to the same

04:37PM  20   presentation?

04:37PM  21   A.   Correct.  After he came in, correct.

04:37PM  22   Q.   And there's nothing that you recall that was out of the

04:37PM  23   ordinary at this meeting, right?

04:37PM  24   A.   To me, there was nothing out of the ordinary.

04:37PM  25   Q.   And at the end of the meeting, you and Joe make the

04:37PM    1    collective decision of great information, but not something

04:37PM    2    we can use at this time, correct?

04:37PM    3            MR. COOPER:  Object to the form of the question.

04:37PM    4            THE COURT:  Overruled.

04:37PM    5            MR. COOPER:  It's calling for hearsay on behalf of

04:37PM    6    his client, Judge.

04:37PM    7            MR. SINGER:  I'm not calling for any hearsay, Judge.

04:37PM    8            THE COURT:  No, overruled.  Overruled.

04:37PM    9            THE WITNESS:  I'm sorry, could you ask it --

04:37PM   10            BY MR. SINGER:

04:37PM   11    Q.  Certainly.  At the end of the meeting, you and Joe come

04:37PM   12    to the collective conclusion of this is nice information, but

04:37PM   13    it's not something we can use?

04:37PM   14    A.  Joe and I had a conversation after Tom left that unless

04:37PM   15    there was an informant involved, or they were up on a wire,

04:38PM   16    that there really wasn't a lot that we could do with it at

04:38PM   17    that point.  We were in agreement that it was good

04:38PM   18    intelligence, but we wanted something more proactive to go

04:38PM   19    on.  And we had just finished a wire, we were still busy with

04:38PM   20    different things.

04:38PM   21    Q.  Yeah, so that particular wire, I'm going to ask you a few

04:38PM   22    questions and we're gonna pause on that for a second.  So

04:38PM   23    that wire involved a target of investigations named

04:38PM   24    Ramos-Ramos?

04:38PM   25    A.  The file title for that was Jonathan Ramos-Ramos.

04:38PM    1    Q.  Okay.  That Ramos-Ramos, that was a wire that took a

04:38PM    2    significant amount of work; is that right?

04:38PM    3    A.  I believe it was maybe six, eight months.

04:38PM    4    Q.  That's something that you and Joe Bongiovanni worked on

04:38PM    5    hand in hand?

04:38PM    6    A.  We were partners on that case.

04:38PM    7    Q.  And right when this meeting was occurring, that

04:38PM    8    investigation had not officially concluded, but it was on the

04:38PM    9    tail end of it?

04:38PM   10    A.  When, the meeting with Tom?

04:38PM   11    Q.  Um-hum?

04:38PM   12    A.  I can't remember.  I think it was like shortly after we

04:38PM   13    did our takedowns.  It was towards the tail end of it.

04:38PM   14    Q.  And when you complete an operation that large, there's a

04:39PM   15    lot of paperwork associated with that?

04:39PM   16    A.  There is.

04:39PM   17    Q.  So there's a lot of things to do on the back end of the

04:39PM   18    investigation, correct?

04:39PM   19    A.  That is correct.

04:39PM   20    Q.  Yeah, it's not like after the arrest and takedown, you

04:39PM   21    can just drop the file and say, all right, I'm all done?

04:39PM   22    A.  No, there was still work to do.

04:39PM   23    Q.  Okay.  As far as Mr. Mozg was concerned, did you believe

04:39PM   24    that he was gonna continue his investigation?

04:39PM   25    A.  I don't remember him specifically saying that, but just

04:39PM  1    based on the overall circumstances, all the work that he had

04:39PM  2    done, his interest in it, that he would continue on.

04:39PM  3    Q.  And fair to say one of reasons why it would probably

04:39PM  4    continue on is that it involved some type of cross-border

04:39PM  5    activity?

04:39PM  6    A.  From what I remember, there was cross border marijuana

04:39PM  7    trafficking involved.

04:39PM  8    Q.  And working for Customs and Border Protection, that's

04:40PM  9    something that that's right in their swing lane, right?

04:40PM  10   A.  Yes.

04:40PM  11   Q.  So even though you and Joe felt not the need continue on

04:40PM  12   and help in that investigation, you felt like it was going to

04:40PM  13   get resolved?

04:40PM  14        MR. COOPER:  Judge, objection again to how the

04:40PM  15   defendant felt.

04:40PM  16        MR. SINGER:  I asked about --

04:40PM  17        THE COURT:  No, no, no, yeah, overruled.

04:40PM  18        THE WITNESS:  Sorry?

04:40PM  19        BY MR. SINGER:

04:40PM  20   Q.  So you felt that that investigation was gonna get

04:40PM  21   resolved in some fashion?

04:40PM  22   A.  I thought that Tom would continue doing what he was

04:40PM  23   doing.  I have no idea if it was gonna get resolved.

04:40PM  24        I think that's why he brought it to us, is because he was

04:40PM  25   kind of at a roadblock and a standstill, and he needed

04:40PM   1   additional assistance, and that's why he was reaching out to

04:40PM   2   us.

04:40PM   3       So I have no idea if he was able to further it.  I was

04:40PM   4   under the belief that's why he brought it to us.  I felt kind

04:40PM   5   of bad afterwards that we didn't provide him with more

04:40PM   6   assistance.  But, again, for the reasons that I mentioned,

04:41PM   7   that's how we ended it.

04:41PM   8   Q.  I understand.  So, one of the other things that the

04:41PM   9   government asked you about was an incident that occurred when

04:41PM   10  you previously testified in a hearing in this matter outside

04:41PM   11  in the hallway?

04:41PM   12  A.  Correct.

04:41PM   13  Q.  All right.  So I want to go through for a little bit.

04:41PM   14      So you had mentioned that this occurred during a break in

04:41PM   15  your testimony, right?

04:41PM   16  A.  I testified.  It was a break.  Right.  So it was in -- it

04:41PM   17  was break during testimony.

04:41PM   18  Q.  Yeah.  It was a break in the day, correct?

04:41PM   19  A.  Yes.

04:41PM   20  Q.  Like, I didn't finish your cross-examination during that

04:41PM   21  first hearing --

04:41PM   22  A.  No.

04:41PM   23  Q.  -- so we all went home for the night and came back in the

04:41PM   24  morning?

04:41PM   25  A.  No.

04:41PM   1   Q.  And you came back in the morning, and you were waiting

04:41PM   2   around for court to get started?

04:41PM   3   A.  I think I had already testified, and then there was a

04:41PM   4   break.  So it wasn't, like, right in the morning in the

04:41PM   5   beginning of the day.  But it was the next day, it was the

04:41PM   6   second day.

04:41PM   7   Q.  All right.  So this meeting -- this -- this incident

04:41PM   8   occurred right next to the men's room entrance, correct?

04:41PM   9   A.  Pretty much.

04:41PM   10  Q.  Yeah.  You're sitting on a bench that's right next to the

04:42PM   11  men's room hallway that everybody walks by, correct?

04:42PM   12  A.  Pretty -- yes.

04:42PM   13  Q.  And the men's room, it's not like a designated men's room

04:42PM   14  for witnesses or the defense team, it's just a public

04:42PM   15  restroom, right?

04:42PM   16  A.  Best of my knowledge, it's a restroom that anybody can

04:42PM   17  use on this floor.

04:42PM   18  Q.  All right.  And you recall that you used the restroom at

04:42PM   19  one point in time before Mr. Bongiovanni came up and made a

04:42PM   20  comment to you, correct?

04:42PM   21  A.  He walked in on me while I was using the bathroom.

04:42PM   22  Q.  Okay.  All right.  So you were using the bathroom, right?

04:42PM   23  A.  Correct.

04:42PM   24  Q.  You were alone?

04:42PM   25  A.  I was alone in the bathroom, and he walked -- like, I

04:42PM    1    didn't see his face, but I believe it was him.

04:42PM    2    Q.  Okay.  So he walks into the bathroom and sees you using

04:42PM    3    the facilities?

04:42PM    4    A.  I'm using the facilities.  He walks into the bathroom

04:42PM    5    where the door is for that part of the bathroom.

04:42PM    6    Q.  Okay.  And then he walks back out, correct?

04:42PM    7    A.  He made an exasperated comment -- not comment, but

04:42PM    8    exasperated sound, and walked out.

04:43PM    9    Q.  Yeah.  Because, you know, safe to say that you don't want

04:43PM    10   to be in the same spot as him?

04:43PM    11   A.  It was uncomfortable.

