08:51AM

1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                    Case No. 1:19-cr-227
4               Plaintiff,                     (LJV)
   v.
5                                   September 26, 2024
   JOSEPH BONGIOVANNI,
6
   _____Defendant._____
7

8     TRANSCRIPT EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 1
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                 UNITED STATES DISTRICT JUDGE

10 **APPEARANCES:**        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                          **BY: JOSEPH M. TRIPI, ESQ.**
11                           **NICHOLAS T. COOPER, ESQ.**
                             **CASEY L. CHALBECK, ESQ.**
12                        Assistant United States Attorneys
                          Federal Centre, 138 Delaware Avenue
13                        Buffalo, New York 14202
                          For the Plaintiff
14
                          **SINGER LEGAL PLLC**
15                        **BY: ROBERT CHARLES SINGER, ESQ.**
                          80 East Spring Street
16                        Williamsville, New York 14221
                             And
17                        **LAW OFFICES OF PARKER ROY MacKAY**
                          **BY: PARKER ROY MacKAY, ESQ.**
18                        3110 Delaware Avenue
                          Kenmore, New York 14217
19                           And
                          **OSBORN, REED & BURKE, LLP**
20                        **BY: JOHN J. GILSENAN, ESQ.**
                          120 Allens Creek Road
21                        Rochester, New York 14618
                          For the Defendant
22
   **PRESENT:**           **BRIAN A. BURNS,** FBI Special Agent
23                        **MARILYN K. HALLIDAY,** HIS Special Agent
                          **KAREN A. CHAMPOUX,** USA Paralegal
24
   **LAW CLERK:**         **REBECCA FABIAN IZZO, ESQ.**
25

Case 1:19-cr-00227-LJV-MJR   Document 1336   Filed 11/03/24   Page 2 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

2

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:  COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:       ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *    *    *    *    *    *    * |
| 7 | |

02:54PM   8    (Excerpt commenced at 2:54 p.m.)

02:54PM   9    (Jury seated at 2:54 p.m.)

02:54PM   10    **THE COURT:**  The record will reflect that all our

02:54PM   11   jurors are present.  As I said, we'll go to 5 tonight, and

02:54PM   12   talk a little bit at 5 about what the plan is for next week.

02:54PM   13    The government can call its next witness.

02:54PM   14    **MR. COOPER:**  Thank you, Judge.  The government calls

02:54PM   15   FBI Special Agent Brian Burns.

02:54PM   16

02:54PM   17   **B R I A N   B U R N S**, having been duly called and sworn,

02:55PM   18   testified as follows:

02:55PM   19    **MR. COOPER:**  May I inquire, Judge?

02:55PM   20    **THE COURT:**  You may.

02:55PM   21

02:55PM   22    **DIRECT EXAMINATION BY MR. COOPER:**

02:55PM   23   Q.  Good afternoon, Special Agent Burns.  Can you introduce

02:55PM   24   yourself to the jury?

02:55PM   25   A.  Sure, my name is Brian Burns.

02:55PM    1    Q.  Okay.  Where did you grow up?

02:55PM    2    A.  Buffalo, Tonawanda area.

02:55PM    3    Q.  All right.  And can you tell the jury a little bit about

02:55PM    4    your educational background?

02:55PM    5    A.  Yes, I graduated with a bachelor's in science and a

02:55PM    6    pharmacy degree, I was a practicing pharmacist, and I

02:55PM    7    received an MBA in health care administration.  And then I

02:55PM    8    joined the FBI in October of 1998.

02:55PM    9    Q.  Okay.  So before joining the FBI in 1998, had you worked

02:56PM   10    kind of a first career as a pharmacist?

02:56PM   11    A.  Yes.  I was a licensed pharmacist for three years.

02:56PM   12    Q.  Okay.  And at some point you switched from pharmacist to

02:56PM   13    FBI special agent; is that right?

02:56PM   14    A.  That's correct.

02:56PM   15    Q.  I don't think we have time today for the story, so we're

02:56PM   16    gonna move on.  Do you get some training when you join the

02:56PM   17    FBI?

02:56PM   18    A.  I sure do.

02:56PM   19    Q.  Okay.  And I don't want to spend too much time there

02:56PM   20    either, but 30,000-foot-view, what kind of training do you

02:56PM   21    receive to become an FBI special agent?

02:56PM   22    A.  You go to Quantico, Virginia.  They teach you

02:56PM   23    constitutional law, how to effect arrests, effect arrests,

02:56PM   24    they teach you firearms, they teach you tactical training,

02:56PM   25    surveillance training, they teach you all the different

| | | |
|---|---|---|
| 02:56PM | 1 | programs that the FBI has jurisdiction over, interviewing |
| 02:56PM | 2 | techniques, kind of, you come out with a lot more skills |
| 02:56PM | 3 | related to investigations than you ever had before. |
| 02:56PM | 4 | Q.  Okay.  And in addition to that initial training at |
| 02:56PM | 5 | Quantico, do you kind of continue throughout your career to |
| 02:56PM | 6 | learn more from working with experienced agents? |
| 02:56PM | 7 | A.  Absolutely. |
| 02:56PM | 8 | Q.  Did that happen in your career? |
| 02:57PM | 9 | A.  Yes. |
| 02:57PM | 10 | Q.  Okay.  After you finish at Quantico, where is your first |
| 02:57PM | 11 | posting? |
| 02:57PM | 12 | A.  Memphis, Tennessee.  The FBI office in Memphis, |
| 02:57PM | 13 | Tennessee. |
| 02:57PM | 14 | Q.  What year did you start in Memphis, Tennessee? |
| 02:57PM | 15 | A.  1999, February. |
| 02:57PM | 16 | Q.  And how long were you there for? |
| 02:57PM | 17 | A.  Approximately ten years, January of 2008. |
| 02:57PM | 18 | Q.  Okay.  And during your time in the Memphis, Tennessee |
| 02:57PM | 19 | office with the FBI, did you start working in narcotics |
| 02:57PM | 20 | investigations? |
| 02:57PM | 21 | A.  Yeah, primarily when I was first assigned down there I |
| 02:57PM | 22 | worked narcotics investigations. |
| 02:57PM | 23 | Q.  Okay.  And eventually did you transition into doing |
| 02:57PM | 24 | public corruption work? |
| 02:57PM | 25 | A.  Yeah, we worked a number of, it segued from narcotics |

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

| | | |
|---|---|---|
| 02:57PM | 1 | investigations into law enforcement corruption involving |
| 02:57PM | 2 | narcotics.  So, basically police officers assisting drug |
| 02:57PM | 3 | dealers.  And then I kind of moved on to some elected |
| 02:57PM | 4 | officials, so I predominantly worked public corruption in my |
| 02:57PM | 5 | career. |
| 02:57PM | 6 | Q.  Okay.  And when you -- eventually after 2008, did you |
| 02:57PM | 7 | leave the Memphis office? |
| 02:57PM | 8 | A.  Yes. |
| 02:57PM | 9 | Q.  Where'd you come? |
| 02:57PM | 10 | A.  I came back to Buffalo, to my hometown. |
| 02:58PM | 11 | Q.  Have you been back in the Buffalo, New York field office |
| 02:58PM | 12 | from 2008 until the present? |
| 02:58PM | 13 | A.  Yes, I was in Niagara Falls, we had a small office there |
| 02:58PM | 14 | for a bit.  And then I, once they closed that, I moved to the |
| 02:58PM | 15 | Buffalo main office here. |
| 02:58PM | 16 | Q.  What group are you in at the FBI? |
| 02:58PM | 17 | A.  The white collar crime, it's WC1 group. |
| 02:58PM | 18 | Q.  Does the white collar crime group work on predominantly |
| 02:58PM | 19 | public corruption cases? |
| 02:58PM | 20 | A.  Yeah, they have economic fraud, healthcare fraud, a |
| 02:58PM | 21 | number of other ones.  But public corruption does fall under |
| 02:58PM | 22 | the white collar program. |
| 02:58PM | 23 | Q.  Got it.  We're gonna jump right in now, enough about your |
| 02:58PM | 24 | background.  I want to talk to you -- we heard yesterday from |
| 02:58PM | 25 | a person named Jason Pierini from Customs and Border Patrol |

02:58PM    1    and about the defendant traveling with Paul Francoforte.  Do

02:58PM    2    you remember reviewing those records yesterday?

02:58PM    3    A.  Yes, I do.

02:58PM    4    Q.  Okay.  And Paul Francoforte, we've heard quite a bit

02:58PM    5    about that person, right?

02:58PM    6    A.  We certainly have.

02:58PM    7    Q.  What's that person's nickname?

02:58PM    8    A.  It's Hot Dog.

02:58PM    9    Q.  Okay.  Is Hot Dog believed by law enforcement to be

02:58PM   10    associated with Italian Organized Crime?

02:58PM   11    A.  Yes.  He is.

02:58PM   12            MR. MacKAY:  Objection, cumulative.

02:58PM   13            THE COURT:  Overruled.

02:58PM   14            BY MR. COOPER:

02:59PM   15    Q.  Is Hot Dog's date of birth October 21st, 1948?

02:59PM   16    A.  Yes, it is.

02:59PM   17    Q.  Okay.

02:59PM   18            MR. COOPER:  Ms. Champoux, can you pull up on the

02:59PM   19    left Government Exhibit 393, and on the right Government

02:59PM   20    Exhibit 3713A?

02:59PM   21            BY MR. COOPER:

02:59PM   22    Q.  All right.  Special Agent Burns, on the left side of your

02:59PM   23    screen here, can you circle Hot Dog for us?

02:59PM   24    A.  Paul Francoforte.

02:59PM   25    Q.  On that same exhibit that's Government Exhibit 393, can

02:59PM  1   you circle the person who has a reputation in the law

02:59PM  2   enforcement community for being the former boss of Italian

02:59PM  3   Organized Crime in Buffalo?

02:59PM  4   A.   Joseph Todaro Sr.

02:59PM  5   Q.   Okay.  Special Agent Burns, on the right side of the

02:59PM  6   screen, can you circle the names of the two people that were

02:59PM  7   crossing the border together on November 29th, 2012?

02:59PM  8   A.   Mr. Francoforte and the defendant.

02:59PM  9   Q.   Okay.

02:59PM  10          MR. COOPER:  Ms. Champoux, can we zoom in on the

02:59PM  11  names there on 3713A, just all the way across to the right?

03:00PM  12      That's perfect, thank you.

03:00PM  13          BY MR. COOPER:

03:00PM  14  Q.   So on November 29th, 2012, the two people crossing the

03:00PM  15  border together are P. Francoforte, with a date of birth of

03:00PM  16  10/21/48, and Joseph Samuel Bongiovanni; is that correct?

03:00PM  17  A.   That's correct.

03:00PM  18  Q.   Okay.

03:00PM  19          MR. COOPER:  Can you zoom out of that?

03:00PM  20          BY MR. COOPER:

03:00PM  21  Q.   Do you know what they were doing crossing the border

03:00PM  22  together?

03:00PM  23  A.   I have no idea.

03:00PM  24  Q.   Okay.  Special Agent Burns, I want to talk about

03:00PM  25  something else that happened in late November of 2012.  When

03:00PM  1   did the New York State Police arrest Wayne Anderson with bulk

03:00PM  2   marijuana and U.S. currency?

03:00PM  3   A.  November 25th, 2012.

03:00PM  4   Q.  Is that about four days before this border crossing?

03:00PM  5   A.  Yes, it is.

03:00PM  6   Q.  Based on your review of the entire C2-13-0026 case file,

03:00PM  7   when did the defendant begin looking into Wayne Anderson's

03:00PM  8   arrest?

03:00PM  9   A.  Based on my review, 11/26/2012.

03:01PM  10  Q.  Is that the very day after he was arrested?

03:01PM  11  A.  The day after.

03:01PM  12  Q.  Okay.  When did the defendant write his first DEA report

03:01PM  13  regarding the Anderson arrest?

03:01PM  14  A.  November 28th, 2012.

03:01PM  15  Q.  Is that the day before he travels to Canada with Hot Dog?

03:01PM  16  A.  That's accurate.

03:01PM  17  Q.  Okay.  Has there been any indication during this trial

03:01PM  18  that the marijuana seizure at Wayne Anderson's house was

03:01PM  19  associated with Ron Serio?

03:01PM  20  A.  Ron Serio testified that the -- that marijuana was his

03:01PM  21  marijuana being delivered to Wayne Anderson's residence.

03:01PM  22  Q.  Okay.

03:01PM  23           **MR. COOPER:**  You can take those down, Ms. Champoux.

03:01PM  24           If we can pull up Government Exhibit 8M in evidence?

        25

03:01PM 1    **BY MR. COOPER:**

03:01PM 2    Q.  Do you see this, sir?

03:01PM 3    A.  Yes, did I do.

03:01PM 4    Q.  Is this the first report that's generated in file

03:01PM 5    C2-13-0026?

03:01PM 6    A.  Yes.  The first DEA-6.

03:01PM 7    Q.  Okay.  And does that same file number ultimately become

03:01PM 8    the defendant's reported investigation into Ron Serio?

03:01PM 9    A.  Yes, it does.

03:01PM 10   Q.  Okay.

03:02PM 11       **MR. COOPER:**  Ms. Champoux, can you take that down and

03:02PM 12   go to Government Exhibit 8A at page 347?

03:02PM 13       **BY MR. COOPER:**

03:02PM 14   Q.  Special Agent Burns, is this a subpoena return for

03:02PM 15   subscriber information from the defendant's case file

03:02PM 16   C2-13-0026?

03:02PM 17   A.  From the paper file, yes, it is.

03:02PM 18   Q.  Okay.  And you see the case number up here at the top?

03:02PM 19   A.  Yes, I do.

03:02PM 20   Q.  And whose subscriber information is the defendant causing

03:02PM 21   to be subpoenaed in this subpoena?

03:02PM 22   A.  Paul Francoforte, a/k/a Hot Dog.

03:02PM 23   Q.  Same guy he's crossing the border with?

03:02PM 24   A.  That's correct.

03:02PM 25   Q.  When did the defendant receive this subpoena response

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

03:02PM   1   providing Hot Dog's subscriber information?

03:02PM   2   A.  March 21st, 2013.

03:02PM   3   Q.  Okay.  Is that about four months after he went to Canada

03:02PM   4   with him?

03:02PM   5   A.  Yes, it is.  Approximately.

03:02PM   6   Q.  In any of the -- did you review that whole case file in

03:03PM   7   Government Exhibit 8A?

03:03PM   8   A.  Yes, paper file, the shared drive, as well as the file

03:03PM   9   from the basement at 85 Adler, the defendant's residence.

03:03PM  10   Q.  Okay.  So let's take -- 8A is the paper file was

03:03PM  11   ultimately scanned and made into a PDF; is that right?

03:03PM  12   A.  That's correct.

03:03PM  13   Q.  Did you review everything in there?

03:03PM  14   A.  Yes, I have.

03:03PM  15   Q.  Government Exhibit 8, that's the electronic file that the

03:03PM  16   DEA maintained, right?

03:03PM  17   A.  The shared drive, yes.

03:03PM  18   Q.  Did you review everything in there?

03:03PM  19   A.  Yes, I have.

03:03PM  20   Q.  Okay.  The file that the defendant had in his basement

03:03PM  21   after he retired, did you review everything in that?

03:03PM  22   A.  Yeah, 100A-1, I think it was.

03:03PM  23   Q.  Okay.  Did the defendant ever mention Hot Dog in any of

03:03PM  24   his DEA-6 reports in this case?

03:03PM  25   A.  Not in any of the DEA-6s.

Case 1:19-cr-00227-LJV-MJR    Document 1336    Filed 11/03/24    Page 11 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

11

03:03PM    1    Q.  Did the defendant ever index Hot Dog or Paul Francoforte

03:03PM    2    in any of the DEA-6 reports?

03:03PM    3    A.  Not in any of the DEA-6 reports.

03:03PM    4    Q.  By causing a subpoena to be issued for Hot Dog's

03:03PM    5    subscriber information, would that cause Hot Dog's phone

03:03PM    6    number to be entered into the DARTS deconfliction database?

03:03PM    7    A.  Yes, it would.

03:03PM    8    Q.  Have you reviewed Government Exhibit 358, the defendant's

03:04PM    9    phone records from December 2013 until January 2019?

03:04PM   10    A.  Yes, I have.

03:04PM   11    Q.  Okay.  Did the defendant have phone contact with Hot Dog?

03:04PM   12    A.  Yes, he did.

03:04PM   13    Q.  Okay.  And has the jury already looked at those phone

03:04PM   14    records and that contact?

03:04PM   15    A.  Yes.

03:04PM   16    Q.  Okay.  How many times did the defendant have phone

03:04PM   17    contact with Hot Dog?

03:04PM   18    A.  Between the time, the frame you reference was 50 times.

03:04PM   19    Q.  50 times?

03:04PM   20    A.  That's correct.

03:04PM   21    Q.  Okay.  What was the earliest phone call between the

03:04PM   22    defendant and Hot Dog in the records that begin on November

03:04PM   23    2013?

03:04PM   24    A.  The records begin November 13th, the first call is

03:04PM   25    December 2013.

03:04PM   1   Q.  Okay.  And you just said the records begin November 13th,

03:04PM   2   did you mean November of 2013?

03:04PM   3   A.  Oh, I'm sorry, right.  It was 2013, yes.

03:04PM   4   Q.  Okay.  And the first phone call is in what month?

03:04PM   5   A.  It's December.  The very next month.

03:04PM   6   Q.  About how long was that first call that shows up in the

03:04PM   7   phone records that we have?

03:04PM   8   A.  I believe it was ten minutes.

03:04PM   9   Q.  Was the defendant's purported investigation into Ron

03:04PM  10   Serio and his drug trafficking still open in December of

03:05PM  11   2013?

03:05PM  12   A.  Yes, it was.

03:05PM  13   Q.  Before that ten minute December 2013 phone call between

03:05PM  14   the defendant and Hot Dog, had Hot Dog's phone number already

03:05PM  15   shown up in the defendant's purported Ron Serio

03:05PM  16   investigation?

03:05PM  17   A.  Repeat that question?

03:05PM  18   Q.  Sure.  So the subpoena return is from March 21st, 2013,

03:05PM  19   right?

03:05PM  20   A.  Yes.

03:05PM  21   Q.  Is that nine months before the phone call that you see in

03:05PM  22   December of 2013?

03:05PM  23   A.  Yes, it is.

03:05PM  24   Q.  Okay.

03:05PM  25           **MR. COOPER:**  Ms. Champoux, can we please go to the

03:05PM   1   papers that were scanned from the box that was found in the

03:05PM   2   defendant's basement in 2019, it's 100A.1, please.  And please

03:05PM   3   click on the PDF entitled 716-830-3226 hot sheet.  You got it.

03:05PM   4   Yep.

03:05PM   5        **BY MR. COOPER:**

03:05PM   6   Q.  Special Agent Burns, what are we looking at here?

03:05PM   7   A.  It's a hot sheet, the records of the phone calls from the

03:05PM   8   subpoena returns.

03:05PM   9   Q.  Okay.  And is it in the name of an individual according

03:06PM  10   to -- okay, this 3226 phone number, was that subscribed to an

03:06PM  11   individual's name?

03:06PM  12   A.  Yes.

03:06PM  13   Q.  Whose name?

03:06PM  14   A.  Christopher Baker.

03:06PM  15   Q.  Okay.  Was Baker identified as a member of Serio's

03:06PM  16   drug-trafficking organization?

03:06PM  17   A.  Yes, he was.

03:06PM  18   Q.  Did Ron Serio testify that the phone number ending in

03:06PM  19   3226 was actually his phone number, but subscribed in the

03:06PM  20   name of his drug associate, Chris Baker?

03:06PM  21   A.  Yes, that was the phones he was utilizing, one of the

03:06PM  22   phones he was utilizing.

03:06PM  23   Q.  Okay.  Does Paul Francoforte, a/k/a Hot Dog, show up on

03:06PM  24   this hot sheet from April 19th of 2013?

03:06PM  25   A.  Is he in this?

Case 1:19-cr-00227-LJV-MJR    Document 1336    Filed 11/03/24    Page 14 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

14

03:06PM    1          **MR. COOPER:**  You can scroll down to the next page,

03:06PM    2    Ms. Champoux.

03:06PM    3          **THE WITNESS:**  There it is, yeah.  Paul Francoforte.

03:06PM    4          **BY MR. COOPER:**

03:06PM    5    Q.  Can you just touch the screen so the jury can see where

03:06PM    6    you're looking?  Okay.

03:06PM    7         So you made a blue mark about halfway down page 2 of this

03:06PM    8    document.  In this hot sheet, so, the run date is April 19th,

03:07PM    9    2013, and it looks like a timeframe from February 14th to

03:07PM   10    March 6th, so give or take two and a half weeks, how many

03:07PM   11    phone calls did Paul Francoforte have with Ron Serio?

03:07PM   12    A.  14.

03:07PM   13    Q.  Okay.  Does the hot sheet here list the same phone number

03:07PM   14    for Hot Dog that the defendant had 50 phone calls with in his

03:07PM   15    phone records?

03:07PM   16    A.  Yes, it does.

03:07PM   17    Q.  That's that 866-2687 phone number?

03:07PM   18    A.  That's correct.

03:07PM   19    Q.  Okay.  Do those 50 phone calls between December 2013 and

03:07PM   20    January 2019 include both incoming calls, so that's from

03:07PM   21    Hot Dog to Joe Bongiovanni, and outgoing calls from Joe

03:07PM   22    Bongiovanni to Hot Dog?

03:07PM   23    A.  Yes, they do.

03:07PM   24    Q.  Two-way street, sir?

03:07PM   25    A.  Absolutely.

03:07PM  1   Q.  Okay.

03:07PM  2        **MR. COOPER:**  Ms. Champoux, can we please go to

03:07PM  3   Government Exhibit 26D as in David at page 4, please?

03:07PM  4        **BY MR. COOPER:**

03:08PM  5   Q.  Is this a DARTS deconfliction notification?

03:08PM  6   A.  Yes, it is.

03:08PM  7   Q.  Okay.  Do you recognize this?

03:08PM  8   A.  Yes, I do.

03:08PM  9   Q.  Did you see this when Special Agent Casullo was sitting

03:08PM  10  on the stand testifying?

03:08PM  11  A.  Yes, I did.

03:08PM  12  Q.  Okay.  And is this on page 4 here --

03:08PM  13       **MR. COOPER:**  If you could just scroll up a tiny bit,

03:08PM  14  Ms. Champoux?

03:08PM  15       **BY MR. COOPER:**

03:08PM  16  Q.  -- is this a DARTS deconfliction related to that same

03:08PM  17  phone number, 866-2687?

03:08PM  18  A.  Yes, number 4, Paul Francoforte.

03:08PM  19  Q.  Okay.  That's Hot Dog up there?

03:08PM  20  A.  That's Hot Dog.

03:08PM  21  Q.  Okay.  And does this indicate here that his number showed

03:08PM  22  up in a deconfliction as being in contact with Frank Bifulco?

03:08PM  23  A.  Yes, it does.

03:08PM  24  Q.  Does that guy have a nickname?

03:08PM  25  A.  Yeah.  That's Butchie --

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

16

| 03:08PM | 1 | Q.  Okay? |
| 03:08PM | 2 | A.  -- Bifocal, a/k/a Butchie. |
| 03:08PM | 3 | Q.  Is Butchie Bifocal, did he have a reputation at this time |
| 03:08PM | 4 | for being involved in Italian Organized Crime? |
| 03:08PM | 5 | A.  Absolutely. |
| 03:08PM | 6 | Q.  Okay.  Did this DARTS deconfliction cause the defendant |
| 03:08PM | 7 | to be notified that Special Agent Casullo ran the phone |
| 03:09PM | 8 | number for Hot Dog on January 7th, of 2019? |
| 03:09PM | 9 | A.  Yes, it did. |
| 03:09PM | 10 | Q.  Is that how DARTS deconflictions work? |
| 03:09PM | 11 | A.  Yes, the line below. |
| 03:09PM | 12 | Q.  Okay.  And so, you indicated the line below.  Can you see |
| 03:09PM | 13 | here, a DARTS deconfliction involving a case the defendant |
| 03:09PM | 14 | worked on? |
| 03:09PM | 15 | A.  Yes. |
| 03:09PM | 16 | Q.  And is that the same Ron Serio investigation we've been |
| 03:09PM | 17 | talking about? |
| 03:09PM | 18 | A.  Yes, it is. |
| 03:09PM | 19 | Q.  Okay.  After Tony Casullo ran Hot Dog's number in DARTS |
| 03:09PM | 20 | on January 7, 2019, did Joe Bongiovanni have a phone call |
| 03:09PM | 21 | with Hot Dog? |
| 03:09PM | 22 | A.  Yes, he did. |
| 03:09PM | 23 | Q.  When was that? |
| 03:09PM | 24 | A.  Oh, it was, I believe, oh, was it the -- |
| 03:09PM | 25 | Q.  Do you remember about how long after the DARTS |

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

03:09PM   1    deconfliction was run the phone call happens?

