1
              **UNITED STATES DISTRICT COURT**
              **WESTERN DISTRICT OF NEW YORK**

2

_____

3
**UNITED STATES OF AMERICA,**

                        Case No. 1:19-cr-227

4
           Plaintiff,            (LJV)

v.

5
                        September 25, 2024

**JOSEPH BONGIOVANNI,**

6

           Defendant.

7

8
  **TRANSCRIPT EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 2**
        **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

9
           **UNITED STATES DISTRICT JUDGE**

10
<u>**APPEARANCES:**</u>        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                   **BY: JOSEPH M. TRIPI, ESQ.**

11
                     **NICHOLAS T. COOPER, ESQ.**
                     **CASEY L. CHALBECK, ESQ.**

12
                Assistant United States Attorneys
                Federal Centre, 138 Delaware Avenue

13
                Buffalo, New York 14202
                For the Plaintiff

14

                **SINGER LEGAL PLLC**

15
                **BY: ROBERT CHARLES SINGER, ESQ.**
                80 East Spring Street

16
                Williamsville, New York 14221
                  And

17
                **LAW OFFICES OF PARKER ROY MacKAY**
                **BY: PARKER ROY MacKAY, ESQ.**

18
                3110 Delaware Avenue
                Kenmore, New York 14217

19
                  And
                **OSBORN, REED & BURKE, LLP**

20
                **BY: JOHN J. GILSENAN, ESQ.**
                120 Allens Creek Road

21
                Rochester, New York 14618
                For the Defendant

22
<u>**PRESENT**</u>**:**           **BRIAN A. BURNS,** FBI Special Agent

23
                **MARILYN K. HALLIDAY,** HSI Special Agent
                **KAREN A. CHAMPOUX,** USA Paralegal

24
<u>**LAW CLERK:**</u>         **REBECCA FABIAN IZZO, ESQ.**

25

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**  COLLEEN M. DEMMA |
| 2 | **COURT REPORTER:**    **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |
| 5 | |
| 6 | *    *    *    *    *    *    * |
| 7 | |
| 8 | (Excerpt commenced at 9:42 p.m.) |
| 9 | (Jury is present.) |

09:42AM  10      **THE COURT:**  The record will reflect that all our

09:42AM  11  jurors are here.

09:42AM  12          I remind the witness that he's still under oath.

09:42AM  13          And, Mr. Singer, you may continue.

09:42AM  14

09:42AM  15  **A N T H O N Y   C A S U L L O**, having been previously duly

09:42AM  16  called and sworn, continued to testify as follows:

09:42AM  17

09:42AM  18          **(CONT'D) CROSS-EXAMINATION BY MR. SINGER:**

09:42AM  19  Q.  Good morning, Mr. Casullo.

09:42AM  20  A.  Good morning.

09:42AM  21  Q.  So yesterday we left off going through some of the events

09:42AM  22  that led up to that August 1, 2018 meeting you had with the

09:42AM  23  U.S. Attorneys, correct?

09:42AM  24  A.  Correct.

09:42AM  25  Q.  So I want to get a little bit more into that particular

09:43AM    1    meeting.  At that meeting, there were a number of prosecutors

09:43AM    2    involved in the case; is that right?

09:43AM    3    A.  At that meeting, so this was the meeting that my

09:43AM    4    supervisor attended?

09:43AM    5    Q.  That's correct, yes.  G.S. McHugh was there?

09:43AM    6    A.  G.S. McHugh and AUSA Tripi, I believe.

09:43AM    7    Q.  Okay.

09:43AM    8    A.  He was there, I don't know if there was anybody else.

09:43AM    9    Q.  Okay.  So you remember that G.S. McHugh was with you at

09:43AM   10    the meeting?

09:43AM   11    A.  Yes.

09:43AM   12    Q.  Do you recall that you were at the meeting?

09:43AM   13    A.  Yes.

09:43AM   14    Q.  You recall that AUSA Tripi was at the meeting?

09:43AM   15    A.  Correct.

09:43AM   16    Q.  Could there have been other people at the meeting

09:43AM   17    possibly?

09:43AM   18    A.  I can't remember.

09:43AM   19    Q.  Okay.  And -- and you went into the meeting under the

09:43AM   20    understanding that you were there to discuss the Anthony

09:43AM   21    Gerace/Peter Gerace investigation?

09:43AM   22    A.  Correct.

09:43AM   23    Q.  So, when you get there and you sit down at the conference

09:43AM   24    table, you don't immediately start discussing what's going on

09:43AM   25    with that part of the investigation, right?

09:43AM    1    A.  I don't remember how it started.

09:43AM    2    Q.  But you do recall that AUSA Tripi raised a concern with

09:44AM    3    you regarding your brother-in-law, Phil Domiano?

09:44AM    4    A.  Yes.

09:44AM    5    Q.  And so we've learned a little bit about Phil Domiano

09:44AM    6    yesterday on direct, so he's your brother-in-law, right?

09:44AM    7    A.  Correct.

09:44AM    8    Q.  He's your wife's brother?

09:44AM    9    A.  Yes.

09:44AM    10   Q.  You had mentioned that he had been a little bit of a

09:44AM    11   thorn in your side, for lack of a better word, during the

09:44AM    12   duration with your with relationship your wife?

09:44AM    13   A.  Pretty much.

09:44AM    14   Q.  He's somebody who you don't really like a lot, correct?

09:44AM    15   A.  We don't talk.

09:44AM    16   Q.  And he's someone that your wife doesn't necessarily get

09:44AM    17   along with either?

09:44AM    18   A.  I wouldn't say that.  I mean, it's her brother, so she

09:44AM    19   talks to him.

09:44AM    20   Q.  But a little less based on her relationship with you?

09:44AM    21   A.  Yeah.  Probably.

09:44AM    22   Q.  You talked about how, you know, from time to time you

09:44AM    23   would see him, right?

09:44AM    24   A.  Yeah.

09:44AM    25   Q.  Yeah, so for instance, like when you lived out in

09:44AM 1 Las Vegas, Phil Domiano lived out in Las Vegas, correct?

09:44AM 2 A.  Correct.

09:44AM 3 Q.  And he's someone who you'd see from time to time at

09:44AM 4 family events?

09:44AM 5 A.  Correct.

09:44AM 6 Q.  That kind of thing?

09:44AM 7 A.  Yep.

09:44AM 8 Q.  And when you would return to Buffalo, when he was living

09:45AM 9 in Buffalo, you'd run into him here, correct?

09:45AM 10 A.  So he came back to Buffalo when I was in New York for

09:45AM 11 several months, so yeah, I'd seen him several times when I'd

09:45AM 12 come when I'd come back on weekends.

09:45AM 13 Q.  Yeah, you talked about the one time where -- where you

09:45AM 14 went over to Brennan's to get some chicken wings, right?

09:45AM 15 A.  Correct.

09:45AM 16 Q.  And Phil Domiano was there, correct?

09:45AM 17 A.  Yes.

09:45AM 18 Q.  And then Peter Gerace came in shortly thereafter?

09:45AM 19 A.  Yes.

09:45AM 20 Q.  And that's when Peter Gerace passed you his cell phone

09:45AM 21 contact number -- or sorry, took yours?

09:45AM 22 A.  Gave him mine, yes.

09:45AM 23 Q.  Right.  So -- so Phil, he lived here at one point in time

09:45AM 24 back in 2014 into 2015, correct?

09:45AM 25 A.  Yeah.  It was, again, I can't remember if it was like six

09:45AM   1   months exact timeframe but it was while I was in New York

09:45AM   2   City which was, what, December of 2013 up until September of

09:45AM   3   2015.  So --

09:45AM   4   Q.  And at that point in time when he has back here in

09:45AM   5   Buffalo, you'd -- he had taken a job with Peter Gerace at

09:45AM   6   Pharaoh's Gentlemen's Club, correct?

09:45AM   7   A.  I found that out, yes.

09:45AM   8   Q.  He was a manager over there, correct?

09:46AM   9   A.  That's what I was told.

09:46AM   10  Q.  So Domiano, besides having this connection to Peter

09:46AM   11  Gerace up here in Buffalo, he also had some connections to

09:46AM   12  some more unsavory people involved in narcotics back in Las

09:46AM   13  Vegas; is that right?

09:46AM   14  A.  That's what I believe.

09:46AM   15  Q.  And you also believe that he had some connections or

09:46AM   16  relationships with people you believe to have IOC connections

09:46AM   17  in Vegas, correct?

09:46AM   18  A.  I think so.

09:46AM   19  Q.  So, at the meeting, AUSA Tripi tells you that he has some

09:46AM   20  concerns about your continued involvement in investigating

09:46AM   21  the case because Phil Domiano pops up as part of their

09:46AM   22  investigation, correct?

09:46AM   23  A.  Again, I don't remember exactly what he said, but there

09:46AM   24  was a concern, yeah.

09:46AM   25  Q.  And a particular concern was -- is that the investigators

| | | |
|---|---|---|
| 09:46AM | 1 | were focusing in on possible overdoses and they believed that |
| 09:46AM | 2 | Phil may have been involved as a manager at the same time |
| 09:47AM | 3 | that a woman may have overdosed at Pharaoh's? |
| 09:47AM | 4 | A.  That's not how it was presented to me. |
| 09:47AM | 5 | Q.  You don't remember that part? |
| 09:47AM | 6 | A.  I remember it was presented to me that there was a police |
| 09:47AM | 7 | report where they found a woman in a parking lot and she was |
| 09:47AM | 8 | unconscious at the time.  And the police were called.  When |
| 09:47AM | 9 | the police got there, I think they came, too, and I believe |
| 09:47AM | 10 | Phil Domiano was present or a witness, but was on the police |
| 09:47AM | 11 | report. |
| 09:47AM | 12 | Q.  And so in this situation, your brother-in-law, he's on |
| 09:47AM | 13 | the police report revolving around this incident, correct? |
| 09:47AM | 14 | A.  That's what I was told. |
| 09:47AM | 15 | Q.  And he's working for Peter Gerace who's the target of the |
| 09:47AM | 16 | investigation, correct? |
| 09:47AM | 17 | A.  Which I found out afterwards. |
| 09:47AM | 18 | Q.  And, so, Peter Gerace, at that point in time, there might |
| 09:47AM | 19 | be information that Phil Domiano, your brother-in-law, |
| 09:47AM | 20 | possesses regarding Peter Gerace, right? |
| 09:47AM | 21 | A.  At that time -- |
| 09:47AM | 22 | Q.  Yes. |
| 09:47AM | 23 | A.  -- when he was interviewed?  I mean, possibly.  I mean, |
| 09:47AM | 24 | logically, I would think so if he was -- |
| 09:48AM | 25 | Q.  And he also might possess information regarding Pharaoh's |

09:48AM    1    Gentlemen's Club based on his relationship with Gerace and

09:48AM    2    working there as a manager, right?

09:48AM    3    A.  I think he would.

09:48AM    4    Q.  And, so this would put you in a position because you may

09:48AM    5    be either using your brother-in-law as a witness against

09:48AM    6    Peter Gerace, right?

09:48AM    7    A.  I'm confused with that question now.

09:48AM    8    Q.  Sure.  So -- so, let's say Phil Domiano had absolutely

09:48AM    9    nothing to do with this girl found in the parking lot?

09:48AM   10    A.  Okay.

09:48AM   11    Q.  He's still a witness to that, correct?

09:48AM   12    A.  Based on the police report that I saw, he was a witness.

09:48AM   13    Q.  And he's your brother-in-law, right?

09:48AM   14    A.  And he's my brother-in-law.

09:48AM   15    Q.  And you're the lead investigator in the case at the time,

09:48AM   16    right?

09:48AM   17    A.  At which time?

09:48AM   18    Q.  At the time that you're sitting down, talking to AUSA

09:48AM   19    Tripi --

09:48AM   20    A.  Yes.

09:48AM   21    Q.  -- on August 1st, 2018?

09:48AM   22    A.  Yeah, yes, yep.

09:48AM   23    Q.  And on top of that, let's say Phil Domiano has something

09:48AM   24    that's -- that's not innocent involved in this situation in

09:48AM   25    the parking lot at Pharaoh's, right?

09:48AM  1        Let's say that he doesn't have that.  You'd be

09:48AM  2   potentially investigating your brother-in-law as a target,

09:48AM  3   correct?

09:49AM  4   A.  Again, based on the circumstances, if it had something to

09:49AM  5   do with Pharaoh's or Peter Gerace, yeah, that would be a

09:49AM  6   conflict.

09:49AM  7   Q.  And so, that was the concern that AUSA Tripi announced to

09:49AM  8   you that morning, correct?

09:49AM  9   A.  Pretty much, that was my understanding.

09:49AM  10  Q.  Because I think yesterday you talked about how you're

09:49AM  11  either in or out of a case when you know someone who's

09:49AM  12  subject to the investigation, right?

09:49AM  13  A.  Yeah.  One way or another, you have a discussion with

09:49AM  14  your supervisor if you think there is a conflict and then a

09:49AM  15  decision is made either to keep you in or not.

09:49AM  16  Q.  And you said yesterday that, you know, if -- if you know

09:49AM  17  someone who's a potential target or witness in the

09:49AM  18  investigation, that that's something that puts you on

09:49AM  19  outside, correct, you have to stop doing what you're doing?

09:49AM  20  A.  Again -- again, it depends.  I mean, that's a discussion

09:49AM  21  with your supervisor and you discuss it.

09:49AM  22  Q.  So there's no clear line when you're related to a

09:49AM  23  potential witness or a target in an investigation that says

09:49AM  24  all stop, you can't investigate anymore?

09:50AM  25  A.  I wouldn't say there's a clear line.  There's a

09:50AM  1  discussion with the supervisor, and then the supervisor and

09:50AM  2  usually an assistant special agent in charge, there would be

09:50AM  3  a discussion, and they would decide to either keep you in the

09:50AM  4  investigation depending on the circumstances or not, or if

09:50AM  5  something else occurred going forward that you could possibly

09:50AM  6  be removed.  It just depends on the situation.

09:50AM  7  Q.  So that morning, you explained to AUSA Tripi and the

09:50AM  8  others at the -- the meeting that -- that you don't believe

09:50AM  9  there's a conflict based on what you're told, correct?

09:50AM  10  A.  Could you be more specific?

09:50AM  11  Q.  Certainly.  So, based on, after AUSA Tripi announces his

09:50AM  12  concerns to you in this meeting, you tell him that you don't

09:50AM  13  believe there's a conflict that requires your removal from

09:50AM  14  the case?

09:50AM  15  A.  Again, I never told him that at that time.  I don't

09:50AM  16  remember the exact conversation in terms of the words, but

09:50AM  17  I -- I don't believe I told him that I shouldn't be involved

09:50AM  18  at that point.

09:50AM  19  Q.  You don't -- you don't believe that you told him you

09:50AM  20  should continue involvement at that time?

09:50AM  21  A.  That I should continue involvement?

09:50AM  22  Q.  Yes.

09:50AM  23  A.  I was still involved at that time.

09:51AM  24  Q.  And you believed at that point in time, notwithstanding

09:51AM  25  what you learned about Domiano, in this incident, you should

09:51AM    1    continue forward as being the investigator in the case,

09:51AM    2    correct?

09:51AM    3    A.  Well, there was a discussion shortly after that where my

09:51AM    4    supervisors did remove me.

09:51AM    5    Q.  Well, I'm not interested in that discussion later.  What

09:51AM    6    I'm asking about is the August 1st, 2018 meeting.  And at

09:51AM    7    that meeting, notwithstanding what AUSA Tripi told you, you

09:51AM    8    stated that you believe you should remain on the

09:51AM    9    investigation?

09:51AM    10   A.  Again, I don't remember those exact words, but I

09:51AM    11   certainly didn't tell him at that time that I should be

09:51AM    12   removed from the investigation.

09:51AM    13   Q.  Okay.  So you don't recall saying something to the effect

09:51AM    14   of, hey, I should -- I should remain here, notwithstanding

09:51AM    15   what -- what I learned about Domiano?

09:51AM    16   A.  I don't think that was really the words of the

09:51AM    17   conversation.

09:51AM    18   Q.  But -- but, you -- you -- you do remember not saying

09:51AM    19   anything to the effect of I should be off this case at this

09:51AM    20   point?

09:51AM    21   A.  Well, again, with AUSA Tripi there and my supervisor, I

09:51AM    22   did not say I should be off this investigation.

09:52AM    23   Q.  So, going a little bit backwards to the summer of 2016,

09:52AM    24   we talked yesterday about how you opened the investigation

09:52AM    25   into Peter Gerace and one of the first things you did was --

09:52AM  1   was run his telephone information?

09:52AM  2   A.  Pulled tolls, excuse me.

09:52AM  3   Q.  And that resulted in information being discovered that

09:52AM  4   Joe Bongiovanni was in contact with Peter Gerace by

09:52AM  5   telephone?

09:52AM  6   A.  Correct.

09:52AM  7   Q.  And that's something that you alerted G.S. Yensan about,

09:52AM  8   correct?

09:52AM  9   A.  Correct.

09:52AM  10  Q.  And then after that, you noticed that Agent Bongiovanni

09:52AM  11  was giving you the cold shoulder around the office?

09:52AM  12  A.  Yes.

09:52AM  13  Q.  And so at that point in time, you made the decision

09:52AM  14  that -- I gotta try to smooth things over here?

09:52AM  15  A.  Correct.

09:52AM  16  Q.  And that's when you offered an invitation to Agent

09:52AM  17  Bongiovanni to come meet you in the conference room at the

09:52AM  18  DEA, correct?

09:52AM  19  A.  Correct.

09:52AM  20  Q.  So you talked a little bit about the conference room.  So

09:52AM  21  that's something -- that's a room inside the -- the general

09:53AM  22  area where everyone works at the DEA?

09:53AM  23  A.  Right.  So on that side of the group, D-57, we had our

09:53AM  24  own conference room that was just off the hallway.  So I

09:53AM  25  consider on the side of D-57, but anybody could use it.

09:53AM    1    Q.  Yeah, it's just a regular conference room where you guys

09:53AM    2    would have your weekly meetings or regular meetings?

09:53AM    3    A.  Right.

09:53AM    4    Q.  And this is not like a soundproof room or interview room

09:53AM    5    for a suspect, right?

09:53AM    6    A.  I mean, I have no idea if it's soundproof or not.

09:53AM    7    Q.  Just a good old-fashioned conference room?

09:53AM    8    A.  It's just a conference room.

09:53AM    9    Q.  So, you invite Joe to meet you in the conference room and

09:53AM    10    he accepts the invitation?

09:53AM    11    A.  Pretty much, yeah.

09:53AM    12    Q.  The two of you walk into the room?

09:53AM    13    A.  Yes.

09:53AM    14    Q.  The door's closed?

09:53AM    15    A.  I believe I shut the door.

09:53AM    16    Q.  And that's when you two discuss what happened, correct?

09:53AM    17    A.  Correct.

09:53AM    18    Q.  And so you talked about how you -- you did this and you

09:53AM    19    weren't trying to get him in trouble in any way, right?

09:53AM    20    A.  Correct.

09:53AM    21    Q.  And he said something to the effect of, you know, this is

09:53AM    22    bullshit?

09:53AM    23    A.  Yes.

09:53AM    24    Q.  So he was displeased with what's happening as a result of

09:54AM    25    you looking into Peter Gerace?

09:54AM 1    A.  I mean, based on what he said.

09:54AM 2    Q.  And, so, this was something you didn't talk to

09:54AM 3    Mr. Bongiovanni about before sitting down with Greg Yensan

09:54AM 4    and deciding to subpoena the toll records, correct?

09:54AM 5    A.  No.

09:54AM 6    Q.  Like you didn't give him a heads-up, like, hey, you know,

09:54AM 7    I'm going open an investigation, I'm going to get subpoena

09:54AM 8    records for Peter Gerace's phone number, you didn't tell

09:54AM 9    him --

09:54AM 10   A.  No, I didn't discuss that with Joe.

09:54AM 11   Q.  That was only something that he learned after the fact,

09:54AM 12   correct?

09:54AM 13   A.  I'm sorry.

09:54AM 14   Q.  Sure.  That was only something he learned about after it

09:54AM 15   was done, correct?

