09:27AM

1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2
     _____
3    UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
4                    Plaintiff,                   1:23-cr-37
     v.                                              (LJV)
5
     PETER GERACE, JR.,                 November 13, 2024
6
     _____Defendant._____
7
            TRANSCRIPT EXCERPT - EXAMINATION OF G.R. (PW #2)
8              BEFORE THE HONORABLE LAWRENCE J. VILARDO
                     UNITED STATES DISTRICT JUDGE
9
     APPEARANCES:        TRINI E. ROSS, UNITED STATES ATTORNEY
10                       BY: JOSEPH M. TRIPI, ESQ.
                             NICHOLAS T. COOPER, ESQ.
11                           CASEY L. CHALBECK, ESQ.
                         Assistant United States Attorneys
12                       Federal Centre, 138 Delaware Avenue
                         Buffalo, New York 14202
13                       For the Plaintiff

14                       THE FOTI LAW FIRM, P.C.
                         BY: MARK ANDREW FOTI, ESQ.
15                       16 West Main Street, Suite 100
                         Rochester, New York 14614
16                          And
                         SOEHNLEIN LAW
17                       BY: ERIC MICHAEL SOEHNLEIN, ESQ.
                         350 Main Street, Suite 2100
18                       Buffalo, New York 14202
                         For the Defendant
19
     PRESENT:            KAREN A. CHAMPOUX, USA PARALEGAL
20                       BRIAN A. BURNS, FBI SPECIAL AGENT
                         MARILYN K. HALLIDAY, HSI SPECIAL AGENT
21
     LAW CLERK:          REBECCA FABIAN IZZO, ESQ.
22
     COURT CLERK:        COLLEEN M. DEMMA
23
     REPORTER:           ANN MEISSNER SAWYER, FCRR, RPR, CRR
24                       Robert H. Jackson Courthouse
                         2 Niagara Square
25                       Buffalo, New York 14202
                         Ann_Sawyer@nywd.uscourts.gov

| | | |
|---|---|---|
| 09:36AM | 1 | (Excerpt commenced at 9:58 a.m.) |
| 09:58AM | 2 | (Jury seated at 9:58 a.m.) |
| 09:58AM | 3 | **THE COURT:**  Good morning, everyone. |
| 09:58AM | 4 | **ALL JURORS:**  Good morning. |
| 09:58AM | 5 | **THE COURT:**  The record will reflect that all our |
| 09:58AM | 6 | jurors are present.  I understand we have a hard stop at 5 |
| 09:59AM | 7 | tonight, and a hard stop at 5 tomorrow night because of one of |
| 09:59AM | 8 | our jurors, so we will honor that obviously.  And I appreciate |
| 09:59AM | 9 | you letting me know about those, because -- it's going to be |
| 09:59AM | 10 | unusual that we go past 5, but on a day like yesterday where |
| 09:59AM | 11 | we' were very close to finishing a witness, it just made more |
| 09:59AM | 12 | sense to do that.  So I apologize for that, but we will |
| 09:59AM | 13 | certainly stop by 5 tonight and tomorrow. |
| 09:59AM | 14 | The government can all its next witness. |
| 09:59AM | 15 | **MR. COOPER:**  The government calls G.R. |
| 09:59AM | 16 | |
| 09:59AM | 17 | **G.R. (PROTECTED WITNESS #2),** having been duly called and |
| 10:00AM | 18 | sworn, testified as follows: |
| 10:00AM | 19 | **MR. COOPER:**  May I inquire, Judge? |
| 10:00AM | 20 | **THE COURT:**  You may. |
| 10:00AM | 21 | |
| 10:00AM | 22 | **DIRECT EXAMINATION BY MR. COOPER:** |
| 10:00AM | 23 | Q.  Good morning, G.R. |
| 10:00AM | 24 | A.  Good morning. |
| 10:00AM | 25 | Q.  So, first of all, that's Ann Sawyer.  She's typing down |

10:00AM  1  everything that we say.  And she reminded me this morning

10:00AM  2  that I need to speak nice and slow, especially in the

10:00AM  3  beginning.  So I'm going to do that, and I'm going to ask you

10:00AM  4  to speak nice and slow, and speak right into the microphone

10:00AM  5  so that everyone can hear.  Okay?

10:00AM  6  A.  Okay.

10:00AM  7  Q.  How old are you?

10:00AM  8  A.  39.

10:00AM  9  Q.  39?

10:00AM  10  A.  Yes.

10:00AM  11  Q.  Okay.  And how far did you go in school?

10:01AM  12  A.  Bachelor's degree.

10:01AM  13  Q.  Okay.  What's your bachelor's degree in?

10:01AM  14  A.  Social sciences.

10:01AM  15  Q.  And when did you get that bachelor's degree?

10:01AM  16  A.  I believe it was 2015.

10:01AM  17          **THE COURT:**  Right into the microphone, ma'am.

10:01AM  18          **THE WITNESS:**  Sorry.

10:01AM  19          **MR. COOPER:**  No, it's okay.

10:01AM  20          **THE COURT:**  It's got to pick up your voice, that's

10:01AM  21  all.

10:01AM  22          **THE WITNESS:**  Okay.  2015.

10:01AM  23          **BY MR. COOPER:**

10:01AM  24  Q.  Okay.  And if you want, you can pull it closer to you.

10:01AM  25  There you go.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

4

10:01AM  1    You said 2015.  Where is that degree from?

10:01AM  2  A.  The University at Buffalo.

10:01AM  3  Q.  Okay.  Generally are you living in the Western New York

10:01AM  4  area now?

10:01AM  5  A.  Yes.

10:01AM  6  Q.  Where'd you grow up at?

10:01AM  7  A.  Watkins Glen, New York.

10:01AM  8  Q.  Now, we're gonna cover some things kind of quickly, and

10:01AM  9  then we'll go through it in more detail.  Generally, are

10:01AM  10  there times in your life where you've struggled with

10:01AM  11  addiction to drugs and alcohol?

10:01AM  12  A.  Yes.

10:01AM  13  Q.  Okay.  Before we go into detail about that, are you

10:01AM  14  currently using drugs?

10:01AM  15  A.  No.

10:01AM  16  Q.  Are you currently using alcohol?

10:02AM  17  A.  No.

10:02AM  18  Q.  Would you describe yourself as living sober now?

10:02AM  19  A.  Yes, for almost 13 years.

10:02AM  20  Q.  Okay.  You said 13 years?

10:02AM  21  A.  Almost, yes.

10:02AM  22  Q.  All right.  Let's hit the rewind button now and start

10:02AM  23  kind of towards the beginning.

10:02AM  24    Can you describe for the jury how those problems with

10:02AM  25  addiction began in your life?

| | | |
|---|---|---|
| 10:02AM | 1 | A.  Sure.  Do you want me to go back to, like, when I was a |
| 10:02AM | 2 | teenager? |
| 10:02AM | 3 | Q.  Yeah.  So, like, was that around age 18, 19 when things |
| 10:02AM | 4 | started to become a problem for you?  When was the first time |
| 10:02AM | 5 | you used drugs?  What age? |
| 10:02AM | 6 | A.  17 for drugs, but I started drinking when I was maybe 13. |
| 10:02AM | 7 | Q.  Okay. |
| 10:02AM | 8 | A.  12, 13. |
| 10:02AM | 9 | Q.  You said you used drug for the first time around age 17? |
| 10:02AM | 10 | A.  Yes. |
| 10:02AM | 11 | Q.  Okay.  And what kind of drugs was that? |
| 10:02AM | 12 | A.  I tried cocaine. |
| 10:02AM | 13 | Q.  Where were you living at that time when you were a |
| 10:02AM | 14 | teenager? |
| 10:02AM | 15 | A.  With my grandparents in Watkins Glen, New York. |
| 10:03AM | 16 | Q.  Did you get in trouble around age 19? |
| 10:03AM | 17 | A.  Yes, I did. |
| 10:03AM | 18 | Q.  Can you tell the jury what happened? |
| 10:03AM | 19 | A.  Yes.  I got my first DWI when I was 19 years old living |
| 10:03AM | 20 | with my grandparents. |
| 10:03AM | 21 | Q.  As a result of that DWI at age 19, did your family send |
| 10:03AM | 22 | you to live somewhere else? |
| 10:03AM | 23 | A.  Yes.  My mother was currently residing in Buffalo, |
| 10:03AM | 24 | New York, with her fiancé at the time.  And my grandfather |
| 10:03AM | 25 | just lost his wife, my grandmother, so he couldn't really |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

6

10:03AM  1  deal with the stress.  So we did a geographical relocation to

10:03AM  2  Buffalo for me.

10:03AM  3  Q.  Were you working at that time?

10:03AM  4  A.  I was going to school full time, and I was waitressing at

10:03AM  5  the Olive Garden.

10:03AM  6  Q.  Okay.  Now, when you say going to school full time, where

10:03AM  7  were you going to school back then?

10:03AM  8  A.  When I was living in Watkins Glen, I was going to Corning

10:03AM  9  Community College, and I transferred to ECC.

10:03AM  10  Q.  Okay.

10:03AM  11  A.  Erie Community College.

10:03AM  12  Q.  And then I asked you if you were working, but let me do a

10:04AM  13  better job with my question.

10:04AM  14      Before you moved to the Buffalo area when you were living

10:04AM  15  in that Watkins Glenn area, were you working at that time?

10:04AM  16  A.  Yes, the Olive Garden, that's where it was.

10:04AM  17  Q.  Got it.  And at the same time you were going to school?

10:04AM  18  A.  Yes.

10:04AM  19  Q.  When you moved to Buffalo, did you set it up so you could

10:04AM  20  continue waitressing at the Olive Garden?

10:04AM  21  A.  Yes.

10:04AM  22  Q.  Okay.  So did you start working at the Olive Garden in

10:04AM  23  the Buffalo area?

10:04AM  24  A.  So, I'm sorry, let me back up.  So, no, I had -- they

10:04AM  25  actually didn't have any positions open.  So I actually took

| | | |
|---|---|---|
| 10:04AM | 1 | a job at Mighty Taco for, like, one day. |
| 10:04AM | 2 | Q.  Okay. |
| 10:04AM | 3 | A.  And I didn't like it. |
| 10:04AM | 4 | Q.  So Mighty Taco for a very short period of time -- |
| 10:04AM | 5 | A.  Yeah, one day. |
| 10:04AM | 6 | Q.  -- is that fair? |
| 10:04AM | 7 | A.  Yeah, fair. |
| 10:04AM | 8 | Q.  Okay.  Now, after Mighty Taco, did you get other |
| 10:04AM | 9 | employment? |
| 10:04AM | 10 | A.  Actually my sister who'd never done it a day in her life |
| 10:04AM | 11 | suggested that I try Rick's Tally-Ho.  It was a strip club, |
| 10:05AM | 12 | an adult entertainment club. |
| 10:05AM | 13 | Q.  Was your sister older or younger than you? |
| 10:05AM | 14 | A.  A few years older. |
| 10:05AM | 15 | Q.  Okay.  And you said she'd never done it a day in her |
| 10:05AM | 16 | life, but she recommended it to you? |
| 10:05AM | 17 | A.  Yeah, she did. |
| 10:05AM | 18 | Q.  And did you give it a shot? |
| 10:05AM | 19 | A.  I did. |
| 10:05AM | 20 | Q.  Okay.  Now I'm not going to go into details at all about |
| 10:05AM | 21 | what happened at Rick's Tally-Ho, but about how long did you |
| 10:05AM | 22 | work there for? |
| 10:05AM | 23 | A.  Maybe, like, a year or two.  And then I transferred to -- |
| 10:05AM | 24 | or, went over to Mademoiselle's. |
| 10:05AM | 25 | Q.  Okay.  And what's Mademoiselle's? |

| | | |
|--|--|--|
| 10:05AM | 1 | A.  It's another gentlemen's club. |
| 10:05AM | 2 | Q.  Okay.  Now, during that time in your life, are you around |
| 10:05AM | 3 | age 19, age 20? |
| 10:05AM | 4 | A.  Yeah, probably 20. |
| 10:05AM | 5 | Q.  Okay.  Did you continue drinking alcohol, abusively? |
| 10:05AM | 6 | A.  Yes. |
| 10:05AM | 7 | Q.  Did you continue to use cocaine? |
| 10:05AM | 8 | A.  Yes. |
| 10:05AM | 9 | Q.  Did you get a second DWI? |
| 10:05AM | 10 | A.  Second and a third, yes. |
| 10:05AM | 11 | Q.  After that third DWI, what happened? |
| 10:05AM | 12 | A.  I got -- the judge sentenced me to -- he gave me rehab, |
| 10:06AM | 13 | and then -- |
| 10:06AM | 14 | Q.  Were you put on probation? |
| 10:06AM | 15 | A.  Yes, felony probation.  And I was to go to an |
| 10:06AM | 16 | outpatient -- inpatient rehab, excuse me. |
| 10:06AM | 17 | Q.  Okay.  Did you go to that inpatient rehab? |
| 10:06AM | 18 | A.  I did. |
| 10:06AM | 19 | Q.  And for a period of time while you're in inpatient rehab, |
| 10:06AM | 20 | did you stay clean and sober? |
| 10:06AM | 21 | A.  Yes, and following my discharge from the outpatient I was |
| 10:06AM | 22 | sober. |
| 10:06AM | 23 | Q.  Got it.  So let's talk about that now. |
| 10:06AM | 24 | Following your discharge from outpatient, were you clean, |
| 10:06AM | 25 | off drugs and alcohol at that time? |

10:06AM    1   A.  Yes.

10:06AM    2   Q.  Okay.  And about how old were you when you got out of

10:06AM    3   that rehab?

10:06AM    4   A.  I feel like I was still 20.  I can't really remember, it

10:06AM    5   was a long time ago.

10:06AM    6   Q.  Did you continue working as an exotic dancer or stripper?

10:06AM    7   A.  I did.  I went back to that.

10:06AM    8   Q.  Okay.  I cannot do math to save my life, but help me

10:07AM    9   here.  What year approximately would that have been when you

10:07AM   10   got out of rehab if you were about 19 or 20?

10:07AM   11   A.  I was born in 19 --

10:07AM   12   Q.  What year were you born?

10:07AM   13   A.  I was born in '85, so --

10:07AM   14   Q.  Okay.  So '05 you would have been 20; is that right?

10:07AM   15   A.  Yeah, about -- '05 sounds right.

10:07AM   16   Q.  Got it.  Sorry about that.

10:07AM   17       Did there come a time after getting out of rehab and

10:07AM   18   going back to work at Rick's Tally-Ho when you switched over

10:07AM   19   and started working at Pharaoh's Gentlemen's Club?

10:07AM   20   A.  Yes.

10:07AM   21   Q.  Okay.  Would that have been sometime around 2006?

10:07AM   22   A.  Yes, that sounds right.

10:07AM   23   Q.  Okay.  How did you learn about Pharaoh's Gentlemen's

10:07AM   24   Club?

10:07AM   25   A.  My roommate at the time was working there.

10:07AM    1    Q.  Okay.  Who was your roommate?

10:07AM    2    A.  Aja Simpson.

10:07AM    3    Q.  Were there things that you heard about Pharaoh's from Aja

10:07AM    4    that made you interested in going to work there?

10:07AM    5    A.  Yes.

10:07AM    6    Q.  What were those things?

10:07AM    7    A.  She said that it was a clean club, and also there was

10:08AM    8    money there.  Better money.

10:08AM    9    Q.  Okay.  And when you say "better money," do customers

10:08AM    10   bring money to the club?

10:08AM    11   A.  Yes.

10:08AM    12   Q.  And was it your understanding from what you heard from

10:08AM    13   Aja that Pharaoh's had more customers?

10:08AM    14   A.  Better clientele.

10:08AM    15   Q.  Okay.  Was that interesting to you?

10:08AM    16   A.  Yes.

10:08AM    17   Q.  At that time when you go and start to work at Pharaoh's,

10:08AM    18   were you using drugs?

10:08AM    19   A.  No.

10:08AM    20   Q.  Were you drinking --

10:08AM    21   A.  I was still sober.

10:08AM    22   Q.  Were you drinking alcohol?

10:08AM    23   A.  No.

10:08AM    24   Q.  When you started working, were you like an on-the-books

10:08AM    25   employee?

| | | |
|---|---|---|
| 10:08AM | 1 | A.  Not at first, no. |
| 10:08AM | 2 | Q.  What was your employment relationship with the club at |
| 10:08AM | 3 | first? |
| 10:08AM | 4 | A.  I don't know the term for that form, but I was an |
| 10:08AM | 5 | independent contractor I guess. |
| 10:08AM | 6 | Q.  Okay.  All right.  Let's talk about working at Pharaoh's |
| 10:09AM | 7 | generally and how you get paid, okay? |
| 10:09AM | 8 | A.  Okay. |
| 10:09AM | 9 | Q.  Can you describe for the jury the different ways that a |
| 10:09AM | 10 | person working as a dancer at Pharaoh's Gentlemen's Club |
| 10:09AM | 11 | earns money? |
| 10:09AM | 12 | A.  Sure.  You can earn money through tips on stage or |
| 10:09AM | 13 | through lap dances.  You get these chips, and the club takes |
| 10:09AM | 14 | a cut, and they give you a cut from the chips. |
| 10:09AM | 15 | Q.  Got it.  And so, I'm gonna break some of this down in a |
| 10:09AM | 16 | little more detail, and I'm not trying to embarrass you at |
| 10:09AM | 17 | all, but I want to explain it for these people. |
| 10:09AM | 18 | When you work at a club like Pharaoh's as a dancer, what |
| 10:09AM | 19 | kind of clothing do you wear? |
| 10:09AM | 20 | A.  Pretty much very revealing clothing. |
| 10:09AM | 21 | Q.  Okay.  Is it similar to, like, a bikini or bathing suit? |
| 10:09AM | 22 | A.  Yeah, yes. |
| 10:09AM | 23 | Q.  Okay.  And you mentioned that one way that you can earn |
| 10:09AM | 24 | money is earning tips doing stage dances; is that correct? |
| 10:09AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:09AM | 1 | Q.  Okay.  So, as a dancer working at Pharaoh's, first of |
| 10:09AM | 2 | all, is there a stage inside kind of the main area? |
| 10:10AM | 3 | A.  Yes. |
| 10:10AM | 4 | Q.  And do you get up on that stage and dance? |
| 10:10AM | 5 | A.  Yeah. |
| 10:10AM | 6 | Q.  And when you do that, would customers put money either on |
| 10:10AM | 7 | the stage or in your clothing? |
| 10:10AM | 8 | A.  Correct. |
| 10:10AM | 9 | Q.  Okay.  Now, was Pharaoh's a club that allowed you to be |
| 10:10AM | 10 | fully nude? |
| 10:10AM | 11 | A.  No. |
| 10:10AM | 12 | Q.  Okay.  So, would you remove your top part of your |
| 10:10AM | 13 | clothing? |
| 10:10AM | 14 | A.  Yeah.  You had to wear underwear -- bottoms and pasties. |
| 10:10AM | 15 | Q.  Okay.  And not trying to be crude, but what do you mean |
| 10:10AM | 16 | when you say the word "pasties?"  What is that? |
| 10:10AM | 17 | A.  Pasties cover -- it's a New York State law, I believe, |
| 10:10AM | 18 | but they cover the nipple. |
| 10:10AM | 19 | Q.  Okay.  And so you were -- would it be fair to say you |
| 10:10AM | 20 | were allowed to take your top off, but you had to have |
| 10:10AM | 21 | something covering your nipples? |
| 10:10AM | 22 | A.  Correct. |
| 10:10AM | 23 | Q.  And then you said the bottoms were supposed to stay on; |
| 10:10AM | 24 | is that correct? |
| 10:10AM | 25 | A.  Yes. |

10:10AM   1   Q.   And when you would go do a stage dance, would customers

10:10AM   2   put money down for you?

10:10AM   3   A.   Sure, yes.

10:10AM   4   Q.   And is that one way that you as a dancer were able to

10:10AM   5   earn money?

10:10AM   6   A.   Yes.

10:10AM   7   Q.   Now at that early time when you started working at

10:10AM   8   Pharaoh's, were you getting paid, like, a weekly salary?

10:11AM   9   A.   No, just whatever I was making on tips.

10:11AM   10  Q.   Did you get paid hourly to be there?

10:11AM   11  A.   No.

10:11AM   12  Q.   Okay.  So the way you earned money was customers putting

10:11AM   13  down tips; is that fair?

10:11AM   14  A.   Yes.

10:11AM   15  Q.   A second way that you described was -- I think you used

10:11AM   16  the word "lap dance;" is that correct?

10:11AM   17  A.   Yes.

10:11AM   18  Q.   Okay.  Let's talk a little more geography here.

10:11AM   19       Other than that main area in the club with the stage, is

10:11AM   20  there a separate area in the club where those lap dances

10:11AM   21  happen?

10:11AM   22  A.   Yes, there's a VIP Room.

10:11AM   23  Q.   Okay.  Can you tell the jury a little bit about that?

10:11AM   24  Where is it?  What's it like back there?  Explain it for

10:11AM   25  them.

10:11AM 1    A.  Sure.  Excuse me.  In Pharaoh's, it was off to the

10:11AM 2    right-hand side as the stage.  And there's two separate

10:11AM 3    rooms.  There's one that's, like, more of an open, I guess,

10:11AM 4    seating where, you know, a bunch of people could sit on

10:11AM 5    couches or whatever.

10:11AM 6        And then there was an actual Champagne Room which is more

10:11AM 7    private and more expensive.

10:11AM 8    Q.  Got it.  Let's break that down a little.

10:11AM 9        So there's a VIP area, and you described there being

10:12AM 10   couches in there?

10:12AM 11   A.  Yes.

10:12AM 12   Q.  And is that -- what's the lighting like in that VIP area?

10:12AM 13   A.  Dim.

10:12AM 14   Q.  Okay.  I mean, is it completely black?  Are you walking

10:12AM 15   into walls?

10:12AM 16   A.  No, you can --

10:12AM 17   Q.  Okay.

10:12AM 18   A.  -- see.

10:12AM 19   Q.  But is it darker?

10:12AM 20   A.  Yes, darker.

10:12AM 21   Q.  Is that on purpose?

10:12AM 22   A.  Yes, it's to set the ambiance, I guess.

10:12AM 23   Q.  Okay.

10:12AM 24   A.  Sorry.  The ambiance, sorry.

10:12AM 25   Q.  It's okay.

| | | |
|---|---|---|
| 10:12AM | 1 | A.  Set the mood. |
| 10:12AM | 2 | Q.  And then I think what you described is -- is there a more |
| 10:12AM | 3 | private area within that VIP area? |
| 10:12AM | 4 | A.  Yeah, it's called the Champagne Room. |
| 10:12AM | 5 | Q.  Okay.  And can you describe how -- is that separated or |
| 10:12AM | 6 | private, more private than the general VIP area? |
| 10:12AM | 7 | A.  If I remember correctly, that was off to the left once |
| 10:12AM | 8 | you paid for the dance.  And it's just, there's -- it's |
| 10:12AM | 9 | walled off from the other rooms.  You can't really see in |
| 10:12AM | 10 | there. |
| 10:12AM | 11 | Q.  Do you recall if there was a door or a curtain or |
| 10:12AM | 12 | anything like that? |
| 10:12AM | 13 | A.  I don't think there's a curtain there. |
| 10:12AM | 14 | Q.  Okay. |
| 10:12AM | 15 | A.  Just walled off.  There's, like, an opening though. |
| 10:13AM | 16 | Q.  Got it.  And it's -- and you described walled off so, |
| 10:13AM | 17 | like, on three sides, I guess, walled off? |
| 10:13AM | 18 | A.  Kind of, yeah.  But you could still see, like, if you |
| 10:13AM | 19 | were trying to look. |
| 10:13AM | 20 | Q.  Sure. |
| 10:13AM | 21 | A.  You could still see in there. |
| 10:13AM | 22 | Q.  Absolutely. |
| 10:13AM | 23 | A.  Yeah. |
| 10:13AM | 24 | Q.  When you would, let's walk through now how you end up |
| 10:13AM | 25 | back there. |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

16

10:13AM  1    How would a dancer end up going into either the VIP area

10:13AM  2    or the Champagne area with a customer?  How's that happen?

10:13AM  3    A.  If you're on the floor and a customer asks for a dance.

10:13AM  4    Q.  Yeah, explain.  Just explain it like they've never been

10:13AM  5    there before.

10:13AM  6    A.  I don't know.  Usually when you're on stage, a customer

10:13AM  7    might come up and say, hey, come see me when you get off

10:13AM  8    stage, I'd like a private dance.

10:13AM  9    Q.  Okay.

10:13AM  10   A.  And then you go see the customer, and then you go in and

10:13AM  11   buy a private dance.

10:13AM  12   Q.  Understood.  Do you recall how much a private dance cost

10:13AM  13   when you were working at Pharaoh's?

10:13AM  14   A.  I think it was like $22 a dance.

10:13AM  15   Q.  You made a face, and you said "I think."

10:13AM  16   A.  Well, inflation.  I don't know.

10:13AM  17   Q.  That's okay.  It's okay if you don't remember to say I

10:14AM  18   don't remember, I'm not sure.  Okay?

10:14AM  19   A.  Yeah, I don't remember.

10:14AM  20   Q.  So do you remember as you sit here today in 2024 how much

10:14AM  21   a private dance cost in 2006?

10:14AM  22   A.  No.

10:14AM  23   Q.  Okay.  You think it was more than $20?

10:14AM  24   A.  Maybe right around there, yeah.

10:14AM  25   Q.  Okay.  Would the customer pay you directly and you would

10:14AM  1  keep that money?

10:14AM  2  A.  No.

10:14AM  3  Q.  Explain how the finances work to them.

10:14AM  4  A.  Right.  There was a VIP doorman, and he would also act

10:14AM  5  as, like, a salesman.  He'd try to get the customer to buy

10:14AM  6  more dances or whatever.  But he would take the money and put

10:14AM  7  it in, like, a drawer.  And he would -- he'd write a tally

10:14AM  8  mark down also, so he could keep track of how many chips you

10:14AM  9  got.  And then he would give you a chip in return.

10:14AM  10  Q.  When you say a "chip," is that like a poker chip kind of?

10:14AM  11  A.  Yeah, it's exactly what it was.

10:14AM  12  Q.  Okay.

10:14AM  13  A.  It was worth money.

10:14AM  14  Q.  And so the customer would give money to a VIP attendant,

10:14AM  15  and you as the dancer would receive a poker chip?

10:15AM  16  A.  Yes.

10:15AM  17  Q.  How would you turn those poker chips into money at the

10:15AM  18  end of the night?

10:15AM  19  A.  Yep.  At the end of the night, you go to the same

10:15AM  20  doorman, and you give him all your chips, and he would cash

10:15AM  21  you out.

10:15AM  22  Q.  Now, did you keep all the money from each VIP dance that

10:15AM  23  happened?

10:15AM  24  A.  No.  The club took a portion of it.  A smaller portion,

10:15AM  25  but they took a portion of it.

10:15AM  1    Q.  So, you kept a percentage, and the club kept a

10:15AM  2    percentage?

10:15AM  3    A.  Yes.

10:15AM  4    Q.  All right.  We're going to come back a little later

10:15AM  5    today, or this morning, and we're going to talk about that in

10:15AM  6    more detail, but I want to move on first.

10:15AM  7         While you worked at Pharaoh's did you come to know who

10:15AM  8    owned the club?

10:15AM  9    A.  Yes.

10:15AM  10   Q.  When you started working there, who owned Pharaoh's

10:15AM  11   Gentlemen's Club?

10:15AM  12   A.  It was my understanding that it was Peter Gerace and Don

10:15AM  13   Parrino.

10:15AM  14   Q.  Okay.  And you mentioned a person named Peter Gerace.  Is

10:15AM  15   that person in court today?

10:15AM  16   A.  Yes.

10:15AM  17   Q.  Can you just point him out and let the jury know what

10:16AM  18   he's wearing for the record?

10:16AM  19   A.  Yeah.  He's sitting over there in a suit and tie right in

10:16AM  20   the middle.

10:16AM  21   Q.  In the middle?

10:16AM  22   A.  Yep.

10:16AM  23        **MR. COOPER:**  For the record, Judge, indicating the

10:16AM  24   defendant.

10:16AM  25        **THE COURT:**  It does.

10:16AM   1       **BY MR. COOPER:**

10:16AM   2    Q.  So when you started working there, Peter and Don Parrino

10:16AM   3    owned the club; is that correct?

10:16AM   4    A.  Yes.

10:16AM   5    Q.  Okay.  Now did Pharaoh's have different -- let's start

10:16AM   6    here.

10:16AM   7       Do you remember how long Pharaoh's was opened generally,

10:16AM   8    like, what hours?

10:16AM   9    A.  I think they opened at noon.  And they were open until 4

10:16AM  10    in the morning.

10:16AM  11    Q.  Okay.  Now were there two different shifts that existed

10:16AM  12    during that noon to 4 a.m. timeframe?

10:16AM  13    A.  Yes.

10:16AM  14    Q.  Okay.  Can we refer to those -- will you know what I'm

10:16AM  15    talking about if I say dayshift and nightshift?

10:16AM  16    A.  Yes.

10:16AM  17    Q.  Okay.  Who ran the dayshift generally?

10:16AM  18    A.  Don Parrino.

10:16AM  19    Q.  Okay.  And who ran the nightshift generally?

10:16AM  20    A.  Usually Peter Gerace.

10:16AM  21    Q.  Did you work -- did you sometimes work dayshifts?

10:16AM  22    A.  Yes.

10:16AM  23    Q.  Did you sometimes work nightshifts?

10:16AM  24    A.  Yes.

10:16AM  25    Q.  Did you observe a difference between the dayshift when

10:17AM   1    Don Parrino was running it and the nightshift when Peter was

10:17AM   2    running it?

10:17AM   3    A.  Yes.

10:17AM   4    Q.  Can you tell them about that?

10:17AM   5    A.  During the day, it was quiet.  There was a lot of guys on

10:17AM   6    their lunch break.  And, you know, I guess rules were

10:17AM   7    followed.

10:17AM   8        And nighttime, it was day and night.  That expression.

10:17AM   9    And -- and nighttime, it was more of a free for all.  And,

10:17AM   10   yeah, more of a wild atmosphere.

10:17AM   11   Q.  When you say "free for all," what do you mean by that?

10:17AM   12   A.  I don't know.  Dancers drinking more and music was

10:17AM   13   louder, different clientele.

10:17AM   14   Q.  Did you observe drug use?

10:17AM   15   A.  Not at first because I was sober, but yes, eventually I

10:17AM   16   noticed drug use was happening.

10:17AM   17   Q.  Okay.

10:17AM   18   A.  Yes.

10:17AM   19   Q.  That's a great transition point right there.  You

10:17AM   20   mentioned that not at first because you were sober; is that

10:17AM   21   correct?

10:17AM   22   A.  Yes.

10:17AM   23   Q.  Did there become a time while you were working at

10:17AM   24   Pharaoh's when you started using again?

10:18AM   25   A.  Yes.

10:18AM  1  Q.  Okay.  I want to talk about that now.

10:18AM  2     Do you remember approximately when that was?

10:18AM  3  A.  I was in nursing school, I remember.  And this was a

10:18AM  4  spring semester, so it was my second semester in nursing

10:18AM  5  school.  I believe it was towards the end, so it might have

10:18AM  6  been April-ish, maybe.

10:18AM  7  Q.  Got it.  And would that have been in 2009?

10:18AM  8  A.  Yes.

10:18AM  9  Q.  So sometime spring of '09, is that a fair estimate?

10:18AM  10  A.  Yeah.

10:18AM  11  Q.  And just -- we're going to pause for one second, get this

10:18AM  12  out of the way.

10:18AM  13     Today's not the first time we've met, right?

10:18AM  14  A.  Right.

10:18AM  15  Q.  We've sat down and spoken about these same topics before;

10:18AM  16  is that right?

10:18AM  17  A.  Yes.

10:18AM  18  Q.  Okay.  Have I asked you a lot of the same questions I'm

10:18AM  19  asking you today?

10:18AM  20  A.  Yes.

10:18AM  21  Q.  Have you answered a lot of the same questions you're

10:18AM  22  answering today?

10:18AM  23  A.  Yes.

