UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                          Case No. 1:19-cr-227

            Plaintiff,           (LJV)

v.

                          September 23, 2024

JOSEPH BONGIOVANNI,

               Defendant.

_____

**TRANSCRIPT EXCERPT - EXAMINATION OF RONALD SERIO - DAY 3**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**          **TRINI E. ROSS, UNITED STATES ATTORNEY**
                       **BY: JOSEPH M. TRIPI, ESQ.**
                          **NICHOLAS T. COOPER, ESQ.**
                          **CASEY L. CHALBECK, ESQ.**
                       Assistant United States Attorneys
                       Federal Centre, 138 Delaware Avenue
                       Buffalo, New York 14202
                       For the Plaintiff

                       **SINGER LEGAL PLLC**
                       **BY: ROBERT CHARLES SINGER, ESQ.**
                       80 East Spring Street
                       Williamsville, New York 14221
                         And
                       **LAW OFFICES OF PARKER ROY MacKAY**
                       **BY: PARKER ROY MacKAY, ESQ.**
                       3110 Delaware Avenue
                       Kenmore, New York 14217
                         And
                       **OSBORN, REED & BURKE, LLP**
                       **BY: JOHN J. GILSENAN, ESQ.**
                       120 Allens Creek Road
                       Rochester, New York 14618
                       For the Defendant

**PRESENT:**             **BRIAN A. BURNS,** FBI Special Agent
                       **MARILYN K. HALLIDAY,** HSI Special Agent
                       **KAREN A. CHAMPOUX,** USA Paralegal

**LAW CLERK:**           **REBECCA FABIAN IZZO, ESQ.**

1    **COURT DEPUTY CLERK:   COLLEEN M. DEMMA**

2    **COURT REPORTER:       ANN MEISSNER SAWYER, FCRR, RPR, CRR**
                             Robert H. Jackson Federal Courthouse
3                            2 Niagara Square
                             Buffalo, New York  14202
4                            Ann_Sawyer@nywd.uscourts.gov

5

6                    *    *    *    *    *    *    *

7

09:49AM    8        (Excerpt commenced at 9:49 a.m.)

09:49AM    9        (Jury seated at 9:49 a.m.)

09:50AM   10        **THE COURT:**   Okay.  Good morning, everyone.

09:50AM   11        **ALL PARTIES:**   Good morning, the record will reflect

09:50AM   12   that all our jurors are present again.  We'll go until 5:30

09:50AM   13   today and tomorrow, and then until 5 on Wednesday and

09:50AM   14   Thursday, we'll be down on Friday.

09:50AM   15        I remind the witness that he's still under oath.

09:50AM   16        And, Mr. MacKay, you may continue.

09:50AM   17

09:50AM   18   **R O N A L D   S E R I O**, having been previously duly called

09:50AM   19   and sworn, continued to testify as follows:

09:50AM   20

09:50AM   21        **(CONT'D) CROSS-EXAMINATION BY MR. MacKAY:**

09:50AM   22   Q.  All right.  Good morning, Mr. Serio.

09:50AM   23   A.  Good morning.

09:50AM   24   Q.  I kind of realized I was talking a little quickly at the

09:50AM   25   end of Friday, so we might have flown through some stuff and

09:50AM   1   I want to go back and clarify some things to get us

09:50AM   2   recentered here.

09:50AM   3         All right.  So you told us after Wayne Anderson's

09:50AM   4   arrest in November of 2012, you hard stopped drug dealing,

09:50AM   5   correct?

09:51AM   6   A.  Correct.

09:51AM   7   Q.  So you're out for about six months or so, correct?

09:51AM   8   A.  Yes.

09:51AM   9   Q.  And then you reconnect with Mark Kagan, correct?

09:51AM  10   A.  Correct.

09:51AM  11   Q.  At that time, you understand you're getting marijuana

09:51AM  12   from Jarrett Guy, but it's through Mark Kagan, correct?

09:51AM  13   A.  Correct.

09:51AM  14   Q.  Now after about six months of that, you cut Mark Kagan

09:51AM  15   out completely, and it's all through Jarrett Guy going

09:51AM  16   forward, correct?

09:51AM  17   A.  Right.

09:51AM  18   Q.  Now, so that puts you at about the end of 2013 or early

09:51AM  19   2014?

09:51AM  20   A.  Correct.

09:51AM  21   Q.  Okay.  And so the first half of 2013 when you're out of

09:51AM  22   the game, you're not receiving any shipments at your house,

09:51AM  23   correct?

09:51AM  24   A.  Correct.

09:51AM  25   Q.  You're not doing packaging or anything like that at your

09:51AM 1 house?

09:51AM 2 A. Correct.

09:51AM 3 Q. And I'm talking about 697 Lebrun.

09:51AM 4 A. Correct.

09:51AM 5 Q. So you know there's no drug activity going on at that

09:52AM 6 address, correct?

09:52AM 7 A. Correct.

09:52AM 8 Q. You're not running around to grow operations or anything

09:52AM 9 like that, correct?

09:52AM 10 A. Correct.

09:52AM 11 Q. Because you were trying to put as much distance between

09:52AM 12 you and drug dealing activity at that time, correct?

09:52AM 13 A. Correct.

09:52AM 14 Q. Okay. I think I covered this but, you know, moving into

09:52AM 15 2015, you are going to the casino a lot, correct?

09:52AM 16 A. Correct.

09:52AM 17 Q. And you're getting flagged at secondary inspection,

09:52AM 18 correct?

09:52AM 19 A. Correct.

09:52AM 20 Q. But you're never receiving any directions through Mike

09:52AM 21 Masecchia about how to avoid or mitigate that, correct?

09:52AM 22 A. Correct.

09:52AM 23 Q. Now, in October of 2015 --

09:52AM 24     **MR. MacKAY:**  Ms. Champoux, can we show Government

09:52AM 25 Exhibit 22Q?

09:52AM  1    **BY MR. MacKAY:**

09:52AM  2    Q.  So about this timeframe, summer of 2015, you're not

09:52AM  3    receiving any information that DHS or HSI is looking into

09:53AM  4    you, correct?

09:53AM  5    A.  Correct.

09:53AM  6        **MR. MacKAY:**  We can take that down, Ms. Champoux.

09:53AM  7        **BY MR. MacKAY:**

09:53AM  8    Q.  Okay.  Now, I want to go through a couple properties that

09:53AM  9    were associated with you, I think.

09:53AM  10       **MR. MacKAY:**  Ms. Champoux, can we show Government

09:53AM  11   Exhibit 42A-30.

09:53AM  12       **BY MR. MacKAY:**

09:53AM  13   Q.  And I think we covered this on direct.  This was a tote

09:53AM  14   box you had with the keys to various rental properties,

09:53AM  15   correct?

09:53AM  16   A.  Correct.

09:53AM  17   Q.  So all the properties in this tote, you either owned

09:53AM  18   directly or indirectly, correct?

09:53AM  19   A.  Correct.

09:53AM  20   Q.  Now, so 42 Norwalk.  That's not on there.  But is that a

09:53AM  21   property you own?

09:53AM  22   A.  42 Norwalk?  No.

09:53AM  23   Q.  That was not?

09:53AM  24   A.  Well, maybe at some point I might have bought and sold it

09:53AM  25   years ago.

09:53AM 1 Q. Okay. Yeah, I just want to touch on that.

09:53AM 2     I think you told us on direct that one of the ways you

09:53AM 3 did grow operations was to buy a property, correct?

09:54AM 4 A. Correct.

09:54AM 5 Q. And when you're in the rehab and flipping stage, that's

09:54AM 6 when you do the grow operation, correct?

09:54AM 7 A. Correct.

09:54AM 8 Q. And then that might only be for, like, one or two grows,

09:54AM 9 correct?

09:54AM 10 A. Correct.

09:54AM 11 Q. Remind us again, how long is an indoor grow?

09:54AM 12 A. About two and a half months a cycle.

09:54AM 13 Q. So you're talking about five months a house might be used

09:54AM 14 for the grow operations, if you're doing that sort of method

09:54AM 15 for flipping property?

09:54AM 16 A. Correct.

09:54AM 17 Q. And then after that, it would be just legitimate rental

09:54AM 18 property, correct?

09:54AM 19 A. Correct.

09:54AM 20 Q. Okay. Now, 467 Tacoma, this circle that's in the upper

09:54AM 21 left of the tote. That was one of your properties, correct?

09:54AM 22 A. Correct.

09:54AM 23 Q. Was there ever a grow operation located there, to your

09:54AM 24 recollection?

09:54AM 25 A. No.

09:54AM   1   Q.  Okay.  Now I'm circling in the bottom, 469 Tacoma.  That

09:54AM   2   was -- would that be, like, a neighboring property?

09:54AM   3   A.  Yes.

09:54AM   4   Q.  Okay.  No grow operation at that location?

09:54AM   5   A.  No.  At this time period, I wasn't growing in any of

09:55AM   6   these houses.  It was more early on.

09:55AM   7   Q.  Sure.  And were there any grow operations associated with

09:55AM   8   that -- those properties if you can recall?

09:55AM   9   A.  No, just Sycamore and Michigan.

09:55AM  10   Q.  Okay.  Yeah.  And so Sycamore and Michigan, that's the

09:55AM  11   joint warehouses on the corner of Sycamore and Michigan,

09:55AM  12   correct?

09:55AM  13   A.  Correct.

09:55AM  14   Q.  Now, for those properties, you had stopped growing at

09:55AM  15   that location in 2010?

09:55AM  16   A.  Correct.

09:55AM  17   Q.  You had done some earlier attempts at it, but then no

09:55AM  18   more growing after 2010?

09:55AM  19   A.  Correct.

09:55AM  20   Q.  Now, moving forward after 2010, I think you told us

09:55AM  21   occasionally you might receive a delivery there, correct?

09:55AM  22   A.  Correct.

09:55AM  23   Q.  But you never really stored drugs there, correct?

09:55AM  24   A.  Very rarely.

09:55AM  25   Q.  Yeah, I mean, I think what you told us on direct is while

09:55AM 1 you might unload something there, you generally took it right

09:55AM 2 immediately to your Lebrun residence, correct?

09:55AM 3 A.   Correct.

09:55AM 4 Q.   And the MDMA pills we went through the pictures of, that

09:55AM 5 was sort of an anomaly?

09:56AM 6 A.   Correct.

09:56AM 7 Q.   By that I mean you weren't generally an MDMA dealer,

09:56AM 8 correct?

09:56AM 9 A.   Correct.

09:56AM 10 Q.   Your source of supply, Jarrett Guy, at the time had said

09:56AM 11 basically can you offload these for me, and you weren't able

09:56AM 12 to do that?

09:56AM 13 A.   Correct.

09:56AM 14 Q.   So you stuck them up under kind of a bump-out in the

09:56AM 15 drywall above the door, correct?

09:56AM 16 A.   Correct.

09:56AM 17 Q.   But otherwise, you know, moving forward from 2010, that

09:56AM 18 location was primarily -- the Sycamore-Michigan location is

09:56AM 19 used primarily for your legitimate real estate and property

09:56AM 20 rental businesses, correct?

09:56AM 21 A.   Correct.

09:56AM 22 Q.   That's why we saw on those photos there's a lot of, like,

09:56AM 23 raw materials for rehab there, correct?

09:56AM 24 A.   Correct.

09:56AM 25 Q.   It wasn't like you were keeping large duffle bags of

09:56AM 1 marijuana at that location?

09:56AM 2 A. Correct.

09:56AM 3 Q. If ever anything was unloaded, it was there for only a

09:56AM 4 brief period of time, correct?

09:56AM 5 A. Correct.

09:56AM 6 Q. Now I want to ask you about another name, Robert Mettal.

09:56AM 7 Is that somebody were you ever associated with?

09:56AM 8 A. Yes.

09:56AM 9 Q. In what capacity?

09:56AM 10 A. Like 30 years ago, I got marijuana from him.

09:57AM 11 Q. Okay. But moving into, like, the 2008 and forward

09:57AM 12 timeframe, you were never associated with him?

09:57AM 13 A. I was friends with him.

09:57AM 14 Q. Okay. Friends, but -- because I know there's a lot of

09:57AM 15 overlap between friends and associates. Was he specifically

09:57AM 16 just a friend, not drug associate?

09:57AM 17 A. Yes, specifically a friend.

09:57AM 18 Q. Okay.

09:57AM 19 A. Maybe an occasion or two, we would try to get a couple

09:57AM 20 pounds of marijuana, but besides that --

09:57AM 21 Q. Okay. Yeah, sorry, I made that question a lot longer

09:57AM 22 than it needed to be.

09:57AM 23 You wouldn't consider him one of your inner circle drug

09:57AM 24 associates, correct?

09:57AM 25 A. Correct.

09:57AM　1　Q.  Okay.  Now Jarrett Guy, we talked about him.

09:57AM　2　　　　　**MR. MacKAY:**  Ms. Champoux, you can take 42A-30 down.

09:57AM　3　　　　　**BY MR. MacKAY:**

09:57AM　4　Q.  So Jarrett Guy enters the picture fully for you kind of

09:57AM　5　end of 2013 into 2014, correct?

09:57AM　6　A.  Correct.

09:57AM　7　Q.  And I think you told us Friday that you never passed the

09:57AM　8　names of any of your sources to Mr. Masecchia, correct?

09:57AM　9　A.  Correct.

09:57AM　10　Q.  Now your understanding of the operation was, though, you

09:57AM　11　would be protected when shipments were coming in?

09:57AM　12　A.  Correct.

09:58AM　13　Q.  And those would be periodically, correct?

09:58AM　14　A.  Correct.

09:58AM　15　Q.  But I think you told us with Jarrett Guy, it wasn't

09:58AM　16　always, like, same time every month, correct?

09:58AM　17　A.  Correct.

09:58AM　18　Q.  You might get a phone call, and it could vary around the

09:58AM　19　time of the month, correct?

09:58AM　20　A.  Correct.

09:58AM　21　Q.  And the phone call would often just alert you it will be

09:58AM　22　coming in in a few days or something, correct?

09:58AM　23　A.  Correct.

09:58AM　24　Q.  It was never a hard schedule, you're working on this day

09:58AM　25　of the month, this location, we're getting drugs, correct?

09:58AM   1    A.  Correct.

09:58AM   2    Q.  And at that point in time, you never passed any of those

09:58AM   3    dates or anything to Mr. Masecchia?

09:58AM   4    A.  Correct.

09:58AM   5    Q.  Now, at this time, though, your understanding was

09:58AM   6    Mr. Masecchia was going to ensure that any shipments or

09:58AM   7    couriers coming to Buffalo were going to be looked out for,

09:58AM   8    correct?

09:58AM   9    A.  Correct.

09:58AM   10   Q.  So that it was your understanding that the way this

09:58AM   11   operation would work, was that if there was something that

09:58AM   12   had been flagged with one of these couriers, you would get a

09:58AM   13   notice to maybe back off?

09:59AM   14   A.  Correct.

09:59AM   15   Q.  Okay.  Now, remind me again.  Jarrett Guy starts with

09:59AM   16   packages in the mail, correct?

09:59AM   17   A.  Correct.

09:59AM   18   Q.  And over time, dealing with just the packages in the

09:59AM   19   mail, some of those didn't arrive, correct?

09:59AM   20   A.  Correct.

09:59AM   21   Q.  And you never got any tip-offs about those, correct?

09:59AM   22   A.  Correct.

09:59AM   23   Q.  You never received any information on the back end, like,

09:59AM   24   hey, here's the agency that took these packages, correct?

09:59AM   25   A.  Correct.

09:59AM 1 Q. Then I think moving forward from the packages, it becomes

09:59AM 2 the U-Hauls, correct?

09:59AM 3 A. Correct.

09:59AM 4 Q. And that's when he's got couriers bringing the U-Hauls

09:59AM 5 into town, correct?

09:59AM 6 A. Correct.

09:59AM 7 Q. About the 2016 timeframe, one of those actually gets

09:59AM 8 arrested, correct? Or was it --

09:59AM 9 A. No. U-Hauls?

09:59AM 10 Q. Yeah. Do you recall there was an arrest of a courier in

09:59AM 11 2016?

09:59AM 12 A. I don't recall. Maybe. But it definitely wasn't a

09:59AM 13 U-Haul though.

09:59AM 14 Q. Do you recall if it was one of the tractor-trailers?

09:59AM 15 A. No.

09:59AM 16 Q. Okay. So you don't recall if a -- one of Jarrett Guy's

10:00AM 17 couriers being arrested at any point in time?

10:00AM 18 A. Through the mail, yes.

10:00AM 19 Q. Okay. Well, and so explain that. What does a courier

10:00AM 20 through the mail mean?

10:00AM 21 A. You get a hotel room, and then they would have the

10:00AM 22 package mailed to the hotel room. I believe two of those got

10:00AM 23 arrested.

10:00AM 24 Q. Okay. I think in the drug business, let's use maybe a

10:00AM 25 different term. When I say "courier," I mean somebody who's

10:00AM    1    kind of running the drugs from point A to point B.  Are you

10:00AM    2    talking about someone who goes and gets the package and

10:00AM    3    brings it to a location?

10:00AM    4    A.  Yes.

