**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

                Plaintiff,

v.

**JOSEPH BONGIOVANNI,**

                Defendant.

_____

Case No. 1:19-cr-227
          (LJV)

September 20, 2024

**TRANSCRIPT EXCERPT - EXAMINATION OF RONALD SERIO - DAY 2**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**        **TRINI E. ROSS, UNITED STATES ATTORNEY**
                    **BY: JOSEPH M. TRIPI, ESQ.**
                        **NICHOLAS T. COOPER, ESQ.**
                        **CASEY L. CHALBECK, ESQ.**
                    Assistant United States Attorneys
                    Federal Centre, 138 Delaware Avenue
                    Buffalo, New York 14202
                    For the Plaintiff

                    **SINGER LEGAL PLLC**
                    **BY: ROBERT CHARLES SINGER, ESQ.**
                    80 East Spring Street
                    Williamsville, New York 14221
                      And
                    **LAW OFFICES OF PARKER ROY MacKAY**
                    **BY: PARKER ROY MacKAY, ESQ.**
                    3110 Delaware Avenue
                    Kenmore, New York 14217
                      And
                    **OSBORN, REED & BURKE, LLP**
                    **BY: JOHN J. GILSENAN, ESQ.**
                    120 Allens Creek Road
                    Rochester, New York 14618
                    For the Defendant

**PRESENT:**           **BRIAN A. BURNS,** FBI Special Agent
                    **MARILYN K. HALLIDAY,** HSI Special Agent
                    **KAREN A. CHAMPOUX,** USA Paralegal

**LAW CLERK:**        **REBECCA FABIAN IZZO, ESQ.**

COURT DEPUTY CLERK:   COLLEEN M. DEMMA

COURT REPORTER:       ANN MEISSNER SAWYER, FCRR, RPR, CRR
                      Robert H. Jackson Federal Courthouse
                      2 Niagara Square
                      Buffalo, New York  14202
                      Ann_Sawyer@nywd.uscourts.gov

\*     \*     \*     \*     \*     \*     \*

09:45AM     (Excerpt commenced at 9:45 a.m.)

09:45AM     (Witness and Jury seated at 9:45 a.m.)

09:45AM          **THE COURT:**  Good morning, everyone.

09:45AM          **ALL PARTIES:**  Good morning.

09:45AM          **THE COURT:**  The record will reflect that all our

09:45AM     jurors are present.  I did my best not to get sick, but wasn't

09:45AM     able to pull through.

09:45AM          So, okay -- and the mask is just a precaution.  I'm

09:45AM     told that because I've been symptom-free and fever-free for 48

09:45AM     hours, I don't even need to wear it, but I worry about other

09:45AM     people.  And, so, I'm wearing this just to protect others

09:46AM     because I think it's a minor inconvenience, and the -- the

09:46AM     incremental safety for others is more important than, you

09:46AM     know, my convenience in not wearing it.  I hate wearing it.  I

09:46AM     hate wearing it.  But I'd rather have people safe, and me in

09:46AM     an unpleasant situation rather than expose people to being

09:46AM     ill.

09:46AM          So, we will go until 4:30 today.  I have to --

09:46AM     someplace to go, so I have to leave at 4:30, so we're going to

09:46AM 1 leave at 4:30 today, we'll be on every day next week except

09:46AM 2 Friday, next Friday we'll be down.  And then we will likely

09:46AM 3 continue the following week because of the various illnesses

09:46AM 4 and other things that have delayed things.  And I apologize,

09:46AM 5 we are so grateful for you folks.  I know it's even worse than

09:46AM 6 you thought it was going to be, but it's beyond our control.

09:47AM 7 You know, when I woke up on Tuesday morning and took my

09:47AM 8 temperature, I said, uh-oh, this is not going to be good.  And

09:47AM 9 called my doctor and got the instructions and did -- followed

09:47AM 10 his instructions and so here we are.  So, so let's get

09:47AM 11 started.

09:47AM 12          I remind the witness he's still under oath.

09:47AM 13          And, Mr. Tripi, you can continue.

09:47AM 14          **MR. TRIPI:**  Thank you very much, Your Honor.

09:47AM 15

09:47AM 16 **R O N A L D   S E R I O,** having been previously duly called

09:47AM 17 and sworn, continued to testify as follows:

09:47AM 18

09:47AM 19          **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

09:47AM 20 Q.  Good morning, Mr. Serio.

09:47AM 21 A.  Good morning.

09:47AM 22 Q.  We last left off on Monday, I just kind of want to --

09:47AM 23 because it's been a few days, I want to recap where we left

09:47AM 24 off, okay?

09:47AM 25      We had talked about 2008 and 2009, you described the

09:47AM    1    operations, distribution, and money you and Masecchia and

09:47AM    2    others were earning during that timeframe.  And it was during

09:47AM    3    that timeframe when Masecchia told you, in sum and substance,

09:47AM    4    that Bongiovanni would look out --

09:47AM    5    A.  Correct.

09:47AM    6    Q.  -- right?

09:47AM    7        Then you described a conversation that happened in your

09:48AM    8    garage I think at 125 Huntington, which was sometime after a

09:48AM    9    roundup that included some people you knew, including David

09:48AM   10    Gambino and Sam Vacanti; is that right?

09:48AM   11    A.  Yes.

09:48AM   12    Q.  And as you understood it, those people were charged

09:48AM   13    federally?

09:48AM   14    A.  Yes.

09:48AM   15    Q.  And I think you described that in your garage, you and

09:48AM   16    Masecchia discussed paying the defendant $2,000 per month for

09:48AM   17    information into investigation -- about investigations and

09:48AM   18    informants; is that right?

09:48AM   19    A.  Correct.

09:48AM   20    Q.  Okay.  All right.  And the payments were to be made

09:48AM   21    monthly, and the information was to flow through Lou Selva;

09:48AM   22    is that right?

09:48AM   23    A.  Correct.

09:48AM   24    Q.  Now, I want to pick it up from there and the discussion,

09:48AM   25    okay?

09:48AM  1   A.  Okay.

09:48AM  2   Q.  What did Mr. Masecchia tell you was the reason that the

09:48AM  3   primary contact and information would flow through Lou Selva?

09:48AM  4   A.  Because Lou was best friends with Joe.  So, it looked

09:49AM  5   better for -- well, Lou was always around Joe.  So instead of

09:49AM  6   Mike, who was a drug dealer, they didn't want me to meet him

09:49AM  7   because I was a drug dealer.

09:49AM  8   Q.  So, to sum it up, sort of less conspicuous to deal with

09:49AM  9   Lou and Joe, as opposed to you and Mike and Joe?

09:49AM 10   A.  Yes.

09:49AM 11   Q.  All right.  Now, what approximate year did the payments

09:49AM 12   of $2,000 begin to the best of your ability?

09:49AM 13   A.  It was 2010.

09:49AM 14   Q.  Okay.  By that point in time, was it your understanding

09:49AM 15   through Mike that Joe had been looking out since about 2008?

09:49AM 16   A.  Yes.

09:49AM 17   Q.  Approximately how long did the payment level persist at

09:49AM 18   the $2,000 per month rate?

09:49AM 19   A.  It's about an around a year, less than a year.

09:50AM 20   Q.  Okay.  Eventually, after that, did it bump up?

09:50AM 21   A.  Yes.

09:50AM 22   Q.  What did it bump up to?

09:50AM 23   A.  To $4,000.

09:50AM 24   Q.  So an additional $2,000 per month?

09:50AM 25   A.  Correct.

09:50AM    1    Q.  So in those years of 2010 into 2011, did your and

09:50AM    2    Masecchia's operations continue to expand?

09:50AM    3    A.  Yes.

09:50AM    4    Q.  Describe for the jury generally, and then I'll get more

09:50AM    5    specific in my questions, but generally explain for them how

09:50AM    6    your operations with Mr. Masecchia continued to expand in

09:50AM    7    2010 and 2011.

09:50AM    8    A.  Well, I developed a new connection where I was able to

09:50AM    9    get larger quantities of marijuana.

09:50AM   10    Q.  So were you moving more volume?

09:50AM   11    A.  Correct.

09:50AM   12    Q.  Were the people selling for you also moving more product

09:50AM   13    for you?

09:50AM   14    A.  Yes.

09:50AM   15    Q.  How much more product were you able to get?

09:50AM   16    A.  About a extra hundred to 200 pounds a month.

09:50AM   17    Q.  And generally, by way of rough estimate, what's the value

09:51AM   18    of that extra hundred, let's say, 200 pounds of marijuana?

09:51AM   19    A.  Profit-wise?

09:51AM   20    Q.  Your cost, and then profit-wise.

09:51AM   21    A.  So the cost around that time was around $3,000, I

09:51AM   22    believe.  And my profit would be anywhere from 20- to 50,000

09:51AM   23    on every hundred.

09:51AM   24    Q.  So your cost is $3,000 a pound?

09:51AM   25    A.  Yes, and I'd sell it for between 32- to 35-.

09:51AM 1   Q.  So, you would make 2- to $500 per pound?

09:51AM 2   A.  Correct.

09:51AM 3   Q.  So as you scale up your operations, you and others

09:51AM 4   working with you were earning more money?

09:51AM 5   A.  Correct.

09:51AM 6   Q.  Was this in addition to the indoor grows that you had at

09:51AM 7   your warehouse, at Suppa's house, and the outdoor grows that

09:52AM 8   Masecchia had going on?

09:52AM 9   A.  Correct.  Well, in 2010, I stopped at my warehouse.

09:52AM 10  Q.  So part of 2010, you were in the warehouse, and then it

09:52AM 11  stopped?

09:52AM 12  A.  Correct.

09:52AM 13  Q.  What part of 2010 did you stop the warehouse operation?

09:52AM 14  A.  It was, I believe, in the winter.  Once the winter was

09:52AM 15  over.

09:52AM 16  Q.  Winter towards the beginning of 2010, or winter towards

09:52AM 17  the end of 2010?

09:52AM 18  A.  The beginning of 2010.

09:52AM 19  Q.  Okay.  We're in Buffalo, so we have to specify; right?

09:52AM 20  A.  Yes.

09:52AM 21  Q.  All right.  Were you also selling cocaine during those

09:52AM 22  timeframes?

09:52AM 23  A.  In 2008 I was.

09:52AM 24  Q.  After 2008, would you sell it intermittently here and

09:52AM 25  there?

09:52AM    1    A.   Starting 2013, I did.

09:52AM    2    Q.   Okay.  So you took a gap of '09 through to the beginning

09:52AM    3    of 2013, you took a break on cocaine?

09:52AM    4    A.   Correct.

09:53AM    5    Q.   What amounts of cocaine, just so we can go back, were you

09:53AM    6    selling in 2008 on a consistent basis?

09:53AM    7    A.   Ounces.  I would get maybe a quarter or a half a key.

09:53AM    8    Q.   And then break it down into ounces?

09:53AM    9    A.   Correct.

09:53AM   10    Q.   And then in 2013, how did that look in terms of your

09:53AM   11    cocaine distribution?

09:53AM   12    A.   Because I was, I developed a -- a new connection, and I

09:53AM   13    was trading marijuana for the cocaine.  So, it wasn't super

09:53AM   14    consistent, but I would sell ounces.  Or even if my friends

09:53AM   15    wanted, like, 3-and-a-half grams or something like that.

09:53AM   16    Q.   And that picked up in 2013?

09:53AM   17    A.   Correct.

09:53AM   18    Q.   And who was that connection?

09:53AM   19    A.   Jimmy Rivera.

09:53AM   20    Q.   By the time you and Masecchia discussed making $2,000 per

09:54AM   21    month payments to the defendant and paying him for

09:54AM   22    information about investigation and informants, were you and

09:54AM   23    Masecchia both feeling more exposed as a result of your

09:54AM   24    continuing operations, expanding your operations?

09:54AM   25    A.   Yes.

09:54AM 1  Q.  Did you believe around that time there was more risk of

09:54AM 2  an informant infiltrating your group?

09:54AM 3  A.  Yes.

09:54AM 4  Q.  Why did you believe that?

09:54AM 5  A.  Well, as you deal with more people, you have more chances

09:54AM 6  of being exposed.

09:54AM 7  Q.  Were the $2,000 monthly payments to Defendant Bongiovanni

09:54AM 8  and the information exchanges set on -- scheduled on set days

09:54AM 9  of the month?

09:55AM 10  A.  No, it was generally in the beginning of the month.  It

09:55AM 11  wasn't a specific day.  I see Mike all the time, so --

09:55AM 12  Q.  I'm sorry, I stepped over you, continue.

09:55AM 13  A.  Oh.  Well, I used to see Mike all the time, so if it was

09:55AM 14  in the beginning of the month, whatever day it was, I would

09:55AM 15  just give it to him.

09:55AM 16  Q.  So it wasn't like every Tuesday.

09:55AM 17  A.  No.

09:55AM 18  Q.  The first of the month, or whatever?

09:55AM 19  A.  No.

09:55AM 20  Q.  Okay.  But somewhere generally near the beginning?

09:55AM 21  A.  Correct.

09:55AM 22  Q.  Now, if something arose off schedule, in other words not

09:55AM 23  in the beginning of the month, not around the time of the

09:55AM 24  payment, not around the time of the defendant's meeting with

09:55AM 25  Lou Selva, that's what I mean by off schedule, okay?

09:55AM 1    A.   Yes.

09:55AM 2    Q.   If something arose off schedule from Mr. Selva's monthly

09:55AM 3    meeting with Defendant Bongiovanni, did Masecchia indicate to

09:55AM 4    you that he could get ahold of Bongiovanni?

09:55AM 5    A.   Yes.

09:55AM 6    Q.   What did he advise you in that record?

09:55AM 7    A.   I don't understand.

09:55AM 8    Q.   How did you know that Masecchia would be able to

09:55AM 9    independently get ahold of Bongiovanni?

09:56AM 10   A.   Well, he didn't specifically say it, but sometimes he

09:56AM 11   would say that he seen Joe.  So I assumed that he had had

09:56AM 12   contact with him.

09:56AM 13   Q.   And when he would say -- sometimes when Mr. Masecchia

09:56AM 14   would say he had seen Joe, was that on a -- on a -- a time of

09:56AM 15   the month that was different from when the payments were?

09:56AM 16   A.   I'm not sure.

09:56AM 17   Q.   Okay.

09:56AM 18   A.   Well, yeah, he used to hang out at M.T. Pockets, and

09:56AM 19   sometimes they would be there together.

09:56AM 20   Q.   Okay.  Is M.T. Pockets a bar on Hertel --

09:56AM 21   A.   Correct.

09:56AM 22   Q.   -- in North Buffalo?

09:56AM 23   A.   Yes.

09:56AM 24   Q.   So, were there times when something came up unexpectedly

09:56AM 25   where you knew Masecchia was able to get the information that

09:56AM    1    you wanted directly from Bongiovanni?

09:56AM    2    A.   Yes.

09:56AM    3    Q.   Can you give this jury two examples?

09:57AM    4    A.   The one time I believe with Mario Vacanti, and -- I'm

09:57AM    5    drawing a blank.

09:57AM    6    Q.   Okay.  I'll ask some more specific questions a little bit

09:57AM    7    later, okay?

09:57AM    8    A.   Yes.

09:57AM    9    Q.   I'll get into more detail.  But was there a situation

09:57AM   10    with an individual named Mark Vitale?

09:57AM   11    A.   Yes, that's the other time.

09:57AM   12    Q.   Can you describe what happened with Mark Vitale and what

09:57AM   13    you asked Masecchia to do?

09:57AM   14    A.   Mark Vitale's house got raided, and I asked Mike to find

09:57AM   15    out if everything was okay.

09:57AM   16    Q.   And what did you mean by "find out if everything was

09:57AM   17    okay?"

09:57AM   18    A.   If Mark was cooperating against me, or said my name, or

09:57AM   19    if there was an investigation on me.

09:57AM   20    Q.   And when you told Mike to see if everything was okay,

09:57AM   21    who -- who were you directing Mike to check with?

09:57AM   22    A.   To Joe Bongiovanni.

09:58AM   23    Q.   Is that an example of a situation that popped up

09:58AM   24    unexpectedly?

09:58AM   25    A.   Yes.

09:58AM 1   Q.  Was there another situation like similar to that when you

09:58AM 2   learned that Wayne Anderson had been arrested?

09:58AM 3   A.  Correct.

09:58AM 4   Q.  Is that a situation that arose unexpectedly?

09:58AM 5   A.  Yes.

09:58AM 6   Q.  I'll get into that in more detail, but is that -- is that

09:58AM 7   a situation where you asked Mike to check on the situation?

09:58AM 8   A.  Yes.

09:58AM 9   Q.  And who were you instructing or asking Mike to check

09:58AM 10  with?

09:58AM 11  A.  Joe Bongiovanni.

09:58AM 12  Q.  And what were you informed after you asked Mike to check

09:58AM 13  into that?

09:58AM 14  A.  That everything was okay.

09:58AM 15  Q.  Okay.  We'll get into those in more specifics in a little

09:58AM 16  bit.

09:58AM 17  A.  Okay.

09:58AM 18  Q.  When did you -- approximately when did you buy your house

09:58AM 19  on Lebrun?

09:58AM 20  A.  It was 2011.

09:58AM 21  Q.  And is that when you began renovating it in the manner

09:59AM 22  that you described Monday?

09:59AM 23  A.  Correct.

09:59AM 24  Q.  Now, by approximately 2011, were you -- were you having

09:59AM 25  your marijuana shipped by trucking across country to you from

09:59AM   1   Santiago Gale?

09:59AM   2   A.   Yes.

09:59AM   3   Q.   Now I just want to take a step back.  In March, in

09:59AM   4   another proceeding in this matter of this year, did you

09:59AM   5   mistakenly estimate during some testimony that you dealt with

09:59AM   6   Santiago Gale in 2012?

09:59AM   7   A.   Yes.

09:59AM   8   Q.   Subsequent to that testimony, did you -- did you review

09:59AM   9   documents indicating Mr. Gale was arrested in 2012 and was in

09:59AM  10   custody?

09:59AM  11   A.   Correct.

09:59AM  12   Q.   Did that refresh your recollection as to the timeline?

09:59AM  13   A.   It did.  I got confused because at the time I wasn't

09:59AM  14   aware that he got arrested.  So, I was still dealing with

09:59AM  15   T.S.  So I didn't know if T.S. had a different connection or

09:59AM  16   they had an agreement.

09:59AM  17      I only met Santiago once, so everything was through Tom.

10:00AM  18   So if they didn't want to stop, they obviously wouldn't tell

10:00AM  19   me that he got arrested.

10:00AM  20   Q.   Okay.  So, we'll break that down a little bit.

10:00AM  21      But, by 2011, you're dealing with Santiago Gale?

10:00AM  22   A.   Yes.

10:00AM  23   Q.   Can you describe how you were introduced to Santiago

10:00AM  24   Gale?

10:00AM  25   A.   Through T.S.

10:00AM 1 Q. And who is T.S.?

10:00AM 2 A. He's a friend of Frank Burkhart that -- I knew Frank

10:00AM 3 Burkhart, and Frank Burkhart introduced me to T.S.

10:00AM 4 Q. And is Frank Burkhart someone you dealt marijuana with?

10:00AM 5 A. Yes.

10:00AM 6 Q. Is Frank Burkhart someone who was also friends with R.K.?

10:00AM 7 B.K.?

10:00AM 8 A. Correct.

10:00AM 9 Q. Now, when you -- I think you touched a little bit on

10:00AM 10 Monday, but when you negotiated with Santiago Gale, can you

10:00AM 11 describe in a little more detail for the jury how you did

10:00AM 12 that?

10:00AM 13 A. I met him in New York City, and I just tried to convince

10:00AM 14 him -- because he also had shipments going to Boston, and I

10:01AM 15 wanted to take all the shipments. So I said it would be

10:01AM 16 safer to give it all to me because I had a DEA agent on the

10:01AM 17 payroll.

10:01AM 18 Q. Was T.S. with you for that meeting?

10:01AM 19 A. Yes.

10:01AM 20 Q. Was Frank Burkhart?

10:01AM 21 A. Yes.

10:01AM 22 Q. And what was your purpose for mentioning that you had a

10:01AM 23 DEA agent on payroll in that negotiation?

10:01AM 24 A. To make him feel more comfortable that we had an insider,

10:01AM 25 in case there was any investigations or anything.

10:01AM 1 Q. During your discussion with Santiago Gale, did he

10:01AM 2 indicate to you where the marijuana would be coming from?

10:01AM 3 A. Out of Utah. Well, it comes from California, then they

10:01AM 4 would have to ship it to Vegas or Utah in small amounts, and

10:01AM 5 then take it from there.

10:01AM 6 Q. In total, what was the amount of the marijuana shipments

10:01AM 7 that you were negotiating?

10:01AM 8 A. Around 200 pounds.

10:01AM 9 Q. Was that an increase from the monthly amount you had been

10:01AM 10 getting from Mark Kagan?

10:01AM 11 A. Yes.

10:02AM 12 Q. Remind the jury, what was the amount you had been getting

10:02AM 13 monthly from Mark Kagan?

10:02AM 14 A. 50 pounds a month.

10:02AM 15 Q. So basically you're up -- you're upping that supply

10:02AM 16 stream by 400 percent?

10:02AM 17 A. Correct.

10:02AM 18 Q. Or four times the amount?

10:02AM 19 A. Yes.

10:02AM 20 Q. Okay. You touched on it a moment ago. What was Santiago

10:02AM 21 Gale's delivery method going to be for you to receive the

10:02AM 22 marijuana?

10:02AM 23 A. Through to the tractor-trailer.

10:02AM 24 Q. A moment ago you said they would get it to Utah or

10:02AM 25 Las Vegas and then put it into trucks. Can you explain that?

10:02AM  1    A.  Well, because coming out of California, they look for

10:02AM  2    large trucks, so they take it in smaller amounts so that it's

10:02AM  3    less conspicuous.  And then they bring it to a warehouse and

10:02AM  4    they store it there.  Then they put it on the big trucks.

10:02AM  5    Q.  So from California, a number of little trucks travel to

10:03AM  6    Utah or Las Vegas?

10:03AM  7    A.  Correct.

10:03AM  8    Q.  And the loads are broken up smaller?

10:03AM  9    A.  From California to Vegas or Utah.  And then from there,

10:03AM  10   you put them in a tractor-trailer.

10:03AM  11   Q.  So then it gets consolidated on to a large truck?

10:03AM  12   A.  Correct.

10:03AM  13   Q.  Okay.  In terms of that delivery method, did it create a

10:03AM  14   larger delivery window for you?

10:03AM  15       Do you understand my question?

10:03AM  16   A.  Yes.  Because I didn't have direct contact with Santiago

10:03AM  17   Gale, so in -- but T.S., it wasn't specific either, it was

10:03AM  18   he'll be within a three-day timeframe, so --

10:03AM  19   Q.  You just had to be ready for a call within a three-day

10:03AM  20   window?

10:03AM  21   A.  Correct.

10:03AM  22   Q.  And contrast that with Mark Kagan.  Mark Kagan was

10:03AM  23   delivering it himself?

10:03AM  24   A.  Yes, he would call me when he was leaving, and then he'd

10:03AM  25   be there within seven hours.

10:03AM 1  Q.  So, you knew -- did you basically know if Kagan wasn't

10:03AM 2  there within seven hours, something was wrong?

10:04AM 3  A.  Yes.

10:04AM 4  Q.  Okay.  Did you know the different drivers that were going

10:04AM 5  to be coming to you from Utah or Las Vegas --

10:04AM 6  A.  No.

10:04AM 7  Q.  -- for Santiago Gale?

10:04AM 8  A.  No.

10:04AM 9  Q.  How would you remain in contact with either Gale or --

10:04AM 10  who was your point of contact when the deliveries were

10:04AM 11  coming?

10:04AM 12  A.  It was T.S.

10:04AM 13  Q.  Okay.

10:04AM 14  A.  I only met Gale once and spoke to him once.

10:04AM 15  Q.  Okay.  So, T.S. was handling the logistics of the

10:04AM 16  delivery to you?

10:04AM 17  A.  Correct.

10:04AM 18  Q.  Were you and he using burner phones?

10:04AM 19  A.  Yes.

10:04AM 20  Q.  By the time you're dealing with Gale, are you -- are you

10:04AM 21  done dealing with Mark Kagan?

10:04AM 22  A.  Yes.

10:04AM 23  Q.  Had he lost his ability to supply you?

10:04AM 24  A.  Correct.

10:04AM 25  Q.  Do you know why?

10:04AM    1    A.  He didn't really explain.

10:04AM    2    Q.  Okay.  So with large delivery windows and not personally

10:05AM    3    knowing the person driving it to you, did that create more

10:05AM    4    uncertainty for you?

10:05AM    5    A.  Yes.

10:05AM    6    Q.  Did that create an interest for you in obtaining more

10:05AM    7    information and more vigilance from this defendant?

10:05AM    8    A.  Yes.

10:05AM    9    Q.  I'm going to circle back to that in just a moment.  But

10:05AM   10    when you were coordinating the receipt of the 200-pound

10:05AM   11    shipments of marijuana with T.S., where would you receive

10:05AM   12    delivery of the trucks?

10:05AM   13    A.  He would bring it -- he would go meet whoever, and then

10:05AM   14    he'd bring it to me at my house.

10:05AM   15    Q.  So T.S. unloaded it from the larger truck to a smaller

10:05AM   16    vehicle?

10:05AM   17    A.  Correct.

10:05AM   18    Q.  And when you said T.S. would bring it to your house, what

10:05AM   19    house is that?

10:05AM   20    A.  It would be on 697 Lebrun.

10:05AM   21    Q.  Okay.  And when T.S. would deliver the 200 pounds, would

10:06AM   22    you provide payment at that point, or were you being fronted

10:06AM   23    the marijuana?

10:06AM   24    A.  Sometimes I'd give some cash, but I was also being

10:06AM   25    fronted.

10:06AM　1　Q.  So you'd provide partial payment?

10:06AM　2　A.  Yes.

10:06AM　3　Q.  In total, how many 200-pound shipments did you receive

10:06AM　4　from Santiago Gale through T.S.?

10:06AM　5　A.  I'd say at least five, if not ten.

10:06AM　6　Q.  And you're partnered up with Mike Masecchia at this

10:06AM　7　point?

10:06AM　8　A.  Yes.

10:06AM　9　Q.  Fair to say he's involved in all aspects of your

10:06AM　10　operation?

10:06AM　11　A.  Yes.

10:06AM　12　Q.  In 2011, did you also travel to Las Vegas with

10:06AM　13　Mr. Masecchia?

10:06AM　14　A.  Yes.

10:06AM　15　Q.  Did your brother Tom go with you?

10:06AM　16　A.  Yes.

10:06AM　17　Q.  I'd like to take a step back from the Santiago Gale

10:07AM　18　distribution for a moment and ask a few more questions about

10:07AM　19　Mr. Masecchia and his connections, okay?

10:07AM　20　A.  Okay.

10:07AM　21　Q.  Over -- over time, through Masecchia, have you had

10:07AM　22　sit-downs with several individuals that he introduced you to

10:07AM　23　that you understood to be connected to Italian Organized

10:07AM　24　Crime?

10:07AM　25　A.  Yes.

10:07AM   1   Q.   And were those sit-downs arranged by Mr. Masecchia to see
10:07AM   2   if you could acquire even more sources of supply for
10:07AM   3   marijuana?
10:07AM   4   A.   Yes.
10:07AM   5   Q.   In one of the meetings, did you sit down with Masecchia
10:07AM   6   and Butchie Bifocal?
10:07AM   7   A.   Yes.
10:07AM   8   Q.   And who did you discuss getting marijuana from at that
10:07AM   9   time?
10:07AM  10   A.   From Percy Gamble, I'm not sure -- is it Percy Gamble?  I
10:07AM  11   know his name is Percy, in Canada.
10:07AM  12   Q.   As you understood it, was Percy connected to Italian
10:08AM  13   Organized Crime?
10:08AM  14   A.   Yes.
10:08AM  15   Q.   What was the general timeframe of that meeting and
10:08AM  16   discussion?
10:08AM  17   A.   It was 2014, I believe.
10:08AM  18   Q.   Okay.  So we fast forwarded a little bit?
10:08AM  19   A.   Yes.
10:08AM  20   Q.   Ultimately, did you determine Percy's prices were too
10:08AM  21   high?
10:08AM  22   A.   Yes.
10:08AM  23   Q.   And did you feel like you had a better connection at that
10:08AM  24   time?
10:08AM  25   A.   Yes.

10:08AM 1 Q. Why did you feel like his prices were too high and you

10:08AM 2 didn't want to go with him?

10:08AM 3 A. Well, because I was -- it was the same price in Canada,

10:08AM 4 and I was responsible for getting it over, as the price that

10:08AM 5 I get it delivered to me in Buffalo.

10:08AM 6 Q. So you were responsible for transport over an

10:08AM 7 international border?

10:08AM 8 A. Correct.

10:08AM 9 Q. At some point, did you also have a sit-down with a guy

10:08AM 10 named John Catanzaro?

10:08AM 11 A. Yes.

10:08AM 12 Q. Approximately when was that?

10:08AM 13 A. That was somewhere in the early 2000s.

10:08AM 14 Q. So, much earlier in your career?

10:08AM 15 A. Yes.

10:08AM 16 Q. What was your understanding of the relationship,

10:09AM 17 familial, or otherwise, between Butchie Bifulco and Mike

10:09AM 18 Masecchia?

10:09AM 19 A. It was Mike's godfather.

10:09AM 20 Q. Was it your understanding that Butchie was a member of

10:09AM 21 Italian Organized Crime in Buffalo?

10:09AM 22 A. Yes.

10:09AM 23 Q. That was his reputation?

10:09AM 24 A. Yes.

10:09AM 25 Q. What did Mike tell you, if anything, about his father's

10:09AM  1  connection to Italian Organized Crime in Buffalo?

10:09AM  2  A.  That his father was connected to organized crime.

10:09AM  3  Q.  At some point during your partnership with Masecchia out

10:09AM  4  of curiosity, did you ask him questions about what it took to

10:09AM  5  become a made person?

10:09AM  6  A.  Yes.

10:09AM  7  Q.  What was Masecchia's response to you?

10:10AM  8  A.  He told me to just shut up and keep making money.

10:10AM  9  Q.  Working with Masecchia, was your ultimate goal to control

10:10AM  10  the entire marijuana market in Buffalo?

10:10AM  11  A.  Yes.

10:10AM  12  Q.  Getting back to Santiago Gale.

10:10AM  13    Did you discuss this new delivery method, the large

10:10AM  14  trucks, did you discuss that delivery method with Masecchia?

10:10AM  15  A.  Yes.

10:10AM  16  Q.  What did Masecchia say about that?

10:10AM  17  A.  Well, I just asked him to ask Joe to be more vigilant

10:10AM  18  about shipments coming in from Utah or Las Vegas.

10:10AM  19  Q.  And when you asked Masecchia to make sure Joe was more

10:10AM  20  vigilant about trucks coming in from Utah or Las Vegas, what

10:10AM  21  were you asking for?

10:10AM  22  A.  Just to see if that -- if he hears anything about

10:11AM  23  shipments coming in that are about to be busted.

10:11AM  24  Q.  What did Mike say when you made that request?

10:11AM  25  A.  He said he'd talk to Joe.

10:11AM 1    Q.  Meaning Joe Bongiovanni?

10:11AM 2    A.  Yes.

10:11AM 3    Q.  Would you say you and -- both you and Masecchia were

10:11AM 4    highly motivated to make sure those trucks made it in safely?

10:11AM 5    A.  Yes.

10:11AM 6    Q.  After Masecchia told you he would talk to Joe, eventually

10:11AM 7    did he come back and tell you what Defendant Bongiovanni

10:11AM 8    said?

10:11AM 9    A.  Yes.

10:11AM 10   Q.  What did Masecchia explain to you?

10:11AM 11   A.  He said that he would do it, but I'd have to pay another

10:11AM 12   $2,000 a month.

10:11AM 13   Q.  Based on your discussions with Masecchia, was Lou Selva

10:11AM 14   also part of that negotiation?

10:12AM 15   A.  Yes.

10:12AM 16   Q.  So did you want information about investigations into

10:12AM 17   cross-country trucking?

10:12AM 18   A.  Correct.

10:12AM 19   Q.  Did you want information about informants?

10:12AM 20   A.  Correct.

10:12AM 21   Q.  Did you want assurances there were no wiretaps on your

10:12AM 22   and Masecchia's main phones?

10:12AM 23   A.  Correct.

10:12AM 24   Q.  Did you want assurance that none of your main associates

10:12AM 25   had their phones tapped?

10:12AM  1    A.  Correct.

10:12AM  2    Q.  Did you want -- did you expect and did you want a

10:12AM  3    heads-up if anyone was looking at your residence at 697

10:12AM  4    Lebrun?

10:12AM  5    A.  Correct.

10:12AM  6    Q.  Now, as you're working with Santiago Gale through T.S.,

10:12AM  7    eventually did you provide access to T.S. to your warehouse

10:13AM  8    at 82 Sycamore?

10:13AM  9    A.  Yes.

10:13AM  10   Q.  What was the reason you provided access to T.S. to your

10:13AM  11   warehouse at 82 Sycamore?

10:13AM  12   A.  It was to store his motorcycles.  To store his

10:13AM  13   motorcycle.

10:13AM  14   Q.  He rides motorcycles?

10:13AM  15   A.  Yes.

10:13AM  16   Q.  He asked you if he can keep his motorcycle there?

10:13AM  17   A.  Correct.

10:13AM  18   Q.  I think it faded out.  Can you just repeat it again?

10:13AM  19   A.  Correct.

10:13AM  20   Q.  Sometimes the mic's not working.

10:13AM  21       At some point in or around 2011, did you -- did you find

10:13AM  22   out that T.S. was actually storing firearms and a decent

10:13AM  23   amount of marijuana at your warehouse?

10:13AM  24   A.  Yes.

10:13AM  25   Q.  How did you find that out?

10:13AM 1 A. My friend Rob Rine told me.

10:13AM 2 Q. Who's Rob Rine? I don't know if we've heard that name

10:14AM 3 yet.

10:14AM 4 A. A friend of mine that I used to hang out with.

10:14AM 5 Q. Is he someone who knew T.S.?

10:14AM 6 A. Yes.

10:14AM 7 Q. After Rob Rine told you T.S. was storing just more than

10:14AM 8 his motorcycle at your warehouse, what did you do?

10:14AM 9 A. I robbed him.

10:14AM 10 Q. Did you get upset?

10:14AM 11 A. Yes, I got real upset.

10:14AM 12 Q. Were you -- why were you upset T.S. was storing guns and

10:14AM 13 marijuana at your warehouse?

10:14AM 14 A. Because he didn't --

10:14AM 15     I don't think the microphone is on.

10:14AM 16 Q. Yeah. Can you just try to speak up? Do your best.

10:14AM 17 A. Okay. Well, because he didn't tell me that he was

10:14AM 18 storing it there, so it made me angry. And I also stored

10:14AM 19 tools there, and my father and some of my employees would go

10:14AM 20 there for my real estate.

10:14AM 21 Q. So, you had actual real estate projects you were working

10:14AM 22 on?

10:15AM 23 A. Yes.

10:15AM 24 Q. Your father is the one who taught you carpentry?

10:15AM 25 A. Correct.

10:15AM  1  Q.  So when you learned that he had marijuana and guns in

10:15AM  2  there, you weren't happy with that at that time?

10:15AM  3  A.  I was not.

10:15AM  4  Q.  So, did you -- did you and Rob Rine come up with a ruse

10:15AM  5  to take that marijuana and those guns?

10:15AM  6  A.  Yes.

10:15AM  7  Q.  What was the ruse you came up with?

10:15AM  8  A.  Rob Rine knew a Tonawanda police detective, and he

10:15AM  9  made -- and the detective made a fake warrant to make it look

10:15AM  10  like the warehouse got raided.

10:15AM  11  Q.  Did Rine ever tell you who this Town of Tonawanda

10:15AM  12  detective was?

10:15AM  13  A.  No.

10:15AM  14  Q.  Did Rine show you, like, what looked like a legitimate

10:15AM  15  search warrant?

10:15AM  16  A.  Yes.

10:15AM  17  Q.  So how did you guys use this fake search warrant to take

10:15AM  18  that marijuana and those guns?

10:15AM  19  A.  Well, Rob was at my house, and he called T.S. over and he

10:15AM  20  showed him the warrant.  And he kept Tom at my house while he

10:16AM  21  was there, and I broke in the safe.

10:16AM  22  Q.  And so how much marijuana did you take, remove?

10:16AM  23  A.  It was 29 pounds and a MAC-10 gun.

10:16AM  24  Q.  As you understood it, was that marijuana that had come

10:16AM  25  from Santiago Gale?

10:16AM    1    A.   Yes.

10:16AM    2    Q.   Ultimately, what did you do with that MAC-10 gun?

10:16AM    3    A.   Gave it to Mike Masecchia.

10:16AM    4    Q.   What did you do with the 29 pounds of marijuana?

10:16AM    5    A.   I sold it.

10:16AM    6    **THE COURT:**   Colleen, can you call somebody to get

10:16AM    7    this fixed?

10:16AM    8    **THE CLERK:**   Yeah, I texted them, Judge.   They can do

10:16AM    9    it the background.

10:16AM    10    **BY MR. TRIPI:**

10:16AM    11    Q.   What did -- sorry?

10:16AM    12    **THE COURT:**   I apologize for interrupting.   I want to

10:16AM    13    get this thing fixed, though.

10:16AM    14    **MR. TRIPI:**   No, it's okay, Judge.   Yeah.

10:16AM    15    **THE COURT:**   Maddening.

10:16AM    16    **MR. TRIPI:**   Work with us, do your best to keep your

10:16AM    17    voice up until we get that remedied, okay?

10:16AM    18    **THE WITNESS:**   Okay.   No problem.

10:16AM    19    **MR. TRIPI:**   Sometimes you might yell at us when it

10:16AM    20    gets plugged back in, but we'll do our best.

10:16AM    21    **BY MR. TRIPI:**

10:16AM    22    Q.   Did -- did you and Rob Rine sort of gloss it over with

10:17AM    23    Santiago Gale -- withdrawn -- with T.S.?

10:17AM    24    A.   Gloss over the --

10:17AM    25    Q.   Did T.S. know that you actually took the marijuana right

10:17AM 1 away?

10:17AM 2 A. At the time, no.

10:17AM 3 Q. Okay. Did he have to answer for that marijuana with his

10:17AM 4 boss, Santiago Gale, if you know?

10:17AM 5 A. I believe so. Well, he owed him the money.

10:17AM 6 Q. Okay. Eventually, did you and T.S. continue to work

10:17AM 7 together after that?

10:17AM 8 A. A little bit. A few times.

10:17AM 9 Q. Eventually, did you pay -- withdrawn.

10:17AM 10 **MR. MacKAY:** I'm sorry, I just didn't hear the

10:17AM 11 answer.

10:17AM 12 **MR. TRIPI:** He said a little bit.

10:17AM 13 **THE CLERK:** Judge, I think I can hook up a wireless

10:17AM 14 mic and I'll shut his mic off.

10:17AM 15 **MR. TRIPI:** Hold that thought, and we'll pick it up.

