```
UNITED STATES; DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------x          19-CR-227(LJV-MJR)
UNITED STATES OF AMERICA,

vs.
                                     Buffalo, New York
JOSEPH BONGIOVANNI,                  August 5, 2024
                Defendant.
--------------------------x
```

**JURY TRIAL EXCERPT - TESTIMONY OF PETER LEPIANE**


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
                  UNITED STATES DISTRICT JUDGE



                    TRINI E. ROSS, UNITED STATES ATTORNEY
                    BY:  JOSEPH M. TRIPI, AUSA
                    BY:  NICHOLAS T. COOPER, AUSA
                    BY:  CASEY L. CHALBECK, AUSA
                    Federal Centre
                    138 Delaware Avenue
                    Buffalo, New York 14202

FOR DEFENDANT:      SINGER LEGAL PLLC
                    BY:  ROBERT CHARLES SINGER, ESQ.
                    80 East Spring Street
                    Williamsville, New York 14221
                         -and-
                    LAW OFFICE OF PARKER ROY MacKAY
                    BY:  PARKER ROY MacKAY, ESQ.
                    3110 Delaware Avenue
                    Kenmore, New York 14217




COURT REPORTER:     Diane S. Martens
                    dmartensreporter@gmail.com

Lepiane - Direct - Cooper

1                    P R O C E E D I N G S

2                    *            *            *

3

4           (**WHEREUPON**, the following is an excerpt taken

5            from proceedings.)

6       **PETER LEPIANE**, called as a witness, being duly sworn,

7    testifies as follows:

8       **MR. COOPER:**  May I inquire, Judge?

9       **THE COURT:**  You may.

3:21PM    10       **MR. COOPER:**  Thank you.

11    **DIRECT EXAMINATION BY MR. COOPER:**

12       **Q**    Good afternoon, sir.

13       A    Good afternoon.

14       **Q**    Can you introduce yourself to our jury?

3:21PM    15       A    Sure.  My name is Peter Lepiane.  I'm a supervising

16    United States Probation Officer in the Western District of

17    New York.

18       **Q**    All right.  Mr. Lepiane, I'm going to ask you to

19    speak nice and slowly and I'm going to try to do the same.

3:21PM    20    That way our court reporter can get everything typed down,

21    okay?

22       A    Yes.

23       **Q**    Okay.  Where did you grow up at?

24       A    I grew up in Niagara Falls, New York.

3:22PM    25       **Q**    And you mentioned that you're working as a

Lepiane - Direct - Cooper

3:22PM  1    supervising probation officer?

2         A    Yes, sir.

3         Q    Can you describe for the jury a bit about your

4    education that led up to that job?

3:22PM  5    A    Yes.  I have a Criminal Justice Administration

6    Master's Degree, Niagara University.

7         Q    And when you graduated with that degree, what sort

8    of work did you get into?

9         A    I got into this work I started as a probation

3:22PM 10    officer assistant in 2006.

11         Q    And what are the duties and responsibilities of a

12    probation officer assistant?

13         A    So we supervise individuals who are released to the

14    community.

3:22PM 15    Q    Did you remain a supervisory -- a probation officer

16    assistant, rather?

17         A    No, in 2007 I was promoted to a probation officer.

18    Then to a specialist, and now I'm a supervisor since 2018.

19         Q    Okay.  And so during your progression through the

3:23PM 20    office, have your responsibilities changed over the years?

21         A    Yes.

22         Q    And how have your responsibilities changed now that

23    you're a supervisor?

24         A    So now I'm responsible and supervise officers that

3:23PM 25    supervise individuals that are released to the community.

Lepiane - Direct - Cooper

3:23PM    1    **Q**    Would it be fair to say that, as a supervising

2    probation officer here in federal court, you're responsible

3    for supervising people who's been sentenced for a conviction

4    of a crime?

3:23PM    5    **A**    Yes, sir.

6    **Q**    I want to speak with you now about how a person

7    ends up getting sentenced.  Can you tell the jury:  How does

8    a person get sentenced in the context of a criminal case?

9    **A**    So, in a criminal case, following a plea or a

3:23PM    10   conviction, an individual is sentenced before a federal judge

11   to either incarceration followed by supervised release or a

12   term of probation.

13   **Q**    You said incarceration followed by supervised

14   release.  Is supervised release always or generally a part of

3:23PM    15   a sentence after a person is released from incarceration?

16   **A**    Yes.

17   **Q**    And what does it mean to be on supervised release?

18   **A**    So, when you're on supervised release, there's a

19   period of time that you're subject to conditions that the

3:24PM    20   Court has ordered.

21   **Q**    And what's the purpose of that?

22   **A**    To make sure that someone is not committing any new

23   crime in the community but also to help them transition from

24   custody to regular life.

3:24PM    25   **Q**    Who decides what conditions a person has -- is

Lepiane - Direct - Cooper

3:24PM  1  subject to when they're on supervised release?

2      A    The sentencing judge.

3      Q    And is that a federal judge?

4      A    Yes.

3:24PM  5      Q    Okay.  And does the probation office -- your

6  office -- make recommendations to that federal judge?

7      A    Yes.

8      Q    Are there something called "standard conditions"?

9      A    Yes.

3:24PM 10      Q    What's an example of that?

11      A    Standard condition would be they have to report

12  police contact within 72 hours.  You can't leave the judicial

13  district that you're in.  You have to report when instructed

14  to do so.

3:24PM 15      Q    Can there also be specific conditions tailored to

16  an individual?

17      A    Yes.  The Court will set special conditions that

18  are tailored to the individual based on their characteristics

19  or the crime they were convicted of.

3:25PM 20      Q    And then who or what agency is responsible for

21  ensuring that a person who's on supervised release is

22  complying with those conditions?

23      A    The U.S. Probation Office.

24      Q    Is that you?

3:25PM 25      A    It is.

6

Lepiane - Direct - Cooper

3:25PM   1      **Q**    Okay.  And the people you work with?

         2      A     Yes.

         3      **Q**    Does your office have the ability and the authority

         4    to investigate suspected violations?

3:25PM   5      A     Yeah, we're required to.

         6      **Q**    Is that your job?

         7      A     It's what we swear to, yes.

         8      **Q**    Okay.  And do you work -- in the context of

         9    investigating those suspected violations, do you often work

3:25PM  10    with members of other law enforcement agencies?

        11      A     We do, yes.

        12      **Q**    Can you describe for the jury how it would be that

        13    you as a probation officer would interact with a member of

        14    another law enforcement agency?

3:25PM  15      A     Yeah.  So, as part of our job we have to stay

        16    informed as to how a person's doing in relation to their

        17    conditions of supervised release.  Our agency is very small

        18    so we like the resources of law enforcement in the community

        19    of where the person lives.  So we'll reach out to them when

3:26PM  20    we get information that maybe something might not be going

        21    right or opposite.

        22      **Q**    Are there instances during the carrying out of your

        23    responsibilities when you'll share information that you have

        24    about a supervisee with members of another law enforcement

3:26PM  25    agency?

7

Lepiane - Direct - Cooper

3:26PM  1      A    Yes.

        2      Q    And can you give an example of how that would

        3  occur?

        4      A    Sure.  We get suspicion or we get information from

3:26PM  5  an outside source that a person we're supervising is not

        6  doing the right thing.  We'll reach out to local law

        7  enforcement for assistance and also to see if they have any

        8  information that can help us.

        9      Q    Okay.  And then I think you started to touch on

3:26PM 10  this but on the flip side of that coin, are there times

       11  during the course of your duties when you're receiving

       12  information from other outside law enforcement agencies?

       13      A    Yeah.  We have a shared interest in community

       14  protection with law enforcement.  So, we'll also receive

3:26PM 15  information from them relating to how someone's doing with

       16  their supervised release conditions.

       17      Q    Now you mentioned that sometimes you interact or

       18  interface with local law enforcement, is that correct?

       19      A    Yes.

3:27PM 20      Q    Do you also interact and share information with

       21  federal law enforcement?

       22      A    Yes.

       23      Q    What are some of the federal law enforcement

       24  agencies that you work with?

3:27PM 25      A    We've worked with Secret Service, FBI, DEA, Customs

Lepiane - Direct - Cooper

3:27PM 1    and Border Patrol, ATF.  All of them.

2         Q    Now you just described the manner in which your

3    office kind of works in concert with some of those other law

4    enforcement agencies.  Would you consider that to be a

3:27PM 5    necessary part of your job?

6         A    Yes, very necessary.

7         Q    Okay.  And when in the course of your job you learn

8    information from a member of a federal law enforcement

9    agency, do you accept it as gospel?

3:27PM 10        A    Yeah, we believe it, yes.

11        Q    You take it to be true?

12        A    Yes.

13        Q    Is there a trust that's inherent in that

14    responsibility?

3:27PM 15        A    Yes.

16        Q    So if an FBI told you something about a supervisee,

17    you're not going to go and investigate whether what they told

18    you is true on your own, right?

19        A    Right.

3:28PM 20        Q    Okay.  Is that kind of trust that's inherent

21    between yourself as a probation officer and other law

22    enforcement agencies important for you to be able to

23    effectively do your job?

24        A    Yeah.  It's necessary.

3:28PM 25        Q    Is that something that just you do, Pete, or does

Lepiane - Direct - Cooper

3:28PM  1    everybody do that in your office?

