```
UNITED STATES; DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------x        19-CR-227(LJV-MJR)
UNITED STATES OF AMERICA,

vs.
                                   Buffalo, New York
JOSEPH BONGIOVANNI,                August 6, 2024
              Defendant.
--------------------------x
```

**JURY TRIAL EXCERPT - TESTIMONY OF DALE KASPRYZK**


                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE LAWRENCE J. VILARDO
                 UNITED STATES DISTRICT JUDGE



                    TRINI E. ROSS, UNITED STATES ATTORNEY
                    BY:  JOSEPH M. TRIPI, AUSA
                    BY:  NICHOLAS T. COOPER, AUSA
                    BY:  CASEY L. CHALBECK, AUSA
                    Federal Centre
                    138 Delaware Avenue
                    Buffalo, New York 14202

FOR DEFENDANT:      SINGER LEGAL PLLC
                    BY:  ROBERT CHARLES SINGER, ESQ.
                    80 East Spring Street
                    Williamsville, New York 14221
                         -and-
                    LAW OFFICE OF PARKER ROY MacKAY
                    BY:  PARKER ROY MacKAY, ESQ.
                    3110 Delaware Avenue
                    Kenmore, New York 14217




COURT REPORTER:     Diane S. Martens
                    dmartensreporter@gmail.com

Kasprzyk - Direct - Tripi

1                    P R O C E E D I N G S

2                *           *           *

3

4          (**WHEREUPON**, the following is an excerpt taken

5           from proceedings.)

6

7          **DALE KASPRZYK**, called as a witness, being duly sworn,

8    testifies as follows:

9          **MR. TRIPI:**  May I inquire, your Honor?

9:48AM   10     **THE COURT:**  You may.

11          **MR. TRIPI:**  Thank you, your Honor.

12    **DIRECT EXAMINATION BY MR. TRIPI:**

13          **Q**    Good morning, Mr. Kasprzyk.

14          A    Good morning, sir.

9:48AM   15     **Q**    Where do you currently reside?

16          A    I currently reside in Estero, Florida.

17          **Q**    And how long have you been a Florida resident?

18          A    Ten months.

19          **Q**    Prior to that, where did you live?

9:48AM   20     A    Prior to that, I lived in the Western New York

21    area.  I lived primarily in Orchard Park, New York.

22          **Q**    What do you currently do for a living?

23          A    I am the head of the financial investigations unit

24    for M&T Bank.

9:48AM   25     **Q**    How long have you been doing that work?

Kasprzyk - Direct - Tripi

9:48AM    1        A    A little over ten years.

          2        Q    Prior to that role at M&T Bank, what did you do for

          3    work?

          4        A    I was employed by the Drug Enforcement

9:49AM    5    Administration.

          6        Q    How many years were you employed by the DEA, for

          7    short?

          8        A    I worked for the DEA for approximately 25 years.

          9    1989 to 2013.

9:49AM   10        Q    And during your tenure, what different places did

         11    the DEA have you assigned, locations?

         12        A    When I was initially hired, I attended basic agent

         13    training and that was in Quantico, Virginia.  And upon

         14    graduation from the training academy, I was assigned to the

9:49AM   15    Buffalo office.

         16        Q    Are you from the Buffalo area originally?

         17        A    Originally I'm from Buffalo.

         18        Q    And so you worked essentially your whole career

         19    after the academy in the Buffalo office?

9:49AM   20        A    Yes, sir.

         21        Q    When you graduated from the academy, what was your

         22    title?

         23        A    I was a Special Agent.

         24        Q    I want to talk a little bit about that training.

9:50AM   25    Can you tell this jury what the training is like to become a

Kasprzyk - Direct - Tripi

9:50AM  1    DEA Special Agent, please?

2        A    The training consists of a number of courses and

3    modules, training modules.  You learn the law, the federal

4    law as it relates to the Controlled Substances Act.  You

9:50AM  5    learn how to conduct street operations, how to do

6    surveillance, how to initiate -- do controlled buys of

7    narcotics.  You learn about DEA policy and procedures.  You

8    also learn about weapons handling, how to shoot.  You learn

9    about how to protect yourself through physical training.  So

9:50AM  10   it's a, it's an extensive academy several months long.

11       Q    How long -- that was my next question.  How long is

12   the academy?

13       A    When I went through, it was about 16 weeks, about

14   four months long.

9:51AM  15       Q    Prior to joining the DEA and going through the

16   application process, did you have any other law enforcement

17   experience?

18       A    Yes, sir.

19       Q    What was your background prior to that?

9:51AM  20       A    I was a police officer with the Reno Police

21   Department in Reno, Nevada.  I joined the Reno Police

22   Department in 1982.  Left there in approximately 1987 as a

23   police lieutenant.  And then I came back to Buffalo where I

24   was employed by the Erie County District Attorney's office as

9:51AM  25   a criminal investigator.

Kasprzyk - Direct - Tripi

9:51AM  1      **Q**     And prior -- I'm working backwards -- prior to

2      joining that Reno Police Department, did you have any formal

3      education?

4      A     Yes, sir.  I attended Buffalo State College,

9:51AM  5      college at Buffalo.  Not sure what they call it now.

6      **Q**     I think it's University now.

7      A     Yes, thank you, sir.  It was here in Buffalo.

8      **Q**     And did you graduate with a degree from that

9      school?

9:52AM  10     A     Yes, sir, I graduated with a bachelor's degree in

11     criminal justice.

12     **Q**     Now I would like to get back to the DEA training in

13     the academy.

14            Does that training consist of specific techniques

9:52AM  15     that the DEA trains agents in to learn how to investigate

16     narcotics cases?

17     A     Yes, sir.

18     **Q**     And I want to go through those in just a moment but

19     what is the DEA's mission?

9:52AM  20     A     Our mission is to investigate violations of the

21     Controlled Substances Act, Title 21.

22     **Q**     And does the DEA have what are called Field Offices

23     all over the country?

24     A     Yes, sir.

9:52AM  25     **Q**     Are those offices limited to the Continental United

Kasprzyk - Direct - Tripi

9:52AM  1  States or does it extend beyond that?

2       A    No, sir.  We have offices in international

3  locations, as well.

4       Q    When you graduate from the DEA academy, do you take

9:53AM  5  an oath?

6       A    Yes, sir.

7       Q    What is that oath?

8       A    That oath is to uphold the laws and the

9  Constitution of the United States of America, to be true to

9:53AM  10  the mission of the DEA, and to protect and honor the

11  organization.

12      Q    Is honesty an important value instilled in agents

13  at the DEA academy?

14      A    Yes, sir, it is.

9:53AM  15      Q    Is integrity important in your work as a DEA agent?

16      A    Yes, sir.

17      Q    Is truthfulness in report writing and accuracy

18  something that is important as a DEA agent?

19      A    Yes, sir.

9:53AM  20      Q    Explain why.

21      A    When you work as a federal narcotics agent, you are

22  expected to, to be honest in your interactions with other

23  agents.  You're expected to be honest in your interactions

24  with your managers and your supervisors.  It goes to the

9:54AM  25  integrity of the investigation.  It goes to your integrity

Kasprzyk - Direct - Tripi

9:54AM 1   when you testify in court.  And it's the foundation to

2   becoming a successful agent:  Your integrity and your ability

3   to be honest.

4      **Q**   Are DEA agents, or anyone in the DEA, allowed to

9:54AM 5   take a person who's under investigation's race into account

6   in the course of an investigation?

7      A   Their race?

8      **Q**   Yeah.

9      A   No, sir.

9:54AM 10      **Q**   Are DEA agents allowed to take someone's gender

11   into account when deciding whether to investigate them?

12      A   No, sir.

13      **Q**   How about their socioeconomic status?

14      A   No, sir.

9:54AM 15      **Q**   How about friendship or personal relationships?

16      A   If you, as an agent, have identified a suspect of a

17   drug investigation and that suspect is a friend, then you as

18   an agent cannot work that investigation.

19      **Q**   Why is that?

9:55AM 20      A   That would be a conflict of interest.  And that

21   would impact the integrity of the investigation and that

22   would impact the agent's ability to make good decisions as it

23   relates to the course of that investigation.

24      **Q**   I'd like to get back to that topic in a little bit

9:55AM 25   but getting back to the specific topics that the DEA trains

Kasprzyk - Direct - Tripi

9:55AM   1    agents on to become a DEA special agent, does that include

         2    how to do what's called physical surveillance?

         3         A    Yes, sir.

         4         Q    Can you briefly describe for the jury what physical

9:55AM   5    surveillance is?

         6         A    Physical surveillance is the act of preparing to go

         7    out and watch and observe the actions of a potential drug

         8    violator.  Physical surveillance is something that DEA agents

         9    do often in their course of -- in the course of their duties

9:56AM  10    as part of the investigation process.

        11         Q    Is that one type of investigative techniques that

        12    agents utilize?

        13         A    Yes, sir.

        14         Q    Does the DEA in the academy train agents how to

9:56AM  15    investigate drug organizations through use of communication

        16    devices like cell phones?

        17         A    Yes, sir.

        18         Q    Can you briefly describe how the DEA trains agents

        19    to conduct that aspect of investigations?

9:56AM  20         A    Yes, sir.  So, communication devices -- cell phones

        21    or landlines -- those are often devices used by drug

        22    traffickers to communicate with other drug traffickers or

        23    other members of the Drug Trafficking Organization.  As a

        24    federal narcotics agent working for the DEA, you are trained

9:56AM  25    to use techniques to identify the telephone number that's

Kasprzyk - Direct - Tripi

9:56AM 1    being used by the drug trafficker.  And once that number is

2    obtained, you can then apply for either a pen register or

3    subpoena toll records or maybe even go up on a Title III

4    wiretap of that communication device.  Again, using those

9:57AM 5    techniques to gather information and evidence to support your

6    investigation.

7        Q     And what do you mean by a toll record subpoena?

8        A     That is a subpoena that we would send to the

9    provider of the cell phone company.  So, for example, if your

9:57AM 10   cell phone company was Verizon, we would send a subpoena to

11   Verizon and Verizon would send us the toll records, so, the

12   records of any calls made by that cell phone.

13       Q     And what is a pen register?

14       A     A pen register is a Court-authorized device that is

9:57AM 15   installed at the cell phone switch that allows the agents to

16   collect information contemporaneous to the actual call being

17   made.  So when the call is made, the pen register will

18   activate and it will show the call that is being made by the

19   cell phone.

9:58AM 20       Q     And does the DEA train agents on how to utilize

21   information returned from phone record subpoenas and pen

22   registers to advance investigations into organizations?

23       A     Yes, sir.

24       Q     Does the DEA train agents on how to develop and

9:58AM 25   utilize confidential sources?

Kasprzyk - Direct - Tripi

9:58AM  1      A     Yes, sir.

        2      Q     How does the DEA train agents to utilize

        3   confidential sources?

        4      A     Confidential sources are an important part of a

9:58AM  5   drug investigation.  A confidential source, or a source of

        6   information, is a person who often is interacting directly

        7   with the drug traffickers and those interactions can be

        8   shared with the agent.  And it helps the agent not only

        9   understand what is happening within the drug trafficking

9:59AM  10  organization, but potentially could lead to the path of

       11   making a controlled buy from that particular drug trafficker.

       12      Q     And what is a controlled buy?

       13      A     A controlled buy is when a confidential

       14   informant -- a documented confidential informant -- will come

9:59AM  15  to the DEA office, meet with his assigned controlling agent,

       16   be given agency funds, money that is serialized that is

       17   provided to him from the DEA.  He's then equipped with a

       18   transmitter, a device which allows us to listen and record

       19   the conversation that would happen.  And then that individual

9:59AM  20  is put under surveillance and sent out to meet with the drug

       21   trafficker to purchase narcotics with those funds that were

       22   provided by the DEA.  Once the purchase is complete, the

       23   informant would meet back with his controlling agent, deliver

       24   the drugs to them and that would conclude the controlled buy.

10:00AM 25     Q     I'd like to ask you about a few more techniques

Kasprzyk - Direct - Tripi

10:00AM  1  that agents are trained upon, okay.

2       Are agents trained in the technique of doing a

3  trash pull at the academy?

4       A    Yes, sir.

10:00AM  5       **Q**    What is a trash pull?

6       A    So a trash pull is a technique that DEA agents will

7  use to help gather evidence from a suspected drug trafficker.

8  A trash pull is initiated through surveillance.  You would

9  conduct surveillance operations on a target.  You would

10:00AM  10  determine what day was trash day and then you would travel

11  out in the, in the midnight hours and collect that, that

12  target's trash that was left at the curb and go through that

13  trash to determine if there was any evidence of drug

14  trafficking activity within the trash.

10:01AM  15       **Q**    And are agents trained in the use of pole cameras

16  as a surveillance technique?

17       A    Yes, sir.

18       **Q**    And what is a pole camera surveillance technique as

19  agents are trained on by the DEA?

10:01AM  20       A    A pole camera is a device, a camera, a visual

21  device that's set up in a public location.  And that public

22  location would be used to place the camera and the camera

23  would be then directed towards an area of concern that the

24  agents had identified as part of the drug trafficking

10:01AM  25  investigation that they were engaging in.  So, an example

Kasprzyk - Direct - Tripi

10:01AM  1   might be a particular residence or business location where

2   the target was doing business as a drug trafficker, that

3   camera would be focused on that area and would allow the

4   agents to monitor the activity remotely from another location

10:02AM  5   without having to have physical surveillance in the area.

6        Q    So, example, through use of technology, could

7   agents sometimes monitor pole cameras from their phones while

8   they're in their home?

9        A    I'm not sure, sir -- I retired in 2013 -- if the

10:02AM 10  technology has advanced that far.

11       Q    Fair enough.  Fair enough.

12       A    Back in 2013 we would be able to monitor it from

13  the office and see the activity.

14       Q    And now you mentioned earlier Title III wiretaps?

10:02AM 15       A    Right.

16       Q    I'll ask you to describe the training in that

17  regard in just a moment.  But are all of the techniques that

18  you've just discussed, surveillance, pen registers, phone

19  records subpoenas, trash pulls, pole cameras, are those all

10:02AM 20  different investigative techniques that need to be either

21  attempted or utilized or considered before an agent is

22  allowed to apply for a Title III wiretap?

23       A    Yes, I would say that -- those are often the

24  techniques that are utilized beforehand, not necessarily

10:03AM 25  required before we go to a Title III but certainly are

Kasprzyk - Direct - Tripi

10:03AM 1    techniques that we would -- that I would encourage as a group

2    supervisor to have the agent consider as part of the

3    application process.

4        Q    And is that part of the requirement for a Title III

10:03AM 5    exhaustion, you have to either use or consider other

6    techniques before you use the technique of a wiretap?

7        A    Yes, sir, that's correct.

8        Q    And that's before the Department of Justice would

9    authorize you to even try to use a wiretap --

10:03AM 10       A    Correct.

11       Q    -- is that right?  What is a wiretap?  And then

12   we'll move on from the training.

13       A    A wiretap is -- again, the wiretap affidavit and

14   warrant is issued by a Court -- a District Court Judge --

10:04AM 15   would sign an authorization for a Title III wiretap.  Once

16   that authorization is obtained by the agent, the agent is

17   entitled to meet with the provider of the phone company.

18   And, again, using Verizon as an example, you would meet with

19   Verizon, present with them the wiretap order and that would

10:04AM 20   then allow equipment to be installed where agents at a

21   listening post, most often at the DEA office, would be able

22   to listen to phone conversations that the trafficker was

23   having contemporaneous to when those conversations were

24   occurring.  So, if the trafficker picked up the phone to make

10:04AM 25   a call, the agents in the office would be able to listen to

Kasprzyk - Direct - Tripi

10:04AM 1  that call as it was occurring.

2      **Q**   So when did you graduate from the DEA academy?

3      A   1989.

4      **Q**   And you mentioned it a moment ago, you retired in

10:04AM 5  2013?

6      A   Yes, sir.

7      **Q**   So, in between those two points in time, you worked

8  here in Buffalo?

9      A   Yes, sir.

10:04AM 10     **Q**   What were the different positions you held within

11  the Buffalo DEA office?

12     A   I was a special agent.  I was a acting group

13  supervisor.  I was a group supervisor.  And then I was the

14  resident agent in charge of the office.

10:05AM 15     **Q**   I'd like to go through each of those positions you

16  held just briefly, okay?

17     A   Yes, sir.

18     **Q**   What was your role in the DEA Buffalo office as a

19  DEA special agent?

10:05AM 20     A   I worked as a special agent when I first came to

21  the office for a number of years.  I worked in both the

22  Enforcement Group Delta 57, as well as the Task Force Group

23  Delta 58 as a special agent.

24     **Q**   Now you just mentioned two groups.  Can you explain

10:05AM 25  that for the jury?

Kasprzyk - Direct - Tripi

10:05AM  1    A    Yes, sir.  At -- during my time in the office,

2    there were two enforcement groups within the DEA office in

3    Buffalo.  One group was our, our primarily agents group.  It

4    was our Delta 57 group.  That had a combination of agents and

10:05AM  5    task force agents.  And then we had a task force group known

6    as Delta 58, D-58.  That was a group that had some agents but

7    had a higher population of task force agents.

8    Q    And what is a task force agent?  So when you say

9    agents, are you referring to a DEA special agent who's gone

10:06AM  10   through the academy and sworn the oath that you've

11   described --

12   A    Correct.

13   Q    -- correct?  Now that other term you've used "task

14   force agent", is that also called a task force officer?

10:06AM  15   A    Yes, sir.

16   Q    Okay.  I'm going to use the term "task force

17   officer", if that's okay.

18   A    That's fine.

19   Q    What is a task force officer at the DEA?  Can you

10:06AM  20   explain what that is for the jury?

21   A    Yes, sir.

22         A task force officer is a police officer or deputy

23   sheriff that comes to us from one of the local law

24   enforcement agencies.  So, it could be the Erie County

10:06AM  25   Sheriff's Department.  It could be the Buffalo Police

Kasprzyk - Direct - Tripi

10:06AM    1    Department.  A variety of police officers and deputy sheriffs

           2    are represented at the DEA office as task force officers.

           3        Q    And is their role to assist in drug enforcement

           4    investigations in the mission of the DEA?

10:07AM    5        A    Yes, sir.

           6        Q    Are task force officers often paired up with a,

           7    with a DEA special agent to partner up at times?

           8        A    Yes, sir.

           9        Q    What is the purpose of that from your time as

10:07AM   10    working at the DEA?

          11        A    Generally, the task force officer is paired with a

          12    special agent because the special agent has greater knowledge

          13    and understanding of the federal drug laws.  They have a

          14    greater understanding of how to work a drug investigation

10:07AM   15    based upon their, their time at the DEA academy.  So when

          16    task force officers come into the office and they're, they're

          17    trying to find their way and understand how to do the job of

          18    a DEA agent, we will often almost always pair them up with a

          19    special agent to give them that mentorship and guidance.

10:07AM   20        Q    And you indicated you were also an acting group

          21    supervisor and a group supervisor within the DEA.  What is

          22    that role?

          23        A    Well, when I was the acting group supervisor, it

          24    was typically when the group supervisor was away on extended

10:08AM   25    leave.  And at the Buffalo office I was the acting group

Kasprzyk - Direct - Tripi

10:08AM   1   supervisor of the Delta 58 Task Force for a number of months

2   while the permanent supervisor was on leave.  When you're the

3   acting group supervisor, you assume all of the duties and

4   responsibilities as the group supervisor.

10:08AM   5       Q    And what does a group supervisor do?

6       A    The group supervisor provides direction and

7   guidance to the agents and task force officers to assist them

8   as they conduct their investigations.  The group supervisor

9   will assist in the establishment of new cases, will assist in

10:08AM   10   the establishment of confidential informants, and will also

11   assist on street operations, enforcement operations that are

12   occurring on the street.

13       Q    And eventually you became the Resident Agent in

14   Charge of that office?

10:09AM   15       A    Yes, sir.

16       Q    Approximately when did you become the Resident

17   Agent in Charge?

18       A    Would have been approximately 2011.

19       Q    Until your retirement?

10:09AM   20       A    Yes, sir.

21       Q    And what is the role of a Resident Agent in Charge?

22       A    The Resident Agent in Charge is the manager of the

23   office.  So, at the time we had the two enforcement groups

24   that I mentioned:  D-57, D-58.  We also had a diversion group

10:09AM   25   that was located within the Buffalo office.  So I would be

Kasprzyk - Direct - Tripi

10:09AM   1   responsible for the overall management of the office.  The

2   GSs on all of those groups would report directly to me.

3       Q    GS is group supervisor?

4       A    Yes, sir.

10:10AM   5       Q    Resident Agent in Charge is "RAC"?

6       A    Yes, sir.

7       Q    And if the jury hears the term "SA", does that mean

8   special agent?

9       A    Yes, sir.

10:10AM  10       Q    Okay.  As the RAC, for example, is one of your

11  duties to manage the budget?

12       A    Yes, sir.

13       Q    Now I'd like to talk a little bit about case work

14  and the division of labor in the DEA office, okay?

10:10AM  15       A    Yes, sir.

16       Q    What -- are you familiar with the term "case

17  agent"?

18       A    Yes.

19       Q    What does the term "case agent" mean?

10:10AM  20       A    So if you are a designated case agent, you are the

21  manager of a particular criminal investigation.  The case

22  agent is typically the, the agent that opens up the

23  investigation.  He or she is the person that initiated the

24  case and he is controlling all aspects of that investigation.

10:11AM  25       Q    And as a case agent on a case, are DEA special

Kasprzyk - Direct - Tripi

10:11AM  1    agents required as part of their duties to initiate cases as

2    agents?

3        A    Yes, sir.

4        Q    Who are the people who drive the casework that the

10:11AM  5    DEA does in any given office?

6        A    Typically the special agents are the employees that

7    drive the new case investigations.

8        Q    Who makes decisions about what cases to initiate?

9        A    It is the special agents that make that initial

10:11AM  10   decision.

11       Q    And supervisors approve?

12       A    Supervisors discuss and approve.

13       Q    Who makes decisions on a day-to-day basis about

14   what to do or not do in a DEA case?

10:11AM  15       A    That would be the case agent.

16       Q    Now, other people who work in the DEA Buffalo

17   office, are you familiar with the role of an intel analyst?

18       A    Yes.

19       Q    What is the role of an intel analyst?

10:12AM  20       A    The intelligence analyst at the DEA office would

21   provide support and assistance.  So, if an agent wanted to

22   develop background on a particular suspect, he would go to

23   the intel analyst and request that that person conduct as

24   much background research on that individual as they could.

10:12AM  25       Q    Does that often include an agent asking an intel

Kasprzyk - Direct - Tripi

10:12AM   1   analyst to issue subpoenas for phone numbers or other items?

2        A    That may, that may be part of those duties, that's

3   right.

4        Q    As it relates to the dynamic between case agents

10:12AM   5   and intel analysts, who's in charge of a given investigation?

6        A    It is the case agent that is in charge of the

7   investigation.

8        Q    Other than intel analysts, are there other support

9   staff that are employed in the DEA office?

10:13AM  10        A    We have forfeiture analysts.  Those are generally

11   contractors but they do work in the DEA office.  And they

12   would support the case agent as part of the investigation if

13   they were conducting forfeiture activities.

14        Q    As to the dynamic between the case agent and a

10:13AM  15   forfeiture analyst, who's in charge of making decisions on a

16   given investigation?

17        A    It is the case agent.

18        Q    Who decides when to open a specific investigation

19   within the DEA?

10:13AM  20        A    It is the case agent that initially develops the

21   case and brings that information to the office for the case

22   opening.

23        Q    And who decides when to initiate closure of a DEA

24   case file?

10:14AM  25        A    It is the case agent.

Kasprzyk - Direct - Tripi

10:14AM    1    **Q**    Do you know Joseph Bongiovanni?

          2    A    I do.

          3    **Q**    How do you know him?

          4    A    I know him through my time working with Joe at the

10:14AM    5    DEA Buffalo office.

          6    **Q**    Did you spend some time working with him at -- when

          7    you were a special agent yourself?

          8    A    Yes, sir.

          9    **Q**    And then ultimately did you become his group

10:14AM   10    supervisor for a period of time?

         11    A    Yes, sir.

         12    **Q**    And later on once you became the RAC, you're in

         13    charge of the whole office, was he still working in Buffalo

         14    under you as the RAC of the office?

10:14AM   15    A    Yes, sir, he was.

         16    **Q**    How many years in total would you say between your

         17    time as a group supervisor or a Resident Agent in Charge

         18    would you have had some type of supervisory role over

         19    Mr. Bongiovanni?

10:15AM   20    A    I would say four to five years.

         21    **Q**    Does that include time as a GS and a RAC?

         22    A    Yes, sir.

         23    **Q**    How many years were you his group supervisor

         24    directly?

10:15AM   25    A    Approximately two and a half years.

22

Kasprzyk - Direct - Tripi

10:15AM 1      **Q**    And what years would those be?

2      **A**    '09, 2010, and maybe a little bit of 2011.  I just

3 I don't remember exactly when I was promoted but in that time

4 period.

10:15AM 5      **Q**    And then from roughly approximately 2011 to '13,

6 you were the RAC?

7      A    Correct.

8      **Q**    Okay.  Of your 25-year career at the Buffalo

9 office, approximately how, how many years did you work in

10:15AM 10 some capacity with the defendant?

11      A    I joined DEA in 1989.  Joe came to Buffalo about

12 eight years after I had gotten there.  So, I would say 17

13 years in total.

14      **Q**    Were there individuals that this defendant --

10:16AM 15 withdrawn.

16          I should have asked you this.  Do you recognize the

17 defendant?  Is he in court today?

18      A    Yes, sir.

19      **Q**    Can you please point to him and describe

10:16AM 20 something's wearing?

21      A    He's sitting between defense counsel.  Dark gray

22 suit.

23      **MR. TRIPI:**  Your Honor, may the record reflect the

24 in-court identification, please?

10:16AM 25      **THE COURT:**  It does.

Kasprzyk - Direct - Tripi

10:16AM  1      **MR. TRIPI:**  Thank you.

2      **Q**    During the defendant's tenure in the DEA that

3      overlapped with yours, were there certain people that he

4      partnered up with or worked closely with?

10:16AM  5      A    Yes, sir.

6      **Q**    And can you name some of those people that you

7      recall he worked closely with on cases?

8      A    There were a number of task force officers that Joe

9      worked with.  I think initially Joe was partnered up with

10:17AM 10     Phil Torre.  Phil was a Buffalo police officer assigned to

11     the office.  After Phil, I believe it was Tom Doctor

12     (phonetic) that Joe most often worked with.  Tom Doctor,

13     again, was a Buffalo police officer assigned to the task

14     force office, or task force group.  After Tom Doctor, it was

10:17AM 15     Joe Palmieri.  Joe Palmieri was, I believe, a Tonawanda

16     detective who had come to the Buffalo office and was working

17     with Joe.  So that would be the three task force officers who

18     had extended, you know, time working with Joe.

19     **Q**    And as to that dynamic, he would have been the DEA

10:17AM 20     special agent that went through the training we've discussed

21     and they were the task force officers from local agencies,

22     correct?

23     A    That's correct.

24     **Q**    Now, were there any other special agents that the

10:18AM 25     defendant seemed close with or worked with from time to time

Kasprzyk - Direct - Tripi

10:18AM   1   in the office?

          2      A    Through the years, Joe worked with a number of

          3   agents.  I would say most recently when I was managing Joe,

          4   the one agent that he maybe worked the most with would have

10:18AM   5   been Mike Hill.

          6      Q    And Mike Hill, unlike those other three, was a

          7   special agent?

