09:09AM

1      **UNITED STATES DISTRICT COURT**
      **WESTERN DISTRICT OF NEW YORK**

2

  _____

3 **UNITED STATES OF AMERICA,**

            Case No. 1:19-cr-227

4      Plaintiff,     1:23-cr-37

  v.            (LJV)

5

  **PETER GERACE, JR.,**    December 17, 2024

6

      Defendant.

7 _____

   **TRANSCRIPT EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 2**

8    **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
      **UNITED STATES DISTRICT JUDGE**

9

 **APPEARANCES:**   **TRINI E. ROSS, UNITED STATES ATTORNEY**

10      **BY: JOSEPH M. TRIPI, ESQ.**
        **NICHOLAS T. COOPER, ESQ.**

11        **CASEY L. CHALBECK, ESQ.**
      Assistant United States Attorneys

12      Federal Centre, 138 Delaware Avenue
      Buffalo, New York 14202

13      For the Plaintiff

14      **THE FOTI LAW FIRM, P.C.**
      **BY: MARK ANDREW FOTI, ESQ.**

15      16 West Main Street, Suite 100
      Rochester, New York 14614

16       And
      **SOEHNLEIN LAW**

17      **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**
      350 Main Street, Suite 2100

18      Buffalo, New York 14202
      For the Defendant

19

 **PRESENT:**    **KAREN A. CHAMPOUX, USA PARALEGAL**

20      **BRIAN A. BURNS, FBI SPECIAL AGENT**
      **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**

21      **OLIVIA A. PROIA, J.D., PARALEGAL**

22 **LAW CLERK:**   **REBECCA FABIAN IZZO, ESQ.**

23 **COURT CLERK:**  **COLLEEN M. DEMMA**

24 **REPORTER:**    **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
      Robert H. Jackson Courthouse

25      2 Niagara Square Buffalo, New York 14202
      Ann_Sawyer@nywd.uscourts.gov

| | | |
|---|---|---|
| 09:23AM | 1 | (Excerpt commenced at 9:23 a.m.) |
| 09:23AM | 2 | (Jury seated at 9:23 a.m.) |
| 09:23AM | 3 | **THE COURT:**  Good morning, everyone. |
| 09:23AM | 4 | **THE JURORS:**  Good morning. |
| 09:23AM | 5 | **THE COURT:**  Welcome back.  The record will reflect |
| 09:23AM | 6 | that all our jurors are present. |
| 09:23AM | 7 | We are going to go until 3:30.  That's the latest |
| 09:23AM | 8 | that you'll be here today.  And then tomorrow, at 9:00 again. |
| 09:24AM | 9 | I remind the witness that he's still under oath. |
| 09:24AM | 10 | And, Mr. Tripi, you may continue. |
| 09:24AM | 11 | **MR. TRIPI:**  Thank you, Your Honor. |
| 09:24AM | 12 | |
| 09:24AM | 13 | **B R I A N   B U R N S,** having been previously duly called and |
| 09:24AM | 14 | sworn, continued to testify as follows: |
| 09:24AM | 15 | |
| 09:24AM | 16 | **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:** |
| 09:24AM | 17 | Q.  Good morning, Special Agent Burns. |
| 09:24AM | 18 | A.  Good morning, Mr. Tripi. |
| 09:24AM | 19 | Q.  We didn't speak last night, correct? |
| 09:24AM | 20 | A.  We did not, it was a quiet night. |
| 09:24AM | 21 | Q.  Okay.  I'll try not to take offense. |
| 09:24AM | 22 | All right.  So, we left off yesterday talking about the |
| 09:24AM | 23 | box with the file folder that was found in Mr. Bongiovanni's |
| 09:24AM | 24 | residence the day of that search.  I want to ask you about |
| 09:24AM | 25 | another document that was contained in that file folder. |

09:24AM  1    Upon your review of that file folder, did you see a

09:24AM  2  Organized Crime Drug Enforcement Administration Task Force

09:24AM  3  report pertaining to a target named Frank Tripi and an

09:24AM  4  operation named Operation Past Due?

09:24AM  5  A.  Yes, I did.

09:25AM  6         MR. TRIPI:  Ms. Champoux, for the witness only, can

09:25AM  7  we show him Government Exhibit 100A.1-2.

09:25AM  8         BY MR. TRIPI:

09:25AM  9  Q.  And I'll hand you up a hard copy just in case it's easier

09:25AM  10  for you to flip through.  Do you recognize that?

09:25AM  11  A.  Yes.

09:25AM  12  Q.  What that?

09:25AM  13  A.  It's an Organized Crime Drug Enforcement Task Force, it's

09:25AM  14  a pack -- it's basically a summary of the case, and they

09:25AM  15  submit it to a committee.  It was in that file in the

09:25AM  16  basement.

09:25AM  17  Q.  Okay.  And I'll get into what OCDETF is more in just a

09:25AM  18  moment --

09:25AM  19  A.  Certainly.

09:25AM  20  Q.  -- but is that a fair and accurate copy of the document

09:25AM  21  that was among the documents in that file folder that was

09:25AM  22  recovered from Mr. Bongiovanni's residence?

09:25AM  23  A.  Yes, it is.

09:25AM  24         MR. TRIPI:  The government offers Exhibit 100A.A-2,

09:26AM  25  Your Honor.

09:26AM  1    **MR. FOTI:**  I renew my relevance objection.

09:26AM  2        **THE COURT:**  Okay.  Other than that, no objection

09:26AM  3  other than that?

09:26AM  4        **MR. FOTI:**  No.

09:26AM  5        **THE COURT:**  Okay.  So it's received over the

09:26AM  6  objection.

09:26AM  7        **(GOV Exhibit 100A.A-2 was received in evidence.)**

09:26AM  8        **MR. TRIPI:**  All right.  Thank you, Your Honor.

09:26AM  9        May we publish that for the jury?

09:26AM  10       **BY MR. TRIPI:**

09:26AM  11  Q.  And then I'll ask just a couple of questions about this

09:26AM  12  document.

09:26AM  13  A.  Certainly.

09:26AM  14  Q.  Just generally, are you familiar with what an Organized

09:26AM  15  Crime Drug Enforcement Task Force investigation initiation

09:26AM  16  form is?

09:26AM  17  A.  Yes.

09:26AM  18  Q.  Can you describe what that is for the jury just in

09:26AM  19  general terms?

09:26AM  20  A.  OCDETF is a program with the Department of Justice on

09:26AM  21  more significant narcotics investigations.

09:26AM  22  Q.  Can I stop you there?  You just said "OCDETF."  Is that

09:26AM  23  an acronym, O-C-D-E-T-F?

09:26AM  24  A.  Yes, it is.  It's a common lingo for that, but Organized

09:26AM  25  Crime Drug Enforcement Task Force.  They're for larger scale

09:26AM  1  investigations.  It's got to be an organization.

09:26AM  2     And you put together a proposal, and you submit it to the

09:26AM  3  local committee, and it also goes down to main justice, the

09:27AM  4  narcotics section.

09:27AM  5     And then if it's approved, there's additional funding and

09:27AM  6  resources that go along with it.  So it's really designed for

09:27AM  7  larger scale investigations that warrant some more resources

09:27AM  8  and attention.

09:27AM  9  Q.  And is this a draft of that document that was found in

09:27AM 10  Mr. Bongiovanni's residence?

09:27AM 11  A.  Yes, it is.

09:27AM 12  Q.  And do you understand that to be a draft because there

09:27AM 13  are some blanks in the OCDETF investigation number in the

09:27AM 14  upper right-hand corner that I've circled on the screen?

09:27AM 15  A.  Correct.  I think that's -- there's also a signature page

09:27AM 16  that wasn't signed.

09:27AM 17  Q.  Okay.  And in terms of how OCDETF, Organized Crime Drug

09:27AM 18  Enforcement Task Force, case gets initiated, is the agent

09:27AM 19  required -- the case agent required to fill out a document

09:27AM 20  like this, provide information, and explain the general

09:27AM 21  parameters of the investigation and what's expected?

09:28AM 22  A.  Yeah, it's usually done by the case agent and then in

09:28AM 23  concert with who's ever -- what other agents or task force

09:28AM 24  officers are assisting him or her, as well as looping in the

09:28AM 25  U.S. Att -- or, the Assistant United States Attorney that's

09:28AM    1    working on that matter.  So it's usually collaborative

09:28AM    2    effort.

09:28AM    3    Q.  Okay.  On the front page here, you see it says

09:28AM    4    law-enforcement sensitive?

09:28AM    5    A.  That's correct.

09:28AM    6    Q.  What does that mean?

09:28AM    7    A.  That means it should not be disseminated outside of the

09:28AM    8    law enforcement -- these are extremely sensitive documents in

09:28AM    9    that they're targets of investigations, sometimes they

09:28AM   10    reference sources, informants, so it's a very -- it's a

09:28AM   11    law-enforcement sensitive document.

09:28AM   12    Q.  Is that the type of document that a retired agent is

09:28AM   13    permitted to bring home?

09:28AM   14    A.  No, never.

09:28AM   15    Q.  Is it the type of document that an agent is permitted

09:28AM   16    to bring to their house at all?

09:28AM   17    A.  Maybe if you wanted to leave it locked in your car if for

09:28AM   18    some reason you're weren't going back in your office, but you

09:28AM   19    should not maintain that in your house or anywhere other

09:28AM   20    individuals can have access to it.

09:29AM   21    Q.  Okay.  Looking on the first page of this, do you see the

09:29AM   22    operation name?

09:29AM   23    A.  The operation, every OCDETF proposal has to have a name,

09:29AM   24    an operation name.  So this one's Operation Past Due.

09:29AM   25    Q.  And does the front page of that document have who the

09:29AM  1  case attorney was at the U.S. Attorney's Office, as well as

09:29AM  2  the case agents?

09:29AM  3  A.  Yes, it does.

09:29AM  4  Q.  Is Mr. Bongiovanni one of the case agents at all?

09:29AM  5  A.  No, he's not.

09:29AM  6  Q.  Okay.

09:29AM  7       MR. TRIPI:  And can we go to the next page on the

09:29AM  8  screen, Ms. Champoux.

09:29AM  9       BY MR. TRIPI:

09:29AM  10  Q.  Okay.  This second page here, does this list identify a

09:29AM  11  list of targets for this operation that the case agent was

09:29AM  12  contemplating?

09:29AM  13  A.  Yeah.  At the initiation form, you want to put in your

09:29AM  14  major targets of the investigation.

09:29AM  15  Q.  And generally are they sort of ranked in order?

09:29AM  16  A.  Usually, I mean, that's how -- I've done a few of these,

09:29AM  17  and that's how I prepare them.  But generally I would say

09:29AM  18  that's the common practice.

09:29AM  19  Q.  And who was the sort of number 1 target listed here?

09:30AM  20  A.  It's Frank Tripi.

09:30AM  21  Q.  And it lists ten other targets in addition to him?

09:30AM  22  A.  That's correct.

09:30AM  23       MR. TRIPI:  Okay.  Let's go to the next page,

09:30AM  24  Ms. Champoux.

       25

09:30AM    1          **BY MR. TRIPI:**

09:30AM    2    Q.  And is every page of this document labeled

09:30AM    3    law-enforcement sensitive?

09:30AM    4    A.  Yes, at the top and bottom.

09:30AM    5    Q.  Generally, does it -- this page 3, just generally does it

09:30AM    6    indicate the different police or law enforcement agencies

09:30AM    7    that will participating in the investigation?

09:30AM    8    A.  Yes.  Along with their case numbers.

09:30AM    9    Q.  Okay.  And here it has indications for ATF, DEA, IRS,

09:30AM   10    state and local investigators, and the Niagara -- which is

09:30AM   11    Niagara Falls Police Department?

09:30AM   12    A.  Yeah, Chris Clark, was the Niagara Falls Police

09:30AM   13    Department TFO assigned to DEA.

09:30AM   14    Q.  And if we go back to the front page, Chris Clark was the

09:30AM   15    case agent on this?

09:30AM   16    A.  That's correct.

09:30AM   17    Q.  All right.

09:30AM   18          **MR. TRIPI:**  Let's go to page 4.  Generally, I want

09:31AM   19    to --

09:31AM   20          **BY MR. TRIPI:**

09:31AM   21    Q.  Does this indicate that the investigation involves

09:31AM   22    cocaine, crack cocaine, and marijuana in terms of controlled

09:31AM   23    substances?

09:31AM   24    A.  Cocaine, I see cocaine and heroin.

09:31AM   25    Q.  I misread the boxes.  Cocaine, heroin, marijuana, and

09:31AM    1    then other prescription down at the bottom?

09:31AM    2    A.  Yes, it does.

09:31AM    3    Q.  Does it indicate there also may be some money-laundering

09:31AM    4    methods used?

09:31AM    5    A.  Yes, some bulk cash movement and wire transfers, business

09:31AM    6    fronts.

09:31AM    7    Q.  Does it indicate the different districts and states and

09:31AM    8    countries that may be impacted by this investigation?

09:31AM    9    A.  Yes.  Towards the middle of the form, it has Canada,

09:31AM   10    Nevada, and then Northern District of California.

09:31AM   11           **MR. TRIPI:**  Let's go to the next page, Ms. Champoux.

09:31AM   12    We can go past this to the next page.  And we'll advance to

09:32AM   13    the next page.  Let's go to page 8.

09:32AM   14           **BY MR. TRIPI:**

09:32AM   15    Q.  All right.  At the very top of page 8 of this exhibit, is

09:32AM   16    it labeled DEA sensitive?

09:32AM   17    A.  Yes, it is.

09:32AM   18    Q.  And generally, does this portion of the document

09:32AM   19    beginning at page 8 outline the details of the investigation

09:32AM   20    that had transpired, and intelligence that had been gathered

09:32AM   21    up to the date where Agent Clark prepared this initiation

09:32AM   22    form?

09:32AM   23    A.  Yeah.  It's standard.  You want to justify it to the

09:32AM   24    committee or the panel why this warrants an OCDETF

09:32AM   25    designation.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

10

| | | |
|---|---|---|
| 09:32AM | 1 | Q.  So this outlines the investigation? |
| 09:32AM | 2 | A.  Correct. |
| 09:32AM | 3 | Q.  That was done up to that date? |
| 09:32AM | 4 | A.  Correct. |
| 09:32AM | 5 | Q.  All right.  And just generally, the document indicates |
| 09:32AM | 6 | there was investigation in 2013; is that about right? |
| 09:33AM | 7 | A.  Yes, it does. |
| 09:33AM | 8 | Q.  Okay. |
| 09:33AM | 9 | **MR. TRIPI:**  Can we go on to the next page, |
| 09:33AM | 10 | Ms. Champoux? |
| 09:33AM | 11 | **BY MR. TRIPI:** |
| 09:33AM | 12 | Q.  I'm just going to leave it up there for a moment. |
| 09:33AM | 13 | Was part of the focus of the investigation as documented |
| 09:33AM | 14 | in the report surrounding Frank Tripi and a collection agency |
| 09:33AM | 15 | called Direct Mediators? |
| 09:33AM | 16 | A.  Yes, located on Pine Avenue in Niagara Falls. |
| 09:33AM | 17 | **MR. TRIPI:**  Okay.  Go to the next page, Ms. Champoux. |
| 09:33AM | 18 | **BY MR. TRIPI:** |
| 09:33AM | 19 | Q.  And again, the rest of this form, does it basically |
| 09:33AM | 20 | describe some of the parameters of the investigation and the |
| 09:34AM | 21 | investigative techniques and goals? |
| 09:34AM | 22 | A.  Yes, as well as the resources that the -- that they're |
| 09:34AM | 23 | gonna commit to it. |
| 09:34AM | 24 | Q.  Can you just read under investigative techniques and |
| 09:34AM | 25 | goals, just under B-1 there, just that first sentence. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

11

09:34AM   1   A.   The overall goals of this investigation are to identify

09:34AM   2   the totality of this drug-trafficking organization, DTO,

09:34AM   3   including but not limited to the command and control

09:34AM   4   elements, smuggling routes, and methods, distribution

09:34AM   5   networks, methods utilized to avoid apprehension by law

09:34AM   6   enforcement, and money-laundering methods.  Upon

09:34AM   7   identification of these elements, it is the intention of the

09:34AM   8   investigating agents to disrupt and dismantle all identified

09:34AM   9   elements of this conspiracy.

09:34AM  10   Q.   All right.  So read on to the next page.

09:34AM  11   A.   Oh, I'm sorry.

09:34AM  12   Q.   That's okay.

09:34AM  13   A.   I wasn't sure.

09:34AM  14   Q.   All right.  Now, you've been in this law enforcement

09:35AM  15   community for -- in the Buffalo area since, I think you said,

09:35AM  16   2008, 2009?

09:35AM  17   A.   A long time.

09:35AM  18   Q.   In terms of reputation in the law enforcement community,

09:35AM  19   does Frank Tripi, the main target of this investigation, have

09:35AM  20   a reputation?

09:35AM  21   A.   Yes, he does.

09:35AM  22   Q.   In your experience, is his reputation one of being an

09:35AM  23   associate or potential associate of Italian Organized Crime

09:35AM  24   in this area?

09:35AM  25   A.   Yes, he is.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

| | | |
|---|---|---|
| 09:35AM | 1 | **MR. FOTI:**  Objection. |
| 09:35AM | 2 | **THE COURT:**  I'm sorry? |
| 09:35AM | 3 | **MR. FOTI:**  Objection. |
| 09:35AM | 4 | **THE COURT:**  Basis? |
| 09:35AM | 5 | **MR. FOTI:**  Judge, hearsay, 602, relevance. |
| 09:35AM | 6 | **THE COURT:**  Overruled. |
| 09:35AM | 7 | **MR. TRIPI:**  Ms. Champoux, we can take that down. |
| 09:35AM | 8 | Now, I'd like to pull back up Government |
| 09:35AM | 9 | Exhibit 310AT, Ms. Champoux.  And we can just briefly look at |
| 09:35AM | 10 | record 48 within that document. |
| 09:36AM | 11 | **BY MR. TRIPI:** |
| 09:36AM | 12 | Q.  Now 310AT is the contacts, some of the contacts that were |
| 09:36AM | 13 | in Mr. -- the defendant's phone, correct? |
| 09:36AM | 14 | A.  That's correct. |
| 09:36AM | 15 | Q.  Is there an entry for -- for Frank Tripi? |
| 09:36AM | 16 | A.  Yes, there is. |
| 09:36AM | 17 | Q.  Do you see that phone number associated with him? |
| 09:36AM | 18 | A.  Yes, I do. |
| 09:36AM | 19 | Q.  Now, Exhibit Number 358 was Mr. Bongiovanni's phone |
| 09:36AM | 20 | records, correct? |
| 09:36AM | 21 | A.  That's correct. |
| 09:36AM | 22 | Q.  Have you reviewed those phone records? |
| 09:36AM | 23 | A.  Yes, I have. |
| 09:36AM | 24 | Q.  In Mr. Bongiovanni's phone records, Exhibit 358 I believe |
| 09:36AM | 25 | it is, did you see contact with this phone number for Frank |

| | | |
|---|---|---|
| 09:36AM | 1 | Tripi in the year of 2018? |
| 09:36AM | 2 | A.  Yes, I believe it was October of 2018. |
| 09:36AM | 3 | Q.  And Mr. Bongiovanni was not part of any investigation of |
| 09:37AM | 4 | Frank Tripi, you had the agents listed on the report we just |
| 09:37AM | 5 | read, correct? |
| 09:37AM | 6 | A.  That's correct. |
| 09:37AM | 7 | **MR. TRIPI:**  We can take that down, Ms. Champoux. |
| 09:37AM | 8 | **BY MR. TRIPI:** |
| 09:37AM | 9 | Q.  In terms of the timeline on October 31st, 2019, was |
| 09:37AM | 10 | Mr. Bongiovanni charged by indictment? |
| 09:37AM | 11 | A.  Yes, he was. |
| 09:37AM | 12 | Q.  In that initial indictment, was it unsealed within or |
| 09:37AM | 13 | made public within a couple of days after that? |
| 09:37AM | 14 | A.  Into November, early November. |
| 09:37AM | 15 | Q.  In that initial document, was this defendant referenced |
| 09:37AM | 16 | as Coconspirator 1? |
| 09:37AM | 17 | A.  Yes, he was. |
| 09:37AM | 18 | Q.  Was a gentleman's club referenced in that document? |
| 09:37AM | 19 | A.  Not Pharaoh's itself, but a gentleman's club. |
| 09:37AM | 20 | Q.  At that time, was there media attention surrounding the |
| 09:37AM | 21 | Bongiovanni indictment? |
| 09:37AM | 22 | A.  Pretty significant media attention. |
| 09:37AM | 23 | Q.  Okay.  And so that was about a month and a half before a |
| 09:37AM | 24 | search warrant was executed at Pharaoh's and this defendant's |
| 09:37AM | 25 | residence; is that right? |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

14

| 09:37AM | 1 | A.  That's correct. |
|---|---|---|
| 09:38AM | 2 | Q.  Were those search warrants executed, federal search |
| 09:38AM | 3 | warrants, on December 12th, 2019? |
| 09:38AM | 4 | A.  They were. |
| 09:38AM | 5 | Q.  Were you present for the execution of a federal search |
| 09:38AM | 6 | warrant that day at Pharaoh's Gentlemen's Club -- "that day" |
| 09:38AM | 7 | meaning December 12th, 2019, located at 999 Aero Drive in |
| 09:38AM | 8 | Cheektowaga, New York? |
| 09:38AM | 9 | A.  Yes, I was present for that search warrant. |
| 09:38AM | 10 | Q.  Is that a commercial establishment with a large a bar? |
| 09:38AM | 11 | A.  Yeah, it's Pharaoh's Gentlemen's Club. |
| 09:38AM | 12 | Q.  Based on your investigation and your participation in it, |
| 09:38AM | 13 | is that an establishment that advertises on Facebook and |
| 09:38AM | 14 | other parts of the internet? |
| 09:38AM | 15 | A.  Yes, and the radio as well. |
| 09:38AM | 16 | Q.  Does it have a website promoting its bar, food, and |
| 09:38AM | 17 | gentlemen's club business? |
| 09:38AM | 18 | A.  It does. |
| 09:38AM | 19 | Q.  And you indicated they also advertise on the radio? |
| 09:38AM | 20 | A.  Yes, I've heard their advertisements on 97 Rock. |
| 09:38AM | 21 | Q.  How close is that to the airport? |
| 09:38AM | 22 | A.  Oh, a mile or two, very close. |
| 09:39AM | 23 | Q.  That same day, was there a search at the defendant's |
| 09:39AM | 24 | residence, we've seen the photo a few times, on Luxor Lane? |
| 09:39AM | 25 | A.  Yeah, the search warrants were executed simultaneously. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

15

09:39AM     1   Q.   And what does that mean?

09:39AM     2   A.   When you're doing an operation with multiple search

09:39AM     3   warrants, it's advantageous to execute them at the same time

09:39AM     4   because obviously if you hit one place, you know, that person

09:39AM     5   usually calls the other one, and a lot of times you can lose

09:39AM     6   evidence and things like that.  So it's pretty routine that

09:39AM     7   you would want to execute multiple warrants at the same time

09:39AM     8   with different teams.

09:39AM     9   Q.   In terms of the division of labor of the case agents who

09:39AM    10   were on the case by that point, was HSI Special Agent Curtis

09:39AM    11   Ryan sort of the lead over at the defendant's residence

09:39AM    12   search?

09:39AM    13   A.   Yes.  There was some agents, or at least one agent as

09:39AM    14   well.

09:39AM    15   Q.   And were you and Special Agent Halliday over at the

09:39AM    16   location at Pharaoh's Gentlemen's Club?

09:39AM    17   A.   With a number of other law enforcement personnel.

09:39AM    18   Q.   Was the defendant at either location?

09:40AM    19   A.   He was not.

09:40AM    20   Q.   At Pharaoh's, did you have an opportunity to walk around

09:40AM    21   the premises?

09:40AM    22   A.   Yes.  I went mostly on the first floor.

09:40AM    23   Q.   You did a walk-through?

09:40AM    24   A.   Yes.  Not searching.

09:40AM    25   Q.   Did you conduct an interview of John Ermin, who I think

09:40AM     1   we've heard his nickname is Tommy O, that day?

09:40AM     2   A.  Yes, I did.

09:40AM     3   Q.  Is he a member of the Outlaws Motorcycle Club?

09:40AM     4   A.  He is.

09:40AM     5   Q.  Was this search roughly almost -- almost a year after the

09:40AM     6   January 2019 search that HSI had executed at Anthony Gerace's

09:40AM     7   house in Clarence, New York?

09:40AM     8   A.  Yeah, about 11 months.

09:40AM     9   Q.  Independently, did Anthony Gerace's case in January of

09:40AM    10   2019 receive some media attention?

09:41AM    11   A.  It did.

09:41AM    12   Q.  Getting back to the search warrant at Pharaoh's,

09:41AM    13   December 12th, 2019, are you aware of whether there was a

09:41AM    14   camera system and whether DVRs were recovered during the

09:41AM    15   search?

09:41AM    16   A.  Oh, yes.  There were three DVRs recovered during that

09:41AM    17   search.  I didn't personally seize them, but they were

09:41AM    18   recovered, I'm familiar with them.

09:41AM    19   Q.  You've reviewed the evidence in the case?

09:41AM    20   A.  Evidence, yes.

09:41AM    21   Q.  You've reviewed the photos of the search?

09:41AM    22   A.  Absolutely.

09:41AM    23   Q.  You know how many DVRs were seized that day?

09:41AM    24   A.  Yes.

09:41AM    25   Q.  You were present while those things were happening?

09:41AM  1    A.  Yes, I was.

09:41AM  2    Q.  Okay.  Were those three DVRs reviewed by members of the

09:41AM  3    investigative team working with you?

09:41AM  4    A.  Yes, they were.

09:41AM  5    Q.  Are you aware of how long did those three DVR store

09:41AM  6    footage for?

09:41AM  7    A.  Two of the DVRs, I had an understanding that the DVRs had

09:41AM  8    multiple cameras attached to them.  Two of the DVRs

09:41AM  9    maintained footage for two weeks, and then one DVR maintained

09:42AM  10   footage for about seven weeks.

09:42AM  11   Q.  Okay.  So that would be two weeks operating backwards

09:42AM  12   from December 19th -- or, excuse me, December 12th, 2019,

09:42AM  13   correct?

09:42AM  14   A.  That's correct.

09:42AM  15   Q.  For two of the DVRs?

09:42AM  16   A.  Yes.

09:42AM  17   Q.  And then seven weeks for the other?

09:42AM  18   A.  Yeah, six and a half to seven, I believe it was.

09:42AM  19   Q.  So essentially two DVRs had footage going back to late

09:42AM  20   November, and another DVR had footage going back to maybe the

09:42AM  21   end of October?

09:42AM  22   A.  Approximately.

09:42AM  23   Q.  So, those DVRs did not contain any footage from 2013

09:42AM  24   through 2018; is that right?

09:42AM  25   A.  They did not.

09:42AM   1   Q.   And they didn't contain any footage from even September

09:42AM   2   2019; is that right?

09:42AM   3   A.   That's correct.

09:42AM   4   Q.   I want to talk to you a little bit about the

09:42AM   5   investigation itself.  As the investigation progressed, were

09:43AM   6   you and others, beginning in sort of the summer of 2020,

09:43AM   7   trying to locate and interview women who had worked at

09:43AM   8   Pharaoh's?

09:43AM   9   A.   Yes.  We had a number of agents running down different

09:43AM  10   leads trying to identify and interview leads.

09:43AM  11   Q.   For example, is that the same summer that individuals

09:43AM  12   that were helping you on the case, Task Force Officers

09:43AM  13   Geraldo Rondon and Angel Benitos-Santos went to Pennsylvania

09:43AM  14   and found L.L.?

09:43AM  15   A.   Yes.  They were part of different teams going out

09:43AM  16   attempting to locate the dancers and interviewing them.

09:43AM  17   Q.   Did a number of the dancers that you and others located

09:43AM  18   testify at this trial?

09:43AM  19   A.   Yes.

09:43AM  20   Q.   Did the process of trying to identify and locate dancers

09:43AM  21   continue essentially right up until the trial?

09:43AM  22   A.   Absolutely.

09:43AM  23   Q.   Were there challenges associated with dancer names or

09:43AM  24   stage names?

09:43AM  25   A.   Yeah.  It was -- it was difficult because a lot of times

09:44AM   1    we would only get the stage name and not the actual

09:44AM   2    individual's true name.  Some of them were transient, it was

09:44AM   3    hard to find them.  A lot of them didn't have stable housing.

09:44AM   4    Some had left the state.  So there was a lot of those sort of

09:44AM   5    challenges in locating these dancers.  And a lot of them

09:44AM   6    didn't really want to be found.

09:44AM   7    Q.  At times, did some dancers share stage names?  In other

09:44AM   8    words, were there multiple Barbies, for example?

09:44AM   9    A.  Yes, I think there were three or four Barbies, and there

09:44AM  10    was a lot of -- a lot of overlap with some of the names, and

09:44AM  11    trying to figure out who was who was not always easy.

09:44AM  12    Q.  I -- I you think you mentioned, but were some of the

09:44AM  13    dancers from even other states?

09:44AM  14    A.  Yes, other states.

09:44AM  15    Q.  Now, since the investigation commenced, have other

09:44AM  16    witnesses or individuals connected to the investigation in

09:45AM  17    some way become unavailable along the way?

09:45AM  18    A.  Yes, a number of them.

09:45AM  19    Q.  For example, the jury has heard about and seen a photo of

09:45AM  20    Wayne van Vleet.  Is he currently deceased?

09:45AM  21    A.  Yes, he's deceased as of October this year.

09:45AM  22    Q.  Was he interviewed prior to being deceased?

09:45AM  23    A.  Multiple times.

09:45AM  24         **MR. FOTI:**  Objection.

09:45AM  25         **THE COURT:**  I'm sorry?

| | | |
|---|---|---|
| 09:45AM | 1 | **MR. FOTI:** Objection. |
| 09:45AM | 2 | **THE COURT:** Was he interviewed? |
| 09:45AM | 3 | **MR. FOTI:** I'll withdraw the objection to that |
| 09:45AM | 4 | specific question. |
| 09:45AM | 5 | **MR. TRIPI:** That's as far as I'm going, Judge. |
| 09:45AM | 6 | **THE COURT:** Pardon me? |
| 09:45AM | 7 | **MR. TRIPI:** That's as far as I'm going. |
| 09:45AM | 8 | **THE COURT:** Yeah. |
| 09:45AM | 9 | **BY MR. TRIPI:** |
| 09:45AM | 10 | Q. Is Crystal Quinn deceased? |
| 09:45AM | 11 | A. Yes, she is. |
| 09:45AM | 12 | Q. And the jury may have heard her name in connection with |
| 09:45AM | 13 | sending some of those messages to P.H.? |
| 09:45AM | 14 | A. The ones from November of -- |
| 09:45AM | 15 | Q. On Facebook, right? |
| 09:45AM | 16 | A. That's correct. |
| 09:45AM | 17 | Q. Is she currently deceased? |
| 09:45AM | 18 | A. Yes, she is. She passed away in -- |
| 09:45AM | 19 | Q. Was she -- |
| 09:45AM | 20 | A. -- fall -- I'm sorry. |
| 09:45AM | 21 | Q. -- was she interviewed prior to being deceased? |
| 09:45AM | 22 | A. Yes, she was. Multiple times. |
| 09:45AM | 23 | Q. The jury's heard about New York State Supreme Court Judge |
| 09:45AM | 24 | John Michalski. Is he currently deceased? |
| 09:46AM | 25 | A. Yes, he is. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

09:46AM  1  Q.  Did the FBI attempt to interview him prior to his being

09:46AM  2  deceased?

09:46AM  3  A.  Yes, we did.

09:46AM  4  Q.  Did the FBI execute a search warrant at his residence?

09:46AM  5  A.  Yes, we did.

09:46AM  6  Q.  In terms of you've heard some cross-examination as the

09:46AM  7  jury sat through the trial, and you sat at the back table,

09:46AM  8  you've heard some cross-examination of several witnesses

09:46AM  9  about expenses for various things, the housing and

09:46AM  10  transportation that the FBI paid for; do you recall that --

09:46AM  11  A.  Yes, I do.

09:46AM  12  Q.  -- as you sat here?

09:46AM  13       I want to talk a little bit about L.L. for a moment.

09:46AM  14  A.  Certainly.

09:46AM  15  Q.  Okay?  And then I'll go to a couple others.

09:46AM  16  A.  Okay.

09:46AM  17  Q.  Give me one second.  Obviously, the jury saw Ms. L.L.

09:46AM  18  testify as recently as yesterday.  After she testified in the

09:47AM  19  grand jury in July of 2020, was her identity kept secure?

09:47AM  20  A.  Yes, it was.

09:47AM  21  Q.  At that point in time in her life, was she residing on

09:47AM  22  her own approximately three hours away round trip from this

09:47AM  23  courthouse?

09:47AM  24  A.  Yes, she was.

09:47AM  25  Q.  Fast forwarding, as trial approached in the year of 2023,

09:47AM 1   did she have issues with transportation?

09:47AM 2   A.  Yes.  We had -- she didn't have a -- we had to transport

09:47AM 3   her from where she was residing.

09:47AM 4   Q.  Did that involve agents driving three hours round trip?

09:47AM 5   A.  On some occasions.  She did have a vehicle for a period

09:47AM 6   of time.

09:47AM 7   Q.  Did she also have issues living in proximity to a drug

09:47AM 8   dealer in the town she was living in?

09:47AM 9   A.  Yes.

09:47AM 10  Q.  In your mind as the case agent, did that create a safety

09:47AM 11  issue for her?

09:47AM 12  A.  A safety issue and abuse issue, obviously.

09:47AM 13  Q.  I guess I was lumping drug abuse into the safety issue.

09:48AM 14  A.  Fair enough.

09:48AM 15  Q.  Okay.  As trial approached in the year of 2023, did she

09:48AM 16  become nervous consistent with sort of her original

09:48AM 17  indications when she was first interviewed?

09:48AM 18  A.  Yes.  We were prepared to have a trial, and at that point

09:48AM 19  she -- we -- we obviously explained to her along the way that

09:48AM 20  until there's a trial, no one really knows who you are.  But

09:48AM 21  when there's trial, you're going to be in court and you're

09:48AM 22  gonna be known, and it's gonna be public, your assistance.

09:48AM 23  Q.  And we've heard a little bit about why, but from your

09:48AM 24  perspective as the case agent, why did the FBI assist her

09:48AM 25  with housing?  Can you just explain it for the jury?

09:48AM 1    A.  Well, I mean, we needed to have her available.

09:48AM 2    Obviously, the fact that she came up here, did the trial

09:48AM 3    prep, relapsed, we had to find her, as she testified to, in a

09:49AM 4    drug house.

09:49AM 5        We were concerned that we would need her for the trial,

09:49AM 6    which was scheduled in proximity to when she came up here.

09:49AM 7    So we decided that the safest course of action would be to

09:49AM 8    put her up in a hotel pending this first -- that trial date.

09:49AM 9    Q.  And then did factors related to adjournments of the trial

09:49AM 10   cause that situation to extend?

09:49AM 11   A.  Extend, yeah, for a long time.

09:49AM 12   Q.  Did she also make efforts on her own to obtain her own

09:49AM 13   housing?

09:49AM 14   A.  Yes.

09:49AM 15   Q.  Was she making efforts?

09:49AM 16   A.  Yeah, she was.  I mean, we started with a hotel room for

09:49AM 17   ten days.  And then looking at it, a hotel room is about 110

09:49AM 18   bucks with taxes and all that.  So for ten days, you're up to

09:49AM 19   1,500 bucks.

09:49AM 20       We determined, when it started getting into months, that

09:49AM 21   it would be more -- financially made more financial sense to

09:49AM 22   secure, like, a monthly rental.  Because I think you can get

09:49AM 23   that for like -- we got that for, like 1,300 or 1400.

09:49AM 24       And then we were also able to then work with the property

09:50AM 25   manager that we vetted and felt comfortable with that it was

USA v Gerace - Burns - Tripi/Direct - 12/17/24

24

```
09:50AM    1    a safe location.
09:50AM    2        And then ultimately during that process, she's taking
09:50AM    3    efforts with Section 8 and DSS, and she was ultimately able
09:50AM    4    to secure her own funding or her own Section 8 voucher for
09:50AM    5    housing independent of us.
09:50AM    6    Q.  Okay.  I'd like to move on next to maybe K.L.  We've
09:50AM    7    heard some testimony about the FBI making payments for, I
09:50AM    8    think, hotel room and rent regarding Ms. K.L.; do you recall
09:50AM    9    that?
09:50AM   10    A.  Yes, I do.
09:50AM   11    Q.  Again, was she originally scheduled to potentially
09:50AM   12    testify in 2023?
09:50AM   13    A.  Yes, she was.
09:50AM   14    Q.  And, obviously, your answers with respect to the delays
09:50AM   15    are similar to Ms. L.L., correct?
09:50AM   16    A.  Correct.
09:50AM   17    Q.  Did -- did -- did the FBI assess and determine that
09:50AM   18    Ms. K.L. needed a safe place to stay?
09:50AM   19    A.  Yeah.  Safe, and again, availability a big part of it.
09:51AM   20    We need witnesses here on the days that they're supposed to
09:51AM   21    be here.  So having them in a safe location where you can get
09:51AM   22    them to court is really important for moving the trial along
09:51AM   23    and not missing any witness testimony.
09:51AM   24    Q.  And just a "yes" or "no."  Did Ms. K.L. express
09:51AM   25    reservations and safety concerns along the way?
```

USA v Gerace - Burns - Tripi/Direct - 12/17/24

25

09:51AM    1    A.  Yes, a number of times.

09:51AM    2    Q.  Did that factor into your assessment as to whether to

09:51AM    3    assist with --

09:51AM    4    A.  Absolutely.

09:51AM    5    Q.  -- her?  Were payments handled by the FBI?

09:51AM    6    A.  Yes.  We didn't put money into her hands.  We booked the

09:51AM    7    hotel room for her.

09:51AM    8    Q.  And could you explain in just a couple short sentences, I

09:51AM    9    guess, why you made the decision you did to pay for housing

09:51AM    10    for Ms. K.L.?

09:51AM    11    A.  Again, as I referenced, availability, the need to know

09:51AM    12    where they are, trying to find a witness who maybe doesn't --

09:51AM    13    is apprehensive about testifying, worried about their safety.

09:52AM    14    They go to friends' houses, they go to -- sometimes it takes

09:52AM    15    tremendous efforts to find these witnesses.  So to have

09:52AM    16    them -- and you're always worried about their safety, as

09:52AM    17    well.  So to have a secure location where you know they're

09:52AM    18    gonna be is, I feel, money well spent to secure their

09:52AM    19    testimony.

09:52AM    20    Q.  And you have to get these things approved as well,

09:52AM    21    correct?

09:52AM    22    A.  Yeah, this is not my --

09:52AM    23    Q.  This is not coming out of Brian Burns' pocket?

09:52AM    24    A.  No, not at all.  They -- there's a number of levels of

09:52AM    25    approvals and -- I may suggest it, but it goes to my

09:52AM   1   supervisor, the ASAC is number two in charge, and then the

09:52AM   2   FBI headquarters actually has to agree as well, and they fund

09:52AM   3   the -- they put the money into the Buffalo office funds for

09:52AM   4   witness protection type expenses.

09:52AM   5   Q.   Now I'd like to move on to P.H.

09:52AM   6   A.   Certainly.

09:52AM   7   Q.   Now, there are certain charges that the jury will be

09:52AM   8   asked to decide in this case about threats pertaining to

09:53AM   9   Ms. P.H.; is that right?

09:53AM  10   A.   That's correct.

09:53AM  11   Q.   Did you also have information regarding the event in the

09:53AM  12   bar where Jessica Leyland headlocked her?

09:53AM  13   A.   Yes, we investigated that.

09:53AM  14   Q.   The combination of those things and other factors, did

09:53AM  15   you assess that she needed to be housed in a safe location?

09:53AM  16   A.   We were very concerned about her safety based on those

09:53AM  17   events and other people that had been in her life.

09:53AM  18   Q.   And so describe the expenses and the reasons for the

09:53AM  19   expenses pertaining to Ms. P.H., just sort of at a

09:53AM  20   30,000-foot level?

09:53AM  21   A.   Yeah, I mean, we obviously arrested her on the

09:53AM  22   misdemeanor drug charge.  She was in an inpatient facility

09:53AM  23   for a period of time.  Then she segued to an outpatient --

09:53AM  24   or, I think it's inpatient extended, I forget what they call

09:53AM  25   that.  And then ultimately it got to the point where that

USA v Gerace - Burns - Tripi/Direct - 12/17/24

09:53AM   1   facility said she was ready, and we had to make a

09:53AM   2   determination.

09:53AM   3       Again the trials were being continued.  So I think it was

09:54AM   4   January, we made the determination the best bet was to put

09:54AM   5   her in a very modest apartment and fund that.  And, in fact,

09:54AM   6   her landlord didn't even know about her affiliation with us.

09:54AM   7   And we did that for a number of months until she relapsed,

09:54AM   8   and we determined that she stole the money, and we arrested

09:54AM   9   her again.

09:54AM  10   Q.  I want to go back.  You mentioned that you charged her

09:54AM  11   with a misdemeanor drug charge.  Typically, is the FBI

09:54AM  12   involved in arresting drug users?

09:54AM  13   A.  No.  I don't think I've ever done a misdemeanor drug

09:54AM  14   charge in my career.

09:54AM  15   Q.  What was -- what was the purpose behind charging Ms. P.H.

09:54AM  16   with a misdemeanor drug charge at that time?

09:54AM  17   A.  So we had, you know, interacted with her earlier in the

09:54AM  18   investigation.  And then she was in a, kind of, a spiral

09:54AM  19   down.  And she kept committing --

09:54AM  20   Q.  Let me stop you there.

09:54AM  21       When you first became aware of Ms. P.H., how was her

09:54AM  22   health compared to what you're describing as a spiral?

09:54AM  23   A.  Oh, it was dramatically worse over the years of substance

09:55AM  24   abuse, and arrests, and what I would consider kind of --

09:55AM  25   people that are addicts, the kind of charges they pick up.

09:55AM    1    They're often caught riding in a car with drug dealers, have

09:55AM    2    paraphernalia, commit larcenies to fuel their drug crimes.

09:55AM    3        So Ms. P.H. had a series of these arrests, and we would

09:55AM    4    try to either get in front of her -- or, we'd get in front of

09:55AM    5    her at the time of the arrest.  A lot of times we weren't

09:55AM    6    able to do that.

09:55AM    7        Or in the way the bail system works, she was able to get

09:55AM    8    bail, so she would essentially just stop showing up for her

09:55AM    9    next court appearances.  So we'd go to the court appearance.

09:55AM   10        Lots of different phone numbers, different places.  It

09:55AM   11    took a lot to actually find her.

09:55AM   12    Q.  At one point before -- before the decision was made to

09:55AM   13    charge her with the misdemeanor drug charge in federal court,

09:55AM   14    did you in fact get in front of her and try to set her up

09:55AM   15    with treatment --

09:55AM   16    A.  Yeah, we have.

09:55AM   17    Q.  -- housing?

09:55AM   18    A.  Yeah.

09:55AM   19    Q.  Explain what you did.

09:55AM   20    A.  So, I think it was -- was it '19 or so?  She reached out,

09:56AM   21    and she had a pending case, and she was concerned about her

09:56AM   22    safety.  And then myself and Task Force Officer Rondon had

09:56AM   23    actually picked her up, and we brought her to PATH, it's a --

09:56AM   24    it's a nonprofit, People Against Trafficking of Humans, and

09:56AM   25    they have a lot of resources for individuals like that.  So

09:56AM  1   we brought her there.

09:56AM  2       They met not -- with us present, they met with

09:56AM  3   counselors.  She met with counselors.  We actually left for a

09:56AM  4   little bit, and they met and they gave her some food and some

09:56AM  5   clothing and stuff with the understanding that they were

09:56AM  6   gonna pick her up the next day and kind of continue to try to

09:56AM  7   get her some help, and then she didn't show up.

09:56AM  8   Q.  And it was PATH who gave her the food and the clothing?

09:56AM  9   A.  They're -- yeah, we don't.  We try to, like, find

09:56AM  10  agencies that do that.  I mean, obviously, the FBI's job is

09:56AM  11  to investigate crimes.  And so we try to identify agencies

09:56AM  12  that can help people in those situations.

09:56AM  13  Q.  And then the next day, it was set up, and she didn't show

09:56AM  14  up?

09:56AM  15  A.  Yeah.  The director of PATH called me and said they had

09:57AM  16  sent a van, and she didn't show up.

09:57AM  17  Q.  At some point later on did you guys find her, after the

09:57AM  18  decision was made to charge her, in a drug house?

09:57AM  19  A.  Yes, it took -- yes, it a few months to actually locate

09:57AM  20  her.  She was kind of couch surfing.

09:57AM  21  Q.  Now, the jury may have heard cross-examination at some

09:57AM  22  point from a witness regarding reimbursements for

09:57AM  23  transportation, a cross-examination about witness fees for

09:57AM  24  being in federal court, things like that.

09:57AM  25       Does the FBI have anything to do with when someone is

| | | |
|---|---|---|
| 09:57AM | 1 | actually subpoenaed to court, paying witness voucher fees, or |
| 09:57AM | 2 | reimbursements for travel expenses? |
| 09:57AM | 3 | A.  Not at all. |
| 09:57AM | 4 | Q.  That's -- that's done through a different entity, and |
| 09:57AM | 5 | it's -- it's statutory; is that right? |
| 09:57AM | 6 | A.  Yeah.  The statute, I mean, you get 40 bucks a day to |
| 09:57AM | 7 | be -- as a witness fee, you get mileage, it's all set out in |
| 09:58AM | 8 | the statute.  So anyone that's a witness, obviously, not a |
| 09:58AM | 9 | government witness, but anyone that's a witness that's here |
| 09:58AM | 10 | is entitled to their witness fee, their -- you know, mileage, |
| 09:58AM | 11 | their expenses like a daily expenses.  It's all set out in |
| 09:58AM | 12 | the statute.  We don't really have anything to do with it |
| 09:58AM | 13 | other than -- I inform the witnesses that there's -- you have |
| 09:58AM | 14 | to sign some paperwork, and that the marshals at some point |
| 09:58AM | 15 | will reimburse them for their expenses under this capitated |
| 09:58AM | 16 | rate that's in statute. |
| 09:58AM | 17 | Q.  It's a nominal fee, similar to what jurors get? |
| 09:58AM | 18 | A.  Yeah, I think jurors get an extra ten bucks. |
| 09:58AM | 19 | Q.  All right.  I want to switch gears now, okay? |
| 09:58AM | 20 | A.  Certainly. |
| 09:58AM | 21 | Q.  As a member of the investigative team, have you received |
| 09:58AM | 22 | and reviewed and helped to isolate text messages that were |
| 09:58AM | 23 | contained in Mr. Gerace's cell phone which was extracted as |
| 09:58AM | 24 | part of Exhibit 310? |
| 09:58AM | 25 | A.  Yes, I have been involved in that. |

| | | |
|---|---|---|
| 09:58AM | 1 | Q.  I want to hand you up Exhibit 310.  That was |
| 09:59AM | 2 | authenticated earlier in the trial by Special Agent Curtis |
| 09:59AM | 3 | Ryan.  Are you also familiar with that same thumb drive that |
| 09:59AM | 4 | contains the complete extraction of Mr. Gerace's phone? |
| 09:59AM | 5 | A.  Very familiar. |
| 09:59AM | 6 | Q.  Have you worked extensively with that? |
| 09:59AM | 7 | A.  Yes, it's the extraction from the border search. |
| 09:59AM | 8 | Q.  Have you helped isolate and reviewed different text |
| 09:59AM | 9 | threads that are contained on that extraction? |
| 09:59AM | 10 | A.  Yes, I have. |
| 09:59AM | 11 | Q.  When I say "text threads," I should say text messaging |
| 09:59AM | 12 | threads. |
| 09:59AM | 13 | A.  Between Mr. Gerace and other individuals, yes. |
| 09:59AM | 14 | Q.  Okay.  You've reviewed the extraction? |
| 09:59AM | 15 | A.  Yes. |
| 09:59AM | 16 | Q.  You've used it to further your investigation? |
| 09:59AM | 17 | A.  Yes, on many occasions. |
| 09:59AM | 18 | Q.  You've spent time reviewing the contents? |
| 09:59AM | 19 | A.  Yes, and carving them out. |
| 09:59AM | 20 | Q.  "Carving them out," meaning isolating different text |
| 09:59AM | 21 | threads? |
| 09:59AM | 22 | A.  Yes.  It's a picture of the image of your phone with all |
| 09:59AM | 23 | the different people you text message, so if you want to -- |
| 10:00AM | 24 | you've got to identify the contact, and then pull those |
| 10:00AM | 25 | particular ones.  And the program does it, the imaging |

10:00AM  1   program, so you're able to isolate just the text messages

10:00AM  2   between Mr. Gerace and certain individuals that we were

10:00AM  3   interested in.

10:00AM  4   Q.  Have you extensively reviewed and helped to carve out or

10:00AM  5   scoped text threads contained in the extraction that are

10:00AM  6   relevant to this trial?

10:00AM  7   A.  Yes, I spent a lot of time on that.

10:00AM  8   Q.  Based on your familiarity with the contents of the

10:00AM  9   extraction, did you review and isolate text message threads

10:00AM  10  between the defendant and Judge John Michalski?

10:00AM  11  A.  Yes.  I reviewed those extensively.

10:00AM  12  Q.  Did you isolate and review text message threads between

10:00AM  13  the defendant and Greg Trotter, an Amherst Police Department

10:00AM  14  detective?

10:00AM  15  A.  Yes, I have.

10:00AM  16  Q.  Did you isolate and review text messages threads between

10:00AM  17  the defendant and P.H., also known as P.R.?

10:00AM  18  A.  Yes, I did.

10:00AM  19  Q.  Did you isolate and review text message threads between

10:00AM  20  the defendant and Darryl LaMont?

10:00AM  21  A.  Yes, I did.

10:00AM  22  Q.  How did you identify the number of -- the phone number

10:00AM  23  pertaining to the text message thread that -- as Darryl

10:01AM  24  LaMont's?

10:01AM  25  A.  In reviewing the text thread, it was pretty comfortable

10:01AM   1   it was Mr. LaMont based on the communications, and when you

10:01AM   2   pull them up you'll see the content of the thing.  But then

10:01AM   3   additionally, we had never subscribed that number.  We

10:01AM   4   never -- you can get a subpoena and get a subscriber, and we

10:01AM   5   had not done that.

10:01AM   6       And so on December 2nd, I just made a phone call to it,

10:01AM   7   and kind of pretended I was looking to set up a stag party to

10:01AM   8   that number.  And the individual identified himself as

10:01AM   9   Darryl.

10:01AM   10      And I said, are you still doing parties?  And he's, like,

10:01AM   11  yeah.

10:01AM   12      And I said, where's your website?  He said, it's down.

10:01AM   13      And I essentially told him -- he indicated this was his

10:01AM   14  personal number, not his business one.  So I knew at that

10:01AM   15  point it was Darryl LaMont.

10:01AM   16  Q.  Did he ask you how you got his personal number?

10:01AM   17  A.  Yes, he did.

10:01AM   18  Q.  What did you say?

10:01AM   19  A.  A dude in a bar gave it to me.

10:01AM   20  Q.  Okay.  You were talking a moment ago about the internal

10:02AM   21  content of the text threads as well.  At one point, are there

10:02AM   22  indications that the person is a black male associated with

10:02AM   23  stag parties?

10:02AM   24  A.  Yes.

10:02AM   25  Q.  Are there also indications that a woman named Sunny wrote

| | | |
|---|---|---|
| 10:02AM | 1 | a text message that said, hey, Darryl's driving so I'm |
| 10:02AM | 2 | writing, or words to that effect? |
| 10:02AM | 3 | A.  Exactly. |
| 10:02AM | 4 | Q.  Did you also isolate and review a text message between |
| 10:02AM | 5 | Peter Gerace and Chris Chudy? |
| 10:02AM | 6 | A.  Yes, I did. |
| 10:02AM | 7 | **MR. FOTI:**  Judge, can we approach? |
| 10:02AM | 8 | **THE COURT:**  Sure. |
| 10:03AM | 9 | (Sidebar discussion held on the record.) |
| 10:03AM | 10 | **MR. FOTI:**  Judge, I think going forward, Mr. Tripi is |
| 10:03AM | 11 | going to start admitting exhibits containing conversations |
| 10:03AM | 12 | from within the phone.  And we would object to any of the |
| 10:03AM | 13 | conversations coming in at least through Mr. Burns, not |
| 10:03AM | 14 | through the witnesses that were participants of the |
| 10:03AM | 15 | conversation.  I think it's -- setting aside just the hearsay |
| 10:03AM | 16 | rules that I would argue, I think there's a general |
| 10:03AM | 17 | confrontation -- constitutional confrontation issue here.  I |
| 10:03AM | 18 | can't cross-examine the participants to these conversations |
| 10:03AM | 19 | and talk about the context, talk about what may have been |
| 10:03AM | 20 | discussed outside of the text chain.  I can't do anything with |
| 10:03AM | 21 | this other than -- |
| 10:03AM | 22 | **THE COURT:**  These are text messages between |
| 10:03AM | 23 | Mr. Gerace and other people? |
| 10:03AM | 24 | **MR. TRIPI:**  Yeah, this is -- for example, this is |
| 10:03AM | 25 | between Judge Michalski and Mr. Gerace, similar to what you've |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

35

| | | |
|---|---|---|
| 10:03AM | 1 | seen between Bongiovanni and Gerace.  So I would argue the |
| 10:04AM | 2 | same arguments in response to getting in, like, the |
| 10:04AM | 3 | Bongiovanni text thread. |
| 10:04AM | 4 |     THE COURT:  So Gerace's, there are no issues |
| 10:04AM | 5 | (indecipherable). |
| 10:04AM | 6 |     MR. FOTI:  So I don't -- I don't -- I don't have an |
| 10:04AM | 7 | objection to Bongiovanni and Gerace.  In fact, I think we even |
| 10:04AM | 8 | stipulated that in.  If not, then we would have. |
| 10:04AM | 9 |     I understand that they're coconspirators. |
| 10:04AM | 10 |     In this case, we're talking about a number of |
| 10:04AM | 11 | individuals that I don't think have been established as |
| 10:04AM | 12 | coconspirators in the charges in this indictment.  And -- |
| 10:04AM | 13 |     THE COURT:  Who? |
| 10:04AM | 14 |     MR. FOTI:  Well, Judge Michalski, I think, is one of |
| 10:04AM | 15 | them. |
| 10:04AM | 16 |     THE COURT:  You don't think he's a coconspirator? |
| 10:04AM | 17 |     MR. FOTI:  I don't.  I don't think it's been |
| 10:04AM | 18 | established yet. |
| 10:04AM | 19 |     THE COURT:  I disagree with that. |
| 10:04AM | 20 |     MR. FOTI:  Chris Chudy.  I don't know who else |
| 10:04AM | 21 | they're gonna put in.  I think just -- |
| 10:04AM | 22 |     MR. TRIPI:  The names that I've just laid out. |
| 10:04AM | 23 |     THE COURT:  Chudy, he's the. |
| 10:04AM | 24 |     MR. TRIPI:  Chudy is the manager. |
| 10:04AM | 25 |     THE COURT:  Right.  Michalski. |

| | | |
|---|---|---|
| 10:04AM | 1 | **MR. TRIPI:**  Michalski.  Trotter. |
| 10:04AM | 2 | **THE COURT:**  Trotter is the Amherst cop. |
| 10:04AM | 3 | **MR. TRIPI:**  Trotter's the Amherst cop. |
| 10:04AM | 4 | P.H., but only the thread that relates to Trotter. |
| 10:04AM | 5 | So that is, he's talking to Trotter about where she is, and |
| 10:05AM | 6 | then he's talking to P.H. about pretending he's gonna pick her |
| 10:05AM | 7 | up.  So he that's how the arrest gets arranged.  So you see |
| 10:05AM | 8 | how he's talking to one and the other. |
| 10:05AM | 9 | And then Darryl LaMont.  So those are the ones. |
| 10:05AM | 10 | **THE COURT:**  The only one I'm concerned about is P.H. |
| 10:05AM | 11 | **MR. TRIPI:**  And actually all of hers are actually |
| 10:05AM | 12 | contained, because he's also screenshotting Trotter, and |
| 10:05AM | 13 | sending the same thing he's saying to P.H., he's |
| 10:05AM | 14 | screenshotting, so it's actually all in Trotter's thread. |
| 10:05AM | 15 | **THE COURT:**  Okay. |
| 10:05AM | 16 | **MR. TRIPI:**  You know? |
| 10:05AM | 17 | **THE COURT:**  I think they're all coconspirators. |
| 10:05AM | 18 | **MR. FOTI:**  I don't -- I don't know what testimony has |
| 10:05AM | 19 | established Trotter as a coconspirator, other than -- |
| 10:05AM | 20 | actually, I can't even think of an example, because he was |
| 10:05AM | 21 | involved in the arrest of individuals in this case, I don't |
| 10:05AM | 22 | think that establishes him as a coconspirator particular to |
| 10:05AM | 23 | anything that is charged here. |
| 10:05AM | 24 | I understand he's been charged by the government |
| 10:05AM | 25 | separately in regard to lying. |

| | | |
|---|---|---|
| 10:05AM | 1 | **THE COURT:**  Well, no, but isn't there testimony that |
| 10:05AM | 2 | Trotter did something in connection with the -- is it the |
| 10:06AM | 3 | Rolex watch? |
| 10:06AM | 4 | **MR. TRIPI:**  Yeah, this is the Rolex arrest. |
| 10:06AM | 5 | **THE COURT:**  Yeah.  And that he -- and that Gerace |
| 10:06AM | 6 | reaches out to him to get her arrested for the -- the Rolex, |
| 10:06AM | 7 | that he's got some sort of connection with him in that regard. |
| 10:06AM | 8 | **MR. FOTI:**  He was an arresting officer on that. |
| 10:06AM | 9 | **MR. TRIPI:**  May I -- I don't mean that interrupt, |
| 10:06AM | 10 | Judge, sorry. |
| 10:06AM | 11 | **THE COURT:**  No, go ahead. |
| 10:06AM | 12 | **MR. TRIPI:**  On that score, the content of the text as |
| 10:06AM | 13 | well as what you've heard already, you're right on it, but the |
| 10:06AM | 14 | context show like, for example, he arrests her.  And a normal |
| 10:06AM | 15 | police officer isn't telling you what a suspect is saying as a |
| 10:06AM | 16 | complaintant realtime. |
| 10:06AM | 17 | Gerace is saying, is she talking?  What is she |
| 10:06AM | 18 | saying?  And he's responding. |
| 10:06AM | 19 | **MR. COOPER:**  And just to put a cherry on it, Judge, |
| 10:06AM | 20 | P.H. is interviewed by federal law enforcement at Trotter's |
| 10:06AM | 21 | department, and then all of a sudden Jessica Leyland is saying |
| 10:06AM | 22 | I heard you talked to the feds, you're a snitch. |
| 10:06AM | 23 | And I think there's an inference that the Court can |
| 10:07AM | 24 | draw there on top of -- |
| 10:07AM | 25 | **THE COURT:**  Yeah, certainly my instinct was that |

| | | |
|---|---|---|
| 10:07AM | 1 | Trotter was a coconspirator.  I think Michalski is, as much as |
| 10:07AM | 2 | I hate to say it, I liked John, but -- |
| 10:07AM | 3 | **MR. TRIPI:**  Everybody did, Judge -- |
| 10:07AM | 4 | **THE COURT:**  I know. |
| 10:07AM | 5 | **MR. TRIPI:**  -- and nobody wanted that to happen. |
| 10:07AM | 6 | **THE COURT:**  It breaks my heart. |
| 10:07AM | 7 | **MR. TRIPI:**  Yeah. |
| 10:07AM | 8 | **THE COURT:**  But I think he is.  I think that Trotter |
| 10:07AM | 9 | is.  I think Chudy certainly is.  And -- |
| 10:07AM | 10 | **MR. TRIPI:**  Darryl LaMont. |
| 10:07AM | 11 | **THE COURT:**  -- Darryl LaMont certainly is. |
| 10:07AM | 12 | **MR. FOTI:**  Judge, no disrespect.  When you say |
| 10:07AM | 13 | "certainly," I don't know what testimony there has been that |
| 10:07AM | 14 | Chris Chudy is a coconspirator other than he works at |
| 10:07AM | 15 | Pharaoh's.  That doesn't make him a coconspirator. |
| 10:07AM | 16 | **THE COURT:**  Isn't he one of the people that's been |
| 10:07AM | 17 | tipped to ignore -- |
| 10:07AM | 18 | **MR. TRIPI:**  He's a manager.  There's been some |
| 10:07AM | 19 | testimony I think earlier in the trial that he was one of |
| 10:07AM | 20 | the -- it was Peter and him who had the key.  At some point I |
| 10:07AM | 21 | think somebody said that. |
| 10:07AM | 22 | **THE COURT:**  That let people upstairs. |
| 10:07AM | 23 | **MR. TRIPI:**  Yeah. |
| 10:07AM | 24 | And then in addition to that, Judge, I think there's |
| 10:07AM | 25 | been ample testimony about sort of the wide ranging use and |

10:08AM    1    distribution that occurs there.  I think there's an inference

10:08AM    2    that can be drawn based on his position in management for a

10:08AM    3    long time.

10:08AM    4         And, of course, you can also consider the text.  It's

10:08AM    5    one text, and in this text, if you let it in, or I can show it

10:08AM    6    to you ahead of time, it's one text in a very long thread

10:08AM    7    because obviously they've texted a lot, we've isolated one

10:08AM    8    text, and essentially it's Chudy being sort of upset that

10:08AM    9    Gerace has fired someone that -- like a bartender or someone

10:08AM   10    that Chudy liked.

10:08AM   11         And in that exchange, Chudy's like, oh, but if there

10:08AM   12    are girls -- I'm paraphrasing -- if there are girls that party

10:08AM   13    with you upstairs then, then there's no problems.

10:08AM   14         And so right in the text, and that's what the

10:08AM   15    evidentiary value of it, it's showing that one of his managers

10:08AM   16    knows there's a separate set of rules here for the favorites,

10:08AM   17    so that would be the argument stemming from that.

10:09AM   18         **MR. SOEHNLEIN:**  To the extent that there's been

10:09AM   19    testimony about Chudy, it's that the key to the upstairs was

10:09AM   20    in his pocket, and that other people would get it from him,

10:09AM   21    and then let -- it was Katrina that said she could get it from

10:09AM   22    his pocket.

10:09AM   23         That doesn't mean that she necessarily got it from

10:09AM   24    him, by the way.

10:09AM   25         **THE COURT:**  Right.

10:09AM    1    **MR. SOEHNLEIN:**  Okay.  The remaining testimony about

10:09AM    2    Chudy is that he was a good manager.  That he --

10:09AM    3    **THE COURT:**  Fired people.

10:09AM    4    **MR. SOEHNLEIN:**  -- he fired people --

10:09AM    5    **THE COURT:**  What about the context of the --

10:09AM    6    **MR. SOEHNLEIN:**  So also I don't understand it, how --

10:09AM    7    in what way is it trying to be --

10:09AM    8    **MR. TRIPI:**  Would you like to see it?

10:09AM    9    **THE COURT:**  Yeah.  So why don't we do everybody

10:09AM    10   except Chudy's right now.

10:09AM    11   **MR. TRIPI:**  Sure.

10:09AM    12   **THE COURT:**  So Michalski, we don't have an argument

10:09AM    13   on.

10:09AM    14   **MR. FOTI:**  Well, I -- I also, the majority of the

10:09AM    15   communication is not in furtherance of the conspiracy.  So

10:09AM    16   even if we establish him as a coconspirator, the majority of

10:09AM    17   the communication, I went through all the text messages.  Over

10:09AM    18   and over again is Judge Michalski and Peter saying do you want

10:09AM    19   to meet up for drinks?  Not available this week, Sue's got

10:10AM    20   whatever going on.

10:10AM    21   I mean, it's just a ton of back and forth about

10:10AM    22   scheduling to hang out.

10:10AM    23   And I think there's, like, one message like right in

10:10AM    24   the beginning about let's get some pussy or something, with no

10:10AM    25   real context of it.

10:10AM    1        **MR. TRIPI:**  It's the very first text.

10:10AM    2        **MR. FOTI:**  Yeah, it's like the first message.  And I

10:10AM    3    get that that -- I guess they're arguing, there's no context

10:10AM    4    to it that that's a statement in furtherance of a conspiracy,

10:10AM    5    but that's like it, and the rest of it is just --

10:10AM    6        **MR. TRIPI:**  Judge, our first argument, and you

10:10AM    7    started to sway, is that these are statements of a party

10:10AM    8    opponent so that none of them are hearsay.

10:10AM    9        Also, let's say you buy Mark's argument full cloth

10:10AM   10    right now that it's not a coconspirator statement.  Statements

10:10AM   11    of a party opponent plus the conversation for context, it

10:10AM   12    should all come in on that analysis alone on top of it.

10:10AM   13        **THE COURT:**  What about all this stuff they're just

10:10AM   14    making arrangements to get together?

10:10AM   15        **MR. TRIPI:**  Well, face-to-face meetings are, like,

10:10AM   16    he's going to meet him on the bench.

10:11AM   17        It's not like a former law partner coming to visit

10:11AM   18    you or something like that.  It's a strip club owner who he

10:11AM   19    hasn't represented since 2006 coming in 2016 and '15, like

10:11AM   20    right in the heart of this.

10:11AM   21        **THE COURT:**  What's the -- what's the -- what is the

10:11AM   22    issue.

10:11AM   23        **MR. TRIPI:**  Well, I think the nature and extent of

10:11AM   24    the relationship, you know, is -- 'cuz conspiracies don't

10:11AM   25    spring up out of nowhere.

10:11AM   1        They discuss Katrina Nigro.  They mock her, you know?

10:11AM   2   And so we need corroborate her knowledge of this situation.

10:11AM   3   They heavily attacked her.

10:11AM   4        They talk about Shelby in a sense that it's

10:11AM   5   corroborative and confirmation of Michalski's connection to

10:11AM   6   Shelby.

10:11AM   7        **THE COURT:**  I'm convinced on that.  So Michalski is

10:11AM   8   okay.

10:11AM   9        **MR. TRIPI:**  Yeah.

10:11AM  10        **THE COURT:**  Who's next?

10:11AM  11        **MR. TRIPI:**  Wherever you want to go.  Darryl.

10:11AM  12        **THE COURT:**  LaMont.  Do you want argument there?

10:11AM  13   He's a coconspirator.

10:11AM  14        **MR. FOTI:**  I don't believe he is.  I think that

10:11AM  15   there's been testimony specifically saying just the only

10:12AM  16   testimony that suggests they're coconspirators is that there's

10:12AM  17   dancers that work for both.  But there's also been testimony

10:12AM  18   that dancers go from club to club, that this is a normal

10:12AM  19   occurrence, that dancers in this industry move between

10:12AM  20   different stag companies, between different clubs.

10:12AM  21        The only testimony I guess that there's any type of,

10:12AM  22   I guess, collaboration between the two that goes just beyond

10:12AM  23   dancers working for both came from Katrina Nigro.  I don't

10:12AM  24   think that that establishes preponderance of coconspirator.

10:12AM  25        You have the alternative testimony from A.G. who was

USA v Gerace - Burns - Tripi/Direct - 12/17/24

43

10:12AM  1   fired by Pharaoh's, who testified they are different

10:12AM  2   companies, they're completely different, I was fired from

10:12AM  3   Pharaoh's.

10:12AM  4        THE COURT:  Can we do -- can we do the Michalski

10:12AM  5   stuff and then take a break?

10:12AM  6        MR. TRIPI:  Sure, we can.  Can I just argue just to

10:12AM  7   cap that part of the argument?

10:12AM  8        THE COURT:  Yes.  I'm inclined to let it all in

10:12AM  9   because it's admissions by, I mean, it's a statement of a

10:12AM  10  party opponent and context.  I mean, I think that it comes in

10:13AM  11  for that reason.

10:13AM  12       MR. FOTI:  But, Judge, that's part of my concern.  I

10:13AM  13  said the hearsay -- there's hearsay objections here,

10:13AM  14  obviously.  But I also have a concern about the context.

10:13AM  15  That's why I'm saying it goes beyond just hearsay, and it's a

10:13AM  16  constitutional issue, it's a confrontation issue.

10:13AM  17       THE COURT:  How so?

10:13AM  18       MR. COOPER:  Peter's available now to call him.

10:13AM  19       THE COURT:  No, no.  But how so?

10:13AM  20       MR. FOTI:  Because, for example, and I do --

10:13AM  21       THE COURT:  Do you have any caselaw that says if

10:13AM  22  you've got an exchange, a back and forth, an exchange of

10:13AM  23  letters, an exchange of emails, an exchange of texts between a

10:13AM  24  defendant and someone, only the defendant's emails come in?

10:13AM  25  And you don't get to put the other ones in unless you have

| | | |
|---|---|---|
| 10:13AM | 1 | context of what the defendant is saying? |
| 10:13AM | 2 | **MR. FOTI:** I don't have a case off the top of my head |
| 10:13AM | 3 | to give to you, Judge. |
| 10:13AM | 4 | **THE COURT:** Well, you knew it was coming in. |
| 10:13AM | 5 | **MR. FOTI:** I don't know that a case like that exists. |
| 10:13AM | 6 | And I know that we do have a constitutional right to |
| 10:13AM | 7 | confrontation. And I've looked at the messages in |
| 10:14AM | 8 | anticipation of today, and I -- and I am looking at these |
| 10:14AM | 9 | messages and there's all kinds of things that there is no |
| 10:14AM | 10 | context to. |
| 10:14AM | 11 | There's call me, and you don't really know where the |
| 10:14AM | 12 | conversation springs off of, what came before, what came |
| 10:14AM | 13 | after. |
| 10:14AM | 14 | **MR. TRIPI:** That's for argument. These two can hash |
| 10:14AM | 15 | it out. |
| 10:14AM | 16 | **THE COURT:** Okay. Let's go. Let's do it. |
| 10:14AM | 17 | (End of sidebar discussion.) |
| 10:14AM | 18 | **BY MR. TRIPI:** |
| 10:14AM | 19 | Q. Okay. I'm going to hand you up Government Exhibit 310AE. |
| 10:14AM | 20 | I'm going to ask you to look through it enough to familiarize |
| 10:14AM | 21 | yourself with what it is, and look back at me when you're |
| 10:14AM | 22 | done. |
| 10:15AM | 23 | A. I'm familiar with it. |
| 10:15AM | 24 | Q. Do you recognize Government Exhibit 310AE? |
| 10:15AM | 25 | A. Yes, I do. |

| | | |
|---|---|---|
| 10:15AM | 1 | Q.  What do you recognize it to be? |
| 10:15AM | 2 | A.  It's text messages between Judge John Michalski and Peter |
| 10:15AM | 3 | Gerace from the phone extraction of 310. |
| 10:15AM | 4 | Q.  And are those accurate from the extraction, Exhibit 310? |
| 10:15AM | 5 | A.  Yes, it's a printout of them. |
| 10:15AM | 6 | **MR. TRIPI:**  The government offers 310AE, Your Honor. |
| 10:15AM | 7 | **MR. FOTI:**  Judge, we just restate the objection that |
| 10:15AM | 8 | we discussed at the sidebar. |
| 10:15AM | 9 | **THE COURT:**  Okay.  Overruled. |
| 10:15AM | 10 | **(GOV Exhibit 310AE was received in evidence.)** |
| 10:15AM | 11 | **MR. TRIPI:**  Okay.  We're going to publish those up on |
| 10:15AM | 12 | the monitor now, Ms. Champoux.  We can start with page 1, |
| 10:15AM | 13 | please. |
| 10:15AM | 14 | **BY MR. TRIPI:** |
| 10:15AM | 15 | Q.  Now we're going to go through a bunch of these, but we're |
| 10:15AM | 16 | not going to go through all of them, okay? |
| 10:15AM | 17 | A.  Yes. |
| 10:15AM | 18 | Q.  Just to orient the jury to the first page, the way it's |
| 10:15AM | 19 | extracted, IOS, iMessage, SMS, MMS.  Essentially, does that |
| 10:15AM | 20 | mean text messages? |
| 10:15AM | 21 | A.  Yes, text communications. |
| 10:16AM | 22 | Q.  Number of participants, two? |
| 10:16AM | 23 | A.  Correct. |
| 10:16AM | 24 | Q.  In the gray bubbles, would that be the number and the |
| 10:16AM | 25 | entry of the name as it existed in the phone for Judge |

10:16AM    1    Michalski?

10:16AM    2    A.   In the contact, yes.

10:16AM    3    Q.   And in the blue bubbles that you see, are those the

10:16AM    4    written communications for Mr. Gerace?

10:16AM    5    A.   Yes, they are.

10:16AM    6    Q.   Okay.  Now in the conversation details of the extraction,

10:16AM    7    does it tell you how many text there are, or messages, I

10:16AM    8    should say?

10:16AM    9    A.   Yes, 1,027.

10:16AM   10    Q.   And what is the date range from that first message to the

10:16AM   11    last?

10:16AM   12    A.   The first one is 6/10 of 2015, and it goes to April 15th

10:16AM   13    of 2019.  The phone, I believe, was seized on April 19th or

10:16AM   14    April 20th.  April 19th, I believe, 2019.

10:16AM   15    Q.   If I told you April 27th, 2019, does that sound about,

10:16AM   16    right?

10:16AM   17    A.   That's better, yes.

10:16AM   18    Q.   Okay.

10:16AM   19    A.   That's accurate.

10:16AM   20    Q.   So the last text is about two weeks before the phone was

10:16AM   21    seized roughly, give or take?

10:16AM   22    A.   Yeah.  And Mr. Gerace had been out of the country for, I

10:16AM   23    believe, a week or so.

10:16AM   24    Q.   Okay.  I'm going to go through some of these texts.

10:17AM   25        On page 1, the very first text on June 10th, 2015, in the

USA v Gerace - Burns - Tripi/Direct - 12/17/24

10:17AM  1  gray box, can you read what Judge Michalski wrote to the

10:17AM  2  defendant?

10:17AM  3  A.  You're funny.  Let's get some pussy there.

10:17AM  4  Q.  Okay.  Let's go to page -- and are there responses in

10:17AM  5  basically -- in the same, within the same minute?

10:17AM  6  A.  Yes.  Where and when, and I want drinks.

10:17AM  7        **MR. TRIPI:**  Okay.  Let's go to page 2, Ms. Champoux.

10:17AM  8        **BY MR. TRIPI:**

10:17AM  9  Q.  Generally, on this page, does it appear that they're in

10:17AM  10  August making arrangements to get together?

10:17AM  11  A.  Yes, that's generally what it says.

10:17AM  12  Q.  Are you familiar with where Judge John Michalski worked,

10:17AM  13  correct?

10:17AM  14  A.  Yes, at the Erie County State Supreme Court building.

10:17AM  15  Well, the court's building, and it's tied to the District

10:17AM  16  Attorney's Office and --

10:17AM  17  Q.  For ease of reference, I'm going to just box an exchange

10:18AM  18  between the two of them on August 30th.  Can you just read

10:18AM  19  those messages?

10:18AM  20  A.  From Judge Michalski:  The middle of the week is good.

10:18AM  21     Mr. Gerace:  Okay.  Mr. Gerace:  T-U-E-S I'm in court at

10:18AM  22  2, your building.

10:18AM  23     And then Michalski -- Judge Michalski indicates:  I

10:18AM  24  should be there stop over.

10:18AM  25        **MR. TRIPI:**  Okay.  Can we go to page 7, Ms. Champoux.

10:18AM    1          **BY MR. TRIPI:**

10:18AM    2    Q.  There's a message on October 16th, 2015.  I boxed it just

10:18AM    3    for ease of reference.  Can you read it for the jury?

10:18AM    4    A.  Yes, it's from Mr. Gerace:  Are you bringing the family

10:18AM    5    to Pharaoh's for dinner?  Well, next message, dinner.

10:18AM    6    Q.  And is there a response that same day from the judge?

10:18AM    7    A.  Yes, it was:  Ha ha ha.

10:18AM    8          For context, the previous message was he was going out

10:19AM    9    with his daughter, I think, and his family.

10:19AM    10   Q.  And so that's the ha ha ha?

10:19AM    11   A.  Right.  When he says are you bringing the family to

10:19AM    12   Pharaoh's for dinner?

10:19AM    13          **MR. TRIPI:**  All right.  Let's go to page 13,

10:19AM    14   Ms. Champoux.  Actually can we go to the bottom of 12, I'm

10:19AM    15   sorry.

10:19AM    16          **BY MR. TRIPI:**

10:19AM    17   Q.  There's a message at the bottom of page 12.  Can you read

10:19AM    18   from there to the third message on page 13, please?

10:19AM    19   A.  Sure.  Mr. Gerace:  Did you leave work yet?

10:19AM    20          Judge Michalski:  Just now.

10:19AM    21          Mr. Gerace:  I'll head there now.

10:19AM    22          Judge Michalski:  Okay.

10:19AM    23   Q.  And those are messages on October 28th, 2015?

10:19AM    24   A.  That's correct.

10:19AM    25          **MR. TRIPI:**  Okay.  Can we scroll down to page 14,

10:19AM    1    Ms. Champoux.

10:19AM    2        **BY MR. TRIPI:**

10:20AM    3    Q. You can continue reading messages on October 29th, 2015.

10:20AM    4    A. Let's get together next week; it's from Mr. Gerace.

10:20AM    5      Judge John Michalski:  Okay.

10:20AM    6    Q. And you just read the messages third and --

10:20AM    7    A. Oh, correct.

10:20AM    8    Q. Second and third from the bottom, correct?

10:20AM    9    A. Correct.

10:20AM    10       **MR. TRIPI:**  Let's go to page 15, Ms. Champoux.

10:20AM    11        **BY MR. TRIPI:**

10:20AM    12    Q. All right.  I want you to read an exchange that was

10:20AM    13    November 3rd -- I'm sorry, yeah, November 3rd, 2015.

10:20AM    14    A. Okay.  From Mr. Gerace:  I'll be downtown at 9:15.  Are

10:20AM    15    you on the bench then?

10:20AM    16      Judge Michalski:  No, I am here at Medaille teaching

10:20AM    17    until 9:30, and then I head downtown after that.

10:21AM    18      And from Mr. Gerace:  Okay, I was gonna say hi.

10:21AM    19       **MR. TRIPI:**  Ms. Champoux, can we go to page 16.

10:21AM    20        **BY MR. TRIPI:**

10:21AM    21    Q. Can you just read the messages and the dates for this

10:21AM    22    whole page?

10:21AM    23    A. Certainly, so 11/8/15, it's from Mr. Gerace:  Call me.

10:21AM    24      11/9/2015 at 4:05:  Are you at work?; it's from Mr. Gerace.

10:21AM    25      Judge John Michalski responds:  Yes.

10:21AM    1    Peter Gerace responds:  Fuck, I left already.

10:21AM    2    And the bottom message:  She's going to jail tomorrow.

10:21AM    3    And that's on November 9th, 2015 at 5:06.

10:21AM    4    **MR. TRIPI:**  Ms. Champoux, can you scroll down so we

10:21AM    5    catch the last message in that response.

10:21AM    6    **BY MR. TRIPI:**

10:21AM    7    Q.  What does Mr. Gerace say after that?

10:21AM    8    A.  Call me on break.

10:21AM    9    Judge John Michalski says:  Wow.  Okay.

10:22AM    10    **MR. TRIPI:**  And can we scroll down a little further,

10:22AM    11    Ms. Champoux.  All right.  We'll move on to page 19, please.

10:22AM    12    **BY MR. TRIPI:**

10:22AM    13    Q.  Can you read a message November 22nd at 2015, written by

10:22AM    14    the defendant?

10:22AM    15    A.  I have a paper for you.

10:22AM    16    Q.  And then can you read messages on November 23rd, 2015?

10:22AM    17    A.  From Mr. Gerace:  Can I stop by when you get home today

10:22AM    18    for a second?

10:22AM    19    From Judge John Michalski:  Sure.

10:22AM    20    **MR. TRIPI:**  Ms. Champoux, let's go to page 21,

10:22AM    21    please.

10:22AM    22    **BY MR. TRIPI:**

10:22AM    23    Q.  Can you read -- there's some messages that begin on

10:22AM    24    November 25th.  By the way, is this UTC time that we're

10:23AM    25    seeing?

10:23AM  1   A.   That's correct.

10:23AM  2   Q.   So at some points in the year, and I'm terrible at it but

10:23AM  3   we have to do some math to get the correct time?

10:23AM  4   A.   Yeah.  And I'm not much better than you, Mr. Tripi, at

10:23AM  5   that.

10:23AM  6   Q.   Basically is it minus four in the winter, and minus five

10:23AM  7   in the summer?

10:23AM  8   A.   I believe that's correct.  I usually use a cheat sheet.

10:23AM  9   Q.   All right.  So, we have a message at the top that says:

10:23AM  10  Are you home?

10:23AM  11      And there's a response:  800 maple.

10:23AM  12      Given the conversion of the time of those are both likely

10:23AM  13  on November 25th; is that fair to say?

10:23AM  14  A.   That's accurate.

10:23AM  15  Q.   Okay.  And is this basically -- can you read the rest of

10:23AM  16  the messages for that day?  Go through the 26th.

10:23AM  17  A.   Yeah, John Michalski:  Yeah, 800 maple.

10:23AM  18      Mr. Gerace:  Is it busy.

10:23AM  19      Michalski:  Kinda.

10:23AM  20      Mr. Gerace:  Happy Thanksgiving.

10:24AM  21      On November 26th, I think that's it.

10:24AM  22  Q.   We agree that these messages were all the 25th though?

10:24AM  23  A.   That's correct, based on the UTC time.

10:24AM  24  Q.   Jumping ahead to December 1st, 2015, we're gonna stick

10:24AM  25  with this portion through.  Can you read the date and who

10:24AM    1   wrote a message on December 1st?

10:24AM    2   A.   Yes.  Mr. Gerace writes a message on 12/1:  Can you call

10:24AM    3   Clarence?

10:24AM    4          **MR. TRIPI:**  And, Ms. Champoux, can you just scroll

10:24AM    5   down, please.

10:24AM    6          **BY MR. TRIPI:**

10:24AM    7   Q.   Now, in terms of -- in terms of Clarence, do the towns

10:24AM    8   around the Buffalo area have town courts?

10:24AM    9   A.   Yes.  All the towns basically have their own courts.

10:24AM   10   Q.   Does Clarence have a town court?

10:24AM   11   A.   They do.

10:24AM   12   Q.   Okay.  What's the next thing that Mr. Gerace wrote on

10:24AM   13   December 1st?

10:24AM   14   A.   Peter Gerace, 4/15/67.

10:24AM   15   Q.   And what did Mr. Gerace write after that?

10:24AM   16   A.   12/10, 7 p.m.

10:25AM   17   Q.   Generally, do the town courts have court at night?

10:25AM   18   A.   Yes, they do, generally.  A couple days a week, usually.

10:25AM   19   Q.   So this message is December 1st, it's talking about a

10:25AM   20   date December 10th at 7 p.m.; is that right?

10:25AM   21   A.   That's correct.

10:25AM   22   Q.   What's the next message Mr. Gerace writes?

10:25AM   23   A.   Let me know when you're home.

10:25AM   24   Q.   And what did the judge respond, Judge Michalski?

10:25AM   25   A.   I don't believe he did because it's 12/1, and then it

| | | |
|---|---|---|
| 10:25AM | 1 | jumps to 12/4. |
| 10:25AM | 2 | Q.  Oh, my fault, thank you. |
| 10:25AM | 3 | **MR. TRIPI:**  Can we scroll down to page 23, |
| 10:25AM | 4 | Ms. Champoux. |
| 10:25AM | 5 | **BY MR. TRIPI:** |
| 10:25AM | 6 | Q.  Okay.  Now a moment ago we saw the Clarence exchange, |
| 10:25AM | 7 | right? |
| 10:25AM | 8 | A.  Correct. |
| 10:25AM | 9 | Q.  Can you read what -- and that date that Mr. Gerace had |
| 10:25AM | 10 | texted was 12/10, 7 p.m.? |
| 10:26AM | 11 | A.  That's correct. |
| 10:26AM | 12 | Q.  Can you read what Judge Michalski writes as referenced |
| 10:26AM | 13 | here on page 23 on December 9th to Mr. Gerace? |
| 10:26AM | 14 | A.  It's from John Michalski:  You don't go to court |
| 10:26AM | 15 | tomorrow.  You'll be getting something in the mail. |
| 10:26AM | 16 | And then another message from Judge Michalski:  I am in |
| 10:26AM | 17 | Columbus right now.  I will get in touch when I get back. |
| 10:26AM | 18 | Q.  I think you said "you" don't go to court.  Does it say: |
| 10:26AM | 19 | Hey, don't go to court? |
| 10:26AM | 20 | A.  I'm sorry, it says:  Hey, don't go to court. |
| 10:26AM | 21 | Q.  And a message from Mr. Gerace responds:  Okay, thank you. |
| 10:26AM | 22 | A.  Correct. |
| 10:26AM | 23 | Q.  And what does the judge, Judge Michalski, respond after |
| 10:26AM | 24 | that? |
| 10:26AM | 25 | A.  What address do they have for you?  It would be the one |

10:26AM  1  that appears on your license.  Is that the right one?

10:26AM  2  Q.  And is there a response by the defendant?

10:26AM  3  A.  No, I put right one down when I mailed it.

10:26AM  4          MR. TRIPI:  Ms. Champoux, can you scroll down a

10:26AM  5  little bit?

10:26AM  6          BY MR. TRIPI:

10:26AM  7  Q.  What else did Mr. Gerace write after?

10:26AM  8  A.  95 Spring Meadow Drive, Number 5, Will, 14221.

10:27AM  9  Q.  Is Williamsville in 14221?

10:27AM  10  A.  Yes.

10:27AM  11  Q.  And what did Judge John Michalski respond to that?

10:27AM  12  A.  Perfect.

10:27AM  13  Q.  A couple hours later, what did -- what did the defendant

10:27AM  14  text Judge Michalski?

10:27AM  15  A.  Think about the other thing, please.

10:27AM  16  Q.  Now, in text messages, we've seen nothing that would give

10:27AM  17  context to the "other thing" at this point?

10:27AM  18  A.  Correct.

10:27AM  19  Q.  About 11 days forward in time on December 21st, 2015, did

10:27AM  20  the defendant write Judge Michalski again?

10:27AM  21  A.  Yes, he did.

10:27AM  22  Q.  What did he write?

10:27AM  23  A.  I'll stop in.  What time you on bench?

10:27AM  24      And Judge Michalski responds:  9:30.

10:27AM  25  Q.  Okay.

10:28AM   1          **MR. TRIPI:**  Ms. Champoux, can we go to page 27,

10:28AM   2    skipping ahead a little bit in time.

10:28AM   3          Can you hover between page 26 and 27 just so I can

10:28AM   4    see the -- no, the other way.  Yep.

10:28AM   5          Scroll down a little bit.  Can you keep scrolling?

10:28AM   6    All right.  Stop there.

10:28AM   7          **BY MR. TRIPI:**

10:28AM   8    Q.  Hovering between page 28 and 29, do you see a text of a

10:28AM   9    photo?

10:28AM  10    A.  Yes, I do.

10:28AM  11    Q.  What's the date of that?

10:28AM  12    A.  January 16th, 2016.

10:28AM  13    Q.  And in the middle there, who's depicted?

10:29AM  14    A.  Mr. Gerace.

10:29AM  15    Q.  So the defendant?

10:29AM  16    A.  The defendant, correct.

10:29AM  17    Q.  And who's to the far right of the bottom of the screen, I

10:29AM  18    guess, which would be the right of the photo?

10:29AM  19    A.  John Michalski.  Judge John Michalski.

10:29AM  20          **MR. TRIPI:**  Ms. Champoux, can we scroll down further.

10:29AM  21          **BY MR. TRIPI:**

10:29AM  22    Q.  On December -- excuse me, on January 19th, 2016, does

10:29AM  23    Mr. Gerace text Judge Michalski?

10:29AM  24    A.  Yes, he does.

10:29AM  25    Q.  And is there a response by Judge Michalski?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

56

10:29AM  1    A.  Yes, there is.

10:29AM  2    Q.  And what is that exchange?

10:29AM  3    A.  Are you working, from Defendant Gerace.

10:29AM  4        And then John Michalski, on my way.

10:29AM  5    Q.  And just to be clear, when there's reference to

10:29AM  6    "working," Judge Michalski is an active, acting Supreme Court

10:29AM  7    judge?

10:29AM  8    A.  Yes, Court of Claims appointed full-time position as a

10:29AM  9    judge.  State Supreme Court judge.

10:29AM  10           **MR. TRIPI:**  Can we keep scrolling, Ms. Champoux?

10:29AM  11           Okay.  Stop there.

10:30AM  12           **BY MR. TRIPI:**

10:30AM  13   Q.  Generally, near the top here, does it appear they're --

10:30AM  14   that the defendant is trying to make plans?

10:30AM  15   A.  Yes, it generally -- yes, that's what it appears to be.

10:30AM  16   Q.  Can you read the bottom two messages on this page, on

10:30AM  17   January 20th, 2016, written by the defendant?

10:30AM  18   A.  Yes.  From the defendant:  Wish we could squash other

10:30AM  19   thing.  I'll stop in Tuesday a.m. if you are there about 8:45

10:30AM  20   a.m.

10:30AM  21   Q.  As you reviewed these as the investigator, did that

10:30AM  22   indicate to you that the defendant would go visit the judge

10:30AM  23   at his courthouse?

10:30AM  24   A.  There were a number of messages that were indicative of

10:30AM  25   that.

10:30AM  1              **MR. FOTI:**  Objection.

10:30AM  2              **THE COURT:**  I'm sorry?

10:31AM  3              **MR. FOTI:**  I'm sorry for the pause, Judge, but

10:31AM  4    I'll -- I'm going to object to what the messages were

10:31AM  5    indicative of.

10:31AM  6              The jury has the messages.  There's no reason why

10:31AM  7    this witness is in a better position to opine on what was

10:31AM  8    meant by the participants.

10:31AM  9              **THE COURT:**  Yeah, I'll sustain the objection and

10:31AM  10   strike that answer.  Next question.

10:31AM  11             **MR. TRIPI:**  If I may, Judge, just a brief response.

10:31AM  12   The question was as the investigator what they indicate.

10:31AM  13             **THE COURT:**  No, I understand.  I'm going to strike

10:31AM  14   the answer.  Next question.

10:31AM  15             **MR. TRIPI:**  All right.  We'll go to page 31.  Can we

10:31AM  16   scroll down just a little bit.

10:31AM  17             **BY MR. TRIPI:**

10:31AM  18   Q.  All right.  Can you read the messages -- I'm sorry, can

10:31AM  19   you read the messages on January 24th?

10:31AM  20   A.  Yes.  From the defendant:  What are you doing, bud?

10:31AM  21   Leave June 25th open.  Parents surprise 50th wed anniversary.

10:31AM  22   Russell's.  Only 70 people.

10:32AM  23       And Judge Michalski responds:  Fun.

10:32AM  24   Q.  Now earlier in this trial, you sat here and you saw the

10:32AM  25   evidence.  Did the jury see a photo of Mr. Gerace in what was

10:32AM  1   the kitchen of Russell's restaurant?

10:32AM  2   A.  Yes, that was an exhibit.

10:32AM  3   Q.  Now that particular exhibit, was the defendant with other

10:32AM  4   individuals like P.H. and people associated with Pharaoh's,

10:32AM  5   correct?

10:32AM  6   A.  Yes, exactly.

10:32AM  7   Q.  Is Russell's -- is there a Russell's owned by Russell

10:32AM  8   Salvatore on Transit Road?

10:32AM  9   A.  Yes, it is.

10:32AM  10  Q.  Is it a restaurant with a connected hotel?

10:32AM  11  A.  Yes, it is.

10:32AM  12  Q.  Is Russell Salvatore someone that you interviewed in this

10:32AM  13  matter?

10:32AM  14  A.  Yes, he is.

10:32AM  15  Q.  Did you also interview sort of the manager of Russell's?

10:32AM  16  A.  Yeah, the -- Mark Jerge, who kind of runs it.  Or runs

10:32AM  17  the hotel, I should say, and the restaurant.

10:32AM  18  Q.  All right.  Now, a couple days later, did you see a

10:32AM  19  message January 26th, 2016?

10:33AM  20  A.  Yes, I do.

10:33AM  21  Q.  What did the defendant write there?

10:33AM  22  A.  Will you be in 8:45 a.m.

10:33AM  23        **MR. TRIPI:**  Can we scroll a little bit, Ms. Champoux?

10:33AM  24        **BY MR. TRIPI:**

10:33AM  25  Q.  And what did Judge Michalski respond there?

10:33AM  1   A.   Prob not.

10:33AM  2          **MR. TRIPI:**  Okay.  Can we go to page 35, please?

10:33AM  3          **BY MR. TRIPI:**

10:33AM  4   Q.   All right.  There's messages January 30th, February 5th,

10:33AM  5   8th, 10th, and 11th, 2016 on this page.  Can you read those

10:33AM  6   messages written by the defendant on those dates?

10:33AM  7   A.   So starting at the top from the defendant:  Call me.

10:33AM  8       Did you think about what we talked about?  Only ten

10:33AM  9   months left.

10:33AM  10  Q.   Hang on there's a gap in days there?

10:33AM  11  A.   That's correct.  Yeah, February 5th.

10:33AM  12      First one's January 30th.  The second one is

10:34AM  13  February 5th, 2016.

10:34AM  14      And then another one on February 5th, 2016.

10:34AM  15      A couple minutes -- three minutes later:  Would make my

10:34AM  16  life easier.

10:34AM  17      And then another one on February 8th, 2016:  Call me.

10:34AM  18      February 10th, 2016, with a question mark.

10:34AM  19      And then February 11th, 2016 with:  H-E-L-L-O-O-O-O.

10:34AM  20      All from the defendant Judge Michalski.

10:34AM  21          **MR. TRIPI:**  Can we move to page 39, Ms. Champoux?

10:34AM  22          **BY MR. TRIPI:**

10:34AM  23  Q.   There's some messages here on March 4th from the

10:34AM  24  defendant to Judge Michalski; is that right?

10:34AM  25  A.   That's correct.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

60

| | | |
|---|---|---|
| 10:34AM | 1 | Q.  Can you read those for the jury? |
| 10:34AM | 2 | A.  From the defendant:  Call me.  I'm going out with Lillo |
| 10:34AM | 3 | Brancato tonight.  I'll be at Russell's. |
| 10:35AM | 4 | Q.  Okay.  I'm gonna stop you there. |
| 10:35AM | 5 | Has the jury seen a photo of this defendant and the actor |
| 10:35AM | 6 | Lillo Brancato together? |
| 10:35AM | 7 | A.  Yes, they have. |
| 10:35AM | 8 | Q.  And I'll be at Russell.  Again, there's a restaurant |
| 10:35AM | 9 | Russell's Steaks, Chops & More on Transit Road? |
| 10:35AM | 10 | A.  The same one I previously discussed. |
| 10:35AM | 11 | Q.  Okay.  And what's the last message there? |
| 10:35AM | 12 | A.  At 6. |
| 10:35AM | 13 | Q.  Okay.  So obviously, we've got to do some math there |
| 10:35AM | 14 | because that text is at 10:14 p.m., correct? |
| 10:35AM | 15 | A.  Yes. |
| 10:35AM | 16 | Q.  That's UTC time? |
| 10:35AM | 17 | A.  That is UTC, yes. |
| 10:35AM | 18 | Q.  All right. |
| 10:35AM | 19 | **MR. TRIPI:**  Let's jump ahead to page 49. |
| 10:35AM | 20 | **BY MR. TRIPI:** |
| 10:35AM | 21 | Q.  I want to look at the messages at the bottom of the |
| 10:36AM | 22 | screen, April 28th, 2016.  Can you read those exchanges for |
| 10:36AM | 23 | the jury? |
| 10:36AM | 24 | A.  From Mr. Gerace:  Can you talk? |
| 10:36AM | 25 | And Judge Michalski:  Sure. |

10:36AM  1    Q.  And this was reviewed earlier in the trial, but there are

10:36AM  2    phone calls between Mr. Gerace and Mr. Michalski through

10:36AM  3    Mr. Gerace's phone records, correct?

10:36AM  4    A.  That's correct.

10:36AM  5           **MR. TRIPI:**  Let's go to page 50, Ms. Champoux.

10:36AM  6           **BY MR. TRIPI:**

10:36AM  7    Q.  I want to focus you in on an exchange on May 20, 2016.

10:36AM  8    Can you read that?

10:36AM  9    A.  That's from the defendant:  You coming to parents' 50th?

10:36AM  10       From Judge Michalski:  Yes.

10:36AM  11   Q.  Did the defendant respond to yes?

10:36AM  12   A.  He responded with:  Thanks.

10:36AM  13          **MR. TRIPI:**  Let's move on to page 51.

10:37AM  14          **BY MR. TRIPI:**

10:37AM  15   Q.  On June 2nd, 2016, is there an exchange?

10:37AM  16   A.  There is.

10:37AM  17   Q.  Can you read that for the jury?

10:37AM  18   A.  From the defendant:  Can you renew parents' vows that

10:37AM  19   night, please?

10:37AM  20       From Judge Michalski:  Sure.

10:37AM  21          **MR. TRIPI:**  Can you scroll up just a little bit,

10:37AM  22   Ms. Champoux.  Or the other way, I guess, down for you.

10:37AM  23          **BY MR. TRIPI:**

10:37AM  24   Q.  This particular photo of this fish, did you also see that

10:37AM  25   photo in a text thread between the defendant and

10:37AM   1   Mr. Bongiovanni?

10:37AM   2   A.  Yes, I did.

10:37AM   3        **MR. TRIPI:**  Let's jump ahead to page 56,

10:37AM   4   Ms. Champoux.  Sorry, we need to hover on 55.  There we go.

10:37AM   5        **BY MR. TRIPI:**

10:37AM   6   Q.  Can you read the exchanges on July 17th, 2016?

10:37AM   7   A.  Yes.  From July 17th, 2016, from the defendant to Mr. --

10:38AM   8   or, Judge Michalski:  Call me later or tomorrow.  I have a

10:38AM   9   question.

10:38AM   10      Judge Michalski gives a thumbs up emoji.

10:38AM   11      Mr. Gerace:  If you're around in a bit, I have to stop

10:38AM   12   and ask you something.

10:38AM   13      Judge Michalski gives a thumbs up.

10:38AM   14      And then the next exchange is on -- is from the defendant

10:38AM   15   on July 18th, 2016.

10:38AM   16        **MR. TRIPI:**  Can you scroll a little, Ms. Champoux?

10:38AM   17        **BY MR. TRIPI:**

10:38AM   18   Q.  Go ahead.

10:38AM   19   A.  C.C., 1/22/85.

10:38AM   20      And a thumbs up from Judge Michalski.

10:38AM   21   Q.  And C.C., she's a witness who testified in this case?

10:38AM   22   A.  Yes.

10:38AM   23   Q.  Does that appear to be her date of birth that's texted

10:38AM   24   next to her name?

10:38AM   25   A.  That is her date of birth.

| | | |
|---|---|---|
| 10:38AM | 1 | Q.  And that's followed up by a thumbs up emoji -- |
| 10:38AM | 2 | A.  That's correct. |
| 10:38AM | 3 | Q.  -- by the judge? |
| 10:38AM | 4 | And what does the defendant respond? |
| 10:38AM | 5 | A.  Thanks.  Keep me posted. |
| 10:38AM | 6 | MR. TRIPI:  Let's scroll to the next page, 57, and |
| 10:39AM | 7 | continue with this discussion.  Stop there. |
| 10:39AM | 8 | BY MR. TRIPI: |
| 10:39AM | 9 | Q.  And do you see another text from the judge, from Judge |
| 10:39AM | 10 | Michalski on July 19th, 2016? |
| 10:39AM | 11 | A.  Yes, I do. |
| 10:39AM | 12 | Q.  And what does it say? |
| 10:39AM | 13 | A.  Peter Todoro is working on an adjournment for Friday. |
| 10:39AM | 14 | Q.  Do you know who Peter Todoro is? |
| 10:39AM | 15 | A.  He's a defense attorney and, I believe, cousins with the |
| 10:39AM | 16 | defendant. |
| 10:39AM | 17 | Q.  And Judge Michalski's the one writing that Peter Todoro |
| 10:39AM | 18 | is working on an adjournment for Friday? |
| 10:39AM | 19 | A.  That's correct. |
| 10:39AM | 20 | Q.  What did the defendant respond? |
| 10:39AM | 21 | A.  Okay.  Thanks. |
| 10:39AM | 22 | Q.  And then earlier we talked about town court judges or |
| 10:39AM | 23 | town courts? |
| 10:39AM | 24 | A.  Yes. |
| 10:39AM | 25 | Q.  Again, do town courts have jurisdiction for traffic |

10:40AM    1    offenses and certain misdemeanor offenses?

10:40AM    2    A.   Yes.  I think they might do a felony initial appearance,

10:40AM    3    but predominantly misdemeanors and traffic violations.

10:40AM    4         MR. TRIPI:  Can we keep scrolling Ms. Champoux.  Keep

10:40AM    5    going down.

10:40AM    6         BY MR. TRIPI:

10:40AM    7    Q.   Okay.  I'd like to focus you in on a message from the

10:40AM    8    defendant September 2nd, 2016.  It's on the bottom of page

10:40AM    9    58.

10:40AM    10   A.   From the defendant to Judge Michalski:  Do you know

10:40AM    11   Officer Trotter?

10:40AM    12        MR. TRIPI:  Can we scroll to the next page,

10:40AM    13   Ms. Champoux?

10:40AM    14        BY MR. TRIPI:

10:40AM    15   Q.   And what did Judge Michalski respond to that?

10:40AM    16   A.   Yes.  Good guy.

10:40AM    17   Q.   And what did the defendant reply?

10:40AM    18   A.   Him and Judge Klein got me order of protection against

10:40AM    19   Katrina.  He's a great guy.  Took great care of me.

10:41AM    20   Q.   And what's the date of that message?

10:41AM    21   A.   December 22nd, 2016.

10:41AM    22   Q.   And did Judge Michalski respond on September 2nd, 2016?

10:41AM    23   A.   About a minute later, Judge Michalski responds:  Yes,

10:41AM    24   agreed.  Geoff Klein, too.

10:41AM    25        MR. TRIPI:  Now, Ms. Champoux, can we side by side

10:41AM  1    with this page Exhibit 467?

10:41AM  2         **BY MR. TRIPI:**

10:41AM  3    Q.  All right.  So, if we look at the exhibit on the right,

10:41AM  4    the purported marriage between the defendant and Katrina

10:41AM  5    Nigro was on September 18th, 2014; is that right?

10:41AM  6    A.  That's correct.

10:41AM  7    Q.  Almost two years before this text exchange about the --

10:41AM  8    Trotter and the protective order against Katrina, right?

10:41AM  9    A.  That's accurate.

10:41AM  10        **MR. TRIPI:**  You can take 467 down.

10:42AM  11        Continue with the texts.  Stop there.  Stop there.

10:42AM  12   I'm sorry.  Let me catch up with my eyes.

10:42AM  13        **BY MR. TRIPI:**

10:42AM  14   Q.  All right.  At the top of the page, September 2nd, 2016,

10:42AM  15   what did Judge Michalski write?

10:42AM  16   A.  September 2nd, 2016, at the top?

10:42AM  17   Q.  At the top.

10:42AM  18   A.  Yes, agreed.  Geoff Klein, too.

10:42AM  19   Q.  And what did the defendant reply to that, yes, agreed,

10:42AM  20   Geoff Klein too?

10:42AM  21   A.  I don't know him.  I have to meet prosecutor next week.

10:42AM  22   Q.  And what did Judge Michalski respond?

10:42AM  23   A.  The thumbs up emoji.

10:43AM  24        **MR. TRIPI:**  Scroll down a little bit, Ms. Champoux.

10:43AM  25        If we could, I'd like to keep going down to page 62.

10:43AM   1   Let's go to page 64, I'm sorry.

10:43AM   2        **BY MR. TRIPI:**

10:43AM   3   Q.   Okay.  Can you look at the top message there, and read

10:43AM   4   that?

10:43AM   5   A.   From Defendant Gerace:  See you tomorrow.

10:43AM   6   Q.   And what's the date of that?

10:43AM   7   A.   September 17th, 2016.

10:43AM   8   Q.   Okay.  But if you're applying the UTC time, it's really

10:43AM   9   written September 16th; is that right?

10:43AM  10   A.   Yes, that's accurate.

10:43AM  11   Q.   Okay.  And then is the next message on September 19th,

10:44AM  12   2016?

10:44AM  13   A.   Yes, it is.

10:44AM  14   Q.   And does appear to be a screenshot of the text -- a

10:44AM  15   screenshot of something from social media, photo?

10:44AM  16   A.   Yes.  It appears to be a screenshot from social media.

10:44AM  17        **MR. TRIPI:**  Can you scroll down a little bit,

10:44AM  18   Ms. Champoux.

10:44AM  19        **BY MR. TRIPI:**

10:44AM  20   Q.   All right.  And do you recognize the people depicted in

10:44AM  21   the screenshot?

10:44AM  22   A.   Yes, I do.

10:44AM  23   Q.   Can you read the screenshot and tell us who the people

10:44AM  24   are?

10:44AM  25   A.   Happy 70th to the best dad in the world.  John Michalski,

10:44AM    1    can you get out of the picture?

10:44AM    2    Q.  And who are the people in this picture, that shot?

10:44AM    3    A.  Mr. and Mrs. Gerace, as well as John Michalski.

10:44AM    4    Q.  And is Judge Michalski to the far left?

10:44AM    5    A.  Yes, he is.

10:44AM    6         **MR. TRIPI:**  Let's scroll down further.  Keep

10:44AM    7    scrolling, Ms. Champoux.  I'll let you know when to stop.  All

10:44AM    8    right.  On September 19th, let's stop here.  Page 66.

10:44AM    9         **BY MR. TRIPI:**

10:45AM    10    Q.  Can you continue sort of the communications on

10:45AM    11    September 19th, 2016, from the top of the page and go through

10:45AM    12    the bottom?

10:45AM    13    A.  Certainly.  Yeah.  So from the defendant, Mr. Gerace:  We

10:45AM    14    will do again soon.

10:45AM    15        From Judge Michalski:  It was nice to see Anthony too.

10:45AM    16        From Mr. Gerace:  Yes, he not around much.  LOL.  My

10:45AM    17    parents were so happy u and Sue came.

10:45AM    18    Q.  Let me stop you there.  Does Judge Michalski have a wife

10:45AM    19    named Sue or Susie?

10:45AM    20    A.  Yes.

10:45AM    21    Q.  Keep going.

10:45AM    22    A.  From Judge Michalski:  They are great.

10:45AM    23        From Mr. Gerace:  I wanted you there for 50th wed ann and

10:45AM    24    70th B day.

10:45AM    25         **MR. TRIPI:**  Scroll to the next page, please,

USA v Gerace - Burns - Tripi/Direct - 12/17/24

68

| | | |
|---|---|---|
| 10:45AM | 1 | Ms. Champoux. |
| 10:45AM | 2 | **BY MR. TRIPI:** |
| 10:45AM | 3 | Q.  Okay.  I'd like to focus you in on now, jump ahead in |
| 10:45AM | 4 | text message time, to October 26th, 2016.  Can you read those |
| 10:45AM | 5 | messages? |
| 10:45AM | 6 | A.  From Mr. Gerace:  Are you in?  I'm on the fifth floor. |
| 10:46AM | 7 | And then from Judge Michalski:  On trial. |
| 10:46AM | 8 | And from Mr. Gerace:  Okay. |
| 10:46AM | 9 | And then -- |
| 10:46AM | 10 | Q.  There's a gap? |
| 10:46AM | 11 | A.  Yeah, there's a gap. |
| 10:46AM | 12 | **THE COURT:**  Mr. Tripi, we have a juror who needs a |
| 10:46AM | 13 | break. |
| 10:46AM | 14 | **MR. TRIPI:**  Oh, I do too.  That's great. |
| 10:46AM | 15 | Thank you. |
| 10:46AM | 16 | **THE COURT:**  Let's take a break.  Please remember my |
| 10:46AM | 17 | instructions.  Don't talk about the case, even with each |
| 10:46AM | 18 | other.  Don't make up your minds.  See you back here in about |
| 10:46AM | 19 | 15 minutes. |
| 10:46AM | 20 | (Jury excused at 10:46 a.m.) |
| 10:47AM | 21 | **THE COURT:**  Anything for the record before we break? |
| 10:47AM | 22 | **MR. FOTI:**  No, Judge. |
| 10:47AM | 23 | **MR. TRIPI:**  No, thank you. |
| 10:47AM | 24 | **THE COURT:**  Great. |
| 10:47AM | 25 | **THE CLERK:**  All rise. |

| 10:47AM | 1 | (Off the record at 10:47 a.m.) |

| 10:47AM | 2 | (Back on the record at 11:02 a.m.) |

| 11:02AM | 3 | (Jury not present.) |

11:02AM    4        **THE CLERK:**  All rise.

11:02AM    5        **THE COURT:**  Please be seated.

11:02AM    6        **THE CLERK:**  We are back on the record for the jury

11:02AM    7    trial in case numbers 19-cr-227 and 23-cr-37, United States of

11:02AM    8    America versus Peter Gerace Jr.

11:02AM    9        All counsel and parties are present.

11:02AM    10        **THE COURT:**  Okay.  So I've thought about this, and

11:02AM    11    I've looked at a little bit of the law.  And I think I'm

11:03AM    12    correct that the texts all come in with respect to context

11:03AM    13    because they're Mr. Gerace's texts, and the texts of the other

11:03AM    14    person come in for context.

11:03AM    15        But that means that the other person's texts don't

11:03AM    16    come in for the truth of what is stated.

11:03AM    17        So I think I need to tell the jury that these texts

11:03AM    18    are coming in, that the texts are coming in because of the

11:03AM    19    defendant's texts, that the texts of the other person are

11:03AM    20    being put in just for context to show Mr. Gerace's state of

11:03AM    21    mind.

11:03AM    22        If there are specific texts that the government

11:03AM    23    believes are in furtherance of -- I haven't seen many, I've

11:03AM    24    seen a couple that you might argue are in furtherance of the

11:03AM    25    conspiracy, and I do think that Judge Michalski is a

11:03AM    1    coconspirator.  If there are texts that come in substantively

11:03AM    2    because they are in furtherance of the conspiracy, I'll

11:04AM    3    consider that from the government and instruct the jury on

11:04AM    4    that.  But I think that they all come in for context.

11:04AM    5         MR. TRIPI:  Rather than sort of wasting time now,

11:04AM    6    would you be amenable to me getting through it, and then

11:04AM    7    circling back and having argument if there are certain ones

11:04AM    8    that should come in substantively?

11:04AM    9         THE COURT:  Sure.  Yeah.

11:04AM    10        MR. TRIPI:  Is that okay?

11:04AM    11        THE COURT:  Do you want to say anything about that?

11:04AM    12        MR. FOTI:  No, I'm fine with that.

11:04AM    13        THE COURT:  Yeah.  And I think that's how they come

11:04AM    14    in.  I think that -- I think that the in furtherance standard,

11:04AM    15    though, is a pretty high standard.  Statements that are made

11:04AM    16    in furtherance of the conspiracy.

11:04AM    17        MR. TRIPI:  So there might be a couple, Judge, and I

11:04AM    18    don't want to drug us into the muck right now, but there might

11:04AM    19    be a couple.  Like, for example, where it's -- I was with

11:04AM    20    Shelby last night, and the judge just says ha ha ha.  That's

11:04AM    21    not even -- that's not even an assertion of anything, so we

11:05AM    22    can argue whatever inferences we want from that.  I'm just

11:05AM    23    using one example.

11:05AM    24        THE COURT:  Yeah.  So I was thinking, and I was

11:05AM    25    talking with Rebecca about this, I was thinking that maybe the

11:05AM    1   ones where Michalski seems to be helping him out might -- I

11:05AM    2   don't think they are, I don't think they're in furtherance of

11:05AM    3   the conspiracy, so -- especially given the standard.  So --

11:05AM    4         MR. TRIPI:  I'll go back and look, and if I have

11:05AM    5   other arguments, like if it's a present sense --

11:05AM    6         THE COURT:  Great.  Okay.  Are you still thinking you

11:05AM    7   might be done by noon?

11:05AM    8         MR. TRIPI:  I'm gonna try to hoof it, yeah.  I'm

11:05AM    9   gonna try.

11:05AM   10         THE COURT:  Anything more for the record?

11:05AM   11         MR. TRIPI:  No, Judge.

11:05AM   12         THE COURT:  Anything for the record?

11:05AM   13         MR. FOTI:  Judge, I guess, in all of those

11:05AM   14   conversations that the government tends to offer and that the

11:05AM   15   Court is going to accept over objection, one separate

11:05AM   16   conversation -- excuse me.

11:05AM   17         THE COURT:  Are you talking about substantively?

11:05AM   18         MR. FOTI:  No, just accept it for context under

11:05AM   19   the -- within the limits that the Court has indicated --

11:05AM   20         THE COURT:  Yeah.

11:05AM   21         MR. FOTI:  -- it would accept it.

11:06AM   22         There is a conversation that I have particular

11:06AM   23   concern about, particularly if it's just being offered for

11:06AM   24   that purpose, which is the communication with LaMont -- oh,

11:06AM   25   I'm sorry, I think I just referenced a former client.  Darryl

11:06AM    1    LaMont.  The -- there's communication in there where it

11:06AM    2    clearly -- the inference, and I imagine that the jury will

11:06AM    3    draw this, is that they're -- they're joking.  But it could be

11:06AM    4    offensive that the -- the comments made to Peter Gerace are

11:06AM    5    things along the lines of are black people allowed at your

11:06AM    6    golf tournament?  And there's an LOL at the end of it,

11:06AM    7    suggesting that it's a joke.  And then Mr. Gerace, in the text

11:06AM    8    message responds, no, LOL.  And then the follow-up response

11:07AM    9    is, I gotta my Tiger Woods on.

11:07AM    10           And it's clearly -- there's -- it's a joke, but

11:07AM    11   there's racial implications to the joke that could be

11:07AM    12   offensive.  Particularly --

11:07AM    13           THE COURT:  Is that coming in?

11:07AM    14           MR. TRIPI:  It's in the text thread, Your Honor.  I

11:07AM    15   wasn't gonna highlight it.  It's not one that I planned to

11:07AM    16   stop on and talk about.

11:07AM    17           But I guess there is some corroboration as to the

11:07AM    18   golf outings, so, you know --

11:07AM    19           THE COURT:  I get it.  But on 403, I don't think -- I

11:07AM    20   think I'm gonna -- I'm not going to a through in.

11:07AM    21           MR. TRIPI:  So, yeah, I'll certainly skip over it,

11:07AM    22   let me just make sure I have it flagged.

11:07AM    23           THE COURT:  And we can -- and we can --

11:07AM    24           MR. TRIPI:  I can redact it later.

11:07AM    25           THE COURT:  Yeah, redact it, please.  I think that's

11:07AM   1   right.  I think that there's -- there's a chance that that

11:07AM   2   could be taken as offensive.  I understand what you're saying,

11:07AM   3   Mr. Foti, I think it probably was a joke, I don't think it's

11:07AM   4   offensive, but a juror might.

11:07AM   5          MR. FOTI:  There's two instances that I can think of.

11:07AM   6   There's that one, and then at the very end of the exhibit I

11:08AM   7   believe there's one that was along the lines of did you have

11:08AM   8   any black people at your birthday party, something like that.

11:08AM   9          THE COURT:  Same thing.

11:08AM  10          MR. TRIPI:  I don't know where that one is.  Can you

11:08AM  11   help me to find it?

11:08AM  12          MR. FOTI:  Yeah, I think I have it.

11:08AM  13          THE COURT:  Same thing.

11:08AM  14          MR. FOTI:  I think it's at the very end.

11:08AM  15          THE COURT:  We don't need to do this now.  We'll do

11:08AM  16   this during a break, right?  But I'm going to keep both out,

11:08AM  17   we're gonna redact those.

11:08AM  18          MR. FOTI:  Understood.

11:08AM  19          THE COURT:  Anything else in particular, Mr. Foti,

11:08AM  20   you have a problem with?

11:08AM  21          MR. FOTI:  So the other one is a little bit more

11:08AM  22   complicated.  It's not race implicated, but there's the

11:08AM  23   comment of Peter Gerace says the message is, you took one of

11:08AM  24   my best weekend girls.

11:08AM  25          And my understanding is that was an expression of

11:08AM  1    frustration.

11:08AM  2          The response back is, again, I think a joke, but I

11:08AM  3    understand why the government would want to offer it, because

11:08AM  4    he says something like, and she today's anal, LOL.

11:08AM  5          **MR. TRIPI:**  Yeah.  I don't care about the LOL at the

11:08AM  6    end of that, Judge.  We definitely think that's a

11:08AM  7    coconspirator statement.  It's talking about a specific sex

11:08AM  8    act done by a specific woman.  And it shows an intimate level

11:09AM  9    of knowledge.  And it shows the flow of personnel between

11:09AM  10   Pharaoh's and No Limit Entertainment.

11:09AM  11          I think that's the whole -- if there's one text in

11:09AM  12   that whole thread, that's the most important text.  So --

11:09AM  13          **THE COURT:**  How is it in furtherance of the

11:09AM  14   conspiracy?

11:09AM  15          **MR. TRIPI:**  Because it's in furtherance of the

11:09AM  16   conspiracy because they're talking about personnel.  They're

11:09AM  17   talking about personnel, a woman --

11:09AM  18          **THE COURT:**  How is LaMont involved in the conspiracy

11:09AM  19   at Pharaoh's?

11:09AM  20          **MR. TRIPI:**  All right.  So we've had plenty of

11:09AM  21   testimony about women who have a nexus between both.

11:09AM  22          **THE COURT:**  Right.

11:09AM  23          **MR. TRIPI:**  Personnel working for each of them.

11:09AM  24          **THE COURT:**  Yes.

11:09AM  25          **MR. TRIPI:**  Sex acts occurring in each location.

| | | |
|---|---|---|
| 11:09AM | 1 | **THE COURT:** Yes. |
| 11:09AM | 2 | **MR. TRIPI:** You heard E.H. say Peter Gerace |
| 11:09AM | 3 | introduced her to Darryl LaMont, and she -- she was |
| 11:09AM | 4 | essentially being asked to go do stag parties, and she says -- |
| 11:09AM | 5 | I don't remember the quote verbatim, that's essentially |
| 11:09AM | 6 | prostitution, and she -- she -- she declined, she mocked him |
| 11:10AM | 7 | in a way, and she pretty quickly fell out of favor there and |
| 11:10AM | 8 | left the club. |
| 11:10AM | 9 | In this context, there are also multiple instances |
| 11:10AM | 10 | where they're discussing Shelby, they're also discussing other |
| 11:10AM | 11 | people in this text thread. It's LaMont saying -- |
| 11:10AM | 12 | **THE COURT:** But how is LaMont -- answer this |
| 11:10AM | 13 | question. How is LaMont a coconspirator with respect to the |
| 11:10AM | 14 | sex trafficking at Pharaoh's? LaMont and -- |
| 11:10AM | 15 | **MR. TRIPI:** Well, hang on. Is a sex-trafficking |
| 11:10AM | 16 | conspiracy. There are no walls and silos placed up. It's a |
| 11:10AM | 17 | sex-trafficking conspiracy. |
| 11:10AM | 18 | I opened, and we've allowed in proof, and I said that |
| 11:10AM | 19 | these acts occurred beyond Pharaoh's walls. And you let in |
| 11:10AM | 20 | proof over 412 objections. |
| 11:10AM | 21 | I guess I would go back to your Sauce/Gander |
| 11:10AM | 22 | Doctrine, Judge. It extends beyond Pharaoh's walls. |
| 11:10AM | 23 | And so when it's good to sort of impeach a witness, |
| 11:10AM | 24 | it comes in, but when it's clearly Darryl LaMont -- just |
| 11:11AM | 25 | yesterday he was identified in the photo as Scooter as someone |

| | | |
|---|---|---|
| 11:11AM | 1 | who the judge -- who Gerace helped arrange heroin for L.L. |
| 11:11AM | 2 | and so she can't work if she's -- |
| 11:11AM | 3 | **THE COURT:**  Let me think about it.  Let me think |
| 11:11AM | 4 | about that one.  Let me think about that. |
| 11:11AM | 5 | We'll keep going.  And let me think about that one. |
| 11:11AM | 6 | Pat, let's bring them back in, please. |
| 11:11AM | 7 | I'm sorry, Mr. Foti. |
| 11:11AM | 8 | **MR. FOTI:**  No, that's it. |
| 11:11AM | 9 | **THE COURT:**  Okay, let's bring them back in. |
| 11:11AM | 10 | **MR. TRIPI:**  I thought the Sauce/Gander Doctrine |
| 11:11AM | 11 | should be documented. |
| 11:11AM | 12 | **THE COURT:**  I know what you meant. |
| 11:11AM | 13 | **MR. TRIPI:**  I was trying to be funny, not offensive, |
| 11:12AM | 14 | Judge.  I hope you didn't take offense. |
| 11:12AM | 15 | **THE COURT:**  No, I get it. |
| 11:12AM | 16 | (Jury seated at 11:12 a.m.) |
| 11:12AM | 17 | **THE COURT:**  Welcome back, folks.  The record will |
| 11:12AM | 18 | reflect that all our jurors are present. |
| 11:12AM | 19 | So I want to explain something to you. |
| 11:12AM | 20 | There are a bunch of text messages that are coming in |
| 11:12AM | 21 | now obviously.  Mr. Gerace's text messages come in for the |
| 11:13AM | 22 | truth of the text messages because they are the defendant's |
| 11:13AM | 23 | text messages. |
| 11:13AM | 24 | The other person in the text message exchange is not |
| 11:13AM | 25 | here to testify.  So those text messages are coming in only to |

11:13AM   1    give context to Mr. Gerace's text messages.  In other words,

11:13AM   2    they're not being admitted for the truth.  If there are

11:13AM   3    statements of fact in those text messages, they're not being

11:13AM   4    admitted for the truth of it.  They're simply being admitted

11:13AM   5    to show Mr. Gerace's state of mind so you can understand

11:13AM   6    Mr. Gerace's state of mind in the context of the text message

11:13AM   7    discussion that's going back and forth.  Okay?  Not for the

11:13AM   8    truth, just to show Mr. Gerace's state of mind and for

11:13AM   9    context.  Got it?

11:13AM   10             **JURORS:**  Got it.

11:13AM   11             **THE COURT:**  Great.  Good.

11:13AM   12             I remind the witness he's still under oath.

11:13AM   13             Mr. Tripi, you may continue.

11:13AM   14             **MR. TRIPI:**  We're back to Exhibit 310AE.  We left off

11:13AM   15    at page 67.  Let move on to page 83, please.

11:14AM   16             Could we scroll down to page 84, please?  Sorry about

11:14AM   17    that.  Keep going.

11:14AM   18             **BY MR. TRIPI:**

11:14AM   19    Q.  Can you read a message from Mr. Gerace from December 27,

11:14AM   20    2016?

11:14AM   21    A.  Our new house, signing tomorrow.

11:14AM   22    Q.  Did that text occur after a couple about it that had sort

11:14AM   23    of photos of houses?

11:14AM   24    A.  Yes.

11:14AM   25    Q.  Interiors of houses?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

78

| | | |
|---|---|---|
| 11:14AM | 1 | A.  Yes. |
| 11:14AM | 2 | Q.  Is there a response by Judge Michalski? |
| 11:14AM | 3 | A.  Spectacular. |
| 11:14AM | 4 | Q.  And what did the defendant respond to that? |
| 11:14AM | 5 | A.  I love it, John.  It took me a long time to get to this |
| 11:14AM | 6 | point. |
| 11:14AM | 7 | **MR. TRIPI:**  Okay.  Let's move forward to page 87, |
| 11:14AM | 8 | Ms. Champoux. |
| 11:14AM | 9 | **BY MR. TRIPI:** |
| 11:14AM | 10 | Q.  Okay.  I'd like you to read what the defendant wrote on |
| 11:15AM | 11 | January 4th, 2017. |
| 11:15AM | 12 | A.  LOL.  I was with Shelby -- or, I was w Shelby. |
| 11:15AM | 13 | Q.  "W" meaning with? |
| 11:15AM | 14 | A.  With, correct. |
| 11:15AM | 15 | Q.  Okay.  And what did Mr. Gerace write after that? |
| 11:15AM | 16 | A.  He asked -- |
| 11:15AM | 17 | Q.  And what did Judge Michalski respond? |
| 11:15AM | 18 | A.  Ha ha ha ha ha ha ha. |
| 11:15AM | 19 | Q.  And is the ha ha ha within a minute of the text? |
| 11:15AM | 20 | A.  Yes. |
| 11:15AM | 21 | Q.  LOLs w Shelby? |
| 11:15AM | 22 | A.  Yes. |
| 11:15AM | 23 | Q.  Within two minutes; is that right? |
| 11:15AM | 24 | A.  Yes, that's accurate. |
| 11:15AM | 25 | Q.  And remind the jury who Shelby is? |

11:15AM  1   A.  Shelby Johnston, she was a dancer at Pharaoh's.

11:15AM  2   Q.  And has the jury also observed a photo of her with other

11:15AM  3   Pharaoh's dancers with Darryl LaMont earlier in the trial?

11:15AM  4   A.  Yes, we have, that's an exhibit.

11:15AM  5   Q.  Okay.  Can you read or describe the text message that was

11:15AM  6   sent on --

11:16AM  7           MR. TRIPI:  Scroll a little bit, please.

11:16AM  8           BY MR. TRIPI:

11:16AM  9   Q.  Describe the text message that was sent from Mr. Gerace

11:16AM  10  on January 5th, 2017 to Judge Michalski.

11:16AM  11  A.  It's a screenshot of a booking photo of Ms. Katrina

11:16AM  12  Nigro.

11:16AM  13  Q.  And just to describe it a little further, it has her

11:16AM  14  face, mugshot, with date intake time?

11:16AM  15  A.  That's correct.

11:16AM  16  Q.  And also has her personal identifying information, age,

11:16AM  17  height, weight?

11:16AM  18  A.  That's correct.

11:16AM  19  Q.  It has a description of the charges?

11:16AM  20  A.  Criminal contempt.

11:16AM  21  Q.  And what bond she had?

11:16AM  22  A.  That's on there, as well.  5,000.

11:16AM  23          MR. TRIPI:  Can you scroll a little bit further.

11:16AM  24          BY MR. TRIPI:

11:16AM  25  Q.  What's the immediate response by the judge?

11:16AM    1    A.  Wow.

11:16AM    2    Q.  Okay.  And what did Mr. Gerace respond after -- the

11:16AM    3    defendant respond after that?

11:16AM    4    A.  Lied to judge today.

11:16AM    5        **MR. TRIPI:**  Can you keep scrolling, Ms. Champoux?

11:17AM    6    Next page?

11:17AM    7        **BY MR. TRIPI:**

11:17AM    8    Q.  What did Mr. Gerace, the defendant, write after that?

11:17AM    9    A.  Goes back in two weeks.  When they get Verizon records,

11:17AM    10   then she gets her 2nd charge.

11:17AM    11   Q.  That's all January 5th still?

11:17AM    12   A.  That's correct.

11:17AM    13   Q.  What did Judge Michalski write after that?

11:17AM    14   A.  34 minutes later, Judge Michalski responds:  Unbelievable.

11:17AM    15   Q.  Okay.  Is this roughly two years before Ms. Nigro would

11:17AM    16   have her own vehicular assault case pending in front of Judge

11:17AM    17   Michalski?

11:17AM    18   A.  Yeah, about two years.

11:17AM    19       **MR. TRIPI:**  Let's go to page 91.  Let's go to page 95

11:17AM    20   actually.  Let's go through these messages on March 15th,

11:18AM    21   please.

11:18AM    22       **BY MR. TRIPI:**

11:18AM    23   Q.  Can you read what the judge wrote and what defendant's

11:18AM    24   response is?

11:18AM    25   A.  Called and left VM.

11:18AM    1      Gerace responds:  Thanks.  She got a week plus $5,000

11:18AM    2   bail.

11:18AM    3           MR. TRIPI:  Can you scroll through the next page,

11:18AM    4   which would be page 96, Ms. Champoux?

11:18AM    5           BY MR. TRIPI:

11:18AM    6   Q.  And what is -- describe what that text is.

11:18AM    7   A.  Again, it's an -- appears to be a booking photo with some

11:18AM    8   personal identifying information, as well as the charges and

11:18AM    9   bond.

11:18AM   10           MR. TRIPI:  Can you scroll down further Ms. Champoux?

11:18AM   11           BY MR. TRIPI:

11:18AM   12   Q.  And what did -- what was Judge Michalski's immediate

11:18AM   13   response?

11:18AM   14   A.  Ha ha ha ha ha ha.

11:18AM   15   Q.  And is there another message about nine days later on

11:18AM   16   March 25th, 2017?

11:18AM   17   A.  Yes, there is.

11:18AM   18   Q.  And what is that one?

11:18AM   19   A.  It's, again, a booking photo with intake date, and

11:18AM   20   then --

11:19AM   21   Q.  What's the intake date?

11:19AM   22   A.  March 22nd.

11:19AM   23           MR. TRIPI:  Please scroll down, Ms. Champoux.

11:19AM   24           THE WITNESS:  Personal identifying information, as

11:19AM   25   well as the charges.

11:19AM    1          **BY MR. TRIPI:**

11:19AM    2     Q.  And do these appear to be screenshots of different

11:19AM    3     charges?

11:19AM    4     A.  Yeah.  They're screenshots of booking photos with the

11:19AM    5     charge information.

11:19AM    6     Q.  Some of them have bond information, some of them have no

11:19AM    7     bond, correct?

11:19AM    8     A.  That's correct.

11:19AM    9          **MR. TRIPI:**  Scroll down further Ms. Champoux.

11:19AM   10          **BY MR. TRIPI:**

11:19AM   11     Q.  What did the defendant, after sending the screenshot or

11:19AM   12     the -- of the booking photo on March 25th, what did he write

11:19AM   13     after that?

11:19AM   14     A.  Back in.  No bail.

11:19AM   15     Q.  And what did Judge Michalski respond?

11:19AM   16     A.  Ha ha ha ha ha ha.

11:19AM   17     Q.  And what did the defendant write after that?

11:19AM   18          **MR. TRIPI:**  Will you scroll down, Ms. Champoux?

11:19AM   19          **THE WITNESS:**  Wasn't supposed to bail out, and failed

11:19AM   20     urine.

11:19AM   21          **BY MR. TRIPI:**

11:19AM   22     Q.  And what did Judge Michalski respond?

11:19AM   23     A.  She looks like crap.

11:19AM   24     Q.  And then what did the defendant respond to that?

11:20AM   25     A.  In until April 17th.  And then the second text, finally.

| | | |
|---|---|---|
| 11:20AM | 1 | Q.  What did Judge Michalski respond to that? |
| 11:20AM | 2 | A.  Give her enough rope, and dot, dot, dot. |
| 11:20AM | 3 | **MR. TRIPI:**  Let's jump ahead to page 108.  Let's go |
| 11:20AM | 4 | up a little bit, Ms. Champoux, see the picture. |
| 11:20AM | 5 | All right.  Scroll back down, I apologize. |
| 11:20AM | 6 | We'll go to page 135. |
| 11:20AM | 7 | **BY MR. TRIPI:** |
| 11:20AM | 8 | Q.  On July 15th, 2018, is there a series of texts?  Would |
| 11:20AM | 9 | you read those? |
| 11:20AM | 10 | A.  From the defendant to Judge Michalski:  Call when you get |
| 11:20AM | 11 | a minute.  Every -- |
| 11:20AM | 12 | And then the second message:  Carmen Abinati. |
| 11:21AM | 13 | Q.  Is that somebody's name? |
| 11:21AM | 14 | A.  That is. |
| 11:21AM | 15 | Q.  Continue. |
| 11:21AM | 16 | A.  Abinati.  And then female. |
| 11:21AM | 17 | **MR. TRIPI:**  Scroll down a little bit, Ms. Champoux. |
| 11:21AM | 18 | **BY MR. TRIPI:** |
| 11:21AM | 19 | Q.  Does Judge Michalski ask a question here? |
| 11:21AM | 20 | A.  Yes, he does. |
| 11:21AM | 21 | Q.  And what's his question? |
| 11:21AM | 22 | A.  Hey, Pete, does Carmen have a scheduled court date this |
| 11:21AM | 23 | week? |
| 11:21AM | 24 | The defendant responds:  No.  I think they gave her to |
| 11:21AM | 25 | the 20th to just show up on Wednesday.  S-R-Y.  Just saw |

11:21AM  1  message.

11:21AM  2  Q.  And does Judge Michalski respond?

11:21AM  3  A.  Yes, he does.

11:21AM  4  Q.  What does he say?

11:21AM  5  A.  Judge Michalski states:  Have her go tomorrow and talk to

11:21AM  6  the prosecutor.

11:21AM  7  Q.  Now in those town courts that we talked about earlier,

11:21AM  8  are there prosecutors who work in those buildings?

11:21AM  9  A.  Yeah, town prosecutors.

11:21AM  10        **MR. TRIPI:**  Can we scroll down a little further.

11:21AM  11        **BY MR. TRIPI:**

11:21AM  12  Q.  And after Judge Michalski said have her go to court

11:21AM  13  tomorrow and talk to the prosecutor, what did the defendant

11:22AM  14  write?

11:22AM  15  A.  Okay.  What should she say.  Should she say anything?

11:22AM  16  Are you on the bench right now?

11:22AM  17  Q.  And what did Judge Michalski respond?

11:22AM  18  A.  Yes.

11:22AM  19     And Mr. Gerace responds:  What time do you get off the

11:22AM  20  bench?  I'm downstairs closing on my house.

11:22AM  21  Q.  Is the Erie County Clerk where they -- where house

11:22AM  22  closings are, is that the same building that the Supreme

11:22AM  23  Court judges sit in?

11:22AM  24  A.  Yeah.  The clerk's office is in the basement, and then

11:22AM  25  the judges are in the higher floors, depending on which

11:22AM    1    building they're in.

11:22AM    2    Q.  And what did the defendant write after he said what time

11:22AM    3    do you get off the bench, I'm downstairs closing on my house?

11:22AM    4    A.  I can shoot up.

11:22AM    5    Q.  Okay.  Those are all on July 27th, those last messages

11:22AM    6    that you read?

11:22AM    7    A.  That's correct.

11:22AM    8           **MR. TRIPI:**  Okay.  Let's move forward to page 144.

11:22AM    9           Let's scroll down to 145 please.

11:23AM   10           **BY MR. TRIPI:**

11:23AM   11    Q.  Okay.  Can you review the messages that you see on the

11:23AM   12    screen from September 17th, 2018?

11:23AM   13    A.  Certainly.  From the defendant:  What's up?  Just got

11:23AM   14    back from Vegas last night.  Calling to see what you're

11:23AM   15    doing.

11:23AM   16        Judge Michalski:  On bench.  Will call later.

11:23AM   17        Mr. Gerace:  Okay.

11:23AM   18        And then there's an invitation to a party at Pharaoh's

11:23AM   19    Gentlemen's Club, or a screenshot picture of it.

11:23AM   20           **MR. TRIPI:**  Can we scroll down to page 146,

11:23AM   21    Ms. Champoux.

11:23AM   22           **BY MR. TRIPI:**

11:23AM   23    Q.  In response to the screenshot of the invitation to the

11:23AM   24    Pharaoh's event -- by the way, for record purposes, on that

11:23AM   25    screenshot, are there two women minimally dressed?

11:24AM    1    A.  Yes.

11:24AM    2    Q.  What does Judge Michalski respond to that?

11:24AM    3    A.  Yum.

11:24AM    4         MR. TRIPI:  Let's go to page 151, Ms. Champoux.

11:24AM    5    Let's go hover between 150 and 151.

11:24AM    6         All right.  Let's go to 153.

11:24AM    7         BY MR. TRIPI:

11:24AM    8    Q.  Can you tell us, can you review the messages from

11:24AM    9    October 16th that I've indicated?  October 16th, 2018.

11:24AM   10    A.  From the defendant:  How is November 4 for you and Sue.

11:24AM   11         From Judge Michalski:  I'm going to be in Columbus, Ohio

11:24AM   12    that weekend.

11:24AM   13         Mr. Gerace responds:  How about the 11th.

11:25AM   14         And Judge Michalski responds:  That's great.

11:25AM   15    Q.  About two days later, does the defendant text Judge

11:25AM   16    Michalski another name?

11:25AM   17    A.  Yes.

11:25AM   18    Q.  And what is that name?

11:25AM   19    A.  Angela Dingledey.

11:25AM   20    Q.  Is that someone you're aware of through this

11:25AM   21    investigation?

11:25AM   22    A.  Yes.

11:25AM   23    Q.  Was she interviewed?

11:25AM   24    A.  Yes.

11:25AM   25    Q.  Was she a Pharaoh's dancer?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

87

11:25AM   1   A.  She was.

11:25AM   2   Q.  And after texting the name Angela Dingledey, what -- what

11:25AM   3   else did the defendant follow up with with the judge?

11:25AM   4   A.  I sent the last of her paperwork over today.

11:25AM   5       And the judge responds:  Okay.

11:25AM   6   Q.  All right.  Stop there.

11:25AM   7       Did Judge Michalski then follow up in that conversation

11:25AM   8   on October 25th, 2018?

11:25AM   9   A.  Yes, he did.

11:25AM  10   Q.  What did he say to the defendant?

11:25AM  11   A.  Hey, Peter.  I made contact with the Buffalo Drug Court,

11:25AM  12   and my contact is telling me Angela is not in that drug

11:25AM  13   court.

11:25AM  14   Q.  Does Buffalo City Court have a drug court?

11:26AM  15   A.  Yes, they do.

11:26AM  16   Q.  Judge Michalski did not work at Buffalo City Court,

11:26AM  17   correct?

11:26AM  18   A.  He did not, he worked in State Supreme Court.

11:26AM  19   Q.  On October 25th, 2018, was there another name texted by

11:26AM  20   the defendant?

11:26AM  21   A.  Camilla Archibald.

11:26AM  22   Q.  And what did Judge Michalski respond?

11:26AM  23   A.  That's who I spoke to.

11:26AM  24       **MR. TRIPI:**  Scroll down, Ms. Champoux.

11:26AM  25       Stop there.  Let's go to page 161.

11:26AM 1          Can you go up a little bit further?  All right.  Stop

11:27AM 2     there.  Let's go to page 165.

11:27AM 3          Can you hover between 164 and 165.

11:27AM 4          **BY MR. TRIPI:**

11:27AM 5     Q.  Okay.  Do you see another text of that same photo we saw

11:27AM 6     earlier on November 9th, 2018?

11:27AM 7     A.  That's correct.

11:27AM 8          **MR. TRIPI:**  Can we scroll down, Ms. Champoux?

11:27AM 9          **BY MR. TRIPI:**

11:27AM 10    Q.  On November 10th, can you read that exchange?

11:27AM 11    A.  The art of fisting.

11:27AM 12        From Judge Michalski:  Ha ha ha ha ha ha.

11:27AM 13        **MR. TRIPI:**  And can we go to page 178.  Can you

11:28AM 14    scroll down, Ms. Champoux?

11:28AM 15        **BY MR. TRIPI:**

11:28AM 16    Q.  Can you describe the text from Judge Michalski to the

11:28AM 17    defendant February 19th, 2019?

11:28AM 18    A.  Yeah, it's a Tim Horton's cup with a Roll Up the Rim

11:28AM 19    promotion, and then the words, blow job, fellatio.

11:28AM 20    Q.  Now you're familiar with the Tim Horton's company.  They

11:28AM 21    do those type of promotions where you roll up the rim and you

11:28AM 22    can win a cup of coffee?

11:28AM 23    A.  Yeah, I'm familiar with those.

11:28AM 24    Q.  They don't really have those types of offerings?

11:28AM 25    A.  Not that I saw.  Not that I've ever seen.

| | | |
|---|---|---|
| 11:28AM | 1 | **MR. TRIPI:** Okay. Let's scroll down a little bit |
| 11:28AM | 2 | further. Let's go down. All right. I think that's it with |
| 11:28AM | 3 | this one. We'll take that down. |
| 11:28AM | 4 | **BY MR. TRIPI:** |
| 11:29AM | 5 | Q. All right. So in that text thread, did you see a |
| 11:29AM | 6 | reference to Shelby Johnson? |
| 11:29AM | 7 | A. Yes, I did. |
| 11:29AM | 8 | Q. Did you see multiple references to Katrina Nigro? |
| 11:29AM | 9 | A. Yes, I did. |
| 11:29AM | 10 | Q. And those references to Katrina Nigro were all before she |
| 11:29AM | 11 | had a pending case in front of Judge Michalski? |
| 11:29AM | 12 | A. Yes, her case was in 2019. |
| 11:29AM | 13 | Q. And were those references all after the purported |
| 11:29AM | 14 | marriage in 2014? |
| 11:29AM | 15 | A. Yes, they were. |
| 11:29AM | 16 | Q. Another text thread that you reviewed and isolated out of |
| 11:29AM | 17 | the extraction was with Detective Greg Trotter; is that |
| 11:29AM | 18 | right? |
| 11:29AM | 19 | A. That's correct. |
| 11:29AM | 20 | Q. I'm going to hand you up Government Exhibit 310AT. |
| 11:29AM | 21 | Do you recognize that? |
| 11:29AM | 22 | A. Yes, I do. |
| 11:29AM | 23 | Q. What do you recognize it to be? |
| 11:29AM | 24 | A. A text string, text message exchanges between the |
| 11:30AM | 25 | defendant, Mr. Gerace, and Amherst Detective -- I think it's |

| | | |
|---|---|---|
| 11:30AM | 1 | Detective Sergeant Greg Trotter. |
| 11:30AM | 2 | Q.  Have you read that numerous times? |
| 11:30AM | 3 | A.  Yes, many times. |
| 11:30AM | 4 | Q.  Is Exhibit 310AQ accurate from the extraction of the cell |
| 11:30AM | 5 | phone that's Exhibit 310? |
| 11:30AM | 6 | A.  Yes.  Those are the carved-out messages between the two |
| 11:30AM | 7 | of them. |
| 11:30AM | 8 | Q.  Are they accurate? |
| 11:30AM | 9 | A.  They are. |
| 11:30AM | 10 | **MR. TRIPI:**  The government offers 310AQ. |
| 11:30AM | 11 | **MR. FOTI:**  No objection. |
| 11:30AM | 12 | **THE COURT:**  Yeah, so folks, the same thing applies |
| 11:30AM | 13 | here.  These are the defendant's text messages, they come in |
| 11:30AM | 14 | for the truth.  And the other person's text messages do not |
| 11:30AM | 15 | come in for the truth, they come in only to give you an idea |
| 11:30AM | 16 | of the context and the defendant's state of mind.  Okay? |
| 11:30AM | 17 | And with that instruction, Mr. Foti, there's no |
| 11:30AM | 18 | objection? |
| 11:30AM | 19 | **MR. FOTI:**  Correct. |
| 11:30AM | 20 | **THE COURT:**  Okay.  So it's admitted without |
| 11:30AM | 21 | objection. |
| 11:30AM | 22 | **(GOV Exhibit 310AQ was received in evidence.)** |
| 11:30AM | 23 | **MR. TRIPI:**  Thank you, Your Honor. |
| 11:31AM | 24 | Could we pull up Exhibit 310AQ?  Okay. |
| | 25 | |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:31AM  | 1  | **BY MR. TRIPI:**                                            |
| 11:31AM  | 2  | Q.  Similar to what we looked at earlier, are these messages |
| 11:31AM  | 3  | between Greg Trotter and the defendant?                      |
| 11:31AM  | 4  | A.  Yes, they are.                                           |
| 11:31AM  | 5  | Q.  Are there 165 of them?                                   |
| 11:31AM  | 6  | A.  They are.                                                |
| 11:31AM  | 7  | Q.  Is the range from the first message to the last          |
| 11:31AM  | 8  | December 20th, 2018 to April 17th, 2019?                     |
| 11:31AM  | 9  | A.  Yes.                                                     |
| 11:31AM  | 10 | Q.  Again, it's UTC time, so you'd have to do some math to   |
| 11:31AM  | 11 | figure out the exact time, correct?                          |
| 11:31AM  | 12 | A.  Correct.                                                 |
| 11:31AM  | 13 | Q.  All right.  Just the very first -- to orient the jury,   |
| 11:31AM  | 14 | the gray boxes are messages by Trotter, the blue are by the  |
| 11:31AM  | 15 | defendant; is that right?                                    |
| 11:31AM  | 16 | A.  That's accurate.                                         |
| 11:31AM  | 17 | Q.  Can you just read the very first text from Trotter to the|
| 11:31AM  | 18 | defendant on December 20th, 2018?                            |
| 11:31AM  | 19 | A.  From Detective Trotter:  It's Trotter.  I talked to Sliwa|
| 11:31AM  | 20 | yesterday.  Thanks for the invite, but unfortunately I have  |
| 11:31AM  | 21 | to work till 11 p.m. tonight.                                |
| 11:31AM  | 22 | Q.  And do you know a Sliwa?                                 |
| 11:31AM  | 23 | A.  Yes, he was a lieutenant, I think is what he retired at, |
| 11:32AM  | 24 | the Amherst Police Department.                               |
| 11:32AM  | 25 | Q.  Okay.  And at the time of these messages, Greg Trotter   |

11:32AM    1    was a detective at the Amherst Police Department?

11:32AM    2    A.  That's correct.

11:32AM    3    Q.  Okay.

11:32AM    4    A.  He might have been detective sergeant, but certainly an

11:32AM    5    officer.

11:32AM    6         MR. TRIPI:  Can we go to the next page, Ms. Champoux?

11:32AM    7    I'm sorry, go back to page 1 real quick.

11:32AM    8         BY MR. TRIPI:

11:32AM    9    Q.  I need you to read the message right under the first

11:32AM   10    message.

11:32AM   11    A.  Is this your new number?  I keep sending you messages and

11:32AM   12    I get no response.

11:32AM   13    Q.  Okay.  Go to the next page, can you read the message from

11:32AM   14    Trotter, December 20th, 2018?

11:32AM   15    A.  Yeah, sorry, thought you had this one.

11:32AM   16    Q.  And continue reading the December 20th messages.

11:32AM   17    A.  From the defendant:  No, I have it now.  Keep in touch.

11:32AM   18    We got to get a drink.

11:32AM   19        From Trotter, Mr. Trotter:  Absolutely.  Let's get a

11:32AM   20    drink soon.  What time you hanging out up there till tonight?

11:33AM   21        From the defendant:  Usually 10 or 11.  I started at 9

11:33AM   22    this morning.

11:33AM   23    Q.  And at this point in time, the defendant is running

11:33AM   24    Pharaoh's Gentlemen's Club; is that right?

11:33AM   25    A.  That's accurate.

11:33AM   1   Q.  Okay.  In terms of some events that the jury's heard

11:33AM   2   about, was Mr. Trotter the arresting officer of P.H.?

11:33AM   3   A.  Yes, he was one of them.

11:33AM   4   Q.  Was he the arresting officer for several arrests of

11:33AM   5   Katrina Nigro?

11:33AM   6   A.  Yes, he was.

11:33AM   7            **MR. TRIPI:**  Let's go to the next page.

11:33AM   8            **BY MR. TRIPI:**

11:33AM   9   Q.  Can you read the second-to-last message on January 22,

11:33AM  10   2019 from the defendant to Trotter?

11:33AM  11   A.  We've got to have a drink soon.  We never got together

11:33AM  12   during the holidays.

11:33AM  13            **MR. TRIPI:**  Let's go to next page.

11:33AM  14            **BY MR. TRIPI:**

11:33AM  15   Q.  Can you read the second message in gray from Trotter on

11:33AM  16   January 25th, please?

11:34AM  17   A.  Hey, buddy.  Sorry.  Forgot to text back the other day.

11:34AM  18   Let's make this happen soon.  I'm working nights next week,

11:34AM  19   so probably the following week.

11:34AM  20   Q.  All right.  After that text about drinks -- or,

11:34AM  21   withdrawn -- about his schedule, do they sort of move into

11:34AM  22   discussion of a police report that was filed regarding the

11:34AM  23   Rolex watch that the jury's heard about?

11:34AM  24   A.  Yes, they do.

11:34AM  25   Q.  I want you to read the last message on that page,

| | | |
|---|---|---|
| 11:34AM | 1 | March 6, 2019, at the bottom of the page? |
| 11:34AM | 2 | A.  Yes.  This is from defendant Gerace:  Because the pawn |
| 11:34AM | 3 | shop and Vegas Metro Police said that Amherst Police have to |
| 11:34AM | 4 | get ahold of them and give them the report in order for them |
| 11:34AM | 5 | to make sure the watch is still there. |
| 11:35AM | 6 | Q.  Right above that, the defendant asks:  Do you happen to |
| 11:35AM | 7 | see the police report; is that right? |
| 11:35AM | 8 | A.  That's accurate. |
| 11:35AM | 9 | **MR. TRIPI:**  All right.  Let's go to the next page. |
| 11:35AM | 10 | **BY MR. TRIPI:** |
| 11:35AM | 11 | Q.  Can you read the very top message at that page in gray |
| 11:35AM | 12 | from the Detective Trotter? |
| 11:35AM | 13 | A.  I did not.  Jeff Gilbert got assigned the case, and will |
| 11:35AM | 14 | get ahold of you tomorrow or Friday. |
| 11:35AM | 15 | **MR. TRIPI:**  Let's go to the next page. |
| 11:35AM | 16 | **BY MR. TRIPI:** |
| 11:35AM | 17 | Q.  Do you recognize generally what's depicted in this |
| 11:35AM | 18 | message from March 6th, 2019? |
| 11:35AM | 19 | A.  Yes, I do. |
| 11:35AM | 20 | Q.  And generally what is that? |
| 11:35AM | 21 | A.  It's the backyard to Mr. Gerace's house. |
| 11:35AM | 22 | Q.  Or -- |
| 11:35AM | 23 | A.  Luxor Lane. |
| 11:35AM | 24 | Q.  Is it similar to what is his yard ended up looking like? |
| 11:35AM | 25 | A.  Yes. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

95

| | | |
|---|---|---|
| 11:35AM | 1 | Q.  Do you know if that's a rendering or the actual photo? |
| 11:35AM | 2 | A.  I think it's a rendering. |
| 11:35AM | 3 | Q.  Okay. |
| 11:36AM | 4 | A.  Similar, I'm sorry. |
| 11:36AM | 5 | Q.  And what's the message under that from Mr. Gerace to |
| 11:36AM | 6 | Detective Trotter say? |
| 11:36AM | 7 | A.  And a water slide in between the water falls.  You have |
| 11:36AM | 8 | to come over this summer. |
| 11:36AM | 9 | Q.  And what was the response from the detective? |
| 11:36AM | 10 | A.  Come over, question mark?  Looks like I'll be moving in, |
| 11:36AM | 11 | exclamation point, exclamation point. |
| 11:36AM | 12 | **MR. TRIPI:**  Ms. Champoux, I'd like to move forward. |
| 11:36AM | 13 | Let me get you the page, though, okay? |
| 11:36AM | 14 | Okay.  Can we move to messages on March 7th, 2019. |
| 11:36AM | 15 | It's several pages, though.  Sorry, I don't have a page number |
| 11:36AM | 16 | for you.  That's where I want to go.  Thank you. |
| 11:36AM | 17 | **BY MR. TRIPI:** |
| 11:36AM | 18 | Q.  All right.  Can you read the two messages basically in |
| 11:37AM | 19 | the middle of the page for March 7th? |
| 11:37AM | 20 | A.  From the defendant to Trotter:  Any luck at all with the |
| 11:37AM | 21 | watch? |
| 11:37AM | 22 | From Mr. Trotter:  Still working on it.  Where was the |
| 11:37AM | 23 | engraving on the watch? |
| 11:37AM | 24 | **MR. TRIPI:**  Can we go forward about two pages? |
| 11:37AM | 25 | All right.  Stop there.  We need to hover between |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

96

11:37AM  1    pages 13 and 14, I'm sorry.

11:37AM  2         **THE WITNESS:**  Right there.

11:37AM  3         **BY MR. TRIPI:**

11:37AM  4    Q.  All right.  Can you read from the bottom of page 13

11:37AM  5    through the middle of page 14?

11:37AM  6    A.  Sure.  From the defendant:  Any luck yet?  And is he

11:37AM  7    going to be going to pick her up soon?

11:37AM  8       From Detective Trotter:  I wasn't there today.  I'll talk

11:37AM  9    with him tomorrow.

11:37AM  10      From the defendant:  Yeah, I just want to make sure that

11:38AM  11    it is still at the pawn shop and her picked up.

11:38AM  12        **MR. TRIPI:**  Keep scrolling down just a little bit,

11:38AM  13    Ms. Champoux.

11:38AM  14        **BY MR. TRIPI:**

11:38AM  15    Q.  If you can continue reading those messages?

11:38AM  16    A.  From Detective Trotter:  Can't pick her up until we deal

11:38AM  17    with Vegas.

11:38AM  18      From the defendant:  Cool.  Have a good weekend.

11:38AM  19    Q.  All right.  I'd like to forward a couple pages, maybe two

11:38AM  20    pages forward.  Can you read the message March 11th, 2019?

11:38AM  21    A.  From the defendant:  She took more stuff from my house I

11:38AM  22    found out.  Michael Kors jacket, Crystal got back.  Woman's

11:38AM  23    facial tools, electric.  Couple hundred dollars for them.

11:38AM  24    And a pair of girlfriend's American Eagle jeans.  Let me know

11:38AM  25    if we have to do a separate report.

| | | |
|---|---|---|
| 11:38AM | 1 | Second message:  Call you in about 20 minutes. |
| 11:38AM | 2 | **MR. TRIPI:**  Go to the next page, Ms. Champoux. |
| 11:38AM | 3 | **BY MR. TRIPI:** |
| 11:38AM | 4 | Q.  All right.  Can you read the response from Mr. Trotter on |
| 11:38AM | 5 | March 11? |
| 11:39AM | 6 | A.  In court this morning.  Pawn shop has a Rolex in their |
| 11:39AM | 7 | inventory that they are shipping to the main store tomorrow. |
| 11:39AM | 8 | When they get it, they will send pictures of it to us.  No |
| 11:39AM | 9 | need for a new police report. |
| 11:39AM | 10 | **MR. TRIPI:**  Can you go forward about two pages, |
| 11:39AM | 11 | Ms. Champoux?  Looking for a message March 22nd, 2019. |
| 11:39AM | 12 | **BY MR. TRIPI:** |
| 11:39AM | 13 | Q.  Okay.  Can you read this message, March 22nd, 2019, from |
| 11:39AM | 14 | the defendant to Trotter? |
| 11:39AM | 15 | A.  Where's my invite to Florida?  LOL. |
| 11:39AM | 16 | **MR. TRIPI:**  And can you scroll down to the next page, |
| 11:39AM | 17 | Ms. Champoux. |
| 11:39AM | 18 | **BY MR. TRIPI:** |
| 11:39AM | 19 | Q.  Can you read the response to that, Special Agent Burns? |
| 11:39AM | 20 | A.  Yes.  From Detective Trotter:  Sorry, invited Katrina |
| 11:39AM | 21 | this time, and a couple little emoji faces. |
| 11:39AM | 22 | Q.  What are the little emoji faces? |
| 11:39AM | 23 | A.  I think little laughy ones. |
| 11:39AM | 24 | Q.  And what's the response from the defendant? |
| 11:40AM | 25 | A.  Ha ha ha ha ha.  Yes, she said you called her 100 times |

11:40AM   1   yesterday.  LOL.

11:40AM   2   Q.  And what's the response from Trotter?

11:40AM   3   A.  Ha ha ha ha ha.

11:40AM   4         **MR. TRIPI:**  Scroll down a little bit, Ms. Champoux.

11:40AM   5         **BY MR. TRIPI:**

11:40AM   6   Q.  What did the defendant say next?

11:40AM   7   A.  Have a great time.  Let me know when you get back.  We'll

11:40AM   8   grab a drink.

11:40AM   9   Q.  And what did Trotter respond?

11:40AM  10   A.  Sounds good.  Thanks, bud.

11:40AM  11         **MR. TRIPI:**  And after that, scroll down just a little

11:40AM  12   bit.  Okay.

11:40AM  13         **BY MR. TRIPI:**

11:40AM  14   Q.  On March 27th, did the defendant text Trotter again?

11:40AM  15   A.  Yes, he did:  Do you know if my watch came in yet?

11:40AM  16         And Detective Trotter responds:  According to Jeff, not

11:40AM  17   yet.

11:40AM  18   Q.  Is Jeff a reference to Jeff Gilbert, another Amherst

11:40AM  19   detective that you've interviewed?

11:40AM  20   A.  Yes, it is.

11:40AM  21   Q.  Okay.  Now, I want to get into April 9th, 2019.  Is that

11:40AM  22   the day that Ms. P.H. was arrested?

11:40AM  23   A.  Yes, it was.

11:40AM  24   Q.  All right.

11:40AM  25         **MR. TRIPI:**  Let's scroll down to messages April 9th,

11:41AM    1    2019, Ms. Champoux.  We can stop there.

11:41AM    2    **BY MR. TRIPI:**

11:41AM    3    Q.  All right.  Can you begin with the message April 9th,

11:41AM    4    2019, with UTC time of 12:55, which I think is earlier in the

11:41AM    5    morning that day, right?

11:41AM    6    A.  Correct.

11:41AM    7    Q.  How many hours earlier, do you know?

11:41AM    8    A.  Three?

11:41AM    9    Q.  Three is definitely not right.

11:41AM    10   A.  No.

11:41AM    11   Q.  It's either four or five?

11:41AM    12   A.  Four or five.  I have a cheat sheet when I do it.

11:41AM    13   Q.  All right.  You don't have your cheat sheet?

11:41AM    14   A.  I don't have my cheat sheet.

11:41AM    15   Q.  Okay.  Give me one second.

11:42AM    16   Would it be fair to say daylight savings is minus four,

11:42AM    17   and not daylight savings it's minus five?

11:42AM    18   A.  That's accurate.

11:42AM    19   Q.  Okay.  April 9, 2019, what's the defendant text?

11:42AM    20   A.  251 Oak Ridge Road.

11:42AM    21   Q.  Where is that located, do you know?

11:42AM    22   A.  It's on Grand Island.

11:42AM    23   Q.  What else did the defendant write after that?

11:42AM    24   A.  She's there right now.

11:42AM    25   Q.  And what did he write after that?

11:42AM   1   A.  251 Oak Ridge Road, Grand Island.

11:42AM   2           **MR. TRIPI:**  Ms. Champoux, can we scroll to the next

11:42AM   3   page?  Stop there.

11:42AM   4           **BY MR. TRIPI:**

11:43AM   5   Q.  Continue with the text please.

11:43AM   6   A.  Right near that pizza place, she thinks I'm going to pick

11:43AM   7   her up at 9:30.

11:43AM   8       Continues.  Let me know if you're going to get her.  She

11:43AM   9   will be there.  She doesn't know where she's spending the

11:43AM  10   night.

11:43AM  11   Q.  In context, are they discussing P.H.?

11:43AM  12   A.  Yes.  She was arrested in the vicinity there, and there's

11:43AM  13   a business Say Cheese Pizza that's in proximity to Oak Ridge.

11:43AM  14   Q.  After those, what does Mr. Trotter write?

11:43AM  15   A.  I'll call you in a couple.

11:43AM  16   Q.  What's the defendant say?

11:43AM  17   A.  Okay.  Because I don't know where she'll be tomorrow.

11:43AM  18       And:  Are you almost there?

11:43AM  19           **MR. TRIPI:**  Okay.  Let's go to the next page,

11:43AM  20   Ms. Champoux.  We're on to page 24.

11:43AM  21           **BY MR. TRIPI:**

11:43AM  22   Q.  Are these texts, are they all basically within minutes of

11:43AM  23   each other that you're reading?

11:43AM  24   A.  Yes.

11:43AM  25   Q.  All right.  What does Detective Trotter say next?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

101

| 11:43AM | 1 | A. We have her. |
|---|---|---|
| 11:43AM | 2 | Defendant responds: Okay. Did she admit it? |
| 11:43AM | 3 | Q. Hang on. Let's -- is that a question? |
| 11:44AM | 4 | A. We have her, is his statement. |
| 11:44AM | 5 | Q. Okay. And then after that from Mr. Gerace, he writes? |
| 11:44AM | 6 | A. Okay. |
| 11:44AM | 7 | Q. And then after that, what does he say? |
| 11:44AM | 8 | A. Did she admit it? |
| 11:44AM | 9 | Q. Okay. And this is, the context is they're discussing the |
| 11:44AM | 10 | arrest of -- for the watch, right? |
| 11:44AM | 11 | A. That's correct. |
| 11:44AM | 12 | Q. And what does Trotter say? |
| 11:44AM | 13 | A. Not at all. |
| 11:44AM | 14 | Q. In your law enforcement training and experience, when |
| 11:44AM | 15 | you're interviewing or attempting to interview a suspect, do |
| 11:44AM | 16 | you give realtime updates to a civilian? |
| 11:44AM | 17 | **MR. FOTI:** Objection. |
| 11:44AM | 18 | **THE WITNESS:** No. |
| 11:44AM | 19 | **THE COURT:** Objection. Basis for the objection? |
| 11:44AM | 20 | **MR. FOTI:** Judge, I think I'd have to argue. Can we |
| 11:44AM | 21 | approach? |
| 11:44AM | 22 | **THE COURT:** Come on up. |
| 11:44AM | 23 | (Sidebar discussion held on the record.) |
| 11:44AM | 24 | **MR. FOTI:** I -- I -- I'm objecting because this is |
| 11:45AM | 25 | not a lay opinion. I think he's being called to generally |

11:45AM    1    essentially gave expert opinion as law enforcement.  And we're

11:45AM    2    talking about two very different types of law enforcement.

11:45AM    3    They're different jurisdictions, states, federal, his

11:45AM    4    training, he's been trained in Quantico specifically on FBI

11:45AM    5    tactics.  I don't think he can talk about what type of

11:45AM    6    training Mr. Trotter's received, whether this is typical

11:45AM    7    practice, whether this is inappropriate, whether it's a

11:45AM    8    violation of protocols for Amherst Police Department to stay

11:45AM    9    in contact with a victim, whether anything along those lines

11:45AM   10    is inappropriate.

11:45AM   11         I understand why Mr. Tripi is asking it, and I

11:45AM   12    understand that there's a relationship to the extent that

11:45AM   13    they're all law enforcement.  But putting that all under one

11:45AM   14    umbrella and making him an expert as to whether Mr. Trotter

11:45AM   15    was doing anything inappropriate I think goes too far.

11:45AM   16         **THE COURT:**  I'm also very concerned about the

11:45AM   17    2nd Circuit's instruction not to allow folks to be a fact

11:45AM   18    witness and an expert witness.

11:45AM   19         **MR. TRIPI:**  I think we've briefed this issue in terms

11:46AM   20    of 701.  It was in my original trial brief.  And it's a lay

11:46AM   21    opinion as to whether a law enforcement officer shares law

11:46AM   22    enforcement information with a civilian.

11:46AM   23         All of the arguments that Mr. Foti has raised, I

11:46AM   24    think those are more appropriately directed towards weight and

11:46AM   25    he can argue to the jury.

USA v Gerace - Burns - Tripi/Direct - 12/17/24          103

| | | |
|---|---|---|
| 11:46AM | 1 | **THE COURT:**  I'll tell you, I don't think so. |
| 11:46AM | 2 | **MR. TRIPI:**  Okay. |
| 11:46AM | 3 | **THE COURT:**  Because, so, and I've let this stuff in |
| 11:46AM | 4 | when it's with respect to DEA policy.  I've let DEA agents |
| 11:46AM | 5 | testify with respect to DEA policy. |
| 11:46AM | 6 | This is him testifying about an opinion as to what's |
| 11:46AM | 7 | appropriate for law enforcement across the board.  And I think |
| 11:46AM | 8 | that is more akin to an expert opinion, not a lay opinion. |
| 11:46AM | 9 | I think you need some expertise on that.  And because |
| 11:46AM | 10 | he has now -- you know, if he were an Amherst cop, I might |
| 11:46AM | 11 | say -- I might let him testify that's our policy, that's our |
| 11:46AM | 12 | procedure.  But he's not. |
| 11:46AM | 13 | And I think this is, therefore, an expert opinion, |
| 11:47AM | 14 | and I'm not going to let it in. |
| 11:47AM | 15 | **MR. TRIPI:**  I think it's -- I think there at least is |
| 11:47AM | 16 | fair argument on summation that Mr. Cooper can make along the |
| 11:47AM | 17 | same lines of what I was trying to draw out. |
| 11:47AM | 18 | **THE COURT:**  I'm not saying -- |
| 11:47AM | 19 | **MR. TRIPI:**  I don't want him to be precluded from |
| 11:47AM | 20 | arguing that. |
| 11:47AM | 21 | **THE COURT:**  No, no, no. |
| 11:47AM | 22 | Would you suggest that he can't argue that? |
| 11:47AM | 23 | **MR. FOTI:**  No, I think the argument is fair game. |
| 11:47AM | 24 | **MR. TRIPI:**  Okay.  I just want to make sure that's |
| 11:47AM | 25 | good. |

11:47AM    1                (End of sidebar discussion.)

11:47AM    2          **THE COURT:**  So the objection is sustained, and the

11:47AM    3    jury will strike the answer if there was an answer, I think

11:47AM    4    there might have been.

11:47AM    5          **BY MR. TRIPI:**

11:47AM    6    Q.  After Detective Trotter wrote not at all, did Mr. Gerace

11:47AM    7    follow up 13 seconds later?

11:47AM    8    A.  Yes, he did.

11:47AM    9    Q.  And what did Mr. Gerace ask?

11:47AM    10   A.  Does she know that you have the receipt from Vegas?

11:47AM    11   Q.  And within that same minute, what did Detective Trotter

11:47AM    12   say?

11:47AM    13   A.  She knows nothing.

11:47AM    14         **MR. TRIPI:**  Let's go to the next page.

11:48AM    15         **BY MR. TRIPI:**

11:48AM    16   Q.  And does Mr. -- the defendant respond after that?

11:48AM    17   A.  Yes.

11:48AM    18   Q.  What did he write?

11:48AM    19   A.  Oh, okay.

11:48AM    20   Q.  And what was Detective Trotter's next text?

11:48AM    21   A.  What was the number she was texting from?  Mr. -- go

11:48AM    22   ahead.

11:48AM    23   Q.  And what did the defendant respond?

11:48AM    24   A.  An email.

11:48AM    25   Q.  Just continue going down the page.

11:48AM   1   A.  Yep.  Detective Trotter says:  What email?

11:48AM   2       And then there's a screenshot with an email,

11:48AM   3   P.K.222@Yahoo.

11:48AM   4       And some text communication on the screenshot:  Is he

11:48AM   5   gonna let you leave?

11:48AM   6   Q.  Let me stop you there for a second, let me ask a

11:48AM   7   question.

11:48AM   8       You've also reviewed the texts from Ms. P.H. this same

11:48AM   9   day, texts between Ms. P.H. and Mr. Gerace; is that correct?

11:48AM  10   A.  That's correct.

11:48AM  11   Q.  To contextualize this, and maybe just to save a little

11:48AM  12   bit of time, in the one thread with Ms. P.H., was

11:49AM  13   Defendant Gerace acting as though he was going to come to

11:49AM  14   Grand Island and pick her up?

11:49AM  15   A.  Him or send somebody.

11:49AM  16   Q.  Okay.  Are some of these now that we're looking at

11:49AM  17   screenshots from the texts that were happening simultaneously

11:49AM  18   with Ms. P.H.?

11:49AM  19   A.  Yes, they are.

11:49AM  20        **MR. TRIPI:**  Okay.  We can just scroll down,

11:49AM  21   Ms. Champoux, and give the jury a chance to look.

11:49AM  22        **BY MR. TRIPI:**

11:49AM  23   Q.  In this screenshot, the gray bubbles there are now

11:49AM  24   Ms. P.H., and the blue bubbles are the defendant?

11:49AM  25   A.  That's right.

| | | |
|---|---|---|
| 11:49AM | 1 | **MR. TRIPI:** Keep scrolling down. Keep scrolling. |
| 11:49AM | 2 | **BY MR. TRIPI:** |
| 11:49AM | 3 | Q. After the screenshots on, again, on April 9th, what does |
| 11:49AM | 4 | the defendant write to Detective Trotter? |
| 11:49AM | 5 | A. That's the number she called me from earlier when she was |
| 11:49AM | 6 | at the bar. |
| 11:49AM | 7 | Q. And what did Detective Trotter respond? |
| 11:50AM | 8 | A. What about the email. |
| 11:50AM | 9 | **MR. TRIPI:** Scroll down further. |
| 11:50AM | 10 | **BY MR. TRIPI:** |
| 11:50AM | 11 | Q. Are these more screenshots that the defendant provided to |
| 11:50AM | 12 | Trotter and texted? |
| 11:50AM | 13 | A. Yes. |
| 11:50AM | 14 | Q. And these were communications with Ms. P.H.? |
| 11:50AM | 15 | A. Yeah, she was utilizing a web-based email communication. |
| 11:50AM | 16 | **THE COURT:** Okay. Again, folks, the emails within |
| 11:50AM | 17 | this and the text messages within this, they can -- they're |
| 11:50AM | 18 | being admitted for the truth of what Mr. Gerace says, not the |
| 11:50AM | 19 | truth of what the person says back to him. These are text |
| 11:50AM | 20 | messages within the text message. And the same admonition |
| 11:50AM | 21 | applies to those. |
| 11:50AM | 22 | Go ahead, Mr. Tripi. |
| 11:50AM | 23 | **MR. TRIPI:** Thank you, Judge. |
| 11:50AM | 24 | If we can keep scrolling down, Ms. Champoux. Go to |
| 11:50AM | 25 | the next page. All right. |

11:50AM   1           **BY MR. TRIPI:**

11:51AM   2   Q.  Can you read those messages that I've indicated from

11:51AM   3   April 9th.  We're on page 30 of the exhibit now.

11:51AM   4   A.  From the defendant:  If you open it up, you can see it

11:51AM   5   was sent from an email.

11:51AM   6       Detective Trotter:  Got it, thanks.

11:51AM   7       From the Defendant Gerace:  P.K.222@yahoo.com.

11:51AM   8       From Detective Trotter:  She'll be spending the night.

11:51AM   9       From Gerace:  I'm sure when she ends up seeing the

11:51AM   10  receipt, she will remember real quick.

11:51AM   11      And then a second message:  Thank you.

11:51AM   12  Q.  And when Trotter writes she'll be spending the night, is

11:51AM   13  that consistent, Ms. P.H. was held overnight?

11:52AM   14  A.  That's accurate.

11:52AM   15          **MR. TRIPI:**  Okay.  We can take that down.  Thank you.

11:52AM   16          **BY MR. TRIPI:**

11:52AM   17  Q.  I'm going to hand you up Government Exhibit 310AL-1.  Do

11:52AM   18  you recognize those?

11:52AM   19  A.  Yes, I do.

11:52AM   20  Q.  What do you recognize them to be?

11:52AM   21  A.  They're text communications between the P.K.222@yahoo.com

11:52AM   22  email, as well as the Mr. Gerace from the extraction.

11:52AM   23  Q.  Are they accurate from the extraction?

11:52AM   24  A.  Yes, they are.

11:52AM   25          **MR. TRIPI:**  Judge, the government offers

11:52AM   1   Exhibit 310AL-1.

11:52AM   2           **THE COURT:**  Any objection with the same admonition?

11:52AM   3           **MR. FOTI:**  No.

11:52AM   4           **THE COURT:**  Okay.  So, same admonition folks.  I

11:52AM   5   won't repeat it again, but you understand.

11:52AM   6           You're okay with that, Mr. Foti, without repeating it

11:53AM   7   again.

11:53AM   8           **MR. FOTI:**  Yes.

11:53AM   9           **THE COURT:**  Thank you.

11:53AM   10          **BY MR. TRIPI:**

11:53AM   11  Q.  And we're not going to go through these, but the

11:53AM   12  screenshots and the other half of the conversation, just to

11:53AM   13  summarize it, where Mr. Gerace was indicating he or someone

11:53AM   14  was going to come pick P.H. up from that address in Grand

11:53AM   15  Island, those are contained in here?

11:53AM   16  A.  That's correct.

11:53AM   17  Q.  All right.  Earlier you indicated that you also reviewed

11:53AM   18  a text thread between the defendant and Darryl LaMont; do you

11:53AM   19  recall that?

11:53AM   20  A.  Yes, I do.

11:53AM   21  Q.  I'm going to hand you up Government Exhibit 310AS.  Just

11:53AM   22  ignore the tabs, those are for me.

11:53AM   23  A.  Okay.

11:53AM   24  Q.  The --

11:54AM   25  A.  I'm familiar with it.

| | | |
|---|---|---|
| 11:54AM | 1 | Q.  Do you recognize Government Exhibit 310AS? |
| 11:54AM | 2 | A.  Yes, I do. |
| 11:54AM | 3 | Q.  What is that? |
| 11:54AM | 4 | A.  Those are text communications between the defendant and |
| 11:54AM | 5 | Darryl LaMont. |
| 11:54AM | 6 | Q.  What's the phone number associated with LaMont? |
| 11:54AM | 7 | A.  It's 716-310-1799. |
| 11:54AM | 8 | Q.  And are those accurate from the extraction of the |
| 11:54AM | 9 | defendant's phone? |
| 11:54AM | 10 | A.  They are. |
| 11:54AM | 11 |         **MR. TRIPI:**  The government offers Exhibit 310AS, |
| 11:54AM | 12 | Your Honor. |
| 11:54AM | 13 |         **MR. FOTI:**  Judge, we had some argument earlier, and |
| 11:54AM | 14 | there was one issue that I think was unresolved. |
| 11:54AM | 15 |         **THE COURT:**  Okay.  So with the same admonition, other |
| 11:54AM | 16 | than that one issue, do you have an objection to these coming |
| 11:54AM | 17 | in? |
| 11:54AM | 18 |         **MR. FOTI:**  Yes. |
| 11:54AM | 19 |         **THE COURT:**  You do? |
| 11:54AM | 20 |         **MR. FOTI:**  Oh, no.  No.  Other than that one issue, |
| 11:54AM | 21 | no. |
| 11:54AM | 22 |         **THE COURT:**  Okay.  So these are coming in, and we |
| 11:54AM | 23 | will talk -- before you get do that one -- |
| 11:54AM | 24 |         **MR. TRIPI:**  Okay. |
| 11:54AM | 25 |         **THE COURT:**  -- come up and talk about it. |

11:54AM    1        But these are being admitted with the same

11:54AM    2   admonition.  The defendant's are coming in because they're the

11:54AM    3   defendant's, but the other ones just come in for his state of

11:54AM    4   mind and context.

11:54AM    5        **MR. TRIPI:**  Thank you.  All right.

11:54AM    6        **(GOV Exhibit 310AS was received in evidence.)**

11:55AM    7        **MR. TRIPI:**  Can we pull up the first page just to

11:55AM    8   give an idea of the number of texts and the duration,

11:55AM    9   Ms. Champoux?

11:55AM   10        **BY MR. TRIPI:**

11:55AM   11   Q.  Again, blue boxes indicate Mr. Gerace's text, and the

11:55AM   12   gray box would be Darryl LaMont with the phone number that

11:55AM   13   you personally verified?

11:55AM   14   A.  Correct.

11:55AM   15   Q.  And the number of messages, is that 118 messages between

11:55AM   16   March 6th, 2017 and April 18th of 2019?

11:55AM   17   A.  Yes.

11:55AM   18   Q.  Okay.  I just want to look at a couple of them.

11:55AM   19        **MR. TRIPI:**  Let's go to page 2, Ms. Champoux.

11:55AM   20        **BY MR. TRIPI:**

11:55AM   21   Q.  Does this -- is this the same screenshot, one of the

11:55AM   22   screenshots that we saw with -- of the -- sort of the mugshot

11:55AM   23   of Katrina Nigro?  The jury just saw this same screenshot on

11:55AM   24   the Michalski thread; is that right?

11:55AM   25   A.  Yeah, same screenshot.

11:55AM   1          MR. TRIPI:  Okay.  And scroll just the next two

11:56AM   2   pages.

11:56AM   3          BY MR. TRIPI:

11:56AM   4   Q.  There's a couple of them sent, correct?

11:56AM   5   A.  That's correct.

11:56AM   6          MR. TRIPI:  All right.  I'd like to scroll down to

11:56AM   7   the next page.

11:56AM   8          BY MR. TRIPI:

11:56AM   9   Q.  At the bottom there, is -- March 26th, 2019, is there a

11:56AM   10   text of a photo of Shelby Johnson to Peter Gerace?

11:56AM   11   A.  Yes, there is.

11:56AM   12          MR. TRIPI:  Scroll down a little bit.

11:56AM   13          And is there message -- stop, please.  Thank you.

11:56AM   14          BY MR. TRIPI:

11:56AM   15   Q.  And is there written content under the photo?

11:56AM   16   A.  Shelby is coming back to work in two weeks.

11:56AM   17   Q.  Okay.  And what did Mr. Gerace respond?

11:56AM   18   A.  Cool.

11:56AM   19          MR. TRIPI:  All right.  Ms. Champoux, can you scroll

11:56AM   20   a couple of pages?  I'm looking at a message June 17th, 2017.

11:57AM   21   Thank you.

11:57AM   22          BY MR. TRIPI:

11:57AM   23   Q.  On June 17th, 2019, 5:03 p.m., does Mr. LaMont write a

11:57AM   24   message to the defendant?

11:57AM   25   A.  Call me back.  It's important.

11:57AM  1      **MR. TRIPI:**  Judge, can we get an -- as I'm going

11:57AM  2  through it, can we just get an instruction that it's a

11:57AM  3  directive so the admonition doesn't apply --

11:57AM  4      **THE COURT:**  So --

11:57AM  5      **MR. TRIPI:**  -- if you that would be appropriate,

11:57AM  6  Judge.

11:57AM  7      **THE COURT:**  Call me back.

11:57AM  8      **MR. TRIPI:**  Call me back, it's important.

11:57AM  9      **THE COURT:**  Mr. Foti, that is a directive.

11:57AM  10      **MR. FOTI:**  No objection.

11:57AM  11      **THE COURT:**  Right?  No objection?

11:57AM  12      **MR. FOTI:**  Sure.

11:57AM  13      **THE COURT:**  So that's a direction.  So, obviously,

11:57AM  14  there's no truth of the matter, so you can consider that for

11:57AM  15  the substance of it that it was a direction.  Okay.

11:57AM  16      **MR. TRIPI:**  Thank you, Judge.

11:57AM  17      All right.  Ms. Champoux, can we down the screen for

11:57AM  18  the jury for just a moment?

11:57AM  19      It's just for us now?  Ms. Champoux, can you get me

11:57AM  20  to a message June 2nd, 2018.  All right.  I got it.

11:58AM  21      And could we resume the screen for the jury now?

11:58AM  22      **THE CLERK:**  All set.

11:58AM  23      **MR. TRIPI:**  Thank you.

11:58AM  24      **BY MR. TRIPI:**

11:58AM  25  Q.  Can you read that exchange on June 2, 2018, between

11:58AM    1    Mr. LaMont and the defendant.

11:58AM    2    A.   From Mr. LaMont:  Bringing a new girl that never danced

11:58AM    3    before.  I just hired her.  I'm going to introduce her to

11:58AM    4    staff, so she can get a tour, dot, dot, dot, after stags.

11:58AM    5    Q.   Just break that message down, Mr. LaMont runs No Limit

11:58AM    6    Entertainment?

11:58AM    7    A.   Yes, an escort service, stag party service.

11:58AM    8    Q.   Okay.  And at Pharaoh's Gentlemen's Club, women perform

11:58AM    9    exotic dances; is that right?

11:58AM   10    A.   That's correct.

11:58AM   11    Q.   And does Pharaoh's Gentlemen's Club have a staff?

11:59AM   12    A.   Yes.  Yes.  Definitely.

11:59AM   13    Q.   What does Defendant Gerace respond to that?

11:59AM   14    A.   Okay.  Cool.  Thanks.

11:59AM   15    Q.   Give me just a moment, please.

11:59AM   16         **MR. TRIPI:**  Can we take the screen down for the jury

11:59AM   17    one moment?

11:59AM   18         **THE CLERK:**  All set.

11:59AM   19         **MR. TRIPI:**  Ms. Champoux, can you get me to a

11:59AM   20    message, at the top of the page it will be July 15th, 2018.

11:59AM   21    Okay.  Stop there.

11:59AM   22         **THE CLERK:**  Back up.

11:59AM   23         **MR. TRIPI:**  We can go back up for the jury.

11:59AM   24         **BY MR. TRIPI:**

11:59AM   25    Q.   Special Agent Burns, can you read the exchanges on

| | | |
|---|---|---|
| 11:59AM | 1 | July 15th that are indicated on page 15, please? |
| 11:59AM | 2 | A.  From Darryl LaMont:  There's a limo of 25 coming to the |
| 11:59AM | 3 | club in 45, dot, dot, dot. |
| 11:59AM | 4 | Need bottle service plus a booth, dot, dot, dot. |
| 11:59AM | 5 | They're coming from Falls. |
| 12:00PM | 6 | From Defendant Gerace:  I'll see if anything is |
| 12:00PM | 7 | available.  I'm away.  Tell them to see Nick. |
| 12:00PM | 8 | Q.  Okay.  Stop there for a second. |
| 12:00PM | 9 | Are you familiar with and have -- has a manager/employee |
| 12:00PM | 10 | of Pharaoh's been interviewed with the first name Nick? |
| 12:00PM | 11 | A.  Yes. |
| 12:00PM | 12 | Q.  What's Nick's last name? |
| 12:00PM | 13 | A.  Oh, Ciechalski.  I'm not pronouncing it properly, but -- |
| 12:00PM | 14 | Q.  Please continue. |
| 12:00PM | 15 | A.  The name, and what, from Mr. Gerace. |
| 12:00PM | 16 | Q.  And did LaMont respond at the end there? |
| 12:00PM | 17 | A.  Okay. |
| 12:00PM | 18 | MR. TRIPI:  And scroll just to the top of the next |
| 12:00PM | 19 | page.  Maybe a little bit further down. |
| 12:00PM | 20 | BY MR. TRIPI: |
| 12:00PM | 21 | Q.  Can you continue reading the July 15th exchanges? |
| 12:00PM | 22 | A.  From Mr. Gerace:  It's under your name. |
| 12:00PM | 23 | From Mr. LaMont:  I'm already gone.  They don't know to |
| 12:00PM | 24 | put it under my name, and I know they are going to Pharaoh's. |
| 12:00PM | 25 | Not sure if it's going to be their first stop but they will |

| | | |
|---|---|---|
| 12:00PM | 1 | for sure be there. |
| 12:01PM | 2 | Sent by Sunny because Darryl is driving. |
| 12:01PM | 3 | Q.  And then does Mr. Gerace respond? |
| 12:01PM | 4 | A.  He does.  I told the guys 30 to 45 minutes, like you |
| 12:01PM | 5 | said.  What is the name, because that's -- that's -- because |
| 12:01PM | 6 | that he saved a VIP section for them. |
| 12:01PM | 7 | From Mr. LaMont:  His name is Harry. |
| 12:01PM | 8 | **MR. TRIPI:**  Ms. Champoux, can we down the screen |
| 12:01PM | 9 | again for the jury please.  And, Ms. Champoux, can you get me |
| 12:01PM | 10 | to a message January 23rd, 2019 please.  It should be the |
| 12:01PM | 11 | second or third page from the end. |
| 12:01PM | 12 | Okay.  Let's go -- all right.  Let's -- sorry, I need |
| 12:01PM | 13 | a date and time.  Thank you.  So we're scrolling between |
| 12:02PM | 14 | page 21 and 22.  Ms. Champoux, can you -- can we have the jury |
| 12:02PM | 15 | view the screen, please? |
| 12:02PM | 16 | **BY MR. TRIPI:** |
| 12:02PM | 17 | Q.  On January 23rd, 2019, did Mr. LaMont send a picture of a |
| 12:02PM | 18 | woman to Mr. Gerace? |
| 12:02PM | 19 | A.  Yes, he did. |
| 12:02PM | 20 | **MR. TRIPI:**  Can you scroll down a little further, |
| 12:02PM | 21 | Ms. Champoux. |
| 12:02PM | 22 | **BY MR. TRIPI:** |
| 12:02PM | 23 | Q.  Underneath the photo, what did Mr. LaMont write? |
| 12:02PM | 24 | A.  New girl I just hired.  Sending her to Pharaoh's Friday |
| 12:02PM | 25 | morning for a dancing job, dot, dot, dot.  Her name is |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

116

| | | |
|---|---|---|
| 12:02PM | 1 | Amanda. |
| 12:02PM | 2 | Q.  Okay.  Now Darryl LaMont doesn't own Pharaoh's, right? |
| 12:02PM | 3 | A.  He does not. |
| 12:02PM | 4 | Q.  The defendant did, right? |
| 12:02PM | 5 | A.  Yes, he did. |
| 12:02PM | 6 | Q.  Okay.  And what does the defendant respond when |
| 12:02PM | 7 | Mr. LaMont writes, new girl I just hired, sending her to |
| 12:02PM | 8 | Pharaoh's Friday morning for a dancing job.  Her name Amanda? |
| 12:02PM | 9 | A.  He responds: Okay.  Let me know.  I'll be there. |
| 12:02PM | 10 | Q.  And what does Mr. LaMont respond? |
| 12:02PM | 11 | A.  She will be there at noon. |
| 12:02PM | 12 | Q.  I'm going to hand you up the hard copy.  And just read |
| 12:03PM | 13 | out loud and stop when you get to sort of the Post-It Notes |
| 12:03PM | 14 | that I'm putting on the page okay? |
| 12:03PM | 15 | **THE COURT:**  Can we take this down now? |
| 12:03PM | 16 | **MR. TRIPI:**  Absolutely. |
| 12:03PM | 17 | **THE COURT:**  Can we post for me what -- |
| 12:03PM | 18 | **MR. TRIPI:**  Yeah. |
| 12:03PM | 19 | **THE COURT:**  -- what you're looking at? |
| 12:03PM | 20 | **MR. TRIPI:**  Yes.  For the judge and the parties only, |
| 12:03PM | 21 | can we move to the last page, Ms. Champoux. |
| 12:03PM | 22 | And, Judge, we're reading that. |
| 12:03PM | 23 | **THE COURT:**  Okay. |
| 12:03PM | 24 | **BY MR. TRIPI:** |
| 12:03PM | 25 | Q.  Just to sort of complete the exchanges about that woman |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

12:03PM  1   that was in the photo on January 25, 2019, can you read how

12:04PM  2   they finished that conversation between Mr. LaMont and the

12:04PM  3   defendant?

12:04PM  4   A.   From Mr. LaMont:  Amanda won't be in until a little later

12:04PM  5   to try out, dot, dot, dot.

12:04PM  6       She has an appointment that came up that she has to be

12:04PM  7   at, dot, dot, dot.

12:04PM  8       I'll be in around 4 myself.

12:04PM  9           **MR. TRIPI:**  Judge, sort of the last thing on this is

12:04PM  10  the one message we needed to argue further about.

12:04PM  11          **THE COURT:**  Okay.  So should we break for lunch now?

12:04PM  12          **MR. TRIPI:**  Yeah, Judge.  I think I can be done in

12:04PM  13  the next 30 minutes, so I think it's a good time to break for

12:04PM  14  lunch, and that's about how much I think, 30 to 35 minutes,

12:04PM  15  I'll be finished.

12:04PM  16          **THE COURT:**  Okay.  So let's take a relatively short

12:04PM  17  lunch break.  Let's take 45 minutes.  Please remember my

12:04PM  18  instructions.  Don't talk about the case, don't communicate

12:04PM  19  about it with anyone.  Don't use tools of technology to learn

12:04PM  20  anything about the case or to communicate about the case.  If

12:04PM  21  there's any news coverage of the case on TV or the radio or

12:05PM  22  newspaper or internet or anywhere else, don't read or watch or

12:05PM  23  listen to it.  And don't make up your mind until you start

12:05PM  24  deliberating.

12:05PM  25          We'll see you back here at about a quarter to 1.

12:05PM    1    Thanks.

12:05PM    2              (Jury excused at 12:05 p.m.)

12:05PM    3         **THE COURT:**  Okay.  Should we do the argument now?

12:05PM    4         **MR. COOPER:**  Sure, Judge.

12:05PM    5         **THE COURT:**  Should we excuse the witness?

12:05PM    6         **MR. COOPER:**  Yes, please.

12:05PM    7         Get out of here, Brian.

12:05PM    8         **THE COURT:**  Mr. Burns, we haven't really been

12:05PM    9    admonishing you because you know don't talk to anybody.

12:06PM   10         **THE WITNESS:**  Certainly.

12:06PM   11         **THE COURT:**  Okay.

12:06PM   12         **MR. TRIPI:**  I think I'm gonna let Mr. Cooper handle

12:06PM   13    this one.

12:06PM   14         **THE COURT:**  And can we put it up on the screen so I

12:06PM   15    can see the exchange?

12:06PM   16         **MR. TRIPI:**  Yeah.  Karen, it's October 26th, 2017.

12:06PM   17         I'll just try to circle them for you, Judge.

12:06PM   18         Those are the two, Judge.

12:06PM   19         **MR. COOPER:**  So, will you let me know when you're

12:06PM   20    ready for the argument, Judge?

12:06PM   21         **THE COURT:**  Yeah, I'm ready.

12:06PM   22         **MR. COOPER:**  Okay.  So first of all, in terms of

12:06PM   23    relevance, which I think it's obvious, it's notice to the

12:06PM   24    defendant that Darryl LaMont has this woman engaging in some

12:06PM   25    kind of sex acts.  At a minimum, the low bar of relevance

12:06PM    1    here, Darryl LaMont is informing the defendant on a text

12:07PM    2    message that the woman engaged in anal sex.

12:07PM    3        So, and I want to set aside for a moment what I

12:07PM    4    expect Mr. Foti to say is that this is a joke.  He can argue

12:07PM    5    it's a joke, and if the defendant wanted to, and obviously

12:07PM    6    it's his choice, he can get up and claim it's a joke.

12:07PM    7        But the words written on the paper indicate that the

12:07PM    8    woman engaged in a sex act, specifically anal sex.

12:07PM    9        And the notice to this defendant that LaMont was

12:07PM   10    using women to get them to engage in sex acts is at issue in

12:07PM   11    this case, which charges a sex-trafficking conspiracy.

12:07PM   12        So, as far as relevance goes, the text messages are

12:07PM   13    obviously relevant.

12:07PM   14        With respect to whether the statement is in

12:07PM   15    furtherance of the conspiracy, I would argue to the Court that

12:07PM   16    they are.  And when two coconspirators are essentially

12:07PM   17    negotiating or arguing about who gets to have this person on a

12:07PM   18    particular day, that's in furtherance of the conspiracy, even

12:07PM   19    if they're at odds with each other, even if they're both

12:08PM   20    saying, like, hey I wanted her this weekend.  That's a

12:08PM   21    statement of essentially negotiation.  They don't have to be

12:08PM   22    lovey-dovey all the time.

12:08PM   23        Peter's appears pissed in the text message.  You took

12:08PM   24    one of my top weekend girls.

12:08PM   25        And LaMont is essentially throwing it in his face.

12:08PM    1    Yeah, and she does anal too.

12:08PM    2           So it's relevant, and it's negotiation about the

12:08PM    3    conspiracy.  And you don't have to find that beyond the

12:08PM    4    reasonable doubt at this stage.

12:08PM    5           **THE COURT:**  Mr. Foti?

12:08PM    6           **MR. FOTI:**  Judge, I -- I -- I'm just trying to -- and

12:08PM    7    I don't mean this to be offensive, I'm trying to wrap my mind

12:08PM    8    around the idea that they're negotiating over something,

12:08PM    9    because Peter Gerace is indicating I -- is speaking to him as

12:08PM   10    a competitor in this respect.  There's no request --

12:08PM   11           **THE COURT:**  Yeah, I agree with you.  I don't think

12:08PM   12    it's in furtherance.  It's not gonna come in for the substance

12:08PM   13    of it.  I don't think it comes in in furtherance of the

12:08PM   14    conspiracy.  In fact, I think in light of what the 2nd Circuit

12:08PM   15    has said, this is -- this is almost anything but.

12:09PM   16           I agree with you.  He's saying I stole one of your --

12:09PM   17    you stole one of my girls, and Peter's a little pissed.  That

12:09PM   18    means it's not in furtherance of the conspiracy.  That means

12:09PM   19    it's as a competitor, so I agree with you on that.

12:09PM   20           **MR. TRIPI:**  Judge --

12:09PM   21           **THE COURT:**  Go ahead.

12:09PM   22           **MR. TRIPI:**  -- I'm sorry, one other way that I

12:09PM   23    believe I argued it in briefing if not in a prior iteration of

12:09PM   24    this, I know a lot of water under the bridge, so, the -- I

12:09PM   25    think this is an adoptive admission as well.  Under

12:09PM  1   circumstances where a regular person would deny knowledge, the

12:09PM  2   defendant is silent.  And there's authority for the notion

12:09PM  3   that where someone would deny something or disavow knowledge

12:09PM  4   and they don't, that you can --

12:09PM  5           **THE COURT:**  So he should say no, he doesn't do anal?

12:09PM  6   After he says she does anal, LOL?

12:10PM  7           **MR. TRIPI:**  Or I don't know what you're talking

12:10PM  8   about.  Things like that.

12:10PM  9           **THE COURT:**  No, especially with the LOL.  Especially

12:10PM  10  with the LOL.  No, I don't agree with that.

12:10PM  11          But, so -- so one of the statements that I'm reading

12:10PM  12  from, the United States versus San -- Saneaux case, which is

12:10PM  13  albeit a District Court case, but I think a good one,

12:10PM  14  statements which tend to frustrate or hinder the goals of the

12:10PM  15  conspiracy cannot reasonably be interpreted as furthering the

12:10PM  16  conspiracy.

12:10PM  17          This certainly would have done that here.

12:10PM  18          **MR. TRIPI:**  Judge, if I could jump in?

12:10PM  19          I -- I go back to what I argued to you at the bench,

12:10PM  20  which was -- and I think we started sort of in the lead on

12:10PM  21  this argument, and we've swung back the other way.  And I

12:10PM  22  think what I was trying to explain at the bench was when you

12:10PM  23  have two people in a conspiracy, and they're discussing

12:10PM  24  personnel, that's clearly what's happening here.

12:11PM  25          So they have a dancer who works for both of them and

12:11PM    1   they're discussing personnel.  That's -- that's no different

12:11PM    2   than moving troops around the field, or personnel in a

12:11PM    3   football game.

12:11PM    4        THE COURT:  Mr. Tripi, I understand what you're

12:11PM    5   saying.  I disagree with you.  I disagree.  It's not coming in

12:11PM    6   for the substance.

12:11PM    7        Talk to me about why it shouldn't come in -- talk to

12:11PM    8   me about why on a 401, 403, it shouldn't come in.

12:11PM    9        MR. FOTI:  Yeah.  So, to give you an idea of -- I

12:11PM   10   mean, obviously we have an -- an argument that it's a joke,

12:11PM   11   but an argument doesn't take away the impact of seeing

12:11PM   12   somebody referencing anal in a message that -- I understand

12:11PM   13   what Mr. Tripi's point was -- but there's no response at all

12:11PM   14   or indication that it was even seen.  The next text message is

12:11PM   15   several months later.

12:11PM   16        THE COURT:  But Mr. Cooper -- but Mr. Cooper, I don't

12:11PM   17   think he's got to put it in proof that it was actually seen.

12:11PM   18   And Mr. Cooper is arguing that it comes in for, again, for the

12:12PM   19   defendant's state of mind and context.  And I don't see why it

12:12PM   20   wouldn't come in for that.

12:12PM   21        And I don't think it's unduly prejudicial, given the

12:12PM   22   fact that there's been plenty of -- dear Lord in heaven, this

12:12PM   23   is one of the milder things that has come in in the course of

12:12PM   24   this trial.  There's been all sorts of proof graphically asked

12:12PM   25   about different types of sex in this case.  So I'm -- I'm not

USA v Gerace - Burns - Tripi/Direct - 12/17/24

12:12PM   1   seeing how this is unduly prejudicial.

12:12PM   2          **MR. FOTI:**  Well, I think it's only probative if

12:12PM   3   there's some confirmation Mr. Gerace saw it.  And if there's

12:12PM   4   no indication that he did, there's no continuation of the

12:12PM   5   conversation at all, or any type of digital acknowledgment

12:12PM   6   that it was something that he actually.

12:12PM   7          **MR. COOPER:**  Judge, it still --

12:12PM   8          I'm sorry, Mark.  I didn't mean to cut you off.  I

12:12PM   9   thought you were wrapping up.

12:12PM   10         If it was the last text message ever in the chain,

12:12PM   11  Mr. Foti would have a stronger argument.  But the conversation

12:12PM   12  continues, he can argue that, hey, there's no proof he read

12:13PM   13  this text message, and we can argue the text messages continue

12:13PM   14  on after that, but it's certainly -- it establishes the

12:13PM   15  defendant's notice that Darryl LaMont was having women engage

12:13PM   16  in sex acts, and that's at issue in this trial --

12:13PM   17         **THE COURT:**  Yep.

12:13PM   18         **MR. COOPER:**  -- without question.

12:13PM   19         **MR. FOTI:**  I think that there's a number of reasons

12:13PM   20  the probative value is limited.  One is that we don't have

12:13PM   21  confirmation that he saw it.  And I understand the argument

12:13PM   22  that that only goes to weight, but that is legitimately a

12:13PM   23  point that diminishes the probative value of the message.

12:13PM   24         The fact that there's an LOL on there suggests that

12:13PM   25  there was, one, potentially an intent to make a joke, whether

12:13PM   1   it was a tasteful joke or not, and certainly that Mr. Gerace

12:13PM   2   could have, if he did see it, could have merely interpreted it

12:13PM   3   as a joke.

12:13PM   4        Trying to import some sort of probative value as to

12:13PM   5   what Mr. Gerace's mindset is on a text message that has no

12:13PM   6   further context at all, given the prejudicial nature of it, I

12:13PM   7   don't think it survives a 403 test.

12:14PM   8        **MR. COOPER:**  Judge, there's almost no -- in this case

12:14PM   9   in the universe of facts that have existed in this courtroom,

12:14PM  10   there's almost no prejudice associated with the word "anal."

12:14PM  11        The reason that they're try -- and I get it, I

12:14PM  12   respect it, it's his job -- but the reason that they're trying

12:14PM  13   so hard to keep it out is because of how much probative value

12:14PM  14   it has.

12:14PM  15        It's Darryl LaMont and Peter Gerace discussing a

12:14PM  16   woman engaging in sex acts.  The fact that the word "anal"

12:14PM  17   exists has almost zero prejudicial value in this case in this

12:14PM  18   universe of facts.

12:14PM  19        **THE COURT:**  Okay.  I think it comes in.  It comes in

12:14PM  20   only for context.  And that's my decision.

12:14PM  21        **MR. COOPER:**  For notice -- for notice to the

12:14PM  22   defendant.

12:14PM  23        **THE COURT:**  For -- for --

12:14PM  24        **MR. COOPER:**  When you say "context" --

12:14PM  25        **THE COURT:**  The defendant's state of mind and the

USA v Gerace - Burns - Tripi/Direct - 12/17/24

125

| | | |
|---|---|---|
| 12:14PM | 1 | context of the conversation. |
| 12:14PM | 2 | **MR. TRIPI:** Understood. Thank you. |
| 12:14PM | 3 | **THE COURT:** Okay. Yes. |
| 12:14PM | 4 | **MR. FOTI:** I just would ask that the ins -- and I |
| 12:14PM | 5 | don't think it has in the past, but just the instruction not |
| 12:14PM | 6 | suggest to the jury that there's an indication he saw the |
| 12:14PM | 7 | message, that's fine. |
| 12:14PM | 8 | **THE COURT:** No, you can argue that. I'm not gonna |
| 12:14PM | 9 | say that. |
| 12:14PM | 10 | **MR. FOTI:** No, I understand that. |
| 12:14PM | 11 | **THE COURT:** Of course you can argue that. |
| 12:14PM | 12 | **MR. COOPER:** It's being offered to prove the |
| 12:15PM | 13 | defendant's knowledge is -- |
| 12:15PM | 14 | **THE COURT:** It's being offered to prove the |
| 12:15PM | 15 | defendant's knowledge. |
| 12:15PM | 16 | **MR. COOPER:** And then you can say -- |
| 12:15PM | 17 | **THE COURT:** And then you can say, I mean, if you want |
| 12:15PM | 18 | to -- if you want to say something at that point, say clarify, |
| 12:15PM | 19 | you know, there's no indication that he actually saw it, I'd |
| 12:15PM | 20 | say I'm not saying that. What I'm saying is it's being |
| 12:15PM | 21 | offered to show that the defendant knew that, whether he saw |
| 12:15PM | 22 | it or not doesn't -- we don't know. |
| 12:15PM | 23 | **MR. COOPER:** I would just suggest that that's for |
| 12:15PM | 24 | cross. He can cross Special Agent Burns on that. |
| 12:15PM | 25 | **THE COURT:** I guess that's true. |

12:15PM   1              **MR. COOPER:**  That's a legal instruction.

12:15PM   2              **MR. FOTI:**  I can't cross Mr. Burns on it.  He doesn't

12:15PM   3    know.

12:15PM   4              **THE COURT:**  That's right.  That's the point.  That's

12:15PM   5    the point.  He's gonna say he doesn't know.

12:15PM   6              Do you know whether Mr. Gerace ever saw this?  I have

12:15PM   7    no idea.

12:15PM   8              **MR. FOTI:**  Yeah, that's -- I think we're not

12:15PM   9    disagreeing with each other, but to the extent that we have no

12:15PM  10    evidence of whether Mr. Gerace saw it, I don't think it should

12:15PM  11    be suggested that he did.

12:15PM  12              **THE COURT:**  So, okay, so let's come up with some

12:15PM  13    language that would you like me to tell the jury that this is

12:15PM  14    being offered to show Mr. Gerace's state of -- I mean, I think

12:16PM  15    that more or less does it.  That it's being -- the government

12:16PM  16    is offering this to show Mr. Gerace's state of mind.

12:16PM  17              I mean, I'm willing to work with you on language that

12:16PM  18    we can -- that -- I mean, I don't think we're really saying

12:16PM  19    anything different on this issue.  And I'm willing to work

12:16PM  20    with you on language.  You've got half an hour to come up with

12:16PM  21    it, okay?

12:16PM  22              **MR. FOTI:**  Understood.

12:16PM  23              **THE COURT:**  Great.  Anything else before we break?

12:16PM  24              **MR. TRIPI:**  The last one we're probably going to

12:16PM  25    argue about is the text thread with Chris Chudy.  It's gonna

USA v Gerace - Burns - Tripi/Direct - 12/17/24

| | | |
|---|---|---|
| 12:16PM | 1 | be a similar type of argument.  Do you want me to just hand it |
| 12:16PM | 2 | up and you want to look at it in chambers and come back? |
| 12:16PM | 3 | **THE COURT:**  Yeah. |
| 12:16PM | 4 | **MR. TRIPI:**  Is that easier for you? |
| 12:16PM | 5 | **THE COURT:**  It's the same sort of thing. |
| 12:16PM | 6 | **MR. TRIPI:**  Same sort of idea.  It's about drugs as |
| 12:16PM | 7 | opposed to sex, but same idea.  And so they're all on |
| 12:16PM | 8 | November 1st, Judge. |
| 12:16PM | 9 | **THE COURT:**  Okay.  Great. |
| 12:16PM | 10 | **MR. TRIPI:**  If you want to do it after -- |
| 12:16PM | 11 | **THE COURT:**  And you're going to go through this, go |
| 12:16PM | 12 | through that, and then what? |
| 12:16PM | 13 | **MR. TRIPI:**  And then I'm going to move into getting |
| 12:16PM | 14 | our chart in. |
| 12:16PM | 15 | **THE COURT:**  And you're going to object to the chart |
| 12:16PM | 16 | or not object to the chart? |
| 12:17PM | 17 | **MR. FOTI:**  No. |
| 12:17PM | 18 | **THE COURT:**  Great.  Thanks, folks. |
| 12:17PM | 19 | **MR. TRIPI:**  Thank you. |
| 12:17PM | 20 | **THE CLERK:**  All rise. |
| 12:17PM | 21 | (Off the record at 12:17 p.m.) |
| 12:54PM | 22 | (Back on the record at 12:54 p.m.) |
| 12:54PM | 23 | (Jury not present.) |
| 12:54PM | 24 | **THE CLERK:**  All rise. |
| 12:54PM | 25 | **THE COURT:**  Please be seated. |

| | | |
|---|---|---|
| 12:54PM | 1 | **THE CLERK:**  We are back on the record for the |
| 12:54PM | 2 | continuation of the jury trial in case numbers 19-cr-227 and |
| 12:54PM | 3 | 23-cr-37, United States of America versus Peter Gerace Jr. |
| 12:54PM | 4 | All counsel and parties are present. |
| 12:54PM | 5 | **THE COURT:**  Okay.  So I've looked at the Chris Chudy |
| 12:54PM | 6 | ones.  I think it's different, Mr. Tripi.  I think that the |
| 12:54PM | 7 | Chris Chudy -- the only reason that they might be relevant is |
| 12:54PM | 8 | for the truth of what Mr. Chudy is saying. |
| 12:54PM | 9 | In other words, he's saying that there are double |
| 12:54PM | 10 | standards.  That do you it all the time for your people.  If |
| 12:54PM | 11 | you're not a biker or a partier, you're nothing.  I'm not |
| 12:54PM | 12 | allowed to watch the cameras. |
| 12:55PM | 13 | So the only reason that could possibly be relevant is |
| 12:55PM | 14 | for the truth, not for Mr. Gerace's state of mind, because |
| 12:55PM | 15 | he's denying it in the context. |
| 12:55PM | 16 | Let me finish.  Please, let me finish. |
| 12:55PM | 17 | And I don't think these could possibly be in |
| 12:55PM | 18 | furtherance of the conspiracy even Mr. -- even if Mr. Chudy is |
| 12:55PM | 19 | a coconspirator because, again, there -- it's a disagreement, |
| 12:55PM | 20 | it's not something that they are doing to further the |
| 12:55PM | 21 | conspiracy. |
| 12:55PM | 22 | So I think it's pure hearsay, and I don't think it's |
| 12:55PM | 23 | coming in, but I will hear your argument. |
| 12:55PM | 24 | **MR. TRIPI:**  And I -- |
| 12:55PM | 25 | **MR. COOPER:**  Judge -- |

| | | |
|---|---|---|
| 12:55PM | 1 | **MR. TRIPI:**  You can follow up, Nick, if you don't |
| 12:55PM | 2 | mind. |
| 12:55PM | 3 | **MR. COOPER:**  Oh, okay. |
| 12:55PM | 4 | **MR. TRIPI:**  He does it to me, too, Judge, I'm sorry. |
| 12:55PM | 5 | **THE COURT:**  No, no, no, that's okay, I get it. |
| 12:55PM | 6 | **MR. TRIPI:**  Yes.  The thing I would argue again, and |
| 12:55PM | 7 | I know you rejected it before the break, but Mr. Gerace |
| 12:55PM | 8 | doesn't respond to any of that directly. |
| 12:55PM | 9 | **THE COURT:**  Yep. |
| 12:55PM | 10 | **MR. TRIPI:**  I think that those circumstances -- my |
| 12:55PM | 11 | argument would be to you an adopted admission.  He goes on to |
| 12:55PM | 12 | other -- he stills addresses it. |
| 12:55PM | 13 | **THE COURT:**  He says no in the last one.  He says no. |
| 12:56PM | 14 | The last -- the last text message is no. |
| 12:56PM | 15 | Go ahead, Mr. Cooper. |
| 12:56PM | 16 | **MR. COOPER:**  Judge, I guess what I would argue |
| 12:56PM | 17 | similar to what I argued earlier with respect to Mr. LaMont is |
| 12:56PM | 18 | that these should come in at a minimum for state of mind, and |
| 12:56PM | 19 | here's why. |
| 12:56PM | 20 | **THE COURT:**  Go ahead. |
| 12:56PM | 21 | **MR. COOPER:**  The defense has argued, and they did so |
| 12:56PM | 22 | as recently as yesterday with respect to Ms. L.L., that the |
| 12:56PM | 23 | fact that Brian was being paid off to look the other way |
| 12:56PM | 24 | doesn't mean that this defendant was aware of illegal conduct |
| 12:56PM | 25 | happening at the club. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

130

| | | |
|---|---|---|
| 12:56PM | 1 | And here, Chudy is saying there's drug dealing, these |
| 12:56PM | 2 | bikers, and you don't care, you know, you're not concerned |
| 12:56PM | 3 | with it if they're people that party with you. |
| 12:56PM | 4 | And so he's making Gerace directly aware of the |
| 12:56PM | 5 | partiers getting away with things that are inappropriate at |
| 12:56PM | 6 | the club.  I expect there's gonna be a defense summation in |
| 12:56PM | 7 | this case heavily referencing that, like, they can't prove |
| 12:56PM | 8 | Peter knew about this stuff. |
| 12:56PM | 9 | So at a minimum, I would suggest to the Court that it |
| 12:57PM | 10 | needs to come in to show state of mind and awareness.  Here's |
| 12:57PM | 11 | a manager reporting, hey, there's this misconduct happening at |
| 12:57PM | 12 | the club. |
| 12:57PM | 13 | THE COURT:  I don't see him reporting misconduct. |
| 12:57PM | 14 | MR. TRIPI:  I think the focus is the word "partier," |
| 12:57PM | 15 | Judge.  Partier, the connotation is cocaine use. |
| 12:57PM | 16 | THE COURT:  No.  This is not going to come in. |
| 12:57PM | 17 | MR. TRIPI:  Okay.  Can get it back? |
| 12:57PM | 18 | THE COURT:  Number 2 -- no, I'm gonna keep it. |
| 12:57PM | 19 | Number 2.  Juror number 6 says that he knows the |
| 12:57PM | 20 | young lady shown in the last photo that was displayed. |
| 12:57PM | 21 | MR. SOEHNLEIN:  Which photo was that? |
| 12:57PM | 22 | MR. TRIPI:  I think that would have been a text |
| 12:57PM | 23 | thread, there was a young lady, Amanda maybe, was referenced. |
| 12:57PM | 24 | It was in 310.  I think that -- I think that was the last |
| 12:57PM | 25 | photo that -- |

12:57PM    1          **MR. COOPER:**  Can you pull up 310AS.  Is it AS?

12:57PM    2          **MR. TRIPI:**  It's AS, yes.  And it's the

12:58PM    3    second-to-last page of the PDF.  It's towards the end.  There

12:58PM    4    you go.

12:58PM    5          I think that's the last photo of a young lady that I

12:58PM    6    had shown.

12:58PM    7          **MR. COOPER:**  Yeah.

12:58PM    8          **THE COURT:**  Should we bring him in and ask?

12:58PM    9          **MR. TRIPI:**  I think given that it's evidence in the

12:58PM   10    case, Judge, I think we have to ask if it's going to impact

12:58PM   11    his ability to be fair to either side.

12:58PM   12          **MR. FOTI:**  Yeah.  And maybe I think it also would be

12:58PM   13    helpful to just note the context under which he knows her.

12:58PM   14          **THE COURT:**  Yeah, I agree.

12:58PM   15          **MR. COOPER:**  Agree.

12:58PM   16          **THE COURT:**  Okay.  So let's bring juror number 6 in,

12:58PM   17    please.

12:58PM   18          **MR. COOPER:**  Would we be able to just confirm that

12:58PM   19    this is what he's speaking about, also maybe quickly show this

12:58PM   20    photo?

12:58PM   21          **THE COURT:**  Any problem with that?

12:58PM   22          **MR. SOEHNLEIN:**  No.

12:58PM   23          **THE COURT:**  Yeah.

12:58PM   24          **MR. COOPER:**  Just to make sure that we know.

12:58PM   25          **THE COURT:**  Yeah, why don't you step down.

12:58PM    1                    **THE WITNESS:**  Okay.

12:58PM    2                    (Mr. Burns exited the courtroom at 12:58 p.m.)

12:58PM    3                    **MS. CHAMPOUX:**  Should I crop this?

12:58PM    4                    **MR. COOPER:**  Yeah, I don't think he needs to see her

12:58PM    5        lower half to make that assessment.

12:59PM    6                    **MS. CHAMPOUX:**  It just says Amanda.

12:59PM    7                    (Juror 6 entered courtroom at 12:59 p.m.)

12:59PM    8                    **THE COURT:**  You can stay right there.  There's no

12:59PM    9        reason for you to go all the way back.

12:59PM   10                    Pat, do we have a microphone?

12:59PM   11                    **THE CLERK:**  I'll get it.

12:59PM   12                    **THE COURT:**  So we're in the courtroom with Juror

12:59PM   13        Number 6.  And I understand that you recognized the young lady

12:59PM   14        shown in one of the photos that was displayed; is that

12:59PM   15        correct?

12:59PM   16                    **JUROR 6:**  Correct.

12:59PM   17                    **THE COURT:**  Is it this photo, the one that's up there

12:59PM   18        now?

12:59PM   19                    **JUROR 6:**  Yes.

12:59PM   20                    **THE COURT:**  Okay.  And how do you know that person?

12:59PM   21                    **JUROR 6:**  We used to work together at the plant, at

12:59PM   22        the General Motors plant.

12:59PM   23                    **THE COURT:**  Okay.  When was the last time you talked

12:59PM   24        to her or saw her?

12:59PM   25                    **JUROR 6:**  Oh, probably the last day she was there.

12:59PM    1    And that was probably seven years ago.

12:59PM    2            THE COURT:  Okay.  Anything about the fact that you

12:59PM    3    know her and that her photo has now appeared in the context of

12:59PM    4    these text messages that's going to affect your ability to be

12:59PM    5    fair in this case?

12:59PM    6            JUROR 6:  No, I just felt I needed to say something.

12:59PM    7            THE COURT:  Absolutely.  And we're very glad that you

12:59PM    8    are.  But is there anything about this that makes you feel

01:00PM    9    uncomfortable, or that makes you feel as though you couldn't

01:00PM   10    give a fair shake to the defendant, or give a fair shake to

01:00PM   11    the government?

01:00PM   12            JURORS 6:  No.

01:00PM   13            MR. COOPER:  May I just --

01:00PM   14            THE COURT:  Go ahead.

01:00PM   15            MR. COOPER:  A very long time ago when we were doing

01:00PM   16    jury selection, one of the things that came up as a recurring

01:00PM   17    theme was keeping the decision-making process when you go in

01:00PM   18    the verdict room limited to what happened and what proof came

01:00PM   19    in this courtroom.

01:00PM   20            If you have had conversations with that person, or

01:00PM   21    know things about them, can you promise everybody that you'll

01:00PM   22    only decide this case based on proof that came in in this

01:00PM   23    courtroom?

01:00PM   24            JUROR 6:  Yes, I can.

01:00PM   25            MR. COOPER:  Excellent.  I'm good, Judge.

01:00PM   1          **MR. FOTI:**  No questions.

01:00PM   2          **THE COURT:**  Terrific.  Thank you very much.  And you

01:00PM   3   did exactly the right thing in telling us.  So, thank you.

01:00PM   4          **JUROR 6:**  No problem.

01:00PM   5          (Juror 6 exited the courtroom at 1:00 p.m.)

01:00PM   6          **THE COURT:**  I think they feel as though when we bring

01:00PM   7   them in, they've done something wrong.

01:00PM   8          **MR. COOPER:**  Like the principal's office.

01:00PM   9          **THE COURT:**  Okay.  Anything else we should do before

01:00PM   10   we resume?

01:01PM   11          **MR. COOPER:**  No.

01:01PM   12          **THE COURT:**  Mr. Tripi?

01:01PM   13          **MR. TRIPI:**  No, Judge.

01:01PM   14          **THE COURT:**  Mr. Foti?

01:01PM   15          **MR. FOTI:**  No, Judge.

01:01PM   16          **THE COURT:**  Okay.  Great.  Thank you.

01:01PM   17          Let's bring them in, please, Pat.

01:01PM   18          **MR. TRIPI:**  We're gonna start with that text message,

01:01PM   19   Judge, so I assume you're going to give your instruction right

01:01PM   20   after I display it?

01:01PM   21          **THE COURT:**  Yes.  Oh, Mr. Foti, did you come up with

01:01PM   22   any language you wanted me to use in addition?

01:01PM   23          **MR. FOTI:**  What I would ask for is just goes to his

01:01PM   24   state of mind to the extent that he may have seen the message,

01:01PM   25   and that's it.

01:01PM   1   **MR. COOPER:**  Judge, I -- I'm not trying to be a pain

01:01PM   2   here, but I don't think that the Court should weigh in on

01:01PM   3   whether or not he saw the message.  The legal ruling is it's

01:01PM   4   being offered for his state of mind.  They can cross-examine

01:01PM   5   the witness, and they can sum up on there's no proof that he

01:01PM   6   saw it.  I'm not -- I don't know that that should really be a

01:01PM   7   part of a legal instruction.

01:01PM   8        **MR. FOTI:**  I didn't ask the Court to weigh it, I just

01:01PM   9   asked to say to the extent that he may have seen the message,

01:02PM  10   which is what the government is saying they want to use it

01:02PM  11   for.

01:02PM  12        **MR. COOPER:**  What are you gonna --

01:02PM  13        **MR. TRIPI:**  Do you want to hold them up, Judge?

01:02PM  14        **THE COURT:**  No, that's okay.  They can come in.

01:02PM  15   You'll hear it when I give it.

01:02PM  16        **MR. COOPER:**  Understood.

01:02PM  17        **THE CLERK:**  Joe, which exhibit number is this?

01:02PM  18        **MR. TRIPI:**  This is 310AS.

01:02PM  19        **THE CLERK:**  Thank you.

01:02PM  20        (Jury seated at 1:02 p.m.)

01:02PM  21        **THE COURT:**  Okay.  Welcome backs, folks.  The record

01:02PM  22   will reflect that all our jurors are present.

01:02PM  23        I remind the witness that he's still under oath.

01:02PM  24        Folks, you're gonna see another text message

01:02PM  25   exchange.  This text message exchange is being offered,

01:03PM  1   again -- Mr. Gerace's text message is being offered for all

01:03PM  2   purposes.  The other person's text message is being offered

01:03PM  3   only to show -- the government says that -- the government

01:03PM  4   believes that it shows Mr. Gerace's state of mind because it's

01:03PM  5   a text message that was sent to him.  Okay?  And it's being

01:03PM  6   admitted only for that.

01:03PM  7           Mr. Tripi, you can continue.

01:03PM  8           **MR. TRIPI:**  Thank you, Your Honor.

01:03PM  9           I'd like to pull up one more message as the judge

01:03PM 10   indicated, the exchange regarding Exhibit 310AS.

01:03PM 11           **BY MR. TRIPI:**

01:03PM 12   Q.  And Special Agent Burns, can you read in the blue box

01:03PM 13   what Mr. Gerace wrote on October 16th, 2017, and Mr. LaMont's

01:03PM 14   response that same day?

01:03PM 15   A.  The defendant stated or text states:  You took one of my

01:03PM 16   top weekend girls.

01:03PM 17       Mr. LaMont responds:  And she does anal, dot, dot, LOL.

01:03PM 18   Q.  Okay.  Now, I want to focus you in on the date and time.

01:04PM 19   We see UTC time for the text by the defendant is

01:04PM 20   October 16th, 2017 at 12:05 p.m.  So given that time of year,

01:04PM 21   I think we've established that would be minus four hours

01:04PM 22   making it that 8:05 a.m.; is that right?

01:04PM 23   A.  That's correct.

01:04PM 24   Q.  All right.  And then the response by Mr. LaMont is at

01:04PM 25   2:03 p.m. UTC time, so minus four hours would put it at about

01:04PM   1   10:03 a.m.; is that right?

01:04PM   2   A.  That's accurate.

01:04PM   3        **MR. TRIPI:**  Okay.  Ms. Champoux, can we flip over to

01:04PM   4   Government Exhibit 359 phone records for Mr. Gerace previously

01:04PM   5   entered into evidence.

01:04PM   6        And can we go to the PDF labeled 2016 to 2018 bills.

01:04PM   7        **BY MR. TRIPI:**

01:04PM   8   Q.  And Mr. -- Special Agent Burns, I'd like to start you at

01:04PM   9   page 567 to orient you as to the year that these bills are

01:04PM  10   in.  Do you see on page 567 a date of February 20th, 2017?

01:05PM  11   A.  Yes, I do.

01:05PM  12   Q.  Is that an indication reading the bills that we're in

01:05PM  13   January of 2017, so we're going follow the months in the far

01:05PM  14   column, and it's going to be the year 2017 until you see

01:05PM  15   we've gone through 12 months; is that right?

01:05PM  16   A.  That's accurate.

01:05PM  17        **MR. TRIPI:**  All right.  Ms. Champoux, can we scroll

01:05PM  18   down, scroll down to page number 955.  But could you scroll

01:05PM  19   just a little bit so they can see the months changing?

01:05PM  20        **BY MR. TRIPI:**

01:05PM  21   Q.  All right.  So there's a lot of call data there.  We're

01:05PM  22   going to jump forward on the PDF to page 955.

01:05PM  23   A.  Okay.

01:05PM  24   Q.  All right.  And I would like to go to a call

01:05PM  25   October 16th, 2017 at 10:04 a.m.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

138

| | | |
|---|---|---|
| 01:05PM | 1 | All right.  Can we get that bar out of there. |
| 01:06PM | 2 | All right.  Moments ago, when we were looking at |
| 01:06PM | 3 | Government Exhibit 310AS, I think you established that the |
| 01:06PM | 4 | time of Mr. Gerace's text to Mr. LaMont that you took one of |
| 01:06PM | 5 | my top weekend girls was at approximately 8:05 a.m.; do you |
| 01:06PM | 6 | recall that? |
| 01:06PM | 7 | A.  Yes, I do. |
| 01:06PM | 8 | Q.  Is there a call from Mr. LaMont incoming to Mr. Gerace's |
| 01:06PM | 9 | phone at about 10:04 a.m. that same day? |
| 01:06PM | 10 | A.  Yeah, shortly after that last text. |
| 01:06PM | 11 | Q.  And how long is that incoming call, what's the duration |
| 01:06PM | 12 | indicated? |
| 01:06PM | 13 | A.  Two-minute call. |
| 01:06PM | 14 | Q.  Okay. |
| 01:06PM | 15 | **MR. TRIPI:**  All right.  We can take that down, |
| 01:06PM | 16 | Ms. Champoux. |
| 01:06PM | 17 | **BY MR. TRIPI:** |
| 01:06PM | 18 | Q.  So that call is the same day, in between the texts; is |
| 01:06PM | 19 | that right? |
| 01:06PM | 20 | A.  Yes, that's accurate. |
| 01:06PM | 21 | Q.  Okay.  All right.  Going back to Mr. Gerace's phone, were |
| 01:07PM | 22 | you also able to isolate some photographs that were in the |
| 01:07PM | 23 | phone? |
| 01:07PM | 24 | A.  Yes.  There were images in the extraction. |
| 01:07PM | 25 | Q.  And -- |

| | | |
|---|---|---|
| 01:07PM | 1 | A.  Pictures. |
| 01:07PM | 2 | Q.  One of them that was extracted, did that include another |
| 01:07PM | 3 | picture of him with -- the defendant with Judge Michalski and |
| 01:07PM | 4 | C.C.? |
| 01:07PM | 5 | A.  Yes. |
| 01:07PM | 6 | Q.  I'm going to hand you up Exhibit 310AU-1. |
| 01:07PM | 7 | Do you recognize that to be an image of a photo that was |
| 01:07PM | 8 | contained inside Mr. Gerace's phone in the extraction? |
| 01:07PM | 9 | A.  Yes, I do. |
| 01:07PM | 10 | Q.  Is it fair and accurate rendering of the photo that was |
| 01:07PM | 11 | extracted from the phone? |
| 01:07PM | 12 | A.  Yes, it's a printout. |
| 01:07PM | 13 | **MR. TRIPI:**  The government offers Exhibit 310AU-1. |
| 01:07PM | 14 | **MR. FOTI:**  No objection. |
| 01:07PM | 15 | **THE COURT:**  Received without objection. |
| 01:07PM | 16 | **(GOV Exhibit 310AU-1 was received in evidence.)** |
| 01:07PM | 17 | **MR. TRIPI:**  May we publish that, Ms. Champoux? |
| 01:07PM | 18 | **BY MR. TRIPI:** |
| 01:08PM | 19 | Q.  Thank you very much.  In the middle, is that the |
| 01:08PM | 20 | defendant. |
| 01:08PM | 21 | A.  Yes, it is. |
| 01:08PM | 22 | Q.  On the left-hand side of the image that we're looking at, |
| 01:08PM | 23 | is that C.C.? |
| 01:08PM | 24 | A.  Yes, sir. |
| 01:08PM | 25 | Q.  Did she testify in this trial? |

01:08PM    1    A.  She did.

01:08PM    2    Q.  And on the right-hand side of the photo, on the other

01:08PM    3    side of Mr. Gerace, is that Judge John Michalski?

01:08PM    4    A.  Yes, it is.

01:08PM    5           **MR. TRIPI:**  Okay.  We can take that down.

01:08PM    6           Ms. Champoux, can we go to Government Exhibit 310AT.

01:08PM    7           **THE COURT:**  Is this in?

01:08PM    8           **MR. TRIPI:**  This is in.

01:08PM    9           **BY MR. TRIPI:**

01:08PM   10    Q.  These are the contacts -- this is the exhibit related to

01:08PM   11    the contacts of Mr. Gerace's phone; is that right?

01:08PM   12    A.  That's correct.

01:08PM   13    Q.  All right.  I'm going to go through some questions here.

01:08PM   14    And I might go to some of the entries, but I'm gonna try to

01:08PM   15    speed this up a bit.

01:08PM   16    A.  Okay.

01:08PM   17    Q.  So, we've heard at this trial some testimony about Justin

01:08PM   18    White, an attorney.  Is there a contact in Mr. Gerace's phone

01:08PM   19    for attorney Justin White?

01:08PM   20    A.  Yes, there is.

01:08PM   21    Q.  Are there contacts for other attorneys that have been

01:08PM   22    mentioned by Ms. Nigro during the investigation?

01:08PM   23    A.  Yes, there is.

01:08PM   24    Q.  Are there contacts in Mr. Gerace's phone for former

01:09PM   25    members of the Buffalo Sabres?

01:09PM   1   A.  Yes, there is.

01:09PM   2   Q.  Does that include one who was mentioned by several

01:09PM   3   witnesses to you?

01:09PM   4   A.  Yes, it does.

01:09PM   5   Q.  Are there members of local police law enforcement

01:09PM   6   agencies in Mr. Gerace's phone contacts?

01:09PM   7   A.  Yes, there is.

01:09PM   8   Q.  Are there members of New York State Police in

01:09PM   9   Mr. Gerace's phone contacts?

01:09PM  10   A.  There is.

01:09PM  11   Q.  Obviously, there was a text message thread between

01:09PM  12   Mr. Gerace and Mr. Bongiovanni, that's been in evidence as in

01:09PM  13   Exhibit 310D; is that correct?

01:09PM  14   A.  That's correct.

01:09PM  15   Q.  So within the phone extraction, there were contacts with

01:09PM  16   local, state, and federal authorities, correct?

01:09PM  17   A.  Yes, there was, law enforcement officers.

01:09PM  18   Q.  Record 12 in Exhibit 310AF, we can go there, was there a

01:09PM  19   phone contact for Dan Derenda?

01:09PM  20   A.  There was.

01:09PM  21   Q.  And that was someone Ms. Nigro had mentioned during her

01:09PM  22   testimony?

01:09PM  23   A.  Yes.

01:10PM  24        **MR. FOTI:**  Objection.

01:10PM  25        **THE COURT:**  Sorry?

USA v Gerace - Burns - Tripi/Direct - 12/17/24
142

01:10PM  1          **MR. FOTI:**  Withdrawn.

01:10PM  2              **BY MR. TRIPI:**

01:10PM  3  Q.  Record 2, there's a contact for Jeff Anzalone; is that

01:10PM  4  right?

01:10PM  5  A.  That's correct.

01:10PM  6          **MR. TRIPI:**  I'm a little ahead of Ms. Champoux.

01:10PM  7  Thank you, Ms. Champoux.

01:10PM  8          **BY MR. TRIPI:**

01:10PM  9  Q.  Was he a witness who testified at this trial?

01:10PM  10  A.  Yes, he is.

01:10PM  11  Q.  Record 9.  Is there a contact with a phone number for

01:10PM  12  Chris Chudy?

01:10PM  13  A.  Yes, there is.

01:10PM  14  Q.  Was he a manager at Pharaoh's during the duration of

01:10PM  15  conduct at this trial?

01:10PM  16  A.  He was.

01:10PM  17  Q.  If we go to record 10, is there a contact for Jessica,

01:10PM  18  also known as Charm?

01:10PM  19  A.  There is.

01:10PM  20  Q.  Do you understand that to be Jessica Leyland?

01:10PM  21  A.  That is Jessica Leyland.

01:10PM  22  Q.  Was she a Pharaoh's associate and employee during the

01:10PM  23  time period encompassed by this trial?

01:10PM  24  A.  Yes, she was.

01:10PM  25          **MR. TRIPI:**  Can we also show, Ms. Champoux,

USA v Gerace - Burns - Tripi/Direct - 12/17/24

143

01:10PM   1   Exhibit 562 just to remind the jury about this exhibit.

01:10PM   2          **BY MR. TRIPI:**

01:10PM   3   Q.  All right.  Do we see a photograph here, Exhibit 562, a

01:10PM   4   photo with Charm in the middle of Mr. Gerace and Mr. Reed?

01:10PM   5   A.  Yes, that's Jessica Leyland.

01:11PM   6          **MR. TRIPI:**  Okay.  You can take that down.

01:11PM   7          If we can go back to 310AT, record 13.

01:11PM   8          **BY MR. TRIPI:**

01:11PM   9   Q.  Is there an entry for Tommy Doctor?

01:11PM  10   A.  Yes, there is.

01:11PM  11   Q.  Is that the former DEA task force officer and Buffalo

01:11PM  12   police narcotics detective?

01:11PM  13   A.  Yes, it is.

01:11PM  14          **MR. TRIPI:**  Can we show Exhibit 126, Ms. Champoux.

01:11PM  15   I'm sorry 127.  My fault.

01:11PM  16          **BY MR. TRIPI:**

01:11PM  17   Q.  Is Mr. Doctor circled on the left-hand side of the image

01:11PM  18   in that exhibit?

01:11PM  19   A.  Yes, that is Mr. Doctor.

01:11PM  20   Q.  And there's been testimony about him at this trial?

01:11PM  21   A.  There has been.

01:11PM  22          **MR. TRIPI:**  We can go back to Exhibit 310AT,

01:11PM  23   Ms. Champoux.

01:11PM  24          **BY MR. TRIPI:**

01:11PM  25   Q.  If we can go to record 15, do you see an entry for an

01:12PM   1   Eric Fox?

01:12PM   2   A.  Yes, I do.

01:12PM   3   Q.  And K.L. was a witness in this trial?

01:12PM   4   A.  She was.

01:12PM   5   Q.  During her testimony, you sat here, did Ms. K.L. mention

01:12PM   6   Eric Fox?

01:12PM   7   A.  She did.

01:12PM   8   Q.  We've talked enough about this next person, but record

01:12PM   9   16.  Is that Hot Dog?

01:12PM  10   A.  Yeah, Paul Francoforte.

01:12PM  11   Q.  And I think yesterday we covered the phone contacts and

01:12PM  12   the phone pertaining to him, correct?

01:12PM  13   A.  That's correct.

01:12PM  14   Q.  All right.  We'll move on then.

01:12PM  15       Does Hot Dog, Paul Francoforte, in the law enforcement

01:12PM  16   community have a reputation as being associated with Italian

01:12PM  17   Organized Crime?

01:12PM  18   A.  Yes, he does.

01:12PM  19            **MR. FOTI:**  Objection, relevance.

01:12PM  20            **MR. TRIPI:**  It's the same.

01:12PM  21            **THE COURT:**  Overruled.

01:12PM  22            **MR. TRIPI:**  Can we go to record number 18, please.

01:12PM  23            **BY MR. TRIPI:**

01:12PM  24   Q.  There's been testimony about Marcus Black in this trial;

01:13PM  25   do you recall that?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

01:13PM   1    A.  Yes.

01:13PM   2    Q.  Does this entry, record 18, have both a phone number and

01:13PM   3    a Facebook for Marcus Black?

01:13PM   4    A.  It does.

01:13PM   5    Q.  Do you know his true name?

01:13PM   6    A.  Yes, I do.

01:13PM   7    Q.  What is that?

01:13PM   8    A.  Marcus Hatten.

01:13PM   9    Q.  Is that one of the indicators in the Facebook account?

01:13PM   10   A.  Yes, it is.

01:13PM   11          **MR. TRIPI:**  Let's go to record 38.

01:13PM   12          **BY MR. TRIPI:**

01:13PM   13   Q.  Is that an entry and a phone number for K.L.?

01:13PM   14   A.  Yes, it is.

01:13PM   15   Q.  Is she a witness who testified in this case?

01:13PM   16   A.  Yes, she is.

01:13PM   17          **MR. TRIPI:**  Let's go to record number 40, please.

01:13PM   18          **BY MR. TRIPI:**

01:13PM   19   Q.  Is that Tom Napoli?

01:13PM   20   A.  It is.

01:13PM   21          **MR. TRIPI:**  Can we show Exhibit 490A.

01:13PM   22          **BY MR. TRIPI:**

01:13PM   23   Q.  Is this a photo the jury has seen, 490A, a photo that

01:14PM   24   depicts Tom Napoli, the defendant, and Joseph Bongiovanni

01:14PM   25   with others in Las Vegas?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

146

01:14PM     1    A.  Yes, it does.

01:14PM     2           MR. TRIPI:  Can we also show Exhibit 127 now?  126.

01:14PM     3    I had those reversed, sorry.

01:14PM     4           BY MR. TRIPI:

01:14PM     5    Q.  Does Exhibit 126 on the right of the screen also show Tom

01:14PM     6    Napoli indicated in a photo from Toronto with Joseph

01:14PM     7    Bongiovanni and others?

01:14PM     8    A.  Yes, it does.

01:14PM     9    Q.  Okay.  And did Lou Selva and Kevin Myszka each provide

01:14PM    10    testimony at this trial about Tom Napoli?

01:14PM    11    A.  They did.

01:14PM    12           MR. TRIPI:  We can take those down.  Let's go back to

01:14PM    13    Exhibit 310AT.  And we're gonna go to record 45.

01:14PM    14           BY MR. TRIPI:

01:14PM    15    Q.  Earlier we went through text messages between the

01:14PM    16    defendant and Greg Trotter; is that correct?

01:14PM    17    A.  That's correct.

01:14PM    18    Q.  And the text thread with Detective Trotter was 310AQ; is

01:14PM    19    that right?

01:15PM    20    A.  That's accurate.

01:15PM    21    Q.  Government Exhibit 251B is a Greg Trotter business card;

01:15PM    22    is that right?

01:15PM    23    A.  That's correct.

01:15PM    24    Q.  There's a phone number on the front, and a handwritten

01:15PM    25    number on the back; is that right?

01:15PM   1   A.  Yes, it does.

01:15PM   2   Q.  Does the handwritten number on the back of Exhibit 251B,

01:15PM   3   is it different than the number that is stored in record

01:15PM   4   number 45?

01:15PM   5   A.  Yes.  This was his Amherst Police Department phone.

01:15PM   6   Q.  Well, you see a phone number on the back of the card,

01:15PM   7   right?

01:15PM   8   A.  Yes.

01:15PM   9   Q.  And that's a 208 number?

01:15PM  10   A.  That is.

01:15PM  11   Q.  And this number stored in Mr. Gerace's phone is

01:15PM  12   different?

01:15PM  13   A.  It is.

01:15PM  14   Q.  In 310AQ, do you remember discussion of Trotter

01:15PM  15   indicating that he had a new phone number?

01:15PM  16   A.  Yes, I do.

01:15PM  17   Q.  And you read those texts earlier today, correct?

01:15PM  18   A.  Yes, I did.

01:15PM  19        **MR. TRIPI:**  All right.  Let's go to record number 48,

01:15PM  20   please, in Exhibit 310AT.

01:15PM  21        **BY MR. TRIPI:**

01:16PM  22   Q.  We've talked about Frank Tripi earlier today; is that

01:16PM  23   right?

01:16PM  24   A.  Yes, we have.

01:16PM  25   Q.  And that was the person indicated in the OCDETF report

01:16PM   1   that was located in Defendant Bongiovanni's basement; is that

01:16PM   2   right?

01:16PM   3   A.  Yes, he was a main subject --

01:16PM   4   Q.  Okay.

01:16PM   5   A.  -- identified in that OCDETF.

01:16PM   6          **MR. TRIPI:**  Let's go to record 50 in Exhibit 310AT.

01:16PM   7          **BY MR. TRIPI:**

01:16PM   8   Q.  Is P.R. also known as P.H.?

01:16PM   9   A.  Yes, it is.

01:16PM  10   Q.  Is Ms. P.H. someone who testified in this trial?

01:16PM  11   A.  She was.

01:16PM  12          **MR. TRIPI:**  Let's go to record number 51.

01:16PM  13          **BY MR. TRIPI:**

01:16PM  14   Q.  And this is an entry for Anthony Bro; is that right?

01:16PM  15   A.  It is.

01:16PM  16   Q.  The defendant has a brother Anthony?

01:16PM  17   A.  Anthony Gerace, correct.

01:16PM  18   Q.  And during the search is entered into the -- withdrawn.

01:16PM  19      During a search of Mr. Anthony Gerace's residence, there

01:16PM  20   was a photo of a ledger entered into evidence as

01:16PM  21   Exhibit 72A-55; is that right?

01:16PM  22   A.  That's correct.

01:16PM  23   Q.  And were there names on that sort of ledger photograph

01:16PM  24   that overlapped with some of the contacts in the defendant's

01:17PM  25   phone?

01:17PM    1    A.  Yes, it was.

01:17PM    2    Q.  Okay.

01:17PM    3              **MR. TRIPI:**  We can take that down.

01:17PM    4              **BY MR. TRIPI:**

01:17PM    5    Q.  I just want to ask you a couple of questions about

01:17PM    6    RuthAnn Arida.

01:17PM    7    A.  Certainly.

01:17PM    8    Q.  You're aware that on June 26th, 2020, members of the FBI

01:17PM    9    task force working with you met and interviewed Ms. Arida; is

01:17PM   10    that right?

01:17PM   11    A.  That's correct.

01:17PM   12    Q.  After that, Ms. Arida was subpoenaed to testify before

01:17PM   13    the grand jury on September 17th, 2020?

01:17PM   14    A.  She was.

01:17PM   15    Q.  Is that grand jury located in this building?

01:17PM   16    A.  Yes, it's on the third floor.

01:17PM   17    Q.  And were you present to meet her in this building with

01:17PM   18    the AUSA who dealt with her in the grand jury?

01:17PM   19    A.  I was present.

01:17PM   20    Q.  Who was the AUSA who was dealing with her that day?

01:17PM   21    A.  Brendan Cullinane AUSA.

01:17PM   22    Q.  Okay.  And just to clarify, based on an exchange in court

01:17PM   23    here, was I present at all that day with Ms. Arida?

01:17PM   24    A.  Not that I recall.

01:18PM   25    Q.  All right.  You had some text messages with Katrina

USA v Gerace - Burns - Tripi/Direct - 12/17/24

01:18PM   1    Nigro; is that right?

01:18PM   2    A.   That's correct.

01:18PM   3    Q.   Did you and others independently investigate and meet

01:18PM   4    with any witnesses that she provided names of?

01:18PM   5    A.   Yeah, she identified a few individuals who she suggested

01:18PM   6    might be useful to --

01:18PM   7    Q.   Was one of them K.M.?

01:18PM   8    A.   One was, yes.

01:18PM   9    Q.   Did Ms. Nigro know her by, like, a dancer name, Maze?

01:18PM  10    A.   Yes.

01:18PM  11    Q.   Other texts from Ms. Nigro related to things that were

01:18PM  12    going on in her life generally speaking?

01:18PM  13    A.   Yeah.  She would text from time to time with things,

01:18PM  14    items like that.

01:18PM  15    Q.   As a human being, and a member of the community, do you

01:18PM  16    genuinely care about the health and wellness of witnesses who

01:18PM  17    you're interacting with?

01:18PM  18    A.   Yes.

01:18PM  19    Q.   Is there anything wrong with someone texting you about

01:18PM  20    what they're doing to improve themselves?

01:18PM  21    A.   Nothing at all.

01:18PM  22    Q.   If they give you an update on what they may be doing to

01:19PM  23    improve their life, do you ignore them?

01:19PM  24    A.   Not at all.

01:19PM  25    Q.   All right.  Special Agent Burns, during the course of

USA v Gerace - Burns - Tripi/Direct - 12/17/24

01:19PM   1   your trial prep in this case, did you work to develop some

01:19PM   2   charts that summarize some of the evidence the jury heard,

01:19PM   3   voluminous evidence and testimony that they heard over the

01:19PM   4   past two months of this trial?

01:19PM   5   A.   Yes.  I put together a chart of the voluminous testimony

01:19PM   6   and the voluminous amount of exhibits.

01:19PM   7   Q.   And generally, did you work with Homeland Security and

01:19PM   8   the U.S. Attorney's Office to create a chart pertaining to

01:19PM   9   the voluminous evidence this jury has heard over the course

01:19PM  10   of roughly two months?

01:19PM  11   A.   Yes, collaboratively we worked on it.

01:19PM  12   Q.   During the course of prep in this case, did you work to

01:19PM  13   work to develop that chart summarizing the evidence and the

01:19PM  14   testimony to create sort of a visual depiction that

01:19PM  15   categorizes exhibits and witnesses with events that are

01:19PM  16   relevant to this trial?

01:19PM  17   A.   Yes.  I built it out.  We started before the trial, and

01:20PM  18   then as the trial has gone on, I've audited it along the way.

01:20PM  19   Q.   Is that commonly referred to as a summary exhibit?

01:20PM  20   A.   Yes, it is.

01:20PM  21   Q.   Is that what you were preparing to try to summarize

01:20PM  22   what's been happening here?

01:20PM  23   A.   Yes.  Some way to organize the voluminous testimony and

01:20PM  24   exhibits in a case of this size.

01:20PM  25   Q.   Okay.  I'm going hand you up a big board marked as

01:20PM   1   Government Exhibit 555.  Do you see it?

01:20PM   2   A.   Yep.

01:20PM   3   Q.   I'm going to arrange the image so you can answer my

01:20PM   4   questions while looking at the exhibit while not displaying

01:20PM   5   it yet.  Okay?

01:20PM   6   A.   Correct.

01:20PM   7   Q.   Generally, can you tell -- tell us what Government

01:20PM   8   Exhibit 555 summarizes?

01:20PM   9   A.   It summarizes the certain events that are the testimony

01:20PM  10   and the exhibits relate to during the course of the

01:20PM  11   conspiracies, and it essentially ties them to the various

01:21PM  12   counts, overt acts, manners and means paragraphs from the

01:21PM  13   indictment.

01:21PM  14   Q.   And is it your understanding the indictment is something

01:21PM  15   the Court will read later on during its charge?

01:21PM  16   A.   That will go to the jury eventually.

01:21PM  17   Q.   Does this exhibit summarize voluminous testimony and

01:21PM  18   evidence and connections that exist between the defendant,

01:21PM  19   Pharaoh's, and different individuals whose names have come up

01:21PM  20   during trial and people who have testified?

01:21PM  21   A.   Yes.  And it relates to the events, certain events that

01:21PM  22   were discussed, and exhibits related to during the course of

01:21PM  23   the trial.

01:21PM  24   Q.   Is every connection or category between events and, sort

01:21PM  25   of, the evidence and the witnesses related to those events

01:21PM    1   based upon testimony and evidence that came in at this trial?

01:21PM    2   A.   Yes, everything that was entered.

01:21PM    3   Q.   How many different individuals are depicted in the chart?

01:22PM    4   A.   Individuals is, you mean, witnesses?

01:22PM    5   Q.   Yes.

01:22PM    6   A.   35.

01:22PM    7   Q.   Now, more than that testified, but not everyone is on the

01:22PM    8   chart; is that right?

01:22PM    9   A.   Correct.

01:22PM   10   Q.   Now in terms of the individuals depicted on the chart,

01:22PM   11   does that include 17 former Pharaoh's dancers?

01:22PM   12   A.   Yes, it does.

01:22PM   13   Q.   Does it include one former manager, C.B.?

01:22PM   14   A.   Yes, it does.

01:22PM   15   Q.   Does it include a former bouncer/manager, Doug

01:22PM   16   Augustyniak?

01:22PM   17   A.   It does.

01:22PM   18   Q.   Does it include four patrons:  John McDonald, Kevin

01:22PM   19   Myszka, Jeff Anzalone and Matthew Albert?

01:22PM   20   A.   Yes, it does.

01:22PM   21   Q.   Coming off of that, sort of linking to the charged

01:22PM   22   sex-trafficking conspiracy counts, is there a line for a

01:22PM   23   witness who testified as an expert, Rebecca Bender?

01:23PM   24   A.   Yes, there is.

01:23PM   25   Q.   Does the chart reference -- what is it, 39 exhibits

USA v Gerace - Burns - Tripi/Direct - 12/17/24

154

01:23PM 1  relating to the different counts and overt acts in an attempt

01:23PM 2  to create a visual depiction for the jury associating the

01:23PM 3  exhibits to events?

01:23PM 4  A.  Yes, 39 exhibits.

01:23PM 5  Q.  Now, as you sit there, are there at least 155 exhibits

01:23PM 6  that have been entered into evidence --

01:23PM 7  A.  Yes.

01:23PM 8  Q.  -- prior to your testimony?

01:23PM 9  A.  Yes, there is.

01:23PM 10  Q.  So not every exhibit is referenced on here?

01:23PM 11  A.  Correct.  I took some of the more pertinent ones to the

01:23PM 12  events.

01:23PM 13          MR. FOTI:  Objection.

01:23PM 14          THE COURT:  Yeah, sustained.  The jury will strike

01:23PM 15  that.

01:23PM 16          BY MR. TRIPI:

01:23PM 17  Q.  Was there an effort made to put enough information to

01:23PM 18  allow the jury to look at this summary exhibit and recall

01:23PM 19  items or occurrences for themselves?

01:24PM 20  A.  Yes.

01:24PM 21  Q.  Does Government Exhibit 555 fairly and accurately

01:24PM 22  summarize the testimony and evidence, and group it in an

01:24PM 23  effort to create a visual summary of the evidence that's come

01:24PM 24  in in the last two months of the trial?

01:24PM 25  A.  It does not summarize the testimony, but it does identify

01:24PM  1   the witnesses and the exhibits.

01:24PM  2   Q.   That was a poorly-phrased question.   It identifies the

01:24PM  3   witnesses so that the jury can recall testimony, and have a

01:24PM  4   visual depiction of the events to which their testimony would

01:24PM  5   have related; is that a better way to phrase that question?

01:24PM  6   A.   Yeah, I'm more comfortable with that.

01:24PM  7   Q.   Okay.   Sorry about that.

01:24PM  8        **MR. TRIPI:**   Judge, with that foundation, we offer

01:24PM  9   Government Exhibit 555 as an exhibit for the jury to have and

01:24PM  10  to reference as they deem appropriate.

01:24PM  11       **MR. FOTI:**   Judge, I'm not going to object.   I just --

01:24PM  12  there's a digital version of it that I'd like to be able to

01:24PM  13  use going forward.   So I'm okay with the admission of 555, I

01:24PM  14  would just ask that if they're admitting the demonstrative, I

01:25PM  15  would ask that we also be able to use the digital copy of it.

01:25PM  16       **MR. TRIPI:**   Yeah, I had planned to do that, Judge.

01:25PM  17  This is so they can take the large board back if they want to

01:25PM  18  use it, and I plan to use the technology.

01:25PM  19       **THE COURT:**   The digital one, and Mr. Foti will be

01:25PM  20  able to use the digital one as well?

01:25PM  21       **MR. TRIPI:**   Yes.

01:25PM  22       **MR. FOTI:**   Sounds good.

01:25PM  23       **THE COURT:**   With that, no objection?

01:25PM  24       **MR. FOTI:**   No objection.

01:25PM  25       **THE COURT:**   Received without objection.

01:25PM    1          **(GOV Exhibit 555 was received in evidence.)**

01:25PM    2          **MR. TRIPI:**  For now, can you put that up on the

01:25PM    3  tripod and --

01:25PM    4          Thank you, Your Honor.

01:25PM    5          Ms. Champoux, can you pull up the digital version of

01:25PM    6  555, please?

01:25PM    7          **BY MR. TRIPI:**

01:25PM    8  Q.  All right.  Special Agent Burns it looks a little small

01:25PM    9  on the screen, right?

01:25PM   10  A.  Put my glasses on, yes.

01:25PM   11  Q.  We're gonna work through it, and what I'd like to do is

01:25PM   12  just have you orient the jury to what's on here so that they

01:25PM   13  can use it if they deem appropriate when they're on their

01:25PM   14  own.

01:25PM   15  A.  Sure.

01:26PM   16          **MR. TRIPI:**  So, Ms. Champoux, what I'd like to do is

01:26PM   17  if we can kind of zoom in on the -- that half of it, maybe

01:26PM   18  from the green line that I wrote, down.  Just kind of trace

01:26PM   19  what I did there.  Or you've got to do a separate line?

01:26PM   20          **MS. CHAMPOUX:**  I'm going to have to go up a little

01:26PM   21  higher.

01:26PM   22          **BY MR. TRIPI:**

01:26PM   23  Q.  I'll work on the bottom half first.  Okay?

01:26PM   24  A.  Yep.

01:26PM   25  Q.  All right.  In the very middle, so we're looking at the

USA v Gerace - Burns - Tripi/Direct - 12/17/24

01:26PM   1   bottom half here, we have a photograph of Pharaoh's

01:26PM   2   Gentlemen's Club?

01:26PM   3   A.   Yes, we do.

01:26PM   4   Q.   Is that basically an image that you took from the

01:26PM   5   internet?

01:26PM   6   A.   Yeah, that's the main entrance.

01:26PM   7   Q.   But it's an accurate --

01:26PM   8   A.   Yes.

01:26PM   9   Q.   -- depiction of Pharaoh's; is that right?

01:26PM   10   A.   Yes, that's what it looks like.

01:26PM   11   Q.   So, right under that picture it says Pharaoh's

01:26PM   12   Gentlemen's Club, and then Counts 1, 3 and 4.  And then it

01:27PM   13   has certain overt acts that are referenced from Count 1; is

01:27PM   14   that correct?

01:27PM   15   A.   That's correct.

01:27PM   16   Q.   And what are the overt acts you're referencing there?

01:27PM   17   A.   35 and 36.

01:27PM   18   Q.   Now, below that, there's a box that says drug conspiracy,

01:27PM   19   maintaining Pharaoh's as a drug-involved premises.  What does

01:27PM   20   that indicate on the chart?

01:27PM   21   A.   That is Count 3 in the indictment.

01:27PM   22   Q.   Okay.  And Counts 1, 3, and 4 generally, and the judge

01:27PM   23   will go into more detail later, but is Count 1 a charged

01:27PM   24   conspiracy between Mr. Bongiovanni and Mr. Gerace to defraud

01:27PM   25   the United States; Count 3 a narcotics conspiracy; and

01:27PM   1   Count 4 a charge of bribery?

01:27PM   2   A.  Count 4, I believe, is a conspiracy to distribute

01:27PM   3   narcotics.

01:27PM   4       And Count 3 is the maintaining the drug premises.

01:27PM   5       And Count 1 is the --

01:27PM   6   Q.  Oh, my fault?

01:27PM   7   A.  -- conspiracy to defraud the United States government, or

01:27PM   8   the United States.

01:28PM   9   Q.  And then below that, you have certain exhibits that are

01:28PM  10   delineated?

01:28PM  11   A.  That's correct.

01:28PM  12   Q.  And what are the descriptions of those exhibits?

01:28PM  13   A.  Exhibit 240F is a photo of A.A. a/k/a Cherry.

01:28PM  14       240, I think that's --

01:28PM  15   Q.  L?

01:28PM  16   A.  -- L, a photo of Darryl LaMont and Marcus Black.

01:28PM  17       345 is a photo of Marcus Black.

01:28PM  18       And then we've got Exhibit 560, 561 562 are photos of the

01:28PM  19   defendant and Jessica Leyland a/k/a Charm.

01:28PM  20   Q.  And now at the bottom, there's a box that says witnesses

01:28PM  21   to conduct at Pharaoh's Gentlemen's Club with a number of

01:28PM  22   images with a number of images of generic males and females

01:28PM  23   with names; is that right?

01:28PM  24   A.  That's correct.

01:28PM  25   Q.  Okay.  And what are -- just go through the names that are

01:28PM  1   in that box of people.

01:28PM  2   A.  Matt Albert, K.A., A.A., Jeff Anzalone, A.A., C.B., A.B.,

01:29PM  3   J.C., A.G., E.H., C.H., P.H., Joseph Krywalski, L.L., K.L.,

01:29PM  4   John McDonald, K.M., Kevin Myszka, Katrina Nigro, A.P., G.R.,

01:29PM  5   J.Z., and R.W.

01:29PM  6   Q.  Are all of those women referenced in that box women who

01:29PM  7   were dancers at some point at Pharaoh's?  With the exception

01:29PM  8   of C.B. who was a manager?

01:29PM  9   A.  Yes, that's correct.

01:29PM  10  Q.  Are all the males referenced, with the exception of

01:29PM  11  Trooper Joseph Krywalski, individuals who were male patrons

01:29PM  12  or customers at Pharaoh's?

01:29PM  13  A.  That's correct.

01:29PM  14  Q.  And all of those people testified at this trial; is that

01:29PM  15  right?

01:29PM  16  A.  They did.

01:29PM  17  Q.  All right.  Now I want to move on to Count 5 coming off

01:29PM  18  of the Pharaoh's box.  And can you follow that along, and

01:29PM  19  explain what that is?

01:29PM  20  A.  Count 5 relates to the conspiracy to commit sex

01:30PM  21  trafficking from '09 to 2018, exhibits related to that, and

01:30PM  22  then connected also to the expert witness, Rebecca Bender.

01:30PM  23  Q.  Now, just to back just for a moment.  There's a line

01:30PM  24  flowing from Pharaoh's Gentlemen's Club to the box of

01:30PM  25  witnesses we talked about, right?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

160

01:30PM  1   A.  Correct.

01:30PM  2   Q.  In terms of a visual depiction, is that an indication

01:30PM  3   that those witnesses relate to the conduct pertaining to

01:30PM  4   those counts and the drug conspiracy?

01:30PM  5   A.  That was what we were going for with that.

01:30PM  6   Q.  Okay.  Now, there's also a line coming from the Pharaoh's

01:30PM  7   box to a box that says conspiracy to commit sex trafficking.

01:30PM  8   And then there's a line that comes down that same box is

01:30PM  9   that, right?

01:30PM  10  A.  That's correct.

01:30PM  11  Q.  And just in terms of when the jury's looking at these

01:30PM  12  lines, can you explain why that flows that way as well?

01:30PM  13  A.  All right.  The conduct at Pharaoh's relates to the

01:31PM  14  charges as a drug conspiracy, and the maintaining of

01:31PM  15  Pharaoh's as a drug-involved premises, as well as the

01:31PM  16  Count 5, the conspiracy to commit sex trafficking.

01:31PM  17       So some exhibits I attached to the conspiracy, sex

01:31PM  18  trafficking, and some I tied more so to the narcotics

01:31PM  19  distribution and operating the drug premises.

01:31PM  20  Q.  And Count 1 is the conspiracy to defraud as well?

01:31PM  21  A.  Right.  The conspiracy to defraud the United States a

01:31PM  22  general conspiracy count.

01:31PM  23  Q.  So, does this visual depiction, was it your effort to aid

01:31PM  24  the jury to categorize witnesses and exhibits pertinent to

01:31PM  25  the charges in Counts 1, 3, 4, and 5?

| | | |
|---|---|---|
| 01:31PM | 1 | A.  Yes, it was. |
| 01:31PM | 2 | Q.  Okay.  And now I didn't finish explaining, there's |
| 01:31PM | 3 | another line coming over to Rebecca Bender who's sort of by |
| 01:31PM | 4 | herself.  What does that indicate? |
| 01:31PM | 5 | A.  She essentially is an expert witness as it related to sex |
| 01:32PM | 6 | trafficking. |
| 01:32PM | 7 | Q.  Okay.  So, that's why there's a line between her and the |
| 01:32PM | 8 | box for conspiracy to commit sex trafficking? |
| 01:32PM | 9 | A.  That's correct. |
| 01:32PM | 10 | Q.  Okay.  All right.  I think we can zoom out of that for |
| 01:32PM | 11 | now. |
| 01:32PM | 12 | A.  All right.  Mr. Tripi, I did want to -- |
| 01:32PM | 13 | Q.  I'm sorry, go through the exhibits.  I'm sorry about |
| 01:32PM | 14 | that.  Can you explain the exhibits listed under -- |
| 01:32PM | 15 | A.  Yes.  The -- there's a photo of the hallway, upstairs at |
| 01:32PM | 16 | Pharaoh's that we've seen numerous times throughout the |
| 01:32PM | 17 | trial.  There's photos of the VIP rooms at Pharaoh's. |
| 01:32PM | 18 | There's a photo of Darryl LaMont.  A photo of Darryl LaMont |
| 01:32PM | 19 | Marcus Black.  And then they have their related exhibit |
| 01:32PM | 20 | numbers, so you'll be able to marry those up. |
| 01:32PM | 21 | A photo of John Michalski and Gerace, and I believe we |
| 01:32PM | 22 | only have one of those in evidence at this point, Mr. Tripi? |
| 01:32PM | 23 | Q.  Yes.  Exhibit 310AU-2, we didn't actually put into |
| 01:33PM | 24 | evidence; is that right? |
| 01:33PM | 25 | A.  That's correct. |

01:33PM  1   Q.  So that one's not in evidence.

01:33PM  2   A.  Unless you want to display it to me right now.

01:33PM  3   Q.  Sure.  Is this another image that was contained in the

01:33PM  4   phone that Mr. Gerace had?

01:33PM  5   A.  Yes, it's from the phone extraction similar to another

01:33PM  6   picture.

01:33PM  7   Q.  Is that another photo that has Mr. Gerace and Judge

01:33PM  8   Michalski?

01:33PM  9   A.  Yes, as well as Attorney Anthony Cervi.

01:33PM  10  Q.  Is that a fair and accurate copy of an image that was in

01:33PM  11  the phone?

01:33PM  12  A.  It is.

01:33PM  13          **MR. TRIPI:**  I offer the exhibit, Your Honor.

01:33PM  14          **MR. FOTI:**  May I just see it, Judge?

01:33PM  15          No objection.

01:33PM  16          **THE COURT:**  Received without objection.

01:33PM  17      **(GOV Exhibit 310AU-2 was received in evidence.)**

01:33PM  18          **THE CLERK:**  What's the number, Mr. Tripi?

01:33PM  19      **MR. TRIPI:**  310AU-2.

01:33PM  20          **THE CLERK:**  Thank you.

01:33PM  21          **BY MR. TRIPI:**

01:33PM  22  Q.  Now that part of the chart is correct?

01:33PM  23  A.  That's correct.  Well, there's one other error, and it's

01:34PM  24  because of not my using my glasses.  But it's Joseph Barsuk

01:34PM  25  on the chart, but it's actually Barsuk.  I should have had my

USA v Gerace - Burns - Tripi/Direct - 12/17/24

01:34PM      1    glasses on when I edited the chart, and I noticed it when we

01:34PM      2    blew it up.

01:34PM      3    Q.  All right.  So you have a typo on the spelling of a name?

01:34PM      4    A.  Yeah, I should have worn my glasses.

01:34PM      5    Q.  All right.  So we have more exhibits that relate to that

01:34PM      6    conspiracy flowing down to towards the witness?

01:34PM      7    A.  That's correct.

01:34PM      8    Q.  And the jury can follow along with the number of the

01:34PM      9    exhibit and a very brief description of what the exhibit is;

01:34PM     10    is that --

01:34PM     11    A.  That's correct.

01:34PM     12          **MR. TRIPI:**  All right.  We can zoom out of that.

01:34PM     13          Can I now have you kind of get that part,

01:34PM     14    Ms. Champoux.

01:34PM     15          **BY MR. TRIPI:**

01:34PM     16    Q.  Okay.  So we just sort of handled the lower part of the

01:34PM     17    chart.

01:34PM     18       Next you have another picture in the middle, that's an

01:34PM     19    Exhibit 120 --

01:35PM     20    A.  -- 7.

01:35PM     21    Q.  -- 7; is that right?

01:35PM     22    A.  I believe that's 127, it's the cottage photo.

01:35PM     23    Q.  Okay.  And describe the lines coming off of there in that

01:35PM     24    direction.

01:35PM     25    A.  So the Count 1 is the conspiracy to defraud the United

01:35PM   1    States with overt act 17.  They relate to the 2005 Craig

01:35PM   2    Border DEA search warrant related to the photographs.

01:35PM   3        And then off of that line is the exhibit from the search

01:35PM   4    warrant at Mr. Border's then-residence back in 2005.  And

01:35PM   5    then it ties to the testimony of Ms. Arida and Mr. Border.

01:35PM   6    Q.  So overt act 17 relates to the incident regarding Craig

01:35PM   7    Border's search warrant and the photos pertaining to

01:35PM   8    Ms. Arida; is that right?

01:35PM   9    A.  That's correct.

01:35PM  10    Q.  The DEA report in evidence about that incident is

01:35PM  11    Exhibit 11A?

01:35PM  12    A.  Correct.

01:35PM  13    Q.  And the two witnesses who referenced it are Ms. Arida and

01:35PM  14    Mr. Border?

01:35PM  15    A.  That's accurate.

01:35PM  16    Q.  Is that how you read that line?

01:35PM  17    A.  That's exactly how you read it.

01:35PM  18    Q.  Let's go up again to the next one now.

01:35PM  19        Count 1, manner and means, paragraphs 4, 5, 7, 8, and

01:36PM  20    9 -- sorry, 8, 10, 11, 12?

01:36PM  21    A.  That's to defraud the United States, relates to

01:36PM  22    Bongiovanni cold approach of Gerace that DEA Special Agent

01:36PM  23    Chris Wisniewski testified, and then the related DEA records

01:36PM  24    that were introduced related.

01:36PM  25    Q.  So you have an indication for Chris Wisniewski being the

01:36PM   1   witness, Exhibits 30B, 30A, and Exhibit 437 relating to his

01:36PM   2   testimony, and a brief description of what the manner and

01:36PM   3   means paragraphs relate to in terms of that event.

01:36PM   4   A.  Yeah, the -- to the reports.

01:36PM   5   Q.  Okay.  Can we move up to -- and now Count 1 repeats

01:36PM   6   itself a number of times on the chart; is that right?

01:36PM   7   A.  Yeah, it's a conspiracy.

01:36PM   8   Q.  Okay.  And this one, this line flows from the photo,

01:36PM   9   Count 1, and it relates to overt acts 19, 20, 21, and 22; is

01:37PM  10   that --

01:37PM  11   A.  That's correct.

01:37PM  12   Q.  And what does the gray box mean?

01:37PM  13   A.  Relates to the 2009 U.S. Probation search of Pharaoh's,

01:37PM  14   and the FBI investigation of Gerace at that time that related

01:37PM  15   to the testimony of Tom Herbst, Dale Kasprzyk, and Peter

01:37PM  16   Lepiane.

01:37PM  17   Q.  Okay.  And so that's over here.  So if you follow the

01:37PM  18   line, those overt acts, that count, brief description of the

01:37PM  19   incident, the exhibits related to the incident, and then the

01:37PM  20   witnesses who testified about it?

01:37PM  21   A.  That's correct.

01:37PM  22          **MR. TRIPI:**  Okay.  And, all right.  Ms. Champoux, can

01:37PM  23   we zoom out, and can you get me maybe that part?

01:37PM  24          Okay.  Can you move it to the middle a little more?

01:37PM  25   Move it up a little.  Thank you.

USA v Gerace - Burns - Tripi/Direct - 12/17/24
166

01:38PM    1        **BY MR. TRIPI:**

01:38PM    2   Q.  All right.  So I want to work from the line going

01:38PM    3   straight up now, okay?

01:38PM    4   A.  Yep.

01:38PM    5   Q.  Can you explain that line, the counts, and overt acts it

01:38PM    6   relates to, the brief description, and the witnesses?

01:38PM    7   A.  Yes.  It's ties back to the picture of Bongiovanni.  It's

01:38PM    8   Count 1 in the conspiracy to commit -- or, conspiracy against

01:38PM    9   the United States, overt acts 26, 35, and then as well it

01:38PM   10   contains Count 2, which is the bribery count.

01:38PM   11   Q.  And I misspoke earlier, Count 2 is the bribery?

01:38PM   12   A.  Correct.

01:38PM   13   Q.  Okay.

01:38PM   14   A.  And then the approximately 2015 overdose at Pharaoh's,

01:38PM   15   and then witnesses that relate to that:  Doug Augustyniak,

01:38PM   16   Anthony Casullo, and Katrina Nigro.

01:38PM   17   Q.  And, again, if there were testimony from other witnesses

01:38PM   18   that also referenced overdoses, you didn't necessarily depict

01:38PM   19   every person who referenced an overdose in that box?

01:38PM   20   A.  Yeah.  We tried keep it so it was understandable and not

01:39PM   21   cluttered and useful.  It is not all encompassing of all the

01:39PM   22   evidence and exhibits at this trial.

01:39PM   23   Q.  For example if we zoom out, and if the jury were to look

01:39PM   24   at people in the box at the bottom, were there some witnesses

01:39PM   25   who referenced overdoses during their testimony?

01:39PM     1   A.   A number of them.

01:39PM     2   Q.   Okay.  Would one be K.M.?

01:39PM     3   A.   Absolutely.

01:39PM     4   Q.   So there was some effort made to group all the witnesses,

01:39PM     5   but the jury will have to work through it in the way they see

01:39PM     6   fit; is that right?

01:39PM     7   A.   Absolutely.  It's just something to aid --

01:39PM     8   Q.   Okay.

01:39PM     9   A.   -- the review, but not all encompassing of witnesses as

01:39PM    10   well as exhibits.

01:39PM    11        **MR. TRIPI:**  Can you get me zoomed back in,

01:39PM    12   Ms. Champoux?  Thank you.

01:39PM    13        **BY MR. TRIPI:**

01:39PM    14   Q.   All right.  Let's go through the next line that I've just

01:39PM    15   indicated.  Just going now, you know, clockwise, like 1:00

01:39PM    16   there.

01:39PM    17   A.   Again, it's relates to Count 1, overt acts 25, 26.  It's

01:40PM    18   2016 S.A. Anthony Casullo investigation of Gerace.  And then

01:40PM    19   there's a number of exhibits that relate to the event, as

01:40PM    20   well as Anthony Casullo's testimony, and he's identified at

01:40PM    21   the edge there.

01:40PM    22   Q.   Okay.  Can we work through the next line regarding

01:40PM    23   Count 1, overt act 27, and Count 2 as well as that way?

01:40PM    24   A.   Yep.  Count 1 is, again, our conspiracy.  That particular

01:40PM    25   event relates to overt act 27.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

168

01:40PM 1     Count 2 is the bribery of a public official.  The event,

01:40PM 2 the 2017 Gerace voicemail to Bongiovanni regarding law

01:40PM 3 enforcement ability to ping a TracFone.  That exhibit is in

01:40PM 4 reference to 311, as well as the text message between Gerace

01:40PM 5 and Bongiovanni, page 42.  And it relates to testimony of

01:40PM 6 Curtis Ryan.

01:40PM 7 Q.  That's page 42 of Exhibit 310D, right?

01:41PM 8 A.  That's correct.

01:41PM 9 Q.  Okay.  And the witness who was going through those text

01:41PM 10 messages and that voicemail was Special Agent Ryan?

01:41PM 11 A.  That's correct.

01:41PM 12 Q.  All right.  Let's move down to this line here, what I've

01:41PM 13 just indicated, referencing Counts 1, 2, and overt acts 29,

01:41PM 14 30, and 31?

01:41PM 15 A.  Correct.  Those relate to the Bongiovanni memos regarding

01:41PM 16 his relationship with Gerace, submitted -- if you look, it's

01:41PM 17 Exhibit 97, 98, 99, those are the three memos authored by

01:41PM 18 Bongiovanni regarding his communication with Gerace, as well

01:41PM 19 as regarding Anthony Casullo.  Additionally, there was the

01:41PM 20 cottage photo.  Again 311, the voicemail from Gerace to

01:41PM 21 Bongiovanni.  Text messages, 310D, between Mr. Gerace and

01:41PM 22 Bongiovanni.  A call detail connection report, the Excel

01:41PM 23 spreadsheet calls between them.  And the Bongiovanni/Gerace

01:41PM 24 dinner photo in 2005, and then the group photo of Gerace and

01:42PM 25 Bongiovanni in Las Vegas 2011.  And, again, the witness who

01:42PM   1   introduced those was Curtis -- or, that relates to testimony

01:42PM   2   was Curtis Ryan.

01:42PM   3   Q.   Now if we work through some of these, for example,

01:42PM   4   cottage photo, P.H. also testified about that; is that right?

01:42PM   5   A.   Correct.

01:42PM   6   Q.   And the -- the call detail reports and the spreadsheets,

01:42PM   7   Greg Machin testified about those?

01:42PM   8   A.   Yeah, the data analyst.  Again, I just couldn't -- it

01:42PM   9   would be too cumbersome and cluttered.

01:42PM   10  Q.   I got you.  I'm just working through some of it.

01:42PM   11  A.   Yeah.

01:42PM   12  Q.   If you go to 426-1, a dinner photo, there was testimony

01:42PM   13  about that from M.U.; is that right?

01:42PM   14  A.   Yes, that's a photo, and Ms. R.A.

01:42PM   15  Q.   And then if we go to 490A, group photo in Las Vegas,

01:42PM   16  there was testimony about that from Tara Ostrowski; is that

01:42PM   17  right?

01:42PM   18  A.   That's correct.

01:42PM   19  Q.   So again, is that just giving you an idea of a witness,

01:42PM   20  not necessarily every witness that relates to an exhibit?

01:43PM   21  A.   That's correct.

01:43PM   22        **MR. TRIPI:**  Okay.  Can we zoom out of that.  And I'd

01:43PM   23  like to kind of zoom in on this part if we could, and finish

01:43PM   24  off the chart.

          25

| | | |
|---|---|---|
| 01:43PM | 1 | **BY MR. TRIPI:** |
| 01:43PM | 2 | Q.  Okay.  I think this is the last line we need to go |
| 01:43PM | 3 | through.  If you could, please, walk the jury through the |
| 01:43PM | 4 | line from the Pharaoh's box to Counts 6, 7, 8, and 9, please? |
| 01:43PM | 5 | A.  Sure.  Counts 6, 7, 8 are witness tampering counts in the |
| 01:43PM | 6 | indictment. |
| 01:43PM | 7 | And 9 is a distribution of cocaine. |
| 01:43PM | 8 | And they all relate to the event on or about 11/19/2019, |
| 01:43PM | 9 | that was in the Luxor Lane residence. |
| 01:43PM | 10 | The exhibits that relate to that are the photo -- the |
| 01:43PM | 11 | front photo of Luxor Lane, Mr. Gerace's residence, and the |
| 01:43PM | 12 | photos that -- from the basement which is 250A-30 and |
| 01:43PM | 13 | 250A-89, and then finally the Facebook messages from Crystal |
| 01:43PM | 14 | Quinn to P.H.  And then the witnesses that relate to that are |
| 01:44PM | 15 | C.C., P.H., and then Protected Witness 12. |
| 01:44PM | 16 | Q.  For example, another example, Kevin Hughes is not on this |
| 01:44PM | 17 | chart at all, but he was another witness who testified in |
| 01:44PM | 18 | this case as well, correct? |
| 01:44PM | 19 | A.  That's right. |
| 01:44PM | 20 | **MR. TRIPI:**  Okay.  We can zoom out of that, |
| 01:44PM | 21 | Ms. Champoux. |
| 01:44PM | 22 | One moment, please, Your Honor. |
| 01:44PM | 23 | No further direct.  Thank you, Judge. |
| 01:44PM | 24 | **THE COURT:**  Mr. Foti? |
| 01:44PM | 25 | **MR. FOTI:**  Yes, Judge. |

**CROSS-EXAMINATION BY MR. FOTI:**

01:44PM   1

01:45PM   2   Q.  Good afternoon, sir.

01:45PM   3   A.  Good afternoon, Mr. Foti.  How are you?

01:45PM   4   Q.  Good, how are you?

01:45PM   5   A.  Good, thanks.

01:45PM   6   Q.  Okay.  So you got to move back to Buffalo, it was about

01:45PM   7   2008, right?

01:45PM   8   A.  That's correct.

01:45PM   9   Q.  And at that point, you're still concluding some of your

01:45PM   10  responsibilities in regards to investigations that you still

01:45PM   11  had?

01:45PM   12  A.  I was residing here, but I was routinely going back to

01:45PM   13  Memphis for a couple of years.

01:45PM   14  Q.  You'd have to still give testimony in certain

01:45PM   15  proceedings?

01:45PM   16  A.  Yeah, there were some trials that were wrapping up and

01:46PM   17  some sentencing hearings.

01:46PM   18  Q.  So other than the fact that you were still traveling back

01:46PM   19  to Tennessee to conclude your responsibilities over there,

01:46PM   20  you were part of the Niagara Falls field office as of 2008,

01:46PM   21  right?

01:46PM   22  A.  That's correct, I was assigned there.

01:46PM   23  Q.  Okay.  And at some point, you testified that Niagara

01:46PM   24  Falls field office closed down based on population reduction

01:46PM   25  and things like that?

01:46PM    1    A.  That was my understanding, yeah.

01:46PM    2    Q.  And when did that happen?

01:46PM    3    A.  I think '11?  2011 or so.

01:46PM    4    Q.  So in 2009, you're not -- you're still in the Niagara

01:46PM    5    Falls field office at that time?

01:46PM    6    A.  That's correct.

01:46PM    7    Q.  And we heard testimony during this trial about the search

01:46PM    8    of Pharaoh's back in 2009, right?

01:46PM    9    A.  That's correct.

01:46PM   10    Q.  And you weren't involved in that in any way?

01:46PM   11    A.  No, I didn't learn about any of that until this case.

01:46PM   12    Q.  Okay.  And you when you say "this case," you're talking

01:46PM   13    about becoming involved in 2019 related to this?

01:46PM   14    A.  Correct, that's correct.

01:46PM   15    Q.  Okay.  So did you work with Tom Herbst at all back then

01:47PM   16    in 2009?

01:47PM   17    A.  I mean, I knew him.  I'd say hi, I was friendly.  We were

01:47PM   18    never partners, and I wasn't involved in the 2009 matter at

01:47PM   19    all.

01:47PM   20    Q.  Any investigation he was pursuing back then did not

01:47PM   21    involve you?

01:47PM   22    A.  Not at all.

01:47PM   23    Q.  Okay.  So you become involved in this investigation, or

01:47PM   24    at least a related investigation around 2019 about a decade

01:47PM   25    later, right?

USA v Gerace - Burns - Foti/Cross - 12/17/24

173

| | | |
|---|---|---|
| 01:47PM | 1 | A.  Correct. |
| 01:47PM | 2 | Q.  And you've testified yesterday and today about some of |
| 01:47PM | 3 | the evidence that was presented during the course of the |
| 01:47PM | 4 | trial, right? |
| 01:47PM | 5 | A.  Yes, I did. |
| 01:47PM | 6 | Q.  You also talked about certain pieces of evidence that the |
| 01:47PM | 7 | jury hadn't heard about yet including text messages? |
| 01:47PM | 8 | A.  That's correct. |
| 01:47PM | 9 | Q.  And you talked about how during the course of your |
| 01:47PM | 10 | investigation, you were involved in the collection of |
| 01:47PM | 11 | evidence, correct? |
| 01:47PM | 12 | A.  Some of it, yes. |
| 01:47PM | 13 | Q.  We talked about the search warrant, for example? |
| 01:48PM | 14 | A.  At Pharaoh's, you mean?  Or -- |
| 01:48PM | 15 | Q.  There was multiple search warrants executed, right? |
| 01:48PM | 16 | A.  Yes, correct, I was at three of them. |
| 01:48PM | 17 | Q.  And you were involved in discussions that led up to the |
| 01:48PM | 18 | execution of those search warrants, correct? |
| 01:48PM | 19 | A.  That's correct. |
| 01:48PM | 20 | Q.  Including the search warrant at Pharaoh's, right? |
| 01:48PM | 21 | A.  Yes, that's correct. |
| 01:48PM | 22 | Q.  And you were aware of which members of law enforcement |
| 01:48PM | 23 | would be at each of these searches, correct? |
| 01:48PM | 24 | A.  Generally, yes. |
| 01:48PM | 25 | Q.  And you were at, at least, the search of Pharaoh's |

USA v Gerace - Burns - Foti/Cross - 12/17/24

01:48PM  1  yourself, right?

01:48PM  2  A.  I was physically present.

01:48PM  3  Q.  And in each of -- and we're gonna talk a little bit more

01:48PM  4  about search warrants, but in each of these situations,

01:48PM  5  evidence was being collected to assist in the investigation,

01:48PM  6  correct?

01:48PM  7  A.  That's correct.

01:48PM  8  Q.  Okay.  And you are also part of the prosecution team,

01:48PM  9  you're the case agent, right?

01:48PM  10  A.  From the FBI side, yes.

01:48PM  11  Q.  So, you're one of the two case agents?  That was no

01:48PM  12  disrespect to agent to Special Agent Halliday.

01:48PM  13  A.  No, none taken I'm sure.

01:48PM  14  Q.  So that makes you a little bit different than the other

01:49PM  15  witnesses who testified in this trial in respect to you being

01:49PM  16  present during the course of the trial, correct?

01:49PM  17  A.  That's correct.

01:49PM  18  Q.  And you understand what a sequestration order is?

01:49PM  19  A.  Yeah, I've been sequestered before during trials.

01:49PM  20  Q.  And that is that witnesses can't sit in and see what

01:49PM  21  other witnesses have to say during the course of a trial,

01:49PM  22  right?

01:49PM  23  A.  Correct.

01:49PM  24  Q.  In your instance, because of your role as the case agent,

01:49PM  25  you sat through all the witness testimony, right?

01:49PM  1   A.  Yeah, we're authorized to sit throughout the trial.

01:49PM  2   Q.  And you've -- and you have assisted throughout the trial

01:49PM  3   in helping the government locate exhibits and have witnesses

01:49PM  4   ready to go?

01:49PM  5   A.  Absolutely.

01:49PM  6   Q.  You played a very significant role in terms of both

01:49PM  7   getting witnesses to court, as well as scheduling witness?

01:49PM  8   A.  Yes, right.  A lot of work.

01:49PM  9   Q.  Okay.  Even before this trial, you were involved in

01:49PM  10  discussions related to who the potential witnesses would be

01:49PM  11  at trial, correct?

01:50PM  12  A.  Yeah.  Kind of collectively look at the witnesses.

01:50PM  13  Q.  And it obviously wasn't -- there was no final decision

01:50PM  14  left to you as to who witnesses were going to be called?

01:50PM  15  A.  No.

01:50PM  16  Q.  You were just part of the team discussion, right?

01:50PM  17  A.  Yeah, that's accurate.

01:50PM  18  Q.  And you were part of -- you were part of discussions as

01:50PM  19  to who would be placed on the government witness list?

01:50PM  20  A.  Yes, I was part of those discussions.

01:50PM  21  Q.  And -- and obviously you understand the government's not

01:50PM  22  obligated to call everybody that's placed on a witness list?

01:50PM  23  A.  Correct.

01:50PM  24  Q.  That's just a list of individuals the government

01:50PM  25  anticipates it may consider calling, right?

01:50PM  1    A.  Yeah, that's accurate.

01:50PM  2    Q.  And you were involved in discussions as to who should be

01:50PM  3    on that specific list, right?

01:50PM  4    A.  Yes, I was.

01:50PM  5    Q.  And you were part of discussions as to who should be

01:50PM  6    called as an actual witness at trial?

01:50PM  7            **MR. TRIPI:**  Objection.  Objection.

01:50PM  8            **THE COURT:**  Basis?

01:50PM  9            **MR. TRIPI:**  I'd like to argue further at the bench if

01:50PM  10   necessary, but 401 and 403 is the anchor of it, Judge.

01:51PM  11           **THE COURT:**  Come on up.

01:51PM  12           (Sidebar discussion held on the record.)

01:51PM  13           **MR. TRIPI:**  So, Judge, I think we're straying into an

01:51PM  14   area where you're gonna instruct the jury on the elements of

01:51PM  15   the proof, and that specific law enforcement techniques, I

01:51PM  16   think you're going to instruct them, are -- are -- are --

01:51PM  17   are -- and essentially we've briefed that a trial is not a

01:51PM  18   trial of the government.

01:51PM  19           So these questions are to stray into why certain

01:51PM  20   people were called and certain people weren't, and that's --

01:51PM  21           **THE COURT:**  He hasn't asked that yet.

01:51PM  22           **MR. TRIPI:**  That's where we're going, so I want to

01:51PM  23   preview the objection further, because we're going to be going

01:51PM  24   there.  And that's -- those are not proper questions, you

01:51PM  25   know, for anybody.  Like, the defendant, it creates an issue

01:51PM  1    within an issue.

01:51PM  2         THE COURT:  I agree with that, but I don't see

01:51PM  3    anything objectionable yet.

01:51PM  4         MR. FOTI:  I think in most instances that's true.  I

01:52PM  5    am going -- I do intend to try to explore this area in part

01:52PM  6    because the direct has went through and asked about did you

01:52PM  7    interview this person in relation to the investigation, did

01:52PM  8    you interview this person in relation to the investigation.  I

01:52PM  9    may be wrong, but I interpreted it that there was at least an

01:52PM  10   inference that these people, particularly the ones who are

01:52PM  11   deceased, provided favorable information.  I want to explore

01:52PM  12   the fact that there was interviews that go beyond just the

01:52PM  13   ones the government's mentioned, and that a number of these

01:52PM  14   people, including former dancers, a decision was made not to

01:52PM  15   call them as witnesses.

01:52PM  16        MR. TRIPI:  But it's -- I think that's not accurate.

01:52PM  17   Respectfully, there were several people, there were objections

01:52PM  18   being made when I was going through the text threads about

01:52PM  19   who's, like, interpreting them.  So in order to link up that

01:52PM  20   it was a person relevant to Pharaoh's, I asked if that person

01:52PM  21   was interviewed, and were they essentially connected to

01:52PM  22   Pharaoh's.  That's as far as I went.  I was trying to

01:52PM  23   contextualize those text messages.

01:52PM  24        THE COURT:  And you can ask those same questions

01:53PM  25   about whether people were interviewed, and you can argue to

01:53PM    1   the jury people were interviewed and not called.

01:53PM    2          **MR. FOTI:**  That's not -- I'm not trying to, through

01:53PM    3   my questions, insinuate anything beyond that.  That would be

01:53PM    4   argument later on about that -- that not right now, that's not

01:53PM    5   exact time.

01:53PM    6          **THE COURT:**  But I don't see how you can -- you can't

01:53PM    7   ask him and a decision was not made to call this a witness.

01:53PM    8          **MR. TRIPI:**  Correct.

01:53PM    9          **THE COURT:**  I think you can say that witness didn't

01:53PM   10   testify.

01:53PM   11          **MR. FOTI:**  Fair enough.

01:53PM   12          **THE COURT:**  But I don't think you can link it to the

01:53PM   13   government's decision, because I don't think that's at issue.

01:53PM   14   But you can ask did you interview this person, and that person

01:53PM   15   wasn't called to testify --

01:53PM   16          **MR. FOTI:**  Yeah.

01:53PM   17          **THE COURT:**  -- then you can certainly argue that to

01:53PM   18   them.  I think it's a waste of time because obviously they

01:53PM   19   weren't called.

01:53PM   20          **MR. COOPER:**  I would just ask for one additional kind

01:53PM   21   of boundary with respect to the questions which is I don't

01:53PM   22   think it's appropriate to get into the fact that there's a

01:53PM   23   government witness list that included more people than we

01:53PM   24   called.  That's outside of this jury's purview.

01:53PM   25          Their job is to decide the case based upon the

01:54PM   1   evidence that they heard in the courtroom.

01:54PM   2           If Mark wants to point out that those people didn't

01:54PM   3   testify, that's fine.  I agree with the Court.

01:54PM   4           But suggesting that they were previously on our list

01:54PM   5   is inappropriate to bring in front of a jury.

01:54PM   6           **MR. TRIPI:**  Because, one example, Cindy Moore.

01:54PM   7   Someone's dying.  Like, there are decisions that are made that

01:54PM   8   have nothing to do with --

01:54PM   9           **THE COURT:**  I understand.  No, no, I agree with you.

01:54PM   10          **MR. FOTI:**  I thought I asked the question that's --

01:54PM   11  that's acceptable.  I didn't think I tried to insinuate that

01:54PM   12  you have to pick -- you have to call everybody you put on a

01:54PM   13  witness list.

01:54PM   14          **MR. COOPER:**  No, but I think even talking about the

01:54PM   15  witness list is objectionable.

01:54PM   16          **THE COURT:**  Right.  I don't think you can ask was so

01:54PM   17  and so on the witness list and not called.  I don't think --

01:54PM   18          **MR. FOTI:**  I don't.

01:54PM   19          **THE COURT:**  -- I don't think the jury gets to know

01:54PM   20  that somebody was on a witness list.  Did you interview this

01:54PM   21  person?  Yes.  That person you didn't call.  Next question.

01:54PM   22          **MR. FOTI:**  That's it.  I don't intend to --

01:54PM   23          (End of sidebar discussion.)

01:54PM   24          **THE COURT:**  Okay.  The objection is overruled.

01:54PM   25          Go ahead, next question.

01:54PM   1        **BY MR. FOTI:**

01:55PM   2   Q.  Okay.  Sir, the jury's heard from certain witnesses, some

01:55PM   3   of which are listed on the chart you prepared, correct?

01:55PM   4   A.  That's correct.

01:55PM   5   Q.  And during direct examination, you talked about a number

01:55PM   6   of individuals that you interviewed, either you or other

01:55PM   7   agents interviewed, that did not testify, correct?

01:55PM   8   A.  That is correct.

01:55PM   9   Q.  Okay.  And I think it's established through the questions

01:55PM   10  on direct that you agree that obviously every person that you

01:55PM   11  interviewed was not somebody who ultimately testified at this

01:55PM   12  trial?

01:55PM   13  A.  No, definitely.

01:55PM   14  Q.  You interviewed a number of people to determine whether

01:55PM   15  they would be somebody that you would be interested in, or

01:55PM   16  whether the government would potentially be interested in

01:55PM   17  eliciting the information that they --

01:55PM   18        **MR. TRIPI:**  Objection.

01:55PM   19        **THE COURT:**  Overruled.

01:55PM   20        **BY MR. FOTI:**

01:55PM   21  Q.  You interviewed a number of people to determine what

01:55PM   22  information they would provide, correct?

01:56PM   23  A.  That, I think, I'm comfortable answering that.  Yeah, we

01:56PM   24  interviewed people to gather information.

01:56PM   25  Q.  And when you -- when you interviewed people and they

01:56PM  1  provided you information, that's information you would share

01:56PM  2  with other members of the investigative team?

01:56PM  3  A.  Yeah, we create reports and --

01:56PM  4  Q.  And those things are considered in the context of your

01:56PM  5  investigation, as well as whether they're viable witnesses,

01:56PM  6  correct?

01:56PM  7  A.  Yeah, it goes into the calculus.

01:56PM  8  Q.  Okay.  You did not conduct each one of these interviews

01:56PM  9  yourself personally, correct?

01:56PM  10  A.  No, I did not.  A number of agents and TFOs assist.

01:56PM  11  Q.  Do you remember during the course of this trial there was

01:56PM  12  some -- there's been a number of questions that we posed, and

01:56PM  13  then there was some back and forth about how many agents were

01:56PM  14  involved in this investigation?  It's come up a few times?

01:56PM  15  A.  Yes, especially during Agent Ryan's testimony.

01:56PM  16  Q.  Okay.  So, you have a better memory than me.

01:56PM  17     I'm going to go through and just ask you about a number

01:57PM  18  of individuals and whether they were involved in the

01:57PM  19  investigation, okay?

01:57PM  20  A.  Yep.

01:57PM  21  Q.  As I do this, I'm going to butcher some of your

01:57PM  22  colleague's names, so apologies to them in advance.

01:57PM  23  A.  I guess my one question I would have is about context,

01:57PM  24  or --

01:57PM  25  Q.  I'm asking at this point generally whether they were

| | | |
|---|---|---|
| 01:57PM | 1 | involved in any interviews, or any involvement in the |
| 01:57PM | 2 | investigation at all.  And then I may ask for more specific |
| 01:57PM | 3 | details. |
| 01:57PM | 4 | A.  Okay.  Yep. |
| 01:57PM | 5 | Q.  Okay?  And if you don't recall -- |
| 01:57PM | 6 | A.  Absolutely. |
| 01:57PM | 7 | Q.  -- for some reason, let me know. |
| 01:57PM | 8 | A.  Yep. |
| 01:57PM | 9 | Q.  Adam Penna? |
| 01:57PM | 10 | A.  Yes. |
| 01:57PM | 11 | Q.  Andrea Sciolino? |
| 01:57PM | 12 | A.  Yes.  Close. |
| 01:57PM | 13 | Q.  That's the first of many.  Andrew Clark? |
| 01:57PM | 14 | A.  Andy Clark, yes, I believe he did some interviews. |
| 01:57PM | 15 | Q.  Anthony Butera? |
| 01:57PM | 16 | A.  Yes. |
| 01:57PM | 17 | Q.  Carly Smaldino? |
| 01:57PM | 18 | A.  Yes. |
| 01:57PM | 19 | Q.  Christopher Gabrielle. |
| 01:57PM | 20 | A.  I'm sorry, read it again?  The name, please. |
| 01:57PM | 21 | Q.  Christopher Gabrielle. |
| 01:58PM | 22 | A.  Can I see a document to refresh my memory? |
| 01:58PM | 23 | Q.  I'll come back to it.  Daniel Rales? |
| 01:58PM | 24 | A.  Some of these might be HSI folks. |
| 01:58PM | 25 | Q.  Okay.  So if it's -- if it's somebody from the FBI, |

01:58PM    1    you'll recognize it?

01:58PM    2    A.  Right.  And a number of HSI folks, but I think those two

01:58PM    3    names I don't recognize.

01:58PM    4    Q.  Okay.  Do you -- was there a -- during the course of the

01:58PM    5    trial, the name or Michelle Sercu has come up, hasn't it?

01:58PM    6    A.  It has.

01:58PM    7    Q.  And that is somebody you understood worked at Pharaoh's?

01:58PM    8    A.  Yes.  I believe she -- was she a bartender, possibly?

01:58PM    9    Q.  She was interviewed back in 2019; is that right?

01:58PM   10    A.  Or was she a cleaner?  I'd have to see the report to --

01:58PM   11    to refresh my memory.

01:58PM   12    Q.  Okay.  Do you have any memory of whether she was

01:58PM   13    interviewed or not?

01:58PM   14    A.  I believe she was.

01:58PM   15    Q.  About December of 2019; does that sound right?

01:58PM   16    A.  It might have been the day of the search at Pharaoh's,

01:58PM   17    but I'd have to see the report to really feel comfortable.

01:59PM   18    Q.  Okay.  Daniel Bradels?

01:59PM   19    A.  As in agent?

01:59PM   20    Q.  Yeah.  Is that somebody who was involved?

01:59PM   21    A.  Daniel --

01:59PM   22    Q.  Bradels?  No?

01:59PM   23    A.  No.  I think it's an HSI folk or person.

01:59PM   24    Q.  Dennis Horrigan?

01:59PM   25    A.  I think that's an HSI person.  We have a Tom Horrigan.

01:59PM | 1 | Q.  Gary Jensen?

01:59PM | 2 | A.  Yes, that was one of my partners.

01:59PM | 3 | Q.  Geraldo Rondon?

01:59PM | 4 | A.  Yeah, Geraldo Rondon.

01:59PM | 5 | Q.  Ian Languidine?

01:59PM | 6 | A.  Yes.  Don't feel bad.  I worked with him for two years

01:59PM | 7 | and I still can't pronounce it.

01:59PM | 8 | Q.  Jacqueline Coyne?

01:59PM | 9 | A.  Yes.

01:59PM | 10 | Q.  Jason Kammeraad?

01:59PM | 11 | A.  Yes.

01:59PM | 12 | Q.  Sean Dion?

01:59PM | 13 | A.  I don't know that name.

01:59PM | 14 | Q.  Joseph Spidone?

01:59PM | 15 | A.  Yep, I know Joe Spidone.

01:59PM | 16 | Q.  Keith Bender?

01:59PM | 17 | A.  Yes.

01:59PM | 18 | Q.  Cody Hughes?

02:00PM | 19 | A.  Yep.

02:00PM | 20 | Q.  Luke Humphrey?

02:00PM | 21 | A.  Yes.

02:00PM | 22 | Q.  Ralph Joseph?

02:00PM | 23 | A.  Yes.

02:00PM | 24 | Q.  Rebecca Gworek?

02:00PM | 25 | A.  Yes.

02:00PM   1   Q.  Richard Cawthorn?

02:00PM   2   A.  Cawthard, yes.

02:00PM   3   Q.  Sean Kelley?

02:00PM   4   A.  Yes.

02:00PM   5   Q.  Steven Olowitnik?

02:00PM   6   A.  He might be a task force officer.

02:00PM   7   Q.  Thomas Darcy?

02:00PM   8   A.  Yes, he's a task force officer.

02:00PM   9   Q.  Thomas Mozg?

02:00PM  10   A.  Mozg, yep.

02:00PM  11   Q.  William Forsythe?

02:00PM  12   A.  Yes.  I'm familiar with Agent Forsythe.

02:00PM  13   Q.  Thomas Callinan?

02:00PM  14   A.  His involvement related to the '09 interviews, so it was

02:00PM  15   before my, kind of like you talked about, whatever was

02:00PM  16   happening in '09.

02:00PM  17   Q.  Everybody I mentioned before him are individuals that

02:00PM  18   had -- that you recognize the names for, are individuals that

02:01PM  19   had some involvement post 2019?

02:01PM  20   A.  Yes.  Correct.

02:01PM  21   Q.  And then Tom Callinan, the point you're making is he had

02:01PM  22   some involvement in the investigation back in '09?

02:01PM  23   A.  Yeah.  He interviewed G.R. and K.L. and worked with Tom

02:01PM  24   Herbst back then.

02:01PM  25   Q.  Right.  And we talked about that a little bit throughout

USA v Gerace - Burns - Foti/Cross - 12/17/24

186

02:01PM  1  the trial, that he had talked to K.L. back in '09?

02:01PM  2  A.  Correct.

02:01PM  3  Q.  And then visited her in the jail in '12?

02:01PM  4  A.  That's correct.

02:01PM  5  Q.  Okay.  And then Special Agent Marilyn Halliday and

02:01PM  6  yourself are the two case agents who have been sitting in the

02:01PM  7  courtroom, correct?

02:01PM  8  A.  That's correct.

02:01PM  9  Q.  And there's other agents who are involved besides the

02:01PM  10  ones that I've named so far?

02:01PM  11  A.  Yeah, when we have a search warrant, we have extra bodies

02:01PM  12  for that sort of thing.

02:01PM  13  Q.  So, back in Curtis Ryan's testimony, when there was some

02:01PM  14  dispute about the number, we can agree that at least in terms

02:01PM  15  of interviews, there's been dozens of agents involved in

02:01PM  16  this, correct?

02:01PM  17  A.  I guess -- some I'd put some context on that in the sense

02:01PM  18  that there's been -- it was a priority case, but there's also

02:02PM  19  been a lot of related investigations, spin-offs, and

02:02PM  20  different matters that kind of tie back to this case.  But

02:02PM  21  there's multiple cases in one.  So I just wanted to kind of

02:02PM  22  put that out there.

02:02PM  23  Q.  Okay.  All right.  Now, you have talked about on direct,

02:02PM  24  and I just asked you a little while ago about individuals who

02:02PM  25  were interviewed but ultimately did not testify at this

02:02PM  1   trial, right?

02:02PM  2   A.  I'm sorry, what was the question?

02:02PM  3   Q.  There were multiple individuals who were interviewed, but

02:02PM  4   did not testify at this trial, correct?

02:02PM  5   A.  Yes, that's correct.

02:02PM  6   Q.  And some of those people include former employees of

02:02PM  7   Pharaoh's, correct?

02:02PM  8   A.  That's correct.

02:02PM  9   Q.  Some of them include former dancers, correct?

02:02PM  10  A.  That's correct.

02:02PM  11  Q.  And we talked about one former employee that was

02:02PM  12  interviewed was Michelle Sercu, correct?

02:02PM  13  A.  Correct.  And I think she was interviewed, I feel pretty

02:02PM  14  comfortable, if I read the report, it's been a long, long

02:02PM  15  time.

02:03PM  16  Q.  Danielle Pericak was interviewed in July of 2020,

02:03PM  17  correct?

02:03PM  18  A.  She -- yes.  I don't that interview, but I know she was

02:03PM  19  interviewed.  I can't say for certain a date, but --

02:03PM  20  Q.  You're aware that she was interviewed by other agents?

02:03PM  21  A.  That is correct.

02:03PM  22  Q.  Okay.  And her name came up during L.L.'s testimony

02:03PM  23  yesterday, correct?

02:03PM  24  A.  Correct.

02:03PM  25  Q.  She was the one that, it was said, had given drugs to the

02:03PM    1    dancer at some point early in her tenure?

02:03PM    2    A.  I believe that's what she testified to.

02:03PM    3    Q.  Okay.  That was somebody that -- that individual,

02:03PM    4    Danielle Pericak, is somebody that you had interviewed

02:03PM    5    before, correct?

02:03PM    6    A.  Yes.  Not me personally, but I know she was interviewed.

02:03PM    7    Q.  That agents interviewed?

02:03PM    8    A.  That's correct.

02:03PM    9    Q.  And she did not testify at this trial, correct?

02:03PM   10    A.  She did not.

02:03PM   11    Q.  Megan Stabler is another -- another former dancer whose

02:03PM   12    name has come up during the course of this trial, correct?

02:04PM   13    A.  Stabler, yes.

02:04PM   14    Q.  She was interviewed in July of 2020 by other agents,

02:04PM   15    correct?

02:04PM   16    A.  Yes.  I don't know about the date, but I know she was

02:04PM   17    interviewed.

02:04PM   18    Q.  You know at some point during the investigation she was

02:04PM   19    interviewed as well?

02:04PM   20    A.  Correct.

02:04PM   21    Q.  And ultimately following that interview, a decision was

02:04PM   22    made that -- not to have her testify at this trial?

02:04PM   23            **MR. TRIPI:**  Objection.

02:04PM   24            **THE COURT:**  Sustained.  You can ask that question.

02:04PM   25    Sustained to the form of the question.

USA v Gerace - Burns - Foti/Cross - 12/17/24

02:04PM   1                **BY MR. FOTI:**

02:04PM   2   Q.  Megan Stabler was talked about during the course of this

02:04PM   3   trial, right?

02:04PM   4   A.  She was, by a number of witnesses, correct.

02:04PM   5   Q.  She did not testify, correct?

02:04PM   6   A.  She did not.

02:04PM   7   Q.  Another name we heard during the course of this trial was

02:04PM   8   DJ Robert Reed?

02:04PM   9   A.  That's correct.

02:04PM  10   Q.  Also an employee of Pharaoh's Gentlemen's Club?

02:04PM  11   A.  That is correct.

02:04PM  12   Q.  And he was interviewed in February of 23rd of 2021,

02:04PM  13   correct?

02:04PM  14   A.  I interviewed him.

02:04PM  15   Q.  You were one of at least two agents that interviewed him?

02:05PM  16   A.  Myself and Agent Kammeraad interviewed him, yes.

02:05PM  17   Q.  Yes.  So he was interviewed.  In this case, it was

02:05PM  18   actually by you, you were present at this interview?

02:05PM  19   A.  Yes, I remember it.

02:05PM  20   Q.  And he's been talked about throughout this trial?

02:05PM  21   A.  He has.

02:05PM  22   Q.  There was at least one picture put in evidence depicting

02:05PM  23   him, correct?

02:05PM  24   A.  Yes, there was.

02:05PM  25   Q.  And you had spoken to him a couple years ago, right?

02:05PM  1   A.  Yes, I did.

02:05PM  2   Q.  And he did not testify, correct?

02:05PM  3   A.  He did not testify.

02:05PM  4   Q.  Another name we have heard throughout this trial that's

02:05PM  5   not an employee of Pharaoh's is Russell Salvatore, his name

02:05PM  6   has come up a few times, correct?

02:05PM  7   A.  Yes, it has.

02:05PM  8   Q.  And this, I believe, is another individual that you had

02:05PM  9   personally interviewed, correct?

02:05PM  10  A.  Yes, I remember.

02:05PM  11  Q.  This was in January of 2021?

02:05PM  12  A.  That sounds right.  I'll take your word for it.

02:05PM  13  Q.  He's the owner of Russell's, right?

02:05PM  14  A.  He is.

02:05PM  15  Q.  And we saw a picture of Mr. Gerace and other individuals

02:06PM  16  in the kitchen at some point at Russell's, right?

02:06PM  17  A.  That's correct.

02:06PM  18  Q.  No pictures of Mr. Gerace and Russell Salvatore entered

02:06PM  19  throughout this trial, correct?

02:06PM  20  A.  Not during this trial.

02:06PM  21  Q.  And in terms of your interview of Mr. Salvatore, that was

02:06PM  22  done at least with one other agent?

02:06PM  23  A.  That was also with Jason Kammeraad.  Agent Kammeraad.

02:06PM  24  Q.  And he did not testify at this trial?

02:06PM  25  A.  He did not.

02:06PM   1   Q.  Angela Dingledey is another dancer at Pharaoh's that

02:06PM   2   you're familiar with, correct?

02:06PM   3   A.  Yes, I am.

02:06PM   4   Q.  You are familiar with the fact that she was interviewed

02:06PM   5   at some point in 2023, correct?

02:06PM   6   A.  Yes, I remember her interview, I didn't conduct it, but I

02:06PM   7   remember.

02:06PM   8   Q.  You were not present in the interview, but you remember

02:06PM   9   that she was interviewed by other agents?

02:06PM   10  A.  Yes, I do.

02:06PM   11  Q.  And her name I think has come up during the course of

02:07PM   12  this trial.

02:07PM   13  A.  A couple times, I believe.  Or text messages maybe.

02:07PM   14  Q.  She didn't testify here today, correct?

02:07PM   15  A.  She did not.

02:07PM   16  Q.  Now on direct, there was questions about attempting to

02:07PM   17  find dancers and interview dancers, and you had testified

02:07PM   18  that there was challenges in locating some of the dancers,

02:07PM   19  right?

02:07PM   20  A.  Yes, definitely.

02:07PM   21  Q.  And one of the reasons you said there were challenges was

02:07PM   22  because some of them danced with their stage name, correct?

02:07PM   23  A.  Right.  Yeah.  Other witnesses would say you should

02:07PM   24  really interview somebody, but all they had was a dancer

02:07PM   25  name, so --

USA v Gerace - Burns - Foti/Cross - 12/17/24

| | | |
|---|---|---|
| 02:07PM | 1 | Q.  So when you talked about having to follow up on leads |
| 02:07PM | 2 | regarding dancer names, those were names being given to you |
| 02:07PM | 3 | by other potential witnesses? |
| 02:08PM | 4 | A.  Yeah.  It's a -- yeah, and there was also -- there's a |
| 02:08PM | 5 | phone -- we got a lot of leads out of John Ermin's phone.  He |
| 02:08PM | 6 | had a lot of the dancer names in there, so we got a lot of |
| 02:08PM | 7 | leads out of that. |
| 02:08PM | 8 | Q.  When you conducted the search at Pharaoh's, there was |
| 02:08PM | 9 | also personnel records that were seized, correct? |
| 02:08PM | 10 | A.  I'm sorry, I missed that. |
| 02:08PM | 11 | Q.  During the search of Pharaoh's in December 2019, there |
| 02:08PM | 12 | were personnel records seized, correct? |
| 02:08PM | 13 | A.  Personnel records, correct. |
| 02:08PM | 14 | Q.  That included applications for -- there was an |
| 02:08PM | 15 | employment, sort of, introductory form? |
| 02:08PM | 16 | A.  Correct. |
| 02:08PM | 17 | Q.  There was tax-related forms, 1099 forms, correct? |
| 02:08PM | 18 | A.  Correct.  I skimmed those.  I'm not as familiar with |
| 02:08PM | 19 | them.  But you did trigger my memory, I think those were |
| 02:08PM | 20 | utilized, too, to sometimes help identify the dancers, |
| 02:08PM | 21 | because I think they designated their stage names on some of |
| 02:08PM | 22 | those documents. |
| 02:08PM | 23 | Q.  So you did have employment documentation at least as to a |
| 02:08PM | 24 | number of employees who had worked at Pharaoh's based on what |
| 02:08PM | 25 | was seized during the search? |

02:08PM    1    A.   Yeah, some of them.  I don't think every one was in

02:09PM    2    there.

02:09PM    3    Q.   I don't know if her name's come up, but there was a

02:09PM    4    dancer named A.C. who was interviewed, correct?  In 2023?

02:09PM    5    A.   A.C.?  I don't remember it offhand.  It certainly is

02:09PM    6    possible.  If you give me a report, it might refresh my

02:09PM    7    memory.

02:09PM    8    Q.   A.N. was a dancer.  She was a dancer that was interviewed

02:09PM    9    last year, correct?

02:09PM   10    A.   That sounds familiar.

02:09PM   11    Q.   She didn't testify at the trial, correct?

02:09PM   12    A.   There was an A.N., did not.

02:09PM   13    Q.   A.C. also didn't testify at this trial, correct?

02:09PM   14    A.   That's correct.

02:09PM   15    Q.   We heard a lot about Jessica Leyland, and she was

02:09PM   16    interviewed by law enforcement at some point, correct?

02:09PM   17    A.   Pursuant to a proffer.

02:09PM   18    Q.   Right.  And that's -- that happened in November of last

02:10PM   19    year, correct?

02:10PM   20    A.   Correct.

02:10PM   21    Q.   She did not testify at this trial, correct?

02:10PM   22    A.   She did not.

02:10PM   23    Q.   I think we attempted his last name earlier, and we

02:10PM   24    referred to him as Nick the manager, Nick Ciechelski?

02:10PM   25    A.   Yes.

02:10PM  1   Q.  Right?  He's a former manager at Pharaoh's, correct?

02:10PM  2   A.  That's right.

02:10PM  3   Q.  And he was also interviewed in September of 2023,

02:10PM  4   correct?

02:10PM  5   A.  He was interviewed not by myself, but he was interviewed.

02:10PM  6   Q.  And he did not testify, correct?

02:10PM  7   A.  He did not testify.

02:10PM  8   Q.  There's phone records between him and Mr. Gerace that

02:10PM  9   were --

02:10PM  10      MR. TRIPI:  Judge, I have an objection to this

02:10PM  11   continued line, if we can come up again.

02:10PM  12      THE COURT:  Come on up.

02:10PM  13      (Sidebar discussion held on the record.)

02:10PM  14      MR. TRIPI:  So, I -- I fail to see the relevance much

02:10PM  15   less the 403 confusion of the issues of every person on earth.

02:11PM  16   They had 200 people on their witness list.  They knew who

02:11PM  17   these people are.  This is an exercise, no matter what he

02:11PM  18   says, of trying to put the government on trial.  It's

02:11PM  19   improper.  It's improper.

02:11PM  20      If he wants to get up on summation and say you heard

02:11PM  21   no evidence from X person, that's one thing.  But to sit and

02:11PM  22   go through 200 names when they have the full ability to call

02:11PM  23   whoever the hell they want, it's not proper.

02:11PM  24      I've never seen this done in my life to this extent,

02:11PM  25   and I don't think it's proper.  I think there's a reason for

02:11PM   1   it.

02:11PM   2         THE COURT:  Maybe.  I disagree with you.  I think

02:11PM   3   it's getting a little tedious, and I think you're going to

02:11PM   4   start losing the jury.

02:11PM   5         But I think the point is that the government had a

02:11PM   6   whole lot of people that weren't called as witnesses, and the

02:11PM   7   argument can be made those people probably had good things to

02:11PM   8   say about Mr. Gerace.

02:11PM   9         MR. TRIPI:  See, I don't think the latter.  There's

02:11PM   10  zero evidence to support the latter, because a lot of them

02:11PM   11  said not nice things about Mr. Gerace, and we still --

02:11PM   12        THE COURT:  And you can argue -- he can argue that to

02:12PM   13  the jury.  He can say to the jury you should presume.  Why

02:12PM   14  can't he say that?

02:12PM   15        MR. TRIPI:  And then we get up on rebuttal and we say

02:12PM   16  it's our burden, but they have a right to call witnesses.

02:12PM   17        THE COURT:  No, you can't say that.

02:12PM   18        MR. TRIPI:  I've done that before, I've briefed it.

02:12PM   19        THE COURT:  I'd like to see it.

02:12PM   20        MR. TRIPI:  Absolutely.  I will do that, then,

02:12PM   21  because I intend to do that.

02:12PM   22        THE COURT:  Let's keep going.  Are you gonna --

02:12PM   23  you're not going to finish today.

02:12PM   24        MR. TRIPI:  Judge, real quick on that last point,

02:12PM   25  just to -- just to finish the point, when they get up there

02:12PM   1   and argue missing witnesses and this is and that, there is

02:12PM   2   strong law, and I will get it for you before I try to do this,

02:12PM   3   but there is strong law that has invited comment that we can

02:12PM   4   rebut with -- you always couch it first by saying the burden

02:12PM   5   is ours, we embrace that burden.

02:12PM   6          THE COURT:  If you've got law, let me look at it.  If

02:12PM   7   you've got law, I'll look at it.  Let's get going, please.

02:12PM   8          (End of sidebar discussion.)

02:12PM   9          THE COURT:  Okay, we're gonna take a short break,

02:12PM   10  folks.  Please remember my instructions about not discussing

02:12PM   11  the case with each other or anyone else, and not making up

02:13PM   12  your mind.  See you back here in about ten or 15 minutes.

02:13PM   13          (Jury excused at 2:13 p.m.)

02:13PM   14          THE COURT:  Okay.  Anything before we break?

02:13PM   15          MR. COOPER:  I guess just a -- I heard the Court ask

02:13PM   16  Mr. Foti a question before we walked down here about

02:13PM   17  scheduling.  We have an hour, even when we get back from the

02:13PM   18  break, an hour left before the 3:30 charge conference.  I

02:13PM   19  didn't hear Mark answer.

02:13PM   20          THE COURT:  He said no, he's not gonna finish.

02:14PM   21          MR. FOTI:  I don't think so, no.  I might, but I

02:14PM   22  don't think so.

02:14PM   23          MR. COOPER:  The 3:30 stop was for the charge

02:14PM   24  conference, not for a juror?

02:14PM   25          THE COURT:  No, it was because of a juror, right?

02:14PM    1          **MR. COOPER:**  I'm asking, I'm not --

02:14PM    2          **THE CLERK:**  Yes, that is correct.

02:14PM    3          **THE COURT:**  It's for a juror.

02:14PM    4          **MR. COOPER:**  Oh, it is for a juror?

02:14PM    5          **THE COURT:**  And if we don't finish, it's Mr. Tripi's

02:14PM    6    own fault.  I mean, that direct went on for an awful long

02:14PM    7    time.  And so if we don't finish, we don't finish.  But that's

02:14PM    8    not put on the defense, and I'm not going to hurry Mr. Foti.

02:14PM    9          **MR. COOPER:**  I'm not -- I wasn't blaming him.  All I

02:14PM   10    was doing was asking about scheduling because we have,

02:14PM   11    obviously, big things to follow when the resting happens.

02:14PM   12          **THE COURT:**  I understand.  So --

02:14PM   13          **MR. COOPER:**  I'm not casting aspersions on Mark.

02:14PM   14          **THE COURT:**  So if you don't finish, what are we gonna

02:14PM   15    do?

02:14PM   16          **MR. FOTI:**  Well, I think we can still have the charge

02:14PM   17    conference.

02:14PM   18          **THE COURT:**  Yeah.

02:14PM   19          **MR. FOTI:**  We -- we obviously have Rule 29, nobody's

02:14PM   20    surprised that we're gonna make motion arguments at the end of

02:14PM   21    proof.  We won't have spoken to Mr. Gerace yet.

02:14PM   22          I guess -- I haven't conferred with Mr. Soehnlein,

02:15PM   23    but I guess my request would be that we do the original plan

02:15PM   24    of either we are calling our witnesses tomorrow no matter what

02:15PM   25    after we finish the Rule 29, or if not, then we close Thursday

02:15PM  1    and we go back to the charge on Friday.

02:15PM  2            **THE COURT:**  Okay.  Fine.  That's what we'll do.

02:15PM  3            **THE CLERK:**  All rise.

02:15PM  4            (Off the record at 2:15 p.m.)

02:27PM  5            (Back on the record at 2:27 p.m.)

02:27PM  6            (Jury not present.)

02:27PM  7            **THE CLERK:**  All rise.

02:27PM  8            **THE COURT:**  Please be seated.

02:27PM  9            **THE CLERK:**  We are back on the record for the

02:27PM  10   continuation of the jury trial in case numbers 19-cr-227 and

02:28PM  11   23-cr-37, United States of America versus Peter Gerace Jr.

02:28PM  12           All counsel and parties are present.

02:28PM  13           **THE COURT:**  Okay.  Anything before we bring them

02:28PM  14   back?

02:28PM  15           **MR. COOPER:**  Just because we might not get a break

02:28PM  16   before you send the jury home, Brian just mentioned to me he

02:28PM  17   has a medical appointment at 8:30 tomorrow morning.  He

02:28PM  18   expects he would be able to be here at the latest at 9:30

02:28PM  19   tomorrow morning.  Is that okay?  Instead of a 9 a.m. start,

02:28PM  20   would you be okay with a 9:30 start tomorrow since he's --

02:28PM  21           **THE COURT:**  Sure.  As long as we're -- we're not

02:28PM  22   going to sum up tomorrow, so sure.

02:28PM  23           **MR. COOPER:**  Yeah.  Exactly.  In light of that,

02:28PM  24   that's why I was asking.

02:28PM  25           **THE COURT:**  Fine.  Anything we need to do before we

USA v Gerace - Burns - Foti/Cross - 12/17/24

02:28PM    1    resume?

02:28PM    2              **MR. FOTI:**  No.

02:28PM    3              **THE COURT:**  Let's bring them back, please.

02:29PM    4              (Jury seated at 2:29 p.m.)

02:29PM    5              **THE COURT:**  The record will reflect that all our

02:30PM    6    jurors are present.

02:30PM    7              I remind the witness he's still under oath.

02:30PM    8              Mr. Foti, you may continue.

02:30PM    9              **MR. FOTI:**  Thank you, Judge.

02:30PM   10              **BY MR. FOTI:**

02:30PM   11    Q.  Okay.  So to fast forward a little bit, instead of just

02:30PM   12    going through individual names, is it fair to say there were

02:30PM   13    other people dancered -- sorry, other people interviewed

02:30PM   14    besides those I just mentioned?

02:30PM   15    A.  Definitely.

02:30PM   16    Q.  There were other dancers who were interviewed besides the

02:30PM   17    ones I just mentioned?

02:30PM   18    A.  Yes, there were.

02:30PM   19    Q.  Other managers who were interviewed besides those I just

02:30PM   20    mentioned?

02:30PM   21    A.  Yes, there were.

02:30PM   22    Q.  Okay.  And -- and other than the individuals you --

02:30PM   23    that -- that the jury heard from during testimony that you

02:30PM   24    included in your chart, nobody else -- well, withdrawn.

02:30PM   25    Scrap that.

USA v Gerace - Burns - Foti/Cross - 12/17/24

200

02:30PM    1    When you created the chart that -- there's a large,

02:31PM    2    enlarged cardboard copy of over there, you attempted to

02:31PM    3    include every individual who provided substantive

02:31PM    4    observations of what occurred inside Pharaoh's, correct?

02:31PM    5    A.   That testified in this trial.

02:31PM    6    Q.   In this trial.

02:31PM    7    A.   Correct.

02:31PM    8    Q.   And you didn't include individuals that you had

02:31PM    9    interviewed that did not testify, correct?

02:31PM    10   A.   I -- it would only be stuff that was in the courtroom.  I

02:31PM    11   mean, that was the goal of the chart.

02:31PM    12   Q.   Right.  This is a summary exhibit that's based on just

02:31PM    13   what happened in this trial?

02:31PM    14   A.   Correct.

02:31PM    15   Q.   And so obviously, a summary exhibit is not going to

02:31PM    16   include the names of the individuals I just asked you about,

02:31PM    17   correct?

02:31PM    18   A.   That's correct.

02:31PM    19   Q.   It doesn't include the names of the dancers who were

02:31PM    20   interviewed but did not testify, correct?

02:31PM    21   A.   That's correct.

02:31PM    22   Q.   It does not include the names of any managers that you

02:31PM    23   interviewed that did not testify, correct?

02:31PM    24   A.   That's correct.

02:31PM    25   Q.   All right.

02:31PM  1    **MR. FOTI:**  Can we pull up an electronic copy of 555,

02:31PM  2    Government Exhibit 555, please.

02:31PM  3        **BY MR. FOTI:**

02:32PM  4    Q.  Okay.  So this is an electronic version of the summary

02:32PM  5    chart?

02:32PM  6    A.  That's correct.

02:32PM  7    Q.  It's the same thing as what's on the cardboard, but it's

02:32PM  8    on the TV screen for us, right?

02:32PM  9    A.  That's correct.

02:32PM  10   Q.  Okay.  You, in preparing this chart, you included the

02:32PM  11   names of individuals who testified, correct?

02:32PM  12   A.  Yes, I did.

02:32PM  13   Q.  You listed exhibits, correct?

02:32PM  14   A.  Some of the exhibits, yes.

02:32PM  15   Q.  Some of the exhibits that you found to be relevant to a

02:32PM  16   particular topic, correct?

02:32PM  17   A.  Correct.

02:32PM  18   Q.  And you listed certain areas to categorize those exhibits

02:32PM  19   and witnesses, correct?

02:32PM  20   A.  Correct.

02:32PM  21   Q.  Okay.  Now this exhibit doesn't get into the substance

02:32PM  22   of -- other than the association with certain topics, it

02:32PM  23   doesn't get into the substance of these witnesses' testimony,

02:32PM  24   correct?

02:32PM  25   A.  No.  That -- that wasn't -- no, I did not want to

02:33PM      1    interpret witnesses' testimony on the chart.

02:33PM      2    Q.  So in terms of this summary exhibit, it doesn't give any

02:33PM      3    indication of which one of these witnesses were fired from

02:33PM      4    Pharaoh's, correct?

02:33PM      5    A.  I'm sorry, can you repeat the question?

02:33PM      6    Q.  The summary exhibit doesn't give any indication which

02:33PM      7    ones of these witnesses were fired from Pharaoh's, correct?

02:33PM      8    A.  Correct.

02:33PM      9    Q.  It doesn't give any indication of which ones of these

02:33PM     10    witnesses communicated to you that they have a bias against

02:33PM     11    Mr. Gerace, correct?

02:33PM     12    A.  Which -- there's no -- there's nothing related to

02:33PM     13    their -- the chart doesn't have anything related to their

02:33PM     14    testimony.

02:33PM     15    Q.  So, no, there's nothing on the chart that indicates which

02:33PM     16    one of these witnesses communicated to law enforcement that

02:33PM     17    they have a bias against Mr. Gerace, correct?

02:33PM     18    A.  Correct.

02:33PM     19    Q.  There's nothing on this chart that indicates which ones

02:33PM     20    of these witnesses have charges pending currently, correct?

02:33PM     21    A.  Correct.

02:33PM     22    Q.  There's nothing on this witness list -- or, I'm sorry, on

02:34PM     23    this summary exhibit that indicates which ones of these

02:34PM     24    witnesses had charges pending during the course of the

02:34PM     25    investigation, correct?

USA v Gerace - Burns - Foti/Cross - 12/17/24

203

02:34PM    1    A.  Correct.

02:34PM    2    Q.  This list does not indicate which ones of these witnesses

02:34PM    3    received some sort of financial benefit, correct?

02:34PM    4    A.  Some of the ones we paid expenses for, no.

02:34PM    5    Q.  Or a dollar value associated with the benefits, or -- or

02:34PM    6    the expenses?

02:34PM    7    A.  Correct.

02:34PM    8    Q.  Now, during the course of the trial, some of these

02:34PM    9    witnesses were asked about expenses that were paid for them,

02:34PM   10    correct?

02:34PM   11    A.  That's correct.

02:34PM   12    Q.  And specifically, there is one witness over here in the

02:34PM   13    corner that was called in to testify as an expert witness,

02:34PM   14    that was Rebecca Bender, correct?

02:34PM   15    A.  That's correct.

02:34PM   16    Q.  And during her testimony, it came out that she was being

02:34PM   17    paid an hourly rate to testify, correct?

02:34PM   18    A.  That's correct.

02:34PM   19    Q.  And after -- after she concluded her testimony, she sent

02:35PM   20    an invoice for her testimony, correct?

02:35PM   21    A.  I believe she did.

02:35PM   22    Q.  Okay.  And did you -- you understand that the total

02:35PM   23    expenses and the total invoice was $8,7555?

02:35PM   24    A.  I didn't see the invoice.  I think I heard that, a number

02:35PM   25    around there.  Or, I heard about the invoice, but I wouldn't

02:35PM    1    feel comfortable saying the exact number just because I

02:35PM    2    didn't see the invoice.

02:35PM    3    Q.  Okay.  But you were aware that that was sent after her

02:35PM    4    testimony was done?

02:35PM    5    A.  I believe, yeah, again, remember hearing about that.

02:35PM    6    Q.  And even if you're not sure what the specific amount is,

02:35PM    7    the number I just gave you of close to $9,000, that's

02:35PM    8    somewhere consistent with what you had heard?

02:35PM    9    A.  Somewhat, yeah.  It was -- I wasn't part of that.  I

02:35PM    10   remember hearing it.

02:35PM    11   Q.  Understood.

02:35PM    12        MR. TRIPI:  Mr. Foti, if you want to give me the

02:35PM    13   document, I'll stipulate to the number.  I just don't have it

02:35PM    14   handy.

02:35PM    15        MR. FOTI:  It's, yeah.

02:35PM    16        MR. TRIPI:  If you're interested in that, sir.

02:36PM    17        He's going to read a number into the record, Judge,

02:36PM    18   and the government will stipulate.

02:36PM    19        MR. FOTI:  So I'm reading in a total on the invoice

02:36PM    20   from Rebecca Bender, and the total invoice is $8,755.98.

02:36PM    21        MR. TRIPI:  We stipulate, Judge.

02:36PM    22        THE COURT:  Okay.

02:36PM    23        BY MR. FOTI:

02:36PM    24   Q.  All right.  Nothing about the summary chart that

02:36PM    25   references her hourly rate, or what her expenses or what her

USA v Gerace - Burns - Foti/Cross - 12/17/24

02:36PM   1   invoice was, correct?

02:36PM   2   A.  No.

02:36PM   3   Q.  This summary chart summarizing the case does not include

02:36PM   4   any inconsistencies that any of these witnesses gave in their

02:36PM   5   testimony with prior testimony, correct?

02:36PM   6   A.  That doesn't encompass any sort of testimony or any kind

02:36PM   7   of interpretations of testimony either from the grand jury or

02:36PM   8   the trial.

02:37PM   9   Q.  So there's nothing on this exhibit that identifies which

02:37PM  10   ones of these witnesses were impeached throughout the trial,

02:37PM  11   correct?

02:37PM  12   A.  Correct.

02:37PM  13   Q.  Okay.  And when I say "impeached," you know I mean they

02:37PM  14   were confronted with prior sworn statements that were

02:37PM  15   different, right?

02:37PM  16   A.  During cross-examination.

02:37PM  17   Q.  Yeah, or direct in this case, right?

02:37PM  18   A.  Correct.

02:37PM  19   Q.  There was a couple direct examination witnesses that were

02:37PM  20   impeached, right?

02:37PM  21   A.  I believe so.

02:37PM  22   Q.  Nothing in this chart references if any of these

02:37PM  23   witnesses gave testimony inconsistent with prior statements

02:37PM  24   they gave to law enforcement, correct?

02:37PM  25   A.  Correct.

USA v Gerace - Burns - Foti/Cross - 12/17/24

02:37PM    1    Q.  And nothing in this chart indicates whether any of these

02:37PM    2    witnesses, during the course of their testimony, gave answers

02:37PM    3    that were inconsistent with the testimony of other witnesses,

02:37PM    4    correct?

02:37PM    5    A.  Correct.

02:37PM    6    Q.  All right.  So, I'm going to --

02:38PM    7         MR. FOTI:  Ms. Champoux, can we zoom in on the

02:38PM    8    witnesses to conduct at Pharaoh's Gentlemen's Club section?

02:38PM    9    My fat fingers can't do it unless we make it a little bigger.

02:38PM   10    Okay.

02:38PM   11         BY MR. FOTI:

02:38PM   12    Q.  Now we heard from L.L. -- I've never been able to

02:38PM   13    pronounce her last name, it's one more I butcher, but L.L.?

02:38PM   14    A.  L.L., I believe.

02:38PM   15    Q.  Yeah, okay.  Good.  I'm glad we both have problems there.

02:38PM   16         She's the one who testified and just finished up

02:38PM   17    yesterday, correct?

02:38PM   18    A.  That's correct.

02:38PM   19    Q.  Okay.  I've just circled her name, and I circled A.A.

02:38PM   20         You recall during her testimony she was testifying about

02:38PM   21    sex acts that she engaged in with A.A., correct?

02:38PM   22    A.  I recall that.

02:38PM   23         MR. TRIPI:  Judge, I'm going to have an objection to

02:39PM   24    the next set of questions in this line.  If he's going to

02:39PM   25    refer to specific testimony I don't think it's appropriate,

02:39PM   1   that's the jury's domain.

02:39PM   2          **THE COURT:**  Hang on.

02:39PM   3          **MR. TRIPI:**  It's hearsay.

02:39PM   4          **THE COURT:**  Well, I don't know what the line is going

02:39PM   5   to be, so to the extent that there's an objection to the last

02:39PM   6   question, you recall during her testimony she was testifying

02:39PM   7   about sex acts she engaged in, that's overruled.

02:39PM   8          Next question.

02:39PM   9          **BY MR. FOTI:**

02:39PM  10   Q.  You recall that testimony, right?

02:39PM  11   A.  I do.

02:39PM  12   Q.  Okay.  And you recall that she testified about engaging

02:40PM  13   in those sex acts with A.A., correct?

02:40PM  14   A.  I recall that.

02:40PM  15   Q.  Okay.  Now, A.A. is one of the witnesses on your summary

02:40PM  16   exhibit, she testified at this trial, correct?

02:40PM  17   A.  She did.

02:40PM  18   Q.  Okay.  And you recall that A.A. indicated she never met

02:40PM  19   Peter Gerace, correct?

02:40PM  20          **MR. TRIPI:**  Objection.  Again this is -- this is what

02:40PM  21   I was talking about, Judge.  This is for the jury to -- we're

02:40PM  22   violating the domain of the jury.  We're going beyond the

02:40PM  23   summary chart.  We're interpreting testimony through a

02:40PM  24   witness.  That's the jury's function.

02:40PM  25          **THE COURT:**  Are you asking whether she testified to

02:40PM  1   that at this trial?

02:40PM  2        MR. FOTI:  Yes.  It was an in-court statement.

02:40PM  3        THE COURT:  I mean, that is for the jury to recall,

02:40PM  4   right?  Why is whether this witness thinks that she testified

02:40PM  5   to that or not relevant?

02:40PM  6        MR. FOTI:  Well, I -- Judge, as we go through the

02:40PM  7   exhibit -- well, should we approach, I guess?

02:40PM  8        THE COURT:  Yeah, come on up.

02:41PM  9        (Sidebar discussion held on the record.)

02:41PM  10       THE COURT:  Are you doing this to impeach him on the

02:41PM  11   exhibit?

02:41PM  12       MR. FOTI:  I'm not, no, I'm not.  I'm not doing that.

02:41PM  13       But he's a summary witness.  And, candidly, I just

02:41PM  14   told Joe a little while ago I've never crossed a summary

02:41PM  15   witness before.  But my understanding is that they're here to

02:41PM  16   highlight certain pieces of the trial that are relevant for

02:41PM  17   the jury's consideration.  And to the extent that there

02:41PM  18   isn't -- I'm not talking about a minor inconsistency, I'm

02:41PM  19   asking didn't A.A. indicate that she had never met Peter

02:41PM  20   before.  That's not encroaching on the jury's --

02:41PM  21       THE COURT:  Well --

02:41PM  22       MR. TRIPI:  I'm sorry, Judge.

02:41PM  23       THE COURT:  -- it may be unless you tie it to the

02:41PM  24   exhibit.

       25

02:41PM    1              **MR. FOTI:**  Right.

02:41PM    2              **THE COURT:**  If you're using this to impeach him on

02:41PM    3       the exhibit that he put together, that's one thing.

02:41PM    4              But to ask him, she didn't -- she -- she testified

02:41PM    5       inconsistently with another witness, that alone, I think

02:41PM    6       that's an argument for the jury, that's something for the jury

02:41PM    7       to remember.  Whether he thinks she did or not is irrelevant.

02:42PM    8              If it's relevant to his preparation of the chart in

02:42PM    9       some way --

02:42PM   10              **MR. FOTI:**  Right.

02:42PM   11              **THE COURT:**  -- then I think you can get to that.

02:42PM   12              **MR. FOTI:**  Right.

02:42PM   13              **THE COURT:**  Only in --

02:42PM   14              **MR. TRIPI:**  And, Judge, I think it cannot by

02:42PM   15       definition of what testimony we have so far be relevant to the

02:42PM   16       chart, because he summarized no testimony.  So it's not like

02:42PM   17       he picked and choosed things to include and things he didn't.

02:42PM   18       He gives a visual depiction --

02:42PM   19              **THE COURT:**  I would not sustain an objection.

02:42PM   20              **MR. COOPER:**  Judge, in the last point, on this in

02:42PM   21       Bongiovanni 2, and I know it was a different trial, but it was

02:42PM   22       the exact same scenario.

02:42PM   23              When I was on direct, I had what I considered to be a

02:42PM   24       wonderful direct examination, asking Special Agent Burns did

02:42PM   25       you hear so-and-so testify, and you sustained about -- and I'm

02:42PM    1   not criticizing the Court, but you sustained about a dozen

02:42PM    2   objections in a row because of hearsay.  The objection was

02:42PM    3   hearsay, and you said Special Agent Burns can't say I heard

02:42PM    4   so-and-so testify to X in court.  You prevented me from doing

02:42PM    5   it.

02:42PM    6          **THE COURT:**  I don't remember that being a hearsay

02:42PM    7   objection, but it may very well be a hearsay objection.  But

02:43PM    8   the point is that unless you can tie it into the exhibit or

02:43PM    9   tie it into impeaching him in some way, it doesn't come in.

02:43PM   10          **MR. TRIPI:**  But, Judge, can I ask one more thing?

02:43PM   11   Because this devolves then into a circular thing where then I

02:43PM   12   get up and I redo my redirect of those witnesses through this

02:43PM   13   witness, didn't -- but didn't they say these consistent

02:43PM   14   things.  And I just think it's a path that is not proper.

02:43PM   15          **THE COURT:**  I agree.  And it's not something we're

02:43PM   16   gonna go down unless there is a specific way to tie it into

02:43PM   17   the exhibit.

02:43PM   18          That's all I'm saying.  Let's go.

02:43PM   19          (Sidebar discussion held on the record.)

02:43PM   20          **BY MR. FOTI:**

02:44PM   21   Q.  Okay.  I'm going to withdraw the question I asked.

02:44PM   22      What I do want to just ask a couple quick more follow-up

02:44PM   23   questions while this is still on the screen.

02:44PM   24      In terms of your summary exhibit, sir, you -- there's a

02:44PM   25   heading here.  These are witnesses to conduct at Pharaoh's

02:44PM    1    Gentlemen's Club -- I think that's supposed to say club,

02:44PM    2    but --

02:44PM    3    A.   Oh, another typo, sorry.

02:44PM    4    Q.   That's okay.

02:44PM    5    A.   Yes.

02:44PM    6    Q.   Nobody does more of them than me, so I won't hold it

02:44PM    7    against you.

02:44PM    8         But this is witnesses to conduct, that's what you were

02:44PM    9    trying to convey with regard to these witnesses, correct?

02:44PM   10    A.   Yeah.  We were very careful, when I was, to not interpret

02:44PM   11    the testimony.  I thought that was neutral enough and generic

02:44PM   12    enough that it wasn't interpreting testimony.  So that's why

02:44PM   13    I came up with that header.

02:44PM   14    Q.   And when you say you're not trying to interpret the

02:44PM   15    testimony, you didn't include any commentary in regards to

02:45PM   16    what any of these individuals testified about, correct?

02:45PM   17    A.   Correct.

02:45PM   18    Q.   You didn't include any of the things that I asked about

02:45PM   19    earlier in regard to whether they had been impeached during

02:45PM   20    the course of the trial, correct?

02:45PM   21    A.   Correct.

02:45PM   22    Q.   And when you say witnesses to conduct, you understand

02:45PM   23    that some of these witnesses gave different answers in terms

02:45PM   24    of what conduct they witnessed, correct?

02:45PM   25    A.   What -- to what conduct they witnessed?  Yes.

02:45PM    1    Q.  Okay.

02:45PM    2         **MR. FOTI:**  Okay.  We can take that down.  Thank you,

02:45PM    3    Ms. Champoux.

02:45PM    4         Can we pull up Government Exhibit 490E as in

02:45PM    5    elephant.

02:45PM    6         **MS. CHAMPOUX:**  There is no 490E as in elephant.

02:45PM    7         **MR. FOTI:**  I'm sorry, B as in boy.  Okay.  And can we

02:46PM    8    zoom in on the -- yep.

02:46PM    9         **BY MR. FOTI:**

02:46PM   10    Q.  All right.  Sir, you're familiar with this picture,

02:46PM   11    correct?

02:46PM   12    A.  Correct.

02:46PM   13    Q.  Okay.  And this was entered into evidence during the

02:46PM   14    course of this trial, correct?

02:46PM   15    A.  That's correct.

02:46PM   16    Q.  All right.  And are you familiar with who the individuals

02:46PM   17    in this picture are?

02:46PM   18    A.  Right.  The middle one, definitely.  And I believe I know

02:46PM   19    who the other two are, but I believe it's not 100 percent

02:46PM   20    certain.

02:46PM   21    Q.  Who are the other -- who do you believe the other two

02:46PM   22    individuals are?

02:46PM   23    A.  One on the left is possibly David, and the one on the

02:46PM   24    right is possibly Anthony.

02:46PM   25    Q.  Okay.

02:46PM 1   A.  I could not say with 100 percent certainty.

02:46PM 2   Q.  Okay.  You're not 100 percent, but your understanding is

02:46PM 3   these are the two -- it's Peter Gerace's two brothers,

02:46PM 4   correct?

02:46PM 5   A.  I believe.  I'm just -- I can't say with 100 percent

02:46PM 6   certainty.

02:46PM 7           **MR. FOTI:**  Okay.  We can take that down, thank you.

02:46PM 8           **BY MR. FOTI:**

02:46PM 9   Q.  All right.  During the course of this investigation,

02:47PM 10  you -- there was the collection of a number of cellular

02:47PM 11  devices at various points, correct?

02:47PM 12  A.  Correct.

02:47PM 13  Q.  As well as other electronic devices such as computers,

02:47PM 14  correct?

02:47PM 15  A.  Correct.

02:47PM 16  Q.  Tablets, right?

02:47PM 17  A.  Yes.  I'm trying to make a distinction between when you

02:47PM 18  say "this," you mean just related to the -- to this

02:47PM 19  defendant?  Or some of the related cases I was referencing?

02:47PM 20  Q.  In terms of Mr. Peter Gerace, there was one cell phone

02:47PM 21  that you reviewed, correct?

02:47PM 22  A.  Correct.

02:47PM 23  Q.  And that you testified about a number of conversations

02:47PM 24  from that cell phone on your direct examination?

02:47PM 25  A.  Correct, the border search.

02:47PM   1   Q.  And there were other electronic devices seized from his

02:47PM   2   home when the search warrant was executed, correct?

02:47PM   3   A.  Yes.  I recall that.  I wasn't the seizing agent, and I

02:47PM   4   was at Pharaoh's.

02:47PM   5   Q.  Okay.  And there was other phones besides Peter Gerace's

02:48PM   6   that were reviewed, or that extractions were done during the

02:48PM   7   course of the investigation, correct?

02:48PM   8   A.  Definitely.

02:48PM   9   Q.  One that I think is stipulated to is Mr. Bongiovanni's

02:48PM  10   phone, correct?

02:48PM  11   A.  The DEA phone, I believe.

02:48PM  12   Q.  Right.  There was -- there's two phones that

02:48PM  13   Mr. Bongiovanni had that you're aware of, correct?  Different

02:48PM  14   timeframes?

02:48PM  15   A.  Correct.  There was the one that he used while he was a

02:48PM  16   DEA agent, and then there was the one in his retirement,

02:48PM  17   after he retired and after he turned the other phone in.

02:48PM  18   Q.  So the -- and I think there's stipulations related to

02:48PM  19   both of those phones, right?

02:48PM  20   A.  I believe there is.

02:48PM  21   Q.  So those are -- the phone that he as a DEA agent was the

02:48PM  22   one that was wiped when he retired, when -- administrative

02:48PM  23   retirement, correct?

02:48PM  24   A.  Correct.  He turned in, it was wiped.

02:48PM  25   Q.  And then there is the phone that he had post retirement

USA v Gerace - Burns - Foti/Cross - 12/17/24

215

02:48PM   1   that he started using as his personal phone?

02:48PM   2   A.  Correct.  And that was imaged as well, I believe.

02:48PM   3   Q.  And by "imaged," what you mean is an extraction was made

02:49PM   4   on the phone, correct?

02:49PM   5   A.  Yeah, same thing.  Extraction/image.

02:49PM   6   Q.  And an extraction is like a search of the phone, pulling

02:49PM   7   the data out?

02:49PM   8   A.  Right.  Yeah, there's a computer tool that pulls it and

02:49PM   9   organizes it.

02:49PM   10  Q.  So, other than those two phones, don't have any reason to

02:49PM   11  believe Mr. Bongiovanni ever possessed any other phone,

02:49PM   12  correct?

02:49PM   13  A.  Not that I -- I'd have to see the search log or the

02:49PM   14  seizure log from his house, but there may have been, like,

02:49PM   15  some older phones.  But those are the two that I directly can

02:49PM   16  recall linking to Mr. Bongiovanni.

02:49PM   17  Q.  Okay.  You don't recall any other phones specifically?

02:49PM   18  A.  Not off the top of my head.

02:49PM   19  Q.  Okay.  And I think did you -- did you review Lou Selva's

02:49PM   20  phone at some point?

02:49PM   21  A.  At some point, portions of it.

02:49PM   22  Q.  I think you testified about it, I --

02:49PM   23  A.  Yeah.  Possibly.

02:50PM   24  Q.  Okay.  Now, you reviewed -- you reviewed phones of

02:50PM   25  targets of the investigation including Peter Gerace, Joseph

02:50PM  1  Bongiovanni, and then Lou Selva is another one, right?

02:50PM  2  A.  I believe, yeah, I didn't spend as much time with

02:50PM  3  Mr. Selva's, but --

02:50PM  4  Q.  You didn't generally have the practice of reviewing

02:50PM  5  phones of witnesses, correct?

02:50PM  6  A.  I mean, I think C.C.'s phone was seized.  I didn't review

02:50PM  7  it, someone else did.

02:50PM  8      I'm trying to think of witnesses.

02:50PM  9      I'm sure Myszka's was.  I wasn't part of that

02:50PM  10  investigation.

02:50PM  11      So I get -- I wouldn't feel comfortable saying exactly

02:50PM  12  which -- which ones you're kind of referring to.

02:50PM  13  Q.  Okay.  So you have a recollection of C.C.'s phone being

02:50PM  14  imaged or extracted at some point?

02:50PM  15  A.  Yes, that one, I recall through being at the --

02:51PM  16  Q.  Didn't personally review it?

02:51PM  17  A.  I didn't personally review it.

02:51PM  18  Q.  Kevin Myszka is another one you believe the phone was

02:51PM  19  extracted at some point?

02:51PM  20  A.  I don't know if I can even say that.  I guess based on

02:51PM  21  the fact that he was part of a DEA investigation and was

02:51PM  22  arrested, that's common practice.  But I didn't see that.

02:51PM  23  Q.  It might have happened, but you didn't personally do it?

02:51PM  24  A.  Right.  Correct.

02:51PM  25  Q.  Anybody else that you recall?

02:51PM    1   A.  I think P.H.'s was.  Again, I didn't review it.  I think

02:51PM    2   hers was imaged or copied the day that they talked with her

02:51PM    3   at the police station.

02:51PM    4   Q.  Anybody else?

02:51PM    5   A.  Not that I can recall.  I don't want to rule out that

02:51PM    6   there isn't another one here and there.

02:51PM    7   Q.  Katrina Nigro certainly is not one that you ever searched

02:51PM    8   her phone, correct?

02:51PM    9   A.  We did not.

02:51PM   10   Q.  And Katrina Nigro, you heard her testimony that she gave

02:51PM   11   you the pass code to her phone at some point?  Or no, I'm

02:51PM   12   sorry, it was her social media.  She said she gave you her

02:51PM   13   pass code to her social media?

02:52PM   14   A.  If she did, I don't recall that, and I never asked for

02:52PM   15   it.

02:52PM   16   Q.  You don't remember her doing that, do you?

02:52PM   17   A.  I don't have a distinctive memory of her doing that.  I

02:52PM   18   mean, could she have said it in passing and I don't recall

02:52PM   19   it?  That's possible.

02:52PM   20   Q.  And you don't recall ever going in and reviewing her

02:52PM   21   social media?

02:52PM   22   A.  That, I can say I did not.

02:52PM   23   Q.  Okay.  Other than what Ms. Nigro provided to you in terms

02:52PM   24   of screenshots of conversations she had, you didn't have

02:52PM   25   any other investigation into what contacts she was having

USA v Gerace - Burns - Foti/Cross - 12/17/24

02:52PM    1    with witnesses, correct?

02:52PM    2    A.   No, other than if she shared something with me.

02:52PM    3    Q.   Now, one of the phones that spent a lot of time on direct

02:52PM    4    was Peter Gerace's phone, correct?

02:52PM    5    A.   The border search one, yes.

02:52PM    6         MR. FOTI:  Can we pull up 310AT.

02:52PM    7         BY MR. FOTI:

02:52PM    8    Q.   I'm sorry, I don't mean to hold this up, but this is the

02:53PM    9    extraction report, the portion that deals with Mr. Gerace's

02:53PM   10    contacts that you were asked about on direct examination,

02:53PM   11    correct?

02:53PM   12    A.   That's correct.

02:53PM   13    Q.   And on direct examination, the government went through

02:53PM   14    and they identified the number of individuals who Mr. Gerace

02:53PM   15    has as a contact in his phone, correct?

02:53PM   16    A.   Correct.

02:53PM   17    Q.   And, obviously, having a contact of somebody in a phone

02:53PM   18    doesn't by itself mean that there's any communication with

02:53PM   19    them, correct?

02:53PM   20    A.   Correct.  It's a contact in a -- you would believe that

02:53PM   21    their storage of contact there's a purpose for that, but --

02:53PM   22    could you rephrase your question?

02:53PM   23    Q.   So, for example, you've got a -- a Smartphone, I imagine,

02:53PM   24    correct?

02:53PM   25    A.   Yeah.  Or pixel or --

02:53PM  1  Q.  So, Android or Apple, same thing, you want to add a

02:53PM  2  contact in your phone, you can add their phone number, their

02:53PM  3  names, correct?

02:53PM  4  A.  Correct.

02:53PM  5  Q.  That doesn't necessarily happen in conjunction with

02:53PM  6  sending a message or communicating, correct?

02:53PM  7  A.  Correct, absolutely.

02:54PM  8  Q.  Somebody might give you their contact information, it may

02:54PM  9  be entered with the expectation that there will be

02:54PM  10  communication down the road, right?

02:54PM  11  A.  Certainly.

02:54PM  12  Q.  And sometimes there may never be communication, correct?

02:54PM  13  A.  Absolutely.

02:54PM  14  Q.  And the contacts that are entered into the phone unless

02:54PM  15  you sort of star it or take some additional step, there's

02:54PM  16  nothing about the contacts that are ranked in term of

02:54PM  17  importance, correct?

02:54PM  18  A.  Not in the contact section.

02:54PM  19  Q.  And in terms of this exhibit, the contacts that you

02:54PM  20  mentioned in this report that's in evidence, doesn't indicate

02:54PM  21  the -- any order related to how much Peter Gerace had contact

02:54PM  22  with these individuals, correct?

02:54PM  23  A.  Correct.

02:54PM  24  Q.  The only thing this report does is indicate that at some

02:54PM  25  point, Peter Gerace or somebody using his phone, entered a

USA v Gerace - Burns - Foti/Cross - 12/17/24

220

02:54PM    1    contact for the individuals who are listed here, correct?

02:54PM    2    A.  That's correct.

02:54PM    3    Q.  And you reviewed this report during the course of your

02:54PM    4    investigation, right?

02:54PM    5    A.  Yes.

02:54PM    6    Q.  So when Mr. Tripi went through and showed you different

02:54PM    7    pages, those were things that you had seen before, right?

02:55PM    8    A.  Absolutely, yes.

02:55PM    9    Q.  So you're aware of who was entered as a contact in Peter

02:55PM    10    Gerace's phone based on this report, right?

02:55PM    11    A.  Correct.

02:55PM    12    Q.  You're also aware of names that are not in this report,

02:55PM    13    correct?

02:55PM    14    A.  In what context?

02:55PM    15    Q.  So let me ask you.  Is the name Joseph Barsuk in this

02:55PM    16    report?

02:55PM    17    A.  I do not believe it is.

02:55PM    18    **MR. FOTI:**  So, can we pull up side by side with this

02:55PM    19    Government Exhibit -- Exhibit 555?

02:55PM    20    **THE WITNESS:**  I'm sorry, did you -- did you mean the

02:55PM    21    310AT, all the contacts?

02:55PM    22    **BY MR. FOTI:**

02:55PM    23    Q.  Yeah.

02:55PM    24    A.  All the contacts?

02:55PM    25    Q.  I mean both.  So let's start with 310AT, in this document

USA v Gerace - Burns - Foti/Cross - 12/17/24

221

02:55PM 1  that's in evidence, this is -- this is a list of contacts?

02:55PM 2  A.  Some.

02:55PM 3  Q.  Yeah.  And in the report that is now in evidence, Joseph

02:55PM 4  Barsuk is not in that document, correct?

02:55PM 5  A.  I don't believe so.

02:55PM 6  Q.  Okay.

02:55PM 7  A.  I have to look at it, but I don't believe so.

02:56PM 8  Q.  And you don't recall him being in Mr. Gerace's contacts

02:56PM 9  at all, correct?

02:56PM 10  A.  Correct.

02:56PM 11  Q.  If he was, it's something that probably would have been

02:56PM 12  put into this exhibit, fair?

02:56PM 13  A.  I think that's fair.

02:56PM 14  Q.  Okay.  And he's not in this exhibit, correct?

02:56PM 15  A.  He is not.

02:56PM 16  Q.  All right.  There's another individual that's been talked

02:56PM 17  about throughout this trial, an individual named Wayne

02:56PM 18  van Vleet, who you're familiar with, correct?

02:56PM 19  A.  Correct.

02:56PM 20  Q.  All right.  In this exhibit of some of Mr. Gerace's

02:56PM 21  contacts, Wayne van Vleet is not listed, correct?

02:56PM 22  A.  That's correct.

02:56PM 23  Q.  And he is not listed in any of the contacts in Peter

02:56PM 24  Gerace's phone as far as you recall, correct?

02:56PM 25  A.  As far as I recall, correct.

02:56PM  1   Q.  If he was, it's very likely that his name would have been

02:56PM  2   placed in this report?

02:56PM  3   A.  Correct.

02:56PM  4   Q.  And it's not there, correct?

02:56PM  5   A.  That's correct.

02:56PM  6   Q.  Okay.

02:57PM  7           **MR. FOTI:**  We can take that down, thank you.

02:57PM  8           **BY MR. FOTI:**

02:57PM  9   Q.  You become involved in this investigation in 2019,

02:57PM  10  correct?

02:57PM  11  A.  Correct.

02:57PM  12  Q.  All right.  And at some point, you become involved

02:57PM  13  initially at some point prior to the search of Pharaoh's in

02:57PM  14  December of 2019, correct?

02:57PM  15  A.  Correct.  There's a meeting in January, and I think the

02:57PM  16  first kind of, like, involvement, like, an investigative step

02:57PM  17  moving forward would have been the search of

02:57PM  18  Mr. Bongiovanni's residence on June 6th, 2019.

02:57PM  19  Q.  Okay.  And I think you said on direct that that search in

02:57PM  20  June 2019 is kind of a first significant event that you were

02:57PM  21  involved in as part of this investigation, correct?

02:57PM  22  A.  Yeah, that's fair.

02:57PM  23  Q.  So you -- your initial involvement starts, there's at

02:58PM  24  least a meeting in January several months before that search,

02:58PM  25  right?

02:58PM   1   A.   Correct.

02:58PM   2   Q.   And then you're at the search of Mr. Bongiovanni's home?

02:58PM   3   A.   That's correct.

02:58PM   4   Q.   And then towards the end of the year in December, there's

02:58PM   5   the search at Pharaoh's, correct?

02:58PM   6   A.   Correct.

02:58PM   7   Q.   You were asked on direct about the fact that

02:58PM   8   Mr. Bongiovanni at some point was charged with a number of

02:58PM   9   crimes, correct?

02:58PM  10   A.   Yeah.   The end of -- I think he's indicted at the end of

02:58PM  11   October, and it's unsealed in early November.

02:58PM  12   Q.   And you testified on direct that when it was unsealed,

02:58PM  13   there was publicity related to that, correct?

02:58PM  14   A.   That's correct.

02:58PM  15   Q.   Now, in December, you said it was unsealed at some point

02:58PM  16   in November?

02:58PM  17   A.   I thought early, without seeing the document, I think

02:58PM  18   early November.

02:58PM  19   Q.   Okay.   I just wanted to confirm.   I think on direct you

02:58PM  20   had said it was around Halloween that the indictment was

02:58PM  21   filed; is that right?

02:58PM  22   A.   Right.   I think it was under seal, and then I think it

02:58PM  23   was unsealed like early November.

02:58PM  24   Q.   So let's just quickly break that down for the jury.

02:59PM  25   A.   Okay.

02:59PM   1   Q.  When indictment is filed, charges are filed against

02:59PM   2   somebody, in some instances it's initially filed under seal

02:59PM   3   so it's not available to the public, correct?

02:59PM   4   A.  Correct.  Until the defendant has their initial

02:59PM   5   appearance, and then it gets unsealed.

02:59PM   6   Q.  So when you're testifying about you think it might be

02:59PM   7   early November, you're referring to an event where the Court

02:59PM   8   unseals it, and then the indictment becomes public, correct?

02:59PM   9   A.  I believe.  I would want to see it.  It's very specific.

02:59PM  10   Q.  All right.  And then at some point after that, there's

02:59PM  11   the search of Pharaoh's in December about four to five weeks

02:59PM  12   later, right?

02:59PM  13   A.  Yes, that's accurate.

02:59PM  14   Q.  Now, prior to the execution of the searches, were you

02:59PM  15   involved in the investigation into either Mr. Bongiovanni or

02:59PM  16   Mr. Gerace in other ways?

02:59PM  17   A.  I guess I'm wondering what by "other ways" you mean?

03:00PM  18   Q.  Well, let me -- let me -- yeah, let me withdraw that and

03:00PM  19   kind of take a step back.

03:00PM  20       Your history in the FBI includes investigations into

03:00PM  21   while collar matters, correct?

03:00PM  22   A.  That's correct.

03:00PM  23   Q.  Which can occasionally include fraud matters, right?

03:00PM  24   A.  That's correct.

03:00PM  25   Q.  And before that, you have a history of investigating a

03:00PM 1    number of narcotics investigations or matters, correct?

03:00PM 2    A.  That's correct.

03:00PM 3    Q.  And a lot of that was in Tennessee, right?

03:00PM 4    A.  A lot of that, yeah, initially started working narcotics

03:00PM 5    when I first started.

03:00PM 6    Q.  But whether Tennessee or Buffalo, New York, a lot of the

03:00PM 7    same investigative techniques are used in terms of how to

03:00PM 8    advance one of these investigations, correct?

03:00PM 9    A.  Yes.

03:00PM 10   Q.  And so with investigations where there is a narcotic or

03:00PM 11   controlled substance element, undercover agents are sometimes

03:00PM 12   used to try to effectuate purchases, correct?

03:00PM 13   A.  Sometimes, yes.

03:00PM 14   Q.  And undercover officers or agents are members of law

03:01PM 15   enforcement who are acting as if they are a customer or a

03:01PM 16   potential patron of a particular --

03:01PM 17   A.  Yeah.  Correct.

03:01PM 18   Q.  Separate from utilizing undercovers, investigations can

03:01PM 19   utilize cooperating individuals, proactively cooperating

03:01PM 20   defendants, as part of trying to effectuate purchases,

03:01PM 21   correct?

03:01PM 22   A.  It depends on the circumstances.

03:01PM 23   Q.  So obviously in some circumstances, in investigations,

03:01PM 24   you're weighing a number of things such as safety concerns,

03:01PM 25   right?

03:01PM  1   A.  Safety concerns.  I mean, is there -- if it's smaller

03:01PM  2   amounts, are people using it, we can't have them use it.  Is

03:01PM  3   it, you know, gonna take a lot of -- how are we gonna get

03:01PM  4   into the group, things like that.  So there's a lot of

03:01PM  5   variables.  I just don't want to paint it with a broad brush.

03:01PM  6   Q.  Yeah, and I'm not -- what I'm asking about isn't intended

03:01PM  7   to suggest that this is something utilized in every

03:02PM  8   investigation, but it is a tactic that can be used in

03:02PM  9   investigations, correct?

03:02PM  10  A.  Definitely.

03:02PM  11  Q.  Individuals who are proactively cooperating and

03:02PM  12  attempting to sort of act in substitute to an undercover

03:02PM  13  officer, correct?

03:02PM  14  A.  Like an informant, certainly.

03:02PM  15  Q.  Surveillance is used during the course of a lot of

03:02PM  16  investigations, correct?

03:02PM  17  A.  It can be, yeah.

03:02PM  18  Q.  And there was surveillance utilized during the course of

03:02PM  19  this investigation, correct?

03:02PM  20  A.  There was some, not a lot.  This is more what I would

03:02PM  21  call, like, a historical conspiracy.

03:02PM  22  Q.  So in terms of the witnesses who gave observations about

03:02PM  23  Pharaoh's that you summarized, or you listed on your summary

03:02PM  24  chart, a lot of them are testifying to things that happened

03:02PM  25  further in the past, correct?

03:02PM    1    A.  Correct.

03:02PM    2    Q.  But the search in December of 2019, was -- was utilized

03:02PM    3    to collect evidence in regard to this investigation, correct?

03:03PM    4    A.  That's correct.  That was the goal.

03:03PM    5    Q.  And that was a search done at the end of 2019, December

03:03PM    6    2019?

03:03PM    7    A.  Yeah.  December 12th, I believe.

03:03PM    8    Q.  Up to that point, you were still engaging in an

03:03PM    9    investigation prior to the arrest of Mr. Gerace, correct?

03:03PM    10    A.  Correct.

03:03PM    11    Q.  And as part of that investigation, there were a number of

03:03PM    12    tactics that you could use to try to advance that

03:03PM    13    investigation, correct?

03:03PM    14    A.  Yes.

03:03PM    15    Q.  Okay.

03:03PM    16    A.  Correct.

03:03PM    17    Q.  And did you -- did -- during the course of your

03:03PM    18    involvement in the investigation, did you ever -- were you

03:03PM    19    ever involved in an undercover officer or agent attempting to

03:03PM    20    try to make a transaction --

03:03PM    21         **MR. TRIPI:**  Objection at this point, Judge.  Law

03:03PM    22    enforcement techniques are not -- you're going to give an

03:03PM    23    instruction on this, I believe.

03:03PM    24         **THE COURT:**  Well, let him finish the question.

   25

03:03PM   1              **BY MR. FOTI:**

03:03PM   2    Q.  So during the course of your involvement in the

03:03PM   3    investigation, was there ever an attempt to have an

03:03PM   4    undercover either purchase drugs or engage in a commercial

03:03PM   5    sex act at Pharaoh's?

03:03PM   6              **THE COURT:**  Don't answer.

03:04PM   7              **MR. TRIPI:**  Now I have an objection.

03:04PM   8              **THE COURT:**  I -- let me think.

03:04PM   9              Come on up.  Come on up, guys.

03:04PM  10              (Sidebar discussion held on the record.)

03:04PM  11              **THE COURT:**  So, the jury's going to be instructed --

03:04PM  12    you're right, specific investigative techniques are not

03:04PM  13    necessary.

03:04PM  14              But the jury is going to be instructed that they can

03:04PM  15    decide based on the evidence or lack of evidence.

03:04PM  16              **MR. TRIPI:**  And those are -- I think those are two

03:04PM  17    mutually exclusive instructions and things, and he can argue

03:04PM  18    the lack of evidence or the lack of the quality of the

03:04PM  19    evidence and various aspects, but -- based on what has or

03:04PM  20    hasn't entered.  But in terms of, you know, a line of cross

03:04PM  21    that repeatedly hits at the opposite of what you're

03:04PM  22    instructing them as to, you're gonna -- if you give the

03:04PM  23    standard instruction that you normally give, Judge, you're

03:04PM  24    gonna say law enforcement techniques are not for your

03:05PM  25    consideration, ergo, why are we spending so much time on --

03:05PM   1        **THE COURT:**  Yeah.  So why -- Mr. Foti, why -- what is

03:05PM   2    the -- what is the relevance of, I assume the answer to this

03:05PM   3    is gonna be no, he didn't try to do that.  So what's the

03:05PM   4    relevance?

03:05PM   5        **MR. FOTI:**  I think it is relevant to the other charge

03:05PM   6    and the other point that there is certain areas where the jury

03:05PM   7    can consider there to be a lack of evidence.

03:05PM   8         And I understand the point.  I'm not trying to

03:05PM   9    insinuate that there's obligation to engage in a certain

03:05PM  10    tactic or a certain law-enforcement technique.  I don't think

03:05PM  11    I've asked that question.

03:05PM  12        **THE COURT:**  So then what is the relevance to the fact

03:05PM  13    that they didn't make a -- a buy, an undercover buy?

03:05PM  14        **MR. FOTI:**  It does speak to the insufficiency of the

03:05PM  15    evidence.  That that's not something for the jury to be able

03:05PM  16    to consider.

03:05PM  17        **THE COURT:**  No, no, you can argue that were no

03:05PM  18    controlled buys.  That's a fact.

03:05PM  19        **MR. FOTI:**  Okay.  So this thing, I see what you're

03:05PM  20    saying.  The distinction is --

03:05PM  21        **THE COURT:**  You're asking -- you're asking him --

03:06PM  22        **MR. FOTI:**  I -- I don't -- I think it survives a

03:06PM  23    relevance test.  If he's the case agent, he's involved in the

03:06PM  24    investigation, and there's certain things they did do that are

03:06PM  25    fair game and certain things they didn't, it can be considered

03:06PM   1   as part, as long as it's not being insinuated that there was

03:06PM   2   an obligation --

03:06PM   3        **THE COURT:**  There's no evidence of controlled buys,

03:06PM   4   right?

03:06PM   5        **MR. TRIPI:**  So during this investigation, no.  But in

03:06PM   6   candor, on redirect, if we go down this path, there were

03:06PM   7   historical buys attempted by the state police in 2015 and

03:06PM   8   2016.  And then there was a spin-off investigation because two

03:06PM   9   Cheektowaga officers ran the plate of the undercover.  One of

03:06PM   10  the days the plate was run was a day the undercover wasn't

03:06PM   11  there.

03:06PM   12       So there's this whole separate potential corruption

03:06PM   13  investigation spinoff into who from the Cheektowaga police may

03:06PM   14  have, may have, I want to be careful here, may have tipped off

03:06PM   15  a state police investigation.

03:07PM   16       **THE COURT:**  I don't think you can get into there are

03:07PM   17  no controlled buys here.  But I think you can get into

03:07PM   18  investigative techniques that can be used.  So that you can

03:07PM   19  then argue, you heard him say that you can do controlled buys.

03:07PM   20  Is a controlled buy something you do in a drug investigation?

03:07PM   21  Yes.

03:07PM   22       I think you can do that, and then argue that you've

03:07PM   23  got no evidence of controlled buys here.

03:07PM   24       **MR. TRIPI:**  Yeah.  I'll address what I can on

03:07PM   25  redirect, Judge, I got it.

03:07PM    1              (End of sidebar discussion.)

03:07PM    2              **THE COURT:**  So the objection to that question is

03:07PM    3    sustained, but you can ask another question.

03:07PM    4              **BY MR. FOTI:**

03:07PM    5    Q.  Okay.  So in your involvement with the FBI, you're

03:07PM    6    familiar with investigative techniques that can include

03:07PM    7    things like undercover buys in regards to drug trafficking,

03:07PM    8    correct?

03:08PM    9    A.  Correct.

03:08PM   10    Q.  And there can also be undercover transactions in regards

03:08PM   11    to other types of investigations, as well, correct?

03:08PM   12    A.  Bribery?

03:08PM   13    Q.  Bribery would be an example, that's true, right?

03:08PM   14    A.  If that's where you're going, yes.

03:08PM   15    Q.  Sex trafficking is another type of investigation where an

03:08PM   16    undercover --

03:08PM   17    A.  You have to be careful with that.  I mean, a lot of

03:08PM   18    these, if you look at all the circumstances around that,

03:08PM   19    obviously that one would be pretty tenuous, you would have to

03:08PM   20    have a --

03:08PM   21    Q.  You have to be careful because obviously the interaction

03:08PM   22    could go too far, right?

03:08PM   23    A.  Or even, I mean, is that person in danger.  Do you need

03:08PM   24    to effectuate an arrest in the beginning?  I mean, that one

03:08PM   25    would be -- a lot of things to consider before pursuing an

03:08PM    1    undercover related to a sex trafficking investigation.

03:08PM    2    Q.  But it can be done, correct?

03:08PM    3    A.  Yeah, it could be done.

03:08PM    4    Q.  Now, search warrants.  The utilization of search warrants

03:08PM    5    are part of conducting an -- it's an investigative technique

03:09PM    6    and part of trying to advance an investigation, correct?

03:09PM    7    A.  That's correct.

03:09PM    8    Q.  Okay.  And there was some testimony about it pretty early

03:09PM    9    on, but a search warrant for the jury is authorization by a

03:09PM    10   court to conduct the search of somebody's property, correct?

03:09PM    11   A.  Correct.  You put together an affidavit.  The judge --

03:09PM    12   you have to present it to the judge.  And if he finds that

03:09PM    13   there's probable cause that evidence of a crime would be at

03:09PM    14   that location or that device, then you're authorized to

03:09PM    15   search it.

03:09PM    16   Q.  So what you're referring to or the answer you just gave

03:09PM    17   was a reference to the procedure that precedes getting the

03:09PM    18   authorization to search, correct?

03:09PM    19   A.  Correct.

03:09PM    20   Q.  It requires a whole lot of writing in some instances,

03:09PM    21   correct?

03:09PM    22   A.  Depending on how involved the probable cause is.

03:09PM    23   Q.  And when you say the probable cause, you're laying out

03:09PM    24   the reason why you believe there's a basis to search a

03:09PM    25   particular area for a particular type of contraband or

USA v Gerace - Burns - Foti/Cross - 12/17/24

233

03:10PM   1    evidence, correct?

03:10PM   2    A.   Correct.

03:10PM   3    Q.   And it's -- it's a different -- totally different type of

03:10PM   4    thing than what the jury has to consider, probable cause is a

03:10PM   5    different type of standard of proof, correct?

03:10PM   6    A.   Yes, it's probable cause versus beyond a reasonable

03:10PM   7    doubt.

03:10PM   8    Q.   And in any event, you get authorization to search an

03:10PM   9    area, and in some instances, as a result of that search, you

03:10PM   10   locate evidence, correct?

03:10PM   11   A.   Correct.

03:10PM   12   Q.   Or in some cases, when you're looking for drugs, for

03:10PM   13   example, you may find the drugs, correct?

03:10PM   14   A.   Correct.

03:10PM   15   Q.   And there was talk about, during the course of this

03:10PM   16   trial, about other searches that were executed including one

03:10PM   17   for Anthony Gerace, right?

03:10PM   18   A.   Correct.

03:10PM   19   Q.   Now, that was a similar procedure about going and getting

03:10PM   20   authorization to conduct a search, correct?

03:10PM   21   A.   Correct.

03:10PM   22   Q.   And in that instances -- in that instance, there was

03:10PM   23   evidence collected of actual drugs, correct?

03:10PM   24   A.   Yes.  Both marijuana, edibles, and firearms.

03:10PM   25   Q.   Now, in terms of the search of Pharaoh's in 2019, I think

USA v Gerace - Burns - Foti/Cross - 12/17/24

03:11PM   1   there was some -- were there drugs found at Pharaoh's in

03:11PM   2   2019?

03:11PM   3   A.   Possibly a small amount.  I think there was some

03:11PM   4   marijuana, some residue, some paraphernalia.

03:11PM   5   Q.   Yeah, I'm having a hard time remembering, too.  But it

03:11PM   6   was something pretty insignificant, correct?

03:11PM   7   A.   I'd have to see the search log to recall, but --

03:11PM   8   Q.   You don't recall what it was?

03:11PM   9   A.   It was -- I believe it was some paraphernalia and maybe a

03:11PM   10  small amount of marijuana off the top of my head.

03:11PM   11  Q.   Okay.

03:11PM   12  A.   Along with records.  I mean, you're talking about

03:11PM   13  evidence, if you're looking just for narcotics, but there was

03:11PM   14  a lot of -- there's some -- a lot of document evidence was

03:11PM   15  also seized.

03:11PM   16  Q.   And we talked a little bit of that earlier that included

03:11PM   17  personnel records, correct?

03:11PM   18  A.   Correct.

03:11PM   19  Q.   That gave you information about prior employees, correct?

03:11PM   20  A.   Correct.

03:11PM   21  Q.   It included financial documents, correct?

03:11PM   22  A.   Yeah, some of the financial records.

03:12PM   23  Q.   And in addition, on direct, you were asked about the

03:12PM   24  seizure of certain video equipment, correct?

03:12PM   25  A.   Correct.

03:12PM    1    Q.   Okay.   Now --

03:12PM    2         **THE COURT:**  Mr. Foti, when you're at a good time to

03:12PM    3    break, I'd like to talk to you folks up at the bench again.

03:12PM    4         Go ahead, you can keep going.

03:12PM    5         **MR. FOTI:**  I think this is the beginning of a whole

03:12PM    6    'nother section.

03:12PM    7         **THE COURT:**  Then come on up.

03:12PM    8         (Sidebar discussion held on the record.)

03:12PM    9         **THE COURT:**  So, I think the questions about whether

03:12PM   10    the government did controlled buys or not are fair game.

03:12PM   11         The charge says, begins, during the trial you have

03:12PM   12    heard testimony of witnesses and argument by counsel that the

03:12PM   13    government did not use specific investigative techniques.  You

03:12PM   14    may consider these facts in deciding whether the government

03:12PM   15    has met its burden of proof because, as I told you, you should

03:12PM   16    look at all the evidence or lack of evidence in deciding

03:12PM   17    whether Mr. Gerace is guilty.

03:12PM   18         You also should understand that there's been a legal

03:13PM   19    requirement that the government use any specific investigative

03:13PM   20    technique to prove its case.  Although law enforcement

03:13PM   21    techniques may be of interest to you, et cetera, et cetera.

03:13PM   22         But -- during the trial, have you heard testimony of

03:13PM   23    witnesses and argument of counsel that the government did not

03:13PM   24    use specific investigative techniques.

03:13PM   25         So, if you want to get into that, you can.

03:13PM    1              Mr. Tripi says he has stuff he wants to get into on

03:13PM    2    redirect, and he can do that.

03:13PM    3         **MR. TRIPI:**  I think he did get some of those

03:13PM    4    questions out, I don't know if he wants to circle back

03:13PM    5    further, but I stopped objecting after our bench conference,

03:13PM    6    and I think he followed up.

03:13PM    7         **THE COURT:**  I understand.  I just want you to know, I

03:13PM    8    want to make it clear, that if you want to get into questions

03:13PM    9    about whether controlled buys were used, and those kinds of

03:13PM   10    things, you can do that.

03:13PM   11              Because as soon as you guys left, I was thinking of

03:13PM   12    what the charge was, and asked Rebecca to send it to me.  And

03:13PM   13    then I realized it does have that preamble in the charge.  So

03:13PM   14    I'm not precluding you, I'm reversing myself on the prior

03:13PM   15    decision, I'm not precluding you from getting into it.

03:14PM   16         **MR. FOTI:**  I've also thought we can do that.

03:14PM   17    Sometimes Mr. Tripi is so convincing that I start to think

03:14PM   18    that --

03:14PM   19         **MR. TRIPI:**  See, I walked away thinking I lost the

03:14PM   20    argument.

03:14PM   21         **THE COURT:**  Yeah.  So, but you can, Mr. Foti, just so

03:14PM   22    you understand.

03:14PM   23              (End of sidebar discussion.)

03:14PM   24         **MR. FOTI:**  We're going until 3:30 judge?

03:14PM   25         **THE COURT:**  Yeah.  I don't think it's a hard stop at

03:14PM    1   3:30.  I think one of our jurors has to leave by 3:45, but

03:14PM    2   yeah.

03:14PM    3              **BY MR. FOTI:**

03:14PM    4   Q.  Okay.  So, sir, I wanted to ask you about something that

03:14PM    5   you briefly testified about on direct, and that's a reference

03:14PM    6   to certain DVR equipment that was seized at Pharaoh's.

03:14PM    7   A.  That's correct.

03:14PM    8   Q.  Okay.  So, now, on direct, you testified that there was

03:14PM    9   essentially three different units, three DVR units located at

03:15PM   10   Pharaoh's in December of 2019, correct?

03:15PM   11   A.  Correct.

03:15PM   12   Q.  Okay.  And when the search was completed, those DVRs had

03:15PM   13   been retained by law enforcement for further review, correct?

03:15PM   14   A.  Correct.

03:15PM   15   Q.  And as part of what you were reviewing was, or part of

03:15PM   16   what was going to be done at that point was looking through

03:15PM   17   the video footage to determine if it has any evidentiary

03:15PM   18   value, correct?

03:15PM   19   A.  Correct.  It was seized pursuant to that.

03:15PM   20   Q.  And when you testified on direct about how far the

03:15PM   21   footage goes back, that was something that was learned during

03:15PM   22   the course of the review of that footage, correct?

03:15PM   23   A.  Correct.  From other agents who did the review.

03:15PM   24   Q.  Okay.  And I think you and Special Agent Marilyn Halliday

03:15PM   25   was personally involved in the review of a significant amount

03:15PM    1    of that footage, correct?

03:15PM    2    A.  Correct.

03:15PM    3    Q.  But obviously, footage of what was happening at Pharaoh's

03:16PM    4    was of interest to everybody on the investigative team,

03:16PM    5    correct?

03:16PM    6    A.  Correct.

03:16PM    7    Q.  And so there were discussions about what was contained in

03:16PM    8    those DVRs, correct?

03:16PM    9    A.  Correct.  From a timeframe, I can't recall.  But I know

03:16PM   10    that there was some discussions about that at some point.

03:16PM   11    Q.  So I'm going to ask you some questions about it, and just

03:16PM   12    answer the ones you can, or if you need --

03:16PM   13    A.  Sure.

03:16PM   14    Q.  -- to have your recollection refreshed, let me know.

03:16PM   15        All right.  Now, as part of keeping this evidence

03:16PM   16    organized, the DVRs were essentially identified as DVR 1, 2,

03:16PM   17    and 3, correct?

03:16PM   18    A.  That's correct.

03:16PM   19    Q.  And you understood DVR 1 to be an equipment that

03:16PM   20    contained video footage of primarily the VIP Room and the

03:16PM   21    stage, correct?

03:16PM   22    A.  I think DVR 1, I believe -- it was I believe eight

03:17PM   23    cameras, six of which were related to the VIP, one of which

03:17PM   24    might have been the edge of the stage, and I think one there

03:17PM   25    ws no recording that was retrievable.

03:17PM    1    Q.   Right.   Okay.   Now earlier on direct you testified about

03:17PM    2    one of the DVRs had footage that goes back, I think you said

03:17PM    3    it was approximately seven weeks, correct?

03:17PM    4    A.   Approximately.

03:17PM    5    Q.   Now when you said that on direct, you were referring to

03:17PM    6    DVR 1, right?

03:17PM    7    A.   Correct.

03:17PM    8    Q.   So DVR 1 has six different camera angles of the VIP

03:17PM    9    rooms, correct?

03:17PM   10    A.   Correct.

03:17PM   11    Q.   And then as you testified to, there's one camera angle in

03:17PM   12    DVR 1 of the stage?

03:17PM   13    A.   Right.   To the left of the stage, I believe.

03:17PM   14    Q.   And then one camera that's sort of a dead camera?

03:17PM   15    A.   Correct.

03:17PM   16    Q.   This footage went back to October 21st of 2019, correct?

03:17PM   17    A.   Correct.

03:17PM   18    Q.   And the search occurs on December 12th of 2019, right?

03:17PM   19    A.   Correct.

03:17PM   20    Q.   So, when you estimated about seven weeks, you're

03:17PM   21    referring to the footage goes back from when you searched

03:18PM   22    back to October 21st of 2019?

03:18PM   23    A.   I -- that sounds correct, without looking at the report.

03:18PM   24    Q.   And that was a date that preceded Mr. Bongiovanni being

03:18PM   25    charged, correct?

03:18PM    1    A.  Correct, was the 19th.

03:18PM    2    Q.  And certainly, it preceded the date of whenever

03:18PM    3    Mr. Bongiovanni's indictment was unsealed, correct?

03:18PM    4    A.  Oh, the beginning of it would be, and then it would go up

03:18PM    5    through the time that it was unsealed.

03:18PM    6    Q.  Okay.  Now, in terms of the geography of Pharaoh's, had

03:18PM    7    you ever been in there prior to -- prior to the search?

03:18PM    8    A.  I had not.

03:18PM    9    Q.  Okay.  So on that day, in addition to any interviews or

03:18PM    10   other responsibilities you had, you also were taking --

03:18PM    11   making observations of the layout, correct?

03:18PM    12   A.  The first one I didn't make it up to the upstairs.

03:18PM    13   Q.  Oh, you didn't go upstairs?

03:18PM    14   A.  No, I did not.

03:18PM    15   Q.  No?

03:18PM    16   A.  No, I spent most of my time with Mr. Ermin.

03:18PM    17   Q.  You talked about that on direct.  Mr. Ermin was another

03:19PM    18   manager that you interviewed?

03:19PM    19   A.  Yeah, Tommy O, a manager.

03:19PM    20   Q.  So he was the general manager at the time that the search

03:19PM    21   was conducted?

03:19PM    22   A.  Correct.  He was there opening it when we got in there.

03:19PM    23   Q.  Okay.  So during the course of the search, there's a

03:19PM    24   point where you have a conversation with Mr. Ermin and ask

03:19PM    25   him questions relevant to the investigation, correct?

USA v Gerace - Burns - Foti/Cross - 12/17/24

03:19PM  1   A.  Correct.

03:19PM  2   Q.  You also had to walk through different areas of the first

03:19PM  3   floor; is that fair?

03:19PM  4   A.  That's fair.

03:19PM  5   Q.  Had you walked into the VIP area?

03:19PM  6   A.  I believe the interview, it's been some time, but we were

03:19PM  7   kind of on the edge of it.

03:19PM  8   Q.  In the hallway?

03:19PM  9   A.  I think there was a table near there.  I remember seeing

03:19PM  10  that area a little bit.  I don't think I sat on those

03:19PM  11  couches.

03:19PM  12  Q.  Your loss.

03:19PM  13      So, okay.  So in terms of the geography, you enter

03:19PM  14  Pharaoh's, you remember the -- you remember seeing the main

03:19PM  15  stage, correct?

03:19PM  16  A.  Yeah, absolutely.

03:19PM  17  Q.  Okay.  And you remember -- there's been testimony about

03:20PM  18  that there's sort of a hallway that goes off of that,

03:20PM  19  correct?

03:20PM  20  A.  It came in through kind of like the side, like the

03:20PM  21  employee entrance, and that's when Mr. Ermin was there.  And

03:20PM  22  we walked through there.  There was kind of where you -- I

03:20PM  23  remember the office, I did go in there.  Downstairs office,

03:20PM  24  not upstairs.  And then I thought we ended up at like a

03:20PM  25  little table kind of near the VIP.

USA v Gerace - Burns - Foti/Cross - 12/17/24

| | | |
|---|---|---|
| 03:20PM | 1 | Q.  Okay.  Do you agree that there's -- off of the main floor |
| 03:20PM | 2 | area, there's sort of two separate hallways, one that goes |
| 03:20PM | 3 | towards the office, and one that goes towards the VIP; is |
| 03:20PM | 4 | that your recollection? |
| 03:20PM | 5 | A.  Best I can recall.  I was pretty focused on Mr. Ermin. |
| 03:20PM | 6 | Q.  Okay.  Fair enough.  Do you -- you said you think that |
| 03:20PM | 7 | you had the interview of Mr. Ermin sort of near the entrance |
| 03:20PM | 8 | or close to the VIP area as you can recall? |
| 03:20PM | 9 | A.  As I can recall. |
| 03:20PM | 10 | Q.  You don't recall ever having went into the VIP area? |
| 03:20PM | 11 | A.  I think I looked in there, or maybe I walked through it. |
| 03:20PM | 12 | I was really kind of laser focused on Mr. Ermin.  We went |
| 03:21PM | 13 | spent a lot of time together. |
| 03:21PM | 14 | Q.  In terms of what you may remember from the VIP area, you |
| 03:21PM | 15 | agree there's no doors on the VIP areas, correct? |
| 03:21PM | 16 | A.  I remember seeing, is an open area.  I mean, there might |
| 03:21PM | 17 | have been a hallway that led to it. |
| 03:21PM | 18 | Q.  Okay.  That's okay.  In any event, you -- you are at |
| 03:21PM | 19 | least aware of, during the course of your investigation, that |
| 03:21PM | 20 | there is a VIP area that -- that can be walked through in the |
| 03:21PM | 21 | back, correct? |
| 03:21PM | 22 | A.  Correct, yeah. |
| 03:21PM | 23 | Q.  And that in the VIP area, there's a number of couches |
| 03:21PM | 24 | that you referenced a little while ago? |
| 03:21PM | 25 | A.  Correct, yes. |

03:21PM   1   Q.  And in some of the rooms in the VIP area, there's

03:21PM   2   multiple couches, correct?

03:21PM   3   A.  Correct.  As I recall.

03:21PM   4   Q.  And your understanding is that there might be multiple

03:21PM   5   dances going on at the same time in the same room, correct?

03:21PM   6   A.  Based on testimony and just pictures from there.

03:21PM   7   Q.  And did you review some of the video footage yourself?

03:21PM   8   A.  I never -- I did not review the video footage myself.

03:21PM   9   Q.  So your understanding of what's in the video footage is

03:21PM  10   just based on communication as part of the investigation?

03:22PM  11   A.  Correct.  Reviewing reports and things like that.

03:22PM  12   Q.  Okay.  In any event, you understood sort of the breakdown

03:22PM  13   of what was depicted in DVR 1 as far as the cameras, correct?

03:22PM  14   A.  Correct, yes.

03:22PM  15   Q.  And you have already testified at this point that for six

03:22PM  16   of the cameras, they were different angles of different rooms

03:22PM  17   inside the VIP area, correct?

03:22PM  18   A.  They were in the -- focused on the VIP area, is probably

03:22PM  19   an accurate way to say it.

03:22PM  20   Q.  And is it your understanding as part of this

03:22PM  21   investigation that those -- that video footage from DVR 1 did

03:22PM  22   depict generally lap dances taking place?

03:22PM  23   A.  Yes, it did.

03:22PM  24   Q.  So from October 31st of 2019 until the time of the

03:22PM  25   search, there were lap dances happening in that VIP area,

03:22PM    1    correct?

03:22PM    2    A.  Correct.

03:22PM    3    Q.  And what was depicted in the cameras on DVR 1 was

03:22PM    4    recordings of those lap dances over about a seven-week

03:23PM    5    period, correct?

03:23PM    6    A.  Correct.

03:23PM    7    Q.  And those were -- is it fair to say that your

03:23PM    8    understanding from being involved in the investigation is

03:23PM    9    those cameras covered different rooms within the VIP area?

03:23PM   10    A.  My understanding is, yeah, they were over the VIP area.

03:23PM   11    I wasn't -- I was aware -- my understanding was there were

03:23PM   12    certain areas that the cameras couldn't see.

03:23PM   13    Q.  So, some of the cameras would -- would kind of peer into

03:23PM   14    one of those little side rooms sort of from the side, right?

03:23PM   15    A.  Possibly.  And, again, that's my understanding.

03:23PM   16    Q.  Okay.

03:23PM   17    A.  But I have not independently reviewed the footage.

03:23PM   18    Q.  Okay.  If I ask you about camera 1 specifically showing a

03:23PM   19    room that's sectioned off into three areas containing

03:23PM   20    different love seats, is that something that you are familiar

03:23PM   21    with?

03:23PM   22    A.  Again, because I didn't review the footage, I know that

03:24PM   23    the cameras covered the VIP area, is what my understanding of

03:24PM   24    it was.  And then I think there's that -- the Champagne area,

03:24PM   25    too, it's attached in some way.

03:24PM    1    Q.  Were you familiar at some point with what each one of

03:24PM    2    those cameras showed?

03:24PM    3    A.  Generally, I would say, again, the -- my understanding

03:24PM    4    was the VIP area.

03:24PM    5    Q.  All right.  And that's what I'm ultimately asking is

03:24PM    6    you're aware a report was produced in regard to what the

03:24PM    7    video footage showed, correct?

03:24PM    8    A.  Yes, I am familiar with that report.

03:24PM    9    Q.  And did you ever review that report?

03:24PM   10    A.  Yes, I've reviewed it.

03:24PM   11    Q.  And would reviewing that report refresh your recollection

03:24PM   12    as to what was depicted on each of those tapes?

03:24PM   13    A.  Yes, it would.

03:24PM   14         **MR. FOTI:**  Can we, for the witness only, pull up

03:24PM   15    3539ED.  And go to page 2, please.

03:25PM   16         **BY MR. FOTI:**

03:25PM   17    Q.  Okay.  Is that big enough to read?

03:25PM   18    A.  Yes.

03:25PM   19    Q.  Can you take a moment to look through that in regards to

03:25PM   20    cameras 1 through 3?

03:25PM   21    A.  Certainly.  Do you want me to focus on 1 through 3?

03:25PM   22    Q.  Yeah.  Just what I want to ask about --

03:25PM   23    A.  Okay.

03:25PM   24    Q.  -- is sort of this area.

03:25PM   25    A.  Got it.  Yeah.

03:25PM   1    Q.  And I don't mean to rush you, whenever you're done let us

03:26PM   2    know.

03:26PM   3    A.  Okay.

03:26PM   4    Q.  Okay.  And does that refresh your recollection generally?

03:26PM   5    A.  Generally, yeah.

03:26PM   6    Q.  Okay.  So camera 1 was of a room that was sectioned off

03:26PM   7    into three different areas, correct?

03:26PM   8    A.  That's correct.

03:26PM   9    Q.  Okay.  And the -- in that -- and that particular camera

03:26PM   10   depicted lap dances over the course of a period of time that

03:26PM   11   we talked about, right?

03:26PM   12   A.  That's correct.

03:26PM   13   Q.  And as part of that, there was observations made of

03:26PM   14   things that would typically be part of a lap dance, including

03:26PM   15   dancing, as well as a customer seated as -- during the course

03:26PM   16   of the lap dance, correct?

03:26PM   17   A.  Correct.

03:26PM   18   Q.  The ultimate determination in terms of camera 1 was that

03:27PM   19   it had no relevant information to the investigation, correct?

03:27PM   20   A.  Can I look at the report again?

03:27PM   21   Q.  It should be still pulled up.

03:27PM   22   A.  Yeah.

03:27PM   23   Q.  So just directing your attention to kind of right here.

03:27PM   24       And if, you're looking at the second sentence, refreshes

03:27PM   25   your recollection, let us know?

03:27PM    1    A.   Yeah, that's what the report states.

03:27PM    2    Q.   Okay.  And ultimately, that's consistent with the

03:27PM    3    determination that that footage was not going to be part of

03:27PM    4    this trial, correct?

03:27PM    5    A.   Correct.

03:27PM    6    Q.   Camera 2 was of a different angle inside the VIP area,

03:27PM    7    correct?  Oh, no, I'm sorry.  Camera 2 is of the stage; is

03:27PM    8    that right?

03:27PM    9    A.   That's correct.

03:27PM    10   Q.   And obviously, during the course of this trial, there

03:27PM    11   hasn't been the same type of allegations presented about the

03:27PM    12   stage, but there was no relevant information that was pulled

03:27PM    13   from camera 2, correct?

03:27PM    14   A.   Correct.  That's what the report says.

03:27PM    15   Q.   All right.  Camera 3 was another room in the VIP area, it

03:28PM    16   was a longer room containing a -- a brown love seat/couch,

03:28PM    17   right?

03:28PM    18   A.   That's correct.

03:28PM    19   Q.   Okay.  And again, observations made during the course of

03:28PM    20   the review of that footage that there was lap dances that

03:28PM    21   took place, correct?

03:28PM    22   A.   That's correct.

03:28PM    23   Q.   But ultimately, it was determined there was no relevant

03:28PM    24   information, correct?

03:28PM    25   A.   That's what the report indicates.

03:28PM  1  Q.  Okay.  And obviously, that footage wasn't shown to this

03:28PM  2  jury at any point during the trial, correct?

03:28PM  3  A.  That's correct.

03:28PM  4  Q.  Camera 4 was -- was footage of the first room when you

03:28PM  5  first enter the VIP Room, correct?

03:28PM  6  A.  Can I get that quick --

03:28PM  7  Q.  Can we go to the next page?

03:28PM  8  A.  -- next page.  Correct.

03:29PM  9  Q.  Yeah.  And in fact, just to save sort of time here --

03:29PM  10  A.  Yeah.

03:29PM  11  Q.  -- camera 4 and 5 were both different angles within this

03:29PM  12  room, correct?

03:29PM  13  A.  Right.  Camera 4 appears to have one love seat, and the

03:29PM  14  other one has three love seats.

03:29PM  15  Q.  And your understanding is that it covered different

03:29PM  16  angles within one specific room, correct?

03:29PM  17  A.  That's my understanding.

03:29PM  18  Q.  And it's also your understanding that camera 4 did not

03:29PM  19  produce any relevant information to this investigation,

03:29PM  20  correct?

03:29PM  21  A.  That's what the report indicates.

03:29PM  22  Q.  And that was your understanding, is there was no

03:29PM  23  evidentiary value provided to the investigation, correct?

03:29PM  24      Setting aside the report for a second, there was

03:29PM  25  discussion of whether this DVR footage would be helpful,

| | | |
|---|---|---|
| 03:29PM | 1 | right? |
| 03:29PM | 2 | A.  Discussion -- |
| 03:29PM | 3 | **MR. TRIPI:**  Objection, hearsay. |
| 03:29PM | 4 | **THE COURT:**  Hang on.  Sustained. |
| 03:30PM | 5 | **BY MR. FOTI:** |
| 03:30PM | 6 | Q.  The DVR was seized during the course of the search |
| 03:30PM | 7 | warrant in December 2019, correct? |
| 03:30PM | 8 | A.  Correct. |
| 03:30PM | 9 | Q.  And it was seized with the purpose of determining whether |
| 03:30PM | 10 | there was any evidentiary value, correct? |
| 03:30PM | 11 | A.  Correct. |
| 03:30PM | 12 | Q.  And the hours spent reviewing it were -- were the reason |
| 03:30PM | 13 | that it was reviewed was for the purpose of determining |
| 03:30PM | 14 | whether there was, in fact, any evidentiary value to the |
| 03:30PM | 15 | footage, correct? |
| 03:30PM | 16 | A.  Correct. |
| 03:30PM | 17 | Q.  And there was a significant amount of footage to review, |
| 03:30PM | 18 | correct? |
| 03:30PM | 19 | A.  My understanding it was, took us -- it was a significant |
| 03:30PM | 20 | amount of footage. |
| 03:30PM | 21 | Q.  And in terms of the review of that footage, it was your |
| 03:30PM | 22 | understanding as part of this investigation if there was any |
| 03:31PM | 23 | evidentiary value to that, it would be utilized as part of -- |
| 03:31PM | 24 | **MR. TRIPI:**  Objection. |
| 03:31PM | 25 | **THE COURT:**  Sustained. |

03:31PM    1          **BY MR. FOTI:**

03:31PM    2    Q.  In terms of --

03:31PM    3          **THE COURT:**  I'm not precluding you from asking about

03:31PM    4    whether he saw any of that footage.  I want you to understand

03:31PM    5    that.

03:31PM    6          **BY MR. FOTI:**

03:31PM    7    Q.  So, did you -- when we asked about these different

03:31PM    8    cameras, including camera 4 and 5 is what I was specifically

03:31PM    9    asking about, did you review it yourself?

03:31PM   10    A.  I did not.

03:31PM   11    Q.  Okay.  So your understanding about whether it had any

03:31PM   12    relevant information was based on the review of other members

03:31PM   13    of the team, correct?

03:31PM   14    A.  Correct.

03:31PM   15    Q.  Okay.  And is it your understanding that cameras 4 and 5

03:31PM   16    did not have any relevant information?

03:31PM   17    A.  Based on the report, I guess the only caveat, I think

03:31PM   18    this ultimately turned out to be outside the timeframe of our

03:31PM   19    conspiracy.  So, I mean, you're asking about whether it was

03:31PM   20    used or not.  I don't know.

03:32PM   21    Q.  So at the time you just referred to the timeframe of the

03:32PM   22    conspiracy, and you're referencing the timeframe and the

03:32PM   23    charges in the indictment, correct?

03:32PM   24    A.  Correct.

03:32PM   25    Q.  At this point, Mr. Gerace was not charged, correct?

USA v Gerace - Burns - Foti/Cross - 12/17/24

251

03:32PM      1    A.   Right.

03:32PM      2    Q.   In December, or I guess when the search was conducted,

03:32PM      3    Mr. Gerace had not yet been charged, correct?

03:32PM      4    A.   When the search was conducted, he was not charged.

03:32PM      5    Q.   And do you recall when footage was reviewed?

03:32PM      6    A.   You have to go to the front page of the report.  I think

03:32PM      7    it --

03:32PM      8            THE COURT:  Mr. Foti, we're past 3:30, so wherever

03:32PM      9    you want to stop.  You know, we've got until 3:45, so any time

03:32PM     10    within the next 13 or 14 minutes.

03:32PM     11            MR. FOTI:  Okay.  All right.  Thank you, Judge.

03:33PM     12            Can we go and just to page 1 of the document.

03:33PM     13            BY MR. FOTI:

03:33PM     14    Q.   Does looking at that refresh your recollection?

03:33PM     15    A.   It says date approved 5/10/23.  Maybe the next page, if

03:33PM     16    there's a reference to when it was actually reviewed.

03:33PM     17            MR. FOTI:  Can we go to page 2?

03:33PM     18            THE WITNESS:  Yeah, I mean, the best I can come up

03:33PM     19    with is the date of approval of the document.  I can't

03:33PM     20    definitively say when it was reviewed.

03:33PM     21            BY MR. FOTI:

03:33PM     22    Q.   It was just sometime before that?

03:33PM     23    A.   It was sometime before that, correct.

03:33PM     24    Q.   All right.  And you don't have an independent

03:33PM     25    recollection of when the footage was reviewed based on your

03:33PM  1   conversations with Special Agent Halliday or anybody else?

03:33PM  2   A.  It was closer in proximity to, I think, the date

03:33PM  3   approved.  I think that's accurate.  I don't want to commit

03:33PM  4   to something that I'm not 100 percent certain on.

03:33PM  5            **MR. FOTI:**  Why don't we pause here, Judge?

03:33PM  6            **THE COURT:**  Okay.  Great.  So, folks, we're done for

03:34PM  7   the day.

03:34PM  8            Remember my instructions about not communicating

03:34PM  9   about the case with anyone in any way.  Don't use tools of

03:34PM  10  technology to communicate about the case or to learn about the

03:34PM  11  case in any way.  Don't do any research about the case.  Don't

03:34PM  12  read or watch or listen to any news coverage of the case, if

03:34PM  13  there is any, while the trial is in progress.  And don't make

03:34PM  14  up your minds until you start deliberating.

03:34PM  15           We're going to start at 9:30 tomorrow for a few

03:34PM  16  reasons.  We have a juror who's getting stitches out, I

03:34PM  17  understand.  No?  That's not true?

03:34PM  18           **JUROR 2:**  Yeah, I'll be good tomorrow.

03:34PM  19           **THE COURT:**  And you should be able to be here by

03:34PM  20  9:30, is that --

03:34PM  21           **JUROR 2:**  I should be able to be here by 9.

03:34PM  22           **THE COURT:**  We've got some other reasons.  I have

03:34PM  23  some other things that I need to do.  So we're going to start

03:34PM  24  at 9:30.  We're going to go until -- I don't know when, but no

03:34PM  25  later than 5:30 tomorrow.

03:34PM   1          And then Thursday and -- Thursday, we're gonna go

03:34PM   2   from 9 until 5:30.  And then Friday from 9 until 12:30ish.

03:34PM   3   I'm going to give you my charge on -- the plan right now is

03:35PM   4   for me to give you my charge on Friday morning, which is

03:35PM   5   probably about three, three and a half hours.  So we're going

03:35PM   6   to try do that.  Okay?

03:35PM   7          Thank you very much.  Drive carefully.  Get a good

03:35PM   8   night's sleep.

03:35PM   9          (Jury excused at 3:35 p.m.)

         10          (Excerpt concluded at 3:25 p.m.)

         11          *     *     *     *     *     *     *

         12

         13

         14

         15

         16                   **CERTIFICATE OF REPORTER**

         17

         18          In accordance with 28, U.S.C., 753(b), I

         19   certify that these original notes are a true and correct

         20   record of proceedings in the United States District Court for

         21   the Western District of New York on December 17, 2024.

         22

         23                        s/ Ann M. Sawyer
                                   Ann M. Sawyer, FCRR, RPR, CRR
         24                        Official Court Reporter
                                   U.S.D.C., W.D.N.Y.
         25

1

2                    **TRANSCRIPT INDEX**

3          **EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 2**

4                    **DECEMBER 17, 2024**

5

6      **W I T N E S S**                              **P A G E**

7      **B R I A N   B U R N S**                         2

8        (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:        2

9        CROSS-EXAMINATION BY MR. FOTI:                 171

10

11

12     **E X H I B I T S**                             **P A G E**

13     GOV Exhibit 100A.A-2                              4

14     GOV Exhibit 310AE                                45

15     GOV Exhibit 310AQ                                91

16     GOV Exhibit 310AS                               110

17     GOV Exhibit 310AU-1                             139

18     GOV Exhibit 555                                 156

19     GOV Exhibit 310AU-2                             163

20

21

22

23

24

25