09:26AM

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                       Case No. 1:19-cr-227
 4             Plaintiff,                       1:23-cr-37
   v.                                              (LJV)
 5
   PETER GERACE, JR.,                   December 18, 2024
 6
   _____Defendant._____
 7
      TRANSCRIPT EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 3
 8          BEFORE THE HONORABLE LAWRENCE J. VILARDO
                  UNITED STATES DISTRICT JUDGE
 9
   APPEARANCES:     TRINI E. ROSS, UNITED STATES ATTORNEY
10                  BY: JOSEPH M. TRIPI, ESQ.
                        NICHOLAS T. COOPER, ESQ.
11                      CASEY L. CHALBECK, ESQ.
                    Assistant United States Attorneys
12                  Federal Centre, 138 Delaware Avenue
                    Buffalo, New York 14202
13                  For the Plaintiff

14                  THE FOTI LAW FIRM, P.C.
                    BY: MARK ANDREW FOTI, ESQ.
15                  16 West Main Street, Suite 100
                    Rochester, New York 14614
16                     And
                    SOEHNLEIN LAW
17                  BY: ERIC MICHAEL SOEHNLEIN, ESQ.
                    350 Main Street, Suite 2100
18                  Buffalo, New York 14202
                    For the Defendant
19
   PRESENT:         KAREN A. CHAMPOUX, USA PARALEGAL
20                  BRIAN A. BURNS, FBI SPECIAL AGENT
                    MARILYN K. HALLIDAY, HSI SPECIAL AGENT
21                  OLIVIA A. PROIA, J.D., PARALEGAL

22 LAW CLERK:       REBECCA FABIAN IZZO, ESQ.

23 COURT CLERK:     COLLEEN M. DEMMA

24 REPORTER:        ANN MEISSNER SAWYER, FCRR, RPR, CRR
                    Robert H. Jackson Courthouse
25                  2 Niagara Square Buffalo, New York 14202
                    Ann_Sawyer@nywd.uscourts.gov
```

09:40AM

| | | |
|---|---|---|
| 09:40AM | 1 | (Excerpt commenced at 9:40 a.m.) |
| 09:40AM | 2 | (Jury seated at 9:40 a.m.) |
| 09:40AM | 3 | **THE COURT:**  Good morning, everyone. |
| 09:40AM | 4 | **THE JURORS:**  Good morning. |
| 09:40AM | 5 | **THE COURT:**  I think the Christmas sweaters look |
| 09:40AM | 6 | lovely, which is probably why they make me wear black every |
| 09:40AM | 7 | day.  The record will reflect that all our jurors are present. |
| 09:40AM | 8 | I remind the witness that he's still under oath. |
| 09:40AM | 9 | And, Mr. Foti, you may continue. |
| 09:40AM | 10 | **MR. FOTI:**  Thank you.  All right.  Can we just -- at |
| 09:40AM | 11 | this time, can we just, for just the witness, can we pull up |
| 09:40AM | 12 | Government Exhibit 3539ED as in dog?  And can we go to page 2. |
| 09:40AM | 13 | |
| 09:40AM | 14 | **B R I A N   B U R N S**, having been previously duly called and |
| 09:40AM | 15 | sworn, continued to testify as follows: |
| 09:41AM | 16 | |
| 09:41AM | 17 | **(CONT'D) CROSS-EXAMINATION BY MR. FOTI:** |
| 09:41AM | 18 | Q.  Good morning, Special Agent Burns. |
| 09:41AM | 19 | A.  Good morning, Mr. Foti. |
| 09:41AM | 20 | Q.  You didn't talk to anybody about your testimony during |
| 09:41AM | 21 | the evening break, correct? |
| 09:41AM | 22 | A.  No, it was very quiet and peaceful.  Home early. |
| 09:41AM | 23 | Q.  Okay.  So where we left off, I was asking you yesterday |
| 09:41AM | 24 | about some of the content of a report that was prepared based |
| 09:41AM | 25 | on the review of the DVR, correct? |

09:41AM  1   A.  Correct.  That I -- I didn't prepare, did you say you --

09:41AM  2   Q.  No.  A report that was prepared.

09:41AM  3   A.  Oh, okay.  Certainly.

09:41AM  4   Q.  And I think that was established yesterday, you're not

09:41AM  5   the one who prepared the --

09:41AM  6   A.  Correct.

09:41AM  7   Q.  -- report.

09:41AM  8      You are familiar with the fact that these reports were

09:41AM  9   prepared as part of the investigation, correct?

09:41AM  10  A.  Yes, I am.

09:41AM  11  Q.  And you were familiar with what was contained in the

09:41AM  12  court -- in the reports related to efforts to review the DVR

09:41AM  13  footage, correct?

09:41AM  14  A.  That's -- that's correct.

09:42AM  15  Q.  And we're talking about, just to kind of circle back to

09:42AM  16  yesterday, we're talking about DVR footage that was seized

09:42AM  17  during the search of Pharaoh's on December 12th of 2019,

09:42AM  18  correct?

09:42AM  19  A.  That's correct.

09:42AM  20  Q.  Okay.  Now, up on your screen, right now the jury can't

09:42AM  21  see this, but this is the report that I was asking you about

09:42AM  22  in regard to DVR 1, correct?

09:42AM  23  A.  Correct.

09:42AM  24  Q.  And just to again kind of remind the jury of what we

09:42AM  25  discussed yesterday, there were three DVRs that were seized

09:42AM  1  from Pharaoh's during the search, correct?

09:42AM  2  A.  That's correct.

09:42AM  3  Q.  And they were labeled -- for organization purposes, they

09:42AM  4  were labeled DVR 1, 2, and 3, right?

09:42AM  5  A.  That's correct.

09:42AM  6  Q.  Okay.  And what we had talked about yesterday and what's

09:42AM  7  on the screen right now is all related to DVR 1, correct?

09:42AM  8  A.  That's accurate.

09:42AM  9  Q.  Okay.  Now, this is the DVR that you had testified on

09:42AM  10  direct covers basically a seven-week span, right?

09:42AM  11  A.  That's correct.

09:42AM  12  Q.  And we talked about that a little bit yesterday, that

09:42AM  13  it -- the recordings appear to begin on October 21st of 2019,

09:42AM  14  right?

09:43AM  15  A.  That's correct.

09:43AM  16  Q.  Okay.  Now, at this time, and this is the report that

09:43AM  17  was -- this is the same report that we were talking about

09:43AM  18  yesterday and that you reviewed as part of the investigation

09:43AM  19  related to DVR 1, correct?

09:43AM  20  A.  That's correct.

09:43AM  21  Q.  This report is the same or substantially same condition

09:43AM  22  as -- as any -- any prior time that you reviewed the report

09:43AM  23  as part of the investigation, correct?

09:43AM  24  A.  Yeah.  It's an accurate representation of this report.

09:43AM  25

09:43AM    1      **MR. FOTI:** Okay. Judge, at this time, I would move

09:43AM    2   Government Exhibit 3539ED into evidence.

09:43AM    3      **MR. TRIPI:** No objection.

09:43AM    4      **THE COURT:** Received without objection.

09:43AM    5      **(GOV Exhibit 3539ED was received in evidence.)**

09:43AM    6      **MR. FOTI:** All right. So if we can publish for the

09:43AM    7   jury what's on the screen.

09:43AM    8      **THE CLERK:** You're all set.

09:43AM    9      **MR. FOTI:** Okay. Thank you.

09:43AM   10      **BY MR. FOTI:**

09:43AM   11   Q. Yesterday I was asking you questions about this, and you

09:43AM   12   were kind of referring to the document. We're going to go

09:43AM   13   through it with -- in front of the jury so they can see what

09:43AM   14   you're seeing, okay?

09:43AM   15   A. Yeah, that will be helpful.

09:44AM   16   Q. Okay. We talked about what -- what's on this page of the

09:44AM   17   report is reference to the three of the cameras that are in

09:44AM   18   DVR 1, correct?

09:44AM   19   A. That's correct.

09:44AM   20   Q. Okay. And I'm just going to briefly circle paragraph

09:44AM   21   here to sort of start.

09:44AM   22      This is the paragraph I was talking about, that talks

09:44AM   23   about there being six different camera angles inside the

09:44AM   24   VIP Room, correct?

09:44AM   25   A. That's correct.

| | | |
|---|---|---|
| 09:44AM | 1 | Q. One camera angle of the stage, correct? |
| 09:44AM | 2 | A. Correct. |
| 09:44AM | 3 | Q. And then as you testified to today, there's one camera |
| 09:44AM | 4 | that just doesn't have any video, right? |
| 09:44AM | 5 | A. That's accurate. |
| 09:44AM | 6 | Q. Okay. And this is -- this paragraph documents the |
| 09:44AM | 7 | specific times of the recordings that we talked about going |
| 09:44AM | 8 | from October 21st, 2019, up until December 11th or 12th of |
| 09:44AM | 9 | 2019, correct? |
| 09:44AM | 10 | A. That is correct. |
| 09:44AM | 11 | Q. Okay. As this paragraph notes at the end, a review was |
| 09:44AM | 12 | conducted of the video, and then the summary of each camera |
| 09:44AM | 13 | is provided below, correct? |
| 09:45AM | 14 | A. That's accurate. |
| 09:45AM | 15 | Q. All right. Okay. Now, camera 1 is -- and I was asking |
| 09:45AM | 16 | this -- about this yesterday, but this is video footage from |
| 09:45AM | 17 | a room sectioned off by three areas that each have a brown |
| 09:45AM | 18 | loveseat-style couch, correct? |
| 09:45AM | 19 | A. That's correct. |
| 09:45AM | 20 | Q. Okay. And as far as you know, each one of the couches |
| 09:45AM | 21 | that are contained in the VIP Room are visible throughout |
| 09:45AM | 22 | these different cameras, correct? |
| 09:45AM | 23 | A. Based on the report, that's what it appears. |
| 09:45AM | 24 | Q. Okay. Now, camera 1, the determination from the review |
| 09:45AM | 25 | of the agent was that it contained no relevant information, |

| | | |
|---|---|---|
| 09:45AM | 1 | correct? |
| 09:45AM | 2 | A.  There's a summary of it, and there is a line in there |
| 09:45AM | 3 | that says camera 1 contains no relevant information. |
| 09:45AM | 4 | Q.  Right.  And we'll go through the summary in a moment. |
| 09:46AM | 5 | But before the summary is provided in the report, the |
| 09:46AM | 6 | determination is provided that the agent didn't find any |
| 09:46AM | 7 | information based on her review, correct? |
| 09:46AM | 8 | A.  Based on the review. |
| 09:46AM | 9 | Q.  And I'm going to circle the paragraph. |
| 09:46AM | 10 | Now, what the -- what the camera 1 shows generally is |
| 09:46AM | 11 | customers coming in and engaging in -- and dancers engaging |
| 09:46AM | 12 | in lap dances, correct? |
| 09:46AM | 13 | A.  That's correct. |
| 09:46AM | 14 | Q.  Okay.  And this paragraph goes on to describe at least |
| 09:46AM | 15 | many of the lap dances that are viewed on camera 1, right? |
| 09:46AM | 16 | A.  Correct. |
| 09:46AM | 17 | Q.  So this indicates that in most cases, the clothing stays, |
| 09:46AM | 18 | the bottom garments stay on, but on a few occasions the |
| 09:46AM | 19 | dancers would take off their bottom garments, correct? |
| 09:46AM | 20 | A.  That's correct. |
| 09:46AM | 21 | Q.  That -- that there's nothing in here indicating that any |
| 09:46AM | 22 | patrons or customers ever took their pants off, correct? |
| 09:46AM | 23 | A.  That's correct. |
| 09:46AM | 24 | Q.  It indicates that the dancer would straddle the male's |
| 09:47AM | 25 | lap and grind her genitals on the male's lap, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

8

09:47AM  1    A.  That's correct.

09:47AM  2    Q.  It indicates that at least in some of the clips there was

09:47AM  3    an observation that the male appeared to be erect, have an

09:47AM  4    erection, correct?

09:47AM  5    A.  That's what the report states.

09:47AM  6    Q.  Okay.  That there's some discussion of how the dance

09:47AM  7    would continue, that the dancer would turn around, grind her

09:47AM  8    buttocks on the male's lap, correct?

09:47AM  9    A.  That's correct.

09:47AM  10   Q.  That she would occasionally do the same with her breasts,

09:47AM  11   correct?

09:47AM  12   A.  That's correct.

09:47AM  13   Q.  And in some clips, you can actually see the customers and

09:47AM  14   the dancers kissing at some point, correct?

09:47AM  15   A.  That's correct.

09:47AM  16   Q.  That there would occasionally be some contact where the

09:47AM  17   males would fondle the dancer's breasts or other parts of

09:47AM  18   their body, correct?

09:47AM  19   A.  That's correct.

09:47AM  20   Q.  And when a dance concludes, it would appear that, at

09:47AM  21   least in most instances, the male would give the dancer

09:47AM  22   money, correct?

09:47AM  23   A.  That's correct.

09:47AM  24   Q.  And your understanding, based on the testimony of this

09:47AM  25   trial and based on the investigation, is that if the customer

09:48AM  1    was giving the dancer money at that point, it was in regard

09:48AM  2    to tips, correct?

09:48AM  3    A.   If it was cash, yes.  If it wasn't the chips, it was

09:48AM  4    cash, it would be a tip.

09:48AM  5    Q.   This describes sort of what is referred to as generally

09:48AM  6    the lap dances that would occur in these clips on camera 1,

09:48AM  7    correct?

09:48AM  8    A.   Correct.

09:48AM  9    Q.   What is not described anywhere is an observation of any

09:48AM  10   type of, in camera 1, there was no observation ever made of

09:48AM  11   any vaginal sex, correct?

09:48AM  12   A.   Correct.

09:48AM  13   Q.   In camera 1, there was no observation ever made of any

09:48AM  14   anal sex, correct?

09:48AM  15   A.   Correct.

09:48AM  16   Q.   In camera 1, there was no observation ever made of any

09:48AM  17   digital penetration, correct?

09:48AM  18   A.   Correct.

09:48AM  19   Q.   Camera 1 indicates that the male customers would keep

09:49AM  20   their pants on throughout the dances, correct?

09:49AM  21   A.   There's no representation of clothes coming off of the

09:49AM  22   males.

09:49AM  23   Q.   So, and when you say "there's no representation," you're

09:49AM  24   saying other than the sentence both the male and female leave

09:49AM  25   their bottom garments on, correct?  With the exception of

USA v Gerace - Burns - Foti/Cross - 12/18/24

09:49AM    1    where the dancer would take her bottom garments off?

09:49AM    2    A.  Correct.

09:49AM    3    Q.  So as far as this report indicates, the male customers

09:49AM    4    would leave their bottom garments on, correct?

09:49AM    5    A.  That's correct.

09:49AM    6    Q.  No observations indicating anything otherwise?

09:49AM    7    A.  Correct.

09:49AM    8    Q.  Okay.  Now, I'll just clear that.

09:49AM    9        Camera 2, as visible from this exhibit, is video footage

09:49AM    10   of the stage and not the VIP Room, correct?

09:49AM    11   A.  That's correct.

09:49AM    12   Q.  So when you talked about yesterday that one of the

09:49AM    13   cameras was outside the VIP Room, that was camera 2?

09:50AM    14   A.  That's correct.

09:50AM    15   Q.  And this indicates that camera 2 shows exotic dancing and

09:50AM    16   customers approaching the stage and giving the dancer money,

09:50AM    17   correct?

09:50AM    18   A.  That's correct.

09:50AM    19   Q.  Nothing indicated that there was anything really besides

09:50AM    20   that happening on camera 2?

09:50AM    21   A.  On camera 2, correct.

09:50AM    22   Q.  And -- and the agent's conclusion within this report is

09:50AM    23   that what says -- says camera 1, but I think the conclusion

09:50AM    24   is there's no relevant information from camera 2?

09:50AM    25   A.  Yeah, I believe it's a typo.

USA v Gerace - Burns - Foti/Cross - 12/18/24

11

| | | |
|---|---|---|
| 09:50AM | 1 | Q.  Sure.  Okay.  Camera 3 is, once again, we're back in the |
| 09:50AM | 2 | VIP Room, correct? |
| 09:50AM | 3 | A.  Camera 3, yes. |
| 09:50AM | 4 | Q.  And this is video footage of a long room containing a |
| 09:50AM | 5 | brown loveseat-style couch, correct? |
| 09:50AM | 6 | A.  That's correct. |
| 09:50AM | 7 | Q.  Again, the conclusion after reviewing the footage was |
| 09:50AM | 8 | there was no relevant information? |
| 09:50AM | 9 | A.  Correct. |
| 09:50AM | 10 | Q.  Now, similar to camera 1, this report goes through and |
| 09:50AM | 11 | documents what camera 3 generally showed, correct? |
| 09:51AM | 12 | A.  That's correct. |
| 09:51AM | 13 | Q.  Generally showed male customers and dancers engaging in |
| 09:51AM | 14 | lap dances, correct? |
| 09:51AM | 15 | A.  Correct. |
| 09:51AM | 16 | Q.  And then it gives a description generally of those lap |
| 09:51AM | 17 | dances that is very similar to what's in camera 1, correct? |
| 09:51AM | 18 | A.  That's correct. |
| 09:51AM | 19 | Q.  Okay.  And again, in terms of camera 3, no indication |
| 09:51AM | 20 | that there was ever any vaginal sex observed, correct? |
| 09:51AM | 21 | A.  Correct. |
| 09:51AM | 22 | Q.  No anal sex observed in camera 3, correct? |
| 09:51AM | 23 | A.  Correct. |
| 09:51AM | 24 | Q.  No digital penetration, correct? |
| 09:51AM | 25 | A.  Correct. |

USA v Gerace - Burns - Foti/Cross - 12/18/24

12

09:51AM    1    Q.  No other physical contact where -- that involved a male

09:51AM    2    taking off his pants, correct?

09:51AM    3    A.  Taking -- correct.

09:51AM    4         MR. FOTI:  Okay.  Can we go to the next page of the

09:51AM    5    document, please?

09:51AM    6         BY MR. FOTI:

09:51AM    7    Q.  Okay.  Camera 4.  Again, inside the VIP Room, correct?

09:51AM    8    A.  Correct.

09:51AM    9    Q.  And you can see another one of the couches from camera 4,

09:51AM   10    right?

09:51AM   11    A.  Correct.

09:51AM   12    Q.  And the conclusion in camera 4, again, after reviewing

09:51AM   13    the footage, is that it contained no relevant information,

09:51AM   14    correct?

09:51AM   15    A.  Per the report.

09:51AM   16    Q.  And -- and you were never told anything other than, you

09:52AM   17    don't have any information other than what's in the report

09:52AM   18    regarding what was viewed on the footage, correct?

09:52AM   19    A.  Correct.  As I mentioned yesterday, I had not

09:52AM   20    independently reviewed those.

09:52AM   21    Q.  Right.  So you're relying on the report to essentially

09:52AM   22    inform you of what was viewable and what could be determined

09:52AM   23    by watching the footage, correct?

09:52AM   24    A.  Correct.

09:52AM   25    Q.  Now this report, again, indicates for camera 4 there's no

USA v Gerace - Burns - Foti/Cross - 12/18/24

09:52AM  1  relevant information, correct?

09:52AM  2  A.  Correct.

09:52AM  3  Q.  And camera 4 again generally shows male customers and

09:52AM  4  dancers engaging in lap dances, correct?

09:52AM  5  A.  Correct.

09:52AM  6  Q.  And it describes the lap dances very similar to how it

09:52AM  7  described the lap dances in camera 1 and camera 3, correct?

09:52AM  8  A.  Correct.

09:52AM  9  Q.  And, again, it indicates that the males would keep their

09:52AM  10  pants on, correct?

09:52AM  11  A.  Yes.

09:52AM  12  Q.  And, again, in camera 4 there's no indication that there

09:52AM  13  was any vaginal sex ever observed in that seven-week period,

09:52AM  14  correct?

09:52AM  15  A.  Correct.

09:52AM  16  Q.  No anal sex observed, correct?

09:52AM  17  A.  Correct.

09:52AM  18  Q.  No digital penetration, correct?

09:53AM  19  A.  Correct.

09:53AM  20  Q.  No other sex act identified in here, correct?

09:53AM  21  A.  There's groping and kissing.

09:53AM  22  Q.  So, okay.  Fair enough.  So there's groping and kissing,

09:53AM  23  and I guess we could have -- argue over whether that's a sex

09:53AM  24  act.  But definitely no type of penetration of any kind,

09:53AM  25  correct?

USA v Gerace - Burns - Foti/Cross - 12/18/24

14

| | | |
|---|---|---|
| 09:53AM | 1 | A.  Correct. |
| 09:53AM | 2 | Q.  And what's described in here is consistent with what is |
| 09:53AM | 3 | identified as generally showing male customers and dancers |
| 09:53AM | 4 | engaging in lap dances, correct? |
| 09:53AM | 5 | A.  Correct. |
| 09:53AM | 6 | Q.  Okay.  Camera 5 is a room containing three brown |
| 09:53AM | 7 | loveseat-style couches, correct? |
| 09:53AM | 8 | A.  That's correct. |
| 09:53AM | 9 | Q.  So camera 5, some of the rooms in the VIP area had |
| 09:53AM | 10 | multiple couches within a single room, correct? |
| 09:53AM | 11 | A.  Correct, based on the photographs I saw. |
| 09:53AM | 12 | Q.  Okay.  Because you don't have an independent recollection |
| 09:53AM | 13 | of the what the VIP Room looked like yourself, correct? |
| 09:53AM | 14 | A.  I remember generally seeing it, but I don't have a really |
| 09:54AM | 15 | clear recollection of it. |
| 09:54AM | 16 | Q.  You said you might have been on the outside at some |
| 09:54AM | 17 | point, the peripheral -- |
| 09:54AM | 18 | A.  Correct.  I think I looked in there and possibly I walked |
| 09:54AM | 19 | through.  Again, my focus was engaging with Mr. Ermin. |
| 09:54AM | 20 | Q.  If you do have a memory of looking into the VIP Room, the |
| 09:54AM | 21 | first VIP Room that's present has multiple couches, correct? |
| 09:54AM | 22 |     If you don't, if you don't remember.  It's okay. |
| 09:54AM | 23 | A.  Yeah, I don't clearly remember, but I remember seeing the |
| 09:54AM | 24 | photos that were used. |
| 09:54AM | 25 | Q.  Okay.  So we, at least according to this report, it's |

USA v Gerace - Burns - Foti/Cross - 12/18/24

15

09:54AM  1    clear that there was a camera showing multiple couches within

09:54AM  2    a single room, correct?

09:54AM  3    A.   Correct.

09:54AM  4    Q.   Okay.  And, again, the conclusion after watching that

09:54AM  5    footage is that there was no relevant information identified,

09:54AM  6    correct?

09:54AM  7    A.   That's what the report states.

09:54AM  8    Q.   Yep.  And, again, it indicates that there are

09:54AM  9    observations made of male customers and dancers engaging in

09:54AM  10   lap dances, correct?

09:54AM  11   A.   Correct.

09:54AM  12   Q.   And in -- it describes those lap dances in a way that's

09:55AM  13   very similar to the other cameras, correct?

09:55AM  14   A.   Correct.

09:55AM  15   Q.   Okay.  And, again, in terms of camera 5, there's no

09:55AM  16   indication that any vaginal sex was ever observed, correct?

09:55AM  17   A.   That's correct.

09:55AM  18   Q.   No anal sex, correct?

09:55AM  19   A.   Correct.

09:55AM  20   Q.   No digital penetration, correct?

09:55AM  21   A.   Correct.

09:55AM  22   Q.   And, again, in camera 5 the male customers that were

09:55AM  23   observed always kept their pants on, correct?

09:55AM  24   A.   Correct.

09:55AM  25   Q.   Okay.  Camera 6 is a camera of a small room within the

09:55AM    1    VIP area that contained a brown loveseat-style couch,

09:55AM    2    correct?

09:55AM    3    A.  Correct.

09:55AM    4    Q.  And I don't want to become too repetitive here, but this

09:55AM    5    is very similar to the other cameras?

09:55AM    6    A.  Yes.

09:55AM    7    Q.  Another determination was made that after viewing the

09:55AM    8    footage on camera 6, there was no relevant information,

09:55AM    9    correct?

09:55AM    10   A.  Correct.

09:55AM    11   Q.  It describes lap dances very similar to the other

09:55AM    12   cameras, correct?

09:55AM    13   A.  It does.

