09:21AM

1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK

2

   _____

3  UNITED STATES OF AMERICA,
                                      Case No. 1:19-cr-227
4                 Plaintiff,                 1:23-cr-37
   v.                                            (LJV)

5
   PETER GERACE, JR.,               November 12, 2024

6

7  _____ Defendant.

8    TRANSCRIPT EXCERPT - EXAMINATION OF DALE KASPRZYK - DAY 2
                BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                    UNITED STATES DISTRICT JUDGE

10 APPEARANCES:       TRINI E. ROSS, UNITED STATES ATTORNEY
                      BY: JOSEPH M. TRIPI, ESQ.
11                        NICHOLAS T. COOPER, ESQ.
                          CASEY L. CHALBECK, ESQ.
12                    Assistant United States Attorneys
                      Federal Centre, 138 Delaware Avenue
13                    Buffalo, New York 14202
                      For the Plaintiff
14
                      THE FOTI LAW FIRM, P.C.
15                    BY: MARK ANDREW FOTI, ESQ.
                      16 West Main Street, Suite 100
16                    Rochester, New York 14614
                        And
17                    SOEHNLEIN LAW
                      BY: ERIC MICHAEL SOEHNLEIN, ESQ.
18                    350 Main Street, Suite 2100
                      Buffalo, New York 14202
19                    For the Defendant

20 PRESENT:           KAREN A. CHAMPOUX, USA PARALEGAL
                      BRIAN A. BURNS, FBI SPECIAL AGENT
21                    MARILYN K. HALLIDAY, HSI SPECIAL AGENT

22 LAW CLERK:         REBECCA FABIAN IZZO, ESQ.

23 COURT CLERK:       COLLEEN M. DEMMA

24 REPORTER:          ANN MEISSNER SAWYER, FCRR, RPR, CRR
                      Robert H. Jackson Courthouse
25                    2 Niagara Square Buffalo, New York 14202
                      Ann_Sawyer@nywd.uscourts.gov

09:41AM

| | | |
|---|---|---|
| 09:41AM | 1 | (Excerpt commenced at 9:41 a.m.) |
| 09:41AM | 2 | (Jury seated at 9:41 a.m.) |
| 09:41AM | 3 | **THE COURT:**  Good morning, everyone. |
| 09:41AM | 4 | **ALL JURORS:**  Good morning. |
| 09:41AM | 5 | **THE COURT:**  Welcome back.  I remind the witness he's |
| 09:41AM | 6 | still under oath. |
| 09:41AM | 7 | The record will reflect that all our jurors are |
| 09:41AM | 8 | present. |
| 09:41AM | 9 | And, Mr. Tripi, you may continue. |
| 09:41AM | 10 | **MR. TRIPI:**  Thank you, Your Honor. |
| 09:41AM | 11 | |
| 09:41AM | 12 | **D A L E   K A S P R Z Y K**, having been previously duly called |
| 09:41AM | 13 | and sworn, continued to testify as follows: |
| 09:42AM | 14 | |
| 09:42AM | 15 | **CONTINUED DIRECT EXAMINATION BY MR. TRIPI:** |
| 09:42AM | 16 | Q.  Good morning, Mr. Kasprzyk. |
| 09:42AM | 17 | A.  Good morning, sir. |
| 09:42AM | 18 | Q.  I just have a little bit more for you, okay? |
| 09:42AM | 19 | A.  Yes, sir. |
| 09:42AM | 20 | **MR. TRIPI:**  Ms. Champoux, can you pull up again |
| 09:42AM | 21 | Exhibit 30A? |
| 09:42AM | 22 | **BY MR. TRIPI:** |
| 09:42AM | 23 | Q.  Just to reorient us from Thursday, this is the document |
| 09:42AM | 24 | that we had sort of finished the day going through paragraph |
| 09:42AM | 25 | by paragraph when we ended; is that right? |

09:42AM    1    A.  Yes, sir, it is.

09:42AM    2    Q.  Okay.  Now, subsequent to this report, did the defendant

09:42AM    3    ever mention to you any meeting that he had with the FBI and

09:42AM    4    Peter Gerace?

09:42AM    5    A.  He did not.

09:42AM    6    Q.  Subsequent to this report that you signed off on, did the

09:42AM    7    defendant ever mention to you that he had passed Gerace off

09:42AM    8    to the FBI for them to work as a source?

09:42AM    9    A.  No, sir.

09:42AM    10    Q.  Subsequent to this report, did the defendant ever ask you

09:43AM    11    to sign any other reports documenting any type of follow-up

09:43AM    12    meeting with Peter Gerace?

09:43AM    13    A.  No, sir, he did not.

09:43AM    14    Q.  I said the word "defendant" a few times.  I meant

09:43AM    15    Mr. Bongiovanni.  Sorry about that.

09:43AM    16    A.  Yes, sir.  I understood what you meant.

09:43AM    17    Q.  It's Monday morning for me, so a little tired?

09:43AM    18    A.  Yes, sir.

09:43AM    19    Q.  Reframing those couple of questions, did Mr. Bongiovanni

09:43AM    20    ever tell you about any meeting with Gerace and the FBI?

09:43AM    21    A.  No, sir, he did not.

09:43AM    22    Q.  Did he ever ask you to sign any reports documenting any

09:43AM    23    follow-up meeting with Gerace and the FBI?

09:43AM    24    A.  No, sir, he did not.

09:43AM    25    Q.  Sorry for misspeaking there.

09:43AM   1      If the FBI was not going to use Gerace or target Gerace,

09:44AM   2   so use him as a source or target him as a criminal defendant,

09:44AM   3   could the DEA have attempted to target him as a defendant?

09:44AM   4   A.  Yes, sir.

09:44AM   5   Q.  During this time, did you have sort of weekly group

09:44AM   6   meetings in -- within the DEA office that you held?

09:44AM   7   A.  Yes, I did.

09:44AM   8   Q.  So were there opportunities for weekly updates by

09:44AM   9   Mr. Bongiovanni to you regarding this situation?

09:44AM   10  A.  Yes, there was.

09:44AM   11  Q.  After -- subsequent to this report, did he ever give you

09:44AM   12  any subsequent updates?

09:44AM   13  A.  He did not.

09:44AM   14  Q.  As far as you're aware now with the benefit of hindsight,

09:44AM   15  was Mr. Gerace ever actually a DEA confidential source?

09:44AM   16  A.  He was not.

09:44AM   17  Q.  As far as you're aware, did the defendant ever actually

09:45AM   18  use Peter Gerace as any type of confidential source or source

09:45AM   19  of information?

09:45AM   20  A.  Sir, do you mean Mr. Bongiovanni?

09:45AM   21  Q.  I'm sorry, yes, Mr. Bongiovanni.  Did he ever use Gerace

09:45AM   22  as any type of confidential source or source of information?

09:45AM   23  A.  No.  Bongiovanni, to my knowledge, did not use Gerace as

09:45AM   24  a confidential source.

09:45AM   25  Q.  When did you leave the DEA?

09:45AM  1  A.  2013.

09:45AM  2  Q.  And once you left, you were -- you had moved up from

09:45AM  3  group supervisor to resident agent in charge?

09:45AM  4  A.  Prior to my retirement, yes, sir, my last two-and-a-half

09:45AM  5  years was working as the resident agent in charge of the

09:45AM  6  Buffalo office.

09:45AM  7       **MR. TRIPI:**  Ms. Champoux, could -- could we put up

09:45AM  8  Exhibit 30B next to Exhibit 30A for a moment.  30B is also in

09:46AM  9  evidence.

