09:25AM

1          **UNITED STATES DISTRICT COURT**
           **WESTERN DISTRICT OF NEW YORK**
2

   _____
3  **UNITED STATES OF AMERICA,**
                                        Case No. 1:19-cr-227
4                   Plaintiff,                  1:23-cr-37
   v.                                              (LJV)
5
   **PETER GERACE, JR.,**                 November 20, 2024
6
                    Defendant.
   _____
7
            **TRANSCRIPT EXCERPT - EXAMINATION OF ANTHONY CASULLO**
8              **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
                  **UNITED STATES DISTRICT JUDGE**
9
   <u>**APPEARANCES:**</u>     **TRINI E. ROSS, UNITED STATES ATTORNEY**
10                  **BY: JOSEPH M. TRIPI, ESQ.**
                        **NICHOLAS T. COOPER, ESQ.**
11                      **CASEY L. CHALBECK, ESQ.**
                    Assistant United States Attorneys
12                  Federal Centre, 138 Delaware Avenue
                    Buffalo, New York 14202
13                  For the Plaintiff

14                  **THE FOTI LAW FIRM, P.C.**
                    **BY: MARK ANDREW FOTI, ESQ.**
15                  16 West Main Street, Suite 100
                    Rochester, New York 14614
16                      And
                    **SOEHNLEIN LAW**
17                  **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**
                    350 Main Street, Suite 2100
18                  Buffalo, New York 14202
                    For the Defendant
19
   <u>**PRESENT:**</u>      **KAREN A. CHAMPOUX, USA PARALEGAL**
20                  **BRIAN A. BURNS, FBI SPECIAL AGENT**
                    **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**
21
   <u>**LAW CLERK:**</u>     **REBECCA FABIAN IZZO, ESQ.**
22
   <u>**COURT CLERK:**</u>   **COLLEEN M. DEMMA**
23
   <u>**REPORTER:**</u>      **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
24                  Robert H. Jackson Courthouse
                    2 Niagara Square Buffalo, New York 14202
25                  Ann_Sawyer@nywd.uscourts.gov

|  |    |  |
|--|----|--|
|  | 1  | (Excerpt commenced at 4:07 p.m.) |
| 04:07PM | 2 | (Jury is present.) |
| 04:07PM | 3 | **THE COURT:**  The government can call its next witness. |
| 04:07PM | 4 | **MR. COOPER:**  I just spilled my water, sorry. |
| 04:07PM | 5 | The government calls Tony Casullo, Judge. |
| 04:07PM | 6 | |
| 04:07PM | 7 | **A N T H O N Y   C A S U L L O**, having been duly called and |
| 04:07PM | 8 | sworn, testified as follows: |
| 04:07PM | 9 | **MR. COOPER:**  May I inquire, Judge? |
| 04:08PM | 10 | **THE COURT:**  Yes. |
| 04:08PM | 11 | |
| 04:08PM | 12 | **DIRECT EXAMINATION BY MR. COOPER:** |
| 04:08PM | 13 | Q.  Good afternoon, sir. |
| 04:08PM | 14 | A.  Good afternoon. |
| 04:08PM | 15 | Q.  Can you introduce yourself to the jury? |
| 04:08PM | 16 | A.  Yes, hi, my name is Anthony Casullo, I was a special |
| 04:08PM | 17 | agent with the DEA for about 23 years. |
| 04:08PM | 18 | Q.  And where do you live currently? |
| 04:08PM | 19 | A.  I currently live in Clarence, New York. |
| 04:08PM | 20 | Q.  How long have you lived in that Clarence, New York area? |
| 04:08PM | 21 | A.  I purchased the house in about 2012.  And then I worked |
| 04:08PM | 22 | in New York City and went back and forth for about two years. |
| 04:08PM | 23 | So, since 2015. |
| 04:09PM | 24 | Q.  Okay.  Is this Western New York area the area where you |
| 04:09PM | 25 | grew up? |

04:09PM    1    A.   Yes.

04:09PM    2    Q.   Where'd you go to high school at?

04:09PM    3    A.   I went to Saint Joe's Collegiate Institute.

04:09PM    4    Q.   You mentioned in the introduction part that you had a

04:09PM    5    career working at the DEA for about 25 years.  We're gonna

04:09PM    6    cover that in a second.  But currently, are you working?

04:09PM    7    A.   Yeah, I do, I am currently working.

04:09PM    8    Q.   What kind of work do you do currently?

04:09PM    9    A.   I work as a subject matter expert, an advisor for a U.S.

04:09PM   10    technology company.  It's a company that's under contract

04:09PM   11    with the U.S. Department of State to provide foreign

04:09PM   12    assistance to foreign governments on law enforcement systems,

04:09PM   13    like case management systems, intelligence systems.

04:09PM   14    Q.   How long have you worked at that job for?

04:09PM   15    A.   Oh, I think about a year and -- about a year and four

04:09PM   16    months, three months.

04:09PM   17    Q.   Okay.  I want to talk with you now about your career in

04:09PM   18    law enforcement.  How did your career in law enforcement

04:10PM   19    start?

04:10PM   20    A.   It started when I graduated from Canisius College, there

04:10PM   21    were some recruiters at my college, one of them being the

04:10PM   22    Immigration Service at the time, which is now Customs and

04:10PM   23    Border Protection.  Excuse me.  And I spoke with one of the

04:10PM   24    individuals there that was at our college, and ultimately

04:10PM   25    about a year later started working as an immigration

04:10PM  1    inspector in Toronto, Canada, doing preflight inspections,

04:10PM  2    what you see at the border, but we worked in Canada clearing

04:10PM  3    flights before they came to the U.S.

04:10PM  4    Q.  What year was that that you started doing that work?

04:10PM  5    A.  That was December of 1990.

04:10PM  6    Q.  Did you eventually end up working at the DEA?

04:10PM  7    A.  I did.

04:10PM  8    Q.  Okay.  When did you start working at the DEA?

04:10PM  9    A.  I was hired by the DEA in July of 1999.

04:10PM  10   Q.  Okay.  And when did you ultimately retire at the DEA?

04:10PM  11   A.  I retired from DEA in March of 2022.

04:10PM  12   Q.  After you -- well, let's, I guess, start here.

04:11PM  13       When you switched over to the DEA, did you go through a

04:11PM  14   training academy?

04:11PM  15   A.  Yes, I did.

04:11PM  16   Q.  About how long did that last?

04:11PM  17   A.  I believe it was, like, 20 weeks.

04:11PM  18   Q.  What office did you start out in after that training

04:11PM  19   academy?

04:11PM  20   A.  So I was hired out of the Buffalo office.  Graduated from

04:11PM  21   the academy, came back to Buffalo for a month, but my

04:11PM  22   assignment that I received when I was at the academy was

04:11PM  23   Las Vegas, Nevada.

04:11PM  24   Q.  So did your work bring you out to Las Vegas?

04:11PM  25   A.  Pardon?

04:11PM  1  Q.  Did your work bring you out to Las Vegas?

04:11PM  2  A.  Yes.  We moved out to Las Vegas in December of 1999.

04:11PM  3  Q.  Can you just describe for the jury, generally, what kind

04:11PM  4  of work you did at the DEA in Las Vegas?

04:11PM  5  A.  Sure.  Generally, there were several different groups, my

04:11PM  6  first assignment was in a gang task force.  So I worked

04:11PM  7  narcotics investigations in a task force with Las Vegas metro

04:12PM  8  police officers, I believe there were three DEA agents and

04:12PM  9  eight Las Vegas metro gang detectives, and we worked

04:12PM  10  narcotics investigations primarily on gang members and gang

04:12PM  11  organizations in the Clark County, Las Vegas area.

04:12PM  12  Q.  After a period of time working as a DEA special agent in

04:12PM  13  the Las Vegas office, did there come a time when you decided

04:12PM  14  to leave the DEA and go to a different federal agency?

04:12PM  15  A.  Yes.

04:12PM  16  Q.  Can you describe that for the jury, please?

04:12PM  17  A.  Sure.  So I was working for the DEA when 9/11 happened.

04:12PM  18  And I applied for DEA and FBI both about the same time.

04:12PM  19      After 9/11, I wanted to work terrorism investigations, I

04:12PM  20  had an interest in doing that because of what happened.  And

04:12PM  21  I ended up calling up the FBI recruiter, reactivated my

04:12PM  22  application, and was hired by the FBI about nine months after

04:12PM  23  9/11.

04:12PM  24  Q.  Okay.  So at that point, had you been working for the DEA

04:13PM  25  for about two, two years or so?

