1              **UNITED STATES DISTRICT COURT**
               **WESTERN DISTRICT OF NEW YORK**

2

    _____

3  **UNITED STATES OF AMERICA,**

                           Case No. 1:19-cr-227

4          Plaintiff,           1:23-cr-37
  **v.**                          (LJV)

5

  **PETER GERACE, JR.,**          November 21, 2024

6

             Defendant.

7  _____

   **TRANSCRIPT EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 2**

8        **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
             **UNITED STATES DISTRICT JUDGE**

9

  <u>**APPEARANCES:**</u>     **TRINI E. ROSS, UNITED STATES ATTORNEY**

10              **BY: JOSEPH M. TRIPI, ESQ.**
                **NICHOLAS T. COOPER, ESQ.**

11                **CASEY L. CHALBECK, ESQ.**
             Assistant United States Attorneys

12             Federal Centre, 138 Delaware Avenue
             Buffalo, New York 14202

13             For the Plaintiff

14              **THE FOTI LAW FIRM, P.C.**
              **BY: MARK ANDREW FOTI, ESQ.**

15             16 West Main Street, Suite 100
             Rochester, New York 14614

16               And
             **SOEHNLEIN LAW**

17              **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**
             350 Main Street, Suite 2100

18             Buffalo, New York 14202
             For the Defendant

19

  <u>**PRESENT:**</u>       **KAREN A. CHAMPOUX, USA PARALEGAL**

20              **BRIAN A. BURNS, FBI SPECIAL AGENT**
              **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**

21

  <u>**LAW CLERK:**</u>      **REBECCA FABIAN IZZO, ESQ.**

22

  <u>**COURT CLERK:**</u>     **COLLEEN M. DEMMA**

23

  <u>**REPORTER:**</u>       **ANN MEISSNER SAWYER, FCRR, RPR, CRR**

24             Robert H. Jackson Courthouse
             2 Niagara Square Buffalo, New York 14202

25             Ann_Sawyer@nywd.uscourts.gov

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

2

| | | |
|---|---|---|
| | 1 | (Excerpt commenced at 9:54 a.m.) |
| | 2 | (Jury is present.) |
| 09:54AM | 3 | **THE COURT:** I remind the witness that he's still |
| 09:54AM | 4 | under oath. |
| 09:54AM | 5 | You may continue, Mr. Cooper. |
| 09:54AM | 6 | **MR. COOPER:** Thank you, Judge. |
| 09:54AM | 7 | |
| 09:54AM | 8 | **A N T H O N Y   C A S U L L O**, having been previously duly |
| 09:54AM | 9 | called and sworn, continued to testify as follows: |
| 09:54AM | 10 | |
| 09:54AM | 11 | **(CONT'D) DIRECT EXAMINATION BY MR. COOPER:** |
| 09:54AM | 12 | Q. I think where we left off yesterday, Mr. Casullo, was we |
| 09:54AM | 13 | were talking about returning -- receiving a return for |
| 09:54AM | 14 | Peter -- Peter Gerace's phone records, and going to your boss |
| 09:55AM | 15 | with those results; do you remember that? |
| 09:55AM | 16 | A. Yes. |
| 09:55AM | 17 | Q. Okay. Was Bongiovanni's phone number present in the toll |
| 09:55AM | 18 | records for Peter Gerace's phone? |
| 09:55AM | 19 | A. Yes. |
| 09:55AM | 20 | Q. Did you advise your supervisor that that was the case? |
| 09:55AM | 21 | A. Yes. |
| 09:55AM | 22 | Q. Okay. Did you receive guidance or a directive from your |
| 09:55AM | 23 | supervisor at that time? |
| 09:55AM | 24 | A. Yes. |
| 09:55AM | 25 | Q. What did he direct you? |

| | | |
|---|---|---|
| 09:55AM | 1 | A.  He just directed me to continue on with the |
| 09:55AM | 2 | investigation, and that he was going to be having a |
| 09:55AM | 3 | conversation with Bongiovanni. |
| 09:55AM | 4 | Q.  Okay.  Earlier you described that in the beginning of |
| 09:55AM | 5 | your time at the DEA Buffalo resident office, you had a |
| 09:55AM | 6 | professional -- friendly relationship with Bongiovanni.  Did |
| 09:55AM | 7 | that change after you subpoenaed Peter Gerace's phone |
| 09:55AM | 8 | records? |
| 09:55AM | 9 | A.  Yes. |
| 09:55AM | 10 | Q.  Did it change after you brought the fact that |
| 09:56AM | 11 | Bongiovanni's phone number was present in those records to |
| 09:56AM | 12 | the attention of your supervisor? |
| 09:56AM | 13 | A.  Yes. |
| 09:56AM | 14 | Q.  How so? |
| 09:56AM | 15 | A.  He was basically ignoring me in the office, wouldn't talk |
| 09:56AM | 16 | to me.  I could tell that he was upset. |
| 09:56AM | 17 | Q.  Was it obvious to you? |
| 09:56AM | 18 | A.  Very obvious.  We had just worked together on a long |
| 09:56AM | 19 | investigation for eight months, and his behavior was |
| 09:56AM | 20 | completely different. |
| 09:56AM | 21 | Q.  Did that make you kind of, you know, uncomfortable for |
| 09:56AM | 22 | lack of a better word in the workplace? |
| 09:56AM | 23 | A.  Oh, it did, absolutely. |
| 09:56AM | 24 | Q.  What, if anything, did you do in response to that? |
| 09:56AM | 25 | A.  I asked him if he'd be willing to talk to me privately in |

09:56AM    1   one of our conference rooms.

09:56AM    2   Q.  Did that happen at the Electric Tower DEA office?

09:56AM    3   A.  Yes.

09:56AM    4   Q.  Okay.  When you asked Bongiovanni if he'd be willing to

09:56AM    5   talk to you privately in a conference room, did he respond?

09:56AM    6   A.  He agreed.

09:56AM    7   Q.  Where'd you go?

09:56AM    8   A.  To that conference room, we have a conference room at the

09:57AM    9   DEA office, it's kind of, it's between the two groups, and

09:57AM   10   it's basically just adjacent to where my group sat.

09:57AM   11   Q.  Now if you -- excuse me.  If you subpoenaed Gerace's

09:57AM   12   phone records around June of 2016, approximately when is this

09:57AM   13   conversation in the conference room with Bongiovanni

09:57AM   14   happening?

09:57AM   15   A.  It was shortly after those phone records came back.

09:57AM   16   Maybe a few days.

09:57AM   17   Q.  Okay.  So we're still talking about the early summer of

09:57AM   18   2016?

09:57AM   19   A.  Yes.

09:57AM   20   Q.  Did you go in the conference room with him?

09:57AM   21   A.  Yes.

09:57AM   22   Q.  Was the door open or closed once you were in there?

09:57AM   23   A.  It was open -- I can't, when we were in there, I can't

09:57AM   24   remember if it was closed when we went in, I think it was

09:57AM   25   open, and then either I closed it or he closed it when we

| | | |
|---|---|---|
| 09:57AM | 1 | went in. |
| 09:57AM | 2 | Q.  Okay.  That's, I guess, the question I'm asking, is once |
| 09:57AM | 3 | you guys go inside, does the door get closed? |
| 09:57AM | 4 | A.  Yes. |
| 09:57AM | 5 | Q.  Is it just the two of you in there? |
| 09:57AM | 6 | A.  Yes. |
| 09:58AM | 7 | Q.  Was that your intention to speak privately with him? |
| 09:58AM | 8 | A.  Yes. |
| 09:58AM | 9 | Q.  Who spoke first to begin the conversation? |
| 09:58AM | 10 | A.  I did. |
| 09:58AM | 11 | Q.  What did you say?  Tell the jury. |
| 09:58AM | 12 | A.  Generally, that I was apologetic, that I wasn't trying to |
| 09:58AM | 13 | get him in trouble, I could tell he was upset, and that that |
| 09:58AM | 14 | was not my intention was to get him in trouble. |
| 09:58AM | 15 | Q.  Did Mr. Bongiovanni respond? |
| 09:58AM | 16 | A.  Yeah, he did. |
| 09:58AM | 17 | Q.  Can you describe for the jury how he responded? |
| 09:58AM | 18 | A.  He was upset.  And he said some things. |
| 09:58AM | 19 | Q.  Explain what you mean when you say he was upset. |
| 09:58AM | 20 | Describe what he looked like, what he was acting like. |
| 09:58AM | 21 | A.  He -- his voice was elevated.  He had an angry look on |
| 09:58AM | 22 | his face.  He was -- he was upset.  He was mad.  He was mad |
| 09:58AM | 23 | at me, he was mad at the situation. |
| 09:58AM | 24 | Q.  Okay.  And after you say to him, hey, I'm not trying to |
| 09:58AM | 25 | get you in trouble, in sum and substance, what are the words |

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

6

| | | |
|---|---|---|
| 09:58AM | 1 | that he says to you?  The first thing he says to you? |
| 09:58AM | 2 | A.  He said this is bullshit. |
| 09:58AM | 3 | Q.  Is he saying that in a conversational friendly tone of |
| 09:59AM | 4 | voice? |
| 09:59AM | 5 | A.  No, he was still upset.  He was mad.  And, again, he |
| 09:59AM | 6 | wasn't screaming, but his voice was elevated. |
| 09:59AM | 7 | Q.  After the defendant says to you this is bullshit, in an |
| 09:59AM | 8 | elevated voice, who is the next person to speak after that, |
| 09:59AM | 9 | you or him? |
| 09:59AM | 10 | A.  He continued to speak. |
| 09:59AM | 11 | Q.  What did he say? |
| 09:59AM | 12 | A.  He spontaneously blurted out that that kid called me, |
| 09:59AM | 13 | referring to Gerace, when a stripper overdosed in his club |
| 09:59AM | 14 | and I told him, meaning him -- |
| 09:59AM | 15 | **MR. FOTI:**  Objection, Judge. |
| 09:59AM | 16 | **THE COURT:**  Basis? |
| 09:59AM | 17 | **MR. FOTI:**  It's hearsay. |
| 09:59AM | 18 | **MR. COOPER:**  It's a coconspirator statement, Judge. |
| 09:59AM | 19 | **MR. FOTI:**  No, no, it isn't.  And it's not in |
| 09:59AM | 20 | furtherance of a conspiracy. |
| 09:59AM | 21 | **THE COURT:**  Stop.  Stop.  Stop. |
| 09:59AM | 22 | **MR. TRIPI:**  There has already been a pretrial ruling |
| 09:59AM | 23 | on this exact conversation, Your Honor. |
| 10:00AM | 24 | **MR. FOTI:**  Judge, can we -- we should just approach, |
| 10:00AM | 25 | I think. |

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

10:00AM    1        **THE COURT:**  Yeah, come on up.  Come on up.

10:00AM    2        (Sidebar discussion held on the record.)

10:00AM    3        **THE COURT:**  This is not a coconspirator statement for

10:00AM    4    the conspiracy purposes.

10:00AM    5        **MR. FOTI:**  That he's -- that the conversation that

10:00AM    6    Mr. Bongiovanni and him are having --

10:00AM    7        **THE COURT:**  Yeah.

10:00AM    8        **MR. FOTI:**  -- in regard to --

10:00AM    9        **THE COURT:**  He's trying to talk this guy out of

10:00AM   10    prosecuting -- or, out of investigating Gerace.

10:00AM   11        **MR. FOTI:**  Any statement along those lines, I guess

10:00AM   12    the argument can be made that it's in furtherance.

10:00AM   13        But at this point, Mr. Casullo initiated the

10:00AM   14    conversation and they're having a conversation about -- about

10:00AM   15    whatever he knows about.

10:00AM   16        **THE COURT:**  Overruled.

10:00AM   17        (Sidebar discussion held on the record.)

10:00AM   18        **THE COURT:**  The objection is overruled.

10:00AM   19        **MR. COOPER:**  Can you let us know how far we got,

10:00AM   20    Ms. Sawyer?  Thank you.

10:00AM   21        (The above-requested question was then read by the

10:01AM   22    reporter.)

10:01AM   23        **BY MR. COOPER:**

10:01AM   24    Q.  And I told him, what?

10:01AM   25    A.  To get her out of the club.

10:01AM   1    Q.  Who was saying the words, I told him to get her out of

10:01AM   2    the club?

10:01AM   3    A.  Bongiovanni.

10:01AM   4    Q.  Who's the "him" in that sentence?

10:01AM   5    A.  Gerace.

10:01AM   6    Q.  Was that -- was Gerace the only person up to that point

10:01AM   7    that you were talking about?

10:01AM   8    A.  Yes.

10:01AM   9    Q.  Was the defendant worked up when he said that to you?

10:01AM   10   A.  Yes.

10:01AM   11   Q.  Was he elevated?

10:01AM   12   A.  Same, elevated, worked up.  He was upset.

10:01AM   13           **MS. CHALBECK:**  Nick.

10:01AM   14           **BY MR. COOPER:**

10:01AM   15   Q.  I think I misspoke.  I said "the defendant."  I'm

10:01AM   16   speaking about Bongiovanni.

10:01AM   17       When Bongiovanni's speaking to you, was he elevated?

10:01AM   18   A.  Yes.

10:01AM   19   Q.  Okay.

10:01AM   20           **MR. COOPER:**  Thank you, Casey.

10:02AM   21           **BY MR. COOPER:**

10:02AM   22   Q.  You mentioned that Bongiovanni said to you that kid

10:02AM   23   called me.  Are those the words you recall him using?

10:02AM   24   A.  Yes.

10:02AM   25   Q.  That kid?

10:02AM  1   A.  Yes.

10:02AM  2   Q.  In the context of the conversation that you were a part

10:02AM  3   of, who was "that kid" referring to?

10:02AM  4   A.  Gerace.

10:02AM  5   Q.  Do those words that Bongiovanni said to you in the

10:02AM  6   conference room at DEA stick out in your mind even now eight

10:02AM  7   years later?

10:02AM  8   A.  Oh, it was shocking.

10:02AM  9   Q.  After the defendant told -- or, after Bongiovanni -- I'm

10:02AM  10  sorry -- told you that kid called me when a stripper

10:02AM  11  overdosed and I told him to get her out of the club, what was

10:02AM  12  your immediate reaction when you heard that?

10:02AM  13  A.  Shocked.  Trying process what he had just said.  If he

10:02AM  14  had witnessed -- been part of some conspiracy, some coverup.

10:02AM  15  I'm trying to figure this all out at once because I was so

10:03AM  16  caught off guard when he said it.  It was unsolicited.  He

10:03AM  17  blurted it out.

10:03AM  18      And I went from having a conversation initially thinking

10:03AM  19  of being apologetic, that I wasn't trying to get him involved

10:03AM  20  in something.  Because my belief at the time was maybe he

10:03AM  21  just was careless with who he associated with, or who his

10:03AM  22  friends were, to what he had just said to me -- what I just

10:03AM  23  said.

10:03AM  24      It just was -- it was a shocking thing to hear.

10:03AM  25  Q.  When you walked into the conference room to begin that

| | | |
|---|---|---|
| 10:03AM | 1 | conversation, were you expecting to hear something like what |
| 10:03AM | 2 | Bongiovanni said to you? |
| 10:03AM | 3 | A.  No.  No.  Not at all. |
| 10:03AM | 4 | Q.  After Bongiovanni said to you that that kid called him |
| 10:03AM | 5 | when a stripper overdosed at his club and he told him to get |
| 10:03AM | 6 | her out of there, who spoke next, you or Bongiovanni? |
| 10:04AM | 7 | A.  He did.  I didn't say anything. |
| 10:04AM | 8 | Q.  What did he say? |
| 10:04AM | 9 | A.  He said, isn't he friends with your brother-in-law? |
| 10:04AM | 10 | Q.  What was his tone of voice when Bongiovanni said to you, |
| 10:04AM | 11 | isn't he friends with your brother-in-law? |
| 10:04AM | 12 | A.  It was almost accusatory. |
| 10:04AM | 13 | Q.  Did you -- who did you believe he was referring to when |
| 10:04AM | 14 | he said that?  Your brother-in-law? |
| 10:04AM | 15 | A.  My wife's brother, Phil Domiano. |
| 10:04AM | 16 | Q.  Okay.  And I'm just gonna kind of work my way through it. |
| 10:04AM | 17 | In that sentence when Bongiovanni says isn't he friends with |
| 10:04AM | 18 | your brother-in-law, who is the "he" referring to? |
| 10:04AM | 19 | A.  Gerace. |
| 10:04AM | 20 | Q.  Did you respond to that? |
| 10:04AM | 21 | A.  Yes. |
| 10:04AM | 22 | Q.  What'd you say? |
| 10:04AM | 23 | A.  I said, yes, he is.  They are friends.  And my |
| 10:04AM | 24 | brother-in-law has caused me -- I said, and he has caused me |
| 10:04AM | 25 | and my wife a lot of problems in the past. |

10:04AM     1    Q.  After you said that, who spoke next?

10:04AM     2    A.  He did.

10:05AM     3    Q.  What did -- who's "he?"

10:05AM     4    A.  Bongiovanni.

10:05AM     5    Q.  What did Bongiovanni say when you told him, yeah, you

10:05AM     6    know, he's friends -- yes, my brother-in-law has caused me

10:05AM     7    and my family problems in the past, what did he say next?

10:05AM     8    A.  Something to the effect of it sounds like he's your

10:05AM     9    problem.

10:05AM    10    Q.  Are you Italian, Special Agent Casullo?

10:05AM    11    A.  Italian by descent.  Was my father was Italian, my

10:05AM    12    grandparents were from Italy.  My mother's -- my mother was

10:05AM    13    Italian, so yes.

10:05AM    14    Q.  Special Agent Bongiovanni, did you have an understanding

10:05AM    15    that he was of Italian descent as well?

10:05AM    16    A.  I did have an understanding of that as well, yes.

10:05AM    17    Q.  Did he bring that up during the conversation?

10:05AM    18    A.  Yes, he did.

10:05AM    19    Q.  Can you describe that for the jury, what did he say?

10:05AM    20    A.  He asked me if I hated Italians.

10:05AM    21    Q.  What was his tone of voice when he asked you if you hated

10:05AM    22    Italians?

10:05AM    23    A.  Still almost accusatory, upset.  Yeah.  It was a very,

10:05AM    24    very direct thing that he asked me.

10:05AM    25    Q.  When he asked you if you hated Italians, what did you

10:06AM     1    interpret his meaning to be in the conversation, in the

10:06AM     2    context of the conversation?

10:06AM     3    A.  Sure.  I took that to mean that I was unfairly -- that he

10:06AM     4    didn't want me to target Peter Gerace.  That Peter Gerace is

10:06AM     5    Italian, and -- and why are you targeting other Italians?

10:06AM     6    Like, why would you be that guy doing that?  That's how I

10:06AM     7    took it.

10:06AM     8        You're Italian.  You're gonna target another Italian?

10:06AM     9    That type of thing.

10:06AM    10    Q.  Did that matter to you at all?

10:06AM    11    A.  Did what?

10:06AM    12    Q.  Investigating someone else who was Italian?

10:06AM    13    A.  No.

10:06AM    14    Q.  Did you care about that?

10:06AM    15    A.  No.

10:06AM    16    Q.  In your 20-plus-year career in law enforcement, has that

10:06AM    17    ever mattered to you?

10:06AM    18    A.  No.  And no one has ever said anything like that to me

10:06AM    19    before either.  Ever.

10:06AM    20    Q.  Did you -- did you respond to that when the def -- when

10:06AM    21    Bongiovanni said to you, what, do you hate Italians?

10:06AM    22    A.  I said no.

10:06AM    23    Q.  After you said no, who spoke next?

10:06AM    24    A.  He did.

10:06AM    25    Q.  What did Bongiovanni say next?

| | | |
|---|---|---|
| 10:06AM | 1 | A.  He said a horrible racial slur. |
| 10:06AM | 2 | Q.  Okay.  So, I'm not gonna ask you to say the exact words, |
| 10:07AM | 3 | I'm gonna ask you a -- I'm gonna ask you to recount what |
| 10:07AM | 4 | Bongiovanni said to you, but you can't use the actual words. |
| 10:07AM | 5 | So tell the jury what he said to you. |
| 10:07AM | 6 | A.  He said, we should be investigating black people, but he |
| 10:07AM | 7 | used the N-word, and he said that we should be investigating |
| 10:07AM | 8 | Hispanic people, but he used an S-word that was a slur. |
| 10:07AM | 9 | Q.  When he said that to you, what was Bongiovanni's tone of |
| 10:07AM | 10 | voice like? |
| 10:07AM | 11 | A.  He said it quieter.  Not like a whisper, but his voice |
| 10:07AM | 12 | wasn't as elevated.  It was lower.  It was quieter. |
| 10:07AM | 13 | Q.  You described earlier when he was making statements to |
| 10:07AM | 14 | you throughout this conversation, that he was elevated and |
| 10:07AM | 15 | upset, do you remember describing him being like that? |
| 10:07AM | 16 | A.  Yes. |
| 10:07AM | 17 | Q.  When he makes this comment to you using racial slurs that |
| 10:07AM | 18 | start with the letter N and the letter S talking about who he |
| 10:07AM | 19 | thinks you should be investigating, did he lower his tone of |
| 10:07AM | 20 | voice? |
| 10:07AM | 21 | A.  It -- it again, it wasn't a whisper.  It was almost like |
| 10:08AM | 22 | he didn't want other people to hear, but we were the only two |
| 10:08AM | 23 | in the room. |
| 10:08AM | 24 | Q.  Was it, I guess my question is, was it quieter than |
| 10:08AM | 25 | earlier parts of the conversation? |

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

14

10:08AM    1    A.  Yes.

10:08AM    2    Q.  Were you inside of a federal law enforcement workplace

10:08AM    3    when that conversation is happening?

10:08AM    4    A.  Yes.

10:08AM    5    Q.  When Bongiovanni told you that you should be

10:08AM    6    investigating N-words and S-words, what was your immediate

10:08AM    7    reaction to that?

10:08AM    8    A.  Again, shocked.  Disbelief.  Anger.  That another federal

10:08AM    9    agent would think that I -- or, assume that I would be okay

10:08AM   10    with someone saying that to me.

10:08AM   11        So besides the shock of what he said, the insult to me

10:08AM   12    that I would be okay with that.  That even if he felt that

10:08AM   13    way, that he would say that in front of me.

10:08AM   14    Q.  Who's the next person that spoke after Bongiovanni said

10:08AM   15    that to you?

10:08AM   16    A.  I did.

10:08AM   17    Q.  What did you say?

10:08AM   18    A.  I said, we should be investigating all criminals.

10:08AM   19    Q.  Did he respond to that?  Or did you keep talking?

10:09AM   20    A.  No.  He -- he -- he did go on to say something else.

10:09AM   21    Q.  Okay.  Let's -- we'll pause there for a second.

10:09AM   22        So at this time, in your mind you've described yourself,

10:09AM   23    I think, as shocked and reeling.  Does your, kind of,

10:09AM   24    motivation or -- or drive for what should happen during this

10:09AM   25    conversation change once he says that?

10:09AM  1    A.  It's all -- I'm trying to process all of this.  And I'm

10:09AM  2    changing from initially when I went in thinking what I was

10:09AM  3    walking into and what I was trying to address, to at this

10:09AM  4    point, trying to process what he had said earlier, what he

10:09AM  5    just said to me with the racial slurs.  And processing -- it

10:09AM  6    was almost like things that I've learned in law enforcement

10:09AM  7    to stay calm in really bad situations, figure out a way to

10:09AM  8    get out of it, and not alarm him.

10:09AM  9        Because at this point, something's terribly wrong, and I

10:09AM  10   don't want him to know that I feel this way because

10:10AM  11   something's terribly wrong.  And trying to almost hopefully

10:10AM  12   have an opportunity to just get out of that conference room

10:10AM  13   and figure out what the hell I'm gonna do.

10:10AM  14   Q.  In the aftermath of that moment that you just described,

10:10AM  15   did Bongiovanni make some statements to kind of walk back

10:10AM  16   what he had just said?

10:10AM  17   A.  He did.

10:10AM  18   Q.  What did he say?

10:10AM  19   A.  He said that Gerace was more of a white collar criminal,

10:10AM  20   that he was more of a drug user.

10:10AM  21            **MR. FOTI:**  Judge, I'm going to object again.

10:10AM  22            **THE COURT:**  No.  Overruled.

10:10AM  23            **THE WITNESS:**  So, it was almost like he was walking

10:10AM  24   it back.  Which was initially, to me, a relief and an

10:10AM  25   opportunity and a segue to have this -- to get out of this

| | | |
|---|---|---|
| 10:10AM | 1 | situation. |
| 10:10AM | 2 | **BY MR. COOPER:** |
| 10:10AM | 3 | Q.  All right.  Let's stay on that point for one second. |
| 10:11AM | 4 | At the DEA, as a special agent, is your primary focus |
| 10:11AM | 5 | investigating white collar criminals? |
| 10:11AM | 6 | A.  No. |
| 10:11AM | 7 | Q.  Okay.  Does the DEA primarily investigate crimes like |
| 10:11AM | 8 | wire fraud or bank fraud? |
| 10:11AM | 9 | A.  No. |
| 10:11AM | 10 | Q.  Does the DEA generally pursue investigations against |
| 10:11AM | 11 | people who are primarily or exclusively drug users? |
| 10:11AM | 12 | A.  No. |
| 10:11AM | 13 | Q.  When Bongiovanni said to you that this defendant, Gerace, |
| 10:11AM | 14 | was more of a white collar type, fraud-type criminal and more |
| 10:11AM | 15 | of a drug user, did you develop an impression of what |
| 10:11AM | 16 | Bongiovanni was trying to get you to do? |
| 10:11AM | 17 | A.  Oh, yeah.  Yes. |
| 10:11AM | 18 | Q.  Tell them about that. |
| 10:11AM | 19 | A.  Yeah.  To -- to not investigate Gerace.  He wasn't worth |
| 10:11AM | 20 | investigating, right?  He's a white collar criminal, he's not |
| 10:11AM | 21 | a drug trafficker, he's just a user.  He's not a drug |
| 10:11AM | 22 | trafficker, we shouldn't be doing this.  Why are we wasting |
| 10:11AM | 23 | our time? |
| 10:11AM | 24 | Q.  Is that how you interpreted it? |
| 10:11AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:11AM | 1 | Q.  Did Bongiovanni make statements to you about what he |
| 10:12AM | 2 | would be willing to do if Gerace was, in fact, a drug dealer? |
| 10:12AM | 3 | A.  He did say something. |
| 10:12AM | 4 | Q.  What'd he say? |
| 10:12AM | 5 | A.  He said that if he was dirty, he would nail him to the |
| 10:12AM | 6 | wall. |
| 10:12AM | 7 | Q.  Did you believe that at that point in the conversation? |
| 10:12AM | 8 | A.  No.  No, of course not. |
| 10:12AM | 9 | Q.  Was that, based on your participation in the |
| 10:12AM | 10 | conversation, was that completely inconsistent with |
| 10:12AM | 11 | everything he had said so far? |
| 10:12AM | 12 | A.  It was bizarre.  It was bizarre.  To see someone act the |
| 10:12AM | 13 | way he did initially, to the point and turn this around.  I |
| 10:12AM | 14 | don't know if he thought I would still be okay with what he |
| 10:12AM | 15 | had said. |
| 10:12AM | 16 | **MR. FOTI:**  Objection. |
| 10:12AM | 17 | **THE COURT:**  Sustained.  Just answer the questions, |
| 10:12AM | 18 | please. |
| 10:12AM | 19 | **BY MR. COOPER:** |
| 10:12AM | 20 | Q.  Was it -- I'm going to move on to another question |
| 10:12AM | 21 | Mr. Casullo. |
| 10:12AM | 22 | Did you see that last statement, if he's dirty I'll nail |
| 10:12AM | 23 | him to a wall, did you see that as kind of a way out of the |
| 10:12AM | 24 | conversation in the conference room? |
| 10:12AM | 25 | A.  Yes. |

10:13AM    1    Q.  What happened next?

10:13AM    2    A.  I can't remember if anything was else -- was said

10:13AM    3    relating to that.  But he did go on to say that Gerace's

10:13AM    4    parents were having a 50th wedding anniversary, and his

10:13AM    5    parents were going to be going, Joe Bongiovanni's parents

10:13AM    6    were going to be going to the 50th wedding anniversary.

10:13AM    7    Q.  Did he explain when that was happening?

10:13AM    8    A.  From what I remember it was, like, soon.  I think it was

10:13AM    9    either, like, the next day.  It was, like, very, very soon to

10:13AM    10   when we were talking.

10:13AM    11   Q.  At that point when Bongiovanni is saying that to you, has

10:13AM    12   the temperature lowered a little bit in the conversation?

10:13AM    13   A.  Yes.

10:13AM    14   Q.  Is he still elevated like he was earlier?

10:13AM    15   A.  No.

10:13AM    16   Q.  Had you pushed back and told him I'm continuing my

10:13AM    17   investigation no matter what?  Did you say that to him?

10:13AM    18   A.  No.

10:13AM    19   Q.  And did he kind of cool down?

10:13AM    20   A.  Yes.  Yeah.  He appeared to.

10:14AM    21   Q.  Did you walk out of that room with the impression that

10:14AM    22   Special Agent Bongiovanni did not want you to investigate

10:14AM    23   Peter Gerace?

10:14AM    24   A.  Oh, absolutely.

10:14AM    25   Q.  Fair to say it was a strong impression that you had --

10:14AM    1    A.  Very strong.

10:14AM    2    Q.  -- at that point?

10:14AM    3    A.  Very strong.

10:14AM    4    Q.  At that point, how long had you been a member of the DEA

10:14AM    5    Buffalo resident office?

10:14AM    6    A.  Oh, not even a year.  Eight months, maybe.

10:14AM    7    Q.  How long had Bongiovanni been there?

10:14AM    8    A.  To the best of my knowledge, maybe 18 years.

10:14AM    9    Q.  Up until that point, that day, in the conference room,

10:15AM   10    had anything like that ever happened to you in your DEA

10:15AM   11    career?

