1                   **UNITED STATES DISTRICT COURT**
                 **WESTERN DISTRICT OF NEW YORK**
2

3  **UNITED STATES OF AMERICA,**
                          Case No. 1:19-cr-227
4             Plaintiff,            1:23-cr-37
   v.                              (LJV)
5

   **PETER GERACE, JR.,**             December 6, 2024
6

              Defendant.
7
       **TRANSCRIPT EXCERPT - EXAMINATION OF R.A. (PW 6)**
8          **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
            **UNITED STATES DISTRICT JUDGE**
9

10  <u>**APPEARANCES:**</u>     **TRINI E. ROSS, UNITED STATES ATTORNEY**
                **BY: JOSEPH M. TRIPI, ESQ.**
                  **NICHOLAS T. COOPER, ESQ.**
11                Assistant United States Attorneys
              Federal Centre, 138 Delaware Avenue
12                Buffalo, New York 14202
              For the Plaintiff
13

              **THE FOTI LAW FIRM, P.C.**
14                **BY: MARK ANDREW FOTI, ESQ.**
              16 West Main Street, Suite 100
15                Rochester, New York 14614
               And
16                **SOEHNLEIN LAW**
              **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**
17                350 Main Street, Suite 2100
              Buffalo, New York 14202
18                For the Defendant

19  <u>**PRESENT:**</u>       **KAREN A. CHAMPOUX, USA PARALEGAL**
              **BRIAN A. BURNS, FBI SPECIAL AGENT**
20                **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**
              **OLIVIA A. PROIA, J.D., PARALEGAL**
21

   <u>**LAW CLERK:**</u>     **REBECCA FABIAN IZZO, ESQ.**
22

   <u>**COURT CLERK:**</u>   **COLLEEN M. DEMMA**
23

   <u>**REPORTER:**</u>      **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
24               Robert H. Jackson Courthouse
             2 Niagara Square Buffalo, New York 14202
25               Ann_Sawyer@nywd.uscourts.gov

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
|          | 1  | (Excerpt commenced at 2:41 p.m.)                                       |
| 02:41PM  | 2  | (Jury is present.)                                                     |
| 02:41PM  | 3  | **THE COURT:**  The government can call its next witness.              |
| 02:41PM  | 4  | **MR. TRIPI:**  One moment, please, Judge.                            |
| 02:41PM  | 5  | We'll call R.A. next.                                                  |
| 02:41PM  | 6  |                                                                        |
| 02:41PM  | 7  | **R. A. (PW 6)**, having been duly called and sworn, testified as     |
| 02:41PM  | 8  | follows:                                                               |
| 02:41PM  | 9  |                                                                        |
| 02:41PM  | 10 | **DIRECT EXAMINATION BY MR. TRIPI:**                                   |
| 02:42PM  | 11 | Q.  Good afternoon, Ms. R.A.                                           |
| 02:42PM  | 12 | A.  Good afternoon.                                                    |
| 02:42PM  | 13 | Q.  I don't think we've ever formally met.  I said hello to           |
| 02:42PM  | 14 | you in the hallway a few times, but you've kind of dealt with         |
| 02:42PM  | 15 | some other prosecutors usually when you've had court matters;         |
| 02:42PM  | 16 | is that right?                                                        |
| 02:42PM  | 17 | A.  Yes.                                                               |
| 02:42PM  | 18 | Q.  All right.  If you don't understand anything that I'm             |
| 02:42PM  | 19 | asking you, just let me know and I'll try to do better, okay?         |
| 02:42PM  | 20 | A.  Okay.                                                              |
| 02:42PM  | 21 | Q.  How old are you, ma'am?  Let's start with an easy                 |
| 02:42PM  | 22 | question.                                                              |
| 02:42PM  | 23 | A.  42.                                                                |
| 02:42PM  | 24 | Q.  Sorry to have to ask.  Where were you born and raised?            |
| 02:42PM  | 25 | A.  Pendleton, New York.                                               |

| | | |
|---|---|---|
| 02:42PM | 1 | Q.  Is that Niagara County? |
| 02:42PM | 2 | A.  Yes, it is. |
| 02:42PM | 3 | Q.  And can you describe your educational background for the |
| 02:43PM | 4 | jury? |
| 02:43PM | 5 | A.  Yes.  I have a degree in behavioral science from |
| 02:43PM | 6 | University of Buffalo.  And I'm currently studying for my |
| 02:43PM | 7 | master's degree in clinical mental health. |
| 02:43PM | 8 | Q.  When did you get the behavioral science degree from U.B.? |
| 02:43PM | 9 | A.  2004 -- sorry, 2024, May. |
| 02:43PM | 10 | Q.  Congratulations. |
| 02:43PM | 11 | A.  Thank you. |
| 02:43PM | 12 | Q.  Before that, as I understand it, you have another degree |
| 02:43PM | 13 | from Buff State? |
| 02:43PM | 14 | A.  Yes, social work. |
| 02:43PM | 15 | Q.  When did you get that? |
| 02:43PM | 16 | A.  2014, I believe. |
| 02:43PM | 17 | Q.  Okay.  And you're currently studying for your master's? |
| 02:43PM | 18 | A.  Yes, I am.  I'm in second year. |
| 02:43PM | 19 | Q.  Is that in U.B. as well? |
| 02:43PM | 20 | A.  No, that's at SUNY Fredonia. |
| 02:43PM | 21 | Q.  And you might have said it, but I missed it.  What's that |
| 02:43PM | 22 | area in? |
| 02:43PM | 23 | A.  Clinical mental health counseling. |
| 02:43PM | 24 | Q.  When do you expect to complete that program? |
| 02:43PM | 25 | A.  Probably 2027. |

02:44PM    1    Q.  Okay.

02:44PM    2    A.  Summer.

02:44PM    3    Q.  Gotcha.  All right.  Are you currently employed?

02:44PM    4    A.  No, I'm a homemaker actually right now and a student.

02:44PM    5    Q.  Previously you've been employed though, right?

02:44PM    6    A.  Yes.

02:44PM    7    Q.  Before you maybe started getting the doctorate, is it?

02:44PM    8    A.  Yes.

02:44PM    9    Q.  What were you doing?

02:44PM    10   A.  I was an -- I'm a chemical dependency counselor.  I'm a

02:44PM    11   CASAC in New York State.

02:44PM    12   Q.  I missed that second part.

02:44PM    13   A.  I have my CASAC in New York State.

02:44PM    14   Q.  What is that?

02:44PM    15   A.  Credentialed drug and alcohol counselor.

02:44PM    16   Q.  Okay.  How long were you a chemical dependency counselor?

02:44PM    17   A.  Four years.

02:44PM    18   Q.  Okay.  All right.  As I understand it, and you correct me

02:44PM    19   if I'm wrong, this is an area you became interested in after

02:44PM    20   some of your own life experiences; is that fair?

02:44PM    21   A.  Absolutely.

02:45PM    22   Q.  So, I hate to do it, but we're going to go back in

02:45PM    23   time --

02:45PM    24   A.  Okay.

02:45PM    25   Q.  -- to that, okay?

02:45PM   1    A.   Sure.

02:45PM   2    Q.   In the early 2000s of your life, were you involved in a

02:45PM   3    different lifestyle?

02:45PM   4    A.   Absolutely, yes.

02:45PM   5    Q.   Can you describe just what you were doing for work and

02:45PM   6    that lifestyle in the early yes 2000s?

02:45PM   7    A.   Early 2000s, probably between 2001 and 2003, early 2000s,

02:45PM   8    I'm not sure exactly, it's a long time ago --

02:45PM   9    Q.   Right.

02:45PM  10    A.   -- I was dancing.  I was an exotic dancer.

02:45PM  11    Q.   And was your -- was your name Diamond?

02:45PM  12    A.   Yes.

02:45PM  13    Q.   And -- and were you dancing at that time, 2001 to 2003,

02:45PM  14    at a specific club, or did you travel around?

02:45PM  15    A.   I worked at one specific club, like, my home club.  But I

02:45PM  16    did travel around.

02:45PM  17    Q.   And which was your home or main club where you danced?

02:46PM  18    A.   Mademoiselle's.

02:46PM  19    Q.   And was that located on Aero Drive?

02:46PM  20    A.   Yes, it was.

02:46PM  21    Q.   777 Aero Drive?

02:46PM  22    A.   Um-hum.

02:46PM  23    Q.   And explain for the jury, just so they have some

02:46PM  24    understanding of traveling around, what does that entail?  Is

02:46PM  25    that --

02:46PM  1    A.  Like, you would dance at one club, and then if you wanted

02:46PM  2    to make more money, or if there was a special event at

02:46PM  3    another club, you would go to that club.

02:46PM  4    Q.  Okay.  Now, I'm going to bounce around a little bit, and

02:46PM  5    I'm not going to try to confuse you with any timelines or

02:46PM  6    anything like that, but --

02:46PM  7    A.  I'm never good with dates, so --

02:46PM  8    Q.  -- but I'm going bounce around just a little bit.  All

02:46PM  9    right?  So, at some point in or about 2005, did you have some

02:46PM  10   type of relationship with a guy named Craig Border?

02:46PM  11   A.  Yes.

02:46PM  12   Q.  Is that somebody that you met where you lived at the

02:46PM  13   Sidway Building on Main Street?

02:46PM  14   A.  Yes.

02:46PM  15   Q.  And that's in Buffalo, New York, for those --

02:46PM  16   A.  Right.

02:46PM  17   Q.  -- who may not know?

02:46PM  18   A.  Yes.

02:46PM  19   Q.  At that time, you were single, right?

02:47PM  20   A.  Yes.

02:47PM  21   Q.  You were not married?

02:47PM  22   A.  Nope.

02:47PM  23   Q.  You were working in the clubs though?

02:47PM  24   A.  Yes.

02:47PM  25   Q.  Okay.  At that point in your time meeting Mr. Border, did

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

02:47PM 1  learn or did you understand him to be a marijuana dealer?

02:47PM 2  A.  Yes.

02:47PM 3  Q.  In that time of your life, were you also involved in sort

02:47PM 4  of use of controlled substances?

02:47PM 5  A.  Yes.

02:47PM 6  Q.  At that point in your life, what type of controlled

02:47PM 7  substances did you use?

02:47PM 8  A.  Alcohol, marijuana, cocaine.

02:47PM 9  Q.  Okay.  What time -- I'm timestamping it around when

02:47PM 10 you're seeing Mr. Border, okay?

02:47PM 11 A.  Okay.

02:47PM 12 Q.  What substances were you using most frequently at that

02:47PM 13 point?

02:47PM 14 A.  Probably alcohol and cocaine at that time.  But it's hard

02:47PM 15 to -- I don't know, mostly alcohol, cocaine.

02:47PM 16 Q.  Okay.

02:47PM 17 A.  Yeah.

02:47PM 18 Q.  What was the nature of your cocaine use like?  And what

02:48PM 19 I'm asking is, was it recreational at that point?  Or was it

02:48PM 20 heavy, like, addiction?

02:48PM 21 A.  I don't know.  I mean, addiction is different for

02:48PM 22 everyone.  At this point, you know, I was -- you know, I was

02:48PM 23 younger, so I could withstand using frequently enough.

02:48PM 24     As I got older, it became more difficult to sustain my

02:48PM 25 addiction.

02:48PM   1   Q.   Okay.  Getting back to Mr. Border briefly in 2005, you're

02:48PM   2   not married at that point, you're seeing him.  Did there come

02:48PM   3   a point in time where you took some photos in sort of

02:48PM   4   lingerie, like, Playboy Bunny photos?

