09:21AM

1                 **UNITED STATES DISTRICT COURT**
                 **WESTERN DISTRICT OF NEW YORK**

2

     _____
3  **UNITED STATES OF AMERICA,**

                        Case No. 1:19-cr-227
4           Plaintiff,          1:23-cr-37
   v.                      (LJV)
5

  **PETER GERACE, JR.,**         November 12, 2024
6

7   _____ Defendant.

8    **TRANSCRIPT EXCERPT - EXAMINATION OF THOMAS HERBST**
       **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
9         **UNITED STATES DISTRICT JUDGE**

10  **APPEARANCES:**    **TRINI E. ROSS, UNITED STATES ATTORNEY**
                 **BY: JOSEPH M. TRIPI, ESQ.**
11                   **NICHOLAS T. COOPER, ESQ.**
                   **CASEY L. CHALBECK, ESQ.**
12               Assistant United States Attorneys
               Federal Centre, 138 Delaware Avenue
13               Buffalo, New York 14202
               For the Plaintiff
14

               **THE FOTI LAW FIRM, P.C.**
15               **BY: MARK ANDREW FOTI, ESQ.**
               16 West Main Street, Suite 100
16               Rochester, New York 14614
                And
17               **SOEHNLEIN LAW**
               **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**
18               350 Main Street, Suite 2100
               Buffalo, New York 14202
19               For the Defendant

20  **PRESENT:**      **KAREN A. CHAMPOUX, USA PARALEGAL**
               **BRIAN A. BURNS, FBI SPECIAL AGENT**
21               **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**

22  **LAW CLERK:**     **REBECCA FABIAN IZZO, ESQ.**

23  **COURT CLERK:**   **COLLEEN M. DEMMA**

24  **REPORTER:**     **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
               Robert H. Jackson Courthouse
25               2 Niagara Square Buffalo, New York 14202
               Ann_Sawyer@nywd.uscourts.gov

02:38PM

| | | |
|---|---|---|
| 02:38PM | 1 | (Excerpt commenced at 2:38 p.m.) |
| 02:38PM | 2 | (Jury is present.) |
| 02:38PM | 3 | **THE COURT:**  The government can call its next witness. |
| 02:38PM | 4 | **MR. COOPER:**  Thank you, Judge.  The government calls |
| 02:38PM | 5 | Thomas Herbst from the FBI. |
| 02:39PM | 6 | |
| 02:39PM | 7 | **T H O M A S   H E R B S T**, having been duly called and sworn, |
| 02:39PM | 8 | testified as follows: |
| 02:39PM | 9 | **MR. COOPER:**  May I inquire, Judge? |
| 02:39PM | 10 | **THE COURT:**  You may. |
| 02:39PM | 11 | |
| 02:39PM | 12 | **DIRECT EXAMINATION BY MR. COOPER:** |
| 02:39PM | 13 | Q.  Good afternoon, sir.  How are you? |
| 02:39PM | 14 | A.  Good afternoon, sir. |
| 02:39PM | 15 | Q.  Can you introduce yourself to the jury? |
| 02:39PM | 16 | A.  Thomas Herbst. |
| 02:39PM | 17 | Q.  Okay.  Where are you from Tom? |
| 02:39PM | 18 | A.  I'm -- I live in Florida now.  I'm originally from |
| 02:39PM | 19 | Buffalo, New York.  Born in Buffalo, raised in South Buffalo, |
| 02:40PM | 20 | graduated from Bishop Timon High School 50 years ago, and |
| 02:40PM | 21 | graduated from the University of Buffalo four years after |
| 02:40PM | 22 | that. |
| 02:40PM | 23 | Q.  Got it.  And ultimately, after you obtained that college |
| 02:40PM | 24 | degree that you just mentioned, what kind of work did you get |
| 02:40PM | 25 | involved in?  Or did you continue your schooling? |

02:40PM  1  A.  Yeah.  Initially I went to law school.  So I finished law

02:40PM  2  school three years later.  And then I came back to the

02:40PM  3  Buffalo area.  And I was a lawyer in the Buffalo, New York

02:40PM  4  area.

02:40PM  5  Q.  Did there come a time when you applied to be a FBI

02:40PM  6  special agent?

02:40PM  7  A.  Yes, I applied to be a FBI special agent in 1985, went

02:40PM  8  through the testing process, the background investigative

02:40PM  9  process, and eventually started with the FBI on June 16th,

02:40PM  10  1986.

02:40PM  11  Q.  Can you describe for the jury the training that you

02:40PM  12  received when you were accepted at -- into the FBI Academy?

02:40PM  13  A.  Well, all FBI agents start at the FBI Academy in

02:41PM  14  Quantico, Virginia.  And I would say it's broken down into

02:41PM  15  three parts, not three equal parts, but three parts.  One

02:41PM  16  part would be physical fitness and defensive -- defensive

02:41PM  17  tactics training.  The second part would be firearms.  And

02:41PM  18  the bulk of it would be what I call academic.

02:41PM  19      Basically, there's two blocks of legal instruction.

02:41PM  20  There's a block of white collar crime instruction.  And then

02:41PM  21  the rest of the instruction is, you're being introduced to

02:41PM  22  different areas that you're going to experience as an FBI

02:41PM  23  agent, whether it be drugs, organized crime, white collar

02:41PM  24  crime.  Any area basically that you might be called on to

02:41PM  25  investigate during your -- your career, you're basically

USA v Gerace - Herbst - Cooper/Direct - 11/12/24

4

02:41PM    1    exposed to that at the FBI Academy.

02:41PM    2    Q.  Got it.  And then after you finish that formal academic

02:41PM    3    training at the FBI Academy, do you continue throughout the

02:41PM    4    course of your career to receive kind of on-the-job training

02:41PM    5    from other agents with more experience?

02:42PM    6    A.  Yes.  You're initially assigned a -- a training agent for

02:42PM    7    a period of time.

02:42PM    8    Q.  When you finished the FBI Academy, where did you first

02:42PM    9    get assigned at the FBI?

02:42PM   10    A.  My first office was officially Tampa, Florida.  Tampa

02:42PM   11    would be the division, but I physically worked out of

02:42PM   12    Orlando, Florida.

02:42PM   13    Q.  Got it.  When you worked in the Orlando, Florida office,

02:42PM   14    did part of your work involve conducting criminal

02:42PM   15    investigations into violent crimes?

02:42PM   16    A.  Yes.  Initially, I would say that all of my initial work

02:42PM   17    in Orlando was under the Bureau's violent crime, major

02:42PM   18    offender program, so it would have been probably for a

02:42PM   19    two-year period pretty much all violent crimes.

02:42PM   20    Q.  Okay.  And did there come a time later in your career

02:42PM   21    where you expanded and worked on a variety of general crimes

02:42PM   22    or white collar crimes as well?

02:42PM   23    A.  Yeah, I did.  Orlando, again, it was a -- like a

02:42PM   24    satellite office, so there was only ten agents, so you pretty

02:42PM   25    much worked a variety of crime, where like a bigger office,

02:43PM   1   you might be assigned just to one violation but, in Orlando,

02:43PM   2   you worked everything.

02:43PM   3   Q.  Got it.  Approximately how long were you in that Orlando

02:43PM   4   field office for?

02:43PM   5   A.  Pretty much four years.

02:43PM   6   Q.  Okay.  After that, where did you go next?

02:43PM   7   A.  Washington, D.C.

02:43PM   8   Q.  And how long were you a special agent with the FBI in

02:43PM   9   Washington, D.C.?

02:43PM   10  A.  I think about 17 years.

02:43PM   11  Q.  Okay.  And after that 17 years in Washington, D.C., what

02:43PM   12  was your next assignment?

02:43PM   13  A.  Buffalo, New York.

02:43PM   14  Q.  So eventually you came home?

02:43PM   15  A.  I did.

02:43PM   16  Q.  Okay.  And what year, approximately, did you return to

02:43PM   17  Buffalo?

02:43PM   18  A.  It was late 2007, about Thanksgiving 2007.

02:43PM   19  Q.  What was your first assignment in the Buffalo office?

02:43PM   20  A.  I was at a -- an intel squad for a very short period of

02:43PM   21  time.  Then an opening came up on Squad 4, which is also the

02:43PM   22  Safe Streets Task Force, and so I took that position.

02:43PM   23  Q.  And just to kind of put a -- give us some context, at

02:43PM   24  that point in your career when you're coming back to Buffalo,

02:44PM   25  about how long had you been working for the FBI as a special

02:44PM   1    agent?

02:44PM   2    A.  Over 20 years, I think, 21 years.

02:44PM   3    Q.  Would it be fair to say that you were an experienced

02:44PM   4    agent by that time?

02:44PM   5    A.  Yes, very experienced.

02:44PM   6    Q.  You mentioned that eventually after coming back to

02:44PM   7    Buffalo, you became assigned to Squad 4, also known as the

02:44PM   8    Safe Streets Task Force; is that right?

02:44PM   9    A.  That's correct.

02:44PM   10   Q.  Was that a task force that had a mission of combating

02:44PM   11   violent crimes?

02:44PM   12   A.  The Safe Streets Task Force specifically would be

02:44PM   13   combating street gangs.

02:44PM   14   Q.  Okay.  Now, was combating street gangs the only work that

02:44PM   15   you did while you were in Squad 4?

02:44PM   16   A.  No.  Basically, in the Buffalo office at that time, there

02:44PM   17   was two criminal squads.  One would be a white collar squad,

02:44PM   18   and Squad 4 would have been pretty much all of the other

02:44PM   19   violations except for, like, cyber crimes.

02:44PM   20   Q.  Okay.  And just to give us an idea, when you say "white

02:44PM   21   collar," are we talking about, like, bank fraud-type cases?

02:44PM   22   A.  Yes.

02:44PM   23   Q.  Okay.  And does it expand way beyond that?

02:44PM   24   A.  Yes.

02:44PM   25   Q.  But generally, are there kind of two categories at the

02:44PM   1    FBI in Buffalo back then, white collar and violent crime?

02:45PM   2    A.  Generally, I'd say that was true, yes.

02:45PM   3    Q.  Okay.  Just like a 30,000-foot view.

02:45PM   4        During the time that you were working in Squad 4 on the

02:45PM   5    Safe Streets Task Force, did you begin working on a project

02:45PM   6    that you had attempting to investigate cold case Italian

02:45PM   7    Organized Crime-related homicides?

02:45PM   8    A.  Yes.  I -- I initiated a case involving Italian Organized

02:45PM   9    Crime, and specifically looking at old unsolved homicides.

02:45PM   10   Q.  As a part of that investigation, would that have been

02:45PM   11   sometime around that, like, 2008, 2009 timeframe?

02:45PM   12   A.  Yes.

02:45PM   13   Q.  As a part of that investigation, did you have a goal of

02:45PM   14   developing an informant or a source of information into

02:45PM   15   Italian Organized Crime here in Buffalo?

02:45PM   16   A.  Yes.  To -- to work that type of crime, to work, like,

02:45PM   17   organized crime, you really need to have an insider's

02:46PM   18   perspective.  You need have an insider telling you who's who

02:46PM   19   and what they do, so that's exactly what I did.

02:46PM   20   Q.  Okay.  And were you looking specifically for a person

02:46PM   21   that you thought would have access to information that could

02:46PM   22   help you further in investigation?

02:46PM   23   A.  Yes.

02:46PM   24   Q.  Are you familiar with a person by the name of Peter

02:46PM   25   Gerace?

02:46PM   1   A.  Yes.

02:46PM   2   Q.  Did that person come up during the course of your

02:46PM   3   investigation?

02:46PM   4   A.  He did.

02:46PM   5   Q.  Can you describe for the jury how that person's name came

02:46PM   6   up and approximately when it came up?

02:46PM   7   A.  The timing would have been the same -- about the same

02:46PM   8   time I opened the case, but his -- I started receiving a lot

02:46PM   9   of information that he might have been involved in drug

02:46PM  10   activities, drug-trafficking activities.  So, I -- I knew

02:46PM  11   that he had a relationship to people in Italian Organized

02:46PM  12   Crime so I thought it might be a good --

02:46PM  13          **MR. FOTI:**  Objection.

02:46PM  14          **THE COURT:**  Basis?

02:47PM  15          **MR. FOTI:**  Objection.  Can we approach?

02:47PM  16          **THE COURT:**  Yeah, come on up.

02:47PM  17          (Sidebar discussion held on the record.)

02:47PM  18          **MR. FOTI:**  Judge, there's a different -- there's a

02:47PM  19   difference between the rhetoric that the government has

02:47PM  20   advanced in both motion arguments and opening versus what this

02:47PM  21   witness testifies to.  I mean, you say we believed or

02:47PM  22   purported.  It leads to the conclusion that it's just an

02:47PM  23   investigation.

02:47PM  24          He -- this witness, both at the Bongiovanni trial and

02:47PM  25   he's begun to do it here, testifies to certain items regarding

| | | |
|---|---|---|
| 02:47PM | 1 | IOC as if they're fact, saying he has ties to people who are |
| 02:47PM | 2 | part of IOC.  It not only assumes that IOC exists, but it -- |
| 02:48PM | 3 | it assumes certain facts in regards to Mr. Gerace's |
| 02:48PM | 4 | relationship. |
| 02:48PM | 5 | The testimony shouldn't come out that way.  And if it |
| 02:48PM | 6 | does, I'm going to object every time. |
| 02:48PM | 7 | **MR. COOPER:**  So my -- |
| 02:48PM | 8 | **THE COURT:**  So I knew that he had a relationship to |
| 02:48PM | 9 | people in Italian Organized Crime.  The objection is to that |
| 02:48PM | 10 | statement? |
| 02:48PM | 11 | **MR. FOTI:**  Yeah, under 602, a witness can only |
| 02:48PM | 12 | testify to what's in their personal knowledge.  He can say, |
| 02:48PM | 13 | based on my investigation, I believed that maybe he had these |
| 02:48PM | 14 | because it informs on his investigation.  Testifying that as a |
| 02:48PM | 15 | fact is improper. |
| 02:48PM | 16 | **THE COURT:**  I don't understand.  It's subject to |
| 02:48PM | 17 | cross-examination, right? |
| 02:48PM | 18 | **MR. FOTI:**  Well, it -- that may be, but there's still |
| 02:48PM | 19 | admissibility issues in terms of stating certain facts or |
| 02:48PM | 20 | purporting certain information as if it's factual and saying |
| 02:48PM | 21 | that he has ties to people in Italian Organized Crime is both |
| 02:48PM | 22 | not supported by any personal knowledge and, two, is extremely |
| 02:49PM | 23 | prejudicial.  It's something that we are very sensitive to. |
| 02:49PM | 24 | **THE COURT:**  Mr. Cooper? |
| 02:49PM | 25 | **MR. COOPER:**  So, Judge, the question that's up on |

02:49PM    1    your screen, the question that I asked was, can you describe

02:49PM    2    for the jury how that person's name came up and approximately

02:49PM    3    when it came up.

02:49PM    4            And, so, I've -- we've been very careful, I think,

02:49PM    5    through -- through two and a half trials now of formulating

02:49PM    6    the questions in accordance with Your Honor's ruling.  So it's

02:49PM    7    based upon your experience in the law enforcement community,

02:49PM    8    did you believe that person to have relationships to people

02:49PM    9    reputed to be involved in Italian Organized Crime.  The -- the

02:49PM   10    answer got ahead of the question.  I don't have a --

02:49PM   11            **THE COURT:**  So I'm going to strike that sentence --

02:49PM   12            **MR. COOPER:**  I'm fine with that.

02:49PM   13            **THE COURT:**  -- and you can continue your questioning.

02:49PM   14            **MR. COOPER:**  Absolutely.

02:49PM   15            **THE COURT:**  I'm also going to direct the witness

02:49PM   16    simply to answer the questions that are asked.

02:49PM   17            **MR. COOPER:**  We've been there before, Judge.

02:49PM   18            **MR. TRIPI:**  To make it clear, we have no problem with

02:49PM   19    that and we understand where Mark's coming from on that.

02:49PM   20    We're trying to control it as best we can.

02:50PM   21            (End of sidebar discussion.)

02:50PM   22            **THE COURT:**  Okay.  So, the objection is sustained.

