1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF NEW YORK
2

   _____
3  UNITED STATES OF AMERICA,
                                    Case No. 1:19-cr-227
4             Plaintiff,                     1:23-cr-37
   v.                                           (LJV)
5
   PETER GERACE, JR.,               December 13, 2024
6
              Defendant.
7  _____

8     TRANSCRIPT EXCERPT - EXAMINATION OF LOUIS SELVA - DAY 2
          BEFORE THE HONORABLE LAWRENCE J. VILARDO
9               UNITED STATES DISTRICT JUDGE

   APPEARANCES:    TRINI E. ROSS, UNITED STATES ATTORNEY
10                 BY: JOSEPH M. TRIPI, ESQ.
                       NICHOLAS T. COOPER, ESQ.
11                     CASEY L. CHALBECK, ESQ.
                   Assistant United States Attorneys
12                 Federal Centre, 138 Delaware Avenue
                   Buffalo, New York 14202
13                 For the Plaintiff

14                 THE FOTI LAW FIRM, P.C.
                   BY: MARK ANDREW FOTI, ESQ.
15                 16 West Main Street, Suite 100
                   Rochester, New York 14614
16                    And
                   SOEHNLEIN LAW
17                 BY: ERIC MICHAEL SOEHNLEIN, ESQ.
                   350 Main Street, Suite 2100
18                 Buffalo, New York 14202
                   For the Defendant
19
   PRESENT:        KAREN A. CHAMPOUX, USA PARALEGAL
20                 BRIAN A. BURNS, FBI SPECIAL AGENT
                   MARILYN K. HALLIDAY, HSI SPECIAL AGENT
21                 OLIVIA A. PROIA, J.D., PARALEGAL

22 LAW CLERK:      REBECCA FABIAN IZZO, ESQ.

23 COURT CLERK:    COLLEEN M. DEMMA

24 REPORTER:       ANN MEISSNER SAWYER, FCRR, RPR, CRR
                   Robert H. Jackson Courthouse
25                 2 Niagara Square Buffalo, New York 14202
                   Ann_Sawyer@nywd.uscourts.gov

09:57AM  1                    (Excerpt commenced at 9:57 a.m.)

09:57AM  2                    (Jury is present.)

09:57AM  3             **THE COURT:**  The record will reflect that all our

09:57AM  4   jurors are present.

09:57AM  5             I remind the witness that he's still under oath.

09:57AM  6             And, Mr. Tripi, you may begin.

09:58AM  7             **MR. TRIPI:**  Thank you, Your Honor.

09:58AM  8

09:58AM  9   **L O U I S   S E L V A**, having been previously duly called and

09:58AM  10  sworn, continued to testify as follows:

09:58AM  11

09:58AM  12            **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

09:58AM  13  Q.  All right.  Mr. Selva, I want to basically pick up where

09:58AM  14  we left off, but yesterday I asked you some questions, I want

09:58AM  15  to kind of follow up on one part.

09:58AM  16     When Mr. Bongiovanni -- yesterday, you testified when

09:58AM  17  Mr. Bongiovanni instructed you to advise law enforcement that

09:58AM  18  you were his informant if law enforcement approached you, by

09:58AM  19  that point in time, had you been involved in your marijuana

09:58AM  20  distribution activity since approximately 2008?

09:58AM  21  A.  Yes, that's correct.

09:58AM  22  Q.  And did Mr. Bongiovanni give you that instruction before

09:58AM  23  your house was searched on August 23rd, 2019?

09:58AM  24  A.  Yes.

09:58AM  25  Q.  Did he remind you about that again after your house was

| | | |
|---|---|---|
| 09:58AM | 1 | searched on August 23rd, 2019? |
| 09:58AM | 2 | A.  Yes. |
| 09:58AM | 3 | Q.  And when he was giving you those instructions and those |
| 09:58AM | 4 | directives, based on conversations and discussions you had |
| 09:58AM | 5 | had with Mr. Bongiovanni, he knew you were involved in |
| 09:58AM | 6 | marijuana distribution with others? |
| 09:59AM | 7 | A.  That's correct. |
| 09:59AM | 8 | Q.  Is that a yes? |
| 09:59AM | 9 | A.  Yes, sir. |
| 09:59AM | 10 | Q.  Okay.  I want to go backwards in time a little bit to |
| 09:59AM | 11 | around the year 2001.  By that point in time, were you back |
| 09:59AM | 12 | living in Buffalo, New York, after a stint in Las Vegas? |
| 09:59AM | 13 | A.  Yes. |
| 09:59AM | 14 | Q.  By that point in time in your life, were you going |
| 09:59AM | 15 | through or about to go through a divorce? |
| 09:59AM | 16 | A.  Around that time, yes.  It was starting to proceed. |
| 09:59AM | 17 | Q.  Also around that time in around 2001, did Mr. Bongiovanni |
| 09:59AM | 18 | return to the Buffalo area after beginning his career as a |
| 09:59AM | 19 | DEA agent in Florida? |
| 09:59AM | 20 | A.  He did, yes. |
| 09:59AM | 21 | Q.  Okay.  By the time Mr. Bongiovanni came back around that |
| 09:59AM | 22 | 2001 timeframe, was he separating from his wife, JoAnn? |
| 09:59AM | 23 | A.  Yes.  They were living separately I believe. |
| 10:00AM | 24 | Q.  They were still married? |
| 10:00AM | 25 | A.  They were still married, yes. |

10:00AM    1    Q.   At that point in time, did Mr. Bongiovanni have a young

10:00AM    2    daughter named Chelsea?

10:00AM    3    A.   He did, yes.

10:00AM    4    Q.   So, both you and Mr. Bongiovanni are sort of both back in

10:00AM    5    the Buffalo area by 2001.  Would it be accurate to say you

10:00AM    6    were both going through something similar in your personal

10:00AM    7    lives?

10:00AM    8    A.   Correct, yes.

10:00AM    9    Q.   Where were you working in 2001?

10:00AM   10    A.   I was a manager in the wireless business for a company

10:00AM   11    called NexTel.

10:00AM   12    Q.   Okay.

10:00AM   13    A.   And I was also bartending on the weekends.

10:00AM   14    Q.   I need you to keep your voice up.

10:00AM   15    A.   I'm sorry.  I was working two jobs, wireless business and

10:00AM   16    bartending.

10:00AM   17    Q.   Where did you bartend?

10:00AM   18    A.   At that time, Harry's Harbor.

10:01AM   19    Q.   And would Mr. Bongiovanni come visit you while you worked

10:01AM   20    at Harry's Harbor?

10:01AM   21    A.   Yes.

10:01AM   22    Q.   And was that a restaurant and a bar?

10:01AM   23    A.   It was on the water, yes.

10:01AM   24    Q.   Did you also work with a young lady there named T.O.?

10:01AM   25    A.   Yes.

| | | |
|---|---|---|
| 10:01AM | 1 | Q. At some point briefly, did you date Ms. T.O.? |
| 10:01AM | 2 | A. I did, yes. |
| 10:01AM | 3 | Q. At a later point in life, did you learn that she has |
| 10:01AM | 4 | dating or had dated Mr. Gerace? |
| 10:01AM | 5 | A. I did, yes. |
| 10:01AM | 6 | Q. When Mr. Bongiovanni would come to Harry's Harbor, would |
| 10:01AM | 7 | you and him socialize? |
| 10:01AM | 8 | A. I would be -- yes, I would serve him drinks, and we would |
| 10:01AM | 9 | talk over the bar, yes. |
| 10:01AM | 10 | Q. When you weren't working, would you go out socially with |
| 10:01AM | 11 | Mr. Bongiovanni? |
| 10:01AM | 12 | A. Yes. |
| 10:01AM | 13 | Q. Did you and he also join the same gym? |
| 10:01AM | 14 | A. Yes. |
| 10:01AM | 15 | Q. Would you work out together as well when you weren't both |
| 10:01AM | 16 | working? |
| 10:01AM | 17 | A. Yes. |
| 10:02AM | 18 | Q. Were you being kept apprised by Mr. Bongiovanni as to the |
| 10:02AM | 19 | nature of his relationship with his wife JoAnn? |
| 10:02AM | 20 | A. Yes. |
| 10:02AM | 21 | Q. Eventually, did their separation move towards divorce |
| 10:02AM | 22 | proceedings? |
| 10:02AM | 23 | A. It did. |
| 10:02AM | 24 | Q. Did Mr. Bongiovanni hire a lawyer? |
| 10:02AM | 25 | A. He did. |

10:02AM    1    Q.  From your own personal experience going through your own

10:02AM    2    divorce around that time, do lawyers cost money?

10:02AM    3    A.  They do.

10:02AM    4    Q.  Did you hear Mr. Bongiovanni complain about how much

10:02AM    5    money his divorce was costing him around that timeframe?

10:02AM    6    A.  Yes.

10:02AM    7    Q.  What were the kinds of things you heard him say?

10:02AM    8    A.  Child support, maintenance, he was paying maintenance,

10:02AM    9    alimony, additional expenses.  Just the whole cost of it,

10:02AM   10    just how his expenses have risen.

10:02AM   11    Q.  Was it a frequent topic of conversation?

10:02AM   12    A.  It would be, yes.

10:03AM   13    Q.  Did he make -- did he complain at all about the fact that

10:03AM   14    his ex-wife didn't work?

10:03AM   15    A.  Yes.

10:03AM   16    Q.  Or at that point, the wife he was -- JoAnn, the wife he

10:03AM   17    was divorcing?

10:03AM   18    A.  Yes.

10:03AM   19    Q.  What kinds of things did he say about that?

10:03AM   20    A.  She wasn't contributing.  He has to pay maintenance, a

10:03AM   21    higher amount of maintenance or spousal support, whatever

10:03AM   22    it's called.  The whole nut was really falling on him.  It

10:03AM   23    was --

10:03AM   24    Q.  By her not working, or her working very little, did that

10:03AM   25    increase the amount of payments he would have to make?

USA v Gerace - Selva - Tripi/Direct - 12/13/24

7

| | | |
|---|---|---|
| 10:03AM | 1 | A.  Correct. |
| 10:03AM | 2 | Q.  Was that -- was that basically what he was saying to you? |
| 10:03AM | 3 | A.  Yes. |
| 10:03AM | 4 | Q.  Did he complain about the fact that she had a master's |
| 10:03AM | 5 | degree and didn't work? |
| 10:03AM | 6 | A.  Yes. |
| 10:03AM | 7 | Q.  Was it a source of frustration, based on your |
| 10:03AM | 8 | interactions with him? |
| 10:03AM | 9 | A.  Yes. |
| 10:03AM | 10 | Q.  All right.  I want to get a little more specific about |
| 10:04AM | 11 | some of the types of things Mr. Bongiovanni talked about |
| 10:04AM | 12 | paying for during that time period, okay? |
| 10:04AM | 13 | A.  Okay. |
| 10:04AM | 14 | Q.  About how old was his daughter, Chelsea?  Was she a |
| 10:04AM | 15 | little kid? |
| 10:04AM | 16 | A.  Yes, she's the same age as my younger daughter, so she |
| 10:04AM | 17 | was maybe -- 2001?  Four, five. |
| 10:04AM | 18 | Q.  Okay.  And how long was he talking about having to pay |
| 10:04AM | 19 | for her child support until? |
| 10:04AM | 20 | A.  Well, until she was 21 or graduated college. |
| 10:04AM | 21 | Q.  Did he talk about also having to pay for her private |
| 10:04AM | 22 | school? |
| 10:04AM | 23 | A.  Yes. |
| 10:04AM | 24 | Q.  Did he talk about having to pay for her medical expenses? |
| 10:04AM | 25 | A.  Yes. |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

8

10:04AM  1   Q.  At a point in Chelsea's life, were you aware that she had

10:04AM  2   some medical issues that required more attention?

10:04AM  3   A.  Yes, he had mentioned that, yes.  What they were, I don't

10:05AM  4   remember.

10:05AM  5   Q.  Do you remember where she was being brought for

10:05AM  6   treatments?

10:05AM  7   A.  I don't.

10:05AM  8   Q.  Okay.  While he's going through that, did Mr. Bongiovanni

10:05AM  9   have other financial obligations that you were aware of,

10:05AM  10  other things he was paying for?

10:05AM  11  A.  Yes, he did.

10:05AM  12  Q.  What did you know he had to pay for?

10:05AM  13  A.  Living expenses, truck payment, expenses for his

10:05AM  14  daughter.  I believe at that time he was -- I don't know if

10:05AM  15  it was set in stone yet, the amount that he was paying child

10:05AM  16  support and maintenance, but he was also supporting his

10:05AM  17  soon-to-be ex wife.

10:05AM  18  Q.  Did he also have a truck that he had to pay for?

10:05AM  19  A.  He did.

10:05AM  20  Q.  What kind of truck did he have at that time?

10:05AM  21  A.  It was an Escalade.

10:05AM  22  Q.  Cadillac?

10:05AM  23  A.  Yes.

10:05AM  24  Q.  In terms of his social life as a newly-single man, was he

10:06AM  25  going out more?

USA v Gerace - Selva - Tripi/Direct - 12/13/24

9

```
10:06AM   1   A.  He was.

10:06AM   2   Q.  Does going out to bars and restaurants cost money, in

10:06AM   3   your life experience?

10:06AM   4   A.  It does.

10:06AM   5   Q.  While you were going through that, did you go out with

10:06AM   6   him?

10:06AM   7   A.  I did.

10:06AM   8   Q.  Eventually, did you and Mr. Bongiovanni use cocaine

10:06AM   9   together?

10:06AM  10   A.  We have.

10:06AM  11   Q.  And did he do that with you while he was a DEA agent?

10:06AM  12   A.  He did.

10:06AM  13         MR. TRIPI:  Ms. Champoux, if we can please pull up

10:06AM  14   Government Exhibit 127?  This is in evidence.

10:06AM  15         BY MR. TRIPI:

10:06AM  16   Q.  Okay.  Just for a moment, I'm going to -- I know you see

10:06AM  17   that on the screen.  I'm going to ask some questions before

10:06AM  18   we turn to the photo, okay?

10:06AM  19   A.  Okay.

10:06AM  20   Q.  Mr. Selva?

10:06AM  21   A.  Yeah, I'm sorry.

10:06AM  22   Q.  Do you know an individual named Tom Doctor?

10:07AM  23   A.  Yes.

10:07AM  24   Q.  What was Tom Doctor's relationship with Joe Bongiovanni?

10:07AM  25   A.  They worked together.  Tom was a part of the DEA task
```

| | | |
|---|---|---|
| 10:07AM | 1 | force. |
| 10:07AM | 2 | Q.  So he was a member of law enforcement? |
| 10:07AM | 3 | A.  He was. |
| 10:07AM | 4 | Q.  Was he also a Buffalo police detective? |
| 10:07AM | 5 | A.  He was. |
| 10:07AM | 6 | Q.  Did you know specifically if he was a narcotics detective |
| 10:07AM | 7 | at the time? |
| 10:07AM | 8 | A.  I did. |
| 10:07AM | 9 | Q.  Have you done coke with both Mr. Doctor and |
| 10:07AM | 10 | Mr. Bongiovanni? |
| 10:07AM | 11 | A.  Yes. |
| 10:07AM | 12 | Q.  Where did you do that with them? |
| 10:07AM | 13 | A.  At a cottage in Angola, and -- |
| 10:07AM | 14 | Q.  Is that -- |
| 10:07AM | 15 | A.  -- and Cabo San Lucas. |
| 10:07AM | 16 | Q.  We'll get to Cabo, but I want to stick with the cottage |
| 10:07AM | 17 | for a moment.  Who had a cottage? |
| 10:07AM | 18 | A.  Mr. Doctor. |
| 10:07AM | 19 | Q.  And where is Angola? |
| 10:07AM | 20 | A.  It's along the -- it's going south, I believe, it's |
| 10:08AM | 21 | outside of Buffalo.  There's bars and cottages, summer |
| 10:08AM | 22 | cottages up there, on the water. |
| 10:08AM | 23 | Q.  In proximity to the cottages, is there a bar called |
| 10:08AM | 24 | Mickey Rats? |
| 10:08AM | 25 | A.  There is, yes. |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

11

| | | |
|---|---|---|
| 10:08AM | 1 | Q.  Have you been to Mr. Doctor's cottage? |
| 10:08AM | 2 | A.  A few times, yes. |
| 10:08AM | 3 | Q.  Have you been to the bar Mickey Rats? |
| 10:08AM | 4 | A.  Yes. |
| 10:08AM | 5 | Q.  When you would be at Mr. Doctor's cottage and at the bar |
| 10:08AM | 6 | Mickey Rats, was that with Mr. Bongiovanni? |
| 10:08AM | 7 | A.  Yes. |
| 10:08AM | 8 | Q.  Was it in that context that at the cottage or in the |
| 10:08AM | 9 | Mickey Rats area you used cocaine with them both? |
| 10:08AM | 10 | A.  That's correct. |
| 10:08AM | 11 | Q.  Now, looking at Exhibit 127, you're not in that |
| 10:08AM | 12 | particular photo, correct? |
| 10:08AM | 13 | A.  No, I'm not. |
| 10:08AM | 14 | Q.  Do you see Mr. Bongiovanni? |
| 10:08AM | 15 | A.  I do. |
| 10:08AM | 16 | Q.  Can you tap the screen and show the jury where he's |
| 10:08AM | 17 | standing?  Okay. |
| 10:09AM | 18 | **MR. TRIPI:**  May the record reflect there's a pre-made |
| 10:09AM | 19 | circle there already on the individual in the back row far |
| 10:09AM | 20 | right blue shirt, the witness placed a temporary mark on that |
| 10:09AM | 21 | individual. |
| 10:09AM | 22 | **BY MR. TRIPI:** |
| 10:09AM | 23 | Q.  Do you see Mr. Doctor?  Can you tap the screen and show |
| 10:09AM | 24 | us where he is? |
| 10:09AM | 25 | **MR. TRIPI:**  May the record reflect there's a pre -- |

10:09AM    1    there's a blue circle around that individual's head already on

10:09AM    2    the photo, but this witness has marked a temporary red dot on

10:09AM    3    the individual sort of third from the left of the photo

10:09AM    4    wearing no shirt, with a beer bottle up to his lips, and

10:09AM    5    sunglasses on.

10:09AM    6            **THE WITNESS:**  Correct.

10:09AM    7            **BY MR. TRIPI:**

10:09AM    8    Q.  Is that a fair description?

10:09AM    9    A.  It is.

10:09AM   10    Q.  Okay.  And do you see Mr. Gerace in that photo?

10:09AM   11    A.  I do, yes.

10:09AM   12    Q.  Can you tap the screen and show us where he is?

10:10AM   13            **MR. TRIPI:**  May the record reflect he put a temporary

10:10AM   14    mark on the individual, front row, second male from right,

10:10AM   15    standing slightly in front of the individual in the blue shirt

10:10AM   16    that the witness has indicated is Mr. Bongiovanni.

10:10AM   17            **BY MR. TRIPI:**

10:10AM   18    Q.  Is that a good description, do you think?

10:10AM   19    A.  Yes.

10:10AM   20    Q.  Okay.  Were you aware that the defendant, in addition to

10:10AM   21    knowing Mr. Bongiovanni, also knew Tom Doctor?

10:10AM   22    A.  Yes.

10:10AM   23    Q.  How long had you known Tom Doctor in life?

10:10AM   24    A.  Since my 20s, late 20s.

10:10AM   25    Q.  So since before -- did you and Mr. Bongiovanni know

| | | |
|---|---|---|
| 10:10AM | 1 | Mr. Doctor from before he was in law enforcement? |
| 10:10AM | 2 | A.  Yes. |
| 10:10AM | 3 | Q.  On some level, would it be fair to say that you, |
| 10:10AM | 4 | Mr. Bongiovanni, this defendant, Mr. Doctor, all met in the |
| 10:10AM | 5 | timeframe of growing up in the Buffalo area? |
| 10:10AM | 6 | A.  Within that timeframe, sure. |
| 10:11AM | 7 | Q.  Okay.  All right.  Now you indicated Angola was one |
| 10:11AM | 8 | location where you had used cocaine with Mr. Doctor and |
| 10:11AM | 9 | Mr. Bongiovanni.  We'll talk about it in more detail later. |
| 10:11AM | 10 | But another location was in Cabo, you said? |
| 10:11AM | 11 | A.  Yes. |
| 10:11AM | 12 | Q.  Cabo San Lucas, is that what you're referencing? |
| 10:11AM | 13 | A.  That's correct. |
| 10:11AM | 14 | Q.  What -- was that in about 2015? |
| 10:11AM | 15 | A.  It was. |
| 10:11AM | 16 | Q.  What was happening there? |
| 10:11AM | 17 | A.  It was Mr. Bongiovanni's wedding.  It was a destination |
| 10:11AM | 18 | wedding. |
| 10:11AM | 19 | Q.  And was Mr. Doctor there? |
| 10:11AM | 20 | A.  He was. |
| 10:11AM | 21 | Q.  Were you there? |
| 10:11AM | 22 | A.  Yes. |
| 10:11AM | 23 | Q.  Was Mr. Bongiovanni there? |
| 10:11AM | 24 | A.  Yes. |
| 10:11AM | 25 | Q.  Was another individual named Tom Napoli there? |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

14

| | | |
|---|---|---|
| 10:11AM | 1 | A.  Yes. |
| 10:11AM | 2 | Q.  Okay. |
| 10:11AM | 3 | **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 126, |
| 10:11AM | 4 | please? |
| 10:11AM | 5 | **BY MR. TRIPI:** |
| 10:12AM | 6 | Q.  Okay.  Do you see Exhibit 126 on the screen here?  I'm |
| 10:12AM | 7 | just going to get rid of those red dots that were there. |
| 10:12AM | 8 | A.  Yes. |
| 10:12AM | 9 | Q.  Do you see Mr. Bongiovanni in this photo? |
| 10:12AM | 10 | A.  I do. |
| 10:12AM | 11 | Q.  Can you tap the screen and show us where he is? |
| 10:12AM | 12 | **MR. TRIPI:**  May the record reflect the witness placed |
| 10:12AM | 13 | a temporary red dot on the male in this picture that is third |
| 10:12AM | 14 | from the right, moving right to left. |
| 10:12AM | 15 | **BY MR. TRIPI:** |
| 10:12AM | 16 | Q.  And do you see Tom Napoli in this picture? |
| 10:12AM | 17 | A.  Yes. |
| 10:12AM | 18 | Q.  Can you place a red dot on him? |
| 10:12AM | 19 | **MR. TRIPI:**  May the record reflect the witness placed |
| 10:12AM | 20 | a temporary red dot sort of right in the middle of the face of |
| 10:12AM | 21 | an individual he's indicated is Tom Napoli, who the second |
| 10:12AM | 22 | going right to left in the photo. |
| 10:12AM | 23 | **BY MR. TRIPI:** |
| 10:12AM | 24 | Q.  Is Mr. Napoli standing right next to Mr. Bongiovanni in |
| 10:12AM | 25 | that picture? |

10:12AM   1    A.  Yes.

10:12AM   2    Q.  And now in Cabo San Lucas, who were the males present

10:13AM   3    when you guys were using cocaine at the destination wedding?

10:13AM   4    A.  Myself, Tom, Mr. Bongiovanni, Tom Doctor, and -- that's

10:13AM   5    it.

10:13AM   6    Q.  Okay.  So you, Mr. Bongiovanni, Tom Doctor, and Tom

10:13AM   7    Napoli?

10:13AM   8    A.  Yes.

10:13AM   9    Q.  Is that right?

10:13AM   10    A.  That's correct.

10:13AM   11    Q.  Is that in a hotel room?

10:13AM   12    A.  Yes.

10:13AM   13    Q.  Was that sort of before a night of partying and drinking?

10:13AM   14    A.  Yes.

10:13AM   15    **MR. TRIPI:**  Okay.  So can we put those 126 and 127

10:13AM   16    next to each other.  Can we zoom in on 127?  And can we -- is

10:13AM   17    there any way we can split the screen, or no?

10:13AM   18    Too large?  Okay.  That's fine.  Okay.  We'll leave

10:13AM   19    it at that.  We can take those down.

10:13AM   20    **BY MR. TRIPI:**

10:14AM   21    Q.  By 2004, though, was Mr. Bongiovanni -- obviously, he was

10:14AM   22    still working for the DEA; is that right?

10:14AM   23    A.  Yes.

10:14AM   24    Q.  Did he start dating someone new?

10:14AM   25    A.  That, yes, he did.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

16

| | | |
|---|---|---|
| 10:14AM | 1 | Q.  Okay. |
| 10:14AM | 2 | A.  At that time. |
| 10:14AM | 3 | **MR. TRIPI:**  Actually, could we pull up -- I forgot to |
| 10:14AM | 4 | do one thing.  Pull up 126, 127, and 490A together. |
| 10:14AM | 5 | Okay.  This isn't going to work right now. |
| 10:14AM | 6 | Let's go to 490 before I move on, sorry about that. |
| 10:14AM | 7 | They get too small.  Can we zoom in on just the photo portion? |
| 10:14AM | 8 | **BY MR. TRIPI:** |
| 10:14AM | 9 | Q.  In 490A, do you see Tom Napoli? |
| 10:14AM | 10 | A.  I do, yes. |
| 10:14AM | 11 | Q.  Could you tap the screen and show the jury where he is? |
| 10:15AM | 12 | **MR. TRIPI:**  Okay.  May the record reflect the witness |
| 10:15AM | 13 | placed a temporary red mark on the male who is fourth from the |
| 10:15AM | 14 | left, going left to right in the photo. |
| 10:15AM | 15 | **BY MR. TRIPI:** |
| 10:15AM | 16 | Q.  Do you see the defendant in that photo? |
| 10:15AM | 17 | A.  Yes. |
| 10:15AM | 18 | Q.  Can you tap the screen and show us where he is? |
| 10:15AM | 19 | **MR. TRIPI:**  May the record reflect the witness has |
| 10:15AM | 20 | placed a temporary red mark on the defendant, who's about in |
| 10:15AM | 21 | the middle of the picture next to Mr. Napoli.  He's the fourth |
| 10:15AM | 22 | person as you're going right to left. |
| 10:15AM | 23 | **BY MR. TRIPI:** |
| 10:15AM | 24 | Q.  Do you see T.O. in that photo? |
| 10:15AM | 25 | A.  I do, yes. |

| | | |
|---|---|---|
| 10:15AM | 1 | Q.  Can you tap the screen and show us where she is? |
| 10:15AM | 2 | **MR. TRIPI:**  May the record reflect the witness has |
| 10:15AM | 3 | placed a temporary red dot on the person who's third, going |
| 10:15AM | 4 | right to left across the photo. |
| 10:15AM | 5 | **BY MR. TRIPI:** |
| 10:15AM | 6 | Q.  Do you see Mr. Bongiovanni in that photo? |
| 10:15AM | 7 | A.  Yes. |
| 10:15AM | 8 | Q.  Can you tap the screen and show the jury where he is? |
| 10:15AM | 9 | **MR. TRIPI:**  May the record reflect he's the person |
| 10:15AM | 10 | standing second from right to left in the photo. |
| 10:15AM | 11 | **BY MR. TRIPI:** |
| 10:15AM | 12 | Q.  And where is Lindsay, Mr. Bongiovanni's eventual wife? |
| 10:16AM | 13 | A.  She's right next to him. |
| 10:16AM | 14 | **MR. TRIPI:**  Okay.  We can take that down. |
| 10:16AM | 15 | Can we pull up Exhibit 426-1 please? |
| 10:16AM | 16 | These are all in evidence, Judge. |
| 10:16AM | 17 | **BY MR. TRIPI:** |
| 10:16AM | 18 | Q.  Okay.  Another photo, do you recognize the people in this |
| 10:16AM | 19 | photo? |
| 10:16AM | 20 | A.  Three of them, yes. |
| 10:16AM | 21 | Q.  Who are the three you recognize? |
| 10:16AM | 22 | A.  Mr. Gerace, Mr. Bongiovanni, and I believe that's |
| 10:16AM | 23 | Mr. Bongiovanni's ex-girlfriend, M.U., I'm not sure. |
| 10:16AM | 24 | Q.  Okay.  Mr. Bongiovanni's on the far left of that photo? |
| 10:16AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:16AM | 1 | Q.  Is the defendant on the far right in the green shirt? |
| 10:16AM | 2 | A.  Yes. |
| 10:16AM | 3 | Q.  And is Mr. Bongiovanni and his girlfriend, who you |
| 10:17AM | 4 | think's name is M.U., next to him in the photo in the white |
| 10:17AM | 5 | shirt? |
| 10:17AM | 6 | A.  Yes. |
| 10:17AM | 7 | Q.  In about the year 2004, after Mr. Bongiovanni's divorce |
| 10:17AM | 8 | proceedings were underway, did he start dating a woman named |
| 10:17AM | 9 | M.U.? |
| 10:17AM | 10 | A.  Yes. |
| 10:17AM | 11 | Q.  Is that the M.U. that you're referencing in the photo? |
| 10:17AM | 12 | A.  It looks like her, yes. |
| 10:17AM | 13 | Q.  It's been a long time, right? |
| 10:17AM | 14 | A.  Yes, it's been a long time. |
| 10:17AM | 15 | **MR. TRIPI:**  Okay.  We can take that down. |
| 10:17AM | 16 | **BY MR. TRIPI:** |
| 10:17AM | 17 | Q.  As the defendant -- withdrawn. |
| 10:17AM | 18 | As Mr. Bongiovanni started dating M.U., was he spending |
| 10:17AM | 19 | money on her as well? |
| 10:17AM | 20 | A.  Yes. |
| 10:17AM | 21 | Q.  What was their social life like? |
| 10:17AM | 22 | A.  Dinners.  They traveled.  A lot of -- lot of gifts, I |
| 10:17AM | 23 | remember him telling me about. |
| 10:17AM | 24 | Q.  At a point did they get engaged? |
| 10:17AM | 25 | A.  They did. |

| | | |
|---|---|---|
| 10:17AM | 1 | Q.  Did Mr. Bongiovanni buy a wedding ring? |
| 10:18AM | 2 | A.  Yes, he did. |
| 10:18AM | 3 | Q.  Ultimately they didn't get married, right? |
| 10:18AM | 4 | A.  No, they called it off. |
| 10:18AM | 5 | Q.  Did he date Ms. M.U. roughly from 2004 to 2009; is that a |
| 10:18AM | 6 | decent estimate? |
| 10:18AM | 7 | A.  Yeah, about five years. |
| 10:18AM | 8 | Q.  I'll get into this timeline a little bit more in a |
| 10:18AM | 9 | moment, but jumping ready just slightly, after Ms. M.U., did |
| 10:18AM | 10 | Mr. Bongiovanni start dating his current wife, Lindsay? |
| 10:18AM | 11 | A.  Not immediately after, but yes, he did, yes. |
| 10:18AM | 12 | Q.  So his next relationship with someone who you can know |
| 10:18AM | 13 | the name of is -- is his wife Lindsay? |
| 10:18AM | 14 | A.  Yes. |
| 10:18AM | 15 | Q.  At that point, did Mr. Bongiovanni take on any financial |
| 10:18AM | 16 | obligations related to his then-girlfriend Lindsay in around |
| 10:19AM | 17 | the year 2009, 2010? |
| 10:19AM | 18 | A.  He did, yes. |
| 10:19AM | 19 | Q.  And what were those? |
| 10:19AM | 20 | A.  He owned a double in North Buffalo on Lovering, and she |
| 10:19AM | 21 | was actually his tenant.  And then when they started dating, |
| 10:19AM | 22 | she moved in with him.  And she had a son.  And -- enrolled |
| 10:19AM | 23 | in nursing school.  And her focus was just going to school, |
| 10:19AM | 24 | and he would take care of all the living expenses. |
| 10:19AM | 25 | Q.  So basically, to sum it up, he started paying all of |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

| | | |
|---|---|---|
| 10:19AM | 1 | Lindsay's bills? |
| 10:19AM | 2 | A.  Correct. |
| 10:19AM | 3 | Q.  And her son's living expenses? |
| 10:19AM | 4 | A.  No, I don't believe so.  The father paid child support. |
| 10:19AM | 5 | Q.  Did they -- did son live with Bongiovanni?, is the |
| 10:19AM | 6 | question. |
| 10:19AM | 7 | A.  Yes. |
| 10:19AM | 8 | Q.  Okay. |
| 10:19AM | 9 | A.  Yes. |
| 10:19AM | 10 | Q.  And did he pay for her schooling, as far as you |
| 10:19AM | 11 | understood it? |
| 10:19AM | 12 | A.  As far as I understand, he was helping her with expenses. |
| 10:19AM | 13 | Q.  Did that include school? |
| 10:20AM | 14 | A.  Yes.  At that time.  Yes. |
| 10:20AM | 15 | Q.  Okay.  When you would interact with Mr. Bongiovanni, as |
| 10:20AM | 16 | such good friends, I'm sure you talked about a number of |
| 10:20AM | 17 | different things -- |
| 10:20AM | 18 | A.  Correct. |
| 10:20AM | 19 | Q.  -- in life, right? |
| 10:20AM | 20 | A.  Yes. |
| 10:20AM | 21 | Q.  In those discussions that you'd have with him, did he |
| 10:20AM | 22 | ever talk about the concept of loyalty to his friends? |
| 10:20AM | 23 | A.  He did, yes. |
| 10:20AM | 24 | Q.  Based on your discussions with him, like, what kinds of |
| 10:20AM | 25 | things did you hear him say about loyalty? |

10:20AM    1    A.  Just integrity.  You know, trust, trustworthy.  Worried

10:20AM    2    if people were trying to hit on his girlfriend.  That type

10:20AM    3    thing.

