09:37AM

```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
 4               Plaintiff,                        (LJV)
   v.
 5                                      September 16, 2024
   JOSEPH BONGIOVANNI,
 6
                 Defendant.
 7   _____
```

```
 8          TRANSCRIPT EXCERPT - EXAMINATION OF D.J. GRANVILLE
                BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                  UNITED STATES DISTRICT JUDGE
```

```
10  APPEARANCES:            TRINI E. ROSS, UNITED STATES ATTORNEY
                            BY: JOSEPH M. TRIPI, ESQ.
11                              NICHOLAS T. COOPER, ESQ.
                                CASEY L. CHALBECK, ESQ.
12                          Assistant United States Attorneys
                            Federal Centre, 138 Delaware Avenue
13                          Buffalo, New York 14202
                            For the Plaintiff
14
                            SINGER LEGAL PLLC
15                          BY: ROBERT CHARLES SINGER, ESQ.
                            80 East Spring Street
16                          Williamsville, New York 14221
                              And
17                          LAW OFFICES OF PARKER ROY MacKAY
                            BY: PARKER ROY MacKAY, ESQ.
18                          3110 Delaware Avenue
                            Kenmore, New York 14217
19                            And
                            OSBORN, REED & BURKE, LLP
20                          BY: JOHN J. GILSENAN, ESQ.
                            120 Allens Creek Road
21                          Rochester, New York 14618
                            For the Defendant
22
    PRESENT:                BRIAN A. BURNS, FBI Special Agent
23                          MARILYN K. HALLIDAY, HSI Special Agent
                            KAREN A. CHAMPOUX, USA Paralegal
24
    LAW CLERK:              REBECCA FABIAN IZZO, ESQ.
25
```

| | |
|---|---|
| 1 | **COURT DEPUTY CLERK:**  **COLLEEN M. DEMMA** |
| 2 | **COURT REPORTER:**  **ANN MEISSNER SAWYER, FCRR, RPR, CRR** |
| 3 | Robert H. Jackson Federal Courthouse<br>2 Niagara Square<br>Buffalo, New York  14202 |
| 4 | Ann_Sawyer@nywd.uscourts.gov |

5                    *    *    *    *    *    *    *

6

7          (Excerpt commenced at 12:27 p.m.)

12:27PM    8          (Jury is present.)

12:27PM    9          **THE COURT:**  You can call your next witness.

12:27PM   10          **MR. COOPER:**  Thanks, Judge, the government calls

12:27PM   11  D.J. Granville.

12:27PM   12

12:27PM   13  **D. J.  G R A N V I L L E**, having been duly called and sworn,

12:28PM   14  testified as follows:

12:28PM   15          **MR. COOPER:**  May I inquire, Judge?

12:28PM   16          **THE COURT:**  You may.

12:28PM   17

12:28PM   18                  **DIRECT EXAMINATION BY MR. COOPER:**

12:28PM   19  Q.  Good afternoon, sir.  How are you?

12:28PM   20  A.  Good.  How are you?

12:28PM   21  Q.  I'm well.

12:28PM   22      Can you introduce yourself to the jury?

12:28PM   23  A.  DJ Granville, currently the Chief of Narcotics and

12:28PM   24  Intelligence with the Erie County Sheriff's Office.

12:28PM   25  Q.  And Chief Granville, where did you grow up at?

12:28PM    1    A.  City of Buffalo.

12:28PM    2    Q.  Have you had a career in law enforcement leading up to

12:28PM    3    your current position as the Chief of Narcotics and

12:28PM    4    Intelligence?

12:28PM    5    A.  Yes.

12:28PM    6    Q.  Can you describe for them a kind of 30,000-foot view how

12:28PM    7    you progressed up to that role?

12:28PM    8    A.  I started in and around August of 1998 with the Buffalo

12:28PM    9    Housing Police.  I was there for approximately seven years.

12:28PM    10   The majority of that time was spent at the FBI, what's now

12:28PM    11   the Safe Streets Task Force.

12:28PM    12       They then closed up shop, disbanded the department.

12:28PM    13   I got hired by the NFTA police in 2005 or so.  I was there

12:28PM    14   for approximately three years.  And then got picked up by the

12:29PM    15   Sheriff's Office.

12:29PM    16   Q.  So would you have been picked up by the Sheriff's Office

12:29PM    17   sometime around 2008?

12:29PM    18   A.  Yes.

12:29PM    19   Q.  And what different roles have you held in the Sheriff's

12:29PM    20   Office between '08 and 2024?

12:29PM    21   A.  I was an undercover deputy for a bit.  I was a road

12:29PM    22   patrol officer for a little while, a detective in narcotics,

12:29PM    23   senior detective in narcotics, and then ultimately the

12:29PM    24   position I'm in now.

12:29PM    25   Q.  Got it.  Between the time that you spent as a detective,

| | | |
|---|---|---|
| 12:29PM | 1 | a senior detective, and the chief, how long have you been |
| 12:29PM | 2 | involved in narcotics-related investigations? |
| 12:29PM | 3 | A.  14, 15 years. |
| 12:29PM | 4 | Q.  During the course of that time, have you worked with |
| 12:29PM | 5 | confidential sources? |
| 12:29PM | 6 | A.  Yes. |
| 12:29PM | 7 | Q.  Have you worked on different types of drug investigations |
| 12:29PM | 8 | like different substances? |
| 12:29PM | 9 | A.  Yes. |
| 12:29PM | 10 | Q.  Have you worked weed cases? |
| 12:29PM | 11 | A.  Yes. |
| 12:29PM | 12 | Q.  Have you worked cocaine cases? |
| 12:29PM | 13 | A.  Yes. |
| 12:29PM | 14 | Q.  Have you worked heroin cases? |
| 12:29PM | 15 | A.  I have. |
| 12:29PM | 16 | Q.  During the course of that experience, have you obtained |
| 12:30PM | 17 | search warrants? |
| 12:30PM | 18 | A.  Yes. |
| 12:30PM | 19 | Q.  Have you participated in the execution of search |
| 12:30PM | 20 | warrants? |
| 12:30PM | 21 | A.  I have. |
| 12:30PM | 22 | Q.  I asked you a moment ago about handling confidential |
| 12:30PM | 23 | sources.  Have you -- have you had a confidential source |
| 12:30PM | 24 | during the course of your career where the person didn't |
| 12:30PM | 25 | presently have any information, but you kept him open anyway? |

USA v Bongiovanni - Granville - Cooper/Direct - 9/16/24

5

| | | |
|---|---|---|
| 12:30PM | 1 | A.  Yes. |
| 12:30PM | 2 | Q.  Okay.  Why would you do that, keep someone open? |
| 12:30PM | 3 | A.  Just -- it -- it would -- it would depend.  If -- if it |
| 12:30PM | 4 | was somebody specifically that was working for, you know, |
| 12:30PM | 5 | money, or something like that, we would -- we would keep |
| 12:30PM | 6 | them open only because it wasn't like there was a court case |
| 12:30PM | 7 | that was being adjudicated or something along those lines. |
| 12:30PM | 8 | Q.  Got it.  Now, if somebody -- if you keep an informant |
| 12:30PM | 9 | open, can they develop information in the future that could |
| 12:30PM | 10 | be useful to you in a future investigation? |
| 12:30PM | 11 | A.  Yes. |
| 12:30PM | 12 | Q.  Does that happen, informants learn things out on the |
| 12:30PM | 13 | street over time and bring them to you? |
| 12:30PM | 14 | A.  Yes. |
| 12:30PM | 15 | Q.  Okay.  And if an informant does have a court case, can |
| 12:31PM | 16 | you work with state and federal prosecuting authorities to |
| 12:31PM | 17 | keep them open if you wanted to? |
| 12:31PM | 18 | A.  Yes. |
| 12:31PM | 19 | Q.  Is that something that happens with frequency? |
| 12:31PM | 20 | A.  It has, yes. |
| 12:31PM | 21 | Q.  What were your roles as a senior detective in the |
| 12:31PM | 22 | narcotics unit of the Erie County Sheriff's Office? |
| 12:31PM | 23 | A.  I supervised the day-to-day activities of detectives and |
| 12:31PM | 24 | deputies that were assigned to narcotics. |
| 12:31PM | 25 | Q.  Okay.  And during the course of your career, both as a |

12:31PM   1   detective, senior detective, and chief, can you estimate for

12:31PM   2   the jury about how many different search warrants you've

12:31PM   3   participated in executing?

12:31PM   4   A.   North of a thousand.

12:31PM   5   Q.   How many different search warrants have you participated

12:31PM   6   in drafting or worked on cases where a search warrant was

12:31PM   7   drafted?

12:31PM   8   A.   Hundreds.

12:31PM   9   Q.   Are you aware of the different sorts of investigative

12:32PM   10   techniques that can be used to obtain a search warrant in a

12:32PM   11   drug case?

12:32PM   12   A.   Yes.

12:32PM   13   Q.   Can that include information from an informant?

12:32PM   14   A.   Yes.

12:32PM   15   Q.   Can it include information you develop by going out and

12:32PM   16   doing surveillance?

12:32PM   17   A.   Yes.

12:32PM   18   Q.   Hey, is going out and doing surveillance an important

12:32PM   19   part of a drug investigation?

12:32PM   20        **MR. MacKAY:**  Objection, 403 cumulative at this point

12:32PM   21   with this line.

12:32PM   22        **THE COURT:**  Sustained.

12:32PM   23        **MR. COOPER:**  I'll move on, Judge.

12:32PM   24        **BY MR. COOPER:**

12:32PM   25   Q.   During the time that you've worked on narcotics cases, is

12:32PM 1    it your understanding that there's sometimes a nexus between

12:32PM 2    narcotics cases and -- and violent crimes like burglary or

12:32PM 3    robbery?

