UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.                                        Case No. 19-CR-227-1-LJV

JOSEPH BONGIOVANNI,

                    Defendant.

---

**DEFENDANT JOSEPH BONGIOVANNI'S
<u>OBJECTIONS TO THE DRAFT PRESENTENCE REPORT</u>**

**THE LAW OFFICE OF PARKER R. MACKAY**
  Parker R. MacKay, Esq.
  3110 Delaware Avenue
  Kenmore, NY 14217
  Ph: (716) 803-8166
  Fx: (716) 408-1651
  Em: Parker@MacKayLawOffice.com



Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com

*Attorneys for Joseph Bongiovanni*

**Preliminary Statement**

In this case, the juries in Trial #1 and Trial #2 convicted Mr. Bongiovanni of several discrete acts, not the overarching conspiracy that that government claims or that the Draft Presentence Report (ECF 1503) [*hereinafter,* "Draft PSR"] relies upon to calculate its guideline recommendations. As the defense has made clear since the conclusion of Trial #2, the jury chose to convict Mr. Bongiovanni for protecting his best friend's basement marijuana grow, for making false entries in DEA reports, for making false statements to investigators to minimize his relationship to Peter Gerace, and for taking the Wayne Anderson working file home following his retirement and in violation of DEA protocols. These convictions do not involve the greater conspiracy the government failed to prove at two successive trials. As a result, the Court should sustain the objections below and order the probation office to amend the Draft PSR accordingly.

**Argument**

Throughout the Draft PSR, the probation office makes several mistakes interpreting the evidence and improperly conveys the import of the jury's verdict. As a result of these errors, the Draft PSR mis-attributes a massive number of narcotics to Mr. Bongiovanni's relevant conduct. The Draft PSR also wrongly groups the counts of conviction, which further exacerbates highly inflated guideline levels. Mr. Bongiovanni objects to these errors.[1]

---

[1] At the time of this filing, Mr. Bongiovanni's Rule 29 Motion remains pending. Several of the Counts mentioned in the PSR and argued about in this filing could later be dismissed by the Court. If such dismissals occur, then the dismissals could materially alter some of the arguments made in this filing and the objections made to the Draft PSR. Consequently, in the event the Court later grants Rule 29 dismissals, then Mr. Bongiovanni reserves his right to refile his objections. For purposes of this filing, however, Mr. Bongiovanni's arguments focus on the Counts of Conviction as they stand today and as reported in the Draft PSR.

I.    **Legal Principles Regarding Attribution of Narcotics as "Relevant Conduct."**

   A.  **USSG § 1B1.3(a)(1) Rules and the *Studley* factors.**

   Quantity determines the base level for narcotics offenses under USSG § 2D1.1(a)(3). "Relevant conduct" under USSG § 1B1.3(a)(1)(A) and (B) guides the determination of the quantity of drugs attributable to the defendant. Section 1B1.3(a)(1)(A) makes a defendant punishable for the total quantity of narcotics he personally handled and "aided, abetted, counseled, commanded, induced, procured, or willfully caused." In other words, this section covers conduct in which the defendant had "direct, personal involvement." *United States v. Chalarca*, 95 F.3d 239, 243 (2d Cir. 1996). Section 1B1.3(a)(1)(B) covers conduct classified as "jointly undertaken criminal activity" (i.e., a conspiracy) and makes the defendant punishable for the total quantity of narcotics that his confederates possessed so long as such narcotics were:

   (i) Within the scope of the jointly undertaken criminal activity,

   (ii) In furtherance of that criminal activity, and

   (iii) Reasonably foreseeable in connection with that criminal activity;

   that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

*See* USSG § 1B1.3(a)(1)(B). Thus, "when the calculation of the base offense level depends on the quantity of narcotics attributable to a defendant who was a member of a narcotics distribution conspiracy, . . . all transactions engaged in by him or by his coconspirators may be considered if the transactions were either known to him or reasonably foreseeable to him." *United States v. Negron*, 967 F.2d 68, 72 (2d Cir. 1992). This rule exists in conspiracy cases because '[w]ithout a reasonable foreseeability test, a defendant in a conspiracy case would be liable not just for his own actions, but also for 'any crimes committed by any other members of the conspiracy.'" *United States v. Velasquez*, 28 F.3d 2, 6 (2d Cir. 1994) (quoting *United States v. Martinez*, 987 F.2d 920, 926 (2d Cir. 1993).

However, Section 1B1.3(a)(1)(B) also limits "relevant conduct" by its scope – the actions of others must be "within the scope of the jointly undertaken criminal activity" agreed to by the defendant. *See* USSG § 1B1.3(a)(1)(B)(i). As such, "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." *See id.* at Application Note 3(B).

In the Second Circuit, in order to hold a defendant liable at the sentencing phase for the relevant conduct of a co-conspirator, a district court is required to make two particularized findings. First, the Court must find that "the scope of the activity to which the defendant agreed was sufficiently broad to include the relevant, co-conspirator conduct in question." Second, the Court must also conclude that "the relevant conduct on the part of the co-conspirator was foreseeable to the defendant." *United States v. Johnson,* 378 F.3d 230, 236 (2d Cir. 2004) (alteration, citation, and quotations omitted). These two findings are referred to as the *"Studley* prongs," based upon *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).

With respect to the first *Studley* prong, it is not sufficient for a court to find that a defendant had knowledge of a co-conspirator's criminal acts, nor is it sufficient for a court to find that a defendant was "aware of the scope of the overall operation and therefore should be held accountable for the activities of the whole operation." *Johnson*, 378 F.3d at 238 (quotations omitted). Rather, a court must make "a particularized finding" that the co-conspirator's act "was within the scope of the *specific* conduct and objectives embraced by the . . . agreement." *Id.* (alteration in original) (quotation omitted). As explained by Application Note 3(B), "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." USSG § 1B1.3, App. Note 3(B). The Application Note instructs that a court may "consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* Moreover, even if an

act of a co-conspirator was known or reasonably foreseeable to a defendant, if it was not within the scope of the defendant's agreement, then it cannot be considered relevant conduct. *Id.* With respect to the second *Studley* prong, foreseeability requires more than just "general knowledge" about the conspiracy. *Johnson*, 378 F.3d at 236 n.8, 239. There must be a "closer link." *Id.* at 239.

### B. USSG § 1B1.3(2) Grouping Rules.

When counts are grouped pursuant to USSG § 3D1.2(d) (as is the case here), "all acts and omissions described in subdivisions (1)(A) and (1)(B) [] that were part of the same course of conduct or common scheme or plan as the offense of conviction" are included as "relevant conduct." *See* USSG § 1B1.3(2). Offenses are "part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* § 1B1.3 Application Note 5(B)(ii). That determination depends on "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* "When one of the above factors is absent, a stronger presence of at least one of the other factors is required." USSG § 1B1.3 Application Note 5(B)(ii). "The same course of conduct concept looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be connected together by common participants or by an overall scheme." *United States v. McCray,* 7 F.4th 40, 48 (2d Cir. 2021) (internal quotation marks and alterations omitted). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *See United States v. Greenwood*, Nos. 23-7199, 24-368, 2025 U.S. App. LEXIS 2208, at *6 (2d Cir. Jan. 31, 2025) (citing USSG § 1B1.3, Application Note 5(B)(i)).

### C.  Other Core Principles.

When attributing narcotics in the realm of "relevant conduct," the Court is guided by three other concepts.  First, when "seized currency appears by a preponderance of the evidence to be the proceeds of narcotics trafficking, a district court may consider the market price for the drugs in which the defendant trafficked in determining the drug quantity represented by that currency." *United States v. Jones*, 531 F.3d 163, 175 (2d Cir. 2008).  Second, narcotics for personal consumption are not included in the calculation of drug quantity pursuant to USSG § 1B1.3(a)(2).  This is because a narcotic possessed for personal use is "not only not a *part of* a scheme or plan to distribute these drugs, it is actually *exclusive* of any plan to distribute them.  Accordingly, [when] calculating the quantity of drugs relevant for purposes of sentencing under 21 U.S.C. § 841, any fractional quantity of drugs intended for personal use must be excluded." *United States v. Williams*, 247 F.3d 353, 358 (2d Cir. 2001) (emphasis in original).  Third, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (quoting *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991)).  "This is because 'the emphasis in substantive conspiracy liability is the scope of the *entire conspiracy*,' while 'the emphasis under the Guidelines is the scope of the *individual defendant's* undertaking.'" *United States v. Rigo*, 13 Cr. 897 (RWS), 2017 U.S. Dist. LEXIS 6228, 2017 WL 213064, at *3 (S.D.N.Y. Jan. 17, 2017) (alteration omitted) (quoting *United States v. Spotted Elk*, 548 F.3d 641, 673-74 (8th Cir. 2008)); *see* USSG § 1B1.3 Application Note 1 ("The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability.").

### D. USSG § 1B1.3(c) Acquitted Conduct Rule.

For thirty years, acquitted conduct was treated as "relevant conduct" for purposes of Guidelines calculations "so long as that conduct [was] prove[n] by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997); *accord United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005). However, on November 1, 2024, this changed. Via Amendment 826, the Sentencing Commission changed this approach through implementation of the acquitted conduct rule. Pursuant to the acquitted conduct rule, "relevant conduct" no longer may include conduct for which the defendant was acquitted at trial. The amendment revised § 1B1.3 by adding new subsection (c), which provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court unless such conduct also establishes, in whole or in part, the instant offense of conviction." The Commission did not define how courts should limit "relevant conduct" when a defendant is both acquitted and convicted of "linked or related charges" or "overlapping conduct" – as is the case here. Instead, the Commission left that job to the courts, commenting in Application Note 10 to §1B1.3(c), that in "cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction . . . , the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct."

This rule is relatively new and, as a result, not a lot of case law exists to demonstrate how courts have resolved situations involving convictions and acquittals for overlapping conduct. However, at least one published case is helpful. In *United States v. Scott*, the district court found that the acquitted conduct rule did not affect the guideline loss calculations in a fraud case because the conduct in the acquitted counts was subsumed within the counts of conviction. *See Scott*, No. 1:21-cr-491-3, 2025 U.S. Dist. LEXIS 77046, at *8-9 (N.D. Ohio Apr. 22, 2025). As the district court explained:

At trial, Mr. Scott was convicted of conspiracy to commit securities fraud (Count 2) and securities fraud (Count 20) but acquitted on two counts of wire fraud (Count 45 and Count 47). The jury was instructed that intent to defraud is an essential element of securities fraud and that good faith is a complete defense. By returning guilty verdicts on both securities fraud and conspiracy to commit securities fraud, then, the jury necessarily found that Mr. Scott acted with the intent to defraud or engaged in a fraud. At trial, the evidence established that the fraud involved artificially manipulating the price of USLG stock. This conduct subsumes the specific transactions involved in the two wire fraud counts, and it is difficult to tease out those transactions for guideline purposes. Therefore, the record supports the determination that Mr. Scott's conduct establishes his participation in the Count 2 conspiracy and responsibility for its full intended loss amount such that Section 1B1.3(c) does not bar its use in calculating the loss amount.

