UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.

                                             Case No.: 19-CR-227

JOSEPH BONGIOVANNI,
PETER GERACE, JR.,
Defendants.

_____

UNITED STATES OF AMERICA,

v.

PETER GERACE, JR.,                             Case No.: 23-CR-37

_____

## PETER GERACE, JR.'S SENTENCING MEMORANDUM

Peter Gerace, Jr., by and through counsel (Mark A. Foti, Esq. and Eric M. Soehnlein, Esq.), respectfully submits the following sentencing memorandum and sentencing motions.

### I.    Introduction

In opening, Mr. Gerace acknowledged he and those around him engaged in conduct that offends community norms.  Mr. Gerace acknowledged that he and

1

individuals he associated with engaged in sex and used drugs consistent with a lifestyle that many people consider sinful.  At no time did Mr. Gerace dispute that fact.[1]

Mr. Gerace chose to contest this case, in part, because Mr. Gerace and the people that surrounded him made deliberate choices to live a party lifestyle, consistent with individuals who choose to associate with and work in strip clubs.[2]  That was confirmed throughout the 19-cr-227 trial.  Witness after witness testified that it was their choice to use drugs, their choice to work at PGC, their choice to associate with PGC, and their choice to engage in sex acts – commercial or otherwise.  They chose a lifestyle, complete with its repercussions.

As the Court knows, the Sentencing Guidelines associated with these offenses contemplate draconian consequences.  That is because the statutes at issue, and the federal sex trafficking statute in particular, contemplate behavior that is especially deviant and conduct that is far different than what occurred here.  Stated another way, the Sentencing Guidelines and the relevant statutes consider conduct that is inconsistent with the proof elicited at the 19-cr-227 trial.

---

[1] Throughout trial, and at Mr. Gerace's direction, the defense cross-examined purported sex trafficking victims with respect and discretion.  The defense believes this is in stark contrast to the tactics employed by the government in eliciting testimony from those same witnesses.

[2] The only plea offer the government was willing to extend to Mr. Gerace before trial was a plea to 360 months (30 years) of incarceration under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  *See* Docket Item 1332 at p. 14.  Given Mr. Gerace's age (57 at the time), such a sentence was tantamount to agreeing to life incarceration.

Indeed, the evidence at trial showed behavior that is consistent with norms within the strip club industry and that, while objectionable and distasteful, is inconsistent with the conduct contemplated by the federal sex trafficking statute.  In particular, the statute and the relevant Guidelines ignore the degree of choice and agency demonstrated by the alleged victims, which was apparent from the testimony at trial.

Further, as is set forth at the conclusion of this memorandum, Mr. Gerace believes the conduct of the government in this prosecution raises several issues about the fairness of the trial, the content of the proof, and the testimony of several witnesses. The government's actions in seeking to win at all costs should not be excused or condoned.  Consistent with the law, the Court is permitted to look to the government's actions in prosecuting this case and the impact of those actions in fashioning an appropriate sentence.  The tactics the government used to prosecute Mr. Gerace should not be condoned in our district or elsewhere.

From opening statements until the conclusion of trial, Mr. Gerace acknowledged that he engaged in conduct that is at odds with community norms.  A fulsome review of his life reveals he is much more than the allegations in this case, however.  There is more to this case than the cold calculations of the Sentencing Guidelines; there is more to Mr. Gerace than the allegations in this case.  Mr. Gerace is worthy of leniency.

## II.    Peter Gerace, Jr.

Peter Gerace, Jr., was born on April 15, 1967 to Peter Gerace, Sr. and Linda Gerace.  The eldest child and eldest grandchild, he was raised by both parents in Tonawanda and then Williamsville, New York.  His father, a laborer, and his mother, a homemaker, cultivated a close-knit family.  Mr. Gerace has two younger siblings: David (age 55) and Anthony (age 46).  He has spent all of his life in Western New York.  He loves his family and continues to speak with his parents nearly every day.

From the outside, Mr. Gerace had a good childhood.  He was surrounded by a loving and supportive family.  He was good student and participated in sports.  He was passionate about hockey, playing the sport at a high level throughout his youth. Family interviewed by counsel reports that Mr. Gerace was well-liked and made friends easily.

His childhood was not always good, however.  In his pre-teen years, Mr. Gerace was the victim of sexual abuse ███████████████████████████████████████████ ██████████████████████████████ Due to the nature of the abuse, the identity of the abuser, and the stigma around the conduct, Mr. Gerace did not disclose the abuse to his family for several years.  Indeed, he did not disclose the abuse to his personal therapist until he was well into adulthood.  Though the abuse is long in the past, it remains a sensitive issue for Mr. Gerace.  The first time he disclosed the abuse to counsel, he cried; when discussing the abuse with Probation for the PSR, Probation

4

notes that Mr. Gerace became "emotional."  He still struggles to talk about it.  It is a lasting scar of unresolved trauma, inflicted at an early age.  It left a significant mark on Mr. Gerace's life.  In counsel's view, it was never appropriately addressed.

Mr. Gerace continued in school, graduating from St. Joseph's Collegiate Institute in Buffalo, New York in 1985.  He attended the University of Buffalo in the fall semester of that year, but left college after the semester.  Instead, he went to work in the construction trades, becoming a laborer in Local 210, working for a food distribution company, and bartending several nights per week.  Mr. Gerace has always worked hard, and he has always been employed.

When he was approximately twenty-seven years old, Mr. Gerace became an entrepreneur.  He started several small businesses in the years that followed, including: Empire State Foods; Clear Alternative of WNY d/b/a G&G Petroleum; Rascals Incorporated (which operated Rascals restaurant); and PPE Enterprises Incorporated d/b/a Advanced Distributing.   During this time Mr. Gerace also worked at Pietro's restaurant, a restaurant owned by his parents, where he was a bartender and assisted in operating the business.

Mr. Gerace also settled into domestic life.  He married Deborah Schmitt on December 6, 1996 in Buffalo, New York.  The marriage produced a son, Peter Gerace, III.

5

The couple had a loving, supportive relationship until Mr. Gerace fell into a deep depressive spell, causing his life to go into a tailspin.

In December, 2000, Mr. Gerace was arrested and charged in the United States District Court for the Western District of New York with Conspiracy to Commit Wire Fraud. The case related to a telemarketing company Mr. Gerace and his friend, Michael Geiger, had run. As is typical in federal criminal cases, resolution of the case stretched for several years. At the case's conclusion, Mr. Gerace acknowledged his guilt and was sentenced to five months imprisonment and three years of supervised release. As the Court can understand, the stress of a pending federal criminal case took a toll on Mr. Gerace, deeply impacting his mental health and emotional stability.

The stress of pending federal charges was only part of Mr. Gerace's problems, however. In December, 2001 Mr. Gerace was involved in a serious motor vehicle accident. The accident left him in pain and unable to work. He sustained a concussion as well as a neck injury and disc herniation in his back. He attempted physical therapy, but it was unsuccessful. He underwent back surgery in September of 2004, which was only partially successful. He underwent a second surgery approximately six months later where he had a portion of his tailbone and the bone above his tailbone removed to help alleviate lingering pain.