04:43PM    12   Q.  He doesn't want to be in the same spot as you?

04:43PM    13   A.  I don't know, I'm guessing.

04:43PM    14   Q.  Yeah.  And one of the things that we do in court to kind

04:43PM    15   of avoid those situations is that the government assigns

04:43PM    16   someone to be a witness keeper, for lack of a better word?

04:43PM    17   A.  I'm not sure I understand.

04:43PM    18   Q.  Sure.  So, when you come in and testify as a witness in a

04:43PM    19   case like this, you're given a handler, right?

04:43PM    20   A.  I have had one in the past, and other times I haven't.

04:43PM    21   But for this case, I have.

04:43PM    22   Q.  And that's to help tell you, hey, you need to go into the

04:43PM    23   courtroom at this point in time, right?

04:43PM    24   A.  Yeah.  Pretty much the logistics of, hey, yeah, it's time

04:43PM    25   for you to testify.  Or -- sure.

04:43PM  1   Q.  Okay.  And, so, you have this uncomfortable encounter

04:43PM  2   inside the bathroom because you guys are in the same place

04:43PM  3   together, and he walks out, right?

04:43PM  4   A.  He walked out.  I finished using the bathroom and came

04:43PM  5   out and sat on the bench --

04:44PM  6   Q.  Um-hum.

04:44PM  7   A.  -- with Ralph Joseph from the FBI.

04:44PM  8   Q.  Yeah.  And Ralph Joseph, he was a person who was assigned

04:44PM  9   to be there with you?

04:44PM  10  A.  That, I have no idea.  Ralph Joseph is a personal friend.

04:44PM  11  We worked in the same task force together at the FBI.  I

04:44PM  12  don't think he was assigned -- I have no idea if he was there

04:44PM  13  and assigned to me.  I thought.

04:44PM  14  Q.  He's sitting next to you?

04:44PM  15  A.  He's sitting next to me.

04:44PM  16  Q.  And then you state that at that point in time when you're

04:44PM  17  sitting down on the bench next to the bathroom,

04:44PM  18  Mr. Bongiovanni had to use the facilities at that point in

04:44PM  19  time, walks back towards the bathroom, right?

04:44PM  20  A.  He walked back towards the bathroom.

04:44PM  21  Q.  And then you state that he says something to the effect

04:44PM  22  of, is this your security?

04:44PM  23  A.  Something like is he your protection?

04:44PM  24      I thought it was protection.  Or are you his protection?

04:44PM  25      I believe it was are you his protection?

04:44PM    1    Q.  Okay.  Because at the point in time when he walks into

04:44PM    2    the bathroom when you're there alone, like, you don't have

04:44PM    3    anybody with you, right?

04:44PM    4    A.  I'm alone at that point.

04:44PM    5    Q.  And it's an awkward situation for both of you, correct?

04:44PM    6    A.  It was for me.

04:45PM    7    Q.  All right.  So then he notices that you have someone

04:45PM    8    sitting next to you, correct?

04:45PM    9    A.  After he walks out of the bathroom back towards court.

04:45PM   10    Q.  And he makes this comment, correct?

04:45PM   11    A.  Correct.

04:45PM   12    Q.  And then after making the comment, he walks into the

04:45PM   13    bathroom?

04:45PM   14    A.  No, I believe it was he used the bathroom, and as he used

04:45PM   15    the bathroom and is walking back to court is when he made the

04:45PM   16    comment.

04:45PM   17    Q.  Okay.  So he makes the comment walking by you after using

04:45PM   18    the facilities?

04:45PM   19    A.  Yes.

04:45PM   20    Q.  And that's it, right?

04:45PM   21    A.  He made that comment and walked off.

04:45PM   22    Q.  Okay.  All right.  So, I want to shift gears a little

04:45PM   23    bit.

04:45PM   24        You get back to the Las Vegas office after a short stint

04:45PM   25    with the FBI, right?

04:45PM    1    A.  Correct.

04:45PM    2    Q.  So you're there from roughly 2003 until about 2013?

04:45PM    3    A.  2000 -- so summer of 2003 until December of '13, I

04:46PM    4    believe.

04:46PM    5    Q.  And then you try to make it back here to Buffalo, so you

04:46PM    6    bring the family back to Buffalo, and you go down to the

04:46PM    7    New York City office?

04:46PM    8    A.  Yeah.  And I spent a little time here in Vegas even

04:46PM    9    before I went to New York while they were in -- until I

04:46PM    10   figured out where in the New York division I was gonna go.

04:46PM    11       They initially offered me Plattsburgh.  I told them no,

04:46PM    12   which I think annoyed them.  And then I had an option to go

04:46PM    13   to New York.

04:46PM    14   Q.  No I get, I get it.

04:46PM    15   A.  So I went to New York.

04:46PM    16   Q.  So you're down in New York for roughly about a two-year

04:46PM    17   period, right?

04:46PM    18   A.  Correct.

04:46PM    19   Q.  And then after the two years, when a Buffalo position

04:46PM    20   opens up, in September of 2015, you move back here to the

04:46PM    21   Buffalo office?

04:46PM    22   A.  It was September of '15 when I came back.

04:46PM    23   Q.  All right.  So we went through a little bit of this

04:46PM    24   before, so it will be quick.

04:46PM    25       So you get back to Buffalo in September of '15, and

| | | |
|---|---|---|
| 04:46PM | 1 | you're assigned to D-57, right? |
| 04:46PM | 2 | A.  Correct. |
| 04:46PM | 3 | Q.  Mr. Bongiovanni is in that group at that point in time, |
| 04:46PM | 4 | right? |
| 04:46PM | 5 | A.  He was. |
| 04:46PM | 6 | Q.  You guys worked some investigations when you first get |
| 04:46PM | 7 | started, correct? |
| 04:47PM | 8 | A.  We did a controlled delivery investigation which was just |
| 04:47PM | 9 | a short investigation.  And then shortly after that, we |
| 04:47PM | 10 | worked a long-term Ramos-Ramos investigation. |
| 04:47PM | 11 | Q.  Okay.  And at that point in time, the group supervisor of |
| 04:47PM | 12 | D-57 is Greg Yensan? |
| 04:47PM | 13 | A.  Correct. |
| 04:47PM | 14 | Q.  So he's your boss, and Joe Bongiovanni's boss, correct? |
| 04:47PM | 15 | A.  Correct. |
| 04:47PM | 16 | Q.  And I think one of the things that you took note of was |
| 04:47PM | 17 | that generally speaking, the Buffalo office did not |
| 04:47PM | 18 | investigate a lot of marijuana-based narcotics offenses, |
| 04:47PM | 19 | correct? |
| 04:47PM | 20 | A.  When I got to the Buffalo office, excuse me, I did not |
| 04:47PM | 21 | witness a lot of marijuana investigations in D-57 at that |
| 04:47PM | 22 | time. |
| 04:47PM | 23 | Q.  I think your -- your experience with the group was that |
| 04:47PM | 24 | they tended to focus more on cocaine, crack cocaine, heroin, |
| 04:47PM | 25 | fentanyl-type cases? |

04:47PM  1    A.  The majority of the cases when I got there were -- I took

04:47PM  2    note of powder cocaine, because I had not worked many powder

04:48PM  3    cocaine investigations out west, because it was mostly

04:48PM  4    methamphetamine.

04:48PM  5        The U.S. Attorney's Office wanted larger amounts because

04:48PM  6    they were so busy with federal investigations to prosecute.

04:48PM  7        So I took note of it was mostly powder cocaine

04:48PM  8    investigations.  I don't know if it was crack.  I don't

04:48PM  9    remember much -- it was mostly powder cocaine.

04:48PM  10   Q.  All right.  And so you two continued working forward, and

04:48PM  11   then I think summer of 2016 a little friction starts to

04:48PM  12   develop, correct, between you two?

04:48PM  13   A.  Correct.

04:48PM  14   Q.  And that's based on you opening up the investigation into

04:48PM  15   Peter Gerace, correct?

04:48PM  16   A.  Well, when I started investigating Peter Gerace.

04:48PM  17   Q.  Based on the fact that the phone call logs that you run

04:48PM  18   on Gerace come back with Joe Bongiovanni's number --

04:48PM  19   A.  Correct.

04:48PM  20   Q.  -- that's something you informed Greg Yensan about,

04:48PM  21   correct?

04:48PM  22   A.  I made Greg aware of it.