03:09PM   2    A.  Oh, a few days.  A few days after.

03:09PM   3    Q.  Okay.

03:09PM   4         **MR. COOPER:**  Ms. Champoux, if we can go to Government

03:09PM   5    Exhibit 358.

03:10PM   6         Yep, open that top PDF.

03:10PM   7         I'm sorry, ma'am, I didn't realize you were waiting

03:10PM   8    for me.

03:10PM   9         And then scroll all the way to the bottom of the

03:10PM  10    document.

03:10PM  11         **THE COURT:**  This is in evidence?

03:10PM  12         **MR. COOPER:**  Yes, Your Honor, it is.

03:10PM  13         And we're looking for January of 2019, Ms. Champoux,

03:10PM  14    so go right towards the bottom.

03:10PM  15         Oh, I'm sorry, ma'am.

03:10PM  16         Will you take down the PDF and in the same

03:10PM  17    Exhibit 358 it's the Volte spreadsheet here, thank you.  And I

03:10PM  18    think it's line 2155, or, 2511 maybe.

03:10PM  19         Keep scrolling.  Looking for January 28th.  Yep, here

03:10PM  20    we go.  Just expand those columns for me.

03:10PM  21         Ms. Champoux, can you just expand out the columns for

03:10PM  22    me real quick?

03:10PM  23         **BY MR. COOPER:**

03:11PM  24    Q.  Okay.  And I'm looking at 2511 here, Special Agent Burns,

03:11PM  25    can you see that row?

Case 1:19-cr-00227-LJV-MJR    Document 1336    Filed 11/03/24    Page 18 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

18

03:11PM  1    A.  Yes, I can.

03:11PM  2    Q.  Okay.  Is that a January 28th, 2019 phone call?

03:11PM  3    A.  Yes, it is.

03:11PM  4    Q.  Is that a phone call between the defendant and Hot Dog?

03:11PM  5    A.  Yes, it is.

03:11PM  6    Q.  Is that about 7:03 p.m.?

03:11PM  7    A.  Yes, it is.

03:11PM  8    Q.  Is that about three weeks after the defendant was

03:11PM  9    notified that Special Agent Casullo was running Hot Dog's

03:11PM  10   number in DARTS?

03:11PM  11   A.  Yeah, not three days, as I stated, three weeks.

03:11PM  12       MR. COOPER:  Okay.  You can take that exhibit down,

03:11PM  13   Ms. Champoux.

03:11PM  14       BY MR. COOPER:

03:11PM  15   Q.  Special Agent Burns, between November of 2013 when the

03:11PM  16   defendant's phone records start until January 28th, 2015,

03:11PM  17   when the defendant formally closes the Ron Serio

03:11PM  18   investigation, how many phone contacts occur between the

03:11PM  19   defendant and Hot Dog?

03:11PM  20   A.  19.

03:11PM  21   Q.  Okay.

03:11PM  22       MR. COOPER:  Ms. Champoux, can you take that exhibit

03:11PM  23   down?  I'm looking for 100B, thank you.

03:11PM  24       BY MR. COOPER:

03:12PM  25   Q.  I'm going to hand you what's in evidence as Government

03:12PM    1    Exhibit 100E-2; do you recognize that, sir?

03:12PM    2    A.  Yes, I do.

03:12PM    3    Q.  Where was that recovered from?

03:12PM    4    A.  Mr. Bongiovanni's residence.

03:12PM    5    Q.  Okay.  And what does it say inside?

03:12PM    6    A.  You want the inside?

03:12PM    7    Q.  Yep.  Just the handwritten.

03:12PM    8    A.  Just the handwriting portion?  Love, Hot Dog and Lynn.

03:12PM    9    Honored to be your friends.  Many years of happiness.

03:12PM   10    Q.  Okay.

03:12PM   11            **MR. COOPER:**  May I approach, Judge?

03:12PM   12            **THE COURT:**  Sure.

03:12PM   13            **MR. COOPER:**  Thank you.  Thank you.

03:12PM   14            **BY MR. COOPER:**

03:12PM   15    Q.  That wedding card, was that recovered from the same house

03:12PM   16    where the defendant had a file in his basement with that

03:12PM   17    guy's phone number listed in the subscriber returns?

03:12PM   18    A.  Yes, it was.

03:12PM   19    Q.  Okay.  We're gonna switch gears for a second, I want to

03:12PM   20    talk about a place called Gables bar.  Are you familiar with

03:13PM   21    that place?

03:13PM   22    A.  Yes, I am.

03:13PM   23    Q.  Okay.  Did you hear testimony from Lou Selva and Ron

03:13PM   24    Serio that they were tipped off that bartenders at Gables

03:13PM   25    were the subject of an ongoing investigation by federal law

03:13PM   1   enforcement?

03:13PM   2   A.  Yes, I was.

03:13PM   3   Q.  Did you hear Special Agent Shane Nastoff testify that the

03:13PM   4   defendant made a comment to him referencing that Anastasia

03:13PM   5   said that Bongo screwed him over?

03:13PM   6          **MR. MacKAY:**  Judge, I'm going to object at this point

03:13PM   7   to the hearsay, that it's, you know, he's testifying

03:13PM   8   essentially to what another witness said before already.  And

03:13PM   9   it's being offered for the truth of the matter, is that what

03:13PM  10   was said here.

03:13PM  11          **MR. COOPER:**  So, Judge, I would --

03:13PM  12          **THE COURT:**  This is foundational, right?

03:13PM  13          **MR. COOPER:**  It's foundational, we had the same

03:13PM  14   obviously previously and --

03:13PM  15          **THE COURT:**  Yeah, yeah.  Overruled.

03:13PM  16          **BY MR. COOPER:**

03:13PM  17   Q.  Did you hear Nastoff testify at this trial that the

03:13PM  18   defendant made a comment to him referencing that Anthony

03:13PM  19   Anastasia said Bongo screwed him over?

03:13PM  20   A.  Yes, I did.

03:13PM  21   Q.  Do you remember that?

03:13PM  22   A.  Yes, I do.

03:13PM  23   Q.  Okay.  Where is Gables bar located at?

03:13PM  24   A.  It's closed now, but it was on Hertel Avenue in North

03:13PM  25   Buffalo.  Close proximity to Colvin Avenue.

03:14PM    1    Q.   Okay.  Is Gables known to be frequented by any specific

03:14PM    2    group of people?

03:14PM    3    A.   During the course of the investigation you're referring

03:14PM    4    to, it was members of IOC would meet there.

03:14PM    5    Q.   Okay.  Was that a bar known to be frequented by law

03:14PM    6    enforcement?

03:14PM    7    A.   Some law enforcement officers.

03:14PM    8    Q.   All right.  So let's talk about 2009.

03:14PM    9         In 2009, were you involved in an FBI investigation into

03:14PM   10    Italian Organized Crime and public corruption?

03:14PM   11    A.   Yes, I was.

03:14PM   12    Q.   Okay.  Was Gables a part of that investigation?

03:14PM   13    A.   Yes, it was.

03:14PM   14    Q.   Describe how.

03:14PM   15    A.   It was the Safe Streets Task Force was looking at the

03:14PM   16    drug angle.  And essentially a couple of the bartenders,

03:14PM   17    their long-time employees, Steven Brucato and Anthony

03:14PM   18    Anastasia, were distributing cocaine out of the bar and in

03:14PM   19    proximity to the bar, they both lived near there.

03:14PM   20         Additionally, we had evidence, and that's kind of where

03:14PM   21    my part came in, they had evidence of certain law enforcement

03:14PM   22    officers would frequent there, were utilizing cocaine.

03:14PM   23         Additionally, there was information there were -- some

03:15PM   24    law enforcement information was being released, sensitive law

03:15PM   25    enforcement information, so it was kind of a drug/public

03:15PM  1    corruption/organized crime case.

03:15PM  2    Q.  Okay.  Was Tom Doctor was one of the law enforcement

03:15PM  3    officers that came up as a subject of your investigation?

03:15PM  4    A.  Yes, he was.

03:15PM  5    Q.  Did the FBI ultimately arrest Anthony Anastasia --

03:15PM  6    A.  Yes, they did.

03:15PM  7    Q.  -- related --

         8    A.  I'm sorry.

         9         **MR. COOPER:**  Yes, ma'am.  You're trying to rush.  I

         10   know we're trying to --

         11        **THE WITNESS:**  My fault.

         12        **BY MR. COOPER:**

         13   Q.  Wait for me to finish asking the question.

         14   A.  Yeah, my fault.  I'm sorry.

         15   Q.  Did the FBI ultimately arrest Anthony Anastasia related

03:15PM  16   to that investigation?

03:15PM  17   A.  Yes, they did.

03:15PM  18   Q.  Okay.  Did he waive and agree to cooperate temporarily?

03:15PM  19   A.  Yes, he did agree.

03:15PM  20   Q.  Did he ultimately cooperate?

03:15PM  21   A.  Not for very long, and he began distributing narcotics

03:15PM  22   again.

03:15PM  23   Q.  Okay.  Did there come a time when you became aware of a

03:15PM  24   DEA investigation occurring around the same time with your

03:15PM  25   FBI investigation?

03:15PM    1    A.  Yeah, it was kind of shortly thereafter Anastasia got on

03:15PM    2    the DEA radar.

03:15PM    3    Q.  Okay.  I want to move on past that now.

03:16PM    4        Was Shane Nastoff the agent that was working that DEA

03:16PM    5    investigation shortly after the FBI one ended?

03:16PM    6    A.  Yes.

03:16PM    7    Q.  Okay.

03:16PM    8    A.  He was the case agent on it.

03:16PM    9    Q.  Got it.  Now I want to move on.

03:16PM   10        January 2019, were you working in the white collar unit

03:16PM   11    of the FBI at that time?

03:16PM   12    A.  Yes, I was.

03:16PM   13    Q.  Did there come a time when you received a brief on the

03:16PM   14    investigation into Joseph Bongiovanni?

03:16PM   15    A.  Yes, I did.

03:16PM   16    Q.  Okay.  Who was at that briefing?

03:16PM   17    A.  It was the -- my executive management.  So my special

03:16PM   18    agent in charge, assistant special agent in charge, my

03:16PM   19    supervisor, couple other agents, HSI's senior management,

03:16PM   20    along with Case Agent Curtis Ryan and Marilyn Halliday.

03:16PM   21        Additionally, the -- from the U.S. Attorney's Office was

03:16PM   22    AUSA Tripi, along with the first -- the U.S. Attorney,

03:16PM   23    J.P. Kennedy.  The first assistant, Joseph Guerra.  And I

03:17PM   24    think there was a couple other ones.

03:17PM   25    Q.  Was the day of the briefing the day that you first became

03:17PM    1    aware of the investigation into then Special Agent Joseph

03:17PM    2    Bongiovanni?

03:17PM    3    A.   Yes.

03:17PM    4    Q.   Who made you aware of the investigation?

03:17PM    5    A.   J.P. Kennedy contacted, we met, and that's how I became

03:17PM    6    aware.

03:17PM    7    Q.   Was he the U.S. Attorney back at that time?

03:17PM    8    A.   Yes, he was.

03:17PM    9    Q.   After that briefing, did you become the lead agent

03:17PM   10    assigned from the FBI for that investigation?

03:17PM   11    A.   Yes, I did.

03:17PM   12    Q.   Do you know, you mentioned the name already actually, but

03:17PM   13    did you work with Curtis Ryan?

03:17PM   14    A.   Yes, I did.

03:17PM   15    Q.   Okay.  And was he from a different agency, Homeland

03:17PM   16    Security?

03:17PM   17    A.   Yes.

03:17PM   18    Q.   Was he involved in the investigation at that time?

03:17PM   19    A.   Yes, he and Marilyn -- Special Agent Marilyn Halliday

03:17PM   20    were the HSI kind of front or lead investigators on it, is

03:17PM   21    the accurate way to say it.

03:17PM   22    Q.   Okay.  And would it be fair to say based on your

03:17PM   23    understanding when you joined the investigation, that Special

03:17PM   24    Agent Halliday and Special Agent Ryan had been working it

03:17PM   25    already for some time?

03:17PM    1    A.  Yes, it was quite --

03:17PM    2    Q.  By June of 2019, so about six months later, had you

03:18PM    3    become increasingly more involved in the investigation over

03:18PM    4    time?

03:18PM    5    A.  Yes.

03:18PM    6    Q.  From 2019 until we're sitting here right now, has the FBI

03:18PM    7    continued to work on this investigation?

03:18PM    8    A.  Yes, extensively.

03:18PM    9    Q.  Would you describe it as a joint investigation with

03:18PM   10    Homeland Security?

03:18PM   11    A.  Definitely.

03:18PM   12    Q.  And with the Office of the Inspector General?

03:18PM   13    A.  That's correct.

03:18PM   14    Q.  Are you familiar with different witnesses in the case?

03:18PM   15    A.  Yes.

03:18PM   16    Q.  Are you familiar with the evidence in the case?

03:18PM   17    A.  Intimately.

03:18PM   18    Q.  Were you present for the search warrant that was executed

03:18PM   19    at Joseph Bongiovanni's residence?

03:18PM   20    A.  Yes, I was.

03:18PM   21    Q.  Okay.  Do you see Joe Bongiovanni in court?

03:18PM   22    A.  Yes, I do.

03:18PM   23    Q.  Can you identify him for the record?

03:18PM   24    A.  He's at the table in between his attorneys wearing a red

03:18PM   25    tie and a blue shirt.

03:18PM   1    MR. COOPER:  For the record, Judge, the witness

03:18PM   2    identified the defendant.

03:18PM   3         THE COURT:  The record does reflect that.

03:18PM   4         MR. COOPER:  Thank you.

03:18PM   5         BY MR. COOPER:

03:18PM   6    Q.  Were you also present for the search of Mike Masecchia's

03:18PM   7    residence on August 23rd, 2019?

03:18PM   8    A.  Yes.  I participated in the search and interviewed

03:18PM   9    Mr. Masecchia briefly.

03:18PM   10   Q.  Okay.  And just remind me, at Masecchia's residence, did

03:18PM   11   law enforcement recover guns?

03:19PM   12   A.  Yes, there were a number of firearms that were recovered.

03:19PM   13   Q.  Did they recover money?

03:19PM   14   A.  Yeah, a significant sum of currency, U.S. currency was

03:19PM   15   recovered.

03:19PM   16   Q.  Was there some drugs recovered there as well?

03:19PM   17   A.  Yes, drugs recovered as well.

03:19PM   18   Q.  Did Masecchia ever agree to cooperate?

03:19PM   19   A.  He did not.

03:19PM   20   Q.  All right.  We're going to switch gears again.

03:19PM   21        Have you reviewed Ron Serio's contacts stored in his

03:19PM   22   phone in Government Exhibit 46?

03:19PM   23   A.  Yes, I have.

03:19PM   24   Q.  Have you reviewed the defendant's contacts report from

03:19PM   25   his post-retirement phone ending in 2784, contained in

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
27

| | | |
|---|---|---|
| 03:19PM | 1 | Government Exhibit 109F as in Frank? |
| 03:19PM | 2 | A.  Yes, I have. |
| 03:19PM | 3 | Q.  Have you reviewed Lou Selva's contact report contained in |
| 03:19PM | 4 | Government Exhibit 208D as in David? |
| 03:19PM | 5 | A.  Yes, I have. |
| 03:19PM | 6 | Q.  Okay.  We just discussed that you've reviewed -- |
| 03:19PM | 7 | withdrawn. |
| 03:19PM | 8 |     Have you reviewed Peter Gerace's contacts contained in |
| 03:19PM | 9 | Government Exhibit 310AT? |
| 03:19PM | 10 | A.  Yes, I have. |
| 03:19PM | 11 | Q.  Have you reviewed Joe Bella's contacts contained in |
| 03:19PM | 12 | Government Exhibit 312E? |
| 03:19PM | 13 | A.  Yes, I have. |
| 03:19PM | 14 | Q.  Okay.  You mentioned that you reviewed the contacts from |
| 03:20PM | 15 | the defendant's post retirement phone.  Did you review the |
| 03:20PM | 16 | contacts that were stored in his DEA phone ending in 0966? |
| 03:20PM | 17 | A.  No, we'd be unable to. |
| 03:20PM | 18 | Q.  Why? |
| 03:20PM | 19 | A.  That phone was wiped before it was turned in. |
| 03:20PM | 20 | Q.  I'm handing you now -- |
| 03:20PM | 21 |         **MR. COOPER:**  Or, actually, I'm just going ask |
| 03:20PM | 22 | Ms. Champoux, for the witness only please, if you can pull up |
| 03:20PM | 23 | Government Exhibit 367 for identification. |
| 03:20PM | 24 |         **BY MR. COOPER:** |
| 03:20PM | 25 | Q.  Do you recognize this, sir? |

03:20PM    1    A.   Yeah, it's a chart of cell phone that's overlapping

03:20PM    2    contacts between the phones we just discussed.

03:20PM    3    Q.   Okay.  So I asked you about a whole bunch of different

03:20PM    4    phone contacts exhibits and whether you reviewed them, and

03:20PM    5    you said yes; is that right?

03:20PM    6    A.   That's accurate.

03:20PM    7    Q.   Was this chart created to show some of the common

03:20PM    8    contacts that exist between all those people's phones?

03:20PM    9    A.   Yeah, the overlapping contacts from their contacts in the

03:20PM   10    phones.

03:20PM   11    Q.   Does this fairly and accurately depict overlapping

03:20PM   12    contacts contained in the phone extractions from phones

03:20PM   13    belonging to the defendant, Lou Selva, Ron Serio, Peter

03:21PM   14    Gerace, and Joe Bella?

03:21PM   15    A.   Yes, it does.

03:21PM   16    Q.   Okay.

03:21PM   17            **MR. COOPER:**  I'd offer 367 into evidence, Judge.

03:21PM   18            **MR. MacKAY:**  No objection.

03:21PM   19            **THE COURT:**  Received without objection.

03:21PM   20            **(GOV Exhibit 367 was received in evidence.)**

03:21PM   21            **MR. COOPER:**  Can we just publish this briefly,

03:21PM   22    please?

03:21PM   23            **THE CLERK:**  You're all set.

03:21PM   24            **MR. COOPER:**  Thank you, ma'am.

          25

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

29

|         |    |                                                                      |
|---------|----|----------------------------------------------------------------------|
| 03:21PM | 1  | **BY MR. COOPER:**                                                   |
| 03:21PM | 2  | Q.  All right.  We're going to work our way through some of          |
| 03:21PM | 3  | this, but just quickly to orient everybody, this left-hand           |
| 03:21PM | 4  | section here, is this the different people stored as contacts        |
| 03:21PM | 5  | in the phones?                                                       |
| 03:21PM | 6  | A.  Yes, it is.                                                      |
| 03:21PM | 7  | Q.  And these names along the top, are these the different           |
| 03:21PM | 8  | phones that these names were found in?                               |
| 03:21PM | 9  | A.  They were in their contacts in those phones, you just            |
| 03:21PM | 10 | referenced the exhibits.                                             |
| 03:21PM | 11 | Q.  Okay.  And then where there's Xs, does that indicate that        |
| 03:21PM | 12 | a name on the left shows up in a phone on the right?                 |
| 03:21PM | 13 | A.  That's correct.                                                 |
| 03:21PM | 14 | Q.  Okay.  Let's go to the bottom of the chart first.  What's        |
| 03:21PM | 15 | the name all the way at the bottom, on the left?                     |
| 03:21PM | 16 | A.  Frank Tripi.                                                    |
| 03:21PM | 17 | Q.  Okay.  And does Frank Tripi's name show up in Ron Serio's        |
| 03:21PM | 18 | phone?                                                               |
| 03:21PM | 19 | A.  Ron Serio's, yes.                                               |
| 03:21PM | 20 | Q.  And just to be clear, is Frank Tripi the person that was         |
| 03:22PM | 21 | the main target of Chris Clark's draft OCDETF report?                |
| 03:22PM | 22 | A.  Yes, he was.                                                    |
| 03:22PM | 23 | Q.  Was that found in the defendant's basement?                      |
| 03:22PM | 24 | A.  It was.                                                         |
| 03:22PM | 25 | Q.  Okay.  How about is Frank Tripi a contact in Peter               |

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

30

03:22PM 1  Gerace's phone?

03:22PM 2  A.  Yes, he is.

03:22PM 3  Q.  How about Joe Bella?

03:22PM 4  A.  He is, as well.

03:22PM 5  Q.  Okay.  Did the defendant have contact with Frank Tripi in

03:22PM 6  his phone records?

03:22PM 7  A.  Yes, he did.

03:22PM 8  Q.  All right.  Let's move on.

03:22PM 9      Do you see the name Paul Francoforte, Hot Dog, that we

03:22PM 10  talked about earlier?

03:22PM 11  A.  Yes.

03:22PM 12  Q.  Okay.  Is he stored as a contact in Serio's phone?

03:22PM 13  A.  Serio's, yes.

03:22PM 14  Q.  Is he in the defendant's phone?

03:22PM 15  A.  Yes, he is.

03:22PM 16  Q.  Is he in Peter Gerace's phone?

03:22PM 17  A.  Yes, he is.

03:22PM 18  Q.  Do you see the line marked Frank Parisi?

03:22PM 19  A.  Yes, I do.

03:22PM 20  Q.  Okay.  Is he stored in a contact in all the phones on

03:22PM 21  this chart?

03:22PM 22  A.  Yes, he is.

03:22PM 23  Q.  Is Lou Selva stored as a contact in the defendant's

03:22PM 24  phone?

03:22PM 25  A.  In the defendant's, yes.

Case 1:19-cr-00227-LJV-MJR    Document 1336    Filed 11/03/24    Page 31 of 128
USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

31

03:23PM    1    Q.  Okay.  And is Lou Selva stored as a contact in Ron

03:23PM    2    Serio's phone?

03:23PM    3    A.  Yes, he is.

03:23PM    4    Q.  Okay.

03:23PM    5         MR. COOPER:  Ms. Champoux, can you take that down

03:23PM    6    please?

03:23PM    7         BY MR. COOPER:

03:23PM    8    Q.  We're gonna shift gears again now.

03:23PM    9    A.  Okay.

03:23PM   10    Q.  Was there ultimately a search warrant conducted at

03:23PM   11    Pharaoh's Gentlemen's Club?

03:23PM   12    A.  Yes, there was in December of 2019.

03:23PM   13    Q.  Okay.  Have you heard testimony in the course of this

03:23PM   14    trial about whether or not there were cameras at Pharaoh's at

03:23PM   15    different times?

03:23PM   16    A.  Yes, I have.

03:23PM   17    Q.  Were you present for the search warrant in December of

03:23PM   18    2019?

03:23PM   19    A.  Yes.  I conducted --

03:23PM   20    Q.  Are you aware --

03:23PM   21    A.  I'm sorry.  I conducted interviews and was present for

03:23PM   22    the search warrant.

03:23PM   23    Q.  Are you aware of whether DVRs were recovered?

03:23PM   24    A.  Yes.

03:23PM   25    Q.  How many?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
32

03:23PM    1    A.   Three DVRs were recovered.

03:23PM    2    Q.   Were they reviewed by the investigative team?

03:23PM    3    A.   Yes, they were.

03:23PM    4    Q.   Okay.  Are you aware of how long the DVRs stored footage

03:23PM    5    for?

03:23PM    6    A.   One of the DVRs stored footage for seven weeks, and the

03:23PM    7    other two was only for two weeks each.

03:23PM    8    Q.   Okay.  And at the time those DVRs were taken into law

03:23PM    9    enforcement custody, it was the year 2019, right?