09:54AM 16   A.  Learned about?

09:54AM 17   Q.  After you subpoenaed the records --

09:54AM 18   A.  I'm sorry, but what are you asking that I learned about?

09:54AM 19   Q.  I'm not asking you.  I'm asking it was only something

09:54AM 20   Mr. Bongiovanni learned about after you ran the subpoena,

09:54AM 21   correct?

09:54AM 22   A.  I don't know when he learned about it.  Based on my

09:54AM 23   conversations with Greg Yensan, Greg said that he --

09:54AM 24   Q.  Again I'm not interested in what Mr. Yensan said?

09:54AM 25   A.  Yeah, I don't know when Joe learned about it.

| | | |
|---|---|---|
| 09:54AM | 1 | Q.  Okay. |
| 09:54AM | 2 | **MR. COOPER:**  Judge, I'm going to object at this |
| 09:55AM | 3 | point.  The question is about what Mr. Bongiovanni knew and |
| 09:55AM | 4 | when he knew it.  The witness is trying to answer, and |
| 09:55AM | 5 | Mr. Singer is cutting him off. |
| 09:55AM | 6 | **THE COURT:**  No. |
| 09:55AM | 7 | **MR. COOPER:**  That's the question that's asked. |
| 09:55AM | 8 | **THE COURT:**  I don't -- I don't think he's cutting him |
| 09:55AM | 9 | off.  The objection is overruled. |
| 09:55AM | 10 | Go ahead, next question. |
| 09:55AM | 11 | **BY MR. SINGER:** |
| 09:55AM | 12 | Q.  So -- so you do know that after you sit down with Greg |
| 09:55AM | 13 | Yensan and talk to him about Joe's number came up, Joe's |
| 09:55AM | 14 | behavior towards you changes, correct? |
| 09:55AM | 15 | A.  Correct. |
| 09:55AM | 16 | Q.  So that would indicate to you that he found out at some |
| 09:55AM | 17 | point, right? |
| 09:55AM | 18 | A.  Correct. |
| 09:55AM | 19 | Q.  And this is something that -- that caught him by |
| 09:55AM | 20 | surprise; fair statement? |
| 09:55AM | 21 | **MR. COOPER:**  Objection as to what caught the |
| 09:55AM | 22 | defendant by surprise.  How could he know that? |
| 09:55AM | 23 | **THE COURT:**  Caught the defendant by surprise?  Is |
| 09:55AM | 24 | that what you're asking? |
| 09:55AM | 25 | **MR. SINGER:**  Yes. |

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

16

| | | |
|---|---|---|
| 09:55AM | 1 | **THE COURT:**  Sustained. |
| 09:55AM | 2 | **BY MR. SINGER:** |
| 09:55AM | 3 | Q.  So, again, you didn't tell Mr. Bongiovanni that you were |
| 09:55AM | 4 | running subpoenas on Mr. Gerace's phone before you did it, |
| 09:55AM | 5 | right? |
| 09:55AM | 6 | A.  I didn't tell him. |
| 09:55AM | 7 | Q.  Okay.  So, one of the things after Mr. Bongiovanni said |
| 09:55AM | 8 | it was bullshit that you talked about yesterday on direct was |
| 09:56AM | 9 | that he told you something to the effect of that Peter Gerace |
| 09:56AM | 10 | is -- is not a drug dealer, he's a drug abuser, right? |
| 09:56AM | 11 | A.  In sum and substance. |
| 09:56AM | 12 | Q.  And another thing you testified about was that when you |
| 09:56AM | 13 | were having this conversation, Mr. Bongiovanni said something |
| 09:56AM | 14 | to the effect of this kid called me up when a stripper was |
| 09:56AM | 15 | overdosing at the club and I told her to get her out of |
| 09:56AM | 16 | there? |
| 09:56AM | 17 | A.  Correct. |
| 09:56AM | 18 | Q.  And, so, this particular conversation that you had, you |
| 09:56AM | 19 | weren't recording this conversation, right? |
| 09:56AM | 20 | A.  No. |
| 09:56AM | 21 | Q.  You weren't taking notes during this conversation, right? |
| 09:56AM | 22 | A.  No. |
| 09:56AM | 23 | Q.  You weren't taking any notes after the conversation, |
| 09:56AM | 24 | correct? |
| 09:56AM | 25 | A.  Not right after.  It was down the road. |

09:56AM    1    Q.  Yeah.  So what I'm getting at is like after you left the

09:56AM    2    meeting, you didn't jot down on a pad, this is what I said to

09:56AM    3    Joe and this is what Joe said?

09:56AM    4    A.  No.

09:56AM    5    Q.  You didn't write a report about this, right?

09:57AM    6    A.  No.

09:57AM    7    Q.  So your memory is that -- is that Joe had told Gerace to

09:57AM    8    get the person out of there who's overdosing?

09:57AM    9    A.  And I told, what I said, is what it was.

09:57AM    10   Q.  Do you recall any type of discussion about Narcan?

09:57AM    11   A.  Absolutely not.

09:57AM    12   Q.  You don't recall any discussion about Narcan coming up

09:57AM    13   during your conversation in the conference room?

09:57AM    14   A.  Absolutely 100 percent no.

09:57AM    15   Q.  When Joe told you based on what you stated in direct

09:57AM    16   yesterday that -- that Peter Gerace should get her out of

09:57AM    17   there, did you follow up with any questions?

09:57AM    18   A.  No, I was in shock.

09:57AM    19   Q.  So you never asked what do you mean by that?

09:57AM    20   A.  No.  I was in shock what he had just said to me.

09:57AM    21   Q.  Do you know if Joe Bongiovanni was referring to calling

09:58AM    22   911?

09:58AM    23   A.  That never was said.

09:58AM    24   Q.  Do you know if the "get her out of there" comment

09:58AM    25   referred to get that person medical attention?

Case 1:19-cr-00227-LJV-MJR    Document 1337    Filed 11/03/24    Page 18 of 103
USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

18

09:58AM      1    A.  That was never said.

09:58AM      2    Q.  Do you know if the comment "get her out of there"

09:58AM      3    referred to get that person to a hospital?

09:58AM      4    A.  That was never said.

09:58AM      5    Q.  And you never asked any follow-up questions to understand

09:58AM      6    what that meant, right?

09:58AM      7    A.  No, I was too in shock that a convicted felon had just

09:58AM      8    called a DEA agent about a stripper overdosing in his club,

09:58AM      9    and I was trying to process that.

09:58AM     10    Q.  Okay.  You would agree with me at least that keeping a

09:58AM     11    person at Pharaoh's Gentlemen's Club who has overdosed inside

09:58AM     12    the club is not really going to provide them much help,

09:58AM     13    right?

09:58AM     14    A.  My belief, if someone is overdosing, you don't move them

09:58AM     15    and you call paramedics.  That is my experience based on

09:59AM     16    being a police officer, based on training that I've had, and

09:59AM     17    first responder training.  That's my belief.

09:59AM     18    Q.  That's what I'm getting at.

09:59AM     19    A.  That's what you do.  You call someone that is a

09:59AM     20    paramedic, 911, someone that could attend to that person.

09:59AM     21    Q.  That's what I'm getting at, is that -- is that if there's

09:59AM     22    no medical attention available at Pharaoh's Gentlemen's Club,

09:59AM     23    that person's not gonna get any help by remaining there,

09:59AM     24    correct?

09:59AM     25    A.  Oh, no, you -- you call someone.  They remain there.

| | | |
|---|---|---|
| 09:59AM | 1 | That could become a crime scene if someone's overdosing. |
| 09:59AM | 2 | Q.  And, again, that's not the question I asked, sir. |
| 09:59AM | 3 | A.  Okay. |
| 09:59AM | 4 | Q.  What I asked you is that if there's no medical attention |
| 09:59AM | 5 | available at Pharaoh's Gentlemen's Club, keeping that person |
| 09:59AM | 6 | at Pharaoh's Gentlemen's Club is not gonna get them any help, |
| 09:59AM | 7 | right? |
| 09:59AM | 8 | A.  What's going to get them help is by calling someone for |
| 09:59AM | 9 | help. |
| 09:59AM | 10 | Q.  I agree.  Because there's no medical attention, to your |
| 09:59AM | 11 | understanding, at Pharaoh's Gentlemen's Club, right? |
| 09:59AM | 12 | A.  I have no idea. |
| 09:59AM | 13 | Q.  And when you heard this comment, you're processing it, |
| 09:59AM | 14 | you said, right? |
| 09:59AM | 15 | A.  Trying to. |
| 10:00AM | 16 | Q.  What's going through your head when you're trying to |
| 10:00AM | 17 | process what was said? |
| 10:00AM | 18 | A.  That a convicted felon had just called a DEA agent about |
| 10:00AM | 19 | a stripper overdosing at his club.  And why would that -- why |
| 10:00AM | 20 | would that even happen?  Why -- to me, as a DEA agent, |
| 10:00AM | 21 | receiving phone calls from someone that is a convicted felon |
| 10:00AM | 22 | about someone overdosing for what purpose, what purpose could |
| 10:00AM | 23 | I possibly serve at that moment to help that situation? |
| 10:00AM | 24 | Common sense tells me that you would call a paramedic to help |
| 10:00AM | 25 | someone that's overdosing, not call a DEA agent that |

10:00AM    1    investigates narcotics crimes.  It doesn't even make sense to

10:00AM    2    me.

10:00AM    3    Q.  So, is it a fair statement that you inferred some type of

10:00AM    4    nefarious purpose behind the call?

10:00AM    5    A.  At the end of that meeting, trying to process everything,

10:00AM    6    that was one of the things I was trying to process.  If he

10:00AM    7    was being called for some possible nefarious purpose such as

10:01AM    8    covering up an overdose, that Gerace might be calling him as

10:01AM    9    a convicted felon, a DEA agent to figure out how to deal with

10:01AM   10    this situation.

10:01AM   11      Not for the health of the person that had overdosed,

10:01AM   12    which to me is common sense, but because a stripper overdosed

10:01AM   13    in a strip club of a convicted felon that's running that club

10:01AM   14    somehow, and that is a huge problem for that person.

10:01AM   15    Q.  So, it seems like there's a couple of things going on.

10:01AM   16    So I want to break that down.

10:01AM   17      So on one hand, we just talked is this call by Peter

10:01AM   18    Gerace to Joe Bongiovanni not for help, right?  That's one

10:01AM   19    thing that's going on in your head?

10:01AM   20    A.  Possibly.

10:01AM   21    Q.  Another thing that's going on in your head is why would

10:01AM   22    Peter Gerace not pick up the call -- a phone and call 911,

10:01AM   23    and instead pick up the phone and call Joe Bongiovanni?

10:01AM   24    That's not going to get Peter Gerace help, correct?

10:01AM   25    A.  Why is he calling Joe Bongiovanni based on those

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

10:01AM    1    circumstances.

10:01AM    2    Q.  So, there's this back and forth that you're having in

10:02AM    3    your mind as you're trying to process this between is it

10:02AM    4    Peter Gerace called Joe Bongiovanni and you don't get the

10:02AM    5    point of that?  Or Peter Gerace called Joe Bongiovanni and

10:02AM    6    there's something nefarious behind it, right?

10:02AM    7    A.  It is the shock of hearing it, first of all.  And then

10:02AM    8    during the moments afterwards and within that timeframe of

10:02AM    9    trying to process that whole thing.

10:02AM    10   Q.  And I -- is it a fair statement that one of the reasons

10:02AM    11   you have this back and forth in your mind when you're trying

10:02AM    12   to process what you were told is that you knew Joe

10:02AM    13   Bongiovanni for several months at that point in time,

10:02AM    14   correct?

10:02AM    15   A.  I had known Joe since I met him years ago when I would

10:02AM    16   come home in the summer.

10:02AM    17   Q.  Yeah, but as far as like a working relationship, you had

10:02AM    18   known him for a longer period of time in the office for

10:02AM    19   several months at that point?

10:02AM    20   A.  Several months.

10:02AM    21   Q.  I think you mentioned that you -- you worked a couple

10:02AM    22   different cases together when you first got up to the DEA in

10:02AM    23   Buffalo in September of 2015?

10:02AM    24   A.  Correct.

10:02AM    25   Q.  And, so, you know, there's some trust that you developed

10:03AM    1    between Agent Bongiovanni when you worked together?

10:03AM    2    A.   Correct.

10:03AM    3    Q.   And so that's something that's influencing this back and

10:03AM    4    forth?

10:03AM    5    A.   It's -- it's bothersome to me.

10:03AM    6    Q.   So after this comment's made, you two continued to

10:03AM    7    converse, correct?

10:03AM    8    A.   For a little bit.

10:03AM    9    Q.   And one of the things you talked about yesterday was that

10:03AM    10   at some point, Mr. Bongiovanni accused you of having some

10:03AM    11   type of Italian-American bias, correct?

10:03AM    12   A.   He asked if I hated Italians.

10:03AM    13   Q.   And so you're Italian-American, correct?

10:03AM    14   A.   I am.

10:03AM    15   Q.   He's Italian-American, correct?

10:03AM    16   A.   Yes.

10:03AM    17   Q.   And so if one Italian-American is accusing another

10:03AM    18   Italian-American of anti-Italian-American bias, that's

10:03AM    19   something that would strike you as odd off the bat?

10:03AM    20   A.   I found what he said to me as highly insulting.

10:04AM    21   Q.   Okay.  So, you drew that comment as an insult, correct?

10:04AM    22   A.   I found it insulting.  And I also at the same time found

10:04AM    23   it concerning as if he was trying to convince me not to

10:04AM    24   investigate Peter Gerace.

10:04AM    25   Q.   All right.  So you drew two negative inferences from that

| | | |
|---|---|---|
| 10:04AM | 1 | comment that was made, correct? |
| 10:04AM | 2 | A.  Based on what I just told you, those two negative |
| 10:04AM | 3 | inferences. |
| 10:04AM | 4 | Q.  And then after this comment back and forth when you deny |
| 10:04AM | 5 | that you have a bias like that, that's when you allege that |
| 10:04AM | 6 | Mr. Bongiovanni made this racial remark about who the DEA |
| 10:04AM | 7 | should be investigating, correct? |
| 10:04AM | 8 | A.  It was shortly after that.  First he asked if Gerace was |
| 10:04AM | 9 | friends with my brother-in-law, and then made the racial |
| 10:04AM | 10 | comments. |
| 10:04AM | 11 | Q.  Now you stated yesterday on direct that when you two |
| 10:04AM | 12 | first get into the conference room, Joe Bongiovanni's angry, |
| 10:04AM | 13 | right? |
| 10:04AM | 14 | A.  Again, he's not talking to me. |
| 10:04AM | 15 | Q.  But when you get into the conference room, you can see |
| 10:05AM | 16 | that he's visibly upset, correct? |
| 10:05AM | 17 | A.  Based on him saying this is bullshit, he seemed upset. |
| 10:05AM | 18 | Q.  Mr. Cooper asked you, is he upset crying or upset mad. |
| 10:05AM | 19 | And you said it's not crying, it's mad; remember that? |
| 10:05AM | 20 | A.  Yeah. |
| 10:05AM | 21 | Q.  So he's mad in that meeting, right? |
| 10:05AM | 22 | A.  Yeah, I would say upset. |
| 10:05AM | 23 | Q.  He's saying it's bullshit to start right off the bat, |
| 10:05AM | 24 | correct? |
| 10:05AM | 25 | A.  Correct. |

| | | |
|---|---|---|
| 10:05AM | 1 | Q.  And your guy's voices are not -- you know, just sitting |
| 10:05AM | 2 | there and just having a normal conversation, correct? |
| 10:05AM | 3 | A.  We're not screaming at each other. |
| 10:05AM | 4 | Q.  But things are elevated as you said yesterday on direct? |
| 10:05AM | 5 | A.  The mood -- the mood, and there was tension, is elevated. |
| 10:05AM | 6 | Q.  Okay.  So -- so, he's elevated, he's mad, he's angry, |
| 10:05AM | 7 | right? |
| 10:05AM | 8 | A.  He seems upset. |
| 10:05AM | 9 | Q.  He's saying things in an upset tone to you, correct? |
| 10:05AM | 10 | A.  He did initially. |
| 10:05AM | 11 | Q.  And when you testified on direct yesterday, you mentioned |
| 10:05AM | 12 | that when he made this racial remark, that he lowered his |
| 10:05AM | 13 | voice; do you remember saying that? |
| 10:05AM | 14 | A.  I do. |
| 10:05AM | 15 | Q.  And so unlike all the other comments that were being made |
| 10:06AM | 16 | back and forth between you and him, he lowered his tone of |
| 10:06AM | 17 | voice at this point in time? |
| 10:06AM | 18 | A.  Again, I don't know about all of the comments at the |
| 10:06AM | 19 | beginning when he came in and said this is bullshit and then |
| 10:06AM | 20 | spouted out about Gerace calling him when a stripper |
| 10:06AM | 21 | overdosed at his club.  That was more animated in terms of |
| 10:06AM | 22 | being upset. |
| 10:06AM | 23 | I'd have to go through it step by step based on what I |
| 10:06AM | 24 | believe was the point that he calmed down. |
| 10:06AM | 25 | Q.  So -- |

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

25

10:06AM    1    A.  That the tone was lowered at some point.

10:06AM    2    Q.  So -- so, it's your testimony that when he made this

10:06AM    3    racial comment, his -- he was calmer?

10:06AM    4    A.  His tone of his voice was quieter.  I wouldn't call it a

10:06AM    5    whisper, but it was toned down and quieter.

10:06AM    6    Q.  So, after this comment is made, you know it's wrong,

10:06AM    7    right?

10:06AM    8    A.  Well, absolutely.  Again, in shock, trying to process

10:07AM    9    that a federal agent had just said that to me.  So, yes, I do

10:07AM    10   know it's wrong.

10:07AM    11   Q.  Okay.  So unlike the comment about the stripper and get

10:07AM    12   her out of there, you don't have this back and forth in your

10:07AM    13   mind of what does this mean?  What is Joe trying to

10:07AM    14   communicate to me, right?

10:07AM    15   A.  I -- I knew very much so what he was trying to

10:07AM    16   communicate.

10:07AM    17   Q.  And so the racial remark doesn't have that back and forth

10:07AM    18   in your head.  You just know right off the bat, that's

10:07AM    19   something that's not appropriate?

10:07AM    20   A.  It's shocking, and it's wrong, and he does not want me to

10:07AM    21   investigate Peter Gerace.

10:07AM    22   Q.  So, the time that this comment was made, you allege that

10:07AM    23   was June of 2016, correct?

10:07AM    24   A.  Yeah.  Whatever I testified to that timeframe.

10:07AM    25   Q.  And you'd been in the DEA at that point in time for about

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

10:07AM   1   15 years, a little bit more?

10:07AM   2   A.  So -- approximately.

10:07AM   3   Q.  And when you're in the DEA for that period of time,

10:08AM   4   there's trainings that you go to as far as racial

10:08AM   5   sensitivity, right?

10:08AM   6   A.  We had ethics training at the DEA academy.  I don't know

10:08AM   7   if there was ongoing training.  I believe there was diversity

10:08AM   8   training that we had throughout the year, possibly.  I don't

10:08AM   9   remember specifically, but it wouldn't be uncommon.

10:08AM   10  Q.  Yeah, so I mean, like, you started at the DEA in 1999,

10:08AM   11  you went to the academy, right?

10:08AM   12  A.  Correct.

10:08AM   13  Q.  You had the ethics training there?

10:08AM   14  A.  Yes.

10:08AM   15  Q.  But, you know, safe to say, things changed over the

10:08AM   16  course of 15 years, 16 years, when you get up to 2016,

10:08AM   17  correct?

10:08AM   18  A.  What's changed?

10:08AM   19  Q.  As far as trainings that you received in the DEA?

10:08AM   20  A.  I continued to receive training over those years.

10:08AM   21  Q.  And racial sensitivity training, that's -- that's a

10:08AM   22  training that went on, maybe not in 1999 as much as it did

10:08AM   23  later in your career; is that right?