10:18AM  24  Q.  Did that help you feel more comfortable getting up on the

10:18AM  25  witness stand?

| | | |
|---|---|---|
| 10:18AM | 1 | A.  Yes. |
| 10:19AM | 2 | Q.  Was it better than getting up there having no clue what I |
| 10:19AM | 3 | was going to ask you? |
| 10:19AM | 4 | A.  Yeah. |
| 10:19AM | 5 | Q.  Let's now jump back into it. |
| 10:19AM | 6 | Spring of 2009.  What happens that causes you to start |
| 10:19AM | 7 | using drugs again?  Just describe for them what occurred. |
| 10:19AM | 8 | A.  I meet this gentleman that I was in rehab with, the rehab |
| 10:19AM | 9 | that I went to that I was sentenced to when I was 19 or 20. |
| 10:19AM | 10 | He was actually in the club one night with his sister, K.L. |
| 10:19AM | 11 | And we hit it off right away, his sister and I.  She was |
| 10:19AM | 12 | super cool.  And she was a cocaine user, I guess.  And she |
| 10:19AM | 13 | offered me some.  And I didn't give it a second thought, and |
| 10:19AM | 14 | I took it. |
| 10:19AM | 15 | Q.  Was that the first time that you had met K.L.? |
| 10:19AM | 16 | A.  Yes. |
| 10:19AM | 17 | Q.  And you mentioned that you knew her brother who was there |
| 10:20AM | 18 | with her from rehab? |
| 10:20AM | 19 | A.  Yes, I was in rehab with him. |
| 10:20AM | 20 | Q.  When you met K.L. that first night, did you use cocaine |
| 10:20AM | 21 | with her? |
| 10:20AM | 22 | A.  Yes. |
| 10:20AM | 23 | Q.  Okay.  At that point, had you been sober up until that |
| 10:20AM | 24 | point? |
| 10:20AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:20AM | 1 | Q.  For a period of time at least? |
| 10:20AM | 2 | A.  Yeah. |
| 10:20AM | 3 | Q.  Okay.  And so if we're in 2009, would it be fair to say |
| 10:20AM | 4 | you had been sober for a couple of years up until the point |
| 10:20AM | 5 | when you met K.L.? |
| 10:20AM | 6 | A.  Yeah, for the most -- yes. |
| 10:20AM | 7 | Q.  Were you going to say for the most part? |
| 10:20AM | 8 | A.  For the most part, yes. |
| 10:20AM | 9 | Q.  Okay. |
| 10:20AM | 10 | A.  Because I had a couple of slips, I wasn't really going |
| 10:20AM | 11 | to -- I wasn't, like, in a program like I am now.  So I was |
| 10:20AM | 12 | sober for the most part, yes.  No drugs. |
| 10:20AM | 13 | Q.  Okay. |
| 10:20AM | 14 | A.  Yes. |
| 10:20AM | 15 | Q.  Some slips, were you referring to alcohol use? |
| 10:20AM | 16 | A.  Yes. |
| 10:20AM | 17 | Q.  Now when -- did K.L. offer you cocaine? |
| 10:20AM | 18 | A.  Yes. |
| 10:20AM | 19 | Q.  Did that happen inside of Pharaoh's? |
| 10:20AM | 20 | A.  Yeah. |
| 10:20AM | 21 | Q.  Now, to be clear, she didn't put a gun your head and make |
| 10:20AM | 22 | you use cocaine, did she? |
| 10:20AM | 23 | A.  No, she didn't. |
| 10:20AM | 24 | Q.  Did she threaten you? |
| 10:21AM | 25 | A.  No, she didn't threaten me. |

10:21AM  1    Q.  Did she force you?

10:21AM  2    A.  No, she did not.

10:21AM  3    Q.  At that time when K.L. offered you cocaine, were you

10:21AM  4    actively addicted to cocaine?

10:21AM  5    A.  No, I wasn't.

10:21AM  6    Q.  Was that the only time you ever met K.L.?

10:21AM  7    A.  Up until that point, yes, it was the first time I met

10:21AM  8    her.

10:21AM  9    Q.  After that, did you continue to interact with her?

10:21AM  10   A.  Yes, her and I became really good friends.

10:21AM  11   Q.  Can you describe for the jury how your relationship with

10:21AM  12   K.L. progressed?

10:21AM  13   A.  We continued hanging out.  And we did a lot of stuff

10:21AM  14   together.  Mostly drinking and drugging.  We partied together

10:21AM  15   a lot.

10:21AM  16   Q.  Did you see her at Pharaoh's again after that first time?

10:21AM  17   A.  Yes.

10:21AM  18   Q.  Did she begin frequenting Pharaoh's more often?

10:21AM  19   A.  Yes.

10:21AM  20   Q.  What was bringing her around Pharaoh's if you know?

10:21AM  21   A.  Yeah.  At some point, she started seeing Peter Gerace.

10:21AM  22   Q.  When you say "seeing" him, what do you mean by that?

10:21AM  23   A.  Dating, if that's what you want to call it.  Sleeping

10:21AM  24   with.

10:21AM  25   Q.  Okay.  She was in a sexual relationship with him?

10:22AM  1    A.  Yes.

10:22AM  2    Q.  Would that timeframe be from the spring into the summer

10:22AM  3    of 2009?

10:22AM  4    A.  Roughly, yes.

10:22AM  5    Q.  Now, you mentioned that you continued to see K.L. a lot,

10:22AM  6    and a lot of what you did was, I think you said, drinking and

10:22AM  7    drugging; is that right?

10:22AM  8    A.  Yes.

10:22AM  9    Q.  Once you started using again, did that spiral pretty

10:22AM  10   quickly for you?

10:22AM  11   A.  Yes.

10:22AM  12   Q.  Can you describe for the jury what it's like to slip back

10:22AM  13   into addiction like that?  How does that happen?

10:22AM  14   A.  How does it happen?  You go from doing it once, and like

10:22AM  15   myself, because I'm an alcoholic and an addict, once became

10:22AM  16   daily, and then it was all day every day.  And then there

10:22AM  17   were gaps or timeframes where I'd be up for two to three days

10:22AM  18   on end.  I was spending all my money on it.

10:22AM  19        Should I --

10:22AM  20   Q.  You're doing fine.

10:22AM  21   A.  Should I say this?  At some point I had lost -- I -- I

10:23AM  22   weigh 135 right now, so I was down to 114 pounds.  I looked

10:23AM  23   strung out.  I felt strung out.  And I wasn't even paying my

10:23AM  24   bills.  I was just -- all my money from dancing was going to

10:23AM  25   drugs and alcohol.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

26

10:23AM   1    Q.  At some point in your mind, when you're using drugs daily

10:23AM   2    as you've described, spending all of your money on it, in

10:23AM   3    your mind, does it go from being a choice you're making to

10:23AM   4    something that you have to do?

10:23AM   5    A.  Yes.

10:23AM   6    Q.  Can you explain that in a little more detail to the jury

10:23AM   7    if they haven't experienced that themselves before?

10:23AM   8    A.  Yeah.  I don't know.  It's like a switch gets flipped in

10:23AM   9    your mind.  You just feel compelled to continue.

10:23AM  10        And when I wasn't doing alcohol and drugs, like, if I'd

10:23AM  11    have moments where I was just waking up, I was thinking about

10:23AM  12    it.  I would plan my entire day, week, whatever, around

10:23AM  13    drinking and drugging.

10:23AM  14    Q.  Did you need money to get drugs?

10:23AM  15    A.  Yes.

10:23AM  16    Q.  How were you getting money at that time in the summer of

10:23AM  17    2009?

10:23AM  18    A.  Dancing.

10:23AM  19    Q.  Were you working at Pharaoh's?

10:23AM  20    A.  Yes.

10:24AM  21    Q.  Did there come a time when in addition to cocaine you

10:24AM  22    started using a different type of drug?

10:24AM  23    A.  Opiates, yes.

10:24AM  24    Q.  Was that also in that summer of 2009?

10:24AM  25    A.  Yes.

10:24AM 1   Q.  Who -- well, first of all, what kind of opiate did you

10:24AM 2   start using?

10:24AM 3   A.  Started off as Lortabs.

10:24AM 4   Q.  What's a Lortab?

10:24AM 5   A.  A Lortab is a pain -- a prescription pain pill.  And at

10:24AM 6   some point it turned into heroin.

10:24AM 7   Q.  Okay.  You said it started off as Lortabs.  When you

10:24AM 8   started using Lortabs, were those addictive?

10:24AM 9   A.  Yes, very.

10:24AM 10  Q.  Can you describe to the jury what addiction to opiates

10:24AM 11  like Lortabs, what's that like?

10:24AM 12  A.  That's worse than being addicted to cocaine and/or

10:24AM 13  alcohol.  Without even realizing it, say, when I didn't have

10:24AM 14  the Lortab, I would go into withdrawal, and I would feel like

10:25AM 15  I had a really bad case of the flu.  I would start vomiting,

10:25AM 16  I'd sweat, shake.  You just feel nauseous and fatigued, and

10:25AM 17  your muscles ache.  You feel terrible.

10:25AM 18  Q.  When you're actively addicted to a substance like

10:25AM 19  Lortabs, are you afraid of not having it and going through

10:25AM 20  that withdrawal?

10:25AM 21  A.  Yes, you don't want to experience that feeling on

10:25AM 22  purpose.

10:25AM 23  Q.  Does that fear of withdrawal drive your decisionmaking

10:25AM 24  when you're in active addiction to opiates like that?

10:25AM 25  A.  I would say so, yes.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

| | | |
|---|---|---|
| 10:25AM | 1 | Q.  Did the Lortab use progress from, like, one pill for the |
| 10:25AM | 2 | first time to daily use? |
| 10:25AM | 3 | A.  Yes.  Just like alcohol and cocaine, it went from a few |
| 10:25AM | 4 | here and there, to daily use, and then it was all day every |
| 10:25AM | 5 | day. |
| 10:25AM | 6 | Q.  Are we talking about that same timeframe of the spring |
| 10:25AM | 7 | into the summer of 2009? |
| 10:26AM | 8 | A.  Yes. |
| 10:26AM | 9 | Q.  By the summer of 2009, are you fully in the throes of |
| 10:26AM | 10 | addiction to cocaine? |
| 10:26AM | 11 | A.  Yes. |
| 10:26AM | 12 | Q.  Are you fully in the throes of addiction to opiates? |
| 10:26AM | 13 | A.  Yes. |
| 10:26AM | 14 | Q.  Do you remember where you got Lortabs from the first |
| 10:26AM | 15 | time? |
| 10:26AM | 16 | A.  I think I got them from K.L.. |
| 10:26AM | 17 | Q.  Okay.  And is that the same K.L. that we were talking |
| 10:26AM | 18 | about a moment ago? |
| 10:26AM | 19 | A.  Yes. |
| 10:26AM | 20 | Q.  Do you know -- and if you don't, say I don't know -- do |
| 10:26AM | 21 | you know where K.L. got them from? |
| 10:26AM | 22 | A.  I don't know. |
| 10:26AM | 23 | Q.  About how much money would you think in a week you were |
| 10:26AM | 24 | making during that timeframe in the summer of 2009? |
| 10:26AM | 25 | A.  Like, two grand a week. |

10:26AM  1  Q.  And $2,000 a week that you're making, were you using that

10:26AM  2  to pay your electric bill?

10:27AM  3  A.  No.

10:27AM  4  Q.  Were you paying your rent?

10:27AM  5  A.  No.

10:27AM  6  Q.  What were you using that money on?

10:27AM  7  A.  It all went to drugs.

10:27AM  8  Q.  Okay.  We've talked a little bit about the geography

10:27AM  9  inside the club at Pharaoh's.  I want to talk about a

10:27AM  10  different area of the club now.

10:27AM  11     Are you aware of an upstairs area at Pharaoh's?

10:27AM  12  A.  Yes.

10:27AM  13  Q.  Okay.  And can you talk to the jury a little bit, just

10:27AM  14  the geography, explain that.  What's it look like?  How do

10:27AM  15  you get there?  That kind of thing.

10:27AM  16  A.  I don't really remember how you get there.  This was,

10:27AM  17  again, 19 years ago.  But I know -- I think the staircase

10:27AM  18  was, like, off the kitchen or something, maybe.  You go

10:27AM  19  upstairs.  There's, like, a hallway, there's a bathroom off

10:27AM  20  to the side, a small bathroom, and then there's an another

10:27AM  21  small room that had, like, a couch and, like, a coffee table

10:27AM  22  and speakers in it.

10:27AM  23  Q.  Was it set up kind of like an apartment?

10:27AM  24  A.  Kind of.

10:28AM  25  Q.  When you first started working at Pharaoh's back in the

10:28AM   1   '06 timeframe, did you go upstairs frequently?

10:28AM   2   A.  No.

10:28AM   3   Q.  Okay.  Did there come a time when you started going

10:28AM   4   upstairs?

10:28AM   5   A.  Yes.

10:28AM   6   Q.  What caused you to start going upstairs?

10:28AM   7   A.  Well, K.L. was invited upstairs, she was seeing Peter, so

10:28AM   8   I would go up with her.

10:28AM   9   Q.  Okay.  So is that, again, now we're talking about the

10:28AM   10  same timeframe when K.L. comes into your life, starting in

10:28AM   11  the spring of '09 into the summer of '09?

10:28AM   12  A.  Yes.

10:28AM   13  Q.  When you would go upstairs with K.L. and Peter, what

10:28AM   14  would happen?

10:28AM   15  A.  Party.

10:28AM   16  Q.  Okay.  When you say "party," what do you mean?

10:28AM   17  A.  Use cocaine, drink, that sort of stuff.

10:28AM   18  Q.  Who would provide the cocaine upstairs?

10:28AM   19  A.  Usually Peter.

10:28AM   20  Q.  Is that this defendant?

10:28AM   21  A.  Yes.

10:28AM   22  Q.  Were you and K.L. the only two people that would be up

10:28AM   23  there partying and using cocaine with the defendant?

10:29AM   24  A.  No, there was other people up there.

10:29AM   25  Q.  Who do you recall also being up there?

| | | |
|---|---|---|
| 10:29AM | 1 | A.  Just like other friends of his, sometimes other dancers. |
| 10:29AM | 2 | Q.  Okay.  When you say "friends of his," is that generally |
| 10:29AM | 3 | men? |
| 10:29AM | 4 | A.  Yes. |
| 10:29AM | 5 | Q.  And are the dancers, are they all women? |
| 10:29AM | 6 | A.  Yeah, there's no male dancers there. |
| 10:29AM | 7 | Q.  You said I think a moment ago that the men, you perceived |
| 10:29AM | 8 | as friends of the defendants; is that correct? |
| 10:29AM | 9 | A.  Yes. |
| 10:29AM | 10 | Q.  Is that based on the observations that you made? |
| 10:29AM | 11 | A.  Yeah. |
| 10:29AM | 12 | Q.  Did you see him interacting with those people? |
| 10:29AM | 13 | A.  Yeah. |
| 10:29AM | 14 | Q.  You're 39 years old, you know what friends look like, |
| 10:29AM | 15 | right? |
| 10:29AM | 16 | A.  Yeah. |
| 10:29AM | 17 | Q.  Would you describe those people as people he seemed close |
| 10:29AM | 18 | with? |
| 10:29AM | 19 | A.  Maybe just, yeah, I don't know. |
| 10:29AM | 20 | Q.  Let me ask a better question. |
| 10:29AM | 21 | A.  Yeah. |
| 10:29AM | 22 | Q.  Downstairs there's random customers, right? |
| 10:29AM | 23 | A.  Yes. |
| 10:29AM | 24 | Q.  Were the random customers allowed to go upstairs -- |
| 10:29AM | 25 | A.  No. |

10:29AM   1    Q.   -- and do cocaine with Peter?

10:29AM   2    A.   Some, no.

10:29AM   3    Q.   And I'm not trying to be critical.

10:29AM   4    A.   Yeah, I know.

10:29AM   5    Q.   So was there a distinction in your mind of who got to go

10:30AM   6    upstairs?

10:30AM   7    A.   People he was closer with, yes.

10:30AM   8    Q.   Okay.  Can you describe about how many times you think

10:30AM   9    you went upstairs and did cocaine with Peter and other

10:30AM  10    people?

10:30AM  11    A.   A few, maybe a half a dozen.  A few times.

10:30AM  12    Q.   In those times, about how much cocaine would you see the

10:30AM  13    defendant with?

10:30AM  14    A.   Nothing more than maybe, like, an 8 Ball or something.

10:30AM  15    Q.   Is that about -- if you know?

10:30AM  16    A.   I don't know what the grams are, sorry, I don't know the

10:30AM  17    measurement.

10:30AM  18    Q.   I got a different question for you.

10:30AM  19    A.   Okay.

10:30AM  20    Q.   About how many people would an 8 Ball of cocaine get

10:30AM  21    high?

10:30AM  22    A.   Maybe like four or five.

10:30AM  23    Q.   Okay.

10:30AM  24    A.   Yeah.

10:30AM  25    Q.   You described for the jury a few minutes ago that during

10:30AM    1    that timeframe we've been discussing, you became a daily user

10:31AM    2    of drugs; is that correct?

10:31AM    3    A.   Yes.

10:31AM    4    Q.   Were you using cocaine daily?

10:31AM    5    A.   Yes.

10:31AM    6    Q.   Were you using opiates daily?

10:31AM    7    A.   Yes.

10:31AM    8    Q.   Okay.   On the days that you would work, were you using

10:31AM    9    those drugs while you worked?

10:31AM    10    A.   Yes.

10:31AM    11    Q.   Did you use cocaine at Pharaoh's?

10:31AM    12    A.   Yes.

10:31AM    13    Q.   Other than just in the upstairs area?

10:31AM    14    A.   Yes.

10:31AM    15    Q.   Did you use opiates at Pharaoh's?

10:31AM    16    A.   I did.

10:31AM    17    Q.   Okay.   Where would you use those drugs if you weren't in

10:31AM    18    the upstairs area?

10:31AM    19    A.   Go in the bathroom.

10:31AM    20    Q.   Okay.   Was that kind of the common place for you?

10:31AM    21    A.   Yes.

10:31AM    22    Q.   Were you the only dancer that you knew went in the

10:31AM    23    bathroom and used drugs?

10:31AM    24    A.   No, there was other dancers.

10:31AM    25    Q.   Okay.   Do you remember the names of any of the other

10:31AM  1   dancers that you saw using drugs at Pharaoh's?

10:31AM  2   A.  No.  Like, I could picture what they look like, but I

10:31AM  3   can't remember exactly who they were.

10:31AM  4   Q.  Okay.  And that's maybe a good point to bring up.  Do

10:31AM  5   most people go by their government name?

10:31AM  6   A.  No.  No, they don't.

10:31AM  7   Q.  Okay.  And this is about 15 years ago?  2009?

10:31AM  8   A.  Yeah.  Yeah, it was quite a while ago, yes.

10:32AM  9   Q.  You described for the jury a few moments ago how that

10:32AM  10  drug addiction impacted your physical appearance; do you

10:32AM  11  remember that?

10:32AM  12  A.  Yes.

10:32AM  13  Q.  Were you the only dancer at Pharaoh's who had that

10:32AM  14  physical appearance of being strung out on drugs?

10:32AM  15  A.  No, K.L. started to look that way, too.

10:32AM  16  Q.  Okay.  Was she a daily cocaine user?

10:32AM  17  A.  Yes.

10:32AM  18  Q.  Was she a daily opiate user?

10:32AM  19  A.  Yes.

10:32AM  20  Q.  Would she use those same drugs at Pharaoh's?

10:32AM  21  A.  Yes.

10:32AM  22  Q.  All right.  I want to talk about the effects of those

10:32AM  23  drugs on you when you used them for a moment.  We'll take

10:32AM  24  them one at a time.

10:32AM  25  A.  Okay.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24
35

10:32AM   1   Q.  Start with cocaine.  How does cocaine make you feel when

10:32AM   2   you use it like the first couple times before you're, you

10:32AM   3   know, heavily addicted to it?

10:32AM   4   A.  Euphoric.

10:32AM   5   Q.  Okay.  It's a great feeling?

10:32AM   6   A.  Superhuman, yes.  Energized.

10:32AM   7   Q.  Is it a stimulant, do you know?

10:32AM   8   A.  Yes, it's a stimulant.

10:32AM   9   Q.  If you're drinking alcohol, which you've described that

10:33AM  10   you struggled with alcohol use, does cocaine give you the

10:33AM  11   ability to stay up and drink more?

10:33AM  12   A.  Yes.

10:33AM  13   Q.  Is that common based on your life experience?

10:33AM  14   A.  Yes.

10:33AM  15   Q.  Did Pharaoh's sell alcohol?

10:33AM  16   A.  Yes.

10:33AM  17   Q.  Over time, as you become a daily cocaine user, does that

10:33AM  18   euphoric effect continue?

10:33AM  19   A.  No.

10:33AM  20   Q.  Describe that.  Explain it to them.

10:33AM  21   A.  It goes from feeling euphoric and exciting to almost like

10:33AM  22   drinking a cup of coffee, that's what it's equivalent to,

10:33AM  23   because you build a tolerance to it.

10:33AM  24       And then there comes a point where I just -- I need it

10:33AM  25   just to function normally.

| | | |
|---|---|---|
| 10:33AM | 1 | Q. What do you mean?  Explain to them that sentence, I need |
| 10:33AM | 2 | it just to function.  What does it mean? |
| 10:33AM | 3 | A. Like, get out of bed.  I'd have no energy and I'd feel, |
| 10:33AM | 4 | like, lethargic and almost, I don't know, like I was sick, |
| 10:33AM | 5 | like I had a cold or something.  So I would take cocaine just |
| 10:34AM | 6 | so I had enough energy to, like, get up and do normal things |
| 10:34AM | 7 | in the morning like brush my teeth, take a shower, put makeup |
| 10:34AM | 8 | on, get dressed, let my dogs out.  Like, all those things |
| 10:34AM | 9 | took a lot of energy. |
| 10:34AM | 10 | Q. During that time when you were addicted to cocaine, could |
| 10:34AM | 11 | you have shown up for work and done a shift dancing at |
| 10:34AM | 12 | Pharaoh's without cocaine? |
| 10:34AM | 13 | A. Not at this point, no. |
| 10:34AM | 14 | Q. Okay.  And at that point, did you need to dance at |
| 10:34AM | 15 | Pharaoh's in order to make money to buy the cocaine? |
| 10:34AM | 16 | A. Yes. |
| 10:34AM | 17 | Q. Is there a bit of a cycle there? |
| 10:34AM | 18 | A. Yes. |
| 10:34AM | 19 | Q. Let's move on to the -- oh, one more question about |
| 10:34AM | 20 | cocaine.  How long did the effects of cocaine last when you |
| 10:34AM | 21 | use it, approximately? |
| 10:34AM | 22 | A. A couple hours. |
| 10:34AM | 23 | Q. Okay. |
| 10:34AM | 24 | A. But if you're a continuous user, I feel like that is less |
| 10:34AM | 25 | time, maybe. |

10:34AM  1  Q.  You talked about tolerance a minute ago?

10:34AM  2  A.  Yes.

10:34AM  3  Q.  As you develop a tolerance, do you need to use more and

10:34AM  4  more --

10:34AM  5  A.  Frequently.

10:34AM  6  Q.  I'm not being critical.  So Ann can type down my

10:34AM  7  question, just try to wait for me to finish asking --

10:34AM  8  A.  Okay.

10:34AM  9  Q.  -- and then you answer, okay?

10:35AM  10  A.  Okay.

10:35AM  11  Q.  Do you need to use more and more in order to get that

10:35AM  12  same effect from it?

10:35AM  13  A.  Yes.  You to use it more frequently.

10:35AM  14  Q.  Okay.  And how long generally were your shifts that you

10:35AM  15  worked at Pharaoh's?

10:35AM  16  A.  Maybe six hours.

10:35AM  17  Q.  Okay.  And so if you used before you went to Pharaoh's,

10:35AM  18  would the effects wear off before your shift ended?

10:35AM  19  A.  Yes.

10:35AM  20  Q.  Would you need to continue using to continue functioning

10:35AM  21  there?

10:35AM  22  A.  Yes.

10:35AM  23  Q.  All right.  We're going to move on now from cocaine to

10:35AM  24  opiates.  You said it started out with Lortab; is that

10:35AM  25  correct?

10:35AM 1    A.  Yes.

10:35AM 2    Q.  What's the feeling like the first few times that you use

10:35AM 3    a Lortab?

10:35AM 4    A.  Relaxed.  Same euphoric feeling, just maybe slightly

10:35AM 5    different.  You don't feel stimulated, you feel more, like, I

10:35AM 6    don't know.  Like, calm, I guess.

10:35AM 7    Q.  Okay.  Is -- is a Lortab a stimulant like cocaine?

10:35AM 8    A.  No.

10:35AM 9    Q.  Okay.  If I used the term "opiate" kind of

10:36AM 10   interchangeably, do you understand what I mean by that?

10:36AM 11   A.  Yes.

10:36AM 12   Q.  Okay.  When you used opiates, do they have a physical

10:36AM 13   addiction that takes hold in you?

10:36AM 14   A.  Yes.

10:36AM 15   Q.  What's that -- what's that like?  How's that happen?

10:36AM 16   A.  The physical addiction?

10:36AM 17   Q.  Yeah.

10:36AM 18   A.  Are you asking me what I felt like when I didn't have it?

10:36AM 19   Q.  Yeah.  Like, what -- how do you become addicted to an

10:36AM 20   opiate?  Yeah, what's it like?

10:36AM 21   A.  I don't know.  All's I know is I started taking pills,

10:36AM 22   and just like the cocaine, I built a tolerance, so I would

10:36AM 23   continue to take more and more.

10:36AM 24       And there would come a day where I didn't have it, and I

10:36AM 25   didn't realize that you would experience the withdrawal that

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

39

| | | |
|---|---|---|
| 10:36AM | 1 | you did and that I did.  So, when I didn't have the pill, I |
| 10:36AM | 2 | went through, like, extreme withdrawal like the sweats, |
| 10:36AM | 3 | shakes, you know, throwing up, like I had the flu. |
| 10:36AM | 4 | Q.  Now, if you have those withdrawal symptoms going on, |
| 10:36AM | 5 | vomiting, shaking, sweating, are you able to work and dance |
| 10:36AM | 6 | at Pharaoh's? |
| 10:37AM | 7 | A.  No. |
| 10:37AM | 8 | Q.  About how much money did a Lortab pill cost back then, do |
| 10:37AM | 9 | you remember? |
| 10:37AM | 10 | A.  I think $10. |
| 10:37AM | 11 | Q.  Okay.  And are you using one pill a day at that time? |
| 10:37AM | 12 | A.  No. |
| 10:37AM | 13 | Q.  Can you describe for the jury as it progresses, how many |
| 10:37AM | 14 | pills do you start using per day? |
| 10:37AM | 15 | A.  Maybe about -- I was up to, like, ten.  So the habit was |
| 10:37AM | 16 | anywhere from 100 to $150 a day. |
| 10:37AM | 17 | Q.  And that's just the Lortabs; is that right? |
| 10:37AM | 18 | A.  Correct. |
| 10:37AM | 19 | Q.  In addition to the Lortabs, were you a daily cocaine |
| 10:37AM | 20 | user? |
| 10:37AM | 21 | A.  Yes. |
| 10:37AM | 22 | Q.  Was cocaine expensive as well? |
| 10:37AM | 23 | A.  Yes. |
| 10:37AM | 24 | Q.  Do you remember how much you had to pay, what amounts |
| 10:37AM | 25 | were you buying cocaine in? |

10:37AM    1    A.  Like, an 8 Ball at a time.

10:37AM    2    Q.  Okay.  And--

10:37AM    3    A.  So it was like $200 maybe.

10:37AM    4    Q.  Okay.  And would you use that over the course of a day?

10:37AM    5    A.  Yes.

10:37AM    6    Q.  Okay.  So would it be fair to say you're spending 200

10:37AM    7    bucks a day on cocaine?

10:37AM    8    A.  Yes.

10:37AM    9    Q.  And you're spending about 100 bucks a day on Lortabs?

10:37AM    10   A.  Yeah, maybe more.

10:37AM    11   Q.  Maybe more?

10:37AM    12   A.  Yeah.

10:37AM    13   Q.  So as a conservative estimate, about $300 a day to feed

10:38AM    14   the drug habit?

10:38AM    15   A.  Yeah.  Yes.

10:38AM    16   Q.  If that occurs over seven days times 300, is that about

10:38AM    17   2,000 or $2,100?

10:38AM    18   A.  Yeah.

10:38AM    19   Q.  Is that about the same amount of money as you were making

10:38AM    20   every week showing up to work?

10:38AM    21   A.  Yes.

10:38AM    22   Q.  You described for the jury before we did any math that

10:38AM    23   you felt like you were spending all your money on drugs; is

10:38AM    24   that right?

10:38AM    25   A.  Yes.

10:38AM 1  Q.  Earlier in the direct examination, you said it's --

10:38AM 2  opiate use started with Lortabs and eventually became heroin;

10:38AM 3  is that correct?

10:38AM 4  A.  Yes.

10:38AM 5  Q.  Where did you get heroin for the first time?

10:38AM 6  A.  Some girl that I -- I think she was dancing at Pharaoh's

10:38AM 7  or maybe I ran into her, but I worked with her at Rick's

10:38AM 8  Tally-Ho.  And she -- we were hanging out with her, K.L. and

10:38AM 9  I were hanging out with her one night, and she had heroin on

10:39AM 10  her.

10:39AM 11  Q.  Did you use it?

10:39AM 12  A.  Yes.

10:39AM 13  Q.  Is that a similar opiate effect on your body to -- to the

10:39AM 14  Lortabs?

10:39AM 15  A.  A little bit different.  It's more instantaneous, like,

10:39AM 16  the effect happens immediately.

10:39AM 17  Q.  Okay.  Was heroin addictive?

10:39AM 18  A.  Very.

10:39AM 19  Q.  Did you continue using heroin?

10:39AM 20  A.  Yes.

10:39AM 21  Q.  Did that spiral and get worse?

10:39AM 22  A.  Yes.

10:39AM 23  Q.  Before you worked at Pharaoh's Gentlemen's Club, had you

10:39AM 24  ever in your life exchanged sex, vaginal intercourse, in

10:40AM 25  exchange for money or drugs?

10:40AM    1    A.  No.

10:40AM    2    Q.  Is that something you ever thought you'd do before you

10:40AM    3    worked at Pharaoh's?

10:40AM    4    A.  No.

10:40AM    5    Q.  Was that in your life plan?

10:40AM    6    A.  No.

10:40AM    7    Q.  Did there come a time when that happened?

10:40AM    8    A.  Yes.

10:40AM    9    Q.  Can you describe for the jury how that played out?

10:40AM    10   A.  Yes.  We, K.L. and myself, were -- went upstairs to

10:40AM    11   party, hang out, whatever.  There was a couple of guys up

10:40AM    12   there.  And -- not exactly sure how it came up, but one of

10:41AM    13   the guys was a little bit younger.  And Peter asked me if I

10:41AM    14   would hook up with him, and he would, like, take care of me

10:41AM    15   or whatever.  And then I had sex with the guy.  When I was

10:41AM    16   done having sex with the guy, Peter gave me, like, 200 bucks.

10:41AM    17   Q.  Okay.  I want to break that down a little bit more.

10:41AM    18       When you went upstairs with K.L., was Peter up there?

10:41AM    19   A.  Yes.

10:41AM    20   Q.  Was -- were there other men up there?

10:41AM    21   A.  Yes.

10:41AM    22   Q.  Do you remember if there were other dancers other than

10:41AM    23   you and K.L. up there?

10:41AM    24   A.  No, I don't remember.

10:41AM    25   Q.  Okay.  Were you using drugs?

10:41AM    1    A.  Yes.

10:41AM    2    Q.  Were you using cocaine?

10:41AM    3    A.  Yes.

10:41AM    4    Q.  Who provided the cocaine that you used upstairs?

10:41AM    5    A.  That, I don't remember that specific time.  I think it

10:41AM    6    was Peter.

10:41AM    7    Q.  Okay.

10:41AM    8    A.  I don't remember.

10:41AM    9    Q.  Well, who controlled access to the upstairs area?

10:41AM   10    A.  Peter.

10:41AM   11    Q.  And I'm not giving you a hard time.

10:42AM   12    A.  Yeah.

10:42AM   13    Q.  This time that we're talking about, now, when you go

10:42AM   14    upstairs, what you just described, were you heavily addicted

10:42AM   15    to cocaine?

10:42AM   16    A.  Yes.

10:42AM   17    Q.  Were you heavily addicted to opiates?

10:42AM   18    A.  Yes.

10:42AM   19    Q.  All those things that you just described for the jury

10:42AM   20    over the course of the last 20 minutes about effects of that

10:42AM   21    addiction and how it -- how it impacted you physically and

10:42AM   22    mentally, were those things actively happening for you at

10:42AM   23    that time?

10:42AM   24    A.  Yes.