10:00AM    5    Q.  Maybe that's a courier, but what I'm thinking of is

10:00AM    6    somebody who will pick up a package at a location that it

10:00AM    7    might be mailed to, and then take it to the actual location

10:00AM    8    to where the drugs are going to end up; is that what you're

10:00AM    9    talking about?

10:00AM   10    A.  Yes.

10:00AM   11    Q.  And you're saying in your timeframe when packages were

10:00AM   12    coming through the mail from Jarrett Guy, there were two

10:00AM   13    people arrested doing that, correct?

10:00AM   14    A.  Correct.

10:00AM   15    Q.  And, again, you never received any heads-up on that,

10:00AM   16    correct?

10:00AM   17    A.  Correct.

10:01AM   18    Q.  And you never received any information on the back end of

10:01AM   19    those arrests of who had arrested those individuals, correct?

10:01AM   20    A.  Correct.

10:01AM   21    Q.  Okay.  Now, Anthony Gerace.  You had never received any

10:01AM   22    information about him being looked into as an oxycodone

10:01AM   23    trafficker, correct?

10:01AM   24    A.  Correct.

10:01AM   25    Q.  You never received any information -- well, strike that.

10:01AM 1    I think we talked about on Monday, you're -- the reason

10:01AM 2 you started wanting to receive more protection and spend

10:01AM 3 money followed Dave Gambino's arrest in late 2009, correct?

10:01AM 4 A.  Correct.

10:01AM 5 Q.  You never came to learn that in connection with that same

10:01AM 6 investigation into Dave Gambino, that Anthony Gerace had

10:01AM 7 actually sat down and proffered, correct?

10:01AM 8 A.  Correct.

10:01AM 9 Q.  So what I mean is, you were never told through Mike

10:01AM 10 Masecchia that, hey, Anthony Gerace has gone in and talked

10:01AM 11 about people, correct?

10:01AM 12 A.  Later on, after I started dealing with Anthony, Mike told

10:02AM 13 me.

10:02AM 14 Q.  Okay.  But at that point in time, back around Dave

10:02AM 15 Gambino's arrest and the timeframe that follows that, you

10:02AM 16 never heard about, correct?

10:02AM 17 A.  Correct.

10:02AM 18 Q.  Okay.  And just to remind us, you dealt with Anthony

10:02AM 19 Gerace all the way up to, what?  Late 2016?

10:02AM 20 A.  To the time of my arrest.

10:02AM 21 Q.  Okay.  So you were still dealing with Anthony Gerace

10:02AM 22 right up until about April of 2017?

10:02AM 23 A.  Correct.

10:02AM 24 Q.  The name J.D., you were never provided a name -- that

10:02AM 25 name as an informant, correct?

10:02AM 1  A.  Correct.

10:02AM 2  Q.  Okay.  Let's talk about R.K., he's one of the names you

10:02AM 3  said you were provided as an informant, correct?

10:02AM 4  A.  Correct.

10:02AM 5  Q.  Now, you got that information from Mike Masecchia,

10:02AM 6  correct?

10:02AM 7  A.  Correct.

10:02AM 8  Q.  Do you recall also learning from Frank Burkhart that he

10:02AM 9  knew -- that Frank Burkhart knew R.K. was an informant?

10:03AM 10  A.  No, I learned from R.K. later on that he was an

10:03AM 11  informant.

10:03AM 12  Q.  Okay.  Yeah, so that's what I want to talk about.  In

10:03AM 13  2015, there's a situation, you're in your car, I think it's

10:03AM 14  Kenmore Avenue, and R.K. jumps right into it, correct?

10:03AM 15  A.  Yes, correct.

10:03AM 16  Q.  And at that point in time, he tells you, hey, I'm an

10:03AM 17  informant, correct?

10:03AM 18  A.  Correct.

10:03AM 19  Q.  And he asks you for some money, correct?

10:03AM 20  A.  Correct.

10:03AM 21  Q.  And you gave him some money, right?  Correct?

10:03AM 22  A.  Correct.

10:03AM 23  Q.  And then kind of just said go away?

10:03AM 24  A.  Correct.

10:03AM 25  Q.  Now, but you were also aware, though, sometime before,

| | | |
|---|---|---|
| 10:03AM | 1 | that he'd been arrested for robbing the Poster Art store on |
| 10:03AM | 2 | Elmwood, correct? |
| 10:03AM | 3 | A.  Correct. |
| 10:03AM | 4 | Q.  And after that point in time, he didn't come around |
| 10:03AM | 5 | anymore, correct? |
| 10:03AM | 6 | A.  Correct. |
| 10:03AM | 7 | Q.  But you don't learn he's an informant until, like, a |
| 10:03AM | 8 | while after that, correct? |
| 10:03AM | 9 | A.  Correct. |
| 10:03AM | 10 | Q.  Okay.  So would that be fair to say you learned he's an |
| 10:03AM | 11 | informant later in 2013? |
| 10:03AM | 12 | A.  Correct.  Well, mid -- |
| 10:03AM | 13 | Q.  Let me try to -- |
| 10:03AM | 14 | **MR. TRIPI:**  Objection, I'd like the witness to be |
| 10:04AM | 15 | able to finish answering. |
| 10:04AM | 16 | **MR. MacKAY:**  I'm going to ask him a question to |
| 10:04AM | 17 | center that. |
| 10:04AM | 18 | **MR. TRIPI:**  He was answering a question. |
| 10:04AM | 19 | **THE COURT:**  Hang on. |
| 10:04AM | 20 | He said mid.  He -- |
| 10:04AM | 21 | The question was:  So would that be fair to say that |
| 10:04AM | 22 | you learned he's an informant later in 2013? |
| 10:04AM | 23 | And the witness said:  Correct.  Well, mid -- |
| 10:04AM | 24 | **MR. TRIPI:**  Sounded like there was going to be more |
| 10:04AM | 25 | of the answer. |

10:04AM     1          **THE COURT:**  Well, you can ask that on --

10:04AM     2          **MR. TRIPI:**  Okay.

10:04AM     3          **THE COURT:**  -- redirect.

10:04AM     4          **MR. TRIPI:**  Withdraw.  Thank you.

10:04AM     5          **THE COURT:**  Go ahead.

10:04AM     6          **BY MR. MacKAY:**

10:04AM     7   Q.  So if we're talking mid 2013, would that be kind of after

10:04AM     8   the timeframe you start dealing back with Mark Kagan?

10:04AM     9   A.  Correct.

10:04AM    10   Q.  Okay.  All right.  Now, Mario Vacanti.  Remind us, when

10:04AM    11   did you learn he's an informant?

10:04AM    12   A.  No, Mario was not an informant.

10:04AM    13   Q.  I'm sorry, yeah.  Let me withdraw that.

10:04AM    14       When did you learn there was an investigation into Mario

10:05AM    15   Vacanti?

10:05AM    16   A.  2015.

10:05AM    17   Q.  Okay.  And again that comes through Mike Masecchia,

10:05AM    18   right?

10:05AM    19   A.  Correct.

10:05AM    20   Q.  And he tells you that Mario Vacanti is being investigated

10:05AM    21   for money laundering, correct?

10:05AM    22   A.  Correct.

10:05AM    23   Q.  And he provides some specific information about a person

10:05AM    24   whom Mario Vacanti is owed money by, correct?

10:05AM    25   A.  Correct.

10:05AM 1   Q. And that was Paul Humphries, correct?

10:05AM 2   A. Correct.

10:05AM 3   Q. He says he owes him $4,000, correct?

10:05AM 4   A. Correct.

10:05AM 5   Q. At that point in time, you didn't ask, like, how does

10:05AM 6   anybody know who owes money, correct?

10:05AM 7   A. Did I ask?

10:05AM 8   Q. Yeah.

10:05AM 9   A. No.

10:05AM 10  Q. Okay. You just took the information as sort of gospel

10:05AM 11  that he was being investigated, correct?

10:05AM 12  A. Correct.

10:05AM 13  Q. So this information -- oh, sorry. Now, you had been

10:05AM 14  dealing with Mario Vacanti for quite some time though,

10:05AM 15  correct?

10:05AM 16  A. A year. A little over a year.

10:05AM 17  Q. Yeah. So I want to talk about Mario.

10:05AM 18     Mario, you recall, he was arrested and charged in federal

10:06AM 19  court in about 2011, correct?

10:06AM 20  A. Correct.

10:06AM 21  Q. And then he ultimately pleads guilty, and do you recall

10:06AM 22  him being on supervised release into 2014?

10:06AM 23  A. I knew that he was on, at some point he was, but I didn't

10:06AM 24  know when I met him that he was still on supervised release.

10:06AM 25  Q. Okay. So if -- if -- when do you think you met Mario

10:06AM   1   Vacanti?

10:06AM   2   A.  It was sometime in 2014.

10:06AM   3   Q.  Okay.  And then --

10:06AM   4        **MR. TRIPI:**  I didn't hear that, I'm sorry.

10:06AM   5        **THE WITNESS:**  Sometime in 2014.

10:06AM   6        **MR. TRIPI:**  Thank you.

10:06AM   7        **BY MR. MacKAY:**

10:06AM   8   Q.  Okay.  And ultimately is it fair to say he becomes part

10:06AM   9   of your inner circle?

10:06AM  10   A.  Correct.

10:06AM  11   Q.  Okay.  And he was a name you passed along to Mike

10:06AM  12   Masecchia to get to Joe Bongiovanni?

10:06AM  13   A.  Correct.

10:06AM  14   Q.  Now, and then again, you think it's sometime in 2015 that

10:06AM  15   you learn that there's an investigation into him, correct?

10:06AM  16   A.  Correct.

10:06AM  17   Q.  But after the -- and at that point in time, you backed

10:06AM  18   off your drug activity with him, correct?

10:06AM  19   A.  Correct.

10:06AM  20   Q.  But with Mario Vacanti, there was also a money-laundering

10:06AM  21   component, correct?

10:06AM  22   A.  Correct.

10:06AM  23   Q.  You laundered money for him, right?

10:06AM  24   A.  Correct.

10:06AM  25        **THE COURT:**  Could you pull the microphone a little

10:07AM 1 closer to you, Mr. Serio?

10:07AM 2         **THE WITNESS:** Oh, sorry.

10:07AM 3         **MR. MacKAY:** Sorry.

10:07AM 4         **BY MR. MacKAY:**

10:07AM 5 Q. The question was: You had laundered money for him,

10:07AM 6 correct?

10:07AM 7 A. Correct.

10:07AM 8 Q. And you did it by way of the trans -- purchase and

10:07AM 9 transfer of homes?

10:07AM 10 A. Correct.

10:07AM 11 Q. Trying to make that a shortened version of it, but you

10:07AM 12 cleaned the money by buying homes with him, correct?

10:07AM 13 A. Correct.

10:07AM 14 Q. And ultimately they get sold off, correct?

10:07AM 15 A. Correct.

10:07AM 16 Q. Now, after you hear that Mario Vacanti's under

10:07AM 17 investigation, you ceased drug-dealing activities with him?

10:07AM 18 A. Correct.

10:07AM 19 Q. But you still continue to deal with him throughout 2015

10:07AM 20 and 2016, correct?

10:07AM 21 A. I don't know about 2015 -- not 2015, I was still friends

10:07AM 22 with him and hung out with him a lot.

10:07AM 23 Q. Okay. But, so let's try to place this because we have

10:07AM 24 seasons here in Buffalo we can use.

10:07AM 25     When do you think, in the year of 2015, you learn that

| | | |
|---|---|---|
| 10:07AM | 1 | Mario Vacanti is potentially under investigation? |
| 10:07AM | 2 | A.  It was either late spring, early summer. |
| 10:08AM | 3 | Q.  Getting towards mid -- |
| 10:08AM | 4 | A.  Yeah, it was warm outside, I remember that. |
| 10:08AM | 5 | Q.  Okay.  But after that point in time, you still have |
| 10:08AM | 6 | substantial contact with Mario Vacanti, correct? |
| 10:08AM | 7 | A.  Yeah. |
| 10:08AM | 8 | Q.  Yeah.  Would you have any reason to doubt me that, you |
| 10:08AM | 9 | know, from November 2015 to September 2016, you had 165 |
| 10:08AM | 10 | telephone calls with him? |
| 10:08AM | 11 | A.  Correct. |
| 10:08AM | 12 | Q.  Okay.  So you're still dealing with him in a |
| 10:08AM | 13 | money-laundering component after the drug activity, correct? |
| 10:08AM | 14 | A.  Yeah, we were working on a property.  Yes. |
| 10:08AM | 15 | Q.  Yeah, there were two properties ultimately that you deal |
| 10:08AM | 16 | with him, correct? |
| 10:08AM | 17 | A.  Correct. |
| 10:08AM | 18 | Q.  It's 165 Wardman, correct? |
| 10:08AM | 19 | A.  Correct. |
| 10:08AM | 20 | Q.  And I think the other one is 180 North Park? |
| 10:08AM | 21 | A.  Correct. |
| 10:08AM | 22 | Q.  And were those, I mean, those were properties that |
| 10:08AM | 23 | involved sort of the transfer of drug money in some fashion, |
| 10:08AM | 24 | correct? |
| 10:08AM | 25 | A.  Correct. |

10:08AM 1   Q.  I mean, those were money-laundered properties, correct?

10:08AM 2   A.  Correct.

10:08AM 3   Q.  Now, you also told us about Gables bar and hearing some

10:09AM 4   information about what was going on there, correct?

10:09AM 5   A.  Correct.

10:09AM 6   Q.  Were you able, in any fashion, to date when that

10:09AM 7   happened?

10:09AM 8   A.  I'm sorry, I didn't hear --

10:09AM 9   Q.  Are you able to date when that happened at all?

10:09AM 10  A.  Not specifically.

10:09AM 11  Q.  Okay.  Again, using some of the reference points, you

10:09AM 12  know, we've talked about different figures and things were

10:09AM 13  happening, can you tell us what it was before or after, by

10:09AM 14  any chance?

10:09AM 15  A.  That, I can't remember.

10:09AM 16  Q.  Okay.  Do you think was closer in time to your arrest, or

10:09AM 17  closer in time to the beginning of your operations?

10:09AM 18  A.  I would say midpoint.

10:09AM 19  Q.  Okay.

10:09AM 20  A.  2013 to '15, somewhere in there.

10:09AM 21  Q.  I guess, so if we're talking about, well, let's do it

10:09AM 22  this way.

10:09AM 23      We know in early 2013, you're out of the drug game for

10:09AM 24  first half of 2013, correct?

10:09AM 25  A.  Correct.

10:09AM 1 Q. Do you think it was after that, or before that?

10:09AM 2 A. That was after that, I believe.

10:09AM 3 Q. Okay. Now, you learned information about an individual

10:09AM 4 named Steve who's a bartender there, correct?

10:09AM 5 A. Correct.

10:09AM 6 Q. I think you told us on direct, it really didn't mean much

10:09AM 7 to you because you didn't deal with these individuals,

10:10AM 8 correct?

10:10AM 9 A. Correct.

10:10AM 10 Q. I mean, you were -- did you grow up in North Buffalo?

10:10AM 11 A. In Tonawanda.

10:10AM 12 Q. Okay. But you owned a sub shop on Hertel Avenue for some

10:10AM 13 time?

10:10AM 14 A. Correct.

10:10AM 15 Q. I mean, fair to say you were familiar with the North

10:10AM 16 Buffalo neighborhood?

10:10AM 17 A. Yes.

10:10AM 18 Q. But you knew Mike Masecchia to have sort of a deeper

10:10AM 19 connection to North Buffalo, correct?

10:10AM 20 A. Correct.

10:10AM 21 Q. He had grown up there, correct?

10:10AM 22 A. Correct.

10:10AM 23 Q. Before he moved into your Huntington property, he

10:10AM 24 maintained a residence on Colvin Boulevard, correct?

10:10AM 25 A. Correct.

10:10AM    1    Q.  That was 407 Colvin, correct?

10:10AM    2    A.  I believe he lived in North Tonawanda for a long time.  I

10:10AM    3    think on Colvin was earlier on.

10:10AM    4    Q.  Okay.  But you know he did maintain a residence on

10:10AM    5    Colvin, correct?

10:10AM    6    A.  Yeah, at some point.

10:10AM    7    Q.  Okay.  You know, kind of, in the vicinity of, like,

10:10AM    8    Tacoma and Colvin?

10:10AM    9    A.  Yes.

10:10AM   10    Q.  Kind of if we're trying to give the jury a picture,

10:10AM   11    probably a -- one long block south of Hanna's Frosty Treats?

10:11AM   12    A.  Sounds right.

10:11AM   13    Q.  Okay.  And that location where Mike Masecchia lived,

10:11AM   14    that's basically one long block and a short block over to

10:11AM   15    Gables bar, correct?

10:11AM   16    A.  Correct.

10:11AM   17    Q.  Gables is on Hertel, kind of just around the corner from

10:11AM   18    Colvin, correct?

10:11AM   19    A.  Correct.

10:11AM   20    Q.  And you knew Mike Masecchia throughout the years to

10:11AM   21    socialize in the North Buffalo neighborhood, correct?

10:11AM   22    A.  Correct.

10:11AM   23    Q.  That was kind of his area to go out, correct?

10:11AM   24    A.  Correct.

10:11AM   25    Q.  You know, his local watering holes were that

10:11AM   1   neighborhood, correct?