10:17AM 16 **THE CLERK:** I'm sorry.

10:17AM 17 **MR. TRIPI:** No, you're good.

10:18AM 18 **BY MR. TRIPI:**

10:18AM 19 Q. Eventually did T.S., over time, sort of put two and two

10:18AM 20 together and figure that you took the weed?

10:18AM 21 A. Yes.

10:18AM 22 Q. Did you make it up to him? Did you pay him back some

10:18AM 23 money?

10:18AM 24 A. I did pay him back some money.

10:18AM 25 Q. How much money did you pay back T.S.?

10:18AM 1    A.  Around 30,000.

10:18AM 2         **MR. MacKAY:**  I'm sorry, what was the number?

10:18AM 3         **THE WITNESS:**  30,000.

10:18AM 4         **BY MR. TRIPI:**

10:18AM 5    Q.  After that event and Santiago Gale was no longer in the

10:18AM 6    picture as a supplier, did T.S. sort of travel back and forth

10:18AM 7    from Utah back into New York?

10:18AM 8    A.  Yes.

10:18AM 9    Q.  Did you continue to work with him getting marijuana

10:18AM 10   through him at times?

10:19AM 11   A.  Yes.

10:19AM 12   Q.  As time went on, did he also travel to you, with you and

10:19AM 13   Masecchia to New York City?

10:19AM 14   A.  Yes.

10:19AM 15   Q.  Was that to obtain marijuana?

10:19AM 16   A.  Yes.

10:19AM 17   Q.  Was that after you had made a connection with Jarrett

10:19AM 18   Guy?

10:19AM 19   A.  Yes.

10:19AM 20   Q.  Okay.  I'll get more into the Jarrett Guy distribution in

10:19AM 21   a moment.  But at this juncture, who introduced you to

10:19AM 22   Jarrett Guy?

10:19AM 23   A.  Mark Kagan.

10:19AM 24   Q.  That was the same Mark Kagan who used to supply you,

10:19AM 25   himself directly, correct?

10:19AM 1  A.  Yes.

10:19AM 2  Q.  Where did you first meet Jarrett Guy?

10:19AM 3  A.  In New York City.

10:19AM 4  **THE WITNESS:**  This mic isn't working now.

10:19AM 5  **MR. SINGER:**  I'm having difficulty hearing anything,

10:19AM 6  Judge, sorry.

10:19AM 7  **THE COURT:**  You really have to keep your voice up.  I

10:19AM 8  think both -- it's not the microphone, it's the whole sound

10:20AM 9  system, it shuts down.

10:20AM 10  **MR. TRIPI:**  Got you.

10:20AM 11  **BY MR. TRIPI:**

10:20AM 12  Q.  Mark Kagan's in New York City, did you say?

10:20AM 13  A.  Yes.

10:20AM 14  **MR. TRIPI:**  Mine seems to be working, so I'm just --

10:20AM 15  **THE WITNESS:**  Yeah.

10:20AM 16  **BY MR. TRIPI:**

10:20AM 17  Q.  And approximately when was that meeting?

10:20AM 18  A.  That was late 2012, I believe.

10:20AM 19  Q.  Okay.  Now, as time's going on, you're moving on from

10:20AM 20  Santiago Gale.  Late 2012, you deal with Jarrett Guy.

10:20AM 21  In November of 2012, did you arrange a source of supply

10:20AM 22  that was coming in through Frank Burkhart?

10:20AM 23  A.  Yes.

10:20AM 24  Q.  And who was going to be receiving delivery of that

10:20AM 25  marijuana intended to you?

10:20AM    1   A.   Wayne Anderson.

10:20AM    2   Q.   Okay.  I'm going to get to that next.

10:20AM    3        But by this point in time, by 2012, you've been paying

10:21AM    4   the defendant for several years now, right?

10:21AM    5   A.   Yes.

10:21AM    6   Q.   And I think you said by 2011 or so, it had bumped up to

10:21AM    7   about $4,000 a month?

10:21AM    8   A.   Yes.

10:21AM    9   Q.   Over time, did you provide names of associates of yours

10:21AM   10   that were distributing controlled substances, marijuana, to

10:21AM   11   Mike Masecchia, to pass along to Lou Selva and ultimately to

10:21AM   12   the defendant?

10:21AM   13   A.   Yes.

10:21AM   14   Q.   How would you provide the names and phone numbers of your

10:21AM   15   associates that you wanted their phones checked out?

10:21AM   16   A.   I'd give them to Mike Masecchia.

10:21AM   17   Q.   Did you write it on a list?

10:21AM   18   A.   Yes.

10:21AM   19   Q.   Did you give that list to Masecchia?

10:21AM   20   A.   Yes.

10:21AM   21   Q.   Was it your understanding Masecchia was going to pass

10:21AM   22   that list to Selva?

10:21AM   23   A.   Yes.

10:21AM   24   Q.   Ultimately for the defendant to check it out?

10:21AM   25   A.   Yes.

10:21AM 1 Q. Was John Robinson someone's phone number you provided?

10:21AM 2 A. Yes.

10:21AM 3 Q. Was Chris Baker someone's phone number you provided?

10:22AM 4 A. Yes.

10:22AM 5 Q. Was Mike Buttitta someone's phone number you provided?

10:22AM 6 A. Yes.

10:22AM 7 Q. Was Mark Vitale someone's phone number you provided?

10:22AM 8 A. Yes.

10:22AM 9 Q. Was Mark Falzone someone's phone number you provided?

10:22AM 10 A. Yes.

10:22AM 11 Q. Was Mario Vacanti?

10:22AM 12 A. Yes.

10:22AM 13 Q. Was Jay Campbell?

10:22AM 14 A. Yes.

10:22AM 15 Q. I haven't asked you about Jay Campbell yet. Who was

10:22AM 16 that?

10:22AM 17 A. That was just another person I dealt with.

10:22AM 18 Q. And what type of drugs did you deal with Jay Campbell?

10:22AM 19 A. Just marijuana.

10:22AM 20 Q. Okay. Was Mike Moynihan someone's name and phone number

10:22AM 21 you provided?

10:22AM 22 A. Yes.

10:22AM 23 Q. Now, eventually did Moynihan start living at 697 Lebrun

10:22AM 24 with you?

10:22AM 25 A. Yes.

10:22AM   1   Q.  What year was that?

10:22AM   2   A.  That was, I believe, 2015.

10:22AM   3   Q.  Okay.  But he had been a close friend of yours basically

10:22AM   4   your whole adult life?

10:22AM   5   A.  Yes.

10:22AM   6   Q.  Was Adrian Fina someone's name and phone number you

10:22AM   7   provided?

10:22AM   8   A.  Yes.

10:22AM   9   Q.  Did you provide your main cell phone number?

10:22AM  10   A.  Yes.

10:22AM  11   Q.  Did Masecchia provide his main cell phone number?

10:22AM  12   A.  I would assume.

10:22AM  13   Q.  Did Masecchia provide your brother Tom's main cell phone

10:23AM  14   number?

10:23AM  15   A.  Yes.

10:23AM  16   Q.  Can you estimate how many lists and numbers you passed

10:23AM  17   along over time?

10:23AM  18   A.  I'd be guessing.  But I would say at least five.

10:23AM  19   Q.  Was it more than one?

10:23AM  20   A.  It's definitely more than one.

10:23AM  21   Q.  Okay.  Was your purpose in passing those lists to make

10:23AM  22   sure your phone was not on a wiretap?

10:23AM  23   A.  Correct.

10:23AM  24   Q.  Did you know people by that point in your drug dealing

10:23AM  25   career who, in the past, had been caught on a wiretap?

10:23AM   1   A.  Yes.

10:23AM   2   Q.  Who were some people that you knew in life that had been

10:23AM   3   caught on wiretaps, as you understood it?

10:23AM   4   A.  I know that Dave Gambino was.

10:23AM   5   Q.  Okay.  Now, you mentioned Wayne Anderson just a moment

10:23AM   6   ago.  I'd like to delve into that a little more, okay?

10:24AM   7   A.  Yes.

10:24AM   8   Q.  I think as you indicated Monday, you were consistently

10:24AM   9   looking for additional sources of supply?

10:24AM  10   A.  Correct.

10:24AM  11   Q.  In short, did you believe you had an ability to move as

10:24AM  12   much marijuana as you could get your hands on?

10:24AM  13   A.  Yes.

10:24AM  14   Q.  So, who is Wayne Anderson?

10:24AM  15   A.  Wayne Anderson was a friend of Frank Burkhart.  Also a

10:24AM  16   friend of Mike Masecchia.

10:24AM  17   Q.  Who introduced you to Wayne Anderson?

10:24AM  18   A.  I met Wayne years before through Mike Buttitta.  But just

10:24AM  19   saying hi, nothing -- no business.

10:24AM  20   Q.  By November of 2012, approximately how long had you known

10:24AM  21   Wayne Anderson?

10:24AM  22   A.  2012?  Probably 15 years.

10:24AM  23   Q.  Okay.  What was your understanding of how well Mike

10:25AM  24   Masecchia and Wayne Anderson knew each other?

10:25AM  25   A.  That they grew up together.

10:25AM  1   Q.  Did you have any understanding of the relationship

10:25AM  2   between Wayne Anderson and the defendant?

10:25AM  3   A.  No, I did not.

10:25AM  4   Q.  Did you have any understanding of the relationship

10:25AM  5   between Lou Selva and Wayne Anderson?

10:25AM  6   A.  No, I did not.

10:25AM  7   Q.  Okay.  But you knew Frank Burkhart and Mike Masecchia

10:25AM  8   were friends with Wayne Anderson?

10:25AM  9   A.  Correct.

10:25AM  10  Q.  Now, in or about November of 2012, did you learn that

10:25AM  11  Wayne Anderson and Damien Abbate were arrested?

10:25AM  12  A.  Yes.

10:25AM  13  Q.  You touched on this a little bit earlier today, but who

10:25AM  14  told you they were arrested?

10:25AM  15  A.  It was Mike Masecchia.

10:25AM  16  Q.  Do you know how Masecchia learned it initially?

10:25AM  17  A.  That he was driving by the general area, Wayne lives off

10:25AM  18  of Elmwood.

10:25AM  19  Q.  The day they got arrested, did you and Masecchia have an

10:26AM  20  understanding that a load of marijuana was coming in intended

10:26AM  21  for you?

10:26AM  22  A.  Yes.

10:26AM  23  Q.  Did you know it was coming that day?

10:26AM  24  A.  I didn't know it was coming that day.

10:26AM  25  Q.  Okay.  Who was handling the logistics of the delivery and

10:26AM 1 receipt?

10:26AM 2 A. Wayne Anderson.

10:26AM 3 Q. What did Masecchia tell you when he -- withdrawn.

10:26AM 4 Did Masecchia indicate that he saw police activity at

10:26AM 5 Anderson's house?

10:26AM 6 A. Yes.

10:26AM 7 Q. What did he tell you when he -- when he talked to you?

10:26AM 8 A. When I met up with him, that he was just going to find

10:26AM 9 out if everything was okay.

10:26AM 10 Q. So initially, I guess that's a poor question on my part,

10:26AM 11 initially did Masecchia call you and set up a meeting?

10:26AM 12 A. Yes.

10:26AM 13 Q. You didn't talk about it over the phone?

10:26AM 14 A. No.

10:26AM 15 Q. Where did you meet to discuss the police activity at

10:26AM 16 Anderson's house?

10:26AM 17 A. I believe it was my house.

10:26AM 18 Q. When you say "my house," are you referencing 697 Lebrun?

10:26AM 19 A. Yes.

10:27AM 20 Q. Did you meet with Masecchia the same day he saw the

10:27AM 21 police activity?

10:27AM 22 A. Yes.

10:27AM 23 Q. What was your discussion with Masecchia about the police

10:27AM 24 activity at Wayne Anderson's house that he observed?

10:27AM 25 A. Just that I was concerned.

10:27AM 1  Q.  What did Masecchia say to you?

10:27AM 2  A.  That he was in gonna find out what was going on.

10:27AM 3  Q.  Find out from who?

10:27AM 4  A.  Joe Bongiovanni.

10:27AM 5  Q.  Did you want to know if everything was going to be okay?

10:27AM 6  A.  Yes.

10:27AM 7  Q.  After you had that initial discussion, the same day that

10:27AM 8  Masecchia saw the police activity at Wayne Anderson's house,

10:27AM 9  did Masecchia get back to you with word from the defendant?

10:27AM 10 A.  The next day.

10:28AM 11 Q.  What did Masecchia tell you?

10:28AM 12 A.  He said everything's okay.

10:28AM 13 Q.  What was your understanding of how Masecchia determined

10:28AM 14 everything was okay?

10:28AM 15 A.  That he contacted Lou, and Lou talked to Joe.

10:28AM 16 Q.  But the person who talked to you was Masecchia?

10:28AM 17 A.  Yes.

10:28AM 18 Q.  After Masecchia told you everything was okay, did anyone

10:28AM 19 from the DEA ever come and ask you questions about Wayne

10:28AM 20 Anderson's marijuana seizure?

10:28AM 21 A.  No.

10:28AM 22 Q.  Did Defendant Joe Bongiovanni ever come to you and ask

10:28AM 23 you questions about Wayne Anderson or the marijuana seizure?

10:28AM 24 A.  No.

10:28AM 25 Q.  Even though you were advised everything was okay, did you

10:29AM  1    pause your operations for a little bit?

10:29AM  2    A.  Yes.

10:29AM  3    Q.  Is this the same window of time you were starting to

10:29AM  4    negotiate with Jarrett Guy?

10:29AM  5    A.  Yes.

10:29AM  6    Q.  After a brief delay, did you start back up?

10:29AM  7    A.  Yes.

10:29AM  8    Q.  And, I guess, start back up distributing?

10:29AM  9    A.  Correct.

10:29AM  10   Q.  Now I think on Monday you said sometime around 2012 or

10:29AM  11   2013, Masecchia took a break from those outdoor grows; do you

10:29AM  12   remember that?

10:29AM  13   A.  Yes.

10:29AM  14   Q.  Was that break that Masecchia took from the outdoor grows

10:29AM  15   in Angelica and Franklinville, was that after the Wayne

10:30AM  16   Anderson arrest, if you know?

10:30AM  17   A.  Yes.  I believe it was Humphrey, not Angelica.

10:30AM  18   Q.  Is Humphrey a town in the Cattaraugus County area?

10:30AM  19   A.  Correct.

10:30AM  20   Q.  Is it somewhere near Morgan Hollow Road?

10:30AM  21   A.  Yes.  It's, like, the next town over.

10:30AM  22   Q.  Okay.  After you laid low for a little bit, did you

10:30AM  23   continue up and -- and consummate the relationship,

10:30AM  24   distribution activity with Jarrett Guy?

10:30AM  25   A.  Yes.

10:30AM    1    Q.  In terms of an estimate, would you estimate that you

10:30AM    2    dealt with Jarrett Guy, the person based out of Vancouver,

10:31AM    3    Canada, as your main supplier from approximately, you know,

10:31AM    4    beginning of 2013 after that Wayne Anderson situation until

10:31AM    5    your arrest in April of 2017?

10:31AM    6    A.  Correct.

10:31AM    7    Q.  Can you describe for the jury the different shipment

10:31AM    8    methods that, how -- how -- how drugs got to you from Jarrett

10:31AM    9    Guy?

10:31AM   10    A.  From Jarrett Guy, sometimes it would just be maybe 50

10:31AM   11    pounds to hold me over, someone would drive it.  Sometimes it

10:31AM   12    would come wrapped in big bales of mulch.  And then sometimes

10:31AM   13    there was tractor trailers where they were hidden in the

10:31AM   14    floorboards, where there was a hydraulic lift that would

10:31AM   15    lifted the floor up.

10:31AM   16    Q.  For a period, did some shipments come by the U.S. Postal

10:32AM   17    Service, right in the mail?

10:32AM   18    A.  Yes, they had a hotel, they would have a courier stay at

10:32AM   19    the hotel and just mail it to the courier.

10:32AM   20    Q.  What do you mean by a courier?

10:32AM   21    A.  Just somebody that they paid to sign for the packages.

10:32AM   22    Q.  Okay.  As you understood it did some of those, or one, or

10:32AM   23    more of those shipments get intercepted?

10:32AM   24    A.  Yes.

10:32AM   25    Q.  Did a courier get arrested, if you know?

10:32AM 1   A.  Yes.

10:32AM 2   Q.  But the investigation never progressed past the courier?

10:32AM 3   A.  No.

10:32AM 4   Q.  So, then I'd like you to go into more detail.  Describe

10:32AM 5   the different shipping methods using vehicles and trucks and

10:32AM 6   the routes, if you can describe that for the jury.

10:32AM 7   A.  So, for the mulch, it would start in Vancouver.  And they

10:32AM 8   would, like, kind of shrink wrap a bale of mulch.  It was 4

10:32AM 9   foot by 4 foot by 4 foot.  And you cut it open, the marijuana

10:33AM 10   would just fall out, the mulch would fall out and you'd pick

10:33AM 11   through it.  And that would come from Vancouver to Kean,

10:33AM 12   New Jersey.  And then from Kean, New Jersey they would have a

10:33AM 13   U-Haul truck bring it to me here.

10:33AM 14     And then the other -- with the tractor-trailer, it would

10:33AM 15   start off in Vancouver to Toronto.  And would come over the

10:33AM 16   border, and I would have it at a loading dock and unload it.

10:33AM 17   Q.  Okay.  And were there times with using the mulch method

10:33AM 18   where they would shrink wrap the mulch, are you saying the

10:33AM 19   mulch was a cover load for the marijuana?

10:33AM 20   A.  Yes.

10:33AM 21   Q.  So, if that truck got pulled over, it would look like

10:33AM 22   someone is transporting a bale of mulch?

10:33AM 23   A.  Correct.

10:33AM 24   Q.  And the marijuana was in shrinkwrapped packages hidden

10:33AM 25   inside the mulch?

10:33AM    1    A.  Correct.

10:33AM    2    Q.  Were they 1- or 2-pound packages?

10:33AM    3    A.  1-pound packages.

10:33AM    4    Q.  Now, you indicated with the mulch method that the trucks

10:34AM    5    went to Kean, New Jersey, and then were transferred to a

10:34AM    6    U-Haul?

10:34AM    7    A.  Yes.

10:34AM    8    Q.  Were there times, though, when you would also, yourself,

10:34AM    9    travel with others to the New York City area to take delivery

10:34AM   10    as opposed to the U-Haul driving to Buffalo?

10:34AM   11    A.  Yes.

10:34AM   12    Q.  Okay.  So that involved how many trips to New York City

10:34AM   13    for you to pick up marijuana, would you estimate?

10:34AM   14    A.  I'd say at least 20.

10:34AM   15    Q.  20 on the low end?

10:34AM   16    A.  On the low end.

10:34AM   17    Q.  And then you described another delivery method that was

10:34AM   18    in larger tractor-trailer trucks from Vancouver to Toronto.

10:34AM   19    And then how would they get into Buffalo?

10:34AM   20    A.  They would just cross the border, the truck driver.

10:34AM   21    Q.  Was there -- was there sort of high-tech hydraulics used

10:34AM   22    to hide the marijuana in these trucks?

10:34AM   23    A.  Yes.

10:34AM   24    Q.  Explain that for the jury.  How did it get over the

10:35AM   25    border?

10:35AM   1   A.   So they would take the back plate --

10:35AM   2        How they got over the border, or once they got it?

10:35AM   3   Q.   How was the marijuana concealed?

10:35AM   4   A.   It was concealed under the floorboards, because they said

10:35AM   5   there was an anomaly that x-ray couldn't detect it.

10:35AM   6   Q.   And when you would receive it from these larger

10:35AM   7   tractor-trailer trucks, how would you receive the marijuana?

10:35AM   8   How did you get it out of this -- this location?

10:35AM   9   A.   I loaded it into my car and take it out.

10:35AM   10  Q.   How did it get from in between the floorboards?

10:35AM   11  A.   Oh.  We'd take off the back plate, and we hook up a

10:35AM   12  battery, and it would lift the floor up and then we'd remove

10:35AM   13  the marijuana.

10:35AM   14  Q.   So there was, like, a hydraulic lift?

10:35AM   15  A.   Correct.

10:35AM   16  Q.   So the manner in which it was concealed in those trucks

10:35AM   17  successfully defeated whatever was set up at the border to

10:35AM   18  detect it?

10:35AM   19  A.   Yes.

10:36AM   20  Q.   I'd like to hone in on the portions of the -- the time

10:36AM   21  where you had to go to actually to New York City to meet and

10:36AM   22  get the marijuana.  Okay?

10:36AM   23  A.   Yes.

10:36AM   24  Q.   Did Jarrett Guy have different people that you would meet

10:36AM   25  with in the New York City area when it came time to pick up?

10:36AM   1   A.  Yes.

10:36AM   2   Q.  Did you go to different parts of New York City?

10:36AM   3   A.  Yes.

10:36AM   4   Q.  Did you go there with different people helping you on

10:36AM   5   those trips?

10:36AM   6   A.  Yes.

10:36AM   7   Q.  Just generally, when you had to go to New York City to

10:36AM   8   pick up marijuana, how would you structure the trips?  And

10:36AM   9   when would you go?  And did you have a technique for getting

10:36AM  10   the weed back safely?

10:36AM  11   A.  I would personally drive the marijuana, because I only

10:36AM  12   trusted myself to do it.  But I'd have someone follow me in

10:36AM  13   case law enforcement got behind me to kind of do something to

10:36AM  14   get them pulled over to deflect from me.

10:37AM  15   Q.  So to -- to put a finer point on it, did -- did you have

10:37AM  16   other people come with you as, like, a follow car?

10:37AM  17   A.  Yes.

10:37AM  18   Q.  Over time, had a number of different people gone with you

10:37AM  19   to New York City to pick up marijuana?

10:37AM  20   A.  Yes.

10:37AM  21   Q.  Did it involve two vehicles in the way you just described

10:37AM  22   every time?

10:37AM  23   A.  Yes.

10:37AM  24   Q.  Who did you have discussions with that that was a better

10:37AM  25   way to do it?

10:37AM  1  A.  The people that I was going with.

10:37AM  2  Q.  Is Mike Masecchia someone who went on those trips with

10:37AM  3  you?

10:37AM  4  A.  Yes.

10:37AM  5  Q.  How many times did Masecchia travel with you to pick up

10:37AM  6  marijuana from New York City?

10:37AM  7  A.  At least five, not more than ten.

10:37AM  8  Q.  So between five and ten?

10:37AM  9  A.  Yes.

10:37AM  10  Q.  Did Mark Falzone go with you?

10:38AM  11  A.  Yes.

10:38AM  12  Q.  How many times did Mark Falzone go with you?

10:38AM  13  A.  He was probably less than five.

10:38AM  14  Q.  Did Mike Moynihan go with you?

10:38AM  15  A.  Yes.

10:38AM  16  Q.  How many times did he go with you?

10:38AM  17  A.  Over five.

10:38AM  18  Q.  Did T.S. go with you?

10:38AM  19  A.  Yes.

10:38AM  20  Q.  How many times did he go?

10:38AM  21  A.  A couple times.

10:38AM  22  Q.  When T.S. went with you, was there one trip where

10:38AM  23  Masecchia also went?

10:38AM  24  A.  Yes.

10:38AM  25  Q.  And these trips with Masecchia -- and this trip with

10:38AM    1    Masecchia and T.S., you're getting sourced now by Jarrett

10:38AM    2    Guy; is that right?

10:38AM    3    A.   No, that time, T.S. knew somebody that was like a new

10:38AM    4    connection that he was trying out.

10:38AM    5    Q.   Okay.  How many times -- you said a couple of times on

10:38AM    6    the other occasion that T.S. went with you?

10:38AM    7    A.   Yes.

10:38AM    8    Q.   Did "a couple" mean two?

10:38AM    9    A.   Sorry?

10:38AM   10    Q.   Are you estimating?  How many times for T.S.?

10:39AM   11    A.   Two times.

10:39AM   12    Q.   On the other occasion, was it weed you were getting from

10:39AM   13    Guy?

10:39AM   14    A.   Yes.

10:39AM   15    Q.   Okay.  Did John Robinson go with you?

10:39AM   16    A.   Yes.

10:39AM   17    Q.   How many times?

10:39AM   18    A.   A few times.

10:39AM   19    Q.   On one of those trips, did Adrian Fina and your wife

10:39AM   20    Lauren go?

10:39AM   21    A.   Yes.

10:39AM   22    Q.   Could it have been three times for John Robinson?

10:39AM   23    A.   Yes.

10:39AM   24    Q.   Are you estimating here?

10:39AM   25    A.   Yeah, I'm estimating.

10:39AM 1    Q.  Did Mario Vacanti go with you?

10:39AM 2    A.  Yes.

10:39AM 3    Q.  How many times would you estimate he went?

10:39AM 4    A.  More than five.

10:39AM 5    Q.  More than five?

10:39AM 6    A.  Yes.

10:39AM 7    Q.  Did Matt LoTempio go with you?

10:39AM 8    A.  Yes.

10:39AM 9    Q.  How many times?

10:39AM 10   A.  More than five.

10:39AM 11   Q.  How many times did Lauren and Adrian go with you?

10:39AM 12   A.  Just a few times.

10:39AM 13   Q.  When they went, would they generally go together?

10:40AM 14   A.  Yes.

10:40AM 15   Q.  Did Anthony Gerace go with you?

10:40AM 16   A.  One time, I believe.

10:40AM 17   Q.  Anybody else I haven't asked you about that went with

10:40AM 18   you?

10:40AM 19   A.  Not that I can think of.

10:40AM 20   Q.  For the shipments that Guy was arranging to Buffalo, what

10:40AM 21   were the amounts of marijuana?

10:40AM 22   A.  Between 100 and 300.

10:40AM 23   Q.  Now, when you didn't have to go to New York City to get

10:40AM 24   it from Guy or his connection there, and when it came in

10:40AM 25   U-Hauls in the mulch as you described, did you take delivery

10:40AM   1   of the U-Haul shipments at various locations?

10:40AM   2   A.   Yes.

10:40AM   3   Q.   What different locations did you take delivery of the

10:41AM   4   U-Haul method where it was -- where it was hidden in the

10:41AM   5   mulch?

10:41AM   6   A.   My house, 697 Lebrun.  The 82 Sycamore location.  And

10:41AM   7   Mark Falzone's house at 377 Englewood.

10:41AM   8   Q.   So those are the locations for the U-Haul method,

10:41AM   9   correct?

10:41AM  10   A.   Yes.

10:41AM  11   Q.   Now, for the large tractor-trailers, did you need a

10:41AM  12   loading dock to be able to deal with what you were dealing

10:41AM  13   with when it came on the big trucks?

10:41AM  14   A.   Yes.

10:41AM  15   Q.   Did you know somebody who had a loading dock?

10:41AM  16   A.   Anthony Gerace.

10:41AM  17   Q.   How many times did you -- well, withdrawn.

10:41AM  18        Where was Anthony Gerace's loading dock?

10:41AM  19   A.   On Aero Drive in Cheektowaga, I believe.

10:41AM  20   Q.   And how many times did Anthony work with you to help you

10:41AM  21   unload at his loading dock?

10:41AM  22   A.   I believe it was three times.

10:41AM  23   Q.   Were those all 300-pound shipments in the big trucks?

10:42AM  24   A.   Yes.

10:42AM  25   Q.   Okay.  All right.  I want to get into a little more

10:42AM   1   specifics now.

10:42AM   2       You indicated Mark Falzone was someone who helped you --

10:42AM   3   in addition to traveling, he helped you unload shipments in

10:42AM   4   Buffalo; is that right?

10:42AM   5   A.   Correct.

10:42AM   6   Q.   You said his house is at 377 Englewood?

10:42AM   7   A.   Yes.

10:42AM   8   Q.   Is that in the Town of Tonawanda?

10:42AM   9   A.   Yes.

10:42AM   10  Q.   Did you pay Mark Falzone for helping you unload?

10:42AM   11  A.   Yes.

10:42AM   12  Q.   What'd you pay him?

10:42AM   13  A.   It was like $500, and he had first choice of whatever he

10:42AM   14  wanted of the marijuana.

10:42AM   15  Q.   Okay.  How many times did you take delivery at 377

10:42AM   16  Englewood at Falzone's house?

10:42AM   17  A.   I want to say maybe three times.

10:42AM   18  Q.   And was there an occasion when you were there unloading

10:43AM   19  with Falzone and Mike Masecchia briefly?

10:43AM   20  A.   Yes.

10:43AM   21  Q.   Describe that occasion.

10:43AM   22  A.   He was -- Mike came there, but then he said that this guy

10:43AM   23  Remus lived across, butting up to Mark's backyard.  And I

10:43AM   24  don't know, something happened between the two of them, so he

10:43AM   25  didn't want to be there.

10:43AM   1   Q.  So, just to elaborate on that, once Masecchia realized

10:43AM   2   Falzone lived near this guy Remus, he left?

10:43AM   3   A.  Yes.

10:43AM   4   Q.  Did it seem like they had some dispute between the two of

10:43AM   5   them?

10:43AM   6   A.  Yes.

10:43AM   7   Q.  Do you know the guy Remus's last name?  If you know?

10:43AM   8   A.  I think Nowak.  Novac, Nowak.

10:43AM   9   Q.  Describe generally how you unloaded the marijuana that

10:43AM  10   was in the mulch at Mark Falzone's house.

10:44AM  11   A.  We would push the box to the edge of the -- of the truck,

10:44AM  12   push it off, and then cut it open.  And then the mulch would

10:44AM  13   fall apart.

10:44AM  14   Q.  Are we talking, like, a heavy shrinkwrapped --

10:44AM  15   A.  Yes.

10:44AM  16   Q.  -- you know, pile of mulch?

10:44AM  17   A.  Yes.

10:44AM  18   Q.  Would it take some time to work it off the truck?

10:44AM  19   A.  Not too much with two of us.  But it was in a cardboard

10:44AM  20   box.  So it was shrinkwrapped in a cardboard box on a pallet,

10:44AM  21   so it was kind of easier to slide.

10:44AM  22   Q.  So you got it off the back?

10:44AM  23   A.  Yes.

10:44AM  24   Q.  And when it would fall, then what would you do?

10:44AM  25   A.  I would cut it open, and then the mulch would fall out

10:44AM    1    everywhere.  And then we'd pick through it to retrieve the

10:44AM    2    marijuana.

10:44AM    3    Q.  Did you take some deliveries at Falzone's house in 2013?

10:44AM    4    Or what year?

10:44AM    5    A.  I think it was, like, '14, '15.

10:44AM    6    Q.  Okay.  You indicated you took delivery at 82 Sycamore,

10:45AM    7    your warehouse?

10:45AM    8    A.  Yes.

10:45AM    9    Q.  How many times did you take delivery there?

10:45AM   10    A.  I'd say, like, four times.

10:45AM   11    Q.  Before I get to 82 Sycamore, on those other occasions

10:45AM   12    other than the one occasion you talked about where it was

10:45AM   13    you, Falzone, and Masecchia briefly, who else helped you and

10:45AM   14    Masecchia unload -- withdrawn.

10:45AM   15        Who else helped you and Falzone unload at Falzone's

10:45AM   16    house?

10:45AM   17    A.  I believe it was Matt LoTempio.  Either Matt LoTempio or

10:45AM   18    Mike Moynihan.  I'm not sure.

10:45AM   19    Q.  Okay.  All right.  Now I'd like to move on to 82

10:45AM   20    Sycamore.  I think you just said you took delivery at your

10:45AM   21    warehouse about four times?

10:45AM   22    A.  Yes.

10:45AM   23    Q.  Using the U-Haul/mulch method?

10:45AM   24    A.  Correct.

10:45AM   25    Q.  Who were the people who helped you unload at 82 Sycamore?

10:46AM    1    A.   I believe it was Matt LoTempio and Mark Falzone.

10:46AM    2    Q.   Same deal?  You're paying them to help you unload, and

10:46AM    3    giving them first choice on the marijuana?

10:46AM    4    A.   Yes.

10:46AM    5         **MR. TRIPI:**  Bear with me one moment.

10:46AM    6         Ms. Champoux, can we pull up again 51A-7?

10:46AM    7         **THE COURT:**  In evidence?

10:46AM    8         **MR. TRIPI:**  It is in evidence, Your Honor, thank you.

10:46AM    9         **BY MR. TRIPI:**

10:46AM   10    Q.   Okay.  We looked at this on Monday.  This is your

10:46AM   11    warehouse at 82 Sycamore?

10:46AM   12    A.   Yes.

10:46AM   13         **MR. TRIPI:**  Ms. Champoux, could we sort of zoom in on

10:46AM   14    this portion of it, and make it a little larger?

10:46AM   15         **BY MR. TRIPI:**

10:46AM   16    Q.   Okay.  Can you see that pretty well?

10:46AM   17    A.   Yes.

10:46AM   18    Q.   Describe for the jury where the U-Haul would pull up for

10:47AM   19    you to take delivery.

10:47AM   20    A.   It couldn't fit in it, so I would back it right up to

10:47AM   21    this door right here as close as possible.

10:47AM   22    Q.   So basically, what was your purpose for pulling it up

10:47AM   23    backed in as close as possible to that garage door?

10:47AM   24    A.   Because I had to push it off so no one could see.  And

10:47AM   25    once I got it off, closed the garage door.

10:47AM     1  Q.   So you're -- was your purpose to limit the amount of --

10:47AM     2  A.   Exposure.

10:47AM     3  Q.   -- exposure?

10:47AM     4  A.   Yes.

10:47AM     5         **THE COURT:**   For the record, you circled the garage

10:47AM     6  door that -- if -- could we zoom out for just one second?

10:47AM     7         **MR. TRIPI:**   Go ahead, Ms. Champoux.   Could you zoom

10:47AM     8  out?

10:47AM     9         **THE COURT:**   It's really the only garage door in the

10:47AM    10  photo.

10:47AM    11         **MR. TRIPI:**   Near the left-hand side of the photo.

10:47AM    12         **THE COURT:**   Near the left side, yes.

10:47AM    13         **MR. TRIPI:**   Thank you, Your Honor.

10:47AM    14         **BY MR. TRIPI:**

10:47AM    15  Q.   And was it generally the same method where you had to

10:47AM    16  push the load off the back, cut it open, and then transfer

10:47AM    17  the packaged marijuana to your vehicle?

10:48AM    18  A.   Yes.

10:48AM    19  Q.   How many vehicles would it take between your vehicle and

10:48AM    20  the people helping you to get it back to where you were

10:48AM    21  bringing it?

10:48AM    22  A.   It depends.   Sometimes two.

10:48AM    23  Q.   And would you bring -- where would you store the

10:48AM    24  marijuana after you got it unloaded, both at Mark Falzone's

10:48AM    25  house and at 82 Sycamore, where would you bring it to store

10:48AM  1   it?

10:48AM  2   A.  At my house.

10:48AM  3   Q.  697 Lebrun?

10:48AM  4   A.  Yes.

10:48AM  5   Q.  As we got into 2014, did you -- did you also store it at

10:48AM  6   Lou Selva's house for a period of time?

10:48AM  7   A.  Yes.

10:48AM  8   Q.  I'm going to circle back to that, okay?  All right.

10:48AM  9       Did you also take delivery directly at your house at 697

10:48AM  10  Lebrun?

10:48AM  11  A.  Yes.

10:49AM  12  Q.  And can you describe where you, you know, where you would

10:49AM  13  receive it, and how -- how that would work at your house?

10:49AM  14  A.  Are you talking about the U-Hauls?

10:49AM  15  Q.  Yes.

10:49AM  16  A.  U-Hauls, I'd back it into where my garage area was.

10:49AM  17      At one time it was wood pellets, like the burning

10:49AM  18  pellets.  And one time it was mulch.

10:49AM  19  Q.  Was there an occasion where -- withdrawn.

10:49AM  20      Did -- did the individuals drive the U-Haul directly to

10:49AM  21  your house, or did they drive the U-Haul to a nearby location

10:49AM  22  where you took the U-Haul from there?

10:49AM  23  A.  I'd meet them at Denny's on Main Street by Harlem, and

10:49AM  24  then I would take the U-Haul.  I didn't want the drivers

10:49AM  25  knowing where I lived.

10:49AM    1    Q.  Okay.  Explain that in a little more detail for the jury,

10:49AM    2    please.

10:49AM    3    A.  So, we set up a time, and I'd go meet them at Denny's.

10:49AM    4    And they would wait at Denny's while I took the truck, went

10:49AM    5    back to my house, pushed it out the back of the truck, and

10:49AM    6    then brought the truck back to them.

10:49AM    7    Q.  And what, if anything, would you give the couriers sort

10:50AM    8    of as collateral while you took the shipments?

10:50AM    9    A.  I would just leave my car with them.

10:50AM   10    Q.  So did you give them your car keys?

10:50AM   11    A.  Yes.

10:50AM   12    Q.  What kind of car were you driving?

10:50AM   13    A.  A Range Rover.

10:50AM   14    Q.  How long did the process of unloading generally take?

10:50AM   15    A.  Well, it was just getting it off the back of the truck.

10:50AM   16    So that point, it would take me -- I'd be back in 20 minutes,

10:50AM   17    a half hour.

10:50AM   18    Q.  Who were the different people who helped you unload at

10:50AM   19    your house at 697 Lebrun?

10:50AM   20    A.  Believe Jacob Martinez helped me once, and Mark and Matt.

10:50AM   21    Mark Falzone and Matt LoTempio.

10:50AM   22    Q.  Okay.  By 2015, had you developed a friendship with

10:51AM   23    Anthony Gerace?

10:51AM   24    A.  Yes.

10:51AM   25    Q.  When did you first meet him?

10:51AM 1  A.  In 2015.

10:51AM 2  Q.  How did you meet him?

10:51AM 3  A.  I had a payment processing company, and my brother asked

10:51AM 4  me to process payments for him because he had a collection

10:51AM 5  agency.

10:51AM 6  Q.  Who had a collection agency?

10:51AM 7  A.  Anthony Gerace did.

10:51AM 8  Q.  Okay.  Did you guys become relatively close during that

10:51AM 9  time?

10:51AM 10  A.  Yes.

10:51AM 11  Q.  Did that relationship continue up till your arrest?

10:51AM 12  A.  Yes.

10:51AM 13  Q.  Were there times when Anthony Gerace would supply you

10:51AM 14  marijuana from his supplier?

10:51AM 15  A.  Yes.

10:51AM 16  Q.  Were there times when you supplied him marijuana?

10:51AM 17  A.  Yes.

10:51AM 18  Q.  A moment ago, you mentioned that when you used the larger

10:51AM 19  tractor-trailer method, you unloaded at Anthony's unloading

10:52AM 20  dock at Aero Drive; do you remember that?

10:52AM 21  A.  Yes.

10:52AM 22  Q.  Okay.  I'm going to hand up two exhibits, Government

10:52AM 23  Exhibit 489A and 489B.

10:52AM 24     Do you recognize what's depicted in Government Exhibit

10:52AM 25  489A and 489B?

10:52AM  1  A.  Yes.

10:52AM  2  Q.  What do you recognize that to be?

10:52AM  3  A.  That is where Anthony had his cabinet store and the

10:52AM  4  docks, the docks all the way to the right is the one we

10:52AM  5  unloaded it at.