        2        A    Our office does.

        3        Q    Are you familiar with a person by the name of

        4    Joseph Bongiovanni?

3:28PM  5        A    I am.

        6        Q    How do you know that person?

        7        A    I worked with Joe Bongiovanni on several cases.

        8        Q    Do you know what his job title was before he

        9    retired?

3:28PM  10       A    Yeah, he was a special agent for the DEA.

        11       Q    And you said you've worked on cases with him

        12   before?

        13       A    Yes, sir.

        14       Q    Have you interacted with him in person before?

3:28PM  15       A    Yes.

        16       Q    Are you familiar with what he looks like?

        17       A    Yes.

        18       Q    Is he in court today?

        19       A    Yes.

3:28PM  20       Q    Can you just point him out and identify an article

        21   of clothing that he's wearing for the record?

        22       A    Yeah, sitting at the defense table.  He's got a

        23   blue suit on, some glasses.

        24       **MR. COOPER:**  Indicating the defendant, Judge?

3:29PM  25       **THE COURT:**  It does.

Lepiane - Direct - Cooper

3:29PM  1      **MR. COOPER:**  Thank you.

2      **Q**    Do you know an individual by the name of Peter

3  Gerace?

4      A    Yes.

3:29PM  5      **Q**    How do you know that person?

6      A    Our office supervised him.

7      **Q**    Did you become assigned personally to supervise

8  Peter Gerace?

9      A    I did, yes.

3:29PM  10     **Q**    Can you tell the jury a little bit about how you

11 became the supervising officer for Peter Gerace and when?

12     A    Sure.  I was the duty officer on August 31st, 2009.

13 Our office will have duty officers assigned daily so that

14 there's somebody in the office just in case there's people on

3:29PM  15 vacation or leave.  That happened to be me that day on

16 August 31st.  I received a phone call, duty phone call, from

17 Agent Tom Herbst with the FBI who indicated that he had

18 information regarding Peter Gerace that he wanted to share.

19     **Q**    Got it.  Let's pause right there for a second.

3:29PM  20     On August 31st of 2009 you're the duty officer?

21     A    Yes, sir.

22     **Q**    Okay.  When you walked into work that day, was it

23 your job to supervise Peter Gerace?

24     A    No.

3:30PM  25     **Q**    When your office received that duty call from

Lepiane - Direct - Cooper

3:30PM 1    Special Agent Herbst, was the supervising officer for Gerace

2    in the office that day?

3        A    No, he, he had actually -- was no longer with our

4    office.

3:30PM 5        Q    And, so, is it fair to say, as the duty officer, it

6    became your job to take that call?

7        A    I took the call, yep.

8        Q    Okay.  And we're going to circle back in a moment

9    to the information you learned from Special Agent Herbst.

3:30PM 10   But, first, I want to ask a little bit about your

11   recordkeeping.

12       Does your job as a probation officer require that

13   you keep records and reports?

14       A    It does.

3:30PM 15       Q    What are your records or reports called?

16       A    They're called chronological records.

17       Q    Do you have a short name for that?

18       A    It's called chronos.

19       Q    Chronos?

3:30PM 20       A    Chronos.

21       Q    That's C-H-R-O-N-O-S?

22       A    Yes.

23       Q    Okay.  What gets reported in a chrono?

24       A    Any contact that we have with individuals or about

3:31PM 25   individuals.

Lepiane - Direct - Cooper

3:31PM    1    **Q**    So if you have a conversation with a supervisee,

2    does that go in a chrono?

3    **A**    Yes.

4    **Q**    If you get a call from Buffalo Police Department

3:31PM    5    talking about something your supervisee did, does that go in

6    a chrono?

7    **A**    Yes.

8    **Q**    Are those chrono logs made and kept in the course

9    of your duties as a U.S. Probation Officer?

3:31PM    10    **A**    Yes.

11    **Q**    Are they routinely kept as a part of U.S.

12    Probation's usual practice?

13    **A**    Yes.

14    **Q**    And do you log the information that you put in the

3:31PM    15    report at or near the time that you learn of it?

16    **A**    Yes.

17    **Q**    Did you create chrono entries related to your

18    supervision of Peter Gerace?

19    **A**    I did.

3:31PM    20    **Q**    You started to tell us that you received a phone

21    call from Special Agent Herbst; is that correct?

22    **A**    Yes.

23    **Q**    Okay.  And this was August 31st of 2009?

24    **A**    Yes.

3:31PM    25    **Q**    What action did you take as a result of receiving

Lepiane - Direct - Cooper

3:31PM   1   that phone call?

2        A   So I received the phone call and then I actually

3   met with Agent Herbst in my office to discuss the information

4   he had regarding Peter Gerace.

3:32PM   5        Q   Okay.  Let me stop you right there.

6            Did the information that Special Agent Herbst told

7   you on that phone call impact your activities going forward?

8        A   Yes.

9        Q   Okay.  What did Special Agent Herbst tell you?

3:32PM  10        A   He said that Peter Gerace was operating Pharaoh's

11   Gentlemen's Club which was a place that he had been told in

12   the past he was not allowed to work at.  So that would have

13   been a violation of one of his conditions.

14        Q   So, as his -- as a probation officer, are you able

3:32PM  15   to see what conditions someone has to follow?

16        A   Yes.

17        Q   Was one of Peter Gerace's conditions having to do

18   with where he could and couldn't work?

19        A   Yes.  He had to work at an approved employment.

3:32PM  20   And that employment wasn't approved because the state liquor

21   authority had denied him to be able to work there.  So we

22   also instructed him not to do so.

23        Q   So was Peter Gerace directly instructed by U.S.

24   Probation that he couldn't work at Pharaoh's?

3:32PM  25        A   Yes.

Lepiane - Direct - Cooper

3:32PM   1      **Q**    In addition to this information about Gerace

2    working at Pharaoh's, did Special Agent Herbst share any

3    information with you related to drugs?

4      A    Yes.  He said that drug use and distribution was

3:33PM   5    happening at the club.

6      **Q**    Okay.  Is that something that would be concerning

7    to you about somebody you're supervising?

8      A    Very concerning.

9      **Q**    Okay.  As a result of that first conversation that

3:33PM  10    you had with Special Agent Herbst, you indicated that you met

11    with him again in the future?

12      A    Yes.

13      **Q**    Okay.  And did you end up beginning an

14    investigation, in your capacity as a probation officer, into

3:33PM  15    whether these allegations were true?

16      A    Yes.  So I took the information that was provided.

17    I talked to my direct supervisor and we started an

18    investigation into whether or not he was in violation of his

19    conditions.  That investigation entailed surveillance

3:33PM  20    operations and other matters to try to determine whether or

21    not he was, in fact, working there.

22      **Q**    Now, is that surveillance that you personally

23    engaged in?

24      A    Yes.

3:33PM  25      **Q**    And you mentioned earlier that you have a pretty

Lepiane - Direct - Cooper

3:34PM  1    small office; is that correct?

2         A    Yes.

3         Q    Is it common for you to work with other federal law

4    enforcement agencies in that sort of situation?

3:34PM  5    A    Yeah, it's necessary.

6         Q    What law enforcement agency was kind of associated

7    with your investigation into Pharaoh's and Peter Gerace?

8         A    FBI.

9         Q    Is that because Special Agent Herbst brought you

3:34PM  10   the information?

11        A    Yes.  They also were the underlying case agent for

12   Mr. Gerace's case.

13        Q    Are you referring to what ended up causing him to

14   be on post-release supervision?

3:34PM  15   A    Yes.

16        Q    Okay.  Did there come a time after your

17   surveillance in the beginning of your investigation when you

18   decided to conduct a search of Pharaoh's Gentlemen's Club?

19        A    Yes.

3:34PM  20   Q    Okay.  Now, is that something that you do

21   occasionally as a probation officer?

22        A    Yes.

23        Q    Is it slightly different for you as a probation

24   officer to search a location than for a federal agent working

3:35PM  25   on a case on their own?

Lepiane - Direct - Cooper

3:35PM 1    A    Yes.  So, one of the special conditions that can be

2    imposed and was imposed in this case is a search condition

3    which allows us to search a person's property, a place of

4    residence, their actual person, and anything else they have

3:35PM 5    under their control.

6    Q    So is that something that was a condition of Peter

7    Gerace's supervised release?

8    A    It was.

9    Q    Do you remember what day you ultimately

3:35PM 10   participated in this search of Pharaoh's Gentlemen's Club?

11   A    Yes, it was October 31st, 2009.

12   Q    Is that, give or take, about two months after you

13   initially got the information?

14   A    Yes.

3:35PM 15   Q    Did you go in there and search it all by yourself?

16   A    No.

17   Q    Who went with you?

18   A    Myself, other members of our Search Enforcement

19   Team, the U.S. Probation Office Search Enforcement Team.  We

3:35PM 20   had the assistance of the FBI, and also Cheektowaga police.

21   Q    And where is Pharaoh's Gentlemen's Club located, do

22   you know generally?

23   A    I believe it's in Cheektowaga.  It's out near Exit

24   49.

3:36PM 25   Q    I'm not asking you the --

Lepiane - Direct - Cooper

3:36PM  1      A    Oh.

        2      Q    -- exact address.  It's in Cheektowaga?

        3      A    Yes.

        4      Q    Is it kind of a big location?

3:36PM  5      A    Yes.

        6      Q    So there's a bunch of members of law enforcement

        7  both from probation and the FBI, is that fair?