          8      A    Correct.

          9      Q    Now, during your tenure from your group supervisor

10:18AM  10   level on through your time as the RAC at the DEA office --

         11   let me withdraw that before I get there.

         12           How are agents and task force officers paired up?

         13   Are they assigned or does that happen organically?  Do you

         14   know what I mean by that?

10:19AM  15      A    I do.  Generally, most often it happens

         16   organically.

         17      Q    Okay.  So, task force officers come into the

         18   office, they kind of meet people or have relationships

         19   already and start working with people?

10:19AM  20      A    That's exactly right.

         21      Q    Okay.  Are there ever times where an agent will

         22   sort of pitch or refer someone they've worked with at a local

         23   agency and suggest that they be brought on as a task force

         24   officer?

10:19AM  25      A    Yes.

Kasprzyk - Direct - Tripi

10:19AM 1      **Q**    Do you recall or are you aware of any situations

2      where that occurred where the defendant pitched or tried to

3      advance someone that he had a relationship working with one

4      of those other agencies, to become a task force officer?

10:19AM 5      **A**    No.

6      **Q**    Okay.  Now, in terms of your relationship with the

7      defendant as a supervisor, did you ever tell him not to

8      investigate a case?

9      **A**    No.

10:20AM 10     **Q**    Did you ever tell him not to investigate a

11     marijuana trafficker?

12     **A**    No.

13     **Q**    Did you ever tell him not to investigate

14     cross-United States continent, cross-country marijuana

10:20AM 15     trafficking?

16     **A**    No.

17     **Q**    Did you ever tell him not to investigate drug

18     trafficking that occurred over an international border?

19     **A**    No.

10:20AM 20     **Q**    Did you ever decline to support investigations that

21     he wanted to initiate?

22     **A**    No.

23     **Q**    As far as you recall and in your experience with

24     the defendant, when he asked you for things for cases, were

10:21AM 25     you supportive of him?

Kasprzyk - Direct - Tripi

10:21AM  1      A    Yes.

2      Q    Back in the timeframe you were at the DEA all the

3   way up through your retirement in 2013, were large-scale

4   marijuana conspiracies important to investigate for the DEA?

10:21AM  5      A    Yes, they were.

6      Q    Were 1,000 kilogram or more marijuana conspiracies

7   something the DEA would investigate and look to dismantle in

8   this area?

9      A    Yes.

10:21AM 10      Q    Going back to academy training for a moment.

11          Are agents at the DEA academy trained in money

12   laundering?

13      A    Yes, sir.

14      Q    And, in fact, you have that role at a bank now,

10:21AM 15   correct?

16      A    Yes, I do.

17      Q    And did you get that job, in part, because of your

18   DEA training?

19      A    Yes, sir.

10:22AM 20      Q    What is money laundering very basically and very

21   briefly?

22      A    Money laundering is the act of taking illicit

23   funds, funds that were used and developed as part of a drug

24   trafficking organization.  Those illicit funds are then taken

10:22AM 25   and washed, laundered, turned into legitimate funds through

Kasprzyk - Direct - Tripi

10:22AM  1  the act of placing those funds into some sort of financial

2  institution.

3     **Q**    Okay.  And does this defendant have that same type

4  of background and training?

10:22AM  5     **A**    Yes, sir, he does.

6     **Q**    I'm going to direct your attention back to the 2009

7  timeframe.  And I think you said you were a group supervisor

8  of the defendant in that timeframe, is that --

9     **A**    Yes, sir.

10:23AM  10    **Q**    -- right?

11       I've talked about marijuana.  Were cocaine

12  traffickers people of interest for the DEA in Buffalo to

13  investigate?

14    **A**    Yes, they were.

10:23AM  15    **Q**    How about people who knew or had access to

16  kilograms of cocaine?

17    **A**    Yes.

18    **Q**    You talked a little bit about how agents are

19  trained to utilize confidential sources at the academy.  Are

10:23AM  20  they also trained on rules and procedures for signing people

21  up to work as confidential sources?

22    **A**    Yes, they are.

23    **Q**    You've told us what a confidential source is.  Can

24  you tell the jury what the process and procedure that agents

10:23AM  25  are trained in that they have to go through to sign up -- the

Kasprzyk - Direct - Tripi

10:24AM   1   steps of signing up a DEA confidential source?

        2        A    For an agent to sign up a person as a confidential

        3   source, that source would be required to come to the Buffalo

        4   DEA office.  The agent would meet with the source.  They

10:24AM   5   would take pictures.  They would take fingerprints.  There'd

        6   be a number of forms that the informant, prospective

        7   informant, would need to sign.  One of them was a DEA-473

        8   form which outlines the responsibilities that the informant

        9   would have while working for the DEA.

10:24AM  10             That information is collected.  There is a

       11   background check done on the informant to include a criminal

       12   history check.  And all of that information is collected and

       13   put together in a file, an informant file, and the informant

       14   was then given a documented source number, informant number,

10:24AM  15   CI number.

       16        Q    Is that informant file kept in a physically

       17   separate place?

       18        A    Yes, sir, it is.

       19        Q    Is it kept securely?

10:25AM  20        A    Yes.

       21        Q    Are agents trained and is it reinforced in agents

       22   to protect the identity of these confidential sources?

       23        A    Yes.

       24        Q    Is that an important duty and function of a DEA

10:25AM  25   agent:  To protect the identity of confidential sources?

Kasprzyk - Direct - Tripi

10:25AM    1        A    Yes.

2        Q    And is a word interchangeable for confidential

3    source, confidential informant?  Same thing?

4        A    Yes, sir.

10:25AM    5        Q    Why is it important and why are agents trained

6    specifically that as part of their duties, they are to

7    protect and secure the identity of confidential sources?

8        A    The confidential informant provides very sensitive

9    information to the DEA on drug trafficking activities.  It's

10:25AM   10    important for the DEA to keep that information confidential

11    to insure the informant's safety and to protect the integrity

12    of the investigation.

13        Q    What do you mean by protect the integrity of the

14    investigation?  Can you elaborate for the jury?

10:26AM   15        A    We -- when working with informants, we do not put

16    their name -- the informant's name in a report because we

17    don't want that information to be shared with other potential

18    witnesses to the investigation.  We want that information to

19    be very confidential and we don't want that to be

10:26AM   20    inadvertently distributed to people that don't have a need to

21    know.

22        Q    If confidential informant or confidential source

23    identities become known to drug organizations, could that

24    jeopardize their safety?

10:26AM   25        A    Yes, sir.

Kasprzyk - Direct - Tripi

10:26AM 1    **Q**   When an agent wants to sign up an informant -- you

2   touched on it a moment ago -- is it typically an initial

3   debrief, is that attended by another witness and a group

4   supervisor?

10:27AM 5    **A**   Yes, sir, that is typically how it goes.

6    **Q**   So, just distinguish for a moment as the RAC, when

7   you had that role, you're typically not sitting in on those

8   debriefings, correct?

9    **A**   Correct.

10:27AM 10    **Q**   But as the group supervisor, sort of the first line

11   supervisor, you would sit in those types of debriefings; is

12   that right?

13    **A**   That is correct.

14    **Q**   All right.  In reports that are written, are agents

10:27AM 15   allowed or supposed to refer to confidential sources or

16   informants by name or by that number you referenced?

17    **A**   By the number.

18    **Q**   Is that another step in maintaining the

19   confidentiality of the person?

10:27AM 20    **A**   Yes, sir.

21    **Q**   Now, is there -- are you familiar with the term

22   "source of information"?

23    **A**   Yes, sir.

24    **Q**   Is there a difference -- well, withdrawn.

10:28AM 25       What is a source of information as distinguished

Kasprzyk - Direct - Tripi

10:28AM  1   from a confidential source or an informant?

2        A     A source of information is an individual that a DEA

3   agent may be talking to that is providing information on drug

4   trafficking activities.  That source of information is not a

10:28AM  5   documented confidential informant and that source of

6   information is listed by name in a DEA-6 when that

7   information's documented as part of the case investigation.

8        Q     "DEA-6", is that another term for a written report

9   that agents make?

10:28AM  10       A     Yes, sir.

11       Q     Report of an investigation?

12       A     Yes, sir.

13       Q     Are those documents that document various steps in

14   an investigation?

10:28AM  15       A     Correct.

16       Q     When an informant or a confidential source

17   participates and aids an agent in some type of investigative

18   activity, is that supposed to be documented in a

19   confidential -- excuse me, DEA-6 report?

10:29AM  20       A     Yes, sir.

21       Q     Is that supposed to be cross-referenced to that

22   informant's file?

23       A     Correct.

24       Q     Why do you cross-reference to the informant file?

10:29AM  25       A     The report is cross-referenced to the informant

Kasprzyk - Direct - Tripi

10:29AM 1   file so that I, as the manager, can look at the informant

2   file and determine what cases that that particular informant

3   is assisting the agents on.

4       Q    And do agents have a duty to document their

10:29AM 5   interactions, as we've just discussed, with confidential

6   sources and informants on investigations?

7       A    Yes, sir.

8       Q    And to make sure that those reports make their way

9   to the informant file?

10:29AM 10      A    Correct.

11      Q    Do they also have a duty to document information

12  provided by those sources of information?

13      A    Yes.

14      Q    And now those people are allowed to have their

10:29AM 15  names documented in a report?

16      A    Correct.

17      Q    Okay.  Why is it important for agents to truthfully

18  and accurately document information by confidential sources?

19  Let's start there.

10:30AM 20      A    It's important to have that information on record

21  so that when you are reflecting back and preparing for court,

22  reflecting back on the statements provided to you by that

23  confidential informant, that you have a permanent record of

24  what that informant said to you.  So, to preserve the

10:30AM 25  integrity of that investigation and to preserve the integrity

Kasprzyk - Direct - Tripi

10:30AM  1    of those communications with the informant and the agent, it

2    needs to be documented in a report of investigation DEA-6.

3        **Q**    And why is it also -- separately, why is it also

4    important to document actions in an investigation --

10:30AM  5    withdrawn -- information, that sources of information provide

6    to agents in an investigation? (

7        A    For the same reasons that I described:  The

8    integrity of the investigation, the integrity of those

9    conversations.  They're all documented in a DEA-6 to ensure

10:31AM  10    that there is a permanent record of what was said by that

11    source of information.

12        **Q**    Is it also important if, for example, do you have

13    some agents who have military obligations?

14        A    (No response.)

10:31AM  15        **Q**    Are there DEA agents who sometimes, for example,

16    have military duty?

17        A    Yes, sir.

18        **Q**    Or other things in their life that take them out of

19    the office for a while?

10:31AM  20        A    Yes, sir.

21        **Q**    And on occasion if that type of situation arises,

22    do cases get assigned -- reassigned?

23        A    Yes, sir, they do.

24        **Q**    Is it important to have the information and

10:31AM  25    investigative material documented so that someone else can

Kasprzyk - Direct - Tripi

10:31AM   1    further an investigation if that were to ever happen?

          2         A    Yes, that's correct.

          3         Q    Is it important to have that information documented

          4    in a file so maybe years in the future, another agent could

10:32AM   5    pick an investigation up and make a link back to something

          6    that happened years earlier?

          7         A    Yes, sir, that's correct.

          8         Q    Does that happen in DEA investigations?

          9         A    Yes, it does.

10:32AM  10         Q    Is that why it's important to document these

         11    things?

         12         A    Yes, sir.

         13         Q    I'm going to ask you a about a particular report in

         14    a little bit.  At any time prior to November 6th, 2009, did

10:32AM  15    this defendant ever come up to you as his group supervisor

         16    and say I have a source of investigation, Peter Gerace, an

         17    owner of a strip club?

         18         A    No, he did not.

         19         Q    At any point prior to that, did the defendant ever

10:32AM  20    come up to you and say I know a strip club owner named Peter

         21    Gerace and I'd like to sign him up as a confidential source,

         22    an informant with me?

         23         A    No, he did not.

         24         Q    Now, if there were someone who was on probation or

10:33AM  25    parole -- let's stick with U.S. Probation.  Are you familiar

Kasprzyk - Direct - Tripi

10:33AM    1    with any rules that probation has if someone under their

2    supervision is identified by an agent under your supervision

3    as a potential confidential source?

4         A    Yes, sir.

10:33AM    5         Q    And have you had that situation many times where

6    you had to coordinate that type of thing?

7         A    Yes, sir.

8         Q    With probation and the various stakeholders

9    including getting court permission?

10:34AM    10         A    Yes.

11         Q    Can you explain those rules and how that works out?

12         A    Yes.  So, for individuals who are on United States

13    probation, if you as an agent would like to sign that person

14    up as a confidential informant, that would be considered a

10:34AM    15    restricted use informant.  And as a restricted use informant,

16    there are approvals that you would have to obtain to be able

17    to utilize that individual as a documented confidential

18    informant.  Those approvals include meeting with the

19    probation officer and getting the approval of the probation

10:34AM    20    officer, meeting with the judge, and getting the approval of

21    the judge who is managing that particular probationee.  Also

22    meeting with the prosecutor, getting their approval.  And

23    then there would be internal approvals within DEA management

24    that would have to be obtained before that person could be

10:35AM    25    utilized as a documented confidential source.

36

Kasprzyk - Direct - Tripi

10:35AM 1    **Q**    Okay.  Now I'd like to focus you in on your role as

2    group supervisor, front line supervisor, for a moment.

3         Are there different reports and forms that, as a

4    group supervisor, you review and sign off on?

10:35AM 5    A    Yes, sir.

6    **Q**    Can you explain that process for the jury?

7    A    As a group supervisor, I would have an in-box.  I

8    would check that in-box every day and agents would prepare

9    reports, submit them into my in-box and I would sign them,

10:35AM 10   review them and sign them almost daily.

11   **Q**    And as a group supervisor, how many agents and task

12   force officers would be under your supervision?

13   A    When I was managing Joe, he was assigned to group

14   D-57, Delta 57.  At the time there was about 12 or 13 people

10:36AM 15   in that group.  It was a combination of agents and task force

16   officers.  If I'm remembering, it was maybe four to five

17   agents, and the remaining individuals were task force

18   officers.

19   **Q**    What are the type of DEA documents as a group

10:36AM 20   supervisor you review and sign off on?

21   A    The primary document would be the DEA-6 that I

22   mentioned earlier.  That's a report of investigation.  I

23   would also sign off on DEA-202s, arrest packages.  I would

24   also sign off on operational plans.  These are plans that are

10:36AM 25   submitted by the agent when they are interested in conducting

Kasprzyk - Direct - Tripi

10:36AM 1   some sort of enforcement operation.

2      **Q**    And what do you mean -- just to define the term --

3   what do you mean by enforcement operation for the jury?

4      A    An enforcement operation would generally involve

10:36AM 5   the agents working as a group, going out on to the street and

6   conducting some sort of controlled buy or some sort of

7   surveillance operation.

8      **Q**    Now you retired in 2013.  Were these sign-offs and

9   these forms that you filled out, were they paper forms --

10:37AM 10     A    Yes, sir.

11     **Q**    -- at the time?  So you were still doing pen and

12   ink signatures and all that?

13     A    Yes.

14     **Q**    And you said you had an in-box.  Describe your in

10:37AM 15   box.

16     A    I had a desk and an in-box and the agents would

17   come in and put the documents in there.  If it was something

18   that needed to be actioned immediately, they would bring it

19   right to me and hand it to me and ask for me to look at it

10:37AM 20   immediately.

21     **Q**    But, otherwise, it would go to the in-box and it

22   would be your job to review things as things piled up?

23     A    That's right.

24     **Q**    Are there sometimes when that in-box got real high?

10:37AM 25     A    Yes, sir.

Kasprzyk - Direct - Tripi

10:37AM 1    **Q**    Are there instances where your other obligations in
2    the office impacted how long you spent reviewing each
3    document?

4    A    Correct.

10:38AM 5    **Q**    Who determines when to put something in your
6    in-box?

7    A    The agents.

8    **Q**    When you have that type of situation, do you go
9    through each form that you're reviewing before you sign off
10:38AM 10   on it and reinvestigate every single sentence and word that
11   an agent wrote in the report?

12   A    No, sir.

13   **Q**    Why don't you do that?

14   A    It would -- it's just not practical.  It's
10:38AM 15   impossible for me to reinvestigate everything that an agent
16   presents to me.  I am trusting the author of the report to
17   provide to me factual information when they prepare that
18   report.

19   **Q**    And are there times when you, in your experience,
10:38AM 20   miss things that might need correcting in a report?

21   A    There are times.

22   **Q**    Are there times when you see something that might
23   be inaccurate and you don't think it's a big deal so you let
24   it go?

10:39AM 25   A    On occasion, that might happen, yes.

Kasprzyk - Direct - Tripi

10:39AM 1    **Q**    Okay.  And are there other times when you kick

2    things back to agents and have them rewrite things?

3    A    Correct.

4    **Q**    And what's an example of a time when you, you know,

10:39AM 5    just an example of a scenario where you might submit

6    something back to an agent to fix something?

7    A    If I saw a particular sentence that described a

8    incident that I might have been a part of that I know might

9    have occurred differently, I would send it back and ask the

10:39AM 10   agent to, to reevaluate what they wrote to ensure that it was

11   consistent with the facts that had happened.

12   **Q**    And that's a question I want to follow up on.  As a

13   group supervisor, if a case agent has an enforcement action,

14   is the group supervisor sometimes out on the street still in

10:39AM 15   a supporting role?

16   A    Yes, sir.

17   **Q**    But those enforcement actions are originated by

18   who?

19   A    The case agent.

10:40AM 20   **Q**    And who writes those operational plans that

21   coincide with enforcement actions?

22   A    The case agents.

23   **Q**    Is the case agent responsible for every word

24   written in those reports?

10:40AM 25   A    Generally, yes.

Kasprzyk - Direct - Tripi

10:40AM   1     **MR. TRIPI:**  Ms. Champoux, on the screen -- and for the

  2  witness only, please at this point -- can we pull up

  3  Government Exhibit Number 30A, please, for the witness.

  4     **Q**   Mr. Kasprzyk, that is a two-page document.  I want

10:40AM   5  to give you just a moment to review it.  Don't say anything

  6  about it.  Once you want to advance to the second page, let

  7  us know.  And when you're done looking at it, look back at me

  8  and let me know, okay.

  9     A   (Witness complies.)

10:40AM  10     Next page.

 11     **MR. TRIPI:**  Ms. Champoux, if you could advance it.

 12  Thank you.

 13  For the record, he's now looking at Page 2.

 14     A   Yes, sir.

10:41AM  15     **Q**   Ms. Champoux, if we can advance it back to the

 16  first page.

 17     Looking at Exhibit number 30A -- you've looked at

 18  both pages -- do you recognize that document?

 19     A   Yes, sir.  This is a report of investigation DEA-6.

10:41AM  20     **Q**   And how do you recognize that specific document?

 21     A   I can see at the bottom of the page my signature.

 22     **Q**   And you've reviewed this document prior to today?

 23     A   Yes, sir.

 24     **Q**   Is this a fair and accurate copy of a DEA-6 that

10:42AM  25  was submitted to you by the defendant that you reviewed and

Kasprzyk - Direct - Tripi

10:42AM 1  signed?

2         A    Yes, it is.

3         **MR. TRIPI:**  Government offers Exhibit 30A, please.

4         **MR. SINGER:**  No objection.

10:42AM 5  **THE COURT:**  I'm sorry?

6         **MR. SINGER:**  No objection.

7         **THE COURT:**  Received without objection.

8         **MR. TRIPI:**  Thank you, your Honor.

9         If we can please publish it for the jury.

10:42AM 10 **THE CLERK:**  You're all set.

11        **MR. TRIPI:**  Oh, thank you very much.

12        **Q**    Just generally tell the jury, explain for the jury

13 what this document is and then we'll go through some

14 specifics.

10:42AM 15        A    This is a DEA-6 Report of Investigation that was

16 prepared by Joe Bongiovanni.  It documents his conversation

17 with an individual identified as Peter Gerace.  Peter Gerace

18 had been involved in a, I'll call it an enforcement

19 operation.  I believe it was a U.S. Probation investigation

10:43AM 20 that resulted in him testing positive in his urine for

21 cocaine.

22        **Q**    Okay.  I'll ask you a few questions about it.  I

23 just want to get the basics of the form down.

24        A    I'm sorry.

10:43AM 25        **Q**    No, poor question.

Kasprzyk - Direct - Tripi

10:43AM    1              So, looking at this form, there's some information

2      filled out in box 3 at the top that's under the term "file

3      number", do you see that?

4          A    I do.

10:43AM    5          Q    Can you tell the jury what that number is?

6          A    The file number is the particular case number that

7      is -- that the report was written to.  The G-DEP

8      identifier -- all cases, all investigations within the DEA

9      are, are G-DEP classified.  That would speak to the level of

10:43AM   10      organization and the particular type of narcotic being sold

11      by that group.  So that's what the G dep identifier

12      represents.

13          Q    If we can zoom out of that, please.

14              If we can, I'd like to highlight boxes 5 and 6.

10:44AM   15      Start with box 5 and go on to box 6 and explain what those

16      are.

17          A    Yes, sir.  Box 5 represents or indicates that the

18      report was prepared by SA Joseph Bongiovanni at the Buffalo

19      Resident Office, Group D-57 and box 6 is our file title.  In

10:44AM   20      this case, the file was written to -- or the case was written

21      to the file under Matthew Scalia.

22          Q    Just a followup question on this.

23              Who decides what file title to write a report to?

24          A    That is the case agent.

10:44AM   25          Q    Okay.  In this case, the author of this report?

                    Kasprzyk - Direct - Tripi

10:44AM   1        A    Correct.

          2        Q    So nobody tells him, hey, write this report to this

          3    file, the agent's responsible for that?

          4        A    Correct.

10:44AM   5        MR. TRIPI:  If we can zoom out of that, please.  Can we

          6    highlight box number 8, Ms. Champoux.

          7        Q    And what does that box indicate?

          8        A    The date that the report was prepared.

          9    November 6th, 2009.

10:45AM   10       MR. TRIPI:  Okay.  We can zoom out of that, please.

          11       Q    There's a couple boxes that are blank.  I want to

          12   ask you about those very quickly.

          13            Number 1 is labeled program code.  What does that

          14   mean?  Do you know why that's blank?

10:45AM   15       A    I do not.  I believe that some cases might have a

          16   particular program code but in this instant there was no code

          17   involved, so I don't have any background on that.

          18       Q    Okay.  So, do you see box 2, it says cross-file

          19   with related files?

10:45AM   20       A    Yes.

          21       Q    What is that box for?

          22       A    That would be an opportunity for the case agent to

          23   cross-file this particular report either to the confidential

          24   informant file or to another investigation that might be

10:45AM   25   related to the, to the case at hand.

Kasprzyk - Direct - Tripi

10:45AM  1    **Q**    So if, if this particular report related to other

2    investigations, this is the space to list those in?

3    A    Correct.

4    **Q**    If this report related to a confidential source or

10:45AM  5    informant, this is the place to list that at?

6    A    Correct.

7    **Q**    And here it's blank?

8    A    That's right.

9    **Q**    Okay.  If we can zoom out of that.

10:46AM  10    I want to focus on boxes 9 and 10 now.

11    Can you talk us through, first, box 9 there, what

12    that box means and what's listed there?

13    A    Box 9 is other officers.  So, anyone that might

14    have been involved in the investigation that was detailed in

10:46AM  15    this particular report of investigation, they would be listed

16    in there as "other officers".

17    And number 10 is a report regarding -- and that is

18    a, just a brief summary or highlight of what it is that the

19    report's about.

10:46AM  20    **MR. TRIPI:**  We can zoom out of that, please.

21    **Q**    I'd like to now take you down to boxes -- if we

22    could highlight boxes 11, 12, the whole bottom there -- can

23    you talk us through and describe box 11 through 15, please.

24    A    Box 11 would be -- would indicate any distribution.

10:47AM  25    So if this report was sent anywhere else, it would be listed

Kasprzyk - Direct - Tripi

10:47AM 1 in box 11.

2 **Q** So, let me just put a finer point on that. If

3 there were an investigative interest by some other DEA office

4 or some other entity that had an investigative interest,

10:47AM 5 there was a space to list that there?

6 **A** Correct.

7 **Q** Please continue.

8 **A** Box 12 is the agent's name and signature who

9 prepared the report.

10:47AM 10 Box 13 is the date that the report was prepared.

11 Box 14 is the name and the title and signature of

12 the supervisor that approved the report.

13 And Box 15 is the date that that happened.

14 **MR. TRIPI:** Okay. If we can zoom out of that, please.

10:47AM 15 Ms. Champoux if we can go to, we're going to go to Page

16 2 first. At the end of the report I want to show you --

17 highlight the indexing, section, please.

18 **Q** Can you tell us what the index section is, please.

19 **A** The indexing section is an area of the report which

10:48AM 20 documents the name of the individual that's listed in the

21 report and it also -- in this case it says NADDIS number

22 pending.

23 NADDIS is a system within DEA that records all

24 information on suspected drug traffickers and/or individuals

10:48AM 25 that have information on drug trafficking that can be named.

Kasprzyk - Direct - Tripi

10:48AM   1   That, that would be in our NADDIS system.

          2       **Q**   So, in other words, if someone had a prior DEA

          3   case, NADDIS would have some information about a prior DEA

          4   case and that information could be written in this indexing

10:48AM   5   section?

          6       A    Correct.

          7       **Q**   Do you know what "NADDIS pending" means?

          8       A    That -- that would indicate that Joe would have

          9   checked NADDIS, looked for a number, couldn't find that

10:49AM  10   number and that that number was pending.  So a number was to

         11   be given to Peter Gerace.

         12       **Q**   And, thus, "pending" means there's no additional

         13   information to write in this box at this time?

         14       A    Correct.

10:49AM  15       **MR. TRIPI:**  Okay.  Zoom out of that, please.  Can we go

         16   back to Page 1.

         17       **Q**   So, just -- Mr. Bongiovanni authored this document,

         18   correct?

         19       A    Yes, sir.

10:49AM  20       **Q**   You did not request this document, did you?

         21       A    No.

         22       **Q**   Did you know that it was being written prior to him

         23   submitting it to you?

         24       A    I don't recall having specific information that he

10:49AM  25   was writing it prior to it coming to me, no.

Kasprzyk - Direct - Tripi

10:49AM   1      **Q**    And those signature blocks, is that your signature

2      on Box 14 for the approval?

3      A    Yes, sir, it is.

4      **Q**    And is that Mr. Bongiovanni for the agent

10:50AM   5      signature?

6      A    Yes.

7      **Q**    Whose job was is to make sure the details of this

8      report were accurate?

9      A    Agent Bongiovanni, Joe Bongiovanni.

10:50AM   10     **Q**    Okay.  Let's start with Paragraph 1 for a moment.

11     Can you read what Paragraph 1 says?

12     A    "Reference is made to all other DEA-6 reports of

13     investigation written to this case/file".

14     **Q**    So who would have authored that line?

10:50AM   15     A    That would have been Joe Bongiovanni.

16     **Q**    So that's not something that's autofilled in,

17     correct?

18     A    No.

19     **Q**    That's something that's typed in by the agent?

10:50AM   20     A    Correct.

21     **Q**    And as the reviewer, what does that mean to you?

22     A    That there are other reports written to this

23     particular case file that would be referenced as a part of

24     this investigation.  So there would be some sort of

10:51AM   25     connection between this individual's information or potential

Kasprzyk - Direct - Tripi

10:51AM  1    information and the Matthew Scalia file.

2         **Q**    Now, do you go back and look through all the other

3    reports in the investigation in the Matthew Scalia file to

4    get more specifics?

10:51AM  5    A    No.

6         **MR. TRIPI:**  Okay.  Let's move on to Paragraph 2.  If we

7    could zoom out of that, please.