09:55AM    14   Q.  And just like the other cameras, there was no

09:56AM    15   observations of any vaginal sex, correct?

09:56AM    16   A.  Correct.

09:56AM    17   Q.  No anal sex, correct?

09:56AM    18   A.  Correct.

09:56AM    19   Q.  No digital penetration, correct?

09:56AM    20   A.  Correct.

09:56AM    21        **MR. FOTI:**  Okay.  Can we go to the next page, please.

09:56AM    22        **BY MR. FOTI:**

09:56AM    23   Q.  And the last camera that showed footage was camera 7,

09:56AM    24   correct?

09:56AM    25   A.  That's correct.

USA v Gerace - Burns - Foti/Cross - 12/18/24

17

09:56AM   1   Q.  And camera 7 is also of a small room within the VIP area

09:56AM   2   showing a couch, correct?

09:56AM   3   A.  A brown loveseat-style couch, correct.

09:56AM   4   Q.  Yep.  And very similar to the other cameras, it's

09:56AM   5   indicated that watching the footage showed that there was

09:56AM   6   customers and dancers engaging in lap dances, correct?

09:56AM   7   A.  That's correct.

09:56AM   8   Q.  Dances are described the same way they are in the other

09:56AM   9   cameras, correct?

09:56AM  10   A.  Correct.

09:56AM  11   Q.  A determination is made that there's no relevant

09:56AM  12   information, correct?

09:56AM  13   A.  That's what report states.

09:56AM  14   Q.  And then nobody ever has indicated as part of this

09:56AM  15   investigation that who watched the footage that made a

09:56AM  16   determination different than that, correct?

09:56AM  17   A.  I'm sorry, can you rephrase that?

09:56AM  18   Q.  Nobody else watched this footage that indicated that

09:57AM  19   there was relevant information contained in these?

09:57AM  20   A.  Yeah, I believe they're -- just the one agent reviewed

09:57AM  21   it.

09:57AM  22   Q.  Okay.  And -- and, again, camera 7, similar to all of the

09:57AM  23   other cameras in the VIP Room, there's no indication there

09:57AM  24   was any vaginal sex observed, correct?

09:57AM  25   A.  Correct.

USA v Gerace - Burns - Foti/Cross - 12/18/24

18

| | | |
|---|---|---|
| 09:57AM | 1 | Q.  No anal sex observed, correct? |
| 09:57AM | 2 | A.  Correct. |
| 09:57AM | 3 | Q.  No digital penetration, correct? |
| 09:57AM | 4 | A.  Correct. |
| 09:57AM | 5 | Q.  No instance of any male attempting to take his pants off, |
| 09:57AM | 6 | correct? |
| 09:57AM | 7 | A.  Correct. |
| 09:57AM | 8 | **MR. FOTI:**  Okay.  We can take that exhibit down. |
| 09:57AM | 9 | Can we pull up 3539EE.  And can we go to page -- |
| 09:57AM | 10 | **BY MR. FOTI:** |
| 09:57AM | 11 | Q.  Well, first, Special Agent Burns, if you can just look at |
| 09:58AM | 12 | that first page.  This is another report related to DVR 2, |
| 09:58AM | 13 | correct? |
| 09:58AM | 14 | A.  Correct.  This is the report related to DVR 2. |
| 09:58AM | 15 | Q.  Okay.  And DVR 2, we're talking about another one of the |
| 09:58AM | 16 | DVRs that was seized from Pharaoh's in December of 2019? |
| 09:58AM | 17 | A.  Yes, it was 203. |
| 09:58AM | 18 | **MR. FOTI:**  Can we go to page 2, please. |
| 09:58AM | 19 | **BY MR. FOTI:** |
| 09:58AM | 20 | Q.  Okay.  Now, on direct you testified that the other two |
| 09:58AM | 21 | DVR system, DVR 2 and 3, did not record as long of a period |
| 09:58AM | 22 | of time as what was in the VIP Room, correct? |
| 09:58AM | 23 | A.  That's correct. |
| 09:58AM | 24 | Q.  This particular DVR system recorded going back about two |
| 09:58AM | 25 | weeks, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

19

| | | |
|---|---|---|
| 09:58AM | 1 | A.   That's correct. |
| 09:58AM | 2 | Q.   And I think you can see in the report, which is not in |
| 09:58AM | 3 | evidence yet, but I expect will be in a moment -- |
| 09:58AM | 4 | A.   Certainly. |
| 09:58AM | 5 | Q.   -- that the majority of the footage starts from |
| 09:58AM | 6 | November 28th, 2019, and goes until about the time of the |
| 09:59AM | 7 | search, correct? |
| 09:59AM | 8 | A.   Correct, based on the first page. |
| 09:59AM | 9 | Q.   Okay.  Now, this is -- you're familiar with this being a |
| 09:59AM | 10 | report that was prepared based on the review of DVR 2, |
| 09:59AM | 11 | correct? |
| 09:59AM | 12 | A.   Correct. |
| 09:59AM | 13 | Q.   And you were aware that had happened as part of the |
| 09:59AM | 14 | investigation, correct? |
| 09:59AM | 15 | A.   Yes, I was. |
| 09:59AM | 16 | Q.   And you're familiar with this report, correct? |
| 09:59AM | 17 | A.   Yes, I am, generally. |
| 09:59AM | 18 | Q.   And this is the same report that you've reviewed in the |
| 09:59AM | 19 | past in regard to the review of DVR 2, correct? |
| 09:59AM | 20 | A.   That's correct. |
| 09:59AM | 21 | Q.   No changes that you see, correct? |
| 09:59AM | 22 | A.   No. |
| 09:59AM | 23 | **MR. FOTI:**  Okay.  At this time, I would seek to move |
| 09:59AM | 24 | Government Exhibit 3539EE into evidence. |
| 09:59AM | 25 | **MR. TRIPI:**  No objection. |

USA v Gerace - Burns - Foti/Cross - 12/18/24

20

09:59AM  1    **THE COURT:**  Received without objection.

09:59AM  2    **(GOV Exhibit 3539EE was received in evidence.)**

09:59AM  3    **BY MR. FOTI:**

09:59AM  4    Q.  Okay.  Now, I don't know if you remember without going

09:59AM  5    through it, but this report is a little bit longer than the

09:59AM  6    other one, just based on the page numbers you can see up at

09:59AM  7    the top-right corner, correct?

09:59AM  8    A.  And the number -- there's quite a few more cameras on

09:59AM  9    this --

09:59AM  10   Q.  Right.

10:00AM  11   A.  -- DVR.

10:00AM  12   Q.  Yep.  On this one, on this particular DVR, there was a

10:00AM  13   total of 37 cameras; is that correct?

10:00AM  14   A.  That's correct.

10:00AM  15   Q.  I think there might have been one that didn't show

10:00AM  16   footage, but the majority of them showed footage, correct?

10:00AM  17   A.  That's correct.

10:00AM  18   Q.  Okay.  And I just, without spending time going through

10:00AM  19   what was generally shown on each one, I just want to cover

10:00AM  20   what cameras were on this particular DVR.

10:00AM  21   So looking at this exhibit --

10:00AM  22   **MR. FOTI:**  This is published to the jury at this

10:00AM  23   point?

10:00AM  24   **THE CLERK:**  Yes.

         25

10:00AM     1          **MR. FOTI:**  Thank you.

10:00AM     2          **BY MR. FOTI:**

10:00AM     3   Q.  -- so looking at this exhibit, you can see camera 1 is of

10:00AM     4   the front desk, or it says front desk, but it's -- that's

10:00AM     5   located near the front door of Pharaoh's, correct?

10:00AM     6   A.  Yeah, the office is right off the -- the one door.

10:00AM     7   Q.  Yep.  And then camera 2 is a location in the front

10:00AM     8   vestibule of Pharaoh's, correct?

10:00AM     9   A.  Correct.

10:00AM    10   Q.  Camera 3 is a location outside the front entrance looking

10:01AM    11   down, correct?

10:01AM    12   A.  That's correct.

10:01AM    13   Q.  Camera 4 is a location, the left side of Pharaoh's facing

10:01AM    14   the stage, correct?

10:01AM    15   A.  Correct.

10:01AM    16   Q.  Camera 5 is a location, the right side of Pharaoh's

10:01AM    17   facing the stage, correct?

10:01AM    18   A.  That's correct.

10:01AM    19   Q.  Okay.  Now before we move on to the next page, these

10:01AM    20   first five cameras each, in this exhibit that's now in

10:01AM    21   evidence, provide a summary of what was observed in each of

10:01AM    22   these areas, correct?

10:01AM    23   A.  That's correct.

10:01AM    24   Q.  At least what was observed in the video footage that

10:01AM    25   covers this two-week span, right?

10:01AM    1    A.  Yes, by the agent that reviewed it, or agents, I can't

10:01AM    2    recall if it was multiple.

10:01AM    3    Q.  Right.  And to skip asking about each camera

10:01AM    4    individually, just looking at this report, this first page of

10:01AM    5    the report, would you agree with cameras 1 through 5 a

10:01AM    6    determination was made by the agent that there was no

10:01AM    7    relevant information on the footage from any of these

10:01AM    8    cameras, correct?

10:01AM    9    A.  Correct.

10:01AM    10    Q.  Okay.  And -- and you would agree, based on your review

10:02AM    11    of the report, there was no indication that there was any

10:02AM    12    visible drug use, correct?

10:02AM    13    A.  Correct.

10:02AM    14    Q.  No -- there is no observation of what appears to be a

10:02AM    15    drug transaction, correct?

10:02AM    16    A.  Correct.

10:02AM    17    Q.  No observation of what would appear to be any type of

10:02AM    18    illegal contraband, correct?

10:02AM    19    A.  Correct.

10:02AM    20    **MR. FOTI:**  Okay.  Can we go page 2 of the report,

10:02AM    21    please?

10:02AM    22    **BY MR. FOTI:**

10:02AM    23    Q.  Okay.  Camera 6 is a location on the right side of the

10:02AM    24    Pharaoh's bar facing the left side of the bar, correct?

10:02AM    25    A.  Yes, correct.

USA v Gerace - Burns - Foti/Cross - 12/18/24

23

| | | |
|---|---|---|
| 10:02AM | 1 | Q.  And camera 7 is basically the other side of the bar, it's |
| 10:02AM | 2 | the left side of the Pharaoh's bar facing right? |
| 10:02AM | 3 | A.  Correct. |
| 10:02AM | 4 | Q.  Camera 8 is a location near the waitress station on the |
| 10:02AM | 5 | left side of the bar, correct? |
| 10:02AM | 6 | A.  That's correct. |
| 10:02AM | 7 | Q.  Camera 9 is a location over the cash register behind the |
| 10:03AM | 8 | bar, correct? |
| 10:03AM | 9 | A.  That's correct. |
| 10:03AM | 10 | Q.  Camera 10 is a location over the cash register as well? |
| 10:03AM | 11 | A.  Correct. |
| 10:03AM | 12 | Q.  Camera 11 is a location on the right side of the stage of |
| 10:03AM | 13 | Pharaoh's with a view of the bar, correct? |
| 10:03AM | 14 | A.  That's correct. |
| 10:03AM | 15 | Q.  And so the pattern that's -- that is developing here is |
| 10:03AM | 16 | these cameras are of some of the areas of Pharaoh's, they |
| 10:03AM | 17 | have different angles on different portions of that front |
| 10:03AM | 18 | room, correct? |
| 10:03AM | 19 | A.  That's accurate. |
| 10:03AM | 20 | Q.  Okay.  Camera -- I don't know if I asked you about camera |
| 10:03AM | 21 | 11, but camera 11 is the location on the right side of the |
| 10:03AM | 22 | stage with a view of the bar, correct? |
| 10:03AM | 23 | A.  That's correct. |
| 10:03AM | 24 | Q.  Camera 12 is a location at the employee entrance of the |
| 10:03AM | 25 | office, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

24

| | | |
|---|---|---|
| 10:03AM | 1 | A.  That's correct. |
| 10:03AM | 2 | Q.  So that camera would cover an area where employees would |
| 10:03AM | 3 | enter into the building, correct? |
| 10:03AM | 4 | A.  That's correct, for the report. |
| 10:03AM | 5 | Q.  And camera 13 is of the kitchen or prep area within the |
| 10:03AM | 6 | kitchen, correct? |
| 10:03AM | 7 | A.  Of the window -- I recall there was a kind of like a |
| 10:04AM | 8 | restaurant, or -- where you have the window and you put the |
| 10:04AM | 9 | food up. |
| 10:04AM | 10 | Q.  As the report says, the food service window? |
| 10:04AM | 11 | A.  Correct, yes. |
| 10:04AM | 12 | Q.  And camera 14 is video footage of the liquor room, |
| 10:04AM | 13 | correct? |
| 10:04AM | 14 | A.  That's correct. |
| 10:04AM | 15 | Q.  Okay.  And again, I'm going to do this all together. |
| 10:04AM | 16 | Cameras 6 through 14 that are discussed on this page, |
| 10:04AM | 17 | there was observations discussed within this document of what |
| 10:04AM | 18 | was observable for each of these areas, correct? |
| 10:04AM | 19 | A.  That's correct. |
| 10:04AM | 20 | Q.  And in the review of each of these cameras, a |
| 10:04AM | 21 | determination was made that there was no relevant |
| 10:04AM | 22 | information, correct? |
| 10:04AM | 23 | A.  Per the report, correct. |
| 10:04AM | 24 | Q.  So per the report from cameras 6 through 14, there's no |
| 10:04AM | 25 | indication that there was any observations of drug use, |

| | | |
|---|---|---|
| 10:04AM | 1 | correct? |
| 10:04AM | 2 | A.  Correct. |
| 10:04AM | 3 | Q.  No observations of any type of apparent drug transaction, |
| 10:04AM | 4 | correct? |
| 10:04AM | 5 | A.  That's correct. |
| 10:04AM | 6 | Q.  No observation of what appeared to be drugs or |
| 10:04AM | 7 | contraband, correct? |
| 10:04AM | 8 | A.  No reference to that activity. |
| 10:04AM | 9 | Q.  Okay.  And something like that would obviously be pretty |
| 10:04AM | 10 | significant, correct? |
| 10:05AM | 11 | A.  Correct.  I would document it. |
| 10:05AM | 12 | Q.  Yep. |
| 10:05AM | 13 | **MR. FOTI:**  Can we go to the next page, please. |
| 10:05AM | 14 | **BY MR. FOTI:** |
| 10:05AM | 15 | Q.  All right.  Going through this, camera 15, a location |
| 10:05AM | 16 | behind the bar, correct? |
| 10:05AM | 17 | A.  Correct. |
| 10:05AM | 18 | Q.  Camera 16, a location in the pool table area to the left |
| 10:05AM | 19 | of the stage, correct? |
| 10:05AM | 20 | A.  Correct. |
| 10:05AM | 21 | Q.  Camera 17 is in the hallway that leads to the bathroom |
| 10:05AM | 22 | and the VIP area, correct? |
| 10:05AM | 23 | A.  Yeah, and the locker room. |
| 10:05AM | 24 | Q.  And the locker room? |
| 10:05AM | 25 | A.  Correct. |

10:05AM   1   Q.  That's what's indicated on the report, right?

10:05AM   2   A.  On the report, yes.

10:05AM   3   Q.  Okay.  Camera 18 is a location outside where there's a

10:05AM   4   fenced-in area which is a smoking area, correct?

10:05AM   5   A.  That's correct.

10:05AM   6   Q.  And you recall that being sort of just before you go down

10:05AM   7   the hallway to the VIP area?  If you don't, that's fine.

10:05AM   8   A.  Yeah, I don't.  I don't have an independent recollection

10:06AM   9   of that.

10:06AM  10   Q.  You've told us a couple times, you were focused on the

10:06AM  11   interview of John Ermin.

10:06AM  12   A.  Correct.

10:06AM  13   Q.  Camera 19 a location by the employee entrance with a view

10:06AM  14   of the parking lot?

10:06AM  15   A.  Correct.

10:06AM  16   Q.  Camera 20 is a location in the office, correct?

10:06AM  17   A.  That's correct.

10:06AM  18   Q.  Camera 21 is a location that covers the screen of one of

10:06AM  19   the cash registers, right?

10:06AM  20   A.  I'm sorry, which camera was that?

10:06AM  21   Q.  I think I said 21.  I meant to say 21.

10:06AM  22   A.  Yes, that's correct.

10:06AM  23   Q.  Which appears to be in, like, the waitress station area?

10:06AM  24   A.  Correct.  Yeah.

10:06AM  25   Q.  Camera 22 is of the parking lot, or it's a view of one of

USA v Gerace - Burns - Foti/Cross - 12/18/24

| | | |
|---|---|---|
| 10:06AM | 1 | the areas of the parking lot? |
| 10:06AM | 2 | A.  That's correct. |
| 10:06AM | 3 | Q.  Okay.  Now, again, cameras 15 through 22, each of -- this |
| 10:06AM | 4 | exhibit indicates that there is -- was observations made of |
| 10:07AM | 5 | what was viewable during that two-week span from each of |
| 10:07AM | 6 | these cameras, correct? |
| 10:07AM | 7 | A.  Correct. |
| 10:07AM | 8 | Q.  And a summary is generally given of what you could |
| 10:07AM | 9 | generally see in each of these areas when you review the |
| 10:07AM | 10 | footage, correct? |
| 10:07AM | 11 | A.  That's correct. |
| 10:07AM | 12 | Q.  Okay.  And in -- in each of these, the review of each of |
| 10:07AM | 13 | these cameras, 15 through 22, resulted in the same conclusion |
| 10:07AM | 14 | by the agent that there was no relevant information, correct? |
| 10:07AM | 15 | A.  Correct. |
| 10:07AM | 16 | Q.  And again, in cameras 15 through 22, there was no |
| 10:07AM | 17 | observations of any drug use, correct? |
| 10:07AM | 18 | A.  There's no notation of that. |
| 10:07AM | 19 | Q.  There's no indication that there was an observation of |
| 10:07AM | 20 | any drug transaction, correct? |
| 10:07AM | 21 | A.  Correct. |
| 10:07AM | 22 | Q.  There's no indication that there was any observation of |
| 10:07AM | 23 | what appeared to potentially be drugs, correct? |
| 10:07AM | 24 | A.  Correct. |
| 10:07AM | 25 | Q.  Or any other type of contraband, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

28

| | | |
|---|---|---|
| 10:07AM | 1 | A.  Correct. |
| 10:07AM | 2 | **MR. FOTI:**  Okay.  Can we go to the next page, please? |
| 10:07AM | 3 | We're making our way through here. |
| 10:08AM | 4 | **BY MR. FOTI:** |
| 10:08AM | 5 | Q.  Let's just go, put them together, cameras 23 through 25, |
| 10:08AM | 6 | all footage from different areas of the parking lot outside |
| 10:08AM | 7 | of Pharaoh's, correct? |
| 10:08AM | 8 | A.  I'm not -- I mean, the first three relate to the outside |
| 10:08AM | 9 | of the parking lot. |
| 10:08AM | 10 | Q.  Right.  So camera 23, camera 24, camera 25 were all |
| 10:08AM | 11 | cameras viewing different parts of the parking lot? |
| 10:08AM | 12 | A.  That's correct. |
| 10:08AM | 13 | Q.  Okay.  Camera 26 is an area with a view of the garage, |
| 10:08AM | 14 | correct? |
| 10:08AM | 15 | A.  That's correct. |
| 10:08AM | 16 | Q.  Back inside of Pharaoh's, camera 27 is a location in the |
| 10:08AM | 17 | kitchen with a view of the front kitchen area, correct? |
| 10:08AM | 18 | A.  Correct. |
| 10:08AM | 19 | Q.  Camera 28 is a location over another one of the cash |
| 10:08AM | 20 | registers, correct? |
| 10:08AM | 21 | A.  That's correct. |
| 10:08AM | 22 | Q.  Same for camera 29, right? |
| 10:08AM | 23 | A.  Correct. |
| 10:08AM | 24 | Q.  Camera -- excuse me, camera 30 is a location in the main |
| 10:09AM | 25 | bar area with a view of the bar, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

29

10:09AM   1    A.  Correct.

10:09AM   2    Q.  Camera 31 is a location in the hallway of Pharaoh's with

10:09AM   3    a view of the door that goes to the upstairs, correct?

10:09AM   4    A.  That's correct.

10:09AM   5    Q.  Okay.  On this page, the -- the -- the agent documented

10:09AM   6    summaries of what was viewable in regards to cameras 23

10:09AM   7    through 31, correct?

10:09AM   8    A.  That's correct.

10:09AM   9    Q.  Okay.  And upon reviewing the footage from each of those

10:09AM   10   cameras, a determination was made by the agent that there was

10:09AM   11   no relevant information, correct?

10:09AM   12   A.  Correct.

10:09AM   13   Q.  Okay.  And, again, per all of the cameras that are

10:09AM   14   documented on this page, there was no indication that there

10:09AM   15   was ever an observation made of drug use, correct?

10:09AM   16   A.  There's no indication in the report of any of that.

10:09AM   17   Q.  No indication in the report that there was any

10:09AM   18   observation of what happened to potentially be a drug

10:09AM   19   transaction, correct?

10:09AM   20   A.  Correct.

10:09AM   21   Q.  No indication that there was ever an observation of what

10:10AM   22   could have potentially been drugs, correct?

10:10AM   23   A.  Correct.

10:10AM   24       **MR. FOTI:**  Can we go to the last page, please?

          25

10:10AM   1          **BY MR. FOTI:**

10:10AM   2   Q.   Okay.  Camera 32 is a location in the hallway from the

10:10AM   3   main floor to the ATM locker rooms?

10:10AM   4   A.   Correct.

10:10AM   5   Q.   All right.  Camera 33 is a location over the main floor

10:10AM   6   showing the left side of the stage?

10:10AM   7   A.   That's correct.

10:10AM   8   Q.   Camera 34 is a view of the Pharaoh's beer cooler, right?

10:10AM   9   A.   That's correct.

10:10AM  10   Q.   Camera 35 is a location with a view of the liquor storage

10:10AM  11   area, correct?

10:10AM  12   A.   Correct.

10:10AM  13   Q.   And the last camera listed is camera 37, which is a

10:10AM  14   location over the exit from the bar area out to the hallway,

10:10AM  15   correct?

10:10AM  16   A.   That's correct.

10:10AM  17   Q.   Again, in this last page of the report, cameras 32

10:10AM  18   through 37 provide a summary of what was generally observed

10:10AM  19   when viewing the footage from each of these cameras?

10:11AM  20   A.   Yeah, a briefly summary.

10:11AM  21   Q.   And, again, the determination was made that for cameras

10:11AM  22   32 through 37, there was no relevant information, correct?

10:11AM  23   A.   Correct.

10:11AM  24   Q.   And, again, no indication in this final page of the

10:11AM  25   report that there was ever an observation of any drug use,

USA v Gerace - Burns - Foti/Cross - 12/18/24

31

10:11AM  1    correct?

10:11AM  2    A.  Correct.

10:11AM  3    Q.  There was never an observation of what appeared to be

10:11AM  4    drug transaction, correct?

10:11AM  5    A.  Correct.

10:11AM  6    Q.  Never an observation of what -- of anything that could

10:11AM  7    potentially be drugs, correct?

10:11AM  8    A.  Correct.

10:11AM  9    Q.  Okay.

10:11AM  10        MR. FOTI:  We can take down that report.

10:11AM  11        Can we pull up Government Exhibit 3539EF?

10:11AM  12        BY MR. FOTI:

10:11AM  13   Q.  Okay.  Sir, this is the report that documents the last of

10:11AM  14   the three DVRs, DVR 3, correct?

10:12AM  15   A.  Correct.

10:12AM  16   Q.  Okay.

10:12AM  17        MR. FOTI:  Can we go to page 2?

10:12AM  18        BY MR. FOTI:

10:12AM  19   Q.  All right.  And I'm showing you the second page of the

10:12AM  20   report.  This is the report that you're familiar with that

10:12AM  21   documented what was viewed on the cameras that were contained

10:12AM  22   in DVR 3, correct?

10:12AM  23   A.  That's correct.

10:12AM  24   Q.  And this report is the same as when you've reviewed it in

10:12AM  25   the past, correct?

USA v Gerace - Burns - Foti/Cross - 12/18/24

32

10:12AM    1    A.  It is.

10:12AM    2    Q.  No changes that you can observe here, correct?

10:12AM    3    A.  Not that I see.

10:12AM    4            MR. FOTI:  Okay.  At this time, I would move in

10:12AM    5    3539EF.

10:12AM    6            MR. TRIPI:  No objection.