09:46AM  10      **BY MR. TRIPI:**

09:46AM  11  Q.  I'd like you to take a look at just that front page of

09:46AM  12  30B.  Read it to yourself, and then the signature blocks

09:46AM  13  there.

09:46AM  14  A.  Yes, sir.

09:46AM  15  Q.  Okay.  Looking at 30A and 30B, do you see those are

09:46AM  16  reports both written to the same case file?

09:46AM  17  A.  Yes, sir.

09:46AM  18  Q.  Looking at 30A and 30B, do you see the author of each

09:46AM  19  report is Joseph Bongiovanni?

09:46AM  20  A.  Yes, sir.  I see that.

09:46AM  21  Q.  Now, looking at 30A as compared to the date prepared for

09:46AM  22  30B, would it be fair to say that the report that you signed

09:46AM  23  off on, authored by Mr. Bongiovanni, was written just a

09:47AM  24  little bit less than a year after the report that he authored

09:47AM  25  in Exhibit 30B?

| | | |
|---|---|---|
| 09:47AM | 1 | A.  Yes, sir. |
| 09:47AM | 2 | Q.  Now, sometimes DEA files can get very large, correct? |
| 09:47AM | 3 | A.  Yes, sir, they do. |
| 09:47AM | 4 | Q.  As a group supervisor, do you know each and every word of |
| 09:47AM | 5 | each and every report in a -- in a -- in one of your agent's |
| 09:47AM | 6 | case files? |
| 09:47AM | 7 | A.  No, sir, I do not. |
| 09:47AM | 8 | Q.  Did Mr. Bongiovanni, in your discussions prior to you |
| 09:47AM | 9 | signing off on the report in 30A, ever tell you that about a |
| 09:47AM | 10 | year earlier, the DEA, and him in particular, had acquired |
| 09:47AM | 11 | a -- some type of organizational chart that had Peter Gerace |
| 09:47AM | 12 | listed on it? |
| 09:47AM | 13 | A.  He did not. |
| 09:47AM | 14 | Q.  Did the -- did Mr. Bongiovanni ever tell you that about a |
| 09:48AM | 15 | year earlier, he had approached a DEA Special Agent named |
| 09:48AM | 16 | Chris Wisniewski, the case agent in the Scalia file, to do a |
| 09:48AM | 17 | cold approach of Peter Gerace offering to be helpful to |
| 09:48AM | 18 | Wisniewski? |
| 09:48AM | 19 | Did he ever tell you that? |
| 09:48AM | 20 | A.  He did not. |
| 09:48AM | 21 | Q.  Now, you're familiar with the technique "cold approach," |
| 09:48AM | 22 | correct? |
| 09:48AM | 23 | A.  Yes, sir. |
| 09:48AM | 24 | Q.  That technique is not something you do to approach a |
| 09:48AM | 25 | confidential source or a source of information, correct? |

09:48AM   1    A.   That's correct.

09:48AM   2    Q.   That term "cold approach" means it's someone we may be

09:48AM   3    targeting, right?

09:48AM   4    A.   Correct.

09:48AM   5    Q.   Is cold approach the opposite of what's being represented

09:48AM   6    to you in Exhibit 30A?

09:48AM   7    A.   Yes, sir.

09:48AM   8         **MR. TRIPI:**  And if we could, Ms. Champoux, scroll to

09:48AM   9    the chart attached to 30B.

09:48AM  10         **BY MR. TRIPI:**

09:48AM  11    Q.   Do you see a -- like a handwritten chart there that in

09:48AM  12    the upper middle of the chart has the name Peter Geraci, Jr.?

09:49AM  13    A.   Yes, sir, I see that.

09:49AM  14    Q.   Did Mr. Bongiovanni ever tell you about the existence of

09:49AM  15    that chart?

09:49AM  16    A.   He did not.

09:49AM  17         **MR. TRIPI:**  We can zoom out of that.

09:49AM  18         **BY MR. TRIPI:**

09:49AM  19    Q.   Upon review of the exhibit that's in 30B, do you believe,

09:49AM  20    as you sit here today, Mr. Bongiovanni concealed information

09:49AM  21    from you regarding Gerace?

09:49AM  22    A.   Yes, I do.

09:49AM  23    Q.   Do you think he misled you?

09:49AM  24    A.   Yes, sir.

09:49AM  25         **MR. TRIPI:**  We can take those down, Ms. Champoux.

Case 1:19-cr-00227-LJV-MJR    Document 1501    Filed 04/25/25    Page 8 of 38
USA v Gerace - Kasprzyk - Soehnlein/Cross - 11/12/24

8

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 09:49AM  | 1  | **BY MR. TRIPI:**                                      |
| 09:49AM  | 2  | Q.  Just a few more questions and then we'll turn -- turn you |
| 09:49AM  | 3  | over for cross, okay?                                   |
| 09:49AM  | 4  |     After you retired from the DEA and went to work at M&T |
| 09:50AM  | 5  | Bank, did there come a time shortly after Mr. Bongiovanni |
| 09:50AM  | 6  | retired from the DEA in early 2019 that he contacted you? |
| 09:50AM  | 7  | A.  Yes, sir.                                           |
| 09:50AM  | 8  | Q.  Was Mr. Bongiovanni looking for a job?              |
| 09:50AM  | 9  | A.  Yes, sir.                                           |
| 09:50AM  | 10 | Q.  Did Mr. Bongiovanni express some concerns to you about a |
| 09:50AM  | 11 | fellow DEA special agent in the Buffalo office?         |
| 09:50AM  | 12 | A.  Yes, he did.                                        |
| 09:50AM  | 13 | Q.  Who was he concerned about?                         |
| 09:50AM  | 14 | A.  He identified an agent known as Tony Casullo, Anthony |
| 09:50AM  | 15 | Casullo.                                                |
| 09:50AM  | 16 | Q.  Did he seem concerned about information Casullo had about |
| 09:50AM  | 17 | him?                                                    |
| 09:50AM  | 18 | A.  Yes, sir.                                           |
| 09:50AM  | 19 |         **MR. TRIPI:**  One moment, please, Your Honor. |
| 09:50AM  | 20 |         Judge, I have no further direct.                |
| 09:50AM  | 21 |         **THE COURT:**  Cross?                          |
| 09:50AM  | 22 |                                                        |
| 09:50AM  | 23 |         **CROSS-EXAMINATION BY MR. SOEHNLEIN:**        |
| 09:50AM  | 24 | Q.  Good morning, Agent Kasprzyk.                       |
| 09:51AM  | 25 | A.  Good morning, sir.                                  |

| | | |
|---|---|---|
| 09:51AM | 1 | Q.  We've never met before? |
| 09:51AM | 2 | A.  That's correct. |
| 09:51AM | 3 | Q.  I'm Eric Soehnlein.  I represent Mr. Gerace.  Good |
| 09:51AM | 4 | morning.  I want to ask you a few questions just to follow up |
| 09:51AM | 5 | on some of the exam that Mr. Tripi had for you. |
| 09:51AM | 6 | What did you do to prepare for today? |
| 09:51AM | 7 | A.  For today, or -- |
| 09:51AM | 8 | Q.  Well, let's start with for today.  What did you do to |
| 09:51AM | 9 | prepare for today? |
| 09:51AM | 10 | A.  Nothing for today.  I prepared for this testimony by |
| 09:51AM | 11 | meeting with the prosecutor. |
| 09:51AM | 12 | Q.  Okay.  And you -- and you did that before Thursday |
| 09:51AM | 13 | presumably? |
| 09:51AM | 14 | A.  Correct. |
| 09:51AM | 15 | Q.  You didn't do anything over the weekend? |
| 09:51AM | 16 | A.  No, sir. |
| 09:51AM | 17 | Q.  Did you go back to Florida over the weekend? |
| 09:51AM | 18 | A.  I did, sir. |
| 09:51AM | 19 | Q.  Was it warm? |
| 09:51AM | 20 | A.  It was. |
| 09:51AM | 21 | Q.  We're all jealous.  Now what did you do to prepare for |
| 09:51AM | 22 | your testimony? |
| 09:51AM | 23 | A.  I had a conversation, very briefly, with Mr. Tripi. |
| 09:51AM | 24 | Q.  Okay.  And -- and how many times have you had |
| 09:51AM | 25 | conversations with Mr. Tripi about testimony relating to |

09:52AM  1  former Special Agent Bongiovanni?