04:13PM  1    A.  Correct.

04:13PM  2    Q.  And maybe two-and-a-half years?

04:13PM  3    A.  Um-hum.  It was about two years, yeah.

04:13PM  4    Q.  Okay.  After that, when you contacted this FBI recruiter,

04:13PM  5    did you leave Las Vegas and go somewhere else?

04:13PM  6    A.  I did.

04:13PM  7    Q.  Where'd you go?

04:13PM  8    A.  So I went to the FBI Academy.  Similar to the DEA

04:13PM  9    Academy, it was 20 -- about 20 weeks in Quantico.  And then I

04:13PM  10   received my assignment when I was in Quantico for

04:13PM  11   Fayetteville, North Carolina.  It was a small resident office

04:13PM  12   of about three -- three or four agents in Fayetteville

04:13PM  13   outside Fort Bragg.

04:13PM  14   Q.  Not trying to be cheeky here, but was Fayetteville, North

04:13PM  15   Carolina your first choice?

04:13PM  16   A.  No.  The division was higher up on my list, which was the

04:13PM  17   Charlotte Division, but Fayetteville, which fell underneath

04:13PM  18   it, wasn't.

04:13PM  19   Q.  Okay.  And just -- just to explain real quick,

04:13PM  20   "division," you say, is that a larger geographical area?

04:13PM  21   A.  Right.  The division is the main office, and then within

04:13PM  22   a division there will be smaller offices.  And Fayetteville

04:14PM  23   is one of the smaller offices of the Charlotte Division for

04:14PM  24   the FBI.

04:14PM  25   Q.  Okay.  And I don't want to spend much time on this, but

04:14PM    1    when you were at the Fayetteville office with the FBI, were

04:14PM    2    you able to do the work that you had hoped to do when you

04:14PM    3    switched over to the FBI?

04:14PM    4    A.   No, I barely worked terrorism investigations.  It was

04:14PM    5    just a smaller office.  We worked mostly violent crime and

04:14PM    6    bank robberies.

04:14PM    7    Q.   Were you happy with the area generally where you were

04:14PM    8    living?

04:14PM    9    A.   No.  We -- I did a house-hunting trip, and wasn't really

04:14PM   10    pleased with the area.  I'd have to commute further away from

04:14PM   11    where I wanted to live, possibly up in Raleigh, it was over

04:14PM   12    an hour.  Long story short, I told my wife to hold off on

04:14PM   13    selling the house, it wasn't somewhere that I wanted to send

04:14PM   14    my kids to school in that area, and we ultimately chose --

04:14PM   15    well, I don't want to get too far ahead of you.

04:14PM   16    Q.   No, that's -- you're doing fine, sir.

04:14PM   17    A.   I ended up staying with the FBI for about a year and a

04:14PM   18    half.  I had two years to go back to DEA.  If I waited longer

04:14PM   19    than two years, I'd have to restart the process again, go to

04:15PM   20    the academy again, and I ended up going back to DEA in

04:15PM   21    Las Vegas after about a year and a half with the FBI.

04:15PM   22    Q.   So after that short stint with the FBI, do you take --

04:15PM   23    you decide to move back to DEA about a year and a half a

04:15PM   24    later?

04:15PM   25    A.   It was about a year and a half.

04:15PM    1    Q.   Okay.  Did you end up going back to the Las Vegas office?

04:15PM    2    A.   Yes.

04:15PM    3    Q.   Now, were you hoping to come back home at some point in

04:15PM    4    your career to work in Western New York?

04:15PM    5    A.   That was our plan initially, to come back at some point.

04:15PM    6    Q.   Okay.  Did you have a wife and kids?

04:15PM    7    A.   I do.  I have a wife and four children.

04:15PM    8    Q.   Okay.  And so, was your goal to kind of get back around

04:15PM    9    near family?

04:15PM   10    A.   It was a goal to come back at some point to raise the

04:15PM   11    kids in the Western New York area.  My family was from

04:15PM   12    Western New York, and my wife's family -- had family in

04:15PM   13    Western New York.

04:15PM   14    Q.   Did that eventually happen, that you were able to switch

04:15PM   15    back to New York?

04:15PM   16    A.   Yes.

04:15PM   17    Q.   Can you explain to the jury how that worked out?

04:15PM   18    A.   Sure.  We finally decided to make the move back.  It was

04:15PM   19    around 2012.  So we stayed out there for a while in

04:16PM   20    Las Vegas, we chose to stay until our kids got to high

04:16PM   21    school.  Then we had wanted to come back and have them do

04:16PM   22    high school in Western New York, we thought the schools are

04:16PM   23    better.  So, at the time I wanted to come back, there were no

04:16PM   24    vacancies in the Buffalo office, which falls under the

04:16PM   25    New York office.  The New York office is a division.

04:16PM 1    So, I was told if I went to New York City for two years

04:16PM 2    and work there, as soon as someone retired in Buffalo or left

04:16PM 3    for another assignment, that I could fill that slot.  And

04:16PM 4    that's what I did.

04:16PM 5    Q.  During the two-year period that you worked in the

04:16PM 6    New York City office, did your family live here in Buffalo?

04:16PM 7    A.  They did.  I had a house here, and I had a small

04:16PM 8    apartment in New Jersey, and kind of went back and forth for

04:16PM 9    a couple years.

04:16PM 10   Q.  What year did you eventually get assigned to the DEA

04:16PM 11   Buffalo resident office?

04:16PM 12   A.  I was assigned to Buffalo, it was September of 2015.

04:16PM 13   Q.  Are there different groups at the DEA Buffalo resident

04:17PM 14   office?

04:17PM 15   A.  Yes.

04:17PM 16   Q.  What are they?

04:17PM 17   A.  They're by number.  There was one group that's D-57, it's

04:17PM 18   called a general enforcement group, meaning that it's mostly

04:17PM 19   agents, DEA agents.  And then there were a few local

04:17PM 20   officers, detectives assigned to that group.

04:17PM 21       And then there's another group called D-58, which is

04:17PM 22   called at task force group, which is kind of like the

04:17PM 23   opposite.  It's primarily detectives and task force officers,

04:17PM 24   local and state officers, and maybe two or three agents in

04:17PM 25   the group.

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

10

| | | |
|---|---|---|
| 04:17PM | 1 | And then the third group is called a tactical diversion |
| 04:17PM | 2 | squad, which is DEA agents and detectives kind of half and |
| 04:17PM | 3 | half that work mostly, like, pharmaceutical-type cases, |
| 04:17PM | 4 | diversion of controlled substances -- controlled substances |
| 04:17PM | 5 | that are being used illicitly. |
| 04:17PM | 6 | Q.  Okay.  So does the third group, diversion, does that |
| 04:17PM | 7 | focus on, like, pharmacies and doctors offices? |
| 04:17PM | 8 | A.  Yeah.  Mostly. |
| 04:18PM | 9 | Q.  Okay.  The other groups, D-57 and D-58, I want to focus |
| 04:18PM | 10 | on that for just a second. |
| 04:18PM | 11 | You talked about special agents.  Is that the title that |
| 04:18PM | 12 | you had after going through the DEA Academy? |
| 04:18PM | 13 | A.  Correct. |
| 04:18PM | 14 | Q.  Did the DEA also permit members of local law enforcement, |
| 04:18PM | 15 | just as an example, let's say the Erie County Sheriff's |
| 04:18PM | 16 | Office, to become task force officers that worked at the DEA |
| 04:18PM | 17 | building with DEA agents? |
| 04:18PM | 18 | A.  Yes.  And that was my experience. |
| 04:18PM | 19 | Q.  Okay.  And so when we -- when we use the phrase "task |
| 04:18PM | 20 | force officer," is that someone who's primarily employed by a |
| 04:18PM | 21 | local or state law enforcement agency? |
| 04:18PM | 22 | A.  Yes. |
| 04:18PM | 23 | Q.  Can it sometimes even be someone from a different federal |
| 04:18PM | 24 | agency? |
| 04:18PM | 25 | A.  Yeah.  They're called task force agents, but it's |

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

11

04:18PM   1   essentially the same thing.

04:18PM   2       We have both state and locals at DEA that will work in

04:18PM   3   groups with agents.  And we also have other federal officers

04:18PM   4   from different agencies, whether it's the Customs and Border

04:18PM   5   Protection, ATF, I've worked with FBI, agents from all

04:18PM   6   different agencies.

04:19PM   7   Q.  Okay.  While you were -- strike that.  Let me move ahead

04:19PM   8   here.