10:15AM   12    A.  Not only my DEA career, but my entire law enforcement

10:15AM   13    career, never.  Never.

10:15AM   14    Q.  When you left that conference room after the

10:15AM   15    conversation, did you walk down the hallway and report what

10:15AM   16    happened immediately to your supervisor?

10:15AM   17    A.  No.

10:15AM   18    Q.  Did you eventually report what happened to a DEA

10:15AM   19    supervisor?

10:15AM   20    A.  Yes.

10:15AM   21    Q.  How long after it happened?

10:15AM   22    A.  So that was the summer of 2016.  It was almost -- almost

10:15AM   23    two years.

10:15AM   24    Q.  Did you report it sometime around the summer of 2018?

10:15AM   25    A.  Yes.

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

10:15AM  1   Q.  I want you to explain to the jury now why you waited two

10:15AM  2   years to tell a DEA supervisor what Joseph Bongiovanni said

10:15AM  3   to you in the conference room.

10:15AM  4   A.  There are numerous reasons.  First, walking out of there,

10:15AM  5   being in shock, trying to figure out as horrible as the

10:16AM  6   racist slurs were, was he involved in some coverup of

10:16AM  7   criminal activity.  Confusion.  How do I handle this?

10:16AM  8        Knowing that if I did report the racist comments, knowing

10:16AM  9   in my experience in law enforcement, sometimes, and it's not

10:16AM  10  uncommon, to get backlash from other agents or officers in

10:16AM  11  the office thinking you're snitching on another agent.  Not

10:16AM  12  being trusted by agents again.  Even management, even

10:16AM  13  management, the backlash possible for management.  Management

10:16AM  14  doesn't want to the have to deal with an internal affairs

10:16AM  15  investigation.

10:16AM  16       And I know it's going right to internal affairs if I say

10:16AM  17  that.  I know, I have that knowledge, that if someone says

10:16AM  18  something like that, that is going to go to an internal

10:16AM  19  affairs investigation.

10:16AM  20       So, as horrible as that is to say, it was almost for

10:16AM  21  myself, knowing that the repercussions of that for me.

10:17AM  22  Q.  Were you worried about being ostracized in an office that

10:17AM  23  you had just gotten assigned to?

10:17AM  24  A.  Yeah, and I had just gotten back to Buffalo, I hadn't

10:17AM  25  even been there a year.  And it took two years of working in

10:17AM  1  New York to even get there.  And I'm thinking I'm here eight

10:17AM  2  months, and all of a sudden I'm gonna be in the middle of

10:17AM  3  this mess.  And I didn't know how to handle it, and I didn't

10:17AM  4  report it to the supervisor.

10:17AM  5  Q.  Did you do the right thing?

10:17AM  6  A.  That is not the right way to handle that.

10:17AM  7  Q.  Looking back, in hind sight now, should you have gone to

10:17AM  8  a supervisor and reported it immediately?

10:17AM  9  A.  Yes.  I should have went through my chain of command and

10:17AM  10  reported that immediately.

10:17AM  11     There was also concern that he was gonna tell Gerace that

10:17AM  12  I was investigating him.  That was a large part of it.

10:17AM  13     Through my whole time -- when I was in there in that

10:17AM  14  office with him and coming out, it was clear in my head at

10:17AM  15  the forefront of it was he's just gonna tell Gerace.

10:17AM  16  Q.  Let's stay on that topic for a second.

10:18AM  17     After that conversation in the conference room with

10:18AM  18  Special Agent Bongiovanni, do you receive an out of the blue,

10:18AM  19  unexpected contact from Peter Gerace?

10:18AM  20  A.  Short time after that, I believe it was a couple weeks, I

10:18AM  21  received a phone call.

10:18AM  22  Q.  Describe that for the jury.

10:18AM  23  A.  I was not at work, I was at home.  I don't remember if it

10:18AM  24  was a weekend.  I got a call on my personal cell phone, not

10:18AM  25  my work cell phone, and it was a 716 number.  I didn't

10:18AM 1    recognize the number, but figured if it was 716 number and

10:18AM 2    it's calling the Vegas number, it's probably someone I know.

10:18AM 3         And I answered it.  And the person on the other end said

10:18AM 4    that they just saw a friend of mine, I think that they were

10:18AM 5    in Ellicottville and they just saw a friend.  And I had no

10:19AM 6    idea who was on the other end saying this.

10:19AM 7    Q.  Okay.  Who was the person that called you?

10:19AM 8    A.  I said, who is this?  He said, it's Gerace.

10:19AM 9    Q.  Did you have the person's phone number saved?

10:19AM 10   A.  No.

10:19AM 11   Q.  Did you recognize the phone number when it called you?

10:19AM 12   A.  No.

10:19AM 13   Q.  Had you ever spoken to Peter Gerace on the phone before

10:19AM 14   that?

10:19AM 15   A.  Peter Gerace has never called me in my entire life up

10:19AM 16   until that point.

10:19AM 17   Q.  Up until just a couple weeks after this conversation with

10:19AM 18   Bongiovanni?

10:19AM 19   A.  Yes.  Ever.

10:19AM 20   Q.  The person that Gerace was telling you on the phone that

10:19AM 21   he saw in Ellicottville, was that person someone you knew or

10:19AM 22   were friends with?

10:19AM 23   A.  The person he was talking about was a close friend of

10:19AM 24   mine that I didn't even know he knew.

10:19AM 25   Q.  Do you know how Peter Gerace got your phone number?

10:19AM    1    A.  Yes.

10:19AM    2    Q.  Can you describe that for the jury.

10:19AM    3    A.  Yes.  So, when I worked in New York City, I would come

10:19AM    4    home back to Buffalo where my family was, where our house is,

10:19AM    5    as frequent as I could.

10:20AM    6        On one of those trips home, I was still actually just

10:20AM    7    pulling into Buffalo after driving for six hours, it was late

10:20AM    8    at night -- not late, but probably about around 9:00 -- I

10:20AM    9    told my wife that I was going to stop at Brennan's Pub on

10:20AM    10   Transit to get some chicken wings before I came home.

10:20AM    11   Q.  Let me pause you right there.  Just give us a time frame.

10:20AM    12   You mentioned this is before you came back to Buffalo.  Would

10:20AM    13   this have been -- what year, you think?

10:20AM    14   A.  So I was in New York City from December '13, so probably

10:20AM    15   would have been somewhere around 2013, '14.

10:20AM    16   Q.  Okay.

10:20AM    17   A.  '14, probably 2014.

10:20AM    18   Q.  Was 2014 about two years earlier than you initiated this

10:20AM    19   investigation into Gerace?

10:20AM    20   A.  Yes.

10:20AM    21   Q.  Okay.  All right.  Continue with the -- the how Gerace

10:20AM    22   got your phone number.

10:20AM    23   A.  So, I told my wife I was gonna go to Brennan's to get

10:20AM    24   chicken wings for my dinner, it was late.

10:20AM    25       She mentioned that her brother was already up there.  So

10:21AM    1    her brother had moved from Las Vegas back to Buffalo at some

10:21AM    2    point while I was in New York City.  And he said -- she said

10:21AM    3    that her brother was up at Brennan's with another friend.

10:21AM    4        And I said, okay.  Well, I'm going there for wings.  And

10:21AM    5    that's what I did.  I went to Brennan's.  And when I walked

10:21AM    6    in, I did see her brother, he was there with another friend

10:21AM    7    of his who I know, as well, from growing up in Kenmore.

10:21AM    8        And while I was there eating my chicken wings, Gerace

10:21AM    9    showed up and walked in.

10:21AM   10    Q.  How did he get your phone number as a result of that?

10:21AM   11    A.  So, when he walked in, which was unexpected to me,

10:21AM   12    because while I was with my wife's brother and the other

10:21AM   13    friend, they never said that Gerace was gonna be showing up.

10:21AM   14    So when he did show up, I was, number 1, surprised, number 2,

10:21AM   15    I was pissed off at her brother that he didn't mention it

10:22AM   16    because he knew I didn't want to be around Peter Gerace, I

10:22AM   17    wouldn't associate with someone like Peter Gerace.

10:22AM   18        But, anyways, I'm in this situation.  I saw Gerace.  We

10:22AM   19    said hi.  I continued to eat my wings, finish my wings.  I

10:22AM   20    was probably there for maybe, I don't know, another 20

10:22AM   21    minutes.  While I was there, my wife called to ask where I

10:22AM   22    was, when I was coming home.

10:22AM   23        I said that I'd be coming home shortly, that I was there

10:22AM   24    with her brother finishing my wings.  And when I hung up the

10:22AM   25    phone, Gerace asked me for my cell phone number.  And I gave

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

10:22AM    1    it to him.

10:22AM    2        I couldn't think of a reason not to.  He caught me off

10:22AM    3    guard.  It was my personal cell phone, so I gave him my cell

10:22AM    4    phone number.

10:22AM    5    Q.  Did you go to Brennan's that night planning to meet your

10:22AM    6    wife's brother?

10:22AM    7    A.  No.  No.

10:22AM    8    Q.  Did you go to Brennan's that night planning to meet this

10:22AM    9    defendant?

10:22AM   10    A.  No.

10:22AM   11    Q.  Okay.  From that time in 2014 when you provided your cell

10:23AM   12    phone number to the defendant, until the conversation that

10:23AM   13    you had with Bongiovanni in the conference room, did Gerace

10:23AM   14    ever reach out to you and call you on the phone?

10:23AM   15    A.  He never called me on the phone.

10:23AM   16    Q.  Did he ever text you?

10:23AM   17    A.  He did text me once after I gave him the cell phone

10:23AM   18    number.

10:23AM   19    Q.  Describe that for me.

10:23AM   20    A.  I believe it was, again, in 2014, I was actually home

10:23AM   21    again.  It was during -- I think it was 2014, there was a bad

10:23AM   22    storm.  I was home, I didn't have to go back to work for a

10:23AM   23    few days, I was actually shoveling snow.  And I got a text

10:23AM   24    message.  It was from a 716 number, didn't recognize it.  And

10:23AM   25    it said something like, hey, special agent, how's everything

10:23AM    1    going in New York?

10:23AM    2         And I texted back, who is this?

10:23AM    3         And he said, it's Gerace.

10:24AM    4         And I said, oh, things are good, Peter.  Things are fine.

10:24AM    5    I don't remember what I -- Peter, or Gerace -- yeah, Peter.

10:24AM    6    I wouldn't have wrote Gerace.  Things are fine.

10:24AM    7         He asked how things were with my family.

10:24AM    8         I said, things are fine with my family.  Hope you're

10:24AM    9    doing well.  And that was it.

10:24AM   10    Q.  Did you carry on months long of text message

10:24AM   11    conversations with him?

10:24AM   12    A.  No.  No.  And, again, caught off guard, shocked.  I

10:24AM   13    remember going upstairs saying, it's weird, Gerace just

10:24AM   14    texted me.

10:24AM   15         And my wife was kind of, not approving of that, why would

10:24AM   16    he text you?  And that was really it at the time.

10:24AM   17    Q.  All right.  At any point in your whole life, have you

10:24AM   18    been friends with this defendant?

10:24AM   19    A.  No.

10:24AM   20    Q.  Did you socialize together?

10:24AM   21    A.  Never hung out, never went to each other's houses, never

10:24AM   22    called each other, never socialized.  No.

10:24AM   23    Q.  Can you describe for this jury the context of how you

10:25AM   24    ultimately reported to a DEA supervisor the comments that

10:25AM   25    Bongiovanni made to you in the conference room?

10:25AM  1   A.  Explain when that happened?

10:25AM  2   Q.  Explain how it happened, yep.

10:25AM  3   A.  So I was requested to go over to the U.S. Attorney's

10:25AM  4   Office for a meeting.  And I can't remember if they requested

10:25AM  5   for my supervisor to go, but my supervisor did go with me.

10:25AM  6   So me and my supervisor at the time, and I'm in a different

10:25AM  7   group now, not the one from when I was in the group with

10:25AM  8   Bongiovanni, but the task force group.  We both went over to

10:25AM  9   the U.S. Attorney's Office.

10:25AM  10      And while we were at the U.S. Attorney's Office, it was

10:25AM  11  brought to my attention that they had found a report where a

10:25AM  12  girl was found in a parking lot outside of Pharaoh's.

10:25AM  13          **MR. FOTI:**  Objection.

10:25AM  14          **THE COURT:**  Yeah, sustained.

10:26AM  15          **BY MR. COOPER:**

10:25AM  16  Q.  I'm going to ask you some specific questions to try to

10:25AM  17  just tighten up the area that we're covering here.

10:26AM  18      First of all, after that conversation in the conference

10:26AM  19  room with Bongiovanni, did that kind of grind to a halt your

10:26AM  20  investigation into Peter Gerace?

10:26AM  21  A.  The -- the only thing that really progressed initially

10:26AM  22  and after that conversation in the conference room was

10:26AM  23  several things with Anthony Gerace that were brought to my

10:26AM  24  attention, him being a marijuana trafficker.

10:26AM  25  Q.  Okay.  So I'm not asking about things that were brought

| | | |
|---|---|---|
| 10:26AM | 1 | to your attention. |
| 10:26AM | 2 | Did you continue after that conversation with Bongiovanni |
| 10:26AM | 3 | to actively pursue an investigation of Peter Gerace, or did |
| 10:26AM | 4 | that conversation kind of beat you back a little bit? |
| 10:26AM | 5 | A.  It slowed things down tremendously. |
| 10:26AM | 6 | Q.  Okay.  'Cuz now we're talking about two years later, I'm |
| 10:26AM | 7 | asking you about how things get brought to the attention of |
| 10:26AM | 8 | your supervisor. |
| 10:26AM | 9 | A.  Right. |
| 10:26AM | 10 | Q.  Is that the summer of 2018? |
| 10:26AM | 11 | A.  Yes. |
| 10:26AM | 12 | Q.  Okay.  And are you made aware that the U.S. Attorney's |
| 10:26AM | 13 | Office is -- is looking for information relating to Peter and |
| 10:26AM | 14 | Anthony Gerace? |
| 10:26AM | 15 | A.  Yes, I was made aware of that. |
| 10:27AM | 16 | Q.  Okay.  After you were made aware of that, did you |
| 10:27AM | 17 | participate in some proffers that were going on with the U.S. |
| 10:27AM | 18 | Attorney's Office and other law enforcement agencies? |
| 10:27AM | 19 | A.  I did participate in a proffer with -- |
| 10:27AM | 20 | Q.  Okay.  Just -- |
| 10:27AM | 21 | A.  Yes. |
| 10:27AM | 22 | Q.  Yep.  Were you informed by the U.S. Attorney's Office to |
| 10:27AM | 23 | look back for historical reporting information regarding |
| 10:27AM | 24 | Peter or Anthony Gerace? |
| 10:27AM | 25 | A.  Yes. |

10:27AM 1    Q.  Okay.  Does that mean go back and look back for old

10:27AM 2    reports in your DEA computer system?

10:27AM 3    A.  Pretty much.  Pretty much, yep.

10:27AM 4    Q.  Were you the only law enforcement agency that was

10:27AM 5    participating at that point with the U.S. Attorney's Office?

10:27AM 6    A.  No.

10:27AM 7    Q.  Okay.  Did you go back and do your part at the DEA to

10:27AM 8    look for historical reporting information on Gerace?

10:27AM 9    A.  Yes.

10:27AM 10   Q.  Did you find a report related to Gerace from back in 2008

10:27AM 11   or '9?

10:27AM 12   A.  I did.

10:27AM 13   Q.  Okay.  Was that your report?

10:27AM 14   A.  No.  It wasn't a report that I wrote.

10:28AM 15   Q.  Where were you in 2009?

10:28AM 16   A.  In 2009, I was in Las Vegas.

10:28AM 17   Q.  Okay.

10:28AM 18   A.  Still.

10:28AM 19   Q.  Whose report was it that you encountered?

10:28AM 20   A.  It was a report written by Joseph Bongiovanni.

10:28AM 21   Q.  Did you provide that report to the U.S. Attorney's

10:28AM 22   Office?

10:28AM 23   A.  Yes.

10:28AM 24   Q.  Why?

10:28AM 25   A.  Because I was requested to see if there were any

10:28AM    1    historical reports, reports of investigation by DEA, on

10:28AM    2    either Peter or Anthony Gerace.

10:28AM    3    Q.  Did you review the contents of the report that

10:28AM    4    Bongiovanni drafted regarding Gerace?

10:28AM    5    A.  Yes, I did.

10:28AM    6    Q.  What was your impression of that report given what you

10:28AM    7    had learned over the course of -- of several years leading up

10:28AM    8    to 2018?

10:28AM    9    A.  That that was a fake report, and he was lying, calling--

10:28AM    10         **MR. FOTI:**  Objection.

10:28AM    11         **THE COURT:**  Overruled.

10:28AM    12         **BY MR. COOPER:**

10:28AM    13    Q.  Go ahead.

10:28AM    14    A.  -- and that he was lying, calling Peter Gerace his

10:29AM    15    informant.

10:29AM    16    Q.  When you looked at it, when you laid eyes on it for the

10:29AM    17    first time, were alarm bells going off in your head?

10:29AM    18    A.  I knew immediately when I read it.  Immediately.

10:29AM    19    Q.  You called it a fake report.  What do you mean by that?

10:29AM    20    A.  Fake in the sense that he was lying in the report.

10:29AM    21         **MR. FOTI:**  Objection.

10:29AM    22         **THE COURT:**  Overruled.

10:29AM    23         **BY MR. COOPER:**

10:29AM    24    Q.  Go ahead.

10:29AM    25    A.  He was lying in the report.  He was calling a friend of

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

| | | |
|---|---|---|
| 10:29AM | 1 | his his informant.  He named him by name in the narrative |
| 10:29AM | 2 | section of a DEA report, which you never do, you only do it |
| 10:29AM | 3 | by a number.  The report wasn't indexed properly.  There were |
| 10:29AM | 4 | several things that were wrong about the report. |
| 10:29AM | 5 | MR. COOPER:  Just give me one second.  I'd like to |
| 10:29AM | 6 | pull up what's in evidence as Government Exhibit 30A. |
| 10:29AM | 7 | BY MR. COOPER: |
| 10:29AM | 8 | Q.  Can you see this on your screen, sir? |
| 10:30AM | 9 | A.  Yes. |
| 10:30AM | 10 | Q.  Do you recognize it? |
| 10:30AM | 11 | A.  Just give me one moment, please.  Yes. |
| 10:30AM | 12 | Q.  Is this the fake report that you were referencing a |
| 10:30AM | 13 | minute ago? |
| 10:30AM | 14 | A.  Yes. |
| 10:30AM | 15 | Q.  When Bongiovanni spoke with you in the conference room in |
| 10:30AM | 16 | 2016, did he say, hey, Tony, don't investigate Peter Gerace, |
| 10:30AM | 17 | he's my confidential source? |
| 10:30AM | 18 | A.  No. |
| 10:30AM | 19 | Q.  Did he say, hey, Tony, don't investigate Peter Gerace, |
| 10:30AM | 20 | he's my source of information? |
| 10:30AM | 21 | A.  No. |
| 10:30AM | 22 | Q.  Did he tell you, hey, Peter Gerace, he's provided |
| 10:30AM | 23 | information in other narcotics investigations, let's work on |
| 10:30AM | 24 | it together? |
| 10:30AM | 25 | A.  No. |

10:30AM    1    Q.  None of that?

10:30AM    2    A.  No.

10:30AM    3    Q.  When you provided this report, Government Exhibit 30A, to

10:31AM    4    the U.S. Attorney's Office, can you describe for the jury how

10:31AM    5    that led to you disclosing the information about the

10:31AM    6    conversation in the conference room in 2016.

10:31AM    7    A.  Could you explain that again?

10:31AM    8    Q.  Sure.

10:31AM    9         MR. COOPER:  Actually, I'm gonna just ask for one

10:31AM   10    second, Judge, to try to make sure that we keep an answer

10:31AM   11    tight.

10:31AM   12         THE COURT:  Fine.

10:31AM   13         MR. COOPER:  Thank you.

10:31AM   14         BY MR. COOPER:

10:31AM   15    Q.  We're gonna try to walk through it chronologically here.

10:31AM   16         After you sent that report to the U.S. Attorney's Office,

10:32AM   17    did Bongiovanni ever come and approach you about that?

10:32AM   18    A.  Yes, he did.

10:32AM   19    Q.  Describe that confrontation.

10:32AM   20    A.  My partner at the time, Dave Davidzik, who was still

10:32AM   21    working in group D-57, he was a task force agent, he was from

10:32AM   22    Customs and Border Protection, CBP.  We were partners

10:32AM   23    together in D-57.  He gave me a heads-up, because he was

10:32AM   24    still working on things related to Gerace while he was in his

10:32AM   25    group.

10:32AM  1    And he said, just to give you a heads-up, Greg, meaning

10:32AM  2    the supervisor, in that group, asked Dave Davidzik why I was

10:32AM  3    over there, and Dave said he told him because Tony found a

10:32AM  4    report where Bongiovanni is calling Gerace his informant.

10:32AM  5    And my old partner told me that Greg had told Bongiovanni

10:32AM  6    that I sent that report to the U.S. Attorney's Office.

10:32AM  7    Q.  So my question is, did Bongiovanni come and confront you

10:33AM  8    about it?

10:33AM  9    A.  So because of that, shortly thereafter, I think it was

10:33AM  10   the same day, Bongiovanni confronted me at my desk.

10:33AM  11   Q.  What was his demeanor like when that happened?

10:33AM  12   A.  He was angry again.

10:33AM  13   Q.  What did he say to you?

10:33AM  14   A.  He said, what is this?  That you sent this bullshit

10:33AM  15   report that I sent to the U.S. Attorney's Office, and wrote

10:33AM  16   years ago, over to the U.S. Attorney's Office.

10:33AM  17   Q.  Was he angry?  Did he appear angry to you that you had

10:33AM  18   provided one of his reports to the U.S. Attorney's Office?

10:33AM  19   A.  He was definitely angry and rattled.

10:33AM  20   Q.  Okay.  Does the DEA work hand in hand with the U.S.

10:33AM  21   Attorney's Office?

10:33AM  22   A.  All of the time.

10:33AM  23   Q.  Is there anything strange or unusual about a DEA special

10:33AM  24   agent sending a DEA report of investigation to a federal

10:33AM  25   prosecutor's office?

10:33AM      1    A.  No, we do it all the time.

10:33AM      2    Q.  I'm going to ask you some specific questions now,

10:34AM           Mr. Casullo.

10:34AM      4       In July of 2018, were you at a proffer with an individual

10:34AM      5    named Ron Serio?

10:34AM      6    A.  Yes.

10:34AM      7    Q.  Had Mr. Serio been arrested?

10:34AM      8    A.  Yes.

10:34AM      9    Q.  Was it your understanding that he was arrested by the

10:34AM     10    Erie County Sheriff's Office and the FBI Safe Streets Task

10:34AM     11    Force?

10:34AM     12    A.  Yes.

10:34AM     13    Q.  That was not a DEA investigation; is that correct?

10:34AM     14    A.  No.

10:34AM     15    Q.  Did the U.S. Attorney's Office set up that proffer

10:34AM     16    meeting with Mr. Serio?

10:34AM     17    A.  Yes, they did, they set that up for us.

10:34AM     18    Q.  Okay.  And did the prosecutors tell you or invite you to

10:34AM     19    join that proffer?

10:34AM     20    A.  Yes.  We actually requested it to have it set up in the

10:34AM     21    U.S. Attorney's Office, set that up for us.

10:34AM     22    Q.  Okay.  Did you ever get a chance -- actually, withdrawn.

10:34AM     23       After that proffer, did you attend that actual proffer?

10:34AM     24    A.  I did.

10:34AM     25    Q.  Okay.  After that proffer, did you learn that you could

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

10:35AM    1    no longer be a case agent investigating Gerace or Serio?

10:35AM    2    A.  At some point after that, yes.

10:35AM    3    Q.  Okay.  I just want to try to nail down the timeframe

10:35AM    4    here.  That proffer, would that have been around July 20th of

10:36AM    5    2018?

10:36AM    6    A.  Yeah.

10:36AM    7    Q.  Okay.  And after that proffer, approximately two weeks

10:36AM    8    later, in early August of 2018, did you attend a meeting with

10:36AM    9    the U.S. Attorney's Office?

10:36AM    10   A.  Yes.

10:36AM    11   Q.  Who were you there with?

10:36AM    12   A.  My supervisor, Jim McHugh.

10:36AM    13   Q.  Okay.  During that Serio proffer, without getting into

10:36AM    14   anything specifically that was said, did Bongiovanni's name

10:36AM    15   come up during the Serio proffer?

10:36AM    16   A.  Yes.

10:36AM    17   Q.  Okay.  And did his name come up in a way that made him,

10:36AM    18   in your view, a possible subject of an investigation?

10:36AM    19   A.  Yes.

10:36AM    20   Q.  As a result of that, did you attend a meeting on

10:36AM    21   August 1st of 2018 with the U.S. Attorney's Office and Jim

10:36AM    22   McHugh as you described a moment ago?

10:36AM    23   A.  Yes.

10:36AM    24   Q.  During that meeting, did you report what had happened

10:36AM    25   back in July of 2016?

Case 1:19-cr-00227-LJV-MJR    Document 1506    Filed 04/26/25    Page 36 of 154
USA v Gerace - Casullo - Cooper/Direct - 11/21/24

36

10:36AM  1    A.   That's when I reported the things that Joe said regarding

10:36AM  2    the racial slurs.

10:36AM  3    Q.   Was that the first time that you had officially reported

10:36AM  4    it to your chain of command?

10:37AM  5    A.   To my chain of command, yes.

10:37AM  6    Q.   Had you told anyone else about it before that?

10:37AM  7    A.   Oh, I told several close friends shortly after it

10:37AM  8    happened, what he had said to me, agents that I trusted with

10:37AM  9    my life, one being my field training agent that worked in

10:37AM  10   Miami, another being an ex-supervisor in Washington, D.C.  A

10:37AM  11   couple agents in the office that were close friends of mine,

10:37AM  12   one that I worked in with in New York.  Just a handful of

10:37AM  13   very close people.

10:37AM  14   Q.   Was this conversation in early August of 2018 the first

10:37AM  15   time that you reported it to a supervisor in the Buffalo

10:37AM  16   resident office?

10:37AM  17   A.   Yes.

10:37AM  18   Q.   Were you instructed at that point during that August 1st,

10:37AM  19   2018 meeting, that you were going to be essentially walled

10:37AM  20   off from investigations into Bongiovanni or Gerace?

10:37AM  21   A.   I was told by my office, my resident agent in charge, Ed

10:37AM  22   Orgon, shortly after that, that I was no longer to work the

10:38AM  23   Gerace investigation.

10:38AM  24        **MR. COOPER:**  You can take 30A down please,

10:38AM  25   Ms. Champoux.

10:38AM  1            **BY MR. COOPER:**

10:38AM  2  Q.  The last topic that I want to cover with you is something

10:38AM  3  called DARTS.  Are you familiar with that?

10:38AM  4  A.  Yes.

10:38AM  5  Q.  Can you explain to the jury, I don't think we've spent

10:38AM  6  time on this yet, what is DARTS?

10:38AM  7  A.  So DARTS is a deconfliction system, a DEA deconfliction

10:38AM  8  system.  Meaning that you can query -- you can input phone

10:38AM  9  numbers into this system, along with email addresses, serial

10:39AM 10  numbers from telephones, but mainly it's for telephone

10:39AM 11  numbers.  You can input it into the system to see if other --

10:39AM 12  other agencies or other agents are looking at the same

10:39AM 13  telephone numbers, looking at possibly the same targets.

10:39AM 14  Q.  Does DEA have offices all across the United States of

10:39AM 15  America?

10:39AM 16  A.  Oh, not the just U.S., but globally as well.

10:39AM 17  Q.  Okay.  And do drug traffickers also function across state

10:39AM 18  lines and across country borders?

10:39AM 19  A.  Globally, nationally, yes.

10:39AM 20  Q.  So, does this DARTS deconfliction system allow an agent

10:39AM 21  in a local office like the Buffalo resident office to see if

10:39AM 22  a specific phone number has come up in other areas like

10:39AM 23  Los Angeles, or Honolulu, or anything like that?

10:39AM 24  A.  All the time.

10:39AM 25  Q.  Okay.  And is that a very common system that's used by

10:39AM   1   DEA special agents?

10:39AM   2   A.  I used it daily.

10:39AM   3   Q.  If you were looking into a suspected drug trafficker's

10:39AM   4   phone number, would it be standard practice to put that

10:40AM   5   number into DARTS?

10:40AM   6   A.  It should be.

10:40AM   7   Q.  Okay.  At DEA, were you allowed to investigate people

10:40AM   8   that you were friends with?

10:40AM   9   A.  No.

10:40AM  10   Q.  Okay.  So if you had a close personal friendship with

10:40AM  11   someone, could you be the lead case agent investigating them?

10:40AM  12   A.  No.

10:40AM  13   Q.  How about their family members?

10:40AM  14   A.  No.

10:40AM  15   Q.  Why not?

10:40AM  16   A.  There'd be a conflict of interest.  There would always be

10:40AM  17   a risk of being put in a situation as an agent of being

10:40AM  18   compromised, possibly.

10:40AM  19   Q.  Is DARTS a law enforcement tool?

10:40AM  20   A.  It's a -- DARTS is a law -- DEA law enforcement system.

10:40AM  21   Q.  Okay.  Are you supposed to use it for law enforcement

10:40AM  22   purposes?

10:40AM  23   A.  Official purposes only.  There's actually a warning when

10:40AM  24   you log on every time stating that.

10:40AM  25   Q.  So could you just run your wife's phone number in DARTS

10:40AM    1    for kicks, you know, kicks and giggles or not?

10:41AM    2    A.  Oh, no.  No.  You could get in a lot of trouble for that.

10:41AM    3    Probably fired, actually.

10:41AM    4    Q.  Now, if you uploaded a certain number, let's say John

10:41AM    5    Smith, you put John Smith's phone number in DARTS.  If

10:41AM    6    another agent in a different office had already uploaded that

10:41AM    7    number into DARTS, explain to the jury what would happen.