02:48PM   5   A.   Yes.

02:48PM   6   Q.   Did you give those photos to him?  Was it around a

02:48PM   7   birthday or something?

02:48PM   8   A.   I think it was a birthday, or he took pictures.

02:48PM   9   Q.   Okay.

02:48PM   10   A.   Not really sure.

02:48PM   11   Q.   As you understood it, those were pictures he had, right?

02:48PM   12   A.   Yes.

02:48PM   13   Q.   Who was your next boyfriend or relationship after

02:49PM   14   Mr. Border?

02:49PM   15   A.   Peter Gerace.

02:49PM   16   Q.   Were they sort of on the heels of one another?  Like,

02:49PM   17   ending with Border, and then starting with Mr. Gerace?

02:49PM   18   A.   Yes.

02:49PM   19   Q.   Okay.  How did you meet Mr. Gerace?

02:49PM   20   A.   I originally had met him at his family's restaurant,

02:49PM   21   Pietro's.  And then I saw him at Mademoiselle's.

02:49PM   22   Q.   And would a time estimate for when you first met him at

02:49PM   23   Pietro's, would a time estimate be around 2004?  Like, a

02:49PM   24   little bit before this Border relationship, you had met him

02:49PM   25   previously?

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

9

| | | |
|---|---|---|
| 02:49PM | 1 | A.  Yes. |
| 02:49PM | 2 | Q.  And then in the 2005 time period, is that when you see |
| 02:50PM | 3 | him at Mademoiselle's roughly? |
| 02:50PM | 4 | A.  Around that time. |
| 02:50PM | 5 | Q.  Okay.  In 2005, did you -- when you started seeing |
| 02:50PM | 6 | Mr. Gerace as opposed to Craig Border, how did that -- how |
| 02:50PM | 7 | did that transpire? |
| 02:50PM | 8 | A.  I just stopped seeing Craig because I met Peter.  And I |
| 02:50PM | 9 | was just basically dating Craig, it was nothing serious. |
| 02:50PM | 10 | Q.  Right. |
| 02:50PM | 11 | A.  And I wanted something serious with Peter. |
| 02:50PM | 12 | Q.  Did you -- did you leave your apartment at the Sidway |
| 02:50PM | 13 | Building and move in with Peter? |
| 02:50PM | 14 | A.  I did. |
| 02:50PM | 15 | Q.  Where did you move into? |
| 02:50PM | 16 | A.  Windsong. |
| 02:50PM | 17 | Q.  Is that an apartment complex or a -- what is that? |
| 02:50PM | 18 | A.  It's like a townhouse/apartment complex type of thing. |
| 02:50PM | 19 | Q.  And where is that located? |
| 02:50PM | 20 | A.  Off of Transit, so East Amherst area. |
| 02:50PM | 21 | Q.  Okay. |
| 02:50PM | 22 | A.  Williamsville. |
| 02:50PM | 23 | Q.  When you moved in with Peter, did you relinquish your |
| 02:51PM | 24 | apartment at the Sidway Building? |
| 02:51PM | 25 | A.  I did. |

02:51PM    1   Q.  After you started seeing Peter and moved in with him, did

02:51PM    2   there come a time at SoHo downtown here where you met a

02:51PM    3   friend of his named Joe Bongiovanni?

02:51PM    4   A.  Yes.

02:51PM    5   Q.  At that time, when you met Mr. Bongiovanni socially

02:51PM    6   through the defendant, did you know what Mr. Bongiovanni did

02:51PM    7   for a living?

02:51PM    8   A.  No.

02:51PM    9   Q.  Did there come a time when, through the defendant while

02:51PM   10   you were dating the defendant, that you learned what

02:52PM   11   Mr. Bongiovanni did for a living?

02:52PM   12   A.  Yes.

02:52PM   13   Q.  Can you explain that situation for the jury, please?

02:52PM   14   A.  I guess maybe he -- Joe had seen a picture of me in

02:52PM   15   Craig's house.  And I think that was around the time that he

02:52PM   16   was getting raided or something.

02:52PM   17           **MR. SOEHNLEIN:**  Objection, Your Honor.  Can we

02:52PM   18   approach on this issue, please?

02:52PM   19           **THE COURT:**  Sure.

02:52PM   20           **MR. SOEHNLEIN:**  Thank you.

02:52PM   21           (Sidebar discussion held on the record.)

02:52PM   22           **MR. SOEHNLEIN:**  I didn't realize that that was going

02:52PM   23   to be her response to that question, I thought that was going

02:52PM   24   to be another question.  But our problem is it's hearsay

02:52PM   25   within hearsay within hearsay.  Because Border testified that

| | | |
|---|---|---|
| 02:52PM | 1 | he doesn't recall anybody that's at his house, he doesn't |
| 02:52PM | 2 | recall who takes the photo, he doesn't recall telling -- |
| 02:52PM | 3 | **THE COURT:**  She says that Peter told her that |
| 02:52PM | 4 | Bongiovanni told him that -- |
| 02:52PM | 5 | (Undecipherable.) |
| 02:52PM | 6 | **MR. SOEHNLEIN:**  Right, but how do we know -- |
| 02:53PM | 7 | **MR. COOPER:**  She can't hear you, Judge. |
| 02:53PM | 8 | **THE COURT:**  She says that Peter told her that |
| 02:53PM | 9 | Bongiovanni told him he saw the photo.  They're both |
| 02:53PM | 10 | coconspirators, and -- |
| 02:53PM | 11 | **MR. TRIPI:**  Statement of a party opponent. |
| 02:53PM | 12 | **MR. SOEHNLEIN:**  But how do we know what Bongiovanni |
| 02:53PM | 13 | told Peter is accurate? |
| 02:53PM | 14 | **MR. TRIPI:**  Doesn't matter.  It's a statement of |
| 02:53PM | 15 | party opponent.  You can argue whatever you want later. |
| 02:53PM | 16 | **THE COURT:**  Bongiovanni told Peter -- |
| 02:53PM | 17 | **MR. TRIPI:**  What Peter says comes in. |
| 02:53PM | 18 | **THE COURT:**  -- we don't, but each hearsay within |
| 02:53PM | 19 | hearsay is admissible, each of the hearsay branches has an |
| 02:53PM | 20 | exception.  Here, we know that what Peter said to her is |
| 02:53PM | 21 | admissible because he's the defendant.  And what Bongiovanni |
| 02:53PM | 22 | says to Peter is admissible because of the coconspirator |
| 02:53PM | 23 | exception. |
| 02:53PM | 24 | **MR. SOEHNLEIN:**  Yeah. |
| 02:53PM | 25 | **THE COURT:**  So I don't see why -- |

02:53PM   1        **MR. FOTI:**  I think we expected it was gonna come in a

02:53PM   2    little differently than the way it came in.  I understand the

02:53PM   3    Court's point, is that she's saying that Bongiovanni --

02:53PM   4        **THE COURT:**  If you want to argue, I'm willing to

02:54PM   5    listen.  If you think I'm wrong --

02:54PM   6        **MR. FOTI:**  No, no, no.  The way it came in, we tend

02:54PM   7    to agree that it's -- there's -- if she's saying that

02:54PM   8    Bongiovanni said he saw the pictures as opposed to just

02:54PM   9    generally saying there were pictures recovered, I get why it

02:54PM   10   doesn't necessarily --

02:54PM   11       **THE COURT:**  Oh, I see what you're saying.  You're

02:54PM   12   saying that there were pictures -- so somebody may have said

02:54PM   13   to Bongiovanni --

02:54PM   14       **MR. SOEHNLEIN:**  Yeah.  And I think that her prior

02:54PM   15   statements were there were pictures recovered, but here today

02:54PM   16   she's testified a little differently.

02:54PM   17       **MR. FOTI:**  I don't know if she testified --

02:54PM   18       **THE COURT:**  Stop.

02:54PM   19       And, Mr. Tripi, you may be -- you may need to lay

02:54PM   20   more of a foundation, too.  I think she certainly can testify

02:54PM   21   that Bongiovanni says I saw the photos and, you know, at the

02:54PM   22   search and tells Gerace that, and Gerace tells her, that

02:54PM   23   certainly come in.

02:54PM   24       If somebody else tells Bongiovanni, maybe not.

02:54PM   25       **MR. SOEHNLEIN:**  Yeah.  My recollection is at the last

02:54PM  1    trial it was different, the pictures were recovered.

02:55PM  2         **MR. TRIPI:**  There's more of a discussion I'm going to

02:55PM  3    draw out.

02:55PM  4         **THE COURT:**  That Joe had -- yeah, Joe had seen a

02:55PM  5    picture in Craig's house.  That comes in.

02:55PM  6         Okay?  So the objection is overruled.  I'll be

02:55PM  7    attentive to what you're talking about, Mr. Soehnlein.

02:55PM  8         **MR. SOEHNLEIN:**  Thank you very much.

02:55PM  9         (End of sidebar discussion.)

02:55PM  10        **THE COURT:**  Ma'am, could you speak right into the

02:55PM  11   microphone?

02:55PM  12        **THE WITNESS:**  Sure.

02:55PM  13        **THE COURT:**  Some of the jurors are having a hard time

02:55PM  14   hearing you.

02:55PM  15        **THE WITNESS:**  Oh, sorry, guys.  All right.

02:55PM  16        **THE COURT:**  So the objection is overruled.

02:55PM  17        Go ahead, Mr. Tripi.

02:55PM  18        **MR. TRIPI:**  Yes, Your Honor.

02:55PM  19        **BY MR. TRIPI:**

02:55PM  20   Q.  Bear with me, I lost my place.

02:55PM  21   A.  Okay.

02:56PM  22   Q.  I want to set this discussion that you had with Peter up

02:56PM  23   a little bit more.

02:56PM  24       In the context of this discussion that you had with Peter

02:56PM  25   about what Joe said, and -- to him about the pictures in

02:56PM   1    Craig's apartment, were you having sort of an argument or

02:56PM   2    disagreement with Mr. Gerace at the time?

02:56PM   3    A.   I'm not really sure if it was a disagreement or an

02:56PM   4    argument necessarily.   Maybe it was us bickering back and

02:56PM   5    forth or something.

02:56PM   6    Q.   Yeah.   That's all I'm trying to drive at.

02:56PM   7    A.   Oh, okay.

02:56PM   8    Q.   Was there something that was going on where then Peter

02:56PM   9    said to you what Mr. Bongiovanni had told him about the

02:56PM   10   picture?

02:56PM   11   A.   Yes.   Yes.

02:56PM   12   Q.   Okay.   Now, as close as you can --

02:56PM   13   A.   Um-hum.

02:56PM   14   Q.   -- to what Mr. Gerace said to you, what did he say about

02:56PM   15   seeing the Playboy Bunny picture outfit in Craig Border's

02:56PM   16   apartment?

02:56PM   17   A.   He said there was a picture of me.

02:57PM   18   Q.   Anything else?

02:57PM   19   A.   And that he -- and that Joe had seen it during the --

02:57PM   20   during this raid or whatever it was.

02:57PM   21   Q.   That's what I'm driving at.   Is that when you learned

02:57PM   22   that Joe Bongiovanni was a DEA agent?

02:57PM   23   A.   That's when I knew, yeah, 100 percent, um-hum.

02:57PM   24   Q.   Is that because Peter told you Joe works for the DEA and

02:57PM   25   was in a raid and he saw your picture?

02:57PM    1    A.  He didn't necessarily tell me that.  I mean, you assume

02:57PM    2    that, you know, if they're involved in a raid and there's a

02:57PM    3    picture, that you're a DEA agent or some sort of agent.