02:50PM   23            I'm going to strike what the witness said about

02:50PM   24    people in Italian Organized Crime.  The jury will strike that.

02:50PM   25            And I -- and when I tell you to strike that, I

02:50PM   1    understand that you can't -- you know, I tell you don't think

02:50PM   2    about the pink elephant, right?  That's all you're gonna think

02:50PM   3    about is a pink elephant.  I understand that.

02:50PM   4         But what I'm saying to you is that it would be unfair

02:50PM   5    to allow that to affect your verdict in any way.  So I'm not

02:50PM   6    telling you to forget about it, I'm just telling you don't

02:50PM   7    allow it to play any role in your deliberations, okay?

02:50PM   8         So we're gonna strike that.

02:50PM   9         And -- and, please, Mr. Herbst, answer the questions

02:50PM   10   and only the questions that are asked.  You have a tendency to

02:50PM   11   go on a little bit, so try to -- try -- and -- and I know,

02:50PM   12   it's not how we do things in real life, but it's how we do

02:50PM   13   things in the courtroom.  So -- so try to confine your answers

02:50PM   14   just to the question that's being asked.

02:50PM   15        Mr. Cooper, you can now ask another question.

02:50PM   16        **MR. COOPER:**  Thank you, Judge.

02:50PM   17        **BY MR. COOPER:**

02:51PM   18   Q.  So, the last question that I had left off with, Special

02:51PM   19   Agent Herbst, was about -- I asked what led Peter Gerace's

02:51PM   20   name to come up during the course of your investigation.  And

02:51PM   21   I think you started to talk about receiving some information

02:51PM   22   about drug trafficking; is that correct?

02:51PM   23   A.  That's correct.

02:51PM   24   Q.  Okay.  Did you receive some information that Gerace was

02:51PM   25   involved in drug trafficking?

02:51PM  1    A.  Yes.

02:51PM  2    Q.  Okay.  In addition to that information, did you also

02:51PM  3    believe that Gerace was related to people who had a

02:51PM  4    reputation in the law enforcement community for being

02:51PM  5    involved in Italian Organized Crime?

02:51PM  6    A.  Yes.

02:51PM  7    Q.  Okay.  At that point in your career, is it fair to say

02:51PM  8    you'd been a member of the law enforcement community for

02:51PM  9    about 20-plus years?

02:51PM  10   A.  Yes.

02:51PM  11   Q.  Okay.  And are you from the Buffalo area?

02:51PM  12   A.  I am.

02:51PM  13   Q.  And had you returned to work here at this point?

02:51PM  14   A.  I did.

02:51PM  15   Q.  What were the relationships that Peter Gerace had --

02:51PM  16   strike that.

02:51PM  17       Who were the people that Peter Gerace was related to that

02:52PM  18   in the law enforcement community were reputed to be

02:52PM  19   associated with Italian Organized Crime?

02:52PM  20   A.  His grandfather and his uncle.

02:52PM  21   Q.  Okay.  And do you know his grandfather's name?

02:52PM  22   A.  Joseph Todaro, Sr.

02:52PM  23   Q.  Okay.  In your mind back at that time, did Peter Gerace

02:52PM  24   constitute a person who may have had access to the IOC,

02:52PM  25   Italian Organized Crime group that you were interested in

USA v Gerace - Herbst - Cooper/Direct - 11/12/24

13

02:52PM    1    investigating?

02:52PM    2    A.  Yes.

02:52PM    3    Q.  And as a result of that, did you open up a sub file on

02:52PM    4    Gerace?

02:52PM    5    A.  I did.

02:52PM    6    Q.  What, if anything, did you learn during your preliminary

02:52PM    7    investigation into Peter Gerace?

02:52PM    8    A.  Well, we had -- there was information to believe that he

02:52PM    9    was involved in narcotics trafficking.

02:52PM   10    Q.  Okay.  Did you learn anything --

02:52PM   11        **MR. COOPER:**  I'm gonna -- I'm gonna lead here.  If

02:52PM   12    you need to object, object, but I'm going to ask a specific

02:52PM   13    question.

02:52PM   14        **BY MR. COOPER:**

02:52PM   15    Q.  Did there come a time when you learned that Peter Gerace

02:52PM   16    was being supervised by United States federal probation?

02:52PM   17    A.  Yes.

02:53PM   18        **MR. FOTI:**  No objection.

02:53PM   19        **MR. COOPER:**  Thank you.

02:53PM   20        **BY MR. COOPER:**

02:53PM   21    Q.  What, if anything, did you do when you learned that

02:53PM   22    Gerace was being supervised by federal probation?

02:53PM   23    A.  I reached out to the supervising probation officer and I

02:53PM   24    asked to meet with him and review Mr. Gerace's file.

02:53PM   25    Q.  Do you remember that person's name?

02:53PM  1    A.  Peter Lepiane.

02:53PM  2    Q.  Did you speak with Lepiane around August 31st of 2009?

02:53PM  3    A.  Yes.

02:53PM  4    Q.  Did you share information that you had learned about

02:53PM  5    Gerace with Lepiane?

02:53PM  6    A.  Yes.  I don't know how much detail I can go into, but

02:53PM  7    when I initially reviewed the probation file, I -- the

02:53PM  8    information in the file that Mr. Gerace had been reporting to

02:53PM  9    his probation officer was inconsistent with the information

02:53PM  10   that I knew to be true.

02:53PM  11   Q.  Can you describe what you mean by that for the jury?

02:53PM  12   A.  There was -- you know, at -- at -- at that point, I knew

02:53PM  13   that Mr. Gerace operated the Pharaoh's club.  And in his

02:54PM  14   probation file, it indicated that he was working in his

02:54PM  15   mother's restaurant.

02:54PM  16       I believe that his -- he was -- he had indicated that he

02:54PM  17   was living at a residence in Tonawanda, which he might have

02:54PM  18   had a residence there, but I know he had a place to reside at

02:54PM  19   the strip club.

02:54PM  20       There might have been more, but those are the two things

02:54PM  21   that I can recall at the time that were inconsistent with

02:54PM  22   what I knew -- inconsistent with the information that was in

02:54PM  23   the probation file.

02:54PM  24   Q.  Okay.  And so, did you tell the information that you knew

02:54PM  25   to Peter Lepiane from probation?

02:54PM   1   A.  Yes.

02:54PM   2   Q.  And did he share with you some information that he had

02:54PM   3   about Gerace?  Or about Gerace's conditions, probation

02:54PM   4   conditions?

02:54PM   5   A.  I'm sure he would have shared anything he knew.

02:54PM   6   Q.  Okay.  At that point, did you begin working kind of in

02:54PM   7   concert with U.S. Probation?

02:54PM   8   A.  Yes.  I think based on the information I provided and

02:54PM   9   maybe some other information they had, they were working

02:55PM  10   towards a possible violation of supervision.

02:55PM  11   Q.  Okay.  Were you present with probation on October 31st of

02:55PM  12   2009 for a search of Pharaoh's Gentlemen's Club?

02:55PM  13   A.  Did you say October 31st?

02:55PM  14   Q.  October 31st of 2009.

02:55PM  15   A.  Yes.  I'm sorry, I thought you said August.  Yeah,

02:55PM  16   October, I was.

02:55PM  17   Q.  So I asked you earlier about the first conversation you

02:55PM  18   had with Pete Lepiane, would that have been back in August --

02:55PM  19   the late -- later portion of August in 2009?

02:55PM  20   A.  Yes.  Sometime in that timeframe, in the late summer of

02:55PM  21   2009.

02:55PM  22   Q.  And then about two months later on Halloween of 2009,

02:55PM  23   were you present for the search at Pharaoh's?

02:55PM  24   A.  I was.

02:55PM  25   Q.  Did you have a partner that you worked with at that time?

02:55PM  1   A.  I did.  My primary partner on the Safe Streets Task Force

02:55PM  2   was Detective Robert Cottrell from the Amherst Police

02:55PM  3   Department.

02:55PM  4   Q.  Was he with you that day as well?

02:55PM  5   A.  He was --

02:55PM  6   Q.  Was it your understanding that U.S. Probation had the

02:56PM  7   authority to search Pharaoh's Gentlemen's Club?

02:56PM  8   A.  Yes, they did.

02:56PM  9   Q.  Were they the primary agency leading the search?

02:56PM  10  A.  They were.

02:56PM  11  Q.  Were you there in a support role?

02:56PM  12  A.  My primary -- yes -- yes, but my primary purpose was to

02:56PM  13  attempt to talk to Mr. Gerace.

02:56PM  14  Q.  Can you describe for the jury from your perspective how

02:56PM  15  that search played out, what -- what did you do that day?

02:56PM  16  A.  I did very little searching.  When I went in there, I --

02:56PM  17  Mr. Gerace was already in custody in his office.  And I

02:56PM  18  talked to the supervising probation officer and I asked if it

02:56PM  19  would be okay for me, somebody had to sit with him.  So I

02:56PM  20  asked if it would be okay for me to sit with him instead of

02:56PM  21  the probation officer, and he agreed to that.

02:56PM  22      So I went in and sat with him along with Detective

02:56PM  23  Cottrell from the Amherst Police Department.

02:56PM  24  Q.  Can you describe for the jury how that conversation went?

02:56PM  25  A.  My conversation with Mr. Gerace?

02:56PM    1    Q.   Correct.

02:56PM    2    A.   Well, the conversation would have lasted during the whole

02:56PM    3    course of the search which probably lasted an hour or less,

02:57PM    4    but it was really a very informal conversation, kind of.

02:57PM    5    Most of the conversation focused on -- we were sitting in his

02:57PM    6    office and there were documents on his desk, so most of the

02:57PM    7    conversation focused on documents that I would have and I

02:57PM    8    would ask him about that, but I was basically trying to build

02:57PM    9    rapport with Mr. Gerace.

02:57PM   10    Q.   Now, before that interview, had you received information

02:57PM   11    from two women who told you about drug dealing happening at

02:57PM   12    Pharaoh's?

02:57PM   13    A.   I had read an FBI 302, which is basically a report that

02:57PM   14    you document of a witness's testimony.  So another FBI agent

02:57PM   15    and another Amherst police officer had interviewed these

02:57PM   16    women and memorialized it in an FD-302, so I had read that

02:57PM   17    report.

02:57PM   18    Q.   You had that information inside your head at the time of

02:57PM   19    the interview; is that fair to say?

02:57PM   20    A.   Yes.

02:57PM   21    Q.   You didn't share that information with Peter Gerace

02:57PM   22    during the interview, did you?

02:57PM   23    A.   No.

02:57PM   24    Q.   Okay.  And so you were trying to gain information from

02:57PM   25    talking to him; is that fair to say?

02:57PM  1   A.  Yeah, I was trying to develop, you know, a relationship

02:58PM  2   with a possible witness or cooperator.

02:58PM  3   Q.  Okay.  And in trying -- in trying to develop a

02:58PM  4   relationship with a possible witness or cooperator, do you

02:58PM  5   try to build rapport?

02:58PM  6   A.  Yes.

02:58PM  7   Q.  Were you trying to build rapport with Gerace that day?

02:58PM  8   A.  Yes.

02:58PM  9   Q.  Did you threaten him or intimidate him in any way?

02:58PM  10  A.  No.

02:58PM  11  Q.  Was the conversation pleasant?

02:58PM  12  A.  Yes, it was.

02:58PM  13  Q.  Was the tone of your voice conversational?

02:58PM  14  A.  Yes.

02:58PM  15  Q.  During that conversation that you had with Gerace on

02:58PM  16  Halloween of 2009, did he offer up any information about

02:58PM  17  people committing crimes?

02:58PM  18  A.  No.  And I'm not sure that I ever asked him any specific

02:58PM  19  questions about that either.

02:58PM  20  Q.  Okay.  Was the goal of that initial conversation to build

02:58PM  21  some trust?

02:58PM  22  A.  Yes.

02:58PM  23  Q.  Ultimately, were you hoping to learn information about

02:58PM  24  people committing crimes from Gerace?

02:58PM  25  A.  Yes.  Ultimately I was hoping that I would develop a

02:58PM   1   relationship with him and that he would cooperate with me or

02:58PM   2   cooperate with the FBI in my investigation.

02:58PM   3   Q.  At any point during that conversation inside of Pharaoh's

02:59PM   4   on Halloween of 2009, did Peter Gerace tell you, hey, Tom, I

02:59PM   5   know about kilo-level cocaine traffickers, help me get out of

02:59PM   6   this mess?  Did he say that to you?

02:59PM   7   A.  No.

02:59PM   8   Q.  I'm going to switch gears for just a second.

02:59PM   9       After the search at Pharaoh's concluded, did there come a

02:59PM  10   time when you were notified by a supervisor at FBI that the

02:59PM  11   DEA wanted to meet with you regarding Peter Gerace?

02:59PM  12   A.  Yes.

02:59PM  13   Q.  What was the name of the supervisor that notified you of

02:59PM  14   that?

02:59PM  15   A.  It was -- my supervisor at the time, his name was James

02:59PM  16   Jancewicz.

02:59PM  17   Q.  Okay.  Now I don't want to get into the contents of the

02:59PM  18   conversation with Jancewicz, but did you have a conversation

02:59PM  19   with him?

02:59PM  20   A.  I did.

02:59PM  21   Q.  And based on that conversation, did you -- were you

02:59PM  22   expecting to receive a phone call from someone?

02:59PM  23   A.  Yes.  I was to receive a phone call from DEA.  I don't

03:00PM  24   know that the individual I was to receive the phone call from

03:00PM  25   was identified, but it was -- I was clear that I would

03:00PM    1    receive a phone call from DEA.

03:00PM    2    Q.  Was that in close proximity after the search at

03:00PM    3    Pharaoh's?

03:00PM    4    A.  Yes.

03:00PM    5    Q.  Okay.  Ultimately, shortly after the search at Pharaoh's,

03:00PM    6    did you receive a phone call from somebody at DEA?

03:00PM    7    A.  I did.  I got a call from Special Agent Bongiovanni.

03:00PM    8    Q.  Can you describe that call for the jury?

03:00PM    9    A.  The essence of that phone call and subsequent phone calls

03:00PM   10    was basically to set up a meeting with him and Mr. Gerace at

03:00PM   11    the DEA office.

03:00PM   12    Q.  Did you know Bongiovanni well before that phone call?

03:00PM   13    A.  I did not.

03:00PM   14    Q.  So when he called you, did he introduce himself?

03:00PM   15    A.  I'm sure he did, yes.

03:00PM   16    Q.  Did he tell you what he was calling about?

03:00PM   17    A.  Yes.

03:00PM   18    Q.  What was he calling about?

03:00PM   19    A.  He was calling to arrange a meeting between me, him and

03:00PM   20    Mr. Gerace.

03:00PM   21    Q.  The fact that Bongiovanni was calling to arrange the

03:01PM   22    meeting between you and Gerace, what did that lead you to

03:01PM   23    believe about Bongiovanni's relationship with Gerace?

03:01PM   24    A.  That Mr. Gerace was cooperating with Agent Bongiovanni in

03:01PM   25    some way.

03:01PM    1    Q.   Okay.   Now at this point in your career, you've been an

03:01PM    2    FBI special agent for about 20 years; is that right?

03:01PM    3    A.   That's right.

03:01PM    4    Q.   Had you handled confidential informants before?

03:01PM    5    A.   Yes.

03:01PM    6    Q.   Had you handled sources of information before?

03:01PM    7    A.   Yes.

03:01PM    8    Q.   Had you been involved in the passing off of information

03:01PM    9    or sources to other agents or other agencies?

03:01PM   10    A.   Probably, but I don't recall specifically.

03:01PM   11    Q.   It's been a long career, right?

03:01PM   12    A.   Yes.

03:01PM   13    Q.   During one of your -- or, during your conversation with

03:01PM   14    Special Agent Bongiovanni, did the topic come up of who you

03:01PM   15    were gonna bring with you to that meeting with Gerace?

03:02PM   16    A.   Yes.   I initially intended to bring my partner, Detective

03:02PM   17    Cottrell from the Amherst Police Department.   And Agent

03:02PM   18    Bongiovanni wanted to have nobody else present.

03:02PM   19    Q.   Was that his request to you?

03:02PM   20    A.   That was his request.

03:02PM   21    Q.   Did that strike you as unusual at the time?