10:20AM    4    Q.  Did he talk about being loyal to friends?

10:20AM    5    A.  Yes.

10:20AM    6    Q.  What kinds of things do you remember saying about that?

10:21AM    7    A.  Just being there for him.  You know, just being honest.

10:21AM    8    Having someone's back.

10:21AM    9    Q.  Okay.  Is that a phrase he's used with you before?

10:21AM   10    A.  Yes.

10:21AM   11    Q.  And he's used that phrase, "having your back," in the

10:21AM   12    context of you selling drugs; is that right?

10:21AM   13         MR. SOEHNLEIN:  Objection.

10:21AM   14         THE COURT:  Basis?

10:21AM   15         MR. SOEHNLEIN:  I think it runs afoul of --

10:21AM   16         MR. TRIPI:  I don't think so at all.

10:21AM   17         THE COURT:  No.  No, no.  Overruled.

10:21AM   18         THE WITNESS:  That's correct.

10:21AM   19         BY MR. TRIPI:

10:21AM   20    Q.  When he knew you were selling drugs, he said he'd have

10:21AM   21    your back?

10:21AM   22    A.  That's correct.

10:21AM   23    Q.  Was that him being loyal?

10:21AM   24    A.  Yes, sir.

10:21AM   25    Q.  That's a different type of integrity than a DEA is

USA v Gerace - Selva - Tripi/Direct - 12/13/24

22

10:21AM   1   supposed to have; would you agree?

10:21AM   2   A.   Yes.

10:21AM   3   Q.   Okay.  So when you say "integrity," you mean loyalty to

10:21AM   4   friends?

10:21AM   5   A.   That's what I meant.

10:21AM   6   Q.   Were most of Mr. Bongiovanni's friends ones like you that

10:21AM   7   he grew up with in the neighborhood and of Italian descent?

10:22AM   8   A.   Yes.

10:22AM   9          **MR. TRIPI:**  Judge, I have another area I'm going to

10:22AM   10  go into.  I do think I need to come up before I do.

10:22AM   11         **THE COURT:**  Okay.  Come up.

10:22AM   12         (Sidebar discussion held on the record.)

10:22AM   13         **MR. TRIPI:**  So I, Judge, I -- I was going to ask

10:22AM   14  about discussions about race that he had had with

10:22AM   15  Mr. Bongiovanni.

10:22AM   16         **THE COURT:**  Race?

10:22AM   17         **MR. TRIPI:**  Yeah.  You didn't let it in with the

10:22AM   18  Bongiovanni trial because the of 401/403 balancing.  I think

10:22AM   19  that balance weighs differently here.

10:22AM   20         They have a 302 where Mr. Selva has indicated he's

10:22AM   21  heard Mr. Bongiovanni say the "N" word before in the context

10:22AM   22  of, sort of, complaints about work.  And I think it's

10:22AM   23  important here because they chose to cross-examine Anthony

10:22AM   24  Casullo after having this 302 from Selva, they chose to

10:22AM   25  cross-examination Anthony Casullo about whether anyone else he

USA v Gerace - Selva - Tripi/Direct - 12/13/24

23

10:23AM   1   worked with has talked about Mr. Bongiovanni saying the "N"

10:23AM   2   word.

10:23AM   3       And so once they chose to cross-examine someone else

10:23AM   4   about whether the absence of Mr. Bongiovanni using that

10:23AM   5   language, I think it's fair for us to ask a question to

10:23AM   6   another witness who has heard that type of language to balance

10:23AM   7   out that type of cross-examination.

10:23AM   8       And so they had the 302 at -- long ago, while they

10:23AM   9   were crossing Casullo.  And so that's why I want to go into

10:23AM   10  this area.  I think the whole 401/403 balancing is much

10:23AM   11  different than the Bongiovanni trial.

10:23AM   12      **THE COURT:**  Did you -- did you cross-examine

10:23AM   13  Mr. Casullo on that?

10:23AM   14      **MR. SOEHNLEIN:**  I don't know, did you?  He did the --

10:23AM   15      **MR. FOTI:**  I cross-examined him.

10:23AM   16      **THE COURT:**  Did you cross-examine him on --

10:23AM   17      **MR. TRIPI:**  The absence of hearing him say that

10:23AM   18  anyone else saying reporting him saying the "N" word.

10:23AM   19      **THE COURT:**  Whether anyone else reported Bongiovanni

10:23AM   20  saying the "N" word.  I don't remember that question.

10:23AM   21      **MR. FOTI:**  I -- I don't remember.

10:23AM   22      **MR. COOPER:**  Either Kasprzyk or Casullo.  A question

10:24AM   23  might have -- it might have been Kasprzyk.  But the question

10:24AM   24  was asked, you never heard him use racist language, that

10:24AM   25  100,000 percent was asked on cross-examination, either

USA v Gerace - Selva - Tripi/Direct - 12/13/24

24

10:24AM   1    Kasprzyk or Casullo.  And it couldn't -- it couldn't -- I

10:24AM   2    don't think could have been Casullo, because he did hear him

10:24AM   3    use racist language.

10:24AM   4         MR. FOTI:  I -- I don't remember it.  But candidly, I

10:24AM   5    may have asked it in context of having heard him use racist

10:24AM   6    language with law enforcement, within law enforcement.

10:24AM   7         THE COURT:  So why --

10:24AM   8         MR. TRIPI:  Yeah, that's what --

10:24AM   9         THE COURT:  -- so why wouldn't you have opened the

10:24AM  10    door for him asking this witness whether he ever heard

10:24AM  11    Bongiovanni use the "N" word.

10:24AM  12         MR. FOTI:  Well, if I did ask it, Judge, I was asking

10:24AM  13    it in terms of whether like -- I was trying to establish that

10:24AM  14    it's not likely that Mr. Bongiovanni would have used that type

10:24AM  15    of language to another -- another member of law enforcement,

10:24AM  16    particularly one that he's not close with.

10:24AM  17         What we're dealing with is a conversation that they

10:24AM  18    would try to introduce related to language that he used with a

10:24AM  19    close friend.

10:24AM  20         THE COURT:  Well, yeah, but you can cross-examine on

10:24AM  21    it.

10:24AM  22         MR. SOEHNLEIN:  I'm sorry, Your Honor, just -- my

10:25AM  23    understanding is what they're trying to show is that

10:25AM  24    Bongiovanni has some affinity for people of Italian descent --

10:25AM  25         THE COURT:  Right.

10:25AM  1       **MR. SOEHNLEIN:**  -- and has some desire to protect his

10:25AM  2  friends, and some willingness to not follow DEA protocols or

10:25AM  3  DEA rules.  Which would -- which would not be something that

10:25AM  4  Selva would be privy to.  He was never in the DEA, he was

10:25AM  5  never an DEA officer, and Kasprzyk and Casullo were.  Okay?

10:25AM  6  And that's their import.

10:25AM  7       To the extent that that cross happened, I don't

10:25AM  8  recall it either.  But to the extent that it did, the import

10:25AM  9  is here he is at the DEA expressing a view that's

10:25AM  10  diametrically opposed to the law enforcement regime's mission.

10:25AM  11  Okay?

10:25AM  12       **THE COURT:**  Okay.

10:25AM  13       **MR. SOEHNLEIN:**  Selva is not privy to or part of the

10:25AM  14  DEA.  He doesn't know -- I -- I -- even if Bongiovanni's

10:25AM  15  expressing racist views outside the DEA, there's absolutely no

10:26AM  16  evidence that influenced the way he would have interacted

10:26AM  17  within the DEA.

10:26AM  18       The prejudice, however, is clear and extreme, and

10:26AM  19  almost incurable, you know, given the fact that you have

10:26AM  20  people --

10:26AM  21       **THE COURT:**  The prejudice -- the prejudice to Gerace

10:26AM  22  is clear?  Explain the prejudice to Gerace.

10:26AM  23       **MR. SOEHNLEIN:**  The prejudice to Gerace comes from

10:26AM  24  the fact that they're trying to -- the entire -- the entirety

10:26AM  25  of their direct exam on Wednesday sought to establish the

10:26AM    1    close relationship between Bongiovanni and Gerace, and that's

10:26AM    2    something that's been going on throughout the trial.

10:26AM    3        The very first exhibit they introduced was a

10:26AM    4    photograph from 2004 with Bongiovanni and Gerace, that's the

10:26AM    5    theme, that's part of the case.  They want the jurors to

10:26AM    6    believe that, in essence, Bongiovanni and Gerace are one and

10:26AM    7    the same and that, in particular, the racist comment from John

10:26AM    8    Bongiovanni, it -- not only is it highly prejudicial, but we

10:26AM    9    know that it's simply -- it's not true.

10:26AM   10        There's no evidence that Gerace has used racist

10:26AM   11    language.  And that's certainly not relevant to any of the

10:27AM   12    charges that he faces in this indictment.

10:27AM   13        And, so, I think the prejudice is very, very high,

10:27AM   14    while the probative value is extremely low.

10:27AM   15        **MR. COOPER:**  Judge, can I jump in on that?

10:27AM   16        So the reason that the cross was done, the question

10:27AM   17    was asked did you ever hear Bongiovanni use racist language,

10:27AM   18    was to attack Casullo's credibility.  That's why that question

10:27AM   19    gets asked.  Because Tony Casullo testified he said these

10:27AM   20    racist things to me.

10:27AM   21        So to cut against Casullo's credibility, they say to

10:27AM   22    a different witness:  You never heard him say racist language,

10:27AM   23    did you?  And that witness said no.

10:27AM   24        The government, I believe, has the ability -- well, I

10:27AM   25    know we have the ability, and I believe we have the right to

```
10:27AM    1   rebut that cross-examine that they chose to go down that road

10:27AM    2   by saying to a different witness:  You've heard him say racist

10:27AM    3   stuff before, right?  And that witness will say yes.

10:27AM    4        So they chose to say Tony Casullo's not credible

10:27AM    5   because nobody else ever heard Bongiovanni -- that creates an

10:27AM    6   impression in the jury's mind.

10:27AM    7        THE COURT:  You get to ask him simply:  Have you ever

10:28AM    8   heard him use the "N" word?  That's all.

10:28AM    9        MR. SOEHNLEIN:  Your Honor, may I make a suggestion?

10:28AM   10        MR. TRIPI:  Can I just ask one followup, Eric?  Can I

10:28AM   11   contextualize it, because it was a very specific context.

10:28AM   12        It was Bongiovanni sort of complaining about

10:28AM   13   situations at work.  So have you heard him about complain

10:28AM   14   about situations at work, like an arrest situation, you know,

10:28AM   15   and then he would get kind of elevated and be like that.

10:28AM   16        THE COURT:  What's your suggestion?

10:28AM   17        MR. SOEHNLEIN:  Can he just ask him have you ever

10:28AM   18   heard him use language referring to race, rather than the

10:28AM   19   specific word.

10:28AM   20        MR. TRIPI:  That's too watered down.  It's not

10:28AM   21   realistic.

10:28AM   22        MR. COOPER:  The corroboration comes -- and the

10:28AM   23   corroboration comes from the word that was used, right?

10:28AM   24        So Tony Casullo says he used the "N" word.

10:28AM   25        THE COURT:  I think you can ask that.  I think you
```

| | | |
|---|---|---|
| 10:28AM | 1 | can ask that.  And you can ask it in the context for one |
| 10:28AM | 2 | question. |
| 10:28AM | 3 | **MR. TRIPI:**  Yeah, I got you. |
| 10:28AM | 4 | **THE COURT:**  One question. |
| 10:28AM | 5 | (End of sidebar discussion.) |
| 10:28AM | 6 | **MR. TRIPI:**  Can we go up one more second, Judge?  I |
| 10:29AM | 7 | forgot. |
| 10:29AM | 8 | (Sidebar discussion held on the record.) |
| 10:29AM | 9 | **MR. TRIPI:**  Judge, I would even ask for you to give a |
| 10:29AM | 10 | limiting instruction, that it's only as to Mr. Bongiovanni's |
| 10:29AM | 11 | state of mind just to further cabin the -- any prejudice, if |
| 10:29AM | 12 | they want. |
| 10:29AM | 13 | **THE COURT:**  What do you mean? |
| 10:29AM | 14 | **MR. TRIPI:**  If Mr. Bongiovanni has ever said the "N" |
| 10:29AM | 15 | word, and the answer is yes, you can give a limiting |
| 10:29AM | 16 | instruction and say that evidence is only admitted as it |
| 10:29AM | 17 | relates to Mr. Bongiovanni's state of mind, it's not -- you |
| 10:29AM | 18 | know, if they want something like that. |
| 10:29AM | 19 | **THE COURT:**  You can think about it. |
| 10:29AM | 20 | **MR. TRIPI:**  Yeah, I just thought of it. |
| 10:29AM | 21 | **MR. SOEHNLEIN:**  Well, I -- but I want to think about |
| 10:29AM | 22 | it right now.  When would you give the limiting instruction if |
| 10:29AM | 23 | we ask for it?  Would you give it during the charge or you |
| 10:29AM | 24 | would give it -- |
| 10:29AM | 25 | **THE COURT:**  Right now. |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

29

| | | |
|---|---|---|
| 10:29AM | 1 | **MR. SOEHNLEIN:**  Can we just have one second then? |
| 10:29AM | 2 | **THE COURT:**  Yeah. |
| 10:29AM | 3 | **MR. TRIPI:**  And, Judge, obviously it would still be |
| 10:29AM | 4 | argued that him stating it corroborates Casullo, but in terms |
| 10:29AM | 5 | of -- |
| 10:29AM | 6 | **THE COURT:**  I understand.  But this relates only to |
| 10:29AM | 7 | Mr. Bongiovanni and Mr. Bongiovanni's state of mind, not |
| 10:30AM | 8 | Mr. Gerace.  It has nothing to do with Mr. Gerace. |
| 10:30AM | 9 | **MR. COOPER:**  That's fine. |
| 10:30AM | 10 | **MR. SOEHNLEIN:**  We don't want it. |
| 10:30AM | 11 | **THE COURT:**  You don't want it?  Okay. |
| 10:30AM | 12 | (End of sidebar discussion.) |
| 10:30AM | 13 | **MR. TRIPI:**  I thought we broke the huddle early, |
| 10:30AM | 14 | Judge. |
| 10:30AM | 15 | **BY MR. TRIPI:** |
| 10:30AM | 16 | Q.  Okay.  I want to just ask you a couple more questions |
| 10:30AM | 17 | about, sort of, things you discussed with Mr. Bongiovanni. |
| 10:30AM | 18 | Just limit your answers to yes or no, okay? |
| 10:30AM | 19 | A.  Okay. |
| 10:30AM | 20 | Q.  When you would talk with Bongiovanni, were there times |
| 10:30AM | 21 | when he would tell stories about work and express frustration |
| 10:30AM | 22 | about people he's arrested? |
| 10:30AM | 23 | A.  Yes. |
| 10:30AM | 24 | Q.  In that context, have you heard him use the "N" word to |
| 10:30AM | 25 | describe black people? |

| | | |
|---|---|---|
| 10:30AM | 1 | A.  Not that I recall. |
| 10:31AM | 2 | Q.  Have you heard him use the "N" word to describe black |
| 10:31AM | 3 | people? |
| 10:31AM | 4 | A.  Not that I recall, no. |
| 10:31AM | 5 | **MR. TRIPI:**  Okay.  Give me a moment. |
| 10:32AM | 6 | **MR. FOTI:**  Judge, can we approach quickly? |
| 10:32AM | 7 | **THE COURT:**  Sure, come on up. |
| 10:32AM | 8 | (Sidebar discussion held on the record.) |
| 10:32AM | 9 | **MR. FOTI:**  I think if a witness says I don't recall |
| 10:32AM | 10 | that, it's not the same as saying I don't remember whether he |
| 10:32AM | 11 | did or didn't. |
| 10:32AM | 12 | I think they're about to refresh recollection on |
| 10:32AM | 13 | something that's extremely prejudicial.  The answer he gave |
| 10:32AM | 14 | was a no. |
| 10:32AM | 15 | **MR. TRIPI:**  It was I don't recall that.  And he |
| 10:32AM | 16 | said -- he said it in a 302 in August, August 18th, 2024. |
| 10:32AM | 17 | And he said -- Selva stated Bongiovanni used racial |
| 10:32AM | 18 | slurs in conversation with Selva. |
| 10:32AM | 19 | **THE COURT:**  Racial slurs? |
| 10:32AM | 20 | **MR. TRIPI:**  And specifically referred to black |
| 10:32AM | 21 | individuals as "N" and Hispanic as "S."  And he stated those |
| 10:32AM | 22 | slurs -- bottom of 1 and going to page 2. |
| 10:33AM | 23 | **MR. SOEHNLEIN:**  What's the date on that one? |
| 10:33AM | 24 | **MR. TRIPI:**  August 18th, it's A I. |
| 10:33AM | 25 | **MR. SOEHNLEIN:**  A I? |

| | | |
|---|---|---|
| 10:33AM | 1 | **THE COURT:** Have you heard him use the "N" word to |
| 10:33AM | 2 | describe black people?  Not that I recall, no. |
| 10:33AM | 3 | **MR. TRIPI:** All right.  Well, now I'm going to |
| 10:33AM | 4 | impeach him under 607.  I can impeach him with an oral |
| 10:33AM | 5 | statement.  It doesn't come in substantively like a transcript |
| 10:33AM | 6 | would, but I can impeach him with an inconsistent statement. |
| 10:33AM | 7 | **THE COURT:** What part of it is inconsistent? |
| 10:34AM | 8 | **MR. TRIPI:** His inconsistent statement would be he |
| 10:34AM | 9 | has heard it, and he has heard him say it.  And so -- |
| 10:34AM | 10 | **THE COURT:** What -- where is the prior inconsistent |
| 10:34AM | 11 | statement?  (Inaudible). |
| 10:34AM | 12 | **MR. TRIPI:** Yeah.  When you -- when you deny knowing |
| 10:34AM | 13 | something -- |
| 10:34AM | 14 | **THE COURT:** Right. |
| 10:34AM | 15 | **MR. TRIPI:** -- that's an inconsistent statement. |
| 10:34AM | 16 | **THE COURT:** You can ask him did you tell the police, |
| 10:34AM | 17 | and if he says no, you're stuck with it. |
| 10:34AM | 18 | **MR. TRIPI:** I'm going to ask him more questions |
| 10:34AM | 19 | around this for sure. |
| 10:34AM | 20 | **THE COURT:** You're stuck with it. |
| 10:34AM | 21 | **MR. TRIPI:** Yeah. |
| 10:34AM | 22 | (End of sidebar discussion.) |
| 10:34AM | 23 | **BY MR. TRIPI:** |
| 10:34AM | 24 | Q.  Now, Mr. Selva, you've testified in two prior proceedings |
| 10:34AM | 25 | this year, correct? |

| | | |
|---|---|---|
| 10:34AM | 1 | A.  Yes, sir. |
| 10:34AM | 2 | Q.  And in between those two prior proceedings, you also sat |
| 10:34AM | 3 | down with the FBI, Special Agent Brian Burns, and others |
| 10:34AM | 4 | including myself, correct? |
| 10:34AM | 5 | A.  Correct. |
| 10:34AM | 6 | Q.  And during those meetings, you were being asked questions |
| 10:34AM | 7 | about Mr. Bongiovanni; is that right? |
| 10:34AM | 8 | A.  That's correct. |
| 10:34AM | 9 | Q.  And did you tell the FBI in one of those meetings that |
| 10:35AM | 10 | Mr. Bongiovanni used the "N" word? |
| 10:35AM | 11 | **MR. SOEHNLEIN:**  Objection. |
| 10:35AM | 12 | **THE COURT:**  Did you tell them that? |
| 10:35AM | 13 | **THE WITNESS:**  Yes, I must have, yes. |
| 10:35AM | 14 | **THE COURT:**  Well, why do you say you must have? |
| 10:35AM | 15 | **THE WITNESS:**  Because I do remember being asked the |
| 10:35AM | 16 | question, and I did say yes. |
| 10:35AM | 17 | **BY MR. TRIPI:** |
| 10:35AM | 18 | Q.  So why, a minute ago, when I asked you did you say no? |
| 10:35AM | 19 | A.  I forgot the timeframe.  I -- |
| 10:35AM | 20 | Q.  No.  I asked you ever.  Why did you say no? |
| 10:35AM | 21 | A.  I don't know.  I was wrong. |
| 10:35AM | 22 | Q.  Were you being honest a minute ago?  Or were you playing |
| 10:35AM | 23 | games? |
| 10:35AM | 24 | **THE COURT:**  Let's move on.  Let's move on.  Let's |
| 10:35AM | 25 | move on. |

10:35AM    1              THE WITNESS:  No, I made a mistake.

10:35AM    2              THE COURT:  Next question.

10:35AM    3              MR. TRIPI:  All right.  So, I need a clear answer to

10:35AM    4    that, I don't think I got one.

10:35AM    5              THE COURT:  No, you got the answer, Mr. Tripi.  Let's

10:35AM    6    move on.  We're gonna go to another area.

10:35AM    7              Next question.

10:35AM    8              BY MR. TRIPI:

10:36AM    9    Q.  All right.  Does Mr. Gerace own a bar you're aware of?

10:36AM   10    A.  Yes.

10:36AM   11    Q.  What bar is that?

10:36AM   12    A.  Pharaoh's nightclub.

10:36AM   13    Q.  What kind of bar is that?

10:36AM   14    A.  It's a strip club.

10:36AM   15    Q.  Have you been there with Mr. Bongiovanni?

10:36AM   16    A.  I have.

10:36AM   17    Q.  During what timeframe?

10:36AM   18    A.  Right when Mr. Gerace had taken it back over.  I believe

10:36AM   19    there was a falling out he had, and he was now the sole

10:36AM   20    owner.

10:36AM   21    Q.  Was that in the 2014 timeframe?

10:36AM   22    A.  I believe so.  2014, '15.

10:36AM   23    Q.  Do you remember specifically?

10:36AM   24    A.  I don't, but it was that timeframe.

10:37AM   25              MR. TRIPI:  For the witness only, can we pull up

10:37AM    1    Exhibit 3540U.  And I'm going to direct his attention to

10:37AM    2    page 5.

10:37AM    3             **BY MR. TRIPI:**

10:37AM    4    Q.  I'm going to see if we can refresh your recollection as

10:37AM    5    to the timeframe, okay?

10:37AM    6    A.  Okay.

10:37AM    7    Q.  Read that to yourself, and when you're done let me know

10:37AM    8    you've read it.

10:37AM    9             **MR. TRIPI:**  Can we zoom in on that, Ms. Champoux, so

10:37AM   10    it's larger for him, please?

10:37AM   11             **THE WITNESS:**  Okay.

10:37AM   12             **BY MR. TRIPI:**

10:37AM   13    Q.  Did that refresh your recollection as to the timeframe?

10:37AM   14    A.  Yes, sir.

10:37AM   15    Q.  What was the approximate timeframe when you went to

10:37AM   16    Pharaoh's with Mr. Bongiovanni?

10:38AM   17    A.  It was around 2013, 2014.

10:38AM   18    Q.  And that's an estimate?

10:38AM   19    A.  That's an estimate, yes.

10:38AM   20    Q.  How many times did you go there?

10:38AM   21    A.  Twice.

10:38AM   22    Q.  On one of those occasions, was there an interaction

10:38AM   23    between Mr. Bongiovanni and Mr. Gerace?

10:38AM   24    A.  Yes.

10:38AM   25    Q.  What was that?  Describe that interaction for the jury.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

35

10:38AM    1    A.  We had went to Pharaoh's.  We were at the bar having a

10:38AM    2    drink.  Mr. Gerace came in, he said hello, and then they

10:38AM    3    stepped aside and had a two- to three-minute, five-minute

10:38AM    4    conversation, whatever it was.

10:38AM    5    Q.  Did they -- was that a one-on-one conversation between

10:38AM    6    Mr. Bongiovanni and Gerace?

10:38AM    7    A.  Yes, they just talked privately.

10:38AM    8    Q.  That was my next question.  Did it appear to be a private

10:38AM    9    conversation between the two of them?

10:38AM   10    A.  It did.

10:38AM   11    Q.  Were you able to hear what they were saying?

10:39AM   12    A.  No, it was loud in there and I was not --

10:39AM   13    Q.  How far did they step away from you?

10:39AM   14    A.  I was in the middle.  To the right, maybe.

10:39AM   15    Q.  Did they go to, like, the end of the bar?

10:39AM   16    A.  To the end of the bar.

10:39AM   17    Q.  When Mr. Bongiovanni -- did he come back over to you

10:39AM   18    then?

10:39AM   19    A.  He did.

10:39AM   20    Q.  Did he tell you anything about what he and Mr. Gerace

10:39AM   21    discussed?

10:39AM   22    A.  No.  No.

10:39AM   23    Q.  Now, your phone number up until the day that your house

10:39AM   24    was searched on August 23rd, 2019, was it 716-903-1654?