12:32PM 4    A.   Yes.

12:32PM 5    Q.   Okay.  And do you work at the Erie County Sheriff's

12:32PM 6    Office with other law enforcement partners when investigating

12:32PM 7    certain criminal activity?

12:32PM 8    A.   Yes.

12:32PM 9    Q.   Do you sometimes work with the Buffalo police?

12:32PM 10   A.   Yes.

12:32PM 11   Q.   Do you sometimes work with the State police?

12:33PM 12   A.   Yes.

12:33PM 13   Q.   And do you also sometimes work with federal law

12:33PM 14   enforcement agencies?

12:33PM 15   A.   Yes, we do.

12:33PM 16   Q.   You mentioned earlier that you had earlier in your career

12:33PM 17   worked on the FBI, Safe Streets Task Force; is that correct?

12:33PM 18   A.   That's correct.

12:33PM 19   Q.   Does the Erie County Sheriff's Office work with the FBI,

12:33PM 20   Safe Streets Task Force?

12:33PM 21   A.   Yes.

12:33PM 22   Q.   In your experience working on narcotics investigations,

12:33PM 23   are large-scale narcotics traffickers subject to being

12:33PM 24   victimized for burglary or robbery more than the average

12:33PM 25   person?

| | | |
|---|---|---|
| 12:33PM | 1 | A.  Yes, they are. |
| 12:33PM | 2 | Q.  Why is that? |
| 12:33PM | 3 | A.  Because they tend to possess, whether it's large amounts |
| 12:33PM | 4 | of U.S. currency, large quantities of drugs, jewelry, or |
| 12:33PM | 5 | items that are of value. |
| 12:33PM | 6 | Q.  I want to speak with you now about a specific |
| 12:34PM | 7 | investigation.  Did there come a time in 2017 when you began |
| 12:34PM | 8 | working with the FBI, Safe Streets Task Force that led |
| 12:34PM | 9 | ultimately to an individual named Ron Serio? |
| 12:34PM | 10 | A.  Yes. |
| 12:34PM | 11 | Q.  Can you describe for the jury how that investigation |
| 12:34PM | 12 | began and what led it in the direction of Ron Serio?  Tell |
| 12:34PM | 13 | them about that. |
| 12:34PM | 14 | A.  The FBI in and around 2017 brought a confidential |
| 12:34PM | 15 | informant to us who described in great detail plans that |
| 12:34PM | 16 | individuals were making to rob Ron Serio who resided at an |
| 12:34PM | 17 | address in -- on Lebrun in the Town of Amherst.  And he was |
| 12:34PM | 18 | also utilizing a secondary address on West Grimsby.  And the |
| 12:34PM | 19 | intent was they were gonna rob Mr. Serio of his alleged drugs |
| 12:34PM | 20 | and money at those two locations. |
| 12:34PM | 21 | Q.  When law enforcement became aware that there was a plan |
| 12:35PM | 22 | being discussed or in place to rob Ron Serio, is that the |
| 12:35PM | 23 | sort of thing that you, in law enforcement, can sit and watch |
| 12:35PM | 24 | and wait for it to happen? |
| 12:35PM | 25 | A.  No. |

USA v Bongiovanni - Granville - Cooper/Direct - 9/16/24

9

12:35PM   1    Q.  Why not?

12:35PM   2    A.  It's very dangerous.  Not only to -- not only for us, but

12:35PM   3    for the intended victims, whether they're drug dealers or

12:35PM   4    not, of the robbery.  And it's dangerous to the community.

12:35PM   5    Q.  So what did you decide to do at that point with the

12:35PM   6    information that you had?

12:35PM   7    A.  We -- we conducted surveillance of the Lebrun Road

12:35PM   8    address.

12:35PM   9    Q.  Okay.  And just to kind of generally put a timeframe on

12:35PM   10   this, are we talking about sometime in April of 2017?

12:35PM   11   A.  Yes.

12:35PM   12   Q.  From the time that you first received this information,

12:35PM   13   from -- who did you receive that information from again?

12:35PM   14   A.  It was from the FBI who was dealing with a confidential

12:35PM   15   informant.

12:35PM   16   Q.  Got it.  From the time that you initially received that

12:35PM   17   information from the FBI until the time that you got out

12:35PM   18   doing surveillance, how much time are we talking about?

12:36PM   19   A.  It was less than two weeks.

12:36PM   20   Q.  Okay.  In that timeframe, did you -- were you a

12:36PM   21   supervisor or a chief at that point, do you recall?

12:36PM   22   A.  I believe I was the senior detective.

12:36PM   23   Q.  Got it.  And as the senior detective, did you supervise

12:36PM   24   the surveillances that were done in that -- in that

12:36PM   25   investigation?

| | | |
|---|---|---|
| 12:36PM | 1 | A.  I did. |
| 12:36PM | 2 | Q.  Was there surveillance done on Ron Serio? |
| 12:36PM | 3 | A.  There was. |
| 12:36PM | 4 | Q.  Okay.  And where was he living at at that time? |
| 12:36PM | 5 | A.  He was living on Lebrun in the Town of Amherst. |
| 12:36PM | 6 | Q.  And is Lebrun the name of the street? |
| 12:36PM | 7 | A.  Yes. |
| 12:36PM | 8 | Q.  Okay.  Do you recall what that address looked like? |
| 12:36PM | 9 | A.  I do. |
| 12:36PM | 10 | Q.  Okay. |
| 12:36PM | 11 | MR. COOPER:  Ms. Champoux, can we pull up what's in |
| 12:36PM | 12 | evidence as Government Exhibit 42A-33. |
| 12:36PM | 13 | BY MR. COOPER: |
| 12:36PM | 14 | Q.  Do you recognize that? |
| 12:36PM | 15 | A.  I do. |
| 12:36PM | 16 | Q.  What is that? |
| 12:36PM | 17 | A.  That's the address in which Ron Serio was living. |
| 12:36PM | 18 | Q.  Now at the time you got this information from the FBI |
| 12:36PM | 19 | that there was this planned robbery, did you have an open |
| 12:36PM | 20 | file investigating Ron Serio? |
| 12:37PM | 21 | A.  No. |
| 12:37PM | 22 | Q.  Did you jump out and do some surveillance? |
| 12:37PM | 23 | A.  We ultimately did, yes. |
| 12:37PM | 24 | Q.  And was this the location where Ron Serio was living when |
| 12:37PM | 25 | you began that in April of 2017? |

USA v Bongiovanni - Granville - Cooper/Direct - 9/16/24

| | | |
|---|---|---|
| 12:37PM | 1 | A.  Yes. |
| 12:37PM | 2 | Q.  You described for us a moment ago that your investigation |
| 12:37PM | 3 | started with some surveillance.  Can you describe how it |
| 12:37PM | 4 | progressed from there? |
| 12:37PM | 5 | A.  Information was given to us by the FBI via the |
| 12:37PM | 6 | confidential informant that there was an individual on |
| 12:37PM | 7 | Huntington in the City of Buffalo that was involved in drug |
| 12:37PM | 8 | activity with Mr. Serio. |
| 12:37PM | 9 | Q.  What did you do at that point? |
| 12:37PM | 10 | A.  We developed probable cause for a search warrant for that |
| 12:37PM | 11 | address on Huntington. |
| 12:37PM | 12 | Q.  How did you do that? |
| 12:37PM | 13 | A.  Just based on the informant's observations and |
| 12:37PM | 14 | reliability, we were able to bring that person in front of a |
| 12:38PM | 15 | judge who then authorized a search warrant for an address on |
| 12:38PM | 16 | Huntington. |
| 12:38PM | 17 | Q.  Got it.  Now, did you continue to do surveillance on both |
| 12:38PM | 18 | that location at Huntington and the location at Lebrun that |
| 12:38PM | 19 | we're looking at here? |
| 12:38PM | 20 | A.  Yes. |
| 12:38PM | 21 | Q.  Did you do surveillance simultaneously on both those |
| 12:38PM | 22 | locations? |
| 12:38PM | 23 | A.  We did. |
| 12:38PM | 24 | Q.  I want to direct your attention now to April 18th of |
| 12:38PM | 25 | 2017. |

| | | |
|---|---|---|
| 12:38PM | 1 | Did there come a time when your surveillance observed Ron |
| 12:38PM | 2 | Serio arriving at that Huntington address that you just |
| 12:38PM | 3 | described a moment ago? |
| 12:38PM | 4 | A.  Yes. |
| 12:38PM | 5 | Q.  Were you present -- which of those surveillances were you |
| 12:38PM | 6 | participating in? |
| 12:38PM | 7 | A.  I was present on Lebrun, and we had other deputies and |
| 12:38PM | 8 | agents over at Huntington. |
| 12:38PM | 9 | Q.  Describe for the jury what you observed with respect to |
| 12:38PM | 10 | Mr. Serio's activity that day, April 18, 2017. |
| 12:38PM | 11 | A.  I observed Mr. Serio arrive at the address on Lebrun |
| 12:39PM | 12 | while we were -- while we had surveillance on the residence. |
| 12:39PM | 13 | A short time later, he departed and traveled to the vicinity |
| 12:39PM | 14 | of the Huntington address in the City of Buffalo. |
| 12:39PM | 15 | Q.  Got it.  And were you in constant communication with the |
| 12:39PM | 16 | other members of law enforcement on your team that were doing |
| 12:39PM | 17 | the surveillance out at Huntington? |
| 12:39PM | 18 | A.  Yes. |
| 12:39PM | 19 | Q.  Okay.  Did you come to learn that Serio ultimately |
| 12:39PM | 20 | arrived at that address on -- on Huntington? |
| 12:39PM | 21 | A.  Yes. |
| 12:39PM | 22 | Q.  What occurred when Ron Serio arrived at that address on |
| 12:39PM | 23 | Huntington? |
| 12:39PM | 24 | MR. MacKAY:  Objection, calls -- I'm sorry, yeah.  It |
| 12:39PM | 25 | calls for hearsay because I think he's not present at |