*See id.*

### E. The Jury's Finding in this Case Were Limited to a Discrete Conspiracy with Louis Selva only.

Here, the acquitted conduct is neither "subsumed" in the counts of conviction nor "difficult to tease out." As the jury verdict made clear, Mr. Bongiovanni was acquitted of conspiring to distribute narcotics, including marijuana, in an amount greater than 50 kilograms. Such a verdict makes participation in the greater Masecchia-Serio DTO conspiracy *impossible*. As Ron Serio made clear in his testimony at trial, the amount of marijuana involved in the conspiracy equated to *thousands* of kilograms, not *less than* 50 kilograms as the jury found. What's more, when you factor in the acquittal on Count 4 (bribery), this further undermines any conclusion that the jury convicted Mr. Bongiovanni of participating in the larger Masecchia-Serio DTO conspiracy because the provision of such bribes formed the very basis for Mr. Bongiovanni's alleged participation in that conspiracy. As a result, the only conclusion that can be reached is that the jury convicted Mr. Bongiovanni of a much smaller, discrete conspiracy. This is why the jury's focus, following the Court's *Allen* charge and partial verdict charge, on the Selva basement grow operation, the outdoor

grow operation, and Mr. Bongiovanni's knowledge of both, is so instructive to determining what
Mr. Bongiovanni *actually* was convicted of at trial.

For example, if the jury saw fit to hold Mr. Bongiovanni accountable for both the
Selva basement grow and the Masecchia-Serio DTO outdoor grow operations, then it would have
convicted Mr. Bongiovanni of engaging in a narcotics conspiracy in Count 3 *far in excess of 50
kilograms* because that is what the proof showed at trial via the testimony of Ron Serio and others.
But the jury did not do this and, by extension, credit such testimony. Instead, the jury limited its
verdict to *less than 50 kilograms*. The *only* grow operation that squares with that finding is the Selva
basement grow, which according to Selva, involved 40-50 plants and yielded 10-15 pounds of
marijuana. *See* ECF 1178 at 43:6-16, 45:25-47:4. This is why the Court can comfortably conclude
that the jury chose to convict Mr. Bongiovanni for conspiring with, and failing to report or arrest,
Lou Selva, as well as other acts to obstruct the detection of Selva, for the one basement grow
operation that Selva testified Mr. Bongiovanni smelled at his residence – *and nothing more.*

This is the agreement to which the jury believed Mr. Bongiovanni agreed. The scope
of that agreement involved the protection of Lou Selva and his one basement grow. Thus, under
*Studley* factor one, even if Mr. Bongiovanni had general awareness of the greater conspiracy Selva
was a part of, that general awareness is not dispositive because the specific objective and conduct
believed by the jury related to protecting only Selva and his basement grow, not anything else.
Moreover, under *Studley* factor two, foreseeability requires more than just general knowledge about
the other circumstances in the greater conspiracy. The guidelines require a "closer link" than that,
namely, an agreement to protect that greater conspiracy. *See Johnson*, 378 F.3d at 236 n.8, 239. Here,
like in factor one, the jury was not convinced beyond a reasonable doubt that Mr. Bongiovanni
made such an agreement. This also is why attributing narcotics to Mr. Bongiovanni as "relevant
conduct", beyond the limited and discrete act of protecting Selva's basement grow, is foreclosed by

the acquitted conduct rule in USSG § 1B1.3(c) and the requirement that the Court make a specific finding that such an agreement existed by a preponderance of the evidence.  In short, 40-50 plants/10-20 pounds of marijuana is the "relevant conduct" drug quantity in this case.

## II.     Objections to Part A of the Draft PSR (non-guideline calculation paragraphs).

### Page 8

- ¶12.  The paragraph discusses the government's "investigation" into an alleged conspiracy involving Serio-Masecchia and Peter Gerace and accepting bribes from Ron Serio and Peter Gerace for the purpose of protection.  Mr. Bongiovanni was acquitted of these allegations in Trial #1 and Trial #2 and the paragraph, as written, is misleading and contains information that is irrelevant to the PSR.  Recommend the following changes (additions in blue underline/deletions in red strikethrough):  "The government investigated the defendant for his alleged involvement investigation revealed that the defendant was involved in two criminal conspiracies and for accepting bribes to further the objectives of the conspiracies. The first criminal conspiracy involved the defendant's alleged protection of the Masecchia-Serio drug-trafficking organization (DTO) in Buffalo, New York.  Louis Selva, the defendant's childhood friend, also was a member of the Masecchia-Serio DTO and investigators alleged that the defendant protected Mr. Selva from investigation/detection. The second criminal conspiracy involved the defendant's alleged protection of his childhood friend, Peter Gerace, Jr., who was the owner and operator of Pharaoh's Gentleman's Club, a gentleman's club in Cheektowaga, New York, that sold drinks, food, and dances with private dancers or strippers.  The defendant was acquitted of accepting bribes from the Serio-Masecchia DTO and from Peter Gerace, Jr.  The defendant also was acquitted of conspiring with Peter Gerace, Jr.  The defendant was convicted of conspiracy, but the jury limited the defendant's involvement to assisting Louis Selva only. The defendant offered protection regarding Gerace's cocaine distribution inside this business. Although the defendant did not personally distribute drugs to others, he was providing protection, through his position as a DEA SA, to these organizations in return for cash bribes. It is noted that Anthony Gerace, Peter Gerace's younger brother was involved in both schemes. He was involved in the trafficking with the Serio organization, and in the cocaine and marijuana trafficking to clientele in and around Pharaoh's Gentlemen's Club.

- The section heading entitled "The Defendant's Role/Acts in the Masecchia-Serio DTO Conspiracy" discusses actions for which Mr. Bongiovanni was acquitted.   Recommend the following change:  The Defendant's Role/Acts Pertaining to Counts 1 and 3

- ¶13, ¶14, ¶15.  These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni.  For example, they discuss a conspiracy with Masecchia and Serio, but the jury acquitted Mr. Bongiovanni of such conduct and limited the conspiracy to protection of Louis Selva only.  The paragraphs discuss the receipt of bribes in exchange for protection, but the jury acquitted Mr. Bongiovanni of such conduct.  The paragraphs discuss Mr. Bongiovanni protecting persons allegedly associated with Italian Organized Crime, but the jury acquitted Mr. Bongiovanni of such conduct (Louis Selva had no affiliation with IOC).  The paragraphs discuss Mr. Bongiovanni providing information on DEA CIs, but the jury acquitted Mr. Bongiovanni of these allegations.  Consequently, the entirety of these paragraphs should be struck from the PSR as misleading and irrelevant.  These paragraphs should be amended as suggested below.

**Page 9**

- ¶16, ¶17, ¶18.  These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni.  For example, ¶16 states that "**in exchange for [at least $250,000] in bribes**" paid by Michael Masecchia, Mr. Bongiovanni provided information Louis Selva "**[i]n exchange for these bribes**" and protection to the Masecchia-Serio DTO.  ¶18 alleges that Mr. Bongiovanni "feigned" the opening closing of the investigation into the Masecchia-Serio DTO based on Mr. Bongiovanni's "**paid protection**."  The jury acquitted Mr. Bongiovanni accepting bribes (Count 4).  The jury also acquitted Mr. Bongiovanni of the remaining allegations of providing details on investigations, targets, informants, and tactics as well as using deconfliction databases to monitor investigations based on the payment of "**bribes**" and "**paid protection.**"  Consequently, the entirety of these paragraphs should be struck from the PSR as misleading and irrelevant.  Recommend the following changes for ¶13, ¶14, ¶15, ¶16, ¶17, ¶18:  Mr. Bongiovanni had a childhood friend, Louis Selva, to whom he was very close.  At the defendant's 2015 wedding, Mr. Selva was the defendant's best man.  At some

point between 2014-2018, Louis Selva testified that the defendant entered his residence and smelled marijuana.  At the time this occurred, Selva was growing marijuana in bulk quantity in his basement.  The defendant confronted Selva about what he smelled.  Selva told the defendant that he was growing marijuana in his basement.  The defendant told Selva that he needed to be "careful" and monitor his utility usage as excessive utility use could tip-off law enforcement to the grow operation.  Selva did not show the defendant the grow operation in his basement and the defendant did not see the grow operation himself.  Selva testified that approximately 40-50 marijuana plants were involved in his basement grow operation during a grow cycle.  The defendant failed to report Selva's grow operation to the DEA and did not take actions to arrest Selva.

- ¶19.  This paragraph discusses false entries and other representations made in DEA documents.  Mr. Bongiovanni was convicted of such offenses in Counts 6, 7, 8, 10, 11, 13 and 15, however the motive alleged in this paragraph (protection and hiding connections) was not proven at trial and, in any event, is irrelevant to the description.  Furthermore, the "investigation" conducted by law enforcement has little pertinence to the PSR as the jury acquitted Mr. Bongiovanni of the bulk the allegations raised by the government's "investigation."  Recommend the following changes:  Furthermore, the ~~investigation revealed that the~~ CIs jury convicted the defendant of making ~~made~~ false entries and representations in DEA documents, and false statements and representations to other members of law enforcement. ~~in order to protect his friends, associates, and co-conspirators from investigation, arrest, prosecution, and potential incarceration. He also would falsely deny to other agents of the DEA the existence and extent of connections between himself and individuals he knew to be involved in the possession, use, distribution, and importation of controlled substances, and individuals he believed were connected to or associated with IOC.~~

**Page 10**

- ¶20.  This paragraph cuts-and-pastes allegations made in the indictment and discusses actions for which the jury acquitted Mr. Bongiovanni.  The jury did not convict Mr. Bongiovanni for providing "cover stories" to persons involved in the Masecchia-Serio DTO.  Consequently, the entirety of this paragraph should be struck from the PSR as misleading and irrelevant.

- ¶21. This paragraph cuts-and-pastes allegations made in the indictment and discusses actions for which the jury acquitted Mr. Bongiovanni. The jury did not convict Mr. Bongiovanni for conspiring with Masecchia and others; instead, the jury convicted Mr. Bongiovanni of conspiring with Louis Selva only. Consequently, the entirety of this paragraph should be struck from the PSR as misleading and irrelevant.

- ¶22. This paragraph cuts-and-pastes allegations made in the indictment and discusses actions for which the jury acquitted Mr. Bongiovanni. Furthermore, the paragraph is factually incorrect and misleading. Louis Selva was the only person identified as a "childhood" friend of Mr. Bongiovanni. Masecchia and Mr. Bongiovanni knew each other in high school (Masecchia was two years younger than Mr. Bongiovanni), but the two did not become friends until both attended college at the University at Buffalo as adults. Mr. Bongiovanni did not meet Wayne Anderson until adulthood. Furthermore, this paragraph improperly classifies Wayne Anderson was a "primary member" of the Masecchia-Serio DTO. The trial testimony did not prove this and neither Selva nor Serio stated this. Rather, Serio discussed how he did not have any understanding of the relationships between either JB and Anderson, nor Selva and Anderson, and that it was indirect through Frank Burkhart. *See* ECF 1473 at 35; 201:18-25. Consequently, the entirety of this paragraph should be struck from the PSR as misleading and irrelevant (the proposed changes to ¶13, ¶14, ¶15, ¶16, ¶17, ¶18 discuss the friendship between Mr. Bongiovanni and Selva.

## Pages 10-11 (Michael Masecchia)

- ¶23, ¶24, ¶25, ¶26, ¶27, ¶28. These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni. Once again, the allegations made in the government's "investigation" do not matter; instead, what matters is what the jury found at trial. Since the jury acquitted Mr. Bongiovanni for the conduct involving the protection of Masecchia, what he did and who he is Mr. Bongiovanni irrelevant to the PSR. Consequently, the entirety of these paragraphs should be struck from the PSR.