Always active, the accident caused him to "lie around the house," his body unable to work. Combined with the stress of pending federal charges, Mr. Gerace fell into a deep depression. It took a toll on Mr. Gerace and on his marriage. He separated from Ms. Schmitt in May 2003 and divorced soon thereafter. Around that time, Mr. Gerace started treating for depression and mood disorders with Dr. Syed Jaffri, being prescribed medication for depression and anxiety. Mr. Gerace was also diagnosed with post-traumatic stress disorder. Since then, Mr. Gerace has dealt with numerous mental and emotional health issues with several providers. Over time, he has been diagnosed with depression, anxiety, sleep disturbances, nightmares and post-traumatic stress disorder.

In 2005 Mr. Gerace was released from federal custody. Shortly thereafter he started a relationship with RA. The couple had a child, Nicholas Gerace, and they married in 2010. Though Mr. Gerace tried to get his life on track, in hindsight it is clear he failed to adequately address the mental health and substance abuse issues that started years earlier. He was frequently depressed and emotionally unstable. He frequently abused cocaine. He tested positive for the substance multiple times while on Probation. Misunderstanding the true gravity of his underlying issues, Mr. Gerace did not get help at this time – a decision he deeply regrets.

Predictably, Mr. Gerace's relationship with RA was rocky. Both Mr. Gerace and RA were hindered by severe substance abuse issues. The relationship was unstable. The

7

couple separated in 2011, with RA leaving to live out of state.  Mr. Gerace had sole custody of their son, five years old at the time, for several years that followed.  Over time, Mr. Gerace and RA repaired their relationship, and they both became active and involved in raising Nicholas.  By all accounts, Mr. Gerace has been a loving, dutiful and stable father to Nicholas.  They maintain a close relationship today, speaking every day.

While Mr. Gerace's personal life progressed after his release from federal custody, so too did his professional life.  In 2005 Mr. Gerace's parents became part owners of Pharoah's Gentlemen's Club (PGC), the business at the forefront of this case. Between 2005 and 2012 Mr. Gerace worked in the business, primarily focusing on bookkeeping and management.

In Fall 2012, the Gerace family was ejected from the club by their partners and Mr. Gerace was prohibited from having any contact with PGC.  A lawsuit over ownership and control followed. It was another dark period.  Mr. Gerace was saddled with a prior felony conviction and was barred from working at his family's business. He lacked resources to gain steady employment or to start a business of his own.  Once again, his emotional health spiraled.

In April 2014, the Gerace family regained control, with Mr. Gerace taking on a larger role at the business.  Also in 2014, Mr. Gerace married KN.  The product of a relationship that started when Mr. Gerace had been shut out of PGC and did not have a

steady income, the relationship was tumultuous and acrimonious almost from the outset.  KN suffered from severe mental health and addiction issues.  She was arrested on several occasions.  Mr. Gerace continued to abuse substances and struggled with his own mental health issues throughout the relationship. The couple separated in 2016 and later divorced.  As the Court knows, as the relationship disintegrated, it became increasingly acrimonious and volatile.

In 2018 Mr. Gerace purchased PGC from his parents, although his parents continued to own the land and the building.  He continued to struggle with substance abuse and his mental health.  He frequently abused cocaine and did not regularly see a therapist for his emotional turmoil.  His business was making money; his life was spiraling out of control.

In 2019 the investigation that led to this case became public.  Mr. Gerace was charged the following year.  Mr. Gerace's mental health and emotional stability deteriorated.  Although he consistently treated with counselors and mental health professionals before his incarceration in March, 2023, this prosecution took a toll upon Mr. Gerace.  He is emotional; he is obsessive; he lacks ability to focus; he worries obsessively about the well-being of his loved ones and the well-being of his son in particular.  He is a shadow of the person he was at the beginning of this case.

### III.    Analysis Under the Sentencing Statute

As the Court knows, 18 U.S.C. 3553(a) requires a district court to impose a sentence that is "sufficient, but not greater than necessary," to achieve the goals of sentencing.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009); *Gall v. United States*, 552 U.S. 38, 48-50 (2007). "The sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, explaining any variance from the former with reference to the latter."  *Nelson*, 555 U.S. at 351.

When determining a sentence in light of these goals, as relevant here, the key factors a court must consider are: (1) the nature and circumstances of the offense, (2) the offender's history and characteristics, (3) the sentencing range established in the Guidelines, and (4) the need to avoid unwarranted sentence disparities among similarly situated defendants.  *See* 18 U.S.C. § 3553(a)(1), (a)(3)-(7).

The Court's discretion to give such weight to these factors as it deems just is broad, and it may consider any fact that it deems relevant to sentencing. *See, e.g.,United States v. Greene,* 249 F.Supp. 2d 262 (S.D.N.Y. 2003) (defendant who had pled guilty to tax charges and faced incarceration in accord to the Federal Sentencing Guidelines was

10

sentenced to three years of probation because of his civic and public service, the health needs of his family, and the nature of the charges.); *United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (affirming downward variance based on judge's own "sense of what is fair and just" and defendant's "education, emotional condition, favorable employment record, family support, and good record on state probation"); *United States v. Ortiz*, 213 F. App'x 312, 317 (5th Cir. 2007) (holding that the district court properly considered, among other factors, defendant's lack of criminal history, family responsibilities with aging parents and children in his care, services in the armed forces and his stable work history); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Consideration of the sentencing factors should counsel the Court to a sentence well below the applicable Guideline range.

### a. The Nature and Circumstances of the Offense

Section 3553(a)(1)(A) requires a sentencing judge to consider "the need for the sentence imposed…to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Counts have traditionally treated

this consideration as the punitive or retributive component of the sentencing factors.

*United States v. Miller*, 643 F.3d 841, 844 (5th Cir. 2011).

Sentencing that is excessive in light of the seriousness of the offense promotes disrespect for the law and provides unjust punishment. *United States v. Zavala*, 300 F. App'x 792 (11th Cir. 2008). In that regard, the offense may be more or less serious depending on "the community view of the gravity of the offense" or the "public concern generated by the offense." 28 U.S.C. 924(c)(4),(5). Indeed, Congress has recognized that "community norms concerning particular criminal behavior might be justification for increasing or decreasing the recommended penalties for the offense." *See* S. Rep. No. 98-225 at 170 (1983). The Second Circuit has looked to community norms in approving variances from Guidelines calculations. *See, e.g., United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008).

The defense concedes that the sex trafficking and narcotics trafficking are serious offenses. But there are several factors unique to Mr. Gerace's case that mitigate the seriousness of the conduct.