04:48PM  23   Q.  And at that point in time, I think you testified that you

04:48PM  24   noticed that Mr. Bongiovanni's demeanor towards you changed?

04:48PM  25   A.  It did.

04:48PM    1    Q.  He was kind of giving you the cold shoulder in the

04:49PM         office?

04:49PM    3    A.  Correct.

04:49PM    4    Q.  All right.  So before we get into that, I want to go back

04:49PM    5    a little bit more in time to before you got to the office.

04:49PM    6         So June of 2015, that's when this reunion for Saint Joe's

04:49PM    7    Collegiate Institute happens, correct?

04:49PM    8    A.  It was -- I think it was June.  It was before I came

04:49PM    9    back, summer of '15.

04:49PM   10    Q.  So summer of '15 is when this -- I realize you may not

04:49PM   11    remember the date, but it occurs in the summer --

04:49PM   12    A.  Correct.

04:49PM   13    Q.  -- before you get back here officially in Buffalo?

04:49PM   14    A.  Yes.

04:49PM   15    Q.  And so Peter Gerace is part of your graduating class,

04:49PM   16    class of '85, right?

04:49PM   17    A.  He is, yes.

04:49PM   18    Q.  And so he was at the reunion that night?

04:49PM   19    A.  He was.

04:49PM   20    Q.  And you were at the reunion that night?

04:49PM   21    A.  I was.

04:49PM   22    Q.  And there were other people in your class at the reunion

04:49PM   23    that night, correct?

04:49PM   24    A.  I believe 50, somewhere around there.

04:49PM   25    Q.  And so I'm assuming everyone from the old class is

04:49PM    1    socializing back and forth, correct?

04:49PM    2    A.   Yeah, for the most part.

04:49PM    3    Q.   This was over at Big Ditch?

04:49PM    4    A.   Big Ditch.

04:49PM    5    Q.   So everyone's drinking beers and catching up?

04:49PM    6    A.   People were drinking beers, yep.

04:49PM    7    Q.   And so at some point in time, Peter Gerace comes up to

04:50PM    8    you, correct?

04:50PM    9    A.   Correct.

04:50PM   10    Q.   And he mentions, based on your testimony, that -- that

04:50PM   11    Joe Bongiovanni is over at Tappo with his brother, and you

04:50PM   12    guys should go on over there and go check it out?

04:50PM   13    A.   Correct.

04:50PM   14    Q.   And I think you stated that initially you declined the

04:50PM   15    invitation?

04:50PM   16    A.   Correct.

04:50PM   17    Q.   But Peter Gerace insisted that you come, and you

04:50PM   18    eventually agreed?

04:50PM   19    A.   Correct.

04:50PM   20    Q.   Big Ditch and Tappo are not really that far away from

04:50PM   21    each other, right?

04:50PM   22    A.   I believe they're right across the street from each

04:50PM   23    other.

04:50PM   24    Q.   Yeah.  And so you, at that point in time, you go over to

04:50PM   25    Tappo, and you see Joe Bongiovanni, correct?

04:50PM    1    A.  Walk in, and Joe's at the bar.

04:50PM    2    Q.  And you said that what you noticed was that he tried to

04:50PM    3    crawl under a table, or looked like he was gonna crawl under

04:50PM    4    a table?

04:50PM    5    A.  He looked very uncomfortable, almost like he wanted to

04:50PM    6    crawl under the table.  Uncomfortable seeing me there, that's

04:50PM    7    how I perceived it.

04:50PM    8    Q.  So you perceived that he was uncomfortable seeing you?

04:51PM    9    A.  That was my perception.  Like he was surprised to see me

04:51PM   10    and uncomfortable to see me.

04:51PM   11    Q.  Okay.  So was it surprise or uncomfortable?  Because

04:51PM   12    those are two different things.

04:51PM   13    A.  Both.

04:51PM   14         MR. COOPER:  Objection.

04:51PM   15         THE COURT:  Basis?

04:51PM   16         MR. COOPER:  Argumentative.

04:51PM   17         THE COURT:  No.

04:51PM   18         MR. COOPER:  Surprised or uncomfortable.

04:51PM   19         THE COURT:  No, overruled.  Overruled.

04:51PM   20         BY MR. SINGER:

04:51PM   21    Q.  So was it surprise or uncomfortable, sir?

04:51PM   22    A.  I think kind of both.

04:51PM   23    Q.  So kind of both?

04:51PM   24    A.  Yes.

04:51PM   25    Q.  All right.  So, you claim that -- that Anthony Gerace was

04:51PM    1    sitting at the table with three other people with Joe

04:51PM    2    Bongiovanni?

04:51PM    3    A.  So it was at the bar.  There was Joe, and then I believe

04:51PM    4    three or four people next to him.  And Anthony Gerace was one

04:51PM    5    of those people.

04:51PM    6    Q.  All right.  So this is June of 2015, right?

04:51PM    7    A.  This is the night of the reunion.

04:51PM    8    Q.  Before you moved back here, correct?

04:51PM    9    A.  Before I moved back.

04:51PM   10    Q.  Before you started with the DEA here?

04:51PM   11    A.  Before I started in Buffalo.

04:51PM   12    Q.  And well before you open your investigation into Anthony

04:51PM   13    Gerace, correct?

04:51PM   14    A.  It was -- yes, it was before.  Yes.

04:51PM   15    Q.  Yeah.  And you didn't really know who Anthony Gerace was

04:51PM   16    at that point, correct?

04:51PM   17    A.  Just -- I'd never met him before, and it was Peter's

04:51PM   18    brother.

04:51PM   19    Q.  But you remember testifying on direct that you were

04:52PM   20    fixated on Anthony Gerace when you got introduced to him?

04:52PM   21    A.  Yeah.  Yeah.  I was pretty much focused more on Anthony

04:52PM   22    because he was Peter's brother.

04:52PM   23    Q.  But why would you be fixated on someone who you didn't

04:52PM   24    investigate at that point in time?

04:52PM   25    A.  Because he was Peter's brother.

04:52PM   1   Q.  Okay.  So the reason why you were fixated on Anthony

04:52PM   2   Gerace at that time is because he was Peter's brother?

04:52PM   3   A.  Pretty much.

04:52PM   4   Q.  So you say that after Tappo, everyone walks back -- you,

04:52PM   5   Joe, and Peter -- to Big Ditch again?

04:52PM   6   A.  Back to Big Ditch across the street.

04:52PM   7   Q.  And eventually you say that you kind of separate yourself

04:52PM   8   from Peter Gerace?

04:52PM   9   A.  Yeah.  Again, I -- I had friends from playing hockey at

04:52PM   10  Saint Joe's who I stayed close with.  So I kind of went off

04:52PM   11  more off to that group, while Joe and Peter went into a

04:52PM   12  group.  And I just remember a couple of the football players

04:52PM   13  that I knew.

04:52PM   14  Q.  Okay.  And then at some point at this party, you

04:53PM   15  testified on direct that one of your classmates states, hey,

04:53PM   16  we're all going over to Pharaoh's to blow coke off strippers

04:53PM   17  asses.  Do you want to come, Tony?

04:53PM   18  A.  He didn't say do you want to come, Tony?  But he did say

04:53PM   19  what you said before that.

04:53PM   20      He said we're all going to Pharaoh's to snort coke off

04:53PM   21  strippers asses.

04:53PM   22  Q.  So did this individual yell this out to the group?

04:53PM   23  A.  He was standing with several other individuals, and said

04:53PM   24  it loudly enough where as other people that were with him

04:53PM   25  even snickered.

04:53PM     1    Q.   Okay.  So, just to kind of resettle a little, we're at a

04:53PM     2    Catholic school reunion, right?

04:53PM     3    A.   It is a Catholic -- well, Saint Joe's is a Catholic

04:53PM     4    institution.  Christian Brothers.

04:53PM     5    Q.   There are 50 people who graduated from Saint Joe's at

04:53PM     6    this event.

04:53PM     7    A.   There were approximately 50 people that were at that

04:53PM     8    party that I remember.

04:53PM     9    Q.   And you guys are the class of 1985 at that point, right?

04:53PM    10    A.   '85.

04:53PM    11    Q.   So we're not talking about a bunch of 20-year olds who

04:54PM    12    just got out of college or just graduated high school, right?

04:54PM    13    A.   No, we were much older than that.

04:54PM    14    Q.   Yeah.  We're talking about a bunch of middle-aged guys,

04:54PM    15    right?