03:24PM   10    A.   In December of 2019.

03:24PM   11    Q.   So almost the very end of the year in 2019?

03:24PM   12    A.   That's correct.

03:24PM   13    Q.   Okay.  Based on what you told the jury about how long

03:24PM   14    those DVRs stored footage for, would it be fair to say that

03:24PM   15    they didn't contain any footage from 2013?

03:24PM   16    A.   No.  No footage.

03:24PM   17    Q.   How about 2014?

03:24PM   18    A.   No footage.

03:24PM   19    Q.   How about 2015?

03:24PM   20    A.   No footage.

03:24PM   21    Q.   How about 2016?

03:24PM   22    A.   No footage.

03:24PM   23    Q.   How about 2017?

03:24PM   24    A.   No footage.

03:24PM   25    Q.   How about 2018?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

33

| 03:24PM | 1 | A.  No footage. |
|---|---|---|
| 03:24PM | 2 | Q.  Okay.  We're going to move on again now, and we're gonna |
| 03:24PM | 3 | talk about case number C2-13-0026.  Have you heard that |
| 03:24PM | 4 | number before? |
| 03:24PM | 5 | A.  Many times. |
| 03:24PM | 6 | Q.  Okay.  Have you reviewed the official file? |
| 03:24PM | 7 | A.  Yes, I have. |
| 03:24PM | 8 | Q.  The paper file? |
| 03:24PM | 9 | A.  Yes, I have. |
| 03:24PM | 10 | Q.  The electronic file? |
| 03:24PM | 11 | A.  Yes, I have. |
| 03:24PM | 12 | Q.  Are you intimately familiar with the reports and contents |
| 03:24PM | 13 | of that file? |
| 03:24PM | 14 | A.  Very much so. |
| 03:24PM | 15 | Q.  Did you review the electric -- the working file that was |
| 03:24PM | 16 | found in the defendant's basement? |
| 03:24PM | 17 | A.  Yes, I did. |
| 03:24PM | 18 | Q.  Okay. |
| 03:24PM | 19 | **MR. COOPER:**  Ms. Champoux, if we can go to |
| 03:24PM | 20 | Government Exhibit 8A very quickly, the full 8A. |
| 03:24PM | 21 | **BY MR. COOPER:** |
| 03:24PM | 22 | Q.  8A, is that the paper file that's scanned in? |
| 03:25PM | 23 | A.  That is. |
| 03:25PM | 24 | **MR. COOPER:**  Can you scroll down to page 3, please, |
| 03:25PM | 25 | Ms. Champoux? |

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
| 03:25PM  | 1  | **BY MR. COOPER:**                                         |
| 03:25PM  | 2  | Q.  The third page of 8A, is this a, essentially a checklist |
| 03:25PM  | 3  | of the DEA-6s contained in that file?                       |
| 03:25PM  | 4  | A.  Yes, it is.                                             |
| 03:25PM  | 5  | Q.  Okay.  And are you aware of whether this page from      |
| 03:25PM  | 6  | Government Exhibit 8A is marked, submarked as 8A-6?         |
| 03:25PM  | 7  | A.  It is 8A-6.                                             |
| 03:25PM  | 8  | **MR. COOPER:**  Okay.  Ms. Champoux, you can take that     |
| 03:25PM  | 9  | down, please?                                              |
| 03:25PM  | 10 | **BY MR. COOPER:**                                         |
| 03:25PM  | 11 | Q.  And I'm going to hand you a big version of 8A-6 which is |
| 03:25PM  | 12 | already in evidence.  Thank you.                           |
| 03:25PM  | 13 | **MR. COOPER:**  Parker, do you need to see it?           |
| 03:25PM  | 14 | **MR. MacKAY:**  Oh, I can see it.                         |
| 03:25PM  | 15 | **MR. COOPER:**  Okay, great.                             |
| 03:25PM  | 16 | **THE JURORS:**  (Laughter.)                              |
| 03:25PM  | 17 | **MR. COOPER:**  Can you put that up there?               |
| 03:25PM  | 18 | Can we close the blinds?                                    |
| 03:25PM  | 19 | **THE CLERK:**  Yes, we can.                              |
| 03:25PM  | 20 | **MR. COOPER:**  I'm sorry to be a pain.                  |
| 03:26PM  | 21 | **THE CLERK:**  You're okay.                              |
| 03:26PM  | 22 | **BY MR. COOPER:**                                         |
| 03:26PM  | 23 | Q.  All right.  We're going to run through some questions   |
| 03:26PM  | 24 | about this now.                                            |
| 03:26PM  | 25 | Is it your understanding that this DEA-6 summary            |

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

03:26PM   1   report -- or, I'm sorry, that this DEA-6 case status report

03:26PM   2   lists all the 6s in the file?

03:26PM   3   A.  It does.

03:26PM   4   Q.  All right.

03:26PM   5        **MR. COOPER:**  Ms. Champoux, on the screen for

03:26PM   6   everybody, can you pull up what's in evidence as Government

03:26PM   7   Exhibit 8M again?

03:26PM   8        **BY MR. COOPER:**

03:26PM   9   Q.  Is this a DEA-6 summary report, Special Agent Burns?

03:26PM  10   A.  Yes, it is.

03:26PM  11   Q.  Is it the first 6 contained in the file?

03:26PM  12   A.  It is.

03:26PM  13   Q.  Okay.  And if you look over there on the giant 8A-6, do

03:26PM  14   you see a summary report reflected at the top of that

03:26PM  15   checklist?

03:26PM  16   A.  Yes, the 11/28/2012 date submitted.

03:26PM  17   Q.  Okay.  And is that the report that we're looking at on

03:26PM  18   our screens here, Government Exhibit 8M?

03:26PM  19   A.  Yes, it is.

03:26PM  20   Q.  Okay.  So I want to talk to you about the case file as it

03:27PM  21   relates to investigation into Ron Serio, okay?

03:27PM  22   A.  Certainly.

03:27PM  23   Q.  So I'm going to focus most of my questions here around

03:27PM  24   the investigation into Ron Serio.

03:27PM  25        Does the summary report in 8M mention Ron Serio or the

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

36

03:27PM  1    Serio drug-trafficking organization at all?

03:27PM  2    A.  It does not.

03:27PM  3    Q.  You mentioned that you've reviewed all the different

03:27PM  4    iterations of the file for C2-13-0026.  Is there any

03:27PM  5    explanation at all in any of the material that you've

03:27PM  6    reviewed indicating what the defendant's basis was for

03:27PM  7    linking Wayne Anderson's arrest to the Ron Serio

03:27PM  8    investigation?

03:27PM  9    A.  None whatsoever that I can identify.

03:27PM  10   Q.  Now outside the confines of the file, did you hear Ron

03:27PM  11   Serio testify in this courtroom that he was expecting a

03:27PM  12   shipment of marijuana to be delivered to Wayne Anderson on

03:27PM  13   his behalf?

03:27PM  14   A.  Yes, he testified to that.

03:27PM  15   Q.  I'm going to hand you a marker, sir.

03:27PM  16          **MR. COOPER:**  May I approach, Judge?

03:27PM  17          **THE COURT:**  Sure.

03:27PM  18          **BY MR. COOPER:**

03:27PM  19   Q.  So no mention of Serio in this summary report from

03:28PM  20   November 28, 2012?

03:28PM  21   A.  No, sir.

03:28PM  22   Q.  Can you cross it off for us?

03:28PM  23        Okay.  Let's move on to the next one.

03:28PM  24        Is it your understanding that Wayne Anderson was caught

03:28PM  25   by the New York State Police receiving hundreds of pounds of

03:28PM    1    marijuana?

03:28PM    2    A.  Yes, on November 25th, 2012, it was 269 pounds of

03:28PM    3    marijuana I believe.

03:28PM    4    Q.  Okay.  And was there significant amount of currency

03:28PM    5    seized from him as well?

03:28PM    6    A.  Yeah, I believe it was $27,000.

03:28PM    7    Q.  Okay.  Have you reviewed Wayne Anderson's criminal

03:28PM    8    history?

03:28PM    9    A.  Yes, I have.

03:28PM   10    Q.  Okay.  Was he ever convicted of any criminal offense

03:28PM   11    related to the 2012 marijuana arrest?

03:28PM   12    A.  He was not.

03:28PM   13    Q.  I want to direct --

03:28PM   14         MR. COOPER:  Ms. Champoux, if you can pull up 8A and

03:28PM   15    go to page 72.

03:28PM   16         BY MR. COOPER:

03:28PM   17    Q.  Who signed this document?

03:28PM   18    A.  Joseph, the defendant.  Joseph Bongiovanni.

03:28PM   19    Q.  Okay.  And what did the defendant, Joseph Bongiovanni,

03:28PM   20    report about the resolution of Wayne Anderson's marijuana

03:28PM   21    arrest in box 23?

03:28PM   22    A.  The defendant disposition report, box 23, on January 4th,

03:29PM   23    2015, Anderson pled in New York State Court and sentenced to

03:29PM   24    36-month probation.

03:29PM   25    Q.  Is the information that's written by the defendant in

03:29PM    1    box 23 of this defendant disposition report consistent with

03:29PM    2    Wayne Anderson's criminal history?

03:29PM    3    A.  No.  Wayne Anderson's criminal history does not show that

03:29PM    4    he was convicted nor -- he was not convicted, he can't be

03:29PM    5    sentenced.

03:29PM    6    Q.  Okay.  Did Wayne Anderson testify in this courtroom about

03:29PM    7    whether he ever cooperated in relation to his arrest?

03:29PM    8    A.  Yes, he did.

03:29PM    9    Q.  What did -- did he testify that he did not cooperate in

03:29PM   10    relation to that arrest?

03:29PM   11    A.  Yes, he testified not cooperate.

03:29PM   12    Q.  Did Wayne Anderson testify that he was never convicted of

03:29PM   13    anything related to that arrest?

03:29PM   14    A.  Yes, he did.

03:29PM   15    Q.  Okay.

03:29PM   16         MR. COOPER:  Ms. Champoux, can you move to page 19

03:29PM   17    now of Government Exhibit 8A?

03:29PM   18         BY MR. COOPER:

03:29PM   19    Q.  Is this a DEA-6 summary report for acquisition of

03:29PM   20    U.S. currency seized from Wayne Anderson?

03:29PM   21    A.  Yes, it is.

03:29PM   22    Q.  What's the date that this report was prepared?

03:30PM   23    A.  January 17th, 2013.

03:30PM   24    Q.  Was the defendant the author of it?

03:30PM   25    A.  No.  Clinton Calloway, TFO.

03:30PM    1    Q.  Okay.  So, this document from January 17th, 2013, is it

03:30PM    2    documented up there on 8A-6, the case status checklist?

03:30PM    3    A.  Let's see.

03:30PM    4    Q.  From 1/17/2013?

03:30PM    5    A.  1/17/2013.  I see it, yes.

03:30PM    6    Q.  Is it up there?

03:30PM    7    A.  Yeah, the cross file through me off.

03:30PM    8    Q.  Okay.  Tell you what, we're going to work from top to

03:30PM    9    bottom straight down that document, okay?  Can you cross that

03:30PM   10    one off?

03:30PM   11    A.  Yes.

03:30PM   12    Q.  The one you just crossed off, that didn't mention Ron

03:30PM   13    Serio at all, right?

03:30PM   14    A.  It did not.

03:30PM   15    Q.  We're going to move on now.

03:30PM   16         **MR. COOPER:**  Ms. Champoux, if you can pull up

03:30PM   17    Government Exhibit 8K?

03:30PM   18         **BY MR. COOPER:**

03:30PM   19    Q.  Do you recognize 8K, Special Agent Burns?

03:30PM   20    A.  Yes, I do.

03:30PM   21    Q.  Is this a DEA-6 report of investigation?

03:30PM   22    A.  Yes, it is.

03:30PM   23    Q.  What's the date it was written?

03:30PM   24    A.  Date prepared is February 7, 2013.

03:31PM   25    Q.  Were you present for the testimony of New York State

03:31PM   1   Police Investigator O'Rourke?

03:31PM   2   A.   Yes, I was.

03:31PM   3   Q.   Did he testify that he was trying to set up a proffer

03:31PM   4   interview with Wayne Anderson?

03:31PM   5           MR. MacKAY:   Objection.   Hearsay.

03:31PM   6           THE COURT:   Yeah, sustained.   And look it, I'll let

03:31PM   7   you ask foundational questions with respect to testimony at

03:31PM   8   the trial, but you're not going to have this witness repeat

03:31PM   9   what other witnesses testified to.

03:31PM  10           MR. COOPER:   Understood, Judge.

03:31PM  11           BY MR. COOPER:

03:31PM  12   Q.   Does this report, Government Exhibit 8K, does this make

03:31PM  13   reference to Investigator O'Rourke looking to set up a

03:31PM  14   proffer interview with Wayne Anderson?

03:31PM  15   A.   Yes, it does.

03:31PM  16   Q.   Did O'Rourke testify in this courtroom in the chair

03:31PM  17   you're sitting in right now?

03:31PM  18   A.   Yes, he did.

03:31PM  19   Q.   Does this DEA-6 make any mention at all of Ron Serio?

03:31PM  20   A.   Does not.

03:31PM  21   Q.   Okay.   Can you go cross it off?

03:31PM  22           MR. COOPER:   Ms. Champoux --

03:31PM  23           BY MR. COOPER:

03:31PM  24   Q.   I'm sorry, Special Agent Burns, can you see 8A-6 from

03:32PM  25   where you're sitting?

03:32PM  1    A.  Yes, I can.

03:32PM  2    Q.  The next entry down from February 22, 2013, does that

03:32PM  3    reference an X file or cross file from C2-12-0090?

03:32PM  4    A.  Yes, it does.

03:32PM  5    Q.  Are you familiar with that report?

03:32PM  6    A.  Yes, I am.

03:32PM  7    Q.  Did the defendant draft it?

03:32PM  8    A.  That one was drafted by Shane Nastoff.

03:32PM  9    Q.  Okay.  Did it have anything to do with the defendant's

03:32PM  10   investigative activity into Ron Serio?

03:32PM  11   A.  Not into Ron Serio, no.

03:32PM  12   Q.  Okay.  Was that Shane Nastoff's report about information

03:32PM  13   he got from his CS?

03:32PM  14   A.  That's correct.

03:32PM  15   Q.  Did Shane Nastoff, based upon your review of the file,

03:32PM  16   cause that information to be conveyed to the defendant?

03:32PM  17   A.  Yes.  The cross file was in both, that DEA-6 went into

03:32PM  18   both files.

03:32PM  19   Q.  Is there any DEA-6 or anything in the file at all

03:32PM  20   indicating that the defendant ever followed up on that

03:32PM  21   information to further his investigation in any way?

03:32PM  22   A.  There is not.

03:32PM  23   Q.  Would it be fair to say that the entry from February 22,

03:32PM  24   2013, documents Shane Nastoff's investigative work and not

03:33PM  25   anything that the defendant did?

03:33PM    1    A.  That's accurate.

03:33PM    2    Q.  Okay.  Can you cross it off for us?

03:33PM    3        All right.  I want to work through the next one down now.

03:33PM    4            MR. COOPER:  Ms. Champoux, can you please pull up

03:33PM    5    Government Exhibit 8I?

03:33PM    6            BY MR. COOPER:

03:33PM    7    Q.  Is this the initial debriefing of R.K.?

03:33PM    8    A.  Yes, it is.

03:33PM    9    Q.  Have you reviewed this document?

03:33PM    10   A.  Yes, I have.

03:33PM    11   Q.  Tell the jury who drafted it.

03:33PM    12   A.  Joseph Bongiovanni drafted it.

03:33PM    13   Q.  What was the date R.K. was interviewed?

03:33PM    14   A.  5 -- May 2nd, 2013.

03:33PM    15   Q.  Okay.  That's the date the report was prepared, right?

03:33PM    16   A.  Right.

03:33PM    17   Q.  What date was R.K. interviewed?

03:33PM    18   A.  4/30/2013.

03:33PM    19   Q.  Got it.  Who does the defendant list as other people

03:33PM    20   involved in the interview of R.K.?

03:33PM    21   A.  Special Agent Shane Nastoff, and the G.S. Supervisor John

03:33PM    22   Flickinger.

03:33PM    23   Q.  Does Government Exhibit 8I indicate that R.K. had access

03:33PM    24   to the leaders of the Ron Serio drug-trafficking

03:33PM    25   organization?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
43

03:33PM    1   A.  Yes, it does.

03:33PM    2   Q.  Okay.  Does 8I indicate that R.K. had access to other

03:34PM    3   members or associates of the Serio organization?

03:34PM    4   A.  Yes, it does.

03:34PM    5   Q.  Is that report drafted on May 2nd, 2013, reflected on

03:34PM    6   Government Exhibit 8A-6?

03:34PM    7   A.  Yes, it is.

03:34PM    8   Q.  All right.  Can we cross that one off?

03:34PM    9      Special Agent Burns, after that May 2nd, 2013, report,

03:34PM   10   the initial debriefing of R.K., what's the next entry on

03:34PM   11   Government Exhibit 8A-6?

03:34PM   12   A.  The June 18th, 2013 DEA-6 surveillance at 82 Sycamore

03:34PM   13   Street.

03:34PM   14   Q.  Okay.  Other than the initial debriefing of R.K., is

03:34PM   15   there any other DEA-6 anywhere in the file indicating that

03:34PM   16   R.K. was ever debriefed again?

03:34PM   17   A.  There is not.

03:34PM   18   Q.  Okay.  I mean, you looked through the whole file

03:34PM   19   yourself, right?

03:34PM   20   A.  Yes, I have.

03:34PM   21   Q.  Is it just missing from the checklist?

03:34PM   22   A.  No, it's not.  There is not a DEA-6 in that file.

03:35PM   23   Q.  Nothing?

03:35PM   24   A.  Nothing.

03:35PM   25   Q.  Let's move on to the June 18th, 2013, surveillance at

03:35PM    1    82 Sycamore Street.  Ms. Champoux's got 8H up on the screen

03:35PM    2    for us.

03:35PM    3         Special Agent Burns, who drafted this report?

03:35PM    4    A.  The defendant, Joseph Bongiovanni.

03:35PM    5    Q.  Who did he list as other officers?

03:35PM    6    A.  Special Agent David Leary.

03:35PM    7    Q.  Okay.  And did you see Dave Leary come in this courtroom

03:35PM    8    and sit in the chair you're in and testify?

03:35PM    9    A.  Yes, I did.

03:35PM   10    Q.  Was he the person who was actually conducting the

03:35PM   11    surveillance based on what's written in Government

03:35PM   12    Exhibit 8H?

03:35PM   13    A.  Yes, he was.

03:35PM   14    Q.  Okay.  Does the DEA-6, 8H, does that indicate that the

03:35PM   15    defendant did the surveillance?

03:35PM   16    A.  No, it does not.

03:35PM   17    Q.  Were you present when Special Agent Leary testified that

03:35PM   18    the defendant told him to break off his surveillance and come

03:35PM   19    back to 82 Sycamore, or come back to the DEA from 82 Sycamore

03:35PM   20    Street?

03:35PM   21    A.  Yes, I was.

03:35PM   22              **MR. MacKAY:**  Objection.  Hearsay.

03:35PM   23              **THE COURT:**  Yeah, sustained.  The jury will strike

03:36PM   24    that one.

          25

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

45

03:36PM    1          **BY MR. COOPER:**

03:36PM    2    Q.  Okay.  Let's get a little more into the warehouse that's

03:36PM    3    referenced here.  Are you familiar with this warehouse at 82

03:36PM    4    Sycamore Street?

03:36PM    5    A.  Yes, I am.

03:36PM    6    Q.  Okay.  Is that the -- that warehouse at 82 Sycamore

03:36PM    7    Street, did the FBI ultimately seize pounds of MDMA from that

03:36PM    8    warehouse?

03:36PM    9    A.  The FBI did.

03:36PM    10   Q.  Okay.  And was that from a consented search --

03:36PM    11   A.  Yes.

03:36PM    12   Q.  -- granted by -- sorry.  Was that a consent search where

03:36PM    13   consent was granted by Ron Serio?

03:36PM    14   A.  Yes, it was.

03:36PM    15   Q.  Okay.  All right.  We're going to stay on the topic of

03:36PM    16   that warehouse for a second.

03:36PM    17      To set the tone for the next line of questions, were you

03:36PM    18   present when Ron Serio testified that he and Rob Rine staged

03:36PM    19   a fake raid to rob T.S. of drugs?

03:37PM    20   A.  Yes.

03:37PM    21   Q.  Okay.  Now remind the jury, Ron Serio, did he explain

03:37PM    22   where they got a fake search warrant from?

03:37PM    23   A.  Yes, he did.

03:37PM    24   Q.  Where?

03:37PM    25   A.  From a detective.  Rob Rine got it from a detective from

03:37PM    1    the Town of Tonawanda Police Department.

03:37PM    2    Q.  Okay.  Did the defendant have any partners at the DEA who

03:37PM    3    worked for the Town of Tonawanda Police Department?

03:37PM    4    A.  Yes, he did.

03:37PM    5    Q.  Who?

03:37PM    6    A.  Joseph Palmieri.

03:37PM    7    Q.  Was he a detective?

03:37PM    8    A.  He was.

03:37PM    9    Q.  Is Palmieri in fact the same partner that looked up

03:37PM   10    police reports related to the Wayne Anderson arrest the day

03:37PM   11    after he was arrested?

03:37PM   12    A.  Yes, he was.

03:37PM   13    Q.  Did --

03:37PM   14        **MR. COOPER:**  Can we go to Exhibit 8A, Ms. Champoux,

03:37PM   15    and go ahead to page 77, please?

03:37PM   16        **BY MR. COOPER:**

03:37PM   17    Q.  What are we looking at here, Special Agent Burns?

03:37PM   18    A.  This is a Buffalo Police Department booking data sheet

03:37PM   19    that was in the 8A file.

03:37PM   20    Q.  Is this related to Wayne Anderson, November 25, 2012,

03:37PM   21    arrest?

03:37PM   22    A.  Yeah, for the arrest from New York State Police with the

03:37PM   23    marijuana.

03:37PM   24        **MR. COOPER:**  Ms. Champoux, if you can zoom in on the

03:37PM   25    top-right corner of the document, those four lines?

| | | |
|---|---|---|
| 03:37PM | 1 | **BY MR. COOPER:** |
| 03:37PM | 2 | Q.  What was the date that this was printed, sir? |
| 03:38PM | 3 | A.  November 26th, 2012. |
| 03:38PM | 4 | Q.  Okay.  Is that the day after Anderson was arrested? |
| 03:38PM | 5 | A.  That's correct. |
| 03:38PM | 6 | **MR. COOPER:**  You can zoom out of that please, |
| 03:38PM | 7 | Ms. Champoux. |
| 03:38PM | 8 | **BY MR. COOPER:** |
| 03:38PM | 9 | Q.  Who's listed as the person that printed this? |
| 03:38PM | 10 | A.  Joseph Palmieri. |
| 03:38PM | 11 | Q.  Is that same Town of Tonawanda detective we've been |
| 03:38PM | 12 | talking about? |
| 03:38PM | 13 | A.  That's correct. |
| 03:38PM | 14 | **MR. COOPER:**  You can zoom out of that, or take that |
| 03:38PM | 15 | down, please, Ms. Champoux. |
| 03:38PM | 16 | And can we please pull up 8H again? |
| 03:38PM | 17 | Can you zoom in on the details section, please? |
| 03:38PM | 18 | **BY MR. COOPER:** |
| 03:38PM | 19 | Q.  Special Agent Burns, do you have professional experience |
| 03:38PM | 20 | conducting surveillance in criminal investigations? |
| 03:38PM | 21 | A.  Yes, quite a bit. |
| 03:38PM | 22 | Q.  Did you do it when you used to work narcotics cases? |
| 03:39PM | 23 | A.  All the time. |
| 03:39PM | 24 | Q.  Is surveillance generally a solo activity, or is that |
| 03:39PM | 25 | something that agents generally do in groups? |

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

48

03:39PM   1   A.   It depends.  It might be solo if you're just going by

03:39PM   2   grab a tag or see if there's any cars there.  But to do a

03:39PM   3   full-blown surveillance, you need multiple vehicles, maybe

03:39PM   4   air support, that's to do a real surveillance, a full

03:39PM   5   surveillance you do need those assets.