10:08AM   24  A.  Again, with DEA, we had it at the academy.  I can't

10:08AM   25  specifically remember specific training with DEA.  I did have

| | | |
|---|---|---|
| 10:08AM | 1 | more afterwards when I went to the State Attorney General's |
| 10:09AM | 2 | Office, which was different. |
| 10:09AM | 3 | Q.  Okay.  Let's just focus -- |
| 10:09AM | 4 | A.  After -- |
| 10:09AM | 5 | Q.  -- let's just focus in on DEA. |
| 10:09AM | 6 | A.  Sure. |
| 10:09AM | 7 | Q.  So your understanding of DEA policy is that if a fellow |
| 10:09AM | 8 | officer in the DEA makes a comment like that, that's |
| 10:09AM | 9 | something that you need to report, correct? |
| 10:09AM | 10 | A.  Correct. |
| 10:09AM | 11 | Q.  And it's not something that you hold onto and try to |
| 10:09AM | 12 | process, the reporting rules are you need to report that to a |
| 10:09AM | 13 | supervisor, correct? |
| 10:09AM | 14 | A.  Correct. |
| 10:09AM | 15 | Q.  And you're clear in the policy -- you're clear on that |
| 10:09AM | 16 | policy in June of 2016, correct? |
| 10:09AM | 17 | A.  Yes. |
| 10:09AM | 18 | Q.  But you don't report it following your conversation, |
| 10:09AM | 19 | right? |
| 10:09AM | 20 | A.  No, I didn't. |
| 10:09AM | 21 | Q.  Walking out of that meeting, you were torn a little bit |
| 10:09AM | 22 | about is that comment about the stripper and get her out of |
| 10:09AM | 23 | there something that Peter Gerace made the phone call to the |
| 10:09AM | 24 | wrong person, or made the phone call to someone who might be |
| 10:09AM | 25 | engaged in illegal misconduct with Peter Gerace, right? |

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

28

10:09AM   1   A.   What do you mean "the wrong person?"

10:10AM   2   Q.   So you mentioned that one of the reasons why you were

10:10AM   3   trying to process what that call meant is that why would

10:10AM   4   Peter Gerace call Joe Bongiovanni?  Why wouldn't he just call

10:10AM   5   911; do you remember testifying about that a few moments ago?

10:10AM   6   A.   Yeah, I was completely caught off guard.

10:10AM   7   Q.   And the other part of it was is Peter Gerace calling Joe

10:10AM   8   Bongiovanni because Joe Bongiovanni has some involvement in

10:10AM   9   this or has some type of involvement in a coverup, right?

10:10AM  10   A.   Possibly.

10:10AM  11   Q.   And so that's going back and forth in your head at that

10:10AM  12   point in time.  When is it that you resolve what the nature

10:10AM  13   of that comment was?

10:10AM  14   A.   The nature of the stripper overdosing?

10:10AM  15   Q.   Yes.

10:10AM  16   A.   I -- I didn't.  I didn't.  I had no idea what he was

10:10AM  17   talking about.

10:10AM  18   Q.   So you didn't walk out of that meeting and then make a

10:10AM  19   decision a day or so later that this was for a bad purpose,

10:10AM  20   right?

10:10AM  21   A.   I never made a conscious decision that I can remember.

10:10AM  22   But I can tell you that I was believing more in this being a

10:10AM  23   bad thing about Gerace calling a DEA agent for help.  And in

10:11AM  24   my opinion at the time, help to cover something up.

10:11AM  25   Q.   And that was based on the fact that in addition to this

10:11AM  1    one particular comment about the stripper and get her out of

10:11AM  2    there, there was also this racial remark that you allege

10:11AM  3    happened in the conversation, right?

10:11AM  4    A.   Both those took place in that conversation.

10:11AM  5    Q.   And so if you have both those together, why isn't it that

10:11AM  6    you go to the supervisor and report all of it at that time?

10:11AM  7    A.   Sure.  Sure.  Very confused.  Trying to process the whole

10:11AM  8    situation.  In shock.  Dealing -- sorry to use the term -- a

10:11AM  9    shit sandwich situation and not knowing what to do.

10:11AM  10       I genuinely did not know as an experienced agent how to

10:11AM  11   deal with that situation.

10:11AM  12   Q.   Would you agree with me that you didn't have, like, any

10:11AM  13   type of long-standing allegiance to Joe Bongiovanni back in

10:11AM  14   June of 2016?

10:12AM  15   A.   I have no idea what you mean, Mr. Singer.  If you

10:12AM  16   could --

10:12AM  17   Q.   Sure.

10:12AM  18   A.   -- explain that.

10:12AM  19   Q.   So you worked with him for a few months; is that right?

10:12AM  20   A.   I worked with him for several months on a couple cases,

10:12AM  21   long-term investigation at that point is probably eight

10:12AM  22   months that I'm in the DEA office in Buffalo.

10:12AM  23   Q.   And you said that before you joined the office in

10:12AM  24   September of 2015, you met Mr. Bongiovanni from time to time

10:12AM  25   at a social event that you may have attended?

| | | |
|---|---|---|
| 10:12AM | 1 | A.  Correct. |
| 10:12AM | 2 | Q.  So you didn't grow up with him, right? |
| 10:12AM | 3 | A.  I did not. |
| 10:12AM | 4 | Q.  You weren't friends with him, correct? |
| 10:12AM | 5 | A.  I never knew Joe Bongiovanni until I got hired by DEA. |
| 10:12AM | 6 | Q.  When you got up here in September of 2016, it wasn't like |
| 10:12AM | 7 | you guys were hanging out after work, buddy-buddy, right? |
| 10:12AM | 8 | A.  Joe and I didn't do that. |
| 10:12AM | 9 | Q.  Your families weren't together after hours, correct? |
| 10:12AM | 10 | A.  No. |
| 10:12AM | 11 | Q.  And so is it a fair statement that you didn't have any |
| 10:12AM | 12 | type of long-standing allegiance to Joe Bongiovanni in June |
| 10:12AM | 13 | of 2016 when you alleged these comments were made? |
| 10:12AM | 14 | A.  Based on how you explained that, no. |
| 10:12AM | 15 | Q.  And we know based -- |
| 10:12AM | 16 | A.  The term "allegiance," though, again, that's -- I'm |
| 10:13AM | 17 | agreeing with what you just said, but that term "allegiance" |
| 10:13AM | 18 | is not a term that I would use to describe that. |
| 10:13AM | 19 | I had an allegiance to a fellow agent that I worked with. |
| 10:13AM | 20 | I had an allegiance to somebody that was my partner that |
| 10:13AM | 21 | had the same badge as I did, enforcing laws that we were |
| 10:13AM | 22 | sworn to do. |
| 10:13AM | 23 | I had an allegiance to someone that I conducted search |
| 10:13AM | 24 | warrants with and went through doors with, trusting someone |
| 10:13AM | 25 | to have my back in situations that are extremely dangerous, |

10:13AM    1    trusting someone that I interviewed informants with that were

10:13AM    2    providing sensitive information.

10:13AM    3        So "allegiance" isn't a term I would use.

10:13AM    4        I did not hang out with Joe in the way that you explained

10:13AM    5    it, but yeah, I had an allegiance through the job of being

10:13AM    6    fellow agents together and partners during a case.

10:13AM    7    Q.   Okay.  So you had an allegiance based on your working

10:13AM    8    relationship; is that fair to say?

10:13AM    9    A.   Correct.

10:13AM   10    Q.   And, so, it's also a fair statement based on your direct

10:13AM   11    testimony that -- that you had a comfort -- sorry, strike

10:13AM   12    that.

10:13AM   13        You were not incapable of making reports about Joe

10:14AM   14    Bongiovanni to your boss, right?

10:14AM   15    A.   What do you mean by "incapable?"

10:14AM   16    Q.   So -- so one of the things that we went over on cross and

10:14AM   17    you went over on direct is that when you had a concern that

10:14AM   18    Joe's phone number would show up in Peter Gerace's phone

10:14AM   19    during the subpoena, you didn't just kind of hide that or do

10:14AM   20    nothing, right?

10:14AM   21    A.   No, that wasn't as big a deal as what I was dealing with.

10:14AM   22    Q.   Okay.  But -- but you -- you had comfort in going to your

10:14AM   23    boss, G.S. Yensan, to report that concern, correct?

10:14AM   24    A.   I wouldn't use the term "comfort," but I went to Greg

10:14AM   25    with that uncomfortable conversation.

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

32

10:14AM   1   Q.  You were not incapable of discussing that with

10:14AM   2   G.S. Yensan?

10:14AM   3   A.  I discussed that with Yensan.

10:14AM   4   Q.  Because you had some trust that G.S. Yensan would give

10:14AM   5   you some advice on what to do, correct?

10:14AM   6   A.  I just knew that it was better to tell him beforehand not

10:14AM   7   even knowing if it would come up and just address it then.

10:14AM   8   Q.  Yeah.  Like, G.S. Yensan was not some stranger to you at

10:14AM   9   that point in time, right?

10:14AM  10   A.  No.  No, he was my supervisor.

10:14AM  11   Q.  And at -- at one point in time, he actually made you the

10:14AM  12   acting G.S. when he was no longer in the office, correct?

10:15AM  13   A.  Yeah.  I don't think it was at that point, but at some

10:15AM  14   point when I was in D-57, I was.

10:15AM  15   Q.  So there's some trust that you have with G.S. Yensan,

10:15AM  16   correct?

10:15AM  17   A.  Yes.

10:15AM  18   Q.  And there's some trust that G.S. Yensan has with you,

10:15AM  19   correct?

10:15AM  20   A.  Correct.

10:15AM  21   Q.  Yet you still chose not to raise this conversation and

10:15AM  22   the allegations you make in it with G.S. Yensan back in June

10:15AM  23   of 2016?

10:15AM  24   A.  No, that was a big jump from phone -- a phone number

10:15AM  25   being in contact with a convicted felon.

10:15AM    1    To me at the time, processing that was poor judgment.

10:15AM    2    Poor judgment of friends, poor judgment to continue to

10:15AM    3    associate with a convicted felon.

10:15AM    4    What I had just heard afterwards in that conference room

10:15AM    5    to me was beyond anything else I ever experienced in my law

10:15AM    6    enforcement career in dealing with a situation like that.

10:15AM    7    And I had no clue on how to process that, not even how to

10:15AM    8    deal with that, to the point that I, at some point, called

10:15AM    9    only fellow agents that had trained me to mention certain

10:15AM    10    things because I had no idea what to do.  No idea what to do.

10:16AM    11    How to handle that bad, bad situation as I explained it, a

10:16AM    12    shit sandwich.

10:16AM    13    Q.  And after all those conversations, you still chose not to

10:16AM    14    report it?

10:16AM    15    A.  No, I didn't.  No one gave me specific instructions and

10:16AM    16    things like that.  They listened to me, and I still chose not

10:16AM    17    to.

10:16AM    18    Q.  So when you raised this fact of this conversation at the

10:16AM    19    August 1st, 2018 meeting, you spoke about this after AUSA

10:16AM    20    Tripi asked you if there was a concern about Phil Domiano

10:16AM    21    being involved in this case; do you recall that?

10:16AM    22    A.  Again, I don't remember his exact words, but it was

10:16AM    23    brought up and my belief was there was a concern, so --

10:16AM    24    Q.  And you recall also telling prosecutors that -- that you

10:16AM    25    had a concern that possibly what Bongiovanni told you in that

| | | |
|---|---|---|
| 10:16AM | 1 | June 2016 conversation had a link to what Domiano may have |
| 10:16AM | 2 | been involved in? |
| 10:16AM | 3 | A.  Possibly.  Based on the circumstances of that girl being |
| 10:16AM | 4 | found in a parking lot, that it's possible that that could |
| 10:17AM | 5 | have been an overdose.  It could have been related back to |
| 10:17AM | 6 | what I was initially told.  I don't know.  I mean, but it was |
| 10:17AM | 7 | something that I mentioned. |
| 10:17AM | 8 | Q.  And as you talked about on direct yesterday, this was the |
| 10:17AM | 9 | very first time that you raised this allegation to anyone, |
| 10:17AM | 10 | correct? |
| 10:17AM | 11 | A.  It was the very first time that I had said it in front of |
| 10:17AM | 12 | a DEA supervisor or anybody at the U.S. Attorney's Office. |
| 10:17AM | 13 | Q.  So G.S. McHugh was with you at that meeting, correct? |
| 10:17AM | 14 | A.  He was. |
| 10:17AM | 15 | Q.  And he wasn't aware that you were gonna make this |
| 10:17AM | 16 | comment, correct? |
| 10:17AM | 17 | A.  No. |
| 10:17AM | 18 | Q.  AUSA Tripi wasn't aware you were gonna make this comment, |
| 10:17AM | 19 | correct? |
| 10:17AM | 20 | A.  Not to my knowledge. |
| 10:17AM | 21 | Q.  And when you make this particular comment, that kind of |
| 10:17AM | 22 | puts the meeting on hold for a little bit? |
| 10:17AM | 23 | A.  What do you mean? |
| 10:17AM | 24 | Q.  Sure.  So, I mean, this is a pretty substantial |
| 10:17AM | 25 | revelation that you just made about Agent Bongiovanni on |

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

10:17AM   1   August 1st, 2018, correct?

10:17AM   2   A.  I agree.

10:17AM   3   Q.  Your supervisor, who was sitting next to you, was caught

10:17AM   4   completely off guard, right?

10:17AM   5   A.  He was.

10:17AM   6   Q.  AUSA Tripi was surprised by the comment, correct?

10:18AM   7   A.  Again, I don't know if he was surprised, but --

10:18AM   8   Q.  But this all of a sudden dominated the remainder of the

10:18AM   9   conversation in that meeting; is that right?

10:18AM  10   A.  I don't know how much we spoke after that.  I think -- I

10:18AM  11   think it was a little bit.  I don't remember specifically

10:18AM  12   what of, but the meeting ended shortly after that.

10:18AM  13   Q.  All right.  So, when you made this allegation, again,

10:18AM  14   just so we're all tight with the timeline, this was after the

10:18AM  15   Ron Serio July 20, 2018 proffer, correct?

10:18AM  16   A.  Correct.

10:18AM  17   Q.  And in that proffer, again, Ron Serio implicated Joe

10:18AM  18   Bongiovanni providing information to him in some capacity?

10:18AM  19   A.  Something to the effect of Joe passing names of DEA

10:18AM  20   informants.

10:18AM  21   Q.  So you're aware of that, correct?

10:19AM  22   A.  I was.

10:19AM  23   Q.  This was after you conducted your investigation into the

10:19AM  24   Ron Serio file; is that right?

10:19AM  25   A.  I don't remember specifically when I looked through the

10:19AM   1   Ron Serio file.

10:19AM   2   Q.  We talked on cross yesterday --

10:19AM   3   A.  Okay.

10:19AM   4   Q.  -- that you took that step before you went into the

10:19AM   5   August 1st, 2018 meeting; do you remember that?

10:19AM   6   A.  I believe so.  Again, I'm sure you could show me, but I

10:19AM   7   have no reason to doubt what you're telling me.

10:19AM   8   Q.  All right.  And it was also after you took a look into

10:19AM   9   whether Peter Gerace showed up in any type of DEA reports and

10:19AM   10  you found Exhibit 30A that we looked at yesterday?

10:19AM   11  A.  Yes.  Yes.

10:19AM   12  Q.  So all those things occurred after you made this comment

10:19AM   13  to AUSA Tripi, correct?

10:19AM   14  A.  No, they occurred before.

10:19AM   15  Q.  They all -- yes, I'm sorry.  They all occurred before you

10:19AM   16  made this comment to AUSA Tripi on August 1st, 2018?

10:19AM   17  A.  Correct.

10:19AM   18  Q.  So, Mr. Casullo, your investigation into Peter Gerace,

10:20AM   19  eventually you're removed, you said, correct?

10:20AM   20  A.  I was told at some point that I would not be involved in

10:20AM   21  the investigation of Peter Gerace.

10:20AM   22  Q.  And I think you stated on direct that at first you didn't

10:20AM   23  really kind of understand the reason why, but later you came

10:20AM   24  to understand the reason why was because you were a witness

10:20AM   25  in the matter and could not investigate anymore?

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24
37

10:20AM   1   A.   Yes.

10:20AM   2   Q.   As far as your case into Peter and Anthony Gerace that

10:20AM   3   existed before this time, Joe Bongiovanni didn't take any

10:20AM   4   steps to prevent you from continuing your investigation,

10:20AM   5   correct?

10:20AM   6   A.   What do you mean?

10:20AM   7   Q.   Sure.  So -- so, you continued to take a look at Peter

10:20AM   8   Gerace in 2016, 2017, and onward, correct?

10:20AM   9   A.   I continued, it's not so much after the meeting with Joe,

10:21AM   10  but after a phone call from the U.S. Attorney's Office.

10:21AM   11  Q.   Well, we went through yesterday that in 2016, you didn't

10:21AM   12  perform any type of trash pulls or pole cams or pen

10:21AM   13  registers, things like that, right?

10:21AM   14  A.   Correct.

10:21AM   15  Q.   That your focus was to try to develop some type of

10:21AM   16  confidential source that you could use to dig inside the

10:21AM   17  organization?

10:21AM   18  A.   That was my hope.

10:21AM   19  Q.   And you didn't interview any strippers or anything along

10:21AM   20  those lines, but eventually Kevin Myszka came along?

10:21AM   21  A.   Correct.

10:21AM   22  Q.   And Kevin Myszka had information relevant to Peter Gerace

10:21AM   23  and Pharaoh's Gentlemen's Club, right?

10:21AM   24  A.   Yeah.  I found that out during the proffer, correct.

10:21AM   25  Q.   And you don't have any information that Mr. Bongiovanni

10:21AM 1    prevented you from doing anything to exploit that information

10:21AM 2    that Kevin Myszka can gave you, correct?

10:21AM 3    A.  I have no idea.

10:21AM 4    Q.  He didn't stop you from using Kevin Myszka to develop

10:21AM 5    sources, vis-à-vis Peter Gerace, right?

10:21AM 6    A.  I have no idea if Joe even was aware that we were doing

10:21AM 7    proffers and that Kevin was cooperating with us.  I have no

10:22AM 8    idea.  I wasn't working with him at that point, and I

10:22AM 9    certainly wasn't going to ask him to go to the proffer.

10:22AM 10   Q.  But everything continued forward as normal after you got

10:22AM 11   the information from Kevin Myszka, correct?

10:22AM 12   A.  So we conducted several proffers and he mentioned it, I

10:22AM 13   believe, in two, maybe all of them.  I can't remember for

10:22AM 14   certain.  So we conducted proffers, and Myszka provided

10:22AM 15   information.  So as far as things going forward as normal --

10:22AM 16   Q.  Yeah.

10:22AM 17   A.  -- is what we said, in -- in what way?

10:22AM 18   Q.  You still investigate Peter Gerace as you wanted,

10:22AM 19   correct?

10:22AM 20   A.  I conducted those proffers and got that information from

10:22AM 21   Myszka.

10:22AM 22   Q.  Like, nothing that Joe Bongiovanni did prevented you from

10:22AM 23   going into the Ron Serio proffer to talk about Anthony

10:22AM 24   Gerace, correct?

10:22AM 25   A.  So nothing prevented me -- yeah, I don't think Joe was

10:22AM  1    aware that I was going to do that.

10:22AM  2    Q.  And then when you start running the DARTS entries in the

10:22AM  3    beginning of August of 2018, it's after the Serio interview,

10:22AM  4    after this August 1st meeting, you mentioned that -- that Joe

10:23AM  5    came up to you and you had a conversation that made you

10:23AM  6    squirm; do you remember testifying to that?

10:23AM  7    A.  Regarding the Anthony Gerace deconfliction.

10:23AM  8    Q.  And you still continued to investigate Anthony Gerace,

10:23AM  9    correct?

10:23AM  10   A.  For a short period of time, yeah.  Because I was removed

10:23AM  11   shortly after that.  So --

10:23AM  12   Q.  And other officers in the DEA and HSI continued to

10:23AM  13   investigate Anthony Gerace, correct?

10:23AM  14   A.  The only person I know that continued to investigate

10:23AM  15   Anthony Gerace was Curtis Ryan from Homeland Security --

10:23AM  16   Q.  And you're --

10:23AM  17   A.  -- who had left our office.