10:42AM   25    Q.  You described how you looked, strung out.  That you were

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

44

| | | |
|---|---|---|
| 10:42AM | 1 | 20 pounds lighter than you are today; is that correct? |
| 10:42AM | 2 | A.  Yes. |
| 10:42AM | 3 | Q.  Was that obvious and apparent on your body that you were |
| 10:42AM | 4 | strung out on drugs? |
| 10:42AM | 5 | **MR. SOEHNLEIN:**  Objection, calls for speculation. |
| 10:42AM | 6 | **THE COURT:**  Yeah, sustained. |
| 10:42AM | 7 | **BY MR. COOPER:** |
| 10:42AM | 8 | Q.  Have you seen other people that look strung out on drugs? |
| 10:42AM | 9 | A.  Yes. |
| 10:42AM | 10 | Q.  Okay.  Is that something that you as a layperson, just a |
| 10:42AM | 11 | normal person living in the world, can observe based with |
| 10:42AM | 12 | your common sense and your eyes? |
| 10:42AM | 13 | A.  Yes. |
| 10:42AM | 14 | Q.  Did you have those physical signs on your body? |
| 10:43AM | 15 | A.  Yes.  I was 114 pounds.  I had bags under my eyes.  And |
| 10:43AM | 16 | even with all the pounds of makeup on, I looked terrible. |
| 10:43AM | 17 | Period. |
| 10:43AM | 18 | Q.  You described that you had become close with K.L.; is |
| 10:43AM | 19 | that correct? |
| 10:43AM | 20 | A.  Yes. |
| 10:43AM | 21 | Q.  You used drugs with her frequently? |
| 10:43AM | 22 | A.  Yes. |
| 10:43AM | 23 | Q.  Did you engage socially and party and use drugs with this |
| 10:43AM | 24 | defendant? |
| 10:43AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:43AM | 1 | Q.  When you went upstairs, was it your plan to have sex with |
| 10:43AM | 2 | someone upstairs? |
| 10:43AM | 3 | A.  No. |
| 10:43AM | 4 | Q.  Was that on your mind? |
| 10:43AM | 5 | A.  No. |
| 10:43AM | 6 | Q.  Were you driven to go upstairs because you were -- and |
| 10:43AM | 7 | I'm not trying to embarrass you -- but because you were, |
| 10:43AM | 8 | like, looking to go have sex?  Is that what was going on in |
| 10:43AM | 9 | your head? |
| 10:43AM | 10 | A.  No, I was looking for drugs. |
| 10:43AM | 11 | Q.  You were looking for what? |
| 10:43AM | 12 | A.  Drugs. |
| 10:43AM | 13 | Q.  Okay.  Did you get drugs upstairs? |
| 10:44AM | 14 | A.  Yes. |
| 10:44AM | 15 | Q.  Who provided the drugs upstairs? |
| 10:44AM | 16 | A.  Peter, I guess. |
| 10:44AM | 17 | Q.  After you used drugs upstairs, how did -- how did this |
| 10:44AM | 18 | conversation start?  Who brought up sex? |
| 10:44AM | 19 | A.  Be mindful, this was a long time ago.  I know Peter asked |
| 10:44AM | 20 | me if I would, like, take -- take care of his friend. |
| 10:44AM | 21 | Q.  Okay. |
| 10:44AM | 22 | A.  A buddy of his. |
| 10:44AM | 23 | Q.  What did you interpret that to mean? |
| 10:44AM | 24 | A.  Hook up with him, like, have sexual intercourse. |
| 10:44AM | 25 | Q.  Okay.  Had you ever met his friend before in your life? |

10:44AM   1   A.  No.

10:44AM   2   Q.  Did the defendant offer you something in exchange for

10:44AM   3   having sex with his friend?

10:44AM   4   A.  Just said he would take care of me.

10:44AM   5   Q.  What did you interpret that to mean?

10:44AM   6   A.  Money or drugs.

10:45AM   7   Q.  Were there any other ways to take care of you that you

10:45AM   8   know of?

10:45AM   9   A.  No.

10:45AM  10   Q.  Did you ultimately receive money?

10:45AM  11   A.  Yes.

10:45AM  12   Q.  Who gave you money?

10:45AM  13   A.  Peter handed it to me when I was done, or when we came

10:45AM  14   out of the bathroom.

10:45AM  15   Q.  Did you end up having sex with the young man in the

10:45AM  16   bathroom?

10:45AM  17   A.  Yes.

10:45AM  18   Q.  About how old was that person based on what you saw?

10:45AM  19   A.  Like, my age.

10:45AM  20   Q.  Okay.  And this was 2009, this would have been sometime

10:45AM  21   around age 24 for you; is that right?

10:45AM  22   A.  Yeah.

10:45AM  23   Q.  The $200 that you got in exchange for having sex with

10:46AM  24   that person, what'd you spend it on?

10:46AM  25   A.  I don't specifically remember now, but my guess is more

10:46AM   1    cocaine.

10:46AM   2    Q.   Okay.  Were you using money to buy anything else at that

10:46AM   3    time in your life?

10:46AM   4    A.   No.  I wasn't paying my bills, and I wasn't paying for

10:46AM   5    anything else, no.

10:46AM   6    Q.   Based on the time that you had spent around the defendant

10:46AM   7    leading up to that night in the upstairs, did he know you

10:46AM   8    were a drug addict?

10:46AM   9         MR. SOEHNLEIN:  Objection, speculation.

10:46AM   10        THE COURT:  Yeah, sustained.  You can lay more

10:46AM   11   foundation, Mr. Cooper.

10:46AM   12        MR. COOPER:  Okay.

10:46AM   13        BY MR. COOPER:

10:46AM   14   Q.   Did he see you use drugs every time he was with you?

10:46AM   15   A.   Yes.

10:46AM   16   Q.   All those things about your physical appearance that you

10:46AM   17   described a moment ago, did all of those things exist when

10:47AM   18   you were hanging out with him?

10:47AM   19   A.   Yes.

10:47AM   20   Q.   Was he in an intimate relationship with K.L.?

10:47AM   21   A.   Yes.

10:47AM   22   Q.   Was she the person that you used drugs with the most?

10:47AM   23   A.   Yes.

10:47AM   24   Q.   Was K.L. a drug addict?

10:47AM   25   A.   Yes.

10:47AM   1    Q.  I'm not asking you to qualify what she is, but based on

10:47AM   2    your observations, was she a daily user of cocaine?

10:47AM   3    A.  Yes.

10:47AM   4    Q.  Was she a daily user of opiates?

10:47AM   5    A.  Yes.

10:47AM   6    Q.  Were you all of those things as well?

10:47AM   7    A.  Yes.

10:47AM   8    Q.  In 2006 when you started working at Pharaoh's, your first

10:47AM   9    day there, your first week there, if this defendant had

10:47AM   10   brought up upstairs and said I want you to go have sex with

10:47AM   11   my friend and I'll take care of you, would you have done it?

10:48AM   12   A.  No.

10:48AM   13   Q.  Why not?

10:48AM   14   A.  Because I didn't really -- I didn't need money then.

10:48AM   15   That wasn't really -- I didn't do that, so, no, I wouldn't

10:48AM   16   have done that.

10:48AM   17   Q.  Are you sure about that?

10:48AM   18   A.  Sure.

10:48AM   19   Q.  Is this stuff comfortable to talk about?

10:48AM   20   A.  No, it's not comfortable.

10:48AM   21   Q.  Have you ever discussed having sex with a person for

10:48AM   22   money upstairs at Pharaoh's publicly like this before?

10:48AM   23   A.  No, I haven't.

10:48AM   24   Q.  Just a few more questions on that topic, and we'll move

10:48AM   25   on.  That day when you went upstairs, who asked you to go

| | | |
|---|---|---|
| 10:48AM | 1 | upstairs?  Were you summoned?  How did you get up there? |
| 10:48AM | 2 | A.  I don't know, I think I just followed K.L. up there, I'm |
| 10:48AM | 3 | not sure. |
| 10:48AM | 4 | Q.  All right.  I want to go into the moment where the |
| 10:49AM | 5 | defendant says to you, I want you to hook up with my friend |
| 10:49AM | 6 | or take care of my friend or whatever he says. |
| 10:49AM | 7 | In that moment, did you need the job that you had at |
| 10:49AM | 8 | Pharaoh's? |
| 10:49AM | 9 | A.  Yes. |
| 10:49AM | 10 | Q.  Was that your way of earning money? |
| 10:49AM | 11 | A.  Yes. |
| 10:49AM | 12 | Q.  Was the money that you earned there money that you spent |
| 10:49AM | 13 | to feed the drug addiction? |
| 10:49AM | 14 | A.  Yes. |
| 10:49AM | 15 | Q.  Was the defendant your boss at that time? |
| 10:49AM | 16 | A.  Yes. |
| 10:49AM | 17 | Q.  Were you standing inside of his club? |
| 10:49AM | 18 | A.  Yes. |
| 10:49AM | 19 | Q.  Were you inside of his private little fiefdom upstairs? |
| 10:49AM | 20 | A.  Yes. |
| 10:49AM | 21 | Q.  After you had sex with the man in the bathroom, did you |
| 10:49AM | 22 | guys talk? |
| 10:49AM | 23 | A.  The guy? |
| 10:49AM | 24 | Q.  Yeah, the guy. |
| 10:49AM | 25 | A.  I don't know. |

| | | |
|---|---|---|
| 10:49AM | 1 | Q.  Did you have anything to talk with him about? |
| 10:49AM | 2 | A.  No. |
| 10:49AM | 3 | Q.  Was there anybody else around when that happened inside |
| 10:50AM | 4 | the bathroom? |
| 10:50AM | 5 | A.  No, not that I can recall, no. |
| 10:50AM | 6 | Q.  Were there other people outside the bathroom in the |
| 10:50AM | 7 | upstairs area? |
| 10:50AM | 8 | A.  Yeah. |
| 10:50AM | 9 | Q.  Was that a new bottom for you? |
| 10:50AM | 10 | A.  Yes, I would say so. |
| 10:50AM | 11 | Q.  Can you describe -- I imagine this is personal stuff to |
| 10:50AM | 12 | talk about, but can you describe for the jury, like, |
| 10:50AM | 13 | emotionally mentally how you felt after that happened in the |
| 10:50AM | 14 | bathroom upstairs? |
| 10:50AM | 15 | A.  So, I didn't feel anything in particular when it was over |
| 10:50AM | 16 | with.  I mean, I was high on drugs, so you don't really feel |
| 10:50AM | 17 | anything.  But I know when I started to come off or come down |
| 10:51AM | 18 | from drugs, I started to reflect on that and other -- the |
| 10:51AM | 19 | dancing and other situations, and it's depressing.  It makes |
| 10:51AM | 20 | you feel very depressed. |
| 10:51AM | 21 | Q.  Did you feel dirty about what had happened? |
| 10:51AM | 22 | A.  Yes, very disgusted. |
| 10:51AM | 23 | Q.  I want to switch gears for a second. |
| 10:51AM | 24 | I want to talk about the VIP Room at Pharaoh's, okay? |
| 10:51AM | 25 | A.  Okay. |

10:51AM 1  Q.  Earlier we talked about lap dances that happen in the VIP

10:51AM 2  Room and the Champagne Room; do you remember that?

10:51AM 3  A.  Yes.

10:51AM 4  Q.  Now, what was the difference between a customer going to

10:51AM 5  the VIP Room and a customer going into that more private

10:51AM 6  Champagne Room?  What -- how'd that happen?

10:51AM 7  A.  Spending more money.

10:51AM 8  Q.  Okay.  Did it cost more to go into the Champagne Room?

10:51AM 9  A.  Yes.

10:51AM 10  Q.  If a customer wanted to buy multiple private dances at

10:52AM 11  once, were they able to do that?

10:52AM 12  A.  Yes.

10:52AM 13  Q.  And would you then as the dancer get multiple chips?

10:52AM 14  A.  Yes.

10:52AM 15  Q.  Each time a dance happens in the back at Pharaoh's, does

10:52AM 16  the club make money?

10:52AM 17  A.  Yes.

10:52AM 18  Q.  Does this defendant own the club?

10:52AM 19  A.  Yes.

10:52AM 20  Q.  Did you as a dancer working there have a financial motive

10:52AM 21  to do more dances in the back?

10:52AM 22  A.  Excuse me.  Yes.

10:52AM 23  Q.  Would that earn you more money?

10:52AM 24  A.  Yes.

10:52AM 25  Q.  Would that also earn the defendant more money?

10:52AM   1   A.   Yeah.

10:52AM   2   Q.   What was supposed to happen in the VIP Room?  What was

10:52AM   3   allowed technically by the rules?

10:52AM   4   A.   I mean, they were contact lap dances, meaning you could

10:52AM   5   sit right on the client's lap.  But the customers were

10:52AM   6   supposed to keep their hands to themselves.  And you had to

10:52AM   7   wear pasties and bottoms.  And I guess, you would dance on

10:52AM   8   'em.

10:52AM   9   Q.   Okay.  Now, you mentioned that the customers were

10:52AM   10  supposed to keep their hands to themselves; is that right?

10:53AM   11  A.   Right.

10:53AM   12  Q.   And you as the dancer were supposed to wear pasties; is

10:53AM   13  that right?

10:53AM   14  A.   Right.

10:53AM   15  Q.   And you were supposed to keep your bottoms on; is that

10:53AM   16  right?

10:53AM   17  A.   Yes.

10:53AM   18  Q.   Was there a person or people who worked at Pharaoh's

10:53AM   19  whose job it was supposedly to enforce those rules?

10:53AM   20  A.   Yeah, the doorman for the VIP.

10:53AM   21  Q.   Okay.  If I say "VIP attendant," will you know what I'm

10:53AM   22  talking about?

10:53AM   23  A.   Yes.

10:53AM   24  Q.   Were there times in that area when customers would engage

10:53AM   25  in conduct that went beyond what you just described was

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

53

| | | |
|---|---|---|
| 10:53AM | 1 | supposed to happen? |
| 10:53AM | 2 | A.  Yes, sometimes customers would get handsy. |
| 10:53AM | 3 | Q.  I'm going to ask some more personal questions to you. |
| 10:53AM | 4 | Did you go in the back and do those private dances? |
| 10:53AM | 5 | A.  Yes. |
| 10:53AM | 6 | Q.  Were there times when customers tried to move your |
| 10:53AM | 7 | bottoms and touch your bare vagina? |
| 10:53AM | 8 | A.  Yes. |
| 10:53AM | 9 | Q.  Were there times when customers tried to kiss you or kiss |
| 10:53AM | 10 | parts of your body? |
| 10:53AM | 11 | A.  Yes. |
| 10:53AM | 12 | Q.  Were there times when customers touched other private |
| 10:54AM | 13 | areas on your body like your buttocks or your breasts? |
| 10:54AM | 14 | A.  Yes. |
| 10:54AM | 15 | Q.  Okay.  Did those things happen to you once or more than |
| 10:54AM | 16 | once? |
| 10:54AM | 17 | A.  More than once. |
| 10:54AM | 18 | Q.  Okay.  Were you the only dancer that you saw those things |
| 10:54AM | 19 | happen to? |
| 10:54AM | 20 | A.  No. |
| 10:54AM | 21 | Q.  Every time those things happened to you, did the VIP |
| 10:54AM | 22 | attendant come running in and say, hey, get your hands off |
| 10:54AM | 23 | G.R.'s vagina? |
| 10:54AM | 24 | A.  Yeah, for the most part he would. |
| 10:54AM | 25 | Q.  Were there times when that didn't happen? |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

54

10:54AM  1   A.  Yeah.  If he was, like, busy because there's cameras back

10:54AM  2   there.

10:54AM  3   Q.  Got it.  I want to ask you about something else you

10:54AM  4   observed in that VIP area.

10:54AM  5       Did you observe a dancer having sex, sexual intercourse

10:54AM  6   with a customer in the VIP or Champagne area?

10:54AM  7   A.  Yes.

10:54AM  8   Q.  Can you describe that for the jury?

10:54AM  9   A.  Her -- this dancer and myself, I don't really remember

10:54AM  10  her name, we were both in the back Champagne Room.  I was

10:55AM  11  with some guy, and she was with some guy.  And the guy she

10:55AM  12  was with had money, but she had sex with him in the VIP Room.

10:55AM  13  Q.  Did you see that happen with your eyes?

10:55AM  14  A.  Yes.

10:55AM  15  Q.  Okay.  Now, sex, it doesn't happen in one second, right?

10:55AM  16  A.  Right.

10:55AM  17  Q.  Okay.  And the sex happened in front of you, right?

10:55AM  18  A.  Yes.

10:55AM  19  Q.  Did it finish to completion?  Did you see that act occur?

10:55AM  20  A.  I think so, yeah.

10:55AM  21  Q.  It wasn't stopped; is that fair to say?

10:55AM  22  A.  Right.  Yes.

10:55AM  23      Sorry.  If I could add, they're -- in the Champagne

10:55AM  24  Rooms, there are blind spots.

10:55AM  25  Q.  Tell them about that.

| | | |
|---|---|---|
| 10:55AM | 1 | A.  So there are spots that maybe the cameras can't see. |
| 10:55AM | 2 | Q.  Do dancers know about that? |
| 10:55AM | 3 | A.  Yes, I'd imagine so.  I did, so yeah. |
| 10:55AM | 4 | Q.  When dancers finish their shift at the end of the night, |
| 10:55AM | 5 | are they required to tip out male employees that work at the |
| 10:56AM | 6 | club? |
| 10:56AM | 7 | A.  Just the DJ and the VIP guy. |
| 10:56AM | 8 | Q.  Okay.  So that's -- the VIP guy, that's who we've been |
| 10:56AM | 9 | talking about that's supposed to be watching those cameras, |
| 10:56AM | 10 | right? |
| 10:56AM | 11 | A.  Yes. |
| 10:56AM | 12 | Q.  Do dancers tip that person at the end of the night? |
| 10:56AM | 13 | A.  Yeah. |
| 10:56AM | 14 | Q.  Do you know if customers ever tip that person separate |
| 10:56AM | 15 | from the dancer? |
| 10:56AM | 16 | A.  I don't know about that, no. |
| 10:56AM | 17 | Q.  Okay.  You haven't seen that happen? |
| 10:56AM | 18 | A.  No.  Not that I can recall. |
| 10:56AM | 19 | Q.  Now, the time that you're in that back Champagne Room and |
| 10:56AM | 20 | you see this other dancer, did you say her name?  I think you |
| 10:56AM | 21 | said Joy? |
| 10:56AM | 22 | A.  Yeah, I think that was her name. |
| 10:56AM | 23 | Q.  You're in this Champagne area with Joy, and you see them |
| 10:56AM | 24 | having sex in the VIP area.  Do you remember the customer |
| 10:56AM | 25 | that you were with? |

| | | |
|---|---|---|
| 10:56AM | 1 | A.  Yes. |
| 10:56AM | 2 | Q.  What sticks out to you about that incident, that |
| 10:56AM | 3 | customer? |
| 10:56AM | 4 | A.  He -- well, I've got to say it because we're on the |
| 10:57AM | 5 | record here.  He masturbated and finished -- |
| 10:57AM | 6 | Q.  Okay. |
| 10:57AM | 7 | A.  -- in the back room. |
| 10:57AM | 8 | Q.  Is that what was supposed to happen in a lap dance? |
| 10:57AM | 9 | A.  No. |
| 10:57AM | 10 | Q.  Anybody run back there and throw him out of the club? |
| 10:57AM | 11 | A.  No. |
| 10:57AM | 12 | Q.  Did he pay you money to go back there with you? |
| 10:57AM | 13 | A.  Yes. |
| 10:57AM | 14 | Q.  Did some of that money go to the club? |
| 10:57AM | 15 | A.  Yes. |
| 10:57AM | 16 | Q.  Did this defendant own the club? |
| 10:57AM | 17 | A.  Yes. |
| 10:57AM | 18 | Q.  Was that a pleasant experience for you? |
| 10:57AM | 19 | A.  No. |
| 10:57AM | 20 | Q.  Okay.  Did you see some people at Pharaoh's get special |
| 10:57AM | 21 | treatment? |
| 10:57AM | 22 | A.  What do you mean by that? |
| 10:57AM | 23 | Q.  Let me ask you this question.  Did you see people come |
| 10:57AM | 24 | into Pharaoh's that you knew to be friends with the |
| 10:58AM | 25 | defendant? |

| | | |
|---|---|---|
| 10:58AM | 1 | A.  Yeah.  They, yes.  I think you're referring to, like, |
| 10:58AM | 2 | when they'd get, like, sections of the club, like, roped off |
| 10:58AM | 3 | or whatever. |
| 10:58AM | 4 | Q.  Is that something you saw happen? |
| 10:58AM | 5 | A.  Yeah. |
| 10:58AM | 6 | Q.  Would you see people that you believed to be, like, |
| 10:58AM | 7 | people in the legal world, attorneys, judges, that came into |
| 10:58AM | 8 | Pharaoh's? |
| 10:58AM | 9 | A.  Yes, I believed them to be.  Yes. |
| 10:58AM | 10 | Q.  Okay.  During that summer of 2009 when you were heavily |
| 10:58AM | 11 | addicted to cocaine and opiates, did there cause -- did |
| 10:58AM | 12 | something happen or did someone say something that caused you |
| 10:58AM | 13 | to feel like you couldn't get in trouble for it? |
| 10:58AM | 14 | A.  Yes.  Maybe one time, when K.L. and I were partying with |
| 10:58AM | 15 | Peter, it was my understanding, if I recall, Peter said he |
| 10:58AM | 16 | had a friend that was, like, the head of narcotics or |
| 10:58AM | 17 | something, I don't know.  I believe that's -- it was the head |
| 10:59AM | 18 | of narcotics in Buffalo. |
| 10:59AM | 19 | Q.  Okay.  Is that something that this defendant said in |
| 10:59AM | 20 | front of you that you heard with your ears? |
| 10:59AM | 21 | A.  Yes. |
| 10:59AM | 22 | Q.  Okay.  Did that cause you to feel, like, hey, we're |
| 10:59AM | 23 | invincible, we can't be touched? |
| 10:59AM | 24 | A.  Yes. |
| 10:59AM | 25 | Q.  Okay.  Do you know as you sit here whether it was true or |

10:59AM  1   not?

10:59AM  2   A.  I actually still don't know if it's true or not.  I don't

10:59AM  3   know.

10:59AM  4   Q.  Okay.  Did it cause you to view this defendant as

10:59AM  5   somebody you believed to be connected to important people?

10:59AM  6   A.  Yeah.

10:59AM  7   Q.  Did it cause you to view this defendant as somebody you

10:59AM  8   believed to be connected to someone who's the head of

10:59AM  9   narcotics in law enforcement?

10:59AM  10  A.  Yes.

10:59AM  11  Q.  Did you believe it at the time when he said it?

10:59AM  12  A.  Yes, I did believe it at the time.

10:59AM  13          **MR. COOPER:**  Judge, are we going to take a morning

10:59AM  14  break?  This might be a good time for me, if you want to keep

11:00AM  15  going.

11:00AM  16          **THE COURT:**  Yeah, I'd like to keep going.

11:00AM  17          **MR. COOPER:**  Got it.

11:00AM  18          **THE COURT:**  We've only been going a little over an

11:00AM  19  hour, I'd like to keep going a little more.

11:00AM  20          **MR. COOPER:**  You good?

11:00AM  21          **THE WITNESS:**  I'm good.

11:00AM  22          **MR. COOPER:**  Okay.

11:00AM  23          **BY MR. COOPER:**

11:00AM  24  Q.  I want to move on now.  We've talked quite a bit about

11:00AM  25  K.L..  was there a time when you received a phone call from

11:00AM    1   this defendant regarding K.L.'s health and wellness?

11:00AM    2   A.  Yes.

11:00AM    3   Q.  What was going on?  Tell them.

11:00AM    4   A.  So K.L. had epilepsy or something.  When we would do

11:00AM    5   cocaine together, sometimes she would have seizures.

11:00AM    6       I got a call from Peter that was, like, early-morning

11:00AM    7   hours, like, I mean the sun was coming up.  And K.L. had had

11:00AM    8   a seizure.  And he asked me if I could come get her from the

11:00AM    9   hotel they were at.

11:00AM   10   Q.  While she was having a seizure?

11:00AM   11   A.  She just had one.

11:00AM   12   Q.  Okay.

11:00AM   13   A.  So he asked me if I could come get her.

11:00AM   14   Q.  Got it.  Were you a doctor?

11:00AM   15   A.  No.

11:00AM   16   Q.  Were you a nurse?

11:01AM   17   A.  No, I'm not a nurse.

11:01AM   18   Q.  Did you work for an ambulance company?

11:01AM   19   A.  No, I did not.

11:01AM   20   Q.  Did he tell you, hey, I just called 911, can you just

11:01AM   21   come sit with K.L. for a bit?

11:01AM   22   A.  No, he didn't say that.

11:01AM   23   Q.  Did you show up?

11:01AM   24   A.  Yes.

11:01AM   25   Q.  What'd you see when you showed up?

11:01AM   1   A.  Went into the hotel room.  The hotel room was a little

11:01AM   2   messy.  There was another girl there.  They had all been

11:01AM   3   partying all night, another dancer from Pharaoh's.  And K.L.

11:01AM   4   was, like, sort of out of it, which you are when you just

11:01AM   5   have, like, one of those seizures.  You're, like, kind of

11:01AM   6   lethargic and not really knowing where you are.

11:01AM   7   Q.  Was there an ambulance there when you got there?

11:01AM   8   A.  No.

11:01AM   9   Q.  What did Peter say to you when you arrived?

11:01AM  10   A.  He just wanted me to take her.  I don't really recall

11:01AM  11   exactly what he said to me.  But he wanted me to take her

11:02AM  12   home.  Because they were, they'd been partying all night in

11:02AM  13   the hotel room.

11:02AM  14   Q.  Did you go into the hotel room?

11:02AM  15   A.  Yes.

11:02AM  16   Q.  Did you see signs of drug use?

11:02AM  17   A.  I didn't see signs of drug use, but I saw the room was

11:02AM  18   messy and used.  I don't know how else to say it.

11:02AM  19   Q.  Okay.  Did there come a time after the events that we've

11:02AM  20   described so far for the jury when you got arrested with

11:02AM  21   K.L.?

11:02AM  22   A.  Yes.

11:02AM  23   Q.  Okay.  Can you describe that night to the best of your

11:02AM  24   recollection for the jury?

11:02AM  25   A.  Yes, I remember we worked that night, or I had worked,

USA v Gerace - G.R. - Cooper/Direct - 11/13/24
61

| Time | Line | Text |
|---|---|---|

11:02AM     1    K.L. didn't really work a lot at the club, but we went out

11:02AM     2    together afterwards.  And I believe we were downtown, I can't

11:02AM     3    recall.  We met these two college kids, and they said there

11:03AM     4    was, like, a party going on somewhere.  So we hopped in my

11:03AM     5    car, and were going to this party off U.B. campus.  We were

11:03AM     6    in Amherst at this point because it's -- it's north campus

11:03AM     7    area.  We stopped at a convenience store.  K.L. and I are

11:03AM     8    high on cocaine, both acting crazy, I'd imagine if you saw us

11:03AM     9    in the store you probably think we were high.

11:03AM    10        The store clerk called the police on K.L. because of the

11:03AM    11    way she was acting, weird or shady, I don't know.  And the

11:03AM    12    police pulled us over, the Amherst police.

11:03AM    13    Q.  Okay.  When you got pulled over, did you get placed under

11:03AM    14    arrest?

11:03AM    15    A.  Yes.

11:03AM    16    Q.  Were you brought back to a police station?

11:03AM    17    A.  Yes.

11:03AM    18    Q.  Was K.L. also arrested?

11:03AM    19    A.  Yeah, she was arrested also.

11:03AM    20    Q.  Did somebody come to ask you questions while you were

11:04AM    21    there?

11:04AM    22    A.  Yes.  Eventually, it was a detective and then an FBI

11:04AM    23    agent.

11:04AM    24    Q.  Okay.  Did you speak with them?

11:04AM    25    A.  Yes, I did.

| | | |
|---|---|---|
| 11:04AM | 1 | Q.  Did you answer their questions? |
| 11:04AM | 2 | A.  Yes. |
| 11:04AM | 3 | Q.  Was this back in 2009 as well? |
| 11:04AM | 4 | A.  Yes. |
| 11:04AM | 5 | Q.  Got it.  And so when you spoke with these agents or |
| 11:04AM | 6 | officers, whatever, back in 2009, were you hoping in your |
| 11:04AM | 7 | head, like, hey, maybe this will help me get out of trouble? |
| 11:04AM | 8 | A.  Yeah, so I think it's important to mention I was on |
| 11:04AM | 9 | felony probation still from that DWI that I received when I |
| 11:04AM | 10 | was 19, the second and third.  So I was already under |
| 11:04AM | 11 | supervision by the law.  So I didn't want to get in trouble, |
| 11:04AM | 12 | or I wanted to do whatever I could to not get in trouble, I |
| 11:04AM | 13 | guess, would be the word to use or the way to say it.  So I |
| 11:04AM | 14 | was willing to answer their questions. |
| 11:05AM | 15 | Q.  Were you hoping by answering their questions that it |
| 11:05AM | 16 | would give you some benefit for the trouble you just got in? |
| 11:05AM | 17 | A.  Yes, I was hoping that I wouldn't get violated through |
| 11:05AM | 18 | probation, and maybe I wouldn't get charged with what they |
| 11:05AM | 19 | charged me with, which was possession of drugs and a few |
| 11:05AM | 20 | other things. |
| 11:05AM | 21 | Q.  Now, did those hopes -- did they actually pan out? |
| 11:05AM | 22 | A.  No.  They didn't.  I ended up getting in trouble.  And I |
| 11:05AM | 23 | ended up paying a lawyer $5,000, and I had to write my |
| 11:05AM | 24 | probation officer a heartfelt letter, and pretty much begged |
| 11:05AM | 25 | him to let me take the drug court program in Amherst.  That's |

11:05AM  1   what happened.

11:05AM  2   Q.  Did you get the drug court program?

11:06AM  3   A.  Yes.

11:06AM  4   Q.  Now we're talking about 2009, right?

11:06AM  5   A.  Yes.

11:06AM  6   Q.  Were you able to stay sober after that period of time?

11:06AM  7   A.  Well, I was in drug court.  Just like when I got out of

11:06AM  8   rehab the first time, I had a couple of slipups, you'd call

11:06AM  9   them.  I wasn't really invested in any kind of program of

11:06AM  10  recovery.  And yes, for the most part, I was on Suboxone, so

11:06AM  11  maybe like a harm-reduction type program.  And I finished the

11:06AM  12  drug court program successfully.

11:06AM  13  Q.  Did there come a time after that when you got in trouble

11:06AM  14  again?

11:06AM  15  A.  Yeah.  So, after I got off drug court, I got off Suboxone

11:06AM  16  and I ended up relapsing on heroin.

11:06AM  17  Q.  Approximately when was that?  What year?

11:06AM  18  A.  I think 2011.

11:07AM  19  Q.  Did you go back to court?

11:07AM  20  A.  Not right away.  There was a few months in there that I

11:07AM  21  was using heavily again.  And then I end up getting arrested

11:07AM  22  in January of 2012.  I get arrested again.

11:07AM  23  Q.  Okay.  And at that time, in January of 2012, did you

11:07AM  24  get -- did you get clean at that point?

11:07AM  25  A.  Yes, I did.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

64

| | | |
|---|---|---|
| 11:07AM | 1 | Q.  Okay. |
| 11:07AM | 2 | A.  I spent 17 days in jail.  I went through all my |
| 11:07AM | 3 | withdrawal in jail.  I did sort of like a door-to-door |
| 11:07AM | 4 | placement.  I went home for two days, packed clothes, and |
| 11:07AM | 5 | went to Clearview rehab. |
| 11:07AM | 6 | And then I got out and I had, I signed up for -- well, |
| 11:07AM | 7 | that's what the lawyer got me, drug court, Buffalo city drug |
| 11:07AM | 8 | court, and I was in the DUI program I think Fiorella, that |
| 11:07AM | 9 | Judge Fiorella ran. |
| 11:07AM | 10 | Q.  Did you ultimately stay sober that time? |
| 11:08AM | 11 | A.  Yes, it's where I began this almost 13 years of sobriety. |
| 11:08AM | 12 | Q.  Now, are you working? |
| 11:08AM | 13 | A.  I am. |
| 11:08AM | 14 | Q.  What kind of work do you do? |
| 11:08AM | 15 | A.  I am a server. |
| 11:08AM | 16 | Q.  Do you pay your bills? |
| 11:08AM | 17 | A.  I do. |
| 11:08AM | 18 | Q.  Do you take care of your kid? |
| 11:08AM | 19 | A.  I do. |
| 11:08AM | 20 | Q.  Has anybody offered you any benefit in exchange for |
| 11:08AM | 21 | coming in here and telling these people what you told them |
| 11:08AM | 22 | today? |
| 11:08AM | 23 | A.  No. |
| 11:08AM | 24 | Q.  Has it been a pleasant experience for you? |
| 11:08AM | 25 | A.  No, because it's taken time away from my son and work, |

11:08AM    1   and, you know, other duties that I would do during the day

11:08AM    2   while he's at school, so, no.

11:08AM    3   Q.  Did you make any of this up because you felt like being

11:08AM    4   in that chair?

11:08AM    5   A.  No.

11:08AM    6   Q.  When you didn't remember, did you say you didn't

11:08AM    7   remember?

11:08AM    8   A.  Yes.

11:08AM    9   Q.  Do you have any strong feelings of hate towards this

11:08AM   10   defendant?

11:08AM   11   A.  No.

11:08AM   12        **MR. COOPER:**  Can I just have one moment, Judge?

11:08AM   13        **THE COURT:**  Sure.

11:09AM   14        **BY MR. COOPER:**

11:09AM   15   Q.  We're getting there, okay?

11:09AM   16   A.  Yeah, that's okay.

11:09AM   17   Q.  Just a few more questions to kind of hit some details

11:10AM   18   that I might have skipped or missed.

11:10AM   19        Going back to the upstairs when you have sex with that

11:10AM   20   man in the bathroom.  When the defendant gave you cocaine and

11:10AM   21   money to have sex with his friend in the bathroom, were you

11:10AM   22   aware of the defendant's reputation in the community or his

11:10AM   23   family's reputation in the community?

11:10AM   24        **MR. SOEHNLEIN:**  Objection, Your Honor.

11:10AM   25        **THE COURT:**  Was she aware?  No, overruled.

11:10AM    1        **THE WITNESS:** Which, Peter's?

11:10AM    2        **BY MR. COOPER:**

11:10AM    3   Q. Peter's, or Peter's family, did you know about any

11:10AM    4   reputation that they had in the community?

11:10AM    5   A. No. I mean, there was, like, speculation or maybe like

11:10AM    6   other dancers talked about, like --

11:10AM    7        **THE COURT:** Hold on.

11:10AM    8        **MR. COOPER:** So, hold on. I don't want you to get --

11:10AM    9        I'll follow up.

11:10AM   10        **THE COURT:** Okay. I just want her to stop.

11:10AM   11        **MR. COOPER:** Absolutely.