10:11AM   2   A.  Correct.

10:11AM   3   Q.  And you knew him to know a lot of people in North

10:11AM   4   Buffalo, correct?

10:11AM   5   A.  Correct.

10:11AM   6   Q.  So not only was he sort of a guy who was always out and

10:11AM   7   about in the North Buffalo area, but he was also a school

10:11AM   8   teacher in the City of Buffalo, correct?

10:11AM   9   A.  Correct.

10:11AM   10  Q.  Now, when Mike Masecchia told you this information about

10:11AM   11  Gables, he never told you specifically where he got it,

10:11AM   12  correct?

10:11AM   13  A.  I was just assuming, correct.

10:11AM   14  Q.  Yeah.  So, I mean, so he never told you this was

10:12AM   15  information I got from Joe Bongiovanni, correct?

10:12AM   16  A.  Correct.

10:12AM   17  Q.  So as you sit here today, you don't know whether he

10:12AM   18  was just telling you neighborhood gossip, correct?

10:12AM   19  A.  Correct.

10:12AM   20  Q.  You don't know whether he actually learned that from the

10:12AM   21  individuals at Gables himself by going to that bar, correct?

10:12AM   22  A.  Correct.

10:12AM   23  Q.  Okay.  Lou Selva.  He's an individual that, for you, he

10:12AM   24  sort of comes into the picture about what time?  2008?  2009?

10:12AM   25  A.  Correct.

10:12AM    1    Q. And how do you first get involved with him?

10:12AM    2    A. Through Mike.

10:12AM    3    Q. Okay. So, I just want to walk through that.

10:12AM    4    Your connection to Lou Selva is through Mike Masecchia,

10:12AM    5    correct?

10:12AM    6    A. Correct.

10:12AM    7    Q. When you met him, you understood him to have some

10:12AM    8    involvement with whatever Mike Masecchia was doing out in the

10:12AM    9    Southern Tier?

10:12AM    10    A. Correct.

10:12AM    11    Q. You didn't previously know Lou Selva in any fashion,

10:12AM    12    correct?

10:12AM    13    A. I mean, I met him a couple times. Like, I knew him, I

10:12AM    14    knew who he was, he knew who I was.

10:12AM    15    Q. Yeah. We put that in kind of the friends category?

10:13AM    16    A. Yeah.

10:13AM    17    Q. Or maybe even not friends, but just somebody from being

10:13AM    18    out and about?

10:13AM    19    A. Yeah, acquaintance.

10:13AM    20    Q. Now, you believed he was a coke head, correct?

10:13AM    21    A. Correct.

10:13AM    22    Q. And your understanding, again, of what Mike Masecchia

10:13AM    23    presented to this operation was he was gonna be the one who

10:13AM    24    talked to Mr. Bongiovanni and get the information, correct?

10:13AM    25    A. Lou was.

```
10:13AM    1   Q.  Yes.

10:13AM    2   A.  Correct.

10:13AM    3   Q.  And he'd relay it to Mike Masecchia, correct?

10:13AM    4   A.  Correct.

10:13AM    5   Q.  Who would get it back to you, correct?

10:13AM    6   A.  Correct.

10:13AM    7   Q.  And now you understand Lou Selva to be Mike Mas -- I'm

10:13AM    8   sorry, to be Joe Bongiovanni's best friend, correct?

10:13AM    9   A.  Correct.

10:13AM   10   Q.  But again, just remind the jury, I think you said it on

10:13AM   11   direct, you never met Joe Bongiovanni, correct?

10:13AM   12   A.  Correct.

10:13AM   13   Q.  You were never -- there was never any situation where you

10:13AM   14   and he sat down, correct?

10:13AM   15   A.  Correct.

10:13AM   16   Q.  Never any situation where you, Mike Masecchia, and him

10:13AM   17   sat down, correct?

10:13AM   18   A.  Correct.

10:13AM   19   Q.  Same with you, Lou Selva, and Mr. Bongiovanni, you never

10:13AM   20   had any sort of sit-down, correct?

10:14AM   21   A.  Correct.

10:14AM   22   Q.  Now, at some point in time, Mr. Selva becomes involved in

10:14AM   23   the negotiations about the payments, correct?

10:14AM   24   A.  Correct.

10:14AM   25   Q.  In what fashion?
```

10:14AM    1    A.  I really -- Mike -- it was between him and Mike.  So, I

10:14AM    2    really didn't know too much about that.

10:14AM    3    Q.  Okay.  But I guess what I'm saying is that at some point

10:14AM    4    in time, there are discussions where -- between you and

10:14AM    5    Mr. Masecchia where Lou Selva is present, too, correct?

10:14AM    6    A.  Correct.

10:14AM    7    Q.  This would occur at the Western Door Steak House?

10:14AM    8    A.  Correct.

10:14AM    9    Q.  And that's in -- was that in context of sort of bumping

10:14AM   10    the payments up to $4,000?

10:14AM   11    A.  I believe so.

10:14AM   12    Q.  And recall, if you can, what was Lou Selva sort of

10:14AM   13    bringing to the table in this conversation?

10:14AM   14    A.  Just that, I mean, he really wasn't saying much.

10:14AM   15    Q.  Okay.  Again, Mike Masecchia is sort of the primary

10:14AM   16    negotiator in all this?

10:14AM   17    A.  Correct.

10:14AM   18    Q.  And but previous --

10:14AM   19    A.  It really wasn't a negotiation.  It was just him telling

10:14AM   20    me that it was going to be bumped up.

10:14AM   21    Q.  Okay.  So, yeah --

10:15AM   22    A.  So it wasn't, like, hashing out details or anything.  It

10:15AM   23    was just, all right, for 2,000 more, he'll take care of you.

10:15AM   24    Q.  Okay.  So at that point in time, Mike Masecchia is sort

10:15AM   25    of presenting you, I don't want to call it, like, a

10:15AM  1   take-it-or-leave-it offer, but he's saying this is what it's

10:15AM  2   gonna be now?

10:15AM  3   A.  Yes.

10:15AM  4   Q.  And at that point in time, I think we talked about this

10:15AM  5   on Friday, you had been paying Mike Masecchia for about a

10:15AM  6   year?

10:15AM  7   A.  Correct.

10:15AM  8   Q.  Because those start, I think you said, it was late 2010

10:15AM  9   the payments start?

10:15AM  10  A.  Correct.

10:15AM  11  Q.  And then they ramp up and sort of a year later when you

10:15AM  12  start dealing with Santiago Gale, correct?

10:15AM  13  A.  Correct.

10:15AM  14  Q.  So this information with Mike Masecchia, Lou Selva and

10:15AM  15  you, that all occurs late 2011 or so?

10:15AM  16  A.  Fall.  About fall 2011, I believe.

10:15AM  17  Q.  Okay.  In proximity to when you start dealing with

10:15AM  18  Santiago Gale?

10:15AM  19  A.  Correct.

10:15AM  20  Q.  Okay.  Now, after you initially start the payments

10:16AM  21  through Mike Masecchia, you understood Lou Selva to still

10:16AM  22  have an ongoing part in the -- the grow operations that were

10:16AM  23  going on down in the Southern Tier, correct?

10:16AM  24  A.  Correct.

10:16AM  25  Q.  But going forward, I think if I understand you correctly,

10:16AM    1    you didn't really have hands-on dealings with those

10:16AM    2    operations down there, correct?

10:16AM    3    A.   Correct.

10:16AM    4    Q.   I think you said you clipped some plants at one point in

10:16AM    5    time, correct?

10:16AM    6    A.   Correct.

10:16AM    7    Q.   I think was that in about the 2009 timeframe?

10:16AM    8    A.   Around then.

10:16AM    9    Q.   But going forward, the only real connection you would

10:16AM   10    have to those activities was to purchase the marijuana once

10:16AM   11    it was done being grown, correct?

10:16AM   12    A.   Correct.

10:16AM   13    Q.   Now, moving forward, at some point in time you set up a

10:16AM   14    grow operation in Lou Selva's house, correct?

10:16AM   15    A.   Correct.

10:16AM   16    Q.   I think that's the one you told us takes about a couple

10:16AM   17    days, correct?

10:16AM   18    A.   Correct.

10:16AM   19    Q.   And then you really don't have any more specific dealings

10:16AM   20    with how that operation is being run, correct?

10:16AM   21    A.   Correct.

10:16AM   22    Q.   It's just another source of marijuana for you to take

10:17AM   23    when it's done, correct?

10:17AM   24    A.   Correct.

10:17AM   25    Q.   And then at some point in time in late 2016, about 15

10:17AM   1   pounds of the marijuana you were storing at Lou Selva's house

10:17AM   2   comes out missing, correct?

10:17AM   3   A.   Correct.

10:17AM   4   Q.   And, you know, your experience in the drug business is

10:17AM   5   oftentimes when things come up missing, you've been ripped

10:17AM   6   off, fair to say?

10:17AM   7          **MR. TRIPI:**  Objection, speculation.

10:17AM   8          **THE COURT:**  No, overruled.

10:17AM   9          **THE WITNESS:**  I mean, in the business, yes.  But also

10:17AM  10   it could have been my mistake, so I didn't make any

10:17AM  11   accusations.

10:17AM  12          **BY MR. MacKAY:**

10:17AM  13   Q.   Okay.  But as you sit here today, do you believe you were

10:17AM  14   ripped off?

10:17AM  15   A.   It's questionable.  I won't say for sure I was because,

10:17AM  16   like I said, it could have been my own mistake.

10:17AM  17   Q.   Okay.  Now, just to give the jury a street estimate,

10:17AM  18   15 pounds of marijuana, about how much is that worth at that

10:17AM  19   time?

10:17AM  20   A.   At that time, about, yeah, $30,000.

10:17AM  21   Q.   After that point in time, you no longer dealt with Lou

10:18AM  22   Selva, correct?

10:18AM  23   A.   Correct.

10:18AM  24   Q.   No longer stored marijuana at his house, correct?

10:18AM  25   A.   Correct.

10:18AM   1   Q.  No longer had any direct dealings with him, correct?

10:18AM   2   A.  Correct.

10:18AM   3   Q.  However, just to be clear, the payments to Mike Masecchia

10:18AM   4   continue all the way up to the time of your arrest, correct?

10:18AM   5   A.  Correct.

10:18AM   6   Q.  So those payments are ongoing up in April of 2017,

10:18AM   7   correct?

10:18AM   8   A.  Correct.

10:18AM   9   Q.  But no further dealings with Lou Selva, correct?

10:18AM  10   A.  Correct.

10:18AM  11   Q.  Okay.  I just want to go back to Mike Masecchia for a

10:18AM  12   second.

10:18AM  13       He's the one that initially proposes the payments to

10:18AM  14   Mr. Bongiovanni, correct?

10:18AM  15   A.  Correct.

10:18AM  16   Q.  Now, you purchased your Lebrun home in approximately

10:18AM  17   November of 2011?

10:18AM  18   A.  Correct.

10:18AM  19   Q.  And you spent about a year renovating that, correct?

10:18AM  20   A.  Correct.

10:18AM  21   Q.  Now at some point in time, you enter into sort of a

10:18AM  22   rent-to-own arrangement with Mike Masecchia?

10:18AM  23   A.  Correct.

10:18AM  24   Q.  Can you date that in terms of what I just talked about?

10:18AM  25   A.  Sometime in 2012, I believe.

10:19AM    1    Q.  Fair to say, like, after the Lebrun house is done and

10:19AM    2    after you're out of Huntington?

10:19AM    3    A.  Oh, yes.

10:19AM    4    Q.  Okay.  So after you move out of Huntington, you rent that

10:19AM    5    to Mike Masecchia, correct?

10:19AM    6    A.  Correct.

10:19AM    7    Q.  With an understanding that the rent is going towards

10:19AM    8    ultimately --

10:19AM    9    A.  The mortgage.

10:19AM   10    Q.  -- the mortgage.

10:19AM   11        Yeah, can you describe that for the jury, how you set it

10:19AM   12    up?

10:19AM   13    A.  So, I sold it to him for, I believe, $400,000.

10:19AM   14        I owed 2-, around 2- or 220- on it.  And he gave me

10:19AM   15    $50,000 down.  And I gave him a two-year time period to get a

10:19AM   16    mortgage, and then pay off the remaining -- the equity in the

10:19AM   17    house.

10:19AM   18        And at that time, he was just to pay the mortgage.  And

10:19AM   19    then once he got the -- his own mortgage, then he would stop

10:19AM   20    paying it.

10:19AM   21    Q.  But he ultimately never got a mortgage on that, correct?

10:19AM   22    A.  Correct.

10:19AM   23    Q.  And he ultimately didn't pay you, correct?

10:19AM   24    A.  Correct.

10:19AM   25    Q.  And you ultimately had to evict him from that property,

10:20AM 1  correct?

10:20AM 2  A.  Yes.

10:20AM 3  Q.  You also learned at some point that he bought a condo in

10:20AM 4  Florida?

10:20AM 5  A.  Yes, sir.

10:20AM 6  Q.  And did you learn that a substantial amount of cash was

10:20AM 7  found at the Huntington address -- I'm sorry, withdrawn.

10:20AM 8      Did you come to find out later that a substantial amount

10:20AM 9  of cash was found when he was arrested?

10:20AM 10 A.  Correct.

10:20AM 11 Q.  Okay.  Now, you understood him to have some sort of

10:20AM 12 dealings in some fashion with Remus Nowak correct?

10:20AM 13 A.  Correct.

10:20AM 14 Q.  I'm using the term "dealings," but it's fair to say they

10:20AM 15 didn't -- it seemed to you like they didn't really like each

10:20AM 16 other, correct?

10:20AM 17 A.  Correct.

10:20AM 18 Q.  And you never really understood what that was about,

10:20AM 19 correct?

10:20AM 20 A.  No.  They had some dealings, and then all of a sudden he

10:20AM 21 didn't like him.

10:20AM 22 Q.  Okay.

10:20AM 23 A.  He really didn't elaborate into it.

10:20AM 24 Q.  And when you said all of a sudden he didn't like him, did

10:20AM 25 that occur when you were dealing with Mr. Masecchia?

10:20AM   1   A. Correct.

10:20AM   2   Q. At some point in time when you and Mr. Masecchia are

10:20AM   3   dealing with each other, you understand there's a break with

10:20AM   4   Remus Nowak, correct?

10:21AM   5   A. Correct.

10:21AM   6   Q. And then moving forward in time with Remus Nowak, you

10:21AM   7   come to find out that potentially he lives next to your

10:21AM   8   friend Mark Falzone, correct?

10:21AM   9   A. Correct.

10:21AM   10   Q. And that comes up in a situation where Mike Masecchia

10:21AM   11   basically says I gotta get out of here because Remus lives

10:21AM   12   next door?

10:21AM   13   A. Correct.

10:21AM   14   Q. And that's kind of further down the line from when you

10:21AM   15   first knew Mr. Masecchia and Mr. Nowak were dealing with each

10:21AM   16   other, correct?

10:21AM   17   A. Correct.

10:21AM   18   Q. Okay. Now in all the years that you were paying

10:21AM   19   Mr. Masecchia, you were never provided with any sort of cover

10:21AM   20   story to use, correct?

10:21AM   21   A. Correct.

10:21AM   22   Q. You were never told any sort of excuse to use if law

10:21AM   23   enforcement talked to you, correct?

10:21AM   24   A. Correct.

10:21AM   25   Q. You were never given any sort of situation to portray

10:21AM    1    yourself as if law enforcement asked you about

10:21AM    2    Mr. Bongiovanni, correct?

10:21AM    3    A.  Correct.

10:21AM    4    Q.  And ultimately, when you're arrested in April of 2017,

10:21AM    5    you asked to see Joe Bongiovanni, correct?

10:21AM    6    A.  Correct.

10:22AM    7    Q.  And at that time, I think you describe you were pretty

10:22AM    8    pissed off about what happened, correct?

10:22AM    9    A.  Correct.

10:22AM   10    Q.  You had thought you had this protection, and here you

10:22AM   11    were being arrested, correct?

10:22AM   12    A.  Correct.

10:22AM   13    Q.  But then you're asked by the officer who you're talking

10:22AM   14    to, are you his informant, correct?

10:22AM   15    A.  Correct.

10:22AM   16    Q.  And just to be clear, that was not a cover story that you

10:22AM   17    were ever provided that you should invoke if -- if arrested,

10:22AM   18    correct?

10:22AM   19    A.  Correct.

10:22AM   20    Q.  All right.  Paul Francoforte, he's a gambling buddy of

10:22AM   21    yours, correct?

10:22AM   22    A.  Correct.

10:22AM   23    Q.  He's not a drug associate in any fashion, correct?

10:22AM   24    A.  Correct.

10:22AM   25    Q.  You dealt with him -- strike that.

10:22AM 1    You met -- where did you meet him, at the casino?

10:22AM 2  A.  At the casino.

10:22AM 3  Q.  Just kind of sat down at a table, he happened to be

10:22AM 4  gambling next to you?

10:22AM 5  A.  Correct.

10:22AM 6  Q.  Kind of struck up a friendship as gamblers over the

10:22AM 7  years?

10:22AM 8  A.  Yes.  We also had mutual friends.