10:52AM  6  Q.  Is that his location at -- on Aero Drive that you

10:52AM  7  utilized?

10:52AM  8  A.  Yes.

10:52AM  9  Q.  Does it fairly and accurately depict sort of a view from

10:52AM 10  the street, and an aerial overhead view of that location --

10:52AM 11  A.  Yes.

10:52AM 12  Q.  -- on Aero Drive?

10:52AM 13  A.  Yes.

10:52AM 14       **MR. TRIPI:**  Government offers 489A and 489B into

10:52AM 15  evidence, Your Honor.

10:52AM 16       **MR. MacKAY:**  No objection.

10:52AM 17       **THE COURT:**  Received without objection.

10:53AM 18       **MR. TRIPI:**  Thank you.

10:53AM 19    **(GOV Exhibits 489A and 489B were received in evidence.)**

10:53AM 20       **MR. TRIPI:**  Ms. Champoux, can we please publish both

10:53AM 21  of these exhibits side by side, 489A and B?

10:53AM 22       **BY MR. TRIPI:**

10:53AM 23  Q.  All right.  Looking at 489A on the left there, is that an

10:53AM 24  aerial view of Anthony Gerace's property on Aero Drive?

10:53AM 25  A.  Yes.

10:53AM    1          **MR. TRIPI:**  Ms. Champoux, can we zoom in on 489A for

10:53AM    2    a moment and make it larger for them?

10:53AM    3          **BY MR. TRIPI:**

10:53AM    4    Q.  Do you see the area where the tractor-trailer truck would

10:53AM    5    be pulled in for unloading?

10:53AM    6    A.  Yes.

10:53AM    7    Q.  Can you use the Telustrator function and circle it for

10:53AM    8    us?

10:53AM    9    A.  It was that bay.

10:53AM   10          **MR. TRIPI:**  May the record reflect the witness placed

10:53AM   11    a circle to the portion of the parking lot near the grass

10:53AM   12    line, sort of the last trucking bay, going left to right from

10:53AM   13    the back of the building.

10:54AM   14          **BY MR. TRIPI:**

10:54AM   15    Q.  Is that about a right description?

10:54AM   16    A.  Yes.

10:54AM   17    Q.  Okay.

10:54AM   18          **MR. TRIPI:**  We can zoom out of that, Ms. Champoux.

10:54AM   19          **BY MR. TRIPI:**

10:54AM   20    Q.  And 489B, that just depicts the view from the front of

10:54AM   21    the building?

10:54AM   22    A.  Yes.

10:54AM   23    Q.  Street view?

10:54AM   24    A.  Yes.

10:54AM   25          **MR. TRIPI:**  You can take those down, thank you.

**BY MR. TRIPI:**

Q.  How many times would you say, I think you indicated three times you unloaded marijuana at that location; is that right?

A.  Correct.

Q.  How would you and Anthony get the marijuana from that trucking bay to your house at 697 Lebrun?

A.  We would drive it in our vehicles.

Q.  And what vehicle were you using?

A.  A Range Rover.

Q.  And what vehicle was he using?

A.  Tahoe.

Q.  So between those SUVs, was there enough space to transport it?

A.  Yes.

Q.  How would you conceal it in your Range Rover?

A.  In garbage bags.

Q.  Is that the same concealment method in Anthony's vehicle?

A.  Yes.

Q.  Is it a relatively short drive from that location on Aero Drive to your house?

A.  Yes, about ten minutes.

Q.  Okay.  When you were discussing distribution activity with Anthony, did you tell him where your source of supply was coming from?

A.  Yes.

10:55AM  1   Q.  What'd you tell him?

10:55AM  2   A.  Vancouver.

10:55AM  3   Q.  Did he tell you -- when you would be receiving marijuana

10:55AM  4   from him, did he tell you where his source of supply was

10:55AM  5   located?

10:55AM  6   A.  Yes.

10:55AM  7   Q.  What did he tell you?

10:55AM  8   A.  New York City.

10:55AM  9   Q.  And would you guys do that back and forth to fill gaps in

10:55AM  10  time between shipments?

10:55AM  11  A.  Yes.

10:55AM  12  Q.  Eventually, between the 2015 time period and your arrest

10:56AM  13  in 2017, did Jarrett Guy start sending along fake oxycodone?

10:56AM  14  A.  Yes.

10:56AM  15  Q.  Was it OxyContin, or oxycodone?

10:56AM  16  A.  OxyContin.

10:56AM  17  Q.  Okay.  And were those fentanyl pills?

10:56AM  18  A.  Yes.

10:56AM  19  Q.  Did you also distribute -- did you also distribute some

10:56AM  20  of those pills to Anthony Gerace?

10:56AM  21  A.  Yes.

10:56AM  22  Q.  Who were some of the other people that you distributed

10:56AM  23  those pills to?

10:56AM  24  A.  Jacob Martinez, Anthony Greco.

10:56AM  25  Q.  Did Anthony Gerace start using those pills?

10:56AM 1 A. Yes. That's -- that's why he took them. They were all

10:56AM 2 users.

10:56AM 3 Q. All three of those people used?

10:56AM 4 A. Yes.

10:56AM 5 Q. Okay. I'd like to shift gears for a moment here.

10:57AM 6 Over the years that information that you requested was

10:57AM 7 passed back to you from Selva and Masecchia as part of this

10:57AM 8 bribery scheme, did you feel you were getting -- did you feel

10:57AM 9 you were getting a good return on your monthly bribery

10:57AM 10 investment to Defendant Bongiovanni?

10:57AM 11 A. Yes.

10:57AM 12 Q. Did you feel like the information you were getting back

10:57AM 13 was authentic?

10:57AM 14 A. Yes.

10:57AM 15 Q. Did you rely on that information in your dealings with

10:57AM 16 drug traffickers?

10:57AM 17 A. Yes.

10:57AM 18 Q. Did the information you were receiving inform your

10:57AM 19 decisionmaking?

10:57AM 20 A. Yes.

10:57AM 21 Q. Now, earlier in your testimony, you indicated that one of

10:57AM 22 the things you were interested in were the names of potential

10:57AM 23 informants, right?

10:57AM 24 A. Yes.

10:58AM 25 **MR. TRIPI:** Now my mic's cutting out. Sorry, Judge.

10:58AM　1　　　　　**THE COURT:**　That's alright.

10:58AM　2　　　　　**BY MR. TRIPI:**

10:58AM　3　Q.　Over the years, were different names provided to you over

10:58AM　4　time as being potential informants?

10:58AM　5　A.　Yes.

10:58AM　6　Q.　Approximately how many times do you think that happened

10:58AM　7　where names were passed to you from Bongiovanni through

10:58AM　8　Masecchia to you, about informants?

10:58AM　9　A.　I would say at least ten, but a lot of them weren't

10:58AM　10　relevant.　Actually, probably way more than ten.

10:58AM　11　Q.　So let's break that down.

10:58AM　12　　　More than ten names came to your attention, but -- but

10:58AM　13　many of them were not relevant.　Explain what you mean to the

10:58AM　14　jury.

10:58AM　15　A.　They had nothing to do with my operation or me, so they

10:58AM　16　didn't mean anything.　I didn't know the people.

10:58AM　17　Q.　So, do you even remember the names that were not really

10:58AM　18　relevant to you?

10:58AM　19　A.　No.

10:58AM　20　Q.　Are you familiar with a bar named Gables on Hertel in

10:59AM　21　North Buffalo?

10:59AM　22　A.　Yes.

10:59AM　23　Q.　Was there information passed to you that an individual

10:59AM　24　named Steven Brucato was supplying cocaine to a person named

10:59AM　25　Joe Mesi?

10:59AM    1    A.  Yes.

10:59AM    2    Q.  Now did you deal with either of those two people?

10:59AM    3    A.  No.

10:59AM    4    Q.  Who passed you that information?

10:59AM    5    A.  Mike Masecchia.

10:59AM    6    Q.  Where did he get the information from?

10:59AM    7    A.  Joe Bongiovanni.

10:59AM    8    Q.  What did Masecchia tell you?

10:59AM    9    A.  Just to stay away from Gables.  But I didn't go to

10:59AM   10    Gables, so it wasn't relevant to me.

10:59AM   11    Q.  Now, did you know who Joe Mesi was?

10:59AM   12    A.  I've heard of him.  I don't know him personally.

10:59AM   13    Q.  Why do you remember that name?

10:59AM   14    A.  Because he was a professional boxer.

10:59AM   15    Q.  For a period of time in the sort of early 2000s, was he

10:59AM   16    relatively popular or famous in this area?

10:59AM   17    A.  Yes.

10:59AM   18    Q.  Is that why you remember his name?

10:59AM   19    A.  Yes.

11:00AM   20    Q.  What drug was the investigation involving Brucato and

11:00AM   21    Mesi?

11:00AM   22    A.  Cocaine.

11:00AM   23    Q.  Okay.  Do you remember approximately what year you

11:00AM   24    learned that Brucato and Mesi were investigation -- under

11:00AM   25    investigation as related to Gables bar?

11:00AM   1   A.   I want to say it was, I don't know, between 2013, 2015.

11:00AM   2   Q.   So that window of time?

11:00AM   3   A.   Yeah.  It wasn't relevant, so I really don't remember.

11:00AM   4   Q.   That's your best estimate?

11:00AM   5   A.   Yes.

11:00AM   6        **MR. TRIPI:**  Your Honor, when would you like our

11:00AM   7   morning break to be?

11:00AM   8        **THE COURT:**  I think this is as good a time as any.

11:00AM   9        I have a -- we have to break for lunch at about

11:00AM  10   12:30, so I think this is a good time to break for our morning

11:01AM  11   break.

11:01AM  12        Please remember my instructions about not talking

11:01AM  13   about the case even with each other and not making up your

11:01AM  14   mind.

11:01AM  15        We'll see you back here in about ten or 15 minutes.

11:01AM  16        (Jury excused at 11:01 a.m.)

11:01AM  17        **THE COURT:**  Okay.  Anything we need to do before we

11:01AM  18   break?

11:01AM  19        **MR. MacKAY:**  No, Your Honor.

11:01AM  20        **MR. TRIPI:**  No, thank you, Judge.

11:01AM  21        **THE COURT:**  Okay, thanks.  We'll see you folks in

11:01AM  22   about ten or 15 minutes.

11:01AM  23        (Off the record at 11:01 a.m.)

11:26AM  24        (Back on the record at 11:26 a.m.)

11:26AM  25        (Jury not present.)

| | | |
|---|---|---|
| 11:26AM | 1 | **THE CLERK:**  All rise. |
| 11:26AM | 2 | **THE COURT:**  Please be seated. |
| 11:26AM | 3 | **THE CLERK:**  We are back on the record for the |
| 11:26AM | 4 | continuation of the jury trial in case number 19-cr-227, |
| 11:26AM | 5 | United States of America versus Joseph Bongiovanni. |
| 11:26AM | 6 | All counsel and parties are present. |
| 11:26AM | 7 | **THE COURT:**  Okay.  Anything from the defense? |
| 11:26AM | 8 | **MR. MacKAY:**  No, Your Honor. |
| 11:26AM | 9 | **THE COURT:**  Anything from the government? |
| 11:26AM | 10 | **MR. TRIPI:**  No, thanks, Judge. |
| 11:26AM | 11 | **THE COURT:**  How much longer? |
| 11:26AM | 12 | **MR. TRIPI:**  I'm definitely going to be going after |
| 11:26AM | 13 | lunch. |
| 11:26AM | 14 | **THE COURT:**  Oh. |
| 11:26AM | 15 | **MR. TRIPI:**  I would say probably I might be able to |
| 11:26AM | 16 | turn over the witness by 2:30. |
| 11:26AM | 17 | **THE COURT:**  Okay.  Fine. |
| 11:26AM | 18 | **MR. TRIPI:**  About two hours. |
| 11:26AM | 19 | **THE COURT:**  And if we spill over, we spill over. |
| 11:26AM | 20 | That's, you know, what we do, we do. |
| 11:26AM | 21 | Okay.  Let's bring them back in, please, Pat. |
| 11:26AM | 22 | **MR. TRIPI:**  I'll try to be quicker than that, but I'm |
| 11:26AM | 23 | trying to be realistic. |
| 11:27AM | 24 | (Jury seated at 11:27 a.m.) |
| 11:27AM | 25 | **THE COURT:**  The record will reflect that all our |

11:27AM 1    jurors are present.

11:28AM 2             I remind the witness that he's still under oath.

11:28AM 3             Mr. Tripi, you may continue.

11:28AM 4             **MR. TRIPI:**  Thank you.

11:28AM 5             **BY MR. TRIPI:**

11:28AM 6    Q.  Okay.  Mr. Serio, we mentioned the name R.K. a few times.

11:28AM 7    I want to go into more detail about him, okay?

11:28AM 8    A.  Yes.

11:28AM 9    Q.  Who was R.K.?

11:28AM 10   A.  R.K. was Frank Burkhart's friend.

11:28AM 11   Q.  And how did you know R.K.?

11:28AM 12   A.  Through Frank Burkhart.  He would bring him around

11:28AM 13   sometimes.

11:28AM 14   Q.  Was R.K. also friends with T.S.?

11:28AM 15   A.  Yes.

11:28AM 16   Q.  Was Mr. R.K. around you and other members of your

11:28AM 17   organization?

11:28AM 18   A.  Yes.

11:28AM 19   Q.  Who else was he around?

11:28AM 20   A.  I'm not exactly sure.  Maybe someone that was at my house

11:28AM 21   that I dealt with when Frank and Robert came there.

11:28AM 22   Q.  Has Mr. R.K. been to your residence at 697 Lebrun?

11:28AM 23   A.  Yes.

11:28AM 24   Q.  About how many times, approximately?

11:28AM 25   A.  About five times.

11:28AM   1   Q.  Have you been engaged in marijuana transactions when

11:29AM   2   Mr. R.K. was at your house?

11:29AM   3   A.  Yes.

11:29AM   4   Q.  Have you been engaged in those transactions in his

11:29AM   5   presence?

11:29AM   6   A.  Yes.

11:29AM   7   Q.  About how many times?

11:29AM   8   A.  I'd say probably five times.

11:29AM   9   Q.  What amounts were you distributing in Mr. R.K.'s

11:29AM  10   presence?

11:29AM  11   A.  Somewhere between 5 to 20 pounds.

11:29AM  12   Q.  Who were you transacting with when Mr. R.K. was present

11:29AM  13   at your house?

11:29AM  14   A.  Frank Burkhart.

11:29AM  15   Q.  Do you know if some of the marijuana was intended for

11:29AM  16   Mr. R.K.?

11:29AM  17   A.  I believe so.

11:29AM  18   Q.  Eventually, were you notified that R.K. was a DEA

11:29AM  19   informant?

11:29AM  20   A.  Yes.

11:29AM  21   Q.  Prior to learning that R.K. was a DEA informant, was --

11:30AM  22   was R.K. someone that you wanted checked out because he had

11:30AM  23   been arrested?

11:30AM  24   A.  No, I didn't give his name.

11:30AM  25   Q.  Did you know R.K. had been arrested?

11:30AM   1   A.  Yes.

11:30AM   2   Q.  How did you find out?

11:30AM   3   A.  I seen it on the news that he robbed Poster Art.

11:30AM   4   Q.  That he what?

11:30AM   5   A.  Robbed Poster Art on Elmwood.  That he broke the window

11:30AM   6   and burglarized it.

11:30AM   7   Q.  When you -- when you were informed Mr. R.K. was an

11:30AM   8   informant, was anyone else present?

11:30AM   9   A.  Oh, Mike Masecchia told me.

11:30AM   10   Q.  Where did Masecchia tell you?

11:30AM   11   A.  At my house, 697 Lebrun.

11:30AM   12   Q.  Was it just the two of you?

11:30AM   13   A.  Yes.

11:30AM   14   Q.  Was it a private conversation?

11:30AM   15   A.  Yes.

11:30AM   16   Q.  Was it important to you to keep those kind of

11:30AM   17   conversations contained?

11:30AM   18   A.  Yes.

11:30AM   19   Q.  What did Masecchia tell you about R.K.?

11:31AM   20   A.  That he was a DEA informant.

11:31AM   21   Q.  Who did Masecchia tell you R.K. was an informant for,

11:31AM   22   specifically, at DEA?

11:31AM   23   A.  Joe Bongiovanni.

11:31AM   24       **MR. TRIPI:**  Ms. Champoux, can we pull up Government

11:31AM   25   Exhibit 9E-2, please?

11:31AM  1    **BY MR. TRIPI:**

11:31AM  2  Q.  Mr. Serio, can you read the big capital lettered bold

11:31AM  3  words that are above that black line?

11:31AM  4  A.  Confidential source agreement.

11:31AM  5  Q.  Okay.

11:31AM  6       **MR. TRIPI:**  Ms. Champoux, can we go to the second

11:31AM  7  page of that?

11:31AM  8       **BY MR. TRIPI:**

11:31AM  9  Q.  Do you see a signature line for the confidential source?

11:31AM  10  A.  Yes.

11:31AM  11  Q.  Does it look like the name R.K. to you?

11:31AM  12  A.  Yes.

11:31AM  13  Q.  Are his initials R.K.?

11:31AM  14  A.  Yes.

11:31AM  15  Q.  Do you see a name for a controlling investigator there?

11:32AM  16  A.  Yes.

11:32AM  17  Q.  Does it look like the name Joe Bongiovanni?

11:32AM  18  A.  Yes.

11:32AM  19  Q.  Have you ever seen that document before this moment in

11:32AM  20  time?

11:32AM  21  A.  No.

11:32AM  22       **MR. TRIPI:**  We can take that down.

11:32AM  23       **BY MR. TRIPI:**

11:32AM  24  Q.  To be clear, before you were specifically informed by

11:32AM  25  Mike Masecchia that R.K. was a DEA informant, would you have

11:32AM    1    sold him marijuana in exchange for money?

11:32AM    2    A.   Yes.

11:32AM    3    Q.   Before you were specifically informed that R.K. was this

11:32AM    4    defendant's informant, would you have sold him cocaine in

11:32AM    5    exchange for money if you had cocaine available for sale?

11:32AM    6    A.   Yes.

11:32AM    7    Q.   After you were specifically informed that R.K. was this

11:32AM    8    defendant's informant, did you stay away from him?

11:33AM    9    A.   Yes.

11:33AM   10    Q.   Did other people in your organization stay away from him?

11:33AM   11    A.   Yes.

11:33AM   12    Q.   Did you tell others to stay away from R.K.?

11:33AM   13    A.   Yes.

11:33AM   14    Q.   By being informed that R.K. was this defendant's DEA

11:33AM   15    informant, did that neutralize the risk, in your mind, that

11:33AM   16    R.K. posed to your organization?

11:33AM   17    A.   Yes.

11:33AM   18    Q.   Was R.K. ever over at your house ever again after you

11:33AM   19    were informed that defendant was R.K.'s DEA handling agent?

11:33AM   20    A.   No.

11:33AM   21    Q.   I'd like to move on to T.S.

11:33AM   22         Eventually, in proximity to the time where you were

11:33AM   23    advised that Mr. R.K. was an informant, were you advised that

11:34AM   24    T.S. was an informant?

11:34AM   25    A.   Yes.

11:34AM  1  Q.  By the time that you were informed that T.S. was an

11:34AM  2  informant, had he traveled to New York City with you and

11:34AM  3  Masecchia?

11:34AM  4  A.  No.

11:34AM  5  Q.  Before you were advised T.S. --

11:34AM  6  A.  Oh.

11:34AM  7  Q.  -- was an informant, had he previously traveled with you?

11:34AM  8  A.  Yes.

11:34AM  9  Q.  Okay.  Who told you T.S. was an informant?

11:34AM  10  A.  Mike Masecchia.

11:34AM  11  Q.  What specific information did Masecchia tell you about

11:34AM  12  T.S.?

11:34AM  13  A.  That he was a DEA informant.

11:34AM  14  Q.  After that, did you stay away from T.S.?

11:34AM  15  A.  Yes.

11:34AM  16  Q.  Did those in your organization stay away from T.S.?

11:34AM  17  A.  Yes.

11:34AM  18  Q.  Did you ensure he no longer dealt with you or had access

11:34AM  19  to your products?

11:34AM  20  A.  Yes.

11:34AM  21  Q.  Did you ensure that he no longer dealt with you or had

11:34AM  22  access to your warehouse?

11:34AM  23  A.  Yes.

11:34AM  24  Q.  Did you take him on any more trips to New York City for

11:34AM  25  drugs?

11:34AM    1    A.   No.

11:34AM    2    Q.   Did you try to get any drugs from him after that?

11:35AM    3    A.   No.

11:35AM    4    Q.   Was that valuable information to you that you believed

11:35AM    5    protected you?

11:35AM    6    A.   Yes.

11:35AM    7    Q.   Were those disclosures as to both R.K. and T.S. made

11:35AM    8    after you were already dealing with Sant -- withdrawn -- with

11:35AM    9    Jarrett Guy?

11:35AM   10    A.   Yes.

11:35AM   11    Q.   Were they made after you were informed about the -- the

11:35AM   12    seizure and arrest of Wayne Anderson?

11:35AM   13    A.   Yes.

11:35AM   14    Q.   Is that the type of information you expected to receive

11:35AM   15    for the money you were paying this defendant?

11:35AM   16    A.   Yes.

11:35AM   17         **MR. TRIPI:**  Can we pull up 9E-2 again?  Let's go to

11:35AM   18    page 2.

11:35AM   19         **BY MR. TRIPI:**

11:35AM   20    Q.   Do you see the dates of these signatures, April 29th,

11:36AM   21    2013?

11:36AM   22    A.   Yes.

11:36AM   23    Q.   Is it -- is that within the timeframe that you were

11:36AM   24    informed Mr. R.K. was an informant?

11:36AM   25    A.   Yes, I believe a little after that.

11:36AM    1    Q.  Same year?

11:36AM    2    A.  Yes.

11:36AM    3             **MR. TRIPI:**  We can take that down.

11:36AM    4             **BY MR. TRIPI:**

11:36AM    5    Q.  After you learned about R.K. and T.S. being informants,

11:36AM    6    did some time go by before you learned more information about

11:36AM    7    a threat to your organization?

11:36AM    8    A.  Yes.

11:36AM    9    Q.  After you learned about R.K. and T.S. being informants,

11:36AM   10    did you receive information that Mario Vacanti was under

11:36AM   11    investigation?

11:36AM   12    A.  Yes.

11:36AM   13    Q.  Tell the jury who Mario Vacanti was in the context of

11:36AM   14    your organization.

11:36AM   15    A.  Mario Vacanti was one of the -- one of my major

11:37AM   16    customers.

11:37AM   17    Q.  Would he take a lot of the product you were supplying and

11:37AM   18    distribute it?

11:37AM   19    A.  Yes.

11:37AM   20    Q.  On a monthly basis, how much marijuana was Mario Vacanti

11:37AM   21    distributing for you?

11:37AM   22    A.  It depends.  I would say on a slow month, 50 pounds at

11:37AM   23    least.

11:37AM   24    Q.  And in a high month?

11:37AM   25    A.  Maybe 150.

11:37AM   1    Q.   So in business terms, he was one of your major sales

11:37AM   2    reps?

11:37AM   3    A.   Yes.

11:37AM   4    Q.   At the time you received this information about Mario

11:37AM   5    Vacanti, where was he living?

11:37AM   6    A.   He was living in my brother's carriage house, at 81

11:37AM   7    Lebrun Circle.

11:37AM   8    Q.   Is that basically a short drive down the street from

11:37AM   9    where you were living at 697 Lebrun?

11:37AM   10   A.   Yes.

11:37AM   11   Q.   Your brother Tom had a house and a carriage house behind

11:38AM   12   it?

11:38AM   13   A.   Correct.

11:38AM   14   Q.   For those who don't know, what's a carriage house?

11:38AM   15   A.   It's where the garage is, and there's an apartment over

11:38AM   16   the garage, or beside the garage, on that case.

11:38AM   17   Q.   So Mario Vacanti was living on the same property as your

11:38AM   18   brother Tom?

11:38AM   19   A.   Correct.

11:38AM   20   Q.   Who told you the information about Mario Vacanti?

11:38AM   21   A.   Mike Masecchia.

11:38AM   22   Q.   Who did he get the information from?

11:38AM   23   A.   Joe Bongiovanni.

11:38AM   24   Q.   Was there -- was Lou Selva involved at all in passing

11:38AM   25   that information?

11:38AM  1   A.  I believe so.

11:38AM  2   Q.  What did Masecchia tell you about Mario Vacanti being

11:38AM  3   under investigation?

11:38AM  4   A.  That he was being investigated for money-laundering, and

11:38AM  5   then he gave the name of the person cooperating against

11:38AM  6   Mario, which was Paul Humphries, which was Mario's

11:38AM  7   half-sister's boyfriend.  And he said that -- Paul Humphries

11:38AM  8   said that he owed him $4,000, and I believe that was it.  But

11:38AM  9   when I told Mario, he was shocked that I knew that he owed

11:38AM  10  him $4,000.

11:38AM  11  Q.  All right.  Let's break that down a little bit.

11:38AM  12      Where does Masecchia tell you that Mario Vacanti's under

11:39AM  13  investigation regarding his dealings with Paul Humphries?

11:39AM  14  A.  I believe it's either my house or Mike's house.

11:39AM  15  Q.  When you heard that, what did you do?

11:39AM  16  A.  I went and seen Mario.

11:39AM  17  Q.  Did you do it right away?

11:39AM  18  A.  Yes.

11:39AM  19  Q.  Was it important to notify him right away?

11:39AM  20  A.  Yes.

11:39AM  21  Q.  When you went to Mario's house, you're talking about the

11:39AM  22  carriage house behind your brother's residence?

11:39AM  23  A.  Correct.

11:39AM  24  Q.  Describe your conversation with Mario Vacanti.

11:39AM  25  A.  I just said that I heard that he's being -- that he's

11:39AM   1    under investigation for money-laundering, and that someone

11:39AM   2    named Paul Humphries was cooperating against him.  And that's

11:39AM   3    when he said that it was his half-sister's ex-boyfriend.

11:39AM   4    Q.  Did you give him specifics about what that information

11:39AM   5    was?

11:39AM   6    A.  Yes, that -- he said that he got marijuana from Mario,

11:39AM   7    and that he owed him $4,000.

11:39AM   8    Q.  So in that context, Humphries was providing information?

11:39AM   9    A.  Yes.

11:39AM   10   Q.  Did Vacanti confirm the accuracy of the information you

11:39AM   11   passed to him?

11:39AM   12   A.  Yes.

11:40AM   13   Q.  Did he thank you for it?

11:40AM   14   A.  Yes.

11:40AM   15   Q.  Did you give him any advice?

11:40AM   16   A.  To stop selling the marijuana.

11:40AM   17   Q.  Take a pause?

11:40AM   18   A.  Yes.

11:40AM   19   Q.  Did you take a pause in distributing to him?

11:40AM   20   A.  I did.

11:40AM   21   Q.  What year was this, approximately?

11:40AM   22   A.  2015.

11:40AM   23   Q.  Is that the kind of information you expected to receive

11:40AM   24   from the defendant for what you were paying?

11:40AM   25   A.  Yes.

11:40AM 1 Q. Did you rely on that information?

11:40AM 2 A. Yes.

11:40AM 3 Q. Did you stop for a period distributing to Mario Vacanti

11:40AM 4 to make sure that that would blow over?

11:40AM 5 A. Yes.

11:40AM 6 Q. Did you know whether Vacanti stopped dealing with Paul

11:40AM 7 Humphries?

11:40AM 8 A. Yes, he did.

11:40AM 9 Q. Vacanti never got arrested, did he?

11:41AM 10 A. No.

11:41AM 11 Q. In terms of some general information that was passed to

11:41AM 12 you over time, was information passed to you about the types

11:41AM 13 of vehicles the DEA used on surveillance?

11:41AM 14 A. Yes.

11:41AM 15 Q. Who passed you that information?

11:41AM 16 A. Mike Masecchia.

11:41AM 17 Q. Where did that information come from?

11:41AM 18 A. Joe Bongiovanni.

11:41AM 19 Q. Was Lou Selva involved in that chain of information being

11:41AM 20 passed?

11:41AM 21 A. Yes.

11:41AM 22 Q. What were you told about the different types of

11:41AM 23 surveillance vehicles the DEA used?

11:41AM 24 A. To look out for utility vehicles that are lingering

11:41AM 25 around all the time.

11:41AM   1   Q.  Is that something you did as you lived at that big house

11:41AM   2   on 697 Lebrun?

11:41AM   3   A.  Yes.

11:41AM   4   Q.  Being on the corner with all those windows, did you have

11:41AM   5   a good vantage point of both streets that intersected around

11:42AM   6   you?

11:42AM   7   A.  Yes.

11:42AM   8   Q.  Were you vigilant?

11:42AM   9   A.  Yes.

11:42AM  10   Q.  Earlier you talked about passing of lists of names and

11:42AM  11   phone numbers.  Were the parameters and people involved in

11:42AM  12   your organization passed along to Defendant Bongiovanni?

11:42AM  13   A.  Yes.

11:42AM  14   Q.  Why was that important for you to do?

11:42AM  15   A.  To make sure that nobody else applying was being

11:42AM  16   investigated.

11:42AM  17   Q.  Was it your intent to maximize the defendant's ability to

11:42AM  18   look out for you?

11:42AM  19   A.  Yes.

11:42AM  20   Q.  Earlier we touched on you storing some marijuana at Lou

11:42AM  21   Selva's house in or about 2014; is that right?

11:42AM  22   A.  Yes.

11:42AM  23   Q.  By that point in time, had you set up a grow operation to

11:43AM  24   make plants grow to adulthood at Lou's house?

11:43AM  25   A.  Yes.

11:43AM 1 Q. Talk about your decision -- withdrawn.

11:43AM 2 Talk about the discussions you had about setting up a

11:43AM 3 full-scale grow operation in Selva's basement?

11:43AM 4 A. Just Mike asked me to build the room.

11:43AM 5 Q. At Selva's house?

11:43AM 6 A. Yes.

11:43AM 7 Q. So did you go to Selva's house?

11:43AM 8 A. Yes, I did.

11:43AM 9 Q. Who was with you?

11:43AM 10 A. Just me, Mike and Lou.

11:43AM 11 Q. And did you guys talk?

11:43AM 12 A. Yes.

11:43AM 13 Q. Did you talk about why a decision was being made to set

11:43AM 14 up a full grow in Selva's house?

11:43AM 15 A. Just that they wanted to.

11:43AM 16 Q. Talk about the work you did that there. Tell the jury.

11:43AM 17 A. I ran all the electricity, and I spaced the lights and

11:43AM 18 hung four lights there, and $CO_2$ generator and an air filter

11:44AM 19 to clean the air.

11:44AM 20 Q. How long did this work take you?

11:44AM 21 A. Like, two days.

11:44AM 22 Q. How many plants did you set up to grow there?

11:44AM 23 A. It was usually 12 to 15 a light. So probably around 60

11:44AM 24 plants.

11:44AM 25 Q. What was the arrangement in terms of monetary

11:44AM    1    compensation or split between the three of you?

11:44AM    2    A.   Well, they were gonna split it, and I would just -- my

11:44AM    3    cut would be getting it at a cheaper price and selling it.

11:44AM    4    Q.   So it increased your capacity to move marijuana?

11:44AM    5    A.   Yes.

11:44AM    6    Q.   What, if anything, did Lou Selva say about setting up a

11:44AM    7    grow at his house as it related to Defendant Bongiovanni?

11:44AM    8    A.   That he would be good because if there was any

11:44AM    9    investigation, he would get a heads-up.

11:44AM   10    Q.   Was this grow operation at Selva's house set up and

11:45AM   11    continuous for several years?

11:45AM   12    A.   Yes.

11:45AM   13    Q.   Do you know how many years it went on for?

11:45AM   14    A.   That, I don't know.

11:45AM   15    Q.   After you set up the grow, did you also start storing

11:45AM   16    some marijuana at Selva's house?

11:45AM   17    A.   Occasionally.

11:45AM   18    Q.   Describe your discussions with Selva about storing

11:45AM   19    marijuana at his house.

11:45AM   20    A.   That I would pay -- well, that it was a good idea to

11:45AM   21    store it there, because if they were being investigated, he

11:45AM   22    would get the heads-up from Joe.

11:45AM   23      And then I paid Lou $50 on every pound, and Mike 100 if

11:45AM   24    he dropped it off to people for me.

11:45AM   25    Q.   During the timeframe where you were setting up a grow in

11:46AM  1  Lou's basement to grow plants to maturity, and during the

11:46AM  2  timeframe you were storing marijuana there, did you ever have

11:46AM  3  a discussion where Lou Selva relayed to you the defendant's

11:46AM  4  views on enforcing marijuana laws?

11:46AM  5  A.  That he wasn't -- he didn't believe that --

11:46AM  6  Q.  Can you use names, please?

11:46AM  7  A.  Oh.  Lou told me that Joe Bongiovanni said that marijuana

11:46AM  8  wasn't something that he cared to investigate.

11:46AM  9  Q.  Now as you understood it, had Lou been involved in the

11:47AM  10  operation going all the way back to 2008, clipping at the

11:47AM  11  Morgan Hollow road location?

11:47AM  12  A.  Yes.  I believe even before that, he was involved.

11:47AM  13  Q.  He's known Masecchia a long time?

11:47AM  14  A.  Yes.

11:47AM  15  Q.  Now at some point, did some marijuana, as far as you

11:47AM  16  understood it, come up missing at Lou's house?

11:47AM  17  A.  Yes.

11:47AM  18  Q.  Do you know specifically how or why?

11:47AM  19  A.  No, I don't.

11:47AM  20  Q.  Did you ever bring it up to Lou or Mike?

11:47AM  21  A.  No, I didn't know for sure, and I didn't want to accuse

11:47AM  22  anybody without evidence.

11:47AM  23  Q.  Did you know whether it was your mistake or their

11:47AM  24  mistakes?

11:47AM  25  A.  I felt pretty strongly that it was one of their mistakes,

11:47AM   1   but it's possible that it could have been mine, that's why I

11:47AM   2   didn't say anything.

11:47AM   3   Q.  Did you ever have any problems with Lou or Mike?

11:47AM   4   A.  No.

11:48AM   5   Q.  Did you guys always get along?

11:48AM   6   A.  Yes.

11:48AM   7   Q.  Did business continue as usual between the three of you

11:48AM   8   after that?

11:48AM   9   A.  Yes.

11:48AM   10  Q.  Did you know Lou to have, like, adult-age kids, as well?

11:48AM   11  A.  I believe he's got one daughter.

11:48AM   12  Q.  Okay.  Regarding Mark Vitale, I'd like to focus you in on

11:48AM   13  that, we talked a little bit about it earlier, okay?

11:48AM   14  A.  Yes.

11:48AM   15  Q.  In or about December of 2015, I think you mentioned you

11:48AM   16  learned he was arrested?

11:48AM   17  A.  Yes.

11:48AM   18  Q.  Can you describe how you were supplying Vitale through

11:48AM   19  other people, for the jury?

11:48AM   20  A.  I was at first giving it to my sister-in-law, Adrian

11:48AM   21  Fina.  And then eventually her boyfriend John Robinson was

11:48AM   22  supplying him.

11:48AM   23  Q.  Was it -- whose decision was it to switch the person who

11:49AM   24  would provide Vitale the marijuana?

11:49AM   25  A.  It was my decision.

11:49AM    1    Q. Why did you make the decision to switch from Fina to

11:49AM    2    Robinson as the person who would deal with Vitale?

11:49AM    3    A. Because my sister-in-law stole some Adderall that I had,

11:49AM    4    and I didn't want her in my house anymore.

11:49AM    5    Q. Okay. So basically, I think I said this Monday or

11:49AM    6    earlier, you gave that account to John Robinson to put it in

11:49AM    7    business terms?

11:49AM    8    A. Yes.

11:49AM    9    Q. How many years had you been supplying Mark Vitale through

11:49AM    10    either Adrian or John Robinson?

11:49AM    11    A. It was a couple years, two years.

11:49AM    12    Q. How much marijuana would he get from you routinely?

11:49AM    13    A. Not quite sure. I know he'd take, like, maybe 2 to

11:50AM    14    5 pounds. Sometimes I would give her maybe 5 pounds, or

11:50AM    15    Adrian 5 pounds, or John would take 10, 15 pounds. And I

11:50AM    16    don't know exactly the amounts that they were giving to

11:50AM    17    different people.

11:50AM    18    Q. That was pretty regularly though?

11:50AM    19    A. Yes.

11:50AM    20    Q. Who did you initially learn in our around December of

11:50AM    21    2015 that Mark Vitale had been arrested from?

11:50AM    22    A. Through my ex-wife.

11:50AM    23    Q. Your wife Lauren?

11:50AM    24    A. Yes.

11:50AM    25    Q. That's Adrian's sister?

11:50AM 1  A.  Yes.

11:50AM 2  Q.  What did you do when you learned that Vitale had been

11:50AM 3  arrested?

11:50AM 4  A.  I went and seen Mike.  Masecchia.

11:50AM 5  Q.  What did you want to know?

11:50AM 6  A.  I wanted to know if everything was okay.

11:50AM 7  Q.  What did you tell Masecchia?

11:50AM 8  A.  Told him that Mark Vitale's -- I heard that his house got

11:50AM 9  raided, and to check on and see if everything's okay.

11:50AM 10  Q.  Did Masecchia know who Vitale was?

11:51AM 11  A.  No.

11:51AM 12  Q.  Did you explain it to him?

11:51AM 13  A.  Yes.

11:51AM 14  Q.  What did you tell him about who Vitale was?

11:51AM 15  A.  I said that John Robinson was supplying Vitale through

11:51AM 16  me.

11:51AM 17  Q.  Did Mike Masecchia know who John Robinson was?

11:51AM 18  A.  Yes.

11:51AM 19  Q.  When you explained the significance of Vitale to

11:51AM 20  Masecchia, did he confirm that he would find out?

11:51AM 21  A.  Yes.

11:51AM 22  Q.  Who was he going to find out from?

11:51AM 23  A.  From Joe Bongiovanni.

11:51AM 24  Q.  What did Masecchia report back to you regarding that

11:51AM 25  situation?

11:51AM  1   A.  That everything was okay.

11:51AM  2   Q.  How much time elapsed from when you asked Masecchia to

11:51AM  3   find out about Vitale's arrest to when he reported back to

11:51AM  4   you that everything's okay?

11:51AM  5   A.  I believe it was the next day.

11:51AM  6   Q.  So it was pretty quick?

11:51AM  7   A.  Yes.

11:51AM  8   Q.  At that time of the Vitale arrest, did you know Joe

11:52AM  9   Bongiovanni's partner at DEA?  Did you know the name of who

11:52AM  10  his partner was?

11:52AM  11  A.  No.

11:52AM  12  Q.  Earlier, I talked -- we talked a little bit about when

11:52AM  13  you met Anthony Gerace in approximately 2015.  And I asked

11:52AM  14  you about supplying each other back and forth, and we went

11:52AM  15  through sort of the tractor-trailers that he helped you

11:52AM  16  unload.  But I don't think I asked you this.  I would like to

11:52AM  17  circle back.

11:52AM  18     Approximately how many times from 2015 on did you supply

11:53AM  19  Anthony Gerace with marijuana?