        8      A    Yes.

        9      Q    When you arrive at Pharaoh's Gentlemen's Club to

3:36PM 10  conduct the search, what was your role?

       11      A    So, I was the case officer.  So the hope was that

       12  he would just open the door and come out and that I would

       13  make contact with him.  His car was in the driveway -- or the

       14  parking lot of the club.  He didn't come out.  So,

3:36PM 15  Cheektowaga police did a welfare check -- because we knew he

       16  was in there -- to make sure he was okay, and he opened the

       17  door.  And then I went in with the rest of the team and

       18  searched.

       19      Q    And what time of day approximately was it?

3:36PM 20      A    It was in the morning.

       21      Q    Okay.  Was part of what you did there administer a

       22  drug test on Peter Gerace?

       23      A    Yes.

       24      Q    Did Gerace make any statements to you about drug

3:37PM 25  use?

Lepiane - Direct - Cooper

3:37PM  1      A    Yeah, he admitted to using cocaine the night
        2  before.
        3      Q    And what was the result of the test that you
        4  conducted?
3:37PM  5      A    He was positive for cocaine use.
        6      Q    Was FBI Special Agent Tom Herbst present for that
        7  search at Pharaoh's Gentlemen's Club?
        8      A    Yes.
        9      Q    Was FBI Task Force Officer Rob Cottrell present for
3:37PM 10  that search?
       11      A    I believe so but I'm not certain.
       12      Q    Now was it one of the conditions of Peter Gerace's
       13  release that he not use cocaine?
       14      A    Yeah, he -- they can't use illegal drugs.
3:37PM 15      Q    So that was a violation, right?
       16      A    Yes.
       17      Q    Did you continue your investigation into whether
       18  Peter Gerace had violated his conditions?
       19      A    Yeah.  So we searched the club.  We were looking
3:37PM 20  for documents or anything that would tie him to operating or
       21  working at the Gentlemen's Club.  And we found various
       22  documents with his name on it and the club's name on it.  In
       23  his wallet he had credit cards for the club in his name.  He
       24  also had keys to the establishment.
3:38PM 25      Q    What, if anything, did you do as a result of the

Lepiane - Direct - Cooper

3:38PM  1  evidence that you found on that search?

2       A    So, we collected the evidence and I told him that

3  I'd be in touch with him and -- that was a Saturday, and then

4  the next Monday I talked to my supervisor about what we were

3:38PM  5  going to do.

6       Q    And is that kind of the common order of events that

7  you would talk to a supervisor next?

8       A    Yeah.  So, it always depends on the violation and

9  the risk that it presents.  And in this case it could be

3:38PM  10  considered a technical violation that he's working somewhere

11  he's not supposed to and the danger to the community is not

12  high enough that we need to go ask the judge for a warrant on

13  that day.  So that's normally what we would do is then go

14  back and talk to our supervisor.

3:38PM  15       Q    And did you notify the Court of this information

16  the following Monday?

17       A    No.

18       Q    And is that some of the discretion that you're

19  allowed, and expected, to exercise in carrying out your job?

3:39PM  20       A    Yeah.  So the Court gives us discretion, as I

21  stated, based on what the risk of danger would be to the

22  community or the risk of the person fleeing.  We try to take

23  action to bring someone back into compliance before just

24  sending someone to jail and that's the discretion that the

3:39PM  25  Court allows us to have.

Lepiane - Direct - Cooper

3:39PM 1      **Q**    Now, to your knowledge, was the DEA present and

2      participating in your search at Pharaoh's Gentlemen's Club?

3      **A**    No, they were not.

4      **Q**    Were they notified in advance of the search of

3:39PM 5      Pharaoh's Gentlemen's Club?

6      **A**    Not by my office, no.

7      **Q**    After the search of the Pharaoh's Gentlemen's Club,

8      did you get contacted from somebody at the DEA regarding

9      Peter Gerace?

3:39PM 10      **A**    Yes.

11      **Q**    Who?

12      **A**    Agent Bongiovanni.

13      **Q**    What was the nature of that communication?

14      **A**    Agent Bongiovanni called me to say that Peter

3:40PM 15      Gerace had reached out to him.  He said that Peter Gerace

16      wanted to potentially cooperate to lessen any violation

17      sentence that would occur.

18              I told him that an individual who's on supervised

19      release can't actively cooperate without the Court's

3:40PM 20      permission.  It's one of their conditions.

21              And he said that in the past, he'd been a

22      confidential source of information for him and he wanted to

23      meet with DEA to potentially lessen his sentence.

24              I told him we don't make any promises and it's

3:40PM 25      ultimately going to be up to the judge.

Lepiane - Direct - Cooper

3:40PM     1        Q     During that phone call with the defendant, did he

           2   tell you that he was friends with Peter Gerace?

           3        A     No.

           4        Q     Did he tell you they hung out?

3:40PM     5        A     No.

           6        Q     Did he tell you they went to dinner together?

           7        A     No.

           8        Q     Did he tell you they text messaged each other

           9   socially?

3:40PM    10        A     No.

          11        Q     Did he tell you they exchanged phone calls

          12   regularly?

          13        A     No.

          14        Q     None of that?

3:40PM    15        A     No.

          16        Q     In the aftermath of the search at Pharaoh's, did

          17   you continue to stay in touch with Special Agent Herbst from

          18   the FBI?

          19        A     Yes.  I talked to him frequently regarding what our

3:41PM    20   ultimately probation was going to do and how his

          21   investigation was going.

          22        Q     Based on your conversations with Special Agent

          23   Herbst, did you develop an understanding that he was

          24   interested in developing a case and charging Peter Gerace?

3:41PM    25        A     Yeah.  He told me that they were investigating him

Lepiane - Direct - Cooper

3:41PM  1   for potential drug conspiracy, yes.

2       Q    And after that conversation that you had with the

3   defendant, did you have future communications with Special

4   Agent Herbst about a meeting between Special Agent Herbst and

3:41PM  5   the defendant, Mr. Bongiovanni?

6       A    Yeah.  Actually the day before Agent Bongiovanni

7   called me, Agent Herbst called to say that Gerace had reached

8   out to the DEA about potentially cooperating.  So then after

9   the conversation I had with Agent Bongiovanni, I continued to

3:42PM  10  touch base to see whether or not that meeting had occurred

11  and what the status was.

12      Q    Now, can that sometimes -- generally in your job,

13  can that factor into how you would handle a situation of a

14  suspected violation if somebody's cooperating?

3:42PM  15      A    It doesn't influence what probation does.  It could

16  be something that the defense and the prosecuting attorney

17  present to the judge as mitigating factor at the time of

18  sentencing on a violation.  But it doesn't influence what

19  we do.

3:42PM  20      Q    So as far as you're concerned, it's business as

21  usual, is that fair to say?

22      A    Yes.

23      Q    How did your probation investigation into Peter

24  Gerace and his activity at Pharaoh's ultimately resolve?

3:42PM  25      A    So, after our investigation, we decided to present

Lepiane - Direct - Cooper

3:42PM  1  to the Court to have his supervision modified so that he'd be

2  on an ankle bracelet.  He had roughly four months left on

3  supervised release so we asked the Court to put him on the

4  ankle bracelet for the remainder of his time, which the Court

3:43PM  5  ultimately agreed to.

6      **Q**    Did you do that because the defendant called you

7  and spoke to you about it?

8      A    No.

9      **Q**    Is that what you would have done anyway?

3:43PM 10      A    Yes.

11      **Q**    Did you provide any preferential treatment at all

12  to Gerace as a result of the phone call you got from the

13  defendant?

14      A    No.

3:43PM 15      **MR. COOPER:**  No more direct, Judge.

16      **THE COURT:**  Folks, we're going to take our afternoon

17  break now.

18      So please remember my instructions about not talking

19  with anyone about the case including each other and not

3:43PM 20  making up your mind.

21      See you back here in about ten or 15 minutes.

22      (**WHEREUPON,** jury excused.)

23      **THE COURT:**  Anything for the record?

24      **MR. SINGER:**  No, your Honor.

3:44PM 25      **THE COURT:**  Anything from the government?

Lepiane - Cross - Singer

3:44PM    1        **MR. COOPER:**  No, thank you, Judge.

2        **THE COURT:**  Okay.  See you in a few minutes.

3         (**WHEREUPON,** recess taken.)

4        (Open court, defendant present.)

4:08PM    5        **THE CLERK:**  We're back on the record for the

6    continuation of the jury trial in 19-CR-227, United States of

7    America v. Joseph Bongiovanni.

8        All counsel and parties are present.

9        **THE COURT:**  Okay.  Anything from the government?

4:09PM   10        **MR. COOPER:**  No, thank you, Judge.

11        **THE COURT:**  Ready to go?

12        **MR. SINGER:**  Yes, Judge.

13        **THE COURT:**  Let's bring them back, please.

14         (**WHEREUPON,** jury present.)

4:09PM   15        **THE COURT:**  The record will reflect that all our jurors

16    are present.

17        I remind the witness that he's still under oath.

18        And, Mr. Singer, you may begin.

19        **MR. SINGER:**  Thank you, Judge.

4:10PM   20    **CROSS-EXAMINATION BY MR. SINGER:**

21        **Q**    Good afternoon, Officer Lepiane.