8         **Q**    Can you read out loud for the jury Paragraph 2 and

9    then I want to follow up with some questions about it.

10:51AM  10   A    "On November 1st, 2009, SA Joseph Bongiovanni

11   received a telephone call from Peter G. Gerace.  Gerace has

12   acted as a confidential source and has been able to provide

13   information regarding the individuals in this case file and

14   other narcotic investigation in the past.  It should be known

10:52AM  15   that Gerace is presently on federal parole and supervised

16   release."

17        **Q**    Let me stop you there for a moment.

18             Now, the term is used "Gerace has acted as a

19   confidential source and has been able to provide

10:52AM  20   information", and the sentence continues; do you see that?

21        A    I do.

22        **Q**    But DEA policy was to reference a confidential

23   source by number, is that correct?

24        A    Correct.

10:52AM  25        **Q**    And then earlier you talked about going on to the

Kasprzyk - Direct - Tripi

10:52AM 1    next sentence where it talks about him being on federal

2    parole and supervised release; do you see that?

3        A    Yes, sir, I do.

4        Q    Earlier you talked about approvals that need to be

10:53AM 5    done before someone could be utilized as a confidential

6    source while on federal -- as it's written here -- federal

7    parole and supervised release?

8        A    Yes, sir.

9        Q    At any point prior to you seeing this report, did

10:53AM 10   the defendant ever come to you and say:  Hey, I know a guy

11   Peter Gerace, he's on supervised release, we'd like to work

12   with him while on supervised release?

13       A    No, sir.

14       Q    So that never happened?

10:53AM 15       A    That never happened.

16       Q    Okay.  Please continue.  I think you were about to

17   start the "at this time" sentence.  Please read further.

18       A    "At this time Gerace advised SA Bongiovanni that

19   United States Probation Officer Peter Lepiane and agents of

10:53AM 20   the FBI initiated a search of Pharaoh's Gentlemen's Club

21   located at 23 Aero Drive in Cheektowaga, New York on or about

22   October 31st, 2009.  (It should be known that Gerace is

23   associated with Pharaoh's Gentlemen's Club)".

24       Q    Prior to this report being presented to you, did

10:54AM 25   you have any familiarity with Peter Gerace being a

Kasprzyk - Direct - Tripi

10:54AM  1  confidential source for the DEA?

2       A    I did not.

3       Q    To your knowledge, was Peter Gerace ever a

4  confidential source with the DEA while you were there?

10:54AM  5  A    To my knowledge, no.

6       Q    Prior to this report did Mr. Bongiovanni ever come

7  up to you and tell you he's a source of information for me?

8       A    He did not.

9       Q    So is this report the first instance you're hearing

10:54AM 10 the name "Peter Gerace" connected to this situation that's

11 being described in the report?

12      A    Yes, sir.

13      Q    Is this the first time you're hearing the name

14 Peter Gerace connected to the defendant in any way?

10:55AM 15 A    Yes.

16      Q    Outside the framework of this report, did you and

17 the defendant have any side conversations where he told you:

18 I'm childhood friends with Peter Gerace?

19      A    No, sir.

10:55AM 20 Q    Outside the of context of this report, did he ever

21 tell you:  I've been to Peter Gerace's club?

22      A    No, sir.

23      Q    Had any of that information been provided to you,

24 would you have scrutinized this report more closely?

10:55AM 25 A    Yes, sir.

Kasprzyk - Direct - Tripi

| | | |
|---|---|---|
| 10:55AM | 1 | **Q**   Would you have approved the defendant operating any |
| | 2 | way, shape or form with Peter Gerace as a confidential |
| | 3 | source? |
| | 4 | A    No, sir. |
| 10:55AM | 5 | **Q**   Would you have approved in any way, shape, or form |
| | 6 | the defendant continuing with Peter Gerace -- withdrawn -- |
| | 7 | the defendant operating a source of information named Peter |
| | 8 | Gerace? |
| | 9 | A    Had I known that relationship? |
| 10:55AM | 10 | **Q**   Correct. |
| | 11 | A    No, sir. |
| | 12 | **Q**   Whose job would it have been to alert you to that |
| | 13 | relationship? |
| | 14 | A    Joe Bongiovanni. |
| 10:56AM | 15 | **Q**   I'd like to go to Paragraph 3, please. |
| | 16 | Can you read that paragraph out loud for the jury, |
| | 17 | please. |
| | 18 | A    "Gerace advised SA Bongiovanni that he was |
| | 19 | administered a urine test to detect the presence of narcotics |
| 10:56AM | 20 | in his urine.  Gerace advised SA Bongiovanni that he failed |
| | 21 | the urine test due to the presence of trace amounts of |
| | 22 | cocaine detected in his urine.  Gerace advised SA Bongiovanni |
| | 23 | that he believed he had now violated his term of supervised |
| | 24 | release.  Gerace stated that he was prepared to offer |
| 10:56AM | 25 | information regarding individuals who are trafficking in |

Kasprzyk - Direct - Tripi

10:56AM  1    narcotics in the Buffalo area.  Gerace stated he wanted to

2    offer this information in lieu of consideration on this

3    pending supervised release violation due to the failed urine

4    test."

10:57AM  5        Q    What did you understand the defendant to be

6    documenting in this paragraph?

7        A    That Mr. Gerace would like to work --

8        **MR. SINGER:**  Your Honor, object to what the witness

9    understands.  The words speak for themselves.

10:57AM  10       **THE COURT:**  Sustained.

11       **MR. TRIPI:**  A may I make a brief argument on that?

12       **THE COURT:**  Sure.  Go ahead.

13       **MR. TRIPI:**  He's the supervisor who signed off on the

14   report.  I think his understanding has some relevance, your

10:57AM  15   Honor.

16       **THE COURT:**  Well, what he understood I think is fine.

17       **MR. TRIPI:**  That was the question.

18       **THE COURT:**  No, I think the question is what he

19   understood Mr. Bongiovanni to mean by it.

10:57AM  20       **MR. TRIPI:**  I can rephrase it, Judge.

21       **THE COURT:**  Sure.

22       Q    What was your understanding of this paragraph as

23   you reviewed it?

24       A    That Peter Gerace had -- or there was the potential

10:58AM  25   of a violation by U.S. Probation against Mr. Gerace and that

Kasprzyk - Direct - Tripi

10:58AM   1   Mr. Gerace had reached out to Joe Bongiovanni and was

2   attempting to work for the DEA as a confidential informant or

3   source of information and take that information and use it to

4   weigh up against his potential or pending probation

10:58AM   5   violation.

6       **Q**    Was becoming involved in Gerace's potential

7   probation violation something you directed the defendant to

8   do or something the defendant did on his own?

9       **MR. SINGER:**  Object to the form of the question.

10:58AM   10      **THE COURT:**  Overruled.

11      **MR. TRIPI:**  There's nothing improper about that.

12      **THE COURT:**  Overruled.

13      A    Joe Bongiovanni brought this information to me --

14      **Q**    Okay.

10:58AM   15      A    -- on his own.  I didn't -- I didn't direct him to

16   do this.  He brought this to me as part of the conversation

17   he had with me.

18      **Q**    Was it your understanding that through this report

19   Mr. Bongiovanni claimed that Mr. Gerace was offering to

10:59AM   20   cooperate with the DEA?

21      A    Yes, sir.

22      **MR. SINGER:**  Objection, same objection, Judge.

23      **THE COURT:**  Overruled.

24      **Q**    Was information about drug traffickers something

10:59AM   25   the DEA would have considered valuable?

Kasprzyk - Direct - Tripi

10:59AM     1     A    Yes, sir.

2     Q    I would like to move on to Paragraph 4. If you

3   could read that out loud.

4     A    "On November 2nd, 2009, Gerace arrived at the DEA

10:59AM     5   Buffalo resident office and spoke briefly to SA Bongiovanni.

6   Gerace stated that he knew significant cocaine traffickers

7   capable of moving kilo quantities of cocaine out of various

8   distribution houses located in the North Buffalo and South

9   Buffalo areas. Gerace stated that he would not offer

11:00AM    10   additional information until he received a good faith

11   commitment from United States Probation Officer Lepiane that

12   he would receive consideration on his violation in lieu of

13   information he is willing to provide."

14     Q    Where it states "Gerace stated that he knew

11:00AM    15   significant cocaine traffickers capable of moving kilo

16   quantities of cocaine" -- and I'll stop it there -- what was

17   your understanding of what that meant?

18     A    To me, that meant that Peter Gerace had information

19   on a Drug Trafficking Organization that was moving kilogram

11:00AM    20   quantities of cocaine in Western New York. That would be

21   information that the DEA would find valuable.

22     Q    In your experience, are those who knew significant

23   cocaine traffickers capable of moving kilo quantities of

24   cocaine, are those individuals who know people like that,

11:01AM    25   typically themselves involved in drug trafficking at a high

Kasprzyk - Direct - Tripi

11:01AM  1    level?

2        **MR. SINGER:**  Object to the foundation.

3        **THE COURT:**  Overruled.

4        A    Typically, yes.

11:01AM  5    Q    Given this context and the information the

6    defendant wrote in this report, would Gerace have been

7    someone the DEA would have wanted to investigate if he had

8    not been purporting to cooperate, as Bongiovanni wrote in

9    this report?

11:01AM  10    A    Yes, sir.

11        **THE COURT:**  Mr. Tripi, good place for a break now?

12        **MR. TRIPI:**  Yes, Judge, this is a good spot.

13        **THE COURT:**  Okay.

14        **MR. TRIPI:**  Thank you.

11:01AM  15    **THE COURT:**  So let's take our morning break now.

16        Please remember my instructions about not communicating

17    about the case with anyone, including each other, and not

18    making up your mind.

19        See you back here in about 10 or 15 minutes.

11:02AM  20    (**WHEREUPON,** jury excused.)

21        **THE COURT:**  Anything for the record before we break?

22        **MR. TRIPI:**  No, your Honor.

23        **MR. SINGER:**  Not from me, Judge.

24        **THE COURT:**  Okay.  We'll see you in a few minutes.

11:02AM  25    (**WHEREUPON,** recess taken.)

Kasprzyk - Direct - Tripi

11:02AM    1        (Open court, defendant present:)

          2        **THE CLERK:**  Back on the record.  Case number 19-CR-277,

          3    United States of America v. Joseph Bongiovanni.

          4        All counsel and parties are present.

11:18AM    5        **THE COURT:**  Okay.  Anything for the record, Mr. Tripi?

          6        **MR. TRIPI:**  No, your Honor.

          7        **THE COURT:**  Anything from the defense?

          8        **MR. MacKAY:**  No.

          9        **THE COURT:**  So we'll go until 12:15, 12:30, convenient

11:18AM   10    spot to break.

         11        How much longer?

         12        **MR. TRIPI:**  I think this witness direct will probably

         13    take us till the lunch break probably cross right after.

         14        **THE COURT:**  Okay, terrific.  So we'll do that.

11:18AM   15        And then I'm also going to tell the jury that next week

         16    we are probably going to break late for lunch.  We'll break

         17    for lunch but we're going to break late for lunch, probably

         18    some time around 1:30 or so every day because I have

         19    something I have to take care around 2:00 o'clock, okay?

11:19AM   20        **MR. TRIPI:**  Thank you, your Honor.

         21        **THE COURT:**  Okay, let's bring them in, Pat, please.

         22        (**WHEREUPON**, jury present.)

         23        **THE COURT:**  The record will reflect that all our jurors

         24    again are present.

11:20AM   25        Folks, we'll go until some time between 12 and 12:30,

Kasprzyk - Direct - Tripi

11:20AM  1    break for lunch for about an hour and then resume.

2         Just so you know for planning purposes, next week our

3    lunch brakes are going to be later than usual.  They'll be

4    between 1:30 and 2 o'clock generally and we'll break for an

11:20AM  5    hour around then because I have something I need to do about

6    2 o'clock every day next week, okay.

7         I remind the witness that he's still under oath.

8         And you may continue, Mr. Tripi.

9         **MR. TRIPI:**  Thank you, your Honor.

11:20AM  10        Ms. Champoux, can we pull the exhibit back up.  We had

11   Paragraph 49 up.

12        **Q**    Looking at this paragraph, again, see that first

13   sentence there "on November 2nd, 2009, Gerace arrived at the

14   DEA Buffalo resident office and spoke briefly to SA

11:21AM  15   Bongiovanni", do you see that sentence?

16        **A**    Yes, sir.

17        **Q**    Now, that date, November 2nd, 2009, that's four

18   days before you signed off on and reviewed this report,

19   correct?

11:21AM  20        **A**    Correct.

21        **Q**    Now, at that time per DEA policy, if an interview

22   was going to be conducted by a DEA agent in the office, was

23   there supposed to be a witness to that interview?

24        **A**    Yes, sir.

11:21AM  25        **Q**    Does this paragraph reference any witness to any

Kasprzyk - Direct - Tripi

11:21AM  1    interaction with a Gerace had with Bongiovanni?

2         A    No, it does not.

3         Q    As per DEA policy, are a witness and supervisor

4    supposed to be present for those initial confidential source

11:21AM  5    debriefings you talked about earlier?

6         A    Yes, sir.

7         Q    Does this paragraph reference any witness or

8    supervisor who was present for a debriefing of Gerace?

9         A    It does not.

11:22AM  10    Q    And just to make the record clear, you were not

11    present for a conversation as the defendant's group

12    supervisor, November 2nd, 2009, when Gerace arrived at the

13    DEA Buffalo resident office, correct?

14         A    I was not.

11:22AM  15    Q    And other than the defendant writing that, do you

16    have any information other than the written words on this

17    page that that actually happened?

18         A    No, sir, I do not.

19         Q    Were you invited to a meeting between Gerace and

11:22AM  20    the defendant on November 2nd, 2009, and just didn't go?

21         A    No, sir, I was not.

22         Q    So, do you have any personal knowledge that a

23    meeting actually happened between Gerace and Bongiovanni on

24    November 2nd, 2009?

11:23AM  25         **MR. SINGER:**  Objection.  Asked and answered.

Kasprzyk - Direct - Tripi

11:23AM   1        **THE COURT:**  Overruled.

          2        A    I do not.

          3        Q    Okay.  I think we've already looked at the rest of

          4    that paragraph, so we're going to move on to Paragraph 5.

11:23AM   5             Can you read for the record and for the jury, can

          6    you read Paragraph 5 out loud and then I'll ask you some

          7    questions.

          8        A    "Later on that same day, SA Bongiovanni reported

          9    this information to G S Kasprzyk of the Buffalo resident

11:23AM  10    office.  GS Kasprzyk contacted FBI GS James Jansewicz to

         11    better understand the FBI's interest in Gerace as well as

         12    their participation in the search at the Pharaoh's club.  FBI

         13    GS Jansewicz stated that the FBI was very interested in

         14    interviewing Gerace on various issues regarding the Pharaoh's

11:24AM  15    club and other FBI investigations."

         16        Q    Okay.  Now, did there come a time when you, in

         17    fact, called FBI Group Supervisor Jansewicz?

         18        A    I did.

         19        Q    Can you describe that -- how -- what triggered you

11:24AM  20    making that phone call?

         21        A    My conversation with Joe led me to call Jim

         22    Jansewicz from the FBI and explain to him the information

         23    that Joe Bongiovanni had provided to me regarding Mr. Gerace.

         24        Q    And that's the information that we just read in

11:24AM  25    Paragraph 4?

Kasprzyk - Direct - Tripi

11:24AM 1    A    Correct.

2    Q    And just to make it clear, who is FBI Group

3 Supervisor James Jansewicz?

4    A    Jim Jansewicz is a FBI Group Supervisor.  At the

11:24AM 5 time he managed the FBI Safe Streets Task Force.  That is an

6 FBI group that also is involved in the investigation of drug

7 trafficking crimes.  So that group, his group, the Safe

8 Streets group, and the DEA office often worked together on

9 overlapping investigations.

11:25AM 10    Q    So why did you call Mr. Jansewicz after the

11 defendant advised you of information related to Gerace and

12 probation search of Pharaoh's?

13    A    I knew from my conversation with Joe Bongiovanni

14 that the FBI was involved with the search at Pharaoh's and

11:25AM 15 with the incident with the probation officer.  So based on

16 that information, I wanted to call Jim and talk to him about

17 his interest in Gerace and his interest in Pharaoh's.

18    Q    Did you believe the FBI, based on that, FBI had

19 significant interest in Gerace?

11:26AM 20    A    After my discussion with Jim, Jim told me they had

21 interest in Gerace and they were -- would like to talk to him

22 as part of their investigation.

23    Q    Is that sort of interagency office sharing

24 important?

11:26AM 25    A    Yes, sir.

Kasprzyk - Direct - Tripi

11:26AM   1      **Q**   Is that a way to de-conflict?

          2      A    Yes, sir.

          3      **Q**   After you spoke to Jansewicz, what did you, what if

          4      anything did you say or direct the defendant to do based on

11:26AM   5      that conversation?

          6      A    I directed Joe Bongiovanni to contact Jim Jansewicz

          7      in the FBI office and make arrangements to have them meet

          8      with Gerace and determine his potential suitability to be a

          9      source of information or confidential source.

11:27AM  10      **Q**   Did you direct him to make sure that occurred?

         11      A    I asked him to, to handle that, yes.

         12      **Q**   Was that to insure that the FBI spoke directly with

         13      Gerace about the drug trafficking information that was

         14      referenced in this report?

11:27AM  15      A    Correct.

         16      **Q**   If after your discussion with the FBI supervisor,

         17      you had learned the FBI was not interested in working with

         18      Peter Gerace, what would you have directed the defendant to

         19      do as it related to Gerace?

11:27AM  20      A    Had I known that, I would have done an internal

         21      assessment as to whether or not we could potentially, at the

         22      DEA, open up Gerace as a confidential informant.

         23      **Q**   And if you learned that someone like Gerace was not

         24      interested in cooperating with the DEA or anyone else, would

11:28AM  25      you have directed an investigation of Gerace?

Kasprzyk - Direct - Tripi

11:28AM   1      A    Yes.

          2      Q    What did you expect the defendant to do coming out

          3   of your conversation with him after you spoke to Jansewicz?

          4      A    I expected him to contact Group Supervisor

11:28AM   5   Jansewicz at the FBI and arrange for a meeting between Gerace

          6   and the FBI to discuss any information that Gerace might be

          7   able to provide on drug traffickers in the Western New York

          8   area.

          9      Q    Could we look at Paragraph 6, please.  And could

11:29AM  10   we -- could you read that first sentence of Paragraph 6.

         11      A    "GS Kasprzyk instructed SA Bongiovanni to set up an

         12   interview with Gerace and FBI agents in the near future."

         13      Q    Is that what you just told this jury you directed

         14   him to do?

11:29AM  15      A    Yes, sir.

         16      Q    Is that consistent with what your instruction was?

         17      A    Yes, it is.

         18      Q    Did the defendant ever tell you that he actually

         19   set up an interview with Gerace and the FBI?

11:29AM  20      A    He said to me that he was planning to do that but I

         21   have no recollection of him actually having that meeting with

         22   the FBI.

         23      Q    No recollection of him coming back and reporting

         24   that he had that meeting?

11:29AM  25      A    Correct.  He never came back to me to say that he

Kasprzyk - Direct - Tripi

11:29AM 1    had that meeting and this is what happened.

2         **Q**    Did he ever present to you a report documenting

3    what transpired with a meeting between Gerace and the FBI for

4    you to review and approve like this report?

11:30AM 5         **A**    He did not.

6         **Q**    At any point did the defendant say:  Hey, I can't

7    work on anything involving Gerace, I'm childhood friends, I

8    need to recuse myself?

9         **A**    He did not.

11:30AM 10        **Q**    Going back to the first paragraph for a moment.

11            I mean the second paragraph, I'm sorry.

12            In that first sentence, the defendant wrote:  "On

13   November 1st, 2009, SA Joseph Bongiovanni received a phone

14   call from Peter G. Gerace."  Is that accurate?

11:31AM 15        **A**    That's accurate.

16        **Q**    Anywhere in this report did the defendant document

17   a phone number where any other agent could get in touch with

18   Peter Gerace?

19        **A**    No, sir.

11:31AM 20        **Q**    Can we go to the second page of the indexing

21   section:  Is the indexing portion of a DEA-6 a place where

22   agents should document things like phone numbers?

23        **A**    Yes, sir.

24        **Q**    Is there any phone number for Peter Gerace written

11:31AM 25   in the indexing section?

Kasprzyk - Direct - Tripi

11:31AM  1        A    No, sir.

         2        Q    During 2009, during this timeframe that we're

         3    talking about, did agents in your group have weekly meetings

         4    with each other?

11:31AM  5        A    Yes, sir.

         6        Q    Was that something that you made sure happened

         7    weekly?

         8        A    Yes, sir, that was a meeting that was organized by

         9    me as the group supervisor.

11:32AM  10       Q    What was the purpose of having weekly meetings

         11   within the group?

         12       A    It would be an opportunity for the agents and the

         13   task force officers to talk about their case investigations,

         14   the progress of those case investigations, opportunities for

11:32AM  15   us to talk through different techniques that we might use to

         16   help each other with investigations.  That was really the

         17   tone of those meetings.

         18       Q    Did the defendant ever report back to you in any of

         19   those meetings that he had set up an interview with Gerace

11:32AM  20   and the FBI and that it had occurred?

         21       A    Not that I recall.

         22       Q    Do you recall the defendant ever mentioning that he

         23   passed Gerace off to the FBI for them to work him as a

         24   source?

11:32AM  25       A    No.

Kasprzyk - Direct - Tripi

11:33AM   1       **Q**    Did you think much of this particular report after

2    this one day that you reviewed and signed it?

3       A    At the time?

4       **Q**    Yeah.

11:33AM   5       A    No.

6       **Q**    Did you move on to other things?

7       A    Yes, sir.

8       **Q**    Whose responsibility is it to follow up in this

9    type of situation?

11:33AM  10       A    The author of the report, Joe Bongiovanni.

11       **Q**    If you had learned the FBI wasn't going to be using

12   Gerace, based upon the information this defendant wrote in

13   the report, do you believe and would you have assessed that

14   the DEA could have attempted to use him to further a kilogram

11:33AM  15   level cocaine investigation?

16       A    Yes.

17       **Q**    But nothing like that ever happened, did it?

18       A    Correct, that did not happen.

19       **MR. TRIPI:**  We can take that down, Ms. Champoux.

11:34AM  20       **Q**    I'd like to change gears a little bit.

21            Are you familiar with the way that funding requests

22   for enforcement actions are handled within the context of the

23   DEA Buffalo Resident Office?

24       A    Yes, sir.

11:34AM  25       **Q**    And earlier you said as the RAC, you're in charge

Kasprzyk - Direct - Tripi

11:34AM  1    of the budget?

2         A    Correct.

3         Q    Not to get too administrative here, but I think we

4    need to follow up and ask what types of things does the DEA

11:34AM  5    have to pay for out of its budget, just general categories?

6         A    So, generally, out of our budget we would authorize

7    funds to pay for controlled buys.  We would authorize funds

8    to pay for informant information.  I would also have to

9    authorize funds to pay for technology services.  If we were

11:35AM  10   working with phone companies and having to pay for pen

11   registers and/or wiretaps, those funds would come out of our,

12   our budget.  So those would be some of the categories that I

13   would manage as the RAC.

14        Q    Okay.  Just to, just to break that down a little

11:35AM  15   bit.

16             If the DEA wants to utilize a confidential source

17   to buy drugs from a member or an associate of a drug

18   organization, that takes money, correct?

19        A    Correct.

11:35AM  20        Q    And in those types of operations, which you've

21   described what they are earlier, the DEA provides the funds

22   to conduct those purchases of drugs?

23        A    That's correct, sir.

24        Q    And that happens in a controlled setting?

11:35AM  25        A    Correct.

Kasprzyk - Direct - Tripi

11:35AM 1     **Q**     And as the supervisor, the RAC, you're ultimately

2     responsible for ensuring those funds are available?

3         A     Correct.

4         **Q**     If someone wants to make a -- if an agent, not just

11:36AM 5     someone -- if an agent wants to make a controlled evidence

6     purchase of drugs from a target that's associated with a drug

7     organization, tell the jury what the steps of the process

8     would be.

9         A     Well, initially they would have to open up a case

11:36AM 10    investigation, a case file.  And that would require the agent

11    to collect as much information as they could on the target of

12    their investigation.  That would be documented in the case

13    initiation file.

14             Once the case is opened and it's appropriately

11:36AM 15    given a case number and a G-DEP identifier, they would then

16    use a confidential informant -- a documented confidential

17    informant -- to infiltrate that organization and conduct a

18    controlled buy.

19        **Q**     And I'd like to focus in on the part of making the

11:37AM 20    funding request.  How does that occur, how does that roll

21    through the office?

22        A     When the agent is working with that confidential

23    informant and develops information to make a controlled buy,

24    that information is documented on a DEA operational plan.

11:37AM 25    That operational plan is prepared in such a way that it

68

Kasprzyk - Direct - Tripi

11:37AM  1    details the -- how the buy is going to go, who the buy is

2    going to be from, the amount of the buy, where it's going to

3    occur.  All of those details are listed in the operational

4    plan.

11:37AM  5         In addition to the operational plan, there's also a

6    DEA-12 that is submitted at the same time as the operational

7    plan.  And the DEA-12 would list out the amount of funds that

8    are being requested by the agent to complete the buy.

9         **Q**    And then who does that paperwork get submitted to?

11:37AM 10         **A**    Initially the agent would submit it to the Group

11   Supervisor.  Once it's signed off by the Group Supervisor, it

12   would go to the RAC and then once it's signed off by the RAC,

13   the case would go to the ASAC for final approval.

14         **Q**    Who's responsible for initiating the law

11:38AM 15   enforcement action that would be subject to the operational

16   plan?

17         **A**    That would be the case agent.

18         **Q**    Who's responsible for writing the words contained

19   in the operational plan?

11:38AM 20         **A**    Generally it's the case agent.

21         **Q**    And who -- at what point are funds requested in

22   that process?

23         **A**    Once the ops -- once the operational plan is

24   submitted to the Group Supervisor, along with the DEA-12,

11:38AM 25   that initiates the process to request the funding.

Kasprzyk - Direct - Tripi

11:38AM  1       **Q**    Based upon your -- the way you practiced in the

2       office and in your history reviewing these things, are

3       operational plans landing on your desk without you having any

4       awareness they're coming or are there conversations that are

11:39AM  5       had between the RAC level and the Group Supervisor level?

6       Can you explain that for the jury?

7       A    Yes.  When I was the group supervisor, you would

8       have conversations with the case agent about the controlled

9       buy.  And those conversations are often detailed where we

11:39AM  10      would discuss the buy itself and how the buy was going to go

11      and the amount of the buy and the reason for the buy.

12           When it was approved by the group supervisor and

13      brought up to the RAC -- when I became the RAC -- there would

14      be less conversation.  I, I would meet with the group

11:39AM  15      supervisor and I would learn about the case from the group

16      supervisor and allow them to provide to me the facts of the

17      investigation.  I normally would not meet with the agent to

18      verify all of what was happening.

19      **Q**    Does the group supervisor reinvestigate everything

11:40AM  20      the agent writes in the operational plan?

21      A    He does not.

22      **Q**    Does the RAC reinvestigate all the words written in

23      the operational plan?

24      A    They do not.

11:40AM  25      **Q**    Does the group supervisor and the RAC reply upon

Kasprzyk - Direct - Tripi

11:40AM  1    the case agent who's the handler of the informant?

2         A    Yes.

3         Q    As the RAC at the point where you sign off, are

4    you -- do you at that point in the process have an awareness

11:40AM  5    that funds will be available and approved by the ASAC above

6    you?