10:12AM    7            THE COURT:  Received without objection.

10:12AM    8            (GOV Exhibit 3539EF was received in evidence.)

10:12AM    9            BY MR. FOTI:

10:12AM    10   Q.  Okay.  Sir, this is the last of the DVRs, correct?

10:12AM    11   A.  The third one, correct.

10:12AM    12   Q.  This one is certainly shorter than DVR 2, right?

10:12AM    13   A.  Yes.

10:12AM    14   Q.  Okay.  We have a total of seven cameras that were

10:12AM    15   viewable on this DVR, correct?

10:12AM    16   A.  That's correct.

10:12AM    17   Q.  And I'm just going to go through these ones, as well.

10:13AM    18       Camera 1 was another location in the hallway of the

10:13AM    19   Pharaoh's kitchen towards the bar area, correct?

10:13AM    20   A.  Correct.

10:13AM    21   Q.  Camera 2 is a location in the main bar area with a view

10:13AM    22   of the bar, correct?

10:13AM    23   A.  Correct.

10:13AM    24   Q.  Location 3 was a location at the door to the hallway

10:13AM    25   leading to the office area over the food prep station and the

USA v Gerace - Burns - Foti/Cross - 12/18/24

33

10:13AM    1    kitchen window, correct?

10:13AM    2    A.  Correct.

10:13AM    3    Q.  Camera 4 is a location of the right side of Pharaoh's

10:13AM    4    facing the seating area, correct?

10:13AM    5    A.  Correct.

10:13AM    6    Q.  Camera 5 is a location directly over the VIP podium desk,

10:13AM    7    correct?

10:13AM    8    A.  That's correct.

10:13AM    9    Q.  And your understanding is there was only one VIP podium,

10:13AM   10    correct?

10:13AM   11    A.  That's my understanding.

10:13AM   12    Q.  That's the VIP podium outside of the VIP area, correct?

10:13AM   13    A.  That's correct.

10:13AM   14    Q.  And that's where we, based on your investigation as well

10:13AM   15    as the testimony we've heard through trial, that's where the

10:13AM   16    chips would be exchanged for money before a lap dances occur,

10:13AM   17    correct?

10:13AM   18    A.  That's correct.

10:13AM   19    Q.  If we go to the second page, camera 6 is a location

10:14AM   20    inside the store area that was the left side of the stage,

10:14AM   21    correct?

10:14AM   22    A.  Correct.

10:14AM   23    Q.  And camera 7 is a location inside of the Pharaoh's

10:14AM   24    office, correct?

10:14AM   25    A.  Correct.

USA v Gerace - Burns - Foti/Cross - 12/18/24

34

| | | |
|---|---|---|
| 10:14AM | 1 | **MR. FOTI:** Can we go back to the previous page, |
| 10:14AM | 2 | page 2? |
| 10:14AM | 3 | **BY MR. FOTI:** |
| 10:14AM | 4 | Q.  Now, I'm going to ask you generally about the entire |
| 10:14AM | 5 | document, cameras 1 through 7 on the two pages that we just |
| 10:14AM | 6 | discussed, each of them provide a brief summary of what is |
| 10:14AM | 7 | observable based on the footage of those particular areas |
| 10:14AM | 8 | that the cameras covered, correct? |
| 10:14AM | 9 | A.  That's what's reported, correct. |
| 10:14AM | 10 | Q.  And I forgot to ask this.  Just to be clear, this -- the |
| 10:14AM | 11 | footage on this DVR covers a timeframe from November 30th up |
| 10:14AM | 12 | to December 12th, correct? |
| 10:14AM | 13 | A.  Yeah, two weeks approximately. |
| 10:14AM | 14 | Q.  Yeah.  So, two weeks, or maybe even just short of two |
| 10:14AM | 15 | weeks on this particular DVR? |
| 10:15AM | 16 | A.  Yeah, that's accurate. |
| 10:15AM | 17 | Q.  Now, in terms of these seven cameras, again, a |
| 10:15AM | 18 | determination was made by the agent reviewing that there was |
| 10:15AM | 19 | no relevant information on each of the cameras, correct? |
| 10:15AM | 20 | A.  That's correct. |
| 10:15AM | 21 | Q.  And in terms of each of these cameras and what was |
| 10:15AM | 22 | observable, there was no indication that there was any drug |
| 10:15AM | 23 | transactions observed, correct? |
| 10:15AM | 24 | A.  That's correct. |
| 10:15AM | 25 | Q.  There's no indication that there was any drug use |

USA v Gerace - Burns - Foti/Cross - 12/18/24

| | | |
|---|---|---|
| 10:15AM | 1 | observed, correct? |
| 10:15AM | 2 | A.  Correct. |
| 10:15AM | 3 | Q.  No indication that there was anything that appeared to |
| 10:15AM | 4 | potentially be type of any controlled substance, correct? |
| 10:15AM | 5 | A.  Correct. |
| 10:15AM | 6 | Q.  Or any other type of contraband, correct? |
| 10:15AM | 7 | A.  Per the report, correct. |
| 10:15AM | 8 | **MR. FOTI:**  Okay.  We can take that down. |
| 10:15AM | 9 | **BY MR. FOTI:** |
| 10:16AM | 10 | Q.  Okay.  Sir, yesterday we were talking about different |
| 10:16AM | 11 | investigative tactics that can be used during the course of a |
| 10:16AM | 12 | narcotics investigation, right? |
| 10:16AM | 13 | A.  Generally, yeah. |
| 10:16AM | 14 | Q.  I was just sort of hitting some general areas of |
| 10:16AM | 15 | investigative techniques, correct? |
| 10:16AM | 16 | A.  Generally, in narcotics investigations, I believe that's |
| 10:16AM | 17 | how you framed it. |
| 10:16AM | 18 | Q.  So I had asked you about your experience in narcotics |
| 10:16AM | 19 | investigations, different techniques that you've used in |
| 10:16AM | 20 | different cases, correct? |
| 10:16AM | 21 | A.  Correct. |
| 10:16AM | 22 | Q.  And I had talked to you about being involved in the use |
| 10:16AM | 23 | of undercover transactions, undercover buys, correct? |
| 10:16AM | 24 | A.  Correct. |
| 10:16AM | 25 | Q.  And certainly in your experience in other narcotics |

USA v Gerace - Burns - Foti/Cross - 12/18/24

36

| | | |
|---|---|---|
| 10:16AM | 1 | investigations, you've utilized that tactic before, correct? |
| 10:16AM | 2 | A.  In some cases, yes. |
| 10:16AM | 3 | Q.  We talked a little bit about surveillance, which I |
| 10:16AM | 4 | believe you indicated there was at least some surveillance |
| 10:16AM | 5 | throughout the course of this investigation, correct? |
| 10:16AM | 6 | A.  Some, yes. |
| 10:17AM | 7 | Q.  We talked about search warrants, correct? |
| 10:17AM | 8 | A.  Correct. |
| 10:17AM | 9 | Q.  All right.  Now, the first search warrant that you were |
| 10:17AM | 10 | involved in in regards to this investigation was a search of |
| 10:17AM | 11 | Mr. Bongiovanni's home, correct? |
| 10:17AM | 12 | A.  Right, June 6th, 2019. |
| 10:17AM | 13 | **MR. FOTI:**  Can we pull up Government Exhibit 100A.1-1 |
| 10:17AM | 14 | in evidence. |
| 10:17AM | 15 | **BY MR. FOTI:** |
| 10:17AM | 16 | Q.  Okay.  You were asked about this on direct, correct? |
| 10:17AM | 17 | A.  I was. |
| 10:17AM | 18 | Q.  And this is -- this is a document that was located in |
| 10:17AM | 19 | Mr. -- in a box in Mr. Bongiovanni's basement; is that |
| 10:17AM | 20 | correct? |
| 10:17AM | 21 | A.  Yeah, in the Redweld folder. |
| 10:17AM | 22 | Q.  Now, we went through this on direct, but I just want |
| 10:17AM | 23 | to -- because we didn't go through and read every line, it |
| 10:17AM | 24 | probably would have been a waste of time, I want to clarify a |
| 10:17AM | 25 | few things. |

USA v Gerace - Burns - Foti/Cross - 12/18/24

10:17AM   1    A.   Certainly.

10:17AM   2    Q.   All right.   In this document, there is a reference to

10:18AM   3    Anthony Gerace, correct?

10:18AM   4    A.   That's correct.

10:18AM   5    Q.   All right.   And there's a reference to Mr. Bongiovanni

10:18AM   6    taking certain steps to be alerted to any -- alerted through

10:18AM   7    this system in regards to certain things that could happen

10:18AM   8    for Anthony Gerace, correct?

10:18AM   9    A.   For numbers related with him, correct.

10:18AM   10   Q.   Now, in this document, there's no reference to Peter

10:18AM   11   Gerace, correct?

10:18AM   12   A.   There is not.

10:18AM   13   Q.   There's no reference to any phone number associated with

10:18AM   14   Peter Gerace, correct?

10:18AM   15   A.   Correct.

10:18AM   16   Q.   There's nothing about this document that references Peter

10:18AM   17   Gerace in any respect, correct?

10:18AM   18   A.   Not that I recall.

10:18AM   19        **MR. FOTI:**   Okay.   Can we -- we can take that down?

10:18AM   20   Pull up 100A.1-2, which is also in evidence.

10:18AM   21        **BY MR. FOTI:**

10:18AM   22   Q.   This was the other document you were asked about on

10:18AM   23   direct, correct?

10:18AM   24   A.   Correct.

10:18AM   25   Q.   And this was a document that was also located in

| 10:19AM | 1 | Mr. Bongiovanni's house during the search, correct? |
| 10:19AM | 2 | A.  In that same box, yes, sir. |
| 10:19AM | 3 | Q.  Yep.  And here on the first page, it indicates who the |
| 10:19AM | 4 | task force case agent was in this particular investigation, |
| 10:19AM | 5 | correct? |
| 10:19AM | 6 | A.  That's correct. |
| 10:19AM | 7 | Q.  And that was Christopher Clark, correct? |
| 10:19AM | 8 | A.  It was. |
| 10:19AM | 9 | Q.  And then there's special agents who are listed as well |
| 10:19AM | 10 | from the IRS, and ATF, and DEA, correct? |
| 10:19AM | 11 | A.  That's correct. |
| 10:19AM | 12 | Q.  And none of these individuals testified during the course |
| 10:19AM | 13 | of this trial, correct? |
| 10:19AM | 14 | A.  They did not. |
| 10:19AM | 15 | **MR. FOTI:**  Okay.  Can we go to page 2 of this report? |
| 10:19AM | 16 | **BY MR. FOTI:** |
| 10:19AM | 17 | Q.  All right.  This report lists 11 names on this particular |
| 10:19AM | 18 | page on the left side, correct? |
| 10:19AM | 19 | A.  That's correct. |
| 10:19AM | 20 | Q.  And you talked about Frank Tripi being one of those |
| 10:19AM | 21 | individuals, correct? |
| 10:19AM | 22 | A.  Correct. |
| 10:19AM | 23 | Q.  There's 11 other names besides Mr. Tripi, correct? |
| 10:20AM | 24 | A.  I think there's 11 total. |
| 10:20AM | 25 | Q.  I'm sorry, ten other. |

USA v Gerace - Burns - Foti/Cross - 12/18/24

| | | |
|---|---|---|
| 10:20AM | 1 | A. Ten other. |
| 10:20AM | 2 | Q. Better at math. All right. So -- |
| 10:20AM | 3 | A. Correct. |
| 10:20AM | 4 | Q. -- better at basic math. |
| 10:20AM | 5 | A. Okay. |
| 10:20AM | 6 | Q. So ten other names besides Mr. Tripi on this particular |
| 10:20AM | 7 | document, correct? |
| 10:20AM | 8 | A. That's correct. |
| 10:20AM | 9 | Q. Okay. And in none of these names are Peter Gerace, |
| 10:20AM | 10 | correct? |
| 10:20AM | 11 | A. That's correct. |
| 10:20AM | 12 | Q. And Peter Gerace is not referenced in this document, |
| 10:20AM | 13 | correct? |
| 10:20AM | 14 | A. He is not referenced in this document. |
| 10:20AM | 15 | **MR. FOTI:** Okay. We can take that down. |
| 10:20AM | 16 | **BY MR. FOTI:** |
| 10:20AM | 17 | Q. Okay. Obviously, there is a broad spectrum of potential |
| 10:20AM | 18 | investigative tactics that can be used during the course of |
| 10:20AM | 19 | investigation, correct? |
| 10:20AM | 20 | A. That's correct. |
| 10:20AM | 21 | Q. And there's specific techniques that can be used in |
| 10:20AM | 22 | certain types of investigations like narcotics |
| 10:21AM | 23 | investigations, correct? |
| 10:21AM | 24 | A. That's correct. |
| 10:21AM | 25 | Q. And we've talked about a couple of them at this point, |

USA v Gerace - Burns - Foti/Cross - 12/18/24

40

10:21AM    1    correct?

10:21AM    2    A.   That's correct.

10:21AM    3    Q.   Another type of technique is to request permission from

10:21AM    4    the Court for authorization to conduct a wiretap, correct?

10:21AM    5    A.   That's a -- it's rarely used because it's pretty --

10:21AM    6    significant resources.  You have to have exhausted all other

10:21AM    7    investigative possibilities, so it's not a common practice

10:21AM    8    because it -- the standard to get there is pretty onerous.

10:21AM    9    Q.   Right.  So we'll walk through that.

10:21AM   10         Like I asked about yesterday, if you were searching a

10:21AM   11    particular location, you have to make an application to the

10:21AM   12    Court, correct?

10:21AM   13    A.   That's correct.

10:21AM   14    Q.   You would have to establish certain allegations that

10:21AM   15    support probable cause, correct?

10:21AM   16    A.   That's correct.

10:21AM   17    Q.   And you have to get the Court's approval to conduct a

10:21AM   18    search of a particular location, right?

10:21AM   19    A.   That's correct.

10:21AM   20    Q.   Now, what you were just referring to is for wiretaps,

10:21AM   21    there's sort of these additional facts that you have to

10:21AM   22    establish, correct?

10:21AM   23    A.   That's correct.

10:21AM   24    Q.   Okay.  So, again, you have to go through some of the same

10:21AM   25    process of establishing that there's allegations to support

USA v Gerace - Burns - Foti/Cross - 12/18/24

41

| | | |
|---|---|---|
| 10:22AM | 1 | probable cause, correct? |
| 10:22AM | 2 | A.   That's correct. |
| 10:22AM | 3 | Q.   And you have to also establish other points related to |
| 10:22AM | 4 | whether you've exhausted other resources, or other feasible |
| 10:22AM | 5 | methods of investigation consistent with the idea that a |
| 10:22AM | 6 | wiretap is more of a last resort, correct? |
| 10:22AM | 7 | A.   Correct. |
| 10:22AM | 8 | Q.   And it doesn't have to be -- it doesn't have to be |
| 10:22AM | 9 | necessarily the last resort, but you have to at least |
| 10:22AM | 10 | indicate to the Court that other techniques have been |
| 10:22AM | 11 | attempted and failed, correct? |
| 10:22AM | 12 | A.   Yeah.  You have to essentially outline the exhausted |
| 10:22AM | 13 | other -- other investigative techniques, as well you have to |
| 10:22AM | 14 | outline that in order to get an understanding of the full and |
| 10:22AM | 15 | essentially all the subjects of the conspiracy, you have to |
| 10:22AM | 16 | outline that as well, that this would be a technique that |
| 10:22AM | 17 | would potentially allow you to get the full size of the |
| 10:22AM | 18 | organization and all the conspirators. |
| 10:22AM | 19 | Q.   So you've been involved in an investigation that has |
| 10:23AM | 20 | utilized wiretaps, correct? |
| 10:23AM | 21 | A.   Yeah, a number of them through the years. |
| 10:23AM | 22 | Q.   And in terms of -- I think it predates your involvement |
| 10:23AM | 23 | with this investigation, but one of the witnesses we heard |
| 10:23AM | 24 | from at this trial was Jeff Anzalone? |
| 10:23AM | 25 | A.   Yes. |

USA v Gerace - Burns - Foti/Cross - 12/18/24

42

10:23AM  1   Q.  And during the course of his investigation, wiretaps were

10:23AM  2   used?

10:23AM  3   A.  That's my understanding.

10:23AM  4   Q.  We've discussed during this trial at least one specific

10:23AM  5   recording that was picked up on wiretap of Jeff Anzalone and

10:23AM  6   K.L. discussing the purchase of Adderall, correct?

10:23AM  7   A.  Correct.

10:23AM  8   Q.  Okay.  And that was a drug transaction being discussed

10:23AM  9   over the phone that was recorded pursuant to a wiretap,

10:23AM  10  correct?

10:23AM  11  A.  It was.

10:23AM  12  Q.  You weren't involved in the investigation at that time,

10:23AM  13  correct?

10:23AM  14  A.  Yeah, that was not mine.  I was not involved in that

10:23AM  15  Anzalone investigation.

10:23AM  16  Q.  But consistent with what you just told this jury, that

10:23AM  17  was clearly a situation where the government had gotten an

10:23AM  18  authorization from a court to conduct a wiretap, correct?

10:23AM  19  A.  Correct.

10:23AM  20  Q.  They had went through the process that you just discussed

10:23AM  21  of establishing certain things to get that approval, correct?

10:23AM  22  A.  That might have been a state wiretap, not a federal one,

10:24AM  23  I don't recall.

10:24AM  24  Q.  Okay.  And based on your experience, state or federal

10:24AM  25  court, the requirements in this geographical region are very

USA v Gerace - Burns - Foti/Cross - 12/18/24

43

| | | |
|---|---|---|
| 10:24AM | 1 | similar, correct? |
| 10:24AM | 2 | A.  My understanding, I haven't done a state wire here, I've |
| 10:24AM | 3 | only -- |
| 10:24AM | 4 | Q.  That's okay if you don't know. |
| 10:24AM | 5 | A.  Yeah, I can't say definitively. |
| 10:24AM | 6 | Q.  All right.  So in any event, there was a wiretap in |
| 10:24AM | 7 | regards to Mr. Anzalone, correct? |
| 10:24AM | 8 | A.  That's correct. |
| 10:24AM | 9 | Q.  And regardless of whether there was differences in the |
| 10:24AM | 10 | procedure, you're aware that even a state wiretap requires |
| 10:24AM | 11 | some sort of court authorization? |
| 10:24AM | 12 | A.  Absolutely. |
| 10:24AM | 13 | Q.  And that process was -- was something that clearly some |
| 10:24AM | 14 | members of law enforcement went through to get the wiretap |
| 10:24AM | 15 | that Mr. Anzalone was recorded on? |
| 10:24AM | 16 | A.  I believe it was Niagara County along with HSI, Niagara |
| 10:24AM | 17 | County Sheriff's Office. |
| 10:24AM | 18 | Q.  Okay.  And we talked about -- it was Mr. Anzalone |
| 10:24AM | 19 | testified at this trial, correct? |
| 10:25AM | 20 | A.  He did. |
| 10:25AM | 21 | Q.  And the content of the recordings throughout his wiretap |
| 10:25AM | 22 | were not a significant part of this trial, correct? |
| 10:25AM | 23 | A.  Correct. |
| 10:25AM | 24 | Q.  I think the only recording that was specifically |
| 10:25AM | 25 | discussed was the recording involving K.L., correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

44

10:25AM      1     A.   That's --

10:25AM      2     Q.   Maybe there were others.

10:25AM      3     A.   Yeah, I think you're correct.  I do recall that

10:25AM      4     testimony.

10:25AM      5     Q.   Okay.  Now, no wiretap was pursued in this investigation,

10:25AM      6     correct?

10:25AM      7     A.   No.  It was -- I don't think it was feasible, based on

10:25AM      8     the events of this investigation.

10:25AM      9     Q.   Okay.  So, regardless of whether it was feasible or not,

10:25AM     10     there was no attempt made, correct?

10:25AM     11          You didn't ask for authorization?

10:25AM     12     A.   No.  We weren't even close to getting there.

10:25AM     13     Q.   You didn't ask authorization of the Court to have a

10:25AM     14     wiretap placed on Mr. Bongiovanni's phone, correct?

10:25AM     15     A.   Again, the circumstances in this one weren't even close

10:25AM     16     to something like that.

10:25AM     17     Q.   Okay.  So, the answer is no, you did not attempt that?

10:25AM     18     A.   We did not, no.

10:26AM     19     Q.   And you did not attempt it in regards to Mr. Gerace's

10:26AM     20     phone, correct?

10:26AM     21     A.   Correct.

10:26AM     22     Q.   You had Mr. Gerace's phone number during the course of

10:26AM     23     this investigation?

10:26AM     24     A.   Yes, his phone was seized in April of 2019.

10:26AM     25     Q.   Okay.  And he, Mr. Gerace, as far as you know, never

USA v Gerace - Burns - Foti/Cross - 12/18/24

45

10:26AM  1   changed the phone number he was using, correct?

10:26AM  2   A.  I believe he might have changed it after that.

10:26AM  3   Q.  Okay.

10:26AM  4   A.  I know he maintained, as I recall, I believe three

10:26AM  5   different phones throughout this investigation.  But maybe,

10:26AM  6   that's going -- I can't say -- say that definitively, but I

10:26AM  7   know there was more than one phone.

10:26AM  8   Q.  You're saying over a period of time?

10:26AM  9   A.  Yes, over the course of our timeframe in the years.

10:26AM  10  Q.  You don't -- you don't recall specifically if he changed

10:26AM  11  the phone number or not?

10:26AM  12  A.  I can't say.  I can't recall.

10:26AM  13  Q.  In any event, if he did, you were aware that he changed

10:26AM  14  the phone number?

10:26AM  15  A.  Correct.

10:26AM  16  Q.  There's no period of time during this investigation where

10:26AM  17  you were struggling to figure out what phone Mr. Gerace was

10:26AM  18  using?

10:26AM  19  A.  It's possible he had a burner, but we certainly had an

10:26AM  20  understanding of his phones throughout the course of the

10:26AM  21  investigation.

10:26AM  22  Q.  Okay.  When you say it's possible he had a burner, you

10:26AM  23  don't have any evidence of that, correct?

10:27AM  24  A.  I don't believe we had any definitive evidence.

10:27AM  25  Q.  You searched his house, correct?

10:27AM    1    A.  I didn't search his house, but --

10:27AM    2    Q.  Well --

10:27AM    3    A.  -- his house was searched.

10:27AM    4    Q.  -- the house was searched?

10:27AM    5    A.  Correct.

10:27AM    6    Q.  And you're familiar with what occurred during the course

10:27AM    7    of that search?

10:27AM    8    A.  Generally.

10:27AM    9    Q.  You don't recall there being any TracFone or burner phone

10:27AM   10    recovered?

10:27AM   11    A.  I couldn't say without looking at the inventory, but I

10:27AM   12    don't recall.

10:27AM   13    Q.  You don't recall?

10:27AM   14    A.  No.

10:27AM   15    Q.  And you don't recall any specific piece of evidence to

10:27AM   16    suggest Mr. Burns -- or, I'm sorry, that Mr. Gerace was ever

10:27AM   17    in possession of a burner phone or TracFone, correct?

10:27AM   18    A.  Not that I recall.

10:27AM   19    Q.  Okay.  Now, you never pursued a wiretap for any phone

10:27AM   20    number that you had associated with Mr. Gerace, correct?

10:27AM   21    A.  That's correct.

10:27AM   22    Q.  There's no recorded phone calls involving Mr. Gerace

10:27AM   23    pursuant to a wiretap on any of his phones, correct?

10:27AM   24    A.  Not pursuant to a wiretap.

10:27AM   25    Q.  Okay.  And do you recall any wiretaps picking up phone

USA v Gerace - Burns - Foti/Cross - 12/18/24

47

10:27AM   1   calls of Mr. Gerace in regards to Mr. Anzalone or anybody

10:27AM   2   else that you reviewed?

10:28AM   3   A.   Not that I recall.  I'm not overly familiar with the

10:28AM   4   Anzalone investigation, whether Mr. Gerace was intercepted on

10:28AM   5   that or not.

10:28AM   6   Q.   Okay.  Whether he was or not, you don't recall ever

10:28AM   7   reviewing a recording of Mr. Gerace engaging in a drug

10:28AM   8   transaction, correct?

10:28AM   9   A.   That's correct.

10:28AM   10  Q.   And just because it hasn't come up in this trial, I don't

10:28AM   11  think it's come up in there this trial, when you listen to

10:28AM   12  recordings from wiretaps, it's sometimes the case that drug

10:28AM   13  transactions occur in code, correct?