09:52AM  2  A.  Three times in total.

09:52AM  3  Q.  Okay.  And when were these conversations?

09:52AM  4  A.  That was prior to my testimony in August.  So I -- I

09:52AM  5  would say early August.

09:52AM  6  Q.  Okay.  Early August of 2023 or 2020?

09:52AM  7  A.  2024.

09:52AM  8  Q.  2024.

09:52AM  9  A.  Yes, sir.

09:52AM  10  Q.  Thank you.  And before that, you had some other meetings

09:52AM  11  with federal law enforcement specifically?

09:52AM  12  A.  Yes, sir.

09:52AM  13  Q.  Do you recall when the first meeting was with federal law

09:52AM  14  enforcement?

09:52AM  15  A.  I would say sometime before or after the indictment,

09:52AM  16  at -- at least four years ago.

09:52AM  17  Q.  Yeah.  But they -- federal law enforcement reached out to

09:52AM  18  you after Bongiovanni had been indicted, correct?

09:52AM  19  A.  Correct.

09:52AM  20  Q.  Yeah.  'Cuz I -- I think -- do you recall the first time

09:52AM  21  that you met with them, you had a conversation about the

09:52AM  22  indictment; is that correct?

09:53AM  23  A.  Yes, sir.

09:53AM  24  Q.  Okay.  All right.  We'll come back to that.

09:53AM  25          MR. SOEHNLEIN:  Can you put 30A back on, please?

09:53AM    1          Thank you.

09:53AM    2          **BY MR. SOEHNLEIN:**

09:53AM    3    Q.   So the date on this document is 11/6/09, do you see that

09:53AM    4    at the bottom right?

09:53AM    5    A.   Yes, sir, I see that.

09:53AM    6    Q.   And you were group supervisor at that time?

09:53AM    7    A.   Yes, I was.

09:53AM    8    Q.   You had been group supervisor for less than a year at

09:53AM    9    that time, correct?

09:53AM   10    A.   I would say that that's -- that's correct, yes.

09:53AM   11    Q.   Okay.  Now, when you become group supervisor, is there

09:53AM   12    additional training that you get from DEA to take on that

09:53AM   13    role?

09:53AM   14    A.   Yes, sir, there is.

09:53AM   15    Q.   Okay.  And what's that training entail?

09:53AM   16    A.   That training consists of a -- it's a program module

09:53AM   17    that's administered at the DEA Training Academy in Quantico.

09:53AM   18    It's leadership training.  It's training on how to manage

09:54AM   19    and -- and supervise agents.  But the focus, the general

09:54AM   20    focus of the training is leadership training.

09:54AM   21    Q.   Okay.  Now, when you say supervise agents, what -- what

09:54AM   22    do you mean by that?  What does that phrase mean?

09:54AM   23    A.   Provide guidance to them as they work their day-to-day

09:54AM   24    activities.

09:54AM   25    Q.   All right.  Because as the -- as the group supervisor,

09:54AM  1   you were a superior officer, correct?

09:54AM  2   A.  I was their manager, sir.

09:54AM  3   Q.  Right.  And in the chain of command, you -- you would be

09:54AM  4   above them, correct?

09:54AM  5   A.  That's correct.

09:54AM  6   Q.  They look to you for guidance, right?

09:54AM  7   A.  At times, sir, yes.

09:54AM  8   Q.  Right.  If they have an issue, they're supposed to go to

09:54AM  9   you, correct?

09:54AM  10  A.  If they have an issue, yes, sir.

09:54AM  11  Q.  Okay.  If they're not sure what to do on a case, you

09:54AM  12  would be an appropriate person for them to contact, correct?

09:54AM  13  A.  Yes, sir, that's correct.

09:54AM  14  Q.  Okay.  And -- and -- and you understand that as a group

09:54AM  15  supervisor, you presumably have more agency knowledge than

09:54AM  16  the agents that work under you, correct?

09:54AM  17  A.  Yes, sir.

09:54AM  18  Q.  Yeah.  Now, you testified a little bit about your

09:55AM  19  relationship with Bongiovanni when he was working in the

09:55AM  20  Buffalo office at the same time that you were.  You -- you

09:55AM  21  recall that testimony?

09:55AM  22  A.  I do, sir.

09:55AM  23  Q.  Okay.  And did you form an impression that you were sort

09:55AM  24  of a -- a -- a father figure or an appropriate person that he

09:55AM  25  would turn to for guidance in that office?

09:55AM   1    A.  A father figure, sir?

09:55AM   2    Q.  Well, what -- how would you characterize your

09:55AM   3    relationship with Special Agent Bongiovanni?

09:55AM   4    A.  Sir, I would describe us as peers.  When we -- when we

09:55AM   5    worked together, he was an agent and I was an agent, and we

09:55AM   6    were peers.

09:55AM   7    Q.  Okay.  How about when you were a group supervisor?

09:55AM   8    A.  I was his manager.

09:55AM   9    Q.  Okay.  And so it would have been appropriate for him to

09:55AM  10    turn to you for guidance and for information and things like

09:55AM  11    that?

09:55AM  12    A.  He would come to me and ask questions when appropriate.

09:55AM  13    Q.  Okay.  And he did that more than once?

09:55AM  14    A.  During the course of our time together, yes, sir.

09:55AM  15    Q.  Okay.  And you talked about these group meetings that you

09:55AM  16    would have at DEA, correct?

09:56AM  17    A.  Yes, sir.

09:56AM  18    Q.  So that was a weekly meeting where he would meet with you

09:56AM  19    to discuss cases, correct?

09:56AM  20    A.  It was a group meeting.  Everyone that was there that

09:56AM  21    particular day would meet, we would meet together and talk

09:56AM  22    about cases and case progress, yes, sir.

09:56AM  23    Q.  Okay.  Now, as group supervisor, did you get any training

09:56AM  24    in -- when you're talking about that management training and

09:56AM  25    things like that, in how to review the work product of the

09:56AM    1    agents that are under you?

09:56AM    2    A.  I don't recall training of that sort.  No, sir.

09:56AM    3    Q.  You -- you don't recall receiving any guidance in that

09:56AM    4    regard, correct?

09:56AM    5    A.  Maybe you can be more specific about your -- your

09:56AM    6    question.  Are you asking me, is there training on how to

09:56AM    7    review a DEA-6 of investigation?

09:56AM    8    Q.  Yeah.  Is there -- does such training exist?

09:56AM    9    A.  No, sir, not that I received.

09:56AM   10    Q.  You never received -- you were never trained on that?

09:56AM   11    A.  On how to read a 6 and review it.

09:56AM   12    Q.  Yeah.

09:56AM   13    A.  There was no training at the course that I went to that

09:57AM   14    spoke to that particular topic.