04:19PM   9       While you were at the DEA in Las Vegas, did you work with

04:19PM  10   a boss who had some experience working on organized crime

04:19PM  11   cases?

04:19PM  12   A.  I did.

04:19PM  13   Q.  Okay.  And so back when you're in Las Vegas working with

04:19PM  14   that boss, does the opportunity present itself for you to

04:19PM  15   work on organized crime cases?

04:19PM  16   A.  Yes.

04:19PM  17   Q.  Were you interested in that?

04:19PM  18   A.  Yes.

04:19PM  19   Q.  We're gonna pause there for a second and move to a new

04:19PM  20   topic.

04:19PM  21       When you became a special agent the DEA, did you take an

04:19PM  22   oath?

04:19PM  23   A.  Yes, I did.

04:19PM  24   Q.  Generally, what was the promise that you made when you

04:19PM  25   took that oath?

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

04:19PM  1   A.  To enforce the U.S. drug laws, excuse me, and to protect

04:19PM  2   the U.S. Constitution from all enemies, both foreign and

04:20PM  3   domestic, essentially.

04:20PM  4   Q.  As a DEA special agent when you went through training,

04:20PM  5   were you given trainings on ethics?

04:20PM  6   A.  Yes.

04:20PM  7   Q.  As a DEA special agent, based on your 20-plus years

04:20PM  8   experience, were you supposed to choose who you investigated

04:20PM  9   based on that person's race or ethnicity?

04:20PM  10  A.  No.

04:20PM  11  Q.  Was that prohibited by DEA policy?

04:20PM  12  A.  Yes.

04:20PM  13  Q.  Mr. Casullo, do you know a person by the name of Joseph

04:20PM  14  Bongiovanni?

04:20PM  15  A.  Yes.

04:20PM  16  Q.  How do you know that person?

04:20PM  17  A.  He was a DEA agent that worked in the Buffalo office

04:20PM  18  while I was in the Buffalo office.

04:20PM  19  Q.  Okay.  How long did you work with Joseph Bongiovanni at

04:20PM  20  the Buffalo resident office?

04:20PM  21  A.  When I first went to Buffalo, we were in the both -- we

04:21PM  22  were both in the same group together.  And I was in that

04:21PM  23  group for maybe I don't know, two, two-and-a-half years.

04:21PM  24      And then I went to the task force group that I explained,

04:21PM  25  the D-58 group, I went to that group after group D-57, and

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

| | | |
|---|---|---|
| 04:21PM | 1 | then we were in different groups up until I retired. |
| 04:21PM | 2 | Q.  Okay.  And so would it be -- well, let me start this way. |
| 04:21PM | 3 |     When you arrived at the DEA Buffalo resident office, was |
| 04:21PM | 4 | Bongiovanni already working there? |
| 04:21PM | 5 | A.  Yes. |
| 04:21PM | 6 | Q.  Was it your understanding that he had been working there |
| 04:21PM | 7 | for quite some time? |
| 04:21PM | 8 | A.  Yes. |
| 04:21PM | 9 | Q.  Did there come a time in or around 2019 when he retired |
| 04:21PM | 10 | from the DEA? |
| 04:21PM | 11 | A.  Yes. |
| 04:21PM | 12 | Q.  Okay.  Were you still working there at that time? |
| 04:21PM | 13 | A.  Yes. |
| 04:21PM | 14 | Q.  So, would it be fair to say from about 20 -- is it 2015 |
| 04:21PM | 15 | when you started in Buffalo? |
| 04:21PM | 16 | A.  September of 2015. |
| 04:21PM | 17 | Q.  So from about September of 2015 until sometime in early |
| 04:21PM | 18 | 2019, did you work together with Joseph Bongiovanni? |
| 04:21PM | 19 | A.  Yes. |
| 04:21PM | 20 | Q.  For a portion of that time, were you in the same group? |
| 04:22PM | 21 | A.  Yes. |
| 04:22PM | 22 | Q.  Which group was that? |
| 04:22PM | 23 | A.  D-57. |
| 04:22PM | 24 | Q.  When you first arrived to the Buffalo office in or around |
| 04:22PM | 25 | September of 2015, can you describe for this jury, what was |

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

14

| | | |
|---|---|---|
| 04:22PM | 1 | your relationship like with Bongiovanni? |
| 04:22PM | 2 | A.  I knew of Joe.  I had met him before.  I had come back |
| 04:22PM | 3 | when I worked in Las Vegas to Buffalo to visit family, and |
| 04:22PM | 4 | sometimes I'd meet some of the Buffalo agents out. |
| 04:22PM | 5 | One agent in particular, we both went to the academy |
| 04:22PM | 6 | together, and he moved back to Buffalo before I did.  So I |
| 04:22PM | 7 | met him maybe once or twice over the summer, so I knew who he |
| 04:22PM | 8 | was. |
| 04:22PM | 9 | Q.  Did you guys have problems at that time? |
| 04:22PM | 10 | A.  No. |
| 04:22PM | 11 | Q.  Did you like him, generally? |
| 04:22PM | 12 | A.  Yeah, he was generally a fine person. |
| 04:22PM | 13 | Q.  Okay.  During the time that you worked at the DEA Buffalo |
| 04:22PM | 14 | resident office, did you ever work on investigations with the |
| 04:22PM | 15 | defendant, or with Joseph Bongiovanni?  I'm sorry. |
| 04:22PM | 16 | A.  Yes, we worked as partners on a couple different |
| 04:23PM | 17 | investigations. |
| 04:23PM | 18 | Q.  I'm going to ask a general question first, and then we |
| 04:23PM | 19 | can get into some more specifics. |
| 04:23PM | 20 | Between 2015 when you started and 2019 when Bongiovanni |
| 04:23PM | 21 | retired, did your relationship with him change? |
| 04:23PM | 22 | A.  Yes. |
| 04:23PM | 23 | Q.  Did it change because of things that he said to you? |
| 04:23PM | 24 | A.  Yes. |
| 04:23PM | 25 | Q.  As you sit here today, can you describe for the jury how |

04:23PM  1   you feel about Bongiovanni?

04:23PM  2   A.  I went through different feelings over the time that I

04:23PM  3   knew him, starting with getting along, working cases.  And

04:23PM  4   then things changed where -- to the point now I have no

04:23PM  5   feelings about him.

04:23PM  6       I went through a hard time of someone that I trusted to

04:23PM  7   someone that I didn't trust, and was hurt by it, was angry,

04:23PM  8   was sad, was confused.

04:24PM  9       But at this point in my life, I have no feelings

04:24PM  10  whatsoever for him.

04:24PM  11  Q.  Do you know a person by the name of Peter Gerace?

04:24PM  12  A.  Yes.

04:24PM  13  Q.  How do you know that person?

04:24PM  14  A.  I went to high school with Peter Gerace at Saint Joe's,

04:24PM  15  we were both in the same graduating class.

04:24PM  16  Q.  Were you friends with him in high school?

04:24PM  17  A.  We knew each other.  It was a small school.  But we

04:24PM  18  never -- we never hung out.

04:24PM  19  Q.  Have you ever at any point in your life been friends with

04:24PM  20  Peter Gerace?

04:24PM  21  A.  No.

04:24PM  22  Q.  Did you ever go to dinner with him?

04:24PM  23  A.  No.

04:24PM  24  Q.  Did you ever go on double dates together?

04:24PM  25  A.  No.

04:24PM   1   Q.  Did you ever go on vacation together?

04:24PM   2   A.  No.

04:24PM   3   Q.  Do you have a relation or a family member who you know or

04:24PM   4   you believe to be friends with Mr. Gerace?

04:24PM   5   A.  Yes.

04:24PM   6   Q.  Who's that person?

04:25PM   7   A.  My wife's brother is friends with Peter Gerace.

04:25PM   8   Q.  What's that person's name, your wife's brother?

04:25PM   9   A.  Phil Domiano.

04:25PM  10   Q.  Can you describe for the jury, do you have a relationship

04:25PM  11   with Phil Domiano?

04:25PM  12   A.  No.  I did when I dated my wife and we got married.  But

04:25PM  13   things changed after I moved out to Las Vegas with DEA, and

04:25PM  14   to the point that he's not even allowed at my house.

04:25PM  15   Q.  You said when you were dating your wife.  What year?  I'm

04:25PM  16   not trying to make fun, what year was that, though?

04:25PM  17   A.  Oh, well, I was in college.  So, 1987.

04:25PM  18   Q.  Okay.  A long time ago, is that fair to say?

04:25PM  19   A.  A long time ago, yeah.