10:41AM    8    A.  So, if somebody else had already put a number in the

10:41AM    9    system, and then you query the number, it's called a hit,

10:41AM   10    meaning that it finds that number already in the system and

10:41AM   11    it sends an email back to the email account of you as the one

10:41AM   12    who just put it in.  And it also sends an email to the other

10:41AM   13    person that put it in previously.  And it kind of alerts both

10:41AM   14    sides that, hey, there's an overlap here in an investigation.

10:41AM   15        The email will typically contain the case number for both

10:41AM   16    the case that was put in initially and your case.  If they're

10:41AM   17    both DEA agents looking at the same number, there will be a

10:41AM   18    little remarks section where you can view comments, it will

10:41AM   19    also say the agent's name or the DEA analyst's name that

10:42AM   20    initially put the number in, and a contact number.  So, both

10:42AM   21    sides are seeing the same thing.

10:42AM   22    Q.  Are those DARTS deconfliction emails automatically

10:42AM   23    generated by the computer system?

10:42AM   24    A.  Yes.

10:42AM   25             MR. COOPER:  For the witness only, Ms. Champoux, can

10:42AM      1    we pull up Government Exhibit 26B, as in bravo?

10:42AM      2              **BY MR. COOPER:**

10:42AM      3    Q.  Can you just -- can you see that, Tony?

10:42AM      4    A.  Yes.

10:42AM      5              **MR. COOPER:**  Can you scroll through, Ms. Champoux, to

10:42AM      6    the next page?  And then the next page.

10:43AM      7              **BY MR. COOPER:**

10:43AM      8    Q.  Do you recognize this three-page document, sir?

10:43AM      9    A.  Yes, I do.

10:43AM     10    Q.  What do you recognize this three-page document to be?

10:43AM     11    A.  This is a DARTS deconfliction.

10:43AM     12    Q.  Okay.  And is it a DARTS deconfliction that involved a

10:43AM     13    phone number that you input into DARTS at some point during

10:43AM     14    your DEA career?

10:43AM     15    A.  Yes.

10:43AM     16    Q.  Okay.  So were you a party essentially to this

10:43AM     17    deconfliction notice?

10:43AM     18    A.  So looking at this, this is the notice from -- I put the

10:43AM     19    number into the system, and when I put the number into the

10:43AM     20    system, it generated the response back finding an overlap and

10:43AM     21    showing me what the overlaps are.  It's one of those emails I

10:43AM     22    described that I receive if it hit on a phone number.

10:43AM     23    Q.  I'm going to ask you some specific questions now, just

10:43AM     24    give me one second.

10:43AM     25        Are DARTS deconfliction notices a DEA official record?

| | | |
|---|---|---|
| 10:44AM | 1 | A.  Yes. |
| 10:44AM | 2 | Q.  Okay.  Are they made at or near the time that a DARTS |
| 10:44AM | 3 | entry is made by an agent or an analyst? |
| 10:44AM | 4 | A.  It's immediate. |
| 10:44AM | 5 | Q.  Okay.  Is that record, a DARTS deconfliction, kept in the |
| 10:44AM | 6 | ordinary course of DEA business? |
| 10:44AM | 7 | A.  Yes.  In an investigative file, yes. |
| 10:44AM | 8 | Q.  Okay.  Is the DEA under a duty to make that record in the |
| 10:44AM | 9 | regular practice of their activity? |
| 10:44AM | 10 | A.  Oh, daily. |
| 10:44AM | 11 | Q.  Okay. |
| 10:44AM | 12 |     MR. COOPER:  With that foundation, I'd offer |
| 10:44AM | 13 | Government Exhibit 26B into evidence. |
| 10:44AM | 14 |     MR. FOTI:  Objection, Judge. |
| 10:44AM | 15 |     THE COURT:  Basis? |
| 10:44AM | 16 |     MR. FOTI:  Hearsay. |
| 10:44AM | 17 |     THE COURT:  Overruled. |
| 10:44AM | 18 |     **(GOV Exhibit 26B was received in evidence.)** |
| 10:44AM | 19 |     MR. COOPER:  Go to page 1, please, Ms. Champoux. |
| 10:44AM | 20 | Thank you, ma'am. |
| 10:44AM | 21 |     BY MR. COOPER: |
| 10:44AM | 22 | Q.  So this is a three-page document, it's the first one |
| 10:45AM | 23 | we're looking at, so I just want to orient everybody. |
| 10:45AM | 24 |     At the top here, I just highlighted a section.  What are |
| 10:45AM | 25 | we looking at at the top here? |

10:45AM   1   A.  The top, the "from" is who put the number in to generate

10:45AM   2   this deconfliction.  The date and time that that was done.

10:45AM   3   And then the "to" is the overlap that I spoke about.  So

10:45AM   4   anybody else that had that number in the system, that's where

10:45AM   5   the "to" should send up.

10:45AM   6       Because it's basically saying I put the number in, so

10:45AM   7   it's from me.  And it's sending this deconfliction that I

10:45AM   8   generated out to the rest of those people.

10:45AM   9   Q.  Got it.  Earlier I asked you if these DARTS deconfliction

10:45AM  10   emails were auto-generated, and you said yes; is that right?

10:45AM  11   A.  Correct.

10:45AM  12   Q.  Where it says here that the email is from you, would it

10:45AM  13   be fair to say you didn't actually sit down and type this

10:45AM  14   email yourself?

10:45AM  15   A.  No.  Like you said, it's auto-generated.

10:45AM  16   Q.  Okay.  But because you're the person who entered the

10:45AM  17   phone number into DARTS, does it appear that it's coming from

10:46AM  18   you?

10:46AM  19   A.  Correct.  When I log into the system, it automatically

10:46AM  20   has me as the person.

10:46AM  21   Q.  Okay.  "To."  Does that list the people or the parties

10:46AM  22   that have investigative overlap with the number that you put

10:46AM  23   in?

10:46AM  24   A.  Yes.

10:46AM  25   Q.  Okay.  Do you see this email address that I just circled

10:46AM  1  there?

10:46AM  2  A.  I do.

10:46AM  3  Q.  Who's that?

10:46AM  4  A.  Joseph Bongiovanni.

10:46AM  5  Q.  Is he one of the people that had investigative overlap

10:46AM  6  with the number that you put in?

10:46AM  7  A.  Yes.

10:46AM  8  Q.  Okay.

10:46AM  9       MR. COOPER:  And then, Ms. Champoux, if we can zoom

10:46AM  10  in on the bottom portion of the page here, please?

10:46AM  11       BY MR. COOPER:

10:46AM  12  Q.  What are we looking at here, sir?  Just, like, orient us

10:46AM  13  to what's on the page.

10:46AM  14  A.  So, again, at the top, the "to" is who's receiving the

10:47AM  15  overlap.  So the other people that had that number in the

10:47AM  16  system before me.  The "from," meaning me, and then the

10:47AM  17  details that I put it in on that date and time, and my case

10:47AM  18  number, and then contact number and email.  Yep.

10:47AM  19  Q.  So up here in bold, is this your name and contact

10:47AM  20  information?

10:47AM  21  A.  Yes.

10:47AM  22  Q.  And it lists the case number you were working on?

10:47AM  23  A.  Yes.

10:47AM  24       MR. COOPER:  You can zoom out of that, please.  And

10:47AM  25  then scroll to the next page, please.  All right.

10:47AM  1         Let's now zoom in, Ms. Champoux, on that next section

10:47AM  2  right there.

10:47AM  3         **BY MR. COOPER:**

10:47AM  4  Q.  All right.  Special Agent Casullo, we're on page 2, and

10:47AM  5  we've zoomed in on the top half essentially of the page.  Is

10:47AM  6  this what the actual deconfliction itself looks like?

10:47AM  7  A.  Yes.

10:47AM  8  Q.  Where it says Trinity item, and then lists a phone

10:47AM  9  number, what is that?  What is that phone number?

10:47AM  10  A.  That's the number that I would have put into the system.

10:47AM  11  So that's the number I'm querying.

10:48AM  12  Q.  Okay.  Can you see your query or your entry into DARTS

10:48AM  13  listed underneath that phone number ending in 5553?

10:48AM  14  A.  Yes.

10:48AM  15  Q.  When did you make your entry?

10:48AM  16  A.  August 2nd, 2018.

10:48AM  17  Q.  What was the remarks section for your entry?

10:48AM  18  A.  Numbers in contact with marijuana trafficker Anthony

10:48AM  19  Gerace.

10:48AM  20  Q.  Is that the brother of Peter Gerace?

10:48AM  21  A.  Yes.

10:48AM  22  Q.  Was there an investigative overlap with a case that

10:48AM  23  Special Agent Bongiovanni was purported to be working on?

10:48AM  24  A.  Yes.

10:48AM  25  Q.  When was that entry made?

10:48AM    1    A.   That was made March 20th, 2013.

10:48AM    2    Q.   Okay.  And what was the remarks section for Bongiovanni's

10:49AM    3    investigation?

10:49AM    4    A.   Number part of ongoing narcotics investigation in contact

10:49AM    5    with target number 716-578-5296 per S.A. Bongiovanni.

10:49AM    6         MR. COOPER:  You can zoom out of that please,

10:49AM    7    Ms. Champoux.  And scroll to the next page.

10:49AM    8         BY MR. COOPER:

10:49AM    9    Q.   Are these additional -- each of these Trinity items, are

10:49AM   10    they additional phone numbers that you were running?

10:49AM   11    A.   Yeah, that was the same batch.  I running numerous

10:49AM   12    numbers, I call them batches, meaning you're running, say, 20

10:49AM   13    numbers at a time, 15 numbers at a time.  So it's the same

10:49AM   14    query.

10:49AM   15    Q.   Got it.

10:49AM   16         MR. COOPER:  We can take that down, Ms. Champoux.

10:49AM   17         Judge, would we be able to take a morning break?  Is

10:50AM   18    it too early for that, or --

10:50AM   19         THE COURT:  No, we can take a break now.

10:50AM   20         MR. COOPER:  Okay, thank you.

10:50AM   21         THE COURT:  Okay, folks, let's take our morning break

10:50AM   22    now.  So remember my instructions, don't talk with anybody

10:50AM   23    about the case, including each other.  Don't make up your

10:50AM   24    mind.

10:50AM   25         See you back here in about 15 minutes or so.

| | | |
|---|---|---|
| 10:50AM | 1 | (Jury excused at 10:50 a.m.) |
| 10:50AM | 2 | **THE COURT:**  Anything for the record from the defense? |
| 10:50AM | 3 | **MR. SOEHNLEIN:**  No, thank you, Judge. |
| 10:50AM | 4 | **THE COURT:**  From the government? |
| 10:50AM | 5 | **MS. CHALBECK:**  No, Judge. |
| 10:50AM | 6 | **THE COURT:**  Thank you very much.  See you in a few |
| 10:51AM | 7 | minutes. |
| 10:51AM | 8 | **THE CLERK:**  All rise. |
| 10:51AM | 9 | (Off the record at 10:51 a.m.) |
| 11:11AM | 10 | (Back on the record at 11:11 a.m.) |
| 11:11AM | 11 | (Jury not present.) |
| 11:11AM | 12 | **THE CLERK:**  All rise. |
| 11:11AM | 13 | **THE COURT:**  Please be seated. |
| 11:11AM | 14 | **THE CLERK:**  We are back on the record for the |
| 11:11AM | 15 | continuation of the jury trial in case number 19-cr-227 and |
| 11:11AM | 16 | 23-cr-37, United States of America versus Peter Gerace, Jr. |
| 11:11AM | 17 | All counsel and parties are present. |
| 11:11AM | 18 | **THE COURT:**  Okay.  Anything for the record? |
| 11:11AM | 19 | **MR. COOPER:**  No, thank you. |
| 11:11AM | 20 | **THE COURT:**  You're welcome. |
| 11:11AM | 21 | Anything for the record? |
| 11:11AM | 22 | **MR. FOTI:**  No, Judge. |
| 11:11AM | 23 | **THE COURT:**  Okay.  Can we get the witness back in? |
| 11:11AM | 24 | And let's get the jury back in, please. |
| 11:11AM | 25 | Are you okay? |

| | | |
|---|---|---|
| 11:11AM | 1 | **MR. COOPER:**  Yeah, thank you. |
| 11:13AM | 2 | (Jury seated at 11:13 a.m.) |
| 11:13AM | 3 | **THE COURT:**  The record will reflect that all our |
| 11:13AM | 4 | jurors again are present. |
| 11:13AM | 5 | I remind the witness that he's still under oath. |
| 11:13AM | 6 | You may continue, Mr. Cooper. |
| 11:13AM | 7 | **MR. COOPER:**  Thank you, Judge. |
| 11:13AM | 8 | **BY MR. COOPER:** |
| 11:13AM | 9 | Q.  Sir, we left off talking about DARTS deconfliction |
| 11:13AM | 10 | notices, and we looked at 26B, as in bravo, which we moved |
| 11:13AM | 11 | in.  That was from August of 2018. |
| 11:13AM | 12 | Did there come a time later in early 2019, when you |
| 11:13AM | 13 | again -- or, excuse me, when you acquired phone records for |
| 11:13AM | 14 | an individual named Anthony Gerace? |
| 11:13AM | 15 | A.  What timeframe? |
| 11:13AM | 16 | Q.  In early 2019. |
| 11:13AM | 17 | A.  I'd have to -- I'd have to see it. |
| 11:13AM | 18 | Q.  Okay.  Do you recall a burglary occurring at a person |
| 11:13AM | 19 | named Michael Sinatra's house? |
| 11:13AM | 20 | A.  Yes. |
| 11:13AM | 21 | Q.  In relation to that event, did you acquire Anthony |
| 11:13AM | 22 | Gerace's phone records? |
| 11:13AM | 23 | A.  Yes, I did. |
| 11:13AM | 24 | Q.  Okay.  And so, if that burglary happened New Year's Eve |
| 11:13AM | 25 | of 2018, December 31st of '18, would you have gotten Gerace's |

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

48

11:14AM     1    phone records sometime shortly after that?

11:14AM     2    A.   Yes.

11:14AM     3    Q.   Okay.  After you subpoenaed Anthony Gerace's phone

11:14AM     4    records, did you put his number into DARTS again?

11:14AM     5    A.   Yes.

11:14AM     6    Q.   Okay.  Upon inputting Anthony Gerace's phone number into

11:14AM     7    DARTS in early 2019, did Bongiovanni approach you?

11:14AM     8    A.   Yes.

11:14AM     9    Q.   What was his demeanor like when he approached you?

11:14AM    10    A.   I remember he came over to my side of the office, because

11:14AM    11    I was in his task force group now, he didn't come directly to

11:14AM    12    my desk.  I believe at the time a Homeland Security agent, my

11:14AM    13    partner, Curtis Ryan, was at my desk.

11:14AM    14       So he came in, looked towards my desk, then he went into

11:14AM    15    the office where the secretaries were, walked around a bit.

11:14AM    16    Appeared to wait for Curtis Ryan to leave, and then came over

11:14AM    17    to my desk.

11:14AM    18    Q.   When he came over to your desk, what happened?

11:14AM    19    A.   He said that he saw that I was running phone records on

11:14AM    20    Anthony Gerace.

11:14AM    21    Q.   Did he say anything else about you running phone records

11:15AM    22    on Anthony Gerace?

11:15AM    23    A.   Yes.  Yeah.  He said that he saw the deconfliction, that

11:15AM    24    he received the deconfliction.  I don't know the exact words

11:15AM    25    that he used, but he saw that I was running the toll records.

11:15AM    1    That his wife was friends with Anthony Gerace and his friends

11:15AM    2    on Facebook.  And that he, Joe, couldn't help in the

11:15AM    3    investigation but he could help through his wife's Facebook

11:15AM    4    account and the friends that she had on Facebook to help me

11:15AM    5    with the investigation.

11:15AM    6    Q.  Did he make comments to you about any drug in particular?

11:15AM    7    A.  Oh, he did.

11:15AM    8    Q.  Tell the jury about that.

11:15AM    9    A.  He made a comment during that conversation that I better

11:15AM   10    hurry up and arrest Anthony Gerace before they make marijuana

11:15AM   11    legal.

11:15AM   12    Q.  Did that statement indicate to you that Bongiovanni

11:15AM   13    believed that Anthony Gerace was involved in marijuana

11:15AM   14    distribution?

11:15AM   15    A.  Based on that comment, he had other comments about other

11:16AM   16    drugs, too.

11:16AM   17    Q.  Okay.  Describe those.

11:16AM   18    A.  Yeah.

11:16AM   19            **MR. FOTI:**  I'm going to object.

11:16AM   20            **THE COURT:**  What's the basis?

11:16AM   21            **MR. FOTI:**  Can we approach?

11:16AM   22            **THE COURT:**  Come on up.

11:16AM   23            (Sidebar discussion held on the record.)

11:16AM   24            **THE COURT:**  You can't just say object, you've got to

11:16AM   25    give me a -- you've got to give me an objection hearsay,

11:16AM     1    objection relevance, objection something.

11:16AM     2         **MR. FOTI:** Right. I understand, Judge, I'm sorry.

11:16AM     3         It's a hearsay objection. I understand

11:16AM     4    Mr. Bongiovanni may -- there may be a finding that he is a

11:16AM     5    coconspirator, but he's talking about Anthony Gerace. And

11:16AM     6    he's talking about evidence that supports Anthony Gerace was

11:16AM     7    actually committing a crime, it's not in furtherance of the

11:16AM     8    conspiracy.

11:16AM     9         **THE COURT:** Yeah. How is this in furtherance of the

11:16AM    10    conspiracy?

11:16AM    11         **MR. COOPER:** This is what Bongiovanni did over and

11:16AM    12    over again with respect to the 2009 FBI. He's getting himself

11:16AM    13    involved, inserting himself. He uses that as a tactic to

11:17AM    14    solicit information from the other law enforcement officer

11:17AM    15    about what they have going on.

11:17AM    16         You saw this play out, I think, repeatedly.

11:17AM    17         **THE COURT:** Well, sure, but that was the Bongiovanni

11:17AM    18    trial.

11:17AM    19         **MR. COOPER:** Sure. But I'm just explaining. So the,

11:17AM    20    I guess, the first argument that I was responding to is how is

11:17AM    21    this in furtherance. And the answer is, just because he's

11:17AM    22    forward facing and saying, oh, I can help up through my wife's

11:17AM    23    Facebook, what he's really doing is gaining the trust of that

11:17AM    24    person, and gaining information about what they're doing, what

11:17AM    25    they have. That's the first part.

11:17AM   1          The second part, with respect to it being Anthony

11:17AM   2   Gerace.  Anthony Gerace is a coconspirator in the Peter Gerace

11:17AM   3   and Bongiovanni conspiracy.  And so, getting involved in Tony

11:17AM   4   Casullo's looking into Anthony's phone records is equally

11:17AM   5   relevant.

11:17AM   6          **THE COURT:**  So we've established Anthony Gerace to be

11:17AM   7   a coconspirator in the Bongiovanni and Peter Gerace

11:17AM   8   conspiracy?

11:17AM   9          **MR. TRIPI:**  Do you want to -- yeah, Judge.  We went

11:17AM  10   through this a little bit at the final pretrial.

11:17AM  11          **THE COURT:**  Okay.

11:18AM  12          **MR. TRIPI:**  I pulled -- I pulled just our exchange.

11:18AM  13   There are several manner and means, it's only three pages, I

11:18AM  14   just thought it would be helpful to --

11:18AM  15          There are several manner and means that talk about

11:18AM  16   shielding that overlap conspiracies one and two, we talked

11:18AM  17   about this.

11:18AM  18          **THE COURT:**  Um-hum.

11:18AM  19          **MR. TRIPI:**  We're not representing the whole Serio

11:18AM  20   conspiracy, but there -- there is certain overlap, and Anthony

11:18AM  21   Gerace is key to that.

11:18AM  22          We've already established at this trial so far that

11:18AM  23   Anthony supplies Peter at times with cocaine.

11:18AM  24          You're going to hear testimony later on from Jeffrey

11:18AM  25   Anzalone where he procured cocaine from Anthony and used it

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

52

11:18AM    1    inside Pharaoh's.

11:18AM    2         So I think -- it's not like it's some ancillary

11:18AM    3    member.  It's also Peter's family member.  So brushing back

11:18AM    4    one of the -- one of the key parts of each conspiracy in one

11:18AM    5    in and two, is dissuading fellow members of law enforcement

11:18AM    6    from investigating people that he was protecting.

11:18AM    7         And -- and as it relates to both conspiracies, we

11:19AM    8    submit that there's evidence that Anthony Gerace fits in both

11:19AM    9    of those conspiracies from that perspective.

11:19AM    10         So whether or not Anthony is dealing in marijuana

11:19AM    11    with one and cocaine in the other, he's in both.  He's got one

11:19AM    12    foot in each.  And so, we're not going to some tertiary member

11:19AM    13    of the Serio conspiracy here and trying to pigeon hole that

11:19AM    14    in.

11:19AM    15         Also, you'll hear testimony from Curtis Ryan that

11:19AM    16    even after the search at Anthony's house where guns, a little

11:19AM    17    bit of cocaine, a little bit of steroids, and a lot of

11:19AM    18    marijuana products are recovered, the directive -- and this

11:19AM    19    came in at two trials -- from Anthony to his girlfriend Lauren

11:19AM    20    was call Peter.

11:19AM    21         So when you put all of that together, I think we have

11:19AM    22    a sufficient basis to --

11:19AM    23         **THE COURT:**  The direction --

11:19AM    24         **MR. TRIPI:**  The directive of Anthony as he's being

11:19AM    25    walked out in handcuffs to his girlfriend Lauren is "call

11:19AM  1   Peter."  So when you put all of that together, that's --

11:19AM  2   obviously, some of that is still to come, I think we're

11:19AM  3   squarely --

11:19AM  4       MR. COOPER:  Thank you.

11:19AM  5       MR. FOTI:  First of all, Judge, I think in regard to

11:20AM  6   the last point, it's very common that when somebody's being

11:20AM  7   arrested, they direct a family member to call somebody else

11:20AM  8   who they think will be able to help them secure counsel.

11:20AM  9       THE COURT:  Of course.  But there's other things, so

11:20AM  10  if you took that in the vacuum, if that was the only thing

11:20AM  11  that Mr. Tripi said to me, then I think I undoubtedly would

11:20AM  12  agree with you, but-- but that's not.  So, there's other

11:20AM  13  things, too.

11:20AM  14      MR. FOTI:  So, so, I'll work backwards to the other

11:20AM  15  points, too.  Any arguments about regarding whether Anthony is

11:20AM  16  a coconspirator, first of all, as a first preliminary point, I

11:20AM  17  don't think it's been established even on the drug conspiracy,

11:20AM  18  there's anything other than a singular buy-sell.  But setting

11:20AM  19  that aside let's say --

11:20AM  20      THE COURT:  Anthony -- Anthony --

11:20AM  21      MR. FOTI:  Gerace.

11:20AM  22      THE COURT:  No, no, I know.  But buy-sell, you're

11:20AM  23  talking about the buy-sell between Anthony and Peter?

11:20AM  24      MR. FOTI:  Yes.  There was testimony about a time

11:20AM  25  that Mr. Gerace came home and that Anthony gave him drugs.  I

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

| | | |
|---|---|---|
| 11:20AM | 1 | think that's really the extent of the proof for the most part. |
| 11:20AM | 2 | **THE COURT:**  For Anthony so far? |
| 11:21AM | 3 | **MR. FOTI:**  Yes. |
| 11:21AM | 4 | **THE COURT:**  Do you agree with that?  So far? |
| 11:21AM | 5 | **MR. COOPER:**  So far, yes. |
| 11:21AM | 6 | **THE COURT:**  Okay.  Go ahead. |
| 11:21AM | 7 | **MR. FOTI:**  Even so, even if -- even if there was more |
| 11:21AM | 8 | proof where a coconspirator relationship had been established |
| 11:21AM | 9 | in regards to the drugs, that does not overlap automatically |
| 11:21AM | 10 | into a conspiracy involving Mr. Bongiovanni.  And it's a |
| 11:21AM | 11 | conspiracy with Mr. Bongiovanni where the statements would |
| 11:21AM | 12 | have to be in furtherance -- it's -- it's Mr. Bongiovanni's |
| 11:21AM | 13 | statements that are at issue here, and the statements are |
| 11:21AM | 14 | hearsay unless they're in furtherance of a conspiracy.  He's |
| 11:21AM | 15 | talking about Anthony Gerace. |
| 11:21AM | 16 | **THE COURT:**  But Bongiovanni is involved, right? |
| 11:21AM | 17 | Aren't there two conspiracies?  The drug conspiracy and -- |
| 11:21AM | 18 | **MR. TRIPI:**  There's a drug conspiracy. |
| 11:21AM | 19 | **THE COURT:**  -- and a conspiracy to defraud the United |
| 11:21AM | 20 | States. |
| 11:21AM | 21 | **MR. TRIPI:**  Correct. |
| 11:21AM | 22 | **THE COURT:**  And so, those are -- those are two |
| 11:21AM | 23 | conspiracies. |
| 11:21AM | 24 | **MR. FOTI:**  So I -- I -- okay.  So, fair, that's a |
| 11:21AM | 25 | fair point.  So I guess if there was an -- if it was |

11:21AM  1    established that this was in furtherance of the drug

11:22AM  2    conspiracy, Mr. Bongiovanni was making these statements about

11:22AM  3    Anthony Gerace in furtherance of the drug conspiracy, then

11:22AM  4    that would be the argument for why it overcomes hearsay.

11:22AM  5    But --

11:22AM  6         THE COURT:  But there's -- but there's -- the two

11:22AM  7    conspiracies are overlapping in this area, right?  It goes --

11:22AM  8    I mean, the conspiracy to defraud the United States and the

11:22AM  9    drug conspiracy, they -- they dovetail.

11:22AM  10         MR. FOTI:  There's obvious -- yeah, there -- I agree,

11:22AM  11    there is, obviously, they're intertwined in different ways, I

11:22AM  12    understand.

11:22AM  13         THE COURT:  Yeah.

11:22AM  14         MR. FOTI:  I understand.  However, at the end -- at

11:22AM  15    the end of the day, you're ultimately still looking at a

11:22AM  16    question of if Mr. Bongiovanni's making statements about

11:22AM  17    Anthony Gerace, is that statements in furtherance of a

11:22AM  18    conspiracy with Peter Gerace here, I don't think Anthony

11:22AM  19    Gerace is established as a coconspirator.  I just don't --

11:22AM  20         MR. COOPER:  Judge --

11:22AM  21         THE COURT:  And I guess that's the question, right?

11:22AM  22    And I -- and I agree, I don't think he's been established as a

11:22AM  23    coconspirator yet, but you're telling me there's stuff that's

11:22AM  24    gonna come in?

11:22AM  25         MR. TRIPI:  Yeah, with a proffer, all of that.

11:22AM    1          MR. COOPER:  And, Judge, for example, like for

11:22AM    2    example, Lou Selva is gonna -- I expect is gonna testify that

11:23AM    3    he was informed that Bongiovanni interceded on Anthony

11:23AM    4    Gerace's behalf when he was involved in a drug arrest.  It's,

11:23AM    5    there's a -- a --

11:23AM    6          THE COURT:  How is that involved in the Peter Gerace

11:23AM    7    conspiracy?

11:23AM    8          MR. COOPER:  I'm struggling right now.

11:23AM    9          THE COURT:  No, no, that's okay.  So --

11:23AM    10         MR. TRIPI:  So there are -- setting that aside,

11:23AM    11   there's different reasons we think some of those statements

11:23AM    12   come in through Lou Selva.  We'll argue that when Lou Selva's

11:23AM    13   up.

11:23AM    14         The -- the key thing we need to remember here is, and

11:23AM    15   I think you were hitting it, Your Honor, the -- the -- you

11:23AM    16   don't have to say which bucket, which conspiracy bucket the

11:23AM    17   statement falls into, both conspiracies coalesce.  And here,

11:23AM    18   you have Anthony supplying cocaine to Gerace on an occasion,

11:24AM    19   or he supplies it to a dancer and we're proffering under

11:24AM    20   104 -- and I think it's Bourjaily, right -- that you're going

11:24AM    21   to hear more testimony from -- from Jeff Anzalone who's

11:24AM    22   testified twice about Anthony distributing drugs to him inside

11:24AM    23   Pharaoh's and using drugs and setting him up --

11:24AM    24         THE COURT:  Inside Pharaoh's?

11:24AM    25         MR. TRIPI:  Yeah, inside Pharaoh's.

11:24AM    1              **THE COURT:**  Okay.  Then I'm --

11:24AM    2              **MR. TRIPI:**  Using drugs together, there's the

11:24AM    3    maintaining the drug premises part.

11:24AM    4              And when the relationship is one of brothers who are

11:24AM    5    involved together --

11:24AM    6              **THE COURT:**  No, I agree with that.  I agree that

11:24AM    7    there's another level there because they are brothers.  But,

11:24AM    8    but so I will allow it, separate to the -- based on the

11:24AM    9    government's proffer, and assuming that the Jeff Anzalone

11:24AM   10    testimony comes in as Mr. Tripi says that it will.

11:24AM   11              **MR. TRIPI:**  And it has come in in two trials.  So if

11:24AM   12    he does a 180, it's been in both trials.

11:24AM   13              **THE COURT:**  I understand.  You certainly have a

11:24AM   14    good-faith basis.  But if it doesn't come in, then we'll jump

11:24AM   15    off that bridge when we come to it.  Okay?

11:25AM   16              (End of sidebar discussion.)

11:25AM   17              **THE COURT:**  The objection is overruled.  You may

11:25AM   18    continue.

11:25AM   19              **BY MR. COOPER:**

11:25AM   20    Q.  We left off with you explaining that Bongiovanni made

11:25AM   21    statements to you about Anthony Gerace being involved in

11:25AM   22    other drugs; is that right?

11:25AM   23    A.  Correct.

11:25AM   24    Q.  Can you explain what he said?