02:57PM    4    Q.  Okay.  On September 17th, 2020, you were subpoenaed to a

02:57PM    5    federal grand jury?

02:57PM    6    A.  Okay.

02:57PM    7    Q.  Do you remember that?

02:57PM    8    A.  Yep.

02:57PM    9    Q.  And -- have I done something to offend you?

02:57PM   10    A.  No.

02:57PM   11    Q.  Okay.  You remember what I'm talking about here, right?

02:57PM   12    A.  Yes.

02:57PM   13    Q.  Okay.  And you were asked questions by an Assistant

02:58PM   14    United States Attorney named Brendan Cullinane; do you

02:58PM   15    remember that?

02:58PM   16    A.  I don't remember Brendan, no.  I don't know names.

02:58PM   17    Q.  It wasn't me, right?

02:58PM   18    A.  No.

02:58PM   19    Q.  And you were asked a series of questions and answers

02:58PM   20    about this, right?

02:58PM   21    A.  Right.

02:58PM   22    Q.  And all of that preceded with you speaking to federal

02:58PM   23    agents who came to talk to you, right?

02:58PM   24    A.  Right.

02:58PM   25    Q.  They had reached out to your mother, right?

| 02:58PM | 1 | A.  Yes. |
| 02:58PM | 2 | Q.  Then you had agreed to meet with them, and you talked to |
| 02:58PM | 3 | them in a car, right? |
| 02:58PM | 4 | A.  Yeah. |
| 02:58PM | 5 | Q.  True? |
| 02:58PM | 6 | A.  Yeah. |
| 02:58PM | 7 | Q.  And you were nervous to talk about Peter, correct? |
| 02:58PM | 8 | A.  Was I nervous? |
| 02:58PM | 9 | Q.  Yes or no:  Were you nervous? |
| 02:58PM | 10 | A.  Of course I was nervous, you're talking to FBI agents. |
| 02:58PM | 11 | Q.  You were nervous about Peter. |
| 02:58PM | 12 | A.  Not -- no, I wasn't nervous about Peter, I was nervous |
| 02:58PM | 13 | that, you know -- |
| 02:58PM | 14 | Q.  Yes -- |
| 02:58PM | 15 | A.  -- there were FBI agents at my door. |
| 02:58PM | 16 | Q.  -- yes or no:  Did you express concern about talking |
| 02:58PM | 17 | about Peter? |
| 02:58PM | 18 | A.  Of course. |
| 02:58PM | 19 | Q.  Okay. |
| 02:58PM | 20 | A.  Yes. |
| 02:58PM | 21 | Q.  Now, fast forwarding to grand jury under oath. |
| 02:58PM | 22 | A.  Um-hum. |
| 02:58PM | 23 | Q.  Were you asked this question, did you give this answer: |
| 02:58PM | 24 | Can you please describe that -- I'll go back a little |
| 02:59PM | 25 | further. |

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

17

02:59PM    1    This is page 18, lines 17 through 25, going on to line 5

02:59PM    2    of page 19.

02:59PM    3    Were you asked these questions under oath, and did you

02:59PM    4    give these answers:

02:59PM    5    "Question:  All right.  At some point after this meeting

02:59PM    6    in which you meet Joseph Bongiovanni through Peter, did there

02:59PM    7    come an incident in your relationship with Peter that

02:59PM    8    involved Joseph Bongiovanni?

02:59PM    9    "Answer:  Yes."

02:59PM    10    Were you asked that question, did you give that answer?

02:59PM    11    A.  Yes.

02:59PM    12    Q.  Next.  "Question:  Can you please describe that for the

02:59PM    13    grand jury?

02:59PM    14    "Answer:  Prior to dating Peter, I was dating an

02:59PM    15    individual that lived in the building next to me named Craig.

02:59PM    16    He got -- ended up getting raided for marijuana sales.  And

02:59PM    17    later on during, like, that week, leading up to after the

02:59PM    18    raid had happened, Peter came up to me and said my friend Joe

02:59PM    19    is a DEA agent, and saw your photo in the house of Craig.

02:59PM    20    Because I had been there, and the picture was of me.  So

02:59PM    21    that's how I became aware he was a DEA agent."

03:00PM    22    Were you asked those questions, did you give those

03:00PM    23    answers?

03:00PM    24    A.  Obviously I did if it's written down.

03:00PM    25    Q.  Did you ask -- did you get asked those questions and did

03:00PM    1    you give those answers?

03:00PM    2    A.  Yes.

03:00PM    3    Q.  Okay.  Now, at -- when you were dancing at

03:00PM    4    Mademoiselle's, was an owner named Don Parrino?

03:00PM    5    A.  Yes.

03:00PM    6    Q.  Did Don Parrino and the defendant open a club called

03:00PM    7    Pharaoh's?

03:00PM    8    A.  Yes.

03:00PM    9    Q.  When was that?

03:00PM    10   A.  2005 or '6.

03:00PM    11   Q.  Okay.  Eventually, in 2006, did you become pregnant?

03:01PM    12   A.  Yes.

03:01PM    13   Q.  By this defendant?

03:01PM    14   A.  Yes.

03:01PM    15   Q.  And I guess we've been talking about Peter Gerace, just

03:01PM    16   for the record, can you point him out for us?

03:01PM    17   A.  He's right there.

03:01PM    18   Q.  Pointing to the person in the middle?

03:01PM    19        **MR. TRIPI:**  She's identified the defendant.

03:01PM    20        **THE WITNESS:**  Yep.

03:01PM    21        **THE COURT:**  Yeah, the record reflects that she

03:01PM    22   identified the defendant.

03:01PM    23        **MR. TRIPI:**  Thank you.

03:01PM    24        **THE WITNESS:**  Okay.

           25

|  |  |  |
|--|--|--|
| 03:01PM | 1 | **BY MR. TRIPI:** |
| 03:01PM | 2 | Q.  After you became pregnant, when did you have your son? |
| 03:01PM | 3 | A.  April 10th, 2006. |
| 03:01PM | 4 | Q.  Where were you and the defendant living at that time? |
| 03:02PM | 5 | A.  I was -- I was -- he was living -- we were living in |
| 03:02PM | 6 | Windsong, and I eventually moved in with my mother and |
| 03:02PM | 7 | father. |
| 03:02PM | 8 | Q.  Did you live with him for a time on Joseph Drive, |
| 03:02PM | 9 | 97 Joseph Drive -- |
| 03:02PM | 10 | A.  Yes. |
| 03:02PM | 11 | Q.  -- in the Town of Tonawanda? |
| 03:02PM | 12 | Was that at his grandfather and grandmother's house? |
| 03:02PM | 13 | A.  Yes. |
| 03:02PM | 14 | Q.  Was there an apartment situated there? |
| 03:02PM | 15 | A.  Yeah. |
| 03:02PM | 16 | Q.  How was the apartment situated as related to the house? |
| 03:02PM | 17 | A.  It was above the garage. |
| 03:02PM | 18 | Q.  Okay.  Now, your son's born April 10th, 2006.  Obviously |
| 03:02PM | 19 | doing math, you're pregnant sometime in 2005, right? |
| 03:02PM | 20 | A.  Um-hum. |
| 03:02PM | 21 | Q.  Prior to that, what was the nature of your cocaine use |
| 03:02PM | 22 | when you were with the defendant? |
| 03:02PM | 23 | A.  I wasn't using that often.  But once I got pregnant I |
| 03:03PM | 24 | stopped using altogether. |
| 03:03PM | 25 | Q.  And would you use cocaine with the defendant at the |

| 03:03PM | 1 | Windsong apartment? |
| 03:03PM | 2 | A.  No, I never did. |
| 03:03PM | 3 | Q.  In the year 2005 before being pregnant, did you use |
| 03:03PM | 4 | cocaine with the defendant? |
| 03:03PM | 5 | A.  I may have, yes. |
| 03:03PM | 6 | Q.  How frequently would you and the defendant use cocaine? |
| 03:03PM | 7 | A.  It was just recreational. |
| 03:03PM | 8 | Q.  So how frequently? |
| 03:03PM | 9 | A.  I don't know.  Maybe once every two weeks, maybe less |
| 03:03PM | 10 | than that. |
| 03:03PM | 11 | Q.  Who provided the cocaine when you would use with him? |
| 03:04PM | 12 | A.  Peter had it. |
| 03:04PM | 13 | Q.  He had it? |
| 03:04PM | 14 | A.  Yeah. |
| 03:04PM | 15 | Q.  Do you know who was giving it to him? |
| 03:04PM | 16 | A.  No. |
| 03:04PM | 17 | Q.  All right.  After your son was born on April 10th, 2006, |
| 03:04PM | 18 | did you and the defendant get married? |
| 03:04PM | 19 | A.  Yes. |
| 03:04PM | 20 | Q.  By that point in time, had you met a person named John |
| 03:04PM | 21 | Michalski through the defendant? |
| 03:04PM | 22 | A.  Yes. |
| 03:04PM | 23 | Q.  How did you meet John Michalski who became a judge? |
| 03:04PM | 24 | A.  He was a friend of Peter's.  We went out to dinner a |
| 03:04PM | 25 | couple of times. |

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24          21

03:04PM    1    Q.    Were you -- when you went out to dinner with

03:04PM    2    Mr. Michalski, was that before he was a judge initially?

03:04PM    3    A.    Maybe, I'm really not sure.

03:04PM    4    Q.    Okay.    Eventually he becomes a New York State Supreme

03:05PM    5    Court judge, though, right?

03:05PM    6    A.    Yep.

03:05PM    7    Q.    Was he the one that married you and the defendant?

03:05PM    8    A.    Yes.

03:05PM    9    Q.    Where -- where did he marry you?    Where was the ceremony?

03:05PM   10    A.    In his office in the courthouse.

03:05PM   11    Q.    So in the judge's chambers; do you recall that?

03:05PM   12    A.    Yes.

03:05PM   13    Q.    Who was present for it?

03:05PM   14    A.    My mother.

03:05PM   15    Q.    Your son, as well?

03:05PM   16    A.    Yes.

03:05PM   17    Q.    And Peter?    All right.    So your mother was the witness?

03:05PM   18    A.    Yes.

03:05PM   19    Q.    When Pharaoh's opened, were the day-to-day operations of

03:05PM   20    that club ran by Mr. Parrino and the defendant?

03:05PM   21    A.    Yes.

03:05PM   22    Q.    When it initially opened, and I know I'm bouncing back to

03:05PM   23    2005 maybe a little bit, when it initially opened, did you

03:06PM   24    dance there at all?