03:02PM   22    A.   Well, it put me in a difficult position, because Bob's my

03:02PM   23    partner, and I'm working with him day in and day out.   And

03:02PM   24    usually at the start of each day it's, like, what are we

03:02PM   25    gonna do today?   And he wasn't gonna be part of that meeting.

USA v Gerace - Herbst - Cooper/Direct - 11/12/24

03:02PM 1    Q.  And that was -- withdrawn.

03:02PM 2        Do you know an individual by the name of Tony Bruce?

03:02PM 3    A.  Yes.  Tony Bruce was a federal prosecutor at that time.

03:02PM 4    Q.  And did you make Tony Bruce aware of your interest into

03:02PM 5    an investigation into cold case IOC homicides?

03:02PM 6    A.  A different prosecutor in the office was handling that

03:02PM 7    investigation.  But I probably did have conversations with

03:03PM 8    Mr. Bruce about that.  But more specifically, I had a

03:03PM 9    conversation with him about Mr. Gerace.

03:03PM 10   Q.  Got it.  And maybe I misspoke in my question.

03:03PM 11       Did you speak with Tony Bruce about the information you

03:03PM 12   had received about Gerace being involved in drug dealing?

03:03PM 13   A.  I did.

03:03PM 14   Q.  Did Bruce agree to pursue a case against Peter Gerace for

03:03PM 15   drugs?

03:03PM 16   A.  Yes.  He indicated that based on the information that we

03:03PM 17   had provided to him, that he would prosecute Mr. Gerace.

03:03PM 18   Q.  Now you weren't at the point in your investigation where

03:03PM 19   you were ready to make an arrest; is that fair to say?

03:03PM 20   A.  No, my investigation was at a very preliminary stage.

03:03PM 21   Again, I had just opened a sub file within my main file to

03:03PM 22   try to develop information on Mr. Gerace to be a cooperator.

03:03PM 23   Q.  Would it be fair to say that at that point there were

03:03PM 24   essentially two paths that could have gone forward with

03:03PM 25   Mr. Gerace:  One of cooperation, or one of further

03:04PM   1   investigation on your part?

03:04PM   2   A.   Yes.

03:04PM   3   Q.   So if he had agreed to cooperate and help you out in your

03:04PM   4   case, fair to say you wouldn't have been simultaneously

03:04PM   5   investigating him for drug dealing?

03:04PM   6   A.   That's correct.

03:04PM   7   Q.   Okay.  And if he didn't agree to cooperate, didn't want

03:04PM   8   anything to do with you, would you have pursued a continued

03:04PM   9   investigation into him?

03:04PM  10   A.   Most likely.

03:04PM  11   Q.   A few moments ago you told the jury that Bongiovanni from

03:04PM  12   the DEA called you to set up a meeting with Gerace; do you

03:04PM  13   remember telling them that?

03:04PM  14   A.   I do.

03:04PM  15   Q.   Did that meeting eventually occur?

03:04PM  16   A.   It did.

03:04PM  17   Q.   About how long, if you remember, after the search at

03:04PM  18   Pharaoh's did that meeting occur?

03:04PM  19   A.   Well, I would say within a month.  But I know that there

03:04PM  20   was a lot of stops and starts.  Mr. Gerace was ill at the

03:04PM  21   time, and so he wasn't -- I know that there were a number of

03:04PM  22   conversations between myself and Agent Bongiovanni about

03:04PM  23   scheduling a meeting.  And a lot of times, the time we had

03:04PM  24   scheduled a meeting had to be cancelled because Mr. Gerace

03:04PM  25   was unavailable.

03:05PM    1    Q.  Okay.  And you said Mr. Gerace was ill at the time.  Is

03:05PM    2    that information that Bongiovanni was providing to you?

03:05PM    3    A.  Yes.

03:05PM    4    Q.  Do you know if it was true or not?

03:05PM    5    A.  I think it was true, yes.

03:05PM    6    Q.  I'm not asking what you think, I'm asking what you know.

03:05PM    7    A.  No, I don't know.

03:05PM    8    Q.  So Bongiovanni was providing you that information, right?

03:05PM    9    A.  He was.

03:05PM   10    Q.  And the meeting continued to get adjourned or pushed off?

03:05PM   11    A.  Yes.

03:05PM   12    Q.  Okay.  You said you think it was about a month after the

03:05PM   13    search at Pharaoh's; is that right?

03:05PM   14    A.  Within a month, I would say.

03:05PM   15    Q.  Can you describe for the jury, just walk us through that.

03:05PM   16    Describe what happened.  Where did it occur?

03:05PM   17    A.  The meeting was at the DEA office, which is located in

03:05PM   18    the Electric Tower in Buffalo.  So I went over there.  I went

03:05PM   19    up to their office.  Mr. Bongiovanni met me at the front

03:05PM   20    door.  We introduced ourselves.

03:05PM   21        And then we went down to the mezzanine level of the

03:05PM   22    Electric Building.  So when you go into the Electric

03:06PM   23    Building, there's the main floor you walk in, and then

03:06PM   24    there's a mezzanine level above that.  And so we went there,

03:06PM   25    we were waiting for Mr. Gerace so come.

03:06PM    1    Q.  That mezzanine area, is that a public area inside the

03:06PM    2    building?

03:06PM    3    A.  I think it is, yes.

03:06PM    4    Q.  Can you describe what you recall about your conversation

03:06PM    5    with Bongiovanni before Gerace arrived?

03:06PM    6    A.  I don't really, I mean, I don't think we had any

03:06PM    7    substantive conversation about the meeting.  It was just

03:06PM    8    maybe talk about the FBI, maybe talk about DEA.

03:06PM    9    Q.  Got it.  So just generic --

03:06PM   10    A.  Yes.

03:06PM   11    Q.  -- conversation?

03:06PM   12    A.  Absolutely.

03:06PM   13    Q.  Did there come a time when Gerace arrived?

03:06PM   14    A.  There did.

03:06PM   15    Q.  Can you describe that for the jury?

03:06PM   16    A.  I know at one point there was a phone call either made by

03:06PM   17    Mr. Gerace or Mr. Bongiovanni.  And I do recall seeing

03:06PM   18    Mr. Gerace kind of walk in the building, and Agent

03:06PM   19    Bongiovanni indicating that we were in the mezzanine level,

03:06PM   20    come up.  So he came up.

03:07PM   21    Q.  Okay.  So at some point, Gerace joins you and

03:07PM   22    Bongiovanni?

03:07PM   23    A.  He did, yes.

03:07PM   24    Q.  What happened at that point?

03:07PM   25    A.  We had a meeting, but it wasn't -- I would -- I won't say

USA v Gerace - Herbst - Cooper/Direct - 11/12/24

03:07PM 1    it was a very substantive meeting.  We had conversations back

03:07PM 2    and forth, but it wasn't much of a meeting.

03:07PM 3    Q.  Did Gerace provide you with any information about ongoing

03:07PM 4    criminal activity?

03:07PM 5    A.  No.

03:07PM 6    Q.  What was the impression of the meeting that you had at

03:07PM 7    that time?

03:07PM 8    A.  That it wasn't very substantive.

03:07PM 9    Q.  Did Gerace eventually leave?

03:07PM 10   A.  He did.

03:07PM 11   Q.  Did you stay and continue to talk with Bongiovanni on the

03:07PM 12   mezzanine level?

03:07PM 13   A.  I did.

03:07PM 14   Q.  Can you tell the jury how that conversation went?

03:07PM 15   A.  I recall a couple of things.  He kind of indicated to me

03:07PM 16   that he had known Mr. Gerace for a long time since they were

03:07PM 17   kids.  And I remember him indicating that Mr. Gerace was a

03:07PM 18   good guy.

03:07PM 19   Q.  When Bongiovanni said those things to you, that he had

03:08PM 20   known Gerace for a long time and that he was a good kid, did

03:08PM 21   you respond to that?

03:08PM 22   A.  No, not really.

03:08PM 23   Q.  Did you -- did you talk to Bongiovanni after that?

03:08PM 24   A.  Well, we were continuing to have a conversation, yes,

03:08PM 25   sir.

03:08PM    1    Q.  So what did you say in the continued conversation?

03:08PM    2    A.  Well, at some point, I indicated to Agent Bongiovanni

03:08PM    3    that Mr. Gerace had an issue with the United States Probation

03:08PM    4    Department, number 1.  Agent Bongiovanni did not seem to be

03:08PM    5    very impressed with that.

03:08PM    6        And then I indicated to him that, you know, I had a -- a

03:08PM    7    drug case on Mr. Gerace that -- and I had already gotten a

03:08PM    8    commitment from the United States Attorney's Office to

03:08PM    9    prosecute that.

03:08PM   10    Q.  Let's break that down a bit.

03:08PM   11        So you mentioned that -- you mentioned to Bongiovanni

03:08PM   12    that Gerace has problems with probation; is that right?

03:08PM   13    A.  I did.

03:09PM   14    Q.  And you said Bongiovanni didn't seem impressed with that?

03:09PM   15    A.  That's correct.

03:09PM   16    Q.  Did he seem concerned by it?

03:09PM   17    A.  No.

03:09PM   18    Q.  And then you mentioned that following after that, you

03:09PM   19    told Bongiovanni that you had a drug investigation or a drug

03:09PM   20    case on Gerace; is that correct?

03:09PM   21    A.  I did.

03:09PM   22    Q.  Okay.  Did you tell Bongiovanni generally what your drug

03:09PM   23    case was about?

03:09PM   24    A.  I did.

03:09PM   25    Q.  Okay.  Did Bongiovanni seem impressed by that?

03:09PM   1   A.   No, he initially indicated that it was not a very good

03:09PM   2   drug case.

03:09PM   3   Q.   Okay.  Did he make any comments to you about whether or

03:09PM   4   not that case would be prosecuted by the U.S. Attorney's

03:09PM   5   Office?

03:09PM   6   A.   Yeah.  I know -- I know he clearly said it was not a very

03:09PM   7   good drug case, and he may have said that nobody would ever

03:09PM   8   prosecute that case.

03:09PM   9   Q.   Okay.  In response to him saying nobody would ever

03:09PM  10   prosecute that case, did you follow up and tell him about

03:09PM  11   your conversation Tony Bruce?

03:09PM  12   A.   I did.  I told him I'd already had a conversation with

03:09PM  13   the United States Attorney's Office, specifically Tony Bruce.

03:09PM  14   And Mr. Bruce had committed to prosecuting Mr. Gerace.

03:09PM  15   Q.   Describe for this jury how Bongiovanni reacted when you

03:10PM  16   told him that Bruce had already agreed to prosecute the case.

03:10PM  17   A.   He -- he -- it was a very marked react -- you know, you

03:10PM  18   could tell, his whole complexion, his whole composure changed

03:10PM  19   when I indicated to him that Mr. Gerace could be prosecuted.

03:10PM  20   Q.   Have you previously described it as having an "oh, shit"

03:10PM  21   look on his face?

03:10PM  22   A.   I did.

03:10PM  23   Q.   Okay.

03:10PM  24   A.   To you.

03:10PM  25           **MR. FOTI:**  Objection.

03:10PM    1         **THE COURT:**  Hearsay?

03:10PM    2         **MR. FOTI:**  Yes.

03:10PM    3         **THE COURT:**  Yeah, sustained.

03:10PM    4         The jury will strike that question and answer.

03:10PM    5         **BY MR. COOPER:**

03:10PM    6    Q.  Explain to the jury what Bongiovanni's face looked when

03:10PM    7    you told him --

03:10PM    8    A.  Well --

03:10PM    9    Q.  -- I already spoke to Tony Bruce, and he'll prosecute.

03:10PM   10    A.  Yeah.  You had asked me before and I had explained to you

03:10PM   11    that it was an "oh, shit" look.  That's what I explained to

03:10PM   12    you.

03:10PM   13    Q.  Did you eventually leave that meeting with Joe

03:10PM   14    Bongiovanni?

03:10PM   15    A.  I did.

03:10PM   16    Q.  When you left that meeting with Joe Bongiovanni, what was

03:10PM   17    the impression that you were left with about his relationship

03:10PM   18    with Peter Gerace?

03:10PM   19    A.  That they had a -- that they had basically grown up

03:11PM   20    together.

03:11PM   21    Q.  Okay.

03:11PM   22    A.  They had a longtime relationship.

03:11PM   23    Q.  What about with respect to, I guess, a professional or a

03:11PM   24    source/handler relationship?  What was your impression there?

03:11PM   25    A.  Yeah.  Number 1, I thought they were friends.  And

03:11PM 1    number 2, I thought that, you know, I thought that was the

03:11PM 2    purpose of the meeting, number 1.  But I thought that

03:11PM 3    Mr. Gerace was working for Mr. Bongiovanni, or Agent

03:11PM 4    Bongiovanni as a source.

03:11PM 5    Q.  Okay.  Was that belief that you had based in part on the

03:11PM 6    fact that Bongiovanni was setting up the meeting for you to

03:11PM 7    have with Gerace?

03:11PM 8    A.  Yes.  I mean, number 1, there's a call from the DEA

03:11PM 9    supervisor to the FBI supervisor that information was

03:11PM 10   conveyed to me.

03:11PM 11       And then I got a call from Agent Bongiovanni to set up

03:11PM 12   this meeting.  So that's clearly, you know, DEA has an

03:11PM 13   interest in the case, and they want the FBI to move on.

03:11PM 14   Q.  Okay.  And is that what you did?  Did you move on?

03:11PM 15   A.  I did.

03:11PM 16   Q.  Did the meeting that you had with Bongiovanni, the way he

03:11PM 17   acted and the things he said, cause you to decide to go a

03:12PM 18   different avenue than Peter Gerace?

03:12PM 19   A.  Yes.  Again, I did not have much time invested into the

03:12PM 20   Gerace investigation.  And, again, my purpose was to develop

03:12PM 21   him as a cooperator in the case.  And since DEA had indicated

03:12PM 22   that they had an interest in the case, I decided to move on

03:12PM 23   and pursue other avenues.

03:12PM 24   Q.  Did Bongiovanni ever say to you at all during that

03:12PM 25   meeting, hey, Tom, I've been instructed by my boss to hand

03:12PM    1    Peter Gerace over to you.  Here he is.  Use him as a source.

03:12PM    2        Did that happen?

03:12PM    3    A.  No.

03:12PM    4            **MR. COOPER:**  Just one second, please, Judge.

03:13PM    5            I have no further direct, Judge.  Thank you.

03:13PM    6            **THE COURT:**  We are going to take our afternoon break

03:13PM    7    now, so please remember my instructions about not talking

03:13PM    8    about the case, even with each other, and not making up your

03:13PM    9    mind.

03:13PM    10           See you back here in about ten or 15 minutes.

03:13PM    11           But you can't leave because we don't have a court

03:13PM    12   security officer present.

03:13PM    13           **MR. TRIPI:**  No bathroom breaks for Pat.

03:13PM    14           **THE COURT:**  Thanks, John.

03:13PM    15           **OFFICER ZOLA:**  You're welcome.

03:14PM    16           (Jury excused at 3:14 p.m.)

03:14PM    17           **THE COURT:**  You're not to talk to anybody.  And

03:14PM    18   forgive me for directing you to keep your mouth shut.

03:14PM    19           **THE WITNESS:**  I understand, Judge.  I tend to ramble,

03:14PM    20   so I understand.

03:14PM    21           **THE COURT:**  Anything we need from the defense?

03:14PM    22           **MR. FOTI:**  No, Judge.

03:14PM    23           **THE COURT:**  Anything from the government?

03:14PM    24           **MR. COOPER:**  No, thank you, Judge.

03:14PM    25           (Off the record at 3:14 p.m.)

03:33PM    1                    (Back on the record at 3:33 p.m.)

03:33PM    2                    (Jury not present.)

03:33PM    3           **THE CLERK:**  We are back on the record for the

03:33PM    4    continuation of the jury trial in case numbers 19-cr-227 and

03:33PM    5    23-cr-37, United States of America versus Peter Gerace, Jr.

03:33PM    6           All counsel and parties are present.

03:33PM    7           **THE COURT:**  Anything we need to put on the record

03:33PM    8    before we begin the cross?

03:33PM    9           **MR. COOPER:**  Nothing from the government.

03:33PM   10           **MR. FOTI:**  No, Judge.