10:39AM   25    A.  Yes.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

36

| | | |
|---|---|---|
| 10:39AM | 1 | Q.  Okay. |
| 10:39AM | 2 | **MR. TRIPI:**  Ms. Champoux, can we please pull up |
| 10:39AM | 3 | Government Exhibit 358, please. |
| 10:39AM | 4 | There's going to be some phone records I want you to |
| 10:39AM | 5 | look at. |
| 10:40AM | 6 | **THE WITNESS:**  Okay. |
| 10:40AM | 7 | **MR. TRIPI:**  Can you expand it so I can see that |
| 10:40AM | 8 | better?  Can we move on to Exhibit 359?  Sorry. |
| 10:40AM | 9 | Okay.  Within Exhibit 359, can you open the PDF |
| 10:40AM | 10 | labeled billed calls 2012, 2013. |
| 10:40AM | 11 | **BY MR. TRIPI:** |
| 10:40AM | 12 | Q.  All right.  First I'd like to go to -- here we go. |
| 10:40AM | 13 | Do you see on -- I'm showing you page 911 at the bottom |
| 10:40AM | 14 | of the screen, it might be 912. |
| 10:40AM | 15 | Do you see that's a Verizon wireless detail for Peter |
| 10:40AM | 16 | Gerace, 716-725-1931? |
| 10:40AM | 17 | A.  Yes. |
| 10:40AM | 18 | Q.  Okay.  Do you see above that, May 24th? |
| 10:41AM | 19 | A.  Yes. |
| 10:41AM | 20 | Q.  Is that your phone number, 716-903-1654? |
| 10:41AM | 21 | A.  Yes. |
| 10:41AM | 22 | Q.  And do you see incoming call? |
| 10:41AM | 23 | A.  Yes. |
| 10:41AM | 24 | Q.  Now, you've worked in the wireless industry yourself, |
| 10:41AM | 25 | correct? |

| | | |
|---|---|---|
| 10:41AM | 1 | A.  Correct. |
| 10:41AM | 2 | Q.  You're familiar with billed call records? |
| 10:41AM | 3 | A.  Correct. |
| 10:41AM | 4 | Q.  So does that indicate there was an incoming call from |
| 10:41AM | 5 | Mr. Gerace to you on May 24th in the year of 2013? |
| 10:41AM | 6 | A.  Yes. |
| 10:41AM | 7 | Q.  Okay.  I'd like to go through some, this was on page 911 |
| 10:41AM | 8 | of the exhibit.  I'd like to go to page 1102. |
| 10:41AM | 9 | Okay.  I'd like to direct your attention to an entry on |
| 10:41AM | 10 | October 1st at 9:07 a.m., right here. |
| 10:42AM | 11 | A.  Yes. |
| 10:42AM | 12 | Q.  Does that indicate that at 9:07 a.m. you called |
| 10:42AM | 13 | Mr. Gerace for 11 minutes? |
| 10:42AM | 14 | A.  Yes. |
| 10:42AM | 15 | Q.  I think I misspoke on the prior one.  They're Peter's |
| 10:42AM | 16 | records.  Where it says "incoming," that would mean you |
| 10:42AM | 17 | called him, right? |
| 10:42AM | 18 | A.  Yes. |
| 10:42AM | 19 | Q.  Okay.  And then when it doesn't say incoming, that would |
| 10:42AM | 20 | be an indication that he called you? |
| 10:42AM | 21 | A.  Correct. |
| 10:42AM | 22 | Q.  Okay.  So I think I misspoke on the prior one. |
| 10:42AM | 23 | But on this entry, October 1st, 9:07 a.m.  Was that your |
| 10:42AM | 24 | phone number, 716-903-1654? |
| 10:42AM | 25 | A.  Yes, it is. |

| | | |
|---|---|---|
| 10:42AM | 1 | Q.  Does that indicate he made an outgoing call to you for |
| 10:43AM | 2 | 11 minutes? |
| 10:43AM | 3 | A.  Yes. |
| 10:43AM | 4 | Q.  I'd like to move down to 9:24 that same day.  Do you see |
| 10:43AM | 5 | that there? |
| 10:43AM | 6 | A.  Yes. |
| 10:43AM | 7 | Q.  Is that another call for five minutes? |
| 10:43AM | 8 | A.  Yes. |
| 10:43AM | 9 | Q.  Is that, again, from your number to Mr. Gerace? |
| 10:43AM | 10 | A.  Yes. |
| 10:43AM | 11 | Q.  Okay.  Let's go to page 1104.  And I'm looking at calls |
| 10:43AM | 12 | at 6:34, 6:42, and 6:56. |
| 10:43AM | 13 | So beginning the 6:32 p.m. call -- |
| 10:43AM | 14 | **MR. TRIPI:**  The one right above that, actually.  Next |
| 10:43AM | 15 | one down.  Sorry, you were right. |
| 10:43AM | 16 | **BY MR. TRIPI:** |
| 10:43AM | 17 | Q.  6:34 p.m., is that another indication of your phone |
| 10:43AM | 18 | number being called by Mr. Gerace? |
| 10:43AM | 19 | A.  Yes. |
| 10:43AM | 20 | Q.  Okay.  6:42 p.m., more call activity, this time you |
| 10:44AM | 21 | calling Mr. Gerace? |
| 10:44AM | 22 | A.  Yes. |
| 10:44AM | 23 | Q.  Let's go to 6:56 p.m.  Is that an outgoing call from |
| 10:44AM | 24 | Mr. Gerace to you? |
| 10:44AM | 25 | A.  Yes. |

USA v Gerace - Selva - Tripi/Direct - 12/13/24
39

10:44AM   1   Q.  Let's go to October 9th.  It's going to be page 1122 at

10:44AM   2   12:59 p.m.  Would that be an outgoing call from Mr. Gerace to

10:44AM   3   you?

10:44AM   4   A.  Yes.

10:44AM   5   Q.  Let's go to 3:07 p.m. that same day.  Would that be

10:44AM   6   another outgoing call from Mr. Gerace to you?

10:44AM   7   A.  Yes.

10:44AM   8   Q.  Let's go to 3:40 p.m. that same day.  Now on page 1123 of

10:44AM   9   the exhibit, were there two sort of back-to-back calls at

10:44AM  10   3:40 and 3:43 both incoming to Mr. Gerace from you?

10:45AM  11   A.  There were, yes.

10:45AM  12   Q.  Let's go to page 1131, and a call October 15th at

10:45AM  13   8:47 a.m.  Is that on outgoing call from you to Mr. Gerace?

10:45AM  14   A.  Yes.

10:45AM  15   Q.  Let's go to 9:13 a.m.  Outgoing call from Mr. Gerace to

10:45AM  16   you?

10:45AM  17   A.  Yes.

10:45AM  18          MR. TRIPI:  Let's go to page 1132, please.

10:45AM  19          BY MR. TRIPI:

10:45AM  20   Q.  Is there another call at 5:45 p.m.?

10:45AM  21   A.  Yes, there is.

10:45AM  22   Q.  Is that a call from Mr. Gerace to you for about two

10:45AM  23   minutes?

10:45AM  24   A.  Yes.

10:45AM  25   Q.  Let's go to page -- October 16th at 9:35 a.m., page 1133.

10:46AM  1   Is that an indication of a call from Mr. Gerace to you?

10:46AM  2   A.   Yes.

10:46AM  3   Q.   Let's go to page 1134 beginning at 4:52 p.m. on

10:46AM  4   October 16th.  October 16th from 4:52 p.m. to the call 5:53.

10:46AM  5   Is there a series of incoming calls from you to Mr. Gerace?

10:46AM  6   A.   Yes.

10:46AM  7   Q.   How many of them do you see there?

10:46AM  8   A.   Five.

10:46AM  9   Q.   Okay.  And then we see page 1134, October 17th at

10:46AM  10  9:37 a.m.  Is that an incoming call from Mr. Gerace to you on

10:47AM  11  that date and time?

10:47AM  12  A.   Yes.

10:47AM  13          **MR. TRIPI:**  Ms. Champoux, can we go to the 2014, 2015

10:47AM  14  PDF of this exhibit.  And can we go to page 573.  And if we

10:47AM  15  can go to 11/14/2014 at 6:28 p.m.

10:47AM  16          **BY MR. TRIPI:**

10:47AM  17  Q.   Is there an incoming call on that date from you to

10:47AM  18  Mr. Gerace for about two minutes?

10:47AM  19  A.   Yes.

10:47AM  20  Q.   Okay.  Now, during -- during that timeframe, were you

10:48AM  21  involved in marijuana distribution activity?

10:48AM  22  A.   Yes.

10:48AM  23  Q.   At some point, did the defendant's younger brother,

10:48AM  24  Anthony Gerace, become involved with you and the individuals

10:48AM  25  you were selling marijuana with?

| | | |
|---|---|---|
| 10:48AM | 1 | A.  Yes. |
| 10:48AM | 2 | **MR. TRIPI:**  You can take that down. |
| 10:48AM | 3 | **BY MR. TRIPI:** |
| 10:48AM | 4 | Q.  What's the defendant's younger brother's name who became |
| 10:48AM | 5 | involved in the group you were involved in? |
| 10:48AM | 6 | A.  Anthony. |
| 10:48AM | 7 | Q.  Sometime around -- I want to go backwards a little bit. |
| 10:49AM | 8 | Sometime around 2009 -- withdrawn. |
| 10:49AM | 9 | Was there ever a time when Mr. Bongiovanni, while a DEA |
| 10:49AM | 10 | agent and while he knew you were involved in marijuana, told |
| 10:49AM | 11 | you about a situation where he helped this defendant out with |
| 10:49AM | 12 | U.S. Probation? |
| 10:49AM | 13 | A.  Yes. |
| 10:49AM | 14 | Q.  What did Mr. Bongiovanni say? |
| 10:49AM | 15 | **MR. SOEHNLEIN:**  Objection. |
| 10:49AM | 16 | **THE COURT:**  Didn't we argue this? |
| 10:49AM | 17 | **MR. TRIPI:**  Yeah, do you want to -- |
| 10:49AM | 18 | **THE COURT:**  Yeah, come on up. |
| 10:49AM | 19 | (Sidebar discussion held on the record.) |
| 10:49AM | 20 | **MR. TRIPI:**  Can I just chime in?  The thing that was |
| 10:49AM | 21 | held out, and sorry to bring this up earlier, the thing that |
| 10:49AM | 22 | was held out and sort of left open was the unavailability, and |
| 10:49AM | 23 | you had asked us to follow up with Mr. Singer and Mr. MacKay, |
| 10:50AM | 24 | and we did that.  And then we emailed chambers yesterday that |
| 10:50AM | 25 | Bongiovanni would, in fact, invoke the Fifth Amendment if |

10:50AM    1    called at this trial.  And so that was, sort of, out there

10:50AM    2    still.

10:50AM    3            And so in my mind, Judge, once I had that, I thought

10:50AM    4    I was okay to proceed.  So I apologize for not flagging it for

10:50AM    5    these guys.

10:50AM    6        THE COURT:  Me, too.  I remember seeing the email,

10:50AM    7    and so that's --

10:50AM    8        MR. TRIPI:  Yeah.

10:50AM    9        THE COURT:  -- what I thought.

10:50AM    10        MR. SOEHNLEIN:  And so, I mean, that's part of it.

10:50AM    11    Part of it, too, is we're preserving our record around all

10:50AM    12    these things.

10:50AM    13        THE COURT:  Of course.  No, no, no, of course.  I

10:50AM    14    just was forgetting that we had put on the record that he's

10:50AM    15    unavailable.  But you're right, I did say only if he's

10:50AM    16    unavailable.

10:50AM    17        MR. SOEHNLEIN:  And now candid --

10:50AM    18        THE COURT:  Do you have a further objection?  If he's

10:50AM    19    unavailable, do you have a further objection?

10:50AM    20        MR. FOTI:  Yes, Judge.  The rules, the Federal Rules

10:50AM    21    of Evidence I think were just amended December 1st, and it was

10:50AM    22    actually the unavailable -- a declarant from an unavailable

10:51AM    23    witness was amended, I think that the Court's still supposed

10:51AM    24    to consider the totality of the circumstances, including

10:51AM    25    whether there's any corroboration related to it.

10:51AM   1           I -- I -- I think that it's not dispositive of

10:51AM   2   whether it's a statement against penal interests if the

10:51AM   3   witness is unavailable, there's still a sort of general

10:51AM   4   consideration of whether it's fair to let the evidence in.

10:51AM   5           **MR. SOEHNLEIN:**  And, Your Honor --

10:51AM   6           **MR. COOPER:**  Judge, there's tons of corroboration

10:51AM   7   here.  Bongiovanni calls Pete Lepiane.  Pete has written

10:51AM   8   reports about conversations saying Bongiovanni is interceding

10:51AM   9   on Gerace's behalf saying he's a source of information.

10:51AM   10  Bongiovanni writes a DEA-6 report corroborating this testimony

10:51AM   11  saying Peter Gerace called me and told me he got in trouble

10:51AM   12  with probation.

10:51AM   13          There's a world of corroboration.

10:51AM   14          **THE COURT:**  Tell me -- tell me, the rule has been

10:52AM   15  amended.  Tell me about the amendment.

10:52AM   16          **MR. FOTI:**  So, I -- if you -- Judge, I can pull up

10:52AM   17  the change.  But Peter Lepiane also said that nothing

10:52AM   18  Mr. Bongiovanni did had any impact.

10:52AM   19          **THE COURT:**  Tell me -- tell me rule.

10:52AM   20          **MR. FOTI:**  I should have -- I should have had it

10:52AM   21  ready knowing that this was going to come up, but I -- if you

10:52AM   22  give me one second, I'll --

10:52AM   23          **MR. TRIPI:**  While he's looking for that.

10:52AM   24          **THE COURT:**  Why don't we take a break.

10:52AM   25          **MR. TRIPI:**  Sure.

```
10:52AM    1              THE COURT:  I've got the 11:00.  Look at it, we'll
10:52AM    2    come back in a few minutes.
10:52AM    3              MR. FOTI:  Yeah.
10:52AM    4              THE COURT:  It's almost 11:00, take the break and
10:52AM    5    come back.
10:52AM    6              MR. TRIPI:  Sounds good.
10:52AM    7              MR. FOTI:  Thanks.
10:52AM    8              (Sidebar discussion ended.)
10:52AM    9              THE COURT:  Okay.  Folks, we have this legal matter
10:52AM   10    we need to handle, and I also have another matter that I'm
10:52AM   11    doing by Zoom at 11:00, so we're going to take a break now.
10:53AM   12    Probably about 20 minutes or so.
10:53AM   13              Please remember my instructions.  Don't talk about
10:53AM   14    the case, even with each other, and don't make up your mind.
10:53AM   15              And we'll see you back here shortly after 11.
10:53AM   16              (Jury excused at 10:53 a.m.)
10:54AM   17              THE COURT:  Okay.  Mr. Selva, again, you're not to
10:54AM   18    talk to anybody about your testimony during the break.  Okay?
10:54AM   19    Except your lawyer.
10:54AM   20              Anything we need to do before we break?
10:54AM   21              MR. TRIPI:  No, Judge.
10:54AM   22              THE COURT:  Anything from the defense?
10:54AM   23              MR. FOTI:  No.
10:54AM   24              THE CLERK:  All rise.
10:54AM   25              (Off the record at 10:54 a.m.)
```

| | | |
|---|---|---|
| 11:20AM | 1 | (Back on the record at 11:20 a.m.) |
| 11:20AM | 2 | (Jury not present.) |
| 11:20AM | 3 | **THE CLERK:**  All rise. |
| 11:20AM | 4 | **THE COURT:**  Please be seated. |
| 11:20AM | 5 | **THE CLERK:**  We are back on the record for the |
| 11:20AM | 6 | continuation of the jury trial in case numbers 19-cr-227 and |
| 11:20AM | 7 | 23-cr-37, United States of America versus Peter Gerace Jr. |
| 11:20AM | 8 | All counsel and parties are present. |
| 11:20AM | 9 | **THE COURT:**  Okay.  Nothing's ever easy.  That |
| 11:20AM | 10 | telephone conference or Zoom conference took longer than I |
| 11:20AM | 11 | expected, and I apologize. |
| 11:20AM | 12 | So on the impeachment with the prior inconsistent |
| 11:20AM | 13 | statement that was not under oath, I think I need to give the |
| 11:20AM | 14 | jury a curative instruction on that that it's not being |
| 11:20AM | 15 | admitted for the truth of the matter, it's being admitted only |
| 11:20AM | 16 | as to the witness's credibility.  Because it was not under |
| 11:20AM | 17 | oath. |
| 11:20AM | 18 | If it's under oath, it can be admitted substantively. |
| 11:20AM | 19 | If it's not under oath, it can only be admitted to impeach. |
| 11:20AM | 20 | **MR. TRIPI:**  Which -- which statement are we talking |
| 11:20AM | 21 | about, Judge? |
| 11:20AM | 22 | **THE COURT:**  We're talking about the "N" and "S." |
| 11:21AM | 23 | Bongiovanni's "N" and "S." |
| 11:21AM | 24 | **MR. TRIPI:**  Judge, I thought by the time we got there |
| 11:21AM | 25 | that that -- that that was -- his recollection was refreshed |

11:21AM    1    essentially.

11:21AM    2        **THE COURT:**  No, I don't think so.  I think you

11:21AM    3    impeached him with a prior inconsistent statement, and the

11:21AM    4    inconsistent statement was not under oath.  And so under --

11:21AM    5    under rule -- whatever it is, 80 -- 801, if it's under oath,

11:21AM    6    it comes in substantively, if it's not under oath it comes in

11:21AM    7    as -- and he may have -- and he may have said in addition to

11:21AM    8    that, that -- he may have changed his answer to the -- to the

11:21AM    9    question.

11:21AM   10        **MR. TRIPI:**  That's my understanding of the testimony.

11:21AM   11        **THE COURT:**  Fine.

11:21AM   12        **MR. TRIPI:**  Okay.

11:21AM   13        **THE COURT:**  But I do think that we do the curative

11:21AM   14    instruction.

11:21AM   15        **MR. FOTI:**  Yeah.  And I think he -- I could be wrong,

11:21AM   16    I think he said yes, I remember being asked -- me talking

11:21AM   17    about that.  I don't think he changed, I think it was just

11:21AM   18    strictly in context of impeachment.

11:22AM   19        **THE COURT:**  No, no.

11:22AM   20        **MR. TRIPI:**  I do want an opportunity then, I

11:22AM   21    understand the curative instruction.  But if there's some

11:22AM   22    ambiguity, I want an opportunity to circle back.  Because now

11:22AM   23    he's acknowledged he said it in a prior situation, I want to

11:22AM   24    now make it clear that that's his testimony in court if that

11:22AM   25    has now refreshed his recollection.  I thought that that

11:22AM    1    became -- it became bifurcated during the exchange, and so I

11:22AM    2    don't want to run afoul of the Court telling me to move on,

11:22AM    3    but if there's some ambiguity there, I want it clear so that

11:22AM    4    when Mr. Cooper is arguing that it also impacts the

11:22AM    5    credibility of another witness --

11:22AM    6         **THE COURT:**  Let's take a look.

11:22AM    7         **MR. TRIPI:**  Okay.

11:22AM    8         **THE COURT:**  Let's take a look.

11:23AM    9         Annie, do you know where it is?

11:23AM   10         **MR. TRIPI:**  That exchange with Mr. Selva after the

11:23AM   11    conference at the bench regarding the N word.

11:23AM   12         **THE COURT:**  Okay.  I got it.  Yeah, he does say I was

11:23AM   13    wrong.

11:23AM   14         **MR. TRIPI:**  Mr. Cooper is free to then make that

11:23AM   15    argument as it relates to credibility that Mr. Bongiovanni has

11:23AM   16    said it before.

11:23AM   17         **THE COURT:**  I think that's probably right, but so

11:23AM   18    think I still give the curative instruction.

11:23AM   19         **MR. TRIPI:**  I think that's fine, Judge.  But I don't

11:23AM   20    want you to then --

11:23AM   21         **THE COURT:**  No, I'm not.

11:23AM   22         **MR. TRIPI:**  -- hamstring Mr. Cooper when he's trying

11:23AM   23    to argue it later.

11:23AM   24         **THE COURT:**  I'm not going to preclude him.  And I

11:23AM   25    think the defense can argue that he was equivocal or whatever,

USA v Gerace - Selva - Tripi/Direct - 12/13/24

| | | |
|---|---|---|
| 11:23AM | 1 | and the jury can remember what it remembers. |
| 11:23AM | 2 | **MR. TRIPI:**  That's fine. |
| 11:23AM | 3 | **THE COURT:**  But I do think I need to give the |
| 11:23AM | 4 | curative instruction, because the impeachment with a prior |
| 11:23AM | 5 | inconsistent statement was with a prior inconsistent statement |
| 11:23AM | 6 | that was not under oath.  Okay? |
| 11:24AM | 7 | **MR. TRIPI:**  I understand that. |
| 11:24AM | 8 | **THE COURT:**  Okay.  Good. |
| 11:24AM | 9 | Mr. Foti, did you find the new rule? |
| 11:24AM | 10 | **MR. FOTI:**  Yeah.  Yes, Judge.  And I apologize for |
| 11:24AM | 11 | not having it ready earlier. |
| 11:24AM | 12 | **THE COURT:**  No, that's okay. |
| 11:24AM | 13 | **MR. FOTI:**  I said two days ago when something goes |
| 11:24AM | 14 | wrong, it's me.  And that's once again the case. |
| 11:24AM | 15 | **MR. SOEHNLEIN:**  That's not true, Judge. |
| 11:24AM | 16 | **MR. FOTI:**  Rule 804(b)(3)(B) -- |
| 11:24AM | 17 | **THE COURT:**  Okay.  Hang on.  Let me find the old |
| 11:24AM | 18 | version, which I think I have here -- |
| 11:24AM | 19 | **MR. FOTI:**  Sure. |
| 11:24AM | 20 | **THE COURT:**  -- at my desk.  804 -- |
| 11:24AM | 21 | **MR. FOTI:**  (b), which is the exceptions. |
| 11:24AM | 22 | Then subdivision (3) is statements against interests. |
| 11:24AM | 23 | **THE COURT:**  Yep. |
| 11:24AM | 24 | **MR. FOTI:**  And then sub (B) under that is -- |
| 11:24AM | 25 | **THE COURT:**  Yep. |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

49

11:24AM    1    **MR. FOTI:** -- the portion that was -- was amended

11:24AM    2    about two weeks ago.

11:24AM    3        The amended version of the rule reads:  If offered in

11:24AM    4    a criminal case, as one that tends to expose the declarant to

11:24AM    5    criminal liability is supported by corroborating circumstances

11:24AM    6    that clearly indicate its trustworthiness --

11:25AM    7        And then this is where there's a modification.

11:25AM    8        -- after considering the totality of circumstances

11:25AM    9    under which it was made and any evidence that supports or

11:25AM   10    undermines it.

11:25AM   11        So, it's -- it's specific.  It just sort of clears up

11:25AM   12    language that the Court before admitting an unavailable

11:25AM   13    witness in a statement of -- against penal interests, there is

11:25AM   14    this additional consideration of the totality of the

11:25AM   15    circumstances.  And the totality of circumstances is language

11:25AM   16    that was specifically added, and --

11:25AM   17        **THE COURT:**  So tell me why the totality of the

11:25AM   18    circumstances should change this.

11:25AM   19        **MR. FOTI:**  So there's been a rule that says the

11:25AM   20    Court's to consider evidence including evidence that

11:25AM   21    undermines the statement.

11:25AM   22        **THE COURT:**  Yeah.

11:25AM   23        **MR. FOTI:**  The evidence that undermines the

11:25AM   24    statement, the statement is Mr. Lepiane was just cited by the

11:25AM   25    government as corroborating evidence, but that's -- that's not

11:25AM    1    my recollection.

11:25AM    2            My recollection is Mr. Lepiane, at trial, consistent

11:25AM    3    the prior statements he's made, has always been consistent

11:26AM    4    that Mr. Bongiovanni had no impact on Mr. Gerace.  He didn't

11:26AM    5    get him out of trouble, he didn't help him, he didn't have any

11:26AM    6    impact on the decision that was made of how to impose a

11:26AM    7    sanction.

11:26AM    8            **THE COURT:**  Okay.  So what's the question you want to

11:26AM    9    ask, Mr. Tripi?

11:26AM    10           **MR. COOPER:**  Judge, can I just respond briefly to

11:26AM    11   that?  It's not the right analysis about whether it impacted

11:26AM    12   Lepiane or not.  What matters is was Bongiovanni trying to

11:26AM    13   impact Mr. Lepiane.

11:26AM    14           **THE COURT:**  Mr. Cooper, I -- if you let me do it my

11:26AM    15   way, I know that.  I -- I -- I recognize that.  Which is why I

11:26AM    16   asked Mr. Tripi what's the question he wants to ask.

11:26AM    17           **MR. TRIPI:**  I just want to get it right.

11:26AM    18           **THE COURT:**  Because the question he asks is did he

11:26AM    19   intervene in a way that helped Mr. Gerace, that may be a

11:26AM    20   different analysis than did he intervene to help Mr. Gerace.

11:26AM    21           **MR. TRIPI:**  I think the question I asked, as least as

11:26AM    22   I have it written here, is -- but I think this is what I

11:26AM    23   asked, is:  What, if anything, did the defendant ever tell you

11:26AM    24   about Peter Gerace, Pharaoh's, and a situation involving

11:26AM    25   U.S. Probation?

11:26AM    1            Just to focus him on that.

11:26AM    2            So, it was a broad question.  What did

11:27AM    3    Mr. Bongiovanni tell you.  And I anticipate the response will

11:27AM    4    be, in sum and substance, he -- at the prior trial, he

11:27AM    5    testified, he told me Peter got violated, he stepped in to

11:27AM    6    help him with U.S. Probation.

11:27AM    7            In a prior -- in a prior report, the way he -- at

11:27AM    8    least it's documented him saying is he helped Peter stay out

11:27AM    9    of jail when he got in trouble with probation.

11:27AM   10            So there's some variation in the two ways he

11:27AM   11    described it.

11:27AM   12        **THE COURT:**  Helped him stay out of jail may be

11:27AM   13    different.

11:27AM   14        **MR. TRIPI:**  Yeah.

11:27AM   15        **THE COURT:**  Yeah.

11:27AM   16        **MR. TRIPI:**  So I don't know what exact verbiage we're

11:27AM   17    gonna get here, but I -- I think that's the range of answers.

11:27AM   18        **THE COURT:**  Well, do you want to try to lead a little

11:27AM   19    bit?

11:27AM   20        **MR. TRIPI:**  Sure, I can do that, Judge.

11:27AM   21            And I just think that to the extent the rule changed

11:27AM   22    a week ago, I don't think that changed the rule in the

11:27AM   23    2nd Circuit.

11:27AM   24        **THE COURT:**  Well, I don't think it -- it does not

11:27AM   25    change my analysis here.

11:27AM    1           **MR. TRIPI:**  Okay.

11:27AM    2           **THE COURT:**  I mean, it -- it -- it fine tunes my

11:27AM    3    analysis here --

11:27AM    4           **MR. TRIPI:**  Yeah.

11:27AM    5           **THE COURT:**  -- but it doesn't cause me to reach a

11:27AM    6    different conclusion.  I understand what you're saying.

11:28AM    7           **MR. FOTI:**  Well, and I'm generally -- I think I'm on

11:28AM    8    the same page, as well.  I think if the answer is about

11:28AM    9    Mr. Bongiovanni attempted to intervene in some way, I do think

11:28AM   10    the evidence corroborates the point that there was some

11:28AM   11    intervention.

11:28AM   12           **THE COURT:**  Yeah, great.

11:28AM   13           **MR. FOTI:**  But it's different from --

11:28AM   14           **THE COURT:**  Did it work?

11:28AM   15           **MR. FOTI:**  Yeah.  Did he -- did he help him stay out

11:28AM   16    of jail is a different thing.

11:28AM   17           **THE COURT:**  Yeah.  And I don't think either -- and I

11:28AM   18    don't think anyone's trying to get there.

11:28AM   19           **MR. TRIPI:**  I may not have written the whole quote

11:28AM   20    from the prior trial, because I have some dot dot dots.  So,

11:28AM   21    but --

11:28AM   22           Ms. Champoux, can we pull up -- just for -- just so

11:28AM   23    we can see what it was?

11:28AM   24           **THE COURT:**  Go ahead.

11:28AM   25           **MR. TRIPI:**  I want to be -- can we pull up 3540AG at

11:28AM    1    page 72, just because I didn't write the full quote from the

11:28AM    2    trial in my notes here.  Just so we can see what he said at

11:28AM    3    the prior trial.

11:28AM    4         All right.  What, if anything, did the defendant ever

11:29AM    5    tell you about Gerace, Pharaoh's nightclub, and --

11:29AM    6         So it's the exact same question I asked at the last

11:29AM    7    trial.

11:29AM    8         His full answer was:  He told me that Peter had

11:29AM    9    gotten violated, something had happened at the club, and

11:29AM   10    he stepped in to help him out.  He reached out, I believe, to

11:29AM   11    probation.  And I believe Peter was looking at going back

11:29AM   12    to -- he was released from federal custody, I believe he did

11:29AM   13    four months or whatever.

11:29AM   14         It was six months, so I'll have to curate that a

11:29AM   15    little bit.

11:29AM   16         **THE COURT:**  Yeah.  So why don't you just ask him the

11:29AM   17    first part of it.  You know, did he tell you about the fact --

11:29AM   18    that first question.  And then follow up with, did he tell you

11:29AM   19    that he intervened to help him when he got violated by

11:29AM   20    probation?  Something like that.

11:29AM   21         **MR. SOEHNLEIN:**  That's -- I think that's fine with

11:29AM   22    us, Judge.

11:29AM   23         **THE COURT:**  Okay.

11:29AM   24         **MR. SOEHNLEIN:**  But as long as we're here, I sense

11:29AM   25    that the next question then is going to be about the Anthony

| | | |
|---|---|---|
| 11:29AM | 1 | Gerace comment, which I think there's a different analysis in |
| 11:29AM | 2 | terms of totality of the circumstances than with -- with |
| 11:30AM | 3 | respect to the Peter Gerace. |
| 11:30AM | 4 | THE COURT:  What's the Anthony Gerace question? |
| 11:30AM | 5 | MR. TRIPI:  Have you ever discussed with Bongiovanni |
| 11:30AM | 6 | any assistance he provided Anthony Gerace to get out of |
| 11:30AM | 7 | trouble. |
| 11:30AM | 8 | And he's going to explain yes, that -- that Peter |
| 11:30AM | 9 | asked -- Bongiovanni said Peter asked him to essentially step |
| 11:30AM | 10 | in when Anthony got in trouble with the Amherst Police |
| 11:30AM | 11 | Department. |
| 11:30AM | 12 | MR. SOEHNLEIN:  I -- |
| 11:30AM | 13 | MR. FOTI:  Judge, my understanding is there's not |
| 11:30AM | 14 | really any corroboration of that at all.  Not just in this |
| 11:30AM | 15 | trial, but in general.  And part of this -- |
| 11:30AM | 16 | THE COURT:  Well, but it doesn't have to |
| 11:30AM | 17 | corroboration, does there?  It's -- the question -- the rule |
| 11:30AM | 18 | that you just read to me says is there -- considering the |
| 11:30AM | 19 | totality of the circumstances, is it -- is it reliable, and is |
| 11:30AM | 20 | there any reason to doubt it. |
| 11:30AM | 21 | MR. FOTI:  Yeah. |
| 11:30AM | 22 | THE COURT:  What reason do I have to doubt it? |
| 11:30AM | 23 | MR. FOTI:  An arrest of Mr. Gerace at the Amherst |
| 11:31AM | 24 | Police Department is something that should easily be |
| 11:31AM | 25 | documented and could be supported by some type of evidence, I |

11:31AM   1    don't think there is any.