| | | |
|---|---|---|
| 12:39PM | 1 | Huntington. |
| 12:39PM | 2 | **MR. COOPER:**  Judge, if we can come up real quick, |
| 12:39PM | 3 | I -- |
| 12:39PM | 4 | **THE COURT:**  Sure. |
| 12:39PM | 5 | (Sidebar discussion held on the record.) |
| 12:39PM | 6 | **MR. COOPER:**  So, I went through this at a high level |
| 12:39PM | 7 | last time.  I think that the purpose was to avoid calling, you |
| 12:40PM | 8 | know, a parade of additional witnesses.  And so he's |
| 12:40PM | 9 | informed -- my understanding is he's informed generally about |
| 12:40PM | 10 | their operations.  It causes him to take the further actions |
| 12:40PM | 11 | that he takes. |
| 12:40PM | 12 | I don't think it's in dispute what -- what happened. |
| 12:40PM | 13 | So if you want to call five more witnesses -- |
| 12:40PM | 14 | **MR. MacKAY:**  Yeah, and I think if it's just a general |
| 12:40PM | 15 | overview, I think -- |
| 12:40PM | 16 | **THE COURT:**  So you're going to withdraw the objection |
| 12:40PM | 17 | to the question? |
| 12:40PM | 18 | **MR. MacKAY:**  Yeah.  I mean, I guess my only concern |
| 12:40PM | 19 | is, is a limiting instruction necessary if it's about what he |
| 12:40PM | 20 | does, what prompts him to do that.  I mean -- |
| 12:40PM | 21 | **THE COURT:**  I'm happy to give a limiting instruction, |
| 12:40PM | 22 | but Mr. Cooper is saying that all that's going to do is make |
| 12:40PM | 23 | you call a witness.  So -- so if you want to withdraw the |
| 12:40PM | 24 | objection now and then object when it gets too far into the |
| 12:40PM | 25 | weeds for you -- |

12:40PM    1          **MR. MacKAY:**  Yeah, that -- that might be the better

12:40PM    2    route, because I think -- I know, you're calling it Adam Day

12:40PM    3    as well, too, who talks about the -- I think it's getting

12:40PM    4    Anthony Gerace on --

12:40PM    5          **MR. COOPER:**  Correct.  And that's not where this is

12:40PM    6    headed.

12:40PM    7          **MR. MacKAY:**  This is just about what's found at

12:41PM    8    Lebrun -- or, at Huntington?

12:41PM    9          **MR. COOPER:**  At Huntington, right.

12:41PM   10          **MR. MacKAY:**  Yeah, okay.  Yeah.

12:41PM   11          I'll do it that way, Judge.  I'll withdraw the

12:41PM   12    current objection.  I think it's too specific.

12:41PM   13          (End of sidebar discussion.)

12:41PM   14          **THE COURT:**  The objection has been withdrawn.  So you

12:41PM   15    can re-ask if you want.

12:41PM   16          **BY MR. COOPER:**

12:41PM   17    Q.  We -- I asked you a moment ago if you were in contact

12:41PM   18    with the other members of your surveillance team; is that

12:41PM   19    correct?

12:41PM   20    A.  That's correct.

12:41PM   21    Q.  Okay.  And so there's people at different locations,

12:41PM   22    right?

12:41PM   23    A.  That's correct.

12:41PM   24    Q.  Is it important for you, as the supervising detective, to

12:41PM   25    be aware of the different things that are going on?

12:41PM  1    A.  It is.

12:41PM  2    Q.  Did you become aware during that day, April 18th of 2017,

12:41PM  3    that Ron Serio arrived at 370 Huntington Avenue?

12:41PM  4    A.  Yes.

12:41PM  5    Q.  And did you become aware that there was an exchange that

12:41PM  6    occurred of duffle bags at that location?

12:41PM  7    A.  Yes.

12:41PM  8    Q.  Okay.  Ultimately, was a search warrant executed at

12:42PM  9    370 Huntington?

12:42PM  10   A.  Yes.

12:42PM  11   Q.  Okay.  And does that mean law enforcement kind of

12:42PM  12   converges on that location?

12:42PM  13   A.  That's correct.

12:42PM  14   Q.  Was Serio present when that happened?

12:42PM  15   A.  He was.

12:42PM  16   Q.  Was he arrested?

12:42PM  17   A.  He was.

12:42PM  18   Q.  Was the other individual at the house also arrested?

12:42PM  19   A.  Yes.

12:42PM  20   Q.  Were drugs recovered?

12:42PM  21   A.  Yes.

12:42PM  22   Q.  What kind of drugs were recovered?

12:42PM  23   A.  Cocaine and marijuana.

12:42PM  24   Q.  And was there a large amount of U.S. currency recovered

12:42PM  25   as well?

USA v Bongiovanni - Granville - Cooper/Direct - 9/16/24

12:42PM   1    A.  Yes.

12:42PM   2    Q.  Now, at the moment where Ron Serio was arrested at that

12:42PM   3    370 Huntington address, did you already have a search warrant

12:42PM   4    for the house on Lebrun?

12:42PM   5    A.  No.

12:42PM   6    Q.  Did you get one?

12:42PM   7    A.  We did.

12:42PM   8    Q.  Did you get one for a separate property on West Grimsby

12:42PM   9    Street in addition to Lebrun?

12:42PM  10    A.  Yes, we did.

12:42PM  11    Q.  And was that an address or a location that you also

12:42PM  12    believed to be associated with Ron Serio based on your

12:42PM  13    investigation?

12:42PM  14    A.  Yes.

12:42PM  15    Q.  Were those warrants that you just described for

12:43PM  16    697 Lebrun and the address on West Grimsby, were they

12:43PM  17    executed on the very day of the warrant at Huntington?

12:43PM  18    A.  They were.

12:43PM  19    Q.  Were you present for one of those?

12:43PM  20    A.  I was.

12:43PM  21    Q.  Which one?

12:43PM  22    A.  Lebrun.

12:43PM  23    Q.  We have 42A-33 up on the screen.  This is the house on

12:43PM  24    Lebrun, 697 Lebrun, right?

12:43PM  25    A.  That's correct.

12:43PM  1    Q.  Would you describe that as a mansion?

12:43PM  2    A.  I would, yes.

12:43PM  3    Q.  What was it like on the inside?

12:43PM  4    A.  It was gorgeous.  Very gaudy.  The house was beautiful.

12:44PM  5         **MR. COOPER:**  Ms. Champoux, if we can take that down,

12:44PM  6    please, and pull up 42A-35.

12:44PM  7         **THE COURT:**  Also in evidence, right?

12:44PM  8         **MR. COOPER:**  Yes, Judge.  I'm sorry.

12:44PM  9         **BY MR. COOPER:**

12:44PM  10   Q.  Can you see this, sir?

12:44PM  11   A.  I do.

12:44PM  12   Q.  Do you recognize this to be an aerial view of that

12:44PM  13   property at 697 Lebrun?

12:44PM  14   A.  I do.

12:44PM  15   Q.  Do you recall what kind of vehicle Ron Serio was driving

12:44PM  16   when he went over to the house on Huntington?

12:44PM  17   A.  It was a Range Rover.

12:44PM  18   Q.  Did you personally search that Range Rover?

12:44PM  19   A.  No.

12:44PM  20   Q.  Did you become aware later that a large amount of U.S.

12:44PM  21   currency was recovered from the Range Rover?

12:44PM  22   A.  I did.

12:44PM  23        **MR. COOPER:**  You can take that down, Ms. Champoux.

12:44PM  24   Thank you.

         25

Case 1:19-cr-00227-LJV-MJR    Document 1531    Filed 05/07/25    Page 18 of 51
USA v Bongiovanni - Granville - Cooper/Direct - 9/16/24

18

12:45PM    1          **BY MR. COOPER:**

12:45PM    2    Q.  Did you have any difficulty obtaining search warrants to

12:45PM    3    search the properties at Lebrun and West Grimsby?

12:45PM    4          **MR. MacKAY:**  Objection.

12:45PM    5          **THE COURT:**  Sustained.

12:45PM    6          **BY MR. COOPER:**

12:45PM    7    Q.  How many days of surveillance do you think it took before

12:45PM    8    you got those search warrants?

12:45PM    9          **MR. MacKAY:**  Objection to form.  He said he thinks,

12:45PM   10    or if he's estimating.

12:45PM   11          **THE COURT:**  No, overruled.

12:45PM   12          **BY MR. COOPER:**

12:45PM   13    Q.  Do you know how many minutes you spent doing

12:45PM   14    surveillance, sir?

12:45PM   15    A.  No.

12:45PM   16    Q.  Do you know how many hours, exactly?

12:45PM   17    A.  No.

12:45PM   18    Q.  How much surveillance -- estimate, please, for the

12:45PM   19    jury -- how much surveillance do you think you did before you

12:45PM   20    arrested Ron Serio?

12:45PM   21    A.  It was a -- it was a few days of sporadic surveillance.

12:45PM   22    Sometimes hours at a time, sometimes minutes.

12:45PM   23    Q.  Do you know a person by the name of Anthony Gerace?

12:45PM   24    A.  I do.

12:45PM   25    Q.  Have you ever met that person before?

12:46PM    1    A.   Yes.