**Pages 11-12 (Lou Selva)**

- ¶29, ¶30, ¶31, and ¶32.  These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni.  First, the IOC allegations are irrelevant as the jury did not convict on that basis (Selva was not IOC).  Second, the paragraphs discuss bribes for which the jury acquitted Mr. Bongiovanni.  Third, the paragraphs discuss a bribe-for-protection scheme that the jury acquitted Mr. Bongiovanni of participating in.  Fourth, the paragraphs discuss shipments of marijuana and other narcotics related to the larger Masecchia-Serio conspiracy of which the jury acquitted Mr. Bongiovanni of participating in.  The scope of the conspiracy to which the jury convicted Mr. Bongiovanni involved the protection of Selva's basement grow only.  The actions of the larger conspiracy involving Masecchia and Serio – which involved tons of marijuana and multiple other narcotics is outside the scope of the small conspiracy the jury agreed upon in the verdict.  This makes the actions of others outside the scope and not reasonably foreseeable to Mr. Bongiovanni.  Based on that as well as the acquitted conduct rule, information pertaining to the larger conspiracy the jury found that Mr. Bongiovanni was not a part of is irrelevant to the PSR and misleading.  Consequently, the entirety of these paragraphs should be struck from the PSR.  Lou Selva's relationship to the conspiracy is set forth in the proposed changes to ¶13, ¶14, ¶15, ¶16, ¶17, ¶18.

**Page 12 (Ron Serio)**

- ¶33 and ¶34.  These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Ron Serio.  The paragraphs further misstate evidence regarding Robert Kaiser, a CI who claimed that he could infiltrate the Masecchia-Serio DTO in 2013 (not 2017).  The paragraph also alleges that a signature on a form by Mark Gentile "was later determined to be a forgery."  This was a hotly contested fact at the trial and the jury never determined that the signature on the form was, in fact, a forgery, so this statement is incorrect and misleading.  To the extent these paragraphs discuss Robert Kaiser and relate to the conviction in Count 6, recommend the following changes:

  In 2013, Amherst Police Department identified a CI, Robert Kaiser, who claimed he had been inside of the Serio's residence and was able to purchase marijuana from Serio and was aware of indoor marijuana grow locations Serio maintained.  Amherst Police Department transferred Kaiser to the defendant and the DEA.  The defendant and the DEA signed up Kaiser as a CI and

attempted to use him to infiltrate the Masecchia-Serio DTO. At least two controlled buys were organized targeting Serio associate Thomas Sibick, but those buys did not materialize. When these buys failed with Sibick, the defendant did not ask Kaiser to attempt a direct purchase from Serio. Kaiser supplied locations of at least two suspected indoor grow locations, but investigation yielded negative results. During the time Kaiser was acting as a CI for the DEA, he also witnessed to a fentanyl overdose death. The defendant then used Kaiser to infiltrate the source of supply for the overdose death. The source of supply for the overdose death was arrested in June 2013 and charged. In July 2013, Kaiser was sentenced in a preexisting state court case and deactivated as a DEA CI, roughly two months after being signed up. The defendant deactivated Kaiser without using Kaiser to infiltrate the Serio DTO any further. The defendant remarked in a DEA deactivation form that Kaiser was no longer a viable source at the time of his deactivation.

### Pages 12-13 (Wayne Anderson Arrest Related to the Serio DTO)

- ¶35, ¶36, and ¶37. These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Ron Serio through deconfliction databases. The paragraphs also contain misstatements of fact. First, the paragraph attempts to link the Anderson bust by NYSP to an unidentified Serio supplier who "ship[ed] hundreds of pounds of marijuana" from California, but the trial evidence does not support this inference. Second, the paragraph states that Anderson was a "friend" of the defendant and Masecchia, but Anderson denied this at trial. Third, the paragraph states that the defendant indicated to O'Rourke that "Anderson may have organized crime connections," but O'Rourke did not testify to this; instead, O'Rourke testified that Mr. Bongiovanni told him that the *case* (not Anderson) may have organized crime connections:

```
21   Q.   To the best of your ability, who was doing the speaking?
22   A.   Agent Bongiovanni.
23   Q.   And what did he say?
24   A.   He said that this case may be tied to organized crime,
25   and they'd like to take it to a new level, possibly adopt it
```

#    #    #

14

```
17  Q.  Okay.  And who said that the case may be tied to
18  organized crime?
19  A.  I believe it was Agent Bongiovanni.
```

*See* ECF 1158 at 20-21.  To the extent these paragraphs discuss the opening of the Wayne Anderson file and relate to the convictions in Counts 12 and 13, recommend the following changes:

35. On November 25, 2012, the New York State Police (NYSP) worked another fast-moving case with the Illinois State Police involving a shipment of 200 pounds of marijuana. During that time period, Serio had a supplier in California who would ship hundreds of pounds of marijuana. This particular load was intended for Wayne Anderson's residence in Buffalo, New York. Anderson was a friend of both Masecchia and the defendant in college and the defendant was acquainted with Masecchia and Anderson thereafter. The marijuana was intended for Serio, and the marijuana was subsequently intercepted prior to delivery by NYSP. The NYSP followed the truck to Anderson's residence and seized approximately 200 pounds of marijuana.

36. When, the defendant learned about the seizure, he subsequently called NYSP investigator Michael O'Rourke, because his name was on that booking paperwork for Anderson. They set up a meeting at the NYSP police office in downtown Buffalo. The defendant indicated to O'Rourke that Anderson the case may have organized crime connections, and asked if the DEA could use Anderson to advance an investigation. NYSP O'Rourke agreed to this proposal and believed the case would be federally prosecuted.

37. The defendant subsequently opened the Wayne Anderson case file. (File title: C-2 13 0026-Wayne Anderson). Two of the entries that appear in forms within this case file were deemed by the jury to have obstructed justice (Counts 6 and 7).  In addition to this file, the defendant produced a "working file" which contained his notes and other investigative documents.  When he retired, the defendant took the working file home which the jury determined obstructed justice (Count 13).  The jury also determined that the defendant made a false statement to HSI regarding his motivation for taking the working file home following his retirement (Count 15).  The defendant subsequently used this file to create deconflictions in the DEA system. On December

~~24, 2012, about a month later, the defendant submitted DEA 202 forms to officially add names to that file. Therefore, the defendant caused a form to be filled out for Roanld Serio, Thomas Serio (Ronald Serio's brother) [uncharged individual], and David Oddo (Anthony Gerace's cocaine supplier-described below) [uncharged individual]. This caused deconflictions to be entered in the DEA database. Additionally, the defendant stared applying for administrative subpoenas of phone records of Serio, Selva, Masecchia and others to put into the DARTS deconfliction system to be alerted if another agency obtained information on them.~~

### Page 13

- ¶38.  This paragraph discusses actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Ron Serio.  Consequently, the entirety of this paragraph should be struck from the PSR as irrelevant and misleading.

- ¶39.  This paragraph discusses actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Ron Serio.  Consequently, the entirety of this paragraph should be struck from the PSR as irrelevant and misleading.

- ¶40.  This paragraph refers to a "second CI" that purportedly Mr. Bongiovanni added to the Wayne Anderson file and "wrote" in the file that "CI-2" could not provide information on the Serio investigation when CI-2 could provide information.  This information is incorrect and conflates the underlying actions involving Kaiser with someone who does not exist.  This paragraph should be deleted.

- ¶41.  This paragraph is irrelevant as Mr. Bongiovanni was acquitted of abusing cocaine.  In addition, Kevin Myszka did not testify that "there was open drug use" by people with whom Mr. Bongiovanni went to Toronto, CA in 2016.  Mr. Myszka testified as follows:

13   Q.   Now, you had said that there was drug use occurring the
14   whole time you were up there, correct?
15   A.   Yes.
16   Q.   But, you know, fair to say there's not drug use occurring
17   right out in the open on this table, correct?
18   A.   Correct.
19   Q.   What you're doing is leaving the table, going into the
20   bathroom and doing it, and coming back, correct?
21   A.   Yes.
22   Q.   And what you said is there might have been some open
23   conversation hinting or explicitly saying that you're going
24   to go to the bathroom, correct?
25   A.   Correct.

USA v Bongiovanni - Myszka - MacKay/Cross - 9/9/24
46

1   Q.   But beyond that, there's no drug use occurring out in
2   sort of the public area of the restaurant, correct?
3   A.   Correct.
4   Q.   And you told this jury you did not see Mr. Bongiovanni
5   using any drugs, correct?
6   A.   Correct.

#      #      #

```
 3   Q.  Okay.  Taking you back to that second night with the bars
 4   and the clubs.
 5       Again, you don't see Mr. Bongiovanni using any drugs,
 6   correct?
 7   A.  Correct.
 8   Q.  And when you used drugs or when you observed others using
 9   drugs, fair to say that was occurring like in the bathrooms
10   in the clubs?
11   A.  For the most part, yes.
12   Q.  Sort of the behavior you talked about also occurring at
13   the restaurant, people would leave and go into the bathroom
14   to do the drugs, correct?
15   A.  Correct, and in the cabs or --
16   Q.  Okay.  And as you sit here today, you know,
17   Mr. Bongiovanni was not in back in the bathroom with anybody
18   where people were doing drugs at that time, correct?
19   A.  Not with me.
20   Q.  Okay.  And, I mean, so obviously, you can only testify to
21   what you saw, and you did not see him back there with you
22   when you were doing drugs, correct?
23   A.  Correct.
```

*See* ECF 1229 at 45-46, 49.  This entire paragraph should be struck as irrelevant, misleading, and false.

- ¶41.  In the first sentence, this paragraph states that Lindsay Bongiovanni was in nursing school in 2014.  This is not correct.  Lindsay Bongiovanni graduated nursing school in 2012.  The first sentence should be amened as follows: In 2014, the defendant was preparing to marry his second wife ~~who was in nursing school~~ and caring for her child.

**Page 14**

- ¶43.  This paragraph discusses actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Ron Serio.  In addition, Selva and Serio offered conflicting versions of what alleged information was passed along regarding informants (CI-3), banking investigations into Serio, targets (Vacanti), and surveillance techniques.  If the jury believed that these allegations

were credible, then the jury would have convicted Mr. Bongiovanni of the larger Serio Conspiracy rather than the distinct act of protecting his friend Selva from investigation for having an indoor marijuana grow.  The jury did not.  Consequently, the entirety of this paragraph should be struck from the PSR as irrelevant and misleading.

- ¶44.  This paragraph discusses actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Ron Serio.  In addition, Selva and Serio offered conflicting versions of what alleged information was passed along regarding informant (CI-4).  If the jury believed that this allegation was credible, then the jury would have convicted Mr. Bongiovanni of the larger Serio Conspiracy rather than the distinct act of protecting his friend Selva from investigation for having an indoor marijuana grow.  The jury did not.  Consequently, the entirety of this paragraph should be struck from the PSR as irrelevant and misleading.

## Pages 14-15 (Ron Serio's arrest and the seizure of narcotics at various locations).

- ¶45, ¶46, ¶47, ¶48, ¶49, ¶50, and ¶51.  These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Ron Serio.  These paragraphs also purport to attribute various narcotics and firearms/ammunition to Mr. Bongiovanni.  For the reasons set forth below, these paragraphs should be struck from the PSR.