First, the purported sex trafficking victims chose to work at PGC, chose to use narcotics, and chose to engage in commercial sex acts, demonstrating significant decision making and autonomy in the choices they made. PH testified she chose to start using drugs and chose to start a sexual relationship with Gerace with full knowledge

and understanding of what she believed would happen; AA2 was addicted to narcotics before her employment at PGC, and throughout her time working there she continued to choose to engage in commercial sex transactions and related relationships wholly independent of Gerace or PGC; KA's addiction pre-dated her employment at PGC, and her testimony confirmed she worked at PGC of her own volition because of the money available to dancers at the club; KL testified that her relationship with Gerace was consensual and romantic, and she never engaged in a commercial sex transaction; LL chose to work at PGC on several occasions when she was clear headed and not addicted to substances, and she chose to engage in commercial sex acts/prostitution outside of PGC of her own volition while she continued to work at the club; GR interpreted the phrase "take care of my friend" as an invitation to engage in sex, but then chose to continue a commercial sex relationship with that individual several occasions throughout the following summer wholly independent of PGC or Mr. Gerace.   Further, each of the above individuals testified that they made choices, even when they were addicted to narcotics.

More notably, every dancer who testified at trial testified that their demeanor and presentation signaled to potential customers, management, and Mr. Gerace that they were interested in doing their job without representing that they were unhappy or dissatisfied with the lifestyle they were leading.  To the contrary, many of the dancers at

trial testified that employment at PGC provided them with compensation far beyond what they could be paid doing other work.

The fact that the purported victims made choices leading to and ratifying the lifestyle they chose diminishes the seriousness of the alleged misconduct. So too does Mr. Gerace's perception of the purported victims throughout the alleged criminality.

Second, the conduct at issue in this case is commonplace in the strip club community. Countless witnesses, including RA and GR, testified that narcotics use and commercial sex acts are widespread in strip clubs across the county; narcotics users Jeff Anzalone and John McDonald testified they used drugs not only in PGC, but also in every other bar and restaurant they went to party in the relevant period. While community norms are not a defense to the wrongdoing, they diminish the seriousness of the allegations.

### b. Deterrence to Criminal Conduct

Section 3553(a)(2)(B) requires the sentencing court to consider "the need for the sentence imposed…to afford adequate deterrence to criminal conduct." Courts consider both specific and general deterrence in this regard.

With regard to general deterrence, the defense believes the unique facts of Mr. Gerace's case, and the publicity the case has garnered, have already served the role of general deterrence. This case has witnessed a very public prosecution of a high-profile

business and businessman in our region.  The alleged misconduct in this case is far

different than the type of behavior the statutes at issue are usually employed to target.

The fact that an entrepreneur in the adult entertainment industry can be prosecuted and

jailed for the type of behavior at issue in this case serves as a wake-up call to other

people in the industry throughout the country.  The goal of general deterrence has

already been satisfied.

As to specific deterrence, the defense notes two uncontroverted facts.  First, the

specific circumstances of this prosecution have already exacted significant consequences

upon Mr. Gerace, making it unlikely (if not impossible) that he engages in similar

conduct in the future.  The prosecution has left him penniless and homeless.  It has left

him without his business.  It has exacted significant damage to his mental and

emotional well-being.   It has left him largely alone, with many former friends refusing

to speak or associate with him.  These are appropriate factors to consider when

discussing specific deterrence under the sentencing factors.

What is more, well-settled empirical research shows that lengthier sentences do

not have any greater deterrent effect, either on individuals or on society at large.

"Three National Academy of Science panels…reached that conclusion, as has every

major survey of the evidence." Michael Tonry, PURPOSES AND FUNCTIONS OF

SENTENCING, 34 Crime and Justice: A Review of Research 28-29 (2006).  In studies, no

difference value has been found, even in the difference between probation and

15

incarceration.  See David Weisburd et. al, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

The Sentencing Commission itself has found that "there is no correlation between recidivism and Guidelines' offense level.  Whether an offender has a low or high Guidelines offense level, recidivism rates are similar.  While surprising at first glance, this finding should be expected.  The Guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. SENTENCING COMM'N, MEASURING RECIDIVISM THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES, at 15 (2004).

### c.  Protection of the Public from Further Crimes of the Defendant

Section 3553(a)(2)(C) requires the sentencing court to consider "the need for the sentence imposed…to protect the public from further crimes of the defendant."  This purpose relates to both the defendant's risk of recidivism and the danger, if any, posed by the defendant.  *See United States v. Rosales-Gonzales*, 801 F.3d 1177, 1184 (9th Cir. 2015).

The behavior Mr. Gerace engaged in that led to the prosecution in this case stems from the intersection of three factors:  Mr. Gerace's failure to maintain his mental health; Mr. Gerace's failure to control his substance abuse; and Mr. Gerace's proximity to the strip club industry.  As a result of this prosecution and the collateral consequences of this prosecution, it is unlikely – if not impossible – that Mr. Gerace can

16

engage in the same course of conduct in the future.  He will engage in mental health

and substance abuse treatment throughout incarceration and after incarceration

through any period of supervised release; he will doubtlessly be precluded from the

strip club industry, either by virtue of an Order of the Court or from the practical

realities attendant to this high-profile prosecution and the closing of his business.

Beyond the fact that Mr. Gerace wishes to leave this lifestyle behind and wants to

appropriately manage his mental health, Mr. Gerace will not reoffend because the facts

and circumstances of this case make it impossible for him to reoffend, regardless of the

period of incarceration imposed.

IV.    **The Sentencing Guidelines are not an Appropriate Starting Point for
       Sentencing Analysis**

While courts are bound to consider the Sentencing Guidelines, the district court

cannot impose a sentence that is greater than necessary to accomplish the goals set forth

in Section 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 91 (2007).  This "parsimony

principle" often leads sentencing courts to determine that the sentencing range

recommended by the Guidelines is too high.  *See, e.g., United States v. Mendoza*, 543 F.3d

1186 (10th Cir. 2008); *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008).

At times, the Second Circuit has gone so far as to hold that application of a

Guideline sentence in sexual offense cases is itself unreasonable.  *See United States v.

Jenkins*, 854 F.3d 181 (2nd Cir. 2017). (The Second Circuit vacated and remanded the

defendant's 225-month sentence for possession and transportation of child pornography. Notwithstanding the fact that the sentence imposed was within the properly calculated guideline range, the court held that the term of imprisonment was "shockingly high" and the conditions of the 25-year term of supervised release were "excessively severe."); *see also United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). (The Second Circuit vacated the within-guideline sentence of 20 years, finding it procedurally and substantively unreasonable. In pertinent part, the Second Circuit stated that in keeping with *Kimbrough*, "a district court may vary from the [g]uidelines range based solely on a policy disagreement with the [g]uidelines, even where that disagreement applies to a wide class of offenders or offenses.").