04:54PM    16    A.   Pretty much.

04:54PM    17    Q.   And one of these middle-aged guys yells out, hey, we're

04:54PM    18    all gonna go to Pharaoh's and blow coke off of a stripper's

04:54PM    19    ass?

04:54PM    20    A.   Yes, he did.

04:54PM    21    Q.   Who was this guy who said that?

04:54PM    22    A.   His name is John Maher.  And he passed away from COVID.

04:54PM    23    Q.   Did you report him to authorities?

04:54PM    24    A.   No.

04:54PM    25    Q.   Well, he just admitted to a federal narcotics crime.

04:54PM   1   A.   He stated what he stated, and I did not report it.

04:54PM   2        Did I report it to who, sir?

04:54PM   3   Q.   Authorities.

04:54PM   4   A.   Meaning, did I report it to my agency?  Or the Buffalo

04:54PM   5   Police Department?

04:54PM   6   Q.   Yeah.  So, you're a DEA agent, right?

04:54PM   7   A.   Correct.

04:54PM   8   Q.   You have federal law enforcement authority?

04:54PM   9   A.   Yep.

04:54PM   10  Q.   You're vested with the power to arrest people?

04:54PM   11  A.   Correct.

04:54PM   12  Q.   Did you call up DEA Buffalo and say, hey, there's gonna

04:54PM   13  be drug activity going on at Pharaoh's, we need to send

04:54PM   14  agents over there to bust this up?

04:55PM   15  A.   No, I didn't report that.

04:55PM   16  Q.   Did you report that this one individual who unfortunately

04:55PM   17  passed away from COVID, before he passed away from COVID, did

04:55PM   18  you report him as to this is a person who we need to

04:55PM   19  investigate for narcotics crimes?

04:55PM   20  A.   No, I did not.

04:55PM   21  Q.   Why not?

04:55PM   22  A.   I didn't know John in the past even being involved with

04:55PM   23  cocaine, so I was kind of surprised.  So I chose not to.  I

04:55PM   24  never knew John was even that type of person until he said

04:55PM   25  that.

04:55PM   1   Q.  So Peter Gerace, you didn't really have a good

04:55PM   2   relationship with him, right?

04:55PM   3   A.  Peter was -- yeah, he wasn't -- he wasn't a friend of

04:55PM   4   mine, and he's a convicted felon.  He'd been in trouble

04:55PM   5   before.  And the belief amongst a lot of the classmates was

04:55PM   6   he was involved heavily with cocaine.

04:55PM   7   Q.  Okay.  So you know that.  This classmate says we're all

04:55PM   8   gonna go over and blow cocaine off a stripper's ass at

04:55PM   9   Pharaoh's?

04:55PM   10  A.  Correct.

04:55PM   11  Q.  Did you report that Pharaoh's may be involved in drug

04:55PM   12  activity based on what you heard?

04:55PM   13  A.  I did not report that.

04:55PM   14  Q.  But you have this belief that Peter Gerace is involved in

04:56PM   15  illegal activity, right?

04:56PM   16  A.  What I stated about him being a convicted felon and

04:56PM   17  involved with cocaine --

04:56PM   18  Q.  Yeah.

04:56PM   19  A.  -- that was my belief at the time.

04:56PM   20  Q.  So that was the belief, right?

04:56PM   21  A.  Yep.

04:56PM   22  Q.  And then someone confirms the belief that you had that

04:56PM   23  there's cocaine activity going on at Peter Gerace's

04:56PM   24  establishment, right?

04:56PM   25  A.  He said that they were gonna go there and snort coke off

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

04:56PM    1    strippers asses.

04:56PM    2    Q.  But you don't do anything to intervene?

04:56PM    3    A.  I listened, and didn't do anything, and remembered it.

04:56PM    4    Q.  Yeah.  I think you said you filed it away in your brain,

04:56PM    5    right?

04:56PM    6    A.  Yes.

04:56PM    7    Q.  But that's all you did?

04:56PM    8    A.  That's all I did.

04:56PM    9    Q.  And then when you get back to Buffalo in September of

04:56PM    10   2015, you don't open up an investigation into your classmate

04:56PM    11   who made this statement, right?

04:56PM    12   A.  No.

04:56PM    13   Q.  You don't open up an investigation into Peter Gerace,

04:56PM    14   correct?

04:56PM    15   A.  I did not start investigating Peter Gerace until the

04:56PM    16   summer of 2016.

04:56PM    17   Q.  Yeah, so a year later, right?

04:57PM    18   A.  Year later.

04:57PM    19   Q.  Did you lose it in the file in your brain?

04:57PM    20   A.  No.

04:57PM    21   Q.  Just took you a year to open up an investigation?

04:57PM    22   A.  That's when I chose to do it.

04:57PM    23   Q.  And that that was the first time really that this

04:57PM    24   incident ever really made it to the light of day, right?

04:57PM    25   A.  It made it to the light of day -- what do you mean?

04:57PM    1    Q.  Sure.  So I guess when you opened up the Peter Gerace

04:57PM    2    file, did you document this incident at your reunion inside

04:57PM    3    the case opening DEA-6?

04:57PM    4    A.  We never opened a case on Peter.  It never got to an

04:57PM    5    actual open case file.  There was no case initiation.

04:57PM    6        We did open a case under Anthony Gerace at some point,

04:57PM    7    which we closed shortly thereafter because of what came up

04:57PM    8    during the Serio proffer.  And it was agreed amongst DEA and

04:57PM    9    HSI management to only have an open file on Anthony Gerace at

04:57PM   10    HSI because of what was said about Joe.

04:57PM   11    Q.  Okay.  But you never opened up a file vis-à-vis this

04:58PM   12    incident on anybody?

04:58PM   13    A.  An actual file was never opened up on Peter Gerace, it

04:58PM   14    was opened up under Anthony Gerace.

04:58PM   15    Q.  And you never reported this to anybody?

04:58PM   16    A.  And it was closed shortly thereafter for the reasons that

04:58PM   17    I said.

04:58PM   18    Q.  And you never reported this to anybody?

04:58PM   19    A.  This was never documented in a DEA-6.

04:58PM   20    Q.  All right.  So getting back at the friction that starts

04:58PM   21    to develop between you and Joe Bongiovanni.

04:58PM   22        So, the friction's caused by your desire to look into

04:58PM   23    Peter Gerace's phone records, right?

04:58PM   24    A.  It was when I started investigating Peter.

04:58PM   25    Q.  And the fact that Joe Bongiovanni's phone records -- or,

04:58PM   1   sorry, phone number comes back in those records, right?

04:58PM   2   A.   His phone number came up in the phone records.

04:58PM   3   Q.   So you talked a little bit about the first steps that

04:59PM   4   you've taken in this type of investigation.

04:59PM   5        So one of the first steps is that you subpoena Peter

04:59PM   6   Gerace's phone records, right?

04:59PM   7   A.   Correct.

04:59PM   8   Q.   And that's a common first step in DEA investigations,

04:59PM   9   right?

04:59PM   10  A.   Yeah.  That's a common first step in any investigation.

04:59PM   11  Q.   Yeah.  And so, you know, you talked about how before you

04:59PM   12  did this, you had a conversation with G.S. Yensan about, hey,

04:59PM   13  this is what I'm prepared to do, and I just want to give you

04:59PM   14  a heads-up because Joe Bongiovanni's number may come up in

04:59PM   15  this, correct?

04:59PM   16  A.   We did have a conversation.

04:59PM   17  Q.   And Yensan says move forward, or words to that effect?

04:59PM   18  A.   Greg said subpoena the tolls, see if his number comes up,

04:59PM   19  and if it does, just come bring it to me.  Essentially.

04:59PM   20  Q.   So you get the subpoena return back, his number's in

04:59PM   21  there, correct?

04:59PM   22  A.   Yes.

04:59PM   23  Q.   And then you go over to Yensan and inform G.S. Yensan

04:59PM   24  that, hey, his number was in there?

04:59PM   25  A.   Yeah, I think I actually gave him the hot list.

04:59PM 1   Q.  Okay.  And so this is something that you indicated caused

05:00PM 2   Mr. Bongiovanni's behavior to change?

05:00PM 3   A.  Yeah.  He stopped talking to me essentially.

05:00PM 4   Q.  Yeah.  So it's obvious that Yensan spoke to him about it

05:00PM 5   in some fashion?  Or he found out, Mr. Bongiovanni?