03:39PM   6   Q.   Okay.  Would you -- would you expect in order to do a

03:39PM   7   lengthy, full surveillance as you've described it, that you'd

03:39PM   8   want to have a bunch of agents present for that?

03:39PM   9   A.   Absolutely.

03:39PM   10   Q.   Can that help follow vehicles if they show up and leave?

03:39PM   11   A.   Certainly.

03:39PM   12   Q.   Based on your surveillance, based on your experience, is

03:39PM   13   surveillance more effective on a narcotics target when it

03:39PM   14   involves a group of agents or officers?

03:39PM   15   A.   Certainly.  Absolutely.

03:39PM   16   Q.   Is there always a risk associated with doing any

03:39PM   17   surveillance of being made or identified?

03:39PM   18   A.   Yes.  I mean, the more vehicles you have out there, the

03:39PM   19   less likely, but it's always a risk.

03:39PM   20   Q.   Is that something you're trained to prevent from

03:40PM   21   happening?

03:40PM   22   A.   Yes, different techniques, set up cars in different

03:40PM   23   parallel streets or air support, those are ways to kind of

03:40PM   24   mitigate the chances of being caught or --

03:40PM   25   Q.   Does using multiple agents and officers to conduct

| | | |
|---|---|---|
| 03:40PM | 1 | surveillance assist in avoiding that detection? |
| 03:40PM | 2 | **MR. MacKAY:** Objection. Cumulative at this point |
| 03:40PM | 3 | about surveillance. |
| 03:40PM | 4 | **THE COURT:** Yeah, sustained. |
| 03:40PM | 5 | **BY MR. COOPER:** |
| 03:40PM | 6 | Q. Based upon your training and experience, does the risk of |
| 03:40PM | 7 | getting burned or made on surveillance prevent law |
| 03:40PM | 8 | enforcement from using surveillance as a technique |
| 03:40PM | 9 | altogether? |
| 03:40PM | 10 | **MR. MacKAY:** Objection, same, Judge. |
| 03:40PM | 11 | **MR. COOPER:** Judge -- |
| 03:40PM | 12 | **THE COURT:** Sustained. This is -- this is -- we've |
| 03:40PM | 13 | been through all this. |
| 03:40PM | 14 | **MR. COOPER:** No, I don't -- Judge, I don't want to. |
| 03:40PM | 15 | **THE COURT:** Come on up, come on up, come on up. |
| 03:40PM | 16 | (Sidebar discussion held on the record.) |
| 03:40PM | 17 | **MR. COOPER:** Judge, I just want to ask for, I guess, |
| 03:40PM | 18 | some latitude. I know that it's late in the afternoon, and I |
| 03:40PM | 19 | know that we lost a half a day yesterday. |
| 03:40PM | 20 | **THE COURT:** No, no, no. I'm not -- I am not |
| 03:41PM | 21 | sustaining these objections because I want to get through |
| 03:41PM | 22 | this. As a matter of fact, you're wasting time up here at the |
| 03:41PM | 23 | bench. I just think we've been through this a number of |
| 03:41PM | 24 | times. |
| 03:41PM | 25 | **MR. COOPER:** I don't know that I've asked -- I think |

03:41PM   1   that the questions about whether the risk of getting burned

03:41PM   2   prevents you from using surveillance as a technique, I don't

03:41PM   3   think I've asked that question.  It's in my script from

03:41PM   4   Brian's direct the last trial, I don't think I've asked that

03:41PM   5   of another witness.  And so I understand if people want to

03:41PM   6   keep it moving, so do I, but --

03:41PM   7            THE COURT:  Who testified to this?

03:41PM   8            MR. MacKAY:  I believe Leary himself, regarding

03:41PM   9   surveillance experience.

03:41PM  10            MR. SINGER:  Nastoff.

03:41PM  11            MR. COOPER:  We spend more time with the objection

03:41PM  12   than --

03:41PM  13            THE COURT:  I'll give you a little latitude, I'll let

03:41PM  14   you ask this question, but nothing else.

03:41PM  15            MR. COOPER:  I'm trying to move it quickly.

03:41PM  16            THE COURT:  I understand it.  And again, that's

03:41PM  17   not -- my goal here is not to move it quickly.  My goal here

03:41PM  18   is to give the defense and to give you enough latitude to

03:42PM  19   prove the case and give the defendant a fair trial.

03:42PM  20            (Indecipherable.)

03:42PM  21            COURT REPORTER:  I can't hear you.

03:42PM  22            THE COURT:  If we go past Tuesday or Wednesday or

03:42PM  23   Thursday, or 2027, my rulings are not going to be based on

03:42PM  24   timing, they're going to based on what I think the right

03:42PM  25   ruling is.

03:42PM    1          And so when I think we are beating a horse into the

03:42PM    2    ground that's been shot several times already, I'm going to

03:42PM    3    sustain the objections.

03:42PM    4          I understand what you're saying.  I think maybe

03:42PM    5    you're right on this getting burned thing, so I will give you

03:42PM    6    some latitude on that.  But on stuff that we've had several

03:42PM    7    DEA agents testify about, you're not going to go through

03:42PM    8    again.

03:42PM    9          **MR. COOPER:**  Understood, Judge.  Thank you.

03:42PM   10          **THE COURT:**  Okay.

03:42PM   11          (Sidebar discussion held on the record.)

03:42PM   12          **THE COURT:**  So the objection to the last question is

03:42PM   13    overruled.

03:42PM   14          **MR. COOPER:**  Thank you, Judge.

03:42PM   15          **BY MR. COOPER:**

03:42PM   16    Q.  Does the chance of getting burned stop you from using

03:42PM   17    surveillance as a technique altogether?

03:42PM   18    A.  No, in my experience, it does happen from time to time,

03:43PM   19    but usually the narcotics traffickers continue to distribute

03:43PM   20    narcotics, maybe they're a little more aware.

03:43PM   21    Q.  Based on your experience doing surveillance, can seeing

03:43PM   22    someone show up at a location that you're doing surveillance

03:43PM   23    on and then leave with someone else, go away, can that be a

03:43PM   24    situation where you can rapidly advance your investigation?

03:43PM   25    A.  Absolutely.

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

52

03:43PM    1    Q.  How?

03:43PM    2    A.  Well, I mean, seeing somebody leave from a target's

03:43PM    3    residence or business, it's suspected they possibly have some

03:43PM    4    sort of narcotics on them.  You can -- we use the term, like,

03:43PM    5    "pick them off" on a traffic stop quite a ways from the

03:43PM    6    location, and then if they have drugs on them, then now you

03:43PM    7    have some leverage over 'em.  And if they don't, then they

03:43PM    8    will just believe it was just a traffic stop and they'll go

03:43PM    9    on their way, and you haven't really burned up your case.

03:43PM   10    Q.  You mentioned sitting on a drug dealer's residence.  Can

03:43PM   11    you use a surveillance technique to wait for customers to

03:44PM   12    arrive to a drug dealer's residence?

03:44PM   13    A.  Yes.

03:44PM   14    Q.  Is that something that's done?

03:44PM   15    A.  Yeah, sitting on a place.

03:44PM   16    Q.  If you catch a customer leaving with drugs, can you flip

03:44PM   17    'em?

03:44PM   18    A.  Absolutely.

03:44PM   19    Q.  What's it mean to flip 'em?

03:44PM   20    A.  It just means if you catch them with narcotics, you now

03:44PM   21    have leverage over them, and you can work up the -- work up

03:44PM   22    the ladder so to speak.

03:44PM   23    Q.  Is that how narcotics investigations work?

03:44PM   24    A.  Yeah.  That's kind of a hallmark of narcotics.

03:44PM   25    Q.  If you're -- have you been at the location, that area

03:44PM  1   around 82 Sycamore Street, you're familiar with that

03:44PM  2   location?

03:44PM  3   A.  Very familiar.

03:44PM  4   Q.  If you're standing outside of 82 Sycamore Street, can you

03:44PM  5   see the DEA office building at the Electric Tower?

03:44PM  6   A.  Yeah, it's a couple blocks from there.

03:44PM  7   Q.  Okay.

03:44PM  8          MR. COOPER:  You can take this down please,

03:44PM  9   Ms. Champoux?

03:44PM  10          BY MR. COOPER:

03:44PM  11  Q.  Other than this DEA-6, where Dave Leary did surveillance

03:44PM  12  on the Ron Serio case, are there any other DEA-6s anywhere in

03:44PM  13  the file about the defendant doing surveillance in the case?

03:45PM  14  A.  There is no other DEA-6 about any surveillance.

03:45PM  15  Q.  None at all?

03:45PM  16  A.  None at all.

03:45PM  17  Q.  Okay.  Can you go cross that one off?

03:45PM  18      So we crossed off the one DEA-6 related to surveillance

03:45PM  19  in the file.  We have six entries left; is that right?

03:45PM  20  A.  That's correct, yes.

03:45PM  21  Q.  The first five entries that are left from the

03:45PM  22  September 11th, 2013, till November 4th, 2014, are those all

03:45PM  23  called case status?

03:45PM  24  A.  Yes, they are.

03:45PM  25  Q.  Okay.  So if I used the term "substantive DEA-6" as a 6

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
54

03:45PM   1   documenting something like the surveillance at 82 Sycamore

03:45PM   2   Street, will you understand that to be different from a DEA-6

03:45PM   3   report that's a quarterly update on the case called a case

03:45PM   4   status?

03:45PM   5   A.  Yes.

03:45PM   6   Q.  So just so we have our terminology clear.  After the

03:45PM   7   DEA-6 of the work Dave Leary did in the case, surveilling

03:46PM   8   82 Sycamore Street, is there a single substantive DEA-6 for

03:46PM   9   the next two years?

03:46PM  10   A.  There is not.

03:46PM  11   Q.  Is there another debriefing of R.K. that we're missing

03:46PM  12   there?

03:46PM  13   A.  There is not.

03:46PM  14   Q.  How about a DEA-6 that says, hey, I can't find R.K.

03:46PM  15   anywhere?  Is that anywhere in the --

03:46PM  16   A.  There is no DEA-6 to that effect.

03:46PM  17   Q.  Any DEA-6s about trying to locate grow operations?

03:46PM  18   A.  No DEA-6s about investigative steps taken towards that.

03:46PM  19   Q.  Okay.  Any DEA-6s that are documenting financial

03:46PM  20   investigations?

03:46PM  21        **MR. MacKAY:**  Objection.  Asked and answered, based on

03:46PM  22   the prior -- the witness's prior answer.

03:46PM  23        **THE COURT:**  No, I'll allow this.

03:46PM  24        **THE WITNESS:**  Sorry.

         25

03:46PM    1        **BY MR. COOPER:**

03:46PM    2    Q.  Any DEA-6s about financial investigation being conducted

03:46PM    3    or the results of it?

03:46PM    4    A.  There's no DEA-6 that relates to that.

03:46PM    5        **MR. COOPER:**  Ms. Champoux, can we pull up what's in

03:46PM    6    evidence as Government Exhibit 22I?

03:46PM    7        **BY MR. COOPER:**

03:47PM    8    Q.  You see in the middle of this document the defendant

03:47PM    9    sends an email on May 23rd, 2013, saying thank you, Scott.

03:47PM    10   We're making strides on the street.  We will report soon.

03:47PM    11       Do you see that?

03:47PM    12   A.  I'm familiar with that.

03:47PM    13   Q.  Okay.  Are there any documents, any DEA-6s documenting

03:47PM    14   buys that occurred in this case?

03:47PM    15   A.  No.

03:47PM    16   Q.  To be clear, is there one document indicating that there

03:47PM    17   was an attempt made to get funding for a buy?

03:47PM    18   A.  Yeah, there are documents to that effect.

03:47PM    19   Q.  Okay.  Any indication that that was followed up on in any

03:47PM    20   way?

03:47PM    21   A.  Documents -- there's no indication that buys were

03:47PM    22   attempted.

03:47PM    23   Q.  Okay.  Any reports documenting attempted controlled phone

03:47PM    24   calls in any way?

03:47PM    25   A.  No DEA-6s to that effect.

03:47PM  1   Q.  Okay.

03:47PM  2        MR. COOPER:  You can take that down please,

03:47PM  3   Ms. Champoux.  And if we can pull up Government Exhibit 8G as

03:47PM  4   in George.

03:47PM  5        BY MR. COOPER:

03:47PM  6   Q.  All right.  Is this the September 11th, 2013, case status

03:48PM  7   report, sir?

03:48PM  8   A.  Yes, it is.

03:48PM  9   Q.  Okay.  Let's work through this one a little bit.

03:48PM  10       MR. COOPER:  Can you zoom in on paragraph 2,

03:48PM  11  Ms. Champoux?

03:48PM  12       BY MR. COOPER:

03:48PM  13  Q.  Do you see a reference in this paragraph to several

03:48PM  14  surveillances?

03:48PM  15  A.  Yes, I do.

03:48PM  16  Q.  Are there any DEA-6s in the file to support the fact that

03:48PM  17  several surveillances were done?

03:48PM  18  A.  The only DEA-6 related to surveillance is the one

03:48PM  19  involving Special Agent Leary.

03:48PM  20  Q.  Okay.  Did you see some pictures in the electronic case

03:48PM  21  file?

03:48PM  22  A.  I saw three pictures.

03:48PM  23  Q.  Three pictures?

03:48PM  24  A.  Yes, three.

03:48PM  25  Q.  Three total?

03:48PM    1    A.  That's, yeah, as I recall, just the three.

03:48PM    2    Q.  Okay.  Earlier you described --

03:48PM    3    A.  I mean, pictures, there's booking pictures, things like

03:48PM    4    that.

03:48PM    5    Q.  I'm talking about pictures, like photographs that look

03:48PM    6    like a --

03:48PM    7    A.  Possible surveillance?

03:48PM    8    Q.  Sure, correct.

03:48PM    9    A.  Yes.

03:48PM   10    Q.  Okay.  And you described earlier in an answer, the

03:48PM   11    difference between kind of a quick solo activity to grab

03:48PM   12    tags, I think you said, or a full-blown surveillance; is that

03:48PM   13    right?

03:49PM   14    A.  Yes, sir.

03:49PM   15    Q.  The three -- three pictures that you saw in the

03:49PM   16    electronic file, are those consistent in your experience with

03:49PM   17    a full-blown surveillance?

03:49PM   18         **MR. MacKAY:**  Objection, improper opinion.

03:49PM   19         **THE COURT:**  Overruled.

03:49PM   20         **BY MR. COOPER:**

03:49PM   21    Q.  How many surveillances have you done in your career?

03:49PM   22    A.  Hundreds.  Hundreds.

03:49PM   23    Q.  Okay.  Do pictures get taken on surveillance?

03:49PM   24    A.  Yeah, absolutely.

03:49PM   25    Q.  Have you gone to grab tags off cars before in your

03:49PM  1   career?

03:49PM  2   A.  Yeah, and we take pictures of the license plates.

03:49PM  3   Q.  Okay.  And so with that foundation, is taking one single

03:49PM  4   picture of one single vehicle consistent in your experience

03:49PM  5   with a full surveillance at a location?

03:49PM  6   A.  Not a full surveillance, no.

03:49PM  7   Q.  Okay.  And are there any 6s documenting several, meaning

03:49PM  8   multiple, surveillances?

03:49PM  9   A.  No, there's not.

03:49PM  10  Q.  Okay.  You see the second sentence here that says agents

03:49PM  11  have utilized air surveillance with the ECSO chopper?

03:49PM  12  A.  Yes.

03:49PM  13  Q.  Did you -- do you understand that reference to ECSO

03:50PM  14  chopper to be a reference to the Erie County Sheriff's

03:50PM  15  Office?

03:50PM  16  A.  Yes.

03:50PM  17  Q.  Okay.

03:50PM  18  A.  I do.

03:50PM  19  Q.  And actually it says it right there, Erie County

03:50PM  20  Sheriff's Office chopper, right?

03:50PM  21  A.  Yep.

03:50PM  22  Q.  Okay.  Did you see Captain Kevin Caffery come in here and

03:50PM  23  testify?

03:50PM  24  A.  Yes, I did.

03:50PM  25  Q.  Okay.  Is it your understanding that he works for the --

03:50PM    1    worked for the Erie County Sheriff's Office?

03:50PM    2    A.  Yeah, he was the lead captain.

03:50PM    3    Q.  Are you familiar with the exhibits that have been

03:50PM    4    received into evidence related to the pilot's log from the

03:50PM    5    Erie County Sheriff's Office Helicopter?

03:50PM    6    A.  Yes, I am.

03:50PM    7    Q.  Based on your review of that record which is in evidence,

03:50PM    8    does it indicate that the helicopter was grounded for

03:50PM    9    maintenance on September 11th?

03:50PM    10   A.  Yes, it does.

03:50PM    11   Q.  Okay.  And does it show all the flights before this

03:50PM    12   September 11th DEA-6?

03:50PM    13   A.  Yes.

03:50PM    14   Q.  That are contained in the log?

03:50PM    15   A.  Yes, it does.

03:50PM    16   Q.  Any reference to the Ron Serio drug-trafficking

03:50PM    17   organization?

03:50PM    18   A.  There's not a reference to that.

03:51PM    19   Q.  Any reference to Joseph Bongiovanni contained anywhere in

03:51PM    20   the log going up in the helicopter?

03:51PM    21   A.  No, absolutely not.

03:51PM    22   Q.  Okay.  Does this report also mention waiting for GPS,

03:51PM    23   waiting for -- let's see, where is it -- waiting for approval

03:51PM    24   from the United States Attorney's Office to use GPS trackers?

03:51PM    25   Do you see that?

03:51PM  1    A.  Yes, I do.

03:51PM  2    Q.  Did you hear AUSA Lynch testify about that?

03:51PM  3    A.  Yes, I did.

03:51PM  4    Q.  And Special Agent Leary, he came in the courtroom and

03:51PM  5    testified too, right?

03:51PM  6    A.  He did.

03:51PM  7    Q.  Okay.  Would it be fair to say that there are some things

03:51PM  8    mentioned in this case status report, some investigative

03:51PM  9    steps that the defendant claims in this report to have taken

03:51PM  10   that aren't supported by any of the prior DEA-6s that are in

03:51PM  11   the file?

03:51PM  12   A.  That's accurate.

03:52PM  13   Q.  Okay.  You can get up and cross that one off for me,

03:52PM  14   please.

03:52PM  15        **MR. COOPER:**  And, Ms. Champoux, if we can please pull

03:52PM  16   up Government Exhibit -- let's see, actually, hold off for

03:52PM  17   just one second.  Yeah.  It's 8F, ma'am.

03:52PM  18        **BY MR. COOPER:**

03:52PM  19   Q.  All right.  After the September 11th, 2013, case status

03:52PM  20   report, what's the next case status report in the file?

03:52PM  21   A.  12/31/2013 case status.

03:52PM  22   Q.  And in the three-and-a-half-month period between those

03:52PM  23   two case status reports, is there any investigative activity

03:52PM  24   documented in the file at all?

03:52PM  25   A.  There's no DEA-6s to that effect.

03:52PM   1   Q.  All right.  Can you see okay?  Or do you need to zoom in?

03:52PM   2   A.  No, I can see.

03:52PM   3   Q.  Okay, great.  Is Remus Nowak mentioned in this

03:52PM   4   December 31, 2013, case status report?

03:52PM   5   A.  Yes, he is.

03:52PM   6   Q.  Okay.  And is there any document anywhere in the file

03:53PM   7   that you reviewed that you were able to find explaining the

03:53PM   8   predication, the basis, for saying that Remus Nowak is

03:53PM   9   believed to be a member or involved with the Ron Serio

03:53PM   10  drug-trafficking organization?

03:53PM   11  A.  None whatsoever.

03:53PM   12  Q.  Okay.  Up until this point, is it fair to say that the

03:53PM   13  main DTO being investigated is called the Serio DTO or Ron

03:53PM   14  Serio DTO; is that fair?

03:53PM   15  A.  That's fair.

03:53PM   16  Q.  Okay.  Does it mention that there's an in-depth financial

03:53PM   17  analysis of the records of Duncan Motor Car Sales being

03:53PM   18  conducted?

03:53PM   19  A.  Yes, it does.

03:53PM   20  Q.  Did you look at Exhibit 22, Scott Deming's log of his

03:54PM   21  work on the case?

03:54PM   22  A.  Yes, I did.

03:54PM   23  Q.  Any mention of Duncan Motor Car Sales in there?

03:54PM   24  A.  There is not.

03:54PM   25  Q.  Any mention of Remus Nowak in there?

| | | |
|---|---|---|
| 03:54PM | 1 | A.  There is not. |
| 03:54PM | 2 | Q.  All right.  Can we go over to 8A-6 and cross this one off |
| 03:54PM | 3 | from December 31st, 2013? |
| 03:54PM | 4 | **MR. COOPER:**  And let's pull up Government Exhibit 8E |
| 03:54PM | 5 | as in echo, please. |
| 03:54PM | 6 | **BY MR. COOPER:** |
| 03:54PM | 7 | Q.  Is this the very next report in the file after 12/31/13? |
| 03:54PM | 8 | A.  It's the next DEA-6. |
| 03:54PM | 9 | Q.  Okay.  What's the date of this report? |
| 03:54PM | 10 | A.  April 7th, 2014. |
| 03:54PM | 11 | Q.  Is this a substantive DEA-6 or another case status? |
| 03:54PM | 12 | A.  Just a case status. |
| 03:54PM | 13 | Q.  Okay. |
| 03:54PM | 14 | **MR. COOPER:**  Ms. Champoux, can you zoom in on just |
| 03:54PM | 15 | paragraph 2 here? |
| 03:54PM | 16 | **BY MR. COOPER:** |
| 03:54PM | 17 | Q.  Any reference to Ron Serio there at all? |
| 03:54PM | 18 | A.  No, there's not. |
| 03:55PM | 19 | Q.  Is this paragraph entirely focused on Remus Nowak? |
| 03:55PM | 20 | A.  It is. |
| 03:55PM | 21 | **MR. COOPER:**  And if you zoom out of that, please, |
| 03:55PM | 22 | and zoom in on paragraph 3, briefly? |
| 03:55PM | 23 | **BY MR. COOPER:** |
| 03:55PM | 24 | Q.  Is that basically repeating the same information from the |
| 03:55PM | 25 | report we just looked at a second ago in 8F? |

03:55PM    1    A.  It's very, very similar.

03:55PM    2    Q.  Okay.

03:55PM    3              MR. COOPER:  You can zoom out of that, please.

03:55PM    4              BY MR. COOPER:

03:55PM    5    Q.  Does the case status report indicate that Nowak is a

03:55PM    6    major money-laundering source for the Serio DTO?

03:55PM    7    A.  Yes, it does.

03:55PM    8    Q.  Are there any reports or any information contained in the

03:55PM    9    file that explains the source of the statement that Remus

03:55PM    10   Nowak is a major money-laundering source for the Serio DTO?

03:55PM    11   A.  There are none.

03:55PM    12   Q.  By this time, April 7th of 2014, had the defendant

03:55PM    13   already closed out his confidential source in the case?

03:55PM    14   A.  Yes, he had.

03:55PM    15   Q.  Had that happened way back in July of 2013?

03:55PM    16   A.  July 30th.

03:55PM    17   Q.  Okay.

03:55PM    18   A.  2013.

03:55PM    19   Q.  Are we still -- is the defendant still referring to the

03:56PM    20   DTO that's being investigated as the Serio DTO in this

03:56PM    21   report?

03:56PM    22   A.  In this report, yes.

03:56PM    23   Q.  Okay.  See that?

03:56PM    24   A.  Yep.  There it is.

03:56PM    25   Q.  Okay.  You can go cross off the April 7th report, please.

03:56PM 1    All right.  We're working our way through the file here.

03:56PM 2  Let's move to Government Exhibit 8D as in David.  Is this

03:56PM 3  another case status report?

03:56PM 4  A.  Yes, it is.

03:56PM 5  Q.  So no DEA-6s in between April and July of 2014?

03:56PM 6  A.  None.

03:56PM 7  Q.  No surveillances?

03:56PM 8  A.  No surveillances.

03:56PM 9  Q.  No controlled calls?

03:56PM 10  A.  No DEA-6s to that effect.

03:56PM 11  Q.  Okay.

03:56PM 12      MR. COOPER:  Can we zoom in on paragraph 2, please,

03:57PM 13  Ms. Champoux?