10:23AM  18   Q.  And your understanding is that -- is that eventually

10:23AM  19   Agent Ryan towards the end of January executed a search

10:23AM  20   warrant in Anthony Gerace's house, correct?

10:23AM  21   A.  Curtis Ryan and Homeland Security Investigations executed

10:23AM  22   a search warrant at Anthony Gerace's house at some point.  I

10:23AM  23   wasn't involved, so I don't know the specifics.

10:23AM  24   Q.  And all that happened before Joe Bongiovanni retired,

10:23AM  25   correct?

USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

| | | |
|---|---|---|
| 10:23AM | 1 | A.  Again, you'd have to give me the timeline. |
| 10:23AM | 2 | Q.  Sure.  So if he retired on February 1st of 2019 -- |
| 10:23AM | 3 | A.  Yep. |
| 10:23AM | 4 | Q.  -- all that happened before he retired, right? |
| 10:24AM | 5 | A.  So that's when he retired.  And when was the search |
| 10:24AM | 6 | warrant executed? |
| 10:24AM | 7 | Q.  The search warrant was executed at the end of January of |
| 10:24AM | 8 | 2019. |
| 10:24AM | 9 | A.  Okay.  Correct. |
| 10:24AM | 10 | Q.  You started looking into Michael Sinatra -- |
| 10:24AM | 11 | A.  So, at some -- |
| 10:24AM | 12 | Q.  -- for burglary? |
| 10:24AM | 13 | A.  So, at some point, yeah, I received a report from Scott |
| 10:24AM | 14 | Sprague regarding a burglary.  So initially I didn't know it |
| 10:24AM | 15 | had anything to do with Michael Sinatra, I just knew it was a |
| 10:24AM | 16 | burglary. |
| 10:24AM | 17 | Q.  And you came to learn that that burglary that happened on |
| 10:24AM | 18 | New Year's Day, 2019, that's something that involved Mike |
| 10:24AM | 19 | Sinatra, correct? |
| 10:24AM | 20 | A.  I did learn that at some point, correct. |
| 10:24AM | 21 | Q.  And that's something that you started to investigate as |
| 10:24AM | 22 | well, correct? |
| 10:24AM | 23 | A.  Correct. |
| 10:24AM | 24 | Q.  You started to enter phone numbers into DARTS, correct? |
| 10:24AM | 25 | A.  I did. |

10:24AM    1    Q.  And we went through how he received notifications about

10:24AM    2    that, right?

10:24AM    3    A.  About what?

10:24AM    4    Q.  About -- about you entering information into DARTS,

10:24AM    5    correct?

10:24AM    6    A.  Correct.

10:24AM    7    Q.  And you continued that investigation unabated, correct?

10:24AM    8    A.  I continued to do that investigation on Sinatra with

10:25AM    9    Curtis Ryan.

10:25AM    10   Q.  And the first time that you make this report about that

10:25AM    11   June 2016 conversation you had with Mr. Bongiovanni was after

10:25AM    12   he was already under investigation, correct?

10:25AM    13   A.  After he was already under investigation by who?

10:25AM    14   Q.  By you, right?

10:25AM    15   A.  I wasn't investigating Joe Bongiovanni.  I was

10:25AM    16   investigating Peter Gerace.  I was investigating Anthony

10:25AM    17   Gerace.  I was not investigating Joseph Bongiovanni.

10:25AM    18   Q.  So you were at the July 20, 2018 proffer, correct?

10:25AM    19   A.  Correct.

10:25AM    20   Q.  That's where Ron Serio made allegations against Joe

10:25AM    21   Bongiovanni, correct?

10:25AM    22   A.  Correct.

10:25AM    23   Q.  You're aware of those, and you reported those to your

10:25AM    24   bosses, correct?

10:25AM    25   A.  We went back and spoke to Jim McHugh.

10:25AM    1   Q.  And you understood that that was going to result in an

10:25AM    2   investigation into Joe Bongiovanni, right?

10:25AM    3   A.  Well, that was the point of the conversation, how we were

10:25AM    4   going to handle that.  And it was decided at that point that

10:26AM    5   that information would be opened in a -- or, included in a

10:26AM    6   Homeland Security Investigation, not a DEA investigation.

10:26AM    7   Q.  Okay.  And so Mr. Bongiovanni, when you walked in on

10:26AM    8   August 1st, 2018, and disclosed the June 2016 conversation,

10:26AM    9   was under investigation, right?

10:26AM   10   A.  Again, could you please --

10:26AM   11           THE COURT:  Mr. Singer, we need to take a break now.

10:26AM   12           MR. SINGER:  Certainly, Judge.

10:26AM   13           THE COURT:  So please, folks, remember my

10:26AM   14   instructions about not communicating about the case even with

10:26AM   15   each other, not making up your mind.

10:26AM   16           See you back here in about ten or 15 minutes.

10:26AM   17           (Jury excused at 10:26 a.m.)

10:27AM   18           MR. MacKAY:  Yes, Judge, Mr. Bongiovanni flagged me

10:27AM   19   for an emergency --

10:27AM   20           THE COURT:  Okay.  Fine, fine.  Okay.  Anything

10:27AM   21   before we break?

10:27AM   22           MR. MacKAY:  No thank you.

10:27AM   23           MR. SINGER:  No, Judge.

10:27AM   24           THE COURT:  Okay.  We'll see you in about ten or 15

10:27AM   25   minutes.

Case 1:19-cr-00227-LJV-MJR    Document 1337    Filed 11/03/24    Page 43 of 103
USA v Bongiovanni - Casullo - Singer/Cross - 9/25/24

43

| | | |
|---|---|---|
| 10:27AM | 1 | **THE CLERK:**  All rise. |
| 10:27AM | 2 | (Off the record at 10:27 a.m.) |
| 10:42AM | 3 | (Back on the record at 10:42 a.m.) |
| 10:42AM | 4 | (Jury not present.) |
| 10:42AM | 5 | **THE CLERK:**  All rise. |
| 10:42AM | 6 | **THE COURT:**  Please be seated. |
| 10:42AM | 7 | **THE CLERK:**  We are back on the record for the |
| 10:42AM | 8 | continuation of the jury trial in case number 19-cr-227, |
| 10:43AM | 9 | United States of America versus Joseph Bongiovanni. |
| 10:43AM | 10 | All counsel and parties are present. |
| 10:43AM | 11 | **THE COURT:**  Okay.  Are we ready to resume? |
| 10:43AM | 12 | **MR. SINGER:**  Yes, Judge. |
| 10:43AM | 13 | **MR. COOPER:**  Yes, Judge. |
| 10:43AM | 14 | **THE COURT:**  Let's bring them back, please. |
| 10:43AM | 15 | Let's get the witness back in. |
| 10:44AM | 16 | (Witness and Jury seated at 10:44 a.m.) |
| 10:44AM | 17 | **THE COURT:**  The record will reflect that all our |
| 10:44AM | 18 | jurors are present. |
| 10:44AM | 19 | I remind the witness he's still under oath. |
| 10:44AM | 20 | Mr. Singer, you may continue. |
| 10:44AM | 21 | **MR. SINGER:**  Thank you. |
| 10:44AM | 22 | **BY MR. SINGER:** |
| 10:44AM | 23 | Q.  So, again, Mr. Casullo, you -- you -- you made an |
| 10:44AM | 24 | official report about the June 2016 conversation that you |
| 10:44AM | 25 | allegedly had with Mr. Bongiovanni not until August 1st of |

10:44AM  1    2018, correct?

10:44AM  2    A.  I -- I wrote a memo, but I never turned it in.

10:45AM  3    Q.  And that official report was made to AUSA Tripi and

10:45AM  4    G.S. McHugh who were in your presence, correct?

10:45AM  5    A.  I -- I can't remember who it was made through.  I think

10:45AM  6    it was made through my chain of command, which would have

10:45AM  7    been Jim McHugh and Ed Orgon, I believe -- maybe, I think,

10:45AM  8    all the way up to ASAC Zon.

10:45AM  9    Q.  But it was at that meeting that you disclosed this for

10:45AM  10   the first time officially?

10:45AM  11   A.  It was at that meeting that we previously discussed.

10:45AM  12   Q.  And that's a conversation in which you allege that

10:45AM  13   Mr. Bongiovanni reported an overdose or possible overdose at

10:45AM  14   Pharaoh's Gentlemen's Club, correct?

10:45AM  15   A.  Based on what I said.

10:45AM  16   Q.  That same conversation in which you allege that he used

10:45AM  17   the "N" and the "S" word to talk about investigations,

10:45AM  18   correct?

10:45AM  19   A.  Yes.

10:45AM  20   Q.  When all your training and reporting told you that you

10:45AM  21   should report the contents of that conversation immediately,

10:45AM  22   correct?

10:45AM  23   A.  Correct.

10:45AM  24   Q.  When all the training that you went to and the other

10:45AM  25   people you talked to about this went to, said they should

10:45AM   1    report the same thing, correct?

10:45AM   2    A.  What about the other people?

10:46AM   3    Q.  You said that you talked to other people in your office

10:46AM   4    and elsewhere about what was said in that June 2016

10:46AM   5    conversation, right?

10:46AM   6    A.  There were several close friends, correct.

10:46AM   7    Q.  And some of them were DEA agents, correct?

10:46AM   8    A.  I believe they were -- almost all of them were DEA

10:46AM   9    agents.

10:46AM   10   Q.  And those people went to the same training that you went

10:46AM   11   to, correct?

10:46AM   12   A.  They went to the academy.  I don't know if they had the

10:46AM   13   same training, but --

10:46AM   14   Q.  And -- and they were aware of the duty to report those

10:46AM   15   things to their supervisor when they learned them, correct?

10:46AM   16   A.  They should have been.

10:46AM   17   Q.  And all of this happened after AUSA Tripi told you that

10:46AM   18   Phil Domiano was somebody who could cause you to get

10:46AM   19   conflicted off of the Peter Gerace investigation?

10:46AM   20   A.  It came up during that meeting.

10:46AM   21        **MR. SINGER:**  Thank you, I have no further questions,

10:46AM   22   Judge.

10:46AM   23        **THE COURT:**  Redirect, Mr. Cooper?

10:46AM   24        **MR. COOPER:**  Yes, Judge, thank you.

10:46AM   25

10:46AM   1         **REDIRECT EXAMINATION BY MR. COOPER:**

10:47AM   2    Q.  What have you gained from reporting what the defendant

10:47AM   3    said to you in June of 2016 to the U.S. Attorney's Office and

10:47AM   4    Jim McHugh?  What got better in your life?

10:47AM   5    A.  It got worse.

10:47AM   6    Q.  Anything?  A single benefit?

10:47AM   7    A.  Not a single thing.  It made my career much more

10:47AM   8    difficult for the remaining years that I was at DEA, to the

10:47AM   9    point that I was actually allowed to go work on a task force

10:47AM  10    at the FBI office for my last, I believe, year and a half on

10:47AM  11    an organized crime task force outside the DEA office.

10:47AM  12    Q.  Did you make it up?

10:47AM  13    A.  Did I --

10:47AM  14    Q.  Did you make up what the defendant said to you in

10:47AM  15    conference room?

10:47AM  16    A.  Absolutely not.

10:47AM  17    Q.  Did you invent it because you wanted to get attention?

10:48AM  18    A.  Absolutely not.

10:48AM  19    Q.  Were you cross-examined for, like, six hours over the

10:48AM  20    last two days?

10:48AM  21    A.  Yes, sir.

10:48AM  22    Q.  I'm estimating there.

10:48AM  23         Was that fun?

10:48AM  24    A.  No.

10:48AM  25    Q.  Did you have a good time?

10:48AM    1    A.  No.

10:48AM    2    Q.  Was this the second time that you've testified at a

10:48AM    3    proceeding in this case?

10:48AM    4    A.  Yes.

10:48AM    5    Q.  Did you get cross-examined in that case?

10:48AM    6    A.  Yes.

10:48AM    7    Q.  Was that a lot of fun?

10:48AM    8    A.  No.

10:48AM    9    Q.  Did reporting it cause you to not be allowed to work on

10:48AM   10    the investigation?

10:48AM   11    A.  Yes.

10:48AM   12    Q.  As you sit here today, do you feel remorse that you

10:48AM   13    didn't report it right away?

10:48AM   14    A.  I should have reported that.  Based on the racial

10:48AM   15    comments alone, let alone the other things, I should have, in

10:48AM   16    hindsight.  I was dealing with a shitty situation, and I did

10:48AM   17    the best I could.

10:48AM   18    Q.  Are you a perfect person?

10:48AM   19    A.  Absolutely not.

10:49AM   20    Q.  I want to talk about some things that you discussed

10:49AM   21    yesterday on cross-examination starting with this Mike

10:49AM   22    Masecchia 2004 Las Vegas investigation.

10:49AM   23        Defense counsel asked you some questions about the

10:49AM   24    conversation that you had with the defendant when the

10:49AM   25    defendant called you in 2004 about Mike Masecchia.

10:49AM   1      Do you remember Mr. Singer asking you about that?

10:49AM   2   A.   Yes.

10:49AM   3   Q.   Now, on direct exam, I asked you an open-ended question,

10:49AM   4   and I said tell the jury about the conversation you had with

10:49AM   5   the defendant, what did the defendant say.

10:49AM   6      Do you remember me asking you that?

10:49AM   7   A.   Yes.

10:49AM   8   Q.   And in your own words, you described that the defendant

10:49AM   9   said he grew up with Mike Masecchia, and that his name

10:49AM  10   couldn't be on any reports; is that correct?

10:49AM  11   A.   In sum and substance, yes.

10:49AM  12   Q.   Okay.   I asked you whether the defendant told you that he

10:49AM  13   was friends with Mike Masecchia, and you said no on direct;

10:49AM  14   is that right?

10:49AM  15   A.   Correct.

10:49AM  16   Q.   I asked you whether the defendant told you that he drove

10:49AM  17   to college with Mike Masecchia every day, and you said no; is

10:49AM  18   that correct?

10:49AM  19   A.   Correct.

10:49AM  20   Q.   Later when Mr. Singer came up to ask you questions on

10:49AM  21   cross in the form of his question, he asked you whether the

10:50AM  22   defendant told you that he grew up with Mike, and that he

10:50AM  23   went to school with him.

10:50AM  24      Do you remember Mr. Singer asking you that question?

10:50AM  25   A.   Kind of.

| | | |
|---|---|---|
| 10:50AM | 1 | Q.  What's that? |
| 10:50AM | 2 | A.  Could you repeat it? |
| 10:50AM | 3 | Q.  Sure.  When Mr. Singer asked you questions, he asked you |
| 10:50AM | 4 | in the form of his question if the defendant told you during |
| 10:50AM | 5 | that 2004 phone call that he went to school with Mike |
| 10:50AM | 6 | Masecchia. |
| 10:50AM | 7 | Do you remember Mr. Singer asking you that? |
| 10:50AM | 8 | A.  Yes. |
| 10:50AM | 9 | Q.  Did the defendant say that to you in the 2004 |
| 10:50AM | 10 | conversation? |
| 10:50AM | 11 | A.  He said that they were from North Buffalo. |
| 10:50AM | 12 | Q.  Okay.  He said they grew up together? |
| 10:50AM | 13 | A.  Yep. |
| 10:50AM | 14 | Q.  On that same topic, you were asked questions regarding |
| 10:50AM | 15 | the information that the defendant told you about Masecchia |
| 10:50AM | 16 | being investigated by the sheriffs for a marijuana grow in |
| 10:50AM | 17 | the Southern Tier; do you remember that? |
| 10:50AM | 18 | A.  Yes. |
| 10:50AM | 19 | Q.  And you described that as, quote, good intelligence; is |
| 10:50AM | 20 | that right? |
| 10:50AM | 21 | A.  Correct. |
| 10:50AM | 22 | Q.  Was there anything that you could do in Las Vegas to |
| 10:50AM | 23 | investigate Mike Masecchia for grows in the Southern Tier of |
| 10:51AM | 24 | New York? |
| 10:51AM | 25 | A.  No. |

10:51AM    1    Q.  You described it as good intelligence.  If the defendant

10:51AM    2    had been tipping Mike Masecchia off about investigations into

10:51AM    3    his marijuana grows in the Southern Tier, would you still

10:51AM    4    consider the information the defendant conveyed to you to be

10:51AM    5    good intelligence?

10:51AM    6            MR. SINGER:  Objection.

10:51AM    7            THE COURT:  Basis of the objection?

10:51AM    8            MR. SINGER:  Assumes a hypothetical and speculation.

10:51AM    9            MR. COOPER:  Judge, there were lots of hypotheticals

10:51AM   10    on cross.  I'm --

10:51AM   11            THE COURT:  Hang on, hang on, hang on.

10:51AM   12            Overruled.

10:51AM   13            BY MR. COOPER:

10:51AM   14    Q.  If the defendant was tipping Mike Masecchia off about

10:51AM   15    investigations at the same time that he's telling you, hey,

10:51AM   16    the sheriffs are looking at him for a grow, would it still be

10:51AM   17    good intelligence?

10:51AM   18    A.  No.

10:51AM   19    Q.  Would it be useless intelligence?

10:51AM   20    A.  Yes.

10:51AM   21    Q.  Defense counsel asked you some questions on cross about

10:51AM   22    reasons why the defendant, this defendant, might not have

10:52AM   23    wanted his name on reports related to Masecchia; do you

10:52AM   24    remember that?