11:10AM   12        **BY MR. COOPER:**

11:10AM   13   Q. So, I'm going to ask some really specific questions, and

11:11AM   14   I just want you to give really specific answers. There's

11:11AM   15   nothing wrong that you did, okay?

11:11AM   16   A. Okay.

11:11AM   17   Q. You mentioned that you were aware of some -- what you

11:11AM   18   called speculation; is that right?

11:11AM   19   A. Yeah.

11:11AM   20   Q. Okay. Without getting into who said what to you, I want

11:11AM   21   to know what was in your mind. What were you -- what was the

11:11AM   22   speculation that you were aware of?

11:11AM   23        **MR. SOEHNLEIN:** Objection.

11:11AM   24        **THE COURT:** Sustained.

11:11AM   25        **MR. COOPER:** Judge, can we come up on it?

| | | |
|---|---|---|
| 11:11AM | 1 | **THE COURT:** Sure. |
| 11:11AM | 2 | (Sidebar discussion held on the record.) |
| 11:11AM | 3 | **MR. COOPER:** I'm just going to wait for -- |
| 11:11AM | 4 | **THE COURT:** Go ahead. |
| 11:11AM | 5 | **MR. COOPER:** So the reason that I'm asking to come up |
| 11:11AM | 6 | on this is because I think I'm not offering this as reputation |
| 11:11AM | 7 | evidence, I'm offering it as state of mind. So the question |
| 11:11AM | 8 | has been premised as at the time that you went upstairs and |
| 11:11AM | 9 | this directive or opportunity or whatever is posed to you, to |
| 11:11AM | 10 | have sex with this man, what does she know about this |
| 11:11AM | 11 | defendant. |
| 11:11AM | 12 | I have to prove coercion in this case. So, if she |
| 11:12AM | 13 | uses the word speculation as a layperson, I don't care how she |
| 11:12AM | 14 | qualifies it. I'm trying to get at what's in her head, which |
| 11:12AM | 15 | is relevant. |
| 11:12AM | 16 | **THE COURT:** You can't ask what speculation is. You |
| 11:12AM | 17 | can ask her what she thought about his family's position in |
| 11:12AM | 18 | the community, you can ask that. |
| 11:12AM | 19 | **MR. COOPER:** Okay. So what she believed. |
| 11:12AM | 20 | **THE COURT:** You can't ask speculation what she. |
| 11:12AM | 21 | (Simultaneous talking.) |
| 11:12AM | 22 | **MR. COOPER:** I'll fix the form of the question, I |
| 11:12AM | 23 | missed that. |
| 11:12AM | 24 | **THE COURT:** You can object. |
| 11:12AM | 25 | **MR. SOEHNLEIN:** And I'm still going to, on a 403 |

| | | |
|---|---|---|
| 11:12AM | 1 | basis, because there's -- |
| 11:12AM | 2 | **THE COURT:**  It's going to depend on how the questions |
| 11:12AM | 3 | are asked and, you know, and I'll consider it. |
| 11:12AM | 4 | Go ahead, finish. |
| 11:12AM | 5 | **MR. SOEHNLEIN:**  No, it sounds like you're going to go |
| 11:12AM | 6 | question by question -- |
| 11:12AM | 7 | **THE COURT:**  Yes. |
| 11:12AM | 8 | **MR. SOEHNLEIN:**  -- regardless, so maybe we just |
| 11:12AM | 9 | handle it question by question. |
| 11:12AM | 10 | **MR. COOPER:**  Okay. |
| 11:12AM | 11 | (End of sidebar discussion.) |
| 11:12AM | 12 | **BY MR. COOPER:** |
| 11:12AM | 13 | Q.  All right.  So, we're going to proceed again with me |
| 11:12AM | 14 | asking really specific questions.  And just be careful to |
| 11:13AM | 15 | only answer exactly what I'm asking you; is that fair? |
| 11:13AM | 16 | A.  Fair. |
| 11:13AM | 17 | Q.  Okay.  Without getting into what anybody said, had you |
| 11:13AM | 18 | heard other people talk about the defendant or his family's |
| 11:13AM | 19 | reputation in the community? |
| 11:13AM | 20 | **MR. SOEHNLEIN:**  Objection, Your Honor. |
| 11:13AM | 21 | **THE WITNESS:**  Yes. |
| 11:13AM | 22 | **THE COURT:**  No, has she heard.  No, overruled. |
| 11:13AM | 23 | **MR. COOPER:**  What was the answer? |
| 11:13AM | 24 | (The above-requested testimony was then read by the |
| 11:13AM | 25 | reporter.) |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

| | | |
|---|---|---|
| 11:13AM | 1 | **THE WITNESS:**  Yes. |
| 11:13AM | 2 | **MR. COOPER:**  Thank you. |
| 11:13AM | 3 | **BY MR. COOPER:** |
| 11:13AM | 4 | Q.  Were those things that you had heard, were they in your |
| 11:13AM | 5 | mind, did you know about them, had you heard them before this |
| 11:13AM | 6 | incident in the upstairs with the man at Pharaoh's? |
| 11:13AM | 7 | A.  That, I don't remember. |
| 11:13AM | 8 | Q.  Okay.  Do you recall who you heard talking -- don't say |
| 11:13AM | 9 | what they said -- but do you recall who you heard talking |
| 11:13AM | 10 | about those things? |
| 11:13AM | 11 | **MR. SOEHNLEIN:**  Objection. |
| 11:13AM | 12 | **THE COURT:**  Overruled. |
| 11:13AM | 13 | **THE WITNESS:**  No. |
| 11:13AM | 14 | **BY MR. COOPER:** |
| 11:13AM | 15 | Q.  Do you recall where you were when you heard it? |
| 11:13AM | 16 | A.  No. |
| 11:13AM | 17 | Q.  Okay. |
| 11:13AM | 18 | **MR. COOPER:**  Just one second, please. |
| 11:14AM | 19 | **THE COURT:**  Yep. |
| 11:14AM | 20 | **BY MR. COOPER:** |
| 11:14AM | 21 | Q.  At some point while you worked at Pharaoh's, I understand |
| 11:14AM | 22 | you can't put a day or a date on it, at some point while you |
| 11:14AM | 23 | worked at Pharaoh's did you become aware of what the |
| 11:14AM | 24 | defendant or his family's reputation was in the community? |
| 11:15AM | 25 | **MR. SOEHNLEIN:**  Objection. |

11:15AM    1          THE COURT:  Did she become aware.  No, overruled.

11:15AM    2          BY MR. COOPER:

11:15AM    3    Q.  While you were working at Pharaoh's?

11:15AM    4    A.  Yes.

11:15AM    5    Q.  Okay.  This is actually a good segue here.

11:15AM    6          After the arrest by the Amherst Police Department, were

11:15AM    7    you able to continue working at Pharaoh's for a while after

11:15AM    8    that?

11:15AM    9    A.  Brief period of time.

11:15AM   10    Q.  Can you explain to the jury why it was a brief period of

11:15AM   11    time?  What happened?

11:15AM   12    A.  Brandon, he was the DJ, had told K.L. and I when we came

11:15AM   13    back to work after the arrest that if anything so much as a

11:15AM   14    Tic Tac fell out of our pocket, that we would be fired.

11:15AM   15    Q.  Now, as you sit here today, do you know if Brandon got

11:15AM   16    that directive from this defendant to tell you that?

11:15AM   17    A.  I don't know that.  I assume so.

11:15AM   18          MR. SOEHNLEIN:  Objection.

11:15AM   19          MR. COOPER:  Does she know?, is the question.

11:15AM   20          THE COURT:  Overruled.

11:15AM   21          THE WITNESS:  I don't know.

11:15AM   22          BY MR. COOPER:

11:15AM   23    Q.  Okay.  Before receiving that directive, that if so much

11:16AM   24    as a Tic Tac falls out of your pocket you're out of here, had

11:16AM   25    you been using drugs regularly with the owner of the club?

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

71

11:16AM    1    A.  Yes.

11:16AM    2    Q.  Did he ever say, hey, you're fired for using drugs?

11:16AM    3    A.  No.

11:16AM    4    Q.  Okay.  Was it the arrest that changed things?

11:16AM    5    A.  Yes, I think so.

11:16AM    6    Q.  The night that you were arrested, did you speak with law

11:16AM    7    enforcement?

11:16AM    8    A.  Yes.

11:16AM    9    Q.  Did you tell them things about this defendant?

11:16AM    10   A.  Yes.

11:16AM    11   Q.  Do you know if he found out about that?

11:16AM    12   A.  I don't know.

11:16AM    13   Q.  Shortly after Brandon Carr makes those statements to you,

11:16AM    14   do you get essentially kind of forced out of Pharaoh's?

11:16AM    15   A.  Yes.

11:16AM    16   Q.  Can you describe that for the jury?

11:16AM    17   A.  Just became an unsavory work environment.  It was -- I

11:16AM    18   don't know.  It was just hard to work there.  And I ended up

11:16AM    19   going back to Rick's Tally-Ho for a little bit.

11:16AM    20   Q.  Okay.  That arrest happened.  Is it -- was that arrest in

11:17AM    21   August of 2009?

11:17AM    22   A.  I believe so, yes.

11:17AM    23   Q.  Okay.  And the timeframe that we've talked about, when

11:17AM    24   you leave, is it shortly after that?

11:17AM    25   A.  Yes.

11:17AM  1   Q.  Okay.  So when I ask you about becoming aware of the

11:17AM  2   defendant or his family's reputation in that community, would

11:17AM  3   that be during that same timeframe with the spiralling drug

11:17AM  4   addiction in the summer of 2009?

11:17AM  5   A.  At some point, yes.

11:17AM  6   Q.  Okay.  Would it be fair to say it's either then or before

11:17AM  7   then when you're working there dating back to '06?

11:17AM  8   A.  It's fair to say that, yes.

11:17AM  9          MR. COOPER:  Judge, I think we should come up before

11:17AM  10  I go further.

11:17AM  11         THE COURT:  Sure, come on up.

11:17AM  12         (Sidebar discussion held on the record.)

11:17AM  13         MR. COOPER:  So I think we got there eventually with

11:18AM  14  the timeframe.

11:18AM  15         THE COURT:  Okay.

11:18AM  16         MR. COOPER:  And so now I think with the timeframe

11:18AM  17  laid, the argument that I made to you earlier about the

11:18AM  18  operative, what -- what's important to me is what's operating

11:18AM  19  in the person's mind at the time.  And so, my inten -- I just

11:18AM  20  want to be up front, my intention is to essentially re-ask

11:18AM  21  what I asked earlier, but switch out that word "speculation"

11:18AM  22  for did you know -- did you have a belief about -- what was

11:18AM  23  the belief that you had about him or his family's reputation.

11:18AM  24         THE COURT:  About his reputation?  No.

11:18AM  25         Because with reputation, reputation can be true or it

11:18AM    1    can be false.  She said it was speculation.  So if it's in her

11:18AM    2    head that his family was involved in Italian Organized Crime,

11:18AM    3    that's one thing.  If it's in her head that there's

11:18AM    4    speculation that his family was involved in organized crime,

11:18AM    5    that's entirely --

11:18AM    6        MR. COOPER:  Hold on.  May I push back on that

11:18AM    7    respectfully a little bit?

11:18AM    8        THE COURT:  Go ahead.

11:19AM    9        MR. COOPER:  I think that to use, like, a totally

11:19AM    10   divorced analogy from this, if somebody showed up at a small

11:19AM    11   business owner -- at a small business owner's business and

11:19AM    12   say, hey, I want you to buy my window washing, or whatever,

11:19AM    13   you know -- something, and the small business owner believes

11:19AM    14   that that person may have a reputation for being in Italian

11:19AM    15   Organized Crime, or being related to an --

11:19AM    16       THE COURT:  Or even reputation?  No.

11:19AM    17       MR. COOPER:  May.

11:19AM    18       THE COURT:  Not may, no.

11:19AM    19       MR. COOPER:  May I finish the --

11:19AM    20       THE COURT:  Go ahead.

11:19AM    21       MR. COOPER:  May have a reputation for being in, just

11:19AM    22   using my -- I'm trying to, like, analyze that, I would think

11:19AM    23   that would weigh on the person's mind about, like, hey, how do

11:19AM    24   I handle the situation?  If you don't, whether you know for

11:19AM    25   sure or not, if you heard that --

| | | |
|---|---|---|
| 11:19AM | 1 | **THE COURT:** I'm not saying she's got to know for |
| 11:19AM | 2 | sure. I'm not saying that. What I'm saying is she's got to |
| 11:19AM | 3 | have a reason to believe that it -- that it is or might be |
| 11:19AM | 4 | true. |
| 11:19AM | 5 | **MR. TRIPI:** Did people make comments to you about his |
| 11:19AM | 6 | family? Yes or no. |
| 11:19AM | 7 | Did you hear a number of those comments? Yes, I did. |
| 11:19AM | 8 | Based on the comments that you heard, did you form a |
| 11:19AM | 9 | belief in your mind? I think that's okay. |
| 11:20AM | 10 | **THE COURT:** Yeah, great. I think that's fine. |
| 11:20AM | 11 | **MR. SOEHNLEIN:** But that's not her testimony. |
| 11:20AM | 12 | **THE COURT:** I understand. |
| 11:20AM | 13 | **MR. COOPER:** I'm going to ask more questions. |
| 11:20AM | 14 | **MR. SOEHNLEIN:** But we've already asked those |
| 11:20AM | 15 | questions. We've spent the last 15 minutes talking, going |
| 11:20AM | 16 | around and around. |
| 11:20AM | 17 | **THE COURT:** He can try again. He can try again. |
| 11:20AM | 18 | (End of sidebar discussion.) |
| 11:20AM | 19 | **MR. COOPER:** Can I just have one more second, Judge? |
| 11:20AM | 20 | **THE COURT:** Yes. |
| 11:21AM | 21 | **MR. COOPER:** Thank you. |
| 11:21AM | 22 | **BY MR. COOPER:** |
| 11:21AM | 23 | Q. Just a couple more slightly different questions. |
| 11:21AM | 24 | During the time that you worked at Pharaoh's, from '06 to |
| 11:21AM | 25 | '09, did people make comments to you or in front of you about |

| | | |
|---|---|---|
| 11:21AM | 1 | the defendant's family? |
| 11:21AM | 2 | A.  I don't remember. |
| 11:21AM | 3 | Q.  Okay.  So, did people make comments to you about the |
| 11:21AM | 4 | defendant's -- withdrawn. |
| 11:21AM | 5 |     Let me -- during the time that you worked at Pharaoh's, |
| 11:21AM | 6 | had you heard things about the defendant or his family that |
| 11:21AM | 7 | caused you to form a belief in your head? |
| 11:21AM | 8 | A.  Yes. |
| 11:21AM | 9 | Q.  What was the belief that you formed in your head? |
| 11:21AM | 10 | A.  I don't know, that Peter was a connected person.  I knew |
| 11:21AM | 11 | he was on -- it was my understanding that he was on parole or |
| 11:21AM | 12 | something.  He just spent time in federal prison maybe. |
| 11:22AM | 13 | Q.  When you say connected -- |
| 11:22AM | 14 |         **MR. SOEHNLEIN:**  Object.  Can we come up, Your Honor? |
| 11:22AM | 15 |         **THE COURT:**  Sure. |
| 11:22AM | 16 |         (Sidebar discussion held on the record.) |
| 11:22AM | 17 |         **MR. SOEHNLEIN:**  They've tried four times now with |
| 11:22AM | 18 | this.  All right?  She has not given them any basis for any |
| 11:22AM | 19 | foundation of reputation, and they keep asking questions. |
| 11:22AM | 20 |         **THE COURT:**  She just said she thought he was a |
| 11:22AM | 21 | connected person, so ask -- |
| 11:22AM | 22 |         **MR. COOPER:**  That's the next question. |
| 11:22AM | 23 |         **THE COURT:**  He can certainly ask what that means. |
| 11:22AM | 24 |         **MR. FOTI:**  I also, it's a real problem now that she |
| 11:22AM | 25 | just said he went to federal prison.  That's -- |

| | | |
|---|---|---|
| 11:22AM | 1 | **THE COURT:**  I'll strike that. |
| 11:22AM | 2 | **MR. FOTI:**  It's -- this is -- that's part of the |
| 11:22AM | 3 | problem where they continue to ask these questions. |
| 11:22AM | 4 | **THE COURT:**  No, it's not.  No, it's not.  No, it's |
| 11:22AM | 5 | not. |
| 11:22AM | 6 | The federal prison had nothing to do with anything. |
| 11:22AM | 7 | She just volunteered it.  You can't stop a witness from |
| 11:22AM | 8 | volunteering.  They have nothing to do with the reputation |
| 11:22AM | 9 | questions that were being asked.  So the government didn't do |
| 11:22AM | 10 | anything wrong in that regard. |
| 11:22AM | 11 | So we'll strike the federal prison, and we'll tell |
| 11:22AM | 12 | the jury they're not to consider the testimony about whether |
| 11:23AM | 13 | he was in federal prison or not.  We don't know that.  The |
| 11:23AM | 14 | witness said she had heard it.  And I will tell them to strike |
| 11:23AM | 15 | that.  And -- |
| 11:23AM | 16 | **MR. COOPER:**  I'll follow up on it. |
| 11:23AM | 17 | **THE COURT:**  -- you can ask the next question as what |
| 11:23AM | 18 | she meant by connected. |
| 11:23AM | 19 | **MR. FOTI:**  At this -- |
| 11:23AM | 20 | **THE COURT:**  Go ahead. |
| 11:23AM | 21 | **MR. FOTI:**  -- at this point, even if the government |
| 11:23AM | 22 | didn't intentionally elicit, I won't move for prejudice, I |
| 11:23AM | 23 | would move for a mistrial based on that. |
| 11:23AM | 24 | I don't believe a curative instruction can strike it |
| 11:23AM | 25 | from the mind of the jurors that this -- this -- that the |

| 11:23AM | 1 | defendant's been -- |
| 11:23AM | 2 | **THE COURT:**  That this -- |
| 11:23AM | 3 | **MR. FOTI:**  -- in federal prison. |
| 11:23AM | 4 | **THE COURT:**  -- that this witness heard that defendant |
| 11:23AM | 5 | was in federal prison.  Is that what she said? |
| 11:23AM | 6 | She said -- just spent time in federal prison maybe. |
| 11:23AM | 7 | **MR. COOPER:**  Judge, it's not even close to manifest |
| 11:23AM | 8 | necessity. |
| 11:23AM | 9 | **THE COURT:**  Denied.  The motion for a mistrial is |
| 11:24AM | 10 | denied.  Let's go. |
| 11:24AM | 11 | (End of sidebar discussion.) |
| 11:24AM | 12 | **THE COURT:**  Okay.  Folks, the witness said:  He just |
| 11:24AM | 13 | spent time in federal prison maybe. |
| 11:24AM | 14 | I'm going to strike that. |
| 11:24AM | 15 | We don't know whether he spent time in federal |
| 11:24AM | 16 | prison, whether he didn't spend time in federal prison.  This |
| 11:24AM | 17 | is the witness's speculation, and you're not to consider |
| 11:24AM | 18 | whether or not he spent time in federal prison in any way |
| 11:24AM | 19 | because we don't know that.  And the witness doesn't know |
| 11:24AM | 20 | that, she said maybe. |
| 11:24AM | 21 | And so that's to be stricken.  Next question. |
| 11:24AM | 22 | **BY MR. COOPER:** |
| 11:24AM | 23 | Q.  So in the previous answer -- |
| 11:24AM | 24 | **MR. COOPER:**  Can I get a read-back up to the point of |
| 11:24AM | 25 | what the judge just struck and the answer, Ann?  I'm sorry. |

11:24AM    1          **THE REPORTER:**  Sure.

11:24AM    2          **MR. COOPER:**  Thank you.

11:24AM    3          (The above-requested testimony was then read by the

11:24AM    4   reporter.)

11:24AM    5          **THE COURT:**  Right there.

11:24AM    6          **MR. COOPER:**  Yep, thank you.

11:24AM    7          **BY MR. COOPER:**

11:24AM    8   Q.  When you say the word "connected," what do you mean?

11:25AM    9   A.  Sounds crazy now, but, like, he had mob ties.

11:25AM   10   Q.  Okay.  All right.  And then I just want to finish a few

11:25AM   11   more questions about upstairs there.

11:25AM   12          When the defendant directed you to go to the bathroom and

11:25AM   13   hook up with his friend, did you understand that as have sex?

11:25AM   14   A.  Yes.

11:25AM   15   Q.  Okay.  Again, I apologize for the personal nature of the

11:25AM   16   question, did the man wear a condom?

11:25AM   17   A.  Yes.

11:25AM   18   Q.  Do you know what that man's status or his connection to

11:26AM   19   Peter was?

11:26AM   20   A.  No.  I thought he came from a family that had money.

11:26AM   21   Q.  Earlier when we were talking about K.L. at the hotel room

11:26AM   22   having a seizure, you said they had -- they had partied all

11:26AM   23   night.  When you say "partied," what do you mean by that?

11:26AM   24   A.  They were drinking and doing cocaine.

11:26AM   25   Q.  After you came to get K.L., did you see what the

| | | |
|---|---|---|
| 11:26AM | 1 | defendant did? |
| 11:26AM | 2 | A.  What do you mean? |
| 11:26AM | 3 | Q.  Do you remember if he stayed or left? |
| 11:26AM | 4 | A.  No, he stayed in the hotel room. |
| 11:27AM | 5 | Q.  Okay. |
| 11:27AM | 6 | **MR. COOPER:**  One second, Judge. |
| 11:27AM | 7 | No further direct, Judge.  Thank you. |
| 11:27AM | 8 | **THE COURT:**  Okay.  We're going to take our break now. |
| 11:27AM | 9 | Please remember my instructions about not |
| 11:27AM | 10 | communicating about the case including with each other, and |
| 11:27AM | 11 | not making up your mind. |
| 11:27AM | 12 | See you back here in about ten or 15 minutes. |
| 11:27AM | 13 | (Jury excused at 11:27 a.m.) |
| 11:27AM | 14 | **THE COURT:**  Ma'am, I want to tell you -- |
| 11:27AM | 15 | **MR. COOPER:**  Hang on one second for me. |
| 11:27AM | 16 | **THE COURT:**  Go ahead, you guys can leave. |
| 11:28AM | 17 | Ma'am, I just want to tell you, don't talk to anybody |
| 11:28AM | 18 | about your testimony during the break.  Okay?  That's all. |
| 11:28AM | 19 | **THE WITNESS:**  Okay. |
| 11:28AM | 20 | **THE COURT:**  Okay.  Thank you. |
| 11:28AM | 21 | (Witness excused at 11:28 a.m.) |
| 11:28AM | 22 | **THE COURT:**  Okay.  Mr. Soehnlein, Mr. Foti, if you |
| 11:28AM | 23 | want to make more of a record, you're welcome to now. |
| 11:28AM | 24 | **MR. FOTI:**  Judge, I -- I think I made the motion, it |
| 11:28AM | 25 | was denied.  I think if there's an issue, I believe we |

11:28AM 1   preserved it.  I just, I believe -- sensitive to all the

11:28AM 2   issues that are really collateral to the elements of this

11:28AM 3   offense, and we obviously dealt with it, and went to

11:28AM 4   painstaking efforts to try to navigate past those as much as

11:28AM 5   possible during jury selection.

11:28AM 6        We're aware that there's things that were reported on

11:28AM 7   in the news that could impact people's perception of

11:29AM 8   Mr. Gerace in this case.  I think we did a good job during

11:29AM 9   jury selection.

11:29AM 10       But any time something comes out from a witness that

11:29AM 11  goes beyond what the -- what was expected in terms of evidence

11:29AM 12  that has some bearing on Mr. Gerace and the perception the

11:29AM 13  jury has of Mr. Gerace in a prejudicial manner such as I

11:29AM 14  formed an opinion because in part I heard that he might have

11:29AM 15  went to federal prison, I don't think that that is repairable.

11:29AM 16  So I made the motion for a mistrial.  I understand it's been

11:29AM 17  denied.  But that was the reason for it.

11:29AM 18       And I know it's only one instance, and there was a

11:29AM 19  curative instruction, but I think it's important that we

11:29AM 20  express our opinion when this testimony comes out, and we'll

11:29AM 21  probably continue to do so if it happens again at some point.

11:29AM 22            **THE COURT:**  Of course.

11:29AM 23            **MR. COOPER:**  Judge, if I --

11:29AM 24            **THE COURT:**  Yeah, go ahead.

11:29AM 25            **MR. COOPER:**  I understand you ruled on it, but I want

11:29AM    1   to make a record as well.

11:29AM    2           **THE COURT:**  Yeah, go ahead.

11:29AM    3           **MR. COOPER:**  First of all, it wasn't directly

11:29AM    4   responsive to the question -- while it may have been

11:29AM    5   responsive to the question, it wasn't what anybody was

11:29AM    6   intending to ask about.

11:30AM    7           I think the curative instruction is more than

11:30AM    8   sufficient, especially in a case like this one where there's

11:30AM    9   already been testimony from a federal probation officer about

11:30AM   10   the defendant being on supervision.  I think it's -- I'm not

11:30AM   11   saying it's the same thing, but it's all viewed on a spectrum.

11:30AM   12   And in this case, the jury has proof that you're already

11:30AM   13   letting in.  So I don't think that the harm is -- is that

11:30AM   14   significant.

11:30AM   15           Additionally, I would say that I chose to just walk

11:30AM   16   away from it because I'm satisfied with the testimony I got,

11:30AM   17   but I think that there are legitimate arguments under 403 for

11:30AM   18   that coming in because of how it weighs on her perception of

11:30AM   19   whether she's -- has to do what's pitched out there.  Knowing

11:30AM   20   someone has been to federal prison is scary, that's why she

11:30AM   21   said it.

11:30AM   22           And so, far from it being testimony worthy of a

11:30AM   23   mistrial, I think I could have and maybe should have argued

11:30AM   24   that the testimony should stand, because it all goes to what

11:30AM   25   was in her head at the time.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

82

| | | |
|---|---|---|
| 11:30AM | 1 | So we walked away from it.  And I apprec -- I |
| 11:31AM | 2 | understand the Court's ruling.  But I just want to make a |
| 11:31AM | 3 | record that I actually think the testimony could have come in |
| 11:31AM | 4 | under 403 given the nature of the charges and the elements. |
| 11:31AM | 5 | **THE COURT:**  Okay.  I'm not so sure I agree with that. |
| 11:31AM | 6 | What I will say is this.  If the defense wants any |
| 11:31AM | 7 | kind of a further curative instruction, I will give it, but |
| 11:31AM | 8 | the motion for a mistrial is denied. |
| 11:31AM | 9 | **MR. FOTI:**  Understood.  Thank you. |
| 11:31AM | 10 | **THE COURT:**  Thank you, all, very much. |
| 11:31AM | 11 | **MR. SOEHNLEIN:**  Your Honor, I'm sorry, I have one |
| 11:31AM | 12 | more thing. |
| 11:31AM | 13 | **THE COURT:**  Go ahead. |
| 11:31AM | 14 | **MR. SOEHNLEIN:**  So, something unanticipated on |
| 11:31AM | 15 | direct.  And I really didn't think the government would do |
| 11:31AM | 16 | this, but it did. |
| 11:31AM | 17 | In its direct exam, it went through subsequent |
| 11:31AM | 18 | arrests that Ms. G.R. had up and through 2012, and to the |
| 11:31AM | 19 | point where she obtained sobriety. |
| 11:31AM | 20 | One of those arrests that they didn't ask about, you |
| 11:31AM | 21 | recall that they asked about DWIs, DWIs, DWIs.  But the |
| 11:31AM | 22 | ultimate arrest was a prostitution arrest. |
| 11:31AM | 23 | And so I believe that they've opened the door and to |
| 11:31AM | 24 | just the fact that that arrest, which was asked about, was in |
| 11:31AM | 25 | fact for prostitution in 2012. |

11:32AM   1        **MR. COOPER:**  So, I -- elicited on direct examination

11:32AM   2   her history up until the point of sobriety.  I don't believe

11:32AM   3   that asking about earlier arrests or convictions opens the

11:32AM   4   door to a later arrest.  I don't see how asking about a 2011

11:32AM   5   or 2012 DWI arrest automatically opens the door to a 2012

11:32AM   6   prostitution arrest.

11:32AM   7        **THE COURT:**  But why wouldn't -- I mean, you asked

11:32AM   8   about a whole series of arrests.  She says, yes, I got

11:32AM   9   arrested for DWI.  Why can't he ask if one of those arrests,

11:32AM  10   one of the times that she was arrested was for prostitution?

11:32AM  11   What's the basis for --

11:32AM  12        **MR. COOPER:**  What's the --

11:32AM  13        **THE COURT:** -- excluding that?

11:32AM  14        **MR. COOPER:**  -- probative value of it?  I would ask,

11:32AM  15   like --

11:32AM  16        **THE COURT:**  To finish --

11:32AM  17        **MR. COOPER:**  -- other than the prejudicial nature of,

11:32AM  18   like, other than the -- other than using the arrest, which

11:33AM  19   it's not a conviction for prostitution.  Like, under the Rules

11:33AM  20   of Evidence, I don't understand what the -- what would be the

11:33AM  21   probative value?  What material fact at issue in the case does

11:33AM  22   it make more or less likely to have occurred that in 2012

11:33AM  23   something happened when the allegation is about what happened

11:33AM  24   in 2009?  It's just to dirty up the witness.

11:33AM  25        **MS. CHALBECK:**  And I would add, Your Honor, that this

11:33AM    1    is the kind of material that Rule 412 generally precludes.

11:33AM    2    **THE COURT:** Go ahead, Mr. Soehnlein.

11:33AM    3    **MR. SOEHNLEIN:** I'm sorry, except Rule 12 precludes

11:33AM    4    it only to the extent that the prosecution doesn't open the

11:33AM    5    door to it.

11:33AM    6    The prosecution has gone through it, and what they're

11:33AM    7    trying show, the reason for their -- the eliciting the

11:33AM    8    testimony was to show that she struggled with sobriety through

11:33AM    9    all this time, her life slowly got better, and she made this

11:33AM   10    great recovery once she was outside of Mr. Gerace's orbit.

11:33AM   11    It does not accurately portray what that story line

11:33AM   12    actually had.

11:33AM   13    And, in fact, when she got to that arrest, Mr. Cooper

11:34AM   14    had been asking, okay, that was an arrest for DWI?  That was

11:34AM   15    an arrest for DWI?  That was an arrest for DWI?

11:34AM   16    When he got to that arrest, he didn't ask the

11:34AM   17    question what it was for.  2012.

11:34AM   18    **THE COURT:** He asked about that arrest?

11:34AM   19    **MR. SOEHNLEIN:** That arrest, she talked about.

11:34AM   20    **THE COURT:** Did you ask about that arrest?

11:34AM   21    **MR. COOPER:** I asked about did -- I was going through

11:34AM   22    chronologically through the timeline, I asked about the

11:34AM   23    last -- the last one that I asked about was I think she said

11:34AM   24    in January of 2012.

11:34AM   25    **THE COURT:** Is that the one?

11:34AM   1          **MR. SOEHNLEIN:**  That's -- that's the one I --

11:34AM   2          **MR. COOPER:**  It's not.

11:34AM   3          **THE COURT:**  I'm going to let him get into it.

11:34AM   4          **MR. COOPER:**  Hold on.

11:34AM   5          **THE COURT:**  I said I'm going to let him get into it.

11:34AM   6  Mr. Cooper said it's not.  Go ahead.

11:34AM   7          **MR. COOPER:**  So January of 2012 is the DWI arrest I

11:34AM   8  believe.  March of 2012, which is what Mr. Soehnlein's

11:34AM   9  referring to, is prostitution arrest.

11:34AM   10         **THE COURT:**  And you did not ask about that?

11:34AM   11         **MR. COOPER:**  I did not ask about that.  I asked about

11:34AM   12  January 2012, that's what puts her in rehab, that's when she

11:34AM   13  gets sober, and that's what I was working through that line of

11:34AM   14  questioning for is how do we get to where we are today.

11:34AM   15         There's nothing misleading about my questioning.

11:34AM   16         An arrest on its own is probative of nothing.  She

11:35AM   17  wasn't convicted of the prostitution.  This is solely and it's

11:35AM   18  completely divorced in time from the allegations in this case

11:35AM   19  in 2009.  So there's not an open-the-door argument to an

11:35AM   20  arrest here.

11:35AM   21         **THE COURT:**  Can he ask if she still was involved in

11:35AM   22  prostitution in 2012?

11:35AM   23         **MR. COOPER:**  We don't believe there's any relevance.

11:35AM   24  It's what 412 exists to prohibit.  And so if it's completely

11:35AM   25  related in time, the rule says that there are very limited

11:35AM  1    exceptions when it can be permissible.

11:35AM  2         The rule exists to prevent exactly what they're

11:35AM  3    trying to do, which is say, hey, because you acted as a

11:35AM  4    prostitute either much earlier or much later, you must have

11:35AM  5    just been consenting to this conduct that's at issue in this

11:35AM  6    case.

11:35AM  7         That's -- that's the only reason for asking about

11:35AM  8    this, and the rule exists to prohibit that.

11:35AM  9         I didn't open the door to it by asking about an

11:35AM  10   earlier arrest that got her in drug treatment.

11:35AM  11        **MR. SOEHNLEIN:**  Your Honor, the rule has the

11:35AM  12   carve-out that you're allowed to get into that testimony to

11:35AM  13   prevent manifest unfairness to the defendant and to complete

11:35AM  14   the record.