10:22AM 9  Q.  Okay.  So did that sort of facilitate talking and

10:23AM 10  becoming friends?

10:23AM 11  A.  Yes.

10:23AM 12  Q.  But through all your years dealing with Paul Francoforte,

10:23AM 13  he was only ever a gambling buddy, correct?

10:23AM 14  A.  Correct.

10:23AM 15  Q.  I mean, good enough friends though that you did go to the

10:23AM 16  Mohegan Sun for a tournament with him?

10:23AM 17  A.  Correct.

10:23AM 18  Q.  But again, he wasn't there for any drug-related behavior,

10:23AM 19  correct?

10:23AM 20  A.  Correct.

10:23AM 21  Q.  All right.  So I want to go through some of the folks

10:23AM 22  that were in your inner circle.

10:23AM 23    Chris Baker, correct?

10:23AM 24  A.  Correct.

10:23AM 25  Q.  Jacob Martinez, correct?

| | | |
|---|---|---|
| 10:23AM | 1 | A. Correct. |
| 10:23AM | 2 | Q. Jay Campbell, correct? |
| 10:23AM | 3 | A. Correct. |
| 10:23AM | 4 | Q. Jimmy Rivera? |
| 10:23AM | 5 | A. Correct. |
| 10:23AM | 6 | Q. Jay Molecki? |
| 10:23AM | 7 | A. Correct. |
| 10:23AM | 8 | Q. Mike Hardick? |
| 10:23AM | 9 | A. Well, he wasn't a drug associate, he worked for me. |
| 10:23AM | 10 | Q. Okay. So -- so Mike Hardick is not a drug associate, |
| 10:23AM | 11 | correct? |
| 10:23AM | 12 | A. Correct. |
| 10:23AM | 13 | Q. But he's involved in the real estate operations, correct? |
| 10:23AM | 14 | A. Correct. |
| 10:23AM | 15 | Q. Okay. And to be clear, is he ever involved in any of the |
| 10:23AM | 16 | operations that you recall where you're flipping the houses |
| 10:24AM | 17 | and using them as grow houses? |
| 10:24AM | 18 | A. No, he was not. |
| 10:24AM | 19 | Q. Okay. So he's really just a friend, correct? |
| 10:24AM | 20 | A. Correct. |
| 10:24AM | 21 | Q. And well, I said friend, but you also -- |
| 10:24AM | 22 | A. Employed him. |
| 10:24AM | 23 | Q. He was an employee? |
| 10:24AM | 24 | A. Correct. |
| 10:24AM | 25 | Q. All right. Mike Moynihan, is he -- |

10:24AM 1   A.  Yes.

10:24AM 2   Q.  -- one of your associates?

10:24AM 3   A.  Correct.

10:24AM 4   Q.  Inner circle?

10:24AM 5   A.  Yes.

10:24AM 6   Q.  Anthony Greco?

10:24AM 7   A.  Yes, correct.

10:24AM 8   Q.  And Anthony Greco, you also had some dealings with some

10:24AM 9 of your opiates, correct?

10:24AM 10   A.  Correct.

10:24AM 11   Q.  You would buy and sell from each other when you needed

10:24AM 12 them?

10:24AM 13   A.  Correct.

10:24AM 14   Q.  Matt LoTempio?

10:24AM 15   A.  Correct.

10:24AM 16   Q.  Inner circle?

10:24AM 17   A.  Yes.

10:24AM 18   Q.  Okay.  Anthony Mayo?

10:24AM 19   A.  Yes.

10:24AM 20   Q.  I think we talked about Mario Vacanti.  But 2014, for a

10:24AM 21 while, he was part of your inner circle?

10:24AM 22   A.  Yes.

10:24AM 23   Q.  Okay.  But not before 2014?

10:24AM 24   A.  No, not before 2014.

10:24AM 25   Q.  Because you wouldn't have met before then, correct?

10:24AM    1    A.  Correct.

10:24AM    2    Q.  Mark Falzone?

10:24AM    3    A.  Yes.

10:24AM    4    Q.  When I'm saying this, I'm saying he's inner circle?

10:25AM    5    A.  Yes.

10:25AM    6    Q.  Okay.  Mike Buttitta?

10:25AM    7    A.  I won't say inner circle, he was more of a friend.  I

10:25AM    8    occasionally sold him marijuana, just small amounts.

10:25AM    9    Q.  Okay.  Let's explore that.  So did he work at all with

10:25AM   10    your property businesses?

10:25AM   11    A.  No.

10:25AM   12    Q.  Okay.  But he was not really a distributor for you?

10:25AM   13    A.  He would take, like, a pound here and there.

10:25AM   14    Q.  Okay.  But not, like, when you say here and there, if you

10:25AM   15    had to estimate, how many times did you ever give him a

10:25AM   16    pound?

10:25AM   17    A.  Maybe ten times.

10:25AM   18    Q.  Okay.  Was he ever a name that you passed to Mike

10:25AM   19    Masecchia to have looked out for?

10:25AM   20    A.  I might have, but I'm not 100 percent sure.

10:25AM   21    Q.  Okay.  John Robinson, part of your inner circle?

10:25AM   22    A.  Yes.

10:25AM   23    Q.  He's a distributor for you?

10:25AM   24    A.  Yes.

10:25AM   25    Q.  Passed his name to Mike Masecchia?

10:25AM    1    A.   Yes.

10:25AM    2    Q.   Okay.  T.S.  Part of your inner circle?

10:25AM    3    A.   Yes, at one point.

10:25AM    4    Q.   Okay.  And I think we went through it, but ultimately

10:25AM    5    there's a point in time, looks like we've got something on

10:25AM    6    the screen.

10:26AM    7         **MR. MacKAY:**  I'm sorry, Judge, it looked like there

10:26AM    8    was an exhibit that popped up, I didn't know.

10:26AM    9         **THE CLERK:**  It did not go to the jury.

10:26AM   10         **MR. TRIPI:**  Sorry about that.

10:26AM   11         **THE CLERK:**  That's okay, I shut it off.

10:26AM   12         **BY MR. MacKAY:**

10:26AM   13    Q.   All right.  So T.S., ultimately your relationship falls

10:26AM   14    off with him, correct?

10:26AM   15    A.   Correct.

10:26AM   16    Q.   And just to remind the jury, he wasn't really a source of

10:26AM   17    supply so much as just a plug to somebody else, correct?

10:26AM   18    A.   Yes, he was in between.

10:26AM   19    Q.   Right.  So he hooks you up with Santiago Gale, correct?

10:26AM   20    A.   Well, he was a go-between.  I met with Santiago Gale

10:26AM   21    once, but he --

10:26AM   22    Q.   But after --

10:26AM   23    A.   -- dealt with Santiago.

10:26AM   24    Q.   -- sort of the initial setup with Santiago Gale,

10:26AM   25    everything goes through T.S. for that source, correct?

10:26AM    1    A.  Correct.

10:26AM    2    Q.  And I think we talked about it, you never provided

10:26AM    3    Santiago Gale's name to Mike Masecchia, correct?

10:26AM    4    A.  Correct.

10:26AM    5    Q.  Do you recall providing T.S.'s name to Mike Masecchia?

10:27AM    6    A.  Yes.

10:27AM    7    Q.  Now at some point in time, you come to learn that T.S.

10:27AM    8    had been or was an informant, correct?

10:27AM    9    A.  Correct.

10:27AM   10    Q.  And approximately what timeframe did that occur?

10:27AM   11    A.  I want to say late 2013.

10:27AM   12    Q.  Okay.  So, by that time, you're exclusively dealing with

10:27AM   13    the -- that's the Mark Kagan/Jarrett Guy timeframe, correct?

10:27AM   14    A.  Correct.

10:27AM   15    Q.  You had stopped dealing with T.S. quite some time before,

10:27AM   16    correct?

10:27AM   17    A.  Correct.

10:27AM   18    Q.  Okay.  Because, again, you were out of the -- the drug

10:27AM   19    game after the Wayne Anderson arrest, correct?

10:27AM   20    A.  Correct.

10:27AM   21    Q.  Now, back when you were dealing with T.S., my question

10:27AM   22    was, did you -- you passed his name to Joe Bongiovanni to

10:27AM   23    look out for?

10:27AM   24    A.  Correct.

10:27AM   25    Q.  Okay.  Now, you never came to learn that he had been a

10:27AM 1   source at that point in time when you passed the name,

10:27AM 2   correct?

10:27AM 3   A.  Correct.

10:27AM 4   Q.  It wasn't until much later that you hear that he's an

10:27AM 5   informant, correct?

10:27AM 6   A.  Correct.

10:27AM 7   Q.  So if you're dealing with T.S., I think did we establish

10:28AM 8   that's approximately 2011 to 2012?

10:28AM 9   A.  Correct.

10:28AM 10  Q.  And that's the timeframe you passed his name to Mike

10:28AM 11  Masecchia, correct?

10:28AM 12  A.  Correct.

10:28AM 13  Q.  But at that point in time, you never received any

10:28AM 14  information that he was actually a DEA confidential source

10:28AM 15  back in 2009, correct?

10:28AM 16  A.  Correct.

10:28AM 17  Q.  All right.  Kelly Brace, he was the individual you were

10:28AM 18  ultimately arrested with, correct?

10:28AM 19  A.  Correct.

10:28AM 20  Q.  Part of your inner circle?

10:28AM 21  A.  He was an associate, yes.

10:28AM 22  Q.  He distributed for you, correct?

10:28AM 23  A.  Yes.

10:28AM 24  Q.  Passed his name to Mike Masecchia?

10:28AM 25  A.  Yes.

10:28AM 1 Q. Okay. Dave Siwek, does that name have any meaning to

10:28AM 2 you?

10:28AM 3 A. No.

10:28AM 4 Q. Okay. How about Dave Mitchkay? Does that name have any

10:28AM 5 meaning to you?

10:28AM 6 A. Yes.

10:28AM 7 Q. Okay. Who was he?

10:28AM 8 A. He was a friend that I had a falling out with, but we did

10:28AM 9 heroin together.

10:28AM 10 Q. Okay. He was never, like, one of your distributors,

10:28AM 11 correct?

10:28AM 12 A. Correct.

10:28AM 13 Q. And when you -- with your drug use, I want to center

10:28AM 14 that. Dave Mitchkay, when were you doing heroin with him?

10:28AM 15 A. I believe it was 2014.

10:29AM 16 Q. Okay. And then ultimately you have this falling out, and

10:29AM 17 there's no more contact with Dave Mitchkay?

10:29AM 18 A. Correct.

10:29AM 19 Q. So he was only really ever a personal use -- somebody you

10:29AM 20 used personally with, correct?

10:29AM 21 A. Correct. Well, he used to get the heroin for me at some

10:29AM 22 point.

10:29AM 23 Q. Okay. But when we gets it for you, this is in

10:29AM 24 personal-use amounts, correct?

10:29AM 25 A. Correct.

10:29AM   1   Q.  You didn't understand him to be like a distributor in

10:29AM   2   some fashion, correct?

10:29AM   3   A.  No.  Correct.

10:29AM   4   Q.  He's not a source of supply for drugs?

10:29AM   5   A.  Correct.

10:29AM   6   Q.  And he's not a part of your inner circle, correct?

10:29AM   7   A.  Correct.

10:29AM   8   Q.  He's just somebody you would do drugs with for a period

10:29AM   9   of time, correct?

10:29AM  10   A.  Correct.

10:29AM  11   Q.  Okay.  So, I went through a number of -- of names in the

10:29AM  12   inner circle.  Those are the ones you passed to Mike

10:29AM  13   Masecchia, correct?

10:29AM  14   A.  Correct.

10:29AM  15   Q.  And you expected those to go to Joe Bongiovanni, correct?

10:29AM  16   A.  Correct.

10:29AM  17   Q.  Okay.  David Oddo, he was not in your inner circle,

10:29AM  18   correct?

10:29AM  19   A.  Correct.

10:29AM  20   Q.  You did not like David Oddo, correct?

10:29AM  21   A.  Correct.

10:29AM  22   Q.  Why?

10:29AM  23   A.  I just -- I met him once, and he was just an arrogant --

10:30AM  24   he just seemed like a jerk.

10:30AM  25   Q.  And because of that, you didn't like him?

10:30AM    1   A.  Correct.

10:30AM    2   Q.  And -- and never dealt with him directly, correct?

10:30AM    3   A.  Correct.

10:30AM    4   Q.  Meaning that he was never a distributor for you, correct?

10:30AM    5   A.  Correct.

10:30AM    6   Q.  And you weren't buying drugs from him?

10:30AM    7   A.  Correct.

10:30AM    8   Q.  At some point in time though, you learned from Anthony

10:30AM    9   Gerace that Gerace might be getting drugs from him, correct?

10:30AM   10   A.  Correct.

10:30AM   11   Q.  But, again, you never dealt directly with David Oddo?

10:30AM   12   A.  Correct.

10:30AM   13   Q.  Jeremie Jones, do you even recognize that name?

10:30AM   14   A.  Yes.

10:30AM   15   Q.  Who do you recognize him as?

10:30AM   16   A.  He was a drug dealer that was friends with Mike Piazza.

10:30AM   17   Q.  Okay.  But he was not part of your network, correct?

10:30AM   18   A.  Correct.

10:30AM   19   Q.  I mean, I think you told us on direct your ultimate goal

10:30AM   20   was to control all the marijuana trade in Buffalo?

10:30AM   21   A.  Correct.

10:30AM   22   Q.  But as you knew it, even while you were operating, there

10:30AM   23   were other drug networks in Buffalo that had been

10:30AM   24   established?

10:30AM   25   A.  Correct.

10:31AM 1 Q. And you as a drug dealer knew who the other drug dealers

10:31AM 2 were, correct?

10:31AM 3 A. Correct.

10:31AM 4 Q. But so the jury understands, not all drug dealers deal

10:31AM 5 with each other?

10:31AM 6 A. Correct.

10:31AM 7 Q. There are sometimes rivalries between drug dealers,

10:31AM 8 correct?

10:31AM 9 A. Correct.

10:31AM 10 Q. For example, David Oddo, you didn't even have a rivalry

10:31AM 11 with him, correct?

10:31AM 12 A. Correct.

10:31AM 13 Q. You just didn't like the guy and stayed away from him,

10:31AM 14 correct?

10:31AM 15 A. Correct.

10:31AM 16 Q. Jeremie Jones was another drug dealer. Would you even

10:31AM 17 consider him a rival?

10:31AM 18 A. He sold to people that I knew, so somewhat.

10:31AM 19 Q. Okay. But he was not somebody's name you ever passed to

10:31AM 20 Mike Masecchia to look out for, correct?

10:31AM 21 A. Correct.

10:31AM 22 Q. Because he's not part of your network, correct?

10:31AM 23 A. Correct.

10:31AM 24 Q. Okay. The name Charles Butera, do you even know who that

10:31AM 25 person is?

10:31AM  1    A.   No.

10:31AM  2    Q.   That's not a name you passed to Mike Masecchia to give to

10:31AM  3    Joe Bongiovanni, correct?

10:31AM  4    A.   Correct.

10:31AM  5    Q.   Mike Sinatra, he was not part of your organization,

10:31AM  6    correct?

10:31AM  7    A.   Correct.

10:31AM  8    Q.   You knew who he was sort of in the -- I think you used

10:31AM  9    the term acquaintance?

10:31AM  10   A.   I never -- I don't even know what he looks like.  I never

10:32AM  11   met him.  I just know that Anthony Gerace was friends with

10:32AM  12   him.

10:32AM  13   Q.   Okay.  So your sole dealings with Michael Sinatra, I

10:32AM  14   shouldn't even call them dealings, the only way you know

10:32AM  15   about Michael Sinatra is you know he was friends with Anthony

10:32AM  16   Gerace, correct?

10:32AM  17   A.   Correct.

10:32AM  18   Q.   He was never a name you passed to Mike Masecchia to have

10:32AM  19   looked out for, correct?

10:32AM  20   A.   Correct.

10:32AM  21   Q.   Because you're not dealing in any fashion in the drug

10:32AM  22   game with Michael Sinatra, correct?

10:32AM  23   A.   Correct.

10:32AM  24   Q.   Okay.  So I want to finish up.

10:32AM  25        Now, I think you've described yourself at times as high

10:32AM  1   functioning when you were on substances, correct?

10:32AM  2   A.  Correct.

10:32AM  3   Q.  And you started using marijuana when you were young,

10:32AM  4   correct?

10:32AM  5   A.  Correct.

10:32AM  6   Q.  That escalated into use of cocaine, correct?

10:32AM  7   A.  Correct.

10:32AM  8   Q.  And ultimately, you get into opiates, correct?

10:32AM  9   A.  Correct.

10:32AM  10  Q.  Starts with heroin?

10:33AM  11  A.  Excuse me?

10:33AM  12  Q.  Does it start with heroin?

10:33AM  13  A.  It starts with Lortabs.

10:33AM  14  Q.  Okay.  But when you couldn't get the opiates, you were

10:33AM  15  ultimately sort of filling in that gap with heroin, correct?

10:33AM  16  A.  Correct.

10:33AM  17  Q.  And now do you recall how much heroin were you using per

10:33AM  18  day if you couldn't get any pills?

10:33AM  19  A.  Well, it escalated.  I didn't start off using that much.