11:53AM  20  A.  Say, maybe ten times.

11:53AM  21  Q.  Okay.  And how many times did he supply you with

11:53AM  22  marijuana?

11:53AM  23  A.  Maybe around the same.

11:53AM  24  Q.  Okay.  And what was, like, an average amount that you

11:53AM  25  would supply Anthony?

11:53AM    1    A.  Anywhere between 10 to 30 pounds.  Nothing too much.  The

11:53AM    2    same thing, it was just kind of to fill in gaps.

11:53AM    3    Q.  And how much would he supply you?

11:53AM    4    A.  About the same.  Actually sometimes more because

11:53AM    5    sometimes he wasn't able to get rid of his, so I would get

11:53AM    6    rid of his for him.

11:53AM    7    Q.  So if you're providing him 10 to 30 pounds, what's, like,

11:53AM    8    a range that he would provide you?

11:53AM    9    A.  Anywhere from 10 to 50.

11:53AM   10    Q.  And you said it was to fill in gaps.  I think you covered

11:53AM   11    it earlier, but just --

11:53AM   12    A.  If I got -- if I was out of marijuana, or if Anthony was

11:53AM   13    out of marijuana, we would help each other out.

11:53AM   14    Q.  So you could keep supplying your customers?

11:54AM   15    A.  Correct.

11:54AM   16    Q.  Did you and Anthony also use cocaine together at times?

11:54AM   17    A.  Yes.

11:54AM   18    Q.  Did you ever provide him with any cocaine when you were

11:54AM   19    together?

11:54AM   20    A.  I can't remember specifically, but I would imagine so.

11:54AM   21    Q.  Did he ever provide you with cocaine when you were

11:54AM   22    together?

11:54AM   23    A.  I would imagine so.

11:54AM   24    Q.  Did you use opiates together at times?

11:54AM   25    A.  All the time.

11:54AM  1   Q.  Did that -- was that often the fentanyl pills that you

11:54AM  2   talked about earlier?

11:54AM  3   A.  Yes.

11:54AM  4   Q.  Did you also on occasion sniff heroin with him?

11:54AM  5   A.  Yes.

11:54AM  6   Q.  And on an occasion when you did cocaine together, did he

11:54AM  7   snort some cocaine, then immediately make a statement about

11:54AM  8   David Oddo?

11:54AM  9   A.  Yes.

11:54AM  10  Q.  What did Anthony Gerace say after he snorted cocaine and

11:54AM  11  then immediately made a statement about David Oddo?

11:54AM  12  A.  He said --

11:55AM  13          **MR. MacKAY:**  Objection, hearsay.

11:55AM  14          **MR. TRIPI:**  It's not.  I can --

11:55AM  15          **THE COURT:**  Come on up, let me find out what it is.

11:55AM  16          (Sidebar discussion held on the record.)

11:55AM  17          **THE COURT:**  So, I recognize this objection could be

11:55AM  18  hearsay.  Let's find out.

11:55AM  19          **MR. TRIPI:**  It's -- I think it's admissible on

11:55AM  20  multiple fronts, Your Honor, that are exceptions to hearsay.

11:55AM  21          First, it's a present-sense impression.  The

11:55AM  22  contemporaneity ensures the reliability, because there's no

11:55AM  23  time for deliberate fabrication.  So it's -- he's immediately

11:55AM  24  sniffing and then making a comment about the quality of David

11:55AM  25  Oddo's cocaine, is what I expect to come out.

11:55AM    1          Additionally, by the time Anthony Gerace discloses,

11:55AM    2    as the conversation elaborates, he discloses his cocaine

11:55AM    3    supplier, they're already heavily involved in a multi-narcotic

11:55AM    4    distribution conspiracy.

11:55AM    5          **THE COURT:**  Even though they're co-conspirators?

11:55AM    6          **MR. TRIPI:**  Yeah.  Even though the primary drug is

11:55AM    7    marijuana, they're involved in other drugs together.

11:55AM    8          **THE COURT:**  I'm not so sure I agree with him in the

11:55AM    9    first point, but the second point --

11:56AM   10          **MR. MacKAY:**  So, so, what I think he's disclosing is

11:56AM   11    I get my cocaine from Oddo.  What -- what I think he's

11:56AM   12    disclosed is Anthony Gerace gets his cocaine from Oddo.

11:56AM   13          We've heard before on other trial that Serio does not

11:56AM   14    like Oddo, doesn't deal with him.  So he's not really part of

11:56AM   15    his network.

11:56AM   16          So this is really kind of this fringe thing that's

11:56AM   17    where Anthony Gerace is saying, yeah, I get my cocaine here

11:56AM   18    from Dave Oddo.  It doesn't -- it doesn't connect him to Ron

11:56AM   19    Serio, because again, Ron Serio has said I don't like Dave

11:56AM   20    Oddo, I don't deal with him, he's not part of my network.

11:56AM   21          Because I asked him at the prior trial was he part of

11:56AM   22    your network, he says no.

11:56AM   23          **MR. TRIPI:**  It doesn't matter.  Two narcotic

11:56AM   24    co-conspirators who supply one another cocaine.

11:56AM   25          Earlier I asked Mr. Serio, did you disclose your --

11:56AM    1    where your product was coming from?  And he said yes.

11:56AM    2          So these are the types of conversations that foster

11:56AM    3    trust between co-conspirators.

11:56AM    4          **THE COURT:**  There's no question that -- that Anthony

11:57AM    5    Gerace and this defendant are involved in a conspiracy

11:57AM    6    together.

11:57AM    7          **MR. MacKAY:**  Correct.

11:57AM    8          **THE COURT:**  There's no doubt that Anthony Gerace is

11:57AM    9    supplying the cocaine to this defendant to use.

11:57AM   10          **MR. MacKAY:**  For use, yes.

11:57AM   11          **THE COURT:**  Yeah.  So Anthony Gerace saying here's

11:57AM   12    where I got this cocaine from, and it's good stuff, how is

11:57AM   13    that not a statement of a co-conspirator?

11:57AM   14          They don't have to -- Serio and Oddo don't have to

11:57AM   15    know each other, or like each other, or have any connection

11:57AM   16    with each other.

11:57AM   17          **MR. MacKAY:**  Well, I mean, I think it also raises the

11:57AM   18    403 confusion ground, because part of the government's theory

11:57AM   19    is somehow David Oddo's name is on this Ron Serio file, he's

11:57AM   20    somehow wrapped up in all of this.

11:57AM   21          But that connection is broken, and he doesn't come in

11:57AM   22    as part -- he's not someone who's working with Ron Serio.

11:57AM   23          **THE COURT:**  That's an argument you can make.  I'm

11:57AM   24    going to overrule the objection.

11:57AM   25          **MR. TRIPI:**  I'm sorry.

11:57AM   1          (End of sidebar discussion.)

11:57AM   2          **THE COURT:**  The objection is overruled.

11:58AM   3          **BY MR. TRIPI:**

11:58AM   4   Q.  After -- after Anthony snorted the cocaine and made a

11:58AM   5   statement about David Oddo, my question was:  What did

11:58AM   6   Anthony say immediately at that point?

11:58AM   7   A.  That David Oddo gets the best cocaine.  Sells the best

11:58AM   8   cocaine.

11:58AM   9   Q.  Did that indicate to you that Oddo was someone who

11:58AM  10   supplied Anthony with cocaine?

11:58AM  11   A.  Yes.

11:58AM  12   Q.  When you and Anthony would talk, did he ever offer to

11:58AM  13   hook you up with any type of suppliers that you needed beyond

11:58AM  14   marijuana, if the need arose?

11:58AM  15   A.  Excuse me?

11:58AM  16   Q.  Did Anthony ever offer to hook you up with other sources

11:58AM  17   of supply for other products if -- if you were interested?

11:58AM  18   A.  No.

11:58AM  19   Q.  But if you wanted cocaine from Anthony, you could get it

11:59AM  20   from him?

11:59AM  21   A.  Yes.

11:59AM  22   Q.  And you knew who his supplier was?

11:59AM  23   A.  Yes.

11:59AM  24   Q.  Now, through Anthony, did you meet his brother Peter

11:59AM  25   Gerace?

11:59AM 1   A. Not through Anthony. I met his brother once when I was

11:59AM 2 at a business meeting and he was at the same restaurant, and

11:59AM 3 a person I was with knew him.

11:59AM 4   Q. Who were you with at this business meeting?

11:59AM 5   A. My brother, and Larry Schiavi.

11:59AM 6   Q. Who's that name? Larry, what?

11:59AM 7   A. Schiavi.

11:59AM 8   Q. Did your brother know Peter Gerace?

11:59AM 9   A. No.

11:59AM 10   Q. Larry Schiavi?

11:59AM 11   A. Yeah, I don't know how to spell it.

11:59AM 12   Q. Okay. That was going to be my question.

11:59AM 13     At some point after you met Peter Gerace, did you and

11:59AM 14 Anthony have a night where you went to Pharaoh's?

11:59AM 15   A. One time.

11:59AM 16   Q. Did you know Peter to be the owner?

11:59AM 17   A. Yes.

11:59AM 18   Q. Were you and Anthony using drugs that night?

11:59AM 19   A. Yes.

11:59AM 20   Q. What type of drugs were you and Anthony using at

11:59AM 21 Pharaoh's that night?

11:59AM 22   A. Heroin.

11:59AM 23   Q. Did you also use cocaine that night?

12:00PM 24   A. I believe so.

12:00PM 25   Q. Is that what you would do sometimes, use heroin and then

12:00PM 1  use cocaine to sort of level out?

12:00PM 2  A.  Yeah, yes.

12:00PM 3  Q.  Where did you and Anthony use the drugs that you were

12:00PM 4  using in Pharaoh's that night?

12:00PM 5  A.  In the bathroom.

12:00PM 6  Q.  Was Peter there that night?

12:00PM 7  A.  No.

12:00PM 8  Q.  When Anthony Gerace traveled with you to New York City to

12:00PM 9  procure marijuana, was the trip you took with him, was Mark

12:00PM 10  Falzone there?

12:00PM 11  A.  Yes.

12:00PM 12  Q.  Did Anthony Gerace eventually -- did you provide him

12:00PM 13  direct access to your residence?

12:00PM 14  A.  Yes.

12:00PM 15  Q.  So, did you -- did you have a gate at the driveway?

12:00PM 16  A.  Yes.

12:00PM 17  Q.  How would you get past the gate?

12:00PM 18  A.  There was a pass code where you punched it in.

12:00PM 19  Q.  Did you give Anthony that code?

12:01PM 20  A.  Yes.

12:01PM 21  Q.  And then did he have a key to your house?

12:01PM 22  A.  He had a -- in the back door I had electronic locks, so

12:01PM 23  he had the code.

12:01PM 24  Q.  Okay.  Why did you give Anthony direct access to your

12:01PM 25  residence at 697 Lebrun?

12:01PM  1   A.  Because sometimes when I wasn't around, if he wanted

12:01PM  2   pills -- because he was a heavy user and he was going through

12:01PM  3   withdrawal -- I'd say go and just -- to my house and go in

12:01PM  4   there and get it.

12:01PM  5   Q.  Would the same apply for marijuana if he wanted

12:01PM  6   marijuana?

12:01PM  7   A.  Yes.

12:01PM  8   Q.  So you had a high level of trust with Anthony?

12:01PM  9   A.  Yes.

12:01PM  10  Q.  Did Anthony tell you he was also friends with Joe

12:01PM  11  Bongiovanni?

12:01PM  12  A.  I don't remember him saying that, but I wound up knowing

12:01PM  13  that he was.

12:01PM  14  Q.  Do you remember how you learned it?

12:01PM  15  A.  Through Mike Masecchia.

12:01PM  16  Q.  During times when you were around Anthony Gerace, did he

12:02PM  17  ever brag about his family?

12:02PM  18  A.  Yes.

12:02PM  19  Q.  In what regard?

12:02PM  20  A.  Just that they were connected.

12:02PM  21  Q.  And what did you understand that to mean?

12:02PM  22  A.  Meaning in the Mafia.

12:02PM  23  Q.  Did Anthony tell you who his grandfather was?

12:02PM  24  A.  Yes.

12:02PM  25  Q.  Who was that?

12:02PM    1    A.  Joe Todaro.

12:02PM    2    Q.  Senior?

12:02PM    3    A.  Yes.

12:02PM    4    Q.  By reputation, what was his reputation?

12:02PM    5    **MR. MacKAY:**  Objection, cumulative at this point.

12:02PM    6    **MR. TRIPI:**  As to Todaro Sr. Is my specific question.

12:02PM    7    **THE COURT:**  Overruled.

12:02PM    8    **THE WITNESS:**  That he was the head of the Mafia.

12:02PM    9    **BY MR. TRIPI:**

12:02PM   10    Q.  Did you interpret the manner in which Anthony talked

12:02PM   11    about his family as -- as bragging?

12:02PM   12    A.  Yes.

12:02PM   13    Q.  Now, I'd like to direct you to the day of your arrest on

12:02PM   14    April 18th, 2017.  Okay?

12:02PM   15    A.  Yes.

12:02PM   16    Q.  Were you arrested at Kelly Brace's house during a drug

12:03PM   17    deal?

12:03PM   18    A.  Yes.

12:03PM   19    Q.  Tell the jury what you did earlier that day, and how you

12:03PM   20    ended up getting arrested, and then I'll follow up.

12:03PM   21    A.  Earlier that day, Kelly called me and said that he needed

12:03PM   22    20 pounds.  So, I went to his house -- well, I talked to him

12:03PM   23    at his house, that's when he told me.

12:03PM   24    Then I believe I went to Grimsby, then Lebrun, because I

12:03PM   25    had the marijuana in two different spots, and then I went

12:03PM 1 back to his house.

12:03PM 2 Q. Okay. Let me ask you a question. I don't think you've

12:03PM 3 mentioned Grimsby yet. Did you own a house at 91 Grimsby?

12:03PM 4 A. I rented a house at 91 Grimsby.

12:03PM 5 Q. You rented it there? Were you storing marijuana at both

12:03PM 6 those locations?

12:03PM 7 A. Yes.

12:03PM 8 Q. If you mentioned it, I forgot, so I apologize.

12:03PM 9 How much marijuana did Kelly Brace want?

12:03PM 10 A. 20 pounds.

12:03PM 11 Q. So you had to go to the two locations to get it?

12:03PM 12 A. Correct.

12:03PM 13 Q. And then what happened?

12:03PM 14 A. Then I got arrested.

12:04PM 15 Q. After you got the marijuana, did you go back to Kelly's

12:04PM 16 house?

12:04PM 17 A. Yes. Yes, I went back to Kelly's house, and that's where

12:04PM 18 I got arrested.

12:04PM 19 Q. And did he live at 370 Huntington?

12:04PM 20 A. I'm not sure the address, but he lived on Huntington.

12:04PM 21 Q. Was it in the City of Buffalo?

12:04PM 22 A. Yes.

12:04PM 23 Q. Okay. Describe what happened in more specifics when you

12:04PM 24 got arrested.

12:04PM 25 A. They came up the driveway. I had to get on the ground.

12:04PM  1  And then they separated us, they brought me into the kitchen

12:04PM  2  and then took Kelly into another room.

12:04PM  3  Q.  Did they approach -- did law enforcement approach you

12:04PM  4  after you had brought the drugs out of your vehicle?

12:04PM  5  A.  Yes.  The garbage bag was in the garage in front of me

12:04PM  6  and Kelly.

12:04PM  7  Q.  Okay.  When you were brought into the kitchen, did you

12:04PM  8  know what law enforcement agency it was at that point?

12:04PM  9  A.  No.

12:04PM 10  Q.  And I think Monday you indicated you were a little upset?

12:04PM 11  A.  Yes.

12:05PM 12  Q.  Did you ask the law enforcement law officer for somebody?

12:05PM 13  A.  Joe Bongiovanni.

12:05PM 14  Q.  What exactly did you say to the officer who you were

12:05PM 15  talking with?

12:05PM 16  A.  I believe I said, Do you know Joe Bongiovanni?

12:05PM 17  Q.  And what was that officer's response in that

12:05PM 18  conversation?

12:05PM 19  A.  Yes.  Why, do you work for him?

12:05PM 20    Or do you -- do you work for him, meaning am I an

12:05PM 21  informant for him.

12:05PM 22  Q.  At that point, what did you do?

12:05PM 23  A.  I asked for my lawyer, and I didn't say anything else.

12:05PM 24  Q.  Why were you asking?  In your mind, why were you asking

12:05PM 25  for Joe Bongiovanni?

12:05PM 1    A.   Well, I was pissed.  And I just wanted to talk to him.

12:05PM 2    Q.   Did you think he could help you?

12:05PM 3    A.   Yes.

12:05PM 4    Q.   Okay.  I'm going to show you some photographs.  Let me

12:05PM 5    just get these together.

12:05PM 6        This first batch is going to be 13 photos, I'll list them

12:05PM 7    for the record and then hand them up.

12:06PM 8    A.   Okay.

12:06PM 9    Q.   41.  Government Exhibit 41A-1, A-2, A-3 -- I'm sorry, I'm

12:06PM 10   only going to show you four, and 41A-13.

12:06PM 11       Okay?  So again for the record, that's 41A-1, 2, 3, and

12:06PM 12   41A-13.

12:06PM 13       Do you recognize Government Exhibits 41A-1, 2, 3 and 13?

12:06PM 14   A.   Yes.

12:06PM 15   Q.   What do you recognize those to be?

12:06PM 16   A.   The garage at Kelly's house, the bag of marijuana, and

12:06PM 17   the marijuana in the bag, and then my Range Rover.

12:06PM 18   Q.   Okay.  Do those all fairly and accurately depict your

12:07PM 19   Range Rover as is depicted that day, as well as the bag of

12:07PM 20   marijuana that was in Kelly Brace's garage that you brought

12:07PM 21   there?

12:07PM 22   A.   Yes.

12:07PM 23            MR. TRIPI:  The government offers 41A-1, 2, 3 and 13,

12:07PM 24   Your Honor.

12:07PM 25            MR. MacKAY:  No objection.

12:07PM  1    **THE COURT:**  They are all admitted without objection.

12:07PM  2    **MR. TRIPI:**  Thank you.

12:07PM  3    **(GOV Exhibits 41A-1, 2, 3 and 13 were received in evidence.)**

12:07PM  4    **MR. TRIPI:**  Ms. Champoux, can we publish these for

12:07PM  5    the jury starting with 41A-1, and can we just split it with

12:07PM  6    41A-2, move it along a little bit?

12:07PM  7    **BY MR. TRIPI:**

12:07PM  8    Q.  Okay.  On the left we have Government Exhibit 41A-2 on

12:07PM  9    your screen, and on the right we have 41A, sorry, 41A-1 on

12:07PM  10   the left, 41A-2 on the right.

12:07PM  11      Starting with the photo on the left, Mr. Serio, can you

12:07PM  12   tell the jury what they're looking at there?

12:07PM  13   A.  At my Range Rover.

12:07PM  14   Q.  Is that parked next to someone else's vehicle?

12:07PM  15   A.  Kelly Brace's vehicle.

12:07PM  16   Q.  Okay.  So, you pulled into his backyard?

12:08PM  17   A.  Correct.

12:08PM  18   Q.  And 41A-2, what is that?

12:08PM  19   A.  That is the bag of marijuana.

12:08PM  20   Q.  Okay.  And you said how much was in there?

12:08PM  21   A.  20 pounds.  Either 19 or 20.

12:08PM  22      **MR. TRIPI:**  Okay.  Ms. Champoux, can we take those

12:08PM  23   down and publish 41A-3 and 41A-13, please?

12:08PM  24      **BY MR. TRIPI:**

12:08PM  25   Q.  And tell the jury what they're looking at there.

12:08PM  1   A.  The marijuana that was in the garbage bag in the garage.

12:08PM  2   Q.  And is that how the marijuana was packaged, you know,

12:08PM  3   after it would be delivered from Jarrett Guy?

12:08PM  4   A.  Yes.

12:08PM  5   Q.  Are those each 1-pound bags?

12:08PM  6   A.  Yes.

12:08PM  7        MR. TRIPI:  We can take that down, Ms. Champoux,

12:08PM  8   thank you.

12:08PM  9        BY MR. TRIPI:

12:08PM  10  Q.  And as you understand it, after you were taken into

12:09PM  11  custody that day, did law enforcement, the Erie County

12:09PM  12  Sheriffs, ultimately obtain search warrants for your house at

12:09PM  13  697 Lebrun, as well as your property at 91 Grimsby?

12:09PM  14  A.  Yes.

12:09PM  15  Q.  I'm going to hand you up some photos.  These are going to

12:09PM  16  be Government Exhibits 41A-1 through 42A-32.  With the

12:10PM  17  exception of 42A-10, I'm going to take that one out.  So,

12:10PM  18  poor quality.  So 42A-1 through 9, and then 11 through 32 is

12:10PM  19  what I'm handing up.

12:10PM  20       Take a moment look through those, when you're done,

12:10PM  21  please look up.

12:11PM  22       Mr. Serio, do you recognize 42A-1 through 9 and 42A-11

12:11PM  23  through 32?

12:11PM  24  A.  Yes.

12:11PM  25  Q.  Generally, do those all depict your residence at 697

12:12PM  1   Lebrun and the various items that were observed and seized by

12:12PM  2   law enforcement that day?

12:12PM  3   A.  Yes.

12:12PM  4   Q.  Do they all fairly and accurately depict things you had

12:12PM  5   and locations in your house that day?

12:12PM  6   A.  Yes.

12:12PM  7          **MR. TRIPI:**  The government offers Exhibit 42A-1

12:12PM  8   through 9, and 42A-11 through 32, Your Honor.

12:12PM  9          **MR. MacKAY:**  No objection.

12:12PM  10         **THE COURT:**  Received without objection.  They're

12:12PM  11  admitted without objection.

12:12PM  12         **MR. TRIPI:**  Thank you.

12:12PM  13  **(GOV Exhs 42A-1 to 9, 42A-11 to 32 were received in evidence.)**

12:12PM  14         **MR. TRIPI:**  Ms. Champoux, let's start, I guess, I

12:12PM  15  want to pull up 42A-33, which is already in evidence.

12:12PM  16         **BY MR. TRIPI:**

12:12PM  17  Q.  So this is the scene, front view, front of your house

12:12PM  18  from Lebrun?

12:12PM  19  A.  Yes.

12:12PM  20         **MR. TRIPI:**  Okay.  Let's go to 42A-1, Ms. Champoux.

12:12PM  21         **BY MR. TRIPI:**

12:12PM  22  Q.  I guess we're starting in a -- some type of drawer, but

12:12PM  23  is that some ammo you had in your house?

12:12PM  24  A.  Yes.

12:12PM  25         **MR. TRIPI:**  Let's go to 42A-2.

12:12PM   1          **BY MR. TRIPI:**

12:12PM   2    Q.  Tell the jury what's depicted here.

12:13PM   3    A.  That's my closet, my front foyer, and bags of marijuana.

12:13PM   4    Q.  This is on the first floor of the residence?

12:13PM   5    A.  Yes.

12:13PM   6          **MR. TRIPI:**  Let's go to 42A-3.

12:13PM   7          **BY MR. TRIPI:**

12:13PM   8    Q.  And tell the jury what's depicted there.

12:13PM   9    A.  It's an AR-15.

12:13PM  10    Q.  Did you have that for your protection because you were

12:13PM  11    involved in drug dealing?

12:13PM  12    A.  Yes.

12:13PM  13    Q.  And because you stored drugs and money at your house?

12:13PM  14    A.  Yes.

12:13PM  15    Q.  Okay.

12:13PM  16          **MR. TRIPI:**  Let's go to 42A-4, please.

12:13PM  17          **BY MR. TRIPI:**

12:13PM  18    Q.  Is that just a close-up of some of the specifics of the

12:13PM  19    firearm?

12:13PM  20    A.  Yes.

12:13PM  21          **MR. TRIPI:**  Let's go to 42A-3.  Or, 5, I'm sorry.

12:13PM  22          **BY MR. TRIPI:**

12:13PM  23    Q.  What's depicted there?

12:13PM  24    A.  Marijuana.

12:13PM  25    Q.  And what part of your house is that generally?

12:13PM    1    A.   That's my laundry room.

12:13PM    2         **MR. TRIPI:**  Okay.  Let's go to 42A-6.

12:13PM    3         **BY MR. TRIPI:**

12:13PM    4    Q.   Is that a view of some of the marijuana in the bag that

12:14PM    5    was in the prior photo?

12:14PM    6    A.   Correct.

12:14PM    7         **MR. TRIPI:**  Let's go to 42A-7.

12:14PM    8         **BY MR. TRIPI:**

12:14PM    9    Q.   Is that another view of that foyer room where you had

12:14PM   10    some marijuana?

12:14PM   11    A.   Yes.

12:14PM   12         **MR. TRIPI:**  Let's go to 42A-8.

12:14PM   13         **BY MR. TRIPI:**

12:14PM   14    Q.   And what are we looking at here?

12:14PM   15    A.   Marijuana.

12:14PM   16    Q.   Is that looking into some of the bags that are in that

12:14PM   17    front foyer?

12:14PM   18    A.   Yes.

12:14PM   19    Q.   After you would take the marijuana in the 1-pound bags,

12:14PM   20    would you generally transfer it into black bag, garage bags

12:14PM   21    or boxes?

12:14PM   22    A.   Yes.

12:14PM   23    Q.   Okay.

12:14PM   24         **MR. TRIPI:**  Let's go to 42A-9.

          25

12:14PM    1    **BY MR. TRIPI:**

12:14PM    2    Q.  Are those just some discarded packaging material?

12:14PM    3    A.  Yes.

12:14PM    4    Q.  Is that for marijuana that you reweighed and then

12:14PM    5    repackaged?  Or can you describe how that ends up in your

12:14PM    6    house for the jury?

12:14PM    7    A.  Yes, sometimes I would take the marijuana, if it weighed

12:15PM    8    over a pound, and I would take the extra out and then reseal

12:15PM    9    it, and then sometimes I would have extra bags.

12:15PM   10    Q.  Okay.

12:15PM   11        **MR. TRIPI:**  Let's go to 42A-11.

12:15PM   12        **BY MR. TRIPI:**

12:15PM   13    Q.  And can you tell the jury what they're looking at there?

12:15PM   14    A.  Those are packages of 2 pounds of marijuana, low-grade

12:15PM   15    marijuana.

12:15PM   16    Q.  What's the difference between the 2-pound packages and

12:15PM   17    the 1-pound packages that we've seen?

12:15PM   18    A.  The 2-pound packages are cheaper.  They're usually around

12:15PM   19    600 a pound, where the other ones are 2,000 a pound.  And

12:15PM   20    those come from Mexico, versus the higher grade is grown

12:15PM   21    either in Vancouver or California.

12:15PM   22    Q.  Was the low-grade marijuana from Mexico also sourced

12:15PM   23    through Jarrett Guy?

12:15PM   24    A.  Jarrett Guy, and also a few times Jacob Martinez.

12:15PM   25    Q.  Okay.

12:15PM    1         **MR. TRIPI:** Let's go to 42A-12.

12:15PM    2         **BY MR. TRIPI:**

12:16PM    3   Q. More magazines for your gun?

12:16PM    4   A. Yes.

12:16PM    5         **MR. TRIPI:** Let's go to 42A-13.

12:16PM    6         **BY MR. TRIPI:**

12:16PM    7   Q. Is that a scale?

12:16PM    8   A. Yes.

12:16PM    9   Q. What did you use that for?

12:16PM   10   A. To weigh the marijuana.

12:16PM   11         **MR. TRIPI:** Let's go to 42A-14.

12:16PM   12         **BY MR. TRIPI:**

12:16PM   13   Q. What's that?

12:16PM   14   A. Money counter.

12:16PM   15   Q. Why did you need that?

12:16PM   16   A. To count the money.

12:16PM   17         **MR. TRIPI:** Let's go to 42A-15.

12:16PM   18         **BY MR. TRIPI:**

12:16PM   19   Q. Tell the jury, generally, what's depicted in that photo?

12:16PM   20   A. Various pills.

12:16PM   21   Q. What various types of pills are there?

12:16PM   22   A. Methadone, oxycodone, and OxyContin.

12:16PM   23         **MR. TRIPI:** Okay. Let's go to 42A-16. And 42A-17.

12:16PM   24         **BY MR. TRIPI:**

12:16PM   25   Q. Does that generally depict some more pills that were in

12:16PM    1   your house?

12:16PM    2   A.   Yes.

12:16PM    3        **MR. TRIPI:**   Let's go to 42A-18.

12:17PM    4        **BY MR. TRIPI:**

12:17PM    5   Q.   Does that depict more ammunition?

12:17PM    6   A.   Yes.

12:17PM    7        **MR. TRIPI:**   Let's go to 42A-19.

12:17PM    8        **BY MR. TRIPI:**

12:17PM    9   Q.   Is that a close-up of some ammunition in a magazine?

12:17PM   10   A.   Yes.

12:17PM   11        **MR. TRIPI:**   Let's go to 42A-20.

12:17PM   12        **BY MR. TRIPI:**

12:17PM   13   Q.   Is that some more of the marijuana packaging as you've

12:17PM   14   previously described?

12:17PM   15   A.   Yes.

12:17PM   16   Q.   Cut open bags?

12:17PM   17   A.   Yes.

12:17PM   18        **MR. TRIPI:**   Let's go to 42A-21.

12:17PM   19        **BY MR. TRIPI:**

12:17PM   20   Q.   What's that?

12:17PM   21   A.   It's a cocaine residue and marijuana residue.

12:17PM   22   Q.   Is that a plate?

12:17PM   23   A.   Yes.

12:17PM   24   Q.   Is that a plate that you had in, like, a bar area?

12:17PM   25   A.   Yes.

12:17PM  1  Q.  So that was something that you would put lines of cocaine

12:17PM  2  on?

12:17PM  3  A.  Correct.

12:17PM  4  Q.  Were there times when you had people over and people used

12:17PM  5  cocaine up there?

12:17PM  6  A.  Yes.

12:17PM  7          **MR. TRIPI:**  Let's go to 42A-22.

12:17PM  8          **BY MR. TRIPI:**

12:17PM  9  Q.  And what's depicted there?

12:18PM  10  A.  Empty bags of marijuana.

12:18PM  11          **MR. TRIPI:**  Let's go to 42A-23.

12:18PM  12          **BY MR. TRIPI:**

12:18PM  13  Q.  You were a big gambler, right?

12:18PM  14  A.  Yes.

12:18PM  15          **MR. TRIPI:**  Let's go to 42A-24.

12:18PM  16          **BY MR. TRIPI:**

12:18PM  17  Q.  And again, is that more empty packaging for marijuana?

12:18PM  18  A.  Yes.

12:18PM  19  Q.  Is this in your basement?

12:18PM  20  A.  Yes.

12:18PM  21          **MR. TRIPI:**  Let's go to 42A-25.

12:18PM  22          **BY MR. TRIPI:**

12:18PM  23  Q.  What's depicted there?

12:18PM  24  A.  An air filter.

12:18PM  25  Q.  Okay.  Now, I think Monday you talked about having a

12:18PM     1   marijuana grow at 697 Lebrun?

12:18PM     2   A.  Yes.

12:18PM     3   Q.  Does 42A-25 depict the area where you had the plants

12:18PM     4   growing?

12:18PM     5   A.  Yes.

12:18PM     6   Q.  It looks like there's some, like, racks at the ceiling.

12:18PM     7   Were those part of the grow, or is that where you hung the

12:18PM     8   lights?

12:18PM     9   A.  That's the structure of the house, because on top of it

12:18PM    10   was a tile floor.  So back then, they used to have beams like

12:19PM    11   that to pour the concrete and the tile.  But that's where I

12:19PM    12   hung the lights, off the beams.

12:19PM    13   Q.  How many plants did you have in your basement there?

12:19PM    14   A.  I want to say it was, like, under 100.

12:19PM    15   Q.  Under 100?

12:19PM    16   A.  Yep.

12:19PM    17   Q.  Was it 100 because you knew the mandatory minimum and you

12:19PM    18   were living there?

12:19PM    19   A.  No, at that point it was because I couldn't fit more in

12:19PM    20   there, so --

12:19PM    21   Q.  Couldn't fit any more?

12:19PM    22   A.  No.

12:19PM    23       **MR. TRIPI:**  Let's go to 42A-26.

12:19PM    24       **BY MR. TRIPI:**

12:19PM    25   Q.  What's -- what's that?

12:19PM   1   A.   It's a timer for the lights.

12:19PM   2   Q.   Okay.  Did you set something like that up in Lou Selva's

12:19PM   3   basement, too?

12:19PM   4   A.   Yeah, every place I set something up, I did that.

12:19PM   5   Q.   What was the purpose of having them on a timer?

12:19PM   6   A.   Because they have to be turned on and off at the same

12:19PM   7   time in sync for -- for it to work, for it to go into the

12:19PM   8   budding cycle.

12:19PM   9   Q.   When you were doing -- setting up these grows, were you

12:19PM  10   cognizant of triggering any red flags with the utility

12:20PM  11   companies?

12:20PM  12   A.   Yes.

12:20PM  13   Q.   How did you learn about that?

12:20PM  14   A.   I think one time I -- I was doing it in the early 2000s,

12:20PM  15   and I had too many lights, and then National Grid wanted to

12:20PM  16   put in a demand meter because there was so much electricity.

12:20PM  17   Which a demand meter, it measures the amount of usage every

12:20PM  18   15 minutes so it could track at what times.  And then if

12:20PM  19   you're doing 12 hours on, 12 hours off every day, and then

12:20PM  20   switch to 18/6, they can see and trigger red flags.

12:20PM  21   Q.   Would the demand meter, would the meter reader come to

12:20PM  22   the house more often?

12:20PM  23   A.   No, at the same time.  But it's just they can see the --

12:20PM  24   the usage of energy in specific times.

12:20PM  25   Q.   Okay.  So you wanted to avoid that?

12:20PM    1    A.   Yes.   Because if you have zero electricity on at -- for

12:20PM    2    12 hours, and then electricity going for 12 hours on, then

12:20PM    3    that's usually a sign of a marijuana grow.

12:20PM    4    Q.   So how did you avoid that by setting up this timer?

12:21PM    5    A.   Well, I would just do enough lights to keep it under the

12:21PM    6    demand meter.   That's why some places I'd only do six lights

12:21PM    7    or four lights, because -- I forgot what the wattage is, if

12:21PM    8    you go over a certain wattage, then they put the demand meter

12:21PM    9    in.   Or if it's a residence, then they investigate it.

12:21PM   10    Q.   So you knew the wattage that you needed to stay below?

12:21PM   11    A.   Correct.

12:21PM   12    Q.   What other tactics did you use to make sure you didn't

12:21PM   13    use a lot of energy, to stay below the wattage?

12:21PM   14    A.   I would turn lights on -- the lights on at night because

12:21PM   15    then it would keep the air conditioning low and the fans low,

12:21PM   16    because the temperatures drop at night versus the daytime.

12:21PM   17    So you use less cooling doing it that way.

12:21PM   18    Q.   So, so your house was using less energy, legitimate --

12:21PM   19    legitimate energy for other house functions?

12:21PM   20    A.   Correct.

12:21PM   21    Q.   Okay.

12:21PM   22    **MR. TRIPI:**   Let's go to 42A-27.

12:21PM   23    **BY MR. TRIPI:**

12:21PM   24    Q.   Is this what you built to walk into for the grow in the

12:22PM   25    basement?

12:22PM 1   A.  I was going to refinish the basement, and that room was

12:22PM 2   already there.  I kind of just put drywall in front of it to

12:22PM 3   kind of block it off.

12:22PM 4   Q.  Okay.  So behind that drywall is where the marijuana

12:22PM 5   plants were growing?

12:22PM 6   A.  Correct.

12:22PM 7           **MR. TRIPI:**  Let's go to 42A-28.

12:22PM 8           **BY MR. TRIPI:**

12:22PM 9   Q.  Here, do we see basically more packaging material?

12:22PM 10  A.  Yes.

12:22PM 11          **MR. TRIPI:**  Let's go to 42A-29.

12:22PM 12          **BY MR. TRIPI:**

12:22PM 13  Q.  Did you have a shotgun, somewhere?

12:22PM 14  A.  At some point, I did.

12:22PM 15  Q.  Okay.  That's a round of shotgun ammunition?

12:22PM 16  A.  Correct.

12:22PM 17          **MR. TRIPI:**  Let's go to 42A-30.

12:22PM 18          **BY MR. TRIPI:**

12:22PM 19  Q.  What are we looking at here?

12:22PM 20  A.  Those were a key holder for some of the properties that I

12:22PM 21  had.

12:22PM 22  Q.  Were those rental properties, or what were they?

12:22PM 23  A.  Rental properties.

12:22PM 24  Q.  Okay.  And we see the key holders for 82 Sycamore and 608

12:23PM 25  Michigan; is that right?

12:23PM  1   A.  Correct.

12:23PM  2   Q.  Did you ever have any other marijuana grows at any of

12:23PM  3   those locations?

12:23PM  4   A.  No.

12:23PM  5   Q.  Okay.  So those are strictly rentals?

12:23PM  6   A.  Correct.

12:23PM  7   Q.  Including 132 Rhode Island?

12:23PM  8   A.  Well, that actually was -- I was holding a mortgage for

12:23PM  9   somebody, and I had to foreclose on it.

12:23PM  10  Q.  Who were you holding the mortgage for?

12:23PM  11  A.  For Jay Camacho, I believe.

12:23PM  12  Q.  Who?

12:23PM  13  A.  Jay Camacho.

12:23PM  14  Q.  And who's that?

12:23PM  15  A.  A friend of mine.

12:23PM  16  Q.  Is that someone who worked for you at your debt

12:23PM  17  collection agency?

12:23PM  18  A.  Correct.

12:23PM  19  Q.  Okay.  So the only drug premises that you held out of

12:23PM  20  these properties, would it be accurate to say, was 82

12:23PM  21  Sycamore and 608 Michigan?

12:23PM  22  A.  Correct.

12:23PM  23       **MR. TRIPI:**  Can we go to 42A-31?

12:24PM  24       **BY MR. TRIPI:**

12:24PM  25  Q.  And, again, we see more empty packaging for marijuana

| | | |
|---|---|---|
| 12:24PM | 1 | there? |
| 12:24PM | 2 | A.  Yes. |
| 12:24PM | 3 | **MR. TRIPI:**  How about 42A-32. |
| 12:24PM | 4 | **BY MR. TRIPI:** |
| 12:24PM | 5 | Q.  The last photo in this set.  That's another view of the |
| 12:24PM | 6 | same key thing?  Sorry about that. |
| 12:24PM | 7 | A.  Yes. |
| 12:24PM | 8 | **MR. TRIPI:**  We'll take that down, Ms. Champoux. |
| 12:24PM | 9 | **BY MR. TRIPI:** |
| 12:24PM | 10 | Q.  Now you've also had an opportunity to review all of the |
| 12:24PM | 11 | evidence that was seized from your house as depicted in those |
| 12:24PM | 12 | photos, correct? |
| 12:24PM | 13 | A.  Correct. |
| 12:24PM | 14 | Q.  All right.  I've handed up Government Exhibit 53, |
| 12:24PM | 15 | Mr. Serio.  Have you seen that before? |
| 12:24PM | 16 | A.  Yes. |
| 12:24PM | 17 | Q.  Is that a portion of the marijuana and packaging material |
| 12:24PM | 18 | that was seized from your residence at 697 Lebrun, as we've |
| 12:25PM | 19 | just seen in some of the photos there? |
| 12:25PM | 20 | A.  Yes. |
| 12:25PM | 21 | Q.  Other than the fact that it's now in a government bag and |
| 12:25PM | 22 | has some labelling on it, is it in the same or substantially |
| 12:25PM | 23 | same condition today as when it was recovered from your |
| 12:25PM | 24 | house? |
| 12:25PM | 25 | A.  Yes. |

12:25PM   1   Q. I'm going hand you up some other exhibits, we're going to

12:25PM   2   try to do the speed round to get this in before lunch, okay?