22        A    Good afternoon, Mr. Singer.

23        **Q**    I got to admit:  When we saw each other in court a

24    week and a half ago, I'm wearing the same ensemble that I am

4:10PM   25    today.  So I apologize for making a fashion faux pas.  But I

Lepiane - Cross - Singer

4:10PM 1    notice you didn't.  So good on you.

2              So I wanted to ask you a couple of questions about

3    your testimony.

4              Before we get to that, though, you had mentioned

4:11PM 5    "chronos" in your testimony on direct; do you remember that?

6         A    Yes, sir.

7         Q    And so are chronos, they're chronological reports

8    that you generate during the course your supervision, is that

9    right?

4:11PM 10        A    Chronological records, yes.

11        Q    And what's the purpose of the chronos?  Why do you

12   keep chronos?

13        A    If you think of it like a journal, right, about the

14   person who's on supervised release.  It's a record of all our

4:11PM 15   contact with them.  So we supervise several individuals.  So,

16   it's hard to remember everything about every single person so

17   we make sure we take good notes.

18        Q    And you had a chance to review your chronological

19   records before you testified here today?

4:11PM 20        A    Yes, sir.

21        Q    And I know we're talking about an incident that

22   occurred more than 15 years at this point, right?

23        A    Yes.

24        Q    So, was that a way to refresh your memory with your

4:11PM 25   testimony so you could testify as accurately as possible?

Lepiane - Cross - Singer

4:11PM   1        A    Yes.

         2        Q    In the chronological reports that you were taking a

         3   look at before you testified today, they were roughly about

         4   14 pages long or so?

4:12PM   5        A    Roughly.

         6        Q    And sometimes you had a couple of sentences on one

         7   particular event?

         8        A    Yes.

         9        Q    But other times you had longer paragraphs about

4:12PM  10   things that happened?

        11        A    Yes.

        12        Q    Okay.  And that's something that aided your

        13   testimony here today, correct?

        14        A    Yes.

4:12PM  15        Q    Okay.  So, let's get down to a little bit of the

        16   facts.  So, you were supervising Peter Gerace on supervision

        17   but not a hundred percent of the time; is that right?

        18        A    I didn't supervise him his whole term.  I started

        19   on August 31st of 2009.

4:12PM  20        Q    Okay.  And that was based on the call that you got

        21   from FBI Special Agent Thomas Herbst, is that right?

        22        A    Yes.

        23        Q    You mentioned that you were the duty officer that

        24   day?

4:12PM  25        A    Yes.

Lepiane - Cross - Singer

4:12PM   1      Q     So, kind of the guy who picked up the phone, for

2    lack of a better word?

3      A     Yes.

4      Q     Okay.  And, so, during that call on the 31st of

4:12PM   5    August in 2009, that's when Special Agent Herbst from the FBI

6    talked to you about information that he had received about

7    Peter Gerace, correct?

8      A     Yes.

9      Q     And so you mentioned a couple different things.

4:13PM  10    You mentioned that there was information that he had that

11    Peter Gerace may have been using some illegal substances, is

12    that right?

13      A     Yes.

14      Q     And one of those, in particular, was cocaine, is

4:13PM  15    that right?

16      A     Yes.

17      Q     And you also had information provided by Special

18    Agent Herbst that Peter Gerace may have been distributing

19    cocaine inside of Pharaoh's Gentlemen's Club?

4:13PM  20      A     That -- the information was that drugs were being

21    distributed from there, yes.

22      Q     Okay.  And so you also understood that Mr. Herbst

23    gave you some information that Peter Gerace may have been

24    frequenting Pharaoh's Gentlemen's Club, which was a violation

4:13PM  25    of his conditions.

Lepiane - Cross - Singer

4:13PM  1      A      The information was that he was owning and

2      operating it, so, yes, he would have been frequenting it,

3      as well.

4      Q      Okay.  And you, after learning all of that, did you

4:13PM  5      offer up the fact that Peter Gerace had a search condition as

6      part of his conditions or did Special Agent Herbst ask you

7      about that?

8      A      So I don't specifically remember either/or.  It

9      could have come up in conversation what are his conditions

4:14PM  10     and I would have listed off his conditions.  But I don't

11     specifically ask -- remember being asked that or telling

12     that.

13     Q      Okay.  But you do recall that that came up as part

14     of the topic of conversation, correct?

4:14PM  15     A      It would have, yes.

16     Q      And one of the things that the two of you discussed

17     as a result of that, was that you needed to establish that

18     Peter Gerace was at Pharaoh's Gentlemen's Club to execute

19     that search condition, correct?

4:14PM  20     A      No.  We just needed to establish he had control

21     over the property.

22     Q      And, so, when you talked about the investigation

23     that you followed up on after this phone call, part of that

24     was related to establishing Peter Gerace's control of

4:14PM  25     Pharaoh's Gentlemen's Club?

Lepiane - Cross - Singer

4:14PM  1     A     Yes.

2     Q     And establishing that fact would allow you to

3   conduct a search there pursuant to the search condition?

4     A     Yes.

4:14PM  5     Q     Okay.  And, so, Mr. Cooper asked you about how it's

6   a little bit different the search condition that you have as

7   a probation officer versus what a law enforcement might apply

8   for in a search warrant?

9     A     Yes.

4:15PM 10     Q     It's a little easier to use your search condition

11  to search a place, fair to say?

12     A     It's -- we don't need probable cause which is what

13  law enforcement needs.

14     Q     Okay.  And, so, the plan that you two develop,

4:15PM 15  either that day or over the course of the next several days,

16  is that some type of surveillance is going to be conducted to

17  establish Peter Gerace having ownership and control of the

18  Pharaoh's Gentlemen's Club, correct?

19     A     So, the plan wasn't -- you phrase it like the plan

4:15PM 20  "you two" established.  It was our plan, the probation

21  office's plan, and we asked for assistance from the FBI.

22     Q     Okay.  Understood.

23     A     If that makes sense.

24     Q     No, it does.  And I don't want to misstate

4:15PM 25  anything.

Lepiane - Cross - Singer

4:15PM   1     A    Okay.

2     Q    So, it was your plan that you needed to establish

3  some type of surveillance to establish the fact that Peter

4  Gerace had control of Pharaoh's?

4:15PM   5     A    Yes.

6     Q    And you had asked FBI to support you in this

7  endeavor?

8     A    Yes.

9     Q    And Special Agent Herbst had agreed to that

4:15PM  10  support?

11     A    Yes.

12     Q    And, so, over the course of the next 60 or so days,

13  both your office and FBI conduct surveillance of Peter

14  Gerace?

4:16PM  15     A    Yes.

16     Q    And also at Pharaoh's Gentlemen's Club?

17     A    Yes.

18     Q    And there's other partners in law enforcement,

19  local ones, that also assist in this particular

4:16PM  20  investigation, correct?

21     A    Yes.

22     Q    So, I think you had mentioned on direct testimony

23  Cheektowaga Police Department was one of those people --

24     A    Yes.

4:16PM  25     Q    -- who established surveillance?

Lepiane - Cross - Singer

4:16PM    1        A    Yes.

          2        Q    Okay.  And there is discussions that all of you

          3    partners in law enforcement have regarding the surveillance

          4    efforts, correct?

4:16PM    5        A    We discuss -- yeah, we would discuss what's being

          6    found during the surveillance, yes.

          7        Q    Okay.  And that all culminates on Halloween of

          8    2009, so, October 31st of 2009 when you are able to conduct a

          9    search of Pharaoh's Gentlemen's Club, is that right?

4:16PM   10        A    Yes.  Once we gather all the information, we

         11    determined he had control over the property, we plan a search

         12    for that day October 31st, 2009, yep, that morning.

         13        Q    Okay.  And you mentioned there were members of the

         14    probation department who were part of that search team?

4:17PM   15        A    Yes.

         16        Q    Also you mentioned that FBI Special Agent Herbst

         17    was a member of that search team?

         18        A    He was there assisting us.  So our -- our team is

         19    the one who has the authority to be there.

4:17PM   20        Q    Mm-mm.

         21        A    We'll have several law enforcement agencies assist

         22    us with that, and on that day, yes, FBI Special Agent Herbst

         23    was there.

         24        Q    Okay.  And he was, he was somebody -- there were

4:17PM   25    also other agencies that were there that were helping you,

Lepiane - Cross - Singer

4:17PM | 1 | as well?

2 |     A    Yes.

3 |     Q    I think you mentioned that Cheektowaga Police

4 | Department was the ones who knocked on the door --

4:17PM | 5 |     A    Yeah.

6 |     Q    -- to eventually raise his attention?

7 |     A    Yes, the welfare check, yes.

8 |     Q    And when all of you -- when Peter Gerace comes to

9 | the door to answer, is that when you engage Peter Gerace in

4:17PM | 10 | your role as the leader?

11 |     A    So I don't specifically remember 15 years ago how

12 | that played out but I would assume as the case officer, I

13 | would have contact with him, yes.

14 |     Q    Okay.  There is eventually a discussion that occurs

4:18PM | 15 | between you and Peter Gerace, right?

16 |     A    Yes.

17 |     Q    And one of the things that you wanted to do was to

18 | test him for the presence of any type of illegal substances

19 | he may have ingested?

4:18PM | 20 |     A    Yes.

21 |     Q    And that's when he made that admission that he had

22 | used cocaine on the previous evening?

23 |     A    Yes.

24 |     Q    And you mentioned that you had also tested him with

4:18PM | 25 | your, your -- your testing equipment?