7         A    Yes, sir.

8         Q    And what is an ASAC?  Just talk about how it goes

9    after the RAC level, please.

11:40AM  10        A    So the RAC is the resident agent in charge.  The

11   ASAC is the Assistant Special Agent in Charge.  The ASAC, in

12   our case, the ASAC sat in Albany and that was a district

13   office at the time and the ASAC had responsibility for

14   Albany, Syracuse, Rochester, and Buffalo.  So all of the RACs

11:41AM  15   in those cities would report to the ASAC.

16        Q    And are there varying levels of funding requests in

17   the context of controlled buys in terms of dollar amounts?

18        A    Yes, sir.

19        Q    Just to give the jury an idea of a range.  What

11:41AM  20   would be sort of a high fund requesting and what would be

21   sort of a lower, more routine level funding request?

22        A    Generally anything under $5,000 would be a routine

23   funding request.  Amounts in excess of 5,000, 10,000, 15 or

24   20 would be a higher level funding request.

11:41AM  25        Q    And in your experience for those $5,000 or less

Kasprzyk - Direct - Tripi

11:41AM  1    funding requests, once you were the group supervisor and then

2    later a RAC, was there ever much trouble getting money for

3    those types of levels?

4         A    For the most part, no.  We, we knew what our budget

11:42AM  5    was at the Buffalo office and generally we tried to work

6    within that budget.

7         Q    As the RAC, in terms of your general practice by

8    the time you were the RAC, by the time a funding request for

9    a controlled buy reaches your desk and you're signing off,

11:42AM  10   have you already had a conversation with the ASAC who has to

11   ultimately sign off about that?

12        A    Typically, yes.

13        Q    And what would the general topic of conversation be

14   that would cause you to sign off?

11:42AM  15        A    The conversation with the ASAC?

16        Q    Yeah.

17        A    Typically I would talk with him or her about the

18   case itself and the need to do the buy and I would validate

19   that we had funds available to do the buy.  The ASAC would

11:42AM  20   always ask me was the safety plan, the operational plan

21   prepared and they would ask that we would send it to them for

22   review and approval.

23        Q    And are there times when everything's set to go,

24   you've had that conversation with the ASAC and then a buy

11:43AM  25   doesn't go for whatever reason?

Kasprzyk - Direct - Tripi

11:43AM  1        A    Yes, sir.

2        Q    Is that a situation where you don't send the final

3   paperwork to the ASAC because you've learned additional

4   information after that phone call that a buy is not going to

11:43AM  5   go for whatever reason?

6        A    Correct.  If the, if the buy was delayed or not

7   going to happen, we would not push that final approval to the

8   ASAC because there would be no need to pull out the money.

9        Q    And who -- what do you mean by we wouldn't push

11:43AM 10   that final approval to the ASAC?

11        A    My -- either myself or my aide would not send that

12   operational plan and the 12 -- the DEA-12 -- to the final

13   ASAC for final approval because there would be no need to

14   pull out the funds for the operation.

11:44AM 15        Q    Because you know the operation is not going

16   forward?

17        A    Correct.

18        Q    And who advises you as the RAC that the operation

19   is not going forward?

11:44AM 20        A    Typically it would be the GS.

21        Q    And who advises the group supervisor?

22        A    The case agent.

23        Q    And who's responsible on making the call on whether

24   the operation goes forward?

11:44AM 25        A    The case agent.

73

Kasprzyk - Direct - Tripi

11:44AM   1      **Q**    I'd like to hand you up Government Exhibit 8A.

2    8A-7 -- sorry.  For the record, it's 8A-7?

3         **THE WITNESS:**  Yes, sir.

4         **MR. TRIPI:**  Judge, we don't have a copy for Court so we

11:44AM   5    can display it for you?  This is something marked today.

6         **THE COURT:**  It was just marked today?

7         **MR. TRIPI:**  Yes.  Yeah, it was marked today so it's not

8    in your binder.  I apologize.

9         **THE CLERK:**  Yes, it is.

11:44AM  10       **THE COURT:**  It is in my binder?

11        **THE CLERK:**  Ms. Champoux gave it to me.

12        **MR. TRIPI:**  My fault, Judge.  Everyone's ahead of me.

13        **Q**    If you could please look at that document, it's a

14   multipage document and just when you're done, just look up.

11:45AM  15       Do you recognize that multipage document which is

16   marked Government Exhibit 8A-7?

17        **A**    I do.

18        **Q**    What do you recognize that to be?

19        **A**    This is a DEA safety plan, otherwise known as an

11:45AM  20   operational plan, that documents an enforcement operation

21   that was to occur.

22        **Q**    And sort of last page of that operational plan,

23   what is that?

24        **A**    The last page is a copy of a DEA-12.  This is a

11:46AM  25   document that is used by an agent to withdraw funds to

74

Kasprzyk - Direct - Tripi

11:46AM 1    facilitate a controlled buy.

2        **Q**    And that multipage exhibit which consists of a

3    five-page operational plan and a one-page DEA-12, are those

4    documents comprised in that exhibit documents that are made

11:46AM 5    in the ordinary course of DEA business?

6        A    Yes, sir.

7        **Q**    Is it the regular course of DEA business to make

8    and keep those records?

9        A    Yes, sir.

11:46AM 10       **Q**    Are the entries made at or near the time of the

11   events that are reported in those records?

12       A    Yes.

13       **Q**    Is the person under an obligation to do -- under an

14   obligation to do so accurately?

11:46AM 15       A    Correct.

16       **MR. TRIPI:**  Government offers Exhibit 8A-7, your Honor.

17   I also anticipate this will come in later as a part of the

18   larger Exhibit 8A.  It's just a subexhibit.

19       **MR. SINGER:**  No objection.

11:47AM 20       **THE COURT:**  Okay.  It's received without objection.

21       (WHEREUPON, Government Exhibit 8A-7 received.)

22       **MR. TRIPI:**  Okay, so we can publish it for the jury, if

23   that's okay.

24       **THE CLERK:**  You're all set.

11:47AM 25       **MR. TRIPI:**  Thank you very much.

Kasprzyk - Direct - Tripi

11:47AM  1      **Q**    Just to orient the jury to what they're looking at.

2      At the very top there's a number there:  C2130026.  What is

3      that?

4      A    That's the DEA case number that references this

11:47AM  5      investigation.

6      **Q**    And under that it says the word "safety plan".  Is

7      that what you've been referring to as an operational plan?

8      A    Yes, sir.

9      **Q**    And can you -- I'll jump in with a couple questions

11:47AM 10      but just to sort of move this along a little bit, can you

11      just go through each of the boxes and tell the jury what they

12      are.  Maybe go through the first five and then I'll follow

13      up.

14      A    The date of the operation is listed up at the top

11:47AM 15      under Box 2.  That's May 6th, 2013 at 6 p.m.

16           Location of the operation.  That would be the area

17      where the controlled buy was going to happen.  In this case,

18      it was 2526 Delaware Avenue, Kelly's Korner Bar.

19           Block 5 lists out the case number, the file title

11:48AM 20      name, group number, and G-DEP number.

21      **Q**    And the file title in this case is Anderson, comma,

22      Wayne, or Wayne Anderson?

23      A    Correct.

24      **MR. TRIPI:**  We can zoom out of that and highlight maybe

11:48AM 25      6 through 10.  Just go down the page a bit.

Kasprzyk - Direct - Tripi

| | | |
|---|---|---|
| 11:48AM | 1 | Thanks. |
| | 2 | A    The information in Box 6, the operation type, it's |
| | 3 | a buy/walk.  This would be a controlled buy where the |
| | 4 | informant would make a purchase and bring those drugs back to |
| 11:48AM | 5 | the agent.  The cash amount would be a thousand dollars.  The |
| | 6 | agent -- |
| | 7 | Q    So let me stop you there. |
| | 8 | In terms of the cash amount, is this one of those |
| | 9 | more so, like, routine level funding requests, a $1,000 drug |
| 11:49AM | 10 | buy? |
| | 11 | A    Yes, sir. |
| | 12 | Q    In terms of your role approving this type of |
| | 13 | funding, is this an amount that typically would cause you any |
| | 14 | difficulty approving? |
| 11:49AM | 15 | A    No. |
| | 16 | Q    Go on to Box 7, if you could. |
| | 17 | A    Box 7 lists out the case agents. |
| | 18 | Q    Who are the two names there? |
| | 19 | A    SA Joseph Bongiovanni and SA Shane Nastoff. |
| 11:49AM | 20 | Q    Okay.  Please continue. |
| | 21 | A    Box 8 lists out the confidential source, the C S. |
| | 22 | In this particular operation, the DEA CS number is pending. |
| | 23 | And that is -- |
| | 24 | Q    So what does that mean, CS number is pending? |
| 11:49AM | 25 | A    That would mean that a confidential informant |

Kasprzyk - Direct - Tripi

11:49AM  1   package was submitted for the informant that they're using

2   and they're waiting to get an actual CS number to attach to

3   that informant.

4       Q    Okay.  Please continue.

11:49AM  5       A    The beeper, cellular, vehicle type, all that

6   information is related to the CS himself.  In the event

7   someone needed to contact the CS, that would be his cell

8   number.  And then at the very right side, you'll see "wired".

9   That means there's a transmitter on the informant which would

11:50AM 10   allow the surveillance agents the ability to listen, monitor

11   and record any conversation between the informant and the

12   target.

13       Q    Now I see Box 9 is blank but what would that be

14   for --

11:50AM 15       A    That --

16       Q    -- if it were filled in?

17       A    That information would document the name of the

18   undercover operative so if they're -- an undercover is a law

19   enforcement officer, either a DEA agent or a police officer

11:50AM 20   that's working in an undercover capacity to purchase

21   narcotics.

22       MR. TRIPI:  Okay.  And we can zoom out and just

23   highlight Box 10, 11, 12, 13, please, at the bottom there.

24       Q    If you can go through 10, 11, 12 and 13, please.

11:51AM 25       A    10 are the radio channels that we would use during

Kasprzyk - Direct - Tripi

11:51AM  1  the operation, the DEA radio channels.

2       Flashroll is 11.  This is not a flashroll event.

3       Special equipment required.  This is pretty

4  standard.  We expect every law enforcement officer to have

11:51AM  5  their bulletproof vests, their raid jackets, search kits,

6  their entry tools, all of that would be available with them

7  during the controlled buy.

8       The box 13 is our, our distresser signals.  We

9  always give the informant or the undercover operative

11:51AM 10  distress signals in the event that the operation goes poorly

11  and the agent or informant's life is in danger.  We would

12  expect them to use these distress signals to signal to the

13  surveillance team that they need help.

14       Q    And so here verbal is "don't hurt me" and visual is

11:51AM 15  hands up in the air?

16       A    Correct.

17       **MR. TRIPI:**  Zoom out of that, please.

18       Q    And then there's some writing at the bottom of the

19  page there.  Can you tell us what that is?

11:52AM 20       A    It's hard for me to make -- I believe this is when

21  the -- it's hard for me to read the letters, to be honest.

22       Q    Okay.  Do you see where it says "to ALB, 5/2/13"?

23       A    Yes.

24       Q    Do you know what the "ALB" reference is?

11:52AM 25       A    (No response.)

Kasprzyk - Direct - Tripi

11:52AM  1      **Q**   Where did the ASAC sit?

2      A    In Albany.  Oh.  Yeah, "ALB" is most likely Albany.

3      **Q**   So do you know what that reference is?

4      A    So that would be --

11:52AM  5      **Q**   If you know?

6      A    Well, that reference would typically be that the

7  operational plan and the 12 was sent to Albany for review and

8  approval.

9      **Q**   Do you know who wrote that?

11:52AM 10      A    I do not.

11      **Q**   That's not your initials?

12      A    No.

13      **MR. TRIPI:**  We can zoom out of that.

14      **Q**   I'm going to skip down to Box 18 at this point.

11:53AM 15          And before I ask you to get into the details here,

16  who's responsible for writing all of the words in this safety

17  plan?

18      A    That would be the case agent.

19      **Q**   And in this case you saw that was the defendant?

11:53AM 20      A    Correct.

21      **Q**   Does that include this narrative in box 18?

22      A    Yes, sir.

23      **Q**   And could you read what was written by the

24  defendant in that box?

11:53AM 25      A    "On May 6th, 2013, agents from Enforcement Group

Kasprzyk - Direct - Tripi

11:53AM   1   D-57 will monitor a buy/walk between a DEA confidential

2   source (pending CS number) and T.S. at Kelly's

3   Korner Bar located at 2526 Delaware Avenue, Buffalo,

4   New York.  The DEA CS will meet S. for the purpose of

11:54AM   5   purchasing approximately one third ounce of cocaine and also

6   making a partial payment towards prior debt owed by S.

7   The CS will also utilize the meeting to negotiate future

8   cocaine purchases from S.  The DEA CS has witnessed

9   S. and other associates distributing large quantities of

11:54AM   10   cocaine and marijuana in the recent past.  It should be known

11   that S. is a trusted associate of the Ronald Serio DTO.

12   According to recent toll analysis of Serio's cellular phone,

13   S. routinely communicates with Serio and allegedly

14   organizes the transportation and delivery of cocaine and

11:54AM   15   marijuana for this Serio DTO."

16        **Q**   Can I stop you there for a moment.

17             You mentioned it earlier.  What is toll analysis?

18        A    Toll analysis is where you prepare a subpoena, send

19   that subpoena to a cell company provider, collect information

11:55AM   20   from that cell provider on all of the numbers used by that

21   particular cell phone, and then conduct analysis of those

22   numbers.

23        **Q**   To see what numbers are communicating with what

24   other numbers?

11:55AM   25        A    To, to -- to establish organizational links but

81

Kasprzyk - Direct - Tripi

11:55AM   1   also to obtain subscriber data on all of the different phones

2   and see who is members of the organization.

3        Q    Can you continue, please, reading.

4        A    S. had solicited the DEA CS to assist the DTO

11:55AM   5   by transporting narcotics from New York City" -- I'm sorry,

6   NYC and in acquiring stash locations for the Serio DTO in the

7   Buffalo area.  DEA agents are coordinating the investigation

8   with the AUSA, WDNY, the office of the New York State

9   Attorney General, the New York State Police, the Buffalo FBI,

11:56AM  10   and the Buffalo IRS and working towards possible wire

11   intercepts of the Serio DTO."

12        Q    Okay.  Let me stop you there for a moment.

13             We go back above.  There were no personnel from the

14   FBI, state police or New York State Attorney General's Office

11:56AM  15   listed as being part of the operational team; is that

16   correct?

17        A    That's correct.

18   **MR. TRIPI:**  Go to the prior page, Ms. Champoux for a

19   moment.  I'm sorry.  Go to the next page after that.  I

11:56AM  20   apologize.  And the next one, sorry.

21        Go to Page 5.  Here we go.  All right.  We'll stop

22   there.

23        Q    Take a moment to look at Box 21, personnel

24   assignment, do you see that?

11:56AM  25        A    Yes, sir, I do.

Kasprzyk - Direct - Tripi

11:57AM   1        **Q**    Those are all DEA personnel; is that right?

2        A    Correct.

3        **Q**    Would this be the space provided in an operational

4    plan to list members of other law enforcement agencies who

11:57AM   5    were participating in an enforcement action?

6        A    Yes, it is.

7        **Q**    Do you see any members of the FBI listed there?

8        A    I do not.

9        **Q**    Do you see any members of the state police, any

11:57AM  10    New York State Police investigators -- not task force

11    officers -- but state police?

12        A    I do not.

13        **Q**    Do you see any IRS agents listed there?

14        A    No, sir.

11:57AM  15        **Q**    Do you see any other law enforcement members other

16    than DEA personnel listed?

17        A    I do not.

18        **MR. TRIPI:**  Did we go back up to Page 3, Ms. Champoux.

19        Page 2, I'm sorry.

11:57AM  20        **Q**    If you could read that second to last paragraph and

21    then the last line there?

22        A    The entire paragraph?

23        **Q**    I think you read that one.  I'm sorry.  I think you

24    left off at...

11:58AM  25        A    Right there (indicating)?

Kasprzyk - Direct - Tripi

11:58AM   1       **Q**    Yeah, thank you.

2         A    "Ron Serio's brother, Thomas Serio, was previously

3    arrested and convicted of trafficking 5 kilograms of cocaine

4    with SOS Robert Mattal.  This will be the first buy/walk from

11:58AM   5    T.S.  GS John Flickinger will be the supervisor on

6    the scene.

7         **Q**    When it reads "this will be the first buy/walk from

8    T.S.", what is your understanding on what that means

9    based on your familiarity with DEA jargon?

11:58AM  10       A    What that represents is there were no previous

11   controlled buys from S. and this would be the first time

12   that one's being attempted.

13       **MR. TRIPI:**  We can zoom out of that, please, Ms.

14   Champoux.  And we can keep scrolling down again.  Next page,

11:58AM  15   please.  All right.

16       **Q**    I'd like to focus you in on Box Number 23.  Can you

17   tell us what is depicted in box number 23, Mr. Kasprzyk?

18       A    The Box 23 lists out the approvals and preparation.

19   This particular safety plan was prepared by SA Joseph

11:59AM  20   Bongiovanni.  It was prepared and dated on the 2nd of May,

21   2013.  It was approved by GS John Flickinger.

22           And if you go to the far right, that box on the far

23   right, those are my initials DMK, 5/2/13.  So this

24   operational plan was sent to me for my review and approval.

11:59AM  25           And then the final box below is approved by ASAC.

Kasprzyk - Direct - Tripi

11:59AM   1   And in this case, was acting ASAC Michael Shelhamer.

          2       Q    Now before you approved it, based upon -- do you

          3   have any personal recollection of this event?

          4       A    I do not.

12:00PM   5       Q    Based upon your review of this and your routine

          6   practice at the point in time when you signed off and

          7   initialed it, would you have -- part of your routine practice

          8   have discussed the funding of it with Michael Shelhamer?

          9       A    Yes, sir.

12:00PM  10       Q    And if it was not going to be approved by the ASAC,

         11   would you have bothered to approve it?

         12       **MR. SINGER:**  Objection.  Calls for speculation.

         13       **Q**    It's --

         14       **THE COURT:**  Overruled.

12:00PM  15       **Q**    -- organizational.

         16       **THE COURT:**  Overruled.  Overruled.

         17       A    No.

         18       Q    Did you understand my question?

         19       A    I did.

12:00PM  20            Yes, if the ASAC had denied the expense, the

         21   purchase of the narcotics, then I would have reported that

         22   back to the GS and we would not have been able to do the

         23   deal.

         24       **Q**    So your signature, your initials would not be

12:00PM  25   there?

Kasprzyk - Direct - Tripi

12:00PM    1        A    Correct.

           2        Q    Okay.  So your initials on that document mean this

           3    was going to be approved, correct?

           4        A    Correct.

12:00PM    5        **MR. TRIPI:**  Could we go down to the next page and can we

           6    sort of rotate the view.  Thank you very much.

           7        Q    Is this a document that gets attached to that plan?

           8        A    Yes, sir, it does.

           9        Q    And what is this document?

12:01PM   10        A    This is the DEA-12 which documents the expense of

          11    $1,000, the funds that are needed to facilitate the

          12    controlled buy.

          13        Q    And that relates to the documents we just reviewed

          14    the prior five pages, correct?

12:01PM   15        A    Yes, sir.

          16        Q    And in your experience -- withdrawn.

          17             So these funds were approved on May 2nd, 2013, and

          18    the operation, based upon what was written, was planned for

          19    May 6th, 2013; is that right?

12:01PM   20        A    Correct.

          21        Q    Do you know specifically why the operation didn't

          22    go?

          23        A    I do not.

          24        Q    Whose job is it to inform supervision when an

12:01PM   25    operation is not going to go?

Kasprzyk - Direct - Tripi

12:02PM   1    A    That would be the responsibility of the case agent.

          2    Q    So, in this case that would be the defendant?

          3    A    Correct.

          4    Q    So at some point between the 2nd and the 6th, based

12:02PM   5    upon your review of these documents and DEA practice, the

          6    defendant informed supervision that this buy was not going to

          7    go?

          8         MR. SINGER:  Objection.  Calls for speculation.

          9         THE COURT:  Yeah, sustained.

12:02PM   10        MR. SINGER:  No personal knowledge.

          11        THE COURT:  Sustained.

          12   Q    What is your understanding of this document based

          13   upon the signatures you see and the dates involved?

          14        MR. SINGER:  Objection.  Same.

12:02PM   15        MR. TRIPI:  Judge, this is an organizational practice

          16   and this is the supervising --

          17        THE COURT:  No, I understand.  I just -- I don't quite

          18   understand the question.  So, I'm going to sustain the

          19   objection to the form of the question.

12:02PM   20        MR. TRIPI:  Okay.  I understand, your Honor.

          21   Q    Whose job -- let's step it back.  What is the case

          22   agent's job as it relates to planning a controlled buy?

          23   A    The case agent orchestrates the purchase.  He

          24   interacts with the informant.  He talks with the informant

12:03PM   25   about the buy.  He arranges for that buy to occur.  Once

Kasprzyk - Direct - Tripi

12:03PM   1   those plans are developed and made, he communicates that to

          2   the GS and to the rest of his team.

          3       **Q**    Who advises the GS, and ultimately the RAC, whether

          4   a buy is going forward or not?

12:03PM   5       **A**    That would be the case agent.

          6       **Q**    Okay.  So in this case funds were going to be

          7   approved, correct?

          8       **A**    Correct.

          9       **Q**    And you know from this document that at some point

12:03PM  10   the case agent advised the buy wasn't go through?

         11       **MR. SINGER:**  Objection.  Calls for speculation.  Same

         12   objection, Judge.

         13       **MR. TRIPI:**  It is not, your Honor.  He has no personal

         14   knowledge.

12:03PM  15       **MR. SINGER:**  Can we approach.

         16       **THE COURT:**  Sure, come on.

         17       (Held at side bar:)

         18       **THE COURT:**  So my question, Mr. Tripi, how does he know

         19   from this document the buy didn't go?

12:04PM  20       **MR. TRIPI:**  Because he just explained that.  We have

         21   established that the practice was the documents would not

         22   have had his sign off if the funds were not available and the

         23   ASAC level was not going to approve it.  So we know it's

         24   approved.  And then we know from the organizational practice,

12:04PM  25   routine practice, that it's the case agent's job to let the

Kasprzyk - Direct - Tripi

12:04PM  1   supervision know whether or not the buy is going to go

2   through.

3        THE COURT:  Right.

4        MR. TRIPI:  And so, here, we don't have the final

12:05PM  5   sign-off, and we don't have a buy that occurred because of

6   some --

7        THE COURT:  How do we know we don't have a buy that

8   occurred?

9        MR. TRIPI:  Because there's not the final sign-off.

12:05PM  10       THE COURT:  I think you need to establish that.

11       MR. TRIPI:  I thought I did, Judge, but I can ask some

12   more questions.

13       MR. SINGER:  Here's the problem is that they're bringing

14   up an individual that has a extraordinarily limited

12:05PM  15   recollection of what happened and professed on the stand that

16   he has no personal knowledge of this buy.

17       THE COURT:  Right.

18       MR. SINGER:  They're trying to use these documents to

19   show that something may or may not have happened.  But the

12:05PM  20   problem is that Mr. Kasprzyk knows that he signed the form.

21   He's identified that.

22       THE COURT:  Yep.

23       MR. SINGER:  He can't say from any personal knowledge,

24   based on his recollection or anything else, what happened

12:05PM  25   with the form after that.  And so the government's trying to

Kasprzyk - Direct - Tripi

12:05PM    1   instead of using a witness with personal knowledge get him to

2   testify to what he may think may have happened with it.  It's

3   all speculative, Judge.  He has no personal knowledge.

4        **THE COURT:**  I think he can testify based on the form

12:06PM    5   what it means if there's no signature in a certain spot.

6        **MR. SINGER:**  Well, Judge, respectfully, he can't testify

7   to that.  He was not the bottom line person in Albany on that

8   form.  He cannot testify to why that person did not sign that

9   form.  He doesn't know.

12:06PM   10        **THE COURT:**  You can voir dire on that.

11        **MR. SINGER:**  But he doesn't know that fact.  That's the

12   problem is he does not know that fact.

13        **THE COURT:**  And you can voir dire and if he can't, if he

14   can't establish that, then I'll preclude the question but I

12:06PM   15   think he can testify what signatures on the form mean or

16   don't do web.

17        **MR. TRIPI:**  This is the original form.

18        **THE COURT:**  Do we have the original form?

19        **MR. TRIPI:**  This is the same document that came in at

12:06PM   20   the last trial as part of a larger file.

21        **THE COURT:**  My question is how do we know that there's

22   not another version?

23        **MR. TRIPI:**  Because we have the whole file.

24        **MR. SINGER:**  All we know is that this was in the file.

12:06PM   25        **MR. TRIPI:**  Judge, this is nothing different than

Kasprzyk - Direct - Tripi

12:06PM   1  absence of a entry in business record with someone from

2  organizational knowledge he has to testify about that.

3     **THE COURT:**  I understand that but he can't testify to

4  what that signature means.  It could mean other things.

12:07PM   5     **MR. TRIPI:**  I think what Mr. Singer is saying is that he

6  doesn't want it in because it hurts him.

7     **THE COURT:**  No, no, no.

8     **MR. TRIPI:**  And cross-examination would be appropriate

9  but this is clearly highly probative damaging testimony that

12:07PM  10  he doesn't want in.

11     **THE COURT:**  If you can establish a foundation for his

12  ability to testify from this document what happened or didn't

13  happen, I'll allow it, okay.  But you've got to establish

14  that foundation first.

12:07PM  15    (Open court:)

16     **Q**   Based upon your understanding of these documents

17  and the signatures that you see on here, and based upon your

18  knowledge of how the DEA operates, between May 2nd, 2013,

19  when the funding was approved by you, and May 6th, 2013, when

12:08PM  20  the operation was planned, what transpired?

21     **MR. SINGER:**  Again, objection, Judge.  We're asking for

22  the witness to testify to something outside of his personal

23  knowledge.

24     **THE COURT:**  Do you know what transpired based on the

12:08PM  25  document?

Kasprzyk - Direct - Tripi

12:08PM  1      **THE WITNESS:**  When you ask what transpired, sir, are you

2       asking, like, what happened between the informant and Agent

3       Bongiovanni?

4       **THE COURT:**  Mr. Tripi asked what transpired and I'm

12:08PM  5      saying can you testify to what happened between May 2nd and

6       May 6th based on this document?

7       **THE WITNESS:**  (No response.)

8       **Q**    Do you know the -- may I ask a question Judge?

9       **THE COURT:**  Sure.

12:08PM 10      **Q**    Do you know the buy did not go forward?

11      A    Yes, I know the buy did not happen.

12      **Q**    Okay.  Based on your training and experience and

13      DEA's practice, what are some common reasons for buys not

14      going forward after --

12:09PM 15      **THE COURT:**  Wait.  How --

16      **Q**    -- the --

17      **THE COURT:**  How do you know the buy didn't go forward?

18      **THE WITNESS:**  The funds were never released.

19      **THE COURT:**  How do you know the funds were never

12:09PM 20      released?

21      **THE WITNESS:**  There was no signature by the ASAC.

22      **THE COURT:**  Okay.  Go ahead.

23      **Q**    And so with that established, who is the person

24      responsible for reporting whether the buy is going forward or

12:09PM 25      not before the funds get released, the case agent's job is to

Kasprzyk - Direct - Tripi

12:09PM   1    do what?

          2        A    Is to work with the confidential source and

          3    organize the buy.

          4        Q    And then do what as it relates to notifying

12:09PM   5    supervision?