10:28AM   14  A.   Absolutely.

10:28AM   15  Q.   So, when you're listening to people talk about a drug

10:28AM   16  transaction, you're not just listening to people say can I

10:28AM   17  buy some cocaine from you, right?

10:28AM   18  A.   It's rare that it's that open, but occasionally.

10:28AM   19  Q.   Right.  And in your experience, throughout your

10:28AM   20  investigations, you often hear other words that appear to

10:28AM   21  indicate there was a transaction occurring?

10:28AM   22  A.   It's very common that there's different codes and --

10:28AM   23  Q.   At no point in your investigation did you ever hear a

10:28AM   24  phone call involving Mr. Gerace that appeared to be

10:29AM   25  consistent with a drug transaction, correct?

USA v Gerace - Burns - Foti/Cross - 12/18/24

10:29AM    1    A.  I did not listen to any recording of Mr. Gerace that I

10:29AM    2    recall, other than the voicemail of his phone, I think that's

10:29AM    3    the only recording.

10:29AM    4    Q.  The voicemail that came in -- that came in earlier in the

10:29AM    5    trial, right?

10:29AM    6    A.  Correct.

10:29AM    7    Q.  Besides that, you never heard any recording via any

10:29AM    8    wiretap that involved Mr. Gerace engaged in what appeared to

10:29AM    9    be a drug transaction, correct?

10:29AM    10   A.  That's correct.

10:29AM    11   Q.  You've never heard any -- I think you indicated the only

10:29AM    12   one you ever heard was that voicemail.  You've never heard

10:29AM    13   any recording at all of Mr. Gerace engaged in any drug

10:29AM    14   transaction, correct?

10:29AM    15   A.  Not that I've heard.

10:30AM    16        **MR. FOTI:**  Okay.  Can -- can we pull up Government

10:30AM    17   Exhibit 555 on the screen, please?

10:30AM    18        Actually, can I just have a minute, Judge?

10:30AM    19        **THE COURT:**  Sure.

10:31AM    20        **BY MR. FOTI:**

10:31AM    21   Q.  This is a digital copy of Government Exhibit 555, which

10:31AM    22   we have on the board over there, correct?

10:31AM    23   A.  That's correct.

10:31AM    24   Q.  Okay.  And in this exhibit, as part of -- yesterday I was

10:31AM    25   asking you about some of the things that -- particularly that

10:31AM   1   relate to testimony of some of these witnesses that's not

10:31AM   2   included in this exhibit, correct?

10:31AM   3   A.   Yeah, as I mentioned yesterday, I wasn't -- we were not

10:31AM   4   gonna interpret testimony.  It's not our --

10:31AM   5   Q.   Right.  So there's no documentation of those things I

10:31AM   6   asked about yesterday, such as who received some sort of

10:31AM   7   benefit or payment of expenses, correct?

10:31AM   8   A.   Correct.

10:31AM   9   Q.   And like I asked about yesterday, there's no indication

10:31AM  10   of which ones of these witnesses had been impeached at some

10:32AM  11   point, right?

10:32AM  12   A.   That's right.

10:32AM  13   Q.   Nothing about testimony at all, correct?

10:32AM  14   A.   Correct.

10:32AM  15   Q.   Now what is on here is a list of exhibits that were

10:32AM  16   identified, based on your review, as something that you

10:32AM  17   believed was relevant to the different charges or events that

10:32AM  18   are documented on this, correct?

10:32AM  19   A.   Events, yeah, tied to the counts.

10:32AM  20   Q.   So, for example, the line that goes down coming off of

10:32AM  21   the entrance of Pharaoh's Gentlemen's Club.  It indicates

10:32AM  22   that there's three counts that are relevant to this drug

10:32AM  23   conspiracy allegation, correct?

10:32AM  24   A.   Correct.

10:32AM  25   Q.   And then it lists a number of exhibits that is intended

USA v Gerace - Burns - Foti/Cross - 12/18/24

10:32AM 1    to provide some indication that in this summary chart those

10:32AM 2    appear to be exhibits that are relevant to that particular

10:32AM 3    account, correct?

10:32AM 4    A.  Yeah, some exhibits, we didn't include each and every

10:32AM 5    one.

10:32AM 6    Q.  Yeah, none of the exhibits on this chart include a

10:33AM 7    picture of any drugs that were seized from Pharaoh's,

10:33AM 8    correct?

10:33AM 9    A.  That's correct.

10:33AM 10   Q.  None of the exhibits on this chart are of any drugs that

10:33AM 11   were seized from Peter Gerace's home, correct?

10:33AM 12   A.  Correct.

10:33AM 13   Q.  None of the exhibits on this chart are any pictures of

10:33AM 14   drugs that were seized from either of those locations,

10:33AM 15   correct?

10:33AM 16   A.  That's correct.

10:33AM 17   Q.  None of the -- yesterday, you talked about this is --

10:33AM 18   this was ultimately charged as more of a historical

10:33AM 19   conspiracy, correct?

10:33AM 20   A.  That's correct.

10:33AM 21   Q.  And so there's a wide range of time that's covered in

10:33AM 22   each of these conspiracy counts, correct?

10:33AM 23   A.  That's correct.

10:33AM 24   Q.  Now, none of these exhibits are any pictures that were

10:33AM 25   provided of drugs at any time during the course of that

10:33AM    1    conspiracy, correct?

10:33AM    2    A.  I'm sorry, can you --

10:33AM    3    Q.  So in other words, none of the witnesses that are on the

10:34AM    4    bottom -- the bottom two rows there, none of those witnesses

10:34AM    5    provided pictures they took inside of Pharaoh's, correct?

10:34AM    6    A.  Correct, no pictures.  That they took -- are you

10:34AM    7    referring to the witnesses, that they took pictures?

10:34AM    8    Q.  Yeah.

10:34AM    9    A.  Yes.  Correct.

10:34AM   10    Q.  So you don't have any exhibits that reference pictures

10:34AM   11    that were taken by these witnesses of things that happened at

10:34AM   12    Pharaoh's, correct?

10:34AM   13    A.  Correct.

10:34AM   14    Q.  No pictures of any drugs located inside Pharaoh's at any

10:34AM   15    time during the course of any of these conspiracies, correct?

10:34AM   16    A.  Correct.

10:34AM   17    Q.  And we saw pictures of Peter Gerace throughout this

10:34AM   18    trial.  No pictures of Peter Gerace ever in possession of any

10:34AM   19    drugs, correct?

10:34AM   20    A.  Correct.  I would add the caveat that most people don't

10:34AM   21    take pictures of themselves consuming narcotics.

10:34AM   22    Q.  Well, that's fair.  But you've also seen during the

10:34AM   23    course of this investigation that some of these witnesses had

10:34AM   24    pictures of themselves holding guns, correct?

10:34AM   25    A.  Holding guns?

USA v Gerace - Burns - Foti/Cross - 12/18/24

52

| | | |
|---|---|---|
| 10:34AM | 1 | Q.  Do you remember a picture of K.L. and P.H.? |
| 10:34AM | 2 | A.  Oh, correct.  Yes, I recall that now. |
| 10:35AM | 3 | Q.  And during the course of your -- |
| 10:35AM | 4 | A.  Sorry. |
| 10:35AM | 5 | Q.  And in the course of other narcotics investigations, |
| 10:35AM | 6 | you've definitely seen people posting pictures or providing |
| 10:35AM | 7 | pictures of large quantities of cash they're in possession |
| 10:35AM | 8 | of, correct? |
| 10:35AM | 9 | MR. TRIPI:  Objection of what he's seen in other |
| 10:35AM | 10 | cases. |
| 10:35AM | 11 | THE COURT:  Overruled. |
| 10:35AM | 12 | THE WITNESS:  Correct, yes, I have seen that in other |
| 10:35AM | 13 | cases. |
| 10:35AM | 14 | BY MR. FOTI: |
| 10:35AM | 15 | Q.  It may be stupid, but people do it, right? |
| 10:35AM | 16 | A.  I would agree with you, it may be stupid, but people do |
| 10:35AM | 17 | do it. |
| 10:35AM | 18 | Q.  There was no -- no pictures like that in any of the |
| 10:35AM | 19 | exhibits contained in this summary chart, correct? |
| 10:35AM | 20 | A.  Yep. |
| 10:35AM | 21 | Q.  And there were no -- no pictures like that entered at any |
| 10:35AM | 22 | point during the course of this trial, correct? |
| 10:35AM | 23 | A.  Correct. |
| 10:35AM | 24 | Q.  None of these exhibits are recordings of Mr. Gerace ever |
| 10:35AM | 25 | talking about any drug transactions, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

53

10:35AM  1   A.   That's correct.

10:35AM  2   Q.   Or any discussion of drugs at all, correct?

10:35AM  3   A.   There is an exhibit of a voicemail where he talked about

10:35AM  4   tra -- or, the voicemail to Bongiovanni concerning the

10:36AM  5   TracFone and drug dealing.

10:36AM  6   Q.   And, well, and drug dealing -- there was no reference to

10:36AM  7   drug dealing in that call, is there?

10:36AM  8   A.   It relates to a ping order and can you track a --

10:36AM  9   Q.   Sure.

10:36AM  10  A.   -- getting a ping order on a burner phone, essentially a

10:36AM  11  TracFone for him.

10:36AM  12  Q.   Ping orders are not exclusive to drug trafficking

10:36AM  13  investigations though, correct?

10:36AM  14  A.   No, we use them for fugitives and things like that, as

10:36AM  15  well.

10:36AM  16  Q.   So when you say it's a recording related to drugs, you're

10:36AM  17  kind of doing a bit of speculation in that regard, right?

10:36AM  18  A.   I believe he says drugs.  I'd have to listen to the

10:36AM  19  exhibit again.  But I believe he says drug traffickers or

10:36AM  20  something.  Going from memory.

10:36AM  21  Q.   He might have said something like that.  But in terms of

10:36AM  22  whether the recording involves Mr. Gerace discussing a drug

10:36AM  23  transaction, there's no discussion of that, correct?

10:36AM  24  A.   Not a specific transaction, no.

10:36AM  25  Q.   No.  And there's no exhibit on this Government 555 that

10:36AM     1    contains a recording like that, correct?

10:36AM     2    A.  That contains --

10:36AM     3    Q.  A recording of Mr. Gerace discussing a drug transaction,

10:36AM     4    correct?

10:36AM     5    A.  Correct.

10:36AM     6    Q.  And there's no recording on this exhibit that discuss --

10:37AM     7    of Mr. Gerace discussing any type of commercial sex act,

10:37AM     8    correct?

10:37AM     9    A.  Some of the Michalski texts could --

10:37AM    10    Q.  I'm just asking about recordings.

10:37AM    11    A.  Oh, recordings?  I'm sorry.  Correct.

10:37AM    12    Q.  Okay.  So, it's correct that there's no exhibits that

10:37AM    13    contain recordings of Mr. Gerace discussing a commercial sex

10:37AM    14    act, correct?

10:37AM    15    A.  A recording.  I'm sorry, I missed the recording.

10:37AM    16    Q.  No, that's okay.

10:37AM    17    A.  Correct.

10:37AM    18    Q.  And you just referenced text messages that we reviewed on

10:37AM    19    direct involving Judge Michalski, correct?

10:37AM    20    A.  That's correct.

10:37AM    21    Q.  And in -- when you say -- when you kind of said, well,

10:37AM    22    some of the messages, which messages are you referring to?

10:37AM    23    A.  Oh, I believe the first one where he says get some pussy

10:37AM    24    there.

10:37AM    25    Q.  Let's get some pussy there?

USA v Gerace - Burns - Foti/Cross - 12/18/24

55

10:37AM    1    A.  Yes.

10:37AM    2    Q.  There was no context to it, right?

10:37AM    3    A.  I have context based on the investigation, but I don't

10:37AM    4    have context based on the text message.

10:37AM    5    Q.  Right.  The text messages don't say if they're talking

10:37AM    6    about going out to a bar together, correct?

10:38AM    7    A.  Correct.

10:38AM    8    Q.  It doesn't say what -- there's no context to indicate

10:38AM    9    whether there's a joke associated with that, correct?

10:38AM   10    A.  Correct.

10:38AM   11    Q.  There's nothing indicating what preceded that text

10:38AM   12    message, correct?

10:38AM   13    A.  Correct.

10:38AM   14    Q.  There's no followup that adds some sort of explanation to

10:38AM   15    what that was in reference to, correct?

10:38AM   16    A.  Correct.

10:38AM   17    Q.  There's no text messages in any of these exhibits where

10:38AM   18    there's a discussion of a commercial sex act being -- being

10:38AM   19    negotiated, correct?

10:38AM   20    A.  Negotiated?  No.

10:38AM   21         I guess I'm thinking about that, she does anal on the

10:38AM   22    Lamont one, but I don't see a negotiating.  If you're asking

10:38AM   23    about negotiations, I don't.

10:38AM   24    Q.  And you -- you recall from the text message thread

10:38AM   25    involving Mr. Lamont that after that comment, the

USA v Gerace - Burns - Foti/Cross - 12/18/24

56

| | | |
|---|---|---|
| 10:38AM | 1 | communication between Mr. Gerace and Mr. Lamont stops for |
| 10:38AM | 2 | several months, correct? |
| 10:39AM | 3 | A.  I believe so.  I don't have it in front of me, but I |
| 10:39AM | 4 | think that's accurate. |
| 10:39AM | 5 | Q.  And there's no -- there's no context beyond just that |
| 10:39AM | 6 | message which says LOL at the end, as to what -- whether it |
| 10:39AM | 7 | was a joke, or whether it was serious, or what it was in |
| 10:39AM | 8 | reference to, correct? |
| 10:39AM | 9 | A.  Correct. |
| 10:39AM | 10 | Q.  In other words, there's no response from Peter Gerace at |
| 10:39AM | 11 | all to that message, correct? |
| 10:39AM | 12 | A.  Going off of memory, correct. |
| 10:39AM | 13 | Q.  All right.  No -- so, going back to my original question, |
| 10:39AM | 14 | none of these exhibits involve communication of Mr. Gerace |
| 10:39AM | 15 | where there's negotiation over a commercial sex act, correct? |
| 10:39AM | 16 | A.  That's correct. |
| 10:39AM | 17 | **MR. FOTI:**  Okay.  Can I just have one more moment, |
| 10:39AM | 18 | Judge? |
| 10:39AM | 19 | **THE COURT:**  Yes. |
| 10:40AM | 20 | **MR. FOTI:**  Okay.  Special Agent Burns, thank you. |
| 10:40AM | 21 | Nothing further. |
| 10:40AM | 22 | **MR. TRIPI:**  Judge, I do have redirect.  I hate to |
| 10:40AM | 23 | ask, but can we take a five-minute break? |
| 10:40AM | 24 | **THE COURT:**  No, I think it's a good idea.  That's |
| 10:40AM | 25 | what I was planning on doing anyway. |

10:40AM    1              Please remember my instructions about not

10:40AM    2    communicating about the case with anyone including each other,

10:40AM    3    and not making up your mind.

10:40AM    4              See you back here in about ten or 15 minutes.

10:40AM    5              (Jury excused at 10:40 a.m.)

10:41AM    6              **THE COURT:**  So, do you plan to rest after this

10:41AM    7    witness?

10:41AM    8              **MR. TRIPI:**  Yes, Judge.

10:41AM    9              **THE COURT:**  Okay.  So just as -- and how long do you

10:41AM   10    think your redirect's going to go?

10:41AM   11              **MR. TRIPI:**  I hesitate to answer.  30 to 40 minutes

10:41AM   12    at max.

10:41AM   13              **THE COURT:**  Okay.  So, what I'm thinking is once

10:41AM   14    we're done with this witness, the government rests.  We will

10:41AM   15    then break for lunch.  And it will be a long break, because

10:41AM   16    we've got the argument, and you want to meet with Mr. Gerace,

10:41AM   17    which I think is --

10:41AM   18              **MR. FOTI:**  Yes.

10:41AM   19              **THE COURT:**  -- probably very wise.

10:41AM   20              So, and then we'll come back, and I'll tell the jury

10:41AM   21    we're going to take a long lunch and then come back, and we'll

10:41AM   22    have the plan for the rest of the week for you then.

10:41AM   23              **MR. TRIPI:**  Sounds good.

10:41AM   24              **THE COURT:**  And maybe we send them home then,

10:41AM   25    depending on where we are.

USA v Gerace - Burns - Foti/Cross - 12/18/24

58

| | | |
|---|---|---|
| 10:41AM | 1 | **MR. COOPER:** Depending on what the decision is. |
| 10:42AM | 2 | **THE COURT:** Yeah. So, I don't have a problem with |
| 10:42AM | 3 | that. Or, we continue with proof. |
| 10:42AM | 4 | **MR. FOTI:** No, that's perfect. It gives them time |
| 10:42AM | 5 | for their pizza party. |
| 10:42AM | 6 | **THE COURT:** Yeah. |
| 10:42AM | 7 | **MR. FOTI:** If we do end up calling witnesses, we have |
| 10:42AM | 8 | the lunch to make sure everybody's here ready to go. |
| 10:42AM | 9 | **THE COURT:** Yep. Terrific. Good. |
| 10:42AM | 10 | So we're not in any rush right now, even if you're |
| 10:42AM | 11 | going to take longer, so we'll take 15, 20 minutes right now |
| 10:42AM | 12 | and come back. |
| 10:42AM | 13 | **MR. TRIPI:** Sounds good. And, Judge, just a last |
| 10:42AM | 14 | housekeeping thing. I think the defense filed something on |
| 10:42AM | 15 | the buyer/seller last night. I intend to, however today goes, |
| 10:42AM | 16 | get you some type of response today in writing. |
| 10:42AM | 17 | **THE COURT:** Great. |
| 10:42AM | 18 | **MR. TRIPI:** It will be short, but I hope that gives |
| 10:42AM | 19 | the Court enough time to look at both filings. |
| 10:42AM | 20 | **THE COURT:** Yeah. I think they submitted something |
| 10:42AM | 21 | on two different charges, right? Buyer/seller and -- |
| 10:42AM | 22 | **MR. SOEHNLEIN:** And bribery/gratuity. |
| 10:42AM | 23 | **MR. TRIPI:** I'll do a combined response. |
| 10:42AM | 24 | **THE COURT:** Great. Terrific. Good. |
| 10:42AM | 25 | **MR. SOEHNLEIN:** And just one more thing from us, |

| | | |
|---|---|---|
| 10:42AM | 1 | Judge.  Mr. Gerace and I have the last appearance on any |
| 10:42AM | 2 | Curcio issue today at 12:30 with Judge Roemer. |
| 10:43AM | 3 | **THE COURT:**  Oh. |
| 10:43AM | 4 | **MR. SOEHNLEIN:**  So that's just to flag that for the |
| 10:43AM | 5 | lunch hour.  I don't expect it to take long.  But Judge Roemer |
| 10:43AM | 6 | scheduled this a while ago.  So I guess it would make sense to |
| 10:43AM | 7 | be respectful of that -- |
| 10:43AM | 8 | **THE COURT:**  In a different case? |
| 10:43AM | 9 | **MR. SOEHNLEIN:**  It's in a different case.  That's |
| 10:43AM | 10 | right.  But it's me and Mr. Gerace. |
| 10:43AM | 11 | **THE COURT:**  That's fine.  Okay? |
| 10:43AM | 12 | **MR. TRIPI:**  Okay. |
| 10:43AM | 13 | **THE COURT:**  Anything else we need to do right now? |
| 10:43AM | 14 | **MR. TRIPI:**  No, thank you, Judge. |
| 10:43AM | 15 | **MR. FOTI:**  No. |
| 10:43AM | 16 | **THE COURT:**  Okay.  Good.  We'll see you folks in a |
| 10:43AM | 17 | little while. |
| 10:43AM | 18 | **THE CLERK:**  All rise. |
| 10:43AM | 19 | (Off the record at 10:43 a.m.) |
| 11:07AM | 20 | (Back on the record at 11:07 a.m.) |
| 11:08AM | 21 | (Jury not present.) |
| 11:08AM | 22 | **THE COURT:**  Please be seated. |
| 11:08AM | 23 | **THE CLERK:**  We are back on the record for the |
| 11:08AM | 24 | continuation of the jury trial in case numbers 19-cr-227 and |
| 11:08AM | 25 | 23-cr-37, United States of America versus Peter Gerace, Jr. |

| | | |
|---|---|---|
| 11:08AM | 1 | All counsel and parties are present. |
| 11:08AM | 2 | **THE COURT:**  Okay.  Are we ready to go? |
| 11:08AM | 3 | **MR. TRIPI:**  Yes, Judge. |
| 11:08AM | 4 | **THE COURT:**  Anything we need to put on the record |
| 11:08AM | 5 | from the government? |
| 11:08AM | 6 | **MR. TRIPI:**  I don't think so. |
| 11:08AM | 7 | **THE COURT:**  Anything from the defense. |
| 11:08AM | 8 | **MR. FOTI:**  No, Judge. |
| 11:08AM | 9 | **THE COURT:**  Okay.  Let's bring them back, please, |
| 11:08AM | 10 | Pat. |
| 11:09AM | 11 | (Jury seated at 11:09 a.m.) |
| 11:09AM | 12 | **THE COURT:**  The record will reflect that all our |
| 11:10AM | 13 | jurors are present. |
| 11:10AM | 14 | I remind the witness that he's still under oath. |
| 11:10AM | 15 | And, Mr. Tripi, you may begin your redirect. |
| 11:10AM | 16 | **MR. TRIPI:**  Thank you, Judge. |
| 11:10AM | 17 | |
| 11:10AM | 18 | **REDIRECT EXAMINATION BY MR. TRIPI:** |
| 11:10AM | 19 | Q.  Good morning, Special Agent Burns. |
| 11:10AM | 20 | A.  Good morning, Mr. Tripi. |
| 11:10AM | 21 | Q.  Special Agent Burns, I'm going try to go in a sort of the |
| 11:10AM | 22 | same order that Mr. Foti questioned you on topics.  If I jump |
| 11:10AM | 23 | around, I apologize in advance. |
| 11:10AM | 24 | A.  That's fine. |
| 11:10AM | 25 | Q.  You were asked, I think at the beginning of cross, about |

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
61

11:10AM  1  sort of the number of personnel that were involved in aspects

11:10AM  2  of the investigation; do you recall that?

11:10AM  3  A.  I do.

11:10AM  4  Q.  You were asked a number of names of various agents.  My

11:10AM  5  question is, on the day to day, were there far fewer agents

11:10AM  6  involved in the actual day-to-day investigation?

11:10AM  7  A.  Yeah, definitely.

11:10AM  8  Q.  For example, when witnesses need to be transported, do

11:10AM  9  two agents need to be involved in a transport?

11:10AM  10  A.  They do.

11:10AM  11  Q.  When one interview is conducted, do two agents need to be

11:10AM  12  present for that typically?

11:10AM  13  A.  Typically.  I mean, you try to always do that.

11:11AM  14  Q.  Does it mean that those transporting agents, or even an

11:11AM  15  agent who does an interview, is a case agent to the extent

11:11AM  16  you are?

11:11AM  17  A.  No.  Correct.

11:11AM  18  Q.  Okay.  In terms of the day to day for the duration of

11:11AM  19  your time, were the -- essentially the lead case agents

11:11AM  20  yourself, Special Agent Ryan, and Special Agent Halliday, and

11:11AM  21  then others joined on at various points?

11:11AM  22  A.  Yeah, depending.  There was some, as I mentioned on

11:11AM  23  direct, there was some related matters that caused us to kind

11:11AM  24  of add some resources to the case.

11:11AM  25  Q.  Yeah, you mentioned spinoff cases and other

11:11AM 1 investigations stemming from there, right?

11:11AM 2 A.  Correct.

11:11AM 3 Q.  And some of those other agents had more involvement in

11:11AM 4 those aspects?

11:11AM 5 A.  Yeah, sometimes they were the point on other related

11:11AM 6 matters.

11:11AM 7 Q.  And I don't want to get into the weeds on those other

11:11AM 8 matters --

11:11AM 9 A.  Certainly.

11:11AM 10 Q.  -- but is that an example of why the number of agents can

11:11AM 11 increase that are related to this?

11:11AM 12 A.  Absolutely.

11:11AM 13 Q.  And now you mentioned you were involved in several search

11:12AM 14 warrants.  In your experience, in your involvement in this

11:12AM 15 case, does the number of agents that assist at a search

11:12AM 16 warrant, is that sort of an inflated number of people for a

11:12AM 17 particular event, and then they all go back to their normal

11:12AM 18 jobs?