09:57AM   15    Q.  All right.  As group supervisor, how many DEA-6 reports

09:57AM   16    like this one did you review and approve of?

09:57AM   17    A.  I would say approximately hundreds.

09:57AM   18    Q.  Hundreds?

09:57AM   19    A.  Hundreds, yes, sir.

09:57AM   20    Q.  Not -- not something that was out of the ordinary, right?

09:57AM   21    A.  Correct.

09:57AM   22    Q.  Something you did every day, right?

09:57AM   23    A.  Yes, sir.

09:57AM   24    Q.  Okay.  Something that you were familiar with, right?

09:57AM   25    A.  Yes, sir.

09:57AM   1    Q.  You filled these forms out yourself, right?

09:57AM   2    A.  That's correct, sir.

09:57AM   3    Q.  When you were an agent, right?

09:57AM   4    A.  Yes, sir.

09:57AM   5    Q.  You know what's supposed to be in them?

09:57AM   6    A.  Yes, sir.

09:57AM   7    Q.  You know what's not supposed to be in them, right?

09:57AM   8    A.  Yes, sir.

09:57AM   9    Q.  When you are a DEA agent, do you have a duty to be

09:57AM  10    thorough?

09:57AM  11    A.  Yes.

09:57AM  12    Q.  Do you have a duty to investigate facts when certain

09:57AM  13    facts are brought to light?

09:57AM  14    A.  Yes, sir.

09:57AM  15    Q.  Okay.  Do you have a duty to try to understand what's

09:57AM  16    going on in an investigation or when something like a DEA-6

09:57AM  17    form is brought to your attention?

09:57AM  18    A.  Yes, sir.

09:57AM  19    Q.  So, I want to ask you a couple -- a couple questions.

09:58AM  20        We talked on --

09:58AM  21             MR. SOEHNLEIN:  We -- we can take that exhibit down

09:58AM  22    now, thank you.  I appreciate that, thank you very much.

09:58AM  23             BY MR. SOEHNLEIN:

09:58AM  24    Q.  We talked on Thursday about the conflict of interest

09:58AM  25    rules; do you recall that?

09:58AM    1    A.  Yes, I do.

09:58AM    2    Q.  Okay.  Did you receive any training in understanding the

09:58AM    3    conflict of interest rules?

09:58AM    4    A.  Yes.

09:58AM    5    Q.  Okay.  And what do you recall?

09:58AM    6    A.  Well, the initial training happened at the DEA academy.

09:58AM    7    Q.  Okay.  And -- and so in your own words, what's a conflict

09:58AM    8    of interest?

09:58AM    9    A.  A conflict of interest is to avoid situations where you

09:58AM   10    could be jeopardizing your decisionmaking ability by a -- a

09:58AM   11    conflict of interest.

09:58AM   12    Q.  When somebody has a conflict of interest, they might not

09:58AM   13    even appreciate it themselves, right?

09:58AM   14         **MR. TRIPI:**  Objection, speculation.

09:58AM   15         **BY MR. SOEHNLEIN:**

09:58AM   16    Q.  Well, you have experience --

09:58AM   17         **THE COURT:**  You're withdrawing the question?

09:58AM   18         **MR. SOEHNLEIN:**  I'll withdraw the question, yeah.

09:58AM   19         **THE COURT:**  Go ahead.

09:58AM   20         **BY MR. SOEHNLEIN:**

09:58AM   21    Q.  You have experience in agents having conflicts of

09:59AM   22    interest on cases, correct?

09:59AM   23    A.  I don't recall having similar situations with other

09:59AM   24    agents having a conflict of interest.

09:59AM   25         I understand what a conflict of interest is and

09:59AM  1  understand when to recognize it.  But I don't recall specific

09:59AM  2  situations where a conflict of interest presented itself to

09:59AM  3  me as a group supervisor previously.

09:59AM  4  Q.  Okay.  So, in -- in dealing with this issue with Special

09:59AM  5  Agent Bongiovanni, this would have been the first time that

09:59AM  6  anything like this came to your attention as group supervisor

09:59AM  7  at DEA Buffalo, fair?

09:59AM  8  A.  That -- that -- that's a complicated question that

09:59AM  9  you're -- that you're asking me.  I would say to you that I

09:59AM  10  didn't recognize it as a conflict of interest then because he

09:59AM  11  did not accurately or honestly describe to me his

10:00AM  12  relationship with Mr. Geraci.

10:00AM  13  Q.  So let's -- let's just sort of set the table here.

10:00AM  14      In November of 2009, you're a relatively new group

10:00AM  15  supervisor, correct, less than a year?

10:00AM  16  A.  Less than a year.

10:00AM  17  Q.  Less than a year?

10:00AM  18  A.  Yes, sir.

10:00AM  19  Q.  You hadn't dealt with a conflict of interest with one of

10:00AM  20  your agents before, fair?

10:00AM  21  A.  Correct.

10:00AM  22  Q.  Correct, okay.  Now, I think on Thursday, I wrote it

10:00AM  23  down, but you can correct me if I'm wrong, okay?  You -- you

10:00AM  24  said that Bongiovanni told you something like that he knew

10:00AM  25  Gerace from the old neighborhood, correct?

Case 1:19-cr-00227-LJV-MJR    Document 1501    Filed 04/25/25    Page 18 of 38
USA v Gerace - Kasprzyk - Soehnlein/Cross - 11/12/24

18

10:00AM   1   A.  Correct.

10:00AM   2   Q.  Okay.  Now, you'd agree with me saying that he knew

10:00AM   3   someone from the old neighborhood suggests that there's a

10:00AM   4   relationship that -- that predates the present time by

10:00AM   5   several years, correct?

10:00AM   6   A.  I wouldn't frame it or describe it as a relationship.  He

10:00AM   7   told me he knew him from the neighborhood and left it at

10:00AM   8   that.  He didn't provide any additional detail other than

10:01AM   9   that.

10:01AM   10  Q.  Okay.  You didn't ask him any follow-up questions?

10:01AM   11  A.  I did not.

10:01AM   12  Q.  Okay.  You should have asked him follow-up questions?

10:01AM   13  A.  Sir, that's your opinion, not mine.

10:01AM   14  Q.  In your opinion, you don't think you had any obligation

10:01AM   15  to ask him any follow-up questions when he told you that

10:01AM   16  Mr. Gerace reached out to him and he knew him from the old

10:01AM   17  neighborhood?

10:01AM   18       **MR. TRIPI:**  Objection, argumentative.

10:01AM   19       **THE COURT:**  Overruled.

10:01AM   20       **THE WITNESS:**  Sir, I believe then, and I believe

10:01AM   21  today, that Mr. Bongiovanni had an obligation to tell me the

10:01AM   22  truth about his relationship with Mr. Geraci.  He did not.