04:25PM  20   Q.  In 20 -- in 2015 when you moved back to Buffalo, did you

04:25PM  21   have a relationship with Phil Domiano?

04:25PM  22   A.  No.  He lived in Las Vegas, we lived in Buffalo.  And

04:25PM  23   it -- when I first came back, he still visited a few times.

04:25PM  24   And then things changed to the point that he wasn't allowed

04:26PM  25   at our house at all.

04:26PM    1    Q.  Does Mr. Domiano associate with people, and are those

04:26PM    2    associations that you didn't approve of?

04:26PM    3    A.  Yes.

04:26PM    4    Q.  Did Mr. Domiano's relationship with, you know, family

04:26PM    5    relation to your wife, influence your work at the DEA at all?

04:26PM    6    A.  No.

04:26PM    7    Q.  Does his relationship or your belief that he has a

04:26PM    8    relationship with Peter Gerace, did that influence your work

04:26PM    9    at the DEA at all?

04:26PM   10    A.  No.

04:26PM   11          **MR. COOPER:**  I don't think this is in yet, so for the

04:26PM   12    witness only, can we show Government's Exhibit 99?

04:26PM   13          **BY MR. COOPER:**

04:27PM   14    Q.  I want you to take a moment, sir, and look at that, and

04:27PM   15    then when you're finished with the first page, you tell me,

04:27PM   16    and I'll have Ms. Champoux move to the next page.

04:28PM   17          **MR. COOPER:**  Ms. Champoux, can you go to the next

04:28PM   18    page, please?  And the next page.  And the next page.  And the

04:28PM   19    next page.  And the next page.  And the next page.  And the

04:28PM   20    next page.  And the next page.  And the next page.  And the

04:29PM   21    next page.  And the next page.  And the next page.  And the

04:29PM   22    next page.  And I think one more time, the next page.

04:29PM   23          Is that it, Ms. Champoux?  Or is there more?

04:29PM   24          Oh, there you go.  That's the last page.  Thank you.

          25

| | | |
|---|---|---|
| 04:29PM | 1 | **BY MR. COOPER:** |
| 04:29PM | 2 | Q.  All right.  So, sir, you just looked at the 17 different |
| 04:29PM | 3 | pages of Government Exhibit 99, do you recognize that? |
| 04:29PM | 4 | A.  Just a couple paragraphs in the very first page, I -- not |
| 04:29PM | 5 | the rest of it. |
| 04:29PM | 6 | Q.  Got it.  So have you seen that first page, have you seen |
| 04:29PM | 7 | that before today? |
| 04:29PM | 8 | A.  Part of it, not all of it. |
| 04:29PM | 9 | Q.  Got it. |
| 04:29PM | 10 | MR. COOPER:  Can you go back to the first page, |
| 04:29PM | 11 | Ms. Champoux? |
| 04:29PM | 12 | **BY MR. COOPER:** |
| 04:29PM | 13 | Q.  Do you recognize what this is? |
| 04:29PM | 14 | A.  Yes. |
| 04:29PM | 15 | Q.  Is it a memorandum, a DEA memorandum? |
| 04:29PM | 16 | A.  Yes. |
| 04:29PM | 17 | Q.  Does it have the DEA seal on it? |
| 04:30PM | 18 | A.  Yes. |
| 04:30PM | 19 | Q.  Do you recognize the names of the people that are written |
| 04:30PM | 20 | on it? |
| 04:30PM | 21 | A.  Yes. |
| 04:30PM | 22 | Q.  Is there a signature on it? |
| 04:30PM | 23 | A.  Yes. |
| 04:30PM | 24 | Q.  Do you recognize that? |
| 04:30PM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 04:30PM | 1 | Q.  Who signed it? |
| 04:30PM | 2 | A.  Joseph Bongiovanni. |
| 04:30PM | 3 | Q.  Okay.  And what's the date on it? |
| 04:30PM | 4 | A.  January 28th, 2019. |
| 04:30PM | 5 | Q.  And what's the subject of the memo? |
| 04:30PM | 6 | A.  Communication with Peter Gerace by Special Agent Anthony |
| 04:30PM | 7 | Casullo and Phil Domiano. |
| 04:30PM | 8 | Q.  Who's the memorandum addressed to? |
| 04:30PM | 9 | A.  To Edward A. Orgon, Jr. |
| 04:30PM | 10 | Q.  Okay.  And did you know that person? |
| 04:30PM | 11 | A.  Yes. |
| 04:30PM | 12 | Q.  Who was that person? |
| 04:30PM | 13 | A.  That's the resident agent in charge, like, the head of |
| 04:30PM | 14 | the Buffalo DEA office. |
| 04:30PM | 15 | Q.  And who's the memo from? |
| 04:30PM | 16 | A.  It's from Joseph Bongiovanni. |
| 04:30PM | 17 | Q.  Okay. |
| 04:30PM | 18 | MR. COOPER:  Judge, I'd ask if we can come up just |
| 04:30PM | 19 | briefly on a conversation. |
| 04:30PM | 20 | THE COURT:  Yeah, come on up. |
| 04:30PM | 21 | MR. COOPER:  Thanks. |
| 04:30PM | 22 | (Sidebar discussion held on the record.) |
| 04:31PM | 23 | MR. COOPER:  I appreciate it. |
| 04:31PM | 24 | So, Judge -- |
| 04:31PM | 25 | THE COURT:  This is it's gonna come in eventually, |

| | | |
|---|---|---|
| 04:31PM | 1 | right? |
| 04:31PM | 2 | MR. FOTI:  I think the government will probably say |
| 04:31PM | 3 | that they expect to lay a foundation and that it eventually |
| 04:31PM | 4 | will.  I -- that may be the case, but at this point, I don't |
| 04:31PM | 5 | think the foundation is there, but -- so I will object at this |
| 04:31PM | 6 | point, but I understand if it's allowed in subject to |
| 04:31PM | 7 | connection. |
| 04:31PM | 8 | MR. COOPER:  That's what I asked Mark when I walked |
| 04:31PM | 9 | over, was I anticipated the objection, I'm going to ask the |
| 04:31PM | 10 | Court to allow it in subject to connection given that we're |
| 04:31PM | 11 | going to call a witness who can authenticate it. |
| 04:31PM | 12 | THE COURT:  And you don't object to that?  Because it |
| 04:31PM | 13 | is -- it's hearsay now, and there's no hearsay within hearsay |
| 04:31PM | 14 | in it because it's -- |
| 04:31PM | 15 | MR. COOPER:  I'll end up recalling -- with the |
| 04:31PM | 16 | Court's permission, what I'll end up doing is recalling Tony |
| 04:31PM | 17 | after this next witness -- or, that witness ultimately |
| 04:32PM | 18 | testifies, so I'm trying to avoid that. |
| 04:32PM | 19 | THE COURT:  So tell me about what you want. |
| 04:32PM | 20 | MR. FOTI:  I'm fine letting it in subject to |
| 04:32PM | 21 | connection, but if it's not laid, we'll move to strike it. |
| 04:32PM | 22 | THE COURT:  Absolutely. |
| 04:32PM | 23 | (End of sidebar discussion.) |
| 04:32PM | 24 | MR. COOPER:  Judge, with that limited foundation, and |
| 04:32PM | 25 | based on our conference at the bench, I'm going to ask to move |

04:32PM  1   this Government Exhibit 99 in subject to connection.

04:32PM  2        **THE COURT:**  Mr. Foti?

04:32PM  3        **MR. FOTI:**  No objection under those -- with that

04:32PM  4   understanding.

04:32PM  5        **THE COURT:**  Right.  So, so it's moved into evidence

04:32PM  6   subject to connection.

04:32PM  7        What that means, it's kind of provisionally in

04:32PM  8   evidence now.  Mr. Cooper and the government are going to call

04:32PM  9   a witness later on to authenticate this.  It's not been

04:32PM  10  authenticated yet.

04:32PM  11       But based on the representation of the government

04:32PM  12  that they have a witness who's going to authenticate it, we're

04:32PM  13  going to let it in now so as not to waste time.

04:32PM  14       Go ahead.  So it's admitted subject to connection.

04:32PM  15       **(GOV Exhibit 99 was received in evidence.)**

04:32PM  16       **MR. COOPER:**  Before we publish that, Ms. Champoux,

04:32PM  17  can you zoom in on this portion that I'm highlighting here?

04:32PM  18       All the way across.  Yeah, there you go.

04:33PM  19       Nope, just up to where I highlighted.  Thank you.

04:33PM  20       I'd ask that this be published to the jury.