11:25AM   25    A.  So before he said that about you better hurry up before

11:25AM   1   they make marijuana legal, he had said that -- that he knew

11:25AM   2   that Anthony Gerace, excuse me, had loads of marijuana

11:25AM   3   delivered to him behind the restaurant, Salvatore's

11:25AM   4   restaurant on Transit, I believe.  That he also sold cocaine

11:25AM   5   to his friends.  And then, but you better hurry up and arrest

11:25AM   6   him before they make marijuana legal.

11:25AM   7   Q.  Was it your impression during that conversation with

11:26AM   8   Bongiovanni that he was attempting to minimize Anthony

11:26AM   9   Gerace's illegal activity?

11:26AM  10   A.  I perceived it as almost mocking me for working a

11:26AM  11   marijuana investigation.  And number 2, that it wasn't even

11:26AM  12   worth investigating.

11:26AM  13       No one, again, no one has ever said that to me in my

11:26AM  14   entire law enforcement career about marijuana.

11:26AM  15   Q.  Okay.  Did you leave that conversation with Bongiovanni

11:26AM  16   with the impression that he was attempting to dissuade you

11:26AM  17   from investigating Anthony Gerace?

11:26AM  18   A.  Absolutely.  And his way, his -- in my opinion, his --

11:26AM  19   yes.

11:26AM  20            MR. COOPER:  Just one second, please, Judge.

11:26AM  21            No further direct, Judge, thank you.

11:26AM  22            THE COURT:  Cross-examination?

11:26AM  23            MR. FOTI:  Yes, Judge.

11:27AM  24

         25

| | | |
|---|---|---|
| 11:27AM | 1 | **CROSS-EXAMINATION BY MR. FOTI:** |
| 11:27AM | 2 | Q.  Good morning. |
| 11:27AM | 3 | A.  Good morning. |
| 11:27AM | 4 | Q.  Sir, when did you first meet Peter Gerace? |
| 11:28AM | 5 | A.  In freshman year of high school, 1981. |
| 11:28AM | 6 | Q.  Okay.  You didn't meet him before going to Saint Joe's? |
| 11:28AM | 7 | A.  No. |
| 11:28AM | 8 | Q.  And when I say "Saint Joe's," sometimes I forget there's |
| 11:28AM | 9 | jurors from all over the place here, so we're talking about |
| 11:28AM | 10 | Saint Joseph's Collegiate Institute, right? |
| 11:28AM | 11 | A.  Yes. |
| 11:28AM | 12 | Q.  Okay.  That's the high school you talked about attending |
| 11:28AM | 13 | during your direct-examination, correct? |
| 11:28AM | 14 | A.  Correct. |
| 11:28AM | 15 | Q.  And because, you know, some of us know it as Saint Joe's, |
| 11:28AM | 16 | we -- we're familiar with it, not every juror is, that's an |
| 11:28AM | 17 | all boys school, right? |
| 11:28AM | 18 | A.  Correct. |
| 11:28AM | 19 | Q.  Okay.  Generally, it's a private school, right? |
| 11:28AM | 20 | A.  Yes. |
| 11:28AM | 21 | Q.  Generally smaller class sizes, correct? |
| 11:28AM | 22 | A.  It is. |
| 11:28AM | 23 | Q.  You have any idea -- you graduated in 1989, correct? |
| 11:28AM | 24 | A.  '85. |
| 11:28AM | 25 | Q.  '85?  Okay.  And do you happen to know how big your |

11:28AM    1    graduating class was?

11:28AM    2    A.  About 200 students, I believe.

11:28AM    3    Q.  Okay.  Peter Gerace attended Saint Joe's at the same

11:29AM    4    time?

11:29AM    5    A.  We were in the same graduating class.

11:29AM    6    Q.  Okay.  He graduated in '85 as well?

11:29AM    7    A.  Yes.

11:29AM    8    Q.  I'll talk to you about that a little bit more in a

11:29AM    9    moment.

11:29AM   10        First, were you -- you testified that you're married,

11:29AM   11    correct?

11:29AM   12    A.  Correct.

11:29AM   13    Q.  When did you meet your wife?

11:29AM   14    A.  19 -- March of 1987.

11:29AM   15    Q.  Okay.  And so that was -- that was after you graduated

11:29AM   16    from high school?

11:29AM   17    A.  Correct.

11:29AM   18    Q.  Had you -- you said you met her in 1987?

11:29AM   19    A.  I met my wife in March of 1987.

11:29AM   20    Q.  And did there come a time that you became aware that she

11:29AM   21    was familiar with Peter Gerace?

11:29AM   22    A.  Actually, during that timeframe when I met her.

11:29AM   23    Q.  Okay.  So, right from the beginning of -- of your first

11:29AM   24    interactions with your wife, you realized she knows somebody

11:30AM   25    that you went to high school with?

11:30AM    1    A.  Yes, the conversation of Saint Joe's came up.  And her

11:30AM    2    and her friend, when I initially met them, said that they

11:30AM    3    knew Gerace.

11:30AM    4    Q.  Okay.  And you knew who they were talking about, right?

11:30AM    5    A.  Peter Gerace.

11:30AM    6    Q.  Yeah, the -- the -- who was a student in your class,

11:30AM    7    right?

11:30AM    8    A.  Correct.

11:30AM    9    Q.  So she -- did she tell you about the background she has

11:30AM    10   with him?

11:30AM    11   A.  I don't know what that means.

11:30AM    12   Q.  Well, she went to school with him as well, correct?

11:30AM    13   A.  Did she tell me about going to school with him then, or

11:30AM    14   at some point during our relationship?

11:30AM    15   Q.  In the initial conversation, did she tell you that she

11:30AM    16   went to school with Peter Gerace?

11:30AM    17   A.  Not initially.

11:30AM    18   Q.  Okay.  At some point you come to learn that that's the

11:30AM    19   case, right?

11:30AM    20   A.  Correct.

11:30AM    21   Q.  She went to grade school at Saint Andrew's?

11:30AM    22   A.  Correct.

11:30AM    23   Q.  And Peter attended at the same time, correct?

11:30AM    24   A.  Correct.

11:30AM    25   Q.  So he actually went to school with her before he went to

| | | |
|---|---|---|
| 11:30AM | 1 | school with you, correct? |
| 11:30AM | 2 | A.  Correct. |
| 11:30AM | 3 | Q.  And that is from kindergarten up to the eighth grade, |
| 11:30AM | 4 | correct? |
| 11:31AM | 5 | A.  I believe that's what their school was. |
| 11:31AM | 6 | Q.  Okay.  So she went to school with him for approximately |
| 11:31AM | 7 | nine, ten years? |
| 11:31AM | 8 | A.  I don't know if they were together, I just know that they |
| 11:31AM | 9 | went to Saint Andrew's together.  I don't know if it was the |
| 11:31AM | 10 | whole time or not, or what. |
| 11:31AM | 11 | Q.  Okay.  And is Saint Andrew's a small private school? |
| 11:31AM | 12 | A.  It's a small Catholic elementary school. |
| 11:31AM | 13 | Q.  And did your brother-in-law -- your brother-in-law, Phil, |
| 11:31AM | 14 | you testified about him on direct, right? |
| 11:31AM | 15 | A.  Correct. |
| 11:31AM | 16 | Q.  And did he go to Saint Andrew's as well? |
| 11:31AM | 17 | A.  I believe so. |
| 11:31AM | 18 | Q.  Phil, it's Domiano, is that how you pronounce the last |
| 11:31AM | 19 | name? |
| 11:31AM | 20 | A.  Correct. |
| 11:31AM | 21 | Q.  So he went to the same school as -- as Mr. Gerace? |
| 11:31AM | 22 | A.  He went to Saint Andrew's for elementary school and |
| 11:31AM | 23 | Saint Joe's for high school. |
| 11:31AM | 24 | Q.  Did he go to high school at Saint Joe's at the same time |
| 11:31AM | 25 | as you? |

11:31AM    1    A.  I think he was a senior when I was a freshman.

11:31AM    2    Q.  Okay.  Were you aware that Peter Gerace and Phil Domiano

11:32AM    3    were close friends?

11:32AM    4    A.  At what point?

11:32AM    5    Q.  You become aware of that at some point?

11:32AM    6    A.  Yes.

11:32AM    7    Q.  Okay.  When did you become aware of that?

11:32AM    8    A.  Through the time that I was dating my wife, that her

11:32AM    9    brother Phil and Peter were friends, that they grew up

11:32AM   10    together in the same neighborhood.

11:32AM   11    Q.  Okay.  And you started dating her after you met her in

11:32AM   12    '87, right?

11:32AM   13    A.  Correct.

11:32AM   14    Q.  Okay.  So at some time shortly thereafter, that you --

11:32AM   15    you realize that her brother is good friends with Peter

11:32AM   16    Gerace?

11:32AM   17    A.  Correct.

11:32AM   18    Q.  And when did you get married?

11:32AM   19    A.  1992.

11:32AM   20    Q.  Okay.  The entire time you're dating her, you're both

11:33AM   21    still in Buffalo, right?

11:33AM   22    A.  Not the entire time.

11:33AM   23    Q.  Okay.  At some point, you move to Vegas?

11:33AM   24    A.  No.  We started dating in '87.  In 1990, I moved to

11:33AM   25    Toronto, Canada for a job with the Immigration Service.

| | | |
|---|---|---|
| 11:33AM | 1 | Q.  Okay.  And how long were you there? |
| 11:33AM | 2 | A.  I was in Toronto for five years. |
| 11:33AM | 3 | Q.  She moves to Toronto with you at some point? |
| 11:33AM | 4 | A.  So, right.  So December of 1990, I moved to Toronto.  And |
| 11:33AM | 5 | then I got married in October of 1992.  So she initially |
| 11:33AM | 6 | didn't move up, but eventually she did while we were married. |
| 11:33AM | 7 | Q.  There comes a time when you both move to Las Vegas, |
| 11:33AM | 8 | correct? |
| 11:33AM | 9 | A.  That we moved -- my family moved to Las Vegas in December |
| 11:33AM | 10 | of 1999. |
| 11:33AM | 11 | Q.  Staying on Buffalo for just a little bit longer, Saint |
| 11:34AM | 12 | Joe's High School, four years, correct? |
| 11:34AM | 13 | A.  That's correct. |
| 11:34AM | 14 | Q.  Okay.  And you said you met Peter Gerace in your freshman |
| 11:34AM | 15 | year at Saint Joe's, correct? |
| 11:34AM | 16 | A.  Correct. |
| 11:34AM | 17 | Q.  So he was there the entire four years? |
| 11:34AM | 18 | A.  Yes. |
| 11:34AM | 19 | Q.  And so were you, right? |
| 11:34AM | 20 | A.  Yes. |
| 11:34AM | 21 | Q.  All right.  And you would generally see him every single |
| 11:34AM | 22 | day while you were at school, correct? |
| 11:34AM | 23 | A.  We weren't really in a lot of classes together, I |
| 11:34AM | 24 | wouldn't say I would see him every single day. |
| 11:34AM | 25 | Q.  You did have classes together though, didn't you? |

11:34AM   1   A.   We did have a couple classes together.

11:34AM   2   Q.   You played hockey in high school?

11:34AM   3   A.   I did play hockey --

11:34AM   4   Q.   Okay.

11:34AM   5   A.   -- in high school for Saint Joe's.

11:34AM   6   Q.   And at some point Peter played hockey with you?

11:34AM   7   A.   Peter did not play for Saint Joe's at the same time I

11:35AM   8   did.  Not on the same team, I'm sorry.  He was not on the

11:35AM   9   same team as I was for Saint Joe's.

11:35AM   10   Q.   He was not on the same team at Saint Joe's?

11:35AM   11   A.   He played for Saint Joe's at a different -- I played

11:35AM   12   freshman year and senior year, I played travel in the middle.

11:35AM   13   I remember he played for Saint Joe's, but not on any of the

11:35AM   14   teams I played for for Saint Joe's.  There were multiple

11:35AM   15   teams at Saint Joe's, I believe there were like five.

11:35AM   16   Q.   Okay.  You were aware he was playing hockey at some

11:35AM   17   point?

11:35AM   18   A.   He did play hockey from what I remember at -- freshman

11:35AM   19   year at Saint Joe's.

11:35AM   20   Q.   Okay.

11:35AM   21   A.   That's how I initially met him.

11:35AM   22   Q.   Oh, you met him through hockey?

11:35AM   23   A.   Through when I was trying out for hockey at Saint Joe's.

11:35AM   24   Q.   And then during the course of the four years, you end up

11:35AM   25   having some classes together.

11:35AM    1    A.  Correct, I don't know how many, there weren't many, but

11:35AM    2    there were at least -- at least one that I remember.

11:35AM    3    Q.  What class was that?

11:35AM    4    A.  That was a history class with Mr. Wolf.

11:35AM    5    Q.  Okay.  And there may have been other classes, you just

11:35AM    6    don't necessarily recall, right?

11:35AM    7    A.  I can't remember for sure, but I do remember if there

11:36AM    8    were -- there weren't many.

11:36AM    9    Q.  I also heard you were pretty good at baseball?

11:36AM   10    A.  Oh, thank you.  I don't know if that's true, but --

11:36AM   11    Q.  You played baseball though, right?

11:36AM   12    A.  I did.

11:36AM   13    Q.  He -- he -- he tried out for baseball?

11:36AM   14    A.  Okay.

11:36AM   15    Q.  At the same time, right?

11:36AM   16    A.  I don't remember.

11:36AM   17    Q.  Okay.  Okay.  So, let's fast forward to your professional

11:36AM   18    career.  You move to Las Vegas, right?

11:36AM   19    A.  I did.

11:36AM   20    Q.  And that's in 1999?

11:36AM   21    A.  Yes.  December of '99.

11:36AM   22    Q.  Okay.  And you testified on direct about a period of time

11:36AM   23    where you pursued a career in the FBI, correct?

11:36AM   24    A.  That's correct.

11:36AM   25    Q.  You said that was after 9/11, right?

11:36AM   1   A.   Yes.

11:36AM   2   Q.   There was, after 9/11, an increased interest in

11:36AM   3   counterterrorism efforts by the Bureau, correct?

11:37AM   4   A.   Correct.

11:37AM   5   Q.   And there was certainly a number of new professional

11:37AM   6   responsibilities that the Bureau had taken on at that point?

11:37AM   7   A.   I don't know if they were new, but there were more

11:37AM   8   priorities.  They had JTTF terrorism task force before that,

11:37AM   9   but they weren't a priority like they are today and after

11:37AM   10  9/11.

11:37AM   11  Q.   And there were professional opportunities for new agents

11:37AM   12  or potentially new agents to join the FBI at that time?

11:37AM   13  A.   They were doing a lot of hiring after 9/11.

11:37AM   14  Q.   So that's a point when you -- you take a time -- a period

11:37AM   15  of time in your professional career where you work with the

11:37AM   16  FBI, correct?

11:37AM   17  A.   That is correct.

11:37AM   18  Q.   But you ultimately return to Las Vegas, correct?

11:37AM   19  A.   I did.

11:37AM   20  Q.   And what year did you return to Las Vegas?

11:37AM   21  A.   June of 2000 -- July of 2003.  I believe.

11:37AM   22  Q.   Okay.  There comes a time in Las Vegas where your

11:37AM   23  brother-in-law moves out there, correct?

11:37AM   24  A.   He -- he lived in Vegas before we did.

11:38AM   25  Q.   He moved out to Vegas before you took a job there?

| | | |
|---|---|---|
| 11:38AM | 1 | A.  Oh, years before.  Like, right after I met my wife. |
| 11:38AM | 2 | Q.  Okay.  So when -- the fact that he lived out there, did |
| 11:38AM | 3 | that -- was that a consideration for you or your wife when |
| 11:38AM | 4 | you moved out there? |
| 11:38AM | 5 | A.  That was my selling point, because my wife did not want |
| 11:38AM | 6 | to leave Buffalo.  I shouldn't call it a selling point, it |
| 11:38AM | 7 | was one of the points that she brought up to me and was |
| 11:38AM | 8 | comforting to her and that I was aware of because she didn't |
| 11:38AM | 9 | want to leave Western New York. |
| 11:38AM | 10 | Q.  And was he involved in any criminal activity at that |
| 11:38AM | 11 | time? |
| 11:38AM | 12 | A.  Not to my knowledge. |
| 11:38AM | 13 | Q.  Okay.  There does come a time where you learn that he's |
| 11:38AM | 14 | involved in criminal activity, correct? |
| 11:38AM | 15 | A.  There was a time when I did learn that he was involved in |
| 11:38AM | 16 | a criminal investigation with the Las Vegas police. |
| 11:38AM | 17 | Q.  Okay.  And you knew before that that he was involved in |
| 11:38AM | 18 | criminal activity, correct? |
| 11:38AM | 19 | A.  Excuse me? |
| 11:38AM | 20 | Q.  You knew before the investigation involving the Las Vegas |
| 11:39AM | 21 | police that he was involved in criminal activity, correct? |
| 11:39AM | 22 | A.  No.  And I don't understand, I don't understand that |
| 11:39AM | 23 | question.  I found out after he was investigated. |
| 11:39AM | 24 | Q.  You found out after he was investigated? |
| 11:39AM | 25 | A.  Or, during. |

11:39AM   1   Q.  You found out during the course of the investigation?

11:39AM   2   A.  Yes.

11:39AM   3   Q.  All right.  We'll come back to that.

11:39AM   4       There comes a time where you return to New York, and at

11:39AM   5   that time you start at the New York City office, correct?

11:39AM   6   A.  So, yes, I started at the New York field division, the

11:39AM   7   New York City office in December, again, of 2013.

11:39AM   8   Q.  Okay.  And the -- the intention was always to return to

11:39AM   9   Buffalo, right?

11:39AM  10   A.  When I went to New York, the intention was -- and what I

11:39AM  11   was told, we don't have a vacancy in Buffalo now, but if you

11:40AM  12   go and work in the field division as soon as a position opens

11:40AM  13   up, we will move you to Buffalo.

11:40AM  14   Q.  And that was your intention to return to Buffalo when

11:40AM  15   that position opens up?

11:40AM  16   A.  That's why I went to New York, yeah.

11:40AM  17   Q.  Okay.  So, you're still in New York City when this

11:40AM  18   reunion occurs for the Saint Joe's, correct?

11:40AM  19   A.  That's correct.

11:40AM  20   Q.  All right.  And you travelled in for that, correct?

11:40AM  21   A.  Yep.  I didn't travel in specifically for the reunion,

11:40AM  22   but that was a weekend that I did come home.

11:40AM  23   Q.  Okay.  Okay.  So you came home that weekend, and the

11:40AM  24   reunion happened to be scheduled that weekend?

11:40AM  25   A.  Right.  I would have came home either way.

11:40AM 1  Q.  Okay.  So you attend this reunion, this is about June

11:40AM 2  2015?

11:40AM 3  A.  Correct.

11:40AM 4  Q.  All right.  And at the reunion you're seeing a lot of

11:40AM 5  people that you probably haven't seen for a pretty long time

11:40AM 6  at that point, correct?

11:40AM 7  A.  Pretty true, yep.

11:40AM 8  Q.  All right.  This was -- was this the 20 -- this would

11:40AM 9  have been 30th?

11:40AM 10  A.  It would have been, yep.

11:41AM 11  Q.  Had you seen Peter Gerace at any point after graduation

11:41AM 12  prior to this reunion?

11:41AM 13  A.  Sure.  There were a few times I think, yes.

11:41AM 14  Q.  Okay.  Well, you testified to on direct about Brennan's.

11:41AM 15  Was that -- that preceded this?

11:41AM 16  A.  Could you say that again?  I'm sorry.

11:41AM 17  Q.  On direct you testified to a time that you saw Peter

11:41AM 18  Gerace at -- at the bar Brennan's, correct?

11:41AM 19  A.  At Brennan's, correct.

11:41AM 20  Q.  Yeah, was that before the reunion?

11:41AM 21  A.  That would have been, yes, that would have been before.

11:41AM 22  So, 2000 -- around 2014.  And then the reunion was '15.

11:41AM 23  Q.  Okay.  And you had seen him a couple times other than

11:41AM 24  that as well?

11:41AM 25  A.  During what timeframe?

11:41AM   1   Q.  Any timeframe between graduation and the reunion, you had

11:41AM   2   seen him other times?

11:41AM   3   A.  Yes.

11:41AM   4   Q.  Okay.  Do you remember where or when?

11:41AM   5   A.  While I was in college, I played on, like, a men's bar

11:42AM   6   league hockey team.  There was a guy on the team whose

11:42AM   7   cousin -- there was a guy on the team who had a cousin that

11:42AM   8   was cousins with Gerace, and Gerace played on this men's ice

11:42AM   9   hockey team for -- I don't know if it was a year or several

11:42AM  10   games.  So there was that timeframe.

11:42AM  11       And then I may have seen him, I remember once -- no, that

11:42AM  12   was while I was in Vegas.  I saw him once at Cracker Barrel

11:42AM  13   with my wife, like, in passing.  I don't -- I think that's

11:42AM  14   while I was in Vegas.

11:42AM  15   Q.  Okay.  So you have memories of just sort of seeing him a

11:42AM  16   couple times in passing?

11:42AM  17   A.  Yeah, I remember hockey, because it was while I was in

11:42AM  18   college.  And then after that, yeah.

11:42AM  19   Q.  He didn't -- he didn't go to the same college as you?

11:42AM  20   Peter Gerace didn't go to the same college?

11:42AM  21   A.  I don't believe so.

11:42AM  22   Q.  Okay.  But he was playing on this hockey team that --

11:42AM  23   A.  He played on that men's hockey team for, I think it was a

11:42AM  24   year, several games or the year, whatever it was.  And that

11:43AM  25   was while I was in college.

11:43AM  1   Q.  Okay.  All right.  Now, on the night of --

11:43AM  2        MR. FOTI:  Well, actually first, can we pull up

11:43AM  3   Government Exhibit 99 in evidence?  And go to page 13.

11:43AM  4        BY MR. FOTI:

11:43AM  5   Q.  All right.  Sir, is that a picture from the reunion?

11:43AM  6   A.  Correct.

11:43AM  7   Q.  And I'm gonna circle one of the individuals, I'm going to

11:43AM  8   circle one of the individuals on this picture.  I'm circling

11:43AM  9   an individual in a blue shirt.  Is that you?

11:43AM  10  A.  Yes.

11:43AM  11  Q.  This is on the left side of the picture?

11:43AM  12  A.  Yep.

11:43AM  13  Q.  And behind you, is that Peter Gerace?

11:43AM  14  A.  Again, it's so dark and fuzzy, but seeing this picture

11:43AM  15  before, I believe so.  But I can't tell by looking at this

11:44AM  16  picture.

11:44AM  17  Q.  Okay.  So from this picture, you don't actually see him

11:44AM  18  because there's -- you can see there's a little bit of a head

11:44AM  19  behind you, your shoulder?

11:44AM  20  A.  It's blurry.

11:44AM  21  Q.  You don't know if it's Mr. Gerace from the picture?

11:44AM  22  A.  It's dark and blurry, I think so from looking at this,

11:44AM  23  but I can't tell from looking at this.

11:44AM  24        MR. FOTI:  Okay.  Can we go to the next page of the

11:44AM  25  exhibit, page 14?

| | | |
|---|---|---|
| 11:44AM | 1 | I know this is sideways, there's probably a way for |
| 11:44AM | 2 | me -- |
| 11:44AM | 3 | **MR. COOPER:** She can rotate it. There you go. |
| 11:44AM | 4 | **MR. FOTI:** Thank you. |
| 11:44AM | 5 | **BY MR. FOTI:** |
| 11:44AM | 6 | Q. This picture is a little bit more clear. You can see the |
| 11:44AM | 7 | face behind you, right? |
| 11:44AM | 8 | A. Yep. |
| 11:44AM | 9 | Q. You agree that's Peter Gerace? |
| 11:44AM | 10 | A. I will agree. |
| 11:44AM | 11 | Q. Okay. And this was taken at Big Ditch? |
| 11:44AM | 12 | A. I'm -- yeah. That would have been -- so the reunion was |
| 11:44AM | 13 | at Big Ditch, this would have been taken at Big Ditch. |
| 11:44AM | 14 | Q. And, again, for anybody who's not familiar with it, Big |
| 11:44AM | 15 | Ditch is brewery here in Buffalo? |
| 11:44AM | 16 | A. Yes, downtown. |
| 11:44AM | 17 | Q. Yeah, not too far from here, right? |
| 11:44AM | 18 | A. No. |
| 11:44AM | 19 | Q. Okay. And this was obviously an organized event for an |
| 11:45AM | 20 | alumni reunion, correct? |
| 11:45AM | 21 | A. Correct. |
| 11:45AM | 22 | Q. You're wearing what appears to be a name tag. Was that a |
| 11:45AM | 23 | name tag identifying yourself as a graduate of Saint Joe's? |
| 11:45AM | 24 | A. Yeah, I believe it just had all our names on it. |
| 11:45AM | 25 | Q. Okay. Anything -- any other information on it other than |

| | | |
|---|---|---|
| 11:45AM | 1 | just -- just the name and maybe the year you graduated? |
| 11:45AM | 2 | A.  I -- I can't remember. |
| 11:45AM | 3 | Q.  Is it just your class that attended this reunion, or were |
| 11:45AM | 4 | there other members of other classes that attended? |
| 11:45AM | 5 | A.  It was just our graduating class. |
| 11:45AM | 6 | Q.  Okay.  Now, during the course of this reunion, you |
| 11:45AM | 7 | testified on direct that you heard a couple of statements |
| 11:45AM | 8 | from other classmates about Peter Gerace, correct? |
| 11:45AM | 9 | A.  That's correct. |
| 11:45AM | 10 | Q.  Okay.  And one of the statements was from another -- |
| 11:45AM | 11 | another graduate who said that they were gonna go to |
| 11:45AM | 12 | Pharaoh's and do lines off -- lines of coke off a stripper's |
| 11:46AM | 13 | ass, right? |
| 11:46AM | 14 | A.  Yes. |
| 11:46AM | 15 | Q.  Okay.  And that individual you -- you identified as John |
| 11:46AM | 16 | Maher? |
| 11:46AM | 17 | A.  Correct. |
| 11:46AM | 18 | Q.  Okay.  And he's -- he's since passed away related to |
| 11:46AM | 19 | COVID, correct? |
| 11:46AM | 20 | A.  Correct. |
| 11:46AM | 21 | Q.  Okay.  And he was joking, or it appeared he was joking |
| 11:46AM | 22 | when he said that, right? |
| 11:46AM | 23 | A.  It didn't appear to me. |
| 11:46AM | 24 | Q.  It -- to you it seemed -- |
| 11:46AM | 25 | A.  I took it. |

| 11:46AM | 1 | Q.  -- like he was being serious? |
| 11:46AM | 2 | A.  I took it serious. |
| 11:46AM | 3 | Q.  You took it seriously? |
| 11:46AM | 4 | A.  Yes. |
| 11:46AM | 5 | Q.  And you -- you were working at the DEA at that time, |
| 11:46AM | 6 | right? |
| 11:46AM | 7 | A.  Correct. |
| 11:46AM | 8 | Q.  And people talk about where they're employed at this |
| 11:46AM | 9 | point in their life, correct? |
| 11:46AM | 10 | A.  People do talk about where they're employed. |
| 11:46AM | 11 | Q.  You weren't trying to hide the fact that you were a |
| 11:46AM | 12 | member of the DEA, correct? |
| 11:46AM | 13 | A.  What -- what do you mean? |
| 11:46AM | 14 | Q.  You weren't -- you weren't concealing your employment |
| 11:46AM | 15 | from other graduates during the course of this reunion, |
| 11:46AM | 16 | right? |
| 11:46AM | 17 | A.  I think a good percentage, at least my friends, already |
| 11:46AM | 18 | knew I worked for DEA. |
| 11:46AM | 19 | Q.  Okay, so -- |
| 11:46AM | 20 | A.  I don't know which ones did and didn't, but I know that |
| 11:46AM | 21 | some people knew I worked for DEA. |
| 11:46AM | 22 | Q.  And if anybody didn't know and they asked you what you're |
| 11:47AM | 23 | up to, you're gonna tell them that your -- what your |
| 11:47AM | 24 | profession is at that point? |
| 11:47AM | 25 | A.  If someone asked me, based on my classmates, most of them |

| | | |
|---|---|---|
| 11:47AM | 1 | probably, ones that were friends. |
| 11:47AM | 2 | Q.  Had you talked to John Maher at all that night other than |
| 11:47AM | 3 | this -- this statement that he made to you? |
| 11:47AM | 4 | A.  Not that I -- no, not that I remember, no. |
| 11:47AM | 5 | Q.  Okay.  So your memory is he just makes this unsolicited |
| 11:47AM | 6 | statement that I'm going to Pharaoh's to do a line of coke |
| 11:47AM | 7 | off a stripper's ass? |
| 11:47AM | 8 | A.  Yeah.  He was with, like, three other people, and said it |
| 11:47AM | 9 | right in front of me.  Right -- right to me. |
| 11:47AM | 10 | He said, hey, Casullo, we're going to strippers and we're |
| 11:47AM | 11 | gonna snort coke off stripper's asses. |
| 11:47AM | 12 | Q.  To the DEA agent in the room? |
| 11:47AM | 13 | A.  He said it to me.  I don't know if he knew I worked for |
| 11:47AM | 14 | the DEA, but he said it to me. |
| 11:47AM | 15 | Q.  And -- and you took him to be serious? |
| 11:47AM | 16 | A.  Yes, I did. |
| 11:47AM | 17 | Q.  Okay. |
| 11:47AM | 18 | A.  I -- I -- I know John Maher, or knew John Maher. |
| 11:47AM | 19 | Q.  There comes a time in the evening where you go to Tappo, |
| 11:47AM | 20 | correct? |
| 11:48AM | 21 | A.  There was. |
| 11:48AM | 22 | Q.  And Tappo was a restaurant very close to Big Ditch, |
| 11:48AM | 23 | correct? |
| 11:48AM | 24 | A.  It was, I believe, diagonal across the street. |
| 11:48AM | 25 | Q.  All right.  And you go to Tappo with Mr. Gerace, correct? |

11:48AM    1    A.  I did agree to walk across the street with Gerace to

11:48AM         Tappo's.