03:06PM   25    A.    Never.

| | | |
|---|---|---|
| 03:06PM | 1 | Q.  When it initially opened, did you socialize there? |
| 03:06PM | 2 | A.  Yeah, maybe for the opening, grand opening party. |
| 03:06PM | 3 | Q.  So we're talking 2006? |
| 03:06PM | 4 | A.  Yeah. |
| 03:06PM | 5 | Q.  2005? |
| 03:06PM | 6 | A.  Yeah, 2006, between 2005 and 2006.  Yes. |
| 03:06PM | 7 | Q.  Okay.  Did you use cocaine inside Pharaoh's with the |
| 03:06PM | 8 | defendant? |
| 03:06PM | 9 | A.  No, I didn't use it with the defendant in Pharaoh's. |
| 03:06PM | 10 | Q.  Did you use cocaine inside Pharaoh's? |
| 03:06PM | 11 | A.  Yes. |
| 03:06PM | 12 | Q.  Where inside Pharaoh's did you use cocaine? |
| 03:06PM | 13 | A.  In the bathroom, whatever.  I used a lot of cocaine. |
| 03:06PM | 14 | Q.  Given your sort of now training, you've distinguished |
| 03:06PM | 15 | between recreational -- I think you said recreational use. |
| 03:06PM | 16 | Is there also something that is referred to active addiction? |
| 03:07PM | 17 | A.  Yes. |
| 03:07PM | 18 | Q.  Were you ever in active addiction for cocaine? |
| 03:07PM | 19 | A.  Yes. |
| 03:07PM | 20 | Q.  When was that? |
| 03:07PM | 21 | A.  Probably between 2008 and 2013.  Just doing a lot of |
| 03:07PM | 22 | drinking. |
| 03:07PM | 23 | Q.  Okay. |
| 03:07PM | 24 | A.  Which would usually lead to cocaine use. |
| 03:07PM | 25 | Q.  Soon after -- soon after Pharaoh's opened, did the |

03:07PM  1  defendant tell you not to go to the club anymore?

03:07PM  2  A.  Yes.

03:07PM  3  Q.  What was your understanding of why?

03:07PM  4  A.  I -- he just -- he didn't want me there.  I don't know

03:07PM  5  exactly why, but he didn't want me there.

03:07PM  6  Q.  During that time period, did the defendant engage with

03:07PM  7  other women?

03:07PM  8  A.  Yes.

03:07PM  9  Q.  Were they women at the club?

03:07PM  10  A.  Some were.

03:07PM  11  Q.  Would that judge that married you, John -- Judge John

03:08PM  12  Michalski, did he go to Pharaoh's?

03:08PM  13  A.  I don't think I ever seen him there.  Maybe he did go

03:08PM  14  there for, like, a grand opening party.  A lot of people were

03:08PM  15  present.

03:08PM  16  Q.  Did you have a Facebook page back then?

03:08PM  17  A.  No.

03:08PM  18  Q.  Have you -- did you view Facebook back then?

03:08PM  19  A.  No.

03:08PM  20  Q.  Did you ever see photos of Judge Michalski in Pharaoh's

03:08PM  21  on Facebook?

03:08PM  22  A.  No.

03:08PM  23  Q.  Okay.  Going back to that grand jury proceeding, were you

03:08PM  24  asked these questions and did you give these answers:

03:08PM  25          **THE COURT:**  Page and line, please.

| | | |
|---|---|---|
| 03:08PM | 1 | **MR. TRIPI:**  I'm trying to find it, Judge, I'm sorry. |
| 03:08PM | 2 | It's on page 15 of the grand jury.  Okay.  I need to |
| 03:09PM | 3 | go to 14, line 22, to the end of that page, and then to the |
| 03:09PM | 4 | top of page 15, line 3. |
| 03:09PM | 5 | **BY MR. TRIPI:** |
| 03:09PM | 6 | Q.  You were asked this question, did you give these answers: |
| 03:09PM | 7 | "Question:  Was Judge Michalski also at Pharaoh's with |
| 03:09PM | 8 | him sometimes? |
| 03:09PM | 9 | "Answer:  I believe so. |
| 03:09PM | 10 | "Question:  Why do you believe that? |
| 03:09PM | 11 | "Answer:  Because a lot of people went out there, and I |
| 03:09PM | 12 | would assume he's been there.  I think maybe I saw some |
| 03:09PM | 13 | pictures in there from Facebook maybe." |
| 03:09PM | 14 | Were you asked those questions and did you give those |
| 03:09PM | 15 | answers? |
| 03:09PM | 16 | A.  Yes. |
| 03:09PM | 17 | Q.  What year did you and the defendant stop physically |
| 03:10PM | 18 | living together? |
| 03:10PM | 19 | A.  I don't know.  The time was very difficult around that |
| 03:10PM | 20 | time because I was in active addiction. |
| 03:10PM | 21 | Q.  Okay.  I think we left off -- at the point in time you |
| 03:10PM | 22 | were married in 2006, are you living at 97 Joseph Drive? |
| 03:10PM | 23 | A.  Yeah. |
| 03:10PM | 24 | Q.  Okay.  Was your divorce finalized December 16th, 2010? |
| 03:10PM | 25 | A.  Yes. |

03:10PM    1    Q.  Somewhere between 2006 and 2010?

03:10PM    2    A.  Um-hum.

03:10PM    3    Q.  Did you stop living with the defendant?

03:10PM    4    A.  Yes.

03:10PM    5    Q.  Where did you go live?

03:10PM    6    A.  My mother.

03:10PM    7    Q.  So in 2007, 2008, 2009, 2010, you didn't live with the

03:11PM    8    defendant, correct?  You did not?

03:11PM    9    A.  Did I live with the defendant?  What?  I'm sorry.

03:11PM   10    Q.  In 2007 through 2010, when your divorce finalized, you

03:11PM   11    did not live with the defendant?

03:11PM   12    A.  No.

03:11PM   13    Q.  Okay.  After your divorce finalized, would there be times

03:11PM   14    when you stayed together though?

03:11PM   15    A.  Yes.

03:11PM   16    Q.  In the year of 2013, did you move back in with the

03:11PM   17    defendant?

03:11PM   18    A.  Briefly, yes.

03:11PM   19    Q.  On Joseph Drive?

03:11PM   20    A.  Yes.

03:11PM   21    Q.  And then you moved back out?

03:11PM   22    A.  Yep.

03:11PM   23    Q.  And during those years, 2007 through 2013, you're not

03:11PM   24    going to Pharaoh's; fair to say?

03:11PM   25    A.  Fair to say, yes.

03:11PM  1    Q.  After you move out of Joseph Drive in 2013 all the way to

03:11PM  2    present day, you're not going to Pharaoh's anymore, correct?

03:12PM  3    A.  No.

03:12PM  4    Q.  Poor question on my part, I'll correct it.  Yes, you're

03:12PM  5    not going to Pharaoh's?

03:12PM  6    A.  I'm not going to Pharaoh's.

03:12PM  7    Q.  Okay.  Thank you.

03:12PM  8         THE COURT:  Mr. Tripi, do you have a sense of how

03:12PM  9    much longer you're going to be?

03:12PM  10        MR. TRIPI:  Maybe five or ten minutes, Judge.

03:12PM  11        THE COURT:  Okay.

03:12PM  12        MR. TRIPI:  If we take a break -- if this is a good

03:12PM  13   time for a break, maybe I could tighten it up and be done in a

03:12PM  14   few minutes.

03:12PM  15        THE COURT:  Great.  Let's do that then.

03:12PM  16        So, folks, let's take our afternoon break.  Remember

03:12PM  17   my instructions about not talking about the case including

03:12PM  18   with each other, and not making up your mind.

03:12PM  19        We'll be back in ten or 15 minutes.

03:12PM  20        (Jury excused at 3:12 p.m.)

03:13PM  21        THE COURT:  Okay.  Ms. R.A., don't talk to anybody

03:13PM  22   about your testimony during the break.

03:13PM  23        THE WITNESS:  Okay.

03:13PM  24        THE COURT:  Anything from the government?

03:13PM  25        MR. COOPER:  No, thank you.

03:13PM  1          **THE COURT:**  Anything from the defense?

03:13PM  2          **MR. FOTI:**  No, thank you.

03:13PM  3          **THE COURT:**  We'll see you in about ten or 15 minutes.

03:13PM  4          (Off the record at 3:13 p.m.)

03:34PM  5          (Back on the record at 3:34 p.m.)

03:34PM  6          (Jury not present.)

03:34PM  7          (Discussion of next witness Jeffrey Anzalone from

03:34PM  8  3:34 p.m. to 3:35 p.m.)

03:34PM  9          (Jury seated at 3:35 p.m.)

03:35PM  10         **THE COURT:**  Okay.  Welcome back for the home stretch,

03:35PM  11  folks.  I think I forgot to mention that Ms. Chalbeck is not

03:35PM  12  here again today.  She had that same matter that she needed to

03:35PM  13  attend to today.  Again, I know about it, it's an important

03:35PM  14  matter, and we hope that she'll be back with us on Monday.

03:35PM  15         The record will reflect that all our jurors are

03:35PM  16  present.

03:35PM  17         I remind the witness that she's still under oath.

03:35PM  18         And, Mr. Tripi, you may continue.

03:35PM  19         **MR. TRIPI:**  Thank you, Your Honor.

03:35PM  20         **BY MR. TRIPI:**

03:35PM  21  Q.  Ms. R.A., a few more minutes, and then I'm going to turn

03:35PM  22  over the questioning.  Okay?  I want to circle back to that

03:35PM  23  discussion about the pictures.

03:35PM  24  A.  Um-hum.

03:35PM  25  Q.  There was one question I neglected to ask you.

03:35PM    1        In that conversation with the defendant, did the

03:35PM    2    defendant also tell you that he had observed the picture that

03:35PM    3    Joe Bongiovanni saw in the house?

03:35PM    4    A.  I'm not sure if he said "observed."

03:35PM    5    Q.  Okay.

03:36PM    6    A.  No.

03:36PM    7    Q.  I'm going to try to refresh your recollection then --

03:36PM    8    A.  Okay.

03:36PM    9    Q.  -- on that, okay?

03:36PM   10        I'm going to show you -- I need the exhibit number

03:36PM   11    actually.  3562A is the number.  We'll show you page 21.

03:36PM   12            MR. TRIPI:  And, Ms. Champoux, if we can do that for

03:36PM   13    the witness only at this time.

03:36PM   14            BY MR. TRIPI:

03:36PM   15    Q.  Look at lines 2 through 4.

03:36PM   16    A.  Okay.

03:36PM   17    Q.  Okay?

03:36PM   18            MR. TRIPI:  You can take that down.

03:36PM   19            THE WITNESS:  Yep.

03:36PM   20            BY MR. TRIPI:

03:36PM   21    Q.  So did Peter tell you that he had actually observed the

03:36PM   22    photo?

03:36PM   23    A.  Yes.

03:36PM   24    Q.  All right.  I want to ask you about another person who

03:36PM   25    was friends with the defendant.  Do you know Dan Derenda?

03:37PM  1   A.   Yes.

03:37PM  2   Q.   Did you -- did you meet him through the defendant?

03:37PM  3   A.   Yes.

03:37PM  4   Q.   What was the defendant's relationship with Mr. Derenda?

03:37PM  5   A.   He was a friend, and he was the godfather of his

03:37PM  6   daughter.

03:37PM  7   Q.   So, Mr. Derenda has a daughter named Mia?

03:37PM  8   A.   Yes.

03:37PM  9   Q.   And the defendant is the godfather?

03:37PM  10  A.   Yes.

03:37PM  11  Q.   When you met Mr. Derenda, was he the Buffalo Police

03:37PM  12  Commissioner at the time?

03:37PM  13  A.   Yes.

03:37PM  14  Q.   Where were you when you met Mr. Derenda through the

03:37PM  15  defendant?

03:37PM  16  A.   I was at his house.

03:37PM  17  Q.   Mr. Derenda's house?

03:37PM  18  A.   Yes.

03:37PM  19  Q.   Now, I don't want to get into specifics of anything

03:37PM  20  underlying, but earlier in your relationship focusing in on

03:37PM  21  that 2006 timeframe, okay --

03:37PM  22  A.   Um-hum.

03:37PM  23  Q.   -- the defendant was on probation with U.S. Probation; is

03:37PM  24  that right?

03:38PM  25  A.   Yes.