03:33PM   11           **THE COURT:**  Let's bring them back in, please, Pat.

03:35PM   12                    (Jury seated at 3:35 p.m.)

03:35PM   13           **THE COURT:**  The record will reflect that all our

03:35PM   14    jurors, again, are present.

03:35PM   15           I remind the witness that he's still under oath.

03:35PM   16           And you may begin your cross-examination.

03:35PM   17           **MR. FOTI:**  Thank you, Judge.

03:35PM   18

03:35PM   19                    **CROSS-EXAMINATION BY MR. FOTI:**

03:35PM   20    Q.  Good afternoon, sir.

03:35PM   21    A.  Good afternoon, sir.

03:35PM   22    Q.  Okay.  So, all right.  Sir, you were subpoenaed to be

03:36PM   23    here, correct?

03:36PM   24    A.  That's correct.

03:36PM   25    Q.  You traveled here from Florida; is that correct?

03:36PM    1    A.  I did.

03:36PM    2    Q.  And you gave testimony today following testimony you've

03:36PM    3    given on other dates as well, correct?

03:36PM    4    A.  That's correct.

03:36PM    5    Q.  You gave testimony at least at some point before a grand

03:36PM    6    jury?

03:36PM    7    A.  I did.

03:36PM    8    Q.  You gave testimony in two trials for Mr. Bongiovanni,

03:36PM    9    correct?

03:36PM    10   A.  I did.

03:36PM    11   Q.  And you have in advance of those dates, you've met with

03:36PM    12   members of the trial team at various times, correct?

03:36PM    13   A.  Prior to the grand jury, I would have.

03:36PM    14       And then I had telephonic conversations with Mr. Cooper

03:36PM    15   prior to the first trial.

03:36PM    16   Q.  When you say "the first trial," you're referring to the

03:36PM    17   first Bongiovanni trial?

03:36PM    18   A.  Yes, February of this year.

03:36PM    19   Q.  Okay.  And do you remember how many times total that you

03:37PM    20   communicated with Mr. Cooper?

03:37PM    21   A.  Two telephone calls.  And then when I got in town for

03:37PM    22   that trial, we might have had one quick phone call.  And then

03:37PM    23   once, like, the day of type of thing.

03:37PM    24   Q.  Okay.  When's of the last time you spoke to Mr. Cooper or

03:37PM    25   anybody from the trial team in advance of your testimony here

USA v Gerace - Herbst - Foti/Cross - 11/12/24

34

03:37PM  1    today?

03:37PM  2    A.  I haven't had any conversations with them other than to

03:37PM  3    say hello this trip.  Really, the only substantive

03:37PM  4    conversations I had with them would go back to prior to the

03:37PM  5    first trial, so that would have been, like, prior to February

03:37PM  6    of 2023.

03:37PM  7    Q.  February 2024, you mean?

03:37PM  8    A.  2024, I'm sorry.

03:37PM  9    Q.  It was earlier this year, right?

03:37PM  10   A.  Yes, I'm sorry.

03:37PM  11   Q.  And did you review any documentation or any material

03:37PM  12   prior to coming in and testifying today?

03:38PM  13   A.  No.

03:38PM  14   Q.  Now --

03:38PM  15   A.  Oh, I'm sorry, Thursday.  Thursday morning I reviewed my

03:38PM  16   trial transcript from the last Bongiovanni trial.

03:38PM  17   Q.  Okay.  You're not talking about the one in February,

03:38PM  18   you're talking about the one after that?

03:38PM  19   A.  That's correct.

03:38PM  20   Q.  All right.  And that's the only documentation you

03:38PM  21   reviewed before coming to testify today?

03:38PM  22   A.  Yes.

03:38PM  23   Q.  Now, let's talk about your early investigation after you

03:38PM  24   came back to Buffalo.

03:38PM  25       You testified about that on direct.

03:38PM   1   A.  I did.

03:38PM   2   Q.  And you testified that there was an interest you had in

03:38PM   3   investigating a cold case involving either a homicide or a

03:38PM   4   number of homicides, correct?

03:38PM   5   A.  Yes.

03:38PM   6   Q.  Okay.  And there was at least, as part of that

03:38PM   7   investigation, there was I believe that those homicides may

03:38PM   8   have been in some way related to Italian Organized Crime,

03:38PM   9   correct?

03:38PM  10   A.  Correct.

03:38PM  11   Q.  Those are -- when you say "cold case," what you mean is

03:38PM  12   that these are investigations that have since sort of fizzled

03:39PM  13   out, nobody was actively investigating them, correct?

03:39PM  14   A.  That's correct.

03:39PM  15   Q.  And do you remember sort of the timeframe of the apparent

03:39PM  16   homicides?

03:39PM  17   A.  I think the last homicide would have been the mid-1980s.

03:39PM  18   Q.  Mid-1980s?

03:39PM  19   A.  Yep.

03:39PM  20   Q.  And were you aware that Mr. Gerace would have been in his

03:39PM  21   early teens around that time?

03:39PM  22   A.  I mean, I didn't -- I didn't believe he was involved.

03:39PM  23   Q.  Right.  So that's where I was going with it.  You -- you

03:39PM  24   had an interest, as you said on direct, because he had a

03:39PM  25   familial relationship with certain people you were interested

03:39PM  1   in, correct?

03:39PM  2   A.   That's correct.

03:39PM  3   Q.   All right.  You had an interest in seeing if you could

03:39PM  4   flip Mr. Gerace, correct?

03:39PM  5   A.   Yes.

03:39PM  6   Q.   And that is a term of art, essentially meaning you take

03:39PM  7   somebody who's not a witness and turn them into a witness,

03:39PM  8   correct?

03:39PM  9   A.   Yes, a cooperator.

03:39PM  10  Q.   You -- you obtain at least some sort of relationship

03:40PM  11  where they provide information to you?

03:40PM  12  A.   Yes.

03:40PM  13  Q.   And you had an interest in potentially jamming him up in

03:40PM  14  some way, correct?

03:40PM  15  A.   Well, I think he jammed himself up.

03:40PM  16  Q.   Well, let's talk about that.

03:40PM  17       You have, as part of developing sources of information,

03:40PM  18  we say "jam up," we mean somebody gets themselves into

03:40PM  19  trouble, right?

03:40PM  20  A.   Yes.

03:40PM  21  Q.   Okay.  And when that happens, and you have an interest in

03:40PM  22  getting information from that person, you can use the trouble

03:40PM  23  they got into as leverage, correct?

03:40PM  24  A.   Correct.

03:40PM  25  Q.   So, the fact that they now have something hanging over

03:40PM    1    their heads, they have some sort of criminal exposure, you

03:40PM    2    can potentially negotiate with that, correct?

03:40PM    3    A.   Yes, but with, obviously, through the -- through the

03:40PM    4    United States Attorney's Office.

03:40PM    5    Q.   You wouldn't directly negotiate with that, but it's

03:40PM    6    something that could be used as part of negotiation, correct?

03:40PM    7    A.   Yes.

03:40PM    8    Q.   And potentially, the more severe the criminal exposure,

03:41PM    9    the more leverage there is in terms of that negotiation?

03:41PM    10   A.   Correct.

03:41PM    11   Q.   Now, in terms of Mr. Gerace, you indicated that you had

03:41PM    12   obtained some information that there may have been drug use

03:41PM    13   or distribution at the Pharaoh's Gentlemen's Club?

03:41PM    14   A.   Correct.

03:41PM    15   Q.   And I think on direct you explained what that was.  You

03:41PM    16   said there was a 302 report related to this, correct?

03:41PM    17   A.   Yes.  That -- that -- that was not the only source of

03:41PM    18   information, but that was one of the sources of information.

03:41PM    19   Q.   Okay.  Well, in terms of identifiable source of

03:41PM    20   information, that came from somebody you could identify, that

03:41PM    21   was contained in the 302 report, correct?

03:41PM    22   A.   Yes.

03:41PM    23   Q.   And in the terms of the 302 report, you indicated on

03:41PM    24   direct it related to two women, correct?

03:41PM    25   A.   Yes.

03:41PM    1    Q.  Do you remember who they were?

03:41PM    2    A.  I do not.

03:41PM    3    Q.  Did you ever interview those women yourself?

03:41PM    4    A.  I did not.

03:41PM    5    Q.  The -- do you remember the circumstances under which

03:41PM    6    those two women provided that information?

03:41PM    7    A.  I'm not sure --

03:41PM    8    Q.  It was following a traffic stop, right?

03:41PM    9    A.  Yeah, I believe it was initially a traffic stop by the

03:41PM   10    Amherst Police Department, and they reached out to somebody.

03:42PM   11    So they were eventually interviewed by the FBI and the

03:42PM   12    Amherst police officer that was assigned to the JTTF.

03:42PM   13    Q.  And was it your understanding that the interview and the

03:42PM   14    information that they provided that assisted them in getting

03:42PM   15    out of trouble after the traffic stop?

03:42PM   16    A.  That they -- the two girls being interviewed, that

03:42PM   17    that --

03:42PM   18    Q.  Yeah, was it your impression they got out of trouble

03:42PM   19    for -- for providing that information?

03:42PM   20    A.  They probably -- they probably did.

03:42PM   21          **MR. COOPER:**  Objection.  Objection as to they

03:42PM   22    probably.  Lacks personal knowledge.

03:42PM   23          **THE COURT:**  Overruled.

03:42PM   24          **THE WITNESS:**  I don't know, honestly.

        25

03:42PM | 1 | **BY MR. FOTI:**

03:42PM | 2 | Q.  That's okay.  And part of the reason you might not know

03:42PM | 3 | is because we're talking about 2009?

03:42PM | 4 | A.  Yes.

03:42PM | 5 | Q.  You're doing your best to recall the details that you

03:42PM | 6 | can, correct?

03:42PM | 7 | A.  That's correct.

03:42PM | 8 | Q.  You didn't review the 302 before coming here today,

03:42PM | 9 | correct?

03:42PM | 10 | A.  I did not.

03:42PM | 11 | Q.  But at that time, you had reviewed that 302.  And there

03:42PM | 12 | appeared to be some information relevant to your

03:42PM | 13 | investigation?

03:42PM | 14 | A.  In 2009?

03:42PM | 15 | Q.  In 2009.

03:42PM | 16 | A.  Yes.

03:42PM | 17 | Q.  And you didn't conduct any independent investigation at

03:43PM | 18 | that time into what was in the 302, correct?

03:43PM | 19 | A.  I did not.

03:43PM | 20 | Q.  You didn't go and conduct an interview yourself of those

03:43PM | 21 | two women, correct?

03:43PM | 22 | A.  I did not.

03:43PM | 23 | Q.  You were partnered up with Bob Cottrell of the Amherst

03:43PM | 24 | Police Department, correct?

03:43PM | 25 | A.  That's correct.

03:43PM   1   Q.  He was on the same task force as you?

03:43PM   2   A.  He was.

03:43PM   3   Q.  That means you two worked on similar investigative

03:43PM   4   objectives, correct?

03:43PM   5   A.  We did.

03:43PM   6   Q.  And you, as far as you know, Bob Cottrell didn't go and

03:43PM   7   interview these two girls, correct?

03:43PM   8   A.  As far as I know, no.

03:43PM   9   Q.  Okay.  Did you ever talk to the agents who authored the

03:43PM  10   report?

03:43PM  11   A.  I did.

03:43PM  12   Q.  Okay.  And did you ever ask if they could facilitate a

03:43PM  13   meeting between yourself and the two women?

03:43PM  14   A.  I'm sure they could have.

03:43PM  15   Q.  Did you ever ask for that -- that meeting, if you

03:43PM  16   remember?

03:43PM  17   A.  No.  Because, I mean, this thing was moving kind of fast.

03:43PM  18   And then by the time I initiated the case, I got a call from

03:43PM  19   DEA, so the case kind of went away.

03:44PM  20      I mean, obviously that would have been one of my next

03:44PM  21   investigative steps, to independent corroborate the

03:44PM  22   information in the 302, but that -- that's not how things

03:44PM  23   proceeded.

03:44PM  24   Q.  Well, the call you're referring to from DEA, that's the

03:44PM  25   call that takes place after the search on October 31st,

03:44PM    1    right?

03:44PM    2    A.   Yes.

03:44PM    3    Q.   So we're backing up.  Right now we're talking about

03:44PM    4    August of 2009, correct?

03:44PM    5    A.   Right.  Right.

03:44PM    6    Q.   You got this information before you reached out to the

03:44PM    7    probation department, correct?  Or the probation office?

03:44PM    8    A.   The information on the 302?

03:44PM    9    Q.   The information -- you had the 302, you had reviewed the

03:44PM    10   302 before reaching out to the U.S. Probation Office,

03:44PM    11   correct?

03:44PM    12   A.   I don't know if the first time I reached out to the

03:44PM    13   probation office.  My recollection is the first time I

03:44PM    14   reached out to the probation office, I certainly -- one of

03:44PM    15   the first things I did was to review their file, and then I

03:44PM    16   realized that the information in the file was inconsistent

03:44PM    17   with the information that I had.

03:44PM    18       At what point I shared the information about the

03:44PM    19   information in the 302, I -- I couldn't tell you.

03:45PM    20   Q.   Well, do you recall actually having met with Officer

03:45PM    21   Lepiane in August of 2009?  August 31st of 2009, do you

03:45PM    22   remember that?

03:45PM    23   A.   Yes.

03:45PM    24   Q.   Okay.  By the time you had met with him, you had reviewed

03:45PM    25   that 302; do you agree with that?

03:45PM  1    A.  If the 302 predates that, then that's correct.

03:45PM  2    Q.  You don't remember?

03:45PM  3    A.  I don't remember.

03:45PM  4    Q.  All right.  Now, when you met with Mr. Lepiane, you had

03:45PM  5    conversations about a potential violation of probation

03:45PM  6    against Mr. Gerace, correct?

03:45PM  7    A.  I don't think I had -- Mr. Lepiane, in the course of our

03:45PM  8    dealings, he might have mentioned.  But I -- it's not like I

03:45PM  9    was asking him to, you know, bring charges, bring a probation

03:45PM  10   violation against Mr. Gerace.

03:45PM  11   Q.  You didn't direct him to file a violation against him?

03:45PM  12   A.  No.

03:45PM  13   Q.  But going back to this timeframe, you did, as we talked

03:45PM  14   about earlier, you had an interest in obtaining leverage

03:46PM  15   against Mr. Gerace, correct?

03:46PM  16   A.  That's correct.

03:46PM  17   Q.  And a violation of probation would have provided that to

03:46PM  18   you, correct?

03:46PM  19   A.  Yes, it would have.

03:46PM  20   Q.  All right.  So you met with him at the end of August to

03:46PM  21   talk about what could potentially be a violation of

03:46PM  22   probation, right?

03:46PM  23   A.  Yes.

03:46PM  24   Q.  All right.  And during the course of that meeting, at

03:46PM  25   some point, there is a discussion of potentially searching

03:46PM  1   Pharaoh's, correct?

03:46PM  2   A.  Yes.

03:46PM  3   Q.  But one of the items of information you provided to

03:46PM  4   Mr. Lepiane is that Mr. Gerace was either employed or had an

03:46PM  5   ownership interest in Pharaoh's, correct?

03:46PM  6   A.  Yes.

03:46PM  7   Q.  Which would have been a violation of one of his

03:46PM  8   conditions?

03:46PM  9   A.  That, I don't know.

03:46PM  10  Q.  Well, based on the information provided to you, it would

03:46PM  11  have potentially been a violation of one of his conditions,

03:46PM  12  right?

03:46PM  13  A.  Which --

03:46PM  14      MR. COOPER:  Objection, Judge.  The witness already

03:46PM  15  said he doesn't know, and it calls for hearsay as well.

03:46PM  16      MR. FOTI:  Okay.

03:46PM  17      THE COURT:  Hang on, hang on.  Do you want to

03:46PM  18  withdraw the question?

03:46PM  19      MR. FOTI:  I'll withdraw.

03:46PM  20      THE COURT:  Go ahead.

03:46PM  21      BY MR. FOTI:

03:46PM  22  Q.  You -- is it your testimony today that the only potential

03:46PM  23  violation you were aware of was the potential drug use or

03:47PM  24  distribution?