11:31AM   2         I think -- and I -- at some point we talked to

11:31AM   3    Mr. Bongiovanni's attorneys about it, and they had said that

11:31AM   4    this was -- was discussed more -- I don't know if it was

11:31AM   5    during the course of trial or as part of their prep, but they

11:31AM   6    said consistently their read on it was there was nothing to

11:31AM   7    back up that this ever occurred at well.

11:31AM   8         **MR. SOEHNLEIN:**  Yeah.  And more to the point, Judge,

11:31AM   9    not that this is, you know, anything that would necessarily

11:31AM   10   come out in court, but from reading the documents, Mr. Selva's

11:31AM   11   arrested in 2019, he doesn't report that comment until

11:31AM   12   September of 2023 to law enforcement.

11:31AM   13        **THE COURT:**  Well, you can cross-examine with that.

11:31AM   14   Go ahead.

11:31AM   15        **MR. TRIPI:**  So, Judge --

11:31AM   16        **THE COURT:**  What do you have?

11:31AM   17        **MR. TRIPI:**  -- what I have on that is, first, there

11:31AM   18   wouldn't be an arrest if Mr. Bongiovanni stepped in in

11:31AM   19   sufficient time to kill an arrest, right?

11:31AM   20        But in terms of -- the 2nd Circuit has long held --

11:31AM   21   this United States versus Saggett, that circumstances

11:32AM   22   indicating trustworthiness include where the statement was

11:32AM   23   made to a person whom the declarant believes an ally.

11:32AM   24        I don't think there's any question that Bongiovanni

11:32AM   25   at the time he said that would have believed Lou Selva and him

| | | |
|---|---|---|
| 11:32AM | 1 | are on the same team.  You know?  So there's a circumstance |
| 11:32AM | 2 | indicating trustworthiness. |
| 11:32AM | 3 | So it's not just is it do you have corroboration, |
| 11:32AM | 4 | there are a number of different circumstances that can |
| 11:32AM | 5 | indicate trustworthiness. |
| 11:32AM | 6 | Another is, does the declarant represent an attempt |
| 11:32AM | 7 | to shift blame?  No, he's taking credit for helping Anthony |
| 11:32AM | 8 | get out of trouble.  Which, again, that lends to the exception |
| 11:32AM | 9 | and believability, an indicator of trustworthiness. |
| 11:32AM | 10 | THE COURT:  Tell me -- tell me -- tell me how it's a, |
| 11:32AM | 11 | I guess, against penal interests, he's -- |
| 11:32AM | 12 | MR. TRIPI:  He's a DEA agent. |
| 11:32AM | 13 | THE COURT:  Yeah, he shouldn't be doing -- |
| 11:32AM | 14 | MR. TRIPI:  And although the jury doesn't know it, |
| 11:32AM | 15 | you know under 104 you can consider all the proffers that -- |
| 11:32AM | 16 | it's in the context when Selva and Bongiovanni are in a |
| 11:32AM | 17 | conspiracy. |
| 11:33AM | 18 | THE COURT:  Yeah. |
| 11:33AM | 19 | MR. FOTI:  Judge, it's a -- even if he killed an |
| 11:33AM | 20 | arrest somehow, which we're totally speculating on because |
| 11:33AM | 21 | there's nothing to back that up other than this statement -- |
| 11:33AM | 22 | MR. COOPER:  Two trials. |
| 11:33AM | 23 | MR. FOTI:  -- there's typically going to be some |
| 11:33AM | 24 | documentation of an interaction with an individual.  Even if |
| 11:33AM | 25 | the arrest itself isn't documented, there's police reports |

| | | |
|---|---|---|
| 11:33AM | 1 | documenting interactions. |
| 11:33AM | 2 | **THE COURT:**  I think it comes in.  I think it comes |
| 11:33AM | 3 | in.  I think it can come in, in very general terms that he |
| 11:33AM | 4 | stepped in to try to help. |
| 11:33AM | 5 | **MR. COOPER:**  That Peter asked, that -- |
| 11:33AM | 6 | **THE COURT:**  That Peter asked him to step in to try |
| 11:33AM | 7 | help Anthony, when Anthony got jammed up with something. |
| 11:33AM | 8 | Yeah.  I think that can come in.  But it's got to be |
| 11:33AM | 9 | pretty general, and in and out. |
| 11:33AM | 10 | **MR. TRIPI:**  Okay. |
| 11:33AM | 11 | **THE COURT:**  Okay.  Anything else before we resume? |
| 11:33AM | 12 | **MR. COOPER:**  Judge, Special Agent Burns mentioned to |
| 11:33AM | 13 | me, and I think it's a good idea, that maybe at some point |
| 11:33AM | 14 | today it would be wise for you to let the jury know kind of |
| 11:33AM | 15 | where we're looking scheduling-wise, because Christmas is |
| 11:33AM | 16 | coming up, and kind of give them an idea of when we think |
| 11:33AM | 17 | we're gonna -- |
| 11:33AM | 18 | **THE COURT:**  Okay.  Yeah.  I hate to get people's |
| 11:34AM | 19 | hopes up, but -- |
| 11:34AM | 20 | **MR. COOPER:**  Well, it doesn't look like it's gonna be |
| 11:34AM | 21 | pre-Christmas at this point. |
| 11:34AM | 22 | **THE COURT:**  Yeah, I guess that's true.  Okay.  Yeah, |
| 11:34AM | 23 | let me -- let me -- I'll try to figure out something to say |
| 11:34AM | 24 | maybe right after our lunch break. |
| 11:34AM | 25 | **MR. TRIPI:**  Is there a way that we can leave this up |

| | | |
|---|---|---|
| 11:34AM | 1 | just for the attorneys for a moment, just so I can get where |
| 11:34AM | 2 | I'm gonna stop?  Or I can go get the hardcopy.  I don't want |
| 11:34AM | 3 | to cause too many problems. |
| 11:34AM | 4 | **THE COURT:**  Yeah, just leave it up, but don't put it |
| 11:34AM | 5 | up for the jury. |
| 11:34AM | 6 | **THE CLERK:**  Yeah, I turned off the witness display. |
| 11:34AM | 7 | **MR. TRIPI:**  Okay.  Great. |
| 11:34AM | 8 | **THE COURT:**  Anything else? |
| 11:34AM | 9 | **MR. TRIPI:**  No. |
| 11:34AM | 10 | **MR. SOEHNLEIN:**  No. |
| 11:34AM | 11 | **THE COURT:**  Let's bring them back.  We're just going |
| 11:34AM | 12 | to go for a half an hour now. |
| 11:35AM | 13 | (Jury seated at 11:35 a.m.) |
| 11:36AM | 14 | **THE COURT:**  Okay.  So it was just pointed out to me |
| 11:36AM | 15 | that number 12 is wearing a Patriots jersey, I'm surprised he |
| 11:36AM | 16 | doesn't have a paper bag over his head this season. |
| 11:36AM | 17 | The record will reflect that all our jurors are again |
| 11:36AM | 18 | present. |
| 11:36AM | 19 | I remind the witness that he's still under oath. |
| 11:36AM | 20 | Before you continue, Mr. Tripi, let me tell the jury |
| 11:36AM | 21 | something about -- |
| 11:36AM | 22 | You can sit down, Mr. Selva. |
| 11:36AM | 23 | **THE WITNESS:**  Okay. |
| 11:36AM | 24 | **THE COURT:**  Before you begin, Mr. Tripi, let me tell |
| 11:36AM | 25 | the jury something about some questions and answers that were |

11:36AM   1   just a few minutes ago.

11:36AM   2         So you remember that Mr. Tripi called to the

11:36AM   3   witness's attention a prior statement that he had made to

11:36AM   4   investigators about whether Mr. Bongiovanni had used the "N"

11:36AM   5   word or other racial terms.  That was admitted only for you to

11:36AM   6   assess Mr. Selva's credibility, it's not being admitted --

11:36AM   7   again, this is one of those things that's not being admitted

11:37AM   8   for the truth of it.

11:37AM   9         So whether Mr. Bongiovanni, in fact, used the racial

11:37AM   10  terms that he was -- that the witness was asked about, the

11:37AM   11  truth of that is not in front of you based on that question

11:37AM   12  about whether he said that to police investigators earlier,

11:37AM   13  okay?  That's only for you to assess this witness's

11:37AM   14  credibility with respect to that and anything else.  Okay?

11:37AM   15  Got it?  Great.

11:37AM   16        Mr. Tripi, you may continue.

11:37AM   17        I remind the witness he's still under oath.

11:37AM   18        **THE WITNESS:**  Yes, Your Honor.

11:37AM   19        **BY MR. TRIPI:**

11:37AM   20  Q.  Okay.  I -- I turned to another topic before the break

11:37AM   21  there, so I'm going to start there, okay?

11:37AM   22     Yes or no to this question:  Did Mr. Bongiovanni ever

11:37AM   23  tell you anything about this defendant, Mr. Gerace, Pharaoh's

11:37AM   24  nightclub, and a situation involving U.S. Probation?  Yes or

11:37AM   25  no?

| | | |
|---|---|---|
| 11:37AM | 1 | A.  Yes. |
| 11:38AM | 2 | Q.  Okay.  Did Mr. Bongiovanni tell you that this defendant |
| 11:38AM | 3 | had gotten violated by U.S. Probation, that something |
| 11:38AM | 4 | happened at Pharaoh's, and that Mr. Bongiovanni stepped in to |
| 11:38AM | 5 | help this defendant out? |
| 11:38AM | 6 | A.  Yes. |
| 11:38AM | 7 | **MR. TRIPI:**  You can take that down, Ms. Champoux, |
| 11:38AM | 8 | thank you. |
| 11:38AM | 9 | **BY MR. TRIPI:** |
| 11:38AM | 10 | Q.  In approximately 2015, did you discuss with |
| 11:38AM | 11 | Mr. Bongiovanni some assistance that he provided to Anthony |
| 11:38AM | 12 | Gerace, to help Anthony Gerace get out of trouble?  Yes or |
| 11:38AM | 13 | no. |
| 11:38AM | 14 | A.  Yes. |
| 11:38AM | 15 | Q.  Did Mr. Bongiovanni -- did that come up in the context of |
| 11:38AM | 16 | discussing both Mr. Gerace -- Anthony Gerace and this |
| 11:39AM | 17 | defendant, was there a discussion that involved the topic of |
| 11:39AM | 18 | both of them at some point? |
| 11:39AM | 19 | A.  Yes. |
| 11:39AM | 20 | Q.  Did Mr. Bongiovanni tell you that this defendant reached |
| 11:39AM | 21 | out to him asking Mr. Bongiovanni to step in on Anthony's |
| 11:39AM | 22 | behalf when Anthony got in trouble with the Amherst Police |
| 11:39AM | 23 | Department? |
| 11:39AM | 24 | A.  Yes. |
| 11:39AM | 25 | Q.  Did Mr. Bongiovanni in that discussion indicate to you |

USA v Gerace - Selva - Tripi/Direct - 12/13/24
61

| | | |
|---|---|---|
| 11:39AM | 1 | that he did step in? |
| 11:39AM | 2 | A.  He did. |
| 11:39AM | 3 | Q.  Did he indicate to you that he told whoever at Amherst |
| 11:39AM | 4 | police that Anthony Gerace was a cooperator? |
| 11:39AM | 5 | A.  Yes, that's what he said. |
| 11:39AM | 6 | Q.  At the time you had this discussion with Mr. Bongiovanni, |
| 11:39AM | 7 | was Mr. Anthony Gerace involved with you and others that you |
| 11:39AM | 8 | were involved with selling marijuana? |
| 11:39AM | 9 | A.  Yes.  At that time, yes. |
| 11:40AM | 10 | Q.  During the course of their relationship, meaning |
| 11:40AM | 11 | Mr. Gerace and Mr. Bongiovanni, were you aware of any trips |
| 11:40AM | 12 | they took together? |
| 11:40AM | 13 | A.  Yes. |
| 11:40AM | 14 | Q.  Where -- where were you aware that they went together? |
| 11:40AM | 15 | A.  Las Vegas, New York, Toronto, I think.  Niagara Falls. |
| 11:40AM | 16 | Possibly Florida.  But they traveled. |
| 11:40AM | 17 | Q.  Were you aware of Mr. Bongiovanni attending Gerace's |
| 11:40AM | 18 | parents' 50th anniversary? |
| 11:40AM | 19 | A.  Yes, he told me he did, yes. |
| 11:40AM | 20 | Q.  Did your parents have a 50th anniversary? |
| 11:40AM | 21 | A.  Yes. |
| 11:40AM | 22 | Q.  Did Mr. Bongiovanni attend their anniversary? |
| 11:40AM | 23 | A.  No. |
| 11:40AM | 24 | Q.  Is that a reason you remember that he attended |
| 11:40AM | 25 | Mr. Gerace's parents' anniversary? |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

11:40AM   1   A.  Yeah.  Yes.

11:41AM   2   Q.  Did Mr. Bongiovanni like nice things, based on your

11:41AM   3   experiences with him?

11:41AM   4   A.  Yes.

11:41AM   5   Q.  Based on your observations, did he like going out for

11:41AM   6   nice dinners?

11:41AM   7   A.  Yes.

11:41AM   8   Q.  Did he like nice clothes?

11:41AM   9   A.  Yes.

11:41AM   10  Q.  And did he and Lindsay, his wife, like to travel?

11:41AM   11  A.  Yes.

11:41AM   12  Q.  Do those things cost money?

11:41AM   13  A.  Yes.

11:41AM   14  Q.  When you would use cocaine with Mr. Bongiovanni, did he

11:42AM   15  ever express to you why he was willing to use cocaine but not

11:42AM   16  marijuana?  Just yes or no first.

11:42AM   17  A.  Yes.

11:42AM   18  Q.  What did he say in that regard?

11:42AM   19  A.  He said that cocaine stays in your system for lesser

11:42AM   20  amount of time.  And if you flush it out from working out and

11:42AM   21  drinking a lot of water, it's not detectable if you were to

11:42AM   22  take a test, where marijuana stays in your system 30 days or

11:42AM   23  so.

11:42AM   24  Q.  Do you know an individual named Paul Francoforte, also

11:42AM   25  known as Hot Dog?

| | | |
|---|---|---|
| 11:42AM | 1 | **MR. SOEHNLEIN:** Objection. Relevance. |
| 11:42AM | 2 | **THE COURT:** Does he know? I'll allow that. |
| 11:42AM | 3 | **MR. TRIPI:** And I'll -- the relevance will become |
| 11:42AM | 4 | clear. |
| 11:42AM | 5 | **THE COURT:** Go ahead. |
| 11:42AM | 6 | **BY MR. TRIPI:** |
| 11:42AM | 7 | Q. Do you know? |
| 11:42AM | 8 | A. Yes. |
| 11:42AM | 9 | Q. At some point, was Mr. Francoforte associated with a |
| 11:42AM | 10 | restaurant on the corner of Hertel and Starin called Boss? |
| 11:43AM | 11 | A. Yes. |
| 11:43AM | 12 | **MR. TRIPI:** Can we pull up Exhibit 310AT, I think |
| 11:43AM | 13 | record number 20. |
| 11:43AM | 14 | **THE COURT:** Is this -- |
| 11:43AM | 15 | **MR. TRIPI:** This is in evidence in this case, yes. |
| 11:43AM | 16 | You passed it. Go up a little bit, please. Top of |
| 11:43AM | 17 | page 9, Ms. Champoux. |
| 11:43AM | 18 | Okay. Can we zoom in on the top of page 9, that box |
| 11:43AM | 19 | there? |
| 11:43AM | 20 | **BY MR. TRIPI:** |
| 11:43AM | 21 | Q. Do you see a first name there? |
| 11:43AM | 22 | A. Yes. |
| 11:43AM | 23 | Q. What's that say? |
| 11:44AM | 24 | A. Pauly. |
| 11:44AM | 25 | Q. Do you see a last name? |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

64

| | | |
|---|---|---|
| 11:44AM | 1 | A.  Yes.  Hot Dog. |
| 11:44AM | 2 | Q.  And is Hot Dog that individual's nickname? |
| 11:44AM | 3 | A.  Yes. |
| 11:44AM | 4 | Q.  Do you know that individual to be Paul Francoforte? |
| 11:44AM | 5 | A.  Yes. |
| 11:44AM | 6 | Q.  And do you see a phone number there? |
| 11:44AM | 7 | A.  Yes. |
| 11:44AM | 8 | Q.  What's that number? |
| 11:44AM | 9 | A.  716-866-2687. |
| 11:44AM | 10 | Q.  And is this the individual we talked about, Pauly |
| 11:44AM | 11 | Francoforte, Hot Dog, is that a person who was friends with |
| 11:44AM | 12 | Mr. Bongiovanni and associated with Boss Restaurant? |
| 11:44AM | 13 | A.  Yes. |
| 11:44AM | 14 | **MR. TRIPI:**  We can take that down. |
| 11:45AM | 15 | **BY MR. TRIPI:** |
| 11:45AM | 16 | Q.  When Mr. Bongiovanni gave you directives and instructions |
| 11:45AM | 17 | regarding telling law enforcement you were his C.I. if they |
| 11:45AM | 18 | ever came to ask you questions, was that done face to face? |
| 11:45AM | 19 | A.  Yes. |
| 11:45AM | 20 | Q.  Did you and he discuss the importance of having those |
| 11:45AM | 21 | types of discussions face to face? |
| 11:45AM | 22 | A.  Yes. |
| 11:45AM | 23 | Q.  Why was it important to you to have those types of |
| 11:45AM | 24 | discussions face to face with Mr. Bongiovanni? |
| 11:45AM | 25 | A.  Not to talk over the phone, and to just get direction |

| 11:45AM | 1 | from him. |

11:45AM 1   from him.

11:45AM 2   Q.  Can you elaborate?  To not talk on the phone, was there a

11:45AM 3   concern about law enforcement tactics?

11:45AM 4   A.  Yes, obviously surveillance, tapping the phones.

11:45AM 5   Q.  Do you mean?  Like, a wiretap?

11:45AM 6   A.  Like a wiretap.

11:45AM 7   Q.  Is that something where you feared people could listen to

11:45AM 8   your conversations?

11:45AM 9   A.  Yes.

11:45AM 10  Q.  Where would you typically meet with Mr. Bongiovanni to

11:45AM 11  have those types of discussions?

11:45AM 12  A.  Various places on Hertel.  We'd meet at a bar.

11:45AM 13  Q.  Did you go to his house?

11:45AM 14  A.  Or his house, yes.

11:46AM 15  Q.  Have you spoken in parks with him?

11:46AM 16  A.  Parks, yes.  We've taken walks.

11:46AM 17  Q.  Okay.  Earlier sort of near the beginning of your

11:46AM 18  testimony, we talked about Mr. Bongiovanni getting married in

11:46AM 19  Cabo San Lucas in February of 2015; do you recall that?

11:46AM 20  A.  I do.

11:46AM 21  Q.  Couple months before that, sort of in the lead-up to the

11:46AM 22  wedding, was there a stag party held for Mr. Bongiovanni?

11:46AM 23  A.  There was.

11:46AM 24  Q.  Is that sort of, like, the bachelor party?

11:46AM 25  A.  Yes.

| | | |
|---|---|---|
| 11:46AM | 1 | Q.  Where was that party held? |
| 11:46AM | 2 | A.  In the Cobblestone District, in Iron Works.  It's a |
| 11:46AM | 3 | bar/restaurant. |
| 11:46AM | 4 | Q.  And for those not from the Buffalo area, is the |
| 11:46AM | 5 | Cobblestone District sort of near where the arena is where |
| 11:46AM | 6 | the Buffalo Sabres play? |
| 11:46AM | 7 | A.  Exactly. |
| 11:46AM | 8 | Q.  And was Iron Works a bar down there? |
| 11:47AM | 9 | A.  Yes. |
| 11:47AM | 10 | Q.  And who arranged the location of the stag party? |
| 11:47AM | 11 | A.  I did. |
| 11:47AM | 12 | Q.  And were you involved -- were you involved handing out |
| 11:47AM | 13 | tickets? |
| 11:47AM | 14 | A.  Yes. |
| 11:47AM | 15 | Q.  Were others, as well? |
| 11:47AM | 16 | A.  Yes. |
| 11:47AM | 17 | Q.  I want to ask you about some of the names of some of the |
| 11:47AM | 18 | people who were at the stag party, okay? |
| 11:47AM | 19 | A.  Okay. |
| 11:47AM | 20 | Q.  Was that individual whose photo we looked at earlier, Tom |
| 11:47AM | 21 | Napoli, was he there? |
| 11:47AM | 22 | A.  Yes. |
| 11:47AM | 23 | Q.  You were there, obviously? |
| 11:47AM | 24 | A.  Yes. |
| 11:47AM | 25 | Q.  Was an individual named Mike Masecchia there? |

USA v Gerace - Selva - Tripi/Direct - 12/13/24
67

| | | |
|---|---|---|
| 11:47AM | 1 | A.  Yes. |
| 11:47AM | 2 | Q.  Was this defendant there? |
| 11:47AM | 3 | A.  Yes. |
| 11:47AM | 4 | Q.  Was Tom Doctor, whose photo we looked at earlier, there? |
| 11:47AM | 5 | A.  Yes. |
| 11:47AM | 6 | Q.  Was -- do you know whether Agent Bongiovanni's partner, |
| 11:48AM | 7 | Joe Palmieri, was there? |
| 11:48AM | 8 | A.  I believe he was, yes. |
| 11:48AM | 9 | Q.  Was an individual named Wayne Anderson there? |
| 11:48AM | 10 | A.  Yes. |
| 11:48AM | 11 | **MR. TRIPI:**  Can we pull up Exhibit 310AT, again, |
| 11:48AM | 12 | please?  I'd like to work -- this is in evidence.  And let's |
| 11:48AM | 13 | stop on the first page there. |
| 11:48AM | 14 | **BY MR. TRIPI:** |
| 11:48AM | 15 | Q.  Do you see where it says forensic examination report? |
| 11:48AM | 16 | Can you read what it says after case number? |
| 11:48AM | 17 | A.  Peter George Gerace. |
| 11:48AM | 18 | **MR. TRIPI:**  Okay.  Let's go to the first page of |
| 11:48AM | 19 | that, Ms. Champoux.  Or, I'm sorry, the first page of the |
| 11:48AM | 20 | contacts. |
| 11:48AM | 21 | **BY MR. TRIPI:** |
| 11:48AM | 22 | Q.  All right.  Regarding number 2, do you see name there |
| 11:48AM | 23 | that says Jeff Anzalone with a phone number? |
| 11:48AM | 24 | A.  Yes. |
| 11:48AM | 25 | Q.  Okay.  Record number 3, do you see an entry there for |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

68

| | | |
|---|---|---|
| 11:48AM | 1 | Wayne Anderson with a phone number? |
| 11:48AM | 2 | A.  Yes. |
| 11:48AM | 3 | **MR. TRIPI:**  Okay.  Let's go to the next page, |
| 11:49AM | 4 | Ms. Champoux.  Let's go to page 6. |
| 11:49AM | 5 | **BY MR. TRIPI:** |
| 11:49AM | 6 | Q.  Record 9, do you see a name Chris Chudy at the bottom? |
| 11:49AM | 7 | A.  Yes, I do. |
| 11:49AM | 8 | Q.  If we can go to page 7 now.  Do you see under record 10 a |
| 11:49AM | 9 | name that's entered as Jessica Charm? |
| 11:49AM | 10 | A.  Yes. |
| 11:49AM | 11 | **MR. TRIPI:**  Can you scroll down to the next page for |
| 11:49AM | 12 | now, Ms. Champoux?  Stop there.  I need to hover between the |
| 11:49AM | 13 | two pages. |
| 11:49AM | 14 | **BY MR. TRIPI:** |
| 11:49AM | 15 | Q.  Do you see a first name and a last name under record |
| 11:49AM | 16 | number 13 there for Tommy Doctor? |
| 11:49AM | 17 | A.  Yes. |
| 11:49AM | 18 | Q.  Is that the person we looked at in the photo earlier, in |
| 11:49AM | 19 | the photo that had Mr. Gerace, Mr. Bongiovanni, and the |
| 11:49AM | 20 | individual with the shirt off drinking a beer? |
| 11:50AM | 21 | A.  It is, yes. |
| 11:50AM | 22 | **MR. TRIPI:**  Can we keep scrolling for now. |
| 11:50AM | 23 | **BY MR. TRIPI:** |
| 11:50AM | 24 | Q.  Okay.  We're now on page 9.  We talked about Pauly |
| 11:50AM | 25 | Hot Dog, right? |

USA v Gerace - Selva - Tripi/Direct - 12/13/24
69

| | | |
|---|---|---|
| 11:50AM | 1 | A.  Yes. |
| 11:50AM | 2 | **MR. TRIPI:**  Okay.  Let's keep scrolling.  Keep going. |
| 11:50AM | 3 | **BY MR. TRIPI:** |
| 11:50AM | 4 | Q.  So there, do you see under record 20 a name, Mike |
| 11:50AM | 5 | Masecchia? |
| 11:50AM | 6 | A.  Yes. |
| 11:50AM | 7 | Q.  Okay.  Under there, record 21, do you see a name Sue |
| 11:50AM | 8 | Michalski? |
| 11:50AM | 9 | A.  Yes. |
| 11:50AM | 10 | **MR. TRIPI:**  Okay.  Keep scrolling. |
| 11:50AM | 11 | **BY MR. TRIPI:** |
| 11:50AM | 12 | Q.  Under record number 22, do you see a name there, Kim |
| 11:50AM | 13 | Mecca? |
| 11:50AM | 14 | A.  Yes. |
| 11:50AM | 15 | Q.  Now who was Kim Mecca to you? |
| 11:50AM | 16 | A.  She was a girl that I went out with. |
| 11:50AM | 17 | Q.  Did she live with you for a period? |
| 11:50AM | 18 | A.  She lived with me for a period, yes. |
| 11:50AM | 19 | Q.  When your house got raided August 23rd, 2019, was Kim |
| 11:51AM | 20 | Mecca there? |
| 11:51AM | 21 | A.  She was. |
| 11:51AM | 22 | Q.  Was she living with you at the time? |
| 11:51AM | 23 | A.  She was. |
| 11:51AM | 24 | **MR. TRIPI:**  Keep scrolling down. |
| | 25 | |

| | | |
|---|---|---|
| 11:51AM | 1 | **BY MR. TRIPI:** |
| 11:51AM | 2 | Q.  Do you see record 25? |
| 11:51AM | 3 | A.  Yes. |
| 11:51AM | 4 | Q.  Do you see the name Joe Palmieri? |
| 11:51AM | 5 | A.  I do, yes. |
| 11:51AM | 6 | Q.  Was he a -- as far as you know, was he a task force |
| 11:51AM | 7 | officer at the DEA and partners with Joseph Bongiovanni? |
| 11:51AM | 8 | A.  Yes, he was. |
| 11:51AM | 9 | **MR. TRIPI:**  Keep scrolling down.  Okay.  Let me stop |
| 11:51AM | 10 | you there.  Do you see a record -- withdrawn.  I misread the |
| 11:51AM | 11 | name.  Keep going. |
| 11:51AM | 12 | Okay.  Stop there.  We're on to page -- looks like |
| 11:52AM | 13 | 15. |
| 11:52AM | 14 | **BY MR. TRIPI:** |
| 11:52AM | 15 | Q.  Now, yesterday I asked you if Mr. Bongiovanni dated a |
| 11:52AM | 16 | woman when he was younger named Dana Panepinto, and whether |
| 11:52AM | 17 | she was the daughter of a guy named Donnie/Turtle Panepinto; |
| 11:52AM | 18 | do you remember that? |
| 11:52AM | 19 | A.  I do. |
| 11:52AM | 20 | Q.  Do you see a name there, Turtle, with a phone number? |
| 11:52AM | 21 | A.  Yes. |
| 11:52AM | 22 | Q.  Okay. |
| 11:52AM | 23 | **MR. TRIPI:**  Keep scrolling down. |
| 11:52AM | 24 | **BY MR. TRIPI:** |
| 11:52AM | 25 | Q.  By the way, record 38, do you see a name K.L.? |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