12:46PM    2    Q.   Where did you meet that person?

12:46PM    3    A.   On the day we arrested Ron Serio.

12:46PM    4    Q.   Can you tell the jury, how did -- how did you end up

12:46PM    5    meeting Anthony Gerace on the same day that you arrested Ron

12:46PM    6    Serio?

12:46PM    7    A.   Mr. Gerace was observed departing the Lebrun Road

12:46PM    8    address.  He was traffic stopped a distance away by a marked

12:46PM    9    police vehicle, and was found in possession of a small

12:46PM    10   quantity of pills which later turned out to be fentanyl.

12:46PM    11        Mr. Gerace was transported back to our offices for

12:46PM    12   debriefing and was interviewed by a couple of our deputies.

12:46PM    13   Q.   Now, the investigation from the time that you gained this

12:47PM    14   information about the purported robbery until the time that

12:47PM    15   Ron Serio was arrested, I think you described it as lasting a

12:47PM    16   couple of weeks; is that correct?

12:47PM    17   A.   That's correct.

12:47PM    18   Q.   Okay.  When you ultimately searched Ron Serio's house,

12:47PM    19   did you seize large amounts of drugs?

12:47PM    20   A.   We did.

12:47PM    21   Q.   Did you seize firearms?

12:47PM    22   A.   We did.

12:47PM    23   Q.   Who were you partnered with in working on that

12:47PM    24   investigation into Ron Serio?

12:47PM    25   A.   The FBI, Safe Streets Task Force.

12:47PM 1          **MR. COOPER:**  May I just have one moment, Judge?

12:47PM 2          **THE COURT:**  Sure.

12:48PM 3          **By MR. COOPER:**

12:48PM 4    Q.  So I just asked you who you were working with on -- on

12:48PM 5    this investigation into Ron Serio, and you said FBI, Safe

12:48PM 6    Streets Task Force?

12:48PM 7    A.  Yes.

12:48PM 8    Q.  I want to put a finer point on it.

12:48PM 9        Did you contact the DEA and tell them, hey, we're looking

12:48PM 10   at Ron Serio?

12:48PM 11   A.  No.

12:48PM 12   Q.  Did you contact this defendant and tell him, hey, we're

12:48PM 13   looking at Ron Serio?

12:48PM 14   A.  No.

12:48PM 15   Q.  Was your coordination exclusively with the FBI, Safe

12:48PM 16   Streets Task Force?

12:48PM 17   A.  It was.

12:48PM 18          **MR. COOPER:**  No further direct.  Thank you, Judge.

12:48PM 19          **THE COURT:**  Cross?

12:48PM 20          **MR. MacKAY:**  Judge, do you want me to start or --

12:48PM 21          **THE COURT:**  Yeah, I think so.

12:48PM 22          **MR. MacKAY:**  Okay.

12:48PM 23          **THE COURT:**  Did you need --

12:48PM 24

         25

|           |    |                                                          |
|-----------|----|----------------------------------------------------------|
| 12:48PM   | 1  | **CROSS-EXAMINATION BY MR. MacKAY:**                     |
| 12:48PM   | 2  | Q.  All right.  Good afternoon, Chief Granville.  I'll get |
| 12:49PM   | 3  | you started here on cross-examination before we need to take |
| 12:49PM   | 4  | our break.                                                |
| 12:49PM   | 5  | Okay.  Let's start back from the end.                     |
| 12:49PM   | 6  | You didn't contact DEA, correct?                          |
| 12:49PM   | 7  | A.  That's correct.                                       |
| 12:49PM   | 8  | Q.  Now, in your experience in law enforcement with sheriffs, |
| 12:49PM   | 9  | with NFTA, with, I think you said, housing police, everybody, |
| 12:49PM   | 10 | you're familiar, generally, with deconfliction, correct?  |
| 12:49PM   | 11 | A.  That's correct.                                       |
| 12:49PM   | 12 | Q.  Easy way to describe it, say, it's -- it's -- there's |
| 12:49PM   | 13 | systems to allow one law enforcement agency or investigative |
| 12:49PM   | 14 | individual to find out if somebody else or some other agency |
| 12:49PM   | 15 | is looking into an individual, correct?                   |
| 12:49PM   | 16 | A.  That's correct.                                       |
| 12:49PM   | 17 | Q.  You can look in -- a law enforcement officer can look in |
| 12:49PM   | 18 | the system and see if that person's a target or a subject or |
| 12:49PM   | 19 | has had any other dealings with another case out there with |
| 12:49PM   | 20 | another agency; is that fair to say?                      |
| 12:49PM   | 21 | A.  Yes.                                                  |
| 12:49PM   | 22 | Q.  Now, fair to say, though, that your practice as Chief of |
| 12:50PM   | 23 | Narcotics at the Erie County Sheriff's Office, you don't  |
| 12:50PM   | 24 | particularly like using deconfliction?                    |
| 12:50PM   | 25 | A.  That's correct.                                       |

12:50PM  1   Q.  Yeah, you kind of smiled a little bit there.  Do you want

12:50PM  2   to tell the jury why?

12:50PM  3   A.  We -- we found that the databases that we utilize are

12:50PM  4   oftentimes stats driven or -- or driven by like a -- like a

12:50PM  5   fishing pond where other agencies are just plucking people in

12:50PM  6   there just to attach themselves to a case or -- or otherwise.

12:50PM  7   Q.  You know, I want to work -- I want to work through a bit,

12:50PM  8   you know, why that might concern you.

12:50PM  9       Is it, when you say "stats driven," is it fair to

12:50PM  10  interpret that that you've had experiences where other

12:50PM  11  agencies have come in and kind of poached a target of yours

12:50PM  12  when you used deconfliction?

12:50PM  13  A.  Yes.

12:50PM  14  Q.  And I used the slang term "poached."  Can you kind of

12:50PM  15  explain what we're talking about here?

12:50PM  16  A.  It's -- it's a -- we've -- we've had cases where we've

12:50PM  17  developed some information or probable cause that could lead

12:51PM  18  to that person's arrest in very short order.  And we've

12:51PM  19  plunked that name into a deconfliction service that -- that

12:51PM  20  we all utilize.  And the brakes are put on because somebody

12:51PM  21  has a longer-term investigation or already has that person

12:51PM  22  identified in that system.

12:51PM  23  Q.  And have you had experience where you've, say, built up a

12:51PM  24  lot of investigative hours on a subject, perhaps even made an

12:51PM  25  arrest, and another agency comes in and takes over the

| | | |
|---|---|---|
| 12:51PM | 1 | investigation? |
| 12:51PM | 2 | A.  Yes. |
| 12:51PM | 3 | Q.  Okay.  And you said these databases, sometimes in your |
| 12:51PM | 4 | opinion, are stat driven, correct? |
| 12:51PM | 5 | A.  That's correct. |
| 12:51PM | 6 | Q.  So connect those two actions.  Is it fair to say that |
| 12:51PM | 7 | what happens then if another agency comes in and takes over |
| 12:51PM | 8 | your investigation, they sort of get the, quote, unquote, |
| 12:51PM | 9 | stat for that investigation? |
| 12:51PM | 10 | A.  Technically, yes. |
| 12:51PM | 11 | Q.  And they might recover -- if there's contraband or assets |
| 12:51PM | 12 | forfeited, they might get the -- the benefit of doing that? |
| 12:52PM | 13 | A.  That's correct. |
| 12:52PM | 14 | Q.  Meaning that the new agency that comes in and sort of |
| 12:52PM | 15 | poaches the target, if there's assets to be recovered, they |
| 12:52PM | 16 | might take the assets despite all the work your agency's been |
| 12:52PM | 17 | done, correct? |
| 12:52PM | 18 | A.  That's correct. |
| 12:52PM | 19 | Q.  And that's a practice you've noticed in your years of law |
| 12:52PM | 20 | enforcement, correct? |
| 12:52PM | 21 | A.  Yes, sir. |
| 12:52PM | 22 | Q.  And as I started to say earlier, when -- your practice |
| 12:52PM | 23 | has been you don't like to use deconfliction for those |
| 12:52PM | 24 | reasons, correct? |
| 12:52PM | 25 | A.  That's correct. |

12:52PM    1    Q.  So, going back to 2017, you didn't perform any

12:52PM    2    deconfliction because of that reason?

12:52PM    3    A.  That was part of it, yes.

12:52PM    4    Q.  Okay.  And you had had a senior role in the Erie County

12:52PM    5    Sheriff's Office narcotics unit by that time, correct?

12:52PM    6    A.  That's correct.

12:52PM    7    Q.  I think you described yourself as sort of the senior

12:52PM    8    detective, correct?

12:52PM    9    A.  That's correct.

12:52PM    10   Q.  You had been that in that role for a few years by that

12:52PM    11   time?

12:52PM    12   A.  At least a couple of years, yes.

12:52PM    13   Q.  And you had started to establish that policy where you

12:52PM    14   weren't going to use deconfliction, correct?

12:53PM    15   A.  That's correct.

12:53PM    16   Q.  And fair to say in your dealings with other law

12:53PM    17   enforcement agencies in that time, it became known that, you

12:53PM    18   know, you specifically, and the sheriffs, weren't going to

12:53PM    19   use deconfliction?

12:53PM    20   A.  It was known that I wasn't a fan of the database.

12:53PM    21       It was also known that if, in fact, there was a

12:53PM    22   deconfliction, we weren't -- we weren't necessarily going to

12:53PM    23   play by the rules.

12:53PM    24   Q.  Okay.  So, yeah, let me explore that.  Meaning that, it

12:53PM    25   was -- your testimony here is that in the law enforcement

12:53PM  1    community, other agencies knew that even if there was a

12:53PM  2    deconfliction, you might go after that target anyway,

12:53PM  3    correct?