  - *370 Huntington Avenue narcotics.*  The PSR attributes 9 kilograms/20 pounds of suspected marijuana (no confirmatory test was conducted) possessed by Ron Serio at 370 Huntington and 13.82 grams of cocaine (confirmed by the Erie County Lab) possessed by Kelly Brace at 370 Huntington.  Attribution of these narcotics to Mr. Bongiovanni as relevant conduct is improper for several reasons.  First, the alleged marijuana was never subject to a confirmatory test.  As a result, the identity of this seizure as a controlled substance is not proven by a preponderance of the evidence and cannot be included.  Second, both of these substances may not be counted based on the acquitted conduct rule.  Since the jury acquitted Mr. Bongiovanni of the larger Masecchia-Serio DTO conspiracy and these substances relate to Ron Serio and that conspiracy, USSG § 1B1.3(c) bars attribution of these substances to Mr. Bongiovanni as "relevant conduct."  Third, Mr. Bongiovanni had no direct involvement in this transaction, so the attribution rule in

USSG § 1B1.3(a)(1)(A) cannot apply. Fourth, this conduct does not meet the requirements of USSG § 1B1.3(a)(2)(B) because it is outside the scope of the agreement, not in furtherance of the conspiracy, and not reasonably foreseeable by Mr. Bongiovanni. Mr. Brace was a buyer of marijuana from Ron Serio in April 2017. As Ron Serio testified at trial, the alleged bribe payments to Mr. Bongiovanni ceased in December 2016.[2] Thus, even if, for the sake of argument, you credit testimony that Mr. Bongiovanni was involved in the larger Serio conspiracy – which was rejected by the jury in its verdict – these substances are not part of the "jointly undertaken criminal activity" because this incident occurred *after* the alleged bribe payments ceased in December 2016 and Mr. Bongiovanni's alleged participation ended. As a result, these narcotics were not within the scope of the conspiracy (i.e., narcotics procured after the agreement ended), in furtherance of the conspiracy Mr. Bongiovanni purportedly agreed to, and not reasonably foreseeable by Mr. Bongiovanni (i.e., he cannot know about actions taken by Ron Serio *after* exiting the conspiracy). Fifth, Mr. Brace was not part of the Masecchia-Serio DTO such that Mr. Bongiovanni would have (or could have) known he was a member; instead, Mr. Brace was a buyer of marijuana from Ron Serio. What's more, the cocaine seized at Mr. Brace's house was *Mr. Brace's narcotics*, not Ron Serio's narcotics. As such, it is improper to attribute these narcotics to Mr. Bongiovanni as Brace was nothing more than a buyer who was part of a buyer-seller transaction. Sixth, even if Brace was a part of the larger Serio conspiracy and all the elements of USSG 1B1.3(a)(1)(B) are met, this amount of cocaine equates to personal use, rather than possession for distribution purposes, and

---

[2] There is a conflict in the testimony Ron Serio provided on this point in Trial #1 versus Trial #2. At Trial #1, Serio testified that he stopped making the alleged bribe payment in December 2016 following his falling out with Selva. *See* ECF 1551 at 175-76. At Trial #2, Serio's narrative changed. While conceding that he stopped dealing with Selva after December 2016 (when Serio believed Selva might have stolen marijuana), Serio claimed at Trial #2 that he continued paying Masecchia right up to his April 2017 arrest. *See* ECF 1468 at 32. Selva, on the other hand, testified that the conspiracy and payments continued until April 2017 and that there was no falling out between himself and Serio. *See* ECF 1179 at 167:10-15; 296:10-16. This testimony is, of course, in conflict to how Serio testified. In the end, to the extent any of this conflicting testimony should be credited, the Court should credit the December 2016 date as the end-date. First, the dates are all in conflict after December 2016, especially without corroboration from Masecchia. Second, the jury chose not to credit the bribery testimony in its entirety given its acquittal on Count 4. Thus, pursuant to the verdict and the rule of lenity, the Court should use the December 2016 date. *See generally United States v. Davis*, 588 U.S. 445, 464-65 (2019) (discussing rule of lenity).

personal use narcotics are not part of the scheme as a matter of law.  *See Williams*, 247
F.3d at 358.

o   *91 West Grimsby Road narcotics.*  The PSR attributes 105 pounds of marijuana, 150 grams of
    cocaine, and 5,120 grams of fentanyl (16,000 pills containing .32 grams of fentanyl per
    pill) possessed by Ron Serio at 91 West Grimsby Road to Mr. Bongiovanni.  These
    narcotics cannot be attributed to Mr. Bongiovanni.  First, all of these substances may not
    be attributed to Mr. Bongiovanni based on the acquitted conduct rule.  Since the jury
    acquitted Mr. Bongiovanni of the larger Masecchia-Serio DTO conspiracy and these
    substances relate to Ron Serio and that conspiracy, USSG § 1B1.3(c) bars attribution of
    these substances to Mr. Bongiovanni as "relevant conduct."  Second, with regard to the
    cocaine and fentanyl pills, even if the acquitted conduct rule does not apply,
    Mr. Bongiovanni had no direct involvement in cocaine and fentanyl transactions, so the
    attribution rule in USSG § 1B1.3(a)(1)(A) cannot apply.  Furthermore, this conduct does
    not meet the requirements of USSG § 1B1.3(a)(2)(B) because it is outside the scope of the
    alleged agreement, not in furtherance of the conspiracy, and not reasonably foreseeable by
    Mr. Bongiovanni.  As discussed previously, the conspiracy ended in December 2016, so
    possession of these items is outside of the scope of the agreement and not reasonably
    foreseeable to Mr. Bongiovanni since his participation in the alleged scheme ended
    months previous to Serio's arrest.  These transactions also are outside the scope of the
    agreement purportedly entered by Mr. Bongiovanni and not reasonably foreseeable
    because, based on Selva's and Ron Serio's testimony, Mr. Bongiovanni purportedly
    agreed to protect a marijuana conspiracy only, not a conspiracy that involved cocaine and
    fentanyl.  For example, Selva, as the "middle-man," never told Mr. Bongiovanni that Ron
    Serio was dealing in cocaine and fentanyl.  Selva never told Mr. Bongiovanni that
    marijuana shipments and warehouses also contained cocaine and fentanyl.  As Ron Serio
    testified, during the bulk of the marijuana conspiracy, he was not selling cocaine or
    fentanyl.  *See* ECF 1551 at 114; ECF 1466 at 11.  Thus, protection from detection of
    cocaine and fentanyl dealing was never the basis of the purported agreement.  And more
    specific to the fentanyl pills, possession and distribution of fentanyl is even more
    attenuated because Ron Serio did not seek out these pills; rather, the pills were
    unexpectedly provided to Ron Serio and, later, the vast majority (if not all) were intended

for personal use, not distribution.  As Ron Serio explained at trial, he *did not* ask Jarrett Guy for these pills; rather, Jarrett Guy provided them to Ron Serio to try and get "rid" of them and because Serio abused opiates.  *See* 3 ECF 1037 at 20; ECF 1466 at 67-69.  Thus, if Ron Serio – the head of the conspiracy – did not even expect to receive these pills, then it is improper to conclude that Mr. Bongiovanni would have agreed to such pills being within the scope of the conspiracy *and* that possession/distribution of such pills was reasonably foreseeable to Mr. Bongiovanni.  For these reasons, the PSR's attribution of the fentanyl pills is unsupported by the evidence and barred by the relevant conduct rule.

In the event the fentanyl pills are attributable to Mr. Bongiovanni, attribution of all 16,000 fentanyl pills to Mr. Bongiovanni is improper because, as Ron Serio testified at trial, approximately 75% of those pills were acquired for personal use, not distribution. *See* ECF 1551 at 16; ECF 1468 at 50; ECF 1466 at 16-17.  As Ron Serio testified, he was heavily addicted to various narcotics at the time of his arrest in 2017 including opiates. Beginning in 2015 and moving forward, Ron Serio testified that he would use 40-60 of these fentanyl pills per day (~14,600 to ~21,000 pills a year).  Thus, these pills clearly were possessed for personal use, not distribution, and the *Williams* rule excludes personal use narcotics from "relevant conduct."  What's more, the defense does not believe that Ron Serio's claim that he distributed "25 percent" of the 16,000 pills he received from Jarrett Guy is credible.  Serio's addiction to and dependence upon opiates suggests that figure is *much less,* if not *totally incredible* based on his habit of 40-60 pills per day, which accounts for *all* of the 16,000 pills he received.  And even if the Court credits Serio's dubious testimony that he distributed 25% or 4,000 of these pills, then the weight of fentanyl attributable to Mr. Bongiovanni should be reduced to 4,000 pills/1,280 grams of fentanyl, not the 16,000 pills/5,120 grams of fentanyl calculated in the PSR.  And if the Court credits Serio's testimony regarding his extensive personal use of fentanyl, then the distribution figure is more likely than not lower than his 4,000-pill estimate.  For example, crediting Serio's testimony that, at a minimum, he abused 40 pills per day starting in 2015 would equate to Serio personally using 14,600 of these pills per year, reducing the quantity for distribution to 1,400 pills/448 grams of fentanyl.  Given that these pills were received by Serio in late 2015 and Serio was arrested in April 2017 – a little more than one year after he received these pills and in the heart of his extensive abuse of opiates – Serio's

consumption of 14,600 of these pills over the course of approximately one year is highly probable. When this evidence is combined with the fact that law enforcement seized 505 pills – about 1/3 of the 1,400 pills that could have been reserved for distribution – 1,400 pills may be the most probable conclusion of what Serio actually reserved for distribution. Of course, this estimate assumes that Serio did not simply forget about or misplace these pills given his voracious habit for abusing opiates, but under any calculation which credits Serio's testimony, the PSR's attribution of all 16,000 pills of fentanyl to Mr. Bongiovanni is grossly excessive, undermined by Serio's trial testimony, and unsupported by a preponderance of the evidence.

o   *697 Lebrun Road narcotics.* The PSR attributes 3 pounds of marijuana and various "assorted pills" which included: 20, 5mg tablets of oxycodone; 30 tablets (6.73 grams) of oxymorphone; 100 tablets (25.19 grams) of methadone; 26 tablets (10.66 grams) of buprenorphine; 107 tablets (26.83 grams) of methadone; and 14 capsules (5.12 grams) of amphetamine possessed by Ron Serio at 697 Lebrun Road to Mr. Bongiovanni. These narcotics cannot be attributed to Mr. Bongiovanni. First, all of these substances may not be attributed to Mr. Bongiovanni based on the acquitted conduct rule. Since the jury acquitted Mr. Bongiovanni of the larger Masecchia-Serio DTO conspiracy and these substances relate to Ron Serio and that conspiracy, USSG § 1B1.3(c) bars attribution of these substances to Mr. Bongiovanni as "relevant conduct." Second, with regard to the "assorted pills," even if the acquitted conduct rule does not apply, Mr. Bongiovanni had no direct involvement the "assorted pill" transactions, so the attribution rule in USSG § 1B1.3(a)(1)(A) cannot apply. Furthermore, this conduct does not meet the requirements of USSG § 1B1.3(a)(2)(B) because it is outside the scope of the alleged agreement, not in furtherance of the conspiracy, and not reasonably foreseeable by Mr. Bongiovanni. As discussed previously, the conspiracy ended in December 2016, so possession of these items is outside of the scope of the agreement and not reasonably foreseeable to Mr. Bongiovanni since his participation in the alleged scheme ended months previous to Serio's arrest. Possession of the "assorted pills" (primarily opiates) also is outside the scope of the agreement purportedly entered by Mr. Bongiovanni and not reasonably foreseeable because, based on Selva's and Ron Serio's testimony, Mr. Bongiovanni purportedly agreed to protect a marijuana conspiracy only, not a conspiracy that involved

23

opiates and/or amphetamines.  For example, Selva, as the "middle-man," never told Mr. Bongiovanni that Ron Serio was dealing in or personally consuming opiates and amphetamines.  As Ron Serio testified, during the bulk of the marijuana conspiracy, he was not selling opiates.  *See* ECF 1551 at 114; ECF 1466 at 11.  Thus, protection from detection of opiate dealing was never the basis of the purported agreement.  Consequently, possession of opiates and amphetamines are not within the scope of the conspiracy *and* the possession/distribution of such pills was not reasonably foreseeable to Mr. Bongiovanni.  For these reasons, the PSR's attribution of the fentanyl pills is unsupported by the evidence and barred by the relevant conduct rule.  Third, attribution of the various "assorted pills" to Mr. Bongiovanni is improper because, as Ron Serio testified at trial, he possessed and acquired these pills for personal use, not distribution.  *See*  ECF 1037 at 35-36, 50, 52, 71, 74, 103-105; ECF 1466 at 16-17.  As Ron Serio testified, he was heavily addicted to various narcotics at the time of his arrest.  He would use 40-60 fentanyl pills a day (~14,600 to ~21,000 pills per a year).  He would "level off" with cocaine, Adderall, and amphetamines.  Thus, these pills clearly were possessed for personal use, not distribution.  Fourth, several of these pills were prescribed by Ron Serio's doctor.  As these pills were possessed lawfully and authorized by a prescription, these pills cannot be attributable to Mr. Bongiovanni as relevant conduct.  For these reasons, the PSR's attribution of these pills and marijuana to Mr. Bongiovanni is improper.