Cases across the country support the proposition that application of the Sentencing Guidelines in cases of sex trafficking conspiracy are too harsh and should result in a sentence far less than what the Guidelines contemplate for Mr. Gerace. *See, e.g., United States v. Guity-Nunez*, 2021 U.S. App. LEXIS 37473 (3d Cir. 2021) (affirming a sentence of 180 months, a term 40% lower than the applicable Guideline range, for conspiracy to engage in sex trafficking where the defendant was accountable for trafficking two minor victims); *United States v. Capone*, No. 3-15-214, 2025 WL 3062737 (M.D. Pa. Nov. 3, 2025) (Capone pleaded guilty to distribution and possession with intent to distribute "molly" (MDMA), in violation of 21 U.S.C. §841(a)(1), and conspiracy to commit sex trafficking by force and coercion, in violation of 18 U.S.C. §1594(c). The

court sentenced Capone to a term of imprisonment of eighty-four months on both charges, to be served concurrently, followed by five years of supervised release.); *United States v. Ellis*, 2023 U.S. Dist. LEXIS 202545 (E.D. La. 2023) (Ellis pleaded guilty to one count of conspiracy to commit sex trafficking in violation of 18 U.S.C. § 371 and one count of transportation for prostitution in violation of 18 U.S.C. § 2421. Ellis was sentenced to 180 months' imprisonment.).

That is the case here. In aggregate, the Sentencing Guidelines contemplate life incarceration, principally driven by the application of the Guidelines attendant to the conviction on Count 5, Conspiracy to Commit Sex Trafficking. But strict application of the Guidelines overstates the conduct at issue in this case. Accepting the government's position as true, the most serious allegations in this case are – at their core – are about sex and drugs at and conceptually adjacent to a strip club. They involve a select subset of dancers and customers in a business that employed *thousands* of dancers and saw perhaps *tens of thousands* of customers in the timeframe the government chose to focus on. It involves drug use by people who knowingly and voluntarily engaged in drug use. And it encompasses commercial sex acts where in each instance the purported victim demonstrated a high degree of choice and decision-making, both in the conduct that brought them to that point and in engaging in the commercial sex act itself.

19

This is not a case where the appropriate sentence comes from application of the Guidelines Range.   The Court should determine that the Guidelines Range overstates and over penalizes the misconduct in this matter.

### V.     Issues of Intent and Perception Should Counsel to a Non-Guideline Sentence

In the defense's view, the misconduct at issue came from the intersection of several factors.

First, Mr. Gerace's childhood sexual trauma, and the fact he never appropriately managed that trauma, doubtlessly impacted his decision-making and his perception of sexual boundaries, including those of the purported victims.  Studies demonstrate the victims of childhood sexual abuse link to problematic sexual patterns in adulthood, including sexual compulsivity and the misunderstanding of sexual boundaries. [3] These patterns cause difficulty understanding consent, desire, boundaries and limitations.[4] Consistent with Mr. Gerace's diagnosis for PTSD, child sexual abuse survivors often

---

[3] Vaillancourt-Morel MP, Godbout N, Sabourin S, Briere J, Lussier Y, Runtz M. Adult Sexual Outcomes of Child Sexual Abuse Vary According to Relationship Status. J Marital Fam Ther. 2016 Apr;42(2):341-56. doi: 10.1111/jmft.12154. Epub 2016 Jan 25. PMID: 26804731.

[4] Barker GG, Volk F, Hazel JS, Reinhardt RA. Past is present: Pathways between childhood sexual abuse and relationship satisfaction. J Marital Fam Ther. 2022 Apr;48(2):604-620. doi: 10.1111/jmft.12522. Epub 2021 Apr 23. PMID: 33890687.

show inappropriate sexual behavior with a difficult to maintaining appropriate boundaries with others.[5]

Childhood abuse is well recognized as a reason to depart downward in this regard.  "It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens."  *Santosky v. Kramer*, 455 U.S. 745, 789 (1982); *see also United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions.").  As a result, courts often grant downward variances and sentencing reductions where a defendant was victimized as a child.  *See, e.g., United States v. Walter*, 256 F.3d 891 (9th Cir. 2001) (finding that defendant's childhood sexual abuse at the hands of his cousin warranted a downward departure).

Mr. Gerace's substance abuse, which the defense believes is linked to his childhood sexual trauma, further impacts this understanding and behavior.  It is well-understood that people turn to substances to manage trauma.  The use of cocaine is linked to increased risk-taking, difficulty maintaining boundaries, and difficulty

---

[5] Krause-Utz, A., Dierick, T., Josef, T. *et al.* Linking experiences of child sexual abuse to adult sexual intimate partner violence: the role of borderline personality features, maladaptive cognitive emotion regulation, and dissociation. *bord personal disord emot dysregul* **8**, 10 (2021). https://doi.org/10.1186/s40479-021-00150-0

21

understanding others.  Cocaine lowers inhibition, and trauma blurs the understanding of what is appropriate.  Both impair perception.

With regard to PGC, those factors coincided with the environment of the strip club – a place where women are paid and have a financial incentive to express sexual desire and personal connection.  It is noteworthy that, throughout the course of the trial, none of the purported victims (and, indeed, none of the former dancers) testified that they ever indicated to Mr. Gerace (or anyone else) that they did not want to perform the acts they were already performing.  Stated another way, within the unique facts and circumstances of Mr. Gerace's world, all available data indicated to him that he was surrounded by people who were deliberately choosing to lead a sexually charged party lifestyle – whether for their personal financial benefit or personal gratification.

The law is clear.  Courts may vary from the Guidelines where a defendant engages in criminal conduct without an explicitly criminal purpose or understanding. *See, e.g., United States . Frappier*, 377 F. Supp.2d 220 (D.Me. 2005) (imposing a sentence of twenty months where the Guidelines recommended forty-one to fifty-one months for being a felon in possession of a firearm based, in part, on the conclusion that the defendant did not possess the weapons for an illegal purpose but rather to teach sons how to use rifles); *United States v. Samuels*, 2009 WL 875320 (S.D.N.Y. Apr. 2, 2009) (time served rather than Guidelines range of seventy to eighty-seven months for younger defendant who did not tell family about drug sales but engaged in drug sales to

22

support her family and loved ones); *United States v. Handy*, 2008 WL 304899 (E.D.N.Y. Aug. 4, 2008) (court imposed below Guidelines sentence on gun case where evidence demonstrated defendant did not believe the firearm was operable).

This analysis is appropriate in evaluating Mr. Gerace's case.  The misconduct at issue here may be objectionable; but from Mr. Gerace's perspective, as confirmed by the testimony at trial, it was conduct that was engaged in by consenting, intelligent adults who made deliberate decisions.

## VI.    The Misconduct is Outside the "Heartland" of Conduct Reflected in the Guidelines

A court may depart downward where aggravating or mitigating circumstances are present that the Guidelines do not adequately take into consideration.  18 U.S.C. 3553(b)(1).  Departures may be appropriate when factors "that have not been given adequate consideration by the Commission" are present, or when, "in light of the unusual circumstances, the weight attached to that factor under the Guidelines is inadequate or excessive." *Rita v. United States*, 551 U.S.338 (2007) (sentencing court may disregard the Guidelines where the case falls outside the "heartland" of cases to which the Commission intends individual Guidelines to apply).