05:00PM 6   A.  Greg told me that he had --

05:00PM 7   Q.  Yeah, I'm not interesting in what he said.

05:00PM 8   A.  Okay.

05:00PM 9   Q.  But your understanding was at some point in time,

05:00PM 10  Mr. Bongiovanni found out about this?

05:00PM 11  A.  Based on Joe's behavior towards me, it was my belief that

05:00PM 12  Greg said something to him.

05:00PM 13  Q.  Okay.  And, so, with regard to the investigation,

05:00PM 14  separate from Joe you get the subpoena return, correct?

05:00PM 15  A.  So I get a subpoena return back on the Peter Gerace

05:00PM 16  number.

05:00PM 17  Q.  And, again, you talked about how you analyzed the

05:00PM 18  records, you ran a hot list on them, correct?

05:00PM 19  A.  I think I had an analyst give me a hot list back.

05:00PM 20  Q.  So that was under an effort to figure out who was it that

05:00PM 21  Peter Gerace was talking to, correct?

05:00PM 22  A.  Yes.

05:00PM 23  Q.  And as far as the next step in the investigation, is

05:01PM 24  usually to figure out, okay, well, if Peter Gerace is

05:01PM 25  associated with these people, how can we potentially develop

05:01PM    1   an informant?

05:01PM    2   A.  That could be a step in that process.

05:01PM    3   Q.  Did you investigate any of the names of the individuals

05:01PM    4   that came back off that hot list?

05:01PM    5   A.  So, from what I remember, is at that point, I was

05:01PM    6   speaking with a detective from the Amherst Police Department,

05:01PM    7   JoAnn DiNoto.  Because he -- started to live in Amherst, who

05:01PM    8   was introduced to me by Greg Yensan, who worked with her

05:01PM    9   previously, and so they --

05:01PM   10   Q.  Sir, just --

05:01PM   11   A.  -- we did a workup -- she did a workup on the phone

05:01PM   12   numbers to try to identify the phone numbers.

05:01PM   13   Q.  Okay.  So she tried to identify who those phone numbers

05:01PM   14   were?

05:01PM   15   A.  She did.

05:01PM   16   Q.  And as far as those phone numbers are concerned, did you

05:01PM   17   interview anyone based on those phone numbers that you

05:01PM   18   received back?

05:01PM   19   A.  I don't remember us interviewing anybody.  I just

05:01PM   20   remember some of the names that were identified.

05:01PM   21   Q.  So you didn't interview any of the employees at the club?

05:01PM   22   A.  No.

05:01PM   23   Q.  You didn't interview any type of strippers at the club?

05:02PM   24   A.  No, we never got to that point.

05:02PM   25   Q.  You didn't identify any type of patrons at the club?

05:02PM     1    A.   No.  And, again, from my past experience, that's not how

05:02PM     2    I would typically proceed with an investigation.

05:02PM     3         I would not go out and start interviewing people right at

05:02PM     4    the start of an investigation out of fear that those people

05:02PM     5    that we interviewed would go back and tell Peter Gerace that

05:02PM     6    they're being questioned by the DEA.

05:02PM     7         I typically chose other routes.  I --

05:02PM     8    Q.   Okay.

05:02PM     9    A.   I try to develop informants.  That's how it typically

05:02PM    10    worked, even if I had to wait.

05:02PM    11    Q.   Yeah.  And so I guess in developing informants, did you

05:02PM    12    conduct any surveillance at Pharaoh's Gentlemen's Club?

05:02PM    13    A.   No, we did not conduct surveillance.

05:02PM    14    Q.   So you didn't sit in the parking lot and take note of the

05:02PM    15    license plates that were going in and out of the club?

05:02PM    16    A.   I never did.  I'm not sure if anybody else did.

05:02PM    17    Q.   Did you ever direct anybody or yourself go to Pharaoh's

05:02PM    18    to determine whether or not there was drug dealing activity

05:02PM    19    that you could observe?

05:02PM    20    A.   I never directed anybody to do that.

05:02PM    21    Q.   Do you ever conduct any type of surveillance outside of

05:02PM    22    Peter Gerace's house?

05:02PM    23    A.   I never did.

05:02PM    24    Q.   Did you ever coordinate with any other agencies other

05:03PM    25    than JoAnn DiNoto at APD to determine if they had any

05:03PM    1    information vis-à-vis Peter Gerace?

05:03PM    2    A.  It was just I believe the Amherst Police Department at

05:03PM    3    that point.  Oh, I'm sorry.  And Homeland Security.  And

05:03PM    4    Homeland Security.

05:03PM    5        It was TJ Webb from Homeland Security that began to

05:03PM    6    supply me with information on Anthony Gerace.

05:03PM    7    Q.  Yeah.  But I'm talking about Peter Gerace right now.

05:03PM    8    A.  And I'm trying to remember if TJ gave us information on

05:03PM    9    Peter or not.  I can't remember if TJ had information on

05:03PM   10    Peter or not, as well.  But definitely Anthony.

05:03PM   11    Q.  Did you try any type of undercover buys at Pharaoh's

05:03PM   12    Gentlemen's Club?

05:03PM   13    A.  We didn't, because we had no informants.

05:03PM   14    Q.  Did you do any type of trash pulls at Pharaoh's

05:03PM   15    Gentlemen's Club?

05:03PM   16    A.  No.  We did no trash pulls.

05:03PM   17    Q.  How about Peter Gerace's house, did you do any --

05:03PM   18    A.  I'm sorry, TJ Webb may have done a trash pull.

05:03PM   19    Q.  Are you sure about that?

05:04PM   20    A.  No, I'm not sure about that.

05:04PM   21    Q.  Okay.  Well --

05:04PM   22    A.  I didn't do a trash pull.  And DEA in my group did not do

05:04PM   23    a trash pull.

05:04PM   24    Q.  How about at Peter Gerace's house?  Did you perform any

05:04PM   25    trash pulls there?

05:04PM    1    A.  No.

05:04PM    2    Q.  How about a pole camera?  Did you install any type of

05:04PM    3    pole camera at Pharaoh's Gentlemen's Club?

05:04PM    4    A.  No, not at that point.

05:04PM    5    Q.  What about at Peter Gerace's house?

05:04PM    6    A.  Pole camera at his house?

05:04PM    7    Q.  Correct.

05:04PM    8    A.  No.

05:04PM    9    Q.  Did you apply for any type of Title III wiretaps?

05:04PM   10    A.  Oh, we weren't even close to that.  That is -- was very

05:04PM   11    far off.  You can't just jump to apply for wiretaps.

05:04PM   12    Q.  Yeah, it takes a lot of steps before you get to that

05:04PM   13    stage.

05:04PM   14    A.  100 percent.  We weren't even remotely close to that.

05:04PM   15    Q.  How about pen registers?

05:04PM   16    A.  Nope.  We did not apply for a pen register.  We were just

05:04PM   17    ordering tolls.

05:04PM   18    Q.  And I think you testified, you know, that one of the main

05:04PM   19    ways that you developed cases is that you try to look for an

05:04PM   20    informant, or develop an informant, correct?

05:04PM   21    A.  Hopefully over time that may work out.

05:04PM   22    Q.  And so this particular investigation, fair to say, it

05:04PM   23    laid dormant for a little bit of time?

05:05PM   24    A.  Yeah.  It wasn't very active after my conversation with

05:05PM   25    Joe.

05:05PM    1    Q.  And it doesn't mean that you weren't working on other

05:05PM    2    files at the time, right, sir?

05:05PM    3    A.  I was working on other cases.

05:05PM    4    Q.  Yeah, like Ramos-Ramos?

05:05PM    5    A.  Ramos-Ramos.  Ramos-Ramos was already over, and I believe

05:05PM    6    we were still cleaning it up.  We were still up on phones and

05:05PM    7    going out and doing surveillance and purchases, but I don't

05:05PM    8    think it was closed yet.  So there was still some work most

05:05PM    9    likely to be done at that point.

05:05PM   10    Q.  Yeah.  So the file was open for a period of time, it was

05:05PM   11    dormant for a period of time, right?

05:05PM   12    A.  It was -- on who?

05:05PM   13    Q.  On Peter Gerace.

05:05PM   14    A.  We never opened a file.  It was the beginning stages,

05:05PM   15    like I mentioned before.  So after the conversation with Joe

05:05PM   16    in the conference room, I did not do much at that point.

05:05PM   17    Q.  Okay.  But it seems like you didn't really do much at all

05:05PM   18    for other reasons too, right?