03:57PM 14      BY MR. COOPER:

03:57PM 15  Q.  Can you read that sentence to the jury?

03:57PM 16  A.  Agents continue to work with Amherst PD in an effort to

03:57PM 17  infiltrate the Remus Nowak DTO.

03:57PM 18  Q.  Has the defendant now renamed the drug-trafficking

03:57PM 19  organization into the Remus Nowak DTO?

03:57PM 20  A.  Yes.  In this paragraph, he has.

03:57PM 21  Q.  Okay.  That's different than the Ron Serio DTO, right?

03:57PM 22  A.  That's correct.

03:57PM 23  Q.  Okay.  And an earlier report that we just looked at, it

03:57PM 24  said Remus Nowak was working with Ron Serio, right?

03:57PM 25  A.  That's correct.

03:57PM   1    Q.  Laundering his money for him, right?

03:57PM   2    A.  That's what it said.

03:57PM   3    Q.  Okay.  And was there any basis in the file that you

03:57PM   4    reviewed for how the Ron Serio DTO became the Remus Nowak

03:57PM   5    DTO?

03:57PM   6    A.  None that I found.

03:57PM   7    Q.  Okay.

03:57PM   8         MR. COOPER:  You can zoom out of that, please,

03:57PM   9    Ms. Champoux.

03:57PM  10         BY MR. COOPER:

03:57PM  11    Q.  Does it have the same case number?

03:57PM  12    A.  Yeah, the C2-13-0026.

03:57PM  13    Q.  Okay.  I want to set the stage for the next question that

03:57PM  14    I'm going to ask you.

03:57PM  15       Did you hear Ron Serio testify about a time that he was

03:57PM  16    unloading marijuana at Mark Falzone's house and Mike

03:58PM  17    Masecchia was there, and Mike Masecchia left; do you remember

03:58PM  18    that?

03:58PM  19    A.  Yes, I do.

03:58PM  20    Q.  Okay.  Does Remus Nowak have a residence near Mark

03:58PM  21    Falzone?

03:58PM  22    A.  Yes, in close proximity.

03:58PM  23    Q.  Okay.

03:58PM  24    A.  Their backyards essentially abut, based on the review of

03:58PM  25    the area, or the maps I looked at.

03:58PM  1    Q.  In paragraph 3 of Government Exhibit 8D is this, again,

03:58PM  2    kind of a regurgitation of the data from the prior case

03:58PM  3    status report?

03:58PM  4    A.  Yes, it's very similar.

03:58PM  5    Q.  Okay.  All right.  Let's cross off the July 7th report,

03:58PM  6    and we'll work our way through the last case status.

03:58PM  7         MR. COOPER:  Ms. Champoux, if you can pull up

03:58PM  8    Government Exhibit 8C, please?

03:58PM  9         BY MR. COOPER:

03:58PM  10   Q.  Same case file, right?

03:59PM  11   A.  Yes, it is.

03:59PM  12   Q.  What's that date this report is prepared?

03:59PM  13   A.  November 4th, 2014.

03:59PM  14   Q.  How's the investigation going at this time?

03:59PM  15   A.  It's pending closure.

03:59PM  16   Q.  Okay.  And on November 4th of 2014, paragraph 3, does the

03:59PM  17   defendant write this investigation is pending closure?

03:59PM  18   A.  Yes, he does.

03:59PM  19   Q.  Okay.  And is Ron Serio indexed in this report?

03:59PM  20   A.  Serio, yes, he's indexed in that report.

03:59PM  21   Q.  Okay.  Is Mike Masecchia indexed in the report?

03:59PM  22   A.  He is not.

03:59PM  23   Q.  How about Lou Selva?

03:59PM  24   A.  He is not.

03:59PM  25   Q.  How about Hot Dog?

03:59PM   1   A.  He is not.

03:59PM   2   Q.  Okay.  To be clear, does this 8C, does this document any

03:59PM   3   investigative activity?

03:59PM   4   A.  It does not.

03:59PM   5   Q.  Okay.  Can you cross it off of the list there for us?

03:59PM   6        MR. COOPER:  And then finally, Ms. Champoux, if we

04:00PM   7   can pull up 8B as in Bravo.

04:00PM   8        BY MR. COOPER:

04:00PM   9   Q.  Special Agent Burns, what's the date that this report's

04:00PM  10   prepared?

04:00PM  11   A.  January 28th, 2015.

04:00PM  12   Q.  About two months after that November case status that we

04:00PM  13   just looked at?

04:00PM  14   A.  Yes, approximately.

04:00PM  15   Q.  Okay.  Is this formally closing the case?

04:00PM  16   A.  Yes, it is now closed.

04:00PM  17   Q.  Does Ron Serio get indexed in the case closure?

04:00PM  18   A.  The only -- it's Wayne Anderson and Damien Abbate.

04:00PM  19   Q.  So, no Ron Serio?

04:00PM  20   A.  No Ron Serio.

04:00PM  21   Q.  No Mike Masecchia?

04:00PM  22   A.  No Mike Masecchia.

04:00PM  23   Q.  No Lou Selva?

04:00PM  24   A.  No Lou Selva.

04:00PM  25   Q.  Okay.  Special Agent Burns, other than the initial

04:00PM      1    debriefing of R.K., and Dave Leary's surveillance at 82

04:00PM      2    Sycamore Street, are there any 6s documenting a substantive

04:00PM      3    investigative activity that happened in this case file?

04:00PM      4    A.   None at all.

04:00PM      5    Q.   There were multiple other agents, based on your review of

04:01PM      6    the report, the initial debriefing of R.K., were there

04:01PM      7    multiple other agents present for that activity?

04:01PM      8    A.   For the debrief?

04:01PM      9    Q.   For the initial debriefing of R.K..

04:01PM     10    A.   Yes, Special Agent DA -- Shane Nastoff and John

04:01PM     11    Flickinger.

04:01PM     12    Q.   Okay.  And then Dave Leary did the surveillance at

04:01PM     13    Sycamore, right?

04:01PM     14    A.   That's correct.

04:01PM     15    Q.   So were there any 6s documenting some investigative

04:01PM     16    action that the defendant did himself?

04:01PM     17    A.   No substantive.

04:01PM     18    Q.   In the file, was Lou Selva's phone number subpoenaed for

04:01PM     19    subscriber information?

04:01PM     20    A.   Yes, it was.

04:01PM     21    Q.   Okay.  And how about Mike Masecchia's?

04:01PM     22    A.   Several numbers, believe, for Masecchia were subpoenaed.

04:01PM     23    Q.   Did that cause their numbers to be entered into the DARTS

04:02PM     24    deconfliction database?

04:02PM     25    A.   Yes, it would have.

04:02PM     1    Q.  Did they ever get mentioned in any DEA-6 report in this

04:02PM     2    case file?

04:02PM     3    A.  Not one.

04:02PM     4    Q.  Okay.  Can you cross off the case closure for me, please?

04:02PM     5       All right.  So, we've worked our way through the DEA-6s

04:02PM     6    contained in C2-13-0026; is that right?

04:02PM     7    A.  That's accurate.

04:02PM     8    Q.  All right.

04:02PM     9       **MR. COOPER:**  Ms. Champoux, you can take down

04:02PM    10    Exhibit 8B, please.

04:02PM    11       **BY MR. COOPER:**

04:02PM    12    Q.  Special Agent Burns, during the course of trial prep in

04:02PM    13    this case, did you work to develop some charts to summarize

04:02PM    14    the voluminous evidence and testimony that the jury has heard

04:02PM    15    over the last two months?

04:02PM    16    A.  Yes, I did.

04:02PM    17    Q.  Okay.  Generally did you work with Homeland Security

04:02PM    18    Investigations and the U.S. Attorney's Office to create kind

04:02PM    19    of two different types of charts?

04:02PM    20    A.  Yes, over many months.

04:02PM    21       **MR. COOPER:**  Judge, may I approach and just take

04:02PM    22    this off the --

04:02PM    23       **THE COURT:**  Of course.

04:02PM    24       **MR. COOPER:**  Thank you.

04:03PM    25       On the witness's screen only please, can I pull up

04:03PM    1    Government Exhibit 552?

04:03PM    2            **BY MR. COOPER:**

04:03PM    3    Q.  Do you recognize what's on the screen in front of you?

04:03PM    4    A.  Yes, I do.

04:03PM    5    Q.  Is this one of the charts that you worked to create?

04:03PM    6    A.  It is one of the charts.

04:03PM    7    Q.  Okay.  And generally, what does Government Exhibit 552

04:03PM    8    summarize?

04:03PM    9    A.  Generally, it summarizes the voluminous testimony and

04:03PM   10    evidence that's been introduced at this trial, and it puts

04:03PM   11    the connections between 58 individuals whose names have been

04:03PM   12    mentioned in the course of this trial.

04:03PM   13    Q.  Okay.  Have there been a ton of names mentioned during

04:03PM   14    the two months and change trial that we've been in?

04:03PM   15    A.  A whole bunch.

04:03PM   16    Q.  Okay.  And does what you've created in Government

04:03PM   17    Exhibit 552 show connections that exist between some of those

04:03PM   18    different names that have come up based on testimony and

04:04PM   19    evidence that's come in during this trial?

04:04PM   20    A.  Yes.

04:04PM   21    Q.  Did you keep an index that shows the either testimony or

04:04PM   22    evidence that supports each connection that you've put on

04:04PM   23    this summary chart?

04:04PM   24    A.  Yes, a lengthy index.

04:04PM   25    Q.  Did you update that lengthy index as the trial was going

04:04PM    1    on?

04:04PM    2    A.  Yes, constantly.

04:04PM    3    Q.  Keep track of the testimony?

04:04PM    4    A.  Yes, I did.

04:04PM    5    Q.  Did you keep track of the exhibits?

04:04PM    6    A.  Yes, I did.

04:04PM    7    Q.  Have you updated that index as the trial's gone on?

04:04PM    8    A.  Yes, I have.

04:04PM    9    Q.  Okay.  How many connections total are documented in

04:04PM   10    Government Exhibit 552?

04:04PM   11    A.  179.

04:04PM   12    Q.  Okay.  And how many different people are -- or names are

04:04PM   13    reflected on that chart?

04:04PM   14    A.  58.

04:04PM   15    Q.  Okay.  You said 179 connections, should it actually be

04:04PM   16    180?

04:04PM   17    A.  Yes.

04:04PM   18    Q.  Okay.  As the trial was going on, did you realize another

04:04PM   19    connection that existed, but the chart had already been

04:04PM   20    finalized at that point?

04:04PM   21    A.  Yeah, just the other day.

04:04PM   22    Q.  Did that happen this week?

04:04PM   23    A.  Yes, it did.

04:04PM   24    Q.  Okay.

04:04PM   25    A.  We weren't going to print it again.

04:05PM  1    Q.  Okay.  To be clear, does the chart that you're looking at

04:05PM  2    list every single name of every single person that's come up

04:05PM  3    during the trial?

04:05PM  4    A.  No, not at all.

04:05PM  5    Q.  Okay.  Was the first day of testimony in this trial taken

04:05PM  6    on August 5, 2024?

04:05PM  7    A.  Yes, it was.

04:05PM  8    Q.  Is it currently September 26th of 2024?

04:05PM  9    A.  Yes, it is.

04:05PM  10   Q.  Okay.  Approximately how many witnesses, including

04:05PM  11   yourself and the transcript of R.K., have testified during

04:05PM  12   this trial?

04:05PM  13   A.  62.

04:05PM  14   Q.  Would it be fair to say that this case involves

04:05PM  15   information about dozens and dozens of different individuals?

04:05PM  16   A.  Absolutely.

04:05PM  17   Q.  Did you create Government Exhibit 552 to fairly and

04:05PM  18   accurately summarize the testimony and evidence from this

04:05PM  19   trial as it relates to the existence of connections between

04:05PM  20   certain individuals listed on your chart?

04:05PM  21   A.  Yes.

04:06PM  22        MR. COOPER:  Judge, if I could just have one moment?

04:06PM  23        THE COURT:  Sure.

04:06PM  24        MR. COOPER:  Okay.  So I think to make everything

04:06PM  25   faster, we'd like to come up real quick if that's okay with

| 04:06PM | 1 | Your Honor. |
| 04:06PM | 2 | **THE COURT:**  Sure, come on up. |
| 04:06PM | 3 | (Sidebar discussion held on the record.) |
| 04:06PM | 4 | **MR. COOPER:**  Parker and I spoke during the break |
| 04:06PM | 5 | about trying to move things along today.  And one of the ways |
| 04:06PM | 6 | that we talked about doing that is not having me go through |
| 04:06PM | 7 | the foundation of all 180, 179 connections on the chart.  He |
| 04:06PM | 8 | agreed to that.  It's a significant timesaving measure.  So I |
| 04:06PM | 9 | wanted to make a record of that. |
| 04:06PM | 10 | He's going to cross-examine on the chart, but I'm not |
| 04:06PM | 11 | going to do all of them as the foundation. |
| 04:06PM | 12 | **THE COURT:**  You're going to offer the chart now and |
| 04:06PM | 13 | you're not going to object? |
| 04:06PM | 14 | **MR. MacKAY:**  Yes, I'm not stipulating, but I'm not |
| 04:07PM | 15 | going to object. |
| 04:07PM | 16 | **THE COURT:**  Great.  Perfect. |
| 04:07PM | 17 | **MR. COOPER:**  Thank you, Judge. |
| 04:07PM | 18 | (End of sidebar discussion.) |
| 04:07PM | 19 | **MR. COOPER:**  So with that foundation, Judge, the |
| 04:07PM | 20 | government would offer Government Exhibit 552 into evidence, |
| 04:07PM | 21 | but I don't want to publish it yet, if that's okay. |
| 04:07PM | 22 | **MR. MacKAY:**  No objection to admission. |
| 04:07PM | 23 | **THE COURT:**  It's received without objection. |
| 04:07PM | 24 | **MR. COOPER:**  Thank you, Judge. |
| 04:07PM | 25 | **(GOV Exhibit 552 was received in evidence.)** |

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
74

04:07PM    1    **BY MR. COOPER:**

04:07PM    2    Q.  Special Agent Burns, did you also create essentially a

04:07PM    3    duplicate of that exhibit, which has been given the name

04:07PM    4    Exhibit Number 553?

04:07PM    5    A.  Yes, I did.

04:07PM    6    Q.  Okay.  And is it fair to say Government Exhibit 552 has

04:07PM    7    got a lot of lines on it?

04:07PM    8    A.  A whole bunch.

04:07PM    9    Q.  Okay.  And did Government Exhibit 553 layer that over the

04:07PM    10    course of five or six different pages to make it a little

04:07PM    11    easier to take in?

04:07PM    12    A.  Yes, it did.

04:07PM    13    Q.  Okay.  Other than the fact that it's layered over five or

04:07PM    14    six different pages, does Government Exhibit 553 contain the

04:07PM    15    same data that's in 552?

04:07PM    16    A.  Yes, it does.

04:07PM    17    **MR. COOPER:**  Okay.  With that foundation, I'd offer

04:07PM    18    553 into evidence.

04:07PM    19    **MR. MacKAY:**  No objection.

04:07PM    20    **THE COURT:**  Received without objection.

04:08PM    21    **(GOV Exhibit 553 was received in evidence.)**

04:08PM    22    **MR. COOPER:**  Thank you.

04:08PM    23    Ms. Champoux, if you can pull up Government

04:08PM    24    Exhibit 553 for the witness.

04:08PM    25    Okay.  And, Ms. Demma, I'd ask that we publish that

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
75

| | | |
|---|---|---|
| 04:08PM | 1 | for the jury. |
| 04:08PM | 2 | **THE CLERK:** You're all set. |
| 04:08PM | 3 | **MR. COOPER:** Thank you. |
| 04:08PM | 4 | **BY MR. COOPER:** |
| 04:08PM | 5 | Q. Can you see this, sir? |
| 04:08PM | 6 | A. Yes, I can. |
| 04:08PM | 7 | Q. Okay. Are the gray boxes all around this chart different |
| 04:08PM | 8 | names that have come up during the trial? |
| 04:08PM | 9 | A. Yeah, those are the 58 I referenced earlier. |
| 04:08PM | 10 | Q. Okay. And then are there some color-coded boxes |
| 04:08PM | 11 | starting -- let's start with the color red; do you see that |
| 04:08PM | 12 | one? |
| 04:08PM | 13 | A. Yes. |
| 04:08PM | 14 | Q. Who's in that box? |
| 04:08PM | 15 | A. That's the defendant, Joseph Bongiovanni. It's the |
| 04:08PM | 16 | exhibit -- the photograph of him in the classic Buick |
| 04:08PM | 17 | automobile. |
| 04:08PM | 18 | Q. Okay. Is that photo from Government Exhibit 109AB? |
| 04:08PM | 19 | A. Yes, it is. |
| 04:08PM | 20 | Q. All right. And then Lou Selva, is he listed in blue |
| 04:08PM | 21 | there? |
| 04:08PM | 22 | A. Yes, he is. |
| 04:08PM | 23 | Q. Ron Serio, is he in green? |
| 04:08PM | 24 | A. Yes, he is. |
| 04:08PM | 25 | Q. Does Mike Masecchia have a black-colored box? |

04:08PM  1    A.  Yes, he does.

04:08PM  2    Q.  And does Peter Gerace have a yellow-colored box?

04:08PM  3    A.  Yes, he does.

04:08PM  4    Q.  Okay.  Are there some lines coming out from the

04:08PM  5    defendant's picture there?

04:08PM  6    A.  Yes, there is.

04:08PM  7    Q.  What do those lines signify?

04:08PM  8    A.  Connections between the defendant and these individuals.

04:09PM  9    Q.  Now to be clear, you haven't followed the defendant

04:09PM  10   around for his whole life to know about that, right?

04:09PM  11   A.  Yes.

04:09PM  12   Q.  What'd you base those lines off of?

04:09PM  13   A.  On the voluminous testimony and the voluminous exhibits

04:09PM  14   in this, that have come -- entered into evidence at this

04:09PM  15   trial.

04:09PM  16   Q.  Okay.  Excuse me.

04:09PM  17        Now we mentioned before, we didn't put every single name

04:09PM  18   that was mentioned during the trial on the chart; is that

04:09PM  19   correct?

04:09PM  20   A.  No, I -- that would have been almost impossible.

04:09PM  21   Q.  Okay.  And did you pick a selection of the names that

04:09PM  22   came up during the course of the trial?

04:09PM  23   A.  Yes, I did.

04:09PM  24   Q.  And does this summarize the testimony and evidence with

04:09PM  25   respect to the selection of names are on the chart?

04:09PM    1    A.  Yes, it does.

04:09PM    2    Q.  Okay.  Is there a line from the defendant to Lou Selva?

04:09PM    3    A.  Yes, there is.

04:09PM    4    Q.  Okay.  And is there a line from the defendant to Peter

04:09PM    5    Gerace?

04:09PM    6    A.  Yes, there is.

04:09PM    7    Q.  How about the defendant and Mark Suppa?

04:09PM    8    A.  Yes, there is.

04:09PM    9    Q.  How about the defendant and John Suppa?

04:09PM   10    A.  Yes, there is.

04:09PM   11    Q.  How about the defendant and Frank Burkhart?

04:09PM   12    A.  Yes, there is.

04:10PM   13    Q.  How about the defendant and Wayne Anderson?

04:10PM   14    A.  Yes, there is.

04:10PM   15    Q.  Do you see all those lines?

04:10PM   16    A.  I sure do.

04:10PM   17    Q.  Okay.

04:10PM   18         MR. COOPER:  Ms. Champoux, if we can scroll on to the

04:10PM   19    next page.

04:10PM   20         BY MR. COOPER:

04:10PM   21    Q.  We're on page 2 now.  Does this list the connections

04:10PM   22    between Ron Serio in green and the other individuals on the

04:10PM   23    chart?

04:10PM   24    A.  Yes, it does.

04:10PM   25    Q.  Okay.  I want to talk about some of the connections in

04:10PM    1    common here, okay?

04:10PM    2    A.   Okay.

04:10PM    3    Q.   Let's start with Joe Bella at the top.

04:10PM    4         Is Joe Bella a person that's listed as a connection in

04:10PM    5    common between Ron Serio and the defendant?

04:10PM    6    A.   Yes.

04:10PM    7    Q.   How about Wayne Anderson?

04:10PM    8    A.   Yes.

04:10PM    9    Q.   How about Frank Burkhart?

04:10PM   10    A.   Yes.

04:10PM   11    Q.   How about Bobby R.K.?

04:10PM   12    A.   Yes.

04:10PM   13    Q.   How about John Suppa?

04:10PM   14    A.   Yes.

04:10PM   15    Q.   And Mark Suppa?

04:10PM   16    A.   Yes.

04:10PM   17    Q.   What about Joe Tomasello?

04:10PM   18    A.   Yes.

04:10PM   19    Q.   Okay.  Now, we're not going to go through every single

04:10PM   20    one, try to keep it moving here.

04:10PM   21         **MR. COOPER:**  Ms. Champoux, if you can scroll to the

04:10PM   22    next page.

04:10PM   23              **BY MR. COOPER:**

04:10PM   24    Q.   Okay.  Do you see some black lines that just appeared on

04:10PM   25    553?

04:10PM  1   A.  Yes, I do.

04:10PM  2   Q.  Okay.  Does this show some of Masecchia's connections to

04:11PM  3   individuals?

04:11PM  4   A.  Yes, it does.

04:11PM  5   Q.  Does Masecchia also have a connection to Bella?

04:11PM  6   A.  Yes, he does.

04:11PM  7   Q.  Does he have a connection to Butchie Bifocals?  Up at the

04:11PM  8   top there.

04:11PM  9   A.  Yes, he does.

04:11PM  10  Q.  Okay.  How about Wayne Anderson?

04:11PM  11  A.  Yes, he does.

04:11PM  12  Q.  Does Masecchia also have a connection to Mark Suppa?

04:11PM  13  A.  Yes, he does.

04:11PM  14  Q.  And is that a connection that Masecchia, Serio, and the

04:11PM  15  defendant all share in common?

04:11PM  16  A.  It is.

04:11PM  17  Q.  How about Joe Tomasello?  Is that a connection that

04:11PM  18  Masecchia, Serio, and the defendant all share in common?

04:11PM  19  A.  Yes, it is.

04:11PM  20  Q.  How about Sal Volpe?

04:11PM  21  A.  Yes, it is.

04:11PM  22  Q.  How about Anthony Gerace?  That's over at the top, maybe

04:11PM  23  four or five inches down the chart.  Do you see Anthony

04:11PM  24  Gerace's gray box?

04:11PM  25  A.  Yes, I do.

04:11PM   1    Q.  Does he have a connection to the defendant?

04:11PM   2    A.  He sure does.

04:11PM   3    Q.  Okay.  And does the chart reflect a connection between

04:11PM   4    Masecchia and Anthony Gerace?

04:11PM   5    A.  Yes, it does.

04:11PM   6    Q.  How about between Ron Serio and Anthony Gerace?

04:12PM   7    A.  Yes, it does.

04:12PM   8    Q.  I was gonna ask you about Peter, but I don't think we're

04:12PM   9    there yet.

04:12PM  10         MR. COOPER:  So let's go to the next page,

04:12PM  11    Ms. Champoux.

04:12PM  12         BY MR. COOPER:

04:12PM  13    Q.  Do the blue lines indicate Lou Selva's connections to

04:12PM  14    some of those same individuals?

04:12PM  15    A.  Yes, it does.

04:12PM  16    Q.  Okay.  And do we see some of the same connections in

04:12PM  17    common that now include Lou Selva?

04:12PM  18    A.  Yes, we do.  In blue.

04:12PM  19    Q.  Sal Volpe?

04:12PM  20    A.  Yes.

04:12PM  21    Q.  How about Mark Suppa?

04:12PM  22    A.  Yes.

04:12PM  23    Q.  How about John Suppa?

04:12PM  24    A.  Yes.

04:12PM  25         MR. COOPER:  Ms. Champoux, if we can go to the next

04:12PM    1    page, please?

04:12PM    2         **BY MR. COOPER:**

04:12PM    3    Q.  All right.  And the yellow lines that just popped up, are

04:12PM    4    those Peter Gerace's connections on the chart?

04:12PM    5    A.  Yes, they are.