10:52AM   25    A.  Yes.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24    51

| | | |
|---|---|---|
| 10:52AM | 1 | Q.  Do you have any clue, any personal knowledge, as to why |
| 10:52AM | 2 | this defendant didn't want his name on reports? |
| 10:52AM | 3 | A.  I had no personal knowledge. |
| 10:52AM | 4 | Q.  You don't know what's in his head, right? |
| 10:52AM | 5 | A.  No. |
| 10:52AM | 6 | Q.  Defense counsel asked you if one possibility was because |
| 10:52AM | 7 | that would be awkward; do you remember being asked that? |
| 10:52AM | 8 | A.  Yes. |
| 10:52AM | 9 | Q.  Is another possibility because the defendant was tipping |
| 10:52AM | 10 | Mike Masecchia off about investigations -- |
| 10:52AM | 11 | **MR. SINGER:**  Objection. |
| 10:52AM | 12 | **BY MR. COOPER:** |
| 10:52AM | 13 | Q.  -- so he didn't want to be on the paperwork? |
| 10:52AM | 14 | **THE COURT:**  Hang on.  Stop. |
| 10:52AM | 15 | Basis? |
| 10:52AM | 16 | **MR. SINGER:**  First off, lack of personal knowledge, |
| 10:52AM | 17 | Judge.  Secondly, speculation. |
| 10:52AM | 18 | **MR. COOPER:**  So, Judge, yesterday the question was |
| 10:52AM | 19 | asked -- |
| 10:52AM | 20 | **MR. SINGER:**  Judge, if we're going to argue -- |
| 10:52AM | 21 | **THE COURT:**  Stop.  Let me read it, first. |
| 10:52AM | 22 | Okay.  Come on up. |
| 10:52AM | 23 | (Sidebar discussion held on the record.) |
| 10:53AM | 24 | **MR. COOPER:**  So, I objected yesterday, I believe, to |
| 10:53AM | 25 | the question being asked when we were getting into asking Tony |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 10:53AM | 1 | to speculate about why the defendant might have not wanted his |
| 10:53AM | 2 | name on reports.  You overruled the objection. |
| 10:53AM | 3 | Counsel's question was asking him if it was possible |
| 10:53AM | 4 | that the reason he didn't want his name on the reports is |
| 10:53AM | 5 | because it's awkward. |
| 10:53AM | 6 | On redirect, I want to explore if another possibility |
| 10:53AM | 7 | is because he's corrupt. |
| 10:53AM | 8 | **MR. SINGER:**  So -- so the basis of my question was |
| 10:53AM | 9 | the conversation that he had with Bongiovanni. |
| 10:53AM | 10 | Bongiovanni, as he related in his direct as well as |
| 10:53AM | 11 | on cross, told him he didn't want his report -- he didn't want |
| 10:53AM | 12 | his name on the report because he grew up with this guy. |
| 10:53AM | 13 | **THE COURT:**  Right. |
| 10:53AM | 14 | **MR. SINGER:**  And so I was alliterating for the jury |
| 10:53AM | 15 | why it was that an agent in DEA would have such concerns.  And |
| 10:53AM | 16 | Agent Casullo, I brought up an analogous example of the Peter |
| 10:53AM | 17 | Gerace investigation where his friend's -- sorry, his daughter |
| 10:53AM | 18 | had a friend on the soccer team which made things awkward for |
| 10:54AM | 19 | his name being on the report. |
| 10:54AM | 20 | **THE COURT:**  Right. |
| 10:54AM | 21 | **MR. SINGER:**  Also, that he grew up in North Buffalo |
| 10:54AM | 22 | and that would make it awkward. |
| 10:54AM | 23 | And that's all that I got into, Judge.  I didn't get |
| 10:54AM | 24 | into the hypotheticals of if this was happening this way.  So |
| 10:54AM | 25 | if he wants to ask -- |

| | | |
|---|---|---|
| 10:54AM | 1 | **THE COURT:** Why can't he ask another -- go ahead. |
| 10:54AM | 2 | **MR. SINGER:** Yeah. So if the government wants to ask |
| 10:54AM | 3 | a question based on what I asked during my cross-examination, |
| 10:54AM | 4 | that's within the scope, they can ask him why was it that you |
| 10:54AM | 5 | talked about how it would be awkward for your daughter to be |
| 10:54AM | 6 | on the same soccer team as a target of investigation, or if |
| 10:54AM | 7 | you went to the same gym as somebody and lived in the same |
| 10:54AM | 8 | community, that's fair game. |
| 10:54AM | 9 | But this is completely outside the scope. |
| 10:54AM | 10 | **MR. COOPER:** That's -- that's his narrative. |
| 10:54AM | 11 | **THE COURT:** Stop. Stop. Stop. Stop. |
| 10:54AM | 12 | Why isn't it -- so you say one reason why he might |
| 10:54AM | 13 | not want his name on the report is because he's got a |
| 10:54AM | 14 | connection, social connection to this guy. And you wouldn't |
| 10:54AM | 15 | want to see his name in the report. Right? |
| 10:54AM | 16 | Why isn't -- why isn't a legitimate question is |
| 10:54AM | 17 | another reason because he was tipping him off? |
| 10:55AM | 18 | **MR. SINGER:** So, because, my question was not based |
| 10:55AM | 19 | on a hypothetical. My question was based on a direct answer |
| 10:55AM | 20 | the witness gave on direct testimony regarding what Joe told |
| 10:55AM | 21 | him about why he didn't want his name on the report. |
| 10:55AM | 22 | This question is different. This question is a |
| 10:55AM | 23 | hypothetical. |
| 10:55AM | 24 | **THE COURT:** No, I don't think so. I don't think so. |
| 10:55AM | 25 | No, no, no. And then I'll -- I think you opened the door to |

| | | |
|---|---|---|
| 10:55AM | 1 | him suggesting that there might be other reasons why, and -- |
| 10:55AM | 2 | and I'm going to allow it. |
| 10:55AM | 3 | (End of sidebar discussion.) |
| 10:55AM | 4 | **THE COURT:**  The objection is overruled. |
| 10:55AM | 5 | **BY MR. COOPER:** |
| 10:55AM | 6 | Q.  We'll start that question again. |
| 10:55AM | 7 | Defense counsel asked you if one possibility why this |
| 10:55AM | 8 | defendant wouldn't want his name on reports is because it |
| 10:55AM | 9 | might be awkward for him. |
| 10:55AM | 10 | Do you remember Mr. Singer asking you that question? |
| 10:55AM | 11 | A.  I do. |
| 10:55AM | 12 | Q.  Is another possibility is because the defendant was |
| 10:55AM | 13 | tipping off Mike Masecchia about investigations, and he |
| 10:55AM | 14 | didn't want his name on the paperwork? |
| 10:55AM | 15 | A.  That's certainly possible. |
| 10:55AM | 16 | Q.  Okay.  You don't know, right? |
| 10:55AM | 17 | A.  I don't. |
| 10:55AM | 18 | Q.  You were asked some questions about -- on cross about the |
| 10:56AM | 19 | Cory Higgins 2009 investigation into Mike Masecchia back in |
| 10:56AM | 20 | Buffalo on cross. |
| 10:56AM | 21 | Do you remember those questions? |
| 10:56AM | 22 | A.  Yes. |
| 10:56AM | 23 | Q.  And you and Mr. Singer went back and forth for a few |
| 10:56AM | 24 | minutes about whether Masecchia was indexed with a NADDIS |
| 10:56AM | 25 | number or not on that form, right? |

| | | |
|---|---|---|
| 10:56AM | 1 | A.  Correct. |
| 10:56AM | 2 | Q.  And it was difficult to tell because the paper you were |
| 10:56AM | 3 | looking at was redacted, right? |
| 10:56AM | 4 | A.  It was. |
| 10:56AM | 5 | Q.  A black line drawn over it? |
| 10:56AM | 6 | A.  Yep. |
| 10:56AM | 7 | **MR. COOPER:**  Okay.  Ms. Champoux, can we pull up |
| 10:56AM | 8 | what's in evidence as Government Exhibit 12A. |
| 10:56AM | 9 | **BY MR. COOPER:** |
| 10:56AM | 10 | Q.  Is this the same ROI DEA-6 you were looking at yesterday? |
| 10:56AM | 11 | A.  This is a case closing. |
| 10:56AM | 12 | Q.  And this related to that 2009 Masecchia investigation |
| 10:56AM | 13 | from Cory Higgins, right? |
| 10:56AM | 14 | A.  Yeah.  Same case, case closing. |
| 10:56AM | 15 | **MR. COOPER:**  Can we go to page 2, Ms. Champoux. |
| 10:57AM | 16 | Page 3.  Page 4.  There we go.  We're good on page 4. |
| 10:57AM | 17 | **BY MR. COOPER:** |
| 10:57AM | 18 | Q.  Do you see Mike Masecchia here, is he indexed? |
| 10:57AM | 19 | A.  He is indexed. |
| 10:57AM | 20 | Q.  Does he have a NADDIS number? |
| 10:57AM | 21 | A.  He does. |
| 10:57AM | 22 | Q.  That clears that up a little bit without the redaction, |
| 10:57AM | 23 | right? |
| 10:57AM | 24 | A.  Correct. |
| 10:57AM | 25 | **MR. COOPER:**  Okay.  You can take that down, |

10:57AM   1   Ms. Champoux.   Thanks.

10:57AM   2            **BY MR. COOPER:**

10:57AM   3   Q.   Were you -- you were asked some questions on cross about

10:57AM   4   whether you ever got a call from the defendant in '09 putting

10:57AM   5   you in touch with Cory Higgins because he was investigating

10:57AM   6   Masecchia at that time, right?

10:57AM   7   A.   Correct.

10:57AM   8   Q.   Okay.   And during that cross, Mr. Singer suggested to you

10:57AM   9   that you wouldn't have had any useful information to provide

10:57AM  10   because your investigation was closed before 2009.

10:57AM  11        Do you remember that?

10:57AM  12   A.   I remember.

10:57AM  13   Q.   Do DEA agents commonly share historical information about

10:57AM  14   targets with each other?

10:57AM  15   A.   Yes.

10:57AM  16   Q.   Does that help further investigations?

10:57AM  17   A.   It certainly could.

10:58AM  18   Q.   Does the fact that your file was closed mean that your

10:58AM  19   brain has no information about Mike Masecchia in it?

10:58AM  20   A.   No.

10:58AM  21   Q.   Did you know people he was supposed to be coming out to

10:58AM  22   Vegas to associate with?

10:58AM  23   A.   I did.

10:58AM  24   Q.   Did you have a case on those people?

10:58AM  25   A.   Yes.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 10:58AM | 1 | Q.  Is it possible, based on your experience as a DEA agent, |
| 10:58AM | 2 | that things you knew could have helped Cory Higgins? |
| 10:58AM | 3 | A.  Possibly. |
| 10:58AM | 4 | Q.  Did the defendant know that the Vegas office had a file |
| 10:58AM | 5 | opened to Masecchia in 2004? |
| 10:58AM | 6 | A.  Yes. |
| 10:58AM | 7 | Q.  Did he know that the Buffalo office had a file opened |
| 10:58AM | 8 | into Masecchia in 2004? |
| 10:58AM | 9 | A.  Yes. |
| 10:58AM | 10 | Q.  Are you aware of whether the defendant ever approached |
| 10:58AM | 11 | Cory Higgins and actually spoke to him about the |
| 10:58AM | 12 | investigation into Masecchia? |
| 10:58AM | 13 | A.  I wasn't aware until Cory Higgins told me -- |
| 10:58AM | 14 | Q.  Okay. |
| 10:58AM | 15 | A.  -- at some point. |
| 10:58AM | 16 | Q.  Do you have personal knowledge of whether that happened |
| 10:58AM | 17 | or not? |
| 10:58AM | 18 | A.  No. |
| 10:58AM | 19 | Q.  Do you know what the defendant -- do you have personal |
| 10:58AM | 20 | knowledge of what that conversation was? |
| 10:58AM | 21 | A.  Not personal knowledge. |
| 10:58AM | 22 | Q.  Would Cory Higgins know that? |
| 10:58AM | 23 | A.  Cory Higgins should know that. |
| 10:58AM | 24 | Q.  Yep.  Next I want to talk with you about the conversation |
| 10:59AM | 25 | you had with this defendant about his Ron Serio case in 2015. |

10:59AM  1    Do you remember being asked about that on cross?

10:59AM  2  A.  Yes.

10:59AM  3  Q.  Defense counsel asked you some questions on cross about

10:59AM  4  that fall 2015 conversation when the defendant talked to you

10:59AM  5  about his investigation of Ron Serio.

10:59AM  6    Do you remember being asked questions about that?

10:59AM  7  A.  Yes.

10:59AM  8  Q.  And Mr. Singer asked you whether you knew the file to be

10:59AM  9  closed already by the time the defendant said those things to

10:59AM  10  you; do you remember that?

10:59AM  11  A.  I remember.

10:59AM  12  Q.  Okay.  And at the time you were having that conversation

10:59AM  13  with the defendant, he's telling you all about his big Ron

10:59AM  14  Serio file.

10:59AM  15    Did you know it to be closed at that time?

10:59AM  16  A.  No.

10:59AM  17  Q.  The way the defendant discussed the case with you, was he

10:59AM  18  representing to you that the case was open?

10:59AM  19  A.  Yes.

10:59AM  20    MR. COOPER:  Ms. Champoux, can we pull up Government

10:59AM  21  Exhibit 8B, please?

10:59AM  22    BY MR. COOPER:

10:59AM  23  Q.  This report's called a case closing, right?

10:59AM  24  A.  Yes.

10:59AM  25  Q.  I think we looked at it on direct.  It's written by Joe

11:00AM   1   Bongiovanni, correct?

11:00AM   2   A.  Correct.

11:00AM   3   Q.  And the date it's prepared is January 28th, 2015, right?

11:00AM   4   A.  Correct.

11:00AM   5   Q.  Okay.  And the file number is C2-13-0026, right?

11:00AM   6   A.  Correct.

11:00AM   7   Q.  January of 2015 is at least six months, seven months

11:00AM   8   before you had that conversation with the defendant, right?

11:00AM   9   A.  Correct.

11:00AM  10   Q.  When he was telling you all about his Serio case, did he

11:00AM  11   pull out the case closing and say, Tony, my case has actually

11:00AM  12   been closed for six months?

11:00AM  13   A.  No.

11:00AM  14   Q.  He didn't say that?

11:00AM  15   A.  No.

11:00AM  16        MR. COOPER:  Ms. Champoux, can we take that down,

11:00AM  17   please.

11:00AM  18        BY MR. COOPER:

11:00AM  19   Q.  Defense counsel asked you a bunch of questions about

11:00AM  20   that.  He pressed you on it, but you maintained on

11:00AM  21   cross-examination that the defendant represented to you that

11:00AM  22   his case was still open; is that correct?

11:00AM  23   A.  Correct.

11:00AM  24        MR. COOPER:  Ms. Champoux, can we pull up Government

11:00AM  25   Exhibit 22Q.  Can we zoom in on this middle email here?

11:00AM  1    That's the one.

11:00AM  2            **BY MR. COOPER:**

11:00AM  3    Q.  What's the date of this email, Special Agent Casullo?

11:01AM  4    A.  July 28th, 2015.

11:01AM  5    Q.  Is that after January 28th, 2015?

11:01AM  6    A.  Yes.

11:01AM  7    Q.  About six months later?

11:01AM  8    A.  Yes.

11:01AM  9    Q.  Read what the defendant wrote to Scott Deming six months

11:01AM  10   after he closed his Serio file.

11:01AM  11   A.  Scott, I am not working on the case with Charlie Tolias.

11:01AM  12   We are and have been working on this case currently.  We

11:01AM  13   never stopped.  I would appreciate if you not share any info

11:01AM  14   relevant to this DEA investigation with DHS until we could

11:01AM  15   coordinate.  Thank you for the message.  S.A. Bongiovanni.

11:01AM  16   Q.  Okay.  So I guess it's fair to say you weren't the only

11:01AM  17   person to whom this defendant represented he had an active

11:01AM  18   investigation into Ron Serio months after he had already

11:01AM  19   closed the file, right?

11:01AM  20           **MR. SINGER:**  Objection to the form of the question.

11:01AM  21           **THE COURT:**  Sustained to the form of the question.

11:01AM  22           **BY MR. COOPER:**

11:01AM  23   Q.  How many years were you a DEA agent, sir?

11:01AM  24   A.  Approximately 23.

11:01AM  25   Q.  In the 23 years of experience that you have as a DEA

11:02AM    1    agent, is it your interpretation of this email that the

11:02AM    2    defendant is representing that his file into Serio is still

11:02AM    3    open?

11:02AM    4            **MR. SINGER:**  Objection to speculation.

11:02AM    5            **THE COURT:**  Overruled.

11:02AM    6            **THE WITNESS:**  Yes.

11:02AM    7            **BY MR. COOPER:**

11:02AM    8    Q.  Not a lot of room for interpretation, right?

11:02AM    9            **MR. SINGER:**  Objection.

11:02AM    10           **BY MR. COOPER:**

11:02AM    11   Q.  We are and have been --

11:02AM    12           **THE COURT:**  Sustained.

11:02AM    13           **BY MR. COOPER:**

11:02AM    14   Q.  Do you see the sentence, we are and have been working on

11:02AM    15   this case currently?

11:02AM    16   A.  Yes.

11:02AM    17   Q.  Do you see the sentence, we never stopped?

11:02AM    18   A.  Yes.

11:02AM    19   Q.  And then do you see the sentence where he says, hey,

11:02AM    20   don't share any of my information with DHS?

11:02AM    21   A.  Yes.

11:02AM    22   Q.  Okay.  That's six months after he closed the file, right?

11:02AM    23   A.  Approximately.

11:02AM    24   Q.  Almost to the day, right, July 28th, 2015?

11:02AM    25   A.  Yes.

| | | |
|---|---|---|
| 11:02AM | 1 | **MR. COOPER:** You can take that down, Ms. Champoux. |
| 11:02AM | 2 | **BY MR. COOPER:** |
| 11:02AM | 3 | Q. On the same topic during cross-examination, you mentioned |
| 11:02AM | 4 | that it would have been of interest to you to learn that Mike |
| 11:02AM | 5 | Masecchia had come up during the defendant's Ron Serio |
| 11:02AM | 6 | investigation; is that right? |
| 11:03AM | 7 | A. Yes. |
| 11:03AM | 8 | Q. During that conversation, did the defendant say to you, |
| 11:03AM | 9 | hey, that target that we both worked on back in '04, Mike |
| 11:03AM | 10 | Masecchia, he's all over Ron Serio's tolls. Do you want to |
| 11:03AM | 11 | help me investigate that? |
| 11:03AM | 12 | A. No. |
| 11:03AM | 13 | Q. He didn't say that to you? |
| 11:03AM | 14 | A. No. |
| 11:03AM | 15 | Q. If he had said that to you, if he had mentioned Mike |
| 11:03AM | 16 | Masecchia at all, would you have taken an interest in |
| 11:03AM | 17 | furthering that investigation? |
| 11:03AM | 18 | A. 100 percent. |
| 11:03AM | 19 | Q. All right. Don't want to spend too much time on DARTS |
| 11:03AM | 20 | deconflictions but we're going to do a little bit. |
| 11:03AM | 21 | **MR. COOPER:** Ms. Champoux, can we pull up 26D, as in |
| 11:03AM | 22 | David, on the left and Government Exhibit 8A on the right. |
| 11:03AM | 23 | All right. And on 26D, can you scroll between pages |
| 11:03AM | 24 | 3 and 4. Yep, that's perfect. |
| 11:03AM | 25 | And then on 8A, can you please go to page 347. |

11:04AM    1              **BY MR. COOPER:**

11:04AM    2    Q.  All right.  That number on the left on the DARTS here for

11:04AM    3    the Trinity item, 716-866-2687.  Is that the same number

11:04AM    4    that's listed here on the subscriber return for Paul

11:04AM    5    Francoforte?

11:04AM    6    A.  Yes.

11:04AM    7    Q.  Is Paul Francoforte Hot Dog?

11:04AM    8    A.  That's how I know him.

11:04AM    9    Q.  When you ran Hot Dog's phone number in DARTS on

11:04AM   10    January 7th, 2019, and March 13th, 2019, did that cause the

11:04AM   11    defendant to be notified that you were looking at his phone

11:04AM   12    number in an investigation?

11:04AM   13    A.  Yes.

11:04AM   14    Q.  Okay.  Special Agent Casullo, I want you to remember the

11:04AM   15    date for me that you ran the DARTS in January.  Look at it

11:04AM   16    right now.  What's the date in January that you ran him in

11:04AM   17    DARTS?

11:04AM   18    A.  January 7th, 2019.

11:04AM   19    Q.  All right.  Keep that in your mind, okay?

11:05AM   20    A.  Yes.

11:05AM   21              **MR. COOPER:**  Ms. Champoux, can you take this down and

11:05AM   22    pull up Government Exhibit 358, the Excel spreadsheet Volty

11:05AM   23    records, and we're going to go to line 2511.