11:35AM  15        Here, what we're trying to do is complete the record.

11:36AM  16        The government chose to go down this road.

11:36AM  17        Mr. Cooper and I had a conversation about it this

11:36AM  18   morning, and he said you don't intend to get into it.

11:36AM  19        I didn't intend to get into it, because I never

11:36AM  20   thought there was any -- any world that existed where they

11:36AM  21   would go down that path and drive right into it.

11:36AM  22        And now that they have, and they've put her life at

11:36AM  23   that point in time at issue --

11:36AM  24        **THE COURT:**  Okay.  So I'm going to think about it.

11:36AM  25   I'm gonna -- I'm gonna -- I'm gonna think about it.  I'm gonna

| | | |
|---|---|---|
| 11:36AM | 1 | take a look at the rule, and I'm gonna think about it. |
| 11:36AM | 2 | Anything else before we break? |
| 11:36AM | 3 | **MR. COOPER:**  No, Judge.  I'd just ask if we need to |
| 11:36AM | 4 | keep arguing it after, that we be given an opportunity to do |
| 11:36AM | 5 | that. |
| 11:36AM | 6 | **THE COURT:**  Yeah -- yeah, I'll listen.  But I'm going |
| 11:36AM | 7 | to think about it now.  Anything more? |
| 11:36AM | 8 | **MR. SOEHNLEIN:**  Nothing else from us, Judge.  Thank |
| 11:36AM | 9 | you. |
| 11:36AM | 10 | **THE COURT:**  Okay. |
| 11:36AM | 11 | **THE CLERK:**  All rise. |
| 11:36AM | 12 | (Off the record at 11:36 a.m.) |
| 11:58AM | 13 | (Back on the record at 11:58 a.m.) |
| 11:58AM | 14 | (Jury not present.) |
| 11:58AM | 15 | **THE CLERK:**  All rise. |
| 11:58AM | 16 | **THE COURT:**  Please be seated. |
| 11:58AM | 17 | **THE CLERK:**  We are back on the record for the |
| 11:58AM | 18 | continuation of the jury trial in case numbers 19-cr-227 and |
| 11:58AM | 19 | 23-cr-37, United States of America versus Peter Gerace, Jr., |
| 11:58AM | 20 | all counsel and parties are present. |
| 11:58AM | 21 | **THE COURT:**  Okay.  So, what concerns me about |
| 11:58AM | 22 | Rule 412 is that it requires a hearing.  And -- obviously |
| 11:58AM | 23 | we're not going to do a hearing in the middle of this trial. |
| 11:58AM | 24 | We've got to put the witness on notice and give her a chance |
| 11:58AM | 25 | to get a lawyer to come in, it looks like.  It's a very |

| 11:58AM | 1 | involved procedure. |
| 11:58AM | 2 | Let me ask you this.  Your concern about the arrest |
| 11:59AM | 3 | in March of -- is it 2012? |
| 11:59AM | 4 | **MR. SOEHNLEIN:**  2012. |
| 11:59AM | 5 | **THE COURT:**  Cutting against the government's |
| 11:59AM | 6 | narrative, why do you need to show that the arrest was for |
| 11:59AM | 7 | prostitution?  Why can't you just simply ask her, you were |
| 11:59AM | 8 | arrested in March of 2012 as well? |
| 11:59AM | 9 | **MR. SOEHNLEIN:**  I think that it does need to be for |
| 11:59AM | 10 | prostitution because the -- what they've gone through is DWI |
| 11:59AM | 11 | arrest, DWI arrest, DWI arrest, which would suggest to the |
| 11:59AM | 12 | jurors that she's just struggling with substance abuse and |
| 11:59AM | 13 | otherwise she's being law abiding.  Otherwise, she's not |
| 11:59AM | 14 | engaging in -- |
| 11:59AM | 15 | **THE COURT:**  But -- but -- but isn't that, doesn't |
| 11:59AM | 16 | that play right into what the government is saying, that the |
| 11:59AM | 17 | fact that it's a prostitution arrest, the only reason you |
| 11:59AM | 18 | could -- you would want to put that in is -- is to show that |
| 11:59AM | 19 | she's got a proclivity to engage in prostitution or that she |
| 11:59AM | 20 | engaged in prostitution after the event, right?  And that's |
| 12:00PM | 21 | exactly what the rule is designed to keep out. |
| 12:00PM | 22 | **MR. SOEHNLEIN:**  The rule is designed to keep that out |
| 12:00PM | 23 | unless it's a manifest prejudice to the defendant. |
| 12:00PM | 24 | **THE COURT:**  Well, I don't see those words in the |
| 12:00PM | 25 | rule.  What am I missing? |

12:00PM    1    **MR. SOEHNLEIN:**  Isn't the -- and I'm -- I don't have

12:00PM    2    it in front of me, I'm recalling from our earlier motion

12:00PM    3    practice.

12:00PM    4    **MR. COOPER:**  I have it in front of me, I'll read it.

12:00PM    5    Rule 412 --

12:00PM    6    **THE COURT:**  You don't have to read the whole thing.

12:00PM    7    **MR. COOPER:**  The part that -- here are the -- the

12:00PM    8    three exceptions spelled out in the criminal case.

12:00PM    9    A.  Evidence of specific instances of sexual behavior

12:00PM   10    by the alleged victim offered to prove that a person other

12:00PM   11    than the accused was the source of the semen, injury, or other

12:00PM   12    physical evidence.  Obviously inapplicable here.

12:00PM   13    B.  Evidence of specific instances of sexual behavior

12:00PM   14    by the alleged victim with respect to the person accused of

12:00PM   15    the sexual misconduct offered by the accused to prove consent

12:00PM   16    or by the prosecution to rebut.  Does not apply here.

12:01PM   17    C.  Evidence the exclusion of which would violate the

12:01PM   18    constitutional rights of the defendant.  That does not apply

12:01PM   19    here either.  He does not have a constitutional right to dirty

12:01PM   20    up a victim asking about a prostitution arrest three years

12:01PM   21    divorced from the facts that are relevant to the charge in the

12:01PM   22    indictment.  It's just, that's what intention is, and that's

12:01PM   23    what the rule exists to prohibit.

12:01PM   24    **THE COURT:**  Yeah.  I think, Mr. Soehnlein, you can

12:01PM   25    ask about the arrest, you can't link the arrest to

12:01PM  1    prostitution.  Okay?  So that's what I will allow.

12:01PM  2         **MR. COOPER:**  I'd like for the witness to be advised

12:01PM  3    outside the presence of the jury not to offer up the fact.

12:01PM  4    She's a very candid person, and I expect when the question is

12:01PM  5    posed to her, she may say in her answer.  So I'd ask Your

12:01PM  6    Honor to inform her of your ruling.

12:01PM  7         **MR. SOEHNLEIN:**  I'm sorry, Your Honor, may I ask that

12:01PM  8    the arrest was not a DWI arrest?

12:01PM  9         **THE COURT:**  Yeah.

12:01PM  10        **MR. COOPER:**  What does it matter?  How does that make

12:01PM  11   any material fact at issue in this case more or less to have

12:01PM  12   occurred, or bear on her credibility?  Not at all.

12:02PM  13        **THE COURT:**  Well, it completes the narrative as

12:02PM  14   Mr. Soehnlein says.  So, so the fact that she was arrested,

12:02PM  15   no, I don't think -- I don't think it matters whether it was

12:02PM  16   for DWI or for something else.  So, no, I don't think you can

12:02PM  17   ask that.  But and -- and yeah, I will instruct her --

12:02PM  18        **MR. COOPER:**  Thank you.

12:02PM  19        **THE COURT:**  -- that she -- she should not say that it

12:02PM  20   was for prostitution.

12:02PM  21        **MR. COOPER:**  And for the same reason, and I don't --

12:02PM  22   this has been briefed before Your Honor.

12:02PM  23        The defense filed a notice.  We've never had the

12:02PM  24   hearing, which I think is the party who's intending to offer

12:02PM  25   the evidence is responsible for -- for pushing that forward.

| 12:02PM | 1 | **THE COURT:**  Of course, Mr. Soehnlein's answer to that |
| 12:02PM | 2 | is he didn't know he was going to do that until your direct. |
| 12:02PM | 3 | **MR. COOPER:**  They opened -- they opened on -- on, I |
| 12:02PM | 4 | believe, this witness engaging in -- in other commercial |
| 12:02PM | 5 | sexual activity after the incident described at Pharaoh's. |
| 12:02PM | 6 | **MR. SOEHNLEIN:**  And Your Honor ruled that if it's |
| 12:02PM | 7 | while she's working at Pharaoh's, then inside, outside, we're |
| 12:03PM | 8 | allowed to ask about it.  And that's what we intend to ask |
| 12:03PM | 9 | about. |
| 12:03PM | 10 | **MR. COOPER:**  Okay. |
| 12:03PM | 11 | **THE COURT:**  Yeah, but that's not-- |
| 12:03PM | 12 | **MR. COOPER:**  Separate from this.  Okay. |
| 12:03PM | 13 | **THE COURT:**  Okay. |
| 12:03PM | 14 | **MR. COOPER:**  All right. |
| 12:03PM | 15 | **THE COURT:**  Okay.  Let's get her back. |
| 12:03PM | 16 | Anything else from the government? |
| 12:03PM | 17 | **MR. COOPER:**  No. |
| 12:03PM | 18 | **THE COURT:**  Anything else from the defense? |
| 12:03PM | 19 | **MR. SOEHNLEIN:**  No, Judge. |
| 12:03PM | 20 | **THE COURT:**  Okay.  We'll go for about an hour. |
| 12:03PM | 21 | I have something that's supposed to be at 12:30? |
| 12:03PM | 22 | **THE CLERK:**  Yes, Judge. |
| 12:03PM | 23 | **THE COURT:**  Okay.  We'll have them wait. |
| 12:03PM | 24 | **THE CLERK:**  Yep. |
| 12:03PM | 25 | **THE COURT:**  So we'll go for about an hour.  And then |

12:03PM      1    we'll break for lunch at 1.  Can you let them know --

12:03PM      2          **THE CLERK:**  I will send an email, Judge.

12:03PM      3          **THE COURT:**  -- that we'll break at 1?

12:03PM      4          Let's bring them in please, Pat.

12:03PM      5          **MR. COOPER:**  Can we wait, Judge, to just instruct the

12:03PM      6    witness?

12:03PM      7          **THE COURT:**  Oh, I'm sorry, yes.

12:03PM      8          Yeah, let's get the witness in first.  Yes, thank

12:03PM      9    you, Mr. Cooper.

12:03PM    10          (Witness seated at 12:03 p.m.  No jury present.)

12:03PM    11          **THE COURT:**  Okay.  Ma'am, you're going to be asked

12:03PM    12    about -- on cross-examination you may be asked about an arrest

12:03PM    13    you had in March of 2012.  You're not to say what that arrest

12:04PM    14    was for.

12:04PM    15          **THE WITNESS:**  Okay.

12:04PM    16          **THE COURT:**  You're not to say the crime that you were

12:04PM    17    arrested for.  Okay?

12:04PM    18          **THE WITNESS:**  All right.

12:04PM    19          **THE COURT:**  Okay.  Let's bring them in, please.

12:04PM    20          **MR. COOPER:**  Do you understand that?

12:04PM    21          **THE WITNESS:**  Yes, I understand.

12:04PM    22          **MR. COOPER:**  Stay standing until they come in, then

12:05PM    23    you can sit down.  Okay?

12:05PM    24          (Jury seated at 12:05 p.m.)

12:05PM    25          **THE COURT:**  The record will reflect that all our

| | | |
|---|---|---|
| 12:06PM | 1 | jurors are, again, present. |
| 12:06PM | 2 | I remind the witness that she's still under oath. |
| 12:06PM | 3 | And you may begin your cross-examination. |
| 12:06PM | 4 | **MR. SOEHNLEIN:**  Thank you, Your Honor. |
| 12:06PM | 5 | |
| 12:06PM | 6 | **CROSS-EXAMINATION BY MR. SOEHNLEIN:** |
| 12:06PM | 7 | Q.  Good afternoon. |
| 12:06PM | 8 | A.  Good afternoon. |
| 12:06PM | 9 | Q.  We've never met before? |
| 12:06PM | 10 | A.  No. |
| 12:06PM | 11 | Q.  My name is Eric Soehnlein, I represent Peter Gerace. |
| 12:06PM | 12 | I'm going to ask you a couple questions to follow up on |
| 12:06PM | 13 | your direct exam from this morning.  If you don't understand |
| 12:06PM | 14 | my questions, just let me know, okay? |
| 12:06PM | 15 | A.  Okay. |
| 12:06PM | 16 | Q.  Otherwise, if you don't say that, I'll assume that you |
| 12:06PM | 17 | understood them; is that fair? |
| 12:06PM | 18 | A.  Fair. |
| 12:06PM | 19 | Q.  Okay.  Very good. |
| 12:06PM | 20 | What did you do to get ready to testify? |
| 12:06PM | 21 | A.  What do you mean? |
| 12:06PM | 22 | Q.  Well, did you review any documents before your testimony |
| 12:06PM | 23 | today? |
| 12:06PM | 24 | A.  Yes. |
| 12:06PM | 25 | Q.  Okay.  And what did you review? |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

94

| | | |
|---|---|---|
| 12:06PM | 1 | A. Questions that I was asked. |
| 12:07PM | 2 | Q. Okay. And this was a hard paper copy document? |
| 12:07PM | 3 | A. Yes. |
| 12:07PM | 4 | Q. Okay. And who gave that to you? |
| 12:07PM | 5 | A. The gentleman there. |
| 12:07PM | 6 | Q. The gentlemen there, is that Mr. Cooper? |
| 12:07PM | 7 | A. Yes. |
| 12:07PM | 8 | Q. Okay. Yeah. And you reviewed those questions? |
| 12:07PM | 9 | A. Yeah. |
| 12:07PM | 10 | Q. Whatever they were? |
| 12:07PM | 11 | A. Yeah. |
| 12:07PM | 12 | Q. Okay. How long did you spend reviewing those questions? |
| 12:07PM | 13 | A. This morning? |
| 12:07PM | 14 | Q. Yeah. |
| 12:07PM | 15 | A. Actually, not really at all, maybe five minutes. |
| 12:07PM | 16 | Q. Okay. |
| 12:07PM | 17 | A. Not even. |
| 12:07PM | 18 | Q. And had he given you that before this morning? |
| 12:07PM | 19 | A. Yes. |
| 12:07PM | 20 | Q. Okay. And when did he give you that prior to this |
| 12:07PM | 21 | morning? |
| 12:07PM | 22 | A. Are you -- I'm sorry, I'm not understanding the question. |
| 12:07PM | 23 |    Do you mean did he hand me a document to take home? Or |
| 12:07PM | 24 | did he -- are you asking me if I've reviewed the questions |
| 12:07PM | 25 | before today? |

| | | |
|---|---|---|
| 12:07PM | 1 | Q.  Well, let's do -- let's do it both. |
| 12:07PM | 2 | Did he give you any documents to take home? |
| 12:07PM | 3 | A.  No. |
| 12:07PM | 4 | Q.  Okay.  Did you review the questions before today? |
| 12:07PM | 5 | A.  Yes. |
| 12:07PM | 6 | Q.  And you did that this morning? |
| 12:07PM | 7 | A.  Very briefly. |
| 12:08PM | 8 | Q.  Okay. |
| 12:08PM | 9 | A.  Yep. |
| 12:08PM | 10 | Q.  And did he do that at any other times? |
| 12:08PM | 11 | A.  Yes. |
| 12:08PM | 12 | Q.  Okay.  And when did you do that? |
| 12:08PM | 13 | A.  Maybe twice before. |
| 12:08PM | 14 | Q.  Okay.  When -- when was the first time that you did that? |
| 12:08PM | 15 | A.  I think it was after I did the grand jury testimony.  It |
| 12:08PM | 16 | was a questions from that, that's what we reviewed. |
| 12:08PM | 17 | Q.  Okay.  And on the topic of the grand jury testimony, that |
| 12:08PM | 18 | was a proceeding in a room with -- do you recall which |
| 12:08PM | 19 | prosecutor you were with in the grand jury? |
| 12:08PM | 20 | A.  I thought it was -- |
| 12:08PM | 21 | **MR. COOPER:**  Objection to relevance.  What does it |
| 12:08PM | 22 | matter which prosecutor? |
| 12:08PM | 23 | **THE COURT:**  Overruled. |
| 12:08PM | 24 | **THE WITNESS:**  I think it was Joseph Tripi.  I think. |
| 12:08PM | 25 | **BY MR. SOEHNLEIN:** |

| | | |
|---|---|---|
| 12:08PM | 1 | Q.  Okay.  Mr. Tripi sitting here in the tie? |
| 12:08PM | 2 | A.  Oh, yeah, sorry.  Sorry. |
| 12:08PM | 3 | Q.  It was Mr. Tripi, correct? |
| 12:08PM | 4 | A.  Yeah, he had shorter hair, though.  I don't know why I |
| 12:08PM | 5 | didn't -- |
| 12:08PM | 6 | MR. TRIPI:  Probably less gray, too. |
| 12:09PM | 7 | MR. SOEHNLEIN:  He looks good with long hair. |
| 12:09PM | 8 | THE WITNESS:  He does. |
| 12:09PM | 9 | MR. SOEHNLEIN:  Longer hair. |
| 12:09PM | 10 | THE WITNESS:  He does. |
| 12:09PM | 11 | BY MR. SOEHNLEIN: |
| 12:09PM | 12 | Q.  So, you met -- you met two times to review the questions |
| 12:09PM | 13 | and -- and then you met with Mr. Cooper this morning, fair? |
| 12:09PM | 14 | A.  Yeah, fair. |
| 12:09PM | 15 | Q.  Okay.  Yeah.  Any other preparation that you did for this |
| 12:09PM | 16 | testimony? |
| 12:09PM | 17 | A.  No, just reviewing the questions. |
| 12:09PM | 18 | Q.  Okay.  I'm gonna ask you some questions, and again, I |
| 12:09PM | 19 | apologize, I know we're gonna go through some points in your |
| 12:09PM | 20 | life that are in the past, right? |
| 12:09PM | 21 | A.  Right. |
| 12:09PM | 22 | Q.  Sometimes the very distant past, right? |
| 12:09PM | 23 | A.  Right. |
| 12:09PM | 24 | Q.  And matters that you put behind you, right? |
| 12:09PM | 25 | A.  Right. |

12:09PM    1    Q.  But I have a job to ask you some questions about those

12:09PM    2    things, you understand that?

12:09PM    3    A.  I understand.

12:09PM    4    Q.  Okay.  On direct exam, Mr. Cooper asked you some

12:10PM    5    questions about the start of your drug use, and the start of

12:10PM    6    your drinking; do you recall those questions?

12:10PM    7    A.  Yes.

12:10PM    8    Q.  Okay.  And I think that you said that at the end of your

12:10PM    9    teenage years, you had been to some sort of rehab program; is

12:10PM    10    that accurate?

12:10PM    11    A.  Correct.

12:10PM    12    Q.  Okay.  That was before the point in time that you had

12:10PM    13    gone to work at Pharaoh's, correct?

12:10PM    14    A.  Yes.

12:10PM    15    Q.  And before the time that you had went to work at strip

12:10PM    16    clubs, correct?

12:10PM    17    A.  No, I was already working in a strip club, when I -- I

12:10PM    18    was working at Mademoiselle's and then I went to the rehab.

12:10PM    19    Q.  Okay.  When you're in the rehab, did you -- did you

12:10PM    20    receive training about how to make smart decisions with

12:10PM    21    respect to drugs and alcohol?

12:10PM    22    A.  To be honest with you, I don't recall at all.

12:10PM    23    Q.  Okay.  The rehab, how long was it?

12:10PM    24    A.  28 days.

12:10PM    25    Q.  Okay.  And where was it?

12:10PM    1    A.    ECMC.

12:10PM    2    Q.    Okay.  Were you inpatient for that?

12:10PM    3    A.    Yes.

12:10PM    4    Q.    That's a pretty intense program, correct?

12:10PM    5    A.    Yeah.

12:10PM    6    Q.    Yeah.  And your friends and family were generally

12:11PM    7    supportive of that, correct?

12:11PM    8    A.    Yes.

12:11PM    9    Q.    Yeah.  You had relationships with your friends and your

12:11PM   10    family at that point in time?

12:11PM   11    A.    Yes.

12:11PM   12    Q.    Supportive relationships, correct?

12:11PM   13    A.    Yeah.

12:11PM   14    Q.    Okay.  And -- and they wanted you to succeed and stay

12:11PM   15    sober, correct?

12:11PM   16    A.    Yes.

12:11PM   17    Q.    You wanted to succeed and stay sober --

12:11PM   18    A.    Yes.

12:11PM   19    Q.    -- correct?

12:11PM   20        And you understood that in order to do that, you had to

12:11PM   21    make healthy choices, correct?

12:11PM   22    A.    Sure, yes.

12:11PM   23    Q.    Smart decision making, correct?

12:11PM   24    A.    Right.

12:11PM   25    Q.    Okay.  Now, before you had worked at Pharaoh's, you had

12:11PM   1   been working at, I think you said two other strip clubs,

12:11PM   2   correct?

12:11PM   3   A.   Yes.

12:11PM   4   Q.   Okay.  So fair to say when you applied for a position at

12:11PM   5   Pharaoh's, you understood generally what the job entailed,

12:11PM   6   correct?

12:11PM   7   A.   Yes.

12:11PM   8   Q.   Yeah.  It entails talking to patrons, right?

12:11PM   9   A.   Yes.

12:11PM  10   Q.   Being flirtatious, correct?

12:11PM  11   A.   Yeah.

12:11PM  12   Q.   Dancing on a stage without a lot of clothes on, correct?

12:11PM  13   A.   Right.

12:12PM  14   Q.   Giving lap dances, correct?

12:12PM  15   A.   Right.

12:12PM  16   Q.   Okay.  And, you -- you knew that at certain points in

12:12PM  17   time, the clientele might be a little rough, correct?

12:12PM  18   A.   Yeah.

12:12PM  19   Q.   Yeah.  You talked about that when you talked about -- I

12:12PM  20   think it was Mademoiselle's, correct?

12:12PM  21   A.   Right.

12:12PM  22   Q.   Okay.  And --

12:12PM  23            MR. COOPER:  I'm going to object, Judge, object to

12:12PM  24   that last question and answer and move to strike, based on a

12:12PM  25   discussion that we had at the bench this morning on this

| | | |
|---|---|---|
| 12:12PM | 1 | topic. |
| 12:12PM | 2 | **THE COURT:**  No, overruled. |
| 12:12PM | 3 | **MR. SOEHNLEIN:**  All right. |
| 12:12PM | 4 | **BY MR. SOEHNLEIN:** |
| 12:12PM | 5 | Q.  Okay.  Now I think that you -- you talked about a time |
| 12:12PM | 6 | where you auditioned at Pharaoh's, correct? |
| 12:12PM | 7 | A.  Yes. |
| 12:12PM | 8 | Q.  Do you recall who you auditioned for? |
| 12:12PM | 9 | A.  I believe it was Chris. |
| 12:12PM | 10 | Q.  Okay. |
| 12:12PM | 11 | A.  He was the manager during the day. |
| 12:12PM | 12 | Q.  Okay.  You didn't audition with Mr. Gerace, correct? |
| 12:12PM | 13 | A.  No. |
| 12:12PM | 14 | Q.  Okay.  And what did the audition entail? |
| 12:13PM | 15 | A.  You just danced to a song.  A song or two. |
| 12:13PM | 16 | Q.  Okay.  And -- and when you're doing that dance, you're |
| 12:13PM | 17 | wearing whatever you would wear or whatever you would not |
| 12:13PM | 18 | wear -- |
| 12:13PM | 19 | A.  Right. |
| 12:13PM | 20 | Q.  -- when you're doing that -- |
| 12:13PM | 21 | A.  Yes. |
| 12:13PM | 22 | Q.  -- when you work in the club? |
| 12:13PM | 23 | Okay.  So you understood that aspect of the job? |
| 12:13PM | 24 | A.  Sure.  Yes. |
| 12:13PM | 25 | Q.  Okay.  Now, I think you said that -- that you chose to go |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

12:13PM  1    work at Pharaoh's because the money was better; that was your

12:13PM  2    perception?

12:13PM  3    A.  Yes.

12:13PM  4    Q.  Right.  And you chose to go work at Pharaoh's because you

12:13PM  5    had heard some things from your roommate at the time who was

12:13PM  6    also working at Pharaoh's, right?

12:13PM  7    A.  Yes.

12:13PM  8    Q.  And she had reported to you that -- that she had a

12:13PM  9    positive experience at Pharaoh's?

12:13PM  10   A.  Yes.

12:13PM  11   Q.  Okay.  I wanted to follow up.  You said earlier that when

12:13PM  12   you first started working at Pharaoh's, you were not aware of

12:13PM  13   drug use in the club, correct?

12:13PM  14   A.  Right.

12:13PM  15   Q.  Right.  Because when you started at Pharaoh's, you

12:13PM  16   weren't using drugs, correct?

12:13PM  17   A.  Not at the time, right.

12:13PM  18   Q.  Not at the time?

12:14PM  19   A.  Right.

12:14PM  20   Q.  And so as a non-drug user working at the club, you did

12:14PM  21   not perceive drugs being present in the club at that time,

12:14PM  22   correct?

12:14PM  23   A.  No.

12:14PM  24   Q.  Yeah.  It wasn't obvious to you, correct?

12:14PM  25   A.  No.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

102

12:14PM  1    Q.  And -- and fairly, it wasn't something you were looking

12:14PM       for at the time either, right?

12:14PM  3    A.  Right.

12:14PM  4    Q.  Okay.  Now, there came a time where you were introduced

12:14PM  5    to drugs again, correct?

12:14PM  6    A.  Yes.

12:14PM  7    Q.  And that was from K.L., right?

12:14PM  8    A.  Yes.

12:14PM  9    Q.  And that came at a time where K.L. was not working at

12:14PM  10   Pharaoh's, correct?

12:14PM  11   A.  No.

12:14PM  12   Q.  She was there socially, right?

12:14PM  13   A.  Yes.

12:14PM  14   Q.  You met her, right?

12:14PM  15   A.  Yep.

12:14PM  16   Q.  You hit it off with her, right?

12:14PM  17   A.  Right.

12:14PM  18   Q.  She provided the cocaine to you, correct?

12:14PM  19   A.  Yes.

12:14PM  20   Q.  And you did it in the bathroom, right?

12:14PM  21   A.  Yes.

12:14PM  22   Q.  You didn't do it out in the open?

12:14PM  23   A.  Right.

12:14PM  24   Q.  You didn't do it off the bar --

12:14PM  25   A.  No.

| | | |
|---|---|---|
| 12:14PM | 1 | Q.  -- right? |
| 12:14PM | 2 | You didn't do it off the stage, right? |
| 12:14PM | 3 | A.  No. |
| 12:14PM | 4 | Q.  Okay.  And it was Ms. K.L.'s idea to go use it in the |
| 12:14PM | 5 | bathroom? |
| 12:14PM | 6 | A.  Pardon me? |
| 12:14PM | 7 | Q.  It was K.L.'s idea to go use it in the bathroom? |
| 12:15PM | 8 | A.  Yes. |
| 12:15PM | 9 | Q.  Yeah. |
| 12:15PM | 10 | A.  I believe so, yeah. |
| 12:15PM | 11 | Q.  Okay.  And in that moment you made the decision that you |
| 12:15PM | 12 | were going to use cocaine, right? |
| 12:15PM | 13 | A.  Yes. |
| 12:15PM | 14 | Q.  Okay.  Now, you and her had been getting along very well |
| 12:15PM | 15 | that night, right? |
| 12:15PM | 16 | A.  Yes.  Yep. |
| 12:15PM | 17 | Q.  It was the first time that you had ever met her, correct? |
| 12:15PM | 18 | A.  Correct. |
| 12:15PM | 19 | Q.  Okay.  And this was before she was dating Mr. Gerace, |
| 12:15PM | 20 | correct? |
| 12:15PM | 21 | A.  Yes. |
| 12:15PM | 22 | Q.  Long before you had ever met Mr. Gerace, correct? |
| 12:15PM | 23 | A.  Well, I had seen him around the club, but I hadn't |
| 12:15PM | 24 | actually formally met him, correct. |
| 12:15PM | 25 | Q.  Correct. |

12:15PM 1 A.  I knew who he was.

12:15PM 2 Q.  Yeah, you knew who he was, but you hadn't shaken his

12:15PM 3 hand --

12:15PM 4 A.  Right, exactly.

12:15PM 5 Q.  -- and said, you know, hi, I'm G.R., or anything like

12:15PM 6 that --

12:15PM 7 A.  Right.

12:15PM 8 Q.  -- right?  Okay.

12:15PM 9     And this actually might be a good time to get that out of

12:15PM 10 the way.  And I'm sorry for asking this question, but I'm

12:15PM 11 just -- one question and we'll move on.  You've never had sex

12:15PM 12 with Mr. Gerace, correct?

12:15PM 13 A.  No.

12:15PM 14 Q.  Okay.  Now, you -- you and K.L. became friends after

12:15PM 15 that, right?

12:15PM 16 A.  Yes.

12:15PM 17 Q.  You became party buddies?

12:16PM 18 A.  Yes.

12:16PM 19 Q.  Is that fair to say?

12:16PM 20 A.  Um-hum.

12:16PM 21 Q.  And in that relationship, you and her, you're using

12:16PM 22 cocaine, you're doing drugs together on a regular basis,

12:16PM 23 correct?

12:16PM 24 A.  Yes.

12:16PM 25 Q.  You're doing that outside the club, correct?

12:16PM    1    A.   Yes.

12:16PM    2    Q.   You're doing that at her house, perhaps?

12:16PM    3    A.   Yes.

12:16PM    4    Q.   You're doing that at your house, perhaps?

12:16PM    5    A.   Yes.

12:16PM    6    Q.   You're doing it at other bars and restaurants, perhaps?

12:16PM    7    A.   Yes.

12:16PM    8    Q.   You're doing it at friends' houses, correct?

12:16PM    9    A.   Yes.

12:16PM    10   Q.   You're doing in cars, correct?

12:16PM    11   A.   Yes.

12:16PM    12   Q.   Okay.   There was nothing about Pharaoh's that made the

12:16PM    13   drug use exclusive, correct?

12:16PM    14   A.   Correct.

12:16PM    15   Q.   Okay.   Now, in terms of where -- where the drugs are

12:16PM    16   coming from at that point in time, okay, you're buying drugs

12:16PM    17   on your own, correct?

12:16PM    18   A.   Yes.

12:16PM    19   Q.   You're buying drugs from people outside of Pharaoh's,

12:16PM    20   right?

12:16PM    21   A.   Yes.

12:16PM    22   Q.   You're buying drugs from people that are your friends,

12:16PM    23   correct?

12:16PM    24   A.   Yes.

12:16PM    25   Q.   You're buying drugs from people that your friends are

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

| | | |
|---|---|---|
| 12:16PM | 1 | introducing you to, correct? |
| 12:16PM | 2 | A.  Yes. |
| 12:16PM | 3 | Q.  You're not struggling to find drugs, right? |
| 12:16PM | 4 | A.  No. |
| 12:16PM | 5 | Q.  But you're choosing to go use drugs, right? |
| 12:17PM | 6 | A.  Yeah, if that's what you want to call it, yes. |
| 12:17PM | 7 | Q.  Yeah, well, you made the choice to use cocaine, right? |
| 12:17PM | 8 | A.  Right. |
| 12:17PM | 9 | Q.  Okay.  You had -- you had at least gone to rehab at least |
| 12:17PM | 10 | one time prior to that, right? |
| 12:17PM | 11 | A.  Yes. |
| 12:17PM | 12 | Q.  Pretty intense rehab program, right? |
| 12:17PM | 13 | A.  Actually, no, it wasn't an intense program.  They still |
| 12:17PM | 14 | allowed cigarette smoking at ECMC during this time, and the |
| 12:17PM | 15 | program was pretty lax if I could say that. |
| 12:17PM | 16 | Q.  So, but it's 28 days at ECMC, correct? |
| 12:17PM | 17 | A.  Yes. |
| 12:17PM | 18 | Q.  Okay.  And you completed the program, right? |
| 12:17PM | 19 | A.  Yes. |
| 12:17PM | 20 | Q.  And you believed that the fact that they let you smoke |
| 12:17PM | 21 | cigarettes meant that it was lax? |
| 12:17PM | 22 | A.  Yeah.  They've changed a lot since 2020, I'm sorry. |
| 12:17PM | 23 | Q.  Okay.  You don't -- you don't believe they should have |
| 12:17PM | 24 | permitted you to smoke cigarettes? |
| 12:17PM | 25 | **MR. COOPER:**  Objection as to what she believes |

12:17PM  1   smoking cigarettes, like, relevance.

12:17PM  2            **THE COURT:**  I'll allow it.  Go ahead.

12:17PM  3            **THE WITNESS:**  I just -- I take meetings and AA

12:17PM  4   meetings into rehabs now, and they don't allow any of that

12:17PM  5   stuff.  It's different from when I went, that's all.  I just

12:18PM  6   observed it.

12:18PM  7            **BY MR. SOEHNLEIN:**

12:18PM  8   Q.  Okay.  You observed that it's different, but you -- you

12:18PM  9   don't think that the program is insufficient in any way,

12:18PM  10  right?

12:18PM  11  A.  Now or then?