10:33AM  20  But towards the end, it was 2 to 3 grams a day.

10:33AM  21  Q.  Now, and when your opiate use escalated, you were using

10:33AM  22  40 or more oxy pills a day, correct?

10:33AM  23  A.  Correct.

10:33AM  24  Q.  I think you told us at one point in time, you get a

10:33AM  25  shipment of about 16,000 pills from Jarrett Guy, correct?

| | | |
|---|---|---|
| 10:33AM | 1 | A.  It was four shipments over a period of time of 4,000. |
| 10:33AM | 2 | Q.  So 4 times 4, you ultimately get $16,000 oxy pills from |
| 10:33AM | 3 | Jarrett Guy? |
| 10:33AM | 4 | A.  Yes. |
| 10:33AM | 5 | Q.  And I think your testimony was you used about three |
| 10:34AM | 6 | quarters of those? |
| 10:34AM | 7 | A.  Correct. |
| 10:34AM | 8 | Q.  And it would have been about a two-year timeframe? |
| 10:34AM | 9 | A.  Correct. |
| 10:34AM | 10 | Q.  So the math would be about 12,000 pills in two years? |
| 10:34AM | 11 | A.  Correct. |
| 10:34AM | 12 | Q.  But I think you've testified, though, that the way you |
| 10:34AM | 13 | would balance your substance use is you would level yourself |
| 10:34AM | 14 | out with cocaine, correct? |
| 10:34AM | 15 | A.  Correct. |
| 10:34AM | 16 | Q.  And I think it was your testimony that on the day of your |
| 10:34AM | 17 | arrest, you had leveled yourself out before going to Kelly |
| 10:34AM | 18 | Brace's house, correct? |
| 10:34AM | 19 | A.  Probably.  I don't remember saying that, but -- |
| 10:34AM | 20 | Q.  Yeah, well -- |
| 10:34AM | 21 | A.  Yeah. |
| 10:34AM | 22 | Q.  -- rather than what you said, I'm asking what you did at |
| 10:34AM | 23 | that point in time. |
| 10:34AM | 24 | A.  Well, I just woke up, so yeah, I did opiates. |
| 10:34AM | 25 | **MR. MacKAY:**  Okay.  So for the witness only can we |

10:34AM   1   show defense Exhibit W.

10:34AM   2          BY MR. MacKAY:

10:34AM   3   Q.  Okay.  Do you recognize that as a fair and accurate

10:34AM   4   depiction of, sort of, your mugshot right after you're

10:34AM   5   arrested?

10:34AM   6   A.  Yes.

10:34AM   7   Q.  Okay.  And that's a fair and accurate depiction of what

10:35AM   8   you looked like on your day of your arrest, correct?

10:35AM   9   A.  Yes.

10:35AM  10          MR. MacKAY:  Defense moves for admission of Defense

10:35AM  11   Exhibit W.

10:35AM  12          MR. TRIPI:  No objection.

10:35AM  13          THE COURT:  Received without objection.

10:35AM  14          (DFT Exhibit W was received in evidence.)

10:35AM  15          MR. MacKAY:  All right.  And can we show that to the

10:35AM  16   jury, Ms. Demma?

10:35AM  17          THE CLERK:  You're all set.

10:35AM  18          BY MR. MacKAY:

10:35AM  19   Q.  And, again, I'm not doing this to embarrass you or

10:35AM  20   anything.  I think you said you're now seven and a half years

10:35AM  21   sober, correct?

10:35AM  22   A.  Correct.

10:35AM  23   Q.  And for what all of us do in this courtroom, that's quite

10:35AM  24   remarkable.  But, you know, fair to say you were at a very

10:35AM  25   different state of mind at the time of your arrest, correct?

10:35AM 1    A.  Correct.

10:35AM 2    Q.  The worst day of your life, correct?

10:35AM 3    A.  Yes.

10:35AM 4    Q.  That kind of was the culmination of all the years of drug

10:35AM 5    use, correct?

10:35AM 6    A.  Correct.

10:35AM 7    Q.  And you had to work quite hard to turn that around to be

10:35AM 8    here as you sit here today, correct?

10:35AM 9    A.  Correct.

10:35AM 10   Q.  And you've also had a lot of time to go over what's

10:35AM 11   happened in your case, correct?

10:35AM 12   A.  Correct.

10:35AM 13   Q.  I mean, you've met with the government many times over

10:35AM 14   the years, correct?

10:35AM 15   A.  Correct.

10:35AM 16   Q.  And you've looked at a lot of in evidence in this case,

10:35AM 17   correct?

10:35AM 18   A.  Correct.

10:35AM 19   Q.  And you've, you know, had a chance to look back at what

10:35AM 20   happened, correct?

10:36AM 21   A.  Correct.

10:36AM 22   Q.  And as you sit here today, can you even say whether any

10:36AM 23   money you paid to Mike Masecchia got to Joe Bongiovanni?

10:36AM 24   A.  Are you asking my personal opinion, or a fact?

10:36AM 25   Q.  Yeah, as a fact, can you say that as you sit here today?

10:36AM  1   A.  I cannot say that.

10:36AM  2   Q.  Now your opinion, I think you've given it earlier, is

10:36AM  3   that you believed this all worked because you were never

10:36AM  4   arrested over those years, correct?

10:36AM  5   A.  Correct.

10:36AM  6   Q.  But you also, as you sit here today, don't know that it

10:36AM  7   wasn't dumb luck, correct?

10:36AM  8   A.  Correct.

10:36AM  9       **MR. MacKAY:**  Okay.  Can I just have a moment,

10:36AM 10   Your Honor?

10:36AM 11       **THE COURT:**  Sure.

10:36AM 12       **MR. MacKAY:**  I have nothing further, Your Honor.

10:36AM 13       **THE COURT:**  Any redirect?

10:36AM 14       **MR. TRIPI:**  Yeah, I do.  Can we get a brief

10:36AM 15   five-minute break, though, Judge?  I apologize --

10:36AM 16       **THE COURT:**  No, that's okay.

10:36AM 17       **MR. TRIPI:**  -- I need a comfort break.

10:36AM 18       **THE COURT:**  Yep.  Yep.  We will take our mid-morning

10:36AM 19   break now.

10:36AM 20       **MR. TRIPI:**  I'm sorry about that.

10:36AM 21       **THE COURT:**  No, that's not a problem.  So we'll take

10:36AM 22   our mid-morning break now.

10:36AM 23       So please, folks, remember my instructions about not

10:36AM 24   communicating about the case even with each other, and not

10:37AM 25   making up your mind.

| | | |
|---|---|---|
| 10:37AM | 1 | We'll see you back here in about ten or 15 minutes. |
| 10:37AM | 2 | (Jury excused at 10:37 a.m.) |
| 10:37AM | 3 | **THE COURT:** Anything for the record? |
| 10:37AM | 4 | **MR. TRIPI:** No, Your Honor, thank you. |
| 10:37AM | 5 | **THE COURT:** Anything for the record? |
| 10:37AM | 6 | **MR. MacKAY:** No, Your Honor. |
| 10:37AM | 7 | **THE COURT:** Okay. We'll see you in about ten or 15 |
| 10:37AM | 8 | minutes. |
| 10:37AM | 9 | **THE CLERK:** All rise. |
| 10:37AM | 10 | (Off the record at 10:37 a.m.) |
| 10:37AM | 11 | (Back on the record at 10:50 a.m.) |
| 10:50AM | 12 | (Jury not present.) |
| 10:50AM | 13 | **THE CLERK:** All rise. |
| 10:50AM | 14 | **THE COURT:** Please be seated. |
| 10:50AM | 15 | **THE CLERK:** We are back on the record for the |
| 10:50AM | 16 | continuation of the jury trial in case number 19-cr-227, |
| 10:50AM | 17 | United States of America versus Joseph Bongiovanni. |
| 10:50AM | 18 | All counsel and parties are present. |
| 10:50AM | 19 | **THE COURT:** Okay. Are we ready? |
| 10:50AM | 20 | **MR. TRIPI:** Yes, thanks. |
| 10:50AM | 21 | **THE COURT:** Anything? |
| 10:50AM | 22 | **MR. MacKAY:** No, Your Honor. |
| 10:50AM | 23 | **THE COURT:** Let's bring them in, please. |
| 10:50AM | 24 | We can bring the witness back in, as well. |
| 10:51AM | 25 | (Jury seated at 10:51 a.m.) |

10:51AM   1           **THE COURT:**  The record will reflect that all our

10:51AM   2   jurors are again present.

10:51AM   3           I remind the witness that he's still under oath.

10:51AM   4           And, Mr. Tripi, you may begin your redirect.

10:51AM   5           **MR. TRIPI:**  Thank you, Judge.

10:51AM   6

10:51AM   7           **REDIRECT EXAMINATION BY MR. TRIPI:**

10:52AM   8   Q.  Good morning.

10:52AM   9   A.  Good morning.

10:52AM  10   Q.  Okay.  I'd like to just pick up where Mr. MacKay maybe

10:52AM  11   started today, and then we'll go to some other areas, okay?

10:52AM  12   A.  Okay.

10:52AM  13   Q.  I think around beginning of the cross-examination today,

10:52AM  14   Mr. MacKay was asking you questions about timeframes.  And

10:52AM  15   specifically timeframes, he asked you a question about after

10:52AM  16   the Wayne Anderson arrest.  He asked you if you did a hard

10:52AM  17   stop to drug dealing for about six months, and then picked up

10:52AM  18   back in late 2013; do you remember that?

10:52AM  19   A.  Yes.

10:52AM  20   Q.  Okay.  And by "hard stop," you understood him in this

10:52AM  21   courtroom to mean no drug dealing at all, right?

10:52AM  22   A.  Yes.

10:52AM  23   Q.  Okay.  Back on March 7th, 2019, you did testify before a

10:52AM  24   federal grand jury; is that right?

10:52AM  25   A.  Yes.

10:52AM  1  Q.  And you were under oath, right?

10:52AM  2  A.  Yes.

10:52AM  3  Q.  And that was about, I don't know, five or so years ago,

10:52AM  4  right?

10:53AM  5  A.  Yes.

10:53AM  6  Q.  And you were asked questions in that grand jury under

10:53AM  7  oath about timeframes; do you remember that?

10:53AM  8  A.  Yes.

10:53AM  9  Q.  And regarding the timeframes surrounding the Wayne

10:53AM  10  Anderson direct, I'm directing counsel's attention to

10:53AM  11  Exhibit 3536M at page 57.  We're going to be reviewing lines

10:53AM  12  2 through 6.

10:53AM  13      Were you asked this question, and did you give this

10:53AM  14  answer:

10:53AM  15      "And did you sell at all?  Or did you just decrease the

10:53AM  16  amounts?  What did you do?

10:53AM  17      "Answer:  I decreased the amounts for, like, six months.

10:53AM  18  I didn't do anything, then I started selling a little bit

10:53AM  19  again, and just went back to it."

10:53AM  20      Were you asked that question, and did you give that

10:53AM  21  answer in grand jury?

10:53AM  22  A.  Yes.

10:53AM  23  Q.  Okay.  So, now I'm going to circle back.

10:53AM  24      After Anderson's arrest, did you still have customers who

10:53AM  25  relied upon you?

10:53AM  1   A.  Yes.

10:53AM  2   Q.  Did you still have product?

10:53AM  3   A.  Yes.

10:53AM  4   Q.  When you talked about laying low, did that laying low

10:54AM  5   relate to receiving large interstate shipments?

10:54AM  6   A.  Yes.

10:54AM  7   Q.  So you didn't hard stop altogether, right?

10:54AM  8   A.  Correct.

10:54AM  9   Q.  Okay.  All right.  Now you were asked a whole bunch of

10:54AM  10  questions about the details of the operation and certain

10:54AM  11  specifics about what Mr. Bongiovanni, through Masecchia and

10:54AM  12  Selva, did or didn't tell you about; do you remember those

10:54AM  13  questions on cross?

10:54AM  14  A.  Yes.

10:54AM  15  Q.  Did you care much about the specifics about how the

10:54AM  16  defendant was keeping law enforcement away from you?

10:54AM  17  A.  No.

10:54AM  18  Q.  Did you care how he found out about Mario Vacanti's

10:54AM  19  investigation and that Paul Humphries was talking about him?

10:55AM  20  A.  No.

10:55AM  21  Q.  Did you care how he knew specifically that R.K. was an

10:55AM  22  informant?

10:55AM  23  A.  No.

10:55AM  24  Q.  Were you told R.K. was the defendant's informant?

10:55AM  25  A.  Yes.

10:55AM  1  Q.  Did that reassure you that R.K. was neutralized as a

10:55AM  2  threat to your organization?

10:55AM  3  A.  Yes.

10:55AM  4  Q.  Did you care how the defendant knew T.S. was an

10:55AM  5  informant?

10:55AM  6  A.  No.

10:55AM  7  Q.  Were you grateful to get that information?

10:55AM  8  A.  Yes.

10:55AM  9  Q.  Did you think that that information was worth the money

10:55AM  10  you were paying?

10:55AM  11  A.  Yes.

10:55AM  12  Q.  If the defendant was shutting down informants --

10:55AM  13  withdrawn?

10:55AM  14     Was the defendant shutting down informants, disclosing

10:55AM  15  their identity, and making sure they weren't harming your

10:55AM  16  organization the type of protection you were paying for?

10:55AM  17  A.  Yes.

10:55AM  18  Q.  When you get the information about R.K. and T.S., did it

10:55AM  19  prove to you that you were getting exactly what you paid for?

10:55AM  20  A.  Yes.

10:55AM  21  Q.  You were asked some questions about shipments.  Did any

10:56AM  22  of the truckloads, of either U-Haul or tractor-trailers

10:56AM  23  intended for you, other than that one Wayne Anderson

10:56AM  24  shipment, so any of the Jarrett Guy trucks, U-Hauls and

10:56AM  25  trucks, did any of those truckloads ever get picked off?

10:56AM    1    A.   No.

10:56AM    2    Q.   Any of the U-Haul trucks ever get picked off?

10:56AM    3    A.   No.

10:56AM    4    Q.   Did any of the drivers ever get arrested?

10:56AM    5    A.   No.

10:56AM    6    Q.   Did you ever get stopped coming or going from New York to

10:56AM    7    pick up U-Hauls?

10:56AM    8    A.   No.

10:56AM    9    Q.   Did your warehouse at 82 Sycamore and 6 Michigan ever get

10:56AM   10    raided?

10:56AM   11    A.   No.

10:56AM   12    Q.   Did your Range Rover, before the Erie County Sheriffs and

10:56AM   13    FBI arrested you, did your Range Rover or any other vehicle

10:56AM   14    you ever had during the time period of this conspiracy ever

10:56AM   15    get stopped and searched?

10:56AM   16    A.   Just at the border when I was crossing to gamble, but

10:56AM   17    besides that, no.

10:56AM   18    Q.   Okay.  Did anyone ever knock on your door at 697 Lebrun

10:56AM   19    and try to ask you questions?

10:56AM   20    A.   No.

10:57AM   21    Q.   Did the defendant ever come to your house and try to talk

10:57AM   22    to you?

10:57AM   23    A.   No.

10:57AM   24    Q.   Did Mark Falzone's house ever get raided?

10:57AM   25    A.   No.

10:57AM    1    Q.  Before Homeland Security and Special Agent Curtis Ryan,

10:57AM    2    who you're familiar with, searched Mike Masecchia's house,

10:57AM    3    prior to that, did Mike Masecchia's house ever get raided?

10:57AM    4    A.  No.

10:57AM    5    Q.  Before Special Agent Marilyn Halliday was part of the

10:57AM    6    search team Lou Selva's house, did his house ever get raided?

10:57AM    7    A.  No.

10:57AM    8    Q.  Did any of your phones ever get tapped?

10:57AM    9    A.  Not to my knowledge.

10:57AM   10    Q.  And you were never told that your phone was tapped,

10:57AM   11    right?

10:57AM   12    A.  Correct.

10:57AM   13    Q.  And that was information you were paying for, to get a

10:57AM   14    heads-up on that, right?

10:57AM   15    A.  Yes.

10:57AM   16    Q.  Was that all of the part of the protection you were

10:57AM   17    paying for from this defendant?

10:57AM   18    A.  Yes.

10:57AM   19    Q.  Are you convinced based upon all of those facts that you

10:57AM   20    were getting protection from the defendant?

10:57AM   21    A.  Yes.

10:57AM   22    Q.  Did you rely upon all of that in your day-to-day life?

10:57AM   23    A.  Yes.

10:57AM   24    Q.  Did it in fact allow you to become complacent and drive

10:58AM   25    around with pounds of marijuana in your vehicle, and over

10:58AM   1   $20,000?

10:58AM   2   A.   Yes.

10:58AM   3   Q.   By 2017, were you pretty fearless?

10:58AM   4   A.   Pretty much.

10:58AM   5   Q.   Now, we talked about Wayne Anderson's arrest in November

10:58AM   6   of 2012.  Did you provide phone numbers to Masecchia to pass

10:58AM   7   to Selva, and for Selva to give to Bongiovanni after Anderson

10:58AM   8   was arrested?

10:58AM   9   A.   Yes.

10:58AM   10   Q.   Is Wayne Anderson also friends with Anthony Gerace?