12:25PM   3   A. Okay.

12:25PM   4   **MR. TRIPI:** For the record, Your Honor, I'm going to

12:25PM   5   hand up Exhibit 57, 58, 56, sorry, I'm out of order here. 55,

12:25PM   6   54, and 59.

12:25PM   7   **THE COURT:** So that's 54 through 59?

12:25PM   8   **MR. TRIPI:** Yeah. I said them out.

12:25PM   9   **THE COURT:** That's okay.

12:25PM   10   **MR. TRIPI:** I just tried to make it harder for

12:25PM   11   everyone, Judge.

12:25PM   12   **THE COURT:** Well, yeah, I'm just showing you I was

12:26PM   13   paying attention.

12:26PM   14   **MR. TRIPI:** So 53 to 59. I'm showing now 45 to 59.

12:26PM   15   **BY MR. TRIPI:**

12:26PM   16   Q. Look through those, Mr. Serio.

12:26PM   17   Do you recognize Exhibits 54 through 59?

12:26PM   18   A. Yes.

12:26PM   19   Q. Did you see those items in some of the photos we just

12:26PM   20   looked at?

12:26PM   21   A. Yes.

12:26PM   22   Q. What do you recognize Exhibits 54 through 59 to contain?

12:26PM   23   A. To contain methadone, various opiates, and Adderall.

12:26PM   24   Q. And were those depicted in the photos we saw?

12:26PM   25   A. Yes.

| | | |
|---|---|---|
| 12:26PM | 1 | Q.  Other than the fact that they're now in those bags and |
| 12:26PM | 2 | they've, you know, been packaged up by law enforcement, do |
| 12:26PM | 3 | you recognize them to be in the same or substantially same |
| 12:27PM | 4 | condition today as when they were in your house? |
| 12:27PM | 5 | A.  Yes. |
| 12:27PM | 6 | Q.  Do some of them have your name on the packaging? |
| 12:27PM | 7 | A.  Yeah, the prescription bottle I believe. |
| 12:27PM | 8 | Q.  Okay.  Some of those drugs were prescribed? |
| 12:27PM | 9 | A.  I think the -- no, I think it was before there was one. |
| 12:27PM | 10 | Q.  So those were old prescription bottles? |
| 12:27PM | 11 | A.  Yes. |
| 12:27PM | 12 | MR. TRIPI:  Judge, with that foundation, we'll offer |
| 12:27PM | 13 | Exhibits 54 through 59, as well. |
| 12:27PM | 14 | MR. MacKAY:  No objection. |
| 12:27PM | 15 | THE COURT:  Received without objection. |
| 12:27PM | 16 | **(GOV Exhibits 53 through 59 were received in evidence.)** |
| 12:27PM | 17 | MR. TRIPI:  Just going to publish what I've put into |
| 12:27PM | 18 | evidence, Judge. |
| 12:27PM | 19 | Oh, I'm offering 53 as well. |
| 12:27PM | 20 | MR. MacKAY:  No objection, as well. |
| 12:27PM | 21 | THE COURT:  That's okay.  They're all received |
| 12:27PM | 22 | without objection. |
| 12:27PM | 23 | MR. TRIPI:  Publishing first Exhibit 53.  54.  55. |
| 12:28PM | 24 | BY MR. TRIPI: |
| 12:28PM | 25 | Q.  Mr. Serio, what are these orange ones, Exhibit 55? |

12:28PM   1   A.   I'm not quite sure.

12:28PM   2   Q.   You don't remember?

12:28PM   3   A.   No.

12:28PM   4          **MR. TRIPI:**  Now publishing 56.

12:28PM   5          Publishing 57.

12:28PM   6          And 58 and 59.

12:28PM   7          Judge, I think this is probably a good spot if you're

12:28PM   8   ready to break for lunch.

12:28PM   9          **THE COURT:**  Yeah, perfect time.  So we'll break for

12:28PM  10   lunch.

12:29PM  11          Please remember my instructions.  Don't communicate

12:29PM  12   about the case with anyone including each other.  Don't use

12:29PM  13   tools of technology to communicate about the case or research

12:29PM  14   the case.  Don't read, or watch, or listen to any news

12:29PM  15   coverage if there is any while the trial is in progress.  And

12:29PM  16   don't make up your mind about anything until you start

12:29PM  17   deliberating.

12:29PM  18          Let's come back about 1:30, maybe 1:40, we'll say

12:29PM  19   1:40.  Okay?  We'll see you then.

12:29PM  20          (Jury excused at 12:29 p.m.)

12:29PM  21          **THE COURT:**  Anything before we break from the

12:29PM  22   government?

12:29PM  23          **MR. TRIPI:**  No, Your Honor.  Just we'll be moving

12:29PM  24   into the last property after the break.  I want to assure you

12:30PM  25   I've curated it down from 99 photos that we did last time down

| | | |
|---|---|---|
| 12:30PM | 1 | to 25. |
| 12:30PM | 2 | **THE COURT:** That sounds pretty good. |
| 12:30PM | 3 | **MR. TRIPI:** Yeah, I just want to let you know I did |
| 12:30PM | 4 | that. |
| 12:30PM | 5 | **THE COURT:** Okay. Anything from the defense? |
| 12:30PM | 6 | **MR. MacKAY:** No, Your Honor. |
| 12:30PM | 7 | **THE COURT:** Okay. We'll see you back here in about |
| 12:30PM | 8 | an hour and ten minutes. Thanks, everybody. |
| 12:30PM | 9 | **MR. MacKAY:** Thanks, Judge. |
| 12:30PM | 10 | (Off the record at 12:30 p.m.) |
| 01:47PM | 11 | (Back on the record at 1:47 p.m.) |
| 01:47PM | 12 | (Jury not present.) |
| 01:47PM | 13 | **THE CLERK:** All rise. |
| 01:47PM | 14 | **THE COURT:** Please be seated. |
| 01:47PM | 15 | **THE CLERK:** We are back on the record for the |
| 01:47PM | 16 | continuation of the jury trial in case number 19-cr-227, |
| 01:47PM | 17 | United States of America versus Joseph Bongiovanni. |
| 01:47PM | 18 | All counsel and parties are present. |
| 01:47PM | 19 | **THE COURT:** Okay. Anything we need to do before we |
| 01:47PM | 20 | resume, Mr. Tripi? |
| 01:47PM | 21 | **MR. TRIPI:** Not from the government. |
| 01:47PM | 22 | **THE COURT:** Mr. MacKay? |
| 01:47PM | 23 | **MR. MacKAY:** No, Your Honor. No. |
| 01:47PM | 24 | **THE COURT:** Okay. Let's get the witness back in. |
| 01:47PM | 25 | And let's bring the jurors back in, please, Pat. |

01:48PM    1         (Jury seated at 1:48 p.m.)

01:49PM    2      **THE COURT:** Okay. The record will reflect that all

01:49PM    3 our jurors are, again, present.

01:49PM    4      Folks, I think I told you we have a hard stop today

01:49PM    5 at 4:30 because of my schedule. But next week, we may try to

01:49PM    6 go to 5:30 more often than not, so if you come in in the

01:49PM    7 morning and you can't stay until 5:30, let me know, okay?

01:49PM    8 Because we're going to try to make up a little time by going

01:49PM    9 until 5:30, get a couple hours in extra, okay?

01:49PM   10      I remind the witness he's still under oath.

01:49PM   11      Mr. Tripi, you may continue.

01:49PM   12      **MR. TRIPI:** Thank you, Your Honor.

01:49PM   13      **BY MR. TRIPI:**

01:49PM   14 Q. Mr. Serio, I'd like to move on to the April 18th, 2017

01:49PM   15 search of your property at 91 Grimsby.

01:49PM   16     Ultimately, are you aware that items were located and

01:49PM   17 seized there by members of the Erie County Sheriff's Office?

01:50PM   18 A. Yes.

01:50PM   19 Q. I'm going to hand you up a number of exhibits. These are

01:50PM   20 going to be photographs. I'll state them for the record and

01:50PM   21 then I'll hand them up.

01:50PM   22     I'm going to hand you Government Exhibit 43A-78, 43A-71,

01:50PM   23 43A-1, 43A-2, 43A-8, 43A-9, 43A-10, 43A-14, 43A-15, 43A-17,

01:50PM   24 43A-19, 43A-20, 43A-22, 43A-36, 43A-37, 43A-39, 43A-40,

01:51PM   25 43A-45, 43A-46, 43A-47, 43A-49, 43A-73, 43A-80, 43A-81,

01:51PM    1    43A-82, 43A-84.  I'm going to hand you up all those exhibits

01:51PM    2    I've just listed, okay?

01:51PM    3        Take a moment, look at these, and when you're done please

01:51PM    4    look up.

01:51PM    5            **MR. MacKAY:**  Is 3 and 4 --

01:51PM    6            **MR. COOPER:**  No, Parker.

01:51PM    7            **MR. TRIPI:**  No, I skipped over those.

01:52PM    8            **MR. COOPER:**  Also, no.

01:52PM    9            **MR. MacKAY:**  Okay.  Good.  I got them all.  Thanks.

01:52PM   10            **BY MR. TRIPI:**

01:52PM   11    Q.  Do you recognize what's depicted in those exhibits?

01:52PM   12    A.  Yes.

01:52PM   13    Q.  Do each of those exhibits fairly and accurately depict

01:52PM   14    your property that you had at 91 Grimsby, as well as items

01:52PM   15    that you had stored at the location, as of the date of your

01:52PM   16    arrest on April 18th, 2017?

01:52PM   17    A.  Yes.

01:52PM   18    Q.  Do they all fairly and accurately depict the items and

01:52PM   19    the property as it existed that day?

01:53PM   20    A.  Yes.

01:53PM   21            **MR. TRIPI:**  The government offers that list that I've

01:53PM   22    read into the record, Your Honor.

01:53PM   23            **MR. MacKAY:**  No objection.

01:53PM   24            **THE COURT:**  They are all received without objection.

01:53PM   25            **MR. TRIPI:**  Thank you, Your Honor.

01:53PM 1  **(GOV Exhibits 43A-78, 43A-71, 43A-1, 43A-2,**

01:53PM 2  **43A-8, 43A-9, 43A-10, 43A-14, 43A-15, 43A-17,**

01:53PM 3  **43A-19, 43A-20, 43A-22, 43A-36, 43A-37, 43A-39,**

01:53PM 4  **43A-40, 43A-45, 43A-46, 43A-47, 43A-49, 43A-73,**

01:50PM 5  **43A-80, 43A-81, 43A-82, 43A-84 were received in evidence.)**

01:53PM 6  **MR. TRIPI:**  Ms. Champoux, can we publish these, and

01:53PM 7  starting with 43A-78?

01:53PM 8  **BY MR. TRIPI:**

01:53PM 9  Q.  Okay.  Is that just an overall front view of the

01:53PM 10  residence, Mr. Serio?

01:53PM 11  A.  Yes.

01:53PM 12  Q.  And this is located in Kenmore, New York, Grimsby?

01:53PM 13  A.  Tonawanda.

01:53PM 14  Q.  Okay.  What street does Grimsby run off of?

01:53PM 15  A.  Colvin.

01:53PM 16  Q.  Okay.

01:53PM 17  **MR. TRIPI:**  Let's move on to 43A-1, please.

01:53PM 18  **BY MR. TRIPI:**

01:53PM 19  Q.  Tell the jury what they're looking at here.

01:53PM 20  A.  Packaged marijuana.

01:53PM 21  Q.  Is this a cabinet inside the house?

01:53PM 22  A.  Yes, in the kitchen.

01:53PM 23  Q.  Kitchen cabinet?

01:53PM 24  **MR. TRIPI:**  Let's go to 43A-2.

25

01:53PM    1    **BY MR. TRIPI:**

01:54PM    2    Q.  Is that more of the packaged marijuana that was in the

01:54PM    3    house?

01:54PM    4    A.  Yes.

01:54PM    5    **MR. TRIPI:**  Let's go to 43A-8.

01:54PM    6    **BY MR. TRIPI:**

01:54PM    7    Q.  And what is that?

01:54PM    8    A.  A scale and scissors.

01:54PM    9    Q.  And what did you use the scale and the scissors for?

01:54PM   10    A.  The scale was to weigh the marijuana.  And the scissors,

01:54PM   11    sometimes marijuana might be leafy, I'd have to trim it a

01:54PM   12    little bit.

01:54PM   13    **MR. TRIPI:**  Let's go to 43A-10.

01:54PM   14    **BY MR. TRIPI:**

01:54PM   15    Q.  Tell the jury what's depicted in that part of the kitchen

01:54PM   16    cabinet.

01:54PM   17    A.  Adderall and cocaine.  Adderall is in the prescription

01:54PM   18    bottles, and cocaine is in the package to the right.

01:54PM   19    Q.  Is -- did I circle the cocaine in that image?

01:54PM   20    A.  Yes.

01:54PM   21    **MR. TRIPI:**  May the record reflect the cocaine is

01:54PM   22    furthest towards the right of the photo.

01:54PM   23    Okay.  I skipped over 43A-9.  Let's go back to that

01:55PM   24    for just a moment.

       25

01:55PM   1          **BY MR. TRIPI:**

01:55PM   2   Q.  And what is that?

01:55PM   3   A.  A vacuum sealer to repackage the marijuana.

01:55PM   4          **MR. TRIPI:**  Okay.  Let's go to 43A-14.

01:55PM   5          **BY MR. TRIPI:**

01:55PM   6   Q.  Is that a close-up of that same cocaine in the kitchen?

01:55PM   7   A.  Yes.

01:55PM   8          **MR. TRIPI:**  Let's go to 43A-15.

01:55PM   9          **BY MR. TRIPI:**

01:55PM  10   Q.  Is that that vacuum sealer with some marijuana as it

01:55PM  11   looked before it was pulled out?

01:55PM  12   A.  Yes.

01:55PM  13          **MR. TRIPI:**  Let's go to 43A-17.

01:55PM  14          **BY MR. TRIPI:**

01:55PM  15   Q.  Do you know what that is?

01:55PM  16   A.  It looks to be a bag of marijuana.

01:55PM  17          **MR. TRIPI:**  Let's go to 43A-19.

01:55PM  18          **BY MR. TRIPI:**

01:55PM  19   Q.  What is that?

01:55PM  20   A.  It's Mark Falzone's address and Social Security Number.

01:55PM  21   Q.  And is that the address where you had marijuana delivered

01:55PM  22   several times from Jarrett Guy?

01:55PM  23   A.  Yes.

01:55PM  24   Q.  And you talked about that earlier today, right?

01:55PM  25   A.  Yes.

01:55PM   1        **MR. TRIPI:**  Okay.  Let's go to 43A-20.

01:55PM   2        **BY MR. TRIPI:**

01:55PM   3   Q.  Is that more marijuana that was inside the residence?

01:56PM   4   A.  Yes.

01:56PM   5        **MR. TRIPI:**  Let's go to 43A-22.

01:56PM   6        **BY MR. TRIPI:**

01:56PM   7   Q.  What is that?

01:56PM   8   A.  Those look like the fentanyl pills.

01:56PM   9   Q.  So, earlier in your testimony, you talked about the pills

01:56PM  10   that you would distribute to Anthony Gerace and I think a

01:56PM  11   couple other people you mentioned?

01:56PM  12   A.  Yes.

01:56PM  13   Q.  And pills that you also used.  Is that what you were

01:56PM  14   talking about?

01:56PM  15   A.  Yes.

01:56PM  16        **MR. TRIPI:**  Let's go to 43A-36.

01:56PM  17        **BY MR. TRIPI:**

01:56PM  18   Q.  What is that?

01:56PM  19   A.  That's a ledger with people that owed me money.

01:56PM  20   Q.  Okay.  Is that for drugs that you had provided?

01:56PM  21   A.  Yes.

01:56PM  22   Q.  Now, in that ledger, did you list out payments you were

01:56PM  23   making to DEA Bongiovanni in your ledger?

01:56PM  24   A.  No.

01:56PM  25   Q.  Why didn't you do that?

01:56PM   1   A.  That was a fixed cost.

01:56PM   2   Q.  Explain what that means for the jury.

01:56PM   3   A.  It was the same amount every month, so there's no point

01:56PM   4   to write it down.

01:56PM   5           **MR. TRIPI:**  Let's go to 43A-37.

01:56PM   6           **BY MR. TRIPI:**

01:56PM   7   Q.  What is that?

01:57PM   8   A.  My tax returns.

01:57PM   9   Q.  And does that reflect the amount of money you were making

01:57PM  10   from your businesses?

01:57PM  11   A.  Yes.

01:57PM  12   Q.  That year you were claiming over a thousand -- excuse

01:57PM  13   me -- over $1 million in adjusted gross income?

01:57PM  14   A.  Correct.

01:57PM  15           **MR. TRIPI:**  Let's go to 43A --

01:57PM  16           **BY MR. TRIPI:**

01:57PM  17   Q.  That's not including the money you made selling drugs,

01:57PM  18   correct?

01:57PM  19   A.  Correct.

01:57PM  20           **MR. TRIPI:**  Let's go to 43A-39.

01:57PM  21           **BY MR. TRIPI:**

01:57PM  22   Q.  Is that another scale inside of a drawer?

01:57PM  23   A.  Yes.

01:57PM  24           **MR. TRIPI:**  Let's go to 43A-40.

         25

01:57PM    1    **BY MR. TRIPI:**

01:57PM    2    Q.  What are those?

01:57PM    3    A.  Marijuana seeds.

01:57PM    4    Q.  So we've talked about indoor grows you set up, we've

01:57PM    5    talked about outdoor grows.  Are these the type of seeds you

01:57PM    6    would use?

01:57PM    7    A.  Yes.

01:57PM    8    Q.  Where would you get the seeds from?

01:57PM    9    A.  Canada.

01:57PM    10    **MR. TRIPI:**  Let's go to 43A-45.

01:57PM    11    **BY MR. TRIPI:**

01:57PM    12    Q.  Is that a look inside one of those black garbage bags

01:58PM    13    with more marijuana in it?

01:58PM    14    A.  Yes.

01:58PM    15    **MR. TRIPI:**  Let's go to 43A-46.

01:58PM    16    **BY MR. TRIPI:**

01:58PM    17    Q.  Is that another look inside a black bag with more

01:58PM    18    marijuana?

01:58PM    19    A.  Yes.

01:58PM    20    **MR. TRIPI:**  Let's go to 43A-47.

01:58PM    21    **BY MR. TRIPI:**

01:58PM    22    Q.  Were you also storing some items in the garage?

01:58PM    23    A.  Yes.

01:58PM    24    Q.  Is this a view into the garage?

01:58PM    25    A.  Yes.

01:58PM    1          MR. TRIPI:  Let's go to 43A-49.

01:58PM    2             BY MR. TRIPI:

01:58PM    3     Q.  How would you use those boxes?

01:58PM    4     A.  I put the marijuana in those to trans -- transport them.

01:58PM    5     Q.  Why did you put the marijuana in, like, U-Haul boxes?

01:58PM    6     A.  Just either garbage bags or U-Haul, less conspicuous if I

01:58PM    7     had to walk out of the house with a U-Haul box.

01:58PM    8          MR. TRIPI:  Okay.  Let's go to 43A-73.

01:58PM    9             BY MR. TRIPI:

01:58PM   10     Q.  Is that another scale, like, the third scale we've seen

01:58PM   11     inside the property?

01:58PM   12     A.  Yes.

01:58PM   13     Q.  Were all the scales used essentially to weigh marijuana

01:59PM   14     or other drugs?

01:59PM   15     A.  Yes.

01:59PM   16          MR. TRIPI:  Let's go to 43A-80.

01:59PM   17             BY MR. TRIPI:

01:59PM   18     Q.  Is this a view inside another bag, a garbage bag with

01:59PM   19     more of that marijuana we talked about?

01:59PM   20     A.  Yes.

01:59PM   21          MR. TRIPI:  Let's go to 43A-81.

01:59PM   22             BY MR. TRIPI:

01:59PM   23     Q.  Again, another view of more marijuana?

01:59PM   24     A.  Yes.

01:59PM   25          MR. TRIPI:  Let's go to 43A-82.

01:59PM  1          **BY MR. TRIPI:**

01:59PM  2   Q.  And this one, the packaging's a little different from

01:59PM  3   some of the other photos of marijuana; is that right?

01:59PM  4   A.  Yes.

01:59PM  5   Q.  Is this another example of the lower-grade marijuana?

01:59PM  6   A.  Correct.

01:59PM  7   Q.  So, the see-through bags that we saw packaged in the

01:59PM  8   see-through bags, that was higher quality?

01:59PM  9   A.  Yes.

01:59PM  10  Q.  And the -- this sort of brown wrapping is, like,

01:59PM  11  lower-grade marijuana?

01:59PM  12  A.  Correct.

01:59PM  13  Q.  And you sold it at different price points?

01:59PM  14  A.  Yes.

01:59PM  15          **MR. TRIPI:**  Let's go to 43A-84.

01:59PM  16          **BY MR. TRIPI:**

02:00PM  17  Q.  Was this another box inside the residence with more of

02:00PM  18  the higher-grade marijuana?

02:00PM  19  A.  Yes.

02:00PM  20  Q.  Okay.  Now, have you reviewed all the physical items of

02:00PM  21  evidence that were recovered from 91 Grimsby prior to today?

02:00PM  22  A.  Yes.

02:00PM  23  Q.  Okay.  I'm going to hand you up government exhibits in a

02:00PM  24  moment, I'll read them into the record now.  265, 268, 269,

02:00PM  25  270, 275, 276, 279, 280, 281A, 281B, 271, I apologize I'm out

02:00PM  1  of numerical order now, 273, 266, and 272, for now.

02:01PM  2      Okay?  I'm going to hand those up to you now.

02:01PM  3          **MR. TRIPI:**  I'm going to start with handing up

02:01PM  4  specifically 264 and 265, Your Honor.

02:01PM  5          **BY MR. TRIPI:**

02:01PM  6  Q.  Mr. Serio, you've seen those items before today; is that

02:01PM  7  right?

02:01PM  8  A.  Yes.

02:01PM  9  Q.  Can you confirm for this jury those are some of the items

02:01PM  10  of marijuana that we just saw in the photographs that were

02:01PM  11  inside 91 Grimsby?

02:01PM  12  A.  Yes, they are.

02:01PM  13  Q.  I'm going to hand you up 269 now.

02:02PM  14      Do you recognize 269 also to be more of the marijuana

02:02PM  15  that was inside 91 Grimsby?

02:02PM  16  A.  Yes.

02:02PM  17  Q.  Okay.  Handing up 272.  Do you recognize Exhibit 272 to

02:02PM  18  be more of the marijuana stored inside of your residence at

02:02PM  19  91 Grimsby?

02:02PM  20  A.  Yes.

02:02PM  21  Q.  Are each of these exhibits, I'll repeat them for the

02:02PM  22  record, 265, 264, 269, and 272, other than the fact that

02:03PM  23  they're in new packaging, in the same or substantially same

02:03PM  24  condition as you had them at your residence --

02:03PM  25  A.  Yes.

02:03PM  1  Q.  -- at 91 Grimsby?

02:03PM  2  A.  Yes.

02:03PM  3      **MR. TRIPI:**  The government offers those exhibits,

02:03PM  4  Your Honor.

02:03PM  5      **MR. MacKAY:**  No objection.

02:03PM  6      **THE COURT:**  Received without objection.

02:03PM  7   **(GOV Exhibit 265, 264, 269, 272 were received in evidence.)**

02:03PM  8      **MR. TRIPI:**  I'm going to publish them starting with

02:03PM  9  265.

02:03PM  10     Next, I've got 272 and 264.

02:03PM  11     **JUROR:**  (Indecipherable) of the garbage bags that were

02:03PM  12  found?

02:03PM  13     **MR. TRIPI:**  A juror asked a question, Judge.

02:03PM  14     **THE COURT:**  No.  So, folks, you can't ask that.  You

02:04PM  15  folks cannot ask questions.

02:04PM  16     **JUROR:**  I'm sorry.

02:04PM  17     **THE COURT:**  Yeah, you folks cannot ask questions.

02:04PM  18  You can ask questions of me, but not of the lawyers, okay?

02:04PM  19     **MR. TRIPI:**  One moment, Judge.

02:04PM  20     I'm going to ask the same question, I've cleared it

02:04PM  21  by counsel.

02:04PM  22     **BY MR. TRIPI:**

02:04PM  23  Q.  This -- this black bag that we see in Exhibit 265, is

02:04PM  24  it -- is that an example of one of the black garbage bags

02:04PM  25  that you stored the marijuana in?

02:04PM   1   A.   Yes.

02:04PM   2   Q.   Thank you.

02:04PM   3            **MR. TRIPI:**  And now publishing Exhibit 269.

02:05PM   4            **BY MR. TRIPI:**

02:05PM   5   Q.   Next I'd like to hand up Exhibit 267, Mr. Serio.

02:05PM   6        Do you recognize that?

02:05PM   7   A.   Yes.

02:05PM   8   Q.   Are those green fentanyl pills that were fake OxyContin?

02:05PM   9   A.   Yes.

02:05PM  10   Q.   Same question.  Other than being in this packaging that

02:05PM  11   law enforcement put it in, is it in the same or substantially

02:05PM  12   same condition as when was in your residence at 91 Grimsby?

02:05PM  13   A.   Yes.

02:05PM  14            **MR. TRIPI:**  The government offers 267, Your Honor.

02:05PM  15            **MR. MacKAY:**  No objection.

02:05PM  16            **THE COURT:**  Received without objection.

02:05PM  17            **(GOV Exhibit 267 was received in evidence.)**

02:05PM  18            **BY MR. TRIPI:**

02:05PM  19   Q.   Next I'm going to hand up Exhibit 266.  Do you recognize

02:06PM  20   Exhibit 266?

02:06PM  21   A.   Yes.

02:06PM  22   Q.   What is that?

02:06PM  23   A.   Cocaine.

02:06PM  24   Q.   Is that the cocaine we saw in the kitchen cabinet in 91

02:06PM  25   Grimsby in that photo?

02:06PM   1   A.   Yes.

02:06PM   2   Q.   Other than the fact that it's now repackaged per law

02:06PM   3   enforcement, is it in the same condition as it was in your

02:06PM   4   residence?

02:06PM   5   A.   Yes.

02:06PM   6           **MR. TRIPI:**  The government offers 266, Your Honor.

02:06PM   7           **MR. MacKAY:**  No objection.

02:06PM   8           **THE COURT:**  Received without objection.

02:06PM   9           **(GOV Exhibit 266 was received in evidence.)**

02:06PM   10          **BY MR. TRIPI:**

02:06PM   11  Q.   Now, Mr. Serio, you've been dealing with cocaine for a

02:06PM   12  long time?

02:06PM   13  A.   Yes.

02:06PM   14  Q.   Over time, does it sometimes change color a little bit?

02:06PM   15  A.   Yes.

02:06PM   16  Q.   Does this appear to have changed color just a little bit

02:06PM   17  from when you had it?

02:06PM   18  A.   Yes.

02:06PM   19  Q.   Can you explain why that happens?

02:06PM   20  A.   Because there's acetone in it, and over time the acetone

02:06PM   21  turns the -- the white cocaine turns beige.

02:06PM   22  Q.   And what is acetone used for in the context of cocaine

02:06PM   23  distribution?

02:06PM   24  A.   It's to make it hard again.  When someone cuts it, they

02:07PM   25  grind it up, put the cut in, put acetone on it, clamp it, and

02:07PM 1  then it becomes a rock again.

02:07PM 2  Q.  Now, you said "cut."  What is "cut" in the context of

02:07PM 3  cocaine?

02:07PM 4  A.  It's usually -- they use inositol, which is a vitamin,

02:07PM 5  and it's relatively cheap.  It makes, say, 1 ounce into

02:07PM 6  2 ounces, so you double your profit.

02:07PM 7  Q.  Is it basically another white powder people mix into the

02:07PM 8  cocaine to make it look like more cocaine?

02:07PM 9  A.  Yes.

02:07PM 10  Q.  Okay.  And could the amount of cut impact the quality of

02:07PM 11  the cocaine?

02:07PM 12  A.  Yes.

02:07PM 13        **MR. TRIPI:**  Publishing 266, Your Honor.

02:07PM 14        **BY MR. TRIPI:**

02:07PM 15  Q.  Now, in those photos we just went through, there were

02:07PM 16  several scales; is that right?

02:08PM 17  A.  Yes.

02:08PM 18  Q.  I'm going to hand you up Exhibits 270 and 275.

02:08PM 19     Do you recognize Exhibits 270 and 275?

02:08PM 20  A.  Yes.

02:08PM 21  Q.  What are those?

02:08PM 22  A.  Those are scales.

02:08PM 23  Q.  Are those the scales in the photos that we just saw a few

02:08PM 24  moments ago that were seized from 91 Grimsby?

02:08PM 25  A.  Yes.

02:08PM   1          **MR. TRIPI:**  The government offers 270 and 275,

02:08PM   2   Your Honor.

02:08PM   3          **MR. MacKAY:**  No objection.

02:08PM   4          **THE COURT:**  Received without objection.

02:08PM   5          **(GOV Exhibits 270, 275 were received in evidence.)**

02:08PM   6          **BY MR. TRIPI:**

02:08PM   7   Q.  Does one bag have two of the scales, and the other just

02:08PM   8   one?

02:08PM   9   A.  Yes.

02:08PM  10   Q.  Next I'm going to hand you 271 and 274.

02:09PM  11       Do you recognize Exhibits 271 and 274?

02:09PM  12   A.  Yes.

02:09PM  13   Q.  What do you recognize those to be?

02:09PM  14   A.  Adderall.

02:09PM  15   Q.  Were these in the prescription bottles that we saw in

02:09PM  16   some of the photos?

02:09PM  17   A.  Yes.

02:09PM  18   Q.  Other than the fact that the packaging's been changed

02:09PM  19   because it's in law enforcement possession now, are these the

02:09PM  20   same items that were in those pictures that you testified

02:09PM  21   about?

02:09PM  22   A.  Yes.

02:09PM  23          **MR. TRIPI:**  The government offers 274 and 271,

02:09PM  24   Your Honor.

02:09PM  25          **MR. MacKAY:**  No objection.

02:09PM 1    **THE COURT:** They're received without objections.

02:09PM 2    **(GOV Exhibits 271, 274 were received in evidence.)**

02:09PM 3    **MR. TRIPI:** Thank you.

02:09PM 4    **BY MR. TRIPI:**

02:09PM 5    Q.  What would you use the Adderall for, Mr. Serio?

02:09PM 6    A.  Just a -- it was a stimulant, because I have ADD.  But

02:09PM 7    they cut off my prescriptions, so I used to buy it on the

02:09PM 8    street.

02:09PM 9    Q.  How did the Adderall mix with or impact when you used the

02:10PM 10   other pills, the opiates?

02:10PM 11   A.  It would bring me up.  It's -- it's more like a cleaner

02:10PM 12   cocaine.

02:10PM 13   Q.  Okay.  Earlier, I think maybe Monday, you described

02:10PM 14   levelling off?

02:10PM 15   A.  Yes.

02:10PM 16   Q.  Is Adderall a drug you would take after you used opiates

02:10PM 17   to kind of wake yourself up?

02:10PM 18   A.  Yes.

02:10PM 19   Q.  Do you call that "levelling off?"

02:10PM 20   A.  Yes.

02:10PM 21   Q.  I'm handing up Exhibit 268.  Do you recognize Exhibit

02:10PM 22   268?

02:10PM 23   A.  Yes.

02:10PM 24   Q.  What do you recognize it to be?

02:10PM 25   A.  Marijuana seeds.

02:10PM   1   Q.  Were those the marijuana seeds we saw in the photo not

02:10PM   2   too long ago?

02:10PM   3   A.  Yes.

02:10PM   4   Q.  Again, other than the fact that it's in law enforcement

02:10PM   5   custody now, in their packaging, are they in the same or

02:10PM   6   substantially same condition today as when they were in your

02:10PM   7   residence at 91 Grimsby?

02:10PM   8   A.  Yes.

02:10PM   9           **MR. TRIPI:**  The government offers 268, Your Honor.

02:10PM  10           **MR. MacKAY:**  No objection.

02:10PM  11           **THE COURT:**  Received without objection.

02:10PM  12           **(GOV Exhibit 268 was received in evidence.)**

02:10PM  13           **MR. TRIPI:**  Thank you.  Publishing for the jury.

02:11PM  14           **BY MR. TRIPI:**

02:11PM  15   Q.  Mr. Serio, does each seed in there represent one

02:11PM  16   marijuana plant?

02:11PM  17   A.  Yes.

02:11PM  18   Q.  Handing up Exhibit 276.  Actually, placing it on the

02:11PM  19   floor next to him, Mr. Serio, can you see that sufficiently?

02:11PM  20   A.  Yes.

02:11PM  21   Q.  Is Exhibit 276 there the same marijuana and boxed that's

02:11PM  22   depicted in Exhibit 43A-84?

02:11PM  23   A.  Yes.

02:11PM  24   Q.  Again, other than the fact it's in law enforcement

02:11PM  25   custody and has some other labelling on it, is it in the same

02:12PM  1    or substantially same condition today as when it was in 91

02:12PM  2    Grimsby?

02:12PM  3    A.  Yes.

02:12PM  4            MR. TRIPI:  The government offers 276, Your Honor.

02:12PM  5            MR. MacKAY:  No objection.

02:12PM  6            THE COURT:  Received without objection.

02:12PM  7            (GOV Exhibit 276 was received in evidence.)

02:12PM  8            MR. TRIPI:  I'm going to try to publish it for the

02:12PM  9    jury without spilling it everywhere this time.

02:12PM  10           BY MR. TRIPI:

02:12PM  11   Q.  How many pounds do you think are in this box, Mr. Serio?

02:12PM  12   A.  Probably 20 or 30.  Probably 20.

02:12PM  13   Q.  So I shouldn't be struggling this much?

02:12PM  14       I'm next handing up 277, 278, and 279.

02:12PM  15       Do you recognize 277, 278, and 279?

02:13PM  16   A.  Yes.

02:13PM  17   Q.  What do you recognize that to be?

02:13PM  18   A.  Marijuana.

02:13PM  19   Q.  Is that more of the marijuana that was seized from inside

02:13PM  20   the premises at 91 Grimsby on April 18th, 2017?

02:13PM  21   A.  Correct.

02:13PM  22   Q.  Other than the fact that it's now packaged in law

02:13PM  23   enforcement packaging, is it in the same or substantially

02:13PM  24   same condition today as when it was seized?

02:13PM  25   A.  Yes.

02:13PM   1   Q.   Now, does that also include a couple duffle bags and

02:13PM   2   garbage bags that the marijuana was in?

02:13PM   3   A.   Correct.

02:13PM   4           **MR. TRIPI:**  The government offers Exhibits 277, 278,

02:13PM   5   and 279, Your Honor.

02:13PM   6           **MR. MacKAY:**  No objection.

02:13PM   7           **THE COURT:**  They are received without objection.

02:13PM   8       **(GOV Exhibits 277, 278, 279 were received in evidence.)**

02:13PM   9           **MR. TRIPI:**  Publishing them for the jury.  The first

02:13PM  10   up is 277.  Next we'll do 278 and 279 together, Your Honor.

02:14PM  11           **BY MR. TRIPI:**

02:14PM  12   Q.   Last, I'm going to hand up 281A and B.

02:14PM  13       Take a look in there.  Do you recognize Exhibit 281A and

02:14PM  14   281B?

02:14PM  15   A.   Yes.

02:14PM  16   Q.   Is that more of the marijuana that was seized from inside

02:15PM  17   91 Grimsby?

02:15PM  18   A.   Yes.

02:15PM  19   Q.   Is it in the same or substantially same condition today

02:15PM  20   as the last time you saw it --

02:15PM  21   A.   Yes.

02:15PM  22   Q.   -- other than the fact that it's repackaged by law

02:15PM  23   enforcement?

02:15PM  24   A.   Yes.

02:15PM  25           **MR. TRIPI:**  The government offers 281A and B,

02:15PM    1    Your Honor.

02:15PM    2              **MR. MacKAY:**  No objection.

02:15PM    3              **THE COURT:**  Received without objection.

02:15PM    4          **(GOV Exhibits 281A, 281B were received in evidence.)**

02:15PM    5              **MR. TRIPI:**  Thank you.  Publishing it for the jury.

02:15PM    6              **BY MR. TRIPI:**

02:15PM    7    Q.  All right.  Now, your Range Rover was seized by law

02:15PM    8    enforcement, impounded that day?

02:15PM    9    A.  Correct.

02:15PM   10    Q.  Did you have some stuff in there, too?

02:15PM   11    A.  Yes.

02:15PM   12    Q.  Did you have some money?

02:15PM   13    A.  Yes.

02:15PM   14    Q.  Did you have some evidence of your drug dealing in there?

02:15PM   15    A.  Yes.

02:15PM   16    Q.  Okay.  I'm going to hand up a few more photos, Government

02:16PM   17    Exhibits 43A-93, 43A-94, 43A-95, 43A-96, 43A-97, 43A-98, and

02:16PM   18    43A-99.

02:16PM   19        Take a moment and look at these.  When you're done, look

02:16PM   20    back at me.

02:16PM   21        Do you recognize -- pardon me -- what's depicted in those

02:16PM   22    photos?

02:16PM   23    A.  Yes.

02:16PM   24    Q.  What is that?

02:16PM   25    A.  That is marijuana, money, and cell phones.

02:16PM   1   Q.  All as were contained inside your Range Rover on

02:16PM   2   April 18th, 2017?

02:16PM   3   A.  Correct.

02:17PM   4   Q.  Do they fairly and accurately depict your Range Rover and

02:17PM   5   the items you had in it the day you were arrested,

02:17PM   6   April 18th, 2017?

02:17PM   7   A.  Yes.

02:17PM   8           **MR. TRIPI:**  The government offers those Exhibits,

02:17PM   9   Your Honor.

02:17PM  10           **MR. MacKAY:**  No objection.

02:17PM  11           **THE COURT:**  Received without objection.

02:17PM  12           **(GOV Exhibits 43A-93, 43A-94, 43A-95, 43A-96,**

02:17PM  13      **43A-97, 43A-98, and 43A-99 were received in evidence.)**

02:17PM  14           **MR. TRIPI:**  Thank you.  Ms. Champoux, can we start

02:17PM  15   with 43A-93?

02:17PM  16           **BY MR. TRIPI:**

02:17PM  17   Q.  This is the front shot of your Range Rover and your

02:17PM  18   license plate?