Lepiane - Cross - Singer

4:18PM    1      A     Yes.

2      **Q**     And that returned a positive result?

3      A     Cocaine, yes.

4      **Q**     And, so, are you asking other questions of Peter

4:18PM    5   Gerace during the course of time that you're in the building?

6      A     Yeah.  I discussed with him the allegation that he

7   had been working there, yes.

8      **Q**     Okay.  Now, I know that one of your other

9   responsibilities was also to help conduct the search, or

4:18PM   10   conduct the search of Pharaoh's?

11      A     Yes.

12      **Q**     And that was looking for documentation which might

13   establish him being there; is that right?

14      A     Him being the owner and operator, yes.

4:18PM   15      **Q**     And you mentioned that you found some credit cards

16   that would be indicative of that, correct?

17      A     Yes.

18      **Q**     You also found some paperwork in the office that

19   may be indicative of that?

4:19PM   20      A     Yes.

21      **Q**     And Special Agent Herbst from the FBI, I know he

22   doesn't work for the probation office but he's also present

23   during the time that you're in the building, correct?

24      A     Yes.

4:19PM   25      **Q**     And it was your understanding that one of the

Lepiane - Cross - Singer

4:19PM   1    reasons why he was there was so that he could help build some

         2    rapport with Peter Gerace?

         3        A    I know that he was -- he was there assisting us but

         4    I know he had his own investigation into Peter Gerace.

4:19PM   5        Q    Okay.  So he had his own objectives and

         6    expectations when he was there?

         7        A    I can't speak to his objectives but he had his own

         8    investigation, yes.

         9        Q    Okay.  And that was separate from your violation --

4:19PM  10        A    Yes.

        11        Q    -- investigation, correct?

        12        A    Yes.

        13        Q    When you were searching Pharaoh's Gentlemen's Club

        14    that day, did you find any type of cocaine on the premises?

4:19PM  15        A    I don't remember, no.

        16        Q    Did you find any other type of narcotics on the

        17    premises?

        18        A    I don't believe so.

        19        Q    So, after conducting the search and the interview

4:20PM  20    and the test of Mr. Gerace that day, you indicated that it

        21    was your decision to go back to the office and discuss what

        22    to do next with your supervisor?

        23        A    Yeah.  We didn't do it that day but that was what

        24    we decided we were going to do.

4:20PM  25        Q    Okay.

Lepiane - Cross - Singer

4:20PM   1       A    So, two days later, yeah.

         2       Q    Because you had mentioned that part of the

         3    violations that you had -- became aware of that day --

         4    involved him working at a place that he shouldn't be working

4:20PM   5    at, correct?

         6       A    Yes.

         7       Q    As well as ingesting cocaine when he shouldn't be

         8    doing that?

         9       A    Yes.

4:20PM  10       Q    And I think you termed those as technical

        11    violations?

        12       A    They could be considered technical violations, yes.

        13       Q    But --

        14       A    I'm not a fan of the word but yes.

4:20PM  15       Q    But the reason why they're termed technical

        16    violations is because they're ones that, as you said, don't

        17    necessarily warrant immediate incarceration, correct?

        18       A    Correct, yes.

        19       Q    Because one of the goals that you have is you want

4:21PM  20    to try to rehabilitate someone when they're on supervised

        21    release, correct?

        22       A    Yes.

        23       Q    And, so, given what had happened here, it was your

        24    decision at that point in time that you may want to try to

4:21PM  25    put him into some type of stricter monitoring conditions to

Lepiane - Cross - Singer

4:21PM  1    help him get along?

2         A    Yeah.  We were going to see if there were other

3    avenues we can take that didn't involve him ending up in jail

4    that could bring him back into compliance, yes.

4:21PM  5    Q    Okay.  So fast forward two days later.  You stated

6    that on November 2nd of 2009 you had received a call from

7    Agent Herbst that Peter Gerace had contacted the DEA and the

8    FBI had been contacted by DEA?

9         A    The phone call I got from Agent Herbst was on

4:21PM  10   November 2nd and that phone call was Agent Herbst telling me

11   that Peter Gerace had reached out to the DEA.  I don't really

12   know how that -- he found out about that but that was the

13   information he told me.

14        Q    Okay.  So he told you that Peter Gerace reached out

4:21PM  15   to the DEA?

16        A    Yes.

17        Q    And then there was also a discussion that there was

18   going to be some type of meeting between the DEA, the FBI,

19   and Peter Gerace to follow up on that?

4:22PM  20        A    Yes.

21        Q    And in addition on that day, you had also made

22   contact with Assistant United States Attorney Tony Bruce; is

23   that right?

24        A    Yes.

4:22PM  25        Q    And Tony Bruce is somebody who worked in the

Lepiane - Cross - Singer

4:22PM    1    prosecutor's office?

2         A    Yes.

3         Q    And you were updating Mr. Bruce with regard to what

4    was going on with the violation; is that right?

4:22PM    5    A    Yes.  So, Tony Bruce was the prosecuting AUSA on

6    Peter Gerace's underlying case.  So we work in conjunction

7    with their office regarding violations.

8         Q    Okay.  So you were giving an update to the U.S.

9    Attorney's Office about the violation that you had witnessed

4:22PM    10    and observed and investigated?

11        A    Yes.

12        Q    And then you mentioned that the next day on

13    November the 3rd of 2009, that's when you get a call from

14    Special Agent Bongiovanni?

4:22PM    15    A    Yes.

16        Q    And he had a conversation with you about Peter

17    Gerace and possible cooperation, is that right?

18        A    Yes.

19        Q    And the purpose of that was to potentially lessen

4:23PM    20    the sanctions for his violation?

21        A    Yes.

22        Q    And you had indicated to Agent Bongiovanni that if

23    that was going to happen, it was going to be something that

24    would at least require court approval because he was on

4:23PM    25    supervision?

Lepiane - Cross - Singer

4:23PM  1      A    In order for them to actively cooperate, they have

2    to get Court permission to do that because they're on

3    supervision, yes.

4      Q    And you also mentioned that Mr. Bongiovanni, when

4:23PM  5    he was talking to you about Gerace, had indicated that he was

6    a source of information, is that right?

7      A    He said he was a confidential source of

8    information, yes.

9      Q    Okay.  Now, on this call you didn't get the

4:23PM  10   impression that the DEA or Mr. Bongiovanni was interested in

11   investigating Peter Gerace, correct?

12     A    Correct.

13     Q    And the meeting between Peter Gerace and the FBI

14   and the DEA, it was somewhat delayed; is that right?

4:24PM  15     A    Yeah, I don't think it happened for, like, three

16   weeks.

17     Q    And part of the reason for that was that Peter

18   Gerace got the Swine Flu?

19     **MR. COOPER:**  Objection, Judge.  Calls for hearsay and

4:24PM  20   speculation.

21     **THE COURT:**  Yeah, sustained.

22     Unless you've got another reason to put it in,

23   Mr. Singer.

24     **MR. SINGER:**  Sure.

4:24PM  25     Q    Did you learn about any type of illness that Peter

Lepiane - Cross - Singer

4:24PM 1    Gerace was suffering during the time period after he was

2    interacting with you on Halloween of 2009?

3         **MR. COOPER:**  Objection, Judge.

4         **THE COURT:**  Sustained.

4:24PM 5         Unless you can give me some relevance that's not

6    hearsay.

7         **Q**    Did you make contact with Peter Gerace personally

8    during that time period?

9         A    Yes.

4:24PM 10        **Q**    And did he appear ill to you at any time during

11   that period of time?

12        A    The contact was over the phone.

13        **Q**    Okay.  So no personal contact?

14        A    There were -- between the time of the search and

4:25PM 15   the meeting with -- I made one home contact with him.  I

16   don't know the date off the top of my head.  But there was

17   home -- one home contact and at that time he did not appear

18   ill.

19        **Q**    Okay.  So, on November 4th of 2009, you have a

4:25PM 20   meeting with AUSA Bruce at the U.S. Attorney's Office,

21   correct?

22        A    Yes.

23        **Q**    And in attendance at that meeting were FBI Special

24   Agent Herbst?

4:25PM 25        A    I believe so, yes.

Lepiane - Cross - Singer

4:25PM    1    **Q**    Was there anything to refresh your memory of that?

2    For instance, if you's looked at your chrono notes on that,

3    would that refresh your memory as to who was at the meeting?

4        A    If he was there, yeah, it would be in my notes.

4:25PM    5    **Q**    Certainly.

6        **MR. SINGER:**  So, Ms. Champoux, would you mind bringing

7    up on the witness's screen only Government Exhibit 3501B.

8        Page 34, Karen.

9        Thank you.

4:26PM    10    **Q**    I'll direct your attention just to the middle of

11    that.  And when you've had an opportunity to look through

12    those notes, if you would just look up at me, Mr. Lepiane.

13        A    (Witness complies).  Okay.

14        **Q**    Did that refresh your memory as to whether

4:26PM    15    Mr. Herbst was at the meeting?

16        A    Yes, sir.

17        **Q**    And was Mr. Herbst at that meeting?

18        A    He was.

19        **Q**    And were there other members of the task force for

4:26PM    20    FBI also present at that meeting?

21        A    There was, yes.

22        **Q**    Who was also present at that meeting for the task

23    force?

24        A    Bob Cottrell was present.

4:26PM    25        **MR. SINGER:**  Ms. Champoux, if you could take that down.