          6        A    Once those arrangements -- once those details are,

          7    are finalized and formulated, the case agent would meet with

          8    the Group Supervisor and let them know the status of the buy

          9    and how it was going to go.

12:09PM  10        Q    And so here, the buy never went through?

         11        A    In this case, there is no ASAC signature.  Funds

         12    were not released because it needs to have an ASAC signature

         13    for that to happen.

         14        Q    But you had put all the parameters in place for the

12:10PM  15    funds to be approved is that correct?

         16        A    Correct.  The operation was approved by the GS and

         17    by myself.

         18        Q    Okay.  Do you know what the defendant reported to

         19    Group Supervisor Flickinger or yourself about why the buy

12:10PM  20    wasn't going through?

         21        A    I do not.

         22        Q    Okay.  Would whatever information that was reported

         23    depend upon this defendant's truthfulness?

         24        A    Yes.

12:11PM  25        **MR. TRIPI:**  We can take that down, Ms. Champoux.

Kasprzyk - Direct - Tripi

12:11PM  1    **Q**    Switching to another gear, Mr. Kasprzyk.

2        Did you speak with the defendant some time shortly

3    after he retired from the DEA in or about February, early

4    February, February 1st, 2019?

12:11PM  5    A    Yes, sir.

6    **Q**    And can you describe for the jury what that

7    conversation was?

8    A    Joe had retired from DEA.  He called me.  He was

9    interested in securing a job, an after DEA job.  He was

12:11PM  10   asking about working potentially for M&T Bank.

11   **Q**    And can you describe more about that conversation?

12   A    Yes.  We talked briefly.  I referred him to a

13   contracting agency that I knew was hiring, hiring retired law

14   enforcement officers.  I suggested that he reach out to them.

12:11PM  15   Joe then talked briefly about the pending investigation that

16   was happening against him.

17   **Q**    And what did Mr. Bongiovanni say to you about the

18   criminal investigation into him?  Withdrawn.  The

19   investigation into him, sorry.

12:12PM  20   A    He complained that he was being unfairly targeted,

21   that another agent in the DEA office, Tony Casullo had it out

22   for him and he felt that he was being unfairly targeted.

23   **Q**    Did he say why?

24   A    No.

12:12PM  25   **Q**    Did he give you details?

Kasprzyk - Direct - Tripi

12:12PM  1          A    No.

         2          Q    Do you know Special Agent Casullo?

         3          A    I know him, yes.

         4          Q    Had you ever worked with him or did he come to the

12:12PM  5     DEA Buffalo office after you left?

         6          A    Yeah, I don't know him well.  He came to the DEA

         7     office after I had retired from the Buffalo office.

         8          Q    After he made those comments to you, what was your

         9     response to the defendant?

12:12PM 10          A    (No response.)

        11          Q    If you recall?

        12          A    I was sympathetic but I really didn't have much to

        13     say because I didn't really know anything about the

        14     investigation that was happening.

12:13PM 15          Q    Did the defendant say anything else to you about

        16     that --

        17          A    No, sir.

        18          Q    -- at that point?  What was your, what was your

        19     impression of the defendant's demeanor pertaining to the

12:13PM 20     investigation?

        21          A    He was very concerned.

        22          **MR. TRIPI:**  One moment, please, your Honor.

        23          (WHEREUPON, a discussion was held off the record.)

        24          **MR. TRIPI:**  I'm done with direct, your Honor.

12:15PM 25          **THE COURT:**  Okay.  So we are going to take our noon

Kasprzyk - Direct - Tripi

12:15PM  1   recess now, folks.

2   Please remember my instructions about not discussing any

3   aspect of this case with anyone, including each other.  Don't

4   do any research on your own.  Don't use tools of technology

12:15PM  5   either to research the case or communicate about the case

6   with anyone and don't read or watch or listen to any news

7   coverage about the case, if any is N progress.  And don't

8   make up your mind about anything until the case is submitted

9   to you.

12:15PM  10   We'll see you back here at about 1:15 or so, okay?

11   Thanks.

12   (**WHEREUPON,** jury excused for luncheon recess.)

13   **THE COURT:**  Okay.  Anything for the record before we

14   break?

12:16PM  15   **MR. TRIPI:**  Not from the government.

16   **MR. SINGER:**  Just to admonish the witness not to discuss

17   his testimony during the break.

18   **THE COURT:**  Yes.  You're not to discuss your testimony

19   with Mr. Tripi or anyone on the government team, or anyone

12:16PM  20   during the lunch break.

21   **THE WITNESS:**  Okay.

22   **THE COURT:**  Great.

23   Thank you.  See you all in about an hour.

24   (**WHEREUPON,** luncheon recess taken.)

1:24PM  25   (Open court, defendant and jury present.)

Kasprzyk - Cross - Singer

1:24PM   1       **THE COURT:**  Welcome back, everyone.

         2       The record will reflect that all our jurors are present.

         3       I remind the witness that he's still under oath.

         4       And, Mr. Singer, you may begin.

1:24PM   5       **MR. SINGER:**  Thank you, Judge.

         6   **CROSS-EXAMINATION BY MR. SINGER:**

         7       **Q**      Hi, Mr. Kasprzyk, how are you.

         8       A      Good afternoon.

         9       **Q**      So, my understanding is that you were the group

1:24PM  10   supervisor of D-57 back in 2009; is that right?

        11       A      Yes, sir.

        12       **Q**      And later after that in 2011, you were promoted up

        13   to become the Resident Agent in Charge, the RAC of the DEA

        14   Buffalo office in 2011?

1:25PM  15       A      Yes.

        16       **Q**      And then you stayed in that position as the RAC

        17   from 2011 till 2013 when you retired, is that right?

        18       A      Correct.

        19       **Q**      Do you recall about when in 2013 you retired?

1:25PM  20       A      It was September-ish, right around in there.

        21       **Q**      So some time toward the end of the summer?

        22       A      Yes, sir.

        23       **Q**      I know sometimes in federal jobs I know sometimes

        24   people have personal leave where you're able to take off the

1:25PM  25   last couple of weeks before you officially retire to cash in

Kasprzyk - Cross - Singer

1:25PM 1    your leave.  Did you do something like that or did you work

2    to near the end?

3         A    No, I had some leave that I was taking at the end.

4         Q    Do you approximately know how long you took leave

1:25PM 5    before you fishily retired?

6         A    I don't recall specifically but it was several

7    weeks.

8         Q    Okay.

9         A    I believe I left the office some time in July.

1:25PM 10        Q    Okay.  And you stated that you first started in

11   Buffalo as a special agent, is that correct?

12        A    Yes, sir.

13        Q    And then eventually you were promoted up to the GS

14   position, right?

1:26PM 15        A    Yes, sir.

16        Q    And then eventually to the RAC position before you

17   retired?

18        A    Correct.

19        Q    So, you talked a little bit on direct about how the

1:26PM 20   Buffalo office is subdivided into different parts.  I want to

21   go through that a little bit with you.

22             So, one of the groups that you mentioned was D-57,

23   correct?

24        A    Yes, sir.

1:26PM 25        Q    Another group you mentioned was D-58?

Kasprzyk - Cross - Singer

1:26PM 1      A     Yes, sir.

2      Q     And then another group you mentioned was the

3      diversion group.  I think it's referred to officially as the

4      tactical diversion group, right?

1:26PM 5      A     No, sir.  I'm talking about the -- I don't believe

6      that the tactical diversion group was in place prior to my

7      retirement.  That, I believe, happened afterwards.  I'm

8      talking about the diversion group.

9      Q     Okay.

1:26PM 10     A     The standard diversion group.

11     Q     All right.  So you mentioned that D-57 is staffed

12     primarily with DEA special agents, along with some local task

13     force officers to support?

14     A     Yes, sir.

1:26PM 15     Q     And then the D-58, that's staffed primarily with

16     task force officers?

17     A     Yes, sir.

18     Q     So, as far as D-57 is concerned, do they

19     investigate narcotics crimes very similar to the same ones

1:27PM 20     that D-58 investigates?

21     A     Yes, sir.

22     Q     So the primary difference between the two groups is

23     that one's composed primarily of special agents from the DEA

24     and D-58, the other one's, composed mainly of task force

1:27PM 25     officers?

Kasprzyk - Cross - Singer

1:27PM   1        A     Yes.

         2        Q     But functionally speaking, they investigate the

         3    same types of crimes?

         4        A     That's correct.

1:27PM   5        Q     And as far as the diversion group that was in place

         6    at that time, what's the purpose of the diversion group?  I

         7    don't think you ever got into that.

         8        A     The diversion group handles regulatory

         9    investigations that would be primarily on DEA registrants, so

1:27PM  10    doctors, pharmacies, people that are given a DEA registration

        11    number to be able to distribute controlled substances

        12    lawfully.

        13        Q     Yeah, so to break that down a little bit.  So, if

        14    I'm a physician and I prescribe certain drugs that are

1:28PM  15    considered scheduled drugs under the Controlled Substances

        16    Act?

        17        A     Right.

        18        Q     The DEA provides me with a license to distribute

        19    those drugs?

1:28PM  20        A     That's right.

        21        Q     And then the Diversion Group's responsibility is to

        22    make sure that the doctor who's writing those prescriptions

        23    is doing it correctly?

        24        A     That's correct.

1:28PM  25        Q     And as far as the pharmacies that have the drugs

Kasprzyk - Cross - Singer

1:28PM   1   the doctor writes the prescription for, the Diversion Group

2   is also responsible to make sure the pharmacies are operating

3   under the law?

4        A    That's correct.

1:28PM   5        Q    So they're not going out investigating street crime

6   or street level crimes like a D-57 or D-58 agent would do,

7   correct?

8        A    Typically not, yes, sir.

9        Q    Okay.  But are there times when people sometimes

1:28PM   10  support from the Diversion Group operations going on with

11  D-57 and D-58?

12       A    Make sure I understand your question.  Would the

13  diversion group support a enforcement operation?

14       Q    Correct.

1:28PM   15       A    If that enforcement operation was targeting a

16  doctor or a pharmacy, the Diversion Group might be involved

17  in that investigation to help support it, yes.

18       Q    Okay.  But as far as operations that are occurring,

19  like a search warrant execution, if you needed extra manpower

1:29PM   20  at a search warrant site, would Diversion Group agents

21  sometimes help out in that responsibility?

22       A    For the initial entry on the search warrant?

23       Q    Overall.

24       A    Again, only if that target of investigation was a

1:29PM   25  DEA registrant and there was a need to have Diversion there

101

Kasprzyk - Cross - Singer

1:29PM  1    to assist in the search warrant.

2         Q    Okay.  And as far as D-57 and 58 were concerned, if

3    someone was doing that search warrant type of operation like

4    I just described, if 58 had some extra people that 57 needed

1:29PM  5    on that particular day because of manning, would they

6    sometimes support the operation 57 was running?

7         A    Yes.

8         Q    And the same thing goes with 58?

9         A    Yes, sir.

1:29PM  10        Q    Okay.  So as far as the breakdowns of the groups,

11   you mentioned that every group is, is run by a front line

12   supervisor who's the GS, correct?

13        A    Yes, sir.

14        Q    And that group supervisor's is in charge of all the

1:30PM  15   agents within that one particular group?

16        A    Yes, sir.

17        Q    And you mentioned that when you were part of D-57

18   and you were the GS of 57, you managed roughly about 12 to 13

19   different agents under you in that position, correct?

1:30PM  20        A    It was a combination of agents and task force

21   officers combined.

22        Q    So 12 to 13 different people inside the group you

23   managed as the GS, correct?

24        A    Correct.

1:30PM  25        Q    And you had supervisor responsibility over all

Kasprzyk - Cross - Singer

1:30PM   1   those people in the group?

         2       A    Yes, sir.

         3       Q    So, I mean, part of your job as a supervisor is to

         4   look after them, correct?

1:30PM   5       A    Yes, sir.

         6       Q    To teach them, correct?

         7       A    Yes, sir.

         8       Q    And sometimes to allocate resources, correct?

         9       A    I didn't hear your question.

1:30PM  10       Q    And sometimes your job as the GS is also to

        11   allocate resources, correct?

        12       A    Outkeep?

        13       Q    Allocate resources?

        14       A    Allocate.  I'm sorry.

1:31PM  15       Q    Okay.

        16       A    I didn't hear your word.

        17       Q    That's okay.

        18       A    In terms of personnel or in terms of funding, what

        19   resources are you specific specifically?

1:31PM  20       Q    Well, let's start, first, with personnel.  So, as

        21   part of your job as the GS of the group, did you have some

        22   control over where people would go sometimes?

        23       A    Yes.

        24       Q    And you'd have control over what people would

1:31PM  25   sometimes focus on as far as investigations, correct?

Kasprzyk - Cross - Singer

1:31PM   1       A    Yes.

         2       Q    So, for instance, if there was a particular

         3   operation going on in one of part of the day, you may choose

         4   as the group's supervisor to say, hey, we need more personnel

1:31PM   5   to work on this one particular case and you'd task those

         6   people to not investigate the cases they were working on and,

         7   instead, focus on that one particular project.

         8       A    No.  I wouldn't tell them not to investigate

         9   another case.  I may have to redeploy resources to assist an

1:32PM  10   active investigation, one in which we're going out on the

        11   street to make a buy or to conduct a surveillance operation.

        12   Those resources would be reallocated temporarily to support

        13   that street operation but once that's done, agents would then

        14   continue to be able to work whatever other cases that they

1:32PM  15   would have going on.

        16       Q    I think that's what I'm getting at is that when you

        17   had a particular operation that required more than just the

        18   case agent -- let's say it required ten different people to

        19   be there -- you may pull people from your group to focus on

1:32PM  20   that one particular event, correct?

        21       A    Correct.

        22       Q    And, so, as far as the money resourcing, I know you

        23   mentioned that when you were the RAC, you'd be responsible

        24   for the overall budget of the office, correct?

1:32PM  25       A    Yes, sir.

Kasprzyk - Cross - Singer

1:32PM    1    **Q**    When you were GS, did you also have

2    responsibilities with regard to money?

3    A    I would have responsibilities to approve buys and

4    approve payments to informants.  So that would be, you know,

1:32PM    5    when it comes to the money and the expenditure of money, that

6    would be my responsibility.

7    **Q**    So you would make a recommendation to the RAC of

8    the office as to whether or not certain funds should be

9    allocated to a particular operation, correct?

1:33PM    10    A    That's correct.

11    **Q**    And then it was up to the RAC to make a decision

12    about whether or not he or she agreed with that decision,

13    correct?

14    A    Yes, sir.

1:33PM    15    **Q**    And then you mentioned there was a further process

16    where all of those decisions from the RAC perspective need to

17    get forwarded to Albany to the ASAC for ultimate approval,

18    correct?

19    A    Yes, sir.

1:33PM    20    **Q**    Okay.  So, as far as the DEA is concerned, you

21    mentioned that the focus of the DEA is to enforce the drug

22    laws under the Controlled Substances Act, correct?

23    A    Yes, sir.

24    **Q**    Title 21?

1:33PM    25    A    Correct.

105

Kasprzyk - Cross - Singer

1:33PM 1      Q    And, so, with regard to those particular

2  substances, I mean, we're talking about hundreds of different

3  substances that are part of the Controlled Substance Act,

4  correct?

1:33PM 5      A    Yes.

6      Q    And there are different schedules as far as levels

7  within the Controlled Substances Act, correct?

8      A    Yes, sir.

9      Q    So sometimes some drugs might be classified as

1:34PM 10 Schedule I controlled substances, right?

11     A    Yes, sir.

12     Q    Sometimes they might be classified as Schedule III

13 controlled substances, correct?

14     A    That's correct.

1:34PM 15     Q    And, so, in Buffalo, D-57, fair statement that the

16 majority of cases that you investigated as far as controlled

17 substances back in 2009, they primarily dealt with powder

18 cocaine, crack cocaine and heroin?

19     A    Primarily that was much of the work that we were

1:34PM 20 doing --

21     Q    Yeah.

22     A    -- in that time period, yes.

23     Q    Yeah, I'm not saying that you don't focus on other

24 type of cases involving other drugs, right?

1:34PM 25     A    That's correct.

Kasprzyk - Cross - Singer

1:34PM  1      Q    So, for instance, you mentioned marijuana was a

2      case type drug that you would investigate as far as D-57 was

3      concerned?

4      A    Yes.  I mean, the investigations -- our targets of

1:34PM  5      investigations would often involve the three drugs that you

6      mentioned.  But they were also sometimes driven by the type

7      of violater, the individual violator himself.  So, if it was

8      a known violator that was involved in drug trafficking, we

9      might target him and it wouldn't be cocaine, powder cocaine,

1:35PM 10      or crack cocaine, it might be some other type of drug.  So

11      that would also influence our decision to open a case file.

12      Q    But when you were the GS back in 2009, it's still a

13      fair statement that the majority of cases that were

14      investigated in the group involved powder cocaine, crack

1:35PM 15      cocaine, and heroin, correct?

16      A    Yes.

17      Q    And fentanyl.  As fentanyl make more ubiquitous

18      within the drug supply within the United States, is that

19      something that happened back in 2009 or a little bit later

1:35PM 20      when you started to become the RAC of the office?

21      A    It was later it started to happen.  I think the

22      focus in '09 up until my retirement was the change with

23      pharmaceuticals and the diversion of pharmaceuticals

24      hydrocodone, OxyContin, Opana, that became part of our work

1:36PM 25      with the DEA.

Kasprzyk - Cross - Singer

1:36PM  1      **Q**    Certainly.  And I think, you know, whether it

2      was -- heroin, your understanding your training and

3      experience is an opiate, correct?

4      A    Correct.

1:36PM  5      **Q**    And the prescription narcotics you just talked

6      about and other type of drugs like that, they're also

7      opiate-based medication, correct?

8      A    Yes, sir.

9      **Q**    And when we talk about fentanyl.  Fentanyl is an

1:36PM  10     opiate type of, of drug, as well, correct?

11     A    That's correct.

12     **Q**    And fair to say that the focus of the DEA on the

13     opiates was in response to the opioid addiction problem that

14     was ongoing within our community?

1:36PM  15     A    Yes, sir.

16     **Q**    So as far as the particular drugs, would you agree

17     with me that there are, there are drugs that are more

18     dangerous than others?

19     **MR. SINGER:**  Objection.  403.

1:37PM  20     **THE COURT:**  I'm sorry?

21     **MR. TRIPI:**  Objection.  Rule 403.

22     **THE COURT:**  No, overruled.

23     A    Yes.

24     **Q**    And so when we talk about the opiates that we just

1:37PM  25     spoke about -- heroin, fentanyl, the opioid medication -- are

Kasprzyk - Cross - Singer

1:37PM  1    those sometimes more dangerous within the supply system in

2    the community?

3        A    Yes, sir.

4        Q    And is that because they sometimes can cause people

1:37PM  5    to overdose and die?

6        A    That's correct, sir.

7        Q    Okay.  And fair statement that part of the reason

8    why your office focused on those particular type of drugs we

9    just talked about, was based on the fact of their

1:37PM  10   dangerousness within the community?

11       A    That's correct.

12       Q    So we talked a little bit about the operations plan

13   that was dated in May of 2013 and I wanted to go through that

14   a little bit with you at this time.

1:37PM  15       **MR. SINGER:**  So, Ms. Champoux, would you mind bringing

16   up Government Exhibit 8A-7, please.

17       Q    See that, Mr. Kasprzyk?

18       A    Yes, sir.

19       Q    All right, perfect.

1:38PM  20           So, as far as the exhibit -- so, prior to coming to

21   court today, you gave a couple different statements to

22   investigators and prosecutors about your involvement and

23   understanding of this case; is that right?

24       A    Prior to when?

1:39PM  25       Q    Prior to coming into court today --

Kasprzyk - Cross - Singer

1:39PM   1      A     Yes.

           2      Q     -- you spoke to a couple different people about the

           3   events that we all talked about --

           4      A     Yes, sir.

1:39PM   5      Q     -- in court today, correct?

           6      A     Yes, sir.

           7      Q     And fair statement that prior to today, you never

           8   talked about this one particular document before

           9   (indicating)?

1:39PM   10      A     That's correct.

         11      Q     Okay.  So I was trying to figure out when the first

         12   time that you were presented this document.  Was it today?

         13      A     It might have been not today maybe during prep for

         14   this trial, so maybe a few days ago.

1:39PM   15      Q     So --

         16      A     Week ago.

         17      Q     So a few days ago was the first time you saw this

         18   document?

         19      A     Yes, since I initially signed it back several years

1:39PM   20   ago but, yes.

         21      Q     That's what I'm getting at.

         22      A     Yeah.

         23      Q     So the first time that you saw this document since

         24   May of 2013 was a few days ago?

1:40PM   25      A     Correct.

110

Kasprzyk - Cross - Singer

1:40PM   1        **Q**    And that was during a witness prep session with the

2   government?

3        **A**    Yes, sir.

4        **Q**    Were there any agents with you from the government

1:40PM   5   during that time?

6        **A**    No, sir, we did it via zoom.

7        **Q**    Do you know if anyone was taking any particular

8   notes during that particular conversation?

9        **A**    I do not know.

1:40PM  10        **Q**    So this particular document, when you were the RAC

11   of the office in Buffalo back in 2011 to 2013, did you keep

12   any type of notes?

13        **A**    On occasion, yes.

14        **Q**    I guess what I'm getting at -- I'm in the Navy.

1:40PM  15   I'm responsible for 30 people and I write down information to

16   keep everything straight about what's going on.  So, did you

17   have a book or some type of journal or something else along

18   those lines where you keep notes about what was going on day

19   to day in the office?

1:41PM  20        **A**    I did not, no.

21        **Q**    Did you keep any type of "to do list" about things

22   that you needed to get done at the office at the time you

23   were the RAC?

24        **A**    On occasion, yes.

1:41PM  25        **Q**    And since you retired, did you maintain any type of

Kasprzyk - Cross - Singer

1:41PM   1   books or notes like that in your possession?

         2        A    No, sir.

         3        Q    Do you know if the DEA has any of those any more?

         4        A    I, I -- I did not provide those personal notes to

1:41PM   5   the DEA when I retired.

         6        Q    So when you were coming in to testify in court, you

         7   didn't have the benefit of trying to refresh your memory

         8   about what may have happened in 2013 or 2009 with notes that

         9   you may have prepared back then?

1:41PM  10        A    I did not.

        11        Q    You testified that with regard to this one

        12   particular exhibit, you recognize your signature, correct?

        13        A    Yes, sir.

        14        Q    But you don't specifically recall many of the

1:41PM  15   events behind the form, correct?

        16        A    Yes, sir, that's right.

        17        Q    And you lack personal knowledge about certain

        18   things that may have happened with regard to the form; is

        19   that correct?

1:42PM  20        A    That's correct.

        21        Q    So I want to go through it a little bit more

        22   specifically with the stuff that you may remember.

        23        MR. SINGER:  So, if we could turn to Page 2 of the form,

        24   Ms. Champoux.  And if we could zoom in on the second

1:42PM  25   paragraph.

Kasprzyk - Cross - Singer

1:42PM 1        **Q**    So, this one particular paragraph, you remember

2    talking about on direct how this related information about

3    other agencies or offices that were involved as part of the

4    investigation?

1:42PM 5        **A**    Yes, sir.

6        **Q**    And this one particular paragraph, it's referring

7    to the investigation of the Ron Serio Drug Trafficking

8    Organization and those people who participated in that

9    investigation?

1:42PM 10        **A**    Yes, sir.

11        **Q**    Do you have any specific recollection of who was

12    involved as far as agents in that particular investigation

13    from people outside the DEA?

14        **A**    I do not.

1:43PM 15        **Q**    Do you have any type of specific recollection about

16    investigation that was ongoing in 2013 regarding Ron Serio's

17    DTO?

18        **A**    I do not.

19        **Q**    It's just too long ago for you to remember anything

1:43PM 20    specific?

21        **A**    Yes.

22        **Q**    All right.  So, as far as this one particular

23    paragraph, this is referring to other agencies and offices

24    that may be involved in the investigation at that time,

1:43PM 25    correct?

113

Kasprzyk - Cross - Singer

1:43PM   1      A    Yes, sir.

2      **MR. SINGER:**  All right.  So if we could zoom out on

3      that, Ms. Champoux, and if we could turn to Page 5 of the

4      exhibit.

1:43PM   5      Q    Do you remember looking and talking about this on

6      direct examination, sir?

7      A    Yes, sir, I do.

8      Q    So this one particular part of the operations plan,

9      this is referring to individual agents who are involved in

1:43PM  10      the operation regarding this one particular controlled buy,

11      correct?

12      A    Correct.

13      Q    And so this form outlines what those agent's

14      responsibilities are with regard to the operation?

1:44PM  15      A    Yes, sir.

16      Q    And it also outlines their contact information?

17      A    Yes, sir.

18      Q    It also outlines their call signs?

19      A    Correct.

1:44PM  20      Q    What type of vehicles they would be driving that

21      day?

22      A    Yes, sir.

23      Q    And this particular operation involving this

24      controlled buy, this was a DEA operation, right?

1:44PM  25      A    It was DEA-led, correct.

Kasprzyk - Cross - Singer

1:44PM    1    **Q**    And sometimes even though other agencies might be

2    involved in an allegation, it's not uncommon for DEA just to

3    run an investigation or operation by themselves, correct?

4    A    It, it happens.

1:44PM    5    **Q**    Yeah.  So for this one particular operation here,

6    this was a controlled buy, correct?

7    A    Correct.

8    **Q**    And this was something, based on what you can see

9    on this paper, that the DEA was staffing, correct?

1:44PM    10    A    Correct.

11    **Q**    And it wouldn't be outside the ordinary for other

12    agencies that may be involved in a larger investigation not

13    to participate in one particular operation, correct?

14    A    Typically with a joint investigation, where you

1:45PM    15    have other agencies involved, you would ask those agencies to

16    participate in the buy.

17    **Q**    Okay.  So typically that may happen but that's not

18    required, right?

19    **MR. TRIPI:**  Objection, argumentative.

1:45PM    20    **THE COURT:**  Overruled.  Go ahead.  You can answer.

21    A    I didn't understand the question.

22    **Q**    Typically that might be asked but that's not

23    required, correct?

24    A    No, it's not required.

1:45PM    25    **Q**    So, for instance, you're the resident agent in

115

Kasprzyk - Cross - Singer

1:45PM  1    charge of the office, correct?

2        A    Yes, sir.

3        Q    That's your signature down at the bottom, right, on

4    that form?

1:45PM  5    A    Those are my initials, yes, sir.

6        Q    And that's your handwriting, correct?

7        A    Correct.

8        Q    And that's your approval, as you testified on

9    direct examination, right?

1:45PM  10   A    Yes, sir.

11       Q    And if you felt the need that you needed to enlist

12   other people from other agencies in this particular

13   operation, you would have said something to the GS, correct?

14       A    I would have.

1:45PM  15   Q    But it doesn't appear like you did that here,

16   correct?

17       A    That would have been a decision that I would have

18   deferred to the case agent and the GS.

19       Q    Okay.  And, so, since the case agent signed at the

1:46PM  20   bottom over here on the left side, do you see that?

21       A    I do.

22       Q    And you see the GS, John Flickinger, signed also,

23   correct?

24       A    Yes, sir.

1:46PM  25   Q    It doesn't appear like they felt the need to have

Kasprzyk - Cross - Singer

1:46PM    1    anybody from another agency participate in this one

2    particular operation, right?

3       A    That would be my assessment based on those

4    signatures.

1:46PM    5       Q    And then when you signed down at the bottom right

6    over there, you took that assessment and approved it,

7    correct?

8       A    Correct.

9       Q    And as the main person in charge of the Buffalo

1:46PM    10    office, you have the ability to disagree with a case agent,

11    right?