11:12AM 19 A.  Correct.  For a search warrant, you need an entry team,

11:12AM 20 obviously for safety.  You need seasoned agents.  So that's a

11:12AM 21 multi-agent project for that day until you get the evidence

11:12AM 22 back, get it checked in, things along those lines.

11:12AM 23 Q.  Do people who work in different parts of the office help

11:12AM 24 out essentially for a day, and then go work on other matters?

11:12AM 25 A.  Yeah.  It sometimes it will bleed into the next day to

11:12AM    1    finish up reports and things like that, but they have their

11:12AM    2    own cases as well.

11:12AM    3    Q.   All right.  Now, from there, I think you were asked about

11:12AM    4    a number of people who were interviewed who didn't testify

11:12AM    5    but whose names the jury might have heard at various points

11:13AM    6    of this trial, and maybe some names they didn't hear; do you

11:13AM    7    recall that?

11:13AM    8    A.   I do.

11:13AM    9    Q.   I'd like to go through that sort of generally first.

11:13AM   10         I want to -- I think some of the names that were

11:13AM   11    mentioned were:  Michelle Sercu; D.P.; Megan Stabler; DJ Rob

11:13AM   12    Reed; Russell Salvatore; Angela Dingledey; Angela Newton;

11:13AM   13    Ashley Chapman or Trayham, I'm not sure which; Jessica

11:13AM   14    Leyland; Nick Ciechalski.  Do you remember those names being

11:13AM   15    mentioned yesterday?

11:13AM   16    A.   I do.

11:13AM   17    Q.   Grouping them all together just for a moment, any

11:13AM   18    interviews of those people that the FBI conducted, those

11:13AM   19    interviews were turned over to the defense; is that correct?

11:13AM   20    A.   Absolutely.

11:13AM   21    Q.   Okay.  And now I'd like to go through in a little bit of

11:13AM   22    detail just in general terms, even for the people who the

11:14AM   23    jury did see here, were a number of witnesses nervous to be

11:14AM   24    involved in this case?

11:14AM   25    A.   Yes.  Absolutely.  In this case particularly, between the

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

64

11:14AM    1    Outlaws, and the organized crime, and then Mr. Gerace's

11:14AM    2    contacts in the community with law enforcement and judges,

11:14AM    3    I've never had an investigation where the witnesses have been

11:14AM    4    so fearful.

11:14AM    5    Q.   Is it easy or difficult to get witnesses to open up about

11:14AM    6    sexual and private matters?

11:14AM    7    A.   It's -- it's very difficult.  And it's been particularly

11:14AM    8    also if it's a male agent with a female witness, that also

11:14AM    9    adds some difficulty to it.  And building trust over a period

11:14AM   10    of time.

11:14AM   11    Q.   So there are maybe a couple other challenges I didn't

11:14AM   12    even ask you about when I was asking you questions; is that

11:14AM   13    fair to say?

11:14AM   14    A.   Yes, it's absolutely fair to say.

11:14AM   15    Q.   Were all of the -- were all of the witnesses who were

11:15AM   16    interviewed forthcoming?

11:15AM   17    A.   No, not at all.

11:15AM   18    Q.   Okay.

11:15AM   19    A.   Actually.

11:15AM   20    Q.   When you were asked about was D.P., I think her dancer

11:15AM   21    name the jury has heard is Kiera, you -- you've reviewed her

11:15AM   22    interview?

11:15AM   23    A.   It's been a while, but I did -- I've seen it.

11:15AM   24    Q.   Based upon the totality of the investigation and

11:15AM   25    information available to you, did you assess that she was

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
65

11:15AM  1  forthcoming or less than forthcoming in her interview?

11:15AM  2  A.  Less than forthcoming.

11:15AM  3  Q.  Okay.  Did you review the Megan Stabler interview?

11:15AM  4  A.  It's been a while, but yes, I did.

11:15AM  5  Q.  At some point, she was married to Rob Reed the DJ,

11:15AM  6  correct?

11:15AM  7  A.  That's correct.

11:15AM  8  Q.  And she was a longtime Pharaoh's employee?

11:15AM  9  A.  Correct.

11:15AM  10  Q.  When you reviewed her interview, did you assess that she

11:15AM  11  was forthcoming or less than forthcoming?

11:15AM  12  A.  Less than forthcoming.

11:15AM  13  Q.  Now I want to talk about DJ Rob Reed.  That interview,

11:15AM  14  you did personally, correct?

11:16AM  15  A.  That I did, correct.

11:16AM  16  Q.  Tell the jury about -- I don't want to get into the

11:16AM  17  specifics of what he said, but tell the jury about how he

11:16AM  18  behaved towards you and the other agent you were with when

11:16AM  19  you went to interview him.

11:16AM  20  A.  He was very short.  It was a very cold day, he wouldn't

11:16AM  21  let us in the house, he stayed in the -- that's why I

11:16AM  22  remember.  Obviously, it was important, but also the fact

11:16AM  23  that it was -- we were outside for an extended period of

11:16AM  24  time.  He did answer some questions, but it was certainly --

11:16AM  25  it was brief.  And it was not a back and forth.

11:16AM   1   Q.  Were you cold?

11:16AM   2   A.  I was very cold that day, that's why I remember it was

11:16AM   3   windy.

11:16AM   4   Q.  Can you contrast that to how L.L. let the agents into her

11:16AM   5   house when she didn't know they were coming?

11:16AM   6   A.  Yeah.  I mean, most, usually if it's bad weather, in my

11:16AM   7   experience, people that are forthcoming will invite you in,

11:16AM   8   you'll sit down, you'll have a back and forth, a dialogue.

11:16AM   9   Q.  And now in terms of some of the things he said to you, in

11:17AM  10   sum and substance --

11:17AM  11        **MR. TRIPI:**  And this is not for the truth, Judge,

11:17AM  12   just to flag it.

11:17AM  13        **BY MR. TRIPI:**

11:17AM  14   Q.  -- but did he say to you in 15 years he never saw a drug

11:17AM  15   inside Pharaoh's?

11:17AM  16   A.  That's correct.

11:17AM  17   Q.  Did that ring hollow to you?

11:17AM  18   A.  Oh, extremely hollow.  I thought he was absolutely not

11:17AM  19   forthcoming at all.

11:17AM  20   Q.  Did you find that statement credible based on the

11:17AM  21   information you had developed to that point?

11:17AM  22   A.  Not at all.

11:17AM  23   Q.  Did DJ Rob Reed give you any leads of people you should

11:17AM  24   go talk to like Katrina Nigro did?

11:17AM  25   A.  He did not.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

| | | |
|---|---|---|
| 11:17AM | 1 | Q.  Then you were asked about Russell Salvatore; do you |
| 11:17AM | 2 | remember that? |
| 11:17AM | 3 | A.  I do. |
| 11:17AM | 4 | Q.  And you interviewed him? |
| 11:17AM | 5 | A.  I did. |
| 11:17AM | 6 | Q.  And he had you also interview his manager, Mark Jerge; is |
| 11:17AM | 7 | that right? |
| 11:17AM | 8 | A.  Yes, he directed us to Mr. Jerge, who had more details |
| 11:17AM | 9 | about the operations and some of the questions we were |
| 11:17AM | 10 | asking. |
| 11:17AM | 11 | Q.  Through that aspect of the investigation, did you learn |
| 11:17AM | 12 | that the defendant had a standing room at Salvatore's, or |
| 11:18AM | 13 | Russell Salvatore's? |
| 11:18AM | 14 | A.  I believe we knew that previously or suspected -- |
| 11:18AM | 15 | **MR. FOTI:**  Objection. |
| 11:18AM | 16 | **THE COURT:**  I'm sorry. |
| 11:18AM | 17 | **MR. FOTI:**  Objection, that's hearsay. |
| 11:18AM | 18 | **THE COURT:**  Hearsay, yeah.  Sustained. |
| 11:18AM | 19 | The jury will strike that. |
| 11:18AM | 20 | **BY MR. TRIPI:** |
| 11:18AM | 21 | Q.  Did Russell Salvatore deny getting a prostitute from |
| 11:18AM | 22 | Mr. Gerace, but indicate he didn't need to because he was the |
| 11:18AM | 23 | boss of his restaurant? |
| 11:18AM | 24 | A.  Correct.  He did. |
| 11:18AM | 25 | Q.  In the context of that discussion, did you understand |

| | | |
|---|---|---|
| 11:18AM | 1 | younger women work for him at his restaurant? |
| 11:18AM | 2 | A.  I did. |
| 11:18AM | 3 | Q.  Did you assess that as forthcoming or less than |
| 11:18AM | 4 | forthcoming? |
| 11:18AM | 5 | A.  Less than forthcoming. |
| 11:18AM | 6 | Q.  You were asked about Angela Dingledey.  Was she sort of |
| 11:19AM | 7 | interviewed more towards the tail end, sort of before trial? |
| 11:19AM | 8 | A.  Correct, yes. |
| 11:19AM | 9 | Q.  So the investigation was basically over at that point. |
| 11:19AM | 10 | We were heading towards trial? |
| 11:19AM | 11 | A.  Yeah, I believe it was post-indictment, and we circled |
| 11:19AM | 12 | the other way. |
| 11:19AM | 13 | Q.  Just a name that was out there, and -- |
| 11:19AM | 14 | A.  Yeah, who we got to, and wanted to follow up on. |
| 11:19AM | 15 | Q.  Was her interview turned over? |
| 11:19AM | 16 | A.  Yes, it was. |
| 11:19AM | 17 | Q.  I think there were two names that you didn't recall, |
| 11:19AM | 18 | Angela Newton and Ashley Chapman, but you were asked about |
| 11:19AM | 19 | the fact that Jessica Leyland did not testify in this trial; |
| 11:19AM | 20 | do you recall that? |
| 11:19AM | 21 | A.  I do. |
| 11:19AM | 22 | Q.  Was she arrested, charged, and did she plead guilty to |
| 11:19AM | 23 | witness tampering? |
| 11:19AM | 24 | A.  She did. |
| 11:19AM | 25 | Q.  Did she decline to cooperate through her attorney? |

11:19AM   1   A.  She did proffer twice, but ultimately declined to

11:19AM   2   cooperate further.

11:19AM   3   Q.  And in those proffers, did you assess the reliability or

11:20AM   4   credibility?

11:20AM   5   A.  It was -- she was less than forthcoming.

11:20AM   6   Q.  And was her witness tampering conviction, her plea,

11:20AM   7   related to her conduct towards P.H.?

11:20AM   8   A.  It was.

11:20AM   9   Q.  Nick Ciechalski, and I can't spell his name, I barely

11:20AM  10   pronounced it right, but do you know who I'm talking about?

11:20AM  11   A.  I do.

11:20AM  12   Q.  He was interviewed?

11:20AM  13   A.  He was.

11:20AM  14   Q.  His interview was turned over to the defense?

11:20AM  15   A.  It was.

11:20AM  16   Q.  And he was a Pharaoh's employee, manager?

11:20AM  17   A.  For later -- later years.

11:20AM  18   Q.  What timeframe?

11:20AM  19   A.  I probably need the report to give you a hard and fast,

11:20AM  20   but I thought it was '18.  '17, '18.  But to testify

11:20AM  21   specifically, I need to look at that document.

11:20AM  22   Q.  I understand.

11:20AM  23       In the interest of time, fair to say it was closer toward

11:20AM  24   the end of the conduct that we're dealing with?

11:20AM  25   A.  As I recall it.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

70

| | | |
|---|---|---|
| 11:20AM | 1 | Q.  Were his interview reports provided to the defense? |
| 11:21AM | 2 | A.  They were. |
| 11:21AM | 3 | Q.  In terms of his interview, in part of it did he indicate |
| 11:21AM | 4 | usually he was out front and not in a position to see things |
| 11:21AM | 5 | that were happening in the back? |
| 11:21AM | 6 | A.  As I recall -- I did not interview him, but I recall, |
| 11:21AM | 7 | that's what I was informed. |
| 11:21AM | 8 | **MR. FOTI:**  Objection. |
| 11:21AM | 9 | **THE COURT:**  Sorry? |
| 11:21AM | 10 | **MR. TRIPI:**  He was asked about assessments he made |
| 11:21AM | 11 | and so -- |
| 11:21AM | 12 | **THE COURT:**  Just a second. |
| 11:21AM | 13 | **MR. TRIPI:**  Okay.  I'm sorry, Judge. |
| 11:21AM | 14 | **THE COURT:**  The objection is sustained, and the jury |
| 11:21AM | 15 | will strike the answer. |
| 11:21AM | 16 | Next question. |
| 11:21AM | 17 | **BY MR. TRIPI:** |
| 11:21AM | 18 | Q.  I'm going to try to rephrase once. |
| 11:21AM | 19 | Did you -- did you assess whether Mr. Ciechalski had |
| 11:21AM | 20 | relevant information to provide? |
| 11:21AM | 21 | A.  It did not appear he had relevant information to provide. |
| 11:22AM | 22 | Q.  All right.  And you were asked questions moving onto your |
| 11:22AM | 23 | chart, it's -- it's -- the large version is sort of next to |
| 11:22AM | 24 | you back there -- |
| 11:22AM | 25 | A.  Correct. |

| | | |
|---|---|---|
| 11:22AM | 1 | Q.  -- in view of the jury.  We can put it up briefly.  I'm |
| 11:22AM | 2 | not going to go through the chart right now, but just some |
| 11:22AM | 3 | general questions about it and maybe I'll circle back and put |
| 11:22AM | 4 | a little more specific later. |
| 11:22AM | 5 |     You were asked questions about sort of witness testimony |
| 11:22AM | 6 | as it pertains to this chart; do you remember that? |
| 11:22AM | 7 | A.  Correct. |
| 11:22AM | 8 | Q.  Fair to say that the chart only summarizes in picture |
| 11:22AM | 9 | format who testified and exhibits that were introduced? |
| 11:22AM | 10 | A.  That's correct. |
| 11:22AM | 11 | Q.  It doesn't summarize testimony at all? |
| 11:23AM | 12 | A.  Correct.  It does not.  And that was a -- a factor when |
| 11:23AM | 13 | we put it together.  It was we were not to interpret |
| 11:23AM | 14 | testimony. |
| 11:23AM | 15 | Q.  Is that because that's the jury's job? |
| 11:23AM | 16 | A.  Correct.  It's the jury's job to determine the testimony |
| 11:23AM | 17 | and interpret it. |
| 11:23AM | 18 | Q.  Nevertheless, you were asked about various things that |
| 11:23AM | 19 | you did or did not include on the chart.  Did you summarize |
| 11:23AM | 20 | how the witnesses were corroborated? |
| 11:23AM | 21 | A.  I did not. |
| 11:23AM | 22 | Q.  Did you summarize, for example, how K.A. may have |
| 11:23AM | 23 | corroborated A.A., for example? |
| 11:23AM | 24 | A.  Correct, I did not, again -- |
| 11:23AM | 25 | Q.  You didn't summarize any testimony? |

11:23AM  1    A.  No, we did not.

11:23AM  2    Q.  So, to ask it in one more concise question, this chart

11:23AM  3    doesn't go through all the ways people were corroborated,

11:23AM  4    correct?

11:23AM  5    A.  No, it does not.

11:23AM  6    Q.  You were asked about a photo, 490B, and you seemed a

11:24AM  7    little bit unsure about who was in it.  But I just want to

11:24AM  8    touch on Exhibit 490B.

11:24AM  9         **MR. TRIPI:**  We can take that down for now.

11:24AM  10        **BY MR. TRIPI:**

11:24AM  11   Q.  Generally, do people's appearances change over time?

11:24AM  12   A.  Absolutely.

11:24AM  13   Q.  We've seen sort of iterations even of the defendant from

11:24AM  14   photographs in 2005, 2011, and later on.  Did his appearance

11:24AM  15   change over time?

11:24AM  16   A.  Yes.

11:24AM  17   Q.  Okay.  So is that a normal human thing that happens as

11:24AM  18   people age?

11:24AM  19   A.  Mine is -- mine has changed, unfortunately.

11:24AM  20   Q.  Same here.  All right.

11:24AM  21        **MR. TRIPI:**  We can take that down.

11:24AM  22        **THE WITNESS:**  And my hairline.

11:24AM  23        **BY MR. TRIPI:**

11:24AM  24   Q.  You were asked about whether Mr. Gerace had

11:24AM  25   communications with certain people, and I think those

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
73

11:24AM   1   questions were sort of based in Exhibit 310AT, which is his

11:25AM   2   list of some of the contacts that were in his phone; is that

11:25AM   3   right?

11:25AM   4   A.  That's right.

11:25AM   5   Q.  And now, those weren't all of the contacts in his phone,

11:25AM   6   they were some of the contacts?

11:25AM   7   A.  That's correct.

11:25AM   8   Q.  And nevertheless, between phone records and

11:25AM   9   communications from the phone, did he have contact with

11:25AM  10   Anthony Gerace?

11:25AM  11   A.  Yes, he did.

11:25AM  12   Q.  Did he have contact with Tom Doctor?

11:25AM  13   A.  Yes, he did.

11:25AM  14   Q.  Did he have contact with Judge John Michalski?

11:25AM  15   A.  Yes.

11:25AM  16   Q.  Did he have contact with Detective Gregory Trotter?

11:25AM  17   A.  Certainly.

11:25AM  18   Q.  Did he have contact with Darryl LaMont?

11:25AM  19   A.  He did.

11:25AM  20   Q.  Did he have contact with Susan Michalski, Judge

11:25AM  21   Michalski's wife?

11:25AM  22   A.  He did.

11:25AM  23   Q.  Did he have contact in his phone records with Lou Selva?

11:25AM  24   A.  He did.

11:25AM  25   Q.  Did he have contact in his text messages with Mike

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

11:25AM    1   Masecchia?

11:25AM    2   A.  He did.

11:25AM    3   Q.  Did he have contact with Chris Chudy?

11:25AM    4   A.  He did.

11:25AM    5   Q.  Did he have contact with Tommy O, the Outlaws?

11:25AM    6   A.  He did.

11:25AM    7   Q.  Did he have contact with P.H.?

11:26AM    8   A.  He did.

11:26AM    9   Q.  Did he have contact with a New York State police officer

11:26AM   10   named Rob Vishion?

11:26AM   11   A.  It's Mark -- Mike -- I don't remember his first name, but

11:26AM   12   it's -- Vishion is his last name.  I thought it was Michael,

11:26AM   13   but I could be wrong.

11:26AM   14   Q.  Maybe I got the name wrong.  If I got the name wrong, I

11:26AM   15   apologize.

11:26AM   16       **MR. TRIPI:**  For the witness only, can we show the

11:26AM   17   Exhibit 310AR just to refresh on the name.

11:26AM   18       Let me know if this refreshes your recollection or

11:26AM   19   mine on the name.

11:26AM   20       It's 310AR for the witness only.  Give me one second.

11:26AM   21       **THE CLERK:**  I'll take it down.

11:26AM   22       **MR. TRIPI:**  Yeah, it should be 310AR.

11:26AM   23       **THE CLERK:**  Okay.

11:26AM   24       **BY MR. TRIPI:**

11:27AM   25   Q.  Does that refresh your recollection that I got the name

11:27AM    1    wrong?

11:27AM    2    A.   Correct.

11:27AM    3    Q.   What's the name?

11:27AM    4    A.   Robert V-I-S-H-I-O-N.

11:27AM    5    Q.   Take it down?

11:27AM    6    A.   You might have had it right.  Vishion, I'm very

11:27AM    7    comfortable with the last name.

11:27AM    8    Q.   Is Robert Vishion, was he a New York State police officer

11:27AM    9    during the time of this investigation?

11:27AM   10    A.   A portion of it, I believe he retired towards the end.

11:27AM   11    Q.   Okay.  Did he make references to being in contact with

11:27AM   12    another law enforcement officer, last name Sliwa?

11:27AM   13    A.   He did.

11:27AM   14    Q.   Who was Sliwa?

11:27AM   15    A.   I believe he's Mark Sliwa, he was a lieutenant with

11:27AM   16    Amherst.  I believe he's retired.

11:27AM   17    Q.   Did he have contact with another law enforcement officer

11:27AM   18    named Scioli?

11:27AM   19    A.   Yeah, Scioli was a New York State trooper.  Who is also,

11:27AM   20    I believe, retired now.

11:27AM   21    Q.   Did he have contact and communication with former Buffalo

11:28AM   22    Police Commissioner Dan Derenda?

11:28AM   23    A.   Yes.

11:28AM   24    Q.   Did he have contact with former Buffalo Police

11:28AM   25    Commissioner Rocco Dina?

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
76

| | | |
|---|---|---|
| 11:28AM | 1 | A.  Yes. |
| 11:28AM | 2 | Q.  And were there a number of others? |
| 11:28AM | 3 | A.  Law enforcement, yes, there were. |
| 11:28AM | 4 | Q.  I don't want to keep going.  Many other people he had |
| 11:28AM | 5 | contact with? |
| 11:28AM | 6 | A.  Generally, yes.  Absolutely. |
| 11:28AM | 7 | **MR. TRIPI:**  Okay.  Can we pull up Exhibit 240E in |
| 11:28AM | 8 | evidence.  E, as in Evelyn, I guess. |
| 11:28AM | 9 | **BY MR. TRIPI:** |
| 11:28AM | 10 | Q.  Do you know who Anthony Barba is? |
| 11:28AM | 11 | A.  I know the name. |
| 11:28AM | 12 | Q.  Okay. |
| 11:28AM | 13 | A.  I wouldn't know him by appearance. |
| 11:28AM | 14 | Q.  Okay.  We'll take this down then. |
| 11:28AM | 15 | A.  But I'm aware that he was a Buffalo -- I believe |
| 11:28AM | 16 | high-ranking Buffalo police officer.  He's retired, I |
| 11:28AM | 17 | believe. |
| 11:29AM | 18 | Q.  Was he a deputy police commissioner? |
| 11:29AM | 19 | A.  That's correct.  He was. |
| 11:29AM | 20 | **MR. FOTI:**  Judge, can we approach briefly? |
| 11:29AM | 21 | **THE COURT:**  Approach?  Sure, yeah, come up. |
| 11:29AM | 22 | (Sidebar discussion held on the record.) |
| 11:29AM | 23 | **MR. FOTI:**  I haven't been objecting, and I don't know |
| 11:29AM | 24 | how much Mr. Tripi is going with this, but it seems like the |
| 11:29AM | 25 | questions are going towards law enforcement contacts. |

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

11:29AM  1      I don't remember crossing about anything along those

11:29AM  2  lines at all.

11:29AM  3      I definitely did cross about some of the things that

11:29AM  4  have been covered at this point on redirect, but I think this

11:29AM  5  is now an area that I didn't get into.

11:29AM  6      MR. TRIPI:  He crossed on 310AT, and there were law

11:29AM  7  enforcement contacts in that -- in the phone, in

11:29AM  8  Exhibit 310AT.  There are also law enforcement contacts in

11:29AM  9  photos, and so that's within the scope of where -- the cross

11:29AM  10  that was done.

11:29AM  11      THE COURT:  How so?  Because he talked about an

11:29AM  12  exhibit, that exhibit's wide open to anything you want to put

11:29AM  13  in?

11:30AM  14      MR. TRIPI:  I think so.

11:30AM  15      THE COURT:  Wasn't the exhibit in on your direct?

11:30AM  16      MR. TRIPI:  Yeah, and he crossed on it.  And so I'm

11:30AM  17  now rebutting some of the inferences that he's --

11:30AM  18      THE COURT:  What's the rebuttal that you're putting

11:30AM  19  in by noting law enforcement contacts in there?

11:30AM  20      MR. TRIPI:  Because there was a cross about these --

11:30AM  21  these are in the contacts in your phone, and you didn't

11:30AM  22  interview everybody.  You didn't -- there are -- it's gonna

11:30AM  23  circle back later, because he crossed him on different law

11:30AM  24  enforcement techniques and challenges.

11:30AM  25      THE COURT:  Okay.