10:01AM   23  And so, he misrepresented or lied to me about that

10:01AM   24  relationship, and so I did not pursue it any more after he

10:01AM   25  said that he only knew him from the neighborhood.

| | | |
|---|---|---|
| 10:01AM | 1 | **BY MR. SOEHNLEIN:** |
| 10:01AM | 2 | Q.  He -- he told you that he knew him from the old |
| 10:01AM | 3 | neighborhood, correct? |
| 10:01AM | 4 | A.  Yes, sir. |
| 10:01AM | 5 | Q.  Okay.  That's not inaccurate, right? |
| 10:01AM | 6 | A.  That's not what, sir? |
| 10:01AM | 7 | Q.  That's an accurate statement, right?  As far as you know, |
| 10:01AM | 8 | he knew him from the old neighborhood? |
| 10:02AM | 9 | A.  That's how he represented it. |
| 10:02AM | 10 | Q.  Okay.  And he told you that Gerace reached out to him |
| 10:02AM | 11 | after having his business searched, right? |
| 10:02AM | 12 | A.  Yes, sir. |
| 10:02AM | 13 | Q.  And he told you that Gerace was on federal supervision; |
| 10:02AM | 14 | is that correct? |
| 10:02AM | 15 | A.  That's correct, sir. |
| 10:02AM | 16 | Q.  And he told you that FBI was present at the search, |
| 10:02AM | 17 | correct? |
| 10:02AM | 18 | A.  Yes, sir. |
| 10:02AM | 19 | Q.  Okay.  And so from that, you would infer that Mr. Gerace |
| 10:02AM | 20 | had his phone number and was able to reach out to him, |
| 10:02AM | 21 | correct? |
| 10:02AM | 22 | A.  Yes, sir. |
| 10:02AM | 23 | Q.  Right?  He didn't say, hey, I -- I found out that this |
| 10:02AM | 24 | guy got searched, and so I proactively went out to him, |
| 10:02AM | 25 | correct? |

| | | |
|---|---|---|
| 10:02AM | 1 | A.  Yes, sir, that's correct. |
| 10:02AM | 2 | Q.  And he told you that he had a conversation with Gerace |
| 10:02AM | 3 | that was just him and Gerace, correct? |
| 10:02AM | 4 | A.  Yes.  He said he talked to Gerace.  I don't -- he didn't |
| 10:02AM | 5 | describe it as others being present, but he said that he |
| 10:02AM | 6 | talked to Gerace, yes. |
| 10:02AM | 7 | Q.  Okay. |
| 10:02AM | 8 | A.  He got a call from Gerace. |
| 10:02AM | 9 | Q.  And you didn't question him on that either, did you? |
| 10:02AM | 10 | A.  No, sir. |
| 10:02AM | 11 | Q.  No, sir.  Okay.  You didn't ask him when the last time he |
| 10:03AM | 12 | had talked to Gerace prior to Gerace reaching out to him was, |
| 10:03AM | 13 | correct? |
| 10:03AM | 14 | A.  No, I did not. |
| 10:03AM | 15 | Q.  You didn't ask him if he had ever been a double date with |
| 10:03AM | 16 | Gerace? |
| 10:03AM | 17 | A.  On a what with Gerace? |
| 10:03AM | 18 | Q.  A double date? |
| 10:03AM | 19 | A.  No, sir.  I did not ask him that. |
| 10:03AM | 20 | Q.  You didn't ask him if he ever saw Gerace socially? |
| 10:03AM | 21 | A.  No, sir, I did not. |
| 10:03AM | 22 | Q.  You didn't ask him when the last time he texted with |
| 10:03AM | 23 | Gerace was? |
| 10:03AM | 24 | A.  No, sir. |
| 10:03AM | 25 | **MR. SOEHNLEIN:**  Can you -- can you put that exhibit |

| | | |
|---|---|---|
| 10:03AM | 1 | back up, please. |
| 10:03AM | 2 | **MS. CHAMPOUX:** 30A? |
| 10:03AM | 3 | **MR. SOEHNLEIN:** Yeah, 30A.  Thank you. |
| 10:03AM | 4 | **BY MR. SOEHNLEIN:** |
| 10:03AM | 5 | Q.  All right.  So what we're looking at now is 30A.  And |
| 10:03AM | 6 | this is a true and accurate copy of the document you're |
| 10:03AM | 7 | reviewing on November 6th, correct? |
| 10:03AM | 8 | A.  Yes, sir, it is. |
| 10:03AM | 9 | Q.  No -- no reason to dispute it, correct? |
| 10:03AM | 10 | A.  Correct. |
| 10:03AM | 11 | Q.  You see this file title, this Matthew Scalia? |
| 10:03AM | 12 | A.  Yes, sir, I see it. |
| 10:03AM | 13 | Q.  Scalia -- I might be saying it wrong.  If I say Matthew |
| 10:03AM | 14 | Scalia, you know who we're talking about up here on the |
| 10:03AM | 15 | right? |
| 10:03AM | 16 | A.  Yes, sir, I do. |
| 10:03AM | 17 | Q.  All right.  When you got this DEA-6 report, did -- did |
| 10:04AM | 18 | you look in this file at all to see what other case reports |
| 10:04AM | 19 | were in there? |
| 10:04AM | 20 | A.  I did not. |
| 10:04AM | 21 | Q.  Okay.  When you got this DEA-6 report, did you read it? |
| 10:04AM | 22 | A.  Yes, sir. |
| 10:04AM | 23 | Q.  Did you understand it? |
| 10:04AM | 24 | A.  Yes, sir. |
| 10:04AM | 25 | Q.  Did you ask Special Agent Bongiovanni any further |

10:04AM    1    questions about it?

10:04AM    2    A.  No, sir.

10:04AM    3    Q.  Okay.  Now --

10:04AM    4         **MR. SOEHNLEIN:**  Can you flip to the next page?

10:04AM    5         Thank you.

10:04AM    6         **BY MR. SOEHNLEIN:**

10:04AM    7    Q.  All right.  So, on -- after Bongiovanni came to you, you

10:04AM    8    reached out to the FBI to figure out their level of interest

10:04AM    9    with Gerace, correct?

10:04AM   10    A.  Yes, sir, that's correct.

10:04AM   11    Q.  And from there, it was your understanding that the FBI

10:04AM   12    was going to investigate Gerace, fair?

10:04AM   13    A.  Yes, sir.  That was my understanding.

10:04AM   14    Q.  So at that point in time, it was not going to be a DEA

10:04AM   15    investigation, correct?

10:04AM   16    A.  It was unknown at that point in time, sir, whether the

10:04AM   17    DEA would participate or not in the investigation.

10:04AM   18    Q.  Okay.  Now, if I look at paragraph 6 here, you see

10:05AM   19    paragraph 6?

10:05AM   20    A.  Yes, sir, I see it.

10:05AM   21    Q.  Do you see where it says G.S. Kasprzyk instructed

10:05AM   22    S.A. Bongiovanni to set up an interview with Gerace and FBI

10:05AM   23    agents in the near future?

10:05AM   24         Did I read that accurately?

10:05AM   25    A.  You did, sir.

10:05AM 1  Q.  Okay.  Is that accurately a statement of what happened?

10:05AM 2  A.  Yes, sir.

10:05AM 3  Q.  Okay.  It doesn't say Kasprzyk instructed Bongiovanni and

10:05AM 4  a partner to set up an interview with Gerace and FBI agents,

10:05AM 5  correct?

10:05AM 6  A.  It does not say that.

10:05AM 7  Q.  Okay.  It doesn't say Kasprzyk instructed other members

10:05AM 8  of DEA to set up an interview with Gerace and FBI in the near

10:05AM 9  future, correct?

10:05AM 10 A.  That's correct, sir.

10:05AM 11 Q.  Okay.  So if -- if Bongiovanni would have set up an

10:05AM 12 interview with Gerace and the FBI agents in the near future,

10:05AM 13 he would have been following your instructions, correct?

10:05AM 14 A.  Yes, sir.

10:05AM 15 Q.  As a Special Agent of the DEA, did he have an obligation

10:05AM 16 to follow your instructions?

10:05AM 17 A.  Yes, sir.

10:05AM 18 Q.  If he didn't follow your instructions would that have

10:05AM 19 been insubordination?

10:05AM 20 A.  Potentially, yes, sir.

10:05AM 21         **MR. TRIPI:**  Objection to hypothetical.