04:33PM  21       **THE CLERK:**  Go ahead.

04:33PM  22       **MR. COOPER:**  Thank you, ma'am.

04:33PM  23       **BY MR. COOPER:**

04:33PM  24  Q.  Mr. Casullo, can you see this on the screen in front of

04:33PM  25  you?

04:33PM   1    A.  Yes.

04:33PM   2    Q.  Is this a portion of that memo that we talked about?

04:33PM   3    A.  Yes.

04:33PM   4    Q.  Is it your understanding that Joseph Bongiovanni wrote

04:33PM   5    this memo?

04:33PM   6    A.  Yes.

04:33PM   7    Q.  Is it about you?

04:33PM   8    A.  Yes.

04:33PM   9    Q.  Let's go through it.

04:33PM  10        This first sentence here, can you read that out loud to

04:33PM  11    the jury?

04:33PM  12    A.  S.A. Joseph Bongiovanni is writing to inform you of

04:33PM  13    information that he has acquired regarding the social

04:34PM  14    affiliation and recent communications with Peter Gerace by

04:34PM  15    Anthony Casullo and S.A. Casullo's brother-in-law, Phil

04:34PM  16    Domiano.

04:34PM  17    Q.  Do you have a social affiliation with Peter Gerace?

04:34PM  18    A.  No.

04:34PM  19    Q.  Is that sentence true?

04:34PM  20    A.  No.

04:34PM  21    Q.  Can you read the next sentence?

04:34PM  22    A.  In that past, S.A. Bongiovanni has verbally informed you,

04:34PM  23    my group supervisor, Greg Yensan, and our ASAC, David T. Zon,

04:34PM  24    of information confirming the friendship of Domiano, Casullo,

04:34PM  25    and Gerace.

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

| | | |
|---|---|---|
| 04:34PM | 1 | Q.  Is that sentence true? |
| 04:34PM | 2 | A.  No. |
| 04:34PM | 3 | Q.  Were you friends with Phil Domiano? |
| 04:34PM | 4 | A.  No. |
| 04:34PM | 5 | Q.  Were you friends with Peter Gerace? |
| 04:34PM | 6 | A.  No. |
| 04:34PM | 7 | Q.  Can you read the next sentence? |
| 04:34PM | 8 | A.  Furthermore, S.A. Bongiovanni has attached information |
| 04:34PM | 9 | confirming that Domiano was a former manager of Pharaoh's |
| 04:34PM | 10 | Gentlemen's Club in Cheektowaga, New York on behalf of |
| 04:34PM | 11 | Gerace. |
| 04:34PM | 12 | Q.  Do you know whether that sentence is true or not? |
| 04:35PM | 13 | A.  Well, I do now. |
| 04:35PM | 14 | Q.  Okay.  How about that bottom portion there, can you read |
| 04:35PM | 15 | that for the jury? |
| 04:35PM | 16 | A.  S.A. Bongiovanni has personally witnessed S.A. Casullo |
| 04:35PM | 17 | meeting and drinking socially with Peter Gerace alone at the |
| 04:35PM | 18 | Big Ditch Brewery and later at Tappo Italian Restaurant in |
| 04:35PM | 19 | Buffalo, New York at approximately at 9:45 p.m. on the |
| 04:35PM | 20 | evening of June 13th, 2015. |
| 04:35PM | 21 | Q.  Is this a memo -- is it your understanding this is a memo |
| 04:35PM | 22 | that Bongiovanni sent to his boss at the DEA? |
| 04:35PM | 23 | A.  Yes. |
| 04:35PM | 24 | Q.  That portion at the bottom there, about drinking socially |
| 04:35PM | 25 | with Peter Gerace alone at the Big Ditch Brewery, is that |

04:35PM  1   true?

04:35PM  2   A.  No.

04:35PM  3   Q.  Did you drink alone with him at the Tappo Italian

04:35PM  4   Restaurant in Buffalo?

04:35PM  5   A.  No.

04:36PM  6          MR. COOPER:  You can take that down, Ms. Champoux.

04:36PM  7          BY MR. COOPER:

04:36PM  8   Q.  In June of 2015, did you attend a high school reunion at

04:36PM  9   the Big Ditch Brewery?

04:36PM  10  A.  Yes.

04:36PM  11  Q.  Were you and Peter Gerace the only people at the high

04:36PM  12  school reunion?

04:36PM  13  A.  No.

04:36PM  14  Q.  Was he your friend when you were at the high school

04:36PM  15  reunion?

04:36PM  16  A.  No.

04:36PM  17  Q.  Was Peter Gerace there?

04:36PM  18  A.  Yes.

04:36PM  19  Q.  Can you describe for the jury what happened at that high

04:36PM  20  school reunion with respect to you and Peter Gerace and

04:36PM  21  Joe -- was Joe Bongiovanni there at the high school reunion?

04:36PM  22  A.  No.

04:36PM  23  Q.  Did you see him that night?

04:36PM  24  A.  I did.

04:36PM  25  Q.  Describe for the jury how that night played out.

04:36PM 1    A.   So, through the night, Gerace mentioned to me that

04:36PM 2    Bongiovanni was across the street at Tappo Restaurant with

04:36PM 3    his brother, Anthony.

04:36PM 4    Q.   Now, at that time, this is June of 2015, is this a few

04:36PM 5    months before you actually come back to Buffalo to start

04:37PM 6    working there?

04:37PM 7    A.   Yes.

04:37PM 8    Q.   And by that time, in June of 2015, did you know

04:37PM 9    Bongiovanni to be a special agent with the DEA?

04:37PM 10   A.   Yes.

04:37PM 11   Q.   When Peter Gerace approached you and told you that

04:37PM 12   Bongiovanni was across the street with his brother, did you

04:37PM 13   have an interest, generally, in going to see Bongiovanni?

04:37PM 14   A.   Initially, I told him no, I didn't want to go over.

04:37PM 15   Q.   What happened then?

04:37PM 16   A.   He said he's just across the street, it's like literally

04:37PM 17   right there.  He asked me two or three times, and I agreed by

04:37PM 18   the third time.

04:37PM 19   Q.   Did you go across the street?

04:37PM 20   A.   Yes.

04:37PM 21   Q.   What did you see when you went there?

04:37PM 22   A.   So when I walked in, off to the right I saw Bongiovanni

04:37PM 23   sitting at the bar with -- I believe it was, like, three --

04:37PM 24   three or four other individuals.

04:37PM 25   Q.   Did you recognize any of them?

04:37PM  1   A.  I recognized Bongiovanni, not the other three or four.

04:38PM  2   Q.  Okay.  We've been talking about Peter Gerace.  Is he in

04:38PM  3   the courtroom today?

04:38PM  4   A.  Yes.

04:38PM  5   Q.  Can you point him out and identify an article of his

04:38PM  6   clothing for the record?

04:38PM  7   A.  Peter Gerace is wearing a blue tie and a gray suit.

04:38PM  8   Going like this, up and down.  That's Peter Gerace with

04:38PM  9   glasses.

04:38PM  10  Q.  Okay.  Which seat is he sitting in?

04:38PM  11  A.  Between his two attorneys.

04:38PM  12      **MR. COOPER:**  Okay.  So the person in the middle,

04:38PM  13  Judge, I'd ask the record to reflect that he's identified the

04:38PM  14  defendant.

04:38PM  15      **THE COURT:**  It does.

04:38PM  16      **BY MR. COOPER:**

04:38PM  17  Q.  And did you say he was nodding his head while you were

04:38PM  18  looking at him?

04:38PM  19  A.  Yes, he was nodding his head up and down.

04:38PM  20  Q.  When the defendant asked you to walk across the street to

04:38PM  21  see Bongiovanni, did he tell you who Bongiovanni was with?

04:38PM  22  A.  Just his brother.

04:38PM  23  Q.  Whose brother?

04:38PM  24  A.  Peter's brother, Anthony.