11:48AM    3    Q.  All right.  And was anybody else with the two of you at

11:48AM         that time?

11:48AM    5    A.  No.

11:48AM    6    Q.  Okay.  So he makes this invite to you personally?

11:48AM    7    A.  He said, hey, Bongiovanni's across the street at Tappo's

11:48AM         with my brother, let's go see him.

11:48AM    9        And I said, no, that's all right.

11:48AM   10        And he asked a second time, which I said no.

11:48AM   11        And by the third time I agree, I was like, sure.

11:48AM   12    Q.  Okay.  Had -- had you and Mr. Gerace talked about

11:48AM         Mr. Bongiovanni prior to that point?

11:48AM   14    A.  At the reunion?

11:48AM   15    Q.  Yeah.

11:48AM   16    A.  I don't remember.  I don't remember doing that.  I don't

11:48AM         think so.

11:48AM   18    Q.  As far as you know, any reference to Mr. Bongiovanni was

11:48AM         because of his affiliation with the DEA?

11:49AM   20    A.  I'm assuming he's telling me that because Bongiovanni

11:49AM         worked for DEA and so did I.

11:49AM   22    Q.  Right.  Okay.  You don't recall bringing up Joe

11:49AM         Bongiovanni to Peter Gerace, correct?

11:49AM   24    A.  I don't remember doing that.

11:49AM   25    Q.  Okay.  You just remember that Peter Gerace brings up the

| | | |
|---|---|---|
| 11:49AM | 1 | fact that he's aware that Joe Bongiovanni's across the |
| 11:49AM | 2 | street? |
| 11:49AM | 3 | A.  Said he was across the street with his brother. |
| 11:49AM | 4 | Q.  And he asked you if you wanted to go across the street |
| 11:49AM | 5 | with him? |
| 11:49AM | 6 | A.  He did. |
| 11:49AM | 7 | Q.  And you've testified now a couple times that -- that he |
| 11:49AM | 8 | asked you more than once? |
| 11:49AM | 9 | A.  He did. |
| 11:49AM | 10 | Q.  Okay.  And you -- your testimony is it's three times that |
| 11:49AM | 11 | he asked you, and then you agreed to go. |
| 11:49AM | 12 | A.  Yeah, I was initially reluctant and then I agreed. |
| 11:49AM | 13 | Q.  Okay.  And nothing changed between the first time and the |
| 11:49AM | 14 | third time other than he had asked you again? |
| 11:49AM | 15 | A.  I became curious to see Bongiovanni across the street |
| 11:49AM | 16 | with Anthony Gerace with my own eyes. |
| 11:49AM | 17 | Q.  Okay.  So your -- your interest now was -- was actually |
| 11:50AM | 18 | going across there to see Mr. Bongiovanni? |
| 11:50AM | 19 | A.  To physically see Joseph Bongiovanni socializing with |
| 11:50AM | 20 | Anthony Gerace. |
| 11:50AM | 21 | Q.  Okay.  So your testimony is on the third time you say |
| 11:50AM | 22 | okay, I'll go across the street with you to Tappo's, and you, |
| 11:50AM | 23 | you agree to actually go over to the restaurant with |
| 11:50AM | 24 | Mr. Gerace, right? |
| 11:50AM | 25 | A.  I walked over, correct. |

| | | |
|---|---|---|
| 11:50AM | 1 | Q. And the two of you walk over together, right? |
| 11:50AM | 2 | A. Yes. |
| 11:50AM | 3 | Q. And at -- once you arrive at Tappo's, you do see that |
| 11:50AM | 4 | Mr. Bongiovanni is there across the street, right? |
| 11:50AM | 5 | A. He's at the bar. |
| 11:50AM | 6 | Q. Okay. After Tappo's, did you return to the reunion at |
| 11:50AM | 7 | any point? |
| 11:50AM | 8 | A. We did. |
| 11:50AM | 9 | Q. Okay. When you say "we did," you're talking about? |
| 11:50AM | 10 | A. Meaning me, Gerace, and Bongiovanni walked back across. |
| 11:51AM | 11 | Q. Mr. Bongiovanni joined you? |
| 11:51AM | 12 | A. The three of us walked back. |
| 11:51AM | 13 | Q. Okay. The three of you go back to the reunion and then |
| 11:51AM | 14 | do you stay there for the rest of the night? |
| 11:51AM | 15 | A. Yes. I did. Yeah, for however long it was. It wasn't |
| 11:51AM | 16 | very long. I didn't stay very late. But I did not -- yeah, |
| 11:51AM | 17 | we went back there. And from there, I went home. |
| 11:51AM | 18 | Q. And how long were you at Tappo's, do you know? Do you |
| 11:51AM | 19 | remember? |
| 11:51AM | 20 | A. The entire time? I don't know. Maybe a couple hours, I |
| 11:51AM | 21 | can't remember for sure. It wasn't crazy long. |
| 11:51AM | 22 | Q. Okay. Now, based on -- I believe your testimony is that |
| 11:51AM | 23 | based on things that you heard at the reunion, you decide to |
| 11:51AM | 24 | start investigating Mr. Gerace, correct? |
| 11:51AM | 25 | A. It led me, at the -- when I got back to Buffalo, at some |

11:51AM   1   point, to have a conversation with my supervisor about, hey,

11:51AM   2   maybe we should look into this, what are your thoughts.

11:51AM   3   Q.  Okay.  Is that the conversation you testified about on

11:52AM   4   direct where you had the intention of pursuing a subpoena?

11:52AM   5   Or did you have a conversation before that?

11:52AM   6   A.  No, it was during that same conversation that the

11:52AM   7   subpoena with the phone records came up between me and Greg.

11:52AM   8   I can't remember if he mentioned it, like, hey, subpoena the

11:52AM   9   records, or if I mentioned it to him.  But it was me

11:52AM  10   initially presenting to him maybe we should look into this,

11:52AM  11   what do you think?

11:52AM  12       And then he had -- his comment back to me was, yeah, I

11:52AM  13   think we should.  Other people have tried to investigate this

11:52AM  14   guy before for years.  No one's been able to get him.  And I

11:52AM  15   think that we should pursue this.  I think that we might find

11:52AM  16   a lot of user amounts, but hopefully we can find a source of

11:52AM  17   supply.

11:52AM  18   Q.  Okay.  And while you're testifying here today, you're

11:52AM  19   saying that the reason that you had this conversation was

11:52AM  20   because of what you heard at the reunion?

11:52AM  21   A.  It was enough for me to have a conversation with Greg

11:52AM  22   that maybe we should look into this.

11:52AM  23   Q.  Okay.  And prior to that, you had, even though you didn't

11:53AM  24   testify about it on direct, prior to that you had made

11:53AM  25   attempts to talk to other law enforcement about Mr. Gerace,

11:53AM      1    correct?

11:53AM      2    A.  What do you mean?

11:53AM      3    Q.  I'm asking you, did you ever talk to other law

11:53AM      4    enforcement about Mr. Gerace prior to that meeting?

11:53AM      5    A.  I did talk to the FBI once while I was in Las Vegas about

11:53AM      6    Mr. Gerace.

11:53AM      7    Q.  Was that in 2010?

11:53AM      8    A.  I can't remember, but it's possible.  It would have been

11:53AM      9    during that timeframe.

11:53AM     10    Q.  Would looking at a prior email related to the timeframe

11:53AM     11    help refresh your recollection?

11:53AM     12    A.  Certainly.

11:53AM     13          **MR. FOTI:**  Can we pull up just -- just for the

11:53AM     14    witness Government Exhibit 3557Y?

11:54AM     15          **BY MR. FOTI:**

11:54AM     16    Q.  So that's not in evidence, so don't read it out loud,

11:54AM     17    but--

11:54AM     18    A.  Pardon?

11:54AM     19    Q.  -- just read it to yourself.

11:54AM     20    A.  Pardon?

11:54AM     21    Q.  It's -- it's not in evidence, so don't read it out loud.

11:54AM     22    A.  Okay.  Okay.

11:54AM     23    Q.  Just read it to yourself.

11:54AM     24    A.  Okay.

11:54AM     25    Q.  And let me know when you're done.

| | | |
|---|---|---|
| 11:54AM | 1 | A.  Okay. |
| 11:54AM | 2 | Q.  Okay.  It was around approximately 2010 when you had the |
| 11:54AM | 3 | conversations with the FBI that you referred to? |
| 11:54AM | 4 | A.  Upon seeing that email, I would agree with that. |
| 11:54AM | 5 | Q.  Okay.  It refreshes your recollection that that's at |
| 11:54AM | 6 | least approximately the time, right? |
| 11:54AM | 7 | A.  Correct. |
| 11:54AM | 8 | Q.  Okay.  And you spoke to Tom Herbst at that time, correct? |
| 11:54AM | 9 | A.  I did. |
| 11:54AM | 10 | Q.  All right.  And you also spoke to him about |
| 11:54AM | 11 | Mr. Bongiovanni at that time, correct? |
| 11:54AM | 12 | A.  He brought it up.  Actually, I can't remember who brought |
| 11:54AM | 13 | it up.  But there became an awareness between the two of them |
| 11:55AM | 14 | that they knew each other. |
| 11:55AM | 15 | Q.  Who's the "two of them" you're talking about? |
| 11:55AM | 16 | A.  That Bongiovanni and Gerace were friends. |
| 11:55AM | 17 | Q.  Okay.  That was something that you discussed with |
| 11:55AM | 18 | Mr. Herbst at that time? |
| 11:55AM | 19 | A.  Like, for a second.  Just basically Tom knew that they -- |
| 11:55AM | 20 | Tom Herbst, the FBI agent, knew that they were friends, or |
| 11:55AM | 21 | knew each other. |
| 11:55AM | 22 | Q.  And this is back in around 2010? |
| 11:55AM | 23 | A.  Correct. |
| 11:55AM | 24 | Q.  You're talking about five years before this reunion? |
| 11:55AM | 25 | A.  Correct. |

11:55AM   1   Q.  And did Tom Herbst reach out to you or did you reach out

11:55AM   2   to him?

11:55AM   3   A.  I was talking to Tom Herbst about Gerace, I believe.

11:55AM   4   Q.  You reached out to him?

11:55AM   5   A.  I reached out to an FBI agent named Bill Fallon who

11:55AM   6   initially -- who passed years after this.  Bill Fallon was

11:55AM   7   close friends with my sister, lived across the street in

11:55AM   8   Clarence.  So I met Bill Fallon when I was going to the DEA

11:55AM   9   Academy, because he just got back from the FBI Academy, I

11:56AM  10   became close friends with Bill Fallon as well.  He was

11:56AM  11   someone that I trusted, a great deal.

11:56AM  12       So when I called the FBI, I called Bill Fallon first.

11:56AM  13   And then Bill Fallon, who was on the JTTF, put me in contact

11:56AM  14   with Tom Herbst because he was on the Safe Streets Task Force

11:56AM  15   and was more appropriate for me to talk to him.  He was more

11:56AM  16   knowledgeable about those types of things that we were

11:56AM  17   working on.

11:56AM  18   Q.  Any follow-up conversations with him after 2010?

11:56AM  19            **MR. COOPER:**  With whom?  With Bill?

11:56AM  20            **BY MR. FOTI:**

11:56AM  21   Q.  Any -- sorry, I should rephrase that.

11:56AM  22       Any follow-up conversations with Tom Herbst after 2010?

11:56AM  23   A.  So I had, I believe, there were several phone calls with

11:56AM  24   Tom.  Not about that, but about other cases, too.

11:56AM  25   Q.  Okay.  And when you would talk to him about other cases,

11:56AM  1  would you also talk to him about Peter Gerace?

11:56AM  2  A.  It was just initially, those initial conversations were

11:56AM  3  about Gerace, and then it was really not much after that.  It

11:57AM  4  was more towards an investigation that we were working on at

11:57AM  5  the time on guy by the name of Sam Spano.

11:57AM  6  Q.  Okay.  All right.  So 2015, this is five years after

11:57AM  7  those conversations you had with Tom Herbst, correct?

11:57AM  8  A.  Correct.

11:57AM  9  Q.  And you decide to have a conversation with your

11:57AM  10  supervisor about Mr. Gerace, correct?

11:57AM  11  A.  Correct.

11:57AM  12  Q.  And you tell him, I think that there may be a -- well,

11:57AM  13  the conversation includes a discussion of subpoenaing phone

11:57AM  14  records, correct?

11:57AM  15  A.  Yep, it came up during that conversation.

11:57AM  16  Q.  You don't remember whose idea that was?

11:57AM  17  A.  I can't remember if Greg said, hey, just subpoena the

11:57AM  18  phone number, or if I said we should do it.  It's such a

11:57AM  19  standard practice, I can't remember if it was him or I that

11:57AM  20  decided.

11:57AM  21  Q.  In any event, when it comes up you tell him I think we

11:57AM  22  might see within the call logs Joseph Bongiovanni's phone

11:57AM  23  number?

11:57AM  24  A.  I said it's possible.  Just giving you a heads-up, I

11:58AM  25  don't want you blind sided when these records come back, it's

USA v Gerace - Casullo - Foti/Cross - 11/21/24

85

11:58AM    1   possible that his phone number may come up in the phone

11:58AM    2   records.

11:58AM    3   Q.   Whether you suggested it or not, you've described it as

11:58AM    4   standard practice.   So when you have this conversation, you

11:58AM    5   certainly knew that a subpoena for phone records was a

11:58AM    6   possibility, right?

11:58AM    7   A.   Yeah, definitely of a possibility, beginning stages of --

11:58AM    8   of an investigation.

11:58AM    9   Q.   Okay.   So you initiate this conversation to start an

11:58AM   10   investigation that you knew is going to potentially implicate

11:58AM   11   Mr. Bongiovanni, correct?

11:58AM   12   A.   I wouldn't agree with that at -- at -- at all.   At that

11:58AM   13   point, I had no idea how close of friends they were.   And as

11:58AM   14   far as implicating Bongiovanni, I didn't think that at the

11:58AM   15   time.

11:58AM   16       I knew it was enough to have a conversation so Greg

11:58AM   17   wouldn't be blind sided.   Initially, my beliefs were that Joe

11:58AM   18   had poor judgement and had -- was friends with someone that,

11:58AM   19   based on DEA standards, he probably shouldn't have been

11:58AM   20   friends with.

11:58AM   21   Q.   When you say "Greg," you're, you're --

11:58AM   22   A.   Supervisor.

11:58AM   23   Q.   -- you're talking your supervisor, right?

11:59AM   24   A.   Yep.

11:59AM   25   Q.   He didn't come to you to talk about launching this

11:59AM    1    investigation, right?

11:59AM    2    A.  I brought it to his attention, asked him what his

11:59AM    3    thoughts were.

11:59AM    4    Q.  During the course of that conversation, did you tell him

11:59AM    5    that you went to high school with Mr. Gerace?

11:59AM    6    A.  It's either during that conversation or shortly

11:59AM    7    thereafter, I told him how Gerace and I went to high school

11:59AM    8    together.

11:59AM    9    Q.  Okay.  And did you tell him that your wife went to school

11:59AM   10    with Mr. Gerace?

11:59AM   11    A.  I may have at some point, but not initially.

11:59AM   12    Q.  Okay.  Did you tell him your brother-in-law is close

11:59AM   13    friends with Mr. Gerace?

11:59AM   14    A.  I believe at some point, but I don't think it was

11:59AM   15    initially.

11:59AM   16    Q.  Did you tell him anything that occurred in Las Vegas

11:59AM   17    involving your brother-in-law related to your professional

11:59AM   18    record?

11:59AM   19    A.  No.

11:59AM   20    Q.  And you -- you know what I'm referring to, right?

12:00PM   21    A.  Yes.

12:00PM   22    Q.  Did there come a time where you advised him of that?

12:00PM   23    A.  I don't believe I ever had that conversation with Greg.

12:00PM   24    Q.  Okay.  I want to talk to you briefly about the practice

12:00PM   25    of getting phone records because we talked -- you mentioned

| | | |
|---|---|---|
| 12:00PM | 1 | it on direct, but I just want to go a little bit deeper into |
| 12:00PM | 2 | it.  A subpoena is different from a warrant, correct? |
| 12:00PM | 3 | A.  That's correct. |
| 12:00PM | 4 | Q.  All right.  You -- you don't have to go to a court for |
| 12:00PM | 5 | authorization for the subpoena, correct? |
| 12:00PM | 6 | A.  It depends on the type of subpoena. |
| 12:00PM | 7 | Q.  This particular type of subpoena you didn't need to, |
| 12:01PM | 8 | correct? |
| 12:01PM | 9 | A.  That was -- right.  The one that I issued was an |
| 12:01PM | 10 | administrative subpoena, that was more or less specific to |
| 12:01PM | 11 | narcotics investigations. |
| 12:01PM | 12 | Q.  Okay.  And it's an administrative subpoena that you can |
| 12:01PM | 13 | issue in your capacity as a special agent with DEA, correct? |
| 12:01PM | 14 | A.  I can do it.  And then it goes to a supervisor for |
| 12:01PM | 15 | approval.  And then once a supervisor approves it, it goes |
| 12:01PM | 16 | directly to the phone carrier, if that's who you're |
| 12:01PM | 17 | subpoenaing.  You can subpoena other things besides phone |
| 12:01PM | 18 | carriers. |
| 12:01PM | 19 | Q.  For this type of subpoena, you don't need to get anybody |
| 12:01PM | 20 | from the U.S. Attorney's Office involved? |
| 12:01PM | 21 | A.  They don't have to sign-off on that.  We can make them |
| 12:01PM | 22 | aware of what we're doing through the course of the |
| 12:01PM | 23 | investigation, but we don't need their authorization to send |
| 12:01PM | 24 | an administrative subpoena. |
| 12:01PM | 25 | Q.  Did you make them aware, was there anybody in the U.S. |

12:01PM   1   Attorney's Office you were consulting with?

12:01PM   2   A.  At that point I don't think we were consulting.  It was

12:01PM   3   at the very beginning stages.  So at that point of the

12:01PM   4   administrative subpoena, I don't believe so.

12:02PM   5   Q.  The only person you consulted with this was your

12:02PM   6   supervisor that you were testifying about?

12:02PM   7   A.  Correct.

12:02PM   8   Q.  That you remember, at least?

12:02PM   9   A.  Correct.

12:02PM  10   Q.  All right.  So you issue the subpoena and get the return

12:02PM  11   of these phone records, correct?

12:02PM  12   A.  That's correct.

12:02PM  13   Q.  All right.  And you review them, and you specifically

12:02PM  14   looked for Mr. Bongiovanni's number, correct?

12:02PM  15   A.  I was instructed by my supervisor to look for his number.

12:02PM  16   Q.  So you did, you looked for his number?

12:02PM  17   A.  And I did.

12:02PM  18   Q.  Okay.  And you did locate, according to your testimony

12:02PM  19   that there was -- that you saw his phone number in the

12:02PM  20   records?

12:02PM  21   A.  Right.  When I got the records back, it wasn't the actual

12:02PM  22   records.  What happens is it comes back, and then an analyst

12:02PM  23   will put it in readable format as opposed to, like, raw data.

12:02PM  24   And I had a list of all the numbers that were in contact with

12:02PM  25   Gerace's phone, and the frequency of the phone calls and the

USA v Gerace - Casullo - Foti/Cross - 11/21/24

89

| | | |
|---|---|---|
| 12:02PM | 1 | date range. |
| 12:02PM | 2 | Q.  And what's your recollection in terms of the frequency |
| 12:03PM | 3 | with the phone calls to Mr. Bongiovanni? |
| 12:03PM | 4 | A.  Again, I don't remember the exact number.  I believe it |
| 12:03PM | 5 | was somewhere maybe the top ten most-frequently called |
| 12:03PM | 6 | numbers, I can't remember for certain.  I -- I do remember it |
| 12:03PM | 7 | was definitely more than -- than one, it may have been at |
| 12:03PM | 8 | least several. |
| 12:03PM | 9 | Q.  Okay. |
| 12:03PM | 10 | A.  Unless I saw it, I can't remember for certain. |
| 12:03PM | 11 | Q.  That's okay.  So more than one? |
| 12:03PM | 12 | A.  It was more than one, I remember that. |
| 12:03PM | 13 | Q.  And you said it may be in the top ten, and you don't have |
| 12:03PM | 14 | any memory of what the breakdown is for each of those |
| 12:03PM | 15 | individuals in the top ten? |
| 12:03PM | 16 | A.  Unless I saw that frequency report again, I -- I don't |
| 12:03PM | 17 | remember for sure. |
| 12:03PM | 18 | Q.  But in any event you see the phone number in there, |
| 12:03PM | 19 | right? |
| 12:03PM | 20 | A.  Yep. |
| 12:03PM | 21 | Q.  And you go talk to your supervisor, correct? |
| 12:03PM | 22 | A.  And I brought the actual frequency report to my |
| 12:03PM | 23 | supervisor, showed it to him, and, yes. |
| 12:03PM | 24 | Q.  Okay.  And did you make any -- did you document in any |
| 12:04PM | 25 | way your review of that report? |

USA v Gerace - Casullo - Foti/Cross - 11/21/24

12:04PM    1    A.  Like in what way?  In a, like, in a DEA-6 report of

12:04PM    2    investigation, like in a memo?  Like, what do you mean

12:04PM    3    exactly?

12:04PM    4    Q.  In any way.

12:04PM    5    A.  I did not document in any way on any official DEA form

12:04PM    6    that contact.

12:04PM    7    Q.  And you just mentioned that there's multiple types of

12:04PM    8    forms that you could document it in, correct?

12:04PM    9    A.  No, I just brought it to my supervisor for him to handle.

12:04PM    10    Q.  Okay.  So, you testified on direct that at some point,

12:04PM    11    there's this meeting with Mr. Bongiovanni because of tension

12:04PM    12    that's developed?

12:04PM    13    A.  I asked him if he would meet me in the -- if he would be

12:04PM    14    willing to talk to me in the DEA conference room privately,

12:04PM    15    him and I.

12:04PM    16    Q.  Okay.  And you testified on direct how this conversation

12:04PM    17    that you said happened played out between the two of you,

12:04PM    18    correct?

12:04PM    19    A.  Yes.  I went through that step by step.

12:05PM    20    Q.  And nobody else was present, obviously, correct?

12:05PM    21    A.  It was just Bongiovanni and myself.

12:05PM    22    Q.  Okay.  And you didn't document this afterwards in a

12:05PM    23    DEA-6, correct?

12:05PM    24    A.  I didn't put it in a DEA-6, but I did document in a memo

12:05PM    25    afterwards after being requested by Ed Orgon.  He told me to

12:05PM    1    prepare it for him the next day, and then he never requested

12:05PM    2    it.  He never asked for it.  But I did prepare one.

12:05PM    3    Q.  Okay.

12:05PM    4    A.  But that wasn't until, like, 2018 I believe.

12:05PM    5    Q.  All right.  So, in the -- in the days following that

12:05PM    6    meeting, you don't document it in a memorandum, correct?

12:05PM    7    A.  I did not.

12:05PM    8    Q.  In the days that follow, you didn't document in a DEA-6

12:05PM    9    or anything like that, correct?

12:05PM   10    A.  I did not.

12:05PM   11    Q.  You didn't document it in any way in relation to an

12:05PM   12    investigation of Mr. Gerace, correct?

12:05PM   13    A.  No.

12:05PM   14    Q.  And I'm talking about the days afterwards, and going

12:05PM   15    beyond that, into the months afterwards, you didn't document

12:05PM   16    it in any type of memorandum, correct?

12:06PM   17    A.  No.

12:06PM   18    Q.  Today, you've testified that you told a couple close

12:06PM   19    friends at some point about this conversation?

12:06PM   20    A.  I did.

12:06PM   21    Q.  And who -- who were they?

12:06PM   22    A.  Different special agents that I had worked with.

12:06PM   23    Q.  Yeah.  Who were they?

12:06PM   24    A.  So Amy Roderick.  She was a special agent that was my

12:06PM   25    field training agent when I was in Las Vegas.  She was in

12:06PM    1    Miami.  Her husband was my first boss, who was a special

12:06PM    2    agent in charge.  So Amy Roderick would have been one.

12:06PM    3        Another person would have been Tim Moran, who was my

12:06PM    4    supervisor in Las Vegas at one point, who I told about it,

12:06PM    5    who was working in headquarters at DEA special operations

12:06PM    6    division.

12:06PM    7        I told an agent that I worked with in New York that was

12:06PM    8    working in Buffalo, Steve Chocksey, about it.

12:06PM    9        I told Shane Nastoff, a DEA agent in Buffalo who I worked

12:06PM    10    with and trusted about it.

12:06PM    11        I told a CBP internal affairs officer who was a close

12:07PM    12    friend about it.

12:07PM    13    Q.  You told an internal affairs officer about it?

12:07PM    14    A.  I told a CBP Department of Homeland Security internal

12:07PM    15    affairs officer about it.

12:07PM    16    Q.  And as far as you know, none of these people documented

12:07PM    17    it?

12:07PM    18    A.  I have no knowledge of any of them documenting it.

12:07PM    19    Q.  Did they tell you this is something you have to report?

12:07PM    20    A.  They did not say that to me.  They're, like, oh, boy.

12:07PM    21    Most of them were, like, oh, boy.

12:07PM    22    Q.  So you're talking about at least five different

12:07PM    23    individuals that work for the federal government?

12:07PM    24    A.  They were five -- those five people that I mentioned.

12:07PM    25    And there may have been one or two others, I can't remember

12:07PM    1    for sure.

12:07PM    2    Q.  And your -- your memory is that each of them just respond

12:07PM    3    with a general oh, boy?

12:07PM    4    A.  No, it wasn't oh, boy.  I shouldn't explain it like that.

12:07PM    5    But the general of, like, that's -- excuse the language, a

12:07PM    6    bag of shit to deal with.  Yeah, that's concerning.  Is he

12:07PM    7    involved in more?  The racist comments alone are horrifying.

12:08PM    8    That would start an internal investigation.  And is there

12:08PM    9    even more than that, as far as, is this guy corrupt working

12:08PM   10    both sides?

12:08PM   11    Q.  Yeah, I mean --

12:08PM   12    A.  That's the sentiment.

12:08PM   13    Q.  The alleged racist comments, if somebody believes it,

12:08PM   14    they've got -- they have a responsibility to do something

12:08PM   15    about it, don't they?

12:08PM   16    A.  Yes.  Yes.

12:08PM   17    Q.  And Shane Nastoff is somebody you work with in Buffalo,

12:08PM   18    correct?

12:08PM   19    A.  Yes.

12:08PM   20    Q.  And he would work with the DEA in Buffalo, correct?

12:08PM   21    A.  Yes.

12:08PM   22    Q.  And if you tell him about that, he also has a

12:08PM   23    responsibility to report it, correct?

12:08PM   24    A.  I'm pretty sure that that's part of the policy.

12:08PM   25    Q.  Did he tell you, hey, you've got to report this?

| | | |
|---|---|---|
| 12:08PM | 1 | Otherwise, I'm holding on to information that I'm obligated |
| 12:08PM | 2 | to report? |
| 12:08PM | 3 | A.  He never said that. |
| 12:08PM | 4 | Q.  He never told you that you have a responsibility to |
| 12:08PM | 5 | report this? |
| 12:08PM | 6 | A.  No. |
| 12:08PM | 7 | Q.  And you didn't report it? |
| 12:08PM | 8 | A.  I didn't. |
| 12:08PM | 9 | Q.  This -- this conversation that allegedly includes racial |
| 12:08PM | 10 | slurs, you didn't feel was necessary to report at that time? |
| 12:08PM | 11 | A.  Oh, it was necessary, I just chose not to. |
| 12:08PM | 12 | Q.  Okay.  And let's talk about why it's necessary.  You |
| 12:09PM | 13 | talked about on direct that you take an oath, correct? |
| 12:09PM | 14 | A.  That is correct. |
| 12:09PM | 15 | Q.  And that oath isn't just to follow DEA policy, right? |
| 12:09PM | 16 | A.  There's multiple things to that oath. |
| 12:09PM | 17 | Q.  And you specifically talked about protecting the |
| 12:09PM | 18 | Constitution, right? |
| 12:09PM | 19 | A.  Yes. |
| 12:09PM | 20 | Q.  And now you're saying that an agent supposedly made a |
| 12:09PM | 21 | comment to you that he has a racial bias against black people |
| 12:09PM | 22 | and Hispanic people, right? |
| 12:09PM | 23 | A.  Correct. |
| 12:09PM | 24 | Q.  And if you don't say something, then that person is going |
| 12:09PM | 25 | to be able to continue his investigation with a bias into |

12:09PM   1   everything he touches after that, right?

12:09PM   2   A.  I never said anything, and he continued to work in the

12:09PM   3   office, and I was still trying to figure out how to handle

12:09PM   4   it.

12:09PM   5   Q.  So you decided after the supposed conversation you were

12:09PM   6   going to allow a DEA agent to continue investigating

12:09PM   7   individuals that you believed was racist?

12:09PM   8   A.  I was trying --

12:09PM   9          **MR. COOPER:**  Objection.  Objection as to the form of

12:09PM  10   that question.  Allow, Judge.

12:09PM  11          **THE COURT:**  No, overruled.

12:09PM  12          **THE WITNESS:**  I was trying to figure out what to do.

12:09PM  13          **BY MR. FOTI:**

12:09PM  14   Q.  And you talked to at least one other individual in --

12:10PM  15   that works in Buffalo law enforcement, correct?

12:10PM  16   A.  There were the people I just mentioned.

12:10PM  17   Q.  Including Shane Nastoff, correct?

12:10PM  18   A.  Shane was in Buffalo, the CBP internal affairs officer

12:10PM  19   was in Buffalo.  Who else did I mention, Steve Chocksey

12:10PM  20   worked in Buffalo.  So there were three.

12:10PM  21   Q.  You don't know whether these people believed you or not?

12:10PM  22   A.  What -- what do I believe if they believed me?  I believe

12:10PM  23   they believed me.