03:38PM   1   Q.  At some point while he was on probation, did the

03:38PM   2   defendant ask you for clean urine?

03:38PM   3   A.  I'm not sure.

03:38PM   4   Q.  Okay.  Let me build that out a little bit.

03:38PM   5       As you understood it, when the defendant was on

03:38PM   6   probation, he couldn't use drugs, right?

03:38PM   7   A.  Yes.

03:38PM   8   Q.  He could not use cocaine, for example?

03:38PM   9   A.  Yes.

03:38PM  10   Q.  As you understood it, he was drug tested?

03:38PM  11   A.  Yes.

03:38PM  12   Q.  And, obviously, drugs are illegal, right?

03:38PM  13   A.  Yes.

03:38PM  14   Q.  And so I want to show you Government Exhibit 3562A at

03:38PM  15   page 31.

03:38PM  16        MR. TRIPI:  Actually, I want to go to the bottom of

03:39PM  17   page -- this is for the witness only, bottom of page 30 first.

03:39PM  18        BY MR. TRIPI:

03:39PM  19   Q.  And then maybe start reading from line 21, down.

03:39PM  20   A.  Okay.

03:39PM  21   Q.  Okay?  Just read it to yourself.  And we'll scroll when

03:39PM  22   you let me know, okay?

03:39PM  23   A.  Um-hum.  Okay.

03:39PM  24        MR. TRIPI:  Can you scroll a little bit more,

03:39PM  25   Ms. Champoux?

03:39PM    1    **BY MR. TRIPI:**

03:39PM    2    Q.  All right.  I'd like you to stop reading around line 19,

03:39PM    3    which I crossed out so you can't read it.  But go from lines

03:39PM    4    1 through 19 now on page 31.

03:39PM    5    A.  Um-hum.

03:39PM    6    Q.  Okay.

03:39PM    7            **MR. TRIPI:**  We can take that down, Ms. Champoux.

03:39PM    8            **BY MR. TRIPI:**

03:39PM    9    Q.  My question now is:  After the defendant had a negative

03:39PM   10    drug test, did he ask you if you could provide him with clean

03:39PM   11    urine?

03:39PM   12    A.  Yes.

03:39PM   13    Q.  And was it your -- was it your understanding so that he

03:40PM   14    would pass future drug tests?

03:40PM   15    A.  It was my understanding that he had to test negative.

03:40PM   16    Q.  Okay.  Negative is past tense, so he's tested, tested

03:40PM   17    negative.  Then he has a conversation with you, correct?

03:40PM   18    A.  Yep.  Yes.

03:40PM   19    Q.  And his conversation with you is to get clean urine

03:40PM   20    moving forward, right?

03:40PM   21    A.  Yes.

03:40PM   22    Q.  And so that means he wanted clean urine in case he was

03:40PM   23    tested in the future, true?

03:40PM   24    A.  Yes.

03:40PM   25    Q.  Did you give it to him?

03:40PM      1    A.  I'm not sure if I did or not.

03:40PM      2    Q.  Okay.

03:40PM      3    A.  It was a long time ago.

03:40PM      4        MR. TRIPI:  Move to strike the extraneous comment,

03:40PM      5    Your Honor.

03:40PM      6        THE COURT:  Yeah.  So just answer his questions,

03:40PM      7    please, ma'am.

03:40PM      8        THE WITNESS:  Okay.

03:40PM      9        THE COURT:  And we'll strike that last comment.

03:40PM     10        MR. TRIPI:  Thank you.

03:40PM     11        BY MR. TRIPI:

03:40PM     12    Q.  So did the defendant ask you for clean urine because he

03:41PM     13    might get tested by U.S. Probation; yes or no?

03:41PM     14    A.  Yes.

03:41PM     15    Q.  Based upon your time inside Pharaoh's, and your

03:41PM     16    discussions with the defendant, did you know many of the

03:41PM     17    Pharaoh's dancers to have drug addictions?

03:41PM     18        MR. SOEHNLEIN:  Objection.

03:41PM     19        THE COURT:  Basis?

03:41PM     20        MR. SOEHNLEIN:  Foundation, and 403, Judge.

03:41PM     21        THE COURT:  Okay.  Lay a foundation please,

03:41PM     22    Mr. Tripi.

03:41PM     23        BY MR. TRIPI:

03:41PM     24    Q.  Have you been inside Pharaoh's?

03:41PM     25    A.  Yes.

03:41PM  1    Q.  We talked about earlier you've used drugs inside

03:41PM  2    Pharaoh's, cocaine, right?

03:41PM  3    A.  Yes.

03:41PM  4    Q.  Have you seen other women walking around inside

03:41PM  5    Pharaoh's?

03:41PM  6    A.  Walking around, yes.

03:41PM  7    Q.  Yeah.  And have you had discussions with the defendant

03:41PM  8    about personnel and people at Pharaoh's?

03:42PM  9    A.  Yes.

03:42PM  10   Q.  Okay.  Based upon your observations and your discussions

03:42PM  11   with the defendant, did you know many dancers at Pharaoh's to

03:42PM  12   have drug addictions; yes or no?

03:42PM  13   A.  Most dancers have drug addictions.

03:42PM  14   Q.  Okay.  But my question is:  Did you know many dancers at

03:42PM  15   Pharaoh's to have drug addictions?

03:42PM  16   A.  Yes.

03:42PM  17   Q.  You knew Don Parrino as well, right?

03:42PM  18   A.  Yes.

03:42PM  19   Q.  Did you hear a conversation between the defendant and Don

03:42PM  20   Parrino where they discussed a dancer named -- I think dancer

03:42PM  21   name G.R., overdosing?

03:43PM  22   A.  Yes, I've heard it.  I'm not sure if I heard it from

03:43PM  23   them, but it was a big, you know, talk around the club.

03:43PM  24   Q.  Did you speak about G.R.'s overdose with the defendant,

03:43PM  25   if you recall?

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

34

| | | |
|---|---|---|
| 03:43PM | 1 | A.  I really don't think I did.  I don't remember. |
| 03:43PM | 2 | Q.  Okay.  So we talked about essentially from 2007 on to |
| 03:43PM | 3 | current day your involvement awareness of physically yourself |
| 03:43PM | 4 | being inside Pharaoh's has been limited; is that fair to say? |
| 03:43PM | 5 | A.  I haven't been in Pharaoh's in years. |
| 03:43PM | 6 | Q.  And I think earlier we established maybe 2007 on? |
| 03:43PM | 7 | A.  Yes. |
| 03:43PM | 8 | Q.  Okay.  Would it be accurate to say then that others who |
| 03:44PM | 9 | were there from 2007 on would know more about what was |
| 03:44PM | 10 | transpiring inside Pharaoh's than you? |
| 03:44PM | 11 | A.  Yes. |
| 03:44PM | 12 | Q.  For the times that you were with the defendant, though, |
| 03:44PM | 13 | whether you lived with him or were with him, did this |
| 03:44PM | 14 | defendant always have access to cocaine? |
| 03:44PM | 15 | A.  I'm not sure if he always had access. |
| 03:44PM | 16 | Q.  From your observations and interactions with him, was |
| 03:44PM | 17 | there ever a time where he couldn't get you cocaine when you |
| 03:44PM | 18 | guys wanted to use it? |
| 03:44PM | 19 | A.  I don't know.  I don't know. |
| 03:44PM | 20 | Q.  Well, you lived it, so can you tell the jury? |
| 03:44PM | 21 | Do you ever remember a time when you and Peter wanted to |
| 03:44PM | 22 | use cocaine and you couldn't -- |
| 03:44PM | 23 | A.  If I wanted to use cocaine, I would have -- |
| 03:44PM | 24 | Q.  Well my -- |
| 03:44PM | 25 | A.  -- and I would -- |

| 03:44PM | 1 | Q.  -- question is about -- |

03:44PM   1   Q.  -- question is about --

03:44PM   2   A.  -- have got it myself or --

03:44PM   3            **THE COURT:**  One at a time, folks.  One at a time.

03:44PM   4            **MR. TRIPI:**  Thank you, Judge.  Sorry.

03:44PM   5            **BY MR. TRIPI:**

03:44PM   6   Q.  My question was about the defendant.

03:44PM   7   A.  Okay.

03:44PM   8   Q.  Was there ever a time you were with the defendant and he

03:44PM   9   couldn't get you cocaine if you wanted it?

03:44PM  10   A.  He didn't get me cocaine.  I used cocaine with him.

03:44PM  11   Q.  That came out of his pocket?

03:44PM  12   A.  I don't know where it came from.

03:45PM  13   Q.  Well, you didn't conjure it up and make it appear?

03:45PM  14   A.  Well, usually a drug dealer would give it to you, but

03:45PM  15   I -- he's not a drug dealer, so I don't know where he got it

03:45PM  16   from.

03:45PM  17   Q.  Well, that's interesting, because when he has cocaine and

03:45PM  18   he gives it to you to use, what do you think that is?

03:45PM  19   A.  I'm choosing to use it, so I'm an active drug user.

03:45PM  20   Q.  When he gives you cocaine --

03:45PM  21   A.  I didn't pay for it.

03:45PM  22   Q.  Oh, because it's free?  Is that what they're teaching you

03:45PM  23   in school?

03:45PM  24   A.  Excuse me?

03:45PM  25            **MR. SOEHNLEIN:**  Objection.  Argumentative.

03:45PM   1          THE COURT:  Sustained.  Sustained.  Sustained.

03:45PM   2          Next question, Mr. Tripi.

03:45PM   3          BY MR. TRIPI:

03:45PM   4   Q.  So that's the line for you.  If the defendant gives you

03:45PM   5   cocaine for free, he's not a drug dealer?

03:45PM   6          MR. SOEHNLEIN:  Objection.  Argumentative.

03:45PM   7          THE COURT:  Sustained.

03:45PM   8          THE WITNESS:  No, he's not a drug dealer.

03:45PM   9          THE COURT:  Stop.  Stop.

03:45PM   10         Ma'am, when I say sustained, you don't answer.

03:45PM   11         Sustained.

03:45PM   12         Next question, Mr. Tripi.

03:45PM   13         MR. TRIPI:  Judge, under Rule 611(c), I think I can

03:45PM   14  lead a little bit here.

03:45PM   15         THE COURT:  You can lead, yeah.  And they're not

03:46PM   16  objecting to the leading, so --

03:46PM   17         MR. TRIPI:  Yeah.

03:46PM   18         THE COURT:  If you folks think it's appropriate to

03:46PM   19  object, you object.

03:46PM   20         MR. TRIPI:  I'm also proceeding under Rule 607.

03:46PM   21         THE COURT:  I understand.

03:46PM   22         BY MR. TRIPI:

03:46PM   23  Q.  Okay.  When you used cocaine with the defendant, he's the

03:46PM   24  one who produced it for you, correct?

03:46PM   25  A.  Yes.

03:46PM    1    Q. How many times has the defendant given you cocaine?

03:46PM    2    A. I don't know how many times.

03:46PM    3    Q. Is it countless?

03:46PM    4    A. No.

03:46PM    5    Q. Can you estimate?

03:46PM    6    A. I cannot estimate.

03:46PM    7    Q. Is it more than one?

03:46PM    8    A. Yes.

03:46PM    9    Q. Is it more than ten?

03:46PM    10    A. Maybe.

03:46PM    11    Q. Those other women that the defendant was going with at

03:47PM    12    Pharaoh's, to your knowledge, was he giving them cocaine too?

03:47PM    13    **MR. SOEHNLEIN:** Objection.

03:47PM    14    **THE WITNESS:** I don't know if he was giving them

03:47PM    15    cocaine.