03:47PM  25  A.  And then providing the false information to probation.

03:47PM  1    Q.  About the employment?

03:47PM  2    A.  Yes.

03:47PM  3    Q.  Which is what I was just asking about, right?

03:47PM  4        You were aware of that at some point?

03:47PM  5    A.  Yes, I was aware of it, yes.

03:47PM  6    Q.  All right.  So, the -- there's a discussion about

03:47PM  7    searching Pharaoh's at some point, correct?

03:47PM  8    A.  That's correct.

03:47PM  9    Q.  And as part of searching Pharaoh's for that to happen

03:47PM  10   through probation, there has to be a violation of -- there

03:47PM  11   has to be a violation of one of Mr. Gerace's search

03:47PM  12   conditions -- or, I'm sorry.

03:47PM  13       One of Mr. Gerace's search conditions involved -- let me

03:47PM  14   rephrase this again.

03:47PM  15       One of Mr. Gerace's probation conditions involved the

03:47PM  16   ability to search a location that he has control over,

03:47PM  17   correct?

03:47PM  18   A.  I'm not familiar with probation's -- what I -- but I

03:47PM  19   believe that to be correct, yes.

03:47PM  20   Q.  Well, typically if you were going to search a private

03:48PM  21   property or a private business, you would have to go through

03:48PM  22   the process of obtaining a warrant, correct?

03:48PM  23   A.  That's correct.

03:48PM  24   Q.  Or some other exception to a warrant?

03:48PM  25   A.  Correct.

03:48PM    1    Q.  Like consent to search?

03:48PM    2    A.  Yes, that's correct.

03:48PM    3    Q.  All right.  And probation has the ability to search an

03:48PM    4    area without going in and obtaining a warrant, correct?

03:48PM    5    A.  My understanding, based on my conversations with Peter

03:48PM    6    Lepiane and his supervisor at that time, is they do -- it

03:48PM    7    might not be the same way we obtain search warrants, but my

03:48PM    8    understanding is there is some sort of process involved in

03:48PM    9    obtaining a warrant.

03:48PM    10   Q.  Your understanding was that there was an -- some sort of

03:48PM    11   process to obtain a warrant in this case?

03:48PM    12           MR. COOPER:  Objection as to relevance, Judge.  We

03:48PM    13   can --

03:48PM    14           THE COURT:  No.

03:48PM    15           MR. COOPER:  Under 403.

03:48PM    16           THE COURT:  Overruled.  Overruled.

03:48PM    17           BY MR. FOTI:

03:48PM    18   Q.  It was your understanding that there was some process to

03:48PM    19   obtaining a warrant in this case?

03:48PM    20   A.  Yeah, my understanding was that maybe it was

03:48PM    21   administrative, but I -- my understanding was there was a

03:48PM    22   procedure with probation that they obtained a warrant.

03:49PM    23   Q.  Okay.  Is it fair to say you don't know anything about

03:49PM    24   what that process would have involved?

03:49PM    25   A.  That is fair to say.

USA v Gerace - Herbst - Foti/Cross - 11/12/24

03:49PM 1  Q.  Okay.  And you don't have any awareness of whether that

03:49PM 2  process would have involved showing probable cause to a judge

03:49PM 3  or anything like that?

03:49PM 4  A.  That's correct.

03:49PM 5  Q.  If you were to obtain a warrant, there are certain

03:49PM 6  requirements you have to fulfill, correct?

03:49PM 7  A.  Absolutely.

03:49PM 8  Q.  You would go to a judge and make an application, correct?

03:49PM 9  A.  Yes.

03:49PM 10  Q.  You would present certain sworn allegations, correct?

03:49PM 11  A.  Correct.

03:49PM 12  Q.  And the -- the effort would include establishing that

03:49PM 13  there's probable cause to search a location, correct?

03:49PM 14  A.  That's correct.

03:49PM 15  Q.  Okay.  You didn't do that in this case, correct?

03:49PM 16  A.  I did not, no.

03:49PM 17  Q.  But you were of the understanding that through probation,

03:49PM 18  a search would be conducted of Pharaoh's, correct?

03:49PM 19  A.  Correct.

03:49PM 20  Q.  And prior to that, there was a surveillance effort of the

03:49PM 21  business, correct?

03:49PM 22  A.  I wouldn't -- yes, but I wouldn't characterize it as a

03:49PM 23  surveillance.  There were spot checks done by a Cheektowaga

03:49PM 24  police officer that was assigned to our task force at the

03:50PM 25  time, just to establish that Mr. Gerace was actually residing

03:50PM   1   there.  And then it was -- there -- a couple of short

03:50PM   2   surveillances on a Friday -- or, on a Saturday morning.

03:50PM   3   Q.  Okay.  And that related to establishing that Mr. Gerace

03:50PM   4   had some control over the location, correct?

03:50PM   5   A.  Yes.

03:50PM   6   Q.  So that the search could be conducted by probation,

03:50PM   7   right?

03:50PM   8   A.  Yeah, I think that the -- and that -- and that he resided

03:50PM   9   there, I guess.

03:50PM   10   Q.  Okay.  And which related to whether the search could be

03:50PM   11   conducted by probation, right?

03:50PM   12   A.  Yes.

03:50PM   13   Q.  Now, you said that the -- you called it, what, spot

03:50PM   14   checks?  What did you just refer to it as?

03:50PM   15   A.  I think I did say spot checks.

03:50PM   16   Q.  Okay.  So, surveillance or spot checks, we're talking

03:50PM   17   about somebody going and watching the location, right?

03:50PM   18   A.  Correct.

03:50PM   19   Q.  All right.  And the person you said you recall doing it

03:50PM   20   was a member of the Cheektowaga Police Department?

03:51PM   21   A.  Yeah.  It was John Wanat.  So John was assigned at that

03:51PM   22   time to the FBI Safe Streets Task Force.

03:51PM   23   Q.  Not a member of the U.S. Probation Office?

03:51PM   24   A.  No.

03:51PM   25   Q.  But on the same Safe Streets Task Force that you were a

03:51PM    1    member of?

03:51PM    2    A.   Yes.

03:51PM    3    Q.   There were discussions of when the search of Pharaoh's

03:51PM    4    would take place, correct?

03:51PM    5    A.   Correct.

03:51PM    6    Q.   You were part of those discussions?

03:51PM    7    A.   Yeah, I was at the meetings, but I didn't pick the date.

03:51PM    8    Q.   Okay.  Do you remember that specifically Halloween was

03:51PM    9    selected, correct?

03:51PM   10    A.   I was at the meeting when probation determined that it

03:51PM   11    was going to be done on October 31st.  I didn't have any

03:51PM   12    input as to when they were going to do their search.

03:51PM   13    Q.   Okay.  But you were aware that there was discussion

03:51PM   14    related to selecting Halloween as the date of the search?

03:51PM   15    A.   Yes.

03:51PM   16    Q.   And it was specifically selected because there was a

03:52PM   17    belief that there was an increased likelihood that drug

03:52PM   18    evidence would be recovered, correct?

03:52PM   19    A.   Yes, I do recall that.

03:52PM   20    Q.   And Halloween on that year, that was a Saturday morning,

03:52PM   21    right?

03:52PM   22    A.   It was.

03:52PM   23    Q.   And you conducted the search early in the morning about

03:52PM   24    8 a.m. would you estimate?

03:52PM   25    A.   Yeah, I think that's probably true.  We met initially at

03:52PM 1    probation, and then went to the premises.

03:52PM 2        And probation has -- they do things differently than we

03:52PM 3    would do if we had a warrant.  So they had to physically see

03:52PM 4    Mr. Gerace before they could enter the premises.  So there

03:52PM 5    was some delay before -- there was some -- we were there

03:52PM 6    early, but there was some delay before we could actually go

03:52PM 7    in.

03:52PM 8    Q.  Were you there before 8 a.m.?

03:52PM 9    A.  Well --

03:52PM 10   Q.  It's okay if you don't remember the time.

03:52PM 11   A.  Yeah, I don't remember the time.  But I know that we

03:52PM 12   initially met at probation.  Their office here, I think it

03:52PM 13   was in the old courthouse.

03:52PM 14   Q.  Okay.

03:52PM 15   A.  And then from there we went to Pharaoh's.  And I was

03:53PM 16   anxious to get it over with because it was a Saturday, I

03:53PM 17   worked Monday through Friday, I had kids at home.  But --

03:53PM 18   Q.  Let me -- let me -- we're just focusing on the timeframe

03:53PM 19   right now, okay?

03:53PM 20   A.  Okay.

03:53PM 21   Q.  Let's keep moving through this sort of piece by piece.

03:53PM 22       So you went to probation that morning, and met up with

03:53PM 23   other members of the search team?

03:53PM 24   A.  Yes.

03:53PM 25   Q.  And that included the different agencies that were

| | | |
|---|---|---|
| 03:53PM | 1 | involved? |
| 03:53PM | 2 | A.  Yes. |
| 03:53PM | 3 | Q.  Or was it just probation officers there, if you remember? |
| 03:53PM | 4 | A.  It was certainly me.  So that was another agency.  And I |
| 03:53PM | 5 | want to say that John Wanat was there from the Cheektowaga |
| 03:53PM | 6 | Police Department.  I don't think that Bob Cottrell was there |
| 03:53PM | 7 | from Amherst at that time. |
| 03:53PM | 8 | Q.  He was positioned watching Mr. Gerace and other -- |
| 03:53PM | 9 | A.  Yes.  I don't know if he was there that early or not, but |
| 03:53PM | 10 | at some point -- |
| 03:53PM | 11 | Q.  He -- he ultimately joins you later? |
| 03:53PM | 12 | A.  He does. |
| 03:53PM | 13 | Q.  Whoever was there at probation, you relocate to |
| 03:53PM | 14 | Pharaoh's, correct? |
| 03:53PM | 15 | A.  Correct. |
| 03:53PM | 16 | Q.  And there were other agencies present as part of this |
| 03:53PM | 17 | search, correct? |
| 03:54PM | 18 | A.  Well, there's probation.  I was there from the FBI.  And |
| 03:54PM | 19 | there would have been one officer from Amherst and one |
| 03:54PM | 20 | officer from Cheektowaga. |
| 03:54PM | 21 | And then Cheektowaga sent the drug dog. |
| 03:54PM | 22 | But the two officers -- the Cheektowaga officer and the |
| 03:54PM | 23 | Amherst officer were assigned to the FBI at the time. |
| 03:54PM | 24 | Q.  They were part of the task force? |
| 03:54PM | 25 | A.  Yes. |

03:54PM    1    Q.  Okay.  You said Cheektowaga sent a drug dog, that's a

03:54PM    2    K-9, correct?

03:54PM    3    A.  Correct.

03:54PM    4    Q.  Okay.  That is a dog that is specifically trained to pick

03:54PM    5    up scents associated with narcotics or drugs, correct?

03:54PM    6    A.  Yes.

03:54PM    7    Q.  Okay.  And who was responsible for the -- was there a K-9

03:54PM    8    officer there, I'm assuming?

03:54PM    9    A.  Yes, of course.

03:54PM   10    Q.  Who was that?

03:54PM   11    A.  I don't recall his name.  I think his first name is John.

03:54PM   12    I had worked with him before, but I don't recall his name.

03:54PM   13    Q.  Okay.  When you're searching an area where there's the

03:54PM   14    possibility of narcotics or drugs, a K-9 is helpful in

03:54PM   15    determine whether there was -- well, first of all, in

03:55PM   16    locating drugs if there are any, correct?

03:55PM   17    A.  Yes.

03:55PM   18    Q.  Or locating where drugs may have been at a location,

03:55PM   19    correct?

03:55PM   20    A.  Yes.

03:55PM   21    Q.  And you weren't personally responsible, but -- you

03:55PM   22    weren't personally responsible for the K-9 yourself?

03:55PM   23    A.  No.

03:55PM   24    Q.  But you were aware that the K-9 was present?

03:55PM   25    A.  I was.

03:55PM    1    Q.  And obviously, the K-9 wasn't there to go through any

03:55PM    2    documents, correct?

03:55PM    3    A.  That's correct.

03:55PM    4    Q.  It had one purpose, which was related to potential drugs,

03:55PM    5    correct?

03:55PM    6    A.  That's correct.

03:55PM    7    Q.  All right.  Now, there comes a time where you ultimately

03:55PM    8    enter Pharaoh's, the club, correct?

03:55PM    9    A.  Correct.

03:55PM   10    Q.  All right.  Do you have any memory of the layout of

03:55PM   11    Pharaoh's?

03:55PM   12    A.  I'm gonna describe it as a -- as a -- as a big warehouse.

03:55PM   13    But I -- very quickly when I went in, I realized that

03:55PM   14    Mr. Gerace was in his office, so again, I made contact with a

03:55PM   15    probation officer.

03:55PM   16    Q.  I'm asking about the layout.  We'll get there.

03:56PM   17    A.  Okay.

03:56PM   18    Q.  All right.  Do you remember how you entered?  Was it

03:56PM   19    through the front door?  Or was it through a back door?  Do

03:56PM   20    you recall?

03:56PM   21    A.  I would say it was the front door.

03:56PM   22    Q.  Okay.  And when you entered the front door, there's a

03:56PM   23    large stage area, correct?

03:56PM   24    A.  I don't recall that.

03:56PM   25    Q.  All right.  Do you recall the bar or anything like that?

03:56PM   1   A.  I remember there was a bar, yes.

03:56PM   2   Q.  Did you -- I think on direct you said something about you

03:56PM   3   weren't very involved in the actual search of the premises;

03:56PM   4   is that correct?

03:56PM   5   A.  That's correct.

03:56PM   6   Q.  Okay.  Your interest was communicating with Mr. Gerace?

03:56PM   7   A.  Correct.

03:56PM   8   Q.  And you indicated that you went to the office area sort

03:56PM   9   of off the back, correct?

03:56PM  10   A.  Yes.

03:56PM  11   Q.  And that's where Mr. Gerace was?

03:56PM  12   A.  Yes.

03:56PM  13   Q.  Do you recall who he was with when you arrived there?

03:56PM  14   A.  Not specifically, no.

03:56PM  15   Q.  Okay.  But he was in handcuffs, you remember that?

03:56PM  16   A.  He was, yes.

03:56PM  17   Q.  And you asked whether he can be unhandcuffed, correct?

03:56PM  18   A.  Probably.

03:56PM  19   Q.  That would be part of what you talked about on direct,

03:57PM  20   establishing a rapport with somebody, correct?

03:57PM  21   A.  Yes.

03:57PM  22   Q.  All right.  Now, you weren't personally involved in the

03:57PM  23   search, but you would agree that you were aware of what was

03:57PM  24   happening during the course of the search, correct?

03:57PM  25   A.  Not -- well, number 1, I -- I did search the area on his

03:57PM  1  desk.  So, I did do some searching.

03:57PM  2  Q.  Okay.

03:57PM  3  A.  But I -- I could not -- to your second question, I really

03:57PM  4  wasn't aware of what was happening outside, because I was

03:57PM  5  again talking to Mr. Gerace, you know, or eye to eye as you

03:57PM  6  and I are talking now, and it was a separate office.  So,

03:57PM  7  most of the search was outside the office area really, so I

03:57PM  8  wasn't aware of what was happening.

03:57PM  9  Q.  You weren't aware of the pacing of the search?

03:57PM  10  A.  The pacing?

03:57PM  11  Q.  You weren't aware of what rooms the people who were

03:57PM  12  engaged in the search were moving through?

03:57PM  13  A.  No.

03:57PM  14  Q.  Okay.  You were aware that there was a search going on,

03:57PM  15  right?

03:57PM  16  A.  Absolutely.

03:57PM  17  Q.  And you were aware that they were looking for among other

03:58PM  18  things, like paperwork, they were looking for drugs?

03:58PM  19  A.  Yes.

03:58PM  20  Q.  And if anybody had located drugs, they would have likely

03:58PM  21  alerted you to that, correct?

03:58PM  22  A.  Correct.

03:58PM  23  Q.  At no point did anybody alert you to recovering any

03:58PM  24  drugs, correct?

03:58PM  25  A.  Correct.

03:58PM    1    Q.  The K-9 didn't recover any evidence, correct?

03:58PM    2    A.  I wouldn't say that.