71

| | | |
|---|---|---|
| 11:52AM | 1 | A.  Yes. |
| 11:52AM | 2 | Q.  Now, do you know -- in fairness, do you know who that |
| 11:52AM | 3 | person is? |
| 11:52AM | 4 | A.  I do not, no. |
| 11:52AM | 5 | Q.  Under record 39, do you see a name Lindsay Schuh? |
| 11:52AM | 6 | A.  Yes. |
| 11:52AM | 7 | Q.  Is that now Lindsay Bongiovanni? |
| 11:52AM | 8 | A.  Yes, it is. |
| 11:52AM | 9 | Q.  So it's Mr. Bongiovanni's wife? |
| 11:52AM | 10 | A.  Correct. |
| 11:52AM | 11 | Q.  Under that, do you see record 40, we're on page 16 of |
| 11:53AM | 12 | this exhibit, is that Tom Napoli? |
| 11:53AM | 13 | A.  Yes, it is. |
| 11:53AM | 14 | Q.  And there's a phone number there? |
| 11:53AM | 15 | A.  Yes. |
| 11:53AM | 16 | Q.  And we've discussed him several times, right? |
| 11:53AM | 17 | A.  Yes. |
| 11:53AM | 18 | MR. TRIPI:  Keep scrolling.  I'm gonna stop you |
| 11:53AM | 19 | there. |
| 11:53AM | 20 | BY MR. TRIPI: |
| 11:53AM | 21 | Q.  Do you see record number 45, do you see a name and phone |
| 11:53AM | 22 | number for a Greg Trotter? |
| 11:53AM | 23 | A.  Yes, I do. |
| 11:53AM | 24 | Q.  Do you know who that is? |
| 11:53AM | 25 | A.  I don't. |

| | | |
|---|---|---|
| 11:53AM | 1 | **MR. TRIPI:** On page number -- go down a little.  Go |
| 11:53AM | 2 | down.  Page number 18. |
| 11:53AM | 3 | **BY MR. TRIPI:** |
| 11:53AM | 4 | Q.  Record 46, do you see a name Tommy O with a phone number? |
| 11:53AM | 5 | A.  Yes. |
| 11:53AM | 6 | Q.  In fairness, do you know who that is? |
| 11:53AM | 7 | A.  I don't. |
| 11:53AM | 8 | **MR. TRIPI:** Keep scrolling.  Stop there. |
| 11:53AM | 9 | **BY MR. TRIPI:** |
| 11:53AM | 10 | Q.  Under record number 48, do you see a name there, Frank |
| 11:53AM | 11 | Tripi? |
| 11:53AM | 12 | A.  Yes. |
| 11:53AM | 13 | Q.  Do you know who that is? |
| 11:53AM | 14 | A.  Yes. |
| 11:53AM | 15 | Q.  No relation of mine, right? |
| 11:53AM | 16 | A.  Correct. |
| 11:53AM | 17 | Q.  Okay.  Is he someone that Mr. Bongiovanni also knew? |
| 11:54AM | 18 | A.  Yes. |
| 11:54AM | 19 | Q.  Under there, record 49, page 19 still, do you see the |
| 11:54AM | 20 | name Joe Tomasello? |
| 11:54AM | 21 | A.  Yes. |
| 11:54AM | 22 | Q.  Is that someone you know? |
| 11:54AM | 23 | A.  Yes. |
| 11:54AM | 24 | Q.  Is that someone Mr. Bongiovanni knows? |
| 11:54AM | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:54AM | 1 | **MR. TRIPI:** Keep scrolling. Stop there. |
| 11:54AM | 2 | **BY MR. TRIPI:** |
| 11:54AM | 3 | Q. Record 51, do you see a record for Anthony bro? |
| 11:54AM | 4 | A. Yes. |
| 11:54AM | 5 | Q. And we talked about Anthony Gerace, this defendant has a |
| 11:54AM | 6 | brother by that name? |
| 11:54AM | 7 | A. Yes. |
| 11:54AM | 8 | **MR. TRIPI:** Keep scrolling. |
| 11:54AM | 9 | Okay. We're gonna take that down now. |
| 11:54AM | 10 | **BY MR. TRIPI:** |
| 11:55AM | 11 | Q. By February of 2015, when Mr. Bongiovanni was getting |
| 11:55AM | 12 | married in Cabo San Lucas, had his sort of complaints about |
| 11:55AM | 13 | his finances stopped by that point? |
| 11:55AM | 14 | A. No. |
| 11:55AM | 15 | Q. Did he still continue to complain about his finances? |
| 11:55AM | 16 | A. Yes. |
| 11:55AM | 17 | Q. Did he pay, though, for a destination wedding though that |
| 11:55AM | 18 | year? |
| 11:55AM | 19 | A. He did. |
| 11:55AM | 20 | Q. Were you the best man at that wedding? |
| 11:55AM | 21 | A. Yes. |
| 11:55AM | 22 | **MR. TRIPI:** Ms. Champoux, for the witness only -- |
| 11:55AM | 23 | Just give me one moment, Judge. |
| 11:55AM | 24 | **THE COURT:** How much more do you have, Mr. Tripi? |
| 11:55AM | 25 | **MR. TRIPI:** Oh, I see the time, Judge. Maybe, like, |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

74

| | | |
|---|---|---|
| 11:55AM | 1 | 15 more minutes or so. |
| 11:55AM | 2 | **THE COURT:** Yeah, so we're gonna have to break. But |
| 11:55AM | 3 | go ahead, we'll go until close to noon. |
| 11:55AM | 4 | **MR. TRIPI:** Okay. I'm going to hand you up -- maybe |
| 11:55AM | 5 | we can end after getting these. |
| 11:55AM | 6 | **THE COURT:** Great. |
| 11:55AM | 7 | **BY MR. TRIPI:** |
| 11:55AM | 8 | Q. I'm going to hand you up Exhibits 213-1 through 213-5 |
| 11:56AM | 9 | inclusive. Take a look at these. When you're done, look |
| 11:56AM | 10 | back at me. |
| 11:56AM | 11 | A. Okay. Thank you. |
| 11:56AM | 12 | Q. Do you recognize those Exhibits 213-1 through 213-5 |
| 11:56AM | 13 | inclusive? |
| 11:56AM | 14 | A. I do. Yes. |
| 11:56AM | 15 | Q. Do those consist of photos of Mr. Bongiovanni's wedding |
| 11:56AM | 16 | that you were in or that you took, and tweets that you made |
| 11:56AM | 17 | following the -- at some point in proximity but following the |
| 11:56AM | 18 | wedding? |
| 11:56AM | 19 | A. Yes. |
| 11:56AM | 20 | Q. Okay. Do they all fairly and accurately depict the |
| 11:56AM | 21 | photos you took and the posting to Twitter of the images of |
| 11:57AM | 22 | the wedding? |
| 11:57AM | 23 | A. Yes. |
| 11:57AM | 24 | **MR. TRIPI:** The government offers 213-1 through 5 |
| 11:57AM | 25 | inclusive, Your Honor. |

| 11:57AM | 1 | **MR. SOEHNLEIN:** Can I just take a look at them, Joe? |
| 11:57AM | 2 | **MR. TRIPI:** Sure, no problem. |
| 11:57AM | 3 | **THE COURT:** Sure. |
| 11:57AM | 4 | **MR. SOEHNLEIN:** No objection. |
| 11:57AM | 5 | **THE COURT:** Received without objection. |
| 11:57AM | 6 | **(GOV Exhibit 213-1 through 5 were received in evidence.)** |
| 11:57AM | 7 | **MR. TRIPI:** All right. Do you want me to keep going? |
| 11:57AM | 8 | I was going to publish a couple of them, do you want me to |
| 11:57AM | 9 | keep going? |
| 11:57AM | 10 | **THE COURT:** Why don't we break, because I have |
| 11:57AM | 11 | another matter that I need do at noon. |
| 11:57AM | 12 | So remember my instructions, folks, about not |
| 11:57AM | 13 | communicating about the case with anyone, including each |
| 11:57AM | 14 | other. Don't use tools of technology to communicate about the |
| 11:57AM | 15 | case or to learn anything about the case. Don't read or watch |
| 11:57AM | 16 | or listen to any news coverage, if there is any, while the |
| 11:57AM | 17 | trial is in progress. And don't make up your mind until you |
| 11:58AM | 18 | start deliberating. |
| 11:58AM | 19 | Let's come back close to quarter to 1, and we'll try |
| 11:58AM | 20 | to go a couple hours, take a break, and then go until 4. |
| 11:58AM | 21 | Okay? Thanks very much. |
| 11:58AM | 22 | Oh, and I hope to have an update for you about the |
| 11:58AM | 23 | rest of the trial when you come back after lunch. |
| 11:58AM | 24 | (Jury excused at 11:58 a.m.) |
| 11:59AM | 25 | **THE COURT:** Again, Mr. Selva, you're not to talk to |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

| | | |
|---|---|---|
| 11:59AM | 1 | anybody except your lawyer during the break. |
| 11:59AM | 2 | (Witness excused at 11:59 a.m.) |
| 11:59AM | 3 | **THE COURT:**  Anything before we break from Mr. Foti? |
| 11:59AM | 4 | **MR. FOTI:**  No. |
| 11:59AM | 5 | **THE COURT:**  Government? |
| 11:59AM | 6 | **MR. COOPER:**  No, thank you. |
| 11:59AM | 7 | **THE COURT:**  All right.  We'll see you in 45 minutes. |
| 11:59AM | 8 | (Off the record at 11:59 a.m.) |
| 12:50PM | 9 | (Back on the record at 12:50 p.m.) |
| 12:50PM | 10 | (Jury not present.) |
| 12:50PM | 11 | **THE CLERK:**  All rise. |
| 12:50PM | 12 | **THE COURT:**  Please be seated. |
| 12:50PM | 13 | **THE CLERK:**  We are back on the record for the |
| 12:50PM | 14 | continuation of the jury trial in case numbers 19-cr-227 and |
| 12:50PM | 15 | 23-cr-37, United States of America versus Peter Gerace Jr. |
| 12:50PM | 16 | All counsel and parties are present.  Mr. Cooper just |
| 12:50PM | 17 | ran out. |
| 12:50PM | 18 | **THE COURT:**  That's okay.  That's fine. |
| 12:50PM | 19 | Have you thought about charging the jury without |
| 12:50PM | 20 | Mr. Soehnlein present? |
| 12:50PM | 21 | **MR. SOEHNLEIN:**  Yeah, we -- we talked about it, |
| 12:50PM | 22 | Your Honor, and we have not talked with Mr. Gerace about it. |
| 12:50PM | 23 | Think Mr. Foti and I are okay with that, but we would just |
| 12:51PM | 24 | ask -- maybe get through one more break, and we'll ask |
| 12:51PM | 25 | Mr. Gerace and make sure he's all right. |

12:51PM   1          THE COURT:  Absolutely, yeah.  It makes sense to me

12:51PM   2    for lots of reasons.  And then maybe even let them to start

12:51PM   3    deliberating with the understanding that if they come back

12:51PM   4    with anything that is substantive as to a request, we don't do

12:51PM   5    it, we send them home and let them start up again when

12:51PM   6    Mr. Soehnlein is back.

12:51PM   7          MR. SOEHNLEIN:  And then I don't have to sit through

12:51PM   8    the charge.

12:51PM   9          THE COURT:  And then you don't have to listen to my

12:51PM  10    voice for as long as you've had to listen to it for most of

12:51PM  11    your adult life, right?

12:51PM  12          MR. SOEHNLEIN:  Well, yeah.

12:51PM  13          MR. COOPER:  He meant to say, I don't get to sit

12:51PM  14    through the charge.  He misspoke.

12:51PM  15          THE COURT:  I get it.  I get it.  I get it.

12:51PM  16          MR. FOTI:  I intend to call him afterwards and tell

12:51PM  17    him how it was, Judge.

12:51PM  18          MS. IZZO:  Riveting.

12:51PM  19          THE COURT:  So what I will do is I'll tell them now.

12:51PM  20          Mr. Tripi, how long is your summation going to go?

12:51PM  21          MR. TRIPI:  Mr. Cooper is closing.

12:52PM  22          THE COURT:  Oh, Mr. Cooper?

12:52PM  23          MR. TRIPI:  I am going to rebut in whatever time is

12:52PM  24    left.  I'll be Mr. Violanti this time, but I'm not gonna do

12:52PM  25    the "I'm gonna talk to you as Joel" routine.

12:52PM   1        **MR. COOPER:**  I've forbidden him from pretending to be

12:52PM   2   Joel.

12:52PM   3        I think that the summation, Judge, probably we'd be

12:52PM   4   asking for three and a half hours for the entire -- because

12:52PM   5   there's a lot, and there's different types of material.

12:52PM   6        **THE COURT:**  I was actually thinking three, but

12:52PM   7   let's -- let me think about it.

12:52PM   8        **MR. COOPER:**  I'll live with whatever you decide.

12:52PM   9        **THE COURT:**  Yeah.  And who's going to sum up?

12:52PM  10        **MR. FOTI:**  I am.

12:52PM  11        **THE COURT:**  And what are you thinking?

12:52PM  12        **MR. FOTI:**  I -- I would think most likely two and a

12:52PM  13   half to three.

12:52PM  14        **THE COURT:**  Yeah.  Yeah.  So I want to get it done in

12:52PM  15   one day.  So maybe we'll say three each.  Let's think about

12:52PM  16   three each right now.

12:52PM  17        And so I'll tell them that that may happen on

12:52PM  18   Thursday, and that they may get charged on Friday next week.

12:52PM  19   And we're not making any promises, but that's what we would

12:52PM  20   think is a possibility.  Okay?  Fair enough?

12:53PM  21        **MR. FOTI:**  And you're not -- Judge, you're just

12:53PM  22   referencing where we're gonna -- we're expecting to end up at

12:53PM  23   the end of the week.  You're not talking about any estimation

12:53PM  24   about how long our case is going on, or whether we're putting

12:53PM  25   on a case at all, right?

| | | |
|---|---|---|
| 12:53PM | 1 | **THE COURT:**  No, just talking in very general terms |
| 12:53PM | 2 | that we are thinking that, you know, that the lawyers may be |
| 12:53PM | 3 | in a position to sum up to you next Thursday, and then I would |
| 12:53PM | 4 | charge you on Friday, so you would begin your deliberations |
| 12:53PM | 5 | perhaps on Friday and then continue the following week.  And |
| 12:53PM | 6 | that -- and leave it at that. |
| 12:53PM | 7 | **MR. FOTI:**  Okay. |
| 12:53PM | 8 | **THE COURT:**  Okay?  Okay.  So anything else before we |
| 12:53PM | 9 | bring them back? |
| 12:53PM | 10 | **MR. SOEHNLEIN:**  One thing briefly, Judge.  Just to |
| 12:53PM | 11 | make a record of it, when I was coming down from the 9th floor |
| 12:53PM | 12 | to the 4th floor, I was with Mr. Glaberson, Ms. Blackman, and |
| 12:53PM | 13 | a marshal.  The elevator doors opened on 7, and a juror walked |
| 12:53PM | 14 | basically right into me, not really, and she said sorry and I |
| 12:53PM | 15 | said sorry, and she stepped off the elevator, and that was it. |
| 12:54PM | 16 | But as long as we're being real careful with that stuff, I |
| 12:54PM | 17 | wanted everyone to be -- |
| 12:54PM | 18 | **THE COURT:**  No, absolutely, we all should be |
| 12:54PM | 19 | transparent about those kinds of things, and I appreciate |
| 12:54PM | 20 | that. |
| 12:54PM | 21 | **MR. COOPER:**  We appreciate it.  We try do the same |
| 12:54PM | 22 | thing, and appreciate you telling us. |
| 12:54PM | 23 | **THE COURT:**  Okay, anything else? |
| 12:54PM | 24 | **MR. SOEHNLEIN:**  No, Judge. |
| 12:54PM | 25 | **THE COURT:**  Anything else from the government? |

| | | |
|---|---|---|
| 12:54PM | 1 | **MR. TRIPI:**  No, Judge. |
| 12:54PM | 2 | **THE COURT:**  Let's bring them back, please, Joe. |
| 12:55PM | 3 | (Jury seated at 12:55 p.m.) |
| 12:55PM | 4 | **THE COURT:**  Okay.  The record will reflect all our |
| 12:55PM | 5 | jurors, again, are present. |
| 12:55PM | 6 | So a couple things, folks. |
| 12:55PM | 7 | One, you'll notice Ms. Chalbeck is not here again |
| 12:56PM | 8 | today.  Again, she's got an important matter that she needed |
| 12:56PM | 9 | to attend to.  I've excused her.  It has nothing to do with |
| 12:56PM | 10 | this case.  You should not be concerned about it in any way. |
| 12:56PM | 11 | Number 2, I told you I'd give you an update on where |
| 12:56PM | 12 | we think we may be going with the trial. |
| 12:56PM | 13 | There's a chance, it's not a promise, but there's a |
| 12:56PM | 14 | chance that the proof will end on Wednesday next week, and the |
| 12:56PM | 15 | lawyers will sum up to you then on Thursday, and I may give |
| 12:56PM | 16 | you the jury charge on Friday, so you'd start deliberating on |
| 12:56PM | 17 | Friday and continue into next week. |
| 12:56PM | 18 | So, that's -- that's not a promise.  You know, lots |
| 12:56PM | 19 | of things have happened to extend this trial:  Weather and |
| 12:56PM | 20 | illness and lots of other things.  But that's what we think is |
| 12:56PM | 21 | a decent guess right now.  Okay?  Yes. |
| 12:56PM | 22 | **JUROR:**  I'm sorry, so we will be here Friday the |
| 12:56PM | 23 | 20th? |
| 12:56PM | 24 | **THE COURT:**  Maybe. |
| 12:57PM | 25 | **JUROR:**  Maybe? |

| | | |
|---|---|---|
| 12:57PM | 1 | **THE COURT:**  It's still up in the air.  Maybe.  Maybe. |
| 12:57PM | 2 | There's a decent possibility that you will be, okay? |
| 12:57PM | 3 | I remind the witness that he's still under oath. |
| 12:57PM | 4 | You may continue, Mr. Tripi. |
| 12:57PM | 5 | **MR. TRIPI:**  Thank you, Your Honor. |
| 12:57PM | 6 | Ms. Champoux, can we split the screen with |
| 12:57PM | 7 | Exhibit 213-1 now in evidence, and 213-4 now in evidence? |
| 12:57PM | 8 | **BY MR. TRIPI:** |
| 12:57PM | 9 | Q.  Okay.  When it comes up on the screen, Mr. Selva, it's a |
| 12:57PM | 10 | little bit darker than it is when I hand you the piece of |
| 12:57PM | 11 | paper, right? |
| 12:57PM | 12 | A.  Yes. |
| 12:57PM | 13 | Q.  In any event, can you see it well enough on the screen? |
| 12:57PM | 14 | A.  Yes. |
| 12:57PM | 15 | Q.  Looking at 213-1, top photo there, we're looking at |
| 12:57PM | 16 | tweets that you made, right? |
| 12:57PM | 17 | A.  Yes. |
| 12:57PM | 18 | Q.  Is that top photo you and Mr. Bongiovanni? |
| 12:57PM | 19 | A.  Yes. |
| 12:57PM | 20 | Q.  Is he the one in the green shirt? |
| 12:58PM | 21 | A.  Yes, to the right. |
| 12:58PM | 22 | Q.  And what's the setting and scene of the photo? |
| 12:58PM | 23 | A.  It's in Cabo San Lucas.  I believe it was on a booze |
| 12:58PM | 24 | cruise. |
| 12:58PM | 25 | Q.  Okay.  Now I'll focus you in on 213-4 at the bottom.  Are |

| | | |
|---|---|---|
| 12:58PM | 1 | you and Mr. Bongiovanni also in that photo? |
| 12:58PM | 2 | A.  Yes. |
| 12:58PM | 3 | Q.  And who's that photo of?  There's four people there. |
| 12:58PM | 4 | A.  Mr. Bongiovanni, myself, Tom Napoli, and |
| 12:58PM | 5 | Mr. Bongiovanni's stepson Matt. |
| 12:58PM | 6 | Q.  Okay.  Tom Napoli's at the far left? |
| 12:58PM | 7 | A.  He's at the far left, yes. |
| 12:58PM | 8 | Q.  Next to him is that Mr. Bongiovanni? |
| 12:58PM | 9 | A.  Yes. |
| 12:58PM | 10 | Q.  Then next to him is that you? |
| 12:58PM | 11 | A.  Yes. |
| 12:58PM | 12 | Q.  Is that basically a picture of the wedding party? |
| 12:58PM | 13 | A.  Yes. |
| 12:58PM | 14 | Q.  Now, the suits that the wedding party is wearing, who |
| 12:58PM | 15 | bought those? |
| 12:58PM | 16 | A.  Mr. Bongiovanni. |
| 12:58PM | 17 | Q.  Okay.  So he paid for your suit? |
| 12:58PM | 18 | A.  Yes. |
| 12:58PM | 19 | Q.  Who paid for the wedding? |
| 12:58PM | 20 | A.  I believe Mr. Bongiovanni. |
| 12:59PM | 21 | **MR. TRIPI:**  Okay.  We can take those down, |
| 12:59PM | 22 | Ms. Champoux. |
| 12:59PM | 23 | **BY MR. TRIPI:** |
| 12:59PM | 24 | Q.  And again, the actual wedding the tweets, the tweets are |
| 12:59PM | 25 | in May, but the actual wedding was in February of 2015? |

12:59PM    1    A.  Yes.

12:59PM    2    Q.  Okay.  I'd like to fast forward now from 2015 to the

12:59PM    3    fall, roughly the fall of 2018.

12:59PM    4        In the fall of 2018, did Mr. Bongiovanni alert you to

12:59PM    5    some trouble he was having at work?

12:59PM    6    A.  Yes.

12:59PM    7    Q.  Did he start talking about retiring around that time?

12:59PM    8    A.  Yes.

12:59PM    9    Q.  Was a concern he expressed, did it relate to another DEA

12:59PM   10    agent he worked with named Anthony Casullo?

12:59PM   11    A.  Yes.

12:59PM   12    Q.  Prior to that point, as far as you knew, had defendant --

01:00PM   13    had Mr. Bongiovanni been planning to retire?

01:00PM   14    A.  No.

01:00PM   15            MR. TRIPI:  Now, if we can pull back up Exhibit 127

01:00PM   16    briefly.  This is in evidence.  I'm sorry, 126.  My fault.

01:00PM   17            BY MR. TRIPI:

01:00PM   18    Q.  Now I showed you this photograph before.  Is there

01:00PM   19    another individual in this photograph named Michael Sinatra?

01:00PM   20            MR. SOEHNLEIN:  Objection.  Relevance.

01:00PM   21            MR. TRIPI:  They've heard testimony about this entire

01:00PM   22    episode from Mr. Myszka.

01:00PM   23            THE COURT:  I'll allow this, and we'll see where it

01:00PM   24    goes.

01:00PM   25            THE WITNESS:  Yes.

| | | |
|---|---|---|
| 01:00PM | 1 | **BY MR. TRIPI:** |
| 01:00PM | 2 | Q.  Can you show the jury where Michael Sinatra is? |
| 01:00PM | 3 | **MR. TRIPI:**  May the record reflect the witness has |
| 01:00PM | 4 | indicated the person second from the left in the photo. |
| 01:00PM | 5 | **BY MR. TRIPI:** |
| 01:01PM | 6 | Q.  Wearing light gray suit coat; is that right? |
| 01:01PM | 7 | A.  Correct. |
| 01:01PM | 8 | Q.  Okay.  Now, in approximately January of 2019, did you |
| 01:01PM | 9 | learn that Anthony Gerace and Michael Sinatra's houses were |
| 01:01PM | 10 | raided by law enforcement? |
| 01:01PM | 11 | A.  Yes. |
| 01:01PM | 12 | **MR. TRIPI:**  We can take that down, Ms. Champoux. |
| 01:01PM | 13 | **BY MR. TRIPI:** |
| 01:01PM | 14 | Q.  After Michael Sinatra and Anthony Gerace's houses were |
| 01:01PM | 15 | searched, did you speak about it -- just yes or no -- with |
| 01:01PM | 16 | Mr. Bongiovanni? |
| 01:01PM | 17 | A.  Yes. |
| 01:01PM | 18 | Q.  Did you discuss, specifically with Mr. Bongiovanni, |
| 01:01PM | 19 | Anthony Gerace's house being searched? |
| 01:01PM | 20 | A.  Yes. |
| 01:01PM | 21 | Q.  When Mr. Bongiovanni discussed that with you, what was |
| 01:02PM | 22 | his demeanor? |
| 01:02PM | 23 | A.  Not himself.  Nervous. |
| 01:02PM | 24 | Q.  In that timeframe between fall of 2018 and the time |
| 01:02PM | 25 | following when you heard about Michael Sinatra and Anthony |

01:02PM    1    Gerace's house being searched, in that timeframe, did

01:02PM    2    Mr. Bongiovanni comment to you that he was being scrutinized

01:02PM    3    at work over Anthony and Peter Gerace?

01:02PM    4            **MR. SOEHNLEIN:**  Objection.  In furtherance.

01:02PM    5            **THE COURT:**  Oh, yeah.  Hearsay.

01:02PM    6            **MR. TRIPI:**  State of mind, Your Honor.

01:02PM    7            **THE COURT:**  Mr. Bongiovanni's state of mind?

01:02PM    8            **MR. TRIPI:**  Yes.

01:02PM    9            **THE COURT:**  Okay.  So this is not being admitted for

01:02PM   10    the truth of it, it's being admitted to show Mr. Bongiovanni's

01:03PM   11    state of mind.

01:03PM   12            Objection overruled on that -- on that limited

01:03PM   13    ground, and you can answer.

01:03PM   14            **THE WITNESS:**  Yes, it was.

01:03PM   15            **BY MR. TRIPI:**

01:03PM   16    Q.  You said:  Yes, it was.

01:03PM   17        Did you mean:  Yes, he was?

01:03PM   18    A.  Yes.

01:03PM   19    Q.  Okay.  Did you witness Mr. Bongiovanni become

01:03PM   20    increasingly stressed prior to retiring from DEA?

01:03PM   21    A.  Yes.

01:03PM   22    Q.  After he retired from DEA, did you later hear that

01:03PM   23    Mr. Bongiovanni's house was searched in around June of 2019?

01:03PM   24    A.  Yes.

01:03PM   25            **MR. SOEHNLEIN:**  Objection.

01:03PM   1          **THE COURT:**  Yeah, sustained.

01:03PM   2          **BY MR. TRIPI:**

01:03PM   3   Q.  After Mr. Bongiovanni's home was searched in or about

01:04PM   4   June of 2019, did you meet up with him at some point?

01:04PM   5          **MR. SOEHNLEIN:**  Objection.  Same objection, Judge.

01:04PM   6          **MR. TRIPI:**  Judge --

01:04PM   7          **THE COURT:**  Did you meet up with him?  No, overruled.

01:04PM   8          **BY MR. TRIPI:**

01:04PM   9   Q.  Did you meet up with Mr. Bongiovanni after a period of

01:04PM  10   time?

01:04PM  11   A.  After a period of time, yes.

01:04PM  12   Q.  Was there a short period of time where Mr. Bongiovanni

01:04PM  13   was sort of laying low where you couldn't get ahold of him?

01:04PM  14   A.  Yes.

01:04PM  15   Q.  After about month or so, did you and he reconnect?

01:04PM  16   A.  Yes.

01:04PM  17   Q.  At that point after the searches of Anthony and Joe later

01:04PM  18   that same year, were you nervous?

01:04PM  19   A.  Yes.

01:04PM  20   Q.  Did you have a discussion with Mr. Bongiovanni at his

01:05PM  21   house in his driveway?

01:05PM  22   A.  Yes.

01:05PM  23   Q.  Now is that one of the occasions where Mr. Bongiovanni

01:05PM  24   reminded you of what you should say to law enforcement if

01:05PM  25   they approached you?

01:05PM    1    A.  It was.  Yes.

01:05PM    2    Q.  Was that essentially to tell them you were his informant?

01:05PM    3    A.  Correct.

01:05PM    4    Q.  And that would have been false, correct?

01:05PM    5    A.  Correct.

01:05PM    6    Q.  Did you also sort of meet up at a point in time near

01:05PM    7    Delaware Park and have a similar discussion?

01:05PM    8    A.  Yes.

01:05PM    9    Q.  During the walk in the Delaware Park meeting, did you

01:05PM   10    also discuss with him Anthony Gerace?

01:05PM   11            MR. SOEHNLEIN:  Objection.

01:05PM   12            MR. TRIPI:  It's a "yes" or "no" question, Judge.

01:05PM   13            THE COURT:  Yeah, overruled.

01:05PM   14            THE WITNESS:  Yes.

01:05PM   15            BY MR. TRIPI:

01:05PM   16    Q.  During the meeting in the park, what, if any, concerns

01:05PM   17    was Mr. Bongiovanni expressing to you regarding Anthony

01:06PM   18    Gerace?

01:06PM   19    A.  Well, he was -- he was nervous about it, that it would

01:06PM   20    come back on him with this whole operation that was going on.

01:06PM   21            MR. SOEHNLEIN:  Your Honor, can we approach, please?

01:06PM   22            THE COURT:  Yeah, come on up.

01:06PM   23            (Sidebar discussion held on the record.)

01:06PM   24            THE COURT:  The whole operation going on, I think

01:06PM   25    he's talking about the Serio conspiracy, which he shouldn't.

01:06PM     1    I don't know if that's what he meant, but I don't want to go.

01:06PM     2        MR. TRIPI:  I understand.  I clearly -- my question

01:06PM     3    is clear about Anthony Gerace.  And the problem for the

01:06PM     4    witness is Anthony Gerace is involved across the board.

01:06PM     5        THE COURT:  I understand.

01:06PM     6        MR. TRIPI:  I understand that.  So I can ask a more

01:06PM     7    leading question.

01:06PM     8        THE COURT:  I don't think there's -- I don't think

01:06PM     9    that the answer right now by itself is harmful if we want to

01:06PM    10    let the jury know what he meant by --

01:07PM    11        MR. TRIPI:  Obviously, something's happening if law

01:07PM    12    enforcement is searching Anthony Gerace's house.  They've seen

01:07PM    13    big boxes of marijuana and drugs.

01:07PM    14        THE COURT:  I understand that.

01:07PM    15        MR. TRIPI:  So, I mean, it's not --

01:07PM    16        THE COURT:  I understand that.  But -- but again, I

01:07PM    17    don't want the Serio conspiracy to make its way in through the

01:07PM    18    back door, so --

01:07PM    19        MR. TRIPI:  I'll ask a very pointed question.

01:07PM    20        THE COURT:  I overrule the objection, but I don't

01:07PM    21    want to get into the Serio conspiracy.

01:07PM    22        MR. FOTI:  Yeah, I think the jury hears "operation,"

01:07PM    23    they're going to assume it relates to something involving

01:07PM    24    between Anthony Gerace and Peter Gerace, and we know factually

01:07PM    25    that that's not the case, so I'm worried about the unfair

01:07PM  1    prejudice.

01:07PM  2             THE COURT:  You can clear that up.

01:07PM  3             MR. FOTI:  We certainly could, but we -- we don't

01:07PM  4    want to do it at risk of an argument being presented that now

01:07PM  5    they've opened the door to other things.

01:07PM  6             THE COURT:  He can certainly say right now --

01:07PM  7             MR. TRIPI:  You don't want me to ask that question,

01:07PM  8    I'm sure.

01:07PM  9             THE COURT:  There may be a way to do it, but I don't

01:07PM  10   think that without thinking of a Serio conspiracy.

01:08PM  11            MR. FOTI:  I don't think so either, it's a reference

01:08PM  12   to a conspiracy involving Peter Gerace.