12:53PM  4         **MR. COOPER:**  Judge, I'm going to object at this point

12:53PM  5    to what other agencies knew.  I don't think there's a

12:53PM  6    foundation for that that's been laid.

12:53PM  7         **MR. MacKAY:**  I'm just clarifying what he said and how

12:53PM  8    he reached that opinion.

12:53PM  9         **THE COURT:**  I think he's allowed to explore what he

12:53PM  10   said and how he reached that opinion, so I'm going to

12:53PM  11   overruled the objection.

12:53PM  12        **MR. MacKAY:**  I'm sorry, Ann.  Can we read that

12:53PM  13   question back?

12:53PM  14        (The above-requested question was then read by the

12:54PM  15   reporter.)

12:54PM  16        **THE WITNESS:**  That's correct.

12:54PM  17        **BY MR. MacKAY:**

12:54PM  18   Q.  Okay.  And specifically there were instances of you and

12:54PM  19   the sheriff's department doing that prior to this point in

12:54PM  20   time, correct?

12:54PM  21   A.  That's correct.

12:54PM  22   Q.  Meaning just, so again, it's crystal clear to the jury,

12:54PM  23   what you're describing is a situation where you or members of

12:54PM  24   the Sheriff's Office would see a target or individual in a

12:54PM  25   deconfliction database that was already marked by another

12:54PM   1   agency, yet you would still go after that target and do your

12:54PM   2   own investigation?

12:54PM   3   A.   That's correct.

12:54PM   4   Q.   Potentially without even contacting the other agency

12:54PM   5   that's in the database?

12:54PM   6   A.   It -- it -- that's correct.  The majority of the time we

12:55PM   7   would reach out to the agency.  There was nothing to hide

12:55PM   8   here, it's just that we were moving forward.

12:55PM   9   Q.   Okay.  And if the -- and in your experience with doing

12:55PM   10  this, sometimes even if the agency reached back and explained

12:55PM   11  the scope of your investigation, you would at times just

12:55PM   12  ignore that and still go after the target, correct?

12:55PM   13  A.   Correct.

12:55PM   14  Q.   Okay.  Okay.  So I want to focus you now on this April

12:55PM   15  2017 time period.  I want to walk through kind of what the

12:55PM   16  steps are.

12:55PM   17          MR. MacKAY:  I mean, Judge, this might be a good time

12:55PM   18  to stop.

12:55PM   19          THE COURT:  Yeah, I think this is probably a good

12:55PM   20  time to break.

12:55PM   21          MR. MacKAY:  We'll pick this up in a few minutes.

12:55PM   22          THE COURT:  So, folks, please remember my

12:55PM   23  instructions about not discussing the case with anyone

12:55PM   24  including each other.  Don't use tools of technology to

12:55PM   25  research anything about the case or to communicate about the

| | | |
|---|---|---|
| 12:55PM | 1 | case.  And don't read, watch, or listen to any news coverage, |
| 12:55PM | 2 | if there is any, while the case is still on trial.  Don't make |
| 12:55PM | 3 | up your mind about anything until you start deliberating. |
| 12:56PM | 4 | We'll see you back here at about -- about 2:00. |
| 12:56PM | 5 | Thanks very much. |
| 12:56PM | 6 | (Jury excused at 12:56 p.m.) |
| 12:56PM | 7 | **THE COURT:**  Anything from the government before we |
| 12:56PM | 8 | break? |
| 12:56PM | 9 | **MR. COOPER:**  No, Judge. |
| 12:56PM | 10 | **THE COURT:**  From the defense? |
| 12:56PM | 11 | **MR. MacKAY:**  No, Your Honor. |
| 12:56PM | 12 | **THE COURT:**  Okay.  We'll see you folks at 2:00. |
| 12:56PM | 13 | (Off the record at 12:56 p.m.) |
| 02:11PM | 14 | (Back on the record at 2:11 p.m.) |
| 02:11PM | 15 | (Jury not present.) |
| 02:12PM | 16 | **THE CLERK:**  All rise. |
| 02:12PM | 17 | **THE COURT:**  Please be seated. |
| 02:12PM | 18 | **THE CLERK:**  We are back on the record for the |
| 02:12PM | 19 | continuation of the jury trial in case 19-cr-227, United |
| 02:12PM | 20 | States of America versus Joseph Bongiovanni. |
| 02:12PM | 21 | All counsel and parties are present. |
| 02:12PM | 22 | **THE COURT:**  Okay.  So two related things.  Juror |
| 02:12PM | 23 | Number 1 cannot be here on Friday the 27th, which is a week |
| 02:12PM | 24 | from this Friday. |
| 02:12PM | 25 | **THE CLERK:**  Correct. |

02:12PM   1          THE COURT:  And number 2, the juror is asking about

02:12PM   2   next week's schedule, whether we're going to be going all next

02:12PM   3   week.

02:12PM   4          So, thoughts?

02:12PM   5          MR. COOPER:  Yes, please.

02:12PM   6          THE COURT:  The government's not going to rest until

02:12PM   7   when?

02:12PM   8          MR. COOPER:  Judge, our expectation right now is

02:12PM   9   probably next Wednesday, possibly next Thursday.  Kind of

02:12PM  10   depends on how long some of the -- we have two lengthier

02:12PM  11   witnesses left, and so some of it's up in the air with how

02:12PM  12   long those witnesses go, but I --

02:12PM  13          THE COURT:  So we're going to spill into the first

02:12PM  14   week of October?

02:12PM  15          MR. COOPER:  I think we're going to rest, like, the

02:13PM  16   25th-ish, and then I don't know how long the defense case is.

02:13PM  17   It's quite possible that week of September 30th, October 1,

02:13PM  18   October 2, I imagine they'll be deliberating, yeah.

02:13PM  19          THE COURT:  Right.  Okay.

02:13PM  20          MR. SINGER:  Yeah.  So Mr. MacKay and I were talking

02:13PM  21   last week and also a little bit this afternoon, just because

02:13PM  22   we have some out-of-town witnesses, so we're trying to figure

02:13PM  23   out the flights.  So -- so no Friday the 27th?

02:13PM  24          THE COURT:  Right.

02:13PM  25          MR. SINGER:  Yeah.  So I guess if we are going to

02:13PM 1  start up on the 25th, we do have some local witnesses that we

02:13PM 2  could call, and maybe get one of the shorter out-of-town

02:13PM 3  witnesses done, and maybe leave the other one for Monday the

02:13PM 4  30th.

02:14PM 5       One question I do have, Judge. So let's say we -- we

02:14PM 6  close our case, and this case gets sent to the jury around

02:14PM 7  October 2nd or so. So before this trial existed, like, I

02:14PM 8  booked a trip with my wife which I promised her that I would

02:14PM 9  go on, like, otherwise, I'm going to face some repercussions.

02:14PM 10      I leave Friday on a flight at -- on the 4th of

02:14PM 11  October at, like, 1:30, 2:00. I don't know if the jury is

02:14PM 12  going to be done by that point in time. If they are not, what

02:14PM 13  should I tell my wife at this point? It's basically --

02:14PM 14      **THE COURT:** I'm the last person you should ask that.

02:14PM 15      **MR. SINGER:** I know. I know, Judge.

02:14PM 16      **MR. TRIPI:** Part of your orders assigned --

02:14PM 17      **MR. SINGER:** Because ultimately, you know -- if we

02:14PM 18  could go off the record for a second -- I'm going to blame

02:14PM 19  you.

02:14PM 20      **THE COURT:** I don't blame you. Yeah, been there,

02:14PM 21  done that. I mean, you know, I -- I -- I understand, I get

02:15PM 22  it. I under -- I understand. I more than understand. But,

02:15PM 23  you know, I -- I don't know. Let's -- let's jump off that

02:15PM 24  bridge when we come to it. I -- yeah, I -- I -- I don't know.

02:15PM 25  I sympathize with you, but I don't know. And we'll worry

| | | |
|---|---|---|
| 02:15PM | 1 | about that at the time, okay? |
| 02:15PM | 2 | **MR. COOPER:**  Judge, on the subject of scheduling, |
| 02:15PM | 3 | Mr. Singer said he might be able to get some local witnesses |
| 02:15PM | 4 | up the 25th, and then he mentioned the next Monday, |
| 02:15PM | 5 | September 30th.  But we would -- we would be working on |
| 02:15PM | 6 | September 26th, which is a Thursday, right, I mean? |
| 02:15PM | 7 | **THE COURT:**  Yes. |
| 02:15PM | 8 | **MR. SINGER:**  Yeah.  I just -- I don't want to fly |
| 02:15PM | 9 | someone in who potentially is gonna be going over the day, and |
| 02:15PM | 10 | then they're not going to be able to -- |
| 02:15PM | 11 | **THE COURT:**  Well, you got to -- you got to weigh that |
| 02:15PM | 12 | against your wife, against -- you know, I mean, there's |
| 02:15PM | 13 | lots -- lots of things you have to weigh into that. |
| 02:15PM | 14 | **MR. SINGER:**  Yeah.  No, I mean, we can fill -- we can |
| 02:15PM | 15 | fill the 26th. |
| 02:15PM | 16 | **MR. COOPER:**  Okay. |
| 02:15PM | 17 | **THE COURT:**  Okay. |
| 02:15PM | 18 | **MR. SINGER:**  It's just -- |
| 02:15PM | 19 | **THE COURT:**  Okay.  Well, I will tell them that we -- |
| 02:15PM | 20 | we may well spill over to the week of September 30th.  And |
| 02:15PM | 21 | we'll be down the 27th. |
| 02:16PM | 22 | **MR. SINGER:**  Understood. |
| 02:16PM | 23 | **THE COURT:**  Okay.  Great.  Anything else before we |
| 02:16PM | 24 | bring them in? |
| 02:16PM | 25 | **MR. MacKAY:**  No, Your Honor. |

02:16PM   1          **MR. COOPER:**  No, thank you, Judge.