- o *697 Lebrun Road firearms and ammunition.*  The PSR attributes two (2) boxes of 5.56 caliber rifle ammunition; one (1) loaded AR-15 type magazine containing 5.56 caliber ammunition; and, one (1) Spirit Arms LLC, model ASA15, 5.56 caliber semiautomatic rifle, bearing serial number AS40588 possessed by Ron Serio at 697 Lebrun Road to Mr. Bongiovanni.  These firearms and ammunition cannot be attributed to Mr. Bongiovanni.  First, these forearms and ammunition may not be attributed to Mr. Bongiovanni based on the acquitted conduct rule.  Since the jury acquitted Mr. Bongiovanni of the larger Masecchia-Serio DTO conspiracy and these firearms and ammunition relate to Ron Serio and that conspiracy, USSG § 1B1.3(c) bars attribution of these items to Mr. Bongiovanni as "relevant conduct."  Second, even if the acquitted conduct rule does not apply, Mr. Bongiovanni had no direct involvement in acquiring the

firearms and ammunition, so the attribution rule in USSG § 1B1.3(a)(1)(A) cannot apply. Furthermore, this conduct does not meet the requirements of USSG § 1B1.3(a)(2)(B) because it is outside the scope of the alleged agreement, not in furtherance of the conspiracy, and not reasonably foreseeable by Mr. Bongiovanni. As discussed previously, the conspiracy ended in December 2016, so possession of these items is outside of the scope of the agreement and not reasonably foreseeable to Mr. Bongiovanni since his participation in the alleged scheme ended months previous to Serio's arrest.

o *Narcotics and Currency found on Ron Serio's person and in his 2011 Range Rover.* The PSR attributes two (2) tablets (.62 grams) of fentanyl, $22,000 in United States currency; and one (1) pound of marijuana possessed by Ron Serio on April 17, 2017 to Mr. Bongiovanni. These narcotics (and their cash-value equivalent) cannot be attributed to Mr. Bongiovanni. First, all of these items may not be attributed to Mr. Bongiovanni based on the acquitted conduct rule. Since the jury acquitted Mr. Bongiovanni of the larger Masecchia-Serio DTO conspiracy and these substances relate to Ron Serio and that conspiracy, USSG § 1B1.3(c) bars attribution of these items to Mr. Bongiovanni as "relevant conduct." Second, even if the acquitted conduct rule does not apply, Mr. Bongiovanni had no direct involvement the transactions, so the attribution rule in USSG § 1B1.3(a)(1)(A) cannot apply. Furthermore, this conduct does not meet the requirements of USSG § 1B1.3(a)(2)(B) because it is outside the scope of the alleged agreement, not in furtherance of the conspiracy, and not reasonably foreseeable by Mr. Bongiovanni. As discussed previously, the conspiracy ended in December 2016, so possession of these items is outside of the scope of the agreement and not reasonably foreseeable to Mr. Bongiovanni since his participation in the alleged scheme ended months previous to Serio's arrest. More specific to the fentanyl pills, possession of these pills is outside the scope of the agreement purportedly entered by Mr. Bongiovanni and not reasonably foreseeable because, based on Selva's and Ron Serio's testimony, Mr. Bongiovanni purportedly agreed to protect a marijuana conspiracy only, not a conspiracy that involved opiates. For example, Selva, as the "middle-man," never told Mr. Bongiovanni that Ron Serio was dealing in or personally consuming opiates. As Ron Serio testified, during the bulk of the marijuana conspiracy, he was not selling opiates. *See* ECF 1551 at 114; ECF 1466 at 11. Thus, protection from detection of opiate dealing was

never the basis of the purported agreement. Consequently, possession of opiates is not within the scope of the conspiracy *and* the possession/distribution of such pills was not reasonably foreseeable to Mr. Bongiovanni. For these reasons, the PSR's attribution of the fentanyl pills is unsupported by the evidence and barred by the relevant conduct rule. Third, attribution of the two fentanyl pills to Mr. Bongiovanni is improper because, as Ron Serio testified at trial, he possessed and acquired these pills for personal use, not distribution. *See* ECF 1037 at 35-36, 50, 52, 71, 74, 103-105; ECF 1466 at 16-17. As Ron Serio testified, he was heavily addicted to various narcotics at the time of his arrest. He would use 40-60 fentanyl pills a day (~14,600 to ~21,000 pills per a year). Thus, these pills clearly were possessed for personal use, not distribution, and under the *Williams* rule, cannot be attributed to Mr. Bongiovanni as relevant conduct. Fourth, it is improper to use a cash conversion in this instance because the $22,000 in currency was being used to buy the marijuana possessed by Kelly Brace. Thus, the PSR is double counting this marijuana – in the first instance, by attributing 20 pounds of marijuana found at 370 Huntington Avenue to Mr. Bongiovanni and, in the second instance, attributing the buy money possessed by Ron Serio at 370 Huntington to purchase those same 20 pounds of marijuana to Mr. Bongiovanni as additional marijuana. Fifth, none of these alleged controlled substances were subject to a confirmatory test. Thus, it cannot be shown, by a preponderance of the evidence, that these purported substances are, in fact, narcotics. For these reasons, the PSR's attribution of these pills and purported marijuana to Mr. Bongiovanni is improper.

## Pages 15-16 (Ron Serio post-arrest statements and investigation/Lous Selva investigation)

- ¶52, ¶53, and ¶54. These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Ron Serio and provision of information to Ron Serio. Inclusion of this information is barred by the acquitted conduct rule in USSG § 1B1.3(c). If the jury believed that these allegations were credible, then the jury would have convicted Mr. Bongiovanni of the larger Serio Conspiracy rather than the distinct act of protecting his friend Selva from investigation for having an indoor marijuana grow. The jury did not. Consequently, the entirety of these paragraphs should be struck from the PSR as irrelevant and misleading.

- ¶55 and ¶56.  These paragraphs cut-and-paste allegations made in the indictment and discuss testimony from Selva of which the jury acquitted Mr. Bongiovanni.  Consequently, inclusion of this information is barred by the acquitted conduct rule in USSG § 1B1.3(c).  If the jury believed that these allegations were credible, then the jury would have convicted Mr. Bongiovanni of the larger Serio Conspiracy rather than the distinct act of protecting his friend Selva from investigation for having an indoor marijuana grow.  The jury did not.  Consequently, the entirety of these paragraphs should be struck from the PSR as irrelevant and misleading.

Regarding the attribution of the .22 caliber rifle and 12-gauge shotgun located at Selva's residence to Mr. Bongiovanni, while the jury did convict Mr. Bongiovanni of protecting Selva and his basement grow, attribution of the firearms to Mr. Bongiovanni would be improper.  First, the seizure of these firearms occurred on August 23, 2019.  Selva's testimony on the date Mr. Bongiovanni purportedly smelled his grow operation was not neat – he stated this occurred sometime between 2014-2018 – but under any interpretation, Selva was found to be in possession of these firearms at least more than one year (and possibly up to five years) *after* Mr. Bongiovanni became aware of the basement grow he was convicted of conspiring with Selva to protect.  There also is *no evidence* that Selva acquired and possessed these firearms at the time Mr. Bongiovanni smelled this basement grow.  As a result, there is insufficient evidence to connect these firearms to the conspiracy with Selva for purposes of attributing the firearms to Mr. Bongiovanni.  Second, attribution of these firearms is improper because the possession of such firearms was not reasonably foreseeable to Mr. Bongiovanni.  As Selva testified, Mr. Bongiovanni did not view the grow, he only "smelled" the grow, and Selva never told Mr. Bongiovanni how large the grow was.  Selva also did not testify that he told Mr. Bongiovanni (or showed him) that he possessed large amounts of currency in his home.  Thus, Mr. Bongiovanni was not in a position to reasonably foresee the necessity of Selva possessing a firearm to protect his grow or drug proceeds from theft.  This makes it more probable than not that Mr. Bongiovanni could not have foreseen the necessity of Selva possessing a firearm in furtherance of the grow in Selva's basement.  As a result, Selva possessing a firearm was not reasonably foreseeable to Mr. Bongiovanni.

**Pages 16-17 (Masecchia possession of narcotics and firearms at 5907 Main Street)**

- ¶57 and ¶58. These paragraphs discuss the seizure of eight (8) firearms, $27,950 in currency, various gram-quantities of marijuana, cocaine, opiates, hashish oil, and steroids at Michael Masecchia's residence on August 23, 2019. Attribution of these items to Mr. Bongiovanni is improper for several reasons. First, all of these items may not be attributed to Mr. Bongiovanni based on the acquitted conduct rule. Since the jury acquitted Mr. Bongiovanni of the larger Masecchia-Serio DTO conspiracy and these substances relate to Masecchia and that conspiracy, USSG § 1B1.3(c) bars attribution of these items to Mr. Bongiovanni as "relevant conduct." Second, even if the acquitted conduct rule does not apply, Mr. Bongiovanni had no direct involvement the transactions, so the attribution rule in USSG § 1B1.3(a)(1)(A) cannot apply. Furthermore, this conduct does not meet the requirements of USSG § 1B1.3(a)(2)(B) because it is outside the scope of the alleged agreement, not in furtherance of the conspiracy, and not reasonably foreseeable by Mr. Bongiovanni. As discussed previously, the conspiracy ended in December 2016, so possession of these items is outside of the scope of the agreement and not reasonably foreseeable to Mr. Bongiovanni since his participation in the alleged scheme ended 3 ½ years prior to these seizures. Regarding the narcotics, possession of the opiates, steroids, and cocaine is outside the scope of the agreement purportedly entered by Mr. Bongiovanni and not reasonably foreseeable because, based on Selva's and Ron Serio's testimony, Mr. Bongiovanni purportedly agreed to protect a marijuana conspiracy only, not a conspiracy that involved opiates. Third, attribution of all of the narcotics is improper because, based on the quantity of narcotics possessed, these substances clearly were possessed for personal use, not distribution, and under the *Williams* rule, cannot be attributed to Mr. Bongiovanni as relevant conduct. Fourth, it is improper to use a cash conversion in this instance because there is insufficient evidence that the $27,950 in currency found 3 ½ years later was proceeds attributable to the Serio-Masecchia DTO conspiracy. Fourth, most of these alleged controlled substances were not subject to a confirmatory test. Thus, it cannot be shown, by a preponderance of the evidence, that these purported substances are, in fact, narcotics, absent the PSR's reported findings on the steroids (no weight specified) and the 1.68 grams of cocaine. For these reasons, the PSR's attribution of these substances to Mr. Bongiovanni is improper. Fifth, even assuming the acquitted conduct rule does not apply, there is *no evidence* that Masecchia acquired and possessed these firearms at the time of Mr. Bongiovanni's alleged involvement in the Masecchia-Serio DTO. As a result, there is

insufficient evidence to connect these firearms to the conspiracy for purposes of attributing the firearms to Mr. Bongiovanni.