The defense believes that is the case here.  The goal of the federal sex trafficking statute – and the images the conviction conjures in the mind – call to mind instances of forced prostitution, violence, and the deliberate exploitation of minors.  Drug trafficking

conspiracies tend to demonstrate systematic, high-quantity, highly organized and repetitive narcotic activity for profit.  Even accepting the government's gloss on the proof at trial, this case is neither.

Because the case is atypical of the conduct the law seeks to criminalize, the Court should not look to the Guidelines when imposing an appropriate sentence.   Rather, the Court should see the alleged misconduct for what it is.  The Court should impose a sentence that is far below the Guidelines range.

## VII.    Investigative and Prosecutorial Misconduct

Where the government has engaged in misconduct that resulted in prejudice to the defendant, a sentencing court may depart or vary downward.  *See, e.g., United States v. Nolan-Cooper*, 155 F.3d 221 (3d Cir. 1998); *United States v. Lopez*, 106 F.3d 309, 311 (9th Cir. 1997).  This is consistent with the Court's mandate to ensure that "legal proceedings appear fair to all who observe them." *Wheat v. United States,* 486 U.S. 153, 160 (1988). The government's actions fall into different categories, but it had the same goal: to disrupt Mr. Gerace's ability to mount a defense and to prevent Mr. Gerace from defending the 19-cr-227 trial.[6]

---

[6] Many instances of the government's misconduct were raised in pretrial motion practice.  *See, e.g.*, Docket Items 515, 979.  The defense incorporates those arguments into the record on this issue.

24

The government's misconduct falls into several categories. At a minimum, Mr. Gerace believes the government engaged in misconduct in: improperly seizing and searching his cell phone at the U.S. border; utilizing administrative tax warrants to conduct a search of PGC and seizure of PGC records; arresting Mr. Gerace in Florida when it knew he was returning to New York and was in touch with Mr. Gerace's counsel and could have arranged for surrender in Buffalo; relying upon the testimony of KN after the government expressed its belief that her grand jury testimony was at times untruthful; deliberately seeking to incarcerate Mr. Gerace immediately before his initial trial date to prevent him from assisting his attorneys in preparing for trial; repeatedly attacking Mr. Gerace's counsel; charging witnesses listed on the defense witness list; paying witnesses who testified on the government's behalf in the 19-cr-227 trial; improperly linking Mr. Gerace to the conduct of his brother, Anthony Gerace; eliciting testimony from LL at trial that was directly contradicted by witness AA1 and therefore could not have been truthful; going out of its way to use the terms Italian Organized Crime and Mafia throughout pleadings, court appearances and trial in efforts to influence the media; and improperly using the delay of trial due to the government's attacks on counsel to cultivate "jailhouse snitch" witnesses.

The defense believes the misconduct deprived Mr. Gerace of his fundamental right to a fair trial and several important Constitutional rights. Without question, the

government's deliberate decisions impacted the 19-cr-227 prosecution and trial in a way that was unfair to Mr. Gerace.  Some of those issues are set forth below.

### a. The government's Efforts to Prevent Mr. Gerace from Calling Key Witnesses at Trial

In the lead up to a trial date set for August, 2023, and in an effort to preserve his right to call individuals who may provide helpful testimony at trial, Mr. Gerace provided a witness list of potential trial witnesses.  Docket Item # 529.  The government used the witness list as a basis for charging decisions, charging individuals who would have provided Mr. Gerace with helpful, exculpatory testimony with federal crimes to make the witnesses unavailable to the defense.   Indeed, in the recent trial of Amherst Detective Gregory Trotter, federal agent testimony acknowledged that the Gerace witness list was a basis for law enforcement investigation.

### i. Brian Rosenthal

One such witness was Brian Rosenthal.  After Mr. Rosenthal was listed on the defense witness list in June 2023, he was indicted on September 14, 2023.  *See* W.D.N.Y. Case No. 23-cr-102 at Docket Item 1.  The indictment charged Mr. Rosenthal and another individual with Conspiracy to Commit Sex Trafficking, False Statements to the Grand Jury and Misprison of a Felony for conduct going back to 2013, several years prior to the filing of the defense witness list. id. at p. 1-4.  At the September 28, 2023 detention hearing, the government moved for detention relying primarily on

"allegations regarding a related case, 19-cr-227, which is a second superseding indictment charging Joseph Bongiovanni and Peter Gerace." id. at Docket Item.# 43, p. 6.  Following that introduction, the bulk of the government's proffer in support of its efforts to detain Mr. Rosenthal stemmed from his employment at Pharoah's and allegations of misconduct at that business.  id. at pp 8-12.   The allegations went back several years, and the government's proffer included facts it had learned through the investigation of Mr. Gerace's case.  id.

The government's proffer also noted that Mr. Rosenthal had been interviewed by the FBI and that he was what the government characterized as a "loyalist," someone who "denied any illegal activity happened."  Id. at pp 11-12.   The government's detention proffer wholly dismissed the possibility that no illegal activity occurred at Mr. Gerace's club or that a witness like Mr. Rosenthal would be unaware of illegal activity, instead arguing that any witness who, like Mr. Rosenthal, denied illegal activity was either "lying, scared, timid, embarrassed, or outright fearful."[7]  id.

If Mr. Rosenthal had not been charged with a federal crime, he would have provided helpful and exculpatory testimony to Mr. Gerace in the 19-cr-227 trial.  His testimony would have rebutted government allegations of prostitution, coercion and

---

[7] The government's proffer is noteworthy.  From the time of Mr. Rosenthal's detention proffer it was clear to everyone that the government viewed any testimony that supported Mr. Gerace as the testimony of someone who was "lying, scared, timid, embarrassed, or outright fearful" – in other words, untruthful and potentially subject to federal charges.

27

drug use.  Because of his history and place in the club, there is no other individual who would have been able to provide the same testimony to Mr. Gerace at trial.  Perhaps most importantly, Mr. Rosenthal would have been a critical witness in rebutting the allegations of LL, government's Protected Witness #1 and the final non-agent witness the government called at trial, about acts that took place in the VIP area of the club.  LL's testimony accused Mr. Rosenthal of looking the other way and accepting bribes to allow sex acts inside the club.

After Mr. Gerace's trial was concluded, Mr. Rosenthal pled guilty to a single count superseding information of making a false statement to a federal agent in violation of 18 U.S.C. 1001 – a major charge reduction from the charges he was facing in the indictment. Id. at Docket Item 97.   Mr. Rosenthal was sentenced to one year probation.  Id. at Docket Item 121.

### ii.  Amherst Detective Gregory Trotter

Having sat through several trials relating to PGC, the Court is well-aware of the amount the government relied on the testimony of Mr. Gerace's ex-wife, KN, who is the only witness who alleged that Mr. Gerace was running a high-end brothel in the upstairs portion of PGC and who was the only witness to allege payments to former DEA agent Bongiovanni.  The Court is also well-aware of the unreliable, changing nature of that testimony.