05:05PM   19    A.  What do you mean?

05:05PM   20    Q.  Well, we went through a list of investigative steps that

05:05PM   21    you didn't take, right?

05:05PM   22    A.  I -- I didn't do the things that I mentioned that you

05:06PM   23    asked me about.

05:06PM   24    Q.  Um-hum.  So, in 2017, in January of 2017, things --

05:06PM   25    things change, right?

05:06PM   1   A.   We conducted a proffer, and someone had information.

05:06PM   2   Q.   Yeah.   So Kevin Myszka gets arrested, right?

05:06PM   3   A.   Kevin gets arrested.

05:06PM   4   Q.   And that was based on an operation that you had involving

05:06PM   5   him, correct?

05:06PM   6   A.   Yep, and the Amherst Police Department.

05:06PM   7   Q.   And so as part of a search warrant that was executed in

05:06PM   8   that operation, you gain a lot of evidence against Kevin

05:06PM   9   Myszka, correct?

05:06PM   10   A.   I think it was a firearm and some cocaine and a scale.

05:06PM   11   Q.   And so that provides an opportunity for you to seek a

05:06PM   12   proffer interview of potentially -- through Kevin Myszka,

05:06PM   13   correct?

05:06PM   14   A.   He eventually agreed to conduct proffers through his

05:06PM   15   attorney.

05:06PM   16   Q.   And that would provide you an opportunity to develop the

05:06PM   17   source that you were lacking in that operation, correct?

05:06PM   18   A.   Possibly.   I mean, for me, my personal opinion was he was

05:06PM   19   already arrested.   I didn't know if other people knew that he

05:06PM   20   was arrested.

05:06PM   21        Typically we try -- I have in past experience, we try to

05:06PM   22   get someone to cooperate quickly after they're arrested, so

05:07PM   23   not many people would know.   But in his case, it had gone on

05:07PM   24   for months.

05:07PM   25        So for me it was like maybe he can provide some

05:07PM    1    intelligence.  I didn't know if he could do anything

05:07PM    2    proactive, because I felt that he was already exposed at that

05:07PM    3    point.

05:07PM    4    Q.   Okay.  But you do sit down with him, and you have

05:07PM    5    information that Kevin Myszka provides you that's valuable to

05:07PM    6    your Peter Gerace investigation, right?

05:07PM    7    A.   He mentions things about Peter Gerace and cocaine and

05:07PM    8    Pharaoh's, correct.  And Anthony Gerace.

05:07PM    9    Q.   And that's much more than you had when you started off

05:07PM    10   looking at Peter Gerace?

05:07PM    11   A.   Yes, it was an actual person that I'm interviewing

05:07PM    12   providing information.

05:07PM    13   Q.   And Kevin Myszka eventually leads you to other people who

05:07PM    14   potentially could be used as confidential sources, correct?

05:07PM    15   A.   Kevin Myszka led us to buys with an individual.  And then

05:07PM    16   based on those buys, we went up on a wiretap on his phone.

05:07PM    17   Q.   Yeah.  So, like, Jeff Anzalone was one of those people?

05:07PM    18   A.   Jeff Anzalone.

05:07PM    19   Q.   And then Jeff Anzalone eventually developed another

05:08PM    20   source, K.L., correct?

05:08PM    21   A.   I know of K.L.  I don't know how she was developed.  I

05:08PM    22   thought we had developed her.

05:08PM    23        I didn't know Jeff Anzalone -- I don't know what you mean

05:08PM    24   by Jeff Anzalone helped develop.

05:08PM    25   Q.   Sure.  Well, at least, Jeff Anzalone, you understood him

05:08PM    1    to be a patron of Pharaoh's Gentlemen's Club, right?

05:08PM    2    A.   At the time of the -- yes, from the Myszka proffers, I

05:08PM    3    believe Anzalone was one of the people that went there.

05:08PM    4    Q.   And you understood him to be a cocaine user, correct?

05:08PM    5    A.   Yes.

05:08PM    6    Q.   And you understood him to be someone who could

05:08PM    7    potentially purchase cocaine at Pharaoh's Gentlemen's Club,

05:08PM    8    correct?

05:08PM    9    A.   I don't know if we got to that point with him being able

05:08PM    10   to purchase cocaine.  I can't remember from the proffer.  It

05:08PM    11   could have came up in the proffer.

05:08PM    12   Q.   All right.

05:08PM    13   A.   Kevin could have said that he was with him when they

05:08PM    14   purchased it, I just don't remember.

05:08PM    15   Q.   Okay.  But, you know, potentially, like, your

05:08PM    16   investigation with this break with Kevin Myszka finally

05:08PM    17   provides you something to move forward with in that

05:08PM    18   investigation, right?

05:08PM    19   A.   Again, what he had said based on the proffer and what we

05:09PM    20   documented about being at Pharaoh's and getting cocaine, I

05:09PM    21   can't remember if it was Peter or Anthony, like, that was

05:09PM    22   beneficial.

05:09PM    23   Q.   Okay.  All right.  So, kind of moving forward through

05:09PM    24   2016 to 2017, your relationship deteriorates over the course

05:09PM    25   of time with Agent Bongiovanni, correct?

05:09PM    1    A.  We just stopped working cases together.  We still spoke,

05:09PM    2    but we stopped working as partners on cases.

05:09PM    3    Q.  Yeah.  Things are awkward between you based on what

05:09PM    4    happened in June, correct?

05:09PM    5    A.  Well, that was an initially it.  But then for me, what

05:09PM    6    stopped it the most was when he said he couldn't continue on

05:09PM    7    with the Kevin Myszka investigation because he didn't trust

05:09PM    8    the informant.  And he had met Kevin at a party in Toronto.

05:09PM    9        So when he said he didn't want to be involved anymore at

05:09PM   10    that point, it was like it's probably best that we just part

05:09PM   11    ways at this point.

05:09PM   12    Q.  Okay.  So you continued to work in D-57 for a period of

05:09PM   13    time, right?

05:09PM   14    A.  I did, yes.

05:09PM   15    Q.  But things aren't improving between Bongiovanni and

05:09PM   16    yourself?

05:09PM   17    A.  Things are what?

05:09PM   18    Q.  Things are not improving between Bongiovanni and

05:10PM   19    yourself, correct?

05:10PM   20    A.  It wasn't like that.  It wasn't like -- Joe wasn't

05:10PM   21    confrontational.  He wasn't rude.  He wasn't -- we still

05:10PM   22    spoke.  He just worked cases, I believe, with Joe Palmieri

05:10PM   23    again, and I was working with another task force officer.  So

05:10PM   24    it wasn't like they weren't improving, we just went our

05:10PM   25    separate ways.

05:10PM   1   Q.  Yeah.  And eventually you get transferred over to D-58?

05:10PM   2   A.  I requested a transfer through the resident agent in

05:10PM   3   charge to go work in D-58.

05:10PM   4   Q.  And so that transfer, that occurs sometime in June or the

05:10PM   5   summer of 2018, correct?

05:10PM   6   A.  I don't know.  I -- I can't remember.  What I can

05:10PM   7   remember is that I spent approximately maybe a couple years

05:10PM   8   in 57.  So, if I started in September of '15, so, summer of

05:10PM   9   '17.  It could have been the beginning of '18, somewhere

05:10PM   10  around the beginning of '18.  Approximately.

05:10PM   11  Q.  At least what you do remember, sir, is that your transfer

05:10PM   12  over to D-58, that occurs before the Ron Serio proffer in

05:11PM   13  July 20 of 2018?

05:11PM   14  A.  Yes.

05:11PM   15  Q.  It occurs before you met with the U.S. Attorney's Office

05:11PM   16  on August 1st, 2018?

05:11PM   17  A.  Yes.

05:11PM   18  Q.  And it occurs months before that stuff, right?

05:11PM   19  A.  Yes.

05:11PM   20  Q.  Those meetings, I should say.

05:11PM   21  A.  Yes, I'm pretty sure.

05:11PM   22  Q.  All right.  So you're working over in D-58 at that point

05:11PM   23  in time in 2018.  And is that when you start to work a little

05:11PM   24  bit with Curtis Ryan?

05:11PM   25  A.  Correct.

05:11PM    1    Q.  Because he's also a member of D-58 at that time?

05:11PM    2    A.  Part of D-58, and he sits directly across from me.

05:11PM    3    Q.  And I think at one point, you two were talking about

05:11PM    4    investigations that you're running, and you start talking

05:11PM    5    about the Anthony Gerace investigation?