04:12PM    6    Q.  Okay.  Are there a lot of connections that are on the

04:12PM    7    left side of the chart that are connections based on the

04:12PM    8    testimony and evidence in the trial, summarized in this chart

04:12PM    9    between both Peter Gerace and the defendant?

04:12PM   10    A.  On the left-hand side?

04:12PM   11    Q.  On the left-hand side over here.

04:12PM   12    A.  Yep.  Yes.

04:12PM   13    Q.  Do you see that?

04:12PM   14    A.  Absolutely.

04:12PM   15    Q.  Okay.  Is Tom Doctor a connection in common?

04:13PM   16    A.  Yes, it is.

04:13PM   17    Q.  How about Anthony Gerace?

04:13PM   18    A.  Yes, he is.

04:13PM   19    Q.  Does everyone -- does Anthony Gerace have connections to

04:13PM   20    the defendant, Peter, Ron, and Mike on this chart?

04:13PM   21    A.  Yes, he does.

04:13PM   22    Q.  Okay.  How about Frank Tripi?  Does Frank Tripi have a

04:13PM   23    connection to Peter Gerace?

04:13PM   24    A.  Peter Gerace, yes, he does.

04:13PM   25    Q.  How about Hot Dog?  Is Hot Dog on the chart?

04:13PM   1    A.  Yes, he is.

04:13PM   2    Q.  Haven't said his name yet.  Do you see Hot Dog there?

04:13PM   3    A.  I do see Hot Dog.

04:13PM   4    Q.  Does Hot Dog have a connection to the defendant?

04:13PM   5    A.  Yes, he does.

04:13PM   6    Q.  And they went to Canada together, right?

04:13PM   7    A.  That's accurate.

04:13PM   8    Q.  How about a connection to Ron Serio?

04:13PM   9    A.  Yes.

04:13PM  10    Q.  Now, is there one -- is there one more page after this

04:14PM  11    one?

04:14PM  12    A.  There is one more page.

04:14PM  13    Q.  Okay.  And does that add a whole bunch more lines on to

04:14PM  14    the chart?

04:14PM  15    A.  Yes, it does.

04:14PM  16    Q.  Is that last page here going to be gray-colored lines?

04:14PM  17    A.  It will be.

04:14PM  18    Q.  The gray-colored lines, what do they signify?

04:14PM  19    A.  The connections between the different individuals.

04:14PM  20    Q.  Okay.

04:14PM  21    A.  Their names.

04:14PM  22    Q.  So initially, you've color coded different people's

04:14PM  23    connections; is that right?

04:14PM  24    A.  That's correct.

04:14PM  25    Q.  Are the gray connections basically all the remaining

04:14PM    1    connections contained on the chart?

04:14PM    2    A.  That's correct.

04:14PM    3    Q.  Okay.  And does that show how some of these gray box

04:14PM    4    people are connected to each other?

04:14PM    5    A.  That's accurate.

04:14PM    6    Q.  Okay.

04:14PM    7        **MR. COOPER:**  And, Ms. Champoux, can we go to the

04:14PM    8    final page?

04:14PM    9        **BY MR. COOPER:**

04:14PM    10    Q.  Gets pretty complex with all the lines on it, right?

04:14PM    11    A.  It certainly does.

04:14PM    12    Q.  Okay.  Was your goal in creating this chart to try to

04:14PM    13    help take this out of the brain and onto a piece of paper?

04:14PM    14    A.  Yeah, the voluminous testimony, as well as the voluminous

04:14PM    15    exhibits.

04:14PM    16    Q.  Okay.

04:14PM    17        **MR. COOPER:**  Ms. Champoux, you can take that down,

04:14PM    18    please.

04:14PM    19        **BY MR. COOPER:**

04:15PM    20    Q.  All right.  You told us before there were two different

04:15PM    21    types of charts.  Was that one of them?

04:15PM    22    A.  Yes, that was the connections one.

04:15PM    23    Q.  Let's talk about the other one now.

04:15PM    24        **MR. COOPER:**  Ms. Champoux, for the witness only, can

04:15PM    25    we bring up Government Exhibit 551?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

84

04:15PM     1          **BY MR. COOPER:**

04:15PM     2     Q.  Can you see that on your screen?

04:15PM     3     A.  Yes, I can.

04:15PM     4     Q.  Okay.  And is this one of the charts that you worked with

04:15PM     5     HSI and the U.S. Attorney's Office to generate?

04:15PM     6     A.  Yes, extensively.

04:15PM     7     Q.  Okay.  What does Government Exhibit 551 summarize?

04:15PM     8     A.  It summarizes some of the exhibits that came into

04:15PM     9     evidence at this trial as they relate to the charged -- the

04:15PM    10     counts in this indictment, and the specific incidents in this

04:15PM    11     indictment --

04:15PM    12     Q.  Okay.

04:15PM    13     A.  -- during this trial.

04:15PM    14     Q.  Okay.  So, counts are contained in an indictment, right?

04:15PM    15     A.  They are.

04:15PM    16     Q.  And the indictment is not evidence, right?

04:15PM    17     A.  It is not evidence.

04:15PM    18     Q.  Okay.  Does the chart that you're looking at, 551,

04:15PM    19     summarize some of the exhibits in evidence and which counts

04:16PM    20     in the indictment they relate to?

04:16PM    21     A.  Yes.  It summarizes 66 of the exhibits which are some of

04:16PM    22     the exhibits in evidence, and the counts they relate to.

04:16PM    23     Q.  Now, have there been hundreds and hundreds of exhibits

04:16PM    24     that have been actually introduced into evidence at this

04:16PM    25     trial?

04:16PM   1   A.  Yes, there have been.

04:16PM   2   Q.  Is that thousands or tens of thousands of pages?

04:16PM   3   A.  Definitely.

04:16PM   4   Q.  Are the 11 charged counts in -- are there 11 charged

04:16PM   5   counts in the indictment in this trial?

04:16PM   6   A.  There is.

04:16PM   7   Q.  Okay.  Are the -- do the counts charged in the indictment

04:16PM   8   span a period of years, from 2005 until 2019?

04:16PM   9   A.  They do.

04:16PM   10   Q.  Okay.  And do those counts arise out of a series of

04:16PM   11   different incidents or occurrences over that 14-year period?

04:16PM   12   A.  They do.

04:16PM   13   Q.  Do the counts charged in the indictment relate to various

04:16PM   14   different investigations?

04:16PM   15   A.  They do.

04:16PM   16   Q.  Okay.  Have members of all those different various law

04:16PM   17   enforcement agencies come and testified at this trial?

04:16PM   18   A.  Yes, they have.

04:16PM   19   Q.  Does that include DEA agents?

04:16PM   20   A.  It does.

04:16PM   21   Q.  HSI agents?

04:16PM   22   A.  It does.

04:16PM   23   Q.  CBP officers?

04:17PM   24   A.  It does.

04:17PM   25   Q.  OIG agents?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
86

| 04:17PM | 1 | A. Yes, it does. |
| 04:17PM | 2 | Q. FBI agents like yourself? |
| 04:17PM | 3 | A. Certainly. |
| 04:17PM | 4 | Q. IRS agents? |
| 04:17PM | 5 | A. Yes. |
| 04:17PM | 6 | Q. U.S. Probation? |
| 04:17PM | 7 | A. Yes. |
| 04:17PM | 8 | Q. The U.S. Attorney's Office, like AUSAs and paralegals? |
| 04:17PM | 9 | A. That's accurate. |
| 04:17PM | 10 | Q. How about local police, like the Amherst Police? |
| 04:17PM | 11 | A. Yes. |
| 04:17PM | 12 | Q. And the Town of Tonawanda? |
| 04:17PM | 13 | A. Yes. |
| 04:17PM | 14 | Q. The Erie County Sheriff's Office? |
| 04:17PM | 15 | A. Yes. |
| 04:17PM | 16 | Q. And the New York State Police? |
| 04:17PM | 17 | A. Yes. |
| 04:17PM | 18 | Q. Okay. So lots of different agencies that have come up, |
| 04:17PM | 19 | right? |
| 04:17PM | 20 | A. That's correct. |
| 04:17PM | 21 | Q. How many different exhibits are listed on Exhibit 551? |
| 04:17PM | 22 | A. 66. |
| 04:17PM | 23 | Q. Okay. That's not every exhibit that was entered into |
| 04:17PM | 24 | evidence, right? |
| 04:17PM | 25 | A. No, there's quite a bit more. |

04:17PM  1  Q.  Okay.  Does 551 provide a table of contents, so to speak,

04:17PM  2  for the exhibits as they relate to different counts charged

04:17PM  3  in the indictment?

04:17PM  4  A.  It does.

04:17PM  5        MR. COOPER:  Judge, can I come over and speak to

04:17PM  6  co-counsel quickly?

04:18PM  7        THE COURT:  Of course.

04:18PM  8        MR. COOPER:  I'm sorry, opposing counsel.

04:18PM  9        Judge, I've spoken with opposing counsel, and with

04:18PM 10  that foundation now, I'm going to offer Exhibit 551 into

04:18PM 11  evidence.

04:18PM 12        MR. MacKAY:  No objection, Judge.

04:18PM 13        THE COURT:  It's received without objection.

04:18PM 14        MR. COOPER:  Thank you.

04:18PM 15        **(GOV Exhibit 551 was received in evidence.)**

04:18PM 16        MR. COOPER:  And we can publish this one on the

04:18PM 17  screen, but I'm going to get a version because the print is

04:18PM 18  very small.

04:18PM 19        **BY MR. COOPER:**

04:18PM 20  Q.  Special Agent Burns, can you see Government Exhibit 551?

04:18PM 21  A.  Yes.

04:18PM 22  Q.  All right.  If you need to stay standing, you can stay

04:18PM 23  standing.  Just keep your voice up, okay?

04:18PM 24  A.  It might be easier off --

04:18PM 25  Q.  Okay.  Easier off the teleprompter, you think?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24
88

| 04:19PM | 1 | A.  Yeah. |

04:19PM    1    A.  Yeah.

04:19PM    2    Q.  Got it.

04:19PM    3    A.  See how it goes.

04:19PM    4    Q.  That's fine, let's work off of that.

04:19PM    5    I want to get oriented to the chart first, and then we

04:19PM    6    can zoom in if we need to.

04:19PM    7    In the center is that same photo from Government Exhibit

04:19PM    8    109AB?

04:19PM    9    A.  Yes, from the Buick.

04:19PM    10    Q.  Okay.  Are there 12 lines going out from that photograph

04:19PM    11    to 12 different gray boxes?

04:19PM    12    A.  There is.

04:19PM    13    Q.  Okay.  And generally, what do those gray boxes signify?

04:19PM    14    A.  They're kind of -- we'll use a book analogy.  They're

04:19PM    15    kind of chapters in the trial or in the case, different

04:19PM    16    chapters.

04:19PM    17    Q.  Are they referenced to different incidents that have come

04:19PM    18    up during the course of the trial?

04:19PM    19    A.  Specific incidents, and then how they tied to the counts

04:19PM    20    in the indictment.  Overt acts.

04:19PM    21    Q.  Okay.  Do you see lines between the photograph of the

04:19PM    22    defendant and the gray boxes?

04:19PM    23    A.  Yes, I do.

04:19PM    24    Q.  Okay.  And are the various Count or Counts related to

04:19PM    25    each gray box listed in the line?

04:19PM    1    A.   Right, to each of those incidents.

04:19PM    2    Q.   Okay.  All the way along the outside of the chart are

04:19PM    3    there a number of different logos and logos?

04:20PM    4    A.   There is.

04:20PM    5    Q.   Are those names representative of law enforcement or

04:20PM    6    other government witnesses who testified at the trial?

04:20PM    7    A.   They are.

04:20PM    8    Q.   Okay.  Are there lines connecting each of those

04:20PM    9    individuals to the gray box, to one or more of the gray

04:20PM   10    boxes?

04:20PM   11    A.   Yes, there is.

04:20PM   12    Q.   Okay.  And primarily, what's listed on the lines between

04:20PM   13    the witnesses and the gray boxes?

04:20PM   14    A.   For the most part, it's some of the exhibits have been

04:20PM   15    admitted at trial with the exception, there's two informants

04:20PM   16    referenced on the left-hand side of the chart, and then on

04:20PM   17    the top there's one line that doesn't have an exhibit related

04:20PM   18    to it.

04:20PM   19    Q.   Okay.  Generally it's exhibits, and in two instances on

04:20PM   20    the left here it's -- it's informant names; is that correct?

04:20PM   21    A.   That's accurate.

04:20PM   22    Q.   And for Pete Lepiane, there's nothing, right?

04:20PM   23    A.   That's correct.

04:20PM   24    Q.   Okay.  Let's quickly try to work our way through this

04:20PM   25    chart.

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

04:20PM    1          MR. COOPER:  Ms. Champoux, if you can just zoom in

04:20PM    2    on the top third or just the center here for Lepiane to

04:21PM    3    Kasprzyk, like that, yeah.  Just down to the photograph of

04:21PM    4    the defendant, thank you.

04:21PM    5          BY MR. COOPER:

04:21PM    6    Q.  All right.  Can you see the grey box entitled Gerace '09

04:21PM    7    probation search?

04:21PM    8    A.  Yes, I can.

04:21PM    9    Q.  Okay.  Which Count or Counts of the indictment is that

04:21PM   10    incident related to?

04:21PM   11    A.  It relates to Count 2, and overt acts 19, 20, 21, 22, 36,

04:21PM   12    as well as Count 5.

04:21PM   13    Q.  Okay.  Is Count 2 charging the conspiracy to defraud the

04:21PM   14    United States involving the defendant and Peter Gerace?

04:21PM   15    A.  That is Count 2.

04:21PM   16    Q.  And is Count 2 charging the drug distribution conspiracy

04:21PM   17    involving the defendant and Peter Gerace?

04:21PM   18    A.  Yes, it does.

04:21PM   19          THE COURT:  I think you meant Count 5.

04:21PM   20          THE WITNESS:  Count 5.

04:21PM   21          MR. COOPER:  Oh, I apologize.

04:21PM   22          THE COURT:  You said Count 2 twice.

04:21PM   23          MR. COOPER:  I apologize, Judge.

04:21PM   24          THE COURT:  That's okay.

04:21PM   25          MR. COOPER:  Lack of sleep.

04:21PM    1    **BY MR. COOPER:**

04:21PM    2    Q.  Count 5, is that the drug distribution between the

04:21PM    3    defendant and Peter Gerace?

04:21PM    4    A.  That is.  I didn't catch it either, it is Count 5.

04:21PM    5    Sorry.

04:21PM    6    Q.  Okay.  What law enforcement witnesses are listed on the

04:22PM    7    chart related to the Gerace '09 probation search?

04:22PM    8    A.  New York -- or, Western District of New York Probation

04:22PM    9    Officer Peter Lepiane, FBI Special Agent Thomas Herbst, and

04:22PM   10    DEA Supervisor Dale Kasprzyk.

04:22PM   11    Q.  Did each of those people testify at the trial?

04:22PM   12    A.  They did.

04:22PM   13    Q.  Okay.  And which exhibits are listed there between the

04:22PM   14    gray box entitled Gerace '09 probation search and Special

04:22PM   15    Agent Herbst?

04:22PM   16    A.  Exhibit 30A, which is a DEA-6, dated 11/6/2009.  It's a

04:22PM   17    report related to the information offered by Gerace.

04:22PM   18    Q.  Is that the same exhibit listed with respect to

04:22PM   19    G.S. Kasprzyk?

04:22PM   20    A.  It is.

04:22PM   21    Q.  Okay.  We're going to move on, and I'm gonna try to work

04:22PM   22    my way around to the right.

04:22PM   23         **MR. COOPER:**  So, Ms. Champoux, if you can zoom in

04:22PM   24    now, and get me this gray box all the way through to Anthony

04:22PM   25    Casullo?  Maybe just the top right corner of the document,

| | | |
|---|---|---|
| 04:22PM | 1 | starting from -- no, we've got to start from further to the |
| 04:22PM | 2 | left, ma'am. |
| 04:22PM | 3 | Yeah, there you go.  And then down.  There you go. |
| 04:22PM | 4 | That's perfect, thank you. |
| 04:22PM | 5 | **BY MR. COOPER:** |
| 04:22PM | 6 | Q.  Can you see the next gray box to the right here, Special |
| 04:23PM | 7 | Agent Casullo investigation of Gerace? |
| 04:23PM | 8 | A.  Yes, I do. |
| 04:23PM | 9 | Q.  Okay.  What counts are between that gray box and the |
| 04:23PM | 10 | defendant's photo? |
| 04:23PM | 11 | A.  That's Count 2, overt acts 25 and 33.  Count 5 and |
| 04:23PM | 12 | Count 11. |
| 04:23PM | 13 | Q.  All right.  We already covered Count 2 and 5.  Let's talk |
| 04:23PM | 14 | about Count 11. |
| 04:23PM | 15 | Is that the count charging false statements made to OIG |
| 04:23PM | 16 | on March 29th, 2019? |
| 04:23PM | 17 | A.  Yes, it is. |
| 04:23PM | 18 | Q.  Okay.  What law enforcement witness is listed on the |
| 04:23PM | 19 | chart related to that gray box? |
| 04:23PM | 20 | A.  DEA Special Agent Anthony Casullo. |
| 04:23PM | 21 | Q.  Okay.  And which exhibits are listed between the gray box |
| 04:23PM | 22 | entitled Casullo investigation of Gerace and the witness |
| 04:23PM | 23 | bubble for Special Agent Casullo? |
| 04:23PM | 24 | A.  Do them together.  DARTS deconfliction notices, |
| 04:23PM | 25 | Exhibit 26B, 26C, 26D, 26E. |

04:23PM  1    Additionally, there's Exhibit 99, which is the

04:23PM  2  January 28th, 2019, memo drafted by the defendant.  And

04:23PM  3  again, that same exhibit that I just mentioned, the 30A from

04:23PM  4  November 6th, 2009.

04:24PM  5  Q.  Okay.

04:24PM  6         MR. COOPER:  We can stay right in that zoom, you

04:24PM  7  don't have to get out of it, Ms. Champoux.

04:24PM  8         BY MR. COOPER:

04:24PM  9  Q.  What's the next grey box down?

04:24PM  10  A.  That's Gerace memos authored by defendant and submitted

04:24PM  11  to DEA, and defendant's subsequent statements to HSI Special

04:24PM  12  Agent Curtis Ryan.

04:24PM  13  Q.  Okay.  And what Counts does that relate to on the line

04:24PM  14  between that gray box and the defendant?

04:24PM  15  A.  Count 2, overt acts 23, 27, 29, 30, 31, as well as

04:24PM  16  Count 8, 9, and 10.

04:24PM  17  Q.  Okay.  We covered Count 2.

04:24PM  18    Is Count 8 charging obstruction of justice related to a

04:24PM  19  November 1, 2018, DEA memo?

04:24PM  20  A.  Yes.

04:24PM  21  Q.  Is Count 9 charging obstruction of justice related to a

04:24PM  22  December 10, 2018, DEA memo?

04:24PM  23  A.  Yes, it is.

04:24PM  24  Q.  Is Count 10 a charge of obstruction of justice related to

04:24PM  25  a January 28th, 2019, DEA memo?

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

04:24PM    1    A.   Yes.

04:24PM    2    Q.   What law enforcement witness is listed on this chart

04:24PM    3    related to that gray box?

04:24PM    4    A.   Curtis Ryan, special agent, HSI.

04:24PM    5    Q.   Okay.  And I'm not going to have you read the whole list,

04:25PM    6    but are there a list of exhibits in between that gray box and

04:25PM    7    Curtis Ryan?

04:25PM    8    A.   Yes, there is.

04:25PM    9    Q.   Okay.

04:25PM   10         MR. COOPER:  Ms. Champoux, if you can get out of

04:25PM   11    this zoom here.  And go to the -- capture this portion of the

04:25PM   12    chart in the zoom, please?

04:25PM   13         THE WITNESS:  That will work.

04:25PM   14         Sorry, I said that will work, I didn't mean to speak

04:25PM   15    out loud.  Sorry.

04:25PM   16         BY MR. COOPER:

04:25PM   17    Q.   Okay.  What's the next gray box down after the one we

04:25PM   18    just reviewed?

04:25PM   19    A.   Defendant statements to OIG.

04:25PM   20    Q.   Okay.  Special Agent Burns, which Count or Counts are

04:25PM   21    listed on the chart next to that gray box?

04:25PM   22    A.   That's Count 11.

04:25PM   23    Q.   All right.  And we -- Count 11, is that a count charging

04:25PM   24    false statements made to OIG on March 29th, 2019?

04:26PM   25    A.   It is.

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

04:26PM    1    Q.  What law enforcement witness is listed on the chart

04:26PM    2    related to this gray box?

04:26PM    3    A.  David Carpenter.

04:26PM    4    Q.  Okay.  And does it list some of the exhibits, a summary

04:26PM    5    of the exhibits that relate to that incident -- next to Dave

04:26PM    6    Carpenter's name?

04:26PM    7    A.  Yes, it does.

04:26PM    8    Q.  Okay.  What's the next gray box down?

04:26PM    9    A.  That's the DEA Gambino investigation, 2008.

04:26PM   10    Q.  Okay.  And is that on the chart, does that have Count 2

04:26PM   11    listed next to that prong?

04:26PM   12    A.  Yes, it does.

04:26PM   13    Q.  And who's the law enforcement witness listed to the right

04:26PM   14    there?

04:26PM   15    A.  Christopher Wisniewski.

04:26PM   16    Q.  Okay.  Is he a DEA special agent that came and testified

04:26PM   17    in -- two months ago at the --

04:26PM   18    A.  Yeah, very early in the trial, Special Agent Chris

04:26PM   19    Wisniewski testified.

04:26PM   20    Q.  And the next one down, the next gray box, what do we have

04:26PM   21    listed there?

04:26PM   22    A.  That's Agent Mozg's investigation of Bella.

04:26PM   23    Q.  Okay.  And what Count or Counts are linked to that on

04:26PM   24    Government Exhibit 551?

04:26PM   25    A.  Count 1, overt act 52.

04:27PM  1   Q.  Okay.  And does it list a number of exhibits related to

04:27PM  2   that gray box?

04:27PM  3   A.  It does.

04:27PM  4   Q.  Okay.

04:27PM  5         MR. COOPER:  And, Ms. Champoux, if we can zoom out

04:27PM  6   now?  And now we're going to move on to the top left corner,

04:27PM  7   and if you can zoom in to catch this portion for me.  A little

04:27PM  8   more to the right.

04:27PM  9         That's perfect, ma'am, thank you.

04:27PM  10        BY MR. COOPER:

04:27PM  11  Q.  All right.  Can you see -- oops.  Starting now from the

04:27PM  12  top and working left, do you see a gray box entitled

04:27PM  13  Operation Past Due?

04:27PM  14  A.  Yes, I do.

04:27PM  15  Q.  Okay.  And is that linked to a Count 1 on this chart?

04:27PM  16  A.  Yeah, overt act 55.

04:27PM  17  Q.  Okay.  And who's the law enforcement witness coming off

04:27PM  18  of that gray box?

04:27PM  19  A.  DEA Task Force Officer Christopher Clark.

04:27PM  20  Q.  Okay.  And are there some exhibits listed with respect to

04:27PM  21  Chris Clark and the gray box Operation Past Due?

04:27PM  22  A.  Yeah, the Tripi OCDETF proposal, and the defendant's

04:27PM  23  phone records.

04:27PM  24  Q.  Tripi?

04:27PM  25  A.  Tripi OCDETF proposal and -- and the defendant's phone

04:27PM    1    records.

04:27PM    2    Q.  Okay.  And the next one down, the next gray box, is that

04:28PM    3    entitled CBP investigation into cross-border drug activity?

04:28PM    4    A.  Yes, it is.

04:28PM    5    Q.  Is that also linked to Count 1 on this chart?

04:28PM    6    A.  Overt act 23, yes.

04:28PM    7    Q.  Okay.  And if you see the law enforcement witness, who's

04:28PM    8    listed there for that gray box?

04:28PM    9    A.  The law enforcement witness is Custom and Border Patrol

04:28PM   10    Officer Larry Jay.

04:28PM   11    Q.  Okay.  And we talked, excuse me, we talked about this

04:28PM   12    right at the beginning when we were laying some foundation.