11:05AM   24              **BY MR. COOPER:**

11:05AM   25    Q.  This is the defendant's phone records, sir.

| | | |
|---|---|---|
| 11:05AM | 1 | Do you see a call on line 2511 from January 28th, 2019? |
| 11:05AM | 2 | A.  Okay.  I'm looking at it.  And I see Hot Dog's number.  I |
| 11:05AM | 3 | don't know the other number that it's in contact with. |
| 11:05AM | 4 | Q.  Okay.  If -- if the 718 -- 716-818-0966 number belongs to |
| 11:05AM | 5 | the defendant, is this an example of a phone call about three |
| 11:05AM | 6 | weeks after you ran Hot Dog's number in DARTS between the |
| 11:05AM | 7 | defendant and Hot Dog? |
| 11:05AM | 8 | A.  Yes. |
| 11:05AM | 9 | MR. SINGER:  Object to form of the question, Judge. |
| 11:05AM | 10 | Misstates the evidence. |
| 11:05AM | 11 | THE COURT:  You can get into that on recross. |
| 11:05AM | 12 | Overruled. |
| 11:05AM | 13 | BY MR. COOPER: |
| 11:05AM | 14 | Q.  Let's -- let's take our time with it.  You're familiar |
| 11:05AM | 15 | with phone records, right, sir? |
| 11:06AM | 16 | A.  Yes. |
| 11:06AM | 17 | Q.  Are these phone records? |
| 11:06AM | 18 | A.  Call detail records, phone records, correct. |
| 11:06AM | 19 | Q.  Does this show when one party is calling another? |
| 11:06AM | 20 | A.  Yes. |
| 11:06AM | 21 | Q.  In -- I always mess this up, in column A, is that the |
| 11:06AM | 22 | date and time that a call was made? |
| 11:06AM | 23 | A.  Correct. |
| 11:06AM | 24 | Q.  Okay.  And in columns D, E, and F, is it listing the |
| 11:06AM | 25 | phone numbers involved in the call? |

| | | |
|---|---|---|
| 11:06AM | 1 | A.  That is correct. |
| 11:06AM | 2 | Q.  Okay.  January 28th, 2019, is about three weeks after |
| 11:06AM | 3 | January 7th, 2019; is that correct? |
| 11:06AM | 4 | A.  Correct. |
| 11:06AM | 5 | Q.  716-866-2687 is Hot Dog's phone number according to the |
| 11:06AM | 6 | subscriber information that we just looked at on Government |
| 11:06AM | 7 | Exhibit 8A, page 347; is that right, sir? |
| 11:06AM | 8 | A.  That's correct. |
| 11:06AM | 9 | Q.  Okay.  Do you know if 716-818-0966 is the defendant's |
| 11:06AM | 10 | phone number? |
| 11:06AM | 11 | A.  I can't remember his number. |
| 11:06AM | 12 | MR. COOPER:  Okay.  We'll take a break for one |
| 11:06AM | 13 | second. |
| 11:07AM | 14 | Is there a stipulation for phone records? |
| 11:07AM | 15 | Oh, it is -- it's stipulated?  Can you get me that? |
| 11:07AM | 16 | MS. CHAMPOUX:  Yes. |
| 11:07AM | 17 | MR. COOPER:  Thank you. |
| 11:07AM | 18 | I'm going to read Court Exhibit 5 for a moment, |
| 11:07AM | 19 | Judge, with your permission. |
| 11:07AM | 20 | THE COURT:  Sure. |
| 11:07AM | 21 | MR. COOPER:  This is paragraph 1 of a Joint Trial |
| 11:07AM | 22 | Stipulation. |
| 11:07AM | 23 | THE COURT:  This is a stipulation? |
| 11:07AM | 24 | MR. COOPER:  Yes, Judge. |
| 11:07AM | 25 | THE COURT:  Okay. |

11:07AM  1    **MR. COOPER:**  On or about February 1, 2019, the

11:07AM  2    defendant turned in his DEA-issued Apple iPhone cellular

11:07AM  3    telephone assigned phone number 716-818-0966, and I'm going to

11:07AM  4    stop reading it there.

11:07AM  5            **BY MR. COOPER:**

11:07AM  6    Q.  Is that the same phone number that's listed in those

11:07AM  7    phone records, sir?

11:07AM  8    A.  Yes.

11:07AM  9    Q.  Calling Hot Dog or receiving a call from Hot Dog?

11:07AM  10   A.  Correct.

11:07AM  11           **MR. COOPER:**  You can take that down, Ms. Champoux.

11:07AM  12           **BY MR. COOPER:**

11:07AM  13   Q.  That's about three weeks after you ran Hot Dog in DARTS,

11:07AM  14   right?

11:07AM  15   A.  Correct.

11:07AM  16   Q.  Do you know what the defendant talked to Hot Dog about on

11:08AM  17   the phone?

11:08AM  18   A.  No.

11:08AM  19           **MR. COOPER:**  Ms. Champoux, let's pivot and go to the

11:08AM  20   PDF from Government Exhibit 358 entitled 190131677bills.PDF.

11:08AM  21           Can you Control F and search 716-866-2687.

11:08AM  22           **BY MR. COOPER:**

11:08AM  23   Q.  In the top-right corner of your screen here, can you see

11:08AM  24   when we search Hot Dog's phone number, how many times he

11:08AM  25   shows up in the defendant's phone records?

11:08AM     1    A.  It says find 1 of 50, I don't know if that's what you're

11:08AM     2    talking about.

11:08AM     3    Q.  Do you see the highlighted entry here from December 2nd?

11:08AM     4    A.  I see that.  Correct.

11:08AM     5    Q.  Okay.  Is that Hot Dog's phone number?

11:08AM     6    A.  Yes.

11:08AM     7          **MR. COOPER:**  Ms. Champoux, can you click the next

11:08AM     8    button?

11:09AM     9          **BY MR. COOPER:**

11:09AM    10    Q.  Is this 2/21 Hot Dog's phone number?

11:09AM    11    A.  That's correct.

11:09AM    12    Q.  Okay.  Now it says 2 of 50 in the top right?

11:09AM    13    A.  Correct.

11:09AM    14    Q.  Do you understand this to mean that there's 50 instances

11:09AM    15    of Hot Dog and the defendant in phone contact in the

11:09AM    16    defendant's phone records?

11:09AM    17    A.  Now, I do.

11:09AM    18    Q.  Is that a yes?

11:09AM    19    A.  That's yes.

11:09AM    20          **MR. COOPER:**  Okay.  Thank you.  You can take that

11:09AM    21    down, Ms. Champoux.

11:09AM    22          **BY MR. COOPER:**

11:09AM    23    Q.  Do you know what they talked about on those 50 phone

11:09AM    24    calls?

11:09AM    25    A.  No.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

11:09AM   1   Q.  You were asked some questions on that same topic of DARTS

11:09AM   2   generally about in the ordinary course of a DEA

11:09AM   3   investigation, if you would first do a subpoena for

11:09AM   4   subscriber information, and then later have a DARTS entry

11:09AM   5   that identifies the name of the user of the phone.

11:09AM   6       Do you remember those questions?

11:09AM   7   A.  Yes.

11:09AM   8   Q.  That's one way to learn someone's phone number, right?

11:09AM   9   To do a subpoena for subscriber information?

11:09AM  10   A.  Oh, yes.

11:09AM  11   Q.  Okay.  Is another way to learn someone's phone number

11:10AM  12   other than doing a law enforcement subpoena to just call that

11:10AM  13   person 50 times on the phone?

11:10AM  14   A.  Yes.

11:10AM  15   Q.  Now, I'm not asking whether you're supposed to do this,

11:10AM  16   but is it possible, humanly possible, for a DEA agent to

11:10AM  17   cause a subpoena for subscriber information to be issued for

11:10AM  18   a phone number when they already know that the phone belongs

11:10AM  19   to a person because they have a personal relationship with

11:10AM  20   them?

11:10AM  21   A.  Oh, yes.

11:10AM  22   Q.  That's humanly possible?

11:10AM  23   A.  Yes.

11:10AM  24   Q.  Would that cause the same DEA agent to be notified if

11:10AM  25   someone else in law enforcement ran that number in DARTS or

| | | |
|---|---|---|
| 11:10AM | 1 | DICE? |
| 11:10AM | 2 | A.  Yes. |
| 11:10AM | 3 | Q.  Was the defendant notified that you ran Hot Dog's number |
| 11:10AM | 4 | in DARTS in January of 2019? |
| 11:10AM | 5 | A.  Yes. |
| 11:10AM | 6 | Q.  All right.  We're going to move on now.  I'm going to |
| 11:10AM | 7 | hand you -- actually, what's in evidence as Government |
| 11:10AM | 8 | Exhibit 100D-2.  Just take a look at this.  Did you ever see |
| 11:11AM | 9 | that before, sir? |
| 11:11AM | 10 | A.  I don't believe so. |
| 11:11AM | 11 | Q.  Open it up.  Take a look at it. |
| 11:11AM | 12 | A.  I've never seen this. |
| 11:11AM | 13 | Q.  Okay.  Can you close it real quick, look at the front. |
| 11:11AM | 14 | What's it say on the front? |
| 11:11AM | 15 | A.  Wedding day, congratulations on your wedding day. |
| 11:11AM | 16 | **MR. COOPER:**  May I approach, Judge? |
| 11:11AM | 17 | **THE COURT:**  Yes, you may. |
| 11:11AM | 18 | **MR. COOPER:**  May I have that back?  Thanks. |
| 11:11AM | 19 | May I have the ELMO, Ms. Demma? |
| 11:11AM | 20 | **BY MR. COOPER:** |
| 11:11AM | 21 | Q.  This is what's in evidence as Government Exhibit 100D-2, |
| 11:11AM | 22 | I'm going to publish it for the jury. |
| 11:11AM | 23 | Is this the front of a card? |
| 11:11AM | 24 | A.  Yes. |
| 11:12AM | 25 | Q.  Does it appear to be a wedding card, based on your life |

11:12AM    1    experience?

11:12AM    2    A.  Yes.

11:12AM    3    Q.  Does it have a handwritten note at the bottom?

11:12AM    4    A.  Yes, it does.

11:12AM    5    Q.  What's it say?

11:12AM    6    A.  Love, Hot Dog and Lynn.  Honored to be your friends.

11:12AM    7    Many years of happiness.

11:12AM    8    Q.  When you ran Hot Dog's number in DARTS, did the defendant

11:12AM    9    come up to you and say, hey, I'm actually friends with

11:12AM    10   Hot Dog?

11:12AM    11   A.  No.

11:12AM    12   Q.  That didn't happen?

11:12AM    13   A.  No.

11:12AM    14   Q.  Do you know where that wedding card was recovered from,

11:12AM    15   sir?

11:12AM    16   A.  No.

11:12AM    17   Q.  Okay.  Special Agent Casullo, you were asked some

11:13AM    18   questions by Mr. Singer about whether you ever reported the

11:13AM    19   comments that the defendant made to you about investigating

11:13AM    20   Anthony Gerace in 2018; do you remember that?

11:13AM    21   A.  I'm sorry, could you repeat that?

11:13AM    22   Q.  Yeah.  Absolutely.

11:13AM    23       You were asked on cross-examination by defense counsel if

11:13AM    24   you ever reported the comments that the defendant made to you

11:13AM    25   about your investigation into Anthony Gerace.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24
71

| | | |
|---|---|---|
| 11:13AM | 1 | Do you remember him asking you about that? |
| 11:13AM | 2 | A.  Yes. |
| 11:13AM | 3 | Q.  Did you report that to a federal grand jury when you |
| 11:13AM | 4 | testified in May of 2020? |
| 11:13AM | 5 | A.  Yes. |
| 11:13AM | 6 | Q.  Did you report it to Special Agent Ryan and AUSA Tripi |
| 11:13AM | 7 | before you ever went in the grand jury? |
| 11:13AM | 8 | A.  Yes. |
| 11:13AM | 9 | Q.  Okay. |
| 11:13AM | 10 | MR. COOPER:  Ms. Champoux, can we go to 26C real -- |
| 11:13AM | 11 | real quick. |
| 11:13AM | 12 | You can scroll down just a bit.  Thanks. |
| 11:13AM | 13 | That's fine, just to get the bottom there. |
| 11:14AM | 14 | BY MR. COOPER: |
| 11:14AM | 15 | Q.  On cross-examination, while you were being cross-examined |
| 11:14AM | 16 | about this document, sir, in response to a question you said, |
| 11:14AM | 17 | hey, there was a reason that I kept my -- my remarks general. |
| 11:14AM | 18 | There was a specific reason I did that.  And then the |
| 11:14AM | 19 | questioning moved on. |
| 11:14AM | 20 | Explain to the jury, what's the specific reasoning that |
| 11:14AM | 21 | you kept your remarks general here? |
| 11:14AM | 22 | A.  Because I didn't want Joe Bongiovanni knowing that I was |
| 11:14AM | 23 | running tolls on Anthony Gerace. |
| 11:14AM | 24 | Q.  Okay.  Had that gone poorly the first time it happened? |
| 11:14AM | 25 | A.  Yes. |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

72

| | | |
|---|---|---|
| 11:14AM | 1 | Q.  Did there come a time where you were notified that the |
| 11:14AM | 2 | defendant had been complaining about you making mention of |
| 11:14AM | 3 | Italian Organized Crime in your DARTS entries? |
| 11:14AM | 4 | **MR. SINGER:**  Object to the hearsay. |
| 11:14AM | 5 | **THE COURT:**  Sustained. |
| 11:14AM | 6 | **BY MR. COOPER:** |
| 11:14AM | 7 | Q.  Did you stop mentioning Italian Organized Crime in your |
| 11:14AM | 8 | DARTS entries at some point? |
| 11:14AM | 9 | A.  Yes, I was told to by my supervisor, Jim McHugh. |
| 11:15AM | 10 | Q.  Okay.  Without getting into what Jim McHugh said to you, |
| 11:15AM | 11 | did Jim McHugh explain to you why he was telling you to stop |
| 11:15AM | 12 | doing that? |
| 11:15AM | 13 | A.  Yes, he did. |
| 11:15AM | 14 | Q.  Was that a directive from Jim McHugh? |
| 11:15AM | 15 | A.  Yes. |
| 11:15AM | 16 | Q.  What did Jim McHugh say to you? |
| 11:15AM | 17 | A.  He said that Ed Orgon, the resident agent in charge -- |
| 11:15AM | 18 | **MR. SINGER:**  Objection to hearsay. |
| 11:15AM | 19 | **MR. COOPER:**  It's a directive, Judge, I just asked |
| 11:15AM | 20 | him. |
| 11:15AM | 21 | **THE COURT:**  It sounds like he's going to say |
| 11:15AM | 22 | something that Ed Orgon said to him. |
| 11:15AM | 23 | **MR. COOPER:**  Okay. |
| 11:15AM | 24 | **THE COURT:**  That sounds like there's going to be |
| 11:15AM | 25 | hearsay within hearsay based on where he's going.  Maybe not. |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24    73

11:15AM    1    So -- so, if you want to continue to explore, but he -- again,

11:15AM    2    there's got to be --

11:15AM    3            **MR. COOPER:**  Sure.

11:15AM    4            **THE COURT:**  -- an exception to hearsay for every bit

11:15AM    5    of hearsay.  You understand that?

11:15AM    6            **MR. COOPER:**  I do, Judge.  Thank you.

11:15AM    7            **BY MR. COOPER:**

11:15AM    8    Q.  Was the defendant brought up in your conversation with

11:15AM    9    Jim McHugh?

11:15AM    10   A.  Yes.

11:15AM    11           **MR. COOPER:**  Okay.  That's fine, we'll move on.

11:15AM    12           Can you take that down, Ms. Champoux.

11:15AM    13           **BY MR. COOPER:**

11:16AM    14   Q.  You were asked some questions by Mr. Singer about whether

11:16AM    15   you saw a lot of marijuana cases in the DEA Buffalo resident

11:16AM    16   office.

11:16AM    17       Do you remember those questions?

11:16AM    18   A.  Correct.

11:16AM    19   Q.  Based on how many years total did you work in the DEA

11:16AM    20   Buffalo resident office?

11:16AM    21   A.  From September of 2015 until I retired in March of 2022.

11:16AM    22   So a little bit less than seven years.

11:16AM    23   Q.  Okay.  And in the little bit less than seven years that

11:16AM    24   you spent in the DEA in Buffalo specifically, would a drug

11:16AM    25   dealer making millions of dollars and living in a giant

| | | |
|---|---|---|
| 11:16AM | 1 | mansion be the sort of thing the DEA Buffalo resident office |
| 11:16AM | 2 | would be very interested in investigating? |
| 11:16AM | 3 | A.  Absolutely. |
| 11:16AM | 4 | Q.  How about kilo-level cocaine traffickers? |
| 11:16AM | 5 | A.  Absolutely. |
| 11:16AM | 6 |       MR. COOPER:  Ms. Champoux, can we pull up Government |
| 11:17AM | 7 | Exhibit 8I real quick? |
| 11:17AM | 8 |       BY MR. COOPER: |
| 11:17AM | 9 | Q.  Do you see the subject of this report? |
| 11:17AM | 10 | A.  I -- yes, I see it. |
| 11:17AM | 11 | Q.  Is it an initial debriefing of a source? |
| 11:17AM | 12 | A.  Yes, it is. |
| 11:17AM | 13 | Q.  Is it in that same file number 13-0026? |
| 11:17AM | 14 | A.  Yes. |
| 11:17AM | 15 | Q.  Did the defendant write this report? |
| 11:17AM | 16 | A.  Yes. |
| 11:17AM | 17 | Q.  Does it talk about kilogram quantities of cocaine? |
| 11:17AM | 18 | A.  Yes. |
| 11:17AM | 19 | Q.  And hundreds of pounds of marijuana? |
| 11:17AM | 20 | A.  Yes. |
| 11:17AM | 21 | Q.  Is that the sort of thing the DEA in Buffalo would be |
| 11:17AM | 22 | interested investigating based on your experience? |
| 11:17AM | 23 | A.  Absolutely. |
| 11:17AM | 24 | Q.  Do you have supervisors in your experience pushing you |
| 11:17AM | 25 | off of kilo-level coke cases? |

| | | |
|---|---|---|
| 11:17AM | 1 | A.  No. |
| 11:17AM | 2 | Q.  That doesn't happen? |
| 11:17AM | 3 | A.  No. |
| 11:17AM | 4 | MR. COOPER:  You can take that down, Ms. Champoux. |
| 11:17AM | 5 | BY MR. COOPER: |
| 11:17AM | 6 | Q.  How about people possessing drugs and firearms together? |
| 11:17AM | 7 | A.  Oh, yes. |
| 11:17AM | 8 | Q.  Is that something the DEA in Buffalo is interested in? |
| 11:17AM | 9 | A.  Yes. |
| 11:17AM | 10 | Q.  How about people arranging international shipments of |
| 11:18AM | 11 | hundreds of pounds of marijuana? |
| 11:18AM | 12 | A.  Yes. |
| 11:18AM | 13 | Q.  Does the DEA clip people on the sidewalk for smoking a |
| 11:18AM | 14 | joint?  Is that what they arrest people for? |
| 11:18AM | 15 | A.  Oh, no. |
| 11:18AM | 16 | Q.  How about shipment of hundreds of pounds of marijuana, |
| 11:18AM | 17 | does that get on the DEA's radar? |
| 11:18AM | 18 | A.  Yes. |
| 11:18AM | 19 | Q.  How about a school teacher dealing hundreds of pounds of |
| 11:18AM | 20 | marijuana? |
| 11:18AM | 21 | A.  Absolutely. |
| 11:18AM | 22 | Q.  Would that be of interest to the DEA in Buffalo? |
| 11:18AM | 23 | A.  Absolutely. |
| 11:18AM | 24 | Q.  How about members and associates of Italian Organized |
| 11:18AM | 25 | Crime being involved in the distribution of hundreds of |

11:18AM    1    pounds of marijuana?

11:18AM    2            **MR. SINGER:**  Object to the cumulative at this point,

11:18AM    3    Judge.

11:18AM    4            **THE COURT:**  Overruled.

11:18AM    5            **BY MR. COOPER:**

11:18AM    6    Q.  How about people, members, and associates of IOC being

11:18AM    7    involved in the distribution of hundreds of pounds of

11:18AM    8    marijuana?

11:18AM    9    A.  Absolutely.

11:18AM    10   Q.  When you were asked those questions by Mr. Singer on

11:18AM    11   cross about whether the DEA seemed to do -- to do a lot of

11:18AM    12   marijuana cases, are all the things I just mentioned things

11:18AM    13   the DEA would have prioritized while you were there?

11:18AM    14   A.  Absolutely.

11:18AM    15   Q.  Mr. Singer asked you some questions -- we're gonna move

11:19AM    16   on to this 2015 high school reunion.

11:19AM    17       Mr. Singer asked you some questions about why you didn't

11:19AM    18   report your classmate for saying they were gonna snort

11:19AM    19   cocaine off of strippers' asses.

11:19AM    20       Do you remember being asked why you didn't report your

11:19AM    21   classmate for making that comment?

11:19AM    22   A.  Yes.

11:19AM    23   Q.  Is making that comment against the law?

11:19AM    24   A.  No.