12:18PM  12  Q.  Well, let's -- let me back up.

12:18PM  13       You did the rehab that ECMC offered at the time, correct?

12:18PM  14  A.  Yes.

12:18PM  15  Q.  Okay.  You completed the rehab program, correct?

12:18PM  16  A.  Yes.

12:18PM  17  Q.  Okay.  Subsequent to that rehab program, you chose to use

12:18PM  18  cocaine again, correct?

12:18PM  19  A.  Yes.

12:18PM  20  Q.  Okay.  And you chose to buy drugs again, correct?

12:18PM  21  A.  Yes.

12:18PM  22  Q.  Okay.  Now, when you -- when you went to rehab, you knew

12:18PM  23  that you were becoming addicted to drugs and alcohol,

12:18PM  24  correct?

12:18PM  25  A.  Yes.

12:18PM  1  Q.  Fair to say?  You understood that about yourself, right?

12:18PM  2  A.  Yes.

12:18PM  3  Q.  Okay.  I want to talk to you a little bit about -- a

12:18PM  4  little bit about what it was to be a dancer at Pharaoh's in

12:18PM  5  that 2006 to 2009 time period.  Okay?  Generally.

12:18PM  6      So we're just going to kind of put the drug use to the

12:18PM  7  side for a minute and just talk about that.

12:19PM  8  A.  Okay.

12:19PM  9  Q.  Okay.  And Mr. Cooper touched on this, one way that you

12:19PM  10  could earn money is by dancing on the stage, correct?

12:19PM  11  A.  Yes.

12:19PM  12  Q.  Okay.  Now, the stage money, customer gives that to you.

12:19PM  13  Do you share that with the club in any way?

12:19PM  14  A.  No, it's mine.

12:19PM  15  Q.  Okay.  It's yours.  You make 100 percent of whatever you

12:19PM  16  get paid on the stage, correct?

12:19PM  17  A.  Yes.

12:19PM  18  Q.  Okay.  How about tips from customers for talking to them,

12:19PM  19  did customers tip you just for talking to them?

12:19PM  20  A.  Yes.

12:19PM  21  Q.  Okay.  Tell us, how did that work?

12:19PM  22  A.  I don't know.  Sometimes guys would throw you 10 or $20,

12:19PM  23  I'm not gonna do a dance, but thanks for talking, or

12:19PM  24  whatever.

12:19PM  25  Q.  Okay.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

109

12:19PM  1    A.  Yeah, like that.

12:19PM  2    Q.  Sometimes guys just wanted a conversation or the company?

12:19PM  3    A.  Yeah, sure.

12:19PM  4    Q.  Okay.  Now, when you're having conversations with guys,

12:19PM  5    you're not mean or standoffish to them, right?

12:19PM  6    A.  No.

12:19PM  7    Q.  No.  You're -- you're -- you're flirtatious, correct?

12:19PM  8    A.  I wasn't like that, but --

12:19PM  9    Q.  You weren't?

12:19PM  10   A.  -- but you're supposed to be generally, yes.

12:19PM  11   Q.  Okay.

12:20PM  12   A.  Yeah.

12:20PM  13   Q.  And generally, so, you -- you were -- you were not

12:20PM  14   flirtatious?

12:20PM  15   A.  No, I just talked normally.

12:20PM  16   Q.  Okay.

12:20PM  17   A.  That's how I did it, yeah.

12:20PM  18   Q.  All right.  All right.  But you were, you were willing to

12:20PM  19   engage in a conversation?

12:20PM  20   A.  Correct.

12:20PM  21   Q.  Because you understood that having that conversation was

12:20PM  22   one way of earning additional income, correct?

12:20PM  23   A.  Yes.

12:20PM  24   Q.  Okay.  And, so, when you're having that conversation and

12:20PM  25   you're engaging with customers, what you're signalling to

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

110

| | | |
|---|---|---|
| 12:20PM | 1 | them, is yes, I do want to talk to you, right? |
| 12:20PM | 2 | A.  Right. |
| 12:20PM | 3 | Q.  I do want to hear what you're saying, yes? |
| 12:20PM | 4 | A.  Right. |
| 12:20PM | 5 | Q.  Right.  I do want to understand, you know, whatever we're |
| 12:20PM | 6 | talking about, and I'm interested in it, correct? |
| 12:20PM | 7 | A.  Yes. |
| 12:20PM | 8 | Q.  All right.  Now, the same way when you're dancing on |
| 12:20PM | 9 | stage, do you ever connect with a specific customer that |
| 12:20PM | 10 | might be coming up on the stage to give you a tip or anything |
| 12:20PM | 11 | like that? |
| 12:20PM | 12 | A.  Sure. |
| 12:20PM | 13 | Q.  Yeah.  And when you're on the stage, it's your job to |
| 12:20PM | 14 | message that, yes, I want to be here, I'm interested in what |
| 12:20PM | 15 | I'm doing, correct? |
| 12:20PM | 16 | A.  Sure. |
| 12:20PM | 17 | Q.  Yes? |
| 12:20PM | 18 | A.  Yeah. |
| 12:20PM | 19 | Q.  If you look disinterested, you're going to make less |
| 12:21PM | 20 | money? |
| 12:21PM | 21 | A.  Exactly. |
| 12:21PM | 22 | Q.  Right.  Part of it is an act, right? |
| 12:21PM | 23 | A.  Yes. |
| 12:21PM | 24 | Q.  You're not using your real name, right? |
| 12:21PM | 25 | A.  I did. |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

| | | |
|---|---|---|
| 12:21PM | 1 | Q.  You did? |
| 12:21PM | 2 | A.  I did. |
| 12:21PM | 3 | Q.  Okay. |
| 12:21PM | 4 | A.  I like my name, so -- |
| 12:21PM | 5 | Q.  I like your name, too. |
| 12:21PM | 6 | A.  Thank you. |
| 12:21PM | 7 | Q.  Now, the -- but you're performing, right? |
| 12:21PM | 8 | A.  Yes. |
| 12:21PM | 9 | Q.  Okay.  The whole night is a performance, fair? |
| 12:21PM | 10 | A.  Fair. |
| 12:21PM | 11 | Q.  Okay.  And the signalling, the messaging that you're |
| 12:21PM | 12 | giving off to everybody that you're interacting with, is that |
| 12:21PM | 13 | you want to be doing what you're doing, fair? |
| 12:21PM | 14 | A.  Yes. |
| 12:21PM | 15 | Q.  Yeah.  That's one path to earning an income working as a |
| 12:21PM | 16 | dancer in a strip club, right? |
| 12:21PM | 17 | A.  Yes. |
| 12:21PM | 18 | Q.  All right.  Same thing with VIP dances.  When you go back |
| 12:21PM | 19 | into the VIP dances, you don't act standoffish with a |
| 12:21PM | 20 | customer, right? |
| 12:21PM | 21 | A.  No. |
| 12:21PM | 22 | Q.  You don't act disinterested, right? |
| 12:21PM | 23 | A.  Right. |
| 12:21PM | 24 | Q.  You're engaging, correct? |
| 12:21PM | 25 | A.  Yes. |

12:21PM  1   Q.  You're maybe a little bit more flirty than you would be

12:22PM  2   normally?

12:22PM  3   A.  Sure.

12:22PM  4   Q.  And the dancers are supposed to be flirty, right?

12:22PM  5   A.  Right.

12:22PM  6   Q.  Okay.  Now, let's talk about the customers that you are

12:22PM  7   going to interact with.  You choose who you're gonna talk,

12:22PM  8   to, right?

12:22PM  9   A.  Right.

12:22PM  10  Q.  Right.  There's no rule that says you have to talk to

12:22PM  11  every single person that talks to you, right?

12:22PM  12  A.  Right.

12:22PM  13  Q.  Okay.  So, it might be that you just say, you know what?

12:22PM  14  I don't want to talk to this guy, I'm not gonna bother with

12:22PM  15  him, right?

12:22PM  16  A.  Right.

12:22PM  17  Q.  Now, the goal of you working as a dancer is to make

12:22PM  18  money, fair?

12:22PM  19  A.  Fair.

12:22PM  20  Q.  So, you are gonna go to the people that you perceive as

12:22PM  21  paying more money, right?

12:22PM  22  A.  Yes.

12:22PM  23  Q.  Fair?  Okay.  So, what kind of things would you have

12:22PM  24  looked for?

12:22PM  25  A.  Handing me a larger bill on stage.

| | | |
|---|---|---|
| 12:22PM | 1 | Q.  Okay.  So if someone handed you had a larger bill on |
| 12:22PM | 2 | stage, you would be more likely to go follow up with that |
| 12:22PM | 3 | customer when you got off stage, right? |
| 12:22PM | 4 | A.  Right. |
| 12:23PM | 5 | Q.  Okay.  'Cuz that signals to you this person is interested |
| 12:23PM | 6 | in me, maybe they want to go have a dance, right? |
| 12:23PM | 7 | A.  Right. |
| 12:23PM | 8 | Q.  And then I'm going to make more money, right? |
| 12:23PM | 9 | A.  Right. |
| 12:23PM | 10 | Q.  What else, what other things would you look for? |
| 12:23PM | 11 | A.  I don't know, what kind of drink they have in front of |
| 12:23PM | 12 | them, how they look. |
| 12:23PM | 13 | Q.  Okay.  So let's talk about that. |
| 12:23PM | 14 | What about the drink is going to signal to you that this |
| 12:23PM | 15 | person might have more money? |
| 12:23PM | 16 | A.  Well, maybe if they had a Manhattan versus a Bud Light. |
| 12:23PM | 17 | Q.  Okay. |
| 12:23PM | 18 | A.  Maybe. |
| 12:23PM | 19 | Q.  Because a Manhattan is more expensive, right? |
| 12:23PM | 20 | A.  Yeah. |
| 12:23PM | 21 | Q.  And you assume it's a more sophisticated person, right? |
| 12:23PM | 22 | A.  Yeah. |
| 12:23PM | 23 | Q.  I don't think that's true, by the way. |
| 12:23PM | 24 | A.  No, I -- |
| 12:23PM | 25 | Q.  But that's -- what, if -- |

12:23PM    1    A.  No, right, maybe it costs more money.

12:23PM    2    Q.  Right.  Costs more money, so you're going to be more

12:23PM    3    likely to go and -- and talk to that person, right?

12:23PM    4    A.  Right.

12:23PM    5    Q.  Okay.  You said how they look.  What about how they look?

12:23PM    6    A.  Maybe if they had expensive clothes on, or they were well

12:23PM    7    kept.  I don't know.  Those things.

12:23PM    8    Q.  Okay.  Any specific articles of clothing that you would

12:23PM    9    look for?

12:23PM   10    A.  No, just looks.  Sharper dressed.  I don't know, I would

12:23PM   11    say that.

12:23PM   12    Q.  Okay.  Yeah, but if you saw someone that you perceived as

12:24PM   13    being more sharper dressed, you'd be more likely to go and

12:24PM   14    have a conversation with him, right?

12:24PM   15    A.  Sure.

12:24PM   16    Q.  And when you're having this conversation you're trying to

12:24PM   17    be engaging, and you're trying to signal to them yes, I want

12:24PM   18    to interact with you, correct?

12:24PM   19    A.  Right.

12:24PM   20    Q.  Okay.  I think we might have touched on this, but you

12:24PM   21    have a recollection of how much money you made when you were

12:24PM   22    working at Pharaoh's?

12:24PM   23    A.  We did touch on it, I said about two grand a week I was

12:24PM   24    making.

12:24PM   25    Q.  Okay.  Two grand a week.  And at that point in time,

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

115

12:24PM   1   where were you living?

12:24PM   2   A.  In Amherst.

12:24PM   3   Q.  Okay.  I don't need to know the specific address, but

12:24PM   4   could you just give us a street?

12:24PM   5   A.  I think it was Sunrise Boulevard something, it was off

12:24PM   6   Sheridan.

12:24PM   7   Q.  Okay.  All right.  And you had a car?

12:24PM   8   A.  I had a car.

12:24PM   9   Q.  Okay.  What kind of car were you driving?

12:24PM   10  A.  A 650i BMW.

12:24PM   11  Q.  You were driving a BMW at that time?

12:24PM   12  A.  Yes.

12:24PM   13  Q.  Okay.  Making $2,000 a week as a dancer, correct?

12:24PM   14  A.  Yes.

12:24PM   15  Q.  The BMW was late model, right?

12:25PM   16  A.  Yes.

12:25PM   17  Q.  Okay.  And that was the car you were zipping around in

12:25PM   18  doing whatever you were doing, right?

12:25PM   19  A.  Yes.

12:25PM   20  Q.  It's the car that you were arrested in in Amherst, right?

12:25PM   21  A.  Yes.

12:25PM   22  Q.  Yeah, 650 -- what color was it?

12:25PM   23  A.  Black.

12:25PM   24  Q.  Okay.  Leather interior?

12:25PM   25  A.  Yes.

| | | |
|---|---|---|
| 12:25PM | 1 | Q.  Power windows? |
| 12:25PM | 2 | A.  Yep. |
| 12:25PM | 3 | Q.  Pretty quick car? |
| 12:25PM | 4 | A.  Yes. |
| 12:25PM | 5 | Q.  Pretty awesome car? |
| 12:25PM | 6 | A.  Yeah. |
| 12:25PM | 7 | Q.  Yeah, all right.  And that was your car? |
| 12:25PM | 8 | A.  It was not in my name, no. |
| 12:25PM | 9 | Q.  Okay.  But you were driving it? |
| 12:25PM | 10 | A.  I was driving it, yeah. |
| 12:25PM | 11 | Q.  Okay.  So, and all right.  So we talked about that. |
| 12:25PM | 12 | I want to ask you some questions about -- you talked |
| 12:25PM | 13 | about some VIPs that you might have perceived being in the |
| 12:25PM | 14 | club; do you recall that testimony? |
| 12:25PM | 15 | A.  Yes. |
| 12:25PM | 16 | Q.  And you said that they were people that maybe had a |
| 12:25PM | 17 | private area, right? |
| 12:25PM | 18 | A.  Yes. |
| 12:25PM | 19 | Q.  They seemed to know Mr. Gerace? |
| 12:25PM | 20 | A.  Yeah. |
| 12:25PM | 21 | Q.  You don't know whether or not those people paid for that |
| 12:25PM | 22 | area, right? |
| 12:25PM | 23 | A.  No. |
| 12:25PM | 24 | Q.  No.  It's entirely possible that they did, in fact, pay |
| 12:25PM | 25 | for that area, right? |

12:26PM     1    A.  Sure.

12:26PM     2    Q.  Okay.  And -- and the fact that Mr. Gerace is the

12:26PM     3    owner -- strike that.

12:26PM     4        You'd been in the club long enough to understand that

12:26PM     5    part of the club is customer service, right?

12:26PM     6    A.  Sure.

12:26PM     7    Q.  It's the customer service industry, right?

12:26PM     8    A.  Yes.

12:26PM     9    Q.  And, so, it wouldn't surprise you that Mr. Gerace as the

12:26PM    10    owner might go over and talk to people that had bought a VIP

12:26PM    11    area in the club, correct?

12:26PM    12    A.  Sure.

12:26PM    13    Q.  That's something that a responsible owner would do,

12:26PM    14    right?

12:26PM    15    A.  Sure.

12:26PM    16    Q.  Okay.

12:26PM    17    A.  Yeah.

12:26PM    18    Q.  Okay.  Now, I want to talk to you a little bit about

12:26PM    19    there was some testimony about upstairs; do you recall that

12:26PM    20    testimony?

12:26PM    21    A.  Yes.

12:26PM    22    Q.  Okay.  And I think you said that when you went upstairs

12:26PM    23    usually you went with K.L., right?

12:26PM    24    A.  Yes.

12:26PM    25    Q.  Okay.  So, so K.L. is sort of your avenue to access to

12:26PM   1   the upstairs, correct?

12:26PM   2   A.   Yes.

12:26PM   3   Q.   Because she had a with relationship Mr. Gerace at that

12:26PM   4   point in time --

12:26PM   5   A.   Yes.

12:26PM   6   Q.   -- right?  Okay.  And you never said no, I don't want to

12:27PM   7   go upstairs, right?

12:27PM   8   A.   No.

12:27PM   9   Q.   And by the same token, regular patrons couldn't just walk

12:27PM  10   upstairs, correct?

12:27PM  11   A.   Right.

12:27PM  12   Q.   So what was going on upstairs was separate from what was

12:27PM  13   going on in the club, right?

12:27PM  14   A.   Sure.

12:27PM  15   Q.   Yeah.  And I think you testified earlier that your drug

12:27PM  16   use in the club was in the bathroom, correct?

12:27PM  17   A.   Right.

12:27PM  18   Q.   Okay.  And you're not doing it in the open, right?

12:27PM  19   A.   No.

12:27PM  20   Q.   There's cameras everywhere, correct?

12:27PM  21   A.   Yes.

12:27PM  22   Q.   Okay.  Everywhere that's permitted by law, right?

12:27PM  23   A.   Correct.

12:27PM  24   Q.   Okay.  No cameras in the bathroom, right?

12:27PM  25   A.   Right.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

119

| | | |
|---|---|---|
| 12:27PM | 1 | Q.  Can't have cameras in the women's bathroom, right? |
| 12:27PM | 2 | A.  Right. |
| 12:27PM | 3 | Q.  Okay.  Can't put a male security guard in the women's |
| 12:27PM | 4 | bathroom, right? |
| 12:27PM | 5 | A.  Right. |
| 12:27PM | 6 | Q.  That wouldn't be permissible, right? |
| 12:27PM | 7 | A.  Correct. |
| 12:27PM | 8 | Q.  Okay.  But when you're using drugs at the club, you're |
| 12:27PM | 9 | going to the bathroom, right? |
| 12:27PM | 10 | A.  Yes. |
| 12:27PM | 11 | Q.  You didn't feel confident enough to just do it in the |
| 12:27PM | 12 | open -- |
| 12:27PM | 13 | A.  Right. |
| 12:27PM | 14 | Q.  -- right?  Okay. |
| 12:27PM | 15 | And before you started doing drugs again, you never saw |
| 12:27PM | 16 | anybody else use drugs in the open either, right? |
| 12:27PM | 17 | A.  No. |
| 12:27PM | 18 | Q.  Now after you started using drugs, you started to |
| 12:28PM | 19 | understand that other people were using drugs, too, right? |
| 12:28PM | 20 | A.  Yes. |
| 12:28PM | 21 | Q.  Okay.  Now your perception changed because your social |
| 12:28PM | 22 | circle changed, right? |
| 12:28PM | 23 | A.  Right. |
| 12:28PM | 24 | Q.  When you started using drugs, you started hanging out |
| 12:28PM | 25 | with other people that were using drugs -- |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

120

| | | |
|---|---|---|
| 12:28PM | 1 | A.  Right. |
| 12:28PM | 2 | Q.  -- fair? |
| 12:28PM | 3 | A.  Yeah. |
| 12:28PM | 4 | Q.  Yeah.  And, so, because of that, you started to pick up |
| 12:28PM | 5 | on things or notice things that you wouldn't have done when |
| 12:28PM | 6 | you were stone-cold sober, right? |
| 12:28PM | 7 | A.  Right. |
| 12:28PM | 8 | Q.  Okay.  And because part of using the drugs was doing them |
| 12:28PM | 9 | in secret, wasn't it? |
| 12:28PM | 10 | A.  Yes. |
| 12:28PM | 11 | Q.  Yeah.  You can't just to it in the open, right? |
| 12:28PM | 12 | A.  Right. |
| 12:28PM | 13 | Q.  If you did it in the open, you would've been fired, |
| 12:28PM | 14 | right? |
| 12:28PM | 15 | A.  Yeah. |
| 12:28PM | 16 | Q.  Yeah.  You're sure of that? |
| 12:28PM | 17 | A.  Pretty sure. |
| 12:28PM | 18 | Q.  Yeah.  Okay.  Now, you talked about heroin use.  Strike |
| 12:28PM | 19 | that. |
| 12:28PM | 20 | You talked about Lortab use, right? |
| 12:28PM | 21 | A.  Yes. |
| 12:28PM | 22 | Q.  K.L. gave you Lortabs, right? |
| 12:28PM | 23 | A.  To begin with, yes. |
| 12:28PM | 24 | Q.  Yeah.  You don't know where she got them from, right? |
| 12:28PM | 25 | A.  Not that -- no, I can't recall. |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

| | | |
|---|---|---|
| 12:28PM | 1 | Q. Okay. And you bought Lortabs on your own, right? |
| 12:29PM | 2 | A. Yes. |
| 12:29PM | 3 | Q. Outside the club, right? |
| 12:29PM | 4 | A. Yeah. |
| 12:29PM | 5 | Q. Bought them from friends? |
| 12:29PM | 6 | A. Yes. |
| 12:29PM | 7 | Q. Bought them from other drug dealers, right? |
| 12:29PM | 8 | A. Right. |
| 12:29PM | 9 | Q. Okay. This is something that you were doing on your own, |
| 12:29PM | 10 | right? |
| 12:29PM | 11 | A. Right. |
| 12:29PM | 12 | Q. Okay. Driving the BMW to a house, buying Lortabs, |
| 12:29PM | 13 | driving back, right? |
| 12:29PM | 14 | A. Right. |
| 12:29PM | 15 | Q. Okay. And same thing with heroin, K.L. introduced you to |
| 12:29PM | 16 | heroin, right? |
| 12:29PM | 17 | A. No, another dancer did. |
| 12:29PM | 18 | Q. Oh, I'm sorry, another dancer introduced you to heroin? |
| 12:29PM | 19 | A. Yes. |
| 12:29PM | 20 | Q. Right. Peter Gerace never gave you heroin? |
| 12:29PM | 21 | A. No. |
| 12:29PM | 22 | Q. You've never seen Peter Gerace do heroin? |
| 12:29PM | 23 | A. No. |
| 12:29PM | 24 | Q. No. Okay. Now, at the time of that 2009 arrest that |
| 12:29PM | 25 | we're talking about, you were addicted to heroin, right? |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

122

| | | |
|---|---|---|
| 12:29PM | 1 | A.  Yes. |
| 12:29PM | 2 | Q.  That night you had done heroin, correct? |
| 12:29PM | 3 | A.  I believe so, yes. |
| 12:29PM | 4 | Q.  Okay.  And you had gotten that from a house on the West |
| 12:29PM | 5 | Side, correct? |
| 12:29PM | 6 | A.  Sounds right. |
| 12:29PM | 7 | Q.  Yeah.  You -- you didn't get that heroin from Pharaoh's, |
| 12:29PM | 8 | right? |
| 12:29PM | 9 | A.  No. |
| 12:29PM | 10 | Q.  No.  You wouldn't -- you've never got heroin from |
| 12:29PM | 11 | Pharaoh's? |
| 12:29PM | 12 | A.  No. |
| 12:30PM | 13 | Q.  Okay.  So even with all of the drug use that's going on, |
| 12:30PM | 14 | you have to go outside the club to get the heroin, right? |
| 12:30PM | 15 | A.  Right. |
| 12:30PM | 16 | Q.  And you chose to use heroin? |
| 12:30PM | 17 | A.  Yes. |
| 12:30PM | 18 | Q.  Yeah.  Okay.  Now, the whole time that you're using |
| 12:30PM | 19 | drugs, the whole time that you're -- you're working through |
| 12:30PM | 20 | this addiction, you're continuing to work at Pharaoh's |
| 12:30PM | 21 | because you wanted the money, fair? |
| 12:30PM | 22 | A.  Yes. |
| 12:30PM | 23 | Q.  Right.  And when you were working at Pharaoh's, we |
| 12:30PM | 24 | already talked about it, but from all perspectives, the vibe |
| 12:30PM | 25 | that you're putting out is I'm enthusiastic to be here, I'm |

| | | |
|---|---|---|
| 12:30PM | 1 | enthusiastic to do what I'm doing, fair? |
| 12:30PM | 2 | A.  Sure. |
| 12:30PM | 3 | Q.  Right.  You're not coming in standoffish, right?  Even |
| 12:30PM | 4 | when you're addicted, you're still trying to make money, and |
| 12:30PM | 5 | so the signals that you're giving to people is I'm doing this |
| 12:30PM | 6 | because I want to do this, right? |
| 12:30PM | 7 | A.  Sure. |
| 12:30PM | 8 | Q.  Yeah.  That was an important part of the signalling, |
| 12:30PM | 9 | correct? |
| 12:31PM | 10 | A.  Right. |
| 12:31PM | 11 | Q.  Right.  If you're not doing that, you're not going to |
| 12:31PM | 12 | make money, right? |
| 12:31PM | 13 | A.  Right. |
| 12:31PM | 14 | Q.  Yeah, and then you're going to have to go do something |
| 12:31PM | 15 | else or work at some other club, right? |
| 12:31PM | 16 | A.  Right. |
| 12:31PM | 17 | Q.  Right.  And by the way, on that point, after you left |
| 12:31PM | 18 | Pharaoh's, you didn't struggle to find another job dancing, |
| 12:31PM | 19 | right? |
| 12:31PM | 20 | A.  No, I went back to Rick's. |
| 12:31PM | 21 | Q.  You went back to where you had been before? |
| 12:31PM | 22 | A.  For two months I think, and then I stopped dancing |
| 12:31PM | 23 | altogether. |
| 12:31PM | 24 | Q.  Okay.  But you didn't struggle to get the job, right? |
| 12:31PM | 25 | A.  No. |

12:31PM  1    Q.  Okay.  I want to talk to you now about the incident that

12:31PM  2    we talked about upstairs.

12:31PM  3         Excuse me just for a second here.  Sorry about that.

12:32PM  4         Now, there came a time when you engaged in sex for money,

12:32PM  5    correct?

12:32PM  6    A.  Yes.

12:32PM  7    Q.  Yeah, and we talked about that.  And your recollection is

12:32PM  8    Mr. Gerace asked you to take care of his friend, correct?

12:32PM  9    A.  Right.

12:32PM  10   Q.  You interpreted that as sex for money, correct?

12:32PM  11   A.  Yes.

12:32PM  12   Q.  All right.  And there's one thing that -- that I notice,

12:32PM  13   you testified this morning that you believe that Mr. Gerace

12:32PM  14   gave you the money after the sex act; is that -- am I

12:32PM  15   recalling that correctly?

12:32PM  16   A.  Yes.

12:32PM  17   Q.  Okay.  In the grand jury you testified differently, isn't

12:32PM  18   that, correct?

12:32PM  19   A.  Yes.

12:32PM  20   Q.  Okay.

12:32PM  21   A.  I don't -- I actually don't know.

12:32PM  22   Q.  Okay.  Well, if I showed you your grand jury testimony

12:32PM  23   would that refresh your recollection?

12:32PM  24   A.  Yeah, it could.

12:32PM  25            MR. SOEHNLEIN:  Could we -- could we put up her grand

12:32PM   1   jury testimony, page 19 please, just for her.

12:32PM   2          **MS. CHAMPOUX:**  35?

12:32PM   3          **MR. SOEHNLEIN:**  35 --

12:32PM   4          **MR. COOPER:**  3565A as in apple.  It's page 19.

12:33PM   5          **MR. SOEHNLEIN:**  Just for her, please.

12:33PM   6          **BY MR. SOEHNLEIN:**

12:33PM   7   Q.  So if you want to start, start at line 8 there on that

12:33PM   8   page, just read that until maybe the bottom of the page and

12:33PM   9   let us know when you finish.

12:33PM  10   A.  Okay.  You want me to read it out loud?

12:33PM  11   Q.  No, no, I don't.  I want you to just read it to yourself,

12:33PM  12   I'm sorry.

12:33PM  13   A.  Oh, all right.  Okay.

12:33PM  14   Q.  Okay.  You're finished reading?

12:33PM  15   A.  Yeah.

12:33PM  16          **MR. SOEHNLEIN:**  All right.  We can take that down,

12:33PM  17   thank you.

12:33PM  18          **BY MR. SOEHNLEIN:**

12:33PM  19   Q.  Okay.  So, so Mr. Gerace asks you to entertain his

12:33PM  20   friend's friend, right?

12:33PM  21   A.  Right.

12:34PM  22   Q.  And he gave you $200, right?

12:34PM  23   A.  He gave me $200, yes.

12:34PM  24   Q.  Okay.  And then you went, and you interpreted that as to

12:34PM  25   have sex, and you went and had sex in the bathroom, correct?

| | | |
|---|---|---|
| 12:34PM | 1 | A.  Right. |
| 12:34PM | 2 | Q.  Okay.  Now, you were using drugs pretty heavily that |
| 12:34PM | 3 | night, correct? |
| 12:34PM | 4 | A.  Yeah. |
| 12:34PM | 5 | Q.  All right.  Safe to say that your decisionmaking wasn't |
| 12:34PM | 6 | straightforward, correct? |
| 12:34PM | 7 | A.  Yeah.  Correct. |
| 12:34PM | 8 | Q.  Yeah.  You make bad decisions when you're using drugs, |
| 12:34PM | 9 | correct? |
| 12:34PM | 10 | A.  Correct. |
| 12:34PM | 11 | Q.  Okay.  And -- and by the same token, and I think we just |
| 12:34PM | 12 | saw, your recollection of that night is pretty fuzzy, |
| 12:34PM | 13 | correct? |
| 12:34PM | 14 | A.  Yeah, it was a long time ago, but, right. |
| 12:34PM | 15 | Q.  Long time ago, and you were using drugs, right? |
| 12:34PM | 16 | A.  Right. |
| 12:34PM | 17 | Q.  And drinks affect your perception, correct? |
| 12:34PM | 18 | A.  Right. |
| 12:34PM | 19 | Q.  It affects your memory? |
| 12:34PM | 20 | A.  It can, yes. |
| 12:34PM | 21 | Q.  Right.  What was your average drug use per day at that |
| 12:34PM | 22 | point in time? |
| 12:34PM | 23 | A.  That, I can't recall.  It was just a substantial amount. |
| 12:34PM | 24 | Q.  Okay. |
| 12:34PM | 25 | A.  My habit as we were discussing was about $300 a day. |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

12:34PM    1    Q.  Yeah, yeah.  All day, every day, right?

12:34PM    2    A.  Right.

12:34PM    3    Q.  Inside the club, outside the club?

12:35PM    4    A.  Right.

12:35PM    5    Q.  Right.  Wake up, you're doing drugs at your house, right?

12:35PM    6    A.  Right.

12:35PM    7    Q.  Doing drugs at K.L.'s house, right?

12:35PM    8    A.  Right.

12:35PM    9    Q.  Doing drugs in the car, right?

12:35PM    10   A.  Right.

12:35PM    11   Q.  Right?

12:35PM    12   A.  Yep.

12:35PM    13   Q.  All over the place.  All right.

12:35PM    14       Now, you -- when -- when you had that conversation with

12:35PM    15   Mr. Gerace, you didn't tell him no, I don't want to do that,

12:35PM    16   correct?

12:35PM    17   A.  Right.

12:35PM    18   Q.  And we talked about your signalling, your messaging,

12:35PM    19   right, at that point in time, was to be enthusiastic and

12:35PM    20   engaging, correct?

12:35PM    21   A.  Sure.

12:35PM    22   Q.  Okay.  And it's your understanding that everybody in

12:35PM    23   Pharaoh's would have perceived that, correct?

12:35PM    24   A.  I guess so, yeah.

12:35PM    25   Q.  Yeah.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

128

12:35PM    1    A.  Sure.

12:35PM    2    Q.  Okay.  And, so, you went and you did that.  And you

12:35PM    3    didn't say anything to him about it afterwards, correct?

12:35PM    4    A.  Right.

12:35PM    5    Q.  No follow-up conversation with Mr. Gerace, right?

12:35PM    6    A.  Right.

12:35PM    7    Q.  And you shared the entirety of the conversation that you

12:35PM    8    had with Mr. Gerace with us here today, correct?

12:35PM    9    A.  Sure.

12:35PM   10    Q.  And so he says, hey, will you entertain my friend?

12:36PM   11        You take it to mean sex for money.  And you go and you

12:36PM   12    have sex with the kid, right?

12:36PM   13    A.  Right.

12:36PM   14    Q.  Fair.  Now, following that, you also had further sex acts

12:36PM   15    with that gentlemen outside the club, correct?

12:36PM   16    A.  Right.

12:36PM   17    Q.  Okay.  And at that point in time, he -- he's calling you

12:36PM   18    on your own, one to one, right?

12:36PM   19    A.  Right.

12:36PM   20    Q.  Right.  He's not involving Mr. Gerace, right?

12:36PM   21    A.  No.

12:36PM   22    Q.  And he's setting up the place with you, right?

12:36PM   23    A.  Yes.  Yep.

12:36PM   24    Q.  The time?

12:36PM   25    A.  Yep.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

12:36PM  1    Q.  You negotiate how much money it's gonna be?

12:36PM  2    A.  Right.

12:36PM  3    Q.  You negotiate what the act is gonna be?

12:36PM  4    A.  Right.

12:36PM  5    Q.  Okay.  And -- and you never told him no, no, no, I don't

12:36PM  6    want to do that, right?

12:36PM  7    A.  Right.

12:36PM  8    Q.  You never shared any of that money with Mr. Gerace?

12:36PM  9    A.  No.

12:36PM  10   Q.  And, in fact, you never told Mr. Gerace about that?

12:36PM  11   A.  No.

12:36PM  12   Q.  Right.  In fact, you hid it from him, right?

12:36PM  13   A.  It wasn't hiding it, I just didn't talk to him.

12:36PM  14   Q.  Yeah.  He would have had no way of knowing you were doing

12:36PM  15   that, right?