10:58AM   11   A.   Yes.

10:58AM   12   Q.   Did you want to make sure you, your phones, and your

10:58AM   13   close associates were okay?

10:58AM   14   A.   Yes.

10:58AM   15   Q.   Did you continue to pass numbers while you were dealing

10:58AM   16   with Jarrett Guy?

10:58AM   17   A.   Yes.

10:58AM   18   Q.   Was that window after Wayne Anderson was arrested a prime

10:58AM   19   time for you to pass numbers along to make sure everyone was

10:58AM   20   okay?

10:58AM   21   A.   Yes.

10:58AM   22   Q.   Was that the window when you were providing numbers for

10:58AM   23   this defendant to check on?

10:58AM   24   A.   Yes.

10:58AM   25   Q.   And as you estimated in your testimony last week, this

10:59AM 1   was in late 2012 going into 2013; is that right?

10:59AM 2   A.  Correct.

10:59AM 3   Q.  Now, back in '08, '09, when this whole thing was started,

10:59AM 4   and then leading into when your payments started in 2010 as

10:59AM 5   you've testified, did Masecchia tell you at that time the

10:59AM 6   defendant could find information out on the computer?

10:59AM 7   A.  Yes.

10:59AM 8   Q.  What did you understand that to mean?

10:59AM 9   A.  That he had just some access to some database that he

10:59AM 10  could find out information.

10:59AM 11  Q.  Was that good enough for you?

10:59AM 12  A.  Yes.

10:59AM 13  Q.  Did you care what the database was called?

10:59AM 14  A.  No.

10:59AM 15  Q.  Did you care how the defendant searched the database?

10:59AM 16  A.  No.

10:59AM 17  Q.  Did you care how the data was manipulated?

10:59AM 18  A.  No.

10:59AM 19  Q.  As time went on, it begins with you, Selva, and

10:59AM 20  Masecchia, but as time went on, did other members, close

11:00AM 21  members, friends and family, learn that the defendant was

11:00AM 22  providing information looking out for you?

11:00AM 23  A.  Yes.

11:00AM 24  Q.  Did that include your brother Tom?

11:00AM 25  A.  Yes.

11:00AM    1    Q.  Did that include your best friend Mark Falzone?

11:00AM    2    A.  Yes.

11:00AM    3    Q.  Did that include your wife Lauren?

11:00AM    4    A.  Yes.

11:00AM    5    Q.  Did that include your sister-in-law Adrian?

11:00AM    6    A.  Yes.

11:00AM    7    Q.  When you're up here and you're testifying about

11:00AM    8    timeframes, are you estimating to the best of your ability?

11:00AM    9    A.  Yes.

11:00AM   10    Q.  But are they just that, estimates?

11:00AM   11    A.  Yes.

11:00AM   12    Q.  Have you thought a lot about this case and done your best

11:00AM   13    to think about timeframes and be accurate for this jury?

11:00AM   14    A.  Yes.

11:00AM   15    Q.  Regardless of whether you're off a month or two here or

11:00AM   16    there, or even three or four months, did everything you said

11:00AM   17    happen --

11:00AM   18    A.  Yes.

11:00AM   19    Q.  -- during the course of this conspiracy that you were

11:00AM   20    paying the defendant?

11:00AM   21    A.  Yes.

11:00AM   22    Q.  Once you were rolling with Jarrett Guy, from 2013 on to

11:01AM   23    the end, did you move more product than ever?

11:01AM   24    A.  Yes.

11:01AM   25    Q.  Did you make more money than ever?

| | | |
|---|---|---|
| 11:01AM | 1 | A.  Yes. |
| 11:01AM | 2 | Q.  Did Masecchia make more money than ever? |
| 11:01AM | 3 | A.  Yes. |
| 11:01AM | 4 | Q.  Were you still dealing with Jarrett Guy in April of 2017? |
| 11:01AM | 5 | A.  Yes. |
| 11:01AM | 6 | Q.  Was Masecchia making at least $240,000 or more dollars |
| 11:01AM | 7 | per year with you? |
| 11:01AM | 8 | A.  Yes. |
| 11:01AM | 9 | Q.  How does that amount compare with any amount that he |
| 11:01AM | 10 | would have stolen from you? |
| 11:01AM | 11 | A.  It wasn't worth it for him. |
| 11:01AM | 12 | Q.  What was his nickname for you? |
| 11:01AM | 13 | A.  Greenie. |
| 11:01AM | 14 | Q.  Is that because you were good at making money for the |
| 11:01AM | 15 | group? |
| 11:01AM | 16 | A.  Yes. |
| 11:01AM | 17 | Q.  Now, you were asked questions about a guy named G.R. last |
| 11:01AM | 18 | week, I think, by Mr. MacKay; do you remember that? |
| 11:01AM | 19 | A.  Yes. |
| 11:01AM | 20 | Q.  Now, during direct, and maybe during cross, you had |
| 11:01AM | 21 | indicated that there were a number of informants' names, |
| 11:01AM | 22 | maybe more than ten, passed to you, but some of them didn't |
| 11:02AM | 23 | mean much to you because you weren't dealing with them; is |
| 11:02AM | 24 | that right? |
| 11:02AM | 25 | A.  Correct. |

11:02AM    1    Q.  Now, your brother Tom and Mike Masecchia, did they have

11:02AM    2    their own relationship?

11:02AM    3    A.  Not as close as mine and Mike's.

11:02AM    4    Q.  Did they have an ability to speak to one another?

11:02AM    5    A.  Yes.

11:02AM    6    Q.  For example, when you went to Las Vegas with Masecchia,

11:02AM    7    that was you, Tom, and Mike, right?

11:02AM    8    A.  Correct.

11:02AM    9    Q.  They had each other's phone number?

11:02AM   10    A.  Yes.

11:02AM   11    Q.  Mike knew where Tom lived?

11:02AM   12    A.  Yes.

11:02AM   13    Q.  Tom knew where Mike lived?

11:02AM   14    A.  Yes.

11:02AM   15    Q.  Mike would come to your debt shop?

11:02AM   16    A.  Occasionally.

11:02AM   17    Q.  The point is, if Masecchia wanted to tell your brother

11:02AM   18    Tom something, he could meet with him directly; is that

11:02AM   19    right?

11:02AM   20    A.  Yes.

11:02AM   21            MR. MacKAY:  Objection, speculation.

11:02AM   22            MR. TRIPI:  Common sense, Judge.

11:02AM   23            THE COURT:  And you can make that common sense

11:02AM   24    argument to the jury.

11:02AM   25            MR. TRIPI:  Sounds good.

| | | |
|---|---|---|
| 11:02AM | 1 | **THE COURT:** Sustained. |
| 11:02AM | 2 | **BY MR. TRIPI:** |
| 11:02AM | 3 | Q. Regarding -- I'd like to switch gears to Mark Vitale's |
| 11:03AM | 4 | arrest. Was your interest following that arrest to find out |
| 11:03AM | 5 | if Vitale talked about you, and if you were okay? |
| 11:03AM | 6 | A. Yes. |
| 11:03AM | 7 | Q. And what did you find out? |
| 11:03AM | 8 | A. That I was okay. |
| 11:03AM | 9 | Q. And how did you find it out? |
| 11:03AM | 10 | A. Through Mike Masecchia. |
| 11:03AM | 11 | Q. And what was your understanding of who Masecchia got the |
| 11:03AM | 12 | information from? |
| 11:03AM | 13 | A. Joe Bongiovanni. |
| 11:03AM | 14 | Q. Did Masecchia even know who Vitale was before you said, |
| 11:03AM | 15 | hey, a guy I sell to, Vitale, get arrested? |
| 11:03AM | 16 | A. No. |
| 11:03AM | 17 | Q. Is that normal in a drug conspiracy? Some people at the |
| 11:03AM | 18 | top sometimes don't know people at the bottom? |
| 11:03AM | 19 | A. Correct. |
| 11:03AM | 20 | Q. And Mike was at the top? |
| 11:03AM | 21 | A. Yes. |
| 11:03AM | 22 | Q. So I'd like to go through a number of people who were |
| 11:03AM | 23 | involved in some capacity in your drug organization, whether |
| 11:03AM | 24 | it be grows, trips to New York City, helping you unload, |
| 11:04AM | 25 | distribution, whatever it may be. Okay? |

| | | |
|---|---|---|
| 11:04AM | 1 | A. Yes. |
| 11:04AM | 2 | Q. You were never arrested by this defendant, correct? |
| 11:04AM | 3 | A. Correct. |
| 11:04AM | 4 | Q. Your brother Tom was never arrested by this defendant? |
| 11:04AM | 5 | A. Correct. |
| 11:04AM | 6 | Q. How about Mike Masecchia? |
| 11:04AM | 7 | A. Correct. |
| 11:04AM | 8 | Q. No? |
| 11:04AM | 9 | A. No. No, he wasn't. |
| 11:04AM | 10 | Q. Lou Selva? |
| 11:04AM | 11 | A. No. |
| 11:04AM | 12 | Q. Joe Tomasello? |
| 11:04AM | 13 | A. No. |
| 11:04AM | 14 | Q. Wayne Anderson? |
| 11:04AM | 15 | A. No. |
| 11:04AM | 16 | Q. Sal Volpe? |
| 11:04AM | 17 | A. No. |
| 11:04AM | 18 | Q. Dave Hersey? |
| 11:04AM | 19 | A. No. |
| 11:04AM | 20 | Q. Mike Moynihan? |
| 11:04AM | 21 | A. No. |
| 11:04AM | 22 | Q. Mark Falzone? |
| 11:04AM | 23 | A. No. |
| 11:04AM | 24 | Q. John Robinson? |
| 11:04AM | 25 | A. No. |

| | | |
|---|---|---|
| 11:04AM | 1 | Q.  Adrian Fina? |
| 11:04AM | 2 | A.  No. |
| 11:04AM | 3 | Q.  Lauren Fina? |
| 11:04AM | 4 | A.  No. |
| 11:04AM | 5 | Q.  Paul Francoforte? |
| 11:04AM | 6 | A.  No. |
| 11:04AM | 7 | Q.  Mike Piazza? |
| 11:04AM | 8 | A.  No. |
| 11:04AM | 9 | Q.  Jimmy Rivera? |
| 11:04AM | 10 | A.  No. |
| 11:04AM | 11 | Q.  Mark Kagan? |
| 11:04AM | 12 | A.  No. |
| 11:04AM | 13 | Q.  T.S.? |
| 11:04AM | 14 | A.  No. |
| 11:04AM | 15 | Q.  Matt LoTempio? |
| 11:04AM | 16 | A.  No. |
| 11:04AM | 17 | Q.  Jarrett Guy? |
| 11:04AM | 18 | A.  No. |
| 11:04AM | 19 | Q.  Frank Burkhart? |
| 11:04AM | 20 | A.  No. |
| 11:04AM | 21 | Q.  Anthony Gerace? |
| 11:04AM | 22 | A.  No. |
| 11:04AM | 23 | Q.  Now even though he lives in Vancouver, Canada, Special |
| 11:04AM | 24 | Agent Curtis Ryan tried to work on an investigation and get |
| 11:04AM | 25 | to the point where he could arrest Jarrett Guy; is that |

11:04AM    1   right?

11:04AM    2   A.   Correct.

11:04AM    3   Q.   As you understand it, were there some logistical issues

11:05AM    4   due to the fact that he's tucked away in Canada?

11:05AM    5   A.   Correct.

11:05AM    6   Q.   Did you help as much as you could?

11:05AM    7   A.   Yes.

11:05AM    8   Q.   That same list of people, did any of them ever come back

11:05AM    9   and say, hey, Defendant Bongiovanni -- Joe Bongiovanni at the

11:05AM   10   DEA tried to interview me?

11:05AM   11   A.   No.

11:05AM   12   Q.   Fast forward when Homeland Security in about 2020 tried

11:05AM   13   to interview Mark Falzone, did he come back and say I got

11:05AM   14   interviewed by Homeland Security?

11:06AM   15   A.   Yes.

11:06AM   16   Q.   You were told about the types of surveillance trucks that

11:06AM   17   the DEA and law enforcement use, do you remember that?

11:06AM   18   A.   Yes.

11:06AM   19   Q.   Did you ever notice any surveillance trucks setting up

11:06AM   20   outside your house on Lebrun?

11:06AM   21   A.   No.

11:06AM   22   Q.   Did you ever notice any surveillance trucks sitting

11:06AM   23   outside your warehouse at 608 Michigan and 82 Sycamore?

11:06AM   24   A.   No.

11:06AM   25   Q.   Did you ever notice any surveillance around Mark

11:06AM     1    Falzone's house?

11:06AM     2    A.   No.

11:06AM     3    Q.   Those were all places that had drug activity from 2008

11:06AM     4    all the way up before the sheriffs arrested you, correct?

11:06AM     5    A.   Correct.

11:06AM     6    Q.   Now you remember on direct, you had mentioned that most

11:06AM     7    times when you went to 82 Sycamore or 6 Michigan, not all the

11:06AM     8    time but most times, it was something drug related; is that

11:06AM     9    fair to say?

11:06AM    10    A.   Yes.

11:06AM    11    Q.   Is that accurate?

11:06AM    12    A.   Yes.

11:06AM    13    Q.   Okay.  So if you were to do the math, June 2013 is a

11:07AM    14    little more than six months after Wayne Anderson was arrested

11:07AM    15    in November of 2012, right?

11:07AM    16    A.   Yes.

11:07AM    17    Q.   And based upon the fact that most times you go there are

11:07AM    18    drug related, if you were observed in June of 2013 at

11:07AM    19    82 Sycamore, is it likely you would have been involved in

11:07AM    20    drug activity at that time?

11:07AM    21    A.   Yes.

11:07AM    22         MR. MacKAY:  Objection.  Assumes a fact not in

11:07AM    23    evidence.

11:07AM    24         MR. TRIPI:  I'm asking about his own personal --

11:07AM    25         THE COURT:  No, no, no.  Hang on.  Hang on.

11:07AM   1          I'm going to sustain the objection to the form of the

11:07AM   2   question because I -- that's a very complex question.  So he

11:07AM   3   can --

11:07AM   4          **BY MR. TRIPI:**

11:07AM   5   Q.   In June of 2013, when you went to 82 Sycamore, were you

11:07AM   6   involved in drug activity there?

11:07AM   7   A.   Yes.

11:07AM   8   Q.   In June of 2013, were you taking loads of drugs that had

11:07AM   9   been delivered there?

11:07AM   10  A.   Yes.

11:07AM   11  Q.   In the event you were observed by DEA on surveillance,

11:07AM   12  were you involved in drug activity in June of 2013 at

11:08AM   13  82 Sycamore?

11:08AM   14  A.   Yes.

11:08AM   15          **MR. MacKAY:**  Objection.

11:08AM   16          **MR. TRIPI:**  I'm asking him what he was involved in.

11:08AM   17          **THE COURT:**  Sustained.  No, no, no.  You asked him

11:08AM   18  that.  That's a different question.  Sustained.

11:08AM   19          And the jury will strike the answer to the question

11:08AM   20  that I sustained the answer to earlier.

11:08AM   21          **BY MR. TRIPI:**

11:08AM   22  Q.   Just because this is muddled, in June of 2013 at 82

11:08AM   23  Sycamore, were you involved in drug activity?

11:08AM   24  A.   Yes.

11:08AM   25  Q.   In June of 2013, were you getting shipments from Jarrett

11:08AM   1   Guy?

11:08AM   2   A.   Yes.

11:08AM   3   Q.   And that's more than six months after Wayne Anderson was

11:08AM   4   arrested, even if you laid low for a bit, right?

11:08AM   5   A.   Yes.

11:08AM   6   Q.   You were asked about some -- there was some discussion

11:09AM   7   today I think about mail couriers -- we'll drop the use of

11:09AM   8   the term "courier" -- some one or two packages that Jarrett

11:09AM   9   Guy mailed to a hotel got -- the person who went to pick up

11:09AM  10   the marijuana got arrested; is that right?

11:09AM  11   A.   Correct.

11:09AM  12   Q.   Okay.  Now, the way the drug operation was set up, did

11:09AM  13   you know the true name of the person going to pick up the

11:09AM  14   packages?

11:09AM  15   A.   No.

11:09AM  16   Q.   The way your dealings with Jarrett Guy was set up, did

11:09AM  17   the person going to pick up the package know it was intended

11:09AM  18   for you?

11:09AM  19   A.   No.

11:09AM  20   Q.   Is that an important way of how a large-scale

11:09AM  21   distribution operation like yours operates?

11:09AM  22   A.   Yes.

11:09AM  23   Q.   Explain that for the jury.

11:09AM  24   A.   Well, everything's a need-to-know basis.  You usually

11:09AM  25   don't use your real names or anything like that, in case

11:10AM   1   something like that happens, the person receiving the package

11:10AM   2   wouldn't be able to identify me.

11:10AM   3   Q.   So in that context, in that situation, where the people

11:10AM   4   who didn't know you and didn't know the marijuana was

11:10AM   5   intended for you got arrested, was there any need for you to

11:10AM   6   run and tell Masecchia to inform Bongiovanni about that?

11:10AM   7   A.   No.

11:10AM   8   Q.   Explain why not.