02:17PM  19   A.  Yes.

02:17PM  20           **MR. TRIPI:**  Let's go to 43A-94, Ms. Champoux.

02:17PM  21           **BY MR. TRIPI:**

02:17PM  22   Q.  Tell the jury what they're looking at here.

02:17PM  23   A.  A pound of marijuana.

02:17PM  24   Q.  And how would you conceal it in your Range Rover?

02:17PM  25   A.  The back seat folds up, and I put it in there and put it

02:17PM    1   back down.

02:17PM    2   Q.  Okay.

02:17PM    3        **MR. TRIPI:**  Let's go to 43A-99.

02:17PM    4        **BY MR. TRIPI:**

02:17PM    5   Q.  Is that another view or angle of how you would conceal

02:17PM    6   the marijuana in the vehicle?

02:17PM    7   A.  Yes.

02:17PM    8        **MR. TRIPI:**  All right.  Let's go to 43A-96.

02:17PM    9        **BY MR. TRIPI:**

02:18PM   10   Q.  And what's depicted there?

02:18PM   11   A.  A box of money.

02:18PM   12   Q.  How much money were you driving around with,

02:18PM   13   approximately?

02:18PM   14   A.  I think it was 20-, 22,000.

02:18PM   15        **MR. TRIPI:**  Ms. Champoux, can we go to 43A-97?

02:18PM   16        **BY MR. TRIPI:**

02:18PM   17   Q.  Is that the money?

02:18PM   18   A.  Yes.

02:18PM   19   Q.  Closer view?

02:18PM   20        And did you also have multiple cell phones with you in

02:18PM   21   the car?

02:18PM   22   A.  Yes.

02:18PM   23        **MR. TRIPI:**  Can we go to 43A-98.

02:18PM   24        **BY MR. TRIPI:**

02:18PM   25   Q.  Okay.  What do we see here?

02:18PM    1    A.  Three cell phones.

02:18PM    2    Q.  All right.  I'm going to work from the top, down.

02:18PM    3        First -- first one that I indicated to you, the top of

02:18PM    4    the screen, top of the photo down, what's that one?

02:18PM    5    A.  An iPhone.  It was one of my personal ones, I think it

02:18PM    6    was broke, though.

02:18PM    7    Q.  Okay.  And now there's another one next to that.  What is

02:18PM    8    that?

02:18PM    9    A.  That was another personal iPhone.

02:19PM   10    Q.  iPhone?

02:19PM   11        And then the third one down, is that a Samsung flip

02:19PM   12    phone?

02:19PM   13    A.  Yes.

02:19PM   14    Q.  What type of phone was that?

02:19PM   15    A.  It's a burner phone.

02:19PM   16    Q.  Okay.  With respect to the phones depicted, this Samsung

02:19PM   17    and the iPhone that we see the screens on, did you consent to

02:19PM   18    a search of those phones ultimately, for the FBI to search

02:19PM   19    those phones?

02:19PM   20    A.  Yes.

02:19PM   21    Q.  And did you do that, you know, with your lawyer's

02:19PM   22    knowledge and consent as well?

02:19PM   23    A.  Yes.

02:19PM   24    Q.  We'll get back to those phones in a moment.

02:19PM   25        But were those -- were the cell phone and the iPhone

02:19PM    1    extracted in terms of the content, the text messages and call

02:19PM    2    logs that you had?

02:20PM    3    A.   Yes.

02:20PM    4    Q.   Have you reviewed those items?

02:20PM    5    A.   Correct.

02:20PM    6    Q.   Okay.  We'll go into those in a little bit, okay?

02:20PM    7         **MR. TRIPI:**  You can take that down, Ms. Champoux.

02:20PM    8         **BY MR. TRIPI:**

02:20PM    9    Q.   Now before I get more sort of fully into those phones, I

02:20PM   10    want to ask you a couple questions, though, okay?

02:20PM   11    A.   Okay.

02:20PM   12    Q.   So, from late 2012 to 2015, were marijuana and cocaine

02:20PM   13    distribution activities happening at your house at 697

02:20PM   14    Lebrun?

02:20PM   15    A.   Yes.

02:20PM   16    Q.   Was that happening in 2013?

02:20PM   17    A.   Yes.

02:20PM   18    Q.   Was that happening in 2014?

02:20PM   19    A.   Yes.

02:20PM   20    Q.   Was that happening in 2015?

02:20PM   21    A.   Yes.

02:20PM   22    Q.   Did it continue in 2016?

02:20PM   23    A.   Yes.

02:20PM   24    Q.   2017?

02:20PM   25    A.   Yes.

02:20PM 1   Q. Were people that were part of your distribution network

02:20PM 2   coming and going?

02:20PM 3   A. Yes.

02:20PM 4   Q. Were U-Hauls utilized to deliver marijuana to that

02:21PM 5   property?

02:21PM 6   A. Yes.

02:21PM 7   Q. Were you making trips from that property to New York City

02:21PM 8   and back that were drug related?

02:21PM 9   A. Yes.

02:21PM 10   Q. In that window of time, did you also store marijuana at

02:21PM 11   Lou Selva's house?

02:21PM 12   A. Yes.

02:21PM 13   Q. At times, were drugs delivered to 82 Sycamore, your

02:21PM 14   warehouse?

02:21PM 15   A. Yes.

02:21PM 16   Q. Were a whole bunch of other people selling marijuana and

02:21PM 17   other drugs you supplied?

02:21PM 18   A. Yes.

02:21PM 19   Q. At times, were you driving around with money and drugs in

02:21PM 20   your vehicle?

02:21PM 21   A. Yes.

02:21PM 22   Q. Were you storing firearms and marijuana in your house?

02:21PM 23   A. Yes.

02:21PM 24   Q. Were you paying Defendant Bongiovanni monthly to protect

02:21PM 25   you because you were doing all of that?

02:21PM   1   A.  Yes.

02:21PM   2   Q.  By that point in time, was Mike Masecchia making about --

02:21PM   3   how much was he making about per month with you?

02:22PM   4   A.  At least 20,000.

02:22PM   5   Q.  How much were you making a month?

02:22PM   6   A.  Depends.  Anywhere, 75-, 150,000.  Sometimes more.

02:22PM   7        **MR. TRIPI:**  Ms. Champoux, can we pull up Government

02:22PM   8   Exhibit 145, please?

02:22PM   9        I'd like that go to paragraph 12A.  Actually, let's

02:22PM  10   go back to first page for a moment.

02:22PM  11        **BY MR. TRIPI:**

02:22PM  12   Q.  Mr. Serio, the -- the residence and the location here is

02:22PM  13   not important, but can you read what it says under the

02:22PM  14   address?

02:22PM  15   A.  Located in the Western New York --

02:22PM  16   Q.  No, right here.  I'm going to circle it.

02:22PM  17   A.  Oh, okay.  Federal law enforcement officer.

02:22PM  18   Q.  No.  The big bold capital sentence.

02:22PM  19   A.  Oh.  Application for search warrant.

02:22PM  20   Q.  Okay.  And do you see the date here?

02:23PM  21   A.  April 14, 2017.

02:23PM  22   Q.  Okay.  So that's about four days before you're arrested?

02:23PM  23   A.  Yes.

02:23PM  24   Q.  And do you see the name of the agent associated with this

02:23PM  25   application?

02:23PM    1    A.   Yes.

02:23PM    2    Q.   What's the name?

02:23PM    3    A.   Joseph Bongiovanni.

02:23PM    4         **MR. TRIPI:**  Ms. Champoux, let's go to paragraph 12A,

02:23PM    5    please.

02:23PM    6         **BY MR. TRIPI:**

02:23PM    7    Q.   Have you ever seen this document before, Mr. Serio?

02:23PM    8    A.   I believe at the last trial.

02:23PM    9    Q.   Okay.  I want you to read paragraph 12A from the word "my

02:23PM   10    discussions," and then continue reading into paragraph,

02:23PM   11    subparagraph A.

02:23PM   12    A.   My discussions with other experienced special agents and

02:23PM   13    task force officers of the DEA, I have learned --

02:23PM   14    Q.   Can you move the mic towards you so we can hear?

02:23PM   15    A.   I'm sorry.

02:23PM   16    Q.   That's okay.

02:23PM   17    A.   My discussions with other experienced special agents and

02:24PM   18    task force officers of the DEA, I have learned:

02:24PM   19         A.   That narcotics traffickers frequently maintain at

02:24PM   20    their residence or place of business, or at residences of

02:24PM   21    other drug associates, amounts of controlled substances and

02:24PM   22    large amounts of currency on hand in order to maintain and

02:24PM   23    finance their ongoing narcotics business.

02:24PM   24         **MR. TRIPI:**  Ms. Champoux, next to this document, can

02:24PM   25    we pull up Exhibits 43A-80 and 43A-82?

02:24PM    1              **BY MR. TRIPI:**

02:24PM    2    Q.  Are those images of controlled substances you had stored

02:24PM    3    in your residence, 43A-80 and 82?

02:24PM    4    A.  Yes.

02:24PM    5              **MR. TRIPI:**  Ms. Champoux, can we take down 43A-80 and

02:24PM    6    82 and put up 42A-11?  We need to keep up 12A, though.

02:25PM    7    42A-11.

02:25PM    8              **BY MR. TRIPI:**

02:25PM    9    Q.  Is 42A-11 marijuana you had in 697 Lebrun?

02:25PM   10    A.  Yes.

02:25PM   11              **MR. MacKAY:**  Judge, I'm going to object.  Can we

02:25PM   12    approach on this line of questioning?

02:25PM   13              **THE COURT:**  Sure, come on up.

02:25PM   14              (Sidebar discussion held on the record.)

02:25PM   15              **MR. MacKAY:**  I think it's something akin to a 403

02:25PM   16    objection, that he's sort of trying to compare the evidence

02:25PM   17    and then get the jury to make a legal conclusion about whether

02:25PM   18    there's probable cause based on what a separate search warrant

02:25PM   19    embodies in its -- in its terms.

02:25PM   20              But, so what he's doing is going through the

02:26PM   21    paragraphs in the search warrant that he used to support

02:26PM   22    probable cause, and then comparing them to what's found.

02:26PM   23              I think that's asking the jury to make an improper

02:26PM   24    legal conclusion to assume it's probable cause that

02:26PM   25    Mr. Bongiovanni would have found or should have found through

02:26PM 1 a search warrant.

02:26PM 2 **MR. TRIPI:** All I'm doing is using evidence that's in

02:26PM 3 through a witness showing them photos that are in, things that

02:26PM 4 were seized from him, and showing another document that's also

02:26PM 5 in evidence. I'm not asking the jury -- I'm not arguing at

02:26PM 6 all right now, I'm just going through evidence. It's fully

02:26PM 7 appropriate.

02:26PM 8 **THE COURT:** Yeah, I think that argument he made might

02:26PM 9 be inappropriate, but I think the fact that he's shown that

02:26PM 10 Mr. Bongiovanni says these are things that from my experience

02:26PM 11 I know that drug dealers do, and then shows that this

02:26PM 12 gentleman, who's a drug dealer, is doing that, I don't see any

02:26PM 13 problem with that.

02:26PM 14 **MR. MacKAY:** I think if it's -- I mean, I understand

02:26PM 15 the Court's analysis. I think if it goes further in any sort

02:27PM 16 of questioning about that, then I think that certainly crossed

02:27PM 17 the line into --

02:27PM 18 **THE COURT:** It might. It might. And I would

02:27PM 19 consider it then. But I don't -- I'm not hearing any reason I

02:27PM 20 would sustain the objection now.

02:27PM 21 **MR. MacKAY:** Right. And you know what? I don't know

02:27PM 22 how long we're going to go on this, but I know we did have

02:27PM 23 Paul Parisi go through the search warrant already and what's

02:27PM 24 in there, so --

02:27PM 25 **THE COURT:** I -- I don't think it's crossed any lines

02:27PM    1    so far, so I'm going to overrule the objection.

02:27PM    2         **MR. MacKAY:**  Thank you.

02:27PM    3         (End of sidebar discussion.)

02:27PM    4         **THE COURT:**  The objection is overruled.

02:27PM    5         **MR. TRIPI:**  Can we pull that back up, please,

02:27PM    6    Ms. Champoux?

02:27PM    7         **BY MR. TRIPI:**

02:27PM    8    Q.  So did you keep drugs and money at your residence?

02:27PM    9    A.  Yes.

02:27PM   10         **MR. TRIPI:**  Let's pull up Exhibit 145 at

02:28PM   11    paragraph 12B.

02:28PM   12         Did we lose our equipment?  Okay.

02:28PM   13         **BY MR. TRIPI:**

02:28PM   14    Q.  Can you read that paragraph B, please?

02:28PM   15    A.  That narcotics traffickers frequently maintain books,

02:28PM   16    records, receipts, notes, ledgers, airline tickets, money

02:28PM   17    orders, and other papers relating to transport -- to the

02:28PM   18    transportation, ordering, sale, and distribution of

02:28PM   19    controlled substances, including butyrfentanyl.

02:28PM   20    Q.  You can skip the butyrfentanyl part.

02:28PM   21    A.  Okay.

02:28PM   22    Q.  Continue reading from "furthermore."

02:28PM   23    A.  Furthermore, I know that the aforementioned books,

02:28PM   24    records, receipts, notes, ledgers, et cetera, are generally

02:28PM   25    maintained where the traffickers have ready access to them,

02:28PM    1    such as a residence.

02:28PM    2    Q.  Did you keep records, receipts, notes, and ledgers at

02:28PM    3    your residences?

02:28PM    4    A.  Yes.

02:28PM    5         **MR. TRIPI:**  Ms. Champoux, can we pull up exhibits

02:28PM    6    next to this 43A-36 and 37?

02:29PM    7         **BY MR. TRIPI:**

02:29PM    8    Q.  In 43A-37, do we see some of your tax documents?

02:29PM    9    A.  Yes.

02:29PM   10    Q.  And 43A-36, do we see a ledger that you had at 91

02:29PM   11    Grimsby?

02:29PM   12    A.  Yes.

02:29PM   13         **BY MR. TRIPI:**  We can pull down 43A-37 and 36,

02:29PM   14    Ms. Champoux.

02:29PM   15         And let's go to paragraph 12-C of Exhibit 145,

02:29PM   16    please.

02:29PM   17         Give me one second, Judge.  Sorry.

02:29PM   18         **BY MR. TRIPI:**

02:29PM   19    Q.  Can you read paragraph 12-C?

02:29PM   20    A.  That it is common for dealers to secrete contraband,

02:29PM   21    proceeds of drug sales, and records of drug transactions in

02:29PM   22    secure locations within the residence.

02:29PM   23    Q.  Did you keep contraband, proceeds, and money from drug

02:29PM   24    sales, and records of your transactions at your residences?

02:29PM   25    A.  Yes.

02:30PM    1    Q.  Let's read 12-D.

02:30PM    2    A.  That persons involved in drug trafficking or significant

02:30PM    3    drug traffickers conceal proceeds of drug sales, records of

02:30PM    4    drug transactions, firearms, ammunition, caches of drugs,

02:30PM    5    large amounts of currency, financial instruments, keys for

02:30PM    6    safe deposit boxes, precious metals, jewelry, and other items

02:30PM    7    of value, and/or proceeds of drug transactions and/or of

02:30PM    8    evidence of financial transactions relating to obtaining,

02:30PM    9    transferring, secreting, or spending large sums of money made

02:30PM   10    from engaging in narcotics trafficking in their residence and

02:30PM   11    other secure locations, including at the residence of their

02:30PM   12    drug associates and/or family members, in order to conceal

02:30PM   13    them from law enforcement authorities.

02:30PM   14    Q.  Did you keep firearms and other records consistent with

02:30PM   15    what you just read in that paragraph at 697 Lebrun?

02:30PM   16    A.  Yes.

02:31PM   17    Q.  Did you keep it at 91 Grimsby?

02:31PM   18    A.  Yes.

02:31PM   19    Q.  Did you keep drugs at times at 82 Sycamore?

02:31PM   20    A.  Yes.

02:31PM   21    Q.  Did you put 82 Sycamore in the name of a family member to

02:31PM   22    conceal it from yourself?

02:31PM   23    A.  Yes.

02:31PM   24    Q.  Who was that family member again?

02:31PM   25    A.  Sam Tedesco.

02:31PM   1   Q.   Can we read 12-B, please?

02:31PM   2   A.   That narcotics traffickers commonly maintain records of

02:31PM   3   telephone calls and billing statements, addresses, or

02:31PM   4   telephone numbers in books or papers which reflects names,

02:31PM   5   addresses, and telephone numbers of their associates in their

02:31PM   6   narcotics trafficking organization, as well as photographs of

02:31PM   7   themselves and their drug-trafficking associates.

02:31PM   8   Q.   Did you keep names and addresses of people in your

02:31PM   9   organization in your possession?

02:31PM   10   A.   Yes.

02:31PM   11   Q.   Were a lot of those stored in your phone?

02:31PM   12   A.   Yes.

02:31PM   13   Q.   Can you read paragraph 12-F, please?

02:31PM   14   A.   That traffickers in Schedule I and II controlled

02:31PM   15   substances commonly keep paraphernalia for manufacturing,

02:32PM   16   packaging, weighing, processing and distributing of

02:32PM   17   Schedule I and II controlled substances.

02:32PM   18   Q.   Did you keep packaging material in your properties?

02:32PM   19   A.   Yes.

02:32PM   20   Q.   Did you keep heat sealers in your properties?

02:32PM   21   A.   Yes.

02:32PM   22   Q.   Did you keep money counters in your properties?

02:32PM   23   A.   Yes.

02:32PM   24   Q.   Were all those things you used as part of your drug

02:32PM   25   trade?

02:32PM  1   A.  Yes.

02:32PM  2   Q.  Did you keep scales in your property?

02:32PM  3   A.  Yes.

02:32PM  4   Q.  Can you read paragraph 12-G?

02:32PM  5   A.  That I'm aware -- that I am aware that the courts have

02:32PM  6   recognized that unexplained wealth is prohibitive of evidence

02:32PM  7   of crimes motivated, at least in part by greed, in particular

02:32PM  8   trafficking in controlled substances, I am also aware.

02:32PM  9          **MR. TRIPI:**  Ms. Champoux, can we go on to page 11 so

02:32PM  10  we can scroll down a little bit?

02:32PM  11          **BY MR. TRIPI:**

02:32PM  12  Q.  It continues up here, Mr. Serio.

02:33PM  13  A.  That many courts have found that weapons, including

02:33PM  14  firearms and ammunition, are among the tools of the trade in

02:33PM  15  narcotics businesses.

02:33PM  16  Q.  Did you have evidence of wealth in your residences?

02:33PM  17  A.  Yes.

02:33PM  18  Q.  Was your residence itself evidence of wealth?

02:33PM  19  A.  Yes.

02:33PM  20  Q.  Did you have firearms and ammunition inside 697 Lebrun?

02:33PM  21  A.  Yes.

02:33PM  22  Q.  Could we read -- last one I want to read here is 12-I.

02:33PM  23  A.  That in my experience that drug traffickers routinely

02:33PM  24  register their personal vehicles or vehicles used as

02:33PM  25  conveyances for drug trafficking in the names of persons

02:33PM   1   other than themselves.  This practice is routinely done for

02:33PM   2   the purpose of deceiving law enforcement as to the identity

02:33PM   3   of the true owner or operator of the vehicle, and to protect

02:33PM   4   the vehicle from possible seizure or future litigation.

02:33PM   5   Q.  In terms of -- I asked you about 82 Sycamore and 608

02:34PM   6   Michigan, that property was in the name of a relative?

02:34PM   7   A.  Correct.

02:34PM   8   Q.  Okay.

02:34PM   9         **MR. TRIPI:**  You can take that down, Ms. Champoux.

02:34PM  10         **BY MR. TRIPI:**

02:34PM  11   Q.  By the time you had been arrested, had you been working

02:34PM  12   directly in a partnership with Mike Masecchia since 2008?

02:34PM  13   A.  Yes.

02:34PM  14   Q.  You never got arrested between 2008 and April of 2017?

02:34PM  15   A.  No.

02:34PM  16   Q.  Did Masecchia ever get arrested?

02:34PM  17   A.  No.

02:34PM  18   Q.  Had you made millions of dollars?

02:34PM  19   A.  Yes.

02:34PM  20   Q.  Was Masecchia doing well?

02:34PM  21   A.  Yes.

02:35PM  22         **MR. TRIPI:**  Just a moment, please.

02:35PM  23         I just need a moment to get organized, Your Honor,

02:35PM  24   I'm sorry.

02:35PM  25         Ms. Champoux, for a few moments can we keep up

02:36PM    1    Government Exhibit 43A-89 on the screen?

02:36PM    2         **BY MR. TRIPI:**

02:36PM    3    Q.   Mr. Serio, I'm going to start by handing up Government

02:36PM    4    Exhibit 48.   I've taken it out of the envelope.   Can you take

02:36PM    5    a look at that?

02:36PM    6       Do you recognize Exhibit 48 to be your Samsung flip phone

02:36PM    7    that's depicted in Government Exhibit 43A-98?

02:36PM    8    A.   Yes.

02:36PM    9    Q.   Can you just push that to the side for me for a moment?

02:37PM   10       Next I'm going to hand up Government Exhibit 44.

02:37PM   11       Can you look at Exhibit 44 for me?

02:37PM   12       Do you recognize that?

02:37PM   13    A.   Yes.

02:37PM   14    Q.   What do you recognize it to be?

02:37PM   15    A.   My broken iPhone.

02:37PM   16    Q.   Is this the iPhone with the crack that we see right there

02:37PM   17    with the screen on?

02:37PM   18    A.   I think it's the top iPhone.   The piece is missing right

02:37PM   19    there.

02:37PM   20    Q.   All right.   Well that one, if that was the one that was

02:37PM   21    able to be extracted, is it the one in the middle then?

02:37PM   22    A.   Yes.

02:37PM   23    Q.   Okay.   I'm going to hand you up Government Exhibits 45

02:37PM   24    and 46.

02:37PM   25       Do you remember looking at that CD that's Government

02:37PM   1    Exhibit 45?

02:37PM   2    A.   Yes.

02:37PM   3    Q.   Do you remember reviewing that and confirming it's the

02:38PM   4    contents of your iPhone that you consented for the FBI to

02:38PM   5    search?

02:38PM   6    A.   Yes.

02:38PM   7    Q.   And with respect to Government Exhibit 46, I want you to

02:38PM   8    look at that for a moment.

02:38PM   9         With respect to Government Exhibit 46, do you recognize

02:38PM  10    that to be contacts that you had stored in your iPhone?

02:38PM  11    A.   Yes.

02:38PM  12    Q.   Do those fairly and accurately depict a number of the

02:38PM  13    contacts stored in your iPhone, not all of them, but a number

02:38PM  14    of them?

02:38PM  15    A.   Yes.

02:38PM  16    Q.   Now I'd like to hand you up Government Exhibit 49.  It's

02:38PM  17    a printout.  Have you looked at that before today?

02:38PM  18    A.   Yes.

02:38PM  19    Q.   Do you recognize Exhibit 49 to be extracted information

02:38PM  20    from the Samsung flip phone?

02:38PM  21    A.   Yes.

02:39PM  22         **MR. TRIPI:**  Your Honor, the government's going to

02:39PM  23    offer just Government Exhibit 46 and 49, so the extraction

02:39PM  24    reports.

02:39PM  25         **MR. MacKAY:**  No objection to those two exhibits.

02:39PM   1    **THE COURT:**  They're received without objection.

02:39PM   2    **(GOV Exhibits 46, 49 were received in evidence.)**

02:39PM   3    **BY MR. TRIPI:**

02:39PM   4    Q.  I'd like to work through some of these, through

02:39PM   5    Exhibit 46 a little bit, Mr. Serio, okay?

02:39PM   6    **MR. TRIPI:**  We can take down 43A-98, Ms. Champoux.

02:39PM   7    And if we can please pull up Government Exhibit 46?

02:39PM   8    **BY MR. TRIPI:**

02:40PM   9    Q.  Again, do you recognize this to be contacts that you had

02:40PM   10   stored in your iPhone?

02:40PM   11   A.  Yes.

02:40PM   12   **MR. TRIPI:**  Ms. Champoux, can we please zoom in on

02:40PM   13   maybe the first four of them so that we can see it better?

02:40PM   14   **BY MR. TRIPI:**

02:40PM   15   Q.  All right.  I'd like to go through some of these, entry

02:40PM   16   number 1, who is that?

02:40PM   17   A.  Angelo Natali.

02:40PM   18   Q.  And you have an entry number for him there?

02:40PM   19   A.  Yes.

02:40PM   20   Q.  Entry number 2, who is that?

02:40PM   21   A.  Anthony Gerace.

02:40PM   22   Q.  And you have a phone number listed for him there?

02:40PM   23   A.  Yes.

02:40PM   24   Q.  Is he actually entries number 2 and 3?

02:40PM   25   A.  Correct.

02:40PM 1   Q.  And that's the Anthony Gerace that you've been discussing

02:40PM 2   earlier; is that right?

02:40PM 3   A.  Yes.

02:40PM 4   Q.  Okay.  Entry number 4, Anthony Mayo, who is that?

02:40PM 5   A.  Another associate of mine.

02:40PM 6   Q.  You've mentioned him before; is that right?

02:40PM 7   A.  Yes.

02:40PM 8   Q.  Is he someone you would get -- distribute those pills to?

02:40PM 9   A.  No, that would be Anthony Greco.

02:41PM 10  Q.  Okay.  Anthony Mayo, what was his role?

02:41PM 11  A.  Just marijuana.

02:41PM 12  Q.  Distributor?

02:41PM 13  A.  Yes.

02:41PM 14  Q.  Okay.  Let's go to lines 5, and 6.

02:41PM 15  You have an entry there for Ash S.  Who is that?

02:41PM 16  A.  I'm not quite sure because them contacts were also in

02:41PM 17  my -- my wife's contacts were my contacts.

02:41PM 18  Q.  Did your wife know an Ashley Schuh?

02:41PM 19  A.  Yes.

02:41PM 20  Q.  Do you believe that to be the entry for that Ash S?

02:41PM 21  A.  Could possibly, because there was another Ash S that

02:41PM 22  lived in one of my apartments.

02:41PM 23         **MR. TRIPI:**  All right.  Can we that down and just for

02:41PM 24  the witness only.

25

02:41PM    1          **BY MR. TRIPI:**

02:41PM    2   Q.  I'm going to see if I can refresh your recollection and

02:41PM    3   have you look at Government Exhibit 3536BA.

02:41PM    4          **MR. TRIPI:**  If we can go to page 83?

02:41PM    5          **BY MR. TRIPI:**

02:41PM    6   Q.  Read that to yourself.  And then let me know -- look back

02:41PM    7   at me when you're done reading it, okay?

02:42PM    8   A.  Okay.

02:42PM    9          **MR. TRIPI:**  Take that down, Ms. Champoux.

02:42PM   10          **BY MR. TRIPI:**

02:42PM   11   Q.  Did that refresh your recollection who -- as to who you

02:42PM   12   believe Ash S is in your phone?

02:42PM   13   A.  Yes.

02:42PM   14   Q.  And who do you believe that to be?

02:42PM   15   A.  Ashley Schuh.

02:42PM   16   Q.  Would that be the sister of Defendant Bongiovanni's wife?

02:42PM   17   A.  Yes.

02:42PM   18   Q.  Did your brother at a certain point, Tom, have a

02:42PM   19   relationship with Ashley Schuh?

02:42PM   20   A.  Yes.

02:42PM   21   Q.  Describe that relationship for the jury.

02:42PM   22   A.  It wasn't a good relationship.

02:42PM   23   Q.  When was it?

02:42PM   24   A.  That was 2016 into '17.

02:42PM   25   Q.  Were you still involved in all these distribution

02:42PM   1   activities at that point?

02:42PM   2   A.   Yes.

02:42PM   3   Q.   Did Ms. Schuh stay at that carriage house that your

02:42PM   4   brother had?

02:42PM   5   A.   Yes.

02:42PM   6   Q.   So she basically lived on the premises, right?

02:42PM   7   A.   Yes.

02:42PM   8   Q.   Was that after Mario Vacanti had moved out of the

02:42PM   9   carriage house?

02:42PM  10   A.   Correct.

02:42PM  11   Q.   Okay.  So for all intents and purposes, Ashley Schuh

02:43PM  12   lived at your brother's property?

02:43PM  13   A.   Correct.

02:43PM  14   Q.   He lived in the main house, and she lived in the carriage

02:43PM  15   house?

02:43PM  16   A.   Correct.

02:43PM  17        **MR. TRIPI:**  Okay.  Let's pull Exhibit 46 back up,

02:43PM  18   Ms. Champoux, and I'd like to, if you can highlight 6, 7, and

02:43PM  19   8 for me, or zoom in, I should say, or -- not 6.  I'm sorry,

02:43PM  20   7, 8 and 9.  I'm sorry about that.

02:43PM  21        **BY MR. TRIPI:**

02:43PM  22   Q.   All right.  7 and 8, you have an entry for Baker; is that

02:43PM  23   right?

02:43PM  24   A.   Yes.

02:43PM  25   Q.   Two entries, looks like the same phone number each time

02:43PM 1 though, right?

02:43PM 2 A. Correct.

02:43PM 3 Q. Now, earlier you indicated Chris Baker's number was one

02:43PM 4 of the numbers you passed along to make sure it was clear,

02:43PM 5 right?

02:43PM 6 A. Yes.

02:43PM 7 **MR. TRIPI:** Ms. Champoux, can we pull up Government

02:43PM 8 Exhibit -- next to this, Exhibit 8A at page 354?

02:43PM 9 **BY MR. TRIPI:**

02:43PM 10 Q. Do you see a document here with a date of March 13th,

02:44PM 11 2023?

02:44PM 12 A. Yes.

02:44PM 13 Q. 2013, excuse me.

02:44PM 14 A. Yes.

02:44PM 15 Q. By that point, you're dealing with Jarrett Guy, correct?

02:44PM 16 A. Correct.

02:44PM 17 Q. Do you see a name of a financially liable party,

02:44PM 18 Christopher Baker?

02:44PM 19 A. Yes.

02:44PM 20 Q. Do you see a phone number that was associated with you?

02:44PM 21 A. Yes.

02:44PM 22 Q. 716-830-3226?

02:44PM 23 A. Correct, that was my phone number.

02:44PM 24 Q. So you had your phone in Baker's name, right?

02:44PM 25 A. Yes.

02:44PM    1    Q.  So if we go back to Exhibit 145, remember those

02:44PM    2    paragraphs that talked about putting things in other people's

02:44PM    3    name?

02:44PM    4    A.  Yes.

02:44PM    5    Q.  Did you have your phone in Chris Baker's name?

02:44PM    6    A.  I did.

02:44PM    7    Q.  But we also see a contact home phone number here, which

02:44PM    8    is, I should say for the record, your phone number under user

02:44PM    9    information was 716-830-3226, correct?

02:45PM   10    A.  Yes.

02:45PM   11    Q.  Now, in the contact home phone for this document we're

02:45PM   12    looking at, there's another phone number there, do you see

02:45PM   13    that?

02:45PM   14    A.  Yes.

02:45PM   15    Q.  Can you read that out loud?

02:45PM   16    A.  716-816-6849.

02:45PM   17    Q.  Is that the same number you had in your phone for Chris

02:45PM   18    Baker?

02:45PM   19    A.  Yes.

02:45PM   20         **MR. TRIPI:**  Okay.  And we can take -- well, I'll just

02:45PM   21    clear that screen.  Keep that up for a moment, Ms. Champoux.

02:45PM   22         **BY MR. TRIPI:**

02:45PM   23    Q.  Next I'd like you to look at Government Exhibit 46.

02:45PM   24         **MR. TRIPI:**  If we can zoom in on line 9.

          25

02:45PM      1              **BY MR. TRIPI:**

02:45PM      2     Q.   Do you see that exhibit?

02:45PM      3     A.   Yes.

02:45PM      4     Q.   Is that a phone number, two phone numbers you had for

02:45PM      5     R.K. or Bob R.K.?

02:45PM      6     A.   Yes.

02:45PM      7     Q.   That's the person you were tipped off, the defendant's

02:45PM      8     informant, right?

02:45PM      9     A.   Correct.

02:45PM     10              **MR. TRIPI:**   Okay.   We can unzoom that Ms. Champoux.

02:45PM     11     Just for the record, actually, zoom back in.   I should --

02:45PM     12              **BY MR. TRIPI:**

02:46PM     13     Q.   Can you tell us what the two phone numbers you had in

02:46PM     14     your phone for Mr. R.K. were?

02:46PM     15     A.   716-605-2778, and 716-935-0252.

02:46PM     16              **MR. TRIPI:**   Okay.   Ms. Champoux, next to this exhibit

02:46PM     17     can we pull up Exhibit 9E-4, please?

02:46PM     18              I'd like to keep 46 up, thank you.

02:46PM     19              **BY MR. TRIPI:**

02:46PM     20     Q.   Do you see what this says at the top?

02:46PM     21     A.   Confidential source establishment.

02:46PM     22     Q.   Now, have you ever seen this document before?

02:46PM     23     A.   This is -- earlier today?

02:46PM     24     Q.   If you haven't seen it today, have you seen it before?

02:46PM     25     A.   No.

02:46PM    1   Q.  Okay.

02:46PM    2        **MR. TRIPI:**  Keep those up, Ms. Champoux.

02:46PM    3        I need 9E-4.

02:46PM    4        Give me just a moment here.

02:47PM    5        Can we zoom in right there, please?

02:47PM    6        **BY MR. TRIPI:**

02:47PM    7   Q.  Do you see a telephone number listed on Exhibit 9E-4?

02:47PM    8   A.  Yes.

02:47PM    9   Q.  What's that number?

02:47PM   10   A.  716-935-0252.

02:47PM   11        **MR. TRIPI:**  Now, Ms. Champoux, can you please zoom

02:47PM   12   in at the top where it has the name?

02:47PM   13        **BY MR. TRIPI:**

02:47PM   14   Q.  Under box 1, do you see name of source there?

02:47PM   15   A.  Source?

02:47PM   16   Q.  Right here.

02:47PM   17   A.  Oh, R.K.

02:47PM   18   Q.  Okay.  Is 716-935-0252 the same phone number you had for

02:47PM   19   R.K.?

02:47PM   20   A.  Yes.

02:47PM   21   Q.  One of the two numbers, right?

02:47PM   22   A.  Correct.

02:47PM   23        **MR. TRIPI:**  Okay.  We can take those down.  Can we

02:48PM   24   go back to 46, please?  And can we zoom in on 10, 11, and 12.

         25

02:48PM 1         **BY MR. TRIPI:**

02:48PM 2   Q.  10, you have an entry for Butch, who is that?

02:48PM 3   A.  Butchie Bifocal.

02:48PM 4   Q.  Is that the person who was Mr. Masecchia's godfather?

02:48PM 5   A.  Yes.

02:48PM 6   Q.  Is that the person you testified earlier was a member of

02:48PM 7  Italian Organized Crime?

02:48PM 8   A.  Yes.

02:48PM 9   Q.  Is that a phone number you had for him?

02:48PM 10  A.  Yes.

02:48PM 11  Q.  What's that phone number?

02:48PM 12  A.  Area code 716-316-2169.

02:48PM 13  Q.  Now, below that, you have two entries for Buttitta with

02:48PM 14  the same phone number, is that Mike Buttitta?

02:48PM 15  A.  Correct.

02:48PM 16  Q.  Is that someone who you talked about earlier who would

02:48PM 17  get marijuana from you?

02:48PM 18  A.  Yes.

02:48PM 19      **MR. TRIPI:**  Okay.  Ms. Champoux, can we go down to

02:48PM 20  entries 13 and 14?

02:49PM 21      **BY MR. TRIPI:**

02:49PM 22  Q.  We've talked about Frank Burkhart earlier; is that right?

02:49PM 23  A.  Yes.

02:49PM 24  Q.  What phone number did you have for Frank Burkhart?

02:49PM 25  A.  716-256-8066.

02:49PM    1          MR. TRIPI:  Ms. Champoux -- actually, let me ask

02:49PM    2    another question.

02:49PM    3          BY MR. TRIPI:

02:49PM    4    Q.  Did he own a tattoo shop?

02:49PM    5    A.  Yes.

02:49PM    6    Q.  What was it called?

02:49PM    7    A.  Hardcore Tattoo.

02:49PM    8    Q.  Where was it located?

02:49PM    9    A.  On Elmwood Avenue.

02:49PM   10          MR. TRIPI:  All right, Ms. Champoux, let's go to

02:49PM   11    Government Exhibit 8A at page 357.

02:49PM   12          BY MR. TRIPI:

02:49PM   13    Q.  Do you see a document there in the top left corner that

02:49PM   14    has a date of March 13th, 2013?

02:49PM   15    A.  Yes.

02:49PM   16    Q.  Do you see at the top it says subscriber information?

02:49PM   17    A.  Yes.

02:49PM   18    Q.  Do you see where it says financially liable party?

02:49PM   19    A.  Yes.

02:49PM   20    Q.  Do you see the name there?

02:50PM   21    A.  Hardcore Tattoo Studio.

02:50PM   22    Q.  Do you see the address?

02:50PM   23    A.  902 Elmwood Avenue.

02:50PM   24    Q.  Is that where Frank Burkhart's tattoo studio was?

02:50PM   25    A.  Yes.

02:50PM    1    Q.  Do you see a user information with a phone number?

02:50PM    2    A.  Is it --

02:50PM    3    Q.  Down there.

02:50PM    4    A.  716-578-6917.

02:50PM    5         **MR. TRIPI:**  Let's go back to Exhibit 46,

02:50PM    6    Ms. Champoux, and pull up 13.  Entry 13.

02:50PM    7         **BY MR. TRIPI:**

02:50PM    8    Q.  Is that a different phone number than you had for --

02:50PM    9    A.  Yes.

02:50PM   10    Q.  -- for him?

02:50PM   11         **MR. TRIPI:**  Okay.  Let's take that down.  Next I'd

02:50PM   12    like to -- we can take down, no, leave 8A up.  We'll need it

02:50PM   13    in just a second.

02:50PM   14         Let's zoom in on Exhibit 46 at 16 and 17.

02:51PM   15         **BY MR. TRIPI:**

02:51PM   16    Q.  Is that an individual you know named Frank Parisi?

02:51PM   17    A.  Yes.

02:51PM   18    Q.  What phone number did you have for him?

02:51PM   19    A.  Area code 716-481-8111.

02:51PM   20         **MR. TRIPI:**  And let's go to 18 and 19, please.

02:51PM   21         **BY MR. TRIPI:**

02:51PM   22    Q.  Who is at entry 18 and 19?

02:51PM   23    A.  Frank Tripi.

02:51PM   24    Q.  And what phone number did you have for him?

02:51PM   25    A.  716-429-6445.

02:51PM  1   Q.  And is that someone that you would communicate with?

02:51PM  2   A.  Yes.

02:51PM  3   Q.  Is that someone that you spoke with and who has been at

02:51PM  4   your house at 697 Lebrun?

02:51PM  5   A.  Yes.

02:51PM  6   Q.  Is that someone you texted with?

02:51PM  7   A.  Yes.

02:52PM  8          MR. TRIPI:  Let's go to boxes 20 and 21.