Lepiane - Cross - Singer

4:26PM    1        Thank you.

          2        Q    And at this meeting, the four of you had a

          3    discussion about further investigation of Peter Gerace

          4    regarding the allegations?

4:26PM    5        A    Yes.

          6        Q    And these allegations weren't just limited to your

          7    violation, correct?

          8        A    They were discussing what their investigation was

          9    and I would discuss what my violation was.  So, yes, it

4:27PM   10    was --

         11        Q    Okay.

         12        A    -- not limited to just my violation.

         13        Q    Okay.  Understood.

         14             And one of the decisions that was made after that

4:27PM   15    meeting was that you were going to hold off on informing the

         16    Court about the violation so that the FBI and the U.S.

         17    Attorney's Office could continue their investigation?

         18        A    Yeah, they wanted me to wait until they had the

         19    chance to talk to Gerace, Gerace sit down with the FBI and

4:27PM   20    have a conversation to see where that went.

         21        Q    Okay.  So, fast forward another two days on

         22    November 6th of 2009, you also had some contact with Special

         23    Agent Herbst, is that correct?

         24        A    I could have, yes.

4:27PM   25        Q    Okay.  Would taking a look at your chronos refresh

Lepiane - Cross - Singer

4:27PM    1    your memory?

2         A    Yes.

3         Q    Certainly.

4         **MR. SINGER:**  So, Ms. Champoux, 3501B again.  And turn to

4:27PM    5    Page 3.

6         Q    And you can take a look at that document, Mr.

7    Lepiane, and look up at me when you're done.

8         A    What date is that again?

9         Q    Sure.  This was the 6th of November.

4:28PM    10       A    Okay.

11        **MR. SINGER:**  If you could bring that down.

12        Q    Does that help you refresh your memory --

13        A    Yes, it does.

14        Q    -- about the --

4:28PM    15       A    Yes.

16        Q    And, so, part of the reason why Mr. Herbst

17   contacted you was there was this follow-up investigation

18   about whether Mr. Gerace had any unreported police contact

19   with Tonawanda Police Department?

4:28PM    20       A    Correct.

21        Q    And it was determined that there wasn't any such

22   contact, correct?

23        A    Correct.

24        Q    All right.  And then on the 12th of November, did

4:28PM    25   you receive another call from Mr. Herbst with regard to the

Lepiane - Cross - Singer

4:28PM  1  status of what was happening with the meeting with DEA and

2  FBI?

3      A    I may have, yes.

4      Q    Certainly.  So would taking a look at your chronos

4:29PM  5  help refresh your memory?

6      A    Yes.

7      Q    Sure.  Why don't I hand you this one chrono I have

8  printed out.

9      A    Thank you.

4:29PM 10      Q    If you would just take a look at that.

11      A    (Witness reviewing document.)

12      Q    Is your memory refreshed now?

13      A    Yes, sir.

14      Q    And do you remember having some conversation on

4:29PM 15  that date with Mr. Herbst regarding what was happening with

16  the meeting?

17      A    Yes.

18      Q    And the reason why you two were conversing about

19  that is because you wanted to figure out if you were going to

4:29PM 20  inform the Court about this violation, correct?

21      A    Yeah.  I needed to know what the status of their

22  investigation, if I was going to include that in my

23  violation, yes.

24      Q    And then on the 18th of November, is that when you

4:29PM 25  had the home visit that you mentioned?

Lepiane - Cross - Singer

4:29PM   1        A     (Indicating.)

         2        Q     If you need to refer yourself to the notes, I'll

         3    just direct you over to Page 5 and maybe that will help

         4    refresh your memory.  I'm sorry, Page 4.

4:30PM   5        A     Yes.  That's when I had the home visit with

         6    Mr. Gerace, yes.

         7        Q     And do you recall whether or not you had further

         8    contact with Mr. Herbst on the 19th of November regarding

         9    what was happening with the meeting?

4:30PM  10        A     Yes.

        11        Q     And I'm just going to note for the record are you

        12    referring to your chronos now just to refresh your memory?

        13        A     Yes, sir.

        14        Q     So if you could take a look at those chronos and

4:30PM  15    when you're done, please look up at me.

        16        A     (Witness complies.)  Okay.

        17        Q     If you just put that to the side, Mr. Lepiane.

        18              So you did have contact on the 19th of November of

        19    2009 with Mr. Herbst.

4:30PM  20        A     Yes.

        21        Q     And you two discussed, in sum and substance, this

        22    meeting and whether it was going to happen or whether it was

        23    going to happen soon?

        24        A     Yes, I told him that we were moving forward with

4:31PM  25    our violation.

45

Lepiane - Cross - Singer

4:31PM   1      **Q**     And in that phone conversation, Mr. Herbst also

2   indicated that he had planned to investigate the drug

3   conspiracy angle that you had testified on direct about,

4   correct?

4:31PM   5      A     Yes.

6      **Q**     Okay.  And, so, on November 23rd of 2009, that's

7   the date that this meeting between the FBI and DEA actually

8   takes place?

9      A     That's what I was told, yes.

4:31PM   10     **Q**     And you were told that by Agent Herbst again?

11     A     Yes.

12     **Q**     And, so, Agent Herbst, he calls you after the

13   meeting takes place?

14     A     I believe it was after, correct, yes.

4:31PM   15     **Q**     And he indicated to you that there wasn't any good

16   information that came from that meeting from Peter Gerace,

17   correct?

18     A     He told me they didn't think Mr. Gerace could

19   provide any info that was good, relevant.

4:31PM   20     **Q**     But he also indicated to you, too, that he wanted

21   to continue to work with Peter Gerace?

22     A     He said that he would continue to work with him,

23   yes.

24     **Q**     And, so, based on that telephone call, that's when

4:32PM   25   you decided to inform the Court about the violation?

Lepiane - Cross - Singer

4:32PM  1      A    So we had already decided that we were going to

2      inform the Court.  But -- so it wasn't based on that

3      telephone call.  We had already decided what our office was

4      going to do.  It was whether or not we were going to include

4:32PM  5      anything related to new criminal activity in the report.

6      Q    And that same date you actually met with Peter

7      Gerace to inform him about what was going to happen as far as

8      the violation, is that right?

9      A    I believe so, yes.

4:32PM  10     Q    And you needed to inform him about the location

11     monitoring condition that was going to be imposed?

12     A    Yes, I informed him of the modification we were

13     requesting, yes.

14     Q    And when you bring someone into your office about

4:32PM  15     modifications, is it common practice that you'll sit the

16     supervisee down and have them sign a piece of paper

17     indicating that they have knowledge of the new condition?

18     A    Yeah.  So, in order to add a condition to

19     somebody's supervised release, we either need the individual

4:33PM  20     to agree to it because they're entitled to a hearing.  And

21     they can waive the hearing and agree to the modification or

22     they can choose not to do that and then we will just write to

23     the Court.  So we do explain that with them either at their

24     house, the office or over the phone.

4:33PM  25     Q    And as you recall, Peter Gerace on the 23rd of

Lepiane - Cross - Singer

4:33PM   1    November 2009 had agreed to waive the hearing and agreed to

         2    the condition?

         3        A    He did, yes.

         4        Q    So I want to review a couple of things.  So, it

4:33PM   5    looks like between August of 2009 to November of 2009, you

         6    had several different phone calls or in-person meetings with

         7    Special Agent Herbst from the FBI; is that right?

         8        A    Yeah, from August 31st, 2009 to November 23rd of

         9    2009, yes.

4:33PM  10        Q    So we're talking about you had the phone call and

        11    the face-to-face meeting with Herbst on August 31st of 2009

        12    when you were on duty?

        13        A    Yes.

        14        Q    You also had a couple of different contacts in the

4:33PM  15    September-October timeframe before the search regarding

        16    surveillance?

        17        A    Yes.

        18        Q    You also had a face-to-face meeting on the date of

        19    the search of the Pharaoh's Gentlemen's Club on the 31st of

4:34PM  20    20 -- sorry, 31st of October 2009?

        21        A    On the day of the search, we had face-to-face

        22    contact, yes.

        23        Q    You had the con -- the phone call that we discussed

        24    that happened on November 2nd of 2009?

4:34PM  25        A    Yes.

Lepiane - Cross - Singer

4:34PM   1      **Q**      You also had the phone call that happened on
         2  November 6th of 2009?
         3      **A**      Yes.
         4      **Q**      You had the phone call that happened -- sorry.
4:34PM   5          You had the meeting that happened on the 4th of
         6  November of 2009 between you, AUSA Bruce and Task Force
         7  Officer Cottrell?
         8      **A**      Yes.
         9      **Q**      And Mr. Herbst was also part of that meeting?
4:34PM  10      **A**      Yes.
        11      **Q**      You also had the call that occurred on the 12th of
        12  November 2009, correct?
        13      **A**      Yes.
        14      **Q**      And then the call on the 19th of November of 2009?
4:34PM  15      **A**      Yes.
        16      **Q**      Then you also had another conversation on the 23rd
        17  of November 2009?
        18      **A**      Yes.
        19      **Q**      So you'd agree with me that that's at least about
4:35PM  20  nine different phone calls or meetings that you had with
        21  Special Agent Herbst during that time period?
        22      **A**      Roughly, yes.
        23      **Q**      And with regard to Special Agent Bongiovanni,
        24  during that same period, you'd received a call from Agent
4:35PM  25  Bongiovanni on the 3rd of November of 2009, correct?