12       A    I do.

13       Q    You have the ability to disagree with the GS,

14    right?

1:46PM    15       A    I do.

16       Q    Because they both work for you, correct?

17       A    Correct.

18       Q    But you didn't appear to do that here, correct?

19       A    That's correct.

1:46PM    20       Q    So, as far as the signature on the bottom of that

21    page, you testified on direct that you claim you spoke with

22    the ASAC in Albany, is that right?

23       A    I testified that typically I would talk to the ASAC

24    prior to sending him a completed 12 and 6.  I do not have any

1:47PM    25    specific recollection of that conversation but in all

117

Kasprzyk - Cross - Singer

1:47PM 1    controlled buy operations that I'd be submitting to the ASAC

2    for approval, I would always call them ahead of time and

3    describe to them what was going to happen.

4        Q    Okay.  And so, again, you don't have any specific

1:47PM 5    recollection of who you spoke to, correct?

6        A    Well, Mike Shelhamer would have been the acting

7    ASAC at the time, so it would have been Mike based on what

8    was written in this DEA-12.

9        Q    Based on the form.  But you don't remember who you

1:47PM 10   may have spoke to?

11       A    I don't have any specific recollection of that

12   conversation with Mike, that's correct.

13       Q    You don't have any type of notes about that

14   conversation any more, correct?

1:47PM 15       A    I do not.

16       Q    Okay.  So, this form was signed by you on the 2nd

17   of May of 2013, correct?

18       A    That's correct, sir.

19       Q    Looks like it was signed by both Special Agent

1:48PM 20   Bongiovanni and GS John Flickinger on the same date, correct?

21       A    Yes, sir.

22       Q    And do you recall what day of the week that was

23   back in 2013?

24       A    I do not.

1:48PM 25       Q    Would taking a look at a calendar perhaps refresh

Kasprzyk - Cross - Singer

1:48PM    1    your recollection as to what day of week that was?

          2         A    Yes, sir.

          3         (Showing cell phone.)

          4         Q    I'll take that away from you.

1:48PM    5              Which day of the week was May 2nd, back in 2013?

          6         A    That was a Thursday.

          7         Q    So it was a Thursday.

          8         **MR. SINGER:**  Then, Ms. Champoux, if you could move back

          9    to Page 1 of the exhibit, please.  If you could zoom in on

1:49PM   10    that notation in handwriting right down at the bottom.

         11         Q    You went through this with Mr. Tripi.  So "ALB", he

         12    had asked you whether or not the ASAC had an office in

         13    Albany?

         14         A    Yes, sir.

1:49PM   15         Q    And the ASAC does have an office in Albany, right?

         16         A    Yes, sir, that's correct.

         17         Q    And when you sign off on a particular form and it

         18    needs to get sent to Albany, do you put that into a fax

         19    machine yourself or do you have someone else do it?

1:49PM   20         A    No, sir.  I have someone else do that for me.

         21         Q    Okay.  And it's part of common practice in your

         22    office when support staff send something to Albany, do they

         23    normally note the time and date that they do that?

         24         A    Typically, yes he.

1:49PM   25         Q    So you wouldn't have any disagreement with me that

Kasprzyk - Cross - Singer

1:49PM  1    that this is a statement about when this was sent to Albany?

2         A    It appears to be that, sir.

3         Q    So this was sent, this package for the controlled

4    operation, to Albany at the end of the day on Thursday, the

1:50PM  5    2nd?

6         A    Correct.

7         Q    And then the 3rd would be Friday, correct?

8         A    Correct.

9         Q    Now this operation was planned for the 6th of May

1:50PM  10   of 2013, correct?

11        A    Yes, sir.

12        Q    And that would be a Monday, correct?

13        A    Yes, sir.

14        Q    So there was an intervening weekend over the time,

1:50PM  15   correct?

16        A    Correct.

17        Q    All right.  So, you had mentioned that there are a

18   number of different reasons why operations sometimes don't

19   move forward, correct?

1:50PM  20        A    Yes, sir.

21        Q    So, one of the particular reasons could potentially

22   be that a controlled -- sorry, a confidential source that

23   you're using may flake, right, they're not willing to move

24   forward with the operation any more?

1:50PM  25        MR. TRIPI:  Objection to the term "flake".  The witness

Kasprzyk - Cross - Singer

1:50PM   1   didn't use that term.

2          **THE COURT:**  No.  Overruled.

3          A    The word again that you used?

4          Q    Sure.  Is it possible that sometimes CSs flake,

1:50PM   5   they don't want to move forward with something any more and,

6    therefore, that's the reason why operations don't move

7    forward?

8          A    Flake?

9          **THE COURT:**  Are you not familiar with that term?

1:51PM  10   A    I'm not familiar with...

11         **THE COURT:**  Then rephrase the question.

12         Q    So, does sometimes CSs, in your experience as an

13   agent for over 25 years, get cold feet?

14         A    Yes, that happens.

1:51PM  15   Q    And sometimes operations can't move forward because

16   that's the reason?

17         A    Yes, sir.

18         Q    And in your experience, do sometimes CSs have

19   trouble getting in touch with the target of a particular

1:51PM  20   operation?

21         A    Yes, sir.

22         Q    And is that sometimes a reason why an operation

23   can't move forward?

24         A    Yes, sir.

1:51PM  25   Q    And sometimes the target of investigations in your

Kasprzyk - Cross - Singer

1:51PM    1    experience may agree to meet up but never show up?

          2        A    Yes, sir, that does happen.

          3        Q    Sometimes that causes operations not to move

          4    forward?

1:51PM    5        A    Correct.

          6        Q    In your experience there might be some logistical

          7    issues that sometimes impact the ability to execute an

          8    operation on a particular day, correct?

          9        A    With "logistical issues", what you specifically

1:52PM   10    referring to?

         11        Q    So let's talk about personnel.  Like you need a

         12    certain number of personnel to staff an operation, correct?

         13        A    Correct.

         14        Q    To do it safely, correct?

1:52PM   15        A    Yes, sir.

         16        Q    And if you had insufficient number of personnel on

         17    a particular date and time to run an operation, that might

         18    cause an operation to get canceled, correct?

         19        A    Yes, sir, it could impact the operation.

1:52PM   20        Q    The same thing is about money.  To do a controlled

         21    buy, you need funds to get approved?

         22        A    That's correct.

         23        Q    And if funds don't get approved, that might cause

         24    an operation not to move forward, correct?

1:52PM   25        A    Yes, sir.

Kasprzyk - Cross - Singer

1:52PM 1    **Q**    So, with regard to fund approval --

2    **MR. SINGER:**  Ms. Champoux, can you move to Page 6 of the

3    exhibit, please.

4    Thank you very much, Ms. Champoux.

1:52PM 5    **Q**    So, you talked a little bit about this form.  This

6    is called a DEA-12 form, right?

7    A    Yes, sir.

8    **Q**    And the purpose of this form is to requisition

9    official government funds for purposes of a controlled buy?

1:53PM 10   A    Yes, sir.

11   **Q**    And, so, what we're looking at here is the amount

12   of money that potentially is going to be approved for a

13   controlled buy, right?

14   A    Yes, sir.

1:53PM 15   **Q**    And that's that thousand dollar figure up in the

16   left side of the document?

17   A    Correct.

18   **Q**    And there's signoffs that happen as part of the

19   approval process, right?

1:53PM 20   A    Yes, sir.

21   **Q**    We're talking about official government funds so it

22   needs to be accounted for, correct?

23   A    Correct.

24   **Q**    So, I'm assuming periodically in the office as the

1:53PM 25   RAC, people from the DEA may come to audit what happened with

Kasprzyk - Cross - Singer

1:53PM   1   official funds?

         2       A    Yes, sir, that's correct.

         3       Q    And so the purpose of this form is to show someone

         4   who later shows up and asks where did the money go, where it

1:53PM   5   went?

         6       A    Yes, sir.

         7       Q    And, so, as part of the approval process, the group

         8   supervisor's in charge of the case agent -- in this case John

         9   Flickinger in charge of Mr. John Bongiovanni -- needs to sign

1:54PM  10   off on his approval for the funds to be released, right?

        11       A    Correct.

        12       Q    And after the GS makes a determination that's

        13   proper, they send the form to you, correct?

        14       A    Yes, sir.

1:54PM  15       Q    Put it in your inbox?

        16       A    Either in my inbox or they'd come and talk to me

        17   about it depending on the urgency of the operation.

        18       Q    And then as a RAC, your decision is to decide

        19   whether or not to allow the funds to be used, right?

1:54PM  20       A    Yes, sir.

        21       Q    And so your signature reflected on this document

        22   shows that you made that approval process, right?

        23       A    Yes, sir.

        24       Q    And then the next step of the process that we

1:54PM  25   talked about is that the SAC -- or, I'm sorry, the ASAC in

Kasprzyk - Cross - Singer

1:54PM   1    Albany, or the acting ASAC in Albany, the person who's in

2    charge of the RAC in Buffalo, needs to also approve those

3    funds?

4         A    Yes, sir.

1:54PM   5         Q    And you mentioned that when funds are approved, a

6    signature is placed on this form, correct?

7         A    Yes, sir.

8         Q    And we're talking about 2013.  So, would this form

9    be emailed to Albany or would it be delivered?  How would it

1:55PM   10   get there?

11        A    Faxed.

12        Q    Okay.  And then if the ASAC signed the form, it

13   would be faxed back with the signature?

14        A    Yes, sir.

1:55PM   15        Q    And then there's another form -- and I realize it's

16   not in this exhibit -- but you're familiar with a DEA-13

17   form, correct?

18        A    Yes.

19        Q    And so that's another form that goes to show the

1:55PM   20   money trail as far as a controlled buy using official funds,

21   correct?

22        A    I haven't used a DEA-13 form in a number of years,

23   so it -- honestly have minimal recollection of a DEA-13 form.

24        Q    Sure.  Let me see if I can help refresh your memory

1:55PM   25   about it.

Kasprzyk - Cross - Singer

1:55PM  1          So, you're aware that after the approval on the

2       DEA-12, there's another form that gets signed by the case

3       agent as well as the confidential source who's getting the

4       funds themselves, right?

1:55PM  5       A    Yes.

6       Q    And I realize you may not know what the particular

7       form number is now but you remember back in your days in the

8       DEA that the source and the case agent would sign a form that

9       would actually allow the source to take those funds?

1:56PM 10       A    Correct.

11       Q    And then after the operation was finished, if there

12      was any money left over, the source and the case agent would

13      also sign that form to indicate what happened with those

14      funds, that you returned the unused portion of the funds?

1:56PM 15       A    Yes, I believe that's my recollection, as well.

16       Q    Okay.  And so with regard to the DEA-12 here,

17      clearly it's not signed by the ASAC, correct?

18       A    That's correct.

19       Q    Or the acting ASAC in this case, correct?

1:56PM 20       A    Correct.

21       Q    But.  You don't recall any specific conversations

22      you may have had with the ASAC about this one particular

23      operation?

24       A    I do not.

1:56PM 25       Q    And you can't say why this operation didn't move

Kasprzyk - Cross - Singer

1:56PM   1   forward definitively?

2        A    I do not know.

3        Q    So, for instance, you don't recall any

4   conversations you had with a Joseph Bongiovanni about why the

1:56PM   5   operation couldn't move forward, right?

6        A    Correct.

7        Q    You don't recall any conversations you had with GS

8   Flickinger about why the operation couldn't move forward?

9        A    Correct.

1:57PM   10       Q    So, any type of opinion about why the operation may

11  not have moved forward is just speculation on your part right

12  now, right?

13       A    Correct.

14       Q    So I want to move back a little bit to 2009.  So,

1:57PM   15  Mr. Bongiovanni was working in D-57 at the time, right?

16       A    Yes, sir.

17       Q    In 2009 you were the GS of D-57, correct?

18       A    Yes, sir.

19       Q    And you were his first line supervisor, right?

1:57PM   20       A    Correct.

21       Q    You were in charge of working with him on a

22  day-to-day basis?

23       A    Yes, sir.

24       Q    Mentoring him on a day-to-day basis?

1:57PM   25       A    Yes, sir.

Kasprzyk - Cross - Singer

1:57PM   1      **Q**    You're in charge with reviewing his work product?

         2      A    Yes, sir.

         3      **Q**    You're in charge of monitoring his progress with

         4   certain investigations?

1:57PM   5      A    Yes, sir.

         6      **Q**    You had the ability to approve confidential sources

         7   that he wanted to use against particular targets?

         8      A    That's correct.

         9      **Q**    You had the ability to approve Mr. Bongiovanni

1:58PM  10   using controlled -- sorry, using confidential sources, right?

        11      A    Yes, sir.

        12      **Q**    So, back in November of 2009, the earlier parts of

        13   2009 in November, Mr. Bongiovanni approached you about Peter

        14   Gerace, correct?

1:58PM  15      A    Correct.

        16      **Q**    And he approached you about Peter Gerace about

        17   potentially him wanting to cooperate with the federal

        18   government?

        19      A    Yes, sir.

1:58PM  20      **Q**    And the reason, like we went through on the form

        21   earlier, was that he was facing a probation or a supervised

        22   release violation, right?

        23      A    Yes, sir, that's correct.

        24      **Q**    And he was looking to potentially reduce his

1:58PM  25   exposure by cooperating?

Kasprzyk - Cross - Singer

1:58PM    1        A    Yes, sir.

          2        Q    And that's not something that's totally out of the

          3    ordinary when someone gets into a situation like that, right?

          4        A    Correct.

1:58PM    5        Q    You've had situations before where people who were

          6    on probation or supervised release had a violation and then

          7    wanted to cooperate to benefit themselves, right?

          8        A    That has happened in the past, yes, sir.

          9        Q    So this was not some weird, out-of-the-norm

1:59PM   10    situation that Mr. Bongiovanni talked to you about that one

         11    particular day?

         12        A    Correct.

         13        Q    And when you were talking to Mr. Bongiovanni about

         14    that, he indicated to you that he knew Peter Gerace in some

1:59PM   15    fashion?

         16        A    Yes, sir.

         17        Q    Didn't get into the details of the relationship but

         18    that he knew him?

         19        A    I asked him how he knew him.

1:59PM   20        Q    Okay.  And what was his response?

         21        A    He knew him from the neighborhood.

         22        Q    Okay.  So you were aware working with

         23    Mr. Bongiovanni, that he grew up in the city of Buffalo?

         24        A    Yes, sir.

1:59PM   25        Q    And that sometimes people who grow up in the same

Kasprzyk - Cross - Singer

1:59PM    1    town they work in, they might know particular targets or

2    sources in an investigation?

3         A    Yes, sir.

4         Q    I'm sure that -- you said you grew up in Buffalo?

1:59PM    5    A    I did, sir.

6         Q    So, at any point in your career did you ever have a

7    situation where you might know someone you were

8    investigating?

9         A    I don't think so.

2:00PM    10   Q    What about particular people that you were looking

11   at.  Did you have a general awareness of who they were or

12   where they might be?

13        A    Yes, sir.

14        Q    Okay.  And that would be based on your experience

2:00PM    15   within this town?

16        A    Yes, sir.

17        Q    Okay.  I think you worked up here the entire time

18   of your career?

19        A    With DEA, sir?

2:00PM    20   Q    Yes.

21        A    Yes, sir.

22        Q    I know you worked out in Reno, Nevada as a police

23   officer before you went to the DEA, correct?

24        A    Reno, Nevada, yes, sir.

2:00PM    25   Q    So you didn't grow up there, right?

Kasprzyk - Cross - Singer

2:00PM    1      A    In Reno?

      2      Q    Correct.

      3      A    Yes, no, I grew up in Buffalo.

      4      Q    So fair statement that when you first started out

2:00PM    5   there, you had to learn a little bit about the town?

      6      A    Yes, sir.

      7      Q    And I'm sure there were officers who grew up in

      8   Reno who worked on the force there?

      9      A    Yes.

2:00PM   10      Q    They had a little bit of local knowledge that

    11   sometimes you rely on?

    12      A    Yes, sir.

    13      Q    Okay.  All right.  So back in November of 2009,

    14   there was no open investigation into Peter Gerace being run

2:01PM   15   by the DEA, correct?

    16      A    Yes, correct.

    17      Q    There was no open investigation into Pharaoh's

    18   Gentlemen's Club being run by the DEA, correct?

    19      A    Correct.

2:01PM   20      Q    But you were aware, based on your coordination with

    21   other agencies, that the FBI had an open investigation into

    22   Peter Gerace, correct?

    23      A    After my conversation with Joe and then GS

    24   Jansewicz, I became aware of their investigation, yes.

2:01PM   25      Q    So you weren't aware of any particular

Kasprzyk - Cross - Singer

2:01PM  1  investigation ongoing with the DEA -- sorry, with the FBI and

2  Peter Gerace based on your coordination with Jim Jansewicz

3  and others?

4      A    I, I, I'd have to think back to conversations that

2:01PM  5  I was having with Jim at the time.  I talked to him pretty

6  regularly about different cases that they had working.  He

7  may have mentioned to me during one of those conversations

8  that they had something going on but I, I, I haven't talked

9  to Jim about this in years and I don't recall specifically

2:01PM  10  but it may have come up in one of our prior conversations.

11      Q    So, you know, it sounds like, so, Jim was the SSA

12  at the FBI; is that right?

13      A    You mean a group supervisor or supervising agent?

14      Q    I guess what I'm trying to figure out the acronyms

2:02PM  15  because I don't know how familiar the jury is.

16           So, a supervisory special agent at the FBI, is that

17  the equivalent of the group supervisor GS at the DEA?

18      A    Correct.

19      Q    And, so, as part of your duties as being a GS and

2:02PM  20  Mr. Jansewicz's duties as being an SSA would you sometimes

21  meet up at that level of organization to talk about

22  investigations that were ongoing?

23      A    We would talk, yes.

24      Q    Okay.  And that was a way to help de-conflict

2:02PM  25  investigations?

Kasprzyk - Cross - Singer

2:02PM  1      A    Correct.

2      Q    It was also a way to understand what was going on

3    inside of the investigative world you were operating in?

4      A    Correct.

2:02PM  5      Q    And you mentioned that SSA Jansewicz, he ran the

6    Safe Streets Task Force at FBI at the time?

7      A    That's correct, sir.

8      Q    And that was part of Squad 4 at the FBI, correct?

9      A    I'm not sure what part of the squad it was.  I just

2:03PM 10    knew I was on Safe Streets Task Force and I worked with Jim.

11    I'm not sure what squad they were in.

12      Q    No problem.  So, as far as Safe Streets Task Force

13    was concerned, you understood it to be a part of the FBI that

14    investigated similar crimes to you, correct?

2:03PM 15      A    They had a similar mission, yes.  They would work

16    drug trafficking cases.

17      Q    Okay.  So, you find out about how the FBI has an

18    interest in Peter Gerace and the DEA doesn't have any type of

19    open case with regard to Gerace at the time, correct?

2:03PM 20      A    That's correct.

21      Q    Or Pharaoh's at the time, correct?

22      A    That's correct.

23      Q    So that's why you order Special Agent Bongiovanni

24    to make contact with the FBI, correct?

2:03PM 25      A    Yes, sir.

Kasprzyk - Cross - Singer

2:03PM    1    **Q**    And you testified about how you weren't certain

2    whether Mr. Bongiovanni did this when you ordered him to do

3    it?

4    A    Correct.

2:03PM    5    **Q**    And that's because you didn't have any

6    conversations with him about any type of particular meeting

7    that happened?

8    A    I trusted him to do it.  I expected him to do it.

9    I didn't have any followup conversations whether or not he

2:04PM    10    did it.

11    **Q**    That's why you can't really say one way or the

12    other whether or not a meeting ever happened?

13    A    That's correct.

14    **Q**    Okay.  So, with regard to Government Exhibit 30A.

2:04PM    15    **MR. SINGER:**  Ms. Champoux, if we could bring down that

16    one exhibit and put up 30A, please.

17    **Q**    So you testified a little bit about this document,

18    how it relates to information that Mr. Bongiovanni related to

19    you about Peter Gerace and the coordination with the FBI?

2:04PM    20    A    Yes, sir.

21    **Q**    And this was something that agents would do when a

22    particular case came in, correct?

23    A    Yes, sir.

24    **Q**    And this is a document that you reviewed, correct?

2:04PM    25    A    Yes, sir.

Kasprzyk - Cross - Singer

2:04PM    1    **Q**    Because I think we went through it, that's your

2    signature down at the bottom?

3    A    Correct.

4    **Q**    And at the time, again, you were his GS,

2:04PM    5    Mr. Bongiovanni's GS?

6    A    That's correct, sir.

7    **Q**    So your responsibility was to review his work

8    product like we just talked about, right?

9    A    Yes, sir.

2:05PM   10    **Q**    And part of that process is you take a look through

11    the form and if everything's all good to you, you sign it,

12    correct?

13    A    Yes, sir.

14    **Q**    Okay.  So I want to talk a little bit more about

2:05PM   15    the form.

16    **MR. SINGER:**  So, Ms. Champoux, if you could zoom in on

17    blocks three and four up at the top right.

18    **Q**    So you talked a little bit about this on your

19    direct testimony.  So this is where a file number goes in

2:05PM   20    that the DEA assigns to a particular file?

21    A    That's correct.

22    **Q**    In this case, the file number was C2-06-0120, is

23    that right?

24    A    That's correct.

2:05PM   25    **Q**    So I just want to break down this number a little

Kasprzyk - Cross - Singer

2:05PM    1    more.  So the "C2" part of this number (indicating), what is

          2    that referring to?

          3        A    The "C2" is the office designator.  So "C2" would

          4    represent the Buffalo Resident Office.

2:06PM    5        Q    Okay.  Then if we could move on.

          6             This "06" number right here (indicating)?

          7        A    That --

          8        Q    Circled like it's a Christmas stocking -- my

          9    apologies for that -- but what does the "06" talk about?

2:06PM   10        A    That would reflect or indicate the date that the

         11    particular file was opened.  So, in this case "06" would

         12    represent 2006.

         13        Q    Yeah.  So that's -- and that's not reflecting

         14    calendar year, that's reflecting a fiscal year, correct?

2:06PM   15        A    Correct.

         16        Q    So like the federal government, they go by fiscal

         17    years, correct?

         18        A    Correct.

         19        Q    And your understanding of this, since you were a

2:06PM   20    former government employee, is that the fiscal year begins

         21    October 1st of the calendar year?

         22        A    Correct.

         23        Q    And then ends September 30th of the next calendar

         24    year?

2:06PM   25        A    Correct.

Kasprzyk - Cross - Singer

2:06PM   1      **Q**    So when it's referring to an "06" fiscal year, that

2      could be a file that potentially's opened up in October of

3      2005, right?

4      A    Correct.

2:06PM   5      **Q**    All the way up until September 30th of 2006,

6      correct?

7      A    Correct.

8      **Q**    All right.  And then as far as the next number that

9      we're looking at here, the "0120", what does that refer to

2:07PM   10     (indicating)?

11     A    I believe that would be the number -- that reflects

12     the next number available in cases.  So, that would have been

13     the 120th case file opened up that particular year.

14     **Q**    Okay.  So it's the 120th DEA case file opened up

2:07PM   15     within fiscal year 2006, correct?

16     A    Correct.

17     **Q**    And then with regard to the G-DEP identifier, you

18     mentioned that this helps the DEA classify certain cases, is

19     that right?

2:07PM   20     A    That's right, sir.

21     **Q**    And so this one particular letter, number, symbol

22     right here, the "C1", you see that, that I circled?

23     A    I do, sir.

24     **Q**    What's that referring to?

2:07PM   25     A    That's a reference to cocaine.

Kasprzyk - Cross - Singer

2:07PM   1    **Q**    And "C1" is referring to powder cocaine, correct?

2    A    I believe so, yes.

3    **Q**    And this is another way the DEA keeps track of

4    cases, correct?

2:08PM   5    A    Correct.

6    **Q**    And your understanding about this particular case

7    involving Peter Gerace and wanting to cooperate is that it

8    involved potential information about powder cocaine, correct?

9    A    Correct.

2:08PM   10    **Q**    All right.  So, with regard to this particular case

11    we're talking about --

12    **MR. SINGER:**  If we zoom out again, Ms. Champoux.

13    **Q**    There's a file title that's located below those two

14    numbers we were just talking about.  Do you see that there in

2:08PM   15    block six?

16    A    I do, sir.

17    **Q**    And this is referring to a file title "Matthew

18    Scalia"?

19    A    Correct.

2:08PM   20    **Q**    So "Matthew Scalia", what's the purpose of that

21    identifier again -- there again?

22    A    The file title name, sir?

23    **Q**    Yes.

24    A    That would be the primary target of the

2:08PM   25    investigation.

Kasprzyk - Cross - Singer

2:08PM   1     **Q**    And when investigations in DEA are run, when the --

2       when that 120 number is assigned, Matthew Scalia is the

3       person that the DEA is looking at as the primary target,

4       correct?

2:09PM   5     A    Yes, sir.

6     **Q**    But over time, it's not uncommon for other targets

7       to develop as part of that investigation, correct?

8     A    Yes.

9     **Q**    And if they have some type of relation to the

2:09PM  10      particular file that's being investigated, it's not

11      inappropriate for someone to put a new name into a file

12      that's not the file title name, correct?

13      A    If there's an organizational link to the primary

14      target, yes, that would be common to do.

2:09PM  15      **Q**    So, I guess what I'm getting at -- so like if you

16      had an investigation that opens up on a new target, you're

17      not going to create an entirely new file on somebody,

18      correct?

19      A    If there's a link to that original target, you can

2:09PM  20      put them in the same file, yes.

21      **Q**    And that link, that might reflect an organizational

22      link to a particular person you're looking at, right?

23      A    That's right, sir.

24      **Q**    It might also indicate a particular geographic link

2:09PM  25      to a target you're looking at?

Kasprzyk - Cross - Singer

2:09PM  1      A    It would generally have to be more than a

2      geographical link.  There'd have to be an organization link

3      to the actual file title.

4      Q    It might also involve a particular drug, right?

2:10PM  5      A    Involve the drug type, you mean?

6      Q    Correct.

7      A    No.  There would have to be more than just a drug

8      type link.  You'd have to have a link.  If you add a new

9      target into a case file, an original case file, there needs

2:10PM  10     to be some sort of organizational link to that initial

11     target.

12     Q    Okay.  Now, with regards to the Matthew Scalia

13     file, do you remember what this file was about?

14     A    I do not.

2:10PM  15     Q    You don't have any specific recollection of it?

16     A    No, sir.

17     Q    You weren't able to review it before your testimony

18     in court today?

19     A    The Scalia file?

2:10PM  20     Q    Correct.

21     A    No, no, sir.

22     Q    It's just too long ago for you to tell the jury

23     about what this file involved?

24     A    Correct.

2:10PM  25     Q    Okay.  So, with regard to the specific paragraph --

Kasprzyk - Cross - Singer

2:10PM  1       **MR. SINGER:**  If we can zoom in on that, Ms. Champoux.

2       Q     So this one particular paragraph, you mentioned on

3   direct, indicates that Peter Gerace acted as a confidential

4   source regarding information in the past, correct?

2:11PM  5       A     Correct.

6       Q     So we talked a little bit about confidential

7   sources.  And I just want to clarify because throughout your

8   testimony you're using the name "confidential source".

9   You're also using the name "confidential informant".  You're

2:11PM  10  also using "source of information".  So I just want to break

11  down and clarify what exactly you mean by that.

12          So "confidential sources" back in 2013, what are

13  you referring to when you say "confidential source" in your

14  testimony?

2:11PM  15      A     Typically when I'm talking about a "confidential

16  source", that would be a documented confidential informant

17  with the DEA.