| | | |
|---|---|---|
| 11:30AM | 1 | **MR. TRIPI:**  And when someone has this level of |
| 11:30AM | 2 | contact with members of law enforcement, it ties the hands of |
| 11:30AM | 3 | law enforcement.  There were state police officers involved in |
| 11:30AM | 4 | this investigation.  Law enforcement community talks, so that |
| 11:30AM | 5 | ties into the challenges we're going to talk about at the end. |
| 11:30AM | 6 | And so I think it -- it -- it -- it's not just |
| 11:30AM | 7 | directed towards his cross on 310AT, but he ended with you |
| 11:30AM | 8 | didn't do this, you didn't do that. |
| 11:30AM | 9 | **THE COURT:**  Yeah. |
| 11:31AM | 10 | **MR. TRIPI:**  And there's a lot of reasons for that |
| 11:31AM | 11 | that I kind of need to lay a groundwork for. |
| 11:31AM | 12 | **THE COURT:**  Why isn't that legitimately in response |
| 11:31AM | 13 | to the cross-examination about the techniques that you didn't |
| 11:31AM | 14 | use? |
| 11:31AM | 15 | **MR. FOTI:**  I guess that argument -- |
| 11:31AM | 16 | **THE COURT:**  The answer would be, well, because he had |
| 11:31AM | 17 | so many law enforcement contacts, and he's got to establish |
| 11:31AM | 18 | that he's got the law enforcement contacts to make that |
| 11:31AM | 19 | argument. |
| 11:31AM | 20 | **MR. FOTI:**  Yeah, I -- I -- I guess I didn't foresee |
| 11:31AM | 21 | that that's where this was going.  I think that is a |
| 11:31AM | 22 | response -- |
| 11:31AM | 23 | **MR. TRIPI:**  And I think that this is the -- probably |
| 11:31AM | 24 | in this bucket, this is the last person I'm asking about.  He |
| 11:31AM | 25 | didn't know the photo. |

11:31AM    1    **THE COURT:** Okay. I think we've established you can

11:31AM    2    legitimately do this. You're withdrawing your objection?

11:31AM    3    **MR. FOTI:** Yeah, based on that.

11:31AM    4    (End of sidebar discussion.)

11:31AM    5    **BY MR. TRIPI:**

11:31AM    6    Q. Okay. Even if you're not -- you didn't recognize the

11:31AM    7    photo, are you generally aware of Anthony Barba's status as a

11:31AM    8    Buffalo Police Deputy Commissioner?

11:31AM    9    A. Definitely.

11:31AM    10    Q. And are you aware of his relationship generally with the

11:32AM    11    defendant?

11:32AM    12    A. They were friends.

11:32AM    13    Q. I'm gonna circle back to this later on, but there was

11:32AM    14    cross-examination about various techniques and tactics that

11:32AM    15    were not used in terms of undercovers and C.I.s, I'm going to

11:32AM    16    ask about it again later when I ask you about wiretaps.

11:32AM    17    But to touch on it right where we are now in sort of the

11:32AM    18    same chronology that Mr. Foti was going, just to lay the

11:32AM    19    groundwork, when you came into the investigation, by that

11:32AM    20    point, did you get briefed up and were you aware of two

11:32AM    21    different instances of New York State Police undercovers

11:32AM    22    endeavoring to infiltrate Pharaoh's?

11:32AM    23    A. Yeah, I did learn about that. I can't recall exactly

11:32AM    24    when, but --

11:32AM    25    Q. You were cross-examined about decisions you made though.

11:32AM  1    Did your awareness of those situations factor into

11:33AM  2    investigative decisions that were made?

11:33AM  3    A.  Yeah, that, and as well as the circumstances of this

11:33AM  4    particular -- where we were at in the case, the events of

11:33AM  5    that.

11:33AM  6    Q.  I'm just asking about that right now though --

11:33AM  7    A.  Absolutely.

11:33AM  8    Q.  -- and I'll get to other circumstances later.  Are you

11:33AM  9    with me?

11:33AM  10   A.  Yep.

11:33AM  11   Q.  All right.  Are you familiar with who Joel Catuzza was?

11:33AM  12   A.  Yes.

11:33AM  13   Q.  Who was that?

11:33AM  14   A.  He was a New York State trooper that kind of oversaw the

11:33AM  15   undercover -- an attempt to do some undercover purchases, and

11:33AM  16   successfully, in Pharaoh's.  I'm not --

11:33AM  17   Q.  Let me ask you, was he a New York State Police undercover

11:33AM  18   agent?

11:33AM  19   A.  He was.

11:33AM  20   Q.  In 2015, early 2016, did he do some work inside Pharaoh's

11:33AM  21   that culminated in K.A.'s arrest?

11:33AM  22   A.  Yes.  I believe he was the undercover that directly

11:33AM  23   purchased from her.

11:33AM  24   Q.  Okay.  When you got involved in this investigation, did

11:33AM  25   you learn of challenges that arose during Joel Catuzza's

11:33AM    1    investigation inside Pharaoh's?

11:33AM    2    A.  I did.

11:33AM    3    Q.  Did some of those challenges relate to his undercover

11:34AM    4    license plate being run by members of -- a member of the

11:34AM    5    Cheektowaga Police Department?

11:34AM    6    A.  It did.

11:34AM    7    Q.  Did that cause a spinoff investigation?

11:34AM    8    A.  We did look into that.

11:34AM    9    Q.  Okay.  Is there more looking into that that may be done

11:34AM    10   in the future?

11:34AM    11   A.  Definitely.

11:34AM    12   Q.  And Cheektowaga is where the gentleman's club is located,

11:34AM    13   correct?

11:34AM    14   A.  That's correct.

11:34AM    15   Q.  Did Joel Catuzza express concerns that his undercover

11:34AM    16   license plate was run at a time when he wasn't at Pharaoh's?

11:34AM    17   A.  He did.

11:34AM    18   Q.  Did that factor into your assessments in the

11:34AM    19   investigative decisions made related to the case?

11:34AM    20   A.  Definitely.

11:34AM    21   Q.  In 2018, did you also become aware that another state

11:34AM    22   police investigator named Angel Benitos-Santos made efforts

11:34AM    23   to purchase drugs inside Pharaoh's?

11:34AM    24   A.  Yes.

11:34AM    25   Q.  Did you debrief with Angel Benitos-Santos about that at

11:35AM   1   some point?

11:35AM   2   A.   Yes, I did.

11:35AM   3   Q.   Did he have a concern when he -- when he tried to make

11:35AM   4   those efforts?

11:35AM   5   A.   He did.

11:35AM   6   Q.   Did he express that concern to you?

11:35AM   7   A.   He did.

11:35AM   8   Q.   Based on those two situations, did you assess, along with

11:35AM   9   the investigative team, that further efforts to use

11:35AM   10  undercovers was not viable?

11:35AM   11  A.   Absolutely.

11:35AM   12  Q.   And now, confidential informants, they might have heard

11:35AM   13  the term a little bit, but that is someone who works -- it

11:35AM   14  might be someone who's in trouble, or someone who is getting

11:35AM   15  paid to work for the government, but that's someone who works

11:35AM   16  as an agent of the government and they pretend to be a

11:35AM   17  criminal; is that a summary?

11:35AM   18  A.   Yeah.

11:35AM   19  Q.   They work confidentially to acquire evidence?

11:35AM   20  A.   They work at our direction.  Most of them are criminals

11:35AM   21  to start with.  But they're at our direction, and employed as

11:35AM   22  a confidential informant to make controlled purchases, or to

11:35AM   23  make recordings, or do those sorts of activities at our

11:36AM   24  direction with our oversight.

11:36AM   25  Q.   Now, and you phrased it better than I did, and I

11:36AM    1    apologize for that.

11:36AM    2        With confidential informants, is there -- are there

11:36AM    3    concerns using them in the context of this investigation?

11:36AM    4    A.  A number of concerns.

11:36AM    5    Q.  Can you list those, please?

11:36AM    6    A.  Certainly.  I mean, obviously, you're dealing -- I mean,

11:36AM    7    we can't -- we can't authorize an informant to use narcotics.

11:36AM    8    We can't authorize an informant to engage in sex acts for

11:36AM    9    obvious reasons.

11:36AM   10        So particularly, putting an informant into a club, if

11:36AM   11    they've been there routinely and now they're not using

11:36AM   12    cocaine or not using drugs because now they're working for

11:36AM   13    us, you know, that's -- I've had informants say I have to go

11:36AM   14    in there and do a line of coke.

11:36AM   15        Our rules are you can't do that.  And then you say, well,

11:36AM   16    that's not -- we're just not going to be able to pursue that

11:36AM   17    particular investigative technique.

11:36AM   18        So a strip club particularly has a lot of things we would

11:36AM   19    have to consider before we started down that road.

11:37AM   20    Q.  And pivoting off of that, have back to Angel

11:37AM   21    Benitos-Santos, did he indicate in sum and substance his

11:37AM   22    belief he was unable to purchase cocaine because he wasn't a

11:37AM   23    known commodity in the club?

11:37AM   24    A.  He did.

11:37AM   25    Q.  Is it sometimes, in addition to the safety and security

| | | |
|---|---|---|
| 11:37AM | 1 | concerns, is it sometimes a challenge, often a challenge, to |
| 11:37AM | 2 | get a C.I. with access? |
| 11:37AM | 3 | A.  Absolutely.  Usually they're part of the inner group. |
| 11:37AM | 4 | Q.  Is another challenging or complicating factor related to |
| 11:37AM | 5 | the defendant's relationship with a federal law enforcement |
| 11:37AM | 6 | agent named Joseph Bongiovanni? |
| 11:37AM | 7 | A.  That was an impediment, certainly. |
| 11:37AM | 8 | Q.  Were there impediments based upon his connections to |
| 11:37AM | 9 | members of the State police, Buffalo Police Department, and |
| 11:37AM | 10 | local police agencies? |
| 11:37AM | 11 | A.  Yeah.  Mr. Gerace -- the defendant had a lot of |
| 11:37AM | 12 | relationships with various law enforcement agencies in the |
| 11:38AM | 13 | Western New York community.  And that certainly went into our |
| 11:38AM | 14 | decision and calculus in deciding how to pursue certain |
| 11:38AM | 15 | investigative techniques. |
| 11:38AM | 16 | Q.  In Joel Catuzza's investigation, are you aware of the |
| 11:38AM | 17 | State judge that they went to for a protective order to not |
| 11:38AM | 18 | disclose the U.C. information? |
| 11:38AM | 19 | A.  I am. |
| 11:38AM | 20 | Q.  Who was that State judge? |
| 11:38AM | 21 | A.  John Michalski. |
| 11:38AM | 22 | Q.  So was trying that again totally off the table? |
| 11:38AM | 23 | A.  Absolutely. |
| 11:38AM | 24 | Q.  Does that mean you can't get a wiretap? |
| 11:38AM | 25 | A.  Correct.  Those would be steps that would lead up towards |

11:38AM    1    a wiretap, or potentially.

11:38AM    2    Q.  Generally, in your experience, is it common when

11:38AM    3    individuals know they are subjects or targets of an

11:38AM    4    investigation to make efforts to ensure that their conduct

11:38AM    5    does not become exposed?

11:38AM    6    A.  Absolutely.  They move narcotics.  Maybe they stop

11:39AM    7    dealing for a period of time.  Stop talking with certain

11:39AM    8    associates.  Change phone numbers.  Those are all things that

11:39AM    9    are very common in investigation, if the subjects feel

11:39AM    10   they're being looked at or they're being investigated.

11:39AM    11   Q.  Do they basically change tactics at times?

11:39AM    12   A.  Yeah.  Or they shut down operations for a while.

11:39AM    13   Q.  Is changing phones a problem?

11:39AM    14   A.  Yeah, definitely.

11:39AM    15   Q.  You mentioned burner phones earlier.

11:39AM    16   A.  Correct.

11:39AM    17   Q.  Do individuals with experience in the drug trade, in your

11:39AM    18   experience, utilize burner phones?

11:39AM    19   A.  Yes, all the time.

11:39AM    20   Q.  What are the additional challenges beyond what you've

11:39AM    21   discussed so far when dealing with burner phone?

11:39AM    22   A.  Burner phones?  They're not your true name.  They've

11:39AM    23   limited minutes.  You drop them.

11:39AM    24       If you're trying to get up -- using the wiretap analogy,

11:39AM    25   you have to have a period of what we call tolls where we're

11:39AM    1    running phone numbers to see who they're in communication

11:39AM    2    with.  So if somebody has a burner for a month, dumps it,

11:39AM    3    gets another one, now we've gotta get up and get the tolls

11:39AM    4    for the new phone, identify the new phone, and then really

11:40AM    5    almost starting over when it comes to figuring out who

11:40AM    6    they're in communication with.  And proving that.  Because a

11:40AM    7    lot of times, their associates will have burner phones as

11:40AM    8    well.

11:40AM    9    Q.  I might ask you more about wiretaps later on, but based

11:40AM   10    on all of the things that an agent has to do to even get to

11:40AM   11    the point of requesting a wiretap, does it often take 30 days

11:40AM   12    or more?

11:40AM   13    A.  Absolutely.  Yeah.

11:40AM   14    Q.  When someone drops a burner phone within 30 days, does

11:40AM   15    that make it a challenge?

11:40AM   16    A.  Yeah.  You're kind of starting over again, at least with

11:40AM   17    a phone workup.

11:40AM   18    Q.  In the context of an investigation where there's an

11:40AM   19    active DEA agent who's able to walk the halls of members of

11:40AM   20    law enforcement's offices, is time of the essence?

11:40AM   21    A.  Absolutely.

11:40AM   22    Q.  All right.  You were asked some questions about DVR

11:40AM   23    footage.  I want to ask a couple follow-ups on that.

11:41AM   24    A.  Okay.

11:41AM   25    Q.  I think Mr. Foti started you with -- I'll call it DVR 1,

11:41AM   1   and we're referencing Exhibit 3539ED.  Just a couple of

11:41AM   2   questions about that.

11:41AM   3                 **MR. TRIPI:**  Can we pull it up and go to page 2.

11:41AM   4                 **BY MR. TRIPI:**

11:41AM   5   Q.  I'm just going to leave it up there, it's in evidence.

11:41AM   6   You can review it if you need it.

11:41AM   7   A.  Certainly.

11:41AM   8   Q.  All right?  The video footage of DVR 1, that went from

11:41AM   9   October -- October 21st, 2019 to December 11th or 12th of

11:41AM  10   2019, the day of the search, right?

11:41AM  11   A.  It did.

11:41AM  12   Q.  Okay.  All right.  Now I want to ask you some questions

11:41AM  13   about things that occurred prior to October 21st, 2019, okay?

11:42AM  14   A.  Certainly.

11:42AM  15   Q.  Was the defendant's brother's house -- was Anthony

11:42AM  16   Gerace's house searched, and was Anthony Gerace arrested on

11:42AM  17   January 28th, 2019?

11:42AM  18   A.  He was.

11:42AM  19   Q.  That was before October 21st, 2019?

11:42AM  20   A.  Correct.

11:42AM  21   Q.  Was the defendant's phone seized and extracted, and

11:42AM  22   ultimately the phone returned to him but the data extracted,

11:42AM  23   on or about April 27th, 2019?

11:42AM  24   A.  Yeah.  At Newark, as he was entering back into the

11:42AM  25   country.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

88

| | | |
|---|---|---|
| 11:42AM | 1 | Q.  And then Special Agent Ryan testified in more detail |
| 11:42AM | 2 | about that, correct? |
| 11:42AM | 3 | A.  He did. |
| 11:42AM | 4 | Q.  Was that before October 21st, 2019? |
| 11:42AM | 5 | A.  It was. |
| 11:42AM | 6 | Q.  Was Defendant Bongiovanni's house searched by federal law |
| 11:42AM | 7 | enforcement on June 6th, 2019, and was evidence recovered? |
| 11:42AM | 8 | A.  It was.  And there was evidence recovered. |
| 11:42AM | 9 | Q.  Was that before October 21st, 2019? |
| 11:42AM | 10 | A.  It was. |
| 11:43AM | 11 | Q.  Were searches of Lou Selva and Mike Masecchia's |
| 11:43AM | 12 | residence, did those occur on August 23rd, 2019? |
| 11:43AM | 13 | A.  They did.  I was present at Mr. Masecchia's house. |
| 11:43AM | 14 | Q.  And Masecchia was arrested? |
| 11:43AM | 15 | A.  He was. |
| 11:43AM | 16 | Q.  Did those events occur before October 21st, 2019? |
| 11:43AM | 17 | A.  They did. |
| 11:43AM | 18 | Q.  Did all of those events happen before the seizure of |
| 11:43AM | 19 | DVR 1? |
| 11:43AM | 20 | A.  They did. |
| 11:43AM | 21 | Q.  Nevertheless, the report that's in evidence, in fairness, |
| 11:43AM | 22 | you didn't write it, correct? |
| 11:43AM | 23 | A.  Correct. |
| 11:43AM | 24 | Q.  In fairness, there was no observations at that point of |
| 11:43AM | 25 | oral sex, anal sex, vaginal sex, correct? |

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

89

11:43AM    1    A.  Correct.

11:43AM    2    Q.  Nevertheless, the report itself documents fondling,

11:43AM    3    right?

11:43AM    4    A.  It does.

11:43AM    5    Q.  On various cameras?

11:43AM    6    A.  On various cameras.

11:43AM    7    Q.  It documents kissing?

11:43AM    8    A.  It does.

11:43AM    9    Q.  It documents grinding?

11:43AM   10    A.  It does.

11:43AM   11    Q.  It documents erect penises?

11:43AM   12    A.  It does.

11:44AM   13    Q.  And all of those things occurred after the defendant

11:44AM   14    would have been on notice that he was under some type of

11:44AM   15    investigation; is that fair?

11:44AM   16    A.  Absolutely.

11:44AM   17    Q.  In your view, and I'm not trying to be critical, but

11:44AM   18    would you have written that sentence, "there's no relevant

11:44AM   19    information," in the context of a sex-trafficking case where

11:44AM   20    there's fondling, kissing, grinding, and erect penises?

11:44AM   21    A.  I would not have.  I was little more familiar with the

11:44AM   22    sex-trafficking aspects of the investigation, and from

11:44AM   23    interviewing so many of the dancers.

11:44AM   24    Q.  Okay.  I can go through camera by camera, but I do want

11:44AM   25    to focus on one that's in this report.

11:44AM     1       Let's go to the last page of this report.  Again, when I

11:44AM     2   say "this report," we're dealing in Exhibit 3539ED.

11:45AM     3       What was recorded for camera 8?

11:45AM     4   A.  No video was recorded.  It was, as I recall, unable to be

11:45AM     5   recovered or wasn't working.

11:45AM     6   Q.  Well, what's it say?

11:45AM     7   A.  It says no video recorded.

11:45AM     8   Q.  Okay.  Have you heard testimony at this trial about there

11:45AM     9   being certain blind spots in Pharaoh's?

11:45AM    10   A.  Yes, I heard that testimony.

11:45AM    11   Q.  If a camera has no video, is that consistent with a blind

11:45AM    12   spot?

11:45AM    13   A.  Absolutely.

11:45AM    14       **MR. TRIPI:**  All right.  You can take that one down.

11:45AM    15       **THE WITNESS:**  And the report indicates there were

11:45AM    16   blind spots.

11:45AM    17       **BY MR. TRIPI:**

11:45AM    18   Q.  I'm sorry, does the report indicate there were blind

11:45AM    19   spots?

11:45AM    20   A.  It does.

11:45AM    21   Q.  What does it say in that regard?

11:45AM    22   A.  If you can bring it back up.

11:45AM    23       **MR. TRIPI:**  Yeah, sure.  Direct us to 3539ED.

11:45AM    24       **BY MR. TRIPI:**

11:45AM    25   Q.  And where are you referencing?

| | | |
|---|---|---|
| 11:45AM | 1 | A.  I think it was the first page.  This might be the other |
| 11:45AM | 2 | report. |
| 11:45AM | 3 | Q.  Oh, yeah.  Let's go to page 2.  The last sentence there, |
| 11:46AM | 4 | is that where you were looking? |
| 11:46AM | 5 | A.  That's what I was referring to. |
| 11:46AM | 6 | Q.  What's it say? |
| 11:46AM | 7 | A.  There are some areas in the VIP section that are not |
| 11:46AM | 8 | covered by these camera angles, and therefore not seen on the |
| 11:46AM | 9 | recordings. |
| 11:46AM | 10 | Q.  Okay.  I'd like to move on now and just ask you a few |
| 11:46AM | 11 | more questions.  And I think I'm encompassing all of the DVRs |
| 11:46AM | 12 | at this point.  Well, let's stick to DVR 1 for a second. |
| 11:46AM | 13 | None of those cameras showed, in terms of, showed the |
| 11:46AM | 14 | dressing room, right? |
| 11:46AM | 15 | A.  Correct. |
| 11:46AM | 16 | Q.  None of them showed the bathroom? |
| 11:46AM | 17 | A.  Correct. |
| 11:46AM | 18 | Q.  None of the DVRs whatsoever showed any views of the |
| 11:46AM | 19 | upstairs; is that right? |
| 11:46AM | 20 | A.  Correct.  That's what I recall. |
| 11:46AM | 21 | Q.  There's been a lot of testimony about what happened |
| 11:46AM | 22 | upstairs at Pharaoh's; fair to say? |
| 11:46AM | 23 | A.  There was. |
| 11:46AM | 24 | **MR. TRIPI:**  Okay.  Now we move on to Exhibit 3539EE. |
| 11:47AM | 25 | We can publish that. |

| | | |
|---|---|---|
| 11:47AM | 1 | **BY MR. TRIPI:** |
| 11:47AM | 2 | Q.  This exhibit, the range of the cameras in this exhibit is |
| 11:47AM | 3 | even shorter than DVR 1, this deals with DVR 2; is that |
| 11:47AM | 4 | right? |
| 11:47AM | 5 | A.  That's correct. |
| 11:47AM | 6 | Q.  And the range here, I think Mr. Foti covered it, but was |
| 11:47AM | 7 | November 28th, 2019 to December 12th, 2019; is that right? |
| 11:47AM | 8 | December 11th or 12th? |
| 11:47AM | 9 | A.  11/28 -- yeah, exactly, to December 11th and 12th, |
| 11:47AM | 10 | depending on the camera. |
| 11:47AM | 11 | Q.  Okay.  I don't want to be too repetitive.  But all those |
| 11:47AM | 12 | questions that I asked you about Anthony Gerace's arrest, the |
| 11:47AM | 13 | seizure of the defendant's phone, the search at Bongiovanni, |
| 11:47AM | 14 | the -- the searches at Masecchia and Selva's residence, and |
| 11:47AM | 15 | Masecchia's arrest, all of those same answers apply here: |
| 11:47AM | 16 | Those all happened before the very first moment of video |
| 11:47AM | 17 | coverage; is that right? |
| 11:47AM | 18 | A.  That's correct. |
| 11:47AM | 19 | Q.  Additionally, by this point in time, by November 28th, |
| 11:48AM | 20 | 2019, an additional thing happened as it relates to Joseph |
| 11:48AM | 21 | Bongiovanni; is that right? |
| 11:48AM | 22 | A.  That's correct. |
| 11:48AM | 23 | Q.  By that point, was he charged? |
| 11:48AM | 24 | A.  Yeah.  He was indicted, and the indictment was unsealed. |
| 11:48AM | 25 | Q.  So that means it was public? |

11:48AM    1    A.   It was public.

11:48AM    2    Q.   And I asked you on direct, but there was a lot of media

11:48AM    3    coverage associated with that event?

11:48AM    4    A.   A pretty extensive amount.

11:48AM    5    Q.   Okay.  I'd like to go to the same exhibit and ask you a

11:48AM    6    question about camera 20.  Now, again, I'm not being

11:48AM    7    critical, but you didn't write this report, right?

11:48AM    8    A.   I did not.

11:48AM    9    Q.   Okay.  What does camera 20 say?  Can you read it for the

11:48AM    10   jury?

11:48AM    11   A.   The whole thing?  Located in the PGC office, video

11:48AM    12   footage from 11/28/2019 at 8:54:19 to 12/12/2019 10:29:39.

11:48AM    13   Camera 20 contains no relevant information.  Camera 20

11:49AM    14   generally shows employees such as Peter Gerace Jr., Peter

11:49AM    15   Gerace Sr., Anthony Gerace, John Ermin a/k/a Tommy O, Nick

11:49AM    16   Ciechalski, and the others doing typical office work.

11:49AM    17   Q.   So the defendant, his brother Anthony, and Tommy O the

11:49AM    18   Outlaws leader are on camera at the club in the office?

11:49AM    19   A.   In the office.

11:49AM    20   Q.   And we've heard testimony about -- at this trial from

11:49AM    21   witnesses about the first floor office; is that right?

11:49AM    22   A.   That's correct.