10:05AM 22         **THE COURT:**  Overruled.

10:05AM 23         **BY MR. SOEHNLEIN:**

10:05AM 24 Q.  Yeah, he would have been disciplined for that, right?

10:06AM 25         **THE COURT:**  The -- the -- the objection is overruled,

10:06AM  1    you can answer.

10:06AM  2              **THE WITNESS:**  I can answer?

10:06AM  3              Again, sir, your question?

10:06AM  4              **BY MR. SOEHNLEIN:**

10:06AM  5    Q.  Did he have an obligation to follow your directions?

10:06AM  6    A.  Yes, sir, he did.

10:06AM  7    Q.  Okay.  And paragraph 6 accurately states your directions

10:06AM  8    to Bongiovanni, correct?

10:06AM  9    A.  Yes, sir.

10:06AM  10   Q.  Okay.  In the time that you worked with Special Agent

10:06AM  11   Bongiovanni, did you form any opinions about his work ethic?

10:06AM  12   A.  Yes.

10:06AM  13   Q.  Okay.  And you thought he was lazy, right?

10:06AM  14   A.  Yes, sir.

10:06AM  15   Q.  You didn't think he was a very good agent, right?

10:06AM  16   A.  I thought he was lazy.

10:06AM  17   Q.  Yeah.  He -- he made paperwork mistakes all the time,

10:06AM  18   didn't he?

10:06AM  19   A.  I -- I would not agree to that.  I would say he -- he

10:06AM  20   made mistakes occasionally.

10:06AM  21   Q.  Okay.  And -- and he did a lot of things that at the time

10:07AM  22   you felt were kind of boneheaded, correct?

10:07AM  23   A.  Again, sir, I -- I would not describe them as boneheaded.

10:07AM  24   Q.  Okay.  Now, the federal law enforcement reached out to

10:07AM  25   you after the -- after Bongiovanni had been indicted,

10:07AM    1    correct?

10:07AM    2    A.   Yes.  That would have been my recollection, yes.  It

10:07AM    3    would have been after the indictment, yes, sir.

10:07AM    4    Q.   Yeah, but you were still in touch with some people from

10:07AM    5    your prior work at the DEA at that point in your life,

10:07AM    6    correct?

10:07AM    7    A.   Occasionally, I would talk to agents from the office,

10:07AM    8    yes.

10:07AM    9    Q.   Okay.  And you were aware of the Bongiovanni indictment?

10:07AM   10    A.   I was aware of it, yes, sir.

10:07AM   11    Q.   And you were aware that the United States Attorney's

10:07AM   12    Office was investigating members of the DEA at that time,

10:07AM   13    correct?

10:07AM   14    A.   I was aware that they were investigating Bongiovanni.

10:07AM   15    Q.   Okay.  Were you aware that they were investigating other

10:07AM   16    people --

10:07AM   17    A.   No, I was not.

10:07AM   18    Q.   -- at the DEA?

10:07AM   19         You were not aware of that?

10:08AM   20    A.   Not specifically, no.

10:08AM   21    Q.   You say not specifically.  You were aware that there was

10:08AM   22    an investigation, correct?

10:08AM   23    A.   Yes, sir.

10:08AM   24    Q.   A DEA agent you worked with had been indicted, correct?

10:08AM   25    A.   Correct.

| | | |
|---|---|---|
| 10:08AM | 1 | Q. They were looking at things you had done, correct? |
| 10:08AM | 2 | A. That I had done, sir? |
| 10:08AM | 3 | Q. You signed this form, correct? |
| 10:08AM | 4 | A. Yes, sir. |
| 10:08AM | 5 | Q. That's an official act of the DEA that you undertook on |
| 10:08AM | 6 | behalf of DEA; isn't that right? |
| 10:08AM | 7 | A. Yes, sir. |
| 10:08AM | 8 | Q. You did that as part of your official capacity as a DEA |
| 10:08AM | 9 | agent, correct? |
| 10:08AM | 10 | A. Yes, sir, that's correct. |
| 10:08AM | 11 | Q. It's -- it's your obligation to stand behind that, isn't |
| 10:08AM | 12 | it? |
| 10:08AM | 13 | A. Yes, sir. |
| 10:08AM | 14 | Q. You're not saying you didn't sign the form, correct? |
| 10:08AM | 15 | A. Yes, sir, that's correct. |
| 10:08AM | 16 | Q. You reviewed every word of it, didn't you? |
| 10:08AM | 17 | A. Yes, sir. |
| 10:08AM | 18 | Q. Okay. And we talked about every question that you had |
| 10:08AM | 19 | for John [sic] Bongiovanni at the time that you reviewed the |
| 10:08AM | 20 | form; isn't that right? |
| 10:08AM | 21 | A. Yes. |
| 10:08AM | 22 | Q. When you got the -- strike that. Hold on. |
| 10:09AM | 23 | **MR. SOEHNLEIN:** May I have one minute, Your Honor? |
| 10:09AM | 24 | **THE COURT:** Sure. |
| | 25 | |

BY MR. SOEHNLEIN:

Q.  Agent Kasprzyk, you weren't part of the conspiracy with Bongiovanni, correct?

A.  That's correct, sir.

Q.  You never had any ill intent to -- to try to obstruct a DEA investigation, correct?

A.  No, sir.

Q.  Okay.  You anticipated, though, that Gerace would get to the FBI and FBI would do their job, right?

A.  As part of my instructions to Bongiovanni, I asked him to arrange that meeting with the FBI.

Q.  Okay.  And you never had any follow-up for him, like, hey, what happened with that Gerace case, correct?

A.  That's correct.

Q.  Okay.  You never asked him hey, how did that meeting go, nothing like that?

A.  Not that I can recall, no, sir.

Q.  Okay.  Now earlier you were shown another DEA-6 from about a year earlier, correct?

A.  Yes, sir.

Q.  Do you recall that?

A.  The report that I saw just now, sir?

Q.  Yeah.  It was 30B, I think?

A.  Yes, sir, I do recall that.

Q.  You recall --

10:10AM    1            MR. SOEHNLEIN:  Can I just get 30B up to refresh his

10:10AM    2    memory?

10:10AM    3            BY MR. SOEHNLEIN:

10:10AM    4    Q.  This is the report I'm talking about, correct?

10:10AM    5    A.  Yes, sir.

10:10AM    6    Q.  This is in 2008?

10:10AM    7    A.  Yes, sir.

10:10AM    8    Q.  And at that point in time, I -- in a way, it says that

10:10AM    9    Mr. Gerace may have been a target, correct, of a criminal

10:10AM   10    investigation?

10:10AM   11    A.  Yes, sir.  He was listed on that organizational chart.

10:10AM   12    Q.  Okay.  Now, just because somebody's a target doesn't mean

10:10AM   13    they're always going to be a target; isn't that right?

10:10AM   14    A.  Sir, I think a person is a target until there's reason to

10:10AM   15    believe that they're not a target.

10:10AM   16    Q.  Right.  So they can be a target and then they become a

10:10AM   17    subject or even a witness, correct?

10:11AM   18    A.  Potentially, sir, yes.

10:11AM   19    Q.  They can go from being a target to being nothing,

10:11AM   20    correct?

10:11AM   21    A.  Potentially, yes.