04:38PM  25  Q.  What happened when you walked across the street with the

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

27

| | | |
|---|---|---|
| 04:38PM | 1 | defendant to see Bongiovanni? |
| 04:38PM | 2 | A.  When I first walked in, we walked up to them, and Joe |
| 04:39PM | 3 | turned around and seemed really surprised to see me. |
| 04:39PM | 4 | He said, what are you doing here?  I thought you were in |
| 04:39PM | 5 | New York. |
| 04:39PM | 6 | I said, I am still working in New York.  I came home for |
| 04:39PM | 7 | my reunion. |
| 04:39PM | 8 | He looked pretty uncomfortable, almost like he didn't |
| 04:39PM | 9 | want to be there.  He eventually introduced me to Anthony |
| 04:39PM | 10 | Gerace, who was sitting next to him.  He introduced me to the |
| 04:39PM | 11 | three other -- or, I believe, there were three other people, |
| 04:39PM | 12 | I don't remember who they are, but, yeah, he introduced me to |
| 04:39PM | 13 | Anthony Gerace and to other people. |
| 04:39PM | 14 | Q.  And when you say he looked surprised to see you, you |
| 04:39PM | 15 | mean, like, happy surprised?  Or, like, concerned surprised? |
| 04:39PM | 16 | A.  Like, uncomfortable. |
| 04:39PM | 17 | Q.  During your time at the DEA, did you ever initiate or |
| 04:39PM | 18 | attempt to investigate this defendant, Peter Gerace? |
| 04:39PM | 19 | A.  Yes. |
| 04:39PM | 20 | Q.  Did that investigation include an investigation of |
| 04:40PM | 21 | Pharaoh's Gentlemen's Club? |
| 04:40PM | 22 | A.  Yes. |
| 04:40PM | 23 | Q.  Did you get very far in that investigation? |
| 04:40PM | 24 | A.  No. |
| 04:40PM | 25 | Q.  Okay.  We're going to cover it in more detail. |

04:40PM    1         When you did start looking into this defendant?

04:40PM    2    A.  I believe it was summer of 2016.

04:40PM    3    Q.  What brought Mr. Gerace to your attention as a target of

04:40PM    4    an investigation?

04:40PM    5    A.  There were a few things.

04:40PM    6         It was no secret amongst people that I knew, classmates,

04:40PM    7    that he was a --

04:40PM    8             MR. FOTI:  Objection, Judge.

04:40PM    9             MR. COOPER:  Judge, it's the state of mind.

04:40PM   10             THE COURT:  Hang on.  What's the basis of the

04:40PM   11    objection?

04:40PM   12             MR. FOTI:  Hearsay.  It's -- can we approach?  Sorry.

04:40PM   13             THE COURT:  Yeah, come on up.

04:40PM   14             (Sidebar discussion held on the record.)

04:41PM   15             THE COURT:  The question is why he started

04:41PM   16    investigating Gerace.

04:41PM   17             MR. FOTI:  Anything about it being no secret among

04:41PM   18    what other people thought or knew, I -- I'm not entirely sure

04:41PM   19    what his answer is gonna be.  But I expect that --

04:41PM   20             MR. COOPER:  It's in the transcript from his prior

04:41PM   21    testimony, and we covered this topic at the most recent

04:41PM   22    Bongiovanni trial.  And it's not being offered for the truth

04:41PM   23    of the matter asserted.  There's been --

04:41PM   24             MR. FOTI:  Why he's --

04:41PM   25             MR. COOPER:  Correct.  And there's been repeated

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

04:41PM    1    cross-examination where the explanation has been, Judge, it

04:41PM    2    goes to the investigation.

04:41PM    3         So I have to be able to explain that he didn't pull

04:41PM    4    it out of his hat, or do it because he didn't like him, that's

04:41PM    5    my job.

04:41PM    6         **THE COURT:**  He certainly can testify to why he

04:41PM    7    started investigating him.  Why can't he testify to why he

04:41PM    8    started investigating him?

04:41PM    9         **MR. FOTI:**  I just -- I have 403 concerns about

04:41PM    10   information that he -- as long as it's -- if -- if there's

04:41PM    11   clarification that --

04:41PM    12        **THE COURT:**  Why don't you lead a little bit more.

04:42PM    13   This witness does have a tendency to go on and volunteer

04:42PM    14   stuff.

04:42PM    15        **MR. COOPER:**  That's Tom Herbst, Judge.

04:42PM    16        **THE COURT:**  Pardon me?

04:42PM    17        (Simultaneous speaking.)

04:42PM    18        **THE COURT:**  So why don't you lead a little bit, and

04:42PM    19   try to keep it narrower.  Ask -- you can lead using anything

04:42PM    20   that you think is appropriate, lead.  But -- but I understand

04:42PM    21   Mr. Foti's concern where he starts with something like there's

04:42PM    22   no secret that.  That would concern me, too.

04:42PM    23        **MR. COOPER:**  Okay.

04:42PM    24        **THE COURT:**  So, so, you can ask questions about why

04:42PM    25   he investigated him, and -- and -- but -- but just try to keep

04:42PM    1    it relatively narrow.  I don't think the subject matter is off

04:42PM    2    limits at all, I think it comes in.  The way you couch it may

04:42PM    3    be problematic.  That's all.  Okay?

04:42PM    4            MR. COOPER:  Yep.  Thanks, Judge.

04:43PM    5            (End of sidebar discussion.)

04:43PM    6            MR. COOPER:  Judge, based on the bench conference,

04:43PM    7    I'm going to ask for a second to find some specific questions

04:43PM    8    to ask.

04:43PM    9            THE COURT:  Absolutely.

04:43PM   10            MR. COOPER:  Just bear with me time-wise for a second

04:43PM   11    here.

04:43PM   12            THE COURT:  And you're withdrawing the last question?

04:43PM   13            MR. COOPER:  Based on the discussion, I'm going to

04:43PM   14    ask some leading specific questions, but I just need a minute.

04:43PM   15            THE COURT:  Yep.

04:43PM   16            MR. COOPER:  Thank you.

04:44PM   17            BY MR. COOPER:

04:44PM   18    Q.  While you were at that high school re --

04:44PM   19        Just answer specifically what I'm asking you.

04:44PM   20        You understand what we're doing here?

04:44PM   21    A.  Yes.

04:44PM   22    Q.  Okay.  While you were at that high school reunion in

04:44PM   23    about June of 2015, did a classmate of yours who worked in

04:44PM   24    law enforcement make statements to you that caused you to be

04:44PM   25    interested in pursuing an investigation of Peter Gerace and

04:44PM    1    Pharaoh's Gentlemen's Club?

04:44PM    2    A.  Yes.

04:44PM    3    Q.  Describe for the jury what that person said to you.

04:45PM    4    A.  He said that Gerace was videotaping everybody in his

04:45PM    5    club.

04:45PM    6    Q.  Did he -- sorry.  So I'd like to be a little more

04:45PM    7    specific than that.  Did he tell you specifically something

04:45PM    8    along the lines of that Gerace had recordings of people with

04:45PM    9    strippers?

04:45PM   10    A.  Something along those lines, yeah.

04:45PM   11    Q.  Okay.  At that same reunion, did you hear other

04:45PM   12    classmates making comments about going to Pharaoh's

04:45PM   13    Gentlemen's Club to use cocaine?

04:45PM   14    A.  Yes.

04:45PM   15    Q.  Is that a social activity that you were interested in

04:45PM   16    participating in?

04:45PM   17    A.  No.

04:45PM   18    Q.  At the time, were you a DEA agent?

04:46PM   19    A.  Yes.

04:46PM   20    Q.  Did it stick in your mind and later materialize in an

04:46PM   21    interest in investigating Peter Gerace?

04:46PM   22    A.  Yes.

04:46PM   23         **MR. COOPER:**  Judge, if we can approach just for one

04:46PM   24    more before I ask it?

04:46PM   25         **THE COURT:**  Absolutely.

04:46PM    1            **MR. COOPER:**  Thank you.

04:46PM    2            (Sidebar discussion on the record.)

04:46PM    3            **THE COURT:**  Fine.

04:46PM    4            **MR. COOPER:**  Actually, no.

04:46PM    5            **THE COURT:**  Oh.

04:46PM    6            **MR. COOPER:**  So I want to obviously, I understand

04:46PM    7    that this is Mr. Gerace's trial, and so things that came in in

04:46PM    8    Bongiovanni don't necessarily come in in Gerace.  We've been

04:46PM    9    cautious up to this point in the trial of discussing the

04:46PM   10    defendant's status as a federally convicted felon.  That's

04:47PM   11    something I expect he'll testify he was aware of and that

04:47PM   12    factored into his decision to pursue an investigation of that

04:47PM   13    person.  It's common in law enforcement for that to be

04:47PM   14    something that causes you to look at one target versus

04:47PM   15    another.

04:47PM   16            I don't know, I wanted to come up and discuss it.  I

04:47PM   17    think it goes to the same basis.  If there's a way for me to

04:47PM   18    soften it, they've already heard from Lepiane that he was on

04:47PM   19    federal probation.  I want to front it for you and see where

04:47PM   20    your position is on it.