12:10PM  24   Q.  Your impression is that they believed you?

12:10PM  25   A.  Absolutely.

12:10PM    1    Q.  They acted as if they believed you?

12:10PM    2    A.  Absolutely.

12:10PM    3    Q.  But obviously, if they did believe you, they would have

12:10PM    4    had some responsibility --

12:10PM    5         MR. COOPER:  Objection.

12:10PM    6         BY MR. FOTI:

12:10PM    7    Q.  -- to follow up?

12:10PM    8         MR. COOPER:  Objection.

12:10PM    9         THE COURT:  Overruled.

12:10PM   10         THE WITNESS:  Could you repeat that please?

12:10PM   11         BY MR. FOTI:

12:10PM   12    Q.  If they did believe you, they would have a professional

12:10PM   13    responsibility to follow up, correct?

12:10PM   14    A.  If their policy is the same as DEA's, then they would

12:10PM   15    have -- the ones that worked for DEA, the one that wasn't,

12:10PM   16    I'm -- I believe that his policy was probably the same, they

12:10PM   17    should have.

12:10PM   18    Q.  You know that every federal law enforcement agency has a

12:10PM   19    responsibility to make sure that they're not guided by

12:10PM   20    racism, correct?

12:10PM   21    A.  Of course.  Of course.

12:11PM   22    Q.  And, obviously, if there's an agent that's involved in

12:11PM   23    investigations in Buffalo, New York that's racist, anybody

12:11PM   24    who is a part of law enforcement would have some obligation

12:11PM   25    to report that, correct?

12:11PM  1    A.  If I had said that to him, yes.

12:11PM  2    Q.  And if they believed you, they would have had to do

12:11PM  3    something about it, right?

12:11PM  4    A.  They would've been -- they would have been responsible --

12:11PM  5    they would have had to have done as well, as far as their

12:11PM  6    policy.

12:11PM  7    Q.  As far as you know, nobody ever did?

12:11PM  8    A.  I don't believe so.

12:11PM  9    Q.  As far as you know, nobody ever has any follow-up

12:11PM  10   conversation with their supervisors or anybody else?

12:11PM  11   A.  About what I told them?  I have no idea.  I have no idea

12:11PM  12   who they spoke to.

12:11PM  13   Q.  Okay.  So the point in which this -- you officially

12:12PM  14   report that this conversation happened is in August of 2018,

12:12PM  15   correct?

12:12PM  16   A.  That was the first time I mentioned it to a DEA

12:12PM  17   supervisor.

12:12PM  18   Q.  And you mentioned it to --

12:12PM  19   A.  The U.S. Attorney's Office.

12:12PM  20   Q.  Yeah.  And that was a meeting in regard to a potential

12:12PM  21   conflict that existed, correct?

12:12PM  22   A.  It was brought to my attention that -- do you want me

12:12PM  23   to --

12:12PM  24   Q.  Without getting into the specifics --

12:12PM  25   A.  Sure, sure.

12:12PM  1  Q.  -- generally, the meeting was called because there was

12:12PM  2  the potential that a conflict existed?

12:12PM  3  A.  That there was a possible conflict.

12:12PM  4  Q.  And the potential conflict related to your

12:12PM  5  brother-in-law, correct?

12:12PM  6  A.  That he was present.

12:12PM  7  Q.  And you were asked about your relationship with him,

12:12PM  8  correct?

12:12PM  9  A.  With my wife's brother?

12:12PM  10  Q.  During the course of this meeting, you were asked about

12:12PM  11  your relationship with your brother-in-law, correct?

12:12PM  12  A.  I really don't remember anything in depth other than that

12:12PM  13  being my brother-in-law, and we don't talk.

12:13PM  14  Q.  And you were told at some point that you could no longer

12:13PM  15  continue an investigation into Mr. Gerace, correct?

12:13PM  16  A.  Right.  Not during that meeting at the U.S. Attorney's

12:13PM  17  Office, but afterwards when I had followup meetings with my

12:13PM  18  resident agent in charge.

12:13PM  19  Q.  Okay.  During that meeting, though, the conversation

12:13PM  20  comes up or the during the conversation, your

12:13PM  21  brother-in-law's brought up, correct?

12:13PM  22  A.  During the one with my resident agent in charge.

12:13PM  23  Q.  In August 1st, 2018, the -- during the course of the

12:13PM  24  conversation on August 1st, 2018, your brother-in-law is

12:13PM  25  brought up, correct?

12:13PM  1   A.  I'm sorry, I'm not trying to be difficult, I'm trying

12:13PM  2   to --

12:13PM  3   Q.  No, that's okay.

12:13PM  4   A.  The meeting with my -- with Ed Orgon?  Or the one at the

12:13PM  5   U.S. Attorney's Office?

12:13PM  6   Q.  Well, let's -- let's go through both.

12:13PM  7   A.  Okay.

12:13PM  8   Q.  All right.  When does -- in one of those meetings, your

12:13PM  9   brother-in-law's name is brought up, correct?

12:13PM  10  A.  The one at the U.S. Attorney's Office.  The first one.

12:13PM  11  Q.  Okay.  So the other meeting takes place after you had

12:14PM  12  went to the U.S. Attorney's Office?

12:14PM  13  A.  Based on what I told them.  I had to meet with my

12:14PM  14  resident agent in charge and supervisor alone.

12:14PM  15  Q.  Okay.  So I wasn't being clear because there were two

12:14PM  16  meetings on that date.  So --

12:14PM  17  A.  I don't know if it was the same day, it might have been

12:14PM  18  like the next day.

12:14PM  19  Q.  All right.  Well, I'm specifically asking about the

12:14PM  20  meeting at the U.S. Attorney's Office on August 1st, 2018.

12:14PM  21  A.  Okay.

12:14PM  22  Q.  Okay?  During the course of that meeting, on August 1st,

12:14PM  23  2018, you -- your brother-in-law's name was brought up,

12:14PM  24  correct?

12:14PM  25  A.  It was.

12:14PM  1    Q.  Who brought it up, his name up?

12:14PM  2    A.  The name of the Assistant U.S. Attorney?

12:14PM  3    Q.  Yeah.

12:14PM  4    A.  Joe Tripi.

12:14PM  5    Q.  Okay.  And it was brought up in the context that there

12:14PM  6    could be a potential conflict here, correct?

12:14PM  7    A.  Correct.

12:14PM  8    Q.  Okay.  And did you discuss what happened back in

12:14PM  9    Las Vegas in regards to your brother-in-law?

12:14PM  10   A.  We didn't go into specifics.  I said are you -- I think

12:14PM  11   it was, are you aware of --

12:14PM  12        MR. COOPER:  Judge, I'm going to object to hearsay.

12:14PM  13   The contents of this conversation are hearsay.

12:15PM  14        THE COURT:  Well, the question is:  Did you discuss

12:15PM  15   what happened back in Las Vegas in regards to your

12:15PM  16   brother-in-law?

12:15PM  17        You object to that question.

12:15PM  18        MR. COOPER:  What's happening right now, I'm

12:15PM  19   saying --

12:15PM  20        THE COURT:  I understand that.  He's not -- he's --

12:15PM  21   what I'm pointing out is he's going beyond the question.

12:15PM  22        Do you have a problem with him answering that

12:15PM  23   question?

12:15PM  24        MR. COOPER:  I'm objecting to hearsay as the answer

12:15PM  25   is hearsay.  I'm -- I'm not sure I'm picking up on --

| | | |
|---|---|---|
| 12:15PM | 1 | **THE COURT:** Okay. So, so, Mr. Casullo, I want you to |
| 12:15PM | 2 | answer the question that was asked. |
| 12:15PM | 3 | The question that was asked was, hang on: And did |
| 12:15PM | 4 | you discuss what happened back in Las Vegas in regards to your |
| 12:15PM | 5 | brother-in-law? |
| 12:15PM | 6 | **THE WITNESS:** Okay. |
| 12:15PM | 7 | **THE COURT:** Yes or no? |
| 12:15PM | 8 | **THE WITNESS:** Yes, to some extent. Yes, something |
| 12:15PM | 9 | was said. |
| 12:15PM | 10 | **THE COURT:** Next question. |
| 12:15PM | 11 | **BY MR. FOTI:** |
| 12:15PM | 12 | Q. Something by you? |
| 12:15PM | 13 | A. That I said to the AUSA. |
| 12:16PM | 14 | Q. Okay. And it's after this meeting that subsequently |
| 12:16PM | 15 | you're told that you're no longer going to be involved in the |
| 12:16PM | 16 | prosecution -- or, the investigation into Mr. Gerace, |
| 12:16PM | 17 | correct? |
| 12:16PM | 18 | A. So, after that meeting, I believe it was either the next |
| 12:16PM | 19 | day, it wasn't the same day I don't think, but the next day I |
| 12:16PM | 20 | had to meet with Ed Orgon, the resident agent in charge. It |
| 12:16PM | 21 | was during that meeting that I was told that I was off the |
| 12:16PM | 22 | Gerace investigation. |
| 12:16PM | 23 | Q. Okay. Earlier I asked you if there came a time that you |
| 12:16PM | 24 | learned that your brother-in-law and Peter Gerace were close |
| 12:16PM | 25 | friends, right? |

12:16PM    1    A.   Yes.

12:16PM    2    Q.   And you -- indicated you did learn that to be the case at

12:16PM    3    some point, correct?

12:16PM    4    A.   At some point, I knew.   I became aware that they were

12:17PM    5    good friends.

12:17PM    6    Q.   Okay.   You certainly knew by 2018, right?

12:17PM    7    A.   Yes.

12:17PM    8    Q.   So when these conversations are happening, you're aware

12:17PM    9    of the relationship between your brother-in-law and Peter

12:17PM   10    Gerace, correct?

12:17PM   11    A.   Yes.

12:17PM   12    Q.   Okay.   And on direct, you testified that your

12:17PM   13    brother-in-law's no longer allowed to even come by the house,

12:17PM   14    correct?

12:17PM   15    A.   He hasn't been for a couple years.   And he tried to come

12:17PM   16    once, and I told my wife he can't be here.   And that was a

12:17PM   17    couple years ago.   It was actually during Thanksgiving.

12:17PM   18    Q.   During Thanksgiving of -- you said a couple years ago,

12:17PM   19    after the --

12:17PM   20    A.   It could have been three years ago, I can't remember.   It

12:17PM   21    was at least two, maybe three.

12:17PM   22    Q.   Post COVID?

12:17PM   23    A.   I don't remember.

12:17PM   24    Q.   Okay.   All right.   When did your brother-in-law move back

12:17PM   25    to Buffalo?

| | | |
|---|---|---|
| 12:17PM | 1 | A.  So sometime while I was working in New York City, which |
| 12:17PM | 2 | was -- so I got to New York City in December of 2013. |
| 12:18PM | 3 | Shortly after that, I think he moved back to Buffalo for a |
| 12:18PM | 4 | couple of months, which was around 2014. |
| 12:18PM | 5 | Q.  So after you leave Las Vegas, he moves after that? |
| 12:18PM | 6 | A.  Yes.  When I went to New York City, he moved back to |
| 12:18PM | 7 | Buffalo for a short period of time. |
| 12:18PM | 8 | Q.  Okay.  Now, I've been alluding to something that happened |
| 12:18PM | 9 | with him back in Las Vegas, and you said you know what I'm |
| 12:18PM | 10 | referring to, right? |
| 12:18PM | 11 | A.  Yes. |
| 12:18PM | 12 | Q.  And that was -- |
| 12:18PM | 13 | MR. COOPER:  Objection.  I'd ask that we come up. |
| 12:18PM | 14 | THE COURT:  Come on up. |
| 12:18PM | 15 | (Sidebar discussion on the record.) |
| 12:18PM | 16 | MR. COOPER:  Judge, it's my understanding that |
| 12:18PM | 17 | there's a pretrial ruling that circumscribes the extent to |
| 12:18PM | 18 | which this topic is going to be covered during the course of |
| 12:18PM | 19 | the trial. |
| 12:18PM | 20 | THE COURT:  Yeah, I remember vaguely. |
| 12:18PM | 21 | MR. COOPER:  Well, that's what I want to conference, |
| 12:18PM | 22 | and so I'm not. |
| 12:19PM | 23 | MR. FOTI:  I only, remember vaguely with him saying |
| 12:19PM | 24 | it, but I -- whatever the analysis was back then, I think it's |
| 12:19PM | 25 | been established that there's a close relationship in 2000 -- |

12:19PM   1   that he's aware of in 2018 when he's making these allegations

12:19PM   2   regarding Phil, his brother-in-law, and Peter Gerace, and any

12:19PM   3   history that -- where he is professionally reprimanded with

12:19PM   4   regards to -- to one of Peter's close friends is relevant.  It

12:19PM   5   goes to bias.

12:19PM   6           THE COURT:  Because?

12:19PM   7           MR. FOTI:  Because it -- it potentially influences a

12:19PM   8   bias that he would have against any of Phil's friends,

12:19PM   9   including Peter Gerace.

12:19PM   10           THE COURT:  Yeah, why not, Mr. Cooper?

12:19PM   11           MR. COOPER:  Judge, because he's spent a lot more

12:19PM   12   time with this issue other than the 30 seconds that we've been

12:19PM   13   up here.  We -- I believe this was briefed, it was argued.

12:19PM   14   And what the ultimate determination that the Court made was

12:20PM   15   that there could be cross-examination, my best recollection of

12:20PM   16   it is cross-examination indicating in sum and substance your

12:20PM   17   brother-in-law caused problems for you when you were out in

12:20PM   18   Las Vegas and that that was it.  And that you weren't getting

12:20PM   19   into discipline.  You're not allowing questioning into

12:20PM   20   potential discipline or underlying facts.

12:20PM   21           THE COURT:  This is starting to come back to me now.

12:20PM   22   So -- so why can't you ask, did your brother-in-law cause

12:20PM   23   problems for you that created issues professionally for you

12:20PM   24   when you were in Las Vegas?

          25

12:20PM   1      **MR. FOTI:**  Well, I guess as a preliminary point, was

12:20PM   2   that in regards to -- did we brief that?  I don't remember

12:20PM   3   briefing that.  Or was that Bongiovanni?

12:20PM   4      I think that was an analysis associated with

12:20PM   5   Mr. Bongiovanni.  It doesn't have the same friendship with

12:20PM   6   Phil, so my argument would be different than it would be if we

12:20PM   7   were in the Bongiovanni case.

12:20PM   8      **MR. COOPER:**  I think it's the exact same argument

12:20PM   9   because Bongiovanni is in --

12:20PM   10      Well, this is my position, you have your position.

12:20PM   11   It's the exact same argument.

12:20PM   12      Because Bongiovanni is in a conspiracy with Gerace,

12:20PM   13   the Bongiovanni attorneys wanted to make the exact same

12:21PM   14   argument.

12:21PM   15      **THE COURT:**  Was this -- was this a pretrial ruling in

12:21PM   16   Bongiovanni?

12:21PM   17      **MR. COOPER:**  Correct.  It's in Bongiovanni.  I don't

12:21PM   18   recall it being --

12:21PM   19      **MR. TRIPI:**  You -- you chimed in, you -- you gave

12:21PM   20   them the transcript from the rulings that you had and allowed

12:21PM   21   them to brief anything further.

12:21PM   22      And I'm not being critical, they didn't brief it

12:21PM   23   further, so I feel like this is a lot to put on the Court in

12:21PM   24   this moment.  If it's going to be a whole --

12:21PM   25      **THE COURT:**  This isn't the first time that's

| | | |
|---|---|---|
| 12:21PM | 1 | happened. |
| 12:21PM | 2 | **MR. TRIPI:** I'm not trying to be critical of anybody, |
| 12:21PM | 3 | okay? Everyone's advocating. |
| 12:21PM | 4 | But -- but there's a lot of history here. Because, |
| 12:21PM | 5 | in other words, in the Vegas situation as I recall the |
| 12:21PM | 6 | records, I haven't looked at them in a while, but there's a -- |
| 12:21PM | 7 | there's a referral, it's the issue with an undercover, right? |
| 12:21PM | 8 | **THE COURT:** Issue of -- |
| 12:21PM | 9 | **MR. TRIPI:** Just maybe if I state some facts it will |
| 12:21PM | 10 | trigger a memory. But Casullo in 2003 or '4, whatever it is, |
| 12:21PM | 11 | he's in Las Vegas, he's at a bar, there's an undercover |
| 12:21PM | 12 | operation going on, they're with his brother-in-law, and |
| 12:22PM | 13 | there's that sequence of phone calls that leads the agent with |
| 12:22PM | 14 | the FBI to believe that Casullo might have, like, tipped off |
| 12:22PM | 15 | or whatever. |
| 12:22PM | 16 | **THE COURT:** Yeah. |
| 12:22PM | 17 | **MR. TRIPI:** So then there's an investigation that was |
| 12:22PM | 18 | triggered. |
| 12:22PM | 19 | **THE COURT:** Yeah, I know. |
| 12:22PM | 20 | **MR. TRIPI:** Ultimately, there's no -- there's no, |
| 12:22PM | 21 | find -- this is something that if he did that, he would have |
| 12:22PM | 22 | been fired and prosecuted for it. |
| 12:22PM | 23 | **THE COURT:** Yes. |
| 12:22PM | 24 | **MR. TRIPI:** So there was no finding. |
| 12:22PM | 25 | **THE COURT:** Right. |

12:22PM    1          **MR. TRIPI:**  So this is -- there was -- there was some

12:22PM    2    investigation.  I don't remember if there was, like, a letter

12:22PM    3    of reprimand or anything like that.  I don't remember.

12:22PM    4          But certainly later on in life, and we argued this to

12:22PM    5    you before, he then -- Casullo works for the FBI, works with

12:22PM    6    the FBI, and in fact later works in the task force here in the

12:22PM    7    FBI where it's led by a guy who was back in Las Vegas who knew

12:22PM    8    the circumstances at the time.

12:22PM    9          **THE COURT:**  Yeah.  But -- let's get back to, so, so

12:22PM   10    the point you want to make is that the brother-in-law caused

12:22PM   11    problems for him in Las Vegas, right?

12:23PM   12          **MR. FOTI:**  Yeah, I think -- I think I want -- I do

12:23PM   13    want to get -- well, there's something that Eric wanted to

12:23PM   14    add.

12:23PM   15          **MR. SOEHNLEIN:**  I'm sorry, I just wanted, with

12:23PM   16    respect to -- I'm soft spoken.

12:23PM   17          With respect to the timeline, I just want to note

12:23PM   18    that whatever the pretrial ruling was, the pretrial analysis,

12:23PM   19    our final pretrial conference where we argued this was

12:23PM   20    October 25th.  The documents were disclosed to us

12:23PM   21    October 30th.  After that pretrial conference when we got an

12:23PM   22    email for who would be the initial witnesses in the trial is

12:23PM   23    when we got disclosure on this issue.  Just to set the table.

12:23PM   24          **MR. FOTI:**  And Mr. Tripi's not -- I mean, saying that

12:23PM   25    that -- that we erred in some way, but that is true.

| | | |
|---|---|---|
| 12:23PM | 1 | **THE COURT:**  Talk about the issue.  Talk about the |
| 12:23PM | 2 | issue. |
| 12:23PM | 3 | **MR. FOTI:**  In terms of the issue, Judge, I do think |
| 12:23PM | 4 | the extent matters.  Saying you were reprimanded can mean |
| 12:23PM | 5 | almost -- it doesn't mean anything.  It means a supervisor |
| 12:23PM | 6 | could -- could say -- |
| 12:23PM | 7 | **THE COURT:**  Okay.  We've got to break.  We can't -- |
| 12:23PM | 8 | we can't do this now.  We're going to break for lunch.  I've |
| 12:23PM | 9 | got a 12:30, we'll come back at 1 and do this. |
| 12:24PM | 10 | **MR. TRIPI:**  Can I also make two other brief record |
| 12:24PM | 11 | things? |
| 12:24PM | 12 | **THE COURT:**  Yeah, about this? |
| 12:24PM | 13 | **MR. TRIPI:**  Generally about this subject.  But we -- |
| 12:24PM | 14 | so, obviously I was -- I was in a meeting that you just |
| 12:24PM | 15 | crossed about -- |
| 12:24PM | 16 | **THE COURT:**  Yeah. |
| 12:24PM | 17 | **MR. TRIPI:**  -- with the supervisor.  Just by way of |
| 12:24PM | 18 | disclosure.  He -- his recollection controls, but -- and he |
| 12:24PM | 19 | testified that we brought this issue up in that meeting. |
| 12:24PM | 20 | I will, I initially brought it up with his |
| 12:24PM | 21 | supervisor, not with him. |
| 12:24PM | 22 | And then I used the police report that lists Phil |
| 12:24PM | 23 | Domiano on it initially with him to say the situation is too |
| 12:24PM | 24 | close. |
| 12:24PM | 25 | His supervisors followed up probably in the manner he |

12:24PM  1  recalls.  But I just want to be clear to the extent I was

12:24PM  2  there, and if it went a little bit different, I want to let

12:24PM  3  you know.

12:24PM  4          **THE COURT:**  Um-hmm.

12:24PM  5          **MR. FOTI:**  I think it said it in one of the

12:24PM  6  memorandums, I think.

12:24PM  7          **MR. TRIPI:**  So, you know, I'm just sitting there, I'm

12:24PM  8  hearing it, and it's a little bit different than I recall it.

12:24PM  9  So I just wanted to make sure to cover the sequence.

12:24PM  10         And then at some point, I don't think this is in any

12:25PM  11  formal interview or whatever, at some point when these events

12:25PM  12  were occurring, you can imagine there were a lot of back and

12:25PM  13  forth between various members of the U.S. Attorney's Office,

12:25PM  14  DEA and DEA agents.

12:25PM  15         At one point I recall having a conversation with

12:25PM  16  Shane Nastoff, and that's information in my brain that he's

12:25PM  17  asking these questions.  Nastoff indicated to me that he

12:25PM  18  learned the information closer in time -- he believed he

12:25PM  19  learned the information closer in time to when DEA management

12:25PM  20  did.  The timing of it wasn't Mark's question.  I think the

12:25PM  21  timing of it was -- was, you know, who did you tell.

12:25PM  22         **MR. FOTI:**  Yeah.

12:25PM  23         **MR. TRIPI:**  But I think that, you know, I think that

12:25PM  24  Nastoff would say I believe I learned it around the time

12:25PM  25  management did.  So, you have that now.

| | | |
|---|---|---|
| 12:25PM | 1 | **MR. FOTI:**  Yeah. |
| 12:25PM | 2 | **MR. TRIPI:**  I'm just trying to think if there's |
| 12:25PM | 3 | anything else surrounding that. |
| 12:25PM | 4 | I think at one point Casullo indicated another name, |
| 12:25PM | 5 | maybe he told Dave Davidzik, you might want to ask about that. |
| 12:26PM | 6 | And Dave Davidzik, my recollection, learned it closer |
| 12:26PM | 7 | in time to when this happened, the -- the June conversation. |
| 12:26PM | 8 | So -- |
| 12:26PM | 9 | **THE COURT:**  Okay. |
| 12:26PM | 10 | **MR. FOTI:**  Thank you, Judge. |
| 12:26PM | 11 | (End of sidebar discussion.) |
| 12:26PM | 12 | **THE COURT:**  Okay.  We have some legal work we have to |
| 12:26PM | 13 | do, and I don't want to waste your time while we're doing it. |
| 12:26PM | 14 | I also have another matter that I've got to handle at |
| 12:26PM | 15 | 12:30, so we are going to break for lunch. |
| 12:26PM | 16 | So remember my instructions.  Don't talk about this |
| 12:26PM | 17 | case with anyone.  Don't communicate electronically or in any |
| 12:26PM | 18 | other way about the case.  Don't research the case |
| 12:26PM | 19 | electronically or in any other way.  Don't read or watch or |
| 12:26PM | 20 | listen to any news coverage, if there is any.  And don't make |
| 12:26PM | 21 | up your mind until you start deliberating. |
| 12:26PM | 22 | Come back at 1:30.  Thanks very much. |
| 12:27PM | 23 | (Jury excused at 12:27 p.m.) |
| 12:27PM | 24 | **THE COURT:**  Okay.  Mr. Casullo, you can step down. |
| 12:27PM | 25 | And you're not to talk to anyone during the break -- |

| | | |
|---|---|---|
| 12:27PM | 1 | **THE WITNESS:**  Yes, Judge. |
| 12:27PM | 2 | **THE COURT:**  -- about this case, obviously. |
| 12:27PM | 3 | **THE WITNESS:**  Yes, Judge. |
| 12:27PM | 4 | (Witness excused at 12:27 p.m.) |
| 12:27PM | 5 | **THE COURT:**  Let's wait until he leaves. |
| 12:27PM | 6 | So, we'll come back at 1 to talk about the issue that |
| 12:27PM | 7 | we were just talking about.  I'm gonna want to see what you |
| 12:27PM | 8 | want to get into.  And I'll want to know the extent you want |
| 12:27PM | 9 | to get into it. |
| 12:27PM | 10 | **MR. FOTI:**  Sure. |
| 12:27PM | 11 | **THE COURT:**  And -- and why.  And then we'll, we'll |
| 12:27PM | 12 | revisit this issue. |
| 12:28PM | 13 | **MR. TRIPI:**  Yeah.  My -- I think you -- I think we |
| 12:28PM | 14 | made initially an ex parte, you ordered disclosures, so I'll |
| 12:28PM | 15 | go back and look at those materials. |
| 12:28PM | 16 | **THE COURT:**  Yeah, please. |
| 12:28PM | 17 | **MR. TRIPI:**  Yeah. |
| 12:28PM | 18 | **THE COURT:**  Great.  Okay?  See you all. |
| 12:28PM | 19 | Anything else that we need to do before we break from |
| 12:28PM | 20 | the defense? |
| 12:28PM | 21 | **MR. SOEHNLEIN:**  I don't think so, no. |
| 12:28PM | 22 | **THE COURT:**  Okay.  From the government? |
| 12:28PM | 23 | **MS. CHALBECK:**  No, Judge. |
| 12:28PM | 24 | **THE COURT:**  All right, terrific.  Okay.  We'll see |
| 12:28PM | 25 | you at 1. |

| | | |
|---|---|---|
| 12:28PM | 1 | **THE CLERK:**  All rise. |
| 12:28PM | 2 | (Off the record at 12:28 p.m.) |
| 01:05PM | 3 | (Back on the record at 1:05 p.m.) |
| 01:05PM | 4 | (Jury not present.) |
| 01:05PM | 5 | **THE CLERK:**  All rise. |
| 01:05PM | 6 | **THE COURT:**  Please be seated. |
| 01:05PM | 7 | **THE CLERK:**  We are back on the record for the |
| 01:06PM | 8 | continuation of the jury trial in case number 19-cr-227 and |
| 01:06PM | 9 | 23-cr-37, United States of America versus Peter Gerace, Jr. |
| 01:06PM | 10 | All counsel and parties are present. |
| 01:06PM | 11 | **THE COURT:**  Okay.  So I thought about this a little |
| 01:06PM | 12 | bit.  Let me tell you what my -- my preliminary thoughts are. |
| 01:06PM | 13 | This is a little different than the Bongiovanni case, |
| 01:06PM | 14 | and I do think there -- there may be room for the defense to |
| 01:06PM | 15 | get into a little bit more. |
| 01:06PM | 16 | I don't think the details of what happened in |
| 01:06PM | 17 | Las Vegas are fair game because I don't think the details add |
| 01:06PM | 18 | anything. |
| 01:06PM | 19 | But perhaps -- so tell me, what was the -- what was |
| 01:06PM | 20 | the result?  Was there a reprimand?  What was it? |
| 01:06PM | 21 | **MR. TRIPI:**  I just reviewed it.  I can hand it up to |
| 01:06PM | 22 | you, too, Judge.  But it was ultimately -- there was a letter |
| 01:06PM | 23 | of reprimand that he used poor judgment.  And it was based |
| 01:06PM | 24 | upon the -- the end result was a letter of reprimand for poor |
| 01:07PM | 25 | judgment.  The lynchpin of the analysis essentially was that |

01:07PM   1    he was complaining loudly to his wife about his P-O-S

01:07PM   2    brother-in-law --

01:07PM   3              **THE COURT:**  Right.

01:07PM   4              **MR. TRIPI:**  -- and why he was with an undercover.

01:07PM   5              **THE COURT:**  Right.

01:07PM   6              **MR. TRIPI:**  And the mother overheard --

01:07PM   7              **THE COURT:**  Overhead it.

01:07PM   8              **MR. TRIPI:**  -- and made a phone call.

01:07PM   9              **MR. COOPER:**  And so, Judge, if we -- if you're

01:07PM  10    allowing the letter of reprimand in, which I don't think is

01:07PM  11    probative of his truthfulness in any way, and I don't think it

01:07PM  12    goes to any bias that he has, if you allow that in, then I

01:07PM  13    think I would kind of be required in order to explain to the

01:07PM  14    jury that there's an innocent explanation for all this and

01:07PM  15    what that is.

01:07PM  16              And it kind of becomes this trial within a trial.

01:07PM  17    Because then he's recrossed on those facts that I've

01:07PM  18    directed -- redirected him on.

01:07PM  19              **THE COURT:**  Yeah, I -- I'm not, I'm not inclined to

01:07PM  20    let that in.  But the fact that he received a reprimand, I am

01:07PM  21    inclined to let in.

01:07PM  22              **MR. COOPER:**  But I guess my concern there then,

01:07PM  23    Judge, is that I -- if you're not inclined to let the

01:08PM  24    underlying facts in, it makes it sound worse than it is.

01:08PM  25    Because --

USA v Gerace - Casullo - Foti/Cross - 11/21/24

01:08PM   1        **THE COURT:**  Oh, I don't think so.  I don't think so.

01:08PM   2   It's a reprimand.  It's not a -- it's not a -- it's not

01:08PM   3   anything else.

01:08PM   4        Is there anything more -- but let me -- let me just

01:08PM   5   ask this.  Is there anything more that you think you should be

01:08PM   6   allowed to go into?