03:47PM    16    **THE COURT:** Hold on. Stop, stop, stop.

03:47PM    17    Stop, stop, stop.

03:47PM    18    Objection, hearsay?

03:47PM    19    **MR. SOEHNLEIN:** Yeah.

03:47PM    20    **THE COURT:** Lay a foundation.

03:47PM    21    **BY MR. TRIPI:**

03:47PM    22    Q. Did you confront him about going with other women at

03:47PM    23    Pharaoh's?

03:47PM    24    A. Yes.

03:47PM    25    Q. When he would come home after being at Pharaoh's --

03:47PM  1      You've been around people intoxicated by cocaine; is that

03:47PM  2  right?

03:47PM  3  A.  Yes.

03:47PM  4  Q.  You know the physical manifestations of it even before

03:47PM  5  your schooling, correct?

03:47PM  6  A.  Yes.

03:47PM  7  Q.  When he would come home from Pharaoh's, did you make

03:47PM  8  observations that led you to conclude he was under the

03:47PM  9  influence of cocaine?

03:47PM  10  A.  I -- I didn't.  Usually, no, I would be sleeping when he

03:47PM  11  came home.

03:47PM  12  Q.  Okay.  You testified in the grand jury, right?

03:47PM  13  A.  Yes.

03:47PM  14  Q.  Okay.  We're gonna just -- give me a second here.  I'll

03:47PM  15  find it.

03:47PM  16  A.  Okay.

03:48PM  17      **MR. TRIPI:**  I'm wrapping up, Judge.  Give me an

03:48PM  18  indulgence here.

03:48PM  19      **THE COURT:**  Sure.

03:48PM  20      **MR. TRIPI:**  Thank you.

03:48PM  21      **BY MR. TRIPI:**

03:48PM  22  Q.  While I'm doing that, all right, we talked about earlier

03:48PM  23  there was a time you weren't allowed at Pharaoh's anymore

03:49PM  24  right, very early on?

03:49PM  25  A.  Yes.

| | | |
|---|---|---|
| 03:49PM | 1 | Q.  In the grand jury, this is Government Exhibit 3562A, I'm |
| 03:49PM | 2 | on page 12, beginning at line 20.  Were you asked this |
| 03:49PM | 3 | question and did you give this answer: |
| 03:49PM | 4 | **MR. FOTI:**  Hang on, Joe.  What page did you say? |
| 03:49PM | 5 | **MR. TRIPI:**  12, and beginning at line 20.  It's going |
| 03:49PM | 6 | to spill on, I think, to the top of the next page. |
| 03:49PM | 7 | **THE COURT:**  Do you have an objection, Mr. Soehnlein |
| 03:49PM | 8 | or Mr. Foti? |
| 03:49PM | 9 | **MR. SOEHNLEIN:**  Yes, Judge.  We're reading the -- the |
| 03:49PM | 10 | lines that Mr. Tripi -- can we approach, Judge? |
| 03:49PM | 11 | **THE COURT:**  Yeah, let me see it.  Bring it up, and |
| 03:49PM | 12 | you guys can approach. |
| 03:50PM | 13 | (Sidebar discussion held on the record.) |
| 03:50PM | 14 | **MR. TRIPI:**  It's at the bottom. |
| 03:50PM | 15 | **THE COURT:**  Yep. |
| 03:50PM | 16 | **MR. TRIPI:**  Just a couple. |
| 03:50PM | 17 | **MR. FOTI:**  I think it's a 602 objection.  She says in |
| 03:50PM | 18 | the grand jury:  Most likely, yes. |
| 03:50PM | 19 | **THE COURT:**  No, no, but then she says, and he would |
| 03:50PM | 20 | come home -- |
| 03:50PM | 21 | So I agreed with you up until there.  That he would |
| 03:50PM | 22 | come home.  And based on your experience, he had been using |
| 03:50PM | 23 | something?  Yes. |
| 03:50PM | 24 | **MR. TRIPI:**  That's where I would end. |
| 03:50PM | 25 | **MR. FOTI:**  I don't think within the grand jury |

03:50PM    1    there's any foundation for what she's basing that on.  Her

03:50PM    2    prior answer says most likely.  I think she's speculating in

03:50PM    3    the grand jury, and it would be used to impeach her here in

03:50PM    4    terms of what she observed.  I don't think it's a proper

03:50PM    5    impeachment.

03:50PM    6         MR. TRIPI:  She said no here, she said yes there.

03:51PM    7         THE COURT:  Yeah.  And I don't think that she --

03:51PM    8    you've got to lay a foundation at the grand jury for that.

03:51PM    9         MR. FOTI:  No, I agree.

03:51PM   10         THE COURT:  So, but, and he's laid the foundation

03:51PM   11   here that she knows what people look like when they're on

03:51PM   12   cocaine.

03:51PM   13         MR. FOTI:  Agreed.

03:51PM   14         THE COURT:  So, and you would come home, and you

03:51PM   15   would be able to tell, based on your experience, he had been

03:51PM   16   using something?  Yes.

03:51PM   17         MR. SOEHNLEIN:  Right.  And I'm sorry to jump in, but

03:51PM   18   the foundation is use of cocaine.  And there, it's using

03:51PM   19   something.  It could be cocaine, it could be drinking, it

03:51PM   20   could be anything.  Using something and using cocaine are

03:51PM   21   different things.

03:51PM   22         THE COURT:  I guess that's true.

03:51PM   23         Was it your belief that he was at Pharaoh's or

03:51PM   24   somewhere else and using cocaine?  Most likely, yes.  And/or

03:51PM   25   drinking.  Um-hum.  He would come home and you'd be able to --

03:51PM  1        **MR. TRIPI:**  And that's why there's the follow up.

03:51PM  2        **THE COURT:**  Something.  Cocaine or alcohol.  Not

03:51PM  3  necessarily cocaine.

03:51PM  4        **MR. TRIPI:**  But that's a lot different than no.

03:51PM  5        And when you're on an inconsistency like this, it

03:51PM  6  doesn't have to be --

03:51PM  7        **MR. SOEHNLEIN:**  It's not a yes.

03:51PM  8        **MR. TRIPI:**  -- it doesn't have to be a 180 degree.

03:52PM  9  She said no here pretty conclusively.  There's a version of

03:52PM  10  yes there.

03:52PM  11        **THE COURT:**  Well, she said she was asleep.

03:52PM  12        **MR. TRIPI:**  Yeah.  That's right.  That's the sum and

03:52PM  13  substance of it, Judge.

03:52PM  14        **THE COURT:**  I'm going to allow it.

03:52PM  15        **MR. TRIPI:**  And I'm not going any further.

03:52PM  16        (End of sidebar discussion.)

03:52PM  17        **BY MR. TRIPI:**

03:52PM  18  Q.  Okay.  In the grand jury, September 17th, 2020, when you

03:52PM  19  were under oath, this is at page 12, beginning at line 20,

03:52PM  20  were you asked this question and did you give this answer:

03:52PM  21     "Question:  Was it your belief that he was at Pharaoh's

03:52PM  22  or somewhere else and using cocaine?

03:52PM  23     "Answer:  Most likely, yes."

03:52PM  24     Were you asked that question, did you give that answer?

03:52PM  25  A.  Most likely, either that or drinking, I --

03:52PM    1          **THE COURT:**  Just, just --

03:52PM    2          **THE WITNESS:**  I don't know.

03:52PM    3          **THE COURT:**  The question is --

03:52PM    4          **MR. TRIPI:**  Were you --

03:52PM    5          **THE WITNESS:**  I'm sorry.

03:52PM    6          **THE COURT:**  Ma'am -- ma'am, listen.

03:52PM    7          The question is:  Were you asked that question and

03:52PM    8   did you give that answer --

03:52PM    9          **THE WITNESS:**  Yes.

03:52PM    10         **THE COURT:**  -- at the grand jury?

03:52PM    11         Next question.

03:52PM    12         **BY MR. TRIPI:**

03:52PM    13   Q.  And the next question was:  And/or drinking?

03:52PM    14       And you answered:  Um-hum?

03:53PM    15   A.  Yes.

03:53PM    16   Q.  Were you asked that question and did you give that

03:53PM    17   answer?

03:53PM    18   A.  Um-hum.  Yes.

03:53PM    19   Q.  And then were you asked this question, and did you give

03:53PM    20   this answer:

03:53PM    21       "Question:  And he would come home, and you would be able

03:53PM    22   to tell, based on your experience, he had been using

03:53PM    23   something?

03:53PM    24       "Answer:  Yes."

03:53PM    25       Were you asked that question, and did you give that

03:53PM  1   answer?

03:53PM  2   A.  Yes.

03:53PM  3   Q.  And lastly, did the defendant tell you where he got the

03:53PM  4   money to start Pharaoh's?

03:53PM  5           MR. SOEHNLEIN:  Objection.  Relevance.

03:53PM  6           THE COURT:  Did he tell you?  The question is:  Did

03:53PM  7   he tell you?

03:53PM  8           THE WITNESS:  Did he tell me?  He didn't tell me

03:53PM  9   directly.  No.

03:53PM  10          THE COURT:  Okay.  Anything else, Mr. Tripi?

03:53PM  11          MR. TRIPI:  I have no further direct.  Thank you.

03:53PM  12          THE COURT:  Great.  Cross.

03:53PM  13

03:53PM  14              CROSS-EXAMINATION BY MR. SOEHNLEIN:

03:53PM  15  Q.  Good afternoon, Ms. R.A.  How are you?

03:53PM  16  A.  Good afternoon.

03:53PM  17  Q.  So I want to start.  There were some -- on direct, you

03:53PM  18  had some testimony about conversations that you had had with

03:53PM  19  Mr. Gerace about what was going on at the club; do you recall

03:53PM  20  that testimony?

03:53PM  21  A.  Yes.

03:54PM  22  Q.  And -- and I think some of the testimony had to do with

03:54PM  23  drug use of the dancers; do you recall that?

03:54PM  24  A.  Yes.

03:54PM  25  Q.  Okay.  And you communicated with Mr. Gerace from the time

03:54PM  1    that you met him in 2005 until, I mean, really, until

03:54PM  2    recently, correct?

03:54PM  3    A.  Yes.

03:54PM  4    Q.  You guys share a child in common, correct?

03:54PM  5    A.  Yes.

03:54PM  6    Q.  And you've had discussions with him about -- about the

03:54PM  7    club, right?

03:54PM  8    A.  Yes.

03:54PM  9    Q.  And it's your belief that he wants to keep drugs out of

03:54PM  10   the club, right?

03:54PM  11        **MR. TRIPI:**  Objection, hearsay.  It's based upon

03:54PM  12   their discussions.

03:54PM  13        **THE COURT:**  Sustained.

03:54PM  14        **BY MR. SOEHNLEIN:**

03:54PM  15   Q.  You've had discussions with him about drug use at the

03:54PM  16   club, correct?

03:54PM  17   A.  Yes.

03:54PM  18   Q.  And you've had discussions with him about measures that

03:54PM  19   the club has taken to try to keep drugs out of the club,

03:54PM  20   correct?

03:54PM  21   A.  Yes.

03:54PM  22   Q.  And what have been the sum and substance --

03:54PM  23        **MR. TRIPI:**  Objection.  Calls for hearsay.

03:54PM  24        **THE COURT:**  Sum and substance of those conversations?

03:54PM  25        **MR. SOEHNLEIN:**  Yeah.

03:54PM  1          **THE COURT:**  Sustained.