03:58PM    3    Q.  The K-9 didn't recover any drugs, correct?

03:58PM    4    A.  Well, he -- no, he did not recover any drugs.

03:58PM    5    Q.  Okay.  And in terms of evidence of drugs, there's other

03:58PM    6    things like paraphernalia that can be recovered?

03:58PM    7    A.  Correct.

03:58PM    8    Q.  Things like baggies?

03:58PM    9    A.  Correct.

03:58PM    10   Q.  Other types of packaging material, right?

03:58PM    11   A.  Well, I don't know that -- are you asking me whether the

03:58PM    12   K-9 would alert to that?  I honestly don't know whether the

03:58PM    13   K-9 would alert to that.  But yeah, that could be recovered,

03:58PM    14   yes.

03:58PM    15   Q.  Yeah, let's set aside the K-9.

03:58PM    16       During the course of a search where there's an interest

03:58PM    17   in looking for drugs, it's not just drugs you're looking for,

03:58PM    18   right?

03:58PM    19   A.  That's correct.

03:58PM    20   Q.  You're looking for other things like paraphernalia,

03:58PM    21   correct?

03:58PM    22   A.  Yeah, anything that would indicate drug activity.

03:59PM    23   Q.  Okay.  And that would include things like what I just

03:59PM    24   mentioned as an example?

03:59PM    25   A.  Yes.

03:59PM  1    Q.  Like packaging material?

03:59PM  2    A.  Yes.

03:59PM  3    Q.  Okay.  And none of that was located, correct?

03:59PM  4    A.  Not as far as I'm aware.

03:59PM  5    Q.  All right.  Now, you personally remained in the office

03:59PM  6    for the majority of the search?

03:59PM  7    A.  Yes, I did.

03:59PM  8    Q.  Now, while you were in the office, you're having a

03:59PM  9    conversation with Mr. Gerace?

03:59PM  10   A.  Yes.

03:59PM  11   Q.  At some point during that meeting, your partner Detective

03:59PM  12   Bob Cottrell, he joins you, correct?

03:59PM  13   A.  Yeah.  I think he was -- I think he was pretty much there

03:59PM  14   the whole time because, as you indicated earlier, he was

03:59PM  15   initially sitting on Mr. Gerace's residence in Tonawanda.

03:59PM  16       But I think I called him and said, hey, it looks like

03:59PM  17   we've seen Mr. Gerace, and we're gonna be able to go in

03:59PM  18   pretty soon.  So I gave him a heads-up, so he wasn't much

03:59PM  19   behind me.

03:59PM  20   Q.  Okay.  So as far as you recall during your conversation

03:59PM  21   with Mr. Gerace, Mr. Cottrell was present for pretty much the

04:00PM  22   entire time?

04:00PM  23   A.  Yes.

04:00PM  24   Q.  Okay.  Following or during the course of that meeting,

04:00PM  25   nothing is discussed related to any type of criminal

04:00PM    1    activity, correct?

04:00PM    2    A.  No.

04:00PM    3    Q.  Okay.  You don't confront him about allegations that two

04:00PM    4    individuals made about drugs?

04:00PM    5    A.  I don't believe I did.

04:00PM    6    Q.  Did you tell him that the search related to anything

04:00PM    7    involving drugs?

04:00PM    8    A.  No.  The preliminary discussions would have been with the

04:00PM    9    probation department.  Between the probation department and

04:00PM   10    Mr. Gerace.

04:00PM   11    Q.  Okay.  So, whatever, and you weren't present at that

04:00PM   12    time?

04:00PM   13    A.  I was not.

04:00PM   14    Q.  So if they advised him that they were looking for

04:00PM   15    anything specific, you wouldn't have --

04:00PM   16    A.  That's correct.

04:00PM   17    Q.  Okay.  The conversation was cordial?

04:00PM   18    A.  Very.

04:00PM   19    Q.  He was respectful to you?

04:00PM   20    A.  He was.

04:00PM   21    Q.  Nothing that stands out in your memory as he said

04:00PM   22    anything that drew a red flag of any kind?

04:00PM   23    A.  No.

04:00PM   24    Q.  Did you have conversations with probation about whether

04:01PM   25    he would be taken into custody that day?

04:01PM    1    A.  I don't recall.

04:01PM    2    Q.  You did become aware at some point that they were

04:01PM    3    choosing not to take him into custody, correct?

04:01PM    4    A.  Yes.

04:01PM    5    Q.  And the Cheektowaga Police Department didn't find that

04:01PM    6    there was a basis to bring any criminal charges against him,

04:01PM    7    correct?

04:01PM    8    A.  When you're saying the Cheektowaga Police Department,

04:01PM    9    you're talking about the one officer that was present as part

04:01PM   10    of the task force?

04:01PM   11    Q.  Nobody brought any criminal charges against him that day?

04:01PM   12    A.  No.

04:01PM   13    Q.  So he was to be released, that was your understanding?

04:01PM   14    A.  Yes.

04:01PM   15    Q.  And you didn't object to that?

04:01PM   16    A.  I had nothing to do with that, that's probation's

04:01PM   17    decision.

04:01PM   18    Q.  Okay.  After the search is over, there comes a time --

04:01PM   19    there comes a few times that you spoke to Mr. Lepiane again,

04:01PM   20    correct?

04:01PM   21    A.  Yes.

04:01PM   22    Q.  All right.  You continued to communicate with him after

04:01PM   23    the search just as you had before the search, correct?

04:02PM   24    A.  Correct.

04:02PM   25    Q.  Do you have any estimate as to how many times you spoke

04:02PM   1    to him after this?

04:02PM   2    A.  At that time, probably once or twice a week.  Maybe twice

04:02PM   3    a week.  You know, certainly, before the search, and then

04:02PM   4    subsequent to the search as things were progressing.  And

04:02PM   5    then eventually obviously things ended.

04:02PM   6    Q.  Okay.  You also -- I may have to back up a little bit

04:02PM   7    here, but you also had had conversations with at least one

04:02PM   8    prosecutor from the U.S. Attorney's Office, right?

04:02PM   9    A.  That's correct.

04:02PM  10    Q.  You talked about that on direct?

04:02PM  11    A.  I did.

04:02PM  12    Q.  Tony Bruce?

04:02PM  13    A.  Correct.

04:02PM  14    Q.  Do you remember when you first spoke to him?

04:02PM  15    A.  It was following the search.  Probation had a policy

04:02PM  16    where they, again, I don't know what their policies are, but

04:02PM  17    I thought they did have some type of warrant, but they

04:02PM  18    certainly had discussed it with the U.S. Attorney's Office

04:02PM  19    before they conducted the search.  And so following the

04:02PM  20    search, they had to meet again with the United States

04:02PM  21    Attorney's Office, and it was during that meeting that I had

04:02PM  22    a discussion with AUSA Bruce.

04:03PM  23    Q.  Did you ever speak to Mr. Bruce about Mr. Gerace prior to

04:03PM  24    the search on October 31st, 2009?

04:03PM  25    A.  I don't think I did, no.

USA v Gerace - Herbst - Foti/Cross - 11/12/24

60

04:03PM    1    Q.  You don't recall?

04:03PM    2    A.  I don't recall.

04:03PM    3    Q.  And you didn't document any meeting with him?

04:03PM    4    A.  No.

04:03PM    5    Q.  Okay.  So, by the time you meet with Mr. Bruce, or speak

04:03PM    6    to Mr. Bruce, as far as you recall, the search had already

04:03PM    7    been conducted?

04:03PM    8    A.  Yes.

04:03PM    9    Q.  And the search had not turned up any drugs?

04:03PM    10   A.  Correct.

04:03PM    11   Q.  At some point in the weeks that followed, you spoke to

04:03PM    12   your supervisor about Mr. Gerace, correct?  Or, no, I

04:03PM    13   guess -- well, you had a conversation with your supervisor

04:03PM    14   that you testified about on direct, right?

04:03PM    15   A.  Right.  Prior to the search.

04:03PM    16   Q.  You had the conversation --

04:03PM    17   A.  Oh, I'm sorry.  No.  No, you're right.  Yeah.

04:03PM    18       You're talking about the conversation that he got a call

04:04PM    19   from DEA?

04:04PM    20   Q.  Yes.

04:04PM    21   A.  Okay.  Got you.

04:04PM    22   Q.  We're on the same page now.

04:04PM    23   A.  I had conversation with my supervisor every day, but --

04:04PM    24   Q.  Right.  Fair enough.

04:04PM    25       When was the conversation we're talking about regarding

04:04PM    1    your supervisor mentioning the DEA?

04:04PM    2    A.  I don't recall the exact date.  But it would have been

04:04PM    3    shortly after the search.

04:04PM    4    Q.  Ask who was your supervisor again?

04:04PM    5    A.  James Jancewicz.

04:04PM    6    Q.  And he indicated that you would receive a call from

04:04PM    7    somebody at the DEA?

04:04PM    8    A.  That's correct.

04:04PM    9    Q.  He had spoken to a supervisor over at the DEA?

04:04PM   10    A.  He did.

04:04PM   11    Q.  And he didn't tell you anything to suggest that

04:04PM   12    Mr. Gerace was working with the DEA, correct?

04:04PM   13    A.  Not that I recall today.

04:04PM   14    Q.  Okay.  At some point, Mr. Bongiovanni reaches out to you

04:04PM   15    by phone?

04:04PM   16    A.  Reached out to me, yes.

04:04PM   17    Q.  That's the first time you spoke to Mr. Bongiovanni about

04:04PM   18    Mr. Gerace, correct?

04:04PM   19    A.  Correct.

04:04PM   20    Q.  You had never discussed Mr. Gerace with Mr. Bongiovanni

04:04PM   21    on anything unrelated to this, correct?

04:05PM   22    A.  That's correct.

04:05PM   23    Q.  Okay.  You had multiple conversations with

04:05PM   24    Mr. Bongiovanni related to scheduling, correct?

04:05PM   25    A.  Correct.

04:05PM    1    Q.  And during the course of those conversations, he was

04:05PM    2    always cordial with you, correct?

04:05PM    3    A.  Mr. Bongiovanni?

04:05PM    4    Q.  Mr. Bongiovanni was always cordial during those

04:05PM    5    conversations?

04:05PM    6    A.  Yes, of course.

04:05PM    7    Q.  He never referred to Mr. Gerace as a confidential

04:05PM    8    informant, did he?

04:05PM    9    A.  No.

04:05PM   10    Q.  He never referred to him as a source of information,

04:05PM   11    correct?

04:05PM   12    A.  No.

04:05PM   13    Q.  And during the course of, I think, the direct examination

04:05PM   14    and various points, we've talked about those two things being

04:05PM   15    separate.  You'd agree, a confidential informant is more

04:05PM   16    formal than a source of information, correct?

04:05PM   17    A.  Yes.

04:05PM   18    Q.  Okay.  Can you just describe the difference between the

04:05PM   19    two?  When we say one versus the other?

04:05PM   20    A.  Between a confidential informant?

04:05PM   21    Q.  Confidential informant versus a source of information.

04:05PM   22    What are you referring to when those --

04:05PM   23    A.  Well, when I think of a confidential informant in terms

04:05PM   24    of the FBI, I think of somebody that's documented and, maybe,

04:06PM   25    long term rather than somebody that's providing, like, a

USA v Gerace - Herbst - Foti/Cross - 11/12/24

04:06PM    1    single source of information.

04:06PM    2    Q.  So there's something more formal about that?

04:06PM    3    A.  Yes.

04:06PM    4    Q.  There is an established relationship involving a

04:06PM    5    confidential informant, correct?

04:06PM    6    A.  Yes.

04:06PM    7    Q.  And when you say source of information, and distinguish

04:06PM    8    that, you're talking about something much more informal,

04:06PM    9    right?

04:06PM   10    A.  Yes, I mean, a source of information can be a telephone

04:06PM   11    call.

04:06PM   12    Q.  Right.  You -- and you said that you spent a good amount

04:06PM   13    of time working in intel, right?

04:06PM   14    A.  No, that's not correct.

04:06PM   15        When I got to the Buffalo office, I was on an intel

04:06PM   16    squad -- a post 9/11 intel squad for a very short period of

04:06PM   17    time.  But my whole career, I worked criminal investigations.

04:06PM   18    Q.  Okay.  But you would agree that in terms of collecting

04:06PM   19    intelligence, it can come from a variety of sources, correct?

04:06PM   20    A.  Correct.

04:06PM   21    Q.  It can come from formal sources such as confidential

04:06PM   22    informants?

04:06PM   23    A.  Yes.

04:06PM   24    Q.  But you also are going to obtain information from other

04:06PM   25    sources, correct?

04:06PM  1    A.  Correct.

04:06PM  2    Q.  You're not going to wait until you formalize a

04:06PM  3    relationship to utilize information they provide to you,

04:07PM  4    correct?

04:07PM  5    A.  Like, a source of information would be the FBI 302 that

04:07PM  6    we referred to, the two girls that provided information, they

04:07PM  7    would be a source of information.

04:07PM  8    Q.  Fair enough.  They didn't have a formal confidential

04:07PM  9    informant relationship, correct?

04:07PM  10   A.  Correct.

04:07PM  11   Q.  Okay.

04:07PM  12   A.  That I'm aware of.

04:07PM  13   Q.  Right.  Based on what you reviewed on the 302, they

04:07PM  14   didn't have it?

04:07PM  15   A.  No.

04:07PM  16   Q.  Okay.  All right.  So Mr. Bongiovanni never indicates

04:07PM  17   that Mr. Gerace has a formal confidential informant-like

04:07PM  18   relationship, correct?

04:07PM  19   A.  Not to me.

04:07PM  20   Q.  Okay.  And he never indicates to you he's been helpful in

04:07PM  21   terms of getting information or intelligence in any other

04:07PM  22   investigation, correct?

04:07PM  23   A.  That's correct.

04:07PM  24   Q.  So you ultimately do meet with Mr. Bongiovanni and

04:07PM  25   Mr. Gerace, correct?

04:07PM    1    A.  I do.

04:07PM    2    Q.  All right.  And there was attempts to schedule that

04:07PM    3    meeting despite the fact that Mr. Gerace had apparently had

04:07PM    4    the swine flu, right?

04:07PM    5    A.  That's correct.

04:07PM    6    Q.  You wanted to make sure you hold off until he got better,

04:07PM    7    right?

04:07PM    8    A.  Yeah.  There was no urgency on my part, because I was no,

04:08PM    9    again, I think it was the swine flu that was going around.

04:08PM   10    So we all knew at the time that that was really bad.  And so,

04:08PM   11    I've got young kids at home, I've got kids at home.  I did

04:08PM   12    not want to be in contact with him.  So in other words, there

04:08PM   13    was no urgency on that my part.

04:08PM   14        But there seemed to be some urgency on their part to get

04:08PM   15    the meeting going, but I wanted to give Mr. Gerace the time

04:08PM   16    he needed to heal.

04:08PM   17    Q.  Okay.  Fair enough.  So you wanted to make sure he was

04:08PM   18    healthy by the time you see him?

04:08PM   19    A.  Yes.

04:08PM   20    Q.  They ultimately do meet with you, and you testified about

04:08PM   21    that interaction on your direct examination, right?

04:08PM   22    A.  I did.

04:08PM   23    Q.  You didn't come into that meeting with the impression

04:08PM   24    that Mr. Gerace was a source of information for the DEA,

04:08PM   25    correct?

04:08PM  1    A.  No, I wouldn't say -- I wouldn't say that was true.  I --

04:08PM  2    I mean, I obviously went to that meeting knowing that DEA had

04:08PM  3    an interest in Mr. Gerace.  They had reached out to the FBI.

04:09PM  4    This DEA supervisor had reached out to the FBI supervisor,

04:09PM  5    and the FBI supervisor had a conversation with me.

04:09PM  6             MR. FOTI:  Can I just have a moment, Judge?

04:09PM  7             THE COURT:  Sure.

04:09PM  8             BY MR. FOTI:

04:09PM  9    Q.  Okay.  Prior to that meeting, nobody had indicated to you

04:10PM  10   that Mr. Gerace was a source for the DEA, correct?

04:10PM  11   A.  I don't -- I don't think that word was ever used.

04:10PM  12   Q.  Okay.  You may have made -- you may have come to certain

04:10PM  13   conclusions based on the circumstances, but nobody told you

04:10PM  14   that?