01:08PM  13            MR. TRIPI:  It's Anthony, Judge.  I'm sorry that he

01:08PM  14   was involved in drugs with his brother, and his brother was

01:08PM  15   involved in drugs with Ron Serio.  But that's the reality of

01:08PM  16   life.

01:08PM  17            And he's already talked about Joe telling him he

01:08PM  18   stepped in for Anthony and Peter.

01:08PM  19            THE COURT:  Yeah, and Anthony is involved in the

01:08PM  20   conspiracy that's at issue here in some ways.

01:08PM  21            MR. FOTI:  Some ways in a very min -- it's certainly

01:08PM  22   not an operation.

01:08PM  23            THE COURT:  I agree.  Well --

01:08PM  24            MR. FOTI:  The testimony that we've heard is Anthony

01:08PM  25   gave Peter drugs once when Peter came over with his girlfriend

01:08PM   1    late at night, and that Anthony has sold drugs a couple times

01:08PM   2    in Pharaoh's.

01:08PM   3             THE COURT:  Do you want me to tell the jury to strike

01:08PM   4    the whole operation and let Mr. Tripi reword it a little

01:08PM   5    differently with questions?

01:08PM   6             MR. TRIPI:  Personally, I think that it's right over

01:08PM   7    their head, and all we're doing is drawing attention to it.

01:09PM   8             THE COURT:  So do I.

01:09PM   9             MR. TRIPI:  Yeah, I get it, I get it.

01:09PM   10            MR. FOTI:  So we won't ask for the instruction.

01:09PM   11            THE COURT:  You don't want it, right?  The next

01:09PM   12   question, right?  And let's keep it tight.

01:09PM   13            (End of sidebar discussion.)

01:09PM   14            THE COURT:  Mr. Selva, I want you to speak up right

01:09PM   15   into the microphone, please.

01:09PM   16            THE WITNESS:  Yes, Your Honor.

01:09PM   17            BY MR. TRIPI:

01:09PM   18   Q.  In your discussion with Mr. Bongiovanni as part of it,

01:09PM   19   just listen to this question, as part of your discussion as

01:09PM   20   you walked with Mr. Bongiovanni in the vicinity of Delaware

01:09PM   21   Park, did Mr. Bongiovanni tell you he was concerned that

01:09PM   22   Anthony would flip because Mr. Bongiovanni had helped him

01:09PM   23   before, and he had helped him on a prior arrest?

01:09PM   24   A.  Yes.

01:09PM   25   Q.  Was Bongiovanni concerned about that?

01:09PM    1    A.  He was.

01:09PM    2    Q.  And is that what you talked about earlier when you

01:10PM    3    referenced him stepping in regarding Amherst police?

01:10PM    4    A.  Correct.

01:10PM    5    Q.  Okay.  All right.  I'm going to hand you an exhibit,

01:10PM    6    Government Exhibit 208D.  I'm going to ask you to just take a

01:10PM    7    look at it, and when you're done, look up.

01:10PM    8         **MR. TRIPI:**  Do you need to see it?

01:10PM    9         **MR. SOEHNLEIN:**  Can I?

01:11PM   10         **BY MR. TRIPI:**

01:11PM   11    Q.  Okay.  I'm going to hand you up two exhibits.  Government

01:11PM   12    Exhibit 208D and Government Exhibit 208K.  Take a moment and

01:11PM   13    look at these and then I'm going to have some questions about

01:11PM   14    them, okay?

01:11PM   15    A.  Okay.

01:11PM   16    Q.  Did you have a chance to look at those?

01:12PM   17    A.  I did.

01:12PM   18    Q.  Starting at Exhibit 208D, do you recognize that?

01:12PM   19    A.  I do.

01:12PM   20    Q.  Now going back in time for a moment, back on August 23rd,

01:12PM   21    2019 when the search warrant was executed at your residence,

01:12PM   22    I think yesterday you indicated that you gave your cell phone

01:12PM   23    to HSI for them to search; is that right?

01:13PM   24    A.  That's correct.

01:13PM   25    Q.  And is it your understanding they extracted the data from

01:13PM   1   your phone and then returned your cell phone?

01:13PM   2   A.   Yes.

01:13PM   3   Q.   And since that time, you've looked at the data extracted

01:13PM   4   from your phone, and you've verified that was from your

01:13PM   5   phone, correct?

01:13PM   6   A.   Correct.

01:13PM   7   Q.   Now looking at Exhibit 208D, does that contain contacts

01:13PM   8   that were in your phone at that time?

01:13PM   9   A.   It does, yes.

01:13PM  10   Q.   And do you recognize it because you reviewed it and

01:13PM  11   initialed it?

01:13PM  12   A.   I do, yes.

01:13PM  13   Q.   And you recognize the contacts that were in the phone as

01:13PM  14   being contacts you had?

01:13PM  15   A.   Yes.

01:13PM  16   Q.   Does that Exhibit 208D fairly and accurately depict

01:13PM  17   contacts that were in your phone as of August 23rd, 2019?

01:13PM  18   A.   They do, yes.

01:13PM  19   Q.   Turning to Exhibit 208K.

01:13PM  20   A.   Okay.

01:13PM  21   Q.   Do you remember doing some internet searches on your

01:13PM  22   phone?

01:13PM  23   A.   Yes.

01:13PM  24   Q.   Did some of those internet searches -- were you trying to

01:13PM  25   find out information about Anthony Gerace during the summer

01:14PM    1    of 2019?

01:14PM    2    A.  Yes.

01:14PM    3    Q.  Do you recognize 208K to be searches that you did on your

01:14PM    4    phone looking for information about Anthony Gerace?

01:14PM    5    A.  Yes.

01:14PM    6    Q.  Do those fairly and accurately depict searches you did in

01:14PM    7    your phone for Anthony Gerace?

01:14PM    8    A.  Yes.

01:14PM    9         **MR. TRIPI:**  The government offers 208D and 208K,

01:14PM   10    Your Honor.

01:14PM   11         **MR. SOEHNLEIN:**  No objection.

01:14PM   12         **THE COURT:**  Received without objection.

01:14PM   13      **(GOV Exhibits 208D, 208K were received in evidence.)**

01:14PM   14         **BY MR. TRIPI:**

01:14PM   15    Q.  I'd like to go through first 208D.  We're winding down,

01:14PM   16    Mr. Selva.  We have a couple more things to cover, but we're

01:14PM   17    almost done.

01:14PM   18    A.  Okay.

01:14PM   19         **MR. TRIPI:**  Okay.  Ms. Champoux, can we zoom in on

01:14PM   20    the contact number 1?

01:14PM   21         **BY MR. TRIPI:**

01:14PM   22    Q.  Did you have a contact in your phone for Anthony Gerace

01:14PM   23    with a phone number?

01:14PM   24    A.  Yes.

01:14PM   25    Q.  Okay.

01:15PM   1        MR. TRIPI:  You can zoom out of that.

01:15PM   2        BY MR. TRIPI:

01:15PM   3   Q.  Did you have several contact numbers for Mike Masecchia?

01:15PM   4   A.  Yes.

01:15PM   5   Q.  And that was someone whose name we saw in the contacts

01:15PM   6   for Mr. Gerace's phone earlier?

01:15PM   7   A.  Yes.

01:15PM   8   Q.  In your contacts, how did you have Mr. Masecchia's saved?

01:15PM   9   A.  The name under --

01:15PM  10   Q.  Yeah.

01:15PM  11   A.  His nickname was the Gorilla.

01:15PM  12   Q.  Okay.  So when we see, Gorilla ape, Gorilla new number,

01:15PM  13   Gorilla, Grover Gorilla, are those references to Masecchia?

01:15PM  14   A.  Yes.

01:15PM  15        MR. TRIPI:  So let's go to the next page,

01:15PM  16   Ms. Champoux.

01:15PM  17        BY MR. TRIPI:

01:15PM  18   Q.  Contact number 8, do you see that?

01:15PM  19   A.  Yes.

01:15PM  20   Q.  Is that a phone number you had for Joe Bongiovanni, two

01:15PM  21   phone numbers?

01:15PM  22   A.  Yes.

01:15PM  23   Q.  Now were those phone numbers you had received regarding

01:15PM  24   him after he separated from the DEA?

01:16PM  25   A.  One, yes.  Well, one of them was.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

95

```
01:16PM    1   Q.  Was his DEA phone number, if you recall it, 818 -- an 818
01:16PM    2   number?
01:16PM    3   A.  It was.
01:16PM    4   Q.  So these are two other numbers you had?
01:16PM    5   A.  Yes.
01:16PM    6        MR. TRIPI:  Okay.  Zoom out of that.
01:16PM    7        BY MR. TRIPI:
01:16PM    8   Q.  Contact number 10.  You have Mr. Bongiovanni's wife's
01:16PM    9   phone number's as well?
01:16PM   10   A.  Yes.
01:16PM   11   Q.  And we saw her in one of the photos earlier in your
01:16PM   12   testimony, correct?
01:16PM   13   A.  Yes.
01:16PM   14   Q.  Okay.
01:16PM   15        MR. TRIPI:  We can zoom out of that.  Scroll down a
01:16PM   16   little bit to contact 11, please.
01:16PM   17        BY MR. TRIPI:
01:16PM   18   Q.  Okay.  Who's that?
01:16PM   19   A.  That's Lillo Brancato, the actor who was actually friends
01:16PM   20   with Kim Mecca who you mentioned earlier.
01:16PM   21   Q.  Okay.
01:16PM   22   A.  And I got to know him through her.
01:16PM   23   Q.  And what were some of the movies or shows he's been in?
01:17PM   24   A.  He was in the movie a Bronx Tale, a few other ones.  He
01:17PM   25   was on The Sopranos, I think Crimson Tide.
```

01:17PM 1    Q.  We're gonna pause here for a moment.

01:17PM 2        **MR. TRIPI:**  Ms. Champoux, can we switch back to

01:17PM 3    Exhibit 310D now?  Bear with me just a moment.

01:18PM 4        Okay.  Ms. Champoux, could we go to a message,

01:18PM 5    March 6th, 2016, at 8:53 p.m.  I can't give you a page number

01:18PM 6    because this isn't numbered, but if you can scroll down to a

01:18PM 7    March 6th, 2016 message in Exhibit 310D.

01:18PM 8        2016, yeah, March 6th.  There you go.

01:18PM 9        **BY MR. TRIPI:**

01:18PM 10   Q.  All right.  Do you see a photograph there of two people

01:18PM 11   on Exhibit 310D?

01:18PM 12   A.  Yes.

01:18PM 13   Q.  Okay.  Who do you see in that photo?

01:19PM 14   A.  Lillo Brancato and Mr. Gerace.

01:19PM 15   Q.  Okay.  That's the same Lillo Brancato that you have

01:19PM 16   stored in your phone, correct?

01:19PM 17   A.  Yes.

01:19PM 18       **MR. TRIPI:**  Let's go back to Exhibit 208D.  We'll

01:19PM 19   look at contact 13, scrolling a little bit.

01:19PM 20       **BY MR. TRIPI:**

01:19PM 21   Q.  Is that another number you had for Mike Masecchia?

01:19PM 22   A.  Yes.

01:19PM 23   Q.  Okay.

01:19PM 24       **MR. TRIPI:**  Let's go to the contact under that,

01:19PM 25   contact 14.

| | | |
|---|---|---|
| 01:19PM | 1 | **BY MR. TRIPI:** |
| 01:19PM | 2 | Q.  Did you have a contact for Michael Sinatra? |
| 01:19PM | 3 | A.  Yes. |
| 01:19PM | 4 | Q.  Is that the same person we saw in that Exhibit 126 a |
| 01:19PM | 5 | moment ago? |
| 01:19PM | 6 | A.  Yeah. |
| 01:19PM | 7 | Q.  The photograph? |
| 01:19PM | 8 | A.  Yes. |
| 01:19PM | 9 | Q.  Okay.  It's the same person who was in the picture with |
| 01:19PM | 10 | Mr. Bongiovanni? |
| 01:19PM | 11 | A.  Yes, sir. |
| 01:19PM | 12 | **MR. TRIPI:**  Okay.  Scroll out of that. |
| 01:19PM | 13 | **BY MR. TRIPI:** |
| 01:20PM | 14 | Q.  And we went through phone records earlier where you were |
| 01:20PM | 15 | in contact with Mr. Gerace, but you had him as a contact in |
| 01:20PM | 16 | your phone, and you had his number saved; is that right? |
| 01:20PM | 17 | A.  That's correct. |
| 01:20PM | 18 | **MR. TRIPI:**  Okay.  We can zoom out of that.  If we |
| 01:20PM | 19 | can zoom in on 18 and 19. |
| 01:20PM | 20 | **BY MR. TRIPI:** |
| 01:20PM | 21 | Q.  When we were looking through contacts for Mr. Gerace's |
| 01:20PM | 22 | phone, we saw a person named Wayne Anderson.  Do you also |
| 01:20PM | 23 | have Wayne Anderson's contact information? |
| 01:20PM | 24 | A.  Yes. |
| 01:20PM | 25 | Q.  Is he someone you've known for a long time? |

| | | |
|---|---|---|
| 01:20PM | 1 | A.  Yes. |
| 01:20PM | 2 | Q.  Is that someone who also knows Mr. Bongiovanni? |
| 01:20PM | 3 | A.  Yes. |
| 01:20PM | 4 | Q.  By the way, does Mr. Masecchia also know Mr. Bongiovanni? |
| 01:20PM | 5 | A.  He does. |
| 01:20PM | 6 | Q.  For a long time? |
| 01:20PM | 7 | A.  He does. |
| 01:20PM | 8 | Q.  Since childhood? |
| 01:20PM | 9 | A.  Since childhood, yes. |
| 01:20PM | 10 | **MR. TRIPI:**  Keep scrolling down.  Stop there. |
| 01:20PM | 11 | **BY MR. TRIPI:** |
| 01:20PM | 12 | Q.  Okay.  Now earlier in Mr. Gerace's phone, we looked at a |
| 01:20PM | 13 | person named Turtle; do you remember that? |
| 01:20PM | 14 | A.  Yes. |
| 01:20PM | 15 | Q.  And now you have a contact named Donnie Panepinto? |
| 01:21PM | 16 | A.  That's Mr. Panepinto's son. |
| 01:21PM | 17 | Q.  So the Donnie that you have in your phone is Turtle's |
| 01:21PM | 18 | son? |
| 01:21PM | 19 | A.  Yes. |
| 01:21PM | 20 | Q.  And I think you indicated already that Mr. Bongiovanni |
| 01:21PM | 21 | previously dated Dana? |
| 01:21PM | 22 | A.  Yes. |
| 01:21PM | 23 | **MR. TRIPI:**  We can zoom out of that.  Are we at the |
| 01:21PM | 24 | bottom? |
| | 25 | |

| | | |
|---|---|---|
| 01:21PM | 1 | **BY MR. TRIPI:** |
| 01:21PM | 2 | Q.  And the last one there was a Frank Tripi in Mr. Gerace's |
| 01:21PM | 3 | phone; do you remember that? |
| 01:21PM | 4 | A.  Yes. |
| 01:21PM | 5 | Q.  Exhibit 310AT, to be specific, do you remember you looked |
| 01:21PM | 6 | at that? |
| 01:21PM | 7 | A.  Yes, I do.  Yes. |
| 01:21PM | 8 | Q.  Remember I showed you the first page? |
| 01:21PM | 9 | A.  Yes. |
| 01:21PM | 10 | Q.  Do you see a Frank Tripi spelled with one P this time? |
| 01:21PM | 11 | A.  Yes. |
| 01:21PM | 12 | Q.  Again, no relation to mine though? |
| 01:21PM | 13 | A.  Correct. |
| 01:21PM | 14 | **MR. TRIPI:**  We can take that down, I think. |
| 01:21PM | 15 | Oops, we've got more.  Keep going. |
| 01:21PM | 16 | Stop a little bit.  Keep going. |
| 01:22PM | 17 | **BY MR. TRIPI:** |
| 01:22PM | 18 | Q.  Oh, yeah, we've talked about Tom Napoli.  You also had |
| 01:22PM | 19 | contact for him in terms of Facebook and phone numbers; is |
| 01:22PM | 20 | that right? |
| 01:22PM | 21 | A.  That's correct. |
| 01:22PM | 22 | **MR. TRIPI:**  Are we at the bottom? |
| 01:22PM | 23 | **MS. CHAMPOUX:**  Yep. |
| 01:22PM | 24 | **MR. TRIPI:**  Okay.  We can take that down, thank you |
| 01:22PM | 25 | very much. |

| | | |
|---|---|---|
| 01:22PM | 1 | All right.  We're going to switch over to Exhibit |
| 01:22PM | 2 | 208K now, and go to -- I think the second page of that. |
| 01:22PM | 3 | If we can zoom in on the searched items. |
| 01:22PM | 4 | **BY MR. TRIPI:** |
| 01:22PM | 5 | Q.  After Mr. Gerace -- Anthony Gerace's house was searched |
| 01:22PM | 6 | in January, and after Mr. Bongiovanni's house was searched in |
| 01:22PM | 7 | June, did you start to search for information about Anthony |
| 01:22PM | 8 | Gerace on the internet? |
| 01:22PM | 9 | A.  Yes. |
| 01:22PM | 10 | Q.  Were you trying to get information about his case? |
| 01:23PM | 11 | A.  Yes. |
| 01:23PM | 12 | Q.  Was that at the time you were becoming increasingly |
| 01:23PM | 13 | concerned? |
| 01:23PM | 14 | A.  Yes. |
| 01:23PM | 15 | Q.  About two months after you did -- a little less than two |
| 01:23PM | 16 | months after you did your first search on June 30th, 2019, |
| 01:23PM | 17 | down at the bottom here, was your house searched? |
| 01:23PM | 18 | A.  Yes. |
| 01:23PM | 19 | Q.  How many times after the warrant was executed at |
| 01:23PM | 20 | Mr. Bongiovanni's house did he meet with you and remind you |
| 01:23PM | 21 | that the cover story was to pretend that you were his |
| 01:23PM | 22 | informant? |
| 01:23PM | 23 | A.  A few times. |
| 01:23PM | 24 | Q.  More than once? |
| 01:23PM | 25 | A.  More than once. |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

101

01:23PM     1    Q.  More than twice?

01:23PM     2    A.  More than twice, yes.

01:23PM     3    Q.  Was -- were those in public places or at his house?

01:23PM     4    A.  At his house.  And then I believe one time we were in a

01:24PM     5    public place, a bar.  But mostly the -- it was at his house,

01:24PM     6    yes.

01:24PM     7    Q.  You remember several meetings?

01:24PM     8    A.  Yes, it was --

01:24PM     9             **MR. TRIPI:**  One moment, please, Your Honor.

01:24PM    10             **THE COURT:**  Yes.

01:24PM    11             **BY MR. TRIPI:**

01:24PM    12    Q.  I think I skipped over one thing, so we're almost done.

01:24PM    13             **MR. TRIPI:**  Can you pull up 109AB?

01:24PM    14             **THE COURT:**  In evidence?

01:24PM    15             **MR. TRIPI:**  Yeah, it is in evidence, Judge.

01:24PM    16             **BY MR. TRIPI:**

01:24PM    17    Q.  Is this a car, do you recognize this?

01:24PM    18    A.  Yes.

01:24PM    19    Q.  Did you take that photo of Mr. Bongiovanni in that

01:24PM    20    vehicle?

01:24PM    21    A.  I did, yes.

01:24PM    22    Q.  When Mr. Bongiovanni first purchased that vehicle, did it

01:24PM    23    look like that?  Was it in that condition?  Or did he restore

01:25PM    24    it?

01:25PM    25    A.  He restored it.

| | | |
|---|---|---|
| 01:25PM | 1 | Q.  Did he do a lot of work on it as far as you know? |
| 01:25PM | 2 | A.  Yes. |
| 01:25PM | 3 | Q.  Did that happen as his financial condition improved? |
| 01:25PM | 4 | A.  Yes. |
| 01:25PM | 5 | **MR. TRIPI:**  Okay.  Nothing further, Judge. |
| 01:25PM | 6 | **THE COURT:**  Mr. Soehnlein. |
| 01:25PM | 7 | |
| 01:25PM | 8 | **CROSS-EXAMINATION BY MR. SOEHNLEIN:** |
| 01:25PM | 9 | Q.  Mr. Selva, what is a cooperation agreement? |
| 01:25PM | 10 | A.  What is a cooperation agreement? |
| 01:25PM | 11 | Q.  Yeah.  Yeah. |
| 01:25PM | 12 | A.  That I'm gonna tell the truth, I mean, I was signed -- I |
| 01:25PM | 13 | signed an agreement with them. |
| 01:25PM | 14 | Q.  And you haven't been charged with a crime, correct? |
| 01:25PM | 15 | A.  No. |
| 01:25PM | 16 | Q.  And the cooperation agreement doesn't necessarily |
| 01:25PM | 17 | contemplate you will be charged with a crime, correct? |
| 01:25PM | 18 | A.  There's nothing guaranteed. |
| 01:25PM | 19 | Q.  Yeah.  And that's an agreement between yourself and the |
| 01:25PM | 20 | United States Attorney's Office, correct? |
| 01:25PM | 21 | A.  Correct. |
| 01:25PM | 22 | Q.  And these prosecutors behind me, they're from the same |
| 01:26PM | 23 | United States Attorney's Office that you have that agreement |
| 01:26PM | 24 | with, correct? |
| 01:26PM | 25 | A.  Correct. |

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
103

01:26PM   1   Q.  And that United States Attorney's Office is the same

01:26PM   2   office that will decide whether or not to bring charges

01:26PM   3   against you, correct?

01:26PM   4   A.  Yes.

01:26PM   5   Q.  Now, as part of that cooperation agreement, you have to

01:26PM   6   show up whenever they want you to show up, correct?

01:26PM   7   A.  Correct.

01:26PM   8   Q.  You have to testify whenever they want you to testify,

01:26PM   9   correct?

01:26PM  10   A.  Correct.

01:26PM  11   Q.  You have to meet with them whenever they want to meet

01:26PM  12   with you, correct?

01:26PM  13   A.  Correct.

01:26PM  14   Q.  And with respect to this case, how many different times

01:26PM  15   did they change the date of your testimony?

01:26PM  16   A.  Today?  I don't know, a few.  I'm not, you know.

01:26PM  17   Q.  Yeah, they kept changing the date on you, correct?

01:26PM  18   A.  Correct.

01:26PM  19   Q.  And you never told them that you couldn't be there,

01:26PM  20   correct?

01:26PM  21   A.  No.

01:26PM  22   Q.  You never told them that you had any scheduling issues or

01:26PM  23   anything like that, correct?

01:26PM  24   A.  Any time I was told, I'd rearranged my schedule.

01:26PM  25   Q.  Yeah.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

104

01:26PM   1   A.   The work schedule.

01:26PM   2   Q.   Yeah.  Because this is the most important thing going on

01:26PM   3   for you right now, correct?

01:26PM   4   A.   It's important, yes.

01:26PM   5   Q.   Well, it's not just important, it's the most important

01:27PM   6   thing?

01:27PM   7   A.   Yes.

01:27PM   8   Q.   I mean, because depending on how you do here is -- is

01:27PM   9   going to play into whether or not you're ever charged

01:27PM  10   correct?

01:27PM  11          **MR. TRIPI:**  Objection.

01:27PM  12          **THE COURT:**  Overruled.

01:27PM  13          **THE WITNESS:**  Correct.

01:27PM  14          **BY MR. SOEHNLEIN:**

01:27PM  15   Q.   Yeah.  And that decision, the judge doesn't make the

01:27PM  16   decision of whether or not you're charged, correct?

01:27PM  17   A.   Correct.

01:27PM  18   Q.   And your lawyer doesn't get to make that decision of

01:27PM  19   whether or not you're charged, correct?

01:27PM  20   A.   Correct.

01:27PM  21   Q.   That's only the United States Attorney's Office, correct?

01:27PM  22   A.   That's correct.

01:27PM  23   Q.   Okay.  So you've got a lot on the line here, correct?

01:27PM  24   A.   Correct.

01:27PM  25   Q.   Might be one of the most important days of your life,

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

105

| | | |
|---|---|---|
| 01:27PM | 1 | right? |
| 01:27PM | 2 | A.  Correct. |
| 01:27PM | 3 | Q.  Okay.  Now, on -- on August 23rd, 2019, your house was |
| 01:27PM | 4 | searched; do you recall that? |
| 01:27PM | 5 | A.  That's correct. |
| 01:27PM | 6 | Q.  The search was early in the morning, correct? |
| 01:27PM | 7 | A.  It was. |
| 01:27PM | 8 | Q.  Flash bangs? |
| 01:27PM | 9 | A.  Yes, they broke the door down. |
| 01:28PM | 10 | Q.  Yeah.  Do you recall how many agents came into your |
| 01:28PM | 11 | house? |
| 01:28PM | 12 | A.  I don't remember.  There was a bunch of them.  I don't, |
| 01:28PM | 13 | there was numerous. |
| 01:28PM | 14 | Q.  Yeah.  And you weren't expecting that to happen, correct? |
| 01:28PM | 15 | A.  No. |
| 01:28PM | 16 | Q.  Yeah.  That was very scary, wasn't it? |
| 01:28PM | 17 | A.  Yes.  It was scary, yes. |
| 01:28PM | 18 | Q.  You were in the house? |
| 01:28PM | 19 | A.  Yes. |
| 01:28PM | 20 | Q.  You were asleep? |
| 01:28PM | 21 | A.  No. |
| 01:28PM | 22 | Q.  No?  You were awake? |
| 01:28PM | 23 | A.  I was actually having a cup of coffee getting ready to go |
| 01:28PM | 24 | to work. |
| 01:28PM | 25 | Q.  And you were getting ready to go to work as an Erie |

01:28PM    1    County sheriff, correct?

01:28PM    2    A.   Yes.

01:28PM    3    Q.   Sheriff's deputy, I should say.

01:28PM    4    A.   Correct.

01:28PM    5    Q.   You work at the holding center, correct?

01:28PM    6    A.   Correct.

01:28PM    7    Q.   And you'd had that job for a couple of years at that

01:28PM    8    point?

01:28PM    9    A.   No, I just -- I had just gotten it in March, so --

01:28PM   10    Q.   Okay.

01:28PM   11    A.   Six months.

01:28PM   12    Q.   Okay.  And before that, you had gone through the academy

01:28PM   13    and the training, correct?

01:28PM   14    A.   Correct.  The academy was 12 weeks, yes.

01:28PM   15    Q.   So you had gone through 12 weeks of training, and then

01:28PM   16    you had the job about six months at that point?

01:28PM   17    A.   Correct.

01:28PM   18    Q.   And you were getting ready to go to work, correct?

01:29PM   19    A.   Correct.

01:29PM   20    Q.   And Ms. Mecca was there with you, as well?

01:29PM   21    A.   She was.

01:29PM   22    Q.   And she was your girlfriend at the time?

01:29PM   23    A.   Correct.

01:29PM   24    Q.   And how long had you been together?

01:29PM   25    A.   A few years.  Almost three years.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:29PM   1    Q.  And -- and that was a stressful experience, correct?

01:29PM   2    A.  Yes.

01:29PM   3    Q.  Describe what thoughts were going through your head.

01:29PM   4    A.  Well, it was startling.  First -- there were a lot of

01:29PM   5    thoughts.

01:29PM   6    Q.  You were thinking about your future, correct?

01:29PM   7    A.  Correct.

01:29PM   8    Q.  You were thinking about the people who were closest to

01:29PM   9    you?

01:29PM   10   A.  Correct.

01:29PM   11   Q.  You were hoping you weren't going to go to jail?

01:29PM   12   A.  Correct.

01:29PM   13   Q.  You were hoping maybe you could keep your job, correct?

01:29PM   14   A.  I knew -- well, the thought was going through my mind

01:29PM   15   that I'd have to resign.

01:29PM   16   Q.  Okay.  And you resigned that day?

01:29PM   17   A.  I resigned that day.

01:29PM   18   Q.  Yeah.  You went into work, and you resigned, correct?

01:29PM   19   A.  After I called my attorney, yes.

01:29PM   20   Q.  Okay.  And because you had some law enforcement training,

01:29PM   21   you did have law enforcement training before that, correct?

01:30PM   22   A.  I did, correct?

01:30PM   23   Q.  We talked about that.

01:30PM   24       And immediately, you met with the people that were

01:30PM   25   searching your house, correct?

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
108

01:30PM    1    A.  Not immediately.  I mean the few days later it was on

01:30PM    2    the --

01:30PM    3    Q.  Well, that day, you consented to a search of your cell

01:30PM    4    phone, correct?

01:30PM    5    A.  Correct.

01:30PM    6    Q.  And you gave some statements to law enforcement, correct?

01:30PM    7    A.  Correct.

01:30PM    8    Q.  You told them some information, correct?

01:30PM    9    A.  Correct.

01:30PM   10    Q.  All right.  Even though you understood you had a right to

01:30PM   11    remain silent, correct?

01:30PM   12    A.  Correct.  It was general information.

01:30PM   13    Q.  Okay.  But you shared that information with them,

01:30PM   14    correct?

01:30PM   15    A.  Yes.

01:30PM   16    Q.  And then you made arrangements to meet with them again on

01:30PM   17    Monday, correct?

01:30PM   18    A.  Yes, with my attorney.

01:30PM   19    Q.  Yeah.  Because the search was on a Friday morning,

01:30PM   20    correct?

01:30PM   21    A.  Correct.

01:30PM   22    Q.  Okay.  So you didn't hesitate to cooperate, correct?

01:30PM   23    A.  I didn't hesitate to speak to them, no.

01:30PM   24    Q.  In fact, you were eager to speak with them, correct?

01:30PM   25    A.  I wanted to speak to them, yes.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:30PM    1    Q.  Yeah.  Yeah.  Over the weekend, you were thinking through

01:30PM    2    all these issues on Saturday and Sunday, correct?

01:30PM    3    A.  Correct.

01:30PM    4    Q.  You're worried about your future, correct?

01:31PM    5    A.  Correct.

01:31PM    6    Q.  You were worried about whether or not you're gonna get

01:31PM    7    charged with a crime, correct?