02:16PM   2          **THE COURT:**  Let's bring them in, please, Pat.

02:16PM   3          I apologize to you for -- for that, but we've got to

02:16PM   4   keep the jury apprised of what's going on.  I hate to waste

02:16PM   5   your time.

02:16PM   6          **MR. COOPER:**  No, I appreciate that.

02:16PM   7          (Jury seated at 2:16 p.m.)

02:17PM   8          **THE COURT:**  Okay.  The record will reflect that all

02:17PM   9   our jurors are present again.

02:17PM  10          So I understand that one juror cannot be here on

02:17PM  11   Friday the 27th, so we will be down on Friday the 27th.

02:17PM  12          You folks have asked about where we are in terms of

02:17PM  13   scheduling.  We're getting there.  But we -- we -- given the

02:17PM  14   fact that we're going to be down on the 27th, we may very well

02:17PM  15   spill over into the next week, so we'll be going Monday,

02:17PM  16   Tuesday, Wednesday, Thursday of next week, and -- and we may

02:17PM  17   spill over and will probably will spill over into the

02:17PM  18   following, okay?  Okay.

02:17PM  19          I remind the witness he's still under oath.

02:17PM  20          And you may continue.

02:17PM  21          **BY MR. MacKAY:**

02:18PM  22   Q.  Good afternoon, again, Chief Granville.

02:18PM  23   A.  Hi.

02:18PM  24   Q.  Before I get into the actual Serio investigation and the

02:18PM  25   steps that were taken, I want talk about confidential

02:18PM  1  informants generally.  I think you said on direct, you've had

02:18PM  2  experience using them throughout your career, correct?

02:18PM  3  A.  That's correct.

02:18PM  4  Q.  Quite a lot of experience?

02:18PM  5  A.  Yes.

02:18PM  6  Q.  Fair to say they often form an important part of an

02:18PM  7  investigation?

02:18PM  8  A.  They do.

02:18PM  9  Q.  Okay.  And I think you were talking about some stuff

02:18PM  10  with, like, money and charges.  Fair to say that when using a

02:18PM  11  confidential informant, usually there has to be incentive for

02:18PM  12  the informant to work with you?

02:18PM  13  A.  Generally, yes.

02:18PM  14  Q.  Meaning that, you know, if they're -- if they're not

02:18PM  15  getting something out of it, they're not going to put

02:18PM  16  themselves in -- in harm's way or any risk; fair to say?

02:18PM  17  A.  That's v correct.

02:18PM  18  Q.  Meaning that, you know, while on one hand you might have

02:18PM  19  the sources of information of people who give, like,

02:18PM  20  tips that -- that -- that's one category of people who

02:19PM  21  provide information to law enforcement in your experience,

02:19PM  22  correct?

02:19PM  23  A.  Correct.

02:19PM  24  Q.  On the other hand, people who go out and do, like,

02:19PM  25  controlled buys and things like that, those are a little bit

02:19PM    1    different category, correct?

02:19PM    2    A.  That's correct.

02:19PM    3    Q.  Those are the ones that usually there has to be something

02:19PM    4    in it for them or they're not going to put themselves in

02:19PM    5    harm's way, correct?

02:19PM    6    A.  That's correct.

02:19PM    7    Q.  And I think you described two different things.  One can

02:19PM    8    be that the C.I. is getting money, correct?

02:19PM    9    A.  Correct.

02:19PM   10    Q.  The other one can be that the C.I. is working off some

02:19PM   11    sort of charges, correct?

02:19PM   12    A.  That's correct.

02:19PM   13    Q.  And what "working off charges" means is that the C.I. is

02:19PM   14    providing information and doing work in the hopes that those

02:19PM   15    charges that -- that your agency will advocate for them in

02:19PM   16    some fashion in the court case, correct?

02:19PM   17    A.  That's correct.

02:19PM   18    Q.  And I think you -- you were asked a question about --

02:19PM   19    from Mr. Cooper about keeping cases open; do you recall that?

02:19PM   20    A.  I do.

02:19PM   21    Q.  Yeah.  So, for example, a C.I. comes to you and you work

02:19PM   22    with them for a little bit of time, and you might have some

02:20PM   23    success; that's one thing that can happen, correct?

02:20PM   24    A.  That's correct.

02:20PM   25    Q.  And is it fair to say that ultimately, you know, it's

02:20PM   1   you, as the C.I.'s handlers, it's in your discretion on when

02:20PM   2   you want to take things to the prosecution?

02:20PM   3   A.  That's correct.

02:20PM   4   Q.  And then in your experience ultimately it's the

02:20PM   5   prosecution who decides, you know, where cases end up in the

02:20PM   6   court system, correct?

02:20PM   7   A.  That's correct.

02:20PM   8   Q.  Okay.  So let's fast forward to April of 2017.

02:20PM   9       I think you said on direct, this whole investigation that

02:20PM  10   culminates in the arrest of Ron Serio and everything we've

02:20PM  11   been talking about, I think you termed that it was a couple

02:20PM  12   weeks that it took?

02:20PM  13   A.  That's correct.

02:20PM  14   Q.  From, say -- what I mean is, from start to the date of

02:20PM  15   arrest, we're talking no more than a couple weeks, correct?

02:20PM  16   A.  That's correct.

02:20PM  17   Q.  Okay.  So let's start at the very beginning.

02:20PM  18       So your understanding, a confidential informant of some

02:20PM  19   sort came into the FBI, correct?

02:21PM  20   A.  That's correct.

02:21PM  21   Q.  The -- the C.I. did not come into the Sheriff's, correct?

02:21PM  22   A.  That's correct.

02:21PM  23   Q.  Because you, as senior detective at the time in the Erie

02:21PM  24   County Sheriff's Office narcotics unit, you received some

02:21PM  25   contact from FBI, correct?

02:21PM   1   A.  That's correct.

02:21PM   2   Q.  Do you recall why sheriffs are contacted in particular as

02:21PM   3   the agency?

02:21PM   4   A.  I don't.

02:21PM   5   Q.  Okay.  In your experience, does the Sheriff's Office do a

02:21PM   6   lot of marijuana operations?

02:21PM   7   A.  We've done just as much as the next guy.

02:21PM   8   Q.  Okay.  But as you sit here, you don't know why, for --

02:21PM   9   why the outreach came from FBI to Sheriff's, correct?

02:21PM  10   A.  That's correct.

02:21PM  11   Q.  And specifically you were dealing with the FBI Special

02:21PM  12   Agent Jason Galle?

02:21PM  13   A.  That's correct.

02:21PM  14   Q.  Okay.  So if you understood it, the C.I. who had sort of

02:21PM  15   started all this, he was an FBI C.I., correct?

02:21PM  16   A.  That's correct.

02:21PM  17   Q.  And then from there, you began the Sheriff's Office

02:21PM  18   component of the investigation, correct?

02:21PM  19   A.  That's correct.

02:22PM  20   Q.  And you're working it jointly with FBI, correct?

02:22PM  21   A.  Correct.

02:22PM  22   Q.  And what that involves is, fair to say, some background

02:22PM  23   information on the targets?

02:22PM  24   A.  That's correct.

02:22PM  25   Q.  Because -- but you had said on direct, though, that the

02:22PM    1    C.I. was reliable, correct?

02:22PM    2    A.  He proved to be reliable.

02:22PM    3    Q.  Did you know whether he was -- I mean, when the C.I. was

02:22PM    4    passed to you, or you came to understand it was a C.I., had

02:22PM    5    you had any understanding on whether the C.I. had done prior

02:22PM    6    operations for FBI?

02:22PM    7    A.  I was unaware of that.

02:22PM    8    Q.  Okay.  You just don't know what -- what that C.I. did

02:22PM    9    before?

02:22PM    10    A.  That's correct.

02:22PM    11    Q.  Okay.  But ultimately, you developed some fairly specific

02:22PM    12    information from the C.I., correct?

02:22PM    13    A.  That's correct.

02:22PM    14    Q.  Target being Ron Serio, a drug dealer, correct?

02:22PM    15    A.  That's correct.

02:22PM    16    Q.  There's some information of some individuals -- specific

02:22PM    17    individuals who are going to rob Ron Serio, correct?

02:22PM    18    A.  That's correct.

02:22PM    19    Q.  And there's a location that's identified by the C.I. on

02:23PM    20    Huntington where there's drug activity, correct?

02:23PM    21    A.  That's correct.

02:23PM    22    Q.  That's the 370 Huntington address, correct?

02:23PM    23    A.  That's correct.

02:23PM    24    Q.  Without getting into name naming, that address was the

02:23PM    25    address of one of the guys who was going to rob Ron Serio,

02:23PM  1   correct?

02:23PM  2   A.  Not to my knowledge.

02:23PM  3   Q.  Okay.  But he -- he -- do you recall him having some

02:23PM  4   involvement in the process?  In the plan process, we'll call

02:23PM  5   it.

02:23PM  6   A.  I don't recall.

02:23PM  7   Q.  Okay.  So in any event, you -- I think you told us you do

02:23PM  8   a couple days of surveillance, correct?

02:23PM  9   A.  That's correct.

02:23PM  10  Q.  And what you testified is at least on the day of the

02:23PM  11  April 18th, 2017, you were surveilling the Lebrun, the Lebrun

02:23PM  12  mansion, correct?

02:23PM  13  A.  That's correct.