## Page 17-18 (Converted Drug Calculations)

- ¶59.  This paragraph of the PSR aggregates the narcotics the PSR attributes to Mr. Bongiovanni into converted drug weight.  As discussed above, these calculations are not accurate because they attribute narcotics to Mr. Bongiovanni that encompass acquitted conduct as well as narcotics that are outside the scope of the alleged conspiracy, not reasonably foreseeable to Mr. Bongiovanni, and were possessed for personal use, not distribution.  Taking into account the jury's verdict and its conclusion that the narcotics conspiracy involved a weight of marijuana of less than 50 kilograms, the proper drug weight attributable to Mr. Bongiovanni is, at most, what Lou Selva testified to was growing in his basement when Mr. Bongiovanni smelled his grow.  According to Selva, this grow included 40-50 plants that yielded 10-20 pounds of marijuana.  When converting marijuana plants to drug weight, the guidelines direct courts to "treat each plant, regardless of sex, as equivalent to 100 grams of marihuana.  *Provided*, however, that if the actual weight of the marihuana is greater, use the actual weight of the marihuana."  *See* USSG § 2D1.1(c), note (E) (emphasis in original).  Conversion of the 40-50 plants into grams equates to 4,000-5,000 grams of marijuana.  However, because Selva testified that the grow yielded an aggregate weight of 10-20 pounds of marijuana and that yield is greater in weight than the plants, the guidelines direct that the actual weight of the marijuana should be used to calculate drug quantity.  *See id.*  10-20 pounds of marijuana converts to 4.5-9 kilograms of marijuana.  4.5-9 kilograms of marijuana occasions a base offense level of 12 (if the Court credits Selva's testimony that the grow yielded 12 pounds/5.4 kilograms or more of marijuana) or base offense level of 10 (if the Court credits Selva's testimony that the grow yielded 10-11 pounds/4.5-4.9 kilograms of marijuana).  *See* USSG § 2D1.1(c)(14) & (15).

## Pages 18-21 (Peter Gerace DTO Information)

- ¶60, ¶61, ¶62, ¶63, ¶64, ¶65, ¶66, ¶67, ¶68, ¶69, and ¶70.  These paragraphs cut-and-paste allegations made in the indictment and discuss actions for which the jury acquitted Mr. Bongiovanni vis-à-vis the alleged protection of Peter Gerace, Jr.  Based on the acquitted conduct rule in USSG § 1B1.3(c), these paragraphs should be struck from the PSR as irrelevant

and misleading.  To the extent context is necessary to provide background to the convictions for Count 8, Count, 10, and Count 11 recommend amending the title of this section to "The Defendant's relationship to Peter Gerace, Jr., Removal of the Wayne Anderson Working File, and False Statements to Investigators" and inclusion of the following language:  Peter Gerace, Jr. was a friend of the defendant.  Peter Gerace, Jr. also was a co-defendant in this case.  The indictment alleged that Mr. Bongiovanni conspired with and accepted bribes from Peter Gerace, Jr. to protect Gerace ad others from investigation and prosecution for narcotics dealing.  The jury acquitted Mr. Bongiovanni of such allegations.  However, trial evidence revealed that the defendant maintained a personal relationship with Gerace during his tenure as a DEA agent.  In 2018 and 2019, the defendant was investigated regarding this relationship because Gerace was under investigation by the DEA and others.  The defendant also wrote a memorandum regarding DEA SA Anthony Casullo (an agent who investigated Gerace) that portrayed SA Casullo to have a closer relationship with Gerace (via Casullo's brother-in-law Phil Domiano who was a former employee of Gerace) than SA Casullo actually had.  Searches of Gerace's properties uncovered photographs of the defendant and Gerace on vacation together.

- ¶75.  This paragraph includes information of which the jury acquitted Mr. Bongiovanni.  Based on USSG § 1B1.3(c), inclusion of this information should be struck from the PSR as irrelevant and misleading.  Recommend the paragraph be amended as follows:  On June 6, 2019, a search warrant was executed at the defendant's residence at 85 Alder Place, Tonawanda, New York, where the aforementioned box with Serio's file was seized. On the same date, the defendant agreed to be interviewed after the search warrant, where he again denied that he was in a close relationship with Gerace, and denied attempting to arrange a meeting with Gerace. He also denied socializing with Mike Sinatra; however, there is a photograph of them together in Toronto. He denied being at that same party in Toronto with Anthony Gerace (Peter Gerace's brother); however, in a text message between the defendant and Peter Gerace where the defendant stated, "I just saw your brother, he was in Toronto." Then he denied the situation in 2009 with FBI Special Agent Tom Herbst, where the defendant pretended that Gerace was his informant, and he falsely stated that Gerace tried to cooperate with the DEA. When the defendant was asked why he had the Serio file in his basement, he stated that he kept this case file because he thought it would come up again and he wanted everything to be on the "up and up".

- ¶76 and ¶77.  These paragraphs include information of which the jury acquitted Mr. Bongiovanni, was outside the scope of the conspiracy, and was not reasonably foreseeable to Mr. Bongiovanni.  Based on USSG § 1B1.3(c), inclusion of this information should be struck from the PSR as irrelevant and misleading.  Recommend the paragraphs be amended as follows:  Eventually, by October of 2019, the defendant was charged in the instant offenses.

**Pages21-22 (Financial Investigation)**

- ¶76 and ¶77.  These paragraphs include information, some of which the government never introduced at Trial #2, and all of which the jury acquitted Mr. Bongiovanni, was outside the scope of the conspiracy, and was not reasonably foreseeable to Mr. Bongiovanni.  Based on USSG § 1B1.3(c), inclusion of this information should be struck from the PSR as irrelevant and misleading.  To the extent these paragraphs summarize some of the conduct forming the basis of conviction, other paragraphs summarize that conduct, making this paragraph superfluous and unnecessary.  As a result, these paragraphs should be struck from the PSR.

**Page 22**

- ¶80.  This paragraph summarizes victim impact.  To the extent this paragraph comments on overdoses, such commentary is irrelevant.  The jury convicted Mr. Bongiovanni of a marijuana offense.  There is no evidence to suggest that anyone overdosed on marijuana in this case – generally speaking, marijuana has never been proven to cause overdoses.  There is no evidence that someone was the victim of violence, shooting, and other crimes as a result of the Selva basement marijuana grow, either.  What's more, marijuana is legal in New York State, so notwithstanding the federal government's off-base and illogical position on controlling marijuana as a Schedule I substance, the Western New York Community, as a whole, has decided that use of marijuana does not victimize its population.  As such, the PSR's conclusion that the community is against marijuana use and that such use "victimizes" the community is unsupported by a preponderance of the evidence and irrelevant.  Recommend this paragraph be amended as follows:  Counts 1, 6, 7, 8, 10, 11, 13, and 15 are Title 18 offenses are there are no identifiable victims. Count 3 is a Title 21 offense and there is no identifiable victim. However, the Western New York community as a whole becomes the victim of illicit drug use and drug distribution. This area is plagued with violence, shootings, unintentional overdoses and various types of crimes

~~that are related to drug distribution. Although the defendant was not directly involved in any acts~~ ~~of violence, involvement in drug distribution contributes to the victimization of the residents.~~ There are no identifiable victims in this offense.

- ¶81.  This paragraph discusses the application of an obstruction of justice enhancement to the charges.  To the extent this paragraph comments on Mr. Bongiovanni's failure to report Selva's basement marijuana grow – the misconduct upon which the jury convicted Mr. Bongiovanni – such commentary is proper pursuant to USSG § 3C1.1 and Application Note 8.  To the extent this paragraph comments on allegations involving the larger Masecchia-Serio DTO and Peter Gerace DTO, of which the jury acquitted Mr. Bongiovanni, such commentary violates the acquitted conduct rule in USSG § 1B1.3(c) and is irrelevant.  Recommend this paragraph be amended as follows:  The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, namely Count 3, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct~~; or a closely related offense, namely~~ ~~the investigation and prosecution of Peter Gerace, Jr.'s drug trafficking activity.~~  The defendant was convicted of five counts of Obstruction of Justice, in violation of 18 U.S.C. § 1519, and two counts of False Statements to an Agency of the United States, in violation of 18 U.S.C. § 1001(a)(2) in this case. ~~Beginning in or about 2008, and continuing to in or about 2017, in the~~ ~~Western District of New York, the defendant, a public official, directly and indirectly did corruptly~~ ~~demand, seek, receive, accept, and agree to receive and accept something of value personally, in~~ ~~return for being induced to do an act and omit to do an act in violation of his official duty as~~ ~~opportunities arose; that is the defendant, was paid at least $250,000 in United States currency to,~~ ~~among other acts, open and close a DEA case file; to open and close a DEA CI; to cause the~~ ~~issuance of DEA administrative subpoenas; to cause the entry of names, locations, and phone~~ ~~numbers in de-confliction databases; to make false and misleading entries in DEA reports and~~ ~~forms; to make false and misleading statements to other members of law enforcement; to provide~~ ~~information about federal investigations, law enforcement methods and techniques, and the~~ ~~identity of individuals cooperating and potentially cooperating with law enforcement in order to~~ ~~conceal the drug trafficking activities, and to help such drug trafficking activities continue, of~~ ~~individuals associated with the defendant, including individuals the defendant believed to be~~ ~~connected to and associated with IOC.~~

III.    **Objections to Part A of the Draft PSR (guideline calculation objections).**

On pages 22-25 of the PSR (¶¶83-107), the probation office separated the counts of conviction into three separate groups.  Count Group 1 included Counts 1 and 3 related to the conspiracy to defraud and narcotics conspiracy.  Count Group 2 included Counts 6-7 (Obstruction of Justice relating to two DEA-6 reports closing out the Wayne Anderson case file), Count 11 (False Statement to SA Carpenter regarding contacts with Gerace) and Count 13 (removing the Wayne Anderson Working File).  Count Group 3 included Count 8 (Obstruction of Justice for minimizing contacts with Gerace), Count 10 (Obstruction of Justice for misrepresenting SA Casullo's relationship to Gerace), and Count 15 (False Statement to SA Ryan regarding the purpose of removing the Wayne Anderson Working File).  The Draft PSR then ascribes various adjustment and enhancements to determine the guideline calculations.  These calculations are incorrect.  As discussed in more detail below, properly grouping the counts results in two groups, not three groups, and further adjustments are required to adjust the guideline calculations to reflect what Mr. Bongiovanni was convicted of at trial and what is his relevant conduct versus what Mr. Bongiovanni was acquitted of and what cannot be included as his relevant conduct.

### A.  The Draft PSR improperly groups the offenses of conviction.

Pursuant to USSG § 3D1.2, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group.  Counts involve substantially the same harm within the meaning of this rule:"

> (a) When counts involve the same victim and the same act or transaction.

> (b) When counts involve the **same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan**.

(c) When **one of the counts embodies conduct that is treated as a** specific offense characteristic in, or other **adjustment to, the guideline applicable to another of the counts**.

*See* USSG § 3D1.2 (emphasis added).