The most critical witness to rebut allegations made by KN was Amherst Police Detective Gregory Trotter, who investigated and arrested KN on several occasions and who, through the course of his police work, determined that her allegations against Mr. Gerace were both malicious and uncredible. Amherst Detective Gregory Trotter interacted with KN on several occasions prior to 2019 when he was called upon to investigate allegations KN made against Mr. Gerace. Those allegations were unsubstantiated. They resulted in KN being charged for her misconduct. Key to those charging decision was the clear falsity of the allegations.

To preserve the right to call Detective Trotter, his name was included on the Gerace witness list filed in June 2023. Before the witness list was filed, the government interviewed Detective Trotter in September 2022. At the time the defense filed its witness list, the government had not charged Detective Trotter in any way. The government was well-aware of not only Detective Trotter's September 2022 interview with federal law enforcement, but also with the content of his text messages with Mr. Gerace that would later give rise to the charges against him. At a March 27, 2023 detention proffer, the government quoted from those text messages and summarized its view of Detective Trotter's relationship with Mr. Gerace. *See* W.D.N.Y. Case No. 23-cr-37, Docket Item #6 at p. 12-13.

Despite having been aware of Detective Trotter's interview and the content of his text messages for at least several months, the government did not charge Detective

29

Trotter until November 28, 2023, on the eve of a trial date in the 19-cr-227 case, when the government charged Detective Trotter by way of criminal complaint alleging that Detective Trotter had made false statements to law enforcement in the September 30, 2022 interview.[8]  *See* W.D.N.Y. Case No. 23-mj-1173 at Docket Item # 1, para. 22.

Detective Trotter was subsequently indicted, and his case proceeded to trial on September 2, 2025.  *See* W.D.N.Y. Case No.: 24-cr-60 at Docket Item 109.  In the course of the trial, government agent testimony acknowledged that the Gerace witness list was a basis for investigation and charging decisions.  At the conclusion of the trial, the jury was deadlocked. The Court declared a mistrial.

Following the mistrial, Detective Trotter moved for a Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  On January 9, 2026, the Court issued a Decision and Order finding that the government provided insufficient evidence as to two of the three allegedly false statements that formed the basis of the Indictment against Detective Trotter.

Following the Court's decision, Detective Trotter pled guilty to a single count superseding information charging him with a misdemeanor in violation of 18 U.S.C.

---

[8] Issues with the government's reliance on the testimony of KN are addressed in Mr. Gerace's Objections to the Presentence Investigation Report and prior motion practice.

111(a)(1), Impeding or Interfering with a Federal Officer.  id. at Docket Item 161.

Detective Trotter is currently awaiting sentencing.

### iii.  Jessica Leyland

Throughout the 19-cr-227 trial, the government elicited testimony regarding Ms. Leyland allegedly placing PH in a headlock at a local bar at a time after it was known that PH had discussed some of the allegations in the 19-cr-227 case with federal agents. Though Mr. Gerace was not charged with Ms. Leyland's alleged assault on PH, the government elicited testimony suggesting the assault was carried out at Mr. Gerace's direction and was part of a campaign to intimidate PH from cooperating with law enforcement. There was also repeated testimony about Ms. Leyland's alleged conduct within PGC, to include drug sales going as far back as 2012.

If called to testify at trial, Ms. Leyland would have made clear, in explicit terms, that her interaction with PH had nothing to do with Mr. Gerace and everything to do with her own personal animus against PH.  Ms. Leyland would have also been able to rebut government allegations regarding the sale of controlled substances within PGC. Indeed, government memoranda shared with the defense team in the lead up to trial confirms that, if asked, Ms. Leyland would have provided helpful and exculpatory testimony to Mr. Gerace.

Mr. Gerace was not able to elicit that testimony at trial, however.  Long after the government was aware of the altercation with PH, and after Ms. Leyland was placed on the defense witness list, Ms. Leyland was charged as a result of her interaction with PH. *See* W.D.N.Y. Case No.: 24-cr-113 at Docket Item 1.  Due to the pendency of that case, Ms. Leyland's testimony was not available to Mr. Gerace in the 19-cr-227 trial.  Of note, in pleading guilty in that case, Ms. Leyland took sole responsibility for her actions against PH, without any attribution or allegation of involvement by Mr. Gerace.  id. at Docket Item 39.

### iv.  John Ermin

For over a decade, Mr. Ermin was an employee and general manager of PGC, tasked with hiring/firing employees, monitoring the activities of dancers and management, and ensuring that PGC dancers were not engaging in acts that violated PGC's policies.  Critically, Mr. Ermin monitored PGC's camera system on a regular and systematic basis.  The Gerace defense anticipated Mr. Ermin's testimony would rebut allegations made by the government that PGC management was instructed to allow or condone commercial sex acts, drug use, and other activities that violated PGC policies.

As the Court knows, after Mr. Ermin was placed on the Gerace defense list, he was charged in W.D.N.Y. Case No.: 23-cr-99 with conspiracy to obstruct justice.  The

pendency of that case deprived Mr. Gerace from being able to call Mr. Ermin at the 19-cr-227 trial.

### v. The government's Charging Decisions Interfered with Mr. Gerace's Right to Present a Defense

As was set forth in prior briefing, the defense believes the government's charging decisions deprived Mr. Gerace of his fundamental right to present a defense.

"The Sixth Amendment guarantees criminal defendants the right to present a defense, which includes a right to call witnesses." *Rigas v. United States*, No. 02-CR-1236, 2020 U.S. Dist. LEXIS 86850, 2020 WL 2521530, at *22 (S.D.N.Y. May 15, 2020) (citing *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000)), aff'd, 848 F. App'x 464 (2d Cir. 2021). "It is elementary that criminal defendants have a right to establish a defense by presenting witnesses." *See Webb v. Texas*, 409 U.S. 95, 98, (1972). The right to establish a defense by presenting witnesses serves the truth-seeking function of the trial process by protecting against the dangers of judgments "founded on a partial or speculative presentation of the facts." *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000).

"A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense -- a right to his day in court -- are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel. " *In re Oliver*, 333 U. S. 257, 273 (1948)(emphasis added). "Few rights are more fundamental

than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). "[J]udicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." *Williams*, 205 F.3d at 29.

The government's decisions to charge Mr. Gerace's witnesses unfairly shaped the evidence in the 19-cr-227 trial. The Court witnessed the government's targeted efforts to eliminate Gerace witnesses first hand at the Trotter trial. The Court should take that into account in fashioning an appropriate sentence in this case.

### b. Payment to Trial Witnesses

While the government engaged in a campaign to charge key defense witnesses, it also started making payments and providing other benefits to government witnesses to "secure" their testimony. W.D.N.Y. Case No.: 19-cr-227 at Docket Item 1494 at pp 20-30. At trial, it was revealed that key government witnesses LL, KL, PH, KN received compensation and significant benefits in contemplation of their trial testimony in the 19-cr-227 case.

For instance, LL received direct cash payments, assistance obtaining housing (on multiple occasions), assistance obtaining public benefits, assistance to her significant other in obtaining employment, assistance in obtaining a car and paying car insurance

among other benefits. At one point during the trial, the government represented LL had received over $30,000 in benefits from the government in contemplation of her testimony. *See* Transcript December 13, 2024 at p. 10.