05:11PM    6    A.  So the reason I spoke to Curtis about that was it was

05:11PM    7    after I believe I received a call from the U.S. Attorney's

05:11PM    8    Office saying that they were opening a file on Anthony and

05:11PM    9    Peter Gerace.

05:11PM   10    Q.  Yeah.  And so with regard to Anthony Gerace, you learned

05:11PM   11    at some point in time there was a nexus between Anthony

05:11PM   12    Gerace and Ron Serio; is that right?

05:12PM   13    A.  I did.  Yes.  Correct.

05:12PM   14    Q.  The nexus was -- is that there was belief, based on Ron

05:12PM   15    Serio's proffer interviews, that Ron Serio was either selling

05:12PM   16    or receiving marijuana from Anthony Gerace?

05:12PM   17    A.  From the proffer, Ron Serio stated that he had supplied

05:12PM   18    Anthony Gerace marijuana.

05:12PM   19    Q.  And so, based on that information, you had an

05:12PM   20    investigation open into Anthony Gerace for a while, correct?

05:12PM   21    A.  Again, we didn't have an actual case file opened, it was

05:12PM   22    similar to Peter, but I had subpoenaed phone records and

05:12PM   23    whatnot.

05:12PM   24    Q.  All right.  And you saw this as an opportunity to at

05:12PM   25    least obtain intelligence regarding Anthony Gerace, correct?

05:12PM  1   A.  I told Curtis we should go back and reinterview Ron Serio

05:12PM  2   and ask him about Anthony Gerace.

05:12PM  3   Q.  And so prior to the July 20, 2018 proffer with Ron Serio,

05:12PM  4   you started preparing yourself to go into that proffer,

05:12PM  5   right?

05:12PM  6   A.  Not really.

05:12PM  7   Q.  So, you just went in there and decided to ask him some

05:12PM  8   questions, and -- did you prepare at all, sir?

05:13PM  9   A.  It wasn't really a formal preparing.  Curtis and I just

05:13PM  10  kind of went in there and said let's see where this goes.

05:13PM  11  Let's try to focus on Anthony Gerace, because he didn't --

05:13PM  12  since my focus was Anthony Gerace, it wasn't Curtis's, I

05:13PM  13  brought it to the attention of Curtis, hey, let's go in and

05:13PM  14  ask him specifically about Anthony Gerace.

05:13PM  15  Q.  Okay.

05:13PM  16  A.  So in terms of a plan, that was -- that was mostly it.

05:13PM  17  Q.  Okay.  And this was important because, kind of like Peter

05:13PM  18  Gerace, up until that point you didn't conduct any type of

05:13PM  19  surveillance regarding Anthony Gerace, right?

05:13PM  20  A.  I don't think we did much at that point.  I, again, I

05:13PM  21  spoke to TJ Webb more.

05:13PM  22  Q.  I got it.  But --

05:13PM  23  A.  No, I never conducted surveillance on Anthony Gerace.

05:13PM  24  Q.  You didn't conduct any type of trash pulls?

05:13PM  25  A.  No.

05:13PM  1    Q.  No pole cams?

05:13PM  2    A.  I didn't.

05:13PM  3    Q.  No pen registers?

05:13PM  4    A.  I didn't.

05:13PM  5    Q.  You got the phone records, but --

05:13PM  6    A.  Phone records.

05:13PM  7    Q.  -- that was it?

05:13PM  8    A.  Phone records and some reports, I believe, from TJ Webb

05:14PM  9    from Homeland Security, yeah.

05:14PM  10   Q.  And the same kind of situation where you're waiting for

05:14PM  11   some insider to provide you information that you might be

05:14PM  12   able to use?

05:14PM  13   A.  Trying to develop a human source.

05:14PM  14   Q.  Okay.  Because that's important to DEA investigations,

05:14PM  15   right?

05:14PM  16   A.  That's very important, and that was something that I was

05:14PM  17   very familiar with.  That was my way of working.

05:14PM  18   Q.  Okay.  So the 7/20/2018 proffer, you attend that proffer,

05:14PM  19   correct?

05:14PM  20   A.  I can't remember the date, but I believe you.

05:14PM  21   Q.  And then when you attend that proffer, this is the

05:14PM  22   proffer where Ron Serio raises allegations about Joe

05:14PM  23   Bongiovanni receiving money in exchange for information,

05:14PM  24   correct?

05:14PM  25   A.  All I -- when I was in that proffer, I wasn't part of the

05:14PM 1   proffer where he mentioned bribes and money.  I was part of

05:14PM 2   the proffer in what I remember was that Joe Bongiovanni was

05:14PM 3   passing names of informants.  And he named three names.

05:14PM 4       So, during that proffer, there was nothing mentioned

05:14PM 5   about bribes or money, it was the passing of those

05:15PM 6   informants' names.

05:15PM 7   Q.  And so following this proffer, you knew about this

05:15PM 8   information, correct?

05:15PM 9   A.  We what?

05:15PM 10  Q.  You knew about this information?

05:15PM 11  A.  So, I heard what I heard during the proffer.

05:15PM 12  Q.  And you were working at D-58 at that time?

05:15PM 13  A.  Still in D-58.

05:15PM 14  Q.  G.S. Jim McHugh was the group supervisor or boss?

05:15PM 15  A.  He was the group supervisor, correct.

05:15PM 16  Q.  He was the boss for both you and Curtis Ryan?

05:15PM 17  A.  Correct.

05:15PM 18  Q.  And after hearing that information, you decide we both

05:15PM 19  need to go back and report this to G.S. McHugh, correct?

05:15PM 20  A.  Correct.

05:15PM 21  Q.  And you guys do do that, correct?

05:15PM 22  A.  We did.

05:15PM 23  Q.  After you make this report to G.S. McHugh, you asked

05:15PM 24  G.S. McHugh for permission to take a look at the Ron Serio

05:15PM 25  file that Joe Bongiovanni worked on?

05:15PM    1    A.  Not during that meeting.  But at some point after that

05:15PM    2    meeting with Jim, I asked Jim other things initially.

05:15PM    3    Q.  And so with regard to this particular file, you said that

05:15PM    4    you went to the file room?

05:15PM    5    A.  So I asked Jim, would it be okay if I went and retrieved

05:16PM    6    the Serio file from the file room to look at it.  Because of

05:16PM    7    the proffer that we had just done, and to look through the

05:16PM    8    file.  And he said yes, it was okay.

05:16PM    9    Q.  And you get this file, and you start going through the

05:16PM   10    DEA-6s, correct?

05:16PM   11    A.  Went mostly through the DEA-6s.  I saw there were lots of

05:16PM   12    subpoenas, which I chose not to go through.  I went right to

05:16PM   13    the DEA-6s, and started going through the 6s.

05:16PM   14    Q.  So you went through the subpoenas -- sorry, you went

05:16PM   15    through the DEA-6s and read those, right?

05:16PM   16    A.  Quickly.

05:16PM   17    Q.  You read the DEA-6s quickly.  And as far as the

05:16PM   18    subpoenas, you never looked through any of them?

05:16PM   19    A.  There were a lot of subpoenas.  Again, it was a thick

05:16PM   20    file, but I did not go through all the subpoenas.  I may have

05:16PM   21    briefly gone through some of them, but I didn't spend a lot

05:16PM   22    of time going through the subpoenas.

05:16PM   23    Q.  Did you gain an understanding of what the subpoenas were

05:16PM   24    directed to?

05:16PM   25    A.  Can -- what do you mean?

05:16PM   1   Q.  Well, you looked through the subpoenas quickly, right,

05:17PM   2   sir?

05:17PM   3   A.  I looked through the subpoenas quickly.

05:17PM   4   Q.  Did you see whether they were directed at phones,

05:17PM   5   utilities, something else?

05:17PM   6   A.  Oh, I'm sorry, phones.  They were phones.

05:17PM   7   Q.  So they were phones?

05:17PM   8   A.  Mostly phones, from what I remember.

05:17PM   9   Q.  What about utilities, did ever see any subpoenas directed

05:17PM  10   towards utilities?

05:17PM  11   A.  I don't remember.

05:17PM  12   Q.  So you mentioned that this was the paper file, correct?

05:17PM  13   A.  This was the case file.  So there's two case files,

05:17PM  14   right?  The actual case file, and then a mirror case file

05:17PM  15   which is the U.S. Attorney's copy.