04:28PM   13    Are there any exhibits listed for that line between Larry Jay

04:28PM   14    and the gray box?

04:28PM   15    A.  Not for that one, just the informant's name.

04:28PM   16    Q.  Okay.  So that's the name, J.D.?

04:28PM   17    A.  Yeah, that's correct.

04:28PM   18    Q.  Was J.D. a witness who testified at this trial as well?

04:28PM   19    A.  Yes, he was.

04:28PM   20    Q.  Okay.  And we're going to move down to the next gray box.

04:28PM   21    What do you have there?

04:28PM   22    A.  Town of Ton -- TTPD, referring to Town of Tonawanda

04:28PM   23    Police Department, referral of C.S. to DEA.

04:28PM   24    Q.  Okay.  And we've seen Count 1 a number of times.  Just to

04:28PM   25    be clear, is Count 1 the count charging conspiracy to defraud

04:29PM  1    the United States involving the defendant, Mike Masecchia,

04:29PM  2    and others?

04:29PM  3    A.  Yes, it is.

04:29PM  4    Q.  Okay.

04:29PM  5    A.  Count 3 and 4 on that one, as well.

04:29PM  6    Q.  Yep.  Who's the law enforcement that's listed with

04:29PM  7    respect to the TTPD referral of C.S. to DEA?

04:29PM  8    A.  It was Detective Thomas Oswald from the Town of Tonawanda

04:29PM  9    Police Department.

04:29PM  10   Q.  Okay.  And what's listed between that gray box and the

04:29PM  11   witness bubble for Intelligence Agent Tom Oswald, or

04:29PM  12   Detective Tom Oswald?

04:29PM  13   A.  C.C.

04:29PM  14   Q.  Okay.  Is that another name of an informant?

04:29PM  15   A.  It was.

04:29PM  16   Q.  Okay.  What's the next gray box down after that?

04:29PM  17   A.  TFO -- so, Task Force Officer Higgins investigation into

04:29PM  18   Masecchia's Southern Tier grow.

04:29PM  19   Q.  Okay.  And what Count or Counts is that linked to on the

04:29PM  20   Government Exhibit 551?

04:29PM  21   A.  In Count 1, manners and means, 4 and 5, Count 3 and

04:30PM  22   Count 4.

04:30PM  23   Q.  Okay.  Who's the law enforcement witness that's listed

04:30PM  24   for that gray box?

04:30PM  25   A.  It's -- what is his title, he's with -- he's a DEA task

04:30PM    1    force officer, I just don't recall his -- it was detective,

04:30PM    2    but I don't know what his highest rank is.

04:30PM    3    Q.  Okay.  We'll call him Cory Higgins, how about that?

04:30PM    4    A.  That works.

04:30PM    5    Q.  Okay.  And are there some exhibits listed with respect to

04:30PM    6    the line between Cory Higgins--

04:30PM    7    A.  Yes.

04:30PM    8    Q.  -- and the gray box for his investigation?

04:30PM    9    A.  There is.

04:30PM   10    Q.  Okay.  And just to focus here for a second, do some of

04:30PM   11    those, is one of those Exhibits 8A?

04:30PM   12    A.  It is.

04:30PM   13    Q.  Is that, like, really long a number of pages, that

04:30PM   14    document?

04:30PM   15    A.  8A I believe is, without looking at it exactly, is over

04:30PM   16    400 pages, but I'd have to see it.  It's hundreds of pages.

04:30PM   17    Q.  Okay.  And was part of the summary that you created here

04:30PM   18    to make reference to specific page numbers inside of

04:30PM   19    Government Exhibit 8A?

04:30PM   20    A.  Right.  So in 8A, it's going through it, if you pull up

04:30PM   21    those page numbers 134, 135, 155, they're contained in 8A.

04:31PM   22    Q.  Got it.  Let's move on to the next gray box down.  What's

04:31PM   23    that gray box entitled?

04:31PM   24    A.  The Wayne Anderson arrest.

04:31PM   25    Q.  Okay.  And what Count or Counts are on the line between

04:31PM  1    the defendant's photo and that gray box?

04:31PM  2    A.  Count 1, overt acts 24, 25, 50, Count 3, Count 4,

04:31PM  3    Count 6, and Count 7.

04:31PM  4    Q.  Okay.  And who's the law enforcement witness that's

04:31PM  5    listed with respect to that gray box?

04:31PM  6    A.  New York State Police Investigator Mike O'Rourke.

04:31PM  7    Q.  Okay.  And are there some exhibits listed with respect to

04:31PM  8    that Wayne Anderson arrest gray box?

04:31PM  9    A.  Yes, there is.

04:31PM  10   Q.  Okay.

04:31PM  11           MR. COOPER:  And, Ms. Champoux, if you can zoom out

04:31PM  12   of that, please?

04:31PM  13           BY MR. COOPER:

04:31PM  14   Q.  Now, we're going to work our way to the bottom of the

04:31PM  15   chart, but first --

04:31PM  16           MR. COOPER:  Let's zoom in on this first here.  In

04:31PM  17   the center, thank you.

04:31PM  18           BY MR. COOPER:

04:31PM  19   Q.  That gray box at the bottom is called Serio

04:31PM  20   investigation; is that right?

04:31PM  21   A.  That is correct.

04:31PM  22   Q.  And does this list all the counts related to that gray

04:32PM  23   box on Government Exhibit 551?

04:32PM  24   A.  Those all relate to the Serio investigation box.

04:32PM  25   Q.  Okay.

04:32PM  1        **MR. COOPER:**  Ms. Champoux, you can zoom out of that.

04:32PM  2   And let's just zoom in maybe on half of it for the left first,

04:32PM  3   yep.  That's perfect, thank you, ma'am.

04:32PM  4        **BY MR. COOPER:**

04:32PM  5   Q.  Let's work our way quickly from left to right here, on

04:32PM  6   the far left of this Serio investigation gray box, who are

04:32PM  7   the two law enforcement officers listed?

04:32PM  8   A.  It's Lieutenant JoAnn DiNoto, as well as Detective Robert

04:32PM  9   Cottrell.  JoAnn DiNoto was with the Amherst Police

04:32PM  10  Department, and Bob Cottrell was a task force officer with

04:32PM  11  the DEA Safe Streets Task Force, or FBI Safe Streets Task

04:32PM  12  Force.

04:32PM  13  Q.  Okay.  And does it list a number of exhibits between the

04:32PM  14  gray box entitled Serio investigation and JoAnn DiNoto and

04:32PM  15  Bob Cottrell?

04:32PM  16  A.  It does.

04:32PM  17  Q.  Okay.  And let's move on now to the next line over, who's

04:32PM  18  the next law enforcement officer listed?

04:33PM  19  A.  Now inspector, DEA Inspector Shane Nastoff.

04:33PM  20  Q.  Okay.  And are there a number of exhibits listed with

04:33PM  21  respect to the line between the gray box of Serio

04:33PM  22  investigation and witness Shane Nastoff?

04:33PM  23  A.  Yeah, exhibits DEA documents.

04:33PM  24  Q.  Okay.  And are those generally exhibits that Shane

04:33PM  25  Nastoff testified about when he was here?

| | | |
|---|---|---|
| 04:33PM | 1 | A.  Yes, he did. |
| 04:33PM | 2 | Q.  Okay.  And let's look at the next line down, who's that? |
| 04:33PM | 3 | A.  That's special agent -- well, now, Supervisor DEA Mark |
| 04:33PM | 4 | Gentile. |
| 04:33PM | 5 | Q.  Okay.  He was just here earlier today, right? |
| 04:33PM | 6 | A.  Yeah.  Just yeah, this morning and afternoon. |
| 04:33PM | 7 | Q.  Okay.  And is that source deactivation form for R.K. |
| 04:33PM | 8 | listed as an exhibit between Mark Gentile and the box |
| 04:33PM | 9 | entitled Serio investigation? |
| 04:33PM | 10 | A.  Yeah, it's Exhibit 9E-3 we spoke extensively about. |
| 04:33PM | 11 | Q.  Okay.  Let's look at the next one.  Who's the next law |
| 04:33PM | 12 | enforcement witness listed? |
| 04:33PM | 13 | A.  The next one is Special Agent David Leary with the DEA. |
| 04:33PM | 14 | Q.  Okay.  And are there a number of exhibits listed here |
| 04:33PM | 15 | with respect to the Serio investigation and Dave Leary in |
| 04:34PM | 16 | between them? |
| 04:34PM | 17 | A.  There's a number of them, I believe the Exhibit 525 has |
| 04:34PM | 18 | not been put into evidence yet, though. |
| 04:34PM | 19 | Q.  Got it. |
| 04:34PM | 20 | **MR. COOPER:**  Ms. Champoux, can we pull up for a |
| 04:34PM | 21 | moment Government Exhibit 525 for the witness only? |
| 04:34PM | 22 | **BY MR. COOPER:** |
| 04:34PM | 23 | Q.  Do you recognize this, sir? |
| 04:34PM | 24 | A.  I certainly do. |
| 04:34PM | 25 | Q.  What do you recognize it to be? |

04:34PM     1    A.   It's a Google Maps or Earth, and it basically documents

04:34PM     2    the difference between the Electric Tower and 82 Sycamore,

04:34PM     3    the Electric Tower being the DEA office at -- in the time of

04:34PM     4    DEA-6 and then the 82 Sycamore warehouse of Serio.

04:34PM     5    Q.   Okay.  And so earlier I asked you if you could see the

04:34PM     6    Electric Tower from 82 Sycamore because I was trying to save

04:34PM     7    some time.  But does Government Exhibit 525 fairly and

04:34PM     8    accurately depict a Google Maps map of the distance between

04:34PM     9    those two locations?

04:34PM    10    A.   Yes, it does.

04:34PM    11    Q.   Okay.

04:34PM    12         MR. COOPER:  With that foundation, I'd offer 525

04:34PM    13    into evidence.

04:35PM    14         MR. MacKAY:  No objection.

04:35PM    15         THE COURT:  Received without objection.

04:35PM    16         (GOV Exhibit 525 was received in evidence.)

04:35PM    17         MR. COOPER:  Okay.  Can we publish that briefly,

04:35PM    18    Ms. Champoux.

04:35PM    19         BY MR. COOPER:

04:35PM    20    Q.   Okay.  Is that about how far the two locations are from

04:35PM    21    one another?

04:35PM    22    A.   Yeah, as I testified, just a couple blocks.

04:35PM    23    Q.   Okay.

04:35PM    24         MR. COOPER:  Ms. Champoux, can we take that down

04:35PM    25    please, and pull up 551 again?  And we'll work our way again

USA v Bongiovanni - Burns - Cooper/Direct - 9/26/24

04:35PM   1   from the left, yep.  Thank you.

04:35PM   2           BY MR. COOPER:

04:35PM   3   Q.  All right.  So 525, are we in evidence now?

04:35PM   4   A.  Just check.  Yes.  Those are all those exhibits are in

04:35PM   5   evidence.

04:35PM   6   Q.  All right.  Thank you, sir.  And the next name that we

04:35PM   7   can see here, who's that?

04:35PM   8   A.  Annette Skinner.

04:35PM   9   Q.  Okay.  And what do we have listed on the exhibits between

04:35PM  10   Serio investigation and Annette Skinner?

04:35PM  11   A.  Annette Skinner was a -- U.S. Attorney's Office

04:35PM  12   paralegal, and there are exhibits related to her.

04:35PM  13   Q.  Okay.

04:35PM  14           MR. COOPER:  And you can zoom out of that,

04:35PM  15   Ms. Champoux.

04:35PM  16           And let's go now, you know, all of the way to the

04:35PM  17   right.  Perfect, ma'am.  Thank you.

04:35PM  18           BY MR. COOPER:

04:35PM  19   Q.  All right.  Working again from left to right.  The next

04:35PM  20   two law enforcement witnesses listed Scott Deming and Charlie

04:36PM  21   Tolias?

04:36PM  22   A.  Yeah, Scott Deming is a financial investigator for the

04:36PM  23   U.S. Attorney's Office, and Charlie Tolias is a special agent

04:36PM  24   with HSI.

04:36PM  25   Q.  Okay.  And then are there a number of exhibits listed

04:36PM  1   between the gray box entitled Serio investigation and the

04:36PM  2   bubble for Scott Deming?

04:36PM  3   A.   Yes.   Significant number of emails and other exhibits.

04:36PM  4   Q.   Okay.   And then between Scott Deming and Charlie Tolias,

04:36PM  5   are there a couple more exhibits listed?

04:36PM  6   A.   There's two exhibits listed on there.

04:36PM  7   Q.   Got it.   Next to them, who do we have?

04:36PM  8   A.   Captain Kevin Caffery from the Erie County Sheriff's

04:36PM  9   Office.

04:36PM  10  Q.   Okay.   Are there a number of exhibits listed between the

04:36PM  11  gray box and Captain Kevin Caffery?

04:36PM  12  A.   Yes.   The 8G, and as well as 407, 407A and B.

04:36PM  13  Q.   Okay.   Were you present when Captain Kevin Caffery

04:36PM  14  testified?

04:36PM  15  A.   I was.

04:36PM  16  Q.   Did all those exhibits come up while he was testifying?

04:36PM  17  A.   They did.

04:36PM  18  Q.   Okay.

04:36PM  19          **MR. COOPER:**   Let's move to the right.

04:36PM  20          We're almost there, move to the right one more.

04:36PM  21          **BY MR. COOPER:**

04:36PM  22  Q.   What do we have?

04:36PM  23  A.   That is Assistant United States Attorney Timothy Lynch

04:36PM  24  from the U.S. Attorney's Office.

04:36PM  25  Q.   Okay.   Is he a witness who testified at this trial?

04:36PM   1   A.  He did.

04:37PM   2   Q.  Are there a number of exhibits listed between the gray

04:37PM   3   box entitled Serio investigation and the box for Tim Lynch?

04:37PM   4   A.  Yep, there's four exhibits referenced between those.

04:37PM   5   Q.  Okay.  And finally, now, all the way on the right at the

04:37PM   6   bottom, who's that?

04:37PM   7   A.  That's IRS Special Agent David Turri from the criminal

04:37PM   8   division.

04:37PM   9   Q.  And can you read the exhibit that's listed between Serio

04:37PM   10  investigation and the box for IRS Special Agent Dave Turri?

04:37PM   11  A.  That's Exhibit 22S, the date is July 11th, 2013, it's an

04:37PM   12  email from Turri to the defendant and a portion of the email

04:37PM   13  is from the email, drawn from the email is the quote, Mike

04:37PM   14  Masecchia is an associate and possibly a made member of the

04:37PM   15  Buffalo LCN family, end quote.

04:37PM   16  Q.  Okay.

04:37PM   17       **MR. COOPER:**  You can zoom out of that, please,

04:37PM   18  Ms. Champoux.

04:37PM   19       Judge, I have good news.  We're definitely going to

04:38PM   20  finish the direct today.

04:38PM   21       Can you give me one second to review my notes here?

04:38PM   22       **BY MR. COOPER:**

04:38PM   23  Q.  Just a couple of nits to gather up before I sit down,

04:38PM   24  Special Agent Burns.

04:38PM   25  A.  No problem.

04:38PM    1    Q.  Have you heard the name Mike Sinatra come up during the

04:38PM    2    course of this trial?

04:38PM    3    A.  Yes, I have.

04:38PM    4    Q.  Are you aware of any relation that that person has to

04:38PM    5    Hot Dog?

04:38PM    6    A.  Mike Sinatra?

04:38PM    7    Q.  Mike Sinatra.

04:38PM    8    A.  Yeah, the relationship -- so, Paul Francoforte, Hot Dog,

04:38PM    9    his long-time partner, romantic, I guess, common-law wife,

04:38PM   10    something like that, they're not married, but they've been

04:38PM   11    together for a long time.  Her daughter married Michael

04:38PM   12    Sinatra a few years back.

04:39PM   13    Q.  So is there some familial or semi-familial connection

04:39PM   14    between Michael Sinatra and Hot Dog?

04:39PM   15    A.  Yes, there is.

04:39PM   16    Q.  Okay.  When we were talking about 552 earlier, the chart

04:39PM   17    with all the lines on it, remember that?

04:39PM   18    A.  Yeah, the connections.

04:39PM   19    Q.  Okay.

04:39PM   20         MR. COOPER:  Ms. Champoux, can you pull up 552 for

04:39PM   21    one second?

04:39PM   22         BY MR. COOPER:

04:39PM   23    Q.  When we were laying foundation, you indicated that there

04:39PM   24    was one that you realized this week was missing from the

04:39PM   25    chart; is that correct?

04:39PM    1    A.   That's one I would have wanted to have on there.

04:39PM    2    Q.   Okay.  What's the connection that you wish you would have

04:39PM    3    caught before earlier this week?

04:39PM    4    A.   It's Paul Francoforte, Hot Dog, and Frank Bifulco a/k/a

04:40PM    5    Butchie Bifocals, there's a connection between those two.

04:40PM    6    Q.   All right.  Let's draw the line just to satisfy you

04:40PM    7    there.  You see that line there?

04:40PM    8    A.   That makes me feel better, Mr. Cooper.

04:40PM    9    Q.   Okay.  And does Government Exhibit 26D, a DARTS

04:40PM    10   deconfliction entry that shows Paul Francoforte's number

04:40PM    11   showing up in Butch Bifocal's phone records?

04:40PM    12   A.   Right, yeah.  The deconfliction notification indicated

04:40PM    13   that those two were in telephonic communication.

04:40PM    14   Q.   Okay.

04:40PM    15   A.   Based on the toll records.

04:40PM    16   Q.   And did you -- I asked you this before, but did you keep

04:40PM    17   an index with respect to -- is that an example of what was

04:40PM    18   kept in your index, that built this chart out?

04:40PM    19   A.   Yeah.  Exhibits and testimony would just go along as

04:40PM    20   somebody testified to it.  And then additionally, if there

04:40PM    21   was an exhibit that tied people together, a contact, phone

04:40PM    22   contact, someone would be in somebody's phone contact would

04:40PM    23   be an example.  So we built it or built it out of the

04:40PM    24   evidence that was admitted at this trial throughout the --

04:40PM    25   since August 5th.

04:40PM  1    Q.  Okay.

04:40PM  2         **MR. COOPER:**  Ms. Champoux, can you take that down,

04:40PM  3    please?

04:41PM  4         Can I just have one second?

04:41PM  5         No further direct, Judge.  Thank you.

04:41PM  6         **THE COURT:**  Mr. MacKay.

04:41PM  7

04:41PM  8              **CROSS-EXAMINATION BY MR. MacKAY:**

04:41PM  9    Q.  Okay.  Good afternoon Special Agent Burns, how are you?

04:41PM  10   A.  Tired.

04:41PM  11   Q.  You and me both.

04:41PM  12   A.  You look tired, Mr. MacKay.

04:41PM  13   Q.  You and I have come to know each other fairly well over a

04:41PM  14   number of months; fair to say?

04:41PM  15   A.  Definitely fair to say.

04:41PM  16   Q.  And that's because you occupy a unique position that no

04:41PM  17   other witness in this trial occupies; is that fair to say?

04:41PM  18   A.  I mean, I think Marilyn Halliday -- Special Agent

04:41PM  19   Halliday --

04:41PM  20   Q.  Well, the two of you occupy the position I'm talking

04:41PM  21   about, right?

04:41PM  22   A.  Correct.

04:41PM  23   Q.  You are what are called summary witnesses, in a fashion

04:41PM  24   that sit here, you get to see all the evidence, you get to

04:41PM  25   testify in the trial, correct?

04:42PM    1    A.  That's correct.

04:42PM    2    Q.  All of other witnesses go through a process called

04:42PM    3    sequestration where they're not allowed to hear any of the

04:42PM    4    other testimony, they come in and give their testimony,

04:42PM    5    correct?

04:42PM    6    A.  That's accurate.

04:42PM    7    Q.  Okay.  So, that's sort of what led you to be here in the

04:42PM    8    seat today?

04:42PM    9    A.  That's accurate.

04:42PM   10    Q.  Okay.  But you're not just here to summarize everything,

04:42PM   11    correct?

04:42PM   12    A.  Ummm --

04:42PM   13    Q.  Well, let me reword that.

04:42PM   14        You also had some actual fact investigation in this case,

04:42PM   15    correct?

04:42PM   16    A.  Oh, yeah.  Quite a bit.  Search warrants and --

04:42PM   17    Q.  Let's start with some of that first.

04:42PM   18    A.  Okay.

04:42PM   19    Q.  We'll go way back --

04:42PM   20    A.  Okay.

04:42PM   21    Q.  -- to 2009, 2010, that's about the time you come back to

04:42PM   22    Buffalo, correct?

04:42PM   23    A.  January 2008, but I was going back and forth, had some

04:42PM   24    trials in Memphis.

04:42PM   25    Q.  Right.  So about that time, though, you land in the FBI's

04:42PM  1  office here in Buffalo, and eventually you get involved in an

04:42PM  2  investigation surrounding Gables, correct?

04:42PM  3  A.  That's correct.

04:42PM  4  Q.  And that centers on a few different people, one of them

04:42PM  5  Steve Brucato, correct?

04:42PM  6  A.  Correct.

04:42PM  7  Q.  And there's Anthony Anastasia, correct?

04:42PM  8  A.  Correct.

04:42PM  9  Q.  And the other one is Joe Mesi, correct?

04:43PM  10  A.  That's correct.

04:43PM  11  Q.  And apart from that, too, is there's suspicion that

04:43PM  12  there's several law enforcement officials that might be

04:43PM  13  frequenting the bar, number 1, involved in drug use, correct?

04:43PM  14  A.  That's accurate.

04:43PM  15  Q.  Number 2, passing information, correct?

04:43PM  16  A.  That's correct.

04:43PM  17  Q.  And to be clear, Joe Bongiovanni's name never came up in

04:43PM  18  that investigation, correct?

04:43PM  19  A.  No, not in that investigation.

04:43PM  20  Q.  Now, what happens is, ultimately FBI makes an arrest of

04:43PM  21  the three individuals that I talked about, correct?

04:43PM  22  A.  That's correct.

04:43PM  23  Q.  They swoop in on two of them, and they find a third one

04:43PM  24  doing cocaine at one of the houses, correct?

04:43PM  25  A.  There's -- they were arrested at separate times.  But the

| | | |
|---|---|---|
| 04:43PM | 1 | one individual starts cooperating, and then the third |
| 04:43PM | 2 | individual, Mr. Mesi, is doing cocaine at Mr. Brucato's |
| 04:43PM | 3 | house. |
| 04:43PM | 4 | Q.  Okay.  And so just so the jury understands, we use the |
| 04:43PM | 5 | term "arrest."  FBI swoops in, and they arrest them in the |
| 04:43PM | 6 | sense they put them in handcuffs and detain them, correct? |
| 04:43PM | 7 | A.  Yeah.  "Detain" is probably a better -- arrest/detain. |
| 04:44PM | 8 | Q.  Yeah.  They're detained.  But they're not arrested in the |
| 04:44PM | 9 | sense that they go down to jail that night and charges are |
| 04:44PM | 10 | filed, correct? |
| 04:44PM | 11 | A.  Right.  It would be detained.  Right.  An arrest -- it |
| 04:44PM | 12 | depends what you want to talk about, but you're right, an |
| 04:44PM | 13 | arrest would involve subsequent to the arrest processing at |
| 04:44PM | 14 | the U.S. Marshal's or the Erie County -- |
| 04:44PM | 15 | Q.  Right.  So long story short, these three individuals all |
| 04:44PM | 16 | leave the scene that day, correct? |
| 04:44PM | 17 | A.  Right.  And, again, they weren't all the same day. |
| 04:44PM | 18 | Q.  Scene of the arrest, I'll say. |
| 04:44PM | 19 | A.  Yeah, that's -- that's more accurate. |
| 04:44PM | 20 | Q.  They're back into the community after this law |
| 04:44PM | 21 | enforcement action? |
| 04:44PM | 22 | A.  That's correct. |
| 04:44PM | 23 | Q.  Joe Mesi becomes an FBI cooperator, correct? |
| 04:44PM | 24 | A.  He does. |
| 04:44PM | 25 | Q.  Anthony Anastasia becomes a cooperator, but kind of only |

04:44PM    1    for a little while, correct?

04:44PM    2    A.   Yeah, he didn't -- he fell off the program.