11:19AM    25   Q.  Once you came back to Buffalo, was it your intention to

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| 11:19AM | 1 | investigate drug trafficking by Peter Gerace occurring at |
| 11:19AM | 2 | Pharaoh's? |
| 11:19AM | 3 | A.  Yes. |
| 11:19AM | 4 | Q.  Did you in fact start pursuing that within a year of |
| 11:19AM | 5 | arriving in Buffalo? |
| 11:19AM | 6 | A.  Yes. |
| 11:19AM | 7 | Q.  Is the DEA's primary focus to investigate drug dealers |
| 11:19AM | 8 | and not guys going through a mid-life crisis talking about |
| 11:19AM | 9 | sniffing cocaine off of a stripper's bottom? |
| 11:19AM | 10 | A.  Yes. |
| 11:19AM | 11 | Q.  Okay.  And you pursued an investigation into Gerace up |
| 11:19AM | 12 | until the point that the defendant stopped you in your tracks |
| 11:19AM | 13 | during that conference room interaction, right? |
| 11:20AM | 14 | **MR. SINGER:**  Objection, misstates the evidence. |
| 11:20AM | 15 | **THE COURT:**  Overruled. |
| 11:20AM | 16 | **BY MR. COOPER:** |
| 11:20AM | 17 | Q.  You started an investigation into Gerace, right? |
| 11:20AM | 18 | A.  Correct. |
| 11:20AM | 19 | Q.  You ran phone tolls, right? |
| 11:20AM | 20 | A.  Yes. |
| 11:20AM | 21 | Q.  After you did that, you had the conversation with the |
| 11:20AM | 22 | defendant in the conference room, right? |
| 11:20AM | 23 | A.  Yes. |
| 11:20AM | 24 | Q.  Is it your -- was it your impression during that |
| 11:20AM | 25 | conversation in the conference room that the defendant was |

11:20AM    1    trying to deter you from investigating Gerace?

11:20AM    2    A.   Yes.

11:20AM    3    Q.   Was it your impression that the shit sandwich, as you

11:20AM    4    described it, that he dumped on you by saying the things that

11:20AM    5    he said to you, did that cause you to just walk away from it

11:20AM    6    for a while?

11:20AM    7    A.   It -- it certainly did.

11:20AM    8    Q.   Did you ultimately start working on it again when you

11:20AM    9    found out that the U.S. Attorney's Office had a file open on

11:20AM    10   Gerace?

11:20AM    11   A.   I started working it more at that point.

11:20AM    12   Q.   You testified that a few weeks after the conversation

11:21AM    13   that you had with the defendant in the conference room where

11:21AM    14   the defendant pressured you to stop investigating Gerace,

11:21AM    15   that Gerace called you out of the blue; is that what

11:21AM    16   happened?

11:21AM    17   A.   That's correct.

11:21AM    18   Q.   Okay.  Do you know Peter Gerace's phone number at that

11:21AM    19   time at least to be 716-725-1931?

11:21AM    20   A.   I don't know his number.

11:21AM    21   Q.   Okay.

11:21AM    22        MR. COOPER:  Ms. Champoux, can I get Court Exhibit 5,

11:21AM    23   ma'am.  Thank you.

11:21AM    24        Can we pull up 359, Ms. Champoux.  I'm sorry, I've

11:22AM    25   got you running around, 359 in evidence.  And if you can go to

11:22AM    1    subscriber information.  Thank you.

11:22AM    2            Can we just expand column A for me, ma'am.  Okay.

11:22AM    3            **BY MR. COOPER:**

11:22AM    4    Q.  And, sir, in column A of Government Exhibit 359, the

11:22AM    5    Excel spreadsheet called Subscriber Information, do you see

11:22AM    6    the phone number listed 716-725-1931.

11:22AM    7    A.  Yes.

11:22AM    8    Q.  Okay.  And in the names listed in columns M, as in

11:22AM    9    Michael, and N, as in Nancy, what are the names listed there?

11:22AM    10   A.  Peter Gerace.

11:22AM    11   Q.  Have you looked at subscriber records before testifying,

11:22AM    12   like, have you done that your whole career?

11:22AM    13   A.  Yes.

11:22AM    14   Q.  Is that phone number in column A associated with Peter

11:22AM    15   Gerace based on this record?

11:22AM    16   A.  Yes.

11:22AM    17   Q.  Okay.  So let's remember that number, 725-1931.

11:23AM    18           **MR. COOPER:**  You can take that down, Ms. Champoux.

11:23AM    19           And if we can go back to Government Exhibit 358, the

11:23AM    20   PDF.

11:23AM    21           Go to page 349, please.  Thank you.

11:23AM    22           **BY MR. COOPER:**

11:23AM    23   Q.  So at the very top here, this is a phone bill, right?

11:23AM    24   A.  Correct.

11:23AM    25   Q.  At the very top here, is this a bill that's due in August

| | | |
|---|---|---|
| 11:23AM | 1 | of 2016? |
| 11:23AM | 2 | A.  Correct. |
| 11:23AM | 3 | Q.  Based on your experience, does that mean that these are |
| 11:23AM | 4 | calls made leading up to August of 2016? |
| 11:23AM | 5 | A.  Yes. |
| 11:23AM | 6 | Q.  Okay.  And let's -- on page 349, let's look for a phone |
| 11:23AM | 7 | call from June 25, 2016, with that same 725-1931 phone |
| 11:23AM | 8 | number. |
| 11:23AM | 9 | Do you see the first one there? |
| 11:23AM | 10 | A.  Yes, I do. |
| 11:23AM | 11 | Q.  And we've already established that this 818-0966 number, |
| 11:23AM | 12 | that's the defendant's phone number, right? |
| 11:23AM | 13 | A.  Correct. |
| 11:23AM | 14 | Q.  Okay.  On June 25 of 2016, is that after the |
| 11:24AM | 15 | confrontation in the conference room, sir? |
| 11:24AM | 16 | A.  Yes. |
| 11:24AM | 17 | Q.  And is there a phone call here for one minute incoming |
| 11:24AM | 18 | from Peter Gerace to Joe Bongiovanni? |
| 11:24AM | 19 | A.  Yes. |
| 11:24AM | 20 | Q.  Okay.  How about the next one down, June 25, 11:51, one |
| 11:24AM | 21 | minute later, another -- oh, I'm sorry, the first one was |
| 11:24AM | 22 | outgoing, the second one, do you see an incoming call here |
| 11:24AM | 23 | from Peter to Joe? |
| 11:24AM | 24 | A.  Yes. |
| 11:24AM | 25 | Q.  And it says incoming call here, right? |

11:24AM    1    A.  Right, correct.

11:24AM    2         **MR. COOPER:**  And then if you can scroll down or

11:24AM    3    highlight just a little lower.

11:24AM    4         **BY MR. COOPER:**

11:24AM    5    Q.  Seven hours later at 8:43 p.m., is there an outgoing call

11:24AM    6    from the defendant to Peter Gerace that lasted about two

11:24AM    7    minutes?

11:24AM    8    A.  Yes.

11:24AM    9    Q.  Is that within weeks of the confrontation in the

11:24AM   10    conference room?

11:24AM   11    A.  Yes.

11:24AM   12    Q.  Do you know what they talked about on those phone calls?

11:24AM   13    A.  No.

11:24AM   14    Q.  So when Mr. Singer asked you all those questions about

11:24AM   15    whether the defendant did anything to hamper your

11:24AM   16    investigation of Gerace, do you know whether he did or not?

11:25AM   17    A.  No.

11:25AM   18         **MR. COOPER:**  You can take that exhibit down,

11:25AM   19    Ms. Champoux.  Thank you.

11:25AM   20         **BY MR. COOPER:**

11:25AM   21    Q.  You did some work on a Peter Gerace investigation in

11:25AM   22    2016, but were stopped pretty quickly; is that fair to say?

11:25AM   23    A.  Yes.

11:25AM   24    Q.  You got started doing some work on Gerace, Peter and

11:25AM   25    Anthony, in 2018; is that right?

11:25AM  1   A.  Correct.

11:25AM  2   Q.  Was Curtis Ryan the primary person who was working on

11:25AM  3   that Gerace investigation?

11:25AM  4   A.  Yes.

11:25AM  5   Q.  Okay.  Was Curtis Ryan the person coordinating with the

11:25AM  6   United States Attorney's Office about that investigation?

11:25AM  7   A.  At -- at which point, sir?

11:25AM  8   Q.  Was Curtis -- based on your awareness, if you know, was

11:25AM  9   Curtis Ryan the primary person who was coordinating with the

11:25AM  10  U.S. Attorney's Office on that case?

11:26AM  11  A.  Yes.

11:26AM  12  Q.  After you made the report on August 1st of 2018 to AUSA

11:26AM  13  Tripi and Jim McHugh about the comments that the defendant

11:26AM  14  had made to you in 2016, did you later submit to multiple

11:26AM  15  interviews by OIG?

11:26AM  16  A.  Yes.

11:26AM  17  Q.  Did you tell them the truth?

11:26AM  18  A.  Yes.

11:26AM  19  Q.  Did you tell this jury the truth?

11:26AM  20  A.  Yes.

11:26AM  21  Q.  You were asked questions on cross-examination about

11:26AM  22  whether Phil Domiano was brought up at that meeting; do you

11:26AM  23  remember that?

11:26AM  24  A.  Yes.

11:26AM  25  Q.  Did the fact that Phil Domiano was brought up at that

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

11:27AM   1   meeting have anything to do with what you disclosed during

11:27AM   2   that meeting about what the defendant said to you?

11:27AM   3   A.  No.

11:27AM   4   Q.  You were asked questions on cross-examination about Phil

11:27AM   5   Domiano's association with Peter Gerace and whether if you as

11:27AM   6   an agent had a relationship with the subject or target.

11:27AM   7        And in response to those questions, you said agents -- an

11:27AM   8   agent should meet with a supervisor and a decision would be

11:27AM   9   made; do you remember that?

11:27AM  10   A.  Yes.

11:27AM  11   Q.  Okay.  Is it the agent's responsibility to bring that to

11:27AM  12   the attention of a supervisor?

11:27AM  13   A.  The conflict of interest?

11:27AM  14   Q.  Yes.

11:27AM  15   A.  Yes.

11:27AM  16   Q.  Okay.  Is it the agent's responsibility to tell the truth

11:27AM  17   about the nature and extent of that relationship?

11:27AM  18   A.  Yes.

11:28AM  19        **MR. COOPER:**  Ms. Champoux, can we pull up three

11:28AM  20   different exhibits, 127, 490A, and 426-1.

11:28AM  21        And on the bottom left here, can you zoom in on just

11:28AM  22   the right side of the photograph with defendant and Peter?

11:28AM  23   No, just the right side of the photograph.

11:28AM  24        All right.  Move that over a little bit.  Perfect.

11:28AM  25        And then on the bottom right, can you zoom in on the

11:28AM  1  right half of the photograph?  Perfect.  Thank you.

11:28AM  2          Move that over.  Awesome.

11:28AM  3          **BY MR. COOPER:**

11:28AM  4  Q.  Do you see these pictures on the screen in front of you,

11:28AM  5  sir?

11:28AM  6  A.  Yes.

11:28AM  7  Q.  You were asked some questions about the conversation that

11:28AM  8  you had with the defendant in the conference room in June of

11:28AM  9  2016.

11:28AM  10      Do you remember being asked those questions?

11:28AM  11  A.  Yes.

11:28AM  12  Q.  You were asked questions about whether the defendant said

11:28AM  13  anything about Narcan.  Did he say anything about Narcan?

11:28AM  14  A.  No.

11:28AM  15  Q.  You were asked questions about the meaning of the words

11:29AM  16  "get her out of there."  Do you remember being asked what

11:29AM  17  those words mean?

11:29AM  18  A.  Yes.

11:29AM  19  Q.  Did the defendant use the words in the meeting with you,

11:29AM  20  "I told him to call 911"?

11:29AM  21  A.  No.

11:29AM  22  Q.  Did he say "I told him to call the police"?

11:29AM  23  A.  Absolutely not.

11:29AM  24  Q.  Did he say "I told him to call an ambulance"?

11:29AM  25  A.  No.

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:29AM | 1 | Q.  Did he say "I told him to get Narcan"? |
| 11:29AM | 2 | A.  No. |
| 11:29AM | 3 | Q.  What did the defendant tell you that he told Peter Gerace |
| 11:29AM | 4 | when he called him and said a stripper was overdosing at his |
| 11:29AM | 5 | club? |
| 11:29AM | 6 | A.  To get her out of there. |
| 11:29AM | 7 | Q.  When you heard him say it, did that make you think it had |
| 11:29AM | 8 | a nefarious purpose? |
| 11:29AM | 9 | A.  Yes. |
| 11:29AM | 10 | MR. COOPER:  Ms. Champoux, I want to play Government |
| 11:29AM | 11 | Exhibit 311 now, and I guess do it with the microphone so that |
| 11:29AM | 12 | it plays from the beginning, please. |
| 11:29AM | 13 | MR. SINGER:  Judge, object to outside the scope at |
| 11:29AM | 14 | this point. |
| 11:29AM | 15 | MR. COOPER:  I can come up and argue it if you want. |
| 11:30AM | 16 | 311 is the voicemail. |
| 11:30AM | 17 | THE COURT:  Yeah, come on up. |
| 10:52AM | 18 | (Sidebar discussion held on the record.) |
| 11:30AM | 19 | MR. COOPER:  So my -- |
| 11:30AM | 20 | THE COURT:  This is the voicemail? |
| 11:30AM | 21 | MR. COOPER:  Yeah, about tracker phone.  So my |
| 11:30AM | 22 | response is that the cross-examination was targeted towards |
| 11:30AM | 23 | saying, hey, there's alternative, innocent explanations for |
| 11:30AM | 24 | the comments that the defendant made. |
| 11:30AM | 25 | I'm contextualizing that with another exhibit that's |

| | | |
|---|---|---|
| 11:30AM | 1 | in evidence.  So the objection to outside of the scope, |
| 11:30AM | 2 | it's -- it's not an exhibit that Mr. Singer chose to use, but |
| 11:30AM | 3 | it's an exhibit that supports the government's theory of the |
| 11:30AM | 4 | case.  I don't believe it's outside the scope, Judge. |
| 11:30AM | 5 |       **THE COURT:**  Yeah, so why isn't that in response to |
| 11:30AM | 6 | your cross? |
| 11:30AM | 7 |       **MR. SINGER:**  I don't think it is.  We're getting so |
| 11:30AM | 8 | far afield at this point in time. |
| 11:30AM | 9 |       If you're going to allow them retry their entirety of |
| 11:30AM | 10 | their case at this point in time on cross-examination, it's |
| 11:30AM | 11 | outside the scope, Judge.  I didn't bring it up, it doesn't |
| 11:30AM | 12 | have anything to do with it. |
| 11:30AM | 13 |       **MR. COOPER:**  He brought up the motive for the comment |
| 11:30AM | 14 | and I'm combatting that with other evidence.  That's redirect. |
| 11:31AM | 15 |       **THE COURT:**  Overruled. |
| 11:31AM | 16 |       (End of sidebar discussion.) |
| 11:31AM | 17 |       **THE COURT:**  Overruled.  You can -- you can proceed. |
| 11:31AM | 18 |       **MR. COOPER:**  Ms. Champoux, can you play 311, please. |
| 11:31AM | 19 | Listen. |
| 11:31AM | 20 |       (Exhibit 311, audio, was played.) |
| 11:31AM | 21 |       **MR. COOPER:**  Can we turn the volume up a little bit, |
| 11:31AM | 22 | please?  Thank you, ma'am. |
| 11:31AM | 23 |       Can we try that one more time, Ms. Champoux? |
| 11:31AM | 24 |       **MR. SINGER:**  Objection. |
| 11:31AM | 25 |       **THE COURT:**  Yes, sustained. |

| | | |
|---|---|---|
| 11:31AM | 1 | **MR. COOPER:** I don't know that it was audible. |
| 11:31AM | 2 | **BY MR. COOPER:** |
| 11:31AM | 3 | Q. Were you able to hear that, sir? |
| 11:31AM | 4 | A. Most of it. |
| 11:31AM | 5 | Q. Okay. Did you catch the words -- all the words that were |
| 11:31AM | 6 | being said? |
| 11:31AM | 7 | A. About tracking a phone. |
| 11:31AM | 8 | Q. Okay. Did you recognize the voices on the call? |
| 11:31AM | 9 | A. I recognized the person making the call. |
| 11:32AM | 10 | Q. Or the voice on the call, I'm sorry. Whose voice did you |
| 11:32AM | 11 | recognize? |
| 11:32AM | 12 | A. Peter Gerace. |
| 11:32AM | 13 | Q. Okay. And what did Peter Gerace say in that recording? |
| 11:32AM | 14 | A. Asking something about trying to track a phone, how you |
| 11:32AM | 15 | could track a phone for him. |
| 11:32AM | 16 | Q. Did you hear him say, hey, Joe, it's Peter? |
| 11:32AM | 17 | A. Yes. |
| 11:32AM | 18 | Q. Did you hear him ask whether the police were able to ping |
| 11:32AM | 19 | a TracFone like they do with drug dealers? |
| 11:32AM | 20 | A. Yes. |
| 11:32AM | 21 | **MR. COOPER:** Can we go to Government Exhibit 310D, |
| 11:32AM | 22 | please. Can we go to page 42, ma'am. |
| 11:32AM | 23 | Can you zoom in on the gray box in the middle there. |
| 11:32AM | 24 | **BY MR. COOPER:** |
| 11:32AM | 25 | Q. Can you see a text message responding to an audio |

| | | |
|---|---|---|
| 11:32AM | 1 | recording here? |
| 11:32AM | 2 | A.  Yes. |
| 11:32AM | 3 | Q.  What's it say? |
| 11:32AM | 4 | A.  Yes, but you would need a warrant to get a ping order. |
| 11:32AM | 5 | **MR. COOPER:**  Okay, you can take that down, |
| 11:33AM | 6 | Ms. Champoux. |
| 11:33AM | 7 | **BY MR. COOPER:** |
| 11:33AM | 8 | Q.  Before just now, had you ever heard that audio recording |
| 11:33AM | 9 | before? |
| 11:33AM | 10 | A.  No. |
| 11:33AM | 11 | Q.  Had you ever seen that text message before? |
| 11:33AM | 12 | A.  No. |
| 11:33AM | 13 | Q.  Did that help you contextualize the comments the |
| 11:33AM | 14 | defendant made to you in the conference room in 2016? |
| 11:33AM | 15 | **MR. SINGER:**  Objection. |
| 11:33AM | 16 | **THE COURT:**  Basis? |
| 11:33AM | 17 | **MR. SINGER:**  Could we come up.  Judge? |
| 11:33AM | 18 | **THE COURT:**  Sure, come on up. |
| 11:33AM | 19 | (Sidebar discussion held on the record.) |
| 11:33AM | 20 | **MR. SINGER:**  So if I understand the question, Judge, |
| 11:33AM | 21 | Mr. Cooper's asking the witness whether something that he |
| 11:33AM | 22 | heard for the first time now can help him contextualize a |
| 11:33AM | 23 | conversation and how he contextualizes it back in 2016.  So |
| 11:33AM | 24 | you can't use -- it's apples and oranges.  You can't use it |
| 11:33AM | 25 | that way. |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

| | | |
|---|---|---|
| 11:33AM | 1 | **MR. COOPER:**  No, I disagree. |
| 11:33AM | 2 | So on cross-examination, Mr. Singer tried to suggest |
| 11:33AM | 3 | repeatedly that there were two possible things, and you were |
| 11:33AM | 4 | grappling with what it was.  And he was grappling with it at |
| 11:34AM | 5 | the time. |
| 11:34AM | 6 | I just played an exhibit that's in evidence, and |
| 11:34AM | 7 | asked him if that helped contextualize what he heard back in |
| 11:34AM | 8 | 2016. |
| 11:34AM | 9 | **THE COURT:**  (Indecipherable.) |
| 11:34AM | 10 | **MR. COOPER:**  The judge said link it to the cross and |
| 11:34AM | 11 | you can do it. |
| 11:34AM | 12 | **THE COURT:**  (Indecipherable.)  I hope we're wrapping |
| 11:34AM | 13 | up. |
| 11:34AM | 14 | **MR. COOPER:**  I have one more -- |
| 11:34AM | 15 | **MR. SINGER:**  Here's the problem is that it's an |
| 11:34AM | 16 | argument question, Judge, all right? |
| 11:34AM | 17 | When I asked questions about what he was grappling |
| 11:34AM | 18 | with, I asked him what was going through your head in 2016 in |
| 11:34AM | 19 | the conference room. |
| 11:34AM | 20 | This is asking him about something that never |
| 11:34AM | 21 | occurred in the conference room, didn't even occur in 2016, |
| 11:34AM | 22 | and he's asking -- |
| 11:34AM | 23 | (Simultaneous talking.) |
| 11:34AM | 24 | **MR. SINGER:**  It has nothing to do with it. |
| 11:34AM | 25 | **THE COURT:**  (Indecipherable.) |

USA v Bongiovanni - Casullo - Cooper/Redirect - 9/25/24

11:34AM  1      **MR. COOPER:**  It's tried -- so the cross-examination

11:34AM  2   was trying to suggest through the witness, instead of arguing

11:34AM  3   on summation, trying to suggest through the witness that the

11:34AM  4   witness thought that there was a potential nefarious purpose

11:34AM  5   or a potential not nefarious purpose.