12:36PM  16   A.  Exactly.

12:36PM  17   Q.  Okay.  Because this was something you were doing

12:37PM  18   completely on your own, right?

12:37PM  19   A.  Right.

12:37PM  20   Q.  Right.  This is -- this is -- you're deciding to continue

12:37PM  21   a prostitution relationship with this guy outside the club on

12:37PM  22   your own, correct?

12:37PM  23   A.  Right.

12:37PM  24   Q.  Your choice, right?

12:37PM  25   A.  Right.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

130

| | | |
|---|---|---|
| 12:37PM | 1 | Q.  Right?  You chose the place, right? |
| 12:37PM | 2 | A.  Right. |
| 12:37PM | 3 | Q.  You chose how much? |
| 12:37PM | 4 | A.  Right. |
| 12:37PM | 5 | Q.  Right?  You chose the acts, correct? |
| 12:37PM | 6 | A.  Right. |
| 12:37PM | 7 | Q.  You could have said no to the acts if you wanted to, |
| 12:37PM | 8 | right? |
| 12:37PM | 9 | A.  Sure. |
| 12:37PM | 10 | Q.  But that wasn't what you wanted to do at that time in |
| 12:37PM | 11 | your life, right? |
| 12:37PM | 12 | A.  I needed the money. |
| 12:37PM | 13 | Q.  Yeah, yeah.  And how many times do you think you did that |
| 12:37PM | 14 | with that other gentleman? |
| 12:37PM | 15 | A.  Just a few. |
| 12:37PM | 16 | Q.  Okay.  More than two? |
| 12:37PM | 17 | A.  Maybe about two or three. |
| 12:37PM | 18 | Q.  Okay.  And he would contact you directly, right? |
| 12:37PM | 19 | A.  Right. |
| 12:37PM | 20 | Q.  Didn't involve Mr. Gerace? |
| 12:37PM | 21 | A.  Right. |
| 12:37PM | 22 | Q.  As far as you know, Mr. Gerace had no idea it was going |
| 12:37PM | 23 | on? |
| 12:37PM | 24 | A.  Right. |
| 12:38PM | 25 | Q.  Okay.  Now, one thing I meant to circle back to.  When |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24
131

| | | |
|---|---|---|
| 12:38PM | 1 | you recall that period of time where you were working at |
| 12:38PM | 2 | Pharaoh's, you hadn't met K.L. yet, right? |
| 12:38PM | 3 | A.  Right. |
| 12:38PM | 4 | Q.  Meeting K.L. is kind of a turning point for you, right? |
| 12:38PM | 5 | A.  Yes. |
| 12:38PM | 6 | Q.  K.L. is sort of the onramp to drug use again, right? |
| 12:38PM | 7 | A.  Yeah. |
| 12:38PM | 8 | Q.  Yeah, K.L. -- K.L. -- K.L. helped you engage in a lot of |
| 12:38PM | 9 | poor decisionmaking, right? |
| 12:38PM | 10 | A.  Yeah. |
| 12:38PM | 11 | Q.  Yeah.  The relationship with K.L. was pretty damaging to |
| 12:38PM | 12 | you, correct? |
| 12:38PM | 13 | A.  Yes. |
| 12:38PM | 14 | Q.  Yeah.  She -- she -- she wasn't a really good friend to |
| 12:38PM | 15 | you? |
| 12:38PM | 16 | A.  Well, at the time I thought she was a good friend, but I |
| 12:38PM | 17 | guess not, no. |
| 12:38PM | 18 | Q.  Yeah, you don't believe that now, she was not, no. |
| 12:38PM | 19 | A.  No. |
| 12:38PM | 20 | Q.  Okay.  Now, at that point in time, you mentioned that |
| 12:38PM | 21 | even though you were sober, you were still drinking from time |
| 12:38PM | 22 | to time, correct? |
| 12:38PM | 23 | A.  Yes. |
| 12:38PM | 24 | Q.  Okay.  And you called these slip-ups, right? |
| 12:38PM | 25 | A.  Yes. |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

132

12:38PM    1    Q.  Okay.  You were drinking, and you weren't proud of these

12:39PM    2    slip-ups at the time I assume, right?

12:39PM    3    A.  No.

12:39PM    4    Q.  Okay.  And there came a time after each slip-up where you

12:39PM    5    thought to yourself, oh, my gosh, I don't want to do that, I

12:39PM    6    don't want to go down that road, right?  Okay.  You continued

12:39PM    7    to work at Pharaoh's, right?

12:39PM    8    A.  Right.

12:39PM    9    Q.  Which is a bar, right?

12:39PM    10   A.  Right.

12:39PM    11   Q.  Which is a place where customers will buy you drinks,

12:39PM    12   right?

12:39PM    13   A.  Right.

12:39PM    14   Q.  Right.  You've had a customer offer to buy you a drink?

12:39PM    15   A.  Sure.

12:39PM    16   Q.  More than ten times, I bet?

12:39PM    17   A.  Right.

12:39PM    18   Q.  More than 100 times, I bet?

12:39PM    19   A.  Right.

12:39PM    20   Q.  That's a very, very common practice, right?

12:39PM    21   A.  Right.

12:39PM    22   Q.  Okay.  I want to talk to you about that, the night of

12:39PM    23   that Amherst arrest.

12:39PM    24       You said that -- I think we already established that you

12:39PM    25   were high on heroin that night, right?

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

133

12:39PM   1   A.   I believe so, yes.

12:39PM   2   Q.   Okay.  And you just bought heroin from the West Side,

12:39PM   3   right?

12:39PM   4   A.   Yes.

12:39PM   5   Q.   And you had gone down to Chippewa Street which is only a

12:39PM   6   half a block from here, and you had met some guys and you

12:39PM   7   were gonna party with them, correct?

12:39PM   8   A.   Right.

12:40PM   9   Q.   And you're driving, you're in the BMW?

12:40PM   10  A.   Right.

12:40PM   11  Q.   But K.L.'s driving?

12:40PM   12  A.   Right.

12:40PM   13  Q.   Okay.  And you're zipping off out of to Amherst when you

12:40PM   14  get pulled over, right?

12:40PM   15  A.   Right.

12:40PM   16  Q.   And you get pulled over with heroin, right?

12:40PM   17  A.   Right.

12:40PM   18  Q.   Which is pretty serious, right?

12:40PM   19  A.   Right.

12:40PM   20  Q.   It would have been the most trouble that you had been

12:40PM   21  involved in at any point in your life up until then?

12:40PM   22  A.   No.  The DWIs were -- I got in trouble for the DWIs.

12:40PM   23  That was pretty serious.

12:40PM   24  Q.   Okay.  It's still pretty serious trouble?

12:40PM   25  A.   Yes.  Yeah, very serious.

USA v Gerace - G.R. - Soehlein/Cross - 11/13/24

134

12:40PM   1   Q.  Yeah, very serious.  And -- and so, when you have an

12:40PM   2   opportunity to speak with law enforcement, you told them what

12:40PM   3   you knew about Mr. Gerace right away, right?

12:40PM   4   A.  Yes.  They asked me some questions, I answered, yes.

12:40PM   5   Q.  There was no filter on what you were sharing with them,

12:40PM   6   right?

12:40PM   7   A.  Correct.

12:40PM   8   Q.  Because you understood it would have been a crime to lie

12:40PM   9   to the FBI, right?

12:40PM   10  A.  Yes.

12:40PM   11  Q.  Yeah.  And federal law enforcement, right?

12:40PM   12  A.  Right.

12:40PM   13  Q.  And they were there, right?

12:40PM   14  A.  Right.

12:40PM   15  Q.  And it didn't take them long to get there, did it?

12:40PM   16  A.  No.

12:40PM   17  Q.  Yeah.  They found out that you had information about

12:41PM   18  Gerace, right?

12:41PM   19  A.  Yes.

12:41PM   20  Q.  Yeah.  And then they were there to hear the information

12:41PM   21  almost immediately, right?

12:41PM   22  A.  I think so, yeah.

12:41PM   23  Q.  Yeah.  Now, you weren't afraid of sharing information

12:41PM   24  about Peter?

12:41PM   25  A.  No.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

135

12:41PM  1   Q.  No.  You shared everything you knew immediately to get

12:41PM  2   yourself out of trouble, right?  Or to try to?

12:41PM  3   A.  Right.  As they were asking questions, I answered them,

12:41PM  4   correct, thinking that I would get out of trouble, correct.

12:41PM  5   Q.  Yeah.  Yeah.  There was no apprehension about, oh, you

12:41PM  6   know, I -- I -- I want to protect Peter, nothing like that?

12:41PM  7   A.  No.

12:41PM  8   Q.  You didn't want to protect Mr. Gerace?

12:41PM  9   A.  No.

12:41PM  10  Q.  You didn't want to protect Pharaoh's?

12:41PM  11  A.  No.

12:41PM  12  Q.  No.  And -- and you -- you strike that.

12:41PM  13      So, you shared with them all the information that you

12:41PM  14  had, right?

12:41PM  15  A.  Right.

12:41PM  16  Q.  Okay.  And I want to talk to you a little bit now about

12:42PM  17  the VIP area, and you shared a time about in the VIP Room

12:42PM  18  that you recall with a dancer name Joy; do you recall that?

12:42PM  19  A.  Yeah.

12:42PM  20  Q.  Okay.  When you first met with law enforcement here you

12:42PM  21  didn't recall that instance, right?

12:42PM  22  A.  No.

12:42PM  23  Q.  No.  You only recalled it like recently within the last

12:42PM  24  month, right?

12:42PM  25  A.  Yeah.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

12:42PM    1    Q.  So -- so, you met with the U.S. Attorney's Office for the

12:42PM    2    first time I think in 2020; is that right?

12:42PM    3    A.  Sounds right.

12:42PM    4    Q.  Right.  And they -- they -- they got your name because of

12:42PM    5    the 2009 arrest, correct?

12:42PM    6    A.  Correct.

12:42PM    7        **MR. COOPER:**  Objection as to how we got her name.

12:42PM    8    How would she know that?

12:42PM    9        **THE COURT:**  I would like her understanding of it, so

12:42PM   10    overruled.

12:42PM   11        **BY MR. SOEHNLEIN:**

12:42PM   12    Q.  Okay.  Do you have an understanding of how they came to

12:42PM   13    know?

12:42PM   14    A.  That would be my understanding.

12:42PM   15    Q.  Yeah.  Yeah.

12:42PM   16    A.  Yeah.

12:42PM   17    Q.  Because, because they -- they, well, strike that.

12:42PM   18        Now, so you first met with them in 2020, right?

12:42PM   19    A.  Right.

12:43PM   20    Q.  And you didn't share this story about Joy in the VIP Room

12:43PM   21    then, right?

12:43PM   22    A.  Right.

12:43PM   23    Q.  And you went into the grand jury and you testified and

12:43PM   24    you didn't share it there either?

12:43PM   25    A.  Right.

12:43PM    1    Q.  Okay.  And you just recalled it within the last month,

12:43PM    2    right?

12:43PM    3    A.  About that, yeah.

12:43PM    4    Q.  Yeah, okay.  Now, that event, when you're witnessing Joy

12:43PM    5    and the other man, did Joy appear like she was being forced

12:43PM    6    in any way?

12:43PM    7    A.  No.

12:43PM    8    Q.  She was being threatened?

12:43PM    9    A.  No.

12:43PM   10    Q.  No?  It looked like that was something that she wanted to

12:43PM   11    do at the time, correct?

12:43PM   12    A.  Yeah.

12:43PM   13    Q.  And I think that you said that you believed that that the

12:43PM   14    customer and Joy may have had a relationship outside of the

12:43PM   15    club, right?

12:43PM   16    A.  Yes.

12:43PM   17    Q.  Right?  It was your understanding that they were like

12:43PM   18    boyfriend and girlfriend, right?

12:43PM   19    A.  Or something.  No, she was a lesbian, so, no.  Sorry.

12:43PM   20    No.  They weren't dating.  But they had some kind of

12:43PM   21    relationship, yes.

12:43PM   22    Q.  Okay.  That -- and that was your understanding based on

12:43PM   23    what you were perceiving, right?

12:43PM   24    A.  Right.

12:43PM   25    Q.  Okay.  So this was not just a random patron, right?

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

138

| | | |
|---|---|---|
| 12:43PM | 1 | A.  Right. |
| 12:43PM | 2 | Q.  It was a patron that she knew? |
| 12:44PM | 3 | A.  Customer. |
| 12:44PM | 4 | Q.  A customer that she knew, yeah. |
| 12:44PM | 5 | A.  Yes. |
| 12:44PM | 6 | Q.  Do you call them customers or patrons?  Customers? |
| 12:44PM | 7 | A.  Patrons sounds classier, but customers. |
| 12:44PM | 8 | Q.  Okay.  We'll go with customers.  We're going try and |
| 12:44PM | 9 | strike that balance at some point in this trial. |
| 12:44PM | 10 | A.  Okay. |
| 12:44PM | 11 | Q.  Okay.  And you never reported what you saw in the VIP |
| 12:44PM | 12 | Room, correct? |
| 12:44PM | 13 | A.  No. |
| 12:44PM | 14 | Q.  You never told the VIP attendant, right? |
| 12:44PM | 15 | A.  No. |
| 12:44PM | 16 | Q.  And that's because in your head, this is what she wanted |
| 12:44PM | 17 | to do, right? |
| 12:44PM | 18 | A.  Right. |
| 12:44PM | 19 | Q.  That she -- she didn't find it objectionable, so you |
| 12:44PM | 20 | really didn't care, right? |
| 12:44PM | 21 | A.  Right. |
| 12:44PM | 22 | Q.  Okay.  You weren't thinking about the rules of the club |
| 12:44PM | 23 | at that point in time, right? |
| 12:44PM | 24 | A.  Correct. |
| 12:44PM | 25 | Q.  Correct.  You weren't consulting the rule book, right? |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

139

| | | |
|---|---|---|
| 12:44PM | 1 | A.  No. |
| 12:44PM | 2 | Q.  Okay.  Now, one other question -- now one other line of |
| 12:44PM | 3 | questions, there was some testimony about K.L. at a hotel and |
| 12:44PM | 4 | Mr. Gerace called you in the early-morning hours; do you |
| 12:44PM | 5 | recall that testimony? |
| 12:44PM | 6 | A.  Yes. |
| 12:44PM | 7 | Q.  Now this wasn't the first time she had an adverse |
| 12:45PM | 8 | reaction to using drugs, correct? |
| 12:45PM | 9 | A.  Right, she had them frequently. |
| 12:45PM | 10 | Q.  Yeah. |
| 12:45PM | 11 | A.  She had epilepsy. |
| 12:45PM | 12 | Q.  Yeah, and you had been in nursing school, right? |
| 12:45PM | 13 | A.  For a year, yes. |
| 12:45PM | 14 | Q.  Okay, yeah.  And, so, when you heard that -- that she had |
| 12:45PM | 15 | had this drug reaction, it didn't surprise you, right? |
| 12:45PM | 16 | A.  Right. |
| 12:45PM | 17 | Q.  You knew that she would be okay, right? |
| 12:45PM | 18 | A.  Based on what happened before, yes. |
| 12:45PM | 19 | Q.  Yes.  And also you and K.L. didn't want to get in |
| 12:45PM | 20 | trouble, right? |
| 12:45PM | 21 | A.  Well, I wasn't with her at the time, but you mean when |
| 12:45PM | 22 | she had them with me, is that what you're asking? |
| 12:45PM | 23 | Q.  Well, let me ask you this.  You knew K.L., right? |
| 12:45PM | 24 | A.  Yes. |
| 12:45PM | 25 | Q.  You guys were friends, right? |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

140

| 12:45PM | 1 | A.  Right. |

12:45PM   2   Q.  Very close friends at that point in time, right?

12:45PM   3   A.  Yes.

12:45PM   4   Q.  You had an understanding of her drug use, correct?

12:45PM   5   A.  Yes.

12:45PM   6   Q.  You had an understand that she liked to use drugs, right?

12:45PM   7   A.  Yes.

12:45PM   8   Q.  You had an understanding that she didn't want to get in

12:45PM   9   trouble for using drugs, correct?

12:45PM   10   A.  Correct.

12:45PM   11   Q.  And you understood that if -- if an ambulance or law

12:45PM   12   enforcement would have been called to that hotel, then

12:45PM   13   there's a good possibility that she would've gotten in

12:45PM   14   trouble, correct?

12:45PM   15   A.  Correct.

12:45PM   16   Q.  She didn't want to get in trouble, did she?

12:45PM   17   A.  No.

12:45PM   18   Q.  Okay.  And, so, it didn't surprise you when Mr. Gerace

12:45PM   19   asked you to come to the hotel, correct?

12:46PM   20   A.  No.

12:46PM   21   Q.  You knew that K.L. would be okay?

12:46PM   22   A.  Yeah.

12:46PM   23   Q.  Okay.  Because you had experienced it before?

12:46PM   24   A.  Right.

12:46PM   25   Q.  Right.  It wasn't really a big deal to you then, it was

12:46PM   1   just something that you had to deal with, correct?

12:46PM   2   A.  Well, still scary because I didn't fully understand what

12:46PM   3   was going on until I got there.

12:46PM   4   Q.  Okay.  It was -- it was scary, but it was within the

12:46PM   5   realm of what your experience had been before that, right?

12:46PM   6   A.  Sure.

12:46PM   7   Q.  How many times had K.L. done that before that?

12:46PM   8   A.  Around me, I think like twice before.

12:46PM   9   Q.  Okay.  And you had dealt with it on your own, right?

12:46PM   10  A.  Yes.

12:46PM   11  Q.  You hadn't called an ambulance?

12:46PM   12  A.  No.

12:46PM   13  Q.  You didn't call police?

12:46PM   14  A.  No.

12:46PM   15  Q.  Okay.  All right.

12:46PM   16         MR. SOEHNLEIN:  I think that might be all I have.

12:46PM   17  Can you just give me one second?

12:46PM   18         THE WITNESS:  Sure.

12:46PM   19         MR. SOEHNLEIN:  That's all I have, thank you very

12:46PM   20  much.

12:46PM   21         THE COURT:  Any redirect, Mr. Cooper?

12:46PM   22         MR. COOPER:  Yes, Judge.  How much time do I have?

12:46PM   23         THE COURT:  Well, I want to break at 1 if we can.

12:46PM   24         MR. COOPER:  Okay.  We may need to break while I'm

12:47PM   25  still redirecting, but I'm happy to start.

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

| | | |
|---|---|---|
| 12:47PM | 1 | **REDIRECT EXAMINATION BY MR. COOPER:** |
| 12:47PM | 2 | Q.  On cross-examination, quite a few times Mr. Soehnlein |
| 12:47PM | 3 | asked you about what happened in the upstairs bathroom when |
| 12:47PM | 4 | Peter told you to take care of his friend; do you remember |
| 12:47PM | 5 | that? |
| 12:47PM | 6 | A.  Right. |
| 12:47PM | 7 | Q.  And you went and that person put his penis inside your |
| 12:47PM | 8 | vagina, right? |
| 12:47PM | 9 | A.  Yes. |
| 12:47PM | 10 | Q.  Was there any confusion in the discussion or the -- the |
| 12:47PM | 11 | words that Peter said to you?  Did you interpret them |
| 12:48PM | 12 | clearly? |
| 12:48PM | 13 | A.  I believe so, yes. |
| 12:48PM | 14 | Q.  Okay.  Any confusion in your mind about what he meant |
| 12:48PM | 15 | when he said, go take care of my buddy? |
| 12:48PM | 16 | A.  No. |
| 12:48PM | 17 | Q.  Okay.  So those questions about how you interpreted it, |
| 12:48PM | 18 | was it clear to you? |
| 12:48PM | 19 | A.  Yes. |
| 12:48PM | 20 | Q.  Was it obvious? |
| 12:48PM | 21 | A.  Yeah. |
| 12:48PM | 22 | Q.  Did you think he meant go play Connect 4 with his friend |
| 12:48PM | 23 | in the bathroom? |
| 12:48PM | 24 | A.  No.  No.  I don't think that. |
| 12:48PM | 25 | Q.  Did you think he meant, hey, go talk to him about, you |

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

143

12:48PM   1   know, what your life was like before you came to work here?

12:48PM   2   Is that how you interpreted it?

12:48PM   3   A.  No.

12:48PM   4   Q.  Did the friend seem surprised when you guys went in the

12:48PM   5   bathroom and had sex?

12:48PM   6   A.  No.

12:48PM   7   Q.  He didn't seem shocked, oh, my God, this woman is taking

12:48PM   8   her clothes off.  That didn't happen?

12:48PM   9   A.  No.

12:48PM  10   Q.  There was no confusion, was there?

12:48PM  11   A.  No.

12:48PM  12   Q.  Let's talk about the BMW.  You were asked some questions

12:48PM  13   about the BMW.  Mr. Soehnlein asked you, oh, nice car you're

12:48PM  14   zipping around; you remember those questions?

12:48PM  15   A.  Yes.

12:48PM  16   Q.  Did you ever pay for that at all?

12:48PM  17   A.  No, I didn't.

12:48PM  18   Q.  Was someone else paying for it?

12:48PM  19   A.  Yes.

12:48PM  20   Q.  During that time in your life, were you spending all your

12:49PM  21   money on drugs?

12:49PM  22   A.  Yes.

12:49PM  23   Q.  Did the BMW last?

12:49PM  24   A.  No, it got repossessed.

12:49PM  25   Q.  Okay.  You were asked some questions about the vibe that

| | | |
|---|---|---|
| 12:49PM | 1 | you were putting out, being enthusiastic; do you remember |
| 12:49PM | 2 | those questions? |
| 12:49PM | 3 | A.  Yeah. |
| 12:49PM | 4 | Q.  Okay.  At the time, let's take summer of 2009, as a heavy |
| 12:49PM | 5 | drug addict using opiates and cocaine every single day to get |
| 12:49PM | 6 | through your shifts, would you describe your generic vibe as |
| 12:49PM | 7 | enthusiastic and excited to be at work? |
| 12:49PM | 8 | A.  Not really.  But -- |
| 12:49PM | 9 | Q.  Okay.  And how about this?  When you walked upstairs the |
| 12:49PM | 10 | night Peter gave you $200 to have sex with his friend, did |
| 12:49PM | 11 | you have a sign around your neck that said I want to have sex |
| 12:49PM | 12 | for money? |
| 12:49PM | 13 | A.  No. |
| 12:49PM | 14 | Q.  Were you putting out a vibe that said I'd like for you to |
| 12:49PM | 15 | sell my body to this man I've never met before?  Was that the |
| 12:49PM | 16 | vibe you were putting out? |
| 12:49PM | 17 | A.  No. |
| 12:49PM | 18 | Q.  Towards the end of the cross there, you were asked some |
| 12:50PM | 19 | questions about K.L.'s seizures, specifically the night that |
| 12:50PM | 20 | you went to the hotel to pick her up; do you remember that? |
| 12:50PM | 21 | A.  Yes. |
| 12:50PM | 22 | Q.  Okay.  That was back around 2009, right? |
| 12:50PM | 23 | A.  Right. |
| 12:50PM | 24 | Q.  As you sit here today, do you have a clear memory of |
| 12:50PM | 25 | exactly what words Peter Gerace said to you when he called |

| | | |
|---|---|---|
| 12:50PM | 1 | you on the phone? |
| 12:50PM | 2 | A.  No. |
| 12:50PM | 3 | Q.  Would looking at a statement that you made back in 2020 |
| 12:50PM | 4 | help refresh your memory? |
| 12:50PM | 5 | A.  Yeah.  Sure, it would. |
| 12:50PM | 6 | **MR. COOPER:**  I'm holding 3565G, and I'm on page 3 of |
| 12:50PM | 7 | 4.  May I approach the witness? |
| 12:50PM | 8 | **THE COURT:**  Sure. |
| 12:50PM | 9 | **BY MR. COOPER:** |
| 12:50PM | 10 | Q.  Just read this paragraph to yourself, not out loud. |
| 12:50PM | 11 | A.  Okay. |
| 12:50PM | 12 | Q.  And look back up at me when you're finished. |
| 12:51PM | 13 | A.  All set. |
| 12:51PM | 14 | Q.  Okay. |
| 12:51PM | 15 | **MR. COOPER:**  May I approach? |
| 12:51PM | 16 | **THE COURT:**  You may. |
| 12:51PM | 17 | **MR. COOPER:**  Thanks. |
| 12:51PM | 18 | **BY MR. COOPER:** |
| 12:51PM | 19 | Q.  Would looking at your grand jury testimony when you |
| 12:51PM | 20 | testified back in December of 2020, would that help refresh |
| 12:51PM | 21 | your memory about the details of that night? |
| 12:51PM | 22 | A.  Sure. |
| 12:51PM | 23 | **MR. COOPER:**  I'm holding what's marked for |
| 12:51PM | 24 | identification as 3565A as in apple, and I'm on page 27. |
| 12:51PM | 25 | **BY MR. COOPER:** |

12:52PM  1  Q.  Starting from around here, read to the bottom of this

12:52PM  2  page.

12:52PM  3  A.  Sure.

12:52PM  4  Q.  And then I'll come back and get it when you're done.

12:52PM  5  A.  Yeah.

12:52PM  6  Q.  Okay.

12:52PM  7          **MR. COOPER:**  May I approach?

12:52PM  8          **THE COURT:**  Yes.

12:52PM  9          **MR. COOPER:**  Thank you.

12:52PM  10          **THE WITNESS:**  Here you go.

12:52PM  11          **MR. COOPER:**  Thank you.

12:52PM  12          **BY MR. COOPER:**

12:52PM  13  Q.  Do you recall what Peter said to you when he called you

12:53PM  14  when K.L. was seizing from cocaine use in his hotel room?

12:53PM  15  A.  Yes.  He was -- he wanted me to come pick her up from the

12:53PM  16  hotel room.  And he said -- I'm sorry, you're asking me what

12:53PM  17  he said to me exactly?

12:53PM  18  Q.  Yeah.  What do you recall about what he said to you on

12:53PM  19  the phone first when you --

12:53PM  20  A.  Oh.  Okay.

12:53PM  21  Q.  Okay.

12:53PM  22  A.  I don't remember even rereading that, I'm just telling

12:53PM  23  you what I remember--

12:53PM  24  Q.  Sure.

12:53PM  25  A.  -- from sitting here today.

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

147

| | | |
|---|---|---|
| 12:53PM | 1 | Q.  Yeah, I'm liking it. |
| 12:53PM | 2 | A.  I don't remember exactly.  I just remember he wanted me |
| 12:53PM | 3 | to come and get her out of the hotel room right away. |
| 12:53PM | 4 | Q.  Okay.  When you showed up, what do you recall happening |
| 12:53PM | 5 | when you showed up? |
| 12:53PM | 6 | A.  Went into the hotel room, and K.L. was, like, all |
| 12:53PM | 7 | dishevelled and, like, waking up, like -- like when people |
| 12:53PM | 8 | have, like, those grand mal seizures they're like almost like |
| 12:53PM | 9 | they have amnesia and they're just, like, kind of out of it. |
| 12:53PM | 10 | And that's what I remember about that.  That's how she was. |
| 12:53PM | 11 | Just like she had just had a seizure. |
| 12:54PM | 12 | Q.  Do you recall Peter Gerace telling you that he didn't |
| 12:54PM | 13 | want K.L. to die in the hotel room, but he wouldn't call 911? |
| 12:54PM | 14 | A.  Yes, I do. |
| 12:54PM | 15 | Q.  This defendant said those words to you? |
| 12:54PM | 16 | A.  Yes. |
| 12:54PM | 17 | Q.  So when Mr. Soehnlein was asking you about whether, you |
| 12:54PM | 18 | know, you had seen this happen before, do you -- did you know |
| 12:54PM | 19 | at the time whether she was gonna be okay or not?  Did you |
| 12:54PM | 20 | know that? |
| 12:54PM | 21 | A.  No.  Because I didn't know what they were doing in the |
| 12:54PM | 22 | ho -- like, I didn't know what drugs they were using and |
| 12:54PM | 23 | stuff, so I didn't exactly know.  But I had seen it happen |
| 12:54PM | 24 | before, and she was okay.  But I didn't know everything, all |
| 12:54PM | 25 | the details, no. |

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

148

| | | |
|---|---|---|
| 12:54PM | 1 | Q.  And it turns out that she was okay, right? |
| 12:54PM | 2 | A.  Yeah. |
| 12:54PM | 3 | Q.  That's what happened. |
| 12:54PM | 4 | A.  She was fine, yeah. |
| 12:54PM | 5 | Q.  But the defendant said to you, I don't want her to die in |
| 12:54PM | 6 | here, right? |
| 12:54PM | 7 | A.  Right. |
| 12:54PM | 8 | Q.  Those were his words? |
| 12:54PM | 9 | A.  Right. |
| 12:54PM | 10 | Q.  Okay.  But he didn't call an ambulance did he? |
| 12:54PM | 11 | A.  No. |
| 12:54PM | 12 | Q.  A couple of times during cross-examination you were asked |
| 12:55PM | 13 | questions about whether you -- the choices that you made; do |
| 12:55PM | 14 | you remember being asked those questions? |
| 12:55PM | 15 | A.  Yes. |
| 12:55PM | 16 | Q.  Okay.  You've been clean and sober about 13 years now, |
| 12:55PM | 17 | correct? |
| 12:55PM | 18 | A.  Yeah. |
| 12:55PM | 19 | Q.  Is your ability to make choices today different than what |
| 12:55PM | 20 | your ability was like to make choices in the summer of 2009? |
| 12:55PM | 21 | A.  Yes. |
| 12:55PM | 22 | Q.  Okay.  When you're deep in the throes of addiction that |
| 12:55PM | 23 | you spent a long time describing to this jury, is it |
| 12:55PM | 24 | different in your brain, like, how your brain perceives |
| 12:56PM | 25 | choices that are presented to you? |

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

149

12:56PM    1    A.   Yes.

12:56PM    2    Q.   Okay.  Are you driven and motivated by that addiction?

12:56PM    3    A.   Today, no.

12:56PM    4    Q.   No, I'm sorry, back then in 2009?

12:56PM    5    A.   Yes.

12:56PM    6    Q.   In the summer?

12:56PM    7    A.   Yes.

12:56PM    8    Q.   Okay.  When the defendant told you that he'd give you

12:56PM    9    $200 to take care of his buddy, and you went in the bathroom

12:56PM   10    and had sex with that man, was that a decision that was

12:56PM   11    driven by the fact that you were heavily addicted to drugs

12:56PM   12    and needed that money?

12:56PM   13    A.   Yes.  I did need that money.

12:56PM   14    Q.   If someone asked you today, hey, go have sex with someone

12:57PM   15    in that back room over there on the side of the courtroom for

12:57PM   16    $200, would you do it?

12:57PM   17    A.   No.

12:57PM   18    Q.   You were asked on cross-examination about whether you

12:57PM   19    continued to see that individual afterwards and have sex for

12:57PM   20    money; do you remember that question?

12:57PM   21    A.   Yes.

12:57PM   22    Q.   Can you explain to the jury, did it become easier to do

12:57PM   23    that after the defendant had already put you up to it once?

12:57PM   24    A.   Yeah.

12:57PM   25    Q.   Can you explain that to them?  What do you mean by that?

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

150

12:57PM   1   A.  When you're, like, an addict I guess or an alcoholic,

12:57PM   2   like, I would set these invisible bars for myself saying,

12:58PM   3   like, if I'm, like, for example, I'll never drink in the

12:58PM   4   morning, or I'll never have sex for money.  And when you're

12:58PM   5   addicted those bars become lowered or nonexistent.

12:58PM   6       And that's exactly what happened after this incident.  It

12:58PM   7   was just easier to do that again, to have sex for money.  And

12:58PM   8   it was like a new way to earn money so I could buy drugs.  I

12:58PM   9   don't know.

12:58PM   10  Q.  Who introduced you to that?

12:58PM   11  A.  Pardon me?

12:58PM   12  Q.  Who made that a new way for you to earn money?  Who

12:58PM   13  brought this into your life?

12:58PM   14  A.  Well, it was that incident upstairs.  I mean, that was --

12:58PM   15  that was how it first happened.  So, Peter, I guess, or K.L..

12:58PM   16  I don't know.

12:58PM   17  Q.  Who -- well, who said go take care of my buddy?  Peter or

12:58PM   18  K.L.?

12:58PM   19  A.  Peter.

12:58PM   20  Q.  Okay.  Who gave you $200?

12:59PM   21  A.  Peter.

12:59PM   22  Q.  You were asked on cross-examination about whether your

12:59PM   23  memory was fuzzy on that night; do you remember being asked

12:59PM   24  that?