11:10AM   9   A.   Because there was an agreement between the supplier and

11:10AM   10  the people receiving it.  And I didn't know their names, and

11:10AM   11  they didn't know mine, so there was no reason for it.

11:10AM   12  Q.   So the risk was on Jarrett Guy's end, not yours?

11:10AM   13  A.   Correct.

11:10AM   14  Q.   Is that sort of consistent with your initial decision to

11:10AM   15  proffer with the government and try to point all of the

11:10AM   16  direction towards Jarrett Guy --

11:10AM   17  A.   Yes.

11:10AM   18  Q.   -- and protect yourself and the people you were directly

11:11AM   19  dealing with in your organization?

11:11AM   20  A.   Yes.

11:11AM   21  Q.   You were asked some questions today about Anthony Gerace;

11:11AM   22  do you remember those?

11:11AM   23  A.   Yes.

11:11AM   24  Q.   And during a response to one of the questions, I think

11:11AM   25  you said you were asked about Anthony Gerace proffering; do

11:11AM   1   you remember that question by Mr. MacKay?

11:11AM   2   A.   Yes.

11:11AM   3   Q.   And I think you said later, after I dealt with Anthony,

11:11AM   4   Masecchia told you that Anthony Gerace had proffered; do you

11:11AM   5   remember that?

11:11AM   6   A.   Yes.

11:11AM   7   Q.   Was that closer in time to your arrest when you learned

11:11AM   8   that?

11:11AM   9   A.   It was kind of after I started dealing with him, because

11:11AM   10  Mike was not happy about it.

11:11AM   11  Q.   So 2016 timeframe?

11:11AM   12  A.   Correct.

11:11AM   13  Q.   Now, do you remember -- do you recall that Wayne

11:11AM   14  Anderson -- do you recall being informed that Wayne Anderson

11:11AM   15  had told Masecchia not to worry because Anthony didn't talk

11:12AM   16  about anyone you guys cared about?

11:12AM   17           **MR. MacKAY:**  Objection to hearsay.

11:12AM   18           **MR. TRIPI:**  This would be 801(d)(2)(E), Your Honor.

11:12AM   19  And they opened the door.

11:12AM   20           **THE COURT:**  Yes.  Overruled.

11:12AM   21           **THE WITNESS:**  Yes.

11:12AM   22           **BY MR. TRIPI:**

11:12AM   23  Q.   Okay.  So there's a discussion between you and Masecchia.

11:12AM   24  And Masecchia tells you about Anthony proffering.

11:12AM   25       And who's the one, you or Masecchia, that talks about the

11:12AM 1 fact that Anderson passed along that Anthony didn't talk

11:12AM 2 about anyone you guys cared about?

11:12AM 3 A. Was it -- I'm sorry, I don't understand the --

11:12AM 4 Q. Who said, you or Masecchia, who said that Wayne Anderson

11:12AM 5 had advised that Anthony didn't talk about anyone you guys

11:12AM 6 would care about?

11:12AM 7 A. I believe Mike did.

11:12AM 8 Q. Mike told you that?

11:12AM 9 A. Yes.

11:12AM 10 Q. And Anthony and Wayne Anderson are friends?

11:12AM 11 A. Yes.

11:12AM 12 Q. And Anthony was involved in your organization?

11:13AM 13 A. Yes.

11:13AM 14 Q. Even though Mike wasn't happy about that?

11:13AM 15 A. Correct.

11:13AM 16 Q. It happened anyway?

11:13AM 17 A. Yes.

11:13AM 18 Q. Did you and Mike have a big fight about it, or just a

11:13AM 19 discussion?

11:13AM 20 A. Just a discussion.

11:13AM 21 Q. Is not talking about anyone you really cared about what

11:13AM 22 you were trying to do in your initial proffer when you talked

11:13AM 23 about Jarrett Guy to the exclusion of Masecchia, Bongiovanni,

11:13AM 24 Selva, Anthony Gerace, Mark Falzone, John Robinson, and

11:13AM 25 others?

11:13AM   1   A.  Yes.

11:13AM   2   Q.  When you told Vacanti about the Paul Humphries

11:14AM   3   information, did Vacanti cut Paul Humphries out?

11:14AM   4   A.  Yes.

11:14AM   5   Q.  Did that satisfy you?

11:14AM   6   A.  Yes.

11:14AM   7   Q.  Did you keep dealing with Vacanti after that?

11:14AM   8   A.  Eventually.  We kind of stopped for a little bit, but

11:14AM   9   eventually I started dealing with him again.

11:14AM  10   Q.  How long did you take a break from him for?

11:14AM  11   A.  Probably, I'd be estimating, six months.

11:14AM  12   Q.  Okay.  When you estimate six months, could it be four?

11:14AM  13   Could it be eight?

11:14AM  14   A.  Yes.

11:14AM  15   Q.  Okay.  Mr. MacKay asked you some questions about, you

11:14AM  16   know, the amount of people Masecchia knows in North Buffalo,

11:14AM  17   and it was in the context of questions about Gables and

11:14AM  18   Steven Brucato and Joe Mesi; do you remember that?

11:15AM  19   A.  Yes.

11:15AM  20   Q.  Masecchia didn't work at the DEA, correct?

11:15AM  21   A.  Correct.

11:15AM  22   Q.  The defendant did?

11:15AM  23   A.  Yes.

11:15AM  24   Q.  Random bartenders and people in North Buffalo other than

11:15AM  25   the defendant didn't work at the DEA?

11:15AM  1   A.  Correct.

11:15AM  2   Q.  Mr. MacKay said -- asked you a question about not dealing

11:15AM  3   with Lou Selva after the -- after the 50 pounds of marijuana

11:15AM  4   came up missing at his house in late 2016; do you remember

11:15AM  5   that?

11:15AM  6   A.  Yes.

11:15AM  7   Q.  I just want to define that.  Does that simply mean you

11:15AM  8   stopped storing marijuana there?

11:15AM  9   A.  Yes.

11:15AM  10  Q.  Lou Selva was still involved in the bribery and passing

11:15AM  11  information; is that correct?

11:16AM  12  A.  Correct.

11:16AM  13  Q.  You were asked questions about ultimately evicting Mike

11:16AM  14  Masecchia from 125 Huntington; do you remember those

11:16AM  15  questions?

11:16AM  16  A.  Yes.

11:16AM  17  Q.  Was that eviction process consummated years after you

11:16AM  18  were arrested?

11:16AM  19  A.  Yes.

11:16AM  20  Q.  Was that after you were cooperating against Masecchia?

11:16AM  21  A.  Yes.

11:16AM  22  Q.  Was that after it was clear to you that you were gonna be

11:16AM  23  sitting here some day maybe talking about Mike Masecchia?

11:16AM  24  A.  Yes.

11:16AM  25  Q.  Did that have any bearing on any of the realtime

11:16AM    1    decisionmaking that happened prior to your arrest?

11:16AM    2    A.   No.

11:16AM    3    Q.   You were asked the question by Mr. MacKay, and he said

11:16AM    4    now you were never given a cover story that you were the

11:16AM    5    defendant's C.I., you were never given that cover story to

11:16AM    6    tell; do you remember that question?

11:16AM    7    A.   Yes.

11:16AM    8    Q.   Based upon your experience and participation in the

11:17AM    9    conspiracy, would a story that you were Joe's C.I. work if

11:17AM   10    the defendant was pretending to investigate you guys?

11:17AM   11            MR. MacKAY:   Objection.

11:17AM   12            THE COURT:   Sustained.

11:17AM   13            BY MR. TRIPI:

11:17AM   14    Q.   Do you know if Masecchia or Anthony Gerace, who had his

11:17AM   15    own relationship with Bongiovanni as you've talked about,

11:17AM   16    ever passed other names to Bongiovanni?

11:17AM   17            MR. MacKAY:   Objection.  Calls for speculation.

11:17AM   18            THE COURT:   No, the question is does he know.

11:17AM   19            BY MR. TRIPI:

11:17AM   20    Q.   Do you know one way or the other?

11:17AM   21    A.   No, I don't.

11:17AM   22    Q.   You said you had mutual friends with Paul Francoforte.

11:17AM   23    Who were those mutual friends?

11:17AM   24    A.   Frank Parisi, Angelo Natali.

11:18AM   25    Q.   From gambling, did you know Francoforte to also be

11:18AM    1    friends with Todaro Sr.?

11:18AM    2    A.   Yes.

11:18AM    3    Q.   And what was Todaro's Sr.'s reputation?  Remind the jury.

11:18AM    4    A.   That he was the leader of the Italian Mafia.

11:18AM    5    Q.   Okay.  In discussing your inner circle, Mr. MacKay

11:18AM    6    mentioned a name that I don't think I asked you about,

11:18AM    7    Anthony Greco?

11:18AM    8    A.   Yes.

11:18AM    9         **MR. TRIPI:**  Ms. Champoux, can we pull up Government

11:18AM   10    Exhibit 8A at page 194, please.

11:18AM   11         **BY MR. TRIPI:**

11:18AM   12    Q.   There's a name Michael Greco there.  Is that person

11:18AM   13    related to Anthony Greco?

11:18AM   14    A.   I don't know.

11:19AM   15         **MR. TRIPI:**  You can take that down.

11:19AM   16         **BY MR. TRIPI:**

11:19AM   17    Q.   Do you know Mike Greco?

11:19AM   18    A.   No.  Anthony has a brother, I'm not sure what his name

11:19AM   19    is, though.

11:19AM   20    Q.   And in your experience in the drug trade, sometimes

11:19AM   21    people register phones in other people's names?

11:19AM   22    A.   Yes.

11:19AM   23    Q.   You did that with Chris Baker, right?

11:19AM   24    A.   Yes.

11:19AM   25    Q.   You were asked questions about whether you liked David

11:19AM   1   Oddo or not, right?

11:19AM   2   A.   Yes.

11:19AM   3   Q.   Whether you liked him or not, was he Anthony Gerace's

11:19AM   4   cocaine supplier?

11:19AM   5   A.   Yes.

11:19AM   6   Q.   What year did you learn that, approximately?

11:19AM   7   A.   I want to say it was 2015.

11:19AM   8   Q.   Was it your understanding that Oddo and Gerace had a

11:19AM   9   long-standing relationship?

11:19AM   10  A.   Yes.

11:19AM   11  Q.   You were asked about Jeremie Jones; do you remember that?

11:20AM   12  A.   Yes.

11:20AM   13  Q.   And I think you said he was a drug dealer that was

11:20AM   14  friends with Mike Piazza?

11:20AM   15  A.   Yes.

11:20AM   16  Q.   Was Mike Piazza the one who introduced you to Mark Kagan?

11:20AM   17  A.   Yes.

11:20AM   18  Q.   Was Mark Kagan the one that introduced you to Jarrett

11:20AM   19  Guy?

11:20AM   20  A.   Yes.

11:20AM   21  Q.   Was Mark Kagan the one who supplied you with a portion of

11:20AM   22  marijuana for a time?

11:20AM   23  A.   Yes.

11:20AM   24  Q.   So through the nexus from Piazza to Kagan to Jarrett Guy,

11:20AM   25  Jeremie Jones had some connection to your network, correct?

| | | |
|---|---|---|
| 11:20AM | 1 | A.  Yes. |
| 11:20AM | 2 | Q.  If Jeremie Jones were on a wiretap with Mike Piazza, is |
| 11:20AM | 3 | there a chance that you might be caught on a wiretap? |
| 11:20AM | 4 | **MR. MacKAY:**  Objection. |
| 11:20AM | 5 | **THE COURT:**  Sustained. |
| 11:20AM | 6 | **BY MR. TRIPI:** |
| 11:20AM | 7 | Q.  Did you talk to Mike Piazza on the phone? |
| 11:20AM | 8 | A.  Yes. |
| 11:20AM | 9 | Q.  Mike Piazza's friends with Jeremie Jones, yes? |
| 11:20AM | 10 | A.  Yes. |
| 11:20AM | 11 | Q.  Are you following that math? |
| 11:20AM | 12 | A.  Yes. |
| 11:20AM | 13 | Q.  Was Michael Sinatra good friends with Anthony Gerace? |
| 11:20AM | 14 | A.  Yes. |
| 11:20AM | 15 | Q.  Anthony Gerace was part of your network? |
| 11:21AM | 16 | A.  Yes. |
| 11:21AM | 17 | Q.  Is that the same math with Jeremie Jones and Mike Piazza? |
| 11:21AM | 18 | A.  Yes. |
| 11:21AM | 19 | Q.  They put a picture up of you much heavier and in much |
| 11:21AM | 20 | worse condition, right? |
| 11:21AM | 21 | A.  Yes. |
| 11:21AM | 22 | Q.  Were you still a good businessman back then? |
| 11:21AM | 23 | A.  Yes. |
| 11:21AM | 24 | Q.  Did you pay attention to details back then? |
| 11:21AM | 25 | A.  Yes. |

11:21AM  1    Q.  Do you believe your mind's even clearer now?

11:21AM  2    A.  Yes.

11:21AM  3    Q.  Have you done your best to tell this jury everything

11:21AM  4    truthful to the best of your ability?

11:21AM  5    A.  Yes.

11:21AM  6    Q.  Was a single person ever associated with your

11:21AM  7    organization arrested or interviewed by this defendant?

11:21AM  8    A.  No.

11:21AM  9    Q.  Was a single location associated with your operation and

11:21AM  10   Masecchia's operation ever searched by this defendant?

11:21AM  11   A.  No.

11:21AM  12   Q.  To your knowledge, not a single phone was tapped,

11:21AM  13   correct?

11:21AM  14   A.  Correct.

11:21AM  15   Q.  Not a single truck pulled over?

11:21AM  16   A.  Correct.

11:21AM  17   Q.  Not a single load seized, other than Wayne Anderson's

11:22AM  18   shipment?

11:22AM  19   A.  Correct.

11:22AM  20   Q.  And you did you understand that to be seized by the state

11:22AM  21   police?

11:22AM  22   A.  Yes.

11:22AM  23   Q.  Not the DEA?

11:22AM  24   A.  Correct.

11:22AM  25   Q.  During the time were bribing the defendant, were multiple

11:22AM    1   informants identified and disclosed to you?

11:22AM    2   A.  Yes.

11:22AM    3   Q.  Is that because, in fact, the defendant was protecting

11:22AM    4   you?

11:22AM    5   A.  Yes.

11:22AM    6              MR. MacKAY:  Objection.

11:22AM    7              THE COURT:  Sustained.

11:22AM    8              BY MR. TRIPI:

11:22AM    9   Q.  Is that the protection you were paying for?

11:22AM   10   A.  Yes.

11:22AM   11   Q.  And who were you paying it for?

11:22AM   12   A.  For Joe Bongiovanni.

11:22AM   13              MR. TRIPI:  I have nothing further, Judge.

11:22AM   14              THE COURT:  Mr. MacKay?

11:22AM   15

11:22AM   16              RECROSS-EXAMINATION BY MR. MacKAY:

11:22AM   17   Q.  All right.  Mr. Serio, so we talked a little bit about

11:22AM   18   the 2013 timeframe, and whether you were doing things or not

11:22AM   19   during that timeframe, correct?

11:22AM   20   A.  Correct.

11:22AM   21   Q.  And in response to my questions, I asked you whether

11:22AM   22   there was a hard stop on drug activity, and you said no --

11:22AM   23   you said there was, correct?

11:22AM   24   A.  Correct.

11:22AM   25   Q.  And then Mr. Tripi asked you some questions, and you

11:23AM   1   walked that back a little bit, correct?

11:23AM   2   A.   Correct.  I was also -- there's a lot to remember, so

11:23AM   3   sometimes I make mistakes.

11:23AM   4   Q.   There is.  And is it fair to say that when I walked you

11:23AM   5   through questions, I talked about events that have occurred

11:23AM   6   in order, correct?

11:23AM   7   A.   Correct.

11:23AM   8   Q.   I'm not raising my voice here to you, am I?

11:23AM   9   A.   No.

11:23AM  10   Q.   I don't control any recommendation that you get in

11:23AM  11   response to your sentencing, correct?

11:23AM  12   A.   Correct.

11:23AM  13   Q.   Meaning that when you go to be sentenced, one component

11:23AM  14   of the recommendation of jail time you get comes from the

11:23AM  15   government, correct?

11:23AM  16   A.   I believe so.

11:23AM  17   Q.   Although, ultimately, your sentencing judge controls what

11:23AM  18   you get, correct?

11:23AM  19   A.   Correct.

11:23AM  20   Q.   All right.  So, you were asked some questions on redirect

11:23AM  21   about Anthony Gerace and who he might know; do you remember

11:23AM  22   that?

11:23AM  23   A.   Yes.

11:23AM  24   Q.   You never made it a point to look out for Anthony

11:23AM  25   Gerace's friends through your connection to Joe Bongiovanni,

11:23AM   1   correct?

11:23AM   2   A.  Correct.

11:23AM   3   Q.  Okay.  Now, you were asked some questions about

11:23AM   4   connections to your network, for example, that Jeremie Jones

11:24AM   5   might have, correct?

11:24AM   6   A.  Correct.

11:24AM   7   Q.  I mean, do you understand that to be somebody could be

11:24AM   8   calling somebody, could be calling somebody, could be calling

11:24AM   9   somebody, could be calling you?