02:52PM  9          BY MR. TRIPI:

02:52PM  10  Q.  Focusing in on 21, do you see that entry?

02:52PM  11  A.  Yes.

02:52PM  12  Q.  Is Hot Dog, Paul Francoforte?

02:52PM  13  A.  Correct.

02:52PM  14  Q.  What number did you have for him?

02:52PM  15  A.  716-866-2687.

02:52PM  16  Q.  Okay.

02:52PM  17          MR. TRIPI:  Ms. Champoux, in Exhibit 8A, can we go to

02:52PM  18  page 347?

02:52PM  19          BY MR. TRIPI:

02:52PM  20  Q.  Do you see at the top left it has a date of March 21st,

02:52PM  21  2013?

02:52PM  22  A.  Yes.

02:52PM  23  Q.  This is looking at Exhibit 8A at page 347?

02:52PM  24  A.  Yes.

02:52PM  25  Q.  Do you see that it says subscriber information?

02:52PM   1   A.  Subscriber information?  Yes.

02:52PM   2   Q.  Under the box labeled financially liable party, do you

02:52PM   3   see Paul Francoforte's name?

02:52PM   4   A.  Financially -- yes.

02:53PM   5   Q.  If you go down a couple boxes to the user information, do

02:53PM   6   you see a phone number there?

02:53PM   7   A.  Yes.

02:53PM   8   Q.  What phone number do you see?

02:53PM   9   A.  716-866-2687.

02:53PM  10   Q.  Is that the same phone number you had for Paul

02:53PM  11   Francoforte, Hot Dog?

02:53PM  12   A.  Yes.

02:53PM  13        **MR. TRIPI:**  Ms. Champoux, you can take down 8A, and

02:53PM  14   if you can pull up 26J at page 7?

02:53PM  15        And, Ms. Champoux, we need to go to page 7.  Thank

02:53PM  16   you.

02:53PM  17        **BY MR. TRIPI:**

02:53PM  18   Q.  Looking at Exhibit 26J at page 7.  You've never seen that

02:53PM  19   before, correct?

02:53PM  20   A.  No.

02:53PM  21   Q.  Okay.  But do you see that phone number, 716-866-2687,

02:53PM  22   right here?

02:53PM  23   A.  Yes.

02:53PM  24   Q.  Is that the same phone number you had for Paul

02:54PM  25   Francoforte?

02:54PM  1    A.  Yes.

02:54PM  2              MR. TRIPI:  We can take down 26J, Ms. Champoux.

02:54PM  3              All right.  I'd like to go to Exhibit 46, please, and

02:54PM  4    let's work through entries 22 to 25.

02:54PM  5              BY MR. TRIPI:

02:54PM  6    Q.  We've already talked about Hot Dog.  23, is that a phone

02:54PM  7    number you had for Jacob Martinez?

02:54PM  8    A.  Yes.

02:54PM  9    Q.  Is 24 a different number you had for him?

02:54PM 10    A.  Yes.

02:54PM 11    Q.  And is 25 a duplicate of the phone number you had in

02:54PM 12    entry 23?

02:54PM 13    A.  Yes.

02:54PM 14              MR. TRIPI:  Let's go to 26, 27, and 28.

02:54PM 15              BY MR. TRIPI:

02:54PM 16    Q.  Looking at 27, who's that?

02:54PM 17    A.  Jarrett Guy.

02:54PM 18    Q.  Is he the Jarrett Guy we've been talking about who was

02:54PM 19    the supplier from Vancouver, Canada?

02:55PM 20    A.  Yes.

02:55PM 21    Q.  Is that a main phone number you had for him?

02:55PM 22    A.  Yes.

02:55PM 23    Q.  Did you guys also communicate on burners?

02:55PM 24    A.  Yes.

02:55PM 25    Q.  28, who is that?

02:55PM   1    A.   Jimmy Rivera.

02:55PM   2    Q.   And you've talked about him already?

02:55PM   3    A.   Yes.

02:55PM   4    Q.   What phone number did you have for him?

02:55PM   5    A.   716-364-2163.

02:55PM   6         **MR. TRIPI:**  Ms. Champoux, let's go 29 through 31,

02:55PM   7    let's say.

02:55PM   8         **BY MR. TRIPI:**

02:55PM   9    Q.   All right.  Entry number 31 is the one I want to focus

02:55PM  10    on.  Who's that?

02:55PM  11    A.   John Robinson.

02:55PM  12    Q.   And you've talked about John Robinson's role in your

02:55PM  13    organization already; is that right?

02:55PM  14    A.   Correct.

02:55PM  15    Q.   What phone number did you have for him?

02:55PM  16    A.   716-481-8002.

02:55PM  17         **MR. TRIPI:**  Okay.  Ms. Champoux, I'd like to take

02:55PM  18    this down just for a moment, and go over to 100A.1, please.

02:56PM  19         And I'd like you to go to 716-481-8002 toll analysis.

02:56PM  20    It's one up from there.  Thank you.

02:56PM  21         **BY MR. TRIPI:**

02:56PM  22    Q.   Do you see that marker at the top of the page there that

02:56PM  23    seems to have written a phone number?

02:56PM  24    A.   Yes.

02:56PM  25    Q.   Is that John Robinson's phone number?

02:56PM 1    A.  Yes.

02:56PM 2         MR. TRIPI:  Okay.  Let's take that down,

02:56PM 3    Ms. Champoux, and let's go back to Exhibit 46.  And let's

02:56PM 4    highlight 32 through 35.

02:56PM 5         BY MR. TRIPI:

02:57PM 6    Q.  Number 35, you have an entry for a John Suppa?

02:57PM 7    A.  Yes.

02:57PM 8    Q.  What number do you have for him?

02:57PM 9    A.  716-553-7365.

02:57PM 10        MR. TRIPI:  Okay.  Ms. Champoux, can we take -- pull

02:57PM 11   up Exhibit 8A at page 158?

02:57PM 12        BY MR. TRIPI:

02:57PM 13   Q.  Do you see on this document, Exhibit 8A at page 158, a

02:57PM 14   location, 1195 Hertel Avenue?

02:57PM 15   A.  Yes.

02:57PM 16   Q.  Is that a premises you knew to be associated with John

02:57PM 17   Suppa?

02:57PM 18   A.  Yes.

02:57PM 19   Q.  Is that where you set up a grow?

02:57PM 20   A.  Yes.

02:57PM 21   Q.  Do you see a phone number, 716-553-7365?

02:57PM 22   A.  Correct.

02:57PM 23   Q.  Is that the phone number you had for John Suppa?

02:57PM 24   A.  Yes.

02:57PM 25        MR. TRIPI:  Okay.  We can take down Exhibit 8A and

| | | |
|---|---|---|
| 02:57PM | 1 | let's go back to 46, Ms. Champoux.  And let's go 37 through |
| 02:58PM | 2 | the bottom of that page.  37 to 42. |
| 02:58PM | 3 | **BY MR. TRIPI:** |
| 02:58PM | 4 | Q.  Kelly Brace, we talked about him.  He was whose house you |
| 02:58PM | 5 | were at when you were arrested, right? |
| 02:58PM | 6 | A.  Yes. |
| 02:58PM | 7 | Q.  41, Krista Masecchia, who's that? |
| 02:58PM | 8 | A.  That's Mike Masecchia's wife. |
| 02:58PM | 9 | Q.  And an entry 42, you have a phone number for her? |
| 02:58PM | 10 | A.  Yes. |
| 02:58PM | 11 | **MR. TRIPI:**  Let's go to 43 through, say, 46. |
| 02:58PM | 12 | **BY MR. TRIPI:** |
| 02:58PM | 13 | Q.  We've talked about Krista Masecchia.  44, 45, 46, those |
| 02:58PM | 14 | are different emails you had for your own wife, correct? |
| 02:58PM | 15 | A.  Correct. |
| 02:58PM | 16 | **MR. TRIPI:**  Let's go to 47 through, say, 51. |
| 02:58PM | 17 | **BY MR. TRIPI:** |
| 02:59PM | 18 | Q.  Look at 48.  Is that an entry for Mark Falzone? |
| 02:59PM | 19 | A.  Yes. |
| 02:59PM | 20 | Q.  What phone number did you have for Mark Falzone? |
| 02:59PM | 21 | A.  I believe that might be -- because it says Leah, that's |
| 02:59PM | 22 | Mark's girlfriend. |
| 02:59PM | 23 | Q.  Okay.  Okay.  He had a girlfriend named -- |
| 02:59PM | 24 | A.  Leah. |
| 02:59PM | 25 | Q.  -- Leah?  Okay.  We'll go to below that, entry number 50, |

02:59PM   1    you have an entry for a Lou Selva?

02:59PM   2    A.  Correct.

02:59PM   3    Q.  Is that the Lou Selva we've been talking about?

02:59PM   4    A.  Yes.

02:59PM   5    Q.  And you're -- the phone number you had for him was

02:59PM   6    716-903-1654?

02:59PM   7    A.  Correct.

02:59PM   8         **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 8A

02:59PM   9    and go to page 197.

02:59PM   10        **BY MR. TRIPI:**

02:59PM   11   Q.  Do you see a document there that has Lou Selva's name and

02:59PM   12   his -- the phone number, 716-903-1654, at Exhibit A at

02:59PM   13   page 197?

02:59PM   14   A.  Yes.

02:59PM   15   Q.  Same phone number you had for Lou Selva?

03:00PM   16   A.  Yes.

03:00PM   17        **MR. TRIPI:**  Okay.  We can take down Exhibit 8A,

03:00PM   18   Ms. Champoux.

03:00PM   19        **THE COURT:**  Mr. Tripi, do you think you're going to

03:00PM   20   be a while?

03:00PM   21        **MR. TRIPI:**  On the plus side, Judge, we are wrapping

03:00PM   22   up relatively soon, but yes, this is a good time.

03:00PM   23        **THE COURT:**  Please remember my instructions about not

03:00PM   24   communicating about the case, not talking with each other.

03:00PM   25        See you back here in 15 minutes.

03:00PM 1          **MR. TRIPI:**  Thank you.

03:00PM 2          (Jury excused at 3:00 p.m.)

03:00PM 3          **THE COURT:**  Anything for the record?

03:00PM 4          **MR. TRIPI:**  No, Your Honor.

03:00PM 5          **MR. MacKAY:**  No, Your Honor.

03:00PM 6          **THE COURT:**  Okay.  We'll see you in ten or 15

03:01PM 7   minutes.

03:01PM 8          **THE CLERK:**  All rise.

03:17PM 9          (Back on the record at 3:17 p.m.)

03:17PM 10          (Jury not present.)

03:17PM 11          **THE CLERK:**  All rise.

03:17PM 12          **THE COURT:**  Please be seated.

03:17PM 13          **THE CLERK:**  We are back on the record for the

03:17PM 14   continuation of the jury trial in case number 19-cr-227,

03:18PM 15   United States of America versus Joseph Bongiovanni.

03:18PM 16          All counsel and parties are present.

03:18PM 17          **THE COURT:**  Anything for the record before we bring

03:18PM 18   the jury back?

03:18PM 19          **MR. TRIPI:**  No, Your Honor.

03:18PM 20          **MR. MacKAY:**  Just one thing with the timing, Judge.

03:18PM 21   I think Mr. Tripi indicated he's probably going somewhere

03:18PM 22   around another half hour with this witness.

03:18PM 23          **MR. TRIPI:**  I'm hoping not, but, yeah.

03:18PM 24          **MR. MacKAY:**  But I appreciate the Court wanting to

03:18PM 25   squeeze every minute out of everything, and I can start on my

03:18PM  1   cross.  Is the Court open if, like, I get near a subject

03:18PM  2   change maybe a little bit early, if we get near a subject

03:18PM  3   change in the cross-examination to break for the day, just

03:18PM  4   because this witness so large and the subject tends to be so

03:18PM  5   large, in chunks.

03:18PM  6        **THE COURT:**  I've got no problem with breaking where

03:18PM  7   you want to break.

03:18PM  8        **MR. MacKAY:**  Okay.

03:18PM  9        **THE COURT:**  I have a hard stop at 4:30.  Any time

03:18PM  10  between 4 and 4:30, I'm fine with.

03:18PM  11        **MR. MacKAY:**  Okay, thank you.

03:18PM  12        **THE COURT:**  Okay.  So ready to go?

03:18PM  13        **MR. TRIPI:**  Yes, Judge.

03:18PM  14        **THE COURT:**  Let's bring them back, please, Pat.

03:20PM  15        (Jury seated at 3:20 p.m.).

03:20PM  16        **THE COURT:**  The record will reflect that all our

03:20PM  17  jurors are present again.

03:20PM  18        I remind the witness he's still under oath.

03:20PM  19        Mr. Tripi, you may continue.

03:20PM  20        **MR. TRIPI:**  Thank you, Your Honor.

03:20PM  21        Ms. Champoux, in Exhibit 46, can we zoom in on rows

03:20PM  22  55 and 56?

03:20PM  23        **BY MR. TRIPI:**

03:20PM  24  Q.  All right.  Is that the entry you had for Mark Falzone?

03:20PM  25  A.  Yes.

03:21PM 1    Q.  What number did you have for him?

03:21PM 2    A.  Area code 716-208-5678.

03:21PM 3         MR. TRIPI:  Ms. Champoux, could we go Exhibit 8A at

03:21PM 4    page 325, please?

03:21PM 5         BY MR. TRIPI:

03:21PM 6    Q.  Do you see Mark Falzone's name on the account billing for

03:21PM 7    this phone number?

03:21PM 8    A.  Yes.

03:21PM 9    Q.  And do you see some subscriber details with a personal

03:21PM 10   telephone number and a number under it?

03:21PM 11   A.  Yes.

03:21PM 12   Q.  What's that number there?

03:21PM 13        MR. TRIPI:  Ms. Champoux, can you move the cursor a

03:21PM 14   little bit?

03:21PM 15        THE WITNESS:  716-208-5678.

03:21PM 16        BY MR. TRIPI:

03:21PM 17   Q.  Is that the same number you had for Mark Falzone?

03:21PM 18   A.  Correct.

03:21PM 19   Q.  Okay.

03:21PM 20        MR. TRIPI:  We can take down 8A for just a moment.

03:21PM 21   Next I'd like to zoom in on Exhibit 46.  Rows 58 and 59.

03:22PM 22        BY MR. TRIPI:

03:22PM 23   Q.  Is that an entry you had for Mark Kagan?

03:22PM 24   A.  Yes.

03:22PM 25   Q.  What phone number did you have for him?

03:22PM    1    A.  Area code 941-993-6367.

03:22PM    2    Q.  And I don't want to go through everything you said about

03:22PM    3    Mark Kagan, but was he one of your suppliers that you talked

03:22PM    4    about earlier in your testimony?

03:22PM    5    A.  Correct.

03:22PM    6         MR. TRIPI:  Ms. Champoux, can we pull up Exhibit 8A

03:22PM    7    at page 370?

03:22PM    8         BY MR. TRIPI:

03:22PM    9    Q.  Do you see an entry there for Mark Kagan under

03:22PM    10   financially liable party with a phone number, contact home

03:22PM    11   phone 941-993-6367 on Exhibit 8A at page 370?

03:22PM    12   A.  Yes.

03:22PM    13   Q.  And do you also see that under that same phone number

03:23PM    14   under the user information section?

03:23PM    15   A.  Yes.

03:23PM    16   Q.  Okay.

03:23PM    17        MR. TRIPI:  Could we go to Exhibit 46 again?  I'd

03:23PM    18   like to go to row 64.

03:23PM    19        BY MR. TRIPI:

03:23PM    20   Q.  And whose phone number is that?

03:23PM    21   A.  Matt Suppa.

03:23PM    22   Q.  And was it his property where the grows were in the

03:23PM    23   Southern Tier?

03:23PM    24   A.  No, that's Mark Suppa.

03:23PM    25   Q.  Is that his brother?

03:23PM   1   A.  Correct.

03:23PM   2   Q.  What number did you have for Matt?

03:23PM   3   A.  716-553-0099.

03:23PM   4   Q.  Okay.

03:23PM   5        **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 8A

03:23PM   6   and go to page 201?  And could you zoom in on that box up at

03:23PM   7   the top?

03:23PM   8        **BY MR. TRIPI:**

03:24PM   9   Q.  Do you see the name, last name Matthew -- or, excuse me,

03:24PM  10   last name Suppa, first name Matthew, third row down, fourth

03:24PM  11   row down?

03:24PM  12   A.  Fourth row down, yes.

03:24PM  13   Q.  And do you see a phone number 716-553-0099?

03:24PM  14   A.  Yes.

03:24PM  15   Q.  Is that the same phone number you had for Matt Suppa?

03:24PM  16   A.  Correct.

03:24PM  17   Q.  Right above that, do you see an entry for a David Hersey?

03:24PM  18   A.  Yes.

03:24PM  19   Q.  Is that one of the people you also said was involved in

03:24PM  20   the outdoor grows?

03:24PM  21   A.  Yes.

03:24PM  22        **MR. TRIPI:**  Okay.  We can take that down,

03:24PM  23   Ms. Champoux.  You can clear the screen.

03:24PM  24        Next I'd like to go to 68.  Row 68 on Exhibit 46.

         25

03:24PM    1          **BY MR. TRIPI:**

03:24PM    2    Q.  Again, we see that name Mike Buttitta, was he one of your

03:24PM    3    customers?

03:24PM    4    A.  Yes.

03:24PM    5          **MR. TRIPI:**  Okay.  Let's zoom out of that.  Let's go

03:25PM    6    below that to row number 69 and 70, please.

03:25PM    7          **BY MR. TRIPI:**

03:25PM    8    Q.  Whose phone number is that?

03:25PM    9    A.  Mike Masecchia.

03:25PM   10    Q.  Okay.  What phone number did you have as the main phone

03:25PM   11    number for Masecchia?

03:25PM   12    A.  Area code 716-812-0664.

03:25PM   13    Q.  Now was that his stable phone?

03:25PM   14    A.  Yes.

03:25PM   15    Q.  Did he have other burner phones that you guys would use?

03:25PM   16    A.  Yes.

03:25PM   17    Q.  Okay.

03:25PM   18          **MR. TRIPI:**  Ms. Champoux, let's go to Exhibit 8A at

03:25PM   19    page 204.

03:25PM   20          **BY MR. TRIPI:**

03:25PM   21    Q.  Okay.  Do you see that box there?

03:25PM   22    A.  Yes.

03:25PM   23    Q.  The first box says Trinity remarks.  Can you read what

03:25PM   24    the rest of it says?

03:25PM   25    A.  Numbers part of ongoing narcotics investigation in

03:25PM  1  contact with Michael Masecchia, area code 716-812-0664, per

03:26PM  2  S.A. Bongiovanni.

03:26PM  3  Q.  Now you've never seen those documents before, correct?

03:26PM  4  A.  No.

03:26PM  5  Q.  But that's the phone number you had for Mike Masecchia,

03:26PM  6  right?

03:26PM  7  A.  Correct.

03:26PM  8        **MR. TRIPI:**  And we can zoom out of that,

03:26PM  9  Ms. Champoux.  I'd like to zoom in on rows 71 and 72.

03:26PM  10       **BY MR. TRIPI:**

03:26PM  11  Q.  Is that the Mike Moynihan you've talked about in your

03:26PM  12  testimony that lived with you for a time and helped with the

03:26PM  13  distribution activity?

03:26PM  14  A.  Yes.

03:26PM  15  Q.  And what phone number did you have for him?

03:26PM  16  A.  Area code 716-573-2174.

03:26PM  17       **MR. TRIPI:**  Ms. Champoux, can we go to Exhibit 8A at

03:26PM  18  page 239 to 240.  Stop there.  Stop there.

03:26PM  19       **BY MR. TRIPI:**

03:27PM  20  Q.  On page 239, do you see that same phone number where it

03:27PM  21  says subject number?

03:27PM  22  A.  Yes.

03:27PM  23  Q.  What's that phone number?

03:27PM  24  A.  716-573-2174.

03:27PM  25  Q.  That's the phone number you had for Moynihan?

03:27PM 1    A.  Correct.

03:27PM 2    Q.  And down below on page 240, do you see an old address

03:27PM 3    associated with Mike Moynihan?

03:27PM 4    A.  Yes.

03:27PM 5         **MR. TRIPI:**  Okay.  Ms. Champoux, we can close out of

03:27PM 6    that for a moment.

03:27PM 7         Let's go to row 73 and 74.  And zoom in there on

03:27PM 8    Exhibit 46, please.

03:27PM 9         **BY MR. TRIPI:**

03:27PM 10   Q.  Who's that?

03:27PM 11   A.  Rob Rine.

03:27PM 12   Q.  Is that the individual you talked about earlier in your

03:27PM 13   testimony who helped you take the marijuana that belonged to

03:27PM 14   Santiago Gale that T.S. stored in your warehouse?

03:27PM 15   A.  Correct.

03:28PM 16   Q.  What phone number did you have for him?

03:28PM 17   A.  716-510-2974.

03:28PM 18   Q.  And would Rine also get marijuana from you and distribute

03:28PM 19   it?

03:28PM 20   A.  Occasionally.

03:28PM 21   Q.  Okay.  What number did you have for him again?

03:28PM 22   A.  716-510-2974.

03:28PM 23        **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 8A

03:28PM 24   at page 314?

         25

03:28PM    1    **BY MR. TRIPI:**

03:28PM    2    Q.  Do you see the name Robert Rine on that page?

03:28PM    3    A.  Yes.

03:28PM    4    Q.  Do you see an address?

03:28PM    5    A.  Yes.

03:28PM    6    Q.  Was that an address you knew to be his?

03:28PM    7    A.  That's his parents' address.

03:28PM    8    Q.  Okay.  And do you see a subject number which was the same

03:28PM    9    phone number you had for Rob Rine?

03:28PM   10    A.  Yes.

03:28PM   11    Q.  510-2974?

03:28PM   12    A.  Correct.

03:28PM   13    **MR. TRIPI:**  On Exhibit 46, can we zoom in on rows 75

03:28PM   14    and 76?

03:28PM   15    **BY MR. TRIPI:**

03:29PM   16    Q.  Was that a phone number you had for Sal Volpe?

03:29PM   17    A.  Yes.

03:29PM   18    Q.  What phone number is that?

03:29PM   19    A.  Area code 561-945-2273.

03:29PM   20    Q.  And was Mr. Volpe involved in the outdoor aspects of the

03:29PM   21    marijuana grow with Masecchia?

03:29PM   22    A.  Yes.

03:29PM   23    **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 222J

03:29PM   24    for a moment?

        25

03:29PM      1          **BY MR. TRIPI:**

03:29PM      2   Q.  Do you see Sal Volpe in 222J which is in evidence?

03:29PM      3   A.  Yes.  He's on the left.

03:29PM      4   Q.  Far left in the gray shirt?

03:29PM      5   A.  Correct.

03:29PM      6   Q.  Who's in the middle?

03:29PM      7   A.  Mike Masecchia.

03:29PM      8   Q.  Who's on the right?

03:29PM      9   A.  Lou Selva.

03:29PM     10          **MR. TRIPI:**  Okay.  Let's take that down.  All right.

03:29PM     11   Just a moment.

03:29PM     12          **THE COURT:**  So, folks, we're just going to have to

03:29PM     13   take a quick break.  I have a phone call that I need to

03:29PM     14   handle.

03:29PM     15          **MR. TRIPI:**  Oh, okay.

03:29PM     16          **THE COURT:**  And I apologize very much for this, it's

03:29PM     17   only going to take five minutes.  Give me five minutes, I'll

03:30PM     18   go handle it, and I'll be right back.

03:30PM     19          (Jury excused at 3:30 p.m.)

03:30PM     20          **THE COURT:**  Okay.  I'll be right back, folks, sorry.

03:30PM     21          **MR. TRIPI:**  No problem.

03:33PM     22          (Off the record at 3:30 p.m.)

03:33PM     23          (Back on the record at 3:33 p.m.)

03:33PM     24          (Jury not present.)

03:33PM     25          **THE COURT:**  Are we ready?

03:33PM 1         **MR. TRIPI:**  Yes, Judge.

03:33PM 2         **THE COURT:**  Defense ready, too?

03:33PM 3         **MR. MacKAY:**  Yes.

03:33PM 4         **THE COURT:**  Let's bring them back.

03:34PM 5         (Jury seated at 3:34 p.m.)

03:34PM 6         **THE COURT:**  I'm sorry, folks.  The record will

03:34PM 7  reflect that all jurors are present again.

03:34PM 8         I remind the witness he's still under oath.

03:34PM 9         Mr. Tripi, you may continue.

03:34PM 10        **MR. TRIPI:**  Thank you, Your Honor.

03:34PM 11        Ms. Champoux, on Exhibit 46, can you zoom in on rows

03:34PM 12  81 and 82?

03:34PM 13        **BY MR. TRIPI:**

03:34PM 14  Q.  And does 81 -- we're looking at row 81, does that have a

03:34PM 15  phone number, a 561 number for your brother Tom?

03:34PM 16  A.  Yes.

03:34PM 17        **MR. TRIPI:**  Ms. Champoux, can we pull up Government

03:34PM 18  Exhibit 8A page 365?

03:35PM 19        **BY MR. TRIPI:**

03:35PM 20  Q.  Do you see your brother Tom's name under the financially

03:35PM 21  liable party portion of that?

03:35PM 22  A.  Yes.

03:35PM 23  Q.  And do you see that number 561-801-0221 in the user

03:35PM 24  information section?

03:35PM 25  A.  Yes.

03:35PM    1    Q.   And was that a main phone number used by your brother?

03:35PM    2    A.   Yes.

03:35PM    3    Q.   Again, at times did he use burner phones?

03:35PM    4    A.   Yes.

03:35PM    5          **MR. TRIPI:**   Okay.   Ms. Champoux, can we also bring

03:35PM    6    up Exhibit 100A.1?   And can you click on 561-801-0221,

03:35PM    7    Serio T toll analysis?

03:35PM    8          **BY MR. TRIPI:**

03:35PM    9    Q.   And is this that same phone number that you had for your

03:35PM   10    brother, 561-801-0221, highlighted in purple?

03:35PM   11    A.   Yes.

03:35PM   12    Q.   Do you also see in row 15 that phone number 481-8022

03:36PM   13    associated with John Robinson that we looked at earlier?

03:36PM   14    A.   Yes.

03:36PM   15    Q.   And do you see a name in the upper right-hand corner

03:36PM   16    written there?

03:36PM   17    A.   Bongo.

03:36PM   18    Q.   Are the names of Chris Baker, Frank Burkhart, Tom Serio,

03:36PM   19    John Robinson, Lou Selva, Mark Falzone, Mark Kagan, Mike

03:36PM   20    Moynihan, Robert Rine, and the Suppas, names that you

03:36PM   21    understood to be passed along to Bongiovanni over time?

03:36PM   22    A.   Besides Matt Suppa.

03:36PM   23    Q.   All of the rest of those names, yes?

03:36PM   24    A.   Yes.

03:36PM   25    Q.   All the rest of those names came from you?

03:36PM 1    A.  Yes.

03:36PM 2    Q.  The phone numbers that we looked at?

03:36PM 3    A.  Yes.

03:36PM 4    Q.  You wanted to make sure all those were good?

03:36PM 5    A.  Yes.

03:37PM 6    Q.  Up until your arrest, were those phones all clear as far

03:37PM 7    as you understood it?

03:37PM 8    A.  Yes.

03:37PM 9         **MR. TRIPI:**  Ms. Champoux, can we pull up Government

03:37PM 10   Exhibit 8A at page 307?  So we can take 100A.1 down.

03:37PM 11        **BY MR. TRIPI:**

03:37PM 12   Q.  Did you indicate that there was a Jay Campbell that you

03:37PM 13   would sell -- sell product to?

03:37PM 14   A.  Yes.

03:37PM 15   Q.  Do you see a name with an email associated with a Jason

03:37PM 16   Campbell there?

03:37PM 17   A.  Yes.

03:37PM 18   Q.  Do you see a phone number associated with that record?

03:37PM 19   A.  Yes.

03:37PM 20   Q.  And who is Jason Campbell again?

03:37PM 21   A.  He would sell marijuana for me.

03:37PM 22   Q.  Okay.  Is that a name and a number you passed along over

03:38PM 23   time?

03:38PM 24   A.  Yes.

03:38PM 25        **MR. TRIPI:**  You can take those down, Ms. Champoux.

03:38PM  1          **BY MR. TRIPI:**

03:38PM  2  Q.  All right.  I'd like to just briefly talk about your

03:38PM  3  Samsung burner phone, you looked at that as Exhibit 49.  That

03:38PM  4  is in evidence; do you remember that?

03:38PM  5  A.  Yes.

03:38PM  6  Q.  And you've looked at that before, correct?

03:38PM  7  A.  Yes.

03:38PM  8  Q.  Fair to say as it relates to that phone, there's a

03:38PM  9  limited amount of actual information in terms of your

03:38PM  10  contacts in that phone?

03:38PM  11  A.  Correct.

03:38PM  12  Q.  Minimal amount of actual names?

03:38PM  13  A.  Yes.

03:38PM  14  Q.  Is it basically just call logs that you were using to

03:38PM  15  coordinate drug meetings?

03:38PM  16  A.  Yes.

03:38PM  17  Q.  Does it have some cryptic text messaging?

03:38PM  18  A.  Yes.

03:38PM  19          **MR. TRIPI:**  Okay.  Ms. Champoux, I want to pull up

03:38PM  20  Government Exhibit 8A one more time.  I'd like to go to

03:39PM  21  page 6.  Can you zoom in, first of all, box 5, can we zoom in

03:39PM  22  on that?

03:39PM  23          **BY MR. TRIPI:**

03:39PM  24  Q.  Can you read who this is by, Mr. Serio?

03:39PM  25  A.  Joseph Bongiovanni.

03:39PM 1    Q.  Okay.

03:39PM 2           **MR. TRIPI:**  Zoom out of there.

03:39PM 3           And can you zoom in on box -- I think that's

03:39PM 4    number 8, Ms. Champoux?

03:39PM 5           **BY MR. TRIPI:**

03:39PM 6    Q.  Do you see a date listed where this was prepared?

03:39PM 7    A.  Yes.

03:39PM 8    Q.  And what date was that?

03:39PM 9    A.  It was July 7th, 2014.

03:39PM 10   Q.  At that time, you were still getting marijuana from

03:39PM 11   Jarrett Guy, right?

03:39PM 12   A.  Correct.

03:39PM 13   Q.  And that year you're storing marijuana at Lou Selva's

03:39PM 14   house?

03:39PM 15   A.  Yes.

03:39PM 16          **MR. TRIPI:**  Okay.  Can we zoom out of that,

03:39PM 17   Ms. Champoux?  Can you zoom in on paragraph 3?

03:39PM 18          **BY MR. TRIPI:**

03:40PM 19   Q.  Can you read that out loud for the jury?

03:40PM 20   A.  Agents have identified Remus Nowak AKA Remo in a prior

03:40PM 21   DEA investigation C2-98-0030 for trafficking in multiple

03:40PM 22   kilograms of marijuana.

03:40PM 23      Nowak is believed to be a major marijuana distributor and

03:40PM 24   money-laundering source for the Ron Serio DTO.

03:40PM 25      Nowak is an owner of Duncan Motor Car Sales located at

03:40PM 1    2030 Delaware Avenue, Buffalo, New York.

03:40PM 2      Agents have initiated in-depth financial analysis of the

03:40PM 3    financial records of Duncan Motor Car Sales in efforts to

03:40PM 4    expose money-laundering and structuring practices.

03:40PM 5    Q.  Okay.  I have a question for you.  See where it says --

03:40PM 6    that second sentence you read, Nowak is believed to a major

03:40PM 7    marijuana and distributor and money-laundering source the

03:40PM 8    Serio DTO; do you see that?

03:40PM 9    A.  Yes.

03:40PM 10   Q.  Do you understand Serio DTO to reference your drug

03:41PM 11   organization?

03:41PM 12   A.  Correct.

03:41PM 13   Q.  Was Remus Nowak ever a money-laundering source for your

03:41PM 14   organization?

03:41PM 15   A.  No.

03:41PM 16   Q.  Was he ever part of your organization, your and

03:41PM 17   Masecchia's organization, in any way, shape, or form?

03:41PM 18   A.  No.

03:41PM 19   Q.  In fact, by the time you were involved, was he -- did you

03:41PM 20   believe him to be an enemy of Mike Masecchia's?

03:41PM 21   A.  Yes.

03:41PM 22   Q.  So is that sentence true at all?  Nowak is believed to be

03:41PM 23   a major distributor and money-laundering source for the Serio

03:41PM 24   DTO?

03:41PM 25   A.  Completely false.

03:41PM 1  Q.  Who laundered your money?

03:41PM 2  A.  Myself.

03:41PM 3  Q.  Through your businesses?

03:41PM 4  A.  Correct.

03:41PM 5  Q.  As you've described for this jury?

03:41PM 6  A.  Yes.

03:41PM 7       MR. TRIPI:  Okay.  We can zoom out of that, and I'd

03:41PM 8  like to go to page Exhibit 8A at page 7.  Can we zoom in on

03:41PM 9  box 5?

03:41PM 10      BY MR. TRIPI:

03:41PM 11  Q.  Do you see who wrote this?

03:41PM 12  A.  Joseph Bongiovanni.

03:41PM 13      MR. TRIPI:  Can we zoom out of that?

03:41PM 14      Can we zoom in on box number 8, please?

03:41PM 15      BY MR. TRIPI:

03:42PM 16  Q.  Do you see the date this was prepared?

03:42PM 17  A.  April 7th, 2014.

03:42PM 18  Q.  You are still getting marijuana from Jarrett Guy?

03:42PM 19  A.  Correct.

03:42PM 20  Q.  You're still storing marijuana in multiple locations to

03:42PM 21  include Lou Selva's house?

03:42PM 22  A.  Correct.

03:42PM 23  Q.  And you set up a grow in Lou Selva's basement?

03:42PM 24  A.  Correct.

03:42PM 25  Q.  Okay.

03:42PM    1          **MR. TRIPI:**  Zoom out of that.

03:42PM    2          Can you zoom in on paragraph 3 again?

03:42PM    3          **BY MR. TRIPI:**

03:42PM    4    Q.  I won't have you read the whole thing, but take a look at

03:42PM    5    that for a moment.  Is that basically the same paragraph you

03:42PM    6    just read in that other document?

03:42PM    7    A.  Looks like the same exact.

03:42PM    8    Q.  That second sentence, Nowak is believed to be a major

03:42PM    9    marijuana distributor and money-laundering source for the

03:42PM   10    Serio DTO; is that true or false?

03:42PM   11    A.  False.

03:42PM   12    Q.  Was he ever your money-launderer?

03:42PM   13    A.  No.

03:42PM   14    Q.  Again, you laundered your own money?

03:42PM   15    A.  Correct.

03:42PM   16    Q.  At all times referencing these documents, you looked at

03:42PM   17    two different dates, was it your understanding Remus Nowak

03:43PM   18    was an enemy of Mike Masecchia?

03:43PM   19    A.  Yes.

03:43PM   20    Q.  From approximately 2008 through April 18th, 2017, while

03:43PM   21    you were partners with Mike Masecchia, what was your

03:43PM   22    understanding of why you and he were able to progress that

03:43PM   23    long without being disrupted by law enforcement?

03:43PM   24    A.  Because of his relationship with Joe Bongiovanni.

03:43PM   25    Q.  During that time, were you, for the majority of the

03:43PM  1   portion of that time, were you paying him money?

03:43PM  2   A.   Yes.

03:43PM  3   Q.   To this defendant?

03:43PM  4   A.   Correct.

03:43PM  5   Q.   When you negotiated with suppliers and referenced having

03:43PM  6   a DEA agent on your payroll in your negotiation with Santiago

03:43PM  7   Gale, who were you referencing?

03:43PM  8   A.   Joe Bongiovanni.

03:43PM  9   Q.   Did you rely upon the information Bongiovanni provided

03:43PM  10  about R.K.?

03:43PM  11  A.   Yes.

03:43PM  12  Q.   Did you rely upon the information he provided about T.S.?

03:44PM  13  A.   Yes.

03:44PM  14  Q.   Did you rely on the information he provided about Mario

03:44PM  15  Vacanti?

03:44PM  16  A.   Yes.

03:44PM  17  Q.   Up through your arrest, you were you and Masecchia close?

03:44PM  18  A.   Yes.

03:44PM  19  Q.   Were you friends?

03:44PM  20  A.   Yes.

03:44PM  21  Q.   Were you business partners?

03:44PM  22  A.   Yes.

03:44PM  23  Q.   Was Masecchia making more than 20,000 per month working

03:44PM  24  with you?

03:44PM  25  A.   Yes.

03:44PM  1   Q.  How much total would you estimate in bribe payments you

03:44PM  2   made to Masecchia for Bongiovanni to pass information that

03:44PM  3   you wanted, from Lou Selva to Masecchia?

03:44PM  4   A.  At least a quarter million dollars.

03:44PM  5   Q.  Is that on the low end?

03:44PM  6   A.  Yes.

03:44PM  7   Q.  What's on the high end?

03:44PM  8   A.  Maybe 3-, 350-.

03:44PM  9   Q.  And your activity was uninterrupted until you were

03:44PM  10  arrested by the Erie County Sheriffs on April 18th, 2017?

03:44PM  11  A.  Correct.

03:44PM  12          **MR. TRIPI:**  Just a moment, Your Honor.

03:45PM  13          Nothing further, Judge.

03:45PM  14          **THE COURT:**  Mr. MacKay.

03:45PM  15

03:45PM  16              **CROSS-EXAMINATION BY MR. MacKAY:**

03:45PM  17  Q.  Good afternoon, Mr. Serio.

03:45PM  18  A.  Good afternoon.

03:45PM  19  Q.  All right.  So, you just ended your testimony on direct.

03:45PM  20  You believe this arrangement worked, or the proof of that was

03:45PM  21  that you were never arrested until you were, correct?

03:45PM  22  A.  Correct.

03:45PM  23  Q.  Meaning that from whenever you allegedly started paying

03:45PM  24  Mr. Bongiovanni, you never had any issues until you were

03:45PM  25  arrested, correct?

03:45PM 1   A.  Correct.

03:45PM 2   Q.  As you sit here though, you don't know that wasn't dumb

03:46PM 3   luck not being arrested, correct?

03:46PM 4   A.  Correct.

03:46PM 5   Q.  For example, some of these individuals you've talked

03:46PM 6   about, they've gone on to start separate businesses and were

03:46PM 7   in the drug business originally, correct?

03:46PM 8   A.  Correct.

03:46PM 9   Q.  And some of them opened prominent restaurants in the City

03:46PM 10  of Buffalo, correct?

03:46PM 11  A.  If you say so, I don't know specifically.

03:46PM 12  Q.  Well, Chris Baker went on to -- to open a bar, correct?

03:46PM 13  A.  Correct.

03:46PM 14  Q.  Opened with Joe Gugino, correct?

03:46PM 15  A.  Correct.

03:46PM 16  Q.  Both of those gentleman were individuals who were big in

03:46PM 17  the drug game, correct?

03:46PM 18  A.  Correct.

03:46PM 19  Q.  And ultimately they were never arrested, correct?

03:46PM 20  A.  Correct.