Lepiane - Cross - Singer

4:35PM    1     A    Yes.

2     Q    But that was the only phone call that you received

3 from Agent Bongiovanni, correct?

4     A    Correct.

4:35PM    5     Q    And that was the only time that you spoke to Agent

6 Bongiovanni about Peter Gerace, correct?

7     A    Correct.

8     Q    He wasn't at the meeting that you had with Special

9 Agent Herbst, Task Force Officer Cottrell and AUSA Bruce,

4:35PM    10 correct?

11     A    He was not.

12     Q    In fact, no one from the DEA was present at that

13 meeting, either?

14     A    No.

4:35PM    15     Q    Now, did Special Agent Bongiovanni's call to you in

16 any way affect your decision to violate Peter Gerace for the

17 noncompliance?

18     A    No.

19     Q    So, Peter Gerace eventually gets violated and the

4:36PM    20 location monitoring's sanction is put in place by the Court,

21 is that correct?

22     A    Yes.

23     Q    And you had mentioned that it was a technical

24 violation.  So that's one of the reasons why, perhaps, he

4:36PM    25 wasn't put in jail?

Lepiane - Cross - Singer

4:36PM  1      A      Yes.

2      Q      And he had learned of your intent to forward up the

3  location monitoring as opposed to just jail on the 23rd of

4  November 2009?

4:36PM  5      A      Peter Gerace did, yes.

6      Q      The fact that the violation was proceeding forward,

7  Officer Lepiane, and the fact that it was adjudged by the

8  Court, did that in any way prevent the FBI from bringing any

9  additional charges against Peter Gerace?

4:36PM 10      **MR. COOPER:**  Objection, Judge, as to whether it would

11  have prevented the FBI from doing something.  This witness

12  works for probation.

13      **THE COURT:**  Yeah, you need to lay more of a foundation.

14      Q      Officer Lepiane, you said you've been working with

4:37PM 15  the probation office for a number of years, is that right?

16      A      18 years.

17      Q      18 years.  And you've worked supervising people and

18  supervised release is the probation officer responsible for

19  that, correct?

4:37PM 20      A      Yes.

21      Q      You've also supervised people who are responsible

22  for that duty now as a supervisor?

23      A      Yes.

24      Q      You've also stated that you've worked with state

4:37PM 25  and local authorities and federal authorities on multiple

Lepiane - Cross - Singer

4:37PM  1    different occasions; is that right?

2       A    Yes.

3       Q    And that included instances where either when they

4    informed you about whether someone who you were supervising

4:37PM  5    was committing violations of the law?

6       A    Yes.

7       Q    And also involved situations where you had learned

8    of situations where that was happening and sought their

9    assistance?

4:37PM  10      A    Yes.

11      Q    And the violations that you investigate in your

12   office, in your experience as a probation officer of 18

13   years, sometimes people are charged with substantive offenses

14   on the basis of that violation, correct?

4:37PM  15      A    Yes.

16      Q    So, for instance, if somebody is dealing drugs or

17   possessing drugs when they're on supervision, you might

18   violate them, correct?

19      A    Yes.

4:38PM  20      Q    But in your experience, other agencies might charge

21   them with a new crime, correct?

22      A    Yes.

23      Q    And it's based on the same thing?

24      A    Yes.

4:38PM  25      Q    And in your experience in that capacity, you've

Lepiane - Cross - Singer

4:38PM   1   seen situations where you violate someone but they still get

     2   charged with a new crime?

     3        A    Yes.

     4        Q    So, again, based on your training and experience of

4:38PM   5   18 years, it's not impossible for someone to get charged with

     6   a new crime based on information learned during a violation

     7   investigation, correct?

     8        A    It's not impossible.

     9        Q    And there's nothing to your knowledge in your

4:38PM  10   training and experience that would prevent the FBI from

    11   charging Peter Gerace for possession or use of cocaine,

    12   correct?

    13        A    Yes.

    14        Q    In your capacity as a probation officer regarding

4:38PM  15   Mr. Gerace, did you ever learn of any new charges that were

    16   levied by the FBI following their investigation?

    17        A    No.

    18        Q    2009?

    19        A    No.

4:39PM  20        Q    Okay.

    21        **MR. SINGER:**  That's all I have, Judge.

    22   Thank you very much.

    23        **THE COURT:**  Redirect?

    24        **MR. COOPER:**  Yes, please.

4:39PM  25   **REDIRECT EXAMINATION BY MR. COOPER:**

Lepiane - Redirect - Cooper

4:39PM 1    **Q**    Mr. Lepiane, you were just asked a second ago by

2    Mr. Singer if you know whether the FBI ever ended up charging

3    Peter Gerace substantively.  Do you remember being asked that

4    question?

4:39PM 5    A    Yes.

6    **Q**    As you sit here today, do you know whether the

7    defendant lied to the FBI and prevented them from charging

8    the defendant?

9    **MR. SINGER:**  Objection.

4:39PM 10   **THE COURT:**  Sustained.

11   **Q**    Do you know about conversations that occurred

12   between the FBI and Special Agent Bongiovanni, the defendant?

13   A    (No response.)

14   **Q**    Were you present for those conversations?

4:39PM 15   A    No.

16   **Q**    Do you know what the defendant said to the FBI?

17   A    No.

18   **Q**    Do you know what representations the defendant made

19   to the FBI?

4:39PM 20   A    I don't.

21   **Q**    Okay.  You were also asked some questions on

22   cross-examination about the number of times Special Agent

23   Herbst called you versus the number of times that this

24   defendant called you.  Do you remember that question?

4:39PM 25   A    Yes.

Lepiane - Redirect - Cooper

4:39PM    1      **Q**    Or those questions, I should say?

2      A    Yes.

3      **Q**    Did it appear from the numerous contacts that you

4   had with Special Agent Herbst that he was intent on

4:40PM   5   investigating Peter Gerace's illegal activity?

6      A    Yes.

7      **Q**    Did it appear that this defendant had an interest

8   in investigating Peter Gerace's illegal activity?

9      A    I don't, I don't know what his intentions were.

4:40PM 10      **Q**    Did he ever say to you I'm investigating Peter

11   Gerace?

12      A    He never said that.

13      **Q**    In fact, when he called you, you testified on

14   direct and cross-examination that he represented to you that

4:40PM 15   Peter Gerace was his confidential source of information, is

16   that correct?

17      A    He said that Peter Gerace was a confidential source

18   of information in the past for the DEA, yes.

19      **Q**    Okay.  And other than him telling you that, did you

4:40PM 20   have any reason to know whether that was true or not?

21      A    No.

22      **Q**    What was your understanding of why the defendant

23   called you to tell you:  Hey, Peter Gerace has been a

24   confidential source in the past?

4:40PM 25      A    My understanding --

Lepiane - Redirect - Cooper

4:41PM  1      **MR. SINGER:**  Objection to the form of the question.

2  Speculation.

3      **THE COURT:**  Sustained.

4      **Q**    You ultimately provided some information to the

4:41PM  5  defendant when he told you:  Hey, Peter used to be a

6  confidential source, right?

7      A    I, I told him that he can't actively cooperate

8  without the Court's permission.

9      **Q**    Why did you tell him that?

4:41PM  10      A    Because Mr. Gerace is required per his conditions

11  to abide by that exact condition that he not cooperate.  So I

12  didn't want him to actively cooperate with the DEA or the FBI

13  or anybody and then he would have -- Mr. Gerace would have

14  got in trouble with the judge.

4:41PM  15      **Q**    So now what I want to follow up on with you is the

16  defendant says this sentence to you that Peter Gerace used to

17  be a confidential source of information for him.

18          As a result of that, you tell him, hey, he can't

19  actively cooperate without Court permission, right?

4:41PM  20      A    Yes.

21      **Q**    What was your understanding of the defendant's

22  statement to you that caused you to give that as your

23  response?

24      **MR. SINGER:**  Objection.

4:41PM  25      **MR. COOPER:**  Well, Judge --

Lepiane - Redirect - Cooper

4:42PM   1          **THE COURT:**  To the form of the question?

         2          **MR. SINGER:**  Yes.

         3          **THE COURT:**  Sustained.

         4          **Q**    What was the thought that went through your head

4:42PM   5     when the defendant said that to you?

         6          **A**    My thought was that Mr. Gerace used to be a

         7     confidential source for the DEA, so he was calling to tell me

         8     that and then whether or not he could do that now in this

         9     instance to help him with his violation.

4:42PM  10          **Q**    When you say "help him with his violation", what do

        11     you mean?

        12          **A**    That Gerace had, had asked Agent Bongiovanni if,

        13     hey, if I cooperate or provide information, will I not go to

        14     jail, like will the violation result be less because of a

4:42PM  15     cooperation.

        16          **Q**    So is it your impression that the defendant was

        17     calling you asking to find a way to help Gerace with his

        18     violation; is that what you're saying?

        19          **MR. SINGER:**  Objection.

4:42PM  20          A    My --

        21          **THE COURT:**  Sustained.

        22          **Q**    What was the impression that you got about why the

        23     defendant was calling?

        24          **MR. SINGER:**  Objection.

4:42PM  25          **THE COURT:**  Sustained.

Lepiane - Redirect - Cooper

4:42PM  1      **MR. SINGER:**  Speculation.