18      Q     Okay.  And you just used the word "confidential

19  informant".  When you say confidential informant, what are

2:11PM  20  you referring to?  Is it the same as confidential source?

21      A     It could be, yes.  Could be the same.

22      Q     Yeah.  I guess that's what I'm trying to clarify.

23  So you say it could be the same.

24          What is the difference between a "confidential

2:12PM  25  source" and a "confidential informant"?

Kasprzyk - Cross - Singer

2:12PM  1     A    Well, I would refer and when I would write a

2       report, typically I would refer to documented informants as

3       "confidential informants".  Some agents would refer to them

4       as "confidential sources".  For the most part, it's one in

2:12PM  5     the same.

6         Q    Okay.  So "confidential informants", as you say,

7       are the same thing as "confidential sources", correct?

8         A    Correct.

9         Q    And when we refer to confidential sources, or

2:12PM  10    confidential informants as you say, there are certain

11      protocols that the DEA requires an agent to follow before

12      that person can be a confidential source, correct?

13        A    That's correct.

14        Q    So, for instance, you talked about how there needs

2:12PM  15    to be an agreement executed between the person who's going to

16      be the confidential source and the DEA about their

17      involvement in an investigation?

18        A    That's correct, sir.

19        Q    And that's something that's signed off by the

2:12PM  20    confidential source, right?

21        A    Yes.

22        Q    The case agent, right?

23        A    Correct.

24        Q    And the group supervisor responsible for the case

2:13PM  25    agent?

Kasprzyk - Cross - Singer

2:13PM  1     A    Correct.

        2     Q    And that's paperwork that's filed away inside the

        3  DEA files, correct?

        4     A    Correct.

2:13PM  5     Q    And because of the safety concerns and

        6  confidentiality associated with a confidential source, after

        7  a confidential source is signed up to act in that capacity

        8  for the DEA, they're assigned a confidential source number,

        9  correct?

2:13PM  10    A    Correct.

        11    Q    And that CS number is something that is used on

        12 official documentation, right?

        13    A    That's correct.

        14    Q    So, moving forward if someone were to write any

2:13PM  15 type of DEA-6 or any other type of paperwork associated with

        16 that confidential source, they're going to use the number,

        17 not the name, right?

        18    A    Correct.

        19    Q    And that's to maintain operational security for

2:13PM  20 that particular asset, right?

        21    A    That's correct.

        22    Q    And in this particular document here, you can see

        23 how Peter Gerace's is named by his full name, right?

        24    A    Correct.

2:14PM  25    Q    He doesn't have any type of confidential source

Kasprzyk - Cross - Singer

2:14PM    1    number associated with him, correct?

2       A    Correct.

3       **Q**    And as GS, you're aware of the confidential sources

4    that work for, or work with case agents assigned to your

2:14PM    5    particular group, right?

6       A    Correct.

7       **Q**    So you gain familiarity with about who those

8    confidential sources are because you're in those meetings

9    signing off on the confidential source agreement, right?

2:14PM    10       A    Correct.

11       **Q**    And you're also aware of those confidential sources

12    because as a GS, you maintain a log of who those people are

13    working for the particular agents in your group?

14       A    The GS doesn't maintain a log.

2:14PM    15       **Q**    So you don't have any type of log or visibility on

16    who the particular confidential sources are working for your

17    agents?

18       A    There's a confidential source file room, file

19    cabinet which is kept separately.  It's not a log kept by the

2:14PM    20    individual group supervisor.

21       **Q**    Okay.  But as the group supervisor, you have access

22    to that one particular file room, correct?

23       A    Yes, sir.

24       **Q**    You can look in there to determine who the

2:15PM    25    confidential sources are for the group, correct?

Kasprzyk - Cross - Singer

2:15PM   1        A    Correct.

2        Q    And, so, in this particular case, you testified

3    that you don't recall any time where Peter Gerace was

4    presented to you by Mr. Bongiovanni or anybody else as a

2:15PM   5    confidential source with that agreement, correct?

6        A    That's correct.

7        Q    You don't recall any time where you signed off an

8    agreement for Peter Gerace to become any type of confidential

9    source, right?

2:15PM  10        A    That's correct.

11        Q    And I don't know if you ever took a look, but

12    you're not aware of any documents in existence in DEA custody

13    that had Peter Gerace listed as a confidential source, right?

14        A    I did not look but I'm not aware of any documents

2:15PM  15    that would have him listed as a confidential source.

16        Q    And there's no particular number that you're aware

17    of that Peter Gerace was assigned to be a confidential

18    source, right?

19        A    Correct.

2:15PM  20        Q    But on top of all that, there's another different

21    avenue where agents get information from in this less

22    official capacity, right?

23        MR. TRIPI:  Objection.  Confusing.

24        MR. SINGER:  Yeah, you know what.  That was a bad

2:16PM  25    question, Judge.  Let me ask it again.

Kasprzyk - Cross - Singer

2:16PM    1      **Q**    So agents don't always get information from

          2    confidential sources, right?

          3      A     That's correct.

          4      **Q**    Sometimes they use other people who are not

2:16PM    5    officially signed up with the DEA, correct?

          6      A     Correct.

          7      **Q**    And those individuals are known as sources of

          8    information, correct?

          9      A     Yes, sir.

2:16PM   10      **Q**    SOIs?

         11      A     Correct.

         12      **Q**    And you used SOIs in your capacity as special agent

         13    with DEA, right?

         14      A     Yes, sir.

2:16PM   15      **Q**    You've had agents who work for you as a GS who use

         16    SOIs, correct?

         17      A     Yes, sir.

         18      **Q**    And you've also had agents and GSs who work for you

         19    as the RAC use SOIs, correct?

2:16PM   20      A     Correct.

         21      **Q**    That's not some weird law enforcement practice,

         22    right?

         23      A     It is not.

         24      **Q**    It's something that's the normal course of business

2:16PM   25    within the DEA?

Kasprzyk - Cross - Singer

2:16PM    1      A    Correct.

2      Q    So, source of information are different because

3   they don't require the same type of approval process that we

4   talked about, right?

2:17PM    5      A    That is one of the distinctions, yes.

6      Q    They don't require any SOI to sign an agreement

7   with the DEA, correct?

8      A    Correct.

9      Q    And sources of information are also not provided a

2:17PM   10   particular number, correct?

11      A    Correct.

12      Q    They're referred to by name inside of paperwork,

13   correct?

14      A    Correct.

2:17PM   15      Q    And, so, taking a look at this one particular form,

16   you agree with me that Peter Gerace is identified by name,

17   right?

18      A    Correct.

19      Q    You agree with me he's not identified by any type

2:17PM   20   CD number?

21      A    Right.

22      Q    You agree with me that you don't have any type of

23   recollection of any CS agreements that you approved for Peter

24   Gerace to act as a CS for the DEA, correct?

2:17PM   25      A    That's correct.

Kasprzyk - Cross - Singer

2:17PM  1        Q    This one particular document talks about
        2   information that Peter Gerace provided in the past, correct?
        3        A    Correct.
        4        Q    Now, with regard to information -- I know it's been
2:17PM  5   a long time and you may not have a specific recollection --
        6   but do you know what type of information Peter Gerace
        7   provided as far as this investigation or other DEA
        8   investigations in the past?
        9        A    I do not.
2:18PM 10        Q    Do you know --
       11        A    I'm unaware of that information.
       12        Q    Do you know when Peter Gerace may have provided
       13   this information as a source of information?
       14        **MR. TRIPI:**  Object as to "may have provided".
2:18PM 15   Speculative.
       16        **THE COURT:**  No.  Overruled.
       17        A    I'm not aware of Mr. Gerace providing any
       18   information to the DEA on drug trafficking activities.  That
       19   was not anything that I ever was made aware of as a group
2:18PM 20   supervisor.
       21        Q    And you were GS at the time, right?
       22        A    Yes, sir.
       23        Q    Now you said that you were responsible for about a
       24   dozen or so personnel during that time period?
2:18PM 25        A    Yes, sir, that's correct.

Kasprzyk - Cross - Singer

2:18PM   1    **Q**    And you testified on direct, you know, that it's

2    just not practical for you to get into the weeds of every

3    case, right?

4        A    Correct.

2:18PM   5    **Q**    So outside the norm of certain details in a case

6    may not -- you may not become aware of those during your

7    course of time as a GS?

8        A    It is possible that an agent would have had a

9    conversation with someone and not shared that information

2:19PM   10    with me.  It is possible.

11        **Q**    And you might not have awareness because of that

12    lack of conversation, right?

13        A    Correct.

14        **Q**    Doesn't mean that it didn't happen, it just means

2:19PM   15    that you're not aware?

16        **MR. TRIPI:**  Objection.  Speculative.

17        **THE COURT:**  Overruled.

18        A    Question again, sir?

19        **Q**    It didn't mean that it didn't happen, it just means

2:19PM   20    that you're not aware?

21        A    Yes, sir.

22        **Q**    Okay.  So, in this particular part here, you'd

23    agree with me that if Peter Gerace was a official

24    confidential source, his name wouldn't appear in this

2:19PM   25    paragraph, right?

Kasprzyk - Cross - Singer

2:19PM 1    A    Correct.

2    Q    And a number would appear in that paragraph?

3    A    Correct.

4    Q    There'd be an agreement?

2:19PM 5    A    Yes, sir, there'd be an agreement.

6    Q    So, when you got presented this one particular

7  DEA-6 for approval as the group supervisor, why didn't you

8  make a correction about what's obvious here:  Mr. Gerace is

9  not a confidential source?

2:19PM 10    A    I can't explain why I didn't make the correction.

11    Q    I think you said earlier on direct, like, hey,

12  sometimes I make mistakes?

13    A    Yeah.

14    Q    Do you think that's a mistake?

2:20PM 15    A    It's a mistake by the agent to incorrectly list him

16  as a confidential source.

17    Q    Okay.  But it's also a mistake by the supervisor to

18  not catch that, right?

19    A    Yes.

2:20PM 20    Q    Hindsight being 20/20, if you had to do it all over

21  again, you would have asked Mr. Bongiovanni to correct that,

22  right?

23    A    Yes, to "change confidential source" to "source of

24  information".

2:20PM 25    **MR. SINGER:**  Okay.  Now if we could move off of that

Kasprzyk - Cross - Singer

2:20PM  1    paragraph, Ms. Champoux, and if we could turn to Page 3 of

2           the document and zoom in on the NADDIS indexing section.

3           **Q**     So you mentioned that NADDIS is a database

4           maintained by the DEA; is that right, sir?

2:20PM  5    A     That's right, sir.

6           **Q**     And NADDIS is a database where names of people who

7           are either targets or have information the DEA processes are

8           placed; is that right?

9           A     Correct.

2:21PM  10   **Q**     And the purpose of NADDIS is so that if a name

11          comes up in one investigation, an agent investigating that

12          case can find out if they have ever been investigated by the

13          DEA previously?

14          A     That's correct.

2:21PM  15   **Q**     And as far as NADDIS was concerned back then in

16          2009, are we talking about something that's computerized or

17          are we talking about something that's on paper?

18          A     It's computerized.

19          **Q**     Okay.  So it was computerized back then.  When did

2:21PM  20   NADDIS get computerized, to your understanding?

21          A     Sir, I don't -- I don't know.  It has been

22          computerized ever since I joined DEA in 1989.

23          **Q**     Okay.

24          A     So, if it, it -- I don't know when it started but

2:21PM  25   it was throughout my career NADDIS was a computerized

Kasprzyk - Cross - Singer

2:21PM   1    program.

2              Q    Okay.  So it was computerized ever since you began

3        your career?

4              A    Yes.

2:21PM   5    Q    Okay.  So, as far as the information here,

6        Mr. Gerace's name appears, is that right?

7              A    Yes, sir.

8              Q    And it indicates "NADDIS number pending"; is that

9        right?

2:22PM  10    A    Correct.

11             Q    And that's indicating that there may be the need to

12       assign Mr. Gerace a NADDIS number; is that right?

13             A    Yes.

14             Q    Okay.  And when you reviewed this form back in

2:22PM  15    2009, did you have any particular problem about the fact that

16       a NADDIS number is still pending for Mr. Gerace?

17             A    The expectation when the author of the report does

18       the report and they index a particular individual, they would

19       run NADDIS on that individual, see if they were in NADDIS.

2:22PM  20    If they weren't in NADDIS, they would -- if they were in

21       NADDIS, they would reflect the NADDIS number of that person.

22       If they weren't in NADDIS, then they would put NADDIS number

23       pending.

24             Q    And that's something you've seen submitted on

2:22PM  25    reports by Mr. Bongiovanni and others, right?

Kasprzyk - Cross - Singer

2:22PM   1      A    Correct.

         2      Q    And as far as the NADDIS number pending, eventually

         3   if one got assigned, that would be appended to the report?

         4      A    Correct.

2:22PM   5      Q    That's something that's done by support staff,

         6   right?

         7      A    Or by the agent when he completes, you know, a

         8   second report, a followup report, they would include the

         9   active NADDIS number then on future investigations.

2:23PM  10      Q    And there's a timeline in which agents must submit

        11   reports, correct?

        12      A    Yes, sir.

        13      Q    It's five days after the investigative action takes

        14   place?

2:23PM  15      A    Yes, sir.

        16      Q    So in this particular case, you have a conversation

        17   with Mr. Bongiovanni about Peter Gerace potentially

        18   cooperating on November 2nd?

        19      A    Yes, sir.

2:23PM  20      Q    And then he forwards this report up to you on the

        21   6th?

        22      A    Correct.

        23      Q    And that's a short timeframe, correct?

        24      A    Yes, sir.

2:23PM  25      Q    Sometimes other things are going on in the office

Kasprzyk - Cross - Singer

2:23PM 1    at that time?

2           A    Correct.

3           **Q**    And so sometimes that might cause a NADDIS number

4    to remain pending, correct?

2:23PM 5    A    Yes, sir.

6           **MR. SINGER:**  Okay.  So, Ms. Champoux, if you could take

7    that down.

8           **Q**    So back in November of 2009, you directed

9    Mr. Bongiovanni to contact FBI, correct?

2:24PM 10    A    Yes, sir.

11           **Q**    And that was based on your conversation you had

12    with SSA Jansewicz, your counterpart at FBI?

13           A    Yes, sir.

14           **Q**    And it was because your understanding was that FBI

2:24PM 15    had an open case on both Peter Gerace and Pharaoh's

16    Gentlemen's Club at the time?

17           A    Yes, sir.

18           **Q**    And the DEA didn't, correct?

19           A    Correct.

2:24PM 20    **Q**    And that was one of the reasons why you didn't

21    decide to open up a DEA file on Mr. Gerace and Pharaoh's at

22    that time, correct?

23           A    Correct.

24           **Q**    Because there's no use in duplicating effort,

2:24PM 25    right?

Kasprzyk - Cross - Singer

2:24PM  1    A    That's correct, sir.

2          Q    So you testified earlier that DEA may have had

3    interest with regard to Peter Gerace or Pharaoh's if the FBI

4    didn't have a case, right?

2:24PM  5    A    That's correct.

6          Q    And that was based on the type of drug that was

7    being discussed inside of your conversations with

8    Mr. Bongiovanni?

9          A    Yes, sir.

2:24PM  10         Q    But ultimately you declined to open up any type of

11    case because of what FBI was doing, right?

12         A    That's correct.

13         Q    And besides having an open case -- you talked about

14    it a little bit earlier -- FBI has similar jurisdiction to

2:25PM  15    the DEA in investigating drug crimes, correct?

16         A    Yes, sir.

17         Q    One of the roles is the Safe Streets Task Force is

18    to investigate drug crimes?

19         A    That's correct.

2:25PM  20         Q    They also investigate cocaine cases, correct?

21         A    Yes, sir.

22         Q    And that's why they had an interest in

23    investigating this particular case, right, to your

24    understanding?

2:25PM  25         **MR. TRIPI:**  Objection as to FBI's mindset, your Honor.

Kasprzyk - Cross - Singer

2:25PM    1    **THE COURT:** Yeah, sustained.

2    **Q**    But that's at least why you wanted to leave the

3    case at the FBI, correct?

4    **A**    I asked Joe Bongiovanni to call the FBI because the

2:25PM    5    FBI had an existing case. They, they were actively

6    investigating Gerace and Pharaoh's and it was appropriate for

7    Joe to call the FBI and to work, to develop -- any

8    information that he could develop, he needed to give to them

9    so that they could work together.

2:26PM    10    **Q**    Okay. Because you wanted to make sure the FBI had

11    everything in their power to do -- to investigate any

12    potential crimes, correct?

13    **A**    Because we work together.

14    **Q**    Correct.

2:26PM    15    **A**    Yes.

16    **Q**    And at that point in time, it was, you know, more

17    or less their case as opposed to the DEA's case, right?

18    **A**    Correct.

19    **Q**    Now, as far as the Safe Streets Task Force and

2:26PM    20    FBI's concerned, you don't control any type of investigative

21    decisions that the FBI makes, correct?

22    **A**    I do not.

23    **Q**    And as far as the FBI was concerned, after you read

24    through this one particular DEA-6, you didn't receive any

2:26PM    25    type of phone calls from the FBI about Gerace, correct?

Kasprzyk - Cross - Singer

| | | |
|---|---|---|
| 2:26PM | 1 | A    I did not. |
| | 2 | **Q**    You didn't receive any phone calls from Jim |
| | 3 | Jansewicz about Pharaoh's Gentlemen's Club, correct? |
| | 4 | A    I did not. |
| 2:26PM | 5 | **Q**    You didn't receive any type of information that |
| | 6 | cooperation regarding Peter Gerace didn't work out, right? |
| | 7 | A    No. |
| | 8 | **Q**    You're not aware of any type of reasons why |
| | 9 | Mr. Gerace may or may not have failed to cooperate? |
| 2:27PM | 10 | **MR. TRIPI:**  Objection.  Assumes facts not in evidence. |
| | 11 | Prior answer was no and then he built it into the next |
| | 12 | question. |
| | 13 | **THE COURT:**  No.  I don't think so.  Overruled. |
| | 14 | A    Question again, sir. |
| 2:27PM | 15 | **MR. SINGER:**  Can you read that back, Diane. |
| | 16 | **THE REPORTER:**  "You're not aware of any type of reasons |
| | 17 | why Mr. Gerace may or may not have failed to cooperate?" |
| | 18 | A    I'm not familiar with why he did or did not |
| | 19 | cooperate with the FBI. |
| 2:27PM | 20 | **Q**    And you mentioned that if you're aware that |
| | 21 | Mr. Gerace was not cooperating or FBI wasn't moving forward |
| | 22 | with their case, this was a case that you may have opened up |
| | 23 | an investigation into regarding Peter Gerace, right? |
| | 24 | A    So I understand your question? |
| 2:27PM | 25 | **Q**    Certainly. |

Kasprzyk - Cross - Singer

2:27PM  1      A     If the FBI did not have an open case, would we at

2      the DEA have opened a case?

3      **Q**    So if the DEA -- let me rephrase that.

4             If the FBI wasn't going to move forward on a case

2:28PM  5      against Gerace, would the DEA have investigated him?

6      A     Potentially, yes.

7      **Q**    And, you know, that was based on the particular

8      drug that was being alleged, is that right?

9      A     It would have been based upon the information that

2:28PM  10     Mr. Gerace was offering to provide but also contingent upon

11     our ability to sign him up as a documented informant.

12     **Q**    And this was not some situation where Mr. Gerace

13     was alleging, hey, I know someone who sells an eight ball

14     down the street on the corner, correct?

2:28PM  15     **MR. TRIPI:**  Objection.  Exhibit 30A is the evidence of

16     what was transmitted to this witness, so personal knowledge,

17     your Honor.

18     **THE COURT:**  No.  Overruled.

19     **Q**    You want me to repeat that question?

2:28PM  20     A     I think I understand it.

21     **Q**    Sure.  Go ahead.

22     A     The information provided by Gerace through

23     Agent Bongiovanni was that Gerace knew about kilogram

24     quantity or kilogram traffickers and that would be of

2:29PM  25     interest to the DEA.

158

Kasprzyk - Cross - Singer

2:29PM    1    **Q**    And that's a significant amount of cocaine,

2    correct?

3    A    Yes, sir.

4    **Q**    And that's something that formed your opinion

2:29PM    5    earlier about why it may pique your interest into

6    investigating this case, correct?

7    A    Correct.

8    **Q**    But you didn't have any type of followup

9    conversations with Special Agent Bongiovanni about this

2:29PM   10    situation, right?

11    A    Not that I can recall.

12    **Q**    And you don't recall having any type of followup

13    conversations with Supervisory Special Agent Jansewicz about

14    what was going on with Gerace, correct?

2:29PM   15    A    No, sir.

16    **Q**    And you would agree with me that over the course of

17    the 25 years you worked at the DEA, sometimes cases just

18    don't move forward, right?

19    A    That's correct.

2:29PM   20    **Q**    Could be for a variety of different reasons?

21    A    Yes, sir.

22    **MR. SINGER:**  That's all I have, your Honor.  Thank you

23    very much.

24    **THE COURT:**  Any redirect?

2:30PM   25    **MR. TRIPI:**  I do have redirect, your Honor.

Kasprzyk - Cross - Singer

2:30PM    1    **THE COURT:**  I think a juror needs a break so we'll take

2    a break.

3    Remember my instructions about not communicating about

4    the case with anyone, including each other, and don't make up

2:30PM    5    your mind.

6    See you back here in about ten minutes.

7    (WHEREUPON, jury excused.)

8    **THE COURT:**  Anything for the record before we break,

9    Mr. Tripi?

2:31PM    10    **MR. TRIPI:**  No, your Honor.  Thank you for asking.

11    **THE COURT:**  Mr. Singer?

12    **MR. SINGER:**  No, I don't have anything.

13    **THE COURT:**  Great.  Thank you.

14    (WHEREUPON, recess taken.)

2:31PM    15    (Open court, defendant present.)

16    **THE CLERK:**  We are back on the record for the

17    continuation of the jury trial in case number 19-CR-227,

18    *United States of America v. Joseph Bongiovanni.*

19    All counsel and parties are present.

2:45PM    20    **THE COURT:**  Anything before we bring the jury back?

21    **MR. TRIPI:**  No, Judge.

22    **THE COURT:**  Mr. Singer?

23    **MR. SINGER:**  No, your Honor.

24    **THE COURT:**  Okay.  Let's bring them back, please.

2:45PM    25    (**WHEREUPON,** jury present.)

Kasprzyk - Redirect - Tripi

2:46PM   1       **THE COURT:**   The record will reflect that all our jurors

2        again are present.

3            I remind the witness that he's still under oath.

4            And, Mr. Tripi, you may begin your redirect.

2:46PM   5       **MR. TRIPI:**   Thank you very much, your Honor.

6    **REDIRECT EXAMINATION BY MR. TRIPI:**

7        **Q**   I'd just like to follow up on a couple of questions

8    Mr. Singer asked you, okay?

9        A    Yes, sir.

2:46PM   10      **Q**   Part of his questions he was asking you about as a

11   supervisor your deployment of personnel and resources.   Do

12   you recall that line of questions?

13       A    Yes, sir.

14       **Q**   As it relates to the matters that you're testifying

2:47PM   15   about today, the 2009 case and the 2013 case that we showed

16   you exhibits, did this defendant ever complain to you that

17   you did not provide him, as a supervisor, sufficient

18   personnel to support his investigations?

19       A    No, sir.

2:47PM   20      **Q**   Did this defendant ever complain to you that you

21   failed to fund or approve funding for the defendant's cases?

22       A    No, sir.

23       **Q**   In terms of personnel management, you were asked

24   some questions about that if an enforcement operation takes

2:47PM   25   three hours, for example, what do agents do after the

Kasprzyk - Redirect - Tripi

2:47PM   1    enforcement operation ends?

         2        A    They'll return to the office and resume work on

         3    whatever other cases they may have pending.

         4        Q    And do agents work eight-hour days?

2:48PM   5        A    Typically not.

         6        Q    What do they work typically?

         7        A    Usually it's eight to ten hours per day and often

         8    in the evening and on weekends.

         9        Q    Holidays, as well?

2:48PM  10        A    Holidays, as well.

        11        Q    So, if the DEA needs to authorize funding for an

        12    enforcement action, and there's four to five days in between,

        13    even if it's a weekend, is that, is that a stumbling -- are

        14    weekends a stumbling block for the DEA?

2:48PM  15        A    No, sir.

        16        Q    Okay.  Do drug dealers deal drugs on weekends?

        17        A    Yes, sir, they do.

        18        Q    Do drug dealers deal drugs on holidays?

        19        A    Yes, sir, they do.

2:48PM  20        Q    Do DEA agents and their supervisors work in kind?

        21        A    Yes, sir.

        22        Q    You were asked a little bit about certain types of

        23    drugs that the DEA investigates, do you remember that?

        24        A    I do, sir.

2:49PM  25        Q    While you supervised and worked at the DEA Buffalo

Kasprzyk - Redirect - Tripi

2:49PM   1    for 25 years, did the DEA work a lot of marijuana conspiracy

2             cases?

3                 A    Yes, sir, we did.

4                 Q    Did that include from 2009 to 2013 while you were a

2:49PM   5    group supervisor and a RAC?

6                 A    Yes, sir.

7                 Q    In your experience, do major marijuana traffickers

8             often deal in other drugs?

9                 A    Yes, sir, they do.

2:49PM   10        **MR. TRIPI:**  Can we pull up Exhibit 8A-7, Page 2, please,

11            Ms. Champoux.  I'd like you to highlight the bottom

12            paragraph.  And could you highlight the last sentence where

13            it begins Ron Serio's brother.

14                Q    Can you read that for the jury?

2:50PM   15        A    "Ron Serio's brother, Thomas Serio, was previously

16            arrested and convicted of trafficking 5 kilograms of cocaine

17            with SOS Robert Mattal.  This will be the first buy/walk from

18            T.S."

19                Q    Does that information indicate this organization

2:50PM   20           had involvement in cocaine?

21                A    Yes, it does.

22            **MR. TRIPI:**  If we could zoom out of that particular box,

23            please.

24                Q    And in the second sentence, is there a reference to

2:50PM   25    cocaine being one of the drugs involved in that operation,

Kasprzyk - Redirect - Tripi

2:51PM    1    that operation plan?

2    A    Okay.  The second sentence of the first paragraph?

3    Q    Sorry about that, yeah.

4    A    Yes, there is, sir.

2:51PM    5    Q    Okay.  And does that paragraph indicate S. is a

6    trusted associate of the Ron Serio DTO?

7    A    Yes, it does.

8    Q    Between roughly 2002 and 2013, do you know how many

9    marijuana cases that resulted in press releases were handled

2:51PM   10    by the DEA and the U.S. Attorney's Office, do you know that

11    number?

12    A    I do not, sir.

13    Q    I'm going to show you something to refresh your

14    recollection.

2:52PM   15    MR. TRIPI:  Judge, can we approach?

16    THE COURT:  Sure.

17    (Held at side bar:)

18    MR. SINGER:  A couple issues.  One is that all of these

19    particular press releases --

2:53PM   20    (Court reporter interrupted for clarification.)

21    MR. SINGER:  So the document is a listing of press

22    releases from the U.S. Attorney's Office and some of them

23    postdate this witnesses's retirement so he wouldn't have any

24    knowledge of those.

2:53PM   25    THE COURT:  He hasn't even indicated that he has any

Kasprzyk - Redirect - Tripi

2:53PM 1    recollection he needs refreshing.  He says he doesn't know.

2    He didn't say he doesn't remember so we don't even know.

3         **MR. TRIPI:**  I'm going there so I wanted to get the

4    exhibit over to Mr. Singer so if I have to refresh his

2:53PM 5    recollection, I will.  But these are all press releases from

6    the time period in which he worked there.