11:49AM    23           **MR. TRIPI:**  We can take that down.

11:49AM    24           **BY MR. TRIPI:**

11:49AM    25   Q.   As to 3539EE, none of those cameras covered the upstairs,

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

11:49AM  1  correct?

11:49AM  2  A.  That's correct.

11:49AM  3  Q.  None of those cameras covered the dressing rooms or the

11:49AM  4  bathrooms, correct?

11:49AM  5  A.  That's correct.

11:49AM  6  Q.  All right.

11:49AM  7        **MR. TRIPI:**  Let's move on to 3539EF.

11:49AM  8        **BY MR. TRIPI:**

11:50AM  9  Q.  And this deals with DVR 3 that you were questioned about?

11:50AM  10  A.  Yes, it does.

11:50AM  11        **MR. TRIPI:**  Let's go to page 2, Ms. Champoux.

11:50AM  12        **BY MR. TRIPI:**

11:50AM  13  Q.  The range on this DVR was November 13th to December 12th,

11:50AM  14  2019, and it showed seven cameras; is that right?

11:50AM  15  A.  Yeah.  11 -- what was the date range?

11:50AM  16  Q.  Oh, maybe I got it wrong.

11:50AM  17     There was a camera that showed November 30th to

11:50AM  18  December 12th; is that right?

11:50AM  19  A.  That's correct.

11:50AM  20  Q.  That's the range on this DVR?

11:50AM  21  A.  Correct.

11:50AM  22  Q.  Okay.  Again, all of those events regarding Anthony

11:50AM  23  Gerace, the defendant's phone being seized at the border,

11:50AM  24  Mike Masecchia, Lou Selva, Joe Bongiovanni's search, all

11:50AM  25  happened before the first moment of footage on this DVR,

11:50AM 1   correct?

11:50AM 2   A.  Correct.

11:50AM 3   Q.  In addition to that, Joseph Bongiovanni's arrest and

11:50AM 4   unsealing of his indictment occurred before the first moment

11:51AM 5   of footage on this DVR?

11:51AM 6   A.  It did.

11:51AM 7   Q.  Now, just in terms of notice, when Mr. Bongiovanni's

11:51AM 8   indictment was unsealed, was there a paragraph in it publicly

11:51AM 9   available that referred to a stripper overdose at a

11:51AM 10  gentleman's club operated by Coconspirator 1 in Cheektowaga,

11:51AM 11  New York, and that Bongiovanni advised Coconspirator 1 to get

11:51AM 12  her out of the gentleman's club?

11:51AM 13  A.  That language was in the indictment.

11:51AM 14  Q.  So that was publicly available to anyone that would have

11:51AM 15  read the indictment?

11:51AM 16  A.  It was.

11:51AM 17  Q.  And I think we established on direct, Coconspirator 1 at

11:51AM 18  that time was a reference to the defendant?

11:51AM 19  A.  Correct.  He was not charged at that point, so you

11:51AM 20  wouldn't utilize his name.

11:51AM 21  Q.  Did you do a lot more interviews pertaining to the

11:51AM 22  defendant after Bongiovanni was charged?

11:51AM 23  A.  Yes.  Significant.

11:51AM 24  Q.  Or caused them to be done by others?

11:52AM 25  A.  Yeah, a significant amount of work went in after that.

11:52AM    1    Q.  All right.  So, were investigative leaks a concern and

11:52AM    2    challenge in this investigation?

11:52AM    3    A.  Definitely.

11:52AM    4    Q.  Explain why.

11:52AM    5    A.  Because of Mr. Gerace's contacts in law enforcement, it

11:52AM    6    was always in the back of our minds, you know, looking at all

11:52AM    7    the associates he had, and all the associated law enforcement

11:52AM    8    members from Western New York, the different departments,

11:52AM    9    obviously the Bongiovanni piece, it was -- it was a serious

11:52AM   10    concern in this investigation.

11:52AM   11    Q.  Are there members of the State police who work on FBI

11:52AM   12    task forces?

11:52AM   13    A.  They are.

11:52AM   14    Q.  Do some of them work in this case?

11:52AM   15    A.  Some do, yes.

11:52AM   16    Q.  Is there a -- is there a concern if they are just talking

11:52AM   17    in their office space amongst each other, and someone they

11:52AM   18    don't know has a connection to a target overhears it, was

11:52AM   19    that a concern?

11:52AM   20    A.  That's a concern.  I will say the -- the agents on our --

11:53AM   21    or, the officers on our task force are well vetted, and we

11:53AM   22    certainly made a point to -- to clue them in on, you know,

11:53AM   23    our concerns and that sort of thing.

11:53AM   24    Q.  HSI had task force officers as well, right?

11:53AM   25    A.  Absolutely.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
97

11:53AM   1   Q.  In other words, in an investigation like this, with this

11:53AM   2   many law enforcement contacts, at the outset do you know

11:53AM   3   everything and every contact and every communication?

11:53AM   4   A.  Not even close.

11:53AM   5   Q.  Does that make it a major concern?

11:53AM   6   A.  Major concern.  Especially on the larger, like on the

11:53AM   7   search warrant executions.  You have to, by design, you need

11:53AM   8   to have marked units, so that expands the number of people

11:53AM   9   involved.  You need to --

11:53AM   10  Q.  What do you mean by a marked unit?

11:53AM   11  A.  I'm sorry.  Patrol car with lights.  For safety reasons

11:53AM   12  we always, at search warrants almost always, sometimes you

11:53AM   13  can get permission not to, but you want a marked unit there.

11:53AM   14  So the place you're searching, the individuals in the

11:53AM   15  residence or business, realize that this is law enforcement

11:54AM   16  action, and not maybe another drug dealer robbing them.

11:54AM   17      So that was a big concern.  You just, by its nature, you

11:54AM   18  have to expand the people in the know, so to speak, including

11:54AM   19  supervisors and bosses.

11:54AM   20      So search warrants are -- were a big concern when you

11:54AM   21  have to execute those.

11:54AM   22  Q.  How many former Buffalo police commissioners did the

11:54AM   23  defendant have some type of a relationship with?

11:54AM   24  A.  Two.

11:54AM   25  Q.  How many New York State police officers did he have some

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

11:54AM  1  type of relationship with?

11:54AM  2  A.  Going -- I think it was five at least, or possibly four.

11:54AM  3  A number of them.

11:54AM  4  Q.  You're estimating?

11:54AM  5  A.  I'm estimating.  I would need my records.

11:54AM  6  Q.  How many other local officers did he have some type of

11:54AM  7  relationship?  And by "local," I mean town, Cheektowaga,

11:54AM  8  Amherst, wherever.

11:54AM  9  A.  Looking at his contacts, and then based on some of our

11:54AM  10  investigative efforts, it was -- it would say 12 to 15.

11:54AM  11  Again, I'd need my records before I would lock in to solid

11:54AM  12  numbers.

11:54AM  13  Q.  As you sit here today, do you know the full extent of

11:55AM  14  everybody he knew?

11:55AM  15  A.  No, I do not.

11:55AM  16      MR. TRIPI:  Can we pull up Exhibit 100A.1-1?

11:55AM  17      BY MR. TRIPI:

11:55AM  18  Q.  All right.  I don't remember want to spend a ton of time

11:55AM  19  on this, but on direct you referenced how this is a DARTS

11:55AM  20  deconfliction email notice, and it has a reference of Paul

11:55AM  21  Francoforte's phone number, and a reference to a number in

11:55AM  22  contact with Anthony Gerace; do you remember that?

11:55AM  23  A.  That's correct, yes.

11:55AM  24  Q.  Would this document have given Joe Bongiovanni notice --

11:55AM  25  A.  Absolutely.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
99

| | | |
|---|---|---|
| 11:55AM | 1 | Q.  -- as a DEA agent of whether or not Anthony Gerace or |
| 11:55AM | 2 | Paul Francoforte were on a wiretap? |
| 11:55AM | 3 | A.  It would on a wiretap, yes. |
| 11:55AM | 4 | Q.  Okay. |
| 11:55AM | 5 | A.  Not -- |
| 11:55AM | 6 | Q.  Okay. |
| 11:55AM | 7 | A.  Yeah. |
| 11:55AM | 8 | Q.  That's a yes? |
| 11:55AM | 9 | A.  That's a yes. |
| 11:55AM | 10 | Q.  If Anthony Gerace's phone is tapped, just explain the |
| 11:56AM | 11 | basics of a wiretap.  If Anthony Gerace's phone is tapped, |
| 11:56AM | 12 | and the defendant were in contact with him, would that |
| 11:56AM | 13 | communication be captured by a wire? |
| 11:56AM | 14 | A.  Yeah.  A wiretap, you get all the calls coming in and |
| 11:56AM | 15 | out. |
| 11:56AM | 16 | Q.  So does Bongiovanni having notice of whether Anthony |
| 11:56AM | 17 | Gerace's phone provides some insight as to whether this |
| 11:56AM | 18 | defendant might be on a wiretap? |
| 11:56AM | 19 | A.  It does. |
| 11:56AM | 20 | Q.  And this document specifically indicates there's no |
| 11:56AM | 21 | wiretaps on them? |
| 11:56AM | 22 | A.  Correct. |
| 11:56AM | 23 | Q.  Okay. |
| 11:56AM | 24 | **MR. TRIPI:**  You can take that down. |
| 11:56AM | 25 | Can we pull up Exhibit 100A.1-2? |

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
100

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
| 11:56AM  | 1  | **BY MR. TRIPI:**                                       |
| 11:56AM  | 2  | Q.  I don't want to spend a lot of time on this, but this is |
| 11:57AM  | 3  | the OCDETF report for Operation Past Due related to Frank |
| 11:57AM  | 4  | Tripi; is that correct?                                  |
| 11:57AM  | 5  | A.  It is.                                               |
| 11:57AM  | 6  | Q.  You've been trained by the FBI?                     |
| 11:57AM  | 7  | A.  Yes, I have.                                         |
| 11:57AM  | 8  | Q.  You've worked cases with the DEA agents?            |
| 11:57AM  | 9  | A.  Yes.                                                 |
| 11:57AM  | 10 | Q.  You've worked cases with ATF?                       |
| 11:57AM  | 11 | A.  Certainly have.                                      |
| 11:57AM  | 12 | Q.  You've worked cases with IRS?                       |
| 11:57AM  | 13 | A.  I have.                                              |
| 11:57AM  | 14 | Q.  You've worked cases with New York State Police?     |
| 11:57AM  | 15 | A.  I have.                                              |
| 11:57AM  | 16 | Q.  You've worked cases with the Buffalo Police Department? |
| 11:57AM  | 17 | A.  Yep.                                                 |
| 11:57AM  | 18 | Q.  Other local agencies, as well?                      |
| 11:57AM  | 19 | A.  Yeah.  Quite a few.                                  |
| 11:57AM  | 20 | Q.  You've had conversations with other members of law  |
| 11:57AM  | 21 | enforcement generally in your career?                   |
| 11:57AM  | 22 | A.  Oh, yeah, lots.                                      |
| 11:57AM  | 23 | Q.  Based upon all of your training and experience, and all |
| 11:57AM  | 24 | of your contacts and communications over the years with other |
| 11:57AM  | 25 | experienced members of law enforcement, I should say you've |

| | | |
|---|---|---|
| 11:57AM | 1 | worked with HSI? |
| 11:57AM | 2 | A.  Yes, I missed that one. |
| 11:57AM | 3 | Q.  Is there any legitimate law enforcement purpose for a |
| 11:57AM | 4 | retired agent to have a draft OCDETF report that's |
| 11:58AM | 5 | law-enforcement sensitive in their residence at retirement? |
| 11:58AM | 6 | A.  Absolutely not. |
| 11:58AM | 7 | MR. TRIPI:  We can take that down. |
| 11:58AM | 8 | BY MR. TRIPI: |
| 11:58AM | 9 | Q.  Okay.  I've covered a lot earlier about the investigative |
| 11:58AM | 10 | technique of a wiretap, so I'm not going to spend a lot more |
| 11:58AM | 11 | time asking those questions over again.  But I do want to |
| 11:58AM | 12 | play you Government Exhibit 311 in the context of you being |
| 11:58AM | 13 | asked about whether a wiretap was viable or feasible.  I want |
| 11:58AM | 14 | to play that for you. |
| 11:58AM | 15 | A.  Okay. |
| 11:58AM | 16 | Q.  And ask you some questions, okay? |
| 11:58AM | 17 | MR. TRIPI:  Can we play Government Exhibit 311, |
| 11:58AM | 18 | please? |
| 11:58AM | 19 | I don't think we have audio.  Stop it, please, I need |
| 11:59AM | 20 | the audio up more. |
| 11:59AM | 21 | (Audio was played.) |
| 11:59AM | 22 | BY MR. TRIPI: |
| 11:59AM | 23 | Q.  Does the defendant mention drugs in the recording? |
| 11:59AM | 24 | A.  He does. |
| 11:59AM | 25 | Q.  Does the defendant mention TracFones? |

11:59AM  1   A.  He does.

11:59AM  2   Q.  In your experience, is a TracFone a common burner phone?

11:59AM  3   A.  Yeah.  A TracFone, burner phone, interchangable.

11:59AM  4   Q.  It's a prepaid phone that is often disposed of?

11:59AM  5   A.  Correct, And not in your name.

11:59AM  6   Q.  And we looked at it earlier, did Joseph Bongiovanni

12:00PM  7   respond to that message?

12:00PM  8   A.  He did.

12:00PM  9   Q.  And was that all after about a year or so after Anthony

12:00PM  10  Casullo and Mr. Bongiovanni had that exchange inside the DEA

12:00PM  11  office?

12:00PM  12  A.  It was.

12:00PM  13  Q.  So explain now why a wiretap was not feasible in this

12:00PM  14  case.

12:00PM  15  A.  Certainly.  I mean, having access to a -- an active DEA

12:00PM  16  agent who could check files, who could provide information on

12:00PM  17  law enforcement techniques, that would, I -- I think preclude

12:00PM  18  realistically pursuing a wiretap in this case.

12:00PM  19  Q.  Okay.  We talked earlier now about informants, right?

12:00PM  20  A.  Correct.

12:00PM  21  Q.  And we talked about challenges of getting an informant

12:00PM  22  into Pharaoh's; is that right?

12:00PM  23  A.  We did.

12:00PM  24  Q.  Did part of the investigation into Bongiovanni also

12:00PM  25  relate to him passing along the identities of informants to

12:00PM  1   individuals like Lou Selva?

12:00PM  2   A.  It did.

12:00PM  3   Q.  Did that concern take this technique completely off the

12:01PM  4   table?

12:01PM  5   A.  Yeah.  The factors -- that, and the other factors in this

12:01PM  6   case, it was not viable.  This was not a case for a wiretap.

12:01PM  7   Q.  And is that based on all of your experience?

12:01PM  8   A.  Yes.

12:01PM  9   Q.  Is that based on all of the experience of all the trained

12:01PM  10  agents that worked on this case with you?

12:01PM  11  A.  Yeah, in consultation with the prosecutors.

12:01PM  12  Q.  When you do investigations and when you put a case

12:01PM  13  together, do you tailor the techniques that you utilize to a

12:01PM  14  particular case you're dealing with?

12:01PM  15  A.  Yes.  Most cases are -- all cases have different factors

12:01PM  16  that you have to consider when you're coming up with

12:01PM  17  strategies and investigative techniques you're gonna pursue

12:01PM  18  or attempt.

12:01PM  19  Q.  Is that what was done in this case?

12:01PM  20  A.  Absolutely.

12:01PM  21  Q.  Now, you were asked earlier on cross if you reviewed a

12:01PM  22  report of the defendant engaged in drug transactions, I think

12:02PM  23  that was the question.

12:02PM  24      Did you conduct numerous interviews and have interviews

12:02PM  25  conducted of numerous witnesses who reported the defendant

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

104

| | | |
|---|---|---|
| 12:02PM | 1 | engaged in drug transactions? |
| 12:02PM | 2 | A.   Yeah, a large number of witnesses. |
| 12:02PM | 3 | Q.   Did you interview witnesses and have witnesses |
| 12:02PM | 4 | interviewed who reported and testified in this trial about |
| 12:02PM | 5 | sex acts committed at Pharaoh's and with this defendant? |
| 12:02PM | 6 | A.   We did.  Or I did, I guess. |
| 12:02PM | 7 | Q.   You were asked some questions about whether there was |
| 12:02PM | 8 | drug paraphernalia inside Pharaoh's on December 12th, 2019. |
| 12:02PM | 9 | **MR. TRIPI:**  Ms. Champoux, can we pull up just briefly |
| 12:02PM | 10 | Exhibit 235A-110. |
| 12:03PM | 11 | **BY MR. TRIPI:** |
| 12:03PM | 12 | Q.   Okay.  Now this is a photo from the search of Pharaoh's; |
| 12:03PM | 13 | is that right? |
| 12:03PM | 14 | A.   That's correct. |
| 12:03PM | 15 | Q.   Do you see some drug-related evidence in this photo? |
| 12:03PM | 16 | A.   Yeah.  Appears to be a couple blunts. |
| 12:03PM | 17 | Q.   Is a blunt basically a marijuana-wrapped cigarette? |
| 12:03PM | 18 | A.   Yeah, a cigar, cigarette. |
| 12:03PM | 19 | **MR. TRIPI:**  Let's go to 235A-A119. |
| 12:03PM | 20 | **BY MR. TRIPI:** |
| 12:03PM | 21 | Q.   On December -- what's depicted in this photo? |
| 12:03PM | 22 | A.   Appears to be some paraphernalia.  Pipes. |
| 12:03PM | 23 | Q.   Some type of smoking device? |
| 12:03PM | 24 | A.   Yeah, that's what it appears to be.  I would have to see |
| 12:03PM | 25 | it physically to say definitively. |

12:03PM    1    Q.  Based on your experience, does it look like a smoking

12:03PM    2    device?

12:03PM    3    A.  It does, it looks like paraphernalia.

12:03PM    4    Q.  Is that why it was photographed?

12:03PM    5    A.  Yes.

12:03PM    6    Q.  Is that some evidence of drug paraphernalia at Pharaoh's?

12:03PM    7    A.  Some evidence, yes.

12:04PM    8         **MR. TRIPI:**  Let's show Exhibit 235A-A115.

12:04PM    9         **BY MR. TRIPI:**

12:04PM   10    Q.  I think Special Agent Ryan testified about this earlier,

12:04PM   11    but what does that look like?

12:04PM   12    A.  Could be, like, hash oil possibly or --

12:04PM   13    Q.  Does it appear to be some type of THC product?

12:04PM   14    A.  Yeah, it does.

12:04PM   15    Q.  Is that some evidence of drug evidence at Pharaoh's?

12:04PM   16    A.  It is.

12:04PM   17    Q.  Okay.  And this was all after all of those events we

12:04PM   18    talked about, and after Mr. Bongiovanni was already charged;

12:04PM   19    is that right?

12:04PM   20    A.  That's correct.

12:04PM   21         **MR. TRIPI:**  Okay.  All right.  Can we pull up

12:04PM   22    Exhibit 555 on the screen?

12:04PM   23         **THE COURT:**  Mr. Tripi, we've been going almost an

12:04PM   24    hour.

12:04PM   25         **MR. TRIPI:**  I'm in my last section, I don't know, do

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

106

| | | |
|---|---|---|
| 12:04PM | 1 | you want to break now, Judge? |
| 12:04PM | 2 | **THE COURT:**  Well, no, I don't want to break now, but |
| 12:04PM | 3 | we've got things that we have to do at 12:30, I think you |
| 12:04PM | 4 | know, and just -- |
| 12:04PM | 5 | **MR. TRIPI:**  I'm almost done. |
| 12:04PM | 6 | **THE COURT:**  Okay. |
| 12:04PM | 7 | **MR. TRIPI:**  We're in the last -- the home stretch. |
| 12:05PM | 8 | **THE COURT:**  All right. |
| 12:05PM | 9 | **BY MR. TRIPI:** |
| 12:05PM | 10 | Q.  You were asked about the timeframe of the cameras and all |
| 12:05PM | 11 | that; do you remember that? |
| 12:05PM | 12 | A.  I do. |
| 12:05PM | 13 | Q.  Based on the duration that each individual was employed |
| 12:05PM | 14 | at Pharaoh's, I'm going to ask the same questions. |
| 12:05PM | 15 |     The earliest footage from Pharaoh's is from October 21st, |
| 12:05PM | 16 | 2019; is that right? |
| 12:05PM | 17 | A.  That's correct. |
| 12:05PM | 18 | Q.  Would that have captured anything that occurred with |
| 12:05PM | 19 | L.L.? |
| 12:05PM | 20 | A.  It would not. |
| 12:05PM | 21 | Q.  Would that have captured anything that occurred with |
| 12:05PM | 22 | A.A.? |
| 12:05PM | 23 | A.  Would not. |
| 12:05PM | 24 | Q.  Would that have captured anything that occurred with |
| 12:05PM | 25 | K.A.? |

12:05PM 1   A.  Would not.

12:05PM 2   Q.  Would that have captured anything that occurred with

12:05PM 3   P.H.?

12:05PM 4   A.  In '19, she did reconnect with -- no, it would not.

12:05PM 5   Q.  October, right?

12:05PM 6   A.  October, right.

12:05PM 7   Q.  Would that have captured anything that occurred with Matt

12:05PM 8   Albert?

12:05PM 9   A.  Nope.

12:05PM 10  Q.  Would that have captured anything related to the car stop

12:05PM 11  of Charm that Joseph Krywalski talked about?

12:05PM 12  A.  Would not.

12:05PM 13  Q.  Would that have captured anything related to Jeff

12:06PM 14  Anzalone's testimony?

12:06PM 15  A.  Would not.

12:06PM 16  Q.  Would that have captured anything related to K.L.'s

12:06PM 17  testimony?

12:06PM 18  A.  Would not.

12:06PM 19  Q.  Would that have captured anything related to A.A.'s

12:06PM 20  testimony?

12:06PM 21  A.  Would not.

12:06PM 22  Q.  Would that have captured anything related to John

12:06PM 23  McDonald's testimony?

12:06PM 24  A.  Would not.

12:06PM 25  Q.  Would that have captured anything related to C.B.'s

12:06PM    1    testimony?

12:06PM    2    A.  Would not.

12:06PM    3    Q.  Would that have captured anything related to K.M.'s

12:06PM    4    testimony, with her testimony related to the house, at

12:06PM    5    Pharaoh's, and a comment that Mr. Gerace made?

12:06PM    6    A.  It would not.

12:06PM    7    Q.  Would it have captured anything related to Kevin Myszka's

12:06PM    8    testimony?

12:06PM    9    A.  Would not.

12:06PM   10    Q.  Anything related to A.B.'s testimony in this trial?

12:06PM   11    A.  Would not.

12:06PM   12    Q.  Would that have captured anything related to Katrina

12:06PM   13    Nigro's testimony?

12:06PM   14    A.  Nope.

12:06PM   15    Q.  How about J.C.?

12:06PM   16    A.  Would not.

12:06PM   17    Q.  How about A.P.?

12:06PM   18    A.  Would not.

12:06PM   19    Q.  How about A.G.?

12:06PM   20    A.  Would not.

12:06PM   21    Q.  How about G.R.?

12:06PM   22    A.  Would not.

12:06PM   23    Q.  How about E.H.?  She worked there in 2014, right?

12:06PM   24    A.  Correct.

12:06PM   25    Q.  How about J.Z.?

| | | |
|---|---|---|
| 12:06PM | 1 | A.  Would not. |
| 12:06PM | 2 | Q.  How about C.H.? |
| 12:06PM | 3 | A.  She's possibly there in '19. |
| 12:06PM | 4 | Q.  Okay.  How about R.W.? |
| 12:07PM | 5 | A.  Would not. |
| 12:07PM | 6 | Q.  How about C.C.? |
| 12:07PM | 7 | A.  Would not. |
| 12:07PM | 8 | Q.  How about Doug Augustyniak? |
| 12:07PM | 9 | A.  He's gone by then. |
| 12:07PM | 10 | Q.  Yep.  Withdrawn, I didn't mean to say yep. |
| 12:07PM | 11 | How about the conduct between Anthony Casullo and Joseph |
| 12:07PM | 12 | Bongiovanni at DEA? |
| 12:07PM | 13 | A.  Correct, it would not. |
| 12:07PM | 14 | Q.  How about investigative activities by Special Agent Ryan? |
| 12:07PM | 15 | A.  Would not. |
| 12:07PM | 16 | Q.  How about the events between Craig Border, R.A. and -- |
| 12:07PM | 17 | pertaining to the defendant in 2005? |
| 12:07PM | 18 | A.  Would not. |
| 12:07PM | 19 | Q.  How about the cold approach related to Chris Wisniewski? |
| 12:07PM | 20 | A.  Would not. |
| 12:07PM | 21 | Q.  How about any of the events of 2009 related to Exhibit |
| 12:07PM | 22 | 30A and the 2009 probation search and FBI meeting with |
| 12:07PM | 23 | Bongiovanni? |
| 12:07PM | 24 | A.  It would not. |
| 12:07PM | 25 | Q.  Okay.  So none of the camera footage from October 21st, |

USA v Gerace - Burns - Foti/Recross - 12/18/24

12:07PM   1   2019 or later undermines anything anyone talked about; is

12:07PM   2   that right?