10:11AM   22    Q.  Yeah.  And a cold approach is something that would be

10:11AM   23    kind of a -- a -- a last -- a last technique that an agency

10:11AM   24    would use in approaching a target if everything else hadn't

10:11AM   25    worked out, correct?

| 10:11AM | 1 | A.  It would be an approach of last resort, yes, sir. |
| 10:11AM | 2 | Q.  Yeah.  So if they're using a cold approach on somebody, |
| 10:11AM | 3 | it means that there's no other way to make contact with that |
| 10:11AM | 4 | individual, correct? |
| 10:11AM | 5 | A.  Typically, yes, sir. |
| 10:11AM | 6 | Q.  Okay. |
| 10:11AM | 7 | MR. SOEHNLEIN:  That's all I have. |
| 10:11AM | 8 | THE COURT:  Redirect? |
| 10:11AM | 9 | MR. TRIPI:  Very briefly, Judge.  Thank you. |
| 10:11AM | 10 | Ms. Champoux, if we could just pull 30A up and leave |
| 10:11AM | 11 | it up for a moment. |
| 10:11AM | 12 | |
| 10:11AM | 13 | **REDIRECT EXAMINATION BY MR. TRIPI:** |
| 10:11AM | 14 | Q.  Are the -- are case agents that are subordinate to the |
| 10:11AM | 15 | group supervisor the ones tasked with driving investigations |
| 10:12AM | 16 | in the DEA? |
| 10:12AM | 17 | A.  Yes, sir. |
| 10:12AM | 18 | Q.  After Mr. Bongiovanni presented you these facts and you |
| 10:12AM | 19 | signed off on this report, did you move on to other duties |
| 10:12AM | 20 | and matters in the DEA? |
| 10:12AM | 21 | A.  Yes, sir. |
| 10:12AM | 22 | Q.  Did you expect Mr. Bongiovanni to follow up as you |
| 10:12AM | 23 | directed? |
| 10:12AM | 24 | A.  Yes.  That would have been my expectation. |
| 10:12AM | 25 | Q.  Now, on cross, you were asked a number of questions |

10:12AM   1   regarding conflicts of interest; do you remember that?

10:12AM   2   A.  Yes, sir.

10:12AM   3   Q.  As you sit here today, based upon anything

10:12AM   4   Mr. Bongiovanni told you verbally or that he put in this

10:12AM   5   report, was there any reason for you to ever perceive a

10:12AM   6   conflict of interest sufficient to take him off of a case or

10:12AM   7   a matter regarding Gerace?

10:12AM   8   A.  Now, or then?

10:12AM   9   Q.  Then, at the time?

10:12AM   10   A.  Then.  No, sir.

10:12AM   11   Q.  This situation, as depicted in Exhibit 30A, was not

10:13AM   12   presented to you by Bongiovanni as a conflict of interest,

10:13AM   13   correct?

10:13AM   14   A.  Yes, sir, that's correct.

10:13AM   15   Q.  Now, being a Special Agent at the DEA, Mr. Bongiovanni

10:13AM   16   basically has the same training as you, gone -- gone through

10:13AM   17   the same academy classes, correct?

10:13AM   18   A.  Yes, sir, that's correct.

10:13AM   19   Q.  Based upon that, you know he's been trained on the same

10:13AM   20   standards of conduct?

10:13AM   21   A.  Yes, sir.

10:13AM   22   Q.  Mr. Soehnlein, I think, read it to you, but after you

10:13AM   23   were presented this information in Exhibit 30A, you directed

10:13AM   24   Bongiovanni to make Gerace available for an FBI interview;

10:13AM   25   that's what it says, right?

USA v Gerace - Kasprzyk - Tripi/Redirect - 11/12/24

31

| | | |
|---|---|---|
| 10:13AM | 1 | A.  Yes, sir, I did that. |
| 10:13AM | 2 | Q.  When you made that directive to Mr. Bongiovanni, did you |
| 10:13AM | 3 | anticipate he would follow DEA procedures and protocols for |
| 10:13AM | 4 | such an interview? |
| 10:13AM | 5 | A.  Yes, sir, I did. |
| 10:13AM | 6 | Q.  Do agents typically work with partners? |
| 10:13AM | 7 | A.  Yes, sir, they do. |
| 10:14AM | 8 | Q.  Do agents under DEA procedures and protocol interview |
| 10:14AM | 9 | people with partners present? |
| 10:14AM | 10 | A.  Yes, sir.  That is a requirement of DEA policy and |
| 10:14AM | 11 | procedure. |
| 10:14AM | 12 | Q.  So when you gave him the directive to set up an |
| 10:14AM | 13 | interview, did you expect there to be a standard interview |
| 10:14AM | 14 | conducted? |
| 10:14AM | 15 | A.  Yes, sir, I did. |
| 10:14AM | 16 | Q.  Did you tell Mr. Bongiovanni, hey, make sure when you set |
| 10:14AM | 17 | up the interview, tell FBI Special Agent Herbst not to bring |
| 10:14AM | 18 | his partner with the FBI? |
| 10:14AM | 19 | A.  I did not. |
| 10:14AM | 20 | Q.  That would be weird, wouldn't it? |
| 10:14AM | 21 | A.  Yes, sir, that would be very unusual. |
| 10:14AM | 22 | Q.  Did you tell Mr. Bongiovanni, hey, do the interview in a |
| 10:14AM | 23 | public mezzanine of a building and not in a secure space? |
| 10:14AM | 24 | Did you tell him that? |
| 10:14AM | 25 | **MR. SOEHNLEIN:**  Objection, speculation. |

| 10:14AM | 1 | **THE COURT:** Overruled. |

| 10:14AM | 2 | **THE WITNESS:** No, sir, I did not. |

| 10:14AM | 3 | **BY MR. TRIPI:** |

10:14AM  4  Q.  That wouldn't be following protocol, would it?

10:14AM  5  A.  That would be very unusual, sir.

10:14AM  6  Q.  Were the instructions you provided premised on the

10:15AM  7  information that Mr. Bongiovanni presented to you?

10:15AM  8  A.  Yes, they were.

10:15AM  9  Q.  Was your sign-off on this document premised on

10:15AM  10  Bongiovanni's representations to you?

10:15AM  11  A.  Yes, sir, that's correct.

10:15AM  12  Q.  And because he's a sworn DEA agent, at that time, did you

10:15AM  13  trust his representations?

10:15AM  14  A.  Yes, sir, I did.

10:15AM  15  Q.  Did you have any reason at that time to question his

10:15AM  16  representations?

10:15AM  17  A.  No, sir, I did not.

10:15AM  18  Q.  Did you reinvestigate every word that he wrote to you or

10:15AM  19  said to you?

10:15AM  20  A.  No, sir, I did not.

10:15AM  21  Q.  You were asked on cross a number of questions.  I don't

10:15AM  22  remember them all, I didn't write them all down.  But do

10:15AM  23  you recall a moment ago you were asked a number of questions

10:15AM  24  about why you didn't ask Mr. Bongiovanni further questions,

10:15AM  25  right?

10:15AM    1   A.  Yes, sir.

10:15AM    2   Q.  Tell this jury why you didn't ask Mr. Bongiovanni more

10:15AM    3   questions, explain it to them.

10:15AM    4   A.  I would expected Mr. Bongiovanni to be honest with me, to

10:15AM    5   be truthful with me, and to explain to me if he had an

10:16AM    6   existing or prior relationship with Mr. Geraci, that he would

10:16AM    7   have disclosed that to me at the time of our initial

10:16AM    8   discussions regarding this matter.

10:16AM    9   Q.  And beyond telling you he knew him from the neighborhood,

10:16AM   10   did that imply to you in the distant past?

10:16AM   11   A.  Yes, sir.

10:16AM   12   Q.  When you signed off on this report and interacted with

10:16AM   13   Mr. Bongiovanni, did you perceive a current, present,

10:16AM   14   existing personal relationship between Bongiovanni and

10:16AM   15   Gerace?