04:47PM   21            **MR. FOTI:**  Judge, I think my problem, I understand

04:47PM   22    there's a reason being provided, and I think the reason it's

04:47PM   23    being provided in good faith for why you want to ask about it.

04:47PM   24    But it's also -- that can be the beginning of the target of

04:47PM   25    any investigation.  In any case where somebody has a prior

04:47PM    1    felony, if that factored into the considerations of the

04:47PM    2    investigators, it would become part of the trial.  And that's

04:47PM    3    clearly not the case.

04:48PM    4         THE COURT:  No, but it could add to the equation.  It

04:48PM    5    could be -- it could be, you know, an incremental additional

04:48PM    6    reason.  Again, so the jury knows that he's on release, they

04:48PM    7    know -- they know that he has a conviction of some sort.  Why

04:48PM    8    do you have to give them any more than that?

04:48PM    9         MR. COOPER:  No, that's fine.  I'm just trying to

04:48PM   10    front it because I don't want to have a big blowup.

04:48PM   11         THE COURT:  I thought the pretrial ruling was they

04:48PM   12    could get into the fact that he has a conviction, but they

04:48PM   13    can't get into the fact that he has a felony, so that's what I

04:48PM   14    understood.

04:48PM   15         MR. COOPER:  Okay.

04:48PM   16         THE COURT:  So -- so I don't have a problem with

04:48PM   17    your, again, leading, and using the word "conviction," not

04:48PM   18    using the word "felony."

04:48PM   19         MR. COOPER:  All right.

04:48PM   20         THE COURT:  It's a fine line, but I think may be

04:48PM   21    important.

04:48PM   22         MR. COOPER:  Got it.  Okay.  That's what I'll do.

04:48PM   23         MR. FOTI:  Understood.

04:48PM   24         (End of sidebar discussion.)

04:48PM   25         BY MR. COOPER:

| | | |
|---|---|---|
| 04:48PM | 1 | Q.  Sir, I'm going to ask you a very specific question, and I |
| 04:48PM | 2 | want you to give me a yes-or-no answer to this one, okay? |
| 04:48PM | 3 | A.  Okay. |
| 04:48PM | 4 | Q.  At that time, were you aware that this defendant had a |
| 04:49PM | 5 | prior conviction?  Yes or no. |
| 04:49PM | 6 | A.  Yes. |
| 04:49PM | 7 | Q.  Okay.  As a law enforcement officer, is that something, |
| 04:49PM | 8 | generally, that can factor into your analysis of who's a |
| 04:49PM | 9 | viable target for investigation? |
| 04:49PM | 10 | A.  Being a prior felon? |
| 04:49PM | 11 | Q.  Well, being -- having any prior conviction, is that |
| 04:49PM | 12 | something that can factor into your analysis? |
| 04:49PM | 13 | A.  Sure. |
| 04:49PM | 14 | **MR. FOTI:**  Judge, can we approach? |
| 04:49PM | 15 | **THE COURT:**  Yeah, come on up. |
| 04:49PM | 16 | (Sidebar discussion on the record.) |
| 04:49PM | 17 | **THE COURT:**  That wasn't Mr. Cooper's fault. |
| 04:49PM | 18 | **MR. FOTI:**  Well, it was -- it wasn't, except there is |
| 04:49PM | 19 | witness prep where that type of thing is supposed to be |
| 04:49PM | 20 | avoided when we make decisions to keep things out. |
| 04:49PM | 21 | **THE COURT:**  So I'm going to instruct the jury to |
| 04:49PM | 22 | disregard the use of the word "felon," and he's testified that |
| 04:49PM | 23 | he had a conviction, and that's all we know. |
| 04:49PM | 24 | **MR. FOTI:**  I'd also, I was going to ask for this |
| 04:50PM | 25 | earlier, if there's going to be a curative instruction, I'd |

USA v Gerace - Casullo - Cooper/Direct - 11/20/24                    35

| | | |
|---|---|---|
| 04:50PM | 1 | also ask to include a curative instruction letting the jury |
| 04:50PM | 2 | know that any statements that he testified to from classmates, |
| 04:50PM | 3 | not being offered for the truth of the matter asserted, that |
| 04:50PM | 4 | the jury is not to speculate as to anything in regards to |
| 04:50PM | 5 | whether there's any truthfulness to anything that was said. |
| 04:50PM | 6 | **THE COURT:**  Talking about drug use at Pharaoh's? |
| 04:50PM | 7 | **MR. FOTI:**  The drug -- really, the most prejudicial |
| 04:50PM | 8 | thing is this idea that he's gonna blackmail people with |
| 04:50PM | 9 | recordings, that he said classmates were telling him that he |
| 04:50PM | 10 | has videos of people.  I mean -- |
| 04:50PM | 11 | **THE COURT:**  That's being offered for -- |
| 04:50PM | 12 | **MR. COOPER:**  Just for his state of mind. |
| 04:50PM | 13 | **THE COURT:**  Right. |
| 04:50PM | 14 | **MR. COOPER:**  And that's -- I've tried to couch my |
| 04:50PM | 15 | questions in that way.  And that's what I was trying to -- |
| 04:50PM | 16 | **THE COURT:**  Mr. Cooper, I -- I disagree with Mr. Foti |
| 04:50PM | 17 | that you did anything that at all that caused this.  So |
| 04:50PM | 18 | believe me, you don't have to defend yourself, okay? |
| 04:50PM | 19 | **MR. COOPER:**  Okay. |
| 04:50PM | 20 | **THE COURT:**  So I will give those two curative |
| 04:50PM | 21 | instructions.  Okay? |
| 04:50PM | 22 | **MR. FOTI:**  Yes. |
| 04:50PM | 23 | (End of sidebar discussion.) |
| 04:50PM | 24 | **THE COURT:**  Okay, folks.  So -- so two things that I |
| 04:50PM | 25 | want to talk to you about. |

04:51PM   1          One is that the testimony that this witness gave

04:51PM   2   about things that people said to him at the reunion about

04:51PM   3   Mr. Gerace and Pharaoh's, those are being offered only for the

04:51PM   4   witness's state of mind.  Whether those things are true or

04:51PM   5   not, we don't know.  Again, this is pure hearsay.  But it's

04:51PM   6   not really hearsay because when it's offered for somebody's

04:51PM   7   state of mind, the law says that's not hearsay.  Okay?

04:51PM   8          But it's just for his state of mind.  We don't know

04:51PM   9   whether those things are true or not, because it's something

04:51PM  10   that somebody else is saying that that person may have heard,

04:51PM  11   or we don't -- we have no idea how that person knew.

04:51PM  12          That person's not going to testify who said it to

04:51PM  13   Mr. Casullo, so we really don't know whether that's true or

04:51PM  14   not.  We know that he heard it, and we know that that's one of

04:51PM  15   the things that triggered him to do the investigation.  But we

04:51PM  16   don't know whether what he heard is true.  Okay?

04:51PM  17          So that's number 1.

04:51PM  18          Number 2, he just used the word "felon."  We don't

04:51PM  19   know that either.

04:51PM  20          Mr. Cooper asked whether he was convicted, and we

04:51PM  21   know that he was convicted of something, we don't know what he

04:52PM  22   was convicted of.  And again, you're not -- I'm going to

04:52PM  23   strike the testimony about convicted felon, and you're to only

04:52PM  24   understand that Mr. Gerace was convicted of something.  Okay?

04:52PM  25   That's all.

04:52PM     1       Go ahead.

04:52PM     2       **MR. COOPER:**  Thank you, Judge.

04:52PM     3       **BY MR. COOPER:**

04:52PM     4   Q.  So, my question very specifically, does the fact that

04:52PM     5   somebody has a prior conviction, can that weigh on your

04:52PM     6   decision as an investigator to pursue that person?

04:52PM     7   A.  Yes.

04:52PM     8   Q.  Okay.  I think you told me a few moments ago that it was

04:52PM     9   sometime in 2016 when you decided to begin this

04:52PM    10   investigation; is that correct?

04:52PM    11   A.  Yes.

04:52PM    12   Q.  What was the first investigative step that you took?

04:52PM    13   A.  I had a conversation with my supervisor of the group.

04:52PM    14   Q.  Okay.  And is that something that's standard to do?

04:53PM    15   A.  Yeah.  Pretty much.

04:53PM    16   Q.  Okay.  Are you familiar with the word "tolls?"

04:53PM    17   A.  Yes.

04:53PM    18   Q.  Like, T-O-L-L-S?

04:53PM    19   A.  Yes.

04:53PM    20   Q.  What are tolls?