01:08PM   7        **MR. FOTI:**  No.  No.  I think the reality is for the

01:08PM   8   purposes of what we want to get into it for, the letter of

01:08PM   9   reprimand covers.  I don't think the underlying facts make a

01:08PM  10   difference.

01:08PM  11        I think the underlying facts may ultimately bear on

01:08PM  12   his credibility in some way, but not in a way that I think.

01:08PM  13        **THE COURT:**  So -- so let me ask the government this

01:08PM  14   then.  Is there a way to get in that there was some

01:08PM  15   employment-related action taken that would solve your problem

01:08PM  16   with the word "reprimand?"

01:08PM  17        I mean, I think a reprimand is just such a -- such a

01:08PM  18   mild sanction, but -- but, I mean, is there some -- is there

01:08PM  19   some -- I mean, so -- so if he said there was a job-related

01:09PM  20   sanction, I think that'd be worse, right?  I think that would

01:09PM  21   be worse than a reprimand.

01:09PM  22        But, but I'm open to discussion about whether there

01:09PM  23   is a way to phrase it in -- in a different way that allows the

01:09PM  24   jury --

01:09PM  25        So the reason is, because -- because Gerace is

01:09PM    1    friends -- is such good friends with this guy, it's different

01:09PM    2    than Bongiovanni.  It's different.  The bias that results from

01:09PM    3    what Domiano does to Casullo is different against Mr. Gerace

01:09PM    4    than it is against Mr. Bongiovanni.  It's a different --

01:09PM    5    it's -- it's a difference of kind in the bias that he might

01:09PM    6    have.  And so I -- and so for that reason, I think that

01:09PM    7    there's a little bit, not a lot, but a little bit more the

01:09PM    8    defense is entitled to do in this case than it was in

01:09PM    9    Bongiovanni.

01:09PM   10            **MR. COOPER:**  Can we confer for a moment?

01:09PM   11            **THE COURT:**  Absolutely.

01:10PM   12            **MR. COOPER:**  Judge, what we just discussed is if the

01:11PM   13    Court is inclined to allow defense counsel to question about

01:11PM   14    the existence of a letter of reprimand related to Domiano and

01:11PM   15    Casullo's, you know, familial relationship with that person,

01:11PM   16    what we would request is the ability on redirect in a leading

01:11PM   17    fashion to elicit from the witness, isn't it true, sir, that

01:11PM   18    that letter of reprimand was related to you complaining about

01:11PM   19    the associations that your brother-in-law had out loud in

01:11PM   20    front of your wife?  Like, it needs to -- from our position,

01:11PM   21    if the letter of reprimand comes up in association with

01:11PM   22    Casullo in a vacuum, and no additional facts are offered,

01:11PM   23    that's -- I -- I view that as very prejudicial to the

01:11PM   24    government.

01:11PM   25            Because I know Mr. Foti and Mr. Soehnlein are good

| | | |
|---|---|---|
| 01:11PM | 1 | advocates, and they're going to use the -- the absence of |
| 01:11PM | 2 | information surrounding that in an effective way for their |
| 01:11PM | 3 | client.  The actual facts -- |
| 01:11PM | 4 | **THE COURT:**  Let me ask the defense:  Do you object to |
| 01:11PM | 5 | the facts of this getting in? |
| 01:11PM | 6 | **MR. FOTI:**  I don't object to the facts if we're |
| 01:12PM | 7 | talking about the full universe of facts. |
| 01:12PM | 8 | **THE COURT:**  Right.  Okay. |
| 01:12PM | 9 | **MR. FOTI:**  Yeah. |
| 01:12PM | 10 | **THE COURT:**  So if you do that, I'll let them get into |
| 01:12PM | 11 | everything. |
| 01:12PM | 12 | **MR. TRIPI:**  Well, that's -- that's -- I guess that's |
| 01:12PM | 13 | what we're talking about, Judge. |
| 01:12PM | 14 | If -- if on -- on the reprimand piece, I think that a |
| 01:12PM | 15 | limited amount of redirect should be permitted then to mete |
| 01:12PM | 16 | that without opening the door to the whole underlying |
| 01:12PM | 17 | consolation of facts because -- |
| 01:12PM | 18 | **THE COURT:**  I think -- I think -- I think you can |
| 01:12PM | 19 | have it one of two ways, Mr. Tripi.  I think you can -- you |
| 01:12PM | 20 | can leave it at reprimand, or we can talk about the whole kit |
| 01:12PM | 21 | and caboodle. |
| 01:12PM | 22 | But I -- but I -- I don't think you can slice it so |
| 01:12PM | 23 | thin that you get to put the facts about it in that you want |
| 01:12PM | 24 | to put in and not have the defense put everything in.  So, so |
| 01:12PM | 25 | I'll leave that to you. |

USA v Gerace - Casullo - Foti/Cross - 11/21/24

01:12PM   1          But -- but -- so, they can get into the fact that

01:12PM   2    there was a reprimand.  If you open the door on redirect with

01:12PM   3    the facts of the reprimand, I'm going to let them get into

01:12PM   4    everything with respect to the reprimand.  And it's just

01:13PM   5    gonna -- I think it will be a tremendous waste of time.  But

01:13PM   6    if you want to do that, we'll do it.

01:13PM   7          **MR. TRIPI:**  I -- we get into -- we start getting into

01:13PM   8    403, that's our -- that's our argument for why the reprimand

01:13PM   9    doesn't come in.

01:13PM   10          **MR. FOTI:**  And, Judge, if they want to -- look, I

01:13PM   11    think the -- if they want to on redirect get into sort of the

01:13PM   12    minimal impact of a reprimand, I'm not gonna argue that that

01:13PM   13    opens the door to anything or that's improper.

01:13PM   14          **THE COURT:**  Right.  I think that's right.

01:13PM   15          **MR. FOTI:**  But obviously, if they get into the

01:13PM   16    underlying facts, then yes.

01:13PM   17          **THE COURT:**  I think that's right.  I think, you know,

01:13PM   18    is a reprimand the least -- the -- the least serious form

01:13PM   19    of -- of --

01:13PM   20          **MR. COOPER:**  Can we have one second?

01:13PM   21          **THE COURT:**  Something along those lines.

01:16PM   22          **MR. TRIPI:**  Judge, I'm going to read from the letter

01:16PM   23    if I may.

01:16PM   24          **THE COURT:**  Go ahead.

01:16PM   25          **MR. TRIPI:**  The -- it says that the -- proposed

01:16PM    1    issue, a letter of reprimand based on the charge of poor

01:16PM    2    judgment.

01:16PM    3         And that poor judgment wasn't associating with

01:16PM    4    Domiano or anything like that.  That poor judgment was limited

01:16PM    5    to the decision to speak in an unauthorized place, his

01:16PM    6    residence, about matters --

01:16PM    7             **THE COURT:**  Involving Domiano?

01:16PM    8             **MR. TRIPI:**  Yeah.

01:16PM    9             **THE COURT:**  And so, I guess what I'm saying is, if --

01:16PM   10    if there's cross about you received a letter of reprimand for

01:16PM   11    poor judgment, just cabining the redirect to did that letter

01:17PM   12    of reprimand -- because they didn't find all those other

01:17PM   13    things, all the underlying things.  They didn't find he did

01:17PM   14    anything wrong other than making the decision to speak in a

01:17PM   15    place he shouldn't have been speaking about work, about

01:17PM   16    Domiano.

01:17PM   17         And so, in a very tight fashion, just like reprimand

01:17PM   18    is tight, I think there's a way to craft a direct -- a

01:17PM   19    redirect that, of course, that you have signed off on in

01:17PM   20    advance, that doesn't open the door to everything, that

01:17PM   21    strikes a proper balance.

01:17PM   22             **THE COURT:**  Mr. Foti may agree with that, but -- but

01:17PM   23    you -- you do it at your own risk.

01:17PM   24         So -- so, you know, it sounds to me like Mr. Foti

01:17PM   25    is -- is agreeing with that.

01:17PM  1     If you guys want to talk about how far you can go

01:17PM  2   and -- and Mr. Foti will tell you what -- what his recross

01:17PM  3   would be, fine.  But I'm telling you that I think that you may

01:17PM  4   be opening a door by doing that sort of redirect.  I

01:17PM  5   think -- I think you can do a redirect on how -- how benign a

01:18PM  6   penalty a reprimand is.  I don't think there's anything that

01:18PM  7   would open any doors with respect to that.  That it's, you

01:18PM  8   know, the least -- I think it probably is the least serious

01:18PM  9   sanction that can be imposed.

01:18PM  10     **MR. TRIPI:**  Because they went through the Douglas

01:18PM  11   factors.  It says serious with no malicious intent; prior to

01:18PM  12   disciplinary record, none; effect on offense on ability to

01:18PM  13   perform job, no trust issues with management; consistency with

01:18PM  14   other penalties, consistent; consistency with agency penalty

01:18PM  15   guideline, consistent; notoriety of defense, minimal;

01:18PM  16   potential for rehabilitation, excellent, based on prior work

01:18PM  17   record and remorse of actions.

01:18PM  18     **THE COURT:**  I think you can get into that.

01:18PM  19     **MR. TRIPI:**  So --

01:18PM  20     **THE COURT:**  That doesn't sound -- that doesn't sound

01:18PM  21   like that would open any doors.

01:18PM  22     Mr. Foti, do you agree with that?

01:18PM  23     **MR. FOTI:**  Yeah, I don't think that gets into any

01:18PM  24   underlying facts.

01:18PM  25     **THE COURT:**  Okay.  As long as you don't get into the

```
01:18PM    1    facts.  If you get into the facts, you're opening the door to

01:19PM    2    the facts.

01:19PM    3         MR. TRIPI:  Understood.

01:19PM    4         THE COURT:  Okay?  Okay.

01:19PM    5         Anything else we need to do?  I'm--

01:19PM    6         MR. COOPER:  Yes.

01:19PM    7         THE COURT:  -- gonna take another break.

01:19PM    8         Go ahead.

01:19PM    9         MR. COOPER:  Sorry.  Thank you.  I think we just need

01:19PM   10    to let him know, because we've had -- this is a different

01:19PM   11    ruling than the two times he's previously testified, so I

01:19PM   12    think the Court just needs to let the witness know outside the

01:19PM   13    presence of the jury that there's gonna be cross on this

01:19PM   14    different from the last proceeding.

01:19PM   15         THE COURT:  Um-hmm.

01:19PM   16         MR. COOPER:  And -- and that it's -- it's gonna be in

01:19PM   17    a manner that's just a yes or no, I hope, you know, to -- to

01:19PM   18    not open the door on their end to facts that shouldn't come

01:19PM   19    in.

01:19PM   20         THE COURT:  And we're not going to get into the facts

01:19PM   21    of what happened.

01:19PM   22         MR. COOPER:  Yeah.

01:19PM   23         THE COURT:  Yep.  Okay.  I'm happy to do that.

01:19PM   24         Any objection from the defense to my doing that?

          25
```

01:19PM      1                  **MR. FOTI:**  No, Judge.

01:19PM      2                  **THE COURT:**  Great.

01:19PM      3                  **MR. FOTI:**  I -- it's really just going to be a couple

01:19PM      4      questions based on the --

01:19PM      5                  **THE COURT:**  Yep.

01:19PM      6                  **MR. FOTI:**  -- way that we've --

01:19PM      7                  **THE COURT:**  Yeah.  Great.  Terrific.

01:19PM      8                  Okay.  Is he available?  Can we bring him in?

01:19PM      9                  **MR. COOPER:**  Yeah.

01:19PM     10                  **THE CLERK:**  Judge, before we get that, we have a note

01:19PM     11      from Pat.

01:20PM     12                  **THE COURT:**  Oh.  So the jury has asked what the term

01:20PM     13      "proffer" means.

01:20PM     14                  **MR. FOTI:**  Oh, I can --

01:20PM     15                  **THE COURT:**  Another one of those words.

01:20PM     16                  **MR. FOTI:**  I can cover it with a question or two,

01:20PM     17      Judge.

01:20PM     18                  **THE COURT:**  Do you?  You have some questions that

01:20PM     19      might clear it up?

01:20PM     20                  **MR. FOTI:**  Well, yeah.  I could cover it right -- or,

01:20PM     21      either way.  You could advise -- I'm fine with you advising

01:20PM     22      the jury, or I can ask him, and if you feel like he still

01:20PM     23      needs to be advised then --

01:20PM     24                  **THE COURT:**  Yeah, why don't you ask some questions on

01:20PM     25      it, and we can fix it.

01:20PM   1              MR. FOTI:  Okay.

01:20PM   2              THE COURT:  Okay.  It's funny, you know, words that

01:20PM   3    are second nature to all of us --

01:20PM   4              MR. FOTI:  Yeah.

01:20PM   5              THE COURT:  -- lots of people don't understand.

01:20PM   6              (Anthony Casullo seated at 1:20.  Jury not present.)

01:20PM   7              THE COURT:  Okay.  You can sit, Mr. Casullo.

01:20PM   8         So we're here with Mr. Casullo, but none of the

01:20PM   9    jurors present.  And I've just made a ruling, Mr. Casullo,

01:20PM  10    that is a little different than the ruling in the Bongiovanni

01:21PM  11    trials.  And that is that the defendant -- the defense counsel

01:21PM  12    is going to be able to cross-examine you with the fact that

01:21PM  13    you received a reprimand for exercising poor judgment when you

01:21PM  14    were in Las Vegas.

01:21PM  15         But they can't get into the facts of that in any way.

01:21PM  16    And the government is not going to get into the facts of that

01:21PM  17    in any way.  The government may ask you if a reprimand is the

01:21PM  18    least severe sanction you can get.  They may get into some of

01:21PM  19    the findings that -- not the factual findings, but some of the

01:21PM  20    standards for a reprimand as opposed to more serious

01:21PM  21    sanctions, but not the facts.

01:21PM  22         So when you answer, just yes-or-no answers.  And

01:21PM  23    don't try to explain with the facts of what is -- of what

01:21PM  24    happened out there.  Okay?

01:21PM  25              THE WITNESS:  Okay, Judge.

USA v Gerace - Casullo - Foti/Cross - 11/21/24

123

| | | |
|---|---|---|
| 01:21PM | 1 | **THE COURT:**  Okay? |
| 01:21PM | 2 | **MR. COOPER:**  Just to add to that, Judge. |
| 01:21PM | 3 | **THE COURT:**  Go ahead. |
| 01:21PM | 4 | **MR. COOPER:**  I expect the defense will ask if you |
| 01:22PM | 5 | received a letter of reprimand, and if that was related to |
| 01:22PM | 6 | Mr. Domiano. |
| 01:22PM | 7 | **THE COURT:**  Yes, of course.  Yes. |
| 01:22PM | 8 | **MR. COOPER:**  And just yes or no to the -- |
| 01:22PM | 9 | **THE COURT:**  Yeah, the fact -- the fact that it was |
| 01:22PM | 10 | related, I mean, that's why I'm allowing them to ask about it, |
| 01:22PM | 11 | because it was related to the brother-in-law. |
| 01:22PM | 12 | But -- but, again, not the facts.  I don't want the |
| 01:22PM | 13 | facts to go beyond that.  It was a letter of reprimand, it was |
| 01:22PM | 14 | related to your brother-in-law. |
| 01:22PM | 15 | **THE WITNESS:**  Okay, Judge. |
| 01:22PM | 16 | **THE COURT:**  Okay?  Got it? |
| 01:22PM | 17 | **THE WITNESS:**  Yes. |
| 01:22PM | 18 | **THE COURT:**  Great.  Okay. |
| 01:22PM | 19 | Anything else, folks? |
| 01:22PM | 20 | **MR. FOTI:**  No. |
| 01:22PM | 21 | **THE COURT:**  Okay.  And -- and Mr. Foti's probably |
| 01:22PM | 22 | going to ask you, the jury doesn't know what the word |
| 01:22PM | 23 | "proffer" meant.  So -- so Mr. Foti's going to try to ask you |
| 01:22PM | 24 | some questions to follow up on Mr. Cooper's direct examination |
| 01:22PM | 25 | about what a proffer is. |

| | | |
|---|---|---|
| 01:22PM | 1 | **THE WITNESS:**  Okay, Judge. |
| 01:22PM | 2 | **THE COURT:**  Okay?  Great. |
| 01:22PM | 3 | **THE WITNESS:**  Sounds good. |
| 01:22PM | 4 | **THE COURT:**  Okay.  Good.  Thanks, everybody. |
| 01:22PM | 5 | **THE CLERK:**  All rise. |
| 01:22PM | 6 | (Off the record at 1:22 p.m.) |
| 01:29PM | 7 | (Back on the record at 1:29 p.m.) |
| 01:29PM | 8 | (Jury not present.) |
| 01:29PM | 9 | **THE CLERK:**  All rise. |
| 01:29PM | 10 | **THE COURT:**  Please be seated. |
| 01:29PM | 11 | **THE CLERK:**  We are back on the record for the |
| 01:29PM | 12 | continuation in the jury trial in case numbers 19-cr-227 and |
| 01:29PM | 13 | 23-cr-37, United States of America versus Peter Gerace, Jr. |
| 01:29PM | 14 | All counsel and parties are present. |
| 01:29PM | 15 | **THE COURT:**  Okay.  Colleen tells me I left rather |
| 01:30PM | 16 | abruptly, I didn't mean to.  I've got a lot of things on my |
| 01:30PM | 17 | mind, and I'm juggling a lot of different things.  So I |
| 01:30PM | 18 | apologize if I was rude when I left the -- the bench. |
| 01:30PM | 19 | **THE CLERK:**  I didn't say he was rude. |
| 01:30PM | 20 | **THE COURT:**  She didn't say rude, but she just said. |
| 01:30PM | 21 | **THE CLERK:**  I said you usually ease out, like, okay, |
| 01:30PM | 22 | the jury will be back at 1:30. |
| 01:30PM | 23 | **MR. SOEHNLEIN:**  I thought you exited with gusto, |
| 01:30PM | 24 | Your Honor. |
| 01:30PM | 25 | **THE COURT:**  What's that?  I'm sorry? |

01:30PM   1          **MR. SOEHNLEIN:**  I thought you left with gusto.

01:30PM   2          **THE COURT:**  Thank you.  I just, you know, I've got a

01:30PM   3   lot of balls in the air right now, and they're all coming

01:30PM   4   crashing down at once, so --

01:30PM   5          Anything else we need to do before we bring the

01:30PM   6   witness back and the jury back?

01:30PM   7          **MR. COOPER:**  Nothing from us, Judge.  Thank you.

01:30PM   8          **THE COURT:**  Great.  Terrific.

01:30PM   9          Okay.  So let's bring the witness back, and let's

01:30PM  10   bring the jury back.

01:32PM  11          (Witness and Jury seated at 1:32 p.m.)

01:32PM  12          **THE COURT:**  The record will reflect that all our

01:32PM  13   jurors are, again, present.

01:32PM  14          I remind the witness he's still under oath.

01:32PM  15          And you may continue the cross.

01:32PM  16          **MR. FOTI:**  Thank you, Judge.

01:32PM  17          **BY MR. FOTI:**

01:32PM  18   Q.  Okay.  Good afternoon again, sir.

01:32PM  19   A.  Good afternoon.

01:32PM  20   Q.  I'm going to shift gears briefly here from where we left

01:33PM  21   off, ask about something else that you talked about on

01:33PM  22   direct.

01:33PM  23       You indicated that before you were no longer permitted to

01:33PM  24   participate in this investigation, you had participated in a

01:33PM  25   number of investigative steps, correct?

USA v Gerace - Casullo - Foti/Cross - 11/21/24

01:33PM   1   A.   Yes.

01:33PM   2   Q.   Okay.  And you testified on direct about having

01:33PM   3   participated in what was referred to as proffers, correct?

01:33PM   4   A.   Correct.

01:33PM   5   Q.   Okay.  Now a proffer is generally a meeting with somebody

01:33PM   6   who is believed -- between law enforcement and somebody who

01:33PM   7   it's believed may have information that law enforcement's

01:33PM   8   interested in, right?

01:33PM   9   A.   Correct.

01:33PM   10   Q.   Sometimes it's a person who's been charged with a crime?

01:33PM   11   A.   True.

01:33PM   12   Q.   Sometimes it's a target of an investigation?

01:33PM   13   A.   Yes.

01:33PM   14   Q.   Sometimes it is a witness who hasn't even been

01:33PM   15   categorized as something as significant as a target, right?

01:33PM   16   A.   True.

01:33PM   17   Q.   Sometimes there's agreements in place as to how the

01:33PM   18   information can be used after the proffer, correct?

01:33PM   19   A.   Yes.

01:33PM   20   Q.   The point is, if there's a proffer that takes place,

01:34PM   21   you're gonna have law enforcement present, right?

01:34PM   22   A.   Yes.

01:34PM   23   Q.   And you're gonna have at least one person that they're

01:34PM   24   interested in interviewing, correct?

01:34PM   25   A.   Correct.

01:34PM 1   Q.  And proffers may be helpful in terms of gathering

01:34PM 2   information that law enforcement's looking for, right?

01:34PM 3   A.  Right.

01:34PM 4   Q.  Some proffers go absolutely nowhere, right?

01:34PM 5   A.  True.

01:34PM 6   Q.  And you said that you had participated in a number of

01:34PM 7   proffers related to this investigation, correct?

01:34PM 8   A.  I believe it was just one.

01:34PM 9   Q.  Just the one proffer?

01:34PM 10  A.  Correct.

01:34PM 11  Q.  And that's what you were referring to, right?

01:34PM 12  A.  Yes.

01:34PM 13  Q.  Okay.  I'm gonna briefly talk to you about this last

01:34PM 14  conversation you talked about on direct involving

01:34PM 15  Mr. Bongiovanni.  That was a conversation primarily about

01:34PM 16  Anthony Gerace, correct?

01:34PM 17  A.  The last conversation we had.

01:34PM 18  Q.  The last conversation with Mr. Bongiovanni was about

01:35PM 19  Anthony Gerace, right?

01:35PM 20  A.  When he came over to my desk, is that what we're talking

01:35PM 21  about?

01:35PM 22  Q.  Yes.

01:35PM 23  A.  Yes.

01:35PM 24  Q.  Okay.  And you said he made a number of comments that

01:35PM 25  sort of downplayed the significance of marijuana; is that

01:35PM  1   fair?

01:35PM  2   A.  Just that last comment.

01:35PM  3   Q.  About you better prosecute him before it's made legal?

01:35PM  4   A.  You better hurry up and arrest him before they make

01:35PM  5   marijuana legal.

01:35PM  6   Q.  I think on direct you made a comment along the lines of

01:35PM  7   you hadn't really heard anything like that from another agent

01:35PM  8   during the entirety of your career, correct?

01:35PM  9   A.  Correct.

01:35PM  10  Q.  And that's what you interpreted as an attempt by

01:35PM  11  Mr. Bongiovanni to have some influence over your

01:35PM  12  decisionmaking in the investigation?

01:35PM  13  A.  That's how I perceived it.

01:35PM  14  Q.  Okay.  And when was this that this -- this conversation

01:35PM  15  took place, time-wise?  Date-wise?

01:35PM  16  A.  I think it was -- I can't remember if it was the end of

01:35PM  17  the summer of '18 or beginning of '19.  I think it was -- it

01:36PM  18  would have been the summer of '18.  Like, August of '18,

01:36PM  19  right around that time period.

01:36PM  20  Q.  Okay.

01:36PM  21  A.  I believe, I could be wrong, it could be January of '19.

01:36PM  22  Q.  Okay.  The point that I'm ultimately getting to here is

01:36PM  23  the laws in regard to marijuana across the country had

01:36PM  24  shifted significantly in 2018 or 2019, from where they were

01:36PM  25  when you started at the DEA, correct?

01:36PM    1    A.  Federally, or --

01:36PM    2    Q.  I'm talking about laws in different jurisdictions across

01:36PM    3    the country, there had been significant changes, right?

01:36PM    4    A.  To the best of my knowledge, not federally.  I know in

01:36PM    5    different states, different things change.  But not

01:36PM    6    federally.

01:36PM    7    Q.  Oh, sure.  In terms of federal law, marijuana has

01:36PM    8    generally remained criminalized, correct?

01:36PM    9    A.  Correct.

01:36PM   10    Q.  But by 2018, 2019, there was a shift in the states where

01:36PM   11    a number of states were beginning to legalize marijuana,

01:36PM   12    correct?

01:37PM   13    A.  I would agree with that.

01:37PM   14    Q.  Or at least decriminalize it, and maybe make it less

01:37PM   15    severe, the sanctions that were imposed?

01:37PM   16    A.  Correct.

01:37PM   17    Q.  And even on a federal level, it was known to you that

01:37PM   18    there was at least conversations about policy related to the

01:37PM   19    legalization of marijuana at that point, correct?

01:37PM   20    A.  I don't know if it was so much about the legalization,

01:37PM   21    but the reclassification of marijuana, being classified as a

01:37PM   22    Schedule I, the most dangerous, to a different schedule, is

01:37PM   23    was what my knowledge was of the discussions with the federal

01:37PM   24    level, within DEA.

01:37PM   25    Q.  Okay.  Within the organization that you were employed by?

01:37PM   1   A.  The organization, before Congress, from our

01:37PM   2   administrator, different things that I read and saw, things

01:37PM   3   like that.

01:37PM   4   Q.  So in terms of your experience with the DEA, you knew

01:37PM   5   there were ongoing conversations about at least the

01:37PM   6   classification of marijuana scheduling?

01:37PM   7   A.  To change the classification.

01:37PM   8   Q.  And when you talk about scheduling, you're talking about

01:37PM   9   sort of the category of severity of --

01:37PM  10   A.  Of seriousness.

01:37PM  11   Q.  Yeah.  It relates to addictiveness, addictive quality

01:38PM  12   of -- of the drug, right?

01:38PM  13        MR. COOPER:  I would object to relevance at this

01:38PM  14   point.

01:38PM  15        THE COURT:  Yeah, sustained.

01:38PM  16        BY MR. FOTI:

01:38PM  17   Q.  So, in any event, the conversation you have with

01:38PM  18   Mr. Bongiovanni, it occurs at a time where at least state, in

01:38PM  19   certain states, legalization had begun to occur?

01:38PM  20   A.  To the best of my knowledge, yes.

01:38PM  21   Q.  And -- and do you know when marijuana was -- obviously,

01:38PM  22   you're a federal agent, but do you know when marijuana was

01:38PM  23   decriminalized in New York?

01:38PM  24   A.  No.

01:38PM  25   Q.  Okay.  In any event, 2018, 2019, the -- at least the

USA v Gerace - Casullo - Foti/Cross - 11/21/24
131

01:38PM    1    state laws on marijuana had shifted from where they were in

01:38PM    2    the '90s?

01:38PM    3    A.  From the '90s, yes.

01:38PM    4    Q.  And -- and they -- the shift had been shifting at that

01:38PM    5    point from where you -- where the laws on marijuana were

01:38PM    6    during the majority of your career, correct?

01:38PM    7    A.  I was more familiar with the Nevada State law than the

01:38PM    8    New York State law.  But within the State of Nevada, it had

01:38PM    9    shifted.  And I was aware of it shifting in New York State,

01:38PM    10   as well, and several other states from just reading open

01:39PM    11   source news stories.

01:39PM    12   Q.  Okay.  While you were in Nevada, you were -- you were in

01:39PM    13   the DEA office in Las Vegas, correct?

01:39PM    14   A.  I was.

01:39PM    15   Q.  Okay.  And I'm going to ask you a couple of specific

01:39PM    16   questions.  Just in terms of background, I think we covered

01:39PM    17   some of this.  But when you moved out to Las Vegas, your

01:39PM    18   brother-in-law Phil Domiano, I don't know why I just suddenly

01:39PM    19   had trouble pronouncing that, he was already living out

01:39PM    20   there, right?

01:39PM    21   A.  He was.

01:39PM    22   Q.  Okay.  And some point after you moved out there, you

01:39PM    23   joined the DEA field office for the, in Las Vegas, correct?

01:39PM    24   A.  Started July of '99 with DEA in Las Vegas.

01:39PM    25   Q.  And while you were --

01:39PM   1    A.  I'm sorry.  I'm sorry.  It was December '99 that I

01:40PM   2    arrived in Vegas.

01:40PM   3    Q.  Okay.  Thank you for the clarification.

01:40PM   4        While you're at that office, at some point after that,

01:40PM   5    there came -- did there come a time that you received a

01:40PM   6    letter of reprimand?

01:40PM   7    A.  Yes.

01:40PM   8    Q.  Okay.  And that was a letter of reprimand based on a

01:40PM   9    charge of poor judgment, correct?

01:40PM  10    A.  It was a charge of poor judgment, yes.

01:40PM  11    Q.  And the charge that was referenced in that letter was in

01:40PM  12    reference to or was related to your brother-in-law, Phil

01:40PM  13    Domiano?

01:40PM  14    A.  Yes.

01:40PM  15            **MR. FOTI:**  Can I just have a minute Judge?

01:41PM  16            All right.  Thank you, sir.  Nothing further at this

01:41PM  17    time.

01:41PM  18            **THE COURT:**  Redirect?

01:41PM  19            **MR. COOPER:**  Yeah, just briefly, Judge, please.

01:41PM  20

01:41PM  21                  **REDIRECT EXAMINATION BY MR. COOPER:**

01:41PM  22    Q.  On that last topic first, let's hit that.

01:41PM  23        Do you recall what year that letter of reprimand was

01:41PM  24    from?

01:41PM  25    A.  I believe when I received the actual letter of reprimand

01:41PM   1   may have been 2004, 2005.

01:41PM   2   Q.  2004 or 2005?

01:41PM   3   A.  Yes.

01:41PM   4   Q.  Okay.  So is that about ten years before you move back to

01:41PM   5   Buffalo?

01:41PM   6   A.  Yes.  Yeah.

01:42PM   7   Q.  Okay.

01:42PM   8   A.  Yeah, at least.  At least ten.

01:42PM   9   Q.  Okay.  Ten or more; is that right?

01:42PM   10  A.  Yep.  I believe so.