03:54PM  2          **BY MR. SOEHNLEIN:**

03:55PM  3   Q.  Have you formed an opinion, based on your time knowing

03:55PM  4   the defendant and speaking with Mr. Gerace, as to whether or

03:55PM  5   not he wants drugs in Pharaoh's?

03:55PM  6          **MR. TRIPI:**  Objection.

03:55PM  7          **THE COURT:**  Sustained.

03:55PM  8          **MR. FOTI:**  Eric.

03:55PM  9          **BY MR. SOEHNLEIN:**

03:55PM 10   Q.  Ms. R.A., you -- you lived with the defendant for a

03:55PM 11   number of years, correct?

03:55PM 12   A.  Yes.

03:55PM 13   Q.  And I think there's some testimony that you and he would

03:55PM 14   occasionally use cocaine together recreationally, correct?

03:55PM 15   A.  Yes.

03:55PM 16   Q.  And your -- your cocaine use eventually grew over time,

03:55PM 17   correct?

03:56PM 18   A.  Yes.

03:56PM 19   Q.  And eventually you got to a point in your life where you

03:56PM 20   achieved sobriety --

03:56PM 21   A.  Yes.

03:56PM 22   Q.  -- correct?  And how long have you been sober now?

03:56PM 23   A.  I've been in recovery since January of 2017, so almost

03:56PM 24   eight years.

03:56PM 25   Q.  Okay.  Now at the point earlier in time when you were

03:56PM  1   using, you didn't recognize the signs of the beginning of

03:56PM  2   addiction at that time, correct?

03:56PM  3   A.  I didn't recognize the signs?

03:56PM  4   Q.  Yeah.

03:56PM  5   A.  Well, no.

03:56PM  6   Q.  Yeah.

03:56PM  7   A.  Not with -- like, with myself, no.

03:56PM  8   Q.  Yeah.  And -- and with regard to Mr. Gerace, would it be

03:56PM  9   your testimony that, to your knowledge, your cocaine use and

03:56PM  10  his cocaine use around that time was relatively similar?

03:56PM  11  A.  I think my drug use was -- it was out of control.

03:56PM  12  Q.  Okay.  And do you think that he exhibited signs of

03:56PM  13  addiction at the point in time where you guys were together

03:57PM  14  from that 2005 to 2017 period?

03:57PM  15  A.  No.

03:57PM  16  Q.  Okay.  Now, I think there was some testimony about your

03:57PM  17  meetings with the government; do you recall that testimony?

03:57PM  18  A.  Yes.

03:57PM  19  Q.  Okay.  And I think that you -- you testified that they

03:57PM  20  met you, and they met you in a car at some point in time?

03:57PM  21  A.  Yes.

03:57PM  22  Q.  Where was that?

03:57PM  23  A.  I recall they showed up to my work.  They -- it was --

03:57PM  24  they showed up to my old apartment.

03:57PM  25  Q.  They showed up to multiple places?

03:57PM    1    A.  Multiple places, yes.

03:57PM    2    Q.  Okay.  And eventually you met with them, correct?

03:57PM    3    A.  Yes.

03:57PM    4    Q.  And eventually in the grand jury, correct?

03:57PM    5    A.  Yes.

03:57PM    6    Q.  And then you had follow-up meetings with them over time,

03:57PM    7    correct?

03:57PM    8    A.  Yes.

03:57PM    9    Q.  And you testified in collateral -- in collateral

03:57PM   10    proceedings as well, correct?

03:57PM   11    A.  Yes.

03:57PM   12    Q.  And it was in those meetings they would ask you questions

03:58PM   13    about Mr. Gerace, correct?

03:58PM   14    A.  Yes.

03:58PM   15    Q.  They had asked you questions about Pharaoh's, correct?

03:58PM   16    A.  Yes.

03:58PM   17    Q.  And they would want to know what you knew about what

03:58PM   18    happened at the club, correct?

03:58PM   19    A.  Yes.

03:58PM   20    Q.  And what you knew about other individuals in Mr. Gerace's

03:58PM   21    life, correct?

03:58PM   22    A.  Yes.

03:58PM   23    Q.  And you shared all information with them that you believe

03:58PM   24    was relevant, correct?

03:58PM   25    A.  Yes.

03:58PM  1   Q.  And sometimes they followed up on that information,

03:58PM  2   correct?

03:58PM  3   A.  Yes.

03:58PM  4         MR. TRIPI:  Objection as to what -- withdrawn.

03:58PM  5   Object.  I misspoke.  Objection as to what the government did.

03:58PM  6   Rule 602, and move to strike.

03:58PM  7         THE COURT:  Stop.

03:58PM  8         MR. SOEHNLEIN:  I'll withdraw.

03:58PM  9         THE COURT:  Okay.  Fine.  The question is withdrawn.

03:58PM  10        MR. SOEHNLEIN:  I'll withdraw.

03:58PM  11        BY MR. SOEHNLEIN:

03:58PM  12  Q.  Sometimes you'd give responses, and then they'd ask you

03:58PM  13  for more information, correct?

03:58PM  14  A.  Yes.

03:58PM  15  Q.  And this is information that they're seeking from you,

03:58PM  16  correct?

03:58PM  17  A.  Yes.

03:58PM  18  Q.  But sometimes, you'd share information and they wouldn't

03:58PM  19  follow up on it; is that correct?

03:58PM  20        MR. TRIPI:  Objection.  We can come up if you want,

03:58PM  21  Judge.

03:58PM  22        THE COURT:  How would she know that, Mr. Soehnlein?

03:58PM  23  Whether they followed up on information that she provided

03:58PM  24  them?

03:59PM  25        The objection -- the objection is sustained without

03:59PM    1    more of a foundation.

03:59PM    2              BY MR. SOEHNLEIN:

03:59PM    3    Q.  Okay.  There came a time where you communicated with the

03:59PM    4    government about Katrina Nigro, correct?

03:59PM    5    A.  Yes.

03:59PM    6    Q.  You -- in June of this year, you sent the government an

03:59PM    7    email about Ms. Nigro, correct?

03:59PM    8    A.  I did.

03:59PM    9    Q.  And what was -- what was the sum and substance of the

03:59PM    10   email?

03:59PM    11             MR. TRIPI:  Objection, hearsay.

03:59PM    12             THE COURT:  Sustained.

03:59PM    13             BY MR. SOEHNLEIN:

03:59PM    14   Q.  You -- you sent them an email calling her a compulsive

03:59PM    15   liar, correct?

03:59PM    16             MR. TRIPI:  Objection.

03:59PM    17             THE COURT:  Sustained.  Sustained.  Sustained.

03:59PM    18   Mr. Soehnlein, it's hearsay.

03:59PM    19             MR. SOEHNLEIN:  It's what she wrote, Judge.

03:59PM    20             MR. COOPER:  It's hearsay.

03:59PM    21             MR. TRIPI:  Objection, hearsay.

03:59PM    22             THE COURT:  It's still hearsay.

03:59PM    23             BY MR. SOEHNLEIN:

03:59PM    24   Q.  How long have you known Ms. Nigro?

03:59PM    25   A.  A long time.

| | | |
|---|---|---|
| 03:59PM | 1 | Q.  When -- do you recall a year that you first met her? |
| 03:59PM | 2 | A.  Early 2000s. |
| 03:59PM | 3 | Q.  It was before you met Mr. Gerace, correct? |
| 03:59PM | 4 | A.  Yes. |
| 03:59PM | 5 | Q.  And how did you meet her? |
| 03:59PM | 6 | A.  In the club -- clubs. |
| 03:59PM | 7 | Q.  You were talking about strip clubs? |
| 03:59PM | 8 | A.  Yeah. |
| 03:59PM | 9 | Q.  Gentlemen's clubs? |
| 03:59PM | 10 | A.  Yes. |
| 03:59PM | 11 | Q.  And she was a dancer? |
| 03:59PM | 12 | A.  Yes. |
| 03:59PM | 13 | Q.  You were a dancer? |
| 03:59PM | 14 | A.  Yes. |
| 03:59PM | 15 | Q.  And you were working in the -- the same locations at that |
| 04:00PM | 16 | time? |
| 04:00PM | 17 | A.  Yes. |
| 04:00PM | 18 | Q.  Okay.  And you continued to have some relationship with |
| 04:00PM | 19 | her after she became involved with Mr. Gerace, correct? |
| 04:00PM | 20 | A.  Yes, somewhat.  I had to. |
| 04:00PM | 21 | Q.  Yeah.  Because you and Mr. Gerace share a child together, |
| 04:00PM | 22 | right? |
| 04:00PM | 23 | A.  Yes. |
| 04:00PM | 24 | Q.  And so to a certain extent, you had to co-parent with |
| 04:00PM | 25 | Ms. Nigro, correct? |

04:00PM   1   A.  Yes.

04:00PM   2   Q.  And in the -- in that circle of individuals, that -- that

04:00PM   3   group of people that are in that strip club industry, in your

04:00PM   4   view, did Ms. Nigro have a reputation?

04:00PM   5   A.  Yes.

04:00PM   6   Q.  And what was that reputation?

04:00PM   7   A.  She was a liar.  And she was manipulative.

04:00PM   8   Q.  And what's the basis for that?

04:00PM   9           MR. TRIPI:  Objection.

04:00PM  10           THE COURT:  I'm sorry?

04:00PM  11           MR. TRIPI:  Objection, the basis would be hearsay.

04:00PM  12           THE COURT:  No.  No.  Overruled.

04:00PM  13           BY MR. SOEHNLEIN:

04:00PM  14   Q.  What's your basis for saying that Ms. Nigro is

04:00PM  15   manipulative?

04:00PM  16           THE COURT:  No, no, no.

04:00PM  17           MR. TRIPI:  Objection, that's personal.

04:00PM  18           THE COURT:  Sustained.  That's not what she said.

04:01PM  19           She said she had a reputation for it.

04:01PM  20           MR. SOEHNLEIN:  Okay.

04:01PM  21           THE COURT:  So what's the basis for her believing

04:01PM  22   that that was her reputation; can be the question.

04:01PM  23           BY MR. SOEHNLEIN:

04:01PM  24   Q.  Okay.  What's the basis for your belief that that was her

04:01PM  25   reputation?

| | | |
|---|---|---|
| 04:01PM | 1 | A.  She would lie to a lot of -- |
| 04:01PM | 2 | **THE COURT:**  No, no, no, ma'am. |
| 04:01PM | 3 | What's -- what's -- what's your basis for believing |
| 04:01PM | 4 | that was her reputation? |
| 04:01PM | 5 | Not specific instances.  What was the basis for your |
| 04:01PM | 6 | belief that it was her reputation? |
| 04:01PM | 7 | You can answer that just generally. |
| 04:01PM | 8 | **THE WITNESS:**  Okay.  Other dancers, and other |
| 04:01PM | 9 | customers would say things. |
| 04:01PM | 10 | **THE COURT:**  Okay.  Great.  Next question. |
| 04:01PM | 11 | **MR. SOEHNLEIN:**  Yeah. |
| 04:01PM | 12 | **BY MR. SOEHNLEIN:** |
| 04:01PM | 13 | Q.  And you had that communication with the government in |
| 04:01PM | 14 | June of this past year, correct? |
| 04:01PM | 15 | A.  Yes. |
| 04:01PM | 16 | **MR. TRIPI:**  Objection, move to strike. |
| 04:01PM | 17 | **THE COURT:**  Yeah. |
| 04:01PM | 18 | **MR. TRIPI:**  Circle back. |
| 04:01PM | 19 | **THE COURT:**  Stricken.  Yes. |
| 04:01PM | 20 | Mr. Soehnlein, you can't ask her about things that |
| 04:01PM | 21 | she said to the government.  That is hearsay. |
| 04:01PM | 22 | Come up.  Come up, guys. |
| 04:01PM | 23 | **MR. SOEHNLEIN:**  I'm sorry. |
| 04:02PM | 24 | (Sidebar discussion held on the record.) |
| 04:02PM | 25 | **MR. SOEHNLEIN:**  Judge, I'm not following how things |

04:02PM   1   that she said to the government is hearsay, it's what she

04:02PM   2   said.