04:10PM  15   A.  That's correct.

04:10PM  16   Q.  Okay.  Your supervisor didn't tell you that, correct?

04:10PM  17   A.  No.

04:10PM  18   Q.  And Mr. Bongiovanni didn't tell you that, correct?

04:10PM  19   A.  No.

04:10PM  20   Q.  And Mr. Gerace, on October 31st when he was talking to

04:10PM  21   you, didn't say I'm working with Mr. Bongiovanni, correct?

04:10PM  22   A.  That's correct.

04:10PM  23   Q.  Okay.  And during the course of that meeting, Mr. Gerace

04:10PM  24   never talked about having previously worked with

04:10PM  25   Mr. Bongiovanni, or -- or he didn't indicate to you that he

04:10PM  1  was currently working Mr. Bongiovanni, correct?

04:10PM  2  A.  I think I missed the first part of the question.  You

04:10PM  3  said Mr. Gerace?

04:10PM  4  Q.  Let me withdraw that.

04:10PM  5     During the course of that meeting, you spoke to both

04:10PM  6  Mr. Bongiovanni and Mr. Gerace, correct?

04:10PM  7  A.  Correct.

04:10PM  8  Q.  And during the course of the meeting, Mr. Gerace never

04:10PM  9  refers to Mr. Bongiovanni as his handler or somebody that

04:11PM  10  he's working with, correct?

04:11PM  11  A.  That's correct.

04:11PM  12  Q.  And Mr. Bongiovanni never refers to Mr. Gerace as

04:11PM  13  somebody that he is working with, correct?

04:11PM  14  A.  That's correct.

04:11PM  15  Q.  Okay.  You drew a number of impressions regarding the

04:11PM  16  relationship between Mr. Gerace and Mr. Bongiovanni from that

04:11PM  17  meeting, correct?

04:11PM  18  A.  Correct.

04:11PM  19  Q.  You didn't ask questions about that relationship,

04:11PM  20  correct?

04:11PM  21  A.  That's correct.

04:11PM  22  Q.  The meeting was very professional, right?

04:11PM  23  A.  Yes.

04:11PM  24  Q.  You did come with other impressions regarding their

04:11PM  25  relationship in regard to how long they've known each other,

04:11PM     1    correct?

04:11PM     2    A.  I did not come to the meeting with that impression?

04:11PM     3    Q.  So, during the course of the meeting, you got the

04:11PM     4    impression that Mr. Bongiovanni had known Mr. Gerace for a

04:11PM     5    long time?

04:11PM     6    A.  Yes.  Right.

04:11PM     7    Q.  That's something you testified on direct?

04:11PM     8    A.  Right.  Correct.

04:11PM     9    Q.  But that wasn't something that they withheld from you

04:11PM    10    during the course of the meeting, correct?

04:11PM    11    A.  No.

04:11PM    12    Q.  Mr. Bongiovanni was pretty upfront about have a long

04:11PM    13    history with Mr. Gerace, correct?

04:11PM    14    A.  My recollection is that -- I that conversation after

04:12PM    15    Mr. Gerace left, but they weren't attempting to hide it.

04:12PM    16    Q.  Okay.  Fair enough.  So Mr. Gerace leaves, and

04:12PM    17    Mr. Bongiovanni talks about having had a long relationship

04:12PM    18    with Mr. Gerace?

04:12PM    19    A.  Right.  And then obviously during the course of the

04:12PM    20    relationship, I could tell that they appeared to be friends.

04:12PM    21    Q.  So what Mr. Bongiovanni said to you afterwards was

04:12PM    22    consistent with your observations during the course --

04:12PM    23    A.  Correct.

04:12PM    24    Q.  You said you had another impression from the meeting that

04:12PM    25    they had known each other since they were kids, correct?

04:12PM   1   A.  Well, Mr. Bongiovanni told me that directly.

04:12PM   2   Q.  Okay.  And that was, again, consistent with your

04:12PM   3   observations, correct?

04:12PM   4   A.  Yes.

04:12PM   5   Q.  After this meeting is over, you never go back and talk to

04:12PM   6   your supervisor about the meeting, do you?

04:12PM   7   A.  I probably did.  I don't recall.  But, again, you talk to

04:12PM   8   your supervisor every day, so I probably did.

04:12PM   9   Q.  But you don't have any recollection of what would have

04:12PM  10   been discussed?

04:12PM  11   A.  No.

04:12PM  12   Q.  You don't recall raising any red flags that

04:12PM  13   Mr. Bongiovanni and Mr. Gerace have known each other since

04:13PM  14   they were kids, do you?

04:13PM  15   A.  No.

04:13PM  16   Q.  You indicated your impression was that Mr. Gerace was

04:13PM  17   working with the DEA, correct?

04:13PM  18   A.  Yes.

04:13PM  19   Q.  Okay.  And that is in spite of the fact that you were

04:13PM  20   told that they'd been friends since they were kids, correct?

04:13PM  21   A.  Yes.

04:13PM  22   Q.  Now, Mr. Bongiovanni never told you that Mr. Gerace's

04:13PM  23   working with him as an informant, correct?

04:13PM  24   A.  Correct.

04:13PM  25   Q.  That was never said when Mr. Gerace was present, right?

04:13PM   1   A.  Right.  That word was never used, right.

04:13PM   2   Q.  It was also never said after Mr. Gerace left, correct?

04:13PM   3   A.  Correct.

04:13PM   4   Q.  He was upfront about their longstanding relationship

04:13PM   5   though, right?

04:13PM   6   A.  He was.

04:13PM   7   Q.  To the extent you talked to your supervisor, you don't

04:13PM   8   recall what you discussed, correct?

04:13PM   9   A.  That's correct.

04:13PM   10   Q.  All right.  You also never documented anything about this

04:13PM   11   meeting in a report, correct?

04:13PM   12   A.  I did not.

04:13PM   13   Q.  You didn't -- if there was information that was pertinent

04:13PM   14   to your investigation, you would have documented it, correct?

04:14PM   15   A.  If there was, if there was useful information discussed

04:14PM   16   at that meeting, I would have documented it, yes.

04:14PM   17   Q.  Or if there was anything that was of concern about the

04:14PM   18   relationship between Mr. Bongiovanni and Mr. Gerace you would

04:14PM   19   have documented it, correct?

04:14PM   20   A.  Yes.

04:14PM   21   Q.  You did not document anything?

04:14PM   22   A.  I did not.

04:14PM   23   Q.  Did you go back and talk to Tony Bruce after this

04:14PM   24   meeting, if you recall?

04:14PM   25   A.  I don't recall.  I mean, I was at the U.S. Attorney's

04:14PM   1   Office frequently, so -- and Tony was not assigned to any

04:14PM   2   case that I was working other than the one we talked about

04:14PM   3   here.

04:14PM   4        So as I would make my way through the U.S. Attorney's

04:14PM   5   Office, it wasn't uncommon for me to stop and talk to

04:14PM   6   different guys, so I might have, but nothing formal.

04:14PM   7   Q.  So, if you spoke to Mr. Bruce again, it was probably in

04:14PM   8   passing at the U.S. Attorney's Office?

04:14PM   9   A.  Yes.

04:14PM  10   Q.  You don't have any recollection of that meeting?

04:14PM  11   A.  I don't.

04:14PM  12   Q.  Mr. Bruce is the one who said he was willing to prosecute

04:15PM  13   Mr. Gerace, correct?

04:15PM  14   A.  That's correct.

04:15PM  15   Q.  You didn't have any follow-up meeting to discuss the

04:15PM  16   relationship between Mr. Gerace and Mr. Bongiovanni?

04:15PM  17   A.  No.  Because my case went away.

04:15PM  18   Q.  Okay.  Mr. Bongiovanni never asked you to refrain from

04:15PM  19   reaching out to Mr. Gerace, correct?

04:15PM  20   A.  To Mr. Gerace?

04:15PM  21   Q.  Mr. Bongiovanni never asked you to refrain from reaching

04:15PM  22   out to Mr. Gerace, correct?

04:15PM  23   A.  No, but I wouldn't have done that.

04:15PM  24   Q.  He didn't ask you?

04:15PM  25   A.  He did not.

04:15PM    1    Q.  And -- and you didn't ever reach out to Mr. Gerace again,

04:15PM    2    correct?

04:15PM    3    A.  No, I ended up closing the investigation.

04:15PM    4    Q.  That's not something Mr. Bongiovanni asked you to do, is

04:15PM    5    it?

04:15PM    6    A.  I wouldn't say that.  I mean, that was kind of the

04:15PM    7    purpose of the meeting, to --

04:15PM    8    Q.  Hold on.  When you say it's the purpose of the meeting,

04:15PM    9    did anybody ever say that?  That they wanted you to close the

04:16PM   10    investigation?

04:16PM   11    A.  Not in those words.

04:16PM   12    Q.  Did your supervisor ever tell you to close the

04:16PM   13    investigation?

04:16PM   14    A.  No.

04:16PM   15    Q.  Did Mr. Bongiovanni ever tell you to close the

04:16PM   16    investigation?

04:16PM   17    A.  Obviously he -- he couldn't.

04:16PM   18    Q.  All right.  So when you say it's the purpose of your

04:16PM   19    meeting, you're talking about your perception of things?

04:16PM   20    A.  Yes.

04:16PM   21    Q.  You had prior to that meeting an open investigation; is

04:16PM   22    that right?

04:16PM   23    A.  Yes.

04:16PM   24    Q.  And you didn't document the reason you decided to close

04:16PM   25    that investigation?

04:16PM   1   A.   Oh, I did not close the investigation, I just closed

04:16PM   2   the -- I did not pursue the sub file against Mr. Gerace.  The

04:16PM   3   investigation wasn't closed.

04:16PM   4   Q.   Okay.  You did talk to Mr. Lepiane again after that

04:16PM   5   meeting, didn't you?

04:16PM   6   A.   Yes.

04:16PM   7   Q.   And you told him that you had met with Mr. Gerace, right?

04:16PM   8   A.   Yes.

04:16PM   9   Q.   You told him he didn't really have any useful information

04:16PM   10   for you?

04:16PM   11   A.   Yes.

04:16PM   12   Q.   You indicated you would continue to work with him if

04:16PM   13   possible, right?

04:16PM   14   A.   Yes.

04:16PM   15   Q.   This was after the meeting with Mr. Bongiovanni, correct?

04:16PM   16   A.   Yes.

04:16PM   17   Q.   But you never did meet with Mr. Gerace again, correct?

04:17PM   18   A.   Correct.

04:17PM   19   Q.   Nobody was stopping you from meeting Mr. Gerace, correct?

04:17PM   20   A.   I guess that's correct.

04:17PM   21   Q.   Okay.  It was your choice?

04:17PM   22   A.   Right.

04:17PM   23   Q.   Okay.

04:17PM   24           **MR. FOTI:**  May I just have a moment, Judge?

04:17PM   25           **THE COURT:**  Sure.

04:18PM    1          **MR. FOTI:**  Sir, thank you very much.  Have safe

04:18PM    2    travels back to Florida, okay?

04:18PM    3          **THE WITNESS:**  Thank you, sir.

04:18PM    4          **THE COURT:**  Any redirect?

04:18PM    5          **MR. COOPER:**  You're not done yet, Tom.

04:18PM    6          Just a couple questions, Judge.

04:18PM    7

04:18PM    8          **REDIRECT EXAMINATION BY MR. COOPER:**

04:18PM    9    Q.  I'm going to start from the end of the cross and kind of

04:18PM   10    work my way backwards.

04:18PM   11          At the end of the cross-examination, Mr. Foti was asking

04:18PM   12    you some questions about whether you were ever -- whether

04:18PM   13    anyone at the DEA ever told you, you know, to refrain from

04:18PM   14    reaching out to Gerace again; do you remember being asked

04:18PM   15    those questions?

04:18PM   16    A.  Yes.

04:18PM   17    Q.  It looked like you had a little more to say there.

04:18PM   18          Would it have been unusual for you to reach out to

04:18PM   19    somebody you believed was a source for another agent at a

04:18PM   20    different agency?

04:18PM   21    A.  You would -- you would never do that.

04:18PM   22    Q.  Explain that to the jury.

04:18PM   23    A.  Oh, it's a -- a confidential source is a confidential

04:18PM   24    source.  So it's relationship between you and that

04:18PM   25    individual.

04:18PM  1      And I think the DEA's probably similar to us, but in the

04:19PM  2   FBI, I mean, we don't even -- we -- their true name is

04:19PM  3   documented at some point, but we don't even use their true

04:19PM  4   name when we contact them.  It's a confidential relationship.

04:19PM  5   And, you know, if you talk to other people about it, it's no

04:19PM  6   longer.

04:19PM  7   Q.  At this time, when this meeting is happening at the

04:19PM  8   mezzanine level of the Electric Tower, had you been a special

04:19PM  9   agent in federal law enforcement for well over 20 years?

04:19PM 10   A.  Yes.

04:19PM 11   Q.  So in the context of that 20-plus years experience, did

04:19PM 12   the way that Bongiovanni acted and the things that he said to

04:19PM 13   you during the phone call and during the meeting lead you to

04:19PM 14   the conclusion that Gerace was his source?

04:19PM 15   A.  Yes.

04:19PM 16   Q.  Is that based on your 20-plus years experience?

04:19PM 17   A.  Yes.

04:19PM 18   Q.  Are there things that you can determine based on that

04:19PM 19   20-plus years experience without them being explicitly said

04:19PM 20   to you?

04:19PM 21   A.  Yes.  I mean, you don't have to -- you don't have to tell

04:19PM 22   somebody that somebody's a source.  Again, repeating myself,

04:20PM 23   but the DEA called the FBI, and said let -- our guy's gonna

04:20PM 24   call your guy, and let's get together and basically work this

04:20PM 25   out.

04:20PM    1    Q.  And you were also asked some questions on

04:20PM    2    cross-examination about whether Bongiovanni was upfront with

04:20PM    3    you about his relationship with Gerace; do you remember being

04:20PM    4    asked those questions?

04:20PM    5    A.  Not specifically, but yes.

04:20PM    6    Q.  Okay.  That topic?

04:20PM    7    A.  Yes.

04:20PM    8    Q.  Do you remember being asked about that topic?

04:20PM    9        Did Bongiovanni essentially tell you that he grew up with

04:20PM   10    Gerace?

04:20PM   11    A.  He did.

04:20PM   12    Q.  Okay.  Did he go into much more detail than that?

04:20PM   13    A.  No.

04:20PM   14    Q.  Did he tell you they went on double dates together?

04:20PM   15    A.  No.

04:20PM   16    Q.  Did he tell you they socialized, like, recently up to

04:20PM   17    that point?

04:20PM   18    A.  No.

04:20PM   19    Q.  Did he tell you that they talked on the phone?

04:20PM   20    A.  No.  All he said --

04:20PM   21    Q.  Hold on, sir.  I'm not -- just answer that question.

04:20PM   22        Did he tell you that they talked on the phone?

04:20PM   23    A.  No.

04:20PM   24    Q.  Did he tell you that they exchanged text messages?

04:20PM   25    A.  No.

04:20PM    1    Q.  Okay.  To the best of your ability now, in 2024, what do

04:20PM    2    you recall Bongiovanni saying about his relationship with

04:20PM    3    Gerace?

04:20PM    4    A.  That they had a long-term relationship, I mean, in terms

04:21PM    5    of they grew up together, and that he was a good kid.

04:21PM    6    Q.  Okay.  That they grew up together, and that he was a good

04:21PM    7    kid, right?

04:21PM    8    A.  Yes.

04:21PM    9    Q.  Did Bongiovanni give you details about, you know, present

04:21PM   10    day in 2009, details about their relationship?

04:21PM   11    A.  No.

04:21PM   12    Q.  Do you know what Bongiovanni told his boss about his

04:21PM   13    relationship with Gerace?

04:21PM   14    A.  No.

04:21PM   15    Q.  His boss would know that, right?

04:21PM   16    A.  Correct.

04:21PM   17    Q.  When you were asked some questions on cross-examination

04:21PM   18    about the involvement of a K-9 at the search at Pharaoh's, do

04:21PM   19    you remember being asked those questions?

04:21PM   20    A.  I do.