01:31PM    8    A.  Correct.

01:31PM    9    Q.  You're worried about whether or not you're gonna go to

01:31PM   10    prison, correct?

01:31PM   11    A.  Sure, correct.

01:31PM   12    Q.  You're thinking about the people who are close to you?

01:31PM   13    A.  Correct.

01:31PM   14    Q.  You're thinking about what impact that would have on them

01:31PM   15    if you had to go to prison, correct?

01:31PM   16    A.  Correct.

01:31PM   17    Q.  You're thinking about your family?

01:31PM   18    A.  Correct.

01:31PM   19    Q.  All right.  And so then you went ahead and you met with

01:31PM   20    law enforcement on August 26th of 2019 at the U.S. Attorney's

01:31PM   21    Office, correct?

01:31PM   22    A.  Correct.

01:31PM   23    Q.  That was the first time that you sat down to cooperate,

01:31PM   24    correct?

01:31PM   25    A.  That's correct.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:31PM   1   Q.  And you knew from your law enforcement training that it

01:31PM   2   was important to be truthful, correct?

01:31PM   3   A.  Correct.

01:31PM   4   Q.  And honest, correct?

01:31PM   5   A.  Correct.

01:31PM   6   Q.  And you also knew that you'd get more cooperation credit

01:31PM   7   if you shared more information, correct?

01:31PM   8   A.  That's correct.

01:31PM   9   Q.  And that's consistent with the cooperation agreement,

01:31PM  10   right?

01:31PM  11   A.  Correct.

01:31PM  12   Q.  The agreement you have in place now, correct?

01:31PM  13   A.  Correct.

01:31PM  14   Q.  The more you give, the more you get, right?

01:32PM  15   A.  I guess.  I'm not sure.  Nothing's been guaranteed.

01:32PM  16   Q.  Right.  Well, you wouldn't be here today if you didn't

01:32PM  17   think was gonna help you, would you?

01:32PM  18   A.  Correct.

01:32PM  19   Q.  You're not enjoying this, correct?

01:32PM  20   A.  Correct.

01:32PM  21   Q.  All right.  And you've done this a couple of times now,

01:32PM  22   right?

01:32PM  23   A.  Correct.

01:32PM  24   Q.  In other matters, correct?

01:32PM  25   A.  Correct.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
111

01:32PM   1   Q.  Okay.  Now, you met with law enforcement on August 26th,

01:32PM   2   2019 with your lawyer, right?

01:32PM   3   A.  Correct.

01:32PM   4   Q.  Okay.  And so I don't want to get into the substance of

01:32PM   5   the conversation, but you knew you that part of the proffer

01:32PM   6   was being honest, correct?

01:32PM   7   A.  Correct.

01:32PM   8   Q.  And you were not honest, right?

01:32PM   9   A.  Not fully at that point, no.

01:32PM  10   Q.  No.  Because later, on direct, they talk about how on

01:32PM  11   September 4th, you had a polygraph exam you that failed,

01:32PM  12   correct?

01:32PM  13   A.  That's correct.

01:32PM  14   Q.  Okay.  And so at the first proffer, you were not honest,

01:32PM  15   correct?

01:32PM  16   A.  Correct.

01:32PM  17   Q.  All right.  And that's a crime, correct?

01:32PM  18   A.  Well, we would -- more information was coming out.

01:33PM  19   Q.  Okay.  More information was coming out as they confronted

01:33PM  20   you with it, right?

01:33PM  21   A.  Correct.

01:33PM  22   Q.  Yeah.  You would give one set of facts, correct?

01:33PM  23   A.  Correct.

01:33PM  24   Q.  And then the prosecutors would confront you with another

01:33PM  25   set of facts, correct?

01:33PM   1   A.  Correct.

01:33PM   2   Q.  Okay.  And ultimately, it came out that be were being

01:33PM   3   untruthful, correct?

01:33PM   4   A.  On the polygraph, yes.

01:33PM   5   Q.  Yeah.  Now they didn't charge you with obstruction that

01:33PM   6   the time, correct?

01:33PM   7   A.  No.

01:33PM   8   Q.  No.  They didn't charge you with making a false statement

01:33PM   9   at that time, correct?

01:33PM  10   A.  No.

01:33PM  11   Q.  They met with you further, correct?

01:33PM  12   A.  Correct.

01:33PM  13   Q.  All right.  They met with you again -- so we talked about

01:33PM  14   August 26th of 2019, and then you took that polygraph on

01:33PM  15   September 4th, 2019, correct?

01:33PM  16   A.  Correct.

01:33PM  17   Q.  And then you met with them again on September 19th, 2019?

01:33PM  18   A.  That's correct.

01:33PM  19   Q.  And then you met with them again on October 1st, 2019,

01:33PM  20   correct?

01:33PM  21   A.  That's correct.

01:33PM  22   Q.  And you met with them again on October 3rd, 2019,

01:33PM  23   correct?

01:33PM  24   A.  That's correct.

01:33PM  25   Q.  And you with met with them again on October 25th, 2019,

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

113

01:34PM  1   correct?

01:34PM  2   A.  That's correct.

01:34PM  3   Q.  Okay.  And then eventually, you got into that cooperation

01:34PM  4   agreement in May of 2020, correct?

01:34PM  5   A.  Correct.

01:34PM  6   Q.  And you recall that.  You came down to the U.S.

01:34PM  7   Attorney's Office with your attorney, correct?

01:34PM  8   A.  That's correct.

01:34PM  9   Q.  And then they had a further interview with you that day

01:34PM  10  too?

01:34PM  11  A.  That's correct.

01:34PM  12  Q.  Okay.  Now, these interviews, who are you meeting with

01:34PM  13  during the course of these interviews?  Who do you recall?

01:34PM  14  A.  The U.S. Attorney and their teams.

01:34PM  15  Q.  Okay.  And so what specific individuals?

01:34PM  16  A.  U.S. Attorney Joe Tripi.

01:34PM  17         **MR. TRIPI:**  Assistant.  Assistant.

01:34PM  18         **THE WITNESS:**  Assistant, I'm sorry.

01:34PM  19         **MR. TRIPI:**  Don't promote me.

01:34PM  20         **THE WITNESS:**  Brian Burns.  Marilyn Halliday.

01:34PM  21  Nicholas Cooper.

01:34PM  22         **BY MR. SOEHNLEIN:**

01:34PM  23  Q.  Is there anybody sitting at the two tables behind me

01:34PM  24  today that you didn't meet with in the course of your

01:34PM  25  cooperation?

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
114

| | | |
|---|---|---|
| 01:34PM | 1 | A.  I believe so, yes. |
| 01:34PM | 2 | Q.  You met with all of them, correct? |
| 01:34PM | 3 | A.  Yes. |
| 01:34PM | 4 | Q.  Those are the people who were in the room, correct? |
| 01:34PM | 5 | A.  Yes. |
| 01:35PM | 6 | Q.  And there were some additional agents as well at certain |
| 01:35PM | 7 | times, correct? |
| 01:35PM | 8 | A.  Yes. |
| 01:35PM | 9 | Q.  So, you get that cooperation agreement in May 2020 |
| 01:35PM | 10 | correct? |
| 01:35PM | 11 | A.  Correct. |
| 01:35PM | 12 | Q.  Correct?  And then you meet with them again in September |
| 01:35PM | 13 | of 2020, correct? |
| 01:35PM | 14 | A.  Correct. |
| 01:35PM | 15 | Q.  Okay.  And then you meet with them again in March of |
| 01:35PM | 16 | 2021, correct?  On March 4th? |
| 01:35PM | 17 | A.  Correct. |
| 01:35PM | 18 | Q.  And you meet with them again on March 10th of 2021, |
| 01:35PM | 19 | correct? |
| 01:35PM | 20 | A.  Correct. |
| 01:35PM | 21 | Q.  And then you meet with them on August 18th of 2023, |
| 01:35PM | 22 | correct? |
| 01:35PM | 23 | A.  Correct. |
| 01:35PM | 24 | Q.  And then you meet with them on August 30th of 2023, |
| 01:35PM | 25 | correct? |

01:35PM   1   A.  That's correct.

01:35PM   2   Q.  And then you meet with them again on September 8th of

01:35PM   3   2023, correct?

01:35PM   4   A.  Correct.

01:35PM   5   Q.  And then you meet with them again on September 15th,

01:35PM   6   2023, correct?

01:35PM   7   A.  Correct.

01:35PM   8   Q.  And then you meet with them again on September 26th of

01:35PM   9   2023, correct?

01:35PM  10   A.  Correct.

01:35PM  11   Q.  And then you meet with them again on October 16th of

01:35PM  12   2023, correct?

01:35PM  13   A.  Correct.

01:35PM  14   Q.  And then you meet with them on January 31st of 2024,

01:35PM  15   correct?

01:35PM  16   A.  Correct.

01:35PM  17   Q.  And then you meet with them again on February 4th of

01:35PM  18   2024, correct?

01:35PM  19   A.  Correct.

01:35PM  20   Q.  And then you meet with them again on February 18th of

01:36PM  21   2024, correct?

01:36PM  22   A.  Correct.

01:36PM  23   Q.  And then you meet with them again on February 19th of

01:36PM  24   2024, correct?

01:36PM  25   A.  Correct.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:36PM   1   Q.  And then you met with them again in connection with this

01:36PM   2   testimony, correct?

01:36PM   3   A.  With this?

01:36PM   4   Q.  Yeah.

01:36PM   5   A.  No.

01:36PM   6   Q.  No?  You haven't had any further meetings with them?

01:36PM   7   A.  No.

01:36PM   8   Q.  Okay.  Now, in the time that you're having those

01:36PM   9   meetings, you understood that the more information you share,

01:36PM  10   the more you get out of cooperation, correct?

01:36PM  11   A.  I guess.

01:36PM  12   Q.  Yeah.

01:36PM  13   A.  Correct.

01:36PM  14   Q.  Well, it -- and you were trying to get as much

01:36PM  15   cooperation credit as you could, correct?

01:36PM  16   A.  I was being honest with them.

01:36PM  17   Q.  Okay.  And sharing all the information that you knew,

01:36PM  18   correct?

01:36PM  19   A.  Yes.

01:36PM  20   Q.  And trying to be honest, correct?

01:36PM  21   A.  I was.

01:36PM  22   Q.  Although, well -- not fully honest, right?

01:36PM  23   A.  Well --

01:36PM  24   Q.  A swing and a miss the first time, right?

01:36PM  25   A.  As we went further on, yes, it started, correct.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:36PM    1    Q.  All right.  So I want to turn our attention just briefly.

01:37PM    2        You had some testimony about some statements with respect

01:37PM    3    to Anthony Gerace and a conversation you had with Joe

01:37PM    4    Bongiovanni; do you recall those statements?

01:37PM    5    A.  Yes.

01:37PM    6    Q.  Do you ever recall that testimony, correct?

01:37PM    7    A.  Yes.

01:37PM    8    Q.  All right.  Now, you were an Erie County Sheriff's deputy

01:37PM    9    for a period of time, correct?

01:37PM   10    A.  Correct.

01:37PM   11    Q.  You went through the academy, correct?

01:37PM   12    A.  Correct.

01:37PM   13    Q.  And you understood that most things that are done in law

01:37PM   14    enforcement are documented, correct?

01:37PM   15    A.  Correct.

01:37PM   16    Q.  Usually if you interview a suspect, there's some sort of

01:37PM   17    report that's generated?

01:37PM   18    A.  Yes.

01:37PM   19    Q.  If there's a person of interest in respect to an

01:37PM   20    incident, usually there's something that's generated, right?

01:37PM   21    A.  Correct.

01:37PM   22    Q.  Because in law enforcement, not document means not done,

01:37PM   23    right?

01:37PM   24    A.  Correct.

01:37PM   25    Q.  Everything that law enforcement does is documented in

01:37PM   1   some way, shape, or form, correct?

01:37PM   2   A.   Correct.

01:37PM   3   Q.   To your knowledge, correct?

01:37PM   4   A.   To my knowledge.

01:37PM   5   Q.   And you were in law enforcement, correct?

01:37PM   6   A.   Yes.

01:37PM   7   Q.   Okay.  At any point in time, have you ever seen a report

01:38PM   8   of Anthony Gerace having interaction with the Amherst Police

01:38PM   9   Department?

01:38PM   10   A.   Did I ever see a report?  No.

01:38PM   11   Q.   You've never seen that?

01:38PM   12   A.   No.

01:38PM   13   Q.   All right.  But from your knowledge, would that

01:38PM   14   information be readily available?

01:38PM   15           **MR. TRIPI:**  Objection.  602.

01:38PM   16           **THE COURT:**  Overruled.

01:38PM   17           **THE WITNESS:**  I would not have readily availability

01:38PM   18   of that.

01:38PM   19           **BY MR. SOEHNLEIN:**

01:38PM   20   Q.   No.  But to law enforcement, it would be available

01:38PM   21   correct?

01:38PM   22           **MR. TRIPI:**  Objection.  Now we're arguing with the

01:38PM   23   witness.

01:38PM   24           **THE COURT:**  Overruled.

25

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
119

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 01:38PM | 1  | **BY MR. SOEHNLEIN:** |
| 01:38PM | 2  | Q.  To law enforcement -- |
| 01:38PM | 3  | A.  To law enforcement it would be, yes. |
| 01:38PM | 4  | Q.  Yeah.  They'd be able to make a call or make a request |
| 01:38PM | 5  | and get that information, right? |
| 01:38PM | 6  | A.  Correct. |
| 01:38PM | 7  | Q.  It wouldn't be hard to find, right? |
| 01:38PM | 8  | A.  Correct. |
| 01:38PM | 9  | Q.  Okay.  Now, you had some testimony about |
| 01:38PM | 10 | Mr. Bongiovanni's child support and alimony; do you remember |
| 01:38PM | 11 | that? |
| 01:38PM | 12 | A.  Yes. |
| 01:38PM | 13 | Q.  Okay.  Now, and you're divorced yourself, correct? |
| 01:38PM | 14 | A.  I am. |
| 01:38PM | 15 | Q.  Child-support payments are either an agreement between |
| 01:38PM | 16 | the parties or set by the Court? |
| 01:38PM | 17 | A.  Correct. |
| 01:39PM | 18 | Q.  And both parties usually have attorneys, correct? |
| 01:39PM | 19 | A.  Correct. |
| 01:39PM | 20 | Q.  And Mr. Bongiovanni had an attorney? |
| 01:39PM | 21 | A.  I believe so, yes. |
| 01:39PM | 22 | Q.  Yeah.  And his wife had an attorney as well? |
| 01:39PM | 23 | A.  Yes. |
| 01:39PM | 24 | Q.  Okay.  And so to your understanding, those agreements |
| 01:39PM | 25 | generally look at a person's income, correct? |

| | | |
|---|---|---|
| 01:39PM | 1 | A.  Correct. |
| 01:39PM | 2 | Q.  And their earning potential, correct? |
| 01:39PM | 3 | A.  Correct. |
| 01:39PM | 4 | Q.  That's usually how the amount is set, correct? |
| 01:39PM | 5 | A.  That's correct. |
| 01:39PM | 6 | Q.  Okay.  All right.  I want to ask you some questions about |
| 01:39PM | 7 | that Cabo wedding.  Do you recall there was some -- there was |
| 01:39PM | 8 | some testimony about you going -- |
| 01:39PM | 9 | A.  Yes. |
| 01:39PM | 10 | Q.  -- to Cabo.  Now you were Mr. Bongiovanni's best friend, |
| 01:39PM | 11 | correct? |
| 01:39PM | 12 | A.  Yes, we were close, yes. |
| 01:39PM | 13 | Q.  Yeah.  Well, best friends, right? |
| 01:39PM | 14 | A.  Yes. |
| 01:39PM | 15 | Q.  You considered him your best friend, correct? |
| 01:39PM | 16 | A.  Yes. |
| 01:39PM | 17 | Q.  Different than a normal friendship, best friends, right? |
| 01:39PM | 18 | A.  Correct. |
| 01:39PM | 19 | Q.  And you were the best man at that wedding, correct? |
| 01:39PM | 20 | A.  Yes. |
| 01:39PM | 21 | Q.  Okay.  And you traveled to Cabo, right? |
| 01:39PM | 22 | A.  Yes. |
| 01:39PM | 23 | Q.  And other people traveled to Cabo, correct? |
| 01:39PM | 24 | A.  Yes. |
| 01:39PM | 25 | Q.  Okay.  And Mr. Gerace did not go to Cabo, did he? |

01:39PM    1    A.   No.

01:39PM    2    Q.   He was not there --

01:39PM    3    A.   He was not.

01:39PM    4    Q.   -- correct?  Yeah.

01:40PM    5         Now, I think that you also had some testimony about some

01:40PM    6    trips that you thought that Mr. Bongiovanni took with

01:40PM    7    Mr. Gerace; do you recall that testimony?

01:40PM    8    A.   Yes.

01:40PM    9    Q.   And I think that -- that you said that one of the trips

01:40PM   10    was to Toronto; do you recall that?

01:40PM   11    A.   Yes.

01:40PM   12    Q.   You don't know that though, right?

01:40PM   13    A.   I don't know that, but I -- I'm going by what

01:40PM   14    Mr. Bongiovanni had told me they had traveled together.

01:40PM   15    Q.   Okay.  Well, you recall that picture that Mr. Tripi

01:40PM   16    showed you that was kind of in a hotel lobby; do you remember

01:40PM   17    that?

01:40PM   18    A.   I believe that was in Las Vegas, if I'm not mistaken.

01:40PM   19    Q.   You believe that that one was in Las Vegas?

01:40PM   20    A.   I don't know.  That's one of the places he said they

01:40PM   21    traveled to.

01:40PM   22    Q.   Okay.  I'm talking about the one that's just all guys.

01:40PM   23    A.   Yes, I don't know where the was at.

01:40PM   24    Q.   All right.  Mr. Gerace is not in that photo, right?

01:40PM   25    A.   No, correct.

01:40PM  1   Q.  You don't know where that photo was taken?

01:40PM  2   A.  I don't, no.

01:40PM  3   Q.  You don't know where that trip was to?

01:40PM  4   A.  I don't.

01:40PM  5   Q.  You know Mr. Gerace -- Peter Gerace was not there?

01:41PM  6   A.  He was not in that photo, correct.

01:41PM  7   Q.  Okay.  We had some testimony last time we were here

01:41PM  8   whenever that was, a couple days ago, about respect growing

01:41PM  9   up, correct; do you recall that?

01:41PM  10  A.  Yes.

01:41PM  11  Q.  Conversations that you had had with Mr. Bongiovanni when

01:41PM  12  you were kids, correct?

01:41PM  13  A.  Correct.

01:41PM  14  Q.  All right.  And fair to say those conversations were like

01:41PM  15  40 years ago, right?

01:41PM  16  A.  Yeah, correct.  Kids.

01:41PM  17  Q.  These are conversations when you're in grammar school and

01:41PM  18  high school, correct?

01:41PM  19  A.  Teenagers, yes.

01:41PM  20  Q.  Yeah.  Yeah.  And -- and in -- in your upbringing, was it

01:41PM  21  important to respect your elders?

01:41PM  22  A.  Yes.

01:41PM  23  Q.  Was it important to be a gentleman?

01:41PM  24  A.  Yes.

01:41PM  25  Q.  Was it important to respect people who were known in the

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

123

01:41PM  1   community?

01:41PM  2   A.  Yes.

01:41PM  3   Q.  Was it important to the respect law enforcement?

01:41PM  4   A.  Yes.

01:41PM  5   Q.  Did you also respect sports stars and celebrities and

01:41PM  6   things like that?

01:41PM  7   A.  Sure.

01:41PM  8   Q.  Yeah.  And Mr. Bongiovanni did all those things too,

01:42PM  9   correct?

01:42PM  10  A.  Yes.

01:42PM  11  Q.  He was a gentleman, right?

01:42PM  12  A.  Yes.

01:42PM  13  Q.  He wasn't mean to anybody, correct?

01:42PM  14  A.  No.

01:42PM  15  Q.  Now, there's some conversations -- strike that.

01:42PM  16      There was some testimony about Mr. Bongiovanni apparently

01:42PM  17  telling you to act like an informant, correct?

01:42PM  18  A.  Correct.

01:42PM  19  Q.  Now, he never told you that he told Mr. Gerace to act

01:42PM  20  like an informant, correct?

01:42PM  21  A.  No.

01:42PM  22  Q.  He never told you that, correct?

01:42PM  23  A.  No.

01:42PM  24  Q.  Okay.  And that conversation with respect to his brother,

01:42PM  25  he told you that Peter had called him about Amherst, correct?

01:42PM    1    A.  Correct.

01:42PM    2    Q.  Peter didn't tell him what to do with respect to Amherst,

01:42PM    3    correct?

01:42PM    4    A.  He said he asked for help.

01:42PM    5    Q.  Okay.  Just asked for help, correct?

01:42PM    6    A.  That's correct.

01:42PM    7    Q.  He asked for help, right?

01:42PM    8    A.  Right, correct.

01:42PM    9    Q.  Now, when you were in Erie County Sheriff's deputy, did

01:43PM    10   you know that other deputies would have friends or family

01:43PM    11   reach out to them for help?

01:43PM    12   A.  Yes.

01:43PM    13   Q.  Was that something that was commonplace?

01:43PM    14   A.  Sure, if somebody -- yes.

01:43PM    15   Q.  Okay.  And they'd help out for -- or, strike that.

01:43PM    16       They would reach out for traffic matters maybe?

01:43PM    17   A.  It -- yeah, I mean, it could be a few things, yes.

01:43PM    18   Q.  Yeah.  Any number of things, right?

01:43PM    19   A.  Right.

01:43PM    20   Q.  People have contact with law enforcement, and they call

01:43PM    21   someone they know in law enforcement for help, correct?

01:43PM    22   A.  Correct.

01:43PM    23   Q.  And when you were a sheriff's deputy, no one told that

01:43PM    24   all that was improper, correct?

01:43PM    25   A.  Correct.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:43PM  1    Q.  That was commonplace, right?

01:43PM  2    A.  I don't know if it was commonplace, no one ever told me

01:43PM  3    it was, you know, wrong.

01:43PM  4    Q.  Okay.  But when you learned about it, it didn't raise any

01:43PM  5    red flags for you, correct?

01:43PM  6    A.  No.

01:43PM  7    Q.  Okay.  Now, we talked a little bit about the importance

01:43PM  8    much being honest; do you recall that testimony?

01:43PM  9    A.  Yes.

01:43PM  10   Q.  And the importance of being candid in your cooperation,

01:43PM  11   correct?

01:44PM  12   A.  Correct.

01:44PM  13   Q.  And we talked about how -- how it was important that --

01:44PM  14   important to you early on to share all the information that

01:44PM  15   you knew in the investigation, correct?

01:44PM  16   A.  Correct.  What I was asked, yes.

01:44PM  17   Q.  Yeah.  And in -- in the early parts of the investigation,

01:44PM  18   they were asking you questions about Mr. Gerace, correct?

01:44PM  19   A.  At times, yes.

01:44PM  20   Q.  They asked you questions about Pharaoh's, correct?

01:44PM  21   A.  Yes.

01:44PM  22   Q.  Okay.  And -- and you didn't -- strike that.

01:44PM  23       And that started in 2019, we agreed, correct?

01:44PM  24   A.  I believe so, yes.

01:44PM  25   Q.  Okay.  And you didn't share anything with law enforcement

01:44PM 1    about you and Mr. Bongiovanni going to Pharaoh's until

01:44PM 2    September of 2023, correct?

01:44PM 3    A.  I don't recall.  I don't remember when.  But --

01:44PM 4    Q.  Okay.  Would reviewing the FBI report refresh your

01:44PM 5    recollection?

01:44PM 6    A.  Yes.

01:44PM 7            MR. SOEHNLEIN:  Can you show the witness 3540U?

01:44PM 8            BY MR. SOEHNLEIN:

01:45PM 9    Q.  Okay.  You'd agree with me the date on this document is

01:45PM 10   September 8th, 2023?

01:45PM 11   A.  Yes.

01:45PM 12   Q.  Okay.  Thank you.

01:45PM 13           MR. SOEHNLEIN:  Ms. Champoux, can you scroll down so

01:45PM 14   he can review it?

01:45PM 15           I think we have to go down a little further than

01:45PM 16   that.

01:45PM 17           Maybe a little further than that.

01:45PM 18           Maybe a little further than that.  There we go.

01:45PM 19           BY MR. SOEHNLEIN:

01:45PM 20   Q.  Do you see that right there?

01:45PM 21   A.  Yes.

01:45PM 22   Q.  Just read it, let me know when you're finished reviewing

01:45PM 23   it.

01:45PM 24   A.  Okay.

01:45PM 25   Q.  So you'd agree with me that you shared that information

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

127

01:46PM  1    in September of 2023, correct?

01:46PM  2    A.  Correct.  That's when it was brought up and asked,

01:46PM  3    correct.

01:46PM  4    Q.  Well, hold on.  But they had been asking you questions

01:46PM  5    about Pharaoh's for four years at that the point in time,

01:46PM  6    correct?

01:46PM  7    A.  Not a lot.  Just if I was familiar with it, and --

01:46PM  8    Q.  But some, right?

01:46PM  9    A.  Some, yeah.

01:46PM  10   Q.  They asked you some?

01:46PM  11   A.  Right.

01:46PM  12   Q.  Familiar with it?  You're talking about you went there

01:46PM  13   with the guy, right?

01:46PM  14   A.  Right.

01:46PM  15   Q.  You didn't say that for four years.

01:46PM  16   A.  I really wasn't asked if I went there.  I'm kind of

01:46PM  17   confused on the question.

01:46PM  18   Q.  They asked you if you were familiar with it?

01:46PM  19   A.  Yeah.  And I told them on two occasions that I went.

01:46PM  20   Q.  But they asked you that in 2019.

01:46PM  21   A.  They asked me if I was familiar with it.

01:46PM  22   Q.  Okay.  And you didn't tell them that you had gone there

01:46PM  23   with Bongiovanni until 2023, correct?

01:46PM  24   A.  Correct.

01:46PM  25   Q.  Four years later, this information comes out that you and

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

128

| | | |
|---|---|---|
| 01:46PM | 1 | Bongiovanni had gone to Pharaoh's, correct? |
| 01:46PM | 2 | A.  Correct. |
| 01:46PM | 3 | Q.  You didn't share it in 2019, right? |
| 01:47PM | 4 | A.  Okay. |
| 01:47PM | 5 | Q.  You didn't share it in 2020? |
| 01:47PM | 6 | A.  No. |
| 01:47PM | 7 | Q.  You didn't share it in 2021 -- |
| 01:47PM | 8 | A.  No. |
| 01:47PM | 9 | Q.  -- right?  You didn't share it in 2022? |
| 01:47PM | 10 | A.  No. |
| 01:47PM | 11 | Q.  You didn't share it until September of 2023. |
| 01:47PM | 12 | A.  Yeah.  I believe that's when it was -- it came up again. |
| 01:47PM | 13 | Q.  All right.  Now that's also the same time that you shared |
| 01:47PM | 14 | this conversation about Anthony Gerace in the park, correct? |
| 01:47PM | 15 | A.  Correct. |
| 01:47PM | 16 | Q.  Now you know that they asked you questions about Anthony |
| 01:47PM | 17 | Gerace, right? |
| 01:47PM | 18 | A.  Correct. |
| 01:47PM | 19 | Q.  And it comes out four years later, correct? |
| 01:47PM | 20 | A.  No, there was other questions asked before that. |
| 01:47PM | 21 | Q.  Okay.  Now, you and Mr. Bongiovanni were best friends, |
| 01:47PM | 22 | right? |
| 01:47PM | 23 | A.  Yes. |
| 01:47PM | 24 | Q.  Talked to each other almost every day, correct? |
| 01:47PM | 25 | A.  Not every day but, you know, we spoke regularly. |

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
129

| 01:47PM | 1 | Q. Several times a week, correct? |
| 01:47PM | 2 | A. Yes, a few times a week, yes. |
| 01:47PM | 3 | Q. You called each other? |
| 01:48PM | 4 | A. Yes. |
| 01:48PM | 5 | Q. You texted each other? |
| 01:48PM | 6 | A. Yes. |
| 01:48PM | 7 | Q. You went to each other's house? |
| 01:48PM | 8 | A. On occasion, yes. |
| 01:48PM | 9 | Q. You worked out together? |
| 01:48PM | 10 | A. Yes. |
| 01:48PM | 11 | Q. You went to dinner together? |
| 01:48PM | 12 | A. Not dinners much, no. |
| 01:48PM | 13 | Q. You ate meals together? |
| 01:48PM | 14 | A. Yeah, on occasion. |
| 01:48PM | 15 | Q. Yeah.  All right.  And so you were around each other with |
| 01:48PM | 16 | some frequency, correct? |
| 01:48PM | 17 | A. Yes. |
| 01:48PM | 18 | Q. And the only time that you recall him being at Pharaoh's |
| 01:48PM | 19 | is just these two occasions that you testified to on direct, |
| 01:48PM | 20 | correct? |
| 01:48PM | 21 | A. Well, that's with me, when I went him. |
| 01:48PM | 22 | Q. Okay. |
| 01:48PM | 23 | A. I was there twice. |
| 01:48PM | 24 | Q. All right.  But you -- but you were around him with a lot |
| 01:48PM | 25 | of frequency, right? |

USA v Gerace - Selva - Tripi/Redirect - 12/13/24

130

| | | |
|---|---|---|
| 01:48PM | 1 | A.  Yes. |
| 01:48PM | 2 | Q.  You were his best friend? |
| 01:48PM | 3 | A.  Yes. |
| 01:48PM | 4 | Q.  You were the best man in his wedding, correct? |
| 01:48PM | 5 | A.  Correct. |
| 01:48PM | 6 | **MR. SOEHNLEIN:**  Just a second, Judge. |
| 01:49PM | 7 | That's all I have.  Thank you, Judge. |
| 01:49PM | 8 | **THE COURT:**  Redirect? |
| 01:49PM | 9 | **MR. TRIPI:**  Yes, Judge, thank you. |
| 01:49PM | 10 | |
| 01:49PM | 11 | **REDIRECT EXAMINATION BY MR. TRIPI:** |
| 01:49PM | 12 | Q.  All right.  A few more questions for you, okay? |
| 01:49PM | 13 | A.  Okay. |
| 01:49PM | 14 | Q.  Okay.  Just bear with me a minute. |
| 01:49PM | 15 | All right.  I'm gonna sort of start where Mr. Soehnlein |
| 01:49PM | 16 | did and kind of go in the same order of things, okay? |
| 01:49PM | 17 | A.  Okay. |
| 01:49PM | 18 | Q.  He started with your cooperation agreement.  As you sit |
| 01:49PM | 19 | here today, is there any promise that you have, any wink and |
| 01:49PM | 20 | a nod, anything like that, that you won't be charged or go to |
| 01:49PM | 21 | jail? |
| 01:49PM | 22 | A.  No. |
| 01:49PM | 23 | Q.  Has anyone from the government ever said anything |
| 01:49PM | 24 | different to you? |
| 01:49PM | 25 | A.  No. |

01:49PM 1    Q.  You have a written agreement, right?