02:23PM  14  Q.  So just so the jury understands, there's -- on that day,

02:23PM  15  on April 18th, 2017, there's police activity that's occurring

02:23PM  16  at the Lebrun mansion, correct?

02:23PM  17  A.  That's correct.

02:23PM  18  Q.  And then simultaneously there's police activity occurring

02:23PM  19  at 370 Huntington, correct?

02:24PM  20  A.  Correct.

02:24PM  21  Q.  And as both you and the FBI and Sheriff's Office, you're

02:24PM  22  coordinating activity between those two locations, correct?

02:24PM  23  A.  That's correct.

02:24PM  24  Q.  And the way it goes down is that Ron Serio's Range Rover

02:24PM  25  is seen leaving Lebrun, correct?

02:24PM    1    A.  Correct.

02:24PM    2    Q.  And then it's seen going to 370 Huntington, correct?

02:24PM    3    A.  That's correct.

02:24PM    4    Q.  And officers at that location observe what appears to be

02:24PM    5    some sort of bag exchange, correct?

02:24PM    6    A.  That's correct.

02:24PM    7    Q.  Now, prior to that point in time, in your surveillance of

02:24PM    8    the Lebrun house, you had not seen anything that specifically

02:24PM    9    pointed to drug activity at that location, had you?

02:24PM    10    A.  That's fair to say.

02:24PM    11    Q.  Right.  You hadn't seen, like, any of that same activity

02:24PM    12    that occurred at Huntington occurring at Lebrun, correct?

02:24PM    13    A.  Correct.

02:24PM    14    Q.  Like bag exchanges, correct?

02:24PM    15    A.  Correct.

02:24PM    16    Q.  You -- you had not seen anybody perform any sort of,

02:24PM    17    like, drug transaction or passing of drugs at Lebrun,

02:24PM    18    correct?

02:25PM    19    A.  That's correct.

02:25PM    20    Q.  So, okay, let's go back to -- to Huntington.

02:25PM    21    There's the bag exchange, and Ron Serio and another

02:25PM    22    individual are arrested, correct?

02:25PM    23    A.  That's correct.

02:25PM    24    Q.  Now, at that point in time, there's no warrant for the

02:25PM    25    Lebrun property, correct?

| | | |
|---|---|---|
| 02:25PM | 1 | A.  That's correct. |
| 02:25PM | 2 | Q.  The -- the warrant is for the Huntington property, |
| 02:25PM | 3 | correct? |
| 02:25PM | 4 | A.  That's correct. |
| 02:25PM | 5 | Q.  So at that point in time, warrant's executed, Ron Serio |
| 02:25PM | 6 | and this other individual are arrested, correct? |
| 02:25PM | 7 | A.  That's correct. |
| 02:25PM | 8 | Q.  And there's some searching of the vehicle and the |
| 02:25PM | 9 | property and contraband is recovered there, correct? |
| 02:25PM | 10 | A.  That's correct. |
| 02:25PM | 11 | Q.  And then what happens next is the other individual other |
| 02:25PM | 12 | than Ron Serio, he's flipped and used to get a search warrant |
| 02:25PM | 13 | for the Lebrun house, correct? |
| 02:25PM | 14 | A.  That's correct. |
| 02:25PM | 15 | Q.  And he's also used to get a search warrant for the |
| 02:25PM | 16 | Grimsby Avenue, Kenmore house, correct? |
| 02:25PM | 17 | A.  That's correct. |
| 02:25PM | 18 | Q.  Okay.  So, again, just so it's clear, those warrants for |
| 02:25PM | 19 | those two locations, Lebrun and Grimsby, did not exist prior |
| 02:26PM | 20 | to the execution of the Huntington -- Huntington Avenue |
| 02:26PM | 21 | search warrant, correct? |
| 02:26PM | 22 | A.  That's correct. |
| 02:26PM | 23 | Q.  Right.  And at that point in time, fair to say, prior to |
| 02:26PM | 24 | execution of the Huntington Avenue warrant, there wasn't |
| 02:26PM | 25 | probable cause from what you had seen to get any warrant at |

02:26PM    1    Lebrun, correct?

02:26PM    2    A.  That's correct.

02:26PM    3    Q.  It was the -- the seizure of the drugs and the

02:26PM    4    circumstances under which they're seized and everything

02:26PM    5    leading up to that Huntington, in combination with what that

02:26PM    6    individual later tells you that helps you to get the warrant

02:26PM    7    for the later two addresses, correct?

02:26PM    8    A.  That's correct.

02:26PM    9    Q.  Okay.  And then from there, the warrants are then

02:26PM    10    executed at both Lebrun and Grimsby, correct?

02:26PM    11    A.  That's correct.

02:26PM    12    Q.  And further contraband is discovered at both of those

02:26PM    13    addresses, correct?

02:26PM    14    A.  That's correct.

02:26PM    15    Q.  Okay.  Now, separate and apart from that, you're

02:26PM    16    surveying the Lebrun house and you see an individual you

02:26PM    17    later learned to be Anthony Gerace leave the residence,

02:26PM    18    correct?

02:27PM    19    A.  That's correct.

02:27PM    20    Q.  You didn't stop him, but a traffic stop was effectuated

02:27PM    21    for him some distance away, correct?

02:27PM    22    A.  Correct.

02:27PM    23    Q.  And that's in a very short time period -- I mean, can you

02:27PM    24    locate that in time -- withdrawn.  Let me start over.

02:27PM    25        He leaves the Lebrun property.  That's about the same

02:27PM   1   time the Huntington warrant is executed?

02:27PM   2   A.  It was in and around the same time.

02:27PM   3   Q.  Close in time, though?

02:27PM   4   A.  That's correct.

02:27PM   5   Q.  Okay.  And then ultimately you then encounter Anthony

02:27PM   6   Gerace in person back at the Sheriff's Office, correct?

02:27PM   7   A.  That's correct.

02:27PM   8   Q.  And he's -- he's subjected to an interview there,

02:27PM   9   correct?

02:27PM   10  A.  Correct.

02:27PM   11  Q.  And in the process, he drops a name of an official,

02:27PM   12  correct?

02:27PM   13  A.  That's correct.

02:27PM   14  Q.  And that was Dan Derenda, correct?

02:27PM   15  A.  That's correct.

02:27PM   16  Q.  And you knew him to be the chief of -- I'm sorry, the

02:27PM   17  Commissioner of the Buffalo Police at the time, correct?

02:28PM   18  A.  That's correct.

02:28PM   19  Q.  But in response to that, did you pick up the phone and

02:28PM   20  call Derenda?

02:28PM   21  A.  No.

02:28PM   22  Q.  Okay.  But ultimately -- no -- no special treatment is

02:28PM   23  given to Anthony Gerace just because he dropped that name,

02:28PM   24  correct?

02:28PM   25  A.  That's correct.

02:28PM  1   Q.  And, I mean, you were there for the entirety of Anthony

02:28PM  2   Gerace's interview, correct?

02:28PM  3   A.  That's correct.

02:28PM  4   Q.  Never mentioned the name Joe Bongiovanni, correct?

02:28PM  5   A.  That's correct.

02:28PM  6        **MR. MacKAY:**  I think that's all the questions I have,

02:28PM  7   Judge.  Thank you.

02:28PM  8        **THE COURT:**  Any redirect?

02:28PM  9        **MR. COOPER:**  Just briefly.  If I may have one second,

02:28PM 10   Judge?  Just briefly, Judge.

02:29PM 11

02:29PM 12             **REDIRECT EXAMINATION BY MR. COOPER:**

02:29PM 13   Q.  At the time you were interviewing Anthony Gerace in the

02:29PM 14   Erie County Sheriff's Office, that was at -- at a local

02:29PM 15   police agency is where he was being interviewed, right?

02:29PM 16   A.  That's correct.

02:29PM 17   Q.  Okay.  And he had been arrested by a local police agency

02:29PM 18   or county-level police agency, right?

02:29PM 19   A.  That's correct.

02:29PM 20   Q.  And did he ask for a person who was affiliated with a

02:29PM 21   local or county police agency?

02:29PM 22   A.  He did.

02:29PM 23   Q.  Okay.  You were asked some questions on cross-examination

02:29PM 24   towards the end there about kind of what ultimately led to

02:29PM 25   the arrest of Ron Serio.  I just want to kind of go over that

02:29PM    1    one more time.

02:29PM    2        Around April of 2017, did you become aware of information

02:29PM    3    that Ron Serio was a drug dealer?

02:30PM    4    A.  Yes.

02:30PM    5    Q.  Did you and other members of the Sheriff's Office do

02:30PM    6    surveillance?

02:30PM    7    A.  We did.

02:30PM    8    Q.  Did you use one vehicle and one deputy to do that

02:30PM    9    surveillance?

02:30PM   10    A.  No.

02:30PM   11    Q.  Why not?

02:30PM   12    A.  Drug dealers are oftentimes surveillance conscious.

02:30PM   13    They're very well aware of their surroundings, and it's

02:30PM   14    important to, you know, rotate vehicles, switch vehicles,

02:30PM   15    things of that nature.

02:30PM   16    Q.  Can using extra deputies help with that?

02:30PM   17    A.  Yes.

02:30PM   18    Q.  Does using multiple vehicles help with that?

02:30PM   19    A.  It does.

02:30PM   20    Q.  Is that how you at the Erie County Sheriff's Office did

02:30PM   21    the surveillance of Ron Serio?

02:30PM   22    A.  We did.

02:30PM   23    Q.  Did you set up surveillance at his house?

02:30PM   24    A.  We did.

02:30PM   25    Q.  Did he get in his vehicle and leave his house?

02:30PM  1    A.  Ultimately, yes.