By creating three distinct groups, the draft PSR improperly groups the offenses of conviction in contravention of USSG § 3D1.2.  First, the manner in which the Draft PSR groups the counts is not logical.  The most obvious example of this occurs in Count Groups 2 and 3.  For Count Group 2, the draft PSR groups Counts 6-7 (Obstruction of Justice relating to two DEA-6 reports closing out the Wayne Anderson case file) and Count 13 (removing the Wayne Anderson Working File) with Count 11 (False Statement to SA Carpenter regarding contacts with Gerace).  While these counts share the same victim (the DEA), Count 11 has nothing to do with Count 6, 7, and 13 because Count 11 relates to obstruction involving Peter Gerace while Counts 6, 7, and 13 relate to obstruction involving Lou Selva.  As a result, Count 11 does not involve the same act, *see* §3D1.2(a), a common objective, scheme or plan, *see* § 3D1.2(b), or conduct treated as a specific offense characteristic or adjustment applicable to another count, *see* § 3D1.2(c).  This is why grouping these offenses together is incorrect.

Count Group 3 suffers from the same problem.  For Count Group 3, the Draft PSR groups Count 8 (Obstruction of Justice for minimizing contacts with Gerace) and Count 10 (Obstruction of Justice for misrepresenting SA Casullo's relationship to Gerace) with Count 15 (False Statement to SA Ryan regarding the purpose of removing the Wayne Anderson Working File).  While these counts share the same victim (the DEA), Count 15 has nothing to do with Counts 8 and 10 because Count 15 relates to obstruction involving Peter Gerace while Counts 8 and 10 relate to obstruction involving Lou Selva.  As a result, Count 15 does not involve the same act, *see* §3D1.2(a), a common objective, scheme or plan, *see* § 3D1.2(b), or conduct treated as a specific

34

offense characteristic or adjustment applicable to another count, *see* § 3D1.2(c).  This is why grouping these offenses together is incorrect.

Second, the Draft PSR, creates three groups when the guidelines require only two groups.  For example, the Draft PSR relies upon USSG § 3D1.2(b) to create separate groups for the conspiracy counts and the obstruction counts involving the Selva-related conduct[3], yet doing this contravenes the plain language of USSG § 3D1.2(b) which directs that "counts involv[ing] the **same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan**" should be grouped together.  *See* USSG § 3D1.2(b).  Here, the conspiracy counts and the obstruction counts involving the Selva-related conduct relate to the same criminal objective and common scheme and plan: allowing Selva to grow marijuana in his basement without detection.

What's more, these acts are not so distinctive as to warrant separate grouping.  The Draft PSR relies upon the belief that Counts 1 and 3 are different because these counts "facilitate continued drug trafficking activities" while Counts 6, 7, 11, and 13 "obstruct the investigation" into such activities.  *See* ECF 1503 at ¶¶84, 85.  Yet, this justification fails because it relies upon a distinction without a difference that the guidelines counsel against.  For example, USSG § 3D1.2(b) is not the only guideline that counsel against making this distinction.  USSG § 3C1.1 states that when "the defendant is convicted both of an obstruction offense . . . and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense **will be** grouped with the count for the underlying offense under subsection (c) of § 3D1.2."

---

[3] As discussed above, Count Group 2 also includes conduct relating to Gerace that *should not* be grouped with the Selva-related offenses.  Mr. Bongiovanni does not repeat and reargue that point again, but the error of including the Gerace-based conduct does not affect the analysis that obstructive counts relating to Counts 1 and 3 (the Selva conspiracy) should be grouped with Counts 1 and 3, not the Gerace-based counts.

*See* USSG § 3C1.1, Application Note 8 (emphasis added).  Thus, the guidelines command a different result than that reached in the Draft PSR; namely, grouping the Selva-related counts of conviction for the conspiracy and obstruction offenses *together*, not separately.  This means that Counts 1, 3, 6, 7, 13, and 15 should form one group pursuant to USSG § 3D1.2(b) because all of the counts relate to the same victim (the DEA) and relate to the same criminal objective and common scheme and plan (i.e., allowing Selva to grow marijuana in his basement without detection).

In addition to USSG § 3D1.2(b), USSG § 3D1.2(c) provides further justification for grouping Counts 1, 3, 6, 7, 13, and 15 together.[4]  Under this guideline, when a "count[] embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts," grouping should occur.  *See* USSG § 3D1.2(c).  Here, the obstructive conduct at issue forms the basis of an upward adjustment pursuant to USSG § 3C1.1 to the conspiracy count.  As a result, the guidelines command that the obstruction counts be grouped with Counts 1 and 3.

As for the Gerace-related counts, Counts 8, 10, and 11 should be grouped together because, while they involve the same victim (the DEA), Counts 8, 10, and 11 are not part of the same scheme or objective, *see* USSG § 3D1.2(b) and do not form the basis for a specific offense characteristic or adjustment, *see* USSG § 3D1.2(c), under the Selva-related counts in Counts 1, 3, 6, 7, 13, and 15.  When the erroneous grouping of Gerace-related counts with the Selva-related counts is corrected and the guideline rules are applied correctly, the result is two groups – Group 1 (Counts 1,

---

[4] USSG § 3D1.2 contemplates that, in certain instances, "[a] single case may result in application of several of the rules in [USSG § 3D1.2]" and can cause "all counts [to] form a single Group."  *See* USSG § 3D1.2, Application Note 7.  As subsections (b) and (c) have greater applicability to this case than subsection (a) because the nature of the charges in this case involves not just the same victim, but the same harm, objective, and obstructive conduct that can form an adjustment, the Court should apply subsections (b) and (c) to group Counts 1, 3, 6, 7, 13, and 15 together.

3, 6, 7, 13, and 15) and Group 2 (Counts 8, 10, and 11) – not three.  This is why the Draft PSR is incorrect and should be ameneded.

**B.  The Draft PSR miscalculates the drug weight attributable to Mr. Bongiovanni.**

As argued above in Section II, *supra*, taking into account the jury's verdict, the acquittals, what narcotics were within the scope of the agreement, what narcotics were reasonably foreseeable to Mr. Bongiovanni, and the jury's conclusion that the narcotics conspiracy involved a weight of marijuana of less than 50 kilograms, the proper drug weight attributable to Mr. Bongiovanni is, at most, what Lou Selva testified to was growing in his basement when Mr. Bongiovanni smelled his grow.  This grow included 40-50 plants that yielded 10-20 pounds of marijuana.  Since the grow yielded an aggregate weight of 10-20 pounds of marijuana and that yield is greater in weight than the plants themselves, the guidelines direct using the actual weight of the marijuana to calculate drug quantity.  *See* USSG § 2D1.1(c), Note (E).  10-20 pounds of marijuana converts to 4.5-9 kilograms of marijuana.  4.5-9 kilograms of marijuana occasions a base offense level of 12 if the grow yielded 12 pounds/5.4 kilograms or more of marijuana.  *See* USSG § 2D1.1(c)(14).  Thus, the Court should conclude that the base offense level in this case for the Selva-related conspiracies is 12 pursuant to USSG § 2D1.1(a)(5) and (c)(14), not 34 as incorrectly determined in the Draft PSR  *See* ECF 1503 at ¶89.

**C.  The Draft PSR improperly applies the firearm Specific Offense Characteristic.**

The Draft PSR misapplies the specific offense characteristic for possession of a firearm pursuant to USSG §2D1.1(b)(1).  As argued above in Section II, *supra*, Mr. Bongiovanni was acquitted of conspiring with Ron Serio and Michael Masecchia, so applying this specific offense characteristic based on Serio's or Masecchia's possession of a firearm is improper and violates USSG § 1B1.3(c).  Moreover, as also argued above, Selva's possession of two long guns cannot form the

basis to apply this specific offense characteristic because the possession of these firearms was not

reasonably foreseeable to Mr. Bongiovanni, *see United States v. Soto*, 959 F.2d 1181, 1186 (2d Cir. 1992

(holding that a firearm enhancement may be applied to a defendant's sentence based on possession

of a weapon by a codefendant so long as the possession of the firearm was reasonably foreseeable to

the defendant), and the preponderance of the evidence does not prove that Selva possessed these

two firearms during the time he grew marijuana in his basement.  There also is no evidence proving

that the firearms, or ammunition, if any, was in the open to put Mr. Bongiovanni on notice that

Selva possessed a firearm.  For these reasons, the application of this specific offense characteristic is

improper.

### D. The Draft PSR improperly applies the "substantial interference" Specific Offense Characteristic to the Gerace-related obstruction counts.

The Draft PSR misapplies the specific offense characteristic for occasioning

"substantial interference with the administration of justice" to the Gerace-related counts pursuant to

USSG §2J1.2(b)(2).  As the commentary to this guideline provides, "substantial interference with the

administration of justice" includes "a premature or improper **termination** of a felony investigation;

an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other

false evidence; or the unnecessary expenditure of substantial governmental or court resources."  *See*

USSG §2J1.2, Application Note 1 (emphasis added).  The trial evidence did not reveal that the

investigation into Peter Gerace **terminated** as a result of the conduct in Counts 8, 10, and 11.  First,

Mr. Bongiovanni was not responsible for investigating Peter Gerace.  As the trial evidence revealed,

the Gerace investigation was opened by SA Casullo in 2016.  SA Casullo, not Mr. Bongiovanni, was

responsible for *all* actions related to the Gerace investigation.  Thus, Mr. Bongiovanni's failure to

report certain contacts between himself and Gerace had no effect on SA Casullo's pursuit of Gerace.

Second, the Gerace investigation was never terminated.  As SA Casullo and others testified at trial,

SA Casullo opened the Gerace investigation in 2016, passed the Gerace investigation on to other agents in the DEA and HSI (including HSI SA Curtis Ryan) in 2018 after revealing his accusations against Mr. Bongiovanni to the U.S. Attorney's Office and getting conflicted off the case, and DEA and HSI continued the Gerace investigation, unabated, until Gerace was charged in this case in 2021. Thus, neither of the allegations embodied on Counts 8, 10, and 11 could have affected the investigation, let alone terminated it, because at the time these acts occurred, SA Casullo was not investigating Gerace – other agents were. Third, Mr. Bongiovanni's conduct in 2018 and 2019 did not interfere with procuring an indictment, superseding indictment, or verdict in the Gerace case. The government procured all of these, unabated, from 2021 to 2025. Fourth, Mr. Bongiovanni's conduct in 2018 and 2019 did not affect any judicial determination in Gerace's case or occasion the unnecessary expenditure of *substantial* government or court resources. As this Court knows, the government chose to invest substantial resources to investigate and prosecute Gerace *prior to* 2018. This makes Mr. Bongiovanni's conduct inapposite to those decisions. Fifth, Mr. Bongiovanni's acts of minimizing his relationship to or contacts with Gerace were collateral to the government's case against Gerace. The government's case against Gerace was premised on drug trafficking and sex trafficking. To prosecute these crimes, the government used drug evidence seized at Gerace's properties and witnesses who testified to Gerace's narcotics dealing and sex trafficking.
Mr. Bongiovanni's minimization of his contacts with Gerace were not part of the core evidence against Gerace. For these reasons, the acts in Counts 8, 10, and 11 cannot be said to have terminated any investigation, indictment, or verdict or occasioned the unnecessary expenditure of substantial governmental or court resources. This is why this adjustment was improperly applied to the Gerace-related counts.