PH received rent payments and direct cash payments on several occasions, which she acknowledged at trial she had used to purchase drugs and for other improper purposes. *See, e.g.*, W.D.N.Y. Case No.: 24-mj-1116 at Docket Item 12.

KL received direct cash payments and assistance in obtaining housing, with the assistance coinciding with times when her allegations against Mr. Gerace became more wide-ranging and more serious. *See, e.g.,* Docket Item 1471 at p. 86.

Finally, KN received direct cash payments, purportedly for rent and other living expenses. The government furnished KN with payments even though it acknowledged the severe credibility issues in her testimony.

The government's misconduct in this regard is clear. In making charging decisions and choosing to pay witnesses, the government rewarded witnesses who supported the government's version of events while seeking to incarcerate those who supported Gerace, making it clear it viewed any witness that would provide exculpatory testimony to Mr. Gerace as a criminal target. The government's payments to witnesses undoubtedly influenced their testimony in a manner that, had Mr. Gerace

similarly paid witnesses, would have made Mr. Gerace or his defense team the subject

of accusations of obstruction of justice or witness tampering.

It is not possible to take stock of the complete record in this case without taking

account of the government's payment to critical witnesses.  And that analysis should

lead the Court to determine that Mr. Gerace is worthy of leniency.

### c.  Attacks on the Gerace Defense Team

More than any other case in our Courthouse, the government repeatedly attacked

Mr. Gerace's attorneys and related professionals.  The government engaged in those

attacks by ignoring the law and well-settled facts.  They also engaged in those attacks

without regard to Mr. Gerace's Sixth Amendment Right to counsel or principles of

fundamental fairness.  At times, the Court noted that the government's actions were so

serious that they threatened to infringe upon the rights of every criminal defendant in

our district.  *See* Docket Item 825 at 1.   It's important that the Court recall this

misconduct in considering the proof and the verdict in the 19-cr-227 trial.

### i.  Conduct Attacking Mr. Gerace's First Attorney, Joel Daniels, Esq.

As the Court knows, the conflict that led to motion practice and the ultimate

withdraw of Mr. Gerace's first attorney, Joel Daniels, came from the testimony of

witness KN – a witness whose uncredible testimony was the subject of motion practice

and, indeed, the basis for entering a judgment of acquittal against former co-defendant Bongiovanni after his first trial.

In that regard, the government did not dispute that when witness KN provided the testimony that formed the basis for the purported conflict, federal prosecutors found those allegations so uncredible that the prosecutor handling the grand jury presentation tried to alter her testimony and correct the clear error.  Docket Item.# 1001 at 10-11.  The government also did not dispute that the government found the allegations regarding Attorney Daniels to be so uncredible they did not intend to raise them to the Court for any conflict analysis and only did so because the issue was "flagged" by Judge Sinatra's law clerk.  Docket Item 1001 at 11.  The government also did not dispute that, in stark contrast to the manner the government handled the conflict regarding Attorney Soehnlein, once Judge Sinatra had oriented the government to the allegations about Attorney Daniels, the government informed Attorney Daniels of the allegations so that he could respond.  Docket Item 1001 at 11-12.  And the government did not dispute that, understanding the nature of the potential conflict, the government affirmatively reached out to the witness whose testimony they relied upon "to review or clarify" her testimony.  Docket Item 1001 at p. 12.

Indeed, because the government did not find the allegations credible, the government had agreed "not to elicit testimony about Mr. Daniels from the witness." Id. at p. 13.  Ultimately, due to the fact that the government intended to persist in

37

presenting testimony from a witness with such questionable credibility, Mr. Gerace was forced to forfeit his right to counsel of his choosing in order to ensure testimony to rebut KN's unsupported, clearly false allegations.

### ii. Subpoenaing of a Defense Investigator

The government's attacks on the Gerace defense team extended to the targeting of a defense investigator in the 19-cr-227 case.

On October 31, 2023, the United States Attorney's Office for the Western District of New York issued a grand jury subpoena seeking documents and testimony from Paul Lawrence, an individual Mr. Foti and Mr. Soehnlein had been told by previous counsel was Mr. Gerace's investigator in three criminal cases in this federal district court: 19-cr-227; 23-cr-37; and 23-cr-60.

The subpoena was served upon Mr. Lawrence on November 1, 2023.  Counsel communicated with the United States Attorney's Office, indicating their belief that Mr. Lawrence had been retained by prior counsel to work for the defense team.

Mr. Gerace made a motion to quash the subpoena on November 7, 2023.  Judge Arcara ruled that Mr. Lawrence should testify in the grand jury and provide the United States Attorney's Office with his recording of an interview with two witnesses.  As part of earlier sanctions briefing, the Court indicated it was reviewing the content of AUSA Tripi's *ex parte* proffer to Judge Arcara to determine whether or not the government's

representations to Judge Arcara are sanctionable.  To date, that motion remains unresolved.

As the Court knows, part of the content of that tape would later lead to the allegations against Attorney Soehnlein – allegations based on statements by Mr. Lawrence using terms "them" and "they" in an ambiguous way that likely did not encompass Soehnlein.

The government came into possession of that tape at the same time Mr. Lawrence testified in the grand jury.  The defense believes Mr. Lawrence's counsel and the content of his testimony before the grand jury made clear that Mr. Lawrence was part of the Gerace defense team.  By its admission, the government listened to the tape shortly after the testimony, weeks before it chose to file the motion to disqualify Attorney Soehnlein.  At no time did the government follow up with Mr. Lawrence and ask about his statements captured on the tape.  Instead, the government made an *ex parte* and sealed motion to disqualify counsel approximately two weeks later.

The intrusion into the defense team to obtain privileged materials is the subject of ongoing motion practice in companion case *United States v. Gogolack*, et.al., 23-cr-99. It was, without question, improper, intruding upon Mr. Gerace's right to investigate his case and elicit testimony from an agent of the defense team who may have provided exculpatory evidence or testimony at the 19-cr-227 trial.

### iii. The government's Repeated Attempts to Disqualify Attorney Soehnlein

The government's efforts to disqualify Attorney Soehnlein spanned months. It encompassed two motions to disqualify, several successive briefings, and consistently shifting theories on the part of the government for why Mr. Gerace should not be entitled to the attorney of his choice. While there is not sufficient time, space, nor appetite to rehash the government's unwarranted attack on counsel, the government's misconduct in that regard should not be forgotten when evaluating the totality of the record in this case.

Beyond the fact that the government obtained the evidence that gave rise to the allegations improperly, the Court should not forget that, at any time, the government could have sought clarification of the statements at issue – made by a personal without personal knowledge who used the term "they" in a way that could have potentially included Attorney Soehnlein – yet the government chose not to seek such clarification.

Instead, the government moved, *ex parte*, to disqualify Attorney Soehnlein on November 21, 2023. Docket Item 666. From the outset, the Court questioned the government's motives for bringing the motion. The Court disagreed with the government's suggestion that it was somehow "duty bound" to bring the motion. Docket Item 679 at 11. At the front of the Court's mind was the contrast between the facts and the facts in *United States v. Fulton*, 5 F.3d 605 (2d Cir. 1993), the case primarily

relied upon by the government. Unlike the circumstances in the 19-cr-227 case, *Fulton* was a case where the allegations came from a trial witness who had met with the government and made direct allegations against defense counsel based on personal knowledge.   Stated another way, *Fulton* (and its progeny) required the government to have credible evidence before raising the conflict.

At a status conference held December 8, 2023, the Court advised that it "want[ed] [defense counsel] to have everything that they need to know about the disqualification motion so that they can weigh in on that," rejecting the government's assertion that the matter had to be litigated *ex parte.*  Docket Item 688 at 5. The government acknowledged this directive as an affirmative obligation to share information, filing a supplement to its revised motion to disqualify Attorney Soehnlein on January 9, 2024.  Docket Item 711 at p. 2.

The Gerace defense team filed its response to the motion on February 20, 2024. Docket Item 771.  In its motion, the Gerace defense team pointed out that, in bringing the motion to disqualify, the government had failed to acknowledge the full content of 18 U.S.C. 1503, the statute the government relied upon in making threats against Attorney Soehnlein.  In that regard, the government did not cite subsection (c) of the statute, the attorney safe harbor provision.

On April 25, 2024, this Court denied the government's motion to disqualify Attorney Soehnlein, holding "…that a defense attorney's putting the name of an individual who has been disclosed in the government's discovery on a witness list—regardless of the intent behind it—is as a matter of law not obstruction of justice under 18 U.S.C. § 1503. Rather, such conduct constitutes 'lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding' and is therefore protected by the safe harbor of 18 U.S.C. § 1515(c)." Docket Item 889 at p.1-2.  In its decision, the Court emphasized that, if the government's attack on defense counsel were permitted on these facts and in this case, it would risk the "rights of all defendants in this District and beyond to the effective assistance of counsel—and by extension this Court's obligation to preserve the fairness of its criminal proceedings." Id.  Also in its decision, the Court questioned the veracity of the government's assertion that it had "just missed" subsection (c) of the relevant statute, stating: "this Court has serious concerns about the fact that in a brief accusing a well-respected member of the bar of a crime, no supervisor at the United States Attorney's Office noticed the omission of a legal provision that could absolve him."  Id at n. 16.

The matter seemingly resolved, the government chose to move to disqualify Attorney Soehnlein a second time.  On May 6, 2024, the government filed a second motion to disqualify Attorney Soehnlein, using the same factual predicate as the first motion, but arguing that it now "analyzes the facts through the actual and potential

conflict rubric, as opposed to through a per se conflict rubric." Dkt. # 925 at p. 2. The government makes no proffer as to why the arguments in the current motion to disqualify could not have been advanced in the first motion to disqualify Attorney Soehnlein or why the government brings this second motion now in a further effort to delay Mr. Gerace's trial.

The government's second motion to disqualify misstated and omitted critical facts and failed to cite controlling law. It also advanced an argument contrary to well-settled law and Department of Justice policy. In the defense view, it was based on a misreading of the law and rank speculation. The motion was ultimately denied, and a lengthy *Curcio* process followed.

The government's efforts to disqualify counsel were not without prejudice to Mr. Gerace. The motion practice delayed the trial date in the case by ten months. In those ten months, the government cultivated jailhouse informant witnesses, who later testified against Mr. Gerace in the 19-cr-227 trial. It also provided time for the government to indict the *Gogolack* case, pursuing theories that placed additional fear into potential Gerace trial witnesses, and it provided time for the government to advance the prosecution of Gerace trial witnesses. Beyond that, it caused severance of former co-defendant Bongiovanni, depriving Mr. Gerace of witnesses and evidence the Bongiovanni defense team was able to elicit in the Bongiovanni trials.

43

Even with efforts by the Court to ameliorate the government's actions, Mr. Gerace experienced substantial prejudice because of the government's attack on defense counsel.  The government's misconduct in this regard should not be forgotten.

### d. The government's Efforts to Incarcerate Mr. Gerace to Complicate his Ability to Prepare for Trial

From the beginning of this case, the government sought to limit Mr. Gerace's ability to review discovery and prepare for trial.

It started with the government seeking protective orders that limited Mr. Gerace's ability to review the evidence against him and that, with regard to some subsets of evidence, precluded him from being aware of the allegations at all.  *See, e.g.,* Docket Item 109.

As the case approached its initial trial date, the government made a calculated decision in March, 2023 to seek Mr. Gerace's incarceration based on evidence that was previously known to the government and that had been disclosed in the first government proffer – notably the November, 2019 text message allegedly sent by Crystal Quinn to PH.  *See* W.D.N.Y. Case No.: 23-cr-37 at Docket Item 1, 6.   Notably, the timing of the charges meant that Mr. Gerace would be incarcerated at the time that the most critical evidence against him was disclosed to his attorneys, and at the time when he would finally be permitted to learn the most serious allegations against him and the identity of the witnesses making such allegations.

The government's efforts in this regard were part of the calculated plan to disrupt Mr. Gerace's ability to mount a defense, combined with the other acts set forth above.  The government's actions prejudiced Mr. Gerace's ability to prepare for trial, especially in light of the other acts of the government set forth above.

## VIII.  Conclusion

Peter Gerace, Jr. stands before the Court for sentencing.  From the time of opening in this case, Mr. Gerace acknowledged that his conduct, and the conduct of those he associated with, fell below societal norms.  Mr. Gerace believes that the people who engaged in that lifestyle with him did so by their own choosing.

Beyond the allegations in this case, Mr. Gerace is a human being worthy of leniency.  He is a good father, brother, son and friend.  He is the victim of childhood sexual trauma.  He has been impaired by his own drug addiction, which doubtlessly negatively impacted his decision making at points in his life.  He continues to struggle with mental and emotional health issues that have become more pronounced through this case.

More critically, this prosecution has already done irreversible damage to Mr. Gerace's life.  It robbed him of his freedom, his reputation, his business, his wealth, his friends, and critical times with his son, Nicholas.

For the reasons set forth above, and for the reasons set forth in the accompanying

Objections to the Presentence Investigation Report, Mr. Gerace is worthy of leniency.

DATED:       March 30, 2026

| | |
|---|---|
| s/ Mark A. Foti, Esq. | _s/ Eric M. Soehnlein, Esq. |
| Mark A. Foti, Esq. | Eric M. Soehnlein, Esq. |
| **The Foti Law Firm, P.C.** | **Soehnlein Law, PLLC** |
| 16 W Main Street, Suite 100 | 135 Delaware Avenue |
| Rochester, NY 14614 | Suite 406 |
| (585) 461-1999 | Buffalo, NY 14202 |
| (585) 491-6512 | (716) 771-9092 |