05:17PM  16   Q.  Okay.

05:17PM  17   A.  So it was the actual case file.

05:17PM  18      I don't remember if it was the AUSA copy for the U.S.

05:17PM  19   Attorney's Office, or the actual criminal file for DEA.

05:17PM  20   Q.  Okay.  But you're familiar with the fact that there are

05:17PM  21   also files on the share drive in the DEA system, correct?

05:17PM  22   A.  So, who do you mean?

05:17PM  23   Q.  Sure.  So the DEA has a computer system, I'm not sure at

05:17PM  24   that point if it was CMS or something else, but --

05:17PM  25   A.  So at that point, there's a case management system called

05:17PM    1   Impact.

05:17PM    2   Q.  Okay.  So there was a -- there was a computer system that

05:17PM    3   the DEA has, right?

05:17PM    4   A.  It was a case management system called Impact.

05:18PM    5   Q.  Okay.  And Impact is something that's put up on a server

05:18PM    6   by the DEA, right?

05:18PM    7   A.  Again, I don't want to go too far technically because --

05:18PM    8   Q.  Yeah.

05:18PM    9   A.  -- I'm just not that knowledgeable.  But it's an

05:18PM   10   automated case management system that sits on a server.  And

05:18PM   11   depending on what group you're in, you have access to your

05:18PM   12   own group's case management system.

05:18PM   13   Q.  Correct.

05:18PM   14   A.  Like, I can access case management through that system

05:18PM   15   for my group but not another group, unless I get permission

05:18PM   16   to do that through management.

05:18PM   17   Q.  And your experience as a DEA agent is that there's a

05:18PM   18   paper file that's kept inside the file room, right?

05:18PM   19   A.  There's the actual -- it's changed now.

05:18PM   20   Q.  Yeah, I know, but back then --

05:18PM   21   A.  Yes.

05:18PM   22   Q.  -- let's just focus on that period of time back in 2008.

05:18PM   23   A.  Yep.  There's the hard-copy file.

05:18PM   24   Q.  Okay.

05:18PM   25   A.  And then the case management system.

05:18PM 1  Q. And case management system file that's on the computer?

05:18PM 2  A. That's automated, yes.

05:18PM 3  Q. Did you look at the case management system?

05:18PM 4  A. I didn't have access to it, because the file was in group

05:18PM 5  D-57.

05:18PM 6  Q. So you never looked through any of that, correct?

05:18PM 7  A. That I don't have access -- I didn't have access to those

05:18PM 8  cases, because that was a D-57 case.

05:19PM 9  Q. Did you asks G.S. McHugh for permission to look at the

05:19PM 10  electronic file?

05:19PM 11  A. No, just the case file.

05:19PM 12  Q. And you stated that you also took a look at DEA files

05:19PM 13  concerning Peter Gerace; is that right?

05:19PM 14  A. It wasn't files.  So you'd have to be more specific.

05:19PM 15  Q. Sure.  So you looked for any type of DEA-6s or entries

05:19PM 16  with regard to Peter Gerace?

05:19PM 17  A. I searched through a process called a DEA electronic file

05:19PM 18  room, which searches all DEA-6s agency-wide.  And I did a

05:19PM 19  search under Peter Gerace and Anthony Gerace, both.

05:19PM 20  Q. Okay.  And that's when you found the entry for

05:19PM 21  November 6th of 2009; is that right?

05:19PM 22  A. Which report is that?

05:19PM 23       **MR. SINGER:**  Sure.  So, Ms. Champoux, can we put up

05:19PM 24  Government Exhibit 30A on the screen, please.

05:19PM 25       **THE WITNESS:**  Yes.

05:19PM    1    **BY MR. SINGER:**

05:19PM    2    Q.   This is what you found in the system, correct, sir?

05:19PM    3    A.   Yes, correct.

05:19PM    4    Q.   And after you found this one particular document, you

05:19PM    5    sent this over to the U.S. Attorney's Office?

05:19PM    6    A.   I eventually sent it to the U.S. Attorney's Office, or

05:20PM    7    gave it to them.  I can't remember which.

05:20PM    8    Q.   And everything that we're talking about, that all occurs

05:20PM    9    before the 8/1/2018 meeting that you had at the U.S.

05:20PM   10    Attorney's Office?

05:20PM   11    A.   This happens before -- are you talking about the

05:20PM   12    coordination meeting?  Or the one where I had said what Joe

05:20PM   13    had said about the racial comments?

05:20PM   14    Q.   Yes, I'm talking about the racial comments meeting.

05:20PM   15    A.   So, yes, I had done that before that meeting at the U.S.

05:20PM   16    Attorney's Office.

05:20PM   17    Q.   Okay.

05:20PM   18        **MR. SINGER:**  Judge, I think this is probably a good

05:20PM   19    time to stop.

05:20PM   20        **THE COURT:**  Yeah.  We're not going to finish this

05:20PM   21    witness today obviously.

05:20PM   22        **MR. SINGER:**  Great.

05:20PM   23        **THE COURT:**  Folks, we'll stop for the day now.

05:20PM   24    Please remember my instructions about not communicating about

05:20PM   25    the case.  Don't use tools of technology to research anything

| | | |
|---|---|---|
| 05:20PM | 1 | about the case.  In fact, don't try to learn anything about |
| 05:20PM | 2 | the case outside the courtroom whatsoever.  And don't use |
| 05:20PM | 3 | tools of technology to communicate about the case. |
| 05:20PM | 4 | If there's any news coverage about the case, don't |
| 05:21PM | 5 | read it or watch it or listen to it.  If there's anything on |
| 05:21PM | 6 | the internet, don't look at that.  And don't make up your mind |
| 05:21PM | 7 | until you start deliberating. |
| 05:21PM | 8 | We'll see you tomorrow morning at 9:30.  We'll go |
| 05:21PM | 9 | until 5 tomorrow.  And then 9:30 to 5 again on Thursday. |
| 05:21PM | 10 | Maybe you can watch a replay of the Bills game tonight, it |
| 05:21PM | 11 | might be on. |
| 05:21PM | 12 | Thanks, everybody. |
| 05:21PM | 13 | (Jury excused at 5:21 p.m.) |
| 05:21PM | 14 | THE COURT:  Okay.  Anything before we break from the |
| 05:21PM | 15 | government? |
| 05:21PM | 16 | MR. COOPER:  No, thank you. |
| 05:21PM | 17 | THE COURT:  From the defense? |
| 05:21PM | 18 | MR. SINGER:  No, Your Honor. |
| 05:21PM | 19 | THE COURT:  So tomorrow morning, I want everybody to |
| 05:21PM | 20 | come prepared to discuss scheduling, what time we're gonna do |
| 05:21PM | 21 | the conference on Friday, when we're gonna sum up, and when |
| 05:21PM | 22 | we're gonna charge.  I'd like to have a plan in place tomorrow |
| 05:22PM | 23 | morning.  So why don't you come in ten minutes early, and |
| 05:22PM | 24 | we'll try do that before -- can you do that, Mr. Singer? |
| 05:22PM | 25 | MR. SINGER:  I can get there, Judge, as long as my |

USA v Bongiovanni - Casullo - Singer/Cross - 9/24/24

05:22PM  1    child doesn't miss the bus like today.

05:22PM  2             THE COURT:  Yeah.  Okay.  So ten minutes early, and

05:22PM  3    we'll talk about that before we talk with the jury.  Okay?

05:22PM  4             MR. COOPER:  Thanks, Judge.

05:22PM  5             THE COURT:  Thanks, everybody.

05:22PM  6             (Proceedings concluded at 5:22 p.m.)

05:22PM  7             *        *        *        *        *

         8

         9

        10

        11

        12

        13

        14               **CERTIFICATE OF REPORTER**

        15

        16             In accordance with 28, U.S.C., 753(b), I

        17    certify that these original notes are a true and correct

        18    record of proceedings in the United States District Court for

        19    the Western District of New York on September 24, 2024.

        20

        21                    s/ Ann M. Sawyer
                              Ann M. Sawyer, FCRR, RPR, CRR
        22                    Official Court Reporter
                              U.S.D.C., W.D.N.Y.
        23

        24

        25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 1**

**SEPTEMBER 24, 2024**

**W I T N E S S**                                                **P A G E**

**A N T H O N Y   C A S U L L O**                        2

  DIRECT EXAMINATION BY MR. COOPER:            2

  CROSS-EXAMINATION BY MR. SINGER:             140