04:44PM    3    Q.   Okay.  Now the sort of catch-and-release scenario, that's

04:44PM    4    relatively common in federal law enforcement investigations?

04:44PM    5    A.   It can be.  It's situational depending on the target and

04:44PM    6    are they under indictment.  There's a lot of factors, but

04:44PM    7    that does happen --

04:44PM    8    Q.   Right.

04:45PM    9    A.   -- from time to time when you're --

04:45PM   10    Q.   It's not uncommon to release people who are arrested back

04:45PM   11    into the community, and then potentially follow up later with

04:45PM   12    charges, correct?

04:45PM   13    A.   Follow up later with charges, and make them a cooperator,

04:45PM   14    yeah, that's very common.

04:45PM   15    Q.   Or perhaps never charge them, correct?

04:45PM   16    A.   Yeah, that happens.  Certainly.

04:45PM   17    Q.   Okay.  And when you're doing these sort of arrests, you

04:45PM   18    know, this is not like a knock on the door and, hi, how are

04:45PM   19    you doing; fair to say?

04:45PM   20    A.   These particular ones?  That wasn't -- I was only present

04:45PM   21    for the Mesi one --

04:45PM   22    Q.   Okay.

04:45PM   23    A.   -- so I can't say exactly how the other ones went down.

04:45PM   24    Q.   Fair to say, though, the usual course of business is, you

04:45PM   25    know, a number of law enforcement officials descend on a

04:45PM    1    house, correct?

04:45PM    2    A.   Yeah, it can be.

04:45PM    3    Q.   And in your experience, executing both search warrants

04:45PM    4    and arrest warrants in these sort of scenarios, neighbors

04:45PM    5    often take an interest in what's going on, correct?

04:45PM    6    A.   Yeah, correct.

04:45PM    7    Q.   You often have to keep them away from a scene, correct?

04:45PM    8    A.   Sometimes.

04:45PM    9    Q.   Obviously, the neighbors know, you know, who their

04:45PM   10    neighbors are at the house, correct?

04:45PM   11    A.   That's correct.

04:45PM   12    Q.   And specifically, with Anthony Anastasia and Brucato,

04:46PM   13    they're known to work at the neighborhood bar in North

04:46PM   14    Buffalo, Gables, correct?

04:46PM   15    A.   Yeah, they both were long-time bartenders, managers at

04:46PM   16    Gables.

04:46PM   17    Q.   Yeah.  And Gables, fair to say, is a neighborhood bar in

04:46PM   18    the North Buffalo area?

04:46PM   19    A.   Yeah, it was, yes.

04:46PM   20    Q.   Yeah, at one point it was.  And, so, after the arrest,

04:46PM   21    both of these individuals go back to the bartending business

04:46PM   22    at Gables, correct?

04:46PM   23    A.   Yes.  Yeah.  Brucato, definitely.  Anastasia, I'm not as

04:46PM   24    familiar, but yeah, he did.

04:46PM   25    Q.   Okay.  Now at that same point in time, you knew Mike

04:46PM   1   Masecchia to be a general resident of the North Buffalo area,

04:46PM   2   correct?

04:46PM   3   A.   Yeah, he was definitely a North Buffalo guy.

04:46PM   4   Q.   Yeah, I mean, he -- at the time he maintained a residence

04:46PM   5   on Colvin Boulevard, correct?

04:46PM   6   A.   I don't want to commit to being at that time, but he was

04:46PM   7   a longtime resident.  He might have been on Colvin at that

04:47PM   8   time.

04:47PM   9   Q.   Yeah, I mean, fair to say he had a reputation for

04:47PM   10  patronizing the bars in North Buffalo?

04:47PM   11  A.   Definitely.

04:47PM   12  Q.   Grew up in that neighborhood, correct?

04:47PM   13  A.   Mike Masecchia, yes.

04:47PM   14  Q.   Yes.  Okay.  Now, fast forward a little bit, just so we

04:47PM   15  can clarify, this is entirely an FBI operation, correct?

04:47PM   16  A.   At that point, yes.

04:47PM   17  Q.   Right.  So up to the arrest and after for a while,

04:47PM   18  there's no DEA involvement, correct?

04:47PM   19  A.   No, none at all.

04:47PM   20  Q.   Because this is an investigation that originally began

04:47PM   21  with FBI, correct?

04:47PM   22  A.   Safe Streets Task Force and, yeah, myself on the public

04:47PM   23  corruption side.

04:47PM   24  Q.   Drugs and public corruption, correct?

04:47PM   25  A.   Correct.

04:47PM  1   Q.  Okay.  Fast forward a little bit, and come to learn DEA

04:47PM  2   separately arrests Anthony Anastasia, correct?

04:47PM  3   A.  That's correct.

04:47PM  4   Q.  And it's about the 2011 timeframe?

04:47PM  5   A.  Yeah, because we go -- '10, 2010 was our investigative --

04:47PM  6   and the arrest you're referring to, and then the 2011 was

04:47PM  7   Shane Nastoff.

04:47PM  8   Q.  And at that time in 2011, it's because Anthony Anastasia

04:48PM  9   is drug dealing, correct?

04:48PM  10  A.  Yes.

04:48PM  11  Q.  And he's out in the community, correct?

04:48PM  12  A.  Right.  He's back doing that, correct.

04:48PM  13  Q.  As you were starting to say, he's back out doing what

04:48PM  14  he's doing before?

04:48PM  15  A.  Correct.

04:48PM  16  Q.  And DEA makes an arrest of him, correct?

04:48PM  17  A.  That's correct.

04:48PM  18  Q.  And you understood Shane Nastoff to be the agent who

04:48PM  19  arrests him, correct?

04:48PM  20  A.  Yeah.  He utilized a source, and --

04:48PM  21  Q.  Okay.

04:48PM  22  A.  -- ultimately arrests and detains him I think.

04:48PM  23  Q.  Right.  Yeah.  And just so remind the source, we may have

04:48PM  24  heard him before, is Richard Himbury, correct?

04:48PM  25  A.  That's correct.

USA v Bongiovanni - Burns - MacKay/Cross - 9/26/24

04:48PM  1  Q.  Now ultimately that creates problems with FBI because

04:48PM  2  there's a little bit of deconfliction that has to be dealt

04:48PM  3  with, correct?

04:48PM  4  A.  I don't say problem, I mean, it happens all the time

04:48PM  5  where another agency or another investigative or police

04:48PM  6  department or somebody has, you know, I just don't like the

04:48PM  7  word "problem," but yes, it necessitates a deconfliction and

04:48PM  8  kind of who's -- what are we gonna charge this person with,

04:48PM  9  what's your purpose of the investigation.  Deconfliction.

04:48PM  10  Q.  Well, and when I use the word "problem" here, one of the

04:48PM  11  issues that arose was that when DEA and FBI deconflicted,

04:49PM  12  there were concerns about whether the new DEA investigation

04:49PM  13  would compromise the FBI CI, correct?

04:49PM  14  A.  Absolutely.

04:49PM  15  Q.  And that CI was Joe Mesi, correct?

04:49PM  16  A.  That's correct, yes.

04:49PM  17  Q.  So deconfliction is done to make sure these

04:49PM  18  investigations are completely separated, correct?

04:49PM  19  A.  That's correct.

04:49PM  20  Q.  And that DEA doesn't learn about Joe Mesi, correct?

04:49PM  21  A.  I wasn't present for the deconfliction, so I don't know

04:49PM  22  who knew what.  I wasn't at that meeting.

04:49PM  23  Q.  But to your understanding, the intention was to keep

04:49PM  24  these two investigations entirely separate, correct?

04:49PM  25  A.  I wouldn't feel comfortable testifying because I wasn't

04:49PM  1   at that deconfliction meeting, so I don't know what was, you

04:49PM  2   know, I kind of was working with Mesi and Safe Streets was

04:49PM  3   involved in that deconfliction.

04:49PM  4   Q.  Ultimately there is a deconfliction that takes place,

04:49PM  5   correct?

04:49PM  6   A.  Right, and I'm not present for that.

04:49PM  7   Q.  Yeah.  And Dan Bradley the FBI --

04:49PM  8   A.  Yes.

04:49PM  9   Q.  -- is part of it?

04:49PM  10  A.  That's correct.

04:49PM  11  Q.  And did you understand Shane Nastoff to be part of that

04:49PM  12  from the DEA end?

04:49PM  13  A.  Yes.

04:50PM  14  Q.  And then it's supervised in some fashion by the members

04:50PM  15  of the U.S. Attorney's Office?

04:50PM  16  A.  Yeah, I believe based on the document I reviewed, AUSA

04:50PM  17  Joseph Guerra was part of that.

04:50PM  18  Q.  Okay.  And, you know, your understanding because of the

04:50PM  19  way the investigation ultimately proceeded, the decision was

04:50PM  20  made we can't charge -- DEA can't charge Anastasia based on

04:50PM  21  anything back in 2011 because that could implicate the FBI's

04:50PM  22  investigation, correct?

04:50PM  23  A.  I wasn't privy.  I would believe that if Anastasia

04:50PM  24  pleads, Anastasia had, you know, wanted -- if they had to

04:50PM  25  indict him and bring him to trial, I suspect they would have

USA v Bongiovanni - Burns - MacKay/Cross - 9/26/24

119

04:50PM    1    brought that evidence from the previous one to make the

04:50PM    2    strongest case.

04:50PM    3    Q.   Okay.  But ultimately, Brucato's not charged -- I'm

04:50PM    4    sorry, Anastasia is not charged for what occurs in 2011 with

04:50PM    5    the FBI investigation, correct?

04:50PM    6    A.   I haven't seen his plea agreement, but I think that's

04:50PM    7    accurate.

04:50PM    8    Q.   Right.  I mean, do you have any reason to disagree with

04:50PM    9    me that he's ultimately charged for what happens that the DEA

04:51PM    10   arrest him for, correct?

04:51PM    11   A.   I just can't without seeing the charge of what he pled to

04:51PM    12   and understanding what was the relevant conduct was, what was

04:51PM    13   included in there.

04:51PM    14   Q.   Sure.  And we can move on.

04:51PM    15   A.   Okay.

04:51PM    16   Q.   But as you sit here today, you had no direct knowledge

04:51PM    17   that any names of any FBI CIs were shared with DEA, correct?

04:51PM    18   A.   I had no knowledge.

04:51PM    19   Q.   I mean, because you were weren't part of the

04:51PM    20   deconfliction meeting between DEA and FBI, correct?

04:51PM    21   A.   That's correct.

04:51PM    22   Q.   And, you know, whatever trickled down to you or however

04:51PM    23   you know it, you have no knowledge that FBI passed the name

04:51PM    24   of their CI to DEA, correct?

04:51PM    25   A.   Repeat that again?  I'm sorry.

USA v Bongiovanni - Burns - MacKay/Cross - 9/26/24

120

04:51PM   1   Q.  It might have been a bad question.

04:51PM   2       To your knowledge, you never know whether DEA learned

04:51PM   3   about Joe Mesi being an informant, correct?

04:51PM   4   A.  They may have, based on some other -- or, like, Dave

04:51PM   5   Turri would have been aware.  Mesi and --

04:51PM   6   Q.  I'm not asking, like, who might have been aware of what.

04:51PM   7   But as far as you know, as you sit here today, I mean, you

04:51PM   8   weren't present with any of the deconfliction --

04:52PM   9   A.  I wasn't.

04:52PM  10   Q.  -- meetings.  Okay.

04:52PM  11       And it happened all through the United States Attorney's

04:52PM  12   Office, correct?

04:52PM  13   A.  I can't speak to that.  I don't know the communication

04:52PM  14   between Dan Bradley -- Special Agent Dan Bradley and Special

04:52PM  15   Agent Shane Nastoff.

04:52PM  16   Q.  And then from there, you have no specific knowledge of

04:52PM  17   anything that occurs on the DEA side of things, correct?

04:52PM  18   A.  Other than what I've heard through this trial.

04:52PM  19   Q.  Right.  I mean, so as you're going forward in the years

04:52PM  20   2011, 2012, '13, '14, you don't know anything about what's

04:52PM  21   going on about the DEA investigation, correct?

04:52PM  22   A.  I do not.

04:52PM  23   Q.  Okay.  And just a reminder, throughout all that time,

04:52PM  24   Steve Brucato is still out in the community uncharged with a

04:52PM  25   crime, correct?

04:52PM    1    A.  I wasn't active in that part of the investigation, I

04:52PM    2    mean, I -- I believe he was not charged, I just can't say

04:52PM    3    definitively whether.

04:52PM    4    Q.  Do you understand that Steve Brucato was never ultimately

04:52PM    5    charged in relation?

04:52PM    6    A.  That's what I believe, yeah, I understand that.

04:53PM    7    Q.  Okay.  You participate in the Pharaoh's search in 2019,

04:53PM    8    correct?

04:53PM    9    A.  In December, yes.

04:53PM    10   Q.  Yeah.  So that's after Joseph Bongiovanni charged,

04:53PM    11   correct?

04:53PM    12   A.  Yes.

04:53PM    13   Q.  And part of your duties at that search were to collect

04:53PM    14   evidence, correct?

04:53PM    15   A.  Mostly, I interviewed the manager, John Ermin a/k/a Tommy

04:53PM    16   O, that -- my predominant job was to interview that manager.

04:53PM    17   Q.  Okay.  Well, so in some capacity, though, you came to

04:53PM    18   learn or you did it yourself that DVRs were recovered from

04:53PM    19   Pharaoh's, correct?

04:53PM    20   A.  Yes.  I was aware that those DVRs were recovered, and

04:53PM    21   they had been reviewed.  But specifically that day, my job

04:53PM    22   that day was to --

04:53PM    23   Q.  And you found they were working insofar as they captured

04:53PM    24   the footage, correct?

04:53PM    25   A.  Yes, they captured the footage that I discussed on my

USA v Bongiovanni - Burns - MacKay/Cross - 9/26/24

122

04:54PM    1    direct testimony.

04:54PM    2    Q.  Okay.  So, at least when you were there in December of

04:54PM    3    2019, it appears there were working cameras of Pharaoh's

04:54PM    4    going back at least, say, seven weeks?

04:54PM    5    A.  Well, one of the DVRs went back seven weeks, and the

04:54PM    6    other two went back two weeks.

04:54PM    7    Q.  Okay.

04:54PM    8    A.  And they had a bunch of cameras attached to them.

04:54PM    9    Q.  Yeah, I mean, so you observed that there were a number of

04:54PM    10   cameras throughout the facility, correct?

04:54PM    11   A.  I didn't personally observe, because I was really focused

04:54PM    12   on my interview.  But, yeah, in the reviewing the DVR, the

04:54PM    13   investigative team is aware that there were multiple cameras.

04:54PM    14   Q.  And you can see it based on, like, the number --

04:54PM    15   A.  Yeah.

04:54PM    16   Q.  -- of different cameras that shows in the DVR, correct?

04:54PM    17   A.  Yeah, that's accurate.

04:54PM    18        **MR. MacKAY:**  Judge, now might be a got time to stop.

04:54PM    19        **THE COURT:**  So let's do it.

04:54PM    20        And, folks, I want to -- don't jump up quite yet.

04:54PM    21   Let's talk a minute about next week.

04:54PM    22        So, there's still a chance that we're going to be on

04:54PM    23   track for what I said earlier, even with the delays that we

04:54PM    24   had.  So I'd like you to come in at 8:30 on Monday and be

04:54PM    25   prepared to stay until 5:30.  And be prepared to do the same

USA v Bongiovanni - Burns - MacKay/Cross - 9/26/24

123

04:55PM    1    thing on Tuesday.  It may not be necessary, but it may.  And

04:55PM    2    if we're close, because it's, like, dominoes right?  There's

04:55PM    3    so many moving parts that if we go past a certain point, we're

04:55PM    4    gonna -- the delays are gonna be more substantial.

04:55PM    5              So I want to try to get this done if we can so that

04:55PM    6    the lawyers can sum up to you, as I said before, on Tuesday.

04:55PM    7              If that's impossible, it's impossible, and we'll deal

04:55PM    8    with it.  But it will just make things go a whole lot easier

04:55PM    9    and more streamlined if we can.

04:55PM   10              So the long and the short of it is come in at 8:30.

04:55PM   11    In fact, come in earlier.  You know, today we planned on 8:30

04:55PM   12    and we couldn't because of traffic, so try to come in earlier

04:55PM   13    so that you're here waiting.  I'll be here earlier, I promise.

04:55PM   14    And we'll try to start right at 8:30.  And be prepared to go

04:55PM   15    to 5:30, maybe even with a short lunch, again, depending on

04:55PM   16    how things go, maybe the same thing on Tuesday.

04:55PM   17              And then Wednesday, we're definitely starting at

04:56PM   18    8:30.  Although, probably won't have to go past 5:00, but

04:56PM   19    definitely starting at 8:30.  Okay?

04:56PM   20              And because we're in the home stretch now, please

04:56PM   21    remember my instructions, and -- don't blow it now, folks.

04:56PM   22    Don't use tools of technology to communicate with anyone about

04:56PM   23    the case.  Don't communicate with anyone about the case in any

04:56PM   24    way at all.

04:56PM   25              At the football game on Sunday night when you folks

USA v Bongiovanni - Burns - MacKay/Cross - 9/26/24
124

04:56PM  1   are at your football parties watching the Bills and the

04:56PM  2   Ravens, you know, don't talk about this case.  People are

04:56PM  3   going to ask you, don't talk to them about it.  Don't try to

04:56PM  4   learn anything about this case outside the courtroom either

04:56PM  5   with tools of technology, or books, or maps, or anything.

04:56PM  6          And don't read, watch, or listen to any news coverage

04:56PM  7   of the case while the trial is still in progress.  Don't make

04:56PM  8   up your mind until you start deliberating.  Okay?

04:56PM  9          Everybody have a wonderful weekend.  We will see you

04:56PM 10   on Monday morning at 8:30.  Get a good night's sleep on Sunday

04:57PM 11   night.  Drive carefully.

04:57PM 12          (Jury excused at 4:57 p.m.)

04:57PM 13          **THE COURT:**  Okay.  Anything?

04:57PM 14          **MR. COOPER:**  Just one thing, Judge.  The blow-up of

04:57PM 15   8A-6 that we had Special Agent Burns mark off, I think for

04:57PM 16   record purposes for any potential matter beyond the trial, we

04:57PM 17   should mark that and preserve it.

04:57PM 18          **THE COURT:**  Oh, I do, too.

04:57PM 19          **MR. COOPER:**  Okay.  So it's -- I would suggest to the

04:57PM 20   Court so that it's distinguishable from 8A-6, which is also

04:57PM 21   available in electronic, is to mark it 8A-6.1, like, period 1.

04:58PM 22   Are you good with that?

04:58PM 23          **MR. MacKAY:**  I think that's good, Judge.  We've used

04:58PM 24   that notation already.

04:58PM 25          **THE COURT:**  We have?

USA v Bongiovanni - Burns - MacKay/Cross - 9/26/24

| | | |
|---|---|---|
| 04:58PM | 1 | **MR. MacKAY:**  No, I meant generally. |
| 04:58PM | 2 | **THE COURT:**  Oh, okay.  Okay.  So then fine, yes. |
| 04:58PM | 3 | **MR. COOPER:**  Okay.  Great.  So we'll amend that, I'll |
| 04:58PM | 4 | do it with Parker after, we'll amend the exhibit sticker. |
| 04:58PM | 5 | **THE COURT:**  Okay, good. |
| 04:58PM | 6 | Anything from the defense? |
| 04:58PM | 7 | **MR. SINGER:**  I actually have one thing. |
| 04:58PM | 8 | So on Agent Gentile's -- I think it was re-redirect, |
| 04:58PM | 9 | Mr. Tripi got up and presented him a handwriting, I guess, |
| 04:58PM | 10 | exemplar of trying to draw out Agent Gentile's signature. |
| 04:58PM | 11 | **THE COURT:**  Um-hum. |
| 04:58PM | 12 | **MR. SINGER:**  I'd like a copy of that so I can present |
| 04:58PM | 13 | that to my expert. |
| 04:58PM | 14 | **MR. TRIPI:**  Oh, sure.  I have to find that. |
| 04:58PM | 15 | **THE COURT:**  Yeah, absolutely.  And we should preserve |
| 04:58PM | 16 | that, too. |
| 04:58PM | 17 | **MR. TRIPI:**  I'll rip the page out. |
| 04:58PM | 18 | **THE COURT:**  That was just shown to him, not the jury? |
| 04:58PM | 19 | **MR. TRIPI:**  Yeah, it was just shown to him. |
| 04:58PM | 20 | **THE COURT:**  Find it, Mr. Tripi. |
| 04:58PM | 21 | **MR. TRIPI:**  What's that? |
| 04:58PM | 22 | **THE COURT:**  I said find it. |
| 04:58PM | 23 | **MR. TRIPI:**  I'm looking, Judge, I'm looking. |
| 04:58PM | 24 | **MR. COOPER:**  Oh.  It's already ripped out. |
| 04:58PM | 25 | **MR. TRIPI:**  No, that's not it.  I knew it was on a |

04:59PM      1    half sheet of paper.

04:59PM      2              **THE COURT:**  Are we ready?  Okay.  Great.

04:59PM      3              Okay.  Anything else folks?  See you at 11:00

04:59PM      4    tomorrow.  11:00 tomorrow.

04:59PM      5              Are you going to be here, Mr. Bongiovanni, tomorrow?

04:59PM      6              **THE DEFENDANT:**  Do you want me to?

04:59PM      7              **THE COURT:**  That is up to you and your lawyers.  It's

04:59PM      8    the charge conference, so that is up to you and your lawyers.

04:59PM      9              **THE DEFENDANT:**  I don't want to -- I want to make

04:59PM     10    sure I'm good with you.

05:00PM     11              **THE COURT:**  No, no, no, you're always fine with me.

05:00PM     12    But you guys can make that call.

05:00PM     13              **MR. SINGER:**  Yeah, we talked to Mr. Bongiovanni, and

05:00PM     14    since it's purely a legal discussion and it may only last

05:00PM     15    frankly a half hour or less, we're gonna waive his appearance.

05:00PM     16              **THE COURT:**  Your lips to God's ears.

05:00PM     17              **MR. SINGER:**  I'm not making any promises, Judge.

05:00PM     18              **THE COURT:**  I know, I know, I know.

05:00PM     19              Okay, thanks.  See you tomorrow morning.

05:00PM     20              **MR. TRIPI:**  Judge, I handed up the note.

05:00PM     21              **THE COURT:**  Yes.

05:00PM     22              **MR. TRIPI:**  Maybe Ms. Demma can be kind enough to

05:00PM     23    make a couple copies.

05:00PM     24              **THE COURT:**  That's what she just said she's going to

05:00PM     25    do.

05:00PM    1          **THE CLERK:**  Are we going to mark this as a Court

05:00PM    2    exhibit?

05:00PM    3          **MR. SINGER:**  Yes, Court exhibit.

05:00PM    4          **MR. TRIPI:**  Court exhibit.

05:00PM    5          **THE CLERK:**  I think we're at 8.

05:00PM    6          (Proceeding concluded at 5:00 p.m.)

           7             *     *     *     *     *     *     *

           8

           9

          10

          11                    **CERTIFICATE OF REPORTER**

          12

          13             In accordance with 28, U.S.C., 753(b), I

          14    certify that these original notes are a true and correct

          15    record of proceedings in the United States District Court for

          16    the Western District of New York on September 26, 2024.

          17

          18                         s/ Ann M. Sawyer
                                      Ann M. Sawyer, FCRR, RPR, CRR
          19                         Official Court Reporter
                                      U.S.D.C., W.D.N.Y.
          20

          21

          22

          23

          24

          25

1

2                     **TRANSCRIPT INDEX**

3       **EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 1**

4                   **SEPTEMBER 26, 2024**

5

6    **W I T N E S S**                           **P A G E**

7    **B R I A N   B U R N S**                   2

8       DIRECT EXAMINATION BY MR. COOPER:         2

9       CROSS-EXAMINATION BY MR. MacKAY:          109

10

11

12   **E X H I B I T S**                          **P A G E**

13   GOV Exhibit 367                              28

14   GOV Exhibit 552                              74

15   GOV Exhibit 553                              74

16   GOV Exhibit 551                              87

17   GOV Exhibit 525                              103

18

19

20

21

22

23

24

25