11:34AM  6      **THE COURT:**  Yes.

11:34AM  7      **MR. COOPER:**  The witness has been played an exhibit

11:35AM  8   in evidence, and I'm asking if that contextualized what he

11:35AM  9   heard in 2016 for him.

11:35AM  10     **THE COURT:**  But again, what -- what Mr. Singer's

11:35AM  11  questions were directed to is what he thought at that time,

11:35AM  12  not what he thinks now.  And what he thinks now, why is that

11:35AM  13  relevant?  It's what he thought at the time, right?  Why is --

11:35AM  14  why is what he thinks about it now relevant.

11:35AM  15        What the jury thinks about it now is what's relevant,

11:35AM  16  not this witness.

11:35AM  17     **MR. COOPER:**  I'll move on.

11:35AM  18     **THE COURT:**  So I'll sustain the objection.

11:35AM  19     (End of sidebar discussion.)

11:35AM  20     **THE COURT:**  The objection is sustained.

11:35AM  21        Next question, please.

11:35AM  22     **BY MR. COOPER:**

11:35AM  23  Q.  At the time that you had that conversation with the

11:35AM  24  defendant in the conference room, did you know that that

11:35AM  25  audio recording existed?

11:35AM    1    A.  No.

11:35AM    2    Q.  Had you ever heard it before?

11:35AM    3    A.  No.

11:35AM    4    Q.  So when Mr. Singer asked you on cross-examination about

11:35AM    5    whether there were alternative explanations for it and he

11:35AM    6    could have meant get her to a hospital, were you basing it on

11:36AM    7    what you knew at the time?

11:36AM    8    A.  Yes.

11:36AM    9    Q.  At the time, did you think it was nefarious?

11:36AM    10   A.  Yes.

11:36AM    11          **MR. COOPER:**  May I just have one second, Judge.

11:37AM    12          **BY MR. COOPER:**

11:37AM    13   Q.  You were asked -- finally, you were asked some questions

11:37AM    14   on cross-examination about when you chose to come forward

11:37AM    15   with the information that you heard from the defendant's

11:37AM    16   mouth in 2016.

11:37AM    17       Do you remember being asked about that?

11:37AM    18   A.  Yes.

11:37AM    19   Q.  And about why you waited?

11:37AM    20   A.  Yes.

11:37AM    21   Q.  And about DEA policy that requires you to report it,

11:37AM    22   right?

11:37AM    23   A.  Yes.

11:37AM    24   Q.  Should you have reported it?

11:37AM    25   A.  Yes.

USA v Bongiovanni - Casullo - Singer/Recross - 9/25/24

92

| | | |
|---|---|---|
| 11:37AM | 1 | Q.  Okay.  Did hearing Ron Serio describe that the defendant |
| 11:37AM | 2 | had passed the names of informants, was that an impetus to -- |
| 11:37AM | 3 | to have you come forward with the information that you knew |
| 11:37AM | 4 | about what the defendant said to you related to Peter Gerace? |
| 11:37AM | 5 | A.  Definitely part of it. |
| 11:37AM | 6 | **MR. COOPER:**  Okay.  I have no further redirect. |
| 11:37AM | 7 | **THE COURT:**  Anything more, Mr. Singer? |
| 11:37AM | 8 | |
| 11:37AM | 9 | **RECROSS-EXAMINATION BY MR. SINGER:** |
| 11:37AM | 10 | Q.  You talked a little bit on redirect, sir, about your |
| 11:38AM | 11 | August 1st, 2018 report about the conversation in June 2016. |
| 11:38AM | 12 | Do you remember testifying to that a few minutes ago? |
| 11:38AM | 13 | A.  Yes. |
| 11:38AM | 14 | Q.  And Mr. Cooper asked you about when you reported this, |
| 11:38AM | 15 | whether you knew about whether you were going to be removed |
| 11:38AM | 16 | from a case because of a conflict; do you remember that? |
| 11:38AM | 17 | A.  Yeah.  What was the specific question he asked? |
| 11:38AM | 18 | Q.  The basic fact is is that when you reported this in 2018, |
| 11:38AM | 19 | you didn't know you were going to be removed from the Peter |
| 11:38AM | 20 | Gerace case at that time, correct? |
| 11:38AM | 21 | A.  I didn't know I would ultimately be removed. |
| 11:38AM | 22 | Q.  I mean, you didn't even think you were gonna be removed |
| 11:38AM | 23 | from the case, right, because you had a conversation with |
| 11:38AM | 24 | Mr. Tripi where you said you didn't think you had a reason to |
| 11:38AM | 25 | be removed, right? |

11:38AM 1   A.  Well, that's Mr. Tripi.  I had no idea what my own

11:38AM 2   management would do.  And I knew that it would go back, and

11:38AM 3   it would go through our chain of command, all the way up to

11:38AM 4   the top.  So I had no idea what was gonna happen at that

11:38AM 5   point.

11:38AM 6   Q.  All right.  So you had no idea what was gonna happen at

11:38AM 7   the point, right?

11:38AM 8   A.  No, because DEA -- I knew it would go through the chain

11:38AM 9   of command at DEA.

11:38AM 10  Q.  So, you got asked on redirect as well about you testified

11:39AM 11  that you -- you didn't have a clue as to why Joe Bongiovanni

11:39AM 12  wanted his name off the reports.

11:39AM 13      Do you remember taking about that, sir?

11:39AM 14  A.  I remember talking about it.

11:39AM 15  Q.  But you knew exactly why, right?

11:39AM 16  A.  What was my testimony?

11:39AM 17  Q.  Joe Bongiovanni told you why he didn't want to be on

11:39AM 18  those reports, correct?

11:39AM 19  A.  He said he knew those people from -- he knew him from

11:39AM 20  growing up.  You're talking about when I --

11:39AM 21  Q.  Yes.

11:39AM 22  A.  -- about Mike Masecchia?  He knew him from North Buffalo.

11:39AM 23  Q.  So you do have a clue as to why he didn't want to be on

11:39AM 24  those reports, correct, sir?

11:39AM 25  A.  Based on what he told me.

11:39AM    1    Q.  Mr. Cooper asked you about that 2009 Mike Masecchia

11:39AM    2    investigation.  The case agent on that case was Cory Higgins,

11:39AM    3    right?

11:39AM    4    A.  Yes.

11:39AM    5    Q.  Cory Higgins never called you up, correct?

11:39AM    6    A.  No.

11:39AM    7    Q.  And you were shown something which confirmed that the

11:39AM    8    NADDIS entry that you put in back in 2004, that was in the

11:39AM    9    system when Cory Higgins opened up the report, correct?

11:39AM   10    A.  So I was shown a NADDIS number from that report, and

11:39AM   11    there was a NADDIS number next to Masecchia.  I don't know if

11:39AM   12    it's the same NADDIS number I had, but it showed a NADDIS

11:39AM   13    number after Michael Masecchia's name.

11:39AM   14    Q.  Yep.  And so Higgins could have looked up your past

11:40AM   15    investigation and called you, right?

11:40AM   16    A.  I mean, part of the process is to search a name that

11:40AM   17    you're targeting in the DEA intelligence system to see if

11:40AM   18    anyone else has been working on that case.

11:40AM   19    Q.  Yep.  And he could have done that, and he didn't do it

11:40AM   20    because, he never called you, right?

11:40AM   21    A.  He never called me.

11:40AM   22    Q.  And you had no information that Joe Bongiovanni was ever

11:40AM   23    involved in that investigation, correct?

11:40AM   24    A.  Involved?

11:40AM   25    Q.  Yes.  He was never investigating that case, correct?

11:40AM   1   A.  Not to my knowledge.

11:40AM   2   Q.  You don't even know today whether he even knew about the

11:40AM   3   case, right?

11:40AM   4   A.  Again, what I said before about Cory Higgins telling me.

11:40AM   5   Q.  I got you.

11:40AM   6        MR. SINGER:  So, Ms. Champoux, can you bring up

11:40AM   7   Exhibit 22Q, please?

11:40AM   8        BY MR. SINGER:

11:40AM   9   Q.  So Mr. Cooper showed you this exhibit; do you remember

11:40AM  10   this, sir?  Talking about the center section.

11:40AM  11   A.  That part I -- yep.

11:40AM  12   Q.  Yeah, about how in 2015, Joe Bongiovanni was talking

11:41AM  13   about still looking into Ron Serio; do you remember that?

11:41AM  14   A.  Yeah.  What I have circled here, I remember this.

11:41AM  15   Q.  And we talked about on your cross-examination how just

11:41AM  16   because a case is closed doesn't mean that a DEA agent loses

11:41AM  17   interest in a target they weren't able to develop a case on,

11:41AM  18   right?

11:41AM  19   A.  Possibly.

11:41AM  20   Q.  Yeah, so for instance, like -- like Peter Gerace, you

11:41AM  21   never really officially opened a file on him, right, as a

11:41AM  22   subject title.

11:41AM  23   A.  I did not.

11:41AM  24   Q.  But you still had interest in him, right?

11:41AM  25   A.  Yes.

11:41AM   1   Q.  And you were just waiting for the right time and place to

11:41AM   2   open up an investigation, correct?

11:41AM   3   A.  Once I have enough information that I believe to open a

11:41AM   4   case.

11:41AM   5   Q.  Mr. Cooper --

11:41AM   6       **MR. SINGER:**  You can take that down, Ms. Champoux.

11:41AM   7       **BY MR. SINGER:**

11:41AM   8   Q.  -- Mr. Cooper asked you questions about Mike Masecchia

11:41AM   9   and whether that was brought up in your 2015 or 2016

11:41AM  10   conversation with Mr. Bongiovanni about the Ron Serio file.

11:41AM  11       Do you remember that, sir?

11:41AM  12   A.  Yes.

11:41AM  13   Q.  And you had mentioned that you had interest in the fact

11:41AM  14   that Mike Masecchia was involved in that investigation,

11:41AM  15   correct?

11:41AM  16   A.  I would have been interested in that if I knew.

11:41AM  17   Q.  So -- so, let's go back to the Ron Serio.  You were told

11:42AM  18   about Ron Serio, right?

11:42AM  19   A.  He mentioned Ron Serio with the file on his desk, that

11:42AM  20   conversation.

11:42AM  21   Q.  Yeah, and he told you it was a big case?

11:42AM  22   A.  Yep.

11:42AM  23   Q.  And did you say to him something like, hey, Joe, this

11:42AM  24   sounds awesome.  Let's go out and investigate this right now.

11:42AM  25   Open it up.  Did you say that?

11:42AM    1    A.  No.

11:42AM    2    Q.  You talked a little bit about Government Exhibit 311 that

11:42AM    3    you were played; do you remember that, sir?

11:42AM    4    A.  Just that recent audio call?

11:42AM    5    Q.  Yes.

11:42AM    6    A.  Yes.

11:42AM    7    Q.  And the substance of that was that Peter Gerace was

11:42AM    8    asking a question about whether the police could track a

11:42AM    9    phone; do you remember that?

11:42AM   10    A.  Yep.

11:42AM   11    Q.  And you've been a law enforcement officer for a really

11:42AM   12    long time, right?

11:42AM   13    A.  Yes.

11:42AM   14    Q.  Have you had friends and family ask you questions about

11:42AM   15    the law?

11:42AM   16    A.  Different questions, yeah.

11:42AM   17    Q.  So that's not just something that comes out of the blue,

11:42AM   18    right?

11:42AM   19    A.  Yes.  Specific question like that, never had that

11:42AM   20    experience before, but I've had people ask me questions about

11:42AM   21    the law in the past.

11:42AM   22    Q.  Thank you.

11:43AM   23        And with regard to the June 2016 conversation, Mr. Cooper

11:43AM   24    asked you whether you inferred a nefarious purpose to that

11:43AM   25    conversation; do you remember that?

11:43AM 1    A.  Yes.

11:43AM 2    Q.  But your testimony on cross was you were conflicted,

11:43AM 3    right?

11:43AM 4    A.  Feeling multiple things.

11:43AM 5    Q.  Yeah.  Like in one hand, you thought maybe there's a

11:43AM 6    nefarious purpose to this, right?

11:43AM 7    A.  Yes.

11:43AM 8    Q.  But on the other hand, you weren't really sure?

11:43AM 9    A.  I was confused.

11:43AM 10   Q.  And you sat with that, and you struggled with that for

11:43AM 11   about two years, right?

11:43AM 12   A.  I sat with it, and things changed along the way.

11:43AM 13   Q.  Um-hum.  But at first, you were sitting there not knowing

11:43AM 14   whether there was a nefarious purpose or not, right?

11:43AM 15   A.  Correct.

11:43AM 16   Q.  So to say on redirect that you inferred a nefarious

11:43AM 17   purpose immediately, that would be incorrect, right?

11:43AM 18   A.  Again, I don't remember the exact words about inferring

11:43AM 19   that immediately, but I did infer that at some point during

11:43AM 20   that process.

11:43AM 21   Q.  But not immediately?

11:43AM 22   A.  Again, I'm not comfortable saying it immediately.  I

11:43AM 23   mean, he said it, and that became part of my thought process.

11:44AM 24   So immediately would be, I guess, when he says it.

11:44AM 25   Q.  And you didn't take any action like we talked about,

USA v Bongiovanni - Casullo - Singer/Recross - 9/25/24

| | | |
|---|---|---|
| 11:44AM | 1 | right? |
| 11:44AM | 2 | A.  No. |
| 11:44AM | 3 | Q.  And as far as Peter Gerace is concerned, back in 2016, |
| 11:44AM | 4 | the government asked you whether or not this June 2016 |
| 11:44AM | 5 | conversation in any way strayed you away from the Peter |
| 11:44AM | 6 | Gerace case. |
| 11:44AM | 7 | Do you remember that? |
| 11:44AM | 8 | A.  Yes. |
| 11:44AM | 9 | Q.  So we went through a number of things on |
| 11:44AM | 10 | cross-examination about what was happening at that time.  So |
| 11:44AM | 11 | one of the things we went through, and we went through it |
| 11:44AM | 12 | again a few moments ago, is you never officially opened a |
| 11:44AM | 13 | file title on Peter Gerace back in 2016, right? |
| 11:44AM | 14 | A.  No. |
| 11:44AM | 15 | Q.  So you didn't even have an open investigation at that |
| 11:44AM | 16 | time, correct? |
| 11:44AM | 17 | A.  It was like the beginning stages of the things that I |
| 11:44AM | 18 | mentioned, but not an actual case file open on Gerace. |
| 11:44AM | 19 | Q.  Correct.  And you had other active cases ongoing at that |
| 11:44AM | 20 | time, right? |
| 11:44AM | 21 | A.  Yeah.  It was during the timeframe -- I think it was at |
| 11:44AM | 22 | the end of that wire case with the State Attorney General's |
| 11:44AM | 23 | Office. |
| 11:44AM | 24 | Q.  Yeah, we mentioned that the Ramos-Ramos case was |
| 11:44AM | 25 | concluding, but there was a lot of work to conclude that, |

USA v Bongiovanni - Casullo - Singer/Recross - 9/25/24

100

11:45AM 1    right?

11:45AM 2    A.   Yes.

11:45AM 3    Q.   And that was all ongoing at that time?

11:45AM 4    A.   It was during that time frame.

11:45AM 5    Q.   And those were all the things that we went through that

11:45AM 6    prevented you from going out and conducting surveillance and

11:45AM 7    pole cameras and things like that, correct?

11:45AM 8    A.   I don't agree with that.  That's not what prevented me

11:45AM 9    from doing it.

11:45AM 10   Q.   Okay.  But you didn't do those things, right?

11:45AM 11   A.   I didn't do those things.

11:45AM 12   Q.   And most importantly, you talked about how at that point

11:45AM 13   in time in 2016 you had not developed a CI with regard to

11:45AM 14   Peter Gerace, correct?

11:45AM 15   A.   I had not.

11:45AM 16   Q.   And that was something that you described in your own

11:45AM 17   testimony was something that was critically important to

11:45AM 18   developing a lot of different cases, right?

11:45AM 19   A.   For me, I believe that.

11:45AM 20   Q.   And in this particular situation vis-à-vis Peter Gerace,

11:45AM 21   that didn't happen until Myszka came in in 2017 to start

11:45AM 22   proffering, correct?

11:45AM 23   A.   Correct.

11:45AM 24   Q.   And then you got information that was useful to you to

11:45AM 25   help develop further investigation, correct?

USA v Bongiovanni - Casullo - Cooper/Re-Redirect - 9/25/24   101

11:45AM  1    A.  Correct.

11:45AM  2    Q.  The CI that you never had, so to speak?

11:45AM  3    A.  It was someone that was a human source that was talking

11:45AM  4    about Peter and illegal activity.

11:45AM  5    Q.  And that helped move the investigation forward, correct?

11:45AM  6    A.  It did.

11:45AM  7            **MR. SINGER:**  Okay.  Thank you.  I have no further

11:46AM  8    questions, Judge.

11:46AM  9

11:46AM  10           **RE-REDIRECT EXAMINATION BY MR. COOPER:**

11:46AM  11   Q.  Just one.  On that Exhibit 311, the audio recording, at

11:46AM  12   the time that that audio recording was made and responded to

11:46AM  13   by a text message by the defendant, Peter Gerace was a

11:46AM  14   convicted felon at that time, right?

11:46AM  15   A.  I believe so.

11:46AM  16   Q.  Peter Gerace had been a convicted felon since the late

11:46AM  17   '90s or early 2000s, right, sir?

11:46AM  18   A.  That's my understand.

11:46AM  19   Q.  Mr. Singer asked you if it was common, not out of the

11:46AM  20   ordinary, for friends and family to ask questions about law

11:46AM  21   enforcement stuff, right?

11:46AM  22   A.  Correct.

11:46AM  23   Q.  Did you ever have a convicted felon ask you if law

11:46AM  24   enforcement has the technological ability to ping TracFones?

11:46AM  25   A.  No.

USA v Bongiovanni - Casullo - Cooper/Re-Redirect - 9/25/24    102

```
11:46AM    1    Q.  No?
11:46AM    2            MR. COOPER:  Nothing further, Judge.
11:46AM    3            THE COURT:  Anything more?
11:46AM    4            MR. SINGER:  Nothing further, Judge.
11:46AM    5            THE COURT:  You can step down, sir.
11:46AM    6            THE WITNESS:  Thank you.
11:46AM    7            (Witness excused at 11:46 a.m.)
           8            (Excerpt concluded at 11:46 a.m.)
           9            *      *      *      *      *      *      *
          10
          11
          12
          13              CERTIFICATE OF REPORTER
          14
          15            In accordance with 28, U.S.C., 753(b), I
          16    certify that these original notes are a true and correct
          17    record of proceedings in the United States District Court for
          18    the Western District of New York on September 25, 2024.
          19
          20
          21                    s/ Ann M. Sawyer
                                Ann M. Sawyer, FCRR, RPR, CRR
          22                    Official Court Reporter
                                U.S.D.C., W.D.N.Y.
          23
          24
          25
```

```
 1
 2                    TRANSCRIPT INDEX

 3       EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 2

 4                   SEPTEMBER 25, 2024

 5

 6

 7    W I T N E S S                          P A G E

 8    A N T H O N Y   C A S U L L O            2

 9      (CONT'D) CROSS-EXAMINATION BY MR. SINGER:    2

10      REDIRECT EXAMINATION BY MR. COOPER:          46

11      RECROSS-EXAMINATION BY MR. SINGER:           92

12      RE-REDIRECT EXAMINATION BY MR. COOPER:      101

13

14

15

16

17

18

19

20

21

22

23

24

25
```