12:59PM   25  A.  Yes.

| | | |
|---|---|---|
| 12:59PM | 1 | Q.  Okay.  You provided the jury with some details, right? |
| 12:59PM | 2 | A.  Right. |
| 12:59PM | 3 | Q.  Okay.  Did you make any of those details up? |
| 12:59PM | 4 | A.  No. |
| 12:59PM | 5 | Q.  Do you recall those details happening? |
| 12:59PM | 6 | A.  Yes. |
| 12:59PM | 7 | Q.  Is that fuzzy at all? |
| 12:59PM | 8 | A.  No. |
| 12:59PM | 9 | Q.  Okay.  Was it a pretty -- is it a pretty, like, iconic |
| 12:59PM | 10 | event in your memory, the first time that you had sex in |
| 12:59PM | 11 | exchange for money? |
| 12:59PM | 12 | A.  Yeah. |
| 12:59PM | 13 | Q.  It stands out in your mind? |
| 12:59PM | 14 | A.  Sure. |
| 12:59PM | 15 | Q.  Have you heard the term "nodding out" before? |
| 12:59PM | 16 | A.  Yes. |
| 12:59PM | 17 | Q.  Do you know what that means? |
| 12:59PM | 18 | **MR. SOEHNLEIN:**  Objection, Your Honor.  This is |
| 12:59PM | 19 | beyond the scope of direct. |
| 01:00PM | 20 | **MR. COOPER:**  This is not beyond the scope of direct. |
| 01:00PM | 21 | There were questions about whether Mr. Gerace knew that she |
| 01:00PM | 22 | was using certain drugs, and I'm going to probe that now. |
| 01:00PM | 23 | **THE COURT:**  Okay, overruled. |
| 01:00PM | 24 | **THE WITNESS:**  Yes. |
| 01:00PM | 25 | **BY MR. COOPER:** |

01:00PM   1   Q.  What's it mean to nod out?

01:00PM   2   A.  To close your eyes and, like, pass out while you're still

01:00PM   3   sitting up almost.

01:00PM   4   Q.  Okay.  And is that something that happens when people use

01:00PM   5   opiates heavily?

01:00PM   6   A.  Yes.

01:00PM   7   Q.  Do you see that happen with people at Pharaoh's?

01:00PM   8   A.  It happened to me.

01:00PM   9   Q.  Describe that for the jury.

01:00PM  10   A.  Well, when I became heroin addicted, there were times

01:00PM  11   where I would be nodding out at work.  Or, you know, I'd be

01:00PM  12   in and out of, like, consciousness, but you're still like

01:00PM  13   sitting up.  Your eyes would close, you'd sway back and

01:00PM  14   forth, almost look like you're drunk.  That's how it was.

01:00PM  15   Q.  Is that a result of opiate use?

01:00PM  16   A.  Yes.

01:00PM  17   Q.  You said it would happen to you at work.  Did it happen

01:00PM  18   once or more than once?

01:00PM  19   A.  A couple of times.

01:00PM  20   Q.  You were asked questions about the fact that K.L. was a

01:01PM  21   bad influence on you; you remember being asked those

01:01PM  22   questions?

01:01PM  23   A.  Right.

01:01PM  24   Q.  Okay.  Did K.L. ever tell you I'll give you $200 to go

01:01PM  25   have sex with my friend?

01:01PM  1    A.  No.

01:01PM  2    Q.  That didn't happen?

01:01PM  3    A.  No.

01:01PM  4    Q.  Do you remember whether other dancers who worked at

01:01PM  5    Pharaoh's that you observed or were aware of were asked to do

01:01PM  6    that same thing by this defendant, have sex with someone for

01:01PM  7    money?

01:01PM  8    A.  No.

01:01PM  9         MR. SOEHNLEIN:  Objection, beyond the scope.

01:02PM  10         THE COURT:  Sustained.

01:02PM  11         Are you getting close, Mr. Cooper?

01:02PM  12         MR. COOPER:  Excuse me?

01:02PM  13         THE COURT:  Are you getting close?

01:02PM  14         MR. COOPER:  Yes.

01:02PM  15         THE COURT:  Okay.

01:02PM  16         MR. COOPER:  Excuse me, just give me one second to

01:02PM  17    find my place.

01:02PM  18         BY MR. COOPER:

01:02PM  19    Q.  Oh, you were asked some questions on cross-examination

01:02PM  20    about the meeting that you had with the FBI back in 2009 when

01:02PM  21    you were arrested; do you remember that?

01:02PM  22    A.  Yes.

01:02PM  23    Q.  Did you answer the questions that they were asking you?

01:03PM  24    A.  Yes.

01:03PM  25    Q.  Okay.  You were also asked some questions about the --

01:03PM   1   what you provided this jury, the information you provided

01:03PM   2   this jury about Joy having sexual intercourse in the

01:03PM   3   Champagne Room; do you remember that?

01:03PM   4   A.   Yes.

01:03PM   5   Q.   And Mr. Soehnlein asked you on cross-examination if you

01:03PM   6   first mentioned that this month; is that right?

01:03PM   7   A.   Yeah.

01:03PM   8   Q.   Let's talk about that a little bit.

01:03PM   9        Earlier on my first direct examination, I asked you if

01:03PM  10   you and I had sat down and prepped before you testified,

01:03PM  11   right?

01:03PM  12   A.   Right.

01:03PM  13   Q.   Did you find that helpful?

01:03PM  14   A.   A little bit, yeah.

01:03PM  15   Q.   Okay.  And when we sat down and talked, did I sometimes

01:03PM  16   ask you different questions?

01:03PM  17   A.   Sometimes, but it was like kind of the same thing.

01:03PM  18   Q.   Okay.  And with respect to the information about Joy, do

01:03PM  19   you recall in that meeting me asking you questions

01:03PM  20   specifically about what happened in the Champagne Room?

01:03PM  21   A.   Yes.

01:03PM  22   Q.   Would you disagree with me that you weren't asked that

01:03PM  23   question in the grand jury?

01:03PM  24   A.   Right.

01:03PM  25   Q.   Okay.  And when I asked you that question, did you tell

01:03PM   1   me what you recalled?

01:03PM   2   A.   Yes.

01:04PM   3   Q.   You were asked questions about whether K.L. wanted to get

01:04PM   4   in trouble, do you remember those questions, with respect to

01:04PM   5   the seizure at the hotel?

01:04PM   6   A.   Right.

01:04PM   7   Q.   Was there a rule that you were aware of at Pharaoh's that

01:04PM   8   the defendant set about not calling an ambulance or the

01:04PM   9   police?

01:04PM  10        MR. SOEHNLEIN:  Objection, beyond the scope.

01:04PM  11        THE COURT:  Sustained.

01:04PM  12        MR. COOPER:  Judge --

01:04PM  13        THE COURT:  Sustained.

01:04PM  14        MR. COOPER:  Can I -- I'd like to come up and argue

01:04PM  15   it then.

01:04PM  16        THE COURT:  No.  Sustained.

01:04PM  17        BY MR. COOPER:

01:04PM  18   Q.   You were asked questions on cross-examination about

01:04PM  19   whether it was K.L.'s fear of getting in trouble or the

01:04PM  20   defendant telling you not to call an ambulance; do you

01:05PM  21   remember being asked about that topic on cross-examination?

01:05PM  22   A.   Yes.

01:05PM  23   Q.   Okay.  Are you aware of whether the defendant set rules

01:05PM  24   about whether people should call an ambulance?

01:05PM  25        MR. SOEHNLEIN:  Objection, beyond the scope.

01:05PM   1          **THE COURT:**  Sustained.

01:05PM   2          **MR. COOPER:**  Judge, I'd like to be heard on it.

01:05PM   3          **THE COURT:**  Mr. Cooper, it's five minutes after 1.

01:05PM   4    If you're gonna finish your redirect, finish the redirect.

01:05PM   5          **MR. COOPER:**  Will I be allowed to argue it if we

01:05PM   6    break then?  I -- I'm just trying to--

01:05PM   7          **THE COURT:**  Okay.  Folks, we're going to take our

01:05PM   8    lunch break now.  Okay?  So you folks remember my

01:05PM   9    instructions.

01:05PM   10         Don't talk about this case with anyone.  Don't talk

01:05PM   11   about it with each other.  Don't use tools of technology to

01:05PM   12   research the case, to learn anything about the case or

01:05PM   13   communicate anything about the case.

01:05PM   14         Don't read or watch or listen to any news coverage of

01:05PM   15   the case, if there is any, while the case in progress.  Don't

01:05PM   16   make up your mind about anything until the case is submitted

01:05PM   17   to you.

01:05PM   18         Be back here at five minutes after 2.  Thank you.

01:05PM   19         (Jury excused at 1:05 p.m.)

01:06PM   20         **THE COURT:**  Hey, Ma'am, don't talk to anybody about

01:06PM   21   your testimony during the lunch break.  Sorry that you're

01:06PM   22   going to have to come back, but that's the way it is.

01:06PM   23         **THE WITNESS:**  Okay.

01:06PM   24         **THE COURT:**  Okay, thanks.

01:06PM   25         (Witness excused at 1:06 p.m.)

01:06PM    1          **THE COURT:**  Okay.  Mr. Cooper, make your record.

01:06PM    2          **MR. COOPER:**  Judge, the purpose of redirect

01:06PM    3    examination is to rehabilitate points that were brought up on

01:07PM    4    cross-examination.

01:07PM    5          **THE COURT:**  Yep.

01:07PM    6          **MR. COOPER:**  The point that was brought up on

01:07PM    7    cross-examination with this witness was to ask about K.L. not

01:07PM    8    wanting to get in trouble.

01:07PM    9          K.L.'s not the person who called her to say come get

01:07PM   10    her out of here, it was the defendant.

01:07PM   11          I'm in possession of facts that I expect this witness

01:07PM   12    to testify to that will rebut the argument that the defense

01:07PM   13    raised on cross-examination.

01:07PM   14          **THE COURT:**  Rebut what argument that the defendant

01:07PM   15    raised?

01:07PM   16          **MR. COOPER:**  That it was K.L. -- that K.L. is the

01:07PM   17    motivating force behind an ambulance not being called the

01:07PM   18    night of her seizure.

01:07PM   19          Judge, I resp -- I feel like if it was a half an hour

01:07PM   20    before the lunch break, this would be an area --

01:07PM   21          **THE COURT:**  No.

01:07PM   22          **MR. COOPER:**  -- I wasn't even able to come up and

01:07PM   23    argue it, and so I respectfully -- nobody feels worse --

01:07PM   24          **THE COURT:**  You don't know what my ruling is gonna

01:07PM   25    be.  You're not going to get into what rules in the club are

01:07PM 1   with respect to a phone call that's made from a hotel room.

01:07PM 2   That's not coming in.  So you can argue until you're blue in

01:07PM 3   the face, and you make whatever record you want.

01:07PM 4        Make whatever record you want.  Try to convince me.

01:08PM 5   Go ahead.

01:08PM 6        **MR. COOPER:**  Judge, it's a -- it's a rule set by the

01:08PM 7   defendant about not calling 911 so that people don't get in

01:08PM 8   trouble.  I would suggest to you that the same behavior the

01:08PM 9   defendant is engaging in in the club, which is doing cocaine

01:08PM 10  in the upstairs area, dancers overdosing, whatever it is, is

01:08PM 11  consistent with the instance here.

01:08PM 12       She worked for him.  Those rules that he's expressed

01:08PM 13  to her are relevant proof for the jury to hear, and it's -- I

01:08PM 14  believe it's within the scope of the cross-examination when

01:08PM 15  there's a -- an argument made that K.L. not wanting to get in

01:08PM 16  trouble is the driving force.

01:08PM 17       They even asked, like, did K.L. want you to call an

01:08PM 18  ambulance?  Or did K.L. -- had you called an ambulance in the

01:08PM 19  past?  This is -- it's --

01:08PM 20       **THE COURT:**  And you can argue to the jury that it

01:08PM 21  wasn't K.L. that made that decision, it was Mr. Gerace.  And

01:08PM 22  the testimony about the rule in Pharaoh's is already in.  So

01:08PM 23  you're not gonna get into this now.  I believe that this

01:08PM 24  question is beyond the scope of the cross-examination that

01:08PM 25  Mr. Soehnlein did.

01:09PM    1            **MR. TRIPI:**  Judge, I have one other --

01:09PM    2            **THE COURT:**  Go ahead.

01:09PM    3            **MR. TRIPI:**  I may as well just argue it now because

01:09PM    4    I'm going to talk to Mr. Cooper over the lunch break, I don't

01:09PM    5    want you to blame him if he comes back and asks a question.

01:09PM    6            So, there was some cross-examination also about the

01:09PM    7    downstairs VIP in the club, so we're separate from the drug

01:09PM    8    rules about -- there was some cross about, you know, the

01:09PM    9    bouncer would come in, there were no sex acts allowed, that he

01:09PM   10    would break it up, if you recall some of that cross.

01:09PM   11            **THE COURT:**  I do.

01:09PM   12            **MR. TRIPI:**  In -- in the club, we're gonna -- I'm

01:09PM   13    gonna talk to Mr. Cooper, but I anticipate maybe some redirect

01:09PM   14    questions about Ms. G.R.'s awareness of other dancers also

01:09PM   15    engaging in sex acts in the upstairs.

01:09PM   16            Now, the stated rule is no sex acts in the club.  She

01:09PM   17    develops a perception, she testified about it in grand jury so

01:09PM   18    you haven't heard it yet on direct, but it's within the scope

01:10PM   19    of this cross-examination regarding the upstairs.  She

01:10PM   20    develops a perception and an understanding that other women

01:10PM   21    are engaged in sex acts as well --

01:10PM   22            **THE COURT:**  Why wasn't that asked on -- why wasn't

01:10PM   23    that asked on direct?

01:10PM   24            **MR. TRIPI:**  I don't -- I don't have an answer for

01:10PM   25    that, Judge, but it is within the scope of the cross.  And if

01:10PM    1    it's not, Judge, if it's not--

01:10PM    2        **THE COURT:**  How is -- how is it within the scope of

01:10PM    3    the cross -- how is whether there were sex acts being engaged

01:10PM    4    in upstairs within the scope of a cross that talks about

01:10PM    5    bouncers downstairs?

01:10PM    6        **MR. TRIPI:**  Well, I -- I hear you, but I think that's

01:10PM    7    slices the bologna a little then.  It's the owner, it's the

01:10PM    8    premises, the whole premises is charged as a drug-involved

01:10PM    9    premises.  The sex and the drugs are intertwined, that's our

01:10PM   10    whole theory of the case.  And if it should have been on the

01:10PM   11    direct direct-exam, then I'd ask for a little bit of latitude

01:10PM   12    to circle back to that, because it's in the grand jury,

01:10PM   13    they're aware of it, it's not something we're making up here

01:11PM   14    on the fly.  I intend to circle back to that.

01:11PM   15        But you would infer, rules for the downstairs, no sex

01:11PM   16    acts, means no sex acts in the club.  They crossed on that.

01:11PM   17        **THE COURT:**  Okay.  Mr. Soehnlein.

01:11PM   18        **MR. SOEHNLEIN:**  Your Honor, I -- I had a part of my

01:11PM   19    cross that was for that, and they didn't bring it up.  And so

01:11PM   20    I didn't do it.

01:11PM   21        And so, I mean, clearly, at least in my head, I

01:11PM   22    thought that that was not something they were gonna pursue

01:11PM   23    with this witness.

01:11PM   24        **THE COURT:**  Yeah, I think Mr. Soehnlein's right, I'm

01:11PM   25    not going to allow it.

01:11PM    1          **MR. TRIPI:**  But, Judge, you can allow recross on

01:11PM    2    that.  We're asking for a little latitude on that.

01:11PM    3          **THE COURT:**  I understand.  No.

01:11PM    4          **MR. TRIPI:**  This is -- this is my last pitch, Judge.

01:11PM    5          **THE COURT:**  Go ahead.

01:11PM    6          **MR. TRIPI:**  This is not a trial where we're gonna

01:11PM    7    have witnesses on the stand two and three days.  You had that

01:11PM    8    last trial.  This is a significant government witness, and

01:11PM    9    it's extending a little longer, but she's not going to be on

01:11PM   10    the stand for two days, I'm asking for a little latitude from

01:11PM   11    the Court with a key witness in the government's proof.

01:11PM   12          **THE COURT:**  No.  We're going to move this case along,

01:12PM   13    and we're not going back and reopening things.

01:12PM   14          **MR. TRIPI:**  But --

01:12PM   15          **THE COURT:**  I've made -- I've made my decision,

01:12PM   16    Mr. Tripi.

01:12PM   17          **MR. TRIPI:**  But this is a --

01:12PM   18          **THE COURT:**  I need you to -- I'm giving you -- I'm --

01:12PM   19    look it.  I have been giving you a lot of latitude.  I'm not

01:12PM   20    going to let you -- I think it's beyond the scope of the

01:12PM   21    cross, and I'm not going to let you reopen the direct.

01:12PM   22          End of story.

01:12PM   23          **MR. TRIPI:**  He did cross on the upstairs though.  He

01:12PM   24    didn't avoid upstairs altogether.

01:12PM   25          **MR. SOEHNLEIN:**  I crossed -- I crossed on the

01:12PM   1   conversation she had with Gerace upstairs.

01:12PM   2        **MR. TRIPI:**  That -- that conversation is happening in

01:12PM   3   the context, Judge, where four or five other men are with

01:12PM   4   other dancers.

01:12PM   5        **MR. SOEHNLEIN:**  They didn't say that on direct.

01:12PM   6        **MR. TRIPI:**  Can I finish here?

01:12PM   7        You can't slice the bologna that thin, Judge.

01:12PM   8        He crosses on the upstairs, in the conversation there

01:12PM   9   are other people there, other things are happening.  That is

01:12PM  10   within the scope of redirect.

01:12PM  11        It might not -- he could've -- he could have avoided

01:12PM  12   upstairs altogether, he didn't.  That's my pitch.

01:12PM  13        **THE COURT:**  Okay.  My ruling is the same.  Okay?

01:12PM  14        We'll see you folks at five -- five after 2.

01:13PM  15        **MR. FOTI:**  You have a matter, Judge, right before.

01:13PM  16        **THE COURT:**  I do.

01:13PM  17        **THE CLERK:**  Yes.

01:13PM  18        (Off the record at 1:13 p.m.)

02:13PM  19        (Back on the record at 2:13 p.m.)

02:13PM  20        (Jury not present.)

02:13PM  21        **THE CLERK:**  All rise.

02:13PM  22        **THE COURT:**  Please be seated.

02:13PM  23        **THE CLERK:**  We are back on the record for the

02:13PM  24   continuation of the jury trial in case numbers 19-CR-227 and

02:14PM  25   23-CR-37, United States of America versus Peter Gerace, Jr.

02:14PM    1              All counsel and parties are present.

02:14PM    2              **THE COURT:**  Okay.  I'm good about --

02:14PM    3              Good afternoon, everybody.  I'm good about letting

02:14PM    4    you folks make a record, and I will continue to be good about

02:14PM    5    making you folks -- letting you folks make a record when I've

02:14PM    6    made my mind up about something.

02:14PM    7              I understand the issue with respect to the rules at

02:14PM    8    Pharaoh's very well.  I honestly don't understand how whether

02:14PM    9    K.L. wanted to get into trouble or not had anything to do with

02:14PM   10    what Mr. Gerace was thinking when he called the witness.  So

02:14PM   11    I'm not sure how that line of cross was relevant.

02:14PM   12              I certainly don't think that any rules at Pharaoh's

02:14PM   13    have anything at all to do with whether K.L. wanted to get in

02:14PM   14    trouble or not.  And -- and I don't think that it -- it gives

02:14PM   15    the government any more ammunition with which to argue that

02:15PM   16    Mr. Gerace wasn't motivated by K.L.'s not wanting to get into

02:15PM   17    trouble.  In fact, I don't even see the link between K.L.'s

02:15PM   18    not getting into trouble, and Mr. Gerace's motivation.

02:15PM   19              So -- so my mind was made up on that issue, and I

02:15PM   20    wanted to get the witness off the stand before lunch, and I

02:15PM   21    didn't want to hear more oral argument.

02:15PM   22              I get to decide whether I hear more oral argument.

02:15PM   23    And it generally is going to be based on whether I think

02:15PM   24    there's an opening for me to be convinced by you, because if

02:15PM   25    there's not, then I will let you make a record on the break.

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

164

01  02:15PM  1  So that is why I didn't ask for argument at the bench, and why

02:15PM  2  I was trying -- I was a bit impatient, perhaps I should be

02:15PM  3  more patient.  When you become a federal judge they take some

02:15PM  4  of your patience away, and I -- perhaps I should have been

02:15PM  5  more patient, and I'm sorry for not being more patient, but

02:15PM  6  that was the reason for my impatience.

02:16PM  7      Is there anything more you'd like to say on that or

02:16PM  8  anything else?

02:16PM  9      **MR. COOPER:**  Just that this is trial number 3, and

02:16PM  10  one year in front of you, and I think every single time

02:16PM  11  something's come up, you're always open to hearing argument on

02:16PM  12  it.  And so patience is something that I think you show a fair

02:16PM  13  amount of.

02:16PM  14      I think what caught me off guard is that I've grown

02:16PM  15  to accustomed to that being accepted by you when we ask.  And

02:16PM  16  then when you say no --

02:16PM  17      **THE COURT:**  Which I why I thought I needed to explain

02:16PM  18  it now.

02:16PM  19      **MR. COOPER:**  And I'm explaining -- I guess what I'm

02:16PM  20  saying is I shouldn't take it for granted, you are allowed to

02:16PM  21  say, no, Mr. Cooper, keep doing your job and I have to listen

02:16PM  22  to that.

02:16PM  23      So I didn't mean to be disobedient to your ruling, I

02:16PM  24  just was surprised and kind of caught off guard.

02:16PM  25      **THE COURT:**  And I understand.  I get it.  And it's in

02:16PM  1   the past.  Okay?

02:16PM  2          MR. COOPER:  Yep.  And I'm prepared to finish the

02:16PM  3   redirect.  So I'm ready when you are.

02:16PM  4          THE COURT:  Great.  Anything we need to do before we

02:16PM  5   bring her back in?

02:16PM  6          MR. SOEHNLEIN:  No, thank you, Judge.

02:17PM  7          THE COURT:  Okay.  Let's bring the witness back in,

02:17PM  8   and let's bring the jury back in.

02:17PM  9          MR. TRIPI:  One brief heads up, Judge, not related to

02:17PM  10  this witness.  Just -- I think we can, it's up to Mr. Foti,

02:17PM  11  but he's handling the next witness, it will be A.B.  I think

02:17PM  12  for 85 to 90 percent of the direct there's, you know, he'll

02:17PM  13  object when he deems it necessary, but there's one issue we

02:17PM  14  might want to flag and before I get into it.  So my thought

02:17PM  15  is, I'll get started, and when I get close to that, maybe it

02:17PM  16  will be time to a break anyway --

02:17PM  17         THE COURT:  Great.

02:17PM  18         MR. TRIPI:  -- and we can handle it that way.  But I

02:17PM  19  just wanted to flag it for you.

02:17PM  20         THE COURT:  Perfect.

02:17PM  21         MR. TRIPI:  Is that okay, Mark?

02:17PM  22         MR. FOTI:  Yes.

02:17PM  23         THE COURT:  Thank you, Mr. Tripi.

02:17PM  24         MR. COOPER:  You can get her back in, too, thank you.

02:18PM  25              (Witness and Jury seated at 2:18 p.m.)

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

166

| | | |
|---|---|---|
| 02:18PM | 1 | **THE COURT:**  The record will reflect that all our |
| 02:19PM | 2 | jurors, again, are present. |
| 02:19PM | 3 | I remind the witness that she's still under oath. |
| 02:19PM | 4 | And, Mr. Cooper, you may continue your redirect. |
| 02:19PM | 5 | **MR. COOPER:**  Thank you, Judge. |
| 02:19PM | 6 | **BY MR. COOPER:** |
| 02:19PM | 7 | Q.  Good afternoon, Ms. G.R. |
| 02:19PM | 8 | A.  Hello. |
| 02:19PM | 9 | Q.  All right.  The judge just reminded you that you're still |
| 02:19PM | 10 | under oath.  Are you a little annoyed that I didn't get you |
| 02:19PM | 11 | out of here before lunch? |
| 02:19PM | 12 | A.  I'm not gonna lie, yes. |
| 02:19PM | 13 | **THE COURT:**  I tried.  I tried. |
| 02:19PM | 14 | **THE WITNESS:**  I know you did. |
| 02:19PM | 15 | **BY MR. COOPER:** |
| 02:19PM | 16 | Q.  I'm sorry about that.  I'm trying do the best I can here, |
| 02:19PM | 17 | so just bear with me.  Hopefully a couple of minutes of me |
| 02:19PM | 18 | asking questions and we'll wrap up.  Okay? |
| 02:19PM | 19 | On cross-examination, you were asked questions about who |
| 02:19PM | 20 | you auditioned for when you first started working at |
| 02:19PM | 21 | Pharaoh's, and I think you said Chris; do you remember that? |
| 02:19PM | 22 | A.  Yes. |
| 02:19PM | 23 | Q.  Do you know Chris's last name? |
| 02:19PM | 24 | A.  No. |
| 02:19PM | 25 | Q.  Okay.  Was he a manager at Pharaoh's? |

02:19PM   1   A.  Yes.

02:19PM   2   Q.  Okay.  Is it a name you think you'd recognize if you

02:20PM   3   heard it again, or you never knew it?

02:20PM   4   A.  I don't think I ever knew, I just know what he looked

02:20PM   5   like.

02:20PM   6   Q.  Got it.  Did Chris, that manager, did he work for this

02:20PM   7   defendant?

02:20PM   8   A.  Yes.

02:20PM   9   Q.  Okay.  At one time -- on cross-examination I think the

02:20PM  10   name Brandon Carr came up; do you remember that?

02:20PM  11   A.  Yes.

02:20PM  12   Q.  Did he -- what was his role at Pharaoh's?

02:20PM  13   A.  He was a DJ.

02:20PM  14   Q.  Okay.  And as a DJ, did he work for the defendant?

02:20PM  15   A.  Yes.

02:20PM  16   Q.  You were asked some questions on cross-examination about

02:20PM  17   how being an exotic dancer is a bit of a performance; do you

02:20PM  18   remember being asked those questions?

02:20PM  19   A.  Yeah.

02:20PM  20   Q.  Okay.  In the summer of 2009, was your addiction to

02:20PM  21   cocaine a performance?

02:20PM  22   A.  No.

02:20PM  23   Q.  Was your addiction to Lortabs a performance?

02:20PM  24   A.  No.

02:20PM  25   Q.  Were you acting that out?

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

168

| | | |
|---|---|---|
| 02:20PM | 1 | A.  No. |
| 02:20PM | 2 | Q.  When you lost 20 pounds, was it for a movie role? |
| 02:20PM | 3 | A.  No. |
| 02:20PM | 4 | Q.  You were asked some questions on cross-examination about |
| 02:21PM | 5 | that Amherst arrest and the conversation that you had with |
| 02:21PM | 6 | law enforcement; do you remember those questions? |
| 02:21PM | 7 | A.  Yes. |
| 02:21PM | 8 | Q.  Do you know who bailed K.L. out? |
| 02:21PM | 9 | A.  Peter. |
| 02:21PM | 10 | Q.  And finally, you were asked some questions on |
| 02:21PM | 11 | cross-examination about the upstairs area at Pharaoh's the |
| 02:21PM | 12 | night Peter gave you money to have sex with someone. |
| 02:21PM | 13 | I'd like for you to describe for the jury to the best of |
| 02:21PM | 14 | your ability to remember who was upstairs when that happened. |
| 02:21PM | 15 | **MR. SOEHNLEIN:**  Objection, beyond the scope. |
| 02:21PM | 16 | **THE COURT:**  No, overruled. |
| 02:21PM | 17 | **BY MR. COOPER:** |
| 02:21PM | 18 | Q.  Go ahead. |
| 02:21PM | 19 | A.  That was a really long time ago.  But I know it was me |
| 02:21PM | 20 | and K.L..  a bunch of nameless, faceless, like, people that |
| 02:21PM | 21 | were, like, guy friends of his.  And Peter. |
| 02:21PM | 22 | Q.  You said nameless, faceless guy friends of his; is that |
| 02:21PM | 23 | correct? |
| 02:22PM | 24 | A.  Yeah, like, I don't remember what he looked like or who |
| 02:22PM | 25 | they were. |

02:22PM      1    Q.  Okay.  Friends of whose?

02:22PM      2    A.  Peter's.

02:22PM      3    Q.  Okay.  And can you estimate was that about five, about

02:22PM      4    ten, do you remember?

02:22PM      5    A.  Not really, no.

02:22PM      6    Q.  Okay.  Would looking at your grand jury testimony help

02:22PM      7    you remember?

02:22PM      8    A.  Yeah, if you gave it to me.

02:22PM      9    Q.  Just give me one second to find it.

02:22PM     10        I'm looking at 3565A, and now I'm on page 18.

02:22PM     11        There's some sticky notes on here, just ignore that.  I'm

02:22PM     12    going to show you page 18, and there's kind of an underlying

02:22PM     13    paragraph, so I'll direct your attention to that.

02:22PM     14             MR. COOPER:  May I approach, Judge?

02:22PM     15             THE COURT:  Yes, you can.

02:23PM     16             THE WITNESS:  Okay.  Yeah, that looks about right.

02:23PM     17             BY MR. COOPER:

02:23PM     18    Q.  Okay.  So did that looking at that without reading from

02:23PM     19    that, just answer this, did looking at that refresh your

02:23PM     20    memory?

02:23PM     21    A.  Yes.  Sounds about right, like I said.

02:23PM     22    Q.  Okay.

02:23PM     23             MR. COOPER:  Can I approach?

02:23PM     24             THE COURT:  Sure.

            25

02:23PM  1    **BY MR. COOPER:**

02:23PM  2    Q.  About how many of Peter's friends do you remember being

02:23PM  3    upstairs?

02:23PM  4    A.  Like a half a dozen.

02:23PM  5    Q.  Okay.  And were there other dancers upstairs as well?

02:23PM  6    A.  No.

02:23PM  7    Q.  So you remember yourself and K.L.?

02:23PM  8    A.  Yes.  That I can remember.

02:23PM  9    Q.  You were asked questions on cross-examination about

02:24PM  10   choices quite a few times; do you remember that?

02:24PM  11   A.  Yes.

02:24PM  12   Q.  Before you got heavily addicted to coke and heroin while

02:24PM  13   you were working at Pharaoh's, in the earlier time when you

02:24PM  14   worked at Pharaoh's, pre-addiction, did this defendant ever

02:24PM  15   try to get you to have sex with his friends for money?

02:24PM  16   A.  No.

02:24PM  17   Q.  Okay.

02:24PM  18        **MR. COOPER:**  I'm finished.  Thank you, Judge.

02:24PM  19        **THE COURT:**  Anything more?

02:24PM  20        **MR. SOEHNLEIN:**  Less than a minute, Judge.

02:24PM  21

02:24PM  22             **RECROSS-EXAMINATION BY MR. SOEHNLEIN:**

02:24PM  23   Q.  Thank you for your patience.

02:24PM  24        When you're addicted to narcotics, you can still make

02:24PM  25   choices, right?

02:24PM  1    A.  Yeah.

02:24PM  2    Q.  Right?  You made the choice to walk through the door into

02:24PM  3    Pharaoh's every day, correct?

02:24PM  4    A.  Right.

02:24PM  5    Q.  You made the decision what outfit you were gonna wear,

02:24PM  6    right?

02:24PM  7    A.  Yes.

02:24PM  8    Q.  You made the decision what car you were gonna drive,

02:24PM  9    right?

02:24PM  10   A.  Right.

02:24PM  11   Q.  And sometimes when you're addicted, you make choices,

02:24PM  12   there's consequences to those choices; isn't that right?

02:24PM  13   A.  Right.

02:24PM  14   Q.  But you can get arrested for those choices, right?

02:24PM  15   A.  Right.

02:24PM  16   Q.  You can get in trouble for those decisions, right?

02:24PM  17   A.  Right.

02:24PM  18   Q.  You can do things you regret because of those decisions;

02:25PM  19   isn't that right?

02:25PM  20   A.  Right.

02:25PM  21   Q.  Peter Gerace didn't get you addicted to drugs did he?

02:25PM  22   A.  No.

02:25PM  23           **MR. SOEHNLEIN:**  That's all I have.

02:25PM  24           **THE COURT:**  Anything more?

02:25PM  25

02:25PM 1       **RE-REDIRECT EXAMINATION BY MR. COOPER:**

02:25PM 2   Q.  When you were addicted to drugs, did he give you money to

02:25PM 3   have sex with one of his friends?

02:25PM 4           **MR. SOEHNLEIN:**  Objection.

02:25PM 5           **THE COURT:**  Overruled.

02:25PM 6           **THE WITNESS:**  Yes.

02:25PM 7           **MR. COOPER:**  I'm good, thanks, Judge.

02:25PM 8           **THE COURT:**  You can step down, ma'am, thank you.

02:25PM 9           (Witness excused at 2:25 p.m.)

10          (Excerpt concluded at 2:25 p.m.)

11              *    *    *    *    *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3

4               In accordance with 28, U.S.C., 753(b), I

5     certify that these original notes are a true and correct

6     record of proceedings in the United States District Court for

7     the Western District of New York on November 13, 2024.

8

9

10                         s/ Ann M. Sawyer
                          _____
                          Ann M. Sawyer, FCRR, RPR, CRR
11                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        **TRANSCRIPT INDEX**

3          **EXCERPT - EXAMINATION OF G.R.(PROTECTED WITNESS #2)**

4                        **NOVEMBER 13, 2024**

5

6

7       **W I T N E S S**                                    **P A G E**

8       **G.R. (PROTECTED WITNESS #2)**                      2

9          DIRECT EXAMINATION BY MR. COOPER:               2

10         CROSS-EXAMINATION BY MR. SOEHNLEIN:             93

11         REDIRECT EXAMINATION BY MR. COOPER:             142

12         RECROSS-EXAMINATION BY MR. SOEHNLEIN:           170

13         RE-REDIRECT EXAMINATION BY MR. COOPER:          172

14

15

16

17

18

19

20

21

22

23

24

25