11:24AM  10   A.  Correct.

11:24AM  11   Q.  Okay.  So, but you have no dealings with Jeremie Jones,

11:24AM  12   correct?

11:24AM  13   A.  Correct.

11:24AM  14   Q.  Okay.  Now, you talked about an eviction process with

11:24AM  15   Mike Masecchia.  That was finalized after your arrest,

11:24AM  16   correct?

11:24AM  17   A.  Correct.

11:24AM  18   Q.  But that was the culmination of him not paying for years

11:24AM  19   though, correct?

11:24AM  20   A.  Correct.

11:24AM  21   Q.  Okay.  Now, you were asked about the folks at Gables at

11:24AM  22   the bar, and you learned that there was an investigation,

11:24AM  23   correct?

11:24AM  24   A.  Correct.

11:24AM  25   Q.  Do you know, in fact, that several of those individuals

11:24AM   1   were arrested in early 20 -- I'm sorry, late 2011?

11:24AM   2   A.  I don't know.

11:24AM   3   Q.  Okay.  So as you sit here today, you can't say whether

11:24AM   4   Mike Masecchia asked one of those individuals, and he was

11:24AM   5   told that they were by -- by those individuals themselves

11:24AM   6   that they were arrested?

11:24AM   7   A.  Correct.

11:24AM   8   Q.  Okay.  Do you understand my question?

11:25AM   9   A.  Yes.

11:25AM   10   Q.  Yeah.  You can't rule out that Mike Masecchia just asked

11:25AM   11   these guys, and they said he was arrested?

11:25AM   12   A.  Correct.

11:25AM   13   Q.  And then he passed that information back to you in the

11:25AM   14   guise of there's an investigation on these guys, correct?

11:25AM   15   A.  Correct.

11:25AM   16   Q.  But Mike Masecchia did not like Anthony Gerace, correct?

11:25AM   17   A.  Correct.

11:25AM   18   Q.  Do you really know as you sit here why?

11:25AM   19   A.  Not particularly.

11:25AM   20   Q.  Okay.  But at some point in time he tells you Mario --

11:25AM   21   somebody's cooperating -- I'm sorry -- there's an

11:25AM   22   investigation into Mario Vacanti, correct?

11:25AM   23   A.  Correct.

11:25AM   24   Q.  You talked a little bit about some packages sort of

11:25AM   25   getting clipped out of the process when the people going to

11:25AM    1   pick them up were arrested, correct?

11:25AM    2   A.  Correct.

11:25AM    3   Q.  Ultimately, and the way this works so the jury

11:25AM    4   understands, is packages get mailed to a location and

11:25AM    5   somebody goes to pick them up, correct?

11:25AM    6   A.  Correct.

11:25AM    7   Q.  And ultimately, they have to get back to you in some

11:25AM    8   fashion, correct?

11:25AM    9   A.  Correct.

11:25AM   10   Q.  So, you know, even if it's passed through several people,

11:26AM   11   ultimately the person picking up the drugs in Buffalo has to

11:26AM   12   pass it to somebody to get to you, correct?

11:26AM   13   A.  Correct.

11:26AM   14   Q.  Now you never provided the names of any of these folks to

11:26AM   15   Mr. Masecchia to look out for, correct?

11:26AM   16   A.  Correct.

11:26AM   17   Q.  You didn't provide the times of these shipments, correct?

11:26AM   18   A.  Correct.

11:26AM   19   Q.  You didn't provide the expected dates of any shipment,

11:26AM   20   correct?

11:26AM   21   A.  Correct.

11:26AM   22   Q.  Okay.  Now, and I think Mr. Tripi asked you some

11:26AM   23   questions about June 2013, about whether there was drug

11:26AM   24   activity at 82 Sycamore and the 608 Michigan location; do you

11:26AM   25   remember that?

11:26AM  1   A.  Yes.

11:26AM  2   Q.  At that point in time, you're just starting to get back

11:26AM  3   in with Mark Kagan, correct?

11:26AM  4   A.  Correct.

11:26AM  5   Q.  You had not taken any shipments or any sort of large

11:26AM  6   deliveries prior to that, correct?

11:26AM  7   A.  Correct.

11:26AM  8   Q.  And these shipments, though, they were not coming to the

11:26AM  9   82 Sycamore, 608 Michigan warehouse, correct?

11:26AM  10  A.  Not directly.

11:26AM  11  Q.  Okay.

11:26AM  12  A.  I pick it up, and then I would bring it there.

11:26AM  13  Q.  But you wouldn't store it there, correct?

11:27AM  14  A.  Correct.

11:27AM  15  Q.  It was never there for very long, correct?

11:27AM  16  A.  Correct.

11:27AM  17  Q.  Ultimately, the location they end up back in was the 697

11:27AM  18  Lebrun, correct?

11:27AM  19  A.  Correct.

11:27AM  20  Q.  And these were shipments through the mail at that point

11:27AM  21  in time, correct?

11:27AM  22  A.  No.

11:27AM  23  Q.  At --

11:27AM  24  A.  For 82 Sycamore?

11:27AM  25  Q.  Yeah.

11:27AM   1   A.  No, that would be if I went and picked up -- so they

11:27AM   2   would drive U-Haul, I would go pick up the U-Haul, and then I

11:27AM   3   would bring it to 82 Sycamore.

11:27AM   4   Q.  Okay.  So I want to get that timeline correct, because

11:27AM   5   what you told me on cross was when you -- when you start back

11:27AM   6   up with Mark Kagan it's through the mail, correct?

11:27AM   7   A.  I don't specifically remember that.

11:27AM   8   Q.  Okay.  Well, that's what I'm trying to get to.  When you

11:27AM   9   go back with Mark Kagan after your time off from the Wayne

11:27AM  10   Anderson arrest --

11:27AM  11   A.  Yes, well it was a variety of ways.

11:27AM  12   Q.  Okay.

11:27AM  13   A.  It wasn't just one specific way every time.

11:27AM  14   Q.  Okay.  Well, again, I want to separate it.  The

11:27AM  15   tractor-trailers come later, correct?

11:27AM  16   A.  Yes, that's correct.

11:27AM  17   Q.  And I guess what I thought we talked about on cross was

11:27AM  18   before the tractor-trailers, there were U-Haul trucks,

11:28AM  19   correct?

11:28AM  20   A.  Correct.

11:28AM  21   Q.  And I thought what we talked about was before the U-Haul

11:28AM  22   trucks, there were packages in the mail, correct?

11:28AM  23   A.  Correct.

11:28AM  24   Q.  Okay.  So that's what I'm trying to get at, is the summer

11:28AM  25   of 2013 that's still exclusively the mail, correct?

11:28AM  1   A.  I can't say for sure.

11:28AM  2   Q.  Okay.  But you really haven't started many of the U-Haul

11:28AM  3   shipments, correct?

11:28AM  4   A.  Yeah, there wouldn't have been a lot of them.

11:28AM  5   Q.  Okay.  Now you were asked about a meeting or a trip out

11:28AM  6   to Las Vegas with your brother and Mike Masecchia, correct?

11:28AM  7   A.  Correct.

11:28AM  8   Q.  That was not drug related, correct?

11:28AM  9   A.  Correct.

11:28AM  10  Q.  That was because you guys were all involved in the debt

11:28AM  11  collection industry, correct?

11:28AM  12  A.  Correct.

11:28AM  13  Q.  There's an annual sort of debt collection conference out

11:28AM  14  there, correct?

11:28AM  15  A.  Correct.

11:28AM  16  Q.  Now Mr. Tripi asked you some questions about your brother

11:28AM  17  in dealings with Michael Masecchia, do you remember those?

11:28AM  18  A.  Yes.

11:28AM  19  Q.  Fair to say they had some dealings in the debt collection

11:28AM  20  business, correct?

11:28AM  21     Well, yeah, what do you explain what, if any, connection

11:29AM  22  they had?

11:29AM  23  A.  Well, in the debt collection, Mike Masecchia knew Marty

11:29AM  24  Mazzara.  We went out to Vegas with my brother, Mike

11:29AM  25  Masecchia and myself to talk to talk to Marty Mazzara.

11:29AM   1   Q.   Is Marty, in this industry, a debt buyer?

11:29AM   2   A.   Correct.

11:29AM   3   Q.   Okay.  And what that means is that, well, just explain

11:29AM   4   what a debt buyer means for a debt collection agency and how

11:29AM   5   that all works, that relationship?

11:29AM   6   A.   Somebody buys the debt from the banks for pennies on the

11:29AM   7   dollar, and then they resell it to people that collect on it.

11:29AM   8   Q.   Okay.  So when you were dealing with the stuff out in

11:29AM   9   Vegas with Mazzara, that's all debt collection stuff,

11:29AM  10   correct?

11:29AM  11   A.   Correct.

11:29AM  12   Q.   It's not drug related, correct?

11:29AM  13   A.   Yes.

11:29AM  14   Q.   Okay.  You know, as you understood it, in all these

11:29AM  15   years, you were the only person who had a direct route to Joe

11:29AM  16   Bongiovanni through payments, correct?

11:29AM  17   A.   Correct.

11:29AM  18   Q.   You know, your brother never came to you and said, hey,

11:29AM  19   by the way, I learned information separately, correct?

11:29AM  20   A.   Correct.

11:29AM  21   Q.   Okay.  So we talked about the 2013 timeframe.  And I

11:30AM  22   think in response to Mr. Tripi's redirect questions, you said

11:30AM  23   you weren't receiving any large shipments in early 2013,

11:30AM  24   correct?

11:30AM  25   A.   Correct.

11:30AM  1    Q.  You were in a -- and this is where I compared you said

11:30AM  2    you had done a hard stop, correct?

11:30AM  3    A.  Correct.

11:30AM  4    Q.  Is it fair to say in that time period you were really

11:30AM  5    just getting rid of what you had?

11:30AM  6    A.  I would get small shipments, I believe.  I really don't

11:30AM  7    remember too much with that.

11:30AM  8    Q.  Okay.  But who would you have been getting the shipments

11:30AM  9    from in early 2013 if you hadn't hooked back up with Mark

11:30AM  10   Kagan?

11:30AM  11   A.  Well, Jacob Martinez would also get marijuana

11:30AM  12   occasionally, too.

11:30AM  13   Q.  Okay.  So these are kind of like some of your --

11:30AM  14   withdrawn.

11:30AM  15      Some of the folks you dealt with had their own sources of

11:30AM  16   supply, correct?

11:30AM  17   A.  Correct.

11:30AM  18   Q.  I think you talked about, you know, sometimes there would

11:30AM  19   be this mutual exchange, correct?

11:30AM  20   A.  Correct.

11:30AM  21   Q.  You know, maybe if somebody had it, you would get it from

11:30AM  22   them or vice versa, correct?

11:30AM  23   A.  Correct.

11:30AM  24   Q.  That's all that's really going on kind of after the Wayne

11:30AM  25   Anderson arrest, correct?

11:30AM   1   A.  Correct.

11:30AM   2   Q.  We're talking small amounts, correct?

11:30AM   3   A.  Correct.

11:31AM   4   Q.  But I think the term Mr. Tripi used was the prime, quote,

11:31AM   5   unquote, prime time after Wayne Anderson's arrest when you

11:31AM   6   would have given a lot of numbers, you said?

11:31AM   7   A.  Yes.

11:31AM   8   Q.  Okay.  But actually, I mean, the time you ramp up your

11:31AM   9   organization of payments, that comes about a year earlier,

11:31AM  10   correct?

11:31AM  11   A.  Correct.

11:31AM  12   Q.  And, you know, it's your testimony, though, that

11:31AM  13   throughout all of the years you were providing numbers,

11:31AM  14   correct?

11:31AM  15   A.  Correct.

11:31AM  16   Q.  Okay.  And T.S., he was a number you provided back in

11:31AM  17   2011, correct?

11:31AM  18   A.  Correct.

11:31AM  19   Q.  That's, you know, again, just to orient you, that's the

11:31AM  20   time you're dealing with Santiago Gale, correct?

11:31AM  21   A.  Correct.

11:31AM  22        **MR. MacKAY:**  Okay.  Ms. Champoux, can we show

11:31AM  23   Government Exhibit 16.

11:31AM  24        Can we blow up the top part.

         25

| | | |
|---|---|---|
| 11:32AM | 1 | **BY MR. MacKAY:** |
| 11:32AM | 2 | Q.  Okay.  Do you see T.S.'s name at the top? |
| 11:32AM | 3 | A.  Yes. |
| 11:32AM | 4 | Q.  You were told, or I think you told us that your |
| 11:32AM | 5 | understanding from Mr. Masecchia was that Joe Bongiovanni |
| 11:32AM | 6 | could go on a computer and just look things up, correct? |
| 11:32AM | 7 | A.  Correct. |
| 11:32AM | 8 | **MR. MacKAY:**  So will you take this down, |
| 11:32AM | 9 | Ms. Champoux, can we go to page 3?  Can we blow up the bottom |
| 11:32AM | 10 | portion?  We can just do it all.  Okay.  Change the color |
| 11:32AM | 11 | here. |
| 11:32AM | 12 | **BY MR. MacKAY:** |
| 11:32AM | 13 | Q.  Do you see that entry that indicates that T.S. was a C.S. |
| 11:32AM | 14 | from January 30th, 2009 to September 2009? |
| 11:32AM | 15 | A.  Yes. |
| 11:32AM | 16 | Q.  Okay.  When you provided T.S.'s name in 2011, you never |
| 11:32AM | 17 | got that information, correct? |
| 11:32AM | 18 | A.  Correct. |
| 11:32AM | 19 | Q.  It's years later that you hear about that, correct? |
| 11:32AM | 20 | A.  Correct. |
| 11:33AM | 21 | **MR. MacKAY:**  You can take that down, Ms. Champoux. |
| 11:33AM | 22 | Thank you. |
| 11:33AM | 23 | I think that's all I have, Judge.  Thank you. |
| 11:33AM | 24 | **THE COURT:**  Anything more, Mr. Tripi? |
| 11:33AM | 25 | **MR. TRIPI:**  Just very briefly, Judge.  Just a couple. |

**RE-REDIRECT EXAMINATION BY MR. TRIPI:**

Q.   Following up on that T.S. information, was T.S.'s name

asked to be checked to determine whether or not he was an

informant in or about 2013?

A.   Yes.

Q.   And who was the one that asked Bongiovanni to check on

that?

A.   Mike Masecchia.

Q.   And what triggered the curiosity as to whether T.S. was

an informant in 2013?

A.   Just wanted to know.

Q.   Was T.S. a connection to R.K.?

A.   Yes.  Yes.

Q.   Was R.K. an informant?

A.   Yes.

Q.   Regarding your brother and Masecchia, earlier you've

talked about Butchie Bifocal?

A.   Yes.

Q.   Did he work at your brother's debt collection agency?

A.   They owned one together.

Q.   Okay.  And that's Masecchia's godfather?

A.   Yes.

Q.   And Butchie was, by reputation, in the Mafia?

A.   Yes.

Q.   Okay.  You were asked questions again about Anthony

11:34AM 1    Gerace.  Do you know of your own personal knowledge whether

11:34AM 2    or not someone else paid the defendant to protect Gerace and

11:34AM 3    his family?

11:34AM 4    A.  No.

11:34AM 5    Q.  As to your sentence, ultimately is that up to your

11:34AM 6    sentencing judge, Judge Sinatra?

11:34AM 7    A.  Yes.

11:34AM 8    Q.  Is it your understanding he could have access to all of

11:34AM 9    your testimony --

11:34AM 10   A.  Yes.

11:35AM 11   Q.  -- and review it and determine the appropriate sentence?

11:35AM 12   A.  Correct.

11:35AM 13   Q.  It's not up to me?

11:35AM 14   A.  Correct.

11:35AM 15           **MR. TRIPI:**  Okay.  I have nothing further.

11:35AM 16           **THE COURT:**  Anything more.

11:35AM 17           **MR. MacKAY:**  No, Your Honor.

11:35AM 18           **THE COURT:**  Okay.  You can step down, sir.  Thank

11:35AM 19   you.

11:35AM 20           **THE WITNESS:**  Thank you.

11:35AM 21           (Witness excused at 11:35 a.m.)

         22           (Excerpt concluded at 11:35 a.m.)

         23              *    *    *    *    *    *    *

         24

         25

## CERTIFICATE OF REPORTER

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on September 23, 2024.


s/ Ann M. Sawyer
Ann M. Sawyer, FCRR, RPR, CRR
Official Court Reporter
U.S.D.C., W.D.N.Y.

1

2  **TRANSCRIPT INDEX**

3  **EXCERPT - EXAMINATION OF RONALD SERIO - DAY 3**

4  **SEPTEMBER 23, 2024**

5

6

7  **W I T N E S S**                                    **P A G E**

8  **R O N A L D   S E R I O**                          2

9    (CONT'D) CROSS-EXAMINATION BY MR. MacKAY:          2

10   REDIRECT EXAMINATION BY MR. TRIPI:                 55

11   RECROSS-EXAMINATION BY MR. MacKAY:                 83

12   RE-REDIRECT EXAMINATION BY MR. TRIPI:              95

13

14

15  **E X H I B I T**                                    **P A G E**

16  DFT Exhibit W                                        51

17

18

19

20

21

22

23

24

25