03:46PM 21  Q.  Now, when you first started talking to Mike Masecchia

03:46PM 22  about this about this payment arrangement, you had concerns

03:46PM 23  about how this would actually be facilitated on

03:46PM 24  Mr. Bongiovanni's end, correct?

03:46PM 25  A.  More so just the -- how to tell about the informants, I

03:46PM   1    just had a question about.

03:46PM   2    Q.  Well, I mean, I think you testified on direct you had

03:46PM   3    concerns about how it would reach so far to reach everybody,

03:46PM   4    correct?

03:47PM   5    A.  Correct.

03:47PM   6    Q.  And you asked Mr. Masecchia some questions about that,

03:47PM   7    correct?

03:47PM   8    A.  Correct.

03:47PM   9    Q.  And he never really got back to you about that, correct?

03:47PM  10    A.  Correct.

03:47PM  11    Q.  Throughout the whole that time that this payment

03:47PM  12    arrangement was going on, Mr. Masecchia never told you about

03:47PM  13    any of the details about how Mr. Bongiovanni was doing

03:47PM  14    whatever he was supposedly doing, correct?

03:47PM  15    A.  Correct.

03:47PM  16    Q.  Now, we just covered it, so while it's fresh in our mind

03:47PM  17    let's talk about some of these things with the phones.

03:47PM  18        You were shown a number of phone contacts, and you recall

03:47PM  19    going through those?

03:47PM  20    A.  Correct.

03:47PM  21        **MR. MacKAY:**  Ms. Champoux, can we pull up Government

03:47PM  22    Exhibit 100A.1, and can we go to the Baker C toll analysis?

03:47PM  23        **THE COURT:**  This is in evidence?

03:47PM  24        **MR. MacKAY:**  This is in evidence, Your Honor.

03:47PM  25        **BY MR. MacKAY:**

03:47PM 1  Q.  So, while that's pulling up, do you recall that the way

03:47PM 2  you were asked question was you were shown a bunch of

03:47PM 3  contacts that came out of your iPhone, correct?

03:47PM 4  A.  Correct.

03:47PM 5  Q.  And then you were comparing them with other documents on

03:47PM 6  the other side to see if they match the same number, correct?

03:47PM 7  A.  Correct.

03:48PM 8  Q.  Now, it's your testimony, the documents that were

03:48PM 9  typically on the right-hand side of the screen, you had never

03:48PM 10 seen those before, correct?

03:48PM 11 A.  Correct.

03:48PM 12 Q.  Now, I'm going to direct your attention to another

03:48PM 13 document I expect you probably have never seen before.  Do

03:48PM 14 you recognize what's in front of you?

03:48PM 15 A.  No.

03:48PM 16 Q.  Okay.  That does, although at the top here highlighted,

03:48PM 17 does have Chris Baker name; do you see that?

03:48PM 18 A.  Correct.

03:48PM 19 Q.  The phone number though further down about middle of the

03:48PM 20 page, that's your -- your phone number, the 830-3226 number,

03:48PM 21 correct?

03:48PM 22 A.  Correct.

03:48PM 23 Q.  Do you understand looking at this, that this is a

03:48PM 24 subpoena return to the DEA?

03:48PM 25 A.  I don't know.

03:48PM 1 Q. You don't know, because you've never seen one of these

03:48PM 2 before, correct?

03:48PM 3 A. Correct.

03:48PM 4    MR. MacKAY: Ms. Champoux, can we go to the next

03:48PM 5 page? Can you rotate that, please?

03:48PM 6    BY MR. MacKAY:

03:48PM 7 Q. Do you know what this document is here in front of you

03:48PM 8 now?

03:48PM 9 A. No.

03:48PM 10 Q. Do you understand this to be a document generated by the

03:48PM 11 DEA that shows all of the numbers that are calling or being

03:48PM 12 called by your phone number?

03:48PM 13 A. I've never seen it before.

03:48PM 14 Q. You've never seen one of those before, correct?

03:49PM 15 A. Correct.

03:49PM 16 Q. Okay. Now, the subpoena return, well --

03:49PM 17    MR. MacKAY: Ms. Champoux, can we pull up Government

03:49PM 18 Exhibit 8A? Okay. Can we go to -- can we word search? Let's

03:49PM 19 just word search Campbell, for example.

03:49PM 20    MS. CHAMPOUX: I don't think you can word search

03:49PM 21 while trial is in progress.

03:49PM 22    MR. MacKAY: Oh, you know what? I can do this.

03:49PM 23    I'll tell you exactly what page.

03:49PM 24    Please go to page 307.

25

03:49PM   1          **BY MR. MacKAY:**

03:49PM   2   Q.   Okay.  You recall seeing this on your direct when you

03:49PM   3   were talking about Jay Campbell?

03:49PM   4   A.   Yes.

03:49PM   5   Q.   As you sit here today, you don't know what this document

03:50PM   6   is, correct?

03:50PM   7   A.   Correct.

03:50PM   8   Q.   But do you understand, or would you -- let's do it this

03:50PM   9   way.  See at the top it says subscriber details?

03:50PM  10   A.   Yes.

03:50PM  11   Q.   Okay.  And then you saw Jason Campbell's name there,

03:50PM  12   correct?

03:50PM  13   A.   Correct.

03:50PM  14   Q.   That's Jay Campbell's full name, correct?

03:50PM  15   A.   Correct.

03:50PM  16   Q.   And you see a phone number there, correct?

03:50PM  17   A.   Correct.

03:50PM  18   Q.   Again, this is an internal DEA document.  You've never

03:50PM  19   seen one of those before, correct?

03:50PM  20   A.   Correct.

03:50PM  21   Q.   Now, it was your testimony, though, that you passed a

03:50PM  22   number of names to Michael Masecchia to pass to Joe

03:50PM  23   Bongiovanni, correct?

03:50PM  24   A.   Correct.

03:50PM  25   Q.   That occurred over a number of years, correct?

03:50PM 1   A.  Correct.

03:50PM 2   Q.  That wasn't all at one point in time, you gave him one

03:50PM 3   list of all sorts of names, correct?

03:50PM 4   A.  Correct.

03:50PM 5          **MR. MacKAY:**  Okay.  You can take that down,

03:50PM 6   Ms. Champoux, for now.

03:50PM 7          **BY MR. MacKAY:**

03:50PM 8   Q.  So I want to talk a little bit about your sort of supply

03:51PM 9   timeline that you've got going on for major sources of supply

03:51PM 10  for marijuana.

03:51PM 11      So you -- you hook up with Mike Masecchia and sort of

03:51PM 12  ramp up operations with him somewhere around the 2008

03:51PM 13  timeframe, correct?

03:51PM 14  A.  Correct.

03:51PM 15  Q.  Now, I think you told us on direct what caused the real

03:51PM 16  concern and ultimately moving towards paying Mr. Masecchia to

03:51PM 17  pay Mr. Bongiovanni was your concern about interest in your

03:51PM 18  operation after your friend Dave Gambino got arrested,

03:51PM 19  correct?

03:51PM 20  A.  Correct.

03:51PM 21  Q.  Meaning that, you know, before Dave Gambino's arrest, you

03:51PM 22  weren't considering any sort of payments, correct?

03:51PM 23  A.  Well, yeah.  Correct.

03:51PM 24  Q.  But then after his arrest, that's sort of when

03:51PM 25  conversations occur about forming some sort of arrangement,

03:51PM 1    correct?

03:51PM 2    A.  Correct.  But I didn't bring it up.  Mike brought it up

03:51PM 3    to me.

03:51PM 4    Q.  Okay.  But, yeah.  So, I want to orient this in time,

03:51PM 5    though.  This occurs after Dave Gambino's arrest, correct?

03:52PM 6    A.  Correct.

03:52PM 7    Q.  And you'd have no reason disagree with me Mr. Gambino was

03:52PM 8    arrested and indicted in federal court in November of 2009?

03:52PM 9    A.  Yes.

03:52PM 10   Q.  So if we use that as a date, your payments to Mike

03:52PM 11   Masecchia occur after that point in time, correct?

03:52PM 12   A.  Correct.

03:52PM 13   Q.  And if it's November, do you think they maybe started in

03:52PM 14   early 2010, perhaps?

03:52PM 15   A.  Early 2010?  I believe it was late 2010.

03:52PM 16   Q.  Late 2010?  Okay.  So late 2010 is when you start paying

03:52PM 17   Mr. Masecchia, correct?

03:52PM 18   A.  Correct.

03:52PM 19   Q.  Okay.  And then it's your testimony, I think, if I recall

03:52PM 20   on direct, that you paid the $2,000 sum for about a year,

03:52PM 21   correct?

03:52PM 22   A.  Correct.

03:52PM 23   Q.  And then it ramps up to 4,000 a month, correct?

03:52PM 24   A.  Correct.

03:52PM 25   Q.  Now, again, I think you told us on direct the reason that

03:52PM 1 it sort of increases is because your operations increased,

03:52PM 2 correct?

03:52PM 3 A. Correct.

03:52PM 4 Q. That's about the time where you start getting involved

03:52PM 5 with marijuana from the West Coast via Santiago Gale,

03:52PM 6 correct?

03:52PM 7 A. Correct.

03:52PM 8 Q. So sometime in about 2011 is when you then hook up with

03:53PM 9 Santiago Gale, correct?

03:53PM 10 A. Correct.

03:53PM 11 Q. But you only ever met him once though, correct?

03:53PM 12 A. Correct.

03:53PM 13 Q. Your contact to Santiago Gale is through T.S., correct?

03:53PM 14 A. Correct.

03:53PM 15 Q. Now, so, then comes a point in time where you're getting

03:53PM 16 loads of marijuana from out west that you understand to be

03:53PM 17 coming from Santiago Gale, correct?

03:53PM 18 A. Correct.

03:53PM 19 Q. And then did you later come to learn that Santiago Gale

03:53PM 20 was arrested in January of 2012?

03:53PM 21 A. Correct.

03:53PM 22 Q. Okay. Now after that point in time -- well, strike that.

03:53PM 23 You didn't immediately learn of his arrest, correct?

03:53PM 24 A. I didn't know of his arrest until much later.

03:53PM 25 Q. Okay. Because you continued to deal basically with T.S.,

03:53PM    1    correct?

03:53PM    2    A.  Correct.

03:53PM    3    Q.  But after Santiago Gale's arrested, your only contact for

03:53PM    4    marijuana out west is through T.S., correct?

03:53PM    5    A.  Correct.

03:53PM    6    Q.  And, I mean, do you know the deal, do you know the

03:53PM    7    details of where he was sourcing the marijuana from after

03:54PM    8    Santiago Gale's arrest?

03:54PM    9    A.  No.

03:54PM   10    Q.  Okay.  Now ultimately, you and T.S. have a breakdown in

03:54PM   11    relationship, correct?

03:54PM   12    A.  Correct.

03:54PM   13    Q.  And it has to do with him storing marijuana at your

03:54PM   14    warehouse, correct?

03:54PM   15    A.  Correct.

03:54PM   16    Q.  And we won't go through all the details again, but

03:54PM   17    basically he tells you he's going to store the motorcycle

03:54PM   18    there, and you find out he's got marijuana and a machine gun

03:54PM   19    there, correct?

03:54PM   20    A.  Correct.

03:54PM   21    Q.  Now at the point in time that this happens, you assume

03:54PM   22    it's Santiago Gale's marijuana, correct?

03:54PM   23    A.  Correct.

03:54PM   24    Q.  Because you had only ever known him to be the plug to

03:54PM   25    Santiago Gale, correct?

03:54PM 1    A.  Correct.

03:54PM 2    Q.  Now, ultimately, you and Rob Rine devise this plan, and

03:54PM 3    steal his marijuana, correct?

03:54PM 4    A.  Correct.

03:54PM 5    Q.  And after that, you're done dealing with T.S., correct?

03:54PM 6    A.  No, I still dealt with him a few times after that.

03:54PM 7    Q.  Few times?

03:54PM 8    A.  Yeah.

03:54PM 9    Q.  Now, this would be in approximately 2012?

03:54PM 10   A.  Correct.

03:54PM 11   Q.  Because we're talking now the trailing timeframe after

03:54PM 12   Santiago Gale is arrested, correct?

03:54PM 13   A.  Correct.

03:55PM 14   Q.  So the few more times you deal with T.S. are 2012?

03:55PM 15   A.  2012, into 2013.

03:55PM 16   Q.  Okay.  Now, but in 2012, in November of 2012, Wayne

03:55PM 17   Anderson's arrested, correct?

03:55PM 18   A.  Correct.

03:55PM 19   Q.  And you had a connection to the marijuana Mr. Anderson

03:55PM 20   was going to receive in some fashion, correct?

03:55PM 21   A.  Correct.

03:55PM 22   Q.  Was really -- is it fair to say it was actually indirect

03:55PM 23   through Frank Burkhart?

03:55PM 24   A.  Yes.

03:55PM 25   Q.  But, you know, ultimately it didn't -- it was supposed to

03:55PM 1 involve Wayne Anderson in some fashion, correct?

03:55PM 2 A. Yes. Correct.

03:55PM 3 Q. Now, after Wayne Anderson's arrest, you take some steps

03:55PM 4 to have Mike Masecchia look into that, correct?

03:55PM 5 A. Correct.

03:55PM 6 Q. Now do you recall that what actually, sort of, concerned

03:55PM 7 you after that arrest was a lawyer talking about your name

03:55PM 8 being brought up in connection with Wayne Anderson?

03:55PM 9 A. Correct.

03:55PM 10 Q. Now as a response to that, to the arrest and the general

03:55PM 11 circumstances after that, you took some time off from drug

03:56PM 12 behavior, drug dealing, correct?

03:56PM 13 A. Correct.

03:56PM 14 Q. And do you recall that it was almost about a year before

03:56PM 15 you got fully back into the business?

03:56PM 16 A. It was probably six months, and then full, yeah, a year

03:56PM 17 when I was --

03:56PM 18 Q. Yeah, let's walk through that.

03:56PM 19    So, after Wayne Anderson's arrest, it's a hard stop on

03:56PM 20 drug dealing for you, correct?

03:56PM 21 A. Correct.

03:56PM 22 Q. You're afraid at that time?

03:56PM 23 A. Correct.

03:56PM 24 Q. So then you take about at least six months of time

03:56PM 25 completely off of drug dealing, correct?

03:56PM  1   A.  Correct.

03:56PM  2   Q.  And then after that point in time, about six months after

03:56PM  3   the arrest you start to reengage with an old guy you dealt

03:56PM  4   with name Mark Kagan, correct?

03:56PM  5   A.  Correct.

03:56PM  6   Q.  And he's a guy that's down in New York City, correct?

03:56PM  7   A.  Correct.

03:56PM  8   Q.  To remind the jury sort of on the front end of some drug

03:56PM  9   dealing, before you really got involved with this payment

03:56PM  10  arrangement you had used Mark Kagan as a source some time

03:56PM  11  ago, correct?

03:56PM  12  A.  Correct.

03:56PM  13  Q.  Approximately what, 2008 timeframe?

03:56PM  14  A.  Correct.

03:56PM  15  Q.  So, you use him in 2008, and kind of disappears from your

03:57PM  16  radar for a while, correct?

03:57PM  17  A.  Correct.

03:57PM  18  Q.  And you pick him up back in about mid 2013 or so?

03:57PM  19  A.  Correct.

03:57PM  20  Q.  And then you deal with him exclusively for about six

03:57PM  21  months, correct?

03:57PM  22  A.  Correct.

03:57PM  23  Q.  And then six months after that, you get introduced to

03:57PM  24  Jarrett Guy, correct?

03:57PM  25  A.  Well, I got introduced to Jarrett Guy before when I

03:57PM 1  stopped.  And then I reconnected with Mark Kagan, and Mark

03:57PM 2  Kagan was going through Jarrett Guy.

03:57PM 3  Q.  Okay.

03:57PM 4  A.  But then I wind up cutting Mark Kagan out.

03:57PM 5  Q.  Okay, yeah.  That's what I'm just trying to clarify.

03:57PM 6  A.  Okay.

03:57PM 7  Q.  So, again, so for the six months after Ron -- I'm sorry.

03:57PM 8  For the six months after the Wayne Anderson arrest, it's just

03:57PM 9  flat no drug dealing, correct?

03:57PM 10  A.  Correct.

03:57PM 11  Q.  And then -- then it's Mark Kagan is your contact for a

03:57PM 12  while, but you know at that point in time he's getting his

03:57PM 13  weed from Jarrett Guy, correct?

03:57PM 14  A.  Correct.

03:57PM 15  Q.  So, for the next six months after that, you're dealing

03:58PM 16  really with Mark Kagan, but you understand it's Jarrett Guy's

03:58PM 17  weed, correct?

03:58PM 18  A.  Correct.

03:58PM 19  Q.  And then so six months of that, and then you completely

03:58PM 20  cut Mark Kagan out, and it's Jarrett Guy all the way,

03:58PM 21  correct?

03:58PM 22  A.  Correct.

03:58PM 23  Q.  So, Jarrett Guy -- and when you start going to Jarrett

03:58PM 24  Guy exclusively, that's -- that starts with the mail,

03:58PM 25  correct?

03:58PM 1  A.  Correct.

03:58PM 2  Q.  And then some time later, it expands to the -- the U-Haul

03:58PM 3  trucks, we'll call them the mid-sized trucks, right?

03:58PM 4  A.  Yes.

03:58PM 5  Q.  And then ultimately expands to the full-size

03:58PM 6  tractor-trailers, correct?

03:58PM 7  A.  Correct.

03:58PM 8  Q.  And that's sort of the thing that's going on right about

03:58PM 9  the time you get arrested, correct?

03:58PM 10  A.  Correct.

03:58PM 11  Q.  Okay.  So, again, just to summarize that, it goes Mark

03:58PM 12  Kagan in the middle of 2013, correct?

03:58PM 13  A.  Correct.

03:58PM 14  Q.  Towards about the end of 2013, and then it's exclusively

03:58PM 15  Jarrett Guy, correct?

03:58PM 16  A.  Correct.

03:59PM 17  Q.  And it's packages first, correct?

03:59PM 18  A.  Correct.

03:59PM 19  Q.  U-Haul second, correct?

03:59PM 20  A.  Correct.

03:59PM 21  Q.  And tractor-trailers third, correct?

03:59PM 22  A.  Correct.

03:59PM 23  Q.  Okay.  Now --

03:59PM 24       MR. MacKAY:  I'm going to try to squeeze in another

03:59PM 25  subject, Judge.

03:59PM    1    **THE COURT:** Okay.

03:59PM    2    **BY MR. MacKAY:**

03:59PM    3   Q. Now, the way this arrangement worked is you made payments

03:59PM    4   to Mike Masecchia, correct?

03:59PM    5   A. Correct.

03:59PM    6   Q. You understood from what -- how he explained it,

03:59PM    7   ultimately, those payments would be -- would make their way

03:59PM    8   to Joe Bongiovanni, correct?

03:59PM    9   A. Correct.

03:59PM   10   Q. But the information would come back ultimately through

03:59PM   11   Mike Masecchia to you, correct?

03:59PM   12   A. Correct.

03:59PM   13   Q. You understood that as you were told, the information

03:59PM   14   might be filtered from Joe Bongiovanni to Lou Selva to Mike

03:59PM   15   Masecchia, correct?

03:59PM   16   A. Correct.

03:59PM   17   Q. But ultimately, it's Mike Masecchia who also forms the

04:00PM   18   back end of the relationship of the information getting back

04:00PM   19   to you, correct?

04:00PM   20   A. Correct.

04:00PM   21   Q. Now, this was always word of mouth, correct?

04:00PM   22   A. Correct.

04:00PM   23   Q. You were never shown any DEA documents, correct?

04:00PM   24   A. Correct.

04:00PM   25   Q. I mean, some of the documents you've seen here are the

04:00PM  1  first time you've ever seen them, correct?

04:00PM  2  A.  Correct.

04:00PM  3  Q.  Now, you had the exclusive relationship, as you

04:00PM  4  understood it, paying Joe Bongiovanni, correct?

04:00PM  5  A.  Correct.

04:00PM  6  Q.  Now you have a brother who also was in the drug game and

04:00PM  7  at some point in time, correct?

04:00PM  8  A.  Correct.

04:00PM  9  Q.  But he did not have a separate sort of payment

04:00PM  10  arrangement or anything going through to Joe Bongiovanni,

04:00PM  11  correct?

04:00PM  12  A.  Correct.

04:00PM  13  Q.  You were the sole exclusive route to and from information

04:00PM  14  of payments of Joe Bongiovanni, correct?

04:00PM  15  A.  Correct.

04:00PM  16  Q.  Okay.  Now, in setting up this arrangement, the purpose

04:00PM  17  was that you wanted to make sure your operation was

04:00PM  18  protected, correct?

04:01PM  19  A.  Correct.

04:01PM  20  Q.  First, is it fair to say it sort of arose from a personal

04:01PM  21  fear right after Dave Gambino's arrest?

04:01PM  22  A.  Correct.

04:01PM  23  Q.  And then as you scale up the operation size about a year

04:01PM  24  later, you want to make sure everybody around you is

04:01PM  25  connected, correct?

04:01PM    1    A.  Correct.

04:01PM    2    Q.  Protected, correct?

04:01PM    3    A.  Correct.

04:01PM    4    Q.  Okay.  Now, Santiago Gale, we talked about him, he was

04:01PM    5    one of your main sources of supply at one point in time,

04:01PM    6    correct?

04:01PM    7    A.  Correct.

04:01PM    8    Q.  If you had to estimate for, what, about a year or so?

04:01PM    9    A.  Correct.

04:01PM   10    Q.  And you were moving a fair amount of product for him,

04:01PM   11    correct?

04:01PM   12    A.  Correct.

04:01PM   13    Q.  I forgot the number, if you can remind us --

04:01PM   14    A.  200.

04:01PM   15    Q.  -- about how much?

04:01PM   16    A.  200 pounds.

04:01PM   17    Q.  200 pounds a month?

04:01PM   18    A.  Yes.

04:01PM   19    Q.  Now, you didn't even learn about his arrest until much

04:01PM   20    later, correct?

04:01PM   21    A.  Correct.

04:01PM   22    Q.  How'd you learn about his arrest?

04:01PM   23    A.  Through the government.

04:01PM   24    Q.  Through the government?

04:01PM   25    A.  Through a proffer.

04:01PM  1   Q.  Okay.  So, what you're telling the jury is you didn't

04:01PM  2   even learn that Santiago Gale had been arrested until after

04:01PM  3   your arrest and you were in discussions with the government,

04:02PM  4   correct?

04:02PM  5   A.  Correct.

04:02PM  6   Q.  And so in January of 2012, you had no realtime

04:02PM  7   information that Santiago Gale had been arrested by the DEA,

04:02PM  8   correct?

04:02PM  9   A.  Correct.

04:02PM  10  Q.  Prior to his arrest, you never received any tip-off that

04:02PM  11  he was under investigation by DEA, correct?

04:02PM  12  A.  Correct.

04:02PM  13  Q.  You had no -- not received any information that he had

04:02PM  14  been arrested out in Utah by DEA Utah, correct?

04:02PM  15  A.  Well, I never gave his name.

04:02PM  16  Q.  Okay.

04:02PM  17  A.  I don't give the supplier names.

04:02PM  18  Q.  Okay.  But, so -- so it's your testimony you never passed

04:02PM  19  along any of your supplier names to -- through Mike Masecchia

04:02PM  20  to Joe Bongiovanni?

04:02PM  21  A.  Correct.

04:02PM  22  Q.  Okay.  And so, it's your testimony you did not pass along

04:02PM  23  Mark Kagan's name?

04:02PM  24  A.  Correct.

04:02PM  25  Q.  And you didn't pass along Santiago Gale's name, correct?

04:02PM   1   A.  Correct.

04:02PM   2   Q.  Okay.  Now, John Robinson.  He's a name that --

04:03PM   3       Let's word it differently.  He dated your ex

04:03PM   4   sister-in-law, correct?

04:03PM   5   A.  Correct.

04:03PM   6   Q.  And he was one of your associates, correct?

04:03PM   7   A.  Correct.

04:03PM   8   Q.  He sold you for, correct?

04:03PM   9   A.  Correct.

04:03PM  10   Q.  He did not supply you, correct?

04:03PM  11   A.  Correct.

04:03PM  12   Q.  But it's your testimony he's a name you provided to -- to

04:03PM  13   Joe Bongiovanni, correct?

04:03PM  14   A.  Correct.

04:03PM  15   Q.  And when I say that, just so we're clear, what I'm saying

04:03PM  16   is you provided to Mike Masecchia, and with the intention of

04:03PM  17   going through to Joe Bongiovanni, correct?

04:03PM  18   A.  Correct.

04:03PM  19   Q.  Just in case I misspeak, that's what I'm intending to

04:03PM  20   communicate.

04:03PM  21   A.  Okay.

04:03PM  22   Q.  Now, you come to learn that Mark Vitale is arrested in

04:03PM  23   December of 2015, correct?

04:03PM  24   A.  Correct.

04:03PM  25   Q.  And you had never received any information prior to his

04:03PM    1    arrest that he was the subject of any investigation, correct?

04:03PM    2    A.  Correct.

04:03PM    3    Q.  You had not received any information that members of

04:03PM    4    Buffalo DEA were looking into his phones in any fashion,

04:03PM    5    correct?

04:04PM    6    A.  Correct.

04:04PM    7    Q.  Never received any information that Mr. Bongiovanni's

04:04PM    8    partner, Joe Palmieri, had any connection to an

04:04PM    9    investigation, correct?

04:04PM   10    A.  Correct.

04:04PM   11    Q.  In fact, you learned about the arrest I think you

04:04PM   12    testified on direct, who was it from?

04:04PM   13    A.  From my ex-wife.

04:04PM   14    Q.  Okay.  So your ex-wife told you, correct?

04:04PM   15    A.  Correct.

04:04PM   16    Q.  Okay.  Do you recall testifying in a prior proceeding

04:04PM   17    here?  Do you recall sitting and testifying in a prior

04:04PM   18    proceeding here?

04:04PM   19    A.  Yes.

04:04PM   20    Q.  Do you recall -- so, I mean, I just want to be clear,

04:04PM   21    it's your testimony that it's your ex-wife, Lauren, who told

04:04PM   22    you about Mark Vitale's arrest?

04:04PM   23    A.  Correct.

04:04PM   24    Q.  Okay.  We'll come back to that.  I lost my place here.

04:05PM   25        You were never provided with the name Corey Cannizzo as

04:05PM    1    an informant, correct?

04:05PM    2    A.   Correct.

04:05PM    3    Q.   That's -- that's not a name you ever heard before,

04:05PM    4    correct?

04:05PM    5    A.   Correct.

04:05PM    6    Q.   Okay.  All right.  The Suppas.

04:05PM    7         Those were individuals who dealt with in the context of

04:05PM    8    the outdoor grows, correct?

04:05PM    9    A.   Correct.

04:05PM   10    Q.   And I think you testified you also helped set up an

04:05PM   11    indoor grow for John Suppa, correct?

04:05PM   12    A.   Correct.

04:05PM   13    Q.   Do you recall the address of that?

04:05PM   14    A.   I don't recall the address.  It's the second building in

04:05PM   15    from the corner of Fairchild and Hertel.

04:05PM   16    Q.   Okay.

04:05PM   17         **MR. MacKAY:**  Ms. Champoux, can we show Government

04:05PM   18    Exhibit 8, 1195 Hertel.Jpeg?  Government Exhibit 8, 1195

04:05PM   19    Hertel.

04:06PM   20         **BY MR. MacKAY:**

04:06PM   21    Q.   Is that the building?

04:06PM   22    A.   Yes.

04:06PM   23    Q.   Okay.  So just to be clear, that's the building in the

04:06PM   24    picture that you set up an indoor grow operation at, correct?

04:06PM   25    A.   Yes.

04:06PM    1    Q.   And what year was that?

04:06PM    2    A.   That was in 2009.

04:06PM    3    Q.   Okay.  Now, you never received any information that back

04:06PM    4    in 2009, the Suppas were the subject of a DEA investigation,

04:06PM    5    correct?

04:06PM    6    A.   Correct.

04:06PM    7         MR. MacKAY:  You can take that down, Ms. Champoux,

04:06PM    8    thank you.

04:06PM    9         BY MR. MacKAY:

04:06PM   10    Q.   Now Mike Masecchia informed you, though, that he had a --

04:06PM   11    had some plants seized down in the Southern Tier quite a long

04:06PM   12    time before that, correct?

04:06PM   13    A.   Correct.

04:06PM   14    Q.   Sometime in the early 2000s?

04:06PM   15    A.   Correct.

04:06PM   16    Q.   Okay.  But in the, you know, when you're getting more

04:06PM   17    involved with Mr. Masecchia around 2009, he never alerts you

04:06PM   18    that he knows about a DEA investigation into him, correct?

04:06PM   19    A.   Correct.

04:06PM   20    Q.   Now, you talked about -- you had a heavy gambling habit,

04:06PM   21    correct?

04:07PM   22    A.   Correct.

04:07PM   23    Q.   That goes back, I mean, when you did start that?

04:07PM   24    A.   Heavy gambling?  Late 2010, early 2011.

04:07PM   25    Q.   Okay.  Approximately the time you really starting to ramp

04:07PM  1  up the income?

04:07PM  2  A.  Yes.

04:07PM  3  Q.  For example, that corresponds about the time you buy the

04:07PM  4  Lebrun house, correct?

04:07PM  5  A.  Correct.

04:07PM  6  Q.  And then moving into about 2015, you are starting to get

04:07PM  7  stopped at the border a lot, correct?

04:07PM  8  A.  Correct.

04:07PM  9  Q.  Because you are -- you're giving information about

04:07PM  10  gambling activity, correct?

04:07PM  11  A.  Correct.

04:07PM  12  Q.  And you're subjected to a number of secondary

04:07PM  13  inspections, correct?

04:07PM  14  A.  Correct.

04:07PM  15  Q.  And around that point in time, you never received any

04:07PM  16  tip-off about any agency looking into you, correct?

04:07PM  17  A.  Correct.

04:07PM  18  Q.  Even going back further into the 2018 timeframe, you

04:07PM  19  never received any information about whether your finances

04:07PM  20  were being subpoenaed, correct?

04:07PM  21  A.  Correct.

04:07PM  22  Q.  Whether your M&T Bank accounts were being subpoenaed,

04:07PM  23  correct?

04:08PM  24  A.  Correct.

04:08PM  25  Q.  Okay.  And in October of 2015, you never received any

04:08PM     1    information that HSI was looking into you, correct?

04:08PM     2    A.  Correct.

04:08PM     3    Q.  In a -- in a financial investigation, correct?

04:08PM     4    A.  Correct.

04:08PM     5    Q.  Okay.  Now, you talked about an individual named Joe

04:08PM     6    Plevniak.

04:08PM     7    A.  Correct.

04:08PM     8    Q.  You laundered some money for him, correct?

04:08PM     9    A.  Correct.

04:08PM    10    Q.  He dealt drugs separately and apart from you, correct?

04:08PM    11    A.  Correct.

04:08PM    12    Q.  But you helped him at least on a couple of occasions to

04:08PM    13    launder some of that drug money, correct?

04:08PM    14    A.  Correct.

04:08PM    15    Q.  You were never made aware that HSI was looking into Joe

04:08PM    16    Plevniak, correct?

04:08PM    17    A.  Correct.

04:08PM    18    Q.  And was Joe Plevniak a name you ever provided to

04:08PM    19    Mr. Masecchia?

04:08PM    20    A.  No.

04:08PM    21    Q.  Okay.  Now, let's go to early 2013.

04:08PM    22        The name G.R., do you even know that name as you sit here

04:08PM    23    today?

04:08PM    24    A.  No.

04:08PM    25    Q.  Okay.  I just want to -- did you and your brother

04:09PM   1   ultimately have a falling out at some point in time?

04:09PM   2   A.   Yes.

04:09PM   3   Q.   When was that approximately?

04:09PM   4   A.   I believe that was 2013.  And I didn't talk to him for

04:09PM   5   two years.

04:09PM   6   Q.   Okay.  What prompted that?

04:09PM   7   A.   We just got into a fight, and we kind of split up the

04:09PM   8   collection agency.  And I felt like I was forced out, so I

04:09PM   9   was kind of pissed off.

04:09PM  10   Q.   Yeah.  Let's kind of walk through that.  Beginning of

04:09PM  11   2013?

04:09PM  12   A.   Possibly.

04:09PM  13   Q.   Okay.  But this is not involving any of the drug

04:09PM  14   business, correct?

04:09PM  15   A.   Correct.

04:09PM  16   Q.   And it sounds like what you're telling us it had to do

04:09PM  17   with arguments regarding your collections businesses,

04:09PM  18   correct?

04:09PM  19   A.   Yeah, we had a different style of managing, and we would

04:09PM  20   argue a lot.

04:09PM  21   Q.   Right up to that point in time you and your brother owned

04:09PM  22   collections agencies together, correct?

04:09PM  23   A.   Correct.

04:09PM  24   Q.   But it sounds like a management style difference

04:09PM  25   triggered that, and you went your own separate ways, correct?

04:09PM  1    A.  Correct.

04:09PM  2    Q.  And as a result of that, you didn't speak to him for two

04:10PM  3    years, correct?

04:10PM  4    A.  Correct.

04:10PM  5    Q.  So in 2013, you didn't provide any information about any

04:10PM  6    informant talking about him, correct?

04:10PM  7    A.  Correct.

04:10PM  8    Q.  You didn't tell him that he was gonna be the subject of

04:10PM  9    any controlled calls of DEA, correct?

04:10PM  10   A.  Correct.

04:10PM  11   Q.  And as you sit here today, like I said, you never even

04:10PM  12   heard the name G.R., correct?

04:10PM  13   A.  Correct.

04:10PM  14   Q.  So fair to say you never passed the name G.R. to your

04:10PM  15   brother Tom Serio?

04:10PM  16   A.  Correct.

04:10PM  17            **MR. MacKAY:**  Judge, now might be a good time to stop.

04:10PM  18            **THE COURT:**  Fine.

04:10PM  19            Okay, folks.  So we're at another weekend, and you

04:10PM  20   know my message, right?  When you're at dinner with family on

04:10PM  21   Sunday, don't talk about the case.  Don't talk about the case

04:10PM  22   at all with anyone at any time over the weekend.

04:10PM  23            Don't read or watch or listen to any news coverage if

04:10PM  24   there is any while the trial is in progress.  Don't use tools

04:10PM  25   of technology to communicate about the case or to research

04:10PM  1  anything about the case.  Don't try to learn anything about

04:11PM  2  the case outside the courtroom.  And don't make up your mind

04:11PM  3  until you start deliberating.

04:11PM  4          We'll see you back here at 9:30 on Monday morning.

04:11PM  5  Again, we'll go until 5:30, unless somebody's got a real

04:11PM  6  problem doing that.  And we'll do that Monday, Tuesday,

04:11PM  7  Wednesday, and Thursday next week.

04:11PM  8          And when I say 5:30, I mean a hard stop at 5:30.

04:11PM  9  We'll go between 5 and 5:30 rather than, you know, approaching

04:11PM 10  5:00 and end.  Okay?

04:11PM 11          Thanks, everybody.  Have a good weekend.  Drive

04:11PM 12  carefully.  And get a good night's sleep on Sunday.

04:11PM 13          (Jury excused at 4:11 p.m.)

04:12PM 14          **THE COURT:**  Anything we need to do before we break?

04:12PM 15          **MR. TRIPI:**  Not from the government, Your Honor.

04:12PM 16          **MR. MacKAY:**  No, Your Honor.

04:12PM 17          **THE COURT:**  We'll see you folks.

04:12PM 18          Mr. Serio, don't talk to anybody about your testimony

04:12PM 19  between now and Monday.  In fact, don't talk to anybody about

04:12PM 20  your testimony while you're still testifying, okay?

04:12PM 21          **THE WITNESS:**  Okay.

04:12PM 22          **THE COURT:**  Thank you.

04:12PM 23          **MR. TRIPI:**  Judge, just a point of clarification.

04:12PM 24  Clearly, we're not going to talk to him, he has his own

04:12PM 25  lawyer.

04:12PM  1       **THE COURT:**  Mr. Serio, you can always talk to your

04:12PM  2  lawyer, you can always, always, always talk to your lawyer.

04:12PM  3       Thank you, Mr. Tripi.

04:12PM  4       **MR. TRIPI:**  I wanted to clarify that, we certainly

04:12PM  5  won't talk to him.

04:12PM  6       **THE COURT:**  Yeah, no, no.  Thank you for that

04:12PM  7  clarification.

04:12PM  8       Colleen, were you trying to direct my attention.

04:12PM  9       **THE CLERK:**  Pat was trying to get Ann's attention,

04:12PM 10  but she couldn't hear.

04:12PM 11       **THE COURT:**  Oh.

04:12PM 12       **THE CLERK:**  So that's why I was trying to get her

04:12PM 13  attention.  Sorry.

04:12PM 14       **THE COURT:**  Okay.  Okay.  We'll see everybody on

04:12PM 15  Monday morning.  Thank you.  All.

04:12PM 16       **MR. TRIPI:**  Thank you, Your Honor.  Continue to feel

04:12PM 17  better, and thanks for grinding it out today.

04:12PM 18       **THE COURT:**  Yeah, thank you.  Thanks.

04:13PM 19       (Excerpt concluded at 4:13 p.m.)

       20          *    *    *    *    *    *    *

       21

       22

       23

       24

       25

**<u>CERTIFICATE OF REPORTER</u>**


         In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on September 20, 2024.


                   s/ Ann M. Sawyer
                   Ann M. Sawyer, FCRR, RPR, CRR
                   Official Court Reporter
                   U.S.D.C., W.D.N.Y.

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF RONALD SERIO - DAY 2**

**SEPTEMBER 20, 2024**

**W I T N E S S**                                               **P A G E**

**R O N A L D   S E R I O**                                    3

  (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:           3

  CROSS-EXAMINATION BY MR. MacKAY:                    191


**E X H I B I T S**                                             **P A G E**

GOV Exhibits 489A and 489B                                     56

GOV Exhibits 41A-1, 2, 3 and 13                                97

GOV Exhibits 42A-1 to 9, 42A-11 to 32                          99

GOV Exhibits 53 through 59                                     113

GOV Exhibits 43A-78, 43A-71, 43A-1, 43A-2,                     118

43A-8, 43A-9, 43A-10, 43A-14, 43A-15, 43A-17,

43A-19, 43A-20, 43A-22, 43A-36, 43A-37, 43A-39,

43A-40, 43A-45, 43A-46, 43A-47, 43A-49, 43A-73,

43A-80, 43A-81, 43A-82, 43A-84

GOV Exhibits 265, 264, 269, 272                                127

GOV Exhibit 267                                                128

GOV Exhibit 266                                                129

GOV Exhibits 270, 275                                          131

1    GOV Exhibits 271, 274                              132

2    GOV Exhibit 268                                    133

3    GOV Exhibit 276                                    134

4    GOV Exhibits 277, 278, 279                         135

5    GOV Exhibits 281A, 281B                            136

6    GOV Exhibits 43A-93, 43A-94, 43A-95, 43A-96,       137

7    43A-97, 43A-98, and 43A-99

8    GOV Exhibits 46, 49                                154

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25