2      **THE COURT:**  Sustained.

3      **Q**    You were also asked some questions on

4      cross-examination about the length of time that you were in

4:43PM  5      contact with the FBI after the search at Pharaoh's and before

6      the revision to Gerace's conditions.  Do you remember those

7      questions?

8      **A**    Yes.

9      **Q**    Up until the conditions were revised, is it fair to

4:43PM 10      say Gerace did not have an ankle monitor on?

11      **A**    He did not.

12      **Q**    So the ankle monitor didn't go on until he signed

13      that piece of paper and acknowledged the new condition?

14      **A**    It didn't go on until the Court ordered it which

4:43PM 15      would happen after he agreed to the condition and we

16      submitted a report (indicating).

17      **Q**    So, could Peter Gerace have been back to Pharaoh's

18      after the search that you conducted?

19      **A**    Yes.

4:43PM 20      **Q**    Okay.  You were asked about whether you found drugs

21      at Pharaoh's when you searched, is that right?

22      **A**    I was asked, yes.

23      **Q**    Was that like a busy popping time at the club when

24      you went there to search?

4:43PM 25      **A**    No.

Lepiane - Redirect - Cooper

4:43PM    1         **MR. SINGER:**  Objection.

          2         **THE COURT:**  I'm sorry?

          3         **MR. SINGER:**  I withdraw the objection.

          4         **THE COURT:**  Okay.

4:44PM    5    A    No, it was the morning.  The club was closed.

          6    Q    Not a lot of customers there?

          7    A    No, sir.

          8    Q    No dancers there?

          9    A    No, sir.

4:44PM   10    Q    You mentioned on cross-examination that DEA would

         11  have had to get Court permission in order to actively use

         12  Peter Gerace as a confidential source; is that correct?

         13    A    Peter Gerace would have had to get the Court's

         14  permission to cooperate.  DEA doesn't reach out -- for

4:44PM   15  someone who's on supervised release, if they want to

         16  cooperate, normally an agent would come to us and say, hey,

         17  this person wants to cooperate.  And then we would write a

         18  letter -- we'd talk to actually the U.S. Attorney's Office.

         19  All parties would be on the same page and they would agree to

4:45PM   20  the stipulations of a cooperation agreement and we would

         21  submit that to the court --

         22    Q    And that's --

         23    A    -- for approval.

         24    Q    And that's something that generates paperwork on

4:45PM   25  your end if it happens; is that right?

Lepiane - Redirect - Cooper

4:45PM   1      A    Yes.

         2      Q    Okay.  You mentioned that you became the

         3  supervising officer for Peter Gerace on August 31 of 2009, is

         4  that correct?

4:45PM   5      A    Yes.

         6      Q    Are there any -- have you reviewed the file of your

         7  office's supervision of Peter Gerace?

         8      A    Yes.

         9      Q    Is there any indication that he ever applied prior

4:45PM  10  to your involvement to be working as a confidential source?

        11      A    No.

        12      Q    Did you ever get contacted prior to the search at

        13  Pharaoh's about, hey, could we bring Peter Gerace in and use

        14  him?

4:45PM  15      A    I did not, no.

        16      Q    Are there any chronos or notes in your file that

        17  indicate that that happened?

        18      A    There are none.

        19      **MR. COOPER:**  I have nothing further, Judge.  Thank you.

4:45PM  20      **THE COURT:**  Anything more, Mr. Singer?

        21      **MR. SINGER:**  Just brief, Judge.

        22  **RECROSS-EXAMINATION BY MR. SINGER:**

        23      Q    Officer Lepiane, as part of your duties, you've

        24  dealt with people who sometimes want to cooperate to lessen

4:46PM  25  the violation they're looking at?

Lepiane - Recross - Singer

4:46PM   1        A    Yes.

         2        Q    And in your experience of 18 years, if they're not

         3    going to get anything in return, does sometimes that cause

         4    them not could cooperate any more?

4:46PM   5        **MR. COOPER:**  Objection.  Calls for speculation.

         6        **THE COURT:**  Overruled.

         7        A    Sometimes.

         8        Q    Mr. Cooper asked you about the ankle monitor

         9    affixing and the Court order on that being delayed; do you

4:46PM  10    recall that?

        11        A    It wasn't delayed but, yeah, we have to wait until

        12    the Court signs off for us to put him on the bracelet,

        13    correct.

        14        Q    And as you testified on cross-examination when I

4:46PM  15    was up here earlier, the reason for -- sorry.  The reason why

        16    you never informed the Court back in early November was at

        17    the FBI's and U.S. Attorney Office's request, right?

        18        A    That wasn't the sole reason.  We were still

        19    investigating whether or not he was allowed to work there.  I

4:47PM  20    had contact with the State Liquor Authority relating to that.

        21    There was, I don't want it -- I don't want to say that we did

        22    not inform the Court because the FBI asked us to do that.  It

        23    was in conjunction with the U.S. Attorney's Office because

        24    they're the ones who have to prosecute violations.

4:47PM  25             So, we were still doing our investigation.  Part of

Lepiane - Recross - Singer

4:47PM  1   the investigation was whether or not he was going to be

2   charged.  So, had he been charged, the report to the Court

3   would have probably not been an ankle bracelet, it would have

4   probably been a violation.

4:47PM  5       Q    I guess the big takeaway is these things don't

6   happen overnight, correct?

7       A    Correct.

8       Q    Sometimes you need to investigate something

9   further, is that right?

4:47PM  10      A    Yes.

11      Q    Sometimes you need to coordinate with the U.S.

12  Attorney's further on something?

13      A    Yes.

14      Q    They get to make a call on when the violation

4:47PM  15  should be forwarded up to the Court, correct?

16      A    Then we have to make the call, yes.

17      Q    And the U.S. Attorney's Office, they're somebody

18  that you work with on a regular basis, right?

19      A    Yes.

4:48PM  20      Q    So, if they're going to ask you for an extra couple

21  days, that's something that you're generally going to

22  respect?

23      A    It depends.  It honestly depends.

24      Q    But it seems like in this situation, you did

4:48PM  25  respect that request?

Lepiane - Further Redirect - Cooper

4:48PM  1      A    We did not delay, Mr. Singer, his -- the report to

2      the Court was not delayed because of the U.S. Attorney's

3      Office, the FBI, anyone.  It was our own investigation.

4      Q    Understand.

4:48PM  5      **MR. SINGER:**  I have no further questions, Judge.  Thank

6      you.

7      **THE COURT:**  Anything more?

8      **MR. COOPER:**  Just one second, please, Judge.

9      (**WHEREUPON**, a discussion was held off the record.)

4:48PM  10     **MR. COOPER:**  Just one question, Judge.

11     **FURTHER REDIRECT EXAMINATION BY MR. COOPER:**

12     Q    You were asked some questions, Mr. Lepiane, about

13     the delay -- or I guess you're saying there wasn't a delay --

14     in the process of processing the violation; is that correct.

4:48PM  15     A    Yes.

16     Q    At any time after the search at Pharaoh's, did

17     Peter Gerace ever reach out and ask for permission to

18     cooperate with the DEA?

19     A    He didn't ask for permission, no.

4:48PM  20     **MR. COOPER:**  Okay.  No further questions, Judge.

21     **RECROSS-EXAMINATION BY MR. COOPER:**

22     Q    Mr. Lepiane, in your experience -- so you just

23     testified that Peter Gerace never reached out to you to say,

24     hey, can I have permission to be a confidential source?

4:49PM  25     A    He never asked for permission, no.

Lepiane - Recross - Singer

4:49PM    1       **Q**    But in your experience as a probation officer,

          2    you're also aware that people sometimes can act as sources of

          3    information, right?

          4       A    Yes.

4:49PM    5       **Q**    And that's different than being a confidential

          6    source, correct?

          7       A    So the, the difference I'm talking about is

          8    actively cooperating would be like making purchases, wearing

          9    wires.  That's active cooperation --

4:49PM   10       **Q**    Mm-mm.

         11       A    -- that they need the Court permission.  Providing

         12    information, they don't need the Court's permission.

         13       **Q**    Correct.  So there's no court permission required

         14    to provide information on somebody, correct?

4:49PM   15       A    Correct.

         16       **Q**    And the specific conversation you had with

         17    Mr. Bongiovanni about Mr. Gerace being a confidential source

         18    of information, you don't know when that information may have

         19    been provided, correct?

4:49PM   20       A    I, I don't know.

         21       **Q**    Okay.

         22       A    Just said past.

         23       **Q**    Thank you.

         24       **MR. SINGER:**  No further questions, Judge.

4:50PM   25       **MR. COOPER:**  I'm finished, Judge.

Lepiane - Recross - Singer

4:50PM    1          **THE COURT:**  You can step down.

          2          (**WHEREUPON,** witness excused.)

          3          (**WHEREUPON,** excerpt ended and proceedings continued.)

Lepiane - Recross - Singer

4:50PM

```
  1
  2
  3                    *          *          *
  4              CERTIFICATE OF REPORTER
  5
  6          In accordance with 28, U.S.C., 753(b), I
  7   certify that these original notes are a true and correct
  8   record of proceedings in the United States District Court
  9   of the Western District of New York before the
 10   Honorable Lawrence J. Vilardo on August 5, 2024.
 11
 12
 13   S/ Diane S. Martens
 14   Diane S. Martens, FCRR, RPR
      Official Court Reporter
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```