7         **THE COURT:**  Well, Mr. Singer is saying some of them are

8    not.

9         **MR. COOPER:**  Some of the releases themselves are dated

2:53PM 10   after he retired but the investigations to which they refer

11   are investigations into conduct that occurred while he was

12   the supervisor, as the Court knows.

13        **THE COURT:**  In first instance he has to indicate that he

14   needs his recollection refreshed.

2:54PM 15        Second of all, the question is between roughly 2002 and

16   '13 do you know how many more listings that resulted in press

17   releases were handled by the DEA and U.S. Attorney's office.

18        So the fact that the release may have occurred after he

19   left doesn't change that but somebody would have to know that

2:54PM 20   a release was issued after he left the office in order to

21   know the number.

22        **MR. SINGER:**  Yeah, I mean.

23        **THE COURT:**  You can voir dire on this, too, but there's

24   no foundation.  So the objection's sustained.

2:55PM 25        (Open court:)

Kasprzyk - Redirect - Tripi

2:55PM    1       **Q**    Do you know how many large scale marijuana cases

2         the DEA handled with the U.S. Attorney's Office from 2009 to

3         2013?

4         A    I do not recall a specific number.

2:55PM    5       **Q**    Was there more than one?

6         A    There were several, yes.

7         **Q**    I'm going to hand you something to see if it could

8         refresh your recollection to give us an estimate, okay?

9         A    Thank you.

2:55PM   10       **Q**    Handing up Exhibit 554, Government Exhibit 554.

11        **MR. SINGER:**  Judge while the witness is reviewing, do

12        you mind if we side bar.

13        (Held at side bar:)

14        **MR. SINGER:**  So beyond whether he's able to refresh his

2:58PM   15       recollection, the other problem, Judge, is that this is like

16        a hundred page exhibit that I just got handed 30 seconds ago.

17        And if I'm going to get into crossing him on this, I'm going

18        to have to get a continuance so I can go through page by

19        page.

2:58PM   20       **THE COURT:**  No, I don't think so.  I don't think so.

21        This is simply to refresh his recollection.

22        The question Mr. Tripi just asked is a very different

23        question than he asked before.  So the question about how

24        many press releases were issued, I think, is a problematic

2:58PM   25       question because I just don't think he's got to know how many

Kasprzyk - Redirect - Tripi

2:58PM  1    press releases were issued.

2         On the other hand, this may well refresh his

3    recollection on how many cases were large scale and I want to

4    make sure that he understands what the question is, what he's

2:58PM  5    answering.  But, you know, you could provide the witness with

6    anything to refresh.  You know this, Mr. Singer.

7         **MR. SINGER:**  I get that but at the same time, too, if I

8    want to cross him on this point, I'm going to have to go

9    through every single one of these press releases.  What I

2:59PM  10   noticed first off, some of the cases don't even originate out

11   of the Western District of New York.  His office doesn't work

12   in Rochester.  So he's familiar --

13        **THE COURT:**  If he gives an exact number.  But we don't

14   know what he's going to say.  If he says, yeah, we're more

2:59PM  15   than ten or something like that, then I just don't see what

16   the problem is.  If you want to delay your cross until

17   tomorrow, we break and we'll delay your cross until tomorrow,

18   that's fine.

19        **MR. TRIPI:**  To be clear, I'm not getting into any facts.

2:59PM  20        **THE COURT:**  No, we're not getting any facts.

21        **MR. TRIPI:**  I just wanted him to know if he thought I

22   was trying to do that.

23        (Open court:)

24        **THE COURT:**  So the question, sir, is:  Does that refresh

2:59PM  25   your recollection about how many large scale marijuana

Kasprzyk - Redirect - Tripi

2:59PM  1   investigations the DEA and the U.S. Attorney's Office in the

2   Western District of New York were involved in from 2009 to

3   2013?  Does it refresh your recollection is the first

4   question.

3:00PM  5       **THE WITNESS:**  Yes, sir.

6       **THE COURT:**  Go ahead, Mr. Tripi.

7       **Q**   Can you provide an estimate?

8       A    Well, based on my reading of these --

9       **THE COURT:**  No, no, not based on your reading.

3:00PM  10      **Q**   Your --

11      **THE COURT:**  Based on your recollection.  We don't

12  want -- anybody can read that and count numbers, okay.

13  That's not what we want.

14      The question is:  Does it refresh your recollection?

3:00PM  15      **THE WITNESS:**  Yes, it does.

16      **THE COURT:**  Okay.  Now go ahead, Mr. Tripi.

17      **MR. TRIPI:**  I'm going to remove the exhibit.

18      **THE COURT:**  Yes.

19      **Q**   Again, I'm only asking you for an estimate.  Did

3:00PM  20  that refresh your recollection to the point where you could

21  give us an estimate of how many marijuana cases that were

22  large-scale were worked by the DEA up until 2013 when you

23  left from early 2000s on?

24      **THE COURT:**  In the Western District.

3:00PM  25      **MR. TRIPI:**  In the Western District of New York, of

Kasprzyk - Redirect - Tripi

3:01PM   1    course.

2         A     Yes.

3         Q     What's your estimate?

4         A     My estimate is at least two or three large scale

3:01PM   5    marijuana operations were investigated each year by the

6    office.

7         Q     Every year?

8         A     Every year.

9         Q     And would a thousand kilogram conspiracy be

3:01PM   10   considered a large-scale marijuana investigation?

11        A     A thousand kilogram marijuana conspiracy?

12        Q     Yes.

13        A     Yes, sir, it would.

14        **MR. TRIPI:**  If we can go to Page 5 of this exhibit,

3:01PM   15   Exhibit 8A-7, please.

16        Q     Mr. Singer asked you some questions -- I think he

17   prefaced with the word "sometimes" and then he asked you some

18   questions about operations.  Do you remember that line of

19   questioning?

3:01PM   20        A     I do, sir.

21        Q     Okay.  Looking at Page 5 of this exhibit, the

22   signature line, when the case agent is signing a document as

23   in this instance, is the agent verifying the information

24   above the signature line?

3:02PM   25        **MR. SINGER:**  Objection.  Outside the scope.

Kasprzyk - Redirect - Tripi

3:02PM    1    **Q**    The accuracy of the information?

2    **THE COURT:**  I'm sorry?

3    **MR. SINGER:**  Outside the scope.

4    **THE COURT:**  No.  Overruled.

3:02PM    5    A    Yes, he is, sir.

6    **Q**    So, in this instance -- not sometimes but in this

7    instance -- the defendant was verifying that this personnel

8    was available for an operation May 6th, 2013; is that

9    correct?

3:02PM    10    A    That's correct, sir.

11    **Q**    By 2009 -- we're switching now to the other

12    exhibit -- but by 2009, and certainly by 2013, would you have

13    considered the defendant an experienced agent?

14    A    Yes, sir, I would.

3:03PM    15    **Q**    Is your knowledge of Exhibit 8A-7 limited to

16    whatever accuracy and truthfulness the defendant wrote in the

17    document?

18    A    Yes, sir.

19    **Q**    Can we put up Exhibit 30A, please.

3:03PM    20    Regarding Exhibit 30A, is your awareness of the

21    information regarding Peter Gerace in this document limited

22    to the accuracy of what the defendant wrote in the report

23    regarding what Gerace told him?

24    A    Yes, sir, that's correct.

3:03PM    25    **Q**    You were asked some questions about the fact that

Kasprzyk - Redirect - Tripi

3:03PM  1    his name is in the document.  Do you remember that line of

2    cross?

3         A    I do, sir.

4         Q    You talked about how a confidential source gets a

3:03PM  5    number and a separate file that's secured separately?

6         A    Yes, sir.

7         Q    After that point in time, do you remember, as a

8    supervisor, the number of every informant of every agent?

9         A    I do not, sir.

3:04PM  10        Q    When you see an informant's number in a report, do

11   you go and independently look through that file and find out

12   who the informant was?

13        A    Typically not.

14        Q    Do you rely on the agent who's authoring the report

3:04PM  15   to be accurate?

16        A    Yes, sir, I do.

17        Q    Could the office even practically function, in your

18   view, if you had to do that for every report that references

19   a confidential source?

3:04PM  20        A    It, it could not.  It would -- it would severely

21   slow down the review process of cases.

22        Q    And how does that impact the DEA's ability --

23   slowing down the review process of cases, how does that

24   impact the DEA's ability to effectively enforce operations in

3:04PM  25   the street?

Kasprzyk - Redirect - Tripi

3:04PM   1         **MR. SINGER:**  Objection.  Relevance.

         2         **THE COURT:**  Overruled.

         3         A    It would impact our ability to work efficiently and

         4    to work quickly and to be agile when it comes to conducting

3:05PM   5    drug investigations.

         6         Q    Regarding this exhibit, Mr. Singer asked you a line

         7    of questions on cross about knowing people from the

         8    neighborhood.  I think he even referenced back to your time

         9    in Reno; do you recall that?

3:05PM  10         A    I do, sir.

        11         Q    Did the defendant ever tell you regarding Peter

        12    Gerace that he went out to dinners with him?

        13         A    No, sir, he did not.

        14         Q    Did he ever tell you he went on double dates with

3:05PM  15    him.

        16         A    No, sir, he did not.

        17         Q    Did he ever tell you they communicated on the phone

        18    frequently?

        19         A    No, sir, he did not.

3:05PM  20         Q    Did he ever tell you at any point in time in your

        21    tenure at DEA up to the point that you retired, that they

        22    went on vacation together?

        23         A    No, sir, he did not.

        24         Q    Would you have permitted the defendant to handle

3:05PM  25    any aspect of any case involving Gerace if you knew any of

Kasprzyk - Redirect - Tripi

3:05PM   1    that?

2       A    No.

3       Q    Whether a source of information, a confidential

4    source or a target, would you allow him anywhere near that

3:06PM   5    case?

6       A    No, sir, I would not.

7       Q    Does DEA have professional conduct standards for

8    agents associating and fraternizing with known convicted

9    felons?

3:06PM   10       A    Yes, sir, it does.

11       Q    What is that policy?

12       A    It's prohibited.

13       Q    Earlier when you were explaining case priorities,

14    you mentioned sometimes it depends upon who the target was or

3:06PM   15    what they're connected to.  I might have misstated it a

16    little bit but do you remember that line of cross?

17       A    Yes, sir, I do.

18       Q    Did the defendant ever tell you that Gerace was the

19    grandson of Joseph Todaro, Sr.?

3:06PM   20       A    No, sir, he did not.

21       Q    Were you familiar with that name through your

22    career in law enforcement in Buffalo?

23       A    Yes, sir, I was.

24       Q    What was the reputation of that person?

3:07PM   25       **MR. SINGER:**  Objection.

Kasprzyk - Redirect - Tripi

3:07PM  1      **THE COURT:**  Sustained.

2      **Q**    Did that person have a reputation in the law

3    enforcement community that overlapped your 25 years as a DEA

4    agent in Buffalo?

3:07PM  5      **MR. SINGER:**  Objection.

6      **MR. TRIPI:**  We briefed this in a pretrial.

7      **THE COURT:**  Yeah.  Overruled.

8      **MR. SINGER:**  Judge, can we approach on this again.

9      **THE COURT:**  Sure.

3:07PM  10     (Held at side bar:)

11     **MR. SINGER:**  The purpose of the IOC evidence you ruled

12   was to allow it in based on beliefs that my client may have

13   held.

14     **THE COURT:**  Right.

3:07PM  15     **MR. SINGER:**  An affinity, whatever someone's reputation

16   in a law enforcement community does not have any bearing on

17   that because, again, what has to be shown is nexus that this

18   witness --

19     **THE COURT:**  I don't think so.

3:07PM  20     **MR. SINGER:**  Nexus on top of --

21     **THE COURT:**  It can be an inference.  So his reputation

22   in law enforcement is he's involved in Italian Organized

23   Crime.  I think an inference can be drawn that Bongiovanni

24   shared that knowledge that that was his reputation.

3:08PM  25     **MR. TRIPI:**  I'll add, Judge, when he's interviewed in

Kasprzyk - Redirect - Tripi

3:08PM  1    June of 2019, he specifically says that Gerace is the

2    grandson of Todaro, Sr., so there will be later evidence

3    further even linking that up.  Just --

4        **MR. SINGER:**  But the problem is, Judge, that evidence

3:08PM  5    discusses what my client understood and may have believed

6    from his personal perspective.

7        (Court reporter interrupted for clarification.)

8        **THE COURT:**  He's not talking about anything what Joseph

9    Bongiovanni may have thought or believed.  He's talking about

3:08PM  10    what this witness believed.

11        **MR. SINGER:**  That's getting into the problem.

12        **THE COURT:**  It's not talking about what this witness

13    believes.  It's talking about what his reputation was in the

14    law enforcement community, a community that both Bongiovanni

3:08PM  15    and this witness were part of.  So I think it's fair game and

16    an inference can be drawn from that that Bongiovanni shared

17    knowledge of that reputation.  Now, whether it's enough for

18    the jury to believe that Bongiovanni believed that, that's

19    another question.

3:09PM  20        **MR. SINGER:**  But, again, it's putting a stamp of

21    approval on law enforcement by we believe this exists and we

22    don't have the opportunity or evidence to rebut that because

23    we're precluded from getting into the underlying facts

24    itself.  So that's the problem, Judge.  I understand when you

3:09PM  25    disagree with the Court's ruling in regard to what our client

Kasprzyk - Redirect - Tripi

3:09PM    1    thought but that the Court's ruling --

2    **THE COURT:**  I'm going to allow --

3    **MR. SINGER:**  -- getting into --

4    **THE COURT:**  I'm going to allow evidence of reputation in

3:09PM    5    the law enforcement.  If it was what the newspapers reported,

6    no.  But reputation in the law enforcement community, yes.

7    That's as far as it's going but, yes.

8    **MR. SINGER:**  Thank you.

9    (Open court:)

3:10PM    10    **MR. TRIPI:**  May I please have the question read back

11    just so I can have it accurately.

12    **THE COURT:**  Sure.

13    **THE REPORTER:**  "Did that person have a reputation in the

14    law enforcement community that overlapped your 25 years as a

3:10PM    15    DEA agent in Buffalo"?

16    **Q**    Your answer to that is?

17    **A**    Yes, sir.

18    **Q**    And what was the reputation of Joseph Todaro, Sr.

19    in the law enforcement community?

3:10PM    20    **A**    That he was involved with organized crime in the

21    Western New York area.

22    **Q**    Had you known that information regarding the

23    relationship between Gerace as referenced in this report and

24    Todaro, Sr., could that have impacted the DEA's assessment of

3:10PM    25    how much investigative effort for you to follow up with in

Kasprzyk - Redirect - Tripi

3:10PM  1    this case?

2       A    Yes, sir, it would have.

3       **MR. TRIPI:**  One moment, please, your Honor.

4       (WHEREUPON, a discussion was held off the record.)

3:11PM  5    **MR. TRIPI:**  One or two last questions, your Honor.

6       I think one of the last things I would like to go to

7    Page 2 of Exhibit 30A.

8       **Q**    Mr. Singer asked you about the indexing section

9    NADDIS pending; do you see that?

3:11PM  10   A    Yes, sir, I see that.

11      **Q**    And earlier you described that that meant that

12   there was not a NADDIS number, in sum and substance; is that

13   right?

14      A    Yes, sir, that's correct.

3:11PM  15   **Q**    I'm going to hand you Government Exhibit 437.  And

16   you're familiar with NADDIS?

17      A    Yes, sir, I am.

18      **Q**    You're familiar with NADDIS, how it's stored in the

19   database and how it's printed out?

3:12PM  20   A    Yes, sir.

21      **Q**    Do you recognize Exhibit 437?

22      A    Yes, this is a NADDIS printout of a individual.

23      **Q**    Do you recognize that as a DEA NADDIS printout of a

24   specific individual?

3:12PM  25   A    Yes, sir.

Kasprzyk - Redirect - Tripi

3:12PM  1      **Q**    Is that made in the ordinary course of DEA

2   business, the NADDIS printouts?

3      **A**    Yes, sir.

4      **Q**    Regular course of business to make and keep that

3:12PM  5   record?

6      **A**    Yes, sir, that's correct.

7      **Q**    And I think earlier you indicated NADDIS has been

8   computerized since you've been an agent?

9      **A**    Correct.

3:12PM 10      **Q**    So are agents under the obligation -- is the DEA

11   under an obligation to keep those reports accurate?

12      **A**    Yes, sir, they are.

13      **MR. TRIPI:**  Government offers Exhibit 437, your Honor.

14      **THE COURT:**  437, your Honor.

3:12PM 15      **MR. SINGER:**  Can I have just one moment, Judge.

16      **THE COURT:**  Sure.

17      (**WHEREUPON**, a discussion was held off the record.)

18      **MR. TRIPI:**  Did you want to see it?

19      **THE COURT:**  Yeah, let me take a look.

3:13PM 20      **MR. SINGER:**  Judge, we have an objection on hearsay and

21   authenticity grounds.  There's other information in the

22   document that is also hearsay.

23      **THE COURT:**  So you're objecting because there's hearsay

24   within hearsay?

3:14PM 25      **MR. SINGER:**  Hearsay within hearsay but also on the

Kasprzyk - Redirect - Tripi

3:14PM  1  authentication aspect, Judge.

2      **THE COURT:**  Because I don't think the witness has

3  testified he actually entered this information.

4      **MR. TRIPI:**  It's not a requirement of a business record,

3:14PM  5  personal entry.

6      **MR. SINGER:**  It may not be a requirement of a business

7  record.

8      **THE COURT:**  If we're going to argue, come on up.

9      (Held at side bar:)

3:14PM  10      **MR. SINGER:**  So there's the authenticity aspect, Judge.

11  I don't think the witness can authenticate the documents.

12      **THE COURT:**  Why can't he authenticate?  He worked at

13  DEA, he's familiar with what NADDIS reports look like, he

14  sees this.

3:14PM  15      How was this generated, Mr. Tripi?

16      **MR. TRIPI:**  It's from the DEA system.  It's Francis

17  Dicarlo provided it.  He's the records custodian.

18      **THE COURT:**  Does this guy know that?

19      **MR. TRIPI:**  He just authenticated that it's a NADDIS

3:15PM  20  report from the NADDIS system.  I just asked him if he's

21  dealt with those reports and how they look when they're

22  printed up from the system.

23      **MR. SINGER:**  He can't authenticate the records.  He

24  can't -- this looks like a NADDIS report.

3:15PM  25      **THE COURT:**  There's a lot of ways that you can

Kasprzyk - Redirect - Tripi

3:15PM  1   authenticate something.  I mean, is Dicarlo going to testify?

2   **MR. TRIPI:**  Of course.  Dicarlo is going to testify

3   later.  But at the same time, this NADDIS report ties

4   directly in.  We could offer it subject to questioning if you

3:15PM  5   want.

6       **THE COURT:**  Yeah, authentication.

7       **MR. TRIPI:**  Judge, I do think -- if I may -- I do think

8   it's been appropriately authenticated.  He said he recognized

9   it as a NADDIS printout from the DEA.  I laid the foundation

3:15PM  10  and he said that.

11      **THE COURT:**  But if I let Mr. Singer voir dire, does he

12  know exactly where this came from, does he know how it was

13  produced, does he know where it came from?

14      **MR. TRIPI:**  My argument would be that's a weight not

3:16PM  15  admissible objection.

16      **THE COURT:**  No, I don't think so.  I think that is an

17  admissible question.  We don't know if it's the real document

18  or not and Dicarlo can testify to that.

19      **MR. TRIPI:**  We got it from him.  It's in court.

3:16PM  20      **THE COURT:**  I understand.

21      **MR. TRIPI:**  Judge, it's an authentic document.

22      **THE COURT:**  I understand and I think I will allow it

23  subject to authentication by Dicarlo later on.

24      **MR. SINGER:**  And the other problem is the hearsay within

3:16PM  25  the hearsay aspect.  So it's not just information pertaining

Kasprzyk - Redirect - Tripi

3:16PM    1    to an entry regarding Peter Gerace when he was put in the

2    system.  It lays out factual case details on his case and

3    other cases which is all hearsay.

4         **MR. TRIPI:**  That could be part of the business record,

3:16PM    5    the whole entire file that comes in is a DEA record down the

6    road.

7         **THE COURT:**  But the point --

8         **MR. TRIPI:**  I gave you the record itself, Judge, there's

9    not the fact --

3:17PM   10         (Court reporter interrupted for clarification.)

11         **MR. TRIPI:**  I'm sorry, Rob, the fact that he's in NADDIS

12    going back to 1992, which is why I showed it to you, is

13    clearly relevant to the testimony that was offered here

14    today.  Not pending.  Pending meant that there is no number.

3:17PM   15    He's had a number.  Gerace has had a number since 1992.

16         **THE COURT:**  So can we submit the document subject to

17    redaction of the stuff that's in there?  You want to admit

18    only for the purpose that he had it?

19         **MR. TRIPI:**  I'm really only interested in the fact that

3:17PM   20    he's had a NADDIS number since 1992.

21         **THE COURT:**  We're going to admit it subject to

22    redaction.

23         And anything that's hearsay, Mr. Singer, you can tell me

24    what's hearsay within hearsay.  Anything hearsay within

3:17PM   25    hearsay can be redacted.

Kasprzyk - Redirect - Tripi

3:17PM  1      **MR. SINGER:**  Anything other than the -- the only reason

2      they're admitting the record is to show the date.  Other than

3      that, it would just would be hearsay.

4          **THE COURT:**  To show he's in the system and a date.

3:18PM  5      **MR. TRIPI:**  Hearsay requires dates of assertions and

6      dates of entry is not assertions.

7          **THE COURT:**  No, the date can come in, and the fact that

8      there is the record and so can anything else that's not an

9      assertion.  I haven't looked at the record close enough.

3:18PM 10  Mr. Singer is telling me that there are things in there that

11  constitute assertions that are factual statements that may

12  not -- that may be hearsay within hearsay.  That could very

13  well be the case.  Just because it's a business record

14  doesn't mean that everything in it comes in.

3:18PM 15      **MR. TRIPI:**  For purposes of finishing this witness, I'll

16  lead on it a couple of questions that don't go into the

17  underlying document.  Then we can work it out later on, if

18  that works, just to move it along.

19          **THE COURT:**  Yes.

3:18PM 20      (Open court:)

21      **Q**     Mr. Kasprzyk, have you had an opportunity to review

22  Government Exhibit 437?

23      A     Yes, sir, I have.

24      **Q**     And did you recognize that document as a NADDIS

3:19PM 25  report for a Peter Gerace?

Kasprzyk - Redirect - Tripi

3:19PM  1      A    Yes, sir, I did.

2      Q    And does that report indicate he had a NADDIS

3  number, 2998032, and the date of record was January 16th,

4  1992?

3:19PM  5      A    Yes, sir.

6      Q    So does that information indicate that Mr. Gerace

7  had a NADDIS number since January 16th 1992?

8      A    That's correct.

9      Q    And so when that is compared to what's written

3:19PM  10  here, "NADDIS pending" in 2009 is not accurate?

11      A    Correct.

12      Q    Did you independently look at that and go research

13  NADDIS to see in the defendant's report was accurate and

14  truthful?

3:19PM  15      A    I did not.

16      MR. TRIPI:  Judge, I'll offer this.

17      MR. SINGER:  Subject to conferencing what redaction is

18  appropriate, as we discussed.

19      THE COURT:  Okay.  Subject to redaction and also subject

3:20PM  20  to authentication through another witness.

21      MR. TRIPI:  Yes, Judge.

22      THE COURT:  It's admitted with those limitations.

23      MR. TRIPI:  At this juncture, I understand, Judge.

24      THE COURT:  So we're not going to show it to the jury

3:20PM  25  until it's been fully authenticated.

Kasprzyk - Recross - Singer

3:20PM   1    **MR. TRIPI:**  Understood.

         2    **THE COURT:**  Mr. Singer, anything more?

         3    **RECROSS-EXAMINATION BY MR. SINGER:**

         4    **Q**    Mr. Kasprzyk, you testified about Government

3:20PM   5    Exhibit 30A, right?

         6    A    30A is which exhibit, sir?

         7    **Q**    Certainly.

         8    **MR. SINGER:**  Ms. Champoux, if you could just put that

         9    back up on the screen, this document?

3:20PM   10   A    Yes, sir, thank you.

         11   **Q**    It's the DEA-6, correct?

         12   A    Yes, sir.

         13   **Q**    And you testified that your information on this was

         14   limited to what's provided in the document?

3:20PM   15   A    Correct.

         16   **Q**    But that's not accurate, right?

         17   A    What's provided in the document and what

         18   conversations I had with Joseph Bongiovanni.

         19   **Q**    That's what I'm getting at.

3:21PM   20   A    Yeah.

         21   **Q**    Besides reading this document, you also had

         22   conversations with Mr. Bongiovanni about what was going on in

         23   this case, right?

         24   A    Correct.

3:21PM   25   **Q**    You had conversations with SSA Jansewicz, correct?

184

Kasprzyk - Recross - Singer

3:21PM   1        A    Yes, sir.

         2        Q    So what you said there on redirect was not a

         3    hundred percent correct, correct?

         4        A    You're going to have to repeat your question, sir.

3:21PM   5        Q    What you said on redirect about "I only know

         6    information based on this document", that's not correct?

         7        **MR. TRIPI:**  Objection.  The question was relating to

         8    specifically to what was represented of observations of the

         9    document.

3:21PM  10        **THE COURT:**  Overruled.

        11        A    Again, your question?

        12        Q    Again, your information that you got about this

        13    case was not solely limited to this document, right?

        14        A    Correct.

3:21PM  15        Q    Okay.  And the same thing goes for Exhibit 8A-7.

        16        **MR. SINGER:**  Ms. Champoux, can you put this one down and

        17    put that up on the screen again.

        18        Q    So, similar to you testified on redirect you only

        19    knew what was information based on this one operations plan,

3:22PM  20    correct?

        21        A    Correct.

        22        Q    But that's not a hundred percent true, as well,

        23    correct?

        24        A    The information that I know about this case came

3:22PM  25    from the operational plan that was presented to me by GS John

Kasprzyk - Recross - Singer

3:22PM    1    Flickinger.

2         **Q**    Exactly.  So that's what I'm getting at.

3              In addition to this operation plan and rating, you

4         also had a sitdown with GS Flickinger, right?

3:22PM    5         **A**    Correct.

6         **Q**    That's something you do on all operations, correct,

7         in the office, right?

8         **A**    Yes.

9         **Q**    And something that the GS did, right?

3:22PM   10         **A**    Yes, sir.

11         **Q**    That conversation I realize was too long ago to

12        remember the details but you would at least follow the

13        procedure of GS Flickinger telling you why this operation

14        should move forward, right?

3:22PM   15         **A**    Yes, sir.

16         **Q**    And so that's another piece of information that you

17        have when making a decision about what to do here in this

18        situation with the operation, right?

19         **A**    Yes, sir.

3:22PM   20         **Q**    Okay.

21        **MR. SINGER:**  That's all I have, Judge.  Thank you.

22        **THE COURT:**  Anything more?

23        **MR. TRIPI:**  No, your Honor.  Thank you.

24        **THE COURT:**  You can step down.

3:23PM   25         (**WHEREUPON,** witness excused.)

Kasprzyk - Recross - Singer

3:23PM    1

2

3                              *          *          *

4                         CERTIFICATE OF REPORTER

5

6            In accordance with 28, U.S.C., 753(b), I

7    certify that these original notes are a true and correct

8    record of proceedings in the United States District Court

9    of the Western District of New York before the

10   Honorable Lawrence J. Vilardo on August 5, 2024.

11

12

13   S/ Diane S. Martens

14   Diane S. Martens, FCRR, RPR
     Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25