12:07PM   3   A.  Correct.

12:07PM   4   Q.  All right.

12:07PM   5          **MR. TRIPI:**  Nothing further, Judge.

12:08PM   6          **THE COURT:**  Mr. Foti?

12:08PM   7

12:08PM   8                **RECROSS-EXAMINATION BY MR. FOTI:**

12:08PM   9   Q.  Okay.  On redirect, you were asked about assessing the

12:08PM  10   forthcomingness and credibility of individuals that were

12:08PM  11   interviewed, correct?

12:08PM  12   A.  Correct.

12:08PM  13   Q.  You were asked about a number of individuals who were

12:08PM  14   interviewed, but ultimately did not testify in this trial?

12:08PM  15   A.  That's correct.

12:08PM  16   Q.  And you were specifically asked questions about specific

12:08PM  17   names and whether you found what the information they gave

12:08PM  18   you to be credible or not, correct?

12:08PM  19   A.  Forthcoming I think was the question.

12:08PM  20   Q.  Forthcoming, and you assessed -- well -- well, to the

12:08PM  21   extent that the question was about whether they were

12:08PM  22   forthcoming or not, Michelle Sercu answered questions about

12:08PM  23   Pharaoh's, correct?

12:08PM  24   A.  Yeah, that one I wasn't as familiar with, but yes, she

12:09PM  25   answered questions about Pharaoh's.

USA v Gerace - Burns - Foti/Recross - 12/18/24

111

12:09PM    1   Q.  And by the time she was interviewed, she had become a

12:09PM    2   night manager, correct?

12:09PM    3   A.  I believe that, as I mentioned on my -- in my cross,

12:09PM    4   I -- I don't remember that one as well.

12:09PM    5   Q.  Okay.  And in terms of Michelle Sercu, she provided

12:09PM    6   information that drugs and prostitution was not tolerated?

12:09PM    7              MR. TRIPI:  Objection.

12:09PM    8              THE COURT:  Basis?

12:09PM    9              MR. TRIPI:  Hearsay.

12:09PM   10              THE COURT:  Overruled.

12:09PM   11              THE WITNESS:  I would need to -- I would just need to

12:09PM   12   read the report to say definitively, Mr. Foti.

12:09PM   13              BY MR. FOTI:

12:09PM   14   Q.  Okay.  To the extent that you said on redirect that she

12:09PM   15   was not forthcoming, you do agree that she was answering

12:09PM   16   questions about drugs and prostitution?

12:09PM   17              MR. TRIPI:  Objection to the extent it

12:09PM   18   mischaracterizes her testimony.  I didn't ask whether she was

12:09PM   19   forthcoming or not with respect to that person, so --

12:09PM   20              THE COURT:  Overruled.

12:09PM   21              BY MR. FOTI:

12:09PM   22   Q.  To the extent you were asked about Ms. Sercu at all, you

12:09PM   23   had indicated you were aware that she had been interviewed,

12:09PM   24   correct?

12:09PM   25   A.  Correct.

USA v Gerace - Burns - Foti/Recross - 12/18/24

| | | |
|---|---|---|
| 12:09PM | 1 | Q.  And you were aware that she indicated there was no drugs |
| 12:09PM | 2 | and prostitution in the club, correct? |
| 12:09PM | 3 | A.  Which is completely contradictory to all the evidence we |
| 12:10PM | 4 | gathered to that point. |
| 12:10PM | 5 | Q.  When you're talking about assessing credibility, you're |
| 12:10PM | 6 | talking about a decision of whether they're providing |
| 12:10PM | 7 | information consistent with the narrative that is developing |
| 12:10PM | 8 | as part of your investigation? |
| 12:10PM | 9 | A.  I disagree with the term "narrative."  I mean, we follow |
| 12:10PM | 10 | evidence. |
| 12:10PM | 11 | Q.  Well, you specifically gave an example of something |
| 12:10PM | 12 | Robert Reed said during his interview that you found not to |
| 12:10PM | 13 | be credible as part of his interview, correct? |
| 12:10PM | 14 | A.  Correct. |
| 12:10PM | 15 | Q.  And he wasn't the only one who told you that there was no |
| 12:10PM | 16 | drugs in the club, correct? |
| 12:10PM | 17 | A.  Yeah, there was some of the people that said that. |
| 12:10PM | 18 | Q.  You talked about, on redirect, the interview -- you |
| 12:10PM | 19 | recall there was an interview of D.P., correct? |
| 12:10PM | 20 | A.  Correct. |
| 12:10PM | 21 | Q.  And she was also somebody who indicated drugs are not |
| 12:10PM | 22 | tolerated in the club, correct? |
| 12:10PM | 23 | A.  Correct. |
| 12:10PM | 24 | Q.  And sex acts are not tolerated in the club? |
| 12:10PM | 25 | A.  Correct. |

| | | |
|---|---|---|
| 12:10PM | 1 | Q.  She said if you get caught doing a sex act, you would be |
| 12:10PM | 2 | fired, correct? |
| 12:10PM | 3 | A.  Without having a report in front of me, I -- |
| 12:10PM | 4 | Q.  No reason to disagree with me? |
| 12:10PM | 5 | A.  No reason to disagree.  I agree with that. |
| 12:10PM | 6 | Q.  You were asked about Megan Stabler -- |
| 12:10PM | 7 | **MR. TRIPI:**  Judge, I have hearsay objections. |
| 12:10PM | 8 | **THE COURT:**  Overruled. |
| 12:11PM | 9 | **BY MR. FOTI:** |
| 12:11PM | 10 | Q.  You were asked about Megan Stabler on redirect, correct? |
| 12:11PM | 11 | A.  I was. |
| 12:11PM | 12 | Q.  And you made assessments about whether you believed what |
| 12:11PM | 13 | she had -- the information that she had to offer, correct? |
| 12:11PM | 14 | A.  Correct. |
| 12:11PM | 15 | Q.  The information she had to offer was sex acts are not |
| 12:11PM | 16 | allowed in the club, correct? |
| 12:11PM | 17 | A.  I -- I'd have to see the report on that one. |
| 12:11PM | 18 | Q.  Well, you have no reason to disagree with that, right? |
| 12:11PM | 19 | A.  I don't have a reason to disagree -- |
| 12:11PM | 20 | Q.  Okay. |
| 12:11PM | 21 | A.  -- with you on that, Mr. Foti. |
| 12:11PM | 22 | Q.  You have no reason to disagree that Megan Stabler |
| 12:11PM | 23 | provided information that if you got caught engaging in sex |
| 12:11PM | 24 | acts, you would be fired, correct? |
| 12:11PM | 25 | A.  She may have said that.  I mean, that's contradictory to |

12:11PM   1   all the evidence that we've gathered in this case.

12:11PM   2   Q.  It's not contradictory to the other individuals that I

12:11PM   3   just asked about interviewing, correct?

12:11PM   4   A.  It appeared that there were certain individuals who were

12:11PM   5   still very loyal to Mr. Gerace, that worked there, and that

12:11PM   6   went into our decision of whether they were forthcoming or

12:11PM   7   not.

12:11PM   8   Q.  So -- okay.  Well, there's a number of people you

12:11PM   9   interviewed that were still working there, and the

12:11PM  10   individuals I just asked about except for Ms. Sercu were not

12:11PM  11   working there anymore, correct?

12:11PM  12   A.  Pericak might have.

12:11PM  13   Q.  Maybe I'm wrong.  Let me ask you about this.  You talked

12:11PM  14   about -- you were asked about on redirect Angela Dingledey,

12:12PM  15   correct?

12:12PM  16   A.  Correct.

12:12PM  17   Q.  That was somebody who was interviewed, correct?

12:12PM  18   A.  It was.

12:12PM  19   Q.  And she was a dancer being terminated for being caught

12:12PM  20   with Xanax, correct?

12:12PM  21   A.  I'm trying to recall that one.  I know she -- it

12:12PM  22   definitely -- I don't have reason to disagree with you on

12:12PM  23   that.  I will say it was clear that Mr. Gerace was still

12:12PM  24   present in her life and involved --

12:12PM  25   Q.  You're --

| | | |
|---|---|---|
| 12:12PM | 1 | A.  -- helping her. |
| 12:12PM | 2 | Q.  Oh, to the extent that Mr. Gerace was helping her, she |
| 12:12PM | 3 | wasn't working at Pharaoh's anymore, correct? |
| 12:12PM | 4 | A.  Yeah.  I think he -- he bailed her out of some charges, |
| 12:12PM | 5 | assaulting a police officer in Tennessee or something.  I'm |
| 12:12PM | 6 | going from memory.  So -- |
| 12:12PM | 7 | Q.  So Mr. Gerace is maintaining a relationship with her, but |
| 12:12PM | 8 | he's not allowing her to work at the club because she was |
| 12:12PM | 9 | caught with Xanax? |
| 12:12PM | 10 | **MR. TRIPI:**  Objection as to what Mr. Gerace was |
| 12:12PM | 11 | doing. |
| 12:12PM | 12 | **THE COURT:**  Overruled. |
| 12:12PM | 13 | Folks, I am overruling these objections, and -- and |
| 12:12PM | 14 | the testimony is not coming in for the truth of it, it's |
| 12:12PM | 15 | coming in with respect to this witness's credibility and -- |
| 12:13PM | 16 | and his assessment of what he said about his assessment of the |
| 12:13PM | 17 | veracity of these people and why they weren't followed up |
| 12:13PM | 18 | with.  Okay?  So that's why it's being admitted.  It's not |
| 12:13PM | 19 | being admitted for the truth of the statements that were made. |
| 12:13PM | 20 | Go ahead.  Keep going. |
| 12:13PM | 21 | **BY MR. FOTI:** |
| 12:13PM | 22 | Q.  You talked about on redirect interviewing Russell |
| 12:13PM | 23 | Salvatore, correct? |
| 12:13PM | 24 | A.  That's correct. |
| 12:13PM | 25 | Q.  And he made what maybe was an obnoxious statement about |

USA v Gerace - Burns - Foti/Recross - 12/18/24

| | | |
|---|---|---|
| 12:13PM | 1 | he wouldn't need a prostitute because he's the owner of a |
| 12:13PM | 2 | restaurant and he's popular with women or something like |
| 12:13PM | 3 | that? |
| 12:13PM | 4 | A.  Yeah, I think he said -- it related to he could help |
| 12:13PM | 5 | them -- put -- give them better tables for, I guess, parties. |
| 12:13PM | 6 | And a waitress would get a better station, maybe a better |
| 12:13PM | 7 | assignment and make more money.  That was the context of that |
| 12:13PM | 8 | statement about everyone wants to be with the boss. |
| 12:13PM | 9 | Q.  The initial context of statement is he said I've never |
| 12:13PM | 10 | hired a prostitute from Mr. Gerace, correct? |
| 12:13PM | 11 | A.  Correct. |
| 12:13PM | 12 | Q.  And without pulling back up 555 again, there's pictures |
| 12:14PM | 13 | of Mr. Gerace with a number of individuals over the course of |
| 12:14PM | 14 | a 15-year span, correct? |
| 12:14PM | 15 | A.  Correct. |
| 12:14PM | 16 | Q.  That have been offered at this trial, right? |
| 12:14PM | 17 | A.  Yes, sir. |
| 12:14PM | 18 | Q.  And there's a picture of Mr. Gerace with a number of |
| 12:14PM | 19 | individuals in the kitchen when he went to Pharaoh's at some |
| 12:14PM | 20 | point, correct? |
| 12:14PM | 21 | A.  Correct. |
| 12:14PM | 22 | Q.  There's no pictures of Mr. Gerace with Russell Salvatore |
| 12:14PM | 23 | at any point, correct? |
| 12:14PM | 24 | A.  Not -- I don't -- not -- not that was exhibited as in |
| 12:14PM | 25 | evidence here. |

USA v Gerace - Burns - Foti/Recross - 12/18/24

12:14PM   1   Q.  And did you, as part of your review of Mr. Gerace's

12:14PM   2   phone, review contacts between Mr. Gerace and Mr. Salvatore?

12:14PM   3   A.  I don't recall any, but I -- I don't recall any.

12:14PM   4   Q.  You had Mr. Gerace's phone, correct?

12:14PM   5   A.  I did.

12:14PM   6   Q.  There was a search conducted of that phone, correct?

12:14PM   7   A.  Correct.

12:14PM   8   Q.  The jury saw contacts that came out of that phone,

12:14PM   9   correct?

12:14PM   10  A.  Correct.

12:14PM   11  Q.  And you don't recall reviewing any contacts between

12:14PM   12  Mr. Salvatore and Mr. Gerace?

12:14PM   13  A.  Not as I sit here right now.  It's possible.

12:14PM   14  Q.  On redirect, you talked about other contacts out of that

12:15PM   15  phone including contacts that Mr. Gerace had with individuals

12:15PM   16  in addition to those that were admitted into evidence during

12:15PM   17  your direct, right?

12:15PM   18  A.  Yes.

12:15PM   19  Q.  Some of the names included Anthony Gerace, right?

12:15PM   20  A.  Correct.

12:15PM   21  Q.  Sue Michalski, correct?

12:15PM   22  A.  Correct.

12:15PM   23  Q.  Lou Selva, correct?

12:15PM   24  A.  Correct.

12:15PM   25  Q.  Trooper Vishion, correct?

12:15PM      1    A.   Yes.

12:15PM      2    Q.   None of those conversations are in evidence and before

12:15PM      3    this jury, correct?

12:15PM      4    A.   That is correct.

12:15PM      5    Q.   Okay.  And when you reviewed those conversations, there

12:15PM      6    was no discussions of any drug transactions, correct?

12:15PM      7    A.   Correct.

12:15PM      8    Q.   There was no discussions of commercial sex acts, correct?

12:15PM      9    A.   Correct.

12:15PM     10    Q.   And in fact, nowhere in any of the other discussions

12:15PM     11    reviewed in that phone were there discussions of drug

12:15PM     12    transactions, correct?

12:15PM     13    A.   Correct.

12:15PM     14    Q.   And no discussions of commercial sex acts, correct?

12:15PM     15    A.   Again, as I -- I mean, the Michalski ones, I feel have a

12:15PM     16    nexus to that.

12:15PM     17    Q.   You have an opinion about the ones that are in front of

12:15PM     18    the jury, right?

12:16PM     19    A.   I do.

12:16PM     20    Q.   In terms of all the other contacts that are in that

12:16PM     21    phone, anything you recall that the jury didn't see in terms

12:16PM     22    of commercial sex acts?

12:16PM     23    A.   Not that I recall.

12:16PM     24    Q.   You talked about a couple of undercover operations, one

12:16PM     25    in 2016 to '17, and one in 2018, correct?

USA v Gerace - Burns - Foti/Recross - 12/18/24

119

| | | |
|---|---|---|
| 12:16PM | 1 | A.  I did. |
| 12:16PM | 2 | Q.  Okay.  And you talked about -- you were asked questions |
| 12:16PM | 3 | about the one in 2016 and '17 and a particular officer that |
| 12:16PM | 4 | was involved was referenced during the redirect, correct? |
| 12:16PM | 5 | A.  He was. |
| 12:16PM | 6 | Q.  And Investigator Frank Vitko was the case agent, correct? |
| 12:16PM | 7 | A.  Yeah, I think he was a supervisor.  Catuzza was the |
| 12:16PM | 8 | undercover. |
| 12:16PM | 9 | Q.  Okay.  You said that that was -- was stopped at some |
| 12:16PM | 10 | point because there was some sort of mixup or conflict where |
| 12:16PM | 11 | the Cheektowaga Police Department ran a plate, and that was a |
| 12:16PM | 12 | reason for discontinuing the investigation? |
| 12:16PM | 13 | MR. TRIPI:  Objection as to mixup. |
| 12:16PM | 14 | MR. FOTI:  I don't know -- |
| 12:16PM | 15 | MR. TRIPI:  Mischaracterizes the testimony. |
| 12:16PM | 16 | THE COURT:  Overruled. |
| 12:16PM | 17 | THE WITNESS:  I'm sorry, can you repeat the question? |
| 12:16PM | 18 | BY MR. FOTI: |
| 12:16PM | 19 | Q.  The investigation apparently comes to an end at some |
| 12:17PM | 20 | point because a plate is run or something by the Cheektowaga |
| 12:17PM | 21 | Police Department? |
| 12:17PM | 22 | A.  Yeah, I didn't get the impression that was the -- I think |
| 12:17PM | 23 | it was a number of factors, not just that. |
| 12:17PM | 24 | Q.  Well, yeah, that was one that you testified to on |
| 12:17PM | 25 | redirect, right? |

USA v Gerace - Burns - Foti/Recross - 12/18/24

120

| | | |
|---|---|---|
| 12:17PM | 1 | A.  Correct. |
| 12:17PM | 2 | Q.  One of the other factors is there was multiple attempts |
| 12:17PM | 3 | to do undercover purchases, correct? |
| 12:17PM | 4 | A.  Trying to remember the conversation with Mr. Catuzza. |
| 12:17PM | 5 | Q.  You did talk about the fact that there was one successful |
| 12:17PM | 6 | undercover purchase involving Ms. K.A., correct? |
| 12:17PM | 7 | A.  Right.  I thought that there was another, maybe, |
| 12:17PM | 8 | marijuana one.  But I could be conflating -- |
| 12:17PM | 9 | Q.  You might be thinking about Mr. Santos. |
| 12:17PM | 10 | A.  I'm sorry?  I may be conflating -- |
| 12:17PM | 11 | Q.  Yeah.  In terms of the 2016 to 2017, there was an attempt |
| 12:17PM | 12 | to make an undercover purchase in March 6th of 2015, correct? |
| 12:17PM | 13 | A.  I -- I would need the records, but I have no reason to |
| 12:17PM | 14 | disagree with you. |
| 12:17PM | 15 | Q.  And another attempt that -- you would not disagree there |
| 12:17PM | 16 | was also another attempt on April 30th of 2015, correct? |
| 12:17PM | 17 | A.  That sounds right.  It's been a while since I looked at |
| 12:17PM | 18 | that file. |
| 12:17PM | 19 | Q.  That's okay.  What you would agree with is there was |
| 12:18PM | 20 | multiple attempts not involving Ms. K.A. at Pharaoh's where |
| 12:18PM | 21 | there was a failure to be able to have an undercover |
| 12:18PM | 22 | purchase, correct? |
| 12:18PM | 23 | A.  I would agree with that. |
| 12:18PM | 24 | Q.  And ultimately, they call off that investigation? |
| 12:18PM | 25 | A.  Correct. |

12:18PM   1   Q.   Okay.  And then you talked about the more recent attempts

12:18PM   2   in 2018 involving Mr. Santos, correct?

12:18PM   3   A.   Correct.

12:18PM   4   Q.   And I think there was some success at getting, like, some

12:18PM   5   marijuana at some point?

12:18PM   6   A.   Correct.

12:18PM   7   Q.   But the attempt was to see if he could get cocaine,

12:18PM   8   correct?

12:18PM   9   A.   That was the ultimate goal of that.

12:18PM   10  Q.   And I think the -- the question on redirect was he

12:18PM   11  expressed that he was, his belief, that he was unable to

12:18PM   12  purchase cocaine because he's not a known commodity, correct?

12:18PM   13  A.   Correct.

12:18PM   14  Q.   Okay.  And the takeaway from that is he was unable to

12:18PM   15  purchase cocaine, correct?

12:18PM   16  A.   He was unable to purchase cocaine.

12:18PM   17  Q.   He made multiple attempts, right?

12:18PM   18  A.   I think he went in there two or three times, maybe.

12:18PM   19  Q.   And unable to purchase cocaine each time he went in,

12:18PM   20  correct?

12:18PM   21  A.   He did have conversations about it, but was unable to.

12:18PM   22  Q.   Had conversations, and was unable to purchase cocaine,

12:18PM   23  right?

12:19PM   24  A.   That's correct.

12:19PM   25  Q.   There was a question about wiretaps and a reference to

12:19PM   1   Judge Michalski being involved in -- as a judge back in 2016,

12:19PM   2   2017, that was overseeing certain requests by law

12:19PM   3   enforcement; is that right?  Something about --

12:19PM   4   A.  No, that related to the undercover operation.  There

12:19PM   5   was -- and, again, I don't -- I -- I -- I know the document,

12:19PM   6   but I would need to see it to be specific, but there was I

12:19PM   7   think a request made to the Court not to disclose part of the

12:19PM   8   undercover, I think, related to K.A.  Because if you charge

12:19PM   9   someone, they have an obligation to turn over evidence, but

12:19PM  10   sometimes you can get permission to pull back some of that

12:19PM  11   evidence.

12:19PM  12      I think that's what that documented related to.  But

12:19PM  13   Judge Michalski was the individual that it was presented to.

12:19PM  14   And Mr. Catuzza obviously didn't have any idea about the

12:19PM  15   relationship.

12:19PM  16   Q.  Ms. K.A., when she was ultimately charged, she was

12:19PM  17   charged with three undercover transactions involving drugs,

12:19PM  18   correct?

12:19PM  19   A.  Correct.

12:20PM  20   Q.  Not four that she was actually involved in, correct?

12:20PM  21   A.  Yeah.  I'd have to look at the indictment, but I think it

12:20PM  22   was three.

12:20PM  23   Q.  She wasn't charged with the undercover purchase at

12:20PM  24   Pharaoh's, correct?

12:20PM  25   A.  I think it was considered as, like, relevant conduct, but

USA v Gerace - Burns - Foti/Recross - 12/18/24

12:20PM   1    it wasn't in the indictment I don't believe.

12:20PM   2    Q.  Okay.  And in terms of just sort of circling back on the

12:20PM   3    issue of wiretaps, if you, as an FBI special agent, were to

12:20PM   4    seek a wiretap, and I think you already said you're not

12:20PM   5    really familiar with State procedures, correct?

12:20PM   6    A.  Correct.

12:20PM   7    Q.  Judge Michalski is a State judge, correct?

12:20PM   8    A.  He is.

12:20PM   9    Q.  If you were to put an application in for authorization,

12:20PM  10    you would be going to a federal magistrate?

12:20PM  11    A.  Federal wiretap, yes.

12:20PM  12    Q.  And Judge Michalski would have nothing to do with that,

12:20PM  13    correct?

12:20PM  14    A.  Correct.

12:20PM  15            **MR. FOTI:**  May I just have a moment, Judge?

12:20PM  16            Nothing further, Judge.

12:21PM  17            **THE COURT:**  Anything more, Mr. Tripi?

12:21PM  18            **MR. TRIPI:**  No, thank you, Judge.

12:21PM  19            **THE COURT:**  Okay.  You may step down, sir.  Thank you

12:21PM  20    very much.

12:21PM  21            **THE WITNESS:**  Thank you.

12:21PM  22            (Witness excused at 12:21 p.m.)

         23            (Excerpt concluded at 12:21 p.m.)

         24            *    *    *    *    *    *    *

         25

1

2                    **CERTIFICATE OF REPORTER**

3

4               In accordance with 28, U.S.C., 753(b), I

5     certify that these original notes are a true and correct

6     record of proceedings in the United States District Court for

7     the Western District of New York on December 18, 2024.

8

9                         s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR
10                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                     TRANSCRIPT INDEX
 3        EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 3
 4                    DECEMBER 18, 2024
 5
 6
 7     W I T N E S S                            P A G E
 8     B R I A N   B U R N S                    2
 9        (CONT'D) CROSS-EXAMINATION BY MR. FOTI:    2
10        REDIRECT EXAMINATION BY MR. TRIPI:        60
11        RECROSS-EXAMINATION BY MR. FOTI:         110
12
13
14     E X H I B I T S                          P A G E
15     GOV Exhibit 3539ED                          5
16     GOV Exhibit 3539EE                         20
17     GOV Exhibit 3539EF                         32
18
19
20
21
22
23
24
25
```