10:16AM   16   A.  I did not.

10:16AM   17           **MR. TRIPI:**  Nothing further, Judge.

10:16AM   18           **THE COURT:**  Anything more?

10:16AM   19           **MR. SOEHNLEIN:**  Just a few questions, Judge.  Thank

10:16AM   20   you.

10:16AM   21

10:16AM   22           **RECROSS-EXAMINATION BY MR. SOEHNLEIN:**

10:16AM   23   Q.  Being too busy to do your job isn't an excuse, correct?

10:16AM   24   A.  Is that a question, sir?

10:16AM   25   Q.  Yeah.  Being too busy isn't an excuse to not do your job

Case 1:19-cr-00227-LJV-MJR   Document 1501   Filed 04/25/25   Page 34 of 38
USA v Gerace - Kasprzyk - Soehnlein/Recross - 11/12/24

34

| | | |
|---|---|---|
| 10:16AM | 1 | at the DEA, correct? |
| 10:16AM | 2 | A.  Yes, sir. |
| 10:16AM | 3 | Q.  When you're group supervisor, you have tasks that you |
| 10:16AM | 4 | have to do, right? |
| 10:17AM | 5 | A.  Yes, sir, that's correct. |
| 10:17AM | 6 | Q.  You're supposed to manage and oversee the agents, |
| 10:17AM | 7 | correct? |
| 10:17AM | 8 | A.  Yes, sir, that's correct. |
| 10:17AM | 9 | Q.  Make sure that the investigations are moving forward, |
| 10:17AM | 10 | correct? |
| 10:17AM | 11 | A.  Yes, sir. |
| 10:17AM | 12 | Q.  And there's no investigation that you say, well, I don't |
| 10:17AM | 13 | really care about that one, or I don't really care about that |
| 10:17AM | 14 | one.  You care about all of them equally, correct? |
| 10:17AM | 15 | A.  Yes, sir, I do. |
| 10:17AM | 16 | Q.  And that's part of your job? |
| 10:17AM | 17 | A.  Yes, sir. |
| 10:17AM | 18 | Q.  Okay.  Special Agent Bongiovanni, he told you that he |
| 10:17AM | 19 | knew the guy from the old neighborhood, right? |
| 10:17AM | 20 | A.  Yes, sir. |
| 10:17AM | 21 | Q.  Told you that the guy reached out to him, correct? |
| 10:17AM | 22 | A.  Yes, sir. |
| 10:17AM | 23 | Q.  He told you on the DEA-6 that he had a -- a meeting with |
| 10:17AM | 24 | the guy, just him, correct? |
| 10:17AM | 25 | We can pull it up again.  You recall that, right? |

10:17AM    1   A.  I recall what's in the 6, sir, yes.

10:17AM    2   Q.  Yeah.  And you read that, right?

10:17AM    3   A.  Yes, sir.

10:17AM    4   Q.  So none of that was untruthful, correct?

10:17AM    5   A.  Yes, sir.

10:17AM    6   Q.  You should have asked more questions, shouldn't you?

10:17AM    7   A.  No, sir.  I relied on Mr. Bongiovanni to provide me

10:18AM    8   honest and truthful explanations about his relationship with

10:18AM    9   Mr. Geraci.

10:18AM   10   Q.  Well, hold on.  So you're having weekly meetings with

10:18AM   11   Bongiovanni, right?  And all the agents in the office, right?

10:18AM   12   A.  Yes, sir.

10:18AM   13   Q.  And you pay attention to every investigation that's in

10:18AM   14   the office in those meetings, right?

10:18AM   15   A.  Yes, sir.

10:18AM   16   Q.  That's the reason you have the meetings, right?

10:18AM   17   A.  Correct, sir.

10:18AM   18   Q.  And he reaches out to you and says, hey, I got this call,

10:18AM   19   and you know the FBI's involved, right?

10:18AM   20   A.  Yes, sir.

10:18AM   21   Q.  And you thought when you heard the FBI was involved that

10:18AM   22   it might be a big enough deal, you called the FBI, right?

10:18AM   23   A.  Yes, sir, I did.

10:18AM   24   Q.  And you figured out what they were trying to do, right?

10:18AM   25   A.  Yes, sir.

10:18AM    1    Q.  And then you instructed Bongiovanni, hey, go make the

10:18AM    2    meeting happen, right?

10:18AM    3    A.  Yes, sir.

10:18AM    4    Q.  And you never followed up with him?

10:18AM    5    A.  No, sir.

10:18AM    6         MR. SOEHNLEIN:  That's all I have -- oh, one second.

10:19AM    7         BY MR. SOEHNLEIN:

10:19AM    8    Q.  Just one more little vignette.

10:19AM    9         You -- you were -- you didn't train Bongiovanni at the

10:19AM   10    academy, correct?

10:19AM   11    A.  I did not, sir.

10:19AM   12    Q.  You don't -- you don't know what training he got,

10:19AM   13    correct?

10:19AM   14    A.  I do not.

10:19AM   15    Q.  Okay.  And you don't know who trained him?

10:19AM   16    A.  At the academy?  There's -- there's a variety of

10:19AM   17    instructors at the academy that train, sir.

10:19AM   18    Q.  Okay.  So you don't know much about his background,

10:19AM   19    correct?

10:19AM   20    A.  I know he went through the same training at the DEA

10:19AM   21    academy that I went through.

10:19AM   22    Q.  Okay.  You didn't review any of the training materials

10:19AM   23    that he would have gotten?

10:19AM   24    A.  I did not.

10:19AM   25    Q.  Okay.  And his career started at a different office other

Case 1:19-cr-00227-LJV-MJR    Document 1501    Filed 04/25/25    Page 37 of 38
USA v Gerace - Kasprzyk - Soehnlein/Recross - 11/12/24

37

10:19AM  1    than the Buffalo office, correct?

10:19AM  2    A.   That's correct, sir.

10:19AM  3               **MR. SOEHNLEIN:**  That's all I have.

10:19AM  4            **THE COURT:**  Anything more?

10:19AM  5            **MR. TRIPI:**  No, thank you, Your Honor.

10:19AM  6            **THE COURT:**  You can step down, sir, thank you.

10:19AM  7            (Witness excused at 10:19 a.m.)

        8            (Excerpt concluded at 10:19 a.m.)

        9               *     *     *     *     *     *     *

       10

       11                    **CERTIFICATE OF REPORTER**

       12

       13               In accordance with 28, U.S.C., 753(b), I

       14    certify that these original notes are a true and correct

       15    record of proceedings in the United States District Court for

       16    the Western District of New York on November 12, 2024.

       17

       18

       19                         s/ Ann M. Sawyer
                                  _____
                                  Ann M. Sawyer, FCRR, RPR, CRR
       20                         Official Court Reporter
                                  U.S.D.C., W.D.N.Y.

       21

       22

       23

       24

       25

1

2                        **TRANSCRIPT INDEX**

3            **EXCERPT - EXAMINATION OF DALE KASPRZYK - DAY 2**

4                          **NOVEMBER 12, 2024**

5

6

7    **W I T N E S S**                                  **P A G E**

8    **D A L E    K A S P R Z Y K**                          2

9       CONTINUED DIRECT EXAMINATION BY MR. TRIPI:       2

10      CROSS-EXAMINATION BY MR. SOEHNLEIN:              8

11      REDIRECT EXAMINATION BY MR. TRIPI:              29

12      RECROSS-EXAMINATION BY MR. SOEHNLEIN:           33

13

14

15

16

17

18

19

20

21

22

23

24

25