04:53PM    21   A.  Tolls are phone records of communications between two

04:53PM    22   numbers, two people, that show, you know -- there's -- it

04:53PM    23   shows a phone number, it shows a duration, a date, a duration

04:53PM    24   of time.

04:53PM    25   Q.  Okay.  Do toll records -- so, hypothetically, let's say

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

38

| 04:53PM | 1 | John Smith texted you.  Would toll records show what John |
| 04:53PM | 2 | Smith said to you in the text message? |
| 04:53PM | 3 | A.  No.  It doesn't show content. |
| 04:53PM | 4 | Q.  Okay.  And so, if John Smith called you, would a toll |
| 04:53PM | 5 | record indicate what John Smith said to you? |
| 04:53PM | 6 | A.  No. |
| 04:53PM | 7 | Q.  Do toll records list out, kind of like, in an Excel |
| 04:53PM | 8 | spreadsheet form or PDF, do they list out just the existence |
| 04:53PM | 9 | of incoming and outgoing calls? |
| 04:53PM | 10 | A.  Yes. |
| 04:53PM | 11 | Q.  Okay.  Are toll records, subpoenaing them, getting them, |
| 04:53PM | 12 | reviewing them, is that a big part of what you do at the DEA? |
| 04:53PM | 13 | A.  Sure.  It's one of the first steps we take in an |
| 04:54PM | 14 | investigation. |
| 04:54PM | 15 | Q.  Okay.  Is that common for a DEA agent in a drug |
| 04:54PM | 16 | investigation? |
| 04:54PM | 17 | A.  Very common. |
| 04:54PM | 18 | Q.  Why is it common in a drug investigation to subpoena and |
| 04:54PM | 19 | acquire toll records of a target? |
| 04:54PM | 20 | A.  Sure.  The way you're trained, in most drug |
| 04:54PM | 21 | investigations, is that there's the possibility that it may |
| 04:54PM | 22 | be a conspiracy, meaning other people being involved.  People |
| 04:54PM | 23 | that may be suppliers, or couriers, or source of supply that |
| 04:54PM | 24 | supplies drugs. |
| 04:54PM | 25 | So you're trying to identify the possibility of a |

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

39

04:54PM  1   conspiracy, and other individuals that might be involved with

04:54PM  2   that criminal activity.

04:54PM  3   Q.  Is it an effective tool in beginning an investigation?

04:54PM  4   A.  Yes.

04:54PM  5   Q.  Is it -- it's not the only thing you do, right?

04:54PM  6   A.  No.

04:54PM  7   Q.  Did you make a determination early on in that

04:54PM  8   investigation into Peter Gerace to subpoena and acquire

04:54PM  9   Mr. Gerace's tolls or phone records?

04:55PM  10  A.  Yes.

04:55PM  11  Q.  Did you discuss that with anybody before you did it?

04:55PM  12  A.  Yes.

04:55PM  13  Q.  Who did you discuss it with?

04:55PM  14  A.  With the group supervisor, Greg Yensan.

04:55PM  15  Q.  Why did you discuss that with your group supervisor, Greg

04:55PM  16  Yensan, before you did it?

04:55PM  17  A.  First, because for me to get a subpoena approved, it

04:55PM  18  would go through him, so I wanted to make him aware of it.

04:55PM  19  Number 1.

04:55PM  20      And number 2, I was aware that Joseph Bongiovanni, I

04:55PM  21  believed that he was friends with Peter Gerace, so I wanted

04:55PM  22  to give him a heads-up that if I pulled phone records that it

04:55PM  23  was possible that Joseph Bongiovanni's phone number may show

04:55PM  24  up in the phone records.

04:55PM  25  Q.  At that time, did you have any problem with Joe

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

04:55PM     1    Bongiovanni?

04:55PM     2    A.  No.  No.

04:55PM     3    Q.  Earlier you described that when you started working at

04:55PM     4    DEA, the relationship was fine, you worked on cases together.

04:55PM     5    Was that the status at the time in 2016 when you acquired the

04:55PM     6    toll records?

04:55PM     7    A.  Yes.

04:55PM     8    Q.  Were you trying to get Bongiovanni in trouble?

04:56PM     9    A.  No.

04:56PM    10    Q.  Did you eventually obtain a subpoena return that gave you

04:56PM    11    Mr. Gerace's phone records?

04:56PM    12    A.  Yes.

04:56PM    13    Q.  Is that for all time, or for a limited period of time?

04:56PM    14    A.  It's -- you can detail the timeframe that you want phone

04:56PM    15    records.  And it's typically 30 months is what it typically

04:56PM    16    is.  You can change it beyond that, beyond that if you want,

04:56PM    17    but it may take longer for the records to come back.  But

04:56PM    18    typically, like, it defaults to 30 days.

04:56PM    19    Q.  Okay.  So during your answer, you said 30 months and 30

04:56PM    20    days.

04:56PM    21    A.  I'm sorry.

04:56PM    22    Q.  That's okay.

04:56PM    23    A.  Yep.

04:56PM    24    Q.  Which one is it?

04:56PM    25    A.  It's 30 days, I'm sorry.  Not 30 months.

USA v Gerace - Casullo - Cooper/Direct - 11/20/24      41

| | | |
|---|---|---|
| 04:56PM | 1 | Q.  Okay.  So a month -- 30 months?  30 days, is that the |
| 04:56PM | 2 | standard length of time that you get back? |
| 04:56PM | 3 | A.  Yes. |
| 04:56PM | 4 | Q.  And you can ask for more or less if you want to? |
| 04:56PM | 5 | A.  Correct. |
| 04:56PM | 6 | Q.  When you got Mr. Gerace's phone records back, did you |
| 04:56PM | 7 | recognize the phone number of anybody that Gerace had been in |
| 04:56PM | 8 | contact with? |
| 04:56PM | 9 | A.  Yes. |
| 04:56PM | 10 | Q.  Who? |
| 04:56PM | 11 | A.  Joseph Bongiovanni. |
| 04:57PM | 12 | Q.  When you saw that Bongiovanni had been in contact with |
| 04:57PM | 13 | Mr. Gerace, and vice versa, what did you do? |
| 04:57PM | 14 | A.  Before when I explained to my supervisor that |
| 04:57PM | 15 | Bongiovanni's number might be with the phone records, he told |
| 04:57PM | 16 | me to subpoena the numbers and to see if that number was in |
| 04:57PM | 17 | the phone records, and if was, to bring him the records. |
| 04:57PM | 18 | Q.  Did you follow that instruction from your boss? |
| 04:57PM | 19 | A.  And that's exactly what I did. |
| 04:57PM | 20 | Q.  Okay. |
| 04:57PM | 21 | **THE COURT:**  Mr. Cooper, is this a good time to -- |
| 04:57PM | 22 | **MR. COOPER:**  Yeah, I'm certainly not finishing, so -- |
| 04:57PM | 23 | **THE COURT:**  Okay.  So, folks, we were going to break |
| 04:57PM | 24 | for the day.  Remember my instructions about not communicating |
| 04:57PM | 25 | about the case with anyone.  Don't use tools -- |

USA v Gerace - Proceedings - 11/20/24

42

04:57PM  1      I know you're getting sick of hearing me, but I'm

04:57PM  2  going to do it every day, twice a day, because it's so darn

04:57PM  3  important.

04:57PM  4      So don't use tools of technology to research the case

04:57PM  5  or to communicate about the case with anyone.  Don't read or

04:57PM  6  watch or listen to any news coverage of the case, if there is

04:57PM  7  any, while the case is on trial.  And don't make up your mind

04:58PM  8  about anything until you start deliberating.

04:58PM  9      See you tomorrow morning at 9:30.  Get a good night's

04:58PM  10  sleep.  Drive carefully.  Thank you very much.

04:58PM  11      (Jury excused at 4:58 p.m.)

04:58PM  12      **THE COURT:**  Okay.  Mr. Casullo, I think you know

04:58PM  13  you're not to talk to anybody about your testimony between now

04:58PM  14  and tomorrow morning.

04:58PM  15      **THE WITNESS:**  Yes, Judge.

04:58PM  16      **THE COURT:**  Anything from the defense?

04:58PM  17      **MR. FOTI:**  No.

04:58PM  18      **THE COURT:**  Anything from the government?

04:58PM  19      **MR. COOPER:**  I just have one request, but you can go

04:58PM  20  Tony, if you're good.

04:58PM  21      **THE COURT:**  Yes.

04:58PM  22      (Witness excused at 4:58 p.m.)

23

24

25