01:42PM   11  Q.  Okay.  On the subject of that, I'm going to also ask you

01:42PM   12  some specific questions like Mr. Foti did, these are going to

01:42PM   13  be yes-or-no questions; do you understand?

01:42PM   14  A.  Yes.

01:42PM   15  Q.  Okay.  With respect to that letter of reprimand, did your

01:42PM   16  agency find that there was no malicious intent?

01:42PM   17  A.  Yes.

01:42PM   18  Q.  Did your agency find that you had no trust issues with

01:42PM   19  management?

01:42PM   20  A.  Yes.

01:42PM   21  Q.  Did your agency find that you had an excellent prior work

01:42PM   22  record and remorse about what occurred?

01:42PM   23  A.  Yes.

01:42PM   24  Q.  Did they find that it was from family-related issues?

01:42PM   25  A.  Yes.

01:42PM    1    Q.  Okay.  You were asked some questions on cross-examination

01:42PM    2    about marijuana laws in the around the time that Bongiovanni

01:42PM    3    tells you, you better hurry up and arrest Anthony Gerace

01:42PM    4    before they make it legal; do you remember that?

01:42PM    5    A.  Yes.

01:42PM    6    Q.  Okay.  As a DEA agent, were both you and Joe Bongiovanni

01:43PM    7    responsible for enforcing federal drug laws?

01:43PM    8    A.  Yes.

01:43PM    9    Q.  Is that under Title 21 of the United States Code?

01:43PM   10    A.  Yes.

01:43PM   11    Q.  Does that have anything do with whether New York or

01:43PM   12    Nevada or any other state decriminalizes marijuana?

01:43PM   13    A.  No.

01:43PM   14    Q.  Nothing at all, right?

01:43PM   15    A.  No.

01:43PM   16    Q.  Okay.  At the time Bongiovanni said it, was a sworn DEA

01:43PM   17    agent responsible for investigating and pushing forward for

01:43PM   18    prosecution people who trafficked in large amounts of

01:43PM   19    marijuana?

01:43PM   20    A.  Yes.

01:43PM   21    Q.  Was that part of your job?

01:43PM   22    A.  Yes.

01:43PM   23    Q.  Was it part of Bongiovanni's job?

01:43PM   24    A.  Yes.

01:43PM   25    Q.  Did individual DEA agents get to decide like, hey,

USA v Gerace - Casullo - Cooper/Redirect - 11/21/24

135

01:43PM    1    New York's decriminalizing it, so I just don't care anymore?

01:43PM    2    A.  No.

01:43PM    3    Q.  Okay.  You were asked some questions on cross-examination

01:44PM    4    about ultimately being walled off from the investigation into

01:44PM    5    Bongiovanni and an investigation into Gerace; do you remember

01:44PM    6    being asked questions about that?

01:44PM    7    A.  Yes.

01:44PM    8    Q.  Was it your understanding that you were walled off

01:44PM    9    because you had been determined to be a fact witness in that

01:44PM   10    case?

01:44PM   11    A.  Yes.

01:44PM   12    Q.  I want to kind of walk through for the -- make sure the

01:44PM   13    jury understands.  When we say "fact witness," do you

01:44PM   14    understand what I'm talking about?

01:44PM   15    A.  Yes.

01:44PM   16    Q.  Okay.  As a law enforcement officer, generally, is your

01:44PM   17    role that of an investigating agent?

01:44PM   18    A.  That's correct.

01:44PM   19    Q.  Okay.  Did the circumstances surrounding things

01:44PM   20    Bongiovanni had said to you and your interactions with him

01:44PM   21    kind of shift your role to a person who would end up on the

01:44PM   22    witness stand testifying in -- in proceedings?

01:44PM   23    A.  Yes.

01:45PM   24    Q.  Was that your understanding of why you were walled off

01:45PM   25    from working on those cases?

01:45PM 1    A.  Yes.

01:45PM 2    Q.  Mr. Foti asked you some questions towards the beginning

01:45PM 3    of his cross-examination about the classmate who made

01:45PM 4    comments about sniffing coke off of strippers' bodies, and he

01:45PM 5    asked you if you took him seriously; do you remember that

01:45PM 6    question?

01:45PM 7    A.  Yes.

01:45PM 8    Q.  And I think -- I forget the person's first name, but you

01:45PM 9    said I know -- what's his first name?

01:45PM 10   A.  John.

01:45PM 11   Q.  John Mayer, is that it?

01:45PM 12   A.  Maher.

01:45PM 13   Q.  Maher, sorry.  John Mayer is the musician.  John Maher.

01:45PM 14       You said I know John Maher, right?  Is that what you said

01:45PM 15   in response to his question?

01:45PM 16   A.  Correct.

01:45PM 17   Q.  Why did knowing John Maher cause you to take that

01:45PM 18   seriously?  Tell them.

01:45PM 19   A.  He was on the wild side.  Partying, drugs, alcohol.

01:45PM 20   Q.  Was it consistent with what you knew about him?

01:46PM 21   A.  Yes.

01:46PM 22   Q.  When Mr. Foti asked you some questions on

01:46PM 23   cross-examination about conversations that you had with FBI

01:46PM 24   Special Agent Tom Herbst around the time of 2010; do you

01:46PM 25   remember those questions?

USA v Gerace - Casullo - Cooper/Redirect - 11/21/24

137

01:46PM    1    A.  Yes.

01:46PM    2    Q.  Okay.  I think twice on cross you indicated that you came

01:46PM    3    to an understanding that Herbst knew that Gerace and

01:46PM    4    Bongiovanni knew each other; is that what you learned from

01:46PM    5    those communications?

01:46PM    6    A.  Yes.

01:46PM    7    Q.  Okay.  You were asked some questions about the fact that

01:47PM    8    when you discovered Bongiovanni's phone number in Gerace's

01:47PM    9    records, that you didn't document that in a 6; do you recall

01:47PM   10    that?

01:47PM   11    A.  I recall.

01:47PM   12    Q.  Okay.  Were you investigating Bongiovanni at that time?

01:47PM   13    A.  No.

01:47PM   14    Q.  Did you alert your supervisor as you had been directed to

01:47PM   15    do?

01:47PM   16    A.  Yes.

01:47PM   17    Q.  Did he direct you to put it in a 6?

01:47PM   18    A.  No.

01:47PM   19    Q.  Did you view it at that time, at that moment, as a part

01:47PM   20    of an investigation that you had going on?

01:47PM   21    A.  No.

01:47PM   22    Q.  Was it just kind of an uncomfortable thing that was

01:47PM   23    occurring in the workplace?

01:47PM   24    A.  Yes.

01:47PM   25            **THE COURT:**  You're talking about a 6, I think --

01:47PM   1        MR. COOPER:  I'm sorry.

01:47PM   2        THE COURT:  It might be a good idea to let the jury

01:47PM   3   know what a 6 is.

01:47PM   4        MR. COOPER:  Thank you.  I appreciate that, Judge.

01:47PM   5   And sometimes I take that for granted.

01:47PM   6        BY MR. COOPER:

01:47PM   7   Q.  DEA puts things in reports; is that right?

01:47PM   8   A.  Correct.

01:47PM   9   Q.  Reports of investigations that agents document, are those

01:47PM  10   called DEA-6 reports?

01:47PM  11   A.  Correct.

01:47PM  12        MR. COOPER:  So, Ms. Champoux, can we pull up 30A for

01:47PM  13   one second?  Well, for more than one second.  Keep it up

01:47PM  14   there.

01:47PM  15        BY MR. COOPER:

01:47PM  16   Q.  Is this an example of a DEA-6 report?

01:48PM  17   A.  Yes.

01:48PM  18   Q.  And up here where it says report of investigation, is

01:48PM  19   this where you document investigative activity?

01:48PM  20   A.  That's correct.

01:48PM  21   Q.  Okay.

01:48PM  22        MR. COOPER:  You can take that down, Ms. Champoux.

01:48PM  23        BY MR. COOPER:

01:48PM  24   Q.  At the time that you discovered Bongiovanni's phone

01:48PM  25   number in Mr. Gerace's phone records, did you view that as a

USA v Gerace - Casullo - Cooper/Redirect - 11/21/24

01:48PM   1   part of your investigative activity?

01:48PM   2   A.   No.

01:48PM   3   Q.   Okay.  Years later, did it become pertinent to you?

01:48PM   4   A.   It became pertinent, and after meeting with him in the

01:48PM   5   conference room, things shifted.

01:48PM   6   Q.   Okay.  But at that time when it first is known to you,

01:48PM   7   it's just uncomfortable, right?

01:48PM   8   A.   Correct.

01:48PM   9   Q.   You were asked some questions by Mr. Foti on

01:48PM   10  cross-examination about Government Exhibit 99 at page 14.

01:48PM   11          **MR. COOPER:**  On the left side of the screen,

01:49PM   12  Ms. Champoux, can you pull up Government Exhibit 99 and go to

01:49PM   13  page 14?

01:49PM   14          And just if you're able to -- thank you so much.

01:49PM   15          And then on the right side of the screen can you pull

01:49PM   16  up what's in evidence as Government Exhibit 426-1.

01:49PM   17          **BY MR. COOPER:**

01:49PM   18  Q.   On the left, is that a picture of your high school

01:49PM   19  reunion, for your 30-year high school reunion?

01:49PM   20  A.   Yes.

01:49PM   21  Q.   Can you estimate for the jury about how many people do

01:49PM   22  you think were there?

01:49PM   23  A.   50 or so, maybe.

01:49PM   24  Q.   Okay.  Can you tell the jury how many people are in the

01:49PM   25  picture on the right?

01:49PM  1    A.  Four.

01:49PM  2    Q.  Okay.  In the left, in the picture on the left, everybody

01:49PM  3    has those white stickers on their shirt.  What's that?

01:49PM  4    A.  Name tags.

01:49PM  5    Q.  Does anybody have name tags on in the picture on the,

01:49PM  6    right?

01:49PM  7    A.  No.

01:49PM  8    Q.  Why do people wear name tags?

01:49PM  9    A.  Over the years people aren't in contact, they look

01:49PM  10   different after 30 years, and you might not know who's who in

01:50PM  11   your class.

01:50PM  12   Q.  It's because not everybody in that picture might even

01:50PM  13   know each other, right?

01:50PM  14        **MR. FOTI:**  Judge, objection.

01:50PM  15        **THE COURT:**  No, overruled.

01:50PM  16        **BY MR. COOPER:**

01:50PM  17   Q.  They might not recognize each other, right?

01:50PM  18   A.  They might not recognize each other is my belief.

01:50PM  19   Q.  Okay.  Do the people in the picture on the right in

01:50PM  20   426-1, do they appear to know each other?

01:50PM  21   A.  I mean, looking at that picture, yes.

01:50PM  22   Q.  Okay.  No name tags, right?

01:50PM  23   A.  No.

01:50PM  24   Q.  This picture on the left, Government Exhibit 99 at

01:50PM  25   page 14, are you close personal friends with everyone in the

01:50PM    1    picture?

01:50PM    2    A.  No.

01:50PM    3    Q.  Do you maintain contact with everyone in the picture?

01:50PM    4    A.  No.

01:50PM    5    Q.  Why are you in the picture?

01:50PM    6    A.  Because I graduated in that graduating class.

01:50PM    7    Q.  Okay.

01:50PM    8         MR. COOPER:  You can take those down, Ms. Champoux,

01:50PM    9    thank you.

01:50PM   10         BY MR. COOPER:

01:50PM   11    Q.  You were asked some questions on cross-examination about

01:50PM   12    whether you were on a -- I think a, like, a men's league

01:51PM   13    hockey team with the defendant when you were in college?

01:51PM   14    A.  Correct.

01:51PM   15    Q.  Okay.  How many people participated in that activity?

01:51PM   16    A.  On that team?

01:51PM   17    Q.  Sure.

01:51PM   18    A.  Maybe 20.

01:51PM   19    Q.  Okay.  And were you close personal friends with all 20

01:51PM   20    people?

01:51PM   21    A.  No.

01:51PM   22    Q.  Did you just play rec league hockey with them?

01:51PM   23    A.  Yeah.  I had a friend of a friend that who knew someone,

01:51PM   24    and I was out of high school and wanted to still play hockey.

01:51PM   25    Q.  Got it.  You were asked some questions about the

01:51PM     1    different people that you disclosed the racist remarks that

01:51PM     2    Bongiovanni made to you; do you remember being asked those

01:51PM     3    questions?

01:51PM     4    A.   Yes.

01:51PM     5    Q.   Was it your responsibility, sir, to report to management

01:51PM     6    when it happened?

01:51PM     7    A.   It was my responsibility, correct.

01:51PM     8    Q.   You should have done that, right?

01:52PM     9    A.   Yes.

01:52PM    10    Q.   Okay.  Did you tell other people about what happened

01:52PM    11    because it troubled you?

01:52PM    12    A.   Yes, very troubling.

01:52PM    13    Q.   Okay.  I think on direct examination, you described it as

01:52PM    14    a something like a shit sandwich that happened, is that -- is

01:52PM    15    that how it felt?  Like you had something awful to deal with?

01:52PM    16    A.   It was a horrible situation, yes.

01:52PM    17    Q.   Okay.  You told these other people about it, is it fair

01:52PM    18    to say, based on your involvement in those conversations,

01:52PM    19    none of them were jumping and chomping at the bit to get

01:52PM    20    involved in your shit sandwich?

01:52PM    21    A.   No.

01:52PM    22    Q.   Okay.  Ultimately, you described on direct examination

01:52PM    23    reasons why you made the choice that you made which was to

01:52PM    24    not immediately report it; do you remember describing that?

01:52PM    25    A.   Yes.

01:52PM    1   Q.  And on cross-examination, you were questioned about when

01:53PM    2   you chose to report it.  Let's focus on that.

01:53PM    3       When you ultimately did report what Joe Bongiovanni said

01:53PM    4   to you about who you should be investigating and when he used

01:53PM    5   racial slurs, when you reported that, what happened to you at

01:53PM    6   work?

01:53PM    7   A.  Multiple things.  Things that I believe basically came

01:53PM    8   true.  It was very hurtful, still bothers me.

01:53PM    9       People that I trusted a lot stopped talking to me, not

01:53PM   10   knowing the full facts that I couldn't talk about anyways.

01:53PM   11       A police officer that was assigned to our office as a

01:53PM   12   task force officer that I knew from the police academy when I

01:53PM   13   was a police officer, literally crossed the street when she

01:53PM   14   saw me.

01:53PM   15       People on my own group ostracized me to some extent that

01:53PM   16   I worked nights on a wiretap case just so I wouldn't have to

01:53PM   17   go into the office.

01:53PM   18       There were numerous things.

01:53PM   19   Q.  Did it cause you a lot of hard, like, difficulty and

01:54PM   20   hardship at work?

01:54PM   21   A.  Probably more than anything else that happened in the

01:54PM   22   whole --

01:54PM   23   Q.  Was it a pleasant experience for you after?

01:54PM   24   A.  It was the worst experience of my career.

01:54PM   25   Q.  Is that what you had feared when you chose to hold into

01:54PM    1    it -- hold onto it and not report it?

01:54PM    2    A.  Yeah, it all came true.

01:54PM    3    Q.  By reporting it, did you get some benefit, did things get

01:54PM    4    good for you in any way?

01:54PM    5    A.  No.

01:54PM    6         MR. COOPER:  Just one second please, Judge.

01:55PM    7         BY MR. COOPER:

01:55PM    8    Q.  Just to put a finer point on that, did you ultimately

01:55PM    9    transfer to a task force at the FBI?

01:55PM   10    A.  I did.

01:55PM   11    Q.  Why?

01:55PM   12    A.  The supervisor of that group was a friend of mine from

01:55PM   13    Las Vegas, the FBI agent, he worked in our office in

01:55PM   14    Las Vegas, and they were starting a new task force.  And he

01:55PM   15    asked if I would be interested to come over to the task

01:55PM   16    force.  And I jumped at the opportunity to work with them and

01:55PM   17    get out of my office because of the situation that was going

01:55PM   18    on in my office.

01:55PM   19         And I didn't think I'd be allowed to -- I didn't think

01:55PM   20    DEA would allow me to go work at FBI.  But his special agent

01:55PM   21    in charge met with my special agent in charge in New York

01:55PM   22    City, and they allowed me to go over.  And it was probably

01:55PM   23    the best year and a half, two years of my time in Buffalo.

01:55PM   24         MR. COOPER:  I'm good, Judge, thank you.

01:55PM   25         THE COURT:  Any re-cross?

01:55PM    1          MR. FOTI:  Yes, Judge.

01:55PM    2

01:55PM    3          RECROSS-EXAMINATION BY MR. FOTI:

01:56PM    4    Q.  Sir, when you saw Peter Gerace in college for the hockey,

01:56PM    5    you didn't need a name tag to recognize him, did you?

01:56PM    6    A.  No.

01:56PM    7    Q.  When you saw him at Brennan's, the bar that you said

01:56PM    8    you -- you gave him your phone number at, you didn't need --

01:56PM    9    he didn't need a name tag for you to recognize him, correct?

01:56PM   10    A.  No.

01:56PM   11    Q.  And you weren't wearing a name tag, correct?

01:56PM   12    A.  No.

01:56PM   13    Q.  And he recognized you there, correct?

01:56PM   14    A.  Yes.

01:56PM   15    Q.  And you even had a conversation that ended in giving

01:56PM   16    Mr. Gerace your phone number, correct?

01:56PM   17    A.  Correct.

01:56PM   18    Q.  At the reunion, you were both wearing name tags, right?

01:56PM   19    A.  Yes.

01:56PM   20    Q.  You didn't need the name tag to recognize that Peter

01:56PM   21    Gerace was Peter Gerace, right?

01:56PM   22    A.  No.

01:56PM   23    Q.  And presumably, he would have recognized you whether you

01:56PM   24    were wearing the name tag or not, right?

01:56PM   25    A.  Yes.

01:56PM  1  Q.  You talked about just now how after making the claim that

01:57PM  2  Mr. Bongiovanni used racial slurs, the number of members of

01:57PM  3  law enforcement didn't want to interact with you anymore; is

01:57PM  4  that right?

01:57PM  5  A.  There were numerous in my office.

01:57PM  6  Q.  Okay.  And -- and you said there was even an incident of

01:57PM  7  somebody that you had previously known cross the street and

01:57PM  8  it appeared they were trying avoid you?

01:57PM  9  A.  Correct.

01:57PM  10  Q.  And this was a perception developed based on the way

01:57PM  11  people were acting towards you within your office, correct?

01:57PM  12  A.  It was based on that, the timeframe, everything.

01:57PM  13  Q.  Did anybody communicate to you that, hey, we don't think

01:57PM  14  you should have said what you said about Mr. Bongiovanni?

01:57PM  15          **MR. COOPER:**  Objection.  Calls for hearsay.

01:57PM  16          **THE COURT:**  No.  Absolutely not.  Overruled.

01:57PM  17          **THE WITNESS:**  Could you repeat the question?

01:57PM  18          **BY MR. FOTI:**

01:57PM  19  Q.  Did anybody have a conversation with you about it within

01:57PM  20  your office, these people you're talking about?

01:58PM  21  A.  Oh, they wouldn't talk to me.

01:58PM  22  Q.  They wouldn't talk to you?

01:58PM  23  A.  No.

01:58PM  24  Q.  Okay.  So nobody told you that they're upset with you

01:58PM  25  because you -- you'd gave the story about Mr. Bongiovanni?

01:58PM     1    A.  They didn't talk to me.

01:58PM     2    Q.  Okay.  That was something that you perceived based on the

01:58PM     3    timing of all of this, right?

01:58PM     4    A.  Absolutely.

01:58PM     5    Q.  All right.  And you have no idea whether those people

01:58PM     6    believed anything that you alleged happened in that meeting?

01:58PM     7    A.  I'm sorry, could you repeat that question?

01:58PM     8    Q.  You have no idea whether any of these people in your

01:58PM     9    office believed anything that you said about what happened in

01:58PM    10    that meeting?

01:58PM    11            **MR. COOPER:**  Objection, Judge.

01:58PM    12            **THE COURT:**  Overruled.

01:58PM    13            **THE WITNESS:**  Whether I knew if they believed?  I'm

01:58PM    14    sorry, I'm trying to understand the question.

01:58PM    15            **BY MR. FOTI:**

01:58PM    16    Q.  It's okay.  You didn't talk to anybody in your office

01:58PM    17    about this, right?  You said they wouldn't talk to you

01:58PM    18    anymore?

01:58PM    19    A.  They didn't.  They stopped talking to me, several people.

01:58PM    20    Q.  Okay.  You never asked them what their opinions were on

01:58PM    21    the fact that you reported this, this alleged conversation?

01:58PM    22    A.  I never asked them that.

01:58PM    23    Q.  They never told you what their position is on it, right?

01:58PM    24    A.  They didn't talk to me.

01:58PM    25    Q.  Nobody told you whether they believe it or not, right?

01:58PM     1   A.   They didn't talk to me.

01:59PM     2          MR. FOTI:   Could I just have a moment, Judge?

01:59PM     3          THE COURT:   Sure.

01:59PM     4          MR. FOTI:   I have nothing further, thank you.

01:59PM     5

01:59PM     6              RE-REDIRECT EXAMINATION BY MR. COOPER:

01:59PM     7   Q.   The people who ignored you, were they people that were

01:59PM     8   close in the office with Bongiovanni?

01:59PM     9   A.   Some.

01:59PM    10   Q.   You said that people didn't discuss it with you.  Did

01:59PM    11   people essentially bad mouth you in your own office about

01:59PM    12   what you did?

01:59PM    13   A.   I believe so.

01:59PM    14   Q.   Did you learn --

01:59PM    15          MR. FOTI:   Objection.

01:59PM    16          THE COURT:   Yeah, sustained.  Let's have some

01:59PM    17   foundation for that.

01:59PM    18          MR. COOPER:   Sure.

01:59PM    19          BY MR. COOPER:

01:59PM    20   Q.   Were there comments made about the fact that you brought

01:59PM    21   a report over to the U.S. Attorney's Office regarding a

01:59PM    22   report that Bongiovanni had written, were there comments made

02:00PM    23   about you providing reports to the U.S. Attorney's Office or

02:00PM    24   working closely with the U.S. Attorney's Office?

02:00PM    25   A.   Oh.  There were comments about me working with the U.S.

| | | |
|---|---|---|
| 02:00PM | 1 | Attorney's Office regarding this investigation. |
| 02:00PM | 2 | Q.  Okay.  And is that in relation to what you disclosed with |
| 02:00PM | 3 | respect to Mr. Bongiovanni? |
| 02:00PM | 4 | A.  Oh, I believe so. |
| 02:00PM | 5 | Q.  Okay.  Tell the jury what they were. |
| 02:00PM | 6 | A.  Oh, I -- |
| 02:00PM | 7 |      **MR. FOTI:**  Objection, Judge. |
| 02:00PM | 8 |      **THE COURT:**  Sustained.  Unless -- unless -- the first |
| 02:00PM | 9 | question that you asked could call for hearsay, and we're not |
| 02:00PM | 10 | going to get into hearsay.  If it's -- if it's not hearsay, |
| 02:00PM | 11 | it's a different story. |
| 02:00PM | 12 |      **MR. COOPER:**  Judge, I'm certainly not offering it for |
| 02:00PM | 13 | the truth of the matter asserted.  If you know what the ans -- |
| 02:00PM | 14 | I can come up and proffer what I expect the answers |
| 02:00PM | 15 | are gonna be, it's not hearsay. |
| 02:00PM | 16 |      **THE COURT:**  Come on up.  It may be hearsay. |
| 02:00PM | 17 |      **MR. COOPER:**  I'm sorry, my position is that I don't |
| 02:00PM | 18 | believe it's hearsay. |
| 02:00PM | 19 |      (Sidebar discussion held on the record.) |
| 02:00PM | 20 |      **THE COURT:**  So -- so if he heard these things |
| 02:00PM | 21 | himself -- |
| 02:00PM | 22 |      **MR. COOPER:**  Yeah. |
| 02:00PM | 23 |      **THE COURT:**  -- then they're not hearsay. |
| 02:01PM | 24 |      **MR. COOPER:**  Yeah, he did. |
| 02:01PM | 25 |      **THE COURT:**  If somebody says to him so-and-so bad |

02:01PM   1   mouthed you, that's a whole different story.

02:01PM   2           **MR. COOPER:**  I can do a better job.

02:01PM   3           **THE COURT:**  Okay.  That's fine.  I just want you to

02:01PM   4   understand --

02:01PM   5           **MR. COOPER:**  I do.

02:01PM   6           **THE COURT:**  -- that there could be a layer of hearsay

02:01PM   7   here that you're not recognizing.

02:01PM   8           **MR. COOPER:**  I appreciate -- I appreciate that.  I'll

02:01PM   9   do a tighter job asking the question then.

02:01PM  10           **MR. TRIPI:**  People told him, told him directly things

02:01PM  11   like they should take a crane to the U.S. Attorney's Office,

02:01PM  12   directly to him.

02:01PM  13           **THE COURT:**  He should?  I think you should?

02:01PM  14           **MR. TRIPI:**  No, they -- they commented directly to

02:01PM  15   Casullo, like, they basically talked smack to him, and he will

02:01PM  16   be able to firsthand relay --

02:01PM  17           **MR. COOPER:**  That he heard it.

02:01PM  18           **THE COURT:**  Like, you're a jerk for talking to the

02:01PM  19   U.S. Attorney's Office, in essence?

02:01PM  20           **MR. TRIPI:**  Correct.  Yes.

02:01PM  21           **THE COURT:**  That's fine.  That's a different story.

02:01PM  22           **MR. COOPER:**  Understood.  I'll lay a foundation.

02:01PM  23           (Sidebar discussion ended.)

02:01PM  24           **BY MR. COOPER:**

02:01PM  25   Q.  I just want to be clear exactly on what I'm asking you.

02:01PM  1    I'm asking you about things that you heard with your own

02:01PM  2  ears come out of other people's mouths.

02:01PM  3    Did you hear with your ears other people essentially

02:01PM  4  talking smack or saying negative things about your decision

02:01PM  5  to report this conduct to the U.S. Attorney's Office?

02:02PM  6  A.  It was things about working with the U.S. Attorney's

02:02PM  7  Office.

02:02PM  8  Q.  Okay.  That you heard; is that fair?

02:02PM  9  A.  Oh, right in front of me.

02:02PM  10  Q.  From your DEA colleagues?

02:02PM  11  A.  Two in particular that were in my group in the task force

02:02PM  12  before I went over to the FBI.

02:02PM  13  Q.  Tell the jury what you heard.

02:02PM  14  A.  One individual said that we shouldn't work with the U.S.

02:02PM  15  Attorney's Office.  We should use a crane and destroy the

02:02PM  16  building.

02:02PM  17    We had another -- another agent said right in front of me

02:02PM  18  that my partner, Curtis Ryan, from Homeland Security was a

02:02PM  19  rat bastard, and some day he'll get his.

02:02PM  20  Q.  What's it mean to be a "rat bastard," in that context?

02:02PM  21  A.  A rat bastard means to inform or say something about

02:02PM  22  another person, a snitch.

02:02PM  23  Q.  Have you heard of that thin blue line spoken about

02:02PM  24  before?

02:02PM  25  A.  Oh, absolutely.

02:02PM  1   Q.  What's that mean?

02:02PM  2   A.  "Thin blue line" means even when there's wrongdoing,

02:02PM  3   officers are unwilling to come forward and speak in order to

02:02PM  4   keep their secrecy and their unit together.

02:02PM  5   Q.  Were those comments directed at you indicating that you

02:02PM  6   violated some unspoken agreement not to talk about law

02:03PM  7   enforcement misconduct?

02:03PM  8   A.  I -- absolutely.

02:03PM  9              **MR. FOTI:**  Objection.

02:03PM  10             **THE COURT:**  I'm sorry?

02:03PM  11             **MR. FOTI:**  Objection.

02:03PM  12             **THE COURT:**  Yeah, sustained.  The jury will strike

02:03PM  13  that answer.

02:03PM  14             **BY MR. COOPER:**

02:03PM  15  Q.  When you reported that Joe Bongiovanni, at the time a DEA

02:03PM  16  special agent, said racist things to you in relation to your

02:03PM  17  investigation of his friend Peter Gerace, did you get

02:03PM  18  ostracized at work by your DEA colleagues?

02:03PM  19  A.  Absolutely.

02:03PM  20  Q.  Was that fun for you?

02:03PM  21  A.  It was miserable.

02:03PM  22             **MR. COOPER:**  Okay.  I'm good.  Thank you, Judge.

02:03PM  23             **THE COURT:**  Anything more Mr. Foti?

02:03PM  24             **MR. FOTI:**  No, thank you, Judge.

02:03PM  25             **THE COURT:**  Okay.  You can step down, sir.  Thank

02:03PM    1    you.

02:03PM    2             THE WITNESS:  Thank you, Judge.

02:03PM    3             (Witness excused at 2:03 p.m.)

           4             (Excerpt concluded at 2:03 p.m.)

           5         *     *     *     *     *     *     *

           6

           7

           8

           9

          10

          11              CERTIFICATE OF REPORTER

          12

          13             In accordance with 28, U.S.C., 753(b), I

          14    certify that these original notes are a true and correct

          15    record of proceedings in the United States District Court for

          16    the Western District of New York on November 21, 2024.

          17

          18

          19                      s/ Ann M. Sawyer
                                   Ann M. Sawyer, FCRR, RPR, CRR
          20                       Official Court Reporter
                                   U.S.D.C., W.D.N.Y.
          21

          22

          23

          24

          25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 2**

**NOVEMBER 21, 2024**

**W I T N E S S**                                    **P A G E**

**A N T H O N Y   C A S U L L O**                    2

  (CONT'D) DIRECT EXAMINATION BY MR. COOPER:    2

  CROSS-EXAMINATION BY MR. FOTI:               59

  REDIRECT EXAMINATION BY MR. COOPER:          132

  RECROSS-EXAMINATION BY MR. FOTI:             145

  RE-REDIRECT EXAMINATION BY MR. COOPER:       148


**E X H I B I T**                                    **P A G E**

GOV Exhibit 26B                                      41