04:02PM   3           **MR. COOPER:**  Out-of-court statements.

04:02PM   4           **THE COURT:**  It's an out-of-court statement.

04:02PM   5           **MR. SOEHNLEIN:**  That she said.

04:02PM   6           **MR. COOPER:**  That's the definition of hearsay.

04:02PM   7   Out-of-court statements offered to prove the truth of the

04:02PM   8   matter asserted.  It's not something that she said in the

04:02PM   9   courtroom, so it's hearsay.

04:02PM  10           **MR. SOEHNLEIN:**  I'm -- I'm -- I'm not talking about

04:02PM  11   the substance of the -- I'm talking about the fact that she

04:02PM  12   communicated with the government, and they never asked her

04:02PM  13   any -- any followup about it.  That's what I'm asking.

04:02PM  14           She made the statement.  It's not hearsay.

04:02PM  15           **MR. TRIPI:**  It is, Eric.

04:02PM  16           **THE COURT:**  Why -- why is it not hearsay?  It's out

04:02PM  17   of court.

04:02PM  18           **MR. FOTI:**  I would argue it's not hearsay because the

04:02PM  19   purpose of hearsay is to prevent an out-of-court statement and

04:02PM  20   to avoid the inability to confront the statement that's being

04:02PM  21   made because you don't have a declarant in the courtroom.

04:02PM  22           We have the declarant on the stand.

04:02PM  23           **THE COURT:**  No, no, no, but whether the declarant is

04:02PM  24   on the stand or not, it's still hearsay.

04:02PM  25           If I said -- if I told somebody the light was red.  I

04:03PM    1    can now testify the light was red.

04:03PM    2          But I can't testify I told somebody the light was

04:03PM    3    red.  That's hearsay.

04:03PM    4          MR. SOEHNLEIN:  And I'm sorry.  And I'm sorry, and

04:03PM    5    that's not -- that's not the reason it's being offered, Judge.

04:03PM    6          THE COURT:  Okay.

04:03PM    7          MR. SOEHNLEIN:  The reason it's being offered for,

04:03PM    8    okay, is that there's -- is that there's points in time where

04:03PM    9    she gives an information, and then there's follow-up inquiries

04:03PM    10   to her because they're trying to cultivate their case.

04:03PM    11         She gives them information that doesn't help the

04:03PM    12   government's case, and there's no follow-up.  There's no

04:03PM    13   investigation as far as she knows.

04:03PM    14         THE COURT:  But why is that relevant?

04:03PM    15         MR. TRIPI:  Yeah, you're not allowed to put the

04:03PM    16   government on trial.  That's -- you gave a specific

04:03PM    17   instruction about that.

04:03PM    18         MR. SOEHNLEIN:  But, Your Honor, I think it's

04:03PM    19   absolutely relevant, because part of the direct had to do with

04:03PM    20   her preparation with the government.  And what -- including

04:03PM    21   to -- including with this meeting in the car that, you know,

04:03PM    22   is elicited for reasons that I don't understand, and the

04:03PM    23   meeting before the grand jury, and things like that.

04:04PM    24         So if they're going to open the door to what

04:04PM    25   investigative steps the government took with respect to Ms.

04:04PM   1   R.A., I think it's fair game.

04:04PM   2            **MR. TRIPI:**  It was relevant because she's a hostile

04:04PM   3   witness based on her demeanor, body language, and fear.

04:04PM   4            **THE COURT:**  Okay.

04:04PM   5            **MR. TRIPI:**  That's why that was relevant.  And the

04:04PM   6   rest of it doesn't change the hearsay of it.  So --

04:04PM   7            **THE COURT:**  Well, but why haven't you opened the

04:04PM   8   door --

04:04PM   9            **MR. TRIPI:**  To what?

04:04PM   10           **THE COURT:**  I'm sorry?

04:04PM   11           **MR. TRIPI:**  To what?  I --

04:04PM   12           **THE COURT:**  Why haven't you opened the door to what

04:04PM   13   followup the government did or didn't do?

04:04PM   14           **MR. TRIPI:**  Okay.  So, she sent -- he wants to get in

04:04PM   15   an email from June after we've tried Bongiovanni once.

04:04PM   16           Like, we have an indictment, like, what -- if that

04:04PM   17   comes in, then there is no hearsay line, Judge.  It's not like

04:04PM   18   we were investigating the case at that point.

04:04PM   19           **THE COURT:**  So, Mr. Soehnlein, she tells -- sends the

04:04PM   20   government something that says that R.A. is a liar; is that

04:04PM   21   the --

04:04PM   22           **MR. TRIPI:**  Katrina Nigro.

04:04PM   23           **THE COURT:**  -- or Katrina Nigro is a liar; is that --

04:04PM   24           **MR. TRIPI:**  Sum and substance.

04:04PM   25           **MR. SOEHNLEIN:**  Compulsive liar.  It's like a -- and

04:05PM   1    I'm not seeking to admit the email.  I'm not gonna seek to do

04:05PM   2    that.

04:05PM   3        **THE COURT:**  But the fact that she told the

04:05PM   4    government -- why -- she's already testified that the woman's

04:05PM   5    reputation is that she's a liar.

04:05PM   6        I think she can testify to her opinion as well,

04:05PM   7    right?

04:05PM   8        **MR. TRIPI:**  She can testify as to opinion.  But now

04:05PM   9    this area now, let's be clear, I'm letting it go because now I

04:05PM   10   get to cross her.  And they've adopted her as their witness

04:05PM   11   for these purposes.  I've let it go on purpose because now I

04:05PM   12   get to cross her.

04:05PM   13       **THE COURT:**  Okay.  So, in any event, why is the fact

04:05PM   14   that she told the government that she's a liar, why is that

04:05PM   15   relevant?

04:05PM   16       **MR. SOEHNLEIN:**  Because it shows -- well, first of

04:05PM   17   all, I still think that they opened the door to --

04:05PM   18       **THE COURT:**  Shows what?  It shows that the government

04:05PM   19   chose not to follow up on something that the government chose

04:05PM   20   not to follow up on.  How it that relevant to Mr. Gerace's

04:05PM   21   case?

04:05PM   22       **MR. FOTI:**  Can I just -- if the government's going to

04:06PM   23   cross on this, I think then it's going to be relevant at that

04:06PM   24   time.  So, if they're indicating they're gonna do it, we can

04:06PM   25   get into it now, or if you want to wait, we can wait.  But --

04:06PM    1          **MR. TRIPI:**  Well, hearsay doesn't come in just

04:06PM    2    because I get to cross.

04:06PM    3          **MR. FOTI:**  If he's crossing on Nigro, in terms of her

04:06PM    4    understanding of Nigro's credibility and things along those

04:06PM    5    lines, of course any communication and specific bad acts are

04:06PM    6    going to become --

04:06PM    7          **MR. TRIPI:**  That's not accurate at all.

04:06PM    8          **MR. FOTI:**  They already opened the door.

04:06PM    9          **THE COURT:**  We're going to break for the day.

04:06PM    10          **MR. TRIPI:**  That's fine.  My last bit on this, Judge,

04:06PM    11    is you dealt with this exact situation in the last trial.

04:06PM    12    This opens the door to her impeachment, not Ms. Nigro's.  They

04:06PM    13    had Ms. Nigro on the stand, they could cross Ms. Nigro until

04:06PM    14    the cows come home.

04:06PM    15          **MR. COOPER:**  And you ruled on this in Bongiovanni 2

04:06PM    16    when it came up, and you ruled on it and you said, A, we got

04:06PM    17    to cross-examine and, B, that specific acts don't come in.

04:06PM    18          We briefed it, and you ruled on it.  It's the same

04:06PM    19    exact same occurrence here.

04:06PM    20          **MR. TRIPI:**  Fair enough.

04:06PM    21          (Sidebar discussion held on the record.)

04:07PM    22          **THE COURT:**  Okay.  I don't know if this is good news

04:07PM    23    or bad news, but we're done for the week.  We have a legal

04:07PM    24    issue that has come up now that we're going to have to resolve

04:07PM    25    before this can continue.

04:07PM  1          So, and the legal issue is not going to take a long,

04:07PM  2  long time, but it's just -- I'm not going to waste your time

04:07PM  3  keeping you here while we're arguing this here when it may

04:07PM  4  take an hour to argue it, and then I've got to send you home

04:07PM  5  and you haven't done anything.  So I might as well send you

04:07PM  6  home now.

04:07PM  7          So remember over the weekend, you're going to be with

04:07PM  8  family, don't talk about this case, don't communicate about it

04:07PM  9  with anyone, electronically or otherwise.  Don't use any

04:07PM 10  electronic means to learn anything about it case.  Don't try

04:07PM 11  to learn anything about the case in any way whatsoever.

04:07PM 12          If there's any news coverage of the case, on TV, on

04:07PM 13  the radio, in the newspaper, anywhere else, don't read or

04:07PM 14  watch or listen to it.  And don't make up your mind about

04:07PM 15  anything until you start deliberating.

04:07PM 16          We'll see you Monday at 9:30.  Next week is 9:30

04:07PM 17  until 5 every day except Friday, when we have a relatively

04:08PM 18  early quit because of me.  Okay?

04:08PM 19          Thank you very much.  Have a great weekend.  Go,

04:08PM 20  Bills --

04:08PM 21          **THE WITNESS:**  Go Bills.

04:08PM 22          **THE JURORS:**  Go Bills.

04:08PM 23          **THE COURT:**  -- and we'll see you early Monday

04:08PM 24  morning.

04:08PM 25          **THE WITNESS:**  Go Bills.

04:08PM    1                    (Jury excused at 4:08 p.m.)

04:08PM    2              **THE COURT:**  Okay.  Ms. R.A. please don't talk to

04:08PM    3    anybody about your testimony over the weekend.  We'll see you

04:08PM    4    on Monday morning at 9:30.  You can step down now.

04:08PM    5                    (Witness excused at 4:08 p.m.)

           6                    (Excerpt concluded at 4:08 p.m.)

           7              *    *    *    *    *    *    *    *

           8

           9

          10

          11

          12

          13

          14                    **CERTIFICATE OF REPORTER**

          15

          16              In accordance with 28, U.S.C., 753(b), I

          17    certify that these original notes are a true and correct

          18    record of proceedings in the United States District Court for

          19    the Western District of New York on December 6, 2024.

          20

          21

          22                    s/ Ann M. Sawyer
                                Ann M. Sawyer, FCRR, RPR, CRR
          23                    Official Court Reporter
                                U.S.D.C., W.D.N.Y.

          24

          25

1

2                          **TRANSCRIPT INDEX**

3              **EXCERPT - EXAMINATION OF R.A. (PW 6)**

4                          **DECEMBER 6, 2024**

5

6

7      **W I T N E S S**                                    **P A G E**

8      **R. A.  (PW 6)**                                     2

9          DIRECT EXAMINATION BY MR. TRIPI:                2

10         CROSS-EXAMINATION BY MR. SOEHNLEIN:             43

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25