04:21PM   21    Q.  It seemed like you had a little something more to say.

04:21PM   22    You were asked about whether drugs were recovered, and they

04:21PM   23    weren't, right?

04:21PM   24    A.  Right.

04:21PM   25    Q.  Did the K-9 alert while he was at Pharaoh's?

04:21PM    1    A.   Yes.

04:21PM    2    Q.   Is a K-9 alerting, is it doing its job trying to find

04:22PM    3    drugs?

04:22PM    4    A.   Yes.

04:22PM    5    Q.   Okay.  Even if drugs are gone, based upon your 20-plus

04:22PM    6    years experience, can a K-9 sometimes alert because drugs had

04:22PM    7    been present?

04:22PM    8    A.   Yes.

04:22PM    9    Q.   Okay.  We're not going to spend too much time on this,

04:22PM   10    but you were asked a bunch of questions about probation's

04:22PM   11    search authority; do you remember being asked that?

04:22PM   12    A.   Yes.

04:22PM   13    Q.   Have you ever worked for probation?

04:22PM   14    A.   No.

04:22PM   15    Q.   Do you know specifically what probation needs to do to

04:22PM   16    search a home?

04:22PM   17    A.   No.

04:22PM   18    Q.   Peter Lepiane, he worked for probation, right?

04:22PM   19    A.   Yes.

04:22PM   20    Q.   Still does?

04:22PM   21    A.   Still does.

04:22PM   22    Q.   Okay.  And he would have a better idea of what probation

04:22PM   23    needs to do in order to conduct a search, right?

04:22PM   24    A.   He would.

04:22PM   25    Q.   Okay.  As a special agent for the Federal Bureau of

04:22PM   1   Investigation, would it be fair to say that it's not your

04:23PM   2   responsibility to investigate potential violations of

04:23PM   3   supervision and bring them to the district court?  Is that

04:23PM   4   your job?

04:23PM   5   A.  No.

04:23PM   6   Q.  Is that probation's job?

04:23PM   7   A.  Yes.

04:23PM   8   Q.  Do you sometimes help probation in doing their job?

04:23PM   9   A.  Yes.

04:23PM   10  Q.  You were asked on cross-examination about whether the two

04:23PM   11  women who were interviewed by another TFO and another special

04:23PM   12  agent from the FBI got out of trouble; do you remember being

04:23PM   13  asked that question?

04:23PM   14  A.  I do.

04:23PM   15  Q.  You have no idea if that happened or not, do you?

04:23PM   16  A.  I don't.

04:23PM   17  Q.  Okay.

04:23PM   18          MR. COOPER:  Just one second, please.

04:23PM   19          BY MR. COOPER:

04:23PM   20  Q.  You were asked on cross-examination if you remember the

04:23PM   21  identity of those two women; do you remember being asked that

04:23PM   22  question?

04:23PM   23  A.  Yes.

04:23PM   24  Q.  You said you didn't remember, right?

04:23PM   25  A.  That's correct.

04:23PM  1    Q.  Okay.

04:24PM  2         **MR. COOPER:**  Judge, I'm holding what's marked for

04:24PM  3    identification as Government Exhibit 3565D, as in David.  May

04:24PM  4    I approach the witness?

04:24PM  5         **THE COURT:**  Sure.

04:24PM  6         **MR. COOPER:**  Do you need to see it, Mark?

04:24PM  7         **MR. FOTI:**  Which one is it, 35?

04:24PM  8         **MR. COOPER:**  3565D.

04:24PM  9         May I approach?

04:24PM  10        **THE COURT:**  You may.

04:24PM  11        **BY MR. COOPER:**

04:24PM  12   Q.  Don't read from this.  Just take a moment, read it to

04:24PM  13   yourself, look back up when you're done.

04:24PM  14       And do you want me to put it on the screen?

04:24PM  15   A.  That would be better.

04:24PM  16        **MR. COOPER:**  Karen, can you pull up on the screen

04:24PM  17   3565D, as in David.

04:24PM  18        **THE WITNESS:**  Can you blow it up?

04:24PM  19        **MR. COOPER:**  Can you zoom in on the first paragraph,

04:24PM  20   or the first couple.

04:24PM  21        **THE WITNESS:**  Yes.  That's good.

04:24PM  22        Do you want me to read the first paragraph?

04:25PM  23        **BY MR. COOPER:**

04:25PM  24   Q.  I don't want you to read it out loud.

04:25PM  25       Did reviewing that refresh your memory about those two

04:25PM    1   individuals?  Just yes or no.

04:25PM    2   A.  Well, yes as to one.  I don't see the second one.  It's

04:25PM    3   an FD-302.

04:25PM    4   Q.  I don't want you to read from the document.  I'm asking

04:25PM    5   you if you look at the document, if it refreshes your memory

04:25PM    6   about those two women.

04:25PM    7   A.  Yes.

04:25PM    8   Q.  Yes, it does?

04:25PM    9   A.  Yes.

04:25PM   10        **MR. COOPER:**  Okay.  Ms. Champoux, can you take that

04:25PM   11   down?

04:25PM   12        **THE WITNESS:**  Yes.

04:25PM   13        **BY MR. COOPER:**

04:25PM   14   Q.  Was one of them named G.R.?

04:25PM   15   A.  Yes.

04:25PM   16   Q.  Was one of them named K.L.?

04:25PM   17   A.  Yes.

04:25PM   18   Q.  Did looking at that report help you to remember their

04:25PM   19   names?

04:25PM   20   A.  Yes.

04:25PM   21   Q.  It's been a long time, right?

04:25PM   22   A.  Right.

04:25PM   23   Q.  You were also asked on cross-examination about whether

04:25PM   24   you followed up and conducted interviews of those women

04:25PM   25   yourself; do you remember being asked those questions?

04:26PM  1   A.  Yes.

04:26PM  2   Q.  And if, at that meeting with Bongiovanni, Peter Gerace

04:26PM  3   was -- it was clear to you that Peter Gerace was not a source

04:26PM  4   for the DEA, if that had been the case, would you have

04:26PM  5   pursued an investigation into Gerace?

04:26PM  6   A.  Yes.  If DEA had no interest in Mr. Gerace at that time,

04:26PM  7   I would have continued my investigation into Mr. Gerace.

04:26PM  8   Q.  Okay.  And you told Mr. Foti on cross-examination that

04:26PM  9   you, in fact, did not continue your investigation; is that

04:26PM  10  right?

04:26PM  11  A.  Right.  I did not close my file, but I did not pursue

04:26PM  12  that avenue.

04:26PM  13  Q.  The avenue of Gerace?

04:26PM  14  A.  Yes.

04:26PM  15  Q.  Is that because of how Bongiovanni acted and what he said

04:26PM  16  before and during that meeting in October or November of

04:26PM  17  2009?

04:26PM  18  A.  Yes.

04:26PM  19  Q.  You were asked some questions on cross-examination about

04:27PM  20  whether Bongiovanni ever told you about -- or, Bongiovanni or

04:27PM  21  Gerace ever told you about Gerace's knowledge of cocaine

04:27PM  22  trafficking; do you remember that?

04:27PM  23  A.  Can you ask the question again?

04:27PM  24  Q.  Yeah.  On cross-examination, Mr. Foti, he asked you some

04:27PM  25  questions about whether you were told during the meeting at

04:27PM   1   the mezzanine that that Gerace had information about cocaine

04:27PM   2   trafficking; do you remember Mr. Foti asking you that?

04:27PM   3   A.  Yes.

04:27PM   4   Q.  Okay.

04:27PM   5           MR. COOPER:  Ms. Champoux, can you pull up Government

04:27PM   6   Exhibit 30A in evidence, please?

04:27PM   7           THE WITNESS:  This is in evidence?

04:27PM   8           BY MR. COOPER:

04:27PM   9   Q.  This is in evidence.  So I think everybody should be able

04:27PM  10   to see it, and can you see it on the screen there?

04:27PM  11   A.  Yeah, but can you blow it up, please?

04:27PM  12           MR. COOPER:  Ms. Champoux, can you get the first

04:27PM  13   couple paragraphs there?  Thank you.

04:27PM  14           BY MR. COOPER:

04:27PM  15   Q.  Do you see paragraph 2 in front of you?

04:27PM  16   A.  I do.

04:27PM  17   Q.  The second sentence of paragraph 2, can you read that out

04:27PM  18   loud?

04:27PM  19   A.  The one it starts it should?

04:28PM  20   Q.  No, the one that starts Gerace.  The second one.

04:28PM  21   A.  Gerace has acted as a confidential source and has been

04:28PM  22   able to provide information regarding individuals in this

04:28PM  23   case file and other narcotic investigations in the past.

04:28PM  24   Q.  All right.  Pause right there.

04:28PM  25       Is that sentence consistent with the impression that you

04:28PM    1    were left with from interacting with Bongiovanni?

04:28PM    2    A.  Yes, it clearly says confidential source.

04:28PM    3    Q.  Okay.  Now at the time that you met with Bongiovanni

04:28PM    4    about Gerace, did he show you this report?

04:28PM    5    A.  No.

04:28PM    6    Q.  Did you know it existed?

04:28PM    7    A.  No.

04:28PM    8    Q.  Did you not see it until the year 2024?

04:28PM    9        Do you remember the first time you saw this?

04:28PM   10    A.  Yeah, you showed it to me prior to the first trial, I

04:28PM   11    believe.

04:28PM   12    Q.  Okay.  That was this year, right?

04:28PM   13    A.  This year.

04:28PM   14    Q.  I want to direct your attention to the sentence in

04:28PM   15    paragraph 3.  I drew a mark on it.  It says Gerace stated; do

04:29PM   16    you see that?

04:29PM   17    A.  I do.

04:29PM   18    Q.  Read that sentence out loud.

04:29PM   19    A.  Gerace stated that he was prepared to offer information

04:29PM   20    regarding individuals who are trafficking in narcotics in the

04:29PM   21    Buffalo area.

04:29PM   22    Q.  Stop right there.

04:29PM   23        Did Bongiovanni tell you that when he met with you?

04:29PM   24    A.  No.

04:29PM   25              **MR. COOPER:**  You can zoom out of that, Ms. Champoux.

04:29PM    1         Can we go to the next page?

04:29PM    2         **BY MR. COOPER:**

04:29PM    3    Q.  Let's look at paragraph 4.  Do you see the sentence

04:29PM    4    starting Gerace stated that he?  Second sentence.

04:29PM    5    A.  Yes, I see that.

04:29PM    6    Q.  Can you read that out loud for the jury?

04:29PM    7    A.  Gerace stated that he knew significant cocaine

04:29PM    8    traffickers capable of moving kilo quantities of cocaine out

04:29PM    9    of various distribution houses located in the North Buffalo

04:29PM   10    and South Buffalo areas.

04:29PM   11    Q.  Did Bongiovanni tell you about that?

04:29PM   12    A.  No.

04:29PM   13    Q.  Did Gerace mention it during this meeting?

04:29PM   14    A.  No.

04:29PM   15    Q.  Did it come up at all?

04:29PM   16    A.  No.

04:29PM   17    Q.  Paragraph 6 of this report.  Can you read that first

04:30PM   18    sentence?

04:30PM   19    A.  G.S. Kasprzyk instructed S.A. Bongiovanni to set up an

04:30PM   20    interview with Gerace and FBI agents in the near future.

04:30PM   21    Q.  That interview happened, right, sir?

04:30PM   22    A.  I wouldn't call it an interview, a meeting happened.

04:30PM   23    Q.  Okay.  And during the meeting that happened, did he tell

04:30PM   24    you, Bongiovanni, did he tell you any of the stuff that's

04:30PM   25    written in this report?

04:30PM    1    A.  No.

04:30PM    2    Q.  This report, it's written before that meeting happened,

04:30PM    3    right, sir?

04:30PM    4    A.  I'd have to look at the date of the DEA-6, but I think it

04:30PM    5    would have to be, yes.  Can you blow it up?

04:30PM    6    Q.  Do you see the date prepared here?

04:30PM    7    A.  I'm not familiar --

04:31PM    8    Q.  That's okay, I'll circle it for you.

04:31PM    9    A.  Okay.  Gotcha.  Yeah, I have seen DEA forms before, but

04:31PM   10    yeah, the date is November 6, 2009.

04:31PM   11    Q.  Okay.  And as you sit here today, do you recall the date

04:31PM   12    that the meeting happened at the mezzanine in the Electric

04:31PM   13    Tower?

04:31PM   14    A.  No, but it would have been later than that, because

04:31PM   15    again, we had trouble setting up a meeting.

04:31PM   16    Q.  Okay.  You're confident in that?

04:31PM   17    A.  Yeah, because the search was October 31st.  And this is

04:31PM   18    November 6th.  So it would have been after that.

04:31PM   19          **MR. COOPER:**  You can zoom out of that, Ms. Champoux.

04:31PM   20    Thank you.  And leave the document up for one second.

04:31PM   21          Can I just have one second, Judge?

04:31PM   22          **THE COURT:**  Sure.

04:31PM   23          **MR. COOPER:**  No further redirect, Judge.

04:32PM   24          **THE COURT:**  Thank you.  Anything further, Mr. Foti?

04:32PM   25          **MR. FOTI:**  Just -- just briefly, while this exhibit

04:32PM   1   is -- is the exhibit still up for everybody?

04:32PM   2               **THE COURT:**  Yes.

04:32PM   3               **MR. FOTI:**  Okay.  Can we zoom in through boxes 11

04:32PM   4   through 15, just the bottom?

04:32PM   5

04:32PM   6               **RECROSS-EXAMINATION BY MR. FOTI:**

04:32PM   7   Q.  Okay.  This is still Exhibit 30A in evidence, sir.  On

04:32PM   8   box 12, is there a name?

04:32PM   9   A.  Yes.

04:32PM  10   Q.  And who is that?

04:32PM  11   A.  S.A. Joseph Bongiovanni.

04:32PM  12   Q.  Okay.  That's the agent that we've been talking about,

04:32PM  13   right?

04:32PM  14   A.  Correct.

04:32PM  15   Q.  Okay.  And then underneath it, it's box 14, right?

04:32PM  16   A.  Yes.

04:32PM  17   Q.  And that is a box for a supervisor to sign off on the

04:32PM  18   report, correct?

04:32PM  19   A.  Correct.

04:32PM  20   Q.  And whose name is there?

04:32PM  21   A.  Dale Kasprzyk.

04:32PM  22   Q.  Okay.  And above his name, it says approved, correct?

04:32PM  23   A.  Yes.

04:32PM  24   Q.  And he dated it in box 15, correct?

04:32PM  25   A.  It appears -- yeah, it looks like he signed it in 14, and

04:33PM   1   dated it in 15.

04:33PM   2           **MR. FOTI:**  Okay.  Nothing further, Judge.

04:33PM   3           **MR. COOPER:**  I'm good.  Thank you, Judge.

04:33PM   4           **THE COURT:**  Okay.  You can step down, sir.  Thank you

          5   very much.

04:33PM   6           **THE WITNESS:**  Thank you very much.

          7           (Witness excused at 4:33 p.m.)

          8           (Excerpt concluded at 4:33 p.m.)

          9           *      *      *      *      *      *      *

         10

         11

         12

         13

         14

         15                   **CERTIFICATE OF REPORTER**

         16

         17           In accordance with 28, U.S.C., 753(b), I

         18   certify that these original notes are a true and correct

         19   record of proceedings in the United States District Court for

         20   the Western District of New York on November 12, 2024.

         21

         22                      s/ Ann M. Sawyer
                                 Ann M. Sawyer, FCRR, RPR, CRR
         23                      Official Court Reporter
                                 U.S.D.C., W.D.N.Y.

         24

         25

1

2                              **TRANSCRIPT INDEX**

3               **EXCERPT - EXAMINATION OF THOMAS HERBST**

4                            **NOVEMBER 12, 2024**

5

6

7    **W I T N E S S**                                    **P A G E**

8    **T H O M A S    H E R B S T**                       2

9       DIRECT EXAMINATION BY MR. COOPER:                 2

10      CROSS-EXAMINATION BY MR. FOTI:                    32

11      REDIRECT EXAMINATION BY MR. COOPER:               74

12      RECROSS-EXAMINATION BY MR. FOTI:                  87

13

14

15

16

17

18

19

20

21

22

23

24

25