01:49PM 2    A.  Correct.

01:49PM 3    Q.  And are you required to do anything other than tell the

01:50PM 4    truth under that agreement?

01:50PM 5    A.  That's correct.

01:50PM 6    Q.  Does your agreement require it?

01:50PM 7    A.  Yes.

01:50PM 8    Q.  If you weren't to tell the truth, could you be charged

01:50PM 9    with more things?

01:50PM 10   A.  Yes.

01:50PM 11   Q.  If you were to lie in front of this grand jury -- or,

01:50PM 12   excuse me, jury, you could be charged with perjury?

01:50PM 13   A.  Yes, sir.

01:50PM 14   Q.  Obstruction of justice?

01:50PM 15   A.  Yes.

01:50PM 16   Q.  All right.  Now, you were asked about more cooperation

01:50PM 17   and all that.  Fair to say you've also testified before a

01:50PM 18   federal grand jury and in other proceedings?

01:50PM 19   A.  Yes.

01:50PM 20   Q.  Fair to say that the scope of your testimony and

01:50PM 21   information you've provided spans well beyond Defendant

01:50PM 22   Gerace?

01:50PM 23   A.  Yes.

01:50PM 24   Q.  Now, when you were first approached by law enforcement at

01:50PM 25   your house the day of that search warrant, August 23rd, 2019,

USA v Gerace - Selva - Tripi/Redirect - 12/13/24
132

01:50PM    1    did you start to talk a little bit about Mr. Bongiovanni?

01:50PM    2    A.  Yes.  Very --

01:51PM    3    Q.  At that point, it wasn't everything you knew?

01:51PM    4    A.  No.  No.

01:51PM    5    Q.  Did you withhold information like Mr. Soehnlein said?

01:51PM    6    A.  Yes.

01:51PM    7    Q.  And I think you tried to articulate it, but as time went

01:51PM    8    on, did you provide more and more information?

01:51PM    9    A.  Yes.

01:51PM    10    Q.  Were you asked more and more questions?

01:51PM    11    A.  I was.

01:51PM    12    Q.  Now, Mr. Soehnlein focused you in on that September 4th,

01:51PM    13    2019 polygraph, and talked about you failing.

01:51PM    14        I'm just gonna ask you directly.  Did you fail because

01:51PM    15    you claimed you were Joe Bongiovanni's informant?

01:51PM    16    A.  Yes.

01:51PM    17    Q.  Okay.  That was a lie?

01:51PM    18    A.  It was a lie.

01:51PM    19    Q.  That was a lie that Bongiovanni fed you?

01:51PM    20    A.  Right.

01:51PM    21    Q.  And you tried to carry through on it?

01:51PM    22    A.  Correct.

01:51PM    23    Q.  After that, did you become more and more forthcoming?

01:51PM    24    A.  I did.

01:51PM    25    Q.  Does that lead to your sitting in this witness stand?

01:51PM   1   A.  It does.

01:51PM   2   Q.  Now, Mr. Soehnlein crossed you about all your meetings

01:52PM   3   with the government from August 23rd, 2019 to October 25th,

01:52PM   4   2019; do you remember that?

01:52PM   5   A.  Yes.

01:52PM   6   Q.  You went through all those dates up through that point.

01:52PM   7       All of those meetings were before Mr. Bongiovanni was

01:52PM   8   charged, correct?

01:52PM   9   A.  Correct.

01:52PM  10   Q.  And did you testify in grand jury before Mr. Bongiovanni

01:52PM  11   was charged?

01:52PM  12   A.  Yes.

01:52PM  13   Q.  And all those meetings, did they cover a lot more

01:52PM  14   information than the questions you're being asked at this

01:52PM  15   trial?

01:52PM  16   A.  Yes.

01:52PM  17   Q.  Now, let's switch over, talk a little bit about Anthony

01:52PM  18   Gerace's arrest, and your discussions along those lines,

01:52PM  19   okay?

01:52PM  20       You were asked about the fact that you're an Erie County

01:52PM  21   sheriff, and are things documented in law enforcement; do you

01:52PM  22   remember those general questions?

01:52PM  23   A.  Yes.

01:52PM  24   Q.  Now you're not a member of the Amherst Police Department,

01:52PM  25   right?

01:52PM  1   A.  I was not, no.

01:52PM  2   Q.  Would you have access to anything that they generate?

01:52PM  3   A.  No.

01:53PM  4   Q.  Okay.  Now, do you know whether Bongiovanni squashed any

01:53PM  5   arrest of Anthony Gerace before it ever happened?

01:53PM  6        **MR. SOEHNLEIN:**  Objection.

01:53PM  7        **MR. TRIPI:**  He opened this door.

01:53PM  8        **THE COURT:**  Does he know?

01:53PM  9        **MR. SOEHNLEIN:**  Yeah, I withdraw it.  I thought the

01:53PM  10  question came out a little differently.

01:53PM  11       **BY MR. TRIPI:**

01:53PM  12  Q.  Do you know whether Bongiovanni squashed any arrest of

01:53PM  13  Anthony Gerace before it ever happened?

01:53PM  14  A.  No.

01:53PM  15  Q.  If Bongiovanni squashed an investigation before it was

01:53PM  16  documented, there would be no report?

01:53PM  17       **MR. SOEHNLEIN:**  Objection.

01:53PM  18       **THE COURT:**  Sustained, sustained, sustained.

01:53PM  19       **BY MR. TRIPI:**

01:53PM  20  Q.  Okay.  Now you were asked about finances; do you remember

01:53PM  21  that?

01:53PM  22  A.  Yes.

01:53PM  23  Q.  Mr. Bongiovanni's finances?

01:53PM  24      In your commonsense life experience, the money that you

01:53PM  25  were earning from illegal activity, did you put your illegal

USA v Gerace - Selva - Tripi/Redirect - 12/13/24
135

01:53PM  1   money in the bank and report it?

01:53PM  2   A.  No.

01:53PM  3   Q.  Okay.  In your commonsense life experience, do people put

01:53PM  4   money from illicit gains into the bank and then report it to

01:54PM  5   their attorney?

01:54PM  6   A.  No.

01:54PM  7   Q.  You were asked about respect to elders and respect to

01:54PM  8   athletes and stuff like that.  Was the type of respect you

01:54PM  9   were talking about yesterday when you were talking about

01:54PM  10  Mr. Bongiovanni showing respect to reputed Italian Organized

01:54PM  11  Crime members in the neighborhood, was it a different type of

01:54PM  12  respect?

01:54PM  13  A.  Yes.

01:54PM  14  Q.  It's not the same hold-the-door-for-an-old-lady type

01:54PM  15  respect, right?

01:54PM  16  A.  No.

01:54PM  17  Q.  Back to the topic of helping people through his position

01:54PM  18  as a DEA agent.  You were asked questions about you didn't

01:54PM  19  know what Bongiovanni meant when he said helping Anthony

01:54PM  20  Gerace when Peter asked him to help Anthony Gerace, and you

01:54PM  21  were asked some questions about law enforcement and whether

01:54PM  22  you were asked to help people; do you remember that?

01:55PM  23  A.  Yes.

01:55PM  24  Q.  All those questions?

01:55PM  25  A.  Yes.

01:55PM  1    Q.  As you sit here, given your life experience and your

01:55PM  2    interactions with Mr. Bongiovanni, is a sworn DEA agent

01:55PM  3    supposed to help individuals involved in drug dealing, or

01:55PM  4    arrest them?

01:55PM  5    A.  Arrest them.

01:55PM  6    Q.  You were asked a lot of questions about whether the first

01:55PM  7    time you mentioned Peter Gerace was in September of 2023

01:55PM  8    after four years of questions; do you remember that?

01:55PM  9    A.  Yes.

01:55PM  10   Q.  Do you remember all the times that you were asked

01:55PM  11   questions and mentioned Mr. Gerace or Pharaoh's?

01:55PM  12   A.  I don't.

01:55PM  13   Q.  Okay.  I'm gonna ask you to take a look at Government

01:55PM  14   Exhibit 3540I.  Let's start with page 1.

01:55PM  15        **MR. TRIPI:**  For the witness only.

01:55PM  16        **BY MR. TRIPI:**

01:55PM  17   Q.  All right.  Just look at your screen.  And when you're

01:55PM  18   done, look back at me.  I'm gonna keep it up just because I'm

01:56PM  19   gonna walk through this a bit, but want you to not look at

01:56PM  20   the screen initially.  Okay?

01:56PM  21       Does that refresh your recollection as to a date that you

01:56PM  22   had an interview?

01:56PM  23   A.  Yes.

01:56PM  24   Q.  Okay.  You've got to look back at me.

01:56PM  25   A.  Yes.

| | | |
|---|---|---|
| 01:56PM | 1 | Q.  Is that September 11th, 2019? |
| 01:56PM | 2 | A.  Yes. |
| 01:56PM | 3 | Q.  All right. |
| 01:56PM | 4 | **MR. TRIPI:**  Ms. Champoux, can we advance to page 6 of |
| 01:56PM | 5 | that, please? |
| 01:56PM | 6 | **BY MR. TRIPI:** |
| 01:56PM | 7 | Q.  Okay.  We're gonna go to -- I want you to read page 6 |
| 01:56PM | 8 | through 7.  Let us know when you're done reading page 6 |
| 01:56PM | 9 | through 7. |
| 01:56PM | 10 | A.  Where you've highlighted at the bottom? |
| 01:56PM | 11 | Q.  Yep. |
| 01:57PM | 12 | A.  Okay. |
| 01:57PM | 13 | **MR. TRIPI:**  Let's go to page 7, please. |
| 01:57PM | 14 | **BY MR. TRIPI:** |
| 01:57PM | 15 | Q.  Read that to yourself. |
| 01:59PM | 16 | A.  Okay. |
| 01:59PM | 17 | Q.  Okay.  To the extent you were just asked questions about |
| 01:59PM | 18 | not talking about Peter Gerace for four years, was that |
| 01:59PM | 19 | accurate? |
| 01:59PM | 20 | A.  No. |
| 01:59PM | 21 | Q.  Okay.  Did you talk about Peter Gerace back on |
| 01:59PM | 22 | September 11th, 2019? |
| 01:59PM | 23 | A.  Yes. |
| 01:59PM | 24 | Q.  Did you -- look at me, please. |
| 01:59PM | 25 | A.  Yes, sir. |

01:59PM   1   Q.  Did you talk about Pharaoh's?

01:59PM   2   A.  Yes.

01:59PM   3   Q.  Did you talk about Anthony Gerace?

01:59PM   4   A.  Yes.

01:59PM   5   Q.  Okay.  Do you remember the next date you provided some

01:59PM   6   information about them?

01:59PM   7   A.  I don't.

01:59PM   8   Q.  Okay.  Be fair to say a lot of the questioning early on

01:59PM   9   particularly was focused on Mr. Bongiovanni, though?

01:59PM  10   A.  Yes.

01:59PM  11   Q.  And then as time went on, it shifted to other people?

01:59PM  12   A.  Yes.

01:59PM  13   Q.  Okay.  We agree that September 11th, 2019, is four years

01:59PM  14   earlier than September of 2023 that you were being asked

01:59PM  15   questions about, correct?

02:00PM  16   A.  Correct.

02:00PM  17   Q.  Okay.  Now, over time, too, did things occur to you over

02:00PM  18   time?

02:00PM  19   A.  Yes.

02:00PM  20   Q.  Were some of those things that occurred to you over time

02:00PM  21   triggered by more specific questions you were asked?

02:00PM  22   A.  Exactly, yes.

02:00PM  23   Q.  Okay.  Do you remember everything you talked about on a

02:00PM  24   meeting March 10th, 2021?

02:00PM  25   A.  No.

02:00PM 1    Q.  Okay.  If we can go to Exhibit 3540M, please as in Mary.

02:00PM 2    And we'll go to page 2.  Read that to yourself, page 2.  Let

02:01PM 3    us know when you want us to move to page 3.

02:01PM 4    A.  Okay.

02:01PM 5            MR. TRIPI:  Can we go to page 3, please?

02:03PM 6            THE WITNESS:  Okay.

02:03PM 7            BY MR. TRIPI:

02:03PM 8    Q.  Did you provide information about Peter and Anthony

02:03PM 9    Gerace during that meeting in March of 2021?

02:03PM 10   A.  Yes.

02:03PM 11   Q.  Okay.  Now, do you remember, Mr. Selva, do you remember

02:03PM 12   what specific questions you were being asked?

02:03PM 13   A.  I don't.

02:03PM 14   Q.  Do you remember if you were asked, hey, did you ever go

02:03PM 15   to Pharaoh's with Bongiovanni?

02:03PM 16   A.  I don't know.

02:03PM 17   Q.  Do you know when the first time you were asked that

02:03PM 18   specific question was?

02:03PM 19   A.  I don't.

02:03PM 20   Q.  Okay.  Had that specific question been asked about you

02:03PM 21   and -- of you in September of 2019, would you have said two

02:03PM 22   times, just like you told this jury?

02:03PM 23   A.  Yes.

02:03PM 24           MR. TRIPI:  All right, Judge, I have no further

02:03PM 25   redirect.

| | | |
|---|---|---|
| 02:03PM | 1 | **THE COURT:**  Anything more, Mr. Soehnlein? |
| 02:03PM | 2 | **MR. SOEHNLEIN:**  Just briefly. |
| 02:03PM | 3 | |
| 02:03PM | 4 | **RECROSS-EXAMINATION BY MR. SOEHNLEIN:** |
| 02:03PM | 5 | Q.  Mr. Tripi just asked you if you had been asked that |
| 02:03PM | 6 | question in September of 2019, the answer would have been two |
| 02:04PM | 7 | times, right?  He just asked you that question? |
| 02:04PM | 8 | A.  Yes. |
| 02:04PM | 9 | Q.  Okay. |
| 02:04PM | 10 | **MR. SOEHNLEIN:**  Can you show the witness 3540I, |
| 02:04PM | 11 | page 6, please. |
| 02:04PM | 12 | **BY MR. SOEHNLEIN:** |
| 02:04PM | 13 | Q.  And reviewing these reports, it's refreshing your memory, |
| 02:04PM | 14 | right? |
| 02:04PM | 15 | A.  Correct. |
| 02:04PM | 16 | Q.  And by the way, so, you'd agree with me that this is a |
| 02:04PM | 17 | report from September of 2019, correct? |
| 02:04PM | 18 | A.  Correct. |
| 02:04PM | 19 | Q.  The exact same time period that Mr. Tripi was just asking |
| 02:04PM | 20 | you about, correct? |
| 02:04PM | 21 | A.  That's correct. |
| 02:04PM | 22 | Q.  Can you just review the second line up what's written |
| 02:04PM | 23 | right there? |
| 02:04PM | 24 | A.  Second line up? |
| 02:04PM | 25 | Q.  Yeah, the second line from the bottom.  What's it say? |

| | | |
|---|---|---|
| 02:04PM | 1 | Well, does it refresh your recollection. |
| 02:04PM | 2 | A.  Yes. |
| 02:04PM | 3 | Q.  You told them Bongiovanni never went to Pharaoh's? |
| 02:04PM | 4 | A.  In 2019. |
| 02:04PM | 5 | Q.  In 2019, you told them Bongiovanni never went to |
| 02:04PM | 6 | Pharaoh's, correct? |
| 02:05PM | 7 | A.  Correct. |
| 02:05PM | 8 | Q.  And in 2023, you told them that you went there with him |
| 02:05PM | 9 | two times, correct? |
| 02:05PM | 10 | A.  Correct. |
| 02:05PM | 11 | Q.  So you lied in 2019? |
| 02:05PM | 12 | A.  No, he -- I -- I was referencing with me he went.  He |
| 02:05PM | 13 | went with me. |
| 02:05PM | 14 | Q.  So, when he went with you, that doesn't mean he went? |
| 02:05PM | 15 | A.  No, that's how I was answering the question, he went with |
| 02:05PM | 16 | me. |
| 02:05PM | 17 | Q.  He went with you? |
| 02:05PM | 18 | A.  Right. |
| 02:05PM | 19 | Q.  But in 2019, you told them he didn't go at all? |
| 02:05PM | 20 | A.  Not with me in 2019, that's how I was referencing the |
| 02:05PM | 21 | question. |
| 02:05PM | 22 | Q.  I'm sorry, but you said he never went at all in 2019, |
| 02:05PM | 23 | correct? |
| 02:05PM | 24 | A.  Right, with -- |
| 02:05PM | 25 | Q.  Never went ever, correct? |

| | | |
|---|---|---|
| 02:05PM | 1 | A.  I believe the question was phrased if he ever went me. |
| 02:05PM | 2 | And I -- |
| 02:05PM | 3 | Q.  You'd agree with me that's not what's reflected in the |
| 02:05PM | 4 | report. |
| 02:05PM | 5 | A.  That's correct. |
| 02:05PM | 6 | Q.  What you said in 2023 is not accurate, is it? |
| 02:05PM | 7 | A.  We went twice in Pharaoh's, him and I. |
| 02:06PM | 8 | Q.  So then what you said in 2019 is a lie? |
| 02:06PM | 9 | A.  It was asked a different way.  He never -- I was |
| 02:06PM | 10 | referenced if he went with me. |
| 02:06PM | 11 | Q.  It's not confusing, Mr. Selva. |
| 02:06PM | 12 | A.  I understand that -- |
| 02:06PM | 13 | Q.  You're wrong -- |
| 02:06PM | 14 | **THE COURT:**  One at a time. |
| 02:06PM | 15 | **BY MR. SOEHNLEIN:** |
| 02:06PM | 16 | Q.  In 2019, you told them he never went to Pharaoh's, |
| 02:06PM | 17 | period, correct? |
| 02:06PM | 18 | A.  Correct. |
| 02:06PM | 19 | Q.  And in 2023, you said he went twice with me, correct? |
| 02:06PM | 20 | A.  Correct. |
| 02:06PM | 21 | Q.  So what you said in 2019 was not accurate? |
| 02:06PM | 22 | A.  Not accurate that he went with me. |
| 02:06PM | 23 | Q.  You understand that you have to be truthful and honest in |
| 02:06PM | 24 | those meetings? |
| 02:06PM | 25 | A.  I am.  Maybe I answered it -- maybe I answered it wrong, |

02:06PM    1    but he -- I was there twice with him.

02:06PM    2    Q.  Now it's possible that maybe you got a little tripped up

02:06PM    3    in the questions, right?

02:06PM    4    A.  Correct.

02:06PM    5    Q.  Okay.  Because those meetings, those are kind of high

02:06PM    6    stress, correct?

02:06PM    7    A.  Correct.

02:06PM    8    Q.  A lot's on the line, right?

02:06PM    9    A.  There's a lot of questions.

02:06PM    10   Q.  And you're with the same prosecutors that you're with

02:07PM    11   here, correct?

02:07PM    12   A.  Correct.

02:07PM    13   Q.  All right.  Now earlier this morning, Mr. Tripi yelled at

02:07PM    14   you.  You recall that, right?

02:07PM    15   A.  Yes.

02:07PM    16   Q.  That's happened before, hasn't it?

02:07PM    17   A.  Yes.

02:07PM    18   Q.  That's happened more than once, hasn't it?

02:07PM    19   A.  A few times.

02:07PM    20   Q.  You're in those meetings, and it's just you and the

02:07PM    21   prosecutors, right?

02:07PM    22   A.  Yes.

02:07PM    23   Q.  There's no judge there?

02:07PM    24   A.  No.

02:07PM    25   Q.  There's no jury there?

| | | |
|---|---|---|
| 02:07PM | 1 | A. No. |
| 02:07PM | 2 | Q. And they tell you to tell the truth, right? |
| 02:07PM | 3 | A. Correct. |
| 02:07PM | 4 | Q. But they act like that toward you, don't they? |
| 02:07PM | 5 | A. They act professional. |
| 02:07PM | 6 | Q. It's not the first time he yelled at you. |
| 02:07PM | 7 | A. I mean, yelling and raising your voice, I mean, being |
| 02:07PM | 8 | direct. |
| 02:07PM | 9 | Q. Is that how you would describe how he treated you this |
| 02:07PM | 10 | morning, being direct? |
| 02:07PM | 11 | A. Being direct, yes.  Raising his voice, yes. |
| 02:07PM | 12 | Q. That's scared you when he did that, didn't it? |
| 02:07PM | 13 | A. He got my attention. |
| 02:07PM | 14 | Q. Yeah, because you've got a lot on the line, right? |
| 02:07PM | 15 | A. Yes. |
| 02:07PM | 16 | Q. And you weren't making him happy, were you? |
| 02:08PM | 17 | **MR. TRIPI:**  Objection as to whether he was making me |
| 02:08PM | 18 | happy. |
| 02:08PM | 19 | **THE COURT:**  Overruled. |
| 02:08PM | 20 | **THE WITNESS:**  I don't know if I was making him happy |
| 02:08PM | 21 | or not.  He was just -- that's his demeanor.  He was asking me |
| 02:08PM | 22 | a direct question. |
| 02:08PM | 23 | **BY MR. SOEHNLEIN:** |
| 02:08PM | 24 | Q. That's just his demeanor? |
| 02:08PM | 25 | A. At times. |

02:08PM        1                    MR. SOEHNLEIN:  That's all I have.

02:08PM        2

02:08PM        3                    RE-REDIRECT EXAMINATION BY MR. TRIPI:

02:08PM        4    Q.  Sometimes in those meetings, you were lying, right?

02:08PM        5    A.  Yes.

02:08PM        6    Q.  You were holding back information?

02:08PM        7    A.  Yes.

02:08PM        8    Q.  Did you expect direct questions when you were lying?

02:08PM        9    A.  Yes.

02:08PM       10    Q.  Were you doing the wrong thing?

02:08PM       11    A.  Yes.

02:08PM       12    Q.  When you've been yelled at before, is that because you

02:08PM       13    asked if you were gonna not have to go to jail?

02:08PM       14    A.  No.

02:08PM       15    Q.  Have I -- have I told you repeatedly your entire

02:08PM       16    agreement is in writing, and there are no promises?

02:08PM       17    A.  Yes.

02:08PM       18    Q.  When you ask me about that agreement, is that when I get

02:08PM       19    firm with you?

02:08PM       20    A.  Yes.

02:08PM       21    Q.  Do I remind you your agreement is in writing?

02:08PM       22    A.  Yes.

02:08PM       23    Q.  And that there are no promises?

02:08PM       24    A.  Yes.

02:09PM       25    Q.  Have I ever told you to do anything other than tell the

USA v Gerace - Selva - Tripi/Re-Redirect - 12/13/24
146

02:09PM    1   truth?

02:09PM    2   A.  No.

02:09PM    3   Q.  Now, are you a grown man?

02:09PM    4   A.  Yes.

02:09PM    5   Q.  When you're in those meetings, you're with your lawyer?

02:09PM    6   A.  Yes.

02:09PM    7   Q.  Do you have any issue with the way I speak with you or

02:09PM    8   the way you speak with me?

02:09PM    9   A.  No.

02:09PM   10   Q.  Okay.  Sometimes do you raise your voice, too?

02:09PM   11   A.  Yes.

02:09PM   12   Q.  Is that sometimes how grown men speak to each other?

02:09PM   13   A.  Yes.

02:09PM   14   Q.  Okay.  Any issue with that?

02:09PM   15   A.  No.

02:09PM   16   Q.  Any misconceptions about what you're supposed to say on

02:09PM   17   the stand in terms of truth or not truth?

02:09PM   18   A.  No.

02:09PM   19   Q.  Okay.  Now, you were just shown a report.  You didn't

02:09PM   20   write the report that you were shown, you didn't sign the

02:09PM   21   report, correct?

02:09PM   22   A.  Correct.

02:09PM   23   Q.  But you testified in grand jury about Mr. Gerace and

02:09PM   24   Mr. Bongiovanni, correct?

02:09PM   25   A.  Correct.

02:09PM    1    Q.  And then you testified at two other proceedings this

02:09PM    2    year, and you've been consistent about two times you went to

02:10PM    3    Pharaoh's with Mr. Bongiovanni; is that true?

02:10PM    4    A.  That's correct.

02:10PM    5    Q.  All right.

02:10PM    6          MR. TRIPI:  Bear with me just a moment.

02:10PM    7          By the way, is it the U.S. Attorney's Office who

02:10PM    8    decides your cooperation, or is it me?

02:10PM    9          MR. SOEHNLEIN:  Objection.

02:10PM   10          THE COURT:  Sustained.

02:10PM   11          MR. TRIPI:  He knows the answer to that.

02:10PM   12          THE WITNESS:  It's the U.S. Attorney.

02:10PM   13          THE COURT:  Mr. Selva, when I say "sustained," you

02:10PM   14    don't answer the question.

02:10PM   15          THE WITNESS:  I'm sorry, Your Honor.

02:10PM   16          THE COURT:  What's the basis of that?

02:10PM   17          MR. SOEHNLEIN:  I believe it calls for speculation

02:10PM   18    and hearsay, Judge.

02:10PM   19          THE COURT:  So lay a foun -- so the jury will strike

02:11PM   20    that answer.  You can lay a foundation.

02:11PM   21          BY MR. TRIPI:

02:11PM   22    Q.  Do you know who the ultimate decisionmaker is?

02:11PM   23    A.  I don't.

02:11PM   24    Q.  Do you think it's me, or someone above me?

02:11PM   25    A.  Someone above.

02:11PM    1        **MR. SOEHNLEIN:**  Same objection, Judge.

02:11PM    2        **THE COURT:**  Well, unless there's a foundation for

02:11PM    3   that, Mr. Tripi, I --

02:11PM    4        **MR. TRIPI:**  It's his perception, Judge.

02:11PM    5        **THE COURT:**  I understand that.  But he's got to have

02:11PM    6   a reason for the perception.  So if there's a reason for it,

02:11PM    7   then lay the foundation for it.

02:11PM    8        **BY MR. TRIPI:**

02:11PM    9   Q.  Do you have a reason in your brain for the answer you're

02:11PM   10   about to give when I ask you that question?

02:11PM   11   A.  Yes.

02:11PM   12   Q.  Okay.  Is it a reason that you formed in your mind?

02:11PM   13   A.  Yes.

02:11PM   14   Q.  Do you believe that anyone in this room is the ultimate

02:11PM   15   decisionmaker on your case?

02:11PM   16   A.  No.

02:11PM   17        **MR. SOEHNLEIN:**  Objection.

02:11PM   18        **THE WITNESS:**  No.

02:11PM   19        **THE COURT:**  Overruled.

02:11PM   20        And, again, folks, this is for his state of mind, not

02:11PM   21   what is in fact the case, okay?

02:11PM   22        **BY MR. TRIPI:**

02:13PM   23   Q.  When you testified in the grand jury, was that

02:13PM   24   October 3rd, 2019?

02:13PM   25   A.  Yes.

USA v Gerace - Selva - Tripi/Re-Redirect - 12/13/24

02:13PM    1    Q.  Were you asked questions about Mr. Bongiovanni?

02:13PM    2    A.  Yes.

02:13PM    3    Q.  Were you asked questions about Mr. Gerace?

02:13PM    4    A.  Yes.

02:13PM    5    Q.  Did you answer a number of specific questions you were

02:13PM    6    asked at that time about Mr. Gerace?

02:13PM    7    A.  Yes.

02:13PM    8    Q.  Did a lot of it cover a lot the same topics you testified

02:13PM    9    to here at trial?

02:13PM   10    A.  Yes.

02:13PM   11            **MR. TRIPI:**  Nothing further, Judge.

02:13PM   12            **THE COURT:**  Anything more?

02:13PM   13            **MR. SOEHNLEIN:**  Nothing, Judge.  Thank you.

02:13PM   14            **THE COURT:**  You can step down, sir, thank you.

02:13PM   15            **THE WITNESS:**  Thank you, Your Honor.

02:13PM   16            (Witness excused at 2:13 p.m.)

          17            (Excerpt concluded at 2:13 p.m.)

          18                *    *    *    *    *    *    *

          19

          20

          21

          22

          23

          24

          25

1

2                    **CERTIFICATE OF REPORTER**

3

4                In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on December 13, 2024.

8

9

10                        s/ Ann M. Sawyer
                         Ann M. Sawyer, FCRR, RPR, CRR
11                        Official Court Reporter
                         U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **TRANSCRIPT INDEX**

3               **EXCERPT - EXAMINATION OF LOUIS SELVA - DAY 2**

4                          **DECEMBER 13, 2024**

5

6

7      **W I T N E S S**                              **P A G E**

8      **L O U I S   S E L V A**                       2

9        (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:     2

10       CROSS-EXAMINATION BY MR. SOEHNLEIN:          102

11       REDIRECT EXAMINATION BY MR. TRIPI:           130

12       RECROSS-EXAMINATION BY MR. SOEHNLEIN:        140

13       RE-REDIRECT EXAMINATION BY MR. TRIPI:        145

14

15

16     **E X H I B I T S**                             **P A G E**

17     GOV Exhibit 213-1 through 5                     75

18     GOV Exhibits 208D, 208K                         93

19

20

21

22

23

24

25