02:30PM  2    Q.  Did members of the Erie County Sheriff's Office follow

02:30PM  3    him when he left his house?

02:30PM  4    A.  We did.

02:30PM  5    Q.  Did they watch where he went?

02:30PM  6    A.  Yes.

02:30PM  7    Q.  Did that help further your investigation?

02:30PM  8    A.  It did.

02:30PM  9    Q.  Did you ultimately observe him show up at some --

02:31PM  10   withdrawn.

02:31PM  11        Did members of the Erie County Sheriff's Office

02:31PM  12   ultimately observe him show up at 370 Huntington and exchange

02:31PM  13   duffle bags of drugs?

02:31PM  14   A.  Yes.

02:31PM  15   Q.  Did that all start with surveillance at his house at

02:31PM  16   697 Lebrun?

02:31PM  17   A.  Yes.  Based upon the surveillance and the information

02:31PM  18   that we had received from the same confidential informant

02:31PM  19   connecting 370 Huntington to the Lebrun Road address, it just

02:31PM  20   corroborated everything that was being said.

02:31PM  21   Q.  Was 697 Lebrun hard to find?

02:31PM  22   A.  No.

02:31PM  23   Q.  Was Ron Serio in his Range Rover hard to follow?

02:31PM  24   A.  No.

02:31PM  25   Q.  You were asked some questions about your feelings about

02:31PM   1   deconfliction databases, and you indicated that you don't --

02:31PM   2   you choose not to use those; is that correct?

02:32PM   3   A.   That's correct.

02:32PM   4   Q.   To be clear, though, if there was a deconfliction

02:32PM   5   database that you would use at the Erie County Sheriff's

02:32PM   6   Office, would that be SafetyNet?

02:32PM   7   A.   Yes.

02:32PM   8   Q.   Okay.  You don't put people into DARTS, do you?

02:32PM   9   A.   No.

02:32PM  10   Q.   Mr. MacKay asked you some questions on cross-examination

02:32PM  11   about other agencies being aware of your feelings about

02:32PM  12   deconfliction databases; do you remember being asked those

02:32PM  13   questions?

02:32PM  14   A.   I do.

02:32PM  15   Q.   Have you ever had a discussion with the defendant about

02:32PM  16   whether you used deconfliction databases or not?

02:32PM  17   A.   I don't recall.

02:32PM  18   Q.   Do you -- do you have any reason to believe that he would

02:32PM  19   know whether or not you used deconfliction databases?

02:32PM  20   A.   I -- I don't know.

02:32PM  21   Q.   You have no personal knowledge of what's inside his head,

02:32PM  22   right?

02:32PM  23   A.   That's correct.

02:32PM  24   Q.   Okay.  You were asked some questions about the activity

02:32PM  25   that you observed while you were posted up at 697 Lebrun; do

USA v Bongiovanni - Granville - Cooper/Redirect - 9/16/24

02:33PM  1   you recall that?

02:33PM  2   A.   Yes.

02:33PM  3   Q.   Anthony Gerace was observed leaving 697 Lebrun, right?

02:33PM  4   A.   That's correct.

02:33PM  5   Q.   And he was traffic stopped?

02:33PM  6   A.   He was.

02:33PM  7   Q.   And he had drugs on him?

02:33PM  8   A.   He did.

02:33PM  9   Q.   He had fentanyl pills, right?

02:33PM 10   A.   That's correct.

02:33PM 11   Q.   When you set up surveillance on a -- on the home of a

02:33PM 12   target, is it a common narcotics investigation tactic to try

02:33PM 13   to look for people coming and going frequently?

02:33PM 14   A.   Yes.

02:33PM 15   Q.   And when you traffic stopped Anthony Gerace as he left

02:33PM 16   the location, is that a consistent, common practice in

02:33PM 17   narcotics investigations?

02:33PM 18   A.   It is.

02:33PM 19   Q.   Did you find drugs on Anthony Gerace?

02:33PM 20   A.   We did.

02:33PM 21   Q.   Is that the sort of investigative activity that can help

02:33PM 22   further probable cause for a search warrant?

02:33PM 23   A.   Yes.

02:33PM 24   Q.   Was that hard to do?

02:33PM 25   A.   No.

02:33PM    1    Q.  And Anthony Gerace -- ultimately, are you aware of

02:34PM    2    whether he was charged with respect to the fentanyl pills

02:34PM    3    that were seized from him?

02:34PM    4    A.  He was.

02:34PM    5    Q.  Where was he charged?

02:34PM    6    A.  With the U.S. Attorney's Office.

02:34PM    7    Q.  Is that here in federal court?

02:34PM    8    A.  Yes.

02:34PM    9         **MR. COOPER:**  Just one second please, Judge?

02:34PM   10         **THE COURT:**  Sure.

02:34PM   11         **BY MR. COOPER:**

02:34PM   12    Q.  Just a couple more follow-up questions.

02:34PM   13         That individual -- you were asked some questions about

02:34PM   14    the police activity that took place at 370 Huntington.  Was

02:35PM   15    the individual who Serio interacted with there named Kelly

02:35PM   16    Brace?

02:35PM   17    A.  Yes.

02:35PM   18    Q.  Okay.  And then I also wanted to ask you, with respect to

02:35PM   19    the Anthony Gerace charges that came here to federal court,

02:35PM   20    did you turn the evidence that you had from the traffic stop

02:35PM   21    over to federal law enforcement authorities?

02:35PM   22         **MR. MacKAY:**  Objection, beyond the scope about the

02:35PM   23    Gerace prosecution.

02:35PM   24         **MR. COOPER:**  Judge, the topic of the Anthony Gerace

02:35PM   25    came up during cross.

| | | |
|---|---|---|
| 02:35PM | 1 | **THE COURT:** I'll allow it -- I'll allow it. |
| 02:35PM | 2 | **BY MR. COOPER:** |
| 02:35PM | 3 | Q. Did you turn the evidence that you got over to the feds? |
| 02:35PM | 4 | A. Yes. |
| 02:35PM | 5 | **MR. COOPER:** Okay. I have no further redirect, |
| 02:35PM | 6 | Judge. Thank you. |
| 02:35PM | 7 | **MR. MacKAY:** Brief, Judge. |
| 02:35PM | 8 | |
| 02:35PM | 9 | **RECROSS-EXAMINATION BY MR. MacKAY:** |
| 02:35PM | 10 | Q. All right. Chief Granville, I'll try to get you out of |
| 02:35PM | 11 | here quick. |
| 02:35PM | 12 | You said on redirect, I think when you were talking about |
| 02:35PM | 13 | the search warrant execution at 370, that everything you saw |
| 02:35PM | 14 | sort of corroborated something, correct? |
| 02:35PM | 15 | A. That's correct. |
| 02:35PM | 16 | Q. In other words, you had reason to believe that there was |
| 02:36PM | 17 | going to be drug activity at 370 Huntington based on what you |
| 02:36PM | 18 | knew already in the investigation, correct? |
| 02:36PM | 19 | A. That's correct. We were in possession of a search |
| 02:36PM | 20 | warrant for that address. |
| 02:36PM | 21 | Q. Right, you had already -- so fair to say prior to that |
| 02:36PM | 22 | date and time when that activity is observed, there had |
| 02:36PM | 23 | already been probable cause that you had developed |
| 02:36PM | 24 | specifically related to that address, correct? |
| 02:36PM | 25 | A. That's correct. |

02:36PM 1    Q.  And specifically as to that individual, Kelly Brace,

02:36PM 2    correct?

02:36PM 3    A.  Correct.

02:36PM 4    Q.  And Kelly Brace is the individual who lived at that

02:36PM 5    address, correct?

02:36PM 6    A.  That's correct.

02:36PM 7    Q.  Okay.  So in sum and substance, it wasn't a surprise that

02:36PM 8    bags were exchanged at that address, correct?

02:36PM 9    A.  No.

02:36PM 10          MR. MacKAY:  Okay.  Nothing further, Your Honor.

02:36PM 11

02:36PM 12          **RE-REDIRECT EXAMINATION BY MR. COOPER:**

02:36PM 13   Q.  Even if you hadn't had a search warrant yet at that

02:36PM 14   point, if you had followed Ron Serio to 370 Huntington, would

02:36PM 15   you have observed him engaging in drug activity regardless of

02:37PM 16   whether there was a warrant already?

02:37PM 17   A.  Yes, we would have.

02:37PM 18   Q.  Just by doing the surveillance?

02:37PM 19   A.  That's correct.

02:37PM 20          **MR. COOPER:**  I have no further questions, Judge.

02:37PM 21          **MR. MacKAY:**  Nothing further, Your Honor.

02:37PM 22          **THE COURT:**  You can step down.  Thank you.

02:37PM 23          (Witness excused at 2:37 p.m.)

24          (Excerpt concluded at 2:37 p.m.)

25               *    *    *    *    *    *    *

1

2                    **CERTIFICATE OF REPORTER**

3

4                In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on September 16, 2024.

8

9

10                        s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR
11                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        **TRANSCRIPT INDEX**

3          **EXCERPT - EXAMINATION OF D.J. GRANVILLE**

4                      **SEPTEMBER 16, 2024**

5

6

7    **W I T N E S S**                              **P A G E**

8    **D. J.  G R A N V I L L E**                      2

9      DIRECT EXAMINATION BY MR. COOPER:            2

10     CROSS-EXAMINATION BY MR. MacKAY:            21

11     REDIRECT EXAMINATION BY MR. COOPER:         42

12     RECROSS-EXAMINATION BY MR. MacKAY:          48

13     RE-REDIRECT EXAMINATION BY MR. COOPER:      49

14

15

16

17

18

19

20

21

22

23

24

25