**E.  The Draft PSR improperly applies the Abuse of Public Trust adjustment to the Gerace-related obstruction counts.**

The Draft PSR misapplies the adjustment for abusing the public trust to the Gerace-related counts pursuant to USSG § 3B1.3.  USSG § 3B1.3 provides for a 2-point enhancement when a defendant "abused a position of public . . . trust . . . in a manner that **significantly facilitated** the commission or concealment of the offense," "(e.g., by making the detection of the offense or defendant's responsibility for the offense more difficult)."  *See* USSG § 3B1.3 & Application Note 1 (emphasis added).  A position of trust is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." *See id.* at Application Note 1 (emphasis added).  Here, the defense does not contest that Mr. Bongiovanni occupied a position of public trust for the conduct alleged in Counts 8 and 10.  As the trial evidence made clear, Mr. Bongiovanni committed these acts when he still was employed as a DEA Special Agent.  As a result, this adjustment *may* apply to Counts 8 and 10.  However, for Count 11, Mr. Bongiovanni committed this act when he was retired from the DEA, so, at least at the time of this offense, Mr. Bongiovanni no longer occupied a position of public trust and this enhancement should not apply.  Getting back to Counts 8 and 10, the focus of this objection concentrates not on the public trust requirement of the adjustment, but, instead, upon the requirement that the position of public trust "significantly facilitated the commission or concealment of the offense."  In that regard, the evidence is deficient.

Counts 8 and 10 alleged that Mr. Bongiovanni obstructed justice or made a false statement by minimizing his contact with Gerace and attempting to paint SA Casullo's relationship with Gerace as closer than it was.  While the jury concluded that the evidence proved such conduct, Mr. Bongiovanni's position as a DEA Special Agent, when he committed these acts, hardly can be said to have "**significantly facilitated** the commission or concealment of the[se] offense[s]."  At the time these statements were made, Mr. Bongiovanni had been under investigation for several

months.  As the trial evidence showed, at the time the DEA, HSI, and prosecutors read these statements in 2018 and 2019, none believed them to be true.  These statements did not *significantly* halt the investigation into Mr. Bongiovanni.  These statements did not *significantly* conceal Mr. Bongiovanni's relationship to Gerace.  And these statements did not *significantly* facilitate the commission of the crime of obstruction because the statements consisted, in one instance, of generalized denials of contact and the provision of texts messages, and, in the other instance, of accusing SA Casullo of having similar contact with Gerace based on familial association and school ties in Facebook postings.  For the reasons above, this adjustment should not apply to the Gerace-related counts as Mr. Bongiovanni's status did not *significantly facilitate* the offenses in Counts 8 and 10.

### F.  Proper Application of the Guidelines results in Two Groups and a Total Offense Level of 16.

Taking into account the objections above, a proper application of the guidelines results in the following guideline calculations:

**Count Group 1: Conspiracy to Possess with Intent to Distribute, and to Distribute, Less Than 50 Kilograms of Marijuana**

**Counts included in Group:**
- Count 1: Conspiracy to Defraud (Selva-related marijuana grow)
- Count 3: Narcotics Conspiracy (Selva-related marijuana grow)
- Count 6: Obstruction of Justice (11/4/14 DEA-6 – preparing Wayne Anderson file for closure)
- Count 7: Obstruction of Justice (1/28/15 DEA-6 – closing Wayne Anderson file)
- Count 13: Obstruction of Justice (taking the Wayne Anderson working file home after retirement)
- Count 15: False Statement (stating to SA Ryan that working file was taken home to ensure everything was on the "up and up")

**Base Offense Level:** The guideline for a violation of 21 U.S.C. § 841(a)(1) is USSG §2D1.1. The instant offense involved at least 5 KG but less than 10 KG of Marijuana.  The base offense level is 12.  USSG § 2D1.1(a)(5) and (c)(14).

<u>12</u>

**Specific Offense Characteristics:**  None.

<u>+0</u>

**Victim Related Adjustment:**  None.                                                          **+0**

**Adjustment for Role in Offense:**  The defendant was a DEA SA (a public official) who used his position of trust as a law enforcement officer to conceal and facilitate the commission of a basement marijuana grow of his best friend, Lou Selva.  The defendant obstructed the investigation into Selva's activities by closing a DEA investigation and removing a working file of that investigation that could have implicated Selva.  The defendant also made a false statement regarding the purpose of removing the working file. The defendant was a DEA agent who operated with little supervision. The DEA required its special agents to uphold the rule of law, and to act with integrity in their personal and professional actions. The defendant abused a position of public trust in a manner that significantly facilitated the commission or concealment of Selva's offenses; therefore, there is an increase by two levels. USSG §3B1.3.

                                                                                              **+2**

**Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense (see above for details).  Four of the counts in the group also involve obstruction of justice offenses. Therefore, two levels are added. USSG §3C1.1.

                                                                                              **+2**

**Adjusted Offense Level (Subtotal):**                                                         **16**

**Count Group 2:  Obstruction of Justice**

**Counts included in Group:**
- Count 8: Obstruction of Justice (11/1/18 Memorandum – minimizing relationship with Gerace)
- Count 10: Obstruction of Justice (1/28/19 Memorandum – misrepresenting SA Casullo's relationship to Gerace)
- Count 11: False Statement (minimizing to SA Carpenter his contacts with Gerace)

**Base Offense Level:** The guideline for a violation of 18 U.S.C. § 1519 is USSG §2J1.2.  The base offense level is 14.  USSG §2J1.2(a).

                                                                                              **14**

**Specific Offense Characteristics:**  None.                                                   **+0**

**Victim Related Adjustment:**  None.                                                          **+0**

**Adjustment for Role in Offense:**  None.                                                     **+0**

**Adjustment for Obstruction of Justice:**  None.                                              **+0**

**Adjusted Offense Level (Subtotal):**                                                      <u>**14**</u>

**Multiple Count Adjustment:** Units are assigned pursuant to USSG §3D1.4(a), (b) and (c).  One unit is assigned to the group with the highest offense level.  One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious.  One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level.  Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

| <u>Group/Count</u> | <u>Adjusted Offense Level</u> | <u>Units</u> |
|---|---|---|
| Count Group 1 | 16 | 1.0 |
| Count Group 2 | 14 | 1.0 |

**Total Number of Units:**                               2.0

**Greater of the Adjusted Offense Levels Above:**                                        <u>**16**</u>

**Increase in Offense Level:** The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at USSG §3D1.4.                <u>**+2**</u>

**Combined Adjusted Offense Level:** The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4.                                                                                  <u>**18**</u>

**Chapter Four Adjustment:** The defendant meets the criteria at USSG §§4C1.1(a)(1)-(11).  Therefore, the defendant is a Zero-Point Offender, and the offense level is reduced by two levels.  USSG §§4C1.1(a) and (b).                                <u>**-2**</u>

106. **Acceptance of Responsibility:** As of completion of the presentence investigation, the defendant has not clearly demonstrated acceptance of responsibility for the offense. USSG §3E1.1.                                                                                      <u>**+0**</u>

**Total Offense Level:**                                                                          <u>**16**</u>

       As a Criminal History Category I offender and a Total Offense Level of 16, the PSR should reflect that Mr. Bongiovanni's guideline range is 21-27 months in Zone D of the sentencing table.

**IV.    Objections to Part C of the Draft PSR.**

      Many of the paragraphs in Part C of the Draft PSR provide information using offense levels that Mr. Bongiovanni objected to above.  To the extent these objections are resolved in Mr. Bongiovanni's favor, the PSR should be amened to reflect those amended guideline ranges.

**V.    Objections to Part D of the Draft PSR.**

      Prior to this filing, the defense conferred with USPO Ferraro regarding changes to Mr. Bongiovanni's characteristics and history.  Upon information and belief, the Draft PSR will be amended to reflect those changes.  As a result, no objections are raised at this time, but the defense reserves the right to raise objections to content that remains unchanged.

**VI.    Objections to Part E of the Draft PSR.**

      As of the date of this filing, there are amendments pending to the guidelines which eliminate sentencing based departures, including USSG § 5K2.7.  *See* USSC, Amendments to the Sentencing Guidelines (Preliminary), Apr. 11, 2024, aviable at:

https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202504_prelim-rf.pdf (last accessed 6/1/25).  While these amendments do not become effective until November 1, 2025, *see id.*, Mr. Bongiovanni objects to the Court's use of departures at sentencing.  Simply put, the Commission has made clear that use of departures is no longer favored.  Moreover, Mr. Bongiovanni objects to language in ¶166 which concludes that his conduct in this case "resulted in significant disruption to a governmental function."  As argued above, the jury acquitted Mr. Bongiovanni of the wide-ranging conspiracy charged in the indictment. In rejecting those allegations and, instead, convicting Mr. Bongiovanni for failing to report Lou

Selva and minimizing his relationship to Peter Gerace, it cannot be concluded that

Mr. Bongiovanni's conduct in the Selva-related counts "significantly disrupted" a government

function. The same is true of the Gerace-related counts. As argued previously, these minimizations

had no effect at all on the government's investigation, prosecution, and conviction of Gerace. For

these reasons, this departure is inappropriate and such conclusions and the language about them in

¶166 should be struck from the Draft PSR entirely.

**VII.    Objections to Part F of the Draft PSR.**

      In ¶168 of the Draft PSR, comment is made that the Court may consider several

"facts" which warrant an above guidelines sentence. These purported "facts" include that "the

defendant's conduct was part of a systematic or pervasive corruption of a governmental function,

process, or office that may cause loss of public confidence in Government" because "the defendant

obstructed multiple investigations, abused a position of public or private trust in a manner that

significantly facilitated the commission or concealment of the offense, and caused the public to lose

confidence in the DEA due to his conduct." The Draft PSR also states that because

Mr. Bongiovanni was convicted of multiple counts of Obstruction of Justice that were grouped

pursuant to the guidelines, an upward adjustment may be warranted because "the harm of these

offenses may not be adequality reflected in the Guidelines." Finally, this paragraph includes as a

purported "fact" that "the defendant disclosed the identities of confidential informants, who

potentially could have been harmed as a result of the defendant's actions" and "this conduct is not

adequately reflected in the Guideline computations." All of these justifications should be rejected

and removed from the Draft PSR.

      Regarding the allegation that Mr. Bongiovanni's conduct was "part of a systematic or

pervasive corruption of a government function," this may be what the government alleged in the

indictment, but it *was not* what the government ultimately proved at trial. The jury rejected these sweeping allegations. So should the Court.

Regarding the argument that the obstruction counts provide an inadequate calculation of the offense level, this argument is without precedent. The grouping rules exist within the guidelines to account for multiple counts of conviction. The grouping rules are designed to provide the Court with an appropriate view of a guideline score in such instances so that a defendant is not punished more severely than necessary (or justified). Doing away with such rules – which the Draft PSR appears to advocate doing here – is unjustified for the reasons articulated above. This argument should be rejected.

Regarding the allegation that Mr. Bongiovanni disclosed the identity of DEA informants, once again, Mr. Bongiovanni was acquitted of such conduct. If the jury believed that these allegations were true, then the jury would have convicted Mr. Bongiovanni of the larger Masecchia-Serio DTO conspiracy as well as the Gerace DTO conspiracy. The jury did not do this, in part, because the government failed to prove these allegations beyond a reasonable doubt. Thus, using these unproven allegations for purposes of an upward adjustment is improper.

For the reasons set forth above, as well as the acquitted conduct rule in USSG § 1B1.3(c), the Court should reject these arguments and strike all of them from ¶168 of the Draft PSR.


Dated: June 16 2025
       Williamsville, New York

**THE LAW OFFICE OF PARKER R. MACKAY**   **SINGER LEGAL PLLC**
*Attorneys for Joseph Bongiovanni*        *Attorneys for Joseph Bongiovanni*

By:   s/Parker R. MacKay                  By:   s/Robert C. Singer
      Parker R. MacKay, Esq.                    Robert C. Singer, Esq.
3110 Delaware Avenue                       80 East Spring Street
Kenmore, NY 14217                          Williamsville, New York 14221
Ph: (716) 803-8166                         (716) 222-3288
Fx: (716) 408-1651                         rob@singerlegalpllc.com
Em: